DrinkerBiddle&Reath LLP

*Law Offices*

One Logan Square
18TH and Cherry Streets
Philadelphia, PA
19103-6996

215-988-2700
215-988-2757 fax
www.drinkerbiddle.com

NEW YORK
WASHINGTON
LOS ANGELES
SAN FRANCISCO
PRINCETON
FLORHAM PARK
BERWYN
WILMINGTON

January 30, 2004

**HAND DELIVERY**

The Honorable Legrome D. Davis, U.S.D.J.
United States District Court
U.S. Courthouse
601 Market Street
Room 5918
Philadelphia, PA 19106

*Re: Boarhead Farm Agreement Group v. Adv. Env. Technology Corp., et al.*
*Civil Action No. 02-3830*

Dear Judge Davis:

I enclose a courtesy copy of the Memorandum of Law of Certain Defendants in Opposition to the Plaintiff's Motion for a Standing Order Regarding Dismissal of Settling Defendants, the original of which is being filed today with the Clerk of Court in the above-captioned matter.

Respectfully submitted,

Andrew P. Foster

Enclosure

cc: All Counsel on Service List (w/encl.)

*Established 1849*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOARHEAD FARM AGREEMENT GROUP,

Plaintiff,

v.

ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, ET AL.,

Defendants.

Civil Action No. 02-3830

**ORDER**

AND NOW, this _______ day of ______________, 2004, upon consideration of the Plaintiff's Motion for Standing Order Regarding Dismissal Of Settling Defendants, and the response of Certain Defendants thereto, it is hereby ORDERED that Plaintiff's Motion for Standing Order is DENIED.

______________________________
Legrome D. Davis, U.S.D.J.

Dated: ________________

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BOARHEAD FARM AGREEMENT GROUP, :
:
Plaintiff, :
:
v. : Civil Action No. 02-3830
:
ADVANCED ENVIRONMENTAL :
TECHNOLOGY CORPORATION, ET AL., :
:
Defendants. :

**ORDER (Alternative)**

AND NOW, this _______ day of ______________, 2004, upon consideration of the Plaintiff's Motion for Standing Order Regarding Dismissal Of Settling Defendants, and the response of Certain Defendants thereto, it is hereby ORDERED that a determination regarding Plaintiff's Motion for Standing Order is DEFERRED, and a Case Management Conference to discuss settlement and dismissal issues is hereby scheduled for ___________, 2004, in Courtroom ___.

______________________________
Legrome D. Davis, U.S.D.J.

Dated: ________________

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BOARHEAD FARM AGREEMENT GROUP, :
Plaintiff, :
v. : Civil Action No. 02-3830
ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, ET AL., :
Defendants. :

**MEMORANDUM OF LAW**
**OF CERTAIN DEFENDANTS**
**IN OPPOSITION TO THE PLAINTIFF'S**
**MOTION FOR A STANDING ORDER REGARDING**
**DISMISSAL OF SETTLING DEFENDANTS**

On three main grounds, the undersigned Defendants[1] oppose the Plaintiff's request for a Standing Order establishing a "fairness hearing" procedure relating to proposed settlements and dismissals.

First, Plaintiff's request is purely hypothetical and therefore not ripe for decision. No actual settlement or dismissal using the proposed approach has been presented to the Court. Second, the proposed "fairness hearing" approach is unduly complicated, legally unnecessary, will be wasteful rather than conservative of judicial resources, and has been overwhelmingly rejected by Courts facing similar requests. Third, if and when a settling defendant seeks to be

[1] This Memorandum of Law is submitted on behalf of eight of the Defendants, including Advanced Environmental Technology, Ashland Chemical Company, Flexible Circuits, Knoll, Inc., NRM Investment Company, Rahns Specialty Metals, Inc./Techalloy Co., Inc., Thomas & Betts, Corporation, and Unisys Corporation.

dismissed from this case, Rule 41(a) of the Federal Rules of Civil Procedure is the appropriate vehicle, and contains all necessary protections.

Before proceeding, the undersigned Defendants want to stress that the filing of these opposition papers is not just a "knee jerk" reaction; i.e., opposing something just because the Plaintiff wants it. Each undersigned Defendant is currently a Non-Settling Defendant, but recognizes that it could become a Settling Defendant at some time in the future. Assuming a self-imposed "veil of ignorance," the principle guiding this opposition filing is that regardless of whether one happens to be sitting on the settling, or the non-settling, side of the Courtroom at any given point in time, there is a much better way to proceed than the cumbersome and unnecessary approach proposed by the Plaintiff.

## ARGUMENT

### 1. Lack of "Ripeness" -- Plaintiff's Motion Puts the Cart Before the Horse

Plaintiff avers in its Motion that it "has reached settlement with one Defendant and has made offers of settlement to several other Defendants." (Motion at ¶ 7). It also predicts "that it will settle with many more Defendants during Phase II" (Motion at ¶ 10). Indeed, the Plaintiff anticipates that these settlements will occur "in the near future." (Memorandum of Law at 3).

Plaintiff's Motion therefore seeks entry of a standing "Order Establishing Procedure," and also seeks approval of a standardized "Order of Settlement and Dismissal" (attached as Exhibit A to Plaintiff's Motion), to be used in connection with each future settlement. This second Order features several pages of settlement terms and conditions, including an elaborate definition of "Response Costs," expressing the Plaintiff's view of which

claims should be dismissed with prejudice, and which claims should be preserved, against a settling Defendant. Overall, the Plaintiff's stated goal is to establish "a simple uniform procedure for Defendants that settle with the Agreement Group to be dismissed from this action." (Memorandum of Law at 2).

The first reason Plaintiff's Motion should be denied is because it puts the cart before the horse. Stated in more traditional legal terminology, it presents a hypothetical question which is not yet "ripe" for decision. To the contrary, the Plaintiff's Motion lacks the one essential element which would warrant this Court actually making a decision now: It does not present the Court with any actual settlement or request any actual dismissal under the proposed "uniform procedure." That being the case, the Plaintiff's request is purely hypothetical and therefore lacks "ripeness" for decision.

Put another way, is there yet any real need, or basis, for the Court to act? The answer is no. The Plaintiff's Motion presents hypothetical possibilities, but not any immediate facts. The Plaintiff's Motion is not asking the Court to approve the dismissal of any particular Defendant using the proposed "uniform procedure." Nor are the actual proposed terms of any hoped-for future settlement/dismissal put before the Court by the Plaintiff's Motion.

As the Court is no doubt well aware, settlements and associated dismissals in CERCLA/HSCA litigation such as this can take a myriad of forms – indemnity or no indemnity; assignments of potential contribution claims or not; a one-time payment or various payment-over-time schemes; the payment of a settlement "premium" or not; a settlement based upon the payment of money, or alternatively involving an agreement to perform certain work; a far-reaching bar (perhaps wishful), against potential future claims by EPA or other non-parties, or no such bar; and, last but not least, negotiated release language -- either broad, narrow, or

somewhere in-between -- as to all sorts of potential claims. This last complexity is nicely illustrated by Plaintiff's own proposed (and characteristically elaborate and long), definition of "Response Costs," which essentially sets the scope of the Plaintiff's proposed release.

At this stage, however, the undersigned Defendants are proceeding in a vacuum, and lack any basis to decide whether they would accept or oppose the so-far yet-to-be-presented terms of any actual settlement/dismissal. Respectfully, the Court is currently breathing the same thin air, and it is therefore appropriate to defer taking any action at this hypothetical time.

Justification for such waiting finds plenty of support in Article III "case or controversy" jurisprudence (which counsels against issuing "advisory opinions")[2], in the related notion of "ripeness" (which counsels against making judicial decisions before they are needed)[3], and in plain old common sense (which counsels for plain old common sense).

There will be no hardship to the Plaintiff in deferring a ruling until a settlement/dismissal actually using the proposed "uniform procedure" is presented to the Court. First, the entire situation, and therefore the need for any judicial decision, may never come to pass. That is because under Rule 41(a), discussed infra at pp. 12-13, dismissal of a settling defendant may not require any action by the Court at all. Second, to date the Plaintiff reports

---

[2] See, e.g., Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (Article III limits federal district courts from issuing an "opinion advising what the law would be upon a hypothetical state of facts"); see also Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 241 (1937) ("It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."); In re Summers, 325 U.S. 561, 567 (1945) ("there must be an actual controversy over an issue, not a desire for an abstract declaration of the law."); Leibundgut v. Liberty Mutual Fire Insurance Co., No. 97-3240, 1997 U.S. Dist. LEXIS 18042 at *4 (E.D. Pa. Nov. 6, 1997) ("Article III requires a federal court to decide only an actual case or controversy; a court may not decide abstract or hypothetical questions" (citations omitted)).

[3] See generally, Wright, Miller & Cooper Federal Practice and Procedure: Jurisdiction 2d at § 3532.1, "Ripeness".

reaching two individual settlements, but neither employs the alleged "uniform procedure" proposed in Plaintiff's Motion. Instead, on information provided by Plaintiff's counsel to undersigned counsel, the actual terms of the settlement reached with defendant Novartis do not match the proposed "standardized" settlement terms and conditions proposed in the Plaintiff's Motion. Nor has defendant Novartis sought dismissal from this case. Similarly, the terms of the settlement reached with defendant United States Navy most certainly do not use the "uniform procedure" proposed in Plaintiff's Motion.[4] Given this 0-2 track record, it is quite apparent that the Plaintiff's so-called "uniform procedure" is anything but "uniform."

Therefore, for the lack of ripeness reasons set forth above (the cart before the horse), Plaintiff's Motion should be denied.

### 2. Plaintiff's "Fairness Hearing" Approach is Both Cumbersome and Legally Unnecessary

If and when a settling defendant actually seeks to be dismissed from this case, how should that be handled?

Plaintiff's Motion proposes a "Fairness Hearing" approach, ostensibly to cover all bases. In a nutshell, Plaintiff argues that any settling defendant should be entitled to a Court-sanctioned dismissal with prejudice of all potential future claims against the settlor for "Response Costs," a concept which Plaintiff incorrectly refers to in shorthand as "contribution

---

[4] As the docket reflects, several weeks after the Plaintiff filed the instant Motion, the Plaintiff and defendant United States Navy filed a Joint Motion seeking Court "approval" of a settlement agreement and proposed dismissal. However, that more recent Joint Motion is at pains to note that it does not use the "uniform procedure" for settlements proposed in the instant Motion. See Joint Motion filed 1/20/04 at fn.1. The undersigned Defendants anticipate opposing the Joint Motion based upon several of the same concerns addressed here, as well as additional concerns specific to that filing.

protection." (Memorandum of Law at 5).[5]  Regardless what it is called, the key question is the effect (if any), that a settlement will have upon the remaining non-settling Defendants, not to mention its effect upon non-parties to the case, such as EPA.

Plaintiff's Motion correctly reports that at least one court under similar circumstances has followed UCATA's "pro tanto" approach (applying a dollar-for-dollar reduction to a plaintiff's overall remaining claim), whereas other courts have followed UCFA's "pro rata" approach (reducing plaintiff's overall remaining claim by the settlor's percentage "share" of responsibility).  (Memorandum of Law at fn.2).  Plaintiff acknowledges that perhaps "some other law," rather than UCATA or UCFA, may in fact be applicable.  (Memorandum of Law at 2, 7).  The most convoluted of those three approaches – the UCATA alternative – imposes upon the Court the burden of holding a fairness hearing to approve the "good faith" of the actual settlement terms.  In recognition of that, and wanting to cover all possible contingencies, the Plaintiff's Motion requests that the Court follow the "fairness hearing" approach – just in case UCATA happens to be the approach ultimately adopted by the Court at some future time.  (Memorandum of Law at 6-7).

However, in surely its most optimistic moment, Plaintiff's Memorandum asserts that if any non-settling Defendant should happen to challenge the "good faith" of a proposed settlement, the Court can easily resolve such an objection via "a brief status hearing" (Memorandum of Law at 6), also referred to by Plaintiff as "a simple fairness hearing" (Id. at 6).

---

[5]  By statute, no such thing as "contribution protection" is available in connection with settling a Section 113(f)(1) claim brought by a private party plaintiff.  Instead, "contribution protection" only is available to a private party defendant who has resolved its Section 107(a) CERCLA liability to the government.  See 42 U.S.C. § 113(f)(2).

### A. The Complexity of "Fairness"

Besides a lack of "ripeness," the most obvious problem with the Plaintiff's proposal is that there is no such thing in a CERCLA contribution case as "a simple fairness hearing." It is well-established that in a Section 113(f)(1) CERCLA contribution case, 42 U.S.C. § 9613(f)(1), the statute directs the Court to allocate recoverable response costs among liable parties using whatever "equitable factors" the Court may deem appropriate. See New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1121-22 (3d Cir. 1997). This direction from Congress is notoriously wide-open, and means that determining a liable party's "fair share" of responsibility for response costs is a complex, technical, highly fact-specific, and ultimately formidable exercise. See, e.g., United States v. Atlas Minerals, No. 91-5118, 1995 U.S. Dist. LEXIS 13907 (E.D. Pa. Aug. 22, 1995) (Judge Cahn's 130-page "equitable factors" bench opinion).

At a bare minimum, determining a CERCLA contribution defendant's "fair share" requires not only a finding of "liability" under Section 107 of CERCLA, 42 U.S.C. § 9607, but also a close examination of that party's entire connection to site remedial costs (volume of waste, toxicity of waste, years of use, location of disposal, degree of care, overall degree of involvement, etc.), not to mention examination of other more intangible factors such as "cooperation," "ability to pay," "fault," "culpability," and even "litigation risk." As to any particular defendant, all of these considerations may be impacted by the same open-ended, "fair share" considerations and analysis applicable to all other potentially liable parties, both plaintiffs and defendants alike. See generally United States v. R.W. Meyer, Inc., 932 F.2d 568, 572-74 (6th Cir. 1991) (discussing flexibility, but complexity, of CERCLA "equitable factors" analysis).

In the case at hand, the Boarhead Farm Superfund Site, it would be highly surprising if the Plaintiff did not readily agree that the backdrop for this notoriously broad factual and legal inquiry will be a paucity of written historical records, a significant amount of deposition testimony, and a plethora of possible "other sites" where any given defendant's waste material may have been disposed (rather than disposed at Boarhead Farm). This all leads to the reality that any proposed settlement agreement presented to the Court for "approval" will require significant study of the record to evaluate. The Plaintiff is engaging in naïve and wishful thinking to suppose that a "simple fairness hearing" will resolve potential challenges to a proposed settlement. By necessity, such a hearing will be an extended and complex exercise to say the least, and will closely resemble a bench trial on the full merits.[6]

It should therefore come as no surprise to this Court that virtually every other federal court faced with a similar choice, under similar circumstances, has stared into the tangle and rejected Plaintiff's proposed UCATA/"fairness hearing" approach. See Tosco Corporation v. Koch Industries, Inc., 216 F.3d 886, 896-97 (10th Cir. 2000) (rejecting argument that district court was obligated to conduct "fairness hearing"); State of New York v. Solvent Chemical Co., Inc., 984 F. Supp. 160, 169 (W.D.N.Y. 1997) (fairness hearing not required); Hillsborough County v. A&E Road Oiling Service, 853 F. Supp. 1402, 1409 (M.D. Fla. 1994) (rejecting

---

[6] As a concrete example, the Joint Motion recently filed by the Plaintiff and defendant United States Navy asks this Court to "approve" that their agreed-upon settlement amount, and their complex proposed settlement terms (7 single-spaced pages), are "Fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest." (See proposed Order attached to Joint Motion). As noted above, CERCLA only authorizes such "fairness" hearings where the United States or a State, as plaintiff, settles a Section 107(a) cost recovery claim; by statute, there is no comparable "approval" procedure in connection with settlement of a private contribution claim under Section 113(f). See, e.g., United States v. Kramer, 19 F. Supp. 2d 273 (D.N.J. 1998) (approving fairness of settlement in Section 107(a) action brought by EPA and State).

fairness hearing approach because "[s]uch proceedings are generally long, complex evidentiary hearings which are considered a deterrent to settlement"); Barton Solvents, Inc. v. Southwest Petro-Chem, Inc., 834 F. Supp. 342, 349 (D. Kan. 1993) (rejecting fairness hearing approach, as involving complex "mini-trials" that would discourage settlement); United States v. SCA Services of Indiana, Inc., 827 F. Supp. 526, 535-36 (N.D. Ind. 1993) (rejecting fairness hearing approach); American Cyanamid Co. v. King Industries, Inc., 814 F. Supp. 215, 218 (D.R.I. 1993) (noting advantage of obviating need for good faith hearing to evaluate settlement agreements); Comerica Bank-Detroit v. Allen Industries, Inc., 769 F. Supp. 1408 (E.D. Mich. 1991) (same); Allied Corp. v. Acme Solvent Reclaiming, Inc., 771 F. Supp. 219, 223 (N.D. Ill. 1990) (rejecting fairness hearing approach because "[i]n a complex case such as this one, a fairness hearing would be long and arduous"); United States v. Western Processing Co.,, 756 F. Supp. 1424, 1427 (W.D. Wash. 1990) (noting advantage of avoiding need for "reasonableness determination" with respect to settlements); Lyncott Corp. v. Chemical Waste Management, Inc., 690 F. Supp. 1409, 1418 (E.D. Pa. 1988) (J. Cahn) (rejecting fairness hearing approach); Edward Hines Lumber Co. v. Vulcan Materials, No. 85-C-1142, 1987 U.S. Dist LEXIS 11961 (N.D. Ill. Dec. 4, 1987) (same); United States v. Conservation Chemical Co., 628 F. Supp. 391, 401 (W.D. Mo. 1985) (same); but see, City and County of Denver v. Adolph Coors Co., 829 F. Supp. 340 (D. Colo. 1993) (applying UCATA approach).

In light of the above authorities, the undersigned Defendants respectfully submit that this Court will be acting prudently, and certainly joining very good company, by rejecting the cumbersome "fairness hearing" approach proposed in Plaintiff's Motion.

**B. <u>Legally Unnecessary</u>**

In point of fact, a closer analysis of the fundamental nature of a Section 113(f)(1) CERCLA contribution claim indicates that no "fairness hearing" is even legally necessary.

Underlying all of the above-cited decisions was a belief -- sometimes stated, sometimes not -- that the liability of non-settling defendants in a Section 113(f)(1) contribution action would in fact be impacted by whether the plaintiff's overall remaining claim was reduced dollar-for-dollar by the settlement amount at issue (using UCATA's "pro tanto" approach), or was instead reduced by a percentage amount equal to the settling party's "equitable share" of responsibility (using UCFA's "pro rata" approach). That belief, quite understandably, was informed by some uncertainty regarding the exact nature of the liability faced by a defendant in a Section 113(f)(1) CERCLA contribution action. So long as such contribution defendants were viewed as potentially liable on a "joint and several" basis, then the UCATA vs. UCFA debate had the potential for real dollar consequences.

Under more modern CERCLA jurisprudence, however, including the above-cited <u>New Castle County</u> decision in the Third Circuit, a plaintiff in a Section 113(f)(1) contribution action is limited to recovering from each liable defendant only that defendant's "equitable share" of response costs. In short, it is now generally accepted that there is no "joint and several" liability between and among co-defendants facing a Section 113(f)(1) private party contribution action. It logically follows that it makes no difference (save for one unusual exception noted below), whether the plaintiff's overall remaining claim against non-settling defendants is reduced by the actual dollar amount (under UCATA), or the percentage amount (under UCFA), of any particular settlement. Because a Section 113(f)(1) contribution plaintiff is statutorily limited to recovering from each liable defendant only that particular defendant's "equitable share" of

liability, that "equitable share" is what it is, and will be neither increased nor decreased by the value of settlements (whether measured in dollars or percentages), which the plaintiff may reach with other named defendants.

Several recent decisions involving CERCLA Section 113(f)(1) contribution claims essentially reflect this newer understanding and approach. See Tosco Corporation v. Koch Industries, Inc., 216 F.3d 886, 896-97 (10th Cir. 2000); Akzo Nobel Coatings, Inc. v. Aigner Corp., 197 F.2d 302, 306-08 (7th Cir. 1999); Stearns & Foster Bedding Co. v. Franklin Holding Corp., 947 F. Supp. 790, 813 (D.N.J. 1996). A recent academic treatise also includes an insightful analysis and summary of this evolving jurisprudence. See John M. Hyson, Private Cost Recovery Actions Under CERCLA at 262-73 (2003) (relevant excerpt attached here as Exhibit A).[7]

The bottom line is this: If and when a settling defendant seeks to be dismissed from this case, no "fairness hearing" is legally necessary, much less workable or appropriate.

---

[7] The one possible exception to the "makes no difference" rule noted above is discussed in Prof. Hyson's article at pages 272-73. He identifies the theoretical possibility that a Section 113(f)(1) contribution plaintiff could recover a "windfall" -- that is, an amount in excess of its total statutorily recoverable response costs -- if its remaining contribution claim against non-settling defendants and/or later added parties is not reduced by at least the actual cash value of the plaintiff's actual recoveries. As a practical matter, however, this outcome can be avoided in either of two ways. First, in connection with equitable allocation, the plaintiff's remaining contribution claim can be reduced by the greater of the settlors' total percentage "share" of responsibility or the total actual cash value of the plaintiff's recoveries. Alternatively, the Court may allow defendants to take full discovery regarding a plaintiff's total alleged response costs and any settlement recoveries. When such information is considered as evidence, the Court's broad equitable discretion under Section 113(f)(1) to allocate response costs can be exercised to prevent a plaintiff from obtaining any such "windfall."

### 3. When the Time Comes, FRCP Rule 41(c) Applies

Instead, if and when a settling defendant seeks to be dismissed from this case, the governing procedure is set forth in Rule 41(a) of the Federal Rules of Civil Procedure.

Entitled "Dismissal of Actions," Rule 41(a) provides three (3) different approaches to dismissal that may be utilized here:

(1). Notice of Dismissal. Under Rule 41(a)(1)(i), the Plaintiff's action against a settling Defendant may be dismissed, without order of court, by means of the Plaintiff "filing a notice of dismissal at any time before service by the adverse party of an Answer or of a Motion for Summary Judgment, whichever first occurs."

(2). Stipulation of the Parties. Alternatively, under Rule 41(a)(1)(ii), the Plaintiff's action against a settling Defendant may be dismissed, again without order of court, by means of the Plaintiff "filing a stipulation of dismissal signed by all parties who have appeared in the action."

(3). Order of Court. Finally, under Rule 41(a)(2), the Plaintiff may file a motion requesting an order of dismissal from the Court, which the Court either may deny, or may grant "upon such terms and conditions as the court deems proper."

Option (1) – a simple Notice of Dismissal without any order of court –remains available here, because under the Case Management Order (CMO) entered in this case, no Answers or Motions for Summary Judgment have been filed.

Option (2) – a Stipulation of the Parties – also remains available here. Indeed, to conserve both judicial resources and party resources, it would have made good sense here for the litigants themselves to have attempted to reach agreement on the terms and conditions of a dismissal stipulation before plunging into motion practice. Given the myriad issues that typically need to be negotiated and addressed in connection with CERCLA/HSCA settlements, see supra

pp. 3-4, that consideration applies with particular force in this case.[8]  In such negotiations, any currently non-settling Defendant would be appropriately motivated to work out settlement/dismissal terms which are fair to both non-settling Defendants and settling Defendants, given the former's likelihood of becoming one of the latter at some future time.

Finally, Option (3) under Rule 41(a), involving a request for dismissal submitted to the Court via motion, also remains available, although as noted above in Section 1 of this Memorandum, only actual settlements/dismissals, not hypothetical future settlements/dismissals, would be "ripe" for presentation in a Rule 41(a)(2) motion.  Without specifically referencing this FRCP rule number, that is exactly how the recent Joint Motion filed by the Plaintiff and the United States Navy ought to be handled.  When the time is ripe to decide such a motion, however the primary concern will be ensuring that the remaining non-settling defendants are not being legally prejudiced.  See Protocomm Corp. v. Novell, Inc., 171 F.Supp.2d 459, 470-72 (E.D. Pa. 2001).

---

[8]  The very concept of a federal Court "approving" the terms of a settlement reached in private party litigation is unusual, and disfavored:

> "Our federal courts have neither the authority nor the resources to review and approve the settlement of every case brought in the federal court system.  There are only certain designated types of suits, for instance consent decrees, class actions, shareholder derivative suits, and compromises of bankruptcy claims where settlement of the suit requires court approval."

Caplan v. Fellheimer, Eichen, Braverman & Kaskey, 68 F.3d 828 (3d. Cir. 1995).

**Conclusion**

The Plaintiff's request for entry of a standing "Order Establishing Procedure," and for approval of a standardized "Order of Settlement and Dismissal," should be denied. It involves hypothetical future settlements/dismissals only, and therefore is not "ripe" for determination. It claims to be proposing a "uniform procedure," but the non-uniform terms of the only two actual settlements reached to date belie that claim. It also proposes a cumbersome "fairness hearing" approach that is legally unnecessary, will waste judicial resources, and has been overwhelmingly rejected by federal Courts facing similar requests. Finally, the simpler and correct way to handle dismissal requests is via the normal procedures and standards of Rule 41(a) of the Federal Rules of Civil Procedure. For all these reasons, an appropriate form of Order denying Plaintiff's Motion is attached.

Finally, should this Honorable Court elect not to deny Plaintiff's Motion, the undersigned Defendants would respectfully request the scheduling of a case management conference with the Court during which the substantive merits of the complicated settlement/dismissal terms and conditions proposed in the Plaintiff's standardized Orders could be addressed. If the Court elects to proceed down that road, there will be many issues to discuss and resolve, and a case management conference would be the best forum for addressing those issues. An alternative form of Order scheduling a case management conference also is attached.

Respectfully submitted,

January 27, 2004

Andrew P. Foster
Adina Dziuk
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103

Counsel for Rahns Specialty Metals, Inc.,
Techalloy Co., Inc., Thomas & Betts
Corporation, and Unisys Corporation

## CERTIFICATE OF SERVICE

I Andrew P. Foster, hereby certify that on this 27th day of January, 2004, I caused a true and correct copy of the foregoing **Memorandum of Law of Certain Defendants In Opposition To The Plaintiff's Motion for a Standing Order Regarding Dismissal Of Settling Defendants** to be served as indicate below:

**BY EMAIL and FIRST-CLASS MAIL:**

**Counsel for Boarhead Farm Agreement Group**
Glenn A. Harris, Esquire
Ballard Spahr Andrews &
Ingersoll, LLP
Plaza 1000 – Suite 500
Main Street
Voorhees, NJ 08043=4636
(856) 761-3440
(856) 761-9001 (Fax)
harrusg@ballardspahr.com

**Counsel for Advanced Environmental Technology**
Thomas Sabino, Esquire
Wolff & Samson
5 Becker Farm Road
Roseland, NJ 07068-1776
(973) 740-0500
(973) 436-4440 (Fax)
tsabino@wolffsamson.com

**Counsel for Ashland Chemical Company**
David M. Doto, Esquire
Phelan, Pettit & Biedrzycki
Suite 1600
The North American Bldg.
121 South Broad Street
Philadelphia, PA 19107
(215) 546-0500
(215) 546-9444 (Fax)
ddoto@pp-b.com

**Counsel for Carpenter Technology Corporation**
Lynn Wright, Esquire
Edwards & Angell
750 Lexington Avenue
New York, NY 10022
(212) 756-0215
(888) 325-9169 (Fax)
lwright@ealaw.com

**Counsel for Crown Metro, Inc. and Emhart Industries**
Laura A. Ford, Esquire
Swidler Berlin Shereff Friedman LLP
3000 "K" St., N.W. – Suite 300
Washington, DC 20007
(202) 424-7500
(202) 424-7643 (Fax)
laford@swidlaw.com

**Counsel for Diaz Chemical Corp.**
Ronald J. Reid, III
Manager, Health/Safety/Environment
Diaż Chemical Corp.
40 Jackson Street
Holley, NY 14470-1156
(716) 638-6321
(716) 638-8356 (Fax)
reid@diazche.com

**Counsel for Flexible Circuits**
Seth v.d.H. Cooley, Esquire
A. Nicole Friant, Esquire
Duane Morris LLP
Suite 4200, One Liberty Place
Philadelphia, PA 19103-7396
(215) 979-1000
(215) 979-1020 (Fax)
secoley@duanemorris.com
anfriant@duanemorris.com

**Counsel for Handy & Harman Tube Co.**
Melissa E. Flax, Esquire
Carella, Byrne, Bain, Gilfillan, Cecchi,
  Stewart & Olstein
Five Becker Farm Road – 3rd Fl.
Roseland, NJ 07068-1739
(973) 994-1700
(973) 994-1744 (Fax)
mflax@carellabyrne.com

**Counsel for Knoll, Inc.**
Richard H. Friedman, Esquire
Scott A. Gould, Esquire
McNees Wallace & Nurick, LLC
100 Pine Street
P.O. Box 1166
Harrisburg, PA  17108-1166
(717) 237-5469
(717) 237-5300 (Fax)
rfriedman@mwn.com

**Counsel for Merit Metals Products Corp.**
Stephen P. Chawaga, Esquire
Monteverde, McAlee & Hurd
One Penn Center at Suburban Station
1617 John F. Kennedy Blvd.
Suite 1500
Philadelphia, PA  19103-1815
(215) 557-2950
(215) 557-2990/2991
schawaga@monteverde.com

**Counsel for Novartis Corporation**
Michael W. Steinberg, Esquire
Michael Dillon, Esquire
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 739-3000
(202) 739-3001 (Fax)
msteinberg@morganlewis.com

**Counsel for NRM Investment Company**
Edward Fackenthal, Esquire
Henderson, Wetherill, O'Hey & Horshey
P.O. Box 751
Suite 902
One Montgomery Plaza
Norristown, PA  19404
(610) 279-3370
(610) 279-0696 (Fax)
edwardfackenthal@cs.com

**Counsel for Plymouth Tube Company**
Steven J. Lemon, Esquire
Jones, Lemon Graham & Clancy
223 East State Street
P.O. Box 805
Geneva, IL  60134
(630) 208-0805
(630) 208-4651 (Fax)
stevenl@joneslemon.com

**Counsel for Quikline Design & Mfg.**
Sanford F. Schmidt, Esquire
Schmidt & Tomlinson Law Offices
29 Union Street
Medford, NJ  08055
(609) 714-0600
(609) 714-0610 (Fax)
lawschmidt@erols.com

**Counsel for Rohm and Haas Company**
Jennifer Berke Levin, Esquire
Rohm & Haas Co.
100 Independence Mall West
Philadelphia, PA  19106-2399
(215) 592-6838
(215) 592-3227
jlevin@rohmhaas,com

**Counsel for Simon Wrecking Co., Inc.**
Sharon Oras Morgan, Esquire
Mattleman Weinroth & Miller P.C.
401 Route 70 East, Suite 100
Cherry Hill, NJ  08034
(856) 429-5507
(856) 429-9036 (Fax)
smorgan@mwm-law.com

**United States of America, Department of Navy**
D. Judith Keith, Esquire
U.S. Department of Justice
Environmental & Natural Resources
Defense Section
P.O. Box 23986
Washington, DC  20026-3986
(202) 514-3747
(202) 514-8865 (Fax)
judith.keith@usdoj.com



Andrew F. Foster

EXHIBIT A

solvent. In such situations, a court must decide how to allocate, among the solvent PRPs, the response costs that are attributable to such hazardous substances—commonly called the "orphan share."[112]

Initially, PRPs that had incurred response costs took the position that they could recover their response costs in a direct cost recovery action under §107(a) in which each of the defendants would be jointly and severally liable for all of the response costs incurred by the defendant. Under this approach, the defendants could offset their liability for all of the plaintiff's response costs only by bringing a contribution counterclaim under which they could obtain a judgment for the plaintiff's equitable share—which would not include any portion of any orphan share. The consequence of this approach was that the entire amount of any orphan share would be borne by the defendants; none of the orphan share would be borne by the plaintiff who had incurred the response costs. This approach was rejected in decisions that held that a PRP seeking to recover its response costs against other PRPs was limited to a contribution action under §113(f)(1) in which the liability of each defendant is several, not joint and several.[113]

The courts have, however, made it clear that a district court has broad discretion in allocating orphan shares among solvent parties. Under §113(f)(1), a court may allocate response costs in accordance with such equitable factors as the court determines are appropriate. The Ninth Circuit has suggested that, although a district court is not precluded from allocating a portion of an orphan share to the PRP who has incurred response costs, the court is "free to consider, together with other relevant factors, the fact that a PRP [i.e., the plaintiff] has itself engaged in cleanup efforts and the circumstances surrounding those efforts."[114] A court, in other words, is not required to allocate an orphan share proportionately among the solvent parties; the court may, for example, allocate a larger (than proportionate) share to those PRPs that did not participate in the cleanup.

### *The Effect of Non-Party PRPs and Settlements Upon the Allocation of Response Costs*

Discussion of a court's task in allocating a plaintiff PRP's private response costs has thus far not addressed two questions that (at least arguably) might affect a court's allocation determinations:

> (1) If there is a solvent non-party PRP from whom the plaintiff might obtain reimbursement of a portion of its response costs in a later contribution action (or in a later settlement), should this possibility affect the court's allocation of response costs among those PRPs that have been named as parties?

(2) If the plaintiff settles its contribution claim with certain PRPs, should these settlements affect the court's allocation of response costs among those PRPs that have not settled?

The two questions are related. Each requires a court, in a §113(f)(1) contribution action, to consider whether, in allocating a plaintiff's response costs among the parties, the court should consider the extent to which the plaintiff has already received, or might in the future receive, reimbursement of some of its response costs.

## The Effect of Solvent Non-Party PRPs[115]

As we have seen, a PRP that seeks reimbursement of private response costs is limited to an action for contribution under §113(f)(1) in which the extent of a defendant's liability is limited to its "equitable share" of the plaintiff's response costs.[116] As a result, a plaintiff that has incurred substantial response costs and wishes to maximize the extent to which it obtains reimbursement of those costs from other PRPs will seek contribution from every solvent PRP that it can identify.[117] And, in order to minimize its litigation costs, the plaintiff will join all the identifiable solvent PRPs as defendants in a single contribution action. In short, it will be the rare situation in which a court, in allocating a plaintiff's response costs among the parties to a contribution action, will have to decide whether its allocation determinations should be affected by the existence of a solvent non-party PRP.

There appears to be only one decision in which a court was faced with this situation—*Akzo II*.[118] The contribution plaintiff with respect to the issue before the court was Aigner, the original defendant. Akzo, the original plaintiff had brought an action to recover response costs that it had incurred in cleaning up a portion of a contaminated site pursuant to a cleanup order issued under §106(a). Aigner sought, by way of a contribution counterclaim, to recover response costs that it had incurred in cleaning up the remainder of the site pursuant to the terms of a consent decree.[119]

In *Akzo II*, the only parties with respect to the defendant Aigner's contribution counterclaim were the plaintiff Akzo and the defendant Aigner.[120] The court stated that "Aigner has settled with some other firms that sent [hazardous substances] to Fisher-Calo [the contaminated site] and with some past owner-operators of portions of the site."[121] The court also noted that Aigner "has claims pending against still more potentially responsible parties."[122]

The *Akzo* litigation presented an unusual situation. Aigner, the PRP that was seeking reimbursement of substantial response costs, had contribution claims for such costs pending in separate actions. The reason for this inefficiency appears to be that counsel for Aigner believed that Aigner's contribu-

tion claim against Akzo was a compulsory counterclaim that had to be asserted in the action that had been commenced against Aigner by Akzo.[123] Aigner asserted its contribution claims against other PRPs in a separate action.[124] In this unusual situation, the district court felt that, in making allocation determinations with respect to Aigner's contribution counterclaim, it had to take into account the contribution claims that Aigner had pending against PRPs other than Akzo.

The parties in the *Akzo* litigation presented conflicting arguments. Akzo, the contribution defendant, argued that, before the district court could allocate response costs, it must undertake a "global assessment of responsibility"—that is, the court must determine the equitable shares of all PRPs, both parties and non-parties.[125] This argument was grounded upon Akzo's interpretation of the Uniform Comparative Fault Act (UCFA). Aigner (the contribution plaintiff), on the other hand, argued that the court, in allocating response costs, should "ignore non-parties";[126] this argument was grounded upon Aigner's interpretation of the UCFA.

The Seventh Circuit described the practical implications of the two approaches. The court first described the implications of the approach advocated by the contribution plaintiff, and adopted by the district court:

> The district court read . . . the UCFA to provide that the responsibility of nonparties must be disregarded, even if they are financially able to pay (indeed, even if they already *have* paid) their share of the cleanup. To take a simple example, suppose Firm A is responsible for 40% of the pollutants, Firm B for 10%, and Firm C for 50%. Firm A agrees with the EPA to perform the cleanup and sues B for contribution. On the district court's reading of the UCFA, B must pay 20% of the total cleanup costs, because B sent 20% of the pollutants that A and B generated jointly. That C is able to pay its 50% share—indeed, that C has *already* paid 50%, and that the outcome of the suit between A and B will leave A bearing only 30% of the total costs—is irrelevant on the district court's . . . understanding of the UCFA. A polluter that agreed to clean up a Superfund site could turn a tidy profit if this were so. Suppose that ten firms, A through J, sent 10% each, and that A, having agreed to do the cleanup work, sues B for contribution. Firms A and B are responsible for equal volumes of wastes, so the court would order B to pay 50% of the total cleanup costs. Next A sues C and recovers another 50%. If all of the firms B through J were good for the judgments, then A would recover 450% of its total outlay for pollution control. Even if the court set a cap of 100%, to prevent A from making a profit, the upshot would be that of ten equally responsible polluters, B and C would pay 50% each, and the other eight would pay nothing.[127]

The court then described the implications of the contribution defendant's approach:

> Akzo contends that the UCFA requires the district court to undertake a global assessment of responsibility, so that Akzo cannot be required to pay anything until every shipper's share has been determined. That might take years of trial time. Akzo would be happy to skip the trial and chip in 9% [Akzo's share of the total amount of hazardous substances at the site], but that would leave Aigner [the contribution plaintiff] holding the bag if the other shippers were unable to pay their shares.[128]

The Seventh Circuit concluded that "[n]one of these approaches is sound"[129] and rejected the assumption of the parties that federal courts should follow the UCFA. The court emphasized that, under §113(f)(1), "[s]uch claims [for contribution]... shall be governed by Federal law" and that "[t]he UCFA is not a federal law."[130] The court stated that "[t]he reference to 'Federal law' in §113(f)(1) implies that the law should be nationally uniform, rather than varying according to each state's idea of appropriate contribution."[131] And the court concluded that the "the UCFA would not be an attractive national rule," not only because it has been adopted by only two states, but also because of its treatment of the effect of settlements:

> When one of the litigants has settled with a third party, the UCFA reduces other shares by the percentage of total fault of the person released in the settlement . . . ; this is the source of Akzo's contention that the district court must hold a comprehensive trial to determine every shipper's share of liability. The UCATA, by contrast, reduces liability only by the dollar amount of third-party settlements . . . [132]

In looking for an appropriate approach as a matter of federal law, the court looked to *McDermott, Inc. v. AmClyde & River Don Castings*,[133] in which the Court determined, as a matter of federal common law, the effect of a settlement of a damage claim in an admiralty case upon nonsettling parties who were jointly and severally liable with the settling defendant. In *McDermott*, the Court reviewed the approaches of both the UCFA and the Uniform Contibution Among Tortfeasors Act (UCATA). According to the Seventh Circuit, the Court concluded that the choice between the two approaches is "a tossup."[134] Accordingly, the Seventh Circuit concluded that "it is best to match the handling of settlements with the way intersecting principles of law work." The court stated that "[f]or CERCLA the most closely related rule of law is §113(f)(2), which reduces third-party claims by the actual cash value of settlements reached with governmental bodies."[135] The court described the benefits of applying this approach to the effect of settlements upon §113(f)(1) contribution claims:

> Extending the *pro tanto* approach of §113(f)(2) to claims under §113(f)(1) enables the district court to avoid what could be a complex and unproductive inquiry into the responsibility of missing parties. The extended litigation [in the present case] well illustrates the difficulties of fixing responsibility for wastes sent years (if not decades) ago to a firm that did not keep good records and contaminated a wide area. Excluding only actual collections from third parties enables the court to conserve its resources.[136]

Based upon the preceding reasoning, the Seventh Circuit directed the district court to determine how much the contribution plaintiff had collected from non-parties in settlements. The court was then to require the contribution defendant to pay 12.56% of the plaintiff's response costs net of those recoveries. (12.56% represented the contribution defendant's share of the total of the hazardous substances for which the contribution plaintiff and the contribution defendant were responsible.) The court went on to say that "[t]he total must be reduced not only by collections [the contribution plaintiff has received] to date, but also by future third-party payments."[137] In other words, if there were future payments to the contribution plaintiff by other PRPs, 12.56 % of any such payments was to be allocated to the contribution defendant. As the court explained, "[p]hrasing [the contribution defendant's] liability as '12.56% of the cleanup cost net of third-party collections' or some similar formula will avoid any need to reopen the judgment . . . to account for the outcome of litigation now pending or to be filed in the future."[138]

The narrow issue before the court in *Akzo II* was whether the district court had erred in concluding, under its interpretation of the UCFA, that a court should disregard the responsibility of non-party PRPs in allocating a plaintiff's response costs among the PRPs who are parties. As stated at the outset of this part, it will be the rare situation in which a plaintiff will fail to join all identifiable solvent PRPs.[139] When all the solvent PRPs have been named as parties, it is clear, under §113(f)(1), that the court is to allocate to each PRP its equitable share.[140] As we have seen, the task of determining each PRP's equitable share can be time-consuming and expensive but, if all solvent PRPs are parties to the action, there is some efficiency in that the task of determining allocations is limited to one action and need not be duplicated in other contribution actions.

In the *Akzo* litigation, there were separate pending contribution actions. In this unusual circumstance, both the district court and the court of appeals apparently believed that the district court had to allocate Aigner's response costs among the parties before it—and leave to the court overseeing Aigner's other contribution claims the task of allocating Aigner's response costs among the parties named in that separate action. This is an inefficient outcome. Apparently, neither the district court nor the court of appeals considered more prac-

tical ways of dealing with the existence of separate pending contribution actions. It might have been possible, for example, for the district court to sever Aigner's contribution counterclaim and transfer it to the court in which Aigner's other contribution claims were pending.[141] Had this been done, all solvent parties would have been joined in one court proceeding and the issue of how to deal with the responsibility of non-party solvent PRPs would have become moot. One court, in a single litigation, could have determined the appropriate equitable shares of all solvent PRPs.

In short, it seems that the question of how the existence of a solvent non-party PRP should affect the allocation of response costs among those who are parties is a question that will rarely present itself because of the practical incentive that a plaintiff has to assert contribution claims against all solvent PRPs in a single contribution action. If the question is presented (under unusual circumstances such as those involved in the *Akzo* litigation), a court has procedural devices available to it by which it can consolidate all of a PRP's contribution claims for response costs in one judicial proceeding.

## The Effect of Settlements

Although it will be the rare situation in which a court, in allocating a plaintiff's response costs among the parties, will have to consider the significance of non-party solvent PRPs, a court will quite commonly be called upon to consider whether such allocations should be affected by any settlements that the plaintiff has reached with PRPs. As previously explained, a plaintiff that has incurred substantial response costs will have a strong incentive to bring contribution claims against all identifiable solvent PRPs. It is likely that many of the PRP defendants, in an effort to avoid the substantial costs of litigation, will enter into settlements with the plaintiff. In this circumstance, a court will have to address the second question set forth at the beginning of this part: Does the fact that the plaintiff has entered into settlements with some PRPs affect the allocations that a court should make to those PRPs that have not settled?

It should be recalled that the Seventh Circuit's analysis in *Akzo II* led it to consider this question.[142] One of the reasons that the court rejected the UCFA as a basis for deciding the precise issue before it—the effect of the existence of solvent nonparty PRPs upon the allocations to be made with respect to those PRPs who are parties—was the court's belief that the UCFA's treatment of the effect of settlements was inconsistent with the approach taken by the Court in *McDermott*.

*McDermott* is simply not applicable to the situation presented in *Akzo II*. In *McDermott*, the Court considered the effect of a settlement in a situation in which a number of entities were *jointly and severally liable* for certain costs

incurred by a plaintiff. In *Akzo II*, the various PRPs were *not* jointly and severally liable for the private response costs incurred by Aigner. The liability of each PRP was limited to its "equitable share" and any settlement involving another PRP would not effect upon that liability. Whatever the amount of any settlement, non-settling PRPs would remain liable in the amount of their equitable shares.

As explained in *McDermott*, the question of the effect of a settlement by one jointly and severally liable party upon the liability of other jointly and severally liable parties is a matter of considerable practical significance. The Court noted that "[i]t is generally agreed that when a plaintiff *settles with one of several joint tortfeasors*, the nonsettling defendants are entitled to a credit for that settlement."[143] The Court recognized, however, there is "a divergence among respected scholars and judges about how that credit should be determined."[144] The Court considered the advantages and disadvantages of three alternative approaches that have been identified by the American Law Institute in the *Restatement (Second) of Torts*. Quoting from the *Restatement*, the Court described the following alternatives:

> "(1) The money paid extinguishes any claim that the injured party has against the party released and the amount of his remaining claim against the other tortfeasor is reached by crediting the amount received; but the transaction does not affect a claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation."
>
> "(2) The money paid extinguishes both any claims on the part of the injured party and any claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation and seeks contribution." (As in alternative (1), the amount of the injured party's claim against the other tortfeasors is calculated by subtracting the amount of the settlement from the plaintiff's damages.)
>
> "(3) The money paid extinguishes any claim that the injured party has against the released tortfeasor and also diminishes the claim that the injured party has against the other tortfeasors by the amount of the equitable share of the obligation of the released tortfeasor."[145]

The Court recognized that alternative (2) provides the strongest inducement to settle. Under alternative (2) a settling party is assured that a settlement "buys peace" in the sense that the settling party is protected against contribution claims by nonsettling parties. Nonsettling parties, on the other hand, are faced with the risk of disproportionate liability—that is, liability in an amount that is excess of their equitable share. Under alternative (2), nonsettling parties are jointly and severally liable for the full amount of the plaintiff's costs

less only the amount of any settlement. And, if a court requires a nonsettling party to reimburse the plaintiff in an amount that exceeds the nonsettling party's equitable share, the nonsettling party is barred from bringing a contribution claim against a settling party.[146]

But all of this is irrelevant when the liable parties are not jointly and severally liable for the full amount of a plaintiff's damages—or, under CERCLA, the full amount of a PRP plaintiff's response costs. Under §113(f)(1), each PRP is liable only for its equitable share of a PRP plaintiff's response costs. The existence of any settlements does not affect that liability. And a settling PRP does not need protection against contribution claims by nonsettling PRPs because the liability of each PRP is limited to its equitable share. In other words, a nonsettling PRP will never be required to pay more than its equitable share and thus will have no basis for a contribution claim against a settling party.

In *Akzo II*, the Seventh Circuit concluded that alternative (2)—of the three alternatives identified in *McDermott*—described the effect of a settlement of a claim for private response costs upon the liability of nonsettling PRPs. The court's reasoning in adopting this conclusion is questionable.[147] But, more basically, the court simply failed to recognize that the question addressed in *McDermott* is not presented in the situation before it—that is, a situation in which PRPs who are liable for private response costs are *not* jointly and severally liable for the total amount of the costs.

The Seventh Circuit in *Akzo II* failed to mention, let alone discuss, a number of district court decisions that have addressed the question whether settlements of claims for private response costs affect the liability of PRPs that have not settled.[148] Many of these decisions involve a situation in which a district court has been presented with a request to approve a settlement of a claim for private response costs and nonsettling PRPs object to the proposed settlement on the ground that approval of the settlement would be unfair to the nonsettling PRPs. In this situation, most district courts have concluded that a court should look to the UCFA in determining the effect of any settlement upon the liability of nonsettling PRPs.[149] Under the UCFA, the liability of nonsettling parties is reduced by the proportionate share of any settling parties.

These district court decisions, like the Seventh Circuit's decision in *Akzo II*, have failed to recognize that a settlement of a claim for private response costs *has no effect* on the extent of liability of nonsettling PRPs. The question of whether the UCATA or the UCFA governs the effect of settlements upon nonsettling parties is significant only when all parties are jointly and severally liable for the full amount of a plaintiff's damages (or response costs). In that situation, it is important to know the extent to which nonsettling parties—who are jointly and severally liable for the full amount of the plaintiff's loss—are entitled to a credit or offset as a result of any settlement. In that situation, it is

significant to know whether the credit or offset is in the amount of the settlement or in the amount of the settling party's proportionate share. Since, however, a nonsettling PRP is liable only for its equitable share of the PRP plaintiff's response costs, it makes no difference whether there have been any settlements and, therefore, the amount of any settlements is irrelevant.[150]

One district court decision seems to make this point—though not as clearly as it might. In *Stearns & Foster Bedding Co. v. Franklin Holding Corp.*,[151] the plaintiff (Stearns & Foster) brought a contribution action to recover response costs that it had incurred in cleaning up a contaminated site. The plaintiff and certain defendants entered into a settlement and sought district court approval of the settlement. In addition, the settling defendants sought a ruling that, in approving the proposed settlement, the district court should also dismiss contribution cross-claims by nonsettling PRPs against the settling defendants. Nonsettling PRPs opposed approval of the settlement and dismissal of their contribution cross-claims against the settling PRPs. The court described the opposing positions as follows:

> I suspect that the highest hurdle in the path of this settlement has not been the adequacy of the settlement amount, but rather the Nurkiewiczes' [the settling defendants] demand that the cross-claims [of the nonsettling defendants] be dismissed with prejudice as part of the settlement. Indeed, the parties are aware that the potential liability of the Nurkiewicz defendants far exceeds the amount they have offered in settlement. The remaining dilemma is who will bear the risk that Stearns & Foster has settled for less than the total liability of the Nurkiewicz defendants. Naturally, Stearns & Foster contends that the non-settling defendants are entitled to no more than a *pro-tanto* reduction for the settlement amount. The Investor Group [nonsettling defendants] argues for a *pro-rata* deduction, which implicitly requires a determination at trial of the Nurkiewicz defendants' allocable percentage of the fault.[152]

The court reached the following conclusion:

> In light of this court's conclusion that Stearns & Foster is limited to a contribution action under [§]113 of CERCLA, liability is several, and plaintiff must bear the risk of settlement with any defendant for less than that defendant's several liability. Plaintiff, by joining the Nurkiewicz defendants' motion to approve the settlement, accepts this risk. In addition, a settling defendant in a private party CERCLA action cannot be sued for contribution by any non-settling defendant. Accordingly, the court will approve the settlement and dismiss the cross-claims against the Nurkiewicz defendants with prejudice.[153]

The court's conclusion goes to the heart of the matter. A PRP seeking to recover its response costs "is limited to a contribution action" under

§113(f)(1). Liability in such an action is several—that is, a defendant's liability is limited to its equitable share of the plaintiff's response costs. Accordingly, the plaintiff bears the risk with respect to any settlement. That is, if the plaintiff enters into a settlement with a PRP in which the PRP settles for less than its equitable share, the plaintiff cannot recover the balance—i.e., the difference between the amount of the settlement and the settling defendant's equitable share—from nonsettling PRPs because each PRP's liability is limited to its own equitable share. And a settling PRP cannot be sued for contribution by another PRP—not because the settlement acts as a bar to contribution claims by nonsettling PRPs but because a nonsettling liability will never be ordered to pay more than its equitable share of the plaintiff's response costs. Thus, a nonsettling PRP will never be in a position to assert that it has a right to contribution because it has paid more than its equitable share.

The basic point that the settlement of a claim for private response costs does not affect the extent of liability of nonsettling PRPs is also suggested by the Tenth Circuit's decision in *Tosco Corp. v. Koch Industries, Inc.*[154] In *Tosco*, a PRP plaintiff brought a §113(f)(1) contribution action for private response costs against a number of PRPs. The plaintiff entered into a settlement with one of the defendant PRPs. The district court rejected a nonsettling PRP's contention that the court must consider the amount of this settlement in determining the extent of the nonsettling PRP's liability for the plaintiff's response costs. The district court allocated 15% of the plaintiff's response costs to the nonsettling PRP.

On appeal, the Tenth Circuit affirmed with the following reasoning:

> Koch [the nonsettling PRP] argues the district court "erred by not taking into consideration the fact of the Sun/Tosco settlement in connection with Koch's liability to Tosco." According to Koch, the district court was obligated to conduct a "fairness hearing" on the amount of that settlement so that Koch, as a non-settling defendant, could be credited with the amount of the settlement. Otherwise, Koch claims Tosco will realize a windfall by recovering more than it is entitled to in contribution (*i.e.*, more than the [response] costs Tosco has or will incur).
>
> Koch's argument is factually flawed and without legal support. The record makes clear the district court allocated liability for past and future response costs *proportionately among the responsible parties—expressly as to Koch and implicitly as to Sun and Tosco—thus avoiding making Koch responsible for more than its fair share.* Sun opted to settle its liability for a fixed amount in order to avoid the uncertainty of unknown future costs. Koch chose not to settle for a fixed amount. We believe where, as here, a responsible party chooses to go to trial and future response costs are likely to be incurred, but the exact amount remains unknown, a judgment on proportional liability is an appropriate

> remedy. . . . [T]he district court acted well within its discretion by allocating Koch's *proportionate share of liability* based on Koch's relative duration of [site] ownership and control—a factor unique to Koch and *unaffected by a settlement between other responsible parties*. . . . Koch cites no persuasive legal authority to the contrary, no authority for its proposition the district court was obligated to conduct a "fairness hearing" on the terms of the Sun/Tosco settlement, and no evidence Tosco will enjoy a windfall. Koch's assertion Tosco may receive double recovery is pure speculation.[155]

Most basically and significantly, the court in *Tosco* held that the district court was not obligated to consider the effect of the Sun/Tosco settlement in determining the appropriate allocation to Koch, the nonsettling party. As the court stated, the court had determined Koch's "proportionate" or "fair" share—and the determination of a PRP's fair share is "unaffected by a settlement between other responsible parties." The district court was not required to conduct a "fairness hearing" on the Sun/Tosco settlement because fairness hearings are only required where a proposed settlement will affect the liability of nonsettling parties.[156]

Finally, the decision in *Tosco* notes (but does not resolve) an interesting question: If a PRP plaintiff enters into settlements with some PRP defendants, and if these settlements are to be disregarded when a court determines the equitable (or proportionate) share of non-settling PRPs, how should a court deal with the possibility that the PRP plaintiff may recover a "windfall"—that is, an amount in excess of its total response costs? First, it must be understood how this might happen. It is possible (perhaps even probable) that some defendants in a § 113(f)(1) contribution action will agree to settlements that are in amounts that exceed their apparent equitable shares.[157] It would be rational for a defendant to enter into any settlement that was more than its apparent equitable share but less than the apparent equitable share plus the litigation costs that the defendant would incur if it did not settle.[158] If a number of defendants entered into such settlements, and if the court required nonsettling defendants to pay their equitable shares, a plaintiff PRP might wind up recovering more than the total amount of the equitable shares of all defendant PRPs—that is, more than the total of its response costs.

The court in *Tosco* avoided addressing this question because of its conclusion that there was "no evidence that Tosco will enjoy a windfall" and that Koch's assertion that "Tosco may receive double recovery is pure speculation." No other court has squarely addressed the question.[159] Perhaps a nonsettling party could persuade a court that it would not be "equitable" to allow a PRP plaintiff to recover more than the total amount of its response costs.

But, as the decision in *Tosco* suggests, the burden would be upon the nonsettling PRP that such a "windfall" was more than "speculative."

In sum, since a nonsettling PRP is liable only for its equitable share of a plaintiff PRP's response costs—that is, a PRP that is a defendant in an action seeking recovery of private response costs is not jointly and severally liable for the total amount of a plaintiff PRP's response costs—a court should disregard the amount of any settlements in determining the appropriate allocation for any nonsettling PRP.

## Declaratory Relief

In addition to an order allocating the response costs that the plaintiff has already incurred, the plaintiff will also wish to obtain declaratory relief with respect to any further response cost that it may incur. At the least, the plaintiff would desire a declaration that the defendants will be liable for such costs; the plaintiff would also desire a declaration that allocates any further response costs among the parties. Such relief would relieve the plaintiff of the burden of relitigating liability and allocation when it incurs further costs; it might also induce defendants to participate in, or contribute to, additional cleanup work.[160]

There are two statutory provisions that at least arguably relate to the availability of declaratory relief in a §113(f)(1) contribution action. The more general provision, the Declaratory Judgments Act, authorizes federal courts to grant declaratory relief.[161] The more specific provision, §113(g)(2) of CERCLA, states that a district court "shall enter a declaratory judgment on liability for response costs . . . that will be binding on any subsequent action or actions to recover to recover further response costs."[162] Courts have questioned, however, whether the mandatory declaratory relief provision in §113(g)(2) is applicable to §113(f)(1) contribution actions.

This part will consider (1) whether the mandatory declaratory relief provision in §113(g)(2) is applicable to §113(f)(1) contribution actions and (2) the limitations upon a court's obligation and authority to grant declaratory relief in §113(f)(1) contribution actions.

### *The Applicability of the Mandatory Declaratory Relief Provision in §113(g)(2) to a Contribution Action Under §113(f)(1)*

There is disagreement, and some confusion, in the case law with respect to whether a plaintiff in a contribution action under §113(f)(1) is entitled to declaratory relief under §113(g)(2). [§]113(g)(2) is applicable to an "initial action for recovery of the costs referred to in section 9607 of this title [CERCLA

114. Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1303 n.4, 27 ELR 21211, 21213 n.4 (9th Cir. 1997). This statement was cited with approval in Centerior Serv. Co. v. Acme Scrap Iron &Metal Corp., 153 F.3d 344, 354 n.12, 29 ELR 20065, 20069 n.12 (6th Cir. 1998).

115. If there are identifiable non-party PRPs that are not solvent, the hazardous substances for which they are responsible would constitute "orphan's shares." For a discussion of the allocation of orphan's shares, see *supra.*

116. *See* Chapter II, *supra.*

117. In FMC Corp. v. Vendo Co., 196 F. Supp. 2d 1023, 32 ELR 20642 *Digest* (E.D.Cal. 2002), the court held that a PRP seeking to recover its response costs was limited to a contribution action under §113(f)(1). The court noted that, if a PRP could bring an action against other PRPs in which the defendants would be jointly and severally liable, it would "reduce[] a plaintiff PRP's incentive to sue all PRPs." *Id.* at 1035.

118. 197 F.3d 302, 30 ELR 20180 (7th Cir. 1999).

119. In an earlier decision, Akzo Coatings, Inc. v. Aigner Corp. (*Akzo I*), 30 F.3d 761, 24 ELR 21254 (7th Cir. 1994), the court addressed Aigner's contention that Akzo's contribution claim was barred by operation of §113(f)(2). (Aigner had entered into a judicially approved cleanup settlement, embodied in a consent decree, in which it had resolved its liability to the United States and the state of Indiana.) In *Akzo I*, the Seventh Circuit concluded that Akzo's contribution claim against Aigner did not relate to "matters addressed" in the consent decree and thus concluded that the contribution protection afforded to Aigner by §113(f)(2) did not bar Akzo's contribution claim. For discussion of the first *Akzo* decision, see Chapter V, *supra.*

120. "Akzo," as the Seventh Circuit explained, is "shorthand for Akzo and O'Brien, the plaintiffs; 'Aigner' stands in for approximately 50 additional firms." 197 F.3d at 303, 30 ELR at 20181.

121. *Id.* at 307, 30 ELR at 20182.

122. *Id.*

123. It should be recalled that, in the original complaint, Akzo sought to recover response costs that it had incurred in cleaning up a portion of the site pursuant to an EPA order under §106(a). Rule 13(a) of the Federal Rules of Civil Procedure provides, in relevant part, that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Counsel for Aigner might reasonably believe that, under Rule 13(a), it was required to assert Aigner's claim for response costs in Aigner's answer to Akzo's complaint because Aigner's claim arose out of the same occurrence that was the subject matter of Akzo's claim—i.e., the release of hazardous substances from the Fisher-Calo site.

124. The opinion in *Akzo II* simply states that Aigner "has claims pending against still more potentially responsible parties." It is not clear whether these "claims"were asserted in one or several lawsuits. It is likely, however, that the claims had been asserted in one action since the joinder of the claims in one action would minimize Aigner's litigation costs.

125. 197 F.3d at 306, 30 ELR at 20182.

126. *Id.*

143. 511 U.S. at 208 (emphasis added).

144. *Id.*

145. *Id.* at 208-09 (quoting RESTATEMENT (SECOND) OF TORTS §886A, at 343-44 (1977)).

146. The approach of alternative (2) applies when a PRP has entered into a settlement of a government claim for response costs. Section 113(f)(2) provides that "[a] person who has resolved its liability to the United States or a [s]tate in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." This is the contribution bar described in alternative (2). For a discussion of the effect and scope of this contribution bar, see Chapter V, *supra*. Section 113(f)(2) also provides that "[s]uch settlement [*i.e.*, a settlement of a claim by the United States or a state] does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement." This latter provision makes it clear that, as in alternative (2) in *McDermott*, the liability of nonsettling PRPs is reduced by the amont of the settlement. Section 113(f)(2) is not applicable to the settlement of *private* claims for response costs.

147. The Seventh Circuit stated that "[e]xtending the *pro tanto* approach of §113(f)(2) to claims under §113(f)(1) enables the district court to avoid what could be a complex and unproductive inquiry into the responsibility of missing parties." 197 F.3d at 309, 30 ELR at 20183. The court, in other words, recognized that the *pro tanto* approach of §113(f)(2) was expressly applicable only to the settlement of government, not private, claims for response costs. Nevertheless, the court assumed that it had the authority, as a matter of federal common law, to "extend" the approach of §113(f)(2) to the settlement of "claims under §113(f)(1)"—that is, private claims. It is, at the least, doubtful that the court could, as a matter of federal common law, override the effect of §113(f)(1), the only provision that is expressly applicable to private claims for response costs. Section 113(f)(1) provides that a PRP's liability is limited to its equitable share. Congress expressly limited the effect of §113(f)(1) when there has been a settlement of a *government* claim; in such a circumstance, §113(f)(2) makes it clear that a nonsettling PRP may be left liable for more than its equitable share. But Congress did not extend the effect of §113(f)(2) to the settlement of claims for response costs.

In TBG, Inc. v. Bendis, 36 F.3d 916 (10th Cir. 1994), the court addressed a similar issue. In *TBG*, a plaintiff sought to recover damages in an action under §§10(b) and 20(a) of the Federal Securities Act. Liability in such an action is joint and several. Two defendants agreed to settle for a specific sum; but the defendants' offer to settle was contingent upon a judicial determination that the effect of the settlement would be *pro tanto*—that is, the prospective settling defendants agreed to settle only if the district court, upon review of the proposed settlement, concluded that the non-settling defendants would be liable for the balance of the plaintiffs' damages (total damages less the amount of the settlement). The district court approved the settlement, determining that the effect of the settlement would be *pro tanto* and that the non-settling defendants would be barred from bringing contribution claims against the settling defendants.

On appeal, the Tenth Circuit vacated the district court's order approving the settlement "insofar as it impermissibly bars federal statutory contribution claims." *Id.* at 929. At the outset of its analysis, the court stated:

> We disagree that the interest in settlement can give courts the power to bar statutory contribution claims. Although federal policy generally encourages settlement, that policy does not override statutory rights. Courts may not extinguish such rights in order to facilitate settlement unless the statute autho-

127. *Id.* There appears to have been no cases in which a contribution plaintiff has attempted what the court describes in this hypothetical. There is no reason to believe that Aigner, the contribution plaintiff in the matter before the court, was attempting to pull the kind of "fast one" described in the court's hypothetical. Rather, as previously explained, it appears that Aigner had separate contribution actions pending only because it felt obligated, under the compulsory counterclaim provision of Federal Rule 13(a), to assert its contribution claim against Akzo in the action originally brought by Akzo.
128. 197 F.3d at 306, 30 ELR at 20182.
129. *Id.*
130. *Id.*
131. *Id.* at 307, 30 ELR at 20182.
132. *Id.* The court noted that the two approaches produced "substantial differences in incentives to settle and in the complexity of litigation." *Id.* The "UCATA" to which the court refers is the Uniform Contribution Among Tortfeasors Act.
133. 511 U.S. 202 (1994).
134. 197 F.3d at 308, 30 ELR at 20183.
135. *Id.*, 30 ELR at 20183. The court's statement of the effect of §113(f)(2) is inaccurate, or at least imprecise. Section 113(f)(2) reduces the "potential liability" (not "the claims") of non-settling parties by "the amount of the settlement" (not the "actual cash value" of the settlement).
136. *Id.*
137. *Id.*
138. *Id.*
139. A plaintiff might fail to join all identifiable solvent PRPs if it believed that, in bringing a series of separate contribution actions, it could recover more than its total response costs. This scenario is set forth in a hypothetical in the Seventh Circuit's opinion in *Akzo II.* But, as the Seventh Circuit suggests, it is unlikely that the courts would conclude that such a result—reimbursement in an amount that exceeded the plaintiff's response costs—would be "equitable" under §113(f)(1).
140. As we have seen, the determination of each party's equitable share might include a portion of any orphan's share—that is, the portion of a plaintiff's response costs that is attributable to hazardous substances that are from an unidentiable or financially insolvent source.
141. Indeed, transfer might not have been necessary. As we have seen (see Chapter IV, *supra*), §113(f)(1) contribution claims are within the exclusive subject matter jurisdiction of the federal courts. §113(b). In addition, venue for such actions "shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office." *Id.* It is possible that Aigner's contribution claims against other PRPs—that is, PRPs other than those who were parties to the *Akzo* litigation—were pending in the same district as the *Akzo* litigation. If so, Aigner's contribution claims against Akzo could have been severed and then consolidated (in accordance with Federal Rule 42(a)) with Aigner's other contribution claims. Even if Aigner's other contribution claims against other PRPs were pending in another district, Aigner's contribution claim against Akzo could have been transferred to that other district. *See* 28 U.S.C. §1404(a).
142. The Seventh Circuit considered this question even though the question of the effect of settlements was not directly presented.

> rizes them to do so. . . . The absence of a provision forbidding such orders [i.e., orders barring statutory contribution claims] does not suggest that courts have the power to issue them.

*Id.* at 924.

148. The district court decisions are collected and discussed in Browning-Ferris Indus. of Ill., Inc. v Ter Maat, 13 F. Supp. 2d 756, 29 ELR 20142 (N.D. Ill. 1998).

149. *See* State of New York v. Solvent Chem. Co., 984 F. Supp. 160, 28 ELR 20570 (W.D.N.Y. 1997); Stearns & Foster Bedding Co. v. Franklin Holding Corp., 947 F. Supp. 790, 27 ELR 20608 (D.N.J. 1996); Hillsborough County v. A&E Rd. Oiling Serv., Inc., 853 F. Supp. 1402, 24 ELR 21569 (M.D. Fla. 1994); Barton Solvents, Inc. v. Southwest Petro-Chem, Inc., 834 F. Supp. 342 (D. Kan. 1993); American Cyanamid Co. v. King Indus., Inc., 814 F. Supp. 215, 23 ELR 20919 (D.R.I. 1993); United States v. Western Processing Co., 756 F. Supp. 1424, 21 ELR 20858 (W.D. Wash. 1991).

150. The incorrect assumption underlying the district court decisions is reflected in a hypothetical set forth in *American Cyanamid*, 814 F. Supp. at 215, 23 ELR at 20919 in which the court explains the effect of settlements under the UCFA:

> A private party sues five defendants for contribution under §113(f)1) of CERCLA. Plaintiff seeks recovery for $100,000 for response costs. One defendant settles for $5,000. At trial, it is determined that each of the five original defendants are (*sic*) liable for an equitable share equaling 10% of the $100,000—or $10,000 per defendant. The plaintiff is found to be liable for 50%—or $50,000. The settling defendant is still responsible for only $5,000. The non-settling defendants, however, may reduce their collective share of liability by the amount of the settling defendant's *equitable* share—in this case, $10,000. Thus, the four non-settling defendants are responsible for $10,000 each, for a total of $40,000. The plaintiff bears the "loss" of $5,000 in contribution recovery as a result of compromising for less than the settling party's equitable share.

*Id.* at 218, 23 ELR 20920.

There is a simpler answer to the hypothetical. Under §113(f)(1) each defendant is liable only for its equitable share—period. Whether the plaintiff enters into a settlement with some PRPs does not change that. The nonsettling PRPs are still liable for only their equitable share of the plaintiff's response costs. The consequence is that described by the court in *American Cyanamid*: the plaintiff bears the loss if it settles for less than the settling party's fair share.

The same incorrect assumption underlies another comment that can be found in many of the district court opinions that adopt the UCFA. Several of the courts state that one of the reasons for their adoption of the UCFA is that it eliminates the need for the court to undertake a "fairness hearing" before approving any proposed settlement. *See, e.g.*, *Barton Solvents*, 834 F. Supp. at 348. This statement assumes that nonsettling defendants are subject to joint and several liability and that their ultimate liability will therefore be affected by any settlements. In other words, there is a need for a fairness hearing only if one assumes that a settlement will affect the ultimate liability of nonsettling PRPs.

In both *American Cyanamid* and *Barton Solvents*, the courts assumed that PRPs are subject to joint and several liability in an action for private response costs. This view has been rejected by the courts. *See* Chapter II, *supra*. In fairness to the courts in both cases, it must be acknowledged that, at the time of the courts' decisions (1993), the question of the

nature of a defendant's liability in an action to recover private response costs had not been clearly resolved.

151. 947 F. Supp. 790, 27 ELR 20608 (D.N.J. 1996).

152. *Id.* at 813, 27 ELR at 20619. It is clear, in context, that the court is using the term "*pro-rata* deduction" to describe the proportionate share approach of the UCFA.

153. *Id.* (internal citations omitted).

154. 216 F.3d 886, 30 ELR 20647 (10th Cir. 2000).

155. *Id.* at 896-97, 30 ELR at 20650-51 (emphases added) (footnote omitted).

156. When a settlement will affect the liability of nonsettling parties, due process may require that nonsettling parties be provided with an opportunity to be heard before a court approves the settlement. As previously explained (see endnote 147, *supra*), §113(f)(2) makes it clear that a settlement of a *government* claim for response costs affects nonsettling parties. PRPs are jointly and severally liable for response costs incurred by the United States or a state. And §113(f)(2) makes it clear that, when there is a settlement of a government claim for response costs, the liability of nonsettling parties is reduced by the amount of the settlement—not the amount of the settling party's equitable share. Recognizing the impact of such settlements upon nonparties—and perhaps recognizing the possible due right of nonsettling parties—Congress enacted provisions that provide nonsettling parties with an opportunity to comment (in effect, a "fairness hearing") upon proposed settlements. *See* §§122(d)(1)(A) and 122(i).

157. Because the determination of a PRP's equitable share is not a precise mathematical process, a defendant contemplating settlement would have to estimate its "apparent" equitable share in determining the amount at which it would be willing to settle.

158. This is apparently what Koch (a non-settling PRP) thought was the nature of Sun's settlement with Tosco. That is, in seeking to have its liability reduced by the amount of the settlement—rather than the amount of Sun's equitable share—Koch apparently believed that Sun had settled for an amount in excess of its equitable share.

159. In American Cyanamid Co. v. King Indus., Inc., 814 F. Supp. 215, 23 ELR 20919 (D.R.I. 1993), the court stated, by way of dicta, that a plaintiff may "reap any 'windfall'" that results if it enters into settlements in amounts that are in excess of the settling parties' equitable shares. *Id.* at 218, 23 ELR 20920.

160. A number of courts have described the benefits of declaratory relief. For example, in Boeing Co. v. Cascade Corp., 207 F.3d 1177, 30 ELR 20423, the court described the benefits as follows:

> CERCLA was intended to encourage quick response and to place the cost on those responsible. Declaratory relief serves these purposes because all parties . . . will know their share of costs before they are incurred. The more liability can be limited and quantified, the more practical it is for a party to budget and borrow to finance it. Environmental litigation is tremendously complex, lengthy, and expensive. The costs and time involved in relitigating issues as complex as these where new costs are incurred would be massive and wasteful. Declaratory relief allocating future costs is therefore consistent with the broader purposes of CERCLA.

*Id.* at 1191, 30 ELR at 20428-29.

161. The Declaratory Judgments Act provides, in relevant part: