DRINKER BIDDLE & REATH LLP
Andrew P. Foster, Esq.
Adina D. Bingham, Esq.
One Logan Square
18th and Cherry Streets                          Attorneys for Defendants
Philadelphia, PA 19103                          Techalloy Co., Inc. and
(215) 988-2696                                      Rahns Specialty Metals, Inc.

---

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**BOARHEAD FARM AGREEMENT GROUP,**     :
                                                             :
                    **Plaintiff**                        :
                                                             :          **CIVIL ACTION**
                                    **v.**                :          **No. 02-3830**
                                                             :
**ADVANCED ENVIRONMENTAL**                :
**TECHNOLOGY CORPORATION et al.,**     :
                                                             :
                    **Defendants**                     :

### MOTION TO COMPEL
### RESPONSES TO INTERROGATORIES
### AND FOR EXTENSION OF FACT DISCOVERY PERIOD

Defendants Techalloy Co., Inc. and Rahns Specialty Metals, Inc. ("Techalloy/RSM")

hereby respectfully move the Court for an Order overruling objections asserted by Plaintiff

Boarhead Farm Agreement Group ("BFAG") and compelling BFAG to respond fully to

Interrogatories served by Techalloy/RSM.

Techalloy/RSM further moves the Court to enter an Order extending the current fact

discovery period for a reasonable period of time following the date BFAG answers the

Interrogatories, to allow time for any further fact discovery necessitated by the substance of

BFAG's responses.

In support, Techalloy/RSM incorporates herein by reference the accompanying

Memorandum of Law.

Respectfully submitted,

DATED:  March 4, 2005

DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103

*Attorneys for Defendants*
*Techalloy Co., Inc. and*
*Rahns Specialty Metals, Inc.*

DRINKER BIDDLE & REATH LLP
Andrew P. Foster, Esq.
Adina D. Bingham, Esq.
One Logan Square
18th and Cherry Streets                        Attorneys for Defendants
Philadelphia, PA 19103                              Techalloy Co., Inc. and
(215) 988-2696                                      Rahns Specialty Metals, Inc.

---

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BOARHEAD FARM AGREEMENT GROUP,** : | |
| : | |
| **Plaintiff** : | |
| : | **CIVIL ACTION** |
| v. : | **No. 02-3830** |
| : | |
| **ADVANCED ENVIRONMENTAL** : | |
| **TECHNOLOGY CORPORATION et al.,** : | |
| : | |
| **Defendants** : | |

## MEMORANDUM OF LAW
## IN SUPPORT OF TECHALLOY/RSM'S
## MOTION TO COMPEL RESPONSES TO INTERROGATORIES
## AND FOR EXTENSION OF FACT DISCOVERY PERIOD

### I.    Introduction

Under Case Management Order No. 7, the fact discovery period in this case currently is

scheduled to end in just two (2) weeks, on March 18, 2005.  However, by continuing to assert

"premature" and other objections to Interrogatories, Plaintiff BFAG is essentially "hiding the

ball," and refusing to tell Defendants the basis for its claims, including the actual amount of its

demands and other critical information.  Without that information, Defendants do not know, and

cannot know, whether it is necessary to pursue additional fact discovery.

Plaintiff's tactic puts the Defendants on the horns of a dilemma. Faced with complete uncertainty regarding the nature and size of the Plaintiff's claims, the Defendants could pursue additional discovery that <u>may</u> be necessary, only to find out later, when BFAG finally responds to the Interrogatories, that the extra discovery was unnecessary and a waste of time and money. Alternatively the Defendants could forego taking possibly necessary discovery, only to find out later (again, when BFAG finally responds to the Interrogatories), that the extra discovery was not only necessary, but critical.

After an unsuccessful effort to resolve this dispute, Defendants Techalloy/RSM are filing this Motion to Compel in an effort to find out the basis of Plaintiff BFAG's claims against them, including the actual size of Plaintiff BFAG's demands. With only two (2) weeks left before the current fact discovery period is scheduled to end, it is high time for BFAG to show its hand and state its case. Pre-trial proceedings are not supposed to be a game of hide-and-seek. Defendants Techalloy/RSM cannot make an informed choice about whether additional fact discovery is necessary until BFAG answers the objected to Interrogatories.

Defendants Techalloy/RSM also request an extension of the current fact discovery period, for a reasonable period of time following the date BFAG provides full answers to outstanding Interrogatories. This will provide time for the Defendants to take any additional discovery necessitated by the substance of BFAG's responses.

## II.  <u>Factual Background</u>

This is a Superfund case. Plaintiff BFAG is asserting contribution claims against Defendants seeking to recover an "equitable share" of the response costs incurred and to be incurred by BFAG in connection with remediating the Boarhead Farm Superfund Site located in Upper Black Eddy, Pennsylvania (the "Site"). Specifically, Plaintiff BFAG is asserting

contribution claims under Sections 113(f) and (g)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§9613(f) and (g)(2), and under Sections 701, 702(a)(3), and 1101 of the parallel Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 P.C.S. §§6020.705, 702(a)(3) and 1101. <u>See</u> Plaintiff's Third Amended Complaint, at ¶¶152, 155, and 165, a true and correct copy of which is attached hereto as <u>Exhibit A</u>.

On July 16, 2004, Defendants Techalloy and RSM each served a substantially identical set of Interrogatories on Plaintiff BFAG. <u>See</u>, e.g., Interrogatories (First Set) of Defendant Techalloy Company, Inc., a true and correct copy of which is attached hereto as <u>Exhibit B</u>.

On September 14, 2004, Plaintiff BFAG served substantially identical Objections and Responses to the Techalloy and RSM Interrogatories. <u>See</u>, e.g., Objections and Responses of Boarhead Farm Agreement Group to Interrogatories (First Set) of Defendant Techalloy Company, Inc., a true and correct copy of which is attached hereto as <u>Exhibit C</u>.

To date, the parties have taken more than fifty (50) depositions in this case, including four (4) depositions taken by BFAG of former Techalloy/RSM employees (Messrs. Hess, Stufflet, Hahn and Senin). No more depositions of former Techalloy/RSM employees are scheduled or contemplated. The fact discovery period is currently scheduled to end in just two (2) weeks, on March 18, 2005. Undersigned counsel recently engaged in a lengthy telephone conference with counsel for BFAG in an effort to resolve the matters that are the subject of this Motion. Counsel for BFAG refused to withdraw any of the "premature" objections at issue, refused to supplement any of the Interrogatory responses discussed, and refused to agree to an extension of the fact discovery period until after the outstanding Interrogatories are fully answered.

III.   **Argument**

A.    **It is Time for Plaintiff to Answer the Defendants' Contention Interrogatories.**

Interrogatories Nos. 1 through 4 served by Defendants Techalloy/RSM on BFAG are contention interrogatories.  In response to each, Plaintiff asserted in its September 14, 2004 papers that providing answers to the Interrogatories was "premature," citing <u>B. Braun Medical, Inc. v. Abbott Laboratories</u>, 155 F.R.D. 525 (E.D. Pa 1994).

This case was filed in June, 2002.  There are now only two (2) weeks left before the fact discovery period is scheduled to end on March 18, 2004.  The parties have completed more than fifty (50) depositions.  No more depositions of former Techalloy/RSM employees are planned.  Despite that late hour, Plaintiff BFAG continues to stand upon its "premature" objections, and refuses to respond to Techalloy/RSM's basic contention Interrogatories.

Techalloy/RSM's Interrogatories Nos. 1 through 4 are proper and timely contention interrogatories under Fed. R. Civ. Pro. 33(c).  They seek relevant, indeed critical, information.  For example, Interrogatory No. 3 asks:

> 3.    **For each of the entities or persons listed below, please state your position as to what "equitable share" of Site response costs you contend they should bear, describing the evidentiary basis for each of your positions and providing a full explanation of how you calculate or otherwise reach and support each of your positions. (<u>Note</u>: If each BFAG member shares the same positions, please so state, and provide one consolidated answer.  Otherwise, pursuant to the March 17, 2003 Stipulation, please provide all individual positions held by each BFAG member):**
>
> A.    **Techalloy;**
>
> B.    **Each non-settled Defendant;**
>
> C.    **Each settled Defendant;**
>
> D.    **Each BFAG member;**

**E.     Every other entity or person that BFAG believes is a liable party under CERCLA or HSCA with respect to the Site.**

Plaintiff BFAG's "premature" objection, and its continuing refusal to answer this contention Interrogatory should be overruled.  This question simply asks BFAG to state what demands it is making in this case, against Defendant Techalloy and others, and also to state how it reaches and supports its demands.  It is hard to imagine what could be <u>more</u> central to this case (or practically any civil case), then the amount of and basis for Plaintiff's demands.  After full document production and the taking of more than fifty (50) depositions, it is high time for BFAG to provide that critical information by responding to the contention Interrogatories.

BFAG's reliance on the <u>Braun Medical</u> case as support for its "premature" objection is misplaced.  First, in that case, the contention interrogatories at issue were being addressed ***before*** the completion of substantial pre-trial discovery.  Here, in contrast, the scheduled fact discovery period is now almost over.  By continuing to object to the contention Interrogatories as "premature," Plaintiff BFAG is apparently aiming to have the fact discovery door slam shut <u>before</u> it is required to provide even the most basic information imaginable about its claims and positions.

Second, even assuming incorrectly that this case were still in the early pre-trial stage, the "burden of justification" showing required under the <u>Braun Medical</u> approach is met in this case.

For example, in responding to Interrogatory No. 3 above, BFAG might -- as specifically suggested by its counsel -- take the litigation position that <u>no</u> waste from parties BFAG has settled with actually was disposed at the Site.  Although that position would be directly inconsistent with both BFAG's pleading and its overall theory of the case, the obvious strategic purpose behind such an approach would be an attempt to place a 0% "equitable share" of liability

5

on the settled parties. BFAG would then argue that under the UCFA principles governing settlements in this case,[1] its claim against the remaining non-settled Defendants should not be reduced at all, despite all the settlements BFAG has pocketed. If BFAG took that position, the remaining non-settled Defendants, including Techalloy/RSM, likely would need to pursue fact discovery against all ten (10) or so of the settled defendants in order to be prepared to "prove up" their Site waste disposals and their appropriate "equitable shares" of liability.

Alternatively, if in responding to Interrogatory No. 3 above BFAG acknowledged, say, that 1.5 million gallons of waste generated by the settled parties was disposed at the Site, and that their collective "equitable share" of overall Site liability should be 75%, then the remaining non-settled Defendants likely would be able to forego time-consuming and expensive discovery against the settled parties, and either stipulate to those figures or rely upon BFAG's sworn Interrogatory responses.

In short, requiring BFAG to answer contention Interrogatory No. 3 and thereby state its positions will greatly clarify the matters at issue and possibly obviate the need for extensive additional fact discovery. See Braun Medical, 155 F.R.D. at 527. Further, unless Plaintiff is required to state what it is actually seeking from each Defendant, and the basis for its claims, it is highly unlikely that meaningful settlement discussions will take place, but highly likely that a great deal of party and judicial resources will be expended in pursuing protracted, but potentially unnecessary discovery.

The same need for basic information regarding BFAG's claims underlies Techalloy/RSM's contention Interrogatories Nos. 2 and 4. Thus, Interrogatory No. 2 asks:

---

[1] See Memorandum and Order, entered June 30, 2004 (Docket No. 96)

2.    **If you contend that Techalloy knew that DeRewal Chemical's handling of Techalloy's waste would result in the release of hazardous substances, or that Techalloy controlled DeRewal Chemical's handling or disposal of Techalloy's waste, please:**

    A.    **State in detail all facts that support your contention;**

    B.    **Identify all persons with relevant knowledge, summarizing the subjects and extent of each person's knowledge; and**

    C.    **Identify all documents that support your contention.**

This Interrogatory flows directly from the Third Circuit's opinion in <u>Morton International v. A.E. Staley Company, Inc.</u>, 343 F.3d 669 (3d Cir. 2003). In <u>Morton</u>, the Third Circuit held that in seeking to establish "arranger liability" under CERCLA, a contribution plaintiff must prove, <u>inter alia</u>, that a Defendant either <u>knew</u> that handling of its waste would result in the release of hazardous substances, or that the Defendant <u>controlled</u> the handling or disposal of its waste. <u>Id.</u>, 343 F.3d at 679 ("A plaintiff is required to demonstrate ownership or possession, but liability cannot be imposed on that basis alone. A plaintiff is also required to demonstrate either knowledge or control").

Thus, Techalloy/RSM's contention Interrogatory No. 2 is designed to discover if Plaintiff BFAG has any "knowledge" or "control" evidence to support its contribution claims. Plaintiff BFAG may disagree that the standard for "arranger liability" set forth in the Third Circuit's <u>Morton</u> opinion applies to BFAG's effort in this case to pin "arranger liability" on Techalloy/RSM. Regardless of that view, Defendant Techalloy/RSM is entitled to prepare its defenses, and requiring Plaintiff to answer this narrowly-tailored contention Interrogatory, at virtually the close of scheduled fact discovery, will further that legitimate purpose. BFAG's answer also is "likely to expose a substantial basis for a motion under . . . Rule 56," which

further justifies the appropriateness of BFAG being required to answer this contention

Interrogatory. <u>Braun Medical</u>, 155 F.R.D. at 527.

Techalloy/RSM's contention Interrogatory No. 4 is similar to Interrogatory No. 3, in that

it simply asks the Plaintiff to articulate the nature and amount of "equitable share" liability it

seeks to impose upon Techalloy/RSM and others in this case:

> **4.    Do you contend that there is any "orphan share" liability associated with the Boarhead Farms Site, and if so, what is your position as to the portion of that orphan share liability, if any, that should be assigned or allocated to:**
>
> > **A.    Techalloy;**
> >
> > **B.    Each non-settled Defendant;**
> >
> > **C.    Each settled Defendant;**
> >
> > **D.    Each BFAG member;**
> >
> > **E.    Every other entity or person that BFAG believes is a liable party under CERCLA or HSCA with respect to the Site.**

To date, discovery in this case indicates that the owner/operator of the Site (Boarhead

Corporation) is a defunct party, the transporter that took virtually all of the waste to the Site

(DeRewal Chemical Company) is a defunct party, and many of the generators whose waste was

disposed at the Site (Diaz Chemical, etc.) also are defunct parties.  As such, it appears likely that

80% or more of the "equitable liability" for Site cleanup costs is attributable to so-called

"orphan" parties, and therefore must be re-distributed in one fashion or another among remaining

parties held liable.  The way in which Plaintiff BFAG contends that this huge orphan share

should be re-distributed is perhaps the most critical equitable allocation issue in this contribution

litigation.  Defendant Techalloy/RSM's Interrogatory No. 4 simply asks BFAG to state its

contentions with regard to that critical issue.  Without that information, the Defendants will be

left standing in the dark with respect to arguably the single most important aspect of the Plaintiff's claims against them.

As alleged justification for not having to respond to Techalloy/RSM's contention Interrogatories, Plaintiff BFAG may argue that the Defendants simply should proceed now to take whatever additional fact discovery they feel is necessary, and then bring that information to bear later, when and if the Plaintiff finally withdraws its "premature" objections and states its contentions. However, that is an inefficient and unfair approach. The Defendants should not be forced to take extensive discovery without knowing whether it is necessary. That would be an inefficient use of both Defendants' and Plaintiff's resources, as well as highly burdensome on former parties no longer part of this lawsuit.

Alternatively, BFAG may argue that Techalloy/RSM's contention Interrogatories ask Plaintiff to articulate its "theories of the case," and that doing so now without the benefit of expert analysis and opinion is premature. That response is not convincing for at least two reasons. First, although expert testimony in CERCLA allocation cases has been permitted to assist with classic scientific matters, such as contaminant fate and transport, relative waste toxicity, etc., the weight of authority holds that a contribution plaintiff's overall position regarding "equitable allocation" claims and shares is not a proper subject for expert opinion, primarily because opinions proffered by alleged experts in "equity" or "equitable allocation" cannot survive the admissibility tests articulated in <u>Daubert v. Merrill Dow</u> and its progeny.[2]

---

[2]   See <u>United States v. Lightman</u>, 1999 U.S. Dist. LEXIS 21646 (D.N.J.); <u>New York v. Westwood-Squibb Pharmaceutical Co.</u>, 2001 U.S. Dist. LEXIS 11765 (W.D.N.Y.); <u>American Special Risk Insurance v. City of Centerline</u>, 2002 U.S. Dist. LEXIS 12343 (E.D. Mich.) (all excluding proposed "equitable factors" allocation experts in CERCLA cases under <u>Daubert</u> analysis).

Second, from a practical point of view, the "wait until expert opinion time" excuse also appears to be a ruse. Counsel for Techalloy/RSM specifically suggested to counsel for BFAG that the parties could resolve the current dispute simply by agreeing to extend the fact discovery period for a reasonable time <u>after</u> BFAG fully answers the contention Interrogatories, to allow any additional necessary fact discovery to take place. If BFAG's counsel had agreed, then allowing Plaintiff to put off stating the nature and extent of its contribution claims until after expert opinions were offered would be fine, because the Defendants would, by agreement, be able to pursue whatever additional fact discovery was necessitated by the substance of BFAG's positions. The problem, of course, is that counsel for Plaintiff BFAG refused to agree to that practical approach. It appears, therefore, that BFAG would prefer to have fact discovery close first, followed sometime later by full Interrogatory answers setting out the basis and scope of its claims, at which point the Defendants would be precluded from pursuing any necessary additional fact discovery.

Given the refusal by BFAG's counsel to agree to a discovery period extension, the Plaintiff should be required to respond now to Techalloy/RSM's contention Interrogatories. Plaintiff has not asserted that it never will be obligated to respond to these contention Interrogatories, just that answering them now would be "premature." However, later does not make sense in this instance. Plaintiff brought suit against certain companies. It alleged that waste they generated was disposed at the Boarhead Farm Site. A large quantity of relevant historical documents have been produced, and more than fifty (50) depositions have now been taken. The fact discovery period is currently scheduled to end in just two (2) weeks. <u>Before</u> the fact discovery period is closed, Plaintiff should at the very least be required to state its basic contentions as the amount of liability it claims against each party, and the basis for its positions.

The Defendants also should be granted the flexibility to pursue additional fact discovery as necessary based upon the substance of BFAG's positions.

**B.      Plaintiff BFAG Should be Compelled to
         Give a Definite Answer to Interrogatory No. 1.**

Putting BFAG's "premature" objections aside, Plaintiff's substantive response to Interrogatory No. 1 features a gigantically open back door, and therefore is improper and of no practical use. Techalloy/RSM simply asked BFAG to state all facts supporting the Plaintiff's contention that waste generated by Techalloy/RSM was disposed at the Site. The Interrogatory also asked BFAG to identify all supporting documents, and identify all persons with relevant knowledge:

**1.      Regarding your allegation that waste from Defendant Techalloy Company, Inc. ("Techalloy") was disposed at the Boarhead Farms Site, please:**

**A.      State in detail all facts that support your contention;**

**B.      Identify all persons with relevant knowledge, summarizing the subjects and extent of each person's knowledge; and**

**C.      Identify all documents that support your contention.**

BFAG's response does enumerate certain documents and cites to certain deposition testimony. However, in the most open-ended fashion possible, BFAG's response also states that "[t]he factual basis for Plaintiffs claims against [Techalloy/RSM] in the complaint, and the identities of persons with knowledge of those facts, **are contained in the deposition testimony that has been elicited in this case . . .**" Then, in addition to providing a few deposition citations, BFAG simply refers Techalloy/RSM in the most general way "**to the deposition testimony that has been elicited in this case [including] . . . all of the other deposition testimony concerning DCC's disposal of waste at the Site.**"

At this stage of the case -- with no more depositions of Techalloy/RSM witnesses scheduled and only two (2) weeks left before the close of fact discovery -- BFAG's completely open-ended response lacks the necessary specificity. In response to its fair question, Defendant Techalloy/RSM has, in effect, been referred by BFAG to all of the deposition testimony taken in the case. That all-encompassing response defeats Techalloy/RSM's reasonable effort to evaluate the particular factual evidence that BFAG claims supports its case against Techalloy/RSM. It also unfairly limits Techalloy/RSM's ability to prepare its defenses in any specific way. BFAG should be required at this late stage of the case to state, with specificity, the factual basis for the claims it is asserting against Techalloy/RSM.

### C.    Interrogatory No. 7 Seeks Relevant Information and BFAG Should be Required to Provide a Full Answer.

Techalloy/RSM's Interrogatory No. 7 requests information about any monetary recoveries obtained by Plaintiff BFAG and/or its members related to the Site:

> 7.    Describe in detail all monetary recoveries, offsets, or other consideration obtained by you that directly or indirectly has or will reduce your net "out of pocket" costs or damages related to the Boarhead Farms Site, including without limitation any such recoveries, offsets, or other consideration obtained from:
>
> A.    Each settled Defendant;
>
> B.    Any insurers or other indemnitors;
>
> C.    Any business expense deduction or other tax benefits; and
>
> D.    Any other entities, persons, or sources whatsoever.

Plaintiff initially objected to this interrogatory as vague, confusing and ambiguous, and also as seeking "information that is neither relevant nor will lead to the discovery of admissible

evidence." Following discussions with Plaintiff's counsel in which the Interrogatory was further explained, Plaintiff's counsel continues to assert an objection on the grounds of relevance.

However, information about any monetary recoveries obtained by BFAG and its members is directly relevant to the validity and amount of the Plaintiff's remaining claims. As a creation of statute, the Plaintiff's CERCLA and HSCA claims sound in "contribution." An essential element of a statutory contribution claim is that a plaintiff has incurred more than its fair share of liability.[3] The "more than fair share" showing is a necessary predicate to recovering any "equitable share" back from other liable parties.

In other words, a CERCLA or HSCA contribution plaintiff is not entitled to a "double recovery." It would directly violate the governing statutory language to permit a contribution plaintiff to recover money from targeted defendants that it already has pocketed through recoveries from other sources, such as settlements, insurance recoveries, and the like. It also would violate the "polluter pays" principle that fundamentally underlies both CERCLA and HSCA. Indeed, were it otherwise, a liable waste generator could actually turn a tidy profit from its polluter status, obtaining far more through "double recoveries" then it actually spent in statutory "response costs" to remediate a Site. Such a result is untenable, as it would perversely turn the "polluter pays" principle into a "polluter profits" approach instead.

Thus, to the extent that members of the Plaintiff already have recovered a portion of their past "response costs," they should not be able to do so again in this litigation and thereby obtain a double recovery. Cf. Bethlehem Iron Works, Inc., 1996 U.S. Dist. LEXIS at *192 (holding that

_____

[3] See New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1122 (3d Cir. 1997) ("while a potentially responsible person should not be permitted to recover all of its costs from another potentially responsible person, the person should be able to recoup that portion of its expenditures which exceeds its fair share of the overall liability")(emphasis added).

funds recovered under CERCLA must be deducted from potential recoveries under HSCA, "to avoid giving the Plaintiffs' double recovery"). At their core, CERCLA and HSCA contribution claims involve allocating Site response costs in accordance with whatever "equitable factors" the Court deems just and appropriate.[4]  Considering whether contribution plaintiffs have obtained potential "double recoveries" or "windfalls" is fairly within the scope of equitable allocation analysis, and therefore fairly within the scope of discovery.

### D.    Defendant Requests an Extension of the Fact Discovery Period for a Reasonable Time After BFAG Supplies Full Interrogatory Answers.

If the Court grants Techalloy/RSM's instant motion, and requires Plaintiff to answer the objected to Interrogatories, it will only be a Pyrrhic victory unless the current fact discovery period is extended for a reasonable period of time _after_ the Plaintiff's responses are provided.  As discussed above, Defendant Techalloy/RSM will need to evaluate the substance of BFAG's full responses in order to determine if further fact discovery is necessary.  If the deadline for fact discovery has already expired before Plaintiff's full responses are provided, that opportunity will be lost.  By the same token, if Defendant Techalloy/RSM determines after reviewing the Plaintiff's full responses that no further fact discovery is necessary, it will promptly communicate that to the Plaintiff and this Court.

---

[4]  Federal courts repeatedly stress that courts may consider "any factors appropriate to balance the equities in the totality of the circumstances." Envtl. Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 509 (7th Cir. 1992) (emphasis added); see also Am. Color & Chem. Corp. v. Tenneco Polymers, Inc., 918 F. Supp. 945, 959 (D.S.C. 1995).  Given the nearly unfettered breadth of such an inquiry, a court performing a CERCLA equitable allocation has discretion to consider several equitable factors or only a few, "depending on the totality of the circumstances and equitable considerations." New Jersey Turnpike Auth. v. PPG Indust., 197 F.3d 96, 104 n.7 (3d Cir. 1999).

## IV.    Conclusion

For the reasons discussed above, Defendant Techalloy/RSM respectfully requests that Plaintiff BFAG be required to provide full responses to Techalloy/RSM Interrogatories Nos. 1, 2, 3, 4, and 7. Without those answers, Defendant is significantly impeded in its effort to evaluate BFAG's claims, prepare its defenses, and evaluate settlement options. Techalloy/RSM also requests an extension of the fact discovery period for a reasonable period of time after receipt of full Interrogatory answers from the Plaintiff, to allow any necessary follow-up discovery to be conducted.

Dated:  March 4, 2005

DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103

*Attorneys for Defendants*
*Techalloy Co., Inc. and*
*Rahns Specialty Metals, Inc.*

## CERTIFICATE OF SERVICE

I Andrew P. Foster, hereby certify that on this 4th day of March, 2005, I caused a

true and correct copy of the foregoing:

## MOTION TO COMPEL
## RESPONSES TO INTERROGATORIES
## AND FOR EXTENSION OF FACT DISCOVERY PERIOD

with supporting Memorandum of Law to be served as indicated below:

## BY EMAIL and FIRST-CLASS MAIL

**Counsel for Boarhead Farm Agreement Group**
Glenn A. Harris, Esquire
Ballard Spahr Andrews &
  Ingersoll, LLP
Plaza 1000 – Suite 500
Main Street
Voorhees, NJ  08043-4636
(856) 761-3440
(856) 761-9001 (Fax)

Monique M. Mooney, Esquire
Ballard Spahr Andrews &
  Ingersoll, LLP
1735 Market Street – 51st Flr.
Philadelphia, PA  19103-7599
(215) 864-8189
(215) 864-9266 (Fax)

**Counsel for Advanced Environmental Technology**
Thomas Sabino, Esquire
Wolff & Samson
5 Becker Farm Road
Roseland, NJ  07068-1776
(973) 740-0500
(973) 436-4440 (Fax)

**Counsel for Ashland Chemical Company**
Richard C. Biedrzycki, Esquire
Phelan, Pettit & Biedrzycki
Suite 1600
The North American Bldg.
121 South Broad Street
Philadelphia, PA  19107
(215) 546-0500
(215) 546-9444 (Fax)

**Counsel for Carpenter Technology Corporation**
Lynn Wright, Esquire
Edwards & Angell
750 Lexington Avenue
New York, NY  10022
(212) 756-0215
(888) 325-9169 (Fax)

**Counsel for Diaz Chemical Corp.**
Ronald J. Reid, III
Manager, Health/Safety/Environment
Diaz Chemical Corp.
40 Jackson Street
Holley, NY 14470-1156
(716) 638-6321
(716) 638-8356 (Fax)

**Counsel for Etched Circuits, Inc. & FCG, Inc.**
Seth v.d.H. Cooley, Esquire
Duane Morris LLP
Suite 4200, One Liberty Place
Philadelphia, PA  19103-7396
(215) 979-1000
(215) 979-1020 (Fax)

**Counsel for Handy & Harman Tube Co.**
Melissa E. Flax, Esquire
Carella, Byrne, Bain, Gilfillan, Cecchi,
  Stewart & Olstein
5 Becker Farm Road
Roseland, NJ  07068-1739
(973) 994-1700
(973) 994-1744 (Fax)

**Counsel for Merit Metals Products Corp.**
Stephen P. Chawaga, Esquire
Monteverde, McAlee & Hurd
One Penn Center at Suburban Station
1617 John F. Kennedy Blvd.
Suite 1500
Philadelphia, PA  19103-1815
(215) 557-2950
(215) 557-2990/2991

**Counsel for NRM Investment Company**
Edward Fackenthal, Esquire
Law Offices of Edward Fackenthal, Esquire
One Montgomery Plaza
Suite 209
Norristown, PA  19401 (610) 279-3370
(610) 279-0696 (Fax)
edwardfackenthal@cs.com

Andrew P. Foster

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

BOARHEAD FARM AGREEMENT GROUP,   :
                                   :
             Plaintiff,           :
                                   :
v.                                     :     Civil Action No. 02-3830
                                   :
ADVANCED ENVIRONMENTAL       :
TECHNOLOGY CORPORATION, ET AL.,   :
                                   :
            Defendants.      :

**ORDER**

AND NOW, this _____ day of _____, 2005, upon consideration of

Defendant Techalloy/RSM's Motion to Compel Responses to Interrogatories and for Extension

of Fact Discovery Period, and any opposition thereto, it is hereby ORDERED that Defendants'

Motion is GRANTED.

It is further hereby ORDERED that Plaintiff must provide full, specific and

complete responses to Techalloy/RSM's Interrogatories Nos. 1, 2, 3, 4, and 7 within 20 days of

the date of this Order.

It is further hereby ORDERED that Case Management Order No. 7 is modified to

provide that the fact discovery period will remain open for a period of ninety (90) days following

Defendant's receipt of Plaintiff's full responses to the Interrogatories identified above.


_____
Legrome D. Davis, U.S.D.J.

Dated: _____

# EXHIBIT "A"

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOARHEAD FARM AGREEMENT
GROUP,

          Plaintiff,

    v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION;
ASHLAND CHEMICAL COMPANY;
BOARHEAD CORPORATION;
CARPENTER TECHNOLOGY
CORPORATION; CROWN METRO,
INC.; DIAZ CHEMICAL
CORPORATION; EMHART
INDUSTRIES, INC.; ETCHED
CIRCUITS, INC.; fcg, INC.; GLOBE
DISPOSAL CO., INC; GLOBE-
WASTECH, INC.; HANDY & HARMAN
TUBE COMPANY, INC.; KNOLL, INC.;
KNOLL INTERNATIONAL, INC.;
MERIT METAL PRODUCTS
CORPORATION; NOVARTIS
CORPORATION; NRM INVESTMENT
COMPANY;
PLYMOUTH TUBE COMPANY;
QUIKLINE DESIGN AND
MANUFACTURING CO.; RAHNS
SPECIALTY METALS, INC.; ROHM
AND HAAS COMPANY; SIMON
WRECKING CO., INC.; TECHALLOY
CO., INC.; THOMAS & BETTS
CORPORATION; UNISYS
CORPORATION; UNITED STATES OF
AMERICA DEPARTMENT OF NAVY,

          Defendants.

Civil Action

02-CV-3830

Judge Legrome D. Davis

### THIRD AMENDED COMPLAINT

Plaintiff Boarhead Farm Agreement Group, by and through its attorneys, by way of

Complaint against the Defendants hereby states as follows:

## FACTUAL BACKGROUND

1.  Plaintiff seeks contribution from Defendants, including an allocation by the Court of response costs as between Plaintiff and Defendants using such equitable factors as the Court determines are appropriate, for the response costs that Plaintiff has incurred and the damages that Plaintiff has suffered as a result of releases or threatened releases of one or more hazardous substance as defined by Section 101 (14) of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, ("CERCLA"), 42 U.S.C. § 9601 (14), and Section 103 of the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 PA. CONS. STAT. § 6020.103 ("Hazardous Substances"), at or from the Boarhead Farms Superfund Site, Lonely Cottage Road, Upper Black Eddy, Bridgeton Township, Bucks County, Pennsylvania (the "Site"). Plaintiff also seeks a declaratory judgment that Defendants are liable to Plaintiff for contribution for any and all response costs that Plaintiff will or may incur and for any and all damages that Plaintiff will or may suffer in the future as a result of releases, threatened releases, or discharges of Hazardous Substances at or from the Site.

2.  Manfred DeRewal ("DeRewal") incorporated Boarhead Corporation in 1969. In addition, DeRewal incorporated and operated DeRewal Chemical Company, Inc. ("DeRewal Chemical"), a hauler of waste materials.

3.  In 1969, Boarhead Corporation purchased the Site. The Site is and was, at all relevant times, a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S. § 9601(9).

4.  From the time of purchase until approximately 1977, the Site was used for, among other things, the disposal of Hazardous Substances.

5.  In the early 1970s, the Bucks County Department of Health (the "DOH"), responding to complaints of dead fish, dead plant life, and other environmental and public health

concerns, investigated the Site. The DOH noted the following at the Site: pungent odors; drums on an open trailer; drums awaiting disposal; empty tanks awaiting removal; a bulldozer burying old drums; 40 drums filled with solvent; and empty tanker trucks parked at the Site.

6. The DOH obtained a search warrant and searched the Site on March 5, 1973. The DOH documented the following at the Site: improperly stored chemicals; chemicals leaking from 55-gallon drums; liquid and solid waste on the ground; chemicals leaking into waste pools, on-Site lagoons, and vats; copper ammonia sulfate; paint solvents; arsenic pentoxide; pesticides; copper naphtholate; and a cleared area in the northeast section of the Site containing drums.

7. In October of 1973, a tank truck discharged approximately 3,000 gallons of ferrous chloride at the Site, for which Boarhead Corporation was found to be in violation of the Pennsylvania Clean Streams Law, 35 PA. CONS. STAT. §§ 691.1 *et seq.*

8. Soil samples taken from the Site in 1974 revealed the following: soil pH levels of 2.9 and the presence of chloride, iron, chromium, copper, zinc, and nickel.

9. In September of 1976, a tank truck released approximately 3,000 gallons of sulfuric acid on the Site, resulting in the evacuation of 34 local residents.

10. In 1984, the United States Environmental Protection Agency ("USEPA") performed a Site inspection. On March 31, 1989, the USEPA placed the Site on the National Priorities List (the "NPL"), 40 C.F.R Part 300, Appendix B, a national list of hazardous waste sites that the USEPA has determined may pose a threat to health, welfare, and the environment. The NPL was established under the National Contingency Plan (the "NCP"), 40 C.F.R. Part 300, as required by Section 105(a) of CERCLA, 42 U.S.C. § 9605(a).

11. The USEPA has conducted three CERCLA removal actions at the Site. In connection with these removal actions, the USEPA located and removed from the Site 2,600 drums as well as contaminated soil. Contaminated groundwater is being treated at an on-site treatment facility.

12. Under an administrative consent order, USEPA Docket Number: III-92-66-DC, General Ceramics, Inc., performed a fourth removal action to address the presence of radioactive waste at the Site.

13. The USEPA completed a Remedial Investigation and Feasibility Study for the Site in July 1997.

14. On or about November 18, 1998, the USEPA issued a Record of Decision (the "ROD") selecting a remedial action for the Site. The Commonwealth of Pennsylvania concurred in this remedy selection.

15. Subsequent to the issuance of the ROD, the USEPA determined to implement the remedial action described in the ROD in two operable units ("OUs"). The USEPA determined that, in general, OU-1 would address: groundwater extraction, metal precipitation, and air stripping; the installation of additional monitoring wells; the implementation of institutional controls and monitoring for OU-1; residential water treatment; and phytoremediation. The USEPA determined that, in general, OU-2 would address: soil aeration and the treatment of volatile organic compound hot spots; the excavation and off-site disposal of buried drums; and the implementation of institutional controls and monitoring for OU-2.

16. Plaintiff Boarhead Farm Agreement Group is an unincorporated association comprised of Agere Systems Inc.; Cytec Industries Inc.; Ford Motor Company; SPS Technologies, Inc.; and TI Group Automotive Systems LLC whereby those companies have

agreed collectively to undertake the cleanup work comprising OU-1 and OU-2, to otherwise resolve the claims of EPA related to the Site, and to seek contribution from the Defendants in this civil action. The members of the Boarhead Farm Agreement Group have agreed that they will, at some future time, and not in this civil action, reach a final allocation among themselves applicable to all costs associated with group activities, including the costs of the cleanup work comprising OU-1 and OU-2.

17. Although denying that they are liable parties under Section 107 of CERCLA, 42 U.S.C. § 9607, Cytec Industries Inc., Ford Motor Company, and SPS Technologies, Inc. are parties to both an Administrative Order on Consent for Remedial Design, USEPA Docket No. III-2000-002-DC, entered in February 2000 (the "OU-1 AOC") and a Consent Decree entered by this Court on or about September 28, 2000 (the "OU-1 Consent Decree") obligating them to perform the OU-1 remedial design and remedial action (the "OU-1 RD/RA") at the Site.

18. The Boarhead Group members have agreed to collectively fund and perform the OU-1 RD/RA and have entered into an agreement with two other entities (the "OU-1 Group Agreement") whereby the parties to that agreement ("the OU-1 Parties") agreed to collectively fund and perform the OU-1 RD/RA. The Boarhead Group and the two other entities collectively, and not any of the OU-1 Parties individually, has taken to date and will in the future take the activities necessary to perform the OU-1 RD/RA. Specifically, the activities necessary for performance of the OU-1 RD/RA have been undertaken on behalf of the Boarhead Group (and the two other entities) by contractors hired by and paid by them. Those contractors were not hired by or paid by any of the OU-1 Parties individually, nor did they do any of the OU-1 RD/RA work on behalf of any of the OU-1 Parties individually.

19. The OU-1 Group Agreement obligates each of the OU-1 Parties to contribute funds to an OU-1 Group trust account ("the OU-1 Trust Account") in amounts collectively sufficient to pay for the performance by the OU-1 Group of the OU-1 RD/RA. Such contributions are made on the basis of an interim allocation among the OU-1 Parties. All costs of the activities to perform the OU-1 RD/RA have been paid for and will in the future be paid for from the OU-1 Trust Account.

20. Although denying that they are liable parties under Section 107 of CERCLA, 42 U.S.C. § 9607, Cytec Industries Inc., Ford Motor Company, SPS Technologies, Inc., and TI Group Automotive Systems LLC are signatories to an Administrative Order on Consent for Remedial Design, EPA Docket No. III – 2001 – 0010 – DC, effective October 17, 2001 (the "OU-2 AOC") and a Consent Decree (the "OU-2 Consent Decree") entered by this Court on March 14, 2002 obligating them to perform the OU-2 remedial design and remedial action (the "OU-2 RD/RA") at the Site and to reimburse the USEPA both for $7,000,000 in response costs incurred and accounted for prior to July 2000 and for an as yet undetermined amount of response costs incurred subsequent to July 2000.

21. The Boarhead Group members have agreed to collectively fund and perform the OU-2 RD/RA. The Boarhead Group, and not any of the Boarhead Group members individually, has taken to date and will in the future take the activities necessary to perform the OU-2 RD/RA. Specifically, the activities necessary for performance of the OU-2 RD/RA have been undertaken on behalf of the Boarhead Group by contractors hired by and paid by the Boarhead Group. Those contractors were not hired by or paid by any of the Boarhead Group members individually, nor did they do any of the OU-2 RD/RA work on behalf of any of the Boarhead Group members individually.

22. The Boarhead Group members contribute funds to an OU-2 Group trust account ("the OU-2 Trust Account") in amounts collectively sufficient to pay for the performance by the Boarhead Group of the OU-2 RD/RA. Such contributions are made on the basis of an interim allocation among the Boarhead Group. All costs of the activities to perform the OU-2 RD/RA and to perform the other requirements of the OU-2 Consent Decree have been paid for and will in the future be paid for from the OU-2 Trust Account.

23. Plaintiff has incurred costs and damages, including attorneys fees, in the course of performing the requirements of the OU-1 and OU-2 AOCs and Consent Decrees. These costs constitute necessary costs of response, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), incurred consistently with the NCP, within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) (collectively, the "Response Costs"). Plaintiff incurred the Response Costs because of releases or threatened releases of Hazardous Substances at or from the Site. The Response Costs incurred by Plaintiff are also reasonable and necessary or appropriate costs consistent with Section 702(a)(3) of HSCA, 35 PA. CONS. STAT. § 6020.703(a)(3).

24. Plaintiff anticipates that it will incur additional necessary costs of response, consistent with the NCP, and will reimburse the USEPA for its administrative and oversight costs in the future ("Future Response Costs") in connection with the Site.

## JURISDICTION AND VENUE

25. This action arises under Section 113 of CERCLA, 42 U.S.C. § 9613, and Section 702(a)(3) of HSCA, 35 PA. CONS. STAT. § 6020.702(a)(3).

26. This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9313(b), 28 U.S.C §§ 1331 and 1367. This Court has supplemental jurisdiction over the state claims based on 28 U.S.C. § 1367.

27.    This Court has authority to enter a declaratory judgment regarding the rights and liabilities of the parties pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2).

28.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases or threatened release of Hazardous Substances, wastes, pollutants, and contaminants alleged herein occurred and the claims set forth herein arose in the Eastern District of Pennsylvania.

## PARTIES

A.    The Plaintiff

29. Plaintiff Boarhead Farm Agreement Group is a person as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

B.    The Defendants

### Defendant Advanced Environmental Technology Corporation

30. Defendant Advanced Environmental Technology Corporation ("AETC") is a New Jersey corporation with a principal place of business in Flanders, New Jersey.

31. AETC arranged with DeRewel Chemical for the disposal of Hazardous Substances from Defendants Ashland Chemical Company ("Ashland") and Diaz Chemical Corporation ("Diaz").

32. AETC transported Hazardous Substances to the Site for disposal, having selected the Site for that purpose.

## Defendant Ashland Chemical Company

33. Defendant Ashland is a Kentucky corporation with a principal place of business in Russell, Kentucky.

34. Ashland used AETC and DeRewal Chemical to remove industrial wastes from its Pennsylvania plant.

35. Ashland's waste was disposed of at the Site.

36. Ashland's waste contained Hazardous Substances.

## Defendant Boarhead Corporation

37. Defendant Boarhead Corporation is a Pennsylvania corporation with a principal place of business in Revere, Pennsylvania. Boarhead Corporation is the current owner of the Site and was the owner and operator of the Site at the time of the disposal of Hazardous Substances.

## Defendant Carpenter Technology Corporation

38. Defendant Carpenter Technology Corporation ("Carpenter Technology") is a Delaware corporation with a principal place of business in Reading, Pennsylvania.

39. Carpenter Technology used DeRewal Chemical for the removal of waste pickling solution from its Reading, Pennsylvania plant.

40. Carpenter Technology's waste was disposed of at the Site.

41. Carpenter Technology's waste contained Hazardous Substances.

## Defendants Crown Metro, Inc. and Emhart Industries, Inc.

42. Defendant Crown Metro, Inc. ("Crown") is a South Carolina corporation with a principal place of business in Greenville, South Carolina.

43. Defendant Emhart Industries, Inc. ("Emhart") is a Connecticut corporation with a registered office in Hartford, Connecticut.

44. USM Corporation ("USM"), formerly a New Jersey corporation, doing business as Bostik South, Inc., used DeRewal Chemical for the removal of waste acid from its Greenville, South Carolina plant.

45. USM's waste was disposed of at the Site.

46. USM's waste contained Hazardous Substances.

47. Emhart is a successor-in-interest to USM through the merger of USM into Emhart.

48. In or about 1980 USM sold the Bostik South, Inc. business, including the Greenville, South Carolina plant, to Bengal Corporation.

49. Bengal Corporation thereafter continued the operation of the Bostik South, Inc. business without change from the way the business was operated while the business was owned by USM.

50. Bengal thereafter changed its name to Crown.

51. Crown is a successor-in-interest to Emhart with respect to liability arising from the Greenville, South Carolina plant.

### Defendant Diaz Chemical Corporation

52. Defendant Diaz is a New York corporation with a principal place of business in Holley, New York.

53. Diaz used AETC and DeRewal Chemical to remove industrial wastes from its

Holley, New York, plant.

54. Diaz's waste was disposed of at the Site.

55. Diaz's waste contained Hazardous Substances.

### Defendant Etched Circuits, Inc.

56. Defendant Etched Circuits, Inc. ("Etched Circuits") is a New Jersey

corporation with a principal place of business in Warminster, Pennsylvania.

57. Etched Circuits, Inc. used DeRewel Chemical to remove industrial waste from

its Cherry Hill, New Jersey plant.

58. Etched Circuits' waste was disposed of at the Site.

59. Etched Circuits' waste contained Hazardous Substances.

### Defendant fcg, inc.
### (a/k/a Flexible Circuits, Inc.)

60. Defendant fcg, inc. (a/k/a Flexible Circuits, Inc.) ("fcg") is a Pennsylvania

corporation with a principal place of business in Warrington, Pennsylvania.

61. Fcg used DeRewal Chemical to remove spent etchings and other industrial

waste from its Warrington, Pennsylvania plant.

62. Fcg's waste was disposed of at the Site.

63. Fcg's waste contained Hazardous Substances.

64. In 1969 fcg became the owner of all outstanding stock of Etched Circuits and

thereafter operated the Etched Circuits facility in Cherry Hill, New Jersey. Fcg is thus a person

who arranged for the transport, disposal, or treatment of Hazardous Substances from the Etched Circuits facility, which Hazardous Substances were disposed of at the Site.

### Defendants Globe Disposal Co., Inc. and Globe-Wastech, Inc.

65. Defendant Globe Disposal Co., Inc. ("Globe") is a Pennsylvania corporation with a principal place of business in Norristown, Pennsylvania.

66. Defendant Globe-Wastech, Inc. ("Wastech") is a Pennsylvania corporation with a principal place of business in Skippack, Pennsylvania.

67. Globe arranged with DeRewel Chemical for the disposal of Hazardous Substances.

68. Globe transported Hazardous Substances to the Site for disposal, having selected the Site for that purpose.

69. Globe Disposal selected the Site for the disposal of Hazardous Substances.

70. On or about March 1978 the sole shareholder of Globe, Earl T. Kelly, and the sole shareholder of Waste Techniques Corporation ("WTC"), Francis J. Keel, exchanged each of their shares in those companies to Wastech.

71. Wastech thereafter continued the operation of Globe without change from the way Globe operated while its shares were owned by Kelly.

72. Wastech is a successor-in-interest to Globe.

### Defendant Handy & Harman Tube Company, Inc.

73. Defendant Handy & Harman Tube Company, Inc. ("Handy & Harman Tube") is a Delaware corporation with a principal place of business in Norristown, Pennsylvania.

74. Handy & Harman Tube used DeRewal Chemical to remove industrial waste from its Norristown, Pennsylvania facility

75. Handy & Harman Tube's waste was disposed at the Site.

76. Handy & Harmon Tube's waste contained Hazardous Substances.

### Defendants Knoll International, Inc. and Knoll, Inc.

77. Defendant Knoll International, Inc. ("Knoll International") is a Delaware corporation with a principal place of business in New York, New York.

78. Art Metal-Knoll Corporation ("Knoll") contracted for the disposal of industrial wastes with DeRewal Chemical from its East Greenville, Pennsylvania facility.

79. Knoll's wastes were disposed of at the Site.

80. Knoll's waste contained Hazardous Substances

81. Knoll International is the successor-in-interest to Knoll through the merger of Knoll into Knoll International.

82. In or about 1990 the business of Knoll International, including the East Greenville facility, was sold to Westinghouse Acquisition Corporation ("Westinghouse"), a Delaware corporation.

83. Westinghouse thereafter continued the operation of the Knoll International business without change from the way the business was operated while it was owned by Knoll International.

84. Westinghouse was merged into Knoll North America, Inc., which was merged into Knoll, Inc., which was merged into T.K.G. Acquisition Corp. T.K.G. Acquisition Corp. was immediately thereafter renamed Knoll, Inc. ("Knoll, Inc.")

85. Defendant Knoll, Inc. is a Delaware corporation with its principal place of business in East Greenville, Pennsylvania and is a successor-in-interest to Knoll International with respect to liability arising from the East Greenville facility.

### Defendant Merit Metal Products Corporation

86. Defendant Merit Metal Products Corporation ("Merit Metal II") is a Pennsylvania corporation with a principal place of business in Warrington, Pennsylvania.

87. Another Pennsylvania corporation also named Merit Metal Products Corporation (Merit Metal I") owned and operated a place of business in Warrington, Pennsylvania from at least 1968 to 1988.

88. Merit Metal I used DeRewal Chemical to remove industrial waste from its Warrington, Pennsylvania facility.

89. Merit Metal I's waste was disposed of at the Site.

90. Merit Metal I's waste contained Hazardous Substances.

91. Merit Metal II purchased the assets and business of Merit Metal I in or about July 1988 and thereafter continued the operation of that business without change from the way the business was operated while the business was owned by Merit Metal I.

92. Merit Metal II is liable as a successor-in-interest to Merit Metal I.

### Defendant Novartis Corporation

93. Defendant Novartis Corporation ("Novartis") is a New York corporation with a principal place of business in Tarrytown, New York.

94. Ciba-Geigy Corporation ("Ciba") used DeRewal Chemical for the removal of waste nitric acid and sulphuric acid from its Cranston, Rhode Island facility.

95. Ciba's waste was disposed of at the Site.

96. Ciba's waste contained Hazardous Substances.

97. Novartis is the corporate successor to Ciba.

## Defendant NRM Investment Company

98. Defendant NRM Investment Company ("NRMC") is a Pennsylvania corporation with its principal place of business in Rosemont, Pennsylvania.

99. From 1974 to 1978 NRMC, then named National Rolling Mills Co., used DeRewal Chemical to dispose of waste pickle liquor solution from its plant located in Malvern, Pennsylvania (the "NRM Plant").

100.    Waste from the NRM Plant was disposed of at the Site.

101.    The NRM Plant waste contained Hazardous Substances.

102.    NRMC is a party to the OU-1 Agreement.

## Defendant Plymouth Tube Company

103.    Defendant Plymouth Tube Company ("Plymouth Tube") is a Michigan corporation with a principal place of business in Warrenville, Illinois.

104.    Plymouth Tube used DeRewal Chemical to dispose of waste pickling solution from its Ellwood Ivins facility in Horsham, Pennsylvania.

105.    Plymouth Tube's waste was disposed of at the Site.

106.    Plymouth Tube's waste pickling solution contained Hazardous Substances.

## Defendant Quikline Design and Manufacturing Co.

107.    Defendant Quikline Design and Manufacturing Co. ("Quikline Design") is a New Jersey corporation with a principal place of business in Gloucester City, New Jersey.

108.    Quikline Design used DeRewal Chemical to dispose of industrial waste from Quikline Design's Cherry Hill, New Jersey facility.

109.    Quikline Design's waste was disposed of at the Site.

110.    Quikline Design's waste contained Hazardous Substances.

## Defendant Rahns Specialty Metals, Inc.

111.    Defendant Rahns Specialty Metals, Inc. ("Rahns") is a Pennsylvania corporation with a principal place of business in Collegeville, Pennsylvania.

112.    In 1991 Rahns acquired the property, premises, and environmental liability associated with Techalloy Co., Inc.'s ("Techalloy") Rahns, Pennsylvania facility.

113.    Thereafter Rahns continued to operate the Techalloy Rahns facility in substantially the same manner in which that facility was operated by Techalloy and otherwise continued the business of Techalloy.

114.    Rahns is a successor-in-interest to Techalloy.

## Rohm and Haas Company

115.    Rohm and Haas Company ("Rohm") is a Pennsylvania Corporation with a principal place of business in Philadelphia, Pennsylvania.

116.    Rohm arranged with a Marvin Jonas business to remove waste from its facilities in the Philadelphia area.

117.    Rohm's waste was disposed of at the Site.

118.   Rohm's waste contained Hazardous Substances.

### Defendant Simon Wrecking Co., Inc.

119.   Defendant Simon Wrecking Co., Inc. ("Simon Wrecking") is a Pennsylvania corporation with a principal place of business in Williamsport, Pennsylvania.

120.   Simon Wrecking used DeRewel Chemical to remove industrial waste from Simon Wrecking's Williamsport facility.

121.   Simon Wrecking's waste was disposed of at the Site.

122.   Simon Wrecking's waste contained Hazardous Substances.

### Defendant Techalloy Co., Inc.

123.   Defendant Techalloy is a Pennsylvania corporation with a principal place of business in Mahway, New Jersey.

124.   Techalloy used DeRewal Chemical to remove spent acids from Techalloy's Rahns, Pennsylvania facility.

125.   Techalloy's waste was disposed of at the Site.

126.   Techalloy's waste contained Hazardous Substances.

### Defendant Thomas & Betts Corporation

127.   Defendant Thomas & Betts Corporation ("Thomas & Betts") is a Tennessee corporation with a principal place of business in Memphis, Tennessee.

128.   Ansley Electronics Corporation ("Ansley") used DeRewel Chemical to remove industrial waste from its New Hope and Perkasie, Pennsylvania facilities.

129.    Wastes from Ansley's New Hope and Perkasie facilities were disposed of at the Site.

130.    Wastes from Ansley's New Hope and Perkasie facilities contained Hazardous Substances.

131.    Ansley was merged into Thomas & Betts in or about January 1, 1984.

132.    Thomas & Betts is a successor-in-interest to Ansley.

### Defendant Unisys Corporation

133.    Defendant Unisys Corporation ("Unisys") is a Delaware corporation with a principal place of business in Blue Bell, Pennsylvania.

134.    Sperry Corporation ("Sperry") used DeRewal Chemical to remove wastes from Sperry's Blue Bell, Pennsylvania, Utica, New York, and other facilities.

135.    Sperry's waste was disposed of at the Site.

136.    Sperry's waste contained Hazardous Substances.

137.    Sperry was merged into Burroughs Corporation. Burroughs Corporation thereafter changed its name to Unisys Corporation.

138.    Unisys is a successor-in-interest to Sperry.

### Defendant United States of America Department of Navy

139.    Defendant the United States of America, Department of Navy is an instrumentality of the United States Government with a base in Willow Grove, Pennsylvania.

140.    The Department of Navy, through the Naval Air Development Center, Warminster, Pennsylvania, used DeRewal Chemical to remove industrial waste.

141.    The Department of Navy's waste was disposed of at the Site.

142.    The Department of Navy's waste contained Hazardous Substances.

## COUNT I

### (CERCLA Section 113(f) Contribution)

143.    The allegations made in paragraphs 1 through 142 are incorporated by reference as if set forth here in full.

144.    Pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), any person may seek contribution from any other person who is liable or potentially liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

145.    Plaintiff is a "person" within the meaning of Sections 101(21) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9601(21) and 9613(f)(1).

146.    Each Defendant is a "person" within the meaning of Sections 101(21) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(21) and 9607(a).

147.    Defendants Advanced Environmental Technology Corporation, Globe Disposal Co., Inc., and Globe-Wastech, Inc. (the "Transporter Defendants") are persons who accepted Hazardous Substances for transport to the Site, having selected the Site as the disposal or treatment facility to which such Hazardous Substances would be transported, or are successors-in-interest to such persons, and are liable pursuant to Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

148.    Defendants AETC, Ashland, Carpenter Technology, Crown, Diaz; Emhart, fcg, Globe, Globe-Wastech, Inc. Handy & Harman Tube, Knoll, Knoll International, Merit Metal, Novartis, NRMC, Plymouth Tube, Quikline Design, Techalloy, Rahns, Rohm,

Simon Wrecking, Thomas & Betts, Unisys, and the United States of America Department of Navy (collectively, the "Generator/Arranger Defendants") are persons who by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of Hazardous Substances owned or possessed by them or by another party or entity, at the Site, or are successors-in-interest to such persons and are liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

149.    The total amount of the wastes transported to the Site by each of the Transporter Defendants was greater than 110 gallons of liquid or greater than 200 pounds of solid materials. None of such wastes were municipal solid waste as defined by CERCLA § 107.

150.    The total amount of the wastes for which the Generator/Arranger Defendants arranged and that were disposed of at the Site was greater than 110 gallons of liquid or greater than 200 pounds of solid materials. None of such wastes were municipal solid waste as defined by CERCLA § 107.

151.    Defendant Boarhead Corporation is liable under Sections 107(a)(1) and 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(1), 42 U.S.C. § 9607(a)(2) as the current owner of the Site, as the owner of the Site at the time of the disposal of Hazardous Substances, and as a person who operated the Site at the time of the disposal of Hazardous Substances.

152.    Pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), Plaintiff is entitled to contribution from Defendants for Response Costs incurred and for Future Response Costs to be incurred by Plaintiff in connection with the Site and to an allocation by the Court of the Response Costs and Future Responses Costs as between Plaintiff and Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE Plaintiff demands judgment in its favor against each of the Defendants, as follows:

(a)    Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for contribution to Plaintiff for Response Costs incurred thus far in connection with the Site and awarding damages to Plaintiff in that amount and for Future Response Costs to be incurred by Plaintiff in connection with the Site, together with interest thereon;

(b)    Allocating responsibility for the Response Costs and Future Response Costs as between Plaintiff and Defendants pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), using such equitable factors as the Court determines are appropriate;

(c)    Ordering Defendants to provide contribution to Plaintiff for Response Costs related to the Site incurred to date and for all Future Response Costs to be incurred in connection with the Site, together with interest thereon, computed in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

(d)    Ordering Defendants to pay Plaintiff its costs of this action, including reasonable attorneys fees; and

(e)    Granting Plaintiff such other, further, and different relief as the Court may deem just and appropriate.

## COUNT II

### (CERCLA Section 113(g)(2) Declaratory Judgment)

153.    The allegations made in paragraphs 1 through 152 are incorporated by reference as if set forth here in full.

154.    A controversy exists between Plaintiff and Defendants insofar as Plaintiff contends, and Defendants deny, that Defendants are liable under CERCLA for contribution for all necessary costs of response incurred and to be incurred by Plaintiff in connection with any response actions taken by Plaintiff at the Site.

155.    Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), Plaintiff requests entry of a declaratory judgment that holds Defendants liable for all necessary costs of response incurred and to be incurred in connection with any response action taken by Plaintiff at the Site, which judgment shall be binding in any subsequent action to recover further response costs or damages.

WHEREFORE Plaintiff demands judgment in its favor against each of the Defendants, as follows:

(a)    Entering a declaratory judgment on liability pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), in favor of Plaintiff and against Defendants, adjudging, decreeing, and declaring that Defendants are liable to Plaintiff for all Future Response Costs consistent with the NCP that Plaintiff may incur and for all damages that Plaintiff may suffer at or with respect to the Site, together with interest thereon, which judgment will be binding in any subsequent action or actions brought by Plaintiff against Defendants to recover Future Response Costs or damages.

## COUNT III

### (Cost Recovery Under the Pennsylvania Hazardous Sites Cleanup Act)

156.    The allegations made in paragraphs 1 through 155 are incorporated by reference as if set forth here in full.

157.    There has been a "release" at the Site within the meaning of Section 103 of HSCA, 35 PA. CONS. STAT. § 6020.103.

158.    Each Defendant is a "person" within the meaning of Section 103 of HSCA, 35 PA. CONS. STAT. § 6020.103.

159.    Plaintiff is a "person" as defined by Section 103 of HSCA, 35 PA. CONS. STAT. § 6020.103.

160.    Each Defendant is a person who has allowed a release and thereby caused a public nuisance pursuant to Section 1101 of HSCA, 35 PA. CONS. STAT. § 6020.1101.

161.    Plaintiff has incurred "reasonable and necessary or appropriate costs" responding to the release and threatened release of Hazardous Substances at the Site pursuant to Section 702 of HSCA, 35 PA. CONS. STAT. § 6020.702(a)(3).

162.    The Transporter Defendants are persons who accepted Hazardous Substances for transport to the Site, having selected the Site as the disposal or treatment facility to which such Hazardous Substances would be transported, or are successors-in-interest to such persons, and are liable to Plaintiff pursuant to Sections 701(a)(3) and 702(a)(3) of HSCA, 35 PA. CONS. STAT. §§ 6020.701(a)(3), 6020.702(a)(3).

163.    The Generator/Arranger Defendants are persons who by contract, agreement or otherwise, arranged for disposal or treatment, or transport for disposal or treatment of Hazardous Substances owned or possessed by them or by another party or entity, at the Site, or are successors-in-interest to such persons, and are liable to Plaintiff pursuant to Sections 701(a)(2) and 702(a)(3) of HSCA, 35 PA. CONS. STAT. §§ 6020.701(a)(2), 6020.702(a)(3).

164. Defendant Boarhead Corporation is liable to Plaintiff pursuant to Sections 701(a)(1) and 702(a)(3) of HSCA, 35 PA. CONS. STAT. §§ 6020.701(a)(1), 6020.70(a)(3), as a person who owns, owned and/or operated the Site at the time a Hazardous Substance was placed or came to be located on the Site and during the time of a release or threatened release.

165. Pursuant to Sections 701, 702(a)(3) and 1101 of HSCA, 35 PA. CONS. STAT. §§ 6020.701, 6020.702(a)(3), 6020.1101, Plaintiff is entitled to contribution from Defendants for Response Costs incurred and for Future Response Costs to be incurred by Plaintiff in connection with the Site and to an allocation by the Court of the Response Costs and Future Responses Costs as between Plaintiff and Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE Plaintiff demands judgment in its favor against each of the Defendants, as follows:

(a) Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 702(a)(3) of HSCA, 35 PA. CONS. STAT. § 6020.702(a)(3), for contribution to Plaintiff for Response Costs incurred thus far in connection with the Site and awarding damages to Plaintiff in that amount and for Future Response Costs to be incurred by Plaintiff in connection with the Site, together with interest thereon.

(b) Allocating responsibility for the Response Costs and Future Response Costs as between Plaintiff and Defendants using such equitable factors as the Court determines are appropriate;

(c) Ordering Defendants to provide contribution to Plaintiff for Response Costs related to the Site incurred to date and for all Future Response Costs to be

incurred in connection with the Site, together with interest thereon, computed in accordance with

Section 702(b) of HSCA, 35 PA. CONS. STAT. § 6020.702(b).

(d)    Ordering Defendants to pay Plaintiff its costs of this action,

including reasonable attorneys fees; and

(e)    Granting Plaintiff such other, further, and different relief as the

Court may deem just and appropriate.

Ballard Spahr Andrews & Ingersoll, LLP

Dated: September 18, 2003                     By: _____
                                                  Brian G. Glass, Esquire (#89405)
                                                  Glenn A. Harris, Esquire (#51222)
                                                  Plaza 1000, Suite 500, Main Street
                                                  Voorhees, New Jersey  08043
                                                  Phone:  (856) 761-3400

                                                  Attorneys for Plaintiff Boarhead Farm
                                                  Agreement Group

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Third

Amended Complaint to be served by postage prepaid first class mail to all counsel of record this

19th day of September, 2003.


Dated:  September 19, 2003

Brian Glass

EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BOARHEAD FARM AGREEMENT GROUP, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil Action No. 02-3830 |
| | : |
| ADVANCED ENVIRONMENTAL | : |
| TECHNOLOGY CORPORATION, ET AL., | : |
| | : |
| Defendants. | : |

**INTERROGATORIES (FIRST SET) OF**
**DEFENDANT TECHALLOY COMPANY, INC.**
**DIRECTED TO PLAINTIFF BOARHEAD FARM AGREEMENT GROUP**

Defendant Techalloy Company, Inc. ("Techalloy"), by its undersigned counsel,

hereby requests that Plaintiff Boarhead Farm Agreement Group, as defined below ("BFAG"),

answer the following Interrogatories within 30 days of service hereof, pursuant to Federal Rule

of Civil Procedure 33.

**DEFINITIONS and INSTRUCTIONS**

1.      The term **"BFAG"** or **"you"** or **"your"** means Plaintiff Boarhead Farm

Agreement Group, together with Agere Systems Inc., Cytec Industries, Inc., Ford Motor

Company, SPS Technologies, Inc., and TI Group Automotive Systems LLC (individually, a

BFAG member, and collectively the BFAG members), together with each BFAG member's

parents, affiliates, subsidiaries, divisions, predecessors, successors, assigns, present or former

officers, directors, employees, agents, representatives, attorneys, and all other persons acting, or

purporting to act, on behalf of BFAG and/or on behalf of each BFAG member.

7/16

2.     The term **"Site"** means the Boarhead Farms Superfund Site located in Bucks County, Pennsylvania.

3.     The term **"identify"** means (1) with respect to a person, to set forth the person's name, present or last known business and personal addresses and telephone numbers, and present or last known job title or position ; and (2) with respect to a document, to set forth the document type, date, author(s), recipient(s), and location.

4.     The term **"waste"** means any solid, liquid, semisolid, or contained gaseous material.

5.     Terms defined in CERCLA or HSCA are incorporated herein by reference.

6.     If you decline to answer all or part of an Interrogatory based upon a claimed privilege, please provide a Privilege Log containing all information upon which you rely in support of your position.

## INTERROGATORIES

1.     Regarding your allegation that waste from Defendant Techalloy Company, Inc. ("Techalloy") was disposed at the Boarhead Farms Site, please:

A.     State in detail all facts that support your contention;

B.     Identify all persons with relevant knowledge, summarizing the subjects and extent of each person's knowledge; and

C.     Identify all documents that support your contention.

2.    If you contend that Techalloy knew that DeRewal Chemical's handling of Techalloy's waste would result in the release of hazardous substances, or that Techalloy controlled DeRewal Chemical's handling or disposal of Techalloy's waste, please:

    A.    State in detail all facts that support your contention;

    B.    Identify all persons with relevant knowledge, summarizing the subjects and extent of each person's knowledge; and

    C.    Identify all documents that support your contention.

3.    For each of the entities or persons listed below, please state your position as to what "equitable share" of Site response costs you contend they should bear, describing the evidentiary basis for each of your positions and providing a full explanation of how you calculate or otherwise reach and support each of your positions.  (Note:  If each BFAG member shares the same positions, please so state, and provide one consolidated answer.  Otherwise, pursuant to the March 17, 2003 Stipulation, please provide all individual positions held by each BFAG member):

    A.    Techalloy;

B.    Each non-settled Defendant;

C.    Each settled Defendant;

D.    Each BFAG member;

E.    Every other entity or person that BFAG believes is a liable party under CERCLA or HSCA with respect to the Site.

4.    Do you contend that there is any "orphan share" liability associated with the Boarhead Farms Site, and if so, what is your position as to the portion of that orphan share liability, if any, that should be assigned or allocated to:

A.    Techalloy;

B.    Each non-settled Defendant;

C.    Each settled Defendant;

D.    Each BFAG member;

E.     Every other entity or person that BFAG believes is a liable party under CERCLA or HSCA with respect to the Site.

5.     Based upon documents, testimony, or any other information known to you, please identify every other location besides the Boarhead Farms Site where DeRewal Chemical disposed waste, or is alleged, believed, or suspected to have disposed waste, during the 1969 through 1977 period.  For each such location, please identify separately and with reasonable particularity the source(s) of your information.

6.     As to all past and future response costs for which you seek contribution, and for all other claimed damages, please describe in detail:

A.     Each separate item, element or category of response costs or other damages;

B.     The amount of each;

C.     The date(s) when incurred;

D.    The particular entity(ies) that incurred the costs or other damages;

E.    The contractors or other persons involved; and

F.    For any estimated response costs or other damages, including without limitation all future response costs or other damages, how each such estimate is calculated.

7.    Describe in detail all monetary recoveries, offsets, or other consideration obtained by you that directly or indirectly has or will reduce your net "out of pocket" costs or damages related to the Boarhead Farms Site, including without limitation any such recoveries, offsets, or other consideration obtained from:

A.    Each settled Defendant;

B.    Any insurers or other indemnitors;

C.    Any business expense deduction or other tax benefits; and

D.    Any other entities, persons, or sources whatsoever.

8.    With regard to any waste associated with BFAG members that was disposed at the Boarhead Farms Site, or is alleged, believed, or suspected to have been disposed at the Boarhead Farms Site, please:

A.    State in detail all facts related to such disposal, or any alleged, believed, or suspected disposal;

B.    Identify all persons with relevant knowledge, summarizing the subjects and extent of each person's knowledge; and

C.    Identify all documents related to such disposal, or any alleged, believed, or suspected disposal.

9.    To the extent not answered above, please describe in detail any known, alleged, believed, or suspected connection between waste associated with your facilities and the Boarhead Farms Site or any entities or persons associated with the Site.

10.    For each of your facilities known, alleged, believed, or suspected to have any connection to waste disposal at the Boarhead Farms Site, please:

      A.    State the address and years of operation;

      B.    Describe in detail all manufacturing operations and other activities;

      C.    Identify all categories and kinds of waste generated at and/or removed from each facility;

      D.    State as best you can the approximate annual volume or amount of each category and kind of waste generated at or removed from each facility;

      E.    Describe all hazardous substances and other chemical constituents contained in, or likely to have been contained in, each category and kind of waste; and

      F.    Describe how, by whom, how often, and where each category and kind of waste was disposed.

11.    For each of your facilities known, alleged, believed, or suspected to have any connection to waste disposal at the Boarhead Farms Site, please identify the following persons for the 1969 through 1977 period, including positions held and relevant years of employment:

    A.    The surviving person most knowledgeable regarding each facility's waste generation and disposal;

    B.    Plant management;

    C.    Production management;

    D.    Purchasing;

    E.    Waste treatment, storage or disposal;

    F.    Maintenance;

    G.    Hiring waste disposal services;

    H.    Accounting, including without limitation accounts payable and accounts receivable;

    I.    Security;

J.    Environmental affairs or environmental management;

K.    Worker Safety; and

L.    Any other surviving person who was employed or worked at each facility during the 1969 through 1977 period.

12.    To the extent not answered above, identify every other person:

A.    Likely to have discoverable information that BFAG and/or each constituent member of BFAG may use to support its claims; and

B.    Likely to have discoverable information regarding any waste associated with your facilities that was disposed, or is alleged, believed, or suspected to have been disposed, at the Boarhead Farms Site; and

C.    For each such person, summarize the subjects and extent of each person's knowledge.

July 16, 2004

Andrew P. Foster
Adina Dziuk
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA  19103

Counsel for Techalloy Company, Inc.

## CERTIFICATE OF SERVICE

I Andrew P. Foster, hereby certify that on this 16th day of July, 2004, I caused a true and

correct copy of the foregoing:

### INTERROGATORIES (FIRST SET) OF
### DEFENDANT TECHALLOY COMPANY, INC.
### DIRECTED TO PLAINTIFF BOARHEAD FARM AGREEMENT GROUP

to be served as indicated below:

### BY FIRST-CLASS MAIL:

### *Boarhead Farm Agreement Group*

Glenn A. Harris, Esquire
Ballard Spahr Andrews &
 Ingersoll, LLP
Plaza 1000 – Suite 500
Main Street
Voorhees, NJ  08043=4636
(856) 761-3440
(856) 761-9001 (Fax)
harrusg@ballardspahr.com

### *Advanced Environmental Technology Corp.*

Thomas W. Sabino, Esq.
Wolff & Samson
One Boland Drive
West Orange, New Jersey 07052
Phone:  (973) 740-0500
Fax:  (973) 740-1407
Email:  tsabino@wolffsamson.com

### *Ashland, Inc.*

Richard C. Biedrzycki, Esq.
Phelan, Pettit & Biedrzycki
Suite 1600
The North American Building, 121 South Broad Street
Philadelphia, Pennsylvania 19107
Phone:  (215) 546-0500
Fax:  (215) 546-9444
Email:  rbiedrzycki@pp-b.com

## Carpenter Technology Corporation

Lynn Wright, Esq.
Edwards & Angell
750 Lexington Avenue
New York, NY 10022
Phone: 212-756-0215
Fax: 888-325-9169
email: lwright@ealaw.com

## Crown Metro, Inc. and Emhart Industries, Inc.

Laura Ford Brust, Esq.
Jerome C. Muys, Jr., Esq.
Swidler Berlin Shereff Friedman, LLP
3000 K Street, N.W., Suite 300
Washington, DC 20007
Phone: 202-424-7500
Fax: 202-424-7643
e-mail: lfbrust@swidlaw.com

## Flexible Circuits

A. Nicole Friant, Esq.
Seth Cooley, Esq.
Duane Morris
One Liberty Place
Philadelphia, Pennsylvania 19103-7396
Phone: (215) 979-1818
Fax: (215) 979-1020
e-mail: anfriant@duanemorris.com

## Handy & Harman Tube Company

Melissa Flax, Esq.
Carella, Byrne, Bain, Gilfillian, Cecchi,
        Stewart & Olstein, P.C.
Five Becker Farm Road
Roseland, New Jersey 07068-1739
Phone: 973-994-1700
Fax: 973-994-1744
e-mail: mflax@carellabyrne.com

## Knoll Inc.

Richard Friedman, Esq.
McNees, Wallace & Nurick, LLC
P.O. Box 1166
100 Pine Street
Harrisburg, PA  17108-1166
Phone:  717-237-5469
Fax:  717-237-5300
e-mail:  rfriedman@mwn.com

## Merit Metals Products Corp.

Stephen P. Chawaga, Esq.
Monteverde, McAlee & Hurd
One Penn Center at Suburban Station
Suite 1500
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103-1815
Phone:  215-557-2900
Fax:  215-557-2990
e-mail:  schawaga@monteverde.com

## NRM Investment Co.

Edward Fackenthal, Esq.
Henderson, Weitherill, O'Hey & Horsey
902 One Montgomery Plaza
P.O. Box 751
Norristown, PA  19404
Phone:  610-279-3370
Fax:  610-279-0696
e-mail:  edwardfackenthal@cs.com

## Plymouth Tube Company

Steven J. Lemon, Esq.
Jones, Lemon, Graham & Chaney
28 North Bennett Street, Suite A
P.O. Box 805
Geneva, IL  60134-0805
Phone:  630-208-0805
Fax: 630-208-4651
e-mail:  stevenl@joneslemon.com

## *Quikline Design*

Sandford F. Schmidt, Esq.
Law Offices of Schmidt & Tomlinson
29 Union Street
Medford, NJ 08055
Phone: 609-714-0600
Fax: 609-714-0610
e-mail: lawschmidt@erols.com

## *Rohm and Haas Company*

Jennifer Berke Levin, Esq.
Rohm and Haas Company
100 Independence Mall West
Philadelphia, PA 19106-2349
Phone: 215-592-6838
Fax: 215-592-3227
e-mail: jlevin@rohmhaas.com

## *Simon Wrecking Co., Inc.*

Sharon Oras Morgan, Esq.
Mattleman Weinroth & Miller
Land Title Building, Suite 2226
Broad & Chestnut Streets
Philadelphia, PA 19110
Phone: 215-923-2225
Fax: 215-567-4151
email: smorgan@mwm-law.com

## *United States of America, Department of Navy*

Judith Keith, Esq.
U.S. Department of Justice
Environmental & Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
Phone: 202-514-3747
Fax: 202-514-8865
e-mail: judith.keith@usdoj.com

*Overnight Mail:*
601 D. Street NW
Suite 8000
Washington, DC 20004

Andrew J. Foster

15

**EXHIBIT "C"**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BOARHEAD FARM AGREEMENT GROUP, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 02-3830 |
| | : | |
| ADVANCED ENVIRONMENTAL | : | |
| TECHNOLOGY CORPORATION, ET. AL. | : | |
| | : | |
| Defendants. | : | |

**OBJECTIONS AND RESPONSES OF BOARHEAD FARM AGREEMENT GROUP TO
INTERROGATORIES (FIRST SET) OF DEFENDANT TECHALLOY COMPANY, INC.**

Plaintiff Boarhead Farm Agreement Group ("Plaintiff"), by its undersigned

attorney, objects and responds to Interrogatories (First Set) of Defendant Techalloy Company,

Inc. ("Initial Interrogatories"), as follows:

**I.    GENERAL OBJECTIONS**

1.    Plaintiff objects to each interrogatory to the extent that it seeks information not in

Plaintiff's possession, custody or control.

2.    Plaintiff objects to each interrogatory to the extent that it seeks information already in

the possession, custody or control of Techalloy Corporation, Inc.

3.    Plaintiff objects to each interrogatory to the extent that it seeks information which is

publicly available and, thus, to which Techalloy Corporation, Inc. has the same access as

Plaintiff.

4.    Plaintiff objects to each interrogatory to the extent that it seeks information protected

by the attorney-client privilege or any other applicable privilege.  Any inadvertent disclosure of

privileged information shall not constitute a waiver of the attorney-client or any other applicable privilege.

5. Plaintiff objects to each interrogatory to the extent that it seeks the discovery of the mental impressions, conclusions, opinions or legal theories of its attorneys or other representatives. Any inadvertent disclosure of work product shall not constitute a waiver of any work product protection.

6. Plaintiff objects to each interrogatory to the extent that it is unlimited in time or scope.

7. Plaintiff objects to each interrogatory to the extent that it is unduly burdensome or designed to be harassing.

8. Plaintiff objects to each interrogatory to the extent that it is vague or ambiguous.

## II.   INTERROGATORIES AND RESPONSES

Subject to and without waiving the foregoing General Objections, Plaintiff makes the following responses to the Initial Interrogatories:

1.   Regarding your allegation that waste from Defendant Techalloy Company, Inc. ("Techalloy") was disposed at the Boarhead Farms Site, please:

> A.   State in detail all facts that support your contention;
>
> B.   Identify all persons with relevant knowledge, summarizing the subjects and extent of each person's knowledge; and
>
> C.   Identify all documents that support your contention.

**RESPONSE:  Plaintiff objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature.  *See B. Braun Medical, Inc. v. Abbott Laboratories,* 155 F.R.D. 525, 527 (E.D. Pa. 1994).  Subject and without waiving the foregoing objection, Plaintiff responds that in 1991, Rahns Specialty Metals, Inc. ("RSM") acquired the**

property, premises and environmental liability associated with the Techalloy facility. The factual basis for Plaintiffs claims against Techalloy in the complaint, and the identities of persons with knowledge of those facts, are contained in the deposition testimony that has been elicited in this case and the documents comprising the nexus files for RSM/Techalloy located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

By way of further response, Plaintiff refers Techalloy to the following documents: a July 14, 1972 DeRewal Chemical Company ("DCC") sales quotation letter to Techalloy; an August 10, 1972 DCC invoice to Techalloy; an October 10, 1972 Techalloy letter to Pennsylvania Department of Environmental Protection referencing the fact that DCC was hauling Techalloy's spent acids; a November 27, 1972 DCC sales quotation letter which references DCC's agreement with Techalloy to remove "stainless steel pickles liquor waste"; and time cards for DCC drivers indicating that DCC hauled waste from Techalloy. In addition, Plaintiff refers RSM to the deposition testimony that has been elicited in this case including, but not limited to, the following testimony: the May 7, 2003 (146:5-147:25) and May 12, 2003 (129:11-132:21) deposition testimony of Manfred DeRewal, Jr.; the June 16, 2003 (13:15-16:23; 23:12-23:17; 26:19-26-24; 32:24-34:14; 35:16-36:7; 38:6-39:13) deposition testimony of Bruce DeRewal; the July 30, 2003 (41:11-46:9; 51:2-51:23;59:18-60:865:20-66:17) deposition testimony of John C. Bean; the July 28, 2003 (20:8-22:16; 60:24-64:9; 72:25-73:5) deposition testimony of June Stevens; the July 30, 2003 (35:19-37:1) deposition testimony of Karen Porter; and all of the other deposition testimony concerning DCC's disposal of waste at the Site. Together the above-referenced documents and

testimony establish that RSM/Techalloy contracted with DCC to remove waste from

RSM/Techalloy facility and that this waste was disposed of at the Boarhead Farm Site.

2.    If you contend that Techalloy knew that DeRewal Chemical's handling of
Techalloy's waste would result in the release of hazardous substances, or that Techalloy
controlled DeRewal Chemical's handling or disposal of Techalloy's waste, please:

      A.    State in detail all facts that support your contention;

      B.    Identify all persons with relevant knowledge, summarizing the subjects
           and extent of each person's knowledge; and

      C.    Identify all documents that support your contention.

**RESPONSE:  Plaintiff objects to this interrogatory insofar as it constitutes a contention**

**interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully**

**developed and, as such, is premature.** *See B. Braun Medical, Inc. v. Abbott Laboratories,*

**155 F.R.D. 525, 527 (E.D. Pa. 1994).**

3.    For each of the entities or persons listed below, please state your position as to
what "equitable share" of Site response costs you contend they should bear, describing the
evidentiary basis for each of your positions and providing a full explanation of how you calculate
or otherwise reach and support each of your positions. (Note: If each BFAG member shares the
same positions, please so state, and provide one consolidated answer. Otherwise, pursuant to the
March 17, 2003 Stipulation, please provide all individual positions held by each BFAG
member):

      A.    Techalloy;

      B.    Each non-settled Defendant;

      C.    Each settled Defendant;

      D.    Each BFAG member;

      E.    Every other entity or person that BFAG believes is a liable party under
           CERCLA or HSCA with respect to the Site.

**RESPONSE:  Plaintiff objects to this interrogatory insofar as it constitutes a contention**

**interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully**

developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155

F.R.D. 525, 527 (E.D. Pa. 1994).

    4.    Do you contend that there is any "orphan share" liability associated with the Boarhead Farms Site, and if so, what is your position as to the portion of that orphan share liability, if any, that should be assigned or allocated to:

        A.    Techalloy;

        B.    Each non-settled Defendant;

        C.    Each settled Defendant;

        D.    Each BFAG member;

        E.    Every other entity or person that BFAG believes is a liable party under CERCLA or HSCA with respect to the Site.

**RESPONSE:** **Plaintiff objects to this interrogatory insofar as it constitutes a contention**

**interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully**

**developed and, as such, is premature.** ***See B.Braun Medical, Inc. v. Abbott Laboratories*, 155**

**F.R.D. 525, 527 (E.D. Pa. 1994).**

    5.    Based upon documents, testimony, or any other information known to you, please identify every other location besides the Boarhead Farms Site where DeRewal Chemical disposed waste, or is alleged, believed, or suspected to have disposed waste, during the 1969 through 1977 period. For each such location, please identify separately and with reasonable particularity the source(s) of your information.

**RESPONSE:** **Plaintiff further objects that this interrogatory seeks information and**

**documents protected by the work product doctrine. By way of further objection, the only**

**non-privileged responsive information "known" to it is "known" through a review and**

**analysis of the documents located in the Boarhead Document Repository at the Offices of**

**Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103 and**

**refers defendant to the same. By way of further response, David F. Michelman, Esquire,**

**2207 Chestnut St., Philadelphia, PA 19103, (215) 557-9440 and Thomas Healey, City of**

**Philadelphia, (215) 592-6233 have knowledge of the creation of the July 5, 1978 letter to**

**Manfred DeRewal from the Philadelphia Water Department alleging DCC disposal of**

**wastes at the Wissinoming Industrial Park.**

6.    As to all past and future response costs for which you seek contribution, and for all other claimed damages, please describe in detail:

            A.    Each separate item, element or category of response costs or other damages;

            B.    The amount of each;

            C.    The date(s) when incurred;

            D.    The particular entity(ies) that incurred the costs or other damages;

            E.    The contractors or other persons involved; and

            F.    For any estimated response costs or other damages, including without limitation all future response costs or other damages, how each such estimate is calculated.

**RESPONSE:  Plaintiff further objects that, with respect to future response costs, it is**

**seeking a declaration of each defendant's equitable share of all necessary costs of response**

**as incurred in the future by it consistent with the national contingency plan, and not a**

**money judgment for any estimate of such costs.  To the extent this interrogatory seeks**

**plaintiff's current estimates of such costs or information and documents related to such**

**estimates, it seeks information that is neither relevant nor will lead to the discovery of**

**admissible evidence.  Without waiving any such objections, pursuant to Fed. R. Civ. P.**

**33(d), the information sought in this interrogatory about response costs incurred to date by**

**Plaintiff can be derived or ascertained from schedules of such costs and invoices reflected**

**on those schedules, all of which are located in the Boarhead Document Repository at the**

**Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA**

**19103.**

7.    Describe in detail all monetary recoveries, offsets, or other consideration obtained by you that directly or indirectly has or will reduce your net "out of pocket" costs or damages related to the Boarhead Farms Site, including without limitation any such recoveries, offsets, or other consideration obtained from:

      A.    Each settled Defendant;

      B.    Any insurers or other indemnitors;

      C.    Any business expense deduction or other tax benefits; and

      D.    Any other entities, persons, or sources whatsoever.

**RESPONSE: Plaintiff further objects that the phrase "that directly or indirectly has or will reduce your net 'out of pocket' costs or damages" is vague, confusing, and ambiguous. By way of further objection, this interrogatory seeks information that is neither relevant nor will lead to the discovery of admissible evidence.**

8.    With regard to any waste associated with BFAG members that was disposed at the Boarhead Farms Site, or is alleged, believed, or suspected to have been disposed at the Boarhead Farms Site, please:

      A.    State in detail all facts related to such disposal, or any alleged, believed, or suspected disposal;

      B.    Identify all persons with relevant knowledge, summarizing the subjects and extent of each person's knowledge; and

      C.    Identify all documents related to such disposal, or any alleged, believed, or suspected disposal.

**RESPONSE: Plaintiff objects that there is no allegation in any pleading in this action that any waste generated by any specific BFAG member facility was disposed of at the Site. By way of further objection, each of Plaintiff's members is unable to state who might believe or suspect that waste generated at any of its facilities was disposed of at the Site. Without waiving any such objections, Plaintiff responds as follows:**

### With respect to TI Group's former Malvern Plant:

A.     **TI Group is aware of no facts related to any disposal, or any alleged, believed, or suspected disposal at the Site other than testimony in this matter.**

B.     **TI Group is aware of no persons with relevant knowledge, other than as set forth in testimony in this matter, however, with respect to the Malvern Plant, without admitting that any of TI Group's waste was disposed of at the Site, and without admitting or adopting the truth of the statements therein, *see* EPA interview summaries located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.**

C.     **TI Group is aware of no documents related to any disposal, or any alleged, believed, or suspected disposal at the Site.**

## With respect to Agere's Pennsylvania Facility and North Carolina Works:

A.     **Agere is aware of no facts related to any disposal, or any alleged, believed, or suspected disposal at the Site, other than testimony in this matter.**

B.     **Agere is aware of no persons with relevant knowledge, other than as set forth in testimony in this matter, however, with respect to the Pennsylvania facility, reference is made to Lucent Technologies' May 9, 1997 response to U.S. EPA's March 19, 1997 CERCLA 104(e) Information Request, specifically Response 3; with respect to the North Carolina Works, reference is made to AT&T Technologies' February 1, 1996 Response to US EPA's December 5, 1995 CERCLA 104(e) Information Request, specifically Response No. 10.**

C.     **Agere is aware of no documents related to any disposal, or any alleged, believed, or suspected disposal at the Site.**

## With respect to SPS's Jenkintown Facility:

A.    SPS is aware of no facts related to any disposal, or any alleged, believed, or suspected disposal at the Site, other than testimony in this matter.

B.    SPS is aware of no persons with relevant knowledge, other than as set forth in testimony in this matter, however, reference is made to SPS's November 3, 1992 response to U.S. EPA's September 30, 1992 CERCLA 104(e) Information Request, specifically, Response No. 6, located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

C.    SPS is aware of no documents related to any disposal, or any alleged, believed, or suspected disposal at the Site.

## With respect to Cytec's Boundbrook Plant:

A.    Cytec is aware of no facts related to any disposal, or any alleged, believed, or suspected disposal at the Site other than testimony in this matter.

B.    Cytec is aware of no persons with relevant knowledge, other than as set forth in testimony in this matter, however, with respect to the Bound Brook Plant, *see* Cyanamid's July 2, 1993 response to U.S. EPA's May 26, 1993 CERCLA 104(e) Information Request, specifically Response No. 8. *See also* Cyanamid's July 13, 1988 response to U.S. EPA's June 10, 1988 CERCLA 104(e) Information Request, specifically, Response No. 1.

C.    Cytec is aware of no documents related to any disposal, or any alleged, believed, or suspected disposal at the Site. *See* Cyanamid's July 13, 1988 response to U.S. EPA's June 10, 1988 CERCLA 104(e) Information Request, specifically, Response No. 7.

## With respect to Ford's Watsontown Plant and Plant 50 Facility:

A.    Ford Motor Company is aware of no facts related to any disposal, or any alleged, believed, or suspected disposal at the Site, other than testimony in this matter and records of drum removal activities.

B.    Ford Motor Company is aware of no persons with relevant knowledge, other than as set forth in testimony in this matter, however, *see* Ford Motor Company's November 24 1992 response to U.S. EPA's September 30, 1992 Information Request, located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

C.    Ford Motor Company is aware of no documents related to any disposal, or any alleged, believed, or suspected disposal at the Site. Ford is a member of the Plaintiff group and a signatory to the referenced Consent Decrees based on potential contractual liability to the arguable successors to Ford's former subsidiary, Philco-Ford Corporation. Ford does not, however, retain corporate records of Philco-Ford, nor does it have any ownership or control over the arguable successors to Philco-Ford. Ford's former subsidiary, Philco-Ford, operated the Watsontown and Plant 50 facilities during the relevant time period. Those facilities were both divested, however, by Philco-Ford, in the early-to-mid 70's. (Watsontown was sold to Zenith in 1974 and Plant 50 was donated to a nonprofit corporation in 1972.)

In 1975, following the divestitures of those facilities, Philco-Ford's name was changed to Aeronutronic Ford Corporation. In 1976, the name again was changed, to Ford Aerospace and Communications Corporation ("FACC"). In approximately 1982, a newly formed subsidiary of Ford, named Ford Electronics and Refrigeration Corporation ("FERCO"), received the assets and liabilities of FACC, other than those associated with

aerospace and communications (i.e., FERCO essentially received what was left of the automotive components business -- the consumer products operations already had been sold in the 1970s). In 1990, Ford Aerospace Corporation ("FAC") was formed, and FACC was merged into FAC. Later in 1990, all of the assets and liabilities of FAC were sold to Loral Aerospace Corporation, except for the Space Systems Division. The day following the asset sale, Ford sold the stock of FAC to Loral Space Systems, Inc., which merged with FAC and was renamed Space Systems/Loral, Inc. Subsequently, FERCO's name was changed to Ford Electronics and Refrigeration LLC, and it later was conveyed to Visteon Corporation (formerly "Visteon Automotive Systems, an enterprise of Ford Motor Company") as part of the spin-off of Visteon by Ford.

In connection with an unrelated inquiry in 1983, a FERCO employee notified Ford that all of the former Philco-Ford's corporate records, except those with respect to its Lansdale facility (not involved in this matter), were reviewed and disposed in 1983 prior to sale of the former Philco-Ford corporate headquarters in Willow Grove, Pennsylvania. In response to various EPA Section 104(e)information requests in the 1990's, Ford interviewed several FERCO (former Philco-Ford) employees who, although they had not worked at Watsontown or Plant 50, were able to provide some information in response to the information requests. *See* Ford Motor Company's November 24 1992 response to U.S. EPA's September 30, 1992 Information Request, located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

9.      To the extent not answered above, please describe in detail any known, alleged, believed, or suspected connection between waste associated with your facilities and the Boarhead Farms Site or any entities or persons associated with the Site.

**RESPONSE:** *See* **response to Techalloy Interrogatory No. 8.  By way of further objection,**

**there is no allegation in any pleading in this action that there is a "connection between**

**waste associated with your facilities and the Boarhead Farms Site or any entities or persons**

**associated with the Site" and that the quoted phrase is vague, confusing, and ambiguous.**

**By way of further objection, Plaintiff is unable to state who might believe or suspect any**

**such connection, other than as set forth in testimony in this matter.**

10.    For each of your facilities known, alleged, believed, or suspected to have any
connection to waste disposal at the Boarhead Farms Site, please:

> A.    State the address and years of operation;
>
> B.    Describe in detail all manufacturing operations and other activities;
>
> C.    Identify all categories and kinds of waste generated at and/or removed
> from each facility;
>
> D.    State as best you can the approximate annual volume or amount of each
> category and kind of waste generated at or removed from each facility;
>
> E.    Describe all hazardous substances and other chemical constituents
> contained in, or likely to have been contained in, each category and kind
> of waste; and
>
> F.    Describe how, by whom, how often, and where each category and kind of
> waste was disposed.

**RESPONSE:** *See* **response to Techalloy Interrogatory No. 9.  Without waiving any such**

**objections, Plaintiff responds as follows:**

> **With respect to TI Group's former Malvern Plant:**
>
> A.    **The address of the Malvern Plant was Morehall Road, Malvern,**

**Pennsylvania 19355.**

> B.    **The Malvern Plant manufactured steel and steel coils.**
>
> C.    **Without admitting that any of TI Group's waste was disposed of at**

**the Site, and without admitting or adopting the truth of the statements therein,** *see* **EPA**

interview summaries located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

   D. *See* response to C above.

   E. *See* response to C above.

   F. *See* response to C above.

   <u>With respect to Agere's Pennsylvania Facility and North Carolina Works:</u>

   A. The address of the North Carolina Works was Western Electric Company, Inc., Lexington Road, Winston-Salem, North Carolina. The North Carolina Works closed in 1976. The address of the Pennsylvania Facility is: (1) 555 Union Boulevard, Allentown, Pennsylvania 18103. The Pennsylvania Facility was opened in 1948 under the name of Western Electric Co, Inc.

   B. The Pennsylvania Facility manufactured semi-conductors, thin film circuits, integrated circuits, ferrite devices, electron tubes, sealed contacts, and hybrid integrated circuits. The North Carolina Works manufactured rigid and flexible printed wiring boards, precision manufactured parts, crystal filers, Electronic Switching System card writers and cables, military equipment, and printed waveguide devices.

   C. Agere believes the Pennsylvania Facility generated: Copper Nitrate; copper sulfate; mixed chemicals; chlorinated solvents—trichloroethylene, flammable solvent—acetone, alcohol, toluene, methanol; industrial waste treatment plant sludge, J-100 photo-resistant stripper and photoresist; waste acid-nitric acid; hydrofluoric acid. Agere believes the North Carolina Works generated: flux and flux thinner; waste chlorinated solvents; used oils; liquid spent ammonium persulfate etchant; electroless copper solution; and cleaners/cleaner conditioners.

      **D.**     Without admitting that any of Agere's waste was disposed at the Site, Agere believes that approximately 100,000 pounds of copper salt (solid) was hauled by Revere from the North Carolina Works to Englewood Cliffs, New Jersey or Frenchtown, New Jersey. *See* Lucent Technologies' May 29, 1997 supplemental response to U.S. EPA's March 19, 1997 CERCLA 104(e) Information Request. *See* AT&T Technologies' February 1, 1996 Response to US EPA's December 5, 1995 CERCLA 104(e) Information Request. With respect to the Pennsylvania Facility, *see* Lucent Technologies' May 29, 1997 supplemental response to U.S. EPA's March 19, 1997 CERCLA 104(e) Information Request. With respect to the North Carolina Works, *see* AT&T Technologies' February 1, 1996 Response to US EPA's December 5, 1995 CERCLA 104(e) Information Request.

      **E.**     *See* response to C above.

      **F.**     At the Pennsylvania Facility, copper nitrate and copper sulfate were collected in plastic lined thirty (30) gallon drums. Waste treatment plant sludge was transported by truck in 20 cubic yard roll off containers. An onsite industrial wastewater treatment plant neutralized acid/alkali, reduced chrome and destroyed cyanide. The effluent was then discharged to a sanitary sewer or stream under the control of local, state and federal authorities. *See also* Response to D above.

      At the North Carolina Works, a recovery system generated ammoniated copper salts, a dry salt, from ammonium persulfate, which was used in the production of printed circuit boards. These copper salts were sold as a product to Sylvan Chemical Corporation. Prior to 1973, any other wastes generated by the North Carolina Works were segregated and stored in fifty-five (55) gallon drums in a storage yard. After 1973, some wastes were stored in large storage tanks designed for this storage. Waste

transporters would remove the wastes from the tanks and drums and place the wastes into tank trucks for removal. *See also* Response to D above.

<u>With respect to SPS's Jenkintown Facility:</u>

A.      The address of the Jenkintown Facility is 301 Highland Avenue, Jenkintown, Pennsylvania 19046, and has been in continuous operation since 1920.

B.      The Jenkintown Facility manufactured precision fasteners and precision metal products. This involves forging, machining, grinding, rolling, heat treating and plating metal parts. BFAG will make available for inspection and copying the 1969 Open House Plant layout and Description of the SPS facility.

C.      Without admitting that any waste was disposed at the Site, wastes and by-products produced by the Jenkintown Facility included scrap metal, empty steel drums, waste oils, grinding sludge, general plant trash, plating waste water from the plating process, waste degreaser fluid, waste cetyl alcohol, and plating waste (e.g. chromic aid). *See* SPS's February 5, 1996 response to U.S. EPA's November 8, 1995 CERCLA 104(e) Information Request, specifically, Response No. 2, located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103, which supplements SPS's November 3, 1992 response to U.S. EPA's September 30, 1992 CERCLA 104(e) Information Request, specifically, Response No. 2, also located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

D.      Without admitting that any waste was disposed at the Site, SPS believes that approximately 221 waste drums were removed in 1970 during four (4) separate pick ups from the Jenkintown Facility, 197 waste drums were removed in 1971

during three (3) separate pick ups from the Jenkintown Facility, and 224 waste drums were removed in 1972 during four (4) separate pick ups from the Jenkintown Facility. In 1973, 318 waste drums were removed during five (5) separate pick ups from the Jenkintown Facility, and 1,000 bulk gallons from SPS in five (5) separate drum related pick-ups, 224 waste drums were removed in 1974 during four (4) separate pick ups from the Jenkintown Facility. Available records for 1975 and 1976 establish that 66 waste drums were picked up in 1976, and 118 waste drums were picked up in 1977 from the Jenkintown Facility. *See* SPS's November 3, 1992 response to U.S. EPA's September 30, 1992 CERCLA 104(e) Information Request, specifically, Appendix A and Appendix B, located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103. *See also* SPS's June 23, 1988 response to U.S. EPA's June 10, 1988 CERCLA 104(e) Information Request, specifically, Appendix E, also located in the Boarhead Document Repository.

E.     *See* response to C above.

F.     *See* response to D above. The Jenkintown Facility was a customer of Marvin Jonas through 1972. From 1973 through February of 1977, The Jenkintown Facility did business with the DeRewal Chemical Company.

### With respect to Cytec's Boundbrook Plant:

A.     The address of the Bound Brook Plant was American Cyanamid Company, West Main Street, Bound Brook, New Jersey.

B.     The Bound Brook Plant manufactured dyes, pigments, rubber chemicals, elastomers, organic intermediates, and bulk pharmaceuticals.

C.    Cytec believes the Bound Brook Plan produced the following waste streams: spent waste acid, consisting mostly of sulfuric acid and nitric acid; ammonia; diphenylamine tars; Mercaptio Benzo Thiazole; Sulfur Mercaptain; alkaline ammonia; and isoprophanol. *See also* Cyanamid's April 28, 1994 response to U.S. EPA's March 11, 1994 CERCLA 104(e) Information Request, specifically Response Nos. 1, 2, 3, and 4.

D.    *See* Cyanamid's April 28, 1994 response to U.S. EPA's March 11, 1994 CERCLA 104(e) Information Request, specifically Attachment No. 5.

E.    *See* response to C above.

F.    The majority of the by-products and wastes generated at the Bound Brook Plant were treated in the plant's wastewater treatment system. What could not be treated was shipped off site for treatment and disposal. *See* Cyanamid's April 28, 1994 response to U.S. EPA's March 11, 1994 CERCLA 104(e) Information Request, specifically Attachment No. 4.

<u>With respect to Ford's Watsontown Plant and Plant 50 Facility:</u>

A.    The address of the Watsontown Plant was 601 Liberty Street, Watsontown, Pennsylvania. Ford Motor Company believes the Watsontown Plant operated from before 1970 through 1974. The address of Plant 50 was 4700 Wissahickon Avenue, Philadelphia, Pennsylvania. Ford Motor Company believes Plant 50 operated from before 1970 through 1972.

B.    Ford Motor Company believes the Watsontown Plant manufactured cabinets for televisions and console phonographs, and assembly of stereo phonographs. Ford Motor Company believes Plant 50 manufactured weaponry, such as sidewinder missiles, for the United States Government.

C.    Ford Motor Company is not ware of any documents or information regarding the nature or quantity of by-products and wastes produced at either the Watsontown Plant or Plant 50, or any processes that generated any by-product or waste. Ford Motor Company believes that wood finishes, shellacs, wood glues, and hide glues were used in the manufacturing process at the Watsontown Plant. The Watsontown Plant also did certain development work in high density foam, possibly urethane manufactured by PPG Industries. Ford Motor Company believes the waste or by-products that may have been produced at either Watsontown Plant or Plant 50 include waste finishing materials and industrial waste solution.

D.    Without admitting any waste was disposed of at the Site, Ford Motor Company believes that approximately one hundred and eighty-four (184) fifty-five (55) gallon drums, or 10,120 gallons of waste finishing material, was removed by DeRewal Chemical Company from the Watsontown Plant. Without admitting any waste was disposed of at the Site, Ford Motor Company believes that approximately thirty-two (32) fifty-five (55) gallon drums, or 1760 gallons of industrial waste solution was removed by DeRewal Chemical Company from Plant 50. *See* U.S. EPA's September 30, 1992 Information Request.

E.    *See* response to C above.

F.    *See* response to D above.

11.    For each of your facilities known, alleged, believed, or suspected to have any connection to waste disposal at the Boarhead Farms Site, please identify the following persons for the 1969 through 1977 period, including positions held and relevant years of employment:

A.    The surviving person most knowledgeable regarding each facility's waste generation and disposal;

B.    Plant management;

18

C.      Production management;

D.      Purchasing;

E.      Waste treatment, storage or disposal;

F.      Maintenance;

G.      Hiring waste disposal services;

H.      Accounting, including without limitation accounts payable and accounts
        receivable;

I.      Security;

J.      Environmental affairs or environmental management;

K.      Worker Safety; and

L.      Any other surviving person who was employed or worked at each facility
        during the 1969 through 1977 period.

**RESPONSE:** *See* **response to Techalloy Interrogatory No. 8(B). Without waiving any such objections, Plaintiff responds as follows:**

**With respect to Agere's Pennsylvania Facility and North Carolina Works:**

*See* **Lucent Technologies' May 9, 1997 response to U.S. EPA's March 19, 1997 CERCLA 104(e) Information Request, specifically Response 3; with respect to the North Carolina Works, reference is made to AT&T Technologies' February 1, 1996 Response to US EPA's December 5, 1995 CERCLA 104(e) Information Request, specifically Response No. 10.**

**By way of further response, BFAG will make available for inspection and copying a list of all surviving employees of the Pennsylvania Facility and the North Carolina Works.**

**With respect to SPS's Jenkintown Facility:**

E.      George Bateman, an engineer in the Jenkintown Facility Engineering Department, was involved in the selection of chemical waste removal contractors. SPS's November 3, 1992 response to U.S. EPA's September 30, 1992 CERCLA 104(e) Information Request, specifically, Response No. 5.

F.      George Kalman, Manager, Plant Facilities, from April 3, 1967 to March 1, 1980.

Walt Wendler, Manager, Plant Maintenance, from April 3, 1967 to March 5, 1979.

G.      William Rambo was responsible for day-to-day arrangements with outside contractors for waste-removal for offsite disposal. *See* SPS's November 3, 1992 response to U.S. EPA's September 30, 1992 CERCLA 104(e) Information Request, specifically, Response No. 7.

L.      Jack Snyder, maintenance worker, responsible for supervising the pick-up of chemical waste at the Jenkintown Facility. *See* SPS's November 3, 1992 response to U.S. EPA's September 30, 1992 CERCLA 104(e) Information Request, specifically, Response No. 7.

Floyd Dinkens, maintenance worker, responsible for supervising the pick-up of chemical waste at the Jenkintown Facility. *See* SPS's November 3, 1992 response to U.S. EPA's September 30, 1992 CERCLA 104(e) Information Request, specifically, Response No. 7. *See also* SPS's February 5, 1996 response to U.S. EPA's November 8, 1995 CERCLA 104(e) Information Request. specifically Response No. 9.

Charles A. Thomas.  *See* SPS's February 5, 1996 response to U.S. EPA's November 8, 1995 CERCLA 104(e) Information Request, specifically Response No. 9.

By way of further response, BFAG will make available for inspection and copying a list of employees at the SPS facility between 1969 and 1997.

## With respect to Cytec's Boundbrook Plant:

*See* Cyanamid's July 2, 1993 response to U.S. EPA's May 26, 1993 CERCLA 104(e) Information Request, specifically Response No. 8.  Cyanamid responds further as follows with respect to the Bound Brook Plant:

J.     Sidney Frankel, former Manager, Environmental Department.

Norma Weston, Senior Environmental Specialist, American Cyanamid Company.

## With respect to Ford's Watsontown Plant and Plant 50 Facility:

B.     Jerry Nunn (former Plant Manager)

H.     Stu Finkler (former Plant Controller)

12.     To the extent not answered above, identify every other person:

    A.     Likely to have discoverable information that BFAG and/or each constituent member of BFAG may use to support its claims; and

    B.     Likely to have discoverable information regarding any waste associated with your facilities that was disposed, or is alleged, believed, or suspected to have been disposed, at the Boarhead Farms Site; and

    C.     For each such person, summarize the subjects and extent of each person's knowledge.

**RESPONSE:** **Plaintiff objects that there is no allegation in any pleading in this action that any waste generated by any specific BFAG member facility was disposed of at the Site. By way of further objection, Plaintiff is unable to state who might believe or suspect that waste generated at any of its facilities was disposed of at the Site other than as set forth in testimony in this matter. Without waiving any such objections,** *see* **depositions of Site Witnesses taken in this action.**

AS TO OBJECTIONS

Dated: 09/14/04

_____

Glenn Harris, Esquire
Attorney I.D. No. 51222
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
Plaza 1000
Suite 500
Voorhees, NJ 08043-4636