# E X H I B I T  B

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
### REGION III

IN THE MATTER OF    :

BOARHEAD FARMS    :
SUPERFUND SITE     :

            :
CYTEC INDUSTRIES, INC.  :
FORD MOTOR COMPANY  :
SPS TECHNOLOGIES, INC.  :

            :

Respondents      :

            :
Proceeding Under Sections 106 :
and 122(a) of the Comprehensive :
Environmental Response, Compen- :
sation, and Liability Act of  :
1980, as amended, 42 U.S.C.  :
§§ 9606 and 9622(a).     :
            :

I ┣ ·
Within : ·        ·      · the
of the ori-g-nal _ACC_ ce _12D_ copy
filed in this matter.

_Sarah P. Keating_
Attorney for
_EPA_

**EPA Docket No.**

**III-2000-002-DC**

## ADMINISTRATIVE ORDER ON CONSENT FOR REMEDIAL DESIGN

   The Parties to this Administrative Order on Consent ["Consent Order"], Cytec Industries, Inc., Ford Motor Company, and SPS Technologies, Inc., ["Respondents"] and the United States Environmental Protection Agency ["EPA"], have agreed to the entry of this Consent Order, and the Respondents agree to undertake all actions required by this Consent Order pursuant to the terms and conditions of this Consent Order, including any attachments hereto.

### I. GENERAL PROVISIONS

1.1 This Consent Order is issued pursuant to the authority vested in the President of the United States by Sections 106 and 122(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ["CERCLA"], 42 U.S.C. §§ 9606 and 9622(a); delegated to the Administrator of EPA by Executive Order No. 12580 [52 Fed. Reg. 2926 (January 29, 1987)]; and further delegated to the Regional Administrators of EPA by EPA Delegation Nos. 14-14-A and 14-14-C.

1.2 The Respondents consent to and will not contest EPA jurisdiction to issue and/or enforce this Consent Order.

1.3     On November 18, 1998, EPA issued a Record of Decision ["ROD"] selecting remedial action for implementation at the Boarhead Farms Superfund Site in Bucks County, Pennsylvania ["Site"]. All findings, conclusions and determinations supporting the legal requirements for issuance of this Consent Order under Section 106 of CERCLA, 42 U.S.C. § 9606, are set forth in the ROD. Issuance of this Consent Order is practicable and in the public interest within the meaning of Section 122(a) of CERCLA, 42 U.S.C. § 9622(a).

1.4     The actions required by this Consent Order are necessary to protect the public health and welfare and the environment.

1.5     All activities undertaken by Respondents pursuant to this Consent Order shall be performed in accordance with the requirements of all applicable Federal and State laws and regulations. Respondents must also comply with all applicable or relevant and appropriate requirements of all Federal and State environmental laws as set forth in the ROD. EPA has determined that activities conducted pursuant to this Consent Order and approved by EPA shall be considered to be consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ["NCP"], 40 C.F.R. Part 300.

1.6     Respondents are jointly and severally responsible for carrying out all actions required by this Consent Order. In the event of the failure of one or more of the Respondents to implement the requirements of this Consent Order, the remaining Respondent(s) shall complete all such requirements.

## II. STATEMENT OF PURPOSE

2.1     In entering into this Consent Order, the common objective of EPA and the Respondents is to expedite commencement and performance of Remedial Design, as defined in Paragraph 4, Section IV (Definitions) of the proposed consent decree appended hereto as Attachment 1 ["Consent Decree"], in accordance with the requirements of this Consent Order and the Consent Decree and to enter into an agreement that is legally binding upon all Parties until the Consent Decree is entered or in the event the Consent Decree is not entered pursuant to Paragraph 92, Section XXVI (Effective Date) of the Consent Decree.

2.2     In an effort to simplify this Consent Order, the Parties have agreed that certain obligations of this Consent Order shall be expressed by reference to provisions of the Consent Decree. Each referenced provision of the Consent Decree, including each provision of the Consent Decree referenced therein, shall be incorporated herein by reference and shall be effective as if set forth in this Consent Order in its entirety. For those provisions, and solely for purposes of this Consent Order, the following definitions apply except as otherwise provided in this Consent Order:

(a)  The term "Settling Defendants" when used in the Consent Decree shall mean Respondents;

(b)  The term "Consent Decree" when used in the Consent Decree shall mean this Consent Order;

(c)  The term "Parties" when used in the Consent Decree shall mean Respondents and EPA;

(d)  All references to the date of lodging or entry of the Consent Decree shall mean the effective date of this Consent Order;

(e)  All references to Section XVIII (Dispute Resolution) of the Consent Decree shall mean Section XV (Dispute Resolution) of this Consent Order.

2.3  Except as provided herein, all terms shall be defined in the manner set forth in Paragraph 4, Section IV (Definitions) of the Consent Decree.

## III. EFFECTIVE DATE AND TERMINATION

3.1  The effective date of this Consent Order shall be the third business day following the date on which EPA forwards a fully executed true and correct copy of this Consent Order to Respondents via overnight delivery.

3.2  This Consent Order shall terminate:

(a)  at the time the Consent Decree becomes effective pursuant to Section XXVI of the Consent Decree;

(b)  at the time the Court denies the United States' petition to enter the Consent Decree; or

(c)  at the time the United States withdraws or withholds its consent from the Consent Decree because comments submitted during the public comment period established pursuant to Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2) and 28 C.F.R. § 50.7, disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper, or inadequate; whichever is earlier.

3.3  Should this Consent Order be terminated under Section 3.2(b) or (c) above, such termination shall not affect Section VIII (Access), Section XV (Dispute Resolution), Section XIX (Retention of Records) and Section XVII (Covenants by Respondents).

BSAI052732

*Boarhead Farms Superfund Site Administrative Order on Consent for Remedial Design*
*EPA Docket No. III-2000-002-DC*

## IV. PARTIES BOUND

4.1    This Consent Order shall apply to and be binding upon EPA and upon Respondents and their successors and assigns. Any change in ownership or corporate status of a Respondent, including, but not limited to, any transfer of assets or real or personal property, shall in no way alter Respondents' responsibilities under this Consent Order.

4.2    Paragraph 3, Section III (Parties Bound) of the Consent Decree is incorporated herein by reference.

## V. NOTICE TO THE COMMONWEALTH

5.1    Notice of issuance of this Consent Order has been given to the Commonwealth of Pennsylvania, pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606(a).

## VI. WORK TO BE PERFORMED

6.1    The following Consent Decree provisions are incorporated herein by reference:

    (a)    Paragraph 8, Section V (General Provisions)

    (b)    Paragraph 9, Section VI (Performance of the Work by Settling Defendants)

    (c)    Paragraph 10 a., b. and c., Section VI (Performance of the Work by Settling Defendants)

    (d)    Paragraph 13, Section VI (Performance of the Work by Settling Defendants), except that modifications under such paragraph can only be required for remedial design activities.

    (e)    Paragraph 14, Section VI (Performance of the Work by Settling Defendants)

    (f)    Paragraph 74, Section XX (Covenants Not to Sue by Plaintiff[s])

## VII . QUALITY ASSURANCE

7.1    Section VII (Quality Assurance, Sampling and Data Analysis) of the Consent Decree is incorporated herein by reference.

## VIII . ACCESS

8.1 Paragraphs 20(a) and (b), 21(a) and (b), and 22 of Section VIII (Access and Institutional Controls) of the Consent Decree is incorporated herein by reference.

## IX. REPORTING REQUIREMENTS

9.1 Section IX (Reporting Requirements) of the Consent Decree is incorporated herein by reference.

## X. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS

10.1 Section X (EPA Approval of Plans and Other Submissions) of the Consent Decree is incorporated herein by reference.

## XI. PROJECT COORDINATORS

11.1 Section XI (Project Coordinators) of the Consent Decree is incorporated herein by reference.

## XII. EMERGENCY RESPONSE

12.1 Section XIV (Emergency Response) of the Consent Decree is incorporated herein by reference.

## XIII . INDEMNIFICATION

13.1 Paragraphs 48 and 49, Section XVI (Indemnification and Insurance) of the Consent Decree are incorporated herein by reference.

## XIV . FORCE MAJEURE

14.1 Section XVII (Force Majeure) of the Consent Decree is incorporated herein by reference.

## XV. DISPUTE RESOLUTION

15.1    For purposes of this Section XV (Dispute Resolution), the term "United States" as used in Section XVIII (Dispute Resolution) of the Consent Decree shall mean EPA.

15.2    The following Consent Decree provisions are incorporated herein by reference:

(a)    Paragraph 55, Section XVIII (Dispute Resolution)

(b)    Paragraph 56, Section XVIII (Dispute Resolution)

(c)    Paragraph 57.a. and b., Section XVIII (Dispute Resolution)

(d)    Paragraph 57.c., Section XVIII (Dispute Resolution) (first sentence only)

(e)    Paragraph 58, Section XVIII (Dispute Resolution)

(f)    Paragraph 58.a., Section XVIII (Dispute Resolution)

(g)    Paragraph 58.b., Section XVIII (Dispute Resolution) (first sentence only)

(h)    Paragraph 58.d., Section XVIII (Dispute Resolution) (first sentence only)

(I)    Paragraph 59, Section XVIII (Dispute Resolution)

(j)    Paragraph 59.a., Section XVIII (Dispute Resolution) (first sentence only).  EPA's decision shall be binding on Respondents.  Respondents shall bear the burden of coming forward with evidence and the burden of persuasion.

(k)    Paragraph 60, Section XVIII (Dispute Resolution), except that the phrase "as provided in Paragraph 69" in the second  sentence shall be omitted.

## XVI. STIPULATED PENALTIES

16.1    Paragraphs 61-68 and 70-71, Section XIX (Stipulated Penalties) of the Consent Decree are incorporated herein by reference, except that the situation referred to in subsection (3) of paragraph 73 shall not apply under this Consent Order.

16.2    Stipulated penalties shall continue to accrue during any dispute resolution period.  In the event Respondents do not prevail upon resolution of a dispute, Respondents shall pay all stipulated penalties owed within thirty (30) days of receipt of EPA's decision regarding the

dispute. These penalties shall include all penalties which accrued prior to and during the period of dispute. Stipulated penalties shall not be owed or collectible for the matter, or that portion of the matter, in dispute to the extent Respondents prevail.

## XVII. COVENANTS BY RESPONDENTS

17.1    Section XXI (Covenants by Settling Defendants) of the Consent Decree is incorporated herein by reference.

## XVIII. ACCESS TO INFORMATION

18.1    Section XXIII (Access to Information) of the Consent Decree is incorporated herein by reference.

## XIX. RETENTION OF RECORDS

19.1    Section XXIV (Retention of Records) of the Consent Decree is incorporated herein by reference.

## XX. NOTICES AND SUBMISSIONS

20.1    Section XXV (Notices and Submissions) of the Consent Decree is incorporated herein by reference.

## XXI. COMMUNITY RELATIONS

21.1    Section XXIX (Community Relations) of the Consent Decree is incorporated herein by reference.

## XXII. MODIFICATION

22.1    Paragraph 96, Section XXX of the Consent Decree is incorporated herein by reference.

22.2    No modifications shall be made to the provisions of this Consent Order without written notification to, and approval of, the Parties.

22.3    Modifications to the Remedial Design Work Plan may be made by mutual agreement of the EPA and Respondents' Project Coordinators. Any such modifications must be in writing and signed first by the Respondents' Project Coordinator and then by the EPA Project Coordinator. The effective date of the modification shall be the date on which the modification is signed by the EPA Project Coordinator.


**IT IS SO AGREED AND ORDERED.**


_____            _____
Bradley M. Campbell                                          Date
Regional Administrator
EPA Region III

BSAI052737

*Boarhead Farms Superfund Site    Administrative Order on Consent for Remedial Design*
*EPA Docket No. III-2000-002-DC*                                                          9

## FOR THE RESPONDENTS:

Each of the undersigned hereby certifies that [he/she] is authorized to execute this Consent Order on behalf of the Respondent for which [he/she] has signed and to bind said Respondent to the terms and conditions of this Consent Order.


**[Respondent]**  FORD MOTOR COMPANY          November 16, 1999
**[Name]**        Thomas DeJure              Date
**[Title]**       Assistant Secretary


**[Respondent]**                              Date
**[Name]**
**[Title]**


**[Respondent]**                              Date
**[Name]**
**[Title]**


**[Respondent]**                              Date
**[Name]**
**[Title]**

BSAI052738

## FOR THE RESPONDENTS:

Each of the undersigned hereby certifies that [he/she] is authorized to execute this Consent Order on behalf of the Respondent for which [he/she] has signed and to bind said Respondent to the terms and conditions of this Consent Order.

*Ray L. Hillard*                                          12/2/99
_____                    _____
[Respondent] Cytec Industries Inc                 Date
[Name] Raymond L. Hillard
[Title] Director, Environmental Services


_____              _____
[Respondent]                                     Date
[Name]
[Title]


_____              _____
[Respondent]                                     Date
[Name]
[Title]


_____              _____
[Respondent]                                     Date
[Name]
[Title]

BSAI052739

## FOR THE RESPONDENTS:

Each of the undersigned hereby certifies that [he/she] is authorized to execute this Consent Order on behalf of the Respondent for which [he/she] has signed and to bind said Respondent to the terms and conditions of this Consent Order.

_James D. Dee_                          DEC. 1, 1999
[Respondent]                            Date
[Name]          SPS Technologies, Inc.
[Title]         James D. Dee
                Vice President


_____               _____
[Respondent]                            Date
[Name]
[Title]


_____               _____
[Respondent]                            Date
[Name]
[Title]


_____               _____
[Respondent]                            Date
[Name]
[Title]

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Civil Action No. |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CYTEC INDUSTRIES, INC., | ) | |
| FORD MOTOR COMPANY, | ) | |
| SPS TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TABLE OF CONTENTS

I.      BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V.      GENERAL PROVISIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VI.     PERFORMANCE OF THE WORK BY SETTLING DEFENDANTS . . . . . . . . . . . 14

VII.    QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS  . . . . . . . . . . . . . 26

VIII.   ACCESS AND INSTITUTIONAL CONTROLS  . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IX.     REPORTING REQUIREMENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

X.      EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . . . . . . . . 37

XI.     PROJECT COORDINATORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

XII.    ASSURANCE OF ABILITY TO COMPLETE WORK . . . . . . . . . . . . . . . . . . . . . . 41

-2-

XIII.    CERTIFICATION OF COMPLETION  .................................... 44

XIV.    EMERGENCY RESPONSE ............................................. 45

XV.    REIMBURSEMENT OF FUTURE RESPONSE COSTS  ..................... 46

XVI.    INDEMNIFICATION AND INSURANCE  ................................ 50

XVII.   FORCE MAJEURE .................................................. 52

XVIII.  DISPUTE RESOLUTION  ............................................. 55

XIX.    STIPULATED PENALTIES ............................................ 59

XX.    COVENANTS NOT TO SUE BY PLAINTIFF .............................. 63

XXI.    COVENANTS BY SETTLING DEFENDANTS ............................. 66

XXII.   EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION  ............. 68

XXIII.  ACCESS TO INFORMATION  .......................................... 70

XXIV.   RETENTION OF RECORDS  ........................................... 71

XXV.   NOTICES AND SUBMISSIONS  ........................................ 73

XXVI.   EFFECTIVE DATE  .................................................. 75

XXVII.  RETENTION OF JURISDICTION ....................................... 75

XXVIII. APPENDICES ..................................................... 75

XXIX.   COMMUNITY RELATIONS  ........................................... 76

XXX.   MODIFICATION  ................................................... 76

XXXI. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT  ............... 77

XXXII. SIGNATORIES/SERVICE ............................................. 78

XXXIII.  RELATIONSHIP BETWEEN CONSENT ORDER AND CONSENT DECREE .
......................................................................... 78

XXXIV. STIPULATION AND DISMISSAL OF THE UNITED STATES' CLAIMS .... 79

BSAI052742

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | |
| | ) | |
| CYTEC INDUSTRIES, INC., | ) | |
| FORD MOTOR COMPANY, | ) | |
| SPS TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CONSENT DECREE

### I. BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of
the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter
pursuant to Sections 106 and 107 of the Comprehensive Environmental Response,
Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

B.    The United States in its complaint seeks, inter alia: (1) reimbursement of costs
incurred by EPA and the Department of Justice for response actions at the Boarhead Farms
Superfund Site ("Site," as defined below) in Upper Black Eddy, Bridgeton Township, Bucks
County, Pennsylvania, together with accrued interest; and (2) performance of studies and
response work by the defendants at the Site consistent with the National Oil and Hazardous
Substances Pollution Contingency Plan, 40 C.F.R. Part 300 (as amended) ("NCP").

C.     In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the Commonwealth of Pennsylvania (the "State") on December 30, 1997 of negotiations with potentially responsible parties regarding the implementation of the remedial design and remedial action for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree.

D.     In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the United States Department of the Interior on August 24, 1992 and January 31, 1997, and the National Oceanic and Atmospheric Administration ("NOAA") on August 24, 1992, of negotiations with potentially responsible parties regarding the release of hazardous substances that may have resulted in injury to the natural resources under Federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this Consent Decree.

E.     The defendants that have entered into this Consent Decree ("Settling Defendants") do not admit any liability to the Plaintiff arising out of the transactions or occurrences alleged in the complaint, nor do they acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent or substantial endangerment to the public health or welfare or the environment.

F.     Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on March 31, 1989, 54 Fed. Reg. 13296.

G.     EPA conducted removal action at the Site beginning in the year 1992 and continuing to the present pursuant to Section 104 of CERCLA, 42 U.S.C. Section 9604. The removal action included, in general: (1) the removal of buried drums; (2) the construction, operation and

BSAI052744

3

*Boarhead Farms Superfund Site, Bucks County, Pennsylvania*
*Consent Decree for Remedial Design/Remedial Action*

maintenance of groundwater interception wells and a groundwater interception trench; (3) the

construction of a groundwater treatment plant on the Site; and (4) the installation, operation and

maintenance of residential well filtration systems.

      H.     In response to a release or a substantial threat of a release of a hazardous

substance(s) at or from the Site, EPA commenced on December 5, 1989, a Remedial

Investigation and Feasibility Study ("RI/FS") for the Site pursuant to 40 C.F.R. § 300.430.

      I.     EPA completed an Ecological Risk Assessment in September 1995. The Baseline

Risk Human Health Risk Assessment was also completed in September 1995. Based on these

documents and the Remedial Investigation, a Feasibility Study ("FS") was prepared in July 1997,

describing the remedial action objectives and comparing cleanup alternatives for the Site.

      J.     Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the

completion of the FS and of the proposed plan for remedial action on January 5, 1998, in a major

local newspaper of general circulation. EPA provided an opportunity for written and oral

comments from the public on the proposed plan for remedial action. A copy of the transcript of

the public meeting is available to the public as part of the administrative record upon which the

Regional Administrator based the selection of the response action.

      K.     The decision by EPA on the remedial action to be implemented at the Site is

embodied in a final Record of Decision ("ROD"), executed on November 18, 1998, on which the

State has given its concurrence. The ROD includes EPA's explanation for any significant

differences between the final plan and the proposed plan as well as a responsiveness summary to

the public comments. Notice of the final plan was published in accordance with Section 117(b)

of CERCLA.

BSAI052745

*Boarhead Farms Superfund Site, Bucks County, Pennsylvania*
*Consent Decree for Remedial Design/Remedial Action*

L.    Subsequent to the issuance of the ROD, EPA determined to implement the remedial design ("RD") and remedial action ("RA") described in the ROD in two operable units ("OUs"). OU-1 (as defined below), in general, will address Remedy Components 3, 4, 5, 6, and 7 outlined in the ROD Declaration (Appendix A). These include:

> Remedy Component 3- Groundwater Extraction, Metals Precipitation, and Air Stripping
> Remedy Component 4- Installation of Additional Monitoring Wells
> Remedy Component 5- Institutional Controls and Monitoring
> Remedy Component 6- Residential Water Treatment
> Remedy Component 7- Phytoremediation

OU-2, in general, will address Remedy Components 1, 2, and 5 outlined in the ROD Declaration (Appendix A) and any other work described in the ROD that was not addressed by this Consent Decree as part of OU-1. These include:

> Remedy Component 1- Soil Aeration and Treatment of VOC Hot Spots
> Remedy Component 2- Excavation and Offsite Disposal of Buried Drums
> Remedy Component 5- Institutional Controls and Monitoring

M.    EPA has commenced the RD for OU-1. Under the terms of this Consent Decree, the Settling Defendants will assume responsibility for the performance of the RD and the RA for all OU-1 activities (together, the "Work"), as defined below.

N.    Based on the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by the Settling Defendants if conducted in accordance with the requirements of this Consent Decree and its appendices.

O.    Solely for the purposes of Section 113(j) of CERCLA, the Remedial Action selected by the ROD and the Work to be performed by the Settling Defendants shall constitute a response action taken or ordered by the President.

5

P.    The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over the Settling Parties. Solely for the purposes of this Consent Decree and the underlying complaint, Settling Defendants waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. The Settling Defendants shall not challenge the terms of this Consent Decree, and the Settling Defendants shall not challenge this Court's jurisdiction to enter and enforce this Consent Decree.

## III. PARTIES BOUND

2.    This Consent Decree applies to and is binding upon the United States and upon Settling Defendants and their successors and assigns. Any change in ownership or corporate or other legal status of a Settling Defendant including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such Settling Defendant's responsibilities under this Consent Decree.

BSAI052747

     3.     Settling Defendants shall provide a copy of this Consent Decree to each contractor hired to perform the Work (as defined below) required by this Consent Decree and to each person representing any Settling Defendant with respect to the Site or the Work and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree. Settling Defendants or their contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work required by this Consent Decree. Settling Defendants shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree. With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with the Settling Defendants within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV. DEFINITIONS

     4.     Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

    "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq.

BSAI052748

"Consent Decree" shall mean this Decree and all appendices attached hereto (listed in Section XXIX). In the event of conflict between this Decree and any appendix, this Decree shall control.

"Day" shall mean a calendar day unless expressly stated to be a working day. "Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

"Duly Authorized Representative" shall mean a person set forth or designated in accordance with the procedures set forth in 40 C.F.R. § 270.11(b).

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs or incurred after November 18, 1998, in performing the RD and any related activities, or in reviewing or developing plans, reports and other items pursuant to this Consent Decree, verifying the Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Sections VIII (including, but not limited to, attorneys fees and any monies paid to secure access and/or to secure or implement institutional controls, including, but not limited to, the amount of just compensation), XIV, and Paragraph 74 of Section XX. Future Response Costs shall not include costs for any response action or operable unit that is not part of "OU-1," as defined in this Consent Decree.

BSAI052749

"Institutional Controls" shall mean land and/or water use restrictions including, but not limited to, restrictions in the form of contractual agreements, restrictive easements/covenants that run with the land, and governmental controls.

"Interest" shall mean interest at the rate specified for interest on investments of the Hazardous Substance Superfund established under Subchapter A of Chapter 98 of Title 26 of the U.S. Code, compounded on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).

"Municipal Solid Waste" shall mean all waste materials generated by households, including single and multi-family residences, and hotels and motels. The term also includes waste materials generated by commercial, institutional, and industrial sources, to the extent such wastes (A) are essentially the same as waste normally generated by households, or (B) are collected and disposed of with other municipal solid waste or sewage sludge as part of normal municipal solid waste collection services and, regardless of when generated, would be considered conditionally exempt small quantity generator waste under regulations issued pursuant to Section 3001(d)(4) of the Solid Waste Disposal Act (42 U.S.C. 6921(d)(4)). Examples of Municipal Solid Waste include food and yard waste, paper, clothing, appliances, consumer product packaging, disposable diapers, office supplies, cosmetics, glass and metal food containers, elementary or secondary school science laboratory waste, and household hazardous waste. The term does not include combustion ash generated by resource recovery facilities or municipal incinerators, or waste from manufacturing or processing (including pollution control) operations not essentially the same as waste normally generated by households.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42

9

U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Operation and Maintenance" or "O & M" shall mean all activities required to maintain the effectiveness of the RA for all OU-1 activities as required under the Operation and Maintenance Plan approved or developed by EPA pursuant to this Consent Decree.

"OU-1" or "OU-1 Activities" shall mean all of those activities described in the ROD that address Remedy Components 3, 4, 5, 6, and 7 outlined in the ROD Declaration (Appendix A). These include, but are not limited to:

> Remedy Component 3- Groundwater Extraction, Metals Precipitation, and Air Stripping
> Remedy Component 4- Installation of Additional Monitoring Wells
> Remedy Component 5- Institutional Controls and Monitoring
> Remedy Component 6- Residential Water Treatment
> Remedy Component 7- Phytoremediation

"OU-2" or "OU-2 Activities" shall mean those activities described in the ROD that address Remedy Components 1, 2, and 5 as described in the ROD Declaration (Appendix A), and any other work described in the ROD that was not addressed by this Consent Decree as part of OU-1. OU-2 or OU-2 Activities include, but are not limited to:

> Remedy Component 1- Soil Aeration and Treatment of VOC Hot Spots
> Remedy Component 2- Excavation and Offsite Disposal of Buried Drums
> Remedy Component 5- Institutional Controls and Monitoring

"Owner, Operator, or Lessee of Residential Property" shall mean a person who owns, operates, manages, or leases Residential Property and who uses or allows the use of the Residential Property exclusively for residential purposes.

"PADEP" shall mean the Pennsylvania Department of Environmental Protection and any successor departments or agencies of the State.

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or an upper case letter.

"Parties" shall mean the United States and the Settling Defendants.

"Performance Standards" shall mean the cleanup standards and other measures of achievement for all OU-1 Activities as defined herein, and as set forth on pages 30-39 of the ROD attached hereto as Appendix A and those that are developed by the Settling Defendants and approved by EPA in writing during Remedial Design.

"Plaintiff" shall mean the United States.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 et seq. (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Site signed on November 18, 1998 by the Director of the Region III Hazardous Site Cleanup Division, or his/her delegate, and all attachments thereto. The ROD is attached as Appendix A.

"Remedial Action" or "RA" shall mean those activities, except for Remedial Design and Operation and Maintenance, to be undertaken by the Settling Defendants to implement all OU-1 Activities as defined herein, in accordance with the final Remedial Design and Remedial Action Work Plans and other plans approved by EPA.

"Remedial Action Work Plan" shall mean the document developed pursuant to Paragraph 11 of this Consent Decree and approved by EPA, and any amendments thereto.

"Remedial Design" or "RD" shall mean those activities to be undertaken by the Settling Defendants to develop the final plans and specifications for the Remedial Action with respect to

BSAI052752

all OU-1 Activities as defined herein, pursuant to the Remedial Design Work Plan and other

plans approved by EPA.

"Remedial Design Work Plan" shall mean the document(s) developed pursuant to Paragraph

11 of this Consent Decree and approved by EPA, and any amendments thereto.

"Residential Property" shall mean single or multi-family residences, including accessory

land, buildings, or improvements incidental to such dwellings, which are exclusively for

residential use.

"Section" shall mean a portion of this Consent Decree identified by a roman numeral.

"Settling Defendants" shall mean those Parties identified in Appendix B (Settling

Defendants).

"Sewage Sludge" means solid, semisolid, or liquid residue removed during the treatment of

municipal waste water, domestic sewage, or other waste water at or by publicly owned or

federally owned treatment works.

"Site" shall mean the Boarhead Farms Superfund Site, encompassing approximately 120

acres, located on Lonely Cottage Road in Upper Black Eddy, Bridgeton Township, Bucks

County, Pennsylvania, and depicted in the ROD.

"Small Business" shall mean any business entity that employs no more than 100 individuals

and is a "small business concern" as defined under the Small Business Act (15 U.S.C. §§ 631 et

seq.).

"Small Nonprofit Organization" shall mean any organization that does not distribute any

part of its income or profit to its members, directors, or officers, employs no more than 100 paid

individuals at the involved chapter, office, or department, and was recognized as a nonprofit

BSAI052753

organization under Section 501(c)(3) of the Internal Revenue Code of 1986.

"State" or "Commonwealth" shall mean the Commonwealth of Pennsylvania.

"Supervising Contractor" shall mean the principal contractor retained by the Settling

Defendants to supervise and direct the implementation of the Work under this Consent Decree.

"United States" shall mean the United States of America, including its agencies,

departments, and instrumentalities.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of

CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33), 42

U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.

§ 6903(27).

"Work" shall mean all activities Settling Defendants are required to perform under this

Consent Decree to perform the RD and RA for all OU-1 Activities, except those required by

Section XXIV (Retention of Records).

## V. GENERAL PROVISIONS

5.    Objectives of the Parties

The objectives of the Parties in entering into this Consent Decree are to protect public health

or welfare and the environment at the Site by the design and implementation of response actions

at the Site by the Settling Defendants, to reimburse the Future Response Costs of the Plaintiff,

and to resolve certain claims of Plaintiff against Settling Defendants as provided in this Consent

Decree. The execution by the Settling Defendants of this Consent Decree is not an admission by

them of liability with respect to any issue dealt with in this Consent Decree nor is it an admission

or denial of the allegations set forth in the Complaint filed by Plaintiff herein. This Consent Decree shall not be admissible as evidence in any proceeding other than one to enforce the terms of this Consent Decree.

      6.    Commitments by Settling Defendants

          a.    Settling Defendants shall finance and perform the Work as specified in Section VI of this Consent Decree. Settling Defendants shall also reimburse the United States for Future Response Costs as provided in this Consent Decree.

          b.    The obligations of Settling Defendants to finance and perform the Work and to pay amounts owed the United States under this Consent Decree are joint and several. In the event of the insolvency or other failure of any one or more Settling Defendants to implement the requirements of this Consent Decree, the remaining Settling Defendants shall complete all such requirements.

          c.    In the event that any of the Settling Defendants files for bankruptcy or is placed involuntarily in bankruptcy proceedings, such Settling Defendant shall notify the United States within three (3) days of such filing.

      7.    Compliance With Applicable Law

All activities undertaken by Settling Defendants pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations. Settling Defendants must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD. The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be considered to be consistent with the NCP.

BSAI052755

8.   Permits

a.   As provided in Section 121(e) of CERCLA and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Defendants shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.   The Settling Defendants may seek relief under the provisions of Section XVII (Force Majeure) of this Consent Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Work.

c.   This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal, state or local statute, regulation, or ordinance.

# VI. PERFORMANCE OF THE WORK BY SETTLING DEFENDANTS

9.   Selection of Contractors.

a.   Supervising Contractor.

ii.   All aspects of the Work to be performed by Settling Defendants pursuant to Sections VI (Performance of the Work by Settling Defendants), VII (Quality Assurance, Sampling, and Data Analysis), and XIV (Emergency Response) of this Consent

*Boarhead Farms Superfund Site, Bucks County, Pennsylvania*
*Consent Decree for Remedial Design/Remedial Action*

Decree shall be under the direction and supervision of the Supervising Contractor, the selection of which shall be subject to acceptance or disapproval by EPA after a reasonable opportunity for review and comment by the State. With the written approval of EPA, the Supervising Contractor may be the same as the Project Coordinator designated by the Settling Defendants pursuant to Paragraph 35 of Section XI (Project Coordinators). Within ten (10) days after the lodging of this Consent Decree, Settling Defendants shall notify EPA in writing of the name, title, and qualifications of any contractor proposed to be the Supervising Contractor. EPA will issue a notice of disapproval or an authorization for the Settling Defendants to proceed. If at any time thereafter, Settling Defendants propose to change a Supervising Contractor, Settling Defendants shall give such notice to EPA and must obtain an authorization to proceed from EPA, after a reasonable opportunity for review and comment by the State, before the new Supervising Contractor performs, directs, or supervises any Work under this Consent Decree.

      ii.     If EPA disapproves the selection of a proposed Supervising Contractor, EPA will notify Settling Defendants in writing. In such event, Settling Defendants shall submit to EPA a list of at least three contractors, including the qualifications of each contractor, that would be acceptable to them within thirty (30) days of receipt of EPA's notice of disapproval of the Settling Defendants' selection of a contractor. EPA will provide written notice of the names of any contractor(s) whose selection it disapproves and an authorization for the Settling Defendants to proceed with respect to any of the other contractors. Settling Defendants may select any contractor whose selection was not disapproved and shall notify EPA of the name of the contractor selected within twenty-one (21) days of EPA's authorization for the Settling Defendants to proceed.

iii.    If EPA fails to provide written notice of its authorization for the Settling Defendants to proceed, or written notice of disapproval as provided in this Paragraph and this failure prevents the Settling Defendants from meeting one or more deadlines in a plan approved by the EPA pursuant to this Consent Decree, Settling Defendants may seek relief under the provisions of Section XVII (Force Majeure) of this Consent Decree.

b.    Other Contractors and Subcontractors.

The Settling Defendants shall submit to EPA for acceptance by EPA the names and qualifications of any additional contractors and subcontractors they propose to use to satisfy any requirement of this Consent Decree before such contractor or subcontractor performs any Work. If EPA does not respond with a notice accepting or disapproving the proposal for additional contractors and subcontractors within fourteen (14) days of receipt by EPA of Settling Defendants' selections, the proposal for additional contractors and subcontractors shall be deemed accepted. In the event EPA disapproves any proposed contractor or subcontractor, Settling Defendants shall submit to EPA a list of at least three contractors or subcontractors, including the qualifications of each, that would be acceptable to them within ten (10) days of receipt of EPA's notice. EPA will provide written notice of the names of any contractor(s) or subcontractor(s) whose selection it disapproves and an authorization for the Settling Defendants to proceed with respect to any of the other contractors or subcontractors. Settling Defendants may select any contractor or subcontractor from that list and shall notify EPA of the name of the contractor or subcontractor selected within twenty-one (21) days of EPA's written notice.

10.    Remedial Design/Remedial Action.

a.    Within thirty (30) days after EPA's issuance of an authorization for the Settling Defendants to proceed pursuant to Paragraph 9, Settling Defendants shall submit to EPA a work plan for the design of the Remedial Action at the Site ("Remedial Design Work Plan" or "RD Work Plan"). The RD Work Plan shall be prepared by the individual(s) and/or entity(ies) responsible for completion of the Remedial Design, except to the extent such persons have been disapproved by EPA. The Remedial Design Work Plan shall provide for design of the remedy set forth in the ROD with respect to all OU-1 Activities and for achievement of the Performance Standards and other requirements for all OU-1 Activities set forth in the ROD and this Consent Decree. Upon its approval by EPA, the Remedial Design Work Plan shall be incorporated into and become enforceable under this Consent Decree. The Settling Defendants shall also submit to EPA and the State, at the time the Remedial Design Work plan is submitted, a Health and Safety Plan for field design activities which conforms to the applicable Occupational Safety and Health Administration and EPA requirements including, but not limited to, 29 C.F.R. § 1910.120.

b.    The Remedial Design Work Plan shall include plans, schedules, and methodologies for implementation of all remedial design and pre-design tasks for all OU-1 Activities and shall, unless EPA agrees otherwise in writing, include, at a minimum:

1.    a Site Management Plan;

2.    a Sampling and Analysis Plan, containing:

a.    a Field Sampling Plan; and

b.    a Quality Assurance Project Plan (QAPP);

BSAI052759

3.    a Remedial Design Contingency Plan;

4.    a Treatability Study Work Plan which includes, at a minimum, plans and schedules for the preparation and submission of a Treatability Study Evaluation Report;

5.    plans and schedules for the preparation and submission of a Preliminary Design Submittal (the preliminary design begins with the initial design and ends with the completion of approximately 30% of the design effort) containing, at a minimum:

    a.    a Design Criteria Report, including:

        1. project description;

        2. design requirements and provisions;

        3. preliminary process flow diagrams;

        4. operation & maintenance requirements;

    b.    a Basis of Design Report, including:

        1. justification of design assumptions;

        2. a project delivery strategy;

        3. remedial action permits plan for off-site permits;

        4. preliminary easement/access requirements;

    c.    Preliminary Drawings and Specifications, including:

        1. outline of general specifications;

        2. preliminary schematics and drawings;

        3.  chemical and geotechnical data (including data from pre-

design activities);

    d.     a value engineering screen; and

    e.     preliminary Remedial Action schedule.

6.    plans and schedules for the preparation and submission of an

intermediate design submittal which shall be submitted at

approximately 60% percent of the design effort and shall address all

of EPA's comments to the preliminary design and, at a minimum,

additionally include:

    a.     a revised Design Criteria Report, if necessary;

    b.     a revised Basis of Design Report, if necessary;

    c.     any value engineering study results;

    d.     a revised Remedial Action schedule;

    e.     a preliminary Remedial Action contingency plan;

    f.     a preliminary Remedial Action Health and Safety Plan

("HASP") for EPA acceptance;

    g.     a preliminary Remedial Action waste management plan; and

    h.     a preliminary Remedial Action Sampling and Analysis Plan.

7.    plans and schedules for the preparation and submission of a pre-final

design submittal which shall be submitted at approximately 90% of

the design effort and shall address all of EPA's comments to the

intermediate design, and, at a minimum, additionally include:

a.    a preliminary Operation & Maintenance Plan;

b.    a preliminary Construction Quality Assurance Plan ("CQAP")
(the CQAP, which shall detail the approach to quality
assurance during construction activities at the Site, shall
specify a quality assurance official ("QA Official"),
independent of the Supervising Contractor, to conduct a
quality assurance program during the construction phase of the
project);

c.    a preliminary Remedial Action decontamination plan;

d.    a draft final Remedial Action schedule;

e.    a draft final Remedial Action contingency plan; and

f.    a draft final Remedial Action HASP for EPA acceptance.

8.    plans and schedules for the preparation and submission of a final
design submittal which shall be submitted at 100% of the design
effort and shall address all of EPA's comments to the pre-final design,
and, at a minimum, additionally include:

a.    a final Remedial Action schedule;

b.    a final Remedial Action contingency plan;

c.    a final Remedial Action HASP for EPA acceptance;

d.    a final Remedial Action waste management plan;

BSAI052762

e.   a preliminary Remedial Action decontamination plan and a schedule for the submission of the final Remedial Action decontamination plan;

f.   a final Design Criteria Report;

g.   a final Remedial Action Sampling and Analysis Plan (directed at measuring progress towards meeting the Performance Standards);

h.   a final Basis of Design Report;

i.   final Drawings and Specifications;

j.   a revised Operation & Maintenance Plan and a schedule for submission of the final Operation & Maintenance Plan;

k.   a final Construction Quality Assurance Plan;

l.   a final Remedial Action decontamination plan; and

m.   a final project delivery strategy.

9. a Remedial Design schedule.

c.   Upon approval of the Remedial Design Work Plan by EPA, after a reasonable opportunity for review and comment by the State, and submittal of the Health and Safety Plan for all field activities to EPA and the State, Settling Defendants shall implement the Remedial Design Work Plan in accordance with the schedules and methodologies contained therein. The Settling Defendants shall submit to EPA all plans, submittals, and other deliverables required under the approved Remedial Design Work Plan in accordance with the approved schedule therein for review and approval pursuant to Section X (EPA Approval of Plans and Other

Submissions). Unless otherwise directed by EPA, Settling Defendants shall not commence further Remedial Design field activities at the Site prior to approval of the Remedial Design Work Plan.

        d.     Upon approval, approval with conditions, or modification by EPA, as provided in Section X (EPA Approval of Plans and Other Submissions), of all components of the final design submittal, the final design submittal shall serve as the Remedial Action Work Plan and shall be enforceable under this Consent Decree. The Settling Defendants shall implement the activities required under the Remedial Action Work Plan in accordance with the schedules and methodologies contained therein.

        e.     The Settling Defendants shall submit all plans, submittals, or other deliverables required under the Remedial Action Work Plan in accordance with the approved schedule for review and approval pursuant to Section X (EPA Approval of Plans and Other Submissions). Unless otherwise directed by EPA or required under the Remedial Design Work Plan, the Settling Defendants shall not commence physical activities at the Site prior to the date for commencement set forth in the approved schedule in the Remedial Action Work Plan.

        11.    Resident Engineer. Following EPA approval, approval with conditions, or modification by EPA, as provided in Section X (EPA Approval of Plans and Other Submissions), of all components of the final design submittal, and prior to commencement of any on-Site Work under the Remedial Action Work Plan, the Settling Defendants shall submit to EPA the name and qualifications of a Resident Engineer to be present at the Site during construction to ensure that the Work is performed in accordance with the approved Remedial Action Work Plan. The Resident Engineer shall be familiar with all aspects of the Remedial

Design approved by EPA. EPA retains the right to disapprove the use of any Resident Engineer proposed by Settling Defendants. In the event EPA disapproves the use of any proposed Resident Engineer, Settling Defendants shall submit to EPA a list of at least three replacements, including the qualifications of each, who would be acceptable to them within ten (10) days of receipt of EPA's notice. EPA will provide written notice of the names of any replacements whose use it would accept. Settling Defendants may select any replacement from the EPA notice and shall notify EPA of the name of the replacement selected within five (5) days of EPA's written notice. Settling Defendants shall ensure that the Resident Engineer performs on-Site inspections as necessary to ensure compliance with the approved Remedial Action Work Plan and that the results of such inspections are promptly provided to Settling Defendants, EPA, and the State. The Resident Engineer may act as the QA Official.

12. The Settling Defendants shall continue to implement the Remedial Action and O & M for all OU-1 Activities until the Performance Standards for all OU-1 Activities are achieved and for so long thereafter as is otherwise required under this Consent Decree.

13. Modification of the Work.

a. If EPA determines, or agrees in writing that modification of the Work is necessary to achieve and maintain the Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD with respect to all OU-1 Activities, EPA may (1) require that such modification be incorporated into the Remedial Design Work Plan, Remedial Action Work Plan, Operation and Maintenance Plan, and/or any other plan relating to such Work, and/or (2) require that Settling Defendants submit a plan for EPA approval which incorporates such modification to the Work and implement such approved plan. Provided,

however, that a modification may be required pursuant to this Paragraph only to the extent that it

is consistent with the scope of the remedy selected in the ROD with respect to all OU-1

Activities.

   b.  For the purposes of this Paragraph 13 and Paragraph 42 only, the "scope of

the remedy selected in the ROD" means:

      1.  tasks employing a technology or combination of technologies
         discussed in Section X (Selected Remedy and Performance
         Standards) of the ROD to achieve and maintain the objectives
         described in the ROD for all OU-1 Activities.

      2.  tasks associated with monitoring of Site conditions and the
         effectiveness of the Remedial Action with respect to all OU-1
         Activities.

      3.  implementation of institutional controls for all OU-1 Activities, as
         defined herein.

   c.  If Settling Defendants object to any modification determined by EPA to be

necessary pursuant to this Paragraph, they may seek dispute resolution pursuant to Section XVIII

(Dispute Resolution), Paragraph 58 (record review). The Remedial Design Work Plan, Remedial

Action Work Plan, Operation and Maintenance Plan, and/or related work plans shall be modified

in accordance with final resolution of the dispute.

   d.  Settling Defendants shall implement any work required by any modifications

incorporated in the Remedial Design Work Plan, Remedial Action Work Plan, Operation and

Maintenance Plan, and/or in work plans developed in accordance with this Paragraph.

   e.  Nothing in this Paragraph shall be construed to limit EPA's authority to

require performance of further response actions as otherwise provided in this Consent Decree.

BSAI052766

  f.  EPA and the Settling Defendants' Project Coordinator shall meet to discuss the oversight activities that EPA intends to perform during the next year. At that time, EPA may evaluate the Site for reduced oversight in accordance with OSWER Directive 9200.4-15, "Reducing Oversight at Superfund Sites with Cooperative and Capable Parties," dated July 31, 1996; provided that the decision by EPA to reduce or not to reduce oversight activities, or to increase oversight activities, shall be in EPA's sole unreviewable discretion. Thereafter, EPA and the Settling Defendants' Project Coordinator shall meet annually to discuss the oversight activities that the EPA intends to perform during the next year.

  14. Settling Defendants acknowledge and agree that nothing in this Consent Decree or the Remedial Design or Remedial Action Work Plans constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the Work Plans will achieve the Performance Standards.

  15. Settling Defendants shall, prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator of such shipment of Waste Material. However, this notification requirement shall not apply to any off-Site shipments when the total volume of all such shipments will not exceed ten (10) cubic yards.

  a. The Settling Defendants shall include in the written notification the following information, where available:

    1. the name and location of the facility to which the Waste Material are to be shipped;
    2. the type and quantity of the Waste Material to be shipped;

BSAI052767

        3.    the expected schedule for the shipment of the Waste Material; and

        4.    the method of transportation.

The Settling Defendants shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

      b. The identity of the receiving facility and state will be determined by the Settling Defendants following the award of the contract for Remedial Action construction. The Settling Defendants shall provide the information required by Paragraph 15.a as soon as practicable after the award of the contract but in no case less than seven (7) days before the Waste Material is actually shipped.

## VII. QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS

    16.    While conducting all sample collection and analysis activities required by this Consent Decree, the Settling Defendants shall implement quality assurance, quality control, and chain of custody procedures in accordance with "EPA Requirements for Quality Assurance Project Plans for Environmental Data Operation," (US EPA Quality Assurance Management Staff: August 1994) (EPA QA/R-5); "EPA NEIC Policies and Procedures Manual," (May 1986) (EPA 330/978-001-R); National Functional Guidelines for Inorganic Data Review (EPA 540/R-94/013) and Modifications to the National Functional Guidelines for Inorganic Data Review (EPA Region III: April 1993); National Functional Guidelines for Organic Data Review (EPA 540/R-94/012) and Modifications to the National Functional Guidelines for Organic Data Review (EPA Region III: September 1994); "Region III Innovative Approaches to Data Validation," (EPA Region III: September 1994); "Data Quality Objectives Process for

Superfund," (EPA 540/R-93/071: September 1994); and subsequent amendments to such guidelines upon notification by EPA to Settling Defendants of such amendment. Amended guidelines shall apply only to procedures conducted after such notification. Prior to the commencement of any monitoring project under this Consent Decree, Settling Defendants shall submit to EPA for approval, after a reasonable opportunity for review and comment by the State, a Quality Assurance Project Plan ("QAPP") for the Work that is consistent with the NCP and the guidance documents cited above. If relevant to the proceeding, the Parties agree that validated sampling data generated in accordance with the QAPP(s) and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Decree. Settling Defendants shall ensure that EPA personnel and its authorized representatives are allowed access at reasonable times to all laboratories utilized by Settling Defendants in implementing this Consent Decree. In addition, Settling Defendants shall ensure that such laboratories shall analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring. Settling Defendants shall ensure that the laboratories they utilize for the analysis of samples taken pursuant to this Decree perform all analyses according to accepted EPA methods. Settling Defendants shall submit to EPA the selected laboratory's(ies') Quality Assurance Program Plan (QAPP) and their qualifications, which shall include, at a minimum, previous certifications, Performance Evaluation (PE) results, equipment lists and personnel resumes. Settling Defendants shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this Decree will be conducted in accordance with the procedures set forth in the QAPP approved by EPA. At the request of EPA, Settling Defendants shall conduct one or more audits of the selected laboratory(ies) to verify analytical capability and compliance with the

QAPP. Auditors shall conduct lab audits during the time the laboratory(ies) is analyzing samples collected pursuant to this Consent Decree. The lab audit shall be conducted according to procedures available from the QA Branch. Audit reports shall be submitted to the EPA Project Coordinator within fifteen (15) days of completion of the audit. The Settling Defendants shall report serious deficiencies, including all those which adversely impact data quality, reliability or accuracy, and take action to correct such deficiencies within twenty-four (24) hours of the time the Settling Defendants knew or should have known of the deficiency.

17.    Upon request, the Settling Defendants shall allow split or duplicate samples to be taken by EPA or its authorized representatives. Settling Defendants shall notify EPA not less than seven (7) working days in advance of any sample collection activity unless shorter notice is agreed to by EPA. In addition, EPA shall have the right to take any additional samples that EPA deems necessary. Upon request, EPA shall allow the Settling Defendants to take split or duplicate samples of any samples it takes as part of the Plaintiff's oversight of the Settling Defendants' implementation of the Work.

18.    Settling Defendants shall submit to EPA and the State three (3) copies each as well as one (1) computer format copy of the results of all sampling and/or tests or other data obtained or generated by or on behalf of Settling Defendants with respect to the Site and/or the implementation of this Consent Decree unless EPA agrees otherwise.

19.    Notwithstanding any provision of this Consent Decree, the United States hereby retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

BSAI052770