# EXHIBIT 1

## VOLUME 1 OF 2

WOLFF & SAMSON PC
THE OFFICES AT CRYSTAL LAKE
ONE BOLAND DRIVE
WEST ORANGE, NEW JERSEY 07052
973-325-1500

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BOARHEAD FARM AGREEMENT GROUP, | Case No. 02-3830 |
| | Judge LeGrome Davis |
| Plaintiff, | |
| v. | **CERTIFICATION OF** |
| | **ROBERT LANDMESSER** |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | |
| Defendants. | |

ROBERT LANDMESSER, of full age, hereby certifies as follows:

1.      I was the president of defendant Advanced Environmental Technology Corporation ("AETC") from its incorporation in 1976 until 1995. I make this certification on behalf of AETC in connection with the mediation in the above matter.

2.      AETC operated as a hazardous waste management company; I was involved with brokering the removal and disposal of wastes for AETC's customers. I had meetings and telephone conversations with Manfred DeRewal, Sr. of DeRewal Chemical Company in 1976-77 when AETC acted as a broker between DeRewal Chemical and Ashland Chemical Company ("Ashland") & Diaz Chemical Company ("Diaz"). In 1976-77 I was not aware that the liquid waste collected by DeRewal Chemical from Ashland and Diaz was being disposed of

850197.01

by DeRewal Chemical at the Boarhead Farms site in Pennsylvania. I understood that all of the liquid waste DeRewal Chemical collected from Ashland and Diaz was deposited at the Wissinoming Industrial Park ("Wissinoming") neutralization facility in Philadelphia, Pennsylvania. No AETC drivers or trucks ever had control or possession of the liquid wastes which DeRewal Chemical collected from Ashland and Diaz. AETC never transported wastes from any of its customers to the Boarhead Farms site.

3.    AETC's business relationship with DeRewal Chemical was based on DeRewal's representation that it held and maintained the appropriate permits to dispose of the type of waste generated by Ashland and Diaz. AETC was shown documentation to support that DeRewal Chemical possessed the necessary permits to transport those wastes.

4.    AETC ceased doing business with DeRewal Chemical sometime in 1977 following a dispute over monies owed. I first learned, during an investigation by Pennsylvania authorities, that hazardous waste had been disposed of by DeRewal Chemical at the Boarhead Farms site after AETC and DeRewal Chemical ceased doing business together. Until then, I believed that Boarhead Farms was merely used by Mr. DeRewal as his country residence.

I hereby certify that the foregoing statements made by me are true to the best of my knowledge, information and belief. I am further aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:    February **22**, 2004

_Robert Landmesser_ Pres
ROBERT LANDMESSER

850197.01

- 2 -

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BOARHEAD FARM AGREEMENT GROUP, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 02-3830 |
| | : | |
| ADVANCED ENVIRONMENTAL | : | |
| TECHNOLOGY CORPORATION, ET. AL. | : | |
| | : | |
| Defendants. | : | |

---

**OBJECTIONS AND RESPONSES OF PLAINTIFF
BOARHEAD FARM AGREEMENT GROUP TO ADVANCED
ENVIRONMENTAL TECHNOLOGY CORPORATION'S INITIAL
SET OF INTERROGATORIES AND DOCUMENT DEMANDS TO PLAINTIFF**

Plaintiff Boarhead Farm Agreement Group ("Plaintiff"), by its undersigned

attorney, objects and responds to Advanced Environmental Technology Corporation's Initial Set

of Interrogatories and Document Demands to Plaintiff ("Initial Interrogatories"), as follows:

**I.    GENERAL OBJECTIONS**

1.    Plaintiff objects to each interrogatory to the extent that it seeks information not in

Plaintiff's possession, custody or control.

2.    Plaintiff objects to each interrogatory to the extent that it seeks information already in

the possession, custody or control of AETC.

3.    Plaintiff objects to each interrogatory to the extent that it seeks information which is

publicly available and, thus, to which AETC has the same access as Plaintiff.

4.    Plaintiff objects to each interrogatory to the extent that it seeks information protected

by the attorney-client privilege or any other applicable privilege. Any inadvertent disclosure of

privileged information shall not constitute a waiver of the attorney-client or any other applicable privilege.

5. Plaintiff objects to each interrogatory to the extent that it seeks the discovery of the mental impressions, conclusions, opinions or legal theories of its attorneys or other representatives. Any inadvertent disclosure of work product shall not constitute a waiver of any work product protection.

6. Plaintiff objects to each interrogatory to the extent that it is unlimited in time or scope.

7. Plaintiff objects to each interrogatory to the extent that it is unduly burdensome or designed to be harassing.

8. Plaintiff objects to each interrogatory to the extent that it is vague or ambiguous.

## II.    INTERROGATORIES AND RESPONSES

Subject to and without waiving the foregoing General Objections, Plaintiff makes the following responses to the Initial Interrogatories:

1. Set forth with particularity the factual basis for Plaintiff's allegation in paragraph 31 of the Complaint that AETC "arranged with DeRewal Chemical for the disposal of Hazardous Substances from Defendants Ashland Chemical Company and Diaz Chemical Corporation," and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a**

**contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

**fully developed and, as such, is premature.  *See B.Braun Medical, Inc. v. Abbott***

***Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994).  Subject to and without waiving the**

**foregoing objection, Plaintiff responds that the factual bases for its claims against AETC in**

**the Complaint, and the identities of the persons with knowledge of those facts, are**

**contained in the documents comprising the nexus files for AETC, Ashland Chemical**

Company ("Ashland") and Diaz Chemical Corporation ("Diaz") located in the Boarhead

Document Repository at the Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735

Market Street, Philadelphia, PA 19103, and refers AETC to the same. By way of further

response, Plaintiff refers AETC to the deposition testimony that has been elicited in this

case including, but not limited to, the following testimony: the May 7, 2003 deposition

testimony of Manfred DeRewal, Sr., 170:16-185:15; the May 8, 2003 deposition testimony

of Manfred DeRewal, Sr., 260:22-266:25; the May 9, 2003 deposition testimony of Manfred

DeRewal, Sr., 496:15-500:5, 528:16-534:17; the May 15, 2003 deposition testimony of Linda

Cochran, 74:2-76:15, 80:20-81:21, 89:11-90:15; and all of the other deposition testimony

concerning DCC's disposal of waste at the Site. Together, the above-referenced documents

and testimony establish that AETC entered into separate contracts with Ashland and Diaz

for the removal and disposal of wastes from those companies, and that, pursuant to those

contracts, Ashland and Diaz consigned their wastes to AETC for removal and disposal.

AETC separately contracted with DeRewal Chemical Company ("DCC") for DCC to haul

and dispose of the Ashland and Diaz wastes. As evidenced by the above-referenced

documents, including, but not limited to, the shipping documents and invoices from AETC

to Ashland and Diaz, and from DCC to AETC, there were no contractual relationships

between DCC and Ashland or DCC and Diaz. By way of further response, David F.

Michelman, Esquire, 2207 Chestnut St., Philadelphia, PA 19103, (215) 557-9440 and

Thomas Healey, City of Philadelphia, (215) 592-6233, have knowledge of the creation of the

July 5, 1978 letter to Manfred DeRewal from the Philadelphia Water Department alleging

DCC disposal of wastes at the Wissinoming Industrial Park.

2. If Plaintiff alleges that AETC is an "arranger" under CERCLA, set forth with particularity the factual basis for that allegation and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff incorporates by reference its response to Interrogatory No. 1.**

3. If Plaintiff alleges that AETC owned the materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site, set forth with particularity the factual basis for that allegation and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff incorporates by reference its response to Interrogatory No. 1.**

4. If Plaintiff alleges that AETC possessed the materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site, set forth with particularity the factual basis for that allegation and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff incorporates by reference its response to Interrogatory No. 1.**

5. If Plaintiff alleges that AETC transported materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site, set forth with particularity the factual basis for that allegation and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff further objects to the use of the phrase "AETC transported materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site" as vague and ambiguous. Subject to and without waiving the foregoing objection, Plaintiff does not allege that trucks owned by AETC conveyed materials and/or hazardous substances to the Site, but rather that AETC arranged for DCC to haul hazardous waste from facilities owned by Ashland and Diaz, and entered into separate contractual relationships with DCC and Ashland and Diaz, respectively, for that purpose. By way of further response, Plaintiff incorporates by reference its response to Interrogatory No. 1.**

6. If Plaintiff alleges that AETC controlled the disposal process by which materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site, set forth with particularity the factual basis for that allegation and

identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE:** **Plaintiff further objects to the phrase "controlled the disposal process by which materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site" as vague and ambiguous.**

7. If you contend that AETC has responsibility under CERCLA for Diaz's allocable share of liability in this Case (whatever that is determined to eventually be), set forth with particularity the factual basis for that contention, and identify all persons with knowledge of those facts and identify all documents that support and/or relate to that contention.

**RESPONSE:** **Plaintiff incorporates by reference its response to Interrogatory No. 1.**

8. Set forth in detail the investigation Plaintiff undertook, if any, to ascertain whether Diaz is a viable entity and/or has assets to satisfy any judgment that may be entered against Diaz in this Case, and identify all persons with knowledge of those facts and identify all documents that support and/or relate to that investigation.

**RESPONSE:** **Plaintiff further objects to Interrogatory No. 8 as seeking information that constitutes attorney work product prepared in anticipation of litigation. By way of further answer, Plaintiff performed internet-based research through PACER to determine that Diaz filed for protection under chapter 7 of the United States Bankruptcy Code and to ascertain the identity of the Chapter 7 Trustee. Plaintiff then contacted the Chapter 7 Trustee, John Ring, Esquire, who informed Plaintiff that the U.S. Environmental Protection Agency holds a $10,000,000 administrative claim over and above millions of dollars of unsecured claims against Diaz. The Trustee indicated that there would be no distribution.**

9. Identify the total amount of hazardous substance that Plaintiff alleges was generated by Diaz that was eventually disposed of at the Site, and include in your answer the precise nature of those hazardous substances and the dates of each shipment that equal the total you allege.

**RESPONSE:** **Plaintiff further objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott*

*Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the

foregoing objection, Plaintiff responds that the opinion of an expert may be relevant in

responding to this interrogatory and that, at this time, Plaintiff has not yet identified any

expert witnesses whom it expects to call at trial. By way of further answer, Plaintiff refers

AETC to the deposition testimony of Manfred DeRewal, Sr., Bruce DeRewal, Linda

Cochran, John Barsum, Jeffrey Shaak, Karen Porter and June Stephens elicited in this

case; all of the other deposition testimony concerning DCC's disposal of waste at the Site;

and the other documents comprising the nexus files for Diaz located in the Boarhead

Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735

Market Street, Philadelphia, PA 19103.

10. Identify the total amount of hazardous substances the Plaintiff alleges was generated by Ashland that was eventually disposed of at the Site, and include in your answer the precise nature of those hazardous substances and the dates of each shipment that equal the total you allege.

**RESPONSE**: Plaintiff further objects to this interrogatory insofar as it constitutes a

contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet

fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott*

*Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the

foregoing objection, Plaintiff responds that this interrogatory calls for the opinion of an

expert and that, at this time, Plaintiff has not yet identified any expert witnesses whom it

expects to call at trial. By way of further answer, Plaintiff refers AETC to the deposition

testimony of Manfred DeRewal, Sr., Bruce DeRewal, Linda Cochran, John Barsum,

Jeffrey Shaak, Karen Porter and June Stephens elicited in this case; all of the other

deposition testimony concerning DCC's disposal of waste at the Site; and the other

documents comprising the nexus files for Ashland located in the Boarhead Document

Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street,

Philadelphia, PA 19103.

11. What share of the Response Costs does Plaintiff allege AETC is responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc. utilized in calculating AETC's alleged share of Response Costs.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a**

**contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

**fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott*

*Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994).**

12. What share of the Response Costs does Plaintiff allege Diaz is responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc, utilized in calculating Diaz's alleged share of Response Costs.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a**

**contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

**fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott*

*Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994).**

13. What share of the Response Costs does Plaintiff allege Ashland is responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc. utilized in calculating Ashland's alleged share of Response Costs.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a**

**contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

**fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott*

*Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994).**

14. Does Plaintiff agree or disagree that DeRewal Chemical Company secretly and surreptitiously disposed of hazardous substances at the Site? If you disagree, set forth with

particularity the factual basis for that disagreement and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that disagreement.

**RESPONSE:** **Plaintiff further objects to the phrase "secretly and surreptitiously" as vague and ambiguous and objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994). By way of further response, Plaintiff agrees that DeRewal Chemical Company disposed of hazardous substances at the Site.**

15. Does Plaintiff contend that the July 5, 1978 letter (and attachment) from the City of Philadelphia (Exhibit D18, marked on May 15, 2003) does not accurately reflect the sewer surcharges referenced therein? If you do so contend, set forth with particularity the factual basis for that contention and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that contention.

**RESPONSE:** **Plaintiff further objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994). Plaintiff further objects to the phrase "accurately reflect" as vague and ambiguous. Subject to and without waiving said objection, Plaintiff responds that, if this interrogatory is asking whether the Plaintiff contends that the information concerning the volumes and location and method of disposal of the wastes enumerated in the July 5, 1978 letter and attachment from the City of Philadelphia is correct, Plaintiff does not so contend. At the time the above-described letter was written, the City of Philadelphia lacked, and has not since obtained, a factual basis for the assumptions concerning volumes and location and method of disposal set forth in the above-described documents. In addition, the deposition testimony of,** *inter alia***, Manfred DeRewal Sr. contradicts the assumptions set forth in these documents. Additional**

individuals with knowledge of facts pertaining to these documents include David

Michelman, Esquire, 2207 Chestnut St., Philadelphia, PA 19103 (215) 557-9440, and

Thomas Healy, City of Philadelphia (215) 592-6233.  By way of further response, Plaintiff

refers AETC to the documents comprising the nexus files for AETC, Ashland and Diaz

located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews &

Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

16. If you contend that any party to this Case has, at any time, made any declaration against interest or admissions, state:

(a)    The name and address of the person making said declaration against interest or admission;

(b)    The name and address of the person to whom it was made;

(c)    The nature of the declaration against interest or admission, in detail;

(d)    If in writing, attach a copy hereto;

(e)    The name and addresses of all persons present when the declaration against interest or admission was made.

**RESPONSE:  Plaintiff responds that defendants have made declarations against interest**

**and admissions in various forums including in their pleadings, in response to discovery**

**propounded in connection with this case, and in documents filed with governmental**

**agencies as public records and which are equally as accessible to defendants as they are to**

**Plaintiff.  By way of further answer, Plaintiff refers AETC to the documents comprising**

**the nexus files for the defendants in this case located in the Boarhead Document Repository**

**at the Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street,**

**Philadelphia, PA 19103 and the deposition testimony of Manfred DeRewal, Sr., Bruce**

**DeRewal, Linda Cochran, John Barsum, Jeffrey Shaak, Karen Porter and June Stephens**

**elicited in this case.**

17. If you have in your possession, custody, or control any statements, whether written or oral, relevant to the subject matter of this Case from any individual, who is not a party to this Case, state:

    (a)    The name and address of the person making said statement;

    (b)    The name and address of the person to whom it was made;

    (c)    The nature of the statement, in detail;

    (d)    If in writing, attach a copy hereto;

    (e)    The name and addresses of all persons present when the statement was made.

**RESPONSE: Plaintiff responds that all discoverable non-party statements relevant to the subject matter of this case in Plaintiff's possession are contained in the files comprising the Boarhead Document Repository located at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103 and the deposition testimony of Bruce DeRewal, Linda Cochran, John Barsum, Jeffrey Shaak, Karen Porter and June Stephens elicited in this case.**

18. Identify all persons (including their last known address and telephone number) who you will or may call to testify at trial, together with a statement of the general subject matter of their testimony.

**RESPONSE: Plaintiff responds that, at this time, it has not yet identified the witnesses whom it expects to call at trial. Plaintiffs will identify the witnesses it expects to call at trial and will supplement its response to this interrogatory in accordance with the rules of this Court at an appropriate time.**

19. Identify by name, current address, and telephone number any and all persons or entities who have performed environmental consulting, investigatory, or remedial activities for or on behalf of You with regard to the Site.

    (a)    Identify, with specificity, said environmental consulting, investigatory, or remedial activities.

    (b)    Attach a copy of all documents identified in the answer to subsection (a) above.

**RESPONSE:** Plaintiff further objects that a request to "attach" copies of documents is not permitted by Rule 33. By way of further objection, this request is overly broad and unduly burdensome. By way of further objection, the word "investigatory" is vague, confusing, and ambiguous. Without waiving any such objections, Pursuant to Fed. R. Civ. P. 33(d), the information sought in this interrogatory can be derived or ascertained from documents concerning Site response costs and activities located in the Boarhead Document Repository at the Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103. By way of further response, such documents may be included in documents located at Pitney Hardin, 200 Campus Drive, Florham Park, New Jersey 07932. Such non-privileged documents are available for inspection and copying upon reasonable notice.

## DOCUMENT REQUESTS

20. All documents whose identity was requested in the above initial Interrogatories.

**RESPONSE:** Plaintiff refers AETC to its responses to the Initial Interrogatories.

21. Any and all documents not located in the document repository that relate to AETC's alleged liability in this Case.

**RESPONSE:** Plaintiff responds that all discoverable documents in its possession, custody and/or control relating to AETC's liability in this case are located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103. By way of further response, such documents may be included in documents located at Pitney Hardin, 200 Campus Drive, Florham Park, New Jersey 07932. Such non-privileged documents are available for inspection and copying upon reasonable notice.

22. Any and all documents not located in the document repository that Plaintiff will use at trial to establish AETC's liability in this Case.

**RESPONSE:** **Plaintiff further objects to this document request insofar as it calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott Laboratories***, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the foregoing objection, Plaintiff responds that it has not yet identified the discoverable documents it will use at trial to establish AETC's liability in this Case. Plaintiff will identify the documents not contained in the Boarhead Document Repository that it will use at trial to establish AETC's liability in this Case and will supplement its response to this interrogatory in accordance with the rules of this Court at an appropriate time. By way of further response, to the best of Plaintiff's present knowledge and belief, all documents that Plaintiff will use at trial to establish AETC's liability are contained in the files comprising the Boarhead Document Repository located at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.**

AS TO OBJECTIONS

Dated: September 14, 2004

Glenn Harris, Esquire
Attorney I.D. No. 51222
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
Plaza 1000
Suite 500
Voorhees, NJ 08043-4636

# EXHIBIT 3

John P. Leuzarder, Jr.

November 29, 2004

Page 1

1               UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3  _____   CIVIL ACTION NO.
   BOARHEAD FARM AGREEMENT          02-CV-3830
   GROUP,                           Judge Legrome D. Davis
4
            Plaintiff,                   VOLUME I
5                                   Oral Deposition of
6        vs.               JOHN P. LEUZARDER, JR.
   ADVANCED ENVIRONMENTAL TECHNOLOGY
7  CORPORATION; ASHLAND CHEMICAL
   COMPANY, BOARHEAD CORPORATION;
8  CARPENTER TECHNOLOGY CORPORATION;
   CROWN METRO, INC.; DIAZ CHEMICAL
9  CORPORATION; EMHART INDUSTRIES,
   INC.; ETCHED CIRCUITS, INC.; FCG,
10 INC.; GLOBE DISPOSL COMPANY, INC.;
   GLOBE-WASTECH, INC.; HANDY & HARMAN
11 TUBE COMPANY, INC.; KNOLL, INC.;
   MERIT METAL PRODUCTS CORPORATION;
12 NOVARTIS CORPORATION; NRM INVESTMENT
   COMPANY; PLYMOUTH TUBE COMPANY;
13 QUIKLINE DESIGN AND MANUFACTURING
   COMPANY; RAHNS SPECIALTY METALS,
14 INC.; ROHM & HAAS COMPANY, SIMON
   WRECKING COMPANY, INC.; TECHALLOY
15 COMPANY, INC; THOMAS & BETTS
   CORPORATION; UNISYS CORPORATION;
16 UNITED STATES OF AMERICA
   DEPARTMENT OF NAVY,
17
            Defendants.
18 _____
            *   *   *   *   *
19       MONDAY, NOVEMBER 29, 2004
            *   *   *   *   *
20       Transcript in the above matter taken at
   the offices of WOLFF & SAMSON, PC, The Offices at
21 Crystal Lake, One Boland Drive, West Orange, New
   Jersey, commencing at 10:30 a.m.
22
        Certified Shorthand Reporting Services
23               Arranged Through
        Mastroianni & Formaroli, Inc.
24           709 White Horse Pike
        Audubon, New Jersey 08106
25           (800) 972-3377

John P. Leuzarder, Jr.                                    November 29, 2004

Page 14

1  incineration was no longer an acceptable alternative
2  and so on and so forth. So I ended not finding
3  anything acceptable and the result was that Bob and I
4  stuck together and we formed the beginnings of AETC.
5      Q.    And how long were you with AETC?
6      A.    Until in, I believe this is correct,
7  until December 31, 1987. It's either '86 or '87. I
8  think it was '87.
9      Q.    And why did you stop in December 31,
10  1987 working for AETC?
11      A.    Frankly, I was burnt out.
12      Q.    Did you go on to hold another position
13  after that time?
14      A.    No, I had been doing woodworking ever
15  since.
16      Q.    Do you own a woodworking business?
17      A.    No, I do it more volunteer. I do a lot
18  of volunteer work and I build a lot of furniture for
19  various camps or things of that nature as a
20  volunteer.
21      Q.    When you first started AETC in July
22  1976, were you one of the owners of the company?
23      A.    Yes.
24      Q.    Were you half owner of the company?
25      A.    Yes.

Page 15

1      Q.    Did AETC issue stock?
2      A.    No.
3      Q.    Was Landmesser an owner of the company
4  at that time, July 1976?
5      A.    Yes.
6      Q.    Did you hold a corporate office at that
7  time?
8      A.    No. We worked out of my house on
9  Randolph -- in Randolph, New Jersey.
10      Q.    Who was the president of AETC?
11      A.    Bob Landmesser.
12      Q.    Who was the vice president?
13      A.    Myself.
14      Q.    Did you hold the title of vice president
15  throughout your tenure at AETC?
16      A.    Yes.
17      Q.    Did you hold any other position at AETC?
18      A.    I was, I guess you'd say I was involved
19  in the sales department, accounting department, Bob
20  was as well but we shared that responsibility. But
21  principally over the course of those ten years that I
22  was involved in a lot of different areas within the
23  company. So I guess you'd call myself -- I share the
24  responsibility with Bob. And that was basically my
25  title was just vice president.

Page 16

1      Q.    Did you have any other employees in
2  1976?
3      A.    I don't recall.
4      Q.    Did you have an office manager?
5      A.    It's very vague to me, you know as to
6  those details what occurred, I don't recall.
7      Q.    In what year did you bring on any other
8  employees?
9      A.    I can -- what I can remember is
10  operating in our garage at our home, my home that I
11  owned at that time and we began to take on
12  secretarial help. I think we had a girl named
13  Phyllis Mulligan. Phyllis Mulligan who is now
14  Phyllis Leuzarder. She's my brother's wife.
15      Q.    When did she work for you?
16      A.    Again, in those first couple years.
17      Q.    Did she provide secretarial support?
18      A.    Yes, she was secretary. Later she went
19  into sales but I'm not sure whether that was '77,
20  '78.
21      Q.    Anyone else you can recall in the first
22  few years that was employed by AETC other than you,
23  Mr. Landmesser and Phyllis Mulligan?
24      A.    I'm trying to think who was there then.
25  I don't remember. But what happened was, the town

Page 17

1  congratulated us on our success because it had been
2  known and asked us now to find a real office. And at
3  that point the company was growing. We had a
4  salesmen working for us, a fellow who was there only
5  a short time. I think, if I'm not mistaken, at one
6  point we had help from a woman name Roberta Strain
7  Bobby Strain, whose husband worked for National
8  Starch.
9      Q.    Could you spell that last name?
10      A.    S-t-r-a-i-n, Strain. Oh, the salesman's
11  was Kevin Donovan.
12      Q.    Do you know when he was employed by
13  AETC?
14      A.    I would say in the '87 -- '78 -- '77,
15  '78 era.
16      Q.    What about Roberta Strain?
17      A.    I don't really recall. Somewhere in
18  those early years.
19      Q.    You mention that AETC found a new
20  location after working in your garage, where was
21  that?
22      A.    We rented offices in Morris Plains on
23  Speedwell Avenue. I believe it was called the Dayton
24  Building or something.
25      Q.    When did you move there?

5 (Pages 14 to 17)

Page 18

A.   Probably '77, '78.  I would say '78.
I'm guessing.  I don't really recall.
Q.   So for approximately the first year and
a half of AETC's corporate existence you were working
out of your garage?
A.   That's correct.
Q.   When you moved to the offices on
Speedwell Avenue, did you take on any employees then?
A.   Yes, we began to -- we began to grow
over the next, you know, the number of years that we
were there.  And I don't remember where we moved up
to our offices in Mt. Olive, but I would say we were
there maybe three or four years, maybe more and we
began to grow.  We took on a number of employees.
Q.   Were any corporate officers added in the
time that you were at Speedwell Avenue?
A.   I believe we had a fellow named Carl
Lehrmann, if I'm not mistaken.  Carl Lehrmann became
our general, kind of like our general manager.
Q.   Do you recall the year that he was
hired?
A.   No.
Q.   How long did he work for AETC?
A.   I would say three years, approximately.
Q.   Any other corporate officers that were

Page 19

brought on while you were at Speedwell Avenue?
A.   I don't think so.
Q.   Where did the offices move after
Speedwell Avenue?
A.   We moved to Gold Mine Road in Mt. Olive.
Q.   And what year was that?
A.   I don't know.
Q.   But you were at Speedwell Avenue for
approximately three to four years?
A.   I would say three years, perhaps.  The
company was growing fairly rapidly and at one point
we had opportunity to acquire land there in Mt. Olive
and we took that, but I don't remember the year it
was exactly.  Bob always had a great memory for
dates.  I'm sorry, I just don't.
Q.   No need to apologize.  How long were you
at Gold Mine Road?
A.   Well, until of course I had left the
company.
Q.   When you and Mr. Landmesser started AETC
in July 1976, what was AETC's business?
A.   We were endeavoring to find alternatives
to help our customers, of course which were few at
that time, to find ways of recycling, recovering and
properly disposing of hazardous and nonhazardous

Page 20

1   waste materials.
2   Q.   Who were your customers when you first
3   started in July 1976?
4   A.   I couldn't give you a list.  You know,
5   obviously with this deposition it is apparent that
6   Ashland Oil or Ashland was, but I only remember that
7   clearly because of the deposition.
8   Q.   And how did AETC endeavor to find
9   alternatives for the disposal of hazardous wastes of
10  its customers?
11  A.   We spent a lot of time -- there was very
12  vague regulations at that time.  The Federal Resource
13  Conservation Recovery Act and other things were not
14  clear.  There was a lot of concern over improper
15  disposal.  It was the common place.  It was common
16  place at that time because most of the waste were
17  handled by garbage men.  And so our -- what we were
18  trying to do is see if within -- we were trying to
19  convince people that we knew at various corporations
20  and so on that we would ask them to entrust us to
21  find alternatives as an example like recycling and
22  trying to put more and more materials back into reuse
23  than to see them disposed of.  Because we had been at
24  Kin-Buc and other places things that we did not like.
25      And one of the reasons we were let go

Page 21

1   was because we were outspoken about those things.
2   What we saw we were -- we would say we just don't
3   think that's right.  And as a result that was one of
4   the reasons we were let go, so quick to be removed in
5   1976.
6       But, we would -- Bob principally would
7   get on the phone and call all over the place and try
8   to track down leads as to finding alternatives for a
9   specific waste stream of a company, let's say that we
10  had approached or had approached us.  Somebody would
11  say to us, we have a particular waste stream.  We
12  don't know what to do with it.  Can you help us to
13  find ways of disposing of this material.  In some
14  case it was acid neutralization, like Mr. DeRewal
15  offered at Wissinoming.  In other cases it was the
16  recovery of solvents at Marisol or other like
17  facilities.  In other cases it was the incineration
18  of materials much like Rowlands Environmental and
19  later other facilities.
20      So we were basically, if you will, like
21  a real estate broker.  We would go in and try to
22  match up a client's need with someone who had the
23  facilities to provide for that and basically that's
24  what we did.  We were -- we would come back to our
25  customers and suggest that they consider this

John P. Leuzarder, Jr.

November 29, 2004

particular alternative and basically that's how the company got started.

Q.    Would you describe your business in the same way in 1977?

A.    Yes. We had very little working out of my home, but with a determination that we were going to be -- we were going to bring professionalism to an industry that didn't have it. And for '76, which was really the very, very beginning and then '77 and into '78, we were still a real small potatoes organization. I think the first vehicle we ever bought probably was in '78. It was a tire van that we bought from a local tire company. And it was just a little short van that we carried safety equipment around in. In other words, just like a family van use. And it happened to be painted red, white and blue. We just took XY Tire Company off the side and put AETC on the side.

Q.    What did you use that vehicle for?

A.    We used it to try to establish credibility with our customers that we were more than just telephone in the sales organization. And that we had -- we accumulated safety equipment and we began to put on, to talk to our customers about chemical safety and various types of fire

extinguishers and various types of things of that nature. So it was principally for involvement in bringing packaging materials to our customers in small quantities and also impressing them with the idea that we had some technical capabilities in that field.

Q.    What was the vehicle that you bought after this first van?

A.    A Ford, I believe it was a Ford straight truck. I don't recall the model or whatever, but I believe it was probably a 22 foot, and I'm guessing, 18 to 22 foot straight truck and we bought a couple of those initially.

Q.    And what year was that?

A.    I'm not really sure.

Q.    Was it prior to 1980?

A.    Oh, yes.

Q.    Was it prior to 1977?

A.    No. I'd say '78, '79.

Q.    Did AETC itself ever haul its customer's waste?

A.    Yes. As the company grew we began to add -- see, our principal business became the handling of laboratory chemicals, meaning that a company would have lab waste, they'd have outdated

1    laboratory reagent chemicals on their shelves. And
2    they wanted -- they had reached the shelf life where
3    they had excess or whatever. And so what we would do
4    is go in and actually pack these up into open top
5    drums with vermiculite insulation according to the
6    DOT categories that were required. And then these
7    materials would be so that recoverable materials
8    would be separated, acids would be categorized, bases
9    would be categorized and so on and so forth. And
10    then these would go out to the various facilities
11    that had at that time licenses to handle these
12    things.
13        Q.    When was AETC doing this?
14        A.    I guess -- I guess we started perhaps in
15    the late '76, maybe '77.
16        Q.    Did you have drivers?
17        A.    No.
18        Q.    Who would physically drive the truck in
19    1976?
20        A.    Well, we didn't have a truck in '76, but
21    we would -- the materials would be I guess picked up
22    by whoever it was that was hauling the materials and
23    I don't remember who that was. I'm not even sure we
24    did this in '76.
25        Q.    What about 1977?

1        A.    I would say we were beginning to do that
2    at that time and I'm just going on the basis of
3    trying to recollect. But I would say in '77 we were
4    probably involved in the laboratory chemical business
5    on a small scale and of course that grew as time went
6    on.
7        Q.    Would AETC pick up the materials and
8    bring it back to an AETC facility?
9        A.    We didn't have a facility at that time.
10    I think we had a trucker and if I'm not mistaken it
11    was Bob Collioud up at ETC. I'm not sure, but I
12    think there was a facility -- I can't recall. It's
13    vague in my recollection as to who was involved in
14    these activities in those early years. But at some
15    point in time we had a company called ETC,
16    Environmental Transport Group or something like that,
17    a guy by the name of Bob Collioud up in Mt. Olive who
18    was doing some of our transport for us and there was
19    some other folks as well.
20        Q.    But AETC itself did do some transporting
21    with its own trucks?
22        A.    Yes, in probably '77, '78, whenever we
23    bought the straight jobs. We may have taken a few, a
24    few things in our little van, but that would have
25    been limited to just a couple drums.

John P. Leuzarder, Jr.                                 November 29, 2004

Page 46

1    A.    I don't remember.
2    Q.    Did you see anything else?
3    A.    I've seen drums there. I believe there
4  were some drums there.
5    Q.    Do you know what was in the drums?
6    A.    Can't be sure. Might have been lab
7  chemicals, my might have been other things, I don't
8  know.
9    Q.    How many drums did you see?
10    A.    Twenty, thirty. Might have been more, I
11  don't remember.
12    Q.    Did you ask Mr. DeRewal about the drums?
13    A.    You know, I don't really remember
14  exactly. He seemed to be operating a facility there
15  that made sense. So it seemed very normal that he
16  would have those things there.
17    Q.    Did he describe -- other than acid
18  neutralization, did he describe anything else that
19  was done at the Wissinoming facility?
20    A.    Yes, he said he was recover laboratory
21  reagent chemicals separating out silver, I believe,
22  and other, other heavy metals for recovery.
23    Q.    Did AETC ever use his services in that
24  capacity?
25    A.    I believe so.

Page 47

1    Q.    Do you recall for what customers?
2    A.    No.
3    Q.    Do you recall when?
4    A.    No.
5    Q.    Prior to 1980?
6    A.    Well, it would have to be because
7  obviously this all -- he got himself into trouble, I
8  believe, in '77, so.
9    Q.    And what exactly did AETC hire him to do
10  in that way?
11    MR. SABINO: Are you talking about the
12  recovery of heavy metals?
13    MS. MOONEY: Yes.
14    THE WITNESS: Laboratory chemicals and
15  other things, I don't recall.
16    MR. SABINO: Do you mind if we take a
17  break?
18    MS. MOONEY: Yes, that's fine.
19  BY MS. MOONEY:
20    Q.    Do you recall the name of Manfred
21  DeRewal's business that AETC dealt with?
22    A.    I thought it was DeRewal Chemical.
23    Q.    Does the name DeRewal Chemical Company
24  sound familiar to you?
25    A.    Yeah.

Page 48

1    Q.    All right, I want to look a little more
2  closely at the nature of the business relationship
3  between DeRewal Chemical Company and AETC. What was
4  the nature of the business relationship between
5  DeRewal Chemical Company and AETC in 1976?
6    A.    As I stated before, we were a brokerage
7  firm that like a real estate operation was connecting
8  up sellers of services with those in need of such
9  services on the basis that the supplier of the
10  services, in this case, DeRewal Chemical Company was
11  approved by the necessary -- by the appropriated
12  authorities. And that the customer in this case
13  Ashland Chemical, would make, would also -- we'd
14  check out their credentials as well, that we would
15  connect it to that they might develop a relationship
16  and that we were paid a commission by DeRewal
17  actually, we billed -- we billed -- that's incorrect.
18  Let me restate that.
19    We billed Ashland for the cost that we
20  were being charged by DeRewal for the neutralization
21  of acids and so on plus a profit for ourselves. And
22  we would then pay DeRewal Chemical what they were
23  asking for the individual truckload prices of
24  neutralization of those particular chemicals.
25    Q.    What paper was generated in that

Page 49

1  transaction?
2    A.    The paper would be a Department of
3  Transportation shipping document issued by Ashland to
4  DeRewal if that's what they called their trucking
5  operation, I think they did. But in other words,
6  they would give a DOT shipping document to the
7  trucker for transportation material to that specific
8  location, to Wissinoming Industrial Park.
9    So the DOT shipping document would be
10  the first thing. And then second of all would be a
11  invoice from DeRewal Chemical to us, AETC, for
12  services rendered both for trucking and disposal.
13  And then a piece of paper would be generated from us
14  to Ashland on the billing of the DeRewal invoice plus
15  our commission.
16    Q.    Would that last document that you
17  described, was that an invoice?
18    A.    Yes, it was.
19    Q.    And how did AETC calculate its profit?
20    A.    It varied with the individual jobs.
21    Q.    In this -- in your relationship with
22  DeRewal, how did you calculate your profit?
23    A.    I don't remember.
24    Q.    Do you recall in this 1976, 1977 time
25  frame, how AETC calculated its profit with other

13 (Pages 46 to 49)

Page 58

approved by the agencies that licensed them, we
didn't go through that procedure on the basis that
the government knew what they were doing.

Q.    Did AETC take a copy of the permits that
were shown to you by DeRewal?

A.    Oh, yes.

Q.    You took copies?

A.    We had copies.

Q.    Do you know what happened to them?

A.    No.

Q.    Do you know where they would be today?

A.    No.

Q.    Did AETC have a contract with DeRewal
Chemical Company?

A.    I don't believe so.

Q.    How did you memorialize the agreement
that you had with DeRewal?

(OBJECTION)   MR. SABINO:  Objection to the form of
the question.  He didn't say it was memorialized.

THE WITNESS:  I believe like with most
of our facilities that we dealt with over the years
it was basically a handshake agreement.  Here's the
price for the material for this year.  And we knew
what the price would be for disposal.  And if they
were going to pass a price increase on to us, they

Page 59

would need to give us that at least with 30 days
written notice to tell us that there's going to be a
change so that we could make adjustments to our price
to our customers, but it was very informal.

BY MS. MOONEY:

Q.    Did AETC retain DeRewal Chemical for
transporting and disposing of its customer's waste?

A.    Again, we never retained them in the
sense of the word.  Did we use -- did we use DeRewal
for disposal, yes.  Did we use them for
transportation particularly of acid streams, yes.  As
to -- but we certainly didn't have a contract of any
sort with them.  It was done informally.  It was, you
know, we have this here, can you handle it, yes, how,
so on.  Learning about their facilities and what they
do and here's what the price per drum or a gallon
will be and this is how we worked with most of our
people over the years.  And you knew who they were.
And 99 percent of them were excellent at what they
did and that was the anomaly.

Q.    Right, but your agreement with DeRewal
Chemical included both picking up the waste from your
customer and also disposing of the waste, not just
picking it up?

A.    Yes.

Page 60

1    Q.    Or just disposing of it?
2    A.    Yeah, they didn't do trucking for us in
3  the sense of trucking to other facilities that I
4  remember.
5    Q.    Other than the pricing, did the
6  agreement you had with DeRewal have any other terms
7  that you discussed with him?
8    A.    Just that everything would be done in
9  conformance with the appropriate state and federal
10  regulations.
11    Q.    Was that an oral representation that he
12  made to you or somebody else?
13    A.    I believe it was our representation to
14  him that everything that -- we always said that
15  everything we said to our customers and we expect it
16  of him, everything would be done in conformance with
17  all state and federal appropriate -- applicable
18  state, federal regulations.
19    Q.    The agreement that AETC had with
20  DeRewal, what customers was he to service for AETC?
21    A.    I don't remember.  Other than Ashland, I
22  just don't remember.
23    Q.    Was he to handle all of AETC's customers
24  acid waste?
25    A.    No.  We had a variety of facilities

Page 61

1  developed over that course of time of companies that
2  handled materials.  But he was primarily, not always,
3  but primarily bulk acid waste, bulk, meaning, full
4  truckload acid waste.
5    Q.    What else did he handle for AETC's
6  customers?
7    A.    I believe recyclable lab reagent
8  chemicals.
9    Q.    Anything else?
10    A.    Not that I remember.  He may have
11  handled drums of acid waste as well, but that's --
12  I'm speculating.  I don't remember exactly.
13    Q.    Did AETC discuss with DeRewal what type
14  of vehicles he would be using in handling AETC's
15  customer's waste?
16    A.    DOT -- they would have to be DOT
17  approved for that particular material.
18    Q.    Did DeRewal have any dealings with your
19  customers himself?
20    A.    Not that I'm aware of.
21    Q.    Was that discussed in your meetings with
22  DeRewal?
23    A.    Not that I remember.
24    Q.    Did AETC discuss with DeRewal where he
25  would be disposing of their customer's waste?

John P. Leuzarder, Jr.                                           November 29, 2004

Page 62

1    A.    Yes.
2    Q.    And what did you discuss with him about
3    that?
4    A.    The acids and any materials that he
5    would recycle would be done at his Wissinoming
6    facility.
7    Q.    Did he mention any other disposal sites
8    to you?
9    A.    No.
10        MR. SABINO: Off the record.
11        (Off-the-Record Discussion)
12   BY MS. MOONEY:
13   Q.    Did AETC in its agreement with DeRewal
14   specify anything to him regarding ownership of the
15   waste that he handled?
16   A.    As I recall it, if once a trucker took
17   the material, it belonged to them.
18   Q.    Did your agreement -- did AETC's
19   agreement with DeRewal specify anything regarding
20   duration of the agreement?
21   A.    Didn't have an agreement, but in terms
22   of a written agreement, but, no.
23   Q.    I meant your oral agreement?
24   A.    Forever.
25   Q.    What about payment?  What provisions

Page 63

1    were made for timing of payment, for example?
2    A.    They wanted their money within 30 days
3    and we endeavored to get it within 30 days from a
4    customer -- we endeavored to get payment from our
5    customer within 30 days in order to pay DeRewal on
6    time. I don't remember whether we had to pay him
7    immediately or whether it was over the normal 30 day
8    span.
9    Q.    What did DeRewal Chemical Company's
10   duties entail for AETC?
11   A.    Safely picking up where they were the
12   trucker they safely -- they were to safely pick up in
13   compliance with the federal regulations U.S.
14   Department of Transportation and transport, properly
15   placard, with properly trained drivers, in other
16   words, according to DOT requirements and transport
17   that material to the facility that was listed on the
18   bill of lading and to properly unload those
19   materials. And then DeRewal Chemical, that was the
20   trucker, in other words, conformance with DOT, then
21   DeRewal Chemical was to properly neutralize and
22   dispose of all or recover all wastes that were
23   shipped to them in conformance with all applicable
24   state and federal regulations.
25   Q.    And none of this was put in writing?

Page 64

1    A.    It may -- I think on all of our, you
2    know, our correspondence when we had written, you
3    know, basically letters back and forth to one
4    another, this was all clearly specified.  It was
5    throughout the history of AETC on one side and the
6    other.  The Ashland Oil would hold us saying, you
7    know, we want to make sure anything we ship to you is
8    being done in compliance with state, federal
9    regulations, we'd pass that on to the person who's
10   actually doing the work.
11   Q.    You said where they were truckers, I
12   think, referring to DeRewal, were there circumstances
13   where DeRewal was not the trucker but he still
14   disposed of the waste?
15   A.    There may have been with laboratory
16   chemicals, I don't know.
17   Q.    In your agreement with DeRewal, was it
18   his duty to supply vehicles for the transport of your
19   customer's waste?
20   A.    Yes.
21   Q.    How was -- how did AETC assign DeRewal
22   Chemical Company his jobs?
23   A.    Like, what do you mean?
24   Q.    Well, how did DeRewal Chemical Company
25   know what it was supposed to do for AETC's customers?

Page 65

1    A.    Based on an original contact via phone,
2    checking out their, obviously their necessary permits
3    and then bringing the particular customer to the
4    facility to approve it.
5        MR. SABINO: I don't think you
6    understood her question. I'm sorry. Go ahead.
7    BY MS. MOONEY:
8    Q.    How did DeRewal Chemical Company know
9    what to do for one of AETC's customers?
10        MR. BIEDRZYCKI: You mean on a specific
11   occasion when there was something a load that
12   somebody wanted?
13   BY MS. MOONEY:
14   Q.    Yes.  Can you describe the mechanics
15   of --
16        MR. SABINO: Once the relationship had
17   been established.
18        THE WITNESS: What were they supposed
19   to do once they got to the site, in other words?
20   BY MS. MOONEY:
21   Q.    Well, how did they know what site to go?
22   A.    They would -- the customer, Ashland
23   would call us and say I have a load of acid that
24   needs to be picked up. We would call -- one of our
25   people would call down to DeRewal over to the office

Page 66

1 and say to their secretary or whoever was in charge
2 of transportation, Ashland has a load of material
3 that needs to be picked up, in this case the
4 oxidizing acids and they need it done, let's say
5 tomorrow, can you do it tomorrow? We'd call back to
6 the customer and say how about tomorrow morning, make
7 those arrangements. The truck driver would show up,
8 he knew exactly where to go and what to do.
9     Q.    How did he know where to go?
10    A.    Because it was always the same tank.
11 And he would have to greet, he'd have to meet the
12 Ashland representative. The two of them would work
13 together to get the truck loaded. The Ashland
14 representative, you know, who is responsible for the
15 process would be there to meet him, the truck driver
16 and they would be sure everything was copacetic and
17 they would load -- the driver would load the truck
18 under the supervision of the Ashland employee. And
19 once that was all sealed up, the bill of lading
20 prepared, the proper placards put on the truck, the
21 truck would exit and take it to Wissinoming.
22    Q.    In the original agreement with DeRewal,
23 did you discuss how many times per week DeRewal would
24 be picking up a customer's waste?
25 (OBJECTION)   MR. SABINO: I don't understand

Page 67

1 original. I object to the use of that word.
2         THE WITNESS: In the -- as we -- we
3 would rely strictly upon the customer to tell us what
4 they had and in this particular case how often they
5 inspected it. And if Ashland said we expect to
6 produce three tank load, tank wagon loads of this
7 acid a week, we would kind of let them know that
8 could vary. It could be two, could be one, could be
9 none, could be four, but the individual calls would
10 go out for individual loads.
11 BY MS. MOONEY:
12    Q.    Who at AETC would be responsible for
13 calling DeRewal?
14    A.    After the initial contact was made by
15 Bob and I as salespeople, it would go more to
16 secretarials.
17    Q.    Do you know what secretary actually
18 would call DeRewal?
19    A.    I don't remember.
20    Q.    Any customers other than Ashland that
21 DeRewal serviced for AETC?
22    A.    I don't know.
23    Q.    You don't know?
24    A.    I just don't know. I can't remember.
25         MS. MOONEY: Do you want to keep going,

Page 68

1 Tom?
2         MR. SABINO: Yes, we're good. It's
3 quarter after.
4 BY MS. MOONEY:
5     Q.    Did AETC take any steps to insure that
6 DeRewal was doing his job properly after you
7 originally had an agreement with him?
8 (OBJECTION)   MR. SABINO: Objection to the use of
9 the word properly.
10        THE WITNESS: Just make a phone call,
11 how did everything go? Fine. Went well.
12 BY MS. MOONEY:
13    Q.    Anything else?
14    A.    As long as he continued to be approved
15 by the appropriate authorities and his permits were
16 upheld, we had no -- we did not -- frankly, I'll be
17 honest with you, we did not question the man. We
18 thought he really was doing the job.
19    Q.    And how did you -- how did AETC insure
20 that his permits were up to date?
21    A.    They were required when the permit
22 expired to send us a new one immediately or it was
23 for a period of -- I guess they were required to keep
24 us up to date on the permits. And of course our
25 secretarial staff or whoever would keep a file or we

Page 69

1 would keep the file and make sure everything was
2 copacetic.
3         We were using contact too with the
4 state, particularly New Jersey DEP and we would be
5 talking to them almost on a weekly basis Ron Buchanan
6 and, you know, what the scuttlebutt was, who's doing
7 what and so on and so forth. And we if heard
8 anything we'd ask about specific companies because we
9 recognized that there was a lot of things going on in
10 the industry at that time and a lot of people
11 unfortunately were going to jail and we needed to be
12 very, very careful about who we dealt with. So we
13 dealt a lot with -- kept in close contact with the
14 New Jersey DEP, Dr. Ron Buchanan just to keep track
15 of what was going on and what he may have heard. And
16 if everything sounded reasonably well, we felt pretty
17 comfortable.
18    Q.    Did you have any dealings with
19 Pennsylvania DEP?
20    A.    I'm sure we did. I didn't personally.
21 I'm sure Bob did, but I don't recall.
22    Q.    Do you recall any discussions with any
23 government officials concerning DeRewal?
24    A.    No.
25    Q.    Do you recall informing any of the

18 (Pages 66 to 69)

1  government official that you spoke with about
2  DeRewal?
3      A.    I don't recall specific conversations.
4      Q.    Did AETC take any steps to insure that
5  DeRewal maintained his vehicles properly?
6      A.    No.   Under his permit that was his
7  responsibility.
8      Q.    Did AETC ever take any other steps other
9  than requiring permits and updates to permits --
10     A.    Other than the visit to the facilities,
11 no.
12     Q.    Let me finish my question before your
13 answer just so we know what it is?
14     A.    I'm sorry.
15     Q.    Did AETC ever take any other steps to
16 insure that the haulers it was using were handling
17 its customer's waste appropriately other than
18 requiring permits and updates to permits?
19     A.    As the company grew we became more and
20 more involved.  We were new to the field.  And as the
21 company grew, we became a much more scrutinizing as
22 time went on.  And of course more and more we became
23 aware of the specifics of the regulations, how things
24 ought to be done.  And, frankly, became relatively
25 expert in that field and were easily able to access

1  the compliance of the various haulers, but not
2  initially it was a learning curve for us.
3      Q.    You say other than the site visit, was
4  that something you did for every hauler who worked
5  with you?
6      A.    We didn't see DeRewal so much as a
7  hauler as a disposal facility.  The hauling in those
8  days was kind of a little bit taken for granted, if
9  you will.  They were licensed.  They were approved in
10 the state of New Jersey to haul in the State of New
11 Jersey, whatever.  And so the transportation aspects
12 if their trucks looked clean and orderly, their
13 people seemed to be competent, they held the
14 liability for the transportation of the material on
15 the roads and so on.  So we left pretty much that
16 part of it, looked into their permits, made sure they
17 were up to date and we felt pretty comfortable with
18 that.  But DeRewal was more of a disposal facility
19 for us, an acid neutralization facility and recovery
20 site than anything else, that would have been the
21 area that we would have scrutinized, so not the
22 hauler so much as the disposer.
23     MR. SABINO:  Monique, I apologize, but
24 I have a call with Judge Smith so I just have to step
25 out for a little bit.

1      MS. MOONEY:  Do you want to break for
2  lunch.
3      MR. SABINO:  That's great.
4      (Luncheon Recess)
5  BY MS. MOONEY:
6      Q.    We were just talking when we left about
7  AETC's agreement with DeRewal Chemical.  In 1976 or
8  1977, did AETC have any written agreements with
9  haulers that it used?
10     A.    I don't remember.
11     Q.    Did AETC keep records regarding its
12 dealings with DeRewal Chemical?
13     A.    We naturally had a normal file of
14 correspondence and things of that nature.
15     Q.    Did you keep records regarding payments
16 made to DeRewal?
17     A.    Our accounting whoever was doing our
18 accounting, our secretary undoubtedly did that.
19     Q.    Do you still have those records?
20     A.    No.
21     Q.    Do you know who does?
22     A.    No.
23     Q.    Were the records regarding payments made
24 to DeRewal created on a schedule?
25     A.    I don't understand the schedule.  What

1  do you mean the schedule?
2      Q.    Was there any documentation associated
3  with payments that AETC made to DeRewal?
4      A.    Normal accounting.
5      Q.    Were these documents generated every
6  week, every time he was paid, on any type of
7  schedule?
8      A.    I don't know.
9      Q.    Was the Wissinoming facility the only
10 disposal site that DeRewal was using to AETC's
11 knowledge?
12     A.    Yes.
13     Q.    Did AETC specify that the Wissinoming
14 facility was to be used for the disposal of any of
15 its customer's waste?
16     A.    I think it was more implied.  It was the
17 only facility that we knew he had.
18     Q.    Did AETC ever ask DeRewal Chemical where
19 it was disposing of waste?
20     A.    Again, it was implied by the fact that
21 was his only facility.
22     Q.    To AETC's knowledge was DeRewal taking
23 its customer's waste to the Wissinoming facility?
24     A.    Yes.
25     Q.    Did AETC ever take any steps to insure

**Page 122**

1 be. I don't remember Ashland, we ever installing
2 this equipment and Ashland ever using these
3 facilities, I just don't remember.
4      Q.    Was it DeRewal's idea the proposal in
5 this document?
6      A.    Yes.
7      Q.    Did he come to you?
8      A.    Yes.
9      Q.    And propose this plan to you?
10      A.    Yes.
11      Q.    Do you recall when he did this?
12      A.    No, just sometime prior to September.
13      Q.    Do you recall if he contacted you
14 through a telephone conversation?
15      A.    I assume so.
16      Q.    Do you have any specific recollection --
17      A.    No.
18      Q.    -- of how he contacted you?
19      A.    No.
20      Q.    Do you recall discussing this with him,
21 you, yourself?
22      A.    No. This letter does stimulate a little
23 bit of memory of this, but it is just extremely vague
24 and if I would comment, I would be misleading you. I
25 think the only thing I remember is that Ashland was

**Page 123**

1 faced with an increase in production. They were kind
2 of desperate to get rid of more acid than maybe
3 DeRewal could handle. And this is probably what
4 happened.
5           In speaking to DeRewal about this that
6 the acid production was going to increase perhaps at
7 the end of October, perhaps Ashland's contract date
8 ended in October and it was going to be renewed their
9 their production of acid was going to be
10 substantially increased. We went to DeRewal and said
11 well, how much of this can you handle. And I think
12 that -- and just very vague, but I think he said
13 well, I have another way that perhaps we can keep up
14 with their demand and that is to actually distill the
15 acid and sell it off for this, what is described here
16 in this letter, which as far as I know never
17 occurred.
18      Q.    Do you know why they anticipated an
19 increase in acid production?
20      A.    Because they had a contract with
21 somebody to make something, I'm not sure whether it
22 was fertilizer or whatever they made. Now the
23 contract was going to increase. And the problem was
24 the contract's going to increase, so is the acid
25 waste stream going to increase.

**Page 124**

1      Q.    Do you know if this proposal or one like
2 it was ever given to any other AETC customers?
3      A.    No.
4 (OBJECTION)  MR. BIEDRZYCKI: I'm going to object
5 to the form in the sense he said other AETC
6 customers. I don't believe he testified that it was
7 given to any customers.
8 BY MS. MOONEY:
9      Q.    In the third paragraph of this letter --
10 oh, do you need to stop?
11      A.    No, I'm all right.
12           MS. MOONEY: Does your client need to
13 leave at 2:30?
14           MR. SABINO: I thought that's what you
15 told me.
16           THE WITNESS: Yeah, I'll keep going
17 here.
18 BY MS. MOONEY:
19      Q.    In the third paragraph it says: We
20 therefore propose to offer to Ashland Chemical
21 economic advantages by installing, parenthesis, with
22 our associate company, dash, Environmental Chemical
23 Control, coma, Inc., closed parens. In what sense
24 was Environmental Chemical Control, Inc. your
25 associate company?

**Page 125**

1      A.    It's a -- when you're a brokerage firm,
2 you really don't own anything, you always talk like
3 that.
4      Q.    And do you mean by that in generalities
5 or?
6      A.    You try to get the customer to
7 understand that you are close to the disposer and you
8 try get the disposer to understand you're very close
9 to the customer. So if we were writing it on the
10 other way, we would say that our very close client
11 relationship with Ashland Oil, in other words, it was
12 merely to avoid having Ashland go direct around us to
13 Environmental Chemical Control.
14      Q.    Right.
15      A.    See, the only thing that kept us going
16 was not because we had disposal facilities or we had
17 trucks or anything else, it was that we had found
18 these people and that we were developing enough -- we
19 had a relationship with the customer and a
20 relationship with the disposer that we were trying to
21 stay in the middle and not be gone around. And there
22 was no way to do that unless the customer continued
23 to believe that we had a close relationship with the
24 disposer and the disposer believed that we had a
25 close relationship with the customer. They could

32 (Pages 122 to 125)

1
2                United States District Court
                 Eastern District of Pennsylvania
3                Civil Action No. 02-3830
4    _____
5    Boarhead Farm Agreement Group
6              plaintiff
                                    Oral Deposition of:
7        V.                         John Leuzarder
                                    Volume II
8    Advanced Environmental
     Technology Corporation,
9    et als.,
              defendants
10   _____
11                    *   *   *   *   *
             Monday, December 6, 2004
12                    *   *   *   *   *
13              Transcript in the above matter taken
     at the law offices of Wolff & Samson, 1 Boland
14   Drive, West Orange, New Jersey, commencing at
     9:00 a.m.
15
16
17
18
19
20
21
22
           CERTIFIED SHORTHAND REPORTING SERIVCES
23                  Arranged Through
           MASTROIANNI & FORMAROLI, INC.
24               709 White Horse Pike
             Audubon, New Jersey 08106
25                  (856) 546-1100



Page 209

1 Q. Is that something that Landmesser, Mr.
2 Landmesser handled?
3 A. He might have.
4 Q. Do you know why the name of the carrier
5 was designated Boarhead Corporation?
6 A. No.
7 Q. Have you ever seen this designation on any
8 other invoice or bill of lading?
9 A. No.
10 Q. This is the last exhibit I'm going to show
11 you. This has been previously marked as
12 Leuzarder 13. There are actually two copies.
13 A. Okay.
14 Q. The first paragraph refers to a recent
15 conversation with Mr. Leuzarder. Do you recall
16 a conversation with Manfred DeRewal regarding
17 insurance?
18 A. No.
19 Q. Do you know why AETC was requiring Mr.
20 DeRewal to get insurance?
21 A. I can only speculate.
22 Q. Educated guesses only.
23 MR. SABINO: Can you distinguish
24 between an educated guess and speculation?
25 MR. BIEDRZYCKI: I'm going to

Page 210

1 object. He already said he would only be
2 speculating.
3 MR. SABINO: Do you have a
4 question? I'm asking Ms. Mooney if she has a
5 question.
6 Q. Did AETC require insurance of all its
7 waste haulers?
8 A. Yes.
9 Q. Do you know when you started implementing
10 that policy?
11 A. I don't remember.
12 Q. Was it the policy of AETC to require the
13 waste haulers with whom it worked to have the
14 insurance issued in AETC's name?
15 A. I believe so. But -- this early on we
16 were just starting. This is pretty much our
17 first month in business. I believe we were let
18 go in July. I was still looking for work until
19 sometime in August. And so we were brand new.
20 So I don't recall what was specific in August of
21 '76.
22 Q. Do you recall any conversations with Mr.
23 Landmesser regarding insurance that AETC would
24 require waste haulers to have?
25 A. Over the years, of course, we demanded

Page 211

1 it. But I can't recall anything that occurred
2 back here in this time period.
3 Q. What do you recall about the account that
4 AETC had with Diaz Chemical Company?
5 A. Nothing.
6 MR. SABINO: Objection. Asked and
7 answered.
8 Q. Nothing whatsoever?
9 A. I didn't have anything to do with it. So
10 I know nothing about it. I never made contact
11 with them. Certain things that certain people
12 handled. Bob handled. I handled other things.
13 I know nothing about Diaz.
14 MS. MOONEY: All right. I think
15 we're done. Thank you.
16 BY MR. BIEDRZYCKI:
17 Q. I'm not going to be long, I promise. It's
18 mostly just follow-up questions from Ms.
19 Mooney. The lab chemicals you may have handled
20 for some customers I believe you testified that
21 you don't recall what disposal sites may have
22 been used for any of those lab chemicals that
23 AETC picked up. Would you be able to say
24 whether any of those disposal sites including
25 the Wissinoming or Boarhead Farm facilities?

Page 212

1 A. Definitely not to Boarhead Farms because
2 that was an office as far as I was concerned.
3 But as to whether, I believe I previously
4 testified that some laboratory chemicals which
5 may have contained silver or some other
6 recoverable metals I believe those did go to the
7 Wissanoming site and Mr. DeRewal had represented
8 he was able to recycle or recover those
9 materials.
10 Q. Would these have been materials that you
11 would have taken there in trucks that you
12 supplied and took them over to Wissanoming?
13 A. Yes.
14 Q. Any other facility associated with DeRewal
15 other than Wissanoming that those types of
16 chemicals would have been taken to?
17 A. No.
18 Q. You had testified on your first day and
19 then today about Southland a little bit. I
20 believe you testified today you made the
21 statement, anyhow, that Ashland became
22 Southland. Did you mean that Ashland no longer
23 existed and Southland was the new company or did
24 you mean the Great Meadows facility was taken
25 over by Southland Corporation; do you recall?

Page 213

1  A.  I don't know what happened.  I just know
2  that the Great Meadows facility at some point
3  came under the name of Southland.  I don't know
4  -- I certainly cannot remember why that
5  occurred.
6  Q.  Going back to your first day of testimony
7  on November the 29th one of the reasons that you
8  stated why you were let go from Gaess was you
9  didn't like how things were going on at the
10 Kin-Buc Landfill.  Can you tell us what some of
11 those things were that you didn't like?
12 A.  Huge amounts of solvents were being dumped
13 in the garbage.  It was legal at the time.  We
14 believed that there was fire hazard.  I saw
15 people, one person was killed in a terrible fire
16 that occurred with diethylether.  I happened to
17 be there that day.  I actually rode in the
18 ambulance to the hospital with the dying man.
19 Q.  Did you complain to the management at
20 Gaess about these practices and goings on?
21 A.  That probably was prior to Gaess.  While I
22 was still with Scientific Incorporated.
23 Q.  Was there anything going on at Kin-Buc you
24 didn't like when you were with Gaess?
25 A.  Kin-Buc was a landfill and it never

Page 214

1  occurred to me as an outsider in the industry
2  because I had come from -- I'd been working in
3  the sale of hydraulic equipment basically in New
4  York City, that their practices were to me were
5  extremely archaic and we believed that materials
6  that were being dumped in garbage that would
7  find their way into the water table could be
8  recycle, reused or whatever.
9      The problem was that many of the customers
10 of Kin-Buc and Gaess were used to paying very
11 low prices for the disposal of waste materials.
12 To come to them and say now we're asking you to
13 pay a much higher price to do this in a
14 responsible way was oftentimes offensive.  It
15 wasn't until regulations began to be promulgated
16 by the New Jersey DEP and the Federal Resource
17 Conservation Recovery Act that people began to
18 be arrested that principally the pharmaceutical
19 companies and other respectable organizations
20 began to pay what was reasonable prices for the
21 disposal of materials.
22     So we, Bob and John, forming AETC were
23 determined to ally ourselves with organizations
24 that would be willing to pay the right price in
25 order that this industry would be changed and

Page 215

1  materials would be handled, recycled and
2  disposed of correctly.
3  Q.  Thank you.  Did you ever become aware -- I
4  don't know if this is the case whether DeRewal
5  Chemical ever hauled any acid waste of any
6  companies other than Ashland, to your knowledge?
7  A.  I see Diaz on invoices.  So that's all
8  that I know.
9  Q.  Have you ever done any business with
10 Ciba-Geigy when you were -- during this 1976 or
11 1977 time period?
12 A.  I believe Ciba-Geigy is Summit.
13 Q.  What do you recall about Summit and its
14 affiliation, if any, with AETC?
15 A.  I had been calling on Ciba-Geigy Summit
16 during that time period with Gaess.  After AETC
17 was formed I went back to them.  I don't recall
18 when it was that they began to deal with AETC.
19 But we were taking primarily having vacuum
20 trucks go in and pump drums of solvent from the
21 facility which those materials were being used,
22 as I recall, in a solvent program at Solite up
23 in New York State which was a large cement kiln.
24 Q.  Do you know if any of their wastes were
25 handled by DeRewal?

Page 216

1  A.  I don't remember.
2  Q.  Would I be correct that DeRewal was
3  permitted to handle acid wastes in 1976 and 1977
4  during the time period you were dealing with
5  them to haul Ashland waste?
6  A.  Yes.
7  Q.  Last time you testified about you believe
8  there were two visits at the Wissanoming
9  facility.  The second one I believe was with Art
10 Curley.  Is that correct?
11 A.  Yes.
12 Q.  Do you remember the time span between the
13 two visits that you had, days, weeks, months?
14 A.  Probably days, maybe a week.
15 Q.  Do you recall if the first visit you had
16 there occurred before or after DeRewal began
17 transporting any Ashland wastes?
18 A.  First visit would have been to evaluate
19 the site ourselves to see if it seemed to be a
20 viable disposal facility and it appeared to be a
21 very highly specialized facility specifically
22 that could handle that kind of materials.  Later
23 on I believe and I'm just doing my best to
24 remember --
25 Q.  Understood.  It's not easy.

16 (Pages 213 to 216)

John Leuzarder                                                    December 6, 2004

Page 217

1  A.  It's not easy.  But I believe then once we
2  were reasonably convinced this was the case we
3  then brought Art Curley the customer down to
4  look it over and make sure they approved of the
5  facility.  Since we were just brokers and not
6  actually handlers.
7  Q.  You believe the visits occurred before any
8  Ashland waste went to Wissanoming?
9  A.  Yes, absolutely.
10  Q.  When you say you stopped, AETC stopped
11  dealing with DeRewal, do you recall what
12  information you became aware of that caused you
13  to stop doing business with them?
14  A.  I heard Bob say to me, very, very upset
15  that DeRewal had been caught dumping acid
16  directly into the Delaware River.
17  Q.  So you learned it from Bob Landmesser?
18  A.  Yes.  Who had talked to the authorities or
19  read it or heard it.  I don't remember.  I
20  remember we were both utterly shocked.
21  Q.  Did you have a conversation with Manfred
22  DeRewal about that after you learned of it from
23  Bob?
24  A.  I don't remember.
25  Q.  Also last time we were together you

Page 218

1  testified I believe that DeRewal also handled
2  some recyclable lab reagent chemicals.  I think
3  you said that today as well?
4  A.  That's correct.
5  Q.  Were these bulk, drums, what types of
6  containers?
7  A.  They would be smaller containers of lab
8  reagents.  If you familiar with them they might
9  be one pint or one pound container packed in
10  vermiculite in drums.  And as I recall, we were
11  sending some materials that were recyclable,
12  according to his standards down to him.
13  Q.  Were the generators of these recyclables
14  somebody other than Ashland, to your knowledge?
15  A.  Yes.
16  Q.  I believe you also testified last time we
17  were together that once the trucker, including
18  DeRewal, picked up a load of acid waste DeRewal
19  could do whatever it wanted with it, sell it,
20  recycle it?
21  A.  No.  It had to go to where he specified in
22  the agreement.  What we were proposing at one
23  point in the correspondence which refreshed my
24  memory was an alternative.  Ashland's cost of
25  competing in the marketplace was dependent upon

Page 219

1  all of their costs associated with their
2  process.  The acid stream was a significant, the
3  waste acid was a significant portion of that.
4  And the result was that we were constantly
5  looking for ways to reduce Ashland's cost to
6  benefit our customer and looking for ways of
7  recycling that acid, putting it back in a
8  productive use as opposed to having it
9  neutralized and turned into water and
10  discharged.  To the best of my knowledge, that
11  never occurred.
12  Q.  The question was DeRewal as a transporter
13  now, not as a disposer, but a transporter of
14  acid waste for Ashland, did you ever become
15  aware of any incident where any driver was ever
16  given a citation for improper transportation,
17  violation of any regulations, laws, whatever?
18  A.  I do not recall any such incident.
19  Q.  Am I correct that the only Ashland
20  facility which DeRewal was supposed to pick up
21  acids and acid waste was the Great Meadows
22  facility?
23  A.  To the best of my knowledge, that is
24  absolutely true.
25  Q.  Do you have any information that DeRewal

Page 220

1  ever picked up any waste of any sort from any
2  other Ashland facility?
3  A.  No.
4  Q.  I believe you also testified previously
5  you believe that Gaess did some work for Ashland
6  in the '76, '77 time frame; is that right, is
7  that your recollection?
8  A.  Probably prior to us --
9  Q.  I was going to ask you was it before or
10  after you were laid off, you and Bob were laid
11  off?
12  A.  Probably before.  They may have done it
13  afterwards but I just don't remember.
14  Q.  Do you have any recollection as to whether
15  AETC ever used All County to dispose of any
16  Ashland wastes?
17  A.  No.  All County primarily did solvent to
18  Solite.
19  Q.  The waste water that we were talking about
20  from Ashland, do you know what was done with
21  that or was that just used to prepare the lime
22  slurry for neutralizing the acid?
23  A.  To the best of my knowledge, that's what
24  it was used for.
25  Q.  Did Kin-Buc handle acid waste streams?

17 (Pages 217 to 220)

# EXHIBIT 4

risi

1

1        UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4    - - - - - - - - - - - - - - - -

5    BOARHEAD FARM AGREEMENT GROUP,      :

6                 Plaintiff,            :

7        vs.                            :

8    ADVANCED ENVIRONMENTAL              :

9    TECHNOLOGY CORPORATION, et al.,     :

10                Defendants.           :

11   - - - - - - - - - - - - - - - -

12

13

14

15        DEPOSITION OF WALTER RISI

16        FRIDAY, JANUARY 14, 2005

17

18

19

20

21

22        MASTROIANNI & FORMAROLI

23        709 White Horse Pike

24    Audubon, New Jersey  08106

25          (856) 546-1100

2

1        Deposition of WALTER RISI, taken in the

Page 1

risi

13

W. RISI - Mr. Sabino

1  I have to say, December of '76.

2      Q.    Okay.

3      A.    'Cause the semester runs September

4  to December.  I remember coming on as an

5  instructor or associate to teach a course, and

6  I picked it up in the half-year.  Was it

7  December 15th or January 1st, '77?  Sometime

8  around there.

9      Q.    Okay.  Now, to the best you can

10  remember, how soon after you started your

11  private practice in 1976 did AETC become a

12  client of yours?

13      A.    My guess would be almost

14  immediately.  I knew John Leuzarder at that

15  time.

16      Q.    Okay.  Did you help AETC

17  incorporate?

18      A.    No, I don't believe I did.

19      Q.    Okay.

20      A.    I remember that Bob Landmesser's

21  father-in-law was a lawyer, and he did those

22  types of things.  As best I can recall, I would

23  have -- I don't remember doing their

24  incorporation.  I remember meeting with them.

25      Q.    What was Landmesser's

14

risi

W. RISI - Mr. Sabino

1    father-in-law's name?

2        A.    I don't remember that name.

3        Q.    Okay.

4        A.    It may come back to me.

5        Q.    Do you have a recollection back in

6    '76 or early '77 of being advised what AETC's

7    business was?

8        A.    Yes, I do.

9        Q.    Okay.  And what was their business?

10       A.    Robert Landmesser and John

11   Leuzarder had gotten together and were --

12   brokers is the word I would use.  People who --

13   people, companies and organizations that needed

14   to comply with environmental laws in regards to

15   disposal of substances, these two fellows were

16   packaging the substances in a way that would

17   comply with the Code of Federal Regulations,

18   and there were very strict guidelines, I can

19   remember.  I can remember looking at the CFRs,

20   and I was -- I still remember that I -- I gave

21   them credit.  I said, you know, this is

22   something for a lawyer to read, and these guys,

23   you know, if you had like a bottle of acid,

24   they knew it had to have so many inches of

25   label on the package, they knew it had to be in

15

risi

1   a certain place, but yeah, they were brokers.

2   A company would have to call, with all these

3   regs, and say, "How do we get rid of it?"  They

4   would sometimes pack it, or sometimes they

5   would broker it.

6       Q.    Thank you.  Excellent.  Now, at

7   some point in time did either Mr. Leuzarder or

8   Mr. Landmesser advise you that they had been

9   named as a defendant in the lawsuit that is the

10  subject --

11      A.    P-1?

12      Q.    -- yeah -- of what is marked as

13  Exhibit 1?

14      A.    Yes.  What I see as Exhibit 1

15  reminds me that they were defending this

16  lawsuit.  DeRewal -- Fred DeRewal had sued them

17  for some reason.

18      Q.    Now, had you heard of Fred DeRewal

19  before you became aware of this lawsuit?

20      A.    I don't know.

21      Q.    Okay.

22      A.    I just don't remember.

23      Q.    And in connection with advising you

24  about the lawsuit that is the subject of Risi

25  Exhibit 1, did either Landmesser or Leuzarder

☐

16

W. RISI - Mr. Sabino

1   tell you that Mr. DeRewal and some of his

2   employees had been arrested by the authorities

# EXHIBIT 5

michelman

1

1           UNITED STATES DISTRICT COURT
2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   BOARHEAD FARM AGREEMENT              CIVIL ACTION NO.
    GROUP,                                 02-CV-3830
5           Plaintiff,              Judge Legrome D. Davis
                                    Oral Deposition of
6       vs.                         DAVID F. MICHELMAN
    ADVANCED ENVIRONMENTAL TECHNOLOGY
7   CORPORATION; ASHLAND CHEMICAL
    COMPANY; BOARHEAD CORPORATION;
8   CARPENTER TECHNOLOGY CORPORATION;
    CROWN METRO, INC.; DIAZ CHEMICAL
9   CORPORATION; EMHART INDUSTRIES,
    INC.; ETCHED CIRCUITS, INC.; FCG,
10  INC.; GLOBE DISPOSAL COMPANY, INC.;
    GLOBE-WASTECH, INC.; HANDY & HARMAN
11  TUBE COMPANY, INC.; KNOLL, INC.;
    MERIT METAL PRODUCTS CORPORATION;
12  NOVARTIS CORPORATION; NRM INVESTMENT
    COMPANY; PLYMOUTH TUBE COMPANY;
13  QUIKLINE DESIGN AND MANUFACTURING
    COMPANY; RAHNS SPECIALTY METALS,
14  INC.; ROHM & HAAS COMPANY, SIMON
    WRECKING COMPANY, INC.; TECHALLOY
15  COMPANY, INC.; THOMAS & BETTS
    CORPORATION; UNISYS CORPORATION;
16  UNITED STATES OF AMERICA
    DEPARTMENT OF NAVY,
17          Defendants.

18
                *   *   *   *   *
19           Wednesday, December 1, 2004
                *   *   *   *   *
20

21           Transcript in the above matter taken at
    the offices of Michelman & Bricker, 2207 Chestnut
22  Street, Philadelphia, Pennsylvania, commencing at 10
    o'clock A.M.

23       Certified Shorthand Reporting Services
                Arranged Through
24          Mastroianni & Formaroli, Inc.
                709 White Horse Pike
25          Audubon, New Jersey 08106
                (856) 546-1100

2

1   A P P E A R A N C E S:

2       BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
        BY: GLENN A. HARRIS, ESQUIRE
3       PLAZA 1000, MAIN STREET, # 500

michelman

7          Now, just in very broad strokes, when

8    you were an assistant district attorney for the

9    Philadelphia District Attorney's office between 1975

10   and 1986, what were your duties and responsibilities?

11        A.    Well, beginning in 1975, I was assigned

12   to the appeals unit.  Shortly after that, I began to

13   work in certain portions of the trial division, and

14   in 1977, I was assigned to the special investigations

15   unit, and that was when I began to get involved in

16   investigating and prosecuting environmental crimes,

17   and I remained in the special investigations unit

18   until I left the DA's office.

19        Q.    Would you happen to remember what month

20   in '77 you went to the special investigations unit?

21        A.    Well, I don't remember the month.  It

22   may have been in 1976 rather than 1977.

23        Q.    Okay.  At some point in time when you

24   were with the special investigative unit, did you

25   become aware of actions, lawsuits by the City of

                                                      10

1    Philadelphia against a gentleman named Manfred

2    DeRewal and certain of his companies, DeRewal

3    Chemical Company and ECC, Environmental Chemical

4    Control, Inc.?

5         A.    In March of 1977, I became aware that

6    Manfred DeRewal and some of the other employees of

7    his company had been arrested by the Philadelphia

8    Police Department, and at that time, I became aware

9    of civil matters relating to that as well.

10        Q.    Okay.  Just so we can try to establish

11   for the record a date, I'm going to hand you what we

                              Page 8

michelman

12    have previously marked as D-23.  It is a complaint

13    from the Commonwealth of Pennsylvania dated 3/29/77

14    against Jeffrey Shaak, John Barsum, Bruce DeRewal and

15    Manfred DeRewal.

16              Is this consistent with your testimony

17    here that it was sometime in March of '77 that you

18    became aware of an action against Manfred DeRewal and

19    some of his employees with respect to allegations of

20    environmental misdoings?

21        A.    Yes.

22              MR. HARRIS:   Objection.  You're

23    refreshing a recollection that the witness already

24    had.

25              MR. SABINO:   I wanted to establish a

                                                    11

1    date.

2              MR. HARRIS:   All right.

3              MR. SABINO:   3/29/77.  He said sometime

4    in 1977.

5              MR. HARRIS:   Now you're asking him if

6    he now has an independent recollection if it was that

7    date?

8    BY MR. SABINO:

9        Q.    Did you ever see this document back in

10    1977?  Do you have any memory of that?

11        A.    Yes, I did.

12        Q.    You did, okay.

13              And was it as a result of seeing this

14    document that has been marked as D-23 that you

15    undertook some type of investigation of Manfred

16    DeRewal and his companies?

                        Page 9

michelman

17    A.    It wasn't as a result of this document

18    per se, but the events that relate to this document.

19    Q.    Okay.  And so then, what type of

20    investigation did you commence as a result of the

21    events stemming from D-23?

22    A.    Okay.  DeRewal and the other members of

23    his company had been arrested by the Philadelphia

24    Police Department on March 29th, 1977, and after I

25    learned about it, I began to work with the

12

1    investigating detective, Detective Thomas Wholey and

2    the Philadelphia Water Department, and took over the

3    prosecution of the case and conducted a further

4    investigation into it.

5    Q.    Who with the water department did you

6    work with?

7    A.    The principal people I worked with were

8    the chief of the industrial waste unit, Thomas

9    Kulesza.  That's spelled K-U-L-E-S-Z-A, and Thomas

10   Healey spelled H-E-A-L-E-Y.  He was the assistant

11   chief of the industrial waste unit.

12   Q.    And what did the investigation comprise

13   of, if you can recall?

14   A.    It was an extensive investigation,

15   because the criminal complaint which you've

16   referenced here was the result of observations by the

17   Philadelphia Police Department on a particular day,

18   March 29th, and we broadened out the investigation to

19   analyze what had been going on prior to that in

20   connection with the site that DeRewal was operating

21   on Comly Street, and we began to investigate several

Page 10

michelman

22    different spills of chemicals which had occurred on,

23    I believe March 23rd, 1977 and March 25th, 1977, and

24    the pattern of activities that were involved in that

25    as far as disposal of chemical wastes at that site.

13

1    And in connection with that, we were also looking at

2    other sites that DeRewal was involved with disposing

3    of chemicals at.

4        Q.    Was there anyone else in the District

5    Attorney's office who was involved with this

6    particular investigation?

7        A.    The chief of the unit, Bill Stevens, who

8    is deceased, was my supervisor and was involved, and

9    the assistant chief of the unit, Michael Stiles, who

10   is now a federal district judge, was also involved.

11       Q.    Was there eventually a lawsuit that was

12   instituted by the Philadelphia District Attorney's

13   office against either Manfred DeRewal or any of the

14   companies that he was affiliated with in connection

15   with events stemming from D-23 and the investigation

16   from that?

17       A.    Could you be a little bit clearer on

18   exactly what you're asking?

19       Q.    Yeah.  Aside from the complaint from the

20   Philadelphia police, did the Federal Government

21   through the District Attorney's office institute suit

22   against DeRewal with respect to the events in D-23?

23       A.    The Federal Government, through the US

24   Attorney's office brought a Clean Water Act criminal

25   prosecution against DeRewal, his company and the

14

michelman

1   employees of the company who were involved in the

2   disposal of waste products in Philadelphia.

3        Q.     Could you tell us how soon after March

4   29th, 1977 that suit was brought?

5        A.     I don't know the exact date that it was

6   brought.  Shortly after I began my investigation, I

7   began to coordinate with the US Attorney's office,

8   but whether that was a matter of days or weeks, I

9   don't recall at this point.

10               MR. SABINO:   Okay.  I'd like to have

11  marked as Michelman-3 a copy of a newspaper article

12  obtained from the document repository in this case.

13  It's from April 7th, 1977.  It's identified as The

14  Inquirer.  Being a Jersey boy, I don't know if that

15  means Philadelphia Inquirer or whatever, but the

16  document is what it is, and it says "US Accuses NJ

17  Firm of Dumping Acid in River."

18               (Exhibit Michelman-3, Newspaper

19  Article, marked for I.D.)

20  BY MR. SABINO:

21       Q.     I'd like to focus your attention on the

22  last paragraph here on Michelman-3.  It says, "The

23  Federal Government also filed Federal separate civil

24  suit yesterday seeking $10,000 a day from

25  Environmental Chemical Control for each day that

15

1   company has violated federal pollution laws."

2               Do you think that there's -- that that

3   is the Clean Water Act criminal prosecution that you

4   mentioned about five minutes ago or is that something

5   different?

Page 12

michelman

6        A.      Well, you're asking me to speculate.

7   Based upon what this says, this refers to a civil

8   suit, and a civil suit is different from a criminal

9   prosecution.

10       Q.      Okay.

11       A.      And I was referring to a criminal

12  prosecution.

13       Q.      Okay.  Were you in any way involved in

14  the institution of a civil suit several weeks after

15  the arrest of Manfred DeRewal and the gentlemen

16  referenced in D-23?

17       A.      I don't know.  Your question is phrased

18  in a broad way asking me was I involved in any way.

19  I don't have a recollection of a civil suit, but I

20  have a recollection of cooperating with the US

21  Attorney's office and providing information to the US

22  Attorney's office, and I have a recollection of them

23  using it in connection with the criminal case, but

24  they may have used it in connection with the civil

25  case as well.

16

1        Q.      Okay.  Do you have a recollection of

2   ever appearing before US District Judge Charles

3   Weiner sometime in early 1977 in connection with any

4   action that had been instituted against Mr. DeRewal

5   or his affiliated companies?

6        A.      No, I do not.

7        Q.      Okay.  Do you know if in connection with

8   the civil suit that was instituted in Federal Court

9   within several weeks after the arrest on March 29th,

10  1977, if an injunction was issued which ordered

Page 13

michelman

11   Environmental Chemical Control to cease operations at

12   the Comly Street facility in the Wissinoming

13   Industrial Park?

14          MR. HARRIS:   Objection to form.  He

15   said he doesn't know whether there ever was a civil

16   suit.  Now you're asking him about details of the

17   civil suit.

18          Q.    I thought you said that you were not

19   involved with it, but that you were aware of it.  Am

20   I wrong?

21          A.    No, I didn't say I was aware of it.  I

22   don't at this time have a recollection of the civil

23   suit.

24          MR. SABINO:   Okay.  I'd like to have

25   marked as Michelman-4 a final decree in an action in

                                                      17

1    the United States District Court for the Eastern

2    District of Pennsylvania, the United States versus

3    Environmental Chemical Control, Civil Action Number

4    77-1226.

5           (Exhibit Michelman-4, Final

6    Decree, marked for I.D.)

7    BY MR. SABINO:

8           Q.    This exhibit, Michelman-4, is captioned

9    "Final Decree", and it appears to be dated April

10   28th, 1977.  On the back, it says "By the Court

11   Edward N. Cahn", C-A-H-N, was the judge.

12          First of all, let me ask you this:  In

13   the caption United States of America versus

14   Environmental Chemical Control, Inc., what's your

15   recollection of who Environmental Chemical Control

Page 14

michelman

16    was back in 1977?

17         A.    Environmental Chemical Control,

18    Incorporated was a corporation which DeRewal used as

19    a front for his operations.

20         Q.    And do you have any recollection of

21    appearing in front of Judge Cahn in 1977 in any way

22    related to this lawsuit captioned 77-1226?

23         A.    No.

24         Q.    Okay.  Do you know who on behalf of the

25    United States the attorneys were for this lawsuit?

18

1          A.    No.

2          Q.    Okay.  Now, eventually, in this time

3    period post March 29th, 1977, you told us that a

4    criminal prosecution under the Clean Water Act was

5    instituted.  Do you know who the defendants were in

6    that case?

7          A.    I know that Manfred DeRewal was a

8    defendant.  My recollection is that the same

9    defendants who were involved in the criminal case

10    that I was prosecuting were all named as criminal

11    defendants as well, but I'm not certain of that part

12    of it.  I believe that the defendants were Manfred

13    DeRewal, Bruce DeRewal, Jeffrey Shaak, John Barsum,

14    Linda Cochran and Environmental Chemical Control

15    Company, Incorporated.

16         Q.    Now, aside from Civil Action 77-1226,

17    which is Michelman-4, was there, to your

18    recollection, one or two or more criminal

19    prosecutions going on more or less at the same time

20    in 1977 against Manfred DeRewal?

Page 15

michelman

 5  disposing of materials.

 6      Q.    The meeting that you told us about a

 7  while ago with at the Great Meadows facility, was

 8  that a single conversation with both Mr. Leuzarder

 9  and the Ashland representative?

10      A.    I have a very vague recollection of the

11  actual meeting.  I remember driving up there to meet

12  there, and I believe there was a single meeting with

13  Mr. Leuzarder and one or more representatives of

14  Ashland.

15      Q.    Tell us what you can about your

16  recollections of the conversation.

17      A.    My recollection at this point is very

18  vague.  The purpose of the meeting was to find out

19  about AETC, the nature of AETC and its relationship

20  with DeRewal as a broker and as a source of the waste

21  from all of the companies that we were investigating,

22  many of whom are named here, and I can't at this

23  point recall whether AETC was involved in brokering

24  each of these waste streams or only some of the waste

25  streams.

                                                    60

 1              I recall that they were involved in the

 2  Ashland waste stream and other acid waste streams,

 3  and I believe that included Drake Chemical and Diaz

 4  and Bostik South.  I don't recall -- and perhaps

 5  Ciba-Geigy.  I don't recall whether some of the other

 6  companies were also involved with AETC.

 7      Q.    Do you have any recollection of what if

 8  anything the AETC folks, Mr. Leuzarder or the Ashland

 9  representative, actually told you about their

Page 50

michelman

10  relationship to each other and/or to DeRewal?

11              MR. SABINO:    Compound question.

12  Object.

13              MR. HARRIS:    Okay.

14  BY MR. HARRIS:

15      Q.    Do you have any recollection of what Mr.

16  Leuzarder said at that meeting about his relationship

17  with Ashland?

18      A.    My recollection is that AETC

19  acknowledged and admitted that it was the broker for

20  DeRewal and that it was providing customers for

21  DeRewal and identifying customers whose wastes could

22  be transported and disposed of by DeRewal, and that

23  Ashland and these other sources of acid were

24  customers who AETC had and directed the waste for

25  disposal through DeRewal, and that was the general

61

1  understanding that I had before the meeting with Mr.

2  Leuzarder and Ashland.

3              I had the same understanding after the

4  meeting, but I don't recall exactly what was said by

5  Mr. Leuzarder or Ashland about that, but my

6  recollection is they agreed that that was, in fact,

7  what had happened.

8      Q.    Prior to the meeting that we've been

9  talking about, did you do an investigation into AETC?

10      A.    I had some information about AETC prior

11  to the meeting that I had obtained from Mr. Healey.

12  I also had a conversation with Mr. Landmesser about

13  AETC, and I can't recall whether that conversation

14  occurred after the meeting with Mr. Leuzarder or

Page 51