# EXHIBIT 6

## VOLUME 2 OF 2

healey

1

```
 1          UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3
                                   CIVIL ACTION NO.
 4  BOARHEAD FARM AGREEMENT            02-CV-3830
    GROUP,                         Judge Legrome D. Davis
 5          Plaintiff,           Oral Deposition of

 6      vs.                          THOMAS F. HEALEY
    ADVANCED ENVIRONMENTAL TECHNOLOGY
 7  CORPORATION; ASHLAND CHEMICAL
    COMPANY; BOARHEAD CORPORATION;
 8  CARPENTER TECHNOLOGY CORPORATION;
    CROWN METRO, INC.; DIAZ CHEMICAL
 9  CORPORATION; EMHART INDUSTRIES,
    INC.; ETCHED CIRCUITS, INC.; FCG,
10  INC.; GLOBE DISPOSAL COMPANY, INC.;
    GLOBE-WASTECH, INC.; HANDY & HARMAN
11  TUBE COMPANY, INC.; KNOLL, INC.;
    MERIT METAL PRODUCTS CORPORATION;
12  NOVARTIS CORPORATION; NRM INVESTMENT
    COMPANY; PLYMOUTH TUBE COMPANY;
13  QUIKLINE DESIGN AND MANUFACTURING
    COMPANY; RAHNS SPECIALTY METALS,
14  INC.; ROHM & HAAS COMPANY, SIMON
    WRECKING COMPANY, INC.; TECHALLOY
15  COMPANY, INC.; THOMAS & BETTS
    CORPORATION; UNISYS CORPORATION;
16  UNITED STATES OF AMERICA
    DEPARTMENT OF NAVY,
17          Defendants.

18
                *  *  *  *  *
19          Thursday, February 10, 2005
                *  *  *  *  *
20
                Transcript in the above matter taken at
21  the offices of Ballard, Spahr, Andrews & Ingersoll,
    LLP, 1735 Market Street, 42nd Floor, Philadelphia,
22  Pennsylvania, commencing at 10 o'clock A.M.

23      Certified Shorthand Reporting Services
                Arranged Through
24          Mastroianni & Formaroli, Inc.
                709 White Horse Pike
25          Audubon, New Jersey 08106
                (856) 546-1100
```

2

```
 1  A P P E A R A N C E S:
```

healey
20      Q.      And when you first started working for

21   the City of Philadelphia Water Department, what was

22   your position?

23      A.      I was a graduate engineer.

24      Q.      I'm sorry?

25      A.      A graduate engineer.


9

1       Q.      Okay.  And your job responsibilities in

2    that capacity?

3       A.      To evaluate industrial waste discharges,

4    to inspect the industries, to protect the sewage

5    treatment plant, and to protect water supply and

6    source water for drinking water.

7       Q.      Okay.  And did you hold any other

8    positions at the time you were at the City of

9    Philadelphia Water Department?

10      A.      Well, progressively since, up through

11   1981, there were more advanced positions or

12   promotional positions within the water department of

13   the city, and in 1981, I became manager of the

14   industrial waste unit.  I've held that title since.

15      Q.      What was the title of your job that you

16   graduated to after you were a graduate engineer?

17   What was the next position you held?

18      A.      Sanitary engineer 1, then sanitary

19   engineer 2, then sanitary engineer 3, and then the

20   manager's title is at sanitary engineer 4 level.

21      Q.      The 1981 position?

22      A.      Yes.

Page 8

healey
23        Q.      Okay.   Did you ever hold the title of

24    assistant to the chief of the industrial waste unit

25    of the water department?


10


 1        A.      Yes, it's a working title, not a civil

 2    service title.   I did that as an SE3.

 3        Q.      At the time you were an SE3, you also

 4    held that title that I just referred to, assistant

 5    chief of the industrial waste unit?

 6        A.      Yes.

 7        Q.      Do you recall what year that was that

 8    you started as a sanitary engineer 3?

 9        A.      Might have been, I'll say 1976 or 1977.

10        Q.      Do you recall how long you held that

11    specific position?

12        A.      Well, through 1985 -- 1981 when I became

13    an SE4.

14        Q.      1981?

15        A.      Yes.

16        Q.      Okay.   And did you hold a position after

17    manager of industrial waste unit?

18        A.      That's my working title now.

19        Q.      Now?

20        A.      Yes.

21        Q.      And you've continued in that position

22    since 1981?

23        A.      That's correct, yes.

24        Q.      All right.   I'm going to ask you some

25    questions now regarding the City of Philadelphia

healey

11

1    Water Department's investigation of Manfred DeRewal,
2    his operation at the Wissinoming Industrial Park on
3    Connelly Street, and I'm going to be referring to
4    that operation as the Wissinoming operation from here
5    on out, so when you hear me use that term, that's
6    what I'm referring to.
7         A.    And what street did you say?
8         Q.    Connelly Street.
9         A.    Comly.
10        Q.    Comly?
11        A.    C-O-M-L-Y.
12              MR. SABINO:    I object because you
13   haven't established and asked him if he knows
14   anything about the Wissinoming Industrial Park, where
15   it is and what happened.  You just said you're going
16   to ask him questions about it.
17              MS. MOONEY:    We'll get there.
18   BY MS. MOONEY:
19        Q.    Are you familiar with the investigation
20   that the City of Philadelphia Water Department
21   undertook of this Wissinoming operation?
22        A.    Yes.
23        Q.    Okay.  Can you describe when this
24   investigation commenced?
25        A.    In March of 1977.

12

Page 10

healey

1       Q.      Okay.  And at that time, were you acting
2    as the assistant chief of industrial waste to the
3    industrial waste unit of the Philadelphia Water
4    Department?
5       A.      That's correct, yes.
6       Q.      And how did you first personally become
7    involved in this investigation?
8       A.      As I recall, a tenant or a neighbor in
9    that Wissinoming Industrial Park, Coyne Chemical
10   Company, wanted -- their managers or the owner called
11   up complaining that there was fumes coming up through
12   his toilet, orange fumes, and at the same time, the
13   river -- his property was located on the Delaware
14   River.  He had waterfront property at the end of
15   Comly Street, and the river was, at that time, was
16   frozen and ice, and at the bank area, the river was
17   orange, and he was also getting orange fumes coming
18   out of the toilet in his warehouse facility.
19      Q.      Okay.  And did he call the water
20   department?
21      A.      Yes.
22      Q.      Okay.  And do you know who he called?
23      A.      He might have spoke to me or Thomas
24   Kulesza.
25      Q.      And who is Thomas Kulesza?

☐

13

1       A.      He was the chief of industrial waste
2    unit at that time.
3               MR. BIEDRZYCKI:  When you say "he", are
                           Page 11

healey

1        Q.      And why were you looking into the
2    sources of the waste?

3        A.      Well, in order to shut down someone like
4    a DeRewal, you know -- on Ontario, he came into the
5    city till he was discovered.  Then he moved someplace
6    else.

7                So we started going after his customer
8    base.  You can't dump illegal chemical if you can't
9    get ahold of it.  So we started going through his
10   customer list.

11       Q.      Do you know how you identified his
12   customers?

13       A.      At one point, we met with John Leuzarder
14   and Bob Landmesser from AETC, and they were brokers,
15   and they hooked up some of their clients out of North
16   Jersey from the previous business contacts that were
17   handling a lot of nitrating acids.  Nitrating acids
18   generated on the East Coast were very difficult to
19   dispose of because they were fuming, and they had
20   pesticides and fungicides in it.  So it's a very
21   tough waste to get legitimate treatment for, and they
22   were being dumped in Northern Jersey landfills,
23   mostly run by the mob, we heard.

24               So when that came to light, they took
25   their client list and found Manfred.  Manfred showed

☐

34

1    them a system of, you know, Manfred's a chemist.  He
2    can tell you that he can treat it, he can do anything
3    with it, still charge 38 cents a gallon for it, and
Page 30

# EXHIBIT 7

A G R E E M E N T

THIS AGREEMENT made this &: day of          , 1976
by and between ADVANCED ENVIROMENTAL TECHNOLOGY, INC., 97 West
Hanover Avenue, Randolph, N. J.  07801 (hereinafter called "AETC"
cr "Contractor") and ASHLAND CHEMICAL COMPANY, Division of Ash-
land Oil, Inc., (hereinafter called "Ashland").

W I T N E S S E T H

The PARTIES HERETO mutually covenant and agree as follows:

1.    The Contractor shall, as requested by the Plant
Manager of Ashland's Plant located in the town of Great Meadows,
County of Warren, State of New Jersey (hereinafter called "Plant")
furnish and pay for all material, labor, power, equipment, trans-
poration and all other items necessary to remove and properly dis-
pose of certain chemical waste materials generated by the Plant
including a blend of sulfuric and nitric acids.  The Ashland Plant
Manager shall specify which chemical waste materials Contractor
is to remove which shall be agreeable to the Contractor.

2.    Contractor shall secure all permits and licenses
necessary for the accomplishment of the work to be done hereunder
and shall comply with all local, state or federal laws, guidelines
and regulations concerning the handling and disposal of such chem-
ical waste materials.  Contractor will furnish to Ashland true copies
of the aforementioned permits and licenses upon written request
by Ashland prior to beginning the work.



AETC184

3.   The aforesaid work will be performed in a good and workmanlike manner by qualified. careful, experienced and effi-cient workers in strict conformity with the best standard practices with all legal requirements.

4.   In consideration for the Contractor undertaking and performing the work to be done hereunder. Ashland, agrees that all materials removed will become the property of the Contractor. Title to the material removed and risk of loss will pass to the Contractor upon completion of loading of the materials, IN AN "AS IS WHERE IS" CONDITION WITHOUT ANY WARRANTY OR REPRESENTATION WHATSOEVER (EXPRESSED OR IMPLIED) AS TO CONDITION OR FITNESS FOR ANY PURPOSE.  Ashland also agrees to pay to the Contractor such sums as are specified on the Rate Schedule attached hereto and made a part hereof.

Notwithstanding the forgoing, Ashland, acknowledges responsibility for the proper identification, packaging and labeling of the chemical materials herein in compliance with applicable Federal, State and Local Laws or regulations (D.O.T., etc.) and shall indemnify AETC for all claims or liabilities resulting from their non-compliance or mis-compliance with the aforesaid laws or regulations.

5.   It is agreed that the Contractor is an independent contractor for the performance of all work undertaken under this Agreement and for the accomplishment of the desired result, and that Ashland is to exercise and have no control whatsoever over the methods and means of such accomplishment, except that the Contractor, while on the property of Ashland, shall observe rules

and regulations required by Ashland with respect to smoking, and
other sources of vapor ignition and shall exercise due care and
diligence to perform the work and to prevent any damage to pro-
perty of Ashland or injury to persons including Ashland's Employ-
ees.

      6.  Contractor agrees to comply with the Federal Social
Security Act, the State and Federal Unemployment Insurance Acts,
the Wage and Hour Laws, any and all applicable Sales, Use and
Gross Receipts Tax Laws and Regulations and all other laws and
regulations; and the Contractor assumes exclusive liability for
the reporting and payment of any and all contributions and taxes
required thereby.

      7.  Each party agrees to indemnify and save harmless
the other against and from any and all liabilities, losses, damages,
costs, expenses (including reasonable attorney's fees), causes
of action, suits, claims, and demands for judgments of any nature
whatsoever a party may sustain as a result of the failure of the
other party to comply with the provisions of this Agreement or
resulting from or arising out of any negligent acts or omissions
of the other party, its employees, and subcontractors in the
performance of the work herein specified.

      8.  Contractor further agrees at his own expense to
procure and keep in force insurance listed below and to furnish
to Ashland certificates by a carrier acceptable to Ashland upon
request.  All certificates of insurance must be attested by a
duly authorized representative of the Insurance Company and con-
tain a statement that the insurance shall not be cancelled with-

AETC186

out ten (10) days written notice to the Insurance Division of Ashland at 1409 Winchester Avenue, Ashland, Kentucky:

(A)  COMPENSATION AND EMPLOYER'S LIABILITY INSURANCE:

The Contractor shall take out and maintain during the life of this contract Workmen's Compensation and Employer's Liability Insurance complying with all statutory provisions for all of its employees to be engaged in work under this contract.

(B)  BODILY INJURY LIABILITY AND PROPERTY DAMAGE LIABILITY INSURANCE:

The Contractor shall take out and maintain during the life of this contract, such Bodily Injury Liability and Property Damage Liability Insurance as shall protect it from claims for damages for personal injury, including accidental deaths, as well as from claims for property damage, which may arise from Contractors negligent operations under this contract, whether such operation be by itself or by any subcontractor or by anyone directly or indirectly employed by either of them, and the amounts of such insurance shall not be less than:

(1) Bodily Injury Liability Insurance, in an amount not less than $100,000.00 for injuries, including wrongful death to any one person, and subject to the same limit for each person in an amount not less than $300,000.00 on account of one accident.

(ii) Property Damage Insurance in an amount not less

AETC187

than $100,000.00 for damages on account of any
one accident.

9.   If the work is unreasonably delayed, or any of the
conditions of the Agreement are being willfully violated or exe-
cuted carelessly, then Ashland or its representatives may notify
the Contractor in writing and request that he immediately remedy
the deficiency or delay; and, if the same shall not be remedied
within forty-eight (48) hours of notice being received then Ashland
may without prejudice to any other right or remedy terminate this
Agreement.

.   If within one week of being notified of the readiness
of a given shipment of chemical wastes AETC does not remove the
shipment or if any work is unreasonably delayed or any of the
conditions of the Agreement are being willfully violated or ex-
ecuted carelessly, then Ashland or its representatives may notify
AETC in writing and request that AETC immediately remedy the
deficiency or delay, and, if the same shall not be remedied within
forty-eight (48) hours of notice being received, then Ashland
may, without prejudice, employ any other contractor or person to
remove any or all of the quanity of waste material in the afore-
said order.

10.   The Contractor shall cooperate fully with Ashland
in performing the work to be done hereunder and shall NOT interfere
with other operations at Ashland's Plant.

11.   The terms, provisions, covenants, or conditions herein
contained shall control in the event of any conflict with any pro-
vision, term, covenant, or condition in any other document executed

AETC188

between the parties. This Agreement constitutes the entire agreement between the parties and no addition to or modification of any of the provisions shall be binding unless made in writing and signed by a duly authorized representative of Ashland and Contractor.

12. Ashland acknowledges and recognizes that AETC will incur and sustain substantial capital equipment costs so that AETC can more properly preform its duties with respect to the distilling of the blend of sulfuric and nitric acids under this agreement. In further consideration of this Agreement and of AETC's promise to make the said investment Ashland shall, for a minimum period of six months from the date hereof, utilize the services of AETC exclusively for the disposal of any of its wastes containing sulfuric or nitric acids or blends of these two in accordance with the price quotes, annexed hereto as Exhibit A. Ashland acknowledges that it is required to use the sole services of AETC with respect to the disposal of its sulfuric and nitric acid wastes for this minimum period regardless of Ashland's ability subsequent to the date of signing to obtain a better price quotation then that set forth in Schedule A.

Ashland further agrees that subsequent to the expiration of this initial six (6) months period but prior to the expiration of this Agreement it will grant AETC the right of last refusal to meet any valid bid or price quotation with respect to the removal of any sulfuric or nitric acid blends by any other contractor. Ashland shall submit, in writing, all such other bids or quotations

AETC189

from other contractors to the offices of AETC and in the event that AETC cannot or will not meet the submitted bid or price within thirty (30) days of its submission then Ashland may terminate this agreement in whole or in part.

13.  Subject to the non-cancellation provisions of paragraph 12 concerning sulfuric and nitric acid blends, this Agreement may be terminated by the Contractor or Ashland at any time by the delivery of written notice of the terminating party's intention so to terminate at least thirty (30) days prior to the effective date of such termination; provided, however, that any such termination shall not release either party from any of its obligations hereunder accruing prior to the effective date of termination.

WITNESS THE following signatures as of the day and year first above written.

ADVANCED ENVIROMENTAL TECHNOLOGY, INC.

By:_____

Title:_____
        Authorized Representative

ASHLAND CHEMICAL COMPANY,
DIVISION OF ASHLAND OIL

By:_____

Title:_____

AETC190

# EXHIBIT 8

# MEMORANDUM

| J. Minott/W. R. Starkey | October 19, 1976 |
|---|---|
| A. T. Curley | Visit to Disposal Site for our CDN Spent Acid |

```
                                    cc:  C. A. Aldag
                                         K. Brown
                                         C. E. Kwartler
                                         J. Sigan
                                         H. E. Sullivan
```

Yesterday morning I accompanied John Leuzarder to Philadelphia to see the setup being utilized to neutralize our CDN spent acid. The site consists of a series of old buildings, most of which Mr. Derewal is using to warehouse materials. When we arrived there was an acid trailer being neutralized. The setup consisted of an open lime slurry tank and a large (about 10,000 gallons) unagitated vertical neutralizing tank. The solid lime was charged to the slurrying tank by means of a front end loader. The acid was being injected into a recirculating stream thru a garden hose and a small pump. There were no visible fumes. Derewal stated that it took about five hours to complete a tank wagon load (3,000 gallons) of acid. The slurry is then dropped into the city sewer system.

The location is certainly not an ongoing chemical operation. The work was performed by Derewal's two sons. Derewal said he uses liquid lime and waste caustic to do most of the neutralizing. I questioned him about the mode of billing by the City Sewage Authority and what controls they exercised over the operation. The City bills by the amount of water usage. They do have pH and explosimeter monitoring in the common lines in the "industrial park" trunk lines.

I asked Derewal where he did all his metal recovery work. He said this was done in Camden, N. J. In addition, he has a 20,000 gallon storage tank there where he can store acid, if need be.

He has located most of the equipment that he will need to distill off the nitric acid and will set that up in the Wissinoming location. He also said he has gotten rid of several of our loads of spent for ore extraction recently. The last 1,500 gallons of the load being neutralized today was to go to a local processor of copper for equipment cleanout.

In summary then, although the location was certainly not impressive, the setup appears adequate. (He was even readying an ejector type of scrubber for installation atop the neutralization vessel.). It would certainly be helpful to obtain (1) more information on the operation of the Philadelphia Sewage System and (2) the relationship of the Pennsylvania Department of Environmental Resources (DER) with the City. This is the agency which Derewal does not want to get involved with.

Shortly after we left Philadelphia on Interstate 95 I spotted a wagon of our acid (it is easily recognizable by means of its coloring - brown and black) on the way

EXHIBIT

Curley-6
12-9-04 (or

6350

BSAI006573

J. Minott/W. K. Starkey                              October 19, 1976

Visit to Disposal Site
for our CDN Spent Acid

Page 2

into town.  It had left the plant about an hour and a half before that.

I gave Leuzarder three signed copies of the contract our Law Department had
drawn up for waiver of liability.  His hesitation tells me that he will sit on
these for awhile and we should not expect to receive the signed contract too
soon, if at all.


ATC:aa

BSAI006574            6351

# EXHIBIT 9

curley

1

1              UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF PENNSYLVANIA
2

3   ─────────────────────────── CIVIL ACTION NO.
                                     02-CV-3830
4   BOARHEAD FARM AGREEMENT     Judge Legrome D. Davis
    GROUP,
              Plaintiff,           Oral Deposition of:
5

6        vs.                    Arthur T. Curley, Jr.

7   ADVANCED ENVIRONMENTAL TECHNOLOGY
    CORPORATION; ASHLAND CHEMICAL
8   COMPANY; BOARHEAD CORPORATION;
    CARPENTER TECHNOLOGY CORPORATION;
9   CROWN METRO, INC.; DIAZ CHEMICAL
    CORPORATION; EMHART INDUSTRIES,
10  INC.; ETCHED CIRCUITS, INC.; FCG,
    INC.; GLOBE DISPOSAL COMPANY, INC.;
11  GLOBE-WASTECH, INC.; HANDY & HARMAN
    TUBE COMPANY, INC.; KNOLL, INC.;
12  MERIT METAL PRODUCTS CORPORATION;
    NOVARTIS CORPORATION; NRM INVESTMENT
13  COMPANY; PLYMOUTH TUBE COMPANY;
    QUIKLINE DESIGN AND MANUFACTURING
14  COMPANY; RAHNS SPECIALTY METALS,
    INC.; ROHM & HAAS COMPANY, SIMON
15  WRECKING COMPANY, INC.; TECHALLOY
    COMPANY, INC.; THOMAS & BETTS
16  CORPORATION; UNISYS CORPORATION;
    UNITED STATES OF AMERICA
17  DEPARTMENT OF NAVY,
              Defendants.
18  ───────────────────────────
             *   *   *   *   *
19       Thursday, December 9, 2004
             *   *   *   *   *
20

21           Transcript in the above matter taken at
    the offices of Ballard, Spahr Andrews & Ingersoll,
22  LLP, Plaza 1000, Main Street, Suite 500, Voorhees,
    New Jersey, commencing at 10:00 a.m.
23
         Certified Shorthand Reporting Services
24               Arranged Through
             Mastroianni & Formaroli, Inc.
25               709 White Horse Pike
             Audubon, New Jersey 08106
                 (856) 546-1100

□

2

1   A P P E A R A N C E S:

Page 1

curley

22        Q.      So --

23                MR. BIEDRZYCKI:  This is for you, by

24    the way.

25    BY MS. MOONEY:

20

1         Q.      And I forgot to tell you in the

2    beginning if, at any time, you want to break or get

3    something to drink or just to stretch your legs,

4    please let me know, I'll be happy to let you do that.

5                 So from 1988 to 1983 you were working

6    on the cleanup of the plant; is that right?

7         A.      To '93.

8         Q.      To '93?

9         A.      Yeah.

10        Q.      And in 1993, what did you go on to do?

11        A.      I retired.  They retired me, officially

12    they retired me.

13        Q.      All right.  I'd like to ask you some

14    questions about your time at Ashland Chemical

15    Company.  In -- let's see, were you an Ashland

16    employee from 1967 with a brief two-year hiatus with

17    the U.S. government project, from 1967 to 1978; is

18    that right, you were with Ashland?

19        A.      Yes.  Yes.

20        Q.      In 1976, if you can cast your mind back

21    to 1976, what exactly was Ashland producing at that

22    time in the way of chemicals or other products?

23                MR. BIEDRZYCKI:  At Great Meadows?

24    BY MS. MOONEY:

Page 18

curley

7       you're going to -- this witness' transcript if you
8       don't mark it.
9               MS. MOONEY:  All right, let's mark it
10      then, that's a really good point.  I had extra
11      copies.  This is going to be Curley Exhibit 4.
12              (Exhibit Curley-4, 7-page Agreement, Bates
13      stamped AETC 184-190, marked for I.D.)
14      BY MS. MOONEY:
15          Q.    So I'll take that one back.
16          A.    (Handing).
17          Q.    Have you had a chance to look at that,
18      Mr. Curley?
19          A.    Yes.
20          Q.    Do you know what this document is?
21          A.    Yeah.
22          Q.    What is it?
23          A.    Contract supposedly to -- between AETC
24      and Ashland for the handling of waste.
25          Q.    Do you know who created this document?

162

1           A.    No.  It was Leuzarder, the company AETC,
2       not Ashland.
3           Q.    Do you know if this document was ever
4       signed by Ashland?
5           A.    No, as far as I know, no.
6           Q.    Do you recall when -- did you receive
7       this document at any time?
8           A.    I'm sure I did, yes.
9           Q.    Do you recall receiving it?
                        Page 146

curley

10      A.      Yes.

11      Q.      You do.

12              Do you know when, do you recall when

13  you received it?

14      A.      No.

15      Q.      What were the circumstances surrounding

16  you're receiving this?

17      A.      I just can assume that John wanted it

18  signed as an agreement between Ashland and AETC and

19  the handling of waste.

20      Q.      Was this, did this agreement concern the

21  handling of the waste that AETC ultimately did handle

22  for Ashland?

23      A.      Yes.

24      Q.      Do you know why Ashland did not sign

25  this document?

163

1       A.      No.

2       Q.      Did you give this document to someone

3   else in Ashland?

4       A.      Yes.  I would have given it to Harold

5   Sullivan.

6       Q.      Did you have any discussions with Mr.

7   Sullivan about this document?

8       A.      Probably not, other than just telling

9   him John would like this signed, no.

10      Q.      Was this document -- was this document a

11  condition of AETC working for you, meaning Ashland?

12  Strike that.

Page 147

curley

13              Did AETC -- did Mr. Leuzarder give you

14      this document before AETC started handling Ashland's

15      waste streams?

16         A.     I don't recall.

17         Q.     Do you recall why Ashland did not sign

18      this document?

19      (Objection)  MR. BIEDRZYCKI:  Objection.

20                  MR. SABINO:  You already asked him

21      that.

22                  MR. BIEDRZYCKI:  Asked and answered.  I

23      know it's getting late.

24                  MS. MOONEY:  I totally forgot I asked

25      that.

☐

164

1                  MR. BIEDRZYCKI:  That's why we're here

2       to remind you.

3                  MS. MOONEY:  I appreciate that.

4                  MR. SABINO:  We're just helping out.

5       BY MS. MOONEY:

6          Q.     Do you recall any discussions that you

7       had with Mr. Leuzarder regarding why Ashland did not

8       sign this contract?

9          A.     No.

10         Q.     Do you know -- did Mr. Leuzarder ever

11      ask you to sign this contract?

12         A.     Why when he handed it to me it goes

13      without saying that he wanted it signed.  Beyond

14      that, I have no recollection ever discussing it

15      again.

curley

16        Q.        On the second page of this document,
17    AETC 185, paragraph four at the top, says:    In
18    consideration for the contract undertaking and
19    performing the work to be done hereunder, Ashland
20    agrees that all materials removed will become the
21    property of the contractor.
22                    Was it your understanding in Ashland's
23    agreement with AETC that the materials AETC removed
24    became their property once it was removed?
25    (Objection)    MR. SABINO:    Objection.

□

165

1                    THE WITNESS:    Not being a lawyer I have
2    no idea what the purpose of something like that would
3    be.    That's what it says though.
4    BY MS. MOONEY:
5        Q.        Did you, yourself, consider that once
6    AETC removed the waste from Ashland it was their
7    property?
8    (Objection)    MR. SABINO:    Objection.    AETC didn't
9    remove the waste.    And objection, legal.
10                    THE WITNESS:    Never thought of it one
11    way or the other.
12    BY MS. MOONEY:
13        Q.        Do you recall any discussions regarding
14    this issue --
15        A.        No.
16        Q.        -- with AETC?
17        A.        No.
18        Q.        Let's move on.
                    Page 149

# EXHIBIT 10

Robert W. Landmesser                    November 22, 2004

Page 1

1           UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____    CIVIL ACTION NO.
3    BOARHEAD FARM AGREEMENT            02-CV-3830
     GROUP,                            Judge Legrome D. Davis
4                                          VOLUME I
              Plaintiff,        Oral Deposition of
5
6         vs.                    ROBERT W. LANDMESSER

ADVANCED ENVIRONMENTAL TECHNOLOGY
7    CORPORATION; ASHLAND CHEMICAL
     COMPANY, BOARHEAD CORPORATION;
8    CARPENTER TECHNOLOGY CORPORATION;
     CROWN METRO, INC.; DIAZ CHEMICAL
9    CORPORATION; EMHART INDUSTRIES,
     INC.; ETCHED CIRCUITS, INC.; FCG,
0    INC.; GLOBE DISPOSL COMPANY, INC.;
     GLOBE-WASTECH, INC.; HANDY & HARMAN
1    TUBE COMPANY, INC.; KNOLL, INC.;
     MERIT METAL PRODUCTS CORPORATION;
2    NOVARTIS CORPORATION; NRM INVESTMENT
     COMPANY; PLYMOUTH TUBE COMPANY;
3    QUIKLINE DESIGN AND MANUFACTURING
     COMPANY; RAHNS SPECIALTY METALS,
4    INC.; ROHM & HAAS COMPANY, SIMON
     WRECKING COMPANY, INC.; TECHALLOY
5    COMPANY, INC; THOMAS & BETTS
     CORPORATION; UNISYS CORPORATION;
6    UNITED STATES OF AMERICA
     DEPARTMENT OF NAVY,
7
8              Defendants.
_____
              *   *   *   *   *
9         MONDAY, NOVEMBER 22, 2004
              *   *   *   *   *
0         Transcript in the above matter taken at
     the offices of WOLFF & SAMSON, PC, The Offices at
1    Crystal Lake, One Boland Drive, West Orange, New
     Jersey, commencing at 10:00 a.m.
2
3         Certified Shorthand Reporting Services
                  Arranged Through
4            Mastroianni & Formaroli, Inc.
                  709 White Horse Pike
5            Audubon, New Jersey 08106
                  (800) 972-3377

Robert W. Landmesser

November 22, 2004

Page 146

the waste haulers that it contracted with?
(OBJECTION) MR. SABINO: Objection to the form of the question, use of the word arrangement. It's a CERCLA term of art.
　　MS. MOONEY: Sometimes.
　　MR. SABINO: We object to it
BY MS. MOONEY:
Q.　Okay, how about agreement?
A.　We set up haulers to do certain things for us.
Q.　Okay, can you describe those things, please?
A.　In general?
Q.　Yes.
A.　I think I've gone into great detail about how I did that.
Q.　Okay.
A.　You know, driver logs and this and that and, you know, DEP licenses or environmental licenses, so.
Q.　Well, I guess I'm just asking you what you would --
A.　You're asking me the same question probably eleven times now. And you have to -- you gotta go for the issue because you're not going to

Page 147

find it in generalities.
Q.　Did you usually have -- did AETC usually have contracts, written contracts with the haulers that it worked with?
A.　In the period of time '76 through '82, it was not my general practice to have contracts with haulers that I remember. We may have, I don't recall at this point.
Q.　So the agreements were oral; is that right?
A.　Well, if they weren't written, they were probably oral.
Q.　Did you have letter agreements as you did with the generators?
A.　I think it was much more we knew the people we were dealing with in most cases, so we had a business relationship with them and to the extent that we gave them what they needed, they gave us what we wanted.
Q.　Did that ever change? Did you start having written contracts with the haulers, AETC?
A.　Yes.
Q.　Okay, when did that change?
A.　I don't recall.
Q.　Late '80s?

Page 148

1　A.　Again, I wouldn't want to be specific in
2　a serious thing like this. I know that it did
3　change. I don't recall specifically when.
4　Q.　What were the responsibilities of the
5　haulers AETC worked with in terms of providing the
6　mode of transportation for the waste?
7　A.　Define mode, air, sea, water?
8　Q.　Well, whatever mode was used. So I
9　guess I'm thinking trucks, vehicles. Did AETC
10　provide the vehicle for the hauler or did the hauler
11　provide his own transportation?
12　A.　The hauler that was not specified but
13　they would have to have the equipment necessary to
14　transport the materials. So there was a discussion
15　between the generator of the materials and the
16　haulers to the extent that there was something
17　unusual about it.
18　Q.　There would be a conversation to the
19　extent there was something unusual about it, what
20　unusual? What do you mean?
21　A.　Is it picric acid? Is it dry? Is it
22　going to blow up in your face? That's pretty
23　specific from a hauling standpoint. Is it a wash
24　water from Clairol or some other baby shampoo
25　manufacturer that can go in pretty much any type of

Page 149

1　container. So there is a menu that you would follow.
2　Q.　And was the practice that the hauler
3　would coordinate with the generator as to what type
4　of vehicle to use to transport that waste?
5　A.　If need be, yes.
6　Q.　Was that usual?
7　A.　Give me specific and I'll tell you.
8　Q.　Well, I'm asking you if it was typical?
9　A.　And I have to answer it maybe, because I
10　don't know if it was general or specific or maybe.
11　It depends on the nature of the material.
12　Q.　Okay. Did AETC ever specify the type of
13　vehicle that a hauler should be using to transport a
14　given waste?
15　A.　It may have.
16　Q.　And this is in the '76 to '82 period?
17　A.　Yes.
18　Q.　Do you want to stop?
19　A.　No, three more minutes. I want to get
20　through at least half the pile.
21　Q.　Don't worry, we're going fast. I
22　already skipped a lot.
23　　　What about maintenance of the vehicle
24　that the hauler used for AETC customers, would that
25　be AETC's responsibility or the haulers?

38 (Pages 146 to 149)

Robert W. Landmesser                                    December 28, 2004

Page 1

1              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
3
                                    CIVIL ACTION NO.
4  BOARHEAD FARM AGREEMENT            02-CV-3830
   GROUP,                         Judge Legrome D. Davis
5          Plaintiff,            Oral Deposition of
6      vs.                       ROBERT W. LANDMESSER
   ADVANCED ENVIRONMENTAL TECHNOLOGY
7  CORPORATION; ASHLAND CHEMICAL        VOLUME III
   COMPANY; BOARHEAD CORPORATION;
8  CARPENTER TECHNOLOGY CORPORATION;
   CROWN METRO, INC.; DIAZ CHEMICAL
9  CORPORATION; EMHART INDUSTRIES,
   INC.; ETCHED CIRCUITS, INC.; FCG,
0  INC.; GLOBE DISPOSAL COMPANY, INC.;
   GLOBE-WASTECH, INC.; HANDY & HARMAN
1  TUBE COMPANY, INC.; KNOLL, INC.;
   MERIT METAL PRODUCTS CORPORATION;
2  NOVARTIS CORPORATION; NRM INVESTMENT
   COMPANY; PLYMOUTH TUBE COMPANY;
3  QUIKLINE DESIGN AND MANUFACTURING
   COMPANY; RAHNS SPECIALTY METALS,
4  INC.; ROHM & HAAS COMPANY, SIMON
   WRECKING COMPANY, INC.; TECHALLOY
5  COMPANY, INC.; THOMAS & BETTS
   CORPORATION; UNISYS CORPORATION;
6  UNITED STATES OF AMERICA
   DEPARTMENT OF NAVY,
7          Defendants.
8
            *   *   *   *   *
9        December 28, 2004
            *   *   *   *   *
0
         Transcript in the above matter taken at
1  the offices of AERC, 2591 Mitchell Avenue, Allentown,
   Pennsylvania, commencing at 10 o'clock A.M.
2
       Certified Shorthand Reporting Services
3              Arranged Through
        Mastroianni & Formaroli, Inc.
4           709 White Horse Pike
        Audubon, New Jersey 08106
5            (856) 546-1100



Robert W. Landmesser                                    December 28, 2004

<table>
<tr><td valign="top" width="50%">

Page 22

1    A.   No.  You should ask the Ashland people.
2    Q.   Okay.  I'm going to ask you a few
3 questions about part of this exhibit, which was
4 previously marked as Leuzarder-4, and I'm going to
5 direct your attention to Bates numbers AETC -- well,
6 first I'd like to direct your attention to Bates AETC
7 185, which is in the middle.
8        MR. SABINO:  Take a look at 184,
9 because it's the first page.
10   Q.   Take 184 to 189, I think, or 190 is the
11 same document.
12       You can just look at 184 to 190 for
13 right now.
14   A.   Okay.
15   Q.   Do you recognize this document that
16 starts on AETC 184 and ends on AETC 190?
17   A.   No.
18   Q.   Do you know who created this document,
19 184 through 190?
20   A.   No.
21   Q.   Have you ever seen this document before
22 to your recollection?
23   A.   I'm just looking at it.
24   Q.   Take your time.
25   A.   No.  I was looking at the writing on

</td><td valign="top" width="50%">

Page 24

1    Q.   I'm asking you if this first sentence
2 accurately describes, to your knowledge, the business
3 relationship between Ashland and AETC in 1976 and
4 '77.
5   A.   I wouldn't know that.
6   Q.   Who would?
7   A.   Whoever put together this document, or
8 no one may know it.
9   Q.   Okay.  Was it your understanding at the
10 time that upon your haulers' removal of Ashland's
11 waste, that that waste became AETC's property?
12       MR. SABINO:  Objection.  It's a legal
13 question.
14   A.   That's contrary to what I believe takes
15 place.
16   Q.   Took place during this time period?
17   A.   Takes place as of today.
18   Q.   Well, I'm not talking about today.  I'm
19 talking about in 1976 and 1977, was it your
20 understanding that when one of the haulers with whom
21 you contracted removed Ashland's waste, that that
22 waste became AETC's waste?
23   A.   No, it's not my understanding.
24   Q.   Okay.  What was your understanding at
25 the time of the ownership of that waste upon removal?

</td></tr>
<tr><td valign="top" width="50%">

Page 23

1 Page 188, and it's too neat for me, for my
2 handwriting.  I don't recall ever seeing this.
3   Q.   Okay.  Let me ask you a question about
4 Page 185.
5   A.   Yes.
6   Q.   Paragraph 4 on Page 185.
7   A.   Yes.
8   Q.   The first sentence of that Paragraph 4
9 says "In consideration for the Contractor," which is
10 defined as AETC, "undertaking and performing the work
11 to be done hereunder, Ashland agrees that all
12 materials removed will become the property of the
13 Contractor."
14       Is that your understanding of the
15 arrangement or the agreement AETC had with Ashland
16 for the removal of Ashland's waste?
17       MR. SABINO:  Objection.  He said he
18 never saw the document.
19       MS. MOONEY:  I'm just asking a
20 question about this substantive issue.
21       MR. SABINO:  Well, you're implying
22 that this agreement became effective.  The record
23 doesn't show that.
24       MS. MOONEY:  I'm not implying that.
25 BY MS. MOONEY:

</td><td valign="top" width="50%">

Page 25

1   A.   It's my understanding that the generator
2 of the material always owns the waste.
3   Q.   And it was your understanding in 1976
4 and '77?
5   A.   I don't know specifically when that
6 information, conclusion came to be part of my memory,
7 so the answer is I don't know.
8   Q.   What about with respect to any of your
9 customers in 1976 and 1977.  Was it your
10 understanding at the time that waste removed by
11 haulers with whom you agreed to remove the waste at
12 the point of removal became AETC's property?  Is that
13 something that happened with any customer?
14       MR. SABINO:  I thought he just said
15 the generator owns the waste and he wasn't sure when
16 he came to that conclusion.
17       MS. MOONEY:  The question was premised
18 on Ashland.  I'm asking a broader question.
19 BY MS. MOONEY:
20   A.   I think the generator historically
21 always has owned the waste, so that's reflected on
22 current law.  When that became part of my
23 understanding, I don't have the ability to fix that,
24 but in today's reality, Ashland is always responsible
25 for the materials, always own it.

</td></tr>
</table>

7 (Pages 22 to 25)

Robert W. Landmesser                                    December 28, 2004

Page 26

1    Q.    Okay.  Once again, I'm not asking about
2  today.  I am asking about 1976 and 1977.
3        MR. SABINO:  He said historically the
4  generator has owned the waste.  He did answer the
5  question.
6    A.    I don't have much of a difference today
7  versus any time previously.
8    Q.    Did AETC's agreement with DeRewal
9  include the understanding that once DeRewal removed
0  waste from one of AETC's customers that that waste
1  still belonged to the customer?
2    A.    I don't have any recollection of us
3  having an agreement with DeRewal, so to that extent,
4  I don't know.
5    Q.    I'm sorry.  Can you explain that?  What
6  do you mean you didn't have an agreement with
7  DeRewal?
8    A.    I don't recall that we had an agreement
9  with DeRewal.
0    Q.    Oral agreement with DeRewal.  When I say
1  "agreement", I'm not limiting it to a written
2  contract or written anything.
3    A.    Yeah.  I would speculate that there was
4  some type of agreement on his part to do what was
5  necessary to meet our agreements to destroy the

Page 27

   waste, neutralize it.  I don't know what our
   understanding was back in '75, '76, '77.
     Q.    With regard to the ownership of the
   waste upon removal?
     A.    I would speculate that we all would be
   responsible for what we were taking on, but the
   generator would ultimately own the waste.
     Q.    Okay.
         MR. BIEDRZYCKI:  Objection.  Move to
   strike, because it's based on speculation.
     Q.    I'm going to direct your attention to
   196, Bates 196 on Leuzarder-4.
     A.    I have it.
     Q.    Okay.  Tell me when you've had a chance
   to look it over.
     A.    I've read it.
     Q.    Okay.  Do you recognize this letter?
     A.    No.
     Q.    Is this your signature at the bottom of
   this letter?
     A.    No.
     Q.    Do you know whose signature that is?
     A.    It was signed by someone, "rfs", but
   that's not my handwriting.
     Q.    Did someone sign this on your behalf?

Page 28

1    A.    Yes.
2    Q.    Does this reflect -- refresh your
3  recollection as to whether or not AETC continued to
4  handle Ashland's waste after DeRewal -- DeRewal's
5  Wissinoming facility was shut down?
6        MR. SABINO:  I object.  This is a
7  quote.  It doesn't establish that there was a
8  relationship.  You can ask him if a quote was made.
9  I don't think you can use this document for whether
10 or not there was an agreement or not.  Go ahead, Bob.
11   A.    I don't have any recollection.
12   Q.    After the Wissinoming facility was shut
13 down, did you have more of the lead in the
14 relationship with Ashland from AETC's perspective?
15   A.    I don't have any recollection.  Most of
16 the letters here in this packet are sent by John
17 Leuzarder.
18   Q.    Do you know if Ashland accepted this
19 proposal that's reflected in AETC 196?
20   A.    They may have, but I don't have any
21 specific recollection.
22   Q.    All right.  You look at AETC 197 through
23 199.
24       MS. FLAX:  That's been marked as
25 Leuzarder-5, which is AETC 197.

Page 29

1        MS. MOONEY:  I actually do.  I'm going
2  to give you a new exhibit.  This was previously
3  marked as Leuzarder Exhibit 5.
4        MR. SABINO:  Thanks, Melissa.
5        MS. MOONEY:  I think you have two.
6        MR. SABINO:  Sorry.
7  BY MS. MOONEY:
8    A.    Okay, I've looked at it.
9    Q.    Do you recognize this document?
10   A.    No, I do not.
11   Q.    Do you know who generated this document?
12   A.    I don't recognize the document, and I
13 don't know who generated it.
14   Q.    All right.  I'm going to have this
15 marked as I guess --
16       MS. FLAX:  Off the record.
17       (Off-the-record discussion.)
18       (Exhibit Landmesser-1, Letter
19 dated December 20, 1977, marked for I.D.)
20   Q.    Just take a moment and look over that.
21   A.    I've read it, yes.
22   Q.    Do you recognize this document?
23   A.    I don't recognize it specifically.  That
24 is, I think I signed it.  That is my signature.
25   Q.    Okay.

eporting@verizon.net          Mastroianni & Formaroli, Inc.          856-546-1100
                        Professionals Serving Professionals

# EXHIBIT 11



EXHIBIT
P-52
5-13-03 KLS

ORIGINAL (Red)

(Uniform Domestic Straight Bill of Lading, Adopted by Carriers in Official, Southern, Western and Illinois Classification Territories, March 15, 1922, as amended August 1, 1930 and June 15, 1941.)

UNIFORM STRAIGHT BILL OF LADING     **Original—Not Negotiable**

ENVIRONMENTAL CHEMICAL CONTROL     Company     Shipper's No. _____

Agent's No. 77-WA-05

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

at **Holley, New York**   JANUARY **6**   19 **77**   from   **Diaz Chemical Corp.**

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own road or its own water line, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

(Mail or street address of consignee—For purposes of notification only

Consigned to **ADVANCED ENVIRONMENTAL TECH. CORPORATION - MILFORD, N.J.**

Destination **Philadelphia, (Wysomming Industrial Park)** State of **Penn.**   County of _____

Route _____

Delivering Carrier **Environmental Chemical Control**   Car Initial _____   Car No. _____

| No. Pkgs | Description of Articles, Special Marks, and Exceptions | *Weight (Sub. to Cor.) | Class or Rate | Check Column | |
|---|---|---|---|---|---|
| 1 | ~~2700~~ ~~Liters~~ Gallons Waste Sulfuric Acid (SPENT) | ~~40,500~~ ~~45,000~~ # | | | Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement: |
| | (CORROSIVE MATERIAL) | | | | The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges. |
| | FOR RECYCLE | | | | |
| | Product Code          (New) | | | | (Signature of Consignor) |
| | | | | | If charges are to be prepaid, write or stamp here, "To be Prepaid." |
| | THIS IS TO CERTIFY THAT THE ABOVE-NAMED MATERIALS ARE PROPERLY | | | | |
| | CLASSIFIED, DESCRIBED, PACKAGED, MARKED AND LABELED AND ARE IN | | | | Received $ _____ to apply in prepayment of the charges on the property described hereon. |
| | PROPER CONDITION FOR TRANSPORATION ACCORDING TO THE APPLICABLE | | | | |
| | REGULATIONS OF THE DEPARTMENT OF TRANSPORATION. | | | | Agent or Cashier |
| | S.J. CHIRAS | | | | |

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight."

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

**0.50** _____ per _____ **lb.**

Per _____
(The signature here acknowledges only the amount prepaid.)

Charges Advanced:

$ _____

†The fibre boxes used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Uniform Freight Classification.
‡Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

**Diaz Chemical Corp.**   Shipper, Per _J.C. Davis_   Agent, Per _____

Permanent post-office address of shipper.

Rediform®
65 685
POLY PAK (20 SETS) #P465

(This Bill of Lading is to be signed by the shipper and agent of the carrier issuing same.)

BSAI029144

ORIGINAL
(Red)

(Uniform Domestic Straight Bill of Lading, Adopted by Carriers in Official, Southern, Western and Illinois Classification Territories, March 15, 1922, as amended August 1, 1930 and June 15, 1941.)

UNIFORM STRAIGHT BILL OF LADING     Original—Not Negotiable     Shipper's No.

ENVIRONMENTAL CHEMICAL CONTROL     Company     Agent's No.  77-VA-08

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

at  **Holley, New York**     **JANUARY  8  1977**  from  **Diaz Chemical Corp.**

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated below, which said company (the word company being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its own road or its own water line, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

(Mail or street address of consignee—For purposes of notification only.)

Consigned to  ADVANCED ENVIRONMENTAL TECH. CORPORATION - MILFORD, N.J.

Destination  PHILADELPHIA, (WYSOMMING INDUSTRIAL PARK)   State of   PA   County of

Route

Delivering Carrier  ENVIRONMENTAL CHEMICAL CONTROL   Car Initial   Car No.

| No. ages | Description of Articles, Special Marks, and Exceptions | *Weight (Sub. to Cor.) | Class or Rate | Check Column | |
|---|---|---|---|---|---|
| 1 | 2,900 Gallons Waste Sulfuric Acid (SPENT) | 44,000# | | | Subject to Section 7 of conditions if this shipment is to be delivered the consignee without recourse on the consignor, the consignor shall sign the following statement. |
| | (CORROSIVE MATERIAL) | | | | The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges |
| | FOR RECYCLE | | | | |
| | Product Code      (NEW) | | | | (Signature of Consigner)<br>If charges are to be prepaid, write or stamp here, "To be Prepaid." |
| | THIS IS TO CERTIFY THAT THE ABOVE-NAMED MATERIALS ARE PROPERLY CLASSIFIED, DESCRIBED, PACKAGED, MARKED AND LABELED AND ARE IN PROPER CONDITION FOR TRANSPORATION ACCORDING TO THE APPLICABLE REGULATIONS OF THE DEPARTMENT OF TRANSPORTATION. | | | | Received $<br>to apply in prepayment of the charges on the property described hereon. |
| | S. J. CHIRAS | | | | Agent or Cashier |

*If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight."

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

0.50   per   1b.

†"The fibre boxes used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Uniform Freight Classification."
‡Shipper's imprint in lieu of stamp; not a part of bill of lading approved by the Interstate Commerce Commission.

Per
(The signature here acknowledges only the amount prepaid.)
Charges Advanced:
$

**Diaz Chemical Corp.**     Shipper, Per  W. A. Lee     Agent, Per

Permanent post-office address of shipper.

Rediform
65 685
POLY PAK (30 SETS) 4P655

(This Bill of Lading is to be signed by the shipper and agent of the carrier issuing same.)

BSAI029146

# STRAIGHT BILL OF LADING
## ORIGINAL - NOT NEGOTIABLE

Shipper No. N° 001058

Carrier No. 77-WA-88 64

### ENVIRONMENTAL CHEMICAL CONTROL
(Name of Carrier)

Date APRIL 13, 197

| | |
|---|---|
| TO: Consignee ADVANCED ENVIRONMENTAL TECH. CORP. | FROM: Shipper **DIAZ CHEMICAL CORP.** ORIG |
| Street WYSOMMING INDURSTRIAL PARK | Street Jackson Street |
| Destination PHILADELPHIA, PA    Zip Code | Origin Holley, New York 14470 |

Route

Vehicle Number

| No. of Units & Container Type | HM | DESCRIPTION AND CLASSIFICATION (Proper Shipping Name and Class per 49 CFR 172.101) | TOTAL QUANTITY (Weight, Volume, Gallons, etc.) | WEIGHT (Subject to Correction) | RATE | CHARG (For Ca Use On |
|---|---|---|---|---|---|---|
| 1 tank truck | X | NITRATING (MIXED) ACID, SPENT | 2,900 Gal. | 44,000# | | |
| | | (CORROSIVE MATERIAL) | | | | |
| | | FOR RECYCLE | | | | |
| | | Product Code          (NEW) | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REMIT C.O.D. TO: ADDRESS

COD   Amt: $

C.O.D. FEE: PREPAID ☐ COLLECT ☐  $

Note—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding.
$ 0.50 per lb.

This is to certify that the above-named materials are properly classified, described, packaged, marked and labeled and are in proper condition for transportation according to the applicable regulations of the Department of Transportation
S. J. CHIRAS       Signature

Subject to Section 7 of the conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.
_____ (Signature of Consignor)

TOTAL CHARGES:   $

FREIGHT CHARGES
FREIGHT PREPAID    Check box -
except when box at
right is checked    ☐

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading, the property described above in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of, said property over all or any portion of said route to destination and as to each party any time interested in all or any said property, that every service to be performed hereund shall be subject to all the bill of lading terms and conditions in the governing classification o the date of shipment.
Shipper hereby certifies that he is familiar with all the bill of lading terms and conditions and the governing classification and the said terms and conditions are hereby agreed to by th shipper and accepted for himself and his assigns.

BSAI029261

| SHIPPER  DIAZ CHEMICAL CORP. | CARRIER |
|---|---|
| PER  *Diane Bower* | PER  X *[signature]* |
| P.O. Box 194, Holley, New York 14470 | DATE  4-13-77 |

STYLE F-65 LABELMASTER CHICAGO, IL. 60660

# STRAIGHT BILL OF LADING
### ORIGINAL - NOT NEGOTIABLE

Shipper No. №  001061

Carrier No. __77-WA-66__

ENVIRONMENTAL CHEMICAL CONTROL

Date APRIL /4, 197_

| TO: Consignee | ADVANCED ENVIRONMENTAL TECH. CORP. | FROM: Shipper | DIAZ CHEMICAL CORP. | | ORIGIN |
|---|---|---|---|---|---|
| Street | WYSOHMING INDUSTRIAL PARK | Street | Jackson Street | | |
| Destination | PHILADELPHIA, PA      Zip Code | Origin | Holley, New York 14470 | | |

| Route | | | | | | Vehicle Number | |
|---|---|---|---|---|---|---|---|

| No. of Units & Container Type | HM | DESCRIPTION AND CLASSIFICATION (Proper Shipping Name and Class per 49 CFR 172.101) | TOTAL QUANTITY (Weight, Volume, Gallons, etc.) | WEIGHT (Subject to Correction) | RATE | CHARG (For Can Use On |
|---|---|---|---|---|---|---|
| 1 tank truck | X | NITRATING (MIXED) ACID, SPENT | 2,900 gal. | 44,000# | | |
| | | (CORROSIVE MATERIAL) | | | | |
| | | FOR RECYCLE | | | | |
| | | Product Code            (NEW) | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| REMIT C.O.D. TO: ADDRESS | | | COD      Amt: $ | | C.O.D. FEE: PREPAID ☐ COLLECT ☐   $ |
|---|---|---|---|---|---|

Note—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding.

$ __0.50__ per __1b__

This is to certify that the above-named materials are property classified, described, packaged, marked and labeled and are in proper condition for transportation according to the applicable requirements of the Department of Transportation.

__S. J. CHIRAS__ Signature

Subject to Section 7 of the conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.

_____ (Signature of Consignor)

| TOTAL CHARGES:   $ |
|---|

**FREIGHT CHARGES**
FREIGHT PREPAID except when box at right is checked
☐ Check box if

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading, the property described above in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or

any of, said property over all or any portion of said route to destination and as to each party at any time interested in all or any said property, that every service to be performed hereunder shall be subject to all the bill of lading terms and conditions in the governing classification o the date of shipment.
Shipper hereby certifies that he is familiar with all the bill of lading terms and conditions i the governing classification and the said terms and conditions are hereby agreed to by th shipper and accepted for himself and his assigns.

| SHIPPER | DIAZ CHEMICAL CORP. | CARRIER | |
|---|---|---|---|
| PER | *Diane Bower* | PER | |
| | P.O. Box 194, Holley, New York 14470 | DATE | 4-14-77 |

BSAI029263

STYLE F-65 LABELMASTER CHICAGO, IL. 60660

# EXHIBIT 12

STRAIGHT BILL OF LADING—SHORT FORM—Original—Not Negotiable.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

CARRIER'S NO

NAME OF CARRIER

## ASHLAND CHEMICAL COMPANY

SHIPPED BY:

ROUTE            ADVANCED ENVIROTECH CO.        SHIP FROM (CITY & STATE)  210 GT MEADOWS N J

DATE SHIPPED  8/9/76

CONSIGNED TO

ADVANCED ENVIROTECH COMPANY
P.O. BOX 152
MILLTOWN NEW JERSEY 08850

COLLECT

| PRODUCT CODE | CONT CODE | DESCRIPTION OF ARTICLES SPECIAL MARKS & EXCEPTIONS | NO. OF CONTENTS | NET QUANTITY SHIPPED | WEIGHT SUB TO COR | FREIGHT RATE |
|---|---|---|---|---|---|---|
| | | 1 Tank Truck Containing Spent Mixed Acid FromsGEN | | | | |
| | | CORROSIVE LIQUID N.O.S CORROSIVE LIQUID | | | | |
| | | APPROX 2,850 Gallons  APPROX 44,000 Lbs | | | | |
| | | CORROSIVE LABELS REQUIRED | | | | |

EXHIBIT # P-63
DATE 6/8/03
MASTROIANNI & FORMAROLI, INC.
CERTIFIED SHORTHAND REPORTERS

IN THE EVENT OF ANY EMERGENCY
CONCERNING THE PRODUCT IN THIS
SHIPMENT, CALL TOLL-FREE NUMBER
800-424-9300, DAY OR NIGHT.

DRUMS RETURNED    I C C    REG

ASHLAND CHEMICAL COMPANY, Shipper        Per ADVANCED ENVIROTECH COMPANY        Agent

Per Charles Skadesk        P O BOX 2219, COLUMBUS, OHIO 43216

ASHL00005

**STRAIGHT BILL OF LADING—SHORT FORM—Original—Not Negotiable.**

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

CARRIER'S NO

NAME OF CARRIER

DELIVERING CARRIER

| | |
|---|---|
| SHIPPED BY: | **ASHLAND CHEMICAL COMPANY** | ORDER NO |

ROUTE

**ADVANCED ENVIROTECH COMPANY**

CAR NO | SHIP FROM (CITY & STATE) **210 GT MEADOWS NJ** | OCO | DATE OF ORDER

CUSTOMER ORDER & REQ NO | DATE SHIPPED 8/16/76 | REQUESTED SHIP DATE

CONSIGNED TO

ADVANCED ENVIRTECH COMPANY
P.O BOX 152
MILLTOWN NEW JERSEY 08850

**COLLECT**

| PRODUCT CODE | | DESCRIPTION OF ARTICLES, SPECIAL MARKS & EXCEPTIONS | NO OF CONTENTS | NET QUANTITY SHIPPED | WEIGHT SUB TO COR | FREIGHT RATE | |
|---|---|---|---|---|---|---|---|
| | | 1 Tank Truck Containing Spent Mixed Acid | | | | | |
| | | CORROSIVE LIQUID N.O.S CORROSIVE LIQUID | | | | | |
| | | APPROX 2,800 GALLONS  APPROX 44,000 Lbs | | | | | |
| | | CORROSIVE LABELS REQUIRED | | | | | |
| | | IN THE EVENT OF ANY EMERGENCY CONCERNING THE PRODUCT IN THIS SHIPMENT, CALL TOLL FREE NUMBER 800-424-9300, DAY OR NIGHT. | | | | | |

DRUMS RETURNED    I.C.C.    REG

ASHLAND CHEMICAL COMPANY, Shipper    Per **ADVANCED ENVIRTECH CO.** Agent

THIS SHIPMENT IS CORRECTLY DESCRIBED
CORRECT WEIGHT IS 44,000 LBS

ASHL00006

## STRAIGHT BILL OF LADING—SHORT FORM—Original—Not Negotiable.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

CARRIER'S NO

| NAME OF CARRIER | DELIVERING CARRIER | | | |
|---|---|---|---|---|
| SHIPPED BY: | **ASHLAND CHEMICAL COMPANY** | | | ORDER NO |

| ROUTE | | CAR NO | SHIP FROM (CITY & STATE) | OCD | DATE OF ORDER |
|---|---|---|---|---|---|
| ADVANCED ENVIROTECH CO | | | 210 GT MEADOWS NJ | | |
| CUSTOMER ORDER & REQ NO | | | DATE SHIPPED 4/5/77 | | REQUESTED SHIP DATE |

CONSIGNED TO

ADVANCED ENVIROTECH COMPANY
P.O. BOX 152
MILLTOWN NEW JERSEY

COLLECT

| PRODUCT CODE | DESCRIPTION OF ARTICLES, SPECIAL MARKS & EXCEPTIONS | NO OF CONTENTS | NET QUANTITY SHIPPED | WEIGHT SUB TO CORR | FREIGHT RATE |
|---|---|---|---|---|---|
| | 1 Tank Truck Containing ~~███~~ | | | | |
| | ~~███~~ | | | | |
| | APPROX 2,000 GALS | ~~███~~ | | | |
| | ~~███~~ | ~~███~~ | | | |
| | | | | | |
| | CORROSIVE PLACARDS REQUIRED | | | | |

IN THE EVENT OF ANY EMERGENCY
CONCERNING THE PRODUCT IN THIS
SHIPMENT, CALL TOLL-FREE NUMBER
800-424-9300, DAY OR NIGHT.

ASHL00247

| DRUMS RETURNED | I.C.C. | REG. |
|---|---|---|

CORRECT WEIGHT IS 44,000 n

| ASHLAND CHEMICAL COMPANY, Shipper | ADVANCED CUSTOMER PICK UP Agent |
|---|---|
| Per | Per |

Permanent post-office address of shipper, P.O. BOX 2219, COLUMBUS, OHIO 43216

## STRAIGHT BILL OF LADING—SHORT FORM—Original—Not Negotiable.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

*(fine print paragraph — illegible)*

CARRIER'S NO

| NAME OF CARRIER | | DELIVERING CARRIER | |
|---|---|---|---|

| SHIPPED BY: | **ASHLAND CHEMICAL COMPANY** | ORDER NO |
|---|---|---|

| ROUTE | | CAR NO. | SHIP FROM (CITY & STATE) | OCO| DATE OF ORDER |
|---|---|---|---|---|

ADVANCED ENVIROTECH CO

CUSTOMER ORDER & REQ. NO.     210 GT MEADOWS N.J.

DATE SHIPPED 4/12/77     REQUESTED SHIP DATE

FOB    SHIPPING POINT   2-DESTINATION   4-PRODUCING PLANT   5-SEE EXPLANATION BELOW

CONSIGNED TO

ADVANCED ENVIROTECH
C/O MODERN TRANSPORTATION
75 JACOBUS AVENUE
SOUTH KEARNY NEW JERSEY 07032

**COLLECT**

| | PRODUCT CODE | CONT CODE | DESCRIPTION OF ARTICLES, SPECIAL MARKS & EXCEPTIONS | NO. OF CONTENTS | NET QUANTITY SHIPPED | WEIGHT (SUB. TO COR) | FREIGHT RATE | |
|---|---|---|---|---|---|---|---|---|
| | | | 1 Tank Truck Containing | CORROSIVE MATERIAL | | | | |
| | | | *(illegible)* | CORROSIVE MATERIAL | | | | |
| | | | APPROX 3,500 Gallons | | | | | |
| | | | APPROX 44,000 Lbs | | | | | |
| | | | CORROSIVE PLACARDS REQUIRED | | | | | |
| | | | IN THE EVENT OF ANY EMERGENCY CONCERNING THE PRODUCT IN THIS SHIPMENT, CALL TOLL-FREE NUMBER 800 424 9300, DAY OR NIGHT. | | | | | |

ASHL00251

| DRUMS RETURNED | I.C.C. | REG. |
|---|---|---|

*(fine print paragraph — illegible)*

THIS SHIPMENT IS CORRECTLY DESCRIBED

CORRECT WEIGHT IS 44,000 LBS.

SUBJECT TO VERIFICATION BY APPROPRIATE WEIGHING AND INSPECTION BUREAU ACCORDING TO AGREEMENT

| ASHLAND CHEMICAL COMPANY, Shipper | ADVANCED ENVIROTECH  Agent |
|---|---|
| Per | Per |

ASHLAND CHEMICAL CO. Shipper

Permanent postoffice address of shipper   P.O. BOX 2219, COLUMBUS, OHIO 43216

STRAIGHT BILL OF LADING—SHORT FORM—Original—Not Negotiable.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading.

| NAME OF CARRIER | DELIVERING CARRIER | | | | | ORDER NO |
|---|---|---|---|---|---|---|
| SHIPPED BY: | ASHLAND CHEMICAL COMPANY | | | | | |

**SHIPPED BY:**

| ROUTE | CAR NO | SHIP FROM (CITY & STATE) | OCO DATE OF ORDER |
|---|---|---|---|
| ADVANCED ENVIROTECH CO | | 210 GT MEADOWS NJ | |
| SHIPPER ORDER & REQ NO | | DATE SHIPPED 4/12/77 | REQUESTED SHIP DATE |

CONSIGNED TO
5 SEE EXPLANATION BELOW

ADVANCED ENVIROTECH CO
C/O MODERN TRANSPORTATION
75 JACOBUS AVENUE
SOUTH KEARNY NEW JERSEY 07032

COLLECT

| PRODUCT CODE | | DESCRIPTION OF ARTICLES, SPECIAL MARKS & EXCEPTIONS | NO OF CONTENTS | NET QUANTITY SHIPPED | WEIGHT ISSUE TO COD | FREIGHT RATE |
|---|---|---|---|---|---|---|
| | | 1 Tank Truck Containing | | | | |
| | | Waste Water From CDN | | | | |
| | | APPROX 5,500 Gallons | | | | |
| | | APPROX 44,000 Lbs | | | | |
| | | NO LABELS REQUIRED | | | | |
| | | IN THE EVENT OF ANY EMERGENCY CONCERNING THE PRODUCT IN THIS SHIPMENT CALL TOLL-FREE NUMBER 800-424-9300, DAY OR NIGHT. | | | | |

ASHL00252

| DRUMS RETURNED | I.C.C. | REG. |
|---|---|---|

CORRECT
WEIGHT 44,000#

ASHLAND CHEMICAL COMPANY, Shipper                    ADVANCED ENVIROTECH        Agent

Per _____                    Per _____

Permanent postoffice address of shipper    P.O. BOX 3319, COLUMBUS, OHIO 43216

STRAIGHT BILL OF LADING—SHORT FORM—Original—Not Negotiable.

RECEIVED, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading,

NAME OF CARRIER

DELIVERING CARRIER

CARRIER'S NO

SHIPPED BY:

## ASHLAND CHEMICAL COMPANY

ORDER NO

ROUTE

CAR NO

SHIP FROM (CITY & STATE)
210 GT MEADOWS NJ

OCD DATE OF ORDER

CUSTOMER ORDER & REQ NO
Advanced EnviroTech Co.

DATE SHIPPED
4/15/7

REQUESTED SHIP DATE

SHIPPING POINT   2 DESTINATION   4 PRODUCING PLANT   5 SEE EXPLANATION BELOW

Advanced EnviroTech Co,

ADVANCED ENVIROTECH CO
C/O MODERN TRANSPORTATION
75 JACOBUS AVENUE
SOUTH KEARNEY NEW JERSEY

COLLECT

| PRODUCT CODE | CON'T CODE | DESCRIPTION OF ARTICLES, SPECIAL MARKS & EXCEPTIONS | NO OF CONTENTS | NET QUANTITY SHIPPED | * WEIGHT ISSUE TO COR* | FREIGHT RATE |
|---|---|---|---|---|---|---|
| | | 1 Tank Truck Containing | | | | |
| | | (MIXED) acid Spent       CORROSIVE MATERIAL | | | | |
| | | APPROX 3,500 Gallons    CORROSIVE LIQUID | | | | |
| | | APPROX 44,000 Lbs | | | | |
| | | TO BE DELIVERED TO MODERN | | | | |
| | | TRANSPORTATION FOR NEUTRALIZATION AT SOUTH KEARNY | | | | |
| | | CORROSIVE PLACARDS REQUIRED | | | | |
| | | IN THE EVENT THE PRODUCT IN THE | | | | |
| | | SHIPPING THE PRODUCT NUMBER | | | | |
| | | CHEMENT CALL | | | | |

DRUMS RETURNED          I.C.C.          REG

THIS SHIPMENT IS CORRECTLY DESCRIBED
CORRECT WEIGHT IS   44,000

SUBJECT TO VERIFICATION BY APPROPRIATE WEIGHING AND INSPECTION BUREAU ACCORDING TO AGREEMENT

ASHLAND CHEMICAL CO SHIPPER

ASHLAND CHEMICAL COMPANY, Shipper          ADVANCED ENVIROTECH          Agent

Per                                        Per

Permanent post-office address of shipper   P.O. BOX 2219, COLUMBUS, OHIO 43216

ASHL00255

# EXHIBIT 13

# MEMORANDUM

| | |
|---|---|
| File | DATE April 19, 1977 |
| A. T. Curley | |
| | Visit to Modern Transportation, So. Kearny, N |

cc: C. E. Kwartler
J. Minott
K. Schumacher
J. Sigan
W. R. Starkey
H. E. Sullivan

Because we have been sending some waste materials to Modern Transportation in So. Kearny, N. J., Ken Schumacher and I visited John Wengryn at that location this morning.

*End of March 1977 STOP DeRewal*

Background: When our spent acid disposer (DeRewal) ran into trouble and was unable to take any more of our acid three weeks ago, Modern seemed capable of filling the breach. In fact, they handled our acid for about two weeks and indicated they could also handle our waste waters. However, last Friday this came to a screeching halt when they called and said they could no longer handle our acid.

The purpose of our trip was (1) to determine their potential for handling our acid and (2) evaluate the facility towards other waste disposal.

The Modern facility is impressive. It was clean and orderly. It primarily consisted of multiple storage tanks (many used in connection with their ocean dumping operation), and a trucking yard. The acid neutralization facility appeared to consist of a semi in ground 12,000 gallon hold (feed) tank and two semi in ground horizontal 20,000 gallon neutralization tanks. They use both a lime slurry and caustic (the latter is another waste for neutralization. The unit is equipped with a caustic scrubbing column. However, they are used to handling only dilute (about 30%) acids. They were forced to feed our material so slowly that their other regular customers were being backed up. After adjusting the pH, the slurry was then released to the Kearny Sewer System (primary treatment). They only operate this unit on the day shift, and did not appear to be interested in around the clock operation. Our waste water would be used to slurry up the lime (the entire operation is similar to DeRewal's, but more impressive).

Wengryn said they are planning on expanding to handle our type of acid but are 6 months away due to permits, approvals and obtaining the necessary new equipment.

They would seem to be a good means of disposal of our water wastes. However, Leuzarder today got a new pricing schedule from Modern and the costs are now considerably higher for both CDN and dye waste waters.

| | Former (DeRewal) | Modern's latest |
|---|---|---|
| CDN waste water | .0875/Gal. | .14/Gal. + $250 frt./Load |
| Dye waste water | .0875/Gal. | .11/Gal. + $250 " " |

As you can see, this is almost double. I will ask Leuzarder if he can have this price lowered a bit.

ATC:aa

AETC20

# EXHIBIT 14



DIAZ CHEMICAL CORPORATION
BOX 194 • HOLLEY, N.Y. 14470 • 716-638-6321
716-637-6010

ORIGINAL
(Red)

ORIGINAL
(Red)

June 24, 1988

Ms. Suzanne Billings
U.S. Environmental Protection Agency, Region III
PA CERLA Remedial Enforcement Section (3HW12)
841 Chestnut Building, 6th floor
Philadelphia, Pennsylvania 19107

Dear Ms. Billings:

The Diaz Chemical Corporation received your office's request for information on the Boarhead Farms Site in the Bridgeton Township, Buck's County Pa. Your letter stated that the site was operated from 1970-1976. Diaz Chemical Corporation was formed in 1974. We had no dealings with Advance Environmental Technology Corporation (AETC) or the DeRewel Chemical Co. until January of 1977. To the best of our knowledge none of our waste was sent to the Boarhead Farms Site.

The waste that we shipped to AETC and DeRewel Chemical was a spent nitrating acid which contained sulfuric acid, nitric acid, water and chloronitrobenzotrifluoride derivatives. Enclosed as Attachment A are the bills of lading and invoices from AETC for loads of spent nitrating acid send to the Wysomming Industrial Park and transported by Environmental Chemical Control. Attachment B is a summary of the loads sent from Diaz during the first part of 1977.

The city of Philadelphia investigated DeRewel Chemical Co., AETC and the transportation firm of Environmental Chemical Control during the period April 77 - January 78. Attachment C includes correspondence between the city and Diaz concerning our shipments of spent acid. The first notice that we received that there was a handling problem with our waste was by phone on January 3, 1978.

All paperwork dealing with the DeRewel Chemical Co. was turned over to the city of Philadelphia water department and district attorney. The only information on DeRewel presently in our possession is represented by Attachment D. These copies are from a check register in May and June of 1977. Other information may be gained by contacting the city of Philadelphia.



Jenney
EXHIBIT NO. 5
KAB 1/24/05

SB. revd 6/30/8

ORIGINAL
(filed)

Diaz Chemical Corporation carries no pollution insurance and is not covered for releases of hazardous wastes or substances as a result of handling of these materials. A statement from our insurer is included as Attachment E.

It is our pleasure to cooperate fully with your investigation. If you have further questions after reviewing the attached materials, please contact Margaret Bonn at the above address and phone number.

Respectfully,

Margaret Bonn
Supervisor Environmental Affairs

T. M. Jenney
Chairman

MMB,TMJ/dab