## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., et al.,                  :
                                              :          CIVIL ACTION NO. 02-3830
        Plaintiffs,                          :
                                              :
        v.                                   :
                                              :
ADVANCED ENVIRONMENTAL                        :
TECHNOLOGY CORPORATION,                       :
et al.,                                       :
                                              :
        Defendants.                          :

### ORDER

AND NOW, this        day of                , 2006, upon

consideration of the Motion for Summary Judgment of Defendant Merit Metal Products Corp. on

the Ground that it is a Non-liable Successor-in-Interest, it is hereby ORDERED and DECREED

that the Motion is granted, and that a judgment is awarded in favor of Defendant Merit Metal

Products Corp. and against Plaintiffs on all counts of their Fourth Amended Complaint.

BY THE COURT:

_____
                                         J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., et al.,      :

                         :     CIVIL ACTION NO. 02-3830

        Plaintiffs,       :

                        :

            v.             :

                        :

ADVANCED ENVIRONMENTAL    :

TECHNOLOGY CORPORATION,    :

et al.,                     :

                        :

        Defendants.      :

## STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE ISSUE EXISTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF MERIT METAL PRODUCTS CORP. ON THE GROUND THAT IT IS A NON-LIABLE SUCCESSOR -IN-INTEREST

Defendant Merit Metal Products Corporation ("Merit Metal"), by its undersigned attorneys, moves this court for a summary judgment in its favor and against the Plaintiffs under Fed.R.Civ.P. 56 on the ground that it is not an entity that generated, transported, or arranged for the transportation of any hazardous waste that was disposed of at the Boarhead Farm site but rather is, at most, a corporate successor twice-removed from such an entity.[1]  During the time period relevant to this litigation – 1969 to 1977, when the Boarhead Farm site was receiving allegedly hazardous waste material – the assets now in the possession of the company doing business at the Merit Metal site in Warrington, PA were owned by an individual, Mel Silverman, who has no connection to the present owners of Merit Metal.  Merit Metal believes that the Plaintiffs will not be able to establish a nexus between Mr. Silverman's operations and the

---

[1] By bringing this Motion at this time limited to the issue of successor liability, Merit Metal is not waiving any other grounds it may have for summary judgment.

1

Boarhead Farm site sufficient to impose liability upon him were he still the owner of Merit

Metal. In this Motion, however, Merit Metal argues that the Court need not reach the issue of

Mr. Silverman's liability, because the present entity that is doing business at the Warrington site

– and the only Merit Metal entity that has been sued in this litigation – cannot have Mr.

Silverman's misconduct, if any, imputed to it. Merit Metal argues that there is no genuine issue

as to any material fact regarding its status and that it is entitled to a judgment as a matter of law

that it is not liable to the Plaintiffs for any actions or inactions of its corporate predecessor. In

support of its Motion, Merit Metal relies upon the Memorandum of Law and exhibits attached

hereto, and upon the following material undisputed facts:

    1.    Merit Metal Products Corporation ("Old Merit Metal") was incorporated in 1966 and

domesticated in Pennsylvania on September 16, 1968, at which time it acquired a facility at 242

Valley Road, Warrington, Pennsylvania, in Bucks County's Paul Valley Industrial Park. <u>See</u>

Pennsylvania Department of State "Entity Details" for Old Merit Metal, a copy of which is

attached hereto as Exhibit "A".

    2.    Leonard Wolberg began working for Old Merit Metal in 1978, at which time it was in

the business of producing brass hardware for the decorative, governmental and marine markets.

Deposition of Leonard Wolberg, hereinafter "Wolberg Dep.", relevant excerpts of which are

attached hereto as Exhibit "B", at 8, 11-12.

    3.    Leonard Sayles began working for Old Merit Metal the following year. Deposition of

Leonard Sayles, hereinafter "Sayles Dep.", relevant excerpts of which are attached hereto as

Exhibit "C", at 8.

    4.    Messrs. Wolberg and Sayles had been looking to acquire their own business, and,

2

according to Mr. Wolberg, after working for Old Merit Metal for a while felt "it was the kind of

business we thought we could handle and the owner of the business [Mr. Silverman] thought that

yes, if things worked out he would sell it." Wolberg Dep. at 10.

5.    Accordingly, in or around 1978, Messrs. Wolberg and Sayles purchased a small

percentage of stock in Old Merit Metal from Mr. Silverman, who owned a majority of the

company's stock at the time (Sayles Dep. At 8-9).

6.    Messrs Wolberg and Sayles acquired a majority of the shares of Old Merit Metal in

1980, and the balance thereafter, for cash (the "Silverman-Wolberg/Sayles Transaction").

According to Mr. Sayles, they ultimately purchased all of the "stock in the company." (Sayles

Dep. at 9, 36-38).

7.    No written copy of the purchase agreement between Mr. Silverman and Messrs.

Sayles and Wolberg has been located, and Mr. Silverman died a number of years ago (Wolberg

Dep. at 55). Mr. Sayles testified, however, that Mr. Silverman did not "ever reacquire any

ownership interest in the company." Sayles Dep. at 38.

8.    During the time Messrs. Wolberg and Sayles owned Old Merit Metal, their annual

sales volume ranged from approximately $1 million to $3 million. Wolberg Dep. at 44.

9.    By an Agreement of Sale and Purchase ("Agreement") dated July 1, 1988, a copy of

which is attached hereto as Exhibit "D", Messrs. Wolberg and Sayles sold the assets of Old Merit

Metal to Stefanowicz & Lutz, Inc. (the "Wolberg/Sayles-Stefanowicz & Lutz Transaction"), a

Pennsylvania business corporation that was incorporated on April 27, 1988, by Richard

Stefanowicz and Edward Lutz for the specific purpose of acquiring the assets of Old Merit Metal.

See Pennsylvania Department of State "Entity Details," a copy of which is attached hereto as

3

Exhibit "E". Stefanowicz & Lutz, Inc., as "Buyer," paid the sum of $446, 250 to acquire from Old Merit Metal, the "Seller", "all right, title and interest of the seller in the assets of every type and description, tangible and intangible, wherever located, and the business of Seller as a going concern," except for certain excluded assets, which Old Merit Metal retained. Agreement, ¶¶ 1, 3(a). The excluded assets were identified in the Agreement as the real estate at 242 Valley Road, two automobiles, cash on hand, and Old Merit Metal's share of prepaid expenses and other assets agreed upon in writing. Agreement, ¶1. As Mr. Sayles stated, "they acquired the assets, we kept the corporation." Sayles Dep. at 32.

10.    Except for the assumption of trade debts, obligations under any purchase order issued by Stefanowicz & Lutz, Inc., and certain other obligations not relevant here, none of Old Merit Metal's "liabilities or obligations of any nature whatsoever, pursuant to this Agreement or otherwise," were "assumed, discharged, or paid or are to be assumed, discharged, paid or performed" by Stefanowicz & Lutz, Inc.. Agreement, ¶ 2(a). In fact, Old Merit Metal agreed to indemnify Stefanowicz & Lutz, Inc. against such liabilities or obligations for two years after the closing date. Agreement, ¶ 8(a).

11.    On July 27, 1988, Stefanowicz & Lutz, Inc. registered Merit Metal Products Corporation ("New Merit Metal") as a fictitious name with the Pennsylvania Department of State, and has operated the business at 242 Valley Road under that name to the present day. See Fictitious Name Registration, a copy of which is attached hereto as Exhibit "F". Messrs. Wolberg and Sayles formally consented to the appropriation of their corporate name. See consent to Appropriation of Name, a copy of which is attached hereto as Exhibit "G ".

12.    Messrs. Wolberg and Sayles acquired no stock or other ownership interest in

4

Stefanowicz & Lutz, Inc. or in New Merit Metal,  and, other than acting as consultants to

Stefanowicz & Lutz for a brief period after July 1, 1988, have performed no services for New

Merit Metal since that date.

13.    Messrs. Wolberg and Sayles changed the name of Old Merit Metal to "Leonards II

Company, Inc." Sayles Dep. at 32.  In 1991, they liquidated Leonards II Co., distributed its

remaining assets, including but not limited to the real estate at 242 Valley Road, to themselves,

and filed a Corporate Dissolution or Liquidation form with the Internal Revenue Service,  a copy

of which is attached hereto as Exhibit "H".  Sayles Dep. at 31-33.  Thereafter, Leonards II Co.

survived as a shell corporation that was not extinguished until 2001.  Ibid.

14.    The Plaintiffs have acknowledged that the company doing business at 242 Valley

Road while Boarhead Farm was receiving hazardous waste is not the same company that does

business there today and that they have sued in this case.  In their Fourth Amended Complaint,

they aver as follows:

> 85.    Defendant Merit Metal Products Corp. ("Merit Metal II") is a
> Pennsylvania Corporation with a principal place of business in
> Warrington, Pennsylvania.
>
> 86.    Another Pennsylvania corporation also named Merit Metal
> Products Corporation ("Merit Metal I") owned and operated a
> place of business in Warrington, Pennsylvania, from at least 1968
> to 1988.
>
> 87.    Merit Metal I used DeRewal Chemical to remove industrial waste
> from its Warrington, Pennsylvania facility.
>
> 88.    Merit Metal I's waste was disposed of at the Site.
>
> 89.    Merit Metal I's waste contained Hazardous Substances.
>
> 90.    Merit Metal II purchased the assets and business of Merit Metal I

5

> in or about July 1988 and thereafter continued the operation of that
> business without change from the way the business was operated
> while the business was owned by Merit Metal I.

(emphasis added).

15.    The Boarhead Farm site was used for the disposal of the hazardous substances that

are at issue in this case between 1969 and 1977.  Fourth Amended Complaint, ¶¶ 3-4.  The

United States Environmental Protection Agency ("USEPA") first examined the site in 1984, and

it was not listed on the USEPA's National Priorities List until 1989.  Ibid.

16.    Neither Mr. Wolberg nor Mr. Sayles heard of Manfred DeRewal or Boarhead Farm

until the commencement of this litigation.  Wolberg Dep. at 50-51; Sayles Dep. at 34.


Dated:  September 1, 2006

Stephen P. Chawaga
MCELROY DEUTSCH MULVANEY &
    CARPENTER, LLP
1617 John F. Kennedy Blvd.
Suite 1500
Philadelphia, PA 19103-1815
(215) 557-2900

Attorneys for Merit Metal Products Corp.

6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., et al.,              :
                                          :        CIVIL ACTION NO. 02-3830
        Plaintiffs,                :
                                          :
          v.                      :
                                          :
ADVANCED ENVIRONMENTAL                    :
TECHNOLOGY CORPORATION,                   :
et al.,                                   :
                                          :
        Defendants.                :

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OF MERIT METAL PRODUCTS CORP.
ON THE GROUND THAT IT IS A NON-LIABLE SUCCESSOR -IN-INTEREST**

**INTRODUCTION**

Fed.R.Civ.P. 56(c) provides that summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A summary judgment is appropriate in this case in favor of Defendant Merit Metal Products Corporation – technically, "Stefanowicz & Lutz, Inc., d/b/a/ Merit Metal Products Corporation," or "New Merit Metal" – on the ground that it did not itself generate any waste disposed of at Boarhead Farm and cannot be held liable as Old Merit Metal's successor-in-interest.

New Merit Metal indisputably did not come into existence until over a decade after the site stopped receiving hazardous materials, so there can be no genuine issue as to its direct liability as a generator, arranger or transporter of waste material in connection with the Boarhead

1

Farm site. The facts relevant to the issue of successor liability are found in the Agreement that effected the Wolberg/Sayles-Stefanowicz & Lutz transaction or are within the unique knowledge of Messrs. Wolberg and Sayles, who have been deposed and relevant portions of whose testimony have been attached to Merit Metal's Motion. Applicable legal precedent from this Circuit, when applied to these facts, compels the conclusion that New Merit Metal is entitled to a judgment as a matter of law, because under these settled cases a subsequent owner may only be held responsible for a predecessor's liabilities if it merged with the prior company by transferring stock to the predecessor's owners. Both the Silverman-Wolberg/Sayles Transaction and the Wolberg/Sayles-Stefanowicz & Lutz Transaction were cash purchases of corporate assets. In neither case did the seller receive stock or any other form of ownership in the surviving entity, and therefore successor liability may not be imposed upon New Merit Metal in this case.

## ARGUMENT

**I.**      **New Merit Metal is not a generator, arranger or transporter of hazardous waste to the Boarhead Farm Site.**

As Plaintiffs have admitted, New Merit Metal – the only Merit Metal entity that is a party to this case – is not a "person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by" it under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3). Nor is New Merit Metal a "person who accepts or accepted any hazardous substances for transport to" Boarhead Farm under Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4). New Merit Metal did not exist during the period the Boarhead Farm site was being used. New Merit Metal was

2

formed in 1988 – 11 years after the waste was last disposed of at Boarhead Farm – as Stefanowicz

& Lutz, Inc., for the specific purpose of purchasing the assets of Old Merit Metal.  As Plaintiffs

conceded in Paragraph 86 of their Fourth Amended Complaint , Stefanowicz & Lutz, Inc. is a

separate Pennsylvania corporation from Old Merit Metal that obtained Old Merit Metal's consent

to continue to do business under the Merit Metal name.  It is therefore undisputed that New Merit

Metal could not itself have arranged for the disposal of its waste at Boarhead Farm or transported

any hazardous materials there.

## II.    New Merit Metal is not a liable as a successor-in-interest to Old Merit Metal as a matter of law.

### A.    Plaintiffs must show, against the presumption imposed by law, both that Messrs. Wolberg and Sayles inherited Mr. Silverman's environmental liabilities, and that they passed them on to New Merit Metal.

As Plaintiffs concede in their complaint, their case against New Merit Metal hinges

upon the argument that New Merit Metal is "liable as a successor-in-interest" to Old Merit Metal.

Fourth Amended Complaint, ¶ 91.  At the outset, it must be noted that before reaching this issue, this

Court will first have to determine that when Messrs. Wolberg and Sayles purchased the assets of Old

Merit Metal from Mr. Silverman, they became liable for any environmental liabilities he might have

had with respect to Boarhead Farm.  Just like Stefanowicz & Lutz, Inc., Messrs. Wolberg and Sayles

did not generate, transport, or arrange for the transportation of any waste that was disposed of at

Boarhead Farm.  It is undisputed that they first began working at Old Merit Metal in 1978 and 1979,

respectively, and did not become the majority owners of Old Merit Metal until 1980, several years

after Boarhead Farm was used as a disposal site.  If, as New Merit Metal argues, Messrs. Wolberg

3

and Sayles did not inherit any liability Mr. Silverman may have to the Plaintiffs, then they could not

have passed this liability on to New Merit Metal at the time of the Wolberg/Sayles-Stefanowicz &

Lutz, Inc. Transaction.

Plaintiffs' burden is therefore a difficult one, particularly given that, " as a general

rule, when one company sells or transfers all its assets to another, the successor company does not

embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets."

McClinton v. Rockford Punch Press & Manufacturing Co., 549 F. Supp. 835, 837 (E.D. Pa. 1982).

The policy reasons for this presumption are readily apparent.  A purchaser of business assets is

generally unaware of the seller's exposure to liability for claims arising out of the seller's conduct,

particularly where the claims are not yet manifest.  Indeed, the seller itself may be ignorant of alleged

wrongdoing that may one day be asserted against it.  The typical purchaser, therefore, does not factor

the cost of such future liabilities into the price it pays for the company.  Imposing the cost of such

exposures upon purchasers as a matter of law would materially change the benefit of the bargain the

purchaser reached with the seller.  Thus, as the Middle District of Pennsylvania held in Conway v.

White Trucks, 692 F. Supp. 442, 449 (M.D. Pa.1988), aff'd 885 F. 2d 90 (1989), "[t]he general rule

of corporate non-liability has, in effect, served as a security blanket which protects corporate

successors from unknown or contingent liabilities of their predecessors.  It is premised upon the

notion that a corporation's mere succession to another corporation's property is not a sufficient basis

upon which to impose liability." Accord, Elf Atochem North America v.United States, 908 F. Supp.

275, 282-83 (E.D. Pa. 1995) ("If mere purchase and subsequent use of assets always gave rise to

successor liability, no company could ever purchase another company's machines and plant, retain

the people who were already trained to use those machines, manufacture the product the machines

4

were designed to manufacture and sell to that product's market without becoming liable for all of
the obligations of the selling company. ")

**B.     The question of successor liability for CERCLA violations is
        decided under Federal law.**

Over a decade ago, the Third Circuit observed that "most courts have recognized that
imposition of CERCLA liability on a successor corporation is a question of federal law." <u>Beazer
East v. The Mead Corporation,</u> 34 F. 3d 206, 212. (3d Cir. 1994), <u>cert. denied</u> 514 U.S. 1065 (1995).
Even earlier, in determining whether the corporate successor to a company that created an asbestos
scrap pile could be held liable for its clean up, The Third Circuit held that "[t]he meager legislative
history available indicates that Congress expected the courts to develop a federal common law to
supplement that statute. . . .  In resolving the successor liability issues here, the district court must
consider national uniformity; otherwise, CERCLA aims may be evaded easily by a responsible
party's choice to arrange a merger or consolidation under the laws of particular states which unduly
restrict successor liability." <u>Smith Land & Improvement Corp. v. Celotex Corp.,</u> 851 F. 2d 86, 91
(3rd Cir. 1988), <u>cert. denied</u> 488 U.S. 1029 (1989).    <u>Accord,</u> <u>Lansford-Coaldale Joint Water
Authority v. Tonolli Corp.,</u> 4 F. 3d 1209, 1224-25 (3d Cir. 1993) ("given the federal interest in
uniformity in the application of CERCLA, it is federal common law, and not state law, which
governs when corporate veil-piercing is justified under CERCLA.")

A panel of the Third Circuit has recently affirmed that federal common law, not state
law, governs the issue of successor liability in CERCLA cases.  In <u>United States v. General Battery
Corporation,</u> 423 F. 3d 294, 299 (3rd Cir. 2005), the Third Circuit reviewed a number of recent
United States Supreme Court opinions on successor liability, including <u>United States v. Bestfoods,</u>

524 U.S. 51 (1998), in which, according to the Third Circuit, the Supreme Court succeeded in "noting, but not resolving, disagreement over 'whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead provide a federal common law.'" After its survey, the court concluded that "Smith Land and Lansford-Coaldale expressly held that CERCLA requires uniform federal standards of successor and veil-piercing liability. Neither case has been overruled" or "undermined by recent Supreme Court decisions," and therefore they "remain circuit law." The Third Circuit found this determination to be "consistent with recent Supreme Court decisions in which gaps in federal liability statutes were filled not with the law of a particular state, but with general common law." General Battery, id, 423 F. 3d at 300-01.

> **C.** **Neither transaction at issue in this case satisfies the applicable federal common law standard for the imposition of successor liability.**

Having decided to apply federal common law to the question of a successor's responsibility for a predecessor's CERCLA violations, the Third Circuit in General Battery then summarized the limited number of recognized exceptions to the presumption of non-liability:

> Turning to the appropriate liability standard, we are mindful of Bestfoods, where the Supreme Court held that CERCLA incorporates, but does not expand upon, 'fundamental' common law principles of indirect corporate liability. The general rule of corporate successorship accepted in most states is non-liability for acquiring corporations, with the following exceptions: 'The purchaser may be liable where (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company.'"

General Battery, id, 423 F. 3d at 305 (citations omitted). None of these exceptions applies here.

1.     **Neither buyer assumed liability for the damages claimed by the plaintiff in this case.**

In <u>Berg Chilling Systems v. Hull Corporation</u>, 435 F. 3d 455, 464 (3d Cir. 2006), the Third Circuit observed that "[t]he first exception" set forth in <u>General Battery</u> "covers situations where the buyer either expressly or implicitly agrees to assume some or all of the seller's liabilities. It is usually straightforward in application. Because this exception is based on interpreting the terms of the parties' agreement, it is characterized most strictly as contract law."

There are no surviving documents from the Silverman-Wolberg/Sayles Transaction. There is therefore no basis to establish that Messrs. Wolberg and Sayles agreed to assume any liability associated with Mr. Silverman's waste disposal practices or with respect to the Boarhead Farm site.  Mr. Wolberg testified that though he could not be certain, he "would expect that we would have been sure that liabilities that [Mr. Silverman] caused stayed with him." Wolberg Dep. at 10-11.

In the case of the Wolberg/Sayles-Stefanowicz & Lutz Transaction, the Agreement neither states nor implies that New Merit Metal accepted any environmental liabilities of Old Merit Metal.  Except for the assumption of trade debts, obligations under any purchase order issued by Stefanowicz & Lutz, and certain other obligations not relevant to this case, none of Old Merit Metal's "liabilities or obligations of any nature whatsoever, pursuant to this Agreement or otherwise," were "assumed, discharged, or paid or are to be assumed, discharged, paid or performed" by New Merit Metal. Agreement, ¶ 2.  In fact, Messrs. Wolberg and Sayles agreed to indemnify Stefanowicz & Lutz against such liabilities or obligations for two years after the closing date. Agreement, ¶ 8(a). There is, therefore, no basis for a determination that either Messrs. Wolberg and

7

Sayles in 1980, or Stefanowicz & Lutz, Inc. in 1988, assumed their respective predecessor's liabilities.

### 2.     Neither transaction was fraudulent or intended to provide an escape from liability.

According to the Third Circuit, to impose successor liability under the fraud exception set forth in General Battery

> requires a finding that the corporate transfer of assets 'is for the *fraudulent purpose* of escaping liability." Fletcher *Cyclopedia of the Law of Private Corporations* § 7122 at 232. The word "fraudulent" . . .characterizes or modifies not the actual means of the transfer of asserts or the conduct undertaken in furtherance thereof, but rather the *purpose* of such transfer. Under Fletcher's articulation of the exception, transferring corporate assets for the purpose, or with the intention, of escaping liability is, by definition, a transfer of assets with fraudulent purpose.

Raytech Corp. v. White, 54 F. 3d 187, 192 (3d Cir. 1995).   No evidence has been, or could be, adduced in this case in support of an argument that either Mr. Silverman or Messrs. Wolberg and Sayles had as their purpose in selling the corporate assets of Old Merit Metal the avoidance of liability at Boarhead Farm. To begin with, the Silverman-Wolberg/Sayles transaction occurred years before the USEPA made its first a site visit to Boarhead Farm in 1984, so even if Mr. Silverman had disposed of waste there he would have had no reason to have been concerned about any adverse consequences from having done so. Similarly, since Messrs. Wolberg and Sayles could not have had any business contact with Boarhead Farm, they also would not have feared any exposure for environmental liability at the time of the Wolberg/Sayles-Stefanowicz & Lutz Transaction.

Moreover, these were ordinary business transactions by individuals motivated by typical financial concerns.  Mr. Wolberg testified that he and Mr. Sayles had been looking for a company to acquire and that Old Merit Metal was of an appropriate size and was owned by someone

8

interesting in selling. Messrs. Wolberg and Sayles had no prior connection to Mr. Silverman before they began working for him, and there is no suggestion that they failed to supply adequate consideration. Similarly, the Wolberg/Sayles-Stefanowicz & Lutz, Inc. Transaction was at arms length and supported by a lengthy, detailed Agreement. In neither case, therefore, is there any suggestion that the buyer was complicit in a scheme to take tainted assets off the hands of a nefarious seller that was prepared to give away the company in order to be insulated from a suit by the USEPA or the Plaintiffs. Absent clear evidence of such intent, the fraud exception should not be used to impose successor liability upon New Merit Metal.

### 3.     There was no consolidation, merger or mere continuation

The Third Circuit held in Berg, id, 435 F. 2d at 464, that "the third and fourth exceptions" to non-liability set forth in General Battery, "*de facto* merger and mere continuation, are generally treated identically." Accord, Luxliner P.I. Export Co. v. RDI/Luxliner, 13 F. 3d 69, 73 (3d Cir. 1993) ("Much the same evidence is relevant to each determination."); Fiber-Lite Corp. v. Molded Acoustical Products, 186 B.R. 603,609 (E.D. Pa. 1994) ("[t]he de facto merger doctrine subsumes the mere continuity theory," citing a concurring and dissenting opinion in Polius v. Clark Equipment Co., 802 F. 2d 75, 77 (3d Cir. 1986 ). Both of these exceptions are directed to the type of asset transfer transaction in which the seller and buyer merge, rather than transfer assets, and in which the seller continues to have an active role in the management and ownership of the surviving entity. As the Third Circuit stated in Smith Land, id, 851 F. 2d at 91, "when two companies merge pursuant to statutory provisions, liabilities become the responsibility of the surviving company," but "[w]hen no statutory merger or consolidation occurs, but one corporation buys all of the assets of another, the successor will not be saddled with the seller's liability except under certain

9

circumstances."

The reason that a merger transaction is treated differently from other types of corporate purchases was explained in Elf Atochem North America v. United States, 908 F. Supp. 275, 282-83 (E.D. Pa. 1995) as follows:

> . It is apparent therefore that what makes an asset purchaser a successor is something more than simply continuing a manufacturing process. . . . Accordingly, successor liability has generally only been found when there are "substantial ties" between purchaser and seller such as "a cozy deal where responsible parties merely changed the form of ownership yet in substance remained the same" or when "the actual managers of a corporation took over its ownership with full knowledge of its past practices."

(citations omitted). The key element is a retention of ownership interest in the same assets both before and after the transaction, which does not happen when they are sold for cash but may occur when business are merged and their owners continue to manage the surviving entity.

In this case, neither the Silverman-Wolberg/Sayles Transaction or the Wolberg/Sayles-Stefanowicz & Lutz Transaction can be characterized as a merger or a "mere continuation" of the previous concern. Therefore, Plaintiffs cannot establish the "something more" referred to in Elf Atochem that would distinguish either transaction from the typical asset purchase agreement on which successor liability is never imposed.

### a. The absence of a stock transfer means neither Merit Metal transaction can be categorized as a de facto merger.

The Third Circuit has established a list of factors to be examined in considering whether a transaction amounts to a statutory, or *de facto*, merger that transfers liabilities to the surviving entity:

> "(a) there is a continuation of the enterprise of the seller, so that there is a continuity of management, personnel, physical location, assets, and general

business operations; (b) there is a continuity of shareholders which results from the purchaser paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller so that they become a constituent part of the purchasing corporation; (c) the seller ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (d) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation."

Philadelphia Electric Co. v. Hercules, 762 F. 2d 303, 310 (3rd Cir.), cert. denied 474 U.S. 980 (1985) (quoting opinion of the court below).

Importantly, these factors are not weighted equally. Rather, primary consideration is given to whether there is a continuity of stockholders as the result of the transaction, because, as discussed above, it is this requirement that goes to the heart of why a *de facto* merger is recognized as an exception to the general rule of successor non-liability. As the Third Circuit explained in Berg, id, 435 F. 3d at 469, "[t]he objective of this requirement is usually to identify situations in which shareholders of a seller corporation unfairly attempt to impose their costs or misdeeds on third parties by retaining assets that have been artificially cleansed of liability." After making this same statement, a different panel of the Third Circuit in General Battery, id, 423 F. 3d at 307, went on to add: "[s]uccessor liability in this context accords a legal remedy to injured third-parties, preventing the externalization of the seller's costs of doing business, and deterring transactions designed to impose the costs of misconduct on third-parties."

District Courts in this Circuit have interpreted the continuity of stockholders factor as mandating a finding that the shareholders of the seller received stock in the surviving entity, in order to support an inference that the selling owners "cleansed" their assets by moving them to a new company, while at the same time retaining an ownership interest in them. In Pol Am Pack v.

11

Redicon, 2000 WL 1539079 (E.D. Pa. 10/18/00) at *3, aff'd 281 F. 3d 223 (2001) (citations omitted; emphasis added), for example, the court held that "[o]f these four factors, the essential inquiry is whether the shareholders of the predecessor corporation became shareholders of the successor through the successor's use of stock in payment for the predecessor's assets. Indeed, the absence of a stock transfer is fatal to a claim of de facto merger." Accord, Forrest v. Beloit Corporation, 278 F. Supp. 2d 471, 476 (E.D. Pa. 2003) ("[o]f these four factors, the transfer of stock is a key element in finding a *de facto* merger because it represents continuity of ownership."); Savini v. Kent Machine Works, 525 F. Supp. 711, 717 (E.D. Pa. 1981) ("The Court notes that transfer of stock is a key element for finding a *de facto* merger because it represents a continuity of shareholder ownership and interest.").

Thus, in this Circuit cash transactions like the Silverman-Wolberg/Sayles Transaction or the Wolberg/Sayles-Stefanowicz & Lutz Transaction do not qualify as *de facto* mergers or mere continuations. In Pol Am Pack, id., 2000 WL 1539079 at *3 the court held that a claim of a *de facto* merger failed "as a matter of law because the stock transfer element is completely absent . . . . Neither party disputes that the only consideration [the successor] paid for [the predecessor's] former assets was the $2.3 million" paid to a creditor. Similarly, in Stutzman v. Syncro Machine Company, 1991 WL 66796 (E.D. Pa. 1991) at *4, the court concluded that "[t]he courts have held that the transfer of stock is a key element in finding a *de facto* merger because it represents a continuity of ownership. In the present case . . .there was no stock transfer. [The successor] purchased [the predecessor's] assets for cash which was paid to the seller corporation itself and not to the shareholders").

Even cases where stock is conveyed by the buyer do not result in a finding of *de facto*

12

merger where the seller is not the recipient. In <u>Tracey v. Winchester Repeating Arms Co.</u>, 745 F.
Supp. 1099, 1110 (E.D. Pa. 1990), <u>aff'd</u> 928 F. 2d 397 (3d Cir. 1991) (citations omitted), the court
declined to find a company that emerged from a financial reorganization liable for the defective
product of its predecessor because "[o]ne of the elements" of a <u>de facto</u> merger "is not present in this
case: a continuity of shareholders resulting from the acquiring corporation paying for the acquired
assets with shares of its own stock. The generally accepted rule is that '[a] consolidation or merger
always involves a transfer of the assets and business of one corporation to another in exchange for
its securities.'" The court noted that in the case before it the transfer of stock in the reorganization
was used only to satisfy the predecessor's creditors. The stock was not transferred to the
predecessor's shareholders and they "did not, therefore, become stockholders" of the successor "as
a result of the asset sale. Absent this essential element, the *de facto* merger exception does not apply
in this case."

In <u>General Battery</u>, <u>id</u>, 423 F. 3d at 296, 307, the Third Circuit rejected the argument
that a <u>substantial</u> continuity of ownership, reflected by a transaction that would be characterized as
"primarily" for stock, was required before successor liability could be imposed. It therefore affirmed
a finding of successor liability against a battery company, General Battery, that acquired, "for cash
and stock," another battery company that had caused lead contamination at various sites at which it
disposed of battery casings. According to the court, the acquired company "was owned by a single
shareholder . . . who sold General Battery most of his company's assets in exchange for $2.95 million
in cash, $100,000 shares of General Battery stock, and a seat on General's board of directors. At the
time, 100,000 General Battery shares were valued at approximately $1 million and represented
4.537% of General's outstanding equity."

13

Of importance to the present case, however, is that the Third Circuit affirmed that the critical "'continuity of ownership' inquiry appears to be whether the owners retained some ongoing interest in their assets." It held that the facts presented to it established that "the owners of the predecessor enterprise [had] become a 'constituent part' of the successor by retaining some ongoing interest in their assets," specifically the "100,000 shares of General Battery stock and a seat on General's board." General Battery, id, 423 F. 3d at 307. In the present case, by contrast, Mr. Silverman was awarded no stock and no seat on the Merit Metal board when he sold his company to Messrs. Wolberg and Sayles. As Mr. Sayles noted, Mr. Silverman did not "ever reacquire any ownership interest in the company." Similarly, as the Agreement reveals, the Wolberg/Sayles-Stefanowicz & Lutz Transaction was purely for cash. Messrs Wolberg and Sayles were given no stock, and took no other interest, in Stefanowicz & Lutz or New Merit Metal. Without the critical factor of a retained ownership interest, the argument that either Mr. Silverman or Messrs. Stefanowicz and Lutz were attempting to cleanse assets that would remain in their possession is defeated, as is the possibility that either transaction could be defined in this Circuit as a *de facto* merger with successor liability imposed on the buyer.

b.    **Other elements of a *de facto* merger are also absent in this case.**

Other elements identified by the Hercules court as important components of a *de facto* merger are also missing from the Silverman-Wolberg/Sayles Transaction and from the Wolberg / Sayles-Stefanowicz & Lutz Transaction. Most notably, in neither case was there a complete "continuation of the enterprise of the seller." To satisfy this element, as the Third Circuit held in Luxliner, id., 13 F. 3d at 75, "the mere fact that [the new company] was engaged in the same business as [the old company] is not dispositive. 'When one company purchases all the assets of

14

another, it is to be expected that the purchasing corporation will continue the operations of the former, but this does not by itself render the purchaser liable for the obligations of the former. <u>For liability to attach, the purchasing corporation must represent merely a "new hat" for the seller.</u>'" (citations omitted, emphasis added).

In the same vein, in <u>Stutzman v. Syncro Machine </u>Company, 1991 WL 66796 (E.D. Pa. 1991) at *4-*5 (citations omitted), the court summarily dismissed the suggestion that the transaction at issue amounted to a continuation of the predecessor's business with the observation that because the acquisition was a cash transaction "[t]he record does not support" such a finding. The court added that "[t]he continuity exception is very limited and focuses on the continuity of the corporate entity, not the continuity of the business operation. A key element of a continuation is a common identity of stockholders, i.e. ownership, as well as officers and directors in the predecessor and successor corporations. The exception is designed to extend liability where the specific purpose of transferring assets is to put them beyond the reach of the predecessor's creditors."

The <u>Stutzman</u> analysis, if applied to the present case, would lead to the conclusion that Messrs. Wolberg and Sayles also did not continue Mr. Silverman's business, and that New Merit Metal, owned by Stefanowicz & Lutz, Inc., did not continue the business of Old Merit Metal.  In both cases a common identity of stockholders, officers and directors is lacking.  Looking at the factors suggested by <u>Luxliner</u> does not change this result, as the Silverman-Wolberg/Sayles transaction did not represent merely a "new hat" for Mr. Silverman, who sold off his interest completely.  Similarly, after Messrs. Wolberg and Sayles sold Merit Metal to Stefanowicz & Lutz, they removed themselves from the business.  Accordingly, the "mere continuation" prong of the "*de facto* merger test is not met by either the Silverman-Wolberg/Sayles or the Wolberg/Sayles-

15

Stefanowicz & Lutz deals.

Finally, another of the <u>Hercules</u> elements – that the seller "ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible" – is not met in the case of the Wolberg/Sayles-Stefanowicz & Lutz Transaction. The remains of Old Merit Metal – which held assets including the premises at 242 Valley Road and two automobiles – survived as "Leonards II Co." until 1991, three years after the Agreement was signed. Even after these assets were liquidated and distributed to Messrs. Sayles and Wolberg, Leonards II Co. continued in existence for another ten years, until 2001. These events are significant because they further demonstrate a lack of involvement by Messrs. Wolberg and Sayles in the affairs of the surviving entity, New Merit Metal. Had Messrs. Wolberg and Sayles intended to continue to exercise an ownership interest in their former business as a whole, they would not have segregated certain of its assets, withheld them from the transaction, and continued to manage them separately. By doing so, they were manifesting their intent to divorce themselves from New Merit Metal, and to direct their business efforts in a different direction. Messrs. Wolberg and Sayles were simply not part of New Merit Metal's operations or ownership.

**4.    The "substantial continuity" or "continuity of enterprise" test has been rejected in this circuit.**

For a number of years, some courts in the Eastern District recognized a variant of the "mere continuation" exception to successor non-liability, referred to as the "continuity of enterprise" or "substantial continuity" theory, that relaxed some of the exception's requirements to make successor liability easier to impose. In <u>Atlantic Richfield v. Blosenski</u>, 847 F. Supp. 1261, 1284 (E.D. Pa. 1994), for example, the court described the doctrine as "a federal rule of decision for

16

CERCLA successor liability that sweeps more broadly than the traditional rules," and determined that it applied in cases where the acquiring company knew of the seller's potential CERCLA liabilities at the time of purchase.  The court in <u>United States v. Exide</u>, 2002 WL 319940 (E.D. Pa. 2002) at *11, <u>aff'd</u> 423 F. 3d 294 (3d Cir. 2005), went even further and applied the theory without consideration of the state of the buyer's knowledge.  In <u>United States v. Atlas Minerals and Chemicals</u>, 824 F. Supp. 46, 50 (E.D. Pa. 1993), by contrast, the court declined to apply the continuity of enterprise theory, holding that "[i]t was never intended that this new approach would replace the traditional test."

In <u>General Battery</u>, <u>id</u>, the Third Circuit put and end to these efforts to broaden successor liability in environmental cases by rejecting the substantial continuity theory, holding it to be "untenable as a basis for successor liability under CERCLA" under the United States Supreme Court's opinion in <u>United States v. Bestfoods</u>, 524 U.S. 51 (1998).  <u>United States v. General Battery Corp.</u>, 423 F. 3d 294, 309 (3d Cir. 2005).  In <u>Bestfoods</u>, the Supreme Court decided that a parent corporation may be indirectly liable under CERCLA for its subsidiary's actions only if the corporate veil can be pierced under traditional common law rules.  Since the substantial continuity doctrine does not exist at common law, having been developed by federal courts solely to impose liability under CERCLA, and since CERCLA itself did not authorize such a modification of the common law, the Third Circuit reasoned in <u>General Battery</u> that the doctrine ran afoul of <u>Bestfoods</u>' directive that "in order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." <u>Bestfoods</u>, <u>id</u>., 524 U.S. at 64, <u>quoting</u> <u>United States v. Texas</u>, 507 U.S. 529, 534 (1993).

A court in the Eastern District reached the same conclusion as <u>General Battery</u> in

Action Manufacturing Co. v. Simon Wrecking Co., 387 F. Supp.2d 439, 453 (E.D. Pa. 2005). Simon

Wrecking, which was issued just days before the General Battery decision, held that the substantial

continuity theory did not provide a valid basis for the imposition of CERCLA liability on a successor

owner.    Following what it described as the "majority view of other circuit courts," the court

reasoned as follows:

> federal common law governs successor liability in CERCLA cases; in the
> interest of national uniformity, federal common law consists of the traditional
> common law rules on successor liability in operation in most jurisdictions;
> and traditional common law rules on successor liability should not be
> expanded for CERCLA cases. I may only apply the substantial continuity test
> if it is a part of federal common law. As set forth above, the substantial
> continuity test is not part of federal common law because it is not part of the
> general doctrine on successor liability in operation in most states. Nor should
> I attempt to expand federal common law beyond traditional common law
> rules in order to encompass the substantial continuity test. Therefore, the
> substantial continuity test should not be applied in the case before me.

There is, therefore, no basis on which to expand the grounds for successor liability beyond those

established at common law which, as discussed above, provide no basis for imposing liability on

either Messrs. Wolberg and Sayles or upon Stefanowicz & Lutz in this case.


## CONCLUSION

The current Merit Metal entity is not directly liable to Plaintiffs under CERCLA

because it did not exist when Boarhead Farm was open as a disposal site.  It is also not liable as a

successor-in-interest to Mr. Silverman's operation, which occupied its business location during the

relevant time period, because Plaintiffs cannot demonstrate that both the Silverman-Wolberg/Sayles

Transaction and the Wolberg/Sayles-Stefanowicz & Lutz Transaction were *de facto* mergers.  In

neither case did the seller acquire stock or other ownership interest in the surviving entity, and in

18

neither case did the seller "merely continue" his or its prior business in a new form in an effort to

"cleanse" the business from environmental liability.  Merit Metal's Motion for Summary Judgment

should therefore be granted, and a judgment awarded in its favor and against Plaintiffs on all counts

of their Fourth Amended Complaint.


Dated:        September 1, 2006

Stephen P. Chawaga
MCELROY DEUTSCH MULVANEY
    & CARPENTER, LLP
1617 John F. Kennedy Blvd.
Suite 1500
Philadelphia, PA 19103-1815
(215) 557-2900

Attorneys for Defendant Merit Metal Products Corp.

## CERTIFICATE OF SERVICE

I, Stephen P. Chawaga, hereby state that on this date I caused to be served a copy of

the foregoing Motion for Summary Judgment by first-class mail directed to counsel for the parties

listed below:

Glenn A. Harris
Ballard Spahr Andrews & Ingersoll, LLP
Plaza 1000, Suite 500
Main Street
Voorhees, NJ 08043-4636

Richard Biedrzycki
Phelan Pettit & Biedrzycki
The North American Building, Suite 1600
121 South Broad St.
Philadelphia, PA 19107

Edward Fackenthal, Esq.
One Montgomery Plaza, Suite 209
Norristown, PA 19401

Lynn Wright
Edwards Angell Palmer & Dodge, LLP
750 Lexington Ave.
New York, NY 10022

Thomas Sabino
Wolff & Samson, P.A.
One Boland Drive
West Orange, New Jersey 07052

Melissa Flax
Carella Byrne Bain Gilfillen Cecchi
    Stewart & Olstein
Five Becker Farm Rd.
Roseland, NJ 07068-1739

Andrew P. Foster, Esq.
Drinker Biddle & Reath
One Logan Square
18th & Cherry Sts.
Philadelphia, PA 19103-6996

Seth v.d.H. Cooley
Duane Morris, LLP
One Liberty Place, Suite 4200
Philadelphia, PA 19103-7398

Dated:        September 1, 2006

Stephen P. Chawaga