# EXHIBIT 1

Page 1

```
 1            UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
                                   CIVIL ACTION NO.
 3   BOARHEAD FARM AGREEMENT       02-CV-3830
     GROUP,                        Judge Legrome D. Davis
 4                                      VOLUME I
              Plaintiff,           Oral Deposition of
 5
         vs.                       ROBERT W. LANDMESSER
 6
     ADVANCED ENVIRONMENTAL TECHNOLOGY
 7   CORPORATION; ASHLAND CHEMICAL
     COMPANY, BOARHEAD CORPORATION;
 8   CARPENTER TECHNOLOGY CORPORATION;
     CROWN METRO, INC.; DIAZ CHEMICAL
 9   CORPORATION; EMHART INDUSTRIES,
     INC.; ETCHED CIRCUITS, INC.; FCG,
10   INC.; GLOBE DISPOSL COMPANY, INC.;
     GLOBE-WASTECH, INC.; HANDY & HARMAN
11   TUBE COMPANY, INC.; KNOLL, INC.;
     MERIT METAL PRODUCTS CORPORATION;
12   NOVARTIS CORPORATION; NRM INVESTMENT
     COMPANY; PLYMOUTH TUBE COMPANY;
13   QUIKLINE DESIGN AND MANUFACTURING
     COMPANY; RAHNS SPECIALTY METALS,
14   INC.; ROHM & HAAS COMPANY, SIMON
     WRECKING COMPANY, INC.; TECHALLOY
15   COMPANY, INC; THOMAS & BETTS
     CORPORATION; UNISYS CORPORATION;
16   UNITED STATES OF AMERICA
     DEPARTMENT OF NAVY,
17
              Defendants.
18   _____
                  * * * * *
19        MONDAY, NOVEMBER 22, 2004
                  * * * * *
20        Transcript in the above matter taken at
     the offices of WOLFF & SAMSON, PC, The Offices at
21   Crystal Lake, One Boland Drive, West Orange, New
     Jersey, commencing at 10:00 a.m.
22
          Certified Shorthand Reporting Services
23                 Arranged Through
              Mastroianni & Formaroli, Inc.
24               709 White Horse Pike
              Audubon, New Jersey 08106
25                 (800) 972-3377
```

Page 26

1 capacity for how long?
2   A.  Till July 6, 1976.
3   Q.  And on that date what did you do?
4   A.  I was terminated.
5   Q.  And why was that?
6   A.  I was too environmentally sensitive.
7   Q.  Meaning?
8   A.  I was too sensitive to the environment.
9   Q.  I don't know what you mean by that. Can
10 you elaborate?
11  A.  I thought there were certain aspects of
12 the disposal industry that was not truly doing what
13 was necessary to insure the long term liability of
14 the environment. And that there were better ways to
15 do certain things so management decided to let myself
16 go.
17  Q.  And what did you do after that?
18  A.  On or about August of 1976 formed a
19 company with a gentleman by the name of John
20 Leuzarder. And we started a company called AE -- or
21 Advanced Environmental Technology Corporation.
22  Q.  Are you familiar with a company called
23 Gaess, G-a-e-s-s.
24  A.  Yes.
25  Q.  And what was that?

Page 27

1   A.  Gaess -- Gaess is a company does outside
2 advertisement.
3   Q.  Did you work for Gaess?
4   A.  Not the outdoor advertisement group, no.
5   Q.  Did you work for another group of Gaess?
6   A.  Another group of Gaess. Gaess
7 Environmental Services was the entity that was the
8 merged between Scientific, Inc. and SCA.
9   Q.  The merged company was called Gaess, is
10 that what --
11  A.  It was called Gaess Environmental
12 Services.
13  Q.  How did you meet John Leuzarder?
14  A.  I don't recall.
15  Q.  Where did you meet him?
16  A.  I thought you just asked me where and
17 when I met him.
18  Q.  I asked you how you met him.
19  A.  I don't recall at this point.
20  Q.  Was he an employee of Gaess?
21  A.  I believe John was, yes.
22  Q.  Did you work together?
23  A.  Yes.
24  Q.  Is the first time you met him while you
25 were working at Gaess?

Page 28

1   A.  I don't recall.
2   Q.  Do you know what his position was at
3 Gaess?
4   A.  Specifically, no.
5   Q.  Do you know what duties he performed for
6 Gaess?
7   A.  I could guess that he was a salesman.
8   Q.  Well, we don't want you to guess. If
9 you have a -- if you can estimate, approximate. If
10 you have some kind of basis to say that, please do,
11 but...
12  A.  All right, I don't know at this point.
13  Q.  Okay. Did he sell Gaess' services, the
14 disposal services?
15  A.  As I said, I believe he was a
16 salesperson so he did pretty much what I did.
17  Q.  Do you know when he started working for
18 Gaess?
19  A.  Whenever the merger took place.
20  Q.  He was there prior to that? He was
21 there when Scientific, Inc. was still Scientific,
22 Inc?
23  A.  I believe so.
24  Q.  Did you know him during that time
25 period?

Page 29

1   A.  I recall knowing him prior to the
2 merger, yes.
3   Q.  Okay, so after July 6, 1976, you and
4 Leuzarder formed a company, is that what you said?
5   A.  That is correct.
6   Q.  And what was the name of that company?
7       MR. SABINO: He already told you that.
8       THE WITNESS: Advanced Environmental
9 Technology Corporation.
10 BY MS. MOONEY:
11  Q.  How did you all come to form that
12 company? I mean, did you have discussions about
13 doing that while you were both Gaess employees? How
14 did it come about, can you describe that?
15  A.  I seem to recall after we got let go, I
16 said we could do a better job than the people who we
17 were formerly employed with.
18  Q.  So Leuzarder was also terminated?
19  A.  Yes.
20  Q.  At the same time that you were?
21  A.  I don't recall. On or about the same
22 time.
23  Q.  Okay. So you were the initiator of the
24 idea, it sounds like?
25  A.  I'm the first adopter, yes.

Page 30

1  Q. And you approached Leuzarder and said
2  hey, I think we can do this better and then what
3  happened after that?
4  A. We formed AETC.
5  Q. And do you know precisely when AETC was
6  formed?
7  A. As I said August of 1976.
8  Q. Did you incorporate then?
9  A. That's my understanding.
10  Q. And where did you incorporate?
11  A. State of New Jersey.
12  Q. What was your relationship to AETC? Do
13  you want to take a break?
14  A. No, I just want to get a cup of coffee.
15      MS. MOONEY: Let's take a break for a
16  second.
17      (Brief Recess)
18  BY MS. MOONEY:
19  Q. When we left we were talking about the
20  formation of AETC and you were describing, I believe,
21  how the company started. Why was it that you
22  approached Leuzarder about starting this company?
23  A. John and I were of one mind regarding
24  how we should treat customers and it seemed like the
25  natural thing to do.

Page 31

1  Q. And how was that? How was it that you
2  treated customers that you appreciated the way that
3  he did it?
4  (OBJECTION) MR. SABINO: Objection. Leading
5  question. Asking how he treated customers suggests
6  something to him.
7  BY MS. MOONEY:
8  Q. What was it that you liked about the
9  treatment of customers?
10  A. Well, I think in these days with the
11  change in law that there was a cleaving of the old
12  ways. And we had a professional background and we
13  understood corporate America and a desire to do
14  things right. So we approached people who we thought
15  wanted to do things correctly with the forward
16  thinking of RECRA.
17  Q. When you say we, who do you mean?
18  A. We is AETC.
19  Q. This is prior to the formation of AETC
20  that you approached Leuzarder, right?
21  A. I think that's a philosophy that we both
22  shared and it was just naturally through setup of
23  ETC.
24  Q. When you say cleaving of the old ways,
25  what old ways are you referring to?

Page 32

1  A. A long discussion could probably follow,
2  but there was now going to be regulation. This is
3  1976, Department of Transportation did not even
4  regulate the shipments of hazardous waste, did not
5  understand them or identify them. So we focused on
6  the DOT part of it. Met with the deputy director of
7  DOT in Washington and made them aware that there were
8  certain things that were taking place that they felt
9  should be regulated. And we approached customers
10  that were interested in complying with the spirit but
11  not the law of transportation to get materials safely
12  from their facility to the end disposal site. So
13  that's what we approached most people on.
14  Q. Complying with new regulations?
15  A. Complying with transportation
16  regulations that were not specific to hazardous
17  waste, but would include hazardous waste upon closer
18  reading of the regulations.
19  Q. So the -- did the initial period of AETC
20  deal with more Department of Transportation
21  regulations?
22  A. That coupled with the -- with the
23  more -- or with the greater awareness of
24  environmental issues, ecology issues back there --
25  back then the proper management of hazardous waste.

Page 33

1  You gotta remember in 1976, the garbage men were
2  handling all the hazardous waste and the garbage men
3  took it to places where garbage went. They had no
4  concept of how materials should be handled.
5  Q. Who else was brought into AETC at that
6  point in August of 1976?
7  A. Brought in as in the form of hire?
8  Q. What other employees did you have?
9  A. A woman by the name of Sue Lemore,
10  L-e-m-o-r-e. That's all I recall right now.
11  Q. And what were her duties?
12  A. Essentially office manager. Very smart
13  woman.
14  Q. So in August 1976, the employees of the
15  company were -- who were they?
16  A. John and Bob and Sue Lemore.
17  Q. And John was who?
18  A. Leuzarder.
19  Q. And Bob?
20  A. Landmesser.
21  Q. Yourself?
22  A. Correct.
23  Q. And where was the company located?
24  A. John Leuzarder had a house, 97 West
25  Hanover Avenue. It was a former real estate office

Page 86

1    Q.   And when you say internal option, what
2  do you mean?
3    A.   Well, American Cyanamid down in Bound
4  Brook, which is one of the plaintiffs here, they had
5  a water treatment facility. And in my dealings with
6  them they dealt with a material called nigrosine dye.
7  The nigrosine dye was an organic dye that lended
8  itself to very simple chlorination. And instead of
9  disposing all this black powder, they could treat it
10 with a sodium hyperchloride and it would convert it
11 to materials that you'd could handle right in their
12 water treatment plant. So it's a very quick and easy
13 way of saying why are you disposing of this when you
14 could do it internally. Why don't you just think of
15 adding bleach to it.
16   Q.   And how did you come up with these
17 alternative ways of dealing with the waste?
18   A.   I learned everything I know from
19 chemistry class or from my customers and by looking
20 outside the box and looking at why people are doing
21 things as opposed to what they're doing. A lot of
22 alternatives and size another example. You know,
23 they were taking QC samples in gallon jars because
24 purchasing could buy gallon jars cheap. So every
25 time they ran a batch, they put it in a gallon jar.

Page 87

1  Now, when they got rid of it, it was a hundred bucks
2  a drum. Take it in 10 cc's, same issues, same QC
3  lab, no waste. We saved them 50, $60 thousand a year
4  just like that, because they weren't thinking about
5  what they were doing.
6    Q.   Did you have occasion to -- strike that.
7         How often did you interact with the
8  regulatory authorities in these disposal options that
9  you would give your customers?
10   A.   I was intimately involved in dealing
11 with the state agencies in 1976 through '80. Even
12 later than that. I helped write a piece for PCBs for
13 headquarters Washington. That was a source of what
14 was taking place and how it was taking place and from
15 that we could craft solutions for our customers.
16   Q.   Okay. And, again, just sticking to the
17 six year period that we had talked about 1976 to
18 1982. After a facility agreed to use AETC's
19 services, how did you memorialize that agreement?
20   A.   With a handshake.
21   Q.   Any documentation generated?
22   A.   I wasn't much on contracts. I felt if
23 you did not want to use our service, you were free to
24 do anything you wanted. We might send them a letter
25 saying this is outlining what we would do and how we

Page 88

1  would do it and why we would do it. It's pretty much
2  how I characterize my relationship. I have customers
3  today or I had customers that went for 17, 18 years
4  with no contract. My word was what I was going to do
5  and I did what I did and they paid me and we were all
6  happy.
7    Q.   So it wasn't standard procedure to get
8  something in writing between AETC and the customer?
9    A.   We did -- we flowed with the needs of
10 the customer, but we did not necessarily go out and
11 try to hammer up a five year agreement. We said
12 we'll do this and you pay us and we'll complete our
13 obligation, you complete yours.
14   Q.   So there were no kind of standard terms
15 of any agreement that you would have with a customer.
16   A.   I'm fuzzy about this. As we got bigger
17 we hired attorneys and the attorneys developed
18 standard contracts. The attorney was also a Ph.D. in
19 environmental science, so he was educated beyond my
20 intelligence.
21   Q.   So at some point you did have a form
22 contract?
23   A.   Yeah, in what year it escapes me.
24   Q.   Early '80's?
25   A.   Maybe.

Page 89

1    Q.   Before that in the '70s?
2    A.   Maybe.
3    Q.   So '70s or '80s, you just don't know?
4    A.   I seem to recall that we had a contract
5  with the National Institute of Health in 1979. It
6  was probably their contract or initiated by them to
7  us.
8    Q.   Did most of your customers have a verbal
9  agreement with AETC or a written agreement?
10   A.   I don't know if you did it on dollar
11 volume versus number of customers. Sister Coleitis
12 didn't have a contract with us, nor did we expect
13 payment but we took her picric acid. Yes, no, I
14 don't recall specifics.
15   Q.   You don't recall whether most of your
16 customers had a written agreement with AETC to handle
17 their waste?
18   A.   I would be guessing and I don't want to
19 do that.
20   Q.   Okay. What about your customers who
21 were established companies? Did most of those
22 customers have written agreement or not?
23   A.   I'm not sure what you mean by
24 established.
25   Q.   Well, you mentioned American Cyanamid,

Page 142

1   A. Yes.
2   Q. Yes, was that the answer?
3   A. Yes.
4   Q. And how did you do that? How did you
5 verify the permitted status of the haulers?
6   A. In a methodical fashion that allowed us
7 to stay on top of who was licensed and who wasn't.
8   Q. Okay, what was that methodical fashion?
9   A. Whatever was necessary during that
10 period of time.
11  Q. Between '76 and '82?
12  A. Yes. You're talking about a whole
13 series of new increased regulations.
14  Q. In general, though, would you contact
15 the state agency or the regulating agency and check
16 on the status, whatever that would entail?
17  A. Well, however we were selecting a
18 hauler. You gotta remember, we were a very localized
19 group of people. Dealing with the State of New
20 Jersey they would give us a conferment and we would
21 verify that in 1976. As the state agencies became
22 more sophisticated we expanded that, especially with
23 JT Baker school, we had to become regulatory savvy
24 throughout the country.
25  Q. Other than contacting the relevant

Page 143

1 agency, is there anything else that you would do to
2 verify the licensed or permitted status of the
3 hauler?
4   A. We'd probably ask for a certificate of
5 insurance and then insurance would be verified with
6 the agency. And as the regulations increased, we
7 would make sure that the MCS90 was more specific than
8 just the bond. If it was not -- if it was only a
9 bond, then we'd even go farther and say let's look at
10 your financial records.
11  Q. How about pre 1980, what did you do?
12  A. I don't have any specific recollection.
13  Q. All right, how about the hauler's
14 driving record? Did you take any steps to verify the
15 driving record of the haulers that you worked with?
16  A. We did. I don't know when we started
17 doing that. There has been changes in the law back
18 and forth on privacy.
19  Q. How about pre 1980?
20  A. I would have to look specifically as to
21 see what was available.
22  Q. How about a background check of the
23 haulers that you worked with, did you do that,
24 criminal background check?
25  A. Nothing that would be considered a

Page 144

1 written formal request, because I don't know if
2 there's any agency that would give that information
3 out. But we were very close with our enforcement
4 people and they were kind enough to tell us who they
5 felt good about. Give you an example, Chemical
6 Control. Are you familiar with Chemical Control?
7 Chemical Control was closed by the state police at
8 two o'clock. It was a Thursday afternoon. If you
9 called the state agency and said were they permitted
10 to take waste and it's okay to go there at ten
11 o'clock they would say yes, even though there was an
12 enforcement action that day and they were under
13 surveillance for two years.
14  Q. Did that change over time that doing the
15 criminal background check, did you do it later post
16 1980 for the haulers?
17  A. I don't believe New Jersey gave anyone
18 access to the casino disclosure statements. Again,
19 you relied upon the enforcement agencies.
20  Q. What about educational requirements, did
21 you have -- did AETC have any educational
22 requirements for its haulers or the haulers that it
23 used?
24  A. Law degrees weren't required. Common
25 sense was and educated common sense certainly.

Page 145

1   Q. How did you ascertain that?
2   A. I don't have any specifics.
3   Q. Did you require a high school degree?
4   A. We may have asked for a college degree,
5 I don't recall.
6   Q. You don't recall. What about
7 references? Did you require the haulers to give you
8 some references before they started working for you?
9   A. We knew most of the haulers that we
10 dealt with from industry knowledge. Other customers
11 that we were in contact with gave us references.
12  Q. For those haulers that you didn't know,
13 did you require references or not?
14  A. I would say that we got references from
15 everyone.
16      MR. BIEDRZYCKI: As the official
17 timekeeper it's 2:02.
18      THE WITNESS: I'd like to stay just
19 another eight minutes so we could have an even four
20 hours of fun.
21      MR. BIEDRZYCKI: You'll have time so
22 you could do that.
23 BY MS. MOONEY:
24  Q. Okay, can you describe in general the
25 nature of the arrangement that AETC would have with

1

1          C E R T I F I C A T E

2

3

4

5          I, Lori A. De Francesco, a Notary Public and

6     Certified Shorthand Reporter of the State of New

7     Jersey do hereby certify that the foregoing is a true

8     and accurate transcript of the testimony as taken

9     stenographically by and before me at the time, place

10    and on the date hereinbefore set forth.

11         I do further certify that I am neither a

12    relative nor employee nor attorney nor counsel of any

13    of the parties to this action, and that I am neither

14    a relative nor employee of such attorney or counsel

15    and that I am not financially interested in this

16    action.

17

18

19

20

21    _____
      Lori A. De Francesco
22    Notary Public, State of New Jersey
      My Commission Expires January 10, 2006
23    Certificate No. XI01797

24

25