# EXHIBIT 2

Page 1

1              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

_____  CIVIL ACTION NO.
3   BOARHEAD FARM AGREEMENT          02-CV-3830
    GROUP,                           Judge Legrome D. Davis
4
               Plaintiff,                   VOLUME I
5                                     Oral Deposition of
6       vs.                      JOHN P. LEUZARDER, JR.
    ADVANCED ENVIRONMENTAL TECHNOLOGY
7   CORPORATION; ASHLAND CHEMICAL
    COMPANY, BOARHEAD CORPORATION;
8   CARPENTER TECHNOLOGY CORPORATION;
    CROWN METRO, INC.; DIAZ CHEMICAL
9   CORPORATION; EMHART INDUSTRIES,
    INC.; ETCHED CIRCUITS, INC.; FCG,
10  INC.; GLOBE DISPOSL COMPANY, INC.;
    GLOBE-WASTECH, INC.; HANDY & HARMAN
11  TUBE COMPANY, INC.; KNOLL, INC.;
    MERIT METAL PRODUCTS CORPORATION;
12  NOVARTIS CORPORATION; NRM INVESTMENT
    COMPANY; PLYMOUTH TUBE COMPANY;
13  QUIKLINE DESIGN AND MANUFACTURING
    COMPANY; RAHNS SPECIALTY METALS,
14  INC.; ROHM & HAAS COMPANY, SIMON
    WRECKING COMPANY, INC.; TECHALLOY
15  COMPANY, INC; THOMAS & BETTS
    CORPORATION; UNISYS CORPORATION;
16  UNITED STATES OF AMERICA
    DEPARTMENT OF NAVY,
17
               Defendants.
18  _____
                *   *   *   *   *
19      MONDAY, NOVEMBER 29, 2004
                *   *   *   *   *
20      Transcript in the above matter taken at
    the offices of WOLFF & SAMSON, PC, The Offices at
21  Crystal Lake, One Boland Drive, West Orange, New
    Jersey, commencing at 10:30 a.m.
22
        Certified Shorthand Reporting Services
23             Arranged Through
        Mastroianni & Formaroli, Inc.
24             709 White Horse Pike
        Audubon, New Jersey 08106
25             (800) 972-3377

Page 1

```
 1                    Mastroianni & Formaroli, Inc.
                      709 White Horse Pike
 2                    Audubon, New Jersey 08106
                      (800)972-3377
 3                    Lori A. De Francesco, C.S.R.
 4
                                    December 14, 2004
 5
      THOMAS W. SABINO, ESQUIRE
 6    Wolff & Samson, Esquires
      One Boland Drive
 7    West Orange, NJ  07052-3698
 8
 9
      RE:  BOARHEAD vs. AETC
10
11
      Dear Mr. Sabino,
12
           Enclosed please find the transcript of the
13    testimony of JOHN B. LEUZARDER, JR., taken on
      November 29, 2004.  At the end of the transcript
14    are attached errata sheets and a signature line
      for the witness to sign and date.
15
           Please forward within 30 days from
16    receipt of this letter the original errata
      sheets to GLENN A. HARRIS, ESQUIRE of Ballard,
17    Spahr, Andrews & Ingersoll, Esquires, 1735
      Market Street, 51st Floor, Philadelphia, PA,
18    19103-7599, in order that the corrections,
      changes and/or deletions may be attached to the
19    original transcript.
20         Should you have any questions, please do
      not hesitate to contact me.
21
                      Sincerely,
22
23                    Lori A. De Francesco, C.S.R.
24    cc:  G.A. Harris, Esq.
25
```

John P. Leuzarder, Jr.                                November 29, 2004

Page 10

1    A.    Same thing. I was a principally a -- I
2  had an expertise in the field of incineration and I
3  was working with them in sales and in technical
4  things.
5    Q.    And after Jennings what position did you
6  have after that?
7    A.    After Jennings I went to work for
8  Scientific Incorporated in Scotch Plains, New Jersey.
9    Q.    And what year was that, if you recall?
10    A.    Approximately '74.
11    Q.    And what did you do at Scientific?
12    A.    I was involved in sales representing
13  them in handling their solid waste. They operated
14  landfills and trucking operations. And I was with
15  them representing them in the sales capacity
16  principally in their solid waste arena.
17    Q.    How long were you with Scientific?
18    A.    It's been so many years it's very hard
19  to remember. I haven't gone over -- I haven't looked
20  into that in detail. I would guess -- I'm guessing
21  now, please, two years.
22    Q.    Can you just estimate or approximate?
23    A.    Two years.
24    Q.    And after Scientific, did you go on to
25  another job?

Page 11

1    A.    Yes, I was -- we were -- Scientific and
2  Gaess Environmental Services, part of SCA had merged
3  their efforts and I was moved into the chemical sales
4  area and I went with Gaess Environmental Services in
5  Passaic, New Jersey for about nine months. And I can
6  tell you that we were let go from that company on
7  July 6, 1976.
8    Q.    And when you say we, who do you mean?
9    A.    A number of salesmen including Bob
10  Landmesser.
11    Q.    And why were you let go?
12    A.    I believe it was because they had
13  reached their maximum capacity and they no longer
14  needed a sales force. We were laid off.
15    Q.    When you say chemical sales at the merge
16  Scientific and Gaess company, what did that entail?
17    A.    We were involved in going to various
18  companies and finding chemical disposal solutions for
19  their various chemical materials for the company that
20  we were represented by.
21    Q.    Did Gaess also operate landfills at that
22  time?
23    A.    No. I don't think so. I don't
24  remember.
25    Q.    What disposal sites were you arranging

Page 12

1  the disposal of the customer's waste for?
2    A.    Marisol and an operation in Middlesex,
3  New Jersey which was Solvent Recovery Operations. We
4  did a lot of -- tried to move materials away from --
5  there was -- the regulations were not established at
6  that time and so we were seeing waste -- we were
7  seeking to have waste taken to places where it could
8  be recovered. And we also -- waste was going to
9  Kin-Buc Landfill in Edison, New Jersey at that time.
10  Gaess and Scientific operated Kin-Buc Landfill. And
11  Gaess and Scientific were in a partnership agreement.
12  And so those were the principal two that I could
13  recall. Oh, there was another one up in Buffalo, New
14  York, the name has escaped me, though.
15    Q.    While you were at Gaess, did you also
16  arrange for the transportation of the waste to a
17  landfill?
18  (OBJECTION)  MR. SABINO: Objection to the form of
19  the question using the word arranged. Arranged is a
20  term of art under CERCLA and I object to its use.
21  BY MS. MOONEY:
22    Q.    You can answer the question.
23    A.    Transportation was done by Gaess
24  Environmental.
25    Q.    Did Gaess own trucks?

Page 13

1    A.    Oh, yes.
2    Q.    And after Gaess what was your next
3  position?
4    A.    After we were let go from Gaess, Bob and
5  I started what would later become AETC.
6    Q.    When did the idea for starting AETC
7  form?
8    A.    Prior to us being terminated because we
9  were -- we were actually laid off, but it was evident
10  that they were laying off salesmen. And we felt that
11  we wanted to see a ethical treatment of our customers
12  and also their waste materials. Because there had
13  been in our opinion, deficit of that up until that
14  time. Part of it was because there were no
15  regulations at that time to govern it for the most
16  part and it was run pretty much by trash haulers.
17    Q.    Can you recollect what year that was
18  that you started AETC?
19    A.    Well, our beginnings were in 1976, July.
20    Q.    So you started it immediately upon
21  leaving Gaess July 1976?
22    A.    I went out and interviewed. I went to
23  an employment agency and began interviewing with
24  other companies. And because of my background where
25  I had been in the field that I had been in

mfreporting@verizon.net          Mastroianni & Formaroli, Inc.          856-546-1100
                      Professionals Serving Professionals

Page 14

1 incineration was no longer an acceptable alternative
2 and so on and so forth. So I ended not finding
3 anything acceptable and the result was that Bob and I
4 stuck together and we formed the beginnings of AETC.
5     Q.    And how long were you with AETC?
6     A.    Until in, I believe this is correct,
7 until December 31, 1987. It's either '86 or '87. I
8 think it was '87.
9     Q.    And why did you stop in December 31,
10 1987 working for AETC?
11    A.    Frankly, I was burnt out.
12    Q.    Did you go on to hold another position
13 after that time?
14    A.    No, I had been doing woodworking ever
15 since.
16    Q.    Do you own a woodworking business?
17    A.    No, I do it more volunteer. I do a lot
18 of volunteer work and I build a lot of furniture for
19 various camps or things of that nature as a
20 volunteer.
21    Q.    When you first started AETC in July
22 1976, were you one of the owners of the company?
23    A.    Yes.
24    Q.    Were you half owner of the company?
25    A.    Yes.

Page 15

1     Q.    Did AETC issue stock?
2     A.    No.
3     Q.    Was Landmesser an owner of the company
4 at that time, July 1976?
5     A.    Yes.
6     Q.    Did you hold a corporate office at that
7 time?
8     A.    No. We worked out of my house on
9 Randolph – in Randolph, New Jersey.
10    Q.    Who was the president of AETC?
11    A.    Bob Landmesser.
12    Q.    Who was the vice president?
13    A.    Myself.
14    Q.    Did you hold the title of vice president
15 throughout your tenure at AETC?
16    A.    Yes.
17    Q.    Did you hold any other position at AETC?
18    A.    I was, I guess you'd say I was involved
19 in the sales department, accounting department, Bob
20 was as well but we shared that responsibility. But
21 principally over the course of those ten years that I
22 was involved in a lot of different areas within the
23 company. So I guess you'd call myself – I share the
24 responsibility with Bob. And that was basically my
25 title was just vice president.

Page 16

1     Q.    Did you have any other employees in
2 1976?
3     A.    I don't recall.
4     Q.    Did you have an office manager?
5     A.    It's very vague to me, you know as to
6 those details what occurred, I don't recall.
7     Q.    In what year did you bring on any other
8 employees?
9     A.    I can – what I can remember is
10 operating in our garage at our home, my home that I
11 owned at that time and we began to take on
12 secretarial help. I think we had a girl named
13 Phyllis Mulligan. Phyllis Mulligan who is now
14 Phyllis Leuzarder. She's my brother's wife.
15    Q.    When did she work for you?
16    A.    Again, in those first couple years.
17    Q.    Did she provide secretarial support?
18    A.    Yes, she was secretary. Later she went
19 into sales but I'm not sure whether that was '77,
20 '78.
21    Q.    Anyone else you can recall in the first
22 few years that was employed by AETC other than you,
23 Mr. Landmesser and Phyllis Mulligan?
24    A.    I'm trying to think who was there then.
25 I don't remember. But what happened was, the town

Page 17

1 congratulated us on our success because it had been
2 known and asked us now to find a real office. And at
3 that point the company was growing. We had a
4 salesmen working for us, a fellow who was there only
5 a short time. I think, if I'm not mistaken, at one
6 point we had help from a woman name Roberta Strain
7 Bobby Strain, whose husband worked for National
8 Starch.
9     Q.    Could you spell that last name?
10    A.    S-t-r-a-i-n, Strain. Oh, the salesman's
11 was Kevin Donovan.
12    Q.    Do you know when he was employed by
13 AETC?
14    A.    I would say in the '87 – '78 – '77,
15 '78 era.
16    Q.    What about Roberta Strain?
17    A.    I don't really recall. Somewhere in
18 those early years.
19    Q.    You mention that AETC found a new
20 location after working in your garage, where was
21 that?
22    A.    We rented offices in Morris Plains on
23 Speedwell Avenue. I believe it was called the Dayton
24 Building or something.
25    Q.    When did you move there?

Page 26

1    Q.    Do you recall any of the facilities that
2  became the ultimate disposal site for the materials
3  that AETC handled?
4    A.    One that stands out in my mind in Newco
5  Environmental up in -- N-e-w-c-o, up in Niagara Falls
6  where a lot of materials went over the years. I'm
7  not sure. We may have sent some stuff to Rowlands
8  Environmental in those days, I don't know. We
9  certainly sent stuff to Marisol, Factory Lane in
10  Middlesex and of course others I just don't recall.
11    Q.    Did you ever dispose of waste that AETC
12  hauled at the Boarhead Farm site?
13    A.    No.
14    Q.    Did AETC in 1977 or '78 haul anything
15  other than these lab, spent lab materials that you
16  described?
17    A.    We didn't, no. We were, of course, as I
18  said, like a real estate broker making connections
19  with other things. And, of course, that was the
20  Ashland acid and so on and so forth. And it was Fred
21  DeRewal's operation to actually send in the trucks
22  and haul out material to the Philadelphia facility.
23  So we did have some -- we did have some brokerage
24  operations, if you will, where we connected up, I
25  think it was All County Environmental was a trucking

Page 27

1  company who handled principally solvents that were
2  going to incineration in a large cement kiln approved
3  by the State of New York up in New York State at that
4  time. But, again, the time periods are vague in my
5  recollection. But they were hauling bulk materials.
6  We would -- somebody would have solvent materials
7  that needed to be reclaimed, it would go to Marisol.
8  Somebody had solvent materials that were mixed then
9  it could not be reclaimed, it might go to the Solite
10  facility in New York State to All County.
11    The Wissinoming site was for the acid
12  materials that we had. And so we would bring our
13  customers to the various facilities, they would look
14  them over. They would basically approve them. We
15  would either -- we would recommend them say based
16  upon what information we had and they would at that
17  point make up their mind as to whether they wanted to
18  use it and then the materials would be shipped there.
19    And in the bulk material -- principally
20  in the bulk material full truckload it was always
21  done by an outside contractor.
22    Q.    What types of companies were AETC's
23  customers in 1976?
24    A.    We called on many of the companies that
25  we had previously called on with Gaess Environmental

Page 28

1  and with Scientific. And it was National Starch and
2  Chemical, it was Ashland Oil, it was Exxon, it was
3  Ciba Geigy and so on.
4    Q.    What about in 1977?
5    A.    Same thing.
6    Q.    '78?
7    A.    Yeah. And the companies that trusted us
8  to handle their materials, American Cyanamid I
9  believe began to use us. It became -- it grew
10  significantly of course over the course of time. By
11  the time I left there was probably, I'm guessing, 250
12  companies that were using our facilities. We were
13  well respected by the State of New Jersey and by a
14  number of organizations and we had earned the respect
15  and trust of our customers and as well as the state
16  people who regulated us.
17    Q.    In the early years, meaning, 1976, '77,
18  '78, how much contact with AETC have with the
19  government?
20    A.    Actually, we began to have a lot of
21  contact. Because in those days it was very vague as
22  to who was doing what. And, again, the -- we spent a
23  lot of time with Dr. Ron Buchanan of the New Jersey
24  State DEP. He was the head of the DEP at the
25  beginning when they started to form, develop state

Page 29

1  regulations and laws and we were intimately involved
2  with him in that and began to get involved and get
3  closer and closer. We also spoke to the American
4  Chemical Society and were helping them to develop,
5  promulgate regulations on chemical storage safety or
6  standards is a better word, standards for chemical
7  storage safety.
8    I worked -- I was on a commission in
9  Washington with the American Chemical Society for
10  about a year and a half as well, helping trying to
11  bring this whole Federal Resource Conservation
12  Recovery Act together so that we could have some
13  common standards nationally, which the Federal
14  Resource Conservation Recovery Act I believe it was,
15  as I said, in 1976 was not really developed until
16  later on. It was an act of congress that later
17  became developed.
18    But our -- what we saw as there were
19  people that were doing things in a way that was
20  not -- that was not acceptable, dumping things in
21  improper ways. And it was just the way things were
22  done in 1976 and before and it was terrible.
23    And so Bob and I decided our company,
24  Advanced Environmental Technology has got to go after
25  and help to develop regulations and methods and ideas

8 (Pages 26 to 29)

Page 30

1  and encourage people who are doing things right.
2  And, frankly, people who are doing things correctly,
3  you know, at that time, and, again, correctly today
4  and correctly then may have been different, but who
5  were trying to do things right were priced so high
6  that the average company didn't want to pay the
7  proper prices for disposal of materials in a correct
8  manner. Because just like it is today, people are
9  cost conscious. And what we were trying to do was to
10  convince our clients that they needed to spend the
11  money and be willing to spend the money to properly
12  dispose of these materials so that they would not do
13  further environmental damage and that took years.
14      Q.    You mention that one of the ways that
15  AETC got customers early on was contacting companies
16  that had Gaess?
17      A.    That Gaess and Scientific had, we had
18  called upon through them, yes.
19      Q.    How did you identify the haulers of your
20  customer's waste?
21      A.    In other words, how did we identify or
22  how did we select?
23      Q.    Well, how did you get them?
24      A.    How did we get them. Same way we
25  found the disposal sites basically, telephone

Page 31

1  conversations. The State of New Jersey and other
2  states in those times were publishing a list of
3  acceptable haulers, they were permitted haulers at
4  that time. We didn't know anything about them. We
5  just knew that they were listed on a piece of paper
6  sent to us by Ron Buchanan as haulers who were
7  acceptable to the New Jersey Department of
8  Environmental Protection for the handling of certain
9  types of waste materials and basically we would pick
10  off that list.
11      Q.    In addition to the list, did you get
12  haulers in any other way?
13      A.    You would -- well, in the case of, as an
14  example DeRewal, he had his own trucks. So if you
15  were going to use his facilities, you also had to use
16  his trucks.
17      Q.    Do you know if DeRewal was on this list?
18      A.    I believe he was, but I'm not sure. I
19  don't remember whether -- I think to haul in New
20  Jersey you had to be on -- you had to have a New
21  Jersey DEP trucking certification, yes, so I believe
22  he was.
23      Q.    Did you advertise for haulers?
24      A.    No.
25      Q.    Did haulers generally come to AETC in

Page 32

1  these early years or was it vice versa?
2      A.    Vice versa.
3      Q.    So AETC sought out haulers?
4      A.    Sought out a few reliable haulers at the
5  time to accommodate our needs.
6      Q.    What about disposal sites?
7      A.    We were -- everything was by hearing
8  about a facility, then going and investigating it,
9  finding out what they were doing, how they were doing
10  it, so on and so forth. It was very, very vague in
11  the early years as to who was doing what. There were
12  some good companies around and, frankly, when we
13  visited the DeRewal site in Philadelphia it looked
14  like he had a state of the art acid neutralization
15  facility. And I was there I could remember with Art
16  Curley of Ashland, we looked at it carefully --
17      Q.    Before we actually get to the specific
18  site, just generally speaking, was the same kind of
19  thing for disposal sites --
20      A.    Absolutely.
21      Q.    -- you would go out and seek them out.
22      A.    We'd seek. We'd find out their
23  reputation. We'd hear -- we'd talk to the DEP. We'd
24  ask Ron Buchanan or others, you know, what do you
25  think of this facility and does it seem to make sense

Page 33

1  and, you know, do you think they're doing things
2  correctly and so on and so forth.
3      Our whole goal was to protect our image
4  and the image of our customers from unscrupulous
5  disposers. Because we were in it for the long term.
6  And AETC starting at a very awkward period in history
7  did extremely well in terms of maintaining the
8  integrity that it started seeking and gaining the
9  confidence of our 250 Fortune 500 customers. We had
10  an excellent reputation with the federal, state and
11  local governments that we dealt with. And there were
12  some glitches in it, unfortunately, that we were not
13  aware of.
14      Q.    Let's turn to AETC's dealings with
15  DeRewal specifically. Obviously you recognize the
16  name Manfred DeRewal. What's the first contact you
17  had with Manfred DeRewal?
18      A.    Myself -- I believe that Bob, my partner
19  was more involved in finding facilities. And I don't
20  believe that I initially contacted DeRewal myself,
21  matter of fact, I'm quite confident of that. But I
22  had our customer which was a company that I had dealt
23  with previously with Gaess Environmental Services and
24  knew that they had a large and very difficult acid
25  stream, nitric acid stream that they could not find

9 (Pages 30 to 33)

John P. Leuzarder, Jr.                                    November 29, 2004

Page 34

1  anyone to dispose of. So we were also doing a few
2  other things for them as well, more in the laboratory
3  chemicals if I'm not mistaken. Maybe there had been
4  some solvents going to Marisol or something of that
5  nature.
6          But we -- Bob, I believe, was
7  diligently looking for alternatives for that and I
8  believe discovered that there was a facility and how
9  we discovered that I do not know. But that there was
10 a facility in Pennsylvania that specialized in that,
11 or and it may have been that Art Curley had heard
12 about it and asked us to go and look into it.
13     Q.    Do you remember the year?
14     A.    I guess it was '76. It was one of our
15 first relationships that we had after we were laid
16 off from our jobs.
17     Q.    What was the name of the company that
18 you mentioned that had the large acid waste stream
19 that you had problems finding alternatives for?
20     A.    Ashland Chemical Company of Great
21 Meadows, New Jersey.
22     MR. SABINO: I'm sorry, but you
23 mischaracterized his testimony. He said they were
24 having troubles. They didn't know where it should
25 go. You said he was having troubles.

Page 35

1          THE WITNESS: Yeah, it wasn't -- I
2  wasn't having trouble. They were asking me can you
3  help us, our facilities are basically going to be
4  shut down unless you can find -- help us find an
5  alternative.
6          MS. MOONEY: Let's go off the record
7  for a second.
8          (Off-the-Record Discussion)
9  BY MS. MOONEY:
10     Q.    So at the point in time that AETC
11 discovered DeRewal, was Ashland already a customer of
12 AETC's?
13 (OBJECTION)  MR. SABINO: Objection to the form of
14 the question. AETC discovered DeRewal, I object to
15 it. Go ahead.
16 BY MS. MOONEY:
17     Q.    You can answer.
18     A.    Too vague. I just know that our friend
19 Art Curley had asked us to -- we were doing a couple
20 things up there, I don't remember exactly what they
21 were. And he had mentioned that he had this
22 difficult problem with this oxidizing acid and was
23 either telling us that he thought he had found
24 somebody to do it but he wasn't sure or did we know
25 of somebody that could do it. And I know that what

Page 36

1  we did, we then began to call the State of
2  Pennsylvania, the State of New Jersey. We went out
3  and you get on the phone and you start to make phone
4  calls and you say do you know anyone that could
5  handle this type of material.
6          And, eventually, I believe it was
7  either Art or Bob, my partner, discovered that there
8  was a facility in Pennsylvania that had an acid
9  neutralization facility in Philadelphia and we then
10 went and visited that facility. I'm not sure whether
11 we visited it with Art the first time or not. We
12 made -- as I recall we made two visits, one was to
13 his offices, Mr. DeRewal's offices which was in the
14 farm that we are talking about. And he had a, I
15 think it was a converted chicken coop made into an
16 office. We met him up there and we went down and
17 visited the Wissinoming facility.
18     Q.    Was the first visit you described to the
19 Boarhead Farm site your first contact with Mr.
20 DeRewal?
21     A.    I think it was the first time, either
22 that or at the Wissinoming site. I can't remember if
23 they were the same day. They weren't that far apart
24 if I remember, maybe an hour. But I'm not sure
25 whether -- I remember being at the Boarhead Farm one

Page 37

1  time, beautiful farm. It was home as far as I knew.
2  I live on a farm now. I live on a hundred seventeen
3  acre dairy farm so I love farms, not the way that
4  farm turned out.
5          We met Mr. DeRewal at his office for
6  the first time. And we at some point in time visited
7  the Wissinoming site and whether that was with Art
8  Curley of Ashland at that point, I'm not sure, but we
9  did visit that facility down there a couple times.
10     Q.    Do you recall what year the visit to the
11 farm site was?
12     A.    '76, '77. I assume it was in '76, but
13 it could have been '77.
14     Q.    And who was there other than yourself
15 and Mr. Landmesser and Mr. DeRewal at that visit?
16     A.    His secretary.
17     Q.    And who was that?
18     A.    Don't remember her name.
19     Q.    A woman?
20     A.    A woman, yes.
21     Q.    Anyone else there?
22     A.    There was probably some people working
23 around the farm, but, you know.
24     Q.    And as far as you know this was your
25 first meeting with DeRewal?

10 (Pages 34 to 37)

Page 34

1  anyone to dispose of. So we were also doing a few
2  other things for them as well, more in the laboratory
3  chemicals if I'm not mistaken. Maybe there had been
4  some solvents going to Marisol or something of that
5  nature.
6       But we -- Bob, I believe, was
7  diligently looking for alternatives for that and I
8  believe discovered that there was a facility and how
9  we discovered that I do not know. But that there was
10  a facility in Pennsylvania that specialized in that,
11  or and it may have been that Art Curley had heard
12  about it and asked us to go and look into it.
13       Q.  Do you remember the year?
14       A.  I guess it was '76. It was one of our
15  first relationships that we had after we were laid
16  off from our jobs.
17       Q.  What was the name of the company that
18  you mentioned that had the large acid waste stream
19  that you had problems finding alternatives for?
20       A.  Ashland Chemical Company of Great
21  Meadows, New Jersey.
22       MR. SABINO: I'm sorry, but you
23  mischaracterized his testimony. He said they were
24  having troubles. They didn't know where it should
25  go. You said he was having troubles.

Page 35

1       THE WITNESS: Yeah, it wasn't -- I
2  wasn't having trouble. They were asking me can you
3  help us, our facilities are basically going to be
4  shut down unless you can find -- help us find an
5  alternative.
6       MS. MOONEY: Let's go off the record
7  for a second.
8       (Off-the-Record Discussion)
9  BY MS. MOONEY:
10       Q.  So at the point in time that AETC
11  discovered DeRewal, was Ashland already a customer of
12  AETC's?
13  (OBJECTION)  MR. SABINO: Objection to the form of
14  the question. AETC discovered DeRewal, I object to
15  it. Go ahead.
16  BY MS. MOONEY:
17       Q.  You can answer.
18       A.  Too vague. I just know that our friend
19  Art Curley had asked us to -- we were doing a couple
20  things up there, I don't remember exactly what they
21  were. And he had mentioned that he had this
22  difficult problem with this oxidizing acid and was
23  either telling us that he thought he had found
24  somebody to do it but he wasn't sure or did we know
25  of somebody that could do it. And I know that what

Page 36

1  we did, we then began to call the State of
2  Pennsylvania, the State of New Jersey. We went out
3  and you get on the phone and you start to make phone
4  calls and you say do you know anyone that could
5  handle this type of material.
6       And, eventually, I believe it was
7  either Art or Bob, my partner, discovered that there
8  was a facility in Pennsylvania that had an acid
9  neutralization facility in Philadelphia and we then
10  went and visited that facility. I'm not sure whether
11  we visited it with Art the first time or not. We
12  made -- as I recall we made two visits, one was to
13  his offices, Mr. DeRewal's offices which was in the
14  farm that we are talking about. And he had a, I
15  think it was a converted chicken coop made into an
16  office. We met him up there and we went down and
17  visited the Wissinoming facility.
18       Q.  Was the first visit you described to the
19  Boarhead Farm site your first contact with Mr.
20  DeRewal?
21       A.  I think it was the first time, either
22  that or at the Wissinoming site. I can't remember if
23  they were the same day. They weren't that far apart
24  if I remember, maybe an hour. But I'm not sure
25  whether -- I remember being at the Boarhead Farm one

Page 37

1  time, beautiful farm. It was home as far as I knew.
2  I live on a farm now. I live on a hundred seventeen
3  acre dairy farm so I love farms, not the way that
4  farm turned out.
5       We met Mr. DeRewal at his office for
6  the first time. And we at some point in time visited
7  the Wissinoming site and whether that was with Art
8  Curley of Ashland at that point, I'm not sure, but we
9  did visit that facility down there a couple times.
10       Q.  Do you recall what year the visit to the
11  farm site was?
12       A.  '76, '77. I assume it was in '76, but
13  it could have been '77.
14       Q.  And who was there other than yourself
15  and Mr. Landmesser and Mr. DeRewal at that visit?
16       A.  His secretary.
17       Q.  And who was that?
18       A.  Don't remember her name.
19       Q.  A woman?
20       A.  A woman, yes.
21       Q.  Anyone else there?
22       A.  There was probably some people working
23  around the farm, but, you know.
24       Q.  And as far as you know this was your
25  first meeting with DeRewal?

John P. Leuzarder, Jr.                                 November 29, 2004

Page 38

1    A.    Yes, I believe that was it, yes.
2    Q.    Okay, and what was the purpose of that
3  meeting?
4    A.    Get acquainted, talk, see whether his
5  facilities were legitimate, to try to evaluate him,
6  his knowledge and expertise. He seemed to be
7  extremely knowledgeable, way above what we were and
8  talked with authority and talked with a lot of
9  understanding about the whole field of acid and
10  chemical neutralization and so on.
11    Q.    Do you recall any of the questions that
12  you posed or Mr. Landmesser posed to Mr. DeRewal at
13  that meeting?
14    A.    No.
15    Q.    Do you recall anything that Mr. DeRewal
16  said to you at that meeting?
17    A.    No.
18    Q.    You mentioned another meeting with Mr.
19  DeRewal at the Wissinoming facility?
20    A.    Yes.
21    Q.    Do you recall when that was?
22    A.    No.
23    Q.    Do you recall if it was before or after
24  the visit to the Boarhead Farm?
25    A.    No.

Page 39

1    Q.    What was the purpose of the visit to the
2  Wissinoming facility?
3    A.    To see his chemical neutralization
4  facilities. And, again, I'm no chemist. I had no
5  chemistry other than high school so and I got a D in
6  it.
7        MR. SABINO: I think I did too.
8        THE WITNESS: But we looked at his
9  neutralization facility. We looked at the rationale
10  associated with it. It seemed to be he had huge
11  piles of lime, which would have been used, in my
12  elementary understanding, that would have been used
13  to neutralize acids. He seemed to have technology
14  that seemed at least logical to me that would work.
15        And I'm not sure if we had Mr. Curley
16  with us at that time or whether Art came on the
17  subsequent visit where we actually visited the
18  facility. And Art looked it over and he being a
19  plant manager of the Ashland plant there in Great
20  Meadows and far more knowledgeable about the
21  chemistries involved, gave the place a seal of
22  approval and said yes, it looks like this place
23  will -- he could do the job that he's saying he's
24  doing.
25    Q.    Was Mr. Landmesser at that meeting at

Page 40

1  the Wissinoming facility?
2    A.    I don't remember.
3    Q.    Other than yourself and Mr. DeRewal and
4  maybe Mr. Landmesser, was there anyone else there?
5    A.    No.
6    Q.    And maybe Mr. Curley?
7    A.    Oh, Mr. Curley was there, obviously.
8  But at that, which may have been the second time I
9  was at the Wissinoming site.
10    Q.    I'm sorry?
11    A.    Which may have been the second time I
12  was at the Wissinoming site. I just don't recall
13  whether I had gone there with Bob and we looked it
14  over and said yes, this seems to be worthy to bring,
15  you know, a customer down and look at it or not, but.
16    Q.    Do you recall any discussions as to any
17  waste generated by Mr. DeRewal at the Wissinoming
18  facility?
19    A.    No.
20    Q.    How about discussions of by-products of
21  his neutralization technique at the facility?
22    A.    No. He said he had a permit to
23  discharge the neutralized acids which were now
24  basically water and other things into the river, I
25  know that and he had a permit to do that, that's all

Page 41

1  we knew.
2    Q.    Did he show you a copy of the permit?
3    A.    Yes.
4    Q.    Do you recall anything the permit said?
5    A.    No.
6    Q.    Do you recall the issuing authority?
7    A.    No.
8    Q.    Do you recall anything Mr. DeRewal said
9  at that visit at the Wissinoming facility?
10    A.    No, except that he sounded like he
11  really knew what he was talking about. And we were
12  impressed by his apparent knowledge of chemical acid
13  neutralization and so on. He had other customers, I
14  believe, I don't know who they were. And he was
15  doing -- he was handling a variety of things at that
16  time. But our interest was principally in the area
17  of the acid neutralization on our first meetings.
18    Q.    Other than the visit to Boarhead Farm
19  and the Wissinoming facility, do you recall any other
20  contacts you had with Mr. DeRewal?
21    A.    Perhaps over the phone. Certainly we
22  communicated by letter as we would consider things,
23  but talking now and then, I don't -- it's vague in my
24  memory of how many times I actually met the man. I
25  don't recall.

11 (Pages 38 to 41)

John P. Leuzarder, Jr.                                    November 29, 2004

Page 42

1    Q.    How about Freddie DeRewal? Did you ever
2  have any contact with a man named Freddie DeRewal?
3    A.    Not that I remember.
4    Q.    How about Bruce DeRewal?
5    A.    No.
6    Q.    How about Linda Cochran?
7    A.    I believe that was his secretary that
8  worked for Fred.
9    Q.    Did you ever have any contact with her?
10   A.    Through -- as I would call her on the
11 phone and we would talk and so on and so forth, yes.
12   Q.    Do you recall any conversations you had
13 with her?
14   A.    No.
15   Q.    Do you recall when those conversations
16 would have taken place?
17   A.    No.
18   Q.    How about June Stephens?
19   A.    Don't recognize that name.
20   Q.    How about Jeffrey Shaak?
21   A.    No.
22   Q.    How about John Barsum?
23   A.    No.
24   Q.    Do you recall having any contacts with
25 any other employees of DeRewal's?

Page 43

1    A.    No.
2    Q.    When you were at the Boarhead Farm site,
3  what did you see at the site?
4    A.    I saw a pristine beautiful horse farm.
5    Q.    Did you see any trucks?
6    A.    There may have been. I was trying to
7  remember that earlier. What I gathered was that it
8  was -- he had some of his trucks kept there out of
9  the city and that he would -- that was -- I think
10 that was the basis of where his trucks would go out
11 and pick materials up and then bring it to the
12 Wissinoming site, but I don't -- I can't swear to it.
13   Q.    Did you see any tanks?
14   A.    Vaguely I can, you know, I have to say
15 that I believe there were acid tankers there at that
16 facility, the ones that he would use to haul from
17 Ashland to Wissinoming.
18   Q.    Do you recall any -- do you need to take
19 a break?
20   MR. SABINO: I'm sorry, was your
21 question did you see any tanks or did you see any
22 tankers?
23 BY MS. MOONEY:
24   Q.    Tanks.
25   A.    Oh, no. No tanks. Tank trucks, not

Page 44

1  tanks.
2    MR. SABINO: She was asking you if you
3  saw any tanks.
4    THE WITNESS: No.
5    MR. SABINO: Thank you.
6  BY MS. MOONEY:
7    Q.    But you saw tanker trucks?
8    A.    I saw, I believe that he had some of his
9  trucks that he would use to conduct his business
10 parked at that facility at that farm. And that he
11 would go out from there and pick up the materials,
12 bring them to his site, empty those tank trucks and
13 they would return there to be parked.
14   Q.    Do you recall any details of these
15 tankers that you saw?
16   A.    All I can remember is that they were
17 acid tankers specializing in acids.
18   Q.    And how did you know that they were acid
19 tankers?
20   A.    An acid tank truck tends to be smaller
21 in physical size because acid is by far heavier than
22 water and the placarding on it would indicate
23 corrosives.
24   Q.    Was there any other words on the trucks
25 other than the placards?

Page 45

1    A.    No. I don't remember.
2    Q.    No identifying information?
3    A.    I believe, I think it said -- I'm
4  guessing, but please don't -- I believe it said
5  DeRewal Chemical on the tractors, but I don't
6  remember.
7    Q.    Do you recall how many acid tankers you
8  saw there?
9    A.    I'm guessing, two.
10   Q.    When you were at the Wissinoming
11 facility, what did you see there?
12   A.    Large pile of lime which was used for
13 the neutralization of the acid, a large tank system,
14 which -- an acid neutralization tank system with a
15 lot of apparatus associated with it. Again, I was
16 not a chemical engineer. And a number of gates,
17 obviously, fences and a number of buildings that were
18 in need of repair. They were not in great shape most
19 of them. I don't think we could see the river from
20 there, I may be wrong, but I don't recall it.
21   Q.    How many buildings comprise the
22 Wissinoming facility?
23   A.    I don't remember. It might have been
24 one big one or maybe two or three, I don't know.
25   Q.    Did you see any trucks there?

12 (Pages 42 to 45)

Page 46

1    A.    I don't remember.
2    Q.    Did you see anything else?
3    A.    I've seen drums there. I believe there
4  were some drums there.
5    Q.    Do you know what was in the drums?
6    A.    Can't be sure. Might have been lab
7  chemicals, my might have been other things, I don't
8  know.
9    Q.    How many drums did you see?
10    A.    Twenty, thirty. Might have been more, I
11  don't remember.
12    Q.    Did you ask Mr. DeRewal about the drums?
13    A.    You know, I don't really remember
14  exactly. He seemed to be operating a facility there
15  that made sense. So it seemed very normal that he
16  would have those things there.
17    Q.    Did he describe -- other than acid
18  neutralization, did he describe anything else that
19  was done at the Wissinoming facility?
20    A.    Yes, he said he was recover laboratory
21  reagent chemicals separating out silver, I believe,
22  and other, other heavy metals for recovery.
23    Q.    Did AETC ever use his services in that
24  capacity?
25    A.    I believe so.

Page 47

1    Q.    Do you recall for what customers?
2    A.    No.
3    Q.    Do you recall when?
4    A.    No.
5    Q.    Prior to 1980?
6    A.    Well, it would have to be because
7  obviously this all -- he got himself into trouble, I
8  believe, in '77, so.
9    Q.    And what exactly did AETC hire him to do
10  in that way?
11    MR. SABINO: Are you talking about the
12  recovery of heavy metals?
13    MS. MOONEY: Yes.
14    THE WITNESS: Laboratory chemicals and
15  other things, I don't recall.
16    MR. SABINO: Do you mind if we take a
17  break?
18    MS. MOONEY: Yes, that's fine.
19  BY MS. MOONEY:
20    Q.    Do you recall the name of Manfred
21  DeRewal's business that AETC dealt with?
22    A.    I thought it was DeRewal Chemical.
23    Q.    Does the name DeRewal Chemical Company
24  sound familiar to you?
25    A.    Yeah.

Page 48

1    Q.    All right, I want to look a little more
2  closely at the nature of the business relationship
3  between DeRewal Chemical Company and AETC. What was
4  the nature of the business relationship between
5  DeRewal Chemical Company and AETC in 1976?
6    A.    As I stated before, we were a brokerage
7  firm that like a real estate operation was connecting
8  up sellers of services with those in need of such
9  services on the basis that the supplier of the
10  services, in this case, DeRewal Chemical Company was
11  approved by the necessary -- by the appropriated
12  authorities. And that the customer in this case
13  Ashland Chemical, would make, would also -- we'd
14  check out their credentials as well, that we would
15  connect it to that they might develop a relationship
16  and that we were paid a commission by DeRewal
17  actually, we billed -- we billed -- that's incorrect.
18  Let me restate that.
19    We billed Ashland for the cost that we
20  were being charged by DeRewal for the neutralization
21  of acids and so on plus a profit for ourselves. And
22  we would then pay DeRewal Chemical what they were
23  asking for the individual truckload prices of
24  neutralization of those particular chemicals.
25    Q.    What paper was generated in that

Page 49

1  transaction?
2    A.    The paper would be a Department of
3  Transportation shipping document issued by Ashland to
4  DeRewal if that's what they called their trucking
5  operation, I think they did. But in other words,
6  they would give a DOT shipping document to the
7  trucker for transportation material to that specific
8  location, to Wissinoming Industrial Park.
9    So the DOT shipping document would be
10  the first thing. And then second of all would be the
11  invoice from DeRewal Chemical to us, AETC, for
12  services rendered both for trucking and disposal.
13  And then a piece of paper would be generated from us
14  to Ashland on the billing of the DeRewal invoice plus
15  our commission.
16    Q.    Would that last document that you
17  described, was that an invoice?
18    A.    Yes, it was.
19    Q.    And how did AETC calculate its profit?
20    A.    It varied with the individual jobs.
21    Q.    In this -- in your relationship with
22  DeRewal, how did you calculate your profit?
23    A.    I don't remember.
24    Q.    Do you recall in this 1976, 1977 time
25  frame, how AETC calculated its profit with other

John P. Leuzarder, Jr.    November 29, 2004

Page 50

1  customers?
2      A.    I think it was what the market would
3  bear.
4      Q.    Did the profit depend on the type of
5  waste you were brokering?
6      A.    Yes.
7      Q.    And how did the type of waste have a
8  bearing on the profit?
9      A.    If it was water waste and it was
10  nontoxic, it would bear a very small percentage of
11  profit, perhaps a penny, a penny and a half a gallon.
12  As the waste became more difficult, if you will say,
13  it would bear a different, obviously more risk, more
14  higher percentage of profit.
15      Q.    When you say more risk, what do you
16  mean?
17      A.    To the trucker and to the -- it was
18  more -- what I'm saying it's pretty much how much the
19  market would bear in that particular case. So if we
20  could make 20 percent, we would. If you could only
21  make a 1 percent, you would. But as a broker, if you
22  will, we were happy with whatever we could make,
23  frankly, especially when we were starting.
24      Q.    Did DeRewal charge you more for more
25  hazardous wastes?

Page 51

1      A.    Well, we only had certain waste streams
2  with him, the acid being the principal one and that
3  was agreed upon up front. So he would charge us what
4  was right, what he needed in order to neutralize it
5  and to take care of it and to transport it and we
6  would simply add something to that price and pass it
7  on to the customers.
8      Q.    You described a DOT shipping document
9  that the customer would give to the transporter, was
10  that a bill of lading?
11      A.    Yes.
12      Q.    Was the bill of lading actually
13  physically handed to the driver of the waste?
14      A.    Yes.
15      Q.    Do you know what the driver did with
16  that document?
17      A.    Put it in the truck and used it in case
18  he was stopped on the highway and it told what the
19  material was and where it was going.
20      Q.    Did the driver have a responsibility to
21  hand that document to someone else?
22      A.    At the end, yes, at the other end.
23      Q.    At the disposal site?
24      A.    Yes.
25      Q.    And did the disposal site then have to

Page 52

1  do something with that document in turn?
2      A.    In that time frame, I don't remember.
3      Q.    Was a bill of lading generated for every
4  shipment that a transporter hauled?
5      A.    Technically, yes.
6      Q.    Was that the law at the time?
7      A.    I believe so. U.S. Department of
8  Transportation was regulating the transportation of
9  hazardous materials for many, many years. Whereas
10  the Federal Resource Conservation Recovery Act, which
11  began to introduce regulations on hazardous waste
12  materials came later. But -- and then they had their
13  own standards. But the U.S. Department of
14  Transportation was in full force and effect at that
15  time.
16      Q.    So these bills of lading were required
17  by the Department of Transportation, not, for
18  example, the EPA or another regulatory body?
19      A.    Right.
20      Q.    Other than yourself, did anyone else at
21  AETC have any dealings with DeRewal Chemical Company?
22      A.    I don't remember. Bob, John and Bob. I
23  believe we were the principal contacts with Fred
24  DeRewal through his secretary.
25      Q.    And the -- when was the beginning, if

Page 53

1  you can recall, of your relationship, your business
2  relationship with DeRewal?
3      A.    Sometime in 1976.
4      Q.    Do you recall when in 1976?
5      A.    No.
6      Q.    And what date was the end of AETC's
7  relationship --
8      A.    I have no idea.
9      Q.    -- with DeRewal?
10      A.    I have no idea.
11      Q.    Was it when he was put out of business?
12      A.    As soon as we found out that he was
13  doing things in an improper way, we stopped that
14  relationship, because it was, obviously, it would
15  have been terrible jeopardy to our customer and also
16  to our own reputation.
17      Q.    Can you describe the legal relationship
18  between AETC and DeRewal Chemical Company?
19  (OBJECTION)    MR. SABINO: Objection to the form of
20  the question.
21      THE WITNESS: No.
22  BY MS. MOONEY:
23      Q.    Was DeRewal Chemical Company a
24  subcontractor of AETC's?
25      A.    I don't -- I don't remember.

14 (Pages 50 to 53)

John P. Leuzarder, Jr.    November 29, 2004

Page 54

1    Q.    Was DeRewal Chemical Company an employee
2 of AETC?
3    A.    No.
4    Q.    Other than visiting the Wissinoming
5 facility and seeing DeRewal's permit for operating
6 that facility, did AETC take any measures to insure
7 that DeRewal was qualified to haul waste?
8 (OBJECTION)   MR. SABINO: Objection to the form of
9 the question. You haven't established that that's
10 what their job was and he hasn't testified that's
11 what their job was. You could answer.
12    THE WITNESS: Right. The state permits
13 covered that issue. We were satisfied that he was
14 approved by the appropriate authorities and trusted
15 that the government's regulations on truckers and on
16 his activities were legitimate.
17 BY MS. MOONEY:
18    Q.    Did he show you more than one permit
19 when you visited Wissinoming?
20    A.    I don't remember.
21    Q.    Do you recall if the permit you were
22 shown dealt with transportation and disposal or just
23 one or the other?
24    A.    I don't recall.
25    Q.    Did AETC require its haulers to submit

Page 55

1 to any formal training?
2 (OBJECTION)   MR. SABINO: Objection to the form of
3 the question. Its haulers is vague.
4 BY MS. MOONEY:
5    Q.    You can answer if you understand my
6 question.
7    A.    No. Our own truckers -- when we
8 eventually put our own transportation fleet into
9 operation, our own drivers were very carefully
10 trained.
11    Q.    When did AETC start training its own
12 drivers?
13    A.    One of our first drivers was our -- one
14 of our main contacts at Ashland Chemical Company and
15 he was excellent and he was well trained. I forgot
16 his name, but he was from the Great Meadows facility.
17 He left Ashland, came to work for us and became the
18 head of our trucking operations. And that was
19 probably in '77, '78 period. And I don't recall his
20 name again, but it was -- we hired people who were
21 very, very familiar initially. And then as we put on
22 new drivers who were principally -- later on AETC
23 actually had master's degree guys driver our trucks.
24 We paid very well and our prices were fairly high
25 because we recognized the responsibility that we had.

Page 56

1 We wanted our drivers to be trained not only in the
2 regulations U.S. Department of Transportation, but
3 also well trained in emergency firefighting response.
4 They carried Scott packs and other equipment in their
5 trucks. And so we had a very elite group of drivers.
6 But that all started with this fellow from Ashland
7 whose name I cannot recall.
8    Q.    You said he came on in '77?
9    A.    I believe.
10    MR. SABINO: He said '77, '78.
11    THE WITNESS: Yes, '77, '78. And one
12 of the other fellows from Ashland also joined us, a
13 guy named Leon Hendershot and I believe he's still
14 with Bob in one of his other operations in, you know,
15 an offshoot of AETC.
16 BY MS. MOONEY:
17    Q.    Do you recall when Mr. Hendershot joined
18 AETC?
19    A.    No. He I think was our longest field
20 employee.
21    Q.    Well, what steps, if any, did you take
22 to insure that DeRewal understood the safety aspect
23 of hauling your customer's waste?
24 (OBJECTION)   MR. SABINO: Objection to the form of
25 the question.

Page 57

1    THE WITNESS: They were very familiar
2 with acids and we weren't, so we took their word for
3 it. And they had the licenses and, you know,
4 necessary trucking and certifications to say that
5 they could do this. So we assumed that they were
6 experts in an area that we were not.
7 BY MS. MOONEY:
8    Q.    Did AETC take any steps to review
9 DeRewal's driving record?
10    A.    No.
11    Q.    Did AETC do a criminal background check
12 of DeRewal Chemical --
13    A.    No.
14    Q.    -- or DeRewal?
15    Did AETC inquire into Mr. DeRewal's
16 educational requirement, any education that he had?
17    A.    No.
18    Q.    AETC get any references from DeRewal?
19    A.    I don't remember.
20    Q.    Was that typically something that AETC
21 would do with its drivers?
22    A.    If they were our own personal drivers
23 that we had hired to work for the company, of course.
24 But since this was an outside trucking firm hauling
25 their material to their own facilities and were

15 (Pages 54 to 57)

Page 58

1  approved by the agencies that licensed them, we
2  didn't go through that procedure on the basis that
3  the government knew what they were doing.
4      Q.   Did AETC take a copy of the permits that
5  were shown to you by DeRewal?
6      A.   Oh, yes.
7      Q.   You took copies?
8      A.   We had copies, yes.
9      Q.   Do you know what happened to them?
10     A.   No.
11     Q.   Do you know where they would be today?
12     A.   No.
13     Q.   Did AETC have a contract with DeRewal
14  Chemical Company?
15     A.   I don't believe so.
16     Q.   How did you memorialize the agreement
17  that you had with DeRewal?
18  (OBJECTION)  MR. SABINO: Objection to the form of
19  the question. He didn't say it was memorialized.
20     THE WITNESS: I believe like with most
21  of our facilities that we dealt with over the years
22  it was basically a handshake agreement. Here's the
23  price for the material for this year. And we knew
24  what the price would be for disposal. And if they
25  were going to pass a price increase on to us, they

Page 59

1  would need to give us that at least with 30 days
2  written notice to tell us that there's going to be a
3  change so that we could make adjustments to our price
4  to our customers, but it was very informal.
5  BY MS. MOONEY:
6      Q.   Did AETC retain DeRewal Chemical for
7  transporting and disposing of its customer's waste?
8      A.   Again, we never retained them in the
9  sense of the word. Did we use -- did we use DeRewal
10  for disposal, yes. Did we use them for
11  transportation particularly of acid streams, yes. As
12  to -- but we certainly didn't have a contract of any
13  sort with them. It was done informally. It was, you
14  know, we have this here, can you handle it, yes, how,
15  so on. Learning about their facilities and what they
16  do and here's what the price per drum or a gallon
17  will be and this is how we worked with most of our
18  people over the years. And you knew who they were.
19  And 99 percent of them were excellent at what they
20  did and that was the anomaly.
21     Q.   Right, but your agreement with DeRewal
22  Chemical included both picking up the waste from your
23  customer and also disposing of the waste, not just
24  picking it up?
25     A.   Yes.

Page 60

1      Q.   Or just disposing of it?
2      A.   Yeah, they didn't do trucking for us in
3  the sense of trucking to other facilities that I
4  remember.
5      Q.   Other than the pricing, did the
6  agreement you had with DeRewal have any other terms
7  that you discussed with him?
8      A.   Just that everything would be done in
9  conformance with the appropriate state and federal
10  regulations.
11     Q.   Was that an oral representation that he
12  made to you or somebody else?
13     A.   I believe it was our representation to
14  him that everything that -- we always said that
15  everything we said to our customers and we expect it
16  of him, everything would be done in conformance with
17  all state and federal appropriate -- applicable
18  state, federal regulations.
19     Q.   The agreement that AETC had with
20  DeRewal, what customers was he to service for AETC?
21     A.   I don't remember. Other than Ashland, I
22  just don't remember.
23     Q.   Was he to handle all of AETC's customers
24  acid waste?
25     A.   No. We had a variety of facilities

Page 61

1  developed over that course of time of companies that
2  handled materials. But he was primarily, not always,
3  but primarily bulk acid waste, bulk, meaning, full
4  truckload acid waste.
5      Q.   What else did he handle for AETC's
6  customers?
7      A.   I believe recyclable lab reagent
8  chemicals.
9      Q.   Anything else?
10     A.   Not that I remember. He may have
11  handled drums of acid waste as well, but that's --
12  I'm speculating. I don't remember exactly.
13     Q.   Did AETC discuss with DeRewal what type
14  of vehicles he would be using in handling AETC's
15  customer's waste?
16     A.   DOT -- they would have to be DOT
17  approved for that particular material.
18     Q.   Did DeRewal have any dealings with your
19  customers himself?
20     A.   Not that I'm aware of.
21     Q.   Was that discussed in your meetings with
22  DeRewal?
23     A.   Not that I remember.
24     Q.   Did AETC discuss with DeRewal where he
25  would be disposing of their customer's waste?

16 (Pages 58 to 61)

John P. Leuzarder, Jr.                                November 29, 2004

Page 62

1    A.    Yes.
2    Q.    And what did you discuss with him about
3  that?
4    A.    The acids and any materials that he
5  would recycle would be done at his Wissinoming
6  facility.
7    Q.    Did he mention any other disposal sites
8  to you?
9    A.    No.
10       MR. SABINO:  Off the record.
11       (Off-the-Record Discussion)
12  BY MS. MOONEY:
13    Q.    Did AETC in its agreement with DeRewal
14  specify anything to him regarding ownership of the
15  waste that he handled?
16    A.    As I recall it, if once a trucker took
17  the material, it belonged to them.
18    Q.    Did your agreement – did AETC's
19  agreement with DeRewal specify anything regarding
20  duration of the agreement?
21    A.    Didn't have an agreement, but in terms
22  of a written agreement, but, no.
23    Q.    I meant your oral agreement?
24    A.    Forever.
25    Q.    What about payment?  What provisions

Page 63

1  were made for timing of payment, for example?
2    A.    They wanted their money within 30 days
3  and we endeavored to get it within 30 days from a
4  customer -- we endeavored to get payment from our
5  customer within 30 days in order to pay DeRewal on
6  time.  I don't remember whether we had to pay him
7  immediately or whether it was over the normal 30 day
8  span.
9    Q.    What did DeRewal Chemical Company's
10  duties entail for AETC?
11    A.    Safely picking up where they were the
12  trucker they safely – they were to safely pick up in
13  compliance with the federal regulations U.S.
14  Department of Transportation and transport, properly
15  placard, with properly trained drivers, in other
16  words, according to DOT requirements and transport
17  that material to the facility that was listed on the
18  bill of lading and to properly unload those
19  materials.  And then DeRewal Chemical, that was the
20  trucker, in other words, conformance with DOT, then
21  DeRewal Chemical was to properly neutralize and
22  dispose of all or recover all wastes that were
23  shipped to them in conformance with all applicable
24  state and federal regulations.
25    Q.    And none of this was put in writing?

Page 64

1    A.    It may – I think on all of our, you
2  know, our correspondence when we had written, you
3  know, basically letters back and forth to one
4  another, this was all clearly specified.  It was
5  throughout the history of AETC on one side and the
6  other.  The Ashland Oil would hold us saying, you
7  know, we want to make sure anything we ship to you is
8  being done in compliance with state, federal
9  regulations, we'd pass that on to the person who's
10  actually doing the work.
11    Q.    You said where they were truckers, I
12  think, referring to DeRewal, were there circumstances
13  where DeRewal was not the trucker but he still
14  disposed of the waste?
15    A.    There may have been with laboratory
16  chemicals, I don't know.
17    Q.    In your agreement with DeRewal, was it
18  his duty to supply vehicles for the transport of your
19  customer's waste?
20    A.    Yes.
21    Q.    How was – how did AETC assign DeRewal
22  Chemical Company his jobs?
23    A.    Like, what do you mean?
24    Q.    Well, how did DeRewal Chemical Company
25  know what it was supposed to do for AETC's customers?

Page 65

1    A.    Based on an original contact via phone,
2  checking out their, obviously their necessary permits
3  and then bringing the particular customer to the
4  facility to approve it.
5       MR. SABINO:  I don't think you
6  understood her question.  I'm sorry.  Go ahead.
7  BY MS. MOONEY:
8    Q.    How did DeRewal Chemical Company know
9  what to do for one of AETC's customers?
10       MR. BIEDRZYCKI:  You mean on a specific
11  occasion when there was something a load that
12  somebody wanted?
13  BY MS. MOONEY:
14    Q.    Yes.  Can you describe the mechanics
15  of –
16       MR. SABINO:  Once the relationship had
17  been established.
18       THE WITNESS:  What were they supposed
19  to do once they got to the site, in other words?
20  BY MS. MOONEY:
21    Q.    Well, how did they know what site to go to?
22    A.    They would – the customer, Ashland
23  would call us and say I have a load of acid that
24  needs to be picked up.  We would call – one of our
25  people would call down to DeRewal over to the office

17 (Pages 62 to 65)

John P. Leuzarder, Jr.

November 29, 2004

Page 66

1  and say to their secretary or whoever was in charge
2  of transportation, Ashland has a load of material
3  that needs to be picked up, in this case the
4  oxidizing acids and they need it done, let's say
5  tomorrow, can you do it tomorrow? We'd call back to
6  the customer and say how about tomorrow morning, make
7  those arrangements. The truck driver would show up,
8  he knew exactly where to go and what to do.
9      Q.   How did he know where to go?
10     A.   Because it was always the same tank.
11  And he would have to greet, he'd have to meet the
12  Ashland representative. The two of them would work
13  together to get the truck loaded. The Ashland
14  representative, you know, who is responsible for the
15  process would be there to meet him, the truck driver
16  and they would be sure everything was copacetic and
17  they would load -- the driver would load the truck
18  under the supervision of the Ashland employee. And
19  once that was all sealed up, the bill of lading
20  prepared, the proper placards put on the truck, the
21  truck would exit and take it to Wissinoming.
22     Q.   In the original agreement with DeRewal,
23  did you discuss how many times per week DeRewal would
24  be picking up a customer's waste?
25  (OBJECTION)   MR. SABINO: I don't understand

Page 67

1  original. I object to the use of that word.
2          THE WITNESS: In the -- as we -- we
3  would rely strictly upon the customer to tell us what
4  they had and in this particular case how often they
5  inspected it. And if Ashland said we expect to
6  produce three tank load, tank wagon loads of this
7  acid a week, we would kind of let them know that
8  could vary. It could be two, could be one, could be
9  none, could be four, but the individual calls would
10  go out for individual loads.
11  BY MS. MOONEY:
12     Q.   Who at AETC would be responsible for
13  calling DeRewal?
14     A.   After the initial contact was made by
15  Bob and I as salespeople, it would go more to
16  secretarials.
17     Q.   Do you know what secretary actually
18  would call DeRewal?
19     A.   I don't remember.
20     Q.   Any customers other than Ashland that
21  DeRewal serviced for AETC?
22     A.   I don't know.
23     Q.   You don't know?
24     A.   I just don't know. I can't remember.
25          MS. MOONEY: Do you want to keep going,

Page 68

1  Tom?
2          MR. SABINO: Yes, we're good. It's
3  quarter after.
4  BY MS. MOONEY:
5      Q.   Did AETC take any steps to insure that
6  DeRewal was doing his job properly after you
7  originally had an agreement with him?
8  (OBJECTION)   MR. SABINO: Objection to the use of
9  the word properly.
10          THE WITNESS: Just make a phone call,
11  how did everything go? Fine. Went well.
12  BY MS. MOONEY:
13     Q.   Anything else?
14     A.   As long as he continued to be approved
15  by the appropriate authorities and his permits were
16  upheld, we had no -- we did not -- frankly, I'll be
17  honest with you, we did not question the man. We
18  thought he really was doing the job.
19     Q.   And how did you -- how did AETC insure
20  that his permits were up to date?
21     A.   They were required when the permit
22  expired to send us a new one immediately or it was
23  for a period of -- I guess they were required to keep
24  us up to date on the permits. And of course our
25  secretarial staff or whoever would keep a file or we

Page 69

1  would keep the file and make sure everything was
2  copacetic.
3          We were using contact too with the
4  state, particularly New Jersey DEP and we would be
5  talking to them almost on a weekly basis Ron Buchanan
6  and, you know, what the scuttlebutt was, who's doing
7  what and so on and so forth. And we if heard
8  anything we'd ask about specific companies because we
9  recognized that there was a lot of things going on in
10  the industry at that time and a lot of people
11  unfortunately were going to jail and we needed to be
12  very, very careful about who we dealt with. So we
13  dealt a lot with -- kept in close contact with the
14  New Jersey DEP, Dr. Ron Buchanan just to keep track
15  of what was going on and what he may have heard. And
16  if everything sounded reasonably well, we felt pretty
17  comfortable.
18     Q.   Did you have any dealings with
19  Pennsylvania DEP?
20     A.   I'm sure we did. I didn't personally.
21  I'm sure Bob did, but I don't recall.
22     Q.   Do you recall any discussions with any
23  government officials concerning DeRewal?
24     A.   No.
25     Q.   Do you recall informing any of the

18 (Pages 66 to 69)

John P. Leuzarder, Jr.                                          November 29, 2004

Page 70

1  government official that you spoke with about
2  DeRewal?
3      A.   I don't recall specific conversations.
4      Q.   Did AETC take any steps to insure that
5  DeRewal maintained his vehicles properly?
6      A.   No. Under his permit that was his
7  responsibility.
8      Q.   Did AETC ever take any other steps other
9  than requiring permits and updates to permits –
10     A.   Other than the visit to the facilities,
11  no.
12     Q.   Let me finish my question before your
13  answer just so we know what it is?
14     A.   I'm sorry.
15     Q.   Did AETC ever take any other steps to
16  insure that the haulers it was using were handling
17  its customer's waste appropriately other than
18  requiring permits and updates to permits?
19     A.   As the company grew we became more and
20  more involved. We were new to the field. And as the
21  company grew, we became a much more scrutinizing as
22  time went on. And of course more and more we became
23  aware of the specifics of the regulations, how things
24  ought to be done. And, frankly, became relatively
25  expert in that field and were easily able to access

Page 71

1  the compliance of the various haulers, but not
2  initially it was a learning curve for us.
3      Q.   You say other than the site visit, was
4  that something you did for every hauler who worked
5  with you?
6      A.   We didn't see DeRewal so much as a
7  hauler as a disposal facility. The hauling in those
8  days was kind of a little bit taken for granted, if
9  you will. They were licensed. They were approved in
10  the State of New Jersey to haul in the State of New
11  Jersey, whatever. And so the transportation aspects
12  if their trucks looked clean and orderly, their
13  people seemed to be competent, they held the
14  liability for the transportation of the material on
15  the roads and so on. So we left pretty much that
16  part of it, looked into their permits, made sure they
17  were up to date and we felt pretty comfortable with
18  that. But DeRewal was more of a disposal facility
19  for us, an acid neutralization facility and recovery
20  site than anything else, that would have been the
21  area that we would have scrutinized, so not the
22  hauler so much as the disposer.
23          MR. SABINO: Monique, I apologize, but
24  I have a call with Judge Smith so I just have to step
25  out for a little bit.

Page 72

1          MS. MOONEY: Do you want to break for
2  lunch.
3          MR. SABINO: That's great.
4          (Luncheon Recess)
5  BY MS. MOONEY:
6      Q.   We were just talking when we left about
7  AETC's agreement with DeRewal Chemical. In 1976 or
8  1977, did AETC have any written agreements with
9  haulers that it used?
10     A.   I don't remember.
11     Q.   Did AETC keep records regarding its
12  dealings with DeRewal Chemical?
13     A.   We naturally had a normal file of
14  correspondence and things of that nature.
15     Q.   Did you keep records regarding payments
16  made to DeRewal?
17     A.   Our accounting whoever was doing our
18  accounting, our secretary undoubtedly did that.
19     Q.   Do you still have those records?
20     A.   No.
21     Q.   Do you know who does?
22     A.   No.
23     Q.   Were the records regarding payments made
24  to DeRewal created on a schedule?
25     A.   I don't understand the schedule. What

Page 73

1  do you mean the schedule?
2      Q.   Was there any documentation associated
3  with payments that AETC made to DeRewal?
4      A.   Normal accounting.
5      Q.   Were these documents generated every
6  week, every time he was paid, on any type of
7  schedule?
8      A.   I don't know.
9      Q.   Was the Wissinoming facility the only
10  disposal site that DeRewal was using to AETC's
11  knowledge?
12     A.   Yes.
13     Q.   Did AETC specify that the Wissinoming
14  facility was to be used for the disposal of any of
15  its customer's waste?
16     A.   I think it was more implied. It was the
17  only facility that we knew he had.
18     Q.   Did AETC ever ask DeRewal Chemical where
19  it was disposing of waste?
20     A.   Again, it was implied by the fact that
21  was his only facility.
22     Q.   To AETC's knowledge was DeRewal taking
23  its customer's waste to the Wissinoming facility?
24     A.   Yes.
25     Q.   Did AETC ever take any steps to insure

19 (Pages 70 to 73)

Page 74

1  that DeRewal Chemical was in fact taking waste to the
2  Wissinoming facility?
3      A.    Not extraordinary steps. I think we had
4  confidence that they were doing what they said. They
5  were permitted and I don't remember if there was any
6  extraordinary steps taken.
7      Q.    Other than verifying the permitting
8  system?
9  (OBJECTION)  MR. SABINO: Objection to the form of
10  the question.
11      THE WITNESS: Verifying the permitting
12  system and the bill of ladings that indicated that
13  they went there and so on.
14  BY MS. MOONEY:
15      Q.    Why did AETC terminate its relationship
16  with DeRewal Chemical?
17  (OBJECTION)  MR. SABINO: That was already
18  answered. Objection. You can go ahead.
19      THE WITNESS: We heard that they were
20  not in compliance with the regulations.
21  BY MS. MOONEY:
22      Q.    How did you hear?
23      A.    I don't remember.
24      Q.    Do you remember any other people who
25  were involved in that?

Page 75

1      A.    No.
2      Q.    Did you read it in the newspaper?
3      A.    I don't know how we found out. I think
4  it was a phone call from someone and Bob, I think,
5  broke the news to me. I don't recall.
6      Q.    What was the first step that AETC took
7  after it learned of DeRewal's term, I guess?
8      A.    I don't remember.
9      Q.    Do you remember how soon after you found
10  out about DeRewal not being licensed that you
11  terminated your relationship with them?
12  (OBJECTION)  MR. SABINO: Objection to the form of
13  the question. He didn't say they heard about not
14  being licensed.
15      THE WITNESS: They were -- we had just
16  heard that they were caught for doing some improper
17  and I don't remember all of the details. And
18  immediately we said wait a minute, that's it. We
19  gotta stop here. It's like hearing of a fire in a
20  building, you don't walk in anymore.
21  BY MS. MOONEY:
22      Q.    Did you contact DeRewal directly?
23      A.    I believe Bob may have.
24      Q.    What arrangements did you -- well, at
25  that point in time what customer's waste was DeRewal

Page 76

1  handling for AETC?
2      A.    I don't remember. Just Ashland and I'm
3  not even sure of that at the time that this happened,
4  but I believe it was Ashland and I don't recall of
5  any others.
6      Q.    What arrangements, if any, did AETC make
7  for Ashland's waste disposal after that?
8      A.    I think it -- we didn't make -- I don't
9  remember, but I think they were shut down.
10      Q.    Who was shut down?
11      A.    I think Ashland's operation that was
12  producing this material was shut down because there
13  was no place for it to go.
14      Q.    Do you recall how long that was?
15      A.    No.
16      Q.    Do you recall that it then reopened at
17  some point?
18      A.    No.
19      Q.    Did DeRewal sue AETC at some point in
20  time after the termination of your relationship with
21  him?
22      A.    I don't know.
23      Q.    What is the most recent dealing between
24  AETC and DeRewal Chemical that you can recall?
25      A.    The only thing that stands out in my

Page 77

1  mind is when we found out that they were disposing or
2  discharging material into the river and as far as I
3  was concerned that was the end of our relationship.
4      Q.    Okay, I want to turn to --
5      MR. BIEDRZYCKI: Just for point of
6  clarification, when you say they were discharging
7  into the river, can I ask what river and from where
8  are you referring to?
9      THE WITNESS: The Wissinoming Park and
10  the acid neutralization facility had a discharge
11  permit into the Delaware River and the neutralized
12  acids, which were now rendered innocuous, they had a
13  permit, I believe, and my memory does not serve me
14  very well on those because of how long ago that was,
15  but that the neutralized acid would be discharged
16  into the Delaware River in Philadelphia which was not
17  far from where Wissinoming was.
18      MR. BIEDRZYCKI: So the improper
19  activities that you were talking about all occurred
20  at the Wissinoming facility?
21      THE WITNESS: Yes, sir.
22      MR. BIEDRZYCKI: Okay, thank you.
23  BY MS. MOONEY:
24      Q.    Okay, I'm going to turn to AETC's
25  dealings with Ashland Chemical Company. Were you the

20 (Pages 74 to 77)

Page 78

1  primary contact between AETC and Ashland Chemical
2  Company?
3      A.    Yes.
4      Q.    And when did your relationship with
5  Ashland start?
6      A.    Probably prior while I was with Gaess
7  Environmental.
8      Q.    Was Ashland a customer of Gaess?
9      A.    Yes, I believe so, but I cannot be sure.
10     Q.    Do you recall if you had any dealings
11  with Ashland while you were at Gaess?
12     A.    It's very vague in my recollection.
13     Q.    How did Ashland become a customer of
14  AETC?
15     A.    I was a salesman and I had called on
16  Ashland while with Gaess after we were let go, I
17  continued as a salesman to make contact with Ashland
18  and Art Curley, who I had a good relationship with
19  and things would come up.  He would ask questions
20  about this or that.  And it was when he identified
21  this acid stream that he was looking for a disposal
22  facility for that I think that relationship started
23  sometime in 1976.
24     Q.    Do you recall what month?
25     A.    No.

Page 79

1      Q.    Did you make -- what arrangements did
2  AETC make for the disposal of Ashland's waste?
3  (OBJECTION)  MR. SABINO:  Objection.  That was
4  already answered.
5          THE WITNESS:  I described that earlier.
6  BY MS. MOONEY:
7      Q.    Other than agreeing with DeRewal
8  Chemical to transport and dispose of Ashland's waste,
9  did AETC make any other arrangements with anyone else
10  to dispose of the waste?
11     A.    Not that I remember.
12     Q.    Did DeRewal Chemical handle Ashland's
13  waste for AETC -- I'm sorry, strike that.
14          Did DeRewal handle the transport and
15  disposal of Ashland's nitrating waste for the entire
16  time Ashland had an arrangement with AETC?
17  (OBJECTION)  MR. SABINO:  Objection to the use of
18  the word arrangement.
19          THE WITNESS:  DeRewal did the trucking
20  and disposal of the Ashland waste, nitrating acid
21  waste while it was handled by AETC.
22  BY MS. MOONEY:
23     Q.    Was any other waste generated by Ashland
24  handled by AETC?
25     A.    I believe there may have been some

Page 80

1  solvents that went to Marisol for recovery, but it is
2  vague in my recollection.
3      Q.    Do you recall a company that transported
4  that solvent waste?
5      A.    Probably Marisol directly.  I believe
6  they had their own fleet of trucks.
7      Q.    Where is Marisol?
8      A.    Factory -- they were on Factory Lane,
9  Middlesex, New Jersey.  I don't know if they still
10  exist.
11     Q.    Did you ever have any face-to-face
12  meetings with Art Curley?
13     A.    Many times.
14     Q.    What was the first one?
15     A.    Probably in, guessing '75, '76 while
16  with Gaess Environmental.
17     Q.    And what was the purpose of that
18  meeting?
19     A.    To explore potential for a relationship
20  between -- in other words, having Gaess handle waste
21  materials from Ashland.
22     Q.    Did those waste materials -- what did
23  those waste materials include?
24     A.    I don't remember.
25     Q.    Do you recall if the waste materials

Page 81

1  included this spent nitrating acid?
2      A.    No.
3      Q.    Did not?
4      A.    I don't know.  I don't remember.  With
5  Gaess it was very vague.  I was only there for nine
6  months.  It was a very short, tumultuous time.
7      Q.    Did Gaess ultimately handle Ashland
8  waste?
9      A.    I don't remember.
10     Q.    And what was the next contact you had
11  with Mr. Curley?
12     A.    On and off during the period of '76, '77
13  calling on him as a salesman occasionally, see how
14  things were going, what was going on and so on.
15     Q.    Do you recall the first time after your
16  visit with Mr. Curley while you were at Gaess the
17  next time after that, was it at Ashland that you met
18  him?
19     A.    I don't really remember.  But I would
20  guess it was, I would think.  I was up there quite a
21  bit.
22     Q.    What was the first time you actually
23  visited the Ashland or where was the Ashland facility
24  that you visited?
25     A.    In Great Meadows, New Jersey.

21 (Pages 78 to 81)

John P. Leuzarder, Jr.                                    November 29, 2004

Page 86

1    Q.    When you went to the Wissinoming
2  facility at this time and observed the neutralizing
3  machinery, was it actually in the process of
4  neutralizing at that point in time?
5    A.    I don't remember.
6    Q.    Did you ever observe the working
7  neutralization?
8    A.    I don't remember.
9    Q.    Do you know what type of background Art
10  Curley had in chemical science?
11    A.    No.
12    Q.    Did he represent to you that he was
13  knowledgeable about the process that DeRewal was
14  showing you?
15  (OBJECTION)   MR. BIEDRZYCKI: Object to the form.
16  You can answer it.
17        THE WITNESS: No, but as a manager of a
18  large chemical plant that produced these acids,
19  certainly he was more knowledgeable than I was.
20  BY MS. MOONEY:
21    Q.    To your knowledge, did any other Ashland
22  employee ever visit the Wissinoming facility?
23    A.    Not that I recall.
24    Q.    Did you have any dealings with anyone
25  other than Art Curley at Ashland?

Page 87

1    A.    There was a doctor, a dear man, he was
2  their chief chemist and I don't remember his name.
3  He was a black man, very good man. And I did have
4  some dealings with him. He was their chief chemical
5  expert.
6    Q.    And what dealings did you have with --
7    A.    Just --
8    Q.    Do you remember his name, I'm sorry?
9    A.    No. Just basic talking about the
10  science of the chemistry of the materials.
11    Q.    And what materials were those?
12    A.    The acids and so on and other materials
13  that we may have handled for them. And like I said,
14  I think we did some solvents for them, perhaps, that
15  went for recovery.
16    Q.    Do you recall when these conversations
17  with the chemists occurred?
18    A.    During that same period in time.
19    Q.    1976 to 1977?
20    A.    Yes.
21    Q.    When you say that your visits -- are you
22  getting tired? Are you okay? Do you want to take a
23  break?
24    A.    No, it's okay. We'll go for a little
25  longer.

Page 88

1    Q.    When you say some of your visits to
2  Ashland were customer relations, what would that
3  entail?
4    A.    As a salesman you're probably familiar
5  that we have a group of accounts and you would go and
6  visit them on a regular basis just to say hi, how are
7  you, is everything going well, perhaps have lunch or
8  discuss specific issues or try to generate more
9  business. And so that would have been -- but many of
10  the times I would physically bring invoices to
11  Ashland and actually hand it to them and they'd write
12  me a check on the spot. And a lot of my visits up
13  there, since it was not a long trip, were actually
14  hand delivering invoices and returning the checks to
15  our accounting department.
16    Q.    And why did you do that?
17    A.    Cash flow. We were a new company and
18  without proper cash flow we certainly would have gone
19  under.
20    Q.    When you would make these customer
21  relation visits, do you recall ever being told of any
22  problems with AETC's business with Ashland?
23    A.    No.
24    Q.    Did -- who did you meet with at these
25  visits?

Page 89

1    A.    Generally Art. Perhaps some of the
2  field men, you know, the guys out in the yard, Leon
3  or somebody.
4    Q.    Do you recall discussing the disposal of
5  their nitrating waste on any of these visits?
6    A.    Usually.
7    Q.    Any -- and what did you discuss?
8    A.    How's everything going? Is everything
9  going well? How's the truck? Is the driver doing
10  what he's supposed to be doing? Does everything look
11  okay? Yes.
12    Q.    No problems that come to mind?
13    A.    Not that I remember.
14    Q.    Did AETC have a written agreement with
15  Ashland?
16    A.    We may have, but I would not recall it
17  or any of the details of it.
18    Q.    What was the agreement between AETC and
19  Ashland in 1976?
20    A.    I don't remember.
21    Q.    What was AETC agreeing to do for Ashland
22  in 1976?
23  (OBJECTION)   MR. SABINO: Objection. He already
24  told you about that this morning.
25  BY MS. MOONEY:

23 (Pages 86 to 89)

John P. Leuzarder, Jr.                                                November 29, 2004

Page 90

1    Q.    You can answer.
2    A.    As I described.
3    Q.    What was Ashland going to do for AETC?
4    (OBJECTION)  MR. BIEDRZYCKI: Object to the form.
5         THE WITNESS: I think we already talked
6    about that also.
7    BY MS. MOONEY:
8    Q.    Were they agreeing to pay you for
9    hauling and disposing of their waste?
10   A.    That's right. They were agreeing to pay
11   us — when a load was shipped they agreed to pay
12   within a time frame for the — to pay our invoice.
13   Q.    Did you have an agreement about how much
14   they were going to pay you?
15   A.    Certainly.
16   Q.    And was that negotiated?
17   A.    It was negotiated on a per load basis, I
18   believe. May have been per gallon based on what they
19   loaded into the truck or it may have been on a per
20   load basis, assuming that that they filled the truck.
21   Q.    So the price was different if a truck
22   was filled as opposed to not?
23   A.    Right. I don't remember the details.
24   I'm just going on generic how we used to handle
25   things. If somebody picked up 4000 gallons from a

Page 91

1    customer, you'd pay for 4000 gallons plus trucking.
2    Somebody picked up 6000, you'd pay for 6000 gallons
3    plus trucking.
4    Q.    Were there any discounts given for a
5    full load?
6    A.    No.
7    Q.    Did — were there any letters written to
8    commemorate the relationship between Ashland and
9    AETC?
10   A.    I'm sure there was. They were in the
11   files. I have no idea where those files are.
12   Q.    In the agreement that AETC had with
13   Ashland, were the identity — was the identity of a
14   waste hauler identified?
15   (OBJECTION)  MR. SABINO: Objection. There was no
16   written agreement.
17        MS. MOONEY: I didn't say written, I
18   said agreement.
19        MR. SABINO: You didn't say oral
20   either.
21        THE WITNESS: I would assume so. If we
22   took stuff to Marisol we could give them a quotation
23   of a particular waste solvent stream in drums. We
24   say a drum will cost you "x", $12 and it will be —
25   in other words, we will pick up 80 drum quantities

Page 92

1    and it will be hauled by Marisol, their license
2    numbers are as follows.
3    BY MS. MOONEY:
4    Q.    That was the information that you would
5    provide to --
6    A.    Customer.
7    Q.    To a customer. In a letter typically
8    or some other way?
9    A.    Yeah, sales letter.
10   Q.    In the agreement that AETC would have
11   with Ashland at this time, did you talk about the
12   type of waste that AETC would handle?
13   A.    We would talk waste specifics. In other
14   words, most customers, most companies would have
15   multiple waste haulers not just one. Because we
16   would specify, we would be hauling their acid waste,
17   somebody else might be hauling their waste waters,
18   others might be handling another sludge material.
19        And so typically in that period of time
20   AETC would be looking at individual waste streams
21   within that facility. And the result was that maybe
22   we would be handling certain materials and not
23   others. So, yes, we would specify what those
24   materials were, where they would go, who would haul
25   them and at what cost.

Page 93

1    Q.    And all these things would be
2    commemorated in letters?
3    A.    Yes, they would be, certainly.
4    Q.    What about amount of waste, was that
5    discussed?
6    A.    You would generally expect that they
7    would say we anticipate "x" number of drums and
8    material a year and so much on a monthly basis, so
9    that we could roughly assess the amount of
10   frequencies that would be needed in order to pick it
11   up.
12        And generally the way it worked is when
13   a customer would call us and say I have 80 drums of
14   XYZ, a particular thing we already quoted them on,
15   that they understood where it was going, what's going
16   to happen to it, who the hauler was, we would then
17   dispatch a truck through the hauler who we would use,
18   whether it be our own vehicles or others, to that
19   site. The truck would be loaded, bill of ladings
20   prepared, specifically listing all of the individual
21   materials. That material would be delivered. The
22   facility that would receive it would send us back an
23   invoice confirming what we had on the bill of lading
24   and we would then bill the customer.
25   Q.    Did your agreement with Ashland specify

24 (Pages 90 to 93)

Page 114

1    Q.  Do you know what, I'm going to have this
2  marked -- actually, let me ask you a question first
3  before I have it marked.  Do you recognize the
4  handwriting on this?
5    A.  No.  Certainly not mine.
6      MS. MOONEY:  Okay, I'm not going to
7  have this marked.
8      MR. BIEDRZYCKI:  Well, since you asked
9  a question on it, I think we have to mark it.  It has
10  to become part of the record.
11      MS. FLAX:  We'll never know what it is.
12      (Exhibit Leuzarder-1, Handwritten document
13  Bates stamped AETC 6, is marked for identification)
14  BY MS. MOONEY:
15    Q.  Do you recall that there was a sulfuric
16  acid spill at Boarhead Farms?
17    A.  No.
18    Q.  You never heard of any kind of acid
19  spill occurring at Boarhead Farms?
20    A.  Not that I recall.
21    Q.  All right.  I'm going to show you a
22  document that you produced -- your attorney produced
23  in response to our request for -- our interrogatories
24  and request for documents?
25      MR. SABINO:  She can tell that because

Page 115

1  of the little number down on the bottom, same thing
2  with the prior document.
3      MS. MOONEY:  Can you mark that
4  Leuzarder-2.
5      (Exhibit Leuzarder-2, Bill of lading
6  9/7/76 Bates stamped AETC 7, is marked for
7  identification)
8  BY MS. MOONEY:
9    Q.  Have you had a chance to look that over?
10  Okay.  This at the top says straight bill of lading
11  short form.  Does this -- first of all, does this
12  look familiar to you?
13    A.  Only generally.  It's a bill of lading
14  form.
15    Q.  And is this the DOT document that you
16  were referring to earlier as what Ashland would
17  generate when --
18    A.  Yes.
19    Q.  And who filled in the information that's
20  contained in the table on the second half of the
21  page?
22      MR. BIEDRZYCKI:  The typed material?
23  BY MS. MOONEY:
24    Q.  The typed material in the box, who
25  filled that in?

Page 116

1    A.  Ashland.
2    Q.  Who was responsible for specifying
3  corrosive labels required?
4    A.  Ashland.
5    Q.  And was that a legal requirement?
6    A.  Legal requirement by the Department of
7  Transportation.
8    Q.  And how about below that where it talks
9  about in the event of any emergency, who specified
10  that being included in a bill of lading like this?
11    A.  Ashland, probably.
12    Q.  Do you know what number, phone number
13  that is?
14    A.  No.
15    Q.  Does it have anything to do with AETC?
16    A.  I don't think so.
17    Q.  To your recollection?
18    A.  No.
19    Q.  At the bottom it has a signature in the
20  middle, which looks like Bruce DeRewal and it says
21  per Advanced Envirotech Company?
22    A.  Right.
23    Q.  Was that Bruce DeRewal signing on behalf
24  of AETC?  What's the relationship between the signer
25  where it says per Advanced Envirotech Company?

Page 117

1    A.  He's the truck driver who picked it up
2  for DeRewal Chemical Company.  And it says, in other
3  words, the load was specified per Advanced Envirotech
4  Company.  We called them, said pick up the load.  He
5  went over, picked it up, he put his name there and
6  Ashland filled in this information.
7    Q.  Okay, at the top where it says route,
8  right under Ashland Chemical Company in the very in
9  the upper.
10    A.  Right.
11    Q.  Underneath that it says route, it's
12  typed in Advanced Envirotech Company, what does that
13  mean, route Advanced Envirotech Company?
14    A.  I don't know.  That was probably their
15  own internal paperwork.
16    Q.  Whose?
17    A.  Ashland's.  We didn't normally get
18  these.  This would have gone with the trucker, so how
19  they filled them out all the time was their
20  responsibility.
21    Q.  The customer's?
22    A.  Yes.
23    Q.  And where it says confined to Advanced
24  Envirotech Company?
25      MR. SABINO:  Where's that?

30 (Pages 114 to 117)

1          C E R T I F I C A T E

2

3

4

5          I, Lori A. De Francesco, a Notary Public and

6    Certified Shorthand Reporter of the State of New

7    Jersey do hereby certify that the foregoing is a true

8    and accurate transcript of the testimony as taken

9    stenographically by and before me at the time, place

10   and on the date hereinbefore set forth.

11          I do further certify that I am neither a

12   relative nor employee nor attorney nor counsel of any

13   of the parties to this action, and that I am neither

14   a relative nor employee of such attorney or counsel

15   and that I am not financially interested in this

16   action.

17

18

19

20

21   _____
     Lori A. De Francesco

22   Notary Public, State of New Jersey
     My Commission Expires January 10, 2006

23   Certificate No. XI01797

24

25