# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC INDUSTRIES, INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC, and TI GROUP AUTOMOTIVE SYSTEMS, LLC,

                     Plaintiffs,

v.

ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, ET AL.,

                     Defendants.

Civil Action No.  02-3830

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION'S MOTION FOR SUMMARY JUDGMENT

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
By:  Glenn A. Harris, Esquire
By:  Monique M. Mooney, Esquire
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey  08043
Phone:  (856) 761-3440

Attorneys for Plaintiffs Agere Systems, Inc., Cytec Industries, Inc., Ford Motor Company, SPS Technologies, LLC and TI Group Automotive Systems, LLC

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 2

STATEMENT OF FACTS ............................................................................................ 3

ARGUMENT ............................................................................................................... 10

I.  *AETC IS A PERSON WHO ARRANGED WITH A TRANSPORTER FOR TRANSPORT FOR DISPOSAL OF HAZARDOUS SUBSTANCES OWNED OR POSSESSED BY AETC* ................................................................................ 10

    A.  *A person "owns or possesses" a hazardous substance where that person has actual or constructive ownership or possession of such substance* ............... 11

    B.  *AETC had actual and constructive ownership and possession of the wastes generated by Ashland and Diaz* ........................................................... 14

    C.  Morton is inapplicable here, but AETC would be liable even if Morton did apply ................................................................................................... 22

        1.  *Morton* is distinguishable because it dealt with completely different facts and with statutory language inapplicable here ................. 22

        2.  AETC is liable even under the *Morton* analysis ........................... 25

II.  *AETC'S REQUEST FOR SUMMARY JUDGMENT REGARDING PLAINTIFFS' DECLARATORY JUDGMENT COUNT IS MOOT* ....................................... 28

III.  *AETC IS LIABLE UNDER HSCA AS A PERSON WHO OWNED OR POSSESSED HAZARDOUS SUBSTANCES AND ARRANGED FOR THE TRANSPORT FOR DISPOSAL OF THOSE SUBSTANCES* ............................. 28

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*American Cyanamid Company v. Capuano*, 381 F.3d 6th (1st Cir. 2004)........10, 11, 12, 29

*BP Amoco Chemical Co. v. Sun Oil*, 316 F. Supp. 1661 (D. Del 2004)...........................24

*Cmty. for Creative Non-Violence v. Reed*, 490 U.S. 730, 739 (1989) ...............................12

*GenCorp, Inc. v. Olin Corporation*, 390 F.3d 433 ..............................................11, 12, 29

*General Electric Company v. AAMCO Transmission, Inc.*, 962 F.2d 281 (2nd Cir. 1992) ....................................................................................................................11, 14, 27

*Morton International, Inc. v. A.E. Staley Manufacturing Company*, 344 F.3d 669 (3rd Cir. 2003) ................................................................22, 24, 25, 26, 27, 28

*Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 761 (1989) ...........18

*Transportation Leasing Company v. State of California*, 861 F. Supp. 931 (D.D. Ca. 1993)........................................................................................................................13

*Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 536 (1819)..........................18

*United States v. Bliss*, 667 F. Supp. 1298 (E.D. Mo. 1987)...............................13, 14, 20

*United States v. Crippen*, 459 F.2d 1387 (3rd Cir. 1972) ...........................................11, 12

*United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726 (8th Cir. 1987)..................................................................................................11, 14, 29

## STATUTES AND RULES

21 U.S.C. §841 .....................................................................................................12

42 U.S.C. § 9607(a) .............................................................................................10

42 U.S.C. § 9607(a)(3) .............................................................................2, 10, 14, 21

42 U.S.C. § 9613(f)..............................................................................................10

Federal Rule of Evidence, 407, 601, 602, 701..................................................................................................19

## MISCELLANEOUS

BLACK'S LAW DICTIONARY (5th ed. 1979)
174 ......................................................................................................................................18
278 ......................................................................................................................................18

Hazardous Sites Cleanup Act,
35 P.S. § 6020.701(a)(2) .......................................................................................................30

Uniform Commercial Code,
U.C.C. § 7-102 .....................................................................................................................18

## INTRODUCTION

Plaintiffs respectfully submit this brief in support of their cross-motion for partial summary judgment and in opposition to the motion of Advanced Environmental Technology Corporation ("AETC") for summary judgment.

AETC's liability is based upon the undisputed fact that AETC contracted with Ashland, Inc. ("Ashland") and Diaz Chemical Corporation ("Diaz") to remove and dispose of wastes generated from facilities operated by those companies. AETC then contracted with Manfred DeRewal for DeRewal[1] employees to go to the Ashland and Diaz facilities, pick-up the wastes, and dispose of them. AETC is thus a "person who by contract, agreement, or otherwise . . . arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person . . .." 42 U.S.C. § 9607(a)(3).

AETC's Motion for Summary Judgment is premised upon the allegation that AETC did not *physically* possess the wastes generated by Ashland and Diaz. Every court to directly consider the meaning of "owned or possessed by such person" in CERCLA Section 107(a)(3), though, has concluded that *constructive* ownership or possession of the hazardous substances is sufficient to establish liability. AETC legally and constructively owned and possessed the hazardous substances generated by Ashland and Diaz at the time it arranged with DeRewal "for transport for disposal or treatment" of those hazardous substances.[2] Plaintiffs are

---

[1]    Mr. DeRewal operated at times relevant to this action through two corporations, DeRewal Chemical Company, Inc. and Environmental Chemical Control, Inc. (collectively "DeRewal").

[2]    AETC goes as far as to suggest that AETC can't be liable under CERCLA because its "employees wore suits and ties and 'handled' telephones; they did not wear boots and overalls and 'handl[e]' trucks of liquid wastes." AETC Brief at 13. It is precisely the

(continued...)

accordingly entitled to a partial summary judgment declaring AETC to be a person liable under Section 107(a)(3) and, for the same reason, AETC's motion for summary judgment should be denied.

## STATEMENT OF FACTS

AETC was incorporated in or about August, 1976 in the state of New Jersey. Landmesser N.T., November 22, 2004, at 29:3 - 30:11 (Exhibit 1). Robert Landmesser and John Leuzarder had both been employed by Gaess Environmental Services ("Gaess"), a chemical waste transporter, and had decided to start their own company. Landmesser N.T., November 22, 2004, at 27:20 - 30:25 (Exhibit 1); Leuzarder N.T., November 29, 2004, at 13:4 - 14:4 (Exhibit 2). Messrs. Landmesser and Leuzarder had known Arthur Curley, the plant manager of Ashland's Great Meadows, New Jersey facility (the "Great Meadows Facility"), while working at Gaess. Leuzarder N.T., November 29, 2004, at 33:21 - 34:21, 78:4 -7 (Exhibit 2); Curley N.T., December 9, 2004, at 109:3 - 110:5 (Exhibit 3). Sometime in 1976, AETC approached Mr. Curley to offer AETC's services to haul away and dispose of certain Ashland wastes. Leuzarder N.T., November 29, 2004, at 78:13 - 23 (Exhibit 2); Curley N.T., December 9, 2004, at 110:24 - 111:9 (Exhibit 3). Pursuant to that agreement, AETC was responsible for hauling away and disposing of certain hazardous waste streams generated by Ashland including a highly concentrated acid waste stream. Leuzarder N.T., November 29, 2004 at 89:18 - 90:20, 92:10 - 25; 114:21 – 115:11 (Exhibit 2); Curley N.T., December 9, 2004 at 111:2 - 23 (Exhibit 3); Letter

---

(...continued)

"suit" who ordered a truck driver to go do the dirty work that is and should be liable, not the person who simply drove the truck.

from AETC to Art Curley dated 8/3/76 (Exhibit 4); Letter from Diaz to Landmesser dated 4/14/77 (Exhibit 5); AETC Invoice #002382 to Diaz dated 3/7/77 (Exhibit 6).

    AETC then attempted to identify someone who could actually perform the hauling and disposing of Ashland's waste streams. Leuzarder N.T., November 29, 2004, at 33:18 - 34:9, 35:18 - 36:10 (Exhibit 2); Curley N.T., December 9, 2004 at 111:24 - 113:7 (Exhibit 3); Leuzarder N.T., December 6, 2004, at 207:14 - 208:4 (Exhibit 7). AETC entered into an oral agreement with DeRewal whereby AETC delegated to DeRewal the task of picking up the waste streams from Ashland and disposing of them for a per-gallon fee charged to AETC. Leuzarder N.T., November 29, 2004, at 48:19-24, 52:25 - 53:5, 58:16 - 59:25 (Exhibit 2); Leuzarder N.T., December 6, 2004, at 161:13-23 (Exhibit 7); AETC 130, 132, ASHL00249 (Exhibit 8). The terms of the agreement between Ashland and AETC are set forth in a contract between them, an unsigned copy of which still exists today. Agreement of Contract between AETC and Ashland [undated] (Exhibit 9). The contract requires AETC to "properly dispose" of Ashland's waste "in strict conformity with…all legal requirements." (Exhibit 9, ¶ 1, 3). The contract also specifies that, upon removal of Ashland's waste from the Great Meadows Facility, the waste becomes AETC's property. Exhibit 9, ¶ 4. Ashland had no agreement whatsoever with DeRewal and, from Ashland's perspective, the identity of the entity which actually hauled the waste was up to AETC; Ashland's only agreement was with AETC. Leuzarder N.T., November 29, 2004, at 61:18-20 (Exhibit 2); Landmesser N.T., December 6, 2004, at 147:25 - 148:2 (Exhibit 10); Curley N.T., December 9, 2004, at 118:14-18, 120:7-13, 130:4 - 131:22 (Exhibit 3).

    Although Ashland paid AETC to ensure that Ashland's waste was hauled and disposed of in a proper legal manner, AETC failed to verify DeRewal's credentials or that

DeRewal was handling Ashland's waste properly. Curley N.T., December 9, 2004, at 127:2-14 (Exhibit 3). DeRewal himself told Leuzarder and Landmesser, shortly after AETC entered into its agreement with DeRewal for the handling of Ashland's waste, that he had formerly run afoul of environmental regulations and that the state environmental regulators did not think well of him. Memo from A.T. Curley to file dated 9/20/76 (Exhibit 11). Likewise, other than one visit (reluctantly agreed to by Mr. Leuzarder at Mr. Curley's urging) by Mr. Leuzarder to DeRewal's Wissinoming "operation" approximately two months after DeRewal began handling Ashland's waste, AETC took no steps to ensure that DeRewal was disposing of Ashland's waste in the manner he represented. *Id.*; Memo from A.T. Curley to J. Minott/W.R. Starkey dated 10/19/76 (Exhibit 12); Landmesser N.T., December 6, 2004, at 151:14 - 152:13, 175:23 - 177:18 (Exhibit 10). Mr. Leuzarder had no chemical training and was not qualified to assess the viability of DeRewal's Wissinoming operations, which Mr. Curley himself found to be slipshod. Memo from A.T. Curley to W.R. Starkey dated 4/14/77 (Exhibit 13); Leuzarder N.T., November 29, 2004, at 38:1-6 (Exhibit 2); Curley N.T., December 9, 2004, at 129:5-13 (Exhibit 3).

Notwithstanding the suspect nature of the Wissinoming operation, and AETC's contemporaneous awareness of the great potential for illegal waste disposal by haulers at this time, AETC never verified with DeRewal, or by any other means, that Ashland's waste even went to Wissinoming. Leuzarder N.T., November 29, 2004, at 69:3-17, 73:13 - 74:6 (Exhibit 2). Instead, AETC "took [DeRewal's] word for it" that DeRewal was qualified to haul and dispose of a highly concentrated, volatile acid waste stream in bulk loads, without so much as checking DeRewal's driving record, much less his background, or other credentials. Leuzarder N.T., November 29, 2004, at 57:1-21 (Exhibit 2); Leuzarder N.T., December 6, 2004, at 168:5-11, 173:18-174:4 (Exhibit 7).

These two agreements proceeded as planned. Ashland would call AETC when it had a load of waste to dispose of and would prepare a bill of lading "consigning" that load to AETC. AETC Brief at 8; Leuzarder N.T., November 29, 2004 at 49:2-15, 51:8-52:5, 65:22-66:21 (Exhibit 2); *e.g.*, ASHL0005 (Exhibit 14). The bill of lading itself defines the terms used therein. It indicates that the entity to whom the bill of lading consigns the waste is a "carrier," and that the carrier is "any person or corporation in possession of the property under the [bill of lading]. *E.g.*, ASHL00048, 124 (Exhibit 14). AETC would call DeRewal and instruct DeRewal to go to Ashland and pick up the waste. AETC Brief at 8; Leuzarder N.T., November 29, 2004, at 65:24-66:8 (Exhibit 2). A DeRewal driver would arrive at Ashland, pick up the waste, and sign the bill of lading on the signature line where "AETC" had been typed in by Ashland. *E.g.*, ASHL0005 (Exhibit 14); Curley N.T., December 9, 2004, at 133:19-20 (Exhibit 3); Manfred DeRewal, Jr., N.T., May 13, 2003 at 408:1-16 (Exhibit 15); Leuzarder N.T., November 29, 2004, at 49:2-8, 51:8 - 52:5 (Exhibit 2). AETC billed Ashland for the load at the Ashland contract price, received payment from Ashland, and then paid DeRewal the price agreed to between AETC and DeRewal. Leuzarder N.T., November 29, 2004, at 48:19-24. Exhibit 2; *e.g.*, ASHL00249 (Exhibit 8).

In or about January, 1977, AETC made a similar arrangement with Diaz to remove and dispose of a concentrated sulfuric and nitric acid waste stream that Diaz generated at its facility located in Holly, New York. Letter from AETC to Diaz dated 1/7/77 (Exhibit 16); Landmesser N.T., December 6, 2004, at 172:25 - 173:4, 183:1-23 (Exhibit 10). Once again, AETC charged Diaz a per-gallon charge to remove and dispose of the Diaz waste then, through a separate arrangement with DeRewal, paid DeRewal to do the work. Exhibit 16; Exhibit 6, DeRewal Invoice #1401 to AETC dated 3/31/77 (Exhibit 17); Landmesser N.T., December 6,

2004, at 161:13-20 (Exhibit 10). All of the contracting documents between AETC and Diaz follow the pattern of the Ashland contracting documents. *E.g.*, BSAI029142, 144 (Exhibit 18); Exhibit 17; BSAI1050935 (Exhibit 19).

AETC knew or should have known before beginning its business relationship with DeRewal that DeRewal was a polluter. Both Messrs. Leuzarder and Landmesser testified at their depositions that they were in close contact with state environmental regulators during the relevant time period. Leuzarder N.T., November 29, 2004, at 28:17 - 29:7, 30:24 - 31:10, 32:22 - 33:13 (Exhibit 2); Landmesser N.T., November 22, 2004, at 87:7-11, 142:14-24, 144:3-5 (Exhibit 1). By 1976 DeRewal had established a lengthy track record of pollution citations involving the Boarhead Farms site. *See, e.g.*, February 14, 1973 Waste Discharge Inspection Report (full barrels of waste and tanker trucks); March 5, 1973 Waste Discharge Inspection Report ("Pools of waste on ground surface"); March 21, 1973 clean-up agreement; January 8, 1974 Bucks County Memorandum (abatement order issued November 2, 1973 by Department of Environmental Resources) (collectively, Exhibit 20). AETC would have learned of these citations through a simple telephone call to the Pennsylvania authorities. Indeed, Mr. DeRewal himself informed Messrs. Leuzarder, Landmesser, and Curley that he had previously run afoul of environmental regulations and that the environmental regulators were not favorably disposed to him. Exhibit 11. A contemporaneous memo written by Mr. Curley of Ashland describes a visit he made to the Site "[a]t [Mr. Curley's] insistence" with Messrs. Leuzarder and Landmesser. *Id.* During this meeting at the Site, Mr. Curley asked Mr. DeRewal how the Department of Environmental Resources would view him and described Mr. DeRewal's response in the following way:

> …[Mr. DeRewal] honestly stated [the Department of
> Environmental Resources.] would down grade [sic] him. [Mr.

DeRewal] has been fined on several occasions for pollution. [Mr. DeRewal] apparently was in the headlines few [sic] years back for pollution.

*Id.*

The evidence, taken as a whole, shows that AETC knew or should have known that DeRewal was disposing of waste at the Site rather than the Wissinoming Facility. AETC failed to make any independent assessment of the viability of DeRewal's acid-neutralizing operation at the Wissinoming Facility prior to entering into an agreement with DeRewal for disposing of Ashland and Diaz waste. Instead, nearly two months after DeRewal started handling Ashland's waste, Mr. Leuzarder, who, of the two AETC principals, was the *least* qualified to assess DeRewal's operations, visited the Wissinoming Facility once with Mr. Curley. Memo to W.R. Starkey dated 8/23/76 (Exhibit 21); Exhibit 11; Exhibit 12; Curley N.T., December 9, 2004, at 128:24 - 129:4 (Exhibit 3); Leuzarder N.T., November 29, 2004, at 38:18 - 40:15 (Exhibit 2); Landmesser N.T., December 6, 2004, at 151:14 - 152:13, 173:18 - 174:10. (Exhibit 10). Mr. Curley, who was more qualified than Mr. Leuzarder to assess the operations at the Wissinoming Facility, was unimpressed with the operations. In addition to describing his impressions that AETC had neither seen the Wissinoming operation prior to representing to Ashland that DeRewal would take Ashland's waste to the Wissinoming Facility or knew very much about DeRewal and his methods, Mr. Curley described the Wissinoming operation as "not impressive" and "certainly not an ongoing chemical operation." Exhibits 21, 11, 12.

Aside from the obvious inadequacy of the Wissinoming operation for the disposal of Ashland and Diaz waste, there were clear indications that DeRewal was disposing of waste at the Boarhead Farms Site. At the September 20, 1976 meeting between Messrs. Landmesser, Leuzarder, Mr. DeRewal and Mr. Curley *at the Site*, Mr. DeRewal informed them that he intended to set up an acid neutralization operation at the Site. Exhibit 11. Acid wagons were

parked on the Site during this meeting and observed by the meeting participants. *Id.*; Leuzarder N.T., November 29, 2004, at 43:14 - 44:23 (Exhibit 2). Furthermore, AETC had been informed both of an acid spill at the Site, in connection with which Mr. DeRewal had been burned, and Mr. DeRewal's rumored disposal of acid waste at the Site. *Id.*; Landmesser N.T., December 6, 2004, at 154:18 - 156:4 (Exhibit 10). Finally, at his deposition, Manfred DeRewal, Sr. testified that he told AETC's two principals, while standing at the Boarhead Site, that Ashland's waste was going to be disposed of at the Boarhead Farm site. Manfred DeRewal, Sr. N.T., May 9, 2003 at 497:28-500:5, 532:9-534:8 (Exhibit 22). Mr. DeRewal also testified that at least one of the two AETC principals brought guns to shoot that day, and that Linda Cochran was present. *Id.* at 534:5-10. Ms. Cochran also testified that she was present at such a meeting. Linda Cochran N.T., May 15, 2003 at 74:2-76:15 (Exhibit 23).

A letter dated September 9, 1976 from Mr. Leuzarder to Mr. DeRewal indicates that AETC knew that DeRewal was not disposing of materials in the manner represented to the customer. Exhibit 24. In the course of confirming the terms of DeRewal's hauling and disposal of waste generated by another AETC customer, Roche-Belvidere, Mr. Leuzarder writes:

> Trucks must be clean and neat in appearance *Roche will be told materials is [sic] going to Gaess Landfill (can it - or at least part?)* and lime makeup.

*Id.* (emphasis added).

At his deposition, Mr. Leuzarder could not explain the meaning of the italicized portion of the above-cited parenthetical. Leuzarder N.T., December 6, 2004, at 206:1-15 (Exhibit 7). However, at the very least, the letter suggests that both AETC and DeRewal contemplated the possible destination for the Roche-Belvidere waste as somewhere other than where AETC had represented to Roche-Belvidere that its waste would be disposed.

AETC continued to provide removal and disposal services to Ashland and Diaz through the arrest of Mr. DeRewal and three of his employees by the Philadelphia Police Department on March 29, 1977 for dumping waste directly into the Delaware River.  March 29, 1977 Complaint (Exhibit 25); *e.g.*, BSAI029261, BSAI029263 (Exhibit 18); Ashland Disposal Logs post-dating March 29, 1977 (Exhibit 26); Curley N.T., December 9, 2004 at 136:4 - 11 (Exhibit 3).  AETC thereafter fulfilled its contractual obligations to Ashland and Diaz by hiring another disposal contractor to pick up and dispose of the wastes from Ashland and Diaz.  AETC Brief at 9; Exhibit 26; AETC 191-194, 196 (Exhibit 27).


## ARGUMENT

I.   *AETC IS A PERSON WHO ARRANGED WITH A TRANSPORTER FOR TRANSPORT FOR DISPOSAL OF HAZARDOUS SUBSTANCES OWNED OR POSSESSED BY AETC*

Section 113 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") provides that a person may seek contribution "from any other person who is liable or potentially liable under section 9607(a) of this title . . .."  42 U.S.C. § 9613(f)(1). Section 9607(a) provides, in relevant part, that persons who are liable include:  "[a]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . .."  42 U.S.C. § 9607(a)(3).  Thus, a person may be liable as an "arranger" either by directly arranging for the disposal or treatment of hazardous substances *or* by arranging with a transporter, which transporter then hauls those substances somewhere for disposal or treatment.

There is no dispute that AETC is a "person," or that AETC arranged with DeRewal for DeRewal to "transport for disposal or treatment" the wastes generated by Ashland and Diaz. Exhibit 17; Exhibit 4; Leuzarder N.T., November 29, 2004, at 47:20-22, 57:8-59:25, 62:13-63:24 (Exhibit 2); Landmesser N.T., December 6, 2004, at 160:24-161:20 (Exhibit 10). AETC also "owned or possessed" those wastes within the meaning of CERCLA.

A.    *A person "owns or possesses" a hazardous substance where that person has actual or constructive ownership or possession of such substance*

It is well-settled that the words "owned or possessed by such person" do not require that the arranger actually own or physically possess the hazardous substances, but include *constructive* ownership or possession of those substances. *See, e.g., American Cyanamid Company v. Capuano*, 381 F.3d 6 (1st Cir. 2004); *General Electric Company v. AAMCO Transmission, Inc.*, 962 F.2d 281 (2nd Cir. 1992); *GenCorp, Inc. v. Olin Corporation*, 390 F.3d 433 (6th Cir. 2005); *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726 (8th Cir. 1987).

The discussion in *GenCorp, Inc.* is particularly instructive. The United States Court of Appeals for the Sixth Circuit noted that CERCLA was enacted "against a statutory and common-law back drop that had long dignified constructive ownership as a legitimate means by which to establish criminal and other forms of liability for individuals and entities that did not have title to or physically possess certain items." 390 F.3d at 448. In particular, the court relied upon *United States v. Crippen*, 459 F.2d 1387 (3rd Cir. 1972), in which that court held that the requirement in a criminal statute that the defendant knowingly or intentionally "possessed" a

"controlled substance" was satisfied by "constructive possession."[3]  The Sixth Circuit next noted the rule that a court must infer, unless the statute dictates otherwise, that Congress meant to incorporate the common law meaning of terms used in the statute.  390 F.3d at 448 (*quoting Cmty. for Creative Non-Violence v. Reed*, 490 U.S. 730, 739 (1989)).  Finally, the Sixth Circuit cited several opinions in which other courts had accepted something less than legal title or physical possession in imposing "arranger" liability.  390 F.3d at 438-49.  The Sixth Circuit held that GenCorp had sufficient control over the hazardous wastes at issue to establish constructive ownership and possession where GenCorp had agreed with another corporation to build a manufacturing plant that would convert one substance into another, and where the generation of toxic waste was a natural bi-product of this manufacturing process.  390 F.3d at 449.

The decision of the United States Court of Appeals for the First Circuit in *Capuano* is also helpful.  In *Capuano*, the Capuanos were in the business of hauling hazardous waste.  31 F.3d at 9-10.  They reached an agreement with Picillo to dump hazardous waste at his pig farm.  *Id.* at 10.  In addition to transporting waste to the site for disposal themselves, the Capuanos also arranged for waste to be picked up by other transporters from various waste generators and dumped on the pig farm, for which they received a fee from the transporters.  *Id.* at 25.  Like AETC in the present case, the Capuanos argued that they could not be held liable as "arrangers" because they only "brokered" the disposal of hazardous material and never owned or

---

[3]  The statute provided:  "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally --

> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . .."

21 U.S.C. §841(a).  The *Crippen* court held that "constructive possession may be found if the constructive possessor had the power to exercise dominion or control over the controlled substance."  459 F.2d 1387 at 1388, n.2.

possessed it themselves. *Id.* at 24-26. The court held that constructive possession was within the definition of "owned or possessed" and that when a broker arranges for the disposal of hazardous waste and exercises control over the waste, such control can amount to constructive possession of the waste. *Id.* The court reasoned: "Were we to interpret CERCLA not to impose liability on a party that constructively possessed hazardous waste and arranged for its illegal disposal, then the statute would be subject to a loophole through which brokers and middlemen could escape liability by arranging to have hazardous waste picked up and deposited at an illegal site." *Id.* at 25.

By way of further example, the court in *Transportation Leasing Company v. State of California*, 861 F. Supp. 931 (C.D. Ca. 1993) held that ownership or possession under Section 107(a)(3) can be either actual or constructive. 861 F. Supp. at 949. It found that municipalities constructively owned or possessed the wastes generated by the residents and businesses within their boundaries, despite the fact that outside waste haulers actually hauled and disposed of those wastes, because the municipalities had the legal duty to do so. *Id.* at 955. The court noted that if defendants themselves had provided the service they would have physically and actually "owned or possessed" the waste, and ruled: "CERCLA does not permit defendants to avoid liability by simply hiring an outside contractor to perform collection services instead of the city fulfilling that duty itself. Despite contracting with private disposal companies to perform this function, defendant cities still constructively owned or possessed the waste those companies collected." *Id.*

*United States v. Bliss,* 667 F. Supp. 1298 (E.D. Mo. 1987), involved facts virtually identical to the facts here. Nepacco, the generator of the waste, arranged with IPC for disposal of that waste. 667 F. Supp. at 1303. IPC then arranged for Bliss (a waste hauler) to

pick-up the waste from Nepacco and dispose of it. *Id.* Bliss charged IPC for the waste disposal services and IPC billed Nepacco, charging a larger amount for disposal then Bliss charged IPC. *Id.* The court ruled that a party need not have actual ownership or possession of waste to fall within the scope of Section 107(a)(3), and that IPC had constructive possession of Nepacco's waste because it "had authority [under its contract with Nepacco] to control the place and manner of disposal; for example, IPC could have chosen Bliss or any other party to dispose of the waste." *Id.* at 1307. *See also AAMCO*, 962 F.2d at 286 ("Congress employed traditional notions of duty and obligation in deciding which entities would be liable under CERCLA as arrangers for the disposal of hazardous substances. Accordingly, this court concludes that it is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances, that makes an entity an arranger under CERCLA's liability provision") (emphasis in original); *Northeastern Pharmaceutical*, 810 F.2d at 743 ("It is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme. . . . We believe requiring proof of personal ownership or actual physical possession of hazardous substances as a precondition for liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA").

  B.   *AETC had actual and constructive ownership and possession of the wastes generated by Ashland and Diaz*

Against this legal backdrop, there can be no question that AETC actually and constructively owned and possessed the wastes generated by Ashland and Diaz at the time it arranged for DeRewal to dispose of those wastes. AETC's ownership and possession are clear

from the very nature of the legal relationships between AETC and its customers, and are reflected in the transactional documents exchanged between those parties.

There is no dispute that AETC entered into agreements with Ashland and Diaz wherein AETC agreed to remove and dispose of the wastes generated by those companies for a fee. *See* discussion and record citations at 3-7 above; AETC Brief at 1,13 (companies were AETC's "customers"). Legally, AETC had the obligation under those contracts to haul away those wastes and dispose of them and the right to be paid for that work. It is also undisputed that neither Ashland nor Diaz had any contractual relationship whatsoever with DeRewal or any DeRewal entity. Curley N.T., December 9, 2004, at 120:7-13 (Exhibit 3); Landmesser N.T. December 6, 2004, at 147:25 - 148:2 (Exhibit 10).[4] Had AETC failed to meet its contractual obligations to Ashland or Diaz, there is no question that Ashland's and Diaz's only remedy for breach of contract would have been to sue AETC, whether the breach was caused by something AETC or DeRewal did or did not do. Similarly, if DeRewal had failed to perform its obligations to AETC or if AETC had failed to pay DeRewal, those parties would have looked solely to each other for breach of contract claims.

In practice, Ashland called AETC and requested removal of a load of waste. AETC Brief at 8. AETC called DeRewal, who sent a driver to Ashland to pick up the waste. *Id.* Ashland presented to the DeRewal driver a bill of lading identifying Ashland as the shipper of the waste and AETC as the consignee and carrier. The DeRewal driver signed the bill of lading on the line "Per Advanced Envirotech Co." and hauled the waste away. AETC billed Ashland

---

[4]    AETC entered into separate agreements with DeRewal, through which agreements DeRewal agreed to pick up the wastes from Ashland and Diaz and dispose of them in return for a fee paid by AETC. Leuzarder N.T. December 6, 2004 at 161:13-23 (Exhibit 7); AETC 130, 132 (Exhibit 8).

for the load and was paid by Ashland. DeRewal billed AETC for the load and was paid by AETC. See discussions and citations at 3-7 above.

The written contract between AETC and Ashland reflects these realities. It provides: "[AETC] shall ... furnish and pay for all material, labor, power, equipment, transportation and all other items necessary to remove and properly dispose of certain chemical waste materials generated by the Plant ...." Exhibit 9 at ¶ 1. Paragraph 12 states: "Ashland shall, for a minimum period of six months from the date hereof, utilize the services of AETC exclusively for the disposal of any of its wastes containing sulfuric or nitric acids ...." It further provides: "Ashland agrees that all materials removed will become the property of [AETC]. Title to the material removed and risk of loss will pass to [AETC] upon completion of loading of the materials . . .." *Id.* at ¶ 4.

The fact that no signed copy of this writing exists today is immaterial. It is black letter law that a contract was formed between Ashland and AETC for the disposal by AETC of the Ashland waste whether or not the agreement was reduced to a writing. In the absence of a writing, it is for the court to determine the terms of that oral contract by divining the intent of the parties. Even though Ashland and AETC have different recollections as to who drafted this document, the writing unquestionably reflects the understanding of at least *one* of them as to the terms of the contract.[5] Moreover, the document accurately reflects the fundamental nature of the transaction -- a promise by AETC to remove and dispose of Ashland's *wastes*. Since Ashland

---

[5]    The contract reflects a true negotiation between Ashland and AETC over the terms of the agreement. For example, there would be no benefit to Ashland to agree to exclusive use of AETC for disposal of its wastes "regardless of Ashland's ability subsequent to the date of signing to obtain a better price quotation than set forth in Schedule A." Exhibit 9 at ¶ 12. Mr. Curley testified that he thought that AETC and Ashland had executed a written agreement. Curley N.T., December 9, 2004, at 116:3-8 (Exhibit 3).

was *paying* AETC to get rid of materials it never wanted to see again it would be nonsensical for Ashland to retain ownership of those wastes  As between Ashland and AETC, the only parties to the contract, only AETC would have had possession and ownership of the wastes after the wastes left Ashland's facility.[6]

The documents relating to the AETC and Diaz relationship likewise confirm that AETC owned and possessed the wastes that Diaz generated as part of that contract.  The January 7, 1977 contract (drafted by AETC) extending "our services" for an additional year makes Diaz contractually obligated to pay AETC for the total removal and disposal fee.  Exhibit 16.  Indeed, AETC "requests 3,000 gallon truckloads" and retains the "discretion" to charge for additional loading time.[7]  The April 14, 1977 letter from Diaz to AETC further confirms that Diaz considered AETC "Diaz Chemical's primary source for disposal of our waste nitration acid." Exhibit 5.  Finally, AETC's March 7, 1977 invoice to Diaz Chemical for work done under the contract specifically identifies that the five loads of waste acid for which billing is made were "shipped via our truck."  Exhibit 6.

All of the other transactional documents confirm AETC's actual ownership or possession of the Ashland and Diaz wastes.  Virtually all of the Ashland bills of lading (the

---

[6]     The written agreement is also consistent with the August 3, 1976 offer letter from AETC to Ashland.  That letter simply and clearly sets forth the proposed terms of the contract between Ashland and AETC with specific prices to be paid by Ashland to AETC for multiple waste streams to be "handled by 'Enviro-Tech.'"  Exhibit 4.  It states further: "We are prepared to begin servicing Ashland upon notice to proceed."  AETC also provided Ashland with a Certificate of Insurance showing AETC's (and not DeRewal's) insurance policies providing coverage for AETC's obligations and liability under the contract.  Exhibit 28.

[7]     Interestingly, this contract, on AETC letterhead, identifies Milltown, New Jersey as the place for AETC's "trucking operations" and identifies, presumably, AETC's P.U.C. hauler and D.E.P. license numbers.

documents that accompanied each individual pickup of wastes) identify AETC as the "consignee" or state "consigned to" AETC. AETC Brief at 8; *e.g.*, ASHL0005 (Exhibit 14). DeRewal's name does not appear anywhere on these documents. *Id.* A "consignee" is: "One to whom a consignment is made. Person named in bill of lading to whom or to whose order the bill promises delivery." *BLACK'S LAW DICTIONARY* 278 (5th ed. 1979)(*quoting* in part U.C.C. § 7-102(b)). "Consign" means: "To deliver goods to a carrier to be transmitted to a designated factor or agent. To deliver or transfer as a charge or trust. To commit, intrust, give in trust. To transfer from oneself to the care of another . . . To deposit with another to be sold, disposed of, or called for, whereby title does not pass until there is action of consignee indicating sale." *Id.* Many of these bills of lading also specifically identify AETC as the "carrier," and define "carrier" as "any person or corporation in possession of the property under the contract."[8] These contracting documents, exchanged between AETC and Ashland and Diaz respectively, prove AETC's actual ownership and possession of the Ashland and Diaz wastes.

AETC stridently attempts to characterize its relationship with Ashland and Diaz as a mere "broker" by simply saying "broker" over and over again.[9] A "broker" is "An agent employed to make bargains and contracts for a compensation." *BLACK'S LAW DICTIONARY* 174

---

[8]    Each of the bills of lading prepared by Ashland bears a signature line pre-printed "Ashland Chemical Company, Shipper" and a signature line "Per Advanced Envirotech Co.," where AETC was to acknowledge having picked up that load of waste. *See, e.g.,* ASHL0005 (Exhibit 14). The DeRewal driver signed on behalf of AETC. AETC, as a corporation, "is an artificial being, invisible, intangible and existing only in contemplation of law." *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 536 (1819). As such, AETC lacked "the ability to function except through actions of its officers, directors, agents and servants." *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 761 (1989). DeRewal's performance of the work and execution of the bills of lading was directed by AETC and was on its behalf.

[9]    Though there is a dispute about how the AETC agreements should be characterized, there is no dispute about the agreements themselves.

(5th ed. 1979). AETC did not facilitate a "bargain or contract" between DeRewal and Ashland or DeRewal and Diaz -- there were no such contracts. Had it done so, and had it been compensated on a commission or other basis for facilitating such contracts, AETC would be a "broker." Furthermore, characterizing itself as a "broker" does not automatically insulate AETC from liability as an arranger under CERCLA. *See Capuano*, 31 F.3d at 24-26. In reality, AETC is a waste disposal company that contracted directly with waste generators and who then unilaterally chose to hire someone else to fulfill certain of the requirements of those contracts.

AETC's "broker" spin is placed in proper prospective by reference to its September 28, 1976 letter to Ashland. Exhibit 29. That letter states: "*Our* current processing of [Ashland's] material is primarily through controlled dilution and neutralization with lime. . . . *We* will install distillation equipment upon receipt of a mutually satisfactory contractual commitment from Ashland," and that "Safeguards must be built into a contract *to protect A.E.T.C.* and Environmental Chemical Control's investment." *Id.* (emphasis added). AETC proposes that "*A.E.T.C.* and E.C.C. expect to begin operating the distillation equipment in 4 to 8 weeks from contract date. *We* can handle 8000 to 9000 gallons per day." *Id.* (emphasis added). Viewed most favorably to AETC, this letter proves that AETC and DeRewal were to be joint venturers in this new method of disposing of Ashland's wastes. It is simply impossible to read this document and conclude that AETC is a mere "broker." Finally, the expressed opinions of Messrs. Resi, Michelman, and Healy, AETC Brief at 6-7, are irrelevant and inadmissible. *See e.g.*, Fed. R. Evid. 407, 601, 602, 701.

AETC attempts to distance itself from its own contracting documents by arguing that the wastes were not actually consigned to it because it never physically picked up those wastes. AETC Brief at 15-16. Whatever AETC says now, the documents legally put the wastes

into AETC's custody. How AETC unilaterally chose to exercise that contractual custody is irrelevant. Indeed, the Diaz bills of lading list AETC as the entity the wastes were legally "consigned to" even though Environmental Chemical Control is shown as the "Delivery Carrier." Exhibit 18. AETC and Diaz each clearly understood then that AETC was the consignee of the Diaz wastes even though AETC had hired DeRewal to pick up those wastes. AETC is listed as both the entity to which the waste was "consigned" and as the waste "carrier" on the Ashland bills of lading.[10] Exhibit 14.

AETC thus actually owned and possessed the Ashland and Diaz wastes. Moreover, under the well-settled case law discussed above, including the virtually identical facts in *Bliss*, there can be no doubt that AETC also had constructive ownership or possession of the wastes. AETC contracted with Ashland and Diaz to remove and dispose of the Ashland and Diaz wastes. How AETC chose to fulfill its contractual obligations to Ashland and Diaz was entirely AETC's decision. Curley N.T., December 9, 2004 at 114:21-115:11 (Exhibit 3);

---

[10]    AETC selectively quotes from Plaintiffs' interrogatory answers to try and narrow Plaintiffs' allegations. AETC Brief at 4, 9, etc. The relevant portion of those answers are: "Together the above-referenced documents and testimony establish that AETC entered into separate contracts with Ashland and Diaz for the removal and disposal of wastes from those companies, and that, pursuant to those contracts, Ashland and Diaz consigned their wastes to AETC for removal and disposal. AETC separately contracted with DeRewal Chemical Company ("DCC") for DCC to haul and dispose of the Ashland and Diaz wastes. As evidenced by the above-referenced documents, including, but not limited to, the shipping documents and invoices from AETC to Ashland and Diaz, and from DCC to AETC, there were no contractual relationships between DCC and Ashland or DCC and Diaz." Response to Interrogatory No. 1. Plaintiff also stated: "Plaintiff does not allege that *trucks owned by* AETC conveyed materials and/or hazardous substances to the site, but rather that AETC arranged for DCC to haul hazardous wastes from facilities owned by Ashland and Diaz, and entered into separate contractual relationships with DCC and Ashland and Diaz, respectively, for that purpose." Response to Interrogatory No. 5 (emphasis added).

Landmesser N.T., December 6, 2004 at 147:25 - 148-2 (Exhibit 10); Exhibit 9 at ¶ 5; Exhibit 16 (no mention of how the wastes are to be hauled or disposed of). By way of example only, AETC could have fulfilled its contractual obligations by buying or renting a truck and having one or more of its officers or employees drive the truck to the generator facility, pick up the waste, and take it somewhere for disposal. AETC could alternatively have purchased or leased a truck and hired an "independent contractor" to drive the truck and take it to a disposal location. Instead, AETC chose to separately contract with DeRewal for DeRewal to use DeRewal's own equipment and employees to pick up the waste and dispose of it wherever DeRewal chose to dispose of it. AETC thus had the legal "power to exercise domain or control" over the wastes, the legal authority to do so, and the legal obligation to do. *Crippen*, 459 F.2d at 1388, n.2. As succinctly stated by the United States District Court for the Central District of California: "CERCLA does not permit defendants to avoid liability by simply hiring an outside contractor to perform collection service instead of the city fulfilling that duty itself." 861 F. Supp. at 955.

There is no doubt that AETC actually and constructively owned or possessed the wastes generated by Ashland and Diaz and that AETC arranged with DeRewal "for transport for disposal" of those wastes. AETC is therefore a person liable under CERCLA Section 107(a)(3) as a "person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport or disposal or treatment, of hazardous substances owned or possessed by such person. 42 U.S.C. § 9607(a)(3).[11]

---

[11] There is additionally a genuine dispute of material fact with respect to AETC's fundamental premise that AETC itself did not have *physical* possession of the wastes generated by Ashland or Diaz. A bill of lading reflecting a pick-up of drummed wastes from Ashland during the period of time when DeRewal was picking up from Ashland is signed by "Robert W. Landmesser" one of AETC's principals. *See, e.g.*, ASHL00056 (Exhibit 14).

C.    *Morton is distinguishable, but AETC would be liable even if Morton did apply*

    1.    <u>*Morton* is distinguishable because it dealt with completely different facts and with statutory language inapplicable here</u>

*Morton International, Inc. v. A.E. Staley Manufacturing Company*, 344 F.3d 669 (3rd Cir. 2003), is distinguishable because *Morton* does not apply to an arrangement the principal purpose of which is for the disposal of hazardous substances and because AETC is not a person who "arranged for disposal" but a person who "arranged with a transporter for transport for disposal." *Morton* explored the frontiers of CERCLA Section 107(a)(3) liability, namely, arrangements that are *not* on their face for the treatment or disposal of hazardous substances. In *Morton*, a series of companies owned a mercury processing plant from approximately 1929 to approximately 1974, with Morton being a statutory successor to the last plant owner and operator. 343 F.3d at 673. Morton sought contribution under CERCLA from Tenneco and other entities for the costs of remediating contamination at the facility based in part upon the allegation that Tenneco entered into "conversion" or "toll" agreements, whereby the facility processed Tenneco's prime virgin mercury into red and yellow oxides of mercury. *Id.* at 680. The stated purpose of each of Tenneco's transactions was thus for the conversion of mercury, and not for the disposal of mercury, mercury wastes, or other hazardous substances. Morton nevertheless argued that Tenneco was a person who "by contract, agreement, or otherwise arranged for disposal or treatment" of a hazardous substance (the waste from the mercury conversion process) because Tenneco knew that the process inevitably resulted in the release of a hazardous waste. Morton argued that such a contract implicitly contemplated Tenneco's arrangement for disposal of a hazardous substance. *Id.*

The Third Circuit explored the extent to which contacts that are not explicitly for disposal nevertheless create liability under Section 107(a)(3) by focusing on the words "or otherwise" after "by contract [or] agreement," reasoning that "or otherwise" indicated Congress's intent to broaden the scope of "arranger" liability. *Id.* at 676. The court determined that a central aspect of this inquiry was to "look beyond the defendant's characterization of the transaction at issue in order to determine whether the transaction, in fact, involves an arrangement for the disposal or treatment of a hazardous substance." *Id.* at 677. It concluded that the "most important factors in determining 'arranger liability' are: (1) ownership or possession; and (2) knowledge or control." *Id.* at 678. The court reasoned that, where a person had such knowledge or control, the person is liable under Section 107(a)(3) because the person is "sufficiently responsible for hazardous waste contamination so that it can fairly be forced to contribute to the costs of cleanup." *Id.* at 578.

There is no need for such an inquiry where, as here, the transaction in question is explicitly and undisputedly an arrangement for the disposal or treatment of a hazardous substance. Where a person intentionally arranges for another to dispose or treat a hazardous substance there is no "process" of which the arranger need have "knowledge" or over which the arranger need have "control" to determine whether the arranger intended to arrange for disposal. He self-evidently did so intend.

There is no dispute that the arrangements at issue in this matter are such arrangements. Specifically, Ashland and Diaz each arranged with AETC for AETC to haul away and dispose of their wastes. AETC's agreements with DeRewal were expressly for DeRewal to do precisely that -- haul away and dispose of wastes generated by Ashland and Diaz. The

*Morton* court's discussion of how to determine whether an arrangement is "in fact" for the disposal or treatment of a hazardous substance is thus unnecessary here.[12]

      *Morton* is also inapposite because the question in *Morton* was whether Tenneco became a person who "arranged for the disposal or treatment of hazardous substances" by contracting with Morton for Morton to convert Tenneco's mercury. The *Morton* court thus had no reason to consider what facts are necessary to prove that a person "arranged with a transporter for transport for disposal." Here, AETC "arranged with a transporter for transport for disposal" of hazardous substances by hiring DeRewal to transport for disposal the wastes generated by Ashland and Diaz. It is readily apparent that the *Morton* focus on "knowledge" or "control" over a manufacturing "process" is completely irrelevant to situations in which a person hires a transporter to haul away and dispose of waste. Indeed, the statute only requires that the person arrange with a transporter for transporter disposal, it does not contain any requirement that the arranger have any knowledge or control over the actual transport or disposal of those wastes.[13] Nor could it do so, given that the whole purpose of arranging with a transporter is so the "arranger" *has no control* over the transport or disposal.

---

[12]    AETC's citation to *BP Amoco Chemical Co. v. Sun Oil*, 316 F. Supp. 1661 (D. Del 2004), is similarly misplaced. The *BP* court looked to *Morton* in a parent-subsidiary fact situation having nothing to do with a party itself directly and explicitly arranging for the disposal of hazardous wastes.

[13]    The *Morton* court also had no occasion to determine whether "owned or possessed by such person" in Section 107(a)(3) could be established by "constructive" ownership or possession. The only dispute between Morton and Tenneco was whether Tenneco legally owned the mercury while it was physically in the possession of Morton. 344 F.3d at 680-81. Morton did not argue, and the court did not consider, whether Tenneco "constructively" owned the mercury. Statements by the *Morton* court such as "the ownership or possession factor can be satisfied by proof that Tenneco owned or possessed the amount of PDM that it paid to have processed" do not reach the question of what types of "proof" are required. *Id.* at 681.

2.    <u>AETC is liable even under the *Morton* analysis</u>

The overriding focus of the *Morton* opinion is on whether the arrangement "in fact" involves the arrangement for disposal of hazardous substances, such that the arranger is "sufficiently responsible for hazardous waste contamination so that it can fairly be forced to contribute to the costs of cleanup." 344 F.3d at 678. AETC's contracts with Ashland and Diaz and its contract with DeRewal together are "in fact" such arrangements under *Morton*.

*Morton's* two-prong analysis: (1) whether the defendant owned or possessed the hazardous substance; and (2) whether the defendant also either had knowledge that the processing of the material could or would result in the release of hazardous waste, or that the defendant had control over the production process, was focused on whether an agreement for the conversion of mercury nevertheless also constituted an arrangement for treatment or disposal of the waste produced by the conversion process. *Id.* at 678. The court reasoned that "proof of a defendant's knowledge that hazardous waste can or will be released in the course of the process it has arranged for, provides a good reason to hold a defendant responsible because such proof demonstrates that the defendant knowingly (if not personally) contributed to the hazardous-waste contamination." *Id.* The court found that the "knowledge" factor could be satisfied by proof of either actual knowledge or "presumed knowledge." *Id.* The court also determined that "proof that the defendant had control over the process could establish that the defendant was responsible for the resulting release of hazardous wastes," stating that "proof of control could also create an inference that the defendant had knowledge that the process resulted in the release of hazardous wastes." *Id.* at 679.

It is most important to read the "knowledge" or "control" prong in the context of the arrangement at issue in *Morton* -- a contract not explicitly for the disposal of waste. The "knowledge" spoken of by the *Morton* court is "knowledge that hazardous waste can or will be

released in the course of the process [the defendant] has arranged for." *Id.* at 678.  Indeed, "general knowledge that waste disposal is an inherent or inevitable part of the process arranged for by the defendant may suffice to establish liability." *Id.*  Similarly, Morton's "control" element means only that a defendant have "control over the process" so that there is at least an inference that the defendant had "knowledge that the process resulted in the release of hazardous wastes." *Id.* at 679.  Indeed, the court concluded:  "Accordingly, we see these two factors as somewhat interrelated." *Id.*

AETC here admittedly had "knowledge" that DeRewal would dispose of the wastes generated by Ashland and Diaz -- that was the whole purpose of the contract.  AETC's suggestion that it did not have the *Morton*-required "knowledge" because it thought DeRewal was going to dump hazardous waste down the sewer at the Wissinoming Industrial Park, and not onto the ground at the Boarhead Farm, simply misreads the *Morton* opinion.  AETC Brief at 18-19.[14]  The "process" that resulted in a release of hazardous waste was AETC's hiring of DeRewal to dispose of the waste somewhere.  Note that the knowledge specified by the *Morton*

---

[14]    Contrary to Messrs. Leuzarder and Landmesser's statements, there is substantial evidence that they knew DeRewal was dumping Ashland and other wastes at the Boarhead site. *See* discussion and citations at 3-8.  Mr. Leuzarder himself admits that AETC did not actually specify that the Wissinoming facility was to be used for the disposal of AETC's customers waste, but that it was just "implied."  Leuzarder N.T., November 29, 2004 at 73:13-17 (Exhibit 3).  Note as well that Mr. Leuzarder dodges the next question:  "Did AETC ever ask DeRewal Chemical where it was disposing of waste?  A.  Again, it is implied by the fact that that was his only facility." *Id.*  This Court will determine the credibility of Mr. Leuzarder and Mr. Landmesser at trial.  Mr. Leuzarder's September 9, 1976 letter to Mr. DeRewal is particularly enlightening in this regard.  Discussing a proposal AETC was about to make to Roche, a generator of hazardous waste, Mr. Leuzarder states:  "Roche will be told materials is [sic] going to Grows [sic] landfill (can it ?) and lime make-up" [sic].  Exhibit 24.  It is quite clear that AETC was perfectly willing to represent to customers the disposal location for those wastes whether or not those representations had any basis in fact.

court is that "*a* release will occur" not that any *specific* release will occur. 343 F.3d at 677 (emphasis added).[15] Dumping hazardous wastes into the city sewer is a release into the environment, because those wastes ultimately would be discharged from the city treatment plant into some body of water. Thus, even assuming that some of the Ashland or Diaz waste was disposed at Wissinoming, DeRewal's operation there could not possibly have been legal.

AETC also had actual control over the disposition of the Ashland and Diaz wastes, at least up until the time it exercised that control by delegating the job to DeRewal. As set forth above, it was AETC's obligation under its agreements with Ashland and Diaz to remove and dispose of those companies' wastes. AETC, and AETC alone, had the right and obligation to determine how and in what exact fashion its obligation to remove the wastes was satisfied. Neither Ashland nor Diaz had any say over such decisions. *See, e.g.*, Curley N.T., December 9, 2004 at 114:21-115:11 (Exhibit 3); Landmesser N.T. December 6, 2004, at 147:25-148-2 (Exhibit 10); Exhibit 9; Exhibit 16. AETC's argument that it did not "control" the actual disposal process because it left that decision up to DeRewal completely and intentionally misunderstands the point of *Morton*.

AETC's underlying suggestions that it is not liable because its "suits" did not drive hazardous waste trucks, but "only" instructed and paid others to do so, is wholly

---

[15]    It is well settled that a person who expressly arranges for the disposal of waste by someone else is liable for the cost of cleanup of the facility where that waste was ultimately disposed even though it had no knowledge of that particular facility, even if the person thought the wastes were supposed to be dumped somewhere else. *See, e.g., U.S. v. Aceto Agr. Chemicals Corp.*, 872 F.2d 1373, 1381 (8th Cir. 1989); *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2nd Cir. 1992); *New Jersey Turnpike Authority v. PPG Industries, Inc.*, 197 F.3d 96, 104 (3d Cir. 1999). Nothing in *Morton* suggests otherwise.

inconsistent with the fundamental purpose of CERCLA. "Were we to interpret CERCLA not to impose liability on a party that constructively possessed hazardous waste and arranged for its illegal disposal, then the statute would be subject to a loophole through which brokers and middlemen could escape liability by arranging to have hazardous waste picked up and deposited at an illegal site." *Capuano*, 31 F.3d at 25.

Thus, even if AETC did not know, or have reason to know, that DeRewal was dumping waste at the Boarhead Farms Site, AETC is liable under CERCLA Section 107(a)(3) because it had knowledge that DeRewal was going to dispose of the waste generated by Ashland and Diaz and because AETC controlled who would in fact haul away and dispose of those wastes. Thus, even under the *Morton* analysis, AETC is "sufficiently responsible for hazardous-waste contamination so that it can fairly be forced to contribute to the cost of clean-up" of the Boarhead site. *Id.* at 678.


II.    *AETC'S REQUEST FOR SUMMARY JUDGMENT REGARDING PLAINTIFFS'
       DECLARATORY JUDGMENT COUNT IS MOOT.*

AETC's motion for summary judgment on the Third Count of the Fourth Amended Complaint should be denied because the sole basis for the motion is AETC's first argument that it is entitled to summary judgment because it is not an "arranger." Because plaintiffs are entitled to judgment as a matter of law that AETC is a person liable under CERCLA Section 107(a)(3), this argument is moot.


III.   *AETC IS LIABLE UNDER HSCA AS A PERSON WHO OWNED OR POSSESSED
       HAZARDOUS SUBSTANCES AND ARRANGED FOR THE TRANSPORT FOR
       DISPOSAL OF THOSE SUBSTANCES*

Count IV of the Fourth Amended Complaint states a claim under the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"). HSCA provides, in relevant part, that a person shall be responsible for a release of a hazardous substance when: "The person generates, owns or possesses a hazardous substance and arranges by contract, agreement or otherwise for the disposal, treatment or transport for disposal or treatment of the hazardous substance." 35 P.S. § 6020.701(a)(2). As demonstrated above in great detail, AETC is such a person.

Plaintiffs are aware of no opinion discussing the meaning of the words "owns or possesses" as used in HSCA. As AETC itself suggests, however, it would be most appropriate for this Court to look to decisions under CERCLA for guidance. Every single CERCLA opinion to consider the question whether "owned or possessed by such person" includes *constructive* ownership or possession, of which Plaintiffs are aware, has agreed that constructive ownership or possession is included in that phrase. *See, e.g., American Cyanamid Company v. Capuano*, 381 F.3d 6th (1st Cir. 2004); *General Electric Company v. AAMCO Transmission, Inc.*, 962 F.2d 281 (2nd Cir. 1992); *GenCorp, Inc. v. Olin Corporation*, 390 F.3d 433 (6th Cir. 2005); *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726 (8th Cir. 1987). There is no reason to think that "owns or possesses" does not also include the concept of constructive ownership or possession.[16]

For all of the reasons discussed in Section I above, there is no genuine dispute of material fact that AETC legally and constructively owned and possessed the wastes generated by Ashland and Diaz at the time it arranged with DeRewal "for the disposal, treatment or transport for disposal or treatment" of those wastes. Plaintiffs are therefore entitled to a partial summary

---

[16] *Morton*, of course, did not address liability under HSCA. This Court is not bound by *Morton* when considering the relevant HSCA provisions.

Count IV of the Fourth Amended Complaint states a claim under the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"). HSCA provides, in relevant part, that a person shall be responsible for a release of a hazardous substance when: "The person generates, owns or possesses a hazardous substance and arranges by contract, agreement or otherwise for the disposal, treatment or transport for disposal or treatment of the hazardous substance." 35 P.S. § 6020.701(a)(2). As demonstrated above in great detail, AETC is such a person.

Plaintiffs are aware of no opinion discussing the meaning of the words "owns or possesses" as used in HSCA. As AETC itself suggests, however, it would be most appropriate for this Court to look to decisions under CERCLA for guidance. Every single CERCLA opinion to consider the question whether "owned or possessed by such person" includes *constructive* ownership or possession, of which Plaintiffs are aware, has agreed that constructive ownership or possession is included in that phrase. *See, e.g., American Cyanamid Company v. Capuano*, 381 F.3d 6th (1st Cir. 2004); *General Electric Company v. AAMCO Transmission, Inc.,* 962 F.2d 281 (2nd Cir. 1992); *GenCorp, Inc. v. Olin Corporation,* 390 F.3d 433 (6th Cir. 2005); *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.,* 810 F.2d 726 (8th Cir. 1987). There is no reason to think that "owns or possesses" does not also include the concept of constructive ownership or possession.[16]

For all of the reasons discussed in Section I above, there is no genuine dispute of material fact that AETC legally and constructively owned and possessed the wastes generated by Ashland and Diaz at the time it arranged with DeRewal "for the disposal, treatment or transport for disposal or treatment" of those wastes. Plaintiffs are therefore entitled to a partial summary

---

[16]   *Morton,* of course, did not address liability under HSCA. This Court is not bound by *Morton* when considering the relevant HSCA provisions.

judgment declaring that AETC is liable under 35 P.S. § 6020.701(a)(2), and AETC's motion for summary judgment as to Count IV of the Fourth Amended Complaint should be denied.

## CONCLUSION

For all the foregoing reasons, and in the interest of justice, Plaintiffs respectfully request that a partial summary judgment declaring that AETC is a person liable under both Section 107(9)(3) of CERCLA and Section 701(a)(2) of HSCA be entered, and that AETC's motion for summary judgment be denied.

Respectfully Submitted,

BALLARD SPAHR ANDREWS & INGERSOLL LLP

By: _____
    Glenn A. Harris, Esquire
    Monique M. Mooney, Esquire

Attorneys for Plaintiffs, Agere Systems, Inc., Cytec Industries, Inc., Ford Motor Company, SPS Technologies, LLC and TI Group Automotive Systems, LLC