Boarhead Farms Superfund Site
011938.075765

PRP Group
Organization Agreement

PHKS 071644

M 20

PHKS 071645

BOARHEAD FARM SITE PRP GROUP ORGANIZATION AGREEMENT

This Agreement is made as of this ___ day of _____, _____ between and among the parties (hereinafter the "Members") whose authorized representatives have executed this Agreement:

WHEREAS, without admitting any fact, responsibility, fault or liability in connection with the Boarhead Farm Superfund Site in Upper Black Eddy, Bridgeton Township, Bucks County, Pennsylvania (the "Site"), the Members hereto will (1) respond efficiently to any claim that may be asserted by the United States, the Commonwealth of Pennsylvania, or others in connection with the Site; (2) attempt to allocate among themselves common legal, technical administrative and other costs incurred in connection with this matter, and (3) cooperate among themselves in this effort;

NOW THEREFORE, in consideration of the foregoing, the Members mutually agree as follows:

1.    **Boarhead Farm PRP Group.** The Members hereby organize and constitute themselves as the Boarhead Farm Site PRP Group (hereinafter "Group"). Each Party whose authorized representative has executed this Agreement is a Member of the Group.

2.    **Purpose.**

2.1   **Activities.** It is the purpose of this Agreement that the terms shall control the manner and means by which the Members will:

(a)   organize and conduct a common response to any claims that may be asserted by the United States, the Commonwealth of Pennsylvania, or others relating to the Site, including but not limited to the Group's performance of any removal or response action or the organizing and conducting of a common defense to any claim;

(b)   organize and conduct negotiations with the United States Environmental Protection Agency ("USEPA") and other persons concerning Group settlement of all or a portion of said claims;

(c)   retain common counsel, liaison counsel, and technical consultants, if the Members so elect;

(d)   raise and spend all reasonably necessary funds to implement these purposes;

(e)   take all necessary and reasonable actions to effectuate this Agreement; and

(f)   attempt to allocate among themselves all costs incurred or to be incurred as authorized by this Agreement, including but not limited to removal and response costs incurred at the Site ("Shared Response Costs") and defense costs, including legal, administrative, and allocation costs ("Shared Defense Costs"), (collectively, "Shared Costs").

2.2    **Member Cooperation.** The Members shall cooperate with each other to effectuate the purposes of this Agreement.

3.     **Organization and Procedures.**

3.1    **Committees.** In order to carry out the purposes of this Agreement, the Members may establish the following four committees: Steering, Executive, Technical, and De Minimis. Each Member, and any individual serving on any committee on behalf of any Member, agrees, by virtue of such service, to maintain the privileged name and confidentiality of all communications and proceedings of such committees; such obligation shall continue in the event such individual should leave the employ of or cease to represent such Member.    Membership on the Steering, Executive, Technical, and De Minimis Committees shall be open to any Member who expresses a willingness to make its representative reasonably available to participate actively in the functions of the relevant committee.

3.2    **Authority to Decide.** Except as otherwise provided herein, the Members shall act by and through the Steering Committee except that the Group reserves to itself the right at any time and from time to time directly to authorize action to be undertaken pursuant to this Agreement in accordance with the voting requirements set forth in this Agreement.

3.3    **Meetings.** The Members may authorize or direct actions under this Agreement only at meetings duly held and called for such purpose, which meetings shall be called regularly by the Steering Committee. Meetings of the Group may be called for any purpose at any time by any two or more Members of the Steering Committee or by any four or more Members of the Group. Meetings may be held by telephone conference.

3.4    **Majority Rule.** Any matter under this Agreement may be referred to a meeting of the Group. The Group shall attempt to make decisions by consensus; however, except as otherwise provided herein, on any matter put to a vote, such matter shall be decided by a majority (more than 50%) of the Voting Power (as defined in Section 3.6 of this Agreement) of the Members present in person or by proxy at the meeting.

3.5    **Notice of Meetings.** Whenever feasible, written notice of the time, place and purpose of any meeting of the Group or of a committee or subcommittee of the Group shall be given to each Member entitled to vote at such meeting at least seven (7) days and not more than thirty (30) days before the date of such meeting either personally, with confirmation by fax, or by mail, charges prepaid, or by other means of written communication, including fax or e-mail, addressed to each Member at the address appearing on the service list maintained by the Steering Committee. (The service list shall indicate the preferred method of notice, whether e-mail or fax, for each Member.) In the event a meeting is called on less than seven (7) days written notice, the Members calling the meeting will make a reasonable effort to provide notice in fact to every Member, including communication by facsimile, voice mail, or e-mail. Meetings may be held by telephone

PHKS 071647

conference. No matter will be acted upon by the Group unless it is within the reasonable scope of the meeting's purpose as specified in the notice.

3.6     **Voting Power.** At any Group meeting, each Member shall have a vote equal to the share assessed such Member under Section 8.4 of this Agreement prior to the time of such meeting; provided that any Member which has been assessed a financial contribution which assessment remains unpaid at the time the meeting is called may vote only upon payment of the full assessment prior to the voting process.

3.7     **Voting by Proxy.** A Member eligible to vote at a Group meeting may assign in writing its vote (in accordance with Section 3.6 of this Agreement) to another Member eligible to vote at the meeting.

3.8     **Quorum.** Sixty percent (60%) of the eligible voting power (as defined in Section 3.6 of this Agreement) of the Group shall be present in person or represented by proxy at any Group meeting.

4.     **Steering Committee, Common Counsel, and Liaison Counsel.**

4.1     **Enumerated Powers of the Steering Committee.** The powers, duties and responsibilities of the Steering Committee shall include:

(a)     retaining, coordinating, supervising and directing the activities of common counsel and liaison counsel, except that, in the event that liaison counsel is also a member of the Steering Committee, liaison counsel shall abstain from participating in Steering Committee decisions with respect to liaison counsel activities;

(b)     selecting, referring, and determining the activities of any contractors and consultants retained for assistance in the matter and seeking advice and assistance in this role from the Technical Committee;

(c)     appointing subcommittees to handle specific matters:

(d)     negotiating and referring settlement matters to the Group,

(e)     election of a Chairperson of the Steering Committee who shall also act as Chairperson of the Group;

(f)     recommending to the Group a de minimis buy-out proposal if appropriate and seeking the advice and recommendation of the De Minimis Committee in this role;

(g)     negotiating with the USEPA and other persons with respect to all matters arising out of the matter;

(h)     recommending to the Group that litigation be commenced against any party to this Agreement for breach of this Agreement, or to enforce the terms hereof,

PHKS 071648

(i)     circulating to the Group such substantive pleadings, motions or other written submissions as the Steering Committee deems necessary in order to allow a Member to determine if it wishes to exercise its option under Section 4.3 hereof and making all such documents otherwise available to all Members, regardless of whether any particular Member chooses to exercise its option under Section 4.3; and

(j)     conducting such other activities that are necessary and proper to carry out the purposes of this Agreement.

4.2     **Liaison Counsel.** Pitney, Hardin, Kipp & Szuch LLP has been retained to serve as liaison counsel to the Group ("Liaison Counsel"). Among other duties assigned by the Group, Liaison Counsel shall serve as the document repository for the Group (the "Document Repository"). Liaison Counsel's compensation, including the cost of maintaining the Document Repository, shall be a Shared Defense Cost.

4.3     **Right of Separate Counsel.** Notwithstanding the retention of common counsel and/or liaison counsel with respect to any matter, each Member reserves the right to select and retain its own counsel to represent such Member on any matter, and to advise common counsel and/or liaison counsel that such Member is not to be represented by or through common counsel and/or liaison counsel with respect to any such matter.

4.4     **Litigation Against Other Persons.** The Steering Committee may recommend to the Group that a claim be asserted on behalf of the Members against other persons. No such claim may be asserted by common counsel or liaison counsel under this Agreement without consent of a majority of the Voting Power of the Group, and any Member may elect to decline participation in any such suit, and may, but need not, in lieu of such participation assign its claims to the other parties. Nothing in this paragraph shall affect or impair the right of any Member to assert any claim in its own name and right against any person.

4.5     **Voting.** The Steering Committee shall attempt to make decisions by consensus; however, on any matter put to a vote, such matter shall be decided by a majority of the Voting Power (as defined in Section 3.6 of this Agreement) of the Members present in person or by proxy at the meeting.

4.6     **Reports to the Group and Call for Group Meetings.** The Steering Committee shall report in writing (with confirmation by fax and/or regular mail if such report is issued by e-mail) its decisions, actions and recommendations to the Group from time to time as may be necessary to keep the Group fully informed of matters covered by this Agreement, and shall call periodic meetings of the Group and refer to such meetings for a vote any matters which, in the judgment of the Steering Committee should be referred.

4.7     **Quorum.** Sixty percent (60%) of the eligible voting power (as defined in Section 3.6 of this Agreement) of the Steering Committee shall be present in person or represented by proxy at any Steering Committee meeting.

PHKS 071649

**4.8**    **Compensation of Steering Committee.** The Members of the Steering Committee shall serve as volunteers without compensation from the Group.

**4.9**    **Call for Meetings.** Meetings of the Steering Committee may be called by the Chairperson or by any three Members of the Committee.

**5.**    **Executive Committee.** The Steering Committee shall appoint an Executive Committee composed of three Members to handle administrative and financial matters as assigned by the Steering Committee. The Members of the Executive Committee shall serve as volunteers without compensation from the Group. Procedures for calling Executive Committee meetings and notice of Executive Committee meetings to Executive Committee Members shall be determined by the Executive Committee.

**6.**    **Technical and De Minimis Committees.**

**6.1**    **Technical Committee Members.** The Technical Committee shall include Member volunteers for the Committee who shall be encouraged to supply technically qualified representatives prepared to participate actively on the Committee.

**6.2**    **Powers of the Technical Committee.** The powers and duties of the Technical Committee shall include:

(a)    acting in response to requests by the Steering Committee or its designee to provide assistance in any matter including assistance with the activities of any consultants retained in connection with the matter and in analyzing technical data, studies and other materials relating to the Site;

(b)    selecting a liaison representative to coordinate activities with the Steering Committee; and

(c)    electing a Chairperson of the Technical Committee.

**6.3**    **De Minimis Committee Members.** The De Minimis Committee shall consist of any Member who wishes to participate with the objective that the committee include a representative sample of the Group as a whole. Members shall supply qualified representatives prepared to participate actively on the Committee.

**6.4**    **Powers of the De Minimis Committee.** The De Minimis Committee is empowered to receive and evaluate de minimis settlement proposals from Members, and advise and recommend to the Steering Committee by written report the term and conditions of a proposed de minimis settlement including, but not limited to, the expected cost of the removal or response action, multiplier or premium, eligibility criteria, and terms of any release or reopener. The De Minimis Committee shall elect a Chairperson.

PHKS 071650

6.5   **Decisions of the Technical and De Minimis Committee.**   The Members of the Technical and De Minimis Committees shall attempt to make decisions by consensus upon all matters within the scope of their powers and duties. Each Committee shall refer any matter upon which consensus cannot be reached to the Steering Committee.

6.6   **Compensation of the Committee Members.**   The Members of the Technical and De Minimis Committees shall serve as volunteers without compensation from the Group.

6.7   **Call for Meetings.**   Meetings of the Technical and De Minimis Committees may be called by the Steering Committee Chairperson, the respective Committee Chairperson, or any three Committee Members.

7.   **Allocation.**

7.1   **Required Participation in Allocation.**   Each Member shall participate in a non-binding process for allocation in accordance with the Non-Binding Allocation Agreement for the Site. Failure to participate in the allocation process in good faith and in accordance with the Non-Binding Allocation Agreement shall be grounds for removal under Section 9.2 of this Agreement.

7.2   **Allocation Consultant.**   John M. Barkett, Esq. will serve as the Members' consultant (the "Allocation Consultant") for the purpose of conducting a non-binding allocation in accordance with the Non-Binding Allocation Agreement for the Site, which sets forth the duties of the Allocation Consultant and the Members with respect to allocation procedures.

7.3   **Compensation of the Allocation Consultant.**   The Allocation Consultant shall be compensated in accordance with the February 11, 2000 letter agreement between the Group and the Allocation Consultant, a copy of which is attached hereto. Such compensation shall be a Shared Defense Cost.

7.4   **Technical Consultants Used in Allocation Process.**   The Group has retained certain technical consultants and may from time to time retain additional technical consultants to work on its collective behalf in connection with any common removal or response action at the Site. No Member of the Group may retain any consultant previously retained by the Group as a whole to assist that Member individually as a technical expert in connection with the Allocation. However, any Member of the Group may rely on information generated by technical consultants retained by the Group as a whole in making arguments and taking positions in connection with the Allocation. In addition, any Member may retain a technical expert not previously retained by the Group to assist that Member individually in connection with the Allocation.

8.   **Shared Costs.**

**8.1**    Purpose of Funds. All monies provided by Members pursuant to this Agreement shall be used solely for the purposes of this Agreement and shall not be considered as payment for any fines, penalties, or monetary sanctions.

(a)    The Members shall establish a fund to hold monies provided by the Members for the purpose of paying Shared Response Costs (the "Response Cost Fund").

(b)    The Members shall establish a fund, separate from the Response Cost Fund, to hold monies provided by the Members for the purpose of paying Shared Defense Costs (the "Defense Fund").

**8.2**    **Payments.** Shared Costs (as defined in Section 2.1(f)) shall be assessed by the Steering Committee or its designee in the manner determined by the Group and in accordance with Paragraph 8.4(a) or 8.4(b) below, whichever may be in effect at the time of such assessment. All assessments shall be due and payable within thirty (30) days of receipt of notice thereof. Interest shall begin to accrue on unpaid balance thirty (30) days after receipt of notice at a rate of 18% per annum. Failure to pay any portion of any assessed financial contribution or interest pursuant to this Agreement within sixty (60) days following receipt of notice of such assessment of Shared Costs may be grounds for removal and collection in accordance with Section 9.2 hereof.

**8.3**    **Initial Payments.**

(a)    The following Members have each made $60,000 in contributions to the Defense Fund: Cytec Industries Inc.; Ford Motor Company; Lucent Technologies, Inc.; and SPS Technologies, Inc.   NRM Investment Company and Worthington Steel Company – Malvern have collectively made $60,000 in contributions to the Defense Fund.

(b)    The following Members have each paid $70,000 in assessments to the Response Cost Fund: Cytec Industries Inc.; Ford Motor Company; Lucent Technologies, Inc.; and SPS Technologies, Inc.   NRM Investment Company and Worthington Steel – Malvern have collectively made $70,000 in contributions to the Response Cost Fund.

**8.4**    **Allocation of Shared Response Costs.**   Shared Response Costs shall be assessed as follows:

(a)    Per Capita Cost Sharing.

From the Effective Date of this Agreement until agreement is reached on an allocation in accordance with Paragraph 8.4(b) below, all Shared Response Costs shall be allocated among the Members on a per capita basis. However, all Members of the Group understand and agree that a single share shall be divided among the current and former owners of the former National Rolling Mills plant in Malvern, Pennsylvania.

(b)    Allocation.

PHKS 071652

If agreement can be reached regarding the Final Allocation Report prepared in accordance with the Non-Binding Allocation Agreement for the Site, that allocation shall apply retroactively so that the Members whose shares are reduced below the level of their per capita shares shall receive a credit for Shared Response Cost payments made on a per capita basis, with a corresponding debit for those whose shares are increased.

(c)     If at any time during the course of this Agreement, the Members receive a monetary contribution toward the Shared Response Costs from the United States Navy or any other non-party to this Agreement, such contribution shall be credited to the Members in accordance with the per capita funding scheme or the Final Allocation Report, whichever may be in effect at the time of its receipt.

**8.5     Shared Defense Costs.**  From the Effective Date of this Agreement until such time as the Members shall agree otherwise, all Shared Defense Costs shall be allocated among the Members on a per capita basis and not subject to reallocation.

**8.6     Accounting for Funds.**  Liaison counsel shall provide to the Members, on a monthly basis, an informal accounting of monies received, spent, and obligated, all itemized by project, and a final accounting upon the termination of the Agreement.

**9.     Withdrawal and Removal.**

**9.1     Withdrawal.**  Any Member may withdraw from all participation in this Agreement upon written notice to the Steering Committee or its designee, as of the date the notice is postmarked except that such Member shall remain liable for its share of all Shared Costs assessed pursuant to this Agreement more than forty-five (45) days prior to the date of withdrawal.  Any Member entering into any settlement with the United States or the Commonwealth of Pennsylvania shall be deemed to have withdrawn from the Group effective upon the date of settlement but shall remain liable for its share of all Shared Costs up to the date of withdrawal.

**9.2     Removal of a Member.**  If any Member's interests or actions are regarded as contrary to the interests of the other Members, such Member may be removed from this Agreement by a vote of two-thirds of the Voting Power of the Group present in person or by proxy at a Group meeting called for the purpose of considering such removal.  In the event any Member fails to pay any portion of any assessed financial contribution or interest pursuant to this Agreement within sixty (60) days following receipt of notice of such assessment, the Member shall be considered in default and may be removed from this Agreement by a vote of two-thirds of the Voting Power present in person or by proxy at a Steering Committee meeting called for the purpose of considering such removal.  Any Member who has been removed from the Group remains subject to collection actions for the unpaid balance of any assessed financial contribution.

**10.     Waiver of Conflict of Interest.**  In the event the Steering Committee engages common counsel and/or liaison counsel each Member agrees that:  (1) it will not claim or assert that based solely on said counsel's past or present representation of a Member, said

PHKS 071653

counsel has a conflict of interest in performing legal services authorized by the Steering Committee and arising out of the Site, unless the Member notifies the Steering Committee of the claimed conflict within twenty (20) days of receiving notice of intent to hire said counsel; (2) it will not claim or assert that, based solely on said counsel's representation of the Group under the terms of this Agreement said counsel has a conflict of interest in connection with any representation of any other person or entity in a matter pending as of the date of receiving notice of intent to hire said counsel, unless the Member notifies the Steering Committee of the claimed conflict within twenty (20) days of receiving said notice; (3) it will not claim or assert that, based solely on said counsel's representation of the Group under the terms of this Agreement, said counsel has a conflict of interest in any person or entity unless the subject matter relating to said representation arises out of or is connected to the Site or involves or could involve any facts or information obtained from the Member during the time of this Agreement (4) in the event that any conflict develops in the performance of work authorized by the Steering Committee or by common counsel and/or liaison counsel and the performance of work authorized by a Member that has retained that counsel, the Member consents to said counsel's continued performance of the work authorized by the Steering Committee; and (5) if a Member withdraws or is removed from this Agreement or its representation by common counsel and/or liaison counsel is in any way terminated it will raise no objection to the continued representation by common counsel and/or liaison counsel of all or any of the other Members in connection with any legal services arising out of the Site.

Should the United States or the Commonwealth of Pennsylvania discuss with, propose or offer a de minimis settlement to any Members potentially eligible for such a settlement, no Member potentially eligible for a de minimis settlement will claim any conflict of interest in, or object to, the continued provision of any technical assistance by any technical consultant retained by the Steering Committee to any Member potentially ineligible for such a de minimis settlement.

If any Member withdraws, or is removed, that Member shall not claim any conflict of interest in, or object to, the continued provision of technical assistance by any technical consultant retained by the Steering Committee.

11.  **New Members.**  Any entity that becomes a Member by execution of this Agreement subsequent to the Effective Date of this Agreement shall be deemed a Member ab initio and shall be assessed and pay all sums which such Member would have been obligated to pay if a Member ab initio, including the $60,000 Defense Fund contribution described in Paragraph 8.3(a), the $70,000 in Response Cost Fund assessments described in Paragraph 8.3(b), and all other assessments paid to the Defense Fund and the Response Cost Fund. However, the Steering Committee may, for good cause, impose different terms and conditions upon any entity seeking to enter this Agreement after its Effective Date.

12.  **Confidentiality and Use of Information.**

12.1  **Shared Information.**  From time to time the Members may elect to disclose or transmit to each other, directly or through common counsel or liaison counsel, such information as

each Member, common counsel, liaison counsel or technical consultant retained for the Group deems appropriate for the sole and limited purpose of asserting any common claims or defenses relating to the Site and coordinating such other activities that are necessary and proper to carry out the purposes of this Agreement. Shared information may be disclosed to or transferred among the Members orally or in writing or by any other appropriate means of communications. The Members intend that no claim of work product privilege or other privileges be waived by reason of participation or cooperation in the common response to, or defense of, any claims arising out of the Site.

12.2    **Preservation of Privilege.** Information disclosed by the Members, common counsel, or liaison counsel may be disclosed to any other Member, and each Member hereby expressly consents to treat such disclosure to it as being for the sole purpose of asserting any common claims or defenses arising out of the Site. Such disclosure shall not be deemed a waiver of the attorney privilege or work product immunity or any other privilege.

12.3    **Confidentiality of Shared Information.**

(a)    Each Member agrees that shared information received from any other Member or its counsel, common counsel, liaison counsel, or technical consultant retained for the Group pursuant to the Agreement shall be held in strict confidence by the receiving Member and by all persons to whom such confidential information is revealed by the receiving Member pursuant to this Agreement, and that such information shall be used only in connection with asserting any common claims or defenses in connection with the Site and conducting such other activities that are necessary and proper to carry out the purposes of this Agreement;

(b)    Shared information that is exchanged in written or in document form and is intended to be kept confidential may, but need not, be marked "Confidential" with a similar legend. If such information becomes the subject of an administrative or judicial order requiring disclosure of such information by a Member, where the information will be unprotected by confidentiality obligations, the Member may satisfy its confidentiality obligations hereunder, by notifying the Member that generated the information and by giving such Member an opportunity to protect the confidentiality of the information or, if the information was generated by common counsel, liaison counsel, or a technical consultant, by giving notice to common counsel and liaison counsel.

(c)    Each Member shall take all necessary and appropriate measures to ensure the any person who is granted access to any shared information or who participates in work on common projects or who otherwise assists any counsel or technical consultants in connection with this Agreement, is familiar with the terms of this Agreement and complies with such terms as they relate to the duties of such person;

(d)    The Members intend by this Section to protect from disclosure all information and documents shared among any Members or between any Member and common counsel, liaison counsel or any technical consultant to the greatest extent permitted by law

regardless of whether the sharing occurred before execution of this Agreement and regardless of whether the writing or document is marked "Confidential;"

(e)     The confidentiality obligations of the Members under this Section shall remain in full force and effect, without regard to whether a Member withdraws or is removed, whether this Agreement is terminated or whether any action arising out of the Site is terminated by final judgment or settlement. The provisions of this Section shall not apply to information which is now or hereafter becomes public knowledge without violation of this Agreement or which is sought and obtained from a Member pursuant to applicable discovery procedures and not otherwise protected from disclosure;

(f)     In the event a Member withdraws from this Agreement pursuant to Section 9.1 or is removed pursuant to Section 9.2, any documents or other physical materials containing confidential information provided by such Member to common counsel or liaison counsel, another Member, or any technical consultant retained for the Group, shall be promptly returned to such Member together with all copies thereof, and any document or physical materials provided by common counsel, liaison counsel, any technical consultant or the other Members to the withdrawing Member shall be promptly returned to common counsel and/or liaison counsel by such Member together with all copies thereof. The withdrawing or removed Member and the remaining Members shall remain obligated to preserve the confidentiality of all confidential information received or disclosed pursuant to this Agreement.

In the event this Agreement is terminated the Members shall return such documents or physical materials to other Members in the same manner as if a Member had withdrawn and all Members shall remain obligated to preserve the confidentiality of all confidential information received or disclosed pursuant to this Agreement.

(g)     Notwithstanding the provisions of this Section, Members may reveal shared information to their insurance carriers for the purpose of making or defending claims related to the Site. Member shall protect from further disclosure all information and documents provided to any insurance carrier by taking all necessary and appropriate measures to ensure that any insurance carrier who is granted access to any shared information is familiar with the terms of this Agreement and complies with such terms.

(h)     Subject to the provisions of Paragraph 14 and to the extent permitted by law, all Members agree not to make written or oral communications with USEPA, the United States Department of Justice, the Commonwealth of Pennsylvania, or any other person regarding any other Member's alleged liability with respect to the Site prior to the termination of this Agreement, except that this Paragraph 12.3(h) shall not apply to any Member that withdraws or is removed from this Agreement in accordance with Section 9.

12.4    **Effect of Agreement On Prior Confidentiality Agreements.** This Agreement shall supersede any confidentiality agreements previously entered into by the Parties relating to the Site.

13. **Denial of Liability.** This Agreement shall not constitute, be interpreted, construed or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor any estoppel against any Member by Members as among themselves or by any other Person not a Member. However, nothing in this Section is intended or should be construed to limit, bar, or otherwise impede the enforcement of any term or condition of the Agreement against any party to this Agreement.

14. **Insurance.** The Members do not intend hereby to make any agreement that will prejudice any Member with respect to its insurers and, by entering into this Agreement, anticipate that the actions taken pursuant to this Agreement will benefit such insurers. If any insurer makes any claims that any aspect of this Agreement provides a basis for rejection or limitation of coverage of a Member, the Group will attempt, consistent with the objectives of this Agreement, to return any Member subject to such claim to a position that is satisfactory to such insurers.

15. **Successors and Assigns.** This Agreement shall be binding upon the successors and assigns of the Members. No assignment or delegation of the obligation to make any payment or reimbursement hereunder will release the assigning Member without the prior written consent of the Steering Committee.

16. **Assessment of Unpaid Balance in the Event of Default.** Subject to a Member's right to withdraw in accordance with Paragraph 9.1, the unpaid balance of any defaulting Member's previously assessed share may be reassessed by the Steering Committee against the other Members hereto (without waiving any rights such Members may have against the defaulting Member or its successors or assigns) in the same proportion as the other Members would have been obligated to pay if the defaulting Member had not been a signatory of this Agreement.

17. **Relationship of Members.** No Member, or representative or counsel for any Member, has acted as counsel for any other Member with respect to such Member entering into this Agreement, except as expressly engaged by such Member with respect to this Agreement, and each Member represents that it has sought and obtained any appropriate legal advice it deems necessary prior to entering into this Agreement.

No Member or its representative serving on any Committee or subcommittee shall act or be deemed to act as legal counsel or a representative of any other Member, unless expressly retained by such Member for such purpose, and, except for such express retention, no attorney/client relationship is intended to be created between representatives on any Committee or subcommittee and the Members.

Nothing herein shall be deemed to create a partnership or joint venture and/or principal and agent relationship between or among the Members.

18. **Indemnification.** No Member or its representative(s) serving on any Committee or subcommittee shall be liable to any Member for any claim demand, liability, cost,

PHKS 071657

expense, legal fee, penalty, loss or judgment incurred or arising as a result of any acts or omissions taken or made hereunder.

Each Member agrees to indemnify, defend and hold harmless any Member and its representative(s) from and against any claim, demand, liability, cost, expense, legal fee, penalty, loss or judgment (collectively "liability") which in any way relates to the good-faith performance of any duties under this Agreement by any Member or its representatives(s) on behalf of any Committee, subcommittee or the Group, including, but not limited to, any liability arising from any contract or agreement signed by the Member or its representative(s) at the request of the Steering Committee or the Group. Except for the payment of legal fees as incurred, this indemnification shall not apply to any liability arising from a criminal proceeding where the Member or its representative(s) had reasonable cause to believe that the conduct in question was unlawful.

Payment under this section shall be a Shared Defense Cost in accordance with Section 2.1(f) hereof, and shall be allocated among each Member that (1) was a Member at the time that the action was taken that gives rise to this indemnification or (2) subsequently joins the Group.

The terms of this Section shall survive the termination of the Agreement and the withdrawal or removal of any Member.

19.    **Effective Date.**  This Agreement shall become effective on the date that the Agreement is signed by the last of the following companies: Cytec Industries Inc.; Ford Motor Company; SPS Technologies, Inc.; Lucent Technologies Inc.; NRM Investment Company, and Worthington Steel – Malvern (the "Effective Date").  These original Members intend that other companies may sign this Agreement.  However, such later Members shall be bound by the terms of this Agreement on the date of their signature.

20.    **Method of Execution.**  This Agreement shall be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

21.    **Amendments.**  This Agreement may be amended only by a vote of at least two-thirds of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such amendment.  Such amendment shall become effective thirty (30) days after written notice of such amendment is mailed to all Group Members.  However, Sections 18 and 21 hereof cannot be amended to limit the effect of Section 18 hereof with respect to acts or omissions taken or omissions prior to such amendment.

22.    **Separability.**  If any provision of this Agreement is deemed invalid or unenforceable, the balance of this Agreement shall remain in full force and effect.

23.    **Law.**  This Agreement shall be interpreted under the laws of the Commonwealth of Pennsylvania.

24. **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25. **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26. **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27. **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: _____    Member:_____

                          By:_____
                                (Name and Title)

Designated Representative for Receipt of Notice and Invoices

Name        _____

Address     _____

Telephone Number:    _____

Facsimile Machine Number    _____

PHKS 071659

24. **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25. **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26. **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27. **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: _____    Member: _Cytec Industries Inc._

By: _____
(Name and Title)
Karen E. Koster, Director of Environmental Services

Designated Representative for Receipt of Notice and Invoices

Name    Thomas A. Waldman, Esq.

Address    Cytec Industries Inc., 5 Garret Mountain Plaza, West Paterson NJ 07424

Telephone Number:    (973) 357-3136

Facsimile Machine Number    (973) 357-3058

PHKS 071660

24. **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25. **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26. **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27. **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: _____    Member: _Cytec Industries Inc._____

By: _____
   (Name and Title)
   Karen E. Koster, Director of Environmental Services

Designated Representative for Receipt of Notice and Invoices

Name    Thomas A. Waldman, Esq.

Address    Cytec Industries Inc., 5 Garret Mountain Plaza, West Paterson NJ 07424

Telephone Number:    (973) 357-3136

Facsimile Machine Number    (973) 357-3058

24. **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25. **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26. **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27. **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: OCT 11 2000        Member:   Ford Motor Company

By: _____
(Name and Title)
Assistant Secretary

Designated Representative for Receipt of Notice and Invoices

Name   Kathy Hofer, Esq.

Address   Three Parklane Blvd   Suite 1500 West   Dearborn, MI   48126

Telephone Number:   (313)594-1687

Facsimile Machine Number   (313) 390-3083

PHKS 071662

24.    **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25.    **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26.    **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27.    **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: OCT 11 2000    Member: _____Ford Motor Company_____

By: _____
(Name and Title)    Assistant Secretary

Designated Representative for Receipt of Notice and Invoices

Name    ___Kathy Hofer, Esq._____

Address    ___Three Parklane Blvd   Suite 1500 West___ Dearborn, MI   48126

Telephone Number: ___(313)594-1687_____

Facsimile Machine Number  (313) 390-3083_____

PHKS 071663

24. **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25. **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26. **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27. **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: ___OCT 1 1 2000___       Member: ___Ford Motor Company___

                                 By: _____
                                        (Name and Title)
                                        **Assistant Secretary**

Designated Representative for Receipt of Notice and Invoices

Name        ___Kathy Hofer, Esq._____

Address     ___Three Parklane Blvd   Suite 1500 West___ Dearborn, MI   48126

Telephone Number:   ___(313)594-1687_____

Facsimile Machine Number ___(313) 390-3083_____

24.    **Nonwaiver.**  Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25.    **Entire Agreement.**  This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26.    **Termination.**  This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27.    **Notice.**  All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement.  Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement.  Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: _OCT 11 2000_           Member: ____Ford Motor Company____

                               By: _____
                                          (Name and Title)
                                       Assistant Secretary

Designated Representative for Receipt of Notice and Invoices

Name          ____Kathy Hofer, Esq.____

Address       ____Three Parklane Blvd.  1500 West__ Dearborn, MI  48126

Telephone Number:   _(313) 594-1687_

Facsimile Machine Number    _(313) 390-3083_

24. **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25. **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26. **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27. **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: _____    Member: Cytec Industries Inc. _____

By: _____
(Name and Title)
Karen E. Koster, Director of Environmental Services

Designated Representative for Receipt of Notice and Invoices

Name       Thomas A. Waldman, Esq. _____

Address    Cytec Industries Inc., 5 Garret Mountain Plaza, West Paterson NJ 07424

Telephone Number:    (973) 357-3136 _____

Facsimile Machine Number    (973) 357-3058 _____