**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | : : : : : : | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | : : | |
| v. | : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : : | |
| Defendants. | : : | |

**MEMORANDUM IN RESPONSE TO NRM INVESTMENT COMPANY'S, ASHLAND CHEMICAL, INC.'S, FCG, INC.'S, AND CARPENTER TECHNOLOGY CORPORATION'S MOTIONS TO COMPEL ANSWERS TO CONTENTION INTERROGATORIES**

**A.     INTRODUCTION**

Plaintiffs hereby respond to the motions of NRM Investment Company ("NRM"),

Ashland Chemical, Inc. ("Ashland") , fcg, inc. ("fcg"), and Carpenter Technology Corporation

("Carpenter") (collectively "the Moving Defendants) to compel answers to contention

interrogatories. Those motions together raise alleged deficiencies in Plaintiffs' responses to

interrogatories served by those Defendants and to interrogatories jointly served by all of the Non-

Settling Defendants.[1] The Court's June 23, 2005 Order permitted Defendants to "submit

---

[1]     Advanced Environmental Technology Corp. and Handy & Harman Tube Company have neither sought to compel answers to individual interrogatories served by them nor joined in any of these four motions with respect to the Joint Interrogatories or otherwise.

narrowly-tailored contention and cost apportionment interrogatories to Plaintiff at the close of expert discovery." June 23, 2005 Order at ¶ 2. Defendants instead served over two hundred (not counting sub-parts) interrogatories that collectively appear to have asked about every contention Plaintiffs have ever made and about contentions no party has yet made.[2]

Plaintiffs responded to each and every interrogatory. Together, those responses provide Defendants with a specific statement about each finding of fact and conclusion of law Plaintiffs will ask the Court to make at trial, a comprehensive list of documents and witnesses Plaintiffs intend to offer into evidence to support those proposed findings and conclusions, and the precise calculations Plaintiffs propose that the Court make (or merely confirm) to reach those findings and conclusions. Plaintiffs' responses include Exhibit A, a spreadsheet identifying each party to which Plaintiffs believe a portion of Plaintiffs' response costs should be equitably allocated at trial and each party's appropriate share, and Exhibit B, a spreadsheet showing for each such party what types and volumes of wastes Plaintiffs contend were picked up by DeRewal Chemical Corporation ("DCC"), which of those wastes Plaintiffs contend were disposed of at the Site, and precisely how those volumes were calculated. These two spreadsheets (along with Plaintiffs' responses with respect to the response costs they seek to recover) encompass Plaintiffs' entire case-in-chief.

There is nothing deficient about these responses. Defendants simply continue their attempt to delay the day of reckoning when they will finally be required to contribute their fair share of the costs of response that, to date, Plaintiffs solely have been funding. For the reasons set forth below, each of those motions should be denied.

---

[2]     Defendants no doubt therefore violated at least the spirit of the Order. Plaintiffs did not seek a protective order because they did not want to delay trial.

**B.      DISCUSSION**

1.      **Plaintiffs contend that certain percentages of all customers' waste hauled by DCC in a certain time period were disposed of at the Site. Plaintiffs identified the documents and testimony that they intend to rely upon to support this contention in their responses to the contention interrogatories. Plaintiffs have no obligation, however, to provide their interpretation of each piece of evidence, or the statements that they might make in summation at trial, to support their interpretation of such proofs.**

NRM asserts that Plaintiffs have not fully responded to Interrogatory Nos. 78-111

of the Defendants' Joint Contention Interrogatories and to NRM Interrogatory Nos. 2, 3, 6 and 7.

Interrogatory No. 78 provides:

> What do plaintiffs contend is Agere's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?
>
> A.      What is the factual basis for plaintiffs' contention as to Agere's allocable/equitable share of the Total Cleanup Cost for the Site?
>
> B.      Set forth the calculation used by plaintiffs to arrive at their contention as to Agere's allocable/equitable share of the Total Cleanup Cost for the Site.

Interrogatory Nos. 79-111 ask the same question with respect to various other entities. In simple

terms, Interrogatory Nos. 78-111 ask Plaintiffs to state what they contend are various entities'

equitable shares of cleanup costs, the calculations used by Plaintiffs to arrive at the equitable

shares, and the evidence that Plaintiffs will rely upon to support these contentions. Plaintiffs

fully responded to these interrogatories. In fact, Plaintiffs provided Defendants with two charts

that disclose Plaintiffs' entire case against the Defendants. *See* Exhibits A and B to Plaintiffs'

Responses to Joint Contention Interrogatories, attached as Exhibit 1 to Ashland's Brief. Exhibit

A shows that Plaintiffs will contend at trial that only those parties listed on the exhibit should be

assigned a share of Plaintiffs' the response costs for the Site. Exhibit A further sets out

Plaintiffs' proposed method of allocating response costs -- namely, that response costs should be allocated not only on the basis of a Non-Settling Defendant's volume of waste disposed of at the Site, but also based on equitable considerations of a particular Non-Settling Defendants' knowledge of Manfred DeRewal's history of pollution violations and disposal of waste at the Site, and of Plaintiffs' cooperation with U.S. EPA and Pennsylvania Department of Environmental Protection in remediating the Site for the past seven years.  Exhibit B shows how Plaintiffs calculated the volume and type of each Party's wastes disposed of at the Site.

Taking Carpenter Technology as an example, Plaintiffs stated that they will ask the Court to determine at trial that Carpenter is responsible for 47.57% of the response costs for the Site. *See* Exhibit A to Plaintiffs' Responses to Joint Contention Interrogatories.  Plaintiffs also explained how they arrived at this percentage.  Specifically, Plaintiffs explained that they will contend that 1,732,772 gallons of Carpenter's waste was hauled by DCC between January 1972 to March 1977.  Plaintiffs also listed the evidence that they intend to rely upon to support this contention. *See* Plaintiffs' Responses to Joint Contention Interrogatories, Pg. 49-50.  In order to determine what amount of the 1,732,772 gallons was actually disposed of at the Site, Plaintiffs stated that they will ask the Court at trial to find that 95% of the waste hauled by DCC between January 1972 and December 1, 1973 and 15% of the waste hauled by DCC between December 1, 1973 and June 30, 1975 (the two applicable Nexus Periods) was disposed of at the Site. *See* Plaintiffs' Responses to Joint Contention Interrogatories, Pg. 42-49.  Plaintiffs included a list of the evidence that they intend to rely upon to support the percentages applicable to these "Nexus Periods."  For example, Plaintiffs stated that they will rely upon the following documents and testimony to support their contention that 95% of all waste handled by DCC between January 1972 and December 1973 was disposed of at the Site:

- Boarhead Corporation Certificate of Incorporation dated September 2, 1969 [P-5];

- Deed Between Robert and Ruth Buckman and Boarhead Corporation dated October 16, 1969 [P-6];

- DeRewal Chemical Company, Inc. Certificate of Incorporation dated December 29, 1969 [P-7];

- Pennsylvania State Police Investigation Report dated April 26, 1972;

- March 7, 1973 and March 12, 1973 BDOH memorandum;

- Waste Discharge Inspection Report and Site Map dated February 14, 1973 [P-22]

- Waste Discharge Inspection Report dated March 5, 1973 [P-23];

- Agreement Between Boarhead Corporation and Manfred DeRewal dated March 21, 1973 [P-24];

- December 20, 1973 Bucks County Department of Health memorandum;

- PADER November 2, 1973 Order to Boarhead Corporation;

- Waste Discharge Inspection Report dated November 5, 1973

- November 23, 1973 Waste Discharge Inspection Report;

- January 8, 1974 Department of Health Memorandum;

- June 28, 1974 Department of Health memo;

- Complaint in Equity filed on May 31, 1974 in the Court of Common Pleas of Bucks County with an injunction issuing on June 21, 1974;

> • Lease Agreement Between Philadelphia Hide
> Corporation and Manfred DeRewal for 3013-31 East
> Ontario Street dated November 15, 1973 [P-20]; and
>
> • Affidavit of John Barsum dated April 28, 2000 [D-27].

*Id.* Plaintiffs also set forth the witnesses that they intend to rely upon to support this contention and similarly set forth the documents and witnesses that they intend to rely upon with respect to the other Nexus Periods. *Id.* Applying the nexus percentages, Plaintiffs indicated that they will contend that 913,242 gallons of Carpenter's waste were actually disposed of at the Site. *See* Exhibit A to Plaintiffs' Responses to Joint Contention Interrogatories.

Further, Plaintiffs' responses set forth the bases upon which they will ask the Court to allocate response costs at trial. Plaintiffs stated that they will ask the Court to allocate response costs primarily based on each relevant entity's volume of waste that was disposed of at the Site. *See* Plaintiffs' Responses to Joint Contention Interrogatories, Pg. 65-67. Plaintiffs also increased certain volumetric shares due to a particular Non-Settling Defendant's knowledge of the history of Manfred DeRewal's pollution violations and DCC's disposal of their waste at the Site, and increased each Non-Settling Defendant's share because Plaintiffs cooperated with the U.S. EPA and Pennsylvania Department of Environmental Protection while the Non-Settling Defendants did not. *Id.* For example, Plaintiffs' responses to Interrogatory Nos. 78-111 provide that Carpenter has a 39.31% volumetric share, which should, taking into account recognized and applied equitable factors, be increased to 47.57% because Carpenter was aware of Manfred DeRewal's history of pollution violations before hiring DCC to dispose of its waste and because Plaintiffs cooperated with the U.S. EPA and PADEP while Carpenter did not. *See* Exhibit A to Plaintiffs' Responses to Joint Contention Interrogatories. As mentioned previously, Plaintiffs

included with their responses two charts that set forth similar information with respect to each

Plaintiff and Settling and Non-Settling Defendant.[3]  Accordingly, Plaintiffs fully and directly

responded to Interrogatory Nos. 78-111 by expressing the various equitable shares in percentages

(as requested), laying out the calculations used by Plaintiffs to arrive at those percentages, and

citing to the evidence that Plaintiffs will rely upon to support these contentions.

NRM's Interrogatory No. 2 is nothing more than a restatement of the questions

asked in Joint Interrogatory Nos. 78-111.  It asks Plaintiffs to state what volume of NRM pickle

liquor they contend was disposed of at the Site.  Plaintiffs responded by referring NRM to its

response to Joint Interrogatory No. 78.  *See* Plaintiffs' Response to NRM's Contention

Interrogatories, Pg. 2, attached as an appendix to NRM's brief.  Specifically, with regard to

NRM, Plaintiffs indicated that they contend that 491,500 gallons of NRM pickle liquor was

disposed of at the Site.  *See* Exhibit A to Plaintiffs' Responses to Joint Contention

Interrogatories.  Interrogatory No. 2 also asks Plaintiffs to set out the factual basis for this

contention and the method used to apply these facts.  Similar to the list of documents described

above with respect to Plaintiffs' contentions about the Nexus Periods, Plaintiffs provided a list of

---

[3]    Despite these charts, Carpenter and fcg continue to assert that Plaintiffs did not set forth
its contentions with respect to the volume of their waste that was disposed of at the Site
(fcg Interrogatory No. 1 and Carpenter Interrogatory Nos. 2 and 3).  fcg Brief at 4-5 and
Carpenter Brief at 6.  Further, Carpenter asserts that Plaintiffs did not indicate what they
contend is any party's allocable share.  Carpenter states that "Defendants have repeatedly
asked Plaintiffs about allocable shares and Plaintiffs have continually refused to answer
it."  Carpenter Brief at 4.  Plaintiffs cannot fathom any explanation as to why these
entities do not believe that Plaintiffs have provided the requested information except that
perhaps they did not read the charts attached as Exhibits A and B to Plaintiffs' Responses
to the Joint Contention Interrogatories.  Exhibit B states that 83,573 gallons of Etched
Circuit's and/or fcg's etchant and 913,242 gallons of Carpenter pickle liquor were
disposed of at the Site.  Exhibit A provides the relevant allocable shares expressed in
percentages.

the documents and testimony that they intend to rely upon at trial to prove that 491,500 gallons of NRM pickle liquor was disposed of at the Site. *See* Plaintiffs' Responses to Joint Contention Interrogatories, Pg. 50-52. Plaintiffs then explained their methodology to arrive at the volume of NRM waste that was disposed of at the Site. Specifically, Plaintiffs believe that the evidence proves that 1,260,000 gallons of NRM pickle liquor were hauled by DCC from January 1972 to March 1977. *See* Exhibit B to Plaintiffs' Responses to Joint Contention Interrogatories. Plaintiffs then applied the nexus percentages described above to determine that 491,500 gallons of NRM pickle liquor were disposed of at the Site during the Nexus Periods. Accordingly, Plaintiffs have fully responded to NRM Interrogatory No. 2.

NRM Interrogatory No. 3 asks nothing more than whether Plaintiffs contend that NRM pickle liquor was disposed of at sites other than Boarhead. Plaintiffs responded that their contentions only pertain to the NRM pickle liquor that was disposed of at the Site. *See* Plaintiffs' Response to NRM's Contention Interrogatories, Pg. 3. Therefore, Plaintiffs have fully responded to NRM Interrogatory No. 3. Though Plaintiffs will not "contend" that NRM waste was disposed of at sites other than Boarhead, there can be no doubt from Plaintiffs' response that they acknowledge that some wastes may have been so disposed.

NRM Interrogatory Nos. 6 and 7 ask Plaintiffs what they contend is NRM's equitable share of the cleanup costs. As discussed in the foregoing paragraphs, Plaintiffs responded that NRM should be responsible for 21.20% of the response costs for the Site and explained the facts and methodology applied to reach this conclusion. *See* Plaintiffs' Response to NRM's Contention Interrogatories, Pg. 4-5. Accordingly, Plaintiffs have fully responded to NRM Interrogatory Nos. 6 and 7.

Despite Plaintiffs' full and direct responses to Joint Contention Interrogatory Nos. 78-111 and to NRM Interrogatory Nos. 2, 3, 6 and 7, NRM nevertheless claims that Plaintiffs' responses to these Interrogatories are insufficient. While it is not easily discernible from NRM's brief exactly what additional information NRM is requesting in response to Joint Contention Interrogatory Nos. 78-111 and NRM Interrogatory Nos. 2, 3, 6 and 7[4], Plaintiffs believe that NRM wants Plaintiffs to explain in great detail Plaintiffs' analysis of the evidence. This presumably would include explanations of how Plaintiffs weigh the evidence, how they view credibility of and relevance with respect to the evidence, and how they assess the probative value of the evidence, all of which are protected from disclosure to the Defendants under the attorney work product doctrine. In essence, the information that NRM is currently requesting is the type of information that will be contained in Plaintiffs' closing argument at trial. Plaintiffs clearly have not "conceal[ed] their basis for assigning a volume and percentage share of liability to each defendant," or chosen "to keep [their methodology] secret until the time of trial or the pre-trial

---

[4]     NRM contends that Plaintiffs did not explain "how the facts which they recite as the basis for their views lead to the damages they assert." NRM Brief, Pg. 1. It claims that, "There is no readily understandable link between the factual bases plaintiffs cite and the damages they assert." NRM Motion, Pg. 1. As described above, however, this is simply untrue and misleading. Plaintiffs fully described their contentions against the Defendants, the evidence that they intend to rely upon to support these contentions, as well as the methodology they applied to reach these contentions. Despite this, Defendants take issue with Plaintiffs' responses to Interrogatory Nos. 78-111 because "plaintiffs' determination of the percentages of waste contributed by each party and the volumes upon which shares of liability were established came from plaintiffs themselves, not some uniform or definitive set of business records." NRM Memorandum, Pg. 4. It is true that Plaintiffs' proposed equitable shares are not contained in any "uniform or definitive set of records," but are based on plaintiffs' view of the evidence. It is not true, however, that there are no business records that establish the volume of NRM waste that was disposed of at the Site. Plaintiffs' cited to such evidence in their response to Interrogatory No. 78. For instance, there exist accounts receivable ledgers, summaries of bills of lading and accounting and invoices, pick up tickets and summaries of same that indicate volumes of NRM waste that were hauled by DCC.

order," as suggested by NRM. NRM Brief, Pgs. 9 and 11. Further, Plaintiffs do not have any additional information "at their fingertips" that they are keeping secret from NRM. NRM Brief, Pg. 10. On the contrary, Plaintiffs have set out all of the evidence that they intend to rely upon at trial to support their stated contentions.

Moreover, Plaintiffs have no obligation to reveal their analysis of documents and testimony, or the statements that they might make in closing at trial to support their interpretation of the evidence. None of the authority cited by NRM requires Plaintiffs to do so. NRM's citation to Rule 26(a)(1)(C) is misplaced. Rule 26(a)(1)(C) merely requires each party to provide to other parties a computation of any category of damages claimed by the disclosing party as well as evidence on which such computation is based without awaiting a discovery request. The Advisory Committee Note for Rule 26(a)(1)(C) provides:

> Subparagraph (C) imposes a burden of disclosure that includes the functional equivalent of a standing Request for Production under Rule 34. A party claiming damages or other monetary relief must, in addition to disclosing the calculation of such damages, make available the supporting documents for inspection and copying as if a request for such materials had been made under Rule 34. This obligation applies only with respect to documents then reasonably available to it and not privileged or protected as work product.

It is undisputed that Plaintiffs have provided documentation of past costs, including reports that track the response costs incurred for OU-1 and OU-2 work as well as backup documentation, including invoices, payment proofs and invoice tracking charts. *See* Plaintiffs' Responses to Joint Contention Interrogatories, Pg. 40-41. Plaintiffs have also set forth a detailed explanation of the response costs incurred by Plaintiffs (explained further in subsection 3 of this Section B of Plaintiffs' Memorandum) and the methodology that they

applied to arrive at Plaintiffs' and each Settling and Non-Settling Defendant's equitable share of response costs. Plaintiffs have fully complied, therefore, with Rule 26(a)(1)(C).

Similarly, none of the cases cited by NRM support its argument that Plaintiffs are required to furnish any additional information with respect to Plaintiff's establishment of the nexus percentages. The cases do not support in any way a proposition that a party must disclose work product in responding to contention interrogatories. On the contrary, the cases hold that the purpose of contention interrogatories is to narrow the issues to expedite resolution of the lawsuit and to provide fair notice to opposing parties. Plaintiffs' responses to Interrogatory Nos. 78-111 and NRM Interrogatory Nos. 2, 3, 6 and 7 give sufficient notice to Defendants of the positions that Plaintiffs will take at trial. Simply stated, Plaintiffs need only provide the contentions they intend to make at trial and the proofs upon which they intend to rely to support those contentions. Plaintiffs do not have any obligation to provide Defendants with a transcript of their summation.

2. **Plaintiffs cannot possibly and are not obligated to infer from the contention interrogatories that the Defendants might make certain arguments at trial, and, therefore, cannot possibly and are not obligated to provide their rebuttal contentions in response to these arguments.**

The Court's June 23, 2005 Order permitted Defendants to "submit narrowly-tailored contention and cost apportioned interrogatories to Plaintiff at the close of expert discovery." June 23, 2005 Order at ¶ 2. No doubt due to this limitation in the type of permitted discovery, almost all of the Defendants' 125 joint interrogatories begin with the phrase, "Do plaintiffs contend ...." Others begin with the phrase, "What do plaintiffs contend is ...." Similarly, most of the Defendants' individual interrogatories ask whether Plaintiffs "contend" some specific proposition. Many of these interrogatories do not actually seek to learn what

*Plaintiffs* contend, however.  Instead, following the "Do Plaintiffs contend" preface, Defendants insert some contention that *Defendants* have come up with or perhaps are worried about and then expect Plaintiffs to agree or disagree with that contention.

Defendants are unhappy that Plaintiffs simply (and rightfully) answered the question asked, in many cases by simply saying "No," because the proposed contention has no part in Plaintiffs' case.  Defendants now assert on various meritless bases that "No" is not an appropriate response to such questions.

Defendants' "Do you contend" interrogatories can only be read to solicit what Plaintiffs intend to contend at trial regarding matters that they must prove in their case against Defendants.  Plaintiffs responded to each and every interrogatory by either (1) stating that they were making the subject contention and, if so, providing the evidentiary support for that contention, or (2) stating that they were not making such a contention.

For example, fcg's Interrogatory No. 3 asks:  "Do *you* contend that any wastes generated by fcg and/or Etched Circuits were disposed of in a particular area(s) or location(s) at the site?" (emphasis added) and, if so, to provide the factual basis for such contention.  Plaintiffs responded, *inter alia*, subject to certain objections, including the objection that the interrogatories "seek information outside the scope of the contentions that Plaintiffs will make as part of their prima facie case at trial":

> By way of further answer, Plaintiffs will not ask the Court at trial to make findings of fact or conclusions of law concerning whether "any wastes generated by fcg and/or Etched Circuit were disposed of in a particular area(s) or location(s) at the site."

This response directly answers the exact question asked, by stating that Plaintiffs are not making such a contention.

Defendants now argue that such interrogatories are not seeking to learn what contentions Plaintiffs intend to make in Plaintiffs' case, but instead to ask Plaintiffs to indicate whether they will contest such positions if Defendants make them, and, if so, on what basis. Ashland Brief at 6, n.2 ("Defendants contend that [such] objection is unwarranted in that the facts that form the subject of these contention interrogatories *may be* facts presented by one or more of the Defendants at trial. Defendants are entitled to know whether and how Plaintiffs will contest such factual allegations")(emphasis added); fcg Brief at 4 ("before Flexible presents evidence at trial … Flexible is entitled to know what contentions Plaintiffs will make (and what evidence (if any) Plaintiffs will seek to introduce) in response"). fcg Interrogatory No. 3 does not ask whether Plaintiff will "contest" an argument that fcg's or Etched Circuit's waste was disposed of in a particular location, however. It simply asks whether Plaintiffs are making such a contention.[5] In essence, defendants are interpreting their phrase "do you contend" to mean "do you contest" even though the interrogatories do not indicate whether Defendants will make a particular argument or what exactly that argument may be. Plaintiffs answered the questions asked.[6]

---

[5]    "Contend" means "to strive in debate: ARGUE." *Webster's Ninth New Collegiate Dictionary*, 1986. Contention interrogatories to Plaintiffs thus properly seek only what points Plaintiffs are advancing or arguing, not points that may or may not be argued by someone else.

[6]    Similarly, fcg Interrogatory No. 4 asks whether Plaintiffs contend that any drums found at and removed from the Site were drums containing, or which had contained at the time of disposal at the Site, wastes generated by fcg or Etched Circuits. Plaintiffs objected to this Interrogatory because it was not and still is not clear whether fcg is asking if Plaintiffs will contend that any fcg or Etched Circuits' wastes were disposed of in drums at the site or whether any drums found at the site had fcg or Etched Circuits labels on them. Despite this, Plaintiffs responded that they will not ask the Court at trial to make findings of fact or conclusions of law concerning whether any wastes generated by fcg and/or Etched Circuits were contained in any specific drum or drum fragment. Plaintiffs

(continued...)

Even if Defendants had actually asked whether Plaintiffs will dispute one or more such Defendant contentions, such interrogatories would have been objectionable. Defendants are essentially suggesting that Plaintiffs must explain in detail the position Plaintiffs might ultimately take at trial to a contention that *Defendants have not yet even made,* much less one supported by evidence and legal analysis. Nothing in any of the cases cited by Defendants holds that a party must set forth in responses to contention interrogatories its rebuttal to arguments that have not yet been made. Plaintiffs are aware of no authority for such a proposition.

The Local Rules of Civil Procedure of the Eastern District of Pennsylvania do not require the identification of rebuttal evidence in pretrial orders, let alone in interrogatories. Local Rule 16.1(d)(1) provides that the pretrial memorandum of each party shall contain a list of witnesses the party submitting the memorandum intends to call at trial in a party's case in chief. Local Rule 16.1(d)(2) requires parties to identify in the pretrial order all witnesses that the parties actually intend to call at trial "during their respective *case in chief.*" Rebuttal evidence cannot be required in response to contention interrogatories when it is not even required in a pretrial order.

The problems with the argument that Plaintiffs must explain what they will say in responses to a contention not yet made by a Defendant are further illustrated by fcg's Interrogatory No. 2: "Do you contend that any spent etchant (or "spent etchings" as that term is used in paragraph 60 of your Fourth Amended Complaint in this Case) generated by FCG an/or Etched Circuits, Inc. was not subjected to or processed through a reclamation, recovery,

---

(...continued)

further referred fcg to its response to Joint Contention Interrogatory No. 78, which states that Plaintiffs will contend that fcg's and Etched Circuit's drummed waste was disposed of at the Site and the basis for such contentions. It is entirely unclear what additional information that fcg is seeking in response to this interrogatory.

recycling, neutralization, treatment and/or other process?" Plaintiffs objected on various

legitimate grounds, but nevertheless responded that they would not ask the Court at trial to make

any such findings of fact or conclusions of law. This response was particularly appropriate

because the "contention" set forth is unintelligible. It is impossible to determine exactly what is

the factual question on which fcg seeks Plaintiffs' comment. It cannot be Plaintiffs' obligation in

responding to contention interrogatories to somehow divine the specific contention that a

Defendant may make at trial, or to search through hundreds of documents and thousands of

pages of deposition transcripts to try and locate "evidence" that might bear on the validity of any

such contention. Plaintiffs cannot determine now whether they might dispute some contention

that a Defendant *may* make at trial because Plaintiffs do not know whether such a Defendant has

any evidence whatsoever to support its argument.[7]

Similarly, Ashland's argument that Plaintiffs' responses to Interrogatory Nos. 67-

70 are deficient because they "fail" to address the disposal of wastes at the Site prior to 1972

(Ashland Brief at 7) illustrates further the folly of Ashland's fundamental argument. Those four

interrogatories ask, as to DCC and Globe Disposal Company: "Do plaintiffs contend that

drummed [or bulk] waste transported by [one of those entities] was disposed of at the Site?" and

then ask, *inter alia*: "A. If not, what is the factual and legal basis for your response. B. If so,

---

[7]    For the same reasons, Plaintiffs cannot be expected to know whether fcg is contemplating
an argument that its wastes were disposed in certain locations at the Site as a result of
reading fcg's Interrogatory No. 3. In fact, Plaintiffs still do not know whether and on
what basis fcg might make this argument, or whether fcg is simply dreaming. Plaintiffs'
response to fcg's Interrogatory No. 6 is also appropriate. It is unclear exactly what
contention fcg is seeking. In any event, Plaintiffs' expert has testified that the precise
nature of any particular waste disposed of at the Site is inconsequential because all wastes
contributed to the need for and cost of response actions and that response costs cannot
meaningfully be allocated on a cost by cost or waste or waste basis.

what is the factual and legal basis for plaintiffs' contention that drummed waste transported by

DCC was disposed of at the Site." Plaintiffs objected to these interrogatories on various grounds,

then responded: "Plaintiffs will ask the Court at trial to make findings of fact and conclusions of

law that drummed and bulk waste hauled by DCC beginning in 1972 was disposed of at the Site.

By way of further response, see response to Interrogatory No. 78.[8] Plaintiffs will not ask the

Court at trial to make findings of fact or conclusions of law that drummed and bulk waste hauled

by Globe was disposed of at the Site." Plaintiffs' Responses at 35-37.

　　　　Ashland now insists that Plaintiffs must explain why Plaintiffs *do not* intend to

ask the Court to make findings concerning wastes hauled by DCC prior to 1972 or by Globe.

Ashland Brief at 7. The reasons why Plaintiffs have chosen to make certain contentions in their

case-in-chief and not others are simply not within the scope of discovery. Fed. R. Civ. P.

26(b)(3). Ashland cites no authority for the proposition that Plaintiffs must set forth the "factual

and legal" basis for why they *are not making* a particular contention. Plaintiffs have no unique

access to the documents and testimony concerning these issues. They have no obligation to

explain to Defendants the reasons for their determination that there maybe insufficient evidence

to establish a particular fact at trial, or that certain information is not relevant, or that they simply

choose for strategic reasons not to make such contentions.[9]

---

[8]　　Interrogatory No. 78 sets forth in great detail exactly what wastes Plaintiffs *will* contend
in their case-in-chief were disposed of at the Site.

[9]　　Likewise, Ashland Interrogatory No. 3 asks whether Plaintiffs contend that Manfred
DeRewal, Boarhead and DCC brought any tank truck, drum or container onto the Site
after October 15, 1976. Plaintiffs responded to this Interrogatory by referring Ashland to
its response to Joint Contention Interrogatory No. 78, which shows that Plaintiffs contend
that hazardous substances were disposed of at the Site throughout the entire Nexus Period
from June 1976 to March 1977.

Generally, a party serves contention interrogatories to learn about the contentions against it. *Moore's Federal Practice 3d*, Section 33.78 at 33-63. This, in turn, leads to avoiding unnecessary discovery, narrowing the issues for trial and expediting the disposition of the lawsuit. In fact, many contention interrogatories systemically track the allegations in an opposing party's complaint. Plaintiffs' responses to Defendants' contention interrogatories are more than sufficient to notify Defendants of the issues they will face at trial; they tell Defendants *exactly* what Plaintiffs do contend and identify all of the documents and testimony Plaintiffs intend to offer into evidence to prove those contentions.

The party filing contention interrogatories has the burden of proving that responses to the interrogatories will contribute meaningfully to clarifying the issues at trial and provide fair notice to the parties of what issues will be relevant at trial. *B. Braun Medical Inc. v. Abbott Laboratories, et al.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). This burden cannot be met by "vague or speculative statements about what might happen if the interrogatories were not answered." *Fischer and Porter Co. v. Tolson*, 143 F.R.D. 93, 96 (E.D. Pa. 1992). Defendants have not met this burden. For example, Ashland's motion seeks to compel Plaintiffs to serve full and complete responses to Joint Contention Interrogatory Nos. 29-32, 47, 48, 53, 72, 111, 118, 124 and 125 without any discussion whatsoever of how Plaintiffs' responses to these interrogatories are insufficient.[10] Ashland did not satisfy its burden of proving that further

---

[10]    Interrogatory Nos. 29-32, 47-48, 53-66, 111, and 124-25 concern entities that Plaintiffs do not believe should be allocated a share of liability for Plaintiffs' response costs, because they are not parties to the action, because they have no assets or are defunct, because Plaintiffs do not contend their wastes were disposed of at the Site, or some combination of those reasons. *See* Response to Interrogatory No. 78, including Exhibit A. Interrogatory No. 72 asks Plaintiffs' contention concerning the "total volume" of waste disposed of at the Site. Plaintiffs' make no such contention because, *inter alia*, they believe that only the wastes from parties to this action are relevant.

responses to these interrogatories are warranted.[11]   Moreover, because the Defendants have control or access over the information they are requesting, they have a heightened burden of proof.  Essentially, Defendants are asking the Court to require Plaintiffs to respond to arguments that Defendants might make at trial.  In its brief, Ashland admits that "the facts that form the subject of these contention interrogatories may be facts presented by one of more of the Defendants at trial."  Therefore, because the potential arguments are Defendant's own arguments, they have control or access over the information about which Defendants are asking.  Defendants' argument that they will be subjected to "surprise" at trial as a result of Plaintiffs' not setting forth their rebuttal to Defendants' potential arguments is entirely unfounded.  As demonstrated above, Plaintiffs have completely laid out their case-in-chief against Defendants.[12]

3.  **Plaintiffs Fully Responded to the Contention Interrogatories Regarding the Response Costs Incurred and To Be Incurred By Them.**

Ashland argues that Plaintiffs' responses to Interrogatory Nos. 76-82 are deficient because Plaintiffs, Ashland says, failed to state each Plaintiff's contention as to the response costs incurred by each Plaintiff and each Plaintiff's allocable share of such costs.  Ashland Brief at 7.  Plaintiffs' responses contain all of the underlying evidence concerning response costs

---

[11]    Ashland's request that Plaintiffs' objection that Plaintiffs do not have to respond to contention interrogatories concerning contentions Plaintiffs are not making in their case-in-chief be "stricken" without reference to any specific responses that Ashland believes are made thereby deficient is inappropriate because it does not explain how any *particular* response is deficient.

[12]    For all of these reasons, Plaintiffs' responses to fcg, inc's Interrogatory Nos. 2-4 are full and complete.  Those interrogatories ask whether Plaintiffs will make contentions that appear to be in reality contentions fcg, inc. is considering making at trial.  This same analysis applies with respect to Carpenter's Interrogatory Nos. 4, 5 and 6.

incurred by each individual Plaintiff and by Plaintiffs collectively and set forth specifically what equitable share of response costs should be allocated to Plaintiffs at trial based upon each individual Plaintiff's share, or lack thereof, of such costs. The only thing Plaintiffs' responses do not do is adopt Ashland's view of what Plaintiffs *should* contend. Rather, the responses state what Plaintiffs *do* contend. Ashland's argument is therefore not really a discovery dispute, rather an attempt to restate legal arguments that Ashland already has made and that this Court already has rejected.

The crux of this argument relates to Interrogatory Nos. 76 and 77.[13] Interrogatory No. 76 states: "What do Plaintiffs contend is the Total Cleanup Costs incurred by each Plaintiff for each of OU-1 and OU-2?" Interrogatory No. 77 states: "Do you contend that any Plaintiff has spent, or is obliged to spend for future costs, amounts in excess of its equitable share of the Total Cleanup Costs?" Plaintiffs' responses to these interrogatories were that they are making no such contentions. Each such response constitutes a full and complete answer to the precise interrogatory posed. Plaintiffs' responses are not deficient merely because Plaintiffs do not intend to make contentions Ashland wishes Plaintiffs would make.

Moreover, Plaintiffs *additionally* stated in detail in response to those two interrogatories what they *do* intend to contend at trial, even though they were not asked to do so. Those responses provide Defendants with detailed and precise statements of how much Plaintiffs collectively and individually have paid to date in response costs and what Plaintiffs contend each Plaintiff's equitable share of such costs to be. The responses also identified all of the documents

---

[13]    Ashland's heading for this section of its brief includes Interrogatory Nos. 78-82. However, nothing in that section of Ashland's brief explains in any way why the responses to those interrogatories are deficient. They are not.

and witnesses Plaintiffs rely upon with respect to those contentions. There is nothing deficient about the responses.

Plaintiffs' response to Interrogatory No. 76 refers Defendants to Plaintiffs' response to Interrogatory No. 73. Interrogatory No. 73 states: "What do Plaintiffs contend is the Total Cleanup Cost for this Site?" Plaintiffs objected to this question on various grounds, including the definition of "Total Cleanup Costs." Defendants defined that phrase to mean: "[A]ll past, present, ongoing and/or future removal, remedial design, remedial action, operation and maintenance and any other 'response cost' as that term is defined in 42 U.S.C. § 9601." Joint Contention Interrogatories to Plaintiffs at 6. Plaintiffs responded without waiving any objections: "Plaintiffs will ask the Court at trial to make findings of fact and conclusions of law based upon testimony and documents Plaintiff will offer into evidence concerning the costs of response incurred by them to a date to be set by the Court. Plaintiffs will also ask the Court to declare that Defendants are liable for contribution for whatever costs of response that are incurred by Plaintiffs after that date. Plaintiffs thus have no contentions concerning 'Total Cleanup Costs.'" Plaintiffs also detailed exactly the response costs incurred to date by them by various categories, detailing what shares of each category costs had been funded by the five Plaintiffs and, with respect to certain of the categories, NRM Investments and Worthington Industries, Inc. Plaintiffs' response additionally referenced all of the documentation of such past costs produced previously to Defendants, and referenced the March 30, 2007 agreement between Agere and the four remaining Plaintiffs resolving certain claims as between themselves.[14] The

---

[14]    Plaintiffs' May 7, 2007 letter in response to Defendants' deficiency letter describes in detail how each dollar number was calculated and states again exactly what contentions Plaintiffs intend to make and what contentions they do not intend to make with respect to these topics. May 7, 2007 letter at 2-7 (attached as Exhibit 5 to Ashland's Brief).

last sentence of Plaintiffs' response to this interrogatory states: "Plaintiffs will ask the Court at trial to rule that they have collectively paid to date an amount in excess of their equitable share of those costs identified above." Plaintiffs' response to Interrogatory No. 76 was thus that Plaintiffs are not contending that each Plaintiff has incurred some portion of "Total Cleanup Costs."

Plaintiffs responded to Interrogatory No. 77, "Do you contend that any Plaintiff has spent, or is obliged to spend for future costs, amounts in excess of its equitable share of the Total Cleanup Costs?", by referring Defendants to Plaintiffs' responses to Interrogatory Nos. 73 and 78. Interrogatory No. 78 asks "What do Plaintiffs contend is Agere's allocable/equitable share of the Total Cleanup Costs for the Site (expressed in a percentage)?" Interrogatory Nos. 79-111 repeat this question, substituting the names of other entities. The subsets for these interrogatories asks for the factual basis as to any such contention and the calculations used to arrive at that contention. Plaintiffs' response to Interrogatory No. 78 sets forth in great detail Plaintiffs' contentions as to the appropriate allocation of response costs incurred by them and to be incurred by them in the future. As discussed previously, that response includes a chart, Exhibit A, setting forth Plaintiffs' contentions with respect to the specific equitable shares Plaintiffs will ask this Court to assign to each party at trial. Plaintiffs' response to Interrogatory No. 77 was effectively "No," both because Plaintiffs make no contention whatsoever concerning "Total Cleanup Costs" and because, as set forth below, Plaintiffs do not agree that they must establish at trial that each of them *individually* must prove that it has incurred response costs in excess of its *individual* equitable share of such costs to maintain this action.

Ashland is thus absolutely incorrect in its statement: "Plaintiffs offer no justification for refusing to state each Plaintiffs' specific contention as to contribution costs they have individually paid or their equitable share of the response costs." Ashland Brief at 12.[15]

Nevertheless, by incorporating their responses to Interrogatory Nos. 73 and 78, Plaintiffs stated their actual contention that they have collectively paid in excess of their equitable share of response costs for which they seek contribution. Plaintiffs' response to Interrogatory No. 73 states exactly how many dollars each Plaintiff has paid to date into the OU-1 and OU-2 accounts from which the EPA and the various contractors actually performing the response actions have been paid. Exhibit A incorporated into Plaintiffs' response to Interrogatory No. 78 reflects Plaintiffs' contention that the Non-Settling Defendants are responsible for 82.09% of Plaintiffs' response costs. It is thus very clear that Plaintiffs do contend that they have collectively paid to date an amount in excess of their share of such costs. Similarly, with respect to any *individual* Plaintiff, though Plaintiffs will make no contention at trial, Defendants were given all of the information they need to determine, if they chose to do so, that each individual Plaintiff has, in fact, to date incurred far in excess of what Plaintiffs contend their equitable share should be.

Ashland's true unhappiness with these responses is that Plaintiffs will not contend that *each* Plaintiff must have incurred an amount in excess of its equitable share of response

---

[15]     Ashland's fourth argument, that Plaintiffs' response to Interrogatory No. 188 is deficient, is simply bizarre. Plaintiffs' response to that interrogatory referenced their response to Interrogatory No. 78. Exhibit A included in that response shows Plaintiffs' contentions with respect to the equitable shares of each Plaintiff, including shares for three Plaintiffs and a zero share for two others. This is a full and complete response. Plaintiffs deny Ashland's statement that "Mr. Harris made an absolute representation to the Court during the most recent case management conference on April 24, 2007, that Plaintiffs had no liability." Ashland Brief at 13.

costs to maintain this action.  Ashland Brief at 7-9.  Ashland argues that Plaintiffs were required

to make such contentions by stating; "Plaintiffs cannot dispute that these are essential

contentions of each Plaintiff's prima facie case of contribution."  Ashland Brief at 7.  Plaintiffs

not only *can* dispute that such contentions are part of Plaintiffs' prima facie case, they have

successfully done so.  Ashland's argument in that quoted sentence at the bottom of Page 7 of

Ashland's Brief to the conclusion of the paragraph at the top of Page 9 is a *word for word* cut

and paste from Ashland's Memorandum of Law in Support of Defendants' Motion to Dismiss

Fourth Amended Complaint for Failure to State a Claim Upon Which Relief Can be Granted,

filed on September 9, 2005 at Docket No. 175.  Ashland argued then that Plaintiffs' Complaint

should be dismissed because it did not include such allegations.  September 9, 2005 Brief at 14-

19.  Plaintiffs' Brief in opposition to that motion set forth on Pages 18-29 exactly why Ashland's

contention was incorrect as a matter of law.  Copies of these pages are attached hereto marked

Exhibit A.  Ashland is therefore doing nothing here other than restating its losing argument.

Ashland attempts to characterize Plaintiffs' response as "deficient" because,

according to Ashland, Plaintiffs' itemization of the amounts each of them has paid into certain

OU-1 and OU-2 Group accounts are not their "true" contribution to response costs.  Ashland

Brief at 9, 12.  The amounts paid to date are not "true," according to Ashland, because Plaintiffs

are funding the costs in accordance with an interim allocation and will, at some future date, reach

amongst themselves a final allocation of those costs.  Ashland Brief at 10.

Defendants have had in their possession the precise details of each and every

payment made by each and every entity into each OU-1 and OU-2 Group accounts as well as the

details of each payment or other distribution from each such account.  Plaintiffs' May 7, 2007

letter states exactly the manner in which those funds were raised.  Ashland's assertion that there

is "uncertainty" and the "need for more specificity" with respect to Plaintiffs' responses, Ashland Brief at 12, is simply not true. There is no uncertainty about the contributions made by each Plaintiff to response costs and the details of those payments could not be more "specific."

Ashland is also incorrect that Plaintiffs actual response costs are "wholly inadequate to allow Defendants to mount a defense." Ashland Brief at 13. Ashland is in possession of all of the evidence necessary to make whatever arguments it chooses to make about what each Plaintiff has or has not paid to date with respect to response costs. It is in possession of all of the information with respect to how those costs were paid and the fact that the interim allocations for those costs may or may not be revised in the future. If Ashland believes that it has a defense in this action based upon those facts, it needs nothing in the way of a further response to Interrogatory Nos. 76-82 to proceed with that defense.

4.    **Plaintiffs' Use of the Phrase "Include, But Are Not Limited to" in the Responses to the Contention Interrogatories is Permissible.**

Plaintiffs responded to several of the contention interrogatories by setting out lists of evidence that they intend to rely upon in support of particular contentions. In fact, Plaintiffs actually cited to specific pages in deposition transcripts, which they intend to rely upon in the event that a particular witness is not available to testify at trial. Plaintiffs prefaced each list of evidence included in their responses to support a particular contention with the phrase, "Include, but are not limited to." Plaintiffs are not confined to only relying upon the evidence set out in their responses to the contention interrogatories to support a particular contention, especially not with respect to designated pages and lines of deposition transcripts. Defendants have cited absolutely no authority to prohibiting use of the phrase, "Include, but not limited to," in responses to contention interrogatories. There is no reason why Defendants cannot make the

argument at trial that a particular document or witness offered into evidence by Plaintiffs may be inadmissible because it was not previously disclosed by Plaintiffs in discovery or Plaintiffs intentionally "surprised" Defendants with the evidence.

## **CONCLUSION**

For all of the foregoing reasons, and in the interest of justice, Plaintiffs respectfully request that the motions of Defendants NRM, Ashland, fcg, and Carpenter be denied.

Respectfully submitted,

Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership

By: _____

Glenn A. Harris
Plaza 1000, Suite 500 Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3440

Attorney for Plaintiffs

Dated: June 15, 2007

# Exhibit A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 02-CV-3830 |
| | : | |
| ADVANCED ENVIRONMENTAL | : | |
| TECHNOLOGY CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS FOURTH AMENDED COMPLAINT
FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

I.    INTRODUCTION

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Eastern District of
Pennsylvania Local Court Rule 7.1, and paragraph 3 of this Court's Order of July 20, 2005,
Defendant Ashland Inc., along with nine (9) other named defendants (collectively referred to as
the "Moving Defendants")[1], presently move this Court to dismiss the Fourth Amended
Complaint filed by the five newly added Plaintiffs for failure to state a claim upon which relief
can be granted. The grounds for dismissal can be summarized as follows:

1.    Neither Plaintiff TI Group Automotive Group Systems, LLC ("TI") with respect
to  its contribution claims for recovery of costs associated with the first phase of remedial design
and action for the Boarhead Site (designated as OU-1) nor Agere Systems, Inc. ("Agere") were

---

[1]    In addition to Ashland Inc., this memorandum of law is submitted on behalf of
Defendants Advanced Environmental Technology Corporation, Carpenter Technology
Corporation, FCG, Inc., a/k/a Flexible Circuits, Inc., Handy & Harman Tube Company, Inc.,
Merit Metals Products Corp., NRM Investment Company, Rahns Specialty Metals, Inc.,
Techalloy Company, Inc. and Thomas & Betts Corporation.

> **2.    Plaintiffs TI (With Respect to OU-1 Costs) and Agere Are Not Entitled to Recover Contribution Against Defendants Under Section 113(f)(3)(B)**

As stated above, CERCLA Section 113(f)(3)(B) provides the exclusive avenue for CERCLA contribution claims by a party that has settled its CERCLA liabilities with the United States or a state. Only TI (with respect to OU-2 costs), Cytec, Ford and SPS satisfy this condition.[7] TI (OU-1 costs) and Agere (OU-1 and OU-2 costs) cannot pursue claims under Section 113(f)(3)(B) because they have not settled their potential liabilities with the United States in an administrative or judicially approved settlement. Agere and TI settled with the other Plaintiffs who had settled with the government, not with the United States. Thus, as parties who settled with the other Plaintiffs, under this Court's June 30, 2004 Order (Exh. "D"), Agere and TI are not entitled to pursue contribution claims under Section 113(f)(3)(B) because they had not been sued by, nor have they settled with, the United States. Consequently, Count II of the Fourth Amended Complaint should be dismissed as to TI (for the OU-1 costs) and Agere.

> **3.    No Plaintiff Has Alleged Facts Sufficient to Support a Contribution Claim Under Section 113(f)(1) or 113(f)(3)(B)**

Assuming, arguendo, that any Plaintiff can successfully overcome the statutory hurdles outlined above and can proceed under either Section 113(f)(1) or Section 113(f)(3)(B), the Fourth Amended Complaint nevertheless still fails to state any valid claim under Section 113(f) because two fundamental elements of a contribution action as defined by the courts are missing.

In In the Matter of Reading Co., 115 F.3d 1111 (3d Cir. 1997), the Court of Appeals recognized the federal common law basis of CERCLA § 113(f) in stating that:

---

[7]    Moving Defendants reserve all rights to argue whether the settlements between TI, Cytec, Ford and SPS constitute settlements contemplated by Section 113(f)(3)(B). For purposes of this motion only, Moving Defendants are not relying on this argument.

Page 15

> In passing § 113(f), Congress acted to codify existing federal common law and to replace the judicially crafted measure with an express statutory remedy.

Id. at 1119. The Reading Court correctly noted that CERCLA does not define the term "contribution." Id. at 1120. The Court further referenced Restatement (Second) of Torts § 886(a) as the embodiment of the "traditional, common law sense" of contribution that Congress intended to be reflected in Section 113(f). Id. at 1124. See also, United States v. Compaction Systems Corp., 88 F. Supp. 2d. 339, 351-352 (D.N.J. 1999); E.I. Du Pont De Nemours and Co. v. United States, 297 F. Supp. 2d 740, 746-747 (D.N.J. 2003).

Section 886(a) of the Restatement (Second) of Torts reads as follows:

> (1) Except as stated in Subsections (2), (3) and (4), when two or more persons become liable in tort to the same person for the same harm, there is a right of contribution among them, even though judgment has not been recovered against all or any of them.
>
> (2) The right of contribution exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability, and is limited to the amount paid by him in excess of his share. No tortfeasor can be required to make contribution beyond his own equitable share of the liability.
>
> (3) There is no right of contribution in favor of any tortfeasor who has intentionally caused the harm.
>
> (4) When one tortfeasor has a right of indemnity against another, neither of them has a right of contribution against the other.

The significant language for the present case is the first sentence of subparagraph (2) -- "[t]he right of contribution exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability, and is limited to the amount paid by him in excess of his share." Thus, a plaintiff that seeks contribution under Section 113 must at least plead facts demonstrating that it has settled all

Page 16

alleged liability to a third party by paying an amount that exceeds its "fair share of the overall liability." New Castle County, supra, 111 F.3d at 1122 (citation omitted). Indeed, at trial, the plaintiff seeking contribution bears the burden of establishing a reasonable basis for apportioning the overall liability to the third party. DeGussa Construction Chem. Operations, Inc. v. Berwind Corp., 280 F. Supp. 2d 393, 401 (E.D. Pa. 2003), citing, United States v. Union Corp., 277 F. Supp. 2d 478, 485 (E.D. Pa. 2003). Thus, each plaintiff seeking contribution must necessarily plead and prove, at a minimum, what it paid in settlement and that its payment exceeded its equitable share of the common liability.

No Plaintiff avers in the Fourth Amended Complaint any facts demonstrating that it settled liability to a third party by paying an amount exceeding its fair share of the overall liability. In fact, due to an ongoing, and fundamental, subterfuge plainly outlined in the Fourth Amended Complaint, the Plaintiffs intend to hide for all time from this Court the ultimate amount that any of them ends up paying. That subterfuge defeats the Plaintiffs' contribution claims because it necessarily prevents any one of them from alleging that it has paid more than its fair share of the common liability of all PRPs, one of the fundamental attributes of a valid claim for contribution. Paragraph 16 of the Fourth Amended Complaint (Exh. "C") avers only that "the Agreement Group Members[8] have agreed that they will, at some future time, and not in this civil action, reach a final allocation among themselves applicable to all costs associated with group activities, including the costs of cleanup work comprising OU-1 and OU-2." (Emphasis added). Plaintiffs further admit in paragraph 21 of their pleading that the contributions they have made towards OU-2 costs have been based on an interim allocation among them that does not bind any of them. Adding to the uncertainty is the allegation in paragraph 18 that the Plaintiffs have also

---

[8] The preamble to the Fourth Amended Complaint identifies the "Agreement Group Members" as Agere, Cytec, Ford, SPS and TI.

entered into an agreement with two other entities (only one of which is identified (¶ 101) and who is a defendant in this litigation), who allegedly also have contributed to the costs of the OU-1 remedial action. According to that Paragraph, those parties' contributions were based upon yet another "interim allocation" that, again, does not bind either the Plaintiffs or the two entities.

Clearly, there is no way to decipher whether and in what amount any particular Plaintiff has made a true contribution to an OU-1 or OU-2 settlement and, consequently, whether or not a particular Plaintiff has paid or ever will pay an amount that exceeded its fair share of liability for overall costs. Potentially, one or more of the Plaintiffs ultimately might contribute nothing to the settlement with the government because a final allocation reached privately after this civil action concludes (and therefore out of earshot of this Court) might assign one hundred percent of the Plaintiffs' collective interim liability payments to the other Plaintiffs.

In short, none of the Plaintiffs in this case have validly alleged in the Fourth Amended Complaint that it has paid in excess of its fair share to resolve a common liability.[9]

The Fourth Amended Complaint lacks another essential element of a contribution action under Section 113(f). There is no allegation that the Plaintiffs, individually or collectively, have "discharged the entire claim for the harm," i.e., have extinguished the liability of the Defendants to the United States for the OU-1 and OU-2 remediation and costs. The federal common law right of contribution recognized in the Reading and Halliburton cases, and embodied in Section 886(A) of the Restatement (Second) of Torts, depends upon the discharge of the common

---

[9]    There is a clear, if improper, purpose lurking behind the Plaintiffs' odd determination to pursue their final allocation *inter se* in a later private proceeding, rather than in this civil action. And that is this -- there are fundamental differences between and among the Plaintiffs as to what the evidentiary facts show and mean, and as to what equitable allocation consequences flow from those facts. Hiding those differences from the Court fundamentally and unfairly tilts the playing field in favor of the Plaintiffs in what is otherwise supposed to be an equitable proceeding. It is exactly as if the Court were being asked to umpire a baseball game, but is allowed to call strikes only against the Defendants, but not against the Plaintiffs.

Page 18

liability as a critical, necessary condition to the accrual of a right to contribution.[10] In E.I. Du Pont De Nemours & Co. v. United States, 297 F. Supp. 2d 740 (D.N.J. 2003), the district court granted summary judgment on a Section 113(f) contribution action on several grounds, including the inability of the plaintiff to prove that it had discharged the common liability on the underlying claim. Id. at 752-753. See Elf Atochem North America, Inc v. United States, 833 F. Supp. 488, 496-497 (E.D. Pa. 1993) (no right to contribution under New Jersey Joint Tortfeasor Contribution Act because no discharge of common liability).

The Fourth Amended Complaint contains no clear averment that the liability of the Defendants has been extinguished by the two settlements which certain of the Plaintiffs' have entered into with the United States. Paragraph 16 of the Fourth Amended Complaint merely alleges that the Plaintiffs agreed to "collectively resolve the claims of EPA related to the site." As a general rule, consent decrees do not extinguish the liability of any other person not party to the agreement unless its terms so provide. 42 U.S.C. § 9622(h)(4); see also, 42 U.S.C. § 9613(f)(2). The Fourth Amended Complaint does not allege that the United States has released any non-parties, including the Defendants, pursuant to the terms of the Consent Decrees or otherwise.[11]

---

[10]     Some courts look to the 1997 Uniform Comparative Fault Act ("UCFA") to define the federal right of contribution. See, e.g., Lyncott v. Chemical Waste Management, Inc., 690 F. Supp. 1409 (E.D. Pa. 1998). Section 4 of the UCFA also provides that in order to sustain a right of contribution, the underlying common liability must first have been extinguished. This Court relied upon the UCFA in its Memorandum Order of June 30, 2004 (Exh. "D") to determine "the extent to which the non-settling defendants' liability should be offset by any settlement agreements." (Page 3, citing American Cyanamid Co. v. King Industries, Inc., 814 F. Supp. 215 (D.R.I. 1993)). In the American Cyanamid case, the court ruled that the settling defendants could not sue non-settling defendants for contribution unless the settlement agreement between plaintiff and the settling defendants extinguished the liability of the non-settling parties. Id. at 218.

[11]     Although not pleaded, there is no dispute that the United States expressly reserved all rights to proceed against non-settling defendants in both Consent Decrees.

Page 19

Moreover, if in the two Consent Decrees the Plaintiffs collectively agreed to implement all remediation efforts required by the United States for the Boarhead Farm Site and agreed to pay all response costs incurred by the United States, the liability of the Defendants, nevertheless, would not be discharged until all remediation was satisfactorily completed and all response costs paid. In <u>United States v. Occidental Chemical Corp.</u>, 200 F. 3d 143 (3d. Cir. 1999), the Court of Appeals reversed the district court's order dismissing the United States' action against one PRP after another PRP entered into a consent order to remediate the site. The Court reasoned that because the consent decree depended upon the completion of remedial action and satisfactory performance by the settling PRP, the United States could pursue other PRPs. <u>Id.</u> at 148-149. <u>See also</u>, <u>Elf Atochem North America v. United States</u>, supra, 833 F. Supp. at 498 (consent decree with United States did not extinguish common liability because of reservation of rights with respect to non-parties). Plaintiffs in this action have not alleged that by the Consent Decrees or otherwise, they have extinguished "the entire claim for the harm" which the Defendants potentially may have to the government, a critical element of a purported right to contribution.

Having failed to plead these essential elements of a contribution action, Plaintiffs' CERCLA claims should be dismissed.

### 4.    <u>Plaintiffs Are Not Entitled to Declaratory Relief Under CERCLA</u>

The prayers for relief under Counts I and II of the Fourth Amended Complaint seek an order declaring, *inter alia*, that the Defendants are liable under CERCLA Sections 113(f)(1) and 113(f)(3)(B) and compelling the Defendants to provide contribution for all future response costs incurred at the Boarhead Site. The only authority cited in Counts I and II of the Fourth Amended Complaint is Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Count III of the Fourth Amended Complaint specifically requests a declaratory judgment pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2).

Page 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AGERE SYSTEMS, INC., CYTEC INDUSTRIES, :
INC., FORD MOTOR COMPANY, SPS :
TECHNOLOGIES, LLC, and TI GROUP :
AUTOMOTIVE SYSTEMS, LLC, :
                       :
             Plaintiffs, :       Civil Action No. 02-3830
                       :
v. :
                       :
ADVANCED ENVIRONMENTAL :
TECHNOLOGY CORPORATION, ET AL., :
                       :
             Defendants. :

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

Page 21

to the satisfactory performance by such party of its obligations under the agreement concerned." 42 U.S.C. § 9622(f)(5). Thus, where a Consent Decree (or administrative settlement) includes an obligation for the settling party to undertake or pay for future work, the claim of the government is not "fully discharged" until the operation and maintenance is complete and a certificate of completion has been issued by EPA, possibly decades after the execution of the administrative settlement or entry of the Consent Decree.

The clear language of section 113(g)(3) requiring the initiation of an action for contribution under § 113(f) within three years from the entry of a judicially approved settlement or the date of an administrative settlement, coupled with the fact that such settlements may take decades to satisfy, conclusively refutes the Defendants' suggestion that such an action cannot be brought until the remedial action is completed. A section 113(f) action would, under Defendants' logic, not accrue until a certificate of completion was issued decades after the very limitations period governing such causes of action had run. Discharging the "entire claim for the harm" cannot be an element of a section 113(f) claim.[18]

Moreover, section 113(f)(3) contradicts Defendants' argument that a section 113(f) plaintiff must allege that he has paid "more than his equitable share of the common liability" as provided in section 886A(2) of the Restatement. That section expressly states that a person who has resolved "its" liability to the government may seek contribution from any person

---

[18]    The Third Circuit correctly noted in *In Re Reading* that a § 113 contribution action may be initiated "at whatever time in the clean-up process the party, seeking contribution, decides to pursue it." 115 F.3d at 1120. *See also DuPont*, 297 F. Supp. 2d at 748, n.9 ("Indeed, textually, the statute of limitations against a contribution action does not begin to run until a settlement or judgment is reached with respect to response costs or damages. The timing of actual clean-up, removal or remediation does not control.") (citation omitted).

who is not a party to a settlement, and, in that contribution action, the rights of any person who has resolved "its" liability to the government are subordinate to the government's rights. Therefore, the statute expressly contemplates that a party settling "its" liability for only a portion of a claim by the United States or a state is entitled to bring an immediate contribution action against any person not a party to that settlement to recover some portion of that settlement amount.

Once again, the legislative history is consistent with this interpretation. As mentioned previously, Congress adopted modifications to CERCLA proposed by the House Energy and Commerce Committee for the specific purpose of allowing parties to recover some portion of their settlement with the United States from other non-settling parties. The House Energy and Commerce Committee report provides that parties who settle with the government "can attempt to recover some portion *of their expenses and obligations* in contribution litigation from parties who were not sued in the enforcement action or who were not parties to the settlement." H.R. REP. No. 99-253, pt. I, at 80 (1985) (emphasis added). On the Senate floor, Senator Stafford, a co-sponsor of the legislation, provided noteworthy comments, stating: "Also where the United States or a State has secured a partial settlement, it may seek relief for any of the remaining response action or costs for which the non-settlors are liable. Similarly, a settler may also maintain a contribution action against non-settlors regarding *the portion* of the response action or costs to which the settler has agreed." 131 Cong. Rec. S11830 (daily ed. September 20, 1985) (emphasis added).

It should be noted that the Restatement subsection relied upon by the Defendants does not actually refer to two separate "elements" of even a common law contribution claim. Section 886A(2) of the Restatement provides, in relevant part:

> The right of contribution exists only in favor of a tortfeasor who has
> discharged the entire claim for the harm by paying more than his equitable
> share of the common liability, and is limited to the amount paid by him in
> excess of his share.

Restatement (Second) of Torts § 886A(2). Section 886A applies only to instances in which

"two or more persons become liable in tort to the same person for the same harm." Thus, the

words "by paying more than his equitable share of the common liability" do nothing more than

describe the initial words to which they are grammatically linked: "who has discharged the entire

claim for the harm." *Each and every* joint tortfeasor who discharges the entire harm must, by

definition, have paid more than his fair share, because that tortfeasor has paid 100% of the

liability and at least one other tortfeasor is also liable to the injured party. The concepts of

"discharge the entire claim" and "more than his fair share" are thus not two independent

elements of even the common law of contribution.

Similarly, a section 113(f) plaintiff seeking to recover from liable parties those

liable parties' equitable shares of the sums paid by the contribution plaintiff to a governmental

entity must have paid more than his "fair share" of the settlement sum precisely because he is the

only person to have paid that sum and the defendants are liable parties. As liable parties, the

defendants must have some equitable share of the amount paid in settlement by the section

113(f) plaintiff, such that, by definition, the section 113(f) plaintiff must have paid more than his

"fair share" of the settlement amount.

All of these statutory provisions conclusively demonstrate that the provisions of

section 886A(2) of the Restatement, or any other supposed embodiment of the common law

"requirement" that a contribution plaintiff must have discharged the entire claim for the harm by

paying more than his equitable share of the common liability, *cannot be* an element of a statutory

claim for contribution pursuant to section 113(f).

Page 24

B.    No Opinion Holds that the Terms of Section 886A(2) of the Restatement
      are Elements of a Section 113(f) Cause of Action

No opinion cited by Defendants holds that the terms of Section 886A(2) of the

Restatement constitute elements of a Section 113(f) cause of action.  Plaintiffs are aware of no

opinion that so holds.  Defendants apparently hope that this Court will over read *In re Reading* as

adding the words of section 886A of the Restatement to the CERCLA statute, and thereby feel

bound to add new pleading requirements to the well-settled elements of a section 113(f)

contribution claim.

The ultimate question in *In re Reading* was whether Conrail could assert a

CERCLA contribution claim against the Reading Company (formerly the Reading Railroad)

with respect to liability that Conrail and other parties were facing in a section 107(a) civil action

brought by the United States with respect to the Douglassville site.  115 F.3d at 116.  Conrail's

third-party complaint against Reading alleged causes of action under § 107(a), § 113(f), common

law contribution and common law restitution.  *Id.* at 117.  The Third Circuit held that CERCLA

preempted Conrail's two common law theories, *id.*, and that section 113(f) "Replaces the

judicially created cause of action under § 107(a)(4)(B) to the extent that a party seeks

contribution," such that Conrail could not bring a § 107(a) claim.  *Id.* at 1119-20.   Solely in the

context of deciding whether the essential nature of Conrail's claim was one for contribution (and

thus properly brought under § 113(f)), the court examined *Black's Law Dictionary* and case

authority (but not the Restatement) to conclude that Conrail's claim was for contribution because

Conrail was seeking apportionment of its liability with Reading.  *Id.* at 1120-21.

The Court next considered whether Conrail had a claim under section 113(f).  The

determining question was whether some form of joint liability between the contribution plaintiff

and the contribution defendant was necessary for liability to attach under section 113(f).  It is

Page 25

only in this section of the opinion that the court makes any reference to the Restatement. The Third Circuit concluded that "CERCLA contribution, like common law contribution, requires some form of joint liability." *Id.* at 1124. It reached this conclusion based upon the plain language of section 113(f): "may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . .." *Id.* at 1124. The court disagreed with Conrail's argument that common liability by two or more defendants to one common governmental agency was not required by this language. *Id.* at 1124. It found instead: "Because § 113(f)(1) *reflects* the traditional concept of contribution, its language does not permit contribution among liable parties who do not have a common derivation of liability." *Id.* at 1124 (emphasis added). In support of its statutory analysis, the Third Circuit merely noted that section 113(f) "parallels the scope of common law contribution," citing to comment (b) of the Restatement § 886A, which is a comment to subsection (1).[19] *Id.* at 1124-25.

It is thus quite clear that the Third Circuit's references to the Restatement and other sources of "common law" are only to support its reading of section 113(f)(1), and not for the purpose of deciding that Restatement § 886A(1) *adds* additional elements to section 113(f)(1). Indeed, because the court concluded that the "common law" of joint liability is identical to the language of section 113(f)(1), the court's opinion cannot be read to mean that the Restatement *adds* new elements to section 113(f). The *Reading* court nowhere quotes or even refers to § 886A(2) of the Restatement, the section relied upon Defendants in patching together

---

[19]     Restatement § 886A(1) says, in relevant part: "When two or more persons become liable in tort to the same person for the same harm, there is a right of contribution among them, even though judgment has not been recovered against all or any of them."

Page 26

their argument here, much less holds that each and every sentence in subsection (2) states an

element of a section 113(f) claim.[20]

Neither of the other opinions cited by Defendants to support such a proposition

hold or even suggest that section 886A(2) is somehow engrafted onto section 113(f)'s

contribution provisions or that it otherwise states "fundamental elements" of a section 113(f)

claim. *E.I. DuPont de Nemours & Company v. United States*, 297 F. Supp. 2d 740, 746-47

(D.N.J. 2003), in fact directly refutes this proposition. The *DuPont* court analyzed whether

DuPont could rely on any of three possible avenues for a contribution claim under CERCLA:

Section 113(f)(1); section 113(f)(3)(B); or pursuant to the savings clause in section 113(f)(1).

297 F. Supp. 2d at 747. The court decided DuPont could not proceed under either of the first two

approaches because there had been no prior civil action and because there had been no prior

settlement. *Id*. at 747-49. The court then analyzed whether a contribution action could

nevertheless be brought under the savings clause. It is in this section of the opinion, and only in

this section, that the *DuPont* court discusses the "common law" preconditions for a contribution

action. Indeed, the court expressly states: "Thus actions brought *pursuant to the savings clause*

must meet all the traditional common law elements of a contribution action . . ." *Id*. at 750

(emphasis in original). The court specifically noted that Congress "*expanded* on the contribution

right [when enacting §113(f)(1)] by permitting such an action to be brought where the primary

action is a CERCLA Section 106 order -- not a traditional lawsuit. But no such exception was

---

[20]    The opinion nowhere says even that § 886A of the Restatement is "the embodiment of
the traditional, common law sense of contribution," contrary to Defendants' suggestion.
Defendants' Brief at 15. The exact sentence referenced by Defendants states: "We held
in part III.A, *Supra*, that § 113(f) uses the term contribution in its traditional, common
law sense. This means that CERCLA contribution, like common law contribution,
requires some form of joint liability." 115 F.3d at 1124.

Page 27

placed into the savings clause." *Id. (emphasis added)*. The court's ruling that DuPont could not pursue a contribution claim because it had not discharged the common liability was thus limited to a "common law" contribution claim that DuPont might be able to bring pursuant to the savings clause. The *DuPont* court expressly recognized that the "traditional common law" requirements for contribution do not apply to a *statutory* contribution action under § 113(f), at least to the extent that any such common law contradicts the statutory language itself. *Id.* at 750-51.[21]

Defendants' essential premise that the terms of section 886A(2) of the Restatement somehow have become elements of a section 113(f) claim is directly refuted by section 113 itself and is without support in case law. Defendants have simply concocted this argument.

Moreover, no opinion cited by the defendants otherwise holds that a pleading fails to state a section 113(f) claim because it does not have an express allegation that the plaintiff has "discharged the entire claim for the harm." Defendants' citation to *DuPont* for the proposition that the court there "granted summary judgment on a section 113(f) contribution action on several grounds, including the inability of the plaintiff to prove that it had discharged the common liability on the underlying claim" is misleading at best. Defendants' Brief at 18. As set forth above, that Court's discussion of common law conditions applied only to a possible claim under the savings clause of § 113(f)(1), and not to DuPont's *statutory* claim.

Defendants' citation to *Elf Atochem North America, Inc. v. United States*, 833 F. Supp. 488 (E.D. Pa. 1993) is also misleading. That opinion construed the New Jersey Joint

---

[21]     The court in *United States v. Compaction Systems Corp.*, 88 F. Supp. 2d 339, 351-52, did nothing more than rely on *In re Reading* to conclude that contribution requires some form of joint liability.

Page 28

Tortfeasors Contribution Act, which statute expressly requires that the right to contribution

provided therein is applicable only where the injured party "recovers a money judgment or

judgments for such injury or damage against one or more of the joint tortfeasors, either in one

action or in separate actions, and any one of the joint tortfeasors pays such judgment in whole *or*

*in part . . .*" N.J.S.A. 2A:53A-3 (emphasis added).[22]  The *Elf Atochem* court was not construing

this statutory language, but was instead determining whether that plaintiff fit within an exception

to the statutory "judgment" requirement because it had entered into a Consent Decree with the

United States.  833 F. Supp. 496-97.  Only in that context was there any discussion of the

"discharge" of a common liability.  *Id.*  Nothing in the opinion even remotely suggests that the

"common law" overrules the New Jersey Act's statutory grant of the right to contribution where

a *judgment* is paid *in part*.[23]

        Neither do any of the opinions cited by Defendants hold that a pleading fails to

state a section113(f) claim if it does not contain an express allegation that the contribution

plaintiff has paid more than its "fair share" of some common liability.  Defendants attempt to

---

[22]     Most interesting, just like CERCLA section 113(f), the New Jersey statute grants a
statutory right to contribution where a "joint tortfeasor" pays only *part* of a judgment,
and does *not* require that the contribution plaintiff have satisfied the entire judgment.

[23]     Defendants' citation to *Lyncott Corp. v. Chemical Waste Management, Inc.*, 690 F. Supp.
1409 (E.D. Pa. 1988) to support the statement that "Some courts looked to the 1997
Uniform Comparative Fault Act ("UCFA") to define the federal right of contribution,"
Defendants' brief at 18, n.10, misrepresents that opinion.  The *Lyncott* court held nothing
other than "the principals of the Uniform Comparative Fault Act are the most consistent
with CERCLA" for determining the effect of plaintiff's release or covenant not to sue one
joint tortfeasor upon the right of other tortfeasors to contribution under CERCLA, just as
this Court did in its October 19, 2004 Opinion.  690 F. Supp. at 1417-18.  The opinion
had nothing to do with the elements of a statutory cause of action under §113(f) and
contained no citation to § 4 of the UCFA, the key section defendants suggest should be
engrafted onto §113(f).

Page 29

conflate the concepts of proving facts at trial from which a court may allocate response costs and

the elements of a prima facie case that must be pled to state a claim. Defendants' Brief at 16

("Thus, each plaintiff seeking contribution must necessary plead and prove. . ."). The court in

*New Castle County* said in dicta *only* that a potentially responsible person "should be able to

recoup that portion of its expenditures which exceeds its fair share of the overall liability." 111

F.3d at 1122. The court did so after also recognizing that the general meaning of the word

"contribution" is a claim "'by and between jointly and severally liable parties for an appropriate

division of the payment one of them has been compelled to make,'" and that in resolving such

claims section 113 provides that "'the court may allocate response costs among liable parties

using such equitable factors as the court determines are appropriate.'" 111 F.3d at 1121

(citations omitted). The quoted sentence thus refers merely to *how* the court is to allocate

equitable response costs, not to any additional requirements for *initiating* a section 113(f) action.

Neither in this language nor anywhere else in the opinion does the *New Castle County* court say,

much less hold, that a section 113(f) plaintiff must *plead* that it has paid more than its fair share

of anything. The other opinions cited by Defendants do nothing more than agree with the several

Courts of Appeal cited on page 8 above with respect to the elements of a section 113(f) cause of

action, including the statement that once the contribution plaintiff demonstrates the elements of

its claim a contribution plaintiff must demonstrate at trial that apportionment is feasible.[24]

---

[24]     *DeGussa Construction Chemicals Operations, Inc. v. Berwind Corp.*, 280 F. Supp. 2d
393 (E.D. Pa. 2003) said in *dicta* only that the "party seeking contribution bears the
burden of establishing a reasonable basis for apportioning liability to a third party and has
the burden of proving each element of the claim by a preponderance of the evidence."
280 F. Supp. 2d at 401. The court did not state, much less hold, that a pleading fails to
state a section 113(f) claim unless it includes an express allegation that the plaintiff has
paid an amount that exceeds its "fair share."

Page 30

C.    Plaintiffs' Complaint Alleges That Plaintiffs Have Paid More Than Their Fair Share

An express allegation by a Section 113(f) contribution plaintiff that it has paid more than its fair share is not required to survive a motion to dismiss. Even if it is, a court deciding a Rule 12(b)(6) motion must accept each allegation in the Complaint as true and must give the plaintiff the benefit of any inferences that could be drawn from those allegations. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). Applying this standard, Plaintiffs' Complaint here alleges that plaintiffs have paid more than their fair share of response costs.

Plaintiffs' Complaint alleges that each of them contributes (or has contributed) funds to Group trust accounts and that the activities necessary for performance of the requirements of the OU-1 and OU-2 Consent Decrees are funded from those Group accounts. Complaint at ¶¶ 18-19, 21-22. Each of the Plaintiffs has thus incurred response costs.[25] Plaintiffs' Complaint also alleges that each of the remaining Defendants is liable under Section 107(a) of CERCLA. Complaint at ¶¶ 145-47. Finally, Plaintiffs' Complaint alleges that the Agreement Group members "are entitled to contribution from Defendants for Response Costs incurred and for Future Response Costs to be incurred by the Agreement Group members in connection with the Site and to an allocation by the Court of the Response Costs and Future Response Costs as between the Agreement Group members and Defendants using such equitable factors as the Court determines are appropriate." Complaint at ¶¶ 151, 154.

Plaintiffs' Complaint therefore expressly seeks to recover from the Defendants those Defendants' equitable shares of the sums paid by the Agreement Group members for

---

[25]    Defendants have been provided in discovery with the exact amounts paid by each Plaintiff into Group accounts and the precise amount paid to whom and for what from those accounts.

Page 31

response costs. No one other than the Agreement Group members has paid those sums. The liability of each of the Defendants having been conceded for the purposes of this Motion, each of the Defendants is liable for some share of those amounts, such that the Agreement Group members must have paid more than their "fair share" of those sums. These allegations collectively either expressly or by inference make the allegation that the Agreement Group members have paid more than their "fair share" of the response costs they are seeking from the Defendants in this action.[26]

Defendants' suggestion that Plaintiffs are engaged in a "subterfuge" by bringing this action before they have decided amongst themselves what final share each of them will have contributed to the OU-1 and OU-2 costs is a red herring. Defendants' Brief at 16-17. This Court will at trial "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 113(f)(1). It will do so by making findings of fact and conclusions of law with respect to each of the Defendants and each member of the Agreement Group. The allocated shares will add up to 100% of Plaintiffs' response costs. Collectively, the Agreement Group members have paid 100% of payments made by the Agreement Group members for response costs irrespective of whatever final allocation the five of them agree to amongst themselves -- that total dollar number will not change. None of the Defendants has paid any portion of those costs. Because each of the Defendants is liable for some share of those costs, collectively the Agreement Group members have paid more than their fair share of those

---

[26]     The Agreement Group members believe that they have paid more than their fair share of the response costs for which they seek contribution from the Defendants. If this Court should conclude that the allegations of Plaintiffs' Complaint cannot be read to include such an allegation, and that such an allegation is required to state a claim under section 113(f), Plaintiffs respectfully request leave to file an amended pleading that would contain such an allegation.

Page 32

costs. Nothing about the way the Agreement Group members are proceeding here affects in any way the equitable share this Court allocates at trial to each of the Defendants. It is immaterial how those Defendants' shares are ultimately divided among the Agreement Group members.

Moreover, Defendants' argument starts from the false premise that when a group of entities agree collectively to resolve governmental claims and collectively bring a section 113(f) contribution action they must *each* plead that *each* has paid more than its "fair share" of the overall liability. The Agreement Group is aware of no opinion so holding. Defendants have simply invented this argument by extrapolating without any authority from the also incorrect belief that a *sole* section 113(f) plaintiff must allege he has paid more than his fair share. Defendants' Brief at 16.[27]

III.    *The Agreement Group Members May Assert Claims Pursuant to Both CERCLA Section 113(f)(1) and 113(f)(3) Simultaneously*

Defendants make the remarkable assertion that a party that settles with the United States can *only* bring a claim under section 113(f)(3)(B) and not under section 113(f)(1). Defendant's Brief at 13. The only reason given for this assertion is that it is "implicit" in the *Coopers Industries* opinion and in this Court's reading of that opinion.[28] Defendant's Brief at 13. The Supreme Court in *Coopers Industries* noted that Congress created two separate express rights of contribution along with a right for cost recovery under § 107(a), and concluded: "In

---

[27]     As set forth above, neither *New Castle County* nor *DeGussa Construction* held that even a sole section 113(f) pleading fails to state a claim unless it includes an allegation that the plaintiff paid more than its "fair share" of some common liability. The sentences in each of those opinions saying that a contribution plaintiff may "recoup that portion of its expenditures which exceeds its fair share of the overall liability" do not refer to pleading requirements and are *obiter dicta*. 111 F.3d at 1122; 280 F. Supp. 2d at 400.

[28]     Defendants' failure to point to specific language in either opinion to support this statement reveals that they just made it up.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES, INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC
and TI GROUP AUTOMOTIVE
SYSTEMS, LLC

                      Plaintiffs,

      v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

                 Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 02-CV-3830 (LDD)

## **ORDER**

AND NOW this _____ day of June, 2007, it is hereby ordered as follows.

1.      Upon consideration of Defendant NRM Investment Company's Motion to Compel Answers to Certain Contention Interrogatories filed on June 1, 2007, it is hereby ORDERED that Defendant's Motion is DENIED.

2.      Upon consideration of Defendant Ashland Chemical, Inc.'s Motion to Compel Plaintiffs Answers to Contention Interrogatories filed on June 1, 2007, it is hereby ORDERED that Defendant's Motion is DENIED.

3.      Upon consideration of Defendant fcg, inc.'s Motion to Compel Answers to Contention Interrogatories filed on June 1, 2007, it is hereby ORDERED that Defendant's Motion is DENIED.

4.    Upon consideration of Defendant Carpenter Technology Corporation's Motion to Compel Answers to Certain Contention Interrogatories and to Certain of Defendants' Joint Contention Interrogatories filed on June 1, 2007, it is hereby ORDERED that Defendant's Motion is DENIED.

_____
                                                                           J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | : <br> : <br> : <br> : <br> : <br> : | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | : <br> : | |
| v. | : <br> : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : <br> : <br> : | |
| Defendants. | : <br> : | |

## CERTIFICATE OF SERVICE

DAWN M. NEUKIRCH, of full age, certifies as follows:

1.      I am employed by the law firm of Ballard Spahr Andrews & Ingersoll, LLP, as a legal secretary.

2.      On this date, I caused one copy of the Memorandum in Response to NRM Investment Company's, Ashland Chemical, Inc.'s, fcg, inc.'s, and Carpenter Technology Corporation's Motions to Compel Answers to Contention Interrogatories, proposed form of Order and Certificate of Service to be served via electronic submission upon the following:

ALL DEFENDANTS ON ATTACHED SERVICE LIST

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dawn M. Neukirch /s/ _____

Dated: June 15, 2007

DMEAST #9807579 v4

## *Boarhead Farm Defendants' Service List*
### *File No.  892241*

Laurie J. Sands, Esquire
Wolff & Samson, PC
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey  07052
Phone:  973-530-2098
Fax:  973-530-2298
e-mail:  lsands@wolffsamson.com

    *-and-*

Robert M. Morris, Esquire
Morris & Adelman, P.C.
1920 Chestnut Street
P.O. Box 30477
Philadelphia, PA  19103
Phone:  215-568-5621
Fax:  215-568-3253
e-mail:  rmmorris@morrisadelman.com
*Advanced Environmental Technology Corp.*


Melissa Flax, Esquire
Carella, Byrne, Bain, Gilfillian, Cecchi,
      Stewart & Olstein, P.C.
5 Becker Farm Road
Roseland, New Jersey  07068-1739
Phone:  973-994-1700
Fax:  973-994-1744
e-mail:  mflax@carellabyrne.com
*Handy & Harman Tube Company*


Lynn Wright, Esquire
Edwards Angell Palmer & Dodge, LLP
750 Lexington Avenue
New York, New York  10022-1200
Phone:  212-308-4411
Fax:  212-308-4844
e-mail:  lwright@ealaw.com
*Carpenter Technology Corporation*

Seth v.d.H. Cooley, Esquire
Duane Morris LLP
Suite 4200, One Liberty Place
Philadelphia, PA  19103-7396
Phone: 215-979-1000
Fax:  215-979-1020
e-mail:  scooley@duanemorris.com
*Flexible Circuits & Etched Circuits*

-and-

A. Nicole Friant, Esquire
Duane Morris LLP
One Liberty Place
Suite 4200
Philadelphia, PA  19103-7396
Phone: 215-979-1818
Fax:  215-979-1020
e-mail:  anfriant@duanemorris.com

Edward Fackenthal, Esquire
Law Office of Edward Fackenthal
One Montgomery Plaza
Suite 209
Norristown, PA  19401
Phone: (610) 279-3370
Fax:  (610) 279-0696
*NRM Investment Co.*
e-mail:  edwardfackenthal@cs.com

Richard C. Biedrzycki, Esquire
Phelan, Pettit & Biedrzycki
The North American Building
Suite 1600
121 South Broad Street
Philadelphia, PA  19107
Phone: 215-546-0500
Fax:  215-546-9444
e-mail:  rbiedrzycki@pp-b.com
*Ashland, Inc.*