# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 02-CV-3830 (LDD) |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al.,, | ) ) ) | |
| Defendants. | ) ) ) ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR LEAVE TO PURSUE LIMITED ADDITIONAL DISCOVERY

---

**WOLFF & SAMSON PC**
Robert T. Carlton, Jr.
Two Penn Center, Suite 1310
Suite 1310
1500 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19102
(215) 567-2878
Attorneys for Defendant
Advanced Environmental Technology Corporation

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

PROCEDURAL HISTORY..................................................................................................... 2

SUPPLEMENTAL DISCOVERY SOUGHT AND WHY DISCOVERY WAS
PREVIOUSLY UNAVAILABLE OR NOT PREVIOUSLY SOUGHT BY THE
DEFENDANTS ...................................................................................................................... 3

      1.     Supplemental Discovery regarding Plaintiffs' Allocation of Cleanup Costs
            Amongst Themselves and the Basis for that Allocation. ....................................... 4

      2.     Basis for Credit taken by Plaintiffs. ...................................................................... 7

      3.     How Plaintiffs determined the estimated volumes they allege each
            Defendant disposed of at the Site........................................................................... 8

      4.     Information concerning the investigation conducted by the Plaintiffs in
            identifying potentially responsible parties for the Site. ....................................... 11

LEGAL ARGUMENT ........................................................................................................... 13

I.     THE DEFENDANTS ARE ENTITLED TO SUPPLEMENTAL DISCOVERY
       REGARDING THE PLAINTIFFS' ALLOCATION AMONGST THEMSELVES
       AND CREDITS TAKEN FOR PAYMENTS MADE BY ALLEGED
       CORPORATE  PREDECESSOR OF CERTAIN PLAINTIFFS. ..................................... 13

II.    THE DEFENDANTS ARE ENTITLED TO SUPPLEMENTAL DISCOVERY
       REGARDING HOW THE PLAINTIFFS DETERMINED THE ESTIMATED
       ALLEGED VOLUMES THEY CLAIM EACH DEFENDANT AND EACH
       PLAINTIFF DISPOSED OF AT THE SITE.................................................................. 16

III.   THE DEFENDANTS ARE ENTITLED TO SUPPLEMENTAL DISCOVERY
       REGARDING THE INVESTIGATION CONDUCTED BY THE PLAINTIFFS
       OF ADDITIONAL PRPS FOR THE SITE. .................................................................. 21

IV.   DEFENDANT FLEXIBLE IS ENTITLED TO TAKE THE DEPOSITION OF
       PETER KNOLL.............................................................................................................. 21

CONCLUSION...................................................................................................................... 22

Defendant Advanced Environmental Technology Corporation files this motion pursuant to Paragraph B.1. of the Tenth Case Management Order requesting leave to pursue limited additional discovery. Defendant Advanced Environmental Technology Corporation files this motion on behalf of all Defendants in this case.

## PRELIMINARY STATEMENT

The Defendants are seeking supplemental discovery on the following issues: (1) the allocable share of clean up costs for each Plaintiff; (2) the estimated volumes of waste the Plaintiffs allege each Defendant and each Plaintiff disposed of at the Site; (3) the investigation conducted by the Plaintiffs to identify potentially responsible parties for the Site; and (4) for fcg, inc. ("Flexible") the deposition of Peter Knoll. These issues are highly relevant to the claims asserted by the Plaintiffs in this case. More importantly, discovery on these issues is necessary for the Defendants to properly prepare their case for trial. Yet, throughout each phase of discovery, Plaintiffs have furnished a reason as to why discovery on these issues cannot be taken. Moreover, the Defendants uncovered certain of these issues through documents produced by the Plaintiffs after the close of discovery, or from documents the production of which was not disclosed to the Defendants until after the close of discovery. With respect to the Flexible issue, the Plaintiffs identified in their recent responses to the Defendants' contention interrogatories, for the first time, Mr. Knoll as a person with knowledge of Flexible's facility. The Defendants should not be disadvantaged at trial because of gamesmanship by the Plaintiffs. Accordingly, the Defendants are seeking from this Court leave to pursue limited supplemental discovery on the above referenced issues to allow the Defendants to obtain the information needed to fully prepare for trial.

## PROCEDURAL HISTORY

This action was initially commenced by Plaintiff, Boarhead Farm Agreement Group ("BFAG"), by Complaint filed on June 18, 2002 seeking damages related to the clean up of the Boarhead Farms Superfund site in Bridgeton Township, Bucks County, Pennsylvania (the "Site"). BFAG consisted of Agere Systems, Inc.; Cytec Industries, Inc.; Ford Motor Company; SPS Technologies, LLC; TI Group Automotive Systems, LLC and others not plaintiffs in this case. As this action progressed through mediation and discovery, several amended complaints were filed. By Memorandum and Order, filed on July 20, 2005, this Court granted leave for the filing of a Fourth Amended Complaint. The Fourth Amended Complaint substituted most of the individual members of BFAG as the Plaintiffs instead of BFAG. The Plaintiffs in the Fourth Amended Complaint allege that they paid more than their fair share of clean up costs to remediate the Site, and, accordingly, are entitled to recover costs from each of the Defendants based on the Plaintiffs' alleged overpayment. The Plaintiffs have calculated what they believe to be each Defendant's share of the clean up costs based upon an alleged volumetric share of waste disposed of at the Site by each party.

There has been a substantial amount of written and oral discovery taken in this case. Most recently, Defendants served upon Plaintiffs contention interrogatories designed to obtain from Plaintiffs the facts and contentions with respect to the claims asserted in their Complaint. The Defendants did not believe that the Plaintiffs responded appropriately to these contention interrogatories, and, thus, filed, on June 1, 2007, a motion to compel the Plaintiffs to provide complete responses to the interrogatories. Plaintiffs responded to the Defendants' motion on June 15, 2007.

2

## SUPPLEMENTAL DISCOVERY SOUGHT AND WHY DISCOVERY WAS PREVIOUSLY UNAVAILABLE OR NOT PREVIOUSLY SOUGHT BY THE DEFENDANTS

The Defendants are now seeking very limited supplemental discovery pursuant to the Tenth Case Management Order filed in this case. The Order allows the Defendants to file a motion requesting supplemental discovery that delineates (a) the scope of the supplemental discovery; (b) the relevance of the supplemental discovery; and (c) an explanation as to why the discovery was previously unavailable or was not previously sought.

The Defendants are filing this motion because during discovery there were certain issues on which the Defendants were unable to take discovery. In addition, during discovery, there were issues about which the Defendants had no knowledge because documents regarding such issues were produced by the Plaintiffs after fact discovery had closed. Moreover, the information sought by the Defendants in supplemental discovery is highly relevant to the claims being asserted by the Plaintiffs and the Defendants' rebuttal case against such claims. The Defendants are seeking supplemental discovery on the following issues:

1)  How the Plaintiffs have allocated clean up costs amongst themselves and other members of BFAG and the basis for that allocation;

2)  The basis for why certain Plaintiffs have taken credit for payments made by alleged corporate predecessors;

3)  How Plaintiffs determined the estimated volumes they allege each Defendant and each Plaintiff disposed of at the Site;

4)  Information concerning the investigation conducted by the Plaintiffs in identifying potentially responsible parties for the Site; and

5)  For Flexible, the deposition of Peter Knoll, an individual recently identified by the Plaintiffs as having knowledge regarding Flexible's facility.

1077639.1

1.    **Supplemental Discovery regarding Plaintiffs' Allocation of Cleanup Costs Amongst Themselves and the Basis for that Allocation.**

Plaintiffs have consistently taken the position in this litigation that they do not need to demonstrate, in order to support their claims of contribution, that each Plaintiff paid more than its fair share of costs incurred at the Site. Rather, the Plaintiffs assert that in order to support their contribution claims they need only to prove they **collectively** paid more than their fair share of the costs. As a result, the Plaintiffs have refused to produce any information regarding internal allocations conducted amongst themselves. Plaintiffs have this information, but are unwilling to share it with the Defendants.

Documents produced by the Plaintiffs indicate that the Plaintiffs at some point agreed to an internal allocation and, in fact, most likely hired a third party to conduct this allocation. The results of the allocation are relevant to the validity of the Plaintiffs' contentions as to their individual equitable/allocable share of the response costs and their claims of contribution based on those shares.

The reason the Defendants did not take discovery on this allocation issue before now is because the documents that reference these allocation activities amongst the Plaintiffs were not produced to the repository until April 18, 2005, a month after fact discovery closed. (See Declaration of Laurie J. Sands, Esq. in Support of The Defendants' Motion for Leave to Pursue Limited Supplemental Discovery, dated June 29, 2007 (hereinafter "Sands Decl."), at ¶ 3). Moreover, these documents were not included on the Index to the Repository until September 16, 2005. Therefore, during discovery, the Defendants were unaware that these allocation efforts ever took place. The Defendants, in contention interrogatories, did ask the Plaintiffs' to identify each Plaintiff's allocable share of the costs incurred at the Site, but, as stated above, the Plaintiffs refused to provide this information.

4

Although the Plaintiffs refused to respond to the contention interrogatories regarding the Plaintiffs' internal allocation, the documents produced to the repository by the Plaintiffs after the close of discovery establish that an allocation process was considered and discussed by the Plaintiffs. The OU-1 and OU-2 agreements to which the Plaintiffs were parties reference the allocation processes between the Plaintiffs and other signatories to these agreements. (See Sands Decl. at Exhibits A and B). The 1999 Agreement in Principle provided for an initial allocation, a non-binding interim allocation and a final allocation. (PHKS 071738-071747).[1] (See Sands Decl. at Exhibit C). At the very least, the Defendants should be entitled to know whether any of these allocations were conducted and the details of each. Note also that paragraph 10 of the 1999 Agreement in Principle states that the signatories to the Agreement will share evidence regarding the liability of those who are or are not signatories to the Agreement.[2]

In paragraph 7.2 of the Boarhead Farm Site PRP Group Organization Agreement, John M. Barkett, Esquire, was designated as the "Allocation Consultant" to conduct a non-binding allocation for the Plaintiffs. (PHKS 0714646-071666). (See Sands Decl. at Exhibit D). Another version of this Agreement, dated April 7, 1998, (BSAI 075474-075488), provided for an "Allocation Committee" among the PRP group which was "empowered to receive and evaluate information as directed by the Steering Committee, advise and recommend to the Steering Committee by written report a means of fairly and equitably allocating Shared Costs among the Members, including an alternative dispute resolution process for resolving allocation disputes

---

[1] The reference is to the bates-stamped number of the document in the Document Repository for this litigation.

[2] Signatories to this Agreement were Plaintiffs Cytech Industries, Inc., Ford Motor Company, and SPS Technologies and Lucent Technologies, Inc., Defendant NRM Investment Company, Inc. and Worthington Steel Company-Malvern. (PHKS071746).

5

1077639.1

among members. . . . If an Allocation Consultant is hired by the Group, the Group shall enter into an Allocation Agreement setting forth the duties of the allocation consultant and the Parties with respect to allocation procedures." (See Sands Decl. at Exhibit E).

Other documents indicate that Barkett was, in fact, engaged as an Allocation Consultant. In a June 17, 2003 e-mail from William Hatfield to Tim Bergere (PHKS 073639-073640), Hatfield states "as discussed, there is very little money in the EPA reimbursement accounts (OU-1 and OU-2) and the Barkett account (for future allocation)." (See Sands Decl. at Exhibit F). Accounting documents produced by Plaintiffs (PHKS 071242-071261) demonstrate that an allocation account was created and identified as 1303, which did have funds credited and disbursed. (See Sands Decl. at Exhibit G). In addition, there are references in the bills from BFAG's joint counsel, Pitney, Hardin, Kipp & Szuch regarding internal BFAG discussions and discussions with Barkett in July-November 2000. (PHKS 071973-071973; PHKS 072024-072022; and PHKS 071920-071923). (See Sands Decl. at Exhibit H).

Given the relevancy of the internal allocation efforts and the Plaintiffs' position as to each Plaintiff's allocable share, the Defendants through supplemental discovery are seeking (1) the "Non-Binding Allocation Agreement"; (2) the February 11, 2000 letter agreement between the Group and the Allocation Consultant; (3) any agreements reached among the parties regarding allocation; (4) any other documents relevant to the development of an allocation among the parties, including questionnaires, correspondence and e-mails, (5) any documents regarding any non-binding mediation or arbitration process; (6) any documents generated by the Allocation Consultant; and (7) any documents generated by the Allocation Committee, to the extent there was such a Committee. Also, the Defendants are seeking to depose John Barkett (the Allocation Consultant) and Tim Bergere (Common Counsel to the BFAG) to obtain the

6

information needed to understand the internal allocation of response costs amongst the Plaintiffs and other parties to these agreements.

>    **2.    Basis for Credit taken by Plaintiffs.**

Defendants are aware certain companies, which are not named Plaintiffs in this litigation, contributed to the total response costs, i.e., Smith's Industries, Lucent, Bundy Corp., referenced in Jerome Exhibit 10, among other documents. Some of these contributions have been credited to the Plaintiffs on a theory of successorship or some other unidentified basis. Plaintiffs have been unwilling to provide information on how these contributions have been credited and the basis for the successorship theory that Plaintiffs have applied to these contributions.

In addition, the Plaintiffs' response to the Defendants' contention interrogatories on behalf of Agere Systems, Inc. indicates there is no evidence establishing that any hazardous wastes owned or possessed by Agere's predecessor, Western Electric, was disposed of at the Site. This response fails to address other possible predecessors of Agere, including AT&T and Lucent Technologies, both of whom have been implicated at the Site.

Moreover, the Plaintiffs' response to the Defendants' contention interrogatories on behalf of Plaintiff TI Group Automated Systems, LLC refers only to hazardous waste owned or possessed by Bundy Corporation. Defendants do not understand Plaintiffs' contentions as to the relationships between Bundy Corporation and Plaintiff TI Group Automated Systems, LLC or TI Group Automotive Systems Corporation (a party to the OU-2 Consent Decree) and National Rolling Mills since none is pleaded in the Fourth Amended Complaint. Defendants' need additional discovery on these successorship issues.

7

### 3.   How Plaintiffs determined the estimated volumes they allege each Defendant disposed of at the Site.

Early in the case, the Defendants sought discovery from the Plaintiffs as to the volume and type of waste the Plaintiffs allege each Defendant and each Plaintiff disposed of at the Site. During discovery, the Plaintiffs refused to provide this information claiming such inquiries were premature. After the close of discovery, the Defendants sought this information through contention interrogatories and, again, the Plaintiffs refused to provide such information, claiming it was protected by the work product doctrine.

It is true that the Plaintiffs have provided a waste volume number that the Plaintiffs attribute to each Defendant and each Plaintiff, but the Plaintiffs refuse to provide the analysis of how they calculated that number. For example, the Plaintiffs, in their recent responses to the Defendants' contention interrogatories, state that for distinct periods of time certain percentages of waste were disposed of at the Boarhead Farms Site. The Plaintiffs state "Plaintiffs will ask the court to conclude that 95% of all of the waste handled by DCC beginning in January of 1972 was disposed of at the Site until the opening of DCC's Ontario Street operation in Philadelphia on December 1, 1973." (See Sands Decl. at Exhibit M). The Plaintiffs then point to documents that allegedly support this percentage. These documents, however, do not establish how the Plaintiffs obtained the number of 95%. The Defendants are seeking the analysis conducted by the Plaintiffs of the evidence identified, and any other evidence, to establish that allegedly 95% of the waste handled by DCC was disposed of at the Site from January 1972 to December 1, 1973. The Defendants are also seeking this analysis for other similar percentages set forth by the Plaintiffs.

In addition, the Plaintiffs assign total volumes of waste, in gallons, to each of the Defendants and each of the Plaintiffs from which the Plaintiffs determine, using the above

8

referenced percentages, how much of that total volume was allegedly disposed of at the Site. The Plaintiffs point to documents and deposition testimony to support these total volumes, but the Defendants have been unable to ascertain from the information identified how the Plaintiffs calculated the volumes. The Plaintiffs refuse to provide information regarding their calculations of the percentages and the waste volumes claiming that they are protected by the work product doctrine.

Moreover, the Defendants were unable to obtain this information through fact discovery of corporate designee witnesses produced by the Plaintiffs.    For example, at the deposition of Dennis Shea, the corporate designee for Plaintiff SPS, Mr. Shea was directed not to answer such questions:

> Q:    What is SPS's position either individually or as a member of the Boarhead Farm Agreement Group as to the volume of waste from Techalloy, which was disposed of at the Site?
>
> Mr. Harris (attorney for SPS): We are not going to answer those questions either. That's not on this list.
>
> Ms. Bingham (attorney for Techalloy): It's clearly within the scope of the interrogatories.
>
> Mr. Harris:    You and I agreed that the scope of the interrogatories with respect to number seven was the waste streams of SPS, the waste disposal practices of SPS, the relationship to Jonas and De Rewal. We're not going – we're not here to answer questions about our litigation strategies, our contentions or anything else.
> . . .
> Ms. Wright (attorney for Carpenter Technology): This is Lynn Wright from Edwards and Angell again, is that an instruction not to answer Glenn?
>
> Mr. Harris: Yeah.  Sure.  We're not going to answer – this witness is not here today to –
>
> Ms. Wright: That's all I needed.
>
> Mr. Harris: --answer any question about Techalloy, Ashland or the man on the moon for that matter.
> …

9

Q:    What is SPS's position whether individually or as a member of the Boarhead Farm Agreement Group as to which hazardous substances if any were contained in the Techalloy waste that was disposed of at the Site?

Mr. Harris: Same thing, we're not answering those questions today. (See Sands Decl. at Exhibit I).

The Plaintiffs stated that they were not required to respond to the line of questioning at the 30(b)(6) depositions because of the Court's ruling that discovery of this information was premature. Although the Court did find that the Defendants' questions regarding contentions were premature, the Court did not foreclose the Defendants from pursuing this line of questioning at a later date. The Court allowed the Defendants to serve contention interrogatories on the Plaintiffs after the close of discovery, and the Defendants did so. Yet, the Defendants still have been unable to obtain the relevant information regarding the Plaintiffs' calculations of waste allegedly disposed of by the Defendants and the Plaintiffs at the Site. The Defendants are now asking through supplemental discovery to be permitted to redepose the corporate designees of the Plaintiffs regarding the volume of waste each Plaintiff contends that each Defendant and each Plaintiff disposed of at the Boarhead Farms Site and how the Plaintiffs calculated such volumes. In addition, the Defendants are seeking through supplemental discovery to depose Jeff Sibel of De Maximus, the remediation consultant at the Site, regarding the volume and type of waste disposed of at the Site. The Defendants are also seeking all documents and information regarding how the Plaintiffs calculated the volumes of waste allegedly disposed of at the Site by each Defendant and each Plaintiff.

In addition, in documents produced by the Plaintiffs in April 2005, after the close of discovery, there are references to discussions between potentially responsible parties and the DeRewals and John Barsum, individuals who transported waste to the Site. These discussions are referenced in the bills from BFAG's joint counsel, Pitney, Hardin, Kipp & Szuch. (PHKS

10

1077639.1

071973-071973; PHKS 072024-072022; and PHKS 071920-071923). (See Sands Decl. at Exhibit H). These discussions certainly involved the volume and type of waste these individuals transported to the Site. Accordingly, the Defendants are seeking through supplemental discovery any information, documents, transcripts or notes regarding these discussions with the DeRewals and John Barsum and the depositions of the individuals who were involved in these discussions.

### 4.    Information concerning the investigation conducted by the Plaintiffs in identifying potentially responsible parties for the Site.

Defendants discovered that the Plaintiffs conducted an investigation as to potentially responsible parties for the Boarhead Farms Site. This information is relevant to the issue of whether there are other entities, parties or not to this litigation, responsible for the clean up at the Site, and, therefore, other parties that should be contributing to the costs incurred at the Site. The Defendants are entitled to information gathered by the Plaintiffs that would establish that entities, either named or not named in this litigation, are responsible for a share of the clean up costs, which would reduce the share of the parties participating in the litigation. (See Sands Decl. at ¶6).

The reason the Defendants are seeking this discovery now is because the documents indicating that such an investigation was conducted were produced to the document repository by the Plaintiffs a little more than a month before the close of fact discovery. The Defendants, however, did not discover the production of these documents until the Index to the Repository was updated in September 2005, which was six months after the close of discovery.

The documents indicting that a PRP search was conducted by the Plaintiffs are as follows:

1.    BSAI075438-075443 - Morgan, Lewis & Bockius 3/16/98 memorandum with ESM search proposal.

1077639.1

   2.  BSAI075444-075445 - Morgan, Lewis & Bockius 3/20/98 letter to U.S. Navy Office of General Counsel referencing the selection of a PRP search consultant.

   3.  BSAI075446-075450 - ESM draft proposal dated 3/21/98.

   4.  BSAI075856-075858 - Morgan, Lewis & Bockius memorandum describing 5/28/98 telephone conference with ESM. Please note that some information on the front of the page has been redacted.

   5.  BSAI075837-075838 and one undesignated page - Fax from ESM reporting on conviction of Freddy DeRewal.

   6.  BSAI075498-075505 - Draft ESM interim status report dated 8/27/98. (See Sands Decl. at Exhibit J).

   The Defendants are seeking through supplemental discovery all documents and information regarding the investigation conducted by the Plaintiffs to identify additional PRPs for the Site and any documents and information resulting from such investigation.

12

## LEGAL ARGUMENT

I.    **THE DEFENDANTS ARE ENTITLED TO SUPPLEMENTAL DISCOVERY REGARDING THE PLAINTIFFS' ALLOCATION AMONGST THEMSELVES AND CREDITS TAKEN FOR PAYMENTS MADE BY ALLEGED CORPORATE PREDECESSOR OF CERTAIN PLAINTIFFS.**

The Plaintiffs assert that in order to support their contribution claims they only have to demonstrate they **collectively** paid more than their fair share of the costs incurred at the Site.  As a result, the Plaintiffs now claim they do not have to provide discovery regarding any internal allocation amongst themselves or their analysis of what they believe is the allocable share of each Plaintiff.  This position is contrary to CERCLA and case law interpreting CERCLA.

Each Plaintiff has asserted a CERCLA Section 113 contribution claim against the Defendants.  Although CERCLA does not define "contribution", courts have held, in CERCLA contribution actions, that no party shall be held liable for more than its fair share of the costs.  SC Holdings, Inc. v. A.A.A. Realty Co., et al, 935 F. Supp. 1354, 1372 (D.N.J. 1996).  The Court of Appeals in In the Matter of Reading Co., 115 F.3d 1111 (3d Cir. 1997), looked towards the Restatement (Second) of Torts § 886(a) as the embodiment of the "traditional, common law sense" of contribution that Congress intended to be reflected in CERCLA Section 113(f).  Id. at 1124.  See also, United States v. Compaction Systems Corp., 88 F. Supp. 2d 339, 351-352 (D.N.J. 1999); E.I. Du Pont De Nemours and Co. v. United States, 297 F. Supp., 2d 740, 746-747 (D.N.J. 2003).  The Restatement (Second) of Torts states that "[t]he right of contribution exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability, and is limited to the amount paid by him in excess of his share."  Accordingly, a plaintiff that seeks contribution under Section 113 of CERCLA must establish that it has paid an amount that exceeds its "fair share of the overall

13

liability." New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1122 (3d Cir. 1997). In fact, at trial, the plaintiff seeking contribution bears the burden of establishing a reasonable basis for apportioning the overall liability to the other parties.  DeGussa Construction Chem. Operations, Inc. v. Berwind Corp., 280 F. Supp. 2d 393, 401 (E.D. Pa. 2003), citing, United States v. Union Corp., 277 F. Supp. 2d 478, 485 (E.D. Pa. 2003).  Thus, each Plaintiff in this action must prove that its payment of response costs exceeded its equitable share of the common liability.

Indeed, in this Court's Memorandum and Order, dated July 20, 2005, the Court found the PRPs and not the BFAG were the real parties in interest: "PRPs are the real parties in interest, despite the fact that here, the PRPs paid for remediation by contributing to the Agreement Group which, acting as an intermediary, then pooled the funds and paid the contractors conducting the remediation."  As a result of this finding, the Court required the individual Plaintiffs to amend the Complaint to name each entity as a Plaintiff instead of naming the BFAG as the sole Plaintiff, recognizing that each Plaintiff must assert an individual contribution claim against the Defendants.  Accordingly, each entity must prove that it has paid more then its fair share of the response costs incurred at the Site in order to support its claims of contribution against each of the Defendants.

After fact discovery closed, the Defendants discovered the Plaintiffs conducted internal allocations amongst themselves and other members of BFAG to determine each Plaintiff's equitable share of costs incurred at the Site.  The documents produced by the Plaintiffs, after the close of discovery, demonstrated that the Plaintiffs contemplated an initial allocation, a non-binding interim allocation and a final allocation.  The documents also indicate

14

that the Boarhead Farm PRP Group hired John Barkett as a "Allocation Consultant" to conduct an allocation for the Plaintiffs.

The Defendants have been attempting through discovery to ascertain what the Plaintiffs have determined are the equitable shares of each Plaintiff involved in this action. The Plaintiffs have taken the position that they do not have to provide this information to the Defendants, but rather, must simply show they collectively paid more then their fair share. According to this Court, however, each Plaintiff is a party in interest, and, therefore, each Plaintiff is required to assert an individual contribution claim against the Defendants. In order to assert such a claim, each Plaintiff must demonstrate that it has paid more than its fair share. The information sought by the Defendants through supplemental discovery is the Plaintiffs' assessment of the fair share of each Plaintiff.

Given the relevancy of the Plaintiffs internal allocation information, the Defendants are seeking through supplemental discovery (1) the "Non-Binding Allocation Agreement"; (2) the February 11, 2000 letter agreement between the Group and the Allocation Consultant; (3) any agreements reached among the parties regarding allocation; (4) any other documents relevant to the development of an allocation among the parties, (5) any documents regarding any non-binding mediation or arbitration process; and (6) any documents generated by the Allocation Committee, to the extent there was such a Committee. Also, the Defendants are seeking through supplemental discovery to depose John Barkett (the Allocation Consultant) and Tim Bergere (Common Counsel to the BFAG) to obtain the information needed to understand the internal allocation of response costs amongst the Plaintiffs.

15

*Credits for Payments made by Predecessor Corporations*

In connection with the equitable share of each Plaintiff is the issue of whether Plaintiffs are entitled to take credit for payments made by allegedly predecessor companies. Certain Plaintiffs are taking credit for payments for response costs made by other entities not involved in this litigation or signatories to the Consent Decrees. The Defendants are entitled to know the relationship between the Plaintiffs and any entity for which a Plaintiff is taking credit for payments. The Defendants are entitled to this information to determine whether the particular Plaintiff has a legal responsibility to the entity for which credit for payment for response costs is being taken. In order to understand each Plaintiff's share, the Defendants also need to understand any credits the Plaintiffs are taking for entities not involved in this litigation and why such credits are supported.

The Defendants also need to understand whether certain entities that allegedly disposed of waste at the Site are somehow connected to any of the Plaintiffs. For example, the response to Defendants' contention interrogatories on behalf of Agere Systems, Inc. fails to address whether hazardous wastes from possible predecessors of Agere, including AT&T and Lucent Technologies, were taken to the Site. This information is directly relevant to the determination of Agere's equitable share of clean up costs at the Site. Thus, the Defendants are seeking any information regarding whether certain Plaintiffs are successor corporations to any entities that allegedly disposed of waste at the Site.

**II.  THE DEFENDANTS ARE ENTITLED TO SUPPLEMENTAL DISCOVERY REGARDING HOW THE PLAINTIFFS DETERMINED THE ESTIMATED ALLEGED VOLUMES THEY CLAIM EACH DEFENDANT AND EACH PLAINTIFF DISPOSED OF AT THE SITE.**

Plaintiffs allege that during certain periods of time a percentage of waste hauled by DCC was taken to the Boarhead Farms Site. The Plaintiffs point to various documents and

1077639.1

deposition testimony to support their allegations. In addition, the Plaintiffs assign total volumes of waste, in gallons, to each of the Defendants and each of the Plaintiffs from which the Plaintiffs, using the above referenced percentages, allegedly calculate the volume of waste disposed of by each Defendant and each Plaintiff at the Site. Again, the Plaintiffs point to documents and deposition testimony to support these total volumes. The Defendants, however, cannot deduce from the evidence identified by the Plaintiffs how the Plaintiffs determined the percentage of waste disposed of at the Site during each time period or the total volume of waste attributed to each Defendant and each Plaintiff.

The Defendants through interrogatories, depositions and contention interrogatories have repeatedly asked Plaintiffs to explain the analysis used to determine the volumes of waste that the Plaintiffs allege each Defendant and each Plaintiff disposed of at the Site. The Plaintiffs first claimed that discovery of this information was premature. The Plaintiffs now claim that such information is protected by the work product doctrine. The Defendants disagree with the Plaintiffs use of the work product doctrine to circumvent discovery of highly relevant information.

At trial, the Plaintiffs, which are seeking contribution in this action, bear the burden of establishing a reasonable basis for apportioning the overall liability to the other parties. DeGussa Construction Chem. Operations, Inc. v. Berwind Corp., 280 F. Supp. 2d 393, 401 (E.D. Pa. 2003), citing, United States v. Union Corp., 277 F. Supp. 2d 478, 485 (E.D. Pa. 2003). The Plaintiffs, as part of their proofs, are setting forth percentages of waste they claim were disposed of at the Site during certain time periods. The Plaintiffs are also setting forth total volumes of waste attributable to each Defendant and each Plaintiff. The Plaintiffs are then using the percentages and the total volumes of waste to determine the alleged volume of waste each

17

Defendant and each Plaintiff disposed of at the Site. The Defendants are entitled to rebut the Plaintiffs claims, but are unable to establish a rebuttal case without understanding how the Plaintiffs calculated their percentages or their total waste volumes for each Defendant and each Plaintiff.

The work product doctrine limits discovery of material prepared by an attorney or an attorney's agent in anticipation of litigation or preparation for trial. Hickman v. Taylor, 329 U.S. 495 (1945). This doctrine does not create a privilege, but instead, creates a qualified immunity. In fact, Rule 26(b)(3) holds that a party may obtain discovery of work product upon a showing that a party "has substantial need of the material in the preparation of the party's case and that the party is unable without due hardship to obtain the substantial equivalent of the material by other means."

The work product doctrine was designed to protect against disclosure "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." See Holmes v. Pension Plain of Bethlehem Steel Corp., 213 F.3d 124, 138 (3d Cir. 2000). The party claiming the work product immunity has the burden of proving the applicability of the doctrine.

The Plaintiffs in this case cannot meet their burden to prove that the information the Defendants seek regarding alleged percentages of waste disposed at the Boarhead Farms Site and the volume of waste attributable to each Defendant and each Plaintiff are considered work product. The Plaintiffs are using percentages and volumes of waste to determine the amount of waste the Plaintiffs allege each Defendant and each Plaintiff disposed of at the Site. The Plaintiffs are then asking the Court to use these numbers to determine each Defendant's and each Plaintiff's alleged allocable share of the costs incurred at the Site. What the Defendants have

18

1077639.1

been seeking all along through discovery is the calculation used by the Plaintiffs to obtain the percentages and the waste volumes the Plaintiffs are now offering to the Court as evidence of disposal at the Site. The Defendants are not asking the Plaintiffs to reveal any of the attorney's mental opinions or legal theories regarding their case. Nor are the Defendants asking for legal conclusions. The Defendants are simply asking for the calculations used to support the assertions now being set forth by the Plaintiffs to the Court. The Defendants are entitled to full disclosure and discovery regarding these calculations.

Moreover, if the Court decides that the information sought by the Defendants is protected by the work product doctrine, the Defendants can demonstrate they need this information to prepare their case for trial. In addition, the Defendants can show they are unable to obtain the same information from any other source. Accordingly, pursuant to Rule 26(b)(3), the Defendants are entitled to discovery of this information.

The Plaintiffs are using percentages and waste volumes to establish a basis for apportioning overall liability to each of the Defendants. The Defendants must understand the basis for the Plaintiffs' apportionment of liability in order to rebut the Plaintiffs' assertions. If the Defendants do not understand how the Plaintiffs calculated percentages and waste volumes on which the Defendants ultimate liability is based, how will the Defendants be able to prepare their case against the Plaintiffs? The Defendants cannot obtain this information from any other source. Indeed, the only source that understands how these percentage and waste volume calculations were conducted is the Plaintiffs. The Plaintiffs should not be permitted to hide behind the work product doctrine in order to avoid providing a necessary explanation for information the Plaintiffs are offering to the Court to support their case in chief.

19

Accordingly, the Defendants are seeking through supplemental discovery any documents or information regarding the calculation of the percentages and waste volumes attributed to each Defendant and each Plaintiff as set forth in the Plaintiffs' responses to the Defendants' contention interrogatories. The Defendants are also seeking the ability to redepose the Plaintiffs' corporate designees regarding the volume of waste each Plaintiff contends that each Defendant and each Plaintiff disposed of at the Boarhead Farms Site and how the Plaintiffs calculated such volumes. In addition, the Defendants are seeking through supplemental discovery to depose Jeff Sibel of De Maximus, the remediation consultant at the Site, regarding the volume and type of waste disposed of at the Site.

Moreover, in documents produced by the Plaintiffs in April 2005, after the close of discovery, there are references to discussions between some of the Plaintiffs and other potentially responsible parties and the DeRewals and John Barsum, individuals that transported waste to the Site. These discussions certainly involved the volume and type of waste these individuals transported to the Site. This information is highly relevant to the issue of the volume and type of waste disposed of by each Defendant and each Plaintiff at the Site. In addition, the fruits of these discussions are not privileged because there were entities involved that are not parties to this lawsuit and are now considered third-parties. Accordingly, the Defendants are seeking through supplemental discovery any information, documents, transcripts or notes regarding discussions between members of the Boarhead Farm PRP Group and the DeRawels or John Barsum and the depositions of the individuals who were involved in these discussions.

1077639.1

III.    **THE DEFENDANTS ARE ENTITLED TO SUPPLEMENTAL DISCOVERY REGARDING THE INVESTIGATION CONDUCTED BY THE PLAINTIFFS OF ADDITIONAL PRPS FOR THE SITE.**

Defendants discovered that the Plaintiffs conducted an investigation as to potentially responsible parties for the Boarhead Farms Site. The Defendants did not find out about this investigation until after the close of fact discovery. The information obtained during this investigation is relevant to the issue of whether there are other parties responsible for the cleanup at the Site, and, therefore, other parties that should be contributing to the costs incurred at the Site. This information is also relevant to whether the existence of these other parties reduces the Defendants' equitable allocation at the Site. Accordingly, the Defendants are entitled to any information gathered by the Plaintiffs regarding other parties potentially responsible for the costs incurred at the Site.

IV.    **DEFENDANT FLEXIBLE IS ENTITLED TO TAKE THE DEPOSITION OF PETER KNOLL.**

Defendant Flexible seeks leave from the Court to take the deposition of a fact witness identified by Plaintiffs in their answers to the Defendants' Joint Contention Interrogatories. Specifically, in their answer to Joint Contention Interrogatory No. 78, Plaintiffs identified an individual named Peter Knoll as a person upon whose testimony Plaintiffs intend to rely. No specific information regarding this individual, such as his past or present employment, or the relevant facts to which he would testify, is provided in Plaintiffs' interrogatory answer. However, Plaintiffs' counsel has informed counsel for Flexible that Mr. Knoll is an employee of the Bucks County Department of Health who inspected Flexible's facility in the past.

Mr. Knoll was not identified in Plaintiffs' responses to Flexible's earlier interrogatories, which were served during the fact discovery period permitted by the Court. Those interrogatories sought the identification of witnesses. (See Sands Decl. at Exhibit K).

21

1077639.1

Following receipt and review of Plaintiffs' answers to Defendants' Joint Contention Interrogatories, counsel for Flexible informed Plaintiffs' counsel that he would like the opportunity to take Mr. Knoll's deposition, and requested that Plaintiffs' counsel concur, so as to avoid motion practice. Plaintiffs' counsel has not concurred, but has indicated that Flexible's request will be further considered following receipt and review of this motion. (See Sands Decl. at Exhibit L). As a result, Flexible is asking for leave to take the deposition of Peter Knoll.

**CONCLUSION**

For the foregoing reasons, this Court should grant the Defendants leave to pursue limited additional discovery in this action.

Respectfully submitted,

/s/ Robert T. Carlton, Jr.
ROBERT T. CARLTON, JR.

Dated: June 29, 2007

22