Wolff & Samson PC
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey 07052
973-325-1500
Attorneys for Defendants Ian Manson and Manson Environmental Corporation

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al.,, <br><br> Defendants. | Civil Action No. 02-CV-3830 (LDD) <br><br><br> **DECLARATION OF LAURIE J. SANDS, ESQ. IN SUPPORT OF THE DEFENDANTS MOTION FOR LEAVE TO PURSUE SUPPLEMENTAL DISCOVERY** |

LAURIE J. SANDS, ESQ. pursuant to 28 U.S.C. §1746, hereby declares as follows:

1.     I am an attorney at law admitted to practice in the State of New Jersey. I am associated with the firm of Wolff & Samson PC, attorneys for defendant, Advanced Environmental Technology Corporation, in the above-captioned matter. As one of the attorneys with principal responsibility for this case, I am fully familiar with the facts and circumstances set forth below. I submit this Declaration in support of the defendants' motion for leave to pursue additional discovery.

2.     I have been admitted *Pro Hac Vice* in the Eastern District of Pennsylvania for the purposes of representing AETC in this matter.

1078515.1

3.    The Plaintiffs produced documents in this case on April 18, 2005, a month after fact discovery closed. The documents produced by the Plaintiffs at that time indicated that some type of internal allocation was either conducted or contemplated amongst the Plaintiffs.

4.    The documents produced by the Plaintiffs that indicated some type of internal allocation was either conducted or contemplated included:

    a.    OU1 Agreement, attached to this Declaration as Exhibit A.

    b.    OU2 Agreement, attached to this Declaration as Exhibit B.

    c.    1999 Agreement in Principle, attached to this Declaration as Exhibit C.

    d.    Boarhead Farm PRP Group Organization Agreement, attached to this Declaration as Exhibit D.

    e.    Boarhead Farm PRP Group Organization Agreement, dated April 7, 1988, attached to this Declaration as Exhibit E.

    f.    June 17, 2003 e-mail from William Hatfield to Tim Bergere, attached to this Declaration as Exhibit F.

    g.    Accounting documents, attached to this Declaration as Exhibit G.

    h.    Pitney, Hardin, Kipp & Szuch bills, attached to this Declaration as Exhibit H.

5.    Dennis Shea, the corporate designee for Plaintiff SPS, was directed by the Plaintiffs' counsel not to respond at his depositions to questions regarding the type and volume of waste that SPS asserts each Defendant disposed of at the Site. The relevant portions of Mr. Shea's deposition regarding this direction is attached at Exhibit I.

6.    The Plaintiffs produced documents regarding an investigation conducted by the Plaintiffs of potentially responsible parties for the Site a little more than a month before the close of discovery. The Defendants did not discover the production of these documents until

1078515.1

September 2005, when the Index for the Document Repository was updated, which is six months after the close of discovery.

7.    The documents that indicate the Plaintiffs conducted an investigation of potentially responsible parties for the Site are as follows:

a.    BSAI075438-075443 - Morgan, Lewis & Bockius 3/16/98 memorandum with ESM search proposal;

b.    BSAI075444-075445 - Morgan, Lewis & Bockius 3/20/98 letter to U.S. Navy Office of General Counsel referencing the selection of a PRP search consultant;

c.    BSAI075446-075450 - ESM draft proposal dated 3/21/98;

e.    BSAI075856-075858 - Morgan, Lewis & Bockius memorandum describing 5/28/98 telephone conference with ESM.  Please note that some information on the front of the page has been redacted;

f.    BSAI075837-075838 and one undesignated page - Fax from ESM reporting on conviction of Freddy DeRewal; and

g.    BSAI075498-075505 - Draft ESM interim status report dated 8/27/98.

All of the above reference documents are attached to this Declaration as Exhibit J.

8.    Peter Knoll was not identified by the Plaintiffs' in responses to Flexible's earlier interrogatories.  Attached to this Declaration as Exhibit K are Objections and Responses of Plaintiff Boarhead Farm Agreement Group to Flexible Circuits' Initial Set of Interrogatories and Document Demands to Plaintiff.

9.    The Plaintiff's counsel had not yet concurred to allowing Flexible to take the deposition of Peter Knoll.  Attached to this Declaration as Exhibit L is a Certificate of Counsel, dated June 29, 2007.

10.    The Plaintiffs served responses to the Defendants' contention interrogatories on April 14, 2007.  Attached to this Declaration as Exhibit M are the portions of those responses relevant to the Defendant's motion for Supplemental Discovery.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 29, 2007.

/s/ Laurie J. Sands, Esq.
Laurie J. Sands, Esq.

1078515.1

# EXHIBIT A

# BOARHEAD FARM SUPERFUND SITE
# ENVIRONMENTAL REMEDIATION TRUST AGREEMENT
# FOR OPERABLE UNIT 1

PHKS 070841

BOARHEAD FARM SUPERFUND SITE
ENVIRONMENTAL REMEDIATION TRUST AGREEMENT

TABLE OF CONTENTS

Page

1. Definitions.............................................................................................................

2. Name and Purpose of the Trust.........................................................................

3. Contributions to the ERT...................................................................................
   3.1    Initial payments by the Initial Grantors into the ERT.......................................
   3.2    Additional Contributions to the ERT ...................................................................
   3.3    ............................................................................................................................
   3.4    Shortfall...............................................................................................................
   3.5    Nature of Contributions by Grantors ...................................................................
   3.6    No Transferability of Interest...............................................................................

4. Dispositive Provisions .......................................................................................
   4.1    Payment of Income and Principal .........................................................................
   4.2    No Authority to Conduct Business .......................................................................
   4.3    Termination of ERT..............................................................................................
   4.4    Distribution of ERT Upon Termination................................................................
   4.5    Alterations, Amendments, and Revocation ..........................................................

5. Trustee Management............................................................................................

6. Express Powers of Trustee..................................................................................
   6.1    ............................................................................................................................
   6.2    Payment of Expenses of Administration...............................................................
   6.3    Retention of Property............................................................................................
   6.4    Preservation of Principal.......................................................................................
   6.5    Retention of Investment Advisor and Other Consultants .....................................
   6.6    Execution of Documents of Transfer....................................................................
   6.7    Extension of Obligations and Negotiations of Claims..........................................
   6.8    Litigation...............................................................................................................
   6.9    Execution of Contracts and Agreements................................................................
   6.10   Discretion In Exercise of Powers..........................................................................

7. Governance of the Trustees ................................................................................
   7.1    Majority..................................................................................................................
   7.2    Meetings.................................................................................................................
   7.3    Voting .....................................................................................................................
   7.4    Expenditures ..........................................................................................................

PHKS 070842

Page

8.    Advice of Counsel.................................................................................................

9.    Trustee Compensation ..........................................................................................

10.   Successor Trustees................................................................................................
      10.1    Vacancy Caused by Resignation or Removal.......................................
      10.2    Appointment of Successor Trustees......................................................
      10.3    Acceptance of Appointment by Successor Trustees.............................
      10.4    Preservation of Record of Changes in Trustees...................................

11.   Instructions to the Trustees..................................................................................
      11.1    Quarterly and Annual Reports .............................................................
      11.2    Counsel.................................................................................................
      11.3    Records.................................................................................................

12.   Indemnity..............................................................................................................
      12.1    Indemnity..............................................................................................
      12.2    Survival.................................................................................................

13.   Interests Not Assignable or Subject to Claims of Creditors ...............................

14.   Approval by Grantors ...........................................................................................
      14.1    ...............................................................................................................
      14.2    Notice of Vote......................................................................................
      14.3    Majority Approval ...............................................................................

15.   Choice of Law.......................................................................................................

16.   Interpretation.........................................................................................................

17.   Separate Documents.............................................................................................

PHKS 070843

## BOARHEAD FARM SUPERFUND SITE
## ENVIRONMENTAL REMEDIATION TRUST AGREEMENT

This Trust Agreement (the "Agreement") is made as of January ___, 2002, by and between the Grantors identified in Appendix A hereto whose authorized representatives have executed this Agreement (the "Grantors") and the Trustee identified in Appendix B hereto whose authorized representative has executed this Agreement (the "Trustee").

WHEREAS, on March 31, 1989, the United States Environmental Protection Agency ("EPA") listed the Boarhead Farm Superfund Site located in Upper Black Eddy, Bridgeton Township, Bucks County, Pennsylvania (the "Site") on the National Priorities List of hazardous waste sites promulgated pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.*, as amended ("CERCLA");

WHEREAS, on November 18, 1998, EPA issued a Record of Decision ("ROD") selecting certain remedial action to be performed at the Site pursuant to CERCLA;

WHEREAS, on January 4, 1999, EPA issued a Special Notice pursuant to Section 122(e) of CERCLA to ten recipients, soliciting a good faith offer, among other things, to perform the remedial design ("RD") and remedial action ("RA") selected by the ROD and to reimburse EPA for its past costs. Of the Grantors to this Agreement, Cytec Industries Inc. ("Cytec"), Ford Motor Company ("Ford"), and SPS Technologies, Inc. ("SPS") were issued Special Notice letters (collectively, the "Special Notice Grantors"); Agere Systems Inc. ("Agere"), NRM Investment Company ("NRM Investment"), and Worthington Steel Company - Malvern ("Worthington") were not issued Special Notice letters;

PHKS 070844

WHEREAS, subsequent to issuing the Special Notice letters, EPA informed counsel for some of the Special Notice Grantors that it had not received a good faith offer from any of the Special Notice recipients and that it had retained contractors to perform the RD/RA selected by the ROD;

WHEREAS, subsequently, EPA indicated the following to some of the Special Notice Grantors:

a) that it would be willing to negotiate dividing the RA selected by the ROD into two operable units ("OUs"). OU-1, in general, would address contaminated groundwater. OU-2, in general, would address (1) the removal of buried drums that are believed by EPA to remain on the Site and (2) contaminated soils;

b) that it would be willing to entertain a partial settlement with the Grantors that would address OU-1 only, and not OU-2, and under which reimbursement of its past costs would be deferred and, if necessary, tolling agreements would be signed;

c) that it had tasked one of its contractors to perform the RD for OU-1 on a "fast-track" basis, with completion of the OU-1 RD scheduled for August 1999;

d) that it believed that substantial cost savings could be realized by the Signatories if they were to perform the RD/RA for OU-1;

e) that it was willing to negotiate the Grantors' takeover and completion of the RD/RA for OU-1;

WHEREAS, in July 1999, the Grantors, including Agere Systems Inc. through its predecessor in interest, Lucent Technologies Inc., but excluding TI Group Automotive Systems, LLC ("TI Group"), entered into an Agreement in Principle under which they committed to funding the OU-1 RD/RA on a per capita basis, subject to reallocation, with the former National

- 2 -

PHKS 070845

Rolling Mills plant in Malvern, Pennsylvania being regarded as a single share to be divided between NRM Investment and Worthington as they would determine;

WHEREAS, on February 12, 2000, Cytec, Ford, and SPS entered into an Administrative Order on Consent for Remedial Design (the "AOC") under which they committed to EPA to begin immediate performance of the OU-1 RD;

WHEREAS, in or about September 2000, Cytec, Ford, and SPS entered into a Consent Decree (the "Consent Decree") under which they committed to EPA to perform and complete the OU-1 RD/RA;

WHEREAS, in September 2000, EPA issued a second Special Notice pursuant to Section 122(e) of CERCLA to ten recipients, including Bundy Corporation;

WHEREAS TI Group assumed responsibility for responding to EPA's Special Notice letter to Bundy Corporation;

WHEREAS, in December 2000, TI Group agreed to participate in funding the OU-1 RD/RA on a per capita basis, subject to reallocation, with the former National Rolling Mills plant in Malvern, Pennsylvania being regarded as a single share assessed equally among NRM Investment, Worthington, and TI Group; and

WHEREAS, the Grantors intend by this Agreement to establish this trust as a "grantor trust" under Sections 671 *et seq.* of the Internal Revenue Code of 1986, as amended, (the "Code"), and an Environmental Remediation Trust ("ERT") in accordance with 26 C.F.R. Section 301.7701-4(e), (61 Fed. Reg. 19,191 (May 1, 1996)), to hold and administer the monies, settlement proceeds, and other funds transferred to the ERT, and any income earned thereon, to

- 3 -

PHKS 070846

be used for the environmental remediation and for response costs and cleanup and removal costs at or in connection with OU-1 at the Site, including response costs and cleanup and removal costs incurred and to be incurred in implementing the groundwater RA as selected and detailed in the ROD, the AOC, and the Consent Decree.

NOW, THEREFORE, the Trustee hereby agrees it will hold, manage, invest, and reinvest the funds contributed to this ERT, and any income earned thereon, consistent with this Agreement, together with any other property hereafter conveyed, assigned, transferred, or paid to it, as Trustee, in trust, subject to the terms, provisions, and conditions hereinafter set forth.

1.   **Definitions.**

As used in this Agreement:

1.1    "Agreement" shall mean this Boarhead Farm Superfund Site Environmental Remediation Trust Agreement for Operable Unit 1, dated as of January ___, 2002.

1.2    "Contractor" shall mean a qualified person or entity selected by the Grantors, for the purpose of performing some or all of the Work.

1.3    "Grantors" shall mean the Grantors whose names are listed on Appendix A to this Agreement.

PHKS 070847

1.4    "Trustee" shall mean the person or persons or entity or entities whose name or names are listed on Appendix B to this Agreement, including any successors under this Agreement.

1.5    "Work" shall have the meaning provided in the Consent Decree.

## 2.    Name and Purpose of the Trust.

2.1    This trust, which shall be known as the Boarhead Farm Superfund Site Environmental Remediation Trust for Operable Unit 1, is hereby established as a "grantor trust" pursuant to Sections 671 *et seq.* of the Code and all relevant terms and provisions of this Agreement shall be interpreted in a manner consistent therewith. The purpose of the ERT is to obtain, hold, invest, and disburse funds, and income earned thereon, necessary to satisfy the obligations of the Grantors for environmental remediation and for response costs and cleanup costs at or in connection with OU-1 at the Site, including response costs and cleanup costs incurred and to be incurred in implementing the groundwater RA as selected and detailed in the ROD, the AOC, and the Consent Decree. To fulfill this purpose, the Trustee shall thoroughly familiarize itself with the terms of the ROD, the AOC, and the Consent Decree, and will take all actions within its powers necessary to ensure that the ROD, the AOC, and the Consent Decree are fully effectuated, including, without limitation, with respect to the performance of the Work.

## 3.    Contributions to the ERT.

3.1    **Initial Payments by Grantors.**    The Grantors shall make initial contributions to the ERT in accordance with the amounts listed in Appendix C. Said amounts are in accordance with the July 1999 Agreement in Principle among the Grantors, as amended by the participation of TI Group, under which the Grantors committed to funding the OU-1 RD/RA

- 5 -

on a per capita basis, subject to reallocation, with the former National Rolling Mills plant in Malvern, Pennsylvania being regarded as a single share assessed equally among NRM Investment, TI Group, and Worthington.

3.2    **Additional Contributions to the ERT.**    Notwithstanding any other provision of this Agreement, if the Trustee determines that an additional contribution to the ERT is required by the Grantors to ensure the completion of the payments required to be made or the uninterrupted progress and timely completion of the Work required by the ROD, the AOC, and/or the Consent Decree, the Trustee, shall promptly demand in writing that the Grantors pay their share of said amount as provided under the July 1999 Agreement in Principle, as amended by the participation of TI Group. Such demand shall be made no more frequently than once each quarter unless, in the determination of the Trustee, such a demand is necessary in order to maintain sufficient funds within the ERT to cover all projected costs of the site activities and trust maintenance (hereinafter referred to as "Emergency Demands"). Emergency Demands shall be made in accordance with the provisions of Article 11. The Grantors shall make the necessary payments within thirty (30) days after receipt of such notice.

3.3    The Grantors remain obligated to ensure that the ERT is sufficient to complete the Work described in the ROD, the AOC, and the Consent Decree and to maintain sufficient assets to satisfy the purpose of this ERT as set forth in Sections 2 and 3 herein. The Grantors hereby agree to satisfy in a timely manner all future demands upon them made in accordance with this Section 3.2.

3.4    **Shortfall.**    In the event that any Grantor fails to make any additional contribution in a timely fashion in accordance with this Agreement, the Trustee shall promptly

- 6 -

PHKS 070849

demand that the remaining Grantors pay such shortfall in accordance with the relative share allocation between the remaining Grantors. The remaining Grantors shall pay the amount of the shortfall to the ERT within thirty (30) days after receipt of the demand, or such shorter period as may be specified in the demand.

      3.5    **Nature of Contributions by Grantors.** All contributions to the Trustee for the ERT shall be made in immediately available funds. All such contributions, together with the earnings thereon, shall be held as a trust fund for the payment of the costs and expenses to be incurred by the Trustee as herein provided. Contributions made by the Grantors shall not be construed as fines, penalties, or monetary sanctions.

      3.6    **No Transferability of Interest.** The interest of the Grantors herein, and their obligation to provide funds under this Section, is not transferable, except to a successor corporation or corporations, and any such transferee corporation shall assume the obligations of the transferring Grantor by executing such documents as the Trustee may require.

4.    **Dispositive Provisions.**

      4.1    **Payment of Income and Principal.** During the term of this ERT, the Trustee shall pay or apply such part (or all) of the income and principal of the ERT as it deems advisable in order to defray the approved costs incurred at the direction of the Grantors, or their designees, in making the payments required to be made or in performing the Work in accordance with the terms of this Agreement, the ROD, the AOC, and the Consent Decree. In this regard, the Trustee shall make all payments and shall pay all bills and invoices approved for payment in writing by the Grantors, or their designees. Bills and invoices to be paid by the Trustee after approval by the Grantors, include, but are not limited to, bills from Contractors and bills for

-7-

PHKS 070850

oversight or administration costs incurred with respect to the Site by or on behalf of the Grantors or for which the Grantors become obligated. Trustee shall endeavor to pay such bills and other expenses in accordance with the terms of contracts between Grantors and Contractors or other vendors that would permit Grantors to obtain discounts and other favorable pricing terms.

4.2     **No Authority to Conduct Business.** The purpose of the ERT is limited to the matters set forth in Sections 2 and 3 hereof, and this Agreement shall not be construed to confer upon the Trustee any authority to carry on any business or activity for profit or to divide the gains therefrom among the Grantors.

4.3     **Termination of ERT.** This trust shall terminate upon completion of the work required by the ROD, the AOC, and the Consent Decree, or upon distribution of the ERT pursuant to Section 4.4 hereof, or exhaustion of the income and principal hereof.

4.4     **Distribution of ERT Upon Termination.** Upon termination of this trust, the Trustee shall liquidate the assets of the ERT and thereupon distribute any remaining trust property, including all accrued, accumulated, and undistributed net income, to the Grantors in proportion to their respective contributions to the ERT during the term of this trust. If any Grantor shall have defaulted with respect to its obligations hereunder and shall remain in default at the time of termination hereunder, the Trustee shall distribute any remaining unused portion of each Grantor's contribution; provided further that, if any Grantor, or its successor, cannot be located within thirty (30) days after the termination date after diligent effort, the Trustee shall distribute the share of such missing Grantor to the remaining Grantors in proportion to their respective contributions to the ERT during the term of this trust. The provisions of this Section or of any other part of this Agreement shall be without prejudice to each Grantor's right to

- 8 -

PHKS 070851

reimbursement from the other Grantor(s) that may exist if this or any other provisions of the trust cause a Grantor's total expenditures for costs of remediation to be in excess of its share under the July 1999 Agreement in Principle, as amended by the participation of TI Group.

4.5 **Alterations, Amendments, and Revocation.** This Agreement may be altered, amended, or revoked from time to time by an instrument in writing executed by the Trustee and the Grantors; provided, however, that no such alteration, amendment, or revocation may conflict with or modify in any respect the obligations of the Grantors under the ROD, the AOC, or the Consent Decree and provided further that Section 12 hereof shall not be revoked and shall not be altered or amended to limit the effect thereof with respect to acts or omissions taken or made up to thirty (30) days after such alteration or amendment.

5. **Trustee Management.**

5.1 The Trustee shall invest and reinvest the principal and income of the ERT and keep the ERT invested in one or more Money Market Accounts, such as a Government Fund, and/or Treasury Bills which shall be treated as a single fund without distinction between principal and income. For purposes of this paragraph, "Money Market Account" shall mean a no-load money fund whose objectives are current income consistent with liquidity and low-risk, the maintenance of a portfolio of high quality, short-term money market instruments, and maintenance of a constant $1.00 net asset value per share. All investments shall be made so as to provide at all times sufficient liquidity to meet the anticipated cash needs of the ERT. In investing, reinvesting, exchanging, selling, and managing the ERT, the Trustee shall discharge its duties with respect to the ERT solely in the interest of the accomplishment of the purposes and objectives of this Agreement. The Trustee, with the prior approval of the Grantors pursuant

PHKS 070852

to Sections 6.4 and 14, may engage the services of an investment advisor or manager, may rely on the advice of such advisor or manager, and may delegate investment decisionmaking authority to such advisor or manager with respect to management of the ERT. The Trustee shall not be personally liable for any action or inaction taken in good faith reliance on the advice of such advisor or manager nor for delegation in good faith of investment decisionmaking authority to such advisor or manager. The Trustee shall keep or arrange to be kept an accounting of all contributions to and disbursements from the ERT.

6. **Express Powers of Trustees.**

      6.1    Without in any way limiting the powers and discretion conferred upon the Trustee by the other provisions of this Agreement or by law, the Trustee is expressly authorized and empowered as hereinafter set forth:

      6.2    **Payment of Expenses of Administration.**  To incur and pay any and all charges, taxes, and expenses upon or connected with the ERT in the discharge of its fiduciary obligations under this Agreement.  All such payments shall be made using the assets of the ERT.

      6.3    **Retention of Property.**  To hold and retain all or any part of the ERT in the form in which the same may be at the time of the receipt by the Trustee, as long as it shall deem advisable, notwithstanding that the same may not be authorized by the laws of any state or rules of any court for the investment of trust funds and without any liability for any loss of principal or income by reason of such retention.

- 10 -

PHKS 070853

6.4    **Preservation of Principal.**  Notwithstanding any other provision in this Agreement, to at all times hold, manage, invest, and reinvest the assets of the ERT in a manner designed to preserve the accrued income and principal of the ERT for the purposes of the ERT.

6.5    **Retention of Investment Advisor and Other Consultants.**  To engage the services of (and pay compensation to) an investment advisor, accountants, agents, managers, common counsel, or other consultants with respect to the management of investments of the ERT, the management of the ERT, or any other matters.

6.6    **Execution of Documents of Transfer.**  To make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

6.7    **Extension of Obligations and Negotiations of Claims.**  Upon obtaining approval of or direction from the Grantors pursuant to Section 14, to renew or extend the time of payment of any obligation payable to or by the ERT for such periods of time and upon such terms as the Trustee may determine and, upon obtaining approval of or direction from the Grantors pursuant to Section 14, to compromise or otherwise adjust all claims in favor of or against the ERT.

6.8    **Litigation.**  Upon obtaining approval of the Grantors pursuant to Section 14, to institute and defend litigation in the name of the ERT on behalf of or in the name of all Grantors.

PHKS 070854

6.9    **Execution of Contracts and Agreements.**  At the direction of the Grantors pursuant to Section 14, to make, execute, acknowledge, and deliver any and all contracts or agreements on behalf of the trust.

6.10    **Discretion In Exercise of Powers.**  To do any other acts which it shall deem proper to effectuate the purpose hereof and to exercise the powers specifically conferred upon it by this Agreement.

7.    **Governance of the Trustees.**

In the event there is more than one Trustee of the ERT:

7.1    **Majority.**  Action may be taken, except as otherwise provided herein, by a majority of the Trustees then in office at any meeting of the Trustees at which a quorum is present.  At any meeting of the Trustees, a majority of the Trustees then in office shall constitute a quorum for the transaction of business, or, if only one such Trustee is then serving, such Trustee shall constitute a quorum.  Less than a quorum may adjourn any meeting from time to time, and the meeting may be held as adjourned without further notice.

7.2    **Meetings.**  Any action may be taken by the Trustees without a meeting if all the Trustees then in office consent to the action in writing and such written consents are filed with the records of the Trustees.  Meetings of the Trustees may be held by telephone conference call.

7.3    **Voting.**  Any action of the Trustees required to approve an amendment of this Agreement or the termination of this trust as provided herein shall require the affirmative

- 12 -

PHKS 070855

vote and signatures of a majority of the Trustees then in office or, if only one Trustee is then serving, by such Trustee.

7.4    **Expenditures.** If more than one (1) Trustee is in office, any expenditure from the ERT of an amount greater than $1,000 for any single transaction shall require the signature of two (2) Trustees.

8.    **Advice of Counsel.**

8.1    The Trustee may from time to time consult with counsel, who may be counsel to any of the Grantors, with respect to any question arising as to compliance with this Agreement, the ROD, the AOC, and/or the Consent Decree.    The Trustee shall be fully protected, to the extent permitted by law, in acting in reliance upon the advice of counsel.

9.    **Trustee Compensation.**

9.1    No individual serving as a Trustee shall receive any compensation for such Trustee's services as a Trustee under this Agreement; provided, however, that any Trustee may be reimbursed for expenses, including travel expenses, reasonably required and incurred by such Trustee in the performance of his duties as Trustee.    Unless otherwise agreed in writing prior to acceptance of appointment, any corporate Trustee acting hereunder shall be compensated in accordance with its published schedule of fees in effect from time to time during the period over which its services are performed.

10.    **Successor Trustees.**

10.1    **Vacancy Caused by Resignation or Removal.** The Trustee may resign at any time by delivering a resignation in writing to the Grantors. The Grantors may remove the

PHKS 070856

Trustee by delivering notice of such removal in writing to such Trustee. Any such resignation or removal shall take effect within thirty (30) days of delivery of the notice of resignation or removal or upon the acceptance of appointment in writing by a successor Trustee, whichever is earlier.

10.2 **Appointment of Successor Trustees.** Any vacancy in the office of Trustee created by death, resignation, or removal by the Grantors shall be filled by the Grantors by an appointment in writing of a successor Trustee.

10.3 **Acceptance of Appointment by Successor Trustees.** Acceptance of appointment as a successor Trustee shall be in writing and shall become effective upon receipt by the Grantors of notice of such acceptance. Upon the acceptance of appointment of any successor Trustee, title to the ERT shall thereupon be vested in said successor Trustee, jointly with the remaining Trustees, if any, without the necessity of any conveyance or instrument. Each successor Trustee shall have all of the rights, powers, duties, authority, and privileges as if initially named as a Trustee hereunder.

10.4 **Preservation of Record of Changes In Trustees.** A copy of each instrument of resignation, removal, appointment, and acceptance of appointment shall be attached to an executed counterpart of this Agreement in the custody of the Grantors.

11. **Instructions to the Trustee.**

11.1 Notwithstanding anything herein to the contrary, the Trustee is hereby directed to do the following in addition to other duties set forth in other provisions of this Agreement:

- 14 -

PHKS 070857

11.2    **Quarterly and Annual Reports.**  Have prepared quarterly and annual financial reports during the term of the trust, describing the manner in which all of the assets of the ERT are then invested and the current market value of such assets, as well as the obligations, income, and expenses of the ERT.  Should, in the discretion of the Trustee, an emergency demand be required, the Trustee shall provide a written statement indicating the reasons for this demand.  This statement will include, at a minimum, a general accounting of the funds currently in the trust, any currently held demands for payment or other payment obligations still pending, the projected costs which will become due prior to the end of the quarter, and an estimate of the funds needed for the trust to make anticipated payments through and until the next quarterly demand.  Copies of such reports shall be transmitted by the Trustee in writing to the Grantors.  ·

11.3    **Counsel.**  Advise, consult, and confer with and otherwise inform the Grantors, upon any request by the Grantors, with respect to matters arising out of this Agreement, administration of the ERT, or any other matter which the Trustee, in its discretion, deems appropriate to bring to the attention of the Grantors.

11.4    **Records.**  Maintain records of all actions taken by the Trustee with respect to matters arising out of this Agreement or administration of the ERT. Copies of said records shall be provided to the Grantors upon request, and, upon termination of this ERT, said records shall be transmitted, together with all other records of the Trustee, to the Grantors.  The Trustee shall have the right to assume, in the absence of written notice to the contrary, that no event constituting a change or a termination of the authority of any of the Grantors has occurred.

PHKS 070858

12.  **Indemnity.**

12.1  **Indemnity.**  Each Trustee, whether initially named or appointed as a successor Trustee, acts as a Trustee only and not personally, and, in respect of any contract, obligation or liability made or incurred by the Trustees or any of them hereunder in good faith, all persons shall look solely to the ERT and not the Trustees personally or the Grantors. Neither the Trustees nor the Grantors shall incur any liability, personal or corporate, of any nature in connection with any act or omission made in good faith by the Trustees or the Grantors in the administration of the ERT or otherwise pursuant to this Agreement. The Trustee initially named, appointed as successor Trustees by the Grantors, or appointed by a court shall be indemnified and held harmless by the ERT and, to the extent that indemnification cannot be obtained from the ERT, jointly and severally by the Grantors. This indemnification and hold harmless provision shall cover all expenses reasonably incurred by such Trustee in defense of the aforementioned acts or omissions of the Trustees or the Grantors. Except for the payment of all expenses reasonably incurred, this indemnification shall not apply to any liability arising from a criminal proceeding where the Trustee(s) had reasonable cause to believe that the conduct in question was unlawful.

12.2  **Survival.** This section shall survive the termination of the trust.

13.  **Interests Not Assignable or Subject to Claims of Creditors.**

13.1  The interest of any Grantor in the ERT shall not be subject to anticipation or assignment nor subject to the claims of any creditor of any Grantor, and any interest reserved to any Grantor shall be made available to the Grantor only upon termination of this Trust pursuant to Section 4 herein.

PHKS 070859

14.  **Approval by Grantors.**

14.1    Any matter that is subject to the approval by the Grantors as indicated in this Agreement shall be obtained by means of a vote held among all of the Grantors.

14.2    **Notice of Vote.**  Any Grantor or Trustee wishing to put a matter to a vote consistent with this Agreement shall give written notice to all Grantors and the Trustees.  A "written notice" shall consist of a writing sent by facsimile or regular mail to each Grantor's Designated Representative for Receipt of Notice, as indicated on the signature page hereto, which contains: (a) the date fixed for return of all votes (which shall be fixed at least fifteen (15) days from the date notice was sent); (b) a concise statement of the matter to be voted upon; (c) a ballot which clearly provides for both affirmative or negative votes; and (d) the facsimile and mailing address to which Grantors' votes are to be transmitted.

14.3    **Majority Approval.**  A matter brought to a vote pursuant to paragraph 14.1 shall be deemed "approved" if a majority (more than 50%) of the Grantors votes affirmatively to approve the matter.

15.  **Choice of Law.**

15.1    This Agreement shall be administered, construed, and enforced according to the laws of the State of Pennsylvania, except to the extent that federal law shall apply to questions arising under CERCLA or the National Contingency Plan, 40 C.F.R. Part 300, promulgated thereunder.

16.  **Interpretation.**

16.1    As used in this Agreement, words in the singular include the plural and words in the plural include the singular; and the masculine and neuter genders shall be deemed to

- 17 -

PHKS 070860

include the masculine, feminine, and neuter. The descriptive heading for each Section and Subsection of this Agreement shall not affect the interpretation or the legal efficacy of this Agreement. It is agreed that neither the act of entering into this Agreement nor any contribution to the ERT nor any action taken under this Agreement shall be deemed to constitute an admission of any liability or fault on the part of the Trustees, the Grantors, or any of them with respect to the Site or otherwise, nor does it constitute a commitment or agreement, either expressed or implied, by any or all of them to undertake any further activities outside the scope of this Agreement.

### 17.  Separate Documents.

17.1    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**WITNESS** the execution hereof of the Trustees as of the date first above written.

_____

(Signature of the Trustee)

PHKS 070861

Boarhead Farm Superfund Site
Environmental Remediation Trust Agreement
for Operable Unit 1

Signature Page

WITNESS the execution of this Agreement by the undersigned Company by its authorized representatives.

Name of Company: _____

Signature: _____

Name of Signer: _____

Title of Signer: _____

Company Taxpayer Identification Number: _____

Date: _____

Designated Representative for Receipt of Notice:

Name: _____

Address: _____

_____

_____

Telephone Number:    (_____)_____

Facsimile Number:    (_____)_____

- 19 -

PHKS 070862

# APPENDIX A

Agere Systems Inc.
Cytec Industries Inc.
Ford Motor Company
NRM Investment Company
SPS Technologies, Inc.
TI Group Automotive Systems, LLC
Worthington Steel – Malvern

PHKS 070863

## APPENDIX B

David W. Payne, Esq., Pitney Hardin, Kipp & Szuch LLP

PHKS 070864

## Appendix C

Agere Systems Inc. - $84,534.32
Cytec Industries Inc. - $84,534.32
Ford Motor Company - $84,534.32
NRM Investment Company - $28,178.11
SPS Technologies, Inc. - $84,534.32
TI Group Automotive Systems, LLC - $28,178.11
Worthington Steel – Malvern - $28,178.11

PHKS 070865

# EXHIBIT B

OU-1
OU-2

William Hatfield     06/17/2003 05:57

To:      "Bergere, Timothy" <tbergere@mmwr.com>
cc:      Sandy Purrington/PHKS@PHKS
Subject: Re: Boarhead Farms

Tim:

In follow up to our recent conference call and your 6/16/03 email information request, we are preparing to send you the documents related to the Boarhead Group and trust account matters. You should be receiving the information from us by mail later this week.

Here is an initial response to your email inquiry:

1) There is an "Agreement in Principle" that 6 of the current OU-1 Group members executed back in July 1999 concerning the Boarhead matter. At that time, Bundy was not a Group member. We are forwarding you a copy of that Agreement.

There is a General PRP Group Organization Agreement (for OU-1) that was circulated among the Group for execution in or about September 2000. We are forwarding you a copy of the OU-1 PRP Group Agreement along with available execution pages from the OU-1 Group members.

There is a Environmental Remediation Trust (ERT) Agreement for OU-1 that was circulated to the Group for execution in January 2002. The named Trustee was David Payne - Pitney Hardin Kipp & Szuch LLP. We are forwarding you the ERT Agreement with available signature pages from the OU-1 Group members.

After David Payne took leave of the firm in late 2002, I continued to serve in his capacity as Trustee of the Boarhead ERT on behalf of the firm.

Under the ERT Agreement, I suggest that we invoke/cite the appropriate provisions to transfer the Boarhead Trust between our firms. We also should obtain the Group's prior written consent to transfer the trust funds and to change Trustees.

2) Based on a review of the file, I do not believe that there is a formal trust agreement for OU-2. There was a draft OU-2 PRP Group Organizational Agreement that was prepared in 2002 that was never finalized. We can provide you with a draft copy of that agreement if you wish.

The OU-2 Group trust funds have been maintained in a separate sub trust account related to the Boarhead matter and handled according to instructions from the OU-2 Group members since January 3, 2002.

3) We are ready to transfer the OU-2 RD/RA trust account funds to you at your convenience. We intend to transfer the OU-1 RD/RA funds by the end of the month. We need to ensure that the last check cleared that account before we transfer it to you.

As discussed, there is very little money in the EPA reimbursement accounts (OU-1 and OU-2) and the Barkett account (for a future allocation). We can also transfer those accounts to you at your convenience.

As agreed, we will retain the monies in the Group defense cost accounts (OU-1 and OU-2) until all of our outstanding fees are paid. When that is complete, we will transfer any remaining funds to your firm.

Please forward us the wire transfer instructions for the 5 Boarhead trust sub accounts (excluding the OU-1 and OU-2 defense cost accounts). I will work with Sandy to ensure that the funds are transferred in an orderly fashion.

PHKS 073639

4) We confirm that, on April 5, 2002, the Group paid the remaining $10K in dispute with EPA related to the OU-1 reimbursement.

5) I do not believe that any of the Boarhead trust accounts were interest bearing - rather it appears that all of the accounts were non-interest bearing.

If you need any further information, please let me know.

Regards,

WSH

"Bergere, Timothy" <tbergere@mmwr.com> on 06/16/2003 03:02:49 PM

      "Bergere, Timothy" <tbergere@mmwr.com> on 06/16/2003 03:02:49 PM

To:         "whatfield@pitneyhardin.com" <whatfield@pitneyhardin.com>
cc:
Subject:  Boarhead Farms

Bill:

Some transitional questions I would like to get squared away prior to my inaugural conference call with the OU-2 Group.

1.    Was the Trust Agreement for creation of the OU-1 Trust ever authorized and, if so, who is the current Trustee?

2..   Was there ever a second Trust established for the OU-2 Group?  If no, why not?

3.    Are you all ready to transfer the funds?  I can send wire transfer instructions as soon as you are ready to go.

4.    Did the Group ever pay the $10K remainder from the $17K dispute it had with EPA over an OU-1 response cost bill?  Was that 10K paid?

5.    Were all of Pitney's accounts here managed as interest bearing accounts owned by the Trust?

I would appreciate any help you can provide, thanks.

Tim Bergere

PHKS 073640

# EXHIBIT C

Boarhead Farm Superfund Site

Agreement in Principle

PHKS 071738

Privileged and Confidential
Joint Defense Document

$M\alpha1$

## AGREEMENT IN PRINCIPLE

The undersigned companies ("Signatories"), with respect to the Boarhead Farm Superfund Site in Upper Black Eddy Township, Bucks County, Pennsylvania (the "Site"), agree as follows:

### A. Background.

1. On November 18, 1998, Region III of the Environmental Protection Agency ("EPA") issued a Record of Decision ("ROD") selecting certain remedial action to be performed at the Site pursuant to the Comprehensive Environmental Response Cleanup and Liability Act ("CERCLA"). EPA estimated the cost of the remedial action selected in the ROD as $13.16MM.

2. On January 4, 1999, EPA issued a Special Notice pursuant to Section 122 (e) of CERCLA to ten recipients, soliciting a good faith offer, among other things, to perform the remedial design ("RD") and remedial action ("RA") selected by the ROD and to reimburse EPA for $11.7MM of its past costs. Of the original Signatories to this Agreement in Principle ("Agreement"), Cytec Industries Inc. ("Cytec"), Ford Motor Company ("Ford") and SPS Technologies, Inc. ("SPS") were issued a Special Notice letter; Lucent Technologies Inc. ("Lucent"), NRM Investment Company, Inc. ("NRM Investment") and Worthington Steel Company - Malvern ("Worthington") were not issued a Special Notice letter, and their participation in this Agreement is in no respect an admission that they believe a Special Notice letter should have been issued to them. Subsequent to issuing the Special Notice letters, EPA informed counsel for some of the Special Notice Signatories that it did not receive a good faith offer from any of the Special Notice recipients and that it has retained contractors to perform the RD/RA selected by the ROD.

3. Subsequently, EPA has indicated the following to some of the Special Notice Signatories to this Agreement:

a). that it would be willing to negotiate dividing the RA selected by the ROD into two operable units ("OUs"). OU1, in general, would address contaminated groundwater. OU2, in general, would address (1) the removal of buried drums that are believed by EPA to remain on the Site and (2) contaminated soils.

b). that it would be willing to entertain a partial settlement with the Signatories which would address OU1 only, and not OU2, and under which reimbursement of its past costs would be deferred and, if necessary, tolling agreements would be signed.

c). that it has tasked one of its contractors to perform the RD for OU1 on a "fast-track" basis, with completion of the OU1 RD scheduled for August 1999.

d). that it believes that substantial cost savings can be realized by the Signatories if they perform the RD/RA for OU1.

1

PHKS 071739

Privileged and Confidential
Joint Defense Document

   e). that it is willing to negotiate the Signatories' takeover and completion of the RD/RA for OU1.

  4. de maximis, inc. has evaluated the cost of the OU1 RD/RA and has estimated that the cost to perform the work would be approximately $510,000 to design and construct the remedy and $300,000 per year for operation and maintenance.

B. Agreement

  5. This Agreement shall become effective on the date that the Agreement is signed by the last of the following companies: Cytec, Ford, SPS, Lucent, NRM Investment, and Worthington (the "Effective Date"). These original Signatories intend that other companies may sign this Agreement. However, such later Signatories shall be bound by the terms of this Agreement on the date of their signature.

  6. Subject to Paragraph 9 below, the Signatories believe that it will be in their best interests to enter into an agreement with EPA under which they would perform and fund the OU1 RD/RA, in return for a standard covenant not to sue and protection from contribution actions or claims as provided by CERCLA Section 113(f)(2) for matters addressed in the OU1 RD/RA settlement.

  7. The execution by the Signatories of this Agreement is not an admission by them of liability with respect to the Site.

  8. The costs of the OU1 RD/RA ("Shared Costs") shall be assessed as follows:

   (a) Initial Allocation. From the Effective Date of this Agreement until an Interim or Final Allocation is performed as provided in 8(c) below, all Shared Costs shall be allocated among the Signatories on a per capita basis, with the former National Rolling Mills plant in Malvern, Pennsylvania being regarded as a single share to be divided between NRM Investment and Worthington as they shall determine.

   (b) The Initial Allocation shall be subject to reallocation in accordance with the Interim Allocation.

   (c) Non-Binding Interim and Final Allocation. All Signatories to this Agreement agree to meet to discuss the framework for, and, seek in good faith, to reach agreement regarding, a non-binding Interim Allocation, and, eventually, a non-binding Final Allocation of such costs and expenses as may be incurred by the Signatories with regard to the Site. The Signatories further agree to obtain assistance, without cost to the Signatories, from David C. Batson, Esq., EPA's Alternative Dispute Resolution Liaison, in seeking to reach agreement on an Interim Allocation. By no later than nine (9) months from the Effective Date of this Agreement or such later date as the Signatories may subsequently agree, the Signatories shall use their best good faith efforts to reach an Interim Allocation. While working toward an Interim Allocation, no Signatory will take action regarding the Site against any other Signatory in an administrative, judicial, or other forum. From the date of any such Interim Allocation until

2

PHKS 071740

Privileged and Confidential
Joint Defense Document

the termination of this Agreement or approval of a Final Allocation, all Shared Costs shall be allocated among the Signatories in accordance with the Interim Allocation. If agreement can be reached regarding an Interim Allocation, the Interim Allocation shall apply retroactively so that the Signatories whose shares are reduced from the Initial Allocation shall receive a credit for payments made during the Initial Allocation concerning OU1, with a corresponding debit for those whose shares are increased. If the Signatories do not reach agreement with regard to an Interim Allocation within nine (9) months from the effective date of the Agreement (or such later date to which the Signatories may subsequently agree), all Signatories reserve their rights to proceed against any or all of the other Signatories in any administrative, judicial, or other forum, to recover any payments which they have made or may later be required to make with regard to the Site. The Interim Allocation shall be subject to reallocation in accordance with the Final Allocation.

(d)    Non-Binding Final Allocation. Following any agreement on an Interim Allocation, the Signatories shall endeavor to reach agreement on a Final Allocation of Shared Costs. The Final Allocation shall apply retroactively so that Signatories whose shares are reduced from the Interim Allocation shall receive a credit for payments during the Interim Allocation, with a corresponding debit for Signatories whose shares are increased.

(e)    If at any time during the course of this Agreement, the Signatories receive a monetary contribution toward the Shared Costs as a result of the United States Navy's status as a Special Notice recipient, such contribution shall be credited to the Signatories in accordance with the Allocation, whether Initial, Interim, or Final, in effect at the time of its receipt.

9. Lucent, NRM Investment, and Worthington (and Bundy Corp., if it should decide to participate equally in funding the share attributable to the former National Rolling Mills plant) shall be extended an opportunity to sign but shall not be required to sign any Consent Decree (the "OU1 Consent Decree") or other writing that the Signatories consider entering into regarding the Site. The Signatories agree not to disclose to the EPA, the U. S. Department of Justice ("DOJ"), or anyone else the participation in this Agreement by Lucent, NRM Investment and/or Worthington (or Bundy Corp. if it participates). The Signatories also agree that Lucent, NRM Investment and/or Worthington (and Bundy Corp. if it participates) may disclose their participation in this Agreement to EPA, DOJ or anyone else.

10. The Signatories agree to use their best efforts to obtain and share evidence regarding the liability of those who are and those who are not Signatories to this Agreement. The cost for sharing information collected prior to executing this Agreement is an issue to be addressed by the Signatories as soon as possible, as is the common effort to investigate evidence of non-Signatory company nexus to the Site. To the extent permitted by law, all Signatories agree not to make written or oral communications with EPA, DOJ or anyone else regarding any other Signatory prior to completion of the Signatories' discussions regarding Interim Allocation, and, if agreement on an Interim Allocation is reached, prior to completion of the Signatories' discussions regarding Final Allocation.

3

PHKS 071741

Jul-30-99 11:17

P.06

Privileged and Confidential
Joint Defense Document

11. The Signatories agree that they will promptly negotiate an amendment to the Boarhead Farm PRP Group Organizational Agreement, which will memorialize this Agreement in Principle.

12. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Signatories hereto, which may be by and through their appointed counsel, enter into the Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: July , 1999

                              Cytec Industries Inc.

                              By: _____

                              Ford Motor Company

                              By: _____

                              Lucent Technologies Inc.

                              By: _____

                              NRM Investment Company Inc.

                              By: _____

                              SPS Technologies Inc.

                              By: _____

                              Worthington Steel Company - Malvern.

                              By: _____

4

PHKS 071742

Privileged and Confidential
Joint Defense Document

11. The Signatories agree that they will promptly negotiate an amendment to the
Boarhead Farm PRP Group Organizational Agreement, which will memorialize this Agreement
in Principle.

12. This Agreement may be executed in one or more counterparts, each of which shall be
deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Signatories hereto, which may be by and through their appointed
counsel, enter into the Agreement. Each person signing this Agreement represents and warrants
that he or she has been duly authorized to enter into this Agreement by the company or entity on
whose behalf it is indicated that the person is signing.

Dated: July 29, 1999

Cytec Industries Inc.

By: _____

Ford Motor Company

By: _____

Lucent Technologies Inc.

By: _____

NRM Investment Company Inc.

By: _____

SPS Technologies Inc.

By: _____

Worthington Steel Company - Malvern.

By: _____

4

PHKS 071743

Privileged and Confidential
Joint Defense Document

    11. The Signatories agree that they will promptly negotiate an amendment to the Boarhead Farm PRP Group Organizational Agreement, which will memorialize this Agreement in Principle.

    12. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Signatories hereto, which may be by and through their appointed counsel, enter into the Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: July 30, 1999

Cytec Industries Inc.

By: _____

Ford Motor Company

By: _____

Lucent Technologies Inc.

By: _____
    Ronald DiCola

NRM Investment Company Inc.

By: _____

SPS Technologies Inc.

By: _____

Worthington Steel Company - Malvern.

By: _____

4

PHKS 071744

Privileged and Confidential
Joint Defense Document

    11. The Signatories agree that they will promptly negotiate an amendment to the Boarhead Farm PRP Group Organizational Agreement, which will memorialize this Agreement in Principle.

    12. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Signatories hereto, which may be by and through their appointed counsel, enter into the Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: July  , 1999

Cytec Industries Inc.

By: _____

Ford Motor Company

By: _____

Lucent Technologies Inc.

By: _____

NRM Investment Company Inc.

By: _Edward Parkenthal_
     _Counsel and assistant secretary_

SPS Technologies Inc.

By: _____

Worthington Steel Company - Malvern.

By: _____

4

PHKS 071745

07/30/99  14:40 FAX 202 467 8900        VSSP WASHINGTON                    ☒002
07/30/99  FRI 12:02 FAX 614 840 3708        WII LEGAL                          ☒002
07/29/99  18:17 FAX 202 467 8900        VSSP WASHINGTON ___                ☒011

FROM PITNEY HARDIN KIPP &SZUCH        (THU) 7.29'99 13:18/ST. 13:09/NO. 4860127340 P  8

Privileged and Confidential
Joint Defense Document

11. The Signatories agree that they will promptly negotiate an amendment to the Boarhead Farm PRP Group Organizational Agreement, which will memorialize this Agreement in Principle.

12. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Signatories hereto, which may be by and through their appointed counsel, enter into the Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: July  , 1999

Cytec Industries Inc.

By: _____

Ford Motor Company

By: _____

Lucent Technologies Inc.

By: _____

NRM Investment Company Inc.

By: _____

SPS Technologies Inc.

By: _____

Worthington Steel Company - Malvern

By: _____
     Secretary

4

PHKS 071747

# EXHIBIT D

BOARHEAD FARM SITE PRP GROUP ORGANIZATION AGREEMENT

This Agreement is made as of this ___ day of _____, _____ between and among the parties (hereinafter the "Members") whose authorized representatives have executed this Agreement:

WHEREAS, without admitting any fact, responsibility, fault or liability in connection with the Boarhead Farm Superfund Site in Upper Black Eddy, Bridgeton Township, Bucks County, Pennsylvania (the "Site"), the Members hereto will (1) respond efficiently to any claim that may be asserted by the United States, the Commonwealth of Pennsylvania, or others in connection with the Site; (2) attempt to allocate among themselves common legal, technical administrative and other costs incurred in connection with this matter, and (3) cooperate among themselves in this effort;

NOW THEREFORE, in consideration of the foregoing, the Members mutually agree as follows:

1.    **Boarhead Farm PRP Group.** The Members hereby organize and constitute themselves as the Boarhead Farm Site PRP Group (hereinafter "Group"). Each Party whose authorized representative has executed this Agreement is a Member of the Group.

2.    **Purpose.**

2.1    **Activities.** It is the purpose of this Agreement that the terms shall control the manner and means by which the Members will:

(a)    organize and conduct a common response to any claims that may be asserted by the United States, the Commonwealth of Pennsylvania, or others relating to the Site, including but not limited to the Group's performance of any removal or response action or the organizing and conducting of a common defense to any claim;

(b)    organize and conduct negotiations with the United States Environmental Protection Agency ("USEPA") and other persons concerning Group settlement of all or a portion of said claims;

(c)    retain common counsel, liaison counsel, and technical consultants, if the Members so elect;

(d)    raise and spend all reasonably necessary funds to implement these purposes;

(e)    take all necessary and reasonable actions to effectuate this Agreement; and

(f)    attempt to allocate among themselves all costs incurred or to be incurred as authorized by this Agreement, including but not limited to removal and response costs incurred at the Site ("Shared Response Costs") and defense costs, including legal, administrative, and allocation costs ("Shared Defense Costs"), (collectively, "Shared Costs").

2.2     **Member Cooperation.** The Members shall cooperate with each other to effectuate the purposes of this Agreement.

3.     **Organization and Procedures.**

3.1     **Committees.** In order to carry out the purposes of this Agreement, the Members may establish the following four committees: Steering, Executive, Technical, and De Minimis. Each Member, and any individual serving on any committee on behalf of any Member, agrees, by virtue of such service, to maintain the privileged name and confidentiality of all communications and proceedings of such committees; such obligation shall continue in the event such individual should leave the employ of or cease to represent such Member. Membership on the Steering, Executive, Technical, and De Minimis Committees shall be open to any Member who expresses a willingness to make its representative reasonably available to participate actively in the functions of the relevant committee.

3.2     **Authority to Decide.** Except as otherwise provided herein, the Members shall act by and through the Steering Committee except that the Group reserves to itself the right at any time and from time to time directly to authorize action to be undertaken pursuant to this Agreement in accordance with the voting requirements set forth in this Agreement.

3.3     **Meetings.** The Members may authorize or direct actions under this Agreement only at meetings duly held and called for such purpose, which meetings shall be called regularly by the Steering Committee. Meetings of the Group may be called for any purpose at any time by any two or more Members of the Steering Committee or by any four or more Members of the Group. Meetings may be held by telephone conference.

3.4     **Majority Rule.** Any matter under this Agreement may be referred to a meeting of the Group. The Group shall attempt to make decisions by consensus; however, except as otherwise provided herein, on any matter put to a vote, such matter shall be decided by a majority (more than 50%) of the Voting Power (as defined in Section 3.6 of this Agreement) of the Members present in person or by proxy at the meeting.

3.5     **Notice of Meetings.** Whenever feasible, written notice of the time, place and purpose of any meeting of the Group or of a committee or subcommittee of the Group shall be given to each Member entitled to vote at such meeting at least seven (7) days and not more than thirty (30) days before the date of such meeting either personally, with confirmation by fax, or by mail, charges prepaid, or by other means of written communication, including fax or e-mail, addressed to each Member at the address appearing on the service list maintained by the Steering Committee. (The service list shall indicate the preferred method of notice, whether e-mail or fax, for each Member.) In the event a meeting is called on less than seven (7) days written notice, the Members calling the meeting will make a reasonable effort to provide notice in fact to every Member, including communication by facsimile, voice mail, or e-mail. Meetings may be held by telephone

conference. No matter will be acted upon by the Group unless it is within the reasonable scope of the meeting's purpose as specified in the notice.

3.6    **Voting Power.** At any Group meeting, each Member shall have a vote equal to the share assessed such Member under Section 8.4 of this Agreement prior to the time of such meeting; provided that any Member which has been assessed a financial contribution which assessment remains unpaid at the time the meeting is called may vote only upon payment of the full assessment prior to the voting process.

3.7    **Voting by Proxy.** A Member eligible to vote at a Group meeting may assign in writing its vote (in accordance with Section 3.6 of this Agreement) to another Member eligible to vote at the meeting.

3.8    **Quorum.** Sixty percent (60%) of the eligible voting power (as defined in Section 3.6 of this Agreement) of the Group shall be present in person or represented by proxy at any Group meeting.

4.    **Steering Committee, Common Counsel, and Liaison Counsel.**

4.1    **Enumerated Powers of the Steering Committee.**    The powers, duties and responsibilities of the Steering Committee shall include:

(a)    retaining, coordinating, supervising and directing the activities of common counsel and liaison counsel, except that, in the event that liaison counsel is also a member of the Steering Committee, liaison counsel shall abstain from participating in Steering Committee decisions with respect to liaison counsel activities;

(b)    selecting, referring, and determining the activities of any contractors and consultants retained for assistance in the matter and seeking advice and assistance in this role from the Technical Committee;

(c)    appointing subcommittees to handle specific matters:

(d)    negotiating and referring settlement matters to the Group,

(e)    election of a Chairperson of the Steering Committee who shall also act as Chairperson of the Group;

(f)    recommending to the Group a de minimis buy-out proposal if appropriate and seeking the advice and recommendation of the De Minimis Committee in this role;

(g)    negotiating with the USEPA and other persons with respect to all matters arising out of the matter;

(h)    recommending to the Group that litigation be commenced against any party to this Agreement for breach of this Agreement, or to enforce the terms hereof,

(i)    circulating to the Group such substantive pleadings, motions or other written submissions as the Steering Committee deems necessary in order to allow a Member to determine if it wishes to exercise its option under Section 4.3 hereof and making all such documents otherwise available to all Members, regardless of whether any particular Member chooses to exercise its option under Section 4.3; and

(j)    conducting such other activities that are necessary and proper to carry out the purposes of this Agreement.

4.2    **Liaison Counsel.** Pitney, Hardin, Kipp & Szuch LLP has been retained to serve as liaison counsel to the Group ("Liaison Counsel"). Among other duties assigned by the Group, Liaison Counsel shall serve as the document repository for the Group (the "Document Repository"). Liaison Counsel's compensation, including the cost of maintaining the Document Repository, shall be a Shared Defense Cost.

4.3    **Right of Separate Counsel.** Notwithstanding the retention of common counsel and/or liaison counsel with respect to any matter, each Member reserves the right to select and retain its own counsel to represent such Member on any matter, and to advise common counsel and/or liaison counsel that such Member is not to be represented by or through common counsel and/or liaison counsel with respect to any such matter.

4.4    **Litigation Against Other Persons.** The Steering Committee may recommend to the Group that a claim be asserted on behalf of the Members against other persons. No such claim may be asserted by common counsel or liaison counsel under this Agreement without consent of a majority of the Voting Power of the Group, and any Member may elect to decline participation in any such suit, and may, but need not, in lieu of such participation assign its claims to the other parties. Nothing in this paragraph shall affect or impair the right of any Member to assert any claim in its own name and right against any person.

4.5    **Voting.** The Steering Committee shall attempt to make decisions by consensus; however, on any matter put to a vote, such matter shall be decided by a majority of the Voting Power (as defined in Section 3.6 of this Agreement) of the Members present in person or by proxy at the meeting.

4.6    **Reports to the Group and Call for Group Meetings.** The Steering Committee shall report in writing (with confirmation by fax and/or regular mail if such report is issued by e-mail) its decisions, actions and recommendations to the Group from time to time as may be necessary to keep the Group fully informed of matters covered by this Agreement, and shall call periodic meetings of the Group and refer to such meetings for a vote any matters which, in the judgment of the Steering Committee should be referred.

4.7    **Quorum.** Sixty percent (60%) of the eligible voting power (as defined in Section 3.6 of this Agreement) of the Steering Committee shall be present in person or represented by proxy at any Steering Committee meeting.

4.8    **Compensation of Steering Committee.** The Members of the Steering Committee shall serve as volunteers without compensation from the Group.

4.9    **Call for Meetings.** Meetings of the Steering Committee may be called by the Chairperson or by any three Members of the Committee.

5.    **Executive Committee.** The Steering Committee shall appoint an Executive Committee composed of three Members to handle administrative and financial matters as assigned by the Steering Committee. The Members of the Executive Committee shall serve as volunteers without compensation from the Group. Procedures for calling Executive Committee meetings and notice of Executive Committee meetings to Executive Committee Members shall be determined by the Executive Committee.

6.    **Technical and De Minimis Committees.**

6.1    **Technical Committee Members.** The Technical Committee shall include Member volunteers for the Committee who shall be encouraged to supply technically qualified representatives prepared to participate actively on the Committee.

6.2    **Powers of the Technical Committee.** The powers and duties of the Technical Committee shall include:

(a)    acting in response to requests by the Steering Committee or its designee to provide assistance in any matter including assistance with the activities of any consultants retained in connection with the matter and in analyzing technical data, studies and other materials relating to the Site;

(b)    selecting a liaison representative to coordinate activities with the Steering Committee; and

(c)    electing a Chairperson of the Technical Committee.

6.3    **De Minimis Committee Members.** The De Minimis Committee shall consist of any Member who wishes to participate with the objective that the committee include a representative sample of the Group as a whole. Members shall supply qualified representatives prepared to participate actively on the Committee.

6.4    **Powers of the De Minimis Committee.** The De Minimis Committee is empowered to receive and evaluate de minimis settlement proposals from Members, and advise and recommend to the Steering Committee by written report the term and conditions of a proposed de minimis settlement including, but not limited to, the expected cost of the removal or response action, multiplier or premium, eligibility criteria, and terms of any release or reopener. The De Minimis Committee shall elect a Chairperson.

PHKS 061019

**6.5**    **Decisions of the Technical and De Minimis Committee.**    The Members of the Technical and De Minimis Committees shall attempt to make decisions by consensus upon all matters within the scope of their powers and duties. Each Committee shall refer any matter upon which consensus cannot be reached to the Steering Committee.

**6.6**    **Compensation of the Committee Members.**    The Members of the Technical and De Minimis Committees shall serve as volunteers without compensation from the Group.

**6.7**    **Call for Meetings.**    Meetings of the Technical and De Minimis Committees may be called by the Steering Committee Chairperson, the respective Committee Chairperson, or any three Committee Members.

**7.**    **Allocation.**

**7.1**    **Required Participation in Allocation.**    Each Member shall participate in a non-binding process for allocation in accordance with the Non-Binding Allocation Agreement for the Site. Failure to participate in the allocation process in good faith and in accordance with the Non-Binding Allocation Agreement shall be grounds for removal under Section 9.2 of this Agreement.

**7.2**    **Allocation Consultant.**    John M. Barkett, Esq. will serve as the Members' consultant (the "Allocation Consultant") for the purpose of conducting a non-binding allocation in accordance with the Non-Binding Allocation Agreement for the Site, which sets forth the duties of the Allocation Consultant and the Members with respect to allocation procedures.

**7.3**    **Compensation of the Allocation Consultant.**    The Allocation Consultant shall be compensated in accordance with the February 11, 2000 letter agreement between the Group and the Allocation Consultant, a copy of which is attached hereto.    Such compensation shall be a Shared Defense Cost.

**7.4**    **Technical Consultants Used in Allocation Process.**    The Group has retained certain technical consultants and may from time to time retain additional technical consultants to work on its collective behalf in connection with any common removal or response action at the Site. No Member of the Group may retain any consultant previously retained by the Group as a whole to assist that Member individually as a technical expert in connection with the Allocation. However, any Member of the Group may rely on information generated by technical consultants retained by the Group as a whole in making arguments and taking positions in connection with the Allocation. In addition, any Member may retain a technical expert not previously retained by the Group to assist that Member individually in connection with the Allocation.

**8.**    **Shared Costs.**

8.1     Purpose of Funds. All monies provided by Members pursuant to this Agreement shall be used solely for the purposes of this Agreement and shall not be considered as payment for any fines, penalties, or monetary sanctions.

(a)     The Members shall establish a fund to hold monies provided by the Members for the purpose of paying Shared Response Costs (the "Response Cost Fund").

(b)     The Members shall establish a fund, separate from the Response Cost Fund, to hold monies provided by the Members for the purpose of paying Shared Defense Costs (the "Defense Fund").

8.2     Payments. Shared Costs (as defined in Section 2.1(f)) shall be assessed by the Steering Committee or its designee in the manner determined by the Group and in accordance with Paragraph 8.4(a) or 8.4(b) below, whichever may be in effect at the time of such assessment. All assessments shall be due and payable within thirty (30) days of receipt of notice thereof. Interest shall begin to accrue on unpaid balance thirty (30) days after receipt of notice at a rate of 18% per annum. Failure to pay any portion of any assessed financial contribution or interest pursuant to this Agreement within sixty (60) days following receipt of notice of such assessment of Shared Costs may be grounds for removal and collection in accordance with Section 9.2 hereof.

8.3     Initial Payments.

(a)     The following Members have each made $60,000 in contributions to the Defense Fund: Cytec Industries Inc.; Ford Motor Company; Lucent Technologies, Inc.; and SPS Technologies, Inc.  NRM Investment Company and Worthington Steel Company – Malvern have collectively made $60,000 in contributions to the Defense Fund.

(b)     The following Members have each paid $70,000 in assessments to the Response Cost Fund: Cytec Industries Inc.; Ford Motor Company; Lucent Technologies, Inc.; and SPS Technologies, Inc.  NRM Investment Company and Worthington Steel – Malvern have collectively made $70,000 in contributions to the Response Cost Fund.

8.4     Allocation of Shared Response Costs.  Shared Response Costs shall be assessed as follows:

(a)     Per Capita Cost Sharing.

From the Effective Date of this Agreement until agreement is reached on an allocation in accordance with Paragraph 8.4(b) below, all Shared Response Costs shall be allocated among the Members on a per capita basis.  However, all Members of the Group understand and agree that a single share shall be divided among the current and former owners of the former National Rolling Mills plant in Malvern, Pennsylvania.

(b)     Allocation.

PHKS 061021

If agreement can be reached regarding the Final Allocation Report prepared in accordance with the Non-Binding Allocation Agreement for the Site, that allocation shall apply retroactively so that the Members whose shares are reduced below the level of their per capita shares shall receive a credit for Shared Response Cost payments made on a per capita basis, with a corresponding debit for those whose shares are increased.

(c)    If at any time during the course of this Agreement, the Members receive a monetary contribution toward the Shared Response Costs from the United States Navy or any other non-party to this Agreement, such contribution shall be credited to the Members in accordance with the per capita funding scheme or the Final Allocation Report, whichever may be in effect at the time of its receipt.

**8.5**    **Shared Defense Costs.** From the Effective Date of this Agreement until such time as the Members shall agree otherwise, all Shared Defense Costs shall be allocated among the Members on a per capita basis and not subject to reallocation.

**8.6**    **Accounting for Funds.** Liaison counsel shall provide to the Members, on a monthly basis, an informal accounting of monies received, spent, and obligated, all itemized by project, and a final accounting upon the termination of the Agreement.

**9.**    **Withdrawal and Removal.**

**9.1**    **Withdrawal.** Any Member may withdraw from all participation in this Agreement upon written notice to the Steering Committee or its designee, as of the date the notice is postmarked except that such Member shall remain liable for its share of all Shared Costs assessed pursuant to this Agreement more than forty-five (45) days prior to the date of withdrawal. Any Member entering into any settlement with the United States or the Commonwealth of Pennsylvania shall be deemed to have withdrawn from the Group effective upon the date of settlement but shall remain liable for its share of all Shared Costs up to the date of withdrawal.

**9.2**    **Removal of a Member.** If any Member's interests or actions are regarded as contrary to the interests of the other Members, such Member may be removed from this Agreement by a vote of two-thirds of the Voting Power of the Group present in person or by proxy at a Group meeting called for the purpose of considering such removal. In the event any Member fails to pay any portion of any assessed financial contribution or interest pursuant to this Agreement within sixty (60) days following receipt of notice of such assessment, the Member shall be considered in default and may be removed from this Agreement by a vote of two-thirds of the Voting Power present in person or by proxy at a Steering Committee meeting called for the purpose of considering such removal. Any Member who has been removed from the Group remains subject to collection actions for the unpaid balance of any assessed financial contribution.

**10.**    **Waiver of Conflict of Interest.** In the event the Steering Committee engages common counsel and/or liaison counsel each Member agrees that: (1) it will not claim or assert that based solely on said counsel's past or present representation of a Member, said

PHKS 061022

counsel has a conflict of interest in performing legal services authorized by the Steering Committee and arising out of the Site, unless the Member notifies the Steering Committee of the claimed conflict within twenty (20) days of receiving notice of intent to hire said counsel; (2) it will not claim or assert that, based solely on said counsel's representation of the Group under the terms of this Agreement said counsel has a conflict of interest in connection with any representation of any other person or entity in a matter pending as of the date of receiving notice of intent to hire said counsel, unless the Member notifies the Steering Committee of the claimed conflict within twenty (20) days of receiving said notice; (3) it will not claim or assert that, based solely on said counsel's representation of the Group under the terms of this Agreement, said counsel has a conflict of interest in any person or entity unless the subject matter relating to said representation arises out of or is connected to the Site or involves or could involve any facts or information obtained from the Member during the time of this Agreement (4) in the event that any conflict develops in the performance of work authorized by the Steering Committee or by common counsel and/or liaison counsel and the performance of work authorized by a Member that has retained that counsel, the Member consents to said counsel's continued performance of the work authorized by the Steering Committee; and (5) if a Member withdraws or is removed from this Agreement or its representation by common counsel and/or liaison counsel is in any way terminated it will raise no objection to the continued representation by common counsel and/or liaison counsel of all or any of the other Members in connection with any legal services arising out of the Site.

Should the United States or the Commonwealth of Pennsylvania discuss with, propose or offer a de minimis settlement to any Members potentially eligible for such a settlement, no Member potentially eligible for a de minimis settlement will claim any conflict of interest in, or object to, the continued provision of any technical assistance by any technical consultant retained by the Steering Committee to any Member potentially ineligible for such a de minimis settlement.

If any Member withdraws, or is removed, that Member shall not claim any conflict of interest in, or object to, the continued provision of technical assistance by any technical consultant retained by the Steering Committee.

11.    **New Members.**  Any entity that becomes a Member by execution of this Agreement subsequent to the Effective Date of this Agreement shall be deemed a Member ab initio and shall be assessed and pay all sums which such Member would have been obligated to pay if a Member ab initio, including the $60,000 Defense Fund contribution described in Paragraph 8.3(a), the $70,000 in Response Cost Fund assessments described in Paragraph 8.3(b), and all other assessments paid to the Defense Fund and the Response Cost Fund. However, the Steering Committee may, for good cause, impose different terms and conditions upon any entity seeking to enter this Agreement after its Effective Date.

12.    **Confidentiality and Use of Information.**

12.1    **Shared Information.**  From time to time the Members may elect to disclose or transmit to each other, directly or through common counsel or liaison counsel, such information as

each Member, common counsel, liaison counsel or technical consultant retained for the Group deems appropriate for the sole and limited purpose of asserting any common claims or defenses relating to the Site and coordinating such other activities that are necessary and proper to carry out the purposes of this Agreement. Shared information may be disclosed to or transferred among the Members orally or in writing or by any other appropriate means of communications. The Members intend that no claim of work product privilege or other privileges be waived by reason of participation or cooperation in the common response to, or defense of, any claims arising out of the Site.

**12.2    Preservation of Privilege.** Information disclosed by the Members, common counsel, or liaison counsel may be disclosed to any other Member, and each Member hereby expressly consents to treat such disclosure to it as being for the sole purpose of asserting any common claims or defenses arising out of the Site. Such disclosure shall not be deemed a waiver of the attorney privilege or work product immunity or any other privilege.

**12.3    Confidentiality of Shared Information.**

(a)    Each Member agrees that shared information received from any other Member or its counsel, common counsel, liaison counsel, or technical consultant retained for the Group pursuant to the Agreement shall be held in strict confidence by the receiving Member and by all persons to whom such confidential information is revealed by the receiving Member pursuant to this Agreement, and that such information shall be used only in connection with asserting any common claims or defenses in connection with the Site and conducting such other activities that are necessary and proper to carry out the purposes of this Agreement;

(b)    Shared information that is exchanged in written or in document form and is intended to be kept confidential may, but need not, be marked "Confidential" with a similar legend. If such information becomes the subject of an administrative or judicial order requiring disclosure of such information by a Member, where the information will be unprotected by confidentiality obligations, the Member may satisfy its confidentiality obligations hereunder, by notifying the Member that generated the information and by giving such Member an opportunity to protect the confidentiality of the information or, if the information was generated by common counsel, liaison counsel, or a technical consultant, by giving notice to common counsel and liaison counsel.

(c)    Each Member shall take all necessary and appropriate measures to ensure the any person who is granted access to any shared information or who participates in work on common projects or who otherwise assists any counsel or technical consultants in connection with this Agreement, is familiar with the terms of this Agreement and complies with such terms as they relate to the duties of such person;

(d)    The Members intend by this Section to protect from disclosure all information and documents shared among any Members or between any Member and common counsel, liaison counsel or any technical consultant to the greatest extent permitted by law

regardless of whether the sharing occurred before execution of this Agreement and regardless of whether the writing or document is marked "Confidential;"

(e)     The confidentiality obligations of the Members under this Section shall remain in full force and effect, without regard to whether a Member withdraws or is removed, whether this Agreement is terminated or whether any action arising out of the Site is terminated by final judgment or settlement. The provisions of this Section shall not apply to information which is now or hereafter becomes public knowledge without violation of this Agreement or which is sought and obtained from a Member pursuant to applicable discovery procedures and not otherwise protected from disclosure;

(f)     In the event a Member withdraws from this Agreement pursuant to Section 9.1 or is removed pursuant to Section 9.2, any documents or other physical materials containing confidential information provided by such Member to common counsel or liaison counsel, another Member, or any technical consultant retained for the Group, shall be promptly returned to such Member together with all copies thereof, and any document or physical materials provided by common counsel, liaison counsel, any technical consultant or the other Members to the withdrawing Member shall be promptly returned to common counsel and/or liaison counsel by such Member together with all copies thereof. The withdrawing or removed Member and the remaining Members shall remain obligated to preserve the confidentiality of all confidential information received or disclosed pursuant to this Agreement.

In the event this Agreement is terminated the Members shall return such documents or physical materials to other Members in the same manner as if a Member had withdrawn and all Members shall remain obligated to preserve the confidentiality of all confidential information received or disclosed pursuant to this Agreement.

(g)     Notwithstanding the provisions of this Section, Members may reveal shared information to their insurance carriers for the purpose of making or defending claims related to the Site. Member shall protect from further disclosure all information and documents provided to any insurance carrier by taking all necessary and appropriate measures to ensure that any insurance carrier who is granted access to any shared information is familiar with the terms of this Agreement and complies with such terms.

(h)     Subject to the provisions of Paragraph 14 and to the extent permitted by law, all Members agree not to make written or oral communications with USEPA, the United States Department of Justice, the Commonwealth of Pennsylvania, or any other person regarding any other Member's alleged liability with respect to the Site prior to the termination of this Agreement, except that this Paragraph 12.3(h) shall not apply to any Member that withdraws or is removed from this Agreement in accordance with Section 9.

**12.4    Effect of Agreement On Prior Confidentiality Agreements.** This Agreement shall supersede any confidentiality agreements previously entered into by the Parties relating to the Site.

PHKS 061025

13.  **Denial of Liability.** This Agreement shall not constitute, be interpreted, construed or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor any estoppel against any Member by Members as among themselves or by any other Person not a Member. However, nothing in this Section is intended or should be construed to limit, bar, or otherwise impede the enforcement of any term or condition of the Agreement against any party to this Agreement.

14.  **Insurance.** The Members do not intend hereby to make any agreement that will prejudice any Member with respect to its insurers and, by entering into this Agreement, anticipate that the actions taken pursuant to this Agreement will benefit such insurers. If any insurer makes any claims that any aspect of this Agreement provides a basis for rejection or limitation of coverage of a Member, the Group will attempt, consistent with the objectives of this Agreement, to return any Member subject to such claim to a position that is satisfactory to such insurers.

15.  **Successors and Assigns.** This Agreement shall be binding upon the successors and assigns of the Members. No assignment or delegation of the obligation to make any payment or reimbursement hereunder will release the assigning Member without the prior written consent of the Steering Committee.

16.  **Assessment of Unpaid Balance in the Event of Default.** Subject to a Member's right to withdraw in accordance with Paragraph 9.1, the unpaid balance of any defaulting Member's previously assessed share may be reassessed by the Steering Committee against the other Members hereto (without waiving any rights such Members may have against the defaulting Member or its successors or assigns) in the same proportion as the other Members would have been obligated to pay if the defaulting Member had not been a signatory of this Agreement.

17.  **Relationship of Members.** No Member, or representative or counsel for any Member, has acted as counsel for any other Member with respect to such Member entering into this Agreement, except as expressly engaged by such Member with respect to this Agreement, and each Member represents that it has sought and obtained any appropriate legal advice it deems necessary prior to entering into this Agreement.

     No Member or its representative serving on any Committee or subcommittee shall act or be deemed to act as legal counsel or a representative of any other Member, unless expressly retained by such Member for such purpose, and, except for such express retention, no attorney/client relationship is intended to be created between representatives on any Committee or subcommittee and the Members.

     Nothing herein shall be deemed to create a partnership or joint venture and/or principal and agent relationship between or among the Members.

18.  **Indemnification.** No Member or its representative(s) serving on any Committee or subcommittee shall be liable to any Member for any claim demand, liability, cost,

PHKS 061026

expense, legal fee, penalty, loss or judgment incurred or arising as a result of any acts or omissions taken or made hereunder.

Each Member agrees to indemnify, defend and hold harmless any Member and its representative(s) from and against any claim, demand, liability, cost, expense, legal fee, penalty, loss or judgment (collectively "liability") which in any way relates to the good-faith performance of any duties under this Agreement by any Member or its representatives(s) on behalf of any Committee, subcommittee or the Group, including, but not limited to, any liability arising from any contract or agreement signed by the Member or its representative(s) at the request of the Steering Committee or the Group. Except for the payment of legal fees as incurred, this indemnification shall not apply to any liability arising from a criminal proceeding where the Member or its representative(s) had reasonable cause to believe that the conduct in question was unlawful.

Payment under this section shall be a Shared Defense Cost in accordance with Section 2.1(f) hereof, and shall be allocated among each Member that (1) was a Member at the time that the action was taken that gives rise to this indemnification or (2) subsequently joins the Group.

The terms of this Section shall survive the termination of the Agreement and the withdrawal or removal of any Member.

19. **Effective Date.** This Agreement shall become effective on the date that the Agreement is signed by the last of the following companies: Cytec Industries Inc.; Ford Motor Company; SPS Technologies, Inc.; Lucent Technologies Inc.; NRM Investment Company, and Worthington Steel – Malvern (the "Effective Date"). These original Members intend that other companies may sign this Agreement. However, such later Members shall be bound by the terms of this Agreement on the date of their signature.

20. **Method of Execution.** This Agreement shall be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

21. **Amendments.** This Agreement may be amended only by a vote of at least two-thirds of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such amendment. Such amendment shall become effective thirty (30) days after written notice of such amendment is mailed to all Group Members. However, Sections 18 and 21 hereof cannot be amended to limit the effect of Section 18 hereof with respect to acts or omissions taken or omissions prior to such amendment.

22. **Separability.** If any provision of this Agreement is deemed invalid or unenforceable, the balance of this Agreement shall remain in full force and effect.

23. **Law.** This Agreement shall be interpreted under the laws of the Commonwealth of Pennsylvania.

24. **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25. **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26. **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27. **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: _____    Member:_____

By:_____
                                   (Name and Title)

Designated Representative for Receipt of Notice and Invoices

Name          _____

Address       _____

Telephone Number:   _____

Facsimile Machine Number   _____

PHKS 061028

24.   **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25.   **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26.   **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27.   **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: _OCT 11 2000_          Member: _____Ford Motor Company_____

By: _____
           (Name and Title)   **Assistant Secretary**

Designated Representative for Receipt of Notice and Invoices

Name ___Kathy Hofer, Esq.___

Address ___Three Parklane Blvd   Suite 1500 West___ Dearborn, MI  48126

Telephone Number: ___(313)594-1687___

Facsimile Machine Number  (313) 390-3083

24.  **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

25.  **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

26.  **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination

27.  **Notice.** All notice, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated: _____    Member: __Cytec Industries Inc._____

By: _____

(Name and Title)

Karen E. Koster, Director of Environmental Services

Designated Representative for Receipt of Notice and Invoices

Name    __Thomas A. Waldman, Esq._____

Address    __Cytec Industries Inc., 5 Garret Mountain Plaza, West Paterson NJ 07424__

Telephone Number: ___(973) 357-3136_____

Facsimile Machine Number ___(973) 357-3058_____

# EXHIBIT E

MEMORANDUM

Morgan, Lewis
&Bockius LLP

COUNSELORS AT LAW

125 years
1 8 7 3 ✓ 1 9 9 8

TO:    Boarhead Farms PRPs
        Kenneth R. Arnold
        Linda Doucette-Ashman
        David C. Dixon
        Edward Fackenthal
        Dominic Hankett
        Jackie McGowan
        Sharon A. Mermuys
        Dennis R. Shea
        John W. Wilmer, Jr.

FROM:    Michael Steinberg

DATE:    April 7, 1998

SUBJECT:    PRP Organization Agreement

I am pleased to inform you that the Navy has agreed to pay $7500 toward the cost of a PRP investigation at the Boarhead Farms site. Until we have formed a PRP Group, however, the Navy cannot deliver its payment. I have attached a copy of the Boarhead Farms Site PRP Organization Agreement for your signature. It has been revised to reflect the points discussed in yesterday's conference call. Please return an executed agreement to me as soon as possible, but no later than April 15. I would appreciate it if you would send me a copy via facsimile with the original to follow by mail. I will distribute a complete copy of the agreement with the executed signature pages once I have received them.

Several of you expressed the concern that we have a "critical mass" before proceeding with group activities. The Agreement does not include a "critical mass" provision, but in the event that fewer than 6 PRPs join the group, I will return your executed signature page to you.

Please do not hesitate to call me at (202) 467-7141 if you have questions.

BSAI075474

# BOARHEAD FARMS SITE PRP GROUP ORGANIZATION AGREEMENT

This Agreement is made as of this 8th day of April, between and among the parties (hereinafter the "Members") whose authorized representatives have executed this Agreement.

W H E R E A S , without admitting any fact, responsibility, fault or liability in connection with the Boarhead Farms Site, located in Bridgeton Township, Bucks County, Pennsylvania the Members hereto wish to (1) devote their resources to respond efficiently to any claims that may be asserted by the United States or the State of Pennsylvania in connection with the Boarhead Farms Superfund Site; (2) allocate among themselves common legal, technical, administrative and other costs incurred in connection with this matter; and (3) cooperate among themselves in this effort;

NOW THEREFORE, in consideration of the foregoing, the Members mutually agree as follows:

1. **Boarhead Farms PRP Group.** The Members hereby organize and constitute themselves as the Boarhead Farms Site PRP Group (hereinafter "Group"). Each Party whose authorized representative has executed this Agreement is a Member of the Group.

**2. Purpose.**

**2.1 Activities.** It is the purpose of this Agreement that the terms hereof shall control the manner and means by which the Members will:

(a) organize and conduct a common response to any claims that may be asserted by the United States, the State of Pennsylvania, or others relating to the Boarhead Farms Site, including but not limited to the Group's performance of any removal or response action or the organizing and conducting of a common defense to any claim;

(b) organize and conduct negotiations with the United States Environmental Protection Agency ("USEPA") and other persons concerning Group settlement of all or a portion of said claims;

(c) retain common counsel and technical consultants;

(d) raise and spend all reasonably necessary funds to implement these purposes;

(e) take all necessary and reasonable actions to effectuate this Agreement; and

(f) allocate among themselves all costs incurred or to be incurred as authorized by this Agreement, including but not limited to legal, technical, administrative and other costs ("Shared Costs").

**2.2 Members' Cooperation.** The Members shall cooperate with each other to effectuate the purposes of this Agreement.

BSAI075475

## 3. Organization and Procedures.

**3.1 Committees.** In order to carry out the purposes of this Agreement, the Members shall establish the following five committees: Steering, Executive, Technical, Allocation and De Minimis. Each Member, and any individual serving on any committee on behalf of any Member, agrees, by virtue of such service, to maintain the privileged nature and confidentiality of all communications and proceedings of such committees; such obligation shall continue in the event such individual should leave the employ of or cease to represent such Member.

**3.2 Authority to Decide.** Except as otherwise provided herein, the Members shall act by and through the Steering Committee except that the Group reserves to itself the right at any time and from time to time directly to authorize action to be undertaken pursuant to this Agreement in accordance with the voting requirements set forth in this Agreement.

**3.3 Meetings.** The Members may authorize or direct actions under this Agreement only at meetings duly held and called for such purpose, which meetings shall be called regularly by the Steering Committee. Meetings of the Group may be called for any purpose at any time by any two or more Members of the Steering Committee or by any four or more Members of the Group. Meetings may be held by telephone conference.

**3.4 Majority Rule.** Any matter under this Agreement may be referred to a meeting of the Group. The Group shall attempt to make decisions by consensus; however, except as otherwise provided herein, on any matter put to a vote, such matter shall be decided by a majority (more than 50%) of the Voting Power (as defined in Section 3.6 of this Agreement) of the Members present in person or by proxy at the meeting.

**3.5 Notice of Meetings.** Whenever feasible, written notice of the time, place and purpose of any meeting of the Group shall be given to each Member entitled to vote at such meeting at least five (5) days and not more than thirty (30) days before the date of such meeting either personally or by mail or by other means of written communication, charges prepaid, addressed to each Member at the address appearing on the service list maintained by the Steering Committee. In the event a meeting is called on less than five (5) days written notice, the Members calling the meeting shall make a reasonable effort to provide notice in fact to every Member, including communication by facsimile, e-mail, or voice mail. No matter will be acted upon by the group unless it is within the reasonable scope of the meeting's purpose as specified in the notice.

Each Member shall have a Vote equal to the Proportion that the Financial Contribution by such Member Bears to the Total Amount of Financial Contribution by all Members

**3.6 Voting Power.** At any Group meeting, each Member shall have a vote in the proportion that the amount of financial contribution assessed and paid by such Member under this Agreement as of the last assessment made pursuant to this Agreement prior to such meeting bears to the total amount of financial contribution assessed and paid by all Members under this Agreement as of

- 2 -

BSAI075476

such assessment; provided that any Member which has been assessed a financial contribution which assessment remains unpaid at the time the meeting is called may vote only upon payment of the full assessment prior to the voting process.

**3.7 Voting by Proxy.** A Member eligible to vote at a Group meeting may assign in writing, using the form attached to this Agreement, its vote (in accordance with Section 3.6 of this Agreement) to another Member eligible to vote at the meeting.

**3.8 Quorum.** Thirty percent (30%) of the eligible voting power (as defined in Section 3.6 of this Agreement) of the Group shall be present in person or represented by proxy at any Group meeting.

**4. Steering Committee and Common Counsel.**

**4.1 Steering Committee Members.** Membership on the Steering Committee shall be open to any Member who expresses a willingness to make its representative reasonably available to participate actively in the functions of the Steering Committee.

**4.2 Enumerated Powers of the Steering Committee.** The powers, duties and responsibilities of the Steering Committee shall include:

(a) retaining, coordinating, supervising and directing the activities of common counsel;

(b) selecting, retaining, and determining the activities of any contractors and consultants retained for assistance in the matter and seeking advice and assistance in this role from the Technical Committee;

(c) appointing subcommittees to handle specific matters;

(d) negotiating and referring settlement matters to the Group;

(e) election of a Chairperson of the Steering Committee who shall also act as Chairperson of the Group;

(f) appointing the Members of the Executive, Technical, Allocation and DE MINIMIS Committees;

(g) recommending to the Group a method of allocating shared costs and seeking the advice and recommendation of the Allocation Committee in this role;

(h) recommending to the Group a de minimis buy-out proposal, if appropriate, and seeking the advice and recommendation of the De Minimis Committee in this role;

- 3 -

BSAI075477

(i) negotiating with the USEPA and other persons with respect to all matters arising out of the matter;

(j) recommending to the Group that litigation be commenced against any party to this Agreement for breach of this Agreement, or to enforce the terms hereof;

(k) circulating to the Group such substantive pleadings, motions or other written submissions as the Steering Committee deems necessary in order to allow a Member to determine if it wishes to exercise its option under Section 4.4 hereof; and

(1) conducting such other activities that are necessary and proper to carry out the purposes of this Agreement.

**4.3 Shared Costs.** Those activities authorized by the Steering Committee or the Group to be incurred on behalf of the Group shall be funded by the Members as Shared Costs.

**4.4 Right of Separate Counsel.** Notwithstanding that common counsel may be retained with respect to any matter, each Member reserves the right to select and retain its own counsel to represent such Member on any matter, and to advise common counsel that such Member is not to be represented by or through common counsel with respect to any such matter.

**4.5 Litigation Against Other Persons.** The Steering Committee may recommend to the Group that a claim be asserted on behalf of the Members against other persons. No such claim may be asserted by common counsel under this Agreement without the consent of a majority of the Voting Power of the Group, and any Member may elect to decline participation in any such suit, and may, but need not, in lieu of such participation assign its claims to the other parties. Nothing in this paragraph shall affect or impair the right of any Member to assert any claim in its own name and right against any person.

**4.6 Voting.** The Steering Committee shall attempt to make decisions by consensus; however, on any matter put to a vote, such matter shall be decided by a majority of the Voting Power (as defined in Section 3.6 of this Agreement) of the Members present in person or by proxy at the meeting.

**4.7 Reports to the Group and Call for Group Meetings.** The Steering Committee shall report in writing its decisions, actions, and recommendations to the Group from time to time as may be necessary to keep the Group fully informed of matters covered by this Agreement, and shall call periodic meetings of the Group and refer to such meetings for a vote any matters which, in the judgment of the Steering Committee, should be referred.

- 4 -

BSAI075478

**4.8 Quorum.** Thirty percent (30%) of the eligible voting power (as defined in Section 3.6 of this Agreement) of the Steering Committee shall be present in person or represented by proxy at any Steering Committee meeting.

**4.9 Compensation of Steering Committee.** The Members of the Steering Committee shall serve as volunteers without compensation from the Group.

**4.10 Call for, and Notice of, Meetings.** Meetings of the Steering Committee may be called by the Chairperson or by any three Members of the Committee. Whenever feasible, written notice of the time, place and purpose of any meeting of the Steering Committee shall be given to each Steering Committee Member at least five (5) days and not more than thirty (30) days before the date of such meeting either personally or by mail or by other means of written communication charges prepaid, addressed to each such Member at the address appearing on a service list to be maintained by the Executive Committee. In the event a meeting is called on less than five (5) days written notice, the Members calling the meeting shall make a reasonable effort to provide notice in fact to every Steering Committee Member.

**5. Executive Committee.** The Steering Committee shall appoint an Executive Committee composed of three Members to handle administrative and financial matters as assigned by the Steering Committee. The Members of the Executive Committee shall serve as volunteers without compensation from the Group. Procedures for calling Executive Committee meetings and Notice of Executive Committee meetings to Executive Committee Members shall be determined by the Executive Committee.

**6. Technical, Allocation and De Minimis Committees.**

**6.1 Technical Committee Members.** The Technical Committee shall consist of Members appointed by the Steering Committee from among Member volunteers for the Committee who shall supply technically qualified representatives prepared to participate actively on the Committee.

**6.2 Powers of the Technical Committee.** The powers and duties of the Technical Committee shall include:

(a) acting in response to requests by the Steering Committee or its designee to provide assistance in any matter, including assistance with the activities of any consultants retained in connection with the matter and in reviewing and analyzing technical data, studies and other materials relating to the Boarhead Farms Site;

(b) selecting a liaison representative to coordinate activities with the Steering Committee; and

(c) electing a Chairperson of the Technical Committee.

- 5 -

BSAI075479

**6.3 Allocation and De Minimis Committee Members.** The Allocation and De Minimis Committees shall consist of Members selected by the Steering Committee from among Member volunteers so as to constitute, to the extent information is available, a representative sample of the Group as a whole. The Steering Committee shall review the membership of the Allocation and De Minimis Committees from time to time as information is obtained, and shall, to the extent necessary to achieve a representative balance of all of the Members, add or delete Members of the Allocation or De Minimis Committees. Members shall supply qualified representatives prepared to participate actively on the Committees.

**6.4 Powers of the Allocation Committee.** The Allocation Committee is empowered to receive and evaluate information as directed by the Steering Committee, advise and recommend to the Steering Committee by written report a means of fairly and equitably allocating Shared Costs among the Members, including an alternative dispute resolution process for resolving allocation disputes among Members. The Allocation Committee shall elect a Chairperson. As directed by the Steering Committee, the Allocation Committee may interview Allocation Consultants and recommend the person or entity to be retained as an Allocation Consultant. If an Allocation Consultant is hired by the Group, the Group shall enter into an Allocation Agreement setting forth the duties of the Allocation Consultant and the Parties with respect to allocation procedures.

**6.5 Powers of the De Minimis Committee.** The De Minimis Committee is empowered to receive and evaluate de minimis settlements at other sites and de minimis settlement proposals from Members, and advise and recommend to the Steering Committee by written report the terms and conditions of a proposed de minimis settlement including, but not limited to, the expected cost of the removal or response action, multiplier or premium, eligibility criteria, and terms of any release or reopener. The De Minimis Committee shall elect a Chairperson.

**6.6 Decisions of the Technical, Allocation, and De Minimis Committees.** The Members of the Technical and Allocation and De Minimis Committees shall attempt to make decisions by consensus upon all matters within the scope of their powers and duties. Each Committee shall refer any matter upon which consensus cannot be reached to the Steering Committee.

**6.7 Compensation of the Committee Members.** The Members of the Allocation, Technical and De Minimis Committees may be compensated as determined by the Executive Committee, which compensation shall be a Shared Cost.

**6.8 Call for, and Notice of, Meetings.** Meetings of the Technical, Allocation and De Minimis Committees may be called by the Steering Committee Chairperson, the respective Committee Chairperson, or any three Committee Members. Whenever feasible, written notice of the time, place and purpose of any meeting of the Technical, Allocation or De Minimis Committees shall be given to each Committee Member at least five (5) days and not more than thirty (30) days before the date of such meeting either personally or by mail or by other means of written communication charges prepaid, addressed to each Committee Member at the address maintained by the chairperson of the Committee. In the event a meeting is called on less than five (5) days

BSAI075480

written notice, the Members calling the meeting shall make a reasonable effort to provide notice in fact to every Committee Member. Meetings may be held by telephone conference.

**7. Members' Obligation to Submit Documentation to the Allocation Committee.** If and when requested by the Steering Committee or common counsel, each Member shall review all information reasonably obtainable that in any way relates to any shipment of its material to the Boarhead Farms Site and submit a document setting forth the amount and a description of each such shipment by date in a form to be approved by the Steering Committee or such non-privileged records as may be requested by the Steering Committee or common counsel to support the information reported in the document. The document and supporting records shall be submitted to facilitate settlement among the Members and as confidential shared information and shall not constitute, be interpreted, construed or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any submitting Member. Failure to so submit the document and supporting records may be grounds for removal in accordance with Section 9.2 hereof.

**8. Shared Costs.**

**8.1 Payments.** Shared Costs (as defined in Section 2.1(d)) shall be assessed by the Steering Committee or its designee in the manner allocated by the Group. All assessments shall be due and payable within 30 days of receipt of notice thereof. Interest shall begin to accrue on unpaid balances 30 days after receipt of notice at a rate of 18% per annum. Failure to pay any portion of any assessed financial contribution or interest pursuant to this Agreement within 60 days following receipt of notice of such assessment shared costs may be grounds for removal and collection in accordance with Section 9.2 hereof.

**8.2 Initial Payment.** All Members of the Group shall make an initial contribution of $15,000 payable to the Group Administrative Fund at the time it executes this Agreement. This initial payment shall be nonrefundable, but may be used as a credit against future assessments.

**8.3 Accounting for Funds.** The Steering Committee shall provide to the Members from time to time informal accountings of monies received, spent, and obligated, and a final accounting upon the termination of the Agreement.

**8.4 Purpose of Funds.** All monies provided by Members pursuant to this Agreement shall be used solely for the purposes of this Agreement and shall not be considered as payment for any fines, penalties, or monetary sanction.

**8.5 Interim Payments.** All interim allocations shall be credited against the final assessment. In any final allocation each Member shall be given credit for all sums previously paid to the Group.

- 7 -

BSAI075481

## 9. Withdrawal and Removal.

9.1 **Withdrawal.** Any Member may withdraw from all participation in this Agreement upon written notice to the Steering Committee or its designee, as of the date the notice is postmarked, except that such Member shall remain liable for its share of all Shared Costs assessed pursuant to this Agreement more than 30 days prior to the date of withdrawal. Any Member entering into any settlement with the United States or the State of Pennsylvania shall be deemed to have withdrawn from the Group effective upon the date of settlement but shall remain liable for its share of all shared costs up to the date of withdrawal.

9.2 **Removal of a Member.** If any Member's interests or actions are regarded as contrary to the interests of the other Members, such Member may be removed from this Agreement by a vote of two-thirds of the Voting Power of the Group present in person or by proxy at a Group meeting called for the purpose of considering such removal. In the event any Member fails to pay any portion of any assessed financial contribution or interest pursuant to this Agreement within 60 days following receipt of notice of such assessment, that Member shall be considered in default and may be removed from this Agreement by a vote of two-thirds of the Voting Power present in person or by proxy at a Steering Committee meeting called for the purpose of considering such removal. Any Member who has been removed from the Group remains subject to collection actions for the unpaid balance of any assessed financial contribution.

10. **Waiver of Conflict of Interest.** In the event that the Steering Committee engages common counsel, each Member agrees that: (1) it will not claim or assert that, based solely on said counsel's past or present representation of a Member, said counsel has a conflict of interest in performing legal services authorized by the Steering Committee and arising out of the Boarhead Farms Site, unless the Member notifies the Steering Committee of the claimed conflict within twenty (20) days of receiving notice of intent to hire said counsel; (2) it will not claim or assert that, based solely on said counsel's representation of the Group under the terms of this Agreement, said counsel has a conflict of interest in connection with any representation of any other person or entity in a matter pending as of the date of receiving notice of intent to hire said counsel, unless the Member notifies the Steering Committee of the claimed conflict within twenty (20) days of receiving said notice; (3) it will not claim or assert that, based solely on said counsel's representation of the Group under the terms of this Agreement, said counsel has a conflict of interest in any future representation of any person or entity unless the subject matter relating to said representation arises out of or is connected to the Boarhead Farms Site or involves or could involve any facts or information obtained from the Member during the term of this Agreement; (4) in the event that any conflict develops in the performance of work authorized by the Steering Committee or by common counsel and the performance of work authorized by a Member that has retained that counsel, the Member consents to common counsel's continued performance of the work authorized by the Steering Committee; and (5) if a Member withdraws or is removed from this Agreement or its representation by common counsel is in any way terminated, it will raise no objection to the continued representation by common counsel of all or

- 8 -

BSAI075482

FROM MORGAN LEWIS, DC

any of the other Members in connection with any legal services arising out of the Boarhead Farms Site.

Should the United States or the State of Pennsylvania discuss with, propose or offer a de minimis settlement to any Members potentially eligible for such a settlement, no Member potentially eligible for a de minimis settlement will claim any conflict of interest in, or object to, the continued provision of any technical assistance by any technical consultant retained by the Steering Committee to any Member potentially ineligible for such a de minimis settlement.

If any Member withdraws, or is removed, that Member shall not claim any conflict of interest in, or object to, the continued provision of technical assistance by any technical consultant retained by the Steering Committee.

**11. New Members.** Any entity that becomes a Member by execution of this Agreement subsequent to the effective date of this Agreement shall be deemed a Member ab initio and shall be assessed and pay all sums which such Member would have been obligated to pay if a Member ab initio, except that the Steering Committee may, for good cause, impose different terms and conditions upon any entity seeking to enter this Agreement after its effective date.

**12. Confidentiality and Use of Information.**

**12.1 Shared Information.** From time to time, the Members may elect to disclose or transmit to each other, directly or through common counsel, such information as each Member, common counsel or technical consultant retained for the Group deems appropriate for the sole and limited purpose of asserting any common claims or defenses relating to the Boarhead Farms Site and coordinating such other activities that are necessary and proper to carry out the purposes of this Agreement. Shared information may be disclosed to or transferred among the Members orally or in writing or by any other appropriate means of communications. The Members intend that no claim of work product privilege or other privilege be waived by reason of participation or cooperation in the common response to, or defense of, any claims arising out of the Boarhead Farms Site.

**12.2 Preservation of Privilege.** Information disclosed by the Members to common counsel may be disclosed to any other Member, and each Member hereby expressly consents to treat such disclosure to it as being for the sole purpose of asserting any common claims or defenses arising out of the Boarhead Farms Site. Such disclosure shall not be deemed a waiver of the attorney-client privilege or work product immunity or any other privilege.

**12.3 Confidentiality of Shared Information.**

(a) Each Member agrees that all shared information received from any other Member or its counsel, common counsel or technical consultant retained for the Group pursuant to this Agreement shall be held in strict confidence by the receiving Member and by all persons to

- 9 -

BSAI075483

whom such confidential information is revealed by the receiving Member pursuant to this Agreement, and that such information shall be used only in connection with asserting any common claims or defenses in connection with the Boarhead Farms Site and conducting such other activities that are necessary and proper to carry out the purposes of this Agreement;

(b) Shared information that is exchanged in written or in document form and is intended to be kept confidential may, but need not, be marked "Confidential" or with a similar legend. If such information becomes the subject of an administrative or judicial order requiring disclosure of such information by a Member, where the information will be unprotected by confidentiality obligations, the Member may satisfy its confidentiality obligations hereunder by notifying the Member that generated the information and by giving such Member an opportunity to protect the confidentiality of the information or, if the information was generated by common counsel or a technical consultant, by giving notice to common counsel.

(c) Each Member shall take all necessary and appropriate measures to ensure that any person who is granted access to any shared information or who participates in work on common projects or who otherwise assists any counsel or technical consultant in connection with this Agreement, is familiar with the terms of this Agreement and complies with such terms as they relate to the duties of such person;

(d) The Members intend by this Section to protect from disclosure all information and documents shared among any Members or between any Member and common counsel or any technical consultant to the greatest extent permitted by law regardless of whether the sharing occurred before execution of this Agreement and regardless of whether the writing or document is marked "Confidential;"

(e) The confidentiality obligations of the Members under this Section shall remain in full force and effect, without regard to whether a Member withdraws or is removed, whether this Agreement is terminated or whether any action arising out of the Boarhead Farms Site is terminated by final judgment or settlement. The provisions of this Section shall not apply to information which is now or hereafter becomes public knowledge without violation of this Agreement, or which is sought and obtained from a Member pursuant to applicable discovery procedures and not otherwise protected from disclosure;

(f) In the event a Member withdraws from this Agreement pursuant to Section 9.1 or is removed pursuant to Section 9.2, any documents or other physical materials containing confidential information provided by such Member to common counsel, to the other Members, or to any technical consultant retained for the Group, shall be promptly returned to such Member together with all copies thereof, and any document or physical materials provided by common counsel, any technical consultant, or the other Members to the withdrawing Member shall be promptly returned to common counsel by such Member together with all copies thereof. The withdrawing or removed Member and the remaining Members shall remain obligated to preserve the confidentiality of all confidential information received or disclosed pursuant to this Agreement.

- 10 -

BSAI075484

In the event this Agreement is terminated, the Members shall return such documents or physical materials to other Members in the same manner as if a Member had withdrawn and all Members shall remain obligated to preserve the confidentiality of all confidential information received or disclosed pursuant to this Agreement.

(g) Notwithstanding the provisions of this Section, Members may reveal shared information to their insurance carriers for the purpose of making or defending claims related to the Boarhead Farms Site. Member shall protect from further disclosure all information and documents provided to any insurance carrier by taking all necessary and appropriate measures to ensure that any insurance carrier who is granted access to any shared information is familiar with the terms of this Agreement and complies with such terms.

**12.4 Effect of This Agreement On Prior Confidentiality Agreements.** This Agreement shall supersede any confidentiality agreements previously entered into by the Parties relating to the Boarhead Farms Site.

**13. Denial of Liability.** This Agreement shall not constitute, be interpreted, construed or used as evidence of any admission of liability, law or fact, a waiver of any right or defense, nor an estoppel against any Member by Members as among themselves or by any other person not a Member. However, nothing in this Section is intended or should be construed to limit, bar, or otherwise impede the enforcement of any term or condition of the Agreement against any party to this Agreement.

**14. Insurance.** The Members do not intend hereby to make any agreement that will prejudice any Member with respect to its insurers and, by entering into this Agreement, anticipate that the actions taken pursuant to this Agreement will benefit such insurers. If any insurer makes any claims that any aspect of this Agreement provides a basis for rejection or limitation of coverage of a Member, the Group will attempt, consistent with the objectives of this Agreement, to return any Member subject to such claim to a position that is satisfactory to such insurers.

**15. Successors and Assigns.** This Agreement shall be binding upon the successors and assigns of the Members. No assignment or delegation of the obligation to make any payment or reimbursement hereunder will release the assigning Member without the prior written consent of the Steering Committee.

**16. Allocation in the Event of Default.** The unpaid balance of any defaulting Member's share may be assessed by the Steering Committee against the other Members hereto (without waiving any rights such Members may have against the defaulting Member or its successors or assigns) in the same proportion as the other Members would have been obligated to pay if the defaulting Member had not been a signatory of this Agreement.

**17. Relationship of Members.** No Member, or representative or counsel for any Member, has acted as counsel for any other Member with respect to such Member entering into this

- 11 -

BSAI075485

Agreement, except as expressly engaged by such Member with respect to this Agreement, and each Member represents that it has sought and obtained any appropriate legal advice it deems necessary prior to entering into this Agreement.

No Member or its representative serving on any Committee or subcommittee shall act or be deemed to act as legal counsel or a representative of any other Member, unless expressly retained by such Member for such purpose, and, except for such express retention, no attorney/client relationship is intended to be created between representatives on any Committee or subcommittee and the Members.

Nothing herein shall be deemed to create a partnership or joint venture and/or principal and agent relationship between or among the Members.

18. **Indemnification.** No Member or its representative(s) serving on any Committee or subcommittee shall be liable to any Member for any claim, demand, liability, cost, expense, legal fee, penalty, loss or judgment incurred or arising as a result of any acts or omissions taken or made hereunder.

Each Member agrees to indemnify, defend and hold harmless any Member and its representative(s) from and against any claim, demand, liability, cost, expense, legal fee, penalty, loss or judgment (collectively "liability") which in any way relates to the good-faith performance of any duties under this Agreement by any Member or its representative(s) on behalf of any Committee, subcommittee or the Group, including, but not limited to, any liability arising from any contract or agreement signed by the Member or its representative(s) at the request of the Steering Committee or the Group. Except for the payment of legal fees as incurred, this indemnification shall not apply to any liability arising from a criminal proceeding where the Member or its representative(s) had reasonable cause to believe that the conduct in question was unlawful.

Payments under this section shall be a shared cost in accordance with Section 4.3 hereof, and shall be allocated among each Member that (1) was a Member at the time that the action was taken that gives rise to this indemnification or (2) subsequently joins the Group.

The terms of this Section shall survive the termination of the Agreement and the withdrawal or removal of any Member.

19. **Effective Date, Method of Execution.** The effective date of this Agreement shall be the date first stated above. This Agreement shall be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

20. **Amendments.** This Agreement may be amended only by a vote of at least two-thirds of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such amendment. Such amendment shall become effective thirty days

- 12 -

BSAI075486

after written notice of such amendment is mailed to all Group Members. However, Sections 18 and 20 hereof cannot be amended to limit the effect of Section 18 hereof with respect to acts or omissions taken or made prior to such amendment.

21. **Separability.** If any provision of this Agreement is deemed invalid or unenforceable, the balance of this Agreement shall remain in full force and effect.

22. **Law.** This Agreement shall be interpreted under the laws of the State of Pennsylvania.

23. **Nonwaiver.** Nothing in this Agreement shall be construed to waive any rights, claims or privileges which any Member shall have against any other Member or any other person or entity.

24. **Entire Agreement.** This Agreement constitutes the entire understanding of the Members with respect to its subject matter.

25. **Termination.** This Agreement may be terminated by a vote of the majority of the Voting Power of the Members present in person or by proxy at a Group meeting called for the purpose of considering such termination.

26. **Notice.** All notices, bills, invoices, reports, and other communications with a Member shall be sent to the representative designated by the Member on said Member's signature page of this Agreement. Each Member shall have the right to change its representative upon ten (10) days written notice to the Chairperson of the Steering Committee.

~ 13 ~

BSAI075487

IN WITNESS WHEREOF, the Members hereto, which may be by and through their appointed counsel, enter into this Agreement. Each person signing this Agreement represents and warrants that he or she has been duly authorized to enter into this Agreement by the company or entity on whose behalf it is indicated that the person is signing.

Dated                    Member:

                                    By:

                                              (Name and Title)

Designated Representative for Receipt of Notice and Invoices

Name
Address

Telephone Number:
Facsimile Machine Number

—  14  —

BSAI075488

# EXHIBIT F

$ou-1$
$ou-2$

| William Hatfield | 🌐 | 06/17/2003 05:57 |

To:      "Bergere, Timothy" <tbergere@mmwr.com>
cc:      Sandy Purrington/PHKS@PHKS
Subject: Re: Boarhead Farms  📄

Tim:

In follow up to our recent conference call and your 6/16/03 email information request, we are preparing to send you the documents related to the Boarhead Group and trust account matters. You should be receiving the information from us by mail later this week.

Here is an initial response to your email inquiry:

1) There is an "Agreement in Principle" that 6 of the current OU-1 Group members executed back in July 1999 concerning the Boarhead matter. At that time, Bundy was not a Group member. We are forwarding you a copy of that Agreement.

There is a General PRP Group Organization Agreement (for OU-1) that was circulated among the Group for execution in or about September 2000. We are forwarding you a copy of the OU-1 PRP Group Agreement along with available execution pages from the OU-1 Group members.

There is a Environmental Remediation Trust (ERT) Agreement for OU-1 that was circulated to the Group for execution in January 2002. The named Trustee was David Payne - Pitney Hardin Kipp & Szuch LLP. We are forwarding you the ERT Agreement with available signature pages from the OU-1 Group members.

After David Payne took leave of the firm in late 2002, I continued to serve in his capacity as Trustee of the Boarhead ERT on behalf of the firm.

Under the ERT Agreement, I suggest that we invoke/cite the appropriate provisions to transfer the Boarhead Trust between our firms. We also should obtain the Group's prior written consent to transfer the trust funds and to change Trustees.

2) Based on a review of the file, I do not believe that there is a formal trust agreement for OU-2. There was a draft OU-2 PRP Group Organizational Agreement that was prepared in 2002 that was never finalized. We can provide you with a draft copy of that agreement if you wish.

The OU-2 Group trust funds have been maintained in a separate sub trust account related to the Boarhead matter and handled according to instructions from the OU-2 Group members since January 3, 2002.

3) We are ready to transfer the OU-2 RD/RA trust account funds to you at your convenience. We intend to transfer the OU-1 RD/RA funds by the end of the month. We need to ensure that the last check cleared that account before we transfer it to you.

As discussed, there is very little money in the EPA reimbursement accounts (OU-1 and OU-2) and the Barkett account (for a future allocation). We can also transfer those accounts to you at your convenience.

As agreed, we will retain the monies in the Group defense cost accounts (OU-1 and OU-2) until all of our outstanding fees are paid. When that is complete, we will transfer any remaining funds to your firm.

Please forward us the wire transfer instructions for the 5 Boarhead trust sub accounts (excluding the OU-1 and OU-2 defense cost accounts). I will work with Sandy to ensure that the funds are transferred in an orderly fashion.

PHKS 073639

# EXHIBIT G

PHKS 071238

_[handwritten notes, partially illegible]_

9/20/01

_breakout info: bills / (illegible)_

① 24,000 K → in OU1 defense
must transit to OU1 RD/RA

② must receive $ (illegible) OU1 defense
(illegible) _____
check $ 5275
$5543.05  12/24/00
(illegible)

③ 2  Assessments

① 1302                        1307
OU-1 defense          OU-2 defense (New)

④ Must rebill — 84% of 01/01 – 06/01
charges
(First 4 invoices of 2001)
to objecting parties?
(note parties who did not
pay (controlled) objects)

_____ (illegible)
→ 10%?

PREPARED BY

Cyfec billing issue

9/23/02    Tom Whildin:          Phone (Bob RSC) → contact

→ Billing matters at TDES will flow
   (was brought) group dynamics

→ oil — Dec 2001 — 66% — legal
                        100% — Proprox

July — 12/01 —          not paid

2007 →

Kathy Trinkle →

full invoice — Bio Pond in the (RE Assn)
      → was enter entry authorized?
                  group audit?
                  or for Cyfec?

PHKS 071240



Assessmts —
OU-1 Sixth    $ 33,333.33                    TI
OU-2 First —   $ 61,250.00                   TI
1/18/01 FRC —  $ 18,178.11                   TU
12/5/01 FRC —  $7800 / $2600                 Cytec
(1305)                                       Ford
                                             SPS
                                             Agere
                                             TI
                                             NVM
                                             Worthington

@
Past Costs — $ 1.75M                          Cytec
                                             TI

Interest on — $ 15,750                        Cytec
Past Costs                                    TI

7ᵗʰ Assessmt $ 30,000 / $10,000              Cytec
(1301)                                       Ford
                                             SPS
                                             Agere
                                             TI
                                             NVM
                                             Worthington

1301 — OU-1 RD/RA (Technical)
1302 — OU-1 Pitney/Legal Costs Account
1303 — OU-1 Basket Account
1304 — OU-2 RD/RA (Technical)
1305 — OU-1 EPA Reimbursements
1306 — OU-2 EPA Reimbursements

PHKS 071241

Today: 9/9/2002
Started: 12:37 PM
Printed: 12:37 PM

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03J,C
Req'd By: Brulnoope, S.

Client
Matter
Trust

| Acct Num | Opening Employee | | Bill Tkpr Bank | Resp Tkpr Acct Type | | | |
|---|---|---|---|---|---|---|---|
| Date | Period | Tran/Amt Type | Payor/Payee | | Opening | Activity Amt | Ending |

**011938  CYTEC INDUSTRIES**
**075765  Boarhead Farm Superfund Site Common Disb**
**1300  BOARHEAD FARMS SUPEF PNCIO        159DWP  Payne, D.        159DWP PNCIO  159DWP G**

| Date | Period | Tran/Amt Type | Payor/Payee | Opening | Activity Amt |
|---|---|---|---|---|---|
| | | | | $0.00 | |
| 11/22/1999 | 199911 | CR / P | Citibank | | 9,694.02 |
| DEPOSIT CHECK FROM CITIBANK FEDERAL SAVINGS | | | | | |
| 12/15/1999 | 199912 | CR / P | Investors Trust Company | | 10,000.00 |
| Check #075016 from Investors Trust Company (Trust Acct.) | | | | | |
| 12/17/1999 | 199912 | CR / P | Vorys, Sater, Seymour and Please LLP | | 10,000.00 |
| Check # 84610 from Vorys, Sater, Seymour and Please LLP (Trust ACCT.) | | | | | |
| 12/23/1999 | 199912 | CR / P | SPS TECHNOLOGIES | | 20,000.00 |
| Check # 251335 from SPS Technologies (Trust ACCT) | | | | | |
| 12/27/1999 | 199912 | CR / P | Cytec Industries | | 20,000.00 |
| Check # 501330 from Cytec Industries | | | | | |
| 1/11/2000 | 200001 | CR / P | LUCENT TECHNOLOGIES | | 20,000.00 |
| Check # 1806021 from Lucent Tech. (Trust Acct) | | | | | |
| 1/12/2000 | 200001 | CR / P | FORD | | 20,000.00 |
| Check # 4919139 from Ford | | | | | |
| 2/4/2000 | 200002 | CH / P | DE MAXIMIS, INC. | | (11,088.70) |
| PAY DE MAXIMIS, INC. FOR CONSULTING SERVICES, CH#50832 | | | | | |
| 2/4/2000 | 200002 | CH / P | BIGLER ASSOCIATES | | (15,000.00) |
| PAYMENT TO BIGLER ASSOCIATES, INC. FOR CONSULTING SERVICES, CH#50833 | | | | | |
| 3/15/2000 | 200003 | CH / P | DE MAXIMIS, INC. | | (13,159.85) |
| PAID DE MAXIMIS, INC. FOR INVOICE NOS. 000084 AND 000186. CK#50979 | | | | | |
| 5/2/2000 | 200005 | CH / P | BIGLER ASSOCIATES | | (8,000.00) |
| PAID BIGLER ASSOCIATES, INC. FOR PARTIAL PAYMENT (APPROX. 80%) FOR THE PREPARATION OF THE DRAFT HEALTH & SAFETY PLAN AND THE REMEDIAL DESIGN WORK PLAN. CK#51175 | | | | | |
| 5/19/2000 | 200005 | CH / P | Eckenfelder / Brown & Caldwell | | (5,688.74) |
| PAID ECKENFELDER / BROWN & CALDWELL FOR CONSULTING SERVICES DURING THE PERIOD FROM 2/26/00 THROUGH 3/31/00. CK#51262 | | | | | |

PHKS 071242

Today: 9/19/2002
Stated: 12:37 PM
Printed: 12:37 PM

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

**Pitney, Hardin, Kipp & Szuch, LLP**
**Trust Subsidiary Report**
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Brulnooge, S.

Client
Matter
Trust

| Acct Num / Date | Period | Tran/Amt Type | Opening Employee / Payor/Payee | Resp Tkpr / Acct Type | Bill Tkpr / Bank | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|
| 5/19/2000 | 200005 | CH / P | Eckenfelder / Brown & Caldwell | | | | (8,695.78) | |
| PAID ECKENFELDER / BROWN & CALDWELL FOR CONSULTING SERVICES DURING THE PERIOD FROM 1/1/00 THROUGH 2/24/00. CK#51263 | | | | | | | | |
| 6/7/2000 | 200006 | CH / P | DE MAXIMIS, INC. | | | | (17,392.90) | |
| CHECK #51366 TO DE MAXIMIS, INC. FOR PAYMENT FOR CONSULTING SERVICES (INVOICE NOS. 000294, 000408 AND 000519) | | | | | | | | |
| 6/26/2000 | 200006 | CH / P | Eckenfelder / Brown & Caldwell | | | | (4,910.92) | |
| PAID ECKENFELDER / BROWN & CALDWELL FOR SERVICES RENDERED 4/1/00 TO 4/28/00 IN CONNECTION WITH THE REMEDIAL DESIGN WORK PLAN FOR OU-1. CK#51467 | | | | | | | | |
| 6/26/2000 | 200006 | CH / P | BIGLER ASSOCIATES | | | | (2,588.75) | |
| PAID BIGLER ASSOCIATES FOR SERVICES RENDERED FROM 4/26 - 5/31/00 IN CONNECTION WITH O&M TRANSITION AND DISCHARGE LIMIT EVALUATION AND NEGOATION. CK#51468 | | | | | | | | |
| 6/29/2000 | 200006 | CH / P | BIGLER ASSOCIATES | | | | (9,112.46) | |
| PAID BIGLER ASSOCIATES, INC. FOR STUDY & CONCEPTUAL DESIGN REPORT FOR GROUNDWATER TREATMENT SYSTEM UPGRADE. CK#51480 | | | | | | | | |
| 8/2/2000 | 200008 | TRT / P | Cytec Industries | | | | (4,360.88) | |
| TRUST TRANSFER FROM 1300 TO 1301 | | | | | | | | |
| 8/2/2000 | 200008 | TRT / P | Cytec Industries | | | | (9,694.02) | |
| TRUST TRANSFER FROM TRUST 1300 TO 1302 | | | | | | | | |
| | | | Trust | 1300 Totals: | | $0.00 | | $0.00 |

| 1301 | OU-1 RD/RA COSTS ACCO | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 159DWP  Payne, D. | PNCIO | G | $0.00 | | |
| 8/2/2000 | 200008 | TRT / P | Cytec Industries | | | | 4,360.88 | |
| TRUST TRANSFER FROM 1300 TO 1301 | | | | | | | | |
| 8/2/2000 | 200008 | CR / P | FORD MOTOR COMPANY CENTRAL | | | | 50,000.00 | |
| DEPOSIT CH#00531403Z FROM FORD MOTOR COMPANY FOR OU-1 RD/RA COSTS ACCOUNT | | | | | | | | |
| 8/9/2000 | 200008 | CH / P | BIGLER ASSOCIATES | | | | (13,712.89) | |
| PAID CH#51655 TO BIGLER ASSOCIATES, INC. FOR PAYMENT FOR OPERATION AND MAINTENANCE SERVICES RENDERED IN MAY 2000 | | | | | | | | |
| 8/9/2000 | 200008 | CH / P | Eckenfelder / Brown & Caldwell | | | | (15,417.21) | |
| PAID CH#51656 TO ECKENFELDER/BROWN & CALDWELL FOR PAYMENT FOR CONSULTING SERVICES RENDERED BETWEEN APRIL 29, 2000 AND MAY 26, 2000 | | | | | | | | |

PHKS 071243

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT
Report: TRST03JC
Req'd By: Bruinooge, S..

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Client
Matter
Trust

| Acct Num | Period | Opening Employee | Tran/Amt Type | Payor/Payee | Bill Tkpr Bank | Resp Tkpr Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|---|
| Date | | | | | | | | | |
| 8/10/2000 | 200008 | | CH / P | BIGLER ASSOCIATES | | | | (11,252.16) | |
| PAID CH#51672 TO BIGLER ASSOCIATES, INC. FOR PAYMENT FOR OPERATION AND MAINTENANCE SERVICES RENDERED IN JUNE 2000 | | | | | | | | | |
| 8/11/2000 | 200008 | | CR / P | Cytec Industries | | | | 50,000.00 | |
| DEPOSIT CH#528977 FROM CYTEC INDUSTRIES INC FOR PAYMENT OF TECHNICAL CONSULTING FEES | | | | | | | | | |
| 8/15/2000 | 200008 | | CR / P | LAUREL TRUST COMPANY | | | | 25,000.00 | |
| DEPOSIT CH#117148 FROM LAUREL TRUST COMPANY FOR TECHNICAL CONSULTING FEES | | | | | | | | | |
| 8/16/2000 | 200008 | | CH / P | BIGLER ASSOCIATES | | | | (1,641.25) | |
| PAID CH#51694 TO BIGLER ASSOCIATES, INC. FOR ENGINEERING SERVICES PROVIDED DURING JUNE 2000 | | | | | | | | | |
| 8/16/2000 | 200008 | | CR / P | SPS TECHNOLOGIES | | | | 50,000.00 | |
| DEPOSIT CH#268530 FROM SPS TECHNOLOGIES FOR TECHNICAL CONSULTING FEES | | | | | | | | | |
| 8/17/2000 | 200008 | | CH / P | Brown & Caldwell/Eckenfelder | | | | (27,014.19) | |
| PAID CH#51708 TO BROWN & CALDWELL/ECKENFELDER FOR TECHNICAL SERVICES RENDERED FROM MAY 27, 2000 THROUGH JUNE 30, 2000 | | | | | | | | | |
| 8/22/2000 | 200008 | | CR / P | Worthington Industries | | | | 25,000.00 | |
| DEPOSIT CH#10000092 FROM WORTHINGTON INDUSTRIES FOR TECHNICAL CONSULTING FEES | | | | | | | | | |
| 8/30/2000 | 200008 | | CH / P | DE MAXIMIS, INC. | | | | (9,490.34) | |
| PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES FROM 5/28/00 TO 7/2/00, CK#51744 | | | | | | | | | |
| 9/8/2000 | 200009 | | CH / P | DE MAXIMIS, INC. | | | | (7,798.25) | |
| PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM 7/3/00 TO 7/30/00. CK#51789 | | | | | | | | | |
| 9/12/2000 | 200009 | | CR / P | LUCENT TECHNOLOGIES | | | | 50,000.00 | |
| DEPOSIT CHECK FROM LUCENT TECHNOLOGIES | | | | | | | | | |
| 9/26/2000 | 200009 | | CH / P | Bigler Associates, Inc. | | | | (14,266.42) | |
| Paid Bigler Associates, Inc. for payment for operation & maintenance services rendered in July 2000 ck#51853 | | | | | | | | | |
| 9/26/2000 | 200009 | | CH / P | Eckenfelder/Brown & Caldwell | | | | (37,894.15) | |
| Paid Eckenfelder/Brown & Caldwell for payment for services rendered from July 1, 2000 through July 26,2000 ck#51852 | | | | | | | | | |

PHKS 071244

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Rec'd By: Bruinooge, S.

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Client
Matter
Trust

| Acct Num | | | | Bill Tkpr | Resp Tkpr | | | |
| Date | Opening Employee Period | Tran/Amt Type | Payor/Payee | Bank | Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|
| 9/28/2000 | 200009 | CH / P | DE MAXIMIS, INC. | | | | (8,922.14) | |
| | | | PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM 5/1/00 THROUGH 5/28/00. CK#51887 | | | | | |
| 10/16/2000 | 200010 | CH / P | Brown & Caldwell/Eckenfelder | | | | (13,988.84) | |
| | | | PAID BROWN & CALDWELL / ECKENFELDER FOR OU-1 REMEDIAL DESIGN SERVICES RENDERED 7/29/00 THROUGH 8/25/00. CK#51940 | | | | | |
| 10/16/2000 | 200010 | CH / P | BIGLER ASSOCIATES | | | | (26,269.63) | |
| | | | PAID BIGLER ASSOCIATES, INC. FOR OPERATION AND MAINTENANCE SERVICES RENDERED IN AUGUST 2000. CK#51941 | | | | | |
| 10/20/2000 | 200010 | CH / P | DE MAXIMIS, INC. | | | | (11,793.80) | |
| | | | PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES FROM 7/31/00 TO 9/3/00. INVOICE #000989. CK#51953 | | | | | |
| 11/16/2000 | 200011 | CH / P | DE MAXIMIS, INC. | | | | (11,288.57) | |
| | | | PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM 9/4/00 TO 10/1/00. CK#52038 | | | | | |
| 11/16/2000 | 200011 | CH / P | Eckenfelder / Brown & Caldwell | | | | (8,154.23) | |
| | | | Paid Eckenfelder / Brown & Caldwell for consulting services from 8/26/00 through 9/29/00. ck#52039 | | | | | |
| 11/16/2000 | 200011 | CH / P | Bigler Associates, Inc. | | | | (18,558.78) | |
| | | | PAID BIGLER ASSOCIATES, INC. FOR OPERATION AND MAINTENANCE SERVICES RENDERED IN SEPTEMBER 2000. CK#52040 | | | | | |
| 12/5/2000 | 200012 | CH / P | DE MAXIMIS, INC. | | | | (9,344.98) | |
| | | | PAID CK#52097 TO DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM 10/2/00 TO 10/29/00 | | | | | |
| 12/21/2000 | 200012 | CH / P | PITNEY, HARDIN, KIPP & SZUCH LLI | | | | (7,543.05) | |
| | | | PAID PHK&S FOR FEES AND COSTS. CK#52175 | | | | | |
| 12/26/2000 | 200012 | CR / P | CYTEC INDUSTRIES | | | | 40,000.00 | |
| | | | DEPOSIT CHECK FROM CYTEC INDUSTRIES INC. | | | | | |
| 12/28/2000 | 200012 | CR / P | FORD MOTOR COMPANY CENTRAL | | | | 40,000.00 | |
| | | | DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES | | | | | |
| 1/5/2001 | 200101 | CR / P | SPS TECHNOLOGIES | | | | 40,000.00 | |
| | | | DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | |
| 1/10/2001 | 200101 | CH / P | Eckenfelder / Brown & Caldwell | | | | (22,708.57) | |
| | | | Paid Eckenfelder / Brown & Caldwell for services rendered from 9/30/00 through 11/22/00. ck#52242 | | | | | |

Page: 4

PHKS 071245

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT
Report: TRST03JC
Req'd By: Brulnooge, S.

Client
Matter
Trust

| Acct Num | | | Opening Employee | | Bill Tkpr | Resp Tkpr | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date | Period | Tran/Amt Type | Payor/Payee | Bank | | Acct Type | Opening | Activity Amt | Ending |
| 1/10/2001 | 200101 | CH / P | Bigler Associates, Inc. | | | | | (24,343.35) | |
| Paid Bigler Associates, Inc. for operation and maintenance services rendered in October 2000. ck#52243 | | | | | | | | | |
| 1/17/2001 | 200101 | TRT / P | Cytec Industries | | | | | 7,543.05 | |
| TRANSFER FROM #1302 TO #1301 | | | | | | | | | |
| 2/7/2001 | 200102 | CH / P | BIGLER ASSOCIATES | | | | | (27,607.22) | |
| PAID BIGLER ASSOCIATES, INC. FOR OPERATION AND MAINTENANCE SERVICES PERFORMED IN NOVEMBER AND DECEMBER 2000. CK#52307 | | | | | | | | | |
| 2/27/2001 | 200102 | CR / P | TI GROUP | | | | | 36,666.66 | |
| DEPOSIT CHECK FROM TI GROUP | | | | | | | | | |
| 2/27/2001 | 200102 | CH / P | DE MAXIMIS, INC. | | | | | (10,301.06) | |
| PAID DE MAXIMIS, INC. FOR PROFESSIONAL SERICES RENDERED IN DECEMBER 2000. CK#52381 | | | | | | | | | |
| 3/12/2001 | 200103 | CH / P | Eckenfelder / Brown & Caldwell | | | | | (6,403.81) | |
| PAID CH#52433 TO ECKENFELDER/BROWN & CALDWELL FOR ENGINEERING SERVICES RENDERED FROM 12/30/00 THROUGH 1/26/01 | | | | | | | | | |
| 3/12/2001 | 200103 | CH / P | BIGLER ASSOCIATES | | | | | (20,967.79) | |
| PAID CH#52434 TO BIGLER ASSOCIATES, INC. FOR OPERATION & MAINTENANCE SERVICES RENDERED IN JANUARY 2001 | | | | | | | | | |
| 3/20/2001 | 200103 | CH / P | DE MAXIMIS, INC. | | | | | (14,862.60) | |
| PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM 1/1/01 THROUGH 2/4/01. CK#52477 | | | | | | | | | |
| 3/26/2001 | 200103 | CH / P | DE MAXIMIS, INC. | | | | | (14,844.35) | |
| PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED IN NOVEMBER 2000. CK#52517 | | | | | | | | | |
| 3/27/2001 | 200103 | CR / P | PROMISTAR TRUST COMPANY | | | | | 1,666.66 | |
| DEPOSIT CHECK FROM PROMISTAR TRUST COMPANY | | | | | | | | | |
| 3/27/2001 | 200103 | CR / P | PROMISTAR TRUST COMPANY | | | | | 750.00 | |
| DEPOSIT CHECK FROM PROMISTAR TRUST COMPANY (OVERAGE) | | | | | | | | | |
| 3/30/2001 | 200103 | CH / P | Eckenfelder/Brown & Caldwell | | | | | (8,228.64) | |
| PAID ECKENFELDER / BROWN & CALDWELL FOR ENGINEERING SERVICES RENDERED FROM 11/23/00 THROUGH 12/29/00. CK#52551 | | | | | | | | | |
| 4/19/2001 | 200104 | CH / P | DE MAXIMIS, INC. | | | | | (11,955.32) | |
| PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM FEBRUARY 5, 2001 THROUGH MARCH 4, 2001. CK#52622 | | | | | | | | | |

PHKS 071246

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Bruinooge, S.

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Piney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Client
Matter
Trust

| Acct Num | Opening Employee | Bill Tkpr / Bank | Resp Tkpr / Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|
| Date | Period | Tran/Amt Type | Payor/Payee | | | |
| 6/12/2001 | 200106 | CR / P | Agere Systems | | 40,000.00 | |
| DEPOSIT CH#6851410 FROM AGERE SYSTEMS TO ACCOUNT OU-1 RD/RA | | | | | | |
| 6/18/2001 | 200106 | CH / P | DE MAXIMIS, INC. | | (10,067.33) | |
| PAID CH#52879 TO DE MAXIMIS INC. FOR SERVICES RENDERED FROM 3/5/01 THROUGH 4/1/01 | | | | | | |
| 6/18/2001 | 200106 | CH / P | Brown & Caldwell/Eckenfelder | | (21,974.35) | |
| PAID CH#52880 TO BRAOWN & CALDWELL/ECKENFELDER FOR SERVICES RENDERED FROM 1/27/01 THROUGH 2/23/01 | | | | | | |
| 6/21/2001 | 200106 | TRT / P | Cytec Industries | | 23,471.67 | |
| TRANSFER BALANCE OF #1302 TO #1301 | | | | | | |
| 6/21/2001 | 200106 | TRT / P | Cytec Industries | | 22,599.50 | |
| TRANSFER BALANCE IN #1303 INTO #1301 | | | | | | |
| 6/21/2001 | 200106 | CH / P | Eckenfelder / Brown & Caldwell | | (34,068.01) | |
| Paid Eckenfelder / Brown & Caldwell for services rendered from February 24, 2001 through March 30, 2001 | | | | | | |
| 6/21/2001 | 200106 | CH / P | Bigler Associates, Inc. | | (24,000.00) | |
| PAID BIGLER ASSOCIATES FOR OPERATION AND MAINTENANCE AND WELLHEAD LEVEL MONITORING SERVICES RENDERED IN FEBRUARY 2001. CK#52894 | | | | | | |
| 8/8/2001 | 200108 | CR / P | SPS TECHNOLOGIES | | 240,000.00 | |
| DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | | |
| 8/16/2001 | 200108 | CH / P | Brown & Caldwell/Eckenfelder | | (70,424.10) | |
| PAID BROWN & CALDWELL / ECKENFELDER FOR INVOICE NOS. 282455; 282547 AND 292830. CK#53164 | | | | | | |
| 8/16/2001 | 200108 | CH / P | DE MAXIMIS, INC. | | (13,867.98) | |
| PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM APRIL 2, 2001 TO APRIL 29, 2001. CK#53165 | | | | | | |
| 8/16/2001 | 200108 | CH / P | Bigler Associates, Inc. | | (48,477.56) | |
| PAID BIGLER ASSOCIATES, INC. FOR INVOICE NOS. 7040, 7106, 7131 AND 7205 AND PAYMENT OF $2,695.15 REMAINING PORTION OF INV#6909. CK#53166 | | | | | | |
| 8/20/2001 | 200108 | TRT / P | Cytec Industries | | (23,471.67) | |
| TRANSFER FROM #1301 TO #1302 | | | | | | |
| 8/20/2001 | 200108 | TRT / P | Cytec Industries | | (22,599.50) | |
| TRANSFER FROM #1301 TO #1303 | | | | | | |

PHKS 071247

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Client
Matter
Trust

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Brulnooge, S.

| Acct Num | Period | Tran/Amt Type | | Payor/Payee | Opening Employee | Bill Tkpr / Bank | Resp Tkpr / Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | | | | | | | | | | |
| 8/22/2001 | 200108 | CR | / P | FORD MOTOR COMPANY CENTRAL | | | | | 240,000.00 | |

DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES

| 9/5/2001 | 200109 | CR | / P | CYTEC INDUSTRIES | | | | | 240,000.00 | |

DEPOSIT CHECK FROM CYTEC INDUSTRIES

| 9/5/2001 | 200109 | CH | / P | Bigler Associates, Inc. | | | | | (72,195.21) | |

PAID BIGLER ASSOCIATES FOR OPERATION AND MAINTENANCE SERVICES PERFORMED IN JULY 2001 AND PART PAYMENT FOR MODIFICATION OF GROUNDWATER EXTRACTION SYSTEM. CK#53239

| 9/10/2001 | 200109 | CR | / P | AGERE SYSTEMS, INC. | | | | | 240,000.00 | |

DEPOSIT CHECK FROM AGERE SYSTEMS, INC.

| 9/12/2001 | 200109 | CH | / P | DE MAXIMIS, INC. | | | | | (29,841.72) | |

PAID DE MAXIMIS, INC. FOR SERVICES RENDEREDE IN MAY & JUNE 2001. CK#53260

| 9/21/2001 | 200109 | CH | / P | Bigler Associates, Inc. | | | | | (110,200.00) | |

PAID BIGLER ASSOCIATES FOR PARTIAL PAYMENT FOR DESIGN AND CONSTRUCTION OF GROUNDWATER EXTRACTION SYSTEM MODIFICATIONS. CK#53312

| 9/26/2001 | 200109 | CH | / P | Bigler Associates, Inc. | | | | | (11,584.20) | |

PAID BIGLER ASSOCIATES FOR OPERATION AND MAINTENANCE SERCICES IN AUGUST 2001, CK#53324

| 10/1/2001 | 200110 | CH | / P | Eckenfelder / Brown & Caldwell | | | | | (5,722.28) | |

PAID ECKENFELDER/BROWN & CALDWELL FOR OU-1 REMEDIAL DESIGN SERVICES PERFORMED FROM 6/30/01 THROUGH 7/27/01. CK#53343

| 10/3/2001 | 200110 | CH | / P | DE MAXIMIS, INC. | | | | | (12,726.05) | |

PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM JULY 2, 2001 TO JULY 29, 2001. CK#53355

| 10/16/2001 | 200110 | CR | / P | Worthington Industries | | | | | 1,666.66 | |

DEPOSIT CHECK FROM WORTHINGTON INDUSTRIES

| 10/16/2001 | 200110 | CR | / P | Worthington Industries | | | | | 80,000.00 | |

DEPOSIT CHECK FROM WORTHINGTON INDUSTRIES

| 10/26/2001 | 200110 | CH | / P | Eckenfelder / Brown & Caldwell | | | | | (5,490.38) | |

PAID ECKENFELDER / BROWN & CALDWELL FOR SERVICES RENDERED FROM JULY 28, 2001 THROUGH AUGUST 24, 2001. CK#53465

| 10/30/2001 | 200110 | CR | / P | Smiths Industries | | | | | 80,000.00 | |

DEPOSIT CHECK FROM SMITHS INDUSTRIES, INC.

PHKS 071248

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Brunooge, S.

Client
Matter
Trust

| Acct Num Date | Period | Tran/Amt Type Opening Employee | Payor/Payee | Bank | Resp Tkpr Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|
| 10/30/2001 | 200110 | CR / P | PROMISTAR TRUST COMPANY | | | | 80,000.00 | |
| DEPOSIT CHECK FROM PROMISTAR TRUST COMPANY | | | | | | | | |
| 11/7/2001 | 200111 | CH / P | DE MAXIMIS, INC. | | | | (11,154.52) | |
| PAID DE MAXIMIS, INC. FOR CONSULTING SERVICES RENDERED FROM 7/30/01 THROUGH 9/2/01. CK#53506 | | | | | | | | |
| 11/21/2001 | 200111 | CH / P | DE MAXIMIS, INC. | | | | (9,997.25) | |
| PAID DE MAXIMIS, INC. FOR SERVICES RENDERED SEPTEMBER 2001. CK#53564 | | | | | | | | |
| 11/21/2001 | 200111 | CH / P | Eckenfelder/Brown & Caldwell | | | | (2,504.63) | |
| Paid Eckenfelder/Brown & Caldwell for OU-1 remedial design work in September 2001. ck#53565 | | | | | | | | |
| 11/21/2001 | 200111 | CH / P | Bigler Associates, Inc. | | | | (13,370.32) | |
| PAID BIGLER ASSOCIATES, INC. FOR OU-1 OPERATION AND MAINTENANCE IN SEPTEMBER 2001. CK#53566 | | | | | | | | |
| 12/3/2001 | 200112 | CH / P | Bigler Associates, Inc. | | | | (35,700.00) | |
| PAID BIGLER ASSOCIATES FOR GROUND WATER TREATMENT PLANT UPGRADE AND UPGRADE DESIGN AND RETAINAGE PAYMENT IN CONNECTION WITH SAME. CK#53595 | | | | | | | | |
| 12/6/2001 | 200112 | CHX / P | DE MAXIMIS, INC. | | | | 12,726.05 | |
| 12/7/2001 | 200112 | CH / P | DE MAXIMIS, INC. | | | | (12,726.05) | |
| PAID DE MAXIMIS, INC. FOR PAYMENT FOR CONSULTING SERVICES RENDERED FROM 7/2/01 TO 7/29/01. CK#53631 (REPLACEMENT CK. ORIGIONAL CK#53355 CANCELLED DATED 10/3/01) | | | | | | | | |
| 12/19/2001 | 200112 | CH / P | DE MAXIMIS, INC. | | | | (8,543.05) | |
| PAID DE MAXIMIS, INC. FOR PROFESSIONAL SERVICES RENDERED IN OCTOBER 2001. INV#011262. CK#53691 | | | | | | | | |
| 12/31/2001 | 200112 | CH / P | PITNEY, HARDIN, KIPP & SZUCH LLI | | | | (42,500.00) | |
| PAID PHKS FOR FEES. CK#53781 | | | | | | | | |
| 1/2/2002 | 200201 | CH / P | Bigler Associates, Inc. | | | | (15,579.42) | |
| PAID BIGLER ASSOCIATES, INC. FOR OPERATION AND MAINTENANCE IN MARCH 2001 AND WELLHEAD LEVEL MONITORING AND INSTALLATION OF MAGMETERS. CK#53782 | | | | | | | | |
| 1/11/2002 | 200201 | CH / P | Eckenfelder / Brown & Caldwell | | | | (17,043.09) | |
| PAID ECKENFELDER / BROWN & CALDWELL FOR SERVICES RENDERED FROM 9/29/01 THROUGH 10/26/01. CK#53822 | | | | | | | | |

PHKS 071249

Today: 9/19/2002
Stated: 12:37 PM
Printed: 12:37 PM

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Brulnooge, S..

Client
Matter
Trust

| Acct Num Date | Opening Employee Period | Tran/Amt Type | Bill Tkpr Bank Payor/Payee | Resp Tkpr Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|
| 1/15/2002 | 200201 | TRT / P | Cytec Industries | | | (65,826.98) | |
| TRANSFER FUNDS FROM SUB ACCT# 1301 TO #1305 | | | | | | | |
| 1/21/2002 | 200201 | CH / P | DE MAXIMIS, INC. | | | (7,849.50) | |
| PAID DE MAXIMIS, INC. FOR SERVICES RENDERED FROM 10/29/01 TO 12/2/01. CK#53842 | | | | | | | |
| 1/30/2002 | 200201 | CR / P | AGERE SYSTEMS INC. | | | 100,000.00 | |
| DEPOSIT CK#10012317 FROM AGERE SYSTEMS INC. FOR OU-1 RD/RA | | | | | | | |
| 2/4/2002 | 200202 | CH / P | Bigler Associates, Inc. | | | (6,500.00) | |
| PAID BIGLER ASSOCIATES FOR ENGINEERING SERVICES IN CONNECTION WITH UPGRADE OF GROUNDWATER TREATMENT SYSTEM. CK#53896 | | | | | | | |
| 2/4/2002 | 200202 | CR / P | Cytec Industries Inc. | | | 100,000.00 | |
| DEPOSIT CHECK FROM CYTEC INDUSTRIES | | | | | | | |
| 2/5/2002, | 200202 | CR / P | FORD MOTOR COMPANY CENTRAL | | | 100,000.00 | |
| DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES | | | | | | | |
| 2/13/2002 | 200202 | CH / P | Bigler Associates, Inc. | | | (10,598.69) | |
| PAID BIGLER ASSOCIATES FOR OPERATION AND MAINTENANCE SERVICES PERFORMED IN DECEMBER 2001. CK#53921 | | | | | | | |
| 2/13/2002 | 200202 | CH / P | ECKENFELDER / BROWN & CALDWI | | | (30,589.40) | |
| PAID ECKENFELDER / BROWN & CALDWELL FOR REMEDIAL DESIGN SERVICES FROM 10/27/01 - 11/23/01. CK#53922 | | | | | | | |
| 2/13/2002 | 200202 | CR / P | SPS TECHNOLOGIES | | | 100,000.00 | |
| DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | | | |
| 2/15/2002 | 200202 | CH / P | Bigler Associates, Inc. | | | (15,663.27) | |
| PAID BIGLER ASSOCIATES INC. FOR OPERATION AND MAINTENANCE SERVICES RENDERED IN OCT. AND NOV. 2001, AS WELL AS RELATED REPAIR WORK. CK#53942 | | | | | | | |
| 2/18/2002 | 200202 | CHX / P | Bigler Associates, Inc. | | | 15,663.27 | |
| 2/18/2002 | 200202 | CH / P | Bigler Associates, Inc. | | | (25,663.27) | |
| PAID BIGLER ASSOCIATES FOR OPERATION AND MAINTENANCE SERVICES RENDERED IN OCTOBER AND NOVEMBER 2001 AS WELL AS RELATED REPAIR WORK. CK#53943 | | | | | | | |

PHKS 071250

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pilney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT
Req'd By: Brulnogge, S.

Report: TRST03JC

Client
Matter
Trust

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

| Acct Num Date | Period | Opening Employee Tran/Amt Type | Payor/Payee | Bill Tkpr Bank | Resp Tkpr Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|
| 2/25/2002 | 200202 | CH / P | Bigler Associates, Inc. | | | | (42,101.30) | |

PAID BIGLER ASSOCIATES INC. FOR SERVICES RENDERED IN CONNECTION WITH SUBMISSION OF DELIVERABLES, IMPROVEMENTS TO SITE ROADS, TREATMENT PLANT UPGRADE AND JANUARY 2002 O&M. CK#53961

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3/4/2002 | 200203 | CR / P | Worthington Industries | | | | 33,333.33 | |

DEPOSIT CHECK FROM WORTHINGTON IND.

| 3/5/2002 | 200203 | CH / P | DE MAXIMIS, INC. | | | | (3,741.16) | |

PAID DE MAXIMIS, INC. FOR PROJECT COORDINATION AND O&M OVERSIGHT ACTIVITIES FROM 12/3/01 THROUGH 12/31/01. CK#53982

| 3/15/2002 | 200203 | CR / P | FIRST NATIONAL TRUST COMPANY | | | | 33,333.33 | |

DEPOSIT CK#720000205 FROM FIRST NATIONAL TRUST COMPANY FOR PAYMENT OF TECHNICAL COSTS

| 3/20/2002 | 200203 | CH / P | BROWN & CALDWELL | | | | (35,933.35) | |

PAID BROWN & CALDWELL FOR SERVICES RENDERED FROM 11/22/01 THROUGH 1/25/02 IN CONNECTION WITH FIRST ROUND OF SAMPLING UNDER LONG TERM MONITORING PLAN. CK#54033

| 3/22/2002 | 200203 | CH / P | DE MAXIMIS, INC. | | | | (10,381.79) | |

PAID DE MAXIMIS, INC. FOR PROJECT COORDINATION SERVICES AND O&M OVERSIGHT RENDERED FROM 1/1/02 THROUGH 2/3/02. CK#54047

| 3/28/2002 | 200203 | CH / P | Bigler Associates, Inc. | | | | (299,880.00) | |

PAID BIGLER ASSOCIATES INC. FOR SECOND, THIRD AND FOURTH SCHEDULED PAYMENTS IN CONNECTION WITH UPGRADE OF GROUND WATER TREATMENT SYSTEM. CK#54090

| 4/4/2002 | 200204 | CH / P | Bigler Associates, Inc. | | | | (10,198.08) | |

PAID BIGLER ASSOCIATES, INC. FOR OPERATION AND MAINTENANCE SERVICES RENDERED IN FEBRUARY 2002. CK#54108

| 4/8/2002 | 200204 | CH / P | Bigler Associates, Inc. | | | | (92,340.00) | |

PAID CK#54122 TO BIGLER ASSOCIATES, INC. FOR FIFTH SCHEDULED PAYMENT FOR UPGRADE OF GROUNDWATER TREATMENT PLANT

| 4/15/2002 | 200204 | CH / P | BROWN & CALDWELL | | | | (11,136.11) | |

PAID BROWN & CALDWELL FOR OU-1 REMEDIAL DESIGN ACTIVITIES FROM 1/26/02 THRU 2/22/02. CK#54157

| 4/18/2002 | 200204 | CH / P | Bigler Associates, Inc. | | | | (85,680.00) | |

PAID BIGLER ASSOCIATES, INC. FOR SIXTH SECHULED PAYMENT FOR GROUNDWATER TREATMENT SYSTEM UPGRADE. CK#54179

| 5/16/2002 | 200205 | CH / P | Brown and Caldwell | | | | (20,386.44) | |

PAID BROWN AND CALDWELL FOR CONSULTING SERVICES FROM 2/23/02 THRU 3/29/02. CK#54293

PHKS 071251

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Brulnooge, S.

Client
Matter
Trust

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

| Acct Num | Opening Employee | | Bill Tkpr | Resp Tkpr | | | |
| Date | Period | Tran/Amt Type | Bank Payor/Payee | Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|
| 5/16/2002 | 200205 | CH / P | Bigler Associates, Inc. | | | (11,529.50) | |
| PAID BIGLER ASSOCIATES, INC. FOR OPERATION & MAINTENANCE SERVICES IN MARCH 2002 FOR METAL STORAGE BOX. CK#54294 | | | | | | | |
| 5/17/2002 | 200205 | CH / P | DE MAXIMIS, INC. | | | (16,560.33) | |
| PAID DE MAXIMIS INC. FOR CONSULTING SERVICES FROM 2/3/02 THRU 3/31/02. CK#54302 | | | | | | | |
| 6/3/2002 | 200206 | CH / P | Bigler Associates, Inc. | | | (9,754.38) | |
| PAID CK#54383 TO BIGLER ASSOCIATES, INC. FOR OPERATION, MAINTENANCE AND WELL LEVEL MONITORING SERVICES IN APRIL 2002 | | | | | | | |
| 6/6/2002 | 200206 | CH / P | Bigler Associates, Inc. | | | (55,600.00) | |
| PAID BIGLER ASSOCIATES, INC. FOR FINAL ACCEPTANCE RETAINAGE PAYMENT FOR GROUNDWATER TREATMENT SYSTEM UPGRADE. CK#54389 | | | | | | | |
| 6/10/2002 | 200206 | CR / P | SMITH INDUSTRIES, INC. | | | 33,333.33 | |
| W/T INTO PNCIO FROM FIRST UNION FOR SMITH INDUSTRIES, INC. REF: BOARHEAD T/S#5678 | | | | | | | |
| 6/14/2002 | 200206 | CH / P | BROWN & CALDWELL | | | (7,830.44) | |
| PAID CK#54421 TO BROWN & CALDWELL FOR PAYMENT FOR SERVICES RENDERED FROM 3/30/02--4/26/02 | | | | | | | |
| 7/9/2002 | 200207 | CH / P | BROWN & CALDWELL | | | (661.17) | |
| PAID BROWN & CALDWELL FOR REMEDIAL DESIGN ACTIVITIES FROM 4/27/02 - 5/24/02. CK#54533 | | | | | | | |
| 7/9/2002 | 200207 | CH / P | Bigler Associates, Inc. | | | (24,089.06) | |
| PAID BIGLER ASSOCIATES, INC. FOR OPERATION AND MAINTENANCE SERVICES AND WELL LEVEL MONITORING IN MAY 2002. CK#54534 | | | | | | | |
| 7/22/2002 | 200207 | CH / P | DE MAXIMIS, INC. | | | (11,013.42) | |
| PAID DE MAXIMIS, INC. FOR SERVICES RENDERED FROM 4/01/02 THROUGH 4/28/02. CK#54580 | | | | | | | |
| 7/30/2002 | 200207 | CR / P | FORD MOTOR COMPANY CENTRAL | | | 30,000.00 | |
| DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES | | | | | | | |
| 8/2/2002 | 200208 | CH / P | DE MAXIMIS, INC. | | | (10,393.60) | |
| PAID DE MAXIMIS, INC. FOR SERVICES RENDERED FROM 4/29/02 THROUGH 6/2/02. CK#54604 | | | | | | | |
| 8/2/2002 | 200208 | CR / P | SPS TECHNOLOGIES | | | 30,000.00 | |
| DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | | | |

PHKS 071252

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pliney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Brulnooge, S.

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Client
Matter
Trust

| Acct Num / Date | Period | Opening Employee / Tran/Amt Type | Bill Tkpr / Bank / Payor/Payee | Resp Tkpr / Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|
| 8/16/2002 | 200208 | CR / P | Cytec Industries Inc. | | | 30,000.00 | |
| DEPOSIT CHECK FROM CYTEC INDUSTRIES INC. | | | | | | | |
| 8/20/2002 | 200208 | CR / P | SMITHS GROUP NORTH AMERICA, I | | | 10,000.00 | |
| DEPOSIT CK#20618 FROM SMITHS GROUP NORTH AMERICA, INC. FOR OU-1RD/RA | | | | | | | |
| 8/27/2002 | 200208 | CR / P | FIRST NATIONAL TRUST COMPANY | | | 10,000.00 | |
| DEPOSIT CK#72000S319 FROM 1ST NATL TRUST CO FOR 7TH ASSESSMENT | | | | | | | |
| 9/3/2002 | 200209 | CH / P | BROWN & CALDWELL | | | (19,359.17) | |
| PAID CK#54717 TO BROWN & CALDWELL FOR PAYMENT OF INVOICE #284015 FOR THE PERIOD 5/25/02–6/28/02 | | | | | | | |
| 9/3/2002 | 200209 | CH / P | BROWN & CALDWELL | | | (9,915.89) | |
| PAID CK#54718 TO BROWN & CALDWELL FOR PAYMENT OF INVOICE #284144 FOR THE PERIOD 6/29/02–7/26/02 | | | | | | | |
| 9/3/2002 | 200209 | CH / P | BIGLER ASSOCIATES | | | (17,515.65) | |
| PAID CK#54719 TO BIGLER ASSOCIATES FOR PAYMENT OF INVOICE #8216 FOR SERVICES RENDERED THROUGH 7/02 | | | | | | | |
| 9/11/2002 | 200209 | CR / P | Worthington Industries | | | 10,000.00 | |
| DEPOSIT CHECK FROM WORTHINGTON IND. | | | | | | | |
| 9/12/2002 | 200209 | CH / P | DE MAXIMIS, INC. | | | (6,956.76) | |
| PAID DE MAXIMIS, INC. FOR INVOICE# 020876 FOR OU-1 SERVICES RENDERED 7/1 - 7/28/02. CK#54751 | | | | | | | |
| 9/12/2002 | 200209 | CH / P | DE MAXIMIS, INC. | | | (7,048.00) | |
| PAID DE MAXIMIS, INC. FOR INVOICE #020767 FOR OU-1 SERVICES RENDERED 6/3 - 6/30/02. CK#54748 | | | | | | | |
| | | | Trust | 1301 Totals: | $0.00 | 271,204.22 | $271,204.22 |
| **1302** | | 159DWP | Payne, D. | PNCIO   G | $0.00 | 9,694.02 | |
| NO.1 DEFENCE COST ACC | | | | | | | |
| 8/2/2000 | 200008 | TRT / P | Cytec Industries | | | 9,694.02 | |
| TRUST TRANSFER FROM TRUST 1300 TO 1302 | | | | | | | |
| 8/2/2000 | 200008 | CR / P | FORD MOTOR COMPANY CENTRAL | | | 40,000.00 | |
| DEPOSIT CH#005314032 FROM FORD MOTOR COMPANY FOR DEFENSE COST ACCOUNT NO. 1 (COMMON DEFENSE COSTS) | | | | | | | |
| 8/11/2000 | 200008 | CR / P | Cytec Industries | | | 40,000.00 | |
| DEPOSIT CH#528977 FROM CYTEC INDUSTRIES FOR COMMON DEFENSE COSTS | | | | | | | |

PHKS 071253

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Brulnoage, S.

Client
Matter
Trust

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

| Date | Period | Opening Employee<br>Tran/Amt Type | Bill Tkpr<br>Bank<br>Payor/Payee | Resp Tkpr<br>Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|
| Acct Num | | | | | | | |
| 8/15/2000 | 200008 | CR / P | LAUREL TRUST COMPANY | | | 20,000.00 | |
| DEPOSIT CH#117148 FROM LAUREL TRUST COMPANY FOR COMMON DEFENSE COSTS | | | | | | | |
| 8/16/2000 | 200008 | CR / P | SPS TECHNOLOGIES | | | 24,000.00 | |
| DEPOSIT CH#268530 FROM SPS TECHNOLOGIES FOR COMMON DEFENSE COSTS | | | | | | | |
| 8/17/2000 | 200008 | CH / P | Pitney, Hardin, Kipp & Szuch LLP | | | (128,355.37) | |
| PAID CH#51709 TO PHK&S FOR PAYMENT OF O/S FEES AND COSTS | | | | | | | |
| 8/22/2000 | 200008 | CR / P | Worthington Industries | | | 20,000.00 | |
| DEPOSIT CH#10000092 FROM WORTHINGTON INDUSTRIES FOR COMMON DEFENSE COSTS | | | | | | | |
| 9/12/2000 | 200009 | CR / P | LUCENT TECHNOLOGIES | | | 40,000.00 | |
| DEPOSIT CHECK FROM LUCENT TECHNOLOGIES | | | | | | | |
| 10/3/2000 | 200010 | CH / P | McCarter & English, LLP | | | (246.85) | |
| PAID MCCARTER & ENGLISH, LLP FOR COPIES OF GENERAL CERAMICS INSURANCE DOCUMENTS. CK#51914 | | | | | | | |
| 12/21/2000 | 200012 | CH / P | PITNEY, HARDIN, KIPP & SZUCH LLI | | | (65,089.80) | |
| PAID PHK&S FOR FEES AND COSTS. CK#52175 | | | | | | | |
| 12/26/2000 | 200012 | CR / P | CYTEC INDUSTRIES | | | 15,000.00 | |
| DEPOSIT CHECK FROM CYTEC INDUSTRIES INC. | | | | | | | |
| 12/27/2000 | 200012 | CH / P | PITNEY, HARDIN, KIPP & SZUCH LLI | | | (10,473.29) | |
| PAID PHK&S FOR INVOICE #1945246. CK#52187 | | | | | | | |
| 12/28/2000 | 200012 | CR / P | FORD MOTOR COMPANY CENTRAL | | | 15,000.00 | |
| DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES | | | | | | | |
| 1/3/2001 | 200101 | TRT / P | Cytec Industries | | | (97.50) | |
| TRANSFER FROM #1302 TO #1303 | | | | | | | |
| 1/5/2001 | 200101 | CR / P | SPS TECHNOLOGIES | | | 15,000.00 | |
| DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | | | |
| 1/17/2001 | 200101 | TRT / P | Cytec Industries | | | (7,543.05) | |
| TRANSFER FROM #1302 TO #1301 | | | | | | | |
| 1/17/2001 | 200101 | TRT / P | Cytec Industries | | | (22,599.50) | |
| TRANSFER FROM #1302 TO #1303 | | | | | | | |

Page: 13

PHKS 071254

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Bruinooge, S.

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Client
Matter
Trust

| Acct Num / Date | Opening Employee / Period | Tran/Amt Type | Payor/Payee / Bank | Resp Tkpr / Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|
| 2/7/2001 | 200102 | CH / P | Nihill & Riedley, P.C. | | | (3,315.00) | |
| Paid Nihill & Riedley, P.C. for forensic accounting services rendered in November and December 2000. ck#52308 | | | | | | | |
| 3/27/2001 | 200103 | CR / P | PROMISTAR TRUST COMPANY | | | 7,500.00 | |
| DEPOSIT CHECK FROM PROMISTAR TRUST COMPANY | | | | | | | |
| 6/12/2001 | 200106 | CR / P | Agere Systems | | | 15,000.00 | |
| DEPOSIT CH#68514108 FROM AGERE SYSTEMS FOR DEFENSE COSTS ACCOUNT | | | | | | | |
| 6/21/2001 | 200106 | TRT / P | Cytec Industries | | | (23,471.67) | |
| TRANSFER BALANCE OF #1302 TO #1301 | | | | | | | |
| 8/20/2001 | 200108 | TRT / P | Cytec Industries | | | 23,471.67 | |
| TRANSFER FROM #1301 TO #1302 | | | | | | | |
| 8/20/2001 | 200108 | CH / P | Nihill & Riedley, P.C. | | | (581.25) | |
| PAID NIHILL & RIEDLEY, P.C. FOR CONSULTING SERVICES. CK#53184 | | | | | | | |
| 10/16/2001 | 200110 | CR / P | Worthington Industries | | | 7,500.00 | |
| DEPOSIT CHECK FROM WORTHINGTON INDUSTRIES | | | | | | | |
| 1/2/2002 | 200201 | CH / P | Nihill & Riedley, P.C. | | | (877.50) | |
| PAID NIHILL & RIEDLEY, P.C. FOR REVIEW OF BACK-UP DOCUMENTATION FOR FUTURE RESPONSE COSTS INVOICE. CK#53783 | | | | | | | |
| 1/18/2002 | 200201 | CH / P | Montgomery, McCracken, Walker & Rho | | | (6,971.12) | |
| Paid Montgomery, McCracken, Walker & Rhoads, LLP for paralegal review of EPA and PADEP documents, legal services in connection with NPDES permit issues and group meeting lunches. ck#53841 | | | | | | | |
| 2/19/2002 | 200202 | CH / P | Montgomery, McCracken, Walker & Rho | | | (133.94) | |
| Paid Montgomery, McCracken, Walker & Rhoads, LLP for lunch at OU-1 Group meeting 1/11/02. ck#53945 | | | | | | | |
| 3/29/2002 | 200203 | CH / P | Nihill & Riedley, P.C. | | | (195.00) | |
| PAID NIHILL & RIEDLEY, P.C. FOR SERVICES IN CONNECTION WITH DISPUTE OVER 1/18/01 FUTURE RESPONSE COSTS INVOICE. CK#54091 | | | | | | | |
| 7/10/2002 | 200207 | CH / P | Nihill & Riedley, P.C. | | | (390.00) | |
| PAID NIHILL & RIEDLEY, PC FOR SERVICES RENDERED IN CONNECTION WITH EPA'S 12/5/01 FUTURE RESPONSE COSTS INVOICE. CK#54549 | | | | | | | |
| | | | Trust | 1302 Totals: | $0.00 | 21,822.86 | |
| 1303 | 159DWP | Payne, D. | PNCIO | G | $0.00 | 21,822.86 | $21,822.86 |

1303    NO. 2 DEFENSE COST ACC

Page: 14

PHKS 071255

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Client
Matter
Trust

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST033C
Req'd By: Brulnogoe, 'S.

| Acct Num Date | Opening Employee Period | Tran/Amt Type | Bill Tkpr Bank Payor/Payee | Resp Tkpr Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|
| 8/2/2000 | 200008 | CR / P | FORD MOTOR COMPANY CENTRAL | | | 5,000.00 | |
| DEPOSIT CH#005314032 FROM FORD MOTOR COMPANY FOR DEFENSE COST ACCOUNT NO. 2 (ALLOCATION PROCESS) | | | | | | | |
| 8/11/2000 | 200008 | CR / P | Cytec Industries | | | 5,000.00 | |
| DEPOSIT CH#528977 FROM CYTEC INDUSTRIES FOR ALLOCATION COSTS | | | | | | | |
| 8/15/2000 | 200008 | CR / P | LAUREL TRUST COMPANY | | | 2,500.00 | |
| DEPOSIT CH#117146 FROM LAUREL TRUST COMPANY FOR ALLOCATION COSTS | | | | | | | |
| 8/16/2000 | 200008 | CR / P | SPS TECHNOLOGIES | | | 5,000.00 | |
| DEPOSIT CH#266530 FROM SPS TECHNOLOGIES FOR ALLOCATION COSTS | | | | | | | |
| 8/22/2000 | 200008 | CR / P | Worthington Industries | | | 2,500.00 | |
| DEPOSIT CH#1000092 FROM WORTHINGTON INDUSTRIES FOR ALLOCATION COSTS | | | | | | | |
| 9/12/2000 | 200009 | CR / P | LUCENT TECHNOLOGIES | | | 5,000.00 | |
| DEPOSIT CHECK FROM LUCENT TECHNOLOGIES | | | | | | | |
| 12/11/2000 | 200012 | CH / P | Shook, Hardy & Bacon, LLP | | | (2,303.00) | |
| PAID SHOOK, HARDY & BACON, LLP FOR PROFESSIONAL SERVICES RENDERED THROUGH 9/30/00. CK#52129 | | | | | | | |
| 12/21/2000 | 200012 | CH / P | PITNEY, HARDIN, KIPP & SZUCH LLI | | | (22,697.00) | |
| PAID PHK&S FOR FEES AND COSTS. CK#52175 | | | | | | | |
| 1/3/2001 | 200101 | TRT / P | Cytec Industries | | | 97.50 | |
| TRANSFER FROM #1302 TO #1303 | | | | | | | |
| 1/3/2001 | 200101 | CH / P | Shook, Hardy & Bacon, LLP | | | (97.50) | |
| Paid Shook, Hardy & Bacon, LLP for allocation services rendered through 10/31/00. ck#52210 | | | | | | | |
| 1/17/2001 | 200101 | TRT / P | Cytec Industries | | | 22,599.50 | |
| TRANSFER FROM #1302 TO #1303 | | | | | | | |
| 6/21/2001 | 200106 | TRT / P | Cytec Industries | | | (22,599.50) | |
| TRANSFER BALANCE IN #1303 INTO #1301 | | | | | | | |
| 8/20/2001 | 200108 | TRT / P | Cytec Industries | | | 22,599.50 | |
| TRANSFER FROM #1301 TO #1303 | | | | | | | |
| | | | 1303 Totals: Trust | | $0.00 | 22,599.50 | $22,599.50 |

Page: 15

PHKS 071256

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT

Report: TRST03JC
Req'd By: Bruinooge, S.

Client
Matter
Trust

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

| Acct Num | | | Opening Employee | | | Bill Tkpr | Resp Tkpr | | |
| Date | Period | Tran/Amt Type | Payor/Payee | | Bank | Acct Type | Opening | Activity Amt | Ending |

1304   OU-2 RD/RA COSTS ACCO

159DWP   Payne, D.

PNCIO   G

Opening $0.00

| Date | Period | Tran/Amt Type | Payor/Payee | Activity Amt |
|---|---|---|---|---|
| 1/3/2002 | 200201 | CR / P | FORD MOTOR COMPANY CENTRAL | 61,250.00 |
| | | | DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES | |
| 1/7/2002 | 200201 | CR / P | CYTEC INDUSTRIES | 61,250.00 |
| | | | DEPOSIT CHECK FROM CYTEC INDUSTRIES | |
| 1/9/2002 | 200201 | CR / P | SPS TECHNOLOGIES | 61,250.00 |
| | | | DEPOSIT CHECK FROM SPS TECHNOLOGIES | |
| 1/11/2002 | 200201 | CH / P | Eckenfelder / Brown & Caldwell | (1,822.50) |
| | | | PAID ECKENFELDER / BROWN & CALDWELL FOR SERVICES PERFORMED FROM 9/29/01 THROUGH 10/26/01. CK#53823 | |
| 1/21/2002 | 200201 | CH / P | DE MAXIMIS, INC. | (1,944.61) |
| | | | PAID DE MAXIMIS, INC. FOR SERVICES RENDERED FROM 10/1/01 TO 10/28/01 FROM 10/29/01 TO 12/2/01. CK#53843 | |
| 2/13/2002 | 200202 | CH / P | ECKENFELDER / BROWN & CALDWI | (16,706.65) |
| | | | PAID ECKENFELDER / BROWN & CALDWELL FOR REMEDIAL DESIGN WORK PLAN SERVICES FROM 10/27/01 - 11/21/01. CK#53920 | |
| 2/25/2002 | 200202 | CH / P | Bigler Associates, Inc. | (3,800.00) |
| | | | PAID BIGLER ASSOCIATES INC. FOR ELECTRICAL SYSTEM UPGRADE, CK#53862 | |
| 2/25/2002 | 200202 | CH / P | ECKENFELDER / BROWN & CALDWI | (4,591.91) |
| | | | PAID ECKENFELDER / BROWN & CALDWELL FOR SERVICES RENDERED FROM NOV. 22, 2001 THROUGH DEC. 28, 2002 IN CONNECTION WITH SUBMISSION OF RDWP. CK#53963 | |
| 3/5/2002 | 200203 | CH / P | DE MAXIMIS, INC. | (682.50) |
| | | | PAID DE MAXIMIS FOR PROJECT COORDINATION FROM 12/3/01 THROUGH 12/31/01 CK#53983 | |
| 3/18/2002 | 200203 | CR / P | PITNEY, HARDIN, KIPP & SZUCH LLI | 5,000.00 |
| | | | DEPOSIT CHECK FROM PHKS OPER. ACCT. | |
| 3/20/2002 | 200203 | CH / P | BROWN & CALDWELL | (973.69) |
| | | | PAID BROWN & CALDWELL FOR SERVICES RENDERED FROM 12/29/01 THROUGH 1/25/02 RE SUBMISSION OF THE OU-2 REMEDIAL DESIGN WORK PLAN. CK#54032 | |
| 3/22/2002 | 200203 | CH / P | DE MAXIMIS, INC. | (2,195.56) |
| | | | PAID DE MAXIMIS, INC. FOR PROJECT COORDINATION SERVICES RENDERED FROM 1/1/02 THROUGH 2/3/02. CK#54046 | |

Page: 16

PHKS 071257

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:37 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT
Report: TRST03JC
Req'd By: Brulnogue, S.

Client
Matter
Trust

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

| Acct Num Date | Period | Opening Employee Tran/Amt Type | Payor/Payee | Bill Tkpr Bank | Resp Tkpr Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|
| 4/15/2002 | 200204 | CH / P | BROWN & CALDWELL | | | | (8,387.95) | |
| PAID BROWN & CALDWELL FOR OU-2 REMEDIAL DESIGN SERVICES FROM 1/26/02 THRU 2/22/02. CK#54156 | | | | | | | | |
| 5/6/2002 | 200205 | CR / P | PITNEY, HARDIN, KIPP & SZUCH LLI | | | | 20,000.00 | |
| DEPOSIT CHECK FROM PHKS OPER. FOR AGERE SYSTEMS, INC. | | | | | | | | |
| 5/16/2002 | 200205 | CH / P | Brown and Caldwell | | | | (3,671.18) | |
| PAID BROWN AND CALDWELL FOR CONSULTING SERVICES FROM 2/23/02 THRU 3/29/02 IN CONNECTION WITH FINALIZING THE REMEDIAL DESIGN WORK PLAN. CK#54235 | | | | | | | | |
| 5/17/2002 | 200205 | CH / P | DE MAXIMIS, INC. | | | | (4,445.71) | |
| PAID DE MAXIMIS, INC. FOR CONSULTING FEES RENDERED FROM 4/4/02 THRU 3/31/02. CK#54301 | | | | | | | | |
| 6/10/2002 | 200206 | CR / P | SMITH INDUSTRIES, INC. | | | | 61,250.00 | |
| W/T INTO PNCIO FROM FIRST UNION FOR SMITH INDUSTRIES, INC. REF: BOARHEAD 7/5#5678 | | | | | | | | |
| 6/14/2002 | 200206 | CH / P | BROWN & CALDWELL | | | | (9,884.20) | |
| PAID CK#54422 TO BROWN & CALDWELL FOR PAYMENT FOR SERVICES PERFORMED IN CONNECTION WITH OU-2 REMEDIAL DESIGN WORK PLAN FROM 3/30/02~4/26/02 | | | | | | | | |
| 7/9/2002 | 200207 | CH / P | BROWN & CALDWELL | | | | (8,559.98) | |
| PAID BROWN & CALDWELL FOR REMEDIAL DESIGN ACTIVITIES FROM 4/27/02 - 5/24/02. CK#54535 | | | | | | | | |
| 7/22/2002 | 200207 | CH / P | DE MAXIMIS, INC. | | | | (1,115.63) | |
| PAID DE MAXIMIS, INC. FOR SERVICES RENDERED FROM 4/1/02 THROUGH 4/28/02. CK#54579 | | | | | | | | |
| 8/2/2002 | 200208 | CH / P | DE MAXIMIS, INC. | | | | (3,466.08) | |
| PAID DE MAXIMIS, INC. FOR SERVICES RENDERED FROM 4/29/02 THROUGH 6/2/02. CK#54605 | | | | | | | | |
| 9/3/2002 | 200209 | CH / P | BROWN & CALDWELL | | | | (8,357.26) | |
| PAID CK#54720 TO BROWN & CALDWELL FOR PAYMENT OF INVOICE #284062 FOR THE PERIOD 5/24/02~6/28/02 | | | | | | | | |
| 9/3/2002 | 200209 | CH / P | BROWN & CALDWELL | | | | (25,016.98) | |
| PAID CK#54721 TO BROWN & CALDWELL FOR PAYMENT OF INVOICE #284192 FOR THE PERIOD 6/29/02~7/26/02 | | | | | | | | |
| 9/12/2002 | 200209 | CH / P | DE MAXIMIS, INC. | | | | (3,360.53) | |
| PAID DE MAXIMIS, INC. FOR INVOICE #020877 FOR OU-2 SERVICES RENDERED 7/1 - 7/28/02. CK#54749 | | | | | | | | |

PHKS 071258

Today: 9/19/2002
Started 12:37 PM
Printed 12:37 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT
Report: 1RST03JC
Rec'd By: Brulnooge, S.

Client
Matter
Trust

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

| Acct Num | Date | Period | Opening Employee | Tran/Amt Type | Bill Tkpr Bank Payor/Payee | Resp Tkpr Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|---|
| | 9/12/2002 | 200209 | | CH / P | DE MAXIMIS, INC. | | | (3,151.47) | |
| | PAID DE MAXIMIS, INC. FOR INVOICE #020768 FOR OU-2 SERVICES RENDERED 6/3 - 6/30/02.  CK#54750 | | | | | | | | |
| | | | | | Trust | 1304 Totals: | $0.00 | 157,865.61 | $157,865.61 |
| 1305 | EPA REIMBURSEMENT CO | | 159DWP | Payne, D. | PNCIO | G | $0.00 | | |
| | 1/3/2002 | 200201 | | CR / P | FORD MOTOR COMPANY CENTRAL | | | 84,534.32 | |
| | DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES | | | | | | | | |
| | 1/7/2002 | 200201 | | CR / P | CYTEC INDUSTRIES | | | 84,534.32 | |
| | DEPOSIT CHECK FROM CYTEC INDUSTRIES | | | | | | | | |
| | 1/9/2002 | 200201 | | CR / P | SPS TECHNOLOGIES | | | 84,534.32 | |
| | DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | | | | |
| | 1/9/2002 | 200201 | | CR / P | AGERE SYSTEMS, INC. | | | 84,534.32 | |
| | DEPOSIT CHECK FROM AGERE SYSTEMS, INC. | | | | | | | | |
| | 1/15/2002 | 200201 | | TRT / P | Cytec Industries | | | 66,826.99 | |
| | TRANSFER FUNDS FROM SUB ACCT# 1301 TO #1305 | | | | | | | | |
| | 1/15/2002 | 200201 | | CH / P | PNC BANK, N.A. | | | (404,964.26) | |
| | PAID PNC BANK, N.A. FOR BANK CHECK TO EPA HAZARDOUS SUBSTANCE SUPERFUND FOR EPA FUTURE RESPONSE COSTS INV. DATED 1/18/01 COVERING 11/18/98 THROUGH 9/30/00.  CK#53824 | | | | | | | | |
| | 3/4/2002 | 200203 | | CR / P | Worthington Industries | | | 28,178.11 | |
| | DEPOSIT CHECK FROM WORTHINGTON IND. | | | | | | | | |
| | 3/15/2002 | 200203 | | CR / P | FIRST NATIONAL TRUST COMPANY | | | 28,178.11 | |
| | DEPOSIT CK#720000205 FROM FIRST NATIONAL TRUST COMPANY FOR PAYMENT OF EPA INVOICE | | | | | | | | |
| | 4/5/2002 | 200204 | | CH / P | PNC BANK | | | (10,688.48) | |
| | PAID PNC BANK FOR BANK CHECK PAYABLE TO EPA HAZARDOUS SUBSTANCE SUPERFUND FOR REMAINING DISPUTED PORTION OF 1/18/01 FUTURE RESPONSE COSTS INVOICE.  CK#54120 | | | | | | | | |
| | 4/25/2002 | 200204 | | CR / P | CHASE BANK OF TEXAS | | | 1,750,000.00 | |
| | DEPOSIT CHECK FROM CHASE BANK OF TEXAS | | | | | | | | |
| | 5/8/2002 | 200205 | | CR / P | SPS TECHNOLOGIES | | | 1,750,000.00 | |
| | DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | | | | |

Page: 18

PHKS 071259

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:38 PM

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

Client
Matter
Trust

**Pitney, Hardin, Kipp & Szuch, LLP**
**Trust Subsidiary Report**
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT
Req'd By: Brulnooge, S.
Report: TRST03./C

| Acct Num Date | Period | Opening Employee Tran/Amt Type | Payor/Payee | Bill Tkpr Bank | Resp Tkpr Acct Type | Opening | Activity Amt | Ending |
|---|---|---|---|---|---|---|---|---|
| 5/30/2002 | 200205 | CR / P | FORD MOTOR COMPANY CENTRAL | | | | 15,750.00 | |
| DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES | | | | | | | | |
| 5/31/2002 | 200205 | CR / P | SPS TECHNOLOGIES | | | | 15,750.00 | |
| DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | | | | |
| 6/10/2002 | 200206 | CR / P | CYTEC INDUSTRIES | | | | 1,750,000.00 | |
| W/T INTO PNCIO FROM CITIBANK FOR CYTEC INDUSTRIES T/S#23469 | | | | | | | | |
| 6/10/2002 | 200206 | CR / P | SMITH INDUSTRIES, INC. | | | | 1,778,178.11 | |
| W/T INTO PNCIO FROM FIRST UNION FOR SMITH INDUSTRIES, INC. REF: BOARHEAD T/S#5678 | | | | | | | | |
| 6/11/2002 | 200206 | CR / P | FORD MOTOR COMPANY CENTRAL | | | | 7,800.00 | |
| DEPOSIT CHECK FROM FORD MOTOR COMPANY CENTRAL ACCOUNTING SERVICES | | | | | | | | |
| 6/12/2002 | 200206 | CH / P | EPA | | | | (7,000,000.00) | |
| W/T FROM PNCIO TO EPA AT TREASURY NYC, DEPT. OF JUSTICE. ABA#021030004. T/S#19755 | | | | | | | | |
| 6/17/2002 | 200206 | CH / P | PNC BANK. | | | | (62,962.06) | |
| PAID PNC BANK FOR CASHIERS CHECK PAYABLE TO EPA - HAZARDOUS SUBSTANCE SUPERFUND FOR 5/13/02 INVOICE ON PAST COSTS. CK#54436 | | | | | | | | |
| 6/17/2002 | 200206 | CR / P | Cytec Industries Inc. | | | | 7,800.00 | |
| DEPOSIT CHECK FROM CYTEC INDUSTRIES, INC. | | | | | | | | |
| 6/17/2002 | 200206 | CR / P | Cytec Industries Inc. | | | | 15,750.00 | |
| DEPOSIT CHECK FROM CYTEC INDUSTRIES, INC. | | | | | | | | |
| 6/18/2002 | 200206 | CR / P | SMITHS GROUP NORTH AMERICA, I | | | | 2,600.00 | |
| DEPOSIT CHECK FROM SMITHS GROUP NORTH AMERICA, INC. | | | | | | | | |
| 6/18/2002 | 200206 | CR / P | SMITHS GROUP NORTH AMERICA, I | | | | 15,750.00 | |
| DEPOSIT CHECK FROM SMITHS GROUP NORTH AMERICA, INC. | | | | | | | | |
| 6/25/2002 | 200206 | CR / P | SPS TECHNOLOGIES | | | | 7,800.00 | |
| DEPOSIT CHECK FROM SPS TECHNOLOGIES | | | | | | | | |
| 6/26/2002 | 200206 | TRT / P | Cytec Industries | | | | (37.94) | |
| TRANSFER FROM #1305 (EPA REIMB.) TO #1306 (OU-2 EPA REIMB.) | | | | | | | | |

PHKS 071260

Today: 9/19/2002
Started: 12:37 PM
Printed: 12:38 PM

Pitney, Hardin, Kipp & Szuch, LLP
Trust Subsidiary Report
From Date 11/1/1999 To Date 9/19/2002

Parameter Set: CLIMAT
Report: TRST03JC
Req'd By: Bruinooge, S.

Client
Matter
Trust

X (G) General
X (I) Invested
X (B) Blended
X (A) Available

| Acct Num | Opening Employee | Bill Tkpr / Bank | Resp Tkpr / Acct Type | | | |
|---|---|---|---|---|---|---|
| Date | Period | Tran/Amt Type | Payor/Payee | Opening | Activity Amt | Ending |
| 7/9/2002 | 200207 | CH /P | PNC BANK | | (38,993.30) | |
| | | | PAID PNC BANK FOR CASHIER'S CHECK PAYABLE TO EPA HAZARDOUS SUBSTANCE SUPERFUND FOR PEA FUTURE RESPONSE COSTS FROM 10/2/00 - 9/30/01. CK#54536 | | | |
| 7/31/2002 | 200207 | CR /P | AGERE SYSTEMS, INC. | | 7,800.00 | |
| | | | DEPOSIT CHECK FROM AGERE SYSTEMS, INC. | | | |
| 8/27/2002 | 200208 | CR /P | FIRST NATIONAL TRUST COMPANY | | 2,600.00 | |
| | | | DEPOSIT CK#7200005320 FROM 1ST NATL TRUST CO FOR OU-1 FUTURE RESPONSE COSTS | | | |
| | | | Trust 1305 Totals: | $0.00 | 71,252.55 | $71,252.55 |

1306    OU-2 EPA REIMBURSEMENT

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/26/2002 | 200206 | 159DWP Payne, D. | PNCIO | G | | |
| | | TRT /P | Cytec Industries | | 37.94 | |
| | | | TRANSFER FROM #1305 (EPA REIMB.) TO #1306 (OU-2 EPA REIMB.) | | | |
| | | | Trust 1306 Totals: | $0.00 | 37.94 | $37.94 |
| | | | Matter 075765 Totals: | $0.00 | $544,782.68 | $544,782.68 |
| | | | Client 011938 Totals: | $0.00 | $544,782.68 | $544,782.68 |
| | | | Report Totals: | $0.00 | $544,782.68 | $544,782.68 |

PHKS 071261

**PITNEY, HARDIN, KIPP & SZUCH** LLP
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945
(973)966-6300

TAX I.D. NO. 22-1661404

CYTEC INDUSTRIES
Attn: David W. Payne
c/o Pitney Hardin Kipp & Szuch
200 Campus Drive
Florham Park, NJ  07932

September 2, 2002

STATEMENT OF ACCOUNT

Our Matter:  Boarhead Farm Superfund Site Common Disbursements
Our Matter No.:  011938.075765
Billing Attorney ID: 159DWP

| Invoice Number | Original Inv. Amount | Invoice Date | Payments and Credits | Invoice Balance Due |
|---|---|---|---|---|
| 1947584 | 13,434.48 | 01/25/01 | 9,388.82 | 4,045.66 |
| 1949869 | 7,522.89 | 02/27/01 | 5,423.05 | 2,099.84 |
| 1952088 | 17,202.80 | 03/21/01 | 11,999.61 | 5,203.19 |
| 1956974 | 20,418.06 | 05/16/01 | 13,639.14 | 6,778.92 |
| 1962600 | 5,486.70 | 07/20/01 | 2,049.38 | 3,437.32 |
| 1964915 | 1,687.80 | 08/21/01 | 0.00 | 1,687.80 |

THIS STATEMENT REFLECTS BILLINGS AND PAYMENTS THROUGH SEPTEMBER 1, 2002.

PHKS 071262

**PITNEY, HARDIN, KIPP & SZUCH** LLP
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945
(973)966-6300

TAX I.D. NO. 22-1661404

| | | | | |
|---|---|---|---|---|
| 1968462 | 7,477.97 | 09/28/01 | 0.00 | 7,477.97 |
| 1971177 | 1,289.81 | 10/30/01 | 0.00 | 1,289.81 |
| 1975878 | 13,123.39 | 12/17/01 | 0.00 | 13,123.39 |
| 1978016 | 4,293.81 | 01/17/02 | 0.00 | 4,293.81 |
| 1979659 | 10,929.46 | 02/05/02 | 0.00 | 10,929.46 |
| 1984814 | 1,549.57 | 03/27/02 | 0.00 | 1,549.57 |
| 1989892 | 12,317.68 | 05/24/02 | 0.00 | 12,317.68 |
| 1992734 | 9,236.02 | 06/26/02 | 0.00 | 9,236.02 |
| 1995747 | 10,262.03 | 07/30/02 | 0.00 | 10,262.03 |

Matter Balance Due    93,732.47

THIS STATEMENT REFLECTS BILLINGS AND PAYMENTS THROUGH SEPTEMBER 1, 2002.

# PITNEY, HARDIN, KIPP & SZUCH LLP
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945
(973)966-6300

TAX I.D. NO. 22-1661404

CYTEC INDUSTRIES
Attn: David W. Payne
c/o Pitney Hardin Kipp & Szuch
200 Campus Drive
Florham Park, NJ   07932

August 1, 2002

STATEMENT OF ACCOUNT

Our Matter:  Boarhead Farm Superfund Site Common Disbursements
Our Matter No.:  011938.075765
Billing Attorney ID: 159DWP

| Invoice Number | Original Inv. Amount | Invoice Date | Payments and Credits | Invoice Balance Due |
|---|---|---|---|---|
| 1947584 | 13,434.48 | 01/25/01 | 9,388.82 | 4,045.66 |
| 1949869 | 7,522.89 | 02/27/01 | 5,423.05 | 2,099.84 |
| 1952088 | 17,202.80 | 03/21/01 | 11,999.61 | 5,203.19 |
| 1956974 | 20,418.06 | 05/16/01 | 13,639.14 | 6,778.92 |
| 1962600 | 5,486.70 | 07/20/01 | 2,049.38 | 3,437.32 |
| 1964915 | 1,687.80 | 08/21/01 | 0.00 | 1,687.80 |

THIS STATEMENT REFLECTS BILLINGS AND PAYMENTS THROUGH JULY 31, 2002.

PHKS 071264

# PITNEY, HARDIN, KIPP & SZUCH LLP
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945
(973)966-6300

TAX I.D. NO. 22-1661404

| | | | | |
|---|---|---|---|---|
| 1968462 | 7,477.97 | 09/28/01 | 0.00 | 7,477.97 |
| 1971177 | 1,289.81 | 10/30/01 | 0.00 | 1,289.81 |
| 1975878 | 13,123.39 | 12/17/01 | 0.00 | 13,123.39 |
| 1978016 | 4,293.81 | 01/17/02 | 0.00 | 4,293.81 |
| 1979659 | 10,929.46 | 02/05/02 | 0.00 | 10,929.46 |
| 1984814 | 1,549.57 | 03/27/02 | 0.00 | 1,549.57 |
| 1989892 | 12,317.68 | 05/24/02 | 0.00 | 12,317.68 |
| 1992734 | 9,236.02 | 06/26/02 | 0.00 | 9,236.02 |
| 1995747 | 10,262.03 | 07/30/02 | 0.00 | 10,262.03 |

Matter Balance Due    93,732.47

THIS STATEMENT REFLECTS BILLINGS AND PAYMENTS THROUGH JULY 31, 2002.

PHKS 071265

9/19/2002
11:53 AM
Period:  200209

Pilney, Hardin, Kipp & Szuch LLP
OUTSTANDING INVOICE REPORT

Report:   PHOIR

| Client Matter | Client Name Matter Name | Invoice Number | Invoice Date | ORIGINAL AMT. OF INV. | Fee Balance | COST BALANCE | LATE CHARGES | OTHER BALANCE | INVOICE BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| Payne, D. | | | | | | | | | |
| 011938 | CYTEC INDUSTRIES | | | | | | | | |
| 075765 | Boarhead Farm Superfund 159DWP | 1947584 | 1/25/2001 | 13,434.48 | 4,045.66 | 0.00 | 0.00 | 0.00 | 4,045.66 |
| 075765 | Boarhead Farm Superfund 159DWP | 1949869 | 2/27/2001 | 7,522.89 | 2,099.84 | 0.00 | 0.00 | 0.00 | 2,099.84 |
| 075765 | Boarhead Farm Superfund 159DWP | 1952088 | 3/21/2001 | 17,202.80 | 5,203.19 | 0.00 | 0.00 | 0.00 | 5,203.19 |
| 075765 | Boarhead Farm Superfund 159DWP | 1956974 | 5/16/2001 | 20,418.06 | 6,778.92 | 0.00 | 0.00 | 0.00 | 6,778.92 |
| 075765 | Boarhead Farm Superfund 159DWP | 1962600 | 7/20/2001 | 5,486.70 | 3,437.32 | 0.00 | 0.00 | 0.00 | 3,437.32 |
| 075765 | Boarhead Farm Superfund 159DWP | 1964915 | 8/21/2001 | 1,687.80 | 1,622.50 | 65.30 | 0.00 | 0.00 | 1,687.80 |
| 075765 | Boarhead Farm Superfund 159DWP | 1968462 | 9/28/2001 | 7,477.97 | 7,205.00 | 272.97 | 0.00 | 0.00 | 7,477.97 |
| 075765 | Boarhead Farm Superfund 159DWP | 1971177 | 10/30/2001 | 1,289.81 | 1,215.00 | 74.81 | 0.00 | 0.00 | 1,289.81 |
| 075765 | Boarhead Farm Superfund 159DWP | 1975878 | 12/17/2001 | 13,123.39 | 12,828.00 | 295.39 | 0.00 | 0.00 | 13,123.39 |
| 075765 | Boarhead Farm Superfund 159DWP | 1978016 | 1/17/2002 | 4,293.81 | 4,095.00 | 198.81 | 0.00 | 0.00 | 4,293.81 |
| 075765 | Boarhead Farm Superfund 159DWP | 1979659 | 2/5/2002 | 10,929.46 | 9,828.50 | 1,100.96 | 0.00 | 0.00 | 10,929.46 |
| 075765 | Boarhead Farm Superfund 159DWP | 1984814 | 3/27/2002 | 1,549.57 | 1,215.00 | 334.57 | 0.00 | 0.00 | 1,549.57 |
| 075765 | Boarhead Farm Superfund 159DWP | 1989892 | 5/24/2002 | 12,317.68 | 9,932.50 | 2,385.18 | 0.00 | 0.00 | 12,317.68 |
| 075765 | Boarhead Farm Superfund 159DWP | 1992734 | 6/26/2002 | 9,236.02 | 8,586.00 | 650.02 | 0.00 | 0.00 | 9,236.02 |
| 075765 | Boarhead Farm Superfund 159DWP | 1995747 | 7/30/2002 | 10,262.03 | 4,772.50 | 5,489.53 | 0.00 | 0.00 | 10,262.03 |
| | Total:   Boarhead Farm Superfund Site Common Disb | | | $136,232.47 | $82,864.93 | $10,867.54 | $0.00 | $0.00 | $93,732.47 |
| | Total:   CYTEC INDUSTRIES | | | $136,232.47 | $82,864.93 | $10,867.54 | $0.00 | $0.00 | $93,732.47 |
| Total:  Payne, D. | | | | $136,232.47 | $82,864.93 | $10,867.54 | $0.00 | $0.00 | $93,732.47 |

PHKS 071266

9/19/2002
11:53 AM
Period:  200209

Pitney, Hardin, Kipp & Szuch LLP
OUTSTANDING INVOICE REPORT

Report:     PHOIR

| Client | Client Name | Invoice | Invoice Date | ORIGINAL | Fee Balance | COST | LATE | OTHER | INVOICE |
|--------|-------------|---------|--------------|----------|-------------|------|------|-------|---------|
| Matter | Matter Name | Number | | AMT. OF INV. | | BALANCE | CHARGES | BALANCE | BALANCE |
| | Report Total: | | | $136,232.47 | $82,864.93 | $10,867.54 | $0.00 | $0.00 | $93,732.47 |

Page:  2

PHKS 071267

9/20/2002
9:04 AM
Period: 200209

Pitney, Hardin, Kipp & Szuch LLP
OUTSTANDING INVOICE REPORT

Report:   PHOIR

| Client<br>Matter | Client Name<br>Matter Name | | Invoice<br>Number | Invoice Date | ORIGINAL<br>AMT. OF INV. | Fee Balance | COST<br>BALANCE | LATE<br>CHARGES | OTHER<br>BALANCE | INVOICE<br>BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|
| Donovan, C. | | | | | | | | | | |
| 011938 | CYTEC INDUSTRIES | | | | | | | | | |
| 090936 | Carteret Impounds | 158CRD | 1999219 | 9/11/2002 | 118.00 | 118.00 | 0.00 | 0.00 | 0.00 | 118.00 |
| Total: | Carteret Impounds | | | | $118.00 | $118.00 | $0.00 | $0.00 | $0.00 | $118.00 |
| 075148 | Warners Plant | 158CRD | 1999215 | 9/11/2002 | 452.44 | 442.50 | 9.94 | 0.00 | 0.00 | 452.44 |
| Total: | Warners Plant | | | | $452.44 | $442.50 | $9.94 | $0.00 | $0.00 | $452.44 |
| Total: | CYTEC INDUSTRIES | | | | $570.44 | $560.50 | $9.94 | $0.00 | $0.00 | $570.44 |
| Total: | Donovan, C. | | | | $570.44 | $560.50 | $9.94 | $0.00 | $0.00 | $570.44 |

Page: 1

PHKS 071268

9/20/2002
9:04 AM
Period:   200209

Pitney, Hardin, Kipp & Szuch LLP
OUTSTANDING INVOICE REPORT

Report:    PHOIR

| Client<br>Matter | Client Name<br>Matter Name | Invoice<br>Number | Invoice Date | ORIGINAL<br>AMT. OF INV. | Fee Balance | COST<br>BALANCE | LATE<br>CHARGES | OTHER<br>BALANCE | INVOICE<br>BALANCE |
|---|---|---|---|---|---|---|---|---|---|
| | Report Total: | | | $511,783.85 | $420,239.18 | $49,044.67 | $0.00 | $0.00 | $469,283.85 |

Page:   3

PHKS 071270