# EXHIBIT H

FILE COPY

# PITNEY, HARDIN, KIPP & SZUCH LLP
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945

TAX I.D. NO. 22-1661404

Cytec Industries
5 Garret Mountain Plaza
West Paterson, NJ  07424
Attn: Thomas A. Waldman, Esq.

Invoice 1933570
011938.075765

July 26, 2000

---

TO PROFESSIONAL SERVICES RENDERED

For services rendered and engagement costs incurred through June 30, 2000.

In connection with Boarhead Farm Superfund Site common disbursements, as described in deatial on the attached printout.

Billing Summary

| Attorney | Level | Hours | Rate | Dollars |
|----------|-------|-------|------|---------|
| D. Payne | Partner | 15.0 | 255 | 3,825.00 |
| C. Trinkle | Associate | 36.4 | 190 | 6,916.00 |
| TOTAL | | 51.4 | | 10,741.00 |

| | | |
|---|---|---|
| IN ALL FOR SERVICES RENDERED | $ | 10,741.00 |
| ENGAGEMENT COSTS | $ | 435.64 |
| TOTAL AMOUNT DUE | $ | 11,176.64 |

PHKS 071973

FILE COPY

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

| Date | Narrative<br>Timekeeper | Hours |
|------|-------------------------|-------|
| 06/01/00 | Telephone conference with Mr. Batson of EPA concerning upcoming PRP meeting. Preparation for same. Drafting of e-mail to Mr. Batson concerning same. Office conferences with M. Moore and D. Payne concerning outstanding FOIA issues. Drafting of e-mail to M. Moore concerning same.<br>C. Trinkle | 1.20 hrs. |
| 06/02/00 | Drafting of e-mail to Ms. Keating of EPA concerning Special Notice parties. Preparation of documents for upcoming PRP Group meeting.<br>C. Trinkle | 1.50 hrs. |
| 06/05/00 | Prepare agenda for Group meeting; prepare budget for task list.<br>D. Payne | 1.70 hrs. |
| 06/05/00 | Continued preparation of documents for upcoming PRP Group meeting. Telephone conference with Mr. Seibel of de maximis concerning cash flow projection, outstanding invoices, and OU-2 draft design. Drafting of lengthy e-mail to D. Payne concerning same. Telephone conference with D. Payne concerning same.<br>C. Trinkle | 3.50 hrs. |
| 06/07/00 | Read e-mail from S. Keating regarding General Ceramics.<br>D. Payne | 0.10 hrs. |
| 06/07/00 | Research concerning new EPA guidance with respect to calculation of indirect costs. Telephone conference with D. Payne concerning same. Telephone conference with Ms. Keating of EPA concerning same. Preparation of invoices for third technical assessment. Telephone conference with Mr. Seibel of de maximis concerning payment of outstanding invoices. Review of invoices. Drafting of correspondence to Mr. Seibel concerning payment. Drafting of lengthy memorandum summarizing outcome of PRP Group meeting. Revision of Eckenfelder contract to reflect discussions at PRP Group meeting.<br>C. Trinkle | 6.00 hrs. |
| 06/09/00 | Revision of Eckenfelder contract to incorporate comments received at recent group meeting. Office conference with D. Payne concerning same. Drafting | |

FILE COPY

Client:   CYTEC INDUSTRIES
Matter:   Boarhead Farm Superfund Site Common
          Disbursements

          of e-mail to Mr. DiPippo of Eckenfelder concerning
          same.  Telephone conference with counsel for
          Worthington concerning past cost issues.  Drafting of
          e-mail to same concerning same.  Drafting of e-mail
          to D. Payne concerning same.
          C. Trinkle                          0.80 hrs.

06/13/00  Office conference with D. Payne concerning
          preparations for upcoming group meeting.  Preparation
          of documents for same.  Telephone conferences with
          counsel for SPS concerning upcoming conference call
          with respect to past cost issues.  Drafting of e-
          mails to group concerning same and concerning
          upcoming group meeting.
          C. Trinkle                          1.30 hrs.

06/14/00  Office conference with D. Payne concerning
          preparations for upcoming group meeting.  Telephone
          conference with Mr. DiPippo of Eckenfelder concerning
          remaining contract issues.  Review of e-mail from
          same concerning same.  Revision of contract to
          incorporate same.
          C. Trinkle                          0.50 hrs.

06/15/00  Preparation of documents for upcoming group meeting.
          Office conference with D. Payne concerning same.
          C. Trinkle                          0.40 hrs.

06/17/00  Send J. Barkett Protocols to Boarhead Farm Group;
          schedule conference call of  Group; forward e-mail
          history of  Site operations to Barkett.
          D. Payne                            0.80 hrs.

06/19/00  Drafting of correspondence to Mr. Barkett concerning
          executed retainer agreement.  Telephone conference
          with Ms. Keating of EPA concerning Special Notice
          issues.  Review of fax from same concerning same.
          Office conference with D. Payne concerning same.
          Telephone conference with counsel for Ford concerning
          upcoming conference call and meeting schedule.
          Review of PRP Group Agreement and Agreement in
          Principle for purposes of merging same.
          C. Trinkle                          3.10 hrs.

06/20/00  Continued review and revision of PRP Group Agreement
          and Agreement in Principle for purposes of merging
          same.
          C. Trinkle                          1.90 hrs.

06/21/00  Review of file for information concerning AETC
          corporate successor information.  Research concerning
          same.  Office conferences with D. Payne concerning

FILE COPY

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

            same.  Telephone conference with Ms. Keating of EPA
            concerning same and other Special Notice letter
            issues.  Drafting of fax to same concerning Merit
            Metals corporate successor issues.  Drafting of e-
            mail to counsel for Ford concerning same.  Review of
            file for information concerning same.
            C. Trinkle                          3.00 hrs.

06/22/00    Review of e-mail from counsel for Ford concerning
            corporate successor issues.  Office conference with
            D. Payne concerning obtaining CRIS search information
            on potential new PRPs, possible interview with Bruce
            DeRewal, and AETC corporate successor issues.
            Research concerning current whereabouts of Bruce
            DeRewal.  Research concerning possible corporate
            successors to AETC.
            C. Trinkle                          1.50 hrs.

06/26/00    Drafting of e-mail to counsel for Ford concerning
            Special Notice letter issues.  Review of fax from
            same concerning same.  Drafting of fax to Ms. Keating
            of EPA concerning same.  Office conference with D.
            Payne concerning proposed new process for approval of
            de maximis invoices.  Drafting of e-mail to Cytec and
            Ford concerning same.  Drafting of e-mail to group
            concerning execution of Eckenfelder contract.
            Drafting of e-mail to counsel for Worthington
            concerning execution of Bigler contract.  Drafting of
            correspondence to Eckenfelder and Bigler concerning
            payment of invoices.  Attention to same.
            C. Trinkle                          3.30 hrs.

06/27/00    Review e-mail from G. Seibel regarding stalemate over
            discharge limits; read e-mail from Seibel to Harper;
            call with Seibel; call with S. Keating; e-mail to C.
            Trinkle regarding conference call.
            D. Payne                            1.40 hrs.

06/27/00    Drafting of e-mail to D. Payne concerning upcoming
            group conference calls.  Continuing revisions to
            merge group agreements.
            C. Trinkle                          0.50 hrs.

06/28/00    e-mail to S. Keating; call from Keating and Harper
            regarding discharge limits; conference call with
            Harper, Keating and Seibel regarding same; call with
            Seibel; review administrative consent order, consent
            decree and remedial design schedule; read e-mail from
            Seibel to State and EPA regarding residential well
            cleanout; e-mail to Boarhead Farm Group regarding
            status on discharge limit issue; call with S. Keating

PHKS 071976

FILE COPY

Client:   CYTEC INDUSTRIES
Matter:   Boarhead Farm Superfund Site Common
          Disbursements

             regarding Special Notice letter draft.
             D. Payne                          4.80 hrs.

06/28/00   Telephone conference with Division of Law concerning
           obtaining CRIS search results.  Telephone conference
           with Mr. Barkett concerning upcoming conference call.
            Continued revision and merger of group agreements.
           Office conferences with D. Payne concerning same.
           C. Trinkle                          2.50 hrs.

06/29/00   Read e-mail from G. Seibel regarding discharge
           limits; several calls with Seibel regarding issues
           and strategy vis-a-vis EPA and State; read e-mail
           from DiPippo; read his draft letter to DEP; read
           lengthy e-mail from Seibel.
           D. Payne                            2.20 hrs.

06/29/00   Further revision of merged group agreement.  Office
           conference with D. Payne concerning same.  Drafting
           of correspondence to Bigler concerning payment of
           invoice.  Attention to same. Drafting of e-mail to D.
           Payne concerning same.  Drafting of e-mails to group
           and to Mr. Batson of EPA and Mr. Barkett concerning
           upcoming conference calls.
           C. Trinkle                          1.60 hrs.

06/30/00   Review letter to DEP and provide comments to G.
           Seibel; several telephone conversations with Seibel;
           read DMR letter to DEP and provide comments to G.
           Seibel; prepare budget for Boarhead Farm Liaison
           Counsel activities; review and revise, merged Group
           agreements.
           D. Payne                            4.00 hrs.

06/30/00   Review of consent decree and AOC.  Revision of
           deliverables timeline to incorporate additional
           information.  Attention to trust account
           administration.  Review and revision of task list.
           Final revision of merged group agreement document.
           C. Trinkle                          3.80 hrs.

Billing Summary

Attorney                          Hours

D. Payne                           15.0
C. Trinkle                         36.4
                                  _____
                     TOTAL         51.4

ENGAGEMENT COSTS

FILE COPY

| | | | |
|---|---|---|---|
| 06/02/00 | PD UPS TO WEST PATERSON; DWP; CK# 210855 | $ | 7.80 |
| 06/07/00 | PD UPS TO ALLENTOWN PA; CAT; CK# 211239 | $ | 9.80 |
| Computer Assisted Research | | $ | 87.12 |
| Duplicating | | $ | 290.60 |
| Postage | | $ | 4.40 |
| Telephone | | $ | 35.92 |
| | | | |
| TOTAL ENGAGEMENT COSTS | | $ | 435.64 |

PHKS 071978

**PITNEY, HARDIN, KIPP & SZUCH LLP**
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945

TAX I.D. NO. 22-1661404

Cytec Industries
5 Garret Mountain Plaza
West Paterson, NJ  07424
Attn: Thomas A. Waldman, Esq.

Invoice 1945246
011938.075765

December 13, 2000

---

TO PROFESSIONAL SERVICES RENDERED

For services rendered and engagement costs
incurred through November 30, 2000.

In connection with Boarhead Farm Superfund
Site common disbursements, as described in
deatial on the attached printout.

| | | |
|---|---|---|
| IN ALL FOR SERVICES RENDERED | $ | 19,322.00 |
| ENGAGEMENT COSTS | $ | 1,200.81 |
| TOTAL INVOICE BALANCE DUE | $ | 20,522.81 |

PHKS 071913

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

| Date | Narrative Timekeeper | Hours |
|------|----------------------|-------|
| 09/06/00 | Call From G. Harris (Elf Atochem) re 104(e) letter; provide status of matter. <br> D. Payne | 0.40 hrs. |
| 09/21/00 | Call with Keating re status; email to Group providing status. <br> D. Payne | 0.50 hrs. |
| 09/25/00 | Call to Keating re status. <br> D. Payne | 0.10 hrs. |
| 09/26/00 | Several calls from Keating re indirect cost issue; call to N. Wise; read EPA guidance on enforcement discretion <br> D. Payne | 1.50 hrs. |
| 09/27/00 | Lengthy call with Neil Wise regarding offer letter requirements; gather material to draft letter. <br> D. Payne | 1.30 hrs. |
| 09/28/00 | Draft offer letter to EPA; forward same to Group; several calls with N. Wise. <br> D. Payne | 3.50 hrs. |
| 09/29/00 | Work on offer letter to EPA, take comments from Group; numerous emails and conversations with N. Wise; finalize letter offer. <br> D. Payne | 3.00 hrs. |
| 11/01/00 | Prepare documents for file review. Update index. Confer with C. Trinkle re: same. <br> S. Evans | 1.60 hrs. |
| 11/01/00 | Read e-mail from counsel for Merit Metals; call to S Keating re OS memo status. <br> D. Payne | 0.20 hrs. |
| 11/01/00 | Telephone conference with counsel for Van Waters & Rogers concerning scheduling document reviews. Office conference with S. Evans concerning same. <br> C. Trinkle | 0.40 hrs. |
| 11/01/00 | Review of Polyrez, Textile Chemical, and Southern California 104(e) responses received from EPA. Office conference with D. Payne concerning same. Review of file documents related to same. Extensive research in connection with orphan share submission. Office conference with D. Payne concerning same. Preparation of documents in support of same. | |

PHKS 071914

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

            C. Trinkle                              6.80 hrs.

11/01/00    Drafting of e-mails to group concerning orphan share
            nexus summaries and 104(e) responses received from
            EPA.
            C. Trinkle                              0.30 hrs.

11/01/00    Research on Manfred T DeRewal/Boarhead Corp/Derewal
            Chemical/Environmental Chemical Control assets
            (Trinkle)
            J. von Schrader                         1.00 hrs.

11/02/00    Organization of  files in conference room in
            preparation for document review.
            S. Evans                                0.80 hrs.

11/02/00    Several calls with S. Keating regarding orphan share
            issue; e-mail to BFG regarding same.
            D. Payne                                0.70 hrs.

11/02/00    Continued research in connection with orphan share
            submission.  Drafting of argument concerning
            owner/operator share of liability.  Office
            conferences with D. Payne concerning same.  Drafting
            of e-mail to counsel for Ford and counsel for SPS
            concerning same.  Telephone conferences with Mr.
            Seibel of de maximis concerning benzene hot spot
            costs as related to Haven orphan share.  Review of e-
            mails from same concerning same.
            C. Trinkle                              6.40 hrs.

11/02/00    Drafting of e-mail to group concerning owner/operator
            orphan share argument.
            C. Trinkle                              0.30 hrs.

11/03/00    Oversee document review.
            S. Evans                                0.70 hrs.

11/03/00    Call with G. Thomas regarding DEP meeting; call with
            L. Wright regarding Cartech; call with S. Schmidt
            regarding ATP issues.
            D. Payne                                2.20 hrs.

11/03/00    Research concerning allocated percentages of
            transporter liability.  Drafting of orphan share
            argument incorporating same.  Office conferences with
            D. Payne concerning same.  Drafting of orphan share
            argument concerning insolvency of Manfred DeRewal and
            Boarhead Corporation.  Telephone conference with
            counsel for Lucent concerning Sylvan nexus summary.
            Revision of same to incorporate comments.
            C. Trinkle                              5.30 hrs.

PHKS 071915

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

11/03/00   Attention to document review by counsel for Van Water
           & Rogers.
           C. Trinkle                           0.30 hrs.

11/06/00   Call with S. Keating on orphan share memo; e-mail to
           Keating with list of company candidates for orphan
           share funding.
           D. Payne                             0.50 hrs.

11/06/00   Review of e-mails from D. Payne concerning draft
           orphan share submission.  Office conference with D.
           Payne concerning same.  Revision of same to
           incorporate comments.  Telephone conference with
           counsel for SPS concerning same.  Incorporation of
           comments from same.  Preparation of supporting
           documentation for same.
           C. Trinkle                           2.80 hrs.

11/06/00   Drafting of e-mail to group concerning revised orphan
           share submission.
           C. Trinkle                           0.10 hrs.

11/07/00   Telephone conference with counsel for Len Sayles and
           Len Wolberg concerning Barsum deposition transcript.
           C. Trinkle                           0.10 hrs.

11/07/00   Telephone conference with counsel for Worthington
           concerning proposed changes to draft orphan share
           submission.  Office conference with D. Payne
           concerning same.  Revision of submission to
           incorporate comments.
           C. Trinkle                           2.30 hrs.

11/08/00   Telephone conference with counsel for Carpenter
           Technologies concerning review of documents.
           Telephone conference with S. Evans concerning same.
           C. Trinkle                           0.20 hrs.

11/08/00   Telephone conferences with counsel for SPS concerning
           follow-up meeting with new Special Notice parties.
           Telephone conferences with Mr. Batson of EPA
           concerning same.   Telephone conference with counsel
           for Worthington concerning same and response to
           counteroffer.  Organization of conference call
           portion of same. Preparation of documents for same.
           C. Trinkle                           1.60 hrs.

11/10/00   Prepare and send documents requested by D. Isabel.
           Confer with C. Trinkle re: same.
           S. Evans                             1.00 hrs.

11/10/00   Drafting of e-mail to group concerning scheduling of
           conference call to form response to Special Notice

Client:   CYTEC INDUSTRIES
Matter:   Boarhead Farm Superfund Site Common
          Disbursements

          parties' counteroffer.
          C. Trinkle                            0.10 hrs.

11/10/00  Drafting of fax to group concerning Sykes litigation
          over new indirect cost policy.
          C. Trinkle                            0.20 hrs.

11/13/00  Oversee document review of  Dave O'Brien.  Confer
          with C. Trinkle.
          S. Evans                              2.30 hrs.

11/13/00  Telephone conference with counsel for Handy & Harman
          concerning scheduling review of documents.  Telephone
          conferences with S. Evans concerning same.
          C. Trinkle                            0.30 hrs.

11/13/00  Attention to review of documents by counsel for
          Quikline.  Office conferences with S. Evans
          concerning same.  Preparation for upcoming reviews by
          counsel for Carpenter Technologies and Plymouth Tube.
          C. Trinkle                            1.00 hrs.

11/13/00  Telephone conference with D. Payne concerning
          response to Special Notice parties' counteroffer.
          Drafting of spreadsheet showing various payment
          scenarios.
          C. Trinkle                            1.10 hrs.

11/14/00  Oversee document review of Dave O'Brien and Steve
          Lemon, and Lynn Wright.   Confer with C. Trinkle.
          S. Evans                              2.80 hrs.

11/14/00  Several conversations with Lynn Wright (counsel for
          CT); several conversations with S. Lemon (counsel for
          Plymouth Tube) regarding site history and liability.
          D. Payne                              2.00 hrs.

11/14/00  Drafting of e-mails to group concerning new Special
          Notice parties' counteroffer and concerning upcoming
          conference call to discuss same.
          C. Trinkle                            0.20 hrs.

11/14/00  Attention to document review by counsel for Quikline,
          counsel for Plymouth Tube, and counsel for Carpenter
          Technologies.
          C. Trinkle                            1.90 hrs.

11/14/00  Revision of spreadsheets for use in responding to new
          Special Notice parties' counteroffer.
          C. Trinkle                            0.40 hrs.

11/14/00  Drafting of e-mail to D. Payne concerning status of
          various contracts.

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

            C. Trinkle                    0.10 hrs.

11/15/00    Oversee document review of Lynn Wright and Steve
            Lemon.  Confer with C. Trinkle.
            S. Evans                      1.60 hrs.

11/15/00    Work with CT on possible options for response to SN
            Group; call with D. Batson re his impressions of
            getting larger group together.
            D. Payne                      1.80 hrs.

11/15/00    Attention to document review conducted by counsel for
            Carpenter Technologies and counsel for Plymouth Tube.
            C. Trinkle                    0.60 hrs.

11/15/00    Office conference with D. Payne concerning draft
            spreadsheet showing possible responses to new Special
            notice parties' counteroffer.  Telephone conference
            with Mr. Seibel of de maximis concerning cost
            assumption incorporated into same.
            C. Trinkle                    1.30 hrs.

11/15/00    Telephone conference with counsel for SPS concerning
            new Special Notice parties and negotiations with
            same.
            C. Trinkle                    0.30 hrs.

11/15/00    Review of monthly report and other technical
            correspondence from Mr. Seibel of de maximis.
            C. Trinkle                    0.40 hrs.

11/16/00    Oversee document review of Mark Sweitzer.
            Organization of documents tagged for copying.  Confer
            with C. Trinkle.
            S. Evans                      1.80 hrs.

11/16/00    Drafting of correspondence to de maximis,
            Eckenfelder/Brown & Caldwell, and Bigler concerning
            payment of outstanding invoices.  Attention to
            accounting issues relevant to same.
            C. Trinkle                    0.30 hrs.

11/16/00    Drafting of e-mail to group concerning upcoming
            conference call.
            C. Trinkle                    0.10 hrs.

11/16/00    Attention to document review by Mr. Sweitzer of Handy
            & Harman.
            C. Trinkle                    0.80 hrs.

11/16/00    Telephone conference with counsel for Lucent
            concerning draft response to new Special Notice
            parties' counteroffer.  Drafting of fax to same
            concerning same.   Telephone conference with counsel

PHKS 071918

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

           for SPS concerning same.
           C. Trinkle                        0.20 hrs.

11/17/00   Prepare tagged documents  from document reviews for
           duplicating.  Confer with C. Trinkle re: same.
           S. Evans                          1.20 hrs.

11/17/00   Call to S. Keating re cost documentation; finalize
           letter to SN parties and forward same to Benik, et.
           al.; call to D. Batson to advise generally of
           response; call with counsel for Bundy re receipt of
           letter and group joinder.
           D. Payne                          1.50 hrs.

11/17/00   Drafting of correspondence to counsel for Lucent
           concerning new Special Notice letter.
           C. Trinkle                        0.10 hrs.

11/17/00   Attention to revision and transmission of response to
           new Special Notice parties' counteroffer.  Office
           conferences with D. Payne concerning same.
           C. Trinkle                        1.10 hrs.

11/17/00   Attention to preparation of documents requested
           during reviews by counsel for Quikline, Plymouth
           Tube, and Carpenter Technologies and by Handy &
           Harman.
           C. Trinkle                        0.10 hrs.

11/17/00   Drafting of e-mail to group concerning upcoming
           conference call with respect to review of past costs
           documentation.  Drafting of e-mail to Mr. Dovell of
           Nihill & Riedley concerning same.
           C. Trinkle                        0.20 hrs.

11/20/00   Preparation of documents flagged during reviews for
           shipping.  Update file review log.
           S. Evans                          2.20 hrs.

11/20/00   Email to SKeating re ATP parties; email same to BFG;
           call from D Shea re cash flow.
           D. Payne                          0.70 hrs.

11/20/00   Review of engagement letter from Mr. Dovell of Nihill
           & Riedley.  Office conference with D. Payne
           concerning same.  Drafting of correspondence to Mr.
           Dovell concerning same.
           C. Trinkle                        0.30 hrs.

11/20/00   Review of invoice received from Mr. Barkett of Shook,
           Hardy & Bacon.  Office conference with D. Payne
           concerning same.  Drafting of correspondence to group
           concerning same.

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

            C. Trinkle                          0.40 hrs.

11/21/00    Preparation of documents flagged during reviews for
            shipping.   Update file review log.
            S. Evans                            1.80 hrs.

11/22/00    Review file for document requested by C. Trinkle.
            S. Evans                            0.70 hrs.

11/22/00    Call from K. Arnold re new Lucent attorney; email to
            J. de Grandpre re conference call.
            D. Payne                            0.70 hrs.

11/22/00    Office conference with D. Payne concerning drafting
            of good faith offer letter to EPA.   Research
            concerning same.   Office conference with W. Hyatt
            concerning same.
            C. Trinkle                          0.80 hrs.

11/22/00    Drafting of e-mail to group concerning upcoming
            conference call.   Preparation of documents for and
            drafting of fax to counsel for Lucent
            Microelectronics.
            C. Trinkle                          1.00 hrs.

11/22/00    Drafting of correspondence to Ms. Keating of EPA
            concerning request for complete cost documentation.
            Review of e-mail from Mr. Dovell of Nihill & Riedley
            concerning same.
            C. Trinkle                          0.30 hrs.

11/27/00    Read EPA guidance on SN letter GFOs; read proposed
            Consent Decree; read SN letter and outline GFO; draft
            GFO;
            D. Payne                            5.50 hrs.

11/27/00    Drafting of good faith offer letter.   Telephone
            conferences with D. Payne concerning same.   Drafting
            of e-mail to counsel for Worthington concerning same.
            C. Trinkle                          1.60 hrs.

11/27/00    Telephone conference with Mr. Batson of EPA
            concerning response to latest offer to new Special
            Notice parties.
            C. Trinkle                          0.10 hrs.

11/28/00    Work on GFO letter; call to Seibel re technical
            issues; email to BFG with draft letter.
            D. Payne                            1.70 hrs.

11/28/00    Telephone conference with D. Payne concerning draft
            good faith offer letter.   Review and revision of same
            to incorporate comments.   Drafting of e-mail to group
            concerning same.   Telephone conferences with Mr.

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

           Seibel of de maximis concerning cost information to
           same and review of technical portions of same.
           Drafting of e-mails to Mr. Seibel concerning
           technical review.   Telephone conference with counsel
           for Worthington concerning comments to draft.
           C. Trinkle                          1.30 hrs.

11/28/00   Drafting of e-mail to counsel for SPS concerning
           response to latest offer to new Special Notice
           parties.   Drafting of e-mail to group concerning
           newly received 104(e) responses.   Review of e-mail
           from counsel for SPS concerning same.   Drafting of
           correspondence to counsel for SPS and counsel for
           Worthington concerning same.
           C. Trinkle                          0.50 hrs.

11/28/00   Drafting of correspondence to counsel for Thomas &
           Betts concerning request for Barsum deposition
           transcript.
           C. Trinkle                          0.20 hrs.

11/29/00   Update document review index per C. Trinkle.
           S. Evans                            0.30 hrs.

11/29/00   Several calls with Mike Hendershot; email Group re
           same; call to GS; call with Batson re new
           developments and non response of SN parties and GFO
           preparation; forward revised GFO to BFG.
           D. Payne                            2.00 hrs.

11/29/00   Telephone conference with counsel for SPS concerning
           draft request for cost documentation.
           C. Trinkle                          0.10 hrs.

11/29/00   Office conference with D. Payne concerning revisions
           to draft good faith offer letter.
           C. Trinkle                          0.20 hrs.

11/29/00   Attention to de maximis invoice approvals and status
           of accounts.
           C. Trinkle                          0.10 hrs.

11/30/00   Drafting of e-mail to group concerning approval and
           payment of latest de maximis invoice.   Review of
           account balances and drafting of e-mail to D. Payne
           concerning need for technical costs assessment.
           C. Trinkle                          0.20 hrs.

11/30/00   Revision of correspondence requesting past cost
           documentation.
           C. Trinkle                          0.10 hrs.

11/30/00   Drafting of e-mail to group concerning upcoming

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

           conference call.  Telephone conference with counsel
           for Ford concerning good faith offer issues.
           C. Trinkle                          0.20 hrs.

11/30/00   Drafting of e-mail to D. Payne concerning status of
           agreement signature pages.
           C. Trinkle                          0.10 hrs.

Billing Summary

| Attorney | | Hours |
|---|---|---|
| D. Payne | | 29.8 |
| C. Trinkle | | 45.2 |
| S. Evans | | 18.8 |
| J. von Schrader | | 1.0 |
| | TOTAL | 94.8 |

ENGAGEMENT COSTS

| | | | |
|---|---|---|---|
| 10/16/00 | PD UPS TO MAHWAH NJ, TOMS RIVER NJ; CAT; CK# 215820 | $ | 15.60 |
| 10/18/00 | PD CONFERENCING; DWP; CK# 215786 | $ | 55.26 |
| 10/19/00 | PD UPS TO PHILADELPHIA PA;DWP;CK# 215820 | $ | 6.54 |
| 10/20/00 | PD UPS TO ALLENTOWN PA;CAT;CK# 215820 | $ | 7.80 |
| 10/23/00 | PD CONFERENCING; DWP; CK# 215786 | $ | 55.39 |
| 10/24/00 | PD TRAVEL EXPENSES TO PHILADELPHIA PA; CAT; UH 11/15/00 | $ | 70.25 |
| 10/25/00 | PD UPS TO PHILADELPHIA PA; CAT; CK# 215821 | $ | 7.80 |
| 10/27/00 | PD UPS TO MONTCLAIR NJ;DWP;CK# 215821 | $ | 29.60 |
| 10/27/00 | PD CONFERENCING; DWP; CK# 216152 | $ | 34.06 |
| 10/28/00 | PD UPS FOR SAT. DELIVERY CHARGES; DWP; CK # 216171 | $ | 10.00 |
| 11/09/00 | PD TRAVEL EXPENSES TO PHILADELPHIA PA; CAT; UH 11/30/00 | $ | 70.25 |
| 11/10/00 | PD UPS TO MORRISTOWN NJ; SLE; CK# 216600 | $ | 15.80 |
| 11/16/00 | PD CONFERENCING; DWP; CK# 216645 | $ | 64.48 |
| 11/16/00 | PD UPS TO VARIOUS LOCS;CHICAGO IL;CAT;CK# 216599 | $ | 29.40 |
| 11/17/00 | PD CONFERENCING; DWP; CK# 216645 | $ | 21.63 |
| Computer Assisted Research | | $ | 41.00 |
| Duplicating | | $ | 565.40 |
| Postage | | $ | 16.38 |
| Telephone | | $ | 84.17 |

PHKS 071922

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

new party payment of technical costs.  Telephone
conference with D. Payne concerning same.  Drafting
of e-mail to same concerning same.  Drafting of e-
mails to group concerning same.  Review of e-mail
from counsel for Worthington concerning same.
Revision of same to incorporate comments from same.
Drafting of memorandum to new parties concerning
same.  Telephone conference with counsel for SPS
concerning same.  Drafting of e-mail to D. Payne
concerning same.
C. Trinkle                          3.00 hrs.

10/27/00  Work on revisions to spreadsheet; review comments
          from BFG members; revise cover memo to recipients;
          several calls to Barsum
          D. Payne                            2.00 hrs.

10/27/00  Drafting of correspondence to counsel for former
          owners of Merit Metals and counsel for Etched
          Circuits and Flexible Circuits concerning Barsum
          deposition transcript and affidavit.  Drafting of e-
          mail to Mr. Batson of EPA concerning same.  Review
          and extensive revision of spreadsheet concerning new
          party payment of technical costs.  Telephone
          conference with counsel for Worthington concerning
          same.  Review of e-mail from same concerning same.
          Revision of spreadsheet to incorporate comments.
          Office conferences with D. Payne concerning same.
          Drafting of e-mails to group and new parties
          concerning same.  Telephone conference with Mr.
          Batson of EPA concerning same.
          C. Trinkle                          3.50 hrs.

10/30/00  Telephone conference with counsel for SPS concerning
          orphan share submission.
          C. Trinkle                          0.10 hrs.

10/31/00  Several calls to J. Barsum.  Travel to PA to meet
          with J. Barsum re status and concerning potential
          contacts from other non-Group member companies.
          D. Payne                            3.00 hrs.

10/31/00  Review of e-mail from counsel for Worthington
          concerning orphan share issues.  Telephone conference
          with same concerning same.  Research concerning
          orphan share percentages assigned by EPA in other
          cases.  Telephone conference with D. Payne concerning
          same.  Drafting of company-specific nexus summaries
          for bankrupt/defunct PRPs.  Preparation of document
          in connection with same.
          C. Trinkle                          6.90 hrs.

PHKS 072020

Client:   CYTEC INDUSTRIES
Matter:   Boarhead Farm Superfund Site Common
          Disbursements

Billing Summary

| Attorney | Hours |
|----------|-------|
| D. Payne | 28.7 |
| K. Helmer | 7.4 |
| C. Trinkle | 47.6 |
| TOTAL | 83.7 |

ENGAGEMENT COSTS

| | | | |
|---|---|---|---|
| 12/14/99 | PD AMEXP TO AMTRAK WASH DC;DWP;CK# 205886 | $ | 209.00 |
| 12/15/99 | PD AMEXP TO CASCADE LODGE;DWP;CK# 205886 | $ | 124.74 |
| 06/01/00 | PD AMEXP TO AMTRAK WASH DC;DWP;CK# 210982 | $ | 252.00 |
| 06/09/00 | PD AMEXP TO AMTRAK WASH DC;DWP;CK# 210982 | $ | 252.00 |
| 06/16/00 | PD AMEXP TO JUNIPER & LOCUST;DWP;CK# 210982 | $ | 8.50 |
| 06/30/00 | PD AMEXP TO NATIONAL TECH INFO;DWP;CK# 210982 | $ | 51.50 |
| 08/29/00 | PD GEN CONF;DWP;CK# 213895 | $ | 58.38 |
| 08/30/00 | PD UPS TO ALLENTOWN; CAT; CK # 213790 | $ | 7.80 |
| 09/07/00 | PDGENESYS CONF;DWP;CK# 215186 | $ | 88.36 |
| 09/07/00 | PDGENESYS CONF;DWP;CK# 215186 | $ | 30.57 |
| 09/08/00 | PD UPS TO ALLENTOWN PA;CAT;CK# 213910 | $ | 9.80 |
| 09/23/00 | PD UPS FOR CORRECTED DELIVERY TO DEARBORN, MI;  CK# 214836 | $ | 10.00 |
| 09/25/00 | PD UPS TO MORRISTOWN NJ, PHILADELPHIA PA, WEST PATERSON NJ, NORRISTOWN PA; CAT; CK# 214836 | $ | 31.20 |
| 09/25/00 | PD UPS TO WASH DC & DEARBORN MI;CAT;CK# 214836 | $ | 21.39 |
| 09/26/00 | PD UPS TO TOMS RIVER NJ; CAT; CK# 214836 | $ | 7.80 |
| 09/26/00 | PD UPS TO MAHWAH NJ; CAT; CK# 214836 | $ | 7.80 |
| 09/27/00 | PD GENESYS CONF;DWP;CK# 214976 | $ | 32.57 |
| 09/27/00 | PD GENESYS CONF;DWP;CK# 214976 | $ | 96.37 |
| 09/28/00 | PD UPS TO ALLENTOWN PA; CAT; CK# 214836 | $ | 9.80 |
| 10/03/00 | PD GEN MESS TO NEWARK NJ; CAT; CK# 215109 | $ | 36.00 |
| 10/03/00 | PD GEN MESS TO FLORHAM PARK NJ; CAT; CK# 215109 | $ | 18.15 |
| 10/04/00 | PD CONFERENCING; DWP; CK# 215514 | $ | 50.47 |
| 10/09/00 | PD CONFERENCING; DWP; CK# 215514 | $ | 28.96 |
| 10/12/00 | PD CONFERENCING; DWP; CK# 215514 | $ | 101.21 |

| | | | |
|---|---|---|---:|
| 10/13/00 | PD CONFERENCING; DWP; CK# 215514 | $ | 85.95 |
| 10/19/00 | Paid Merrill Corp. for services rendered #10501; S#1308 | $ | 267.12 |
| Duplicating from prior months processed in September | | $ | 206.20 |
| Duplicating | | $ | 961.60 |
| Postage | | $ | 27.88 |
| Telephone | | $ | 164.55 |
| | | | |
| TOTAL ENGAGEMENT COSTS | | $ | 3,257.67 |

PHKS 072022

TOTAL ENGAGEMENT COSTS                    $  1,200.81

    TOTAL INVOICE BALANCE          $   20,522.81

PHKS 071923

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

D. Payne                                    1.20 hrs.

07/11/00    Office conference with D. Payne concerning upcoming
            group meeting.   Review and revision of agenda for
            same.   Review of cash flow estimate and outstanding
            invoices in preparation for same.
            C. Trinkle                            1.10 hrs.

07/11/00    Telephone conference with Ms Keating of EPA
            concerning need for additional information concerning
            Bundy Corporation.   Review of file.  Drafting of fax
            to Ms. Keating concerning same.
            C. Trinkle                            0.90 hrs.

07/12/00    Attend Boarhead Farm meeting in Philadelphia.
            D. Payne                              9.50 hrs.

07/13/00    Review and revision of merged group agreement to
            incorporate comments from group meeting.
            C. Trinkle                            3.00 hrs.

07/13/00    Review and revision of Allocation Protocol to
            incorporate comments from group meeting.
            C. Trinkle                            1.80 hrs.

07/13/00    Review of file and drafting of fax to counsel for
            Lucent concerning new EPA guidance on indirect cost
            calculation and task list.
            C. Trinkle                            0.20 hrs.

07/13/00    Telephone conference with Mr. Barraclough of Wolf,
            Schorr concerning PRP conflict list.
            C. Trinkle                            0.10 hrs.

07/13/00    Drafting, review, and revision of invoices for group
            assessment with respect to response, administrative,
            and allocation costs.   Office conference with D.
            Payne concerning same.
            C. Trinkle                            1.10 hrs.

07/14/00    Revision of invoices in relation to third assessment.
             Drafting of correspondence to group concerning same.
            C. Trinkle                            0.90 hrs.

07/14/00    Review and revision of draft allocation protocol to
            incorporate comments received at group meeting.
            Office conference with D. Payne concerning same.
            C. Trinkle                            2.20 hrs.

07/14/00    Continued revision of group agreement to incorporate
            comments received at recent meeting.
            C. Trinkle                            0.30 hrs.

07/17/00    Review of comments received from counsel for Lucent

PHKS 072025

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

concerning revised group agreement.  Revision of
agreement to incorporate same.  Office conference
with D. Payne concerning same.
C. Trinkle                          0.50 hrs.

07/17/00   Review of comments received from counsel for Lucent
           concerning draft allocation protocol.  Revision of
           protocol to incorporate same.  Office conference with
           D. Payne concerning same.
           C. Trinkle                          0.50 hrs.

07/17/00   Review and revision of Special Notice Letter.
           C. Trinkle                          0.40 hrs.

07/18/00   Receipt and review of comments on Special Notice
           Letter from counsel for Worthington.
           C. Trinkle                          0.20 hrs.

07/19/00   Telephone conferences with Mr. Eichman of N.J.
           Division of Law concerning status of CRIS search
           request.
           C. Trinkle                          0.20 hrs.

07/19/00   Telephone conference with counsel for Worthington
           concerning proposed revisions to allocation protocol.
            Office conference with D. Payne concerning same.
           C. Trinkle                          0.30 hrs.

07/20/00   Review and revise Group agreement; forward same to
           Group.
           D. Payne                            0.50 hrs.

07/21/00   Meeting with Catherine Trinkle regarding Boarhead
           trust account; review trust account documents and
           create excel spreadsheets regarding same.
           M. Moore                            2.40 hrs.

07/21/00   Office conference with M. Moore concerning
           establishing accounting system for various group
           funds.
           C. Trinkle                          0.20 hrs.

07/21/00   Revision of draft allocation protocol to incorporate
           comments received during group conference call.
           Drafting of e-mails to D. Payne concerning same and
           concerning revised group agreement.
           C. Trinkle                          2.10 hrs.

07/24/00   Prepare and revise trust account spreadsheet.
           M. Moore                            2.30 hrs.

07/25/00   Drafting of e-mail to group concerning upcoming
           conference call with respect to technical submissions
           to EPA.

PHKS 072026

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

            C. Trinkle                          0.20 hrs.

07/25/00    Revision of merged group agreement to incorporation
            comments received at recent group meeting.  Drafting
            of e-mail to counsel for Worthington concerning same.
            C. Trinkle                          1.50 hrs.

07/25/00    Drafting of e-mail to counsel for Worthington
            concerning execution of Bigler and Eckenfelder
            contracts.
            C. Trinkle                          0.10 hrs.

07/27/00    Confer with Catherine Trinkle regarding spreadsheet
            for trust fund account.
            M. Moore                            0.50 hrs.

07/27/00    Office conference with M. Moore concerning draft
            spreadsheets for use in accounting for group funds.
            C. Trinkle                          0.20 hrs.

07/27/00    Telephone conference with counsel for Worthington
            concerning third assessment invoice.  Revision of
            same.  Drafting of e-mail concerning same.
            C. Trinkle                          0.20 hrs.

07/28/00    Confer with C. Trinkle regarding Group agreement
            revisions.
            D. Payne                            0.30 hrs.

07/28/00    Further revision of merged group agreement.  Drafting
            of e-mail to group concerning same.  Review of e-
            mails from counsel for Worthington and SPS concerning
            same.
            C. Trinkle                          0.80 hrs.

07/31/00    Telephone conference with counsel for Lucent
            concerning revised group agreement.  Revision of same
            to incorporate comment received from counsel for
            Worthington.  Drafting of e-mail to D. Payne
            concerning same.
            C. Trinkle                          0.30 hrs.

07/31/00    Office conference with M. Moore concerning index of
            documents received in response to FOIA requests.
            C. Trinkle                          0.10 hrs.

08/01/00    Travel to Ottsville to attempt visit with Barsum.
            D. Payne                            3.00 hrs.

08/01/00    Office conference with D. Payne concerning structure
            of various group accounts.  Drafting of memorandum
            concerning same.  Telephone conference with
            Accounting Department concerning same.  Drafting of
            e-mail to D. Payne concerning same.  Completion of

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

            paperwork concerning same.  Office conference with M.
            Moore concerning accounting spreadsheet set-up.
            C. Trinkle                              1.50 hrs.

08/02/00    Office conference with D. Payne concerning accounting
            issues.
            C. Trinkle                              0.10 hrs.

08/04/00    Status e-mail to Boarhead Farm Group.
            D. Payne                                0.40 hrs.

08/04/00    Call to S. Keating re Merit Metals 104(e)
            response;confer with Trinkle re same.
            D. Payne                                0.50 hrs.

08/04/00    Office conference with D. Payne concerning fax from
            SPS concerning recent assessment.  Revision of
            invoice to same.  Drafting of fax to same concerning
            same.
            C. Trinkle                              0.20 hrs.

08/04/00    Telephone conference with counsel for Lucent
            concerning comments to merged group agreement.
            Drafting of e-mail to D. Payne concerning same.
            C. Trinkle                              0.30 hrs.

08/07/00    Telephone conference with counsel for Lucent
            concerning comments to draft allocation protocol.
            C. Trinkle                              0.20 hrs.

08/07/00    Attention to payment of recent Bigler and Eckenfelder
            invoices.
            C. Trinkle                              0.10 hrs.

08/08/00    Review file materials for El f Atochem's answer to
            interrogatories and other discovery responses per D.
            Payne's request.
            S. Evans                                1.80 hrs.

08/08/00    Review Jonas Grid information regarding Polyrez;
            status e-mail to Group; review all other 104(e)
            requests prepared for EPA with C. Trinkle; call to S.
            Keating regarding same.
            D. Payne                                2.00 hrs.

08/08/00    Telephone conference with Ms. Keating of EPA
            concerning successor liability issues relevant to
            Merit Metals.  Office conference with D. Payne
            concerning same.
            C. Trinkle                              0.30 hrs.

08/08/00    Office conference with D. Payne concerning Polyrez
            information from Kramer file.

PHKS 072028

Client:      CYTEC INDUSTRIES
Matter:      Boarhead Farm Superfund Site Common
             Disbursements

             C. Trinkle                            0.30 hrs.

08/09/00     Review file materials for El f Atochem's answer to
             interrogatories and other discovery responses per D.
             Payne's request.
             S. Evans                              1.20 hrs.

08/09/00     E-mail to G. Seibel regarding waste disposal; call to
             Seibel.
             D. Payne                              0.50 hrs.

08/09/00     Telephone conference with counsel for SPS concerning
             group agreement.
             C. Trinkle                            0.10 hrs.

08/09/00     Telephone conference with counsel for SPS concerning
             allocation protocol and questionnaire.  Office
             conference with D. Payne concerning same.
             C. Trinkle                            0.30 hrs.

08/09/00     Telephone conference with counsel for SPS concerning
             special notice issues.
             C. Trinkle                            0.10 hrs.

08/09/00     Drafting of correspondence to Bigler and Eckenfelder
             concerning payment of outstanding invoices.
             C. Trinkle                            0.30 hrs.

08/09/00     Review of information received from EPA concerning
             successor liability issues involving Merit Metals.
             Telephone conference with EPA personnel concerning
             same.
             C. Trinkle                            0.20 hrs.

08/09/00     Review of Polyrez interrogatory answers from Kramer
             file.
             C. Trinkle                            0.10 hrs.

08/10/00     Call with Bruce DeRewal and S. King; e-mail to Group
             regarding same; confer with Trinkle re preparation
             for meeting. .
             D. Payne                              0.70 hrs.

08/10/00     Review and revision of 104(e)s for submission to EPA.
             Office conferences with D. Payne concerning same.
             Drafting of correspondence to EPA concerning same.
             C. Trinkle                            3.00 hrs.

08/10/00     Attention to payment of Bigler invoice for June 2000
             O&M services.  Drafting of correspondence to Mr.
             Bigler concerning same.  Drafting of e-mail to
             Technical Committee representatives concerning
             approval process for de maximis invoices.
             C. Trinkle                            0.70 hrs.

PHKS 072029

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

08/11/00   Drafting of e-mail to group concerning revised
           process for approval of de maximis invoices.
           C. Trinkle                         0.20 hrs.

08/11/00   Processing and allocation of assessment payments from
           Cytec and NRM Investment.
           C. Trinkle                         0.40 hrs.

08/11/00   Office conference with D. Payne concerning upcoming
           meeting with Bruce DeRewal.  Preparation of documents
           for use in connection with same.
           C. Trinkle                         4.50 hrs.

08/11/00   Telephone conference with Mr. Batson of EPA
           concerning case status.  Drafting of e-mail to D.
           Payne concerning same.
           C. Trinkle                         0.10 hrs.

08/14/00   Prepare for interview with B. DeRewal
           D. Payne                           1.50 hrs.

08/14/00   Continued preparation of documents for use in
           connection with upcoming meeting with Bruce DeRewal.
           C. Trinkle                         1.00 hrs.

08/14/00   Revision of Barkett allocation protocol to
           incorporate comments received from counsel for
           Lucent.  Drafting of e-mail to D. Payne concerning
           same.
           C. Trinkle                         0.90 hrs.

08/15/00   Travel to Montgomeryville, Pennsylvania to interview
           Bruce DeRewal with S. King; P.M. visit with J. Barsum
           and son.
           D. Payne                           9.00 hrs.

08/15/00   Processing of payment for latest Bigler invoice.
           C. Trinkle                         0.10 hrs.

08/15/00   Processing of assessment payment received from SPS
           Technologies.
           C. Trinkle                         0.20 hrs.

08/16/00   Office conference with D. Payne concerning meeting
           with Bruce DeRewal.
           C. Trinkle                         0.20 hrs.

08/16/00   Office conference with D. Payne concerning request
           from counsel for Worthington for W-9 to support
           assessment payment.  Drafting of e-mail to counsel
           for Worthington concerning same.
           C. Trinkle                         0.50 hrs.

PHKS 072030

Client:    CYTEC INDUSTRIES
Matter:    Boarhead Farm Superfund Site Common
           Disbursements

08/16/00   Telephone conference with Ms. Keating and Ms. Martin-
           Banks of EPA concerning recently submitted draft
           104(e)s and related issues.  Drafting of lengthy e-
           mail to same concerning same.  Review of file for
           documents relevant to same.
           C. Trinkle                            4.40 hrs.

08/16/00   Telephone conference with Ms. Keating and Ms. Martin-
           Banks of EPA concerning orphan share parties.
           Drafting of nexus summary and preparation of nexus
           package for Sylvan Chemical Corporation.
           C. Trinkle                            1.80 hrs.

08/17/00   Review letter from Wolf Block regarding Boarhead
           Farms.
           L. Braender                           1.00 hrs.

08/17/00   Call with King and attorney for Bruce DeRewal re his
           participation; forward him copy of Bruce DeRewal
           deposition.
           D. Payne                              0.70 hrs.

08/17/00   Drafting of e-mail to D. Payne concerning various
           accounting issues.  Office conference with same
           concerning same.  Attention to same.  Drafting of
           correspondence to Bigler and Eckenfelder concerning
           payment of latest invoices.
           C. Trinkle                            1.00 hrs.

08/17/00   Office conference with D. Payne concerning
           information requested by Ms. Keating of EPA
           concerning Sylvan Chemical Corporation.  Drafting of
           correspondence to counsel for Lucent concerning same.
           C. Trinkle                            0.90 hrs.

08/17/00   Review and revision of e-mail to Ms. Keating and Ms.
           Martin-Banks of EPA concerning draft 104(e)s.
           Drafting of fax to same concerning same.  Drafting of
           correspondence to same concerning same.  Office
           conference with D. Payne concerning same.  Drafting
           of additional 104(e) with respect to GTE Sylvania.
           C. Trinkle                            1.00 hrs.

08/18/00   Review of GTE Sylvania file in connection with
           drafting of 104(e).  Review of and revision of same.
           C. Trinkle                            0.80 hrs.

08/21/00   Telephone conference with Ms. Keating of EPA
           concerning proposed 104(e) to American Nickeloid.
           Telephone conference with Ms. Martin-Banks of EPA
           concerning relationship between Elf Atochem and
           Polyrez.  Research concerning same.
           C. Trinkle                            1.80 hrs.

# PITNEY, HARDIN, KIPP & SZUCH

(MAIL TO)
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945

—

(DELIVERY TO)
200 CAMPUS DRIVE
FLORHAM PARK, NEW JERSEY 07932-0950
(973) 966-6300
FACSIMILE (973) 966-1550

DAVID W. PAYNE

—

DIRECT DIAL NUMBER
(973) 966-8196

E-MAIL
DPAYNE@PHKS.COM

152 WEST 57th STREET
NEW YORK, N.Y.   10019-3310
(212) 371-8880
FACSIMILE (212) 371-8540

December 4, 2000

**VIA REGULAR U.S. MAIL**

To:     The Boarhead Farms PRP Group

   Re: **Boarhead Farms Superfund Site**

Dear Colleagues:

   Enclosed herewith please find our firm's billing for the period July 1, 2000, through October 31, 2000.

        Very truly yours,

        DAVID W. PAYNE

DWP/dw
enclosure

655693A01120400

PHKS 072009

### PITNEY, HARDIN, KIPP & SZUCH LLP
P.O. BOX 1945
MORRISTOWN, NEW JERSEY 07962-1945

TAX I.D. NO. 22-1661404

Cytec Industries
5 Garret Mountain Plaza
West Paterson, NJ  07424
Attn: Thomas A. Waldman, Esq.

Invoice 1938843
011938.075765
Boarhead Farm
Superfund Site
Common Disb
September 29, 2000

---

TO PROFESSIONAL SERVICES RENDERED

For services rendered and engagement costs
incurred through August 31, 2000.

In connection with Boarhead Farm Superfund
Site common disbursements, as described in
deatial on the attached printout.

Billing Summary

| Attorney | Level | Hours | Rate | Dollars |
|----------|-------|-------|------|---------|
| L. Braender | Partner | 1.0 | 290 | 290.00 |
| D. Payne | Partner | 35.3 | 270 | 9,531.00 |
| C. Trinkle | Associate | 56.2 | 190 | 10,678.00 |
| S. Evans | Paralegal | 4.0 | 75 | 300.00 |
| M. Moore | Paralegal | 5.2 | 85 | 442.00 |
| TOTAL | | 101.7 | | 21,241.00 |

| | | |
|---|---|---|
| IN ALL FOR SERVICES RENDERED | $ | 21,241.00 |
| ENGAGEMENT COSTS | $ | 2,433.93 |
| TOTAL AMOUNT DUE | $ | 23,674.93 |

PHKS 072023

Client:     CYTEC INDUSTRIES
Matter:     Boarhead Farm Superfund Site Common
            Disbursements

| Date | Narrative<br>Timekeeper | Hours |
|------|------|------|
| 07/03/00 | Prepare Task List, forward same to group; revise Group Agreement and forward same to Group; prepare Liaison Counsel budget and forward same to Group.<br>D. Payne | 3.80 hrs. |
| 07/05/00 | Confer with Trinkle regarding revisions to BGF agreement; discuss K. Arnold's comments on the draft protocol with C. Trinklel<br>D. Payne | 0.30 hrs. |
| 07/05/00 | Telephone conference with counsel for Lucent concerning comments on Allocation Protocol.  Drafting of e-mail to D. Payne concerning same.<br>C. Trinkle | 0.40 hrs. |
| 07/05/00 | Telephone conference with Mr. Barkett concerning schedule for discussion of Allocation Protocol. Drafting of e-mail to D. Payne concerning same.<br>C. Trinkle | 0.20 hrs. |
| 07/05/00 | Review of e-mail from counsel for SPS concerning execution of Eckenfelder contract.  Drafting of reply to same.<br>C. Trinkle | 0.20 hrs. |
| 07/05/00 | Drafting of e-mail to Mr. Batson of EPA concerning upcoming group meeting.<br>C. Trinkle | 0.30 hrs. |
| 07/05/00 | Lengthy telephone conference with Mr. Eichman of Division of Law concerning request for CRIS search information relevant to Special Notice Letter issuance.  Drafting of e-mail to D. Payne concerning same.<br>C. Trinkle | 1.10 hrs. |
| 07/06/00 | Prepare revised cost estimate.<br>D. Payne | 0.20 hrs. |
| 07/07/00 | Receipt and review of Eckenfelder invoice and approval forms.  Drafting of correspondence to Eckenfelder concerning payment of same.  Attention to same.  Review of status of response costs account.<br>C. Trinkle | 0.40 hrs. |
| 07/11/00 | Call with S. Keating regarding status of special notice review; respond to request for information re Bundy prepare meeting agenda. | |

PHKS 072024

# EXHIBIT I

Page 1

```
 1           UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3   _____  CIVIL ACTION NO.
                                      02-CV-3830
 4
     Boarhead Farm Agreement Group,
 5
                Plaintiff,          Oral Deposition of
 6
           vs.                          Dennis Shea
 7
     Advanced Environmental
 8   Technology Corporation;
     Ashland Chemical Company;
 9   Boarhead Corporation;
     Carpenter Technology
10   Corporation; Crown Metro,
     Inc.; Diaz Chemical Corporation;
11   Emhart Industries, Inc.; Globe
     Disposal Company, Inc.;
12   Globe-Wastech, Inc.; Handy &
     Harman Tube Company, Inc.;
13   Knoll, Inc.; Merit Metal
     Products Corporation; Novartis
14   Corporation; NRM Investment
     Company; Plymouth Tube Company;
15   Quikline Design and Manufacturing
     Company; Rahns Specialty Metals,
16   Inc.; Rohm & Haas Company; Simon
     Wrecking Company, Inc.; Techalloy
17   Company, Inc.; Thomas & Betts
     Corporation; Unisys Corporation;
18   United States of America
     Department of Navy,
19
                Defendants.
20   _____
21
22
          Certified Shorthand Reporting Services
23                arranged through
             Mastroianni & Formaroli, Inc.
24              709 White Horse Pike
             Audubon, New Jersey 08106
25                (856) 546-1100
```

Dennis Shea                                            February 9, 2005

Page 74

1    requisitions, etcetera?
2        A.    No.
3        Q.    Do you know if there were some method to
4    which ones Mr. Rambo decided to keep?
5        A.    I have no idea if he kept a portion or
6    all and if there was any method or selection
7    criteria.
8        Q.    Have you ever personally spoken to Mr.
9    Rambo?
10       A.    No.
11       Q.    Okay.
12             So the company didn't ask him why he
13   kept these particular documents?
14       A.    I don't know the answer to that.
15       Q.    What volume of waste did SPS send to
16   Boarhead Farm?
17       A.    I don't think we sent anything to
18   Boarhead Farm.
19       Q.    What is the basis for that belief?
20       A.    Well, I know that there was at least
21   some sodium cyanide found when Mr. De Rewal was
22   arrested for illegal disposal down on Ontario Street,
23   there were numerous drums down there, SPS is very
24   close to the Philadelphia locations that Mr. De Rewal
25   was using, you know, I know that -- as far as I know,

Page 75

1    with the possible exception of your client, that
2    there's -- SPS is the only defendant that's ever been
3    identified as potentially sending materials to the
4    Frenchtown site.
5        Q.    When was SPS identified as potentially
6    sending materials to Frenchtown?
7        A.    1990.
8        Q.    Was that in connection with the
9    remediation of Frenchtown?
10       A.    It was in connection -- it was before
11   the remediation of Frenchtown and continued until
12   after the remediation of Frenchtown was completed.
13       Q.    What types of materials was SPS alleged
14   to have sent to Frenchtown?
15       A.    I think EPA looked at the entire gamut
16   of our dealings with De Rewal when they were talking
17   to us, but there was one document in particular that
18   identified Frenchtown and it was cyanide.
19       Q.    Was that a document that's been produced
20   in this litigation?
21       A.    I believe it has.
22       Q.    Do you know what document it is?
23       A.    Probably -- you have my 104(e)?
24       Q.    I do. They're all tabbed up, but --
25       A.    Why don't you give me the 1996 --

Page 76

1             MR. HARRIS:  How about that one?
2             THE WITNESS:  Yeah, that's it,
3    SPST00325.
4    BY MS. BINGHAM:
5        Q.    Okay.
6             Are there any other bases aside from
7    those you've just listed, and we kind of got off on a
8    tangent about Frenchtown, any other bases for your
9    assertion that SPS --
10       A.    You know, as you're aware, I'm here as
11   our 30(B)(6) representative, but I'm also an attorney
12   and I -- I think that you've got the right person to
13   talk about everything on this list here, waste
14   disposal practices, waste streams created,
15   relationship, we're not aware of any relationship
16   outside of these -- these documents for Jonas and
17   De Rewal, I'm not aware of any relationship between
18   SPS or Standard Press Steel and the Boarhead Farm
19   site beyond our participation as a -- one of the
20   active parties that have stepped up to the plate to
21   take care of that site, I just -- I have no -- you
22   know, but I'm not going to sit here and hypothesize
23   with you about all of the potential reasons why our
24   waste generated in that relevant time period went to
25   the site.

Page 77

1             MS. WRIGHT:  I think the question
2    was -- this is Lynn Wright from Edwards and Angell, I
3    think the question was why do you think waste did not
4    go to the site, not why you think it went to the
5    site.
6             THE WITNESS:  I've given you two pretty
7    good reasons why I think it didn't go to the site,
8    sitting here right now --
9             MR. HARRIS:  Hold on a second.
10            We don't think that question is within
11   the scope of this notice, anyway.
12            MS. BINGHAM:  You don't think that the
13   volume of waste sent is relevant to the relationship
14   between the Boarhead Farm site and Standard Press
15   Steel?
16            MR. HARRIS:  The volume of waste sent
17   where?
18            MS. BINGHAM:  To Boarhead Farm.
19            MR. HARRIS:  He said the answer is
20   none, that's the answer.
21            MS. BINGHAM:  And I'm asking for the
22   basis for that answer.
23            THE WITNESS:  I just gave you --
24            MR. HARRIS:  Well, you know -- we're
25   not here today to present, you know, litigation

20 (Pages 74 to 77)

Page 78

1   analysis of -- of why we think waste did or didn't go
2   somewhere else, we're here to respond to factual
3   questions.
4            MS. BINGHAM: I was asking for the
5   factual bases for his assertion of zero, that's a
6   fact, I'm asking for a factual bases.
7            MR. HARRIS: Well, frankly, I
8   understood your question to be did SPS send any waste
9   to the site, I understood his answer to be no because
10  SPS didn't send any waste to the site.
11           MS. BINGHAM: Okay.
12           MR. HARRIS: They may have given waste
13  to De Rewal or they may have given waste to Marvin
14  Jonas, but they -- I understood his answer to mean
15  SPS didn't send any waste to the Boarhead site.
16           MS. BINGHAM: I will rephrase the
17  question then.
18  BY MS. BINGHAM:
19      Q.    What volume of waste that was picked up
20  by De Rewal made its way to Boarhead Farm from SPS?
21           MR. HARRIS: I'm not going to let him
22  answer that question either. He doesn't have any
23  knowledge of that. That's not within the scope.
24           MS. BINGHAM: The relationship between
25  Boarhead Farm and Standard Press Steel?

Page 79

1            MR. HARRIS: There is none.
2            THE WITNESS: There is none.
3            MR. HARRIS: They had no business
4   dealings, that's the relationship. None. They
5   didn't do business.
6            MS. BINGHAM: Their presence at
7   Standard Press Steel waste on Boarhead Farm site
8   wouldn't be a relationship?
9            MR. HARRIS: Well, you didn't ask him
10  that.
11           MS. BINGHAM: I asked him what waste
12  transported by De Rewal ended up at Boarhead Farm
13  site from SPS.
14           THE WITNESS: I'm aware of none.
15  BY MS. BINGHAM:
16      Q.    What is the bases for your assertion?
17           What factual information do you have to
18  support that assertion?
19           MR. HARRIS: Well, I think he said
20  there's an absence of information, he says he's aware
21  of no information that suggests that, that was the
22  answer.
23  BY MS. BINGHAM:
24      Q.    What is SPS's position either
25  individually or as a member of the Boarhead Farm

Page 80

1   Agreement Group as to the volume of waste from
2   Techalloy which was disposed of at the site?
3            MR. HARRIS: We are not going to answer
4   those questions either. That's not on this list.
5            MS. BINGHAM: It's clearly within the
6   scope of the interrogatories.
7            MR. HARRIS: You and I agreed that the
8   scope of the interrogatories with respect to number
9   seven was the waste streams of SPS, the waste
10  disposal practices of SPS, the relationship to Jonas
11  and De Rewal. We're not going -- we're not here to
12  answer questions about our litigation strategies, our
13  contentions or anything else.
14           MS. BINGHAM: I agree that that largely
15  covered what it was.
16           MR. HARRIS: And, anyway, seven says as
17  they related to the Standard Press Steel facility,
18  which is exactly what we understood and you and I
19  talked about. We're not here to talk about any other
20  answers to interrogatories other than the ones that
21  have to do with their Jenkintown facility.
22           MS. WRIGHT: This is Lynn Wright from
23  Edward and Angell again, is that an instruction not
24  to answer, Glenn?
25           MR. HARRIS: Yeah. Sure. We're not

Page 81

1   going to answer -- this witness is not here today
2   to --
3            MS. WRIGHT: That's all I needed.
4            MR. HARRIS: -- answer any questions
5   about Techalloy, Ashland, or the man on the moon, for
6   that matter.
7            MS. BINGHAM: When will SPS be prepared
8   to answer such a question?
9            MR. HARRIS: If and when we receive an
10  interrogatory that's within the scope of the federal
11  rules of civil procedure we'll respond to it as we're
12  required to do so, if and when we get a deposition
13  notice to seek such information we'll respond to it
14  within the scope of the federal rules of civil
15  procedure, but in our view that hasn't happened yet.
16  BY MS. BINGHAM:
17      Q.    What is SPS's position either
18  individually or as a member of the Boarhead Farm
19  Agreement Group as to which hazardous substances if
20  any were contained in the Techalloy waste that were
21  disposed of at the site?
22           MR. HARRIS: Same thing, we're not
23  answering those questions today.
24           MS. BINGHAM: I just want to get the
25  instruction on the record.

21 (Pages 78 to 81)



Dennis Shea                                        February 9, 2005

**Page 82**

1      MR. HARRIS: Okay.
2  BY MS. BINGHAM:
3      Q.   What is SPS's position either
4  individually or as a member of the Boarhead Farm
5  Agreement Group as to what percentage of the clean up
6  costs Techalloy should pay?
7      A.   Quick jerking around.
8      MR. HARRIS: Yeah, that's --
9      THE WITNESS: I read this thing and I
10 know what it says and it talks about that Standard
11 Press Steel facility in Jenkintown. I'm sorry I'm
12 losing my temper, but I came here prepared today to
13 answer some questions. I got other things to do. I
14 want everyone to get a chance to answer questions,
15 but don't -- we just told you we're not going to
16 answer questions about your client. I'm not here
17 to --
18 BY MS. BINGHAM:
19     Q.   Look, all I'm trying to do --
20     A.   -- do that today. I'm a 30(B)(6)
21 witness -- let me finish.
22     I'm a 30(B)(6) witness for SBS, you got
23 a good witness in front of you who knows to ask about
24 the facility and the practices in the 1970's, take
25 advantage of that, don't start jerking around asking

**Page 83**

1  about your client.
2      Q.   I just wanted to get Glenn to give you
3  the instruction on the record not to answer the
4  question.
5      MR. HARRIS: Let's make this easy, I
6  said it before, let me say it again in case it wasn't
7  clear, this witness is not going to answer any
8  questions about any of the other -- about anything
9  other than the Jenkintown facility of SPS and as
10 indicated here he's not going to answer questions
11 about the defendants, he's not going to answer
12 questions about the clean up, he's not going to
13 answer questions about anything else that isn't on
14 this sheet, and none of those things are on those
15 sheets and he's not going to answer them.
16     MS. BINGHAM: I have no further
17 questions at this time.
18     MR. HARRIS: Your turn.
19     Any questions, Brent?
20     MR. COSSROW: Yeah, I'm thinking.
21     MR. HARRIS: Okay.
22     MS. COSSROW: Glenn, would you let
23 Dennis answer the question -- let me introduce it
24 this way, he said he's aware of no waste from SPS
25 that got to Boarhead to the site; right?

**Page 84**

1      MR. HARRIS: I think that's what he
2  said.
3      MS. COSSROW: Will you let him say --
4  would you let him answer the question that he has
5  arrived at that conclusion based on the
6  investigations, the review of documents, that he has
7  testified to today.
8      MR. HARRIS: I don't think I understand
9  the question.
10     Why don't you ask the question, we'll
11 find out whether he's going to answer it or not.
12 (EXAMINATION OF MR. SHEA BY MS. COSSROW:)
13     Q.   You did testify earlier that you're
14 aware of no SPS waste at the Boarhead Farm site;
15 correct?
16     A.   That's correct.
17     Q.   And when you say that you're aware of
18 none, have you reached that conclusion on the basis
19 of the investigations, document review and other
20 discussions you've had with SPS employees that you
21 did to prepare for today's deposition?
22     A.   Nothing -- there are no documents I
23 reviewed, there are no employees I talked to, and
24 there's nothing that I've ever seen related to, and
25 know, our preparing answers to interrogatories,

**Page 85**

1  104(e) responses that ever indicated to me, yes, SPS,
2  your waste went to the Boarhead Farm site, no, I've
3  never seen that.
4      MS. COSSROW: We have nothing.
5      MR. HARRIS: Lynn?
6      MS. WRIGHT: Yes?
7      MR. HARRIS: Any questions?
8      MS. WRIGHT: No questions.
9      MR. HARRIS: Melissa?
10     MS. FLAX: Yeah, I just have a couple
11 of questions.
12 (EXAMINATION OF MR. SHEA BY MS. FLAX:)
13     Q.   Mr. Shea, I introduced myself earlier,
14 my name is Melissa Flax and I represent Handy &
15 Harman Tube Company.
16     I thought you testified -- just bear
17 with me one second -- in response to a question posed
18 by Ms. Bingham that not every part got plated or goes
19 through the degreaser.
20     Do you recall that?
21     A.   I don't specifically recall, but that is
22 correct, your assertion is correct, not every part
23 that we produce would be plated, not every part would
24 go through the degreaser.
25     Q.   Okay.





Page 90

1 no -- that you have cyanide generated and you
2 wouldn't have acetone generated at the same time and
3 you wouldn't have TC generated at the same time.
4     Q.    Oh, I understand that, I wasn't trying
5 to suggest that they were being generated at the same
6 time, I was just grouping them all together because I
7 believe you had testified that those would be an
8 affirmative call pick up and --
9     A.    That's correct, then you have that
10 right.
11     Q.    Do you have any knowledge as to where
12 these drums were disposed of?
13     A.    No, we do not.
14     Q.    And, again, are you aware of anyone
15 living who would have knowledge of where these drums
16 are disposed of?
17     A.    No, we do not. No, we are not.
18         MS. FLAX: Thank you, Mr. Shea, that's
19 all I have.
20         THE WITNESS: Thanks.
21         MR. HARRIS: Anybody else?
22         MS. BINGHAM: Actually, before we go
23 off the record, I just want to make sure that I have
24 on the record my position, Mr. Harris has stated his
25 position and why he's requested that his -- or

Page 91

1 suggested that his witness not respond to certain
2 questions I asked and I would respectfully disagree
3 with his instruction, the sort of disputed number
4 seven states all matters contained in the objections
5 and responses of Boarhead Farm Agreement Group, the
6 document requests and interrogatories of Defendants
7 Techalloy Company, Rahns Specialty Metals, Inc. and
8 Thomas & Betts Corporation as they related to the
9 Standard Press Steel facility in Jenkintown,
10 Pennsylvania or SPS Technologies, Incorporated, those
11 objections and responses were on behalf of a large
12 group in which included four other companies besides
13 SPS Technologies, I wanted to distinguish --
14 obviously, I'm not going to ask Mr. Shea to answer
15 anything on behalf of American -- I do believe that
16 he should be able to respond on behalf of SPS
17 Technologies as to the matters contained in the
18 interrogatories. Mr. Harris and I did have a
19 conversation regarding that number -- that -- that
20 category of information, I did not understand that
21 conversation to mean that Mr. Harris was going to
22 order his witness not to answer questions that were
23 clearly within the interrogatories, but Mr. Harris
24 has made such a response today, I just wanted to note
25 for the record my disagreement with Mr. Harris'



Page 92

1 position.
2         MR. HARRIS: Anything else?
3         Okay.
4         (Witness Excused.)
5         (Testimony Concluded.)

Page 93

1         C E R T I F I C A T E
2     I, Christi A. Argenbright, a Notary Public and
3 Certified Shorthand Reporter of The State of New
4 Jersey and a Commissioner of Deeds of The State of
5 Pennsylvania, do hereby certify that prior to the
6 commencement of the examination,
7             DENNIS SHEA
8 was duly sworn by me to testify to the truth,
9 the whole truth and nothing but the truth.
10     I do further certify that the foregoing is
11 a true and accurate transcript of the testimony
12 as taken stenographically by and before me at the
13 time, place and on the date hereinbefore set forth.
14     I do further certify that I am neither a
15 relative nor employee nor attorney nor counsel of any
16 of the parties to this action, and that I am neither
17 a relative nor employee of such attorney or counsel
18 and that I am not financially interested in this
19 action.
20
21
     _____
     Christi A. Argenbright, C.S.R.
22   Notary Public, State of New Jersey
     My commission expires October 16, 2005
23   Certificate No. XI01789
     Date: February 23, 2005
24
25

24 (Pages 90 to 93)



1

1         C E R T I F I C A T E

2

3

4

5         I, Christi A. Argenbright, a Notary Public and

6    Certified Shorthand Reporter of The State of New

7    Jersey do hereby certify that the foregoing is a true

8    and accurate transcript of the testimony as taken

9    stenographically by and before me at the time, place

10   and on the date hereinbefore set forth.

11        I do further certify that I am neither a

12   relative nor employee nor attorney nor counsel of any

13   of the parties to this action, and that I am neither

14   a relative nor employee of such attorney or counsel

15   and that I am not financially interested in this

16   action.

17

18   _____
     Christi A. Argenbright, C.S.R.
19   Notary Public, State of New Jersey
     My commission expires October 16, 2005
20   Certificate No. XI01789

21

22

23

24

25

# EXHIBIT J

1800 M Street, N.W.
Washington, D.C. 20036-5869
Tel. 202-467-7000
Fax: 202-467-7176

# Morgan, Lewis
## &Bockius LLP
### COUNSELORS AT LAW

## FAX MESSAGE

Send to:

| Dominic J. Hanket | Lockheed Martin | Fax: 818-847-0256<br>Phone: 818-847-0789 |
| Linda Doucette-Ashman | Cytec Industries | Fax: 973-367-3058<br>Phone: 973-367-3136 |
| Karen Hill | Ashland Chemical | Fax: 614-790-4258<br>Phone: 614-790-3319 |
| Ralph Lombardo | U.S. Navy | Fax: 610-595-0611<br>Phone: 610-595-0606, ext. 152 |
| Jackie McGowan | Riker, Danzig (AERC/AETC) | Fax: 973-538-1984<br>Phone: 973-538-0800 |
| Dennis Shea | SPS Technologies, inc. | Fax: 215-517-2030<br>Phone: 215-517-2023 |
| Sharon Mermuys | Ford Motor | Fax: 313-390-3083<br>Phone: 313-594-1656 |
| Edward Fackenthal, Esq. | NRM Investment | Fax: 610-279-0696<br>Phone: 610-279-3370 |
| Jack Wilmer | Vorys, Sater, Seymour & Pease, LLP | Fax: 202-467-8900<br>Phone: 202-467-8819 |
| David Dixon | Scangarella & Feeney | Fax: 973-839-4203<br>Phone: 973-839-6100 |
| Ken Arnold | Lucent | Fax: 973-606-3345<br>Phone: 973-606-4095 |

From:

Name:   Farleigh Earhart          Floor: 8th     Operator Sending:

Telephone Number:   (202) 467-7674          Time Sent:     Date Sent: March 16, 1998

Number of Pages (INCLUDING COVER PAGE):   7

Note:

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU.

Comments:

Re: PRP Search Firm

DO NOT SEND TO CLIENTS - TEAR ALONG DOTTED LINE - THIS PORTION FOR BILLING PURPOSES ONLY.

BSAI075438

MEMORANDUM

Morgan, Lewis
& Bockius LLP

COUNSELORS AT LAW

125 years
1 8 7 3    1 9 9 8

TO:     Boarhead Farms PRPs
        Kenneth R. Arnold
        David C. Dixon
        Linda Doucette-Ashman
        Edward Fackenthal
        Dominic Hanket
        Karen Hill
        Ralph Lombardo
        Jackie McGowan
        Sharon A. Mernuys
        Dennis R. Shea
        John W. Wilmer, Jr.

FROM:     Farleigh Earhart

DATE:     March 16, 1998

SUBJECT:     PRP Search Firm

Attached for your consideration is a PRP search proposal letter prepared by Jeremy Akers of Environmental Strategies Management. Mr. Akers was recommended to me last week, and, at my request, prepared this proposal on short notice so that we could review it with the others during our call on Wednesday. The call is scheduled for 11 a.m. Wednesday, March 18. The dial-in number of (202) 467-7930.

BSAI075439

# Environmental Strategies Management

### 4632 Reservoir Road, NW, Washington, DC, 20007
Phone/ Fax: 202-968-6516

March 15, 1998

Farleigh Earhart, Esquire
Morgan, Lewis & Bockius
1800 M Street, N.W.
Washington, D.C., 20036

Re: Proposed PRP Investigation of Boarhead Farms Site

Dear Ms. Earhart,

At your request, I am forwarding to you this letter which largely summarizes the information I provided to you during our telephone conversation of March 13. I understand that you will be providing copies of this letter along with my personal resume to certain other attorneys who will be working with you in the Boarhead Farms PRP investigation.

As reflected by my resume, I have over thirty years of investigative experience. This experience includes the supervision of a team of Congressional investigators; a stint as a criminal prosecutor; a significant period of time as a federal environmental litigator; a period of time with the environmental division of an international investigations company; and, currently, the chief operations officer of my own environmental consulting company. Although my company, Environmental Strategies Management ("ESM"), provides a number of services, it specializes in Potentially Responsible Party ("PRP") searches.

*ESM Personnel* As the chief operations officer of ESM, I both supervise the PRP searches, and actively participate in field investigations. The personnel used by ESM in its PRP investigations consist of environmental attorneys, retired federal investigative agents, and local law enforcement officials.

BSAI075440

ESM Rates  ESM charges a straight hourly rate of $100, plus expenses for its investigative services. This rate applies to each investigator utilized by ESM in any particular case. Paralegals, although rarely used, are billed at $35 per hour. Expenses include hotels, transportation, food, supplies, and incidental expenses such as database searches, document acquisition, and photography.

Outline of Boarhead Farms PRP Investigation  In the conduct of its PRP investigations, ESM closely coordinates its activities with the supervising attorney(s). Therefore, it is possible, given the supervising attorney's present superior knowledge of the site, that the following outline steps might be modified:

1. Review of all materials relating to the Boarhead Farms and Revere Chemical sites in the possession of the attorneys, including EPA reports, PADEP reports, BCDOH reports, local police reports, public meeting transcripts, aerial photographs, site sketches, and legal documents such as depositions;

2. To the extent that possibly relevant materials from the above sources are not in the possession of the attorneys, such materials should be promptly located and reviewed;

3. Personnel from federal, state, and local agencies who have personal knowledge about the Boarhead Farms site as well as the Revere Chemical site should be located and interviewed.  This would include people who generated reports about the sites.

4. Additional aerial photographs of the site should be located and obtained, especially those which predate the 1970 aerial photos apparently thus far obtained;

5. Persons living in the vicinity of the Boarhead Farms site as well as those living near the Revere Chemical site should be identified and interviewed;

6. Local law enforcement personnel, including the State Highway Patrol, with knowledge of local traffic should be identified and interviewed;

7. Former employees, including truck drivers, of Manfred DeRewal and his various enterprises including Boarhead Farms, Boarhead Corporation, DeRewal Chemical Co., Echo Inc., and Revere Chemical Company should be identified, located and interviewed;

2

BSAI075441

# JEREMY RAY AKERS

PROFESSIONAL EXPERIENCE

### Environmental Strategies Management
Washington, D.C.

- Chief executive of an environmental consulting firm that combines legal and investigative perspectives with scientific and technical expertise to support a broad range of services including responsible party identification and asset searches; reconstruction of site histories; environmental audits and assessments; cost allocation; and public relations services.

### Kroll Environmental Services
Washington, D.C.

- Director of Corporate Services for international company that provided environmental consulting, investigative, and allocation services for U.S. and foreign corporations as well as for law firms, and investment and commercial banks; supervised environmental investigative teams at hazardous waste sites to reconstruct site histories and identify the character and source of waste contained in the site; supervised allocation projects at hazardous waste sites in which contributing parties were assigned liability based upon individual percentages of waste volume and toxicity; supervised witness and asset searches; provided liaison services between corporate clients and local, state, and federal regulatory agencies.

### United States Department of Justice
Washington, D.C.

- Trial Attorney assigned to Environmental Enforcement Section of Environment and Natural Resources Division. Responsible for investigation, evaluation, preparation, negotiation, and trial of cases arising under federal environmental statutes including the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA" or "Superfund"), the Resource Conservation and Recovery Act ("RCRA"), the Toxic Substances Control Act ("TSCA"); the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), the Clean Air Act ("CAA"), and the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA").

### Office of the State Attorney
Dade County, Florida

- Assistant State Attorney; trial attorney responsible for investigation, evaluation, preparation and trial of criminal cases; also assigned to Economic Fraud Division, specializing in investigation and trial of white collar crime, political corruption, Food Stamp and Medicare fraud cases; supervised and directed criminal investigative teams consisting of law enforcement officers from local police departments, state agencies and the State Attorney's Office.

BSAI075442

**House Select Committee on Assassinations**　　　Washington, D.C.

- As Staff Counsel, formulated and wrote investigative outline identifying intermediate objectives and ultimate issues to be resolved over a two-year period of investigation; supervised and directed investigative team of four research assistants and four criminal investigators; coordinated and negotiated policy decisions between the Committee, local police departments, the Federal Bureau of Investigation, and the Central Intelligence Agency; supervised ballistic, fingerprint, handwriting, and soil/fiber analysis projects; planned, coordinated and wrote testimony for Congressional hearings; conducted Congressional hearings, including direct and cross-examination of witnesses in televised sessions.

**EDUCATION**

**University of Virginia Law School**　　　Charlottesville, Virginia

**MILITARY EXPERIENCE**

**United States Marine Corps**

- Served as Infantry Platoon Commander with Company I., Third Battalion, Fourth Regiment, Third Division during combat operations in the Republic of Vietnam; served as Aerial Observer and Forward Air Controller with the Intelligence Section of the Third Division; served as Infantry Instructor at The Basic School, Quantico, Virginia.

- Awarded: Silver Star; Three Air Medals; Two Purple Hearts; Vietnamese Cross of Gallantry with Gold; Combat Action Ribbon; Presidential Unit Citation; National Defense Service Medal; Vietnamese Campaign Medal with Two Stars; Vietnamese Service Medal with Two Stars.

**PROFESSIONAL AFFILIATIONS**

- The State Bar of California since 1973;

- The State Bar of Florida since 1980;

- The Bar of the Supreme Court of the United States since 1978.

BSAI075443

1800 M Street, N.W.

Washington, D.C. 20036-5869

202-467-7000

Fax: 202-467-7176

# Morgan, Lewis
## & Bockius LLP
COUNSELORS AT LAW

Michael W. Steinberg
202-467-7141

March 20, 1998

Ralph Lombardo, Esquire
Office of General Counsel
U.S. Navy
Northern Division
Naval Facilities Engineering Command 09C Dept. Code
10 Industrial Highway MSC82
Lester, PA   19113-2090

Re:      Boarhead Farms Superfund Site
         Funding of PRP Search

Dear Mr. Lombardo:

As you are aware, several PRPs at the Boarhead Farms Superfund site are coordinating two important efforts to prepare comments on the Proposed Remedial Action Plan presented by EPA in January, 1998 and to locate additional PRPs at the Site. With a comment deadline of April 6, drafting of the technical comments is well underway. The group also is in the final stages of selecting a PRP search consultant, with the goal of identifying additional PRPs prior to the anticipated mid-summer entry of a final Record of Decision.

The purpose of this letter is to request that the Navy participate with the other PRPs in funding the PRP search. Our immediate plan is to collect per capita contributions from participating PRPs to fund an initial search budget not to exceed $60,000. Once PRPs are located, they will invited to join the group with the expectation that, by doing so, they will contribute towards past and future search costs. When viewed in light of the fact that EPA's past costs at the site are close to $12 million and the proposed plan is very likely to exceed its cost estimate of $13 million, the cost to identify additional PRPs at the site is a worthwhile investment.

The PRPs are sensitive to the fact that the Navy faces unique issues that may prevent it from entering into a formal PRP group agreement. Participation in funding the PRP search, however, would not require the Navy's signing such an agreement. We therefore hope that the Navy will contribute a per capita share of an initial $60,000 budget to accomplish the significant task of enlarging the number of PRPs at the site.

BSAI075444

Morgan, Lewis
& Bockius LLP

March 20, 1998
Page 2

If you would call me at your earliest convenience, I would be happy to explain our anticipated search strategy and the steps we have taken thus far in selecting an investigator. As we intend to proceed with the search quickly, I would appreciate your informing me of the Navy's willingness to participate no later than Monday, April 6, 1998.

Yours very truly,

Michael W. Steinberg

cc:    Boarhead Farms PRP Group

BSAI075445

1800 M Street, N.W.
Washington, D.C. 20036-5869
Tel. 202-467-7000
Fax: 202-467-7176

# Morgan, Lewis
## & Bockius LLP
### COUNSELORS AT LAW

## FAX MESSAGE

Send to:

| Dominic J. Hanket | Lockheed Martin | Fax: 818-847-0256<br>Phone: 818-847-0789 |
| Linda Doucette-Ashman | Cytec Industries | Fax: 973-357-3058<br>Phone: 973-357-3136 |
| Karen Hill | Ashland Chemical | Fax: 614-790-4268<br>Phone: 614-790-3319 |
| Ralph Lombardo | U.S. Navy | Fax: 610-595-0511<br>Phone: 610-595-0606, ext. 152 |
| Jackie McGowan | Riker, Danzig (AERC/AETC) | Fax: 973-538-1984<br>Phone: 973-538-0800 |
| Dennis Shea | SPS Technologies, Inc. | Fax: 215-517-2030<br>Phone: 215-517-2023 |
| Sharon Mermuys | Ford Motor | Fax: 313-390-3063<br>Phone: 313-394-1656 |
| Edward Fackenthal, Esq. | NRM Investment | Fax: 610-279-0696<br>Phone: 610-279-3370 |
| Jack Wilmer | Vorys, Sater, Seymour & Pease, LLP | Fax: 202-467-8900<br>Phone: 202-467-8819 |
| David Dixon | Scangarella & Feeney | Fax: 973-839-4203<br>Phone: 973-839-5100 |
| Ken Arnold | Lucent | Fax: 973-606-3345<br>Phone: 973-606-4095 |

From:

Name:  Farleigh Earhart                          Floor: 8th      Operator Sending:

Telephone Number:   (202) 467-7674               Time Sent:      Date Sent: March 24, 1998

Number of Pages (INCLUDING COVER PAGE): 5

Note:

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU.

Comments: Attached is a draft contract for PRP search services prepared by Jeremy Akers of Environmental Strategies Management. Please let me know if you have comments or suggestions.

DO NOT SEND TO CLIENTS - TEAR ALONG DOTTED LINE - THIS PORTION FOR BILLING PURPOSES ONLY. BSAI075446

# Environmental Strategies Management

**4632 Reservoir Road, NW, Washington, DC, 20007**
Phone/ Fax: 202-985-8518

DRAFT

March 21, 1998

Mr. Michael Steinberg, Esquire
Ms. Fairleigh Earhart, Esquire
Morgan, Lewis & Bockius, LLP
1800 M Street, N.W.
Washington, D.C.    20036-5689

                              Re: PRP Investigation re Boarhead Farms Site

Dear Mr. Steinberg and Ms. Earhart,

    This letter is provided to confirm your PRP Group's engagement of
Environmental Strategies Management ("ESM") for the purpose of conducting a
Potentially Responsible Party ("PRP") investigation relating to the Boarhead
Farms Site located on Lonely Cottage Road in Upper Black Eddy, Bridgeton
Township, Bucks County, Pennsylvania.

### 1.  Services

    Your PRP Group, consisting of [ _____ ]
has asked ESM to conduct a PRP investigation relating to the Boarhead Farms
site.  During the course of the Assignment, ESM agrees to coordinate its
activities closely with the PRP group.  As discussed, ESM will initiate the PRP
search with three field persons.  Given the relatively large scope of the
assignment combined with potentially constricted time lines, it may be desirable
to add one or more field personnel.  Prior to the utilization of any additional field
personnel, ESM will obtain the approval of the PRP group.

BSAI075447

## 2. Engagement Terms

If any person or entity requests or subpoenas any information or material relating to the Assignment which is within our custody or control (or the custody of any or our agents or representatives), ESM will inform the PRP Group of such request or subpoena. Should the PRP Group require us to the take any legal action to seek protection against disclosure of such information or materials, the PRP Group will either retain legal counsel to represent ESM, or will indemnify ESM for all costs and expenses, including reasonable attorney's fees and disbursements, resulting from such action.

The PRP Group agrees to hold harmless and indemnify ESM (including officers, employees and agents) against all claims; damages and costs (including reasonable attorney's fees and disbursements) arising out of the Assignment, except for such claims, damages and costs resulting from actions by ESM constituting fraud or unlawful conduct.

## 3. Confidentiality

The PRP Group agrees that reports and information received form ESM will be treated as confidential and are intended solely for the PRP Group's private and exclusive use.

ESM agrees to maintain the confidentiality of all confidential, proprietary, and privileged information received from the PRP Group.

## 4. Retainer, Fees and Charges

An initial retainer fee of $10,000 is required prior to the commencement of field work. This fee will be credited to the first four bi-monthly invoices.

As previously discussed, ESM will charge $100 per hour for its two senior personnel, Mr. Akers and Mr. Connor. All other field personnel will be billed at $80 per hour. Paralegals, if utilized, will be billed at $35 per hour.

Additional charges will include out-of-pocket expenses that cover hotels, transportation, food, supplies, and other incidental expenses such as database searches, document acquisition, and photography.

BSAI075448

ESM intends to provides invoices to the PRP Group on a bi-monthly basis. Payment of invoices is due promptly upon receipt, and any unpaid balances will accrue interest at the rate of 20% per annum from 30 days after the date of each invoice.

This agreement shall be effective as of the date on which ESM first provides services to the PRP Group. If this letter is satisfactory to you, kindly execute and return the enclosed copy.

ESM looks forward to working with you, and achieving a successful conclusion.

Very truly yours,

Jeremy Ray Akers, Esquire
President, Environmental Strategies Management

**Accepted and Agreed to this**

_____ of _____, 1998.

PRP GROUP

By: _____

Title: _____

Representing: _____

Date: _____

BSAI075449

FROM MORGAN, LEWIS - DC

Accepted and Agreed to this

_____ of _____, 1998.

PRP GROUP

By: _____

Title: _____

Representing: _____

Date: _____

Accepted and Agreed to this

_____ of _____, 1998.

PRP GROUP

By: _____

Title: _____

Representing: _____

Date: _____

Accepted and Agreed to this

_____ of _____, 1998.

PRP GROUP

By: _____

Title: _____

Representing: _____

Date: _____

BSAI075450

(FRI) 05. 22' 98 07:57/ST. 07:46/NO. 3560278743 P 1/3

FROM MORGAN LEWIS-DC

1800 M Street, N.W.
Washington, D.C. 20036-5869
Tel. 202-467-7000
Fax: 202-467-7176

**Morgan, Lewis**
**& Bockius** LLP

COUNSELORS AT LAW

## FAX MESSAGE

Send to:

| Kenneth R. Arnold | Lucent | Fax: 973-606-3345 Phone: 973-606-4095 |
|---|---|---|
| David C. Dixon | Scangarella & Feeney | Fax: 973-839-4203 Phone: 973-839-3100 |
| Edward Fackenthal, Esq. | NRM Investment | Fax: 610-279-0696 Phone: 610-279-3370 |
| Jennie Jaklitsch | Ciba | Fax: 914-785-4831 Phone: 914-785-2729 |
| Jackie McGowan | Riker, Danzig (AERC/AFTC) | Fax: 973-538-1984 Phone: 973-538-0800 |
| Sharon A. Mermuys | Ford Motor | Fax: 313-390-3083 Phone: 313-394-1656 |
| Dennis R. Shea | SPS Technologies, Inc. | Fax: 215-517-2030 Phone: 215-517-2023 |
| John W. Wilmer, Jr. | Vorys, Sater, Seymour & Pease, LLP | Fax: 202-467-8900 Phone: 202-467-8819 |

From:

Name:   Farleigh Earhart                     Floor: 8th       Operator Sending:

Telephone Number:   (202) 467-7674         Time Sent:      Date Sent: May 22, 1998

Number of Pages (INCLUDING COVER PAGE): 3

Note:

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU.

REDACTED

BSAI075856

FROM MORGAN LEWIS-DC

MEMORANDUM

**Morgan, Lewis**
**& Bockius** LLP

COUNSELORS AT LAW

*125 years*
1 8 7 3 — 1 9 9 8

TO:    Boarhead Farms PRPs
       Kenneth R. Arnold
       David C. Dixon
       Edward Fackenthal
       Jennie Jacklitsch
       Jackie McGowan
       Sharon A. Mermuys
       Dennis R. Shea
       John W. Wilmer, Jr.

FROM:       Farleigh Earhart

DATE:       May 22, 1998

SUBJECT:    PRP Conference Call

A conference call took place yesterday with Jeremy Akers, our PRP investigator. Jeremy reported that he met with Manfred De Rewal and was successful in persuading him to cooperate with the group. As he anticipated, Jeremy was asked which companies are in the group. Consistent with our initial decision, he has not revealed our identities. Those of us on the call agreed to re-think this decision since it may chill Jeremy's ability both to gain confidence of the interviewees and to focus the interviews on other PRPs. Please let me know your thoughts on this point so we may provide Jeremy with additional guidance.

Manfred maintains that most of his knowledge about the activities at the site is secondhand because he was not at the Boarhead Farm often. Nonetheless, Manfred volunteered that he believed that waste from Diaz Chemical and Ashland were disposed of at the farm. Jeremy used his first meeting with Manfred to get acquainted and will follow up with a series of questions about individual companies and their waste streams in later interviews.

Jeremy also met Bruce De Rewal and Manfred De Rewal, Jr. ("Fred") who worked as drivers and who have substantial information about the activities at the farm. Unfortunately Fred is currently under indictment for illegal storage of waste at an unrelated site and has been instructed by his attorney not to speak with anyone. Likewise, Bruce is under investigation for criminal activity and is reluctant to talk about the site. Both have also indicated that they have concerns about contradicting their sworn deposition testimony that they have little memory of what went on at the site. Jeremy will persist in trying to convince them to cooperate with us. The brothers' attitudes may change following Fred's June 6 trial.

BSAI075857

(FRI) 05. 22' 98 07:58/ST. 07:46/NO. 3560278743 P 3/3

Jeremy also located and spoke briefly with John Barsum, a former driver, and Linda Cochran, a former office assistant who lived at the farm. Jeremy will make plans to interview both of them.

We scheduled our next call for June 5 at 3 p.m. I will distribute a call-in number the week of June 1.

-2-

BSAI075858

Post-it® Fax Note    7671    Date 6/18/98    # of pages ▶ 3
To Jeremy Akers    From D. Shea
Co./Dept. c/o F. Earhart    Co. SPS
Phone # M L + Boelius    Phone # 202-467-7176
Fax # I don't have Jeremy's    Fax # fax #.
Please forward.

Manfred F. DeRewal Jr. also was found guilty of trying to manufacture methamphetamine.

A Bucks County man was convicted Monday on federal charges of illegally storing hazardous waste and attempting to manufacture methamphetamine at an industrial site in Doylestown.

A U.S. District Court jury in Philadelphia found Manfred F. DeRewal Jr., 41, guilty of violating federal law by storing 55-gallon drums of hazardous hydrochloric acid, nitric acid and solvents in a garage next to the former Chem-Fab plant on North Broad Street in Doylestown.

DeRewal also was found guilty of attempting to manufacture methamphetamine at the same property. He was acquitted of possessing a chemical called methylamine with the knowledge it would be used to make methamphetamine.

The trial started last Monday, and the jury began deliberating on Friday.

Federal Judge J. Curtis Joyner revoked DeRewal's bail and set sentencing for Sept. 16.

The defendant faces a maximum penalty of five years in jail and a $50,000-a-day fine on the hazardous waste charge, and 20 years imprisonment and a $1 million fine on the methamphetamine charge, according to Assistant U.S. Attorney

Christopher Hall, who prosecuted the case.

DeRewal formerly operated Electronic Metals Inc., a metal-extraction business located in a converted house and garage at 360 N. Broad St., which adjoins the Chem-Fab property at 300 N. Broad St. Both firms were owned by members of the DeRewal family.

DeRewal's father, Manfred, previously owned chemical companies in Bridgeton and Nockamixon townships and served two prison terms for environmental crimes. He also was imprisoned on federal drug smuggling and conspiracy charges.

The former president of Chem-Fab, Hans R. Becker, pleaded guilty in April to illegally storing hazardous waste in a leaking underground tank. Becker, who is awaiting sentencing July 29, has agreed to pay a $35,000 fine, Hall said.

That money will defray some of the estimated $300,000 cost of cleaning up the Chem-Fab and Electronic Metals sites. Hall said the government will seek to recover part of the cost from DeRewal.

DeRewal was indicted for his role in the Chem-Fab hazardous waste storage, but that charge was dropped in pre-trial proceedings.

DeRewal ran Electronic Metals Inc. until 1987 when it went out of business, according to Hall.

He said the defendant left fifty 55-gallon drums of chemicals inside the garage in a room with the door nailed shut. The liquids were flammable, corrosive or toxic.

Meanwhile, DeRewal continued to order through Chem-Fab chemicals used in the manufacture of methamphetamine, Hall said. DeRewal had laboratory glassware and equipment needed to make the drug.

Hall said DeRewal attempted to manufacture methamphetamine, but there is no evidence he actually produced the drug.

DeRewal also operated Electronic Marketing Group, a mail-order computer business started in 1993, first at 360 N. Broad St. and then in the Chem-Fab building. Chem-Fab shut down in November 1993.[1]

In September 1994, the U.S. Environmental Protection Agency received a tip that hazardous waste was being stored at the now-vacant properties at 300 and 360 N. Broad St.

In addition to the drums and underground storage tank, EPA agents also found laboratory equipment that could be used to make drugs. The federal Drug Enforcement Administration joined the investigation.

DeRewal was indicted in April 1997 on the hazardous waste and methamphetamine charges.

Hall said some of the hazardous chemicals stored in the garage had a flashpoint of 80 degrees, which means a spark easily could have ignited the vapors.

He said employees of the computer business worked in the same garage where the chemicals were stored behind a partition.

BSAI075837

The EPA subsequently removed the drums and cleaned up the Chem-Fab property.

Hall said the jury found DeRewal violated federal law on hazardous waste storage.

"This is not a hard-working small businessman who accidentally overlooked an obscure regulation. He deliberately abandoned chemicals," he said.

DeRewal's attorney, Anne Dixon of Philadelphia, could not be reached for comment.

Tuesday, June 16, 1998 <Picture>

BSAI075838

1800 M Street, N.W.
Washington, D.C. 20036-5869
Tel. 202-467-7000
Fax: 202-467-7176

# Morgan, Lewis
# & Bockius LLP
COUNSELORS AT LAW

**FAX MESSAGE**

Send to:

| Kenneth R. Arnold | Lucent Technologies | Fax: 973-606-3345<br>Phone: 973-606-4095 |
| David C. Dixon | Scangarella & Feeney for General Ceramics | Fax: 973-838-4203<br>Phone: 973-839-5100 |
| Edward Fackenthal, Esq. | Henderson, Wetherill, O'Hey & Horsey for NRM Investment | Fax: 610-279-0696<br>Phone: 610-279-3370 |
| Jennie Jacklitsch | Ciba Specialty Chemicals | Fax: 914-785-4831<br>Phone: 914-785-2729 |
| Jackie McGowan | Riker, Danzig for AETC | Fax: 973-538-1984<br>Phone: 973-538-0800 |
| Sandy Weaver | Ford Motor | Fax: 313-390-3083<br>Phone: 313-248-2352 |
| Dennis R. Shea | SPS Technologies, Inc. | Fax: 215-517-2030 or 215-517-2032<br>Phone: 215-517-2025 |
| John W. Wilmer, Jr. | Vorys, Sater, Seymour & Pease, LLP for National Rolling Mills | Fax: 202-467-8900<br>Phone: 202-467-8819 |

**From:**

Name:  Farleigh Earhart

Telephone Number:  (202) 467-7674

Number of Pages (INCLUDING COVER PAGE):  2

Floor:  8th

Time Sent:

Operator Sending:

Date Sent: August 31, 1998

**Note:**

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR, AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU.

BSAI075498

MEMORANDUM

Morgan, Lewis
& Bockius LLP

COUNSELORS AT LAW

*125 years*
1 8 7 3   1 9 9 8

TO:     Boarhead Farms PRPs
        Kenneth R. Arnold
        David C. Dixon
        Edward Fackenthal
        Jennie Jacklitsch
        Dennis R. Shea
        Sandy Weaver
        John W. Wilmer, Jr.


FROM:       Farleigh Earhart

DATE:       August 31, 1998

SUBJECT:    Draft Report, Invoice and Conference Call

Attached is the draft report prepared by Jeremy Akers as well as his invoice for services through
August 9. I propose that we have a **conference call** on **September 9 at 10:00 a.m.** to discuss
them. Please let me know if you will not be available. I will distribute a reminder with the dial-
in number prior to the 9th.

WM03/116257.1

BSAI075499

# Environmental
# Strategies
# Management

4632 Reservoir Road, N.W., Washington, D.C., 20007
Telephone/Fax:   202-965-6516

# FAX COVER SHEET

## Recipient(s):
Michael Steinberg
Morgan, Lewis & Bockius

## Recipient Fax: 202-467-7176

## Sender:   Jeremy R. Akers
## Sender's Direct Line: 202-965-6516

## Date: August 27, 1998

## Re:   Interim Status Report

CONFIDENTIALITY NOTICE

The information in this telecopy is intended for the named recipients only. It may contain privileged and confidential matter. If you have received this telecopy in error, please notify us immediately at 1-800-417-6499, and return the original to the sender by mail. We will reimburse you for postage. Do not disclose the contents to anyone. Thank you for your assistance and cooperation.

## Remarks:

Dear Mike:

Attached is the draft of the interim Status Report. As instructed I have attempted to make it short and to the point. Once you have distributed it to the members of the PRP Group and have received their comments, I shall expect to hear from you.

I still have not heard from Freddie DeRewal, but have spoken to Andy Duchovnay, who hopes to have records available for me next week.

## Total Pages W/ Cover: 6

REMARKS:   ☐ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please comment

AUG 27 1998 11:58

PAGE.01

BSAI075500

# Environmental Strategies Management

### 4632 Reservoir Road, NW, Washington, DC, 20007

Phone/ Fax: 202-995-6516

*Privileged & Confidential*
*Attorney/Client Work Product*
*Do Not Disclose*

# DRAFT
# M E M O R A N D U M

## Joint Defense Privilege

**To:**       Boarhead Farms Site PRP Group

**From:**       Jeremy Akers

**Date:**       August 24, 1998

**Re:**       Interim Status Report

### I: Introduction

The purpose of this Interim Status Report is to briefly encapsulate the findings to date of the Boarhead Farms PRP investigation. These preliminary findings, which have been previously communicated to the PRP Group in a series of telephone conference calls, are presented in summary form without elaboration. Therefore, there is no discussion in this report of significant events and time lines which support the proposition that waste materials were disposed of at Boarhead Farms during the time period from 1969 through, at least, 1977, and possibly as late as 1983. There is also largely no discussion of those specific projects which

BSAI075501

need to be completed in order to "firm up" the liability of the PRP's listed herein. Additionally, there is no discussion of Marvin Jonas or his disposal activities.

It should be noted that the "Preliminary PRP Listing," which occupies the main body of the report, purposefully does not include any of the members of the PRP Group. This is due to the fact that specific instructions were given prior to the onset of the investigation that questions relating to the potential liability of PRP Group members were neither to be raised nor pursued. Presumably, such questions will be addressed in the next phase of the investigation for allocation purposes.    Therefore, the final report will include all companies, including members of the PRP Group which have been identified as having contributed waste materials to the Boarhead Farms Site.    ‌‌‌‌‌‌‌‌‌‌‌‌‌‌L alleged to have                 L that subst.

Although thousands of pages of documents have been reviewed and a large number of persons have been interviewed to date, including neighbors, government officials, DeRewal family members, and ex-employees of the various Manfred DeRewal enterprises, the information presented in this report relating to the potential responsibility and liability of specific companies primarily derives from a series of interviews with Manfred DeRewal, Sr. Some information is additionally based upon incomplete interviews with three DeRewal Chemical Company employees, Linda Cochran, an administrative employee, John Barsum, a truck driver, and Michael Minthorn, an employee and son of a deceased DeRewal truck driver.

As noted in the various PRP Group telephone conferences, additional DeRewal Chemical truck drivers essentially fall into these groupings: [1] Dead; [2] Unlocated; [3] Unwilling to talk. Of these three categories, category three, which consists of three family members, Freddie DeRewal, Bruce DeRewal, and Jeff Shaak, appears to be the most promising in terms of providing relevant PRP information.    There are additionally at least two other persons who may be able to offer significant PRP information. One is Karen Bean, a former DeRewal Chemical Company employee who worked closely with Manfred DeRewal in the late 1960's and early 1970's. The other is John Lapsley, a retired policeman, who stopped and talked to many of the DeRewal truck drivers. Both are presently living in Florida.

## II. Preliminary PRP Listing [1]

The below Preliminary PRP Listing contains the names of companies whose waste is currently believed to have been disposed of at the Boarhead Farms Site along with their location and the type of waste disposed. It is likely that the

---

[1]  It should be noted that Manfred DeRewal has indicated that, in at least some cases, it would be necessary for him to review his company's operating records, presently in the possession of the Environmental Protection Agency, in order to solidify and possibly expand his twenty-five year old memory concerning the companies herein listed.

BSAI075502

information in this listing will be modified and possibly expanded after additional witness interviews. Such interviews will be conducted with the assistance of DeRewal Chemical Company operating records which are currently in the custody and control of Region III of the U.S. Environmental Protection Agency.

1. Ashland Chemical, Inc.
Great Meadows, NJ
[nitrating acid]

2. American Cyanamid
Boundbrook, NJ and Sommerville, NJ
[ammonium hydroxide]

3. Bostick South
Greenville, SC
[nitrating acid]

4. Brush Beryllium Corporation
Shumakersville, PA
[dilute nitric acid]

5. Burroughs Corporation [Unysis]
Paoli, PA
[etching solutions ?]

6. Carpenter Technology
Reading, PA
[hydrochloric acid]

7. Diaz Chemical Corporation
Holley, NY
[nitrating acid]

8. Drake Chemical
Lockhaven, PA
[nitrating acid ?]

9. Etched Circuits
[etching solutions including perhaps copper ammonium sulfate]

10. Flexible Circuits, Inc.
Warrington, PA
[etching solutions including probably copper ammonium sulfate]

BSAI075503

11. George A. Erkenbrach Co.
Moonachie, NJ
[etching solutions]

12. McArthur Chemical
Quebec, Canada
[copper ammonium sulfate]

13. Mohawk Data Services
Herkimer, NY
[etching solutions?]

14. Meritt Metals Products Corporation
Warrington, PA
[plating solutions containing among other possible metals cadmium

15. Naval Air Development Center
Warminster, PA
[mixture of chemicals from experimental activities]

16. NCR Corporation
Cambridge, OH
[ferric chloride]

17. Municipality of Princeton, NJ
[sewage sludge]

18. Radio Corporation of America [RCA]
Moorestown, NJ
[etching solutions including spent chromic acid]

19. Rahns Specialty Metals, Inc.
Norristown, PA
[hydrochloric acid]

20. Rohm and Haas Company
Philadelphia, PA and Bristol, PA
[acrylic latex]

21. Sitkin
Lancaster, PA [area]
[dilute acid and fly ash]

BSAI075504

22. Sperry Rand Corporation [Univac]
Blue Bell, PA
[etching solutions?]

23. Sylvan Chemical Co.
Englewood, NJ
[copper salts]

## III. Conclusion

Although no due diligence has been performed with respect to the companies herein listed, it appears that the overwhelming majority are currently active and engaged in normal business activities. A review of DeRewal Chemical Company records, which are currently in the possession of EPA, should shed relevant light upon not only the period of time during which each listed company disposed of waste materials through DeRewal, but also the volumes of those materials.

BSAI075505

LAW OFFICES

## HENDERSON, WETHERILL, O'HEY & HORSEY

SUITE 902·ONE MONTGOMERY PLAZA

P. O. BOX 751

NORRISTOWN, PENNSYLVANIA 19404

TELEPHONE (610) 279·3370
TELECOPIER (810) 279·0696

EDWARD FACKENTHAL
KATHARINE G. LIOZ

COUNSEL
ELKINS WETHERILL
J. G. GORDON YOCUM

KNOX HENDERSON
(1801-1871)

WILLIAM L. O'HEY, JR.
(1934-1991)

ALONZO R. HORSEY
(1898-234·)

TELECOPIER COVER PAGE

DATE ___12-28-98_____

TIME _____

WE ARE TRANSMITTING ___3___ PAGES, INCLUDING THIS COVER PAGE.

PLEASE DELIVER TO:

NAME: ___Mr. Dennis R. Shea_____ 215-517-2030___

COMPANY: ___SPS Technologies, Inc._____

FROM: ____EDWARD FACKENTHAL, ESQUIRE
HENDERSON, WETHERILL, O'HEY & HORSEY

FAX (610) 279-0696
_PHONE (610) 279-3370

SPECIAL INSTRUCTIONS:_____

_____

_____

_____

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY
PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE
OF THE INTENDED RECIPIENT NAMED ABOVE. . IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT
RESPONSIBLE TO DELIVER  IT TO THE INTENDED RECIPIENT, YOU ARE
HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING
OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RE-
CEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US BY TELEPHONE
AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS ABOVE VIA
UNITED STATES POSTAL SERVICE

BSAI075558

LAW OFFICES

## HENDERSON, WETHERILL, O'HEY & HORSEY

SUITE 802-ONE MONTGOMERY PLAZA

P. O. Box 751

EDWARD FACKENTHAL
KATHARINE G. LIDZ

NORRISTOWN, PENNSYLVANIA 19404

TELEPHONE (610) 279-3370
TELECOPIER (610) 279-0996

COUNSEL
ELKINS WETHERILL
J. G. GORDON YOCUM

KNOX HENDERSON
(1931-1971)

WILLIAM L O'HEY, JR.
(1934-1981)

ALONZO R. HORSEY
(1886-1954)

December 28, 1998

Farleigh Earhart
Kenneth R. Arnold
David C. Dixon
Jennie Jacklitsch
Dennis R. Shea
Sandy Weaver
John W. Wilmer, Jr.

**SENT TO THE ABOVE VIA FACSIMILE**

Re: Boarhead Farms Environmental Matter

Dear Group Member:

I enclose a draft of a letter I would like to send to EPA's Andrew Goldman early in 1999. The information in the letter falls within the "shared information" paragraph 12 of our organization agreement and, and accordingly should not be released without the consent of all members. As you will see, the draft letter is written on behalf of my client and not on behalf of the group or any other single member. Please be in touch with me promptly to let me know if there is any objection to the mailing of my letter and the enclosure named therein, or any comment on the format of the letter. I will not mail it absent affirmative approval from all.

Very truly yours,

Edward Fackenthal

EF:kk

BSAI075559

**DRAFT**

LAW OFFICES

## HENDERSON, WETHERILL, O'HEY & HORSEY

SUITE 902·ONE MONTGOMERY PLAZA

P. O. BOX 751

NORRISTOWN, PENNSYLVANIA 19404

EDWARD FACKENTHAL
KATHARINE G. LIDZ

TELEPHONE (610) 279-3370
TELECOPIER (610) 279-0696

COUNSEL
ELKINS WETHERILL
J. G. GORDON YOCUM

KNOX HENDERSON
(1831-1971)

December      , 1998

WILLIAM L O'HEY, JR.
(1894-1991)

ALONZO R. HORSEY
(1856-1994)

Mr. Andrew Goldman, Sr.
3RC21
EPA Region 3
1650 Arch Street
Philadelphia, PA  19103

Re: Boarhead Farms

Dear Mr. Goldman:

I believe you are aware that a group entitled "the Boarhead Farms PRP Group" exists to respond to claims that the Environmental Protection Agency has made and may make in the future. The Agency issued a Record of Decision in November, 1998. I understand that cleanup orders under Section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 will be forthcoming based upon the ROD and directed to some or all of our group members. My firm represents one of the members.

The group employed an investigator, Jeremy R. Akers of Environmental Strategies Management, to collect information about possible contributors to the site during the relevant time period. Much of his work was interviewing Manfred DeRewal. He prepared an interim report of his investigation which lists 21 entities not participating in our group which according to the investigation have some linkage to the site. I enclose a copy of the interim report which shows the linkage. There is also some evidence of other entities that may have a link to Boarhead based upon documents or lables. They are Unisys, Thomas & Betts, Quantel Corporation, Fuji Hunt Photographic Chemicals, Inc., Quaker Chemical Corporation, Elf Atochem North America, Inc., Olin Corporation, GAF Corporation, and Lockheed.

If my understanding is correct that 106 orders are to be issued, it is my request that the Agency use the information contained in the report, together with any information it may have independently thereof to include some or all of these entities as recipients of orders.

Very truly yours,

Edward Fackenthal

EF:kk

BSAI075560



Partner Sites:
Newsweek.com
Britannica Internet Guide

Related Items

From The Post
■ June 7:
Romance Novelist
Slain in D.C.

On the Web

■ Nancy Richards-
Akers's Web page
■ RealAudio:
Richards-Akers
reads from one of
her books, on the
Free Gallery of
Authors' Voices
Web site.

# Romance Novelist Slain in D.C.

*By Peter Slevin and Alan Sipress*
*Washington Post Staff Writers*
*Monday, June 7, 1999; Page A1*

Nancy Richards-Akers, a popular romance
novelist, was shot twice in the back of the head
and killed by her estranged husband on
Reservoir Road NW late Saturday as their two
young children watched, D.C. police said
yesterday.

A short time later, in the grass facing the
Vietnam Veterans Memorial, a man who police
believe was Jeremy R. Akers put a shotgun
barrel into his mouth and pulled the trigger as
two U.S. Park Police officers approached. He
died instantly.



Nancy Richards-Akers
dressed up for
Halloween in an
undated family photo.
(From Nancy Richards-Akers's
Web site)

The shooting outside the home the couple once shared shocked
residents in a neighborhood of elegant houses and solid reputations,
where violent crime is all but unknown. A police officer said the
couple's two elementary-school-age children had been living with
their father, a former Marine, and were left behind when he fled after
shooting Richards-Akers inside her red Jeep.

Yesterday, as friends gathered to console one another, one neighbor
said, "None of the people in the family want to talk. They're
absolutely shredded. We're absolutely shredded."

Susan Milloy, principal of Our Lady of Victory Elementary School,
visited the Akers children, who are in the fourth grade and fifth grade
at the nearby Catholic school. She said that the parents of all 155
students would be alerted and that a grief counselor would be at the
school today.

"A very nice family," Milloy said. "We are shocked and saddened.
Right now, our focus is helping the children through this and keeping
them in our prayers."

The Rev. William Foley, priest at Our Lady of Victory Church, said,
"The only thing I can say is they both cared about their kids."

Grim details about the deaths outnumbered public details about what triggered them.

Richards-Akers, 45, wrote 16 historical romance novels, including such titles as "Devil's Wager" and "Miss Wickham's Betrothal." Her latest offering was "So Wild a Kiss," and she painted lively portraits of herself in Internet interviews and on World Wide Web sites that she managed.

"All my fiction is inspired by real life," Richards-Akers wrote. "Nancy will never cease to marvel at the wonder of working at home to spin romantic tales of faraway places, forgotten times, heroic men and courageous, self-aware heroines."

The family moved into the large, shaded house in the 4600 block of Reservoir Road, across the street from the German Embassy, in 1993. Richards-Akers spent long hours writing. Jeremy Akers, a lawyer, also worked at home.

After the marriage soured, police said, Jeremy Akers, 57, stayed in the home with the children while Richards-Akers moved into a nearby apartment on MacArthur Boulevard. The couple, who also had an adult child, split the child-rearing duties, and the children often were seen around the neighborhood with their father.

One neighbor, who said she traded polite greetings with Jeremy Akers scant minutes before the shooting, described him as an intense man who often volunteered his sharply conservative political views.

"He was very vocal about it," said the neighbor, who asked not to be further identified. "He liked to have intense conversations with people. He was the kind of guy who got in your personal space and you had to step back."

Akers also made it known that he kept guns in the house, said the neighbor, who added that he had offered to provide protection for her against crime. She said such protection seemed unnecessary in the quiet community.

Witnesses reported gunshots shortly before 10:30 p.m. Saturday. Police and paramedics who raced to the scene found Richards-Akers slumped inside her Jeep. A paramedic described two wounds in the back of her head from a small-caliber handgun. Attempts to revive her failed.

A neighbor took the two children from the house, police said.

Witnesses said Akers fled in a Mercury Mountaineer sport utility vehicle. About 90 minutes after officers broadcast a lookout call, one of Jeremy Akers's friends called police to say Akers had called him.

Police traced Akers's call to a pay telephone near the Lincoln Memorial.

At 12:50 a.m., as Park Police officers neared the dark, wing-shaped Vietnam Veterans Memorial off Constitution Avenue NW, they saw Akers seated on the grass about 50 feet from the monument's etched wall, authorities said. When Akers saw them, D.C. police said, he shot himself.

Akers's Mountaineer was found nearby. Police have not formally identified the body but said Akers's relatives will view the remains today.

"Strange, sad, horrible," one neighbor said of the night's events.

Richards-Akers, a 1971 graduate of Mount Vernon College, said in a recent interview with Amazon.com, an online bookseller, that she wrote speeches for a North Carolina congressman early in her career and later worked at a firm that produced political ads.

"What a detour those years were," Richards-Akers said, "and if it hadn't been for my son asking me, 'Mommy, what are you going to be when you grow up?,' I suppose I might still be writing the words to come out of other people's mouths."

Asked about her workdays, she said she started at 8 a.m. Monday through Friday and continued until "later afternoon. Often I start up again in the evening, if I'm on deadline or have this wonderful flow of ideas and energy that won't stop. Same goes for Saturday and Sundays."

Richards-Akers, whose 1997 book "Wild Irish Skies" was named one of the top 10 romance novels of that year by The Washington Post, spoke gratefully of the world she created in her fiction.

"I do love historical romance, and especially as a genre for Irish historicals, because history can be depressing and dreary, dark, cold, dank, unliberated and hopeless," the author said. "But romance allows me to find the happy ending, to modify reality just enough to give it hope."

© Copyright 1999 The Washington Post Company

Back to the top



# MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

## ATTORNEYS AT LAW

123 SOUTH BROAD STREET · PHILADELPHIA, PA 19109-1029 · 215-772-1500 · FAX 215-772-7620

DAVID H. MARION
RALPH W. BRENNER
HARRY CARL SCHAUB
ARTHUR H. MOSS
DAVID L. GROVE
JOHN C. WRIGHT, JR.
ANTHONY F. VISCO, JR.
JOHN W. FRAZIER, IV
BALDO M. CARNECCHIA, JR.
JEFFREY R. LERMAN
STEPHEN A. MADVA
STEPHEN W. ARMSTRONG
FRANCIS PATRICK NEWELL
JOHN E. CARUSO
EDWARD T. ELLIS
LARRY R. BARRON
LEONARD A. BUSBY
JEREMY D. MISHKIN
JAMES A. WILLHITE, JR.
CHRISTOPHER SCOTT D'ANGELO
JOYCE S. MEYERS
GARY M. EDELSON
RICHARD G. PLACEY
PATRICK T. RYAN
CHARLES B. CASPER
NATALIE D. RAMSEY
FRANCES A. McCHILL
JOHN J. LEVY
JULIE HOFMANN CHELIUS
JAMES J. EISENHOWER
STEPHAN I. CUTLER
PATRICK J. HARVEY
SALLY ACKERMAN KING
M. HOWARD VIGDERMAN

M. THOMAS FELIX, II
CARTER R. BULER
S. JONATHAN EMERSON
JOHN FRANCIS GOUGH
MICHAEL D. MATTEO
DONALD W. KRAMER
RICHARD H. MARTIN
STEPHEN L. VOLPICELLI
HOWARD D. SCHER
ROBERT A. MacDONNELL
JENNIFER A. STILER
ROBERT GORDON CHAMBERS
KENNETH M. JARIN
KATHLEEN O'BRIEN
DAVID SMOCHTMAN
SAMUEL MASON
DOREEN S. DAVIS
MARY F. PLATT
GREGORY J. FOX
CRAIG E. ZIEGLER
JOSEPH T. STAPLETON
LOUIS A. PETRONI
RICHARD L. SCHOFF
VIRGINIA P. SIKES
BRUCE H. BIKIN
TIMOTHY J. BERGERE
LARRY L. TURNER
ARLENE J. ANGELO
STEPHEN G. RHOADS
STEVEN C. SIZAFA
MARY THERESA ENYART
RONALD E. HURST
RICHARD M. SIMINS

OF COUNSEL

JOHN S. ESTEY
RICHARD S. HYLAND
WILLIAM F. DRAKE, JR.
STEPHEN G. RAYMOND
NANCY H. WONHAN
W. JEFFREY GARSON
CLIFFORD SCOTT MEYER
WALTER L. BARTHOLOMEW, JR.
JOSEPH W. SWAIN, JR.
JOSEPH K. GORDON
HOWARD H. LEWIS
ARTHUR GREGG JACKSON
FRANK S. DEMING
MERVIN J. HARTMAN
ALAN REEVE HUNT

SENIOR COUNSEL

MARIANNE BECHTLE
MARTIN W. BOND
RALPH H. COLFLESH, JR.
THOMAS F. HURLEY

• MEMBER OF NEW JERSEY BAR
• MEMBER OF WASHINGTON, D.C. BAR
▲ MEMBER OF NEW YORK BAR
• NOT A MEMBER OF PENNSYLVANIA BAR
• NEW JERSEY RESPONSIBLE ATTORNEYS

THOMAS H. SUODATH, JR.
BRAD A. RUBENS
RAMIRO M. CARDONELL
MARY ELIZABETH NAGY
JOANNE SCHEDSTER
FRANK A. CHERNAK
HOWARD J. BASHMAN
THOMAS J. COLEMAN, II
JOANNE L. BAKKER
RICHARD M. DONALDSON
CYNTHIA M. BINNION
MICHAEL D. EPSTEIN
ERIC LECHTZIN
JOHN EHMANN
JENNIFER J. POLOCESSY
MICHAEL G. JONES
ELIZABETH C. BUTMAN
LEE S. FIEDERER
DONNA M. O'BRIEN
W. MICHAEL GRADISEK
MICHAEL L. EPSTEIN
DAVID E. BRICE
STUART M. SKLAR
MICHON L. CRAWFORD
MAUREEN B. KENNEY
C. ALEXA ABOWITZ
WENDY A. FLEMING
SHAWN R. FARRELL
MICHELE A. LEDO
JANICE A. GREENBERG
ROBERT J. DOWNS, JR.
MICHAEL P. WILLIAMS

D. CRAIG CALLAGHAN
MARGARET L. HARRISON
GERALDINE D. ZIDOW
JOHN P. McLAUGHLIN
STEVEN MARLOEF
CATHERINE M. GILLESPIE
LARISSA RENSHAW WHITMAN
DAVID JAMES MacMAIN
CARIDAD DIEGO HOPKINS
SHARON O'NEILL FINNEGAN
DOUGLAS E. OVERTOOM
PATRICIA J. LARSON
CAROL A. CANNERELLI
MAUREEN D. LUKE
PETER BRESLAUER
DAVID D. LANGFITT
GERARD M. McCABE
CHRISTINA M. CORSAC
CHARLES A. ERCOLE
MICHAEL J. TIERNEY
SUZANNE IC. ABT
HUMANE L. ZAY
JOSEPH C. RAGAGLIA
WILLIAM D. GEORGES
ELLEN K. POMFRET
ROBERT W. ELIAS
SIDNEY S. LIEBESMAN
STACY ALISON FOLK
JAMES J. FITZGERALD, IV
PATRICIA M. BAILEY
DEBRA L. SWANK
MICHAEL LUONGO

NEW JERSEY OFFICE:
457 HADDONFIELD ROAD
CHERRY HILL, NJ 08002
609-486-7700
FAX 609-486-7730

DIRECT DIAL
215-772-7412

April 5, 2000

Sarah P. Keating, Esquire
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region III
1650 Arch Street
Philadelphia, PA 19103-2029

Re:   **Boarhead Farms Superfund Site**

Dear Sarah:

Enclosed are copies of nexus packages for three of the companies that we discussed during our meeting on February 23, 2000. The companies are Ashland Chemical, CIBA-Geigy, and Thomas & Betts.

Please call me if you have any questions.

Very truly yours,

Sally Ackerman King

SAK/tlb
Enclosures

A LIMITED LIABILITY PARTNERSHIP FORMED IN PENNSYLVANIA

BSAI074842

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOARHEAD FARM AGREEMENT GROUP,           :
                                          :
                        Plaintiff,        :          CIVIL ACTION
                                          :
        v.                                :          NO. 02-3830
                                          :
ADVANCED ENVIRONMENTAL                    :
TECHNOLOGY CORPORATION, ET. AL.           :
                                          :
                        Defendants.       :

---

## OBJECTIONS AND RESPONSES OF PLAINTIFF BOARHEAD FARM AGREEMENT GROUP TO FLEXIBLE CIRCUITS INITIAL SET OF INTERROGATORIES AND DOCUMENT DEMANDS TO PLAINTIFF

Plaintiff Boarhead Farm Agreement Group ("Plaintiff"), by its undersigned attorney, objects and responds to Flexible Circuit's Initial Set of Interrogatories and Document Demands to Plaintiff ("Initial Interrogatories"), as follows:

I.      **GENERAL OBJECTIONS**

1.  Plaintiff objects to each interrogatory to the extent that it seeks information not in Plaintiff's possession, custody or control.

2.  Plaintiff objects to each interrogatory to the extent that it seeks information already in the possession, custody or control of FCG.

3.  Plaintiff objects to each interrogatory to the extent that it seeks information which is publicly available and, thus, to which FCG has the same access as Plaintiff.

4.  Plaintiff objects to each interrogatory to the extent that it seeks information protected by the attorney-client privilege or any other applicable privilege. Any inadvertent disclosure of

privileged information shall not constitute a waiver of the attorney-client or any other applicable privilege.

5. Plaintiff objects to each interrogatory to the extent that it seeks the discovery of the mental impressions, conclusions, opinions or legal theories of its attorneys or other representatives. Any inadvertent disclosure of work product shall not constitute a waiver of any work product protection.

6. Plaintiff objects to each interrogatory to the extent that it is unlimited in time or scope.

7. Plaintiff objects to each interrogatory to the extent that it is unduly burdensome or designed to be harassing.

8. Plaintiff objects to each interrogatory to the extent that it is vague or ambiguous.

## II.  INTERROGATORIES AND RESPONSES

Subject to and without waiving the foregoing General Objections, Plaintiff makes the following responses to the Initial Interrogatories:

1. Identify each shipment of Hazardous Substances Plaintiff contends was generated and/or transported to and disposed of at the Site by or on behalf of FCG and, for each such shipment, provide the following.

      a.    the precise nature of each type of Hazardous Substance;

      b.    the date of each shipment;

      c.    the identity of the transporter of each shipment;

      d.    the identity of each arranger, if any, of each shipment;

      e.    the identity and employer of the driver of the transport vehicle;

      f.    the volume of each type of Hazardous Substances transported to and disposed of at the Site;

g.      the type and identity of each tank wagon, drum, vessel or other container in which each Hazardous Substance was transported to and disposed of at the Site;

h.      the manner in which each Hazardous Substance was disposed of at the Site and the exact location at the Site at which each was disposed;

i.      he identity of all persons believed by you to have information or knowledge about the transportation to and disposal of each Hazardous Substance at the Site; and

j.      the identity of any and all documents evidencing, referring or relating to each shipment.

RESPONSE: Plaintiff objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the foregoing objection, Plaintiff responds that corporate records demonstrate that Flexible Circuits operated a facility on Valley Road in Warrington, PA, throughout the Relevant Period. The factual basis for Plaintiffs' claim against Flexible Circuits in the complaint, and the identities of persons with knowledge of those facts, are contained in the deposition testimony that has been elicited in this case, and the documents comprising the nexus files for Flexible Circuits, located in the Borhead Document Repository at the Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

By way of further response, Plaintiff refers Flexible Circuits to the following documents: a January 10, 1972 DeRewal Chemical Company ("DCC") sales quotation letter to Flexible Circuits; multiple invoices during the middle 1970's from DCC to Flexible Circuits; and a summarized transaction sheet provided by Flexible Circuits to EPA in 1987 showing yearly totals of amounts billed to Flexible Circuits by DCC and paid by Flexible Circuits to DCC for the years 1972 through 1976.

By way of further response, Plaintiff refers Flexible Circuits to the deposition testimony that has been elicited in this case including, but not limited to, the following testimony: the May 7, 2003 deposition testimony of Manfred DeRewal, Sr., 50:15-65:11; the May 12th deposition testimony of Manfred DeRewal, Jr., 80:16 – 89:17; the May 13th deposition testimony of Manfred DeRewal, Jr., 374:14 – 396:16; the June 4, 2003 deposition testimony of Jeffrey Shaak; 48:24 – 56:20, 68:25 – 70:14; the July 28, 2003 deposition testimony of June Stephens; 52:5 – 57:12, 74:2 – 78:13, 111: 2 – 22; the July 30, 2003 deposition testimony of John C. Bean; 60:9 – 61:5; the June 16, 2003 deposition testimony of Bruce DeRewal; 77:8 – 80:7; the deposition testimony of John Barsum, and all of the other deposition testimony concerning DCC's disposal of waste at the Site. Together the above-referenced documents and testimony establish that Flexible Circuits contracted with DCC to remove waste from its Valley Road facility and that this waste was disposed of at the Boarhead Farm Site.

2.    Set forth with particularity all facts which form the basis for your allegation in Paragraph 59 of Plaintiff's Third Amended Complaint that the Etched Circuits' waste contained Hazardous Substances, and specifically:

      a.    State in detail all facts that support your contention;

      b.    Identify all persons believed by you to have relevant information or knowledge, summarizing the subjects and extent of each Person's knowledge and

      c.    Identify all documents that support your contention.

RESPONSE: Plaintiff objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the foregoing objection, Plaintiff responds that the opinion of an expert may be relevant in responding to this

interrogatory and that, at this time, Plaintiff has not yet identified any expert witnesses whom it expects to call at trial. By way of further answer, Plaintiff incorporates by reference its response to Interrogatory No. 5, including the deposition testimony listed therein. Plaintiff additionally refers Flexible Circuits to the following documents that detail the hazardous composition of Etched Circuits' waste streams: a September 4, 1990 GIS from Etched Circuits to the New Jersey Department of Environment Protection; an October 27, 1998 New Jersey Department of Environment Protection Industrial Pretreatment Inspection Report; a July 17, 1974 DCC invoice to Etched Circuits regarding the removal of spent etchant; and an October 2, 1987 letter from Etched Circuits to U.S.E.P.A detailing its production of spent etchant and waste acid.

3.     Set forth with particularity all facts which form the basis for your allegation in Paragraph 63 of Plaintiff's Third Amended Complaint that that FCG's waste contained Hazardous Substances, and specifically:

   a.     State in detail all facts that support your contention;

   b.     Identify all persons believed by you to have relevant information or knowledge, summarizing the subjects and extent of each person's knowledge; and

   c.     Identify all documents that support your contention.

RESPONSE:  Plaintiff objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the foregoing objection, Plaintiff responds that the opinion of an expert may be relevant in responding to this interrogatory and that, at this time, Plaintiff has not yet identified any expert witnesses whom it expects to call at trial. By way of further answer, Plaintiff incorporates by reference its response to Interrogatory No. 5, including the deposition testimony listed

therein. Plaintiff additionally refers Flexible Circuits to the following documents that detail the hazardous waste composition of Flexible Circuits' waste streams: a November 6, 1987 letter from Flexible Circuits to U.S.E.P.A detailing its production of spent etchant; the response of Flexible Circuits to Plaintiff's interrogatories, which details the presence of copper, ammoniated or cupric chloride and hydrochloric acid in the spent etchant, and the use of butyl cellosolve, MEK, and acetone in its flexible circuit manufacturing process; its May 27, 1983 letter to Warren Frame, describing the production process; and DCC invoices to Flexible Circuits for the removal of spent etchant, waste acid and industrial waste.

4. Set forth with particularity all facts which form the basis for your allegation in Paragraph 64 of Plaintiff's Third Amended Complaint that that FCG is a "person who arranged for transport, disposal, or treatment of Hazardous Substances from the Etched Circuits facility," and specifically:

  a. State in detail all facts that support your contention;

  b. Identify all persons believed by you to have relevant information or knowledge, summarizing the subjects and extent of each person's knowledge; and

  c. Identify all documents that support your contention.

RESPONSE: Plaintiff objects to this interrogatory insofar as it calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature. By way of example, written discovery is ongoing; Plaintiff received numerous documents from Flexible Circuits regarding its relationship with Etched Circuits this month. Oral discovery is also incomplete. Subject to and without waiving the foregoing objection, Plaintiff refers Flexible Circuits to documents evidencing: the presence of overlapping officers and directors between Flexible Circuits and Etched Circuits; decentralization of the Etched Circuits sales organization following the Flexible Circuits purchase of Etched

Circuits; utilization of the Etched Circuits' Cherry Hill facility to manufacture Flexible

Circuits' products, installation of a second nickel tank at Etched Circuits to handle

additional production. Additional evidence includes the decision to install Flexible

Circuits' plating supervisor, Melvin Bach, as the new president of Etched Circuits, and to

later have Mr. Bach and Etched Circuits use the same waste hauling services as Flexible

Circuits, *see* March 2, 1973 letter from DCC to Etched Circuits.

     5.     Identify each shipment of Hazardous Substances Plaintiff contends was generated and/or transported to and disposed of at the Site by or on behalf of Etched Circuits, Inc. and, for each such shipment, provide the following:

     a.     the precise nature of each type of Hazardous Substance;

     b.     the date of each shipment;

     c.     the identify of the transporter of each shipment;

     d.     the identify of each arranger, if any, of each shipment;

     e.     the identity and employer of the driver of the transport vehicle;

     f.     the volume of each type of Hazardous Substances transported to and disposed of at the Site;

     g.     the type and identity of each tank wagon, drum, vessel or other container in which each Hazardous Substance was transported to and disposed of at the Site;

     h.     the manner in which each Hazardous Substance was disposed of at the Site and the exact location at the Site at which each was disposed;

     i.     the identity of all persons believed by you to have relevant information or knowledge about the transportation to and disposal of each Hazardous Substance at the Site; and

     j.     the identity of any and all documents evidencing, referring or relating to each shipment.

<u>RESPONSE</u>: Plaintiff objects to this interrogatory insofar as it constitutes a contention

interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully

developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155

F.R.D. 525, 527 (E.D. Pa. 1994). Subject and without waiving the foregoing objection, Plaintiff incorporates by reference its response to Interrogatory No. 3. Plaintiff further responds that the factual basis for claims against Etched Circuits and its parent/operator, Flexible Circuits in the complaint, and the identities of persons with knowledge of those facts, are contained in the deposition testimony that has been elicited in this case, and the documents comprising the nexus files for Etched Circuits and Flexible Circuits, located in the Boarhead Document Repository at the Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

By way of further response, Plaintiff refers Flexible Circuits to the following documents: a March 2, 1973 DCC sales quotation letter to Etched Circuits; a July 17, 1974 invoice from DCC to Etched Circuits for the removal of drums of spent etchant, a summarized transaction sheet provided to EPA in 1987 showing yearly totals of amounts billed to Etched Circuits by DCC and paid to DCC for the years 1972 through 1976. By way of further response, Plaintiff refers Flexible Circuits to the deposition testimony that has been elicited in this case including, but not limited to, the following testimony: the May 7, 2003 deposition testimony of Manfred DeRewal, Sr., 148:1-150:15; the May 12th deposition testimony of Manfred DeRewal, Jr., 127:9 – 129:10; the June 4, 2003 deposition testimony of Jeffrey Shaak; 27:23 – 31:21, the deposition testimony of John Barsum, and all of the other deposition testimony concerning DCC's disposal of waste at the Site. Together the above-referenced documents and testimony establish that DCC removed hazardous waste from the Cherry Hill facility and that this waste was disposed of at the Boarhead Farm Site.

## DOCUMENT REQUESTS

All documents which refer or relate in any way to the information requested in the preceding Interrogatories.

**RESPONSE:  Plaintiff refers Flexible Circuits to its responses to the Initial Interrogatories.**

Identify all documents which were utilized, examined, consulted or relied upon in responding to the preceding Interrogatories.

**RESPONSE:  Plaintiff responds that it relied upon all discoverable documents in its**

**possession, custody and/or control relating to Flexible Circuits and Etched Circuits'**

**liability in this case, which are located in the Boarhead Document Repository at the offices**

**of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.**

AS TO OBJECTIONS

Dated: 09/14/04

Glenn Harris, Esquire
Attorney I.D. No. 51222
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
Plaza 1000
Suite 500
Voorhees, NJ 08043-4636

# EXHIBIT L

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., et al.,                    :
                                                :
                        Plaintiffs              :        Civil Action No.  02-CV-3830
            v.                                  :
                                                :
ADVANCED ENVIRONMENTAL                          :
TECHNOLOGY CORPORATION, et al.,                 :
                                                :
                        Defendants.             :

### CERTIFICATE

Pursuant to Eastern District Rule 26.1(f) and the Tenth Case Management Order in this action, the undersigned counsel for Defendant fcg, inc. ("Flexible") certifies that counsel for Flexible and Plaintiffs, after reasonable effort, were unable to resolve the discovery dispute relating specifically to Flexible which is the subject of the attached Motion and Memorandum.

Following receipt and review of Plaintiffs' answers to the Defendants' Joint Contention Interrogatories, the undersigned counsel for Flexible informed Plaintiffs' counsel, Amy Trojecki, Esquire, that he would like the opportunity to take the deposition of Peter Knoll, a witness identified by Plaintiffs in those answers, and requested that Plaintiffs' counsel concur, so as to avoid motion practice.  Ms. Trojecki did not concur, but indicated that Flexible's request will be further considered following receipt and review of the Defendants' motion for leave to pursue additional discovery.

Seth v.d.H. Cooley – PA 41804
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103-4196

Attorneys for Defendant fcg, inc.

Dated:  June 29, 2007

# EXHIBIT M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC
and TI GROUP AUTOMOTIVE
SYSTEMS, LLC

        Plaintiffs,

v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

        Defendants.

Civil Action No. 02-CV-3830 (LDD)

**PLAINTIFFS' RESPONSES TO JOINT
CONTENTION INTERROGATORIES OF
ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION,
ASHLAND, INC., CARPENTER
TECHNOLOGY CORPORATION, fcg,
inc., HANDY & HARMAN TUBE
COMPANY, INC. AND NRM
INVESTMENT COMPANY**

Plaintiffs Agere Systems, Inc., Cytec Industries Inc., Ford Motor Company, SPS

Technologies, LLC and TI Group Automotive Systems, LLC ("Plaintiffs"), by their undersigned

attorneys, object and respond to the joint contention interrogatories of Advanced Environmental

Technology Corporation ("AETC"), Ashland, Inc., Carpenter Technology Corporation, fcg, inc.,

Handy & Harman Tube Company, Inc. and NRM Investment Company (collectively,

"Defendants") as follows:

### GENERAL STATEMENTS AND OBJECTIONS

1.    Plaintiffs object to Defendants' Definitions, Instructions and Interrogatories to the

extent that they are not "narrowly-tailored contention interrogatories" as permitted by Judge

Davis' June 23, 2005 Order.

2.    Plaintiffs object to Defendants' Definitions, Instructions and Interrogatories to the

extent that they seek information outside the scope of the contentions that Plaintiffs will make as

part of their prima facie case at trial. Plaintiffs specifically reserve the right to make any factual

76.    What do plaintiffs contend is the Total Cleanup Cost incurred by each plaintiff for each of OU-1 andOU-2?

   **ANSWER:**    See Plaintiffs' response to Interrogatory No. 73.

77.    Do you contend that any Plaintiff has spent, or is obliged to spend for future costs, amounts in excess of its equitable share of the Total Cleanup Cost?

   A.    If so, state what each plaintiff contends to be the amount it has already spent and that it will be obliged to spend.

   **ANSWER:**    See Plaintiffs' response to Interrogatory No. 73. By way of further answer, see Plaintiffs' response to Interrogatory No. 78.

78.    What do plaintiffs contend is Agere's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

   A.    What is the factual basis for plaintiffs' contention as to Agere's allocable/equitable share of the Total Cleanup Cost for the Site?

   B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Agere's allocable/equitable share of the Total Cleanup Cost for the Site.

   Plaintiffs object to this Interrogatory to the extent that it seeks information outside the scope of the contentions that Plaintiffs will make as part of their prima facie case at trial. Plaintiffs further object to this Interrogatory to the extent that it seeks the discovery of the mental impressions, conclusions, strategies, opinions, research or legal theories of their attorneys or other representatives or information protected by the attorney-client privilege or any other applicable privilege. By way of further objection, Defendants' definition of "factual basis" is overbroad and unduly burdensome.

   Without waiving any such objections, Plaintiffs will ask the Court at trial to make findings of fact and conclusions of law based upon testimony and documents Plaintiffs will offer into evidence concerning the hazardous substances owned or possessed by those Defendants who have not settled ("the Non-Settling Defendants") that were disposed of at the Site, by Plaintiffs that were disposed of at the Site, and by Plymouth Tube Company, Quikline Design and

Manufacturing Co., Rohm and Haas Company, Simon Wrecking Co., Inc., Unisys Corporation, United States of America Department of Navy, Novartis Corporation, Techalloy Company, Inc./Rahns Specialty Metals, Inc., and Emhart Industries, Inc./Crown Metro, Inc. ("Settling Defendants") that were disposed of at the Site. Plaintiffs will not ask as part of their case-in-chief that the Court make findings of fact and conclusions of law concerning disposal at the Site of hazardous substances owned or possessed by any other person or entity.

Plaintiffs will ask the Court to make findings of fact concerning the Non-Settling Defendants' total volumes of hazardous wastes that were hauled by DeRewal Chemical Company and/or Environmental Chemical Control (collectively "DCC"). Plaintiffs will then ask the Court to determine the amount of each Non-Settling Defendants' total volume of waste that was disposed of at the Site based upon evidence concerning DCC's handling of all its customer wastes in various time periods ("Nexus Periods") as well as DCC's handling of particular Non-Settling Defendants' wastes. Plaintiffs will ask the Court to conclude that a specific percentage of all wastes handled by DCC in any given Nexus Period was disposed of at the Site, and to apply that percentage to all wastes of Non-Settling Defendants handled by DCC in that Nexus Period. Set forth below is the testimony and documents Plaintiffs intend to offer into evidence for the Court's consideration.

Should the Court adopt Plaintiffs' proposed conclusions that specific percentages of all wastes handled by DCC in any given Nexus Period were disposed of at the Site, then the Plaintiffs expect that the Court will apply the same nexus percentages to the Plaintiffs and Settled Defendant's wastes. Exhibit A attached hereto is a chart showing the total volumes of each Non-Settling Defendant's, each Plaintiff's, and each Settling Defendant's wastes that were hauled by DCC in each Nexus Period ("Gross" on the chart by "Time" period), the nexus

percentages Plaintiffs will ask the Court to find ("Factor" on the chart), and the volumes that the Court will conclude were disposed of at the Site if those nexus percentages are adopted ("Net" on the chart). The entries for "Ashland/AETC" and "Diaz/AETC" show waste that was hauled by DCC from Ashland and Diaz respectively, the transportation for disposal of which those entities and AETC each arranged. Plaintiffs will ask the Court to allocate the "Ashland/AETC" share jointly and severally to Ashland and AETC and the "Diaz/AETC" share to AETC. The entries for "Etched/Flexible" show waste that was hauled by DCC from the Etched Circuits facility for which Flexible is liable.

Plaintiffs will ask the Court to allocate response costs incurred by them up to a date to be set by the Court among Plaintiffs, Non-Settling Defendants, and Settling Defendants only based primarily upon the respective volume of each party's waste that was disposed at the Site (as set forth more fully below). Plaintiffs will also ask the Court for interest on its response costs. Plaintiffs will also ask the Court to apply this allocation to response costs to be incurred by Plaintiffs after that date.

A.    Waste Quantities

1.    *Nexus Periods*

(a).    1/72 to 12/1/73

Plaintiffs will ask the Court to conclude that 95% of all of the waste handled by DCC beginning in January of 1972 was disposed of at the Site until the opening of DCC's Ontario Street operation in Philadelphia on December 1, 1973. The documents that Plaintiffs intend to rely upon to support this conclusion include, but are not limited to:

- Boarhead Corporation Certificate of Incorporation dated September 2, 1969 [P-5];

- Deed Between Robert and Ruth Buckman and Boarhead Corporation dated October 16, 1969 [P-6];

- DeRewal Chemical Company, Inc. Certificate of Incorporation dated December 29, 1969 [P-7];

- Pennsylvania State Police Investigation Report dated April 26, 1972;

- March 7, 1973 and March 12, 1973 BDOH memorandum;

- Waste Discharge Inspection Report and Site Map dated February 14, 1973 [P-22]

- Waste Discharge Inspection Report dated March 5, 1973 [P-23];

- Agreement Between Boarhead Corporation and Manfred DeRewal dated March 21, 1973 [P-24];

- December 20, 1973 Bucks County Department of Health memorandum;

- PADER November 2, 1973 Order to Boarhead Corporation;

- Waste Discharge Inspection Report dated November 5, 1973

- November 23, 1973 Waste Discharge Inspection Report;

- January 8, 1974 Department of Health Memorandum;

- June 28, 1974 Department of Health memo;

- Complaint in Equity filed on May 31, 1974 in the Court of Common Pleas of Bucks County with an injunction issuing on June 21, 1974;

- Lease Agreement Between Philadelphia Hide Corporation and Manfred DeRewal for 3013-31 East Ontario Street dated November 15, 1973 [P-20]; and

- Affidavit of John Barsum dated April 28, 2000 [D-27].

Plaintiffs also intend to rely upon the testimony of Bruce DeRewal, Freddie DeRewal, Jeff Shaak, John Barsum, John Bean, and June Stephens to support that conclusion. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of the depositions taken in this action of those individuals. Plaintiffs believe that the testimony of those individuals as reflected in those transcripts supports this conclusion, including, but not limited to:

- Bruce DeRewal at 12-38;

- Jeff Shaak at 13-56;

- June Stephens at 20-22, 28-29, 45, 92, 98, 169-71;

- John Bean at 13-24, 45-88;

- John Barsum at 40-43, 51-52, 57-58, 92-93, 206-08, 244-46, 328-30; and

- Freddie DeRewal at 15, 39-58, 129-37.

        (b).    12/1/73 to 6/30/75

Plaintiffs will ask the Court to conclude that 15% of all of the waste handled by DCC

after the opening of DCC's Ontario Street operation on December 1, 1973 until the closing of

Ontario Street on or before June 30, 1975 was disposed at the Site. The documents that Plaintiffs

intend to rely upon to support this conclusion include, but are not limited to:

- Lease Agreement Between Philadelphia Hide Corporation and Manfred DeRewal for 3013-31 East Ontario Street dated November 15, 1973 [P-20];

- Letter and Diagram from Thomas J. Kulesza of the City of Philadelphia Water Department to Manfred DeRewal dated September 24, 1974 regarding operations at 3015 E. Ontario Street [P-25];

- Letter from Michael Nelson of the City of Philadelphia Water Department to Manfred DeRewal dated June 2, 1975 regarding cessation of sewer and water services at 3015 E. Ontario Street [P-26];

- June 17, 1975 Philadelphia Water Department letter;

- Waste Discharge Inspection Report dated April 25, 1974;

- Commonwealth of Pennsylvania Complaint in equity on May 28, 1974, which was resolved with an agreed order; and

- February 26, 1975 Waste Discharge Inspection Report.

Plaintiffs also intend to rely upon the testimony of Bruce DeRewal, Freddie DeRewal,

Jeff Shaak, John Barsum, John Bean, Manfred DeRewal, and June Stephens to support that

conclusion. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs

intend to offer into evidence the transcripts of the depositions taken in this action of those

individuals. Plaintiffs believe that the testimony of those individuals as reflected in those

transcripts supports that conclusion, including, but not limited to:

- Fred DeRewal at 113-14;

- June Stephens at 28-29, 92-102, 171;

- John Bean at 47-48, 70-80; and

- Bruce DeRewal at 46-47, 55-56.

        (c).    7/1/75 to 6/1/76

Plaintiffs will ask the Court to conclude that 65% of all of the waste handled by DCC

after the closing of DCC's Ontario Street operation on or before June 30, 1975 and until the

opening of DCC's Wissinoming operation on June 1, 1976 was disposed at the Site. The

documents that Plaintiffs intend to rely upon to support this conclusion include, but are not

limited to:

- Bench opinion filed May 16, 1978 in <u>United States v. Manfred DeRewal, et al.</u> in the United States District Court for the Eastern District of Pennsylvania at Docket No. 77-287;

- Environmental Chemical Control, Inc. Certificate of Incorporation dated October 18, 1976 [P-27];

- July 16, 1975 Waste Discharge Inspection Report;

- Nine criminal complaints filed by BCDOH on January 25, 1976 and February 18, 1976 against Boarhead Corporation and Manfred DeRewal alleging violations of the Pennsylvania Clean Streams Law; and

- Waste Discharge Inspection Report dated April 1, 1976.

Plaintiffs also intend to rely upon the testimony of Bruce DeRewal, Freddie DeRewal,

Jeff Shaak, John Barsum, John Bean, Manfred DeRewal, Linda Cochran, and June Stephens to

support that conclusion. Should one or more of those individuals be unavailable to testify at

trial, Plaintiffs intend to offer into evidence the transcripts of the depositions taken in this action

of those individuals. Plaintiffs believe that the testimony of those individuals as reflected in those transcripts supports that conclusion, including, but not limited to:

- Freddie DeRewal at 51-52, 125-26, 383-91;
- Linda Cochran at 91;
- Fred DeRewal at 115-17; and
- John Bean at 45-70, 80.

    (d).    6/1/76 to March 29, 1977

Plaintiffs will ask the Court to conclude that 15% of all of the waste handled by DCC after opening of DCC's Wissinoming operation on June 1, 1976 until March 29, 1977 were disposed of at the Site, except that 25% of the wastes believed by the DCC drivers to consist of nitrating acids were disposed of at the Site during this period. The documents that Plaintiffs intend to rely upon to support this conclusion include, but are not limited to:

- Violation Notice to Ed and Linda Cochron regarding premises located at 5001 Comly Street (Bldg. R) dated April 5, 1977 [P-28];
- Agreement between Manfred DeRewal, Environmental Chemical Control, Inc., Environmental Protection Agency and the City of Philadelphia dated May 12, 1977 [P-29];
- BCDOH "Field Action Report" on July 9, 1976;
- A Waste Discharge Inspection Report dated July 30, 1976;
- Bridgeton Police Department complaint of ammonia odor on September 8, 1976; and
- September 20, 1976 memorandum prepared by Arthur Curley.

Plaintiffs also intend to rely upon the testimony of Bruce DeRewal, Freddie DeRewal, Jeff Shaak, John Barsum, John Bean, Manfred DeRewal, Linda Cochran, and June Stephens to support that conclusion. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of the depositions taken in this action

of those individuals. Plaintiffs believe that the testimony of those individuals as reflected in those transcripts supports that conclusion, including, but not limited to:

- Fred DeRewal at 117-22;
- Bruce DeRewal at 142-43;
- Freddie DeRewal at 328-30; and
- Jeff Shaak at 59-61.

### 2. *Non-Settling Defendants' Wastes Hauled By DCC*

Carpenter Technology Corporation:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Carpenter Technology Corporation include, but are not limited to:

- 6/12/73 contract (Cheri-2) and legal department cover letter (Cheri-1);
- 12/20/73 purchase order (Cheri-3);
- "Waste Acid Removal Cost" chart (Cheri-8);
- "DeRewal Chemical Co. Waste Acid Removal" chart (Cheri-7);
- "DeRewal Chemical Co. 80#228" chart (Cheri-6);
- 10/8/74 Memo (Mann-4);
- 2/25/71 letter (Mann-15);
- Analysis Requests (Mann-3);
- Handwritten notes (Mann-12);
- 7/17/69 Memo (Mann-8);
- 7/8/69 Handwritten telephone note (Adams-2);
- 2/25/70 Memo (Mann-14); and
- Polinko Affidavit.

Plaintiffs also intend to rely upon the testimony of Richard Cheri, William Reger, James Adams, David Mann, Charles Polinko, Robert Elbert, Freddie DeRewal, Bruce DeRewal, June Stevens, John Barsum, and Jurgen H. Exner, Ph.D. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Cheri 24-27, 33-38, 43-50, 52-56, 70-74;

- Reger 13-24;

- Adams 21-23, 35, 48-59, 67-87;

- Mann 19-21, 57-64, 70-74, 81-89, 95, 105-109, 115-17, 127-33, 145-49;

- Elbert 45-47, 67;

- Freddie DeRewal 132-37, 352-53;

- Bruce DeRewal 39-47;

- June Stevens 95-98; and

- John Barsum 51-52, 92-94.

NRM Investment Co.

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to NRM Investment Co. include, but are not limited to:

- 4/87 business confidential response to EPA;

- February 1975 letter to NJDEP;

- Handwritten document from 1977 detailing hauling NRM waste acid;

- Accounts receivable ledger for 1974-75;

- February 2000 letter to Platt, including attachments;

- Handwritten notes from 1976;

- February 1991 interview notes regarding Minthorn;

- Summaries of bills of lading and accounting;

- May 1986 application for discharge permit;

- May 1984 letter to Valley Forge Sewer Authority;

- November 1989 evaluation of cyanide treatment alternatives with attachments;

- April 1986 letter to EPA;

- 1987 engineering records including handwritten calculations and sample results;

- 1988-89 fact sheet and tables;

- May 1989 proposed wastewater treatment plan;

- 1986 handwritten notes re CN;

- 6/88 handwritten notes;

- Schematic of NRM facility;

- Invoices, pick up tickets, summaries of the same, and

- Other correspondence related to hauling of NRM liquid waste.

Plaintiffs also intend to rely upon the testimony of Santo Quici, Frederick Chesky, Peter Freda, Merle Winters, Fred Piotto, Manfred DeRewal, Freddie DeRewal, John Barsum, Jeff Shaak, June Stevens, Bruce DeRewal and Jurgen H. Exner, Ph.D. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Piotti, 13-14, 20-32, 39-47, 50, 55-60, 64-65, 79-83, 86, 93-95, 97-100, 104;

- Quici 15-18, 22-25;

- Chesky 11-14, 16-17, 21-25, 27, 30-31, 36-37, 40-42, 45-48, 52-55, 56-62;

- Freda 9-10, 12-16, 18-24, 27, 30, 37-40, 43-45, 47-78, 57, 62;

- Winters 10-13, 17-18, 21-28, 31, 36-37, 39-40, 42-43, 47, 59, 68-70;

- Manfred DeRewal 157-60, 410-14, 510;

- Freddie DeRewal 47-50, 52, 58-59, 381-84;

- John Barsum 117-20;

- Jeff Shaak 56-64, 113-14;

- June Stevens 90-92; and

- Bruce DeRewal 39, 86-87.

<u>Advanced Environmental Technology Corporation</u>

*As to AETC Itself*

The documents that Plaintiffs intend to rely upon to support their conclusions with

respect to Advanced Environmental Technology Corporation include, but are not limited to, the

documents identified with respect to Diaz Chemical Corporation and Ashland Chemical

Company below, and the following:

- Correspondence dated August 17, 1976 from ECC to AETC, (AETC51);

- Correspondence dated August 31, 1976 from AETC to DCC, (AETC135);

- Correspondence from AETC to Ashland dated September 28, 1976 (Leuzarder-3);

- Correspondence from John Leuzarder to Manfred DeRewal, dated August 31, 1976, confirming conversation regarding trucking and disposal services (Leuzarder-7);

- DCC invoice dated March 31, 1977 (Leuzarder-9);

- Correspondence dated September 7, 1976 from Leuzarder to DeRewal (Leuzarder-11);

- Correspondence from Susan Lemore to Manfred DeRewal, dated August 23, 1976, confirming conversation regarding required certificate of insurance to be issued to Advanced Environmental Technology Corp. for work to be performed at Ashland Chemical (Leuzarder-13);

- Handwritten notes (undated) referring to sulfuric acid leak at Boarhead Farms (Landmesser-3);

52

- USEPA's Information Requests to Advanced Environmental Technology Corp. and Advanced Environmental Technology Corporation's Response to Information Requests of USEPA (BSAI022885-022936 and BSAI022975022997);

Plaintiffs also intend to rely upon the testimony of individuals in this case including, but not limited to, the deposition testimony identified with respect to Diaz Chemical Corporation and Ashland Chemical Company below, and the following: Arthur Curley, John Leuzarder and Robert Landmesser. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including, but not limited to:

- Curley: 107, 108, 111, 114-115, 117, 122, 125-130, 157;

- Leuzarder: 37-38, 42, 47, 53, 56-59, 62-68, 70-73, 88-93;

- Landmesser (v.2) 144-147, 151, 154-155, 166-168; (v.1) 56-59, 64-65, 76-78, 86-87, 92, 94-95, 101, 151.

*As to Waste from Diaz Chemical Corporation:*

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Diaz Chemical Corporation include, but are not limited to:

- Letter Agreement, dated January 7, 1977, between R.W. Landmesser of Advanced Environmental Technology Corp. and Don Hollwedel of Diaz Chemical Corporation extending services (Landmesser-4);

- Correspondence from H.D. Hollwedel of Diaz Chemical Corporation to Robert Landmesser of Advanced Environmental Technology Corp., dated April 14, 1977, confirming Diaz Chemical Corporation as primary source for disposal of its waste nitration acid (Landmesser-5);

- Invoice, dated March 7, 1977, from Advanced Environmental Technology Corp. to Diaz Chemical Corporation (Landmesser-6);

- USEPA's Information Request to Diaz Chemical Corporation (BSAI029281-BSAI029290; BSAI029291-BSAI029293);

- Diaz Chemical Corporation's Response to Information Request of USEPA (BSAI029140-BSAI029277; BSAI029278-BSAI029280);

- Purchase Order dated 5/16/77 (BSAI029294-BSAI029295)

- Acknowledgment of bill of lading dated 5/28/77 (Leuzarder-12);

- Receipts (variously dated) (BSAI029297-BSAI029301)

- Handwritten notes (BSAI029302)

- Portion of document indicating the amount of money and waste streams that were sent to DCC from Ashland Chemical and Diaz (AETC197-199)

Plaintiffs also intend to rely upon the testimony of individuals in this case including, but not limited to, the following: Theodore Jenney, Stanley Chiras, Diane Shampine, Robert Landmesser, John Leuzarder and Jurgen H. Exner, Ph.D. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including, but not limited to:

- Jenney: 32-49;

- Chiras: 20-26, 34-41; 62, 73;

- Shampine: 19-23; and

- Landmesser: (v.2) 161, 177, 185-192, (v.3) 41-42, 46.

Ashland, Inc.

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Ashland, Inc. include, but are not limited to:

- Correspondence from R.T. Olsen of Ashland Chemical Company to Andrea Barnhouse of A.B.M. Disposal Company, dated August 4, 1976, regarding "best estimate" analysis of its A.C.C. Code 616-220 CDN Spent Acid (ASHL00004);

- Bills of lading, dated 8/9/76-4/12/77 (ASHL00005-00010; ASHL00037-00044; ASHL00048-00065; ASHL00070-00072; ASHL00075-00084; ASHL00000087-00089; ASHL00091-00099; ASHL00105-00110; ASHL00113-00118; ASHL00120-00121; ASHL00124-00126; ASHL00128-00129; ASHL00131; ASHL00133-00139; ASHL00142-00143; ASHL00145-00146; ASHL00148; ASHL00150; ASHL00152; ASHL00154; ASHL00156; ASHL00163-00164; ASHL00166; ASHL00168; ASHL00170; ASHL00172; ASHL00174; ASHL00176; ASHL00178-00180; ASHL00182; ASHL00184; ASHL00186-

00187; ASHL00192-00195; ASHL00197-00212; ASHL00215; ASHL00217-00231; ASHL00233-00234; ASHL00239; ASHL00246-00249; ASHL00251-00252);

- Memorandum from A.T. Curley to W.R. Starkey dated September 16, 1976 (ASHL00066-00069);

- USEPA's Information Requests to Ashland Chemical Company and Ashland Responses to USEPA Information Requests (ASHL00313-ASHL00472 and BSAI005140-005142);

- Invoice from DeRewal Chemical Co., Inc. to Advanced Environmental Tech., dated 4/9/77 (ASHL00249);

- Portions of waste ledger sheets (BSAI024255-024256; BSAI024275-024276; BSAI033916; BSAI033932; BSAI033937-033938; BSAI034142-034143; BSAI034201);

- Bill of lading, dated 4/28/77 (BSAI024001);

- Correspondence from John Leuzarder of Advanced Technology, Inc. to Art Curley of Ashland Chemical Co., dated August 3, 1976 regarding pricing on various waste streams (Curley -1);

- Memorandum, dated August 23, 1976, from A.T. Curley to W. R. Starkey regarding waste chemical disposal (Curley-2);

- Agreement between Advanced Environmental Technology, Inc. and Ashland Chemical Company, undated and unsigned (Curley-4);

- Memorandum to file, dated September 20, 1976, from A.T. Curley regarding visit with current spent acid disposer (Curley-5);

- Memorandum, dated October 19, 1976, from A.T. Curley to J. Minott/W.R. Starkey regarding visit to disposal site for its CDN spent acid (Curley-6);

- Memorandum, dated April 14, 1977, from A.T. Curley to W.R. Starkey regarding CDN spent acid disposal (Curley-8);

- Memorandum, dated May 18, 1977, from A.T. Curley to T. Bailey regarding waste disposal (Curley-9);

- Portion of waste ledger sheet for April 1977 (Curley-11);

- Correspondence from John Leuzarder of Advanced Environmental Technology Corp., Inc. to Art Curley of Ashland Chemical Corporation, dated August 16,

1976, offering reduced pricing on two items covered in its quote of August 3, 1976 (Curley-16);

- Correspondence from Arthur Curley of Ashland Chemical Company to John Leuzarder of Advanced Environmental Technology Corp., Inc., dated October 26, 1976, regarding freeze point of its spent acid (Curley-17);

- Correspondence from John Leuzarder of Advanced Environmental Technology Corp., Inc. to Art Curley of Ashland Chemical Company, dated September 28, 1976, providing quote on extension of services (Curley-18);

- Bill of lading, dated 9/8/76 (C. Hendershot-5);

- Bill of lading, dated 11/4/76 (C. Hendershot-8);

- "Totals Paid DeRewal", (AETC197-199; Leuzarder-5);

- Photographs regarding Ashland Chemical drums and labels found at the site; and

- Sample results regarding contents of drums with Ashland Chemical labels

Plaintiffs also intend to rely upon the testimony of individuals in this case including, but not limited to, the following: Arthur Curley, John Leuzarder, Robert Landmesser, Charles R. Wilcox, Howard L. Hendershot, Charles Hendershot, Alberto Celleri, Freddie DeRewal, John Barsum, Jeff Shaak, Bruce DeRewal, June Stevens, Jurgen H. Exner, Ph.D and Craig Coslett and Geoffrey Siebel of de maximis, inc. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including, but not limited to:

- Curley 44, 46-51, 53-54, 57, 59-60, 71, 110, 133-139, 141-145, 149-148, 167, 193;

- Wilcox 35-36, 37, 72;

- L. Hendershot 21;

- C. Hendershot 31-32, 36, 86, 89, 95;

- Celleri 23-24, 28-29;

- Freddie DeRewal 65-69;

- Jeff Shaak 65-68;

- John Barsum 180-84;

- Bruce DeRewal 80-83; and

- June Stevens 88-89.

Plaintiffs also intend to offer into evidence the transcripts of depositions taken in other

cases, including the deposition of William C. Olasin taken on May 14, 2001 in *Rohm and Haas*

*Co. v. American Cyanamid Co., et al.*, No. 95-1864 and 99-1891 (D.N.J.) 72-75, 158, 201; and

the deposition of Arthur Curley taken on August 21, 1996 in *U.S. v. Davis, et al.*, No. 90-0484/P

(D.R.I.) 35-37, 42, 62-63, 68-69, 83, 90, 108-111, 139-180, 201-205.

fcg, inc.

*As to Waste From Flexible Circuit Facility:*

- All documents recovered from the Bucks County Department of Health files for Flexible Circuits, produced at Bates Range BSAI082378-082771, including, but not limited to, a March 1968 Valley Sewer Authority sample; a June 1968 letter from Edwin Faunce to Flexible Circuits; follow up letters from 10/15/68, 10/16/68, 10/16/68; a February 27, 1969 letter from Flexible Circuits to the PA DER; follow up correspondence between Flexible Circuits and state agencies on 5/15/70; 6/18/70 handwritten notes; 7/7/70 letter from Melvin Bach; a July 1970 proposal from Udyllite; 10/10/70 inspection report; 1/29/71 and 2/22/71 inspection reports and samples; 2/10/71 letter; 7/7/71 complaint; 1/10/72 letter from DeRewal; 5/2/72 and 6/13/72 inspection reports; 6/15/72, 6/19/72, 6/23/72, 7/3/72 letters; 7/10/72, 8/8/72 inspection reports; 8/17/72 letter; 8/17/72 and 9/5/72 reports; a 10/72 agreement; 10/19/72 and 10/25/72 inspection reports; 1/12/73 and 3/12/73 inspection reports; 9/9/74 inspection report; 1/9/75 inspection report; 6/10/77 handwritten notes from BCDH; 9/21/77 and 11/21/77 letters; 4/6/79, 5/24/79, 5/25/79 and 5/29/79 reports and 5/31/79 response letter; 8/16/79 memo to DER; 10/16/79 letter; 10/17/79 handwritten notes; 2/20/80 letter; 5/5/82 handwritten notes; 6/16/82 letter; 11/3/82 letter; 2/1/83 letter and 1984 handwritten notes; 10/4/84 letter; 1992 inspection report.

- Additional documents not from the Bucks County Department of Health files for Flexible Circuits include 11/6/87 letter from Stollsteimer to EPA; a 10/2/87 letter from Bach to EPA; 9/11/87 letter from Bach to EPA; handwritten notes detailing DeRewal purchases and payments; 10/13/87 handwritten notes by Zia; 1/10/72 letter from DeRewal; 9/22/00 letter from Barbin to EPA; 1/27/86 letter and PPC Plan; 5/27/83 letter; undated Flexible Circuits Inc's promotional materials; the

Flexible Circuits' 1969 Annual Report, multiple DeRewal invoice's and pickup tickets 1973-75.

Plaintiffs also intend to rely upon the testimony of Melvin Bach, George Stollsteimer, Peter Knoll, Ralph Parker, Richard Yeatman, Freddie DeRewal, June Stevens, John Bean, Bruce DeRewal, John Barsum, Jeff Shaak and Jurgen H. Exner, Ph.D. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Bach 8, 15-20, 21-26, 27-30, 34-36, 38, 43, 49-56, 58-63, 65-66, 68, 71-73, 75, 80, 83, 86-89;

- Stollsteimer 10-13, 16-19, 23-25, 30-33, 35, 37, 39-41, 43, 53-61, 63-64, 66-67, 70-71, 77-80, 85-87, 92-94;

- Freddie DeRewal 8-88, 127-29;

- June Stevens 78-83, 107;

- John Bean 60-61;

- Bruce DeRewal 77-79;

- John Barsum 111-18, 154-60, 137-40, 179-80; and

- Jeff Shaak 29-31, 86-87.

*As to Waste From Etched Circuits Facility:*

- All of the documents and testimony listed under Flexible Circuits and in addition, to rely on a 10/2/87 letter from Bach to EPA; 10/24/70 meeting minutes; 4/25/70 meeting notes; 11/2/77 field representative waste survey report; 3/2/73 letter; 9/11/87 letter; 9/4/90 GIS submission; DeRewal invoices; 11/15/88 Inspection Report, 9/28/2000 response to EPA.

## Handy & Harman Tube Company, Inc.

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Handy & Harman Tube Company, Inc. include, but are not limited to:

- 1/7/93 letter to EPA;

- September 1992 Site Investigation;
- 10/29/92 letter to EPA;
- February 1973 DCC invoice;
- Interview notes of Jay Crawford, Mary Kollmar, Thomas Curran; and
- Handy & Harman interrogatory responses.

Plaintiffs also intend to rely upon the testimony of Jay Crawford, Mary Kollmar, Thomas Curran, James McElya, Bruce DeRewal, Freddie DeRewal, John Barsum and Jurgen H. Exner, Ph.D. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Curran 31-32, 48-49, 52-56, 61, 71-71, 84;
- Kollmar 24;
- Bruce DeRewal 43-56;
- Freddie DeRewal 119-23, 397; and
- John Barsum 122, 326-328.

### 3. Settling Defendants' Waste Hauled By DCC

Rohm and Haas: There are no documents and no testimony establishing that DCC ever hauled waste from Rohm and Haas.

Unisys:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Unisys include, but are not limited to:

- 4/30/72 Invoice to Univac (P-18)
- January 21, 1972 DCC letter to Univac (P-16)
- 3/6/73 Remington Rand Purchase Order

- 4/27/73 Univac Purchase Order

<u>Plymouth Tube</u>:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Plymouth Tube include, but are not limited to:

- November 27, 1972 DCC letter to Carpenter Technology (P-32);
- January 10, 1973 letter from Hugh Hawk to EPA;
- DCC invoices dated 1976 (P-15);
- May 24, 1977 letter from Hugh Hawk to PADER.

<u>Quikline Design and Manufacturing Co.</u>:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Quikline Design and Manufacturing Co. include, but are not limited to:

- March 1973 DCC Invoice;
- March 2, 1973 letter from DeRewal to Marchewka; and
- 1978 Waste Survey Report

Plaintiffs also intend to rely upon the testimony of Manfred DeRewal and Freddie DeRewal. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Manfred DeRewal at 150-152
- Freddie DeRewal at 361-367

<u>United States Navy</u>:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to the United States Navy include, but are not limited to:

- 5/17/76 Fumara letter; and

- 9/7/76 Lynn letter

Plaintiffs also intend to rely upon the testimony of Freddie DeRewal.  Should Freddie DeRewal be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of his depositions taken in this action, including but not limited to:

- Freddie DeRewal at 107-10, 368-69

Simon Wrecking Co., Inc.:  There are no documents to permit any estimate of total volume of waste hauled in any time period by DCC from Simon Wrecking.

Plaintiffs intend to rely upon the testimony of Freddie DeRewal.  Should Freddie DeRewal be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of his depositions taken in this action, including but not limited to:

- Freddie DeRewal at 112-16, 158-61, 421-22, 423-28

Crown Metro/Emhart:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Crown Metro/Emhart include, but are not limited to:

- 12/1/76 DCC letter to Bostik South; and
- 2/25/77 Bostik South letter to DCC

Plaintiffs intend to rely upon the testimony of Freddie DeRewal and Jeffrey Shaak.  Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Freddie DeRewal at 116-119, 353-361
- Jeff Shaak at 81-83

Novartis:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Novartis include, but are not limited to:

- Ciba-Geigy shipping documents (D-25)
- Ciba-Geigy 6/6/76 Purchase Order (D-26)

Thomas & Betts Corporation:  There are no documents and testimony establishing that DCC hauled waste from Thomas & Betts after January 1, 1972.

Techalloy/Rahns:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Techalloy/Rahns include, but are not limited to:

- August 1972 DCC invoice to Techalloy (P-37);
- July 14, 1972 DCC quotation letter to Techalloy;
- October 12, 1972 Techalloy letter to PADER (RAHN 0288);
- 11/26/73 Techalloy purchase order to Liquid Removal Service;
- DCC time card for Bruce DeRewal dated 9/21/73;
- DCC time cards for "Walt" dated 11/26 and 11/27/73;
- 5/16/73 PADER Waste Discharge Inspection Report of Techalloy (RAHN-521);
- 10/17/73 PADER Regional Engineer's Review of Techalloy (RAHN-0592-93);
- 6/5/72 Waste Inspection Report of Techalloy;
- August 20, 1971 PADER Waste Discharge Inspection Report of Techalloy (RAHN-0622);
- Techalloy 104(e) response to EPA;
- February 1973 portions of Techalloy accounts payable register (Senin-2);
- Sanitary Sewerage System, Drawing No. S-10 (Moran-1);
- Application for Plumbing Permit to Connect Building to Public Sewer (Moran-2 and RAHN 1251-59); and

- Portions of Weston Technical Report (RAHN-0539- RAHN0555)

Plaintiffs intend to rely upon the testimony of Theodore Hahn, John T. Moran, Sr., Freddie DeRewal, Bruce DeRewal, June Stephens, John Bean, and William J. Lehane. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Theodore Hahn at 12-38, 47-51, 59-61, 70-78;

- John T. Moran, Sr.;

- Freddie DeRewal at 129-32

- Bruce DeRewal at 13-16, 35

- June Stephens at 20-22, 63-64, 72-73

- John Bean at 41-46, 59-60

- William J. Lehane, Esquire, Drinker Biddle & Reath

    4.    *Plaintiffs' Waste Hauled By DCC*

Agere Systems, Inc.

There are no documents and no testimony establishing that any hazardous waste owned or possessed by Agere's predecessor, Western Electric, was disposed at the Site.

Cytec Industries Inc.

American Cyanamid was never a customer of DCC. Rather, records indicate that Marvin Jonas hauled waste for American Cyanamid during the 1970s. The Jonas records reflect, however, that DCC collected on Jonas' behalf American Cyanamid waste in two distinct time periods. The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Cytec include, but are not limited to:

- February 18, 1975 Jonas, Incorporated report to NJDEP otherwise known as "Phylis Jonas Grid", which was identified as Jonas-14 during the June 21, 1995 deposition of Marvin Jonas in the Buzby landfill litigation;

- Marvin Jonas, Inc. Registration Statement for a Solid/Liquid Waste Collector-Hauler dated March 31, 1975, which was identified as Jonas-15 during the June 21, 1995 deposition of Marvin Jonas in the Buzby landfill litigation;

- Marvin Jonas, Portions of Marvin Jonas' handwritten transactional ledger for the year 1976, which are Bates-stamped BSAI071668-BSAI071670;

- Marvin Jonas, Inc. Registration Statement for a Solid/Liquid Waste Collector-Hauler dated May 26, 1977, which was identified as Jonas-11 during the June 21, 1995 deposition of Marvin Jonas in the Buzby landfill litigation;

- American Cyanamid responses to EPA 104(e) Information Requests;

- April 14, 1992 correspondence from Margaret Tribble at American Cyanamid Company to Martha Wilkie Murray at Peterson Consulting Company and attached affidavits from Jonas employees.

Plaintiffs also intend to offer into evidence the transcripts of Marvin Jonas' depositions in the Buzby landfill litigation.

### SPS Technologies, LLC

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to SPS Technologies, LLC include, but are not limited to:

- SPS purchase orders, DCC shipping orders and DCC invoices (SPST00137-155, SPST00165-176 and SPST00234;

- November 3, 1992 response to EPA 104(e) Information Request (SPST00090); and

- February 5, 1996 response to EPA 104(e) Information Request (SPST00182);

### TI Group Automotive Systems, LLC

There are no documents and no testimony establishing that any hazardous waste owned or possessed by Bundy Corporation was disposed at the Site or was hauled by DCC.

### Ford Motor Company

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Ford Motor Company include, but are not limited to:

- DCC invoices and Ford purchase orders (FORD000009, FORD00010-12, FORD000016, FORD000032-000121, FORD000128, FORD000130-132, FORD000134;

- January 21, 1972 letter from DCC to Mike Margarite (FORD000123);

- Responses to EPA 104(e) Information Requests (FORD000016); and

- Analytical Sampling Results (FORD000032-000121); and

- Waste Characterization Report dated September 26, 2003

Plaintiffs also intend to rely upon the testimony of Craig Coslett and/or Geoffrey Siebel of de maximis, inc.

B.    Allocation

Plaintiffs will ask the Court at trial to allocate response costs primarily based upon the equitable factor of volume of wastes of Plaintiffs, Non-Settling Defendants, and Settling Defendants that were disposed of at the Site. Plaintiffs will also ask the Court at trial to increase the allocation to AETC and Ashland by 10% because those parties knew that Manfred DeRewal had a history of pollution violations and that he intended to dispose of Ashland waste at the Site and because AETC knew that he was in fact disposing of those wastes at the Site. Plaintiffs will also ask the Court at trial to increase the allocation to Carpenter by 10% because Carpenter knew before it contracted with DCC in 1973 to remove Carpenter's wastes that Manfred DeRewal was a principal in DCC and that he had a history of pollution violations. Plaintiffs will also ask the Court at trial to decrease Plaintiffs' share by 50% based upon the fact that Plaintiffs have cooperated with EPA and the Commonwealth of Pennsylvania by, inter alia, settling EPA's past costs claim and conducting the response actions required by the OU-1 and OU-2 Consent

Decrees and because the Non-Settling Defendants did not do so, despite having received notice letters from EPA.

Plaintiffs intend to rely upon the following documents and testimony to support these conclusions:

- Documents and testimony concerning the knowledge and conduct of AETC, Ashland, and Carpenter as set forth in the section "Non-Settling Defendants Wastes Hauled by DCC" above;

- Documents and testimony in the Administrative Record establishing the reasons for EPA's initial response activities at the Site, the study and analysis by EPA of a multitude of COPCs identified at the Site in the RI/FS and otherwise, the distribution of inorganic and organic compounds in soils throughout the Site, EPA's Record of Decision and the process leading to the ROD, and the response actions taken by EPA;

- Testimony of Jay Vandeven (including documents referenced in his expert reports);

- Consent Decrees entered with respect to the Site on or about September 28, 2000 and March 14, 2002.

- Defendants received General Notice Letter and Special Notice Letters from EPA as follows: AETC, Ashland, NRM Investment Company - General Notice Letters in May and July 1989; Carpenter, Etched Circuits, fcg, inc., Handy & Harman - General/Special Notice Letters in September 2000.

Exhibit B attached hereto is a chart showing the volumes that the Court will conclude were disposed of at the Site based upon Exhibit A, and the shares Plaintiffs will ask the Court to allocate to Plaintiffs collectively (based upon aggregating their individual shares, if any, and the individual shares of the Settling Defendants, if any) and to each Non-Settling Defendant. Specifically, the volumetric shares of Carpenter, Ashland/AETC, and AETC (for Diaz waste) were increased by 10% each, and the volumetric shares of all other entities were decreased pro-rata by the total amount of the increase ("Increase to PRPs with Knowledge" on chart). The share otherwise attributable to Plaintiffs was then reduced by 50% and the volumetric shares of the Non-Settling Defendants were increased pro-rata by the total amount of the decrease ("50%

Cooperation Credit to Plaintiffs" on chart). This column sets forth the share Plaintiffs will ask

the Court to allocate to each entity.

79.    What do plaintiffs contend is Cytec's allocable/equitable share of the Total Cleanup Cost
for the Site (expressed in a percentage)?

A.    What is the factual basis for plaintiffs' contention as to Cytec's
allocable/equitable share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to
Cytec's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

80.    What do plaintiffs contend is Ford's allocable/equitable share of the Total Cleanup Cost
for the Site (expressed in a percentage)?

A.    What is the factual basis for plaintiffs' contention as to Ford's allocable/equitable
share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Ford's
allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

81.    What do plaintiffs contend is SPS' allocable/equitable share of the Total Cleanup Cost
for the Site (expressed in a percentage)?

A.    What is the factual basis for plaintiffs' contention as to SPS' allocable/equitable
share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to SPS'
allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

82.    What do plaintiffs contend is TI's allocable/equitable share of the Total Cleanup Cost for
the Site (expressed in a percentage)?

A.    What is the factual basis for plaintiffs' contention as to TI's allocable/equitable
share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to TI's
allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

83.   What do plaintiffs contend is AETC's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

   A.   What is the factual basis for plaintiffs' contention as to AETC's allocable/equitable share of the Total Cleanup Cost for the Site?

   B.   Set forth the calculation used by plaintiffs to arrive at their contention as to AETC's allocable/equitable share of the Total Cleanup Cost for the Site.

   **ANSWER:**   See Plaintiffs' response to Interrogatory No. 78.

84.   What do plaintiffs contend is Ashland's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

   A.   What is the factual basis for plaintiffs' contention as to Ashland's allocable/equitable share of the Total Cleanup Cost for the Site?

   B.   Set forth the calculation used by plaintiffs to arrive at their contention as to Ashland's allocable/equitable share of the Total Cleanup Cost for the Site.

   **ANSWER:**   See Plaintiffs' response to Interrogatory No. 78.

85.   What do plaintiffs contend is Boarhead's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

   A.   What is the factual basis for plaintiffs' contention as to Boarhead's allocable/equitable share of the Total Cleanup Cost for the Site?

   B.   Set forth the calculation used by plaintiffs to arrive at their contention as to Boarhead's allocable/equitable share of the Total Cleanup Cost for the Site.

   **ANSWER:**   See Plaintiffs' response to Interrogatory No. 78.  By way of further

response, Boarhead Corporation has no identifiable assets that would enable it to participate

financially in the cleanup of the Site.  By way of further response, see June 29, 2006 expert

report of Raymond F. Dovell, C.P.A. previously produced and documents referenced therein.  By

way of further response, Boarhead Corporation is not a party to this action.

86.   What do plaintiffs contend is Carpenter's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

   A.   What is the factual basis for plaintiffs' contention as to Carpenter's allocable/equitable share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Carpenter's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

87.    What do plaintiffs contend is Crown's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.    What is the factual basis for plaintiffs' contention as to Crown's allocable/equitable share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Crown's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

88.    What do plaintiffs contend is Diaz's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.    What is the factual basis for plaintiffs' contention as to Diaz's allocable/equitable share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Diaz's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.  By way of further response, Diaz Chemical Corporation has no identifiable assets that would enable it to participate financially in the cleanup of the Site.  By way of further response, see June 29, 2006 expert report of Raymond F. Dovell, C.P.A. previously produced and documents referenced therein.

89.    What do plaintiffs contend is Etched's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.    What is the factual basis for plaintiffs' contention as to Etched's allocable/equitable share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Etched's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

90.    What do plaintiffs contend is fcg's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.  What is the factual basis for plaintiffs' contention as to fcg's allocable/equitable share of the Total Cleanup Cost for the Site?

B.  Set forth the calculation used by plaintiffs to arrive at their contention as to fcg's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**  See Plaintiffs' response to Interrogatory No. 78.

91.  What do plaintiffs contend is H&H's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.  What is the factual basis for plaintiffs' contention as to H&H's allocable/equitable share of the Total Cleanup Cost for the Site?

B.  Set forth the calculation used by plaintiffs to arrive at their contention as to H&H's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**  See Plaintiffs' response to Interrogatory No. 78.

92.  What do plaintiffs contend is Knoll's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.  What is the factual basis for plaintiffs' contention as to Knoll's allocable/equitable share of the Total Cleanup Cost for the Site?

B.  Set forth the calculation used by plaintiffs to arrive at their contention as to Knoll's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**  See Plaintiffs' response to Interrogatory No. 78.  By way of further response, Knoll, Inc. has no successor liability for any waste disposed of at the Site from the Art Metal-Knoll Corporation East Greenville, Pennsylvania facility.  Art Metal-Knoll Corporation (now Trace International) has no identifiable assets that would enable it to participate financially in the cleanup of the Site.  By way of further response, see June 29, 2006 expert report of Raymond F. Dovell, C.P.A. previously produced and documents referenced therein.

93.  What do plaintiffs contend is Merit Metals' allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.  What is the factual basis for plaintiffs' contention as to Merit Metals' allocable/equitable share of the Total Cleanup Cost for the Site?

B.  Set forth the calculation used by plaintiffs to arrive at their contention as to Merit Metals' allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.  By way of further response, Merit Metal Products Corp. has no successor liability for any waste disposed of at the Site from the Merit Metal-Products Corporation Warrington, Pennsylvania facility.  Merit Metal Products Corporation (now Leonards II Co., Inc.) has no identifiable assets that would enable it to participate financially in the cleanup of the Site.  By way of further response, see June 29, 2006 expert report of Raymond F. Dovell, C.P.A. previously produced and documents referenced therein.

94.    What do plaintiffs contend is Novartis' allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to Novartis' allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Novartis' allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

95.    What do plaintiffs contend is NRM's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to NRM's allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to NRM's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

96.    What do plaintiffs contend is Plymouth's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to Plymouth's allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Plymouth's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

97.    What do plaintiffs contend is Quickline's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to Quickline's allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Quickline's allocable/equitable share of the Total Cleanup Cost for the Site.

    **ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

98.    What do plaintiffs contend is RSM's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to RSM's allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to RSM's allocable/equitable share of the Total Cleanup Cost for the Site.

    **ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

99.    What do plaintiffs contend is R&H's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to R&H's allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to R&H's allocable/equitable share of the Total Cleanup Cost for the Site.

    **ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

100.    What do plaintiffs contend is Simon's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to Simon's allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Simon's allocable/equitable share of the Total Cleanup Cost for the Site.

    **ANSWER:**    See Plaintiffs' response to Interrogatory No. 78.

101.    What do plaintiffs contend is T&B's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.   What is the factual basis for plaintiffs' contention as to T&B's allocable/equitable share of the Total Cleanup Cost for the Site?

B.   Set forth the calculation used by plaintiffs to arrive at their contention as to T&B's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**   See Plaintiffs' response to Interrogatory No. 78.

102.  What do plaintiffs contend is Unisys' allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.   What is the factual basis for plaintiffs' contention as to Unisys' allocable/equitable share of the Total Cleanup Cost for the Site?

B.   Set forth the calculation used by plaintiffs to arrive at their contention as to Unisys' allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**   See Plaintiffs' response to Interrogatory No. 78.

103.  What do plaintiffs contend is Navy's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.   What is the factual basis for plaintiffs' contention as to Navy's allocable/equitable share of the Total Cleanup Cost for the Site?

B.   Set forth the calculation used by plaintiffs to arrive at their contention as to Navy's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**   See Plaintiffs' response to Interrogatory No. 78.

104.  What do plaintiffs contend is Haven's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.   What is the factual basis for plaintiffs' contention as to Haven's allocable/equitable share of the Total Cleanup Cost for the Site?

B.   Set forth the calculation used by plaintiffs to arrive at their contention as to Haven's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**   See Plaintiffs' response to Interrogatory No. 78. By way of further

response, Haven Chemical, Inc. and Haven Industries, Inc. have no identifiable assets that would

enable them to participate financially in the cleanup of the Site. By way of further response, see

June 29, 2006 expert report of Raymond F. Dovell, C.P.A. previously produced and documents

referenced therein. By way of further response, Haven Chemical Inc. and Haven Industries, Inc. are not parties to this action.

105.    What do plaintiffs contend is Envirotec's [sic] allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to Envirotec's allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Envirotec's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78. By way of further response, Enviratec, Inc. has no identifiable assets that would enable it to participate financially in the cleanup of the Site. By way of further response, see June 29, 2006 expert report of Raymond F. Dovell, C.P.A. previously produced and documents referenced therein. By way of further response, Enviratec, Inc. is not a party to this action.

106.    What do plaintiffs contend is Sitkin's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

    A.    What is the factual basis for plaintiffs' contention as to Sitkin's allocable/equitable share of the Total Cleanup Cost for the Site?

    B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Sitkin's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 78. By way of further response, Sitkin Smelting & Refining, Inc. has no identifiable assets that would enable it to participate financially in the cleanup of the Site. By way of further response, see June 29, 2006 expert report of Raymond F. Dovell, C.P.A. previously produced and documents referenced therein. By way of further response, Sitkin Smelting & Refining, Inc. is not a party to this action.

107.    What do plaintiffs contend is Trace's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.  What is the factual basis for plaintiffs' contention as to Trace's allocable/equitable share of the Total Cleanup Cost for the Site?

B.  Set forth the calculation used by plaintiffs to arrive at their contention as to Trace's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**  Art Metal-Knoll Corporation (now Trace International) has no identifiable assets that would enable it to participate financially in the cleanup of the Site.  By way of further response, see June 29, 2006 expert report of Raymond F. Dovell, C.P.A. previously produced and documents referenced therein.  By way of further response, Trace International is not a party to this action.

108.  What do plaintiffs contend is General Ceramics' allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.  What is the factual basis for plaintiffs' contention as to General Ceramics' allocable/equitable share of the Total Cleanup Cost for the Site?

B.  Set forth the calculation used by plaintiffs to arrive at their contention as to General Ceramics" allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**  See Plaintiffs' response to Interrogatory No. 78.  By way of further response, General Ceramics is not a party to this action.  By way of further response, General Ceramics conducted a removal action in which it removed, to EPA's satisfaction, any wastes for which it might be liable.

109.  What do plaintiffs contend is DeRewal's allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.  What is the factual basis for plaintiffs' contention as to DeRewal's allocable/equitable share of the Total Cleanup Cost for the Site?

B.  Set forth the calculation used by plaintiffs to arrive at their contention as to DeRewal's allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**  See Plaintiffs' response to Interrogatory No. 78.  By way of further response, Manfred DeRewal, Sr. has no identifiable assets that would enable him to participate financially in the cleanup of the Site.  By way of further response, see June 29, 2006 expert

report of Raymond F. Dovell, C.P.A. previously produced and documents referenced therein. By

way of further response, Manfred DeRewal, Sr. is not a party to this action.

110.   What do plaintiffs contend is DCC's allocable/equitable share of the Total Cleanup Cost
       for the Site (expressed in a percentage)?

   A.   What is the factual basis for plaintiffs' contention as to DCC's allocable/equitable
        share of the Total Cleanup Cost for the Site?

   B.   Set forth the calculation used by plaintiffs to arrive at their contention as to
        DCC's allocable/equitable share of the Total Cleanup Cost for the Site.

   **ANSWER:**   See Plaintiffs' response to Interrogatory No. 78. By way of further

response, DeRewal Chemical Company, Inc. has no identifiable assets that would enable it to

participate financially in the cleanup of the Site. By way of further response, see June 29, 2006

expert report of Raymond F. Dovell, C.P.A. previously produced and documents referenced

therein. By way of further response, DeRewal Chemical Company, Inc. is not a party to this

action.

111.   What do plaintiffs contend is Globe's allocable/equitable share of the Total Cleanup Cost
       for the Site (expressed in a percentage)?

   A.   What is the factual basis for plaintiffs' contention as to Globe's
        allocable/equitable share of the Total Cleanup Cost for the Site?

   B.   Set forth the calculation used by plaintiffs to arrive at their contention as to
        Globe's allocable/equitable share of the Total Cleanup Cost for the Site.

   **ANSWER:**   See Plaintiffs' response to Interrogatory No. 78. By way of further

response, Globe Disposal Company, Inc. has no identifiable assets that would enable it to

participate financially in the cleanup of the Site. By way of further response, see June 29, 2006

expert report of Raymond F. Dovell, C.P.A. previously produced and documents referenced

therein. By way of further response, Globe Disposal Company, Inc. is not a party to this action.

112.   Do plaintiffs contend that the first removal action conducted by the United States (as that
       removal action is described in the first paragraph of page 3 of the Record of Decision for
       the Site) was not completed in 1992?

EXHIBIT A

| Party Defendants | Waste In | Volumetric Share | Increase to PRPs with Knowledge | 50% Cooperation Credit to Plaintiffs |
|---|---|---|---|---|
| | | | 0.1 | 0.5 |
| Carpenter | 913,242 | 39.31% | 43.25% | 47.57% |
| Ashland/AETC | 138,481 | 5.96% | 6.56% | 7.21% |
| Diaz/AETC | 43,275 | 1.86% | 2.05% | 2.25% |
| Flexible | 51,948 | 2.24% | 2.04% | 2.24% |
| Etched/Flexible | 31,625 | 1.36% | 1.24% | 1.38% |
| NRM | 491,500 | 21.16% | 19.27% | 21.20% |
| Handy | 5,899 | 0.25% | 0.23% | 0.25% |
| Total | 1,675,970 | 72.15% | 74.63% | 82.09% |

| Plaintiffs | | | | |
|---|---|---|---|---|
| Cytec | 309,000 | 13.30% | 12.12% | 6.06% |
| Ford | 36,993 | 1.59% | 1.45% | 0.73% |
| SPS | 34,579 | 1.49% | 1.36% | 0.68% |
| Agere | - | 0.00% | 0.00% | 0.00% |
| TI | - | 0.00% | 0.00% | 0.00% |
| Total | 380,572 | 16.38% | 14.92% | 7.46% |

| Settled | | | | |
|---|---|---|---|---|
| Plymouth | 14,976 | 0.64% | 0.59% | 0.59% |
| Quickline | 1,285 | 0.06% | 0.05% | 0.05% |
| Navy | 437 | 0.02% | 0.02% | 0.02% |
| Simon | 3,025 | 0.13% | 0.12% | 0.12% |
| Unisys | 3,292 | 0.14% | 0.13% | 0.13% |
| Rohm | - | 0.00% | 0.00% | 0.00% |
| Bostik | 7,125 | 0.31% | 0.28% | 0.28% |
| Novartis | 13,450 | 0.58% | 0.53% | 0.53% |
| Techalloy | 222,775 | 9.59% | 8.74% | 8.74% |
| Thomas | - | 0.00% | 0.00% | 0.00% |
| Total | 266,365 | 11.47% | 10.44% | 10.44% |

DMEAST #9522604 v6

EXHIBIT A

| Waste In | 2,322,907 | 100.00% | 100.00% | 100.00% |
|----------|-----------|---------|---------|---------|

EXHIBIT B

| | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Flexible** | 1/72-12/73 | - | 0.95 | - |
| Bulk | 12/1/73-6/30/75 | 93,000 | 0.15 | 13,950 |
| Etchant | 7/1/75-6/1/76 | 7,150 | 0.65 | 4,648 |
| | 6/1/76-3/30/77 | 3,900 | 0.15 | 585 |
| | | 104,050 | | 19,183 |
| | | | | |
| Drums | 1/72-12/73 | 34,000 | 0.95 | 32,300 |
| Etchant | 12/1/73-6/30/75 | 3,100 | 0.15 | 465 |
| | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | - | 0.15 | - |
| | | 37,100 | | 32,765 |

| | | | | |
|---|---|---|---|---|
| **Diaz/AETC** | 1/72-12/73 | - | 0.95 | - |
| Nitric Acid | 12/1/73-6/30/75 | - | 0.15 | - |
| Bulk | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | 173,100 | 0.25 | 43,275 |
| | | 173,100 | | 43,275 |

| | | | | |
|---|---|---|---|---|
| **Ashland/AETC** | 1/72-12/73 | - | 0.95 | - |
| Nitric Acid | 12/1/73-6/30/75 | - | 0.15 | - |
| Bulk | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | 216,650 | 0.25 | 54,163 |
| | | | | |
| Dye Waste | 1/72-12/73 | - | 0.95 | - |
| Bulk | 12/1/73-6/30/75 | - | 0.15 | - |
| | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | 185,300 | 0.25 | 46,325 |
| | | | | |
| Pthalide Acid | 1/72-12/73 | - | 0.95 | - |
| Bulk | 12/1/73-6/30/75 | - | 0.15 | - |
| | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | 50,000 | 0.25 | 12,500 |
| | | | | |
| CDN Waste | 1/72-12/73 | - | 0.95 | - |
| Bulk | 12/1/73-6/30/75 | - | 0.15 | - |
| | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | 86,410 | 0.25 | 21,603 |
| | | | | |
| Solvents | 1/72-12/73 | - | 0.95 | - |
| Bulk | 12/1/73-6/30/75 | - | 0.15 | - |
| | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | 12,950 | 0.25 | 3,238 |
| | | | | |
| Solvents | 1/72-12/73 | - | 0.95 | - |
| Drum | 12/1/73-6/30/75 | - | 0.15 | - |
| | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | 4,345 | 0.15 | 652 |

EXHIBIT B

|  | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **NRM** | 1/72-12/73 | - | 0.95 | - |
| Pickle Liquor | 4/24/74-6/30/75 | 360,000 | 0.15 | 54,000 |
| Bulk | 7/1/75-6/1/76 | 605,000 | 0.65 | 393,250 |
|  | 6/1/76-3/30/77 | 295,000 | 0.15 | 44,250 |
|  |  | 1,260,000 |  | 491,500 |

| **Handy** | 1/72-12/73 | 5,020 | 0.95 | 4769 |
|---|---|---|---|---|
| Solvents (TCE, | 12/1/73-6/30/75 | 7,530 | 0.15 | 1129.5 |
| MEK, acetone) | 7/1/75-6/1/76 | - | 0.65 | 0 |
|  | 6/1/76-3/30/77 | - | 0.15 | 0 |
|  |  | 12,550 |  | 5,899 |

| **Etched/Flexible** | 1/72-12/73 | 17,500 | 0.95 | 16,625 |
|---|---|---|---|---|
| Drums | 12/1/73-6/30/75 | 23,000 | 0.15 | 3,450 |
| Etchant | 7/1/75-6/1/76 | 15,000 | 0.65 | 9,750 |
|  | 6/1/76-3/30/77 | 12,000 | 0.15 | 1,800 |
|  |  | 67,500 |  | 31,625 |

| **Thomas** | 1/72-12/73 | - | 0.95 | - |
|---|---|---|---|---|
|  | 12/1/73-6/30/75 | - | 0.15 | 0 |
|  | 7/1/75-6/1/76 | - | 0.65 | 0 |
|  | 6/1/76-3/30/77 | - | 0.15 | 0 |
|  |  | - |  | - |

| **Carpenter** | 1/72-12/73 | 816,658 | 0.95 | 775,825 |
|---|---|---|---|---|
| Bulk | 12/1/73-6/30/75 | 916,114 | 0.15 | 137,417 |
| Pickle Liquor | 7/1/75-6/1/76 | - | 0.65 | 0 |
|  | 6/1/76-3/30/77 | - | 0.15 | 0 |
|  |  | 1,732,772 |  | 913,242 |

| **Agere** | 1/72-12/73 | - | 0.95 | - |
|---|---|---|---|---|
|  | 12/1/73-6/30/75 | - | 0.15 | - |
|  | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | - |  | - |

| **TI** | 1/72-12/73 | - | 0.95 | - |
|---|---|---|---|---|
|  | 12/1/73-6/30/75 | - | 0.15 | - |
|  | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | - |  | - |

EXHIBIT B

|  | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Ford** | 1/72-12/73 | 13,585 | 0.95 | 12,906 |
| Drums | 12/1/73-6/30/75 | - | 0.15 | - |
| Plastics | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | 13,585 |  | 12,906 |

|  | Time | Gross | Factor | Net |
|---|---|---|---|---|
|  | 1/72-12/73 | 23,595 | 0.95 | 22,415 |
| Drums | 12/1/73-6/30/75 | - | 0.15 | - |
| Finishing Materials | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | 23,595 |  | 22,415 |

|  | Time | Gross | Factor | Net |
|---|---|---|---|---|
|  | 1/72-12/73 | 1,760 | 0.95 | 1,672 |
| Drums | 12/1/73-6/30/75 | - | 0.15 | - |
| Industrial Waste | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | 1,760 |  | 1,672 |

|  | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Cytec** | 1/72-12/73 | - | 0.95 | - |
| Bulk | 12/1/73-6/30/75 | 193,000 | 0.15 | 28,950 |
| Ammonia | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | 116,000 | 0.15 | 17,400 |
| Based on Driver Testimony |  | 309,000 |  | 46,350 |

EXHIBIT B

|  | Time | Gross | Factor | Net |
|---|---|---|---|---|
| SPS | 1/72-12/73 | 7,838 | 0.95 | 7,446 |
| Drums | 12/1/73-6/30/75 | 12,155 | 0.15 | 1,823 |
| Chromic Acid | 7/1/75-6/1/76 | 6,270 | 0.65 | 4,076 |
|  | 6/1/76-3/30/77 | 5,858 | 0.15 | 879 |
|  |  | 32,120 |  | 14,223 |
|  |  |  |  |  |
|  | 1/72-12/73 | 8,388 | 0.95 | 7,968 |
| Drums | 12/1/73-6/30/75 | 12,320 | 0.15 | 1,848 |
| Cyanide Waste | 7/1/75-6/1/76 | 6,270 | 0.65 | 4,076 |
|  | 6/1/76-3/30/77 | 6,573 | 0.15 | 986 |
|  |  | 33,550 |  | 14,878 |
|  |  |  |  |  |
|  | 1/72-12/73 | 990 | 0.95 | 941 |
| Drums | 12/1/73-6/30/75 | - | 0.15 | - |
| Degreasing Fluids | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | 990 |  | 941 |
|  |  |  |  |  |
|  | 1/72-12/73 | 165 | 0.95 | 157 |
| Drums | 12/1/73-6/30/75 | - | 0.15 | - |
| Acetone Waste | 7/1/75-6/1/76 | - | 0 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | 165 |  | 157 |
|  |  |  |  |  |
|  | 1/72-12/73 | 110 | 0.95 | 105 |
| Drums | 12/1/73-6/30/75 | - | 0.15 | - |
| Nickel Waste | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | 110 |  | 105 |
|  |  |  |  |  |
| Cyanide Waste | 1/72-12/73 | 4,500 | 0.95 | 4,275 |
| Bulk | 12/1/73-6/30/75 | - | 0.15 | - |
|  | 7/1/75-6/1/76 | - | 0.65 | - |
|  | 6/1/76-3/30/77 | - | 0.15 | - |
|  |  | 4,500 |  | 4,275 |

EXHIBIT B

| | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Plymouth** | 1/72-12/73 | 10,604 | 0.95 | 10,074 |
| Bulk | 12/1/73-6/30/75 | 11,667 | 0.15 | 1,750 |
| Pickle Liquor | 7/1/75-6/1/76 | 4,465 | 0.65 | 2,902 |
| | 6/1/76-11/31/76 | 1,665 | 0.15 | 250 |
| | | 28,401 | | 14,976 |

| | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Quickline** | 1/72-12/73 | 1,071 | 0.95 | 1017.45 |
| Drums | 12/1/73-6/30/75 | 1,785 | 0.15 | 267.75 |
| Etchant | 7/1/75-6/1/76 | - | 0.65 | 0 |
| | 6/1/76-3/30/77 | - | 0.15 | 0 |
| | | 2,856 | | 1,285 |

| | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Navy** | 1/72-12/73 | - | 0.95 | - |
| Drums/Carboys | 12/1/73-6/30/75 | - | 0.15 | - |
| | 7/1/75-6/1/76 | - | 0.65 | - |
| | 6/1/76-3/30/77 | - | 0.15 | - |
| Driver Testimony | | - | | 437 |

| | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Simon** | 1/72-12/73 | - | 0.95 | 0 |
| Bulk/Plastic Drums | 12/1/73-6/30/75 | | 0.15 | |
| Sulphuric Nitrate | 7/1/75-6/1/76 | - | 0.65 | 0 |
| | 6/1/76-3/30/77 | - | 0.15 | 0 |
| Driver Testimony | | | | 3,025 |

| | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Unisys** | 1/72-12/73 | 3,465 | 0.95 | 3291.75 |
| Drums | 12/1/73-6/30/75 | - | 0.15 | 0 |
| Etchant | 7/1/75-6/1/76 | - | 0.65 | 0 |
| | 6/1/76-3/30/77 | - | 0.15 | 0 |
| | | 3,465 | | 3,292 |

| | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Rohm** | 1/72-12/73 | - | | 0 |
| | 12/1/73-6/30/75 | - | | 0 |
| | 7/1/75-6/1/76 | - | | 0 |
| | 6/1/76-3/30/77 | - | | 0 |
| | | - | | - |

| | Time | Gross | Factor | Net |
|---|---|---|---|---|
| **Bostik** | 1/72-12/73 | - | 0.95 | 0 |
| Bulk | 12/1/73-6/30/75 | - | 0.15 | 0 |
| Nitric Acid | 7/1/75-6/1/76 | - | 0.65 | 0 |
| | 6/1/76-3/30/77 | - | 0.25 | 0 |
| Driver Testimony | | - | | 7,125 |

EXHIBIT B

| | CDN Waste | Bulk | 21,603 |
|---|---|---|---|
| | Pthalide Acid | Bulk | 12,500 |
| | Solvents | Bulk | 3,238 |
| | Solvents | Drum | 652 |
| Diaz/AETC | Nitric Acid | Bulk | 43,275 |
| Flexible | Etchant | Bulk | 19,183 |
| | Etchant | Drum | 32,765 |
| Etched/Flexible | Etchant | Drum | 31,625 |
| NRM | Pickle Liquor | Bulk | 491,500 |
| Handy | Solvents | Drum | 5,899 |
| | | | 1,675,967 |

**Plaintiff Totals**

| Cytec | Ammonia | Bulk | 309,000 |
|---|---|---|---|
| Ford | Plastics | Drums | 12,906 |
| Ford | Finishing Mat. | Drums | 22,415 |
| Ford | Industrial Waste | Drums | 1,672 |
| SPS | Chromic Acid | Drums | 14,223 |
| SPS | Cyanide Waste | Drums | 14,878 |
| SPS | Cyanide Waste | Bulk | 4,275 |
| SPS | Degreasers | Drums | 941 |
| SPS | Acetone | Drums | 157 |
| SPS | Nickle Waste | Drums | 105 |
| | | | 380,570 |

**Settled Totals**

| Quickline | Etchant | Drums | 1,285 |
|---|---|---|---|
| Navy | Waste | Drums | 437 |
| Simon Wrecking | Sulphuric Nitrate | Bulk | 3,025 |
| Novartis | Nitric Acid | Bulk | 13,450 |
| Bostik | Nitric Acid | Bulk | 7,125 |
| Techalloy | Waste Oil | Drums | 2,375 |
| Techalloy | Pickle Liquor | Bulk | 220,400 |
| Plymouth Tube | Pickle Liquor | Bulk | 14,976 |
| Rohm | | | - |
| Unisys | Etchant | Drums | 3,292 |
| Thomas | Etchant | Drum | - |
| | | | 266,365 |