**EXHIBIT 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES,
LLC, and TI GROUP AUTOMOTIVE
SYSTEMS LLC,

              Plaintiffs,

              v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORP.; ASHLAND,
INC., BOARHEAD CORPORATION;
CARPENTER TECHNOLOGY
CORPORATION; CROWN METRO,
INC.; DIAZ CHEMICAL
CORPORATION; EMHART
INDUSTRIES, INC.; ETCHED
CIRCUITS, INC.; fcg, INC.; GLOBE
DISPOSAL CO., INC; GLOBE-
WASTECH, INC.; HANDY & HARMAN
TUBE COMPANY; KNOLL, INC.;
KNOLL INTERNATIONAL, INC.;
MERIT METAL PRODUCTS CORP.;
NOVARTIS CORPORATION; NRM
INVESTMENT COMPANY;
PLYMOUTH TUBE COMPANY;
QUIKLINE DESIGN AND
MANUFACTURING CO.; RAHNS
SPECIALTY METALS, INC.; ROHM
AND HAAS COMPANY; SIMON
WRECKING CO., INC.; TECHALLOY
COMPANY, INC.; THOMAS & BETTS
CORPORATION; UNISYS
CORPORATION; UNITED STATES OF
AMERICA DEPARTMENT OF NAVY,

              Defendants.

CIVIL ACTION

NO. 02-CV-3830

Judge Legrome D. Davis

## FOURTH AMENDED COMPLAINT

Plaintiffs Agere Systems, Inc. ("Agere"), Cytec Industries Inc. ("Cytec") , Ford Motor Company ("Ford"), SPS Technologies, LLC (as successor to SPS Technologies, Inc.) ("SPS") and TI Group Automotive Systems, LLC ("TI") (collectively "the Boarhead Farm Agreement Group" or "the Agreement Group members"), by and through their attorneys, by way of Complaint against the Defendants hereby state as follows:

## FACTUAL BACKGROUND

1.  The Agreement Group members seek contribution from Defendants, including an allocation by the Court of response costs as between Plaintiffs and Defendants using such equitable factors as the Court determines are appropriate, for the response costs that Plaintiffs have incurred and the damages that Plaintiffs have suffered as a result of releases or threatened releases of one or more hazardous substance as defined by Section 101 (14) of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, ("CERCLA"), 42 U.S.C. § 9601 (14), and Section 103 of the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 PA. CONS. STAT. § 6020.103 ("Hazardous Substances"), at or from the Boarhead Farms Superfund Site, Lonely Cottage Road, Upper Black Eddy, Bridgeton Township, Bucks County, Pennsylvania (the "Site"). Plaintiffs also seek a declaratory judgment that Defendants are liable to Plaintiffs for contribution for any and all response costs that Plaintiffs will or may incur and for any and all damages that Plaintiffs will or may suffer in the future as a result of releases, threatened releases, or discharges of Hazardous Substances at or from the Site.

2.  Manfred DeRewal ("DeRewal") incorporated Boarhead Corporation in 1969. In addition, DeRewal incorporated and operated DeRewal Chemical Company, Inc. ("DeRewal Chemical"), a hauler of waste materials.

3.  In 1969, Boarhead Corporation purchased the Site. The Site is and was, at all relevant times, a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S. § 9601(9).

4.  From the time of purchase until approximately 1977, the Site was used for, among other things, the disposal of Hazardous Substances.

5.  In the early 1970s, the Bucks County Department of Health (the "DOH"), responding to complaints of dead fish, dead plant life, and other environmental and public health concerns, investigated the Site. The DOH noted the following at the Site: pungent odors; drums on an open trailer; drums awaiting disposal; empty tanks awaiting removal; a bulldozer burying old drums; 40 drums filled with solvent; and empty tanker trucks parked at the Site.

6.  The DOH obtained a search warrant and searched the Site on March 5, 1973. The DOH documented the following at the Site: improperly stored chemicals; chemicals leaking from 55-gallon drums; liquid and solid waste on the ground; chemicals leaking into waste pools, on-Site lagoons, and vats; copper ammonia sulfate; paint solvents; arsenic pentoxide; pesticides; copper naphtholate; and a cleared area in the northeast section of the Site containing drums.

7.  In October of 1973, a tank truck discharged approximately 3,000 gallons of ferrous chloride at the Site, for which Boarhead Corporation was found to be in violation of the Pennsylvania Clean Streams Law, 35 PA. CONS. STAT. §§ 691.1 et seq.

8.  Soil samples taken from the Site in 1974 revealed the following: soil pH levels of 2.9 and the presence of chloride, iron, chromium, copper, zinc, and nickel.

9. In September of 1976, a tank truck released approximately 3,000 gallons of sulfuric acid on the Site, resulting in the evacuation of 34 local residents.

10. In 1984, the United States Environmental Protection Agency ("USEPA") performed a Site inspection. On March 31, 1989, the USEPA placed the Site on the National Priorities List (the "NPL"), 40 C.F.R Part 300, Appendix B, a national list of hazardous waste sites that the USEPA has determined may pose a threat to health, welfare, and the environment. The NPL was established under the National Contingency Plan (the "NCP"), 40 C.F.R. Part 300, as required by Section 105(a) of CERCLA, 42 U.S.C. § 9605(a).

11. The USEPA has conducted three CERCLA removal actions at the Site. In connection with these removal actions, the USEPA located and removed from the Site 2,600 drums as well as contaminated soil. Contaminated groundwater is being treated at an on-site treatment facility.

12. Under an administrative consent order, USEPA Docket Number: III-92-66-DC, General Ceramics, Inc., performed a fourth removal action to address the presence of radioactive waste at the Site.

13. The USEPA completed a Remedial Investigation and Feasibility Study for the Site in July 1997.

14. On or about November 18, 1998, the USEPA issued a Record of Decision (the "ROD") selecting a remedial action for the Site. The Commonwealth of Pennsylvania concurred in this remedy selection.

15. Subsequent to the issuance of the ROD, the USEPA determined to implement the remedial action described in the ROD in two operable units ("OUs"). The USEPA

determined that, in general, OU-1 would address: groundwater extraction, metal precipitation, and air stripping; the installation of additional monitoring wells; the implementation of institutional controls and monitoring for OU-1; residential water treatment; and phytoremediation. The USEPA determined that, in general, OU-2 would address: soil aeration and the treatment of volatile organic compound hot spots; the excavation and off-site disposal of buried drums; and the implementation of institutional controls and monitoring for OU-2.

16. The Agreement Group members have agreed collectively to undertake the cleanup work comprising OU-1 and OU-2, to otherwise collectively resolve the claims of EPA related to the Site, and to seek collectively contribution from the Defendants in this civil action. The Agreement Group members have agreed that they will, at some future time, and not in this civil action, reach a final allocation among themselves applicable to all costs associated with group activities, including the costs of the cleanup work comprising OU-1 and OU-2.

17. Although denying that they are liable parties under Section 107 of CERCLA, 42 U.S.C. § 9607, Cytec Industries Inc., Ford Motor Company, and SPS Technologies, Inc. are parties to both an Administrative Order on Consent for Remedial Design, USEPA Docket No. III-2000-002-DC, entered in February 2000 (the "OU-1 AOC") and a Consent Decree entered by this Court on or about September 28, 2000 (the "OU-1 Consent Decree") obligating them to perform the OU-1 remedial design and remedial action (the "OU-1 RD/RA") at the Site.

18. Plaintiffs have agreed to collectively fund and perform the OU-1 RD/RA and have entered into an agreement with two other entities (the "OU-1 Group Agreement") whereby the parties to that agreement ("the OU-1 Parties") agreed to collectively fund and perform the OU-1 RD/RA. Specifically, each of the OU-1 Parties contributes (or has contributed) funds to an OU-1 Group trust account ("the OU-1 Trust Account"). Such contributions are (or have been)

made on the basis of an interim allocation among the OU-1 Parties. The interim allocation does not bind any of the OU-1 Parties, and they have agreed to reach a final allocation of their shares separate and apart from this action. The activities necessary for performance of the OU-1 RD/RA have been undertaken by Plaintiffs (and the two other entities), collectively by using contractors hired by and paid by them collectively.

19. Costs related to activities to perform the OU-1 RD/RA have been paid for and will in the future be paid for from the OU-1 Trust Account.

20. Although denying that they are liable parties under Section 107 of CERCLA, 42 U.S.C. § 9607, Cytec, Ford, SPS, and TI are signatories to an Administrative Order on Consent for Remedial Design, EPA Docket No. III – 2001 – 0010 – DC, effective October 17, 2001 (the "OU-2 AOC") and a Consent Decree (the "OU-2 Consent Decree") entered by this Court on March 14, 2002 obligating them to perform the OU-2 remedial design and remedial action (the "OU-2 RD/RA") at the Site and to reimburse the USEPA both for $7,000,000 in response costs incurred and accounted for prior to July 2000 and for an as yet undetermined amount of response costs incurred subsequent to July 2000.

21. Plaintiffs have and will in the future collectively fund and perform the OU-2 RD/RA. Specifically, Plaintiffs contribute funds to an OU-2 Group trust account ("the OU-2 Trust Account"). Such contributions are made on the basis of an interim allocation among Plaintiffs. The interim allocation does not bind any of the Plaintiffs, and they have agreed to reach a final allocation of their shares separate and apart from this action. The activities necessary for performance of the OU-2 RD/RA have been undertaken by Plaintiffs collectively by using contractors hired by and paid by them collectively.

22. All costs of the activities to perform the OU-2 RD/RA and to perform the other requirements of the OU-2 Consent Decree have been paid for and will in the future be paid for from the OU-2 Trust Account.

23. Plaintiffs have incurred costs and damages, including attorneys fees, in the course of collectively performing the requirements of the OU-1 and OU-2 AOCs and Consent Decrees. These costs constitute necessary costs of response, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), incurred consistently with the NCP, within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) (collectively, the "Response Costs"). Releases or threatened releases of Hazardous Substances at or from the Site have caused Plaintiffs to incur Response Costs. The Response Costs incurred by Plaintiffs are also reasonable and necessary or appropriate costs consistent with Section 702(a)(3) of HSCA, 35 PA. CONS. STAT. § 6020.703(a)(3).

24. Plaintiffs anticipate that they will incur additional necessary costs of response, consistent with the NCP, and will reimburse the USEPA for its administrative and oversight costs in the future ("Future Response Costs") in connection with the Site.

## JURISDICTION AND VENUE

25. This action arises under Section 107 of CERCLA, 42 U.S.C. § 9607, Section 113 of CERCLA, 42 U.S.C. § 9613, and Section 702(a)(3) of HSCA, 35 PA. CONS. STAT. § 6020.702(a)(3).

26. This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9313(b), 28 U.S.C. §§ 1331 and 1367. This Court has supplemental jurisdiction over the state claims based on 28 U.S.C. § 1367.

27.     This Court has authority to enter a declaratory judgment regarding the rights and liabilities of the parties pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2).

28.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases or threatened release of Hazardous Substances, wastes, pollutants, and contaminants alleged herein occurred and the claims set forth herein arose in the Eastern District of Pennsylvania.

## PARTIES

### A.     The Plaintiffs

29. Plaintiffs are persons as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21). Agere is a Delaware corporation with a principal place of business in Allentown, Pennsylvania. Cytec is a Delaware corporation with a principal place of business in West Paterson, New Jersey. Ford is a Delaware corporation with a principal place of business in Dearborn, Michigan. SPS is a Pennsylvania limited liability corporation with a principal place of business in Jenkintown, Pennsylvania. TI is a Delaware limited liability company with a principal place of business in Warren, Michigan.

### B.     The Defendants

### Defendant Advanced Environmental Technology Corp.

30. Defendant Advanced Environmental Technology Corp. ("AETC") is a New Jersey corporation with a principal place of business in Flanders, New Jersey.

31. AETC arranged with DeRewal Chemical for the disposal of Hazardous Substances from Defendants Ashland Inc. ("Ashland") and Diaz Chemical Corporation ("Diaz"), which Hazardous Substances were disposed of at the Site.

### Defendant Ashland Inc.

32. Defendant Ashland is a Kentucky corporation with a principal place of business in Russell, Kentucky.

33. Ashland used AETC and DeRewal Chemical to remove industrial wastes from its Great Meadows, New Jersey plant.

34. Ashland's waste was disposed of at the Site.

35. Ashland's waste contained Hazardous Substances.

### Defendant Boarhead Corporation

36. Defendant Boarhead Corporation is a Pennsylvania corporation with a principal place of business in Revere, Pennsylvania. Boarhead Corporation is the current owner of the Site and was the owner of the Site at the time of the disposal of Hazardous Substances.

### Defendant Carpenter Technology Corporation

37. Defendant Carpenter Technology Corporation ("Carpenter Technology") is a Delaware corporation with a principal place of business in Reading, Pennsylvania.

38. Carpenter Technology used DeRewal Chemical for the removal of waste pickling solution from its Reading, Pennsylvania plant.

39. Carpenter Technology's waste was disposed of at the Site.

40. Carpenter Technology's waste contained Hazardous Substances.

**Defendants Crown Metro, Inc. and Emhart Industries, Inc.**

41. Defendant Crown Metro, Inc. ("Crown") is a South Carolina corporation with a principal place of business in Greenville, South Carolina.

42. Defendant Emhart Industries, Inc. ("Emhart") is a Connecticut corporation with a registered office in Hartford, Connecticut.

43. USM Corporation ("USM"), formerly a New Jersey corporation, doing business as Bostik South, Inc., used DeRewal Chemical for the removal of waste acid from its Greenville, South Carolina plant.

44. USM's waste was disposed of at the Site.

45. USM's waste contained Hazardous Substances.

46. Emhart is a successor-in-interest to USM through the merger of USM into Emhart.

47. In or about 1980 USM sold the Bostik South, Inc. business, including the Greenville, South Carolina plant, to Bengal Corporation.

48. Bengal Corporation thereafter continued the operation of the Bostik South, Inc. business without change from the way the business was operated while the business was owned by USM.

49. Bengal thereafter changed its name to Crown.

50. Crown is a successor-in-interest to Emhart with respect to liability arising from the Greenville, South Carolina plant.

### Defendant Diaz Chemical Corporation

51. Defendant Diaz is a New York corporation with a principal place of business in Holley, New York.

52. Diaz used AETC and DeRewal Chemical to remove industrial wastes from its Holley, New York, plant.

53. Diaz's waste was disposed of at the Site.

54. Diaz's waste contained Hazardous Substances.

### Defendant Etched Circuits, Inc.

55. Defendant Etched Circuits, Inc. ("Etched Circuits") is a New Jersey corporation with a principal place of business in Warminster, Pennsylvania.

56. Etched Circuits, Inc. used DeRewal Chemical to remove industrial waste from its Cherry Hill, New Jersey plant.

57. Etched Circuits' waste was disposed of at the Site.

58. Etched Circuits' waste contained Hazardous Substances.

### Defendant fcg, inc.
### (a/k/a Flexible Circuits, Inc.)

59. Defendant fcg, inc. (a/k/a Flexible Circuits, Inc.) ("fcg") is a Pennsylvania corporation with a principal place of business in Warrington, Pennsylvania.

60. Fcg used DeRewal Chemical to remove spent etchings and other industrial waste from its Warrington, Pennsylvania plant.

61. Fcg's waste was disposed of at the Site.

62. Fcg's waste contained Hazardous Substances.

63. In 1969 fcg became the owner of all outstanding stock of Etched Circuits and thereafter operated the Etched Circuits facility in Cherry Hill, New Jersey. Fcg is thus a person who arranged for the transport, disposal, or treatment of Hazardous Substances from the Etched Circuits facility, which Hazardous Substances were disposed of at the Site.

### Defendants Globe Disposal Co., Inc. and Globe-Wastech, Inc.

64. Defendant Globe Disposal Co., Inc. ("Globe") is a Pennsylvania corporation with a principal place of business in Norristown, Pennsylvania.

65. Defendant Globe-Wastech, Inc. ("Wastech") is a Pennsylvania corporation with a principal place of business in Skippack, Pennsylvania.

66. Globe arranged with DeRewal Chemical for the disposal of Hazardous Substances.

67. Globe transported Hazardous Substances to the Site for disposal, having selected the Site for that purpose.

68. Globe Disposal selected the Site for the disposal of Hazardous Substances.

69. On or about March 1978 the sole shareholder of Globe, Earl T. Kelly, and the sole shareholder of Waste Techniques Corporation ("WTC"), Francis J. Keel, exchanged each of their shares in those companies to Wastech.

70. Wastech thereafter continued the operation of Globe without change from the way Globe operated while its shares were owned by Kelly.

71. Wastech is a successor-in-interest to Globe.

## Defendant Handy & Harman Tube Company

72. Defendant Handy & Harman Tube Company ("Handy & Harman Tube") is a Delaware corporation with a principal place of business in Norristown, Pennsylvania.

73. Handy & Harman Tube used DeRewal Chemical to remove industrial waste from its Norristown, Pennsylvania facility.

74. Handy & Harman Tube's waste was disposed at the Site.

75. Handy & Harmon Tube's waste contained Hazardous Substances.

## Defendants Knoll International, Inc. and Knoll, Inc.

76. Defendant Knoll International, Inc. ("Knoll International") is a Delaware corporation with a principal place of business in New York, New York.

77. Art Metal-Knoll Corporation ("Knoll") contracted for the disposal of industrial wastes with DeRewal Chemical from its East Greenville, Pennsylvania facility.

78. Knoll's wastes were disposed of at the Site.

79. Knoll's waste contained Hazardous Substances

80. Knoll International is the successor-in-interest to Knoll through the merger of Knoll into Knoll International.

81. In or about 1990 the business of Knoll International, including the East Greenville facility, was sold to Westinghouse Acquisition Corporation ("Westinghouse"), a Delaware corporation.

82. Westinghouse thereafter continued the operation of the Knoll International business without change from the way the business was operated while it was owned by Knoll International.

83. Westinghouse was merged into Knoll North America, Inc., which was merged into Knoll, Inc., which was merged into T.K.G. Acquisition Corp. T.K.G. Acquisition Corp. was immediately thereafter renamed Knoll, Inc. ("Knoll, Inc.")

84. Defendant Knoll, Inc. is a Delaware corporation with its principal place of business in East Greenville, Pennsylvania and is a successor-in-interest to Knoll International with respect to liability arising from the East Greenville facility.

### Defendant Merit Metal Products Corp.

85. Defendant Merit Metal Products Corp. ("Merit Metal II") is a Pennsylvania corporation with a principal place of business in Warrington, Pennsylvania.

86. Another Pennsylvania corporation also named Merit Metal Products Corporation (Merit Metal I") owned and operated a place of business in Warrington, Pennsylvania from at least 1968 to 1988.

87. Merit Metal I used DeRewal Chemical to remove industrial waste from its Warrington, Pennsylvania facility.

88. Merit Metal I's waste was disposed of at the Site.

89. Merit Metal I's waste contained Hazardous Substances.

90. Merit Metal II purchased the assets and business of Merit Metal I in or about July 1988 and thereafter continued the operation of that business without change from the way the business was operated while the business was owned by Merit Metal I.

91. Merit Metal II is liable as a successor-in-interest to Merit Metal I.

## Defendant Novartis Corporation

92. Defendant Novartis Corporation ("Novartis") is a New York corporation with a principal place of business in Tarrytown, New York.

93. Ciba-Geigy Corporation ("Ciba") used DeRewal Chemical for the removal of waste nitric acid and sulphuric acid from its Cranston, Rhode Island facility.

94. Ciba's waste was disposed of at the Site.

95. Ciba's waste contained Hazardous Substances.

96. Novartis is the corporate successor to Ciba.

## Defendant NRM Investment Company

97. Defendant NRM Investment Company ("NRMC") is a Pennsylvania corporation with its principal place of business in Rosemont, Pennsylvania.

98. From 1974 to 1978 NRMC, then named National Rolling Mills Co., used DeRewal Chemical to dispose of waste pickle liquor solution from its plant located in Malvern, Pennsylvania (the "NRM Plant").

99. Waste from the NRM Plant was disposed of at the Site.

100.    The NRM Plant waste contained Hazardous Substances.

101.    NRMC is a party to the OU-1 Agreement.

## Defendant Plymouth Tube Company

102.    Defendant Plymouth Tube Company ("Plymouth Tube") is a Michigan corporation with a principal place of business in Warrenville, Illinois.

103.    Plymouth Tube used DeRewal Chemical to dispose of waste pickling solution from its Ellwood Ivins facility in Horsham, Pennsylvania.

104.    Plymouth Tube's waste was disposed of at the Site.

105.    Plymouth Tube's waste pickling solution contained Hazardous Substances.

### Defendant Quikline Design and Manufacturing Co.

106.    Defendant Quikline Design and Manufacturing Co. ("Quikline Design") is a New Jersey corporation with a principal place of business in Gloucester City, New Jersey.

107.    Quikline Design used DeRewal Chemical to dispose of industrial waste from Quikline Design's Cherry Hill, New Jersey facility.

108.    Quikline Design's waste was disposed of at the Site.

109.    Quikline Design's waste contained Hazardous Substances.

### Defendant Rahns Specialty Metals, Inc.

110.    Defendant Rahns Specialty Metals, Inc. ("Rahns") is a Pennsylvania corporation with a principal place of business in Collegeville, Pennsylvania.

111.    In 1991 Rahns acquired the property, premises, and environmental liability associated with Techalloy Company, Inc.'s ("Techalloy") Rahns, Pennsylvania facility.

112.    Thereafter Rahns continued to operate the Techalloy Rahns facility in substantially the same manner in which that facility was operated by Techalloy and otherwise continued the business of Techalloy.

113.    Rahns is a successor-in-interest to Techalloy.

## Rohm and Haas Company

114.    Rohm and Haas Company ("Rohm") is a Pennsylvania Corporation with a principal place of business in Philadelphia, Pennsylvania.

115.    Rohm arranged with a Marvin Jonas business to remove waste from its facilities in the Philadelphia area.

116.    Rohm's waste was disposed of at the Site.

117.    Rohm's waste contained Hazardous Substances.

## Defendant Simon Wrecking Co., Inc.

118.    Defendant Simon Wrecking Co., Inc. ("Simon Wrecking") is a Pennsylvania corporation with a principal place of business in Williamsport, Pennsylvania.

119.    Simon Wrecking used DeRewal Chemical to remove industrial waste from Simon Wrecking's Williamsport facility.

120.    Simon Wrecking's waste was disposed of at the Site.

121.    Simon Wrecking's waste contained Hazardous Substances.

## Defendant Techalloy Company, Inc.

122.    Defendant Techalloy is a Pennsylvania corporation with a principal place of business in Mahway, New Jersey.

123.    Techalloy used DeRewal Chemical to remove spent acids from Techalloy's Rahns, Pennsylvania facility.

124.    Techalloy's waste was disposed of at the Site.

125.    Techalloy's waste contained Hazardous Substances.

**Defendant Thomas & Betts Corporation**

126.    Defendant Thomas & Betts Corporation ("Thomas & Betts") is a Tennessee corporation with a principal place of business in Memphis, Tennessee.

127.    Ansley Electronics Corporation ("Ansley") used DeRewal Chemical to remove industrial waste from its New Hope and Perkasie, Pennsylvania facilities.

128.    Wastes from Ansley's New Hope and Perkasie facilities were disposed of at the Site.

129.    Wastes from Ansley's New Hope and Perkasie facilities contained Hazardous Substances.

130.    Ansley was merged into Thomas & Betts in or about January 1, 1984.

131.    Thomas & Betts is a successor-in-interest to Ansley.

**Defendant Unisys Corporation**

132.    Defendant Unisys Corporation ("Unisys") is a Delaware corporation with a principal place of business in Blue Bell, Pennsylvania.

133.    Sperry Corporation ("Sperry") used DeRewal Chemical to remove wastes from Sperry's Blue Bell, Pennsylvania, Utica, New York, and other facilities.

134.    Sperry's waste was disposed of at the Site.

135.    Sperry's waste contained Hazardous Substances.

136.    Sperry was merged into Burroughs Corporation. Burroughs Corporation thereafter changed its name to Unisys Corporation.

137.    Unisys is a successor-in-interest to Sperry.

**Defendant United States of America Department of Navy**

138.    Defendant the United States of America, Department of Navy is an instrumentality of the United States Government with a base in Willow Grove, Pennsylvania.

139.    The Department of Navy, through the Naval Air Development Center, Warminster, Pennsylvania, used DeRewal Chemical to remove industrial waste.

140.    The Department of Navy's waste was disposed of at the Site.

141.    The Department of Navy's waste contained Hazardous Substances.

## COUNT I

### (CERCLA Section 113(f)(1) Contribution)

142.    The allegations made in paragraphs 1 through 141 are incorporated by reference as if set forth here in full.

143.    Pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), any person may seek contribution from any other person who is liable or potentially liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

144.    Plaintiffs are "persons" within the meaning of Sections 101(21) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9601(21) and 9613(f)(1).

145.    Each Defendant is a "person" within the meaning of Sections 101(21) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(21) and 9607(a).

146.    Defendants Globe Disposal Co., Inc., and Globe-Wastech, Inc. (the "Transporter Defendants") are persons who accepted Hazardous Substances for transport to the Site, having selected the Site as the disposal or treatment facility to which such Hazardous

Substances would be transported, or are successors-in-interest to such persons, and are liable pursuant to Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

147.    Defendants AETC, Ashland, Carpenter Technology, Crown, Diaz; Emhart, fcg, Globe, Globe-Wastech, Inc. Handy & Harman Tube, Knoll, Knoll International, Merit Metal, Novartis, NRMC, Plymouth Tube, Quikline Design, Techalloy, Rahns, Rohm, Simon Wrecking, Thomas & Betts, Unisys, and the United States of America Department of Navy (collectively, the "Generator/Arranger Defendants") are persons who by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of Hazardous Substances owned or possessed by them or by another party or entity, at the Site, or are successors-in-interest to such persons and are liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

148.    The total amount of the wastes transported to the Site by each of the Transporter Defendants was greater than 110 gallons of liquid or greater than 200 pounds of solid materials. None of such wastes were municipal solid waste as defined by CERCLA § 107.

149.    The total amount of the wastes for which the Generator/Arranger Defendants arranged and that were disposed of at the Site was greater than 110 gallons of liquid or greater than 200 pounds of solid materials. None of such wastes were municipal solid waste as defined by CERCLA § 107.

150.    Defendant Boarhead Corporation is liable under Sections 107(a)(1) and 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(1), 42 U.S.C. § 9607(a)(2) as the current owner of the Site and as the owner of the Site at the time of the disposal of Hazardous Substances.

151.    Pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), the Agreement Group members are entitled to contribution from Defendants for Response Costs

incurred and for Future Response Costs to be incurred by the Agreement Group members in connection with the Site and to an allocation by the Court of the Response Costs and Future Responses Costs as between the Agreement Group members and Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE the Agreement Group members demand judgment in their favor against each of the Defendants, as follows:

(a)     Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for contribution to the Agreement Group members for Response Costs incurred thus far in connection with the Site and awarding damages to the Agreement Group members in that amount and for Future Response Costs to be incurred by the Agreement Group members in connection with the Site, together with interest thereon;

(b)     Allocating responsibility for the Response Costs and Future Response Costs as between the Agreement Group members and Defendants pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), using such equitable factors as the Court determines are appropriate;

(c)     Ordering Defendants to provide contribution to the Agreement Group members for Response Costs related to the Site incurred to date and for all Future Response Costs to be incurred in connection with the Site, together with interest thereon, computed in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

(d)     Ordering Defendants to pay the Agreement Group members their costs of this action, including reasonable attorneys fees; and

(e)    Granting the Agreement Group members such other, further, and different relief as the Court may deem just and appropriate.

## COUNT II

### (CERCLA Section 113(f)(3)(B)

152.    The allegations made in paragraphs 1 through 151 are incorporated by reference as if set forth here in full.

153.    Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), any person may seek contribution from any other person who is not a party to a settlement under section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).

154.    Pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), the Agreement Group members are entitled to contribution from Defendants for Response Costs incurred and for Future Response Costs to be incurred by the Agreement Group members in connection with the Site and to an allocation by the Court of the Response Costs and Future Responses Costs as between the Agreement Group members and Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE the Agreement Group members demand judgment in their favor against each of the Defendants, as follows:

(a)    Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), for contribution to the Agreement Group members for Response Costs incurred thus far in connection with the Site and awarding damages to the Agreement Group members in that amount and for Future Response Costs to be incurred by the Agreement Group members in connection with the Site, together with interest thereon;

(b)     Allocating responsibility for the Response Costs and Future Response Costs as between the Agreement Group members and Defendants pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), using such equitable factors as the Court determines are appropriate;

(c)     Ordering Defendants to provide contribution to the Agreement Group members for Response Costs related to the Site incurred to date and for all Future Response Costs to be incurred in connection with the Site, together with interest thereon, computed in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

(d)     Ordering Defendants to pay the Agreement Group members their costs of this action, including reasonable attorneys fees; and

(e)     Granting the Agreement Group members such other, further, and different relief as the Court may deem just and appropriate.

(f)     Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for contribution to the Agreement Group members for Response Costs incurred thus far in connection with the Site and awarding damages to the Agreement Group members in that amount and for Future Response Costs to be incurred by the Agreement Group members in connection with the Site, together with interest thereon;

## COUNT III

### (CERCLA Section 113(g)(2) Declaratory Judgment)

155.    The allegations made in paragraphs 1 through 154 are incorporated by reference as if set forth here in full.

156.    A controversy exists between the Agreement Group members and Defendants insofar as the Agreement Group members contend, and Defendants deny, that Defendants are liable under CERCLA for contribution for all necessary costs of response incurred and to be incurred by the Agreement Group members in connection with any response actions taken by the Agreement Group members at the Site.

157.    Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), the Agreement Group members request entry of a declaratory judgment that holds Defendants liable for all necessary costs of response incurred and to be incurred in connection with any response action taken by the Agreement Group members at the Site, which judgment shall be binding in any subsequent action to recover further response costs or damages.

WHEREFORE the Agreement Group members demand judgment in their favor against each of the Defendants, as follows:

(a)    Entering a declaratory judgment on liability pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), in favor of the Agreement Group members and against Defendants, adjudging, decreeing, and declaring that Defendants are liable to the Agreement Group members for all Future Response Costs consistent with the NCP that the Agreement Group members may incur and for all damages that the Agreement Group members may suffer at or with respect to the Site, together with interest thereon, which judgment will be binding in any subsequent action or actions brought by the Agreement Group members against Defendants to recover Future Response Costs or damages.

## COUNT IV

### (Cost Recovery Under the Pennsylvania Hazardous Sites Cleanup Act)

158.    The allegations made in paragraphs 1 through 157 are incorporated by reference as if set forth here in full.

159.    There has been a "release" at the Site within the meaning of Section 103 of HSCA, 35 PA. CONS. STAT. § 6020.103.

160.    Each Defendant is a "person" within the meaning of Section 103 of HSCA, 35 PA. CONS. STAT. § 6020.103.

161.    Plaintiffs are "persons" as defined by Section 103 of HSCA, 35 PA. CONS. STAT. § 6020.103.

162.    Each Defendant is a person who has allowed a release and thereby caused a public nuisance pursuant to Section 1101 of HSCA, 35 PA. CONS. STAT. § 6020.1101.

163.    The Agreement Group members have incurred "reasonable and necessary or appropriate costs" responding to the release and threatened release of Hazardous Substances at the Site pursuant to Section 702 of HSCA, 35 PA. CONS. STAT. § 6020.702(a)(3).

164.    The Transporter Defendants are persons who accepted Hazardous Substances for transport to the Site, having selected the Site as the disposal or treatment facility to which such Hazardous Substances would be transported, or are successors-in-interest to such persons, and are liable to the Agreement Group members pursuant to Sections 701(a)(3) and 702(a)(3) of HSCA, 35 PA. CONS. STAT. §§ 6020.701(a)(3), 6020.702(a)(3).

165.    The Generator/Arranger Defendants are persons who by contract, agreement or otherwise, arranged for disposal or treatment, or transport for disposal or treatment

of Hazardous Substances owned or possessed by them or by another party or entity, at the Site, or are successors-in-interest to such persons, and are liable to the Agreement Group members pursuant to Sections 701(a)(2) and 702(a)(3) of HSCA, 35 PA. CONS. STAT. §§ 6020.701(a)(2), 6020.702(a)(3).

166.    Defendant Boarhead Corporation is liable to the Agreement Group members pursuant to Sections 701(a)(1) and 702(a)(3) of HSCA, 35 PA. CONS. STAT. §§ 6020.701(a)(1), 6020.70(a)(3), as a person who owns now the Site and owned the Site at the time a Hazardous Substance was placed or came to be located on the Site and during the time of a release or threatened release.

167.    Pursuant to Sections 701, 702(a)(3) and 1101 of HSCA, 35 PA. CONS. STAT. §§ 6020.701, 6020.702(a)(3), 6020.1101, the Agreement Group members are entitled to contribution from Defendants for Response Costs incurred and for Future Response Costs to be incurred by the Agreement Group members in connection with the Site and to an allocation by the Court of the Response Costs and Future Responses Costs as between the Agreement Group members and Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE the Agreement Group members demand judgment in their favor against each of the Defendants, as follows:

(a)    Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 702(a)(3) of HSCA, 35 PA. CONS. STAT. § 6020.702(a)(3), for contribution to the Agreement Group members for Response Costs incurred thus far in connection with the Site and awarding damages to the Agreement Group members in that amount and for Future Response Costs to be incurred by the Agreement Group members in connection with the Site, together with interest thereon.

(b)    Allocating responsibility for the Response Costs and Future Response Costs as between the Agreement Group members and Defendants using such equitable factors as the Court determines are appropriate;

(c)    Ordering Defendants to provide contribution to the Agreement Group members for Response Costs related to the Site incurred to date and for all Future Response Costs to be incurred in connection with the Site, together with interest thereon, computed in accordance with Section 702(b) of HSCA, 35 PA. CONS. STAT. § 6020.702(b).

(d)    Ordering Defendants to pay the Agreement Group members their costs of this action, including reasonable attorneys fees; and

(e)    Granting the Agreement Group members such other, further, and different relief as the Court may deem just and appropriate.

Ballard Spahr Andrews & Ingersoll, LLP

By: _Glenn Harris_

Glenn A. Harris, Esquire (#51222)
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3400

Attorneys for Plaintiffs Agere Systems, Inc., Cytec Industries Inc., Ford Motor Company, SPS Technologies, LLC and TI Group Automotive Systems, LLC

Dated: July 25, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC. , CYTEC
INDUSTRIES, INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC,
and TI GROUP AUTOMOTIVE
SYSTEMS, LLC,

           Plaintiffs,

    v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

           Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION
NO. 02-3830

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2005, I caused a true and correct copy of the

Plaintiffs' Fourth Amended Complaint to be served by postage prepaid first class mail on the

following:

Andrew P. Foster, Esquire
Drinker, Biddle & Reath, LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

Thomas W. Sabino, Esquire
Wolff & Samson, PC
280 Corporate Center
5 Becker Farm Road
Roseland, NJ 07068-1776

Melissa Flax, Esquire
Carella, Byrne, Bain, Gilfillian, Cecchi, Stewart, & Olstein, P.C.
5 Becker Farm Road
Roseland, NJ 07068-1739

PHL_A #2022084 v1

Richard C. Biedrzycki, Esquire
Phelan Pettit & Biedrzycki
121 South Broad Street, Suite 1600
Philadelphia, PA 19107

Robert M. Morris, Esquire
Morris & Adelman, P.C.
1920 Chestnut Street
P.O. Box 30477
Philadelphia, PA  19103

Lynn Wright, Esquire
Edwards & Angell, LLP
750 Lexington Avenue
New York, NY  10022-1200

Seth v.d.H. Cooley, Esquire
Duane Morris LLP
Suite 4200, One Liberty Place
Philadelphia, PA  19103-7396

Stephen P. Chawaga, Esquire
.Monteverde, McAlee & Hurd
One Penn Center, Suite 1500
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103-1815

Edward Fackenthal, Esquire
One Montgomery Plaza, Suite 209
Norristown, PA  19401

Dated: August 1, 2005                                    Anne K. Heidel

**EXHIBIT 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BOARHEAD FARM AGREEMENT GROUP, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 02-3830 |
| | : | |
| ADVANCED ENVIRONMENTAL | : | |
| TECHNOLOGY CORPORATION, ET. AL. | | |
| | : | |
| Defendants. | : | |

---

**OBJECTIONS AND RESPONSES OF PLAINTIFF
BOARHEAD FARM AGREEMENT GROUP TO ADVANCED
ENVIRONMENTAL TECHNOLOGY CORPORATION'S INITIAL
SET OF INTERROGATORIES AND DOCUMENT DEMANDS TO PLAINTIFF**

Plaintiff Boarhead Farm Agreement Group ("Plaintiff"), by its undersigned

attorney, objects and responds to Advanced Environmental Technology Corporation's Initial Set

of Interrogatories and Document Demands to Plaintiff ("Initial Interrogatories"), as follows:

**I.    GENERAL OBJECTIONS**

1.  Plaintiff objects to each interrogatory to the extent that it seeks information not in

Plaintiff's possession, custody or control.

2.  Plaintiff objects to each interrogatory to the extent that it seeks information already in

the possession, custody or control of AETC.

3.  Plaintiff objects to each interrogatory to the extent that it seeks information which is

publicly available and, thus, to which AETC has the same access as Plaintiff.

4.  Plaintiff objects to each interrogatory to the extent that it seeks information protected

by the attorney-client privilege or any other applicable privilege.  Any inadvertent disclosure of

privileged information shall not constitute a waiver of the attorney-client or any other applicable privilege.

5. Plaintiff objects to each interrogatory to the extent that it seeks the discovery of the mental impressions, conclusions, opinions or legal theories of its attorneys or other representatives. Any inadvertent disclosure of work product shall not constitute a waiver of any work product protection.

6. Plaintiff objects to each interrogatory to the extent that it is unlimited in time or scope.

7. Plaintiff objects to each interrogatory to the extent that it is unduly burdensome or designed to be harassing.

8. Plaintiff objects to each interrogatory to the extent that it is vague or ambiguous.

## II.    INTERROGATORIES AND RESPONSES

Subject to and without waiving the foregoing General Objections, Plaintiff makes the following responses to the Initial Interrogatories:

1. Set forth with particularity the factual basis for Plaintiff's allegation in paragraph 31 of the Complaint that AETC "arranged with DeRewal Chemical for the disposal of Hazardous Substances from Defendants Ashland Chemical Company and Diaz Chemical Corporation," and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the foregoing objection, Plaintiff responds that the factual bases for its claims against AETC in the Complaint, and the identities of the persons with knowledge of those facts, are contained in the documents comprising the nexus files for AETC, Ashland Chemical**

Company ("Ashland") and Diaz Chemical Corporation ("Diaz") located in the Boarhead

Document Repository at the Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735

Market Street, Philadelphia, PA 19103, and refers AETC to the same. By way of further

response, Plaintiff refers AETC to the deposition testimony that has been elicited in this

case including, but not limited to, the following testimony: the May 7, 2003 deposition

testimony of Manfred DeRewal, Sr., 170:16-185:15; the May 8, 2003 deposition testimony

of Manfred DeRewal, Sr., 260:22-266:25; the May 9, 2003 deposition testimony of Manfred

DeRewal, Sr., 496:15-500:5, 528:16-534:17; the May 15, 2003 deposition testimony of Linda

Cochran, 74:2-76:15, 80:20-81:21, 89:11-90:15; and all of the other deposition testimony

concerning DCC's disposal of waste at the Site. Together, the above-referenced documents

and testimony establish that AETC entered into separate contracts with Ashland and Diaz

for the removal and disposal of wastes from those companies, and that, pursuant to those

contracts, Ashland and Diaz consigned their wastes to AETC for removal and disposal.

AETC separately contracted with DeRewal Chemical Company ("DCC") for DCC to haul

and dispose of the Ashland and Diaz wastes. As evidenced by the above-referenced

documents, including, but not limited to, the shipping documents and invoices from AETC

to Ashland and Diaz, and from DCC to AETC, there were no contractual relationships

between DCC and Ashland or DCC and Diaz. By way of further response, David F.

Michelman, Esquire, 2207 Chestnut St., Philadelphia, PA 19103, (215) 557-9440 and

Thomas Healey, City of Philadelphia, (215) 592-6233, have knowledge of the creation of the

July 5, 1978 letter to Manfred DeRewal from the Philadelphia Water Department alleging

DCC disposal of wastes at the Wissinoming Industrial Park.

2. If Plaintiff alleges that AETC is an "arranger" under CERCLA, set forth with particularity the factual basis for that allegation and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff incorporates by reference its response to Interrogatory No. 1.**

3. If Plaintiff alleges that AETC owned the materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site, set forth with particularity the factual basis for that allegation and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff incorporates by reference its response to Interrogatory No. 1.**

4. If Plaintiff alleges that AETC possessed the materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site, set forth with particularity the factual basis for that allegation and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff incorporates by reference its response to Interrogatory No. 1.**

5. If Plaintiff alleges that AETC transported materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site, set forth with particularity the factual basis for that allegation and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff further objects to the use of the phrase "AETC transported materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site" as vague and ambiguous. Subject to and without waiving the foregoing objection, Plaintiff does not allege that trucks owned by AETC conveyed materials and/or hazardous substances to the Site, but rather that AETC arranged for DCC to haul hazardous waste from facilities owned by Ashland and Diaz, and entered into separate contractual relationships with DCC and Ashland and Diaz, respectively, for that purpose. By way of further response, Plaintiff incorporates by reference its response to Interrogatory No. 1.**

6. If Plaintiff alleges that AETC controlled the disposal process by which materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site, set forth with particularity the factual basis for that allegation and

identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that allegation.

**RESPONSE: Plaintiff further objects to the phrase "controlled the disposal process by which materials and/or hazardous substances that were allegedly transported from the Ashland Facility and the Diaz Facility to the Site" as vague and ambiguous.**

7.  If you contend that AETC has responsibility under CERCLA for Diaz's allocable share of liability in this Case (whatever that is determined to eventually be), set forth with particularity the factual basis for that contention, and identify all persons with knowledge of those facts and identify all documents that support and/or relate to that contention.

**RESPONSE: Plaintiff incorporates by reference its response to Interrogatory No. 1.**

8.  Set forth in detail the investigation Plaintiff undertook, if any, to ascertain whether Diaz is a viable entity and/or has assets to satisfy any judgment that may be entered against Diaz in this Case, and identify all persons with knowledge of those facts and identify all documents that support and/or relate to that investigation.

**RESPONSE: Plaintiff further objects to Interrogatory No. 8 as seeking information that constitutes attorney work product prepared in anticipation of litigation. By way of further answer, Plaintiff performed internet-based research through PACER to determine that Diaz filed for protection under chapter 7 of the United States Bankruptcy Code and to ascertain the identity of the Chapter 7 Trustee. Plaintiff then contacted the Chapter 7 Trustee, John Ring, Esquire, who informed Plaintiff that the U.S. Environmental Protection Agency holds a $10,000,000 administrative claim over and above millions of dollars of unsecured claims against Diaz. The Trustee indicated that there would be no distribution.**

9.  Identify the total amount of hazardous substance that Plaintiff alleges was generated by Diaz that was eventually disposed of at the Site, and include in your answer the precise nature of those hazardous substances and the dates of each shipment that equal the total you allege.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the foregoing objection, Plaintiff responds that the opinion of an expert may be relevant in responding to this interrogatory and that, at this time, Plaintiff has not yet identified any expert witnesses whom it expects to call at trial. By way of further answer, Plaintiff refers AETC to the deposition testimony of Manfred DeRewal, Sr., Bruce DeRewal, Linda Cochran, John Barsum, Jeffrey Shaak, Karen Porter and June Stephens elicited in this case; all of the other deposition testimony concerning DCC's disposal of waste at the Site; and the other documents comprising the nexus files for Diaz located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

10. Identify the total amount of hazardous substances the Plaintiff alleges was generated by Ashland that was eventually disposed of at the Site, and include in your answer the precise nature of those hazardous substances and the dates of each shipment that equal the total you allege.

RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the foregoing objection, Plaintiff responds that this interrogatory calls for the opinion of an expert and that, at this time, Plaintiff has not yet identified any expert witnesses whom it expects to call at trial. By way of further answer, Plaintiff refers AETC to the deposition testimony of Manfred DeRewal, Sr., Bruce DeRewal, Linda Cochran, John Barsum, Jeffrey Shaak, Karen Porter and June Stephens elicited in this case; all of the other deposition testimony concerning DCC's disposal of waste at the Site; and the other

documents comprising the nexus files for Ashland located in the Boarhead Document

Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street,

Philadelphia, PA 19103.

11. What share of the Response Costs does Plaintiff allege AETC is responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc. utilized in calculating AETC's alleged share of Response Costs.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a**

**contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

**fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott*

*Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994).**

12. What share of the Response Costs does Plaintiff allege Diaz is responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc, utilized in calculating Diaz's alleged share of Response Costs.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a**

**contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

**fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott*

*Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994).**

13. What share of the Response Costs does Plaintiff allege Ashland is responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc. utilized in calculating Ashland's alleged share of Response Costs.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a**

**contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet**

**fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott*

*Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994).**

14. Does Plaintiff agree or disagree that DeRewal Chemical Company secretly and surreptitiously disposed of hazardous substances at the Site? If you disagree, set forth with

particularity the factual basis for that disagreement and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that disagreement.

**RESPONSE: Plaintiff further objects to the phrase "secretly and surreptitiously" as vague and ambiguous and objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994). By way of further response, Plaintiff agrees that DeRewal Chemical Company disposed of hazardous substances at the Site.**

15. Does Plaintiff contend that the July 5, 1978 letter (and attachment) from the City of Philadelphia (Exhibit D18, marked on May 15, 2003) does not accurately reflect the sewer surcharges referenced therein? If you do so contend, set forth with particularity the factual basis for that contention and identify all persons with knowledge of those facts, and identify all documents that support and/or relate to that contention.

**RESPONSE: Plaintiff further objects to this interrogatory insofar as it constitutes a contention interrogatory that calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature.** *See B.Braun Medical, Inc. v. Abbott Laboratories*, **155 F.R.D. 525, 527 (E.D. Pa. 1994). Plaintiff further objects to the phrase "accurately reflect" as vague and ambiguous. Subject to and without waiving said objection, Plaintiff responds that, if this interrogatory is asking whether the Plaintiff contends that the information concerning the volumes and location and method of disposal of the wastes enumerated in the July 5, 1978 letter and attachment from the City of Philadelphia is correct, Plaintiff does not so contend. At the time the above-described letter was written, the City of Philadelphia lacked, and has not since obtained, a factual basis for the assumptions concerning volumes and location and method of disposal set forth in the above-described documents. In addition, the deposition testimony of,** *inter alia*, **Manfred DeRewal Sr. contradicts the assumptions set forth in these documents. Additional**

individuals with knowledge of facts pertaining to these documents include David

Michelman, Esquire, 2207 Chestnut St., Philadelphia, PA 19103 (215) 557-9440, and

Thomas Healy, City of Philadelphia (215) 592-6233.  By way of further response, Plaintiff

refers AETC to the documents comprising the nexus files for AETC, Ashland and Diaz

located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews &

Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

    16. If you contend that any party to this Case has, at any time, made any declaration
against interest or admissions, state:

    (a)    The name and address of the person making said declaration against
           interest or admission;

    (b)    The name and address of the person to whom it was made;

    (c)    The nature of the declaration against interest or admission, in detail;

    (d)    If in writing, attach a copy hereto;

    (e)    The name and addresses of all persons present when the declaration
           against interest or admission was made.

**RESPONSE: Plaintiff responds that defendants have made declarations against interest**

**and admissions in various forums including in their pleadings, in response to discovery**

**propounded in connection with this case, and in documents filed with governmental**

**agencies as public records and which are equally as accessible to defendants as they are to**

**Plaintiff.  By way of further answer, Plaintiff refers AETC to the documents comprising**

**the nexus files for the defendants in this case located in the Boarhead Document Repository**

**at the Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street,**

**Philadelphia, PA 19103 and the deposition testimony of Manfred DeRewal, Sr., Bruce**

**DeRewal, Linda Cochran, John Barsum, Jeffrey Shaak, Karen Porter and June Stephens**

**elicited in this case.**

17. If you have in your possession, custody, or control any statements, whether written or oral, relevant to the subject matter of this Case from any individual, who is not a party to this Case, state:

      (a)    The name and address of the person making said statement;

      (b)    The name and address of the person to whom it was made;

      (c)    The nature of the statement, in detail;

      (d)    If in writing, attach a copy hereto;

      (e)    The name and addresses of all persons present when the statement was made.

**RESPONSE:  Plaintiff responds that all discoverable non-party statements relevant to the subject matter of this case in Plaintiff's possession are contained in the files comprising the Boarhead Document Repository located at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103 and the deposition testimony of Bruce DeRewal, Linda Cochran, John Barsum, Jeffrey Shaak, Karen Porter and June Stephens elicited in this case.**

18. Identify all persons (including their last known address and telephone number) who you will or may call to testify at trial, together with a statement of the general subject matter of their testimony.

**RESPONSE:  Plaintiff responds that, at this time, it has not yet identified the witnesses whom it expects to call at trial.  Plaintiffs will identify the witnesses it expects to call at trial and will supplement its response to this interrogatory in accordance with the rules of this Court at an appropriate time.**

19. Identify by name, current address, and telephone number any and all persons or entities who have performed environmental consulting, investigatory, or remedial activities for or on behalf of You with regard to the Site.

      (a)    Identify, with specificity, said environmental consulting, investigatory, or remedial activities.

      (b)    Attach a copy of all documents identified in the answer to subsection (a) above.

**RESPONSE:** Plaintiff further objects that a request to "attach" copies of documents is not permitted by Rule 33. By way of further objection, this request is overly broad and unduly burdensome. By way of further objection, the word "investigatory" is vague, confusing, and ambiguous. Without waiving any such objections, Pursuant to Fed. R. Civ. P. 33(d), the information sought in this interrogatory can be derived or ascertained from documents concerning Site response costs and activities located in the Boarhead Document Repository at the Offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103. By way of further response, such documents may be included in documents located at Pitney Hardin, 200 Campus Drive, Florham Park, New Jersey 07932. Such non-privileged documents are available for inspection and copying upon reasonable notice.

## DOCUMENT REQUESTS

20. All documents whose identity was requested in the above initial Interrogatories.

**RESPONSE:** Plaintiff refers AETC to its responses to the Initial Interrogatories.

21. Any and all documents not located in the document repository that relate to AETC's alleged liability in this Case.

**RESPONSE:** Plaintiff responds that all discoverable documents in its possession, custody and/or control relating to AETC's liability in this case are located in the Boarhead Document Repository at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103. By way of further response, such documents may be included in documents located at Pitney Hardin, 200 Campus Drive, Florham Park, New Jersey 07932. Such non-privileged documents are available for inspection and copying upon reasonable notice.

22. Any and all documents not located in the document repository that Plaintiff will use at trial to establish AETC's liability in this Case.

**RESPONSE:** Plaintiff further objects to this document request insofar as it calls for the Plaintiff to articulate theories of its case not yet fully developed and, as such, is premature. *See B.Braun Medical, Inc. v. Abbott Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). Subject to and without waiving the foregoing objection, Plaintiff responds that it has not yet identified the discoverable documents it will use at trial to establish AETC's liability in this Case. Plaintiff will identify the documents not contained in the Boarhead Document Repository that it will use at trial to establish AETC's liability in this Case and will supplement its response to this interrogatory in accordance with the rules of this Court at an appropriate time. By way of further response, to the best of Plaintiff's present knowledge and belief, all documents that Plaintiff will use at trial to establish AETC's liability are contained in the files comprising the Boarhead Document Repository located at the offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, Philadelphia, PA 19103.

AS TO OBJECTIONS

Dated: September 14, 2004

_____

Glenn Harris, Esquire
Attorney I.D. No. 51222-
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
Plaza 1000
Suite 500
Voorhees, NJ 08043-4636

**EXHIBIT 3**

**Report of
Raymond F. Dovell, CPA
re:**

**Boarhead Farms Superfund Site
Asset Searches for Manfred T. DeRewal
and Certain Other Parties**

Prepared by: _____

Raymond F. Dovell, CPA
Nihill & Riedley, P.C.
The Public Ledger Building, Suite 800
150 Independence Mall West
Philadelphia, PA  19106
June 29, 2006



nihill & riedley
A Professional Corporation

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

QUALIFICATIONS ............................................................................... 2

FINDINGS & CONCLUSIONS ............................................................. 3

   1.   Manfred T. DeRewal, Sr. ........................................................... 3

   2.   Boarhead Corporation ............................................................... 7

   3.   DeRewal Chemical Company, Inc. ........................................... 8

   4.   Environmental Chemical Control, Inc. ..................................... 8

   5.   Diaz Chemical Corporation ...................................................... 8

   6.   Drake Chemical, Inc. ............................................................... 10

   7.   Enviratec, Inc. .......................................................................... 11

   8.   Globe Disposal Company, Inc. ................................................. 11

   9.   Haven Chemical, Inc. and Haven Industries, Inc. ................... 12

   10.  Merit Metal Products Corporation .......................................... 12

   11.  Sitkin Smelting & Refining, Inc. ............................................ 13

   12.  Trace International, Inc. ............................................................ 13

EXHIBITS



nihill & riedley

A Professional Corporation

## INTRODUCTION

I have been engaged by Ballard Spahr Andrews & Ingersoll, LLP on behalf of the Boarhead
Farm Agreement Group to determine whether certain parties associated with the Boarhead Farms
Superfund Site have any identifiable assets which would enable them to participate financially
with the cleanup of the site. Counsel identified the parties as follows:

- Manfred T. DeRewal, Sr. and certain of his businesses: Boarhead Corporation; DeRewal
  Chemical Company, Inc.; and Environmental Chemical Control, Inc.;
- Diaz Chemical Corporation;
- Drake Chemicals, Inc.;
- Enviratec, Inc.;
- Globe Disposal Co., Inc.;
- Haven Industries, Inc. and Haven Chemical, Inc.;
- Merit Metal Products Corporation;
- Sitkin Smelting & Refining, Inc.; and
- Trace International, Inc.

My analysis of these parties was based on documents provided by counsel and computer
searches of public records and commercially available data sources. Searches concerning
individuals were performed by generating a report from the LexisNexis service which generally
covers property ownership, Uniform Commercial Code ("UCC") filings, corporate affiliations,
bankruptcies, motor vehicles, merchant vessels, aircrafts, professional licenses, criminal records,
and legal actions such as suits, judgments and liens. Regarding the businesses, we reviewed
corporate records filed with the respective Secretary of State or Department of State and business
summary reports from services such as Dun & Bradstreet which provide self-reported sales data
and other business information such as: public filings; UCC filings; corporate officers; credit
rating; history and operations of the business; corporate affiliates; number of employees; and
facility information including size and ownership. Comprehensive Business Reports were also



nihill & riedley
A Professional Corporation

File No. 20131
Page 2 of 15

generated using the LexisNexis service which provides similar data.[1] For certain parties, additional investigative procedures were performed as described in more detail later in this report. These additional procedures include manual searches of public records, site visits, internet searches, and analysis of bankruptcy dockets. The documents that I reviewed are listed in **Exhibit 1**.

I have been conducting financial investigations for 19 years and these procedures are commonly employed by investigators conducting asset searches for individuals and businesses. In addition, I have been engaged as a consulting expert at several Superfund sites to conduct Potentially Responsible Party ("PRP") searches and I am also familiar with the manner in which the United States Environmental Protection Agency ("EPA") conducts these searches. The process of generating computer reports from services such as Dun & Bradstreet is a common method to investigate a company's history and operations, identify corporate affiliates and assess whether the business is a solvent PRP.

## QUALIFICATIONS AND COMPENSATION

Nihill & Riedley, P.C. is an accounting firm located in Philadelphia, Pennsylvania. I have been with the firm since 1987 and a shareholder of the firm since 1992. Prior to this, I was an Auditor and then a Special Agent for the U.S. Department of Labor. My responsibilities were to assist prosecutors during their investigation, indictment and sentencing of cases involving financial crimes. I also provided testimony at grand jury proceedings. For the past 19 years, I have been engaged as either a consulting or testifying expert in a wide range of cases involving commercial damages, fraud, and environmental damages. I have been retained as an expert to analyze government claims for past response costs and for oversight costs incurred pursuant to reimbursement provisions of Consent Decrees and Administrative Orders. I also work for groups of potentially responsible parties to either account for or analyze costs that they incur to

---

[1] We retained Keystone Intelligence Network, Inc. to assist with these searches and to conduct other investigative procedures. We directed and supervised the work performed by Keystone. It should be noted that the data sources used for these searches sometimes contain errors. The computer searches are utilized to analyze available information on the subject and to assess the need for further investigation.



nihill & riedley
A Professional Corporation

cleanup environmental sites. In addition, I have conducted searches to identify PRPs and have performed ability to pay analyses. My commercial litigation experience includes contact disputes, lost profits analysis, shareholder actions, purchase disputes, securities fraud, and professional liability. I have provided expert testimony in state and federal courts, arbitrations and grand jury proceedings. I have been a certified public accountant since 1987 and a certified fraud examiner since 1994. I am also a member of several professional associations. My resume containing my qualifications and testimony by deposition and trial is attached as **Exhibit 2** to this report.

Nihill & Riedley, PC is being compensated for my services at an hourly rate of $195.

## FINDINGS & CONCLUSIONS

I have reviewed the data that was compiled on the parties covered in this report. Based on our investigation, these parties do not have any identifiable assets which are available and would allow them to participate financially in the cleanup of the Boarhead Farms Superfund site. Our findings and conclusions are summarized in the following sections.

1. **Manfred T. Derewal, Sr. ("Derewal")**

   From about 1965 to 1976, DeRewal operated his businesses from three different locations, creating three separate Superfund sites. From 1965 to 1969, DeRewal operated from a facility which is now known as the Revere Chemical Site, a 113 acre parcel in Nockamixon Township, Bucks County, Pennsylvania. The U.S. District Court ordered the facility closed in 1969 and DeRewal left behind drums, waste-filled lagoons and piles of solid wastes. The Revere Chemical Site was placed on the National Priorities List ("NPL") in July 1987 and the remedy to cleanup the site was selected in June 1996. In January 2004, the property was transferred to Nockamixon Township. As the Revere Chemical operations closed in 1969, DeRewal formed two more businesses, Boarhead Corporation and DeRewal Chemical Company, Inc. Boarhead Corporation was formed on September 6, 1969 and purchased the Lonely Cottage Road property in Upper Black Eddy, Bridgeton Township, Bucks County,



nihill & riedley
A Professional Corporation

File No. 20131
Page 4 of 15

Pennsylvania on October 16, 1969. The property was placed on the NPL on March 31, 1989 and the remedy to cleanup the site was selected in November 1998. Boarhead Corporation is still the owner of the property which is now known as the Boarhead Farms Superfund site.

While DeRewal operated at the Boarhead property, he also leased the eastern portion of a property located in Kingswood Township, Hunterdon County, New Jersey from about 1970 to 1973. DeRewal Chemical used this site for storage of chemicals and was ordered by the State of New Jersey to conduct a removal action in 1973. According to EPA documents, DeRewal Chemical filed for bankruptcy in 1974. The property was placed on the NPL in 1984 and the remedy was selected for the DeRewal Chemical Superfund site in 1989. The township currently owns most of site and New Jersey's Green Acres Program is purchasing part of the site for conservation. According to DeRewal's testimony, DeRewal Chemical never filed for bankruptcy. However, he testified that the company has no assets and the last time it conducted business was 20 years ago.

In October 1976, DeRewal formed another company, Environmental Chemical Control, Inc. which leased a facility in Philadelphia, Pennsylvania. On March 29, 1977, a Philadelphia police officer saw a tanker truck parked near the Delaware River with the hose leading from the truck to the river. The officer learned that the truck contained 3,000 gallons of sulfuric acid and arrested DeRewal, his son Bruce, his son-in-law and a company driver. The ensuing investigation ended with DeRewal doing 6 months in federal prison for illegally dumping 730,000 gallons of toxic chemicals directly into the Delaware River from the leased Philadelphia facility. (See the Intelligencer article, 11/28/05). DeRewal testified that Environmental Chemical Control conducted the same type of business as DeRewal Chemical, and it leased a facility in the Wissinoming section of Philadelphia for neutralizing nitrating acid and for waste disposal. According to DeRewal, he stopped using the Wissinoming property because they had problems with the local authorities and he had a problem with the EPA. DeRewal testified as follows: *"So I said, no more trucks are going to move. I'm going to go fishing for the rest of my life."*



nihill & riedley
A Professional Corporation

While he was operating his businesses, DeRewal testified that he had homes in Duck Key, Florida and Margate, New Jersey and his boat moved between both homes. After the businesses ceased their operations, DeRewal had property in Costa Rica which reportedly involved a restaurant ("Villas Pacifica") and a deep-sea fishing operation with two boats. According to DeRewal, he took steps to make himself judgment proof.

Our investigation of DeRewal included computer searches, manual searches in the Bucks County Clerks office and certain procedures performed in Costa Rica. Our findings are summarized below.

- DeRewal's address is 1310 Lonely Cottage Road, Upper Black Eddy, Pennsylvania which is currently owned by Boarhead Corporation. Searches of public records and commercially available data sources revealed the following:

    - DeRewal does not own any real property nor does he have any motor vehicles, boats or aircraft registered in his name.

    - DeRewal's name is not affiliated with any active corporations. There were also no UCC filings or bankruptcy filings found for DeRewal.

- DeRewal had a previous, non-verified address of 110 Main Street, Bristol, Pennsylvania. Our investigation indicates that this property is owned by Steven and Diane Baum and is used as a marina. The Baums have two businesses, D&S Boat Sales, Inc. and Baum's Cove Marina, Inc. There was no connection found between DeRewal and these businesses.

- There were three phone numbers listed for the Lonely Cottage Road address. DeRewal had one phone number and the other two numbers were for International Technology, the contractor conducting the cleanup at the Boarhead Farms site and Crown Network Systems. There were several telephone listings for Crown Network in the Philadelphia area. Our investigator visited two of the locations and found signs for a "Crown Castle International." According to this company's website, Crown Castle is a leading independent owner of shared wireless



infrastructure including extensive networks of towers. Crown Castle International has no connection to DeRewal other than a recorded easement on the Boarhead Corporation property which was assigned to Crown Atlantic Company in March 1999.

- We directed Keystone Intelligence to engage another consultant, Dwyer and Co. to conduct an investigation in Costa Rica in early 2005. The purpose of the investigation was to determine whether DeRewal had assets in his name in Costa Rica. The investigation determined that there was no property registered under DeRewal's name. Further, there were no records located for "Villas Pacifica" in Costa Rica's Registro Publico which is where all legitimate businesses are required to be registered. Our investigative contractor learned that DeRewal initially owned a property known as Villas Pacifica which consisted of several chalets. According to the investigator, the property has changed hands several times and is currently being used by a real estate firm and a restaurant. Based on visual inspection of the property, the two businesses do not appear to be associated with DeRewal. On February 24, 2005, the Registro Publico shows that DeRewal purchased a 1996 Isuzu Trooper from an auto dealership. Immigration records also reflect that DeRewal has been in and out of Costa Rica on a continuous basis from January 2003 through January 2005. In the immigration records, he listed himself as a businessman.

- There was a mortgage dated February 2, 2003 in the amount of $500,000 recorded in the Bucks County Clerks office between Boarhead Corporation and Club Villas Pacifica where Boarhead Corporation as the mortgagor promised to pay $250,000 plus interest to Club Villas Pacifica. The document was singed by DeRewal as president of Boarhead Corporation. No other documentation was found concerning this mortgage.

- The United States has filed federal tax liens in 1989 and 1996 against DeRewal which exceed $1.3 million.

Our investigation did not locate any assets in DeRewal's name in the United States or Costa Rica other than the automobile purchased in 2005.. Further, he has no current business affiliations and three of his former businesses are responsible for creating separate Superfund sites which are named after them. DeRewal also has federal tax liens filed against him that exceed $1.3 million.

## 2. Boarhead Corporation

Boarhead Corporation was formed on September 2, 1969 and is still the owner of the Upper Black Eddy Township property. Pennsylvania corporate records do not list any corporate officers and the only document on file is the articles of incorporation. In May 1992, the EPA filed an Administrative Order For Access against Boarhead Corporation to conduct a removal action, perform a Remedial Investigation and Feasibility Study and conduct any other response actions that EPA determined were necessary. In September 1992, EPA filed a Notice of Federal Superfund Lien against the two parcels of property owned by Boarhead Corporation. The amount of the lien was $862,390.39 for costs incurred through May 27, 1992. This notice of lien was withdrawn in November 1992, and another Notice of Federal Superfund Lien was filed in May 1993 for EPA costs in the amount of $1,577,895.56 through November 17, 1992. In January 1995, Boarhead Corporation's attorney filed a petition appealing the tax assessment for this property and stated that the company's property had only nominal value of $1.00 due to the access agreement granted to EPA and the Federal Superfund Lien.

Our investigation of Boarhead Corporation found that the company is not conducting any business operations and its only asset, the Superfund property, has a lien filed against it by EPA for government costs incurred for the Boarhead Farms Superfund Site. According to EPA's cost summary, the government's past costs for this site were $13,662,871 through



nihill & riedley
A Professional Corporation

July 31, 2000.    Counsel advised that the Boarhead Farm Agreement Group paid approximately $7 million to the government for their past costs.

3.  **Derewal Chemical Company ("Derewal Chemcial")**

DeRewal Chemical was formed on December 29, 1969 and according to DeRewal's testimony, the company has not conducted any business for about 20 years.  As stated earlier, there is a New Jersey Superfund site named after this company, and a Dun & Bradstreet report indicates that the Administrator of the Spill Compensation Fund filed a lawsuit against the company on February 3, 2004.  Our investigation did not locate any assets for this company, and we found no evidence that the company has active operations.

4.  **Environmental Chemical Control, Inc.**

The company was formed on October 18, 1976 with a registered office of 519 Main Street, Pennsburg, Pennsylvania.  The property is owned by Jacquelyn Ganter and appears to be used for apartments.  A visual inspection of this property was conducted by our investigator on February 3, 2005 and there was no indication that Environmental Chemical Control conducts any business at this address.  Our investigation did not locate any assets for the company, and we found no evidence that the company has active operations.

5.  **Diaz Chemical Corporation ("Diaz Chemical")**

According to a removal memorandum prepared by EPA, Diaz Chemical was a specialty chemical manufacturer located in a residential neighborhood in Holley, New York.  The manufacturing facility included four main buildings and the company operated at this site for about 25 years.  Diaz Chemical filed a Chapter 7 bankruptcy petition on June 23, 2003 and no longer conducts any operations at this location.  In September 2003, EPA estimated that its costs for conducting a removal action at the Diaz Chemical facility were approximately $7.7 million.



nihill & riedley
A Professional Corporation

In July 2004, the Diaz Chemical site in Holley, New York was added to the NPL. According to EPA records, EPA has removed 2,400 drums and 40,000 gallons of bulk chemicals from the site. Residents that were dislocated from their homes following a January 2002 chemical release continue to receive relocation assistance from EPA. Further, EPA maintains a groundwater treatment system on the site which is designed to address migration of subsurface contamination.

According to the bankruptcy trustee for Diaz Chemical, he has about $80,000 and a fund of about $400,000 to which there are conflicting claims between the trustee and Diaz Intermediates Corporation ("DIC"), which represent all of the assets of the estate except for the Diaz Chemical facility in Holley, New York and a potential claim against DIC. DIC is a separate corporation having the same ownership as Diaz Chemical and has operations in Arkansas. In June 2005, the trustee brought an action against DIC and three individuals who were officers and directors of both companies to recover fraudulent conveyances and receipt of the benefits of various breaches of fiduciary duty. In August 2005, attorneys for DIC and the individual defendants filed a motion to stay this case and for additional time to answer the complaint. According to this motion, the defendants are currently the subject of a criminal investigation concerning alleged concealment of Diaz Chemical's assets, the giving of false oaths and claims, bribery, and for bankruptcy fraud. The alleged facts of the criminal investigation are similar to the factual allegations asserted in the action brought by the trustee.

On September 7, 2005, a Stipulation and Order was entered by the bankruptcy court which provided for the following:

- The United States agreed to withdraw its objection of the trustee's notice of intention to abandon the Diaz Chemical property.



nihill & riedley
A Professional Corporation

- EPA was given administrative priority in the distribution of funds currently within, and to be acquired by the bankruptcy estate, for all response costs incurred addressing the contamination on Diaz Chemical's property. Further, EPA will be allowed to file liens against the property.

- The United States agreed not to oppose any request by the trustee for superpriority status for his and his counsel's administrative expense claims subject to certain conditions.

As stated above, recoveries from the sale of the property or the action against DIC will go toward the administrative claim of EPA which was estimated to be at least $5.7 million by the trustee. However, EPA continues to incur costs at the Diaz Chemical Superfund site. Due to the size of EPA's claim, the trustee did not expect any distributions to the pre-petition unsecured creditors. Further, there was no present estimate of value for the New York facility subsequent to the remediation efforts. With respect to potential recoveries from DIC, the company reported to Dun & Bradstreet in January 2004 that its annual sales were $2,900,000 and it owns a 20,000 square foot manufacturing facility in Arkansas. DIC has secured debt to Regions Bank pursuant to a UCC filed on January 16, 1997. Even if the trustee's claim against DIC is successful, it appears to be a small company with a secured creditor. Further, the bankruptcy trustee has superpriority status for administrative expense claims to pursue the DIC litigation and EPA has administrative priority to any recoveries.

Based on our investigation, any available assets in the Diaz Chemical bankruptcy estate will be applied toward EPA's claim.

6.  **Drake Chemicals, Inc.**

Drake Chemicals was a former manufacturer of chemical intermediates for pesticides and other organic compounds. It began operations in Lock Haven, Pennsylvania in the 1960s and closed when Drake Chemicals filed for bankruptcy in the fall of 1981. The



nihill & riedley
A Professional Corporation

manufacturing facility was added to the NPL in September 1983 and the remedy to cleanup the site (known as the Drake Chemical Superfund Site) was selected in September 1984. According to EPA's website, the government has incurred almost $150 million to cleanup the site and the groundwater remediation is continuing. EPA received approximately $20,000 from the bankruptcy estate and the trustee abandoned the property.

Our investigation did not identify any assets which are in the name of Drake Chemicals. We also found no evidence that this business has any active operations.

## 7.   Enviratec, Inc.

Enviratec was incorporated in December 1969. According to a Dun & Bradstreet report, Enviratec was purchased by Allied Conditioning in 1986 which later filed for bankruptcy protection. The chief executive of Allied Conditioning was listed as J. Walker Poole, Jr., who was also a director and incorporator of Enviratec.

Our investigation did not identify any assets which are in the name of Enviratec or Allied Conditioning. We also found no evidence that the businesses have active operations.

## 8.   Globe Disposal Co., Inc.

Globe Disposal Co., Inc. was incorporated in Pennsylvania on February 3, 1969 and used the fictitious name of Globe Disposal Company. In December 1986, the shareholders of Globe Disposal Co., Inc. (Earl T. Kelly, Frank J. Keel and John F. Kennedy) sold the assets of Globe Disposal to Browning-Ferris, Inc. which included the exclusive right to use the name of the seller and any similar variations of the name. Immediately after the closing of the transaction, the sellers agreed to change the corporate name. According to the corporate records, Globe Disposal Co., Inc. then changed its name to GDI Liquidating, Inc. with Earl T. Kelly as its chief executive officer. On July 23, 1987, Globe Disposal Co., Inc. was then incorporated in Pennsylvania with BFI listed as the business owner.



nihill & riedley
A Professional Corporation

Another business, Globe Industrial Services, Inc. was incorporated in Pennsylvania on November 21, 1977 and had the same address (P.O. Box 137, Skippack, Pennsylvania) as the company billed by DeRewal Chemical. The chief executive officer of Globe Industrial was Robert DeMeno who changed the corporate name of the company to Lucon Enterprises, Inc. on July 6, 1987. A few days later, Globe Industrial Services was incorporated in Pennsylvania with O'Hara Sanitation Company listed as the business owner.

Our investigation did not identify any assets in the name of GDI Liquidating or Lucon Enterprises. Further, Dun & Bradstreet reports do not reflect any active business operations for these companies. The former shareholders of Globe Disposal (Kelly and Keel) were also involved with two other corporations, Waste Techniques Corporation and Globe-Waste Tech, Inc. We also conducted an asset search for these corporations which failed to identify any assets. Further, Dun & Bradstreet did not have any reports for these companies.

## 9.   Haven Chemical, Inc. and Haven Industries, Inc.

Haven Chemical was incorporated in Massachusetts on June 2, 1978 and shortly thereafter, filed a voluntary dissolution on September 5, 1979. Haven Industries, Inc. was incorporated in Pennsylvania on February 11, 1974 and provided a Worcester, Massachusetts address of 39 Jolma Road. On October 27, 1975, the company qualified to conduct business in Massachusetts. The last annual report filed with the Massachusetts Secretary of State was in April 1991 and the foreign corporate status was revoked on November 14, 1994.

Our investigation did not identify any assets in the name of Haven Chemical or Haven Industries. Further, Dun & Bradstreet did not have any reports for these companies.

## 10.  Merit Metal Products Corporation

Merit Metal Products Corporation was formed in September 1968 in Pennsylvania and according to counsel, did business with DeRewal Chemical in the early to mid-1970s. The business operated from a facility at 242 Valley Road, Warrington, Pennsylvania. According



nihill & riedley
A Professional Corporation

File No. 20131
Page 13 of 15

to testimony from a former shareholder, in July 1988, most of the assets of Merit Metal Products were sold to Stefanowicz & Lutz, Inc. Merit Metal Products then changed its name to Leonards II Co., Inc. and the remaining assets of the corporation were distributed in 1991. After the distribution, the former shareholder described Leonards II as a shell corporation which was formally dissolved in July 2001.

Stefanowicz & Lutz, Inc. was formed in April 1988 and uses Merit Metal Products Corporation as a fictitious name.

Our investigation did not identify any assets in the name of Leonards II and the Dun & Bradstreet report shows that the business is not active.

**11.** **Sitkin Smelting & Refining, Inc.**

The company was incorporated in 1949 as Lewistown Smelting & Refining Company and its name was changed to Sitkin Smelting & Refining, Inc. ("Sitkin Smelting") in June 1967. From about 1958 to 1977, Sitkin Smelting operated at a 105 acre site located in the village of Maitland, Mifflin County, Pennsylvania. The company's operations included smelting non-ferrous metals, and it also operated a metal recycling business that included breaking transformers and lead batteries. The property which was owned by Sitkin Smelting is now known as the Jacks Creek / Sitkin Smelting & Refining Superfund Site and it was placed on the NPL in October 1989. Sitkin Smelting & Refining filed for bankruptcy in 1977. The bankruptcy was converted to a Chapter 7 on July 12, 1978 and the company ceased all operations. Our investigation did not identify any assets in the company's name.

**12.** **Trace Internationl, Inc.**

According to counsel, Art Metal-Knoll Corporation used DeRewal Chemical during the 1970s. Art Metal-Knoll was a wholly-owned subsidiary of the Walter E. Heller International Co. of Chicago, a company which provided loans and other financial services to commercial



nihill & riedley
A Professional Corporation

and industrial companies. Art Metal-Knoll changed its name to Knoll International, Inc. and then went through a series of mergers and name changes as follows:

- Knoll International was merged into KWW, Inc. on September 1, 1977.
- On March 13, 1978, KII, Inc. was incorporated in Delaware and changed its name to Knoll International, Inc. on July 10, 1978.

- On June 28, 1983, *KWW* merged into *Knoll International* and then changed its name to *'21' International* on August 31, 1990.

- *'21' International* merged into *'21' Nevada, Inc.* on February 11, 1991 and *'21' Nevada* changed its name to *'21' International, Inc.*

- On January 23, 1996, *'21' International* changed its name to Trace **International, Inc.** and the corporate status was permanently revoked on August 1, 2005. The Nevada Secretary of State shows that the required filing of officers was delinquent since November 30, 1998.

Marshall Cogan, through his privately-held holding company, made an investment in Knoll International in 1977 and eventually sold the business in or around 1991. In addition to a number of other business investments, Cogan also bought and sold the '21' Club, a restaurant in New York City. Cogan's holding company, Trace International Holdings, Inc., filed for bankruptcy in New York on July 21, 1999. At the time, Trace International Holdings' liabilities exceeded its assets by $121 million. On January 24, 2000, the court converted the case to a Chapter 7 liquidation.

nihill & riedley
A Professional Corporation

File No. 20131
Page 15 of 15

Our investigation did not identify any assets in the name of either Trace International, Inc., '21'
Nevada or '21' International.  Also, Dun & Bradstreet did not have any reports available for
these companies.

RFD:ep
06 29 06 – Boarhead Farms



nihill & riedley
A Professional Corporation

# EXHIBITS



# LIST OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Documents Reviewed List |
| 2 | Resume of Raymond F. Dovell, CPA |

nihill & riedley
A Professional Corporation

**Exhibit 1**

## DOCUMENTS REVIEWED

1.  Correspondence with Ballard Spahr

2.  Correspondence and reports from Keystone Intelligence

3.  Comprehensive Report – Manfred T. De Rewal dated 12/10/04

4.  Comprehensive Report – Steven F. Baum dated 12/20/04

5.  Comprehensive Report – Diane J. Baum dated 12/20/04

6.  Comprehensive Business Report – Baum Cove Marina, Inc. dated 12/20/04

7.  Comprehensive Business Report – Environmental Chemical Control dated 1/5/05

8.  Comprehensive Report – Jacquelyn A. Gantor dated 1/10/05

9.  Comprehensive Business Report – Crown Network Systems dated 1/5/05

10. Comprehensive Business Report – International Technology dated 1/5/05

11. Criminal Docket – Manfred DeRewal, Jr.

12. Selected Documents from Boarhead Farms Superfund Site Administrative Records including deeds, correspondence with DeRewal's counsel, and Notice of Liens

13. Department of State and Dun & Bradstreet Report -  Boarhead Corporation

14. Department of State and Dun & Bradstreet Report -  DeRewal Chemical

15. Department of State and Dun & Bradstreet Report -  Environmental Chemical Control

16. Documents from manual search at the Berks County Courthouse

17. Newspaper articles by the Intelligencer, Doylestown, PA on 11/27/05 and 11/28/05

18. Record of Decision and related documents for Revere Chemical site, DeRewal Chemical site and Boaread Farms

19. Internet search results for Crown Castle International

20. Deposition Transcripts of Manfred T. DeRewal dated 5/7/03, 5/8/03 and 5/9/93

21. Deposition Transcript of Linda Cochran dated 5/15/03

22. Deposition Transcript of Karen Castillo dated 6/3/03

23. Selected documents from EPA's website

24. Selected documents from the Diaz Chemical bankruptcy in the United States Bankruptcy Court for the Western District of New York

25. Comprehensive Business Report -  Diaz Intermediates dated 12/20/04

**Exhibit 1**

## Documents Reviewed (Cont.)

26. Dun & Bradstreet Reports, Diaz Intermediates dated 12/20/04 and 5/23/06

27. Comprehensive Business Report – Diaz Chemical dated 12/20/04

28. Dun & Bradstreet Reports, Comprehensive Business Reports, and documents regarding regarding corporate filings for the following:

   - Enviratec and Allied Conditioning

   - Drake Chemicals

   - Haven Chemical and Haven Industries

   - GDI Liquidating and Globe Disposal Co.

   - Lucon Enterprises and Globe Industrial Services

   - Leonards II and Merit Metal Products

   - Sitkin Smelting & Refining

   - Trace International

29. Selected documents from EPA's website and DEP's website regarding the Drake Chemical site

30. Agreement, Assignment and Bill of Sale between Globe Disposal and Browning Ferris

31. Selected documents relating to the Jack Creek/Sitkin Smelting & Refining Superfund site

32. Newspaper articles related to Art Metal-Knoll Corporation

33. Knoll Inc. Form 10-K for 12/31/96 (Excerpts)

34. Selected documents relating to Trace International Holdings' bankruptcy case

35. EPA Itemized Cost Summary Report dated 9/6/00 covering past costs through 7/31/00

RFD/ep

# RAYMOND F. DOVELL, C.P.A., C.F.E.

**EXPERIENCE:**

1992 – present    **Principal** - Nihill & Riedley, P.C.

1987 - 1991    **Associate**

The firm concentrates its practice in forensic accounting.

Forensic accounting engagements have focused on fraud, misapplication of funds, diversion of assets, theft of tax receipts, and questionable transactions. Insurance matters have included reinsurance arbitration, inventory analysis and business interruption claims. Commercial litigation cases involving investigation and damage analysis have included accounting malpractice, class action, bankruptcy, contract disputes, securities litigation, shareholder disputes and bank litigation. Engagements have also included providing expert testimony and grand jury testimony.

Environmental engagements have included investigations of past costs claims; analysis of government oversight claims; preparation and analysis of private party cost claims; insurance coverage disputes; volumetric allocations; cost allocations; contract disputes; PRP searches; and analysis of ability to pay issues. Engagements have also included providing expert testimony.

1985 - 1987    **Special Agent** - U.S. Department of Labor, Office of Labor Racketeering.

Planned, conducted and supervised financial investigations involving violations of various federal and state statutes. Major cases focused on financial crimes and required testimony at grand jury proceedings. Assisted attorney during the investigation, indictment and sentencing of criminal cases.

1983 - 1985    **Auditor** - U.S. Department of Labor, Office of Audit.

Planned, conducted and supervised a national audit of state Unemployment Insurance agencies. Briefed appointed state officials on audit findings to aid in the development of new state legislation. Assisted in the design and drafting of a national audit report summarizing audit findings developed in twelve states.



nihill & riedley
A Professional Corporation

**RAYMOND F. DOVELL, C.P.A., C.F.E.**
**Page 2**

## EDUCATION AND PROFESSIONAL AFFILIATIONS

➢    B.S. - Accounting, LaSalle University

➢    Certified Public Accountant licensed in Pennsylvania

➢    Certified Fraud Examiner, Association of Certified Fraud Examiners

➢    Member, American Institute of Certified Public Accountants

➢    Member, Pennsylvania Institute of Certified Public Accountants

➢    Fellow, New Jersey Society of Certified Public Accountants

## TESTIMONY AT TRIAL OR BY DEPOSITION

➢    Arbitration between Heck Family Partnership, et al. and Accupac Acquisition, Inc.
     (American Arbitration Association) 2006

➢    Action Manufacturing Co., Inc. et al. v. Simon Wrecking Company, et al.
     (United States District Court for the Eastern District of Pennsylvania) 2004, 2005, 2006

➢    Phoenix Poultry Corp. v. Wellington Farms of Massachusetts, Inc. et al.
     (United States District Court for the District of Massachusetts) 2005

➢    United States of America and State of New Jersey v. Dominick Manzo et al.
     (United States District Court for the District of New Jersey) 2005

➢    Decision Insights, Inc. v. Jeffrey Quillen, et al.
     (United States District Court for the Eastern District of Virginia) 2005

➢    Kathryn S. Nassberg v. John C. Schultz, et al.
     (Court of Common Pleas, Lycoming County) 2005

➢    Arbitration between WM Financial Services, Inc. and Fiserv Securities, Inc.
     (National Association of Securities Dealers) 2004

➢    ATS Products Corp. v. Willow Grove Bank
     (United States Bankruptcy Court for the Eastern District of Pennsylvania) 2004

➢    Constellation NewEnergy, Inc. v. Powerweb Technologies, Inc., et al.
     (United States District Court for the Eastern District of Pennsylvania) 2004



nihill & riedley
A Professional Corporation

**RAYMOND F. DOVELL, C.P.A., C.F.E.**
**Page 3**


## TESTIMONY AT TRIAL OR BY DEPOSITION (Cont.)

➤ American Cyanamid Company and Rohm and Haas Company v. 3M Corporation, et al.
  (United States District Court for the District of Rhode Island) 2003

➤ United States of America v. E.I. du Pont de Nemours and Company, Inc.
  (United States District Court for the Western District of New York) 2003

➤ Medical Consultants Network, Inc. et al. v. Patricia B. Maloney, et al.
  (Court of Common Pleas, Delaware County) 2002

➤ Signature Combs, Inc. (f/k/a AMR Combs, Inc.) et al. v. United States of America, et al.
  (United States District Court for the Western District of Tennessee) 2002, 2003

➤ Rohm and Haas Company v. American Cyanamid Company, et al.
  (United States District Court for the District of New Jersey) 2002

➤ Six C's Corporation, et al. v. Clement & Muller, Inc., et al.
  (Court of Common Pleas, Delaware County) 2002

➤ Accucorp, Inc., et al. v. Kalish, Inc.
  (United States District Court for the Eastern District of Pennsylvania) 2002

➤ United States of America v. Rohm and Haas Company, et al. v. John Cucinotta, et al.
  (United States District Court for the District of New Jersey) 1998, 1999, 2000

➤ Olin Corporation v. Fisons PLC, et al.
  (United States District Court for the District of Massachusetts) 1999

➤ In re: Greenbrier Industries, Trustee v. United States of America
  (United States Bankruptcy Court – District of New Jersey) 1998

➤ Nancy S. duPont, et al. v. Gruntal & Co., Inc., et al.
  (Court of Common Pleas of Philadelphia County) 1998

➤ Rohm and Haas Company v. Continental Casualty Company, et al.
  (Court of Common Pleas of Philadelphia County) 1997

➤ General Electric v. Buzby Bros., et al.
  (United States District Court for the District of New Jersey) 1997

➤ In the Matter of the Woodlands Alternative Dispute Resolution, 1996



nihill & riedley
A Professional Corporation

**RAYMOND F. DOVELL, C.P.A., C.F.E.**
**Page 4**


## TESTIMONY AT TRIAL OR BY DEPOSITION (Cont.)

➤   United States of America v. Atlas Minerals and Chemicals, Inc., et al.
     (United States District Court for the Eastern District of Pennsylvania) 1994

➤   Olsen v. Brandolini, et al.
     (United States District Court for the Eastern District of Pennsylvania) 1994

➤   County of Bucks, et al. v. Cogan, et al.
     (Court of Common Pleas of Bucks County) 1994

➤   Commonwealth of Pennsylvania v. Mary Cogan
     (Court of Common Pleas of Bucks County Criminal Division) 1992

➤   Arbitration between Employers Reinsurance Corp., et al. and Admiral Insurance Co.
     (United States District Court for the District of New Jersey) 1990

➤   Lott Group, Inc., et al. v. Pennsylvania Manufacturers Association Insurance Co.
     (United States District Court for the Eastern District of Pennsylvania) 1989



**EXHIBIT 4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS, LLC       : : : : : | Civil Action No. 02-CV-3830 (LDD) |
|            Plaintiffs,       : : : | **PLAINTIFFS' RESPONSES TO DEFENDANT ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION'S CONTENTION INTERROGATORIES** |
|       v.              : : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al.,       : : : | |
|            Defendants.       : | |

Plaintiffs Agere Systems, Inc., Cytec Industries Inc., Ford Motor Company, SPS

Technologies, LLC and TI Group Automotive Systems, LLC ("Plaintiffs"), by their undersigned

attorneys, object and respond to the contention interrogatories of Advanced Environmental

Technology Corporation ("Defendant") as follows:

### GENERAL STATEMENTS AND OBJECTIONS

Plaintiffs hereby incorporate by reference, as if fully set forth herein, the General

Statements and Objections contained in Plaintiffs' Responses to the joint contention

interrogatories of Advanced Environmental Technology Corporation ("AETC"), Ashland, Inc.,

Carpenter Technology Corporation, fcg, inc., Handy & Harman Tube Company, Inc. and NRM

Investment Company (collectively, "Defendants").

### INTERROGATORIES AND RESPONSES

Subject to and without waiving the foregoing General Objections, Plaintiffs make the

following responses to the contention interrogatories of Defendant:

1.      Do Plaintiffs contend that Diaz is liable for a share of Response Costs sought by
Plaintiffs in this Action? If so, what share of those Response Costs do Plaintiffs contend Diaz is

DMEAST #9759077 v1

responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc. utilized in calculating Diaz's alleged share of those Response Costs, and identify all documents (and attach copies of same to your answer to these Interrogatories) that support and/or relate to that contention.

      **ANSWER:** Plaintiffs object to this Interrogatory to the extent that it seeks information outside the scope of the contentions that Plaintiffs will make as part of their prima facie case at trial. Plaintiffs further object to this Interrogatory because it is vague, confusing and ambiguous. Plaintiffs further object to this Interrogatory to the extent that it seeks the discovery of the mental impressions, conclusions, strategies, opinions, research or legal theories of their attorneys or other representatives or information protected by the attorney-client privilege or any other applicable privilege.

      Without waiving any such objections, Plaintiffs contend that AETC arranged for Ashland's and Diaz's waste to be disposed of at the Site. Plaintiffs will ask the Court to allocate the "Ashland/AETC" share jointly and severally to Ashland and AETC and the "Diaz/AETC" share to AETC. By way of further answer, see Plaintiffs' response to Interrogatory No. 78 of the Defendants' Joint Contention Interrogatories to Plaintiffs.

2.    Do Plaintiffs contend that AETC should pay for Diaz's alleged share of Response Costs in this Action since Diaz is an orphan (i.e. defunct and assetless)? If so, set forth with particularity the factual and legal basis for that contention, identify all persons with knowledge of those facts and identify all case law and all documents (and attach copies of same to your answer to these Interrogatories) that support and/or relate to that contention.

**ANSWER:** See Plaintiffs' response to Interrogatory No. 1.

3.    Do Plaintiffs contend that Diaz generated Hazardous Substances that were deposited at the Site? If so, identify the total amount, and type, of Hazardous Substances that Plaintiffs contend was generated by Diaz that was disposed at the Site, and set forth with particularity the factual basis for that contention, and identify all persons with knowledge of those facts and identify all documents (and attach copies of same to your answer to these Interrogatories) that support and/or relate to that contention.

**ANSWER:** See Plaintiffs' response to Interrogatory No. 1.

4.    Do Plaintiffs contend that Ashland generated Hazardous Substances that were deposited at the Site? If so, identify the total amount, and type, of Hazardous Substances that Plaintiffs contend was generated by Ashland that was disposed at the Site, and set forth with particularity the factual basis for that contention, and identify all persons with knowledge of those facts and identify all documents (and attach copies of same to your answer to these Interrogatories) that support and/or relate to that contention.

**ANSWER:** See Plaintiffs' response to Interrogatory No. 1.

5.    Do Plaintiffs contend that AETC is liable for a share of Response Costs sought by Plaintiffs in this Action? If so, what share of those Response Costs do Plaintiffs contend AETC is responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc. utilized in calculating AETC's alleged share of Response Costs, and identify all documents (and attach copies of same to your answer to these Interrogatories) that support and/or relate to that contention.

**ANSWER:** See Plaintiffs' response to Interrogatory No. 1.

6.    Do Plaintiffs contend that Ashland is liable for a share of Response Costs sought by Plaintiffs in this Action? If so, what share of the Response Costs do Plaintiffs contend Ashland is responsible for, and set forth with particularity the precise rationale for your answer by identifying all documents, facts, numbers, expenses, damages, etc. utilized in calculating Ashland's alleged share of Response Costs, and identify all documents (and attach copies of same to your answer to these Interrogatories) that support and/or relate to that contention.

**ANSWER:** See Plaintiffs' response to Interrogatory No. 1.

7.    Do Plaintiffs contend that DeRewal Chemical Company openly (as opposed to secretly) disposed of Hazardous Substances at the Site? If so, set forth with particularity the factual basis for that contention, and identify all persons with knowledge of those facts and identify all documents that support and/or relate to that contention; and identify all documents (and attach copies of same to your answer to these Interrogatories) that support and/or relate to that contention.

**ANSWER:**  Plaintiffs object to this Interrogatory to the extent that it seeks information

outside the scope of the contentions that Plaintiffs will make as part of their prima facie case at

trial.  Plaintiffs further object to this Interrogatory because it is vague, confusing and ambiguous.

Plaintiffs further object to this Interrogatory to the extent that it seeks the discovery of the mental

impressions, conclusions, strategies, opinions, research or legal theories of their attorneys or

other representatives or information protected by the attorney-client privilege or any other

applicable privilege.

Without waiving any such objections, Plaintiffs will not ask the Court at trial to make

findings of fact or conclusions of law concerning whether DCC "openly (as opposed to secretly)

disposed of Hazardous Substances at the Site." By way of further answer, see Plaintiffs'

response to Interrogatory No. 78 of the Defendants' Joint Contention Interrogatories to Plaintiffs.

8.    If you contend that any party to this Action has, at any time, made any declaration against interest or admission, identify each specific declaration against interest or admission, as well as:

(a)    The name of the person making said declaration against interest or admission;

(b)    The name of the person to whom it was made;

(c)    The nature of the declaration against interest or admission, in detail;

(d)    If in writing, attach a copy hereto;

(e)    The name and addresses of all persons present when the declaration against interest or admission was made.

**ANSWER:** Plaintiffs object to this Interrogatory because it is grossly overbroad and burdensome. Plaintiffs further object to this Interrogatory to the extent that it seeks information outside the scope of the contentions that Plaintiffs will make as part of their prima facie case at trial. Plaintiffs further object to this Interrogatory because it is vague, confusing and ambiguous. Plaintiffs further object to this Interrogatory to the extent that it seeks the discovery of the mental impressions, conclusions, strategies, opinions, research or legal theories of their attorneys or other representatives or information protected by the attorney-client privilege or any other applicable privilege.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS, LLC | : : : : : : | |
| Plaintiffs, | : : | Civil Action No. 02-CV-3830 (LDD) |
| v. | : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I certify that on this day I served a copy of Plaintiffs' Responses To Contention

Interrogatories of Advanced Environmental Technology Corporation by electronic mail and first-

class postage prepaid United States mail, on the counsel listed on the service list.

*Amy Trojecki*
Amy M. Trojecki

Dated: 4/17/07

## **VERIFICATION**

Jocelyn T. deGrandpre, being duly sworn, deposes and says that she is an authorized agent of Agere Systems Inc., and that she verifies the foregoing responses and objections to Interrogatories to the Plaintiffs from Advanced Environmental Technology Corporation, for and on behalf of Agere Systems Inc.; that the matters stated therein are not within the personal knowledge of deponent; that the facts stated therein have been assembled by authorized employees and counsel of Agere Systems Inc.; and deponent is informed that the facts stated therein are true.

Dated:  April 13, 2007                                   *Jocelyn T de Grandpre*

## VERIFICATION

Thomas E. Mesevage, being duly sworn, deposes and says that he is an authorized agent of Cytec Industries Inc. and that he verifies the foregoing responses and objections to Interrogatories to the Plaintiffs from Advanced Environmental Technology Corporation, for and on behalf of Cytec Industries Inc.; that the matters stated therein are not within the personal knowledge of deponent; that the facts stated therein have been assembled by authorized employees and counsel of Cytec Industries Inc. and deponent is informed that the facts stated therein are true.

Dated: <u>April 16, 2007</u>          Signature: _____

Thomas E. Mesevage
Safety, Health and Environmental Counsel
Cytec Industries Inc.
5 Garret Mountain Plaza
West Paterson, NJ 07424

## VERIFICATION

Timothy M. Guerriero, being duly sworn, deposes and says that he is an authorized agent of TI Group Automotive Systems, L.L.C. and that he verifies the foregoing responses and objections to Interrogatories to the Plaintiffs from Advanced Environmental Technology Corporation, for and on behalf of TI Group Automotive Systems, L.L.C.; that the matters stated therein are not within the personal knowledge of deponent; that the facts stated therein have been assembled by authorized employees and counsel of TI Group Automotive Systems, L.L.C.; and deponent is informed that the facts stated therein are true.

Dated:  April 12, 2007

_____
Timothy M. Guerriero, Secretary

## **VERIFICATION**

_Tom Cross_ , being duly sworn, deposes and says that he is an

authorized agent of SPS Technologies, LLC and that he verifies the foregoing responses and

objections to the Interrogatories to the Plaintiffs from Advanced Environmental Technology

Corporation, for and on behalf of SPS Technologies, LLC; that the matters stated therein are not

within the personal knowledge of deponent; that the facts stated therein have been assembled by

authorized employees and counsel of SPS Technologies, LLC and deponent is informed that the

facts stated therein are true.


Dated: 12 April 2007                              _Thomas S. Cross_

## VERIFICATION

_____ **Kathryn Lamping** , being duly sworn, deposes and says that he is an

authorized agent of Ford Motor Company, and that he verifies the foregoing responses and

objections to Interrogatories to the Plaintiffs from Advanced Environmental Technology

Corporation, for and on behalf of Ford Motor Company; that the matters stated therein are not

within the personal knowledge of deponent; that the facts stated therein have been assembled by

authorized employees and counsel of Ford Motor Company and deponent is informed that the

facts stated therein are true.


Dated:

_____

Kathryn S. Lamping
Assistant Secretary

**EXHIBIT 5**

 **EPA**

United States
Environmental Protection
Agency

**Superfund Reforms: Progress**                    June 4, 1996

## FACT SHEET:
## ORPHAN SHARE REFORM

### EPA INCREASING FAIRNESS IN THE ENFORCEMENT PROCESS

- By October of this year, EPA expects to offer over $50 million of past costs and projected oversight costs to compensate for a portion of the orphan share based on settling parties' willingness to perform work.

- Under CERCLA's joint and several liability system, at sites where there are parties who have no money to contribute to the cleanup or who are no longer in existence, viable potentially responsible parties (PRPs) are required to absorb the shares that may be attributable to such insolvent and defunct PRPs. Under this reform, EPA will consider this in its assessment of the federal compromise it provides in settlement at such sites.

- EPA will provide compensation to settling parties who perform cleanups by forgiving past costs and projected oversight costs.

- This compensation must necessarily be subject to the adequacy of funding of the cleanup program, since the taxing authority to replenish the Superfund Trust Fund expired on December 31, 1995.

- As a result of these concerns, and the need to minimize delay in cleanup negotiations, minimize additional transaction costs, and provide equity among sites, the Agency decided to limit such compensation. Compensation will be up to 25% of the projected cost of the remedial action at the site.

- This principle of maximizing available compensation is also contained in guidance issued today that will help EPA to better implement this new way of settling with performing parties.

- If you have any questions about this reform, please call Susan Boushell, at 202/564-5107, or Patricia Mott, at 202/564-5133.

**EXHIBIT 6**

 **Orphan Share Superfund Reform
Questions and Answers**

January 2001

These questions and answers are intended for use by employees of the U.S. Environmental Protection Agency. They do not constitute rulemaking by the Agency and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law or in equity, by any person. The Agency may take action at variance with this document.

*Orphan Share Qs & As*

## <u>Table of Contents</u>

**Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**A. General Principles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.  Interim guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.  Joint & several liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        a. Treatment of non-settlors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        b. Divisibility of harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    3.  Orphan Share Reform & Mixed Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**B. Eligibility** (Policy application to work & cost recovery settlement negotiations) . . . . . . . . . 3

    1a. Basic eligibility criteria for work negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    1b. Basic eligibility criteria for cost recovery negotiations
    2. Time-critical removals & removals at non-NPL sites . . . . . . . . . . . . . . . . . . . . . . . 4
    3. Types of costs included in cost recovery cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    4. Remedial Investigation/Feasibility Study negotiations. . . . . . . . . . . . . . . . . . . . . . . . 5
    5. Sites excluded from reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        a. Rationale for owner/operator-only sites exclusion . . . . . . . . . . . . . . . . . . . . . . 5
        b. Both owner/operator & generator/transporter theory of liability for a party . . 5
        c. One generator/transporter sites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        d. "Aceto" generators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    6. Federal PRPs at privately owned sites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    7. Remedial Action only negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    8. UAO Conversions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    9. Operations & Maintenance only negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    10. *De minimis* parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    11. State-lead sites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    12. Reopening past settlements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    13. Factors to consider when deciding whether to make CR offer . . . . . . . . . . . . . . . . . . 9

**C. Determining the Orphan Share** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    1. Definition of Orphan Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    2. Exclusions from definition of Orphan Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    3. Definition of insolvent and defunct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        a. No ability to pay determinations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        b. Ability to Pay analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Orphan Share Qs & As*

   c. Defunct/non-locatable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   d. Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   e. Sources of income (*e.g.*, insurance; indemnification) . . . . . . . . . . . . . . . . . . 14
   f. Proceeds from Prospective Purchaser Agreements . . . . . . . . . . . . . . . . . . . . . 15
   g. Foreign assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   h. Affiliated party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
  4. Government Estimate of Orphan Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
  5. PRP's estimate of Orphan Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**D.  Calculating Orphan Share Compensation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

  1. Maximum Amount Appropriate for Compensation (MAAC) in Work Negotiations  16
  2. MAAC in Cost Recovery Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
  3. Change in ROD or removal cost estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  4. Unanticipated changes in scope of the remedy under a CD or AOC . . . . . . . . . . . 18
  5. Anticipated changes in scope of the remedy under a CD or AOC . . . . . . . . . . . . . 19
  6. 25% ROD/removal cap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  7. Compensation above the MAAC in Work Negotiations . . . . . . . . . . . . . . . . . . . . 19
  8. Forgiveness of costs (multiple covenants for same costs) . . . . . . . . . . . . . . . . . . . 20
   a. "No" scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   b. "Yes" scenario . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  9. Presumption to offer MAAC in Work Negotiations . . . . . . . . . . . . . . . . . . . . . . . 20
  10. Adjustment of MAAC in Work Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
  11. Compensation for Work vs. Cost Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
  12. "No better deal" in Cost Recovery Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . 21
  13. Negotiations for less than entire OU? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
  14. Multiple OUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
  15. Allocation between generators - MSW waste excluded . . . . . . . . . . . . . . . . . . . . . 22
  16. Orphan Share compensation to generators/transporters of MSW . . . . . . . . . . . . . 23
  17. Orphan Share compensation to municipal owner/operator . . . . . . . . . . . . . . . . . . 23
  18. Forgiveness of unbilled oversight costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  19. Future oversight costs vs. past cost forgiveness . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**E.  Implementation in Work & Cost Recovery Settlement Negotiations** . . . . . . . . . . . . . . 24

  1. Notice to parties in work negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
  2. Notice to parties in cost recovery negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
  3. Distinguishing between orphan share compensation & litigation risk in 10 point
   settlement document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
  4. OECA concurrence and consultations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## BACKGROUND

Orphan share compensation was introduced in the third round of Superfund reforms. The Agency announced it would compensate parties for a limited portion of the orphan share in settlements involving future cleanup and issued the *Interim Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time Critical Removals* (work policy) on June 3, 1996. The work policy is intended to enhance fairness and encourage potentially responsible parties ("PRPs") to agree to perform cleanups at contaminated sites. The work policy provides for compromise of federal claims based on the orphan share, up to certain specified caps.

The orphan share reform was expanded in September 1997 with the issuance of the *Addendum to the "Interim CERCLA Settlement Policy Issued on December 5, 1984"* (cost recovery policy). The cost recovery policy provides Regions with discretion to offer orphan share compensation in cost recovery cases (*i.e.*, those in which EPA has already cleaned up a site or has taken other action and is now seeking to recover its costs) where a significant orphan share exists.

There is an important distinction between the work and cost recovery policies. Under the work policy, settlement negotiations for future work that meet certain requirements should include an offer of orphan share compensation. In contrast, under the cost recovery policy, Regions have discretion to offer orphan share compensation in negotiations covered by the policy.

In both work and cost recovery settlements, orphan share compensation is provided in the form of a compromise of government costs at a site (it does not involve the Agency providing money from the Fund to PRPs). "Orphan share compensation" is a term of art limited to the compromise calculated pursuant to the dictates and limitations of the work and cost recovery policies, and is not intended to be synonymous with the term "federal compromise." Orphan share compensation may represent all or merely a part of the total federal compromise in a settlement. Thus, for example, in a cost recovery negotiation, a case team may calculate the appropriate amount of orphan share compensation pursuant to the cost recovery policy, but may determine that the litigative risks, ability to pay, and/or equitable factors at a site call for a compromise of costs in addition to orphan share compensation. In either the work or cost recovery context, the orphan share reform is not intended to interfere with the government's ability to reach an appropriate settlement figure, which may include a federal compromise greater than the orphan share compensation calculated pursuant to the policies, once it has been determined that settlement is in the best interests of the United States.

*Orphan Share Qs & As*

## A.  GENERAL PRINCIPLES

1. **Since the work policy and the cost recovery policy are only interim documents, when are the finals expected?**

   The work and cost recovery policies are entitled "interim" to give EPA the flexibility to modify them as we gain experience through implementation. Although labeled "interim," they have the same effect as "final" guidance. At a later date, EPA may modify the documents to reflect lessons learned and may issue final versions.

2. **How does the orphan share reform affect the Region's ability to pursue parties under principles of joint and several liability?**

   None of EPA's settlement principles, including those related to orphan share, has any effect on joint and several liability. Common law tort principles of joint and several liability are not disturbed by this reform. CERCLA remains a statute that provides for joint and several liability unless there is sufficient proof of divisibility of harm and a reasonable basis for apportionment.

   As an inducement to settlement, however, the Regions <u>should</u> offer "orphan share" compensation for eligible remedial design/remedial action (RD/RA) sites and non-time-critical (NTC) NPL removal sites and <u>may</u> offer such compensation for cost recovery sites as one component of their settlement analysis, along with traditional factors such as litigation risks, cooperation of performing parties and resources of the parties. In fact, this willingness of the government to compromise based on orphan share is one of the major benefits of settling promptly with the government. Absent such settlements, the United States will generally require the burden of all site cleanup costs to be borne by viable liable parties.

   a. **How does the reform affect the Region's treatment of nonsettlors?**

      Regions should pursue nonsettlors jointly and severally for cleanup work and recovery of response costs. Again, the orphan share component of the Federal compromise is only available through EPA's enforcement discretion during settlement negotiations and in accordance with the orphan share policies.

   b. **What if the Region or a court determines that the parties have met their burden of proving that the harm is divisible and reasonably capable of apportionment?**

      The orphan share reform is not intended to disturb a party's divisibility of harm defense to joint and several liability. Divisibility is the legal apportionment of harm at the site. A party that has proved divisibility at a site is not liable for the divisible portion of the

2

cleanup or costs. However, orphan share compensation could still be offered with respect to the portion of the costs that the party <u>is</u> liable for provided there is an orphan share associated with that portion of the harm at the site.

### 3. Is mixed funding available to implement the reform?

The reform does not provide for mixed funding, nor does it disturb the Agency's enforcement discretion to enter into mixed funding agreements. ( *See* footnote 3, page 3 of work policy and Q&A D.7).

## B. ELIGIBILITY

### 1a. What are the basic criteria for providing orphan share compensation in work negotiations?

At sites where a work settlement is being negotiated, the following criteria must be satisfied for specific application of the policy (*But see* Q&A B.5 for site exclusions):

1) EPA initiates or is engaged in negotiations for RD/RA at NPL sites[1] or for Non-Time Critical (NTC) removal at an NPL site;

2) A PRP or group of PRPs agrees to conduct the RD/RA or RA pursuant to a consent decree or the NTC removal pursuant to a consent decree or an administrative order on consent; and

3) An "orphan share" exists at the site.

The policy, however, may be applied in other circumstances (*e.g.*, *See* Q&As B.2).

### 1b. What are the basic criteria for providing orphan share compensation in cost recovery negotiations?

In cost recovery settlement negotiations, the following criteria must be satisfied along with considering all relevant site-specific factors to determine if an orphan share offer is appropriate:

1) A significant orphan share exists at the site;

2) The settling party did not previously refuse a settlement offer that included orphan share compensation (except in extraordinary cases, *See* Q&A D.2 and E.5). "Settlement offer" includes any offer, not limited to special notice, of a compromise based on orphan share (*e.g.*, a verbal offer). A party that had the opportunity to proceed in negotiations with EPA after having received a settlement

---

[1] Orphan share compensation may be available in RD/RA negotiations for work at non-NPL sites where PRPs agree to certain conditions. While EPA is developing guidance on this topic, we ask that regions contact headquarters if you are interested in providing orphan share compensation at NPL-equivalent sites.

3

offer that included orphan share compensation, but that did not proceed with such negotiations, can be deemed to have "refused" that settlement offer for purposes of this analysis.

2.  **Since the work policy specifically applies to NTC removals at NPL sites, does this mean that time-critical removals or removals at non-NPL sites are excluded from the policy?**

No. The work policy is intended to encourage PRPs to perform cleanup work. The Regions should offer orphan share compensation during settlement negotiations for RD/RA and NTC removal actions at NPL sites. However, the Region may determine that it is also appropriate, in light of timing, resources and other factors (*e.g.*, the orphan share is large, the work parties' share of responsibility is small), to apply the reform to time-critical removals or removals at non-NPL sites. Because the Agency does not want to create disincentives for PRPs to perform removal work under a consent agreement, it is important to provide opportunities for compensation during removal work settlement negotiations (including time-critical and non-NPL if possible). This discretion recognizes that for time-critical removals the Region may not have the ability to negotiate a work agreement that includes orphan share compensation due to the urgent need for response action. However, in situations where time permits, time-critical removal negotiations should generally include offers of orphan share compensation, to the extent sufficient information is available, in order to maintain incentives for parties to perform work.

3.  **Are there any limitations on the types of response costs that may be included in calculating an offer in a cost recovery case?**

No. Under the cost recovery policy, the Regions may offer orphan share compensation in negotiations regardless of the type of costs being negotiated. Costs may include those associated with time critical and non-time critical removals, EECAs, RI/FS work, RD/RA work and oversight at NPL and non-NPL sites. When making a cost recovery offer in the case of a time-critical or non-NPL removal action, as with any cost recovery offer, the Region should be mindful to make an offer no better than that which would have been made at the time work was being negotiated,[2] while striving to maintain incentives to reach work settlements. (*See also* Q&A D.2.)

4.  **Can the Region apply the orphan share reform to benefit parties performing a remedial investigation/feasibility study (RI/FS) under an AOC?**

---

[2]When determining the amount of orphan share compensation, Regions should consider the time-value of money as to those parties which had the benefit of not expending dollars prior to or during cleanup.

In general, the work policy is intended to encourage PRPs to perform response cleanup work and does not apply to remedial investigations and feasibility studies and the like, (*e.g.*, EECAs). However, there may be circumstances in which it would be appropriate to offer orphan share compensation to PRPs willing to perform an RI/FS under an AOC. In these cases, the offer of compensation is permitted in the form of forgiveness of past costs and not as a waiver of future oversight costs. CERCLA § 104(a)(1) requires PRPs conducting an RI/FS to agree to "reimburse the Fund for any costs incurred by the President under, or in connection with, the oversight contract or arrangement."

5.  **At which types of sites is orphan share compensation NOT available under the work and cost recovery policies?**

Orphan share compensation is <u>not</u> available for either work or cost recovery at:
1)  Federal facilities (*See* footnote #2, page 2 of the work policy);
2)  "Owner/operator only" sites--sites where <u>every</u> PRP is liable as a current or former owner and/or operator, (*i.e.*, "chain-of-title" sites where the only PRPs identified by the Region are owners or operators and there are <u>no</u> generators or transporters). (*See* footnote #2 , page 2 of the work policy).[3]

a.  **Why are owner/operator-only sites (or "chain-of-title sites") excluded from the reform**

At the time of policy formulation, a decision was made that it would be more prudent to use limited government resources for settlements that reduce high transaction costs at sites with larger numbers of PRPs, namely sites with generators and transporters. This site type exclusion (*i.e.*, owner/operator-only sites) is explicit in the work policy. The exclusion applies implicitly to cost recovery cases. This is a <u>site</u> type exclusion--not a <u>party</u> type exclusion (*See* Q&A B.5.b & c).

b.  **What if an owner/operator was also a generator?**

Consistent with legislative reauthorization proposals supported by EPA, "owner/operator-only" sites are excluded even if the owner/operators may also be liable as generators or transporters at the site. In other words, even though an operator may also be liable as a generator at the site, its generator liability would not make orphan share compensation available at the site if there are no other non-owner/operator generators at the site.

---

[3]The fact that the orphan share policy does not apply to owner/operator only sites does not mean that the United States cannot exercise its prosecutorial discretion in appropriate circumstances to otherwise compromise its claim based on litigation risk or equities.

   c.  **Does this mean that sites that have one or more owner/operators are excluded, even if there are generators at the site?**

No, the exclusion applies solely to owner/operator <u>only</u> sites. The presence of a single non-owner/operator PRP whose liability is based on a generator or transporter theory means that the orphan share reform can apply at the site, even to the benefit of owner PRPs.

   d.  **If the only generators at the site are "Aceto" generators, and the only other PRPs are owner/operators, are the PRPs at the site eligible for orphan share compensation?**

Yes, the PRPs at the site may be eligible for orphan share compensation. Typically, "Aceto" generators are persons who arranged for the disposal of a hazardous substance by: (1) supplying a chemical ingredient to a formulator or processor; (2) retaining ownership or control of the ingredient throughout the formulation process, which involves the contemporaneous generation and disposal of hazardous substances; and (3) retaining ownership of the finished product. *See* <u>United States v. Aceto Agricultural Chem. Corp.</u>, 872 F.2d 1373 (8th Cir. 1989). (Eighth Circuit held allegations that defendant pesticide manufacturers contracted for the formulation of hazardous substances into commercial grade pesticides which they owned, in a process that involved the generation and disposal of wastes, were sufficient to withstand defendants' motion to dismiss).

6.  **Are Federal PRPs at a privately owned site eligible for orphan share compensation in work and cost recovery negotiations?**

Yes. Federal PRPs at privately owned sites are treated the same as private parties[4] for purposes of the orphan share reform. Federal PRPs would receive orphan share compensation even if the Federal parties were the only generators or transporters at the site.

---

[4] The only difference that may apply in work negotiations is that, because of unique federal appropriations limitations, most Federal PRPs do not perform cleanup work, but instead only provide funding to the private PRPs performing the work.

7.  **How are the MAAC caps calculated if the subject of negotiations is only the remedial action and does not include the remedial design?**

    If the subject of the negotiations is limited to remedial action, the past cost/future oversight costs MAAC cap should be limited to EPA's unreimbursed past costs and future oversight costs associated with the remedial action; it cannot include the PRPs' past costs of work performed at the site (*e.g.*, PRPs' costs of performing remedial design, with the exception of a limited set of UAO conversion cases). (*See* Q&A B.8 .)  Similarly, the 25% of the ROD MAAC cap, should be limited to the RA costs.[5]  It should be noted that, if pursuant to the RD, RA costs have been revised, Regions should use that revised number to calculate the 25% ROD MAAC cap as opposed to the RA estimate in the ROD.  When calculating the orphan share MAAC cap, total site costs should not include PRP past costs for performing the RD.

8.  **Can PRPs who are doing work under a UAO convert to a CD in order to benefit from orphan share compensation?**

    In general, because of the effort required to convert a UAO to a CD, the Region should only do so if it finds that a substantial benefit accrues to the Agency.  However, once the Region makes the decision that conversion is appropriate, the Region may consider offering orphan share compensation if fairness dictates the application of the reform.  Of course, there may be UAO conversion cases in which  it is inappropriate to offer orphan share compensation.  For example, the Regions should generally not offer orphan share compensation in a UAO conversion context if the respondents had previously been offered, but refused, an opportunity to settle with orphan share compensation.  Even then, there may be mitigating factors that might warrant orphan share compensation in an extraordinary case. (*See* Q&A E.5.)

    In a UAO conversion case, we recommend the following when calculating the 25% ROD cap in analysis of the Maximum Amount Appropriate for Compensation (MAAC):
    1) 25% of the cost of the future work to be performed under the CD (typical case); or,
    2) in appropriate circumstances, 25% of the total ROD costs (*e.g.*, order had been issued due to site exigencies but it was understood at the time by the Agency and PRPs that once work started, the order would be converted to a settlement agreement).

---

[5] Where PRPs signed up to perform RD under an AOC after the OS policy was created, they should have already received Orphan share compensation related to the RD.  If PRPs did not get such compensation at the RD stage, equities may dictate that compensation should be given in RA negotiations.  For example, if a group of PRPs performed the RD separately from the RA at the encouragement of EPA and did not previously receive orphan share compensation, it may be appropriate to consider costs associated with the RD as part of the RA MAAC analysis.

9. **Does the work policy apply where the subject of the CD consists only of an agreement to perform Operations and Maintenance (O&M)?**

Yes, the reform applies to settlements in which the PRPs agree to perform only O&M at the site provided that the other requirements of the policy are met. However, when calculating the MAAC, the Regions should typically take 25% of O&M costs (not all ROD costs) in calculating the 25% ROD cap. In limited circumstances (*e.g.*, where certain PRPs performed RD/RA work under a UAO rather than a CD because reaching agreement on federal party or other issues would have delayed the work), it may be appropriate to make a different calculation. In such instances the Headquarters (HQs) Orphan Share Team is available to assist the Regions in this calculation.

10. **Can the Region give *de minimis* parties the benefit of orphan share compensation?**

Yes, the Region should consider giving *de minimis parties* the benefit of the orphan share compensation where the information needed to determine the MAAC at the time of negotiations is available, and orphan share is not already accounted for in the *de minimis* cashout formula. Please consult with the appropriate HQs orphan share contact for ways to handle orphan share compensation in *de minimis* settlements.

11. **How does the reform apply to state-lead enforcement sites?**

In the work and cost recovery policies, only the Federal government committed to provide orphan share compensation. The reform therefore applies only to costs incurred by the Federal government, which may include costs incurred by the U.S. before or after the state takes the lead at a site. With respect to costs incurred by the state at a state-lead site, interested parties may contact the relevant state environmental agency to learn whether and how that state compensates responsible parties for the orphan share associated with costs that the state has incurred.

12. **Can past settlements be reopened in order to provide orphan share compensation?**

No, the orphan share reform cannot be applied retroactively where settlement agreements have already been reached (*i.e.*, settlements should not be reopened). In addition, regions may not agree to "forgive" past costs that PRPs have agreed to pay in a previous CD or AOC.

8

**13. What factors should a Region consider in determining whether to make an orphan share compensation offer in cost recovery negotiations?**

In implementing the orphan share reform in cost recovery cases, the Regions should bear in mind the primary purpose of both the work and cost recovery policies, which is to be more fair and equitable by making settlement offers that, at least in part, mitigate the effects of joint and several liability. However, as the cost recovery policy cautions, the Regions should not offer settlements that provide incentives or precedents for parties to refuse to enter into agreements for performance of work, believing they may get a better orphan share offer at the time EPA pursues a cost recovery claim. Therefore, in general, EPA should not offer orphan share compensation in a cost recovery settlement to a party that refused a previous settlement offer that included a compromise based on orphan share compensation (the costs being negotiated in cost recovery are the same costs that were on the table during the work negotiations). In other words, PRPs should only get one "bite at the apple" for receiving orphan share compensation for the same costs. Additionally, the Region should consider the following factors:

- *Overall size of the orphan share*: the larger the orphan share, the more equitable it would be to provide compensation.

- *Relative shares of viable settlors and orphan parties*: it may be more equitable to give compensation to a settlor where its share is relatively small compared to the orphan share rather than to a settlor where its share is relatively large compared to the orphan share.

- *Opportunity to do the work*: it may be appropriate for late-identified PRPs that were not given the opportunity to perform the work and receive orphan share compensation to receive orphan share compensation in cost recovery negotiations. In other words, PRPs who never had the opportunity to do work should not be penalized for this in cost recovery negotiations.

- *Ability to do the work*: regions may consider a PRP's financial or technical inability to perform the work on its own as a mitigating factor weighing in favor of providing the PRP with some orphan share compensation in cost recovery even if the PRP declined a previous offer to do the work that included orphan share compensation as long as the PRP has otherwise been cooperative with the Agency. Such an offer would be in recognition of the fact that it was not the PRP's recalcitrance which prevents it from doing work under consent, but rather the party's financial or technical constraints.

9

- **Cooperation:** cooperation with the government and other parties (*e.g.*, information disclosure) and good faith in negotiations may weigh in favor of providing orphan share compensation to cost recovery parties.

- **Fairness:** behavior resulting in unfairness to other parties (*e.g.*, suits against *de micromis* contributors) may weigh against providing orphan share compensation to cost recovery parties.

- **Exclusions:** the site eligibility exclusions explicitly set forth in the work policy are also applicable to the cost recovery policy. Accordingly, orphan share compensation may not be offered at owner/operator only sites and Federal facilities. (*See* Q&A B.5.)

## C. DETERMINING THE ORPHAN SHARE

**1.    What is an "orphan share?"**

The orphan share is that share of responsibility for response costs specifically attributable to identified parties determined by the Agency to be:
   1) potentially liable;
   2) insolvent or defunct; <u>and</u>
   3) unaffiliated with any other viable party potentially liable for response costs at the site.

**2.    What is not included in the orphan share definition?**

The orphan share does NOT include shares associated with:
   1)    unattributable wastes (*i.e.*, waste that cannot be specifically attributed to an identified party);
   2)    the difference between a party's actual share and the share that it is able to pay;
   3)    *de micromis*, municipal solid waste (MSW) and other contributors typically not pursued by the Agency; <u>or</u>
   4)    those exempt from liability by the Superfund Recycling Equity Act, which is codified in CERCLA at 42 U.S.C. § 9627.

**3.    When is a party "insolvent?"  When is a party "defunct?"**

Section 101(31) of the Bankruptcy Code, 11 U.S.C. § 101(31), indicates that a party is insolvent when its assets are exceeded by its liabilities and/or it is unable to meet debts as they become due. However, for purposes of the orphan share reform, a party is considered **insolvent** when it has "no ability to pay." EPA may determine a party has "no ability to pay" even if it is not technically insolvent pursuant to the Bankruptcy Code. Conversely,

EPA may determine that a party is not an orphan party even if it is determined to be insolvent pursuant to the Bankruptcy Code. (*See also*, Q&A C.3.d.)

For purposes of the orphan share analysis, a party should be considered **defunct** if it ceased to exist or ceased operations and has fully distributed its assets such that the party has "no ability to pay." It is important when deciding whether a party is defunct to attempt to determine if and when a company ceased operations or ceased to exist, particularly if assets were distributed and formalities were not fully observed. Formalities may include filing a Notice of Bulk Transfer, Notice of Non-Responsibility, Certificate of Intent to Dissolve, and Notice of Dissolution. If the company ceased operations before EPA established a bankruptcy claim, then EPA would probably have no further interest in the distributed assets. However, if the distribution occurred within one year before or after EPA's claim arose, then EPA may need to closely examine any distributions of company property when analyzing the party's ability to pay and consider whether these assets may be available or attainable for use towards site cleanup costs. NEIC may be helpful in making these determinations through resources such as Dunn & Bradstreet. This database may provide information such as the company's history of reorganization and mergers or whether there are any surviving entities.

A PRP that has a viable liable successor or is affiliated with another party with potential liability cannot be considered an insolvent or defunct party for purposes of the reform. (*See* Q&A C.3.h.)

Currently, no guidance on making an insolvent or defunct determination is available for orphan share purposes. However, the Agency's guidance on making Ability to Pay determinations (*See* Breen, 9/30/97, *General Policy on Superfund Ability to Pay Determinations*) may assist the Regions in determining what financial information to review in order to make insolvent/defunct determinations.

Note that an extensive effort to identify insolvent and defunct parties may <u>not</u> be necessary if either: 1) 25% of the ROD or removal costs; or 2) past costs plus future oversight costs, will clearly be the MAAC.

**a.  How does the Region determine whether a party has "no ability to pay?"**

To determine whether a party has "no ability to pay," the Region should evaluate the party's financial status. In general, if a party cannot make any payment at a site without undue financial hardship, the party would be considered to have "no ability to pay." An undue financial hardship occurs if, in the opinion of EPA, "satisfaction of the environmental claim will deprive a PRP of ordinary and necessary assets or cause a PRP to be unable to pay for ordinary and necessary business or living expenses." (*See* Breen, 9/30/97, *General Policy on Superfund Ability to Pay Determinations*, page 1.)

In some circumstances, an extremely large difference between a party's equitable share and its "ability to pay" may lead a Region to conclude that the party qualifies as an orphan. For example, if the Region's evaluation indicates that a party can pay $100 toward its $1 million share, the Region should obviously determine that the party has "no ability to pay" and is an orphan. However, if a party could pay $250,000 out of a $1 million share, the Region could determine that the party has a limited ability to pay and therefore is not an orphan. For further assistance in making "no ability to pay" determinations, consult the HQs contacts and/or the document *Overview of the Process for Providing Orphan Share Compensation*, located in the Orphan Share Implementation Notebook at Tab 3, or the 9/30/97 *General Policy on Superfund Ability to Pay Determinations*.

b.  **Does the Region have to perform an "ability to pay" analysis according to the Ability to Pay Guidance for each party that it believes may be insolvent or defunct?**

Not necessarily. The 1996 work policy requires Regions to make a "rough estimate" of the size of the orphan share, based on readily available or easily obtainable information. Some inquiry into the party's financial status is necessary to determine whether the party is insolvent or defunct, but the degree of inquiry necessary for each party depends on the available information, the specific circumstances of the case, and the time available for performing the analysis (*e.g.*, determining the orphan share should not impede cleanup or delay statutory negotiation deadlines).[6] In some cases, parties may be identified as orphans based upon a review of those parties' tax returns. Many financial assessments may be screened and resolved by EPA personnel with some knowledge of ability to pay issues or by using contractor resources. Defunct parties may be investigated and questions may be resolved using investigators or ESS/SES contractors. (*See* Tab 3 of the Orphan Share Implementation Notebook, *Overview of the Process for Providing Orphan Share Compensation*.) The Region should consult a financial analyst for particularly complex financial determinations.

---

[6] Note that the government may need to perform a more thorough analysis of a party's viability and/or ability to pay at other stages of the enforcement action, for example, when determining an appropriate cost recovery settlement amount for a particular PRP or when determining whether to sue a non-settling PRP.

12

c.  **May a Region consider an entity defunct if the Region cannot locate that entity?**

Yes. Entities that Regions cannot locate may be considered defunct if an adequate search has been done to locate them. Appropriate efforts may include, for example, sending out notice letters to the last known address and checking to see if parties are listed in Dunn & Bradstreet and other available business databases (*e.g.*, "Finder" on Lexis-Nexis).

d.  **Should a party who has filed for bankruptcy, or is bankrupt, be considered insolvent?**

Not necessarily. Depending on the particular bankruptcy filing, the Agency may recover according to a percentage on the dollar for the claim or reach a separate settlement agreement for payment with a bankrupt party. Some debtors pay creditors 100% of their claims or may enter into settlements with EPA providing for payment of their settlement share. The term insolvent for purposes of the orphan share policy is not being used as it is in the Bankruptcy Code.[7] However, it is likely that many debtors will be insolvent (i.e., will have no ability to pay under the orphan share policy) because many debtors are unable to pay their ordinary and necessary business expenses. Indeed, many debtors file for bankruptcy in order to discharge the ordinary and necessary business expenses that they are unable to pay.

There are a number of factors to consider in assessing a debtor's ability to pay. These factors include the number of creditors (secured and unsecured), the amount and due date for the debtor's liabilities, and the amount of assets. The type of filing[8] however is

---

[7]For example, a bankruptcy court may determine a party is insolvent under the Bankruptcy Code. But under the distribution plan, each creditor is being paid 10¢ on a dollar. In this case, depending on a party's allocated share, the Region may decide that party has "no ability to pay" and therefore is an orphan party (because 10¢ on the dollar on a large share is too little of an ability to pay), or that the party has a limited ability to pay (because it has a smaller allocated share) and is not an orphan party.

[8]In a **Chapter 7 individual bankruptcy**, a trustee is appointed, the debtor's assets are liquidated, and pre-petition debts are then discharged. From the liquidated assets, the trustee will pay the creditors who filed proofs of claim in the order of their priority. (Secured creditors first, then unsecured creditors). In a **Chapter 7 corporate liquidation**, the trustee takes control of and liquidates all property in which the corporation has an interest. The assets are distributed to the corporation's creditors listed in the corporation's bankruptcy schedules or those that filed timely proofs of claim, following the priority schedule. If there are insufficient funds to pay all claims in full, payment is made pro rata within each class of claims. If the case is a **no-asset Chapter 7** case, there are no funds available for distribution and no possibility of recovery. In a **Chapter 11 corporate reorganization**, the debtor corporation remains in possession of its property. The debtor corporation must file a schedule of its liabilities which describes the corporation's debts. The debtor corporation then prepares a plan of reorganization which details its offer to pay a percentage of its debts consistent with the priority schedule under the Bankruptcy Code. The plan must be accepted by the creditors and approved by the bankruptcy court. Pre-petition claims are paid under the plan and are discharged.

not necessarily a determinative factor in assessing whether a party is insolvent under the orphan share compensation policy.

Regions should also note that there is an administrative expense priority which applies to environmental cleanup claims incurred post-petition with respect to property of the debtor's estate. Secured creditors will still be paid first, but the environmental cleanup creditor with an administrative expense priority will be paid before an unsecured creditor. Likewise, if a debtor will continue to own contaminated property, its liability for threatened or ongoing releases is not dischargeable. Also, if a party signed a CD as a work party and then filed for bankruptcy, EPA contends that the party's liability is non-dischargeable. In such cases, the debtor or reorganized debtor may fully comply with its obligations.

It is important for the Region to include an analysis in the 10-point settlement document regarding whether a bankrupt party is insolvent and, if not affiliated with another viable party, an orphan party. For more information on Bankruptcy *See*: 1) *EPA Participation in Bankruptcy Cases*, OECA Guidance issued 9/30/97; and 2) *Bankruptcy Primer for the Regional Attorney*, issued 2/94.

e.  **Should a party be considered an orphan if it has other potential sources of income (*e.g.*, insurance proceeds)?**

No. The Region should consider whether funds from sources such as insurance recoveries, indemnification agreements, contribution actions, and increases in property values resulting from cleanup activities will be available to the party being analyzed. This is consistent with the Agency's guidance on ability to pay. (*See* Breen, 9/30/97, page 5, *General Policy on Superfund Ability to Pay Determinations*) If these funds are significant and likely to be recovered, they should be considered in determining whether the party is an orphan. This of course presumes that adequate information on such funding sources can be obtained in a timely fashion. If, however, there is any question regarding other potential sources of income, and the Region does not have adequate time to investigate those potential sources, the Region should err on the side of the US and leave the burden on viable PRPs to demonstrate the other potential sources of income will not become available.

f.  **Can an owner's orphan status be affected by a Prospective Purchaser Agreement (PPA)?**

---

**In any of these types of bankruptcies**, EPA should consider filing a proof of claim before the bar date in order to ensure that its cost recovery claims against the party are preserved. Requests for filing a proof of claim or other participation before a bankruptcy court are made by referral to DOJ.

Yes. Proceeds or services generated and directed to a site cleanup via a PPA should be considered in determining whether an owner is actually an orphan. A seller once thought of as an orphan may lose this status as a result of new resources generated by a sale of its property, such as: direct proceeds that enable the owner to pay its equitable share of site costs; the purchaser's payment into a special account of funds for future site work; or the purchaser's commitment to perform work at the site pursuant to the remedy. If, however, a PPA's consideration does not include reimbursement of costs or remedial work (*e.g.* consideration is access or other nominal consideration), the seller's status as an orphan would remain unchanged.

### g. Should foreign assets be considered in assessing a PRP's ability to pay?

Consideration of foreign assets may be relevant in assessing a PRP's ability to pay (including any affiliated parties). It is unusual that the United States would search for or have evidence pertaining to the foreign assets of a PRP in a typical CERCLA case. However, if evidence exists that a PRP has foreign assets and there appears to be a reasonable prospect for reaching these assets, it should be considered in determining that party's ability to pay for purposes of an orphan share determination.

### h. What is an "affiliated party?"

An affiliated party can include a liable successor corporation, parent corporation, subsidiary corporation or an individual (*e.g.*, an officer, director, shareholder, or employee). The work policy provides that the estimated share for an insolvent or defunct party affiliated with another potentially liable and financially viable party cannot be an orphan at the site for purposes of applying the reform. The general approach is that if the financially viable party (*i.e.*, the affiliate) could be liable under a credible legal theory for the share of another party with "no ability to pay," the party with "no ability to pay" should not be considered an orphan.

## 4. How is the orphan share estimated?

The government gains additional experience in making orphan share estimates with every site or case where the issue is considered, but EPA has not issued guidance for estimating the orphan share. The Gore Factors, and other equitable factors, are frequently relied upon by courts in making equitable allocations in contribution actions and may be helpful to the Region when estimating the equitable share of an orphan party. Such equitable factors may include:

1) the amount of hazardous substances contributed by each party;
2) the degree of toxicity of hazardous substances contributed by each party;
3) the degree of involvement of each party in the generation, transport, treatment, storage, or disposal of hazardous substances;

4) the degree of care exercised by each party with respect to each hazardous substance;

5) the cooperation of each party in contributing to the response action and in providing information;

6) the mobility of hazardous substances contributed by each party; and

7) a party's financial benefit from the operation.

In addition, there may be case law on point and trade press publications (*e.g.*, ABA publications, Environmental Law Reporter, etc.), which may be instructive in estimating the size of the orphan share (*See* Tab 5 of the Orphan Share Implementation Notebook).

**5. Can the Region rely on PRPs' estimates of the size of the orphan share?**

The Region may not rely solely on PRP estimates of the size of the orphan share. The Region should require the PRPs to provide supporting documentation, review whether the documentation substantiates the PRPs' estimate of the orphan share, and make an independent determination based on all relevant information. (Note: this is critical in cases where the offer of orphan share compensation is based on the orphan share percent of total site costs.)

**D.  CALCULATING ORPHAN SHARE COMPENSATION**

**1.    How should the Region calculate the amount of orphan share compensation to offer under the work policy?**

The work policy states a presumption that the Region will offer the maximum amount appropriate for the orphan share component of the Federal compromise. The MAAC is the lowest of the following dollar figures and should not exceed any of the following:

1) Orphan share % of total site costs (total site costs are the costs that are being negotiated, *e.g.*, all unreimbursed past costs incurred by EPA, ROD costs or NTC removal costs, and associated projected future oversight costs);

2) 25% of future ROD costs or removal costs (in general, for the phases being negotiated; *See* Q&A B.7, B8, B.9); or

3) EPA's total unreimbursed past costs (not the PRPs' past costs) plus future oversight costs.

For purposes of determining orphan share compensation, unreimbursed past costs (*i.e.*, those which are on the table for negotiation) do NOT include PRP past costs or response costs that

16

PRPs have committed to pay in any previous agreement but have not yet paid. [9] In addition, future oversight costs that PRPs have committed to pay in a previous agreement should not be included in the estimated future oversight cost calculation. One example of costs that do not constitute unreimbursed past costs in the orphan share context would be oversight costs that a PRP agreed to pay in a previous RI/FS AOC.

2.  **How should the Region calculate the amount of orphan share compensation to offer under the cost recovery policy?**

    There is no orphan share compensation formula in the cost recovery policy. Rather, the cost recovery policy provides three guiding principles:
    1) in order to consider making an offer, there must be a significant orphan share;
    2) except in extraordinary cases, cost recovery parties should not get an orphan share compensation offer if they were already offered orphan share compensation in the work context (the "no two bites of the apple" principle); and
    3) except in extraordinary cases, cost recovery parties should not receive more orphan share compensation than they would have received had they been made an orphan share offer in the work context (the "no better deal than work parties" principle).

    The first two principles are addressed in Q&A B.13, which discusses factors that are relevant to the decision whether to offer orphan share compensation at all in cost recovery negotiations. The third principle goes to how much orphan share compensation the parties should receive. The starting point for determining the appropriate amount of the orphan share compromise should be the MAAC analysis as stated in the work policy. That is the lesser of: 1) the orphan share; 2) past costs & future oversight; or 3) 25% of response action, *e.g.*, ROD costs.

    In most cases, it will be fairly simple to calculate the orphan share cap and the 25% of future response costs cap.[10] In calculating the past cost and future oversight cost cap, the Regions should perform a "back in time" analysis in order to give effect to the "no better deal than the work parties" principle. That is, instead of calculating the past and future costs at the time of the cost recovery negotiations (when costs are generally significantly higher because most of the work is already done), the Regions should calculate past plus future oversight costs as of the time a work offer would have been made (when, in general, past costs would have been significantly lower because site work is likely just starting).

---

[9]The fact that the orphan share policy does not allow for the PRP costs to be included in cap calculations does not mean that the United States cannot exercise its prosecutorial discretion in appropriate circumstances to otherwise compromise its claim based on equities such as PRP cooperation.

[10] Where the actual ROD costs are lower than the ROD estimate, use the actual ROD costs. This will ensure that the non-work PRPs are not getting more orphan share compensation than they would have in the work context.

Unlike the work policy, the cost recovery policy does not have a presumption that PRPs should be offered the MAAC. However, the Regions are encouraged to offer the MAAC when it is equitable to do so. To determine whether to offer parties in cost recovery negotiations the MAAC or less than the MAAC, the Regions should consider factors, such as: 1) why the PRPs did not perform work under consent if offered an opportunity to do so; 2) whether PRPs performed work under a UAO; 3) if Fund monies were used to perform the cleanup; 4) if there is a large orphan share at the site; 5) whether small party contributors (relative to the orphan share) were asked to do the work; etc... (*See also* the factors discussed under Q&A B.13.)

Because the analysis is based on a factual scenario that never actually happened, applying the "back in time principle" can be difficult and, in some instances, imprecise. The HQs Orphan Share Team is available to assist in making this sometimes difficult calculation. There may be instances when a strict application of the MAAC analysis (particularly the "back in time" analysis) produces too little compensation. In these instances (i.e, extraordinary cases as stated in the cost recovery policy), the Region may request HQs concurrence to exceed the MAAC.

3.  **What if there is a change in the ROD or removal cost estimate during work negotiations?**

    If during negotiations, cost estimates significantly increase since the initial orphan share compensation offer was made, Regions should use that increased number to calculate the 25% ROD or removal cap. On the other hand, if during negotiations the cost estimate significantly decreases since the initial orphan share compensation offer was made (*e.g.*, the ROD is amended), the 25% ROD cap would be calculated based on the lower ROD estimate.

4.  **What if there is a change in the scope of the remedy under an existing CD or AOC?**

    If a CD or AOC is amended such that additional work is required resulting in a substantial increase in the cost of the remedy, the Region may re-visit the MAAC analysis and, if appropriate, offer compensation based on the future work component of the amended CD. If costs or cost estimates change during implementation of the remedy but no CD amendment is needed to implement the remedy change, then orphan share compensation should not be revisited.

5.  **What if it is known at the time of the CD or AOC negotiations that there is a good chance that the ROD or removal costs will substantially increase or substantially decrease after the CD or AOC is final?**

    If there is a good chance that a PRP's work obligation will substantially change after a CD or AOC is final (*e.g.*, the subject of the negotiations is a contingent ROD), it is appropriate

to negotiate a provision that would further compensate the PRP for the orphan share or allow for the United States to recover costs that may have been forgiven in excess of the actual MAAC. The HQs Orphan Share Team is available to assist the Regions in drafting such a provision.

6. **Why is one of the limits on the amount of orphan share compensation based on 25% rather than a greater percentage of the ROD or removal costs?**

Because Congress has not reauthorized Superfund or reinstated the Superfund taxing authority and has not provided the Agency with a separate appropriation for orphan share compensation, the Trust Fund would be depleted by the costs of implementing the program and achieving cleanups. Given these circumstances, EPA believes that establishing a 25% limitation at every site strikes the appropriate balance between providing meaningful implementation of this reform and preserving the Trust Fund.

7. **Because the MAAC may be limited in situations where there are minimal past costs to forgive, are there other means of compensating parties beyond the MAAC?**

In some cases a great disparity exists between the orphan share and the amount of past costs and future oversight costs sought by the Agency (and thus available for compromise under the MAAC formula). Because the orphan share policy does not authorize Regions to exceed the MAAC, Regions may consider other means of compensating parties such as mixed funding or special account funds. The orphan share reform does not alter the Agency's enforcement discretion to enter into mixed funding agreements at appropriate sites. Any decision to pursue a mixed funding settlement must be based upon a totality of the circumstances at a site, which may include the existence of a large orphan share (*See: Evaluating Mixed Funding Settlements Under CERCLA*, OSWER Directive #9834.9, October 20, 1987). In addition, the Region may consider giving work PRPs access to special account funds. (*See: Interim Final Guidance on Disbursement of Funds from EPA Special Accounts to CERCLA Potentially Responsible Parties*, Breen, 11/3/98). Mixed funding or special account amounts made available to the PRPs are not considered orphan share compensation under the reform.

8.  **If some of the past costs have already been compromised during a prior settlement, should those costs be used in calculating the MAAC?**

    It depends on whether the parties to the prior settlement are the same as the parties to the current settlement negotiations.

    a.  **If the parties to the prior settlement are the same parties to the current settlement negotiations --**

        and some portion of the past costs were forgiven in the prior settlement (*i.e.*, EPA compromised the costs in the prior settlement), the forgiven costs (and any reimbursed past costs) should not be used in calculating the appropriate orphan share compensation. In other words, the costs already forgiven by the Agency as to those parties and the monies already collected by the Agency are off the table for purposes of the current settlement negotiations.

    b.  **If the parties to the prior settlement are different from the parties to the current settlement negotiations --**

        and some portion of the past costs were forgiven in the prior settlement, the Region may decide to include those forgiven past costs (which were forgiven only to previous settlors) in the current settlement negotiations. These unreimbursed costs may be included in the calculation of orphan share compensation here and not in the above scenario because, consistent with joint and several liability, these new parties are still liable for the costs not reimbursed by the other parties.

        The general principle is that as long as it is to a different set of parties, the Regions may give the same covenant not to sue for the same costs (those being compensated in recognition of the orphan share) to multiple parties.

9.  **Is the Region required to offer the MAAC under the work policy?**

    There is a *presumption* that the Regions will offer the MAAC. In some circumstances, equitable considerations may justify offering less than the MAAC.

10. **What factors may be used to adjust the MAAC?**

    The work policy describes three factors to consider when determining whether to offer less than the MAAC:

    1) fairness to other PRPs, including small businesses, MSW parties, small volume waste contributors, and certain lenders and home owners;
    2) PRP cooperation; and
    3) size of the orphan share.

PRPs are expected to be fair and cooperative. In addition, the work policy does not authorize the Regions to increase compensation beyond the MAAC. Therefore, the factors mentioned above should not be used to increase the compensation offered under the policy. However, the large size of an orphan share may be used as a mitigating factor which may explain the PRPs lack of cooperation in some instances. The Region must provide an analysis of its decision to offer less than the maximum amount in the 10-point settlement analysis.

11. **How much compensation can a party receive in a cost recovery settlement as compared to a work settlement?**

The settling party must not receive a greater compromise of response costs in a cost recovery settlement based on the existence of an orphan share than it would have received if the party had signed a consent agreement to perform the work and the orphan share policy was applied, except in extraordinary cases (which need HQs concurrence). (*See* Q&A D.2.)

12. **May the Region provide orphan share compensation in a cost recovery settlement if the parties would not have received any orphan share compensation in the work context because, for example, the cleanup was negotiated prior to the existence of the June 1996 policy or the cleanup was for a time critical removal and the work policy would not have required an offer in these circumstances?**

Yes, although the general principle is that parties should not receive a better deal in cost recovery than they would have received in the work context. The intent of this principle is to maintain incentives for parties to do work and not to provide incentives for a party's unwillingness to conduct work. However, where, for example, parties would not have received compensation because work negotiations occurred pre-June 1996, the Regions have the discretion to offer compensation in the cost recovery context so long as the amount offered would not be more compensation than parties would have received had the June 1996 policy been applied at the time work was conducted. (*See* discussion on "back in time" principle, Q&A D.2)

13. **Should orphan share compensation be provided when the Region is negotiating with parties to perform less than the entire response action for either the whole site or an operable unit?**

Orphan share compensation can be provided to PRPs who agree to perform the response action at an operable unit (OU) for a site. However, in general, only PRPs that are willing to perform the entire response action at an OU, or the entire response action at a site that does not have distinct OUs, should be entitled to orphan share compensation. PRPs agreeing to perform only a portion of the work should generally not be granted orphan share compensation unless those PRPs have a compelling reason for not performing the entire

21

remedy, such as a strong divisibility argument. If the Region apportions the work, the Region should only offer compensation for undertaking a portion of the work if there is an orphan share associated with that portion of the work. In general, the MAAC analysis should be done only on those costs associated with the work being negotiated. (*See* Q&A D.14 below).

In many instances, the government will negotiate a global settlement and the PRPs will work out allocation issues without government involvement. The Regions, however, also have the discretion to divide the work if it is advantageous and equitable to do so. In these instances, the Regions have the discretion to offer orphan share compensation to both groups or to only one group of PRPs if, in EPA's judgment, that group is performing a portion of the work that is demonstrably larger than its equitable share.

## 14. How should the Region deal with using past costs for compensation at sites where there are multiple OUs?

The rule of thumb is that orphan share compensation is available to offset whatever costs the Region is negotiating (*i.e.*, what is "on the table"). When the same PRPs are liable for each OU at a site, but the Region is only negotiating one of the OUs, the Region has discretion to agree to recover past costs associated with other OUs (and provide compensation by forgiving such past costs) or to determine that such past costs should be recovered separately when EPA negotiates a settlement with the PRPs for the work at that OU. Where different sets (or overlapping sets) of PRPs are responsible for the multiple OUs, such settlements may be so difficult to negotiate that the Regions are encouraged to keep costs associated with each OU separate. (*See* Q&A D.4 with regard to prior settlements with PRPs for work at a site.)

## 15. When the Region allocates shares between the generators at a site, should it include the volume of MSW sent to the site?

No. MSW volumes are not considered in calculating the generator shares because EPA generally does not pursue parties who contributed only MSW to a site. (*See: Policy for Municipality and Municipal Solid Waste CERCLA Settlements at Co-Disposal Sites*, (February 5, 1998) and *Interim Policy on CERCLA Settlements Involving Municipalities and Municipal Wastes*, (December 6, 1989)). This is consistent with the guidance on preparing waste-in lists which states that the Regions should not include volumes attributable to parties whose contribution is solely MSW. (*Final Guidance on Preparing Waste-in Lists and Volumetric Rankings for Release to Potentially Responsible Parties (PRPs) under CERCLA*, OSWER Directive No. 9835.16 (February 22, 1991)). Thus, only the wastes of those parties whom EPA would ordinarily pursue should be included in the total volume of wastes for purposes of allocating equitable shares among the generators.

22

16. **Should the Region provide orphan share compensation to a party settling under the February 5, 1998 "Policy for Municipality and Municipal Solid Waste CERCLA Settlements at NPL Co-Disposal Sites" if that party's settlement is based solely on the generation or transportation of MSW?**

No. That party's settlement share is determined using a dollar-per-ton multiplier for the party's contribution of MSW. Since the share is based on that party's contribution of only MSW to the site, that settlement amount should be considered an appropriate share for that party, and it would not be appropriate to give that party orphan share compensation.

17. **Should the Region give orphan share compensation to a municipal owner/operator settling under the February 5, 1998 "Policy for Municipality and Municipal Solid Waste CERCLA Settlements at NPL Co-Disposal Sites?"**

No. A municipal owner/operator settling under the February 1998 MSW policy should not be given orphan share consideration. The presumptive baseline settlement amount of 20-35% for municipal owner/operators is considered to be the appropriate share for those parties. Therefore, no adjustment should be made to the presumptive settlement amount to account for potential orphan shares at the site. However, a municipal owner/operator who is also participating in a settlement because of liability in addition to its owner/operator liability should be given orphan share consideration for the portion of the settlement not associated with owner/operator liability (but not for payments for MSW - *See* Q & A, D. 10).

18. **In negotiations for work or cost recovery, may the Region forgive as part of the orphan share compensation unbilled oversight costs which PRPs have committed to pay in prior agreements?**

No, because it would constitute the reopening of a prior settlement and it is inappropriate to reopen prior settlement agreements, even when equities may be in the PRPs' favor (*e.g.*, cooperative in the past therefore minimal past costs are on the table). The Agency has consistently maintained during the Superfund reauthorization debate that settlements should not be reopened. To reopen settlements would be to give retroactive effect to the orphan share policy. Reopening settlements may signal to PRPs that the Agency is willing to renegotiate any number of previously agreed to provisions of prior settlement agreements.

Also, if the Agency were to institute the policy of forgiving unbilled oversight costs which PRPs are legally obligated to pay, it would be difficult to explain why the Agency would not also be willing to forgive billed, but not yet paid, oversight costs. This policy could provide an incentive to PRPs to neglect paying oversight costs which they are legally obligated to pay.

23

If equities indicate great unfairness to PRPs, the Region may want to consider the possible use of mixed funding dollars or special account funds to address PRP concerns.

**19. May the Region forgive future oversight costs before forgiving past costs?**

Yes. The Region has discretion to forgive all future oversight costs before it forgives past costs. This discretion applies to cases where the amount of compensation is capped by either the orphan share or 25% of response action costs. The practical effect of forgiving future oversight before past costs is twofold: 1) the Agency may be able to collect some of its past costs; 2) forgiveness of oversight costs would reduce [or eliminate] the need for the issuance of oversight bills. This approach does not apply where the amount of compensation is capped at 100% of the sum of past costs and future oversight costs being negotiated. (*See also* Q&A B.4 for limitations on this approach.)

**E. IMPLEMENTATION**

**1. Should the Region notify all parties in work settlement negotiations that orphan share compensation may be available for the site? Is a notice letter the appropriate method for such notification?**

Yes. If work negotiations are forthcoming, Regions should indicate in the special notice letter that orphan share compensation may be available for the site. Assuming they have adequate information, Regional staff should include the MAAC in all special notice letters or the functional equivalent for removal actions. If appropriate, the amount of compensation may be included in general notice letters as well. In any notice letter, Regional staff should caveat the dollar amount, indicating the dollar amount could change, subject to increased or decreased ROD or removal costs or an increase or decrease in the orphan share based on information obtained from the PRPs as negotiations ensue. (*See also* Q&A C.6.) Giving early notice could provide a greater willingness among PRPs to negotiate early in the process and a greater incentive to settle. If the special notice letter is waived or if negotiations are ongoing, Regions should send out a letter to the PRPs indicating the same. In order to receive credit for providing orphan share compensation in a work settlement, Regions must disclose the amount of the offer to the PRPs.

2.   **If the Region has decided that part of the federal compromise may be attributed to the orphan share in a cost recovery case, should the Region notify parties in cost recovery negotiations that orphan share compensation may be available for the site?**

Generally, yes. However, unlike the work policy, in a cost recovery settlement, Regions are not required to disclose to the PRPs the amount of orphan share compensation being offered. From a reform standpoint, it is preferable to make the offer as early as possible in the negotiation process (*e.g.*, in the demand letter) and to be as specific as possible regarding the amount of the orphan share offer (*i.e.*, identify a specific dollar amount). We recommend such disclosure because it is important to communicate to the PRPs that the orphan share compensation offered during settlement is one way in which the Agency is reforming the Superfund program. However, from the standpoint of reaching a successful settlement, in some cases it may be appropriate to communicate to the parties only that part of the federal compromise is attributable to equitable factors, such as an orphan share, but not disclose the specific dollar amount. Finally, there may be limited cases in which it may not be appropriate to explain to the parties that part of the federal compromise is in recognition of the orphan share. In these cases, the Regions should consult with HQs. [Note that in order to receive credit for providing orphan share compensation in a cost recovery settlement, Regions must disclose to the PRPs that part of the federal compromise is attributable to the orphan share policy.]

3.   **Must the Region distinguish between orphan share compensation and litigation risk in the 10-point settlement document?**

Yes. In both work and cost recovery settlements, Regions should assign a dollar amount to the orphan share compensation portion of the Federal compromise in the 10-point settlement analysis (in addition to the analysis of litigation risk and other factors) whether or not a specific dollar amount has been disclosed to the PRPs. Regions should also include in the 10-point settlement analysis a paragraph supporting the orphan share party determination behind the orphan share component of the Federal compromise. In addition, the offer should be reported to the HQs Orphan Share Team. If a settlement is not ultimately reached, the Region should record the offer in an appropriate document (*e.g.*, memo to the file), as well as notify the HQs Team.

4.   **What are the obligations of the Regions regarding orphan share compensation under the "OECA Concurrence and Consultation Requirements for CERCLA Case and Policy Areas" or "Roles Memo?"**

While HQs is available for consultation and assistance on every site, the official requirements are outlined below. Regional staff should contact their HQs contact, either orally or in writing, prior to making a formal offer where there is prior written approval

required. HQs will evaluate the proposed offer, considering site-specific data and discuss the case with the Region as quickly as possible.

Two Prior Written and/or Oral Approval requirements:
1)  Prior written or oral approval of the Director of the Regional Support Division (RSD) on orphan share settlement offers when projected ROD or removal costs exceed $30 million.
2)  Prior written approval of the Director of the Office of Site Remediation Enforcement (OSRE) on cost recovery settlements offering orphan share compensation to a party who rejected an earlier orphan share compensation offer, or offering greater orphan share compensation than would have been offered had the settlor entered in a work agreement (cost recovery "extraordinary cases").

Two Consultation requirements:
1)  Consult with the HQs (RSD) Orphan Share Team on all cost recovery orphan share offers.
2)  Consult with the HQs (RSD) Orphan Share Team on all *de minimis* contributor orphan share offers (*de minimis* settlements where an orphan share exists at the site).

Any time the Region is considering a significant deviation from the orphan share policy, HQs should be contacted.

26

.

**EXHIBIT 7**



Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

**H**
Caldwell Trucking PRP Group v. Spaulding
Composites Co., Inc.
D.N.J.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.
CALDWELL TRUCKING PRP GROUP, Plaintiff,
v.
SPAULDING COMPOSITES COMPANY, INC.
Defendant.
**Civ. No. 94-3531 (WGB).**

April 22, 1996.

Peter J. Herzberg, Kathy Dutton Helmer, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for Plaintiff.
John J. Dugan, Timby, Brown & Timby, Camden, NJ, for Defendant.

*OPINION*

BASSLER, District Judge:
**\*1** Plaintiff, Caldwell Trucking PRP Group (" Caldwell Trucking"), moves for partial summary judgment declaring Defendant, Spaulding Composites Company, Inc. ("Spaulding"), liable for its equitable share of cleanup costs pursuant to Sections 107(a) (cost recovery) and 113(f) (contribution) of the Comprehensive Environmental Response, Compensation and Liability Act (" CERCLA"), 42 United States Code Sections 9601 *et seq,* as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99-499, § 101 *et seq.* Spaulding cross-moves for partial summary judgment dismissing Caldwell Trucking's Section 107 claim for cost recovery, and limiting Spaulding's potential liability [FN1] to Caldwell Trucking's Section 113 contribution claim.

> FN1. The parties seek a declaration as to liability only pursuant to Sections 107(a) and 113, as opposed to the amount of

damages Caldwell Trucking may eventually recover under either section. The Court's Opinion, therefore, first addresses the legal question of whether Caldwell is potentially liable under Section 107(a) and Section 113, or whether Section 113 alone applies. The Court then addresses whether the facts establish Spaulding's liability under Section 113. The Court does not address in this Opinion the amount of damages for which Spaulding is liable, or whether Spaulding may be liable for "orphan shares," because the Court believes such an inquiry more suited to a separate hearing on damages where the Court can weigh the totality of the circumstances in arriving at an equitable distribution of costs.

Caldwell Trucking argues that Spaulding's cross-motion is "esoteric" and "premature" in that it applies only to the amount of Spaulding's liability, not the fact of Spaulding's liability. A decision as to whether Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), is applicable on the facts of this case is obviously relevant to allocation.

The practical significance of the parties' dispute is that liability under CERCLA Section 107(a), 42 U.S.C. § 9607(a) is joint and several, while liability under CERCLA Section 113, 42 U.S.C. § 9613 appears to be several. If CERCLA Section 113, 42 U.S.C. § 9613, alone applies to this case it is possible that Spaulding will not be liable for " orphan shares"-that is, shares attributable to judgment-proof parties-of the cleanup costs incurred by Caldwell Trucking. *See Gould Inc. v. A & M Battery and Tire Service,* 901 F.Supp. 906, 908 (M.D.Pa.1995) (liability under CERCLA Section 113 is several while liability under CERCLA Section 107 is joint and several; contribution defendant therefore cannot be liable for any orphan shares); *but see Fresno v. NL Industries,* 1995 U.S. Dist. Lexis (E.D.Ca.1995) (even where a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 2

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

defendant is severally liable, plaintiff does not necessarily bear the full burden of orphan shares; the court can apportion these shares equitably among the parties).[FN2]

> FN2. The Court emphasizes that it does not, on this motion seeking a summary declaration as to liability only, resolve the issue of whether Spaulding may ultimately be held liable for "orphan shares," an equitable issue that is more relevant to the quantum of Spaulding's liability than the fact of it.

Further, liability under CERCLA Section 107(a), 42 U.S.C. § 9607(a), is strict and subject only to the defenses listed in CERCLA Section 107(b), 42 U.S.C. § 9607(b), whereas liability under CERCLA Section 113(f), 42 U.S.C. § 9613(f), is subject to equitable defenses, *cf. Smith Land & Imp. Corp. v. Celotex Corp.,* 851 F.2d 86, 89 (3d Cir.1988) (" [t]he defenses enumerated in section 9607(b) are not exclusive in suits for contribution"), *cert. denied,* 488 U.S. 1029 (1989), and to an equitable showing of causation, *United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530, 1535 (10th Cir.1995) (" 'Causation' in the context of this [CERCLA Section 113(f) ] case means whether [the PRP] caused the increase in expense of remediation. If it did, that would be an equitable factor for the court to consider under Section 113(f)(1).").

The Court does not agree, therefore, that Spaulding's cross-motion is premature. Whether Section 107(a) applies in this case is ripe for summary adjudication because, among other things, Caldwell Trucking seeks summary judgment under both Section 107(a) and Section 113.

*2 For the reasons set forth below, the Court grants in part and denies in part Caldwell Trucking's motion for summary judgment and grants Spaulding's cross-motion for summary judgment.

## I. BACKGROUND

The parties are referred to this Court's earlier

Opinions in this matter, familiarity with which is assumed, for further background. *See, e.g., Caldwell Trucking PRP Group v. Spaulding Composites,* 890 F.Supp. 1247 (D.N.J.1995).

The facts material to resolution of the present motion are not in dispute.

The Caldwell Trucking Superfund Site (the "Site") is located at or near 222 Passaic Avenue in Fairfield Township, New Jersey. (Defendant's Rule 12G Statement ¶ 2). The Site was operated by Caldwell Trucking, which was incorporated in 1946 to dispose of waste from residential cesspools and septic systems. (*Id.* ).

Caldwell Trucking's business expanded over the years to include industrial and municipal customers, including Spaulding. (*Id.* ¶ 3). Caldwell Trucking alleges in its Complaint that Spaulding arranged for Caldwell Trucking to transport a lead-containing material from its facility in Clifton, New Jersey. (*Id.* ¶ 4).

Caldwell Trucking transported slurry by-product from the Spaulding Facility for a time ending in 1973, (*Id.* ¶ 6), which resulted from Spaulding's manufacture of glass-bonded mica and synthetic mica products. (Affidavit of Kathy Dutton Helmer ( "Helmer Aff."), Ex. F(3) at 15 to 43).

In 1973, Spaulding arranged to have a sample of the slurry waste analyzed in connection with an ocean-dumping permit application by Caldwell Trucking. (Plaintiff's Rule 12G Statement of Material Facts as to Which There Does Not Exist a Genuine Issue ¶ 13). The waste, according to the laboratory reports, contained lead, among other things. (*Id.* ¶ 14).

In connection with the Site investigation and remediation, the Environmental Protection Agency ( "EPA") and Caldwell Trucking arranged for the collection and analysis of samples of the soils and sludges from various locations at the Site. (*Id.* ¶ 16). Pockets of white-gray sludge, which Caldwell Trucking contends is attributable to Spaulding's slurry waste, were found and determined to contain lead content in excess of 1,000 mg/kg. (*Id.* ¶ 17).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

The EPA and Caldwell Trucking analyzed the samples using the Toxicity Characteristic Leaching Procedure ("TCLP"), and determined that TCLP lead exceeded 5 mg/l. (*Id.* at 21).

The EPA placed the Site on the National Priorities List ("NPL") in 1983. (*Id.* ¶ 22). Caldwell Trucking subsequently reached a settlement agreement with the United States to implement response actions at the Site, which was confirmed by a Consent Order entered by this Court on July 25, 1994.

Pursuant to administrative orders issued by the EPA, Caldwell Trucking has incurred in excess of $3.7 million in connection with soils remediation work [FN3] and $1.15 million on account of governmental response costs and natural resource damages. (*Id.* ¶ 29). Caldwell Trucking estimates its future response costs to be $2.3 million to complete soils remediation and $1.05 million in additional governmental response costs. (*Id.*).

> FN3. Spaulding disputes the amount of cleanup-costs that are attributable to remediation of the lead-containing soils at the Site. (*See* Defendant's 12G Statement ¶ 18). Spaulding also contends that lead-contamination at the Site stems from sources other than Spaulding's slurry waste-*e.g.*, from septic and sewage sludge. (*Id.* ¶ 19). Finally, the parties dispute whether Spaulding's slurry waste was readily identifiable because of its allegedly whitish-gray appearance. (*Id.* at 21). These factual issues appear relevant only to the allocation of costs between Caldwell Trucking and Spaulding in the event that Spaulding is liable under either Section 107 or 113. The Court need not determine the allocation of remediation costs on this motion, however. Therefore, the factual disputes identified by the parties do not preclude summary resolution of applicability of Section 107 or Spaulding's liability under Section 113(f).

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

**\*3** Summary judgment is appropriate when the " pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the nonmoving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Whether a fact is material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098 (1989).

The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the moving party satisfies this requirement, the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial. *Id.* at 324. Once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Federal Rule of Civil Procedure 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor, *Anderson,* 477 U.S. at 249, and not just "some metaphysical doubt as to material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In determining whether any genuine issues of material fact exist, the Court must resolve "all inferences, doubts, and issues of credibility ... against the moving party." *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dism'd.,* 465 U.S. 1091 (1984) ( *citing Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972)).

Since a motion for summary judgment is designed to go beyond the pleadings, factual specificity is required of a party who opposes such a motion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 4

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

*Celotex,* 477 U.S. 317, 322-23 (1986). Accordingly, in order to defeat a properly supported motion for summary judgment, a party may not merely restate the allegations of his complaint. *Farmer v. Carlson,* 685 F.Supp. 1335, 1339 (M.D.Pa.1988). Moreover, a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record. *Celotex,* 477 U.S. at 322-23. A non-moving party must point to concrete evidence in the record which supports each essential element of his case. *Id.* If the party fails to provide such evidence, then he is not entitled to a trial and the moving-party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(e).

In deciding a summary judgment motion, however, the Court's role is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 248. If the party opposing summary judgment has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the Court cannot credit the movant's version of events, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 113 S.Ct. 1262 (1993).

**\*4** The parties' dispute on this motion concerns primarily a legal question of whether one private responsible party ("PRP"), who was compelled by the EPA to incur cleanup costs under Section 106 of CERCLA, may sue another PRP under Section 107, CERCLA's cost recovery provision, or whether a PRP's remedy vis a vis another PRP is limited to Section 113, CERCLA's contribution provision.

No facts material to the disposition of this legal issue are in dispute. *See* Note 3 above. The matter is therefore ripe for summary judgment. *See Gould,* 901 F.Supp. at 909 (issue of whether a PRP under CERCLA can maintain both a Section 107 and 113 action is question of law ripe for summary disposition).

Furthermore, Spaulding has not opposed the branch of Caldwell Trucking's motion that seeks a declaration as to Spaulding's liability under Section

113(f). For the reasons set forth below, the Court's independent review of the record reveals that no genuine issues of material fact exist regarding Spaulding's liability under Section 113(f).

### B. *CERCLA's Cost Recovery and Contribution Provisions*

#### 1. *The Statutory Framework*

CERCLA Section 107, 42 United States Code Section 9607, provides, in pertinent part:
§ 9607. Liability
(a) Covered Persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date
Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section-

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substance ... shall be liable for-
(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

The 1986 SARA amendments to CERCLA added 42 United States Code Section 9613, which expressly created a right of contribution among PRP's:§ 9613. Civil Proceedings
(f) Contribution
(1) Contribution
Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

civil action under section 9606 of this title or under
section 9607(a) of this title ... In resolving
contribution claims, the court may allocate response
costs among liable parties using such equitable
factors as the court determines are appropriate.
(2) Settlement
A person who has resolved its liability to the United
States or a State in an administrative or judicially
approved settlement shall not be liable for claims
for contribution regarding matters addressed in the
settlement. Such settlement does not discharge any
of the other potentially liable persons unless its
terms so provide, but it reduces the potential
liability of the others by the amount of the
settlement.

### 2. *Caldwell Trucking's Motion for Partial Summary Judgment Under CERCLA Section 113(f)*

*5 The Court grants Caldwell Trucking's motion for
summary judgment as to Spaulding's liability under
CERCLA Section 113(f), 42 U.S.C. § 9613(f).

Recovery of response costs by a private party
pursuant to CERCLA Section 113(f), 42 U.S.C. §
9613(f), is a two-step process. Initially, a plaintiff
must provide that the defendant is liable under
CERCLA. Once that is accomplished, the
defendant's share of liability is apportioned in an
equitable manner. *Control Data Corp. v. S.C.S.C.
Corp.,* 53 F.3d 930, 934 (8th Cir.1995). The Court
addresses only the first step of this process on this
motion.

To establish Spaulding's liability under CERCLA,
Caldwell Trucking must demonstrate: (1) that
Spaulding is a responsible party as defined in
CERCLA § 107(a), 42 U.S.C. § 9607(a); (2) there
was a release or threatened release of hazardous
substances from a facility; (3) the release or
threatened release caused Caldwell Trucking to
incur costs; (4) those costs were necessary costs of
response; and (5) that the costs were consistent
with the national contingency plan.[FN4] *Control
Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 934 (8th
Cir.1995); *United States v. Alcan Aluminum Corp.,*
964 F.2d 252, 258-59 (3d Cir.1992) (not listing

consistency with national contingency plan as
element necessary to establish liability under
CERCLA Section 107).

> FN4. Courts disagree as to whether proof
> that the costs incurred were consistent with
> the national contingency plan is an
> essential element of the prima facie case as
> to liability, or whether such proof is
> relevant only as to damages. *Compare
> Ascon Properties, Inc. v. Mobil Oil Co.,*
> 866 F.2d 1149, 1152 (9th Cir.1989) (proof
> of consistency part of prima facie liability
> case) *with United States v. Kramer,* 757
> F.Supp. 397, 436 (D.N.J.1991) ("defense
> that government's response costs are
> inconsistent with the [national contingency
> plan] is only a defense to the recoverability
> of particular response costs, but not to
> liability"). The Court need not resolve
> this dispute because it concludes that the
> proofs submitted establish beyond
> reasonable dispute that the costs incurred
> were consistent with the national
> contingency plan.

### a. *Spaulding is a Responsible Party Under CERCLA Section 107(a)*

The undisputed facts of this case establish that
Spaulding is a "responsible party" under CERCLA
Section 107(a), 42 U.S.C. § 9607(a), satisfying the
first element necessary to establish Spaulding's
liability under CERCLA Section 113(f), 42 U.S.C. §
9613(f).

CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3)
, provides that "any person who by contract,
agreement or otherwise arranged for disposal or
treatment ... of hazardous substances ... shall be
liable" under CERCLA.

Spaulding concedes that for a time ending in 1973,
Caldwell transported slurry by-product from the
Mycalex/Spaulding Facility. (Spaulding's 12G
Statement ¶ 6). Undisputed deposition testimony
confirms that Spaulding arranged for Caldwell
Trucking to dispose of Spaulding's slurry

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 6

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

by-product during an approximately fifteen year period ending in 1973. (Helmer Aff. at Ex. (F) at 15-43).

The slurry by-product, furthermore, is a "hazardous substance" as that term is used in CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3). CERCLA defines "hazardous substance" as, among other things, any substance so designated by the EPA. 42 U.S.C. § 9601(14). The EPA has designated as hazardous substances: (1) "[t]he elements and compounds and hazardous wastes" listed in Table 302.4 (40 C.F.R. § 302.4(a)); and (2) a solid waste that exhibits any one of four characteristics-ignitability, corrosivity, reactivity or toxicity (40 C.F.R. § 302.4(b)). The regulations further define toxic solid waste to include waste that, "if using the Toxicity Characteristic Leaching Procedure test," indicates a presence of 5 mg/1 or more of lead. 40 C.F.R. § 261.24 and Table 1; *see also Alcan Aluminum*, 964 F.2d at 260.

*6 The slurry-waste disposed of in the Site qualifies as a "hazardous substance." Spaulding concedes that the substance contained lead, which is an element listed in Table 302.4. (*See* Defendant's 12G Statement ¶ 9). Furthermore, uncontested testimony of the project manager for the soil remediation project at the Site indicates TCLP lead well in excess of the 5 mg/1 limit imposed by the EPA regulation. (*See* McNally Aff. ¶¶ 4, 6 and Exhibits C, G-J)).

Spaulding submits no evidence of record in opposition to this testimony. Spaulding, having admittedly arranged for the disposal of hazardous substances at the Site, is a responsible party within the meaning of CERCLA Section 107(a), 42 U.S.C. § 9607(a).

b. *The Release of Hazardous Substances Caused Caldwell Trucking to Incur Response Costs*

Spaulding does not seriously contest that the release of its lead-containing slurry waste at the Site caused Caldwell Trucking to incur response costs. Further, the evidence of record establishes beyond cavil that such is the case.

CERCLA's characteristically lengthy definition of " release" is as follows:
any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which [sic] results in exposure to persons solely within a workplace, with respect to a claim which [sic] such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, by-product, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act, or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 7912(a)(1) or 7942(a) of this title and (D) the normal application of fertilizer.

42 U.S.C. § 9601.

The facts of record indicate that Spaulding's slurry waste was poured, discharged or dumped into the Site. (*See generally* Affidavit of George O'Connor at 15-42, Ex. F. to Helmer Affidavit). The slurry waste was therefore "released" within the meaning of CERCLA.

Furthermore, it is clear from the record that Caldwell Trucking incurred "response" costs as a result of removing the lead-containing waste. *See* 42 U.S.C. § 9601 (defining "respond" and "response " as meaning "remove, removal, remedy, and remedial action" including enforcement actions relating thereto).

Caldwell Trucking's actions were taken in response to government orders indicating the need to remove the contaminated soils. (*See* Helmer Affidavit at Exhibit G and Exhibit H, Record of Decision

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

Page 7

Amendment authored by EPA ("Metals, primarily lead, cadmium and mercury, volatile organic compounds (VOCs), polynuclear aromatic hydrocarbons (PAHs), and polychlorinated biphenyls (PCBs) were detected in on-site subsurface soils. Lead, PCBs, and PAHs were also detected in on-site surface soils. Lead is the primary metal of concern in both the surface and subsurface soils.").

*7 Once again, Spaulding has not contested this version of events. The costs Caldwell Trucking incurred in implementing the EPA's remediation plan were clearly costs of response within the meaning of CERCLA.

c. At Least Some of Caldwell Trucking's Costs Were Necessary Costs of Response

At least some of the costs associated with the remediation of the Site were "necessary costs of response" within the meaning of CERCLA.[FN5]

> FN5. The Court need not address whether all the costs incurred by Caldwell Trucking were "necessary costs of response" in order to conclude that Spaulding is liable under CERCLA Section 113, 42 U.S.C. § 9613.

In April 1993, the EPA issued, pursuant to Section 106 of CERCLA, an Administrative Order to Caldwell Trucking, directing it to pay for the remediation of soils and sludges at the Site. (Helmer Aff. at Ex. G. ¶ 45). Spaulding does not contest that Caldwell Trucking has incurred substantial costs in remediating the Site pursuant to the EPA's order. (Herzberg Cert. ¶¶ 3-5).

"Necessary costs" under CERCLA include costs incurred to perform EPA-approved or mandated response actions, as well as costs that are otherwise "compulsory" or "logically unavoidable." Allied Corp. v. Acme Solvents Reclaiming, Inc., 691 F.Supp. 1100, 1106-07 (N.D.Ill.1988). (See Defendant's 12G Statement ¶ 18 ("Spaulding does not dispute that [Caldwell Trucking] has spent

money in connection with the clean-up of the Site"). It is clear from the record that at least part of the costs incurred by Caldwell Trucking were incurred to perform EPA-mandated response actions and are therefore "necessary response costs" under CERCLA.

d. At Least Some of Caldwell Trucking Costs Were Consistent with the National Contingency Plan

Finally, Spaulding does not seriously dispute that at least some of Caldwell Trucking's response costs were consistent with the national contingency plan ("NCP"), codified at 40 C.F.R. § 300 et seq.

The NCP specifies the prerequisites and procedures that apply to removal and remedial actions under CERCLA. For remedial actions, defined as actions "intended to restore long-term environmental quality," Artesian Water Co. v. Gov. of New Castle County, 659 F.Supp. 1269, 1278 (D.Del.1987), aff'd, 851 F.2d 643 (3d Cir.1988), the NCP requires that there be a remedial investigation and feasibility study of the site that: assesses site conditions; performs risk assessments; evaluates alternative remedies; and develops and provides access to a public record documenting the remedial investigation. Further, the NCP requires that public hearings be held. 40 C.F.R. § 300.430.

The Site's remediation followed all these procedures. (See Record of Decision Amendment, filed by EPA on 2/27/95, Helmer Aff. at Ex. H. at 1 (the "modified remedy [for the Site] was selected in accordance with the requirements of [CERCLA] and to the extent practicable, the NCP. 40 C.F.R. Part 300.")). The Record of Decision Amendment lists the investigation, feasibility studies, remedy evaluation activities, and public hearings that preceded selection of the modified remedy. (See Helmer Aff. Ex. H at 1-7). The Record of Decision Amendment also describes the designated NCP criteria the EPA evaluated in selecting the remedy. (Id. at 6-7). Furthermore, the EPA has supervised and controlled the remediation of the Site. (Helmer Aff. Ex. G (EPA Order regarding remediation of the Site)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 8

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

*8 Spaulding submits no evidence contesting Caldwell Trucking's assertions regarding the Site's remediation, which are amply supported by the record. This evidence clearly establishes that at least a portion of the costs incurred by Caldwell Trucking were consistent with the NCP.

The unopposed factual submissions of Caldwell Trucking establish that Spaulding is liable under Section 113 for its equitable share of cleanup costs at the Site. Accordingly, the Court grants Caldwell Trucking's motion for summary judgment insofar as it seeks a declaration of liability under CERCLA Section 113(f), 42 U.S.C. § 9613(f).

The issue becomes, then, whether a claim by a private PRP against another private PRP can be brought under CERCLA Section 107(a), 42 U.S.C. § 9607(a), as well.

### 3. Implied and Express Contribution Actions Under CERCLA

Prior to the enactment of CERCLA Section 113(f), 42 U.S.C. § 9613(f), district courts interpreted CERCLA Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), as creating a private right of action in contribution in favor of a private party that had incurred cleanup costs against other potentially responsible parties. See Key Tronic Corp. v. United States, 128 L.Ed.2d 797, 805 n. 7 (1994) (discussing history of implied right of action under Section 9607); Walls v. Waste Resource Corp., 761 F.2d 311 (6th Cir.1985) (district courts were virtually unanimous in holding that Section 9607(a)(4)(B) created a private right of action for the recovery of necessary response costs).

The existence of CERCLA Section 113(f), 42 U.S.C. § 9613(f), has confused the status of the implied right of contribution under CERCLA Section 107(a), 42 U.S.C. § 9607(a). See, e.g., Key Tronic Corp. v. United States, 128 L.Ed.2d 797, 805 (1994) (CERCLA "now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107").

The Third Circuit has yet directly to address whether, and in what circumstances, an implied right of contribution under CERCLA Section 107(a), 42 U.S.C. § 9607(a), survives the enactment of CERCLA Section 113(f), 42 U.S.C. § 9613(f). At least three other Circuits, the First, Seventh and Tenth, have explicitly addressed this issue, however. They unanimously conclude, after an exhaustive survey of the caselaw and CERCLA's legislative history, that a claim by one PRP against a second PRP is a contribution claim governed by CERCLA Section 113, 42 U.S.C. § 9613, not a cost recovery action under CERCLA Section 107, 42 U.S.C. § 9607(a). See United States v. Colorado & Eastern R.R. Co., 50 F.3d 1530, 1534 (10th Cir.1995); Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 764-65 (7th Cir.1994); United Technologies v. Browning-Ferris Industries, 33 F.3d 96, 103 (1st Cir.1994). FN6 For the reasons stated below, the Court agrees.

> FN6. See also Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 935 (8th Cir.1995) (holding without discussion that recovery of response costs by a PRP from another PRP involves the application of Section 113(f)); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 672 (5th Cir.1989) (holding, without extensive discussion, that "[w]hen one liable party sues another to recover its equitable share of the response costs, the action is one for contribution, which is specifically recognized under CERCLA").

In United Technologies, the EPA initiated suit against United Technologies's predecessor, Inmont ( "UT"), and others pursuant to CERCLA Section 106, 42 U.S.C. § 9606. The parties settled as embodied in a consent decree entered by the district court. United Technologies, 33 F.3d at 97. UT agreed to complete work at the contaminated site in accordance with a plan for remedial action. Id. After incurring substantial costs of remediation, but before completion of cleanup activities, UT initiated suit against other PRP's. UT argued that the recovery of costs it incurred to cleanup the contaminated site from other PRP's constituted an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 9

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

action under CERCLA Section 107(a), 42 U.S.C. §
9607(a), not an action under CERCLA Section
113(f), 42 U.S.C. § 9613(f). *Id.* at 98. The
practical significance of the distinction in *United
Technologies* was that an action under CERCLA
Section 113(f), 42 U.S.C. § 9613(f), would have
been time barred under CERCLA's statute of
limitations, 42 U.S.C. § 9613(g), while an action
under CERCLA Section 107(a), 42 U.S.C. § 9607(a)
, would not have been.

*9 First, the First Circuit examined the statutory
language. Under accepted canons of construction,
the First Circuit reasoned, legal terms used in
framing a statute are presumed to convey their
customary legal meaning. *Id.* at 99. The word "
contribution," as used in CERCLA Section 113(f),
42 U.S.C. § 9613(f), should therefore be accorded
its customary legal meaning-to wit, a claim "by and
between jointly and severally liable parties for an
appropriate division of the payment one of them has
been compelled to make." *Id.* (citing *AKZO
Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 764
(7th Cir.1994)).

The First Circuit next examined prior caselaw and
the legislative history surrounding passage of
SARA to conclude that the term "contribution" in
CERCLA Section 113(f), 42 U.S.C. § 9613(f),
should be accorded its ordinary meaning. *United
Technologies,* 33 F.3d at 99. Both the House and
Senate committees responsible for drafting SARA
viewed what is now section 9613(f) as codifying
existing caselaw and "clarify[ing] and confirm[ing]
the right of a person held jointly and severally liable
under CERCLA to seek contribution from other
potentially liable parties, when the person believes
that it [sic] has assumed a share of the cleanup or
cost that may be greater than its [sic] equitable
share under the circumstances." S.Rep. No. 11,
99th Cong., 1st Sess. 44 (1985).

Declining appellant's invitation to "rewrite
[CERCLA] by the simple expedient of calling a
camel a horse, overlooking obvious humps," *United
Technologies,* 33 F.3d at 102, the First Circuit
concluded that UT's action, which consisted of a
claim by one responsible party to recover from
another responsible party that portion of its costs

that were in excess of its pro rata share of the
aggregate response costs, "clearly qualifie[d] as an
action for contribution under Section 9613(f)(1)."
*Id.* at 103. Further, "because CERCLA's text
indicates that contribution and cost recovery actions
are distinct, non-overlapping anodynes [sic] FN7,"
the First Circuit concluded that the shorter statute of
limitations applicable to actions brought under
CERCLA Section 113(f), 42 U.S.C. § 9613(f),
applied to UT's claim.

> FN7. While the Court endorses and adopts
> much of Judge Selya's opinion in *United
> Technologies,* it cannot endorse his use of
> the word "anodyne," which the Court
> understands to mean "a drug that allays
> pain (as an opiate or narcotic)" or "
> something that soothes, calms, or comforts.
> " Webster's *Third New International
> Dictionary* at 88 (1976). Having
> examined the "layman's" dictionary for a
> meaning of the word "anodyne" that
> seemed consonant with the remainder of
> Judge Selya's sentence, and concerned that
> none of the definitions listed by Webster's
> accorded "anodyne" such a meaning, the
> Court turned to Black's Law Dictionary to
> see if "anodyne" has a different meaning in
> a legal context. Alas, the Court's search of
> Black's was fruitless. Since "opiate"
> doesn't appear to coincide with the
> intended meaning of "anodyne" as used by
> Judge Selya, the Court will interpret the
> word to mean "avenue of relief."

The First Circuit also addressed the Supreme
Court's decision in *Key Tronic Corp. v. United
States,* 128 L.Ed.2d 797, 805 (1994), which stated,
in *dictum,* that CERCLA "now expressly authorizes
a cause of action for contribution in § 113 and
impliedly authorizes a similar and somewhat
overlapping remedy in § 107."

The First Circuit wrote that "envisioning
contribution and cost recovery actions as
nonoverlapping is perfectly consistent with the
Court's recent determination that 42 U.S.C. §§ 9613
and 9707(a) create 'similar and somewhat

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                  Page 10

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

overlapping' actions for contribution." *United Technologies,* 33 F.3d at 103 n. 12. *Key Tronic,* the First Circuit reasoned, discussed two different species of contribution actions, not the relationship between a cost recovery action under CERCLA Section 107, 42 U.S.C. § 9607, and a contribution action under CERCLA Section 113, 42 U.S.C. § 9613. The First Circuit also posited, without holding, that an implied cause of action for contribution under CERCLA Section 107(a), 42 U.S.C. § 9607(a), might still exist despite the enactment of CERCLA Section 113, 42 U.S.C. § 9613, for a PRP who spontaneously initiates a cleanup without governmental prodding. *Id.* at 99 n. 8; *cf. Fisher Development Co. v. Boise Cascade Corp.,* 37 F.3d 104 (3d Cir.1994) (affirming without discussion lower court's decision applying CERCLA Section 107 to claim between PRP's when plaintiff voluntarily initiated cleanup).

**\*10** Caldwell Trucking attempts to distinguish *United Technologies* by pointing out: (1) that the First Circuit's ruling addressed the availability of CERCLA Section 107(a), 42 U.S.C. § 9607(a), to a PRP in the context of resolving a statute of limitations issue; and (2) that the plaintiffs in *United Technologies* admitted liability.

As an initial matter, Caldwell Trucking, by its inclusion in the consent decree entered in this case, appears to have admitted liability to the same extent as the plaintiff in *United Technologies.* Even if Caldwell Trucking has not conceded its status as a PRP, it appears clear from the record in this case that it is. In any event, the Court does not read the First Circuit's holding in *United Technologies* to turn upon whether UT admitted liability. The distinction is, therefore, without consequence. *See New Castle County v. Halliburton Nus Corp.,* 903 F.Supp. 771, 779 (D.Del.1995) (fact that plaintiffs did not make formal admission of liability did not render CERCLA Section 107(a) applicable to claim where plaintiff-PRP had incurred substantial liability and sought to apportion costs among other PRP's).

Similarly, the Court does not read the holding in *United Technologies* as limited to cases involving the application of CERCLA's statute of limitations

provisions. *See United Technologies,* 33 F.3d at 103 ("The word 'contribution' should be given its plain meaning. Adapted to an environmental case, it refers to an action by a responsible party to recover from another responsible party that portion of its costs that are in excess of its pro rata share of the aggregate response costs").

The Court, finding the First Circuit's reasoning persuasive, adopts the holding in *United Technologies* and applies it to the facts of this case. Caldwell Trucking's claim, which seeks to hold Spaulding liable for its equitable share of costs incurred in connection with cleanup of the Site, is a paradigmatic example of a contribution claim. Caldwell Trucking's cause of action, therefore, is limited to CERCLA Section 113(f), 42 U.S.C. § 9613(f).

The Court finds support for its conclusion that Caldwell Trucking's claim is under CERCLA Section 113(f), 42 U.S.C. § 9613(f), in the holdings of several other Circuit Courts of Appeal, and in a case from the Third Circuit implying that suits between PRP's seeking an allocation of costs incurred pursuant to a compelled remediation under CERCLA is not a claim under CERCLA Section 107(a), 42 U.S.C. § 9607(a).

In *Smith Land & Imp. Corp. v. Celotex Corp.,* 851 F.2d 86 (3d Cir.1988), the Third Circuit addressed the availability of the equitable defense, *caveat emptor,* to a suit for contribution under CERCLA. In *Smith Land,* the EPA informed the site owner that unless it remediated the site, the EPA would perform the work and seek recovery of its costs. The owner of the site settled with the EPA, incurred costs remediating the site, and then sued the prior owner of the site under CERCLA Section 107(a), 42 U.S.C. § 9607(a).

**\*11** Although not specifically addressing whether CERCLA Section 107(a), 42 U.S.C. § 9607(a), or CERCLA Section 113(f), 42 U.S.C. § 9613(f), applied, the Third Circuit held that "[t]he defenses in Section 9607(b) are not exclusive in suits for contribution." *Id.* at 89. By recognizing the non-exclusivity of Section 9607(b)'s defenses in those circumstances, the Third Circuit implicitly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 11

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

held that CERCLA Section 107(a), 42 U.S.C. § 9607(a) is inapplicable to CERCLA contribution suits. *See Gould Inc. v. A & M Battery and Tire Service,* 901 F.Supp. 906, 910 (M.D.Pa.1995) (" [T]he Third Circuit all but recognized that a cost recovery claim by a private PRP is a claim for contribution under Section 113 of CERCLA because a § 107(a) cost recovery action has only the limited defenses specified in § 107(b)").

Similarly, in *Witco Corp v. Beekius,* 38 F.3d 682 (3d Cir.1994), the Third Circuit again implicitly recognized that a suit by a site owner, who had signed a consent order with the EPA, against another PRP was a contribution claim under CERCLA Section 113(f), 42 U.S.C. § 9613(f), rather than a cost recovery claim under CERCLA Section 107(a), 42 U.S.C. § 9607(a). *See id.* at 689 (applying statute of limitation applicable to CERCLA Section 113(f) claim).

While Third Circuit opinions contain implicit support for the Court's holding in this Opinion, the decisions of other Circuit courts provide explicit support.

In *United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530 (10th Cir.1995), the Tenth Circuit considered the applicability of CERCLA Section 113(f), 42 U.S.C. § 9613(f), to facts remarkably similar to the case before this Court. As in this case, the EPA filed suit against all known PRP's. *Id.* at 1533. Several of the PRP's settled with the EPA as reflected in a partial consent decree. The defendants in the EPA action filed cross-claims against each other, all of which settled, save for one. In that claim, the cross-claimant sought to recover, under both CERCLA Section 107(a), 42 U.S.C. § 9607(a), and CERCLA Section 113(f), 42 U.S.C. § 9613(f), cleanup expenses it incurred. *Id.* at 1533. The district court concluded, as a matter of law, that the cross-claimant was entitled to recover its costs jointly and severally under CERCLA Section 107(a), 42 U.S.C. § 9607(a). *Id.* at 1534.

The Tenth Circuit reversed, stating:
Whatever label [the cross-claimant] may wish to use, its claim remains one by and between jointly

and severally liable parties for an appropriate division of the payment one of them has been compelled to make. Accordingly, we hold, as a matter of law, that [the cross-claimant's] claim is controlled by § 113(f) and that the district court erred in proceeding under § 107.

*Colorado & Eastern,* 50 F.3d at 1536.

The Seventh Circuit reached an identical result in *Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761 (7th Cir.1994). In *Akzo,* the plaintiff brought suit for contribution under CERCLA Sections 107(a) and 113(f), 42 U.S.C. §§ 9607(a) & 9613(f), against a number of companies that entered into a consent decree with the government. *Id.* at 762. The Seventh Circuit concluded that Akzo's claim, which sought an appropriate division of payments between jointly and severally liable parties, constituted a " quintessential claim for contribution" governed exclusively by CERCLA Section 113(f), 42 U.S.C. § 9613(f). *Id.* at 764.

**\*12** Caldwell Trucking attempts to circumvent the import of these cases by limiting their holdings to situations where a PRP sues another PRP who has settled with the government. Courts uniformly reject plaintiffs' attempts in those circumstances to make an "end-run" around the damages immunity provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), to persons who have resolved their liability to the government.[FN8] *See United States v. SCA Services of Indiana, Inc.,* 849 F.Supp. 1264, 1272-77 (N.D.Ind.1994) (collecting cases); *New Castle County v. Halliburton Nus Corp.,* 903 F.Supp. 771, 778 (D.Del.1995); *United Technologies,* 33 F.3d at 102-103; *Colorado & Eastern,* 50 F.3d at 1536.

> FN8. The record does not indicate whether Spaulding has or has not entered a settlement in this case.

Two district courts have considered and rejected the very argument Caldwell Trucking advances. In *Ekotek Site PRP Committee v. Self,* 881 F.Supp. 1516, 1521 (D.Utah 1995), the District of Utah persuasively dismissed the contention that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

reasoning of *Colorado & Eastern* and *United Technologies* was limited to situations involving settling PRP's seeking the shelter of CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2):

[Plaintiff] attempts to distinguish *Colorado & Easter Rd.,* as well as the district court decisions taking a similar position, on two grounds. First, that in those cases the responsible parties had not, like the [plaintiff], "voluntarily" incurred response costs by assisting in the cleanup operations of the various sites, and second, that the plaintiffs in those actions were suing parties which had already settled their liability with the EPA.

[Plaintiff's] arguments have been found persuasive by other courts. *See Companies for Fair Alloc'n,* 853 F.Supp. at 580 (making similar distinctions). But *Colorado & Eastern Rd.* cannot be disposed of on such a basis; the broad language of the court's opinion prevents such an interpretation. The existence of such settlements plays no substantial role in the court's discussion of the issue.

*In re Matter of Reading Co.,* 900 F.Supp. 738, 749 (E.D.Pa.1995) also rejected Caldwell Trucking's argument:Whenever possible, courts should interpret a single statutory provision uniformly.... [T]here is substantial authority indicating that the term "contribution" as used in § 9613 must be given its plain meaning. *See, e.g., United Tech.,* 33 F.3d at 101. Thus, it follows that outside of the non-settling/settling-PRP context, the word contribution as used in § 9613(f) should also be given its plain meaning. Such an interpretation contributes to a uniform construction of CERCLA, a statute already widely criticized for its complexity and poor draftsmanship. *See In re Chicago, Milwaukee St. Paul & Pacific Railroad,* 3 F.3d 200, 201 (7th Cir.1993).

The Court agrees with its sister courts in Pennsylvania and Utah that uniformity of interpretation, accepted cannons of construction and CERCLA policies require that where one PRP sues another PRP for equitable apportionment of CERCLA costs, the claim is one for contribution governed by CERCLA Section 113(f), 42 U.S.C. § 9613(f).

*\*13* Caldwell Trucking cites a bevy of district court cases holding that a PRP may maintain a CERCLA Section 107(a) cost recovery action against another PRP notwithstanding CERCLA Section 113(f). *See Bethlehem Iron Works v. Lewis Indus.,* 891 F.Supp. 221 (E.D.Pa.1995) (holding that, in absence of showing that defendant PRP settled and would therefore be eligible for contribution protection pursuant to CERCLA Section 113(f)(2), PRP could sue another PRP under either CERCLA Section 107(a) or CERCLA Section 113(f)); *Companies for Fair Allocation v. Axil Corp.,* 853 F.Supp. 575, 580-81 (D.Conn.1994); *FMC Corp. v. U.S. Dept. of Commerce,* 786 F.Supp. 471, 486 (E.D.Pa.1992), *aff'd,* 29 F.3d 833 (3d Cir.1994) [FN9]; *Transportation Leasing v. State of California,* 861 F.Supp. 931, 938 (C.D.Cal.1993) (CERCLA permits third-party plaintiffs to sue under CERCLA Section 107); *Burlington Railroad v. Time Oil Co.,* 738 F.Supp. 1339 (W.D.Wash.1990); *Charter Township of Oshtemo v. American Cyanamid Co.,* 910 F.Supp. 332 (W.D.Mich.1995).[FN10]

> FN9. The *FMC* case involved a claim, under Section 107(a), by a current owner of land against the United States, as a former owner of the land. Though the Third Circuit affirmed the district court's imposition of liability under Section 107, it did not address the applicability of Section 107 in suits between two PRP's. The Court does not read the *FMC* affirmance, therefore, as controlling precedent in the resolution of the controversy before the Court.

> FN10. A similarly numerous list of district court decisions reject the application of Section 107(a) to claims among PRP's. *See Matter of Reading Co.,* 900 F.Supp. 738, 744 (E.D.Pa.1995) (holding, without discussing Section 107(a), that suits between PRP's to recover CERCLA cleanup costs are contribution claims governed by Section 113); *New Castle County v. Halliburton Nus Corp.,* 903 F.Supp. 771, 779-80 (D.Del.1995) (adopting *United Technologies* and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

holding that claims among PRP's are governed by Section 113(f)); *Gould v. A & M Battery and Tire Service,* 901 F.Supp. 738 (M.D.Pa.1995); *Matter of Reading Co.,* 900 F.Supp. 738 (E.D.Pa.1995); *Reichhold Chemicals, Inc. v. Textron, Inc.,* 888 F.Supp. 1116 (N.D.Fla.1995); *Ekotek Site PRP Committee v. Self,* 881 F.Supp. 1516 (D.Utah 1995); *Transtech Industries, Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079 (D.N.J.1992).

Some of the district court cases are distinguishable ( *see, e.g., Town of Wallkill v. Tesa Tape, Inc.,* 891 F.Supp. 955 (S.D.N.Y.1995) (permitting municipal PRP to assert CERCLA Section 107(a) claim against private PRP)), while some are not (*see, e.g., United States v. SCA Servs. of Indiana, Inc.,* 849 F.Supp. 1264, 1284 (N.D.Ind.1994) (allowing PRP to pursue a Section 107 claim was "supported by the fundamental policy underlying CERCLA: encouraging negotiated private party cleanup of hazardous waste sites").

Many of the district court cases rely on policy arguments favoring an interpretation of CERCLA that allows PRP's to maintain CERCLA Section 107(a) actions against other PRP's. *See, e.g., Charter Township of Oshtemo,* 910 F.Supp. at 337 ( "By permitting parties, including liable parties, to have a private right of action under section 107 to recover all costs incurred by such parties, except for those which may be owed back as their equitable share of contribution in a section 113 action, it encourages 'prompt and complete response actions to ... dangerous contamination' "); *Companies for Fair Allocation,* 853 F.Supp. at 579 (same).

However salutory such policies may be, they cannot override the plain language of the statute. *See West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 98-99 (1991); *Demarest v. Manspeaker,* 498 U.S. 184, 190 (1991); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989); *Pennsylvania Dept of Public Welfare v. Davenport,* 495 U.S. 552, 557-58 (1990); *Caminetti v. United States,* 242 U.S. 470, 485 (1917); *Chisom v. Roemer,* 111 S.Ct. 2354, 2369 (1991) (Scalia, J.) (dissenting opinion). In the Court's view, allowing

policy arguments to trump the plain meaning of the statute subverts customary methods of statutory interpretation and constitutes judicial legislation of a kind to be avoided. Accordingly, the Court follows the Courts of Appeal that have accorded the word "contribution" its customary meaning despite the potential attraction of policy arguments to the contrary.

**\*14** As discussed above, Caldwell Trucking's claim, which seeks an equitable apportionment of costs among jointly and severally liable parties, is a typical example of a contribution claim governed by the express provisions of CERCLA Section 113(f), 42 U.S.C. § 9613(f). To the extent the cases cited by Caldwell Trucking hold otherwise, the Court declines to follow them. *See Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 764-65, 765 n. 5 (7th Cir.1994) (declining to follow district court cases concluding that claims among PRP's are not governed by CERCLA Section 113(f)).

Accordingly, the Court grants Spaulding's cross-motion for summary judgment dismissing Caldwell Trucking's claim against Spaulding insofar as it seeks recovery under CERCLA Section 107(a), 42 U.S.C. § 9607(a).

### III. CONCLUSION

For the foregoing reasons, the Court grants Caldwell Trucking's motion insofar as it seeks a declaration that Spaulding is liable under CERCLA Section 113(f), 42 U.S.C. § 9613(f), and denies Caldwell Trucking's motion insofar as it seeks a declaration that Spaulding is liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a). Further, the Court grants Spaulding's motion for summary judgment dismissing Caldwell Trucking's Complaint insofar as it seeks to hold Spaulding liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a).

D.N.J.,1996.
Caldwell Trucking PRP Group v. Spaulding Composites Co., Inc.
Not Reported in F.Supp., 1996 WL 608490 (D.N.J.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.