IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, <br><br> Plaintiffs, <br> v. <br><br> ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., <br><br> Defendants. | Civil Action No. 02-CV-3830 (LDD) |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO PURSUE LIMITED ADDITIONAL DISCOVERY

Plaintiffs Agere Systems, Inc. ("Agere"), Cytec Industries Inc., Ford Motor Company, SPS Technologies, LLC and TI Group Automotive Systems LLC ("TI")(collectively "Plaintiffs") hereby respectfully submit this Memorandum in Opposition to Defendants' Motion for Leave to Pursue Limited Additional Discovery. This motion seeks unnecessary and improper discovery, and should be denied.

## INTRODUCTION

This phase of the litigation is governed by the Tenth Case Management Order (the "CMO"). The CMO required, *inter alia*, Defendants to file any motions requesting supplemental discovery on or before June 29, 2007. It further provided: "In such motions, defendants shall specifically delineate (a) the scope of the supplemental discovery (names of witnesses to be deposed; nature of their testimony; anticipated duration of the individual depositions, etc.), (b) the relevance of the supplemental discovery, and (c) an explanation as to why the discovery was previously unavailable or was not previously sought." CMO No. 10 at (B)(1). These

requirements were no doubt established in recognition of the fact that all fact discovery had initially been scheduled to conclude on January 10, 2005 (CMO No. 5), was then extended for an additional four weeks (CMO No. 6), and again, at the request of the Defendants and with a representation to the Court that all discovery could be completed in this "final" period, until March 18, 2005. CMO No. 7. Indeed, Defendants argued in their 2005 motions seeking to compel responses to contention interrogatories and for additional discovery that the need for any such discovery would be necessary only if the additional Plaintiff responses sought were deficient. Techalloy Memorandum in support of Motion to Compel Responses to Interrogatories and for Extension of Fact Discovery Period at 14 ("Techalloy/RSM will need to evaluate the substance of BFAG's full responses in order to determine if further fact discovery is necessary").

Plaintiffs have provided appropriate responses to the voluminous contention interrogatories served by Defendants, as set forth fully in Plaintiffs' June 15, 2007 memorandum in opposition to the various motions to compel that are *sub judice*. Plaintiffs additionally provided significant additional information in their May 7, 2007 letter responding to the concerns and objections expressed by Defendants in their April 30, 2007 letters identifying "all perceived deficiencies in plaintiffs' responses to the contention interrogatories." CMO No. 10 at A. A copy of Plaintiffs' May 7, 2007 letter is attached hereto marked Exhibit "A." Plaintiffs provided amended and supplemented information in their July 12, 2007 letter to Defendants, including copies of certain corporate documents relating to Agere and TI.

Defendants have all of the discovery to which they are entitled. Defendants' motion should be denied.

# ARGUMENT

**Plaintiffs' Allocation of Response Costs**

Defendants' request for discovery concerning "internal allocations" conducted by Plaintiffs to arrive at the interim allocations of response costs each of the Plaintiffs has been contributing for the last seven years confuses the *result* of the discussions with the discussions themselves. Defendants have been aware since at least September 28, 2004 of the exact dollar amounts contributed by each Plaintiff (and by NRM Investment Company ("NRM") and Worthington Steel Company - Malvern ("Worthington"), the other two members of the OU-1 Group) to each of the trust accounts used to pay contractors performing the remedial actions, to reimburse EPA's past costs claim and pay its on-going oversight costs, and to fund other Group costs. Attached hereto marked Exhibit "B" is an e-mail of that date to Defendants attaching trust ledgers from the Pitney Hardin trust accounts. Plaintiffs' May 7, 2007 letter explains in great detail the information set forth in the previously-produced Group accounting documents as well as the precise method by which Plaintiffs have determined each Group member's share of the various categories of costs sought in this action. May 7, 2007 letter at 4-7. Defendants thus do not seek any discovery concerning the actual payment of response costs or the actual "internal allocations" by which each Plaintiff paid those costs. Instead, they solely seek discovery concerning the *process* by which those allocations were set. They are not entitled to this information for several reasons.

Discovery with respect to any internal allocation processes could have been sought during any of the previous fact discovery periods. Defendants' explanation that they did not take discovery before now "because the documents that referenced these allocation activities amongst the Plaintiffs were not produced to the Repository until April 18, 2005, a month after

DMEAST #9824442 v2                                3

fact discovery closed" is both preposterous on its face and factually incorrect.[1] It has been self-evident since the beginning of this action that Plaintiffs *must* have had some discussions amongst themselves to reach agreements as to how various categories of response costs would be funded by the members of the OU-1 Group and the OU-2 Group. Defendants did not become suddenly aware that such discussions must have taken place by reviewing the documents they discuss at pages 4-6 of their Brief. It is important to note as well that one of the Defendants, NRM, joined in Defendants' Motion. NRM is and has always been a member of the OU-1 Group. It most certainly knows not only of the existence of discussions concerning the interim allocations relevant to the OU-1 Group, but it knows all of the details of those discussions. The other Defendants have known since the inception of this action that NRM is a member of the OU-1 Group and could simply have asked NRM about any allocation discussions.

Moreover, Plaintiff produced years ago all or most of the documents identified now by Defendants as "not produced to the Repository until April 18, 2005." Plaintiffs responded to Defendants' initial written discovery requests on September 14, 2004. A copy of the letter producing those responses is attached hereto marked as Exhibit "C." Six days later, Plaintiffs provided to Defendants, *inter alia*, a detailed index of the documents available for inspection and copying at Pitney Hardin, one of the firms utilized by Plaintiffs to retain Group records. A copy of the September 20, 2004 e-mail and attached detailed index is attached hereto marked as Exhibit "D." The PRP Group Agreement, the Agreement in Principle (Index at Box

---

[1] Defendants' Brief is rife with incorrect and unsupported statements concerning Plaintiffs' alleged refusal to produce certain information and "positions" Plaintiffs have alleged taken with respect to discovery. This Brief, and Plaintiffs' actual responses to Defendants' contention interrogatories, accurately states the comprehensive identification of documents and testimony provided by Plaintiffs to Defendants and Plaintiffs actual view of their discovery obligations.

F), the Barkett Agreement, resume of Mr. Barkett, and background information on Mr. Barkett (Index at Box O2), Agere comments on Non-Binding Allocation Agreement, Confidentiality Agreements dated October 24, 2000, and PRP Group Agreement (Index at Box T2) each appear on that Index. All of the information necessary to confirm the obvious -- that Plaintiffs, NRM, and Worthington had initial discussions on how to allocate temporarily response costs -- has thus been available to Defendants for almost three years.[2]

Defendants thus could have sought discovery concerning Plaintiffs' internal allocations years ago. Plaintiffs' accounting documents (produced to Defendants) show that there have been no changes to the initial allocated shares of the various OU-1 and OU-2 Group counts since 2000, except as they relate to the recent settlement between Agere Systems, Inc. and the other four Plaintiffs.

Defendants have also failed to explain why information about the allocation *process* is relevant. They say only that the "results of the allocation are relevant," Defendants' Brief at 4, and then summarily state that they "need" to "understand the internal allocation of response costs." Defendants' Brief at 6-7. *What* each Plaintiff has contributed to the response costs sought here is admittedly relevant and has been provided.[3] *Why* the Plaintiffs agreed to contribute those amounts or *how* they reached that agreement are not relevant.

---

[2]  Ms. Sands's Declaration is particularly distressing given the fact that Thomas Sabino, the Wolff & Samson, P.C. lawyer in charge of this matter for AETC until he was just recently replaced by Ms. Sands, was provided with the Index again and actually visited the Pitney Hardin repository on November 11, 2004. *See* November 10, 2004 e-mail attached hereto marked Exhibit "E." Ms. Sands's statement was thus not only flat out false, it was at least recklessly so.

[3]  Plaintiffs disagree with many of the statements and arguments made in pages 13-14 of
(continued...)

Even if the information was relevant, each of the seven categories of documents now sought were created in conjunction with compromise negotiations amongst Plaintiffs, NRM, and Worthington and are thus not subject to discovery. Any discussions those entities had amongst themselves or, had there been any, with Mr. Barkett (the alleged Allocation Consultant) constitute compromise negotiations.[4] Such discussions, including the statements made in documents exchanged in conjunction with such discussions, are protected from disclosure by Fed. R. Evid. 408. For the same reasons, any deposition of Mr. Bergere, common counsel to the OU-1 and OU-2 Groups with respect to matters other than this litigation, is prohibited to the extent that Defendants would ask Mr. Bergere about how the various allocations were reached. There is no need to depose Mr. Bergere with respect to what the various allocations *are* because that information has been provided to Defendants.[5]

---

(...continued)
    Defendants' Brief. Because those statements relate only to the relevance of the actual payments made by Plaintiffs and not to why Plaintiffs agreed to make such payments, Plaintiffs will not otherwise address them here.

[4]    Mr. Barkett in fact never conducted any settlement or other allocation discussions with Plaintiffs and does not have any of the information Defendants seek. Indeed, Defendants were told at the inception of this action in a July 11, 2002 meeting held by Plaintiffs after filing of the Complaint but before service of process that Plaintiffs were willing for Mr. Barkett to conduct an alternative dispute resolution process that would include Plaintiffs and all of the initial Defendants. As reflected in the initial Case Management Order herein, Defendants chose to litigate Plaintiffs' claims instead of undertaking that ADR process.

[5]    Such discussions are also protected by joint defense agreements. For example, two of the documents Defendants rely upon, agreements between Group members, expressly state that all communications between those members are confidential. *See* Exhibit "A" to Defendants' Brief at page 54 of 111 (PHKS061024) and page 71 of 111 (BSAI075483).

Defendants' request should therefore be denied because it does not seek relevant information, and because this discovery could have been sought years ago.[6]

**Plaintiffs' Determination of the Wastes They Allege of Each Defendant's to Have Been Disposed of at the Site**

Defendants seek depositions of corporate designees of each of the Plaintiffs, of Geoffrey Seibel (an engineer at de maximis, inc., the firm that has been the supervising remediation contractor for the OU-1 and OU-2 Groups), and "all documents and information regarding how the Plaintiffs calculated the volumes of such waste." Defendants' Brief at 10. Once again, Defendants are not seeking Plaintiffs' contentions with respect to Defendants' wastes, nor are they seeking the evidence upon which Plaintiffs rely to support those contentions. Instead, Defendants are seeking Plaintiffs' *explanation* of why Plaintiffs believe that this Court will ultimately find at trial that the evidence does, in fact, support those contentions. This request is, except for the relief sought, identical to the argument made by Defendants in their current motions to compel. Plaintiffs refer this Court to pages 3-11 of Plaintiffs' Memorandum filed in opposition thereto for all the reasons why Defendants are not entitled to such information.[7]

---

[6] Defendants have also failed to "specifically delineate" the scope of the discovery they seek. They do not provide the information requested by the Court with respect to the deposition of either Mr. Barkett or Mr. Bergere, and virtually each of the seven categories of documents sought are just that -- categories seeking "any" documents.

[7] Defendants' repeated statements that they need "the calculation used by the Plaintiffs to obtain the percentages" and the like are mystifying. *See, e.g.*, Defendants' Brief at 18-20. Plaintiffs have identified and reviewed all of the evidence relevant to DeRewal Chemical Company's operations during the various Nexus Periods (all of which has been identified in response to Defendants' contention interrogatories) and decided what Plaintiffs believe that evidence will prove at trial. There is no piece of paper with a "calculation" reflecting Plaintiffs' analysis or magic equation into which the evidence was put to yield an answer.

(continued...)

Defendants' request for depositions of corporate designees to answer questions about Plaintiffs' analysis of the evidence should additionally be denied because this Court granted Plaintiffs' March 16, 2005 Motion for Entry of a Protective Order seeking to prevent Defendants from asking corporate designees those very questions. This Court held that "contention interrogatories are more appropriate than Rule 30(b)(6) depositions to elicit a party's legal conclusions." June 23, 2005 Order at ¶ 6. Defendants did not file a motion for reconsideration of that decision, and they are precluded from doing so now under the guise of this new motion.[8]

Neither have Defendants explained why they are entitled to a deposition now of Mr. Seibel. Defendants have known of Mr. Seibel's position for years. Plaintiffs produced Mr. Seibel for a briefing and question and answer period with Defendants as part of the 2004 mediation process herein. Defendants fail to explain why they did not previously request a deposition of Mr. Seibel. They have no good reason or excuse for not having done so.

---

(...continued)
    The "information" Defendants claim Plaintiffs are "hiding" consists of the documents and witnesses about which that they already know. Similarly, Defendants do not "need" to know why Plaintiffs think those proofs support Plaintiffs' contentions, either to rebut those contentions or otherwise. If they think different evidence relevant to the practices of DeRewal Chemical Corporation in one or more Nexus Periods exists, or if they think the evidence identified by Plaintiffs is insufficient, then they need only to introduce any such evidence at trial and argue that the Court should reach different conclusions from all of the evidence.

[8]    Defendants' statement that "the Court did not foreclose the Defendants from pursuing this line of questioning at a later date," Defendants' Brief at 10, cannot be reconciled with the June 23, 2005 Order. In any event, Defendants have utterly failed to show that they meet the standards for a motion for reconsideration, or even to explain why the requested depositions would be appropriate in the unlikely event that this Court determines in ruling upon the motions to compel that Plaintiffs must provide this information.

Defendants also have failed to provide the exact nature of the testimony they seek to illicit from Mr. Seibel, or the anticipated duration of the deposition.

Defendants throw into the general category of "how" Plaintiffs reached their nexus contentions a request for discovery of interviews between Plaintiffs and any of the DeRewals or John Barsum, an individual who worked for DeRewal Chemical Company. They reference invoices from Pitney Hardin pertaining to such interviews, presumably to suggest that Defendants have only recently become aware of the fact that various individuals on behalf of Plaintiffs did interview Fred DeRewal, Freddie DeRewal, and John Barsum. Defendants were informed at the July 11, 2002 meeting referenced above that the undersigned interviewed certain former DCC employees as part of his Rule 11 due diligence to determine which entities to name in the initial Complaint. An Affidavit from Mr. Barsum, obviously obtained by Plaintiffs, was produced to Defendants as part of the initial production of documents to the Document Repository and used at his deposition. Mr. Barsum and the three DeRewals were each questioned at their depositions about conversations they had with representatives of Plaintiffs. Defendants have therefore known since the inception of this action that interviews were conducted with certain of these individuals. Defendants should have requested the information sought here about those discussions years ago.

Defendants' requests, including the depositions sought of the persons who have spoken on occasions with the DeRewals or Mr. Barsum about those conversations, seek classic core attorney work product. Fed. R. Civ. P. 26(b)(3). Defendants have failed to explain why they are entitled to attorney notes or to depose counsel concerning such interviews. They are not. Each of the three DeRewals and Mr. Barsum are non-party witnesses and are not represented by counsel for Plaintiffs. Defendants have been free for five years to contact these

individuals and ask them whatever they want. Defendants had the opportunity three years ago to ask the witnesses under oath whatever questions they thought relevant. Defendants simply do not need to see core attorney work product reflecting counsel's recollections of counsel's discussions with these individuals.

For all of the above reasons, Defendants' request for supplemental discovery with respect to why Plaintiffs believe that the evidence they rely upon supports their proposed findings of fact should be denied.

**Plaintiffs' PRP Investigation**

Defendants claim to have "discovered" that Plaintiffs investigated potentially responsible parties prior to filing of the initial Complaint in this action, stating that "documents indicating such an investigation was conducted were produced to the Document Repository by the Plaintiffs a little more than a month before the close of fact discovery." Defendants' Brief at 11. It is difficult to understand how counsel for AETC could have signed this brief containing that statement. It is self-evident that Plaintiffs conducted at least *some* investigation into possible defendants in this action based upon the simple fact that they sued the Defendants herein and made allegations that those Defendants are liable persons.

Moreover, Plaintiffs' production of documents to the Repository at the initiation of this action included voluminous files on just such potentially responsible parties ("PRPs"), including all of the DCC "Chicken Coop" documents (the DCC business records seized from DCC's business office at the Boarhead Site by EPA), each and every 104(e) request from EPA

and response thereto from scores of PRPs,[9] Freedom of Information Act requests and response thereto filed on behalf of Plaintiffs with various governmental entities, files containing "corporate information" on numerous PRPs, and "PRP Document" files prepared by Plaintiffs with respect to dozens of PRPs. A copy of an October 28, 2004 e-mail to all Defendants providing an *updated* Repository Index is attached hereto and marked Exhibit "F", including selective pages from the 210 page Index identifying such documents. Documents including "orphan share documents," "company specific PRP docs", nexus packets, newspaper articles, aerial photographs, drum logs, etc., were also produced as part of Plaintiffs' 2004 initial responses to written discovery. *See* Index of Pitney Hardin documents attached hereto and marked Exhibit "D." Together, these documents provide information about scores of entities that might, potentially, have had a connection to the Boarhead Farms Site and might, potentially, be liable under CERCLA or HSCA.

Defendants have been free since the inception of this litigation to review any or all of those files, to determine whether Defendants should have named any such entities as third-party defendants when they were permitted to do so,[10] or to ask any of the dozens of witnesses deposed herein whether they had information about the disposal of waste at the Site from any such entities. Defendants presumably did none of these things either because they lacked diligence or because they determined, as did Plaintiffs, that there was no reason to sue any such

---

[9]   Section 104(e) of CERCLA gives EPA the authority to request information from anyone it believes may have knowledge of releases at a Superfund site. 42 U.S.C. § 9604(e).

[10]   CMO No. 5 permitted third-party practice as of right on or before June 30, 2004. CMO No. 5 at ¶ 3.

entities. Of course, Defendants already have available to them all of the above documents, and had no need to seek them in this motion.

Defendants' request for supplemental discovery with respect to Plaintiffs' PRP investigation should be denied.

**Deposition of Peter Noll**

Defendant fcg, inc. ("Flexible") seeks to take the deposition of Peter Noll, an employee of the Bucks County Department of Health (incorrectly identified by Defendants as "Peter Knoll"), on the basis that Mr. Noll was not identified in Plaintiffs' Responses to Flexible's Initial Interrogatories. Defendants' Brief at 21. Mr. Noll *was* identified on numerous documents produced at the initiation of this litigation as a person who conducted several investigations of the Boarhead Farms Site. Flexible has apparently just "discovered" that Mr. Noll also inspected *its* facilities on at least one occasion. Flexible's argument thus is that it should now be entitled to take the deposition of Mr. Noll because Plaintiffs did not tell Flexible that Mr. Noll conducted one or more investigations of *Flexible's own facility,* something that Flexible already knew.

In fact, Plaintiffs came to learn of Mr. Noll's involvement with the Flexible facility only because they surmised that Flexible's facility may have been the subject of pollution investigations by the Bucks County Department of Health. Plaintiffs accordingly made a Freedom of Information Act request of that agency, in response to which it received both documents provided to the agency by Flexible and documents provided to Flexible by the agency, including copies of Mr. Noll's inspection reports. Flexible should have produced those documents to Plaintiffs in the first place. Flexible's suggestion that it should be entitled to now

take Mr. Noll's deposition because Plaintiffs didn't identify Mr. Noll in an interrogatory response until 2005 adds new meaning to the word *chutzpah*.

**"Successorship" Issues**

Defendants incorrectly state that "Plaintiffs have been unwilling to provide information on how [contributions by Smith's Industries, Lucent, and Bundy Corporation] have been credited." Defendants' Brief at 7. Once again, Defendants have known about payments from these various entities since at least September 28, 2004 when they were given the Pitney Hardin trust ledgers (Exhibit "B").

Under the category "Receipts" in those ledgers are two payments from Lucent ($20,000 and $50,000) in 2000 and multiple payments from Agere thereafter. Plaintiffs' May 7, 2007 letter explained that Western Electric, the entity that operated the North Carolina and Allentown facilities relevant to this action, changed its name to AT&T. Lucent was then "spun off" from AT&T and took with it, *inter alia*, the Western Electric assets and liabilities. Agere was then "spun off" from Lucent and took with it those assets and liabilities. Plaintiffs additionally have produced to Defendants the relevant pages from the February 1, 2001 Separation and Distribution Agreement by and between Lucent Technologies Inc. and Agere Systems Inc. by which this transfer was accomplished. Lucent was the initial OU-1 Group member and made the two contributions to the Group accounts while it was the member. *See* Agreement in Principle attached as Exhibit A to Defendants' Brief at page 36 of 111 (PHKS071739). Agere "became" the OU-1 Group member and made all additional payments after it was created and inherited any Western Electric liability, and joined the OU-2 Group in its own name when that group was later formed. Defendants do not need discovery with respect to these facts.

With respect to Plaintiff TI Group Automotive Systems, LLC, the May 7, 2007 letter explained that Bundy Corporation operated the Malvern facility relevant to this action through its National Rollings Mill Division during the relevant period up until April 23, 1974 (when the facility was sold to Defendant NRM Investments). It additionally stated that Bundy Corporation changed its name to TI Automotive some years after selling that facility. Plaintiffs provided to Defendants with their July 12, 2007 letter copies of: The October 19, 1999 Certificate of Amendment to the Articles of Incorporation of Bundy Corporation wherein the name of that corporation was changed to TI Group Automotive Systems Corporation; the June 8, 2001 Certificate of Formation of TI Group Automotive Systems, L.L.C.; and the June 25, 2001 Certificate of Merger of TI Group Automotive Systems Corporation with and into TI Group Automotive Systems, L.L.C. Plaintiff TI is thus the statutory successor to Bundy Corporation. Payments made to the OU-1 and OU-2 Group accounts by Bundy and TI are thus from the same entity. The shares of TI were, until April 2001, ultimately owned by Smiths Group plc ("Smiths"), a UK corporation. The shares of TI were sold pursuant to an April 25, 2001 Transfer Agreement, a copy of which has been provided to Defendants, to another UK corporation then known as 329th Shelf Investment Company Limited ("329"). Smiths agreed in the Transfer Agreement to indemnify 329 from any liability related to the Boarhead Farms Site. Smiths made payments to the OU-1 and OU-2 Group accounts on behalf of TI in accordance with that indemnity. Defendants do not need further discovery with respect to these facts.

Defendants also suggest that they need discovery concerning "whether certain entities that allegedly disposed of waste at the Site are somehow connected to any of the Plaintiffs," specifically referencing Agere and TI. Defendants' Brief at 7 and 16. The key word here is "somehow." All parties to this action understood at the initiation thereof that each

Plaintiff and each Defendant was associated with one or more facilities that had a known connection to DeRewal Chemical Corporation. Accordingly, the initial case management order, carefully negotiated and drafted by both Plaintiffs and Defendants, specified the facilities with respect to which Plaintiffs and Defendants were required to respond in discovery. Case Management Order at ¶ 3(B)(2) and Exhibit "B." Agere was identified with the two former Western Electric facilities and TI was affiliated with the Malvern facility. There has never been any suggestion in any deposition or other discovery that Agere is connected in any way, shape, or form with any entities related to this action other than Western Electric or that TI is affiliated with any entity related to this action other than Bundy. Neither has there been any information of any kind in discovery that there are facilities other than these three for which Agere or TI may be liable. This request by Defendants is nothing more than a fishing expedition years out of time. Understandably, Defendants' request completely fails to comply with CMO No. 10's requirement that discovery be "specifically delineated," because Defendants have no idea what they are looking for. In any event, neither Agere nor TI has any information suggesting that they are connected in any way to any other facility with which DeRewal Chemical Company did business in the relevant time frame.

Defendants' request for additional discovery concerning TI and Agere should therefore be denied.

## CONCLUSION

For all the foregoing reasons, and in the interest of justice, Defendants' Motion for Leave to Pursue Limited Discovery should be denied.

Dated: July 13, 2007

/s/ Glenn A. Harris

Glenn A. Harris, Esquire
Ballard Spahr Andrews & Ingersoll
A Pennsylvania Limited Liability Partnership
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3400

Attorney for Plaintiffs