IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, LLC, et al.,

                  Plaintiffs,

     v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

                Defendants.

CIVIL ACTION NO.
02-cv-3830 (LDD)

**MEMORANDUM ON BEHALF OF DEFENDANT HANDY & HARMAN TUBE
COMPANY, INC. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

After almost five (5) years of litigation, the production of hundreds of thousands of documents and dozens of depositions (both fact and expert), the only "waste" arguably generated by defendant Handy & Harman Tube Company, Inc. ("H&H Tube") that is alleged to have been disposed of at the Boarhead Farms Superfund Site (the "Site") is a primarily water-based liquid identified as "industrial waste solution." The undisputed evidence demonstrates that this "industrial waste solution" was non-hazardous.

Both the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the Pennsylvania Hazardous Sites Cleanup Act ("HSCA") provide that, in order to have liability, a responsible party who is a generator/arranger[1] must have generated or arranged for the disposal of a "hazardous substance." Where there is no "hazardous substance",

---

[1] Here, H&H Tube is alleged to have been a generator/arranger not a transporter.

there can be no liability. Here, H&H Tube's "industrial waste solution" does not fall within the definition of "hazardous substance" as that term is defined in both CERCLA and HSCA. As such, summary judgment in favor of H&H Tube is warranted as a matter of law and should be granted.

## STATEMENT OF UNDISPUTED FACTS

1.      H&H Tube manufactures small-diameter precision tubing made from tube hollows (e.g. 1 ¼" O.D./1" I.D. or 2" O.D./1" I.D.) of stainless steel, carbon steel and various alloyed steels ("Raw Stock"). Declaration of Melissa E. Flax in Support of Handy & Harman Tube Company, Inc.'s Motion for Summary Judgment ("Flax Decl."), Exhibit A at Interrogatory 3(g).

2.      The manufacturing procedures employed at H&H Tube vary only slightly from product to product and involves the following: cold drawing of Raw Stock through a die, degreasing, annealing and pickling. These steps are repeated until the tube meets customer specifications. Flax Decl., Exhibit A at Interrogatory 6(a).

3.      The waste streams generated by the manufacturing process described above include spent TCE sludge, TCE contaminated lubricants and spent acids (the "Manufacturing waste"). Flax Decl., Exhibit A at Interrogatory 3(g)

4.      Manufacturing waste was temporarily stored in 55-gallon drums and holding tanks. The 55-gallon drums were removed and the holding tanks were emptied by waste removal companies. Flax Decl., Exhibit A at Interrogatory 3(g).

5.      The other waste streams generated at H&H Tube were (a) office trash, (b) trash from manufacturing operations (both of which were disposed of in an on-premises dumpster

2

which was removed by a waste removal company) and (c) "industrial waste solution." Flax Decl., Exhibit A at Interrogatory 3(g) and Exhibit B at 53:20-55:14.

6.    The "industrial waste solution" was also stored in 55-gallon drums for disposal. Flax Decl., Exhibit B at 53:20-55:14.

7.    Thomas Curran ("Curran") was an employee of H&H Tube for approximately 35 years from 1964 to 1998 when he retired. Flax Decl., Exhibit A at Interrogatory 3(i). At the time of his retirement, Curran held the position of Vice President of Operations. *Id.*

8.    Curran testified that the "industrial waste solution" that was disposed of in 55-gallon drums was generated when the facility was shutdown for cleaning the process machinery and work areas and that the "industrial waste solution" consisted mostly of water. Flax Decl., Exhibit B at 53:20-55:14.

9.    H&H Tube has submitted the expert report of Dr. Kirk W. Brown, Ph.D. Flax Decl., Exhibit C. Dr. Brown is a principal consultant with the firm of SI Group ("SIG"), whose offices are located at 1701 Southwest Parkway, Suite 100, College Station, Texas. Flax Decl., Exhibit C. His educational background includes a Bachelor of Science degree in Agronomy from Delaware Valley College (1962), a Masters of Science degree in Agronomy/Plant Physiology from Cornell University (1964), and a Doctor of Philosophy degree in Agronomy from the University of Nebraska (1969). *Id.*

10.    From 1970 through 2001, Dr. Brown was a member of the faculty at Texas A&M University and he currently serves as *Professor Emeritus* in the Soil and Crop Sciences Department, Texas A&M University, College Station, Texas. *Id.* During his tenure at Texas A&M, he conducted extensive research including numerous research projects for the U.S. Environmental Protection Agency ("USEPA") on the fate and transport of contaminants in the

3

environment including Resource Conservation and Recovery Act ("RCRA") hazardous wastes and CERCLA hazardous substances. As a result of his research efforts, Dr. Brown has authored or co-authored over 190 peer-reviewed, scientific publications. *Id.*

11.     Research projects, which Dr. Brown conducted included investigations of the movement of hazardous substances through geomembrane landfill liners and caps and the underlying soil, the fate and movement of hazardous metals in the environment and the land treatment of wastes. His research was instrumental in the development of the USEPA regulations which specify the design of hazardous and municipal waste landfills, and in the banning of liquid and untreated wastes from disposal in landfills. *Id.*

12.     Dr. Brown served on technical advisory panels to the USEPA, US Congressional Office of Technology Assessment, National Science Foundation, and the National Academy of Science. Significant reports resulting from these committee assignments include, Groundwater and Soil Cleanup, Improving Management of Persistent Contaminants (1999); Ranking Hazardous Waste Sites (1994); Coming Clean, Superfund Problems Can be Solved (1989); and Superfund Strategy (1985). *Id.*

13.     Dr. Brown was the primary author of two publications for the USEPA entitled Hazardous Waste Land Treatment (1983) and Characteristics of Hazardous Waste Streams (1982). Both of these texts deal with the composition, handling and disposal of hazardous substances in industrial waste streams. *Id.* Dr. Brown was formerly a member of the American Society of Agronomy (1970-2001), Soil Science Society of America (1970-2001), American Chemical Society (1970-2001), and the International Society of Soil Science (1970-2001). Additionally, he served on the editorial board for Environmental Engineering Science, formerly known as Hazardous Waste and Hazardous Materials from 1989 through 2001. *Id.*

4

14.    Some of Dr. Brown's other committee assignments include the following:

- National Academy of Sciences, National Research Council Committee on Environmental Technologies Subcommittee on Landfills (1995-1998).
- EPA Review for Risk Assessment for Petroleum Industry Hazardous Waste Listing Determination (Sept 1995).
- Environmental Geosciences Advisory Committee of the American Geological Institute representing the Soil Science Society of America (1993-2000).
- National Academy of Sciences (NRC) Committee on Remedial Action Priorities for Hazardous Waste Sites (1991-1994).
- EPA Hazardous Waste Center Review Panel (1988).
- National Science Foundation, Environmental Engineering Div., Review Panel (1987-1995).
- Advisory Panel to U.S. Congressional Office of Technology Assessment (OTA) on An Assessment of the Effectiveness of the EPA in Identifying, Prioritizing and Cleaning Up Hazardous Waste Sites (1987-1995).
- Organizing Committee for SSSA Workshop on Utilization, Treatment and Disposal of Waste on Land (1985).
- Panel to Write Research Needs for Hazardous Waste Treatment and Disposal for National Science Foundation. Drexel University, PA (1986).
- EPA Technical Advisory Panel on the Adequacy of Ground Water Monitoring at Hazardous Waste Landfills (1985).
- EPA Panel to Review the Acceptability of Landfill Disposal of Sewage Sludge (1984).
- Office of Water Regulations and Standards Committee on Municipal Sludge Landfilling to Advise EPA on the Pollutants which should be Regulated for Various Disposal Options and the Methods or Procedures to be Used for Regulating such Pollutants (1984).
- Advisory Panel to U.S. Congressional Office of Technology Assessment (OTA) to Determine the Effectiveness of Current Programs to Clean Up Uncontrolled Hazardous Waste Sites (1983-84).
- EPA Science Review Panel for Environmental Engineering Research Grants (1982-1998).
- United States Environmental Protection Agency Land Treatment Task Force (1981-1985).

*Id.*

15.    Dr. Brown has been a consultant in the field of environmental science and engineering for the past 25 years. He founded K. W. Brown and Assoc., Inc. and served as President from 1980 until 1991. He was employed as a principal consultant with K. W. Brown Environmental Services from 1991 until 1999 and with SIG since 2000. Consulting activities

have included consultations on the cleanup and disposal of wastes, the impacts of hazardous waste on the environment, the design of hazardous waste landfills and solid waste management units, and the fate and mobility of hazardous substances in the soil, groundwater, and air. *Id.*

16.    Dr. Brown has extensive experience in the remedial design for hazardous waste disposal sites, remediation/reclamation of contaminated and drastically disturbed lands, and the design of hazardous waste landfills and solid waste management units, including landfill liner and cap design. He has extensive experience in preparing detailed cost estimates for remediation projects dealing with in-situ chemical treatment, fixation and stabilization of metals in the environment, biodegradation, land treatment, capping and cover, and excavation with off-site disposal. *Id.*

17.    Dr. Brown has qualified and given testimony as an expert witness in civil cases in federal and state courts, regulatory hearings, and enforcement actions pertaining to hazardous wastes, heavy metal contamination, the fate and transport of inorganic chemicals and other contaminants in environmental media, and remediation of contaminated sites, among other issues. He has offered opinions related to the fate and transport and/or clean up of metals at several Superfund sites. *Id.*

18.    In the published opinion in the matter entitled *B.F. Goodrich v. Bertowski*, 99 F.3d 505, 525 (2d Cir. 1996), the Second Circuit commented on Dr. Brown's qualifications in the field of environmental remediation as follows: " ... it is difficult for us to imagine an expert with more experience and knowledge in the hazardous substances field than Dr. Brown."

19.    In the published opinion in the matter entitled *Interfaith Community Organization v. Honeywell International, Inc.*, 263 F. Supp. 2d 796, 810 (D.N.J. 2003), *aff'd* 399 F.3d 248 (3d

Cir. 2005), the District Court commented on Dr. Brown's qualifications and trial testimony as follows:

> I found Dr. Brown to be most believable and credible and I therefore afforded his testimony the greatest weight. Not only was he a knowledgeable and believable witness, but the subject of his testimony was perhaps the most significant in assisting the Court regarding the appropriate remediation at the Site. Dr. Brown was an excellent witness.

20.    In his deposition, Dr. Brown testified that, based upon the record evidence and his experience and knowledge, H&H Tube's "industrial waste solution" was "a waste water that includes some traces of oil, grit, dirt and other things that were generated during the periodic shut down and clean up of the [H&H Tube] operation." He noted in his testimony that H&H Tube personnel "went systematically through the plant and cleaned their draw machines, cleaned their grinding machines and that type of thing, during shut down, ... it was a sporadically generated waste that was put in barrels, drums." Flax Decl., Exhibit D at 100:19-101:2.

21.    Dr. Brown further specifically testified on examination by Plaintiffs' counsel that the "industrial waste solution" generated at the H&H Tube facility was not a hazardous substance.

**TROJECKI: Q.**    In paragraph 43 of your report you state that the based on the description of the cleaning process during the plant shut down the waste water generated as the industrial waste solution was non-hazardous.    What do you mean the description of the cleaning process during the shut down?

**BROWN:    A.**    Curran's description of the washed down of the machines. And it's my opinion that had that been tested it would not have been classified as hazardous waste. So it would have been a non-hazardous waste.

     **Q.**    Why is that?

     **A.**    Because it was a water base cleaning process.    They were cleaning grit and grime and particles off the machinery and

7

> there would have been nothing -- while there would have
> been metals in the waste, traces of oil, that type of thing,
> nothing would have been of high enough concentration to
> classify it as a hazardous waste.

> **Q.**    Again, the basis for your description or what you believe is
> a industrial waste solution is Curran's deposition testimony;
> is that correct?

> **A.**    Yes, his testimony on how that was generated.

> **Q.**    Is there any other basis as to what's in the industrial waste
> solution?

> **A.**    That and my then knowledge of the chemistry of what was
> going on at the machines that were being cleaned.

Flax Decl., Exhibit D at 107:21-108:24.

22.    The only document that exists after 5 years of litigation which purportedly
connects H&H Tube to the Site is a one-page DeRewal Chemical Company invoice dated
February 1973 (the "DeRewal invoice").[2]  Flax Decl., Exhibit E.  The invoice refers to 55 and 30
gallon drums of "Industrial Waste Solution."  *Id.*[3]

23.    During Plaintiffs' examination of Dr. Brown at his deposition, Dr. Brown opined
that the "Industrial Waste Solution" referred to in the DeRewal invoice is the same "industrial
waste solution" referred to by Curran.  In that regard, Dr. Brown testified as follows:

**TROJECKI: Q.**    What's the basis of your opinion?

---

[2]  The authenticity of this invoice has not been established.  Plaintiffs deposed three current and
former H&H Tube employees.  None of those witnesses could identify the invoice.  *See* Flax
Decl., Exhibit D at 63:1-17; Exhibit F at 24:9-14; Exhibit G at 34:9-17.  In addition, the parties
most familiar with the illegal dumping operations at the Site (Manfred DeRewal, Sr. and Karen
Castillo) could not shed any light on the contents or meaning of the invoice.  *See* Flax Decl.,
Exhibit H at 249:7-17; 254:9-255:20; Exhibit I at 76:11-78:6.  The admissibility of this invoice
will be challenged by H&H Tube in the event that summary judgment is not granted.

[3]  The invoice reflects a total of 2,510 gallons of "Industrial Waste Solution" ((26 x 55-gallon
drums = 1,080) + (36 x 30-gallon drums = 1,430) = 2,510 gallons).

**BROWN:**   **A.**   Well, if you look at the other waste generated at this facility there is nothing else that's generated in a quantity that you would get this number of barrels. That wasn't handled in some other method. We know the acid waste was taken out by somebody else, the polisher waste was, the used oil and lubricants were taken off. The ketone wastes were very small. The polisher wastes were sent off somewhere else. So this is the only one that would possibly be accumulated in such volumes.

           **Q.**   Any other reason why you believe the industrial waste solution referenced in B-6 is the industrial waste solution that you speak about in paragraph 42 of your report?

           **A.**   Well, the bottom [sludges] from the trichlorethylene degreaser would have been solids so you wouldn't call those solutions, and that kind of closes the loop. There's nothing else that would fit the description but industrial waste solution that's cited by Curran and the e-mail we just looked at by Coates.

Flax Decl., Exhibit D at 114:8-115:4.

    24.    Dr. Brown further testified upon examination by Plaintiffs' counsel that the "industrial waste solution" was non-hazardous and any metals or solvents that may have been present in the "industrial waste solution" were minimal. He also testified that the existence of any metals or solvents in the "industrial waste solution" would not have rendered the waste hazardous. Flax Decl., Exhibit D at 128:15-135:10. In that regard, Dr. Brown testified as follows:

**TROJECKI:** **Q.**   It's your opinion that the solution that Curran is referring to in his deposition as industrial waste solution is non hazardous; is that correct?

**BROWN:**   **A.**   Yes.

           **Q.**   Why do you think that?

             *         *         *         *

9

A.     It's not a listed hazardous waste. It would not fail any of the four criteria for being a hazardous waste. It would not fail toxic concentration -- it's a test for soluble metals in waste, if I have the acronym right, TCLP, I'll get you the right acronym, it wouldn't fail that test, it wouldn't have a pH outside the normal range. It wouldn't be flammable. It wouldn't be corrosive. So it wouldn't be reactive. So there's nothing there that would indicate that it was a hazardous waste.

Flax Decl., Exhibit J at 233:14-234:6.

25.     Bruce DeRewal ("B. DeRewal") was the only witness that gave deposition testimony in this case indicating that drummed waste was picked up at H&H Tube and taken to the Site.[4] Flax Decl., Exhibit K at 50:16-51:4; 55:13-56:18. However, under examination by Plaintiffs' counsel, B. DeRewal admitted that he did not know what was contained in the 55-gallon drums that he picked up from H&H Tube. Flax Decl., Exhibit K at 43:17-25.

26.     B. DeRewal testified that he picked up drummed waste from H&H Tube less than 10 times and that there were no more than 20 drums per trip. He also testified that only 25% or less of these drums were taken to the Site. B. DeRewal also testified on examination by Plaintiffs' counsel that he did not know if the drums that went back to the Site were disposed of at the Site – he simply dropped the truck with the drums at the Site. Flax Decl., Exhibit K at 50:16-52:4; 55:21-56:21

---

[4] A determination as to whether H&H Tube has any nexus to the Site is not necessary for purposes of deciding the within motion for summary judgment. H&H Tube reserves its right to challenge nexus in the event the within motion is not granted.

27.    In Plaintiffs' response to the Joint Contention Interrogatories propounded by Defendants, Plaintiffs contend that H&H Tube contributed 5,899 gallons of drummed waste[5] between January 1972 and June 30, 1975 that was disposed of at the Site. Flax Decl., Exhibit L at p.58 and Exhibit B.

28.    Plaintiffs have further contended in their response to the Joint Contention Interrogatories that H&H Tube's total allocable share with respect to the investigation and remediation of the Site is only one quarter of one percent (0.25%). Flax Decl., Exhibit L at p.58 and Exhibit A.

29.    In Plaintiffs' response to H&H Tube's Contention Interrogatories, Plaintiffs contend that the "Industrial Waste Solution" referred to in the DeRewal invoice that Dr. Brown testified was not a hazardous substance, is, to the contrary, a hazardous substance as that term is defined in CERCLA § 101(14), 42 U.S.C. § 9601(14). Flax Decl., Exhibits M and N.

30.    Plaintiffs further contended in their response to H&H Tube's Contention Interrogatories that the "Industrial Waste Solution" referred to in the DeRewal invoice that Dr. Brown testified was not a hazardous substance, is, to the contrary, a hazardous substance as that term is defined in HSCA, § 6020.103. Flax Decl., Exhibits M and N.

31.    Neither Plaintiffs nor any party to this litigation have produced any fact or opinion evidence that in any way suggests that the primarily water-based "industrial waste solution" generated at the H&H Tube facility is a hazardous substance as that term is defined under CERCLA or HSCA.

_____

[5] H&H Tube has been unable to replicate Plaintiffs' calculation. The DeRewal invoice reflects 2,510 gallons of "Industrial Waste Solution." B. DeRewal's testimony provides for an additional 50 (10 x 20 x 0.25) 55-gallon drums or 2,750 gallons for a total of 5,260 gallons. There is currently pending a motion by Defendants which seeks, among other things, disclosure of Plaintiffs' volume calculation.

32.    Jurgen H. Exner, one of Plaintiffs' experts, testified at his deposition in this case that he was not retained to render, nor did he render, an opinion as to whether any wastes generated by H&H Tube were transported to and disposed of at the Site. Flax Decl., Exhibit O at 56:1-9.

33.    Dr. Exner further testified that he was not retained to render, nor did he render, an opinion with respect to H&H Tube's allocable share. Flax Decl., Exhibit O at 56:10-16.

34.    All of Dr. Exner's opinions in this case are set forth in his report. Flax Decl., Exhibit O at 79:5-10. Dr. Exner was only asked to provide an opinion as to the kinds of wastes that would have been produced by the Defendants based upon the record. Flax Decl., Exhibit O at 138:12-139:22; 215:19-216:4.

35.    Dr. Exner admitted that he has no information regarding the volume of waste generated at H&H Tube. Flax Decl., Exhibit O at 60:6-15.

36.    In his deposition, Dr. Exner confirmed that he had reviewed Dr. Brown's expert report and concluded that nothing in Dr. Brown's report changed any of his opinions. Flax Decl., Exhibit O at 73:16-74:17. Dr. Exner's own notes marked at his deposition acknowledge that Dr. Brown opined that the drummed waste which was "industrial waste solution" was non-hazardous – an opinion that Dr. Exner has not disputed. Flax Decl., Exhibit P.

37.    Plaintiffs' other expert, Jay Vandeven, was asked at his deposition whether he believed that the "industrial waste solution" described by Curran contained any hazardous material. Flax Decl., Exhibit Q at 109:16-20. Before he could answer, Plaintiffs' counsel intervened and stated that Vandeven was offering no opinions as to whether the "industrial waste solution" was a hazardous substance. The question and the position taken by Plaintiffs' counsel are as follows:

12

FLAX:   Q. Is there anything in Mr. Curran's testimony that suggests that the industrial waste solution that he describes contains any hazardous material?

Mr. Harris: Hold on a second. He's not being offered as an expert – he's not here to give an opinion as to what was in Handy & Harman's waste, so that's not a proper question.

Ms. Flax: Are you directing him not to answer?

Mr. Harris: I might. I'm trying to figure out where you are going with this. He is not going to offer an opinion in this case as to what was in Handy & Harman's waste. That is not in his report. He's not here to form new opinions.

     *    *    *    *

Flax Decl., Exhibit Q at 109:16-110:11. The colloquy regarding Plaintiffs' offering expert testimony with respect to the makeup of H&H Tube's "industrial waste solution" ended with Plaintiffs' counsel unequivocally stating there will be no such expert testimony by Vandeven:

> [Vandeven] is not going to take the stand and say it is my opinion that X, Y and Z is in Handy & Harman's industrial waste [solution].

Flax Decl., Exhibit Q at 116:20-24.


## POINT I

## H&H TUBE'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED

### A. Summary Judgment Standard

Summary judgment under Rule 56 shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Hersh v. Allen Prods. Co.*, 789 F.2d 230 (3d Cir. 1986)(quoting Fed.R.Civ.P. 56(c)). Whether a fact is "material" is determined by the

substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.

1989).

In *Matsushita Electrical Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court pronounced that a party opposing a motion for

summary judgment must demonstrate the following:

> [I]n the language of the Rule, the non-moving party must come
> forward with "specific facts showing that there is a genuine issue
> for trial." ... [W]here the record taken as a whole could not lead a
> rational trier of fact to find for the non-moving party, there is no
> "genuine issue for trial." 475 U .S. at 586-87.

Summary judgment must, therefore, be granted if no reasonable trier of fact could find

for the non-moving party. *Id.* Further, when, as here, it is the non-moving party who bears the

burden of proof at trial, and that party has failed in opposition to a motion for summary judgment

to raise a disputed fact issue as to any essential element of his or her claim, summary judgment

should be granted because a "complete failure of proof concerning an essential element of the

non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the moving party has carried its burden of establishing the absence of a genuine

issue of material fact, the burden shifts to the non-moving party to "do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

"The mere existence of a scintilla of evidence will be insufficient." *Anderson*, 477 U.S. at 249-

50. The inquiry is whether, "seen through the prism of the substantive evidentiary burden," a

reasonable jury could render a verdict for the non-movant. *Id.* at 254-55.

When the foregoing standard is applied to the undisputed facts and applicable law, it is clear that summary judgment dismissing Plaintiffs' claims against H&H Tube should be granted.

**B.    The "Industrial Waste Solution" Allegedly Disposed of at the Site was Non-Hazardous and Therefore, H&H Tube is Not Liable Under CERCLA and HSCA**

### 1.    There Is No CERCLA Liability

Plaintiffs seek contribution from H&H Tube under CERCLA on the basis that H&H Tube arranged for the disposal of hazardous substances at the Site. To successfully assert such a claim, Plaintiffs must establish that (1) H&H Tube falls within one of the four categories of potentially responsible parties set forth in CERCLA §107(a); (2) the Site is a facility as defined in CERCLA §101(9); (3) there has been a release or threatened release of hazardous substances at the Site; (4) Plaintiffs incurred costs in responding to the release or threatened release; and (5) the response costs incurred are consistent with the National Contingency Plan. *See New Jersey Turnpike Authority v. PPG Industries, Inc.*, 197 F.3d 96, 103-04 (3d Cir. 1999) (citing 42 U.S.C. § 9607(a); *United States v. CDMG Realty Co.*, 96 F.3d 706, 712 (3d Cir. 1996)).

In this motion, H&H Tube establishes that the irrefutable proofs reveal that H&H Tube is not a "person who by contract, agreement, or otherwise arranged for disposal ... of hazardous substances owned or possessed by such person, ... at any facility ... owned or operated by another party or entity and containing such hazardous substances." CERCLA §107(a)(3), 42 U.S.C. §9607(a)(3). Here, the simple issue is whether the H&H Tube waste that was allegedly disposed of at the Site was a "hazardous substance" within the meaning of CERCLA. The answer is no.

CERCLA defines "hazardous substances" as follows:

> (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42

U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14). If the waste that was allegedly disposed of at a site is non-hazardous, then there is no liability under CERCLA.

In *O'Neil v. Picillo*, 682 F. Supp. 706 (D.R.I. 1988), *aff'd* 883 F.2d 176 (1st Cir. 1989), *cert. denied*, 493 U.S.1071, 110 S.Ct. 1115 (1990), an action under CERCLA, the Court determined that two of the defendants were not liable to the plaintiff under CERCLA because the waste that those defendants generated which was disposed of at the site in question was not a hazardous substance. Exxon was one of the defendants. The Court found that the twenty or thirty bottles found at the site that were Exxon's did not contain a hazardous substance. In making this determination, the Court concluded that, other than the testimony that the bottles were "probably flammable", there was no further proof of toxicity introduced by the plaintiff and as such the material was not hazardous within the meaning of CERCLA. *Id.* at 722. As a result, Exxon had no liability to plaintiff.

The *O'Neil* Court also determined that Olin Corporation, another defendant, was not liable under CERCLA because the plaintiff had similarly failed to establish that the Olin waste disposed of at the site was hazardous. Olin's Manager of Toxicology testified that the substances that were found in Olin's 55-gallon drums at the site were not hazardous substances as defined

16

under CERCLA. *Id.* at 723. Because this testimony was unrefuted, judgment was entered in favor of Olin. *Id. See also Ascon Properties, Inc. v. Mobile Oil Company*, 1991 WL 327472 (C.D. Cal.) (granting defendants' motions for summary judgment because plaintiff failed to demonstrate that the defendants generated hazardous substances within the meaning of CERCLA).

Although the ruling in *O'Neil* followed a bench trial, there is no reason why, when as is the case here, there are no issues of material fact with regard to whether the waste in question is non-hazardous, that the claim against H&H Tube should not be dismissed on summary judgment. Here, the former H&H Tube employee that Plaintiffs deposed in order to determine the makeup of the "industrial waste solution" provided what has been uncontroverted proof that the "industrial waste solution" is non-hazardous. Thomas Curran, with 35 years of experience at H&H Tube who at the time of his retirement was the Vice President of Operations, testified on examination by Plaintiffs' counsel as follows:

DAVIES:   Q.   Now, let me ask you in the second numbered paragraph it references a waste stream designated as industrial waste solution, do you recall what that refers to?

CURRAN:   A.   Yes.

             Q.   Okay. And is that one of the waste streams that we've talked about today?

             A.   I'm trying to think of the waste streams we talked about today so far. We talked about the acids.

             Q.   We can go one by one.

             A.   It's not the acids.

             Q.   It's not the acids. Is it the spent solvents from the degreasing operation?

             A.   No.

**Q.**    Could you tell me what waste stream it is referring to?

**A.**    Yes. During the -- we had a two-week shutdown period for maintenance purposes every summer, during that period we would clean all of the machines, all of the drawing machines and we collected the solutions that came off of that and we were always afraid that maybe somebody would use something like acetone to clean up around the machines, so we had them tested, traces were found of some of the solvents and I know that from the time that I went with Handy & Harman that we were told, for instance, if you were helping with the shutdown in any way and they at times would press people like myself even if I was in production control to go out during that shutdown period to supervise, to make sure everything was being done right. That sort of combination most of it was water, it also had like some just sludge from around the machines in it and that was all taken off as -- I had forgotten this term but I think this is what it's referring to and we would have that just once a year and we would get it out of there soon after our shutdown period.

**Q.**    And do you recall how this material, I'll just refer to as industrial waste solution, how it was stored?

**A.**    You mean after we took it off the machines?

**Q.**    Correct.

**A.**    It would have been in 55-gallon drums.

Flax Decl., Exhibit B at 53:20-55:14

Dr. Brown testified that, based upon all of the information (including Curran's deposition) that he reviewed, the only H&H Tube waste stream that could possibly have been hauled in the quantity testified to by B. DeRewal (*i.e.* 20 drums per pickup, less than 10 pickups, only a quarter of which went to the Site) and referenced in the DeRewal invoice was the "industrial waste solution."[6] As Dr. Brown further testified, none of the other H&H Tube waste

---

[6] As noted above, the DeRewal invoice specifically references "industrial waste solution."

streams generated that volume of waste. Thus, even assuming the "industrial waste solution" was disposed of at the Site,[7] according to the unrefuted testimony of Dr. Brown on examination by Plaintiffs' counsel, the "industrial waste solution" was non-hazardous. Dr. Brown testified:

TROJECKI:  Q.    It's your opinion that the solution that Curran is referring to in his deposition as industrial waste solution is non hazardous; is that correct?

BROWN:     A.    Yes.

           Q.    Why do you think that?

           *           *           *           *

           A.    It's not a listed hazardous waste. It would not fail any of the four criteria for being a hazardous waste. It would not fail toxic concentration -- it's a test for soluble metals in waste, if I have the acronym right, TCLP, I'll get you the right acronym, it wouldn't fail that test, it wouldn't have a pH outside the normal range. It wouldn't be flammable. It wouldn't be corrosive. So it wouldn't be reactive. So there's nothing there that would indicate that it was a hazardous waste.

Flax Decl., Exhibit J at 233:14-234:6.

There is no fact or opinion evidence in this case to rebut this testimony. Plaintiffs' own experts have not identified the "industrial waste solution" as a hazardous substance.[8] Since Plaintiffs bear the burden of proving that H&H Tube generated hazardous substances that were disposed of at the Site and since there is no evidence that any waste, other than "industrial waste solution" was disposed of at the Site, Plaintiffs cannot, under any circumstances, meet their burden of proof. As such, H&H Tube is not liable to Plaintiffs under CERCLA. As a matter of

---

[7] *See* footnote 4, *supra*.

[8] None of the experts retained by the Defendants have identified the H&H Tube "industrial waste solution" as a hazardous substance.

law, summary judgment dismissing Plaintiffs' CERCLA contribution claim should be granted in favor of H&H Tube.

### 2.    There Is No HSCA Liability

Pennsylvania's counterpart to CERCLA is HSCA (the Pennsylvania Hazardous Sites Cleanup Act). 35 P.S. § 6020.101, *et seq.* As noted in *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.*, 12 F. Supp. 2d 391, 407 (M.D. Pa. 1998), HSCA resembles CERCLA. Therefore, as is the case under CERCLA, to establish a claim for contribution under HSCA, a plaintiff must demonstrate the following four elements: (1) a release or threatened release, (2) of a hazardous substance, (3) from a site, (4) by a responsible person as defined in HSCA. *Andritz Sprout-Bauer*, 12 F. Supp. 2d at 407.

HSCA defines the term "hazardous substance" by adopting the definition used by CERCLA. *See* 35 P.S. § 6020.103. Thus, there is no substantive difference between Plaintiffs' claim against H&H Tube under HSCA and their claim under CERCLA. HSCA requires that Plaintiffs establish that H&H Tube arranged for the disposal of waste at the Site that falls within the definition of "hazardous substance." As demonstrated in Point B.1. above, any "industrial waste solution" generated at H&H Tube was not a "hazardous substance." As such, H&H Tube is not liable to Plaintiffs under HSCA. As a matter of law, summary judgment dismissing Plaintiffs' HSCA claim should be granted in favor of H&H Tube.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that Handy & Harman Tube Company, Inc.'s motion for summary judgment be granted.

Respectfully submitted,

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Attorneys for Defendant, Handy & Harman
Tube Company, Inc.

Dated: July 17, 2007

By: ___MF 1386___

MELISSA E. FLAX
JOHN M. AGNELLO
G. GLENNON TROUBLEFIELD (Bar No. 64989)
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
(973) 994-1744 (fax)

21