## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, LLC, et al.,

              Plaintiff,

     v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

              Defendants.

CIVIL ACTION NO.
02-cv-3830 (LDD)

## DECLARATION OF MELISSA E. FLAX IN SUPPORT OF HANDY & HARMAN TUBE COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT

MELISSA E. FLAX, of full age and upon her oath declares as follows:

1.    I am a member of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, attorneys for defendant Handy & Harman Tube Company, Inc. ("Handy & Harman Tube Company") and am admitted *pro hac vice* before this Court in connection with the above captioned matter.

2.    I submit this declaration in support of Handy & Harman Tube Company's motion for summary judgment.

3.    Attached hereto as Exhibit A is a true and accurate copy of relevant portions of Handy & Harman Tube Company's Objections and Responses to Plaintiff's Interrogatories and Requests for Production of Documents.

4.    Attached hereto as Exhibit B is a true and accurate copy of relevant portions of the deposition transcript of Thomas M. Curran, dated December 2, 2004.

5.    Attached hereto as Exhibit C is a true and accurate copy of the Expert Report of Dr. Kirk W. Brown, Ph.D.

6.      Attached hereto as Exhibit D is a true and accurate copy of relevant portions of the deposition transcript of Kirk W. Brown, dated December 1, 2006.

7.      Attached hereto as Exhibit E is a true and accurate copy of a DeRewal Chemical Company invoice dated February 1973.

8.      Attached hereto as Exhibit F is a true and accurate copy of relevant portions of the deposition transcript of Larry, Rees, dated November 18, 2004.

9.      Attached hereto as Exhibit G is a true and accurate copy of relevant portions of the deposition transcript of Mary Kollmar, dated November 18, 2004.

10.     Attached hereto as Exhibit H is a true and accurate copy of relevant portions of the deposition transcript of Manfred T. DeRewal, Sr., dated May 8, 2003.

11.     Attached hereto as Exhibit I is a true and accurate copy of relevant portions of the deposition transcript of Karen Castillo, dated June 3, 2003.

12.     Attached hereto as Exhibit J is a true and accurate copy of relevant portions of the deposition transcript of Kirk W. Brown, dated January 29, 2007.

13.     Attached hereto as Exhibit K is a true and accurate copy of relevant portions of the deposition transcript of Bruce DeRewal, dated June 16, 2003.

14.     Attached hereto as Exhibit L is a true and accurate copy of relevant portions of Plaintiffs' Responses to Joint Contention Interrogatories of Advanced Environmental Technology Corporation, Ashland, Inc., Carpenter Technology Corporation, fcg, inc., Handy & Harman Tube Company, Inc. and NRM Investment Company.

15.    Attached hereto as Exhibit M is a true and accurate copy of Plaintiffs' Responses to Defendant Handy & Harman Tube Company, Inc.'s Contention Interrogatories.

16.    Attached hereto as Exhibit N is a true and accurate copy of the May 7, 2007 letter from Amy M. Trojecki, Esq. to Melissa E. Flax, Esq.

17.    Attached hereto as Exhibit O is a true and accurate copy of relevant portions of the deposition transcript of Jurgen H. Exner, dated January 9, 2007.

18.    Attached hereto as Exhibit P is a true and accurate copy of Exhibit 8 that was marked at the deposition of Jurgen H. Exner.

19.    Attached hereto as Exhibit Q is a true and accurate copy of relevant portions of the deposition transcript of Jay Vandeven, dated February 13, 2007.

I declare under penalty of perjury that the foregoing is true and accurate. Executed on this 17th day of July 2007.

[MF1386]
MELISSA E. FLAX [MF4060]

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BOARHEAD FARM AGREEMENT GROUP, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : | 02-cv-3830 (LDD) |
| | : | |
| ADVANCED ENVIRONMENTAL | : | |
| TECHNOLOGY CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## HANDY & HARMAN TUBE COMPANY, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant, Handy & Harman Tube Company, Inc. ("Handy & Harman Tube Company") hereby responds as follows to plaintiff Boarhead Farm Agreement Group's ("BFAG") interrogatories and requests for production of documents.

## GENERAL OBJECTIONS AND
## OBJECTIONS TO INSTRUCTIONS

Handy & Harman Tube Company objects generally to BFAG's Interrogatories (the "Interrogatories") and Requests for Production of Documents (the "Requests") and to the definitions set forth therein to the extent specified below. All responses herein are made subject to these objections.

1.      In providing responses to the Interrogatories and Requests, Handy & Harman Tube Company does not in any way waive or intend to waive, but rather intends to preserve and does preserve:

      a.      All objections as to relevancy, materiality and admissibility;

      b.      All rights to object on any ground to the use of any of the information produced in response hereto in any proceedings, including the trial of this or any other action;

      c.      All objections as to vagueness and ambiguity; and

      d.      All rights to object on any ground to any further requests for information involving or related to any of the paragraphs in the Requests.

2.      Handy & Harman Tube Company objects to the definitions to the extent that they purport to impose obligations broader in scope than those imposed by the Federal Rules of Civil Procedure and Handy & Harman Tube Company expressly disclaims any obligation to do more than is required by those rules.

3.      Handy & Harman Tube Company objects to each Interrogatory and Request to the extent that they seek information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

2

4.    Handy & Harman Tube Company objects to the Interrogatories and Requests to the extent that they seek to obtain documents from Handy & Harman Tube Company which are not in the possession, custody or control of Handy & Harman Tube Company.

5.    Handy & Harman Tube Company objects to the definition of "you," "your" or "your company" to the extent that it seeks information relating to any company other than Handy & Harman Tube Company, Inc., located at 701 W. Township Line Road, Norristown, Pennsylvania.

6.    Handy & Harman Tube Company objects to the definition of "facility" or "facilities" to the extent that it seeks information relating to any facility other than Handy & Harman Tube Company, Inc., located at 701 W. Township Line Road, Norristown, Pennsylvania.

7.    Handy & Harman Tube Company objects to the definition of "hazardous substance" to the extent that no claims have been asserted in this action under the New Jersey Spill Compensation and Control Act.

7.    Handy & Harman Tube Company objects to the definition of "Geographic Area" to the extent that it seeks information relating to any company other than Handy & Harman Tube Company, Inc., located at 701 W. Township Line Road, Norristown, Pennsylvania.

8.    Handy & Harman Tube Company reserves the right to supplement its responses as discovery and investigations proceed if information that is not set forth herein but which may be responsive to the Interrogatories and/or the Requests is discovered.

9.    Each of the above General Objections and Objections to Definitions (the "General Objections") shall be deemed to apply, where appropriate, to Handy & Harman Tube Company's responses set forth below notwithstanding the fact that Handy & Harman Tube Company has supplied response to the Interrogatories and Requests.

**Interrogatory No. 3**:

For each facility identified in response to Interrogatory No. 1 above, identify the following:

      (a)     Address;

      (b)     Distance of facility from the Site;

      (c)     Years you owned or operated the facility;

      (d)     Your predecessor at the facility;

      (e)     Your successor at the facility;

      (f)     Years your immediate predecessor and immediate successor owned or operated the facility;

      (g)     A complete description of the types of manufacturing, storage and disposal activities which occurred at the facility, including a description of each waste stream generated at the facility;

      (h)     Copies of all Federal, State and local permits that relate to any waste stream described above;

      (i)     The names of person(s) presently or formerly employed by you who have the most knowledge about the subject matter of the Interrogatories, and state the time period employment and the positions held;

      (j)     The total number of employees at each facility during the relevant time period and a description of any personnel changes during the relevant time period;

      (k)     Any documents, including without limitation, photographs, paintings, drawings, sketches, models, reproductions, that depict or purport to depict the exterior of the facility; and

      (l)     All documents that refer to, relate to, support or contradict your response to this interrogatory and its subparts.

**Response**:

Handy & Harman Tube Company incorporates by reference its General Objections as if set forth at length herein. Handy & Harman Tube Company further objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Handy & Harman Tube Company further objects to this interrogatory on the ground that storage and disposal at its premises is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Handy & Harman Tube Company further objects to this interrogatory on the ground that it seeks information outside the Relevant Time Period and is therefore irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, Handy & Harman Tube Company responds to subparts (a) through (k) as follows with respect to the Relevant Time Period:

      (a)     701 W. Township Line Road, Norristown, Pennsylvania 19403.

      (b)     Unknown.

      (c)     1963 to present.

      (d)     Posen & Kline Tube Company, Inc. of Norristown, Pennsylvania.

      (e)     None.

      (f)     As to predecessor– 1948 to 1958; as to successor- not applicable.

(g)     Handy & Harman Tube Company manufactures small-diameter precision tubing made from tube hollows (*e.g.* 1 ¼" O.D./1" I.D. or 2" O.D./1" I.D.) of stainless steel, carbon and various alloyed steels ("Raw Stock"). Manufacturing waste was temporarily stored in 55-gallon drums and tanks which were removed/emptied by waste removal companies. The manufacturing waste consisted of spent TCE/still bottoms, TCE contaminated lubricants and spent acids. Office trash and trash from manufacturing operations were disposed of in an on-premises dumpster which was removed by a waste removal company. No disposal activities occurred at the facility.

(h)     None.

(i)     <u>Larry Rees</u> (current employee)

| | |
|---|---|
| July 1975 | Production Operator |
| 1979 | Supervisor, Small Tube |
| 1984 | Manager Small Tube & Capillary |
| | (title changed to Business Unit Manager, Capillary) |
| Currently | Foreman, Capillary Division |

<u>Mary Kollmar</u> (current employee)

| | |
|---|---|
| October 1972 | Purchasing Clerk |
| 1981 | Junior Buyer |
| Mid-1980s | Senior Buyer/Purchasing Agent |
| 1992 | Purchasing Manager |

<u>Thomas Curran</u> (Retired)

| | |
|---|---|
| 1964 | Lab services |
| 1970 | Production Control Office Assistant |
| 1973 | Supervisor of Production Control |
| 1984 | Director of Production and Engineering |
| Early 1990s | Vice President of Manufacturing for Tune Group |
| 1998 | Vice President of Operations for Tube Group |

(j)     Approximately 250 employees. No personnel changes occurred other than retirements, separations and new hires in the normal course of business.

(k)     The search for items responsive to this request continues.

(l)     *See* objections set forth above.

**Interrogatory No. 6**:

For each waste stream referenced above in your response to interrogatory number 3(g) which you believe, have reason to believe or surmise was sent directly or indirectly to the Site or which is referenced in any document relating to the Site or which was handled by a Transporter, unless you can demonstrate that such waste stream handled by such Transporter, was, in its entirety, taken directly to a site or sites other than the Site, state or provide a good faith estimate of:

(a)    A complete description of the process creating the waste stream, noting any changes in the process that occurred during the Relevant Time Period and the points in the process where the waste stream was generated, and including, without limitation, the raw materials used and byproducts or off-spec material generated in the process that produced the waste stream and, if the composition of the raw material is not clearly identifiable from its name, provide material safety data sheets or equivalent documentation;

(b)    The specific source, nature, formulation and constituents of each waste stream including, without limitation, any constituent that, based on its mishandling, may have become part of a waste stream, the physical state of the waste stream (e.g. liquid, gas, solid, semi-solid). The chemical content of the waste stream and the chemical, generic, trade, brand or other name for the waste. If you contend that a constituent evaporated or was neutralized, the basis for this contention must be explained in full;

(c)    The amount of each waste stream produced per year during the Relevant Time Period.

(d)    The receptacle used to collect each waste stream including: (1) a description of the receptacle, including without limitation each bin, box, drum, dumpster, tank, sump, catch basin, reactor, tanker, pipe, pit, ditch, roll off, bag, barrel and lagoon; (2) the size of each receptacle; (3) the supplier of each receptacle (i.e. your company or another person); (4) the location of each receptacle; and (5) the frequency at which each receptacle was emptied;

(e)    The equipment used to remove the waste from each receptacle including: (1) a description of the type of equipment; (2) the amount of waste the equipment removed or could remove; and (3) whether any equipment used to remove each waste stream was owned or operated by the facility or another person, and, if owned or operated by another person, the identity of that person.

Identify all documents that refer to, relate to, support or contradict your response to this interrogatory and its subparts.

**Response**:

Handy & Harman Tube Company incorporates by reference its General Objections as if set forth at length herein. Handy & Harman Tube Company further objects to this interrogatory on the grounds that it is vague, overbroad and unduly burdensome. Handy & Harman Tube Company further objects to this interrogatory on the ground that it calls for speculation. Handy & Harman Tube Company's responses are limited to facts within the knowledge of either current or former employees. Handy & Harman Tube Company further objects to this interrogatory on

the ground that it seeks information outside the Relevant Time Period and is therefore irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections and limitations, Handy & Harman Tube Company responds as follows with respect to the Relevant Time Period:

Handy & Harman Tube Company does not believe nor does it have reason to believe that any of its waste was sent to the Site. Handy & Harman Tube Company's office waste and manufacturing waste were removed and disposed of by William O'Hara Garbage Services. The spent acids were removed and disposed of by Waste Conversion Systems.

(a)     Waste stream: Spent TCE and TCE contaminated lubricants:

Manufacturing procedures vary slightly from product to product. The following is an accurate generalization of the manufacturing of most products.

(1)     Cold Draw – A 20-foot piece of Raw Stock is drawn through a die in order to make a longer and thinner tube. The tube is lubricated as it goes through the die.

(2)     Degreasing – After the tube completes the cold draw, it is put through the degreaser to clean off any residual lubricants that remain on the tube. The degreaser uses TCE which is distilled for reuse.

(3)     Annealing – After the degreasing, the tube is annealed.

(4)     Pickling – The tube is then placed in an acid bath to remove rust and scale from the outside of the tube and etch the surface.

(5)     Steps (1) through (4) are repeated until the tube meets the specifications of the customer. Once the specifications have been met, the last run through of the process stops at the annealing stage.

(b)     Spent TCE/still bottoms:

50% spent TCE
50% contaminants (*e.g.* lubricants, metal fines, solid impurities)

TCE contaminated lubricants:

Lubricants contaminated with residual TCE from cleaning tooling (*i.e.* dies) at the benches and a small amount from the degreasing process.

(c)     Spent TCE/still bottoms:

No documentation exists on which to base a good faith estimate. Former employees best able to give a good faith estimate are deceased.

TCE contaminated lubricants:

No documentation exists on which to base a good faith estimate. Former employees best able to give a good faith estimate are deceased.

(d)    <u>Spent TCE/still bottoms</u>:

    (1)    Drums.
    (2)    55-gallons.
    (3)    Unknown at this time.
    (4)    Stored on premises pending removal.
    (5)    No documentation exists on which to base a good faith estimate. Former employees best able to give a good faith estimate are deceased.

<u>TCE contaminated lubricants</u>:

    (1)    Drums.
    (2)    55-gallons.
    (3)    Unknown at this time.
    (4)    Stored on premises pending removal.
    (5)    No documentation exists on which to base a good faith estimate. Former employees best able to give a good faith estimate are deceased.

(e)    <u>Spent TCE/still bottoms</u>:

Drums were removed from Handy & Harman Tube Company's premises by waste removal companies, including Lightman Drum, ChemClene and Delaware Container.

<u>TCE contaminated lubricants</u>:

Drums were removed from Handy & Harman Tube Company's premises by waste removal companies, including Lightman Drum, ChemClene and Delaware Container.

No documents referring to, relating to, supporting or contradicting the foregoing responses exist for the Relevant Time Period.

Summary of Information: Facility maintenance; Equipment maintenance.

(14)   Barry Hall, Small-tube bull-wheel operator, hired April 1975, current employee.

Summary of Information: Equipment maintenance.

(b)   Other than those who are deceased, none.

(c)   Documents relevant to the interrogatories posed.

(d)   None.

(e)   None.

**Objections Interposed By:**

Dated: September 15, 2004

CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN

By: _____
      MELISSA E. FLAX [MF4060]

SEP.15.2004   4:54PM   HANDY & HARMAN

# CERTIFICATION

The information contained in Handy & Harman Tube Company's responses has been gathered by counsel for Handy & Harman Tube Company from various current and former Handy & Harman Tube Company employees. In addition, information contained in documents produced in this action and maintained in the document repository has also been referenced. The information provided is true and accurate to the best of the undersigned's knowledge but in many cases is based upon the recollection of current or former employees of events which occurred anywhere from twenty-seven (27) to thirty-five (35) years ago. Subject to and limited by the foregoing, I certify that the foregoing responses are true and accurate to the best of my knowledge.

Dated:

By: _David L. Kelly_

Title:   Handy & Harman
Director, Corporate Environmental,
Health & Safety

34

**EXHIBIT B**

Thomas M. Curran                                    December 2, 2004

Page 1

```
            UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF PENNSYLVANIA
```

_____    CIVIL ACTION NO.
                                    02-CV-3830
BOARHEAD FARM AGREEMENT      Judge Legrome D. Davis
GROUP,
              Plaintiff,          Oral Deposition of:

        vs.                       Thomas M. Curran

ADVANCED ENVIRONMENTAL TECHNOLOGY
CORPORATION; ASHLAND CHEMICAL
COMPANY; BOARHEAD CORPORATION;
CARPENTER TECHNOLOGY CORPORATION;
CROWN METRO, INC.; DIAZ CHEMICAL
CORPORATION; EMHART INDUSTRIES,
INC.; ETCHED CIRCUITS, INC.; FCG,
INC.; GLOBE DISPOSAL COMPANY, INC.;
GLOBE-WASTECH, INC.; HANDY & HARMAN
TUBE COMPANY, INC.; KNOLL, INC.;
MERIT METAL PRODUCTS CORPORATION;
NOVARTIS CORPORATION; NRM INVESTMENT
COMPANY; PLYMOUTH TUBE COMPANY;
QUIKLINE DESIGN AND MANUFACTURING
COMPANY; RAHNS SPECIALTY METALS,
INC.; ROHM & HAAS COMPANY, SIMON
WRECKING COMPANY, INC.; TECHALLOY
COMPANY, INC.; THOMAS & BETTS
CORPORATION; UNISYS CORPORATION;
UNITED STATES OF AMERICA
DEPARTMENT OF NAVY,
              Defendants.
_____

              *   *   *   *   *
         Thursday, December 2, 2004
              *   *   *   *   *

        Transcript in the above matter taken at
the offices of Ballard, Spahr, Andrews & Ingersoll,
LLP, 1735 Market Street, 42nd Floor, Philadelphia,
Pennsylvania, commencing at 10:00 a.m.
      Certified Shorthand Reporting Services
            Arranged Through
        Mastroianni & Formaroli, Inc.
          709 White Horse Pike
        Audubon, New Jersey 08106
            (856) 546-1100

Thomas M. Curran

December 2, 2004

Page 2

A P P E A R A N C E S:
BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
BY:  MARC E. DAVIES, ESQUIRE
1735 MARKET STREET, 51ST FLOOR
PHILADELPHIA, PENNSYLVANIA 19103-7599
(215) 864-8248
ATTORNEYS FOR THE PLAINTIFF

HINMAN, HOWARD & KATTELL, LLP
BY:  RALPH K. KESSLER, ESQUIRE
106 CORPORATE PARK DRIVE, SUITE 317
WHITE PLAINS, NEW YORK 10604
(914) 694-4102
ALSO APPEARING FOR THE PLAINTIFF

CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
STEWART & OLSTEIN, ESQUIRES
BY:  JOHN M. AGNELLO, ESQUIRE
5 BECKER FARM ROAD
ROSELAND, NEW JERSEY 07068-1739
(973) 994,1700
ATTORNEYS FOR THE DEFENDANT
HANDY & HARMAN TUBE COMPANY, INC.

LAW OFFICE OF EDWARD FACKENTHAL
BY:  EDWARD FACKENTHAL, ESQUIRE
ONE MONTGOMERY PLAZA, SUITE 209
NORRISTOWN, PENNSYLVANIA 19401
(610) 279-3370
ATTORNEYS FOR THE DEFENDANT
NRM INVESTMENT COMPANY

Page 4

OBJECTIONS
OBJECTION INDEX

 3   (Objection)............................28:18
     (Objection)............................28:25
 4   (Objection)............................29:11
     (Objection)............................30:4
 5   (Objection)............................31:1
     (Objection)............................32:12
 6   (Objection)............................34:5
     (Objection)............................36:16
 7   (Objection)............................58:25
     (Objection)............................63:24
 8   (Objection)............................66:9
     (Objection)............................66:20
 9   (Objection)............................67:12
     (Objection)............................77:25
10   (Objection)............................79:9
     (Objection)............................80:8
11   (Objection)............................81:22
     (Objection)............................84:9
12   (Objection)............................92:17
     (Objection)............................94:15
13   (Objection)............................97:17
     (Objection)............................114:13
14   (Objection)............................115:6
     (Objection)............................115:20
15   (Objection)............................116:13
     (Objection)............................117:11
16   (Objection)............................118:23

Page 3

### W I T N E S S   I N D E X

Examination of Mr. Curran

By Mr. Davies:        Page 5

By Mr. Fackenthal:    Page 99

### E X H I B I T S

EXHIBIT INDEX
Appears at the conclusion of this Transcript

Page 5

1  (T H O M A S  M.  C U R R A N, having been duly
2  sworn, was examined and testified as follows:)
3  (EXAMINATION OF MR. CURRAN BY MR. DAVIES:)
4      Q.    Mr. Curran, thanks for coming here.
5            Will you state your name, for the
6  record, please?
7      A.    Thomas Curran.
8      Q.    And that's C-u-r-r-a-n?
9      A.    That's right.
10     Q.    Have you been deposed before?
11     A.    No, I have not.
12     Q.    I'll just go over briefly sort of the
13 rules of the road and if you ever have any questions
14 about what I'm telling you now or in the future,
15 please just ask.
16           This is formal in a way but also
17 informal, we're really just talking.  So first your
18 testimony today is sworn testimony, which means the
19 answers you give are under oath, have the same weight
20 as if you were in court.  Please make sure because we
21 have the reporter taking down whatever everyone says
22 that your answers are verbal.  If you nod your head
23 she can't take that down or if you just sort of give
24 an um-hum.  It's clearer to have a yes or no.
25     A.    I understand.

2 (Pages 2 to 5)

Page 50

conjunction with the plant engineer and maintenance group who would make the decisions on where they wanted to go.

Q.     So now going back to early, mid-'70s, do you recall who was in maintenance?

A.     Early, mid-'70s, the group was directed by Mr. Bob Zimmerman. He was our plant engineer.

Q.     Anyone else in the group at that time?

A.     You want names of the other people in his group?

Q.     Yes.

A.     Jack Schurr was an engineer. I can't think of the other names.

Q.     Do you remember the name John Kemmerer?

A.     Sure. He wasn't in that group.

Q.     What did he do?

A.     John Kemmerer is a process writer for the production control department. He also works or worked in the lab at one time. In the '70s he did work in the lab, in the beginning of the '70s. He definitely not with the engineering or maintenance department.

Q.     Can you think of the names of any other individuals in those groups?

MR. AGNELLO: Well --

Page 51

BY MR. DAVIES:

Q.     Or --

MR. AGNELLO: -- you said groups, are we still with the maintenance?

MR. DAVIES: Well, he said maintenance.

MR. AGNELLO: Plant engineering.

MR. DAVIES: And engineering, right.

THE WITNESS: I should be able to but I, especially back in that era, I don't remember who they were.

BY MR. DAVIES:

Q.     Do you remember the name of the companies that would have hauled away the drums, solvents, other than the TCE back in the mid to late 1970s?

A.     No, I don't. You're asking who took the other solvents, not the TCE?

Q.     Correct.

A.     I can't answer that, I don't know.

Q.     Do you remember who took --

A.     The --

Q.     Go ahead.

A.     Just to elaborate, the amounts were very small, you might be talking about, I don't know, we dispensed from tanks that were only about, you know,

Page 52

1  maybe two feet by maybe ten, 12 inches in diameter,
2  something like that and the amounts were so small, I
3  don't know where they went. All I know was they were
4  drummed, they would keep them in a drum and send them
5  to whomever they contracted with.
6       Q.     Do you recall the size of the drums that
7  they were kept in?
8       A.     Yeah, they would -- they were not
9  55-gallon drums, they would be the next one down,
10 probably like a 30-gallon, something like that.
11      Q.     Now, during the same time period, early,
12 mid-1970s, do you recall whether the facility used
13 something what you would call industrial waste
14 solution or had something called industrial waste
15 solution?
16      A.     Industrial waste solution?
17      Q.     Yes. There was a document that I saw
18 that name, I was just going to ask you whether it was
19 the same as the pickle, pickle bath?
20      MR. DAVIES: Let me have this marked
21 first and I'll show it to you.
22      (Exhibit Curran-1, 4-page Letter dated January
23 17, 1993, marked for I.D.)
24 BY MR. DAVIES:
25      Q.     I'm going to show you a document which

Page 53

1  is marked as Curran-1. It's a January 7th, 1993
2  letter. I'll just ask you to just take a look at it
3  for a minute. Just to give you the heads up, I'll be
4  asking you about the second numbered paragraph when
5  you're done but take your time.
6       MR. AGNELLO: Why don't you read the
7  entire document, it's three-and-a-half pages or so.
8       THE WITNESS: Do I recognize the term,
9  no.
10      MR. AGNELLO: Wait for the question.
11 He wants you to read it, now he's going to ask you
12 something.
13 BY MR. DAVIES:
14      Q.     Were you involved in the preparation of
15 this letter?
16      A.     Yes.
17      Q.     Do you recognize -- is that your
18 signature on the bottom of the last page?
19      A.     Yes.
20      Q.     Now, let me ask you in the second
21 numbered paragraph it references a waste stream
22 designated as industrial waste solution, do you
23 recall what that refers to?
24      A.     Yes.
25      Q.     Okay. And is that one of the waste

reporting@verizon.net                    Mastroianni & Formaroli, Inc.                    856-546-1100
                                        Professionals Serving Professionals

Thomas M. Curran                                    December 2, 2004

Page 54

streams that we've talked about today?

A.   I'm trying to think of the waste streams we talked about today so far. We talked about the acids.

Q.   We can go one by one.

A.   It's not the acids.

Q.   It's not the acids. Is it the spent solvents from the degreasing operation?

A.   No.

Q.   Could you tell me what waste stream it is referring to?

A.   Yes. During the -- we had a two-week shutdown period for maintenance purposes every summer, during that period we would clean all of the machines, all of the drawing machines and we collected the solutions that came off of that and we were always afraid that maybe somebody would use something like acetone to clean up around the machines, so we had them tested, traces were found of some of the solvents and I know that from the time that I went with Handy & Harman that we were told, for instance, if you were helping with the shutdown in any way and they at times would press people like myself even if I was in production control to go out during that shutdown period to supervise, to make

Page 55

sure everything was being done right. That sort of combination most of it was water, it also had like some just sludge from around the machines in it and that was all taken off as -- I had forgotten this term but I think this is what it's referring to and we would have that just once a year and we would get it out of there soon after our shutdown period.

Q.   And do you recall how this material, which I'll just refer to as industrial waste solution, how it was stored?

A.   You mean after we took it off the machines?

Q.   Correct.

A.   It would have been in 55-gallon drums.

Q.   And do you remember who disposed of this material, let's say starting back as early as you can remember to begin with?

A.   I don't know. Again, I, you know, I think I can talk about a period, you know, after like '85 but I don't know who they were using during the '70s. I have no idea.

Q.   Okay. Let's go back to the degreaser where we were a couple minutes ago.

A.   Okay.

Q.   You mentioned that the degreaser was

Page 56

1  about 15 feet deep, do you recall, can you estimate
2  about how high the actual solvent would go in that
3  machine?
4      A.   Yes, it was about four, five feet.
5      Q.   And do you recall how often you would
6  need to change the solvent material in the degreaser?
7      A.   I don't -- it was not on a regular
8  basis. It had a still where we were able to condense
9  the trichlor that was not in a liquid state, we would
10 condense that and, you know, the dirt, the metal
11 would drop out of it and then that condensation from
12 it is pure and we would use that over and over and
13 over. So I can't answer that, I don't know.
14     Q.   Do you recall how you removed the
15 solvent when it was spent?
16     A.   The solvent never really became spent.
17 It could be used almost indefinitely, that is, the
18 part that was distilled. The grime and the metal
19 and, you know, the dirt, so to speak, that came off
20 the tubes gathered in the bottom and we would clean
21 that out, you know, I don't know how often that
22 happened but, you know, they would pump the good
23 trichlor into drums, get the whole degreaser empty
24 and then they would go in with shovels and dig out
25 this stuff and put it in drums.

Page 57

1      Q.   Do you recall the size of those drums?
2      A.   55-gallon.
3      Q.   And do you recall about how many drums
4  you would need to use just for cleaning the degreaser
5  at one time?
6      A.   I would just be guessing. I'm not going
7  to guess on something like that. I just wasn't close
8  enough to it, I don't know.
9      Q.   Can you estimate whether it was more
10 than 20 or less than 20? 25 drums?
11        MR. AGNELLO:  Again don't guess.
12        THE WITNESS:  I can't because I can
13 remember witnessing soon after we had it dried out
14 and one, during one of our periods and I was
15 astounded at how little was in the bottom. In fact,
16 I was quite annoyed that we were doing it when I saw
17 what happened. So I can only assume that they were
18 guessing at when it needed to be done. It was not
19 frequent, though, what I would call frequent.
20 BY MR. DAVIES:
21     Q.   Do you know who Handy & Harman used to
22 remove these drums of dirt, muck, whatever you want
23 to call it?
24        MR. AGNELLO:  Period of time?
25        THE WITNESS:  During what period?

15 (Pages 54 to 57)

Mastroianni & Formaroli, Inc.
Professionals Serving Professionals
856-546-1100

Thomas M. Curran                                                December 2, 2004

Page 62

Q. Does that seem like the right time frame for Robert Becker as the purchasing agent?

A. It does.

Q. Now, do you recall who was purchasing agent before Mr. Becker?

A. The only name I can come up with is Joe McCarron. I gave you that earlier.

Q. Right. And you just mentioned that there might have been a person in between?

A. There might have been but I don't remember.

Q. I was just fishing for that, you never know.

This document also references that you were shown, let me see where that is, you were shown an invoice number -- dated 2/5/73. The 20-year anniversary of the interview.

Why don't I just show it to you. Actually I'll have it marked first then I'll ask you a question.

A. Okay.

MR. DAVIES: Mark that Curran-3.

(Exhibit Curran-3, 1-page copy of Invoice dated 2/5/73, marked for I.D.)

BY MR. DAVIES:

Page 63

Q. I'll show you Curran-3, which is the February 5th, 1973 invoice reference. Take a look at that, let me know if you recognize it?

A. I'm --

MR. AGNELLO: I'm sorry, your question was whether he --

MR. DAVIES: Whether he recognizes the document.

THE WITNESS: Does that question mean have I seen this before?

BY MR. DAVIES:

Q. Yes.

A. The answer is yes.

Q. And other than the 1993 interview with EPA, do you recall whether you had seen that document before?

A. I had not.

Q. If you could just look in the middle of the document it talks about 55-gallon drums and 30-gallon drums of industrial waste solution, do you know whether that's the same solution that we were discussing earlier when we talked about industrial waste solution?

(Objection) MR. AGNELLO: Objection as to form. He never saw the document before so how would he know

Page 64

anything about that? You can't put -- you can't do that, you just can't do that. He never saw the document so now you're asking him to interpret the document that he never saw before as to whether that means something, can't do it. Just can't do that, Marc. You can ask him other questions but you certainly can't do that because he's told you he never saw the document and quite frankly it's consistent with what this person, whoever this was, wrote on this piece of paper that you've marked Curran-2 that was never signed by Mr. Curran, so.

MR. DAVIES: The objection is that that was never signed by Mr. Curran?

MR. AGNELLO: No. The objection is he's testified that he never saw the document. And you're now asking him whether or not some reference in that document refers to something he's testified to earlier in the deposition and I'm saying to you that if he never saw the document, how can he tell you what anything in that document references?

BY MR. DAVIES:

Q. All right, in 1973, do you recall -- let's say the early 1970s, do you recall whether you were involved with the two-week shutdowns that occurred at the facility?

Page 65

A. I could not say that specifically.

Q. Okay. Now, a couple minutes ago we were talking about, I was asking about what industrial waste solution was and you indicated that it was a solution generated during the cleaning of machines, et cetera, that happened during this two-week shutdown. Do you recall about how much material would be generated during these shutdowns?

MR. AGNELLO: Do you want to put a time frame on that?

BY MR. DAVIES:

Q. Let's start with early, mid-1970s.

MR. AGNELLO: Again just because he said he wasn't involved in '73.

MR. DAVIES: Well, he, I'm not sure he said he wasn't involved. He said he wasn't sure exactly so I'm asking early to mid-1970s. As far back as you can recall.

MR. AGNELLO: If you know.

THE WITNESS: Would you state the question again?

BY MR. DAVIES:

Q. Sure.

As far back as you can recall, I'm asking for the volume of industrial waste solution

17 (Pages 62 to 65)

1    C E R T I F I C A T E

2        I, Cynthia A. Cormaney, a Notary Public

3    and Certified Shorthand Reporter of the State

4    of New Jersey and a Commissioner of Deeds of

5    the State of Pennsylvania, do hereby certify

6    that the foregoing is a true and accurate

7    transcript of the testimony as taken

8    stenographically by and before me at the time,

9    place and on the date hereinbefore set forth.

10       I do further certify that I am neither a

11   relative nor employee nor attorney nor counsel

12   of any of the parties to this action, and that

13   I am neither a relative nor employee of such

14   attorney or counsel and that I am not

15   financially interested in this action.

16

17   _____
     Cynthia A. Cormaney, C.S.R.
18   Notary Public, State of New Jersey
     My Commission Expires July 24, 2006
19   Certificate No. XI01116

20

21

22

23

24

25