## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, LLC, et al.,

                Plaintiff,

        v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

                Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
02-cv-3830 (LDD)

## REPLY DECLARATION OF MELISSA E. FLAX IN FURTHER SUPPORT OF HANDY & HARMAN TUBE COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT

MELISSA E. FLAX, of full age and upon her oath declares as follows:

1.    I am a member of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, attorneys for defendant Handy & Harman Tube Company, Inc. ("Handy & Harman Tube Company") and am admitted *pro hac vice* before this Court in connection with the above captioned matter.

2.    I submit this reply declaration in further support of Handy & Harman Tube Company's motion for summary judgment.

3.    Attached hereto as Exhibit A is a true and accurate copy of relevant portions of the deposition transcript of Thomas M. Curran, dated December 2, 2004.

4.    Attached hereto as Exhibit B is a true and accurate copy of relevant portions of the deposition transcript of John Barsum dated September 8, 2003.

5.    Attached hereto as Exhibit C is a true and accurate copy of Curran-1, which is a January 7, 1993 letter from Thomas Curran to USEPA.

6.       Attached hereto as Exhibit D is a true and accurate copy of relevant portions of the deposition transcript of Manfred DeRewal, Sr. dated May 7, 2003.

7.       Attached hereto as Exhibit E is a true and accurate copy of relevant portions of the deposition transcript of Larry, Rees, dated November 18, 2004.

8.       Attached hereto as Exhibit F is a true and accurate copy of relevant portions of the deposition transcript of Thomas Bell, dated February 24, 2005.

9.       Attached hereto as Exhibit G are a true and accurate copies of various newspaper articles obtained from the Internet.

I declare under penalty of perjury that the foregoing is true and accurate. Executed on this 31st day of August 2007.

[MF1386]

MELISSA E. FLAX [MF4060]

# EXHIBIT A

Thomas M. Curran                                    December 2, 2004

Page 1

1              UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF PENNSYLVANIA

2

                                        CIVIL ACTION NO.
3    _____      02-CV-3830

     BOARHEAD FARM AGREEMENT     Judge Legrome D. Davis
4    GROUP,
                  Plaintiff,        Oral Deposition of:
5

                                      Thomas M. Curran
        vs.
6

     ADVANCED ENVIRONMENTAL TECHNOLOGY
7    CORPORATION; ASHLAND CHEMICAL
     COMPANY; BOARHEAD CORPORATION;
8    CARPENTER TECHNOLOGY CORPORATION;
     CROWN METRO, INC.; DIAZ CHEMICAL
9    CORPORATION; EMHART INDUSTRIES,
     INC.; ETCHED CIRCUITS, INC.; FCG,
10   INC.; GLOBE DISPOSAL COMPANY, INC.;
     GLOBE-WASTECH, INC.; HANDY & HARMAN
11   TUBE COMPANY, INC.; KNOLL, INC.;
     MERIT METAL PRODUCTS CORPORATION;
12   NOVARTIS CORPORATION; NRM INVESTMENT
     COMPANY; PLYMOUTH TUBE COMPANY;
13   QUIKLINE DESIGN AND MANUFACTURING
     COMPANY; RAHNS SPECIALTY METALS,
14   INC.; ROHM & HAAS COMPANY, SIMON
     WRECKING COMPANY, INC.; TECHALLOY
15   COMPANY, INC.; THOMAS & BETTS
     CORPORATION; UNISYS CORPORATION;
16   UNITED STATES OF AMERICA
     DEPARTMENT OF NAVY,
17              Defendants.

18   _____
                  *   *   *   *   *
19          Thursday, December 2, 2004
                  *   *   *   *   *
20

                 Transcript in the above matter taken at
21   the offices of Ballard, Spahr, Andrews & Ingersoll,
     LLP, 1735 Market Street, 42nd Floor, Philadelphia,
22   Pennsylvania, commencing at 10:00 a.m.
23        Certified Shorthand Reporting Services
                  Arranged Through
24           Mastroianni & Formaroli, Inc.
                709 White Horse Pike
25           Audubon, New Jersey 08106
                  (856) 546-1100

Thomas M. Curran

December 2, 2004

Page 2

1  A P P E A R A N C E S:
2  BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
   BY:  MARC E. DAVIES, ESQUIRE
3  1735 MARKET STREET, 51ST FLOOR
   PHILADELPHIA, PENNSYLVANIA 19103-7599
4  (215) 864-8248
   ATTORNEYS FOR THE PLAINTIFF
5
6  HINMAN, HOWARD & KATTELL, LLP
   BY:  RALPH K. KESSLER, ESQUIRE
7  106 CORPORATE PARK DRIVE, SUITE 317
   WHITE PLAINS, NEW YORK 10604
8  (914) 694-4102
   ALSO APPEARING FOR THE PLAINTIFF
9
10 CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
   STEWART & OLSTEIN, ESQUIRES
11 BY:  JOHN M. AGNELLO, ESQUIRE
   5 BECKER FARM ROAD
12 ROSELAND, NEW JERSEY 07068-1739
   (973) 994-1700
13 ATTORNEYS FOR THE DEFENDANT
   HANDY & HARMAN TUBE COMPANY, INC.
14
15 LAW OFFICE OF EDWARD FACKENTHAL
   BY:  EDWARD FACKENTHAL, ESQUIRE
16 ONE MONTGOMERY PLAZA, SUITE 209
   NORRISTOWN, PENNSYLVANIA 19401
17 (610) 279-3370
   ATTORNEYS FOR THE DEFENDANT
18 NRM INVESTMENT COMPANY
19
20
21
22
23
24
25

Page 4

1       O B J E C T I O N S
2          OBJECTION INDEX
3  (Objection).........................28:18
   (Objection).........................28:25
4  (Objection).........................29:11
   (Objection).........................30:4
5  (Objection).........................31:1
   (Objection).........................32:12
6  (Objection).........................34:5
   (Objection).........................36:16
7  (Objection).........................58:25
   (Objection).........................63:24
8  (Objection).........................66:9
   (Objection).........................66:20
9  (Objection).........................67:12
   (Objection).........................77:25
10 (Objection).........................79:9
   (Objection).........................80:8
11 (Objection).........................81:22
   (Objection).........................84:9
12 (Objection).........................92:17
   (Objection).........................94:15
13 (Objection).........................97:17
   (Objection).........................114:13
14 (Objection).........................115:6
   (Objection).........................115:20
15 (Objection).........................116:13
   (Objection).........................117:11
16 (Objection).........................118:23
17
18
19
20
21
22
23
24
25

Page 3

1       W I T N E S S   I N D E X
2
   Examination of Mr. Curran
3
   By Mr. Davies:        Page 5
4
   By Mr. Fackenthal:    Page 99
5
6
7
8
9
10
11

       E X H I B I T S
12
13      EXHIBIT INDEX
14 Appears at the conclusion of this Transcript
15
16
17
18
19
20
21
22
23
24
25

Page 5

1  (T H O M A S   M.   C U R R A N, having been duly
2  sworn, was examined and testified as follows:)
3  (EXAMINATION OF MR. CURRAN BY MR. DAVIES:)
4      Q.   Mr. Curran, thanks for coming here.
5           Will you state your name, for the
6  record, please?
7      A.   Thomas Curran.
8      Q.   And that's C-u-r-r-a-n?
9      A.   That's right.
10     Q.   Have you been deposed before?
11     A.   No, I have not.
12     Q.   I'll just go over briefly sort of the
13 rules of the road and if you ever have any questions
14 about what I'm telling you now or in the future,
15 please just ask.
16          This is formal in a way but also
17 informal, we're really just talking.  So first your
18 testimony today is sworn testimony, which means the
19 answers you give are under oath, have the same weight
20 as if you were in court.  Please make sure because we
21 have the reporter taking down whatever everyone says
22 that your answers are verbal.  If you nod your head
23 she can't take that down or if you just sort of give
24 an um-hum.  It's clearer to have a yes or no.
25     A.   I understand.

Thomas M. Curran                                    December 2, 2004

1  material?
2      A.    I'm not so sure I understand the
3  question. Do you mean --
4      Q.    Well, I'll -- did you use the 1010
5  carbon for some product line in the facility? Or
6  I'll ask you, what was the 1010 carbon used for in
7  the facility?
8      A.    We made what was known as a capillary
9  tube out of it. A capillary tube.
10     Q.    And did you perform any tests on the
11 capillary tube or on the 1010 carbon?
12     A.    At the finished side?
13     Q.    Well, at any point in the process.
14     A.    Yes.
15     Q.    Could you describe those tests?
16     A.    Yes. We would run a sample test to pass
17 air through it because these were very fine inside
18 diameters. The major product had an inside diameter
19 of about ten thousandths. So we would run a
20 substantial sample to make sure that it was still
21 open, that nothing had collapsed in there. We would
22 run a tensile test to determine the strength. We
23 would make sure that the paperwork was proper in the
24 sense that it had gone through the process without
25 any question marks as to, you know, what it was so

1  that it wouldn't be mixed with other alloy.
2      Q.    I'll ask you the same type of question
3  for the nickel based series, first, what kind of
4  products?
5      A.    Yeah, okay, on the nickel based pretty
6  much the same sort of testing depending on what the
7  finish size was. And we would often send out to get
8  a spectroscopic analysis on the finished product on
9  some of the nickels. They're worth a lot of money
10 relative to the normal 300 series stainless. On the
11 300 series stainless, same sort of test, with the
12 addition that we frequently would mount them and
13 microscopically inspect samples for like grain size
14 because many of the finished applications required a
15 band of grain sizes that you had to hit. We would
16 give it a test to determine how long it could
17 tolerate, for instance, a sulfuric acid test,
18 something like that. All on a sample basis.
19     Q.    Did you use any other kinds of acids
20 besides sulfuric acid in the lab?
21     A.    In testing?
22     Q.    Yes.
23     A.    Yes. The basic acids, like we had
24 hydrochloric for some of the tests, hydrofluoric for
25 some of the tests. Nitric.

1      Q.    And what would you do with the test
2  materials when you were finished with them, when the
3  test was complete?
4      A.    They were normally rinsed off so that
5  there was no acid residue and the metal itself was
6  disposed of as scrap.
7      Q.    Do you recall who was responsible for
8  that disposal at the facility?
9      A.    During what time frame?
10     Q.    Let's say mid to late '60s when you
11 were -- well, when did you finish working in the lab?
12     A.    1970.
13     Q.    So in the 1965 to 1970 period, do you
14 recall who handled the disposal of the scrap metals?
15     A.    Yes, the purchasing department would
16 contract them out to whomever.
17     Q.    Do you remember who was in the
18 purchasing department?
19     A.    In that period I think, I'm not certain,
20 I think the name was McCarron, Joe McCarron.
21     Q.    Do you remember who was in purchasing
22 after Mr. McCarron?
23     A.    Yes, Becker. Wait. I'm wrong. I can't
24 say for sure, there is another name and I can't pull
25 it back, there were a number of different people out

1  there.
2      Q.    Who was Becker?
3      A.    He was the purchasing agent, I think, in
4  that part of that time period.
5      Q.    After 1970?
6      A.    Yeah, I can't recall how long he was
7  there. I had very little contact with him so I
8  really -- I don't know.
9      Q.    Now, what did you do with the various
10 acids that you used for testing when you were done
11 with them?
12     A.    They were taken by Waste Conversion
13 Systems.
14     Q.    Were you responsible for calling Waste
15 Conversion Systems to come pick up the acids?
16     A.    No.
17     Q.    Do you remember who was?
18     A.    Somebody in purchasing.
19     Q.    Now, after you finished working in the
20 lab you say around 1970, what was your next job or
21 responsibilities?
22     A.    I was an assistant in the production
23 control department.
24     Q.    And what did you do as an assistant?
25     A.    I wrote the processes on how we were

5 (Pages 14 to 17)

Thomas M. Curran                                    December 2, 2004

Page 42

1    A.   I don't know.  I don't know that.
2    Q.   Do you recall whether the number of
3  people increased or decreased during your decade
4  working in production control?
5    A.   Decreased.
6    Q.   Can you tell me about how much it would
7  have decreased either in terms of number of people or
8  sort of percentage?
9    A.   May I estimate?
10   Q.   Yeah, you can estimate.
11       MR. AGNELLO:  Don't guess.  If you have
12  a good faith estimate, that's fine.  If you're
13  guessing, don't do it.
14       THE WITNESS:  Ten percent drop.
15  BY MR. DAVIES:
16   Q.   Now, let's go from the -- well, what
17  year did you finish in production control?
18   A.   I guess it was 1984.  In 1980 I was
19  moved, I continued to supervise production control at
20  that point and I also began to be involved with the
21  steel hollows, you know, where we got them, how much
22  we paid for them.
23   Q.   So after 1984 or about the time you
24  stopped working in production control, did you remain
25  familiar with the production process, were you still

Page 43

1  part of production at the facility?
2    A.   Yes.
3    Q.   And what were you doing then?
4    A.   Directing.
5    Q.   Directing what?
6    A.   Manufacturing.
7    Q.   Did the number of people you had in the
8  manufacturing process increase during the 1980s or
9  decrease after 1984, excuse me?
10   A.   It was stable through the '80s.
11   Q.   Let's go back for a moment to the
12  storage tank which you said was in the basement.
13       Do you recall who worked in the
14  basement -- what else was in the basement, I'm sorry,
15  besides the storage tank?
16   A.   There was a weir, there were boilers
17  down there to heat the baths with.  There was a
18  plumbing shop.  Part of our maintenance group was
19  down there.  There was a plumbing shop there.  It was
20  a grungy place I tried to stay out of.
21   Q.   Were there any loading docks or areas
22  from the outside that were accessible to the
23  basement?  Well, I'll ask the question differently.
24   A.   Yes.
25   Q.   Do you recall how the waste material in

Page 44

1  this storage tank was removed from the storage tank?
2    A.   Pumped out.
3    Q.   And where was it pumped from, I mean
4  just describe how that process happened?
5    A.   I don't know the exact process.
6    Q.   Do you recall whether it was pumped into
7  drums or pumped into a truck?
8    A.   It was pumped into Waste Conversion
9  Systems, as I remember, would send tank trucks, we
10  pumped it right into a tank truck.
11   Q.   And do you recall the process of how
12  that happened, would the truck park inside the actual
13  basement or was there some kind of tube connecting
14  the storage tank to the truck itself?
15   A.   It was parked on a concrete apron in the
16  back of the acid house.  I can't recite the safety
17  procedures that were taken, you know, to avoid
18  spills.  But it was pumped from the tank in the
19  basement into the truck.  And I'm not aware of any
20  spills.
21   Q.   And you mentioned Waste Conversion?
22   A.   Yes.
23   Q.   Did you know any of the employees of
24  Waste Conversion, did you ever meet them?
25   A.   Did I know any of them?

Page 45

1    Q.   Yes.
2    A.   Yes, but this was in a time period of
3  the '80s, the late '80s.
4    Q.   Late '80s, okay.
5       Well, starting with the late '80s then
6  do you recall about how often they would come to haul
7  materials from the acid house?
8       MR. AGNELLO:  They meaning Waste
9  Conversion?
10      MR. DAVIES:  Waste Conversion.
11      THE WITNESS:  I don't.
12  BY MR. DAVIES:
13   Q.   Do you remember --
14   A.   I did --
15   Q.   I'm sorry, go ahead.
16   A.   I did not receive any reports on things
17  like that.  You know, I was used to looking at dollar
18  figures for what we were spending on things.  But I
19  wouldn't be able to say we went out every month, we
20  went every six months, I have no idea.
21   Q.   Do you recall what you were spending on
22  the hauling of the spent acid?
23   A.   You're taking me back too far.  No.
24   Q.   Well, let's go back just to the late
25  '80s, can you recall what you spent on hauling waste

12 (Pages 42 to 45)

Thomas M. Curran                                    December 2, 2004

Page 58

1   Yeah, that --
2           MR. AGNELLO: Wait. Let's get a period
3   here.
4   BY MR. DAVIES:
5       Q.   Let's start with the early, mid-'70s.
6       A.   I don't know who they were using during
7   that period.
8       Q.   How about the late 1970s?
9       A.   We used Chemclene. I can remember from
10  like the 1983, '84 period on we were using Chemclene
11  at that point.
12      Q.   Do you recall the name DeRewal?
13      A.   I've heard of the name DeRewal simply
14  because the EPA when they -- somebody interviewed me
15  and brought up that same name, I could not recall it
16  and I don't think -- I don't know whether any of our
17  other people did or not, but I don't know the name.
18  I just -- I don't know, you know, again what period
19  it was in, I guess I'm going to be embarrassed if
20  that name was somebody we were using after I sort of
21  took over. I don't recall that name though.
22      Q.   Now, let me just be clear, when you were
23  interviewed before by EPA, did you recall the name
24  DeRewal at that time?
25  (Objection) MR. AGNELLO: Objection. Just

Page 59

1   clarification, when was he interviewed?
2           MR. DAVIES: Well, he mentioned a
3   moment ago that he was interviewed by EPA and asked
4   about the name DeRewal.
5           MR. AGNELLO: So your question is at
6   the time of that interview, whenever that was, does
7   he recall today whether he remembered the name
8   DeRewal at that time?
9           MR. DAVIES: At that time.
10          MR. AGNELLO: Okay.
11          THE WITNESS: I kind of remember the
12  year of the interview but it seemed to me it was in
13  the early '90s some point.
14  BY MR. DAVIES:
15      Q.   I think I have it here. But aside from
16  the year.
17      A.   Anyway, they asked me about the name, I
18  said I could not recall it. But I don't, you know, I
19  don't remember, if we did have them, I don't remember
20  anything about them. And I wouldn't expect myself to
21  remember unless it was like after '84.
22          MR. DAVIES: Why don't I mark, this is
23  I guess a transcript of the interview. Maybe not
24  transcript, a summary and just make it Curran-2.
25      (Exhibit Curran-2, 2-page Summary Interview of

Page 60

1   Thomas M. Curran on 2/5/93, marked for I.D.)
2           MR. AGNELLO: Just for the record for
3   purposes of identification, Curran-2 is a two-page
4   document has the number A-3 and A-4 on the bottom and
5   first and second page, it's an unsigned document
6   looks like it was prepared by someone from Hemenway
7   Associates regarding an interview of Mr. Curran
8   allegedly.
9           THE WITNESS: Is this what we're going
10  to read now?
11          MR. AGNELLO: He's going to show you
12  it. I just wanted to clarify the description.
13  BY MR. DAVIES:
14      Q.   This is Curran-2, take a moment to look
15  at it, looks like it's February 5th, 1993 interview
16  that it's referencing.
17          MR. AGNELLO: Wait a minute, there's no
18  question.
19  BY MR. DAVIES:
20      Q.   Are you done reading it?
21      A.   Yes.
22      Q.   Now, this document Curran-2 seems to
23  indicate that the interviewer was named Richard
24  Grabill. Do you remember speaking with Mr. Grabill?
25      A.   Vaguely.

Page 61

1       Q.   And does the time frame here February
2   5th, 1993, does that appear to be about the same time
3   frame you recalled before when you mentioned you were
4   interviewed by an EPA person?
5       A.   Yes.
6       Q.   Now, on the second page towards the
7   bottom it mentions Mr. Curran stated that while the
8   name DeRewal was familiar to him he did not recognize
9   the names DeRewal Chemical Company, et cetera. Does
10  that seem accurate to you?
11          MR. AGNELLO: Again, just so that we're
12  clear, accurate of his recollection today of what was
13  said or accurate -- yeah, accurate today of what he
14  said at the time?
15          MR. DAVIES: Absolutely.
16          THE WITNESS: Yes.
17  BY MR. DAVIES:
18      Q.   I also see that it mentions the name
19  Robert Becker as a purchasing agent possibly in 1972
20  or 1973.
21          MR. AGNELLO: What paragraph is that?
22          MR. DAVIES: We're on the first page,
23  the third paragraph.
24          THE WITNESS: Um-hum.
25  BY MR. DAVIES:

1          C E R T I F I C A T E

2          I, Cynthia A. Cormaney, a Notary Public

3     and Certified Shorthand Reporter of the State

4     of New Jersey and a Commissioner of Deeds of

5     the State of Pennsylvania, do hereby certify

6     that the foregoing is a true and accurate

7     transcript of the testimony as taken

8     stenographically by and before me at the time,

9     place and on the date hereinbefore set forth.

10         I do further certify that I am neither a

11    relative nor employee nor attorney nor counsel

12    of any of the parties to this action, and that

13    I am neither a relative nor employee of such

14    attorney or counsel and that I am not

15    financially interested in this action.

16

17    _____
      Cynthia A. Cormaney, C.S.R.
18    Notary Public, State of New Jersey
      My Commission Expires July 24, 2006
19    Certificate No. XI01116

20

21

22

23

24

25

# EXHIBIT B

```
1              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2   _____  _____
                                 CIVIL ACTION NO.
3   BOARHEAD FARM AGREEMENT      02-CV-3830
    GROUP,                       Judge Legrome D.
4   Davis

5          Plaintiff,
        vs.
6
    ADVANCED ENVIRONMENTAL TECHNOLOGY
7   CORPORATION; ASHLAND CHEMICAL
    COMPANY; BOARHEAD CORPORATION;
8   CARPENTER TECHNOLOGY CORPORATION;
    CROWN METRO, INC.; DIAZ CHEMICAL
9   CORPORATION; EMHART INDUSTRIES,    ORAL DEPOSITION OF:
    INC.; ETCHED CIRCUITS, INC.; FCG,
10  INC.; GLOBE DISPOSAL COMPANY, INC.;   JOHN BARSUM
    GLOBE-WASTECH, INC.; HANDY & HARMAN
11  TUBE COMPANY, INC.; KNOLL, INC.;
    MERIT METAL PRODUCTS CORPORATION;
12  NOVARTIS CORPORATION; NRM INVESTMENT
    COMPANY; PLYMOUTH TUBE COMPANY;
13  QUIKLINE DESIGN AND MANUFACTURING
    COMPANY; RAHNS SPECIALTY METALS,
14  INC.; ROHM & HAAS COMPANY, SIMON
    WRECKING COMPANY, INC.; TECHALLOY
15  COMPANY, INC.; THOMAS & BETTS
    CORPORATION; UNISYS CORPORATION;
16  UNITED STATES OF AMERICA
    DEPARTMENT OF NAVY,
17
            Defendants.
18  _____

19             *   *   *   *   *
            Monday, September 8, 2003
20             *   *   *   *   *
            Transcript in the above matter taken at
21  the offices of Ballard, Spahr, Andrews & Ingersoll,
    LLP, 1735 Market Street, 42nd Floor, Philadelphia,
22  Pennsylvania, commencing at 10:05 a.m.

23       Certified Shorthand Reporting Services
                 Arranged Through
24         Mastroianni & Formaroli, Inc.
               709 White Horse Pike
25         Audubon, New Jersey 08106
                (856) 546-1100
```

```
 1  A P P E A R A N C E S:

 2          BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
            BY: GLENN A. HARRIS, ESQUIRE
 3          PLAZA 1000, MAIN STREET, # 500
            VOORHEES, NEW JERSEY  08043
 4          (856)761-3400
            ATTORNEYS FOR THE PLAINTIFF
 5

 6          HINMAN, HOWARD & KATTELL, LLP
            BY:  RALPH K. KESSLER, ESQUIRE
 7          106 CORPORATE PARK DRIVE, SUITE 317
            WHITE PLAINS, NEW YORK  10604
 8          (914)694-4102
            ALSO APPEARING FOR THE PLAINTIFF

 9          WOLFF & SAMSON, PC
            BY:  THOMAS W. SABINO, ESQUIRE
10          THE OFFICES AT CRYSTAL LAKE
            ONE BOLAND DRIVE
11          WEST ORANGE, NEW JERSEY  07052-3698
            (973)530-2044
12          ATTORNEYS FOR THE DEFENDANT,
            ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION
13
            PHELAN, PETTIT & BIEDRZYCKI, ESQUIRES
14          BY:  DAVID M. DOTO, ESQUIRE
            NORTH AMERICAN BUILDING
15          121 SOUTH BROAD STREET, SUITE 1600
            PHILADELPHIA, PENNSYLVANIA  19107
16          (215)546-0500
            ATTORNEYS FOR THE DEFENDANT,
17          ASHLAND CHEMICAL COMPANY

18          EDWARDS & ANGELL, LLP
            BY:  LYNN WRIGHT, ESQUIRE
19          51 JOHN F. KENNEDY PARKWAY
            SHORT HILLS, NEW JERSEY  07078-5006
20          (973)376-7700
            ATTORNEYS FOR THE DEFENDANT,
21          CARPENTER TECHNOLOGY CORPORATION

22          SWIDLER, BERLIN, SHEREFF, FRIEDMAN, LLP
            BY:  LAURA A. FORD, ESQUIRE
23          3000 K STREET, N.W., SUITE 300
            WASHINGTON, D.C.  20007-5116
24          (202)424-7861
            ATTORNEYS FOR THE DEFENDANTS,
25          CROWN METRO and EMHART INDUSTRIES
```

```
 1   A P P E A R A N C E S  (CONTINUED:)

 2           DUANE MORRIS
             BY:  A. NICOLE FRIANT, ESQUIRE
 3           ONE LIBERTY PLACE
             PHILADELPHIA, PENNSYLVANIA  19103-7396
 4           (215)979-1818
             ATTORNEYS FOR THE DEFENDANT,
 5           FLEXIBLE CIRCUITS

 6           CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
                STEWART & OLSTEIN, PC
 7           BY:  MELISSA E. FLAX, ESQUIRE
             5 BECKER FARM ROAD
 8           ROSELAND, NEW JERSEY  07068-1739
             (973)994-1700
 9           ATTORNEYS FOR THE DEFENDANT,
             HANDY & HARMAN TUBE COMPANY, INC.
10
             MC NEES, WALLACE & NURICK, LLC
11           BY:  RICHARD H. FRIEDMAN, ESQUIRE
             100 PINE STREET
12           HARRISBURG, PENNSYLVANIA  17108-1166
             (717)237-5469
13           ATTORNEYS FOR THE DEFENDANT, KNOLL, INC.

14           MONTEVERDE, MC ALEE & HURD, ESQUIRES
             BY:  STEPHEN P. CHAWAGA, ESQUIRE
15           1617 JFK BOULEVARD, SUITE 1500
             PHILADELPHIA, PENNSYLVANIA  19103-1815
16           (215)557-2900
             ATTORNEYS FOR THE DEFENDANT,
17           MERIT METALS PRODUCTS CORPORATION

18           MORGAN, LEWIS & BOCKIUS, LLP
             BY:  MICHAEL R. DILLON, ESQUIRE
19           and WADE B. WILSON, ESQUIRE
             1701 MARKET STREET
20           PHILADELPHIA, PENNSYLVANIA  19103-2921
             (215)963-4938
21           ATTORNEYS FOR THE DEFENDANT,
             NOVARTIS CORPORATION
22
             HENDERSON, WETHERILL, O'HEY & HORSEY, ESQUIRES
23           BY:  EDWARD FACKENTHAL, ESQUIRE
             ONE MONTGOMERY PLAZA, SUITE 902
24           NORRISTOWN, PENNSYLVANIA  19404
             (610)279-3370
25           ATTORNEYS FOR THE DEFENDANT,
             NRM INVESTMENT COMPANY
```

4

1  A P P E A R A N C E S  (CONTINUED:)

2          JONES, LEMON, GRAHAM & CLANCY, ESQUIRES
           BY:  STEVEN J. LEMON, ESQUIRE
3          223 EAST STATE STREET
           GENEVA, ILLINOIS  60134-0805
4          (630)208-0805
           ATTORNEYS FOR THE DEFENDANT,
5          PLYMOUTH TUBE COMPANY

6          SCHMIDT & TOMLINSON, ESQUIRES
           BY:  MARGARET QUINN, ESQUIRE
7          29 UNION STREET
           MEDFORD, NEW JERSEY  08055
8          (609)714-0600
           ATTORNEYS FOR THE DEFENDANT,
9          QUIKLINE DESIGN AND MANUFACTURING COMPANY

10         ROHM AND HAAS COMPANY
           BY:  JENNIFER BERKE LEVIN, ESQUIRE
11         100 INDEPENDENCE MALL WEST
           PHILADELPHIA, PENNSYLVANIA  19106-2399
12         ATTORNEYS FOR THE DEFENDANT,
           ROHM AND HAAS COMPANY
13
           MATTLEMAN, WEINROTH & MILLER, PC
14         BY:  SHARON ORAS MORGAN, ESQUIRE
           LAND TITLE BUILDING, SUITE 2226
15         BROAD & CHESTNUT STREETS
           PHILADELPHIA, PENNSYLVANIA  19110
16         (215)923-2225
           ATTORNEYS FOR THE DEFENDANT,
17         SIMON WRECKING COMPANY, INC.

18         DRINKER, BIDDLE & REATH, LLP
           BY:  ADINA M. DZIUK, ESQUIRE
19         ONE LOGAN SQUARE
           18TH & CHERRY STREETS
20         PHILADELPHIA, PENNSYLVANIA  19103-6996
           (215)988-2696
21         ATTORNEYS FOR THE DEFENDANTS,
           RAHNS SPECIALTY METALS, INC.,
22         TECHALLOY COMPANY, INC., THOMAS & BETTS
           CORPORATION and UNISYS CORPORATION
23

24

25

```
 1   A P P E A R A N C E S (CONTINUED:)

 2            DEPARTMENT OF THE NAVY
              NAVY LITIGATION OFFICE
 3            OFFICE OF THE GENERAL COUNSEL
              BY:  JOHN D. TEW, SENIOR TRIAL ATTORNEY
 4            720 KENNON STREET SE, ROOM 233
              WASHINGTON NAVY YARD, D.C.
 5            (202)685-7030
              ATTORNEYS FOR THE DEFENDANT,
 6            UNITED STATES OF AMERICA DEPARTMENT OF NAVY

 7

 8   A L S O   P R E S E N T:

 9            ED BARSUM

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

326

```
 1        A.    No.
 2                  MR. DILLON:  Objection to the form.
 3   Other than he's seen the other trucks down at
 4   Wissinoming?
 5   BY MR. HARRIS:
 6        Q.    I'd like to show you a document that's
 7   previously been marked as P-42.  It's a DeRewal
 8   Chemical invoice to Handy & Harman Tube Company in
 9   Norristown, Pennsylvania.  Do you see where it says
10   Township Line Road on there?
11        A.    Yes.
12        Q.    Looking at that document, I know we talked
13   about Jenkintown and we talked about cyanide and we
14   talked about the words Handy & Harman that you say you
15   saw on a sign.
16        A.    I remember the name Norristown, that's where
17   it was at.  I remember it.
18        Q.    Having seen this piece of paper --
19        A.    It was right by Bridgeport.
20        Q.    -- do you think that you personally went to
21   a place called Handy & Harman in, near Norristown?
22        A.    One time, that's all, Glenn.  That's where
23   it was at, Norristown, not Jenkintown.  I'm sorry, I
24   said Jenkintown.  That was Standard.
25        Q.    So you went to both places; is that right?
```

1      A.    Yeah, I did, because I remember crossing the

2  bridge on Ridge Road.  I know, yeah.

3      Q.    So now, what did the place --

4      A.    I remember that now.

5      Q.    Now, that we're focusing on this Handy &

6  Harman --

7      A.    One time though.

8      Q.    Okay, one time.  What did that one look

9  like?  Do you remember what that one looked like?

10      A.    No, I can't remember.

11      Q.    What did you pick up the time you went

12  there?

13      A.    Drums.

14      Q.    How many?

15      A.    Fifteen, 10 or 15.

16      Q.    Are you just guessing?

17      A.    Twelve, 15.  Maybe 25.  I don't know.

18      Q.    You don't remember, is that a fair

19  statement?

20      A.    I'm saying it -- yeah, it wasn't no full

21  trailer load.

22      Q.    Okay.

23      A.    Could have been 20; 15, 20.

24      Q.    And you don't remember what that facility

25  looked like?

1        A.    No, that was nighttime.  I remember it now

2    when I see Norristown, yeah.  I remember going across

3    that bridge --

4        Q.    Okay.

5        A.    -- to get there.

6        Q.    All right.  What were you driving?

7        A.    Fred's truck.

8        Q.    The Brockway?

9        A.    Yeah.

10       Q.    Pulling a trailer, a flat trailer?

11       A.    Yeah.

12       Q.    Where did you take those drums to be

13   disposed?

14       A.    Philadelphia, Ontario.

15       Q.    Did you ever take waste down to Marvin

16   Jonas's Sewell location from a DeRewal customer before

17   Ontario opened?

18       A.    Well, I'll tell you he had a couple flatbeds

19   there with drums to go, before Wissinoming and Ontario

20   came in.  And that's where we took it from Fred's down

21   to Jonas.  It was up there already and I just drove it

22   down, dropped it.  Frankie said just drop it right

23   here, I put it there and dropped it.

24       Q.    Two times?

25       A.    Couple times, yeah.

```
 1              C E R T I F I C A T E

 2          I, Karen L. Siedlecki, a Notary Public and

 3  Certified Shorthand Reporter of the State of New

 4  Jersey and Commissioner of Deeds for the Commonwealth

 5  of Pennsylvania, do hereby certify that the foregoing

 6  is a true and accurate transcript of the testimony

 7  as taken stenographically by and before me at the

 8  time, place and on the date hereinbefore set

 9  forth.

10          I do further certify that I am neither a

11  relative nor employee nor attorney nor counsel of

12  any of the parties to this action, and that I am

13  neither a relative nor employee of such attorney

14  or counsel and that I am not financially

15  interested in this action.

16

17

18      _____
        Karen L. Siedlecki, C.S.R. #XI 01958
19      Notary Public, State of New Jersey
        Certificate No. 2162671
20      My Commission expires 2-17-04
        Commissioner of Deeds expires 9-4-06
21

22

23

24

25
```

# EXHIBIT C



**Handy & Harman**
**Tube Co., Inc.**

Township Line & Whitehall Road, RD #3, Norristown, PA 19403
Telephone: (215) 539-3900 • FAX: (215) 539-3250

ORIGINAL
(Red)

January 7, 1993

Ms. Joan E. Martin-Banks
U.S. Environmental Protection Agency
PRP Search Section (3HW11)
841 Chestnut Building, 9th Floor
Philadelphia, PA 19107

Re:    Supplemental Information Submission
       Boarhead Farms Site
       Bridgeton Township
       Bucks County, Pennsylvania

Dear Ms. Martin-Banks,

In accordance with the United States Environmental Protection Agency (U.S.
EPA) directive letter received on Tuesday, January 5, 1993 and our same day
telephone discussion regarding the above mentioned subject, Handy & Harman
Tube Company, Inc. (Handy) is providing supplemental information as outlined
in the U.S. EPA questionnaire letter dated September 30, 1992.

To summarize, Handy's initial reply to the U.S. EPA questionnaire letter dated
September 30, 1992 was answered on October 29, 1992 by Mr. Francis Rosato,
Director of Manufacturing. The U.S. EPA had stated in their letter received
Tuesday, January 5, 1993 that Handy's initial reply letter dated October 29,
1992 did not provide an "adequate response".

Handy's supplemental information submission response to the  U.S. EPA ques-
tionnaire letter dated September 30, 1992 is as follows:

    1.    The nature of Handy's current business is the production
        of small diameter stainless, nickel alloy, carbon and
        alloy steel tubing in a wide range of diameters, wall
        thickness, shapes and forms. The nature of Handy's
        business between the years of 1969 through 1977 was
        similar to current operations.

    2.    According to information obtained from employees who
        recall operations between the years of 1969 through 1977,
        waste streams included general plant trash including
        packaging material and office refuse. A waste stream
        designated as "Industrial Waste Solution" was also
        shipped out for disposal. It is not known what chemical
        components or characteristics comprised the "Industrial
        Waste Solution". The physical state of the waste streams
        were probably solids and liquids, based upon past opera-
        tions in the mill.



EXHIBIT
Curran-1
12-2-04

-2-

The annual quantity of each by-product or waste produced by Handy between 1969 and 1977 is unknown. After an extensive search for active and inactive records at Handy, no waste stream records or manifests were located for the period of 1969 through 1977. Unfortunately, records and manifests were not kept by Handy during the period of 1969 through 1977.

The current processes at Handy include a degreasing bath utilizing TCE, a pickling operation utilizing nitric, hydrochloric and hydrofluoric acids. Spent oils, sandblast dust and inert materials contaminated with TCE are also generated from process operations. General plant trash and office refuse are also currently generated.

3.   The following list of personnel may potentially have limited knowledge of disposal, treatment or coordination of disposal transportation between the years of 1969 through 1977 and are provided for your convenience:

    a.    Thomas C. Curran, Vice President
            Whitehall & Township Line Roads
            Norristown, PA 19403
            (215) 539-3900

            Area of Responsibility: Coordinate Manufacturing and Operations

    b.    Mary Kollmar, Purchasing Manager
            Whitehall & Township Line Roads
            Norristown, PA 19403
            (215) 539-3900

            Area of Responsibility: Coordinate Purchasing Operations

    c.    Jay Crawford, Welding & Raw Materials Supervisor
            Whitehall & Township Line Roads
            Norristown, PA 19403
            (215) 539-3900

            Area of Responsibility: Coordinate Welding and Raw Material Operations

4.   Based upon employees who recall operations at Handy between the years of 1969 through 1977, a local waste hauler was contracted to dispose of the material. Information regarding the name of the contracted hauler, the types of waste and the quantities of waste generated are unknown.



A currently inactive cistern, located outside in the storage yard, was once utilized for disposal of waste materials. The quantities and components of the waste stream disposal in the cistern are unknown.

5.  Due to the lack of available waste disposal records and manifests, the name of the waste hauler, the type of waste hauled, the quantity of waste generated, the dates the waste was generated, the month each waste was containerized and the precise locations at which each material was disposed is unknown. The personnel who selected the disposal site, the final disposition of each material involved in the transaction and the names of owners and agents for the transporter are also unknown.

6.  The physical state of material disposed of off-site and on-site are unknown due to a lack of available records and manifests between the years of 1969 and 1977. However, based upon current operations, liquid and solid phase wastes were probably generated. There are no available records to indicate the name of the hauler or who supplied Handy with hauling services.

A currently inactive cistern, was utilized to some degree to dispose of wastes generated by Handy between the years of 1969 through 1977 (see response #4). Unfortunately, records regarding the components, quantity or handling procedures of the wastes were not kept.

7.  This answer can be found in response #3.

8.  Waste disposal records, waste disposal applications and waste disposal permits submitted to regulatory agencies between the years 1969 through 1977 were not kept.

9.  Copies of correspondence regarding waste disposal between Handy and third parties were not kept between the years of 1969 through 1977.

10.  This answer can be found in response #3. No waste disposal records have been discovered between the years of 1969 through 1977.

11.  This answer can be found in response #3. No change in ownership of Handy occurred between 1969 and 1977.

-4-

ORIGINAL
(Red)

12.  Additional information regarding the project should be
     directed to:

     Thomas C. Curran, Vice President
     Whitehall & Township Line Roads
     Norristown, PA  19403
     (215) 539-3900

13.  This answer can be found in response #3.

14.  This answer can be found in response #3.

15.  This answer can be found in response #12.

Since the inception of RCRA rules and regulations during the year 1976, Handy
has been keeping waste disposal records and manifests in accordance with
applicable Federal and State guidelines.   Unfortunately, waste disposal
records and manifests were not kept between the years 1969 through 1977.

Handy is prepared to cooperate fully with the U.S. EPA on this matter.

If you have any questions or should require additional information, please
telephone me at (215) 539-3900.

Sincerely,

Thomas M. Curran
Vice President
Handy & Harman Tube Company

TMC

# EXHIBIT D

1

```
 1              UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3                              CIVIL ACTION NO.
         BOARHEAD FARM AGREEMENT     02-CV-3830
 4       GROUP,                 Judge Legrome D. Davis
                  Plaintiff,    Oral Deposition of
 5
              vs.               MANFRED T. DE REWAL, SR.
 6       ADVANCED ENVIRONMENTAL TECHNOLOGY
         CORPORATION; ASHLAND CHEMICAL
 7       COMPANY; BOARHEAD CORPORATION;
         CARPENTER TECHNOLOGY CORPORATION;
 8       CROWN METRO, INC.; DIAZ CHEMICAL
         CORPORATION; EMHART INDUSTRIES,
 9       INC.; ETCHED CIRCUITS, INC.; FCG,
         INC.; GLOBE DISPOSAL COMPANY, INC.;
10       GLOBE-WASTECH, INC.; HANDY & HARMAN
         TUBE COMPANY, INC.; KNOLL, INC.;
11       MERIT METAL PRODUCTS CORPORATION;
         NOVARTIS CORPORATION; NRM INVESTMENT
12       COMPANY; PLYMOUTH TUBE COMPANY;
         QUIKLINE DESIGN AND MANUFACTURING
13       COMPANY; RAHNS SPECIALTY METALS,
         INC.; ROHM & HAAS COMPANY, SIMON
14       WRECKING COMPANY, INC.; TECHALLOY
         COMPANY, INC.; THOMAS & BETTS
15       CORPORATION; UNISYS CORPORATION;
         UNITED STATES OF AMERICA
16       DEPARTMENT OF NAVY,
                  Defendants.
17

18              *   *   *   *   *
              Wednesday, May 7, 2003
19              *   *   *   *   *

20              Transcript in the above matter taken at
         the offices of Ballard, Spahr, Andrews & Ingersoll,
21       LLP, 1735 Market Street, 42nd Floor, Philadelphia,
         Pennsylvania, commencing at 10:10 A.M.
22
              Certified Shorthand Reporting Services
23                   Arranged Through
              Mastroianni & Formaroli, Inc.
24                709 White Horse Pike
                Audubon, New Jersey 08106
25                  (856) 546-1100
```

2

```
 1   A P P E A R A N C E S:

 2        BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
          BY: GLENN A. HARRIS, ESQUIRE
 3        PLAZA 1000, MAIN STREET, # 500
          VOORHEES, NEW JERSEY  08043
 4        (856)761-3400
          ATTORNEYS FOR THE PLAINTIFF
 5
          HINMAN, HOWARD & KATTELL, LLP
 6        BY:  RALPH K. KESSLER, ESQUIRE
          106 CORPORATE PARK DRIVE, SUITE 317
 7        WHITE PLAINS, NEW YORK  10604
          (914)694-4102
 8        ALSO APPEARING FOR THE PLAINTIFF

 9        CYTEC INDUSTRIES, INC.
          BY:  THOMAS A. WALDMAN, ESQUIRE
10        5 GARRET MOUNTAIN PLAZA
          WEST PATERSON, NEW JERSEY  07424
11        (973)357-3136
          ALSO APPEARING FOR THE PLAINTIFF
12
          FORD MOTOR COMPANY
13        BY:  KATHY J. HOFER, ESQUIRE
          PARKLANE TOWERS WEST, SUITE 1500
14        3 PARKLANE BOULEVARD
          DEARBORN, MICHIGAN  48126-2493
15        (313)594-1687
          ALSO APPEARING FOR THE PLAINTIFF
16
          WOLFF & SAMSON, PC
17        BY:  THOMAS W. SABINO, ESQUIRE
          THE OFFICES AT CRYSTAL LAKE
18        ONE BOLAND DRIVE
          WEST ORANGE, NEW JERSEY  07052-3698
19        (973)530-2044
          ATTORNEYS FOR THE DEFENDANT,
20        ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION

21        PHELAN, PETTIT & BIEDRZYCKI, ESQUIRES
          BY:  DAVID M. DOTO, ESQUIRE
22        NORTH AMERICAN BUILDING
          121 SOUTH BROAD STREET, SUITE 1600
23        PHILADELPHIA, PENNSYLVANIA  19107
          (215)546-0500
24        ATTORNEYS FOR THE DEFENDANT,
          ASHLAND CHEMICAL COMPANY
25
```

3

```
 1    A P P E A R A N C E S  (CONTINUED:)

 2         EDWARDS & ANGELL, LLP
           BY:  LYNN WRIGHT, ESQUIRE
 3         51 JOHN F. KENNEDY PARKWAY
           SHORT HILLS, NEW JERSEY  07078-5006
 4         (973)376-7700
           ATTORNEYS FOR THE DEFENDANT,
 5         CARPENTER TECHNOLOGY CORPORATION

 6         SWIDLER, BERLIN, SHEREFF, FRIEDMAN, LLP
           BY:  LAURA A. FORD, ESQUIRE
 7         3000 K STREET, N.W., SUITE 300
           WASHINGTON, D.C.  20007-5116
 8         (202)424-7861
           ATTORNEYS FOR THE DEFENDANTS,
 9         CROWN METRO and EMHART INDUSTRIES

10         DUANE MORRIS
           BY:  A. NICOLE FRIANT, ESQUIRE
11         ONE LIBERTY PLACE
           PHILADELPHIA, PENNSYLVANIA  19103-7396
12         (215)979-1818
           ATTORNEYS FOR THE DEFENDANT,
13         FLEXIBLE CIRCUITS

14         CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
           STEWART & OLSTEIN, PC
15         BY:  MELISSA E. FLAX, ESQUIRE
           6 BECKER FARM ROAD
16         ROSELAND, NEW JERSEY  07068-1739
           (973)994-1700
17         ATTORNEYS FOR THE DEFENDANT,
           HANDY & HARMAN TUBE COMPANY, INC.
18
           MC NEES, WALLACE & NURICK, LLC
19         BY:  RICHARD H. FRIEDMAN, ESQUIRE
           100 PINE STREET
20         HARRISBURG, PENNSYLVANIA  17108-1166
           (717)237-5469
21         ATTORNEYS FOR THE DEFENDANT, KNOLL, INC.

22         MONTEVERDE, MC ALEE & HURD, ESQUIRES
           BY:  STEPHEN P. CHAWAGA, ESQUIRE
23         1617 JFK BOULEVARD, SUITE 1500
           PHILADELPHIA, PENNSYLVANIA  19103-1815
24         (215)557-2900
           ATTORNEYS FOR THE DEFENDANT,
25         MERIT METALS PRODUCTS CORPORATION
```

4

```
 1    A P P E A R A N C E S  (CONTINUED:)

 2         MORGAN, LEWIS & BOCKIUS, LLP
           BY:  MICHAEL R. DILLON, ESQUIRE
 3         1701 MARKET STREET
           PHILADELPHIA, PENNSYLVANIA  19103-2921
 4         (215)963-4938
           ATTORNEYS FOR THE DEFENDANT,
 5         NOVARTIS CORPORATION

 6         HENDERSON, WETHERILL, O'HEY & HORSEY, ESQUIRES
           BY:  EDWARD FACKENTHAL, ESQUIRE
 7         ONE MONTGOMERY PLAZA, SUITE 902
           NORRISTOWN, PENNSYLVANIA  19404
 8         (610)279-3370
           ATTORNEYS FOR THE DEFENDANT,
 9         NRM INVESTMENT COMPANY

10         JONES, LEMON, GRAHAM & CLANCEY, ESQUIRES
           BY:  STEVEN J. LEMON, ESQUIRE
11         223 EAST STATE STREET
           GENEVA, ILLINOIS  60134-0805
12         (630)208-0805
           ATTORNEYS FOR THE DEFENDANT,
13         PLYMOUTH TUBE COMPANY

14         SCHMIDT & TOMLINSON, ESQUIRES
           BY:  SANFORD F. SCHMIDT, ESQUIRE
15             and MARGARET QUINN, ESQUIRE
           29 UNION STREET
16         MEDOFRD, NEW JERSEY  08055
           (609)714-0600
17         ATTORNEYS FOR THE DEFENDANT,
           QUICKLINE DESIGN AND MANUFACTURING COMPANY
18
           ROHM AND HAAS COMPANY
19         BY:  JENNIFER BERKE LEVIN, ESQUIRE
           100 INDEPENDENCE MALL WEST
20         PHILADELPHIA, PENNSYLVANIA  19106-2399
           ATTORNEYS FOR THE DEFENDANT,
21         ROHM AND HAAS COMPANY

22         MATTLEMAN, WEINROTH & MILLER, PC
           BY:  SHARON ORAS MORGAN, ESQUIRE
23         LAND TITLE BUILDING, SUITE 2226
           BROAD & CHESTNUT STREETS
24         PHILADELPHIA, PENNSYLVANIA  19110
           (215)923-2225
25         ATTORNEYS FOR THE DEFENDANT,
           SIMON WRECKING COMPANY, INC.
```

5

```
 1   A P P E A R A N C E S  (CONTINUED:)

 2        DRINKER, BIDDLE & REATH, LLP
          BY:  ANDREW P. FOSTER, ESQUIRE
 3            and ADINA M. DZIUK, ESQUIRE
          ONE LOGAN SQUARE
 4        18TH & CHERRY STREETS
          PHILADELPHIA, PENNSYLVANIA  19103-6996
 5        (215)988-2512
          ATTORNEYS FOR THE DEFENDANTS,
 6        RAHNS SPECIALTY METALS, INC.,
          TECHALLOY COMPANY, INC., THOMAS & BETTS
 7        CORPORATION and UNISYS CORPORATION

 8        NAVY LITIGATION OFFICE
          BY:  ROBERT MANLEY, ESQUIRE
 9        WASHINGTON NAVY YARD
          WASHINGTON, D.C.  20002
10        (202)685-6987
             -and-
11        UNITED STATES DEPARTMENT OF JUSTICE
          ENVIRONMENT & NATURAL RESOURCES
12        BY:  JOHN SHEEHAN, ESQUIRE (present via phone)
          601 D STREET NW, SUITE 8120
13        WASHINGTON, D.C.
          (202)514-0995
14        ATTORNEYS FOR THE DEFENDANT,
          UNITED STATES OF AMERICA DEPARTMENT OF NAVY
15

16

17

18

19

20

21

22

23

24

25
```

153

1        A.      I don't even know the type of waste they

2    have.

3                    (Exhibit P-42, Invoice to Handy &

4              Harman, marked for I.D.)

5        Q.      Mr. DeRewal, take a look at the document

6    that's been marked Exhibit P-42 and let me ask you

7    whether you recognize this or not.

8        A.      It's an invoice to Handy & Harman.

9        Q.      Okay.  Taking a look at the invoice

10    where it says 55-gallon drums industrial waste

11    solution and 30-gallon drums.  Does that jog your

12    memory as to what kind of waste Handy & Harman had?

13        A.      No.

14        Q.      Now, this invoice is addressed to

15    Norristown, Pennsylvania.  I forgot what town you

16    mentioned a moment ago when I asked you about them.

17        A.      I don't know.  I thought they were in

18    Paoli.  They might be in Norristown.

19        Q.      You don't have a real good recollection

20    of this customer, right?

21        A.      No.

22                    MR. HARRIS:  Okay.  Nobody

23              objected.  That was leading, I can't

24              understand it.

25                    (Off-the-record discussion.)

186

```
 1              C E R T I F I C A T E

 2         I, NORA M. GALLAGHER, a Notary Public and

 3    Certified Shorthand Reporter of the State of New

 4    Jersey, and Commissioner of Deeds of the Commonwealth

 5    of Pennsylvania, do hereby certify that prior to the

 6    commencement of the examination,

 7              MANFRED T. DE REWAL

 8    was duly sworn by me to testify to the truth, the

 9    whole truth and nothing but the truth.

10              I do further certify that the foregoing

11    is a true and accurate transcript of the testimony as

12    taken stenographically by and before me at the time,

13    place and on the date hereinbefore set forth.

14              I do further certify that I am neither

15    a relative nor employee nor attorney nor counsel of

16    any of the parties to this action, and that I am

17    neither a relative nor employee of such attorney or

18    counsel and that I am not financially interested in

19    this action.

20

21

22         Nora M. Gallagher, C.S.R.
           My Commission Expires October 24, 2007
23         Certificate No. XI00911
           Date:
24

25
```

**EXHIBIT E**

lrees.txt

1

```
 1            UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3  _____  CIVIL ACTION NO.
                                     02-CV-3830
 4
    Boarhead Farm Agreement Group,
 5
              Plaintiff,          Oral Deposition of
 6
         vs.                        Larry Rees
 7
    Advanced Environmental
 8  Technology Corporation;
    Ashland Chemical Company;
 9  Boarhead Corporation;
    Carpenter Technology
10  Corporation; Crown Metro,
    Inc.; Diaz Chemical Corporation;
11  Emhart Industries, Inc.; Globe
    Disposal Company, Inc.;
12  Globe-Wastech, Inc.; Handy &
    Harman Tube Company, Inc.;
13  Knoll, Inc.; Merit Metal
    Products Corporation; Novartis
14  Corporation; NRM Investment
    Company; Plymouth Tube Company;
15  Quikline Design and Manufacturing
    Company; Rahns Specialty Metals,
16  Inc.; Rohm & Haas Company; Simon
    Wrecking Company, Inc.; Techalloy
17  Company, Inc.; Thomas & Betts
    Corporation; Unisys Corporation;
18  United States of America
    Department of Navy,
19
              Defendants.
20  _____

21

22
            Certified Shorthand Reporting Services
23               arranged through
            Mastroianni & Formaroli, Inc.
24               709 White Horse Pike
            Audubon, New Jersey 08106
25               (856) 546-1100
```

2

```
 1                 *   *   *   *   *
              Thursday, November 18, 2004
                      Page 1
```

```
                          lrees.txt
2                      *   *   *   *   *

3              Transcript in the above matter taken at
        the offices of Ballard, Spahr, Andrews & Ingersoll,
4       Esquires, 1735 Market Street, Philadelphia,
        Pennsylvania, commencing at 9:30 a.m.
5
        A P P E A R A N C E S:
6
             BALLARD, SPAHR, ANDREWS & INGERSOLL, ESQUIRES
7            BY:  MARC E. DAVIES, ESQUIRE
                    - and -
8                ANNE HEIDEL, ESQUIRE
             1735 MARKET STREET
9            51ST FLOOR
             PHILADELPHIA, PENNSYLVANIA 19103
10           (215) 864-8248
             Attorneys for the Plaintiff,
11             BFAG

12           HINMAN, HOWARD & KATTELL, ESQUIRES
             BY:  RALPH K. KESSLER, ESQUIRE
13           106 CORPORATE PARK DRIVE
             SUITE 317
14           WHITE PLAINS, NEW YORK 10604
             (914) 694-4102
15           Attorneys for the Plaintiff,
               TI Automotive
16
17           CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
               STEWART & OLSTEIN, ESQUIRES
18           BY:  JOHN M. AGNELLO, ESQUIRE
             5 BECKER FARM ROAD
19           ROSELAND, NEW JERSEY 07068
             (973) 994-1700
20           Attorneys for the Defendant,
               Handy & Harman Tube Company
21

22

23

24

25
```

[]

3

```
1              W I T N E S S   I N D E X

2       Examination of Mr. Rees by Ms. Heidel:
               Page 5
3

4
```

Page 2

lrees.txt

19    the waste that was generated?

20        A.    What time period?

21        Q.    Sorry, from '79 to '84.

22        A.    No.

23        Q.    You said in the production process --

24    let's look at this again.

25            You mentioned part of the process was

26

LARRY REES - NOVEMBER 18, 2004

1    annealing?

2        A.    Um-hum.

3        Q.    Can you describe what that entails?

4        A.    It means taking material to a given

5    temperature, whatever the material calls for,

6    specification, you heat it to soften it up so we can

7    work it again.

8        Q.    Okay.

9            And was that done to prepare the tubes

10    before they were cut to size?

11        A.    No, it was for drawing.

12        Q.    For drawing.

13            Okay.

14            So just to clarify, from '84 to 2000

15    you were working on the second floor up here, were

16    you ever supervising people who were on the first

17    floor, either in the commercial mill or in the

18    production area on the first floor?

19        A.    No.

20        Q.    Okay.

Page 24

lrees.txt

1                      What about records for the waste
2    generated?
3          A.     That I wouldn't know.
4          Q.     What about invoices that you get from
5    outside vendors, do you know who is responsible for
6    that from '84 to 2004, what department?
7          A.     I'd just be guessing and say accounting,
8    but that's just a guess, I have no idea.
9          Q.     Okay.
10                 MS. HEIDEL:  Do you need a quick break?
11                 THE WITNESS:  No, I'm ready to go.
12                 MS. HEIDEL:  Can we take a five-minute
13   break and we'll be right back?
14                 THE WITNESS:  Sure.
15                 (Brief Recess.)
16                 MS. HEIDEL:  Actually, I think we're
17   done.
18                 MR. AGNELLO:  Good.
19                 MS. HEIDEL:  Thanks so much for coming
20   in.
21                 (Witness Excused.)
22                 (Testimony Concluded.)
23
24
25

▯

33

1            C E R T I F I C A T E
2        I, Christi A. Argenbright, a Notary Public and
3    Certified Shorthand Reporter of The State of New

Page 30

lrees.txt

4    Jersey and a Commissioner of Deeds of The State of

5    Pennsylvania, do hereby certify that prior to the

6    commencement of the examination,

7                        LARRY REES

8    was duly sworn by me to testify to the truth,

9    the whole truth and nothing but the truth.

10        I do further certify that the foregoing is

11    a true and accurate transcript of the testimony

12    as taken stenographically by and before me at the

13    time, place and on the date hereinbefore set forth.

14        I do further certify that I am neither a

15    relative nor employee nor attorney nor counsel of any

16    of the parties to this action, and that I am neither

17    a relative nor employee of such attorney or counsel

18    and that I am not financially interested in this

19    action.

20

21    _____

22    Christi A. Argenbright, C.S.R.
     Notary Public, State of New Jersey
     My Commission expires October 16, 2005
23    Certificate No. XI01789
     Date: December 6, 2004
24

25

34

1    (Exhibit LR-1, Diagram, is marked for
     identification.)............................. 18:7
2
     (Exhibit LR-2, Diagram, is marked for
3    identification.)............................. 24:7

4    (Exhibit LR-3, Invoice, is marked for
     identification.)............................. 24:9
5

6

Page 31

# EXHIBIT F

Thomas Bell

February 24, 2005

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
2

3    _____  Civil Action No.
                                        02-CV-3830
     BOARHEAD FARM AGREEMENT
4    GROUP,

5                  Plaintiff,        Oral Deposition of
                                        THOMAS BELL
6         vs.
7    ADVANCED ENVIRONMENTAL TECHNOLOGY
     CORPORATION; ASHLAND CHEMICAL
8    COMPANY; BOARHEAD CORPORATION;
     CARPENTER TECHNOLOGY CORPORATION;
9    CROWN METRO, INC.; DIAZ CHEMICAL
     CORPORATION; EMHART INDUSTRIES,
10   INC.; ETCHED CIRCUITS, INC.; FCG,
     INC.; GLOBE DISPOSAL COMPANY, INC.;
11   GLOBE-WASTECH, INC.; HANDY & HARMAN
     TUBE COMPANY, INC.; KNOLL, INC.;
12   MERIT METAL PRODUCTS CORPORATION;
     NOVARTIS CORPORATION; NRM INVESTMENT
13   COMPANY; PLYMOUTH TUBE COMPANY;
     QUIKLINE DESIGN AND MANUFACTURING
14   COMPANY; RAHNS SPECIALTY METALS,
     INC.; ROHM & HAAS COMPANY, SIMON
15   WRECKING COMPANY, INC.; TECHALLOY
     COMPANY, INC.; THOMAS & BETTS
16   CORPORATION; UNISYS CORPORATION;
     UNITED STATES OF AMERICA DEPARTMENT
17   OF NAVY,
18             Defendants.

19   _____

20              *   *   *   *   *
                Thursday, February 24, 2005
21                 *   *   *   *   *

22

23        Certified Shorthand Reporting Services
                    Arranged Through
24          Mastroianni & Formaroli, Inc.
                  709 White Horse Pike
25             Audubon, New Jersey 08106
                    (856) 546-1100

Page 2

Transcript in the above matter taken at
the offices of Drinker, Biddle & Reath, Esquires,
1000 Westlakes Drive, Berwyn, Pennsylvania,
commencing at 10:00 A.M.

APPEARANCES:

BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
BY: MARC E. DAVIES, ESQUIRE
1735 Market Street
51st Floor
Philadelphia, PA 19103-7599
215-864-8248
Attorneys for the Plaintiff

CARELLA, BYRNE, BAIN, GILFILLAN,
  CECCHI, STEWART & OLSTEIN, ESQUIRES
BY: JOHN M. AGNELLO, ESQUIRE
5 Becker Farm Road
Roseland, NJ 07068
973-994-1700
Attorneys for the Defendant,
Handy & Harman Tube Company

---

Page 3

WITNESS INDEX

Examination of Mr. Bell

By Mr. Davies:  Page 4

EXHIBITS

(Exhibits appear at the
conclusion of the transcript)
(Exhibits are retained by
counsel)

---

Page 4

1   (Thomas Bell, having been duly sworn, was examined
2   and testified as follows:)
3   (EXAMINATION OF MR. BELL BY MR. DAVIES:)
4        Q.   Mr. Bell, my name is Marc Davies.  We
5   just met.  I am an attorney representing a group of
6   companies involved with paying for the remediation or
7   clean-up of the landfill and we are suing another
8   number of other companies that they believe are also
9   involved.
10        We are going to go over the
11   instructions briefly.
12        I will ask, have you been deposed
13   before?
14        A.   You mean --
15        Q.   A deposition, with a court reporter.
16        A.   Uh-uh.
17        Q.   I will just go over a couple of the
18   instructions.  Again, if you have any questions about
19   these instructions or anything, please just ask.
20        First, your testimony is sworn
21   testimony.  You are answering under oath, just like
22   if you were in a courtroom.
23        Please make sure that your answers are
24   verbal.  The court reporter can't take down a shrug
25   or uh-huh.  We need a yes or no, whatever your answer

---

Page 5

1   is.
2        Also, please listen to my questions.
3   If you don't understand something, ask me to clarify,
4   I'm happy to do that.
5        On the same token, if I'm asking you
6   about something that you have a good basis to answer,
7   but you can't be precise, if you want to give a
8   range, an approximation, that's fine.  I don't want
9   you to guess.  If you don't know, don't guess, but if
10   you feel like you have a good handle on something and
11   you can give an exact number or a range, I would ask
12   you to do that.
13        We also need to make sure we don't talk
14   over each other so the court reporter can take
15   everything down.  Please make sure that I finish my
16   question completely before answering.  Also, the
17   attorney for the company might want to say something
18   as well, so just let's try to make sure we speak one
19   person at a time.
20        I will ask you whether you've taken any
21   medication of any kind within the last 24 hours that
22   might impact your ability to testify today.
23        A.   No.
24        Q.   Let's briefly go through your personal
25   information.  Your name again for the record?

Page 70

invoice from De Rewal Chemical Company dated February of 1973. Have you ever seen this invoice before?

A. No.

Q. Have you ever seen an invoice from De Rewal Chemical Company or anything with the name De Rewal on it?

A. Not to my knowledge or not to my memory, anyway.

Q. Aside from perhaps preparing for this deposition, have you ever heard the name De Rewal?

A. No.

Q. Looking under the description, the first thing that is mentioned is a 250-gallon oil tank. Did you ever have an oil tank like that at Handy & Harman?

A. You mean -- are we talking about 1973?

Q. Well, that would be where to start, yes.

A. I couldn't honestly say. I don't know if they had a 250-gallon oil tank in 1973 or not. I mean -- I don't know.

Q. Can you, in your mind, to your best recollection, ever recall Handy & Harman having a 250-gallon oil tank at any time?

A. Gas?

Q. I don't really know what it would hold,

Page 71

but a tank that would hold 250 gallons, whether it be gas or oil or whatever it holds. It could hold water. A tank of the size that would hold approximately 250 gallons.

(OBJECTION) MR. AGNELLO: Objection. I'd ask for a clarification.

At any time during his 45 years or 44 years at Handy & Harman does he remember ever seeing a 250-gallon tank that was used for any purpose, to store anything?

MR. DAVIES: Yes.

MR. AGNELLO: So it's any time, anything.

THE WITNESS: There was a gas tank, we used to fill the trucks and I believe that was 250 gallons. I could be wrong, but we had a gas tank that to me would have been 250 gallons.

BY MR. DAVIES:

Q. Where on Bell-1 would that have been?

MR. AGNELLO: Now, again, Bell-1 is the mid -- early to mid '70's document. You are now asking him for a gas tank. I guess the question is, not to ask it, but so we get the time periods, when did this time period exist, and Mr. Davis would like to know where it was.

Page 72

1  THE WITNESS: The gas tank that I'm
2  referring to would be in the late '90's into the 2000
3  area and it would have been kept about right there
4  (indicating).
5  MR. AGNELLO: Why don't you put gas
6  tank and put late '90's, 2000? That way, there is no
7  question.
8  BY MR. DAVIES:
9  Q. So prior to the late '90's, the gas tank
10  wasn't there that you've written on that drawing?
11  There was not a gas tank there prior to the late
12  '90's?
13  A. I don't know when it came. Within the
14  last couple of years, it went. I can't say it got
15  there February 10th, 1987. I don't know when it
16  first came. I remember -- the question was do you
17  remember ever seeing a tank, okay. I remember this
18  tank sometime in the '90's, at least in the '90's.
19  Q. Okay. Now, do you know that the tank
20  wasn't there in the '70's or do you just not recall
21  one way or the other?
22  A. I don't recall to say it wasn't there.
23  I'm just not sure of that. To say it was there, I'm
24  not sure of that.
25  Q. Fair enough. Going back to Bell-2,

Page 73

1  there are several 55-gallon drums and 30-gallon
2  drums, what is referred to as industrial waste
3  solution. Do you know what that is referring to?
4  A. No.
5  Q. Is that a term that you recall using
6  when you worked at Handy & Harman?
7  A. I wouldn't know what -- I don't know
8  what the term would be, how they would send out waste
9  product. I wouldn't have been privied to this or, if
10  I would have, I don't remember or recognize it.
11  Q. Now, under that, it says 25 empty
12  55-gallon drums delivered.
13  Can you tell me why they would be
14  delivering empty drums?
15  (OBJECTION) MR. AGNELLO: Objection as to form.
16  He already said he never saw the document before, so
17  I guess if your question is -- I object as to form,
18  foundation.
19  MR. DAVIES: I will rephrase slightly.
20  We talked a little bit earlier about
21  55-gallon drums being delivered for the two-week
22  shut-down. Aside from that, do you recall whether
23  empty drums were ever delivered to the facility?
24  (OBJECTION) MR. AGNELLO: Objection. I don't
25  think there is any testimony specifically about

19 (Pages 70 to 73)

1                    C E R T I F I C A T E

2

3

4

5          I, Lori A. Porto, a Notary Public and

6     Certified Shorthand Reporter of the State of New

7     Jersey, do hereby certify that that the

8     foregoing is a true and accurate transcript of

9     the testimony as taken stenographically by and

10    before me at the time, place and on the date

11    hereinbefore set forth. ·

12         I do further certify that I am neither a

13    relative nor employee nor attorney nor counsel

14    of any of the parties to this action, and that I

15    am neither a relative nor employee of such

16    attorney or counsel and that I am not

17    financially interested in this action.

18

19

20

21    _____
      Lori A. Porto, C.S.R.
22    Notary Public, State of New Jersey
      Certificate No. XI01577
23

24

25

# EXHIBIT G



**THE REGION'S HOME PAGE**

 **Articles contain no graphics or photos.**

# INTERNATIONAL DRUG-SMUGGLING CASE GOES TO TRIAL HERE

By   **Joseph A. Slobodzian, Inquirer Staff Writer**
Source: **Philadelphia Inquirer, The (PA)**; 788 words
Published: **1989-01-26**
Section: **LOCAL**  |  Page **B03**  |  Edition: **FINAL**

Even after serving a six-month prison term in 1978 and paying a $20,000 fine for illegally dumping hundreds of thousands of gallons of toxic chemicals into the Delaware River, life was pretty good for Manfred **DeRewal**.

**DeRewal**, in his early 50s and still wealthy from real estate investments and other businesses, gave up his chemical-disposal companies and home in Nockamixon, Bucks County, and in 1980 moved to Costa Rica in Central America.

There, by all accounts, in Guanacaste Province on the northern Pacific Coast, **DeRewal** prospered. He founded a new company specializing in the extraction of gold as well as the development of fertilizers and insecticides. He developed Las Palmas, a resort hotel and fishing club, and a condominium complex where units sold for $200,000 and up. His home became known as a gathering place for Costa Rican and international business people, government ministers and even a former Costa Rican president.

It was also in Costa Rica, say federal prosecutors, that **DeRewal** eventually took up a new trade: international drug smuggler.

Yesterday **DeRewal**, now 62, back in the States and in federal custody, went on trial before U.S. District Judge James McGirr Kelly on charges of conspiring to export the key ingredient of methamphetamine, or "speed," from Costa Rica into Bucks County. **DeRewal** was indicted on charges of conspiracy to import, importation of, and attempting to import phenyl-2-proponone, or P2P. If convicted on all counts, he could be sentenced to a maximum of 15 years' imprisonment and fined $45,000.

"This case is about drugs, and the evidence will show that Mr. **DeRewal** was an international drug smuggler," prosecutor Deborah J. Rhodes of the Justice Department's Organized Crime Strike Force, said in her opening statement to the jury.

Rhodes said the 17 gallons of P2P that **DeRewal** allegedly smuggled into the United States, as well as 100 gallons of P2P whose transport went awry at the last minute, would have produced more than 900 pounds of the illegal street stimulant, at a value of more than $10 million.

Not true, A. Charles Peruto Sr., **DeRewal**'s attorney, said in his opening remarks to the jury. Peruto painted a picture of a respected international businessman, a trained chemist who legally imported the P2P from Europe into Costa Rica for use in his gold-extraction process and agricultural experiments.

"This case is not about the ability of using P2P to make . . . drugs," Peruto said. "This case has to do with conspiring to import P2P into this country. P2P was perfectly legal in just about every country in the world except the United States."

Yesterday, the president of a Costa Rican pharmaceutical firm testified about how he met **DeRewal** and his colleague and translator, Hubert Guysman, when he responded to an advertisement for **DeRewal**'s condominium. It was that introduction, said Omar Acuna, testifying through a translator, that led him to agree to import for **DeRewal** the P2P and another chemical called monomethylamine into Costa Rica.

Federal drug officials say P2P is the chief ingredient of speed and thus is illegal in the United States and a growing number of other countries, including Costa Rica, which banned it in May. Monomethylamine, drug officials say, is a catalyst chemical legal everywhere, including the United States, that in one process is used to convert P2P into speed.

In July or August 1982, Acuna said, DeRewal and Guysman came to visit him at his office and asked for his help in importing P2P. Acuna said he imported 50 kilograms of P2P for DeRewal in late 1982, charging him about $33 per kilo. That was followed by an order in early 1983 for about 2,000 kilograms of P2P and in March 1984 by an order for 1,000 pounds of monomethylamine, which he imported from the United States.

Acuna said he had never imported either chemical before and did not know they could be used to produce illegal drugs. He said Guysman told him DeRewal used them in his gold and agricultural processes.

DeRewal was a good customer who paid in full in cash and in advance, Acuna said. On several occasions, Acuna added, DeRewal invited him, his wife and a granddaughter to his home and he was impressed by the hospitality and the government ministers who attended parties there.

Thus, Acuna testified, he was shocked when, in July 1984, narcotics agents from the Organization of Judicial Investigation, the Costa Rican equivalent of the FBI, and the U.S. Drug Enforcement Administration entered his office to question him about the imports for DeRewal and telling him the chemicals were being used to produce illegal drugs.

Acuna said he felt DeRewal and Guysman had "abused the confidence and friendship I had given them." He was so angry, he said, that he called Guysman to berate him. Guysman, Acuna testified, said the agents' accusations "were not possible . . . they must be crazy."

© Philadelphia Inquirer, The (PA)

All content is copyrighted and may not be republished without permission.



# philly●com
## THE REGION'S HOME PAGE

 Articles contain no graphics or photos.

## THIS TIME, FRIEND SINGS A DIFFERENT TUNE IN DRUG CASE

By    Joseph A. Slobodzian, Inquirer Staff Writer
Source: **Philadelphia Inquirer, The (PA)**; 605 words
Published: **1989-01-27**
Section: **LOCAL**  |  Page B03  |  Edition: **FINAL**

"I considered him my best friend," Daniel Rufe said of his 20-year friendship with Manfred **DeRewal**.

**DeRewal**, a man whom federal prosecutors have called an international drug smuggler, gave him his first job when he got out of the service. They bought and sold real estate together, and Rufe and his family regularly stayed at **DeRewal's** home on the Pacific coast of Costa Rica.

And when he was arrested in 1985 on charges of illegally importing into Bucks County from Costa Rica 17 gallons of phenyl-2-proponone, or P-2-P, the key ingredient of the street stimulant "speed," Rufe's loyalty was such that he lied in court to protect **DeRewal** and identified another man as his link to the illegal chemical.

But after three years in a federal prison, his secret discovered by investigators and facing the prospect of more prison time, Rufe's loyalty cracked. He was granted immunity from further prosecution and agreed to testify against **DeRewal**.

Yesterday, Rufe, his monotone voice occasionally quavering with emotion, told a federal court jury in Philadelphia how in February 1983 he had obtained through **DeRewal** the 17 gallons of P-2-P. He and another man hid the drug in a spare fuel tank of a pickup truck belonging to **DeRewal's** son, he said, and guided by an interpreter supplied by **DeRewal**, made the tortuous drive through Central America and Mexico and into the United States.

Rufe, 46, a Bucks County real estate broker, also testified about an attempt in 1984 to smuggle in 100 more gallons of P-2-P, an effort that ended Aug. 6, 1984, when FBI agents showed up at his Nockamixon Township office to tell him he was under investigation for smuggling the 17 gallons of P-2-P the year before.

**DeRewal**, 62, was indicted last year on charges of conspiracy to import, importation of, and attempting to import P-2-P. If convicted on all counts, **DeRewal** could be sentenced to a maximum of 15 years' imprisonment and fined $45,000.

Defense attorney A. Charles Peruto Sr. has contended that **DeRewal** was not involved in the conspiracy to import the P-2-P. Peruto has said **DeRewal**, a chemist, had legally imported the chemical into Costa Rica, where it was legal until May, for use in a gold-extraction process and in agricultural experiments.

Peruto, who earlier had referred to Rufe as "Judas Rufe," yesterday attacked Rufe's credibility, noting that he had lied at his 1985 trial when he identified Hubert Guysman, a Costa Rican businessman and associate of **DeRewal's**, as the man who gave him an anonymous telephone number that led to his purchase of the P-2-P.

"Why sir, did you in this courtroom, say that Mr. Hubert Guysman gave you that number?" asked Peruto.

"Because I didn't want to say that Manfred **DeRewal** gave me the telephone number," Rufe replied. "I'm not proud of it, but that's what I did."

Peruto also suggested that Rufe agreed to cooperate with prosecutors to escape further imprisonment and that a letter written to federal parole officials by prosecutor Deborah J. Rhodes, of the Justice Department's Organized Crime Strike Force, detailing his cooperation, led to his early release.

"Would it be correct, in your situation, for me to say that you didn't have a prayer without her?" Peruto said, pointing to Rhodes.

"I didn't have a prayer with her or without her," Rufe angrily replied. "They wrote a letter . . . It didn't do me a damned bit of good."

Rufe said that when he was released from prison last September, he had served 33 months in prison. A 38-month sentence - two-thirds of his five-year prison sentence - is considered a maximum term by federal officials. He said he had earned that release by taking college classes in prison.

"I didn't get any break," Rufe insisted.

© Philadelphia Inquirer, The (PA)

---

All content is copyrighted and may not be republished without permission.

---



**THE REGION'S HOME PAGE**

 Articles contain no graphics or photos.

# WITNESS RECOUNTS SUSPECT'S TALK OF DRUG SMUGGLING

By   Lacy McCrary, Inquirer Staff Writer
Source: Philadelphia Inquirer, The (PA); 688 words
Published: **1989-01-28**
Section: **LOCAL**  |  Page B03  |  Edition: **FINAL**

A woman described by federal prosecutors as an 11th-hour witness testified in U.S. District Court yesterday that former Bucks County resident Manfred **DeRewal** had told her how he arranged the smuggling of illegal chemicals into the United States from Central America.

"He said you use two trucks," said witness Peggy Turner, the wife of a lawyer who at one time represented **DeRewal**. "In one, both gas tanks have gas in them. If that truck makes it (across the border), there is a 90-something percent chance the second truck will go through, and its other tank would have the chemical."

**DeRewal** - whom prosecutors say is an international drug smuggler - described the two-truck method to Turner, her husband, Jonathan Dunn, and her step-son, James Dunn, Turner said. The discussion took place in December 1986 as the four were eating sandwiches at the bar of a restaurant in Costa Rica, where her family lived for nine years, she recalled.

Turner said **DeRewal** also talked about acquiring a chemical about which she remembered only that it started with the letter "P." She said that he never admitted smuggling the chemical himself but that "he said he had someone do it."

**DeRewal**, 62, who moved to Costa Rica in 1980, is on trial before District Court Judge James M. Kelly on charges of conspiring to export the key ingredient of methamphetamine, or "speed," from Costa Rica into Bucks County.

He was indicted on charges of conspiracy to import, importation of and attempting to import phenyl-2-proponone or P-2-P.

"I knew they were bringing it into the States as an ingredient, to be part of other ingredients, to form an illegal drug," said Turner, who now lives in Boston.

She said that she had known **DeRewal** since the mid-1970s and that she met him through her husband.

On Thursday, another Bucks County man, Daniel Rufe, testified that in February 1983, he obtained 17 gallons of P-2-P through **DeRewal**. He said he and another man hid the drug in a spare fuel tank of a pickup truck and, guided by an interpreter supplied by **DeRewal**, he made the long drive through Central America and Mexico and into the United States.

**DeRewal** "said he arranged to have it (P-2-P) put on the truck," Turner testified.

Turner's entire testimony was protested by defense attorney A. Charles Peruto Sr., who said he had received no notice that she would be a witness. He moved to have her testimony disallowed, but Kelly overruled him.

Turner said that she first made contact, voluntarily, with government officials about six weeks ago, and that she decided to give her information to prosecutors because of threats **DeRewal** had made "on our lives."

"Mr. **DeRewal** intended to blow you all up, didn't he?" Peruto asked with some sarcasm.

"I'm here because I'm afraid for my husband's life because of threats that have been made," she reiterated.

Earlier, in testimony without the jury being present, Turner described the only threat made in her presence. She said it occurred about March 1986 when she and her husband visited **DeRewal** at his Costa Rican home.

"There was some drinking and the talk got heavy. There were a lot of guns around. Fred (**DeRewal**) put his hand on a gun and said, 'You know what happens to people who talk too much,' " she said.

She also said that her husband had a gun pointed at him and that he was "kidnapped" from **DeRewal**'s home on other occasions. She was not asked to be more specific.

"That kind of threat goes on; there is no time limit to it," she said.

On cross-examination, Turner, a small woman with short, graying hair, said she is not living with her husband "at this time."

Earlier yesterday, Leslie Schmidt, 47, formerly of Philadelphia and Bucks County and twice convicted of making speed or distributing it, testified that Rufe and another man, Michael Giambi, told him of traveling to Costa Rica and returning with 17 gallons of P-2-P.

"I saw one gallon in Mike Giambi's barn. I looked at it and smelled it and considered it was good P-2-P," Schmidt said.

**Illustration/Photo:**

PHOTO (1)

1. Manfred **DeRewal**; Charged with smuggling P-2-P

© Philadelphia Inquirer, The (PA)

---

All content is copyrighted and may not be republished without permission.

---



 **Articles contain no graphics or photos.**

# DRUG PLOTTER FACES PRISON

By   **Jim Smith, Daily News Staff Writer**
Source: **Philadelphia Daily News (PA)**; 246 words
Published: **1989-02-03**
Section: **LOCAL**  |  Page **16**  |  Edition: **PM**

A former Bucks County businessman, once jailed for dumping toxic waste into the Delaware River, now faces a lengthy prison sentence for smuggling P2P, a key ingredient in the drug methamphetamine.

Manfred **DeRewal**, 62, was convicted by a federal jury in Philadelphia yesterday of conspiring to smuggle P2P from Costa Rica, where he operates a resort hotel and fishing club.

**DeRewal**, operator of Las Palmes resort in Costa Rica, has been in jail since his arrest last Oct. 19 at a farm in Upper Black Eddy, Bucks County. He will be sentenced March 21 by U.S. District Judge James McGirr Kelly.

**DeRewal** could be jailed for 15 years and fined $45,000, said prosecutor Deborah Rhodes, an attorney with the U.S. Organized Crime Strike Force in Philadelphia.

In convicting **DeRewal**, the jury accepted the testimony of Daniel Rufe, 46, a Bucks County building contractor and convicted drug smuggler who served about three years in prison for the same offense.

Rufe testified that **DeRewal** arranged for him to smuggle about 17 gallons of P2P in the fuel tank of a pick-up truck in 1983, Rhodes said. They attempted to smuggle an additional 100 gallons the next year but gave up because of an investigation, Rufe testified.

**DeRewal** did not testify at the trial.

His lawyer, A. Charles Peruto Sr., contended Rufe was not worthy of belief. Peruto said he will appeal.

**DeRewal** served a six-month sentence about 10 years ago for dumping toxic chemicals into the Delaware River and city sewers in 1976 and 1977.

© Philadelphia Daily News (PA)

All content is copyrighted and may not be republished without permission.



**philly⊙com**

THE REGION'S HOME PAGE

 Articles contain no graphics or photos.

# EX-BUCKS CHEMIST GETS PRISON TERM

By Joseph A. Slobodzian, Inquirer Staff Writer
Source: Philadelphia Inquirer, The (PA); 597 words
Published: 1989-04-13
Section: **LOCAL** | Page **B03** | Edition: **FINAL**

Contending he was innocent to the end, former Bucks County chemist Manfred DeRewal was sentenced yesterday by a federal judge to 10 years' imprisonment and fined $30,000 for his role in a scheme to smuggle the key element of the illegal drug methamphetamine into the United States.

Speaking in open court for the first time since his arrest in October, DeRewal insisted that, while living in Costa Rica, he had legally imported phenyl-2-propanone, or P-2-P, the main ingredient of the illegal stimulant also known as "speed," at the request of some unidentified Nicaraguans.

DeRewal said he assumed the Nicaraguans wanted to produce methamphetamine for their army: "They have a 200,000-man army. Give them methamphetamines and now you have a 400,000-man army."

DeRewal said the Nicaraguans had taken possession of all the P-2-P he had imported into the Central American country from Europe.

"The reason Daniel Rufe didn't get any P-2-P (from me) is that there wasn't any there," DeRewal told U.S. District Judge James McGirr Kelly, referring to his former friend and co-conspirator, who became the government's key witness against him.

"So you're saying this is all a figment of Daniel Rufe's imagination," Kelly said.

Kelly told DeRewal, 62, he felt a strong sentence was warranted because illicit-drug trafficking is "the most important domestic problem in the U.S. today . . . it touches every community and every strata of our society."

DeRewal, who has been imprisoned without bail since he was arrested by federal agents Oct. 19 at his 100-acre Boarhead Farm in Nockamixon, Bucks County, could have received a maximum of 15 years' imprisonment and a fine of $45,000.

A. Charles Peruto Sr., DeRewal's attorney, told Kelly he would appeal DeRewal's Feb. 2 conviction on charges of conspiracy to import, importation of, and attempting to import P-2-P. Peruto said one issue that would be appealed is the legality of telephone wiretaps made from June 5 through early August 1984 at DeRewal's home in Playa Flamingo on the northern Pacific coast of Costa Rica. The tapes, which were key evidence against DeRewal, were made by Costa Rican agents with the cooperation of the U.S. Drug Enforcement Administration.

DeRewal's sentencing comes a decade after his release from a federal prison following a six-month term and $20,000 fine for illegally dumping 730,000 gallons of toxic chemicals into the Delaware River.

In 1980 - the same year P-2-P was banned in the United States - DeRewal left Bucks County and relocated to Costa Rica. There, according to trial testimony, he founded several new companies experimenting with gold extraction and herbicides.

During 1982 and 1983, according to testimony, **DeRewal** imported into Costa Rica about 500 gallons of P-2-P, telling Costa Ricans he needed the chemical for his gold and agricultural processes. In reality, witnesses testified, **DeRewal** was conspiring with Daniel Rufe, an upper Bucks County real estate broker, to smuggle the chemical into Pennsylvania.

In February 1983, according to testimony, Rufe and another man flew to Costa Rica and obtained 17 gallons of P-2-P through **DeRewal**, hid the chemical in the spare fuel tank of a pickup truck belonging to **DeRewal**'s son and drove through Central America and Mexico and across the Texas border.

A subsequent attempt by Rufe to import 100 gallons of P-2-P was aborted Aug. 6, 1984, after FBI agents told Rufe he was being investigated for importing the 17 gallons the year before.

Rufe pleaded guilty to charges stemming from the 17-gallon incident - without identifying **DeRewal** as his source - and served almost three years in prison before being released in September. Facing additional jail time after investigators learned he had lied during sentencing, Rufe agreed to cooperate with federal investigators and testified against **DeRewal**.

© Philadelphia Inquirer, The (PA)

---

All content is copyrighted and may not be republished without permission.

---