## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC.,          )
CYTEC INDUSTRIES, INC.,      )
FORD MOTOR COMPANY,       )
SPS TECHNOLOGIES, LLC and   )
TI GROUP AUTOMOTIVE SYSTEMS LLC,  )
                )    **Case No. 02-cv-3830**
         **Plaintiffs,** )
                )    **Judge LeGrome D. Davis**
     **v.**            )
                )
ADVANCED ENVIRONMENTAL    )
TECHNOLOGY CORPORATION, et al.,  )
                )
        **Defendants.** )

## DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE FOURTH AMENDED COMPLAINT

### INTRODUCTION

Defendants Advanced Environmental Technology Corporation,[1] Ashland, Inc., Carpenter Technology Corporation, fcg, inc., a/k/a Flexible Circuits, Inc., Handy & Harman Tube Company, Inc. and NRM Investment Company (collectively, the "Defendants"), submit this joint memorandum of law in opposition to Plaintiffs' motion for leave to amend the Fourth Amended Complaint.

---

[1] Plaintiffs in their Motion for Leave to Amend state on page 10 that AETC is "jointly and severally liable." AETC will not address Plaintiffs' contentions at this time, but rather, will appropriately address them in opposition to Plaintiff's Cross-Motion for Summary Judgment regarding AETC, which has been adjourned pending the outcome of Plaintiffs' Motion for Leave to Amend.

## PRELIMINARY STATEMENT

The motion of Plaintiffs Agere Systems, Inc. ("Agere"), Cytec Industries, Inc. ("Cytec"), Ford Motor Company ("Ford"), SPS Technologies, LLC ("SPS") and TI Group Automotive Systems LLC ("TI") (collectively "Plaintiffs") for leave to amend the Fourth Amended Complaint should be denied because it does not fulfill applicable factual and legal elements required for such relief. While decisions regarding motions to amend pleading are entrusted to the discretion of the Court, amendments may be denied (1) where undue prejudice will result if the motion is granted, or (2) where the new claim asserted is unsupported as a matter of law, *i.e.,* where the new claim is futile. Consideration of each of these points leads to the conclusion that the Plaintiffs should not be permitted to amend the Fourth Amended Complaint.

First, Plaintiffs declare that "nothing in the proposed pleading will delay the progress of the action" and that at trial the Court will adjudicate an equitable allocation of the costs of cleaning up the Boarhead Farms Superfund Site (the "Site") among the Plaintiffs and the Defendants just as it would under the Fourth Amended Complaint. (See Plaintiffs' Memorandum in Support of Motion for Leave to Amend Fourth Amended Complaint p. 1, hereinafter "Plaintiffs' Memorandum"). Plaintiffs further maintain that the amendment is necessary to "assure that such allocation is reached based upon correct causes of action as clarified by the United States Supreme Court." (Id. at p. 2). The reality is that, if permitted, the Proposed Fifth Amended Complaint (1) could significantly impact the ultimate determination of liability for alleged response costs; (2) reinforces the Defendants' need for additional discovery; (3) creates potential inconsistencies in the burdens of proof among Plaintiffs and Defendants; and (4) will disrupt the Court's carefully crafted process which has allowed settling defendants to be dismissed from the case without prejudicing the rights of the remaining Defendants to prove the

settling defendants' equitable shares of response costs. The injection into this case of these new issues will undoubtedly create significant delay in this litigation, despite Plaintiffs' assurances to the contrary, and, more importantly, will significantly and unduly prejudice the non-settling Defendants.

Second, the Proposed Fifth Amended Complaint seeks to add two entities as plaintiffs that have allegedly been making payments to the OU-1 and OU-2 group accounts on behalf of plaintiff TI Group Automotive Systems LLC, namely Smiths Group Services Corp. and Smiths Group North America, Inc. Plaintiffs have presumably known of the identity of these parties since the filing of the first Complaint, but certainly by the filing of the Fourth Amended Compliant, and chose not to name them as parties. While it may be true that the "defendants have known about the dollars into and out of each of the accounts [by the Smiths] for years" (Plaintiffs' Memorandum p. 12), that statement is irrelevant. What matters is that the Plaintiffs knew that Smiths Group Services Corp. and Smiths Group North America, Inc. could have been parties to this action and yet chose not to name them in any of the complaints. Any claims these proposed new parties may have had against the Defendants for the recovery of response costs and contribution are now time barred. Thus, Plaintiffs motion should be denied in its entirety.

## PROCEDURAL HISTORY

This action was initially commenced by the Boarhead Farm Agreement Group ("BFAG"), by Complaint filed on June 18, 2002 seeking damages related to the cleanup of the Site. BFAG consisted of Agere, Cytec, Ford, SPS, and TI.

As this action progressed through mediation and discovery, several amended complaints were filed. By "Memorandum and Order" dated July 20, 2005, this Court granted leave for the filing of a Fourth Amended Complaint. The Fourth Amended Complaint substituted the individual members of BFAG as the Plaintiffs in place of BFAG. However, this Court's July 20,

2005 "Memorandum and Order" did not grant leave for the Plaintiffs to assert a CERCLA Section 107 cost recovery action against the Defendants because the Plaintiffs were themselves parties responsible for the contamination at the Site.

On September 9, 2005, the Defendants filed a Motion to Dismiss the Fourth Amended Complaint for failure to state a claim upon which relief could be granted. The Defendants argued, in part, that the Plaintiffs had failed to allege sufficient facts to establish liability under Sections 113(f)(1) or 113(f)(3)(B) of CERCLA. The Defendants also argued that the Plaintiffs' state contribution claims under Section 702 of the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. § 6020.701 et seq. ("HSCA"), were preempted by CERCLA, or in the alternative, that such claims were invalid because the Plaintiffs did not have an implied right of contribution under Section 702 of that statute, 35 P.S. § 6020.702. By Order dated March 28, 2006, this Court denied the Defendants' motion to dismiss.

Thereafter, the Defendants filed answers to the Fourth Amended Complaint and discovery including, but not limited to, the exchange of contention interrogatories, continued pursuant to multiple case management orders. Currently there are various motions pending before this Court, including the Plaintiffs' Motion for Leave to Amend the Fourth Amended Complaint.

## STATEMENT OF FACTS

The following facts are drawn from Plaintiffs' Proposed Fifth Amended Complaint, from the public record or from the documents produced by the parties during discovery, and will be assumed to be true for purposes of this opposition brief.

### A.    Removal and Remediation Activities at the Boarhead Farms Site

The Site was placed on the National Priorities List on March 31, 1989. (See Plaintiffs' Proposed Fifth Amended Complaint ("Proposed Fifth Amended Complaint") ¶ 10). Thereafter,

4

a removal action was conducted by the USEPA during which 2,600 drums and contaminated soils were removed from the Site. (See Proposed Fifth Amended Complaint ¶ 11). Contaminated groundwater at the Site is being treated at an on-site treatment facility. (Id.). A separate removal action was conducted by General Ceramics, Inc. to address the presence of radioactive waste at the Site. (See Proposed Fifth Amended Complaint ¶ 12). In addition, a Remedial Investigation and Feasibility Study was prepared by the USEPA for the Site in July 1997. (See Proposed Fifth Amended Complaint ¶ 13).

Thereafter, a Record of Decision (the "ROD"), dated November 18, 1998, set forth a remedy to be implemented at the Site. (See Proposed Fifth Amended Complaint ¶ 14). The remedy was to be implemented in two operable units. Operable Unit One ("OU-1") would include groundwater extraction, metal precipitation, and air stripping; the installation of additional monitoring wells; the implementation of institutional controls; monitoring residential water treatment; and phytoremediation. Operable Unit Two ("OU-2") would include soil aeration and the treatment of volatile organic compound hot spots; the excavation and off-site disposal of buried drums; and the implementation of institutional controls and monitoring for OU-2. (See Proposed Fifth Amended Complaint ¶15).

Plaintiffs Cytec, Ford and SPS entered into a settlement with the USEPA in or about February 2000. The terms of that settlement are set forth in the Administrative Order on Consent for Remedial Design, USEPA Docket No. III-2000-002-DC, and a Consent Decree entered by this Court on or about September 28, 2000. (See Proposed Fifth Amended Complaint ¶ 17, Administrative Order on Consent dated February 2000 and Consent Decree entered September 28, 2000). Agere, NRM, TI, and Worthington Steel Company – Malvern ("Worthington") agreed by way of a separate group agreement to fund and perform the remedial activities

required under OU-1. (See Proposed Fifth Amended Complaint ¶ 18). All contributions to the OU-1 trust account are made pursuant to an interim allocation. (See Proposed Fifth Amended Complaint ¶ 18).

Similarly, Plaintiffs Cytec, Ford, SPS and TI are signatories to a second Administrative Order on Consent for Remedial Design, EPA Docket No. III-2001-0010-DC, effective October 17, 2001 and a Consent Decree entered by this Court on March 14, 2002 for OU-2. (See Proposed Fifth Amended Complaint ¶ 20, Administrative Order on Consent effective October 17, 2001 and Consent Decree entered March 14, 2002). Work performed by the Plaintiffs in connection with OU-2 is also financed through a trust account to which contributions are made pursuant to an interim allocation process. (See Proposed Fifth Amended Complaint ¶21).

As a result of their participation in OU-1 and OU-2, Plaintiffs allege that they have collectively incurred reasonable and necessary response costs as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), consistent with the National Contingency Plan within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) and Section 702(a)(3) of HSCA, 35 PA. Cons. Stat. § 6020.703(a)(3). (See Proposed Fifth Amended Complaint ¶ 23).

Notably, Plaintiff Agere entered into a settlement agreement with Plaintiffs SPS, Ford, Cytec and TI on March 30, 2007 concerning Agere's share of all OU-1 and OU-2 group costs. In exchange for $400,000, Agere assigned its rights in this action to SPS, Ford, Cytec and TI. (See Proposed Fifth Amended Complaint ¶ 25).

### B.    Smiths Group Services Corp. and Smiths Group North America, Inc.

Paragraphs 26 and 27 of the proposed Fifth Amended Complaint set forth facts allegedly supporting a claim for contribution by two new parties, namely Smiths Group Services Corp. and Smiths Group North America, Inc. Smiths Group, plc, a United Kingdom corporation, was the

6

parent company to plaintiff TI prior to April 25, 2001. (See Proposed Fifth Amended Complaint ¶ 26). On or about April 25, 2001, Smiths Group, plc sold its shares of TI and other related companies to 329th Shelf Investment Company Limited ("329"). (Proposed Fifth Amended Complaint ¶ 26). As part of the sale agreement, Smiths Group plc agreed to indemnify TI and 329 and began directing its subsidiaries Smiths Group Services Corp. and Smith Group North America, Inc. (hereinafter "Smiths") to make payments to the OU-1 and OU-2 groups on behalf of TI. (Proposed Fifth Amended Complaint ¶ 26). Smiths Group North America, Inc. voluntarily dissolved on or about July 31, 2004 (See Proposed Fifth Amended Complaint ¶ 32), and presumably, Plaintiffs will contend since that date payments on behalf of Plaintiff TI have been made by the proposed plaintiff Smiths Group Services Corp.

Plaintiffs now improperly seek to add a direct cause of action by Smiths for cost recovery and contribution from the Defendants for the "response costs it has incurred through payments made by it at the direction of Smiths Group plc on behalf of TI into the OU-1 and OU-2 Group Trust Accounts." (See Proposed Fifth Amended Complaint ¶ 27). Specifically, Plaintiffs erroneously allege that Smiths is entitled to recover under Section 107 of CERCLA because they have allegedly incurred response costs for the OU-1 RD/RA (they also allege that Smiths is entitled to a declaratory judgment for future response costs to be incurred meeting the requirements imposed by the OU-1 Consent Decree). (See Proposed Fifth Amended Complaint ¶ 68). Plaintiffs further claim that Smiths is entitled to recover under Section 107 because they have allegedly incurred response costs for the OU-2 RD/RA and for the interim response action (as with OU-1, they also allege that Smiths is entitled to a declaratory judgment for future response costs to be incurred meeting the requirements imposed by the OU-2 Consent Decree.) (See Proposed Fifth Amended Complaint ¶ 70). In addition, Plaintiffs seek leave to permit

Smiths to assert a new claim under Section 113(f) for past, interim and future response costs required under the OU-2 Consent Decree. (See Proposed Fifth Amended Complaint ¶ 78-79).

## ARGUMENT

Although Plaintiffs make the statement in their Memorandum, "Nothing in the proposed pleading will change the essential relief sought from the Defendants" (Plaintiffs' Memorandum p. 6), their *Proposed Fifth Amended Complaint* would fundamentally change the landscape of this case. If permitted, Plaintiffs' proposed pleading will give rise to numerous new issues that will need to be adjudicated by this Court, issues that potentially could significantly affect each Defendant's liability for alleged response costs, expand the Defendants' need for additional discovery, create potential inconsistencies in the burdens of proof among Plaintiffs and Defendants and, disrupt the Court's carefully crafted process which has allowed settling defendants to be dismissed from the case without prejudicing the rights of remaining defendants to prove the settling defendants' equitable shares of response costs. The injection into this case of these new issues will undoubtedly create undue delay in this litigation, despite Plaintiffs' assurances to the contrary, and, more importantly, will significantly and unduly prejudice the non-settling Defendants.

There are not one, but two, standards that the Court needs to consider in deciding this motion. First, Rule 15, as noted in the Plaintiffs' Memorandum, imposes limits on the Court's discretion to grant the Plaintiffs' motion. Second, because this Court has issued ten Case Management Orders in this case, Plaintiffs must demonstrate "good cause" under Federal Rule of Civil Procedure 16(b) to justify the filing of yet another amended complaint. Chancellor v. Pottsgrove School District, 2007 WL 2274837 *3 (E.D. Pa. August 8, 2007). Prejudice to the non-moving parties, a consideration under Rule 15, is also considered in deciding whether there is good cause. Id. *4 n.5.

## POINT I

### THE PROPOSED FIFTH AMENDED COMPLAINT WILL UNDULY PREJUDICE DEFENDANTS AND UNNECESSARILY DELAY THE PROCEEDINGS BY REQUIRING DEFENDANTS TO DEFEND AGAINST PLAINTIFFS' NEW LEGAL THEORIES

"Substantial effort and expense" in resolving a motion to dismiss a proposed amended complaint can constitute undue delay or prejudice to the non-moving parties sufficient to deny a motion for leave to amend. Rolo v. City Investing Co. Liquidating Trust, 155 F. 3d 644, 655 (3d Cir. 1998). Furthermore, if a proposed amendment "would unduly complicate the issues" and "result in unnecessary confusion," the amendment should be barred. Suehle v. Markem Machine Co., 38 F.R.D. 69, 71 (E.D. Pa. 1965). Plaintiffs' motion to add new claims under CERCLA § 107(a) to their existing claims under CERCLA § 113(f) should be denied for these reasons.

Defendants agree that the United States Supreme Court's decision in United States v. Atlantic Research Corporation, 127 S.Ct. 2331 (2007), opened the door for certain plaintiffs to pursue Section 107 claims. Plaintiffs in this case, however, are attempting to kick open that door in a manner that will require the Court to decide a significant legal issue left open in the Atlantic Research opinion if the Plaintiffs' motion is granted and the Defendants, as they expect to do, file a motion to dismiss. If any Plaintiff in this case is granted the right to proceed under Section 107(a), the parties' respective burdens of proof in this case could change dramatically and the Court's ability to adjudicate the equitable shares of the settling defendants and the previously dismissed defendants could be compromised. First, however, it is necessary to outline the significant legal issues invoked by a particular Plaintiff's attempt to proceed under Section 107(a).

**A.     Impact of Atlantic Research on this Case**

In their Memorandum of Law, Plaintiffs describe both the <u>Atlantic Research</u> Court's clarification of which potentially responsible parties ("PRPs") may maintain a cause of action under Section 107(a), and the issue left unresolved by the Court -- whether PRPs who have been compelled to incur response costs can recover under Section 107(a) or only under Section 113(f). As noted by the Plaintiffs, the Court clarified that PRPs that have paid money to satisfy a judgment or settlement "stemming from an action under § 106 or § 107(a)" may maintain a contribution action under Section 113(f), but may not bring an action under Section 107. <u>Atlantic Research</u>, 127 S.Ct. at 2338. The Court also recognized the right of a PRP proceeding under Section 107(a) to recover response costs that the PRP <u>voluntarily</u> and directly incurred. <u>Id</u>.

This case presents a different scenario. Plaintiffs here incurred certain response costs because, and only because, the EPA brought an enforcement action against them, resulting in the Consent Decrees for OU-1 and OU-2. Thus, the Plaintiffs did not incur these response costs "voluntarily." It is equally clear that in paying these incurred costs, Plaintiffs did not reimburse others, and, therefore, Plaintiffs are barred from pursuing a contribution action under Section 113(f). The question here is whether the Plaintiffs, having incurred "compelled costs of response" paid pursuant to a consent decree, can sue under Section 107(a). This is precisely the question left open and not decided by the Supreme Court in <u>Atlantic Research</u>. <u>Id</u>. at 2338 n. 6.[2]

---

[2]     The Court in <u>Atlantic Research</u> explained that "a PRP may sustain expenses pursuant to a consent decree following a suit under Section 106 or Section 107. In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party. <u>We do not decide</u> whether these compelled costs of response are recoverable under Section 113(f), Section 107, or both. For our purposes it sufficed to demonstrate that costs incurred voluntarily are recoverable only by way of Section 107(a)(4)(B) and costs of reimbursement to another

As a result, there is substantial uncertainty with respect to the rights of the Plaintiffs to proceed under Sections 107(a) and 113(f), uncertainty that will have to be resolved by this Court should it grant the Plaintiffs' motion for leave to file the Proposed Fifth Amended Complaint.

Plaintiffs elected in their Memorandum of Law to summarize the proposed Section 113(f) and 107(a) claims pleaded in the Proposed Fifth Amended Complaint by analyzing the five categories of costs involved at the Site. (See Plaintiffs' Memorandum pp. 8-9). Defendants submit, however, that it is more useful for the Court to examine each Plaintiff's right to proceed under Section 107(a) or 113(f) as a means to highlight the confusion created by the Atlantic Research opinion as applied to the facts of this case.

1.    Cytec, Ford and SPS

Cytec, Ford and SPS, three of the Plaintiffs, are parties to the Consent Decrees entered for both the OU-1 and the OU-2 remediation. Pursuant to those decrees, these three Plaintiffs agreed to implement the remedial measures required by the decrees and also to reimburse the United States for the response costs that the United States incurred. The costs to be incurred for the remedial work are the "compelled costs" identified by the Court in Atlantic Research. As discussed above, the Court did not decide whether such compelled costs could be recovered under Sections 107(a) or 113(f). Thus, if Plaintiffs' motion is granted here, this Court will have to determine at some point what section or sections of CERCLA may be available to these Plaintiffs.

It is clear that under Atlantic Research, Plaintiffs' payment of $7 million to the United States pursuant to the OU-2 Consent Decree can only be the subject of a claim for contribution

person pursuant to a legal judgment or settlement are recoverable only under Section 113(f)." 127 S.Ct. at 2338 n.6 (citations omitted). (Emphasis added).

under Section 113(f); as Plaintiffs themselves acknowledge, no Section 107(a) claim is available with respect to this $7 million payment.

2.    TI Group Automotive Systems, LLC

TI Automotive Systems Corporation ("TI-Corp"), not plaintiff TI Automotive Systems, LLC ("TI-LLC"), was a party to the Consent Decree for the OU-2 remedy. The response costs incurred pursuant to that Consent Decree are "compelled costs," recovery of which was not addressed by the Supreme Court (of course, recovery under any theory would first require a determination that Plaintiff TI-LLC is the successor to TI-Corp). As with Cytec, Ford and SPS, TI-LLC's right to recover a share of the $7 million paid to the United States is limited to a Section 113(f) claim (Category 4).

This leaves the costs incurred for the OU-1 remediation. Plaintiffs contend that TI-LLC's share of OU-1 costs was incurred and not compelled and is therefore recoverable under Section 107(a). The Defendants, however, can make the complementary argument that TI was merely reimbursing Cytec, Ford and SPS, the parties to the OU-1 decree, for the costs that those parties had incurred and, therefore, that TI-LLC should be limited to Section 113(f) for the recovery of OU-1 costs (should TI ultimately be determined to have the right to bring any Section 113(f) claims; under this Court's earlier ruling, TI-LLC has the right to maintain a Section 113(f) action for these costs because of the underlying CERCLA § 106 action by the United States that led to the Consent Decrees, even though TI was not a party to these Decrees).

3.    Agere

Agere was not a party to either the OU-1 or OU-2 Consent Decree. Plaintiffs contend that Agere has a Section 107 claim for both the OU-1 and OU-2 costs (Categories 1-4) because Agere was not "compelled" to pay these costs. This Court previously decided that Agere has a

12

right to seek recovery of these costs under Section 113(f). Plaintiffs do not claim that Agere has a right to recover a share of the $7 million in past response costs paid to the United States.

Agere, however, settled its claim for costs incurred in connection with the Boarhead Farms remediation. Plaintiffs Cytec, Ford, SPS and TI-LLC thereafter paid $400,000 to Agere, and Agere assigned to these Plaintiffs its right to proceed against the Defendants. Under the terms of the settlement agreement (BSAI-02980-02993), Agere agreed to remain as a named Plaintiff in the action and to cooperate with these Plaintiffs, but would not by responsible for any additional response costs or litigation costs incurred on or after January 31, 2007. By this agreement, Agere, in effect, has not "incurred" any costs for remediation of the Site or reimbursed any other parties for their costs. Therefore, Agere has no right to proceed under either Section 107 or 113. In reality, Agere is a settled defendant, not a remediation plaintiff, and arguably should be treated accordingly.

4.    Smiths Group Services Corp. and Smiths Group North America, Inc.

Plaintiffs allege in paragraph 26 of the Proposed Fifth Amended Complaint that "Smiths" transferred funds into the OU-1 and OU-2 group trust accounts on behalf of TI-LLC pursuant to instructions by their parent corporation, Smiths Group PLC, in accordance with an indemnification agreement arising out of a sale of TI and certain other companies. Plaintiffs claim that these corporations can pursue a Section 107 claim for OU-1 costs (Category 1, 2) because they are not parties to the OU-1 Consent Decree and can recover OU-2 response costs (Category 3, 4) under Sections 107(a), 113(f) or both. Plaintiffs do not assert that either proposed plaintiff has a Section 113(f) claim for a share paid by TI of the $7 million in past response costs. Permitting the Complaint to be further amended to add one of these proposed Plaintiffs -- Smiths Group North America, Inc. -- would be futile for the singular reason that

13

according to paragraph 32 of the Proposed Fifth Amended Complaint, this proposed Plaintiff voluntarily dissolved on July 31, 2004. Therefore, it cannot possibly file a lawsuit. In addition, as discussed on pages 36 to 37 of this Memorandum, neither proposed Plaintiff has a right to recover under Section 107 since neither has "incurred" any costs; each has only contributed to costs incurred by TI and other Plaintiffs and, in any event, all of these claims are barred by the applicable statute of limitations.

**B.    Plaintiffs' "Future Response Costs" are Only Recoverable under Section 113(f)**

In the OU-1 Consent Decree that was entered on September 28, 2000, Cytec, Ford and SPS agreed to pay the "Future Response Costs" which the first Consent Decree defined as direct and indirect costs incurred by the United States after November 18, 1998. Under the terms of the Second Consent Decree, entered on March 14, 2002, these Plaintiffs and TI-Corp. also agreed to pay the United States' "Interim Response Costs," which were defined as the same costs incurred by the United States between July 31, 2000 and the effective date of the Consent Decree, March 14, 2002. Plaintiffs assert that "Future Response Costs" under OU-1 (category 2), but not past response costs paid to the United States (category 5) and the "Interim" and "Future" Response costs under OU-2 (category 4), are recoverable under Section 107(a). As payments to the United States for reimbursement of the government's costs, they were not "incurred costs." This is another issue the Court will have to adjudicate if Plaintiffs' amendment is allowed, since these payments appear to be precisely the type of reimbursement to the United States that the Atlantic Research court deemed recoverable, if at all, only under Section 113(f).

14

C.    **Failure to Plead the Amount of Response Costs Incurred or Reimbursed by Each Individual Plaintiff**

The Proposed Fifth Amended Complaint highlights the same types of deficiencies in the Plaintiffs' claims that have existed throughout this litigation, but now in the different context of a Section 107 claim. Plaintiffs have consistently alleged, as they do in paragraph 16 of their Proposed Fifth Amended Complaint, that they have agreed collectively to (1) clean up the Site; (2) resolve the claims of the EPA; and (3) seek recovery from the Defendants. Paragraphs 18 and 21 blatantly state that the payments made by Plaintiffs and others for remediation of the Site were made pursuant to an interim, non-binding allocation arrangement. Furthermore, "Plaintiffs have agreed that they will, at some future time, not in this civil action, reach a final allocation among themselves applicable to all costs associated with group activities, including the cost of the clean up work comprising OU-1 and OU-2." (See Proposed Fifth Amended Complaint ¶ 16).

Defendants have consistently contended that the Plaintiffs' interim allocation arrangement prohibits Plaintiffs from proceeding on a Section 113(f) contribution claim because to sustain such a claim, each Plaintiff must show that it has paid more in response costs than its individual fair share, and the interim nature of the allocation arrangement negates any contention by any individual Plaintiff that it has truly paid (as opposed to fronted) any response costs.. United States v. Atlantic Research Corp., supra, 127 S.Ct. at 2337-2338; New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1122 (3d Cir. 1997). Plaintiffs have steadfastly refused to permit Defendants to take discovery of the facts relating to the interim and final allocation shares of the Plaintiffs, on the grounds that the Plaintiffs need only identify how much each Plaintiff has contributed to the group funds providing for the remediation and payment of response costs. This issue is among those raised in the discovery motions pending before the Court.

If any Plaintiff is ultimately permitted to proceed under Section 107, that Plaintiff will have to demonstrate what costs it has individually "incurred" for the remediation of the Boarhead Farms Site.    United States v. Atlantic Research Corporation, supra, 127 S.Ct. at 2338. Defendants continue to stress their entitlement to know the amount of each Plaintiff's actual final payment of response costs incurred to remediate the Site.  Granting leave to Plaintiffs to file their Proposed Fifth Amended Complaint will only enable Plaintiffs to continue to engage in the shell game for the new Section 107 claims that they have utilized in connection with their Section 113(f) claims.  The bottom line is that in order for any Plaintiff to sustain a claim under either Section 113 or 107, it must establish what it has truly paid (as opposed to fronted) as "incurred" response costs or as contribution.  Absent a final allocation among them, Plaintiffs have no right to proceed under any section of CERCLA.

The Proposed Fifth Amended Complaint will unduly prejudice Defendants and unnecessarily delay the proceedings by requiring Defendants to defend against Plaintiffs' new legal theories.

## POINT II

### GRANTING PLAINTIFFS' MOTION WOULD DISRUPT THE COURT'S MECHANISM FOR SETTLEMENT, UNDULY PREJUDICE DEFENDANTS AND DELAY THE LITIGATION

The relief provided to PRPs by CERCLA Section 107 is fundamentally different than the relief provided by CERCLA Section 113(f).  As the Plaintiffs in their Memorandum of Law (p. 9) remind the Defendants, Plaintiffs will seek to impose joint and several liability on the Defendants under Section 107 for Plaintiffs' response costs, except the $7 million paid to the United States for past response costs.  Plaintiffs do not disavow that the imposition of joint and several liability would result in each remaining Defendant being liable for the entire amount of

16

response costs sought by Plaintiffs, not just each Defendant's allocable share, if any, as is the case with Plaintiffs' existing Section 113 claims. In such a situation, each Defendant would have the burden to seek payment, through contribution and execution proceedings, from other responsible PRPs (including Plaintiffs) for any amount collected by Plaintiffs from such Defendant in excess of that Defendant's allocable equitable share.

Under Section 113(f) -- the statutory section underlying the present causes of action pleaded in the Fourth Amended Complaint -- a non-settling Defendant would be potentially liable to the Plaintiffs only for that Defendant's equitable fair share as allocated by the Court. This enabled the Court to establish a procedure in its June 30, 2004 Order whereby a defendant could settle with the Plaintiffs and be protected against a separate contribution action and dismissed from the litigation. Non-settling Defendants received the benefit of that settlement because such Defendants, if found liable to Plaintiffs, will be credited at the final allocation the equitable share of each settling defendant so that any non-settling Defendant could never be required to pay more than its equitable share. The Court's June 30, 2004 Order made no provision for resolution of Section 107 claims involving joint and several liability and, therefore, may not have provided protection to the settling defendants against contribution actions by non-settling Defendants who are found liable for Section 107 response costs and who are forced to pay more than their allocated equitable share.

Plaintiffs attempt to minimize the potential adverse impact on the Defendants of Section 107's joint and several liability requirement by echoing the Supreme Court's suggestion that allocation will nevertheless occur because the non-settling Defendants have filed counterclaims or crossclaims under Section 113(f). The Fifth Case Management Order provided that Answers to the Third Amended Complaint were deemed to raise cross-claims or counterclaims for

17

contribution and presumably any order granting leave to file another complaint would have the same provision. While this may establish a non-settling Defendant's claims for contribution against the other non-settling Defendants, it does not necessarily hold true with regard to contribution claims against those Plaintiffs (Cytec, Ford, SPS and TI-Corp) that are parties to the Consent Decrees. Pursuant to CERCLA § 113(f)(2), those Decrees, Plaintiffs will undoubtedly contend, protect them from the Defendants' contribution claims. Thus, the Defendants face the real possibility that they will now have to litigate this previously resolved issue to preserve their right to contribution from the Plaintiffs with regard to the alleged Section 107(a) costs.

Defendants face a similar burden with respect to obtaining contribution from the settling defendants that have been dismissed from the case pursuant to the Court's June 30, 2004 Order. Under the terms of that Order, those defendants are no longer deemed in the case. Notably, none of the settling defendants are named in the Plaintiffs' Proposed Fifth Amended Complaint. In order for the remaining non-settling Defendants to assert cross-claims against the settling defendants for contribution on Plaintiffs' Section 107 joint and several liability claims against the non-settling Defendants, the settling Defendants will have to be rejoined as third-party defendants in this litigation or new suits will have to be filed against them for contribution. If a settling defendant is not brought back into this litigation by a third-party action, then a separate contribution action against that settling defendant would be necessary to obtain contribution for any amounts that the non-settling Defendants will be compelled to pay in excess of their fair shares. Principles of collateral estoppel and res judicata would be inapplicable as to the settling defendants whose allocable equitable shares may be determined in this action since those defendants would not have been parties to the underlying lawsuit, thereby increasing, not reducing, the amount of litigation and the possibility of inconsistent results.

As an example, consider defendants Techalloy Company, Inc. ("Techalloy") and Rahns Specialty Metals, Inc. ("Rahns"), which settled with the Plaintiffs by paying $3 million. Those defendants were dismissed pursuant to the terms of this Court's June 30, 2004 Order. Under those terms, the remaining non-settling Defendants will receive full credit for Techalloy's and Rahns' equitable allocated shares of the response costs at the trial of Plaintiffs' existing Section 113(f) claims, thereby preventing the non-settling Defendants from having to pay any amount in excess of their own allocated equitable share of the liability as may be determined by the Court at trial. If the Plaintiffs were permitted to amend their Complaint as proposed to recover response costs under Section 107, with Defendants being held jointly and severally liable for all response costs, including Techalloy's and Rahns' shares, the only way for the non-settling Defendants to receive the benefit of Techalloy's and Rahns' settlements in the event that Plaintiffs seek to recover from the non-settling Defendants any amount in excess of their allocated shares would be to rejoin Techalloy and Rahns as third-party defendants or file separate contribution actions against them in the future. In such event, Defendants would confront the dismissal Order of May 2, 2007, which provided that all deemed and asserted crossclaims by the non-settling Defendants against the settled defendants are barred. For the same reasons, in the event that any of the current non-settling Defendants settle with the Plaintiffs in the future absent the provisions and adequate protections afforded to both the settling and non-settling Defendants by the Court – which are far less certain – the other current non-settling Defendants would likely seek to have the settler remain in the case to defend against the non-settling Defendants' cross-claims, further complicating the ability of the currently non-setting Defendants to settle.

The prejudice to the non-settling Defendants under the new scheme proposed by Plaintiffs is obvious. Furthermore, instead of providing desirable finality to these proceedings,

permitting the amendment will only create the likelihood for extended litigation, which is reason enough to deny the motion.  Cureton v. National Collegiate & Athletic Association, 252 F.3d 267, 273 to 274 (3d Cir. 2001).

A related question that will need to be addressed if Plaintiffs' motion is granted is the following: what is the effect of a settlement paid by a settling defendant on the non-settling Defendants' liability for costs under Section 107?  If the settling defendant is found to be jointly and severally liable, what credits do the remaining non-settling Defendants earn for the settlement share: (1) the amount of the settlement; (2) the settling defendant's equitable share; or (3) a per capita amount?  In a typical joint tortfeasor case, the effect is dictated by a carefully drawn release, but the results are by no means certain.  In any event, non-settling Defendants would be entitled to know the terms of the settlement.

Granting Plaintiffs' motion would disrupt the Court's mechanism for settlement, unduly prejudice Defendants and delay the litigation.

## POINT III

### ALLOWANCE OF SECTION 107 CLAIMS MAY SHIFT THE BURDEN OF PROOF

If the Court allows any Plaintiff to proceed under Section 107, trial of that claim, Defendants expect, could be markedly different than the trial of the same Plaintiffs' Section 113(f) claims.  Section 113(f) contribution claims such as those pleaded in the present Fourth Amended Complaint require Plaintiffs to establish a reasonable basis for apportioning the overall liability among the parties.  DeGussa Construction Chem. Operations, Inc. v. Berwind Corp., 280 F. Supp. 2d 393, 401 (E.D. Pa. 2003).  Plaintiffs have proposed a basis, which is expressed in their responses to Defendants' Contention Interrogatories: the volumetric shares of waste allegedly disposed of at the Site by Plaintiffs, Defendants, and settled Defendants, coupled with a

20

percentage thereof for different time periods during the existence of the Site's operations. Under Section 107, Plaintiffs can be expected to contend that they have no such burden. If entitled to pursue cost recovery claims under Section 107, Plaintiffs undoubtedly will take the position that they merely have to prove that some amount (even a de minimis amount) of hazardous substance-containing waste generated by a non-settling Defendant was disposed of at the Site and that such proof requires the imposition of the entirety of the response costs on that Defendant. The Defendant would then be required to prove how and to what extent, if at all, its particular waste contributed to the total response costs so as to establish its equitable share of such costs. With expert discovery and most fact discovery completed, the prejudice to the Defendants, who did not prepare their cases in consideration of such a scenario, is clear.

Furthermore, if the Plaintiffs are permitted to seek joint and several liability, the Court will be faced with two different cases to try. Plaintiffs who are only entitled to seek contribution under Section 113(f) for the costs that they have reimbursed the United States and other Plaintiffs would be required to prove a basis for allocation of responsibility among themselves, the non-settling Defendants and the settled defendants. In contrast, the non-settling Defendants would have the burden (Plaintiffs will argue) of proving a basis for allocating response costs that the Court determines are recoverable under Section 107. This is plainly evident in the prayers for relief under Counts I and II of the Proposed Fifth Amended Complaint. Count 1, the proposed Section 107 claim, prays only that the Court decree and declare that "defendants are jointly and severally liable pursuant to Section 107(a) of CERCLA, . . . ." The prayer for relief under Count II, a claim for contribution, has the added demand that the Court allocate "responsibility for such response costs incurred to date and to be incurred as between the defendants pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), using such equitable

factors as the Court determines are appropriate." (See Proposed Fifth Amended Complaint at ¶ 16).

If this case proceeds to trial on this basis, the effect on the practical management of a trial of these quite different claims will be enormous. This is especially true given the Plaintiffs' stated position that all waste discharged at the Site contributed "in some manner" to the response costs. It will be difficult, if not is impossible, to separate out an allocation among the parties for the $7 million paid to the United States in a Section 113(f) contribution action, for example, from all the other OU-1 and OU-2 remediation costs allegedly incurred by some of the Plaintiffs, costs that, under the Plaintiffs' theories, would be recoverable jointly and severally under Section 107. This is all the more reason to deny Plaintiffs' motion.

If Plaintiffs, as they assert in their Memorandum of Law, truly believe that their proposed pleading does not change the relief sought, *i.e.*, "the recovery by Plaintiffs of the equitable shares attributable to the Defendants of the past and future response costs" (Plaintiffs' Memorandum p. 6), then there is no reason to grant Plaintiffs' motion to amend to the extent it seeks to add new Section 107 claims. The Court has already denied Defendants' motion to dismiss the two parties whom the Defendants argued cannot proceed under Section 113(f) -- TI-LLC for OU-2 costs and Agere -- with the reasoning that the government's Section 106 lawsuits against, and settlements with, some of the Plaintiffs was sufficient to justify a contribution action under Section 113 even as to Plaintiffs who were not sued by, or who did not settle with, the government. In addition, one of those parties -- Agere -- has settled this case and should not even be a Plaintiff.

## POINT IV

## IF PLAINTIFFS ARE PERMITTED TO PROCEED, ADDITIONAL DISCOVERY IS REQUIRED

The proposed addition of two new Plaintiffs and Section 107 claims, and disclosures concerning Agere's status, will require additional discovery. The allegations concerning the relationship of the two new proposed Plaintiffs -- Smiths Group Services Corp. and Smiths Group North America, Inc. -- and their relationships to TI-LLC and the Site raise significant questions about pertinent corporate relationships to which Defendants would need to take additional discovery. In paragraph 32 of the Proposed Fifth Amended Complaint, Smiths Group Services Corp. is identified as a Delaware corporation and Smiths Group North America, Inc. is identified as a Florida corporation which purportedly adopted a new name on or about June 13, 2001 and dissolved on or about July 31, 2004. Plaintiffs used the word "Smiths" to refer to both corporations throughout their proposed pleading. To further complicate matters, the TI Plaintiff in this case is TI Group Automotive Systems, LLC ("TI-LLC") while the party to the second Consent Decree was TI-Group Automotive Systems Corporation ("TI-Corp."). Thus, when Plaintiffs allege, as they do in paragraph 18 of the Proposed Fifth Amended Complaint, that "Smiths on behalf of TI" contributed to OU-1 trust accounts, it is not clear to which Smiths entity or TI entity Plaintiffs refer. Further confusion is added in paragraph 26 of the Proposed Fifth Amended Complaint. Yet another Smiths entity, Smiths Group, plc, a United Kingdom corporation that is alleged to be the ultimate parent of TI-LLC, is identified as the "ultimate parent of TI." It is further alleged that "Smiths," as part of a sale of shares of TI-LLC, agreed to indemnify another corporation, 329 Shelf Investment Company Ltd., with respect to liabilities arising out of the Site. It is not clear whether the "Smiths" that made this indemnification agreement is Smiths Group, plc, Smiths Industries, Inc., Smiths Group North America, Inc. or

23

Smiths Group Services Corp. Furthermore, there is no allegation of the relationship of any Smiths entity to the Site. It is clear then that additional discovery, only some of which has been provided by Plaintiffs, is necessary to identify and track the proper history of all of these companies and the indemnification agreement to fully understand the basis for the Plaintiffs' respective alleged contributions to the OU-1 and OU-2 trust accounts. This becomes especially important when determining whether these funds can be recovered under Section 107 as costs incurred or under Section 113 as reimbursement of costs paid by other parties.

For the same reason, additional discovery will need to be conducted on the Agere settlement and the contributions made by it or on its behalf to the OU-1 and OU-2 trust accounts. In addition, discovery will need to take place as to various settlement agreements and releases signed by the settling defendants to fully gauge the impact of those agreements and releases on the remaining non-settling Defendants' potential joint and several liability for incurred costs under Section 107.

Finally, in their Memorandum of Law (p. 13 n.7), Plaintiffs state, in passing, that "A few changes to allegations were made based upon facts analyzed by Plaintiffs since filing of the Fourth Amended Complaint." Among other changes, Plaintiffs are apparently referring to some subtle, but significant, changes made to paragraphs 11 and 12 of their Fourth Amended Complaint.

In paragraph 11, the Fourth Amended Complaint presently reads that the EPA conducted three CERCLA removal actions at the Site. In the Proposed Fifth Amended Complaint, Plaintiffs replaced that phrase in paragraph 11 with "a CERCLA removal action." Defendants believe this relates specifically to the Defendants' contentions concerning the applicability of CERCLA's six (6) year statute of limitations. This is covered specifically in Contention

24

Interrogatories served by the Defendants, Interrogatories to which Plaintiffs have objected to answering and which are the subject of a pending motion.

Similarly, in paragraph 12 of the present Fourth Amended Complaint, Plaintiffs allege that the EPA performed a fourth removal action to address radioactive waste at the Site. Paragraph 12 of the Proposed Fifth Amended Complaint identifies this as a "separate removal action." Defendants have addressed this issue in Contention Interrogatories and requested additional discovery as to what consideration, if any, the Plaintiffs received arising out of claims made against General Ceramics or its insurance carriers. In addition, whether this is a separate removal action or a fourth removal action may be very relevant for statute of limitations purposes in this case.

**POINT V**

**THE PROPOSED AMENDMENTS SEEKING TO ADD AS PLAINTIFFS SMITHS GROUP SERVICES CORP. AND SMITHS GROUP NORTH AMERICA, INC. ARE FUTILE**

**A.     The Proposed CERCLA 113 Contribution Claims Sought to be Asserted by Smiths Are Barred by CERCLA's Three Year Statute of Limitations**

Plaintiffs' Proposed Fifth Amended Complaint seeks to add as new parties "Smiths" as a result of "Smiths" April 2001 commitment to fund TI's share of the remediation of the Site. To the extent that "Smiths" has any contribution claims, the record clearly establishes that they have known of those claims since April 2001. (See Plaintiffs' Memorandum at p. 5).

The proposed CERCLA Section 113 claims sought to be asserted by "Smiths" are barred by CERCLA's three year statute of limitations. 42 U.S.C. 9613(g)(3)(B). The relevant portion of the statute provides:

> No action for contribution for any response costs or damages may
> be commenced more than 3 years after –

25

       *           *           *           *

(B)    the date of an administrative order under section ...
9622(h) of this title (relating to cost recovery settlements)
or entry of a judicially approved settlement with respect to
such costs or damages.

More than three (3) years have passed since the entry of a judicially approved settlement. The OU-1 Consent Decree was lodged with the Court on February 7, 2000 and entered on September 28, 2000. (See Proposed Fifth Amended Complaint ¶ 17). Therefore, the statute of limitations for any claim for contribution under CERCLA § 113 relating to OU-1 ran on September 28, 2003. The OU-2 Consent Decree was lodged with the Court on September 27, 2001 and entered on March 14, 2002. (See Proposed Fifth Amended Complaint ¶20). The statute of limitations for CERCLA § 113 contribution claims relating to OU-2 expired on March 14, 2005. Since the claims sought to be asserted by "Smiths" in the Proposed Fifth Amended Complaint were not lodged within three years of the entry of either OU-1 or OU-2, Smiths' purported CERCLA 113 contribution claims are time barred.

## B.    Smiths' CERCLA 107 Claims are Barred by the Six Year Statute of Limitations

Plaintiffs also seek to amend the complaint to permit "Smiths" to assert CERCLA Section 107 claims. Plaintiffs' proposed CERCLA Section 107 claims relate to remedial actions taken by Plaintiffs at the Site. For a remedial action, "[a]n initial action for recovery of the costs referred to in section 9607 . . . must be commenced within 6 years after initiation of physical on-site construction of the remedial action . . . ." 42 U.S.C. § 9613(g)(2)(B).

The term "remedy" or "remedial action" means:

[T]hose actions consistent with permanent remedy taken instead of
or in addition to removal actions in the event of a release or
threatened release of a hazardous substance into the environment,

26

to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24).

In order to recover costs for a remedial action under CERCLA, the initial action for recovery must be commenced "within 6 years *after initiation of physical on-site construction of the remedial action* . . . ." § 9613(g)(2)(B) (emphasis added). Neither the Third Circuit nor the District Courts of Pennsylvania have ruled on the interpretation of the phrase, "*initiation of physical on-site construction.*" However, the District of New Jersey and the Second and Seventh Circuits have all done so, and their rulings are instructive here.

Those courts that have addressed the issue of "initiation of physical on site construction" looked to the plain meaning of the statute, and sought to identify the actual initiation of the physical on-site construction. See Schaefer v. Town of Victor, 457 F.3d 188, 207 (2d Cir. 2006); United States v. Navistar Int'l Transp. Corp., 152 F.3d 702, 711-12 (7th Cir. 1998); United States

v. Manzo, 182 F. Supp. 2d 385 (D.N.J. 2001). The Second Circuit explicitly rejected application of a suggested "bright line rule" that "physical on-site construction consistent with the final remedy can only occur after approval of the final remedial action plan."[3] Schaefer, 457 F.3d at 207. The Sixth Circuit, in turn, noted that that other circuits have rejected use of a bright-line rule and have "adhere[d] to the principle that for a 'remedial action' to begin, the work must be 'consistent with [the] permanent remedy.'" Gencorp, Inc. v. Olin Corp., 390 F.3d 433, 444 (6th Cir. 2005) (citing Geraghty & Miller, Inc. v. Conoco Inc., 234 F.3d 917 (5th Cir. 2000), and Navistar, 152 F.3d 702.)

In Schaefer, a landfill's solid waste included certain hazardous substances as defined by CERCLA. 457 F.3d at 190-91. The landfill operator brought a CERCLA action against the town and village. Id. at 191-92. The action was initiated on January 13, 1999. Id. at 193. The action fell under the 6-year statute of limitations provision of section 113(g)(2)(B). Id.

The Second Circuit found that plaintiff's use of a crane, in 1990, to spread cover over his landfill satisfied the statutory requirements of initiation. Id. at 203. "[U]sing this equipment to dig, drag, and spread on-site soils and other material over the site as cover qualifies as construction of the remedial action." Id. at 204. This action was "necessary for 'closure' of the

---

[3]        The Ninth Circuit has held that "[f]or an action to be 'consistent with permanent remedy,' a permanent remedy must already have been adopted . . . . [N]o action can be 'remedial' until a final remedial action plan is in place . . . . [I]nitiation of physical on-site construction of the remedial action' can only occur after the final remedial action plan is adopted, . . . [therefore], the statute of limitations . . . could not have begun to run until the final remedial action was approved . . . ." Cal. v. Neville Chem. Co., 358 F.3d 661, 667, 670-71 (9th Cir. 2004). The Ninth Circuit is alone in this view. More importantly, the Ninth Circuit's decision applies only to government actions. The Ninth Circuit explicitly stated in Neville Chemical that it need not address the limitations period applicable to private suits not involving the government, like the cost recovery action brought by Plaintiffs here. See *Neville Chem.*, 358 F.3d at 667 n.3.

landfill, an 'action[] consistent with permanent remedy,' and thus qualifies as the initiation of remedial action." Id.

The court further held that "use of cover necessary for closure is itself the initiation of physical on-site construction of a remedial nature." Id.  "[S]preading this cover on his site in preparation for closure also constitutes an 'action [] consistent with permanent remedy." Id.  The court noted that between 1987 and 1992, many of Schaefer's actions at the site, some of which included physical on-site construction, were part of a remedial action and were necessary for preparations for closure.  Id.  These actions were not associated with the normal, day-to-day activities, but were specifically in contemplation of, and consistent with, the permanent remedy. Id.

In rejecting a "bright-line rule" that physical construction can only occur after the final remedial action plan is adopted, the court held that a bright-line rule, "is in tension with the plain language of the statute, which speaks of 'actions consistent with permanent remedy' and nowhere mentions either approval of the final remedial action plan or closure of the landfill in connection with the statute of limitations." Id. at 207.  The court stated:

> The statute is devoid of any reference that would lead us to conclude from its plain language that Congress intended to incorporate this specific aspect of the administrative process in establishing the actions that would trigger the limitations period. On the contrary, "remedial action" is a term broadly defined by the statute – a fact of which Congress was no doubt well aware when it incorporated that term in the statute of limitations.  If it had intended to require that the EPA issue its final approval of the remedial design in order for a "remedial action" to begin within the meaning of § 9613(g)(2)(B) – a contention unsupported by the definition of "remedial action" – Congress surely would have provided us with a more explicit direction to that effect.  Rather, in crafting the statute of limitations, Congress specifically made "the initiation of physical on-site construction of the remedial action" the triggering event.

Id. at 208.

The court stated that the adoption of a bright-line rule would allow the commencement of the statute of limitations to become a discretionary determination for the party responsible for approving the remedial action plan. Id. at 209. "[A] plaintiff could engage in strategic behavior to preclude the start of any limitations period . . . . [A]n opportunistic plaintiff could prevent the commencement of the limitations period merely by preventing the approval of the final remedial action plan." Id.

In Navistar, the federal and state governments brought separate actions under CERCLA to recover costs incurred by them in connection with an environmental cleanup and remediation of a landfill site. 152 F.3d at 704. The actions were commenced in February, 1989. Id. In July 1989, the parties entered into a consent decree indicating that the implementation of the remedial action was to begin after the final remedial design plans were approved in writing by the EPA and the State. Id. at 704-05. In July 1990, the owner/operator obtained permission to begin certain activities in connection with the remedial action. Id. at 705. These activities included hooking up utilities at the site for use in the remedial action, constructing an access road, clearing, and grubbing part of the site to prepare for placement of the clay cap. Id. The final design of the remedial action had not been submitted at this time, so approval to begin the implementation phase of the action had not yet been obtained. Id.

On September 11, 1990, the final design documents were submitted. Id. On September 14, 1990, the EPA's project manager gave the owner/operator oral approval of the final design. Id. On September 17, 1990, oral authorization was given to the owner/operator to proceed with construction of the remedial action. Id. On September 18, 1990, the first "lift" of clay to build

the permanent clay cap was placed on the landfill. Id. On September 20, 1990, the owner/operator obtained written authorization to begin construction. Id.

On September 19, 1996, the United States filed an action against Navistar to recover its costs for the remedial action not covered by the 1989 Consent Decree. Id. The State of Indiana filed a similar action on September 20, 1996. Id. The Seventh Circuit determined that the governments' CERCLA claims were time barred because the governments' actions were filed more than six years following the initiation of physical on-site construction of the remedial action. Id. at 706-07.

The court stated, "remedial action constitutes '[t]hose actions taken consistent with [the] permanent remedy' including 'such actions at the location of the release as storage confinement, . . . [and] clay cover.'" Id. at 711 (citing § 9601(24).) "It cannot be disputed that the placement of the clay was a physical action undertaken by [the owner/operator] on the site . . . . We cannot see how the action at issue could be anything other than the initiation of such construction." Id. at 713. The remedial action for the site called for the construction of a permanent clay cap and Navistar demonstrated that the owner/operator began building that cap on September 18, 1990. Id. at 713. "Therefore, the government's actions filed on September 19 and 20, 1996, were filed more than six years after the 'initiation of physical on-site construction of the remedial action' and they are time barred."[4] Id.

---

[4]    Because the court concluded that the placement of clay on the site triggered the statute of limitations period, it did not reach the question of whether any of the other actions the owner/operator performed at the site in August and September 1990 were sufficient to do so. 142 F.3d at 713 n.19.

Rejecting use of a "bright-line rule," the Seventh Circuit was not persuaded that Congress intended such a rule and stated the same opinion as the one provided in Schaefer. Id. at 712; see also Schaefer, supra, 457 F.3d at 208.

In Manzo, the United States brought an action under CERCLA to recover response costs incurred in responding to the alleged release or threatened release of hazardous substances at a Superfund site. Manzo, 182 F. Supp. 2d 385. The site was divided into three separate Operable Units ("OU") and a separate Record of Decision was issued for each OU. Id. at 391. The EPA issued ROD2 for OU-2 on September 29, 1988 and the Remedial Design was completed by May 6, 1994. Id. at 392. In determining whether an action to recover costs associated with OU-2 was barred by the six-year statute of limitations, the court found that "[at] the earliest, initiation of 'physical on-site construction' of OU-2 began with the construction of the security fencing along Spring Valley Road . . . ." Id. at 403. Put another way, the Manzo Court found that "physical on-site construction" did begin prior to adoption or approval of a final remedial action plan.

Here, Plaintiffs initiated on-site construction on September 28, 2000, immediately upon taking over the remediation. Thus, as of that date (the latest date that the statute began to run), the statute of limitations on CERCLA Section 107 claims began to run, and it expired six years later, on September 28, 2006. As was the case in Manzo, the fact that the Boarhead Farm Site OU-2 ROD was issued in 2002 does not save the proposed CERCLA Section 107 claims relating to OU-2 from being barred by the six year statute of limitations.

Smiths' CERCLA Section 107 claims, like their CERCLA 113 claims, are barred by the applicable statute of limitations. As such, Plaintiffs' motion for leave to file a Fifth Amended Complaint adding Smiths as plaintiffs should be denied.

C. **The Proposed Amendments to Add Smiths as Plaintiffs Do Not "Relate Back" to the Filing of the Original Complaint**

At page 13 of their memorandum, Plaintiffs summarily assert that the Proposed Fifth Amended Complaint "relates back to the date of the original pleading because the claim asserted in the amended pleading arose out of the 'conduct, transaction, or occurrence' set forth in the original pleading." (See Plaintiffs' Memorandum p. 13). Contrary to Plaintiffs assertion, the addition of Smiths as plaintiffs do not relate back to the date of the original filing.

Federal Rule of Civil Procedure 15(c) permits amendment of a pleading to relate back to the date of the original pleading when:

> (1)     relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2)     the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3)     the amendment changes the party or the naming of the party *against whom a claim is asserted if the foregoing* provision (2) is satisfied and ... the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party....

Fed.R.Civ.P. 15(c).

The controlling law in this Circuit interpreting Rule 15(c)(3) is Nelson v. County of Allegheny, 60 F.3d 1010 (3d Cir. 1995), cert. denied, 516 U.S. 1173 (1996). The Nelson Court *noted that, while Rule 15(c) only addresses amendments adding additional defendants, it is also* applicable when new plaintiffs are sought to be added. In that regard, Judge Scirica wrote:

33

> The Committee Note to the 1966 Amendment to the rule advises, the relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is generally easier [than that of amendments changing defendants]. Again, the chief consideration of policy is that of the statute of limitations, and the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs.

Nelson, 60 F.3d at 1014, n.7. The *Nelson* Court held that "all three conditions specified in Rule 15(c)(3) must be satisfied" for claims of late-filing plaintiffs to relate back to timely-filed claims.

Nelson, 60 F.3d at 1014. The Court further observed that without some limit, relation back

> would allow the tardy plaintiffs to benefit from the diligence of the other victims and, more importantly, could cause defendants' liability to increase geometrically and their defensive strategy to become far more complex long after the statute of limitations had run. Even if, as here, there were no showing of specific prejudice in the sense of lost or destroyed evidence, defendants would still be deprived of their interest in repose. At some point, defendants should have notice of who their adversaries are.

Nelson, 60 F.3d at 1015 (quoting Leachman v. Beech Aircraft Corp., 694 F.2d 1301, 1309 (D.C. Cir. 1982)).

In finding that Rule 15(c)(3) had not been satisfied, the Nelson Court noted that, in order to preserve the protection of the statute of limitations, the relation back rule not only requires that "defendants are not unfairly prejudiced by these late-coming plaintiffs" but that, in addition, the "plaintiffs have not slept on their rights." Id. The Nelson Court ultimately ruled that the late-filing plaintiffs would not be permitted "to take advantage of the rule to perform an end-run around the statute of limitations that bars their claims." Id.

In Brever v. Federal Equity Management Company of Pennsylvania, 233 F.R.D. 429 (W.D. Pa. 2005), the Court permitted an amendment to the complaint alleging violation of the Investment Company Act that allowed new plaintiffs to join the suit, but did not permit the new

plaintiffs' claims to relate back to the filing of the original complaint. The <u>Brever</u> Court, in determining that the new plaintiffs' claims did not relate back to the filing of the original complaint made the following observations:

> The notice inquiry is designed to eliminate the prejudice that would result from having to assemble evidence and construct a defense after a claim has become stale. (Citation omitted). The requirement to demonstrate a mistake concerning the identity of the proper party is concerned with protecting a defendant's interest in repose where a dilatory complainant has simply sat on his or her rights and seeks to invoke the rule in an effort to perform an end-run around the statute of limitations. (Citation omitted).

<u>Brever</u>, 233 F.R.D. at 435. Like <u>Nelson</u>, the <u>Brever</u> Court also recognized that the relation back doctrine must have some limits. <u>Brever</u>, 233 F.R.D. at 435.

Here, the proposed new plaintiffs, Smiths, cannot satisfy Rule 15(c).[5] By their own admission, Plaintiffs (and the two Smiths, obviously) have known since April 25, 2001 that "Smiths" was paying, directly or indirectly, TI's funding obligations under OU-1 and OU-2 agreements with the Plaintiffs and other entities. (<u>See</u> Plaintiffs' Memorandum at pp. 5-6). Defendants were aware that there were several contributors to the OU-1 and OU-1 Funds that were not plaintiffs in this case. Among those contributors was "Smiths Industries, Inc.", which has paid over $1.7 million to the Funds. (Exhibit Jerome 10 to the deposition of Cytec corporate designee, 1/6/05). It was not until the Plaintiffs responded to the Defendants' Contention Interrogatories that Defendants became aware that Plaintiffs were crediting the contributions by

---

[5]    In this Court's July 20, 2005 Memorandum & Order, the Court determined that the proposed amendment substituting the corporate members of the Boarhead Farms Agreement Group was permissible because the corporate members were the real parties in interest pursuant to Rule 17. The Court stated that "it need not address the application of Rule 15(c) in this context" but noted that "the concerns underlying the elements listed in Rule 15(c)(3), notice and prejudice to the Defendants, are not at issue here." Mem. & Op. at p. 8. The current application presents a completely <u>different</u> set of facts with new and unknown proposed plaintiffs.

Smiths Industries, Inc. as contributions by TI. On May 7, 2007, Plaintiffs' counsel explained that a "Bundy Corporation" had operated the National Rolling Mills plant until April 23, 2004 and then changed its name to TI Automotive after selling the facility. Plaintiffs provided additional information on July 12, 2007, the day before it filed its Memorandum in Opposition to Defendants' Motion for Leave to Pursue Limited Additional Discovery. In that response, it provided documents purportedly evidencing the merger between TI-LLC and TI Corp. and an agreement purporting to evidence the sale of shares of TI by Smiths Group PLC to 329th Shelf Investment Company, Ltd. Plaintiffs' counsel also represented that Smiths Group plc (not Smiths Industries, Inc.) "made payments to the OU-1 and OU-2 group accounts on behalf of TI in accordance with indemnity." Defendants are now informed through this motion that Smiths Group Services Corp. and Smiths Group North America, Inc. – two previously unidentified entities – actually made the contributions on behalf of TI. Thus, at no time prior to the filing of the Plaintiffs' current motion to amend did Defendants have notice that these two corporations might have a claim or be a plaintiff.

Plaintiffs made a calculated decision not to add Smiths in any of their complaints including their Fourth Amended Complaint. The omission was done by design – a design which has now proven to be a failure. Having sat on their rights, Smiths should not be permitted to use Rule 15(c) to perform an end-run around the statute of limitations. The proposed amendments to add Smiths as Plaintiffs do not "relate back" to the filing of the original complaint.

### D. Notwithstanding Any Statute of Limitations Claim, Smiths Cannot Maintain a CERCLA §107 Claim Against Defendants

In Atlantic Research, the Supreme Court recognized that a private party may assert a claim under Section 107(a) but limited such a claim to costs that a private party "incurred" in cleaning up a site. The Court further stated that "by reimbursing response costs paid by other

parties, the PRP has not incurred its own costs of response and therefore cannot recover under §107(a)." 127 S. Ct. at 2338.

Here, Smiths has not "incurred" any response costs. Rather, as Plaintiffs point out in their memorandum, Smiths has agreed to "indemnify" TI for its obligations to the OU-1 and OU-2 Groups. Indemnification does not translate into incurrence of costs. At best, Smiths' sole basis for asserting a claim is under §113(f) – a claim that is barred by the statute of limitations. The language in Atlantic Research is clear – Smiths cannot assert a §107(a) claim.

The proposed amendments seeking to add as Plaintiffs Smiths Group Services Corp. and Smiths Group North America, Inc. are futile. Plaintiffs' motion for leave to amend should be denied.

## CONCLUSION

For the reasons set forth herein, the Defendants respectfully submit that the Plaintiffs' motion for leave to amend the Fourth Amended Complaint should be denied in its entirety.

Respectfully submitted,

s/Jeffrey L. Pettit
RICHARD C. BIEDRZYCKI, ESQUIRE
Attorney I.D. No. 30604
JEFFREY L. PETTIT, ESQUIRE
Attorney I.D. No. 21624
PHELAN, PETTIT & BIEDRZYCKI
121 South Broad Street
Suite 1600
Philadelphia, PA 19107
(215) 546-0500

Counsel for Defendant Ashland Inc.

Date: September 10, 2007

37