LAW OFFICES

# BALLARD SPAHR ANDREWS & INGERSOLL, LLP

A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
PLAZA 1000, SUITE 500
MAIN STREET
VOORHEES, NEW JERSEY 08043-4636
856-761-3400
FAX: 856-761-1020
WWW.BALLARDSPAHR.COM

PHILADELPHIA, PA
BALTIMORE, MD
BETHESDA, MD
DENVER, CO
LAS VEGAS, NV
PHOENIX, AZ
SALT LAKE CITY, UT
WASHINGTON, DC
WILMINGTON, DE

PARTNER RESPONSIBLE FOR
VOORHEES, NJ PRACTICE
BENJAMIN A. LEVIN

GLENN A. HARRIS
DIRECT DIAL: 856-761-3440
PERSONAL FAX: 856-761-9001
HARRISG@BALLARDSPAHR.COM

September 13, 2007

The Honorable Legrome D. Davis, U.S.D.J.
United States District Court
for the Eastern District of Pennsylvania
United States Courthouse
601 Market Street, Room 6614
Philadelphia, Pennsylvania 19106

> Re:   *Agere Systems, et als. v. Advanced Environmental Technology Corporation, et als.*
>       *Civil Action No. 02-CV-3830 (LDD)*

Dear Judge Davis:

Please accept this letter brief in opposition to the motion by Handy and Harman Tube Company, Inc. ("Handy and Harman") to strike two exhibits to and portions of Plaintiffs' memorandum in opposition to Handy and Harman's motion for summary judgment.

Plaintiffs intend to establish at trial a foundation for and to offer into evidence the two EPA summaries of EPA interviews of then-employees of Handy and Harman, conducted with respect to DeRewal Chemical Company and the Boarhead Farms Site.

Because, however, the statements of the Handy and Harman then-employees are not necessary for the proper resolution of Handy and Harman's Rule 56 motion, Plaintiffs hereby withdraw those two summaries, Exhibits A and C to the Certification of Ms. Trojecki. They also file herewith a revised version of their memorandum in response to the Rule 56 motion deleting references to those summaries.

Accordingly, Plaintiffs respectfully request that Your Honor deny Handy and Harman's motion to strike as moot. A Form of Order is enclosed.

Respectfully submitted,

Glenn A. Harris

GAH/dmn
Enclosure

cc w/encl.:    All Defendants

DMEAST #9871840 v1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., <br><br> Defendants. | Civil Action No. 02-CV-3830 (LDD) |

## ORDER

AND NOW, this _____ day of _____, 2007, upon consideration of Plaintiffs' Memorandum in Opposition to Handy & Harman Tube Company, Inc.'s ("Handy") Motion to Strike it is hereby ORDERED that Handy's Motion is DENIED as moot.

_____
Legrome D. Davis, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES, INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC
and TI GROUP AUTOMOTIVE
SYSTEMS, LLC,

                    Plaintiffs,

    v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

                    Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 02-CV-3830 (LDD)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**HANDY & HARMAN'S SUMMARY JUDGMENT MOTION**

**INTRODUCTION**

      Handy & Harman Tube Company, Inc.'s ("H&H Tube") argument that it is

entitled to judgment as a matter of law is based solely upon its assertion that the waste hauled

from its facility by DeRewal Chemical Company ("DCC") was not a "hazardous substance" for

which it can be liable under CERCLA. H&H Tube's assertion is premised upon two so-called

"facts" -- that the only waste hauled by DCC was waste created during the annual summer

shutdown of the H&H Tube facility, and that the shutdown waste is not a CERCLA "hazardous

substance." Not only did DCC pick up many of the various waste streams generated at the H&H

Tube facility (all of which contained CERCLA hazardous substances), but the annual shutdown

waste contained several contaminants that are, in fact, CERCLA hazardous substances. H&H Tube's motion should therefore be denied.[1]

## PRELIMINARY STATEMENT

H&H Tube unjustifiably takes the position that the only H&H Tube waste that is alleged to have been disposed of at the Boarhead Farms Superfund Site (the "Site") is drummed waste that was generated during the annual shutdown of its Norristown, Pennsylvania facility. For no reason whatsoever explained in its brief, H&H Tube completely ignores evidence that other H&H Tube waste containing hazardous substances was disposed of at the Site. For example, Freddie DeRewal testified that he personally picked up H&H Tube's spent acids and disposed of them at the Site.[2] Moreover, there is substantial evidence establishing that DCC hauled many of H&H Tube's manufacturing wastes, including H&H Tube employees' recollection of an ongoing business relationship between H&H Tube and DCC and testimony of DCC drivers that H&H Tube's drummed waste was disposed of at the Site on numerous occasions.

In any event, even if the only H&H Tube waste that was disposed of at the Site was its annual shutdown waste, H&H Tube is still liable under CERCLA because that waste contained hazardous substances. Specifically, both Dr. Brown and Thomas Curran, a long-standing H&H Tube employee repeatedly and consistently admitted that H&H Tube's annual shutdown waste contained: Spent solvents, such as acetone and methyl ethyl ketone; metals, such as iron, chromium and nickel; and oil and grease. With the exception of iron, each of these

---

[1]     H&H does not dispute, for the purposes of its motion, that DCC disposed of its waste at the Boarhead Farms site ("the Site"), or that it arranged with DCC for the disposal of that waste.

[2]     Even H&H Tube's own expert, Dr. Kirk W. Brown, Ph.D., acknowledged this testimony.

substances, except iron, are included on the list of hazardous substances promulgated by the United States Environmental Protection Agency (U.S. EPA) under the authority of CERCLA. The United States Court of Appeals for the Third Circuit has held that the CERCLA definition of hazardous substance does not include a quantity and/or concentration requirement, so that even "trace" amounts of these contaminants brings the shutdown waste within the CERCLA liability scheme.

Finally, H&H Tube's assertion that the "industrial waste solution" referenced in a February 1973 DCC invoice refers only to H&H Tube's annual shutdown waste is certainly wrong. For instance, Mr. Curran testified that the annual shutdown occurred in the summer and that the resulting waste was removed shortly after the shutdown period. The DCC invoice, however, is dated February 1973 - many months after the shutdown would have occurred. Further, the DCC invoice indicates that both 30 and 55 gallon drums of "industrial waste solution" were picked up from H&H Tube. Curran testified, however, that the annual shutdown waste was disposed of in 55 gallon drums, not 30 gallon drums, and that the 30 gallon drums were used to dispose of the smaller spent acetone and methyl ethyl ketone H&H Tube waste stream. In addition, no H&H Tube employees recalled the use of the term "industrial waste solution" to describe any type of H&H Tube waste, despite the fact that these same employees were able to specifically identify several other of H&H Tube's waste streams.

Accordingly, for the reasons set forth above and explained more fully below, we respectfully request that the Court deny H&H Tube's motion for summary judgment.

## STATEMENT OF FACTS

Plaintiffs allege that H&H Tube is responsible for a share of the cleanup costs for the Site because H&H Tube's wastes contained hazardous substances and were disposed of at the Site. H&H Tube is seeking summary judgment on the basis that its waste that was disposed of at the Site did not contain hazardous substances.

### 1.  Business Relationship Between DCC and H&H Tube

H&H Tube had a prolonged relationship with DCC in which DCC hauled away and disposed of many H&H Tube waste streams. H&H Tube's employees recall today that H&H Tube did business with DCC in the 1970s. Jay Crawford, the Supervisor of Welding and Raw Material at H&H Tube for twenty five years, recalled that DCC hauled spent lubricants from H&H Tube during the time when DCC disposed of waste at the Site. Trojecki Cert, Exhibit A at 1. Mr. Crawford estimated that the accumulation of drums prior to each pickup was fewer than a dozen. *Id.* Mary Kollmar, who worked as a Purchasing Clerk and later Purchasing Manager at H&H Tube for over thirty years, testified that she recalled the name DCC in connection her employment at H&H Tube. Trojecki Cert., Exhibit B at 8:4-10:1 and 25:21-26:16. There must have been a significant relationship between DCC and H&H Tube for this many H&H Tube witnesses to remember DCC as a waste disposal contractor thirty plus years later.

In addition, DCC drivers recalled hauling waste from H&H Tube to the Site. Freddie DeRewal recalled hauling bulk waste from H&H Tube to the Site.

> Q. Did you ever pick up any waste from a Handy & Harman facility?
>
> A. Yes.
>
> Q. Where was that facility located?

> A.    I believe that is, it's south of--I know it's outside of Norristown, I don't know what street that would be on.
>
> ***
>
> Q.    The one that we're talking about now that might be outside of Norristown.
>
> A.    Okay.
>
> Q.    Describe that facility for us.
>
> A.    Big white building, block.  We used to have to go through a gate and that was also bulk pick-up.
>
> Q.    A bulk pick-up?
>
> A.    Yeah.
>
> ***
>
> Q.    Where did that waste go that you picked up for disposal?
>
> A.    That would have went to Boarhead.

Trojecki Cert., Exhibit D at 119:12-122:20.  Bruce DeRewal remembered picking up approximately twenty drums of waste from H&H Tube on about ten occasions and disposing of H&H Tube drums of waste at the Site.[3]  Trojecki Cert., Exhibit E at 50:16-52:4.  John Barsum also recalled hauling ten to fifteen drums of waste from H&H Tube's Norristown facility, though he was initially mistaken about the name.

> Q.    I'd like to show you a document that's previously been marked as P-42.  It's a DeRewal Chemical invoice to Handy & Harman Company in Norristown, Pennsylvania? Do you see where it says Township Line Road on there?
>
> A.    Yes.
>
> Q.    Looking at that document, I know we talked about Jenkintown and we talked about cyanide and we talked about the words Handy & Harman that you say you saw on a sign.

---

[3]    Though Bruce DeRewal could not specifically identify the name H&H Tube, H&H Tube concedes that his testimony is that he picked up waste from the H&H Tube facility. H&H Tube Brief at 10.

A.    I remember the name Norristown, that's where it was at.  I remember it.

***

Q.    Do you think that you personally went to a place called Handy & Harman in, near Norristown?

A.    One time, that's all, Glenn.  That's where it was at, Norristown, not Jenkintown.  I remember it.

Trojecki Cert., Exhibit F at 326:6-327:23.

There can be no doubt that DCC picked up various types of wastes from H&H Tube over an extended period of time.[4]

## 2.    H&H Tube's Bulk and Drummed Waste Streams

H&H Tube's manufacturing operations resulted in the generation of several different waste streams, each of which contained hazardous substances, including both drummed and bulk waste.  H&H Tube identified the following manufacturing waste streams in its answers to interrogatories:  Spent acids; spent TCE still bottoms; and TCE-contaminated lubricants. Trojecki Cert., Exhibit G at Interrogatory 3(g).  Mr. Curran identified the following additional drummed wastes that were generated at H&H Tube during his deposition:  Polisher wastes; spent acetone and methyl ethyl ketone solvents; and waste generated from H&H Tube's annual shutdown.  Trojecki Cert., Exhibit H at 71:11-72:25, 48:23-49:22, 51:12-55:21.

H&H Tube's spent acid waste consisted of waste mixtures of water, sulfuric, nitric, hydrochloric, and hydrofluoric acids.  Trojecki Cert., Exhibit H at 21:3-10.  The acids were disposed of as bulk waste.  Trojecki Cert., Exhibit I at Pg. 12.  The spent TCE still bottoms

---

[4]    Further, two full-time DCC drivers that hauled waste during the time that DCC operated the Site are now deceased.  It is likely that these drivers hauled waste from the same customers and disposed of it in the same places as the drivers who have testified.

contained 50% spent TCE and 50% other contaminants (*e.g.*, lubricants, metal fines and solid impurities). Trojecki Cert., Exhibit G at Interrogatory 6(b). These still bottoms were disposed of in 55 gallon drums. Trojecki Cert., Exhibit H at 56:14-57:2. The spent lubricants were oils such as 10W-30 and 5W-30 that were contaminated with TCE from cleaning tooling (*i.e.*, dies) at the benches and from the degreasing processes. Trojecki Cert., Exhibit H at 73:1-13 and Trojecki Cert., Exhibit G at Interrogatory 6(b). Mr. Curran testified that these wastes were disposed of in 55 gallon drums. Trojecki Cert. Exhibit H at 73:6-13. The polisher wastes contained water with grit and metal particulates of stainless steel and other raw materials used at H&H Tube. Trojecki Cert., Exhibit H at 71:11-15. H&H disposed of the polisher wastes in drums; however, there is no testimony regarding the size of the drums. Trojecki Cert., Exhibit H at 73:14-21. Acetone and methyl ethyl ketone were dispensed by H&H Tube from tanks to clean tools. Trojecki Cert., Exhibit H at 48:23-52:10. The spent acetone and methyl ethyl ketone solvent wastes were disposed of in 30 gallon drums. Trojecki Cert., Exhibit H at 51:12-52:10. The waste from H&H Tube's shutdown was generated during the annual summer cleaning of certain machines. Trojecki Cert., Exhibit H at 54:10-55:7. The waste consisted of oil, grease, solvents, metals, all CERCLA hazardous substances, and water created when H&H Tube cleaned all of the plant machinery. *Id.* The annual shutdown waste was stored in 55-gallon drums and was disposed of "soon after [H&H Tube's] shutdown period." Trojecki Cert., Exhibit H at 55:7-14.

### 3.    <u>Industrial Waste Solution</u>

H&H Tube arbitrarily assumes that the term "industrial waste solution," which appears on DCC's February 1973 invoice to H&H Tube, refers to its annual shutdown waste.

There is no way for H&H Tube to know, however, what particular H&H Tube waste this term refers to or if it is refers to any particular waste type at all.

"Industrial waste solution" is a term no doubt made up by DCC to generally describe H&H Tube's manufacturing waste -- indeed it is a generic description that aptly fits each of the aqueous waste streams generated by H&H Tube. No H&H Tube employees specifically recalled the use of that term to describe any H&H Tube waste stream. Mary Kollmar, who worked for H&H Tube for over thirty years, was able to identify H&H Tube's spent TCE still bottom and spent acid wastes, but testified that she never heard of the term "industrial waste solution." Trojecki Cert. Exhibit B at 17:22-17:24 and 33:24-34:2. Likewise, Thomas Curran was able to explain in detail the various waste streams generated by H&H Tube, but testified that he did not recognize the term "industrial waste solution." Trojecki Cert., Exhibit H at 52:11-53:9.

There can be no dispute that the H&H Tube wastes disposed of at the Site contained hazardous substances, such that H&H Tube is liable under CERCLA for those wastes.

## DISCUSSION

Summary judgment is appropriate when the pleadings, affidavits and discovery materials produce no "genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Lawrence v. National Westminster Bank*, 98 F.3d 61, 65 (3d Cir. 1996). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A nonmoving party creates a genuine issue of material fact when it provides evidence such that a reasonable jury could return a verdict

for the nonmoving party.  *Id.*  On summary judgment the inferences to be drawn from the

underlying facts must be viewed in the light most favorable to the party opposing the motion.

*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Sarko v. Penn-Del Directory Co.*, 968

F. Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), aff'd, 189 F.3d 464 (3d Cir. 1999).

**A.    H&H Tube's waste that was hauled to the Site by DCC contained hazardous substances.**

     **1.    <u>DCC hauled many of H&H's waste streams to the Site, each of which contained hazardous substances</u>**

       The first sentence of H&H Tube's Brief states that "the only 'waste' arguably

generated by [H&H Tube] that is alleged to have been disposed of at the [Site] is a primarily

water-based liquid identified as 'industrial waste solution.'"  H&H Tube Brief at 1.  However,

nowhere does H&H Tube provide factual support for this bald statement or account for the fact

that it ignored substantial evidence indicating that various types of H&H Tube's manufacturing

wastes containing hazardous substances were disposed of at the Site.  There is ample evidence to

prove that DCC disposed of H&H Tube's manufacturing wastes containing hazardous substances

at the Site.

       Freddie DeRewal testified that he disposed of H&H Tube's bulk waste at the Site:

| | |
|---|---|
| Q. | Did you ever pick up any waste from a Handy & Harman facility? |
| A. | Yes. |
| Q. | Where was that facility located? |
| A. | I believe that is, it's south of--I know it's outside of Norristown, I don't know what street that would be on. |

***

| | |
|---|---|
| Q. | The one that we're talking about now that might be outside of Norristown. |
| A. | Okay. |

9

Q. Describe that facility for us.

A. Big white building, block. We used to have o go through a gate and that was also bulk pick-up.

Q. A bulk pick-up?

A. Yeah.

\*\*\*

Q. Where did that waste go that you picked up for disposal?

A. That would have went to Boarhead.

Trojecki Cert., Exhibit D at 119:12-122:20. The only waste H&H Tube disposed of in bulk was spent acids, as was concluded by H&H Tube's own expert. Trojecki Cert., Exhibit I at pg. 12.[5] H&H Tube flatly disregarded Freddie DeRewal's testimony and the statements of its own expert about the disposal of H&H Tube's spent acid to the Site.

H&H Tube's spent acid waste is a CERCLA hazardous substance. The term "hazardous substance" is defined in CERCLA as:

(A) any substance designated pursuant to section 1321 (b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 69211] (but not including any waste the regulation of which under the Spill Waste Disposal Act [42 U.S.C.A. § 6901 *et seq.*] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A)

---

[5] Dr. Brown goes further to acknowledge that Freddie DeRewal testified that he hauled bulk waste to the Site, and even provided an estimate of the potential volume of such spent acid bulk waste that might have been disposed of at the Site. Trojecki Cert., Exhibit I at pg. 31.

> through (F) of this paragraph, and the term does not include natural
> gas, natural gas liquids, liquefied natural gas, or synthetic gas
> usable for fuel (or mixtures of natural gas and synthetic gas).

42 U.S.C. § 9601(14). CERCLA's definition of hazardous substances includes a variety of

chemicals and compounds that are designated as such by the EPA under the authority of

CERCLA as well as several other environmental statutes such as the Clean Water Act, 33

U.S.C.A. § 1251 *et seq.* and the Clean Air Act, 42 U.S.C.A. § 7401 *et seq.* EPA consolidated the

lists of hazardous substances designated pursuant to various environmental statutes in Table

302.4. 40 C.F.R. 302.4. *U.S. v. Alcan Aluminum Corp. et al.*, 964 F.2d 252, 262 (3rd Cir. 1992).

H&H Tube's spent acid waste consisted of waste mixtures of water, sulfuric,

nitric, hydrochloric, and hydrofluoric acids and was disposed of in bulk. Trojecki Cert., Exhibit

H at 21:3-10. Table 302.4 expressly lists sulfuric acid (Chemical Abstract Service Registry

Number ("CASRN") 7664-93-9), nitric acid (CASRN 7697-37-2), hydrochloric acid (CASRN

7647-01-0) and hydrofluoric acid (CASRN 7664-39-3) as hazardous substances. In addition, Dr.

Brown testified that the spent acids would have contained iron, nickel and chromium. Trojecki

Cert., Exhibit J at 97:24-98:13. Table 302.4 expressly lists nickel (CASRN 7440-02-0) and

chromium (CASRN 7440-47-3) as hazardous substances. Trojecki Cert., Exhibit (Brown) 97:24-

98:13. Moreover, Dr. Brown described a spent acid waste stream similar to H&H Tube's spent

acid wastes from another defendant in this case as being hazardous. Dr. Brown testified as

follows:

> [T]he acids…and the plating solutions, how low their pH's are,
> very acids, very low pH's. And also that those acids would be in
> themselves number one they're listed hazardous wastes and
> number two they would be classified as hazardous wastes because
> of their pH and likely their metal contents even though, even if
> they hadn't been listed.

Trojecki Cert., Exhibit J at 187:1-11. Accordingly, H&H Tube's spent acid wastes were disposed of at the Site and contained hazardous substances. H&H Tube's motion should be denied on this basis alone.

H&H Tube's waste lubricating oils were also disposed of at the Site.[6] The spent lubricating oils were one of only two types of H&H Tube wastes (the other was acetone and methyl ethyl ketone spent solvents) that were disposed of in 30-gallon drums. This is important because the February 1973 DCC invoice issued to H&H Tube indicates that DCC picked up 30-gallon drums of waste from H&H Tube. Bruce DeRewal and John Barsum both recalled picking up drums of waste from the H&H Tube facility. Bruce DeRewal remembered picking up approximately twenty drums of waste from H&H Tube on about ten occasions and disposing of H&H Tube drums of waste at the Site. Trojecki Cert., Exhibit E at 50:16-52:4. John Barsum also recalled hauling ten to fifteen drums of waste from H&H Tube. Trojecki Cert., Exhibit F at 326:6-327:23.

H&H Tube's spent lubricating oils were contaminated with TCE. Table 302.4 expressly lists TCE (CASRN 79-01-6) as a hazardous substance. Further, although the CERCLA definition of hazardous substance does not include petroleum, including crude oil or any fraction thereof, this "petroleum exclusion" does not apply to waste oil that becomes contaminated with other substances. *Alcan* at 266.

> EPA has distinguished between oil that naturally contains low
> levels of hazardous substances and oil to which hazardous

---

[6]    H&H Tube ignored additional evidence establishing that DCC hauled H&H Tube's manufacturing waste to the Site. Mary Kollmar, who started working for the company in the early 1970s, testified that she recalled the name DeRewal in connection with her employment at H&H Tube. Trojecki Cert., Exhibit B at 8:4-10:1 and 25:21-26:16.

> substances have been added through use. Although EPA has
> extended the petroleum exclusion to the former category of oil
> substances, it has specifically declined to extend such protection to
> the latter category. In EPA's words: 'EPA does not consider
> materials such as waste oil to which listed CERCLA substances
> have been added to be within the petroleum exclusion.'

*Id.* (citing 50 Fed. Reg. 13,460 (1985). *See also Tosco Corp. v. Koch Indus.*, 216 F.3d 886 (10th

Cir. 2000) (the EPA did not does not consider materials such as waste oil to which listed

CERCLA substances have been added to be within the petroleum exclusion to the definition of

hazardous substances); *Cose v. Getty Oil Co.*, 4 F.3d 700 (9th Cir. 1993) (petroleum exclusion

does not apply to waste oil to which CERCLA hazardous substances have been added).

Therefore, because H&H Tube's lubricating oils became contaminated with other materials,

especially TCE, CERCLA's petroleum exclusion does not apply and the lubricating oils fall

within CERCLA's definition of hazardous substance.

    H&H's other manufacturing wastes also contained hazardous substances. The

presence of TCE in the spent TCE still bottoms render that waste a hazardous substance. The

metals in the polisher wastes cause that waste to be a hazardous substance. Finally, as discussed

further below, H&H Tube's spent acetone and methyl ethyl ketone solvents were hazardous

substances. Both acetone and methyl ethyl ketone are included in the U.S. EPA's list of

hazardous substances. 40 C.F.R. 302.4. All of these wastes were drummed and hauled away

from the H&H facility for disposal.

    Accordingly, there is substantial evidence, all of which was ignored by H&H

Tube, that DCC disposed of many of H&H Tube's wastes (all of which contain CERCLA

hazardous substances) at the Site.

2.     **H&H Tube's annual shutdown waste constitutes a hazardous substance**

H&H Tube references the testimony of its expert that the annual shutdown waste is not a "hazardous waste" as sole support for its assertion that the annual shutdown waste is not a CERCLA hazardous substance. H&H Tube Brief at 19. H&H Tube's reliance on this testimony is disingenuous because: (1) the terms "hazardous waste" and "hazardous substance" each have separate legal significance; and (2) Dr. Brown expressly admitted both in his expert report and during his deposition that H&H Tube's shutdown waste contained "hazardous substances," as that term is defined under CERCLA.

"Hazardous waste" is a term defined under the Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C.A. § 6901 *et seq.* Regulations promulgated pursuant to RCRA provide that a waste is hazardous if it is either a "listed" or "characteristic" hazardous waste. 40 C.F.R. § 261.3(a). Several hundred substances are now "listed" as hazardous wastes in the Code of Federal Regulations. 40 C.F.R. §§ 261.30-261.38 (subpart D). Other substances qualify as hazardous waste if testing shows that they exhibit the "characteristics" of hazardous waste, including ignitability, corrosivity, reactivity and toxicity. 40 C.F.R. §§ 261.3(a)(2)(i), 261.20. The CERCLA term "hazardous substance," though, is much broader, including any substance containing any material containing *any* of thousands of compounds. 42 U.S.C. § 9601(14).

It is well settled that "hazardous substance" includes any material containing at least one molecule of a compound within the broad CERCLA definition of "hazardous substances." The quantity or concentration of hazardous substances disposed of at a facility is irrelevant to the question of whether a person is liable under CERCLA. *U.S. v. Alcan Aluminum Corp. et al.,* 964 F.2d 252, 259 (3rd Cir. 1992). In *Alcan*, the defendant sought to avoid

CERCLA liability on the basis that its waste did not contain hazardous substances. The waste in question contained fragments of aluminum ingots, which also contained copper, chromium, cadmium, lead and zinc. The waste was filtered before it was disposed of, but the filtering process was imperfect and trace amounts of metal compounds remained. The defendant argued that it was not liable under CERCLA because the waste was not toxic and was "orders of magnitude below ambient or naturally occurring background levels." *Id.* at 256. "[T]he uncontested facts show that Alcan's waste contained less of these [hazardous] elements that can be found in clean dirt." *Id.* at 259. The Third Circuit held that CERCLA, on its face, does not contain any quantitative requirement in its definition of hazardous substance. In addition, the Court found that the legislative history supports that Congress did not intend to allow an otherwise polluter to escape CERCLA liability because "the amount of its own pollution was minimal." *Id.* at 260. *See also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir. 1989) (holding that the plain statutory language of CERCLA fails to impose any quantitative requirement on the term hazardous substance); *Eagle-Picher Indus. v. United States EPA*, 759 F.2d 922, 927 (D.C.Cir. 1985) (holding a "substance is a 'hazardous substance' within the meaning of CERCLA if it qualifies under any of" the statute's definitional requirements); *City of New York v. Exxon Corp.*, 744 F. Supp. 474, 483 (S.D.N.Y. 1990) (CERCLA liability attaches regardless of the concentration of hazardous substances present in a defendant's waste); *U.S. v. Wade*, 577 F. Supp. 1326, 1340 (E.D. Pa. 1983) (listed substance is hazardous regardless of the concentration or amount of any particular discharge).

H&H Tube's annual shutdown waste indisputably contained several hazardous substances, even if in only trace amounts. The waste consisted of oil, grease, solvents, metals, all CERCLA hazardous substances, and water created when H&H Tube cleaned all of the plant machinery. Trojecki Cert., Exhibit H at 54:10-55:7. Acetone (Chemical Abstract Service

Registry Number ("CASRN") 67-64-1) and methyl ethyl ketone (CASRN 78-93-3) are expressly

designated as hazardous substances in Table 302.4.  Further, Table 302.4 also includes

chromium (CASRN 7440-47-3) and nickel (CASRN 7440-02-0), each of which Curran and Dr.

Brown testified would be included in the H&H Tube shutdown waste, as well as many other

metals.  Moreover, the petroleum exclusion does not apply to the oil and grease in the annual

shutdown waste because such materials were commingled with other CERCLA hazardous

substances.

Accordingly, regardless of the quantity of acetone, methyl ethyl ketone,

chromium, nickel and/or oil and grease that is contained in the shutdown waste, the presence of

one or more of these contaminants renders the shutdown waste a hazardous substance under

CERCLA.

H&H Tube either manipulates or, at the very least, mischaracterizes Dr. Brown's

testimony to suggest that Dr. Brown's opinion is that the annual shutdown waste was not a

CERCLA hazardous substance.  Dr. Brown never gave any such testimony, but, on the contrary,

admitted that the annual shutdown waste contained contaminants that are expressly included in

the US EPA's list of hazardous substances.  Specifically, Dr. Brown testified that the annual

shutdown waste would contain spent solvents, such as acetone and methyl ethyl ketone; metals,

such as iron, chromium and nickel; and oil and grease.  Trojecki Cert., Exhibit J at 132:3-133:15.

Moreover, Dr. Brown expressly admitted that these constituents were "hazardous substances" in

his expert report.  Dr. Brown stated:

> As previously discussed, the [annual shutdown waste] would have
> consisted of wash water with trace amounts of residual grease and
> oil removed from the drawing machines (Curran, 2004, pg. 55).
> The waste generated as the [annual shutdown waste] was non-
> hazardous and would have contained only miniscule quantities, if
> any, of the "hazardous substances" (i.e., those that may have been
> contained in the raw materials and/or picked up with the grease
> and lubricants used with the drawing machines.

Trojecki Cert., Exhibit I at pg. 19.

Dr. Brown testified only that he believed that the waste generated from H&H Tube's annual shutdown was not a "hazardous waste" as that term is defined under RCRA, which is of no consequence in determining whether a substance is hazardous for purposes of CERCLA:

> Q.   It's your opinion that the solution that Curran is referring to in his deposition as industrial waste solution is non hazardous; is that correct?
>
> A.   Yes.
>
> Q.   Why do you think that?
>
> A.   It's not listed as a hazardous waste. It would not fail any of the four criteria for being a hazardous waste. It would not fail toxic concentration -- it's a test for soluble metals in waste, if I have the acronym right, TCLP, I'll get you the right acronym, it wouldn't fail that test, if wouldn't have a pH outside the normal range. It wouldn't be flammable. It wouldn't be corrosive. So it wouldn't be reactive. So there's nothing there that would indicate that it was a hazardous waste.

Trojecki Cert., Exhibit J at 233:14-234:6.

### 3.   The term "industrial waste solution" used by DCC to describe H&H Tube's manufacturing waste was not H&H Tube's annual shutdown waste.

H&H Tube premises its entire motion on the assertion that the only H&H Tube waste disposed of at the Site was the annual shutdown waste. H&H Tube Brief at 1. That assertion is based upon the single extant DCC invoice to H&H Tube. The evidence strongly suggests that the term on the invoice "industrial waste solution" *does not* refer to the shutdown waste, if it refers to any particular waste at all.

The February 1973 invoice indicates that a waste described as "industrial waste solution" was picked up from H&H Tube's Norristown facility in 30 and 55-gallon drums. Trojecki Cert., Exhibit K. DCC, rather than H&H Tube, used the term "industrial waste

solution" to describe the H&H Tube waste that was picked up by DCC. No H&H Tube employees recalled the use of that term to describe any H&H Tube waste stream. Mary Kollmar, who worked for H&H Tube for over thirty years, was able to identify H&H Tube's spent TCE still bottom and spent acid wastes, but testified that she never heard of the term "industrial waste solution." Trojecki Cert. Exhibit B at 17:22-17:24 and 33:24-34:2. Likewise, Thomas Curran was able to explain in detail the various waste streams generated by H&H Tube, but testified that he did not recognize the term "industrial waste solution." Trojecki Cert., Exhibit H at 52:11-53:9. Because there *was no* H&H Tube "industrial waste solution," the invoice could have been referring to any of the H&H Tube waste streams.

Indeed, the "industrial waste solution" was likely either H&H Tube's spent acetone and methyl ethyl ketone solvents or TCE contaminated lubricants. Mr. Curran testified that the annual shutdown occurred in the summer and that the resulting wastes were disposed of shortly after the shutdown was complete. The DCC invoice is dated February 1973 -- many months after the shutdown would have occurred. Further, the DCC invoice indicates that the H&H Tube waste was in 30 and 55 gallon drums. Mr. Curran testified that the annual shutdown waste was disposed of in 55 gallon drums, not in 30 gallon drums. The only waste that Mr. Curran recalled being disposed of in 30 gallon drums was spent acetone and methyl ethyl ketone solvents. Mr. Crawford recalled that DCC disposed of H&H Tube's spent lubricants in 30 gallon drums. It thus is more likely than not that at least the waste in 30 gallon drums was not the annual shutdown waste. Both of those waste streams are CERCLA hazardous substances. Accordingly, H&H Tube's position that DCC's term "industrial waste solution" referred to its annual shutdown waste is not supported by the facts.

## CONCLUSION

For the foregoing reasons, and in the interest of justice, it is respectfully requested that Handy & Harman Tube Company, Inc.'s motion for summary judgment be denied.

Respectfully submitted,

BALLARD SPAHR ANDREWS & INGERSOLL, LLP

By: _____

    Glenn A. Harris, Esquire
    Amy M. Trojecki, Esquire
Main Street, Plaza 1000, Suite 500
Voorhees, New Jersey  08043

Attorneys for Plaintiffs

Dated:  September 13, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC
and TI GROUP AUTOMOTIVE SYSTEMS
LLC,

                          Plaintiffs,

      v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

                        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 02-CV-3830 (LDD)

## CERTIFICATE OF SERVICE

       I, DAWN M. NEUKIRCH, hereby certify that on this date, I caused one copy of

Plaintiffs' Memorandum of Law in Opposition to Handy & Harman's Motion to Strike to be

served via electronic submission upon the following:

### ALL DEFENDANTS ON ATTACHED SERVICE LIST

       I hereby certify that the foregoing statements made by me are true.  I am aware

that if any of the foregoing statements made by me are willfully false, I am subject to

punishment.

                                 _____
                                 DAWN M. NEUKIRCH

Dated:  September 13, 2007

## SERVICE LIST

Laurie J. Sands, Esquire
Wolff & Samson, PC
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey  07052
Phone:  973-530-2098
Fax:  973-530-2298
e-mail:  lsands@wolffsamson.com

-and-

Robert M. Morris, Esquire
Morris & Adelman, P.C.
1920 Chestnut Street
P.O. Box 30477
Philadelphia, PA  19103
Phone:  215-568-5621
Fax:  215-568-3253
e-mail:  rmmorris@morrisadelman.com
*Advanced Environmental Technology Corp.*

Melissa Flax, Esquire
Carella, Byrne, Bain, Gilfillian, Cecchi,
Stewart & Olstein, P.C.
5 Becker Farm Road
Roseland, New Jersey  07068-1739
Phone:  973-994-1700
Fax:  973-994-1744
e-mail:  mflax@carellabyrne.com
*Handy & Harman Tube Company*

Lynn Wright, Esquire
Edwards Angell Palmer & Dodge, LLP
750 Lexington Avenue
New York, New York  10022-1200
Phone:  212-308-4411
Fax:  212-308-4844
e-mail:  lwright@ealaw.com
*Carpenter Technology Corporation*

Seth v.d.H. Cooley, Esquire
Duane Morris LLP
Suite 4200, One Liberty Place
Philadelphia, PA  19103-7396
Phone:  215-979-1000
Fax:  215-979-1020
e-mail:  scooley@duanemorris.com
*Flexible Circuits & Etched Circuits*

*-and-*

A. Nicole Friant, Esquire
Duane Morris LLP
One Liberty Place
Suite 4200
Philadelphia, PA  19103-7396
Phone:  215-979-1818
Fax:  215-979-1020
e-mail:  anfriant@duanemorris.com


Edward Fackenthal, Esquire
Law Office of Edward Fackenthal
One Montgomery Plaza
Suite 209
Norristown, PA  19401
Phone: (610) 279-3370
Fax:  (610) 279-0696
*NRM Investment Co.*
e-mail:  edwardfackenthal@cs.com


Richard C. Biedrzycki, Esquire
Phelan, Pettit & Biedrzycki
The North American Building
Suite 1600
121 South Broad Street
Philadelphia, PA  19107
Phone:  215-546-0500
Fax:  215-546-9444
e-mail:  rbiedrzycki@pp-b.com
*Ashland, Inc.*