IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., ET AL., | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ADVANCED ENVIRONMENTAL | : | NO. 02-3830 |
| TECHNOLOGY CORPORATION, ET AL., | : | |
| | : | |
| Defendants. | : | |

ORDER

Upon consideration of defendant Handy & Harman Tube Company's Motion for Summary Judgment (Doc. No. 242), plaintiffs' Motion in Opposition (Doc. No. 245), defendant's reply (Doc. No. 249), and plaintiffs' surreply (Doc. No. 259), it is hereby ordered that defendant's motion for summary judgment is denied.

In considering a motion for summary judgment, the Court must examine "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," to determine whether there is any "genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on the motion, the Court must draw all reasonable inferences in the light most favorable to the nonmoving party, and "may not weigh the evidence or make credibility determinations." Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255. Therefore, "where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d. Cir. 1992), cert. denied, 507 U.S. 912 (1993).

Defendant, Handy & Harman Tube Company, Incorporated ("defendant" or "H&H") asserts that it is entitled to summary judgment because "the only 'waste' arguably generated by defendant . . . that is alleged to have been disposed of at the Boarhead Farms Superfund Site (the "Site") is a primarily water-based liquid identified as 'industrial waste solution.'" (Def.'s Mot at 1.) Defendant argues that the "industrial waste solution" was non-hazardous for purposes of CERCLA liability. (Id.)

To support this argument, H&H states that the following are undisputed facts: (1) the only document connecting H&H to the Site is an invoice from DeRewal Chemical Company referring to 55 and 30 gallon drums of "industrial waste solution"; (2) the term "industrial waste solution" refers to "a waste water that includes some traces of oil, grit, dirt and other things that were generated during the periodic shut down and clean up" of defendant's facility; and (3) the "industrial waste solution" was not a hazardous substance within the meaning of CERCLA or HSCA. (Def.'s Mot at 7, 8, 15, and 20.)

Additionally, defendant argues that even if the "industrial waste solution" is determined to be hazardous, the waste is *de minimus*. Defendant asserts that it is appropriate for a court to grant summary judgment "in situations where there are trace or *de minimus* amounts of 'hazardous substances'" so long as "the purposes of CERCLA are served." (Def.'s Reply at 14.) H&H believes that its waste, calculated by plaintiffs to be 0.25% of the total waste, is *de minimus* and warrants summary judgment. (Id. at 15.)

Plaintiffs argue that there is a genuine issue of material fact with respect to all of

defendant's "undisputed facts" listed above.

<u>1. There is a Genuine Issue of Material Fact as to Whether Waste Generated by H&H, Other than that Listed on the DCC Invoice, was Disposed of at the Site.</u>

H&H asserts that the only document connecting it to the Boarhead Farms Site is a DeRewal Chemical Company ("DCC") invoice dated February 1973. (Def.'s Mot. at 8.) From this statement H&H draws the inference that the only waste plaintiffs can prove H&H disposed of at the site was the "industrial waste solution" listed on the invoice.[1]

However, plaintiffs refute the first premise of defendant's motion for summary judgment by citing the deposition testimony of Manfred DeRewal, Junior. (Pls.' Mot. in Opp'n, Exh. D.) In his testimony, Mr. DeRewal states:

> (By Harris): Did you ever pick up any waste from a Handy & Harman facility?
> (By DeRewal): Yes
> Q: Where was that facility located?
> A: I believe that is, it's south of–I know it's outside of Norristown, I don't know what street that would be on.
> * * * *
> (By Harris): The one that we're talking about now that might be outside Norristown.
> (By DeRewal): Okay.
> Q: Describe that facility for us.
> A: Big white building, block. We used to have to go through a gate and that was also bulk pick-up.
> Q: A bulk pick-up?
> A: Yeah.
> * * * *
> Q: Tell me what happened after you drove through the gate.
> A: Went in through the gate, and I believe it was a tight fit. I forget what was on either side but I remember a tight fit backing down to get loaded. There again, somebody would come out, put the hose in until it was full.
> * * * *
> Q: Where did that waste go that you picked up for disposal?

---

[1]Although H&H does not specifically state this inference in its motion for summary judgment, the inference is implicit in the remainder of defendant's argument for summary judgment.

3

>    A: That would have went to Boarhead.

(Id. at 119:12-122:20.)

The Court agrees that this testimony is in direct contradiction to the defendant's contention that the only waste plaintiffs can prove H&H disposed at the Site is the waste listed on the invoice. The DCC invoice lists twenty-six "55 gallon drums Industrial Waste Solution" and thirty-six "30 gallon drums Industrial Waste Solution." The invoice does not list the bulk waste described by Mr. DeRewal in his deposition. Thus, plaintiffs have presented evidence that waste generated by H&H, other than the "industrial waste solution" listed on the invoice, was disposed at the Site.

For the above reasons, a genuine issue of material fact exists as to the quantity and nature of H&H waste disposed at the Site.

2. There is a Genuine Issue of Material Fact as to the Meaning of "Industrial Waste Solution" in the DCC Invoice.

H&H asserts that the term "Industrial Waste Solution" on the DCC invoice refers to waste generated during a two-week period in the summer when H&H shut down its facility and cleaned its machinery. H&H cites the deposition testimony of Thomas Curran, an H&H employee, in support of this contention. Mr. Curran testified as follows:

> (By Davies): Now, let me ask you in the second numbered paragraph it [a Letter dated January 7, 1993] references a waste stream designated as industrial waste solution, do you recall what that refers to?
> (By Curran): Yes.
> * * * *
> Q: Could you tell me what waste stream it is referring to?
> A: Yes. During the–we had a two-week shutdown period for maintenance purposes every summer, during that period we would clean all of the machines, all of the drawing machines and we collected the solutions that came off of that . . . . That sort of combination most of it was water, it also had like some just sludge from around the

> machines in it and that was all taken off –I had forgotten this term but I think this is what it's referring to and we would have that just once a year and we would get it out of there soon after our shutdown period.
> Q: And do you recall how this material, which I'll just refer to as industrial waste solution, how it was stored?
> A: You mean after we took it off the machines?
> Q: Correct.
> A: It would have been stored in 55-gallon drums.

(Def.'s Mot., Exh. B at 53:20-55:14.) Defendant's expert witness, Dr. Kirk Brown, testified in his deposition that the industrial waste solution referred to in the DCC invoice is the same industrial waste solution about which Mr. Curran testified. (Def.'s Mot. at 8-9, Exh. D at 114:8-115:4.) Dr. Brown testified that of H&H's various waste streams, only the waste described by Mr. Curran fits the description of the waste in the DCC invoice. (Id.)

Plaintiffs contend that the industrial waste solution referred to in the DCC invoice is not the waste described by Mr. Curran in his deposition testimony. First, plaintiffs point out that although Mr. Curran states that the industrial waste solution was generated during a summer cleaning and disposed of soon after, the DCC invoice is dated February 1973. (Compare Def.'s Mot., Exh. B at 54:12-54:15 with Def.'s Mot., Exh. E.) Secondly, plaintiffs note that Mr. Curran states that the waste generated during the summer cleaning was stored in 55-gallon drums whereas the DCC invoice references both 55-gallon and 30-gallon drums. (Compare Def.'s Mot., Exh. B at 55:14 with Def.'s Mot., Exh. E.)

Plaintiffs have established the existence of a genuine issue of material fact as to whether the term industrial waste solution in the DCC invoice refers to the waste generated during H&H's summer cleaning.

<u>3. There is a Genuine Issue of Material Fact as to Whether the Waste Generated by H&H During the Summer Cleanup was a Hazardous Substance Within the Meaning of CERCLA or HSCA.</u>

Defendant asserts that "neither Plaintiffs nor any party to this litigation have produced any fact or opinion evidence that in any way suggests that the primarily water-based 'industrial waste solution' generated at the H&H Tube facility is a hazardous substance as that term is defined in CERCLA or HSCA." (Def.'s Mot. at 11.) Furthermore, H&H argues that the waste generated during its summer cleanup was not hazardous under CERCLA or HSCA.[2] In support of this argument, H&H presents the deposition testimony of Dr. Brown. Dr. Brown testified as follows:

> (By Trojecki): In paragraph 43 of your report you state that the [sic] based on the description of the cleaning process during the plant shut down the waste water generated as the industrial waste solution was non-hazardous. What do you mean the description of the cleaning process during the shut down?
> (By Brown): Curran's description of the washed [sic] down of the machines. And it's my opinion that had that been tested it would not have been classified as hazardous waste. So it would have been a non-hazardous waste.
> Q: Why is that?
> A: Because it was a water base [sic] cleaning process. They were cleaning grit and grime and particles off the machinery and there would have been nothing–while there would have been metals in the waste, traces of oil, that type of thing, nothing would have been in high enough concentration to classify it as a hazardous waste.
> * * * *
> Q: It's your opinion that the solution that Curran is referring to in his deposition as industrial waste solution is non hazardous; is that correct?
> A: Yes.
> Q: Why do you think that?
> (By Flax): Objection. Asked and answered. You can answer it.
> Q: It's not a listed hazardous waste. It would not fail any of the four criteria for being a hazardous waste. It would not fail toxic concentration–it's a test for soluble metals in waste, if I have the acronym right, TCLP, I'll get you the right acronym, it wouldn't fail

---

[2]HSCA adopts CERCLA's definition of "hazardous substance". 35 Pa. Cons. Stat. § 6020.103. Therefore, if a substance is hazardous under CERCLA it is also hazardous for purposes of HSCA.

that test, it wouldn't have a pH outside the normal range. It wouldn't be flammable. It wouldn't be corrosive. So it wouldn't be reactive. So, there's nothing there that would indicate that it was a hazardous waste.

(Def.'s Mot., Exh. D 107:21-108:14, 233:14-234:6.)

The plaintiffs assert that the waste generated by H&H during its summer cleanup contained "oil, grease, solvents, [and] metals . . . ." Moreover, plaintiffs argue that all of these are hazardous substances as defined in CERCLA and thus HSCA. Plaintiffs further argue that even if these substances were only present in trace amounts, under the law of the Third Circuit, the quantity or concentration of a hazardous substance is irrelevant for purposes of liability pursuant to CERCLA.

> Under CERCLA, the term hazardous substance is defined as:
>
> (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15.

42 U.S.C. § 9601(14). The Environmental Protection Agency has promulgated a Table listing elements, compounds, and hazardous wastes which have been designated as CERCLA hazardous substances.[3] 40 C.F.R. § 302.4, App. A. Additionally, the Third Circuit held that for a substance to be hazardous, it must "simply fall within one of the designated categories." United States v.

---

[3]Table 302.4 "is a consolidation of the lists promulgated pursuant to the Clean Water Act, the Clearn Air Act and the Resource Conservation and Recovery Act." United States v. Alcan Aluminum Corp., 964 F.2d 252, 261 (3d Cir. 1992).

Alcan Aluminum Corp., 964 F.2d 252, 260 (3d Cir. 1992). For purposes of CERCLA liability, the concentration or quantity of the hazardous substance is irrelevant. Id. at 259-61.

There is evidence that H&H's waste from the summer cleanup of its facility contained hazardous substances and was therefore itself a hazardous substance. First, Mr. Curran's deposition testimony suggests that the waste contained traces of solvents such as acetone. (Pls.' Mot. in Opp'n, Exh. H at 54:18-20.)

Second, in his deposition, Mr. Curran also states that the waste contained "sludge from around the machines . . . ." (Pls.' Mot. in Opp'n, Exh. H at 55:3.) Dr. Brown described this sludge as containing "water, the soap solution, any ketones being acetone or methyl ethyl ketone that was used in the wipe down, it's going to include some dirt and grime, it's going to include some flakes of metal, and it's going to include some of the oil and grease that was at the drawing machine." (Def.'s Mot., Exh. D at 135:1-135:7.) The flakes of metal Dr. Brown refers to are those that would abrade off the material used by H&H to construct tubes. (Def.'s Mot., Exh. D at 133:9-133:20.) According to H&H's motion, this would include stainless steel, carbon steel, and various alloyed steels. (Def.'s Mot. at 2.) Furthermore, Mr. Curran testified stainless steel is composed of nickel, chrome, and traces of sulfur, silicon, and copper. (Pls.' Mot in Opp'n, Exh. H 72:9-72:12.)

The EPA designated the following as hazardous substances: acetone, methyl ethyl ketone, nickel, chromium, and copper. 40 C.F.R. § 302.4, App. A. Additionally, the oil and grease may be hazardous substances given that there is evidence that they might contain hazardous substances and fall outside the scope of CERCLA's petroleum exception. See Alcan, 964 F.2d at 266 ("EPA has distinguished between oil that naturally contains low levels of

hazardous substances and oil to which hazardous substances have been added through use.").

Although H&H argues that the concentration of these substances was so low that the industrial waste solution would not be hazardous for purposes of CERCLA liability, this assertion incorrectly states Third Circuit law. See Alcan, 964 F.2d at 259-60 (holding that there is no quantitative requirement or concentration level for a substance to be hazardous); United States v. Wade, 577 F. Supp. 1326, 1340 (E.D. Pa 1983)(same). As discussed above, the concentration of a hazardous substance is irrelevant. Alcan, 964 F.2d at 259-60; Wade, 577 F. Supp. at 1340. If waste contains listed substances, the waste is hazardous regardless of the concentration of the listed substances. Alcan, 964 F.2d at 263. See also State of Ariz. v. Motorola, Inc., 774 F. Supp. 566, 572 (D. Ariz. 1991)("[I]f a waste material contains a hazardous substance-regardless of the volume or concentration-then the waste itself is hazardous for purposes of CERCLA.") H&H's expert, Dr. Brown, stated that the industrial waste solution contained listed substances. Therefore, there is evidence that the industrial waste solution was hazardous.

Furthermore, defendant's argument that the industrial waste solution was not hazardous because it "would not fail any of the four criteria [ignitability, corrosivity, reactivity, and toxicity] for being a hazardous waste" is of no moment. (Def.'s Mot. at 10.) There is evidence that the industrial waste solution contained substances listed by the EPA as hazardous. If the industrial waste solution contained hazardous substances, it itself was hazardous, and there is no need to address whether it would fail any of the four criteria for being a hazardous waste. See Alcan, 964 F.2d at 263. See also Motorola, 774 F. Supp. at 571-72 ("The application of 40 C.F.R. § 302.4(b) [the four criteria for a hazardous substance] is limited, in this Court's view, to a

9

situation where the waste and its constituents are not listed in Table 302.4.").

For all of the above reasons, plaintiffs present a genuine issue of material fact with respect to whether H&H's waste generated during the summer cleanup of the facility was hazardous.

4.  Defendant's Waste Contribution, Even if "De Minimus", Does Not Warrant Summary Judgment.

H&H argues that even if its industrial waste solution is hazardous, as defined by CERCLA, its motion for summary judgment should still be granted because its waste was *de minimus*. In support of this argument, defendants cite a July 1993 EPA Guideline intended to provide guidance to the EPA for settling *de minimus* claims. Additionally, defendants refer to Acushnet Company v. Mohasco Corporation, in support of their argument that a *de minimus* contributor is entitled to summary judgment. 191 F.3d 69 (1st Cir. 1999)(holding that equity may permit a defendant to "avoid joint and several liability . . . if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts.")

With respect to the EPA Guideline, this court notes that the purpose of this EPA Guideline is to provide guidance *to the EPA* for settling *de minimus* claims. The Guideline is not binding on this Court and is of minimal influence given the nature of the guideline and the law of the Third Circuit. The July 1993 EPA Guideline provides guidance for *settlement* with respect to parties who made *de minimus* contributions. By its very nature, this EPA Guideline indicates that summary judgment, which would not provide for any liability, is inappropriate with respect

to *de minimus* contributors.

Defendant cannot avail itself of Acushnet either. In that case, the court held that "a defendant may avoid joint and several liability for response costs in a contribution action under § 9613(f) if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts." 191 F.3d at 77. However, the court immediately cautioned that its holding was based on the court's determination of what was equitable *in that particular case*. Id. at 77-78. Additionally, the Acushnet court stated that, "To the extent that the district court held that some minimal quantity of hazardous waste must be involved before a defendant may be held to have 'caused' the expenditure of response costs, it was mistaken." Id. at 77.

First, H&H makes no showing that its share of the hazardous waste deposited at the Boarhead site contributed no more than background amounts of substances in the environment. Additionally, H&H has not shown that its waste cannot concentrate with other wastes to produce higher amounts. Finally, this Court believes that, factually, the defendant's position in Acushnet was significantly different from H&H's position in this lawsuit.[4]

For all of the above reasons, H&H is not entitled to summary judgment based on its supposed *de minimus* contribution of waste.

---

[4] In Acushnet, the defendant offered evidence that its equitable share was zero.

11

Accordingly, this 30th day of October, 2007, it is hereby Ordered that Handy and Harman Tube Company's Motion for Summary Judgment (Doc. No. 242) is DENIED.

        BY THE COURT:

        /S/LEGROME D. DAVIS

        Legrome D. Davis, J.