# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., et al.,                :
                                            :
                Plaintiff,      :        Civil Action No. 02-CV-3830
   v.                                       :
                                            :
ADVANCED ENVIRONMENTAL                      :
TECHNOLOGY CORPORATION, et al.              :
                                            :
            Defendants.         :

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS' CLAIM FOR CONTRIBUTION TOWARD CERTAIN USEPA PAST COSTS

INTRODUCTION

    Defendants[1] respectfully submit this memorandum of law in support of their Motion for Partial Summary Judgment against Plaintiffs[2] with respect to Plaintiffs' claim for contribution toward monies paid by certain Plaintiffs to the United States Environmental Protection Agency ("USEPA") in reimbursement of certain USEPA past removal costs.

    As the Court is aware, Plaintiffs are pursuing (a) cost recovery under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C § 9601, *et seq.* ("CERCLA"), for certain costs incurred directly by Plaintiffs, and (b) contribution under Section 113(f) of CERCLA and under the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. §

---

[1]    Defendants are Advanced Environmental Technology Corporation, Ashland, Inc., Carpenter Technology Corporation, fcg, inc. (a/k/a Flexible Circuits, Inc.), Handy & Harman Tube Company, Inc., and NRM Investment Company (collectively, "Defendants").

[2]    Plaintiffs are Agere Systems, LLC ("Agere"), Cytec Industries Inc. ("Cytec"), Ford Motor Company ("Ford"), SPS Technologies, LLC ("SPS") and TI Group Automotive Systems LLC ("TI")(collectively "Plaintiffs").

6020.101, *et seq.*, with respect to various response costs that Plaintiffs have allegedly paid by way of reimbursement to USEPA. Among the reimbursed costs are $7,062,962.06 paid by Plaintiffs to USEPA pursuant to a March 13, 2002 Consent Decree ("OU-2 Consent Decree").[3] This sum was paid in reimbursement of USEPA's "Past Response Costs" (as defined in the OU-2 Consent Decree). USEPA's "Past Response Costs" included the costs incurred by USEPA in connection with a removal action performed by USEPA in 1992, and a second removal action performed by USEPA in 1993 (the "First Removal Action" and the "Second Removal Action," respectively).

As explained in this Court's January 11, 2008 Opinion in this action, "'costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under [CERCLA] § 113(f).'" Opinion at p. 5, quoting United States v. Atlantic Research, 127 S. Ct. 2331 (2007). Accordingly, in their effort to recover contribution under CERCLA toward the monies paid to USEPA in reimbursement of the costs of the First and Second Removal Actions, Plaintiffs must seek contribution under § 113(f), and cannot proceed under § 107. This point is not in dispute.

As explained by the Supreme Court in Atlantic Research, contribution claims are founded on the existence of a common liability: "'Contribution is defined as the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her

---

[3]    The OU-2 Consent Decree was signed by Plaintiffs Cytec, Ford, SPS, and TI only. Plaintiff Agere did not sign the OU-2 Consent Decree. Per the Fifth Amended Complaint, Plaintiff Agere did not pay any portion of USEPA's Past Response Costs. For purposes of this Motion for Partial Summary Judgment only, without admission, and for the sake of simplicity, Defendants will assume that Plaintiffs Cytec, Ford, SPS, and TI all contributed to the reimbursement of the USEPA Past Response Costs, including the costs of the First and Second Removal Actions. All references herein to payment of USEPA Past Response Costs by "Plaintiffs" shall mean payment by Plaintiffs Cytec, Ford, SPS, and TI.

proportionate share, the shares being determined as a percentage of fault.' Black's Law Dictionary 353 (8th ed. 1999). Nothing in § 113(f) suggests that Congress used the term 'contribution' in anything other than this traditional sense. The statute authorizes a PRP to seek contribution 'during or following' a suit under § 106 or § 107(a). 42 U. S. C. § 9613(f)(1). Thus, § 113(f)(1) permits suit before or after the establishment of common liability." 127 S. Ct. at 2337-38 (footnote omitted)(emphasis added).

As the foregoing passage makes clear, in order for Plaintiffs to succeed on their CERCLA § 113(f) and HSCA claims for contribution toward USEPA's costs of performing the First and Second Removal Actions, Plaintiffs must first establish that they and Defendants shared a common liability to USEPA at the time Plaintiffs Cytec, Ford, SPS and TI executed the OU-2 Consent Decree. Only if this common liability were established would the Court need to consider whether Plaintiffs paid more than their proportionate share of the common liability.

Here, at the time they signed the OU-2 Consent Decree, Plaintiffs Cytec, Ford, SPS and TI had no liability to USEPA for costs of the First and Second Removal Actions. In fact, none of the Plaintiffs or Defendants were liable to USEPA for those costs at the time the OU-2 Consent Decree was signed, because the statutory time periods within which USEPA could bring a claim for recovery of those past costs (set forth at 42 U.S.C. § 113(g)(2) and 35 P.S. § 6020.1114) had expired.

Because Plaintiffs cannot, as a matter of law, establish a common liability as between themselves and Defendants with respect to the monies paid by Plaintiffs in reimbursement of USEPA's costs of the First and Second Removal Actions, summary judgment should be granted in favor of Defendants and against Plaintiffs on Plaintiffs' CERCLA § 113(f) and HSCA claims for contribution toward such costs.

STATEMENT OF FACTS

As reflected in the USEPA Record of Decision ("ROD") for the Boarhead Farms Superfund Site (the "Boarhead Site" or "Site"), USEPA discovered the Site no later than 1984, when it commenced a "site investigation" ("SI") of the Site.  (USEPA Record of Decision, Boarhead Farms, November 18, 1998, p. 2) (Exhibit 1).

USEPA issued a final SI report in 1986, and listed the Site on the National Priorities List (list of federal Superfund sites) in 1989.  (USEPA Record of Decision, Boarhead Farms, November 18, 1998, p. 3) (Exhibit 1).

USEPA conducted what it has described as its first removal action at the Site (the "First Removal Action") in 1992.  (USEPA Record of Decision, Boarhead Farms, November 18, 1998, p. 3) (Exhibit 1).

The First Removal Action began on July 29, 1992.  On September 4, 1992, USEPA made a determination to grant a waiver under § 9604(c)(1)(C) of CERCLA for continued removal actions at the Site, thereby establishing an exemption from the otherwise applicable $2 million statutory limit on removal action expenditures.  (Memorandum from Edwin B. Erickson, Regional Administrator, USEPA Region 3, to Donald R. Clay, Assistant Administrator, USEPA, Office of Solid Waste and Emergency Response, September 4, 1992)("the Boarhead § 9604(c)(1)(C) Waiver") (Exhibit 2).

USEPA conducted what it has described as its second removal action at the Site (the "Second Removal Action") in 1993.  (USEPA Record of Decision, Boarhead Farms, November 18, 1998, p. 3) (Exhibit 1).

In its November 18, 1998 ROD, USEPA more specifically described the nature and timing of its First and Second Removal Actions (and a third, later USEPA removal action) as follows: "EPA has conducted three removal actions at the Boarhead Farms Site. During the first two, one each in 1992 and 1993, over 2500 buried drums were located, excavated and disposed of offsite, reducing the contaminant levels in the subsurface soils. The excavated areas were then covered with a layer of clean fill to reduce exposure risk. A third removal action to intercept, collect and treat contaminated groundwater in an onsite treatment facility is continuing at this time." (USEPA Record of Decision, Boarhead Farms, November 18, 1998, p. 3) (Exhibit 1).

A separate (fourth) removal action was performed by General Ceramics, Inc. pursuant to a December, 1992 Administrative Order by Consent. (USEPA Record of Decision, Boarhead Farms, November 18, 1998, p. 3) (Exhibit 1).

USEPA issued a Proposed Plan for the Site in January, 1998 (Exhibit 3).

USEPA issued the ROD for the Site on November 18, 1998) (Exhibit 1).

The OU-1 Consent Decree was entered by this Court on September 28, 2000. (OU-2 Consent Decree, section I.C.) (Exhibit 4). The OU-1 Consent Decree does not require the respondents thereunder (Plaintiffs Cytec, Ford and SPS) to reimburse USEPA for the costs of the First and/or Second Removal Actions (OU-1 Consent Decree, para. 45(a) (requiring only reimbursement of "Future Response Costs")) (Exhibit 5).

Subsequent to the September 28, 2000 entry of the OU-1 Consent Decree but prior to December 6, 2001 (the date of lodging of the OU-2 Consent Decree with this Court), Plaintiffs Cytec, Ford, SPS and TI signed the OU-2 Consent Decree. (Revision to Notice of Lodging of Consent Decree Under the Comprehensive Environmental Response, Compensation, and

Liability Act Published on January 8, 2002, U.S. Department of Justice, Wednesday, January 23, 2002, 67 FR 3233) (Exhibit 6).

The OU-2 Consent Decree obligates the Plaintiffs that signed it to reimburse EPA "Past Response Costs" costs totaling $7,000,000 (principal amount). (OU-2 Consent Decree, para. 54) (Exhibit 4).

The OU-2 Consent Decree defines "Past Response Costs" to mean "all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through July 31, 2000, plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a) through such date." (OU-2 Consent Decree, para. 4) (Exhibit 4).

USEPA provided Plaintiffs (or some of them) with a demand document relating to its Past Response Costs, which Plaintiffs placed in the document repository created for this litigation. This demand document is Bates stamped BSAI082007 – BSAI082318 (the "Past Costs Demand"). (Letter from Glenn Harris to "Boarhead Defendants," July 12, 2007, p. 4) (Exhibit 7).

The USEPA Past Costs Demand includes documentation demonstrating that the costs of the First and Second Removal Actions are included in the "Past Response Costs" as defined in the OU-2 Consent Decree.   (See, e.g., USEPA cost report re services rendered by "Environmental Technology of North America" for "Period of Performance" 6/18/92 to 06/18/93, "Initiate Removal Action with appropriate personnel and equipment at Boarhead Farms Site") (BSAI 082200 - BSAI 082201) (Exhibit 8).

ARGUMENT

    A.    Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if "a reasonable jury could return a verdict" on that issue in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2). On the contrary, to avoid summary judgment, the non-moving party "must set out specific facts," by affidavits or as otherwise provided in Rule 56, "showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the fact finder could reasonably find for the non-moving party. See Anderson, 477 U.S. at 252. Summary judgment is mandatory if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure just

speedy and inexpensive determination of every action.'" Id. at 327. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims Id. at 323-24. Indeed, Fed. R. Civ. P. 56(d)(1) directs that where partial summary judgment is requested or warranted, "the court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys."

Finally, Fed. R. Civ. P. 56(d)(2) provides that, "An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages."

B.      Plaintiffs' Reimbursement of USEPA's Costs of the First and Second Removal
        Actions, if Recoverable from Defendants, Would be Recoverable under CERCLA
        § 113(f), Not CERCLA § 107

It is undisputed that the costs that Plaintiffs incurred by reimbursing USEPA (pursuant to the OU-2 Consent Decree) for its costs associated with the First and Second Removal Actions are costs of reimbursement. USEPA paid these costs in the first instance. Plaintiffs reimbursed USEPA for these costs.

As has been made clear already by this Court, costs of reimbursement are recoverable under CERCLA § 113(f) only: "'[C]osts of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f).'" January 11, 2008 Opinion, p. 5, quoting United States v. Atlantic Research, 127 S. Ct. 2331 (2007).

C.      In Order for Plaintiffs to Succeed on Their CERCLA § 113(f) and HSCA Claims
        for the Costs of the First and Second Removal Actions, Plaintiffs Must First
        Establish That They and Defendants Shared a Common Liability to USEPA at the
        Time the OU-2 Consent Decree was Executed

As explained by the United States Supreme Court:

> Contribution is defined as the "tortfeasor's right to collect from
> others responsible for the same tort after the tortfeasor has paid
> more than his or her proportionate share, the shares being

8

determined as a percentage of fault." Black's Law Dictionary 353 (8th ed. 1999). Nothing in §113(f) suggests that Congress used the term "contribution" in anything other than this traditional sense. The statute authorizes a PRP to seek contribution "during or following" a suit under §106 or §107(a). 42 U. S. C. §9613(f)(1). Thus, §113(f)(1) permits suit before or after <u>the establishment of common liability</u>."

127 S. Ct. at 2337-38 (footnote omitted)(emphasis added).

Here, in order for Plaintiffs and Defendants to have shared – at the time Plaintiffs Cytec, Ford, SPS and TI signed the OU-2 Consent Decree – a common liability to USEPA for its costs associated with the First and Second Removal Actions, it would have to have been the case that (1) the elements of CERCLA 107(a) and HSCA liability were in place with respect to both Plaintiffs and Defendants, and (2) a claim by USEPA for recovery of such costs from Plaintiffs and Defendants was timely under CERCLA § 113(f) and HSCA § 1114. Because, as explained below, USEPA's cost recovery claim was time barred, (a) it is not necessary to consider the first of these two requisites, and (b) neither Plaintiffs nor Defendants were liable to USEPA for the costs of the First and Second Removal Actions, and therefore could not have shared a common liability.

D.    Plaintiffs Cannot Establish That They and Defendants Shared a Common Liability to USEPA for the Costs of the First and Second Removal Actions at the Time the OU-2 Consent Decree was Executed, and Therefore They Have No Viable <u>CERCLA § 113(g) or HSCA Contribution Claim</u>

1.    The Three Year Statute of Limitations Set Forth in 42 U.S.C. § 9613(g)(2) <u>Applies Here</u>

The CERCLA statute of limitations on cost recovery claims by USEPA, for a removal action, is three (3) years after completion of the removal action, and six (6) years (in the case of longer removal actions) after a determination to grant a § 9604(c)(1)(C) waiver:

9

(2) Actions for recovery of costs

An initial action for recovery of the costs referred to in section 9607 of this title <u>must be commenced</u> –

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action <u>must be brought</u> within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

§ 113(g)(2), 42 U.S.C. § 9613(g)(2) (emphasis added).

Here, the First Removal Action was completed in 1992. (Exhibit 1). The determination to grant the Boarhead § 9604(c)(1)(C) Waiver (permitting expenditures to exceed $2 million) was made on September 4, 1992. (Exhibit 2). The Second Removal Action was completed in 1993. (Exhibit 1).

The Plaintiffs that agreed to reimburse the USEPA "Past Response Costs" (Cytec, Ford, SPS and TI) did so by signing the OU-2 Consent Decree. They signed that agreement sometime between September 28, 2000 (date of entry of OU-1 Consent Decree) and December 6, 2001 (date of lodging of OU-2 Consent Decree). (Exhibits 4 and 6).

10

The date on which these Plaintiffs signed the OU-2 Consent Decree (no earlier than September 28, 2000) is well beyond three years following the completion of both the First (1992) and Second (1993) Removal Actions, and, for good measure, more than six years after USEPA made a determination to grant the Boarhead § 9604(c)(1)(C) Waiver (September 4, 1992). Because (a) CERCLA mandates that an initial action for recovery of removal action costs "must be commenced" within three years after completion of the removal action, and (b) USEPA did not bring an initial cost recovery action within the three year statutory time frame, USEPA's claims against Plaintiffs (and Defendants) for the costs of the First and Second Removal Actions were time-barred when Plaintiffs Cytec, Ford, SPS and TI signed the OU-2 Consent Decree. It necessarily follows that (a) at the time they signed the OU-2 Consent Decree, Plaintiffs Cytec, Ford, SPS and TI (along with Defendants) had no liability to USEPA under CERCLA for the costs of the First or Second Removal Actions, and (b) accordingly, there was no shared liability between Plaintiffs and Defendants for these costs.

2.    The Six Year Statute of Limitations Set Forth in 35 P.S. § 6020.1114 Applies Here

The HSCA statute of limitations on cost recovery claims is six (6) years following the date on which the costs are incurred: "Actions to recover response costs may be commenced within six years of the date those costs are incurred." 35 P.S. § 6020.1114.

As discussed above, the First Removal Action was completed in 1992, and the Second Removal Action was completed in 1993. Under 35 P.S. § 6020.1114, USEPA had until the end of 1999, at the latest, to commence an action under HSCA to recover even a portion of the costs of those removal actions. It did not do so. As further discussed above, Plaintiffs Cytec, Ford, SPS and TI signed the OU-2 Consent Decree no earlier than September 28, 2000, which is more

than six years following the dates on which the costs of the First (1992) and Second (1993) Removal Actions were incurred. Because (a) HSCA mandates that an action to recover response costs must be commenced within six years after the date the response costs in question were incurred, and (b) USEPA did not bring a cost recovery action within the six year statutory time frame, USEPA's claims against Plaintiffs (and Defendants) for the costs of the First and Second Removal Actions were time-barred when Plaintiffs Cytec, Ford, SPS and TI signed the OU-2 Consent Decree. It necessarily follows that (a) at the time they signed the OU-2 Consent Decree, Plaintiffs Cytec, Ford, SPS and TI (along with Defendants) had no liability to USEPA under HSCA for the costs of the First or Second Removal Actions, and (b) accordingly, there was no shared liability between Plaintiffs and Defendants for these costs.

3.    There is No Ambiguity as to the Separate Nature and Duration of the Several Removal Actions at the Boarhead Site

Defendants anticipate that Plaintiffs will argue that instead of there having been a number of separate removal actions at the Site, there was only one removal action, consisting of multiple components. In support of their argument, Plaintiffs will likely point to language in the OU-1 Consent Decree (as Plaintiffs did in their answers to Defendants' contention interrogatories) which states: "EPA conducted removal action at the Site beginning in the year 1992 and continuing to the present pursuant to Section 104 of CERCLA, 42 U.S.C. Section 9604. The removal action included, in general: (1) the removal of buried drums; (2) the construction, operation and maintenance of groundwater interception wells and a groundwater interception trench; (3) the construction of a groundwater treatment plant on the Site; and (4) the installation, operation and maintenance of residential well filtration systems." OU-1 Consent Decree, section I(G) (Exhibit 5).

12

Taking this language from the OU-1 Consent Decree first, there is nothing inconsistent with its description of "removal action" at the Site and the fact that several discrete removal actions were performed. The OU-1 Consent Decree states only that "removal action" was conducted; it does not state that a single removal action was conducted. OU-1 Consent Decree, section I(G) (Exhibit 5).

Moreover, revealing language bearing on the question of whether there was but one big removal action (as Plaintiffs are expected to contend), or, instead, a series of separate removal actions, is found repeatedly throughout USEPA's administrative record for the Site. Examples include:

- "EPA has conducted three removal actions at the Boarhead Farms Site. During the first two, one each in 1992 and 1993, over 2500 buried drums were located, excavated and disposed of offsite, reducing the contaminant levels in the subsurface soils. The excavated areas were then covered with a layer of clean fill to reduce exposure risk. A third removal action to intercept, collect and treat contaminated groundwater in an onsite treatment facility is continuing at this time." ROD, p. 3. (Emphasis added). (Exhibit 1).

- "Currently, the existing interceptor trench and groundwater treatment system (constructed as part of a separate removal action) collect a large amount of the onsite groundwater and treat it onsite, thus reducing the potential for migration of groundwater offsite." ROD, p. 10. (Emphasis added) (Exhibit 1).

- "In 1992 and 1993, EPA removed more that 2500 buried drums from 40 locations in the open field area at the Boarhead Farms Site. While a significant number of buried drums are believed to have been removed during this effort, some buried drums still remain. Following completion of the drum removal effort, EPA conducted a magnetometer survey to identify remaining subsurface magnetic anomalies." ROD, p. 11. (Emphasis added) (Exhibit 1).

- "After the drum removal actions of 1992 and 1993, a layer of clean fill was placed over the excavation areas and eliminated the exposure risk to surface soil." ROD, p. 16. (Emphasis added) (Exhibit 1).

- "EPA mobilized to the Site on June 18, 1992 and conducted two Superfund removal actions. These involved locating, excavating and disposing of over 2500 buried drums throughout the Site. The excavated areas were then covered with a layer of clean fill to reduce exposure risk. Removal of the drums greatly reduced

13

the contaminant levels in the subsurface soils throughout the Site. <u>A third removal action was performed by General Ceramics, Inc.</u> (GCI) pursuant to an Administrative Order by Consent dated December11, 1992 (EPA Docket no. III-92-66-DC)." USEPA Proposed Plan, Boarhead Farms Site, January, 1998, "Site Background and History" section. (Emphasis added) (Exhibit 3).

- "<u>A fourth removal action</u> to intercept, collect, and treat contaminated groundwater in an onsite treatment facility and provide nearby residents with home well treatment systems <u>is continuing at this time</u> (Figure 3)." USEPA Proposed Plan, Boarhead Farms Site, January, 1998, "Site Background and History" section. (Emphasis added) (Exhibit 3).

- "<u>In 1992 and 1993</u> more than 2500 drums were excavated from the open field areas (Areas 5 and 6, Figure 2). <u>After these removal actions</u>, a magnetometer survey was conducted and remaining subsurface anomalies were identified." USEPA Proposed Plan, Boarhead Farms Site, January, 1998, "Nature and Extent of Contamination" section. (Emphasis added) (Exhibit 3).

- "The <u>previous removal actions</u> have reduced the risk of exposure." USEPA Proposed Plan, Boarhead Farms Site, January, 1998, "Summary of Site Risks" section. (Emphasis added) (Exhibit 3).

These revealing quotations from multiple sections of USEPA's Boarhead Site administrative record compel the conclusion that, unlike in the case of some other sites, here there were multiple, discrete removal actions.

One additional observation must be made about the record in this case. Not only has EPA made it clear that there were four separate removal actions at the Site; Plaintiffs themselves said the same thing in their original Complaint and in their three subsequent Amended Complaints. In each pleading, signed by counsel and subject to Rule 11, Plaintiffs accurately recounted the history of Site removal actions:

> 11. **The USEPA has conducted three CERCLA removal**
>
> **actions at the Site**. In connection with these removal actions, the
>
> USEPA located and removed from the Site 2,600 drums as well as

contaminated soil.  Contaminated groundwater is being treated at

an on-site treatment facility.

12.  Under an administrative consent order, USEPA Docket

Number: III-92-66DC, **General Ceramics, Inc., performed a**

**fourth removal action** to address the presence of radioactive

waste at the Site.

Complaint, paras. 11 and 12; First Amended Complaint, para. 11 and 12; Second Amended

Complaint, paras. 11 and 12; Third Amended Complaint, paras. 11 and 12; Fourth Amended

Complaint, paras. 11 and 12 (emphasis added).

But after Defendants had effectively exposed, through a series of contention

interrogatories (Contention Interrogatory Nos. 112 through 117), their awareness of the time bar

that exists by virtue of there having been distinct, separate removal actions at the Site, Plaintiffs

attempted to slip in a misleading alteration of history.  As observed by the Court itself, "Plaintiffs

casually mention in a footnote at the end of their motion that '[a] few changes to allegations were

made based on facts analyzed by Plaintiffs since the filing of the Fourth Amended Complaint.'

(Pls.' Mot to Amend the Fourth Am. Compl. at 13.)"  Opinion and Order, January 11, 2008.  One

of these "casually mentioned" changes to allegations was the gross rewriting of paragraphs 11

and 12 as they had appeared in each of the four earlier Complaints, to read as follows:

11.  **The USEPA has conducted a CERCLA removal**

**action at the Site**.  In connection with this removal action, the

USEPA located and removed from the Site 2,600 drums as well as

contaminated soil.  Contaminated groundwater is being treated in

an on-site treatment facility.

>12.  Under an administrative consent order, USEPA Docket
>Number: III-92-66DC, **General Ceramics, Inc., performed a
>separate removal action** to address the presence of radioactive
>waste at the Site.

Proposed Fifth Amended Complaint, paras. 11 and 12 (emphasis added).

Defendants respectfully suggest that not only is the revised paragraph 11 factually inaccurate, but it is also reflective of an effort by Plaintiffs to "paper over" a problem (for Plaintiffs) that cannot be so easily dodged.  Plaintiffs may be able to file an amended complaint, but they cannot re-write the USEPA administrative record or the Boarhead Site ROD; they cannot erase from the record their prior, long-standing, and repeated contention that USEPA conducted three, not one, removal actions at the Site; and they cannot escape the legal import of that oft-repeated contention:  it is an admission.  The "law is quite clear that such pleadings [superseded pleadings in civil litigation] constitute the admissions of a party opponent and are admissible in the case in which they were originally filed as well as in subsequent litigation involving that party." United States v. McKeon, 738 F.2d 26, 31 (2d Cir. 1984) ("A party thus cannot advance one version of facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories."). See also Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 707 (2d Cir. 1989) (holding a party to its assertions in earlier pleadings, and confirming that the "amendment of a pleading does not make it any the less an admission of the party"); Digene Corp. v. Ventana Medical Sys., Inc., 316 F. Supp. 2d 174, 1784 (D. Del. 2004) (same).

4.    The Better-Reasoned Case Law Supports the Conclusion that There Were Separate Removal Actions

Plaintiffs are likely to direct the Court to one or more reported decisions in which other courts have rejected contentions that discrete removal or remedial actions had transpired and were time-barred by § 113(g)(2).  See, e.g., Kelley v. E.I. DuPont De Nemours and Co., 17 F.3d 836 (6th Cir. 1994).

These decisions should not be followed here because the facts are not analogous, and, in any event, the decisions are not well-reasoned.  The decisions that should guide the Court here are United States v. Ambroid Company, Inc., 34 F. Supp. 2d 86 (D. Mass. 1999), and United States v. Manzo, 2006 U.S. LEXIS 70860 (D.N.J. 2006).

In Ambroid, the Court faced the very question presented here:

> Because there are no material facts in dispute, this issue is ripe for summary judgment.  If, as the government argues, the EPA's activities constitute one continuous "removal action" beginning in March 1992 and ending in June 1994, the government's claim for the entire cleanup cost would be timely.  If, as Defendants argue, the EPA's actions constitute two separate "removal actions," the first of which ended in February 1993, the costs associated with those removal activities would be barred from recovery under the three-year statute of limitations.

34 F. Supp. 2d at 87.

In addressing this question, the Ambroid Court first correctly observed that, "Most precedents on statute of limitations involve ongoing removal and remedial efforts by the EPA which made up one removal action, even though the activities were conducted in stages.  These cases generally interpret 'removal action' broadly." 34 F. Supp. 2d at 87.  Having made this important observation, the Ambroid Court proceeded to review the factual record before it, and found, among other things, "EPA's own treatment of the removal activities as two separate

17

'removal actions' to be persuasive evidence that there were in fact two separate 'removal actions' for purposes of § 9613(g)(2)(A)." 34 F. Supp. 2d. at 90.

Plaintiffs here will surely assert that there were other facts at play in <u>Ambroid</u>, beyond the fact that EPA itself treated and described its removal work as having occurred in two separate removal actions. Defendant readily acknowledge that other facts were at play in <u>Ambroid</u>, including, for example, USEPA's transfer of site management to the state (Commonwealth of Massachusetts) following the first removal action and prior to the second one. But these facts do not suggest a different outcome here. The <u>Ambroid</u> Court did not identify the facts before it as predicate elements that must be demonstrated before a court can find that multiple, discrete removal actions occurred. Nor did the <u>Ambroid</u> Court suggest that each of the facts it had identified was necessary to support its ruling. A fair reading of <u>Ambroid</u> instructs that of all the factors identified by the court, the most telling one was that USEPA itself had treated the several removal actions in question as being separate – <u>just as is the case here</u>. Indeed, the Boarhead ROD is literally replete with statements describing multiple, discrete, previously completed removal actions.

More recently, the District of New Jersey, without any reliance on <u>Ambroid</u>, reached the same conclusion. <u>United States v. Manzo</u>, 2006 U.S. LEXIS 70860 (D.N.J. 2006). Rejecting the conclusion of some courts that CERCLA's statute of limitations anticipates only one removal action and one remedial action, the <u>Manzo</u> court "focused not only on the text of CERCLA's statute of limitations provisions, but also on the overall structure of the entire CERCLA statute, the relevant administrative framework, and the legislative policy favoring the United States' interpretation of the statute of limitations. This Court remains convinced that these considerations do not support a finding that there is only one removal or remedial action per site,

and justify our interpretation that the statute of limitations contemplates multiple actions . . .." 2006 U.S. LEXIS 70860 at *24-*25.  The "United States' interpretation" to which the <u>Manzo</u> court makes reference is the interpretation of CERCLA as contemplating. multiple, discrete response actions, not a single removal action and a single remedial action.  Put another way, USEPA shares Defendants' interpretation of the statute, as is patently evident from the way the Boarhead ROD is written (describing four separate removal actions).

Defendants respectfully suggest that the proper test as to whether there was but one removal action or multiple removal actions is a simple one:  Does the evidence in a given case, before a given court, lead to the conclusion that multiple, discrete removal actions occurred?  If the answer to this question, based on relevant, material information presented to the court, is "Yes," then a ruling consistent with that evidence should follow.  Here, the answer is "Yes."

     5.     Because Plaintiffs and Defendants Do Not Share a Common Liability, Plaintiffs' CERCLA § 113 and HSCA Claims For Contribution Toward The First and Second Removal Action Costs Must Fail

As clarified by the United States Supreme Court in its recent decision in <u>United States v. Atlantic Research</u>, 127 S. Ct. 2331 (2007), "[n]othing in §113(f) suggests that Congress used the term 'contribution' in anything other than this traditional sense.  The statute authorizes a PRP to seek contribution 'during or following' a suit under §106 or §107(a).  42 U. S. C. §9613(f)(1).  Thus, §113(f)(1) permits suit before or after <u>the establishment of common liability</u>."  127 S. Ct. at 2338 (footnote omitted)(emphasis added).  It follows directly that where there is no common liability, a contribution action under § 113 of CERCLA cannot be maintained.

As suggested above, the <u>Atlantic Research</u> decision merely clarified what has long been the law – including in the Third Circuit.  <u>In the Matter of Reading Company</u>, 115 F.3d 1111 (3d Cir. 1997), spelled it out a decade ago.

In Reading, Conrail sought contribution from Reading Company ("Reading") under §
113(f) of CERCLA (just as Plaintiffs here seek contribution from Defendants under § 113(f)).
The Third Circuit, reversing this Court, held that Conrail's contribution action failed because
Reading did not share a common liability (with Conrail) to the United States (just as Plaintiffs
here did not share a common liability (with Defendants) to the United States).

The Third Circuit first stated its conclusion:

> Conrail's contribution claim depends on Conrail and Reading both
> being liable to a third party, in this case to the United States.
> Because, for the reasons we state below, we find that the United
> States's claim was discharged by Reading's bankruptcy, Conrail's
> contribution action, based on Reading's common liability with
> Conrail to the United States, cannot proceed.

115 F.3d at 1123.

Next, the Court addressed the argument of the United States (which sought to preserve its
own claim against Reading) that the Court need not reach the issue of Reading's liability to the
United States.  The Court rejected this argument, holding that "although an absence of joint
liability may be a defense, when there is no question that joint liability is lacking, a necessary
element to establish contribution cannot be proven.  The claim for contribution must then as a
matter of law, fail."  115 F.3d at 1124.

Elaborating, the Court explained that although Reading had originally been liable to the
United States under § 107(a) of CERCLA, its liability ended when the United States' claim was
discharged in Reading's bankruptcy:

> CERCLA § 113(f) captures the requirements of joint liability in its
> statutory language: "Any person may seek contribution from any
> other person who is liable or potentially liable under section
> 9607(a) of this title, during or following any civil action under
> section 9606 of this title or under section 9607(a) of this title."  42
> U.S.C. § 9613(f).  Conrail suggests, however, that this provision
> establishes a new form of statutory contribution that spreads

20

liability beyond traditional common law principles.    Quoting
*Sylvester Bros. Dev. Co. v. Burlington N.R. Co.*, 133 B.R. 648, 653
(D. Minn. 1991), Conrail argues that common liability by two or
more defendants to one common government agency is not
necessary under § 113(f).  We disagree.  Contribution, by its own
definition, requires a common liability for the same injury.

. . .

. . . Applying this traditional meaning of contribution to the current
case, we conclude that Reading's liability to Conrail depends on
Reading's liability to the United States.    To be liable for
contribution, Reading must be liable to the United States under §
107(a).

. . .

Applying the *Schweitzer/Paoli Yard* analysis, we find that all four
CERCLA elements making up the United States' claim [against
Reading] existed at the time of Reading's § 77 reorganization.

. . .

We hold . . . that under our decisions in *Schweitzer* and *Paoli Yard*,
the United States' CERCLA claim against Reading for
environmental clean-up at the Douglassville site was discharged in
the § 77 reorganization.  Reading is not liable to the United States
under § 107(a)(4)(A), and Reading is therefore not a "person who
is liable or potentially liable under [§107(a)] of this title.    42
U.S.C. § 9613(f)(1).    Conrail's claim for contribution under §
113(f) fails as a matter of law.

115 F.3d 1124-26 (citations omitted).

Here, for purposes of this Motion for Partial Summary Judgment, we can assume
(without any admission) that during the three years following the completion of each of the First
and Second Removal Actions, the United States <u>could</u> have established, as against each of the
Plaintiffs and each of the Defendants, the elements of liability under § 107(a) of CERCLA, and
<u>could</u> have timely brought a CERCLA cost recovery action to obtain reimbursement of the costs
of the First and Second Removal Actions.  Similarly, within six years of incurring the costs of

the First and Second Removal Actions, the United States could have timely asserted a contribution claim under HSCA.[4] But the United States did not act. Having failed to bring such a cost recovery action during the statutorily limited time periods within which to do so, the United States lost its ability to bring such an action. To paraphrase the Reading court, because Defendants were not, at the time Cytec, Ford, SPS and TI signed the OU-2 Consent Decree, liable to the United States under CERCLA § 107(a) or HSCA, Defendants are not persons who are liable or potentially liable under CERCLA § 107(a) or HSCA, and Plaintiffs' claim for contribution under CERCLA § 113(f) and HSCA fails as a matter of law.

CONCLUSION

A CERCLA action by the government against Plaintiffs and Defendants for recovery of the costs of the First Removal Action would have been timely if filed as late as 1995 (the three year anniversary of the completion of the First Removal Action). A CERCLA action by the government against Plaintiffs and Defendants for recovery of the costs of the Second Removal Action would have been timely if filed as late as 1996 (the three year anniversary of the completion of the Second Removal Action). A HSCA contribution action by the government against Plaintiffs and Defendants for recovery of at least some of the costs of the First and Second Removal Actions would have been timely if filed as late as 1999 (the six year anniversary of the completion of the Second Removal Action). Because USEPA did not timely commence an action for these costs, USEPA's claim for these costs became time-barred. Accordingly, in 2000 or 2001, at the time that Plaintiffs Cytec, Ford, SPS and TI signed the OU-

---

[4]    Statute of limitations considerations aside, Defendants do not admit that such an action would have been cognizable, and reserve all rights as to this point.

2 Consent Decree, neither Plaintiffs nor Defendants had any liability to USEPA for these costs. Because Plaintiffs and Defendants had no liability to USEPA for these costs, they had no common liability to USEPA for these costs. Because Plaintiffs and Defendant had no common liability to USEPA for these costs, Plaintiffs have no viable CERCLA § 113(f) or HSCA contribution claim against Defendants for these costs.[5]

For all of the foregoing reasons, Defendants respectfully request that partial summary judgment be entered in their favor and against Plaintiffs on Plaintiffs' claim for contribution toward the amount paid to the United States in reimbursement of the costs of the First and Second Removal Actions.

Dated: February 22, 2008                    Respectfully submitted,

                                            DUANE MORRIS LLP

                        By:     _____
                                Seth v.d.H. Cooley – PA 41801
                                Duane Morris LLP
                                30 South 17th Street
                                Philadelphia, PA 19103-4196

                                Attorneys for Defendant
                                fcg, inc.

---

[5]     Even if the Plaintiffs who signed the Consent Decree had entered into agreements with USEPA that effectively tolled the running of the statute of limitations applicable to a USEPA claim for past costs relating to the First and Second Removal Actions, Defendants did not enter into any tolling agreements, and therefore Defendants had no liability to USEPA at the time the OU-2 Consent Decree was signed. See RAM Investment Associates v. Citizens Fidelity Bank & Trust Co., 1992 WL 240594 (S.D.N.Y.), *2 (claims against non-signatories to tolling agreement are time barred); see also Abraham Zion Corp. v. Lebow, 761 F.2d 93, 103 (2d Cir. 1985) (non-signatory to a contract not bound by the contract where the party who signed the contract was not the non-signatory's agent). Because Defendants had no liability to the United States, there could not have been a common liability to the United States.

DM2\1349708.6