# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


BOARHEAD FARM AGREEMENT GROUP,   :

        Plaintiff,              :      Civil Action

           v.               :      02-CV-3830

ADVANCED ENVIRONMENTAL         :
TECHNOLOGY CORPORATION, ET AL.,   :

        Defendants.         :


## FIFTH CASE MANAGEMENT ORDER

       This Court has determined that the just, efficient, cost-effective, and prompt resolution of

this case requires entry of this Case Management Order pursuant to Fed. R. Civ. P. 16(b) and

26(f). The parties have had an opportunity to participate in the development of this Case

Management Order.

       WHEREFORE, it is hereby ORDERED that this Case Management Order shall govern

the proceedings in this matter.

       1.     Initial Pleadings.  On or before July 15, 2004, Defendants who have not reached

settlements in principle with Plaintiff shall answer, move (to the extent not limited by prior Case

Management Orders), or otherwise plead in response to the Third Amended Complaint.

Answers shall be deemed to raise cross-claims or counterclaims for contribution pursuant to

1

CERCLA and Pennsylvania Hazardous Sites Cleanup Act. All such deemed cross-claims and counterclaims shall be deemed denied. Cross-claims or counterclaims based on separate claims peculiar to an individual party, such as claims for contractual indemnification (and other than claims against the insurance company), shall be individually pleaded.

2.    Fact Discovery. From the date this Order is entered, the parties shall have thirty (30) days to propound and thirty (30) days to respond to written discovery, including interrogatories, requests for admissions and requests for production of documents. There shall be no depositions taken during this sixty (60) day written discovery period. Following the foregoing sixty (60) day written discovery period, fact discovery shall continue for an additional one-hundred fifty (150) days and include, but not be limited to further written discovery and the depositions of party representatives pursuant to notice and the depositions of non-parties pursuant to subpoena.

3.    Defendant Claims. Any Defendant may file a third-party complaint and Plaintiff may file a Fourth Amended Complaint on or before June 30, 2004 as of right. Any claims against insurance companies must be brought in a separate action in this or another court.

4.    Depositions. All fact discovery shall be completed on or before January 10, 2005. No deposition shall be take without leave of the Court before August 13, 2004.

5.    Motion Practice. Any party may file a motion for summary judgment at any time as permitted by the Federal Rules of Civil Procedure.

6.    Case Management Conference. Following decisions of motions for summary judgment, or, if no motions have been filed, Plaintiff shall be responsible for contacting the Court and arranging a case management conference to establish a framework and schedule for

2

the expert phase of the case. Prior to the conference, the parties shall confer in good faith regarding the terms of a proposed Sixth Case Management Order to govern further proceedings.

BY THE COURT:

Legrome D. Davis, J

# *EXHIBIT D*

# SIVE, PAGET & RIESEL, P.C.

### 460 PARK AVENUE

### NEW YORK, NEW YORK 10022-1906

TELEPHONE: (212) 421-2150
FACSIMILE: (212) 421-2035

ERIC BREGMAN
MARK A. CHERTOK
PAMELA R. ESTERMAN*
DAVID PAGET
DANIEL RIESEL
ROBIN E. ROSENBERG
DAVID SIVE
———
*ALSO ADMITTED IN N.J.

WEB SITE: www.sprlaw.com
E-MAIL: spr@sprlaw.com

MICHAEL S. BOGIN
LAURENCE HORVATH
STEVEN RUSSO
KATE SINDING
ANNMARIE TERRACIANO
DAVID S. YUDELSON
———
STEVEN BARSHOV
PAUL D. CASOWITZ*
WILLIAM R. GINSBERG
ARTHUR J. JACOBSON
COUNSEL.
———
81 MAIN STREET · SUITE 415
WHITE PLAINS, N.Y. 10601
TELEPHONE: (914) 682-3944

December 22, 1999

VIA FEDERAL EXPRESS

Bruce Rosen, Esq.
MARC & W
127 Main Street
Chatham, NJ 07928

      RE:   Advanced Environmental Technology
            Company ("AETC")
            Boarhead Farms Superfund Site

Dear Bruce:

      In furtherance of our recent telephone conversation, I enclose a copy of the nexus materials that were distributed at the December 16, 1999 PRP Group Meeting in Philadelphia. (Exhibit "A.") The nexus package includes EPA enforcement documents, excerpts of depositions and interviews relating to AETC's alleged involvement at the Boarhead Farms site and to various pleadings and correspondence relating to a lawsuit brought by Manfred DeRewel, the owner of Boarhead Farms, against AETC. In addition to the nexus materials, I have included outlines of presentations that were made at the meeting by David Payne of Pitney Hardin (Cytec Industries) (Exhibit "B") and Jeff Siebel of de maximis (Technical Consultant to the PRP Group). (Exhibit "C".)

History Of The Boarhead Farms Site

      The Boarhead Farms site was operated by Manfred DeRewel from 1970 through 1977. He also operated several other facilities during certain of those years. The Ontario Street, Philadelphia facility was operated from November 1993 through July 1975. The Wissinoming Industrial Park, Philadelphia facility was operated from June 1976 through July 1977. All of DeRewel's operations were run out of the Boarhead Farms location.

SIVE, PAGET & RIESEL, P.C.

December 22, 1999
Page 2


## EPA's Actions With Respect To The Boarhead Farms Site

        EPA has conducted three removal actions at the Boarhead
Farms site.  During the first two, over 2700 buried drums were
removed from the site.  A third removal action to intercept,
collect and treat contaminated shallow groundwater in an onsite
treatment facility is continuing at this time.

        EPA prepared an RI/FS for the site in 1997 and issued a
Record of Decision ("ROD") for the site in 1998.  (A copy of the
ROD is attached as Exhibit "D.")  The components of the ROD
include:

    1.    Soil aeration and treatment of Volatile Organic Compound
          hot spots.

    2.    Additional drum removal.

    3.    Groundwater  extraction  --  upgrade  existing  treatment
          facility.

    4.    Imposition of institutional controls.

    5.    Installation of additional monitoring wells.

    6.    Residential water treatment.

    7.    Phytoremediation.

        On January 4, 1999, EPA issued a special notice letter
pursuant to Section 122(e) of CERCLA to ten recipients, soliciting
a good faith offer to perform the remedial design selected by the
ROD and reimburse EPA for $11.7 million of its past costs.  The
recipients included Cytec Industries, Ford Motor Co. and SPS
Technologies.  To my knowledge, AETC did not receive this letter.
Thereafter, EPA indicated to the Special Notice Letter recipients
that the Agency would be willing to negotiate dividing  the ROD
into two operable units.  OU-I would address contaminated
groundwater (Items 3-7, above) and OU-2 would address the removal
of buried drums and contaminated soils believed to remain on site
(Items 1-2, above).  EPA also indicated a willingness to entertain
a partial settlement under which reimbursement of past costs would
be deferred.

## Future Expectations Of The Boarhead Farms Group

        As I previously mentioned, there is a group of PRPs that
plan to enter into a Consent Decree with EPA in early January and

SIVE, PAGET & RIESEL, P.C.

December 22, 1999
Page 3

agree to perform the OU-1 remedy at the site. (A copy of the Agreement in Principle governing the PRP Group is attached as Exhibit "E.") The Group is not committing, at this time, to reimburse EPA for past costs or to perform any actions relating to OU-2. (A copy of the draft Consent Decree is attached as Exhibit "F.")

The following is a comparison of the PRP Group and EPA cost estimates for OU-1.

|  | PRP Group Estimate | | EPA Estimate |
|---|---|---|---|
| Remedial design/capital | $661,000 | v. | $2,743,000 |
| Annual O&M Cost (x 30 years) | $354,100 | v. | $ 423,600 |

The Group plans to do a "quick and dirty" initial allocation among all of the parties who sign the Consent Decree in order to avoid a per capita cost sharing arrangement. The "quick and dirty" allocation will be performed at no expense to the Group by David Batson, the EPA's senior ADR specialist. A more thorough allocation will thereafter be performed by a technical consultant for the PRP Group.

The deadline for other PRPs to join the group is January 7, 2000. In light of the holidays and the fact that the PRP Group did not convene a meeting until December 16, 1999, the January 7 deadline will likely be extended.

Manfred DeRewel's Deposition Regarding
AETC's Alleged Involvement

DeRewel testified that there was a contractual arrangement between DeRewel Chemical Company and AETC to remove waste acid in bulk from Ashland Chemical, Diaz Chemical and Ciba Geigy. The shipments were allegedly made in the 1976 to 1977 time frame. In depositions, DeRewel could not say that any of the waste was not disposed at Boarhead. He admitted taking some of the waste to his Philadelphia locations. DeRewel testified that he believes AETC dumped at Boarhead. He also believes AETC brought radioactive spark plugs, which reportedly came from General Ceramics/National Beryllia Division, to Boarhead for disposal.

Conclusion

AETC must respond by January 7, 2000 to the PRP Group's request that it enter into a Consent Decree with EPA and agree to participate in funding the OU-1 remedy. At this time, six PRPs

SIVE, PAGET & RIESEL, P.C.

December 22, 1999
Page 4


have indicated that they will sign the decree. It is not known how
many of the 20 to 30 additional companies that were also invited to
the PRP meeting will sign the agreement.

Please contact AETC's insurance carriers immediately in
order to ascertain their willingness to participate on behalf of
AETC.

If you or any of the insurance carriers have any
questions, please do not hesitate to contact me.

Sincerely,

Pamela R. Esterman

Enclosures
cc (w/e): Mr. Robert Landmesser

P:\0099\preros

# *EXHIBIT E*

# A G R E E M E N T

THIS AGREEMENT made this ⁞⁞  day of          , 1976

by and between ADVANCED ENVIROMENTAL TECHNOLOGY, INC., 97 West

Hanover Avenue, Randolph, N. J.  07801 (hereinafter called "AETC"

or "Contractor") and ASHLAND CHEMICAL COMPANY, Division of Ash-

land Oil, Inc., (hereinafter called "Ashland").

## W I T N E S S E T H

The PARTIES HERETO mutually covenant and agree as follows:

1.  The Contractor shall, as requested by the Plant

Manager of Ashland's Plant located in the town of Great Meadows,

County of Warren, State of New Jersey (hereinafter called "Plant")

furnish and pay for all material, labor, power, equipment, trans-

poration and all other items necessary to remove and properly dis-

pose of certain chemical waste materials generated by the Plant

including a blend of sulfuric and nitric acids.  The Ashland Plant

Manager shall specify which chemical waste materials Contractor

is to remove which shall be agreeable to the Contractor.

2.  Contractor shall secure all permits and licenses

necessary for the accomplishment of the work to be done hereunder

and shall comply with all local, state or federal laws, guidelines

and regulations concerning the handling and disposal of such chem-

ical waste materials.  Contractor will furnish to Ashland true copies

of the aforementioned permits and licenses upon written request

by Ashland prior to beginning the work.



AETC184

3. The aforesaid work will be performed in a good and workmanlike manner by qualified, careful, experienced and efficient workers in strict conformity with the best standard practices with all legal requirements.

4. In consideration for the Contractor undertaking and performing the work to be done hereunder, Ashland, agrees that all materials removed will become the property of the Contractor. Title to the material removed and risk of loss will pass to the Contractor upon completion of loading of the materials, IN AN "AS IS WHERE IS" CONDITION WITHOUT ANY WARRANTY OR REPRESENTATION WHATSOEVER (EXPRESSED OR IMPLIED) AS TO CONDITION OR FITNESS FOR ANY PURPOSE. Ashland also agrees to pay to the Contractor such sums as are specified on the Rate Schedule attached hereto and made a part hereof.

Notwithstanding the forgoing, Ashland, acknowledges responsibility for the proper identification, packaging and labeling of the chemical materials herein in compliance with applicable Federal, State and Local Laws or regulations (D.O.T., etc.) and shall indemnify AETC for all claims or liabilities resulting from their non-compliance or mis-compliance with the aforesaid laws or regulations.

5. It is agreed that the Contractor is an independent contractor for the performance of all work undertaken under this Agreement and for the accomplishment of the desired result, and that Ashland is to exercise and have no control whatsoever over the methods and means of such accomplishment, except that the Contractor, while on the property of Ashland, shall observe rules

AETC185

and regulations required by Ashland with respect to smoking, and other sources of vapor ignition and shall exercise due care and diligence to perform the work and to prevent any damage to property of Ashland or injury to persons including Ashland's Employees.

6.   Contractor agrees to comply with the Federal Social Security Act, the State and Federal Unemployment Insurance Acts, the Wage and Hour Laws, any and all applicable Sales, Use and Gross Receipts Tax Laws and Regulations and all other laws and regulations; and the Contractor assumes exclusive liability for the reporting and payment of any and all contributions and taxes required thereby.

7.   Each party agrees to indemnify and save harmless the other against and from any and all liabilities, losses, damages, costs, expenses (including reasonable attorney's fees), causes of action, suits, claims, and demands for judgments of any nature whatsoever a party may sustain as a result of the failure of the other party to comply with the provisions of this Agreement or resulting from or arising out of any negligent acts or omissions of the other party, its employees, and subcontractors in the performance of the work herein specified.

8.   Contractor further agrees at his own expense to procure and keep in force insurance listed below and to furnish to Ashland certificates by a carrier acceptable to Ashland upon request.  All certificates of insurance must be attested by a duly authorized representative of the Insurance Company and contain a statement that the insurance shall not be cancelled with-

AETC186

out ten (10) days written notice to the Insurance Division of Ashland at 1409 Winchester Avenue, Ashland, Kentucky:

(A)  COMPENSATION AND EMPLOYER'S LIABILITY INSURANCE:

The Contractor shall take out and maintain during the life of this contract Workmen's Compensation and Employer's Liability Insurance complying with all statutory provisions for all of its employees to be engaged in work under this contract.

(B)  BODILY INJURY LIABILITY AND PROPERTY DAMAGE LIABILITY INSURANCE:

The Contractor shall take out and maintain during the life of this contract, such Bodily Injury Liability and Property Damage Liability Insurance as shall protect it from claims for damages for personal injury, including accidental deaths, as well as from claims for property damage, which may arise from Contractors negligent operations under this contract, whether such operation be by itself or by any subcontractor or by anyone directly or indirectly employed by either of them, and the amounts of such insurance shall not be less than:

(1) Bodily Injury Liability Insurance, in an amount not less than $100,000.00 for injuries, including wrongful death to any one person, and subject to the same limit for each person in an amount not less than $300,000.00 on account of one accident.

(ii)Property Damage Insurance in an amount not less

**AETC187**

than $100,000.00 for damages on account of any
one accident.

9.   If the work is unreasonably delayed, or any of the
conditions of the Agreement are being willfully violated or exe-
cuted carelessly, then Ashland or its representatives may notify
the Contractor in writing and request that he immediately remedy
the deficiency or delay, and, if the same shall not be remedied
within forty-eight (48) hours of notice being received then Ashland
may without prejudice to any other right or remedy terminate this
Agreement.

If within one week of being notified of the readiness
of a given shipment of chemical wastes AETC does not remove the
shipment or if any work is unreasonably delayed or any of the
conditions of the Agreement are being willfully violated or ex-
ecuted carelessly, then Ashland or its representatives may notify
AETC in writing and request that AETC immediately remedy the
deficiency or delay, and, if the same shall not be remedied within
forty-eight (48) hours of notice being received, then Ashland
may, without prejudice, employ any other contractor or person to
remove any or all of the quanity of waste material in the afore-
said order.

10.   The Contractor shall cooperate fully with Ashland
in performing the work to be done hereunder and shall NOT interfere
with other operations at Ashland's Plant.

11.   The terms, provisions, covenants, or conditions herein
contained shall control in the event of any conflict with any pro-
vision, term, covenant, or condition in any other document executed

AETC188

between the parties. This Agreement constitutes the entire agreement between the parties and no addition to or modification of any of the provisions shall be binding unless made in writing and signed by a duly authorized representative of Ashland and Contractor.

12. Ashland acknowledges and recognizes that AETC will incur and sustain substantial capital equipment costs so that AETC can more properly preform its duties with respect to the distilling of the blend of sulfuric and nitric acids under this agreement. In further consideration of this Agreement and of AETC's promise to make the said investment Ashland shall, for a minimum period of six months from the date hereof, utilize the services of AETC exclusively for the disposal of any of its wastes containing sulfuric or nitric acids or blends of these two in accordance with the price quotes, annexed hereto as Exhibit A. Ashland acknowledges that it is required to use the sole services of AETC with respect to the disposal of its sulfuric and nitric acid wastes for this minimum period regardless of Ashland's ability subsequent to the date of signing to obtain a better price quotation then that set forth in Schedule A.

Ashland further agrees that subsequent to the expiration of this initial six (6) months period but prior to the expiration of this Agreement it will grant AETC the right of last refusal to meet any valid bid or price quotation with respect to the removal of any sulfuric or nitric acid blends by any other contractor. Ashland shall submit, in writing, all such other bids or quotations

AETC189

from other contractors to the offices of AETC and in the event that AETC cannot or will not meet the submitted bid or price within thirty (30) days of its submission then Ashland may terminate this agreement in whole or in part.

13.   Subject to the non-cancellation provisions of paragraph 12 concerning sulfuric and nitric acid blends, this Agreement may be terminated by the Contractor or Ashland at any time by the delivery of written notice of the terminating party's intention so to terminate at least thirty (30) days prior to the effective date of such termination; provided, however, that any such termination shall not release either party from any of its obligations hereunder accruing prior to the effective date of termination.

WITNESS THE following signatures as of the day and year first above written.

ADVANCED ENVIRONMENTAL TECHNOLOGY, INC.            ASHLAND CHEMICAL COMPANY
                                                  DIVISION OF ASHLAND OIL

By:_____               By:_____

Title:_____               Title:_____
      Authorized Representative

AETC190

# EXHIBIT  G

September 28, 1976

Mr. Art Curley - Plant Manager
Ashland Chemical Corp.
Alphano Rd.
Great Meadows, N.J.  07838


Dear Mr. Curley,

We are pleased to quote on the extension of our service to
cover a one year contractual period for the neutralization
and distillation of approximately fourteen (14) million pounds
of Mixed Acid - CDN (our code number AC-MA-1).

Our current processing of this material is primarily through
controlled dilution and neutralization with lime. We feel,
however, that this "disposal" method neglects the potential
of the waste stream for reuse of the Nitric and Sulfuric
acids which constitute it.

We, therefore, propose to offer to Ashland Chemical economic
advantages by installing (with our associate Co. - Environmental
Chemical Control, Inc.) acid distillation equipment for de-
nitrification. The constituent acids containing organics will
then be used in ore extraction. A.E.T.C. will work to provide
sufficient markets for the material to maintain the economic
structure of our proposal. A.E.T.C. and Environmental Chemical
Control reserve the right to confidentiality on all markets
for this material, but will reflect improved economics back to
Ashland Chemical should on-going market conditions warrant.

The utilization of this approach insures Ashland that changing
Environmental Regulations on disposal of materials will not
affect the contract. The material is no longer a "waste material".
Our proposal does assume, however, that the mono nitrated
organic contaminate in the sulfuric acid will not create
problems in reuse.

Until such time as an agreement is finalized between A.E.T.C.
and Ashland we will continue to provide our present services
at the established price of $.4473/gallon. We can handle up
to two (2) loads per day of your material on an ongoing basis
at our neutralization facilities.

AETC180

-2-

We will install distillation equipment upon receipt of a
mutually satisfactory contractual commitment from Ashland
for handling all acid produced over a twelve (12) month period
(based on a tentative figure of 14 million pounds production).
Safeguards must be built into a contract to protect A.E.T.C.
and Environmental Chemical Control's investment.

**Details:**

A)  Equipment Requirements - A.E.T.C. and E.C.C. will install
     all necessary stainless steel equipment including still,
     condenser, nitric acid cooling and storage equipment,
     pumps, bulk storage tanks, heater, piping, controls,
     and electrical.
B)  Plant Location - This will be at the Wissinoming Industrial
     Park, Tacony & Comly Streets, Philadelphia, Pa.
C)  Equipment operation date - A.E.T.C. and E.C.C. expect to
     begin operating the distillation equipment in 4 to 8
     weeks from contract date.  We can handle 8000-9000
     gallons per day.
D)  Depreciation of the Equipment - Will be over a one year
     period which is normal for acid distillation equipment,
     due to the high corrosion and maintenance requirments.
     The investment to set-up the foregoing described
     equipment (not including land, operation, maintenance
     costs, etc.) will be about $46,000.00. This figure is
     attractive since we have some unused tankage and excellent
     pricing on a used still.

**Pricing:**

A)  The existing price on acid neutralization will held at
     $.4473/gallon until the distillation equipment is in use.
B)  Acid Distillation - Tentative marketing surveys show that
     there is a good market in the ore extraction industry,
     however, the large quantity of material will require
     additional markets be developed.  In addition the fact
     that the sulfuric will contain organic contaminates does
     restrict the selling price and marketability and will
     require that surplus material be given away.

All things considered we are confident that the following price
is realistic and will cover our costs for an one year period,
assuming that no legal restrictions on the resale of material
containing the mono nitrated organics takes place.  Should

-3-

improved economic conditions warrent we will provide, at
our discretion, reduced prices to Ashland.

Our price to Ashland will be ------------------$.37/gallon.

(2850 gal. X $.37 = $1054.50)

We look forward to discussing the foregoing in detail and look
forward to a good continuing relationship.

Sincerely,


John S. Leuzarder
Technical Service Rep.

AETC182

# EXHIBIT F

00156

1

2         United States District Court
          Eastern District of Pennsylvania
3         Civil Action No. 02-3830

4  _____

5  Boarhead Farm Agreement Group

6     plaintiff
             Oral Deposition of:
7   V.       John Leuzarder
           Volume II
8  Advanced Environmental
   Technology Corporation,
9  et als.,
     defendants
10  _____

11      * * * * *
     Monday, December 6, 2004
12      * * * * *

13     Transcript in the above matter taken
  at the law offices of Wolff & Samson, 1 Boland
14  Drive, West Orange, New Jersey, commencing at
  9:00 a.m.
15

16

17

18

19

20

21

22
    CERTIFIED SHORTHAND REPORTING SERIVCES
23      Arranged Through
   MASTROIANNI & FORMAROLI, INC.
24     709 White Horse Pike
   Audubon, New Jersey 08106
25     (856) 546-1100

00182

1  Ashland.

2  Q.   Why do you believe that?

3  A.   We normally did not write contracts like

4  this.

5  Q.   Why was that?

6  A.   Generally it was the customer that created

7  contracts which we responded to.

8  Q.   Do you know why this document was created?

9       MR. SABINO:  Objection.  How is he

10  supposed to know what the person who created

11  this document was thinking or why it was

12  created.

13  Q.   You can answer if you know.

14  A.   It appeared to be -- it appeared to be

15  trying to relate to the distillation of nitric

16  acid.  On page 189, AETC 189 under number 12,

17  Ashland acknowledges or recognizes AETC will

18  incur and sustain substantial capital equipment

19  costs so AETC can more properly perform its

20  duties with respect to a distilling of a blend

21  of sulfuric and nitric acids under this

22  agreement.

23       This appears to be tied in with the

24  quotation which you would know as AETC 176 and

25  was probably produced in response to that.

**Leuzarder, John P. Jr. 120604 (2).txt**          **Page 182**

00183

1  However as you can see it was not signed and I

2  have no recollection that it ever was signed or

3  executed.

4  Q.   Do you know if DeRewal had some kind of

5  involvement with this contract?

6  A.   Had what?

7  Q.   Had an involvement with this contract?

8  A.   Only to the extent that he was the

9  individual that -- DeRewal Chemical was the

10  company that was going to install, had come to

11  us with the proposal that they would install

12  distillation equipment and therefore turn a

13  waste into a resaleable material.  We were

14  trying to serve our customer and was strongly

15  determined to recycle as much material as we

16  could instead of putting it through chemical

17  process or whatever.

18      But if we could resell it and turn it back

19  into a useful commodity that was part of our

20  philosophy as a company.  So consequently when

21  DeRewal had proposed the idea of distilling this

22  sulfuric acid being able to sell it I believe he

23  said for ore reclamation it seemed like a good

24  thing to us.  Whether it ever became a reality,

25  I don't think so, but I don't remember.

00184

1 Q.   If you turn to page AETC 191 in Leuzarder

2 Exhibit 4 and just take a look at this letter.

3 A.   Okay.

4 Q.   Do you recall sending this letter to Art

5 Curley?

6 A.   No.

7 Q.   This letter isn't signed.  Was it your

8 practice to sign all your correspondence?

9 A.   Yes.

10 Q.   Do you believe you did send this to Art

11 Curley?

12 A.   Don't remember.

13 Q.   The third paragraph refers to lime make-up

14 water.  Do you see that?  Materials are to be

15 used as lime make-up water.

16 A.   Yes, I see that.

17 Q.   Do you know what lime make-up water is?

18 A.   I'll speculate that in the acid

19 neutralization process you mix lime with water

20 and that water then is used to neutralize the

21 acid.  Because lime would be delivered to a

22 facility as dry lime and so what you would do is

23 mix it, in this particular case the CDN waste

24 water, I guess or the dye water whichever -- I'm

25 not really sure but you would mix that with lime

**Leuzarder, John P. Jr. 120604 (2).txt**          **Page 184**

00185

1  creating a slurry that would be used there then

2  to neutralize the acid.

3  Q.   So you didn't need pure water to --

4  A.   No.

5  Q.   -- for this process to work?

6  A.   No.  The determination of whether it would

7  be acceptable to that purpose would be entirely

8  based upon the disposer, in this case Modern

9  Transportation's evaluation of the water

10  samples.

11  Q.   Do you recall any details of the

12  conversation that's referred to in the first

13  line?

14  A.   No.

15  Q.   Do you know why AETC was providing a new

16  price quote for Ashland at this point in time?

17  A.   No.

18  Q.   Meaning April 19th, 1977?

19  A.   Don't remember.

20  Q.   Do you recall that it may have had

21  something to do with the shutdown of Manfred

22  DeRewal?

23  A.   I don't recall.

24       MR. SABINO:  Objection.

25  Q.   Do you know if Ashland accepted this

# EXHIBIT H

# MEMORANDUM

| | | | DATE |
|---|---|---|---|
| File | | | September 20, 1976 |

FROM: A. T. Curley

SUBJECT: Visit with Current Spent Acid Disposer

REMARKS:

cc: C. A. Aldag     K. Schumacher
     F. ·Cook     J. ·Sigan
     C. E. Kwartler     W. R. Starkey
     J. Minott     H. E. Sullivan

At my insistance, I was invited to meet Fred Derewal of Environmental Chemical Control, the firm which has been handling our spent acid for the past couple of months. I had originally asked to go to Philadelphia where the acid was supposedly disposed of, but as a result of a call I received from Gaess' Santoro relating to an incident "on a farm in Pennsylvania where a Dural (this turned out to be Derewal) and his son were burned, one critically, when a valve on an acid wagon alledgedly carrying Ashland acid broke off resulting in the burns and a spillage of acid", Leuzarder, when confronted by me with this rumored incident, explained that there was an incident, the burns were slight, the spill was contained and reported, the acid was not ours and no charges were made. When I told Leuzarder that Santoro hinted that the acid was being dumped on the farm, he said the trucks sometimes stopped at this location and went on into Philadelphia the next day. At this point Leuzarder felt we should meet Derewal at this location in Revere, Pa. and further discuss our relationship.

This morning Leuzarder and two of his three partners, Bob Landmesser, another ex-Gaess salesman, and Gene Conlin, associated with Jersey Sanitation, picked me up at the plant and we proceeded to Revere, which is about 15 to 20 miles south of Easton. Our destination was out in the wilderness. It consisted of an old stone home under restoration, a small building with a rather plush living room and kitchen type setting where we sat and talked, a barn, 6 or 8 appaloosa horses and an area being graded off (later found it was to be a lake). There were a few acid wagons parked about and one vertical storage tank visible. This location is apparently being prepared as a retreat for Derewal; Derewal actually lives in Bedminster,·five miles away.

Derewal monopolized the conversation almost immediately. He is in his early fifties, makes a good appearance and is very well spoken. He obviously has a strong chemical background - his father worked in the chemical industry before him. He seemed very frank, not hesitating nor mincing his words. His expertise is in the utilization of waste chemicals, primarily in the metals recovery area. He recovers Copper, Nickel, Cobalt and heavy metals. He also converts ferrous chloride to ferric chloride and sells it to water companies as a flocculent. He said he peddles our acid for ore extraction and agricultural uses. He neutralizes our acid only as a last resort. He said our high nitric acid content (4 to 5%) is a drawback. Ciba-Geigy's acid, which they are still handling, has only 1% nitric. Landmesser says, as he has all along, this is CDN related acid - What are they doing to reduce nitric acid to 1%? A reminder, Ciba-Geigy does not know we are dealing with Derewal and Landmesser would like us to honor this confidential information. Derewal also handles acid for Drake Chemical.

AETC166

314-1

File                                                                September 20, 1976

Visit with Current Spent Acid Disposer

Page 2

When they do neutralize our acid, it is now done in Philadelphia, but they
plan on setting up to do it at Revere. When done in Philadelphia, either lime-
stone, caustic or ammonia are used depending on availability. Liquors are
sewered. Insolubles are isolated and landfilled. No scrubbers are used. When
I inquired about fumes, he said they were minimal when 5 to 1 dilution was
employed, running the acid into water beneath the surface.

I asked whether the agricultural and ore people were aware of impurities when
they used our acid. He said they didn't ask. I was hinting at the possible
liability due to the toxicity of an impurity. Derewal's retort was that this
was a sale of a material, not a disposal, and liability did not enter in.

Derewal stated that he would be interested in setting up a nitric acid distil-
lation unit (for about $50,000) if he could get a commitment from Ashland and
others for their business. I get the impression that Derewal is a very inno-
vative person, who can and will come up with solutions to problems. I do not
feel he is the type to dump wastes in the first hole he can find. He is
acquainted with Gamma. He had a couple ex-Gamma employees working for him at
one time. He has bought Copper-8 from us. He also has imported it from
Japan for re-sale. When I asked him how the D.E.R. (Department of Environmental
Resources) would talk about him, he honestly stated they would down grade him.
He has been fined on several occasions for pollution. He apparently was in the
headlines a few years back for pollution. He said he was in no trouble now.

I would next like to visit his Philadelphia location and get an idea of how he
conducts business there.

I would ask John Minott if we desired a liability waver contract in this instance,
would we enter into it with Derewal or Envirotech?

September 21, 1976

I called Leuzarder today and asked what percentage of our acid was being re-sold.
After checking back with Derewal, he said most of the first loads were given away
for evaluation to the ore extractors. Since the nitric acid is a drawback, most
of the acid is now neutralized. With a one year contract with us, he would in-
stall the aforementioned distillation equipment. Then he could sell most of the
acid. In this connection, we could possibly get a price reduction of $100 - $200
per load, especially after he had written off his capital the first year.

ATC:aa

# *EXHIBIT I*

# MEMORANDUM

| | |
|---|---|
| J. Minott/W. R. Starkey | October 19, 1976 |
| A. T. Curley | Visit to Disposal Site for our CDN Spent Acid |

cc: C. A. Aldag
    K. Brown
    C. E. Kwartler
    J. Sigan
    H. E. Sullivan

Yesterday morning I accompanied John Leuzarder to Philadelphia to see the setup being utilized to neutralize our CDN spent acid. The site consists of a series of old buildings, most of which Mr. Derewal is using to warehouse materials. When we arrived there was an acid trailer being neutralized. The setup consisted of an open lime slurry tank and a large (about 10,000 gallons) unagitated vertical neutralizing tank. The solid lime was charged to the slurrying tank by means of a front end loader. The acid was being injected into a recirculating stream thru a garden hose and a small pump. There were no visible fumes. Derewal stated that it took about five hours to complete a tank wagon load (3,000 gallons) of acid. The slurry is then dropped into the city sewer system.

The location is certainly not an ongoing chemical operation. The work was per-formed by Derewal's two sons. Derewal said he uses liquid lime and waste caustic to do most of the neutralizing. I questioned him about the mode of billing by the City Sewage Authority and what controls they exercised over the operation. The City bills by the amount of water usage. They do have pH and explosimeter monitoring in the common lines in the "industrial park" trunk lines.

I asked Derewal where he did all his metal recovery work. He said this was done in Camden, N. J. In addition, he has a 20,000 gallon storage tank there where he can store acid, if need be.

He has located most of the equipment that he will need to distill off the nitric acid and will set that up in the Wissinoming location. He also said he has gotten rid of several of our loads of spent for ore extraction recently. The last 1,500 gallons of the load being neutralized today was to go to a local processor of copper for equipment cleanout.

In summary then, although the location was certainly not impressive, the setup appears adequate. (He was even readying an ejector type of scrubber for installa-tion atop the neutralization vessel.). It would certainly be helpful to obtain (1) more information on the operation of the Philadelphia Sewage System and (2) the relationship of the Pennsylvania Department of Environmental Resources (DER) with the City. This is the agency which Derewal does not want to get involved with.

Shortly after we left Philadelphia on Interstate 95 I spotted a wagon of our acid (it is easily recognizable by means of its coloring - brown and black) on the way

AETC161

J. Minott/W. R. Starkey                                    October 19, 1976

Visit to Disposal Site
for our CDN Spent Acid

Page 2

into town.  It had left the plant about an hour and a half before that.

I gave Leuzarder three signed copies of the contract our Law Department had
drawn up for waiver of liability.  His hesitation tells me that he will sit on
these for awhile and we should not expect to receive the signed contract too
soon, if at all.

ATC:aa

AETC162

# *EXHIBIT J*

00001
1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF PENNSYLVANIA
2
                                    CIVIL ACTION NO.
3                      02-CV-3830
   BOARHEAD FARM AGREEMENT   Judge Legrome D. Davis
4  GROUP,
           Plaintiff,     Oral Deposition of:
5
                          Arthur T. Curley, Jr.
6          vs.
   ADVANCED ENVIRONMENTAL TECHNOLOGY
7  CORPORATION; ASHLAND CHEMICAL
   COMPANY; BOARHEAD CORPORATION;
8  CARPENTER TECHNOLOGY CORPORATION;
   CROWN METRO, INC.; DIAZ CHEMICAL
9  CORPORATION; EMHART INDUSTRIES,
   INC.; ETCHED CIRCUITS, INC.; FCG,
10 INC.; GLOBE DISPOSAL COMPANY, INC.;
   GLOBE-WASTECH, INC.; HANDY & HARMAN
11 TUBE COMPANY, INC.; KNOLL, INC.;
   MERIT METAL PRODUCTS CORPORATION;
12 NOVARTIS CORPORATION; NRM INVESTMENT
   COMPANY; PLYMOUTH TUBE COMPANY;
13 QUIKLINE DESIGN AND MANUFACTURING
   COMPANY; RAHNS SPECIALTY METALS,
14 INC.; ROHM & HAAS COMPANY, SIMON
   WRECKING COMPANY, INC.; TECHALLOY
15 COMPANY, INC.; THOMAS & BETTS
   CORPORATION; UNISYS CORPORATION;
16 UNITED STATES OF AMERICA
   DEPARTMENT OF NAVY,
17         Defendants.

18
                 *  *  *  *  *
19         Thursday, December 9, 2004
                 *  *  *  *  *
20
           Transcript in the above matter taken at
21 the offices of Ballard, Spahr Andrews & Ingersoll,
   LLP, Plaza 1000, Main Street, Suite 500, Voorhees,
22 New Jersey, commencing at 10:00 a.m.

23     Certified Shorthand Reporting Services
           Arranged Through
24         Mastroianni & Formaroli, Inc.
           709 White Horse Pike
25         Audubon, New Jersey 08106
           (856) 546-1100

**Curley, Arthur T. Jr. 120904.txt**          **Page 1**

00112

1    A.    Well, I guess the first thing he said

2  about it -- first of all, I think he handled it a

3  couple locations, trying things out, I don't know

4  whether he took it to Modern, this is a long time

5  ago, I'm not --

6    Q.    No, I understand.

7    A.    I'm not sure of the progression.  The

8  bottom line is that he came at some point and

9  mentioned DeRewal and that he thought he could get

10  rid of the acid.

11    Q.    Do you know if the first time he came to

12  you and told you that they had started -- he had

13  started a new company, did he tell you about DeRewal

14  at that meeting, if you recall, or some later

15  meeting?

16    A.    No, it would have been later.

17    Q.    Later, okay.

18        Had you asked him to find someone who

19  can -- who could dispose of the acid waste stream?

20    A.    Oh, I don't know exactly what

21  transpired.  He knew, he knew of that stream and that

22  it was a problem with to get rid of.

23    Q.    Is it your recollection that he had a

24  prior relationship with DeRewal before he started

25  handling Ashland's waste stream?

**Curley, Arthur T. Jr. 120904.txt**          **Page 112**

00113

1   A.   No.

2   Q.   He did not?

3   A.   Not that I know of, no.

4   Q.   Do you know how long after he told you

5  that he started this new company that he brought

6  DeRewal, that DeRewal became affiliated with him?

7   A.   No, no.

8  (Objection)  MR. SABINO:  Objection to the use of

9  the word affiliated.

10  BY MS. MOONEY:

11   Q.   How did -- was Mr. Leuzarder the primary

12  contact for -- between Ashland and AETC?

13   A.   Repeat.

14   Q.   Let me restate.  Strike that.

15       Was Mr. Leuzarder your primary contact

16  with AETC?

17   A.   Yes.

18   Q.   Did you have contact with anyone else

19  from AETC at any point?

20   A.   Yes.

21   Q.   And who did you have contact with?

22   A.   Well, I met Bob Landmesser.  There were

23  other representatives along the way that would come

24  in.  Read one of them in one of those memos, Debbert

25  I think his name was.

00131

1   Q.   Did you ever visit the Boarhead Farm

2 site?

3   A.   I believe. I don't know which site

4 we're talking about, but --

5   Q.   Well, did you ever visit --

6   A.   Were there Appaloosa horses there?

7   Q.   You tell me.

8   A.   'cause where I visited there were.

9   Q.   Can you tell me about that visit?

10   A.   Well, it was to meet the man, find out

11 about him and see what he could do with the acid

12 stream.

13   Q.   Was this before or after your

14 Wissinoming visit?

15   A.   Oh, it was before.

16   Q.   Do you recall any details of your trip

17 to the farm?

18   A.   The Appaloosas.

19   Q.   That's a pretty specific detail. Did

20 you ride the Appaloosas?

21   A.   No. The -- they had like a hunting

22 lodge or something there where we sat in and talked.

23 But a lot of it is vague anymore as to the site, you

24 know, I don't really recall a whole lot anymore. But

25 we were sitting down in a place that reminded me of a

**Curley, Arthur T. Jr. 120904.txt**          **Page 131**

00174

1          MR. BIEDRZYCKI:  You can add that to

2  the pile.  Only 16 more to go.

3      (Exhibit Curley-6, 2-page Memorandum dated

4  October 19, 1976, Bates stamped BSAI 006573-006574,

5  marked for I.D.)

6  BY MS. MOONEY:

7      Q.    I'm going to show you Curley Exhibit 6,

8  which is Bates number BSAI 006573 and 6574.

9          MR. SABINO:  What's the date on that,

10  Rich?

11          MR. BIEDRZYCKI:  October 19, 1976.  You

12  are quick on the draw today.

13  BY MS. MOONEY:

14      Q.    You done?

15      A.    Yes.

16      Q.    Can you describe this document?

17      A.    Well, it's a document writing up my

18  experiences with the visit to the Philadelphia site

19  where they were neutralizing the acid, the visit that

20  I had been seeking for about month-and-a-half, two

21  months.

22      Q.    Do you recall why you addressed this to

23  Mr. Minott?

24      A.    Well, he, I told you he's the

25  environmental engineer in Columbus.

00175

1    Q.    Do you recall if when you visited the

2  site was it actually, was the process being performed

3  at that time?

4    A.    Yes.

5    Q.    It was in the works?

6    A.    Yes.

7    Q.    Do you know whose acid was in the system

8  when you were viewing it?

9    A.    At this point, I don't recall.

10    Q.    When you were -- when you visited this

11  facility, did you ask to see any permits?

12    A.    No.

13    Q.    Did he show you, did Mr. DeRewal show

14  you any permits at this facility?

15    A.    No.

16    Q.    Did you ask Mr. DeRewal who he sold the

17  acid to that he was distilling here?

18    A.    He's not distilling, he's neutralizing.

19    Q.    Or neutralizing?

20    A.    He's not selling anything.

21    Q.    Well, let's see in the fourth

22  paragraph -- sorry, strike that.

23        The last 1500 gallons of the load being

24  neutralized today was to go to a local processor of

25  copper for equipment cleanout.

**Curley, Arthur T. Jr. 120904.txt**          **Page 175**

00176

1          Do you know if he was selling that or

2  giving it away?

3     A.    I don't.

4     Q.    In the next paragraph you talk about it

5  would certainly be helpful to obtain more information

6  on the operation of the Philadelphia Sewage System

7  and, two, the relationship of the Pennsylvania

8  Department of Environmental Resources with the city.

9  This is the agency which DeRewal does not want to get

10  involved with.

11          What's -- why did you write this is the

12  agency which DeRewal does not want to get involved

13  with, how did you know that?

14    A.    Because he knocked the DER.

15    Q.    Mr. DeRewal?

16    A.    Yeah.  He's very, very negative about

17  them.  I don't know if he had bad experiences with

18  them or what.

19    Q.    Did you take any steps after this to

20  obtain that information?

21    A.    No, that's why I would have put Minott

22  on it, let him track down things like that.

23    Q.    And in the latter part of this

24  memorandum you talk about spotting a wagon of Ashland

25  acid, I assume is that, I assume on the road, was

00177

1  that an Ashland truck or was it -- whose truck was it

2  that you saw?

3      A.    I don't know who was doing the hauling

4  but it was one of the ones that was, that was hauling

5  the acid to Philadelphia.

6      Q.    Was that one of DeRewal's trucks?

7      A.    I don't know whose truck it was.  We

8  just recognized the truck by seeing it in the plant

9  loading.

10     Q.    Oh, I see.

11     A.    And Jake would have been the one that

12  knew who was doing the trucking.

13     Q.    The last paragraph refers to you giving

14  Leuzarder three signed copies of the contract our law

15  department had drawn up for waiver of liability.

16          How -- did you request the law

17  department to draw up these contracts?

18     A.    I have no recollection of that, that

19  whole paragraph.  It's almost like I didn't write it.

20     Q.    I understand.  It was a long time ago.

21  Almost 40 -- no, 30 years ago.  All right.

22          (Exhibit Curley-7, 6-page Memorandum dated

23  April 5, 1977, Bates stamped BSAI 033297-033302,

24  marked for I.D.)

25  BY MS. MOONEY: