## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., et al.,                    :
                                                :
                              Plaintiffs,        :
                                                :
              v.                                :        Civil Action No. 02-CV-3830
                                                :
ADVANCED ENVIRONMENTAL                           :
TECHNOLOGY CORPORATION, et al.,                  :
                                                :
                              Defendants.        :

## ORDER

**AND NOW**, this        day of                    , 2005, upon consideration of the

Motion for Partial Summary Judgment of Defendant Ashland Inc., and any responses thereto, it

is hereby **ORDERED** that Ashland's Motion for Partial Summary Judgment is **GRANTED** in its

favor and against Plaintiffs on each Count of Plaintiffs' Fifth Amended Complaint and against

Defendants on their cross-claims, deemed or otherwise, as to all claims and cross-claims against

Ashland with respect to any waste other than nitrating acid waste allegedly generated by

Ashland, including, but not limited to, dye waste, pthalide acid waste, CDN waste, drummed

solvent waste, bulk solvent waste allegedly disposed of at the Boarhead Farm Site, which claims

and cross-claims are hereby **DISMISSED**, with prejudice.

BY THE COURT:

_____
Legrome D. Davis, U.S.D.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., et al.,                    :
                                                :
                            Plaintiffs,         :
                                                :
            v.                                  :        Civil Action No. 02-CV-3830
                                                :
ADVANCED ENVIRONMENTAL                          :
TECHNOLOGY CORPORATION, et al.,                 :
                                                :
                            Defendants.         :

## MOTION FOR PARTIAL SUMMARY JUDGMENT OF DEFENDANT ASHLAND INC.

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendant Ashland Inc. ("Ashland") respectfully moves this Court to grant partial summary judgment in its favor on each Count of the Fifth Amended Complaint filed by Plaintiffs and on all cross-claims of Defendants, deemed or otherwise.

The grounds for this motion are summarized as follows:

1.      In this action, Plaintiffs seek to recover from Ashland and the other Defendants for certain costs incurred directly by Plaintiffs under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA") and for contribution with respect to various response costs that Plaintiffs have allegedly paid by way of reimbursement to USEPA under Section 113(f) of CERCLA and under the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. § 6020.101, *et seq.*, all in connection with the Boarhead Farm Superfund Site. Defendants have filed actual and/or deemed cross-claims against Ashland to recover Ashland's alleged equitable share of the response costs allegedly incurred by Plaintiffs.

2.      The evidence produced in this case establishes, at best, the existence of a genuine issue of material fact that quantities of an alleged hazardous waste described by Plaintiffs as

spent/mixed nitrating acid waste generated at Ashland's Great Meadows, New Jersey facility was disposed at the Boarhead Farm Site.

3.    There is no evidence in this case to support a contention that any other Ashland-generated hazardous waste, including wastes described by Plaintiffs as dye waste, pthalide acid waste, CDN waste, drummed solvent waste and bulk solvent waste, was disposed of at the Boarhead Farm Site.

4.    Ashland is, therefore, entitled to partial summary judgment in its favor and against the Plaintiffs on each Count of the Fifth Amended Complaint and on Defendants' cross-claims, deemed or otherwise, against Ashland arising out of the alleged disposal of any Ashland-generated dye waste, pthalide acid waste, CDN waste, drummed solvent waste or bulk solvent waste, or any waste other than spent/mixed nitrating acid waste, allegedly disposed of at the Boarhead Farm Site.

The grounds for Ashland's Motion are more fully set forth in the accompanying Memorandum of Law which, along with the exhibits thereto, are incorporated herein by reference. A proposed Order is attached pursuant to Local Rule 7.1.

Respectfully submitted,

/s/ Jeffrey L. Pettit
JEFFREY L. PETTIT, ESQUIRE
Attorney I.D. No. 21624
RICHARD C. BIEDRZYCKI, ESQUIRE
Attorney I.D. No. 30604
PHELAN, PETTIT & BIEDRZYCKI
121 South Broad Street
Suite 1600
Philadelphia, PA 19107
(215) 546-0500

Counsel for Defendant Ashland Inc.

Date: February 22, 2008

G:\DATA\1357-29\Pldgs\Ashland Partial MSJ\Motion.doc

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AGERE SYSTEMS, INC., et al.        :
                            :
               Plaintiffs     :     Civil Action No.  02-CV-3830
     v.                      :
                            :
ADVANCED ENVIRONMENTAL   :
TECHNOLOGY CORPORATION, et al.,   :
                            :
             Defendants.    :

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT OF DEFENDANT ASHLAND INC.**

      Defendant Ashland Inc. (hereinafter "Ashland"), by and through its undersigned counsel, respectfully submits its within Memorandum of Law in Support of its Motion for Partial Summary Judgment on Counts I, II, III and V of the Plaintiffs' Fifth Amended Complaint and on all cross-claims, deemed or otherwise, against Ashland.

**I.**    **INTRODUCTION**

      Plaintiffs Agere Systems, Inc., Cytec Industries, Inc., Ford Motor Company, SPS Technologies, LLC and TI Group Automotive Systems, LLC ("Plaintiffs") seek contribution from Defendants, including Ashland, for costs allegedly incurred by each Plaintiff for the remediation of the Boarhead Farm Superfund Site ("Boarhead Farm Site") under CERCLA and the Pennsylvania Hazardous Sites Cleanup Act ("HSCA").  With respect to Ashland, Plaintiffs contend that six different types of Ashland-generated waste were transported to and discharged at the Boarhead Farm Site, allegedly causing Plaintiffs to incur remediation costs.  However, the evidence identified by Plaintiffs to support these contentions creates a material issue of fact only with respect to one of the six types of waste allegedly generated by Ashland -- spent/mixed nitrating acid.  Therefore, by filing its motion for partial summary judgment, Ashland seeks to

narrow the factual issues that need to be tried in this case, consistent with the evidence that Plaintiffs, through their discovery responses, are expected to present.

## II.    STATEMENT OF FACTS RELEVANT TO THIS MOTION

Plaintiffs' case against Ashland is based upon certain undisputed facts about the nature and the amount of the waste generated by Ashland during the relevant time period and the grand assumption by Plaintiffs that some of this waste was disposed of at the Boarhead Farm Site. Ashland's motion challenges the legal sufficiency of this assumption which, Ashland herein asserts, rises to a level no higher than rank speculation and hence is inadmissible and insufficient to support Plaintiffs' claims against Ashland for the alleged disposal of its non-acid waste at the Boarhead Farm Site.[1]

### A.    Ashland's Potential Involvement With The Boarhead Site Was, At Most, From August 1976 To April 1977

The extensive documents produced and testimony developed in this case demonstrate that the relevant time period with respect to the disposal of Ashland's alleged wastes at the Boarhead Farm Site is limited to no more than an eight (8) month period between August 1976 and April 1977. Indeed, Plaintiffs contend no more than this. In their Amended and Supplemental Responses to Contention Interrogatories (Exhibit "1" to this Motion), Plaintiffs allege the disposal of hazardous waste generated by Ashland at Boarhead only during the period of June 1, 1976 to March 30, 1977, which the Plaintiffs define as the "Wissinoming Period."[2]    The

---

[1]  As noted above, Ashland also seeks partial summary judgment on any and all deemed or otherwise pleaded cross-claims. Thus, all references herein to "Plaintiffs" shall, for purposes of this Motion, also be deemed to include the cross-claiming Defendants.

[2]  Plaintiffs have indicated in their Amended and Supplemental Responses to Contention Interrogatories that at trial they will divide the disposal of waste at the Boarhead Farm Site into four specific "Nexus periods" as follows:  (1) Pre-Ontario Street Period (1/1/72 to 12/1/73); (2)

contentions against Ashland are supported by bills of lading and other documents produced by Ashland that indicate that various loads of waste generated by Ashland's Great Meadows, New Jersey specialty chemicals facility were picked up for disposal during this time period. However, the earliest such pick up, as evidenced by a bill of lading, was August 9, 1976. (Exhibit "2".)

### B.    Only Waste Generated At Ashland's Great Meadows, New Jersey Facility Is Involved In This Case

In or around the summer of 1976, Ashland retained Defendant Advanced Environmental Technology Corporation ("AETC") to arrange for the pick up and disposal of certain chemical wastes from Ashland's Great Meadows, New Jersey Facility. DeRewal Chemical Company ("DCC") was one of the transporters that AETC then retained to pick up and dispose of Ashland's wastes from its Great Meadows facility. The testimony and documents produced to date also demonstrate that the only Ashland facility from which DCC, as arranged by AETC, picked up and transported wastes was Ashland's Great Meadows specialty organic chemical production facility. There is no evidence, or even any claim that has been advanced by Plaintiffs in this case, that any wastes from any other Ashland facility were arranged by AETC or anyone else to be transported, or were transported, by DCC to the Boarhead Farm Site during the relevant time period or, for that matter, at any other time.[3]

---

the Ontario Street Period (12/1/73 to 6/30/75); (3) the Gap Period (7/1/75 to 6/1/76); and (4) the Wissinoming Period (6/1/76 to 3/29/77). (Exhibit "1", pp. 11-31). Exhibit "B" to Plaintiffs' Amended and Supplemental Responses to Contention Interrogatories (Exhibit "1") alleges disposal of Ashland wastes at the Boarhead Farm Site only during the June 1, 1976 to March 30, 1977 "Wissinoming Period."

[3]    Paragraph 36 of Plaintiff's Fifth Amended Complaint avers only that industrial waste from Ashland's Great Meadows facility was removed by AETC and DCC.

3

C.   **During The Eight Month "Wissinoming Period," DCC Owned, Operated And Used Another Facility In Philadelphia, Pennsylvania As Its Primary Waste Disposal Facility, As Well As Other Sites**

There also is no dispute that during the eight (8) month time period that DCC picked up and transported wastes from Ashland's Great Meadows facility, DCC (or one of its affiliated companies) owned and operated a chemical processing and disposal facility located on the banks of the Delaware River in the Wissinoming section of the City of Philadelphia (the "Wissinoming Facility") which began operating on June 1, 1976 and continued to operate through the entire Wissinoming Period. (Exhibit "1", pp. 26-27, 30-31.) Meanwhile, at the Boarhead Farm Site, enforcement activity by local and county officials resulted in an injunctive order issued by the Bucks County, Pennsylvania Court of Common Pleas (No. 76-9647) on October 15, 1976 prohibiting Manfred DeRewal, Boarhead Corporation and DCC from bringing any tank truck, drum or container of any kind onto the Boarhead Farm Site. (Exhibit "3".)

In early 1977, the EPA, the Pennsylvania DEP and the City of Philadelphia investigated reports of illegal dumping by DCC of bulk wastes from its Wissinoming Facility into the Delaware River. Those agencies' investigations resulted in the arrests of a number of DCC personnel beginning on March 29, 1977, which individuals were charged with, and ultimately convicted of, criminal conduct in connection with the illegal dumping of wastes, including acid wastes, from Ashland's Great Meadows facility, into the Delaware River from the Wissinoming Facility. The Wissinoming Facility was then shut down and DCC stopped hauling and disposing of Ashland's wastes. (Exhibit "1", p. 30.) DCC was thereafter billed by the City of Philadelphia for unpaid sewer charges in connection with its illegal dumping of wastes into the Delaware River from the Wissinoming Facility, which wastes included the very Ashland wastes that Plaintiff is now claiming, were dumped at the Boarhead Farm Site. (Exhibit "4", 7/5/78 letter,

4

Exhibit "3".)

In addition to the Wissinoming Facility, Freddie DeRewal claimed that DCC used other locations for the disposal of wastes that it transported for others:

1.     Allentown facility (for sulfuric acid) (Exhibit "12", pp. 264-265);

2.     William Carriccino's, Elizabeth, New Jersey (Exhibit "12", pp. 267-268);

3.     Blosinski's Landfill off Route 100 (Exhibit "12", p 56);

4.     Landfill underneath Platt Bridge, Philadelphia (Exhibit "12", pp. 52-53, 56-58, 257-298);

5.     G.R.O.W.S. Landfill (Exhibit "12", pp. 52, 59-60, 251-253);

John Barsum also identified Kingwood, Pennsylvania as another waste disposal site used by DCC during the Wissinoming Period. (Exhibit "13", pp. 244-249, 329-330.)

### D.     Ashland's Great Meadows Facility Generated Six Distinct Types Of Waste For Disposal During The August 1976 – April 1977 Time Period

In response to Plaintiffs' discovery requests in this case, Ashland produced a series of documents relating to wastes generated at the Great Meadows facility, which documents Plaintiffs identified in their Amended and Supplemental Responses to Contention Interrogatories (Exhibit "1", pp. 39-40) as evidence upon which they will rely at trial.  Based on these documents, Plaintiffs state that they will contend at trial that the total volume of wastes generated by Ashland at its Great Meadows facility was as follows:

>spent/mixed nitrating acid – 216,650 gallons
>dye waste – 185,300 gallons
>pthalide acid waste – 50,000 gallons
>CDN waste – 86,410 gallons
>drummed solvent waste – 4,345 gallons
>bulk solvent waste – 12, 950 gallons

(Exhibit "1", p. 60.)

5

For purposes of this Motion, Ashland does not contest the Plaintiffs' computations or that DCC, as arranged by AETC, did pick up these wastes in the volumetric amounts alleged by Plaintiffs. Also for purposes of this Motion Ashland will not dispute the nature of these wastes as asserted by Plaintiffs. According to Plaintiffs' expert, Jurgen H. Exner, Ph.D., the chemical components of Ashland's bulk wastes can be summarized as follows: (a) spent/mixed nitrating acid (CDNBF): 83% sulfuric acid, 3.5% nitric acid, 0.1% hydrogen fluoride, 10% water and 3-4% organic compounds; and (b) phthalide acid waste – 1.5% sulfuric acid, 32% sodium sulfate, 30% organic byproducts and zinc and copper sulfate. (Exhibit "5", Exner Report, p. 6.) Dr. Exner's report was not specific as to the components of Ashland's CDN waste water and dye wastes. AETC's August 3, 1976 proposal to Ashland, however, does identify the elements of these two bulk wastes as follows: (a) CDN – aqueous stream containing phosphates, organics, etc.; and (b) dye waste – aqueous containing miscellaneous polymers, salts, acetates, sulfates, amines, etc. (Exhibit "6").

The bulk solvent wastes were primarily isopropyl alcohol (Exhibit "7", Curley 2004 deposition, p. 53), MEOH, xylene, naphtha and NOS. (Exhibit "1", p. 60.) The drummed solvent waste was isopropanol and methanol. (Exhibit "8".)

> **E.** **Even If The DCC Drivers Are To Be Believed, The Only Wastes Generated At Ashland's Great Meadows Facility Disposed Of At The Boarhead Site Would Have Been Bulk Spent/Mixed Nitrating Acid**

The central issue raised in Ashland's within Motion is whether and which of its wastes there is admissible evidence sufficient for the trier of fact to find found their way to the Boarhead Farm Site.[4] Ashland concedes, for purposes of this Motion, that the evidence upon which the

---

[4]    None of the bills of lading reflect a destination for the wastes picked up by DCC from the Great Meadows facility.

6

Plaintiffs intend to rely to prove their case creates, at most, an issue of fact that Ashland's spent/mixed nitrating acid was discharged at the Boarhead Farm Site. The evidence does not, however, support Plaintiffs' contention that any of the other types of waste picked up from Ashland's Great Meadows facility were ever taken to the Boarhead Farm Site.

The sole evidence upon which Plaintiffs rely to try to connect Ashland's waste to the Boarhead Farm Site is deposition testimony given in this case by three drivers formerly employed by DCC -- Manfred DeRewal, Jr. (a/k/a "Freddie" DeRewal), John Barsum and Jeffrey Shaak. These drivers actually provided testimony on two different occasions in connection with the Boarhead Farm Site. After the March 29, 1977 arrests and subsequent convictions of DCC personnel, the EPA began investigating charges of illegal waste dumping activity at the Boarhead Farm Site. Sworn testimony of DCC personnel was taken by deposition in connection with the EPA's investigation. In responding to questions relating to DCC's disposal of wastes from Ashland's Great Meadows facility, all of the testifying Boarhead/DCC personnel -- including DCC's truck drivers -- testified at that time that all of the waste picked up by DCC from Ashland's Great Meadows facility was transported to and disposed of at the DCC Wissinoming Facility and that none of that waste was transported to or disposed of at the Boarhead Farm Site. These deponents included Freddie DeRewal, John Barsum and Jeffrey Shaak. Both DeRewal and Barsum told the EPA that all Ashland waste was disposed of at DCC's Wissinoming Facility in Philadelphia. (Exhibit "9", M. DeRewal, Jr., Feb. 26, 1997 deposition, p. 71; Exhibit "10", J. Barsum June 4, 1997 deposition, pp. 80-81.) Mr. Shaak testified that he did not know where the Ashland waste was taken to. (Exhibit "11", Jeffrey Shaak, June 25, 1997 deposition, p. 82.)

7

Ashland cooperated with the EPA and provided all information and documents requested by the EPA with respect to its waste disposal activities, as well as any association it may have had with DCC, the Wissinoming Facility and/or the Boarhead Farm Site.  The EPA apparently concluded, following its extensive investigation, that there was no basis for pursuing claims against Ashland with respect to the disposal of hazardous waste at the Boarhead Farm Site.

Despite the EPA's conclusion, the extensive document production prior to and during the course of this contribution and cost recovery action, and the extensive testimony developed prior to the filing of this action which reflects that no waste from any Ashland facility was disposed of at the Boarhead Farm Site, Plaintiffs produced for deposition in this case many of the same former Boarhead/DCC employees who had testified earlier, including Freddie DeRewal, John Barsum and Jeff Shaak, all of whom, as reflected above, previously exonerated Ashland from any association with the Boarhead Farm Site.  In 2003, these three witnesses, all former DCC truck drivers, gave deposition testimony in this case contradicting some of their earlier testimony with respect to, inter alia, the disposal of Ashland wastes by testifying that they suddenly "recalled" that some of the loads of acid waste picked up by them from Ashland's Great Meadows facility were transported to and disposed of at the Boarhead Farm Site.  They acknowledged, however, that the great majority of Ashland's waste was disposed of at DCC's Wissinoming Facility.  The drivers' altered testimony as to the disposal at the Boarhead Farm Site of some of the truckloads of Ashland-generated waste was not, however, supported by any documents or by the testimony of any independent witnesses.  This altered testimony of three convicted felons is the sum essence of Plaintiffs' case as to the alleged disposal of Ashland-generated waste at the Boarhead Farm Site.

8

For purposes of this Motion only, Ashland concedes that the altered testimony of these three drivers creates a material issue of fact as to the diversion of some of Ashland's waste destined for the Wissinoming Facility to the Boarhead Farm Site. However, the three drivers' 2003 testimony in this case, taken at its word, is clear that the only Ashland-generated waste that these drivers testified was taken to the Boarhead Farm Site was the spent/mixed nitrating acid and nothing else. Plaintiffs' Amended and Supplemented Responses to Contention Interrogatories identified excerpts from the 2003 depositions of these three drivers as support for their contentions against Ashland. Plaintiffs designated pages 65 to 69 of Freddie DeRewal's deposition wherein DeRewal stated that the waste that he picked up at Ashland's Great Meadows facility was "sulfuric nitric mix organics." He knew this because the material was described on the bill of lading as "sulfuric nitric." He further described it as "a very hot, dangerous acid." While DeRewal testified that he took most of this acid waste to the Wissinoming Facility, he further testified that he took eight to fifteen loads to the Boarhead Farm Site for disposal. (F. DeRewal 2003 dep., Exhibit "12", pp. 68.) At no time did DeRewal testify that he took any other type of Ashland-generated waste to the Boarhead Farm Site or, for that matter, that he even picked up any other waste at all.

Plaintiffs also identified pages 180 to 184 of John Barsum's 2003 deposition wherein Barsum testified that the only waste that he picked from Ashland's Great Meadows facility was bulk sulfuric acid. He at first testified that such material went to the Wissinoming Facility. He was then asked the following question:

Q.    "Any of if ever go back to the farm that you drove?

A.    "I never took any. Maybe one or two, maybe. I'm not sure though. I could have took one or two there. But the bulk of it came to Philly.

9

Q.    What's causing you to say maybe one or two?

A.    Because I don't remember -- I remember one or two
      <u>possibly</u> that went there because he couldn't take it to Philly
      for some reason. So I came out the farm and took it.

Q.    And sitting here today, you think that happened a couple of
      times?

A.    Yeah, I <u>think</u> it did.

(Exhibit "13", pp. 183) (emphasis added). Barsum further explained that the loads he supposedly

took to the Boarhead Farm Site were not dumped onto the ground, but into a neutralization tank.

(Exhibit "13", pp. 183-184.)

Finally, Plaintiffs also identified pages 65 to 68 of the June 4, 2003 deposition in this case

of the third driver, Jeffrey Shaak. Shaak testified that he picked up acid waste in bulk quantities

from a New Jersey facility that he <u>assumed</u> to be an Ashland facility, utilizing a rubber-lined

tanker truck. When asked how many loads he took back to the Boarhead Farm Site, he testified,

"maybe three or four, something like that." (Exhibit "14", pp. 68.) Relying on Freddie

DeRewal's 2003 testimony, Plaintiffs postulate that some spent/mixed nitrating acid would have

been taken to the Boarhead Farm Site because of the colored fumes that were generated

whenever acid was dumped at the Wissinoming Facility. (Plaintiffs' Amended and Supplemental

Response to Contention Interrogatories, p. 31, Exhibit "1", Exhibit "12", p. 80.)

## III.    **STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate if the "pleadings, the discovery, and disclosures on

file, and any affidavits, show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine"

only if "a reasonable jury could return a verdict" on that issue in favor of the non-moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [its] pleading." Fed. R. Civ. P. 56(e). On the contrary, to avoid summary judgment, the non-moving party "must set forth specific facts," by affidavit, or as otherwise provided in Rule 56, answers to interrogatories or admissions on file, "showing that there is a genuine issue for trial." Celotex, 422 U.S. at 323. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the factfinder could reasonably find for the noninoving party. See Anderson, 477 U.S. at 252. Summary judgment is mandatory if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure just speedy and inexpensive determination of every action.'" Id. at 327. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims Id. at 323-24. Indeed, Fed.R.Civ.P. 56 (d) directs that where partial summary judgment is requested or warranted, "the court should, to the extent practicable, determine what material facts are not genuinely at issue."

IV.    **ARGUMENT**

Ashland is well aware of the complexities of this case, given the number of plaintiffs and defendants, the varied array of wastes alleged to have been discharged at the Boarhead Farm Site, and the long period of time during which the Boarhead Farm Site was used as an unregulated disposal site, thereby implying that no factual issue could be ripe for summary judgment. Ashland, however, does not request that the Court, through this motion, consider at this time the relationship of the alleged waste to remediation, allocation of remediation costs or divisibility of the remedy, issues left for resolution at a later stage of proceedings. Ashland respectfully suggests that the Court's focus in deciding this motion can be limited to the 2003 testimony of the three DeRewal drivers on which Plaintiffs intend to rely in an attempt to establish that some of the Ashland-generated waste was discharged at the Boarhead Farm Site. In granting its within motion, Ashland requests only that the Court restrict the Plaintiffs' claims against Ashland to bulk spent/mixed nitrating acid waste and exclude any claims arising out of other wastes as to which the evidence is lacking to prove ever went to the Boarhead Farm Site.

A.    **Plaintiffs' Burden Of Proof Under CERCLA Sections 107 and 113 and HCSA**

Section 113(f) of CERCLA provides that any person may seek contribution from any other person who is liable or potentially liable under Section 107 of CERCLA. 42 U.S.C. § 96313(f). Section 113 (f) "does not in itself create any new liability; rather, it confirms the right of a potentially responsible person under Section 107 to obtain contribution from other potentially responsible persons." New Castle County v. Halliburton NUS Corp., 113 F.3d 1116, 1122 (3d Cir. 1997). In seeking contribution, Potentially Responsible Parties ("PRPs") such as the Plaintiffs must prove the four elements that establish a defendant's liability under CERCLA § 107:  (1) that the defendant falls within one of the four categories of "responsible parties"; (2)

that hazardous substances were disposed of at a "facility"; (3) that a "release" or "threatened release" of a hazardous substance from the property occurred; and (4) the occurrence of a "release" or "threatened release" from the facility that has caused a claimant to incur "response costs." United States v. Alcan Aluminum Corp., 964 F.2d 252, 258-259 (3d Cir. 1992). See also United States v. Lightman, 87 F. Supp. 2d 365, 370 (D.N.J. 1999), citing United States v. CDM Realty Co., 96 F.3d 706, 712 (3d. Cir. 1992). The party seeking contribution must prove each of these elements by a preponderance of the evidence. United States v. Union Corp., 277 F. Supp. 2d 478, 485 (E.D. Pa. 2003); United States v. Pesses, 120 F. Supp. 2d 503, 505 (W.D. Pa. 2000).

The four categories of PRPs established by Section 107 of CERCLA are: (1) the current owner or operator of a facility; (2) any person who has owned or operated the facility at the time with the disposal of hazardous substances; (3) any person who arranged for disposal or treatment, or arranged for transport for disposal or treatment of hazardous substances at a facility; and (4) any person who accepts or accepted hazardous substances for the transporter to sites selected by such person. 42 U.S.C. § 9607(a); New Jersey Turnpike Authority v. PPG Industries Inc., 197 F. 3d 96, 103 (3d. Cir. 1999). In this case, the Plaintiffs claim that Ashland was "an arranger" for the disposal of its hazardous wastes to the Boarhead Farm Site. Thus, an essential component of Plaintiffs' case against Ashland as an alleged arranger for the disposal of its own waste is that the waste that caused remediation or removal was actually disposed of at the Boarhead Farm Site. PPG Industries, Inc., 197 F.3d 96, 105 citing United States v. Allcan Aluminum Corp., 964 F.2d 252, 266 (3d. Cir. 1992). CERCLA defines the term "disposal" by incorporating the definition set forth in the Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. § 9601(29). RCRA's definition of disposal reads as follows:

13

> The term "disposal" means the discharge, deposit, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

Plaintiffs' claim under HCSA should be subject to the same burden of proof because it has long been recognized by the district courts that HCSA's provisions generally mirror those of CERCLA. See e.g., General Electric Environmental Services, Inc. v. Envirotech Corp., 763 F. Supp. 113, 118-120 (M.D. Pa. 1991).

**C.    Plaintiffs Can Present No Admissible Evidence That Any Ashland-Generated Waste Other Than Bulk Spent/Mixed Nitrating Acid Waste Was Disposed Of At The Boarhead Farm Site**

Ashland does not presently dispute the existence of Plaintiffs' evidence that DCC picked up various types of waste from Ashland's Great Meadows facility during the "Wissinoming Period" (6/1/76 to 4/1/77). Accordingly, Ashland concedes that there may be a genuine issue of fact, based upon the altered "new" testimony of three DCC drivers -- Freddie DeRewal, John Barsum and Jeffrey Shaak -- that some of the spent/mixed nitrating acid generated at the Great Meadows facility was disposed of at the Boarhead Farm Site. However, a finding that any other type of Ashland-generated waste was disposed of at the Boarhead Farm Site would be the product of sheer speculation and conjecture which, of course, is insufficient to defeat a summary judgment motion. See Bowen Engineering v. Estate of Reeve, 799 F. Supp. 467, 4777 (D.NJ 1992), citing, Anderson v. Liberty Lobby, Inc., 477 U.S. 1242, 249 (1986). Plaintiffs' contention that non-acid wastes generated by Ashland at its Great Meadows facility were disposed at the Boarhead Farm Site is based wholly on the above-referenced testimony of three DCC drivers that

they took <u>some</u> bulk spent/mixed nitrating acid to the Boarhead Farm Site. (Exhibit "1", p. 73). Such contention relies wholly on rank speculation, not credible admissible evidence nor any fair and reasonable inferences therefrom.

Courts in this Circuit have granted summary judgment to CERCLA defendants in similar circumstances. In <u>New Jersey Turnpike Authority v. PPG Industries, Inc.</u>, 197 F. 3d 96 (3d Cir. 1999), the Court of Appeals affirmed the district court's granting of a motion for summary judgment in favor of certain defendants based upon similarly insufficient evidence of disposal. The New Jersey Turnpike Authority in that case filed suit for contribution against the defendants for chromium ore processing residue that contaminated a number of sites along the New Jersey Turnpike. Similar to the Plaintiffs' case here, the undisputed evidence was that the defendants had contracted with various transport companies to remove the waste. The relevant dispute was whether that waste was disposed at any of the seven specific turnpike locations at issue. The Turnpike Authority relied upon testimony of transporters who provided imprecise testimony as to the location to which they had taken the waste: (1) one witness could not establish to which of the sixteen sites he had taken the waste; and (2) a second witness testified that he had brought an unidentified load of fill to areas at which sewage pipelines were being installed, but could not identify that the fill material that was used. <u>Id.</u> at 110 to 111. The Court of Appeals rejected the testimony of those witnesses as so unreliable and imprecise that it could not create a genuine issue of material fact to avoid the granting of the defendants' motions for summary judgment. Id. at 112.

In <u>United States v. Lightman</u>, 87 F. Supp. 2d 265 (D.NJ 1999), the district court granted four defendants' motions for summary judgment. With respect to one of the sites at issue in that case (the D'Imperio site), the court granted summary judgment because there was no evidence on

which a reasonable fact finder could determine that the waste generated by those defendants was disposed of at that site. Id. at 370-372. For the other site at issue in that case (Ewan site), Plaintiffs relied upon a driver who testified that it was "likely" that they had dumped waste at that site. The court, however, quite properly deemed this testimony to constitute "speculation" and therefore granted summary judgment for the defendants. Id. at 372-373.

Three other facts in this case also support Ashland's Motion for Partial Summary Judgment. First, the bulk waste that the drivers who testified contend was taken to Boarhead was a highly concentrated corrosive acid, unlike Ashland's other alleged types of waste. If Freddie DeRewal is to be believed, the reason that not all of the spent/mixed nitrating acid was disposed of at the Wissinoming Facility was because of its high acid content which produced highly visible, and hence easily detectable, orange fumes. The other wastes picked up by DCC did not create such fumes and, therefore, there would be no similar reason to dispose of such other wastes at any site other than Wissinoming. Second, even if DCC's drivers did not use the Wissinoming Facility for disposal during the "Wissinoming Period," there were other disposal sites available to them other than the Boarhead Farm Site. (See page 5 of this Memorandum of Law.) Given the fact that the Boarhead Farm Site had been shut down on October 15, 1976 by Court Order (see below), these other locations obviously became more likely alternative disposal sites than the Boarhead Farm Site.

Finally, during the majority of the time that Plaintiffs define as the "Wissinoming Period," the Boarhead Farm Site was shut down pursuant to a court injunction starting October 15, 1976. (Exhibit "3".)[5] In their response to Joint Contention Interrogatories Nos. 78-92 and 94-

---

[5]    Plaintiffs contend that this injunction had no effect on DCC's disposal practices. According to Plaintiffs' responses to Ashland's Contention Interrogatories, "Plaintiffs believe this

16

111, the Plaintiffs stated, "DCC used the [Boarhead Farm] Site for the disposal of waste DCC picked up from its customers from 1972 to the end of DCC's waste disposal business in early 1977. The history of DCC is characterized by periods of time when a single location is used predominantly for waste disposal. . . . DCC consistently used one primary disposal location for its customers' waste at any given time." (Exhibit "1", p. 10.) Thus, it is reasonable to infer that given the availability of its Wissinoming Facility during the "Wissinoming Period," DCC transported no Ashland-generated waste to the Boarhead Farm Site other than possibly bulk nitrating acid waste. Furthermore, the few instances of the disposal of waste at the Boarhead Farm Site referenced in Plaintiffs' Answers to Defendants' Joint Contention Interrogatories occurred during the "Wissinoming Period" only in July and September, 1976 (Exhibit "1", p. 37), prior to the October 15, 1976 injunction. Plaintiffs have offered nothing to support a contention that any waste was disposed of at the Boarhead Farm Site after October 15, 1976. Freddie DeRewal testified that DCC's drivers would not take waste to a location if they were being watched. (Exhibit "12", p. 55.) John Barsum confirmed that he avoided Boarhead when the "Farm got shut down." (Exhibit "13", pp. 244-245, 329-330.) This is further proof that the total percentage of waste that Plaintiffs contend was disposed of at the Boarhead Farm Site during the Wissinoming Period, which Plaintiffs contend ran until March 29, 1977, is mere speculation at best. In any event, Plaintiffs have offered no evidence whatsoever to support any contention that any Ashland-generated waste other than bulk spent/nitrating acid waste was disposed of at the

---

is true throughout the Wissinoming Period, irrespective of the injunction. Plaintiffs do not have any specific contention one way or another concerning the injunction, as Plaintiffs are aware of no evidence that the injunction altered DCC's practices." (Exhibit "1", pp. 13, 72-73). Plaintiffs' response is notably, and tellingly, inconsistent with the their responses to other contention interrogatories concerning DCC's disposal activities and practices during other disposal periods. (See, e.g., Exhibit "1", p. 10.)

Boarhead Farm Site.  Accordingly, there is no genuine issue of material fact precluding the entry of partial summary judgment in Ashland's favor in this case.

## V.    CONCLUSION

Plaintiffs have not identified any admissible evidence or reasonable inferences therefrom to support their claims against Ashland as to the disposal at the Boarhead Farm Site of five of the six types of waste allegedly generated by Ashland at its Great Meadows, New Jersey facility during the relevant "Wissinoming Period."  Accordingly, Ashland respectfully submits that its motion for partial summary judgment should be granted as to Plaintiffs' claims and the other defendants' cross-claims for the disposal of such waste at the Boarhead Farm Site.

Respectfully submitted,

/s/ Jeffrey L. Pettit
JEFFREY L. PETTIT
Attorney I.D. No. 21624
RICHARD C. BIEDRZYCKI
Attorney I.D. No. 30604
Phelan, Pettit & Biedrzycki, LLC
1600 North American Building
121 South Broad Street
Philadelphia, PA  19107
(215) 546-0500

Counsel for Defendant Ashland Inc.

Dated:    February 22, 2008

G:\DATA\1357-29\Pldgs\Ashland Partial MSJ\AshlandMPSJ(Memo).doc