IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | : : : : : : | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | : : | |
| v. | : : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : : | |
| Defendants. | : | |

## PLAINTIFFS' AMENDED AND SUPPLEMENTED RESPONSES TO CONTENTION INTERROGATORIES

Plaintiffs hereby amend and supplement their previous responses to contention interrogatories, in part in response to the Court's Order dated October 29, 2007. All of the following responses incorporate Plaintiffs' General Statements and Objections set forth in their prior responses, and are made without waiving any objections stated therein.

### RESPONSES TO JOINT CONTENTION INTERROGATORIES OF ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, ASHLAND, INC., CARPENTER TECHNOLOGY CORPORATION, fcg, inc; HANDY & HARMAN TUBE COMPANY, INC. AND NRM INVESTMENT COMPANY

73:    What do plaintiffs contend is the Total Cleanup Cost for the Site?

**ANSWER:**

Except as set forth below, Plaintiff's response to Interrogatory No. 73 remains as stated in their April 2007 Responses to the Defendants' Joint Contention Interrogatories and more specifically answered in Glenn Harris's July 12, 2007 letter to the Defendants.

The costs of the response actions required by the OU-1 Consent Decree have been funded until very recently as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. However, Agere stopped making contributions to these and other OU-1 and OU-2 activities as set forth below. The costs of the response actions required by the OU-2 Consent Decree were funded as follows: Ford - 22.5%; Cytec - 22.5%; SPS - 22.5%; Agere - 10%; TI - 22.5%. Payment of EPA oversight costs with respect to the OU-1 work were funded as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. Payment of the EPA oversight costs with respect to the OU-2 work were funded as follows: Ford - 22.5%; Cytec - 22.5%; SPS - 22.5%; Agere - 10%; TI - 22.5%. Payment of the EPA past costs demand were funded as follows: Ford - 25%; Cytec - 25%; SPS - 25%; TI - 25%. Payment of the EPA interim costs demand were funded as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. Plaintiffs are not seeking contribution towards response costs incurred by NRM Investments or Worthington Industries, but provided this information only to fully explain how the costs relating to the OU-1 Group were paid.

The amounts that were paid by each entity into the various OU-1 and OU-2 accounts include, with respect to the OU-1 and OU-2 RD/RA accounts, amounts spent on Group activities for which Plaintiffs do not seek recovery in this action. Therefore, Plaintiffs determined the amounts set forth in this response by applying the respective percentages of all Group costs for a particular category of costs actually paid by Plaintiffs (and Worthington and NRM) to the amounts of such costs for which Plaintiffs seek recovery.

Plaintiffs' calculations used to determine the dollar amounts set forth in these responses are as follows:

With respect to OU-1 costs, assessments were made as follows: In approximately August of 2000 Ford, Cytec, SPS and Agere each paid $50,000 and in approximately December of 2000 Ford, Cytec, SPS and Agere each paid $40,000; TI paid $36,666.66 toward these costs, NRM paid $27,416.66, and Worthington paid $ 26,666.66; in approximately August of 2001 Ford, Cytec, SPS and Agere each paid $240,000; TI, NRM, and Worthington each paid $80,000; in approximately February of 2002 Ford, Cytec, SPS and Agere each paid $100,000; TI, NRM, and Worthington each paid $33,333.33; in approximately July of 2002 Ford, Cytec, SPS and Agere each paid $30,000; TI, NRM, and Worthington each paid $10,000; in approximately August of 2003 Ford, Cytec, SPS and Agere each paid $120,000; TI, NRM, and Worthington each paid $40,000; in approximately March of 2005 Ford, Cytec, and SPS each paid $120,000; TI, NRM, and Worthington each paid $40,000; in approximately June of 2006 Ford, Cytec and SPS each paid $100,000; TI, NRM, and Worthington each paid $33,333.33. Each entity's percentage share of assessments was thus: Ford - 21.1267%, Cytec - 21.2831%, SPS - 21.1267%, Agere 15.3169%; TI - 7.2183%; NRM - 6.9740%; and Worthington - 6.9542%. Total costs of the response actions required by the OU-1 Consent Decree through 2006 are $3,381,696.00 as reflected on the de maximis OU-1 invoice tracking chart. Each entity's share of these response costs was thus: Ford - $714,441.94, Cytec - $719,730.00, SPS - $714,441.94, Agere - $517,970.41, TI - $244,100.99, NRM - $235,840.25 and Worthington - $235,170.46.

With respect to OU-1 EPA costs, on or about July 9, 2002 $38,993.30 was paid from PHKS account 1305 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $7,800.00 into that account from which the reimbursement was made;

TI, NRM, and Worthington each made a payment of $2,600.00. Ford, Cytec, SPS, and Agere thus each had a $7,798.66 share of that reimbursement; TI and NRM each had a $2,599.55 share. On or about September 11, 2003 $169,720.60 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $33,944.12 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $11,314.71. Those payments exactly paid each entity's share. On or about August 10, 2004 $80,466.45 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $16,093.29 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $5,364.43. Those payments exactly paid each entity's share. On or about August 3, 2005 $33,015.66 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $6,603.14 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $2,201.05. Those payments exactly paid each entity's share. On or about June 2006 $10,564.97 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec and SPS each made payments of $6,564.92 into that account from which the reimbursement was made; TI, NRM and Worthington each made a payment of $2,188.31. Ford, Cytec and SPS thus each had a $2,641.24 share of that reimbursement; TI, NRM and Worthington each had a $880.41 share. Total OU-1 EPA costs are thus: Ford - $67,080.44, Cytec - $67,080.44, SPS - $67,080.44, Agere - $64,439.20, TI - $22,360.15, NRM - $22,360.15, and Worthington - $19,760.60.

With respect to OU-2 costs, three assessments were made as follows: In approximately January of 2002 Ford, Cytec, SPS and TI each paid $61,250 and Agere paid $25,000; in approximately December 2002 Cytec made a payment of $9,101.24 and a payment

of $1,190.87; in approximately July of 2003 Ford, Cytec, SPS and TI each paid $450,000 and

Agere paid $200,000; in approximately February of 2004 Ford, Cytec, SPS and TI each paid

$112,500. Each entity's percentage share of assessments was thus: Ford - 22.8455%, Cytec -

23.2225%, SPS - 22.8455%, TI - 22.8455% and Agere 8.2409%. Total costs of the response

actions required by the OU-2 Consent Decree through 2006 are $2,186,424.06 as reflected on the

de maximis OU-2 invoice tracking chart plus $1,286.92 additional invoices from de maximis

(available in the Document Repository), plus $74,000 paid for the reconstruction of the DeRewal

garage (as reflected on the Zaumeyer charts), for a total of $2,261,710.90. Each entity's share of

these response costs was thus: Ford - $516,700.11, Cytec - $525,225.85, SPS - $516,700.11,

Agere - $186,384.81, and TI - $516,700.11.

With respect to OU-2 EPA costs, on or about September 8, 2003 $133,327.41 was

paid from MMWR account 405 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and

TI each made payments of $29,998.66 into that account from which the reimbursement was

made; Agere made a payment of $13,332.77. Those payments exactly paid each entity's share.

On or about September 15, 2004 $120,958.65 was paid from MMWR account 405 to EPA to

reimburse EPA's future costs. Ford, Cytec, SPS, and TI each made payments of $29,535.21 into

that account from which the reimbursement was made; Agere made a payment of $13,126.77.

Ford, Cytec, SPS, and TI thus each had a $27,215.70 share of that reimbursement; Agere had a

$12,095.87 share. On or about August 3, 2005 $71,695.27 was paid from MMWR account 405

to EPA to reimburse EPA's future costs. This payment was made from funds available in the

OU-2 RD/RA account. In order to calculate each party's share of this invoice, we applied the

percentage that each entity paid for OU-2 response costs. Thus, each entity's share was as

follows: Ford - $17,850.18, Cytec - $18,144.72, SPS - $17,850.18, and TI - $17,850.18. Total

OU-2 EPA costs are thus: Ford - $75,064.55, Cytec - $75,359.08, SPS - $75,064.55, TI - $75,064.55 and Agere - $25,428.61.

On or about June 17, 2002 $7,062,962.06 was paid from PHKS account 1305 to EPA to reimburse EPA's past costs, including interest thereon. Ford, Cytec, SPS, and TI each made payments of $1,750,000.00 and $15,750.00 into that account from which the reimbursement was made. Each such Plaintiff's share of that reimbursement was thus $1,765,740.52. On or about January 15, 2002 and April 5, 2002 a total of $415,652.74 was paid from the same PHKS account to EPA to reimburse EPA's interim costs. Ford, Cytec, SPS, and Agere each made payments of $84,534.32 into that account with respect to that obligation; TI, Worthington, and NRM each made payments of $28,178.11 into that account as well. Ford, Cytec, SPS, and Agere thus each had a $83,130.55 share of that reimbursement; TI, Worthington, and NRM each had a $27,710.18 share.

Plaintiffs have incurred through 2006 $13,209,612.72 (the amounts contributed by each individual Plaintiff to the response costs for work required by OU-1 Consent Decree and EPA Oversight Costs pursuant to that decree, the response costs for work required by the OU-2 Consent Decree and EPA's Oversight costs related to that decree, and the payment of EPA's past and interim costs as required by the OU-2 Consent Decree.) Plaintiffs' equitable share of those costs is 6.78% or $895,612 an amount in excess of the total dollar numbers paid by them of such costs.

74.    What do plaintiffs contend is the Total Cleanup Cost for OU-1 ?

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 73.

75.    What do plaintiffs contend is the Total Cleanup Cost for OU-2?

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 73.

76.    What do plaintiffs contend is the Total Cleanup Cost incurred by each plaintiff for each of OU-1 and OU-2?

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 73.

77.    Do you contend that any Plaintiff has spent, or is obliged to spend for future costs, amounts in excess of its equitable share of the Total Cleanup Cost?

A.    If so, state what each plaintiff contends to be the amount it has already spent and that it will be obliged to spend.

**ANSWER:**    See Plaintiffs' response to Interrogatory No. 73. By way of further answer, see Plaintiffs' response to Interrogatory No. 78.

78-92 and 94-111:    What do plaintiffs contend is Agere's [etc.] allocable/equitable share of the Total Cleanup Cost for the Site (expressed in a percentage)?

A.    What is the factual basis for plaintiffs' contention as to Agere's [etc.] allocable/equitable share of the Total Cleanup Cost for the Site?

B.    Set forth the calculation used by plaintiffs to arrive at their contention as to Agere's [etc.] allocable/equitable share of the Total Cleanup Cost for the Site.

**ANSWER:**

Plaintiffs object to this Interrogatory to the extent that it seeks information outside the scope of the contentions that Plaintiffs will make as part of their prima facie case at trial. Plaintiffs further object to this Interrogatory to the extent that it seeks the discovery of the mental impressions, conclusions, strategies, opinions, research or legal theories of their attorneys or other representatives or information protected by the attorney-client privilege or any other

applicable privilege.  By way of further objection, Defendants' definition of "factual basis" is overbroad and unduly burdensome.

Without waiving any such objections, Plaintiffs will ask the Court at trial to make findings of fact and conclusions of law based upon testimony and documents Plaintiffs will offer into evidence concerning the hazardous substances owned or possessed by those Defendants who have not settled ("the Non-Settling Defendants") that were disposed of at the Boarhead Farms Site ("the Site"), by Plaintiffs that were disposed of at the Site, and by Plymouth Tube Company, Quikline Design and Manufacturing Co., Rohm and Haas Company, Simon Wrecking Co., Inc., Unisys Corporation, United States of America Department of Navy, Novartis Corporation, Techalloy Company, Inc./Rahns Specialty Metals, Inc., and Emhart Industries, Inc./Crown Metro, Inc. ("Settling Defendants") that were disposed of at the Site.  Plaintiffs will not ask as part of their case-in-chief that the Court make findings of fact and conclusions of law concerning disposal at the Site of hazardous substances owned or possessed by any other person or entity.

Plaintiffs will ask the Court to make findings of fact concerning the Non-Settling Defendants' total volumes of hazardous wastes that were hauled by DeRewal Chemical Company and/or Environmental Chemical Control (collectively "DCC").  Plaintiffs will then ask the Court to determine the amount of each Non-Settling Defendants' total volume of waste that was disposed of at the Site based upon evidence concerning DCC's handling of all its customer wastes in various time periods ("Nexus Periods") as well as DCC's handling of particular Non-Settling Defendants' wastes.  Plaintiffs will ask the Court to conclude that a specific percentage of all wastes handled by DCC in any given Nexus Period was disposed of at the Site, and to apply that percentage to all wastes of Non-Settling Defendants handled by DCC in that Nexus

Period. Set forth below is the testimony and documents Plaintiffs intend to offer into evidence for the Court's consideration.

Should the Court adopt Plaintiffs' proposed conclusions that specific percentages of all wastes handled by DCC in any given Nexus Period were disposed of at the Site, then the Plaintiffs expect that the Court will apply the same nexus percentages to the Plaintiffs and Settled Defendant's wastes. Exhibit A attached hereto is a chart showing the total volumes of each Non-Settling Defendant's, each Plaintiff's, and each Settling Defendant's wastes that were hauled by DCC in each Nexus Period ("Gross" on the chart by "Time" period), the nexus percentages Plaintiffs will ask the Court to find ("Factor" on the chart), and the volumes that the Court will conclude were disposed of at the Site if those nexus percentages are adopted ("Net" on the chart). The entries for "Ashland/AETC" and "Diaz/AETC" show waste that was hauled by DCC from Ashland and Diaz respectively, the transportation for disposal of which those entities and AETC each arranged. Plaintiffs will ask the Court to allocate the "Ashland/AETC" share jointly and severally to Ashland and AETC and the "Diaz/AETC" share to AETC. The entries for "Etched/Flexible" show waste that was hauled by DCC from the Etched Circuits facility for which Flexible is liable.

Plaintiffs will ask the Court to allocate response costs incurred by them up to a date to be set by the Court among Plaintiffs, Non-Settling Defendants, and Settling Defendants only based primarily upon the respective volume of each party's waste that was disposed at the Site (as set forth more fully below). Plaintiffs will also ask the Court for interest on its response costs. Plaintiffs will also ask the Court to apply this allocation to response costs to be incurred by Plaintiffs after that date.

      1.    Waste Quantities

*See* revised Exhibits A and B attached hereto.

(a)    Nexus Periods

Without limiting their reliance on the documents and testimony set forth below to prove at trial the volumes and types of waste disposed of by DCC at the Site with respect to each of the following entities, Plaintiffs calculated the specific percentages of all wastes handled by DCC in any given Nexus Period as follows:

DCC used the Site for disposal of waste DCC picked up from its customers from 1972 through the end of DCC's waste disposal business in early 1977. The history of DCC is characterized by periods of time when a single location was used predominantly for waste disposal. The relative use of the Site in each such period can be determined by the testimony of the DCC drivers and by other available evidence. The DCC periods are: the pre-Ontario Street period; the Ontario Street period; the Gap period; and the Wissinoming period. The Site was the only location from which DCC conducted its waste hauling and disposal business.

DCC consistently used one primary disposal location for its customers' wastes at any given time. Though all of the DCC drivers repeatedly testified to this practice, Freddie DeRewal described it most effectively when discussing Carpenter Technology's waste:

> **Q.**    Is there a certain time frame in which it went to Boarhead or went to somewhere else?
>
> **A.**    The beginning of '73 until we got the Ontario Street location and then it would go there until we got caught there in Ontario or had to relocate and that's what would happen to all of the chemicals on that certain timeframe. That's where you went.
>
> **Q.**    So we are clear on this, before Ontario waste went back to Boarhead?
>
> **A.**    Right.
>
> **Q.**    While Ontario was open it went to Ontario, after Ontario it went back to Boarhead?
>
> **A.**    Correct. Then Wissinoming.

**Q.**     Your talking in general?

**A.**     In general.

Freddie DeRewal at 135-36.

It is thus most useful to characterize DCC's operations by sequential "periods" wherein a particular waste disposal location was used predominantly.

(i)     The Pre-Ontario Street Period (1/1/72 to 12/1/73)

Plaintiffs will ask the Court to conclude that between 95% and 100% of all of the waste handled by DCC beginning in January of 1972 was disposed of at the Site until the opening of DCC's Ontario Street operation in Philadelphia on December 1, 1973.  The documents that Plaintiffs intend to rely upon to support this conclusion include, but are not limited to:

- Boarhead Corporation Certificate of Incorporation dated September 2, 1969 [P-5];

- Deed Between Robert and Ruth Buckman and Boarhead Corporation dated October 16, 1969 [P-6];

- DeRewal Chemical Company, Inc. Certificate of Incorporation dated December 29, 1969 [P-7];

- Pennsylvania State Police Investigation Report dated April 26, 1972 (BSAI015601);

- March 7, 1973 and March 12, 1973 Bucks County Department of Health ("BCDOH") memoranda (BSAI013090-013092 and BSAI015633-015635);

- Waste Discharge Inspection Report and Site Map dated February 14, 1973 [P-22]

- Waste Discharge Inspection Report dated March 5, 1973 [P-23];

- Agreement Between Pennsylvania Department of Environmental Resources ("PADER"), Boarhead Corporation and Manfred DeRewal dated March 21, 1973 [P-24];

- December 20, 1973 BCDOH memorandum (BSAI015760-015761);

- PADER November 2, 1973 Order to Boarhead Corporation (BSAI013111-03113 and BSAI013115-013118);

- Waste Discharge Inspection Report dated November 5, 1973 (BSAI015676-015684);

- November 23, 1973 Waste Discharge Inspection Report (BSAI015705-015710);

- January 8, 1974 BCDOH memorandum (BSAI015775-015777);

- June 28, 1974 BCDOH memorandum (BSAI015392-015393);

- Complaint in Equity filed on May 31, 1974 in the Court of Common Pleas of Bucks County with an injunction issuing on June 21, 1974;

- Lease Agreement Between Philadelphia Hide Corporation and Manfred DeRewal for 3013-31 East Ontario Street dated November 15, 1973 [P-20]; and

- Affidavit of John Barsum dated April 28, 2000 [D-27].

- January 1997 EPA Remedial Investigation Report "Site History" (AR310754-764).

Plaintiffs also intend to rely upon the testimony of Bruce DeRewal, Freddie DeRewal, Jeff Shaak, John Barsum, John Bean, and June Stephens to support that conclusion. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of the depositions taken in this action of those individuals. Plaintiffs believe that the testimony of those individuals as reflected in those transcripts supports this conclusion, including, but not limited to:

- Bruce DeRewal at 12-38;

- Jeff Shaak at 13-56;

- June Stephens at 20-22, 28-29, 45, 92, 98, 169-71;

- John Bean at 13-24, 45-88;

- John Barsum at 40-43, 51-52, 57-58, 92-93, 206-08, 244-46, 328-30; and

- Freddie DeRewal at 15, 39-58, 129-37.

Plaintiffs believe that this evidence supports their conclusion that virtually all of the waste handled by DCC from January 1972 was disposed of at the Site until the opening of DCC's Ontario Street operation in Philadelphia on December 1, 1973.

The Boarhead Site was the only location owned and operated by Fred DeRewal on January 1, 1972. Each DCC driver testified that the Site was the only (or virtually only) location to which he took DCC customer wastes until Ontario Street opened on December 1, 1973. Bulk wastes were usually drained into seepage pits specially created for that purpose. The first pits had logs stacked on top, so that the pits were disguised. Freddie DeRewal at 394-95. Those pits were used for chemicals other than nitrating acids. Freddie DeRewal at 395-96. A hose from the tank truck was run into a pit to drain the waste. Stephens at 71-72. Special pits were later created just for nitrating acids. These pits were filled with big stumps, rocks, and debris, then covered with dirt. Freddie DeRewal at 329. The dirt tops contained the nitrating acids fumes, so that you could walk over the pits and not know they were there. Freddie DeRewal at 328-30. Drums were either buried full at the Site or simply dumped and the drum sold to a drum company. Freddie DeRewal at 169-71.

The wholesale dumping of wastes at the Site was first discovered by regulators in April of 1972. A Pennsylvania State Police Investigation Report dated April 26, 1972 (BSAI015601) reported a complaint of dead fish, dead plant life, and foaming along the edges of the stream on property adjacent to the Site. The complaint alleged that the pollution was caused by dumping of acid into the stream from tank trucks at the Site. The BCDOH went to the Site on April 28, 1972 in response to the complaint. BCDOH inspected the Site again on February 14, 1973 noting large tanks, an open trailer with barrels, rubber-lined tankers, and full barrels

standing on the ground. (P-22). A follow-up inspection on March 5, 1973 by BCDOH pursuant

to a search warrant noted liquid and solid waste spilled on the ground and runoff from several

locations carrying wastes to an unnamed tributary of the Delaware River. (P-23).. The February

14th and March 5th inspections were memorialized in BCDOH memoranda dated March 7, 1973

(BSAI013090) and March 12, 1973 (BSAI015633-015635). The March 7th memorandum states

that the inspectors observed a flatbed truck with approximately 40 barrels of an unidentified

solvent, and that an "active" industrial waste discharge was present. The March 12th

memorandum discussed a lagoon discovered during the March 5th inspection. The lagoon was

approximately 10 feet square by two feet deep and contained an unknown liquid waste. A clean-

up agreement between PADER (through the BCDOH), Boarhead Corporation and Mandred

DeRewal was signed on March 21, 1973 in which it was agreed that all industrial waste would be

removed from the Site and soil cleaned up by the end of that month. (P-24/BSAI047230-

047234)) Boarhead Corporation additionally agreed that it would store no further hazardous

substances or conduct any further landfill operations without PADER's prior permission.

Ongoing dumping at the Site nevertheless continued. A December 20, 1973

BCDOH memorandum (BSAI015760-015761) reflects that BCDOH had been "actively involved

in investigating and taking enforcement action concerning an extreme pollution incident at the

Boarhead Corporation Site . . . since October 31, 1973." A nearby resident had complained that

a stream running through his property had been "discolored and foamy for several days." An

investigator responding to the neighbor's complaint found "pools of green liquid chemicals on

the property and evidence of runoff of the liquid chemicals into a swamp on the property." The

memorandum additionally states that PADER issued a November 2, 1973 Order (BSAI013111-

013113) to Boarhead Corporation requiring cleanup of that pollution and steps to be taken to

prevent further pollution.  The memorandum further recites that the BCDOH had since

October 31, 1973 "conducted many follow-up inspections of this Site. . . . "  It further noted that

the "case" was then in the hands of the "State Pollution Strike Force attorney."  A Waste

Discharge Inspection Report dated November 5, 1973 (BSAI015676) reported that lime had been

spread in three spots in the "swamp" but that the majority of the swamp remained saturated with

untreated waste.  A November 23, 1973 Waste Discharge Inspection Report (BSAI015705) also

reported that, though more lime had been spread in the swamp, puddles of waste in a large part

of the swamp remained untreated.

      A January 8, 1974 BCDOH memorandum (BSAI015775-015777) states that

Boarhead Corporation appealed the PADER Order and that the strike force attorney was

considering filing for an injunction.  It recites that the BCDOH had conducted ten inspections of

the Site since October 31, 1973 and had discovered "ample technical evidence" to show the

pollution and violations.  Its concludes that Boarhead Corporation "has not complied with the

Abatement Order issued November 2, 1973."  A June 28, 1974 BCDOH memorandum

(BSAI015392-015393) reflects that Boarhead Corporation's appeal of the Abatement Order was

denied on January 16th and that a Complaint in Equity was filed on May 31, 1974 in the Court of

Common Pleas of Bucks County with an injunction issuing on June 21, 1974.  It is quite clear

that DCC continued to dispose of its customers' wastes at the Site until serious regulatory heat

was applied in November of 1973.

      There can be no doubt that this heightened enforcement activity at the end of 1973

led to the leasing by Fred DeRewal on November 15, 1973 of a one story building at 3013-31

East Ontario Street in Philadelphia.  (P-20/PHKS003410-003414)  Indeed, Fred DeRewal

testified that inspections of the Site by the PADER and the BCDOH was one of the factors in his

leasing of the Ontario facility. Fred DeRewal at 98. Possession was permitted under the Lease

on December 1, 1973. DCC thereafter used Ontario Street for disposal of many of the wastes it

hauled. The pre-Ontario period thus runs from January 1, 1972 to December 1, 1973.

Four DCC drivers testified that the *one and only* disposal location to which they

took waste before the opening of the Ontario facility was the Boarhead Farm Site.[1]

Bruce DeRewal testified that he first worked for his father before graduating from

high school. Bruce DeRewal Transcript at 12-13. He drove for six months or so. Bruce

DeRewal at 27. Mr. DeRewal was born on May 13, 1955 and graduated from 12th grade. Id.

at 7. He therefore graduated from high school in June of 1973 and drove for DCC starting in

approximately Fall of 1972. The only disposal location Mr. DeRewal used in this time period

was the Site. Bruce DeRewal at 21-24, 34-38. When he graduated from high school he stopped

working for his father, then returned as a driver after the Ontario Street location had opened. Id.

at 16-17, 20-21, 28.

Jeff Shaak also worked for DCC in two periods of time. He began working as a

driver for DCC in the Fall of 1972 and continued until just before Ontario Street opened in

December of 1973. Shaak at 13 (worked the first time for between 1 and 2 years). Mr. Shaak

testified that DCC did not have a Philadelphia facility when he first came to work for DCC.

Shaak at 27-29. He returned sometime after the Wissinoming location opened and worked

through the end of the DCC period. Shaak at 26, 59-60. He thus likely worked for DCC the

second time from the summer of 1976 through April of 1977. Mr. Shaak repeatedly testified that

---

[1]     The DCC drivers deposed in this matter are: Bruce DeRewal; Freddie DeRewal; Jeff
Shaak; John Barsum; June Stephens; John Bean; and Karen Porter. Richie Minthorn is a
deceased DCC driver. Ed Cypecki is a DCC driver either dead or long disappeared. Cal
Abbott worked for Fred DeRewal at Echo and may have worked through 1971; he is
dead. Cal Abbott was gone by the time John Barsum arrived. John Coleman also worked
for Fred DeRewal at Echo and through some portion of 1970.

he took every single customer's wastes in the first period to the Site for disposal. Shaak at 27-56.

June Stephens took waste only to the Site before Ontario Street opened. She began driving for DCC in the pre-Ontario period. She thinks she worked for approximately two years at DCC before she went to any Philadelphia facility. Stephens at 169. Indeed, she specifically stated: "I seem to recall that when I first started, and I would think this would be two, three years – if anything was happening in Philadelphia, I didn't know about it cause I only returned to Boarhead Farms, so if I started in '71 or thereabouts, anywhere from – heck, '73, '74 on up to then – I don't know when the first time I was in Philadelphia, but I know that the first couple of years at least or a few years I strictly returned to Boarhead Farms. That was the only place I went with a tanker." Stephens at 170-71. DCC still had its operation in Reedsville when she started driving for DCC. Stephens at 45. The first customer she hauled for was Techalloy, a pre-Ontario Street period customer, so she must have started in fall of 1972 or perhaps a bit later. Stephens at 20-22. She testified that she took the Techalloy waste to the Site "most of the time," and when directly asked if she remembered taking it anywhere else she said she did not remember doing so. Stephens at 63-64, 72-73.

John Bean was a part-time driver for DCC beginning approximately in the Fall of 1972 and continuing through sometime just prior to the demise of the DCC business. Bean at 86-88. He had previously worked for Echo. All of the waste he hauled before Ontario Street opened went to the Site. Bean at 13-15, 21-24. Mr. Bean's jobs were virtually all "fill in," typically on the weekends or evenings. Bean at 34. Each and every customer from which Mr. Bean identified having picked up waste had its waste taken to the Site by Mr. Bean. Bean at 45-70. Mr. Bean had only heard about a Philadelphia facility, he never went there himself with

waste or otherwise. Bean at 47-48, 80 ("I mean I just went and picked it up and parked it, brought it back and parked it"). He did nothing other than drop material off at Boarhead when he came back with the truck from runs to customers. Bean at 94.

Two additional DCC drivers testified that virtually all of the waste they handled prior to Ontario Street was disposed of at the Boarhead Farm Site.

John Barsum drove a truck for DCC from approximately late 1971 or early 1972 through the demise of DCC. He first went to work at the Boarhead property three or four years before Ontario Street opened, Barsum at 42-43, and hauled waste from Drake for about two years before Ontario opened. Barsum at 57-58.[2] The only "driver" when Mr. Barsum started doing site work at the farm was a "Jersey guy." Barsum at 40-41. Bruce DeRewal had not yet started working as a driver. Barsum at 42. Mr. Barsum owned his own tractor, and worked as a contract hauler when needed and if he was available. Prior to his deposition, Mr. Barsum had signed an affidavit dated April 28, 2000 which stated, among other things: "Prior to the opening of DeRewal Chemical Company's Ontario Street facility in Philadelphia, Pennsylvania, during fall of 1973, I took all of the waste I hauled for DeRewal Chemical to the Boarhead Farms property." (D-27). When asked at his deposition to read through the affidavit, Mr. Barsum did so and pronounced "Yep, that's correct." Barsum at 252. When asked specifically whether before Ontario Street opened he ever took waste anywhere than the Boarhead Site he responded "No, to Boarhead." Barsum at 206-207. Mr. Barsum testified that prior to the opening of the Ontario Street location he took Drake's material back to the farm and that DCC constructed a "neutralization plant" at the Boarhead Farm Site. Barsum at 58-59. The "plant" consisted of one (and later another) upright steel tank into which waste acids were placed, lime was added, and

---

[2]      Ed Cypecki started right about the time Barsum did. Barsum at 35-57. After that came
         Richie Minthorn. Barsum at 37.

then the mixture was discharged to the ground. Barsum at 58-68. Similarly, all of the material from Sitkin came back to Boarhead for disposal in the neutralization tanks. Barsum at 73-75. Mr. Barsum said that the neutralization tanks were ultimately taken to the Wissinoming location, but that they were used at Boarhead up until that time. Barsum 243-44. All of the Knoll waste that he picked up was before Ontario Street opened and went back to Boarhead for disposal. Barsum at 101-102. The Merit Metals waste also went back to the Site and was put on the driveway. Barsum at 116-17. Plymouth Tube's material was picked up in bulk and went to the Boarhead Farm pre-Ontario. Barsum at 153-54.

Mr. Barsum testified that he began taking waste to places other than the Site only after the Site was "shut down." He testified that DCC used the Kingwood Facility (Frenchtown) for disposal when the Site got "shut down." Barsum at 244-45. He took some drums to Frenchtown and dumped them there when the Boarhead Farm driveway was blocked during regulatory problems. The drums were filled with "light stuff." Barsum at 245-46. He also later testified that the driveway was blocked for only "a week or so," perhaps "a couple of weeks" when the material went to Frenchtown. Barsum at 329. He only went to Frenchtown a half a dozen times. Barsum at 330. He also acknowledged that he took waste perhaps two to four times to Jonas's transfer station and that it was the only other place he went before Ontario opened. Barsum at 328. He specifically denied dumping materials near any bridges in Philadelphia before Ontario Street opened. Barsum at 207-08.

Freddie DeRewal testified that he started driving for DCC before the Ontario Street location was available and that "in the beginning there was, we had a place in Frenchtown, New Jersey little bit of activity there, not much. And the rest of that time went back to Boarhead Farms." Freddie DeRewal at 39-40. Mr. DeRewal obtained his drivers license on his sixteenth

birthday (September of 1972) and then dropped out of school to drive for DCC. Freddie

DeRewal at 15. He may have ceased working for DCC for three to four months in 1976 and then

returned until the end of DCC in April of 1977. Freddie DeRewal at 386. Mr. DeRewal testified

that he took no drums to the Frenchtown facility but that some bulk was emptied there, Freddie

DeRewal at 40-41, and that he disposed of liquid waste at Frenchtown "very little." Freddie

DeRewal at 58. Freddie DeRewal consistently testified to taking virtually every customer's

waste in some time period to the Boarhead Farm Site. For example, Freddie DeRewal personally

picked waste up three or four times in a 4,000 gallon rubber-lined tanker and took it on each

occasion to Boarhead. Freddie DeRewal at 129-131. He put it in pits covered with logs.

Freddie DeRewal at 132. When he first picked up from Carpenter, Ontario had not yet opened

and all of the waste pre-Ontario went to the Boarhead Site. Freddie DeRewal at 135-36. The

Carpenter waste was dumped right on the ground at the Site. Freddie DeRewal at 136-37. When

asked whether the proximity of customers would govern the location to which the waste was

disposed of Mr. DeRewal answered "depending the time and what was going on at that time, if

we were in Wissinoming or Ontario. If they were closed they would have went to Boarhead.

The majority of the drums did go to Boarhead though." Freddie DeRewal at 168-69.

       The DCC driver testimony with respect to Techalloy, a company from which

DCC picked up substantial quantities of waste exclusively in the pre-Ontario period, is fully

consistent with the general driver testimony above. Four separate DCC drivers remembered

removing bulk waste from Techalloy and taking it exclusively back to the Boarhead Site.

       It is very clear from the DCC driver testimony, the pollution activities and the

consequences thereof at the Site observed by PADER, and the simple fact that DCC had no other

disposal location under its control prior to December 1973 that virtually all of the waste it

handled from 1972 through DCC's acquisition of the Ontario Street location was disposed of at

the Boarhead Site. Thus, Plaintiffs will ask the Court to conclude that between 95% and 100%

of the wastes handled by DCC of its customers were disposed of at the Site.

(ii)    The Ontario Street Period (12/1/73 to 6/30/75)

Plaintiffs will ask the Court to conclude that at least 15% of all of the waste

handled by DCC after the opening of DCC's Ontario Street operation on December 1, 1973 until

the closing of Ontario Street on or before June 30, 1975 was disposed at the Site. The documents

that Plaintiffs intend to rely upon to support this conclusion include, but are not limited to:

- Lease Agreement Between Philadelphia Hide Corporation and Manfred DeRewal for 3013-31 East Ontario Street dated November 15, 1973 [P-20];

- Letter and Diagram from Thomas J. Kulesza of the City of Philadelphia Water Department to Manfred DeRewal dated September 24, 1974 regarding operations at 3015 E. Ontario Street [P-25];

- Letter from Michael Nelson of the City of Philadelphia Water Department to Manfred DeRewal dated June 2, 1975 regarding cessation of sewer and water services at 3015 E. Ontario Street [P-26];

- June 17, 1975 Philadelphia Water Department letter (BSAI013271-013272);

- Waste Discharge Inspection Report dated April 25, 1974 (BSAI013186);

- Commonwealth of Pennsylvania Complaint in equity on May 28, 1974, which was resolved with an agreed order; and

- February 26, 1975 Waste Discharge Inspection Report (BSAI015935).

- January 1997 EPA Remedial Investigation Report "Site History" (AR310754-764).

Plaintiffs also intend to rely upon the testimony of Bruce DeRewal, Freddie

DeRewal, Jeff Shaak, John Barsum, John Bean, Manfred DeRewal, and June Stephens to support

that conclusion. Should one or more of those individuals be unavailable to testify at trial,

Plaintiffs intend to offer into evidence the transcripts of the depositions taken in this action of those individuals. Plaintiffs believe that the testimony of those individuals as reflected in those transcripts supports that conclusion, including, but not limited to:

- Fred DeRewal at 113-14;

- June Stephens at 28-29, 92-102, 171;

- John Bean at 47-48, 70-80; and

- Bruce DeRewal at 46-47, 55-56.

Plaintiffs believe the above evidence supports their contention.

Regulatory inspections and enforcement at the Site forced DCC to temporarily discontinue its use of the Site for disposal of customer wastes. DCC sought another illegal disposal location where it could dump those wastes essentially for free. Its disposal activities first shifted to Ontario Street when that location became available on December 1, 1973. Two of DCC's drivers, however, June Stephens and John Bean, always took waste exclusively (or, in the case of Ms. Stephens, virtually exclusively) to the Boarhead Site no matter where other DCC drivers were disposing of waste.

Ontario Street was a warehouse about two blocks from the Delaware River. Fred DeRewal at 80-81. The Ontario Street lease (P-20/PHKS003410-003414) is the only lease there was for the facility. Fred DeRewal at 84. Fred DeRewal admitted that the inspections of the Boarhead Site was one of the factors in his leasing of the Ontario facility. Fred DeRewal at 98. DCC simply dumped wastes down the sewer there.

DCC stopped using the Ontario Street location when its polluting activities became known to the Philadelphia Water Department. On September 24, 1974, the Water Department wrote to DeRewal about his "spent chromic acid transfer operations." The Water Department directed DeRewal to install a limestone interceptor at the facility and a two

compartment oil inceptor necessary to prevent oil discharges to the city sewer system." A copy of the letter is attached hereto. (P-25/PHKS003282-003284). The Water Department again wrote to DeRewal and to his landlord on June 2, 1975. (P-26). This letter noted various deficiencies in DCC's operation of the Ontario Street Site and informed DCC that it planned to terminate both sewer and water services to the facility to end those operations. A June 17, 1975 letter to the landlord states that "the lateral connection was plugged as indicated would be done in our June 2, 1975 letter," and that to eliminate the possibility of . . . illegal discharges to the City sewer system, the Water Department severed and sealed the lateral on June 13, 1975." (BSAI013271-013272) Mr. DeRewal testified that when the City cut off the water and sewer services it was not possible to use the Ontario Street location anymore, and that it wasn't very long after the date of the June letter. Fred DeRewal at 113-14.

The Ontario Street period thus runs from December 1, 1973 to June 30, 1975.

Freddie DeRewal, John Barsum, and Bruce DeRewal each testified consistently that they took waste predominantly to Ontario Street for disposal while Ontario Street was available. Nevertheless, a substantial amount of DCC customer waste was still being disposed of at the Site in the Ontario period.

Even after Ontario Street was opened, Ms. Stephens and Mr. Bean continued to take virtually all of the waste they hauled to the Site and not to Ontario Street. June Stephens consistently testified that during her entire career as a driver for DCC she took all but a handful of loads back to the Boarhead Site. She testified that she went "maybe two or three times" to one of the Philadelphia locations and that she didn't go to the other one "more than two or three times." Stephens at 28-29. She repeatedly said that there were only a few times she actually went to Philadelphia, and that most of the time she went to the Site. Stephens at 92 ("So

originally I would have taken everything back to Boarhead"), 101-02 ("I would – as I say, I was only in the Philly operation a couple of times. I'd say the big Philly thing which I think is the one on Comely Street. I think I was only there two or three times. The other one on – and I think it was Ontario Street. I think I was only there twice, if I'm not mistaken, so that means that – I don't know. The big one I might have been in and out of a few times, but the rest of the time, everything else, I took to Boarhead"). Ms. Stephens, when then asked whether she went five or six times to Philadelphia responded "I would say total – I one hundred percent remember would be four times . . . those are four that I can actually say I went to Philadelphia." Stephens at 171. John Bean testified that the one and only location to which he took wastes picked up by DCC was to the Site. Bean at 70-80, 47-48. Bruce DeRewal testified that during the Ontario Street period he took waste either to Ontario Street or back to the farm; no other disposal locations were used by him in that time period. Bruce DeRewal at 55-56. For example, the only two places he took Carpenter waste were Ontario Street and the farm. Bruce DeRewal at 47.

All of the driver testimony is consistent with the documentary evidence relating to regulatory inspections of the Site. A Waste Discharge Inspection Report dated April 25, 1974 (BSAI013186), just over four months after Ontario Street opened, noted foaming in the swamp and its discharge to downstream waters. It is also noted that a large part of the swamp remained soaked with untreated waste and that there was a puddle of unknown orange substance near old tanks and trucks on the Site. The Commonwealth of Pennsylvania filed a Complaint in equity on May 28, 1974 as a result, seeking a preliminary injunction against Boarhead Corporation and Manfred DeRewal requiring compliance with the March 21, 1973 Agreement with PADER. (BSAI015828-015836) This Complaint was resolved with an agreed order (BSAI013208-013211) wherein the defendants were to retain a consultant acceptable to PADER who would

submit a proposal for the immediate treatment of the waste materials at the Site and would thereafter submit three weekly sampling reports. A February 26, 1975 Waste Discharge Inspection Report stated that the pollution problems at the Site had not been corrected, noted an overflowing collection pit, a parked flat bed trailer containing barrels marked "acid," and a parked trailer with damaged drums of dry chemicals. (BSAI015935)

The DCC drivers in the Ontario Street period were Bruce DeRewal (though Bruce DeRewal did mostly mechanical work, Bruce DeRewal at 159), Freddie DeRewal, John Barsum, June Stephens, Ed Cypecki, Ritchie Minthorn (though Mr. Minthorn worked as a dispatcher as well), and John Bean (though Mr. Bean only worked part-time). There were thus four full-time drivers and three part-time drivers. Between 15% and 20% of the waste picked up by DCC in the Ontario Street period thus was picked up by Ms. Stephens and Mr. Bean and returned to the Boarhead Site for disposal. Thus, Plaintiffs will ask the Court to conclude that at least 15% of all DCC customer waste hauled in the Ontario Street Period was disposed of at the Site.

(iii)    The Gap Period (7/1/75 to 6/1/76)

Plaintiffs will ask the Court to conclude that at least 65% of all of the waste handled by DCC after the closing of DCC's Ontario Street operation on or before June 30, 1975 and until the opening of DCC's Wissinoming operation on June 1, 1976 was disposed at the Site. The documents that Plaintiffs intend to rely upon to support this conclusion include, but are not limited to:

- Bench opinion filed May 16, 1978 in United States v. Manfred DeRewal, et al. in the United States District Court for the Eastern District of Pennsylvania at Docket No. 77-287 (BSAI018271-BSAI 018363);

- Environmental Chemical Control, Inc. Certificate of Incorporation dated October 18, 1976 [P-27];

- July 16, 1975 Waste Discharge Inspection Report (BSAI015953-015954);

- Nine criminal complaints filed by BCDOH on January 25, 1976 and February 18, 1976 against Boarhead Corporation and Manfred DeRewal alleging violations of the Pennsylvania Clean Streams Law (BSAI015964-015967 and BSAI015969-015976); and

- Waste Discharge Inspection Report dated April 1, 1976 (BSAI016037-016043).

- January 1997 EPA Remedial Investigation Report "Site History" (AR310754-764).

Plaintiffs also intend to rely upon the testimony of Bruce DeRewal, Freddie DeRewal, Jeff Shaak, John Barsum, John Bean, Manfred DeRewal, Linda Cochran, and June Stephens to support that conclusion. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of the depositions taken in this action of those individuals. Plaintiffs believe that the testimony of those individuals as reflected in those transcripts supports that conclusion, including, but not limited to:

- Freddie DeRewal at 51-52, 125-26, 383-91;

- Linda Cochran at 91;

- Fred DeRewal at 115-17; and

- John Bean at 45-70, 80.

Plaintiffs believe the above evidence supports their contention.

DCC did not obtain another non-Boarhead Site waste disposal location until sometime in 1976. A bench opinion filed May 16, 1978 in the United States District Court for the Eastern District of Pennsylvania and the criminal action ultimately brought against Fred DeRewal, et al. contains finding of fact concerning the leasing of the Wissinoming facility. (BSAI018271-018363) The Lease in which the landlord was the Wissinoming Industrial Park and lessee was Environmental Chemical Control was dated May 6, 1976 and had a term of June 1, 1976 to May 31, 1977. The initial leasehold was limited to the first floor building "R."

On November 1, 1976 an addendum to the lease was executed stating that effective that date additional space was leased in Building "G" and Building "Z" and approximately 1,400 square feet of yard space. The lease was to continue for its remaining six months and then for another year. Nothing in the District Court Opinion suggests that DCC used the Wissinoming facility prior to June 1, 1976.[3] The Gap period thus runs from July 1, 1975 to June 1, 1976, a period of eleven months.

Substantial amounts of DCC customer wastes were disposed of at the Site during the gap period. Freddie DeRewal testified that most waste went to the Site in this time period. Freddie DeRewal at 125-26. Freddie said with respect to NRM that after Ontario Street closed the NRM waste went to the Site and to various landfills until Wissinoming was available. Freddie DeRewal at 51-52. He also testified that after DCC was shut down at Ontario Street and before Wissinoming was acquired DCC drivers went either to the Site or to landfills. Freddie DeRewal at 383-84. He repeated again that "normally during those gaps, that's [the Site] where the majority of the chemicals went, unless we were able to get into a landfill." Freddie DeRewal at 391.

Despite Freddie DeRewal's testimony about DCC's use of landfills during the gap period, many DCC drivers denied *ever* using landfills for disposal of DCC customer wastes. Jeff Shaak denied knowledge of any landfill disposal by DCC at any time. Shaak at 138-39. He specifically denied knowledge of the Enterprise Avenue Landfill or the Knickerbocker Landfill.

---

[3] ECC was a Pennsylvania corporation formed on October 18, 1976. (P-27). Linda Cochran's name appears on the ECC incorporation documents, however she denied that she signed or was otherwise involved with the incorporation of ECC. Linda Cochran at 91. Fred DeRewal testified that the business was incorporated for the same purposes as DCC, removing industrial waste. Fred DeRewal admits that he formed the corporation and that he used her name to form it. Fred DeRewal at 115-17. This additionally suggests that DCC did not have access to the Wissinoming facility prior to June of 1976.

Shaak at 138-39.  Bruce DeRewal was not aware of any landfill disposal locations being utilized

by DCC, specifically denying any knowledge of the Enterprise Avenue Landfill, any New Jersey

locations, the Knickerbocker Landfill, the Blowsinski Landfill, or landfills in Chester County.

Bruce DeRewal at 181-83.  June Stephens did not identify a single landfill to which she took

DCC waste.  John Bean took DCC waste only to the Boarhead Site.  Bean at 45-70, 80.  John

Barsum did not identify a single landfill that he went to with DCC customer wastes in *any* time

period.

    Even Freddie's testimony about landfills to which he went during the gap period

is very limited.  He did not recall any landfills that any DCC employees were directed to by

Marvin Jonas other than GROWS and the landfill under the Pennrose (or Platt) Bridge, to which

he took some loads from NRM, but only after Ontario Street closed down.  Freddie DeRewal at

51-52, 270.  Mr. DeRewal went only twice to GROWS.  Freddie DeRewal at 251-52.  He went

to a disposal site off Route 100 on two occasions in an unspecified time period.  Freddie

DeRewal at 253-54.  He denied using the Knickerbocker Landfill.  Freddie DeRewal at 270.

    The history of regulatory inspections confirms that significant disposal of wastes

was taking place at the Site during the gap period.  A July 16, 1975 Waste Discharge Inspection

Report noted that a 4,000 gallon tanker leaking an unspecified liquid entered the Site, though it

appeared not to be leaking while parked on the Site.  (BSAI015953)  On January 25, 1976 and

February 18, 1976 BCDOH filed a total of nine criminal complaints against Boarhead

Corporation and Manfred DeRewal alleging violations of the Pennsylvania Clean Streams Law.

(BSAI015964-015967 and BSAI015969-015976)  Mr. DeRewal was found guilty of all nine

criminal counts on March 29, 1976.  A Waste Discharge Inspection Report dated April 1, 1976

reported that approximately 4,000 gallons of liquid ammonia were released at the Site from an open valve on a tanker.  (BSAI016037)

The DCC drivers in the Gap period were Bruce DeRewal (though Bruce DeRewal did mostly mechanical work, Bruce DeRewal at 159), Freddie DeRewal, John Barsum, June Stephens, Ed Cypecki, Ritchie Minthorn (also a dispatcher), and John Bean (though Mr. Bean only worked part-time).  There were thus four full-time drivers and three part-time drivers. Freddie DeRewal said "most" of the DCC customer wastes were disposed of at the Site during this period.  All of the loads hauled by June Stephens and John Bean (between 15% and 20% of the waste picked up by DCC) went to the Site.  Thus, Plaintiffs will ask the Court to conclude that between 65% and 75% of DCC customer wastes handled during the Gap period were disposed of at the Site.

(iv)    The Wissinoming Period (6/1/76 to 3/29/77)

Plaintiffs will ask the Court to conclude that at least 15% of all of the waste handled by DCC after opening of DCC's Wissinoming operation on June 1, 1976 until March 29, 1977 were disposed of at the Site, except that at least 25% of the wastes believed by the DCC drivers to consist of nitrating acids were disposed of at the Site during this period.  The documents that Plaintiffs intend to rely upon to support this conclusion include, but are not limited to:

- Violation Notice to Ed and Linda Cochran regarding premises located at 5001 Comly Street (Bldg. R) dated April 5, 1977 [P-28];

- Agreement between Manfred DeRewal, Environmental Chemical Control, Inc., Environmental Protection Agency and the City of Philadelphia dated May 12, 1977 [P-29];

- BCDOH "Field Action Report" on July 9, 1976 (BSAI016117);

- A Waste Discharge Inspection Report dated July 30, 1976 (BSAI016124);

- Bridgeton Police Department complaint of ammonia odor on September 8, 1976 (D-4);

- September 20, 1976 memorandum prepared by Arthur Curley (Curley-5); and

- January 1997 EPA Remedial Investigation Report "Site History" (AR310754-764).

Plaintiffs also intend to rely upon the testimony of Bruce DeRewal, Freddie DeRewal, Jeff Shaak, John Barsum, John Bean, Manfred DeRewal, Linda Cochran, and June Stephens to support that conclusion. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of the depositions taken in this action of those individuals. Plaintiffs believe that the testimony of those individuals as reflected in those transcripts supports that conclusion, including, but not limited to:

- Fred DeRewal at 117-22;

- Bruce DeRewal at 142-43;

- Freddie DeRewal at 328-30; and

- Jeff Shaak at 59-61.

Plaintiffs believe the above evidence supports their contention.

DCC was able to acquire another Philadelphia facility in June of 1976, this time off Comly Street in the Wissinoming Industrial Park. DCC used Wissinoming until Fred DeRewal and others were arrested on March 29, 1977 for dumping waste directly into the Delaware River near that location.[4]

---

[4]    The March 29, 1977 arrest of Fred DeRewal and other DCC employees ended DCC's waste disposal operations within a month or so thereafter. A notice of violation was issued on April 5, 1977 (P-28) and an agreement was entered into between DCC, ECC, EPA and the City of Philadelphia on May 12, 1977 for the disposal of two tank loads of material discovered at the Site. (P-29).

Wissinoming was a warehouse facility ideal primarily because it included a sewer into which DCC customer wastes could be dumped. Bruce DeRewal at 87. The sewer outfall was directly into the adjacent Delaware River. DCC set up a "neutralization facility" at Wissinoming consisting of a couple of large holding tanks for lime and a scrubbing system for the vapors and fumes, but it was not efficient and did not operate for very long. Fred DeRewal at 117-18; Bruce DeRewal at 142-43. The neutralization system did not work in part because there were too many fumes created by the neutralization of nitrating acids. Fred DeRewal at 120-21.

Though many DCC customer wastes were disposed of at Wissinoming in this period, nitrating acids were still disposed of at Boarhead. Fred DeRewal at 121-22. Both Fred and Freddie DeRewal testified that nitrating acids were not disposed of at Wissinoming because of the colored fumes that were created when such wastes were dumped. Freddie DeRewal testified that special pits were constructed at the Boarhead Site just to receive these nitrating acids. Freddie DeRewal at 328-30. He said that more than half of the net nitrating acid loads were disposed of at the site. Freddie DeRewal at 180-81. Jeff Shaak's testimony confirms that both loads of acids were disposed of in pits. Shaak at 42-44; 62-63. Drummed wastes as well were not taken to the Wissinoming facility. Fred DeRewal at 122. Also no flammable solvents were disposed of at Wissinoming. Fred DeRewal at 123.

Jeff Shaak testified that he generally did not take waste for disposal anywhere other than the Wissinoming facility during the second period of time he worked for DCC though, he admitted that he disposed of at least some waste at the Boarhead Site during this period. Shaak at 59-61. Moreover, even after Wissinoming opened, Ms. Stephens and Mr. Bean continued to take virtually all of the waste they hauled to the Site.

Several regulatory documents confirm that waste was being disposed of at the Site during the Wissinoming period. A BCDOH "Field Action Report" on July 9, 1976 documented a complaint to the local police department of ammonia odors on Lonely Cottage Road. (BSAI016117) Additional complaints of the same type were made on July 27th and July 28th. A Waste Discharge Inspection Report dated July 30, 1976 stated that eight barrels marked "scrap HCL" and a tanker full of ammonia were on the Site. (BSAI016124) The Bridgeton Police Department received another complaint of ammonia odor on September 8, 1976, and reference was made to a heavy fog created when liquid from a leaking tanker truck loaded with an unspecified amount of sulfuric acid hit the ground. Fred DeRewal and Bruce DeRewal were burned and taken to the hospital as a result of this spill. (D-4) A September 20, 1976 memorandum prepared by Arthur Curley, the plant manager of Ashland Chemical, reports that Mr. Curley had been "warned" by another waste hauling company that DCC was taking Ashland Chemical's wastes to a "farm in Pennsylvania." (Curley-5)

The DCC drivers in the Wissinoming period were Bruce DeRewal, Freddie DeRewal, John Barsum, June Stephens, Jeff Shaak, Ed Cypecki, Ritchie Minthorn (also a dispatcher), and John Bean (though Mr. Bean only worked part-time and Bruce DeRewal did mostly mechanical work on the trucks and took care of the trailers that came in at Wissinoming). Bruce DeRewal at 83, 159. There were thus five full-time drivers and three part-time drivers.[5] All of the waste hauled by Mr. Bean and virtually all hauled by Ms. Stephens went to the Site. They hauled approximately 15% of all DCC wastes in this period.

Several drivers' testimony about pit disposal, Freddie DeRewal's testimony about nitrating acids, and Freddie DeRewal's testimony that about one-half of the loads of nitrating

---

[5]    Karen Porter drove two or three trips for DCC during the Wissinoming period. Porter at 12-15, 38.

acids were disposed of at the Site establishes that between 25% and 50% of the nitrating acids were disposed of at the Site during this time period.

Thus, Plaintiffs will ask the Court to conclude that between 15% to 20% of all wastes hauled by DCC during the Wissinoming period were disposed of at the Site, except that between 25% and 50% of nitrating acids were disposed of at the Site.

        (b)     Customer Waste Hauled By DCC

             (i)     Non-Settling Defendants' Wastes Hauled By DCC

Carpenter Technology Corporation:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Carpenter Technology Corporation include, but are not limited to:

- 6/12/73 Agreement between DeRewal Chemical Co., Inc. and Carpenter Technology (Cheri-2) and legal department cover letter dated 6/5/73 forwarding proposed Agreement (Cheri-1);

- 12/20/73 purchase order (Cheri-3);

- "Waste Acid Removal Cost" chart (Cheri-8);

- "DeRewal Chemical Co. Waste Acid Removal" chart (Cheri-7);

- "DeRewal Chemical Co. 80#228" ledger sheet (Cheri-6);

- 10/8/74 Memo regarding waste acid disposal costs (Mann-4);

- 2/25/71 letter from David Mann to Ernest Roth regarding CarTech waste acids (Mann-15);

- Analysis Requests (Mann-3);

- Handwritten notes (Mann-12);

- 7/17/69 Memo regarding evaluation of Revere Chemical Corporation (Mann-8);

- 7/8/69 Handwritten telephone note (Adams-2);

- 2/25/70 Memo confirming Revere Chemical no longer removing CarTech's waste hydrochloric acid (Mann-14); and

- Polinko Affidavit dated 10/12/06.

Plaintiffs also intend to rely upon the testimony of Richard Cheri, William Reger, James Adams, David Mann, Charles Polinko, Robert Elbert, Freddie DeRewal, Bruce DeRewal, June Stephens, John Barsum, and Jurgen H. Exner, Ph.D.  Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Cheri 24-27, 33-38, 43-50, 52-56, 70-74;

- Reger 13-24;

- Adams 21-23, 35, 48-59, 67-87;

- Mann 19-21, 57-64, 70-74, 81-89, 95, 105-109, 115-17, 127-33, 145-49;

- Elbert 45-47, 67;

- Freddie DeRewal 132-37, 352-53;

- Bruce DeRewal 39-47;

- June Stephens 95-98; and

- John Barsum 51-52, 92-94.

NRM Investment Co.

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to NRM Investment Co. include, but are not limited to:

- 4//22/87 business confidential response to EPA;

- 2/18/75 letter from Phylis Jonas (with attachments) to NJDEP (Jonas-14);

- Jonas Transaction Ledger from 1977 detailing hauling NRM waste acid (Barsum-8);

- Jonas accounts receivable ledger for 1974-75 (Smajda Affidavit);

- 2/3/00 letter to Mary Platt, including attachments from Pitney Hardin;

- Jonas Transaction Ledger from 1976 (Barsum-9);

- 2/4/91 interview notes regarding Minthorn;

- 5/2/86 application for industrial waste discharge permit;

- 9/27/84 letter to Valley Forge Sewer Authority;

- 11/15/89 evaluation of cyanide treatment alternatives with attachments;

- 4/25/86 letter from EPA to Peter Freda;

- 1987 engineering records including handwritten calculations and sample results;

- 1988-89 fact sheet and tables;

- Proposed Wastewater Treatment Plan;

- 7/17/86 handwritten notes re CN;

- 6/29/88 handwritten notes;

- Schematic of NRM facility;

- Jonas and DCC Invoices, pick up tickets, NRM checks (BSAI074137 - BSIA074449);

- Other correspondence related to hauling of NRM liquid waste.

- The transcripts of Marvin Jonas's depositions in the Buzby landfill litigation.

Plaintiffs also intend to rely upon the testimony of Santo Quici, Frederick Chesky, Peter Freda, Merle Winters, Fred Piotto, Manfred DeRewal, Freddie DeRewal, John Barsum, Jeff Shaak, June Stephens, Bruce DeRewal, Jurgen H. Exner, Ph.D and a records custodian of Worthington Steel Company. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Piotti, 13-14, 20-32, 39-47, 50, 55-60, 64-65, 79-83, 86, 93-95, 97-100, 104;

- Quici 15-18, 22-25;

- Chesky 11-14, 16-17, 21-25, 27, 30-31, 36-37, 40-42, 45-48, 52-55, 56-62;

- Freda 9-10, 12-16, 18-24, 27, 30, 37-40, 43-45, 47-48, 57, 62;

- Winters 10-13, 17-18, 21-28, 31, 36-37, 39-40, 42-43, 47, 59, 68-70;

- Manfred DeRewal 157-60, 410-14, 510;

- Freddie DeRewal 47-50, 52, 58-59, 381-84;

- John Barsum 117-20;

- Jeff Shaak 56-64, 113-14;

- June Stephens 90-92; and

- Bruce DeRewal 39, 86-87.

<u>Advanced Environmental Technology Corporation</u>

*As to AETC Itself*

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Advanced Environmental Technology Corporation include, but are not limited to, the documents identified with respect to Diaz Chemical Corporation and Ashland Chemical Company below, and the following:

- Correspondence dated August 17, 1976 from ECC to AETC, (AETC51);

- Correspondence dated August 31, 1976 from AETC to DCC, (AETC135);

- Correspondence from AETC to Ashland dated September 28, 1976 (Leuzarder-3);

- Correspondence from John Leuzarder to Manfred DeRewal, dated August 31, 1976, confirming conversation regarding trucking and disposal services (Leuzarder-7);

- DCC invoice dated March 31, 1977 (Leuzarder-9);

- Correspondence dated September 9, 1976 from Leuzarder to DeRewal (Leuzarder-11);

- Correspondence from Susan Lemore to Manfred DeRewal, dated August 23, 1976, confirming conversation regarding required certificate of insurance to be issued to Advanced Environmental Technology Corp. for work to be performed at Ashland Chemical (Leuzarder-13);

- Handwritten notes (undated) referring to sulfuric acid leak at Boarhead Farms (Landmesser-3);

- USEPA's Information Requests to Advanced Environmental Technology Corp. and Advanced Environmental Technology Corporation's Response to Information Requests of USEPA (BSAI022885-022936 and BSAI022975-BSAI022997);

Plaintiffs also intend to rely upon the testimony of individuals in this case including, but not limited to, the deposition testimony identified with respect to Diaz Chemical Corporation and Ashland Chemical Company below, and the following: Arthur Curley, John Leuzarder and Robert Landmesser.  Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including, but not limited to:

- Curley: 107-108, 111, 114-115, 117, 122, 125-130, 157;

- Leuzarder: 37-38, 42, 47, 53, 56-59, 62-68, 70-73, 88-93;

- Landmesser (v.2) 144-147, 151, 154-155, 166-168; (v.1) 56-59, 64-65, 76-78, 86-87, 92, 94-95, 101, 151.

*As to Waste from Diaz Chemical Corporation:*

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Diaz Chemical Corporation include, but are not limited to:

- Letter Agreement, dated January 7, 1977, between R.W. Landmesser of Advanced Environmental Technology Corp. and Don Hollwedel of Diaz Chemical Corporation extending services (Landmesser-4);

- Correspondence from H.D. Hollwedel of Diaz Chemical Corporation to Robert Landmesser of Advanced Environmental Technology Corp., dated April 14, 1977, confirming Diaz Chemical Corporation as primary source for disposal of its waste nitration acid (Landmesser-5);

- Invoice, dated March 7, 1977, from Advanced Environmental Technology Corp. to Diaz Chemical Corporation (Landmesser-6);

- USEPA's Information Request to Diaz Chemical Corporation (BSAI029281-BSAI029290; BSAI029291-BSAI029293);

- Diaz Chemical Corporation's Response to Information Request of USEPA (BSAI029140-BSAI029277; BSAI029278-BSAI029280);

- Purchase Order dated 5/16/77 (BSAI029294-BSAI029295)

- Acknowledgment of bill of lading dated 5/28/77 (Leuzarder-12);

- Receipts (variously dated) (BSAI029297-BSAI029301)

- Handwritten notes (BSAI029302)

- Portion of document indicating the amount of money and waste streams that were sent to DCC from Ashland Chemical and Diaz (AETC197-199)

Plaintiffs also intend to rely upon the testimony of individuals in this case including, but not limited to, the following: Theodore Jenney, Stanley Chiras, Diane Shampine, Robert Landmesser, John Leuzarder and Jurgen H. Exner, Ph.D. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including, but not limited to:

- Jenney: 32-49;

- Chiras: 20-26, 34-41; 62, 73;

- Shampine: 19-23; and

- Landmesser: (v.2) 161, 177, 185-192, (v.3) 41-42, 46.

Ashland, Inc.

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Ashland, Inc. include, but are not limited to:

- Correspondence from R.T. Olsen of Ashland Chemical Company to Andrea Barnhouse of A.B.M. Disposal Company, dated August 4, 1976, regarding "best estimate" analysis of its A.C.C. Code 616-220 CDN Spent Acid (ASHL00004);

- Bills of lading, dated 8/9/76-4/12/77 (ASHL00005-00010; ASHL00037-00044; ASHL00048-00065; ASHL00070-00072; ASHL00075-00084; ASHL00087-00089; ASHL00091-00099; ASHL00105-00110; ASHL00113-00118; ASHL00120-00121; ASHL00124-00126; ASHL00128-00129; ASHL00131; ASHL00133-00139; ASHL00142-00143; ASHL00145-00146; ASHL00148; ASHL00150; ASHL00152; ASHL00154; ASHL00156; ASHL00163-00164; ASHL00166; ASHL00168; ASHL00170; ASHL00172; ASHL00174; ASHL00176; ASHL00178-00180; ASHL00182; ASHL00184; ASHL00186-00187; ASHL00192-00195; ASHL00197-00212; ASHL00215; ASHL00217-00231; ASHL00233-00234; ASHL00239; ASHL00246-00249; ASHL00251-00252);

- Memorandum from A.T. Curley to W.R. Starkey dated September 16, 1976 (ASHL00066-00069);

- USEPA's Information Requests to Ashland Chemical Company and Ashland Responses to USEPA Information Requests (ASHL00313-ASHL00472 and BSAI005140-005142);

- Invoice from DeRewal Chemical Co., Inc. to Advanced Environmental Tech., dated 4/9/77 (ASHL00249);

- Portions of waste ledger sheets (BSAI024255-024256; BSAI024275-024276; BSAI033916; BSAI033932; BSAI033937-033938; BSAI034142-034143; BSAI034201);

- Bill of lading, dated 4/28/77 (BSAI024001);

- Correspondence from John Leuzarder of Advanced Technology, Inc. to Art Curley of Ashland Chemical Co., dated August 3, 1976 regarding pricing on various waste streams (Curley -1);

- Memorandum, dated August 23, 1976, from A.T. Curley to W. R. Starkey regarding waste chemical disposal (Curley-2);

- Agreement between Advanced Environmental Technology, Inc. and Ashland Chemical Company, undated and unsigned (Curley-4);

- Memorandum to file, dated September 20, 1976, from A.T. Curley regarding visit with current spent acid disposer (Curley-5);

- Memorandum, dated October 19, 1976, from A.T. Curley to J. Minott/W.R. Starkey regarding visit to disposal site for its CDN spent acid (Curley-6);

- Memorandum, dated April 14, 1977, from A.T. Curley to W.R. Starkey regarding CDN spent acid disposal (Curley-8);

- Memorandum, dated May 18, 1977, from A.T. Curley to T. Bailey regarding waste disposal (Curley-9);

- Portion of waste ledger sheet for April 1977 (Curley-11);

- Correspondence from John Leuzarder of Advanced Environmental Technology Corp., Inc. to Art Curley of Ashland Chemical Corporation, dated August 16, 1976, offering reduced pricing on two items covered in its quote of August 3, 1976 (Curley-16);

- Correspondence from Arthur Curley of Ashland Chemical Company to John Leuzarder of Advanced Environmental Technology Corp., Inc., dated October 26, 1976, regarding freeze point of its spent acid (Curley-17);

- Correspondence from John Leuzarder of Advanced Environmental Technology Corp., Inc. to Art Curley of Ashland Chemical Company, dated September 28, 1976, providing quote on extension of services (Curley-18);

- Bill of lading, dated 9/8/76 (C. Hendershot-5);

- Bill of lading, dated 11/4/76 (C. Hendershot-8);

- "Totals Paid DeRewal", (AETC197-199; Leuzarder-5);

- Photographs regarding Ashland Chemical drums and labels found at the site; and

- Sample results regarding contents of drums with Ashland Chemical labels

Plaintiffs also intend to rely upon the testimony of individuals in this case including, but not limited to, the following: Arthur Curley, John Leuzarder, Robert Landmesser, Charles R. Wilcox, Howard L. Hendershot, Charles Hendershot, Alberto Celleri, Freddie DeRewal, John Barsum, Jeff Shaak, Bruce DeRewal, June Stephens, Jurgen H. Exner, Ph.D and Craig Coslett and Geoffrey Siebel of de maximis, inc. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including, but not limited to:

- Curley 44, 46-51, 53-54, 57, 59-60, 71, 110, 133-139, 141-145, 148-149, 167, 193;

- Wilcox 35-37, 72;

- L. Hendershot 21;

- C. Hendershot 31-32, 36, 86, 89, 95;

- Celleri 23-24, 28-29;

- Freddie DeRewal 65-69;

- Jeff Shaak 65-68;

- John Barsum 180-84;

- Bruce DeRewal 80-83; and

- June Stephens 88-89.

Plaintiffs also intend to offer into evidence the transcripts of depositions taken in other cases, including the deposition of William C. Olasin taken on May 14, 2001 in *Rohm and Haas Co. v. American Cyanamid Co., et al.*, No. 95-1864 and 99-1891 (D.N.J.) 72-75, 158, 201; and the deposition of Arthur Curley taken on August 21, 1996 in *U.S. v. Davis, et al.*, No. 90-0484/P (D.R.I.) 35-37, 42, 62-63, 68-69, 83, 90, 108-111, 139-180, 201-205.

fcg, inc.

*As to Waste From Flexible Circuits Facility:*

- All documents recovered from the Bucks County Department of Health files for Flexible Circuits, produced at Bates Range BSAI082378-082771, including, but not limited to, a March 1968 Valley Sewer Authority sample; a June 1968 letter from Edwin Faunce to Flexible Circuits; follow up letters from 10/15/68, 10/16/68, 10/16/68; a February 27, 1969 letter from Flexible Circuits to the PA DER; follow up correspondence between Flexible Circuits and state agencies on 5/15/70; 6/18/70 handwritten notes; 7/7/70 letter from Melvin Bach; a July 1970 proposal from Udyllite; 10/10/70 inspection report; 1/29/71 and 2/22/71 inspection reports and samples; 2/10/71 letter; 7/7/71 complaint; 1/10/72 letter from DeRewal; 5/2/72 and 6/13/72 inspection reports; 6/15/72, 6/23/72, 7/3/72 letters; 7/10/72, 8/8/72 inspection reports; 7/26/72 letter; 8/17/72 and 9/5/72 reports; a 10/72 agreement; 10/19/72 and 10/25/72 inspection reports; 1/12/73 and 3/15/73 inspection reports; 9/5/72 inspection report; 1/9/75 inspection report; 6/10/77 handwritten notes from BCDH; 9/21/77 and 11/17/77 letters; 4/6/79, 5/24/79, 5/25/79 and 5/29/79 reports and 5/31/79 response letter; 8/16/79 memo to DER; 10/15/79 letter; 10/17/79 handwritten notes; 2/20/80 letter; 5/5/82 handwritten notes; 6/16/82 letter; 10/29/82 letter; 2/1/83 letter and 1984 handwritten notes; 10/4/84 letter; 1992 inspection report.

- Additional documents not from the Bucks County Department of Health files for Flexible Circuits include 11/6/87 letter from Stollsteimer to EPA; a 10/2/87 letter from Bach to EPA; 9/11/87 letter from Bach to EPA; handwritten notes detailing DeRewal purchases and payments; 10/13/87 handwritten notes by Zia; 1/10/72 letter from DeRewal; 9/22/00 letter from Barbin to EPA; 1/27/86 letter and PPC Plan; 5/27/83 letter; undated Flexible Circuits Inc's promotional materials; the Flexible Circuits' 1969 Annual Report, multiple DeRewal invoices and pickup tickets 1973-75.

Plaintiffs also intend to rely upon the testimony of Melvin Bach, George Stollsteimer, Peter Knoll, Ralph Parker, Richard Yeatman, Freddie DeRewal, June Stephens, John Bean, Bruce DeRewal, John Barsum, Jeff Shaak and Jurgen H. Exner, Ph.D.  Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Bach 8, 15-20, 21-26, 27-30, 34-36, 38, 43, 49-56, 58-63, 65-66, 68, 71-73, 75, 80, 83, 86-89;

- Stollsteimer 10-13, 16-19, 23-25, 30-33, 35, 37, 39-41, 43, 53-61, 63-64, 66-67, 70-71, 77-80, 85-87, 92-94;

- Freddie DeRewal 8-88, 127-29;

- June Stephens 78-83, 107;

- John Bean 60-61;

- Bruce DeRewal 77-79;

- John Barsum 111-18, 137-40, 154-60, 179-80; and

- Jeff Shaak 29-31, 86-87.

*As to Waste From Etched Circuits Facility:*

- All of the documents and testimony listed under Flexible Circuits and in addition, to rely on a 10/2/87 letter from Bach to EPA; 10/24/70 meeting minutes; 4/25/70 meeting notes; 11/2/77 field representative waste survey report; 3/2/73 letter; 9/11/87 letter; 9/4/90 GIS submission; DeRewal invoices; 10/27/88 Inspection Report, 9/28/2000 response to EPA.

<u>Handy & Harman Tube Company, Inc.</u>

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Handy & Harman Tube Company, Inc. include, but are not limited to:

- 1/7/93 letter from Curran to EPA;

- September 1992 Site Investigation;

- 10/29/92 letter from Rosato to EPA;

- February 1973 DCC invoice;

- Interview notes of Jay Crawford, Mary Kollmar, Thomas Curran; and

- Handy & Harman interrogatory responses.

Plaintiffs also intend to rely upon the testimony of Jay Crawford, Mary Kollmar, Thomas Curran, James McElya, Bruce DeRewal, Freddie DeRewal, John Barsum and Jurgen H.

Exner, Ph.D. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Curran 31-32, 48-49, 52-56, 61, 71-84;
- Kollmar 24;
- Bruce DeRewal 43-56;
- Freddie DeRewal 119-23, 397; and
- John Barsum 122, 326-328.

        (ii)    Settling Defendants' Waste Hauled By DCC

<u>Rohm and Haas:</u> There are no documents and no testimony establishing that DCC ever hauled waste from Rohm and Haas.

<u>Unisys:</u>

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Unisys include, but are not limited to:

- 4/30/72 Invoice to Univac (P-18);
- January 21, 1972 DCC letter to Univac (P-16);
- 3/6/73 Remington Rand Purchase Order (UNIS-0013);
- 4/27/73 Univac Purchase Order (UNIS-0012).

<u>Plymouth Tube:</u>

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Plymouth Tube include, but are not limited to:

- November 27, 1972 DCC letter to Carpenter Technology (P-32);
- January 10, 1973 letter from Hugh Hawk to EPA;
- DCC invoices dated 1976 (P-15);

- May 24, 1977 letter from Hugh Hawk to PADER (BSAI052290).

<u>Quikline Design and Manufacturing Co.:</u>

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Quikline Design and Manufacturing Co. include, but are not limited to:

- March 1973 DCC Invoice (BSAI052229);
- March 2, 1973 letter from DeRewal to Marchewka (BSAI052230); and
- 10/24/78 Industrial Waste Survey Report.

Plaintiffs also intend to rely upon the testimony of Manfred DeRewal and Freddie DeRewal. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Manfred DeRewal at 150-152
- Freddie DeRewal at 361-367

<u>United States Navy:</u>

There are no documents and no testimony to permit any estimate of total volume of waste hauled in any time period by DCC from a Navy installation. The documents that Plaintiffs intend to rely upon to support their conclusions with respect to the United States Navy include, but are not limited to:

- 5/17/76 letter from DeRewal to Fumara; and
- 9/7/76 letter from Lynn to Department of Navy

Plaintiffs also intend to rely upon the testimony of Freddie DeRewal. Should Freddie DeRewal be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of his depositions taken in this action, including but not limited to:

- Freddie DeRewal at 107-10, 368-69

<u>Simon Wrecking Co., Inc.</u>: There are no documents and no testimony to permit any estimate of total volume of waste hauled in any time period by DCC from Simon Wrecking.

Plaintiffs intend to rely upon the testimony of Freddie DeRewal. Should Freddie DeRewal be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of his depositions taken in this action, including but not limited to:

- Freddie DeRewal at 112-16, 158-61, 421-22, 423-28

<u>Crown Metro/Emhart/Bostik:</u>

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Crown Metro/Emhart include, but are not limited to:

- 12/1/76 DCC letter to Bostik South (BSAI051694); and

- 2/25/77 Bostik South letter to DCC (BSAI051679)

Plaintiffs intend to rely upon the testimony of Freddie DeRewal and Jeffrey Shaak. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Freddie DeRewal at 116-119, 353-361

- Jeff Shaak at 81-83

<u>Novartis:</u>

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Novartis include, but are not limited to:

- Ciba-Geigy shipping documents (D-25)

- Ciba-Geigy 6/6/76 Purchase Order (D-26)

<u>Thomas & Betts Corporation</u>: There are no documents and testimony establishing that DCC hauled waste from Thomas & Betts after January 1, 1972.

Techalloy/Rahns:

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Techalloy/Rahns include, but are not limited to:

- August 1972 DCC invoice to Techalloy (P-37);

- July 14, 1972 DCC quotation letter to Techalloy (BSAI020443);

- October 12, 1972 Techalloy letter to PADER (RAHN-0288);

- 11/28/73 Techalloy purchase order to Liquid Removal Service (RAHN-0014);

- DCC time card for Bruce DeRewal dated 9/21/73;

- DCC time card for "Walt" dated 11/26 and 11/27/73 (RAHN-0016);

- 5/16/73 PADER Waste Discharge Inspection Report of Techalloy (RAHN-0521);

- 10/17/73 PADER Regional Engineer's Review of Techalloy (RAHN-0592-93);

- 6/5/72 Waste Inspection Report of Techalloy (RAHN-0610);

- August 20, 1971 PADER Waste Discharge Inspection Report of Techalloy (RAHN-0622);

- Techalloy 104(e) response to EPA (RAHN-001-0010);

- February 1973 portions of Techalloy accounts payable register (Senin-2);

- Sanitary Sewerage System, Drawing No. S-10 (Moran-1);

- Application for Plumbing Permit to Connect Building to Public Sewer (Moran-2 and RAHN-1251-59); and

- Portions of Weston Technical Report (RAHN-0539- RAHN-0555)

Plaintiffs intend to rely upon the testimony of Theodore Hahn, John T. Moran, Sr., Freddie DeRewal, Bruce DeRewal, June Stephens, John Bean, and William J. Lehane. Should one or more of those individuals be unavailable to testify at trial, Plaintiffs intend to offer

into evidence the transcripts of depositions taken in this action of those individuals, including but not limited to:

- Theodore Hahn at 12-38, 47-51, 59-61, 70-78;

- John T. Moran, Sr.;

- Freddie DeRewal at 129-32

- Bruce DeRewal at 13-16, 35

- June Stephens at 20-22, 63-64, 72-73

- John Bean at 41-46, 59-60

- William J. Lehane, Esquire, Drinker Biddle & Reath

      (iii)    Plaintiffs' Waste Hauled By DCC

Agere Systems, Inc.

There are no documents and no testimony establishing that any hazardous waste owned or possessed by Agere's predecessor, Western Electric, was disposed at the Site.

Cytec Industries Inc.

American Cyanamid was never a customer of DCC. Rather, records indicate that Marvin Jonas hauled waste for American Cyanamid during the 1970s. The Jonas records reflect, however, that DCC collected on Jonas' behalf American Cyanamid waste in two distinct time periods. The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Cytec include, but are not limited to:

- February 18, 1975 Jonas, Incorporated report to NJDEP otherwise known as "Phylis Jonas Grid", which was identified as Jonas-14 during the June 21, 1995 deposition of Marvin Jonas in the Buzby landfill litigation;

- Marvin Jonas, Inc. Registration Statement for a Solid/Liquid Waste Collector-Hauler dated March 31, 1975, which was identified as Jonas-15 during the June 21, 1995 deposition of Marvin Jonas in the Buzby landfill litigation;

- Marvin Jonas, Portions of Marvin Jonas' handwritten transactional ledger for the year 1976, which are Bates-stamped BSAI071668-BSAI071670;

- Marvin Jonas, Inc. Registration Statement for a Solid/Liquid Waste Collector-Hauler dated May 26, 1977, which was identified as Jonas-11 during the June 21, 1995 deposition of Marvin Jonas in the Buzby landfill litigation;

- American Cyanamid responses to EPA 104(e) Information Requests (BSAI001625-001739);

- April 14, 1992 correspondence from Margaret Tribble at American Cyanamid Company to Martha Wilkie Murray at Peterson Consulting Company and attached affidavits from Jonas employees (BSAI103165-103190).

- The transcripts of Marvin Jonas's depositions in the Buzby landfill litigation.

SPS Technologies, LLC

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to SPS Technologies, LLC include, but are not limited to:

- SPS purchase orders, DCC shipping orders and DCC invoices (SPST00137-155, SPST00165-176 and SPST00234;

- November 3, 1992 response to EPA 104(e) Information Request (SPST00090); and

- February 5, 1996 response to EPA 104(e) Information Request (SPST00182);

- The transcripts of Marvin Jonas' depositions in the Buzby landfill litigation.

TI Group Automotive Systems, LLC

There are no documents and no testimony establishing that any hazardous waste owned or possessed by Bundy Corporation was disposed at the Site or was hauled by DCC.

Ford Motor Company

The documents that Plaintiffs intend to rely upon to support their conclusions with respect to Ford Motor Company include, but are not limited to:

- DCC invoices and Ford purchase orders (FORD000009, FORD00010-12, FORD000016, FORD000032-000121, FORD000128, FORD000130-132, FORD000134;

- January 21, 1972 letter from DCC to Mike Margarite (FORD000123);

- Responses to EPA 104(e) Information Requests (FORD000016); and

- Analytical Sampling Results (FORD000032-000121); and

- Waste Characterization Report dated September 26, 2003 (BSAI083709-083715)

Plaintiffs also intend to rely upon the testimony of Craig Coslett and/or Geoffrey Siebel of de maximis, inc.

(c)     Volume Calculations

Without limiting their reliance on the documents and testimony set forth above to prove at trial the volumes and types of waste hauled by DCC with respect to each of the following entities, Plaintiffs calculated the volumes set forth on Exhibit B under the column "Gross" as follows:

Flexible

Without limiting the reliance on the documents and testimony set forth above, the volumes for Flexible set forth on Exhibit B under the column "Gross" were calculated as follows:

Pre-Ontario -- Bills of lading and invoices for 1973 (Flex 00092-95) reflect pickups solely of drummed waste (55 gallon and 15 gallon drums) with per gallon charges of $0.19 and $0.22 respectively.  The 1973 documents show about 65% 55 gallon drums and 35%