# EXHIBIT 7

accordingly entitled to a partial summary judgment declaring AETC to be a person liable under Section 107(a)(3) and, for the same reason, AETC's motion for summary judgment should be denied.

## STATEMENT OF FACTS

AETC was incorporated in or about August, 1976 in the state of New Jersey. Landmesser N.T., November 22, 2004, at 29:3 - 30:11 (Exhibit 1). Robert Landmesser and John Leuzarder had both been employed by Gaess Environmental Services ("Gaess"), a chemical waste transporter, and had decided to start their own company. Landmesser N.T., November 22, 2004, at 27:20 - 30:25 (Exhibit 1); Leuzarder N.T., November 29, 2004, at 13:4 - 14:4 (Exhibit 2). Messrs. Landmesser and Leuzarder had known Arthur Curley, the plant manager of Ashland's Great Meadows, New Jersey facility (the "Great Meadows Facility"), while working at Gaess. Leuzarder N.T., November 29, 2004, at 33:21 - 34:21, 78:4 -7 (Exhibit 2); Curley N.T., December 9, 2004, at 109:3 - 110:5 (Exhibit 3). Sometime in 1976, AETC approached Mr. Curley to offer AETC's services to haul away and dispose of certain Ashland wastes. Leuzarder N.T., November 29, 2004, at 78:13 - 23 (Exhibit 2); Curley N.T., December 9, 2004, at 110:24 - 111:9 (Exhibit 3). Pursuant to that agreement, AETC was responsible for hauling away and disposing of certain hazardous waste streams generated by Ashland including a highly concentrated acid waste stream. Leuzarder N.T., November 29, 2004 at 89:18 - 90:20, 92:10 - 25; 114:21 – 115:11 (Exhibit 2); Curley N.T., December 9, 2004 at 111:2 - 23 (Exhibit 3); Letter

---

(...continued)
"suit" who ordered a truck driver to go do the dirty work that is and should be liable, not the person who simply drove the truck.

from AETC to Art Curley dated 8/3/76 (Exhibit 4); Letter from Diaz to Landmesser dated 4/14/77 (Exhibit 5); AETC Invoice #002382 to Diaz dated 3/7/77 (Exhibit 6).

AETC then attempted to identify someone who could actually perform the hauling and disposing of Ashland's waste streams. Leuzarder N.T., November 29, 2004, at 33:18 - 34:9, 35:18 - 36:10 (Exhibit 2); Curley N.T., December 9, 2004 at 111:24 - 113:7 (Exhibit 3); Leuzarder N.T., December 6, 2004, at 207:14 - 208:4 (Exhibit 7). AETC entered into an oral agreement with DeRewal whereby AETC delegated to DeRewal the task of picking up the waste streams from Ashland and disposing of them for a per-gallon fee charged to AETC. Leuzarder N.T., November 29, 2004, at 48:19-24, 52:25 - 53:5, 58:16 - 59:25 (Exhibit 2); Leuzarder N.T., December 6, 2004, at 161:13-23 (Exhibit 7); AETC 130, 132, ASHL00249 (Exhibit 8). The terms of the agreement between Ashland and AETC are set forth in a contract between them, an unsigned copy of which still exists today. Agreement of Contract between AETC and Ashland [undated] (Exhibit 9). The contract requires AETC to "properly dispose" of Ashland's waste "in strict conformity with…all legal requirements." (Exhibit 9, ¶ 1, 3). The contract also specifies that, upon removal of Ashland's waste from the Great Meadows Facility, the waste becomes AETC's property. Exhibit 9, ¶ 4. Ashland had no agreement whatsoever with DeRewal and, from Ashland's perspective, the identity of the entity which actually hauled the waste was up to AETC; Ashland's only agreement was with AETC. Leuzarder N.T., November 29, 2004, at 61:18-20 (Exhibit 2); Landmesser N.T., December 6, 2004, at 147:25 - 148:2 (Exhibit 10); Curley N.T., December 9, 2004, at 118:14-18, 120:7-13, 130:4 - 131:22 (Exhibit 3).

Although Ashland paid AETC to ensure that Ashland's waste was hauled and disposed of in a proper legal manner, AETC failed to verify DeRewal's credentials or that

DeRewal was handling Ashland's waste properly. Curley N.T., December 9, 2004, at 127:2-14 (Exhibit 3). DeRewal himself told Leuzarder and Landmesser, shortly after AETC entered into its agreement with DeRewal for the handling of Ashland's waste, that he had formerly run afoul of environmental regulations and that the state environmental regulators did not think well of him. Memo from A.T. Curley to file dated 9/20/76 (Exhibit 11). Likewise, other than one visit (reluctantly agreed to by Mr. Leuzarder at Mr. Curley's urging) by Mr. Leuzarder to DeRewal's Wissinoming "operation" approximately two months after DeRewal began handling Ashland's waste, AETC took no steps to ensure that DeRewal was disposing of Ashland's waste in the manner he represented. *Id.*; Memo from A.T. Curley to J. Minott/W.R. Starkey dated 10/19/76 (Exhibit 12); Landmesser N.T., December 6, 2004, at 151:14 - 152:13, 175:23 - 177:18 (Exhibit 10). Mr. Leuzarder had no chemical training and was not qualified to assess the viability of DeRewal's Wissinoming operations, which Mr. Curley himself found to be slipshod. Memo from A.T. Curley to W.R. Starkey dated 4/14/77 (Exhibit 13); Leuzarder N.T., November 29, 2004, at 38:1-6 (Exhibit 2); Curley N.T., December 9, 2004, at 129:5-13 (Exhibit 3).

Notwithstanding the suspect nature of the Wissinoming operation, and AETC's contemporaneous awareness of the great potential for illegal waste disposal by haulers at this time, AETC never verified with DeRewal, or by any other means, that Ashland's waste even went to Wissinoming. Leuzarder N.T., November 29, 2004, at 69:3-17, 73:13 - 74:6 (Exhibit 2). Instead, AETC "took [DeRewal's] word for it" that DeRewal was qualified to haul and dispose of a highly concentrated, volatile acid waste stream in bulk loads, without so much as checking DeRewal's driving record, much less his background, or other credentials. Leuzarder N.T., November 29, 2004, at 57:1-21 (Exhibit 2); Leuzarder N.T., December 6, 2004, at 168:5-11, 173:18-174:4 (Exhibit 7).

These two agreements proceeded as planned. Ashland would call AETC when it had a load of waste to dispose of and would prepare a bill of lading "consigning" that load to AETC. AETC Brief at 8; Leuzarder N.T., November 29, 2004 at 49:2-15, 51:8-52:5, 65:22-66:21 (Exhibit 2); *e.g.*, ASHL0005 (Exhibit 14). The bill of lading itself defines the terms used therein. It indicates that the entity to whom the bill of lading consigns the waste is a "carrier," and that the carrier is "any person or corporation in possession of the property under the [bill of lading]. *E.g.*, ASHL00048, 124 (Exhibit 14). AETC would call DeRewal and instruct DeRewal to go to Ashland and pick up the waste. AETC Brief at 8; Leuzarder N.T., November 29, 2004, at 65:24-66:8 (Exhibit 2). A DeRewal driver would arrive at Ashland, pick up the waste, and sign the bill of lading on the signature line where "AETC" had been typed in by Ashland. *E.g.*, ASHL0005 (Exhibit 14); Curley N.T., December 9, 2004, at 133:19-20 (Exhibit 3); Manfred DeRewal, Jr., N.T., May 13, 2003 at 408:1-16 (Exhibit 15); Leuzarder N.T., November 29, 2004, at 49:2-8, 51:8 - 52:5 (Exhibit 2). AETC billed Ashland for the load at the Ashland contract price, received payment from Ashland, and then paid DeRewal the price agreed to between AETC and DeRewal. Leuzarder N.T., November 29, 2004, at 48:19-24. Exhibit 2; *e.g.*, ASHL00249 (Exhibit 8).

In or about January, 1977, AETC made a similar arrangement with Diaz to remove and dispose of a concentrated sulfuric and nitric acid waste stream that Diaz generated at its facility located in Holly, New York. Letter from AETC to Diaz dated 1/7/77 (Exhibit 16); Landmesser N.T., December 6, 2004, at 172:25 - 173:4, 183:1-23 (Exhibit 10). Once again, AETC charged Diaz a per-gallon charge to remove and dispose of the Diaz waste then, through a separate arrangement with DeRewal, paid DeRewal to do the work. Exhibit 16; Exhibit 6, DeRewal Invoice #1401 to AETC dated 3/31/77 (Exhibit 17); Landmesser N.T., December 6,

2004, at 161:13-20 (Exhibit 10). All of the contracting documents between AETC and Diaz follow the pattern of the Ashland contracting documents. *E.g.*, BSAI029142, 144 (Exhibit 18); Exhibit 17; BSAI1050935 (Exhibit 19).

AETC knew or should have known before beginning its business relationship with DeRewal that DeRewal was a polluter. Both Messrs. Leuzarder and Landmesser testified at their depositions that they were in close contact with state environmental regulators during the relevant time period. Leuzarder N.T., November 29, 2004, at 28:17 - 29:7, 30:24 - 31:10, 32:22 - 33:13 (Exhibit 2); Landmesser N.T., November 22, 2004, at 87:7-11, 142:14-24, 144:3-5 (Exhibit 1). By 1976 DeRewal had established a lengthy track record of pollution citations involving the Boarhead Farms site. *See, e.g.*, February 14, 1973 Waste Discharge Inspection Report (full barrels of waste and tanker trucks); March 5, 1973 Waste Discharge Inspection Report ("Pools of waste on ground surface"); March 21, 1973 clean-up agreement; January 8, 1974 Bucks County Memorandum (abatement order issued November 2, 1973 by Department of Environmental Resources) (collectively, Exhibit 20). AETC would have learned of these citations through a simple telephone call to the Pennsylvania authorities. Indeed, Mr. DeRewal himself informed Messrs. Leuzarder, Landmesser, and Curley that he had previously run afoul of environmental regulations and that the environmental regulators were not favorably disposed to him. Exhibit 11. A contemporaneous memo written by Mr. Curley of Ashland describes a visit he made to the Site "[a]t [Mr. Curley's] insistence" with Messrs. Leuzarder and Landmesser. *Id.* During this meeting at the Site, Mr. Curley asked Mr. DeRewal how the Department of Environmental Resources would view him and described Mr. DeRewal's response in the following way:

> …[Mr. DeRewal] honestly stated [the Department of Environmental Resources.] would down grade [sic] him. [Mr.

> DeRewal] has been fined on several occasions for pollution. [Mr. DeRewal] apparently was in the headlines few [sic] years back for pollution.

*Id.*

The evidence, taken as a whole, shows that AETC knew or should have known that DeRewal was disposing of waste at the Site rather than the Wissinoming Facility. AETC failed to make any independent assessment of the viability of DeRewal's acid-neutralizing operation at the Wissinoming Facility prior to entering into an agreement with DeRewal for disposing of Ashland and Diaz waste. Instead, nearly two months after DeRewal started handling Ashland's waste, Mr. Leuzarder, who, of the two AETC principals, was the *least* qualified to assess DeRewal's operations, visited the Wissinoming Facility once with Mr. Curley. Memo to W.R. Starkey dated 8/23/76 (Exhibit 21); Exhibit 11; Exhibit 12; Curley N.T., December 9, 2004, at 128:24 - 129:4 (Exhibit 3); Leuzarder N.T., November 29, 2004, at 38:18 - 40:15 (Exhibit 2); Landmesser N.T., December 6, 2004, at 151:14 - 152:13, 173:18 - 174:10. (Exhibit 10). Mr. Curley, who was more qualified than Mr. Leuzarder to assess the operations at the Wissinoming Facility, was unimpressed with the operations. In addition to describing his impressions that AETC had neither seen the Wissinoming operation prior to representing to Ashland that DeRewal would take Ashland's waste to the Wissinoming Facility or knew very much about DeRewal and his methods, Mr. Curley described the Wissinoming operation as "not impressive" and "certainly not an ongoing chemical operation." Exhibits 21, 11, 12.

Aside from the obvious inadequacy of the Wissinoming operation for the disposal of Ashland and Diaz waste, there were clear indications that DeRewal was disposing of waste at the Boarhead Farms Site. At the September 20, 1976 meeting between Messrs. Landmesser, Leuzarder, Mr. DeRewal and Mr. Curley *at the Site*, Mr. DeRewal informed them that he intended to set up an acid neutralization operation at the Site. Exhibit 11. Acid wagons were

DMEAST #9580238 v4

8

parked on the Site during this meeting and observed by the meeting participants. *Id.*; Leuzarder N.T., November 29, 2004, at 43:14 - 44:23 (Exhibit 2). Furthermore, AETC had been informed both of an acid spill at the Site, in connection with which Mr. DeRewal had been burned, and Mr. DeRewal's rumored disposal of acid waste at the Site. *Id.*; Landmesser N.T., December 6, 2004, at 154:18 - 156:4 (Exhibit 10). Finally, at his deposition, Manfred DeRewal, Sr. testified that he told AETC's two principals, while standing at the Boarhead Site, that Ashland's waste was going to be disposed of at the Boarhead Farm site. Manfred DeRewal, Sr. N.T., May 9, 2003 at 497:28-500:5, 532:9-534:8 (Exhibit 22). Mr. DeRewal also testified that at least one of the two AETC principals brought guns to shoot that day, and that Linda Cochran was present. *Id.* at 534:5-10. Ms. Cochran also testified that she was present at such a meeting. Linda Cochran N.T., May 15, 2003 at 74:2-76:15 (Exhibit 23).

A letter dated September 9, 1976 from Mr. Leuzarder to Mr. DeRewal indicates that AETC knew that DeRewal was not disposing of materials in the manner represented to the customer. Exhibit 24. In the course of confirming the terms of DeRewal's hauling and disposal of waste generated by another AETC customer, Roche-Belvidere, Mr. Leuzarder writes:

> Trucks must be clean and neat in appearance *Roche will be told materials is [sic] going to Gaess Landfill (can it - or at least part?)* and lime makeup.

*Id.* (emphasis added).

At his deposition, Mr. Leuzarder could not explain the meaning of the italicized portion of the above-cited parenthetical. Leuzarder N.T., December 6, 2004, at 206:1-15 (Exhibit 7). However, at the very least, the letter suggests that both AETC and DeRewal contemplated the possible destination for the Roche-Belvidere waste as somewhere other than where AETC had represented to Roche-Belvidere that its waste would be disposed.

AETC continued to provide removal and disposal services to Ashland and Diaz through the arrest of Mr. DeRewal and three of his employees by the Philadelphia Police Department on March 29, 1977 for dumping waste directly into the Delaware River. March 29, 1977 Complaint (Exhibit 25); *e.g.*, BSAI029261, BSAI029263 (Exhibit 18); Ashland Disposal Logs post-dating March 29, 1977 (Exhibit 26); Curley N.T., December 9, 2004 at 136:4 - 11 (Exhibit 3). AETC thereafter fulfilled its contractual obligations to Ashland and Diaz by hiring another disposal contractor to pick up and dispose of the wastes from Ashland and Diaz. AETC Brief at 9; Exhibit 26; AETC 191-194, 196 (Exhibit 27).

## ARGUMENT

I. **AETC IS A PERSON WHO ARRANGED WITH A TRANSPORTER FOR TRANSPORT FOR DISPOSAL OF HAZARDOUS SUBSTANCES OWNED OR POSSESSED BY AETC**

Section 113 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") provides that a person may seek contribution "from any other person who is liable or potentially liable under section 9607(a) of this title . . . ." 42 U.S.C. § 9613(f)(1). Section 9607(a) provides, in relevant part, that persons who are liable include: "[a]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . ." 42 U.S.C. § 9607(a)(3). Thus, a person may be liable as an "arranger" either by directly arranging for the disposal or treatment of hazardous substances *or* by arranging with a transporter, which transporter then hauls those substances somewhere for disposal or treatment.