# EXHIBIT 8

EXPERT REPORT OF DEFENDANT AETC

AGERE SYSTEMS V. AETC ET AL.
CIVIL ACTION NO. 02-3830 (LDD)
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT
OF PENNSYLVANIA



**EXPERT REPORT OF DEFENDANT AETC**

**AGERE SYSTEMS V. AETC ET AL.**
**CIVIL ACTION NO. 02-3830 (LDD)**
**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT**
**OF PENNSYLVANIA**

PREPARED FOR:

THOMAS SABINO, ESQ.
WOLFF & SAMSON PC
ONE BOLAND DRIVE
WEST ORANGE, NEW JERSEY 07052

PREPARED BY:

Kenneth Goldstein, P.E.

**Ransom Environmental**
**2127 Hamilton Avenue**
**Hamilton, New Jersey**

**Ransom Project # 060150**

**September 2006**



# TABLE OF CONTENTS

1.0    PURPOSE AND SCOPE ................................................................... 1

2.0    QUALIFICATIONS AND EXPERIENCE .................................. 2

3.0    FACTUAL BACKGROUND ............................................................ 3

4.0    STATE OF THE ART OF HAZARDOUS WASTE MANAGEMENT IN 1970 ........ 4

5.0    EVALAUTION OF AETC ............................................................... 11

6.0    EVALUATION OF AETC – DEREWAL RELATIONSHIP ..................................... 15

7.0    OPINIONS ......................................................................................... 21

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

## 1.0    PURPOSE AND SCOPE

This expert report has been prepared by Ransom Environmental (Ransom) of Hamilton, New Jersey, for Wolff & Samson PC, counsel representing Advanced Environmental Technology Corporation (AETC) in the matter of the Agere Systems v. AETC, et al. The matter involves a Complaint filed by Plaintiffs[1] seeking damages related to the cleanup of the Boarhead Farms Superfund Site in Bridgeton Township, Pennsylvania (Site).  AETC is one of several Defendants named in the Amended Complaint.

The opinions presented herein are based on information provided by counsel, including correspondence, memoranda, bills of lading, invoices, deposition testimony and other such materials.  In addition, Ransom was asked to review three expert reports provided by the Plaintiffs[2] in this matter. None of the three expert reports reviewed by Ransom provides a nexus between AETC and the hazardous waste allegedly improperly discharged at the Site.  In fact, the only mention of AETC is in the reiteration of the litigation caption in one of the reports.

Nonetheless, counsel has requested that Ransom assess the actions of AETC in providing brokering services to two hazardous waste generators whose wastes were allegedly improperly disposed at the Site in the 1976 – 1977.

Ransom's opinions are also based on our knowledge of the applicable Federal, Pennsylvania and New Jersey regulations, as well as professional experience.  Ransom reserves the right to supplement this report as additional information becomes available.  This report has been prepared to a reasonable degree of scientific certainty.

---

[1] The Plaintiffs, formerly known as the Boarhead Farms Agreement Group, consists of Agere Systems, Inc., Cytec Industries, Inc., Ford Motor Company, SPS Technologies, LL and TI Group Automotive Systems, LLC.
[2] Report of Expert Witness; Boarhead Farms Agreement Group v. Advanced Environmental Technology Corporation, et al., Jurgen H. Exner, Ph.D., June 29, 2006
   Report of Raymond F. Dovell, CPA re: Boarhead Farms Superfund Site; Asset Searched for Manfred T. DeRewal and Certain Other Parties, June 29, 2006
   Expert Report of Jay Vandeven re: Boarhead Farms Superfund Site, June 30, 2006

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

## 2.0    QUALIFICATIONS AND EXPERIENCE

The opinions expressed herein are those of Kenneth Goldstein, P.E.  Mr. Goldstein is Director of Technical Services at Ransom, and possesses thirty years of professional experience in the private and public sectors.  He has a broad range of technical and regulatory expertise in soil and groundwater remediation, waste disposal requirements, underground storage tank (UST) management, wastewater treatment processes, and stormwater management.

Mr. Goldstein has worked as a consultant in the private sector for 14 years.  For 16 years prior to joining the private sector, Mr. Goldstein held various managerial positions in the New Jersey Department of Environmental Protection (NJDEP), including Chief of the Bureau of Underground Storage Tanks, Chief of the Bureau of Applicability and Compliance, and Chief of the Industrial Pretreatment Section.  He directed or assisted in the development and implementation of new regulatory programs for USTs, industrial pretreatment, and sludge management, including the development of the New Jersey Pollutant Discharge Elimination System (NJPDES) regulations.

Mr. Goldstein's resume and a list of his recent expert witness experience are provided in Appendix A.

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

## 3.0    FACTUAL BACKGROUND

The following section is provided for context. Greater details are available in various documents within the project file. A list of relevant documents reviewed is provided in Appendix B.

In the 1976-77 timeframe, AETC's business operations consisted of bringing together generators of hazardous waste with facilities that provided waste disposal alternatives. Two of AETC's customers during this time period, Ashland Chemical Company (Great Meadows, New Jersey) and Diaz Chemical Corporation (Holley, New York), generated highly acidic waste streams and more dilute acidic waste streams. AETC became aware of an acid treatment (via neutralization) and disposal facility in the Wissinoming section of Philadelphia operated by DeRewal Chemical Company (a/d/a Environmental Chemical Control).[3] AETC brokered business deals between these two generators and the treatment and disposal facility, whereby DeRewal Chemical Company would come to the two chemical manufacturing facilities and collect the waste streams into tanker trucks. The tanker trucks owned by DeRewal Chemical Company would transport the waste streams to the Philadelphia facility operated by DeRewal Chemical Company for proper treatment and disposal. Unbeknownst to these two generators and AETC, DeRewal Chemical Company improperly and secretly transported some of that waste stream to an isolated, rural, property owned by Manfred DeRewal, which later became known as the Boarhead Farms Superfund Site, where the waste streams were allegedly discharged to the ground without treatment. During the same time period, DeRewal Chemical Company was surreptitiously discharging acidic waste streams directly into the Delaware River. AETC had ceased doing business with DeRewal Chemical in early 1977 following a dispute over monies owed and permanently ceased relations when DeRewal Chemical Company's surreptitious illegal disposal practices were discovered by Pennsylvania authorities in 1977.

---

[3] Although AETC primarily knew of the company as Environmental Chemical Control, Inc. in the 1976-1977 time frame, for the purposes of this report, the company name DeRewal Chemical Company will be used.

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

## 4.0     STATE OF THE ART OF HAZARDOUS WASTE MANAGEMENT IN 1970S

### 4.1     National Program

In 1970, the Congress identified hazardous waste storage and disposal as a problem of grave national concern. Section 212 of the Resource Recovery Act of 1970 required EPA prepare a comprehensive report to the Congress on hazardous waste storage and disposal. The June 30, 1973 report entitled, *Disposal of Hazardous Waste*, concluded that:[4]

-     the management of the Nation's hazardous residues is generally inadequate;

-     public health and welfare are threatened unnecessarily by uncontrolled waste discharge; and

-     hazardous waste disposal on the land is increasing.

Due to a lack of regulatory oversight and enforcement, waste generators had little or no pressure to properly manage their hazardous waste disposal practices.[5]     Few controls existed over hazardous waste. With permissive or totally absent legislation, the most inexpensive disposal method was generally used regardless of environmental consequences. As a result, public health and the environment were threatened.[6]

Both principals from AETC testified in this litigation that hazardous waste transport and disposal were handled by garbage men during this time period, implying the lack of sophistication and effective government controls on the management of these wastes.[7] [8]

To address the identified problems, Congress passed the Resource Conservation and Recovery Act (RCRA) on October 21, 1976. Congress intended RCRA to insure that hazardous wastes

---

[4] Report to the Congress, *Hazardous Waste Programs Will Not be Effective: Greater Efforts are Needed,* prepared by the Comptroller General, United Stated General Accounting Office, January 23, 1979, p.2
[5] Report to Congress, January 23, 1979, p.2
[6] Report to the Congress, *How to Dispose of Hazardous Waste – A Serious Question That Needs to be Resolved,* prepared by the Comptroller General, United Stated General Accounting Office, January 23, 1979, p.2
[7] Deposition of Robert Landmesser, November 22, 2004, p.32
[8] Deposition of John Leuzarder, November 29, 2004, p.13

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

would be properly managed and sought to regulate them from 'cradle to grave.'[9] RCRA banned all open dumping of waste, encouraged source reduction and recycling and promoted the safe disposal of municipal waste.

EPA was given 18 months to prepare rules and regulations governing waste disposal, but the task was much greater and would take longer than Congress anticipated.[10]     The two reports to Congress by the Government Accounting Office (GAO) during the time period while EPA was preparing rules provide a glimpse into the issues faced by EPA in regulating hazardous waste.

The primary components of the RCRA rules under preparation included:
- development of a definition of hazardous waste;
- establishment of a manifest system to track wastes from point of generation to ultimate disposal at a permitted Treatment, Storage, and Disposal (TSD) facility; and
- development of standards for the operation of TSDs.[11]

However, the problem across the nation was that there was a shortage of acceptable disposal facilities at that time, and the GAO and EPA were concerned that the disposal problem would become more acute as 1) additional wastes were added to the hazardous waste list, 2) wastes previously stored in an environmentally unsound manner would now require proper disposal, and 3) wastes previously treated and disposed on company property would now be transported to approved offsite disposal facilities.[12]

The concern regarding the disposal situation was compounded by the simple lack of available data on hazardous waste generation and disposal. The GAO visited or contacted officials in 26 states regarding the status of their hazardous waste programs. The state regulators did not know the volume of hazardous waste generated nor could they adequately account for the disposition

---

[9] Report to Congress, January 23, 1979, p.2
[10] EPA was required to develop the regulatory framework by April 21, 1978, but the rules were not promulgated until May 19, 1980.
[11] Report to Congress, December 19, 1978, p.3
[12] Report to Congress, December 19, 1978, p.i

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

of these wastes.[13]    According to a January 1977 EPA report, 24 states did not have any incineration, treatment or disposal facilities.[14] As of March 1978, for example, New Jersey had only seven commercial offsite disposal facilities.  A prohibition existed against any dumping of hazardous waste in landfills; the last landfill (Kin-Buc) closed in June 1976.[15]

In order to eliminate the improper disposal of wastes, additional environmentally sound disposal facilities were critical to the successful implementation of the RCRA-mandated hazardous waste regulatory program.  Based on the GAO's survey, this capability did not exist in 1978.[16]   The GAO concluded that until a regulatory program was in place and enforced, there would be minimal development of new facilities which would meet the strict environmental standards necessary to provide environmentally sound disposal of hazardous waste.  Thus, until regulations were developed and enforced, generators of hazardous waste could choose to avoid paying the high cost of disposal at existing specially designed and acceptable facilities.[17]   More critically, generators could not be certain that the government agencies had thoroughly inspected and approved treatment and disposal facilities which claimed to be in compliance.

RCRA also promoted the reduction in the volume of the hazardous wastes generated.  Such steps as the reduction or the elimination of hazardous wastes by the substitution of less hazardous raw materials, and better internal quality control procedures to reduce lost product (and thus reduce the volume of wastes).  Other techniques such as the isolation of the hazardous waste stream from other waste streams (and thus reduce the hazardous quantity); reduction of the volume of waste via dewatering; and material recovery and reuse did not gain general acceptance or wide use because land disposal was acceptable and cheaper.  These techniques of reducing the overall volume of hazardous wastes were expected to become more cost competitive as more stringent controls over disposal and increased enforcement cause disposal costs to increase.[18]

---

[13] Report to Congress, January 23, 1979, p.5
[14] Report to Congress, December 19, 1978, p.1
[15] Report to Congress, December 19, 1978, p.6
[16] Report to Congress, December 19, 1978, p.5
[17] Report to Congress, December 19, 1978, p.4 – Quote from National Solid Waste Management Association.
[18] Report to Congress, December 19, 1978, p.18

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

## 4.2    New Jersey Regulatory Program Prior to Adoption of RCRA Rules[19]

### 4.2.1    1970

The hazardous waste management program in New Jersey appears to have originated in the adoption of Chapter VIII of the New Jersey Sanitary Code, effective date July 1, 1970.  These rules were adopted by the New Jersey Department of Health (NJDOH).  The NJDEP was formed about the same time as the rule adoption, and thus was responsible for its implementation.

Regulation 6c is entitled, <u>Hazardous and/or Chemical Wastes, Excluding All Radioactive Waste.</u>  The three subparts of Regulation 6c were geared towards the Waste Producer, Hauler and Receiver (defined as landfill operator, chemical incinerator operator, recovery operator or treatment operator) respectively.

The Waste Producer was responsible for providing labels in accordance with Federal regulations for Explosives and Other Dangerous Articles (presumed to be Department of Transportation rules) and otherwise "provide such information s may be required to insure safe disposal."  The Waste Producer was also responsible for issuing a bill of lading to accompany the waste shipment which purpose is to communicate potential hazards to handlers of the waste.  The bill of lading was intended to identify the type of waste, whether flammable liquid or solid, combustible, dangerous when wet (reactive), oxidizing agent, acid, caustic or other hazards.

The Hauler was responsible for operating under existing state transportation laws, but no details are provided in the Sanitary Code.

The Receiver, along with a general requirement to "operate in compliance with all laws and regulations," had to comply with the following prohibition:  "No chemical wastes, liquid or solid shall be deposited in direct or indirect contact with surface or groundwaters of the State."

---

[19] AETC was a New Jersey based company, as was its customer Ashland Chemical

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

The Code does not define hazardous or chemical wastes.

## 4.2.2   1974

Although the NJDEP promulgated a series of amendments to the hazardous waste regulations in the 1972-3 time frame, including the codification of the rules as N.J.A.C. 7:26, very little changed in the requirements from the Sanitary Code adoption in 1970. NJDEP did prepare a definition of hazardous waste, but it was not very detailed or useful.

However, in June 1974, a broader amendment to the rules provided a more substantial change to the hazardous waste management program. A detailed definition of hazardous waste was provided for the first time, which included references to the federal Occupational Safety and Health Administration (OSHA) and DOT lists of toxic materials, plus generic criteria for other material that exhibits toxic, corrosive, irritating or sensitizing, radioactive, biologically infectious, explosive or flammable characteristics.

The hazardous waste generator has similar requirements as the Waste Producer, but has the added responsibility to assure that the carrier transporting the waste is registered with NJDEP and that the shipment is consigned to a Solid Waste Facility (SWFs) registered with and authorized by the NJDEP. This is first example in the state rules of the cradle to grave notion of having the generator focus on the final disposition of the waste. Generators were also required to submit a list of wastes disposed and their disposal locations to the NJDEP on an annual basis. This allowed the NJDEP to start tracking the volume of wastes generated.

Hauler responsibilities were similar to the 1970 Sanitary Code, with the inclusion of a hauler registration program.

Operators of SWFs had to maintain operating records of all hazardous waste received, including date received, material, source (generator), quantity, carrier, shipping document number, and type of treatment or disposal location. These records would allow NJDEP to track the disposal of hazardous wastes. Additionally, all SWFs receiving hazardous wastes were required to install

monitoring wells to test if groundwater contamination was occurring as a result of the waste disposal practices. Finally, a ban on disposal of hazardous waste in SWFs (i.e. landfills) after March 15, 1975 was imposed, unless the SWF had installed a leachate collection system approved by the NJDEP.

### 4.2.3    1978

The rules were further amended in May 1, 1978 to include the category of "special wastes" which had a similar, although not identical, definition as hazardous waste. The intention of the NJDEP in establishing this separate category is not clear from the regulations. The definition of special waste appears to be more inclusive of additional toxic materials. Aside from the change in terminology, the 1978 rules contained further requirements on generators, haulers and disposal facilities of special wastes. Of most import was the imposition of the requirement for all three partied to utilize a state-issued manifest form. The five-part form was completed by the three entities as the waste was moved from generator to transporter to disposer. After the generator filled out the form initially, he retained copy E and sent copy D to the NJDEP. The other three copies went with the transporter to the disposer. After both signed the remaining three forms, the hauler kept copy C, the disposer kept copy B, and the disposer sent copy A to the NJDEP. With this new manifest system in place, NJDEP would be able to track each waste shipment from its point of origin to its disposal location. In addition, each entity of the transportation process also was responsible for ensuring that the waste followed its intended path to its final destination.

### 4.2.4    Conclusions

1.    The NJDOH and the NJDEP were aware of the problem of hazardous waste disposal in 1970 and adopted regulations to control the transport and disposal of such wastes.
2.    The rules evolved over time to require generators to identify the disposal facility and eventually complete manifest forms to track the waste from its origin to its treatment or disposal point.

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

3.    By 1974, NJDEP was aware that unmanaged disposal of hazardous wastes into landfills was contaminating groundwater and banned all future disposal into landfills after March 1975.

## 4.3    Pennsylvania Regulatory Program Prior to Adoption of the RCRA Rules

The Pennsylvania Department of Environmental Protection (PADEP) regulated waste materials under the authorization of the Solid Waste Management Act of 1968 and Chapter 75, Solid Waste Regulations, promulgated in 1971. These rules were amended in 1977 to specifically define and manage hazardous wastes.

Pennsylvania state officials acknowledge that as of December 1977, they had not implemented a viable hazardous waste program. In a November 1976 report, the Division of Solid Waste Management estimated that only 10% of the hazardous waste generated was subject to enforcement, while 90% was unregulated and uncontrolled.[20]

---

[20] Report to Congress, January 23, 1979, p.9

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

## 5.0    EVALUATION OF AETC

### 5.1    The Start-up of AETC

AETC was established in August 1976 by Robert Landmesser and John Leuzarder. The business was located in Leuzarder's garage at his residence in Randolph, New Jersey.[21]  Immediately prior to this date, Landmesser and Leuzarder were co-workers at Scientific Inc., a company specializing in waste management activities.[22]  The individuals were terminated from their positions at Scientific Inc. in July 1976.  Landmesser believed that he was terminated because he was "too environmentally sensitive."[23]  Leuzarder stated that the reason for his termination was his dislike of the flawed disposal protocol at the Kin-Buc Landfill located in Edison, New Jersey, owned and operated by Scientific, Inc.[24]

From the beginning, AETC was determined to see an ethical treatment of customers and their waste materials.[25]  Without a thorough Federal or State regulatory program in place, hazardous waste was handled by garbage men.[26] [27]  Leuzarder felt that the disposal practice at Kin-Buc of pouring the hazardous wastestream directly onto trash was "extremely archaic."[28]  He strove to bring professionalism into an industry that did not have it.[29]  Due in large part to the unsophisticated methods of waste disposal, Kin-Buc charged lower prices to accept waste.  Once regulations were passed [outlawing landfill acceptance of hazardous wastes in 1974], then industries had to pay more to dispose of their waste streams at proper disposal facilities.[30]  AETC was determined to ally itself, as a broker, with organizations that would be willing to pay the

---

[21] Deposition of Robert Landmesser, November 22, 2004, p.33-4
[22] Scientific Inc. was also referred to as SCA, Gaess and Earthline in the documents – the precise timing of the corporate nomenclature is not relevant to this report.
[23] Deposition of Robert Landmesser, November 22, 2004, p. 26
[24] Deposition of John Leuzarder, November 29, 2004, p. 20
[25] Deposition of John Leuzarder, November 29, 2004, p. 13
[26] Deposition of Robert Landmesser, November 22, 2004, p. 32
[27] Deposition of John Leuzarder, November 29, 2004, p. 13
[28] Deposition of John Leuzarder, November 29, 2004, p. 14
[29] Deposition of John Leuzarder, November 29, 2004, p. 22
[30] Deposition of John Leuzarder, November 29, 2004, p. 14

right price to handle, recycle and dispose of materials correctly.[31]   Leuzarder had a succinct personal goal to "prevent improper dumping."[32]

## 5.2    AETC Business Practices

AETC's primary business objective in its infancy focused on finding alternatives to help customers recycle, recover and properly dispose of hazardous and nonhazardous waste materials.[33] In other words, AETC acted as a broker that tried to match the client's needs for waste management with facilities that provided services to address that need [34]

In order to provide this service, AETC sought out legitimate haulers and disposal sites.  Disposal sites were routinely investigated and discussed with the NJDEP.   The company's goal was to protect AETC and customers from unscrupulous disposal facilities.[35]

AETC provided waste management services by helping identify the chemicals and other waste materials, helping segregate the material by compatibility and packaging per DOT specifications and making recommendations concerning the transport of waste material to State or EPA approved disposal sites.  AETC visited proposed disposal sites before any waste was sent to a site.  As a broker, AETC gave its customers options of disposal sites and the customer decided on the site based on location and price.[36]

During this time period, government regulations were in the process of changing.  Due to the closure of Kin-Buc, and the increased attention being paid by regulatory officials to waste disposal, AETC provided a valuable service by instructing customers on proper packaging and disposal of hazardous waste.[37]  In order to best assist its clientele, AETC developed a step-by-step process for customers to prepare Waste Information Profiles of the generated waste

---

[31] Deposition of John Leuzarder, November 29, 2004, p, 14-5
[32] Deposition of John Leuzarder, November 29, 2004, p. 29
[33] Deposition of John Leuzarder, November 29, 2004, p. 19-20
[34] Deposition of John Leuzarder, November 29, 2004, p. 21
[35] Deposition of John Leuzarder, November 29, 2004, p. 30-33
[36] Defendant AETC's Answer to Plaintiff's Interrogatories, August 16, 2004, #3
[37] Deposition of Robert Landmesser, November 22, 2004, p.61

streams.[38] The customer would identify the source and composition of the waste within the Waste Information Profile, including the collection and analysis of a sample of the waste stream to accurately characterize its composition. AETC urged its customers to evaluate internal (recycling or reuse) options first, then would discuss off-site disposal alternatives.[39] AETC considered itself to be in a partnership with its customers.[40] In part due to the Waste Information Profile, haulers liked working with AETC because they knew what they were hauling.[41]

While AETC later eventually (in 1978) was involved in the transport of small amounts of waste for its customers, the Plaintiffs do not allege that AETC itself directly transported any waste to the Site.[42]

AETC also eventually found a niche as emergency responders for spills of hazardous materials. Landmesser recalls working on over 400 cases in 1977-8 with the New Jersey State Police.[43] As a result of the volume of business; Landmesser and Leuzarder were not desperate for customers to make AETC a quick profit. AETC turned customers down if they did not like a customer's choice of a particular disposal option.[44] If AETC did not like dealing with a customer, they dropped them.[45] AETC eventually expanded to 22 locations, a testament to a successful business plan.[46]

AETC brokered disposal and shipping transactions. A DOT shipping document would be prepared, plus an invoice from the transporter or disposal facility to AETC and a second invoice from AETC to the customer. The second invoice would include a markup, which varied based on wastestream.[47]

---

[38] Deposition of Robert Landmesser, November 22, 2004, p. 75-6
[39] Deposition of Robert Landmesser, November 22, 2004, p. 85
[40] Deposition of Robert Landmesser, November 22, 2004, p. 116
[41] Deposition of Robert Landmesser, November 22, 2004, p.123
[42] Objections and Responses of Plaintiff to AETC's Initial Set of Interrogatories, September 14, 2004, #5
[43] Deposition of Robert Landmesser, November 22, 2004, p. 121
[44] Deposition of Robert Landmesser, November 22, 2004, p. 82
[45] Deposition of Robert Landmesser, November 22, 2004, p.117
[46] Deposition of Robert Landmesser, November 22, 2004, p. 48
[47] Deposition of John Leuzarder, November 29, 2004, p. 49-50

## 5.3    AETC Stature

AETC's stature in the hazardous waste business community was significant in comparison to the company's size.  Landmesser met with DOT officials regarding transport of hazardous waste.[48] During the development of the state and federal hazardous waste regulations and programs, AETC individuals met with NJDEP and USEPA officials to provide their input.  Landmesser also participated in the writing of RCRA rules.[49]

AETC established, in conjunction with JT Baker Chemical Corporation, a training school focusing on hazardous waste management.[50]  The school trained hazardous waste generators and haulers in the intricacies of the new hazardous waste regulations.[51]  The training course was presented in 54 cities throughout North America.[52]

Leuzarder was involved with NJDEP in the late 1970s in setting up the new hazardous waste rules as well.  He also worked with the American Chemical Society for 1.5 years in Washington, contributing to the implementation of RCRA.[53]

## 5.4    Conclusions regarding AETC

a.    AETC was formed in 1976 by two individuals interested in improving the treatment, disposal and regulatory oversight of hazardous waste management.

b.    In its early years, AETC was a broker that brought together generators of hazardous waste and transporters and disposal facilities for hazardous waste.

c.    AETC did not own or operate a manufacturing facility that generated hazardous waste.

d.    In the 1976-1977 time frame, AETC did not own any transport vehicles capable of transporting acid waste streams.

[48] Deposition of Robert Landmesser, November 22, 2004, p. 32
[49] Deposition of Robert Landmesser, November 22, 2004, p. 56
[50] Deposition of Robert Landmesser, November 22, 2004, p. 65
[51] Deposition of Robert Landmesser, November 22, 2004, p. 65
[52] Deposition of Robert Landmesser, November 22, 2004, p. 132
[53] Deposition of John Leuzarder, November 29, 2004, p. 29

## 6.0     EVALAUTION OF AETC – DEREWAL RELATIONSHIP

### 6.1     Prior to DeRewal

During the same time period as the incorporation of AETC in 1976, the hazardous waste management industry in New Jersey was undergoing significant changes (see Section 4.0).

Prior to 1976, the Kin-Buc Landfill provided a legal, low-cost alternative for the disposal of certain difficult-to-manage hazardous waste streams.  Ashland Chemical (Ashland) produced an acid waste stream that was disposed at the Kin-Buc Landfill.  Art Curley, the plant manager of the Ashland facility in Great Meadows, knew John Leuzarder when Leuzarder worked for Scientific (Gaess), owners of the Kin-Buc Landfill.  Leuzarder, apparently expressing his concern about the "archaic" practices at the Landfill, told Curley that Kin-Buc was "overtaxed."[54]  Shortly thereafter, Kin-Buc was closed in April/May 1976.  By this time, Leuzarder has started AETC and went calling on Ashland to solicit business.  AETC was already handling disposal of Ashland's lab chemicals when the critical issue of the disposal of the acid stream arose, so AETC focused on that task.

Shortly thereafter, Ciba-Geigy, one of Landmesser's former clients at Scientific/Gaess, started to use DeRewal Chemical Company for the disposal of its similar acid waste stream.  Ciba-Geigy's waste previously went to Kin-Buc until the closure in April/May 1976.[55]  AETC saw the opportunity to broker a disposal agreement between Ashland and DeRewal.  The introduction of DeRewal to Ashland by AETC assisted Ashland greatly.  Curley was very grateful to AETC for its effort to assist them.[56]

---

[54] Deposition of Arthur Curley, December 9, 2004, p. 108-9
[55] Deposition of Robert Landmesser, November 22, 2004, p. 166-7
[56] Deposition of Arthur Curley, December 9, 2004, p. 108-9

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

## 6.2    Meeting Manfred DeRewal

AETC's first involvement with DeRewal Chemical Company was through Ciba-Geigy, who was using DeRewal for disposal of its nitration acid wastestream.[57]   Thereafter, Leuzarder met Manfred DeRewal at his residence, Boarhead Farms, in 1976. Mr. DeRewal came across as extremely knowledgeable as to the treatment of acid waste.[58]   AETC was satisfied that DeRewal's state permits and familiarity with acid made DeRewal Chemical Company the correct choice for its customers.[59]   Landmesser recalled that Mr. DeRewal had licenses from "agencies."[60]  During one of his site visits, Leuzarder saw the discharge permit that DeRewal Chemical Company held for discharge of wastewater effluent from neutralization facility into the river.[61]

Landmesser and Leuzarder trusted Mr. DeRewal; Mr. DeRewal represented that the permits were up-to-date and authorities approved him.[62]   A standard paragraph in the proposals by DeRewal Chemical Company to treat waste streams stated that DeRewal will perform its services in full compliance with all existing local, state and federal laws.[63]   AETC requested, and received, a Certificate of Insurance issued on behalf of DeRewal Chemical Company, naming AETC as an additional insured.[64]

Manfred DeRewal also intrigued AETC's business and societal desire to reduce or entirely eliminate hazardous waste streams.  DeRewal Chemical Company occasionally sold acid from Diaz directly to fertilizer companies.[65]  There were ongoing discussions between the generators, AETC and Mr. DeRewal regarding a proposal by DeRewal Chemical Company to distill the acid

---

[57] Deposition of Robert Landmesser, November 22, 2004, p. 145
[58] Deposition of John Leuzarder, November 29, 2004, p. 36
[59] Deposition of John Leuzarder, November 29, 2004, p. 54-57
[60] Deposition of Robert Landmesser, December 6, 2004, p. 169
[61] Deposition of John Leuzarder, November 29, 2004, p. 39
[62] Deposition of John Leuzarder, November 29, 2004, p.68
[63] Exhibits P-9 and P-44
[64] AETC104
[65] Deposition of Robert Landmesser, December 6, 2004, p. 175

wastestream and thus reuse a portion of the waste. The reused portion would therefore not have to be disposed, which appealed to AETC. The proposal never came to be implemented.[66]

Curley was also impressed with Manfred DeRewal's strong chemistry background and knowledge of waste chemicals and metal recovery. "I get the impression that DeRewal is a very innovative person, who can and will come up with solutions to problems. I do not feel he is the type to dump wastes in the first hole he can find."[67]

## 6.3    Wissinoming Treatment Facility

The DeRewal Chemical Company operated an acid neutralization facility in the Wissinoming section of Philadelphia. Leuzarder went to visit the Wissinoming facility in October 1976.[68] During visits to the facility, Leuzarder observed large piles of lime used by DeRewal to neutralize the strong acid.[69]    To AETC's eyes, DeRewal seemed to be the only people who knew how to handle the nitrating acid. DeRewal could manage 1-3 loads per week; 3000 gallons per load.    Ashland gave a 'paper analysis' to DeRewal presumably to assist in the treatment of the waste.[70] Overall, Leuzarder was impressed with DeRewal's system.[71]

Curley also visited the Wissinoming facility in October 1976, two months after initiating the waste shipments to DeRewal, and recalled observing the lime slurry injection treatment system. Although Curley, who was used to the technology of an industrial manufacturing facility, was "so-so impressed" with the facility, he was grateful that at least it was available.[72] The site visit satisfied Curley, who did not stop using DeRewal to treat the Ashland waste stream at the Wissinoming facility after the site visit.[73]

---

[66] Deposition of John Leuzarder, November 29, 2004, p. 121-123

[67] Exhibit Curley-5, Memo Curley to file 9/20/76
[68] Defendant AETC's Answer to Plaintiff's Interrogatories, August 16, 2004, #5
[69] Deposition of John Leuzarder, November 29, 2004, p. 45-46
[70] Deposition of John Leuzarder, November 29, 2004, p. 95-7
[71] Deposition of John Leuzarder, November 29, 2004, p. 85
[72] Deposition of Arthur Curley, December 9, 2004, p. 128-9
[73] Deposition of Arthur Curley, December 9, 2004 , p. 201

DeRewal had the equipment necessary to transport the strong nitrate and sulfuric acid.[74] When he met with Manfred DeRewal, Leuzarder observed acid tanker trucks parked at Boarhead. He knew they were for acid transport because they were smaller than normal trucks – acid is denser than most liquids and thus heavier.[75] He also observed that the trucks were placarded for corrosives.[76] Curley was very concerned about the proper handling of the waste acid. He was aware of dangers of acid waste and concerned that it was hauled properly, not in a regular tanker.[77] He provided sample results to AETC and encouraged the proper use of goggles, clothing and gloves.[78] It is apparent that if Curley felt that the acid was not transported properly, he would have terminated his business with DeRewal.

After five months of transport and disposal of Ashland's acid waste at Wissinoming, AETC brokered a business deal whereby acid waste generated by Diaz Chemical would be transported by DeRewal to Wissinoming for treatment.[79] Bills of lading indicate that Diaz-generated waste stream went to Wissinoming from January 1977 through April 1977.[80]

## 6.4    Termination of the use of DeRewal Chemical Company

Both Landmesser and Leuzarder had the expectation that the nitration acid from Ashland and Diaz would be transported to the Wissinoming facility for treatment by DeRewal.[81]

Manfred DeRewal and his employees were arrested in March 29, 1977 for discharging acid directly into the Delaware River. Further investigation revealed a series of previous improper discharges.[82]

---

[74] Deposition of Robert Landmesser, December 6, 2004, p. 170-1
[75] Deposition of John Leuzarder, November 29, 2004, p. 45
[76] Deposition of John Leuzarder, November 29, 2004, p. 44
[77] Deposition of Arthur Curley, December 9, 2004, p.118-9
[78] Deposition of Arthur Curley, December 9, 2004, p. 121
[79] Deposition of Robert Landmesser, December 6, 2004, p.156
[80] Exhibit P-52
[81] Deposition of Robert Landmesser, December 6, 2004, p. 173 and Deposition of John Leuzarder, November 29, 2004, p. 73.
[82] Deposition of David Michelman, December 1, 2004, p. 12

AETC permanently ended its relationship with DeRewal in March 1977 when they found out that "he was doing things in an improper way."[83] More specifically, Landmesser and Leuzarder found out that DeRewal was caught dumping acid into the Delaware River.[84] AETC had previously ceased business with DeRewal due to a dispute over money.[85] AETC learned about DeRewal's disposal of waste streams at Boarhead Farms site after cessation of relationship. Although both had visited Manfred DeRewal at Boarhead Farms, they believed the Farm was DeRewal's country residence. AETC never transported any waste to Boarhead Farms, nor did they broker any business deal that contemplated transport of any waste to Boarhead Farms.[86] The Diaz bills of lading indicate that Wissinoming was the destination of the waste.[87]

## 6.5    Conclusions regarding the AETC-DeRewal Relationship

a.    Manfred DeRewal was a knowledgeable individual in the treatment of hazardous waste, including the processes of neutralization, metal recovery, and distillation;

b.    DeRewal Chemical Company owned and operated a fleet of specialized tanker trucks, which were needed to transport strong acid wastes;

c.    Manfred DeRewal represented to AETC that DeRewal Chemical Company maintained permits for the discharge of wastewater from its Wissinoming facility and for its transport vehicles. Copies of documents shown to AETC confirmed this representation;

d.    The Wissinoming facility had the necessary equipment and materials to properly neutralize strong acid waste streams;

e.    AETC never accepted ownership of the wastes generated by Ashland or Diaz. The decision to utilize the DeRewal Chemical Company's treatment facility was made by Ashland and Diaz representatives;

f.    Manfred DeRewal and DeRewal Chemical Company deceived AETC and its customers into believing that the entirety of the transported waste streams were being

---

[83] Deposition of John Leuzarder, November 29, 2004, p. 53
[84] Deposition of John Leuzarder, November 29, 2004, p. 217
[85] Certification of Robert Landmesser, February 22, 2004
[86] Certification of Robert Landmesser, February 22, 2004
[87] Exhibit P-52

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

properly treated at the Wissinoming facility. In reality, some portion of the waste streams was being secretly and illegally discharged directly into the Delaware River and into the ground at Boarhead Farms, Manfred DeRewal's country residence.

## 7.0    OPINIONS

Based on the documents reviewed, I have developed the following opinions:

1.    The state of the art of hazardous waste management at the time of AETC's incorporation and the business deal with the DeRewal Chemical Company was best exemplified by the 1974 amendments to N.J.A.C. 7:26, which required that a hazardous waste generator properly label its waste material, provide a bill of lading to the hauler identifying the waste stream, and consign the waste stream to an approved hauler and disposal facility.  Based on the documents reviewed, AETC's customers satisfied these conditions.  The hazardous waste regulatory program in Pennsylvania, by the admission of its representatives, was not capable of effectively managing the generation, transport and disposal of hazardous waste in the state. Although RCRA was passed by Congress in October 1976, EPA had not yet had the opportunity to prepare regulations that implemented the new federal law. AETC conducted its business in compliance with the state of the art of hazardous waste management as it existed in 1976-77.

2.    The transport of highly acidic waste streams, as generated by Ashland Chemical and Diaz Chemical, required specialized equipment.  In the 1976 – 1977 time frame, AETC did not own any tanker trucks capable of transporting these waste streams.

3.    AETC did not own or operate a manufacturing facility that generated hazardous waste.  There is no evidence that AETC took ownership of any hazardous waste from either generator through a written document.  Even if such a document existed, based on my experience as a regulator, it is my opinion that the ownership of the hazardous waste could not pass from a generator to another party under waste management regulations.

4.    Manfred DeRewal and DeRewal Chemical Company deceived AETC and its customers into believing that the entirety of the transported waste streams were being properly treated at the Wissinoming facility.  In reality, some portion of the waste streams was being discharged surreptitiously directly into the Delaware River and into the ground at Boarhead Farms, Manfred DeRewal's country residence.

APPENDIX A

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

# APPENDIX A

## Resume of Kenneth Goldstein, P.E.

**KENNETH GOLDSTEIN, PE**
**Director of Technical Services**

## EDUCATION

**B.S. in Environmental Engineering**
Rensselaer Polytechnic Institute, Troy NY

**M.E. in Environmental Engineering**
Rensselaer Polytechnic Institute, Troy NY

## PROFESSIONAL REGISTRATIONS

< Professional Engineer: NJ-24GE03025000

< Professional Engineer: PA-PE031898E

< New Jersey Department of Environmental
  Protection (NJDEP) UST Certification for
  Subsurface Evaluation and Closure

< OSHA 40-hour Health & Safety Certification
  Training - Hazardous Waste and Emergency
  Response, 1993

< OSHA 8-hour Annual Update, 1994-Current

< NJDEP Cleanup Star

## PROFESSIONAL AFFILIATIONS

< New Jersey Water Environment Association

## TEACHING EXPERIENCE

Mr. Goldstein is an instructor for the UST
Recertification Course, required by the NJDEP
for certified individuals on a triennial basis.
Over the last 10 years, he has presented over 50
courses.

## GENERAL BACKGROUND

Mr. Goldstein has over 29 years experience in
the environmental industry before joining
Ransom Environmental as the Director of
Technical Services. His experience includes

more than 16 years in various managerial
positions in the New Jersey Department of
Environmental Protection, including
responsibility for the Underground Storage Tank
Program (Bureau Chief) and Industrial
Pretreatment Program (Section Chief), and
substantial involvement with the Residuals
Management, NJPDES, and Site Remediation
Programs.

Mr. Goldstein has nearly 13 years experience in
the environmental consulting business in the
Mid-Atlantic States, during which his
responsibilities included the management and
direction of a staff of engineers and geologists
responsible for the project management of
environmental compliance and remediation
issues for industrial, commercial, governmental
and residential clients. Responsibilities also
include performing marketing, strategic planning
and workload analysis functions.

Mr. Goldstein's responsibilities at Ransom entail
similar tasks, focusing on management and
oversight of environmental compliance and site
remediation projects for clients to achieve
compliance with State and Federal regulations.

## EXPERIENCE

< Project Manager for a former printed circuit
  board manufacturing facility in Rockaway,
  NJ. Directed Preliminary Assessment and
  soil and groundwater remedial investigation
  tasks. Contaminants consist of copper and
  chlorinated solvents. Additional site
  concerns involved impacts to proximate
  wetlands and high quality surface water.
  Extensive coordination is necessary as the
  client no longer owns the property.

< Project Manager for a former operating
  facility of a multinational chemical company
  that manufactured pesticides in Clifton, NJ.
  Developed the Remedial Action Workplan
  for the remediation of soil and groundwater
  contamination consisting of benzene and
  mercury. Remedial alternatives are impacted

Page 1

by the effect of benzene treatment on the speciation, volatility and mobility of mercury. The remediation tasks are compounded by the presence of building structures in the vicinity of the contaminated area.

< Project Manager for a residential property developer looking to address pesticide-impacted soil on two former nursery properties. Directed the performance of Preliminary Assessment and Remedial Investigation. Developed cost-effective approach to excavate contaminated soil and place the soil into an on-site berm. The berm is constructed as a landscaped feature, covered with clean topsoil and vegetated. The berm area is deed noticed, but the remaining property is now clean of contamination and ready for residential development. One site in Plainsboro has been completed, while a second in South Brunswick is awaiting NJDEP approval for the remedial phase. The South Brunswick site is complicated by the presence of pesticides in the soil and sediment located in nearby forested wetlands.

< Project Manager for a residential developer constructing a development proximate to a former Superfund site in Jackson, NJ. The developer is performing the final stages of the remediation, which consists of chlorinated and non-chlorinated volatile organic compounds. Site also includes impacts to surface water.

< Project Manager for developer seeking to construct residential buildings on a site in Bayonne, NJ. Successfully obtained approval by NJDEP to address contaminated historical fill via engineering controls consisting of site structures consisting of the proposed garage floor, asphalt pavement and landscaped areas. Assisting client in negotiations with party responsible for the presence of chromate ore processing residue waste near a sewer interceptor beneath a portion of the property.

< Project Manager for an operating RCRA TSD facility in South Kearny, NJ. Directed

the preparation of a Spill Prevention Control and Countermeasure (SPCC) Plan, Resource Conservation and Recovery Act (RCRA) Part B permit modifications, and soil and groundwater investigations. The primary contaminant present in the soil and groundwater is lead; however, the facility handles hazardous waste material which may contain any hazardous substance.

< Project Manager for the preparation of Discharge Prevention Containment and Countermeasure (DPCC)/ Discharge Cleanup and Response (DCR) Plans for facilities located in Newark, Elizabeth, Piscataway, and Plainsboro NJ, including performance of site inspections, development of plans for secondary containment to prevent discharges, inspection/monitoring programs, and emergency preparedness programs.

< Project Manager for preparation of SPCC Plans for facilities located in Secaucus, Raritan, and Ewing NJ, including site inspections, development of plans for secondary containment to prevent discharges, inspection/monitoring programs, and emergency preparedness programs.

< Project Manager for due diligence investigations for prospective purchasers of former industrial properties for residential development. Directed the performance of Preliminary Assessments and Focused Site Investigations geared towards client's end use. Provided technical guidance during contract negotiations to assist client in maintaining innocent purchaser status.

< Expert witness for various clients in the fields of environmental compliance, site remediation and UST management. Efforts included development of cost allocations, historical regulatory analysis and dating of releases. List of clients available upon request.

< Project Manager for a municipal client seeking technical assistance to understand developer's approach to constructing a new groundwater supply. Services included review of hydrogeological and engineering

reports and workplans prepared by others and providing technical advice to client. Presented project summaries to governing body.

< Project Manager for municipal client addressing contaminated private wells caused by Township's public works yard. Wells are contaminated with sodium and chloride originating from road salt discharge. Directed pump tests and water treatment alternative analysis. Developed site-specific reverse osmosis POET designs in conjunction with vendors to address removal of the salt from the drinking water.

< Project Manager for former manufacturing facility in Winslow NJ that discharged high volumes of ammonia, sulfate and molybdenum into the drinking water aquifer. Directed the sampling of impacted residential supplies, groundwater monitoring and development of groundwater remedial action workplans.

< Project Manager for study of sewer collection system for industrial facility located in Newark to determine potential for discharge of chlorinated solvents to the subsurface. Analyzed groundwater data to determine source locations.

< Project Manager for two Cleanup Star projects addressing soil contamination. Approval from NJDEP for both projects was received one week after report submittals.

# EXPERT TESTIMONY & LITIGATION SUPPORT

Kenneth Goldstein (selected projects)

| CLIENT | CASE NAME | ATTORNEY FOR CLIENT | SCOPE OF SERVICES |
|---|---|---|---|
| James Mulholland | | Michael Faul, Jr., Esq. Walder Hayden Brogan | Prepared expert report on behalf of property owner regarding appropriateness of remedial activities and costs at gasoline UST discharge. (2005) |
| Harleysville Mutual | Joseph A. Laezza and Helen A. Laezza v. Exxon Company USA et al., Superior Court of New Jersey Law Division, Ocean County, Docket No. L-064095-86 | Lance Kalik, Esq. Riker Danzig, et al. | Prepared expert report regarding date of release of gasoline UST discharge. (2005) |
| New Jersey Manufacturers | | Loren Pierce, Esq. McElroy Deutsch Mulvany | Prepared expert report and gave deposition testimony regarding remediation costs at former foundry. (2004) |
| Island Transportation | | Shelia Woolson, Esq. Epstein Becker & Greene | Prepared expert report and gave deposition testimony regarding impact of on-site groundwater contamination on regional groundwater plume. (2003) |
| Viacom | New West Urban Renewal Co. v. Viacom, Inc., United States District Court for the District of New Jersey, Civil Action No. 1-CV-707 (SMO) | Mark Sheppard, Esq. Babst, Calland, Clement | Prepared expert report regarding the costs for remediation at a property formerly owned by a Viacom predecessor. (2003) |
| Heritage Minerals | Heritage Minerals, Inc. and Hovsons, Inc. v. United States of America acting by and through the U.S. Navy, and the U.S. Environmental Protection Agency, U.S. District Court for the District of New Jersey Docket No. 99-83 (MLC) | Brendan Judge, Esq. Connell Foley | Prepared expert report and gave deposition testimony on behalf of property owner impacted by chlorinated solvent groundwater plume originating at Superfund site owned by Navy. (2002) |
| Recuperacion de Terrenos | Thomas Citignano, et al., v. Recuperacion de Terrenos S.A. de C.V. at v. Interstate Tank Testing, Inc., Superior Court of New Jersey Chancery Division – Atlantic County, Docket No. ATL-C-65-99 | Paul Maselli, Esq. Maselli and Warren | Prepared expert report regarding groundwater impacts of gasoline UST. (2002) |
| Century Insurance | Northern Burlington Regional School District, et al., v. Utica National Insurance Group, et al., Superior Court of New Jersey Law Division Burlington County, Docket No. L-003054-01 | John Glowacki, Esq. Siegal & Napierkowski | Prepared expert report regarding groundwater impacts of gasoline and diesel fuel USTs. (2001) |
| Joint Insurance Defense Group | Raclaur, Inc. v. Allianz Insurance Group, et al., v. Utica National Insurance Group, et al., Superior Court of New Jersey Law Division – Essex County, Docket No. L-12078-95 | St. John & Wayne Sachs Maitlin McElroy Deutsch Mulvany | Prepared expert reports for three separate sites involving soil and groundwater impacts of dye wastes and PCBs. Developed cost allocation formula. (2000) |
| Estate of Thelma Dear | Thelma Dear v. Chubb Insurance Company of New Jersey, et al.; Superior Court of New Jersey Law Division, Morris County Docket No. MRS-L-2868-98 | Michael Faul, Jr., Esq. Walder Sondak and Brogan | Prepared expert report regarding the cause of the discharge of fuel oil from an UST. Reviewed ongoing costs for remediation. (1997) |
| Conair | Polaris Development Company, Inc. v. Conair Corporation et al.; Superior Court of New Jersey, Monmouth County, Law Division, Docket No. L-3274-93 | Clifford Kuhn, Esq. Kuhn and Cahn | Prepared expert report, gave deposition and trial testimony for defense of claim of misrepresenting UST integrity tightness test results. (1993) |
| Hudson Environmental | | Jeffrey Gerber, Esq. Bressler, Amory and Ross | Provided expert testimony at mediation for defense of malfeasance claim against client in conducting remediation at UST site. (1995) |
| Island Transportation | (1) Cranbury Road Mobil Station, et al. v. Cities Services Company, et al; Superior Court of New Jersey, Middlesex County, Chancery Division, Docket NO. MDL-C200-97
(2) Sensible Auto Service Inc., et al. v. Harleysville Insurance Company of New Jersey, et al.; Superior Court of New Jersey Law Division – Union County, Docket No. L-4378-97
(3) Donald F. Ury and Elenor G. Ury et al. v. Amoco Oil Company et al.; Superior Court of New Jersey, Middlesex County, Law Division, Docket No. MDL-L-6256-99 | Shelia Woolson, Esq. Epstein, Becker & Green | Prepared three expert reports for three separate sites involving the contribution of client's delivery of gasoline products to contamination at the sites. (1998-9) |
| Peapack-Gladstone Borough | | Borough Counsel | Presented testimony for client in arbitration hearing in case involving source of hydrogen sulfide in sewer lines. (2000) |
| Hahola | | Keith McKenna, Esq. Ambrosio, et al. | Prepared expert testimony and gave deposition testimony on behalf of property owner to obtain coverage for insurance claim due to discharge from gasoline UST. (1999) |

| CLIENT | CASE NAME | ATTORNEY FOR CLIENT | SCOPE OF SERVICES |
|---|---|---|---|
| Hartz Mountain | | Curt Michael, Esq. In-house counsel | Prepared expert report and gave deposition testimony on behalf of client for case involving discharge from USTs. (1995) |
| Home Insurance | | Karol Corbin Walker, Esq. St. John & Wayne | Reviewed remedial cost estimate by insurance claimant of $200-$300 million for 13 Superfund sites from a major waste company. (1997) |
| Home Insurance | | William McGrath, Esq. Smith Stratton | Reviewed remedial cost estimate by insurance claimant of $25-$30 million for four Superfund sites. |
| Andover Engineering | | Jeffrey Walder, Esq. Walder Hayden and Brogan | Reviewed cost expenditure for remediation of UST site. |
| Evan's Rule | | John Alder, Esq. Helfring, Goldstein | Prepared expert report and gave deposition testimony on behalf of client in case involving origin of fuel oil discharge on site. |

Ransom Environmental
Last Revised 1/06

**APPENDIX B**

Evaluation of Actions by AETC
Boarhead Superfund Site
September 27, 2006

# APPENDIX B

## Document List

EXPERT REPORT OF DEFENDANT AETC

AGERE SYSTEMS V. AETC ET AL.
CIVIL ACTION NO. 02-3830 (LDD)
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

<u>Document list</u>

Report of Expert Witness; Boarhead Farms Agreement Group v. Advanced Environmental Technology Corporation, et al., Jurgen H. Exner, Ph.D., June 29, 2006

Report of Raymond F. Dovell, CPA re: Boarhead Farms Superfund Site; Asset Searched for Manfred T. DeRewal and Certain Other Parties, June 29, 2006

Expert Report of Jay Vandeven re: Boarhead Farms Superfund Site, June 30, 2006

Report to the Congress, *Hazardous Waste Programs Will Not be Effective: Greater Efforts are Needed,* prepared by the Comptroller General, United Stated General Accounting Office, January 23, 1979

Report to the Congress, *How to Dispose of Hazardous Waste – A Serious Question That Needs to be Resolved,* prepared by the Comptroller General, United Stated General Accounting Office, January 23, 1979

Defendant AETC's Answer to Plaintiff's Interrogatories, August 16, 2004

Defendant AETC's Motion for Summary Judgment, August 2, 2006

Objections and Responses of Plaintiff to AETC's Initial Set of Interrogatories, September 14, 2004

Deposition of Robert Landmesser, November 22, 2004, December 6, 2004, December 28, 2004

Deposition of John Leuzarder, November 29, 2004, December 6, 2004

Deposition of Arthur Curley, December 9, 2004

Deposition of David Michelman, December 1, 2004

Deposition of Walter Risi, January 14, 2005

Deposition of Diane Shampire, February 8, 2005

Certification of Robert Landmesser, February 22, 2004

Bills of Lading, Invoices and various correspondence regarding the relationship amongst DeRewal Chemical Company, AETC and waste generators.