# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | |
| v. | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | |
| Defendants. | |

## ORDER

AND NOW, this _____ day of _____,

2008, upon consideration of Plaintiffs' Memorandum in Opposition to Defendants'

Motion for Partial Summary Judgment, it is hereby ORDERED that Defendants' motion

for partial summary judgment is DENIED.

_____

Legrome D. Davis, J.

DMEAST #9987264 v2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS L.L.C., | : : : : : : | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | : : | |
| v. | : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Glenn A. Harris, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey  08043
Phone:  (856) 761-3440
Fax:  (856) 761-9001
E-mail:  harrisg@ballardspahr.com

Dated:  March 14, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES............................................................................ ii

INTRODUCTION.......................................................................................... 1

FACTS............................................................................................................ 2

ARGUMENT................................................................................................. 6

1.  Plaintiffs Did Not Pay EPA for Any Specific Claimed Past Response
    Costs. ............................................................................................... 6

2.  The $7 Million Paid by Plaintiffs to EPA Are Recoverable
    from Defendants As a Matter of Law........................................... 8

3.  The Statute of Limitations Had Not Run in 2000 on EPA's Claimed
    Past Response Costs. ..................................................................... 10

CONCLUSION. ........................................................................................... 21

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Action Manufacturing Co., Inc. v. Simon Wrecking Co.*, 428 F. Supp. 2d 288 (E.D. Pa. 2006) .................................................................................................. 9

*Andrews v. Metropolitan North Commuter Railroad Co., 882 F.2d 705* (2d Cir. 1989) .................................................................................................................... 19

*Digene Corp. v. Ventana Medical Systems, Inc., et al.*, 316 F. Supp. 2d 174 (D. Del. 2004) ............................................................................................................... 19

*Kelley v. E.I. du Pont de Nemours and Company, et al.*, 17 F.3d 836 (6th Cir. 1994) *infra* ............................................................................ 12, 13, 15, 16, 17, 18

*Morrison Enterprises v. McShares*, 302 F.3d 1127 (10th Cir. 2002) .............................. 10

*One Wheeler Road Associates v. Foxboro Co.*, 843 F. Supp. 792 (D. Mass. 1984) ............... 17, 18

*Pneumo Abex Corp. V. Bessemer and Lake Erie Railway Co.*, 936 F. Supp. 1250 (E.D. Va. 1996) ........................................................................................................ 17, 18

*United States v. Ambroid Company, Inc., et al.*, 34 F. Supp. 2d 86 (D. Mass. 1999) ................................................................................................................... 16, 17

*United States v. Cannons Engineering Corp.*, 899 F.2d 79 (1st Cir. 1990) ................................. 8, 9

*United States v. Helen Kramer, et al.*, 19 F. Supp. 2d 273 (D.N.J. 1998) ....................... 8

*United States v. McKeon*, 738 F. Supp. 2d 26 (D. Del. 1984) ......................................... 19

### STATE CASES

*United States v. Atlas Minerals & Chemicals, Inc.*, 1995 WL 510304 ......................... 10

# FEDERAL STATUTES AND REGULATIONS

40 C.F.R. 300.5.................................................................................................................2

40 C.F.R. 300...................................................................................................................14

40 C.F.R. 300.700(c)(3)(ii)...............................................................................................10

42 U.S.C. §107(a)............................................................................................................10

42 U.S.C. §113(f).............................................................................................................10

42 U.S.C. §113(g)(2).......................................................................................................16

42 U.S.C. § 113(g)(2)(A)............................................................................................18, 20

42 U.S.C. § 5121..............................................................................................................12

42 U.S.C. § 9601(23)...................................................................................................12, 15

42 U.S.C. § 9604.............................................................................................................5, 18

42 U.S.C. § 9604(b)..........................................................................................................12

42 U.S.C. § 9604(c)(1)(C)............................................................................................11, 12

42 U.S.C. § 9607...............................................................................................................11

42 U.S.C. § 9607(a)............................................................................................................3

42 U.S.C. § 9613(g)(2)(A)................................................................................................11

42 U.S.C. § 9617.................................................................................................................2

42 U.S.C. § 9622(d)(2)........................................................................................................8

42 U.S.C. § 9622(e)............................................................................................................4

42 U.S.C. § 9697(a)............................................................................................................6

# FEDERAL RULES

Fed. R. Civ. P. 54...............................................................................................................9

Fed. R. Civ. P. 58...............................................................................................................9

## INTRODUCTION

Plaintiffs respectfully submit this memorandum in opposition to the motion for partial summary judgment filed by all Defendants. Defendants' motion must be denied because it is based on a fundamental fallacy. There simply are no "monies paid by Plaintiffs in reimbursement of USEPA's costs of the First and Second Removal Actions." Plaintiffs resolved for only $7 million an Environmental Protection Agency ("EPA") past costs demand totaling almost $14 million, which demand included a wide variety of response costs EPA claimed to have incurred at the Boarhead Farms Site ("the Site") from approximately 1987 to July 31, 2000. The settlement was no different from any other settlement of disputed claims wherein one party pays a specified amount of money to the other without admitting or denying the validity of any particular portion of such claims. Whether or not EPA's claim with respect to certain of those costs had merit is now irrelevant. Defendants' motion should also be denied because it was embodied in a Consent Decree entered by this Court, in which this Court concluded that the settlement was "fair, reasonable and in the public interest." Finally, this Court should conclude either that the applicable statutes of limitations had not run with respect to those portions of EPA's claim upon which Defendants focus or that there are genuine issues of material fact precluding a decision now on that issue.

Despite notice and the opportunity to participate, Defendants chose to sit on the sidelines while Plaintiffs negotiated a resolution with EPA. They now want to contest Plaintiffs' decision to settle, at a substantial discount, the agency's sizable past cost claim, hoping to escape liability for some portion of the settlement amount. Their motion should be denied.

## FACTS

EPA's involvement with the Site began with a Site Inspection starting in May 1984, which inspection resulted in the issuance of a Site Inspection Report on January 20, 1986.[1] EPA placed the Site on the National Priorities List ("NPL") on March 31, 1989. 2000 Consent Decree at 2. EPA began its Remedial Investigation of the Site on December 5, 1989, which investigation formed the basis for a Remedial Investigation Report in January 1997.[2] *Id.* at 3. EPA additionally conducted several individual tasks leading up to the issuance of a Feasibility Study Report in July 1997.[3] *Id.* A Proposed Plan for comprehensive site cleanup, based upon the conclusions in the Remedial Investigation/Feasibility Study ("RI/FS"), was issued in January 1998.[4] *Id.* Following public notice and comment on the Proposed Plan, the Record of Decision ("ROD") was issued on November 18, 1998.[5] *Id.*

EPA determined in the midst of the RI/FS process that certain contamination at the Site needed a response prior to whatever long-term remedy EPA ultimately would select, so it took certain steps to address that contamination. EPA excavated buried drums and contaminated soil hotspots, constructed and then operated a

---

[1] A site inspection is an on-site investigation to determine if there has been a release and to augment the data collected in the Preliminary Assessment to determine if a full remedial investigation is warranted. 40 C.F.R. 300.5.

[2] A remedial investigation is a process to determine the nature and extent of the problem presented by the release. It includes the gathering of sufficient information to determine the necessity for remedial action and support the evaluation of remedial alternatives. *Id.*

[3] A Feasibility Study uses the RI data to define objectives of the response action, to develop remedial action alternatives, and to undertake an initial screening and detailed analysis of the alternatives. *Id.*

[4] A Proposed Plan sets forth EPA's proposed remedial action decision with respect to a site. 42 U.S.C. § 9617.

[5] The Record of Decision is EPA's final selection of each component of the selected remedial action. 42 U.S.C. § 9617.

groundwater extraction and treatment system designed to prevent contaminated groundwater from migrating, and installed residential water treatment systems on some properties in the vicinity of the Site.

EPA thereafter sought to recover from Plaintiffs and other PRPs the money it claimed to have spent and sought either payment for its anticipated future costs of remediating the Site as set forth in the ROD or an agreement to perform those tasks. In or about 2000, EPA provided to a number of PRPs a demand for alleged past response costs of at least $13,662,870.77, said to represent costs paid by EPA for response activities related to the Site as of the date specified in the Consent Decree. *See* copy of the past costs claim attached hereto and marked Exhibit A.[6] The demand included a detailed accounting of those costs.

The almost $14 million demand for past response costs was made up of approximately $4.5 million of costs to perform the Remedial Investigation and Feasibility Study ("RI/FS"),[7] almost $2 million paid to the Army Corps of Engineers for the groundwater recovery and treatment system,[8] over $1,500,000 for EPA's indirect costs and payroll costs,[9] and approximately $4 million identified by the Defendants as relating

---

[6] The United States is entitled to recover under CERCLA, *inter alia*, its enforcement costs. 42 U.S.C. Section 9607(a). Plaintiffs, by settling, avoided the possibility of further enforcement actions, including cost recovery litigation, and the costs thereof that they would have had to pay, if liable, in addition to actual recoverable response costs.

[7] *See* Exhibit A at BSAI 082019-20 (CH2M Hill, Contract Lab Program, Technical Assistance Team, US Geological Survey, Environmental Services Assistance Team), and BSAI 082141-43; BSAI 082149-195; BSAI 082269-70, 72-74, and 81; BSAI 082249-50; and BSAI 082218-29 (respective descriptions of work).

[8] *See* Exhibit A at BSAI 082019-20 and BSAI 082238-39 (work description).

[9] *See* Exhibit A at BSAI 082019.

to what Defendants term the "First and Second Removal Actions," namely the excavation of buried drums and contaminated soils.[10]

Three of the Plaintiffs, Cytec Industries Inc., Ford Motor Company, and SPS Technologies, Inc., entered into extensive negotiations with EPA attempting to resolve these claims. The Defendants herein did nothing, even though each had received a General Notice Letter, a Special Notice Letter, or both.[11] Those negotiations ultimately produced two settlements.

The United States and those three Plaintiffs first entered into a Consent Decree in 2000 wherein the three Plaintiffs agreed to do a significant portion of the remediation work that EPA had determined to be necessary in the ROD. 2001 Consent Decree at 1. A copy of the relevant pages of the 2000 Consent Decree is attached hereto and marked Exhibit C. That Consent Decree was entered by this Court on September 28, 2000. EPA's almost $14 million claim for past response costs was not resolved at that time, but was asserted in the Complaint lodging the Consent Decree. 2000 Consent Decree at 1. The 2000 Consent Decree, however, referred to certain remedial actions that had been taken by EPA at the Site, the costs of which were included in EPA's demand for

---

[10] Defendants identify Environmental Technology of North America as the vendor that preformed the referenced 1992-93 work. Defendants' Brief at 6. That vendor was paid $3,954,553.49. *See* Exhibit A at BSAI 082019 and BSAI 082201 (work description).
[11] General notice and special notice letters are documents by which EPA informs a person that EPA considers that person to be potentially liable pursuant to Section 107 of CERCLA. Section 122(e) additionally gives the recipient a specified amount of time to agree to a specific action. 42 U.S.C. § 9622(e). Defendants Ashland, AETC, NRM Investment Company each received a general notice letter; Carpenter Technology, fcg, inc. and Handy & Harman each received general/special notice letters in September of 2000. Copies of the General Notice letters and of a Special Notice Letter reflecting recipients thereof is attached hereto marked Exhibit B.

past response costs.  The 2000 Consent Decree, a document negotiated by EPA and

Plaintiffs and entered by this Court, states:

> EPA conducted removal action at the Site beginning in the
> year 1992 and continuing to the present pursuant to Section
> 104 of CERCLA, 42 U.S.C. Section 9604.  The removal
> action included, in general: (1) the removal of buried
> drums; (2) the construction, operation and maintenance of
> groundwater interception wells and a groundwater
> interception trench; (3) the construction of a groundwater
> treatment plant on the Site; and (4) the installation,
> operation and maintenance of a residential well filtration
> systems.

2000 Consent Decree at 2-3.

Further negotiations ultimately resulted in a significant compromise by

EPA of its past costs claim.  Plaintiffs did not admit liability, nor did they concede that

any or all of the costs sought by EPA constituted recoverable costs of response under

CERCLA.  Plaintiffs and EPA simply negotiated until they arrived at a sum of money

that Plaintiffs were willing to pay and EPA was willing to accept.  Like any other

settlement, each side no doubt agreed to that dollar amount for a variety of reasons, none

of which were specified by either side in the settlement.

The United States, Cytec Industries Inc., Ford Motor Company, SPS

Technologies, Inc., and TI Automotive Systems Corp. thereafter jointly lodged a Consent

Decree in this Court on or about December 6, 2001 to effectuate that settlement.  A copy

of the relevant pages of the 2001 Consent Decree is attached hereto and marked Exhibit

D.  The later four entities therein agreed to pay to EPA $7 million "in payment for Past

Response Costs."  2001 Consent Decree at Paragraph 54.  "Past Response Costs" is

defined in the Consent Decree to mean "all costs, including, but not limited to, direct and

indirect costs, that the United States paid at or in connection with the Site through July

31, 2000, plus interest on all such costs which has accrued pursuant to 42 U.S.C. Section

9697(a) through such date." 2001 Consent Decree at 11. Those entities also agreed to

perform the work set forth in the ROD that had not been included in the 2000 Consent

Decree. This Court entered the Consent Decree, finding the decree to be "fair,

reasonable, and in the public interest." 2001 Consent Decree at 5.

## ARGUMENT

### 1.  Plaintiffs Did Not Pay EPA for Any Specific Claimed Past Response Costs.

Defendants argue that they can only be liable in contribution for a

"common liability," and that neither they nor Plaintiffs could have been found liable for

the costs claimed by EPA in 2001 relating to EPA's excavation of buried drums and

contaminated soil. Defendants' Brief at 8-9. Thus, they say, Plaintiffs cannot recover

from them "the monies paid by Plaintiffs in reimbursement of the USEPA's costs of the

First and Second Removal Actions." Defendants' Brief at 3.

Plaintiffs, however, paid not so much as one dime for those costs, nor did

Plaintiffs pay for any other specific costs that EPA claimed to be recoverable costs of

response. Plaintiffs simply paid a sum of money with respect to disputed claims to buy

their peace. Plaintiffs seek in this litigation recovery from the Defendants of the

equitable shares of those Defendants of, *inter alia*, the $7 million Plaintiffs paid in

settlement. They are not seeking reimbursement of any specific EPA claimed past

response costs. Defendants cite no legal authority for the remarkable, but unstated,

proposition that one who settles multiple disputed claims is deemed to have "paid" some

specific amount of dollars (or for that matter *any* dollars), with respect to one or more of

the specific disputed claims.

Defendants do not dispute their potential liability to EPA for any other portion of the costs claimed by EPA in 2000. *They thus do not dispute that they were at the time of the 2001 Consent Decree potentially liable for almost $10 million in claimed EPA Past Response Costs, such that, even under their argument, there was a "common liability" in at least that amount.* Because Plaintiffs only paid $7 million to settle all of EPA's claims, it is wholly irrelevant whether the $4 million associated with the drum and soil removal activities characterized by the Defendants as the "First and Second Removal Actions" were recoverable.

Even if one were to assume in argument that a portion of EPA's claim had expired, almost $10 million in agency response costs would remain for which Defendants acknowledge a common liability for purpose of contribution. This amount far exceeds the sum ultimately negotiated and agreed upon in settlement of such claims. Given such facts, there can be no basis for Defendants to claim that Plaintiffs' $7M settlement did not address a common liability. Indeed, Defendants make no argument that, if EPA had excluded the costs of the so-called "First and Second Removal Actions" from its demand, the settlement amount finally reached would have been any different.

Defendants' framing of the relief they seek reveals the fallacy in their argument. They seek a summary judgment that Plaintiffs cannot recover under Section 113 of CERCLA and under HSCA "for claims for contribution toward payments made by or on behalf of Plaintiffs to the United States Protection Agency ("USEPA") in reimbursement of USEPA's "Past Response Costs" . . . incurred in connection with the 1992 and 1993 removal actions performed by USEPA at the Boarhead Farms Superfund

Site." Defendants' Proposed Order. Defendants are unable to state how exactly the outcome at trial would differ whether or not their motion is granted. This is so because Defendants do not explain how the specific dollar amounts of EPA's claimed past response costs they believe were incurred for the drum and soil excavation work relate to Plaintiffs' claim here for the $7 million Plaintiffs paid in settlement to EPA. They do not relate at all. Plaintiffs' payment was simply a settlement of many disputed cost claims.

Because it does not matter whether the costs on which Defendants focus were legally recoverable in 2000, Defendants' motion should be denied.

**2.    The $7 Million Paid by Plaintiffs to EPA Are Recoverable from Defendants As a Matter of Law.**

This Court entered the 2001 Consent Decree accomplishing, *inter alia*, Plaintiffs' settlement of EPA's claims for past response costs, and found the decree to be "fair, reasonable, and in the public interest." 2001 Consent Decree at 5. Defendants now are trying to collaterally attack the amount of that settlement, having neither participated in nor objected to it. If they were permitted to do so, Defendants could relitigate here the merits of each portion of EPA's past costs claim on whatever grounds the Defendants could dream up (barred by a limitation statute, not consistent with the NCP, unreasonable and unnecessary, etc.). That cannot possibly be correct.

CERCLA Consent Decrees are lodged with the court for a minimum thirty day comment period for the express purpose of giving any non-signatory an opportunity to object to the terms of the decree. 42 U.S.C. § 9622(d)(2). It is well-settled that the court should approve entry of a Consent Decree only when it is satisfied that the decree is fair, reasonable, and consistent with the Constitution and the mandate of law. *See, e.g.*, *United States v. Helen Kramer, et al.*, 19 F. Supp. 2d 273 (D.N.J. 1998); *United States v.*

*Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990); 2001 Consent Decree at 88

("The United States reserves the right to withdraw or withhold its consent if the

comments regarding the Consent Decree disclose facts or considerations which indicate

that the Consent Decree is inappropriate, improper, or inadequate").  Congress intended a

court considering entry of a Consent Decree to take "into account the interests of the

public at large, the settling parties and the non-settlers alike." *Kramer*, 19 F. Supp. at 280

(citing H.R. Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985) *reprinted in* 1986 U.S.

Code Cong. & Admin. News 3038, 3042).  The 2001 Consent Decree was entered as a

Final Judgment pursuant to Fed. R. Civ. P. 54 and 58.  2001 Consent Decree at 90.

Each of the remaining Defendants had received either a General Notice

Letter or a Special Notice Letter from EPA in which EPA advised that Defendant that

EPA considered it to be potentially responsible for EPA's past and future costs of

remediating the Boarhead Farms Site.  The time for the Defendants to challenge any

portion of the Consent Decree was when it was lodged with this Court for notice and

comment, not now having made no such objection to entry of the Consent Decree.  This

Court should not even consider Defendants' challenge to the settlement, having already

determined that the settlement was fair and reasonable.  2001 Consent Decree at 5.

Courts have routinely held that dollars paid to EPA or a state for past

governmental costs pursuant to a Consent Decree constitute response costs that are

recoverable as a matter of law by the person or persons who paid those dollars. *See, e.g.,*

*Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 428 F. Supp. 2d 288, 321 (E.D. Pa. 2006)

("[A]ny costs the [plaintiff] incurs in complying with the Consent Decree are considered

consistent with the NCP and should be allocable in a CERCLA contribution action.");

*United States v. Atlas Minerals & Chems., Inc.*, 1995 WL 510304; *Morrison Enterprises v. McShares*, 302 F.3d 1127, 1136-37 (10th Cir. 2002). *See also* 40 C.F.R. Section 300.700(c)(3)(ii)("[a]ny response action carried out in compliance with the terms of … a consent decree entered pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'").

In *Atlas Minerals*, for example, the Third-Party Plaintiffs had entered into a Consent Decree repaying certain past costs claimed by the United States. Third-Party Defendants argued that Third-Party Plaintiffs had failed to specify in their proofs at trial whether any of the costs reimbursed "were related to nonrecoverable oversight costs." Judge Cahn rejected this argument. Among his reasons was the fact that such costs were paid pursuant to a Consent Decree, which he had entered and had found to be "reasonable, fair, and consistent with CERCLA's goals." 1995 WL 510304, *105. Plaintiffs know of no opinion holding otherwise. Defendants neither mentioned this body of case law nor explained why they think *Atlantic Research* overruled that law.[12]

This Court should thus deny Defendants' motion because the $7 million paid to EPA constitutes response costs that are recoverable by Plaintiffs as a matter of law.

### 3. The Statute of Limitations Had Not Run in 2000 on EPA's Claimed Past Response Costs.

Even if EPA's sole Past Response Costs claim had consisted of the costs for excavating the buried drums and contaminated soils, and even if Plaintiffs had paid

---

[12] Plaintiffs note that the Supreme Court held that Atlantic Research had a claim solely under Section 107(a), such that the Court's discussion of the requirements for a Section 113(f) action was not in the context of an actual Consent Decree. *Atlantic Research* thus cannot establish a rule of law for a situation like the one here wherein the parties thereto settled at half price EPA claims for recovery of a multitude of alleged past costs.

100% of those costs (such that Plaintiffs had actually reimbursed those specific costs),

Defendants' motion would still be properly denied either because the applicable statute of

limitations had not run on EPA's claim for those costs or because there is a genuine issue

of material fact whether the conclusion of those excavation activities started the running

of a limitations period, as Defendant contend.  The fundamental flaw in Defendants'

argument is that they rely on certain EPA characterizations of EPA's activities rather than

on the actual facts concerning those activities.

Defendants point to 42 U.S.C. Section 9613(g)(2)(A) as providing the

limitations period applicable to a cost recovery claim EPA could have brought for EPA's

past costs.  That section provides:

> An initial action for recovery of the costs referred to in
> section 9607 of this title must be commenced --
>
> (A) for a removal action, within 3 years after completion of
> the removal action, except that such cost recovery action
> must be brought within 6 years after a determination to
> grant a waiver under section 9604(c)(1)(C) of this title for
> continued response action.

42 U.S.C. Section 9613(g)(2)(A).

EPA's "initial action to recover costs" consisted of the Complaint and

Consent Decree lodged with this Court on or about May 2, 2000.  *See* 2000 Consent

Decree at 1 ("The United States in its complaint seeks, *inter alia*:  (1) reimbursement of

costs incurred by EPA and the Department of Justice for response actions").  The 2001

Complaint and Consent Decree constituted a subsequent action.  *Id.*  The question, then,

is the meaning of the words "completion of the removal action," the event that must have

occurred no earlier than 6 years prior to May 2, 2000 (May 3, 1994) to be timely.[13]

CERCLA contains no definition of "removal action," defining only the terms "remove or removal."  Those terms mean:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604 (b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

42 U.S.C. Section 9601(23).  Neither is the word "action" defined in CERCLA.  The common meaning of "action" is:  "An act or thing done; the performance of a function."  New Webster's Dictionary of the English Language, Modern Desk Edition, 1976.

EPA has long recognized that CERCLA contains neither a definition of "removal action" or of "completion of the removal action," and has a long-standing policy that a removal action may be complete for certain purposes even though it is not complete for cost recovery statute of limitations purposes.  *See, e.g.* Superfund Program Implementation Manual, OSWER Directive 9200.3-14-1G-S, April 1, 2007 and S-5.  The current Superfund Program Implementation Manual provides:

---

[13] The September 4, 2002 EPA Memorandum referenced below constitutes the grant of a Section 9604(c)(1)(C) waiver, as Defendants virtually concede.  Defendants' Brief at 11.

> Agency policy for statute of limitation purposes provides that removal is not complete until EPA has made a final decision on whether any additional clean-up activity is required (and, if it is required, until EPA has both made a final decision on such additional activity and has completed the design for that activity). The date found in the removal action, actual complete column of the CERCLIS report is a programmatic measure only and cannot be relied upon to create any rights, substantive or procedural, enforceable by any party in litigation with the United States.

OSWER Directive 9200.3-14-1G-S at F-5. A copy of the relevant sections of the OSWER Directive are attached hereto marked Exhibit E. The court in *Kelley v. E.I. du Pont de Nemours and Company, et al.,* 17 F.3d 836 (6th Cir. 1994) *infra* noted that this policy goes back to at least 1987. 17 F.3d at 841.

Under EPA's guidance, the "completion of the removal action" for the Boarhead Farms Site had not occurred as of the date of the 2000 Consent Decree because the ROD required "additional clean-up activity" and EPA had only initiated the "design for that activity." 2000 Consent Decree at 4 ("EPA has commenced the RD for OU-1").[14]

EPA's claim in 2000 for its past response costs included a multitude of coordinated tasks designed to address threats posed by the Site to human health and the environment, including: the 1986 Site Inspection Report; the RI/FS process from 1989 through July 1997; issuance of the Proposed Plan and the ROD in 1998; the drum and soil excavation activities from 1992 through 1993; and the construction and operation of the groundwater collection and treatment system, which began in approximately 1996

---

[14]    Plaintiffs acknowledge that the OSWER Directive is a document intended solely for the guidance of EPA employees. Nevertheless, EPA's views should be persuasive to this Court, just as they were to the *Kelley* court. Moreover, and as set forth below, this guidance shows EPA's understanding that the words "removal action" have different meanings in different contexts.

and was still proceeding in 2000. *See* Exhibit A at BSAI 082019-20 and 2000 Consent Decree (Exhibit B) at 1. Collectively, those tasks addressed both short-term and long-term remedies for contamination at the Site.

      The drum and soil removal activities began in June 1992 and continued through September 1993. Federal On-Scene Coordinator's Report ("OSC Report") at ii. A copy of the OSC Report is attached hereto marked Exhibit F.[15] On September 4, 1992, after EPA recognized that the cost of the drum and soil removal would exceed $2 million, EPA's Regional Administrator approved "continued removal actions above $2 million pursuant to the consistency waiver at NPL sites." September 4, 1992 Memorandum, attached as Exhibit 2 to Defendants' Brief. Payment vouchers from Environmental Technology of North America are dated from August 3, 1992 and continue through March 9, 1995 and were submitted and paid pursuant to *a single contract*. Exhibit A at BSAI 082197-200. At least one invoice was paid for each month from August 1982 through January 1994. The "Period of Performance" for the contract is stated to be 6/18/92 to 6/18/93, and nothing in the "Description of Work" suggests that this work was done in stages, much less that it was two independent "removals." *Id.* at BSAI 082200. This work was obviously one continuous effort, as is clear from both these invoices and the description of the activities in the OSC Report. OSC Report at 12-16 (note too discussion of multiple other EPA activities (and the General Ceramics removal work) that took place concurrently with the drum and soil removal work). EPA also entered into an interagency agreement with the Army Corps of Engineers to construct and operate the

---

[15]    The OSC Report is the final report by the EPA On-Scene Coordinator, the person with overall responsibility at the site of a remediation, of activities related primarily to the 1992-93 drum and soil removal. OSC Report at iv; 40 C.F.R. 300.

groundwater collection and treatment system, which system was designed and

constructed in approximately 1994-1996 and was operated by the Army Corps until

Plaintiffs took over that work in 2000. Exhibit A at BSAI 082237-2244. All of this work

was performed during the RI/FS process, which is itself a "removal." *See, e.g.*, Exhibit A

at BSAI 082238 ("This work will be conducted while the RI/FS is ongoing"); 42 U.S.C.

Section 9601(23)("… such actions as may be necessary to monitor, assess, and evaluate

the release or threat of release of hazardous substances .).

   The United States Court of Appeals for the Sixth Circuit held, on virtually

identical facts, that the conduct of "arguably independent removal activities" comprised a

single "removal action" within the meaning of the statute of limitations. *Kelley v. E. I. du*

*Pont de Nemours and Company, et al.*, 17 F.3d 836 (6th Cir. 1994). In *Kelley*, the

Michigan Department of Natural Resources ("MDNR") appropriated money on June 27,

1984 to clean up the Stevens Landfill. 17 F.3d at 838. It contracted with Hazardous

Waste Technology Services, Inc. ("Haztech") in October 1985 for that company to

physically remove surface waste from the landfill. *Id.* At about that same time, MDNR

hired a separate company, NUS, to conduct an RI/FS, which activities were also begun in

October 1985. MDNR announced to the public in March 1986 that Haztech had

completed its physical removal efforts. *Id.* at 839. The final RI/FS reports were released

in the late fall of 1987. *Id.* A third contractor, Inland Waters, was hired to remove drums

and related contamination from an on-site pond, which work was completed on July 15,

1987. *Id.* MDNR filed a cost recovery action pursuant to CERCLA on July 12, 1990.

Defendants argued that MDNR could not recover the money it paid to Haztech for the

surface removal because that was a "discreet removal action" completed in March 1986,

such that the three year statute had run. *Id.* at 839. The court rejected this argument, reasoning that Congress intended the term "removal action" in Section 113(g)(2) to be given a "broad interpretation," and that it would be "simply inconsistent" with the essential purposes of CERCLA "to require suit on each arguably independent removal activity." 17 F.3d at 843.

The facts in *United States v. Ambroid Company, Inc., et al.,* 34 F. Supp.2d 86 (D. Mass. 1999), heavily relied upon by Defendants, could not be farther from the facts here, involving as they did a limited EPA removal action to address specific past releases, then, unexpectedly and only as a result of vandalism, a second EPA removal action to address *new* releases. In *Ambroid*, EPA had conducted a series of cleanup and removal activities at the Yankee Chemical Corporation Site from March 1992 to February 1993, ending in a report by EPA's On-Scene Coordinator referring to the case as "closed." 34 F. Supp.2d at 86-87. EPA thereafter handed over the site to the appropriate Massachusetts environmental authority. *Id.* at 87. Eighteen months later, the state authority informed EPA that the site had been broken into and that drums containing hazardous wastes (that EPA had left at the site) had been scattered, thereby creating new threats of release. *Id.* EPA returned to the site and removed those drums on June 17, 1994. *Id.* The court held, on the basis of these "unusual circumstances," that the 1994 EPA drum removal was separate and distinct from the 1992 and 1993 EPA actions. *Id.* Indeed, EPA had addressed fully in its initial work all of the historic releases at the site. *Id.* The later work was necessitated only by *new* releases that occurred *after* EPA had completed the work that had addressed historic releases. *Id.* EPA's later work would not have been necessary but for those new releases. That work addressed only those new

releases or threats of release, it had nothing to do with the already-remediated historic releases.

Defendants' reliance on *Ambroid* is particularly surprising because the court there agreed with the holding of *Kelley*. Indeed, the *Ambroid* court cited with approval another District of Massachusetts opinion, *One Wheeler Road Associates v. Foxboro Co.*, 843 F. Supp. 792 (D. Mass. 1984), wherein that court held that a removal process conducted in three stages was complete with respect to the statute of limitations only at the conclusion of the entire cleanup. 304 F. Supp.2d at 88. The *Ambroid* court found *Kelley* and *One Wheeler* to be "factually distinguishable," referring to the facts before it at least five times as "unique" or "unusual." *Id.* It also distinguished an opinion holding that a removal action is not complete for statute of limitation purposes until the date of the Record of Decision, *Pneumo Abex Corp. V. Bessemer and Lake Erie Railway Co.*, 936 F. Supp. 1250 (E.D. Va. 1996), because there was no Record of Decision issued with respect to the Yankee Chemical Corporation Site. *Id.* at 89-90.[16]

Just as in *Kelley*, EPA here performed several tasks that each was a "removal" during which time it also performed several tasks which together consisted of an eight year RI/FS (itself a "removal") to select a long-term remedy for the Site. These actions, like EPA's actions in *Pneumo Abex*, led to a Record of Decision. Just as in *Kelley*, EPA used many different contractors to perform discrete tasks as part of EPA's coordinated and comprehensive actions. Because EPA's operation of the groundwater collection and treatment system (a "removal") was ongoing at the time of the 2000

---

[16]    EPA's activities in *Ambroid* were always intended to be specific and limited "removal" actions, and were never to include the selection and implementation of a long-term "remedial action." Thus, EPA never undertook an RI/FS, ROD, etc., as it did for the Boarhead Farms Site.

Consent Decree, the date of that decree is the earliest date that would constitute "the completion of removal action" for purposes of Section 113 (g)(2)(A).

Based upon the undisputed facts concerning EPA's ongoing and comprehensive work at the Site, and upon decisions like *Kelley, One Wheeler Road* and *Pneumo Abex,* EPA's claims with respect to the 1992-1993 drum and soil excavation work were not barred by the Section 113(g)(2)(A) statute of limitations at either the time of the 2000 Consent Decree or the 2001 Consent Decree.

Understandably, Plaintiffs here do not rely upon the actual facts concerning the multitude of tasks undertaken by EPA at the Boarhead Farms Site over almost fifteen years or even mention that CERCLA does not define "removal action." Instead, they argue that they are entitled to judgment as a matter of law because EPA made certain statements in its Record of Decision and Proposed Plan, and because Plaintiffs' initial pleadings repeated those statements. Defendants' Brief at 4-5, 10.

EPA and Plaintiffs, however, expressly stated in the 2000 Consent Decree that EPA's activities from 1992 to the date of the Consent Decree constituted a single "removal action":

> EPA conducted removal action at the Site beginning in the year 1992 and continuing to the present pursuant to Section 104 of CERCLA, 42 U.S.C. Section 9604. The removal action included, in general: (1) the removal of buried drums; (2) the construction, operation and maintenance of groundwater interception wells and a groundwater interception trench; (3) the construction of a groundwater treatment plant on the Site; and (4) the installation, operation and maintenance of a residential well filtration systems.

2000 Consent Decree at 2-3. This Court agreed by entering the Consent Decree. The words "The removal action included, in general" certainly mean that EPA, Plaintiffs, and

this Court then considered all of the enumerated tasks to constitute one "removal action." First, the word "action" is singular. Second, the word "the" is a definite article, defined in part as: "Used, especially before nouns, with a specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article, *a* or *an* ...." New Webster's Dictionary of the English Language, Modern Desk Edition, 1976 (emphasis in original). The Fifth Amended Complaint includes a similar allegation. Fifth Amended Complaint at ¶11. These statements are fully consistent with the meaning of "removal action" in Section 113(g)(2)(A), the facts concerning EPA's comprehensive response actions at the Site, and EPA's longstanding guidance documents. OSWER 9200.3-14-1G-S at F-5.

Defendants thus are asking this Court to rule as a matter of law that certain statements by EPA and Plaintiffs (those in the ROD and in Plaintiffs' initial pleadings) are true and conclusive with respect to the limitations provisions whereas other statements (those in the 2000 Consent Decree and in Plaintiffs' current Complaint) are not. Defendants offer no authority for this remarkable proposition. *United States v. McKeon*, 738 F. Supp.2d 26 (D. Del. 1984), relied upon by Defendants, stands only for the proposition that an amended or withdrawn pleading is "competent evidence" that "ceases to be a conclusive judicial admission" and is "controvertible." 738 F. Supp.2d at 31. *See also Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705, 707 (2d Cir. 1989) (abuse of discretion for District Court to not receive into evidence original complaint); *Digene Corp. v. Ventana Medical Systems, Inc., et al.*, 316 F. Supp.2d 174, 184 (D. Del. 2004) (earlier complaint is "pertinent evidence").

Moreover, nothing in the statements of EPA and Plaintiffs relied upon by Defendants is inconsistent with Plaintiffs' position here. There is no doubt that the removal of drums and contaminated soil in 1992 and 1993, the construction and operation of the groundwater collection and treatment system, and the work by General Dynamics to remove its wastes each was an "action" that constituted a "removal." This is true whether or not the conclusion of one or more of those actions constituted a "completion of the removal action" triggering the statute of limitations. EPA's statements in the ROD and Proposed Plan are fully consistent with its recognition that the words "removal action" can have different meanings in different contexts, and with its policy that its use of the word in one context is without prejudice to its view that "a removal is not complete until EPA has . . . both made a final decision on such additional activity and has completed the design for that activity". *Id.*

The statements by EPA in the ROD and Plaintiffs' statements in their initial pleadings thus do not create a genuine dispute of material fact whether the 1992-1993 drum and soil excavation work was a separate and independent "removal action" within the meaning of the Section 113(g)(2)(A) statute of limitations. Even if those statements are *some* evidence that such work could be found at trial to be a separate "removal action" for limitations purposes, the actual facts and the statements in the 2000 Consent Decree approved by this Court create a genuine issue of material fact precluding summary judgment.

## CONCLUSION

For the foregoing reasons and in the interests of justice, Plaintiffs respectfully request that this Court deny Defendants' motion for partial summary judgment.

Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership

By: _____
     Glenn A. Harris, Esquire
     Plaza 1000, Suite 500, Main Street
     Voorhees, New Jersey  08043
     Phone:  (856) 761-3440
     E-mail:  harrisg@ballardspahr.com

Dated:  March 14, 2008

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | : : : : : : : | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | : : | |
| v. | : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

ANNA M. BENCKERT, of full age, certifies as follows:

1.    I am employed by the law firm of Ballard Spahr Andrews & Ingersoll, LLP, as a legal secretary.

2.    On this date, I caused one copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment, proposed form of Order and Certificate of Service to be served via electronic submission upon the following:

<u>ALL DEFENDANTS ON ATTACHED SERVICE LIST</u>

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Anna M. Benckert /s/ _____

Dated:  March 14, 2008

Boarhead Farm Defendant Service List

File No. 892241

Laurie J. Sands, Esquire
Wolff & Samson, PC
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey 07052
Phone: 973-530-2098
Fax: 973-530-2298
e-mail: lsands@wolffsamson.com

*-and-*

Robert M. Morris, Esquire
Morris & Adelman, P.C.
1920 Chestnut Street
P.O. Box 30477
Philadelphia, PA 19103
Phone: 215-568-5621
Fax: 215-568-3253
e-mail: rmmorris@morrisadelman.com
*Advanced Environmental Technology Corp.*

Melissa Flax, Esquire
Carella, Byrne, Bain, Gilfillian, Cecchi,
        Stewart & Olstein, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068-1739
Phone: 973-994-1700
Fax: 973-994-1744
e-mail: mflax@carellabyrne.com
*Handy & Harman Tube Company*

Lynn Wright, Esquire
Edwards Angell Palmer & Dodge, LLP
750 Lexington Avenue
New York, New York 10022-1200
Phone: 212-308-4411
Fax: 212-308-4844
e-mail: lwright@ealaw.com
*Carpenter Technology Corporation*

Christopher R. Booth, Jr., Esquire
Booth and Tucker
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 1700
Philadelphia, Pennsylvania 19103
Phone: 215-875-0609
Fax: 215-875-8143
e-mail: cbooth@boothtucker.com
*Special Litigation Counsel for Carpenter Technology Corporation*

Seth v.d.H. Cooley, Esquire
Duane Morris LLP
United Plaza
30 South 17th Street
Philadelphia, PA 19103-4196
Phone: 215-979-1838
Fax: 215-979-1020
e-mail: scooley@duanemorris.com
*Flexible Circuits*

Edward Fackenthal, Esquire
Law Office of Edward Fackenthal
One Montgomery Plaza
Suite 209
Norristown, PA 19401
Phone: (610) 279-3370
Fax: (610) 279-0696
*NRM Investment Co.*
e-mail: edwardfackenthal@cs.com

Richard C. Biedrzycki, Esquire
Phelan, Pettit & Biedrzycki
The North American Building
Suite 1600
121 South Broad Street
Philadelphia, PA 19107
Phone: 215-546-0500
Fax: 215-546-9444
e-mail: rbiedrzycki@pp-b.com
*Ashland, Inc.*