# EXHIBIT B

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

ORIGINAL
(Red)

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

MAY 18 1989

Mr. George Shepherd
Corporate Counsel
Advanced Environmental Technology Corporation
Goldmine Road
Flanders, NJ  07836

Re:  Boarhead Farms, Upper Black Eddy, Bucks County, PA

Dear Mr. Shepherd:

The United States Environmental Protection Agency (EPA or the Agency) has expended public funds to investigate releases or threatened releases of hazardous substances at the above-referenced site, and EPA may spend additional public funds on actions to further investigate and control these releases or threatened releases.  This letter notifies you that Advanced Environmental Technology Corporation (AETC) is a potentially responsible party (PRP) for contamination at the Boarhead Farms site.  Unless EPA determines that a responsible party will properly perform such actions, EPA intends to do so pursuant to Section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9604, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-449, 100 Stat. 1613 (October 17, 1986) (CERCLA) and the National Contingency Plan, 40 C.F.R. Part 300.  EPA is planning to conduct the following studies at the Boarhead Farms site:

1.   Remedial Investigation (RI) – Further investigations to define the nature and extent of soil, air, ground water, surface water and sediment contam-ination at the site, and to identify the local hydrogeological character-istics and impact on biotic receptors at the site.

2.   Feasibility Study (FS) – A study to evaluate potential remedial alternatives, with emphasis on risk reduction through actions that utilize treatment to permanently and significantly reduce the toxicity, mobility, or volume of hazardous substances, pollutants, or contaminants.

| CONCURRENCES | | | | | | |
|---|---|---|---|---|---|---|
| SYMBOL | | | | | | |
| SURNAME | S. Billings | B. Nishidai | J.Guytell | B. Smith | | BSAI005128 |
| DATE | 5/11/89 | 5/12/89 | 5/12 | 5/18 | | |

OFFICIAL FILE COPY

ORIGINAL
(Red)

In addition to the above studies, AETC may be asked to undertake additional corrective measures to protect public health, welfare, or the environment for which they may be liable. Such measures may include but are not limited to:

1. Implementing emergency removal actions, e.g., securing the site to prevent contact with any hazardous substances that may be present at the site and/or removal of contaminated material from the surface of the site.

2. Implementing expedited response actions or non-time-critical removal actions taken when the Agency decides to implement a cleanup that does not require extensive study. (This type of action must be clearly defined and limited in scope and duration.)

3. Designing and implementing the EPA-approved remedial option.

4. Providing any monitoring and maintenance necessary after remedial measures are completed.

EPA encourages AETC to voluntarily undertake the Remedial Investigation/ Feasibility Study (RI/FS), which will be overseen by the Agency.

Under Section 107(a) of CERCLA, as amended, 42 U.S.C. Section 9607(a), responsible parties are liable for the costs of response actions. Under this section, responsible parties include: 1) current owners or operators of the site; 2) owners or operators at the time of disposal; 3) any persons who arranged for disposal or treatment of hazardous substances at the site; and, 4) transporters of hazardous substances to the site. EPA has information indicating that AETC arranged for the disposal of sulfuric acid from the Ashland Chemical Company, Great Meadows, NJ (Ashland) facility to the Boarhead Farms site in 1976. You should also be aware that EPA has identified other potentially responsible parties at this site.

EPA will consider an immediate offer from AETC to conduct or participate in and finance (under EPA supervision) the RI/FS described above, in accordance with a work plan consistent with the enclosed RI/FS guidance. You should notify EPA in writing, addressed to Suzanne T. Billings within fourteen (14) calendar days from the receipt of this letter, as to whether AETC is willing to undertake the RI/FS. The address is as follows:

Ms. Suzanne T. Billings (3HW12)
U.S. Environmental Protection Agency
Region III
PA CERCLA Remedial Enforcement Section
841 Chestnut Building
Philadelphia, PA 19107

BSAI005129

3

Your letter should indicate the appropriate name, address, and telephone number for further contact with a representative of AETC. Otherwise, EPA will assume that AETC declines any involvement in the RI/FS, and EPA will proceed with the appropriate studies and any emergency removal actions needed to secure the site. EPA may later invite AETC to undertake the design and implementation of the selected remedy upon the Agency's completion of the RI/FS.

ORIGINAL (Red)

In order for a potentially responsible party to undertake such action in accordance with Section 104(a) of CERCLA, as amended, 42 U.S.C. Section 9604(a), the President must determine that the potentially responsible party is qualified to conduct or participate in and finance the RI/FS, will promptly and properly complete the same, and agree to reimburse the government for any costs incurred by or in connection with the RI/FS.

If the Agency receives AETC's expression of interest in conducting or participating in and financing the RI/FS, and the Agency determines that a period of negotiation will facilitate an agreement and expedite remedial action, a special notice letter may be sent to AETC. Under such circumstances EPA will refrain from expending funds on the site for a period of time so that meaningful discussions concerning a Consent Order under Section 104 or Section 106 of CERCLA, as amended, 42 U.S.C. Section 9604 or Section 9606, can take place. A model Consent Order for an RI/FS is enclosed.

Under Section 122(e) of CERCLA, as amended, 42 U.S.C. Section 9622(e), responsible parties may be extended the opportunity to present a good-faith proposal to conduct the RI/FS to the Agency within sixty (60) days of receipt of a "special notice" letter. Should this proposal be received by the Agency within this time frame, the Agency will allow additional time totaling ninety (90) days from receipt of the special notice letter for negotiations between AETC and the Agency. This good-faith proposal should be in writing and should indicate AETC's qualifications and willingness to conduct or participate in and/or finance the RI/FS. This proposal should specifically identify, through a work plan, work schedule, or statement of work, the work in which AETC as a responsible party is willing to participate. A model scope of work has been provided as part of the enclosed RI/FS guidance.

EPA would like to encourage good-faith negotiations between AETC and the Agency, and between AETC and the other parties potentially responsible for the Boarhead Farms site. To facilitate these negotiations, the names of the other potentially responsible parties have been revealed to you in the enclosed Potentially Responsible Party List. The Agency requests that you schedule meaningful discussions with the other potentially responsible parties regarding all issues pertinent to the site and quickly organize yourselves into a single representative body to facilitate negotiations with the Agency.

BSAI005130

5

ORIGINAL
(Red)

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. William S. Hood, Jr.
Senior Attorney
Ashland Chemical Company
5200 Paul G. Blazer Memorial Parkway
Dublin, OH  43017

MAY 18 1989

Re:  Boarhead Farms, Upper Black Eddy, Bucks County, PA

Dear Mr. Hood:

The United States Environmental Protection Agency (EPA or the Agency)
has expended public funds to investigate releases or threatened releases
of hazardous substances at the above-referenced site, and EPA may spend
additional public funds on actions to further investigate and control these
releases or threatened releases.  This letter notifies you that Ashland
Chemical Company (Ashland) is a potentially responsible party (PRP) for
contamination at the Boarhead Farms site.  Unless EPA determines that a
responsible party will properly perform such actions, EPA intends to do so
pursuant to Section 104 of the Comprehensive Environmental Response, Com-
pensation and Liability Act of 1980, 42 U.S.C. Section 9604, as amended by
the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499,
100 Stat. 1613 (October 17, 1986), (CERCLA) and the National Contingency
Plan, 40 C.F.R. Part 300.  EPA is planning to conduct the following studies
at the Boarhead Farms site:

1.   **Remedial Investigation (RI)** - Further investigations to define the nature
     and extent of soil, air, ground water, surface water and sediment contam-
     ination at the site, and to identify the local hydrogeological character-
     istics and impact on biotic receptors at the site.

2.   **Feasibility Study (FS)** - A study to evaluate potential remedial alternatives
     with emphasis on risk reduction through actions that utilize treatment
     to permanently and significantly reduce the toxicity, mobility, or
     volume of hazardous substances, pollutants, or contaminants.

BSAI005136

In addition to the above studies, Ashland may be asked to undertake additional corrective measures to protect public health, welfare, or the environment for which they may be liable. Such measures may include but are not limited to:

1. Implementing emergency removal actions, e.g., securing the site to prevent contact with any hazardous substances that may be present at the site and/or removal of contaminated material from the surface of the site.

2. Implementing expedited response actions or non-time-critical removal actions taken when the Agency decides to implement a cleanup that does not require extensive study. (This type of action must be clearly defined and limited in scope and duration.)

3. Designing and implementing the EPA-approved remedial option.

4. Providing any monitoring and maintenance necessary after remedial measures are completed.

EPA encourages Ashland to voluntarily undertake the Remedial Investigation Feasibility Study (RI/FS), which will be conducted [illegible]

Under Section 107 of CERCLA, as amended, four classes of potentially responsible parties are liable [illegible] section, responsible parties include 1) current owners or operators of a site; 2) owners or operators of [illegible] of disposal of any [illegible] arranged for disposal [illegible] 4) transporters of hazardous substances to the site [illegible] indicating that the Ashland Chemical Company [illegible] a generator and [illegible] disposal [illegible] ronmental Technologies [illegible] (owner/operator of the [illegible] Boarhead Farms site [illegible] potentially responsible [illegible]

EPA/DEP requests [illegible] that Ashland to consider to participate in [illegible] the RI/FS described [illegible] accordance [illegible] conditions within the enclosed RI/FS [illegible] should [illegible] inform Ms. Gillian [illegible] within fourteen (14) calendar [illegible] receipt of this letter, as to whether Ashland is willing [illegible]

[illegible]

BSAI005137

3

Your letter should indicate the appropriate name, address, and telephone number for further contact with a representative of Ashland. Otherwise, EPA will assume that Ashland declines any involvement in the RI/FS, and EPA will proceed with the appropriate studies and any emergency removal actions needed to secure the site. EPA may later invite Ashland to undertake the design and implementation of the selected remedy upon the Agency's completion of the RI/FS.

In order for a potentially responsible party to undertake such action in accordance with Section 104(a) of CERCLA, as amended, 42 U.S.C. Section 9604(a), the President must determine that the potentially responsible party is qualified to conduct or participate in and finance the RI/FS, will promptly and properly complete the same, and agree to reimburse the government for any costs incurred by or in connection with the RI/FS.

ORIGINAL
(Red)

If the Agency receives Ashland's expression of interest in conducting or participating in and financing the RI/FS, and the Agency determines that a period of negotiation will facilitate an agreement and expedite remedial action, a special notice letter may be sent to Ashland. Under such circumstances EPA will refrain from expending funds on the site for a period of time so that meaningful discussions concerning a Consent Order under Section 104 or Section 106 of CERCLA, as amended 42 U.S.C. Section 9604 or Section 9606, can take place. A model Consent Order for an RI/FS is enclosed.

Under Section 122(e) of CERCLA, as amended, 42 U.S.C. Section 9622(e), responsible parties may be extended the opportunity to present a good-faith proposal to conduct the RI/FS to the Agency within sixty (60) days of receipt of a "special notice" letter. Should this proposal be received by the Agency within this time frame, the Agency will allow additional time totaling ninety (90) days from receipt of the special notice letter for negotiations between Ashland and the Agency. This good-faith proposal should be in writing and should indicate Ashland's qualifications and willingness to conduct or participate in and/or finance the RI/FS. This proposal should specifically identify, through a work plan, work schedule, or statement of work, the work in which Ashland as a responsible party is willing to participate. A model scope of work has been provided as part of the enclosed RI/FS guidance.

EPA would like to encourage good-faith negotiations between Ashland and the Agency, and between Ashland and the other parties potentially responsible for the Boarhead Farms site. To facilitate these negotiations, the names of the other potentially responsible parties have been revealed to you in the enclosed Potentially Responsible Party List. The Agency requests that you schedule meaningful discussions with the other potentially responsible parties regarding all issues pertinent to the site and quickly organize yourselves into a single representative body to facilitate negotiations with the Agency.

BSAI005138

BSAI005139



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION III
841 Chestnut Building
Philadelphia. Pennsylvania 19107

ORIGINAL
(Red)

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

John H. McCoy                                    JUL 2 8 1989
Principal Executive Officer
NRM Investment Company
919 Conestoga Road
Rosemont, Pennsylvania  19010

Re:  Boarhead Farms, Upper Black Eddy, Bucks County, PA

Dear Mr. McCoy:

    The United States Environmental Protection Agency (EPA or the Agency)
has expended public funds to investigate releases or threatened releases
of hazardous substances at the above-referenced site, and EPA may spend
additional public funds on actions to further investigate and control these
releases or threatened releases.  This letter notifies you that NRM Invest-
ment Company (NRM) is a potentially responsible party (PRP) for contamination
at the Boarhead Farms site.  Unless EPA determines that a responsible party
will properly perform such actions, EPA intends to do so pursuant to Section
104 of the Comprehensive Environmental Response, Compensation and Liability
Act of 1980, 42 U.S.C. Section 9604, as amended by the Superfund Amendments
and Reauthorization Act of 1986, Pub. L. No. 99-449, 100 Stat. 1613 (October
17, 1986) (CERCLA) and the National Contingency Plan, 40 C.F.R. Part 300.
EPA is planning to conduct the following studies at the Boarhead Farms site:

1.  Remedial Investigation (RI) - Further investigations to define the nature
    and extent of soil, air, ground water, surface water and sediment contam-
    ination at the site, and to identify the local hydrogeological character-
    istics and impact on biotic receptors at the site.

2.  Feasibility Study (FS) - A study to evaluate potential remedial alterna-
    tives, with emphasis on risk reduction through actions that utilize
    treatment to permanently and significantly reduce the toxicity, mobility,
    or volume of hazardous substances, pollutants, or contaminants.

- 2 -                                    ORIGINAL
                                          (Red)

In addition to the above studies, NRM may be asked to undertake additional corrective measures to protect public health, welfare, or the environment for which they may be liable.  Such measures may include but are not limited to:

1.  Implementing emergency removal actions, e.g., securing the site to prevent contact with any hazardous substances that may be present at the site and/or removal of contaminated material from the surface of the site.

2.  Implementing expedited response actions or non-time-critical removal actions taken when the Agency decides to implement a cleanup that does not require extensive study.  (This type of action must be clearly de-fined and limited in scope and duration.)

3.  Designing and implementing the EPA-approved remedial option.

4.  Providing any monitoring and maintenance necessary after remedial measures are completed.

EPA encourages NRM to voluntarily undertake the Remedial Investigation/ Feasibility Study (RI/FS), which will be overseen by the Agency.

Under Section 107(a) of CERCLA, as amended, 42 U.S.C. Section 9607(a), responsible parties are liable for the costs of response actions.  Under this section, responsible parties include: 1) current owners or operators of the site; 2) owners or operators at the time of disposal; 3) any persons who arranged for disposal or treatment of hazardous substances at the site; and, 4) transporters of hazardous substances to the site.  EPA has information indicating that a former truck driver for Manfred DeRewal, Sr. (owner/operator of the site) brought waste to the Boarhead Farms site from the current National Rolling Mills, Inc., Paoli, Pennsylvania site.  This facility was owned and operated by the former National Rolling Mills Company from 1974 to August 1979.  National Rolling Mills Company is now known as the NRM Investment Company (NRM).  The waste hauling activities connected with the Boarhead Farms allegedly occurred during the 1974 to August 1979 time period.

EPA will consider an immediate offer from NRM to conduct or partici-pate in and finance (under EPA supervision) the RI/FS described above, in accordance with a work plan consistent with the enclosed RI/FS guidance. You should notify EPA in writing, addressed to Jack Kelly within fourteen (14) calendar days from the receipt of this letter, as to whether NRM is willing to undertake the RI/FS.  The address is as follows:

Mr. Jack Kelly  (3HW12)
U.S. Environmental Protection Agency
Region III
PA CERCLA Remedial Enforcement Section
841 Chestnut Building
Philadelphia, PA  19107

BSAI032542

3

{Red}

Your letter should indicate the appropriate name, address, and telephone number for further contact with a representative of NRM. Otherwise, EPA will assume that NRM declines any involvement in the RI/FS, and EPA will proceed with the appropriate studies and any emergency removal actions needed to secure the site. EPA may later invite NRM to undertake the design and implementation of the selected remedy upon the Agency's completion of the RI/FS.

In order for a potentially responsible party to undertake such action in accordance with Section 104(a) of CERCLA, as amended, 42 U.S.C. Section 9604(a), the President must determine that the potentially responsible party is qualified to conduct or participate in and finance the RI/FS, will promptly and properly complete the same, and agree to reimburse the government for any costs incurred by or in connection with the RI/FS.

If the Agency receives NRM's expression of interest in conducting or participating in and financing the RI/FS, and the Agency determines that a period of negotiation will facilitate an agreement and expedite remedial action, a special notice letter may be sent to NRM. Under such circumstances EPA will refrain from expending funds on the site for a period of time so that meaningful discussions concerning a Consent Order under Section 104 or Section 106 of CERCLA, as amended, 42 U.S.C. Section 9604 or Section 9606, can take place. A model Consent Order for an RI/FS is enclosed.

Under Section 122(e) of CERCLA, as amended, 42 U.S.C. Section 9622(e), responsible parties may be extended the opportunity to present a good-faith proposal to conduct the RI/FS to the Agency within sixty (60) days of receipt of a "special notice" letter. Should this proposal be received by the Agency within this time frame, the Agency will allow additional time totaling ninety (90) days from receipt of the special notice letter for negotiations between NRM and the Agency. This good-faith proposal should be in writing and should indicate NRM's qualifications and willingness to conduct or participate in and/or finance the RI/FS. This proposal should specifically identify, through a work plan, work schedule, or statement of work, the work in which NRM as a responsible party is willing to participate. A model scope of work has been provided as part of the enclosed RI/FS guidance.

EPA would like to encourage good-faith negotiations between NRM and the Agency, and between NRM and the other parties potentially responsible for the Boarhead Farms site. To facilitate these negotiations, the names of the other potentially responsible parties have been revealed to you in the enclosed Potentially Responsible Party List. The Agency requests that you schedule meaningful discussions with the other potentially responsible parties regarding all issues pertinent to the site and quickly organize yourselves into a single representative body to facilitate negotiations with the Agency.

BSAI032543

4

ORIGIN
(Red)

If NRM is already involved in discussions with state or local author-
ities, engaged in voluntary action, or involved in a lawsuit regarding this
site, you should not interpret this letter to be advising or directing NRM
to restrict or discontinue any such activities. On the other hand, this
letter should not be interpreted to be endorsing any such efforts by state
or local authorities. You should report, however, the status of those
discussions or that action in your letter to us. Please provide a copy of
your letter to any other party involved in those discussions. You should
also be aware that this site cannot be delisted from the CERCLA National
Priorities List until after an RI/FS has been completed and the necessary
remedial work concluded in accordance with the enclosed RI/FS guidance and
EPA's National Contingency Plan.

If you need further information, Jack Kelly can be reached at (215)
597-3168.

The factual and legal discussions contained in this letter are intended
solely for notification and information purposes. They are not intended to
be and cannot be relied upon as a final Agency position on any matter set
forth herein.

Sincerely,

Stephen R. Wassersug, Director
Hazardous Waste Management Division

Enclosures:  PRP List, Model Consent Order, EPA RI/FS Guidance (October 1988),
             Location Map

cc: James P. Snyder, PADER
    Mark Bonenberger, PADER
    Brian Nishitani, EPA
    Suzanne Canning, EPA
    Alicia Coreley, OWPE

BSAI032544



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
1650 Arch Street
**Philadelphia, Pennsylvania 19103**

RECEIVED

OCT 0 6 2000

PITNEY, HARDIN, KIPP & SZUCH LLP

<u>**VIA CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED**</u>

September 28, 2000

Albert Costello, Chairman
American Cyanamid Company
One Cyanamid Plaza
Wayne, N.J. 07470-8426

Re:     **Boarhead Farms Superfund Site:  "Special Notice" for Negotiations for**
        <u>**Remedial Design & Remedial Action and Demand for Payment of Costs**</u>

Dear Mr. Costello:

This letter relates to the liability of your company in connection with the Boarhead Farms Superfund Site in Bucks County, Pennsylvania ("Site" or "Boarhead Site").

## <u>INTRODUCTION</u>

The United States Environmental Protection Agency ("EPA" or "Agency") has conducted and overseen activities undertaken at the Site in response to the release and/or threat of release of hazardous substances, pollutants, or contaminants into the environment. Through a previous letter, EPA notified American Cyanamid Company of its potential liability for such response action pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA", 42 U.S.C. § 9607.  EPA later sent your company a Special Notice Letter ("SNL") on January 4, 1999.  As outlined in the SNL sent in 1999, EPA has selected remedial action for implementation at the Site, which remedial action is described in a document called a Record of Decision ("ROD") issued by EPA on November 18, 1998.

The SNLs sent by EPA in January of 1999 did not result in the Agency receiving a "good faith offer" for settlement.  EPA therefore began doing the work at the Site using Superfund money. However, sometime after that, a small group of companies formed the Boarhead Farms Group ("BFG").  This group requested that: (1) EPA consider negotiating with them to take over a portion of the work at the Site; and (2) EPA continue its PRP search activities.  EPA agreed, and during negotiations, the Agency determined to divide the remedy for the Site into two operable units.  The

remedy for the Site. This agreement is embodied in a consent decree, hereinafter referred to as the "OU-1 Consent Decree." The OU-1 Consent Decree was lodged with the federal district court for the Eastern District of Pennsylvania on May 2, 2000. The United States also filed a Motion to Enter the OU-1 Consent Decree on July 10, 2000. That motion is pending.

EPA has completed the remedial design for the remainder of the work to be performed at the Site (hereinafter referred to as "Operable Unit 2 work" or "OU-2 work") at the Site. Together, OU-1 work and OU-2 work encompass the entire remedial action selected in the ROD.

EPA is now contacting your company again in an attempt to resolve its liability with respect to the Boarhead Farms Superfund Site. Toward that end, this letter contains:

1.    A formal demand for reimbursement of costs that have been paid (including interest thereon) and that are to be paid (which are subject to interest) in conducting and/or overseeing response actions at the Site (Demand for Payment);

2.    Notification that a limited period of formal negotiations for an agreement under which your company will implement the requirements of the ROD not addressed by the OU-1 Consent Decree begins with your receipt of this letter (Special Notice);

3.    General and site-specific information to assist you in these negotiations; and

4.    A copy of a draft site-specific consent decree and administrative order on consent for settlement of this matter.

## DEMAND FOR PAYMENT

As of July 31, 2000 (the date on which the latest cost report was prepared), EPA paid costs of at least $13,662,870.77 for response activities related to the Site. Although this figure may not include all applicable costs incurred and paid to date, the figure represents EPA's most recent calculation. Furthermore, additional costs, including oversight and related enforcement costs, may continue to be incurred.

By this letter, EPA demands that your company reimburse the Agency for past costs of at least $13,662,870.77. These costs were not addressed by the OU-1 Consent Decree mentioned above. Failure to pay, or delay in payment, may subject your company to liability for increased costs associated with these past costs including, but not limited to, interest and enforcement costs. Interest on amounts recoverable begins to accrue as of the date of receipt of this letter as provided by Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

You may contact the following person to arrange for payment of the above-described costs:

Sarah P. Keating, Esquire (3RC43)
Sr. Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA 19103-2029
(215) 814-2655

## SPECIAL NOTICE NEGOTIATIONS MORATORIUM

EPA has determined that use of the "special notice" procedures specified in Section 122 of CERCLA, 42 U.S.C. § 9622, would facilitate a settlement between EPA and your company for implementation of the remedial action at the Site. Therefore, pursuant to that section, your receipt of this letter triggers a sixty (60)-day moratorium on certain EPA response and enforcement activities at the Site. During this sixty (60)-day period, your company is invited to submit a good faith proposal (defined below) to conduct and/or finance such remedial action and negotiate a consent decree (described below) under which your company will perform such work. If EPA determines that such a good faith offer has been timely received, the Agency will provide an additional sixty (60) days to finalize the consent decree. When approved by EPA and the United States Department of Justice, the consent decree will then be filed in federal court.

EPA encourages your company's participation by submitting a good faith proposal as defined below.

### Good Faith Proposal

A good faith proposal to conduct or finance the remedial action is a written proposal that demonstrates your company's qualifications and willingness to perform such work and includes the following elements:

1. A statement of willingness and financial ability by your company to implement the requirements of the ROD and the proposed consent decree;

2. A demonstration of your company's technical capability to conduct the work, including the identification of the firm(s) your company intends to retain to conduct all or portions of such work or a description of the process your company will use to select the firm(s);

3.     A statement of your company's willingness and ability to reimburse EPA for costs incurred in overseeing the performance of the work as well as EPA's past costs (as described above);

4.     Comments, if any, on the proposed consent decree and on the proposed administrative order (see below);

5.     The name, address, telephone, and telefax number (if any) of the person(s) who will represent your company in negotiations for a consent decree.

### Consent Decree

Section 122(d)(1)(A) of CERCLA, 42 U.S.C. § 9622(d)(1)(A), requires that settlements for remedial action be entered in the appropriate federal district court in the form of a consent decree. Enclosed with this letter you will find a copy of a draft consent decree and administrative order on consent for settlement of this matter. This document has been tailored for use in connection with the subject Site and contains language which, for the most part, is the same language the Government will expect in a final settlement because it reflects legal and procedural terms that have been found acceptable to both EPA and the regulated community in a large number of situations. Your company's decision to submit a good faith proposal to perform the work should be made with the understanding that the terms appearing in the site-specific draft consent decree and administrative order are substantially the terms which EPA expects to appear in the final settlement.

### PRP Steering Committee

EPA encourages good-faith negotiations between your company and EPA and between your company and other potentially responsible parties ("PRPs"). To facilitate these negotiations, EPA has enclosed a list of other PRPs to whom this notification has been sent. Inclusion on, or exclusion from, this list does not constitute a final determination by EPA concerning the liability of any party with respect to the Site.

EPA recommends that all PRPs meet to select a steering committee responsible for representing the group's interests. Establishing a manageable group is very important for successful negotiations with EPA.[1]

### PRP Response/EPA Contact Person

Your company is encouraged to contact EPA as soon as possible to state its willingness to participate in negotiations relating to the Site. Specifically, you have sixty (60) calendar days from receipt of this letter to provide EPA with a written proposal as described above. You may respond individually or through a steering committee. If EPA does not receive a timely response, EPA will assume that your company does not wish to negotiate a resolution of its liabilities in this matter and that your company has declined any involvement in performing the response activities described above. In such event, EPA may, among other things, issue an administrative order directing your company to perform the response action; seek to file an action in federal court to obtain a court order directing your company to perform the response action; and/or perform such response action and seek reimbursement from liable parties.

If a proposal is submitted which EPA determines is not a good faith offer, you will be notified in writing of EPA's decision to end the negotiations moratorium and the reasons therefor. Your company may be liable for performing the response action pursuant to a unilateral administrative order or court order and/or reimbursing EPA for the cost of response actions performed by EPA.

Your response to this letter, including written proposals to perform the remedial action selected for the Site, should be sent to:

James Harper (3HS21)
Remedial Project Manager
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA 19103-2029
(215) 814-3197

---

[1]The BFG of PRPs can be reached through David Payne, Esq. at the following address:

David W. Payne, Esq.
Pitney, Hardin, Kipp & Szuch LLP
P.O. Box 1945
Morristown, New Jersey 07962-1945
Phone: (973) 966-8196
Fax: (973) 966-1015

## ADMINISTRATIVE RECORD

Pursuant to section 113(k) of CERCLA, 42 U.S.C. § 9613(k), EPA has established an administrative record which contains documents forming the basis of EPA's selection of response action for the Site. The administrative record file is available to the public for inspection and comment. You may wish to review the administrative record to assist you in responding to this letter, but your review should not delay such response. Copies of the file are located both at the EPA Region III office and:

Bucks County Library Center
150 S. Pine Street
Doylestown, PA 18901-4932
(215) 348-9081

EPA will consider comments received, if any, after the close of the comment period in accordance with 40 C.F.R. § 300.825.

The factual and legal discussions contained in this letter are intended solely for notification and information purposes. They are not intended to be and cannot be relied upon as final EPA positions on any matter set forth herein.

If you or your attorney have any questions pertaining to this matter, please direct them to Sr. Assistant Regional Counsel Sarah P. Keating at (215) 814-2655.

Sincerely,

Abraham Ferdas, Director
Hazardous Sites Cleanup Division

cc:     Thomas Waldman, Esq. (Cytec Industries, Inc.)
        David Payne, Esq. (Pitney, Hardin, Kipp & Szuch)
        Sarah P. Keating (EPA)
        James Harper (EPA)
        Donna Duer (DOJ)

*Boarhead Farms Superfund Site: RD/RA Special Notice*
*Letter and Demand for Payment of Response Costs*                                                7

Enclosures:    Service List of Prior Special Notice Letter Recipients (1/4/99)
               Service List of Recipients of General Notice/Special Notice (9/00)
               Service List of Recipients of this Letter
               Draft Site-Specific Consent Decree
               Draft Administrative Order on Consent
               Copy of OU-1 Consent Decree
               Updated Cost Summary Report (7/31/00)

## General Notice/Special Notice Letter Mailing List (September 2000)

<u>Bundy Corporation</u>
D. James Davis, President
TI Group Automotive Systems Corporation
P.O. Box 77639
12345 E. Nine Mile Road
Warren, MI   48049

Mary Platt, Esq.
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street
Philadelphia, PA  19109
Phone: 215-772-1500
Fax:    215-772-7620


<u>Carpenter Technology</u>
David A. Christiansen, Esq.
Associate General Counsel
Carpenter Technology Corporation
1047 North Park Road
Wyomissing, Pennsylvania  19610
Phone: 610-208-2000
Fax:    610-736-7361

Robert W. Cardy, Chairman-CEO
Carpenter Technology Corporation
1047 North Park Road
Wyomissing, PA  19610
Tel:  (610) 208-2000
Fax: (610) 736-7361


<u>Etched Circuits</u>
Melvin A. Bach
President
Etched Circuits, Inc.
Cherry Hill Industrial Park
Cherry Hill, New Jersey  08003
Phone: 609-424-2425

George B. Stollsteimer, CHB
President
FGC, Inc.
202 Valley Road
Warrington, Pennsylvania  18976-2580
Phone: 215-343-2300
Fax:    215-343-2075


Harry C. Barbin, Esq.
Secretary and General Counsel
FGC, Inc.
202 Valley Road
Warrington, Pennsylvania  18976-2580
Phone: 215-343-2300
Fax:    215-343-2075


Flexible Circuits
George B. Stollsteimer, CHB
President
FGC, Inc.
202 Valley Road
Warrington, Pennsylvania  18976-2580
Phone: 215-343-2300
Fax:    215-343-2075

Harry C. Barbin, Esq.
Secretary and General Counsel
FGC, Inc.
202 Valley Road
Warrington, Pennsylvania  18976-2580
Phone: 215-343-2300
Fax:    215-343-2075


Handy & Harman
Mark J. Scheideker
Environmental Compliance Manager
Camden Metals Corp./Handy & Harman Co.
Vepco Industrial Park
Drawer F
Camden, Delaware  19934
Phone: 302-697-9521
Fax:    302-697-9620

Thomas M. Curran
Vice President
Handy & Harman Tube Company
701 W. Township Line Road
RD #3
Norristown, Pennsylvania 19403
Tel: (610) 539-3900
Fax: (610) 539-3250


Merit Metals
A. Richard Stefanowicz
President
Merit Metal Products Corporation
242 Valley Road
Warrington, Pennsylvania  18976
Phone: 215-343-2500
Fax:    215-343-4839

Lawrence R. Woehrle, Esq.
Monteverde, McAlee, Fitzpatrick,
Tanker & Hurd
One Penn Center at Suburban Station
Suite 1500
1617 John F. Kennedy Boulevard
Philadelphia, Pennsylvania  19103
Phone: 215-557-2900
Fax:    215-557-2990/2991


Mr. Leonard Sayles
1426 Dorel Road
Rydal, Pennsylvania  19046-1410


Mr. Steven T. Miano, Esq.
Wolf, Block, Schorr & Solis-Cohen, LLP
1650 Arch Street
22nd Floor
Philadelphia, PA 19103
Tel: (215) 977-2228
Fax: (215) 405-3828

Mr. Leonard Wolberg
1230 Gantt Drive
Huntington Valley, Pennsylvania 19006-3212

Mr. Steven T. Miano, Esq.
Wolf, Block, Schorr & Solis-Cohen, LLP
1650 Arch Street
22nd Floor
Philadelphia, PA 19103
Tel: (215) 977-2228
Fax: (215) 405-3828


Plymouth Tube
Mr. Lou Smith
Plymouth Tube Company, Inc.
Ellwood Ivins Plant
1005 Horsham Road
Horsham, Pennsylvania 19044

Steven J. Lemon, Esq.
Jones & Lemon
28 North Bennett Street
Suite A
P.O. Box 805
Geneva, Illinois 60134-0805
Phone: 708-208-0805
Fax: 708-208-4651

Donald C. Van Pelt, Jr.
President-CEO
Plymouth Tube Company, Inc.
29 W. 150 Warrenville Road
Warrenville, IL 60555


Quikline
Vinu Patel
President/Chief Executive Officer
Quikline Design & Manufacturing, Inc.
Route 130 & Nicholson Road
(85 Nicholson Road)
Gloucester City, New Jersey 08030
Tel: 856-742-0550

Sandford F. Schmidt, Esq.
Law Offices of Sandford F. Schmidt
29 Union Street
Medford, New Jersey 08055
Phone: 609-714-0600
Fax:    609-714-0610

Patrick F. McAndrew, Esq.
Union Professional Building
29 Union Street
Medford, NJ 08055

Thomas & Betts
Michael Geiger, Esq.
Senior Environmental & Corporate Counsel
Thomas & Betts Corporation
8155 Thomas & Betts Boulevard
Memphis, Tennessee  38125
Phone: 901-252-5000
Fax:    901-252-1340

Karen A. Mignone, Esq.
McGovern, Noel & Benik, Inc.
159 Millburn Avenue, 2nd Floor
Millburn, New Jersey  07041
Phone: 973-376-4255
Fax:    973-376-8554

Clyde R. Moore
President-CEO
Thomas & Betts Corporation
8155 Thomas & Betts Boulevard
Memphis, Tennessee  38125
Phone: 901-252-5000
Fax:    901-252-1340

McArthur Chemical

Allan  B. Bakalian, Esq.
Senior Corporate Counsel
Van Waters & Rogers Inc.
A Royal Pakhoed Company
6100 Carillon Point
Kirkland, Washington  98124-1325
Phone: 206-889-3644
Fax:    206-889-4136

Paul Hough, President
Van Waters & Rogers, Inc.
A Royal Pakhoed Company
6100 Carillon Point
Kirkland, WA 98124-1325
Tel: (206) 889-3400

Larry Bullock, President
Van Waters & Rogers, Ltd.
9800 Van Horne Way
Vancouver, British Columbia V6B 3R2
Tel: (604) 273-1441
Fax: (604) 273-2046

EXHIBIT C



# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Civil Action No. |
| | ) | |
| | ) | OO-CV-2248 |
| Plaintiff, | ) | |
| | ) | RECEIVED |
| v. | ) | |
| | ) | SEP 2 8 2000 |
| CYTEC INDUSTRIES, INC., | ) | |
| FORD MOTOR COMPANY, | ) | TUCKER, PETRESE B.   F I L E D |
| SPS TECHNOLOGIES, INC. | ) | |
| | ) | SEP 2 8 2000 |
| Defendants. | ) | |
| | ) | MICHAEL E. KUNZ, Clerk |
| | | By _____ Dep. Clerk |

CONSENT DECREE
## TABLE OF CONTENTS

I.      BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V.      GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VI.     PERFORMANCE OF THE WORK BY SETTLING DEFENDANTS . . . . . . . . . . 14

VII.    QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS . . . . . . . . . . . . 26

VIII.   ACCESS AND INSTITUTIONAL CONTROLS . . . . . . . . . . . . . . . . . . . . . . . 29

IX.     REPORTING REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

X.      EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . . . . . . . 37

XI.     PROJECT COORDINATORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

XII.    ASSURANCE OF ABILITY TO COMPLETE WORK . . . . . . . . . . . . . . . . . . . . 41

-2-

XIII.  CERTIFICATION OF COMPLETION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

XIV.  EMERGENCY RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

XV.  REIMBURSEMENT OF FUTURE RESPONSE COSTS . . . . . . . . . . . . . . . . . 46

XVI.  INDEMNIFICATION AND INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

XVII.  FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

XVIII.  DISPUTE RESOLUTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

XIX.  STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

XX.  COVENANTS NOT TO SUE BY PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . 63

XXI.  COVENANTS BY SETTLING DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . 66

XXII.  EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION . . . . . . . . . . . 68

XXIII. ACCESS TO INFORMATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

XXIV.  RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XXV.  NOTICES AND SUBMISSIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

XXVI.  EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

XXVII.  RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

XXVIII. APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

XXIX.  COMMUNITY RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

XXX.  MODIFICATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

XXXI. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT  . . . . . . . . . . . . 77

XXXII. SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

XXXIII.  RELATIONSHIP BETWEEN CONSENT ORDER AND CONSENT DECREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

XXXIV. STIPULATION AND DISMISSAL OF THE UNITED STATES' CLAIMS . . . . 79

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | |
| CYTEC INDUSTRIES, INC., | ) | |
| FORD MOTOR COMPANY, | ) | |
| SPS TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CONSENT DECREE

## I. BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of

the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter

pursuant to Sections 106 and 107 of the Comprehensive Environmental Response,

Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

B.    The United States in its complaint seeks, inter alia: (1) reimbursement of costs

incurred by EPA and the Department of Justice for response actions at the Boarhead Farms

Superfund Site ("Site," as defined below) in Upper Black Eddy, Bridgeton Township, Bucks

County, Pennsylvania, together with accrued interest; and (2) performance of studies and

response work by the defendants at the Site consistent with the National Oil and Hazardous

Substances Pollution Contingency Plan, 40 C.F.R. Part 300 (as amended) ("NCP").

C.    In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the Commonwealth of Pennsylvania (the "State") on December 30, 1997 of negotiations with potentially responsible parties regarding the implementation of the remedial design and remedial action for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree.

D.    In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the United States Department of the Interior on August 24, 1992 and January 31, 1997, and the National Oceanic and Atmospheric Administration ("NOAA") on August 24, 1992, of negotiations with potentially responsible parties regarding the release of hazardous substances that may have resulted in injury to the natural resources under Federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this Consent Decree.

E.    The defendants that have entered into this Consent Decree ("Settling Defendants") do not admit any liability to the Plaintiff arising out of the transactions or occurrences alleged in the complaint, nor do they acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent or substantial endangerment to the public health or welfare or the environment.

F.    Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on March 31, 1989, 54 Fed. Reg. 13296.

G.    EPA conducted removal action at the Site beginning in the year 1992 and continuing to the present pursuant to Section 104 of CERCLA, 42 U.S.C. Section 9604.  The removal action included, in general:  (1) the removal of buried drums; (2) the construction, operation and

maintenance of groundwater interception wells and a groundwater interception trench; (3) the construction of a groundwater treatment plant on the Site; and (4) the installation, operation and maintenance of residential well filtration systems.

H.    In response to a release or a substantial threat of a release of a hazardous substance(s) at or from the Site, EPA commenced on December 5, 1989, a Remedial Investigation and Feasibility Study ("RI/FS") for the Site pursuant to 40 C.F.R. § 300.430.

I.    EPA completed an Ecological Risk Assessment in September 1995. The Baseline Risk Human Health Risk Assessment was also completed in September 1995. Based on these documents and the Remedial Investigation, a Feasibility Study ("FS") was prepared in July 1997, describing the remedial action objectives and comparing cleanup alternatives for the Site.

J.    Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the proposed plan for remedial action on January 5, 1998, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Regional Administrator based the selection of the response action.

K.    The decision by EPA on the remedial action to be implemented at the Site is embodied in a final Record of Decision ("ROD"), executed on November 18, 1998, on which the State has given its concurrence. The ROD includes EPA's explanation for any significant differences between the final plan and the proposed plan as well as a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA.

L.    Subsequent to the issuance of the ROD, EPA determined to implement the remedial

design ("RD") and remedial action ("RA") described in the ROD in two operable units ("OUs").

OU-1 (as defined below), in general, will address Remedy Components 3, 4, 5, 6, and 7 outlined

in the ROD Declaration (Appendix A).  These include:

> Remedy Component 3- Groundwater Extraction, Metals Precipitation, and Air
> Stripping
> Remedy Component 4- Installation of Additional Monitoring Wells
> Remedy Component 5- Institutional Controls and Monitoring for OU-1
> Remedy Component 6- Residential Water Treatment
> Remedy Component 7- Phytoremediation

OU-2, in general, will address Remedy Components 1, 2, and 5 outlined in the ROD Declaration

(Appendix A) and any other work described in the ROD that was not addressed by this Consent

Decree as part of OU-1.  These include:

> Remedy Component 1- Soil Aeration and Treatment of VOC Hot Spots
> Remedy Component 2- Excavation and Offsite Disposal of Buried Drums
> Remedy Component 5- Institutional Controls and Monitoring for OU-2

M.    EPA has commenced the RD for OU-1.  Under the terms of this Consent Decree, the

Settling Defendants will assume responsibility for the performance of the RD and the RA for all

OU-1 activities (together, the "Work"), as defined below.

N.    Based on the information presently available to EPA, EPA  believes that the Work

will be properly and promptly conducted by the Settling Defendants if conducted in accordance

with the requirements of this Consent Decree and its appendices.

O.    Solely for the purposes of Section 113(j) of CERCLA, the Remedial Action selected

by the ROD and the Work to be performed by the Settling Defendants shall constitute a response

action taken or ordered by the President.

P.    The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over the Settling Parties. Solely for the purposes of this Consent Decree and the underlying complaint, Settling Defendants waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. The Settling Defendants shall not challenge the terms of this Consent Decree, and the Settling Defendants shall not challenge this Court's jurisdiction to enter and enforce this Consent Decree.

## III. PARTIES BOUND

2.    This Consent Decree applies to and is binding upon the United States and upon Settling Defendants and their successors and assigns. Any change in ownership or corporate or other legal status of a Settling Defendant including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such Settling Defendant's responsibilities under this Consent Decree.

3.      Settling Defendants shall provide a copy of this Consent Decree to each contractor hired to perform the Work (as defined below) required by this Consent Decree and to each person representing any Settling Defendant with respect to the Site or the Work and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree.  Settling Defendants or their contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work required by this Consent Decree.  Settling Defendants shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be in a contractual relationship with the Settling Defendants within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV. DEFINITIONS

4.      Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations.  Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq.

"Consent Decree" shall mean this Decree and all appendices attached hereto (listed in Section XXIX). In the event of conflict between this Decree and any appendix, this Decree shall control.

"Day" shall mean a calendar day unless expressly stated to be a working day. "Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

"Duly Authorized Representative" shall mean a person set forth or designated in accordance with the procedures set forth in 40 C.F.R. § 270.11(b).

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs or incurred after November 18, 1998, in performing the RD and any related activities, or in reviewing or developing plans, reports and other items pursuant to this Consent Decree, verifying the Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to Sections VIII (including, but not limited to, attorneys fees and any monies paid to secure access and/or to secure or implement institutional controls for OU-1, including, but not limited to, the amount of just compensation), XIV, and Paragraph 74 of Section XX. Future Response Costs shall not include costs for any response action or operable unit that is not part of "OU-1," as defined in this Consent Decree.

"Institutional Controls" shall mean land and/or water use restrictions including, but not limited to, restrictions in the form of contractual agreements, restrictive easements/covenants that run with the land, and governmental controls.

"Interest" shall mean interest at the rate specified for interest on investments of the Hazardous Substance Superfund established under Subchapter A of Chapter 98 of Title 26 of the U.S. Code, compounded on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).

"Municipal Solid Waste" shall mean all waste materials generated by households, including single and multi-family residences, and hotels and motels. The term also includes waste materials generated by commercial, institutional, and industrial sources, to the extent such wastes (A) are essentially the same as waste normally generated by households, or (B) are collected and disposed of with other municipal solid waste or sewage sludge as part of normal municipal solid waste collection services and, regardless of when generated, would be considered conditionally exempt small quantity generator waste under regulations issued pursuant to Section 3001(d)(4) of the Solid Waste Disposal Act (42 U.S.C. 6921(d)(4)). Examples of Municipal Solid Waste include food and yard waste, paper, clothing, appliances, consumer product packaging, disposable diapers, office supplies, cosmetics, glass and metal food containers, elementary or secondary school science laboratory waste, and household hazardous waste. The term does not include combustion ash generated by resource recovery facilities or municipal incinerators, or waste from manufacturing or processing (including pollution control) operations not essentially the same as waste normally generated by households.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42

U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Operation and Maintenance" or "O & M" shall mean all activities required to maintain the

effectiveness of the RA for all OU-1 activities as required under the Operation and Maintenance

Plan approved or developed by EPA pursuant to this Consent Decree.

"OU-1" or "OU-1 Activities" shall mean all of those activities described in the ROD that

address Remedy Components 3, 4, 5, 6, and 7 outlined in the ROD Declaration (Appendix A).

These include, but are not limited to:

> Remedy Component 3- Groundwater Extraction, Metals Precipitation, and Air
> Stripping
> Remedy Component 4- Installation of Additional Monitoring Wells
> Remedy Component 5- Institutional Controls and Monitoring for OU-1
> Remedy Component 6- Residential Water Treatment
> Remedy Component 7- Phytoremediation

"OU-2" or "OU-2 Activities" shall mean those activities described in the ROD that address

Remedy Components 1, 2, and 5 as described in the ROD Declaration (Appendix A), and any

other work described in the ROD that was not addressed by this Consent Decree as part of OU-1.

OU-2 or OU-2 Activities include, but are not limited to:

> Remedy Component 1- Soil Aeration and Treatment of VOC Hot Spots
> Remedy Component 2- Excavation and Offsite Disposal of Buried Drums
> Remedy Component 5- Institutional Controls and Monitoring for OU-2

"Owner, Operator, or Lessee of Residential Property" shall mean a person who owns,

operates, manages, or leases Residential Property and who uses or allows the use of the

Residential Property exclusively for residential purposes.

"PADEP" shall mean the Pennsylvania Department of Environmental Protection and any

successor departments or agencies of the State.

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or an upper case letter.

"Parties" shall mean the United States and the Settling Defendants.

"Performance Standards" shall mean the cleanup standards and other measures of achievement for all OU-1 Activities as defined herein, and as set forth on pages 30-39 of the ROD attached hereto as Appendix A and those that are developed by the Settling Defendants and approved by EPA in writing during Remedial Design.

"Plaintiff" shall mean the United States.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 et seq. (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Site signed on November 18, 1998 by the Director of the Region III Hazardous Site Cleanup Division, or his/her delegate, and all attachments thereto. The ROD is attached as Appendix A.

"Remedial Action" or "RA" shall mean those activities, except for Remedial Design and Operation and Maintenance, to be undertaken by the Settling Defendants to implement all OU-1 Activities as defined herein, in accordance with the final Remedial Design and Remedial Action Work Plans and other plans approved by EPA.

"Remedial Action Work Plan" shall mean the document developed pursuant to Paragraph 11 of this Consent Decree and approved by EPA, and any amendments thereto.

"Remedial Design" or "RD" shall mean those activities to be undertaken by the Settling Defendants to develop the final plans and specifications for the Remedial Action with respect to

all OU-1 Activities as defined herein, pursuant to the Remedial Design Work Plan and other

plans approved by EPA.

"Remedial Design Work Plan" shall mean the document(s) developed pursuant to Paragraph

11 of this Consent Decree and approved by EPA, and any amendments thereto.

"Residential Property" shall mean single or multi-family residences, including accessory

land, buildings, or improvements incidental to such dwellings, which are exclusively for

residential use.

"Section" shall mean a portion of this Consent Decree identified by a roman numeral.

"Settling Defendants" shall mean those Parties identified in Appendix B (Settling

Defendants).

"Sewage Sludge" means solid, semisolid, or liquid residue removed during the treatment of

municipal waste water, domestic sewage, or other waste water at or by publicly owned or

federally owned treatment works.

"Site" shall mean the Boarhead Farms Superfund Site, encompassing approximately 120

acres, located on Lonely Cottage Road in Upper Black Eddy, Bridgeton Township, Bucks

County, Pennsylvania, and depicted in the ROD.

"Small Business" shall mean any business entity that employs no more than 100 individuals

and is a "small business concern" as defined under the Small Business Act (15 U.S.C. §§ 631 et

seq.).

"Small Nonprofit Organization" shall mean any organization that does not distribute any

part of its income or profit to its members, directors, or officers, employs no more than 100 paid

individuals at the involved chapter, office, or department, and was recognized as a nonprofit

organization under Section 501(c)(3) of the Internal Revenue Code of 1986.

"State" or "Commonwealth" shall mean the Commonwealth of Pennsylvania.

"Supervising Contractor" shall mean the principal contractor retained by the Settling

Defendants to supervise and direct the implementation of the Work under this Consent Decree.

"United States" shall mean the United States of America, including its agencies,

departments, and instrumentalities.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of

CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33), 42

U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.

§ 6903(27).

"Work" shall mean all activities Settling Defendants are required to perform under this

Consent Decree to perform the RD and RA for all OU-1 Activities, except those required by

Section XXIV (Retention of Records).

## V.  GENERAL PROVISIONS

### 5.    Objectives of the Parties

The objectives of the Parties in entering into this Consent Decree are to protect public health

or welfare and the environment at the Site by the design and implementation of response actions

at the Site by the Settling Defendants, to reimburse the Future Response Costs of the Plaintiff,

and to resolve certain claims of Plaintiff against Settling Defendants as provided in this Consent

Decree.  The execution by the Settling Defendants of this Consent Decree is not an admission by

them of liability with respect to any issue dealt with in this Consent Decree nor is it an admission