IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | : : : : : | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | : : | |
| v. | : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : | |
| Defendants. | : | |

## ORDER

AND NOW, this _____ day of _____,

2008, upon consideration of Plaintiffs ' Brief in Opposition to Defendant Ashland, Inc.'s

Motion for Partial Summary Judgment, it is hereby ORDERED that Defendant Ashland,

Inc.'s motion for partial summary judgment is DENIED.

_____
Legrome D. Davis, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS L.L.C., | : : : : : : | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | : : | |
| v. | : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : | |
| Defendants. | : : | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT ASHLAND, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Glenn A. Harris, Esquire
Amy M. Trojecki, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3440
Fax: (856) 761-9001
E-mail: harrisg@ballardspahr.com

Dated: March 14, 2008

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

DISCUSSION .............................................................................................................. 10

I.     Several Different Types of Ashland's Waste Other Than its Spent Mixed Acids were
       Disposed of at the Site. ..................................................................................... 12

II.    Ashland's Motion Should Be Denied Because it Did Not Comply With Rule 56 ............... 19

CONCLUSION………………………………………………………………………..22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................10

*Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358 (3d. Cir. 1992), *cert. denied*, 507 U.S. 912 (1993) ........................................................10

*Boyle v. City of Allegheny*, 139 F.3d 386 (3d Cir. 1998) ....................................................10

*New Jersey Turnpike Authority v. PPG Industries, Inc., et al.*, 197 F.3d 96 ..............11, 21

*United States v. Alcan Aluminum Corp., et al.*, 964 F.2d 252 ............................................11

*United States v. Lightman*, 87 F. Supp. 2d 365 (D.N.J. 1999).....................................11, 12

## DOCKETED CASES

*U.S. v. Manfred DeRewal, et al*, No. 77-287 .....................................................................3, 4

## FEDERAL STATUTES

Fed. R. Civ. P. 56.................................................................................................................3, 19

Fed. R. Civ. P. 56(c) .............................................................................................................10

Fed. Evid. at 804(b)(1) ...........................................................................................................21

## INTRODUCTION

Ashland is seeking a summary judgment that its dye waste, phthalide acid waste, CDN waste, isopropanol alcohol, and drummed and bulk solvent wastes were not disposed of at the Site. Ashland concedes that there is a genuine issue of material fact as to whether its mixed spent acid wastes were disposed of at the Site. Ashland argues that the only waste picked up from its facility was its spent mixed acid, and that, therefore, the only waste that could have been disposed of at the Site was those spent mixed acid wastes. In fact, it is undisputed that DCC drivers picked up many different kinds of waste from Ashland's facility, and there is substantial evidence that each kind was disposed of at the Site. Accordingly, Ashland's motion for summary judgment should be denied.

## PRELIMINARY STATEMENT

Ashland's sole argument for summary judgment is found on pages 9 and 10 of its brief. It can be summarized as follows: (1) the only evidence that Ashland waste was disposed of at the Site is the deposition testimony of three DCC drivers, and (2) this deposition testimony must be read to mean that the drivers disposed of only mixed spent acids at the Site.

Ashland's argument that the DCC drivers *disposed of* only Ashland's mixed spent acids at the Site is based *solely* on its contention that three DCC drivers testified that they *picked up* only mixed spent acids from Ashland. In making this argument, Ashland equates waste *picked up* from the Ashland facility with waste *disposed of* at the Site. Plaintiffs agree with Ashland's proposition that Ashland wastes disposed of at the Site were the wastes that were picked up by DCC drivers. Indeed, there is no deposition testimony, and no reason to believe, that the DCC drivers had a

1

practice of disposing of only Ashland's mixed spent acids at the Site while disposing of its other wastes elsewhere. The difference between Plaintiffs' and Ashland's positions is that Plaintiffs contend that the DCC drivers picked up many types of wastes from Ashland in addition to its mixed spent acids, and Ashland wants this Court to conclude that only its mixed spent acids were picked up by DCC.

As explained in the discussion to follow, Plaintiffs intend to rely upon much more evidence at trial than the deposition testimony of the three DCC drivers referred to by Ashland to prove that many kinds of Ashland waste were disposed of at the Site. This evidence includes Ashland's own bills of lading, each of which was signed by an Ashland employee and the DCC driver that picked up that specific load of waste from Ashland's facility, and which plainly indicate the type and quantity of waste that was picked up. Plaintiffs will also rely upon the deposition testimony of DCC drivers that they disposed of Ashland's wastes at the Site. Finally, Plaintiffs will rely upon the fact that Ashland drums, including a drum containing the same types of compounds generated at Ashland's facility, were found buried at the Site. Even if Plaintiffs were limited to the testimony of the DCC drivers cited by Ashland, however, that testimony cannot be read, especially in a light favorable to Plaintiffs, to mean that the one and only type of Ashland waste disposed of at the Site was its mixed spent acids. Ashland completely ignores its own bills of lading and the Ashland drums found at the Site without any explanation for doing so, and relies on nothing more than an incorrect interpretation of three DCC drivers' testimony to argue that only its mixed spent acids were picked up by DCC.

2

## STATEMENT OF FACTS[1]

In or about August, 1976 Ashland's Great Meadows, New Jersey facility contracted with Advanced Environmental Technology Corporation ("AETC") for AETC to remove and dispose of several types of waste. Ashland Brief at 2-3. AETC then contracted with DeRewal Chemical Company ("DCC") to do the work. *Id.* at 3. Environmental Chemical Control, another Manfred DeRewal corporation, had entered into a lease giving it possession as of June 1, 1976 of a run down industrial property in the Wissinoming Industrial Park on Comly Street in Philadelphia. *U.S. v. Manfred DeRewal, et al.*, No. 77-287, May 16, 1978 Bench Opinion, Exhibit 1 at BSAI018278. DCC hauled Ashland's waste through the demise of DCC's operation at the end of March, 1977. The "Wissinoming Period" is thus from June 1, 1976 to March 29, 1977.

Ashland manufactured a variety of custom chemicals in batch mode for its customers at Great Meadows. Jurgen H. Exner, Ph.D. June 29, 2006 Expert Report, Exhibit 2 at 2. The largest quantity of material produced during the Wissinoming Period was CDNBF, an intermediate for various herbicides. Exhibit 2 at 3. Wastes generated from the CDNBF manufacturing process included spent acids and CDN waste water. Exhibit 2 at 3-4. The spent acids consisted of about 83% sulfuric acid, 3% nitric acid,

---

[1]     As set forth in detail in Point Two below, Ashland failed to comply with Fed. R. Civ. P. 56, in that it relies upon documents and testimony without having made any such potential evidence part of the record for this motion through one or more affidavits or otherwise. It has also not complied with this Court's procedures for Rule 56 motions by submitting a numbered statement of the material facts as to which Ashland contends no genuine issue exists. Court Practices and Procedures at 4-5. Ashland instead freely states "facts" throughout its brief without putting any evidence before this Court to support such statements. There are thus no "material facts set forth in the statement" that should be taken as admitted. Plaintiffs do and will, when and if any supporting documents or testimony is offered into evidence, dispute many, many of Ashland's statements. Plaintiffs address herein only certain of Ashland's more egregious misstatements.

10% water and 3-4% of organic material. *Id.* The organic compounds in the acid waste

were chloronitrobenzotrifluoride (CNBF), sulfonated CNBF, chlorobenzoic acid, chloro-

nitrobenzoic acid, and CDNBF. *Id.* The Ashland facility also created other wastes,

including: dye wastewater from the dye manufacturing process containing high

concentrations of nitric and sulfuric acid and about 10-20% of organic reagents, products

and by-products (Exhibit 2 at 5); an acidic waste stream from phthalide production

containing about 1.5% sulfuric acid, 32% sodium sulfate, about 30% organic by-

products, and zinc and copper sulfate (Exhibit 2 at 6); and a variety of organic solvent

wastes from solvents used as a reagent, solvent, or purification medium during the

production of various chemicals. *Id.*

   All of these wastes were hauled from the Ashland facility by DCC.

   DCC had no contract with Ashland. Thus, each time a DCC driver arrived

at Ashland he was given a bill of lading that had been completed by Ashland to reflect

the specific load of waste that the driver was going to haul away. *See, e.g.*, Barsum Dep.

at 184:18-185:4.[2] The waste was loaded, the bill of lading was signed by the driver and

by an Ashland employee, and the driver drove away with the waste. *Id.* Ashland

produced the bills of lading reflecting each and every load picked up by a DCC driver

during the Wissinoming Period. The various types and quantities of Ashland waste

picked up by each DCC driver, as reflected on the Ashland bills of lading, are

summarized in Exhibit 4. The bills of lading are also attached thereto. The bills of

lading prove that the DCC drivers collectively picked up 216,650 gallons of spent mixed

---

[2]  Copies of the relevant pages of referenced deposition transcripts are attached
hereto marked Exhibit 3.

acid, 185,300 gallons of dye waste, 50,000 gallons of phthalide acid, 86,410 gallons of CDN waste water, and 17,295 gallons of solvent wastes.

There is substantial evidence that each type of Ashland waste was disposed of at the Site.

### Driver Testimony

(a)    *John Barsum*

John Barsum was a truck driver for DCC from the start of DCC until DCC was shut down in 1977.  Barsum Dep. at 41:8-25; 287:6-18.  Mr. Barsum testified that each time he picked up a load at Ashland he identified himself to an Ashland employee, was given a "manifest," and signed the manifest.  Barsum Dep. at 184:18-185:4.  Mr. Barsum testified that he went to the Ashland facility in Great Meadows, New Jersey and made pick-ups of bulk waste with a tank wagon trailer.  Barsum Dep. at 180:4-23.  He testified that the wastes were in four different tanks, each 20,000 to 30,000 gallons in size.  Barsum Dep. at 182:17-183:4.  When asked what type of waste he picked up, he responded, "Sulfuric," because he recalled that the tanks were marked "sulfuric."  Barsum Dep. at 181:21-25.  Mr. Barsum testified that he took loads of Ashland waste back to the Boarhead Site for disposal a couple of times.  Barsum Dep. at 183:12-24.

Whatever Mr. Barsum remembers seeing on the side of one or more of the Ashland tanks, there can be no doubt from the bills of lading that Mr. Barsum in fact hauled spent mixed acid, CDN waste water, dye waste water, and phthalide acid waste from the Ashland facility.  Mr. Barsum identified his signature on many Ashland bills of lading.  Barsum Dep. at 185:5-189:16.  The bills of lading show that John Barsum picked up 17,400 gallons of spent mixed acid, 10,000 gallons of CDN waste water, 25,500 gallons of dye waste water, and 10,000 gallons of phthalide acid waste.

5

Nothing in Mr. Barsum's testimony suggests that he treated any of these particular wastes in a particular fashion. In fact, any fair reading of his testimony is that he did not realize that he was actually hauling several different types of wastes.

> (b)    *Jeff Shaak*

Jeff Shaak worked for DCC in two separate periods as a truck driver picking up waste from DCC customers. Shaak Dep. at 18:16-19:20. When Mr. Shaak came to work for DCC the second time, DCC already had the Wissinoming location. Shaak Dep. at 51:14-23. Mr. Shaak continued to work for DCC until after the Wissinoming location was shut down. Shaak Dep. at 24:18-25:17. He picked up waste from the Ashland facility in Great Meadows, New Jersey on several occasions. He described how he drove to that facility, and identified his signature on the Ashland bills of lading. Shaak Dep. at 64:23-66:24; 70:18-75:21. The bills of lading prove that Mr. Shaak picked up 40,900 gallons of spent mixed acid, 20,000 gallons of CDN waste water, 38,000 gallons of dye waste and 15,000 gallons of phthalide acid waste. He testified that he took a rubber lined tanker to make the run, but did not say what type of waste he picked up at Ashland. Shaak Dep. at 66:25-67:9. Mr. Shaak testified that he took "maybe three or four, something like that" loads back to the Boarhead Site to be disposed of, and identified the location of the pits there into which he dumped the Ashland waste. Shaak Dep. at 68:4-16. He made no mention of disposing of different Ashland wastes in different locations; he simply testified that he disposed of loads from Ashland at the Site.

> (c)    *Freddie DeRewal*

Freddie DeRewal first started to work for his father driving a truck when he obtained his driver's license in approximately September 1972. Manfred DeRewal, Jr. Dep. at 15:5-19. He worked for DCC full-time until the DCC operation was shut down in

DMEAST #9989107 v10

April of 1977, except for, perhaps, a few months in approximately 1973. Manfred

DeRewal, Jr. Dep. at 387:12-25; 24:2-9. Freddie DeRewal testified that he picked up

waste from Ashland's Great Meadows facility between 25 and 30 times. Manfred

DeRewal, Jr. Dep. at 66:13-15. He identified his signature on many Ashland bills of

lading. Mr. DeRewal testified that he picked up a "sulfuric nitric mix," though his only

basis for that recollection was that he remembered the words "sulfuric nitric" typed on

the Ashland bills of lading. Manfred DeRewal, Jr. Dep. at 65:18-66:5.

Mr. DeRewal testified both that he took 8 to 15 loads of Ashland's waste

to the Boarhead Farms Site for disposal, Manfred DeRewal, Jr. Dep. at 66:20-68:7, and

that he took the first 4 to 5 loads that he hauled to Wissinoming and the rest to the Site.

Manfred DeRewal, Jr. Dep. at 404:1-6. Mr. DeRewal testified that he disposed of the

Ashland waste into a pit by putting a hose from the tanker truck into the pit. Manfred

DeRewal, Jr. Dep. at 68:8-25.

In fact, the bills of lading prove that Mr. DeRewal picked up 21,000

gallons of spent mixed acid, 5,000 gallons of CDN waste water, 64,000 gallons of dye

waste and 7,000 gallons of phthalide acid waste. The fact that he recalled that the loads

were all "sulfuric nitric" proves that he handled all of the loads the same way without

regard to the actual nature of the waste. Indeed, nothing in his testimony suggests

otherwise.

(d)    <em>June Stephens</em>

June Stephens began driving a truck for DCC in approximately 1972,

before the Ontario Street location was acquired. Stephens Dep. at 169:14-171:11. She

was still working for DCC during the Wissinoming Period. Ms. Stephens repeatedly

testified that throughout her entire tenure with DCC she took every load of waste that she

7

picked up to the Boarhead Farms Site, except for maybe "two or three" loads to the

Wissinoming location and "two or three" loads to the Ontario Street location. Stephens

Dep. at 24:1-29:14; 92:13-93:4; 101:25-102:9.

       Ms. Stephens did not remember where the Ashland facility was located,

but she identified her signature on an Ashland bill of lading indicating that she picked up

mixed spent acid waste from Ashland and said that she did remember making the pick-

up. Stephens Dep. at 88:10-89:8. Because Ms. Stephens took at most two or three loads

to Wissinoming and took all of the other loads she hauled from DCC customers to the

Site while Wissinoming was open, it is much more likely than not that this load was

disposed of at the Site.

               (e)     *Bruce DeRewal*

       Bruce DeRewal started to work for his father driving a truck before

graduating from high school in June of 1973, Bruce DeRewal Dep. at 12:8-13:6; 7:16-17,

then came back to work after the Ontario Street location was open and continued to work

for DCC until the business shut down. Bruce DeRewal Dep. at 20:16-25; 21:1-4. He did

not have a specific recollection of going to pick up waste at Ashland Chemical Company,

but identified his signature on several Ashland bills of lading. Bruce DeRewal Dep. at

80:9-82:25. Bruce DeRewal picked up 25,800 gallons of spent mixed acid, 4,500 gallons

of CDN waste water and 4,000 gallons of phthalide acid waste. Mr. DeRewal worked at

the Wissinoming facility while that location was available, where he did truck mechanic

work and took care of the trailers that came in as well as drove a truck to pick up DCC

customer wastes. Bruce DeRewal Dep. at 83:12-24. He testified that there were periods

of time at Wissinoming when no waste disposal was taking place. Bruce DeRewal Dep.

at 99:12-19. He further testified that it was very difficult to dispose of wastes in the

8

winter at Wissinoming because the waste would solidify in the tank trailer and would

have to be heated up to reliquify it before it could be drained into the sewer. Bruce

DeRewal Dep. at 98:1-99:14.

(f)    <i>Dead Drivers</i>

In addition to the above DCC drivers, the bills of lading show that two

other DCC drivers picked up significant quantities of Ashland waste. Edward Czypecki

(also known as Ed Long) and Richard Minthorn drove trucks for DCC to pick-up

Ashland's wastes during the Wissinoming period. Several DCC drivers testified that Mr.

Minthorn was deceased. Manfred DeRewal, Sr. Dep. at 47:21-23. Mr. Czypecki has not

been seen for twenty years. Barsum Dep. at 37:9-38:25. He has not been located and is

presumed dead. The bills of lading reflect that Mr. Minthorn picked up at least 23,900

gallons of waste from Ashland on at least seven different occasions during the

Wissinoming period. Only two of Minthorn's seven pickups were Ashland's spent acid

waste. Ed Long picked up at least 166,695 gallons of waste from Ashland on at least 52

different occasions -- 14 of those times he picked up waste types other than Ashland's

spent acid wastes. There is no reason to believe that these drivers did not dispose of the

Ashland waste that they picked up any differently than the drivers who have been

deposed.

<b><u>Other Evidence that Ashland's Waste was Disposed of at the Site</u></b>

One drum fragment (a piece of a drum) and two intact drums with

Ashland Chemical Company labels were excavated while work was being performed to

satisfy Plaintiffs' cleanup obligations under the OU-2 Consent Decree. <i>See</i> Affidavit of

Craig Coslett, attached hereto. The contents of one of the Ashland drums were sampled.

<i>Id.</i> The analytical results show that the drum contained, among other things, solvents

9

such as benzene, several other benzene compounds, phenols, methylene chloride,

acetone, and toluene and toluene compounds. *Id.* These types of solvent wastes were

generated at the Ashland facility. Exhibit 2 at 6.

## DISCUSSION

Plaintiffs allege that Ashland is responsible for a share of Plaintiffs' past

and future costs of response because DCC drivers disposed of Ashland's waste that

contained hazardous substances at the Site. Ashland is seeking a summary judgment that

certain types of its waste were not disposed of at the Site because it contends that the

evidence supports that only its "spent/mixed nitrating acid" wastes were disposed of at

the Site. There is ample evidence that each of the waste types removed from Ashland by

DCC was disposed of at the Site.

In considering a motion for summary judgment, the Court must examine

"the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits," to determine whether there is any "genuine issue as to any material

fact." Fed. R.Civ. P. 56(c). A genuine issue of material fact exists when a "reasonable

jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248 (1986). In ruling on the motion, the Court must draw all reasonable

inferences in the light most favorable to the nonmoving party, and "may not weigh the

evidence or make credibility determinations." *Boyle v. City of Allegheny*, 139 F.3d 386,

393 (3d Cir. 1998); *Anderson*, 477 U.S. at 255. Therefore, "where the non-moving

party's evidence contradicts the movant's, then the non-movant's must be taken as true."

*Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d. Cir.

1992), *cert. denied*, 507 U.S. 912 (1993).

This Court has already ruled that Plaintiffs must prove at trial that Ashland arranged for the disposal of its wastes and that some of those wastes were disposed of at the Site.  November 17, 2006 Order at 10-11.  This is so even if Ashland thought or intended that its wastes were to be disposed of elsewhere.  *Id.*  Ashland concedes that the applicable burden of proof is the preponderance of the evidence standard.  Ashland Brief at 13.[3]  Testimony of a driver that it is "likely" that he dumped waste at the subject site is sufficient for the finder of fact to conclude that such disposal occurred.  *United States v. Lightman*, 87 F. Supp.2d 365 (D.N.J. 1999).[4]

---

[3]      Ashland's statement: "Thus, an essential component of Plaintiffs' case against Ashland as an alleged arranger for the disposal of its own waste is that the waste that caused remediation or removal was actually disposed of at the Boarhead Farm Site," Ashland Brief at 13, is incorrect.  It is well settled in this Circuit that a Plaintiff need not show that a particular arranger's waste "caused" the need for remediation as is clear from a reading of the very cases Ashland cites in support of its incorrect statement.  Plaintiffs' burden with respect to an arranger is to prove that the arranger's hazardous substances were deposited at the site *from which* there was a release and that the *release* caused the incurrence of response costs." *United States v. Alcan Aluminum Corp., et al.*, 964 F.2d 252, 266 ("Accordingly, we reject Alcan's argument that the Government must prove that Alcan's emulsion deposited in the Borehole caused the release or caused the Government to incur response costs.  Rather, the Government must simply prove that the Defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs." (emphasis in original) *New Jersey Turnpike Authority v. PPG Industries, Inc., et al.*, 197 F.3d 96, 105 ("It is true that as a CERCLA plaintiff, the Turnpike need not prove causation in the traditional sense of the word for the appellees to be found liable. ...it is not necessary for [the Turnpike] to trace the cause of the response costs to each Generator Defendant").

[4]      Ashland's explication of *Lightman* flat out misrepresents that opinion.  In *Lightman*, Earl Emmons, a driver for Lightman Drum Company, stated in an affidavit that Quaker Chemical was an LDC customer whose waste he was "likely" to have disposed of at that site.  87 F. Supp.2d at 372.  Judge Simandle found, based on this evidence, that a reasonable fact finder *could* determine that waste generated by Quaker was disposed of at the Lightman Drum Company site.  *Id.* at 373.  The court's other conclusion, that a reasonable fact finder could *not* determine "that such waste *contained hazardous substances* as required under § 107(a) of CERCLA," is an entirely different proposition.  *Id.* at 373 (emphasis added).  The *Lightman Drum* court's conclusion that Quaker Chemical, B&W and FMC were entitled to summary judgment where there was

(continued...)

11

I.    *Several Different Types of Ashland's Waste Other Than its Spent Mixed Acids were Disposed of at the Site.*

The bills of lading produced by Ashland unequivocally establish that several DCC drivers picked up many different types of waste from Ashland. Each time a DCC driver arrived at Ashland, he was given a bill of lading that had been completed by Ashland indicating the type and quantity of waste that the driver was going to haul away. *See, e.g.*, Barsum Dep. at 184:18-185:4. The bills of lading were signed by the DCC drivers. *Id.* Therefore, each bill of lading indisputably shows for each load of waste picked up from Ashland the name of the DCC driver and the type and quantity of waste that he picked up from Ashland on that trip. The bills of lading show that DCC drivers picked up mixed spent acids, CDN waste water, dye waste water, phthalide acid waste, isopropanol alcohol and methanol. To provide the Court with some perspective, John Barsum picked up 17,400 gallons of Ashland's mixed spent acids and 45,500 gallons of other types of Ashland's wastes; Jeff Shaak picked up 40,900 gallons of Ashland's mixed spent acids and 73,000 gallons of other types of Ashland's wastes; and Freddie DeRewal picked up 21,000 gallons of Ashland's mixed spent acids and 76,000 gallons of other types of Ashland's wastes. The various types and quantities of Ashland waste picked up by all of the DCC drivers that hauled Ashland's wastes, as reflected on the Ashland bills of lading, are summarized in Exhibit 4.

There is substantial evidence that each type of Ashland waste picked up by the DCC drivers, as reflected on the bills of lading, was disposed of at the Site. First, and most telling, living DCC drivers who signed the bills of ladings testified that they

_____

(...continued)

literally no evidence that their waste was taken to the D'Imperio site is unremarkable. 87 F. Supp. at 372.

recognized their signatures on the documents and disposed of Ashland wastes at the Site.

John Barsum recognized his signature on the Ashland bills of lading and testified that he

took loads of Ashland waste back to the Boarhead Site for disposal a couple of times.

Barsum Dep. at 183:12-24 and 185:5-189:16. Jeff Shaak also identified his signature on

the Ashland bills of lading and testified that he took three or four loads of Ashland waste

to the Boarhead Site. Shaak Dep. at 68:4-16 and 71:1-75:21. Mr. Shaak also identified

the location of the pits where he dumped the waste at the Site. Shaak Dep. at 68:4-16.

Freddie DeRewal identified his signature on the Ashland bills of lading (Manfred

DeRewal, Jr. Dep. at 409:10-410:18; 415:13-416:2) and testified that he took the first 4

or 5 loads of Ashland waste that he hauled to Wissinoming and the rest to the Boarhead

Farm Site. Manfred DeRewal, Jr. Dep. at 404:1-6. Consequently, of the 23 loads of

waste that Freddie DeRewal picked up from Ashland, at least 18 loads were disposed of

at the Site. Mr. DeRewal specifically recalled disposing Ashland's waste into a pit at the

Site through a hose from the tanker truck into the pit. Manfred DeRewal, Jr. Dep. at

68:8-25. Finally, June Stephens testified that her signature appeared on an Ashland bill

of lading and that she recalled picking up waste at Ashland. Stephens Dep. at 88:10-89:8.

Ms. Stephens repeatedly testified that throughout her entire tenure with DCC she took

every load of waste that she picked up to the Boarhead Farms Site, except for maybe

"two or three" loads to the Wissinoming location and "two or three" loads to the Ontario

Street location. Stephens Dep. at 24:1-29:14; 92:13-93:4; 101:25-102:9. Therefore, it is

more likely than not that Ms. Stephens took the load of Ashland waste to the Site.

       In deciding a motion for summary judgment, the Court must view the facts

in a light most favorable to the nonmoving party. There is no evidence to suggest that

13

these DCC drivers disposed of Ashland's mixed spent acid wastes any differently from the other of Ashland's waste streams. There can be no doubt that the Ashland bills of lading coupled with the DCC driver testimony that they disposed of waste picked up from Ashland at the Site create a genuine issue of fact that each type of Ashland wastes was disposed of at the Site.

Moreover, two drums and a drum fragment bearing Ashland Chemical Company labels buried at the Site establish that Ashland's waste other than mixed spent acid was disposed of there. The contents of one of the Ashland drums was tested, with the results showing that the drum contained, among other things, solvents such as benzene, several other benzene compounds, phenols, methylene chloride, acetone, and toluene and toluene compounds. Exhibit 5. Ashland's spent acid wastes did not contain any of these compounds, and Ashland's spent acid wastes were not disposed of in drums. *See* Exhibit 2 at 3-4. These types of solvent wastes are also consistent with wastes that were generated at the Ashland facility. Exhibit 2 at 6. The fact that these drums were excavated at the Site are direct evidence that those Ashland wastes were disposed of at the Site, such that there is at least a genuine issue of material fact precluding summary judgment.

Ashland's motion ignores or obfuscates the above facts and analysis. Ashland concedes that living DCC drivers testified at depositions herein that they disposed of Ashland waste at the Site. Ashland Brief at 9. The *sole basis* for Ashland's argument that only its mixed spent acids were disposed of a the Site is Ashland's statement that three DCC drivers, John Barsum, Jeff Shaak and Freddie DeRewal, testified that they *picked up* only Ashland's mixed spent acids from the Site, implying

14

that such testimony must also mean that the testimony of those drivers that they disposed of some Ashland wastes at the Site *must mean* that only the mixed spent acids were so disposed. Ashland Brief at 9-10.

There are two fatal flaws in this argument. First, Ashland's own bills of lading, and the drivers' acknowledgment that they signed them, conclusively establishes that those drivers in fact picked up all of the various types of Ashland wastes. Second, Ashland mischaracterizes the driver testimony. Each of the DCC drivers testified simply that he went to Ashland's facility to pick up waste and that he disposed of some of that waste at the Site. None of the DCC drivers testified that they disposed of any particular type of Ashland waste in a particular manner, nor did they say that they disposed of only mixed spent acids at the Site. The logical consequence of Ashland's own argument is that, if the DCC drivers in fact picked up types of Ashland's waste in addition to its mixed spent acids, then those wastes were also disposed of at the Site.

Ashland completely ignores its own bills of lading, which bills of lading unequivocally establish that DCC drivers picked up Ashland wastes other than mixed spent acids. Even if each driver had testified initially that, based on his recollection, he picked up X type of waste from Ashland, his acknowledgement later in the deposition that the bills of lading bearing his signature were the very bills of lading he said accompanied each load of waste necessarily modifies the initial testimony. This is so whether or not he witness was specifically asked if the bills of lading refreshed his recollection, or even if he was asked if they did and said that they did not.[5]

---

[5]     When Freddie DeRewal was shown one of the Ashland bills of lading by counsel for Ashland, which bill of lading said "one tank truck containing spent mixed acid" and asked how he knew that "spent mixed acid" is a "sulfuric nitric mixed," Mr. DeRewal

(continued...)

Because there is no reason to believe that the mixed spent acids were disposed of in a unique manner from the other Ashland waste streams, and because the DCC drivers testified that they disposed of Ashland's wastes at the Site, it must be that the wastes that the DCC drivers picked up from Ashland, as indicated on the bills of lading, are the wastes that they disposed of at the Site.

Even if the bills of lading did not exist or did not show that DCC drivers picked up much more than Ashland's mixed spent acid waste, Ashland's motion fails because its assertion that the DCC drivers testified that they picked up only spent mixed acids is simply not true. In fact, the DCC drivers' testimony relied upon by Ashland for the proposition that those drivers picked up only Ashland's mixed spent acids is consistent with the bills of lading establishing that various kinds of Ashland wastes were picked up by DCC drivers, which Ashland ignores.

John Barsum answered in response to a question what kind of waste he picked up from Ashland's facility:  "sulfuric." Ashland relies upon this one word answer to support its statement that Mr. Barsum "testified that the only waste that he picked up from Ashland's Great Meadows facility was bulk sulfuric acid." Ashland Brief at 9. Worse, Ashland then implicitly argues that the "sulfuric" must have been only what Ashland repeatedly calls "spent/mixed nitrating acid."

---

(...continued)
admitted "you wouldn't know." Counsel for Ashland questioned Mr. DeRewal as follows:

| | | |
|---|---|---|
| Q. | So is it fair to say that you just assumed when saw "spent mixed acid" that that was a sulfuric nitric mix? | |
| A. | Yes.  And depending on what type of tank truck you would be using. | |
| Q. | And does that assumption hold true for each of the bills of lading? | |
| A. | Yes. | |

Manfred DeRewal, Jr. Dep. at 414:3-19.

16

Mr. Barsum's answer of "sulfuric," however, even if it was not later modified by his acknowledgement that he signed bills of lading proving pickups of many different Ashland wastes,[6] cannot be interpreted to mean only Ashland's "mixed spent acid." Most of Ashland's waste streams picked up by DCC drivers included large quantities of sulfuric acid, not just the "mixed spent acid." For instance, Ashland's dye waste water contained high concentrations of nitric and sulfuric acid (Exhibit 2 at 5) and its phthalide acid waste stream contained about 1.5% sulfuric acid (Exhibit 2 at 6). Mr. Barsum's response "sulfuric" could have related to any of these Ashland waste streams. Because he picked up almost three times as much other wastes as spent mixed acid, it is much more likely than not that those two loads were other types of Ashland waste.

Jeff Shaak testified only that he picked up waste at Ashland's facility with a rubber lined tanker. Shaak Dep. at 66:25-67:9. He did not say that he picked up any particular type of waste with that tanker. Ashland's statement that Mr. Shaak "testified that he picked up acid waste in bulk quantities" from Ashland's facility reads too much into Mr. Shaak's actual words. Ashland Brief at 10. Ashland's use of this testimony to support its proposition that the drivers only picked up or disposed of "spent/mixed nitrating acid" is an illogical leap. Most of Ashland's waste streams, including it CDN waste water, dye waste water and phthalide acid wastes, were picked up by DCC in bulk, such that a tanker would be used. *See* Exhibit 4. Most of those streams were also acidic, including the mixed spent acid, the dye wastes, and the phthalide acid waste. Because he picked up almost twice as much of the other Ashland waste types as spent mixed acid, it

---

[6]     Ashland bills of lading signed by Mr. Barsum establish that Mr. Barsum picked up over 8,000 gallons more of dye waste water, which contained high concentrations of sulfuric acid, than Ashland's mixed spent acids.

17

is much more likely than not that at least some of those four loads were the other types of

Ashland waste.

        Freddie DeRewal initially testified that he picked up a "sulfuric nitric

mix," from Ashland, though his only basis for that recollection was that he remembered

the words "sulfuric nitric" typed on the Ashland bills of lading.  Manfred DeRewal, Jr.

Dep. at 65:18-66:5.  His testimony was later effectively modified when he identified his

signature on Ashland bills of lading showing that he picked up 64,000 gallons of dye

waste water and only 21,000 gallons of mixed spent acid.  Freddie's response of "sulfuric

nitric" cannot be limited to Ashland's mixed spent acid in any event.  Ashland's dye

waste also contained high concentrations of sulfuric and nitric acids.  Exhibit 2 at 5.

Freddie's testimony, similar to the other drivers' testimony, when construed in a light

favorable to Plaintiffs for the purposes of this motion, must mean that he picked up

various types of waste from Ashland's facility.[7]  Because only seven of the twenty-three

loads he hauled were mixed spent acid, the bills of lading prove that at least twelve loads

of the other Ashland wastes had to have been disposed of at the Site, even if all four of

the loads taken to Wissinoming were such other wastes.  Exhibit 4.

        Finally, Ashland ignores without any explanation whatsoever the

discovery during cleanup activities of two drums and a drum fragment bearing Ashland

---

[7]     Ed Czypecki and Richie Minthorn together picked up over 190,000 gallons of
Ashland waste, including mixed spent acids, CDN waste water, dye waste water,
phthalide acid waste water and solvent.  They died or disappeared before being deposed.
John Barsum, Freddie DeRewal, and Jeff Shaak each testified that they took at least some
loads of Ashland waste to the Site.  June Stephens's testimony proves that it is more
likely than not that she took the single load of Ashland waste she picked up to the Site.
Plaintiffs are entitled on this motion to the inference that Mr. Czypecki and Mr. Minthorn
handled the Ashland loads they picked up the same as did the living drivers, namely, that
they disposed of at least some of those loads at the Site.

Chemical Company labels buried at the Site. The discovery of the buried Ashland drums and drum fragment shows that some type of Ashland waste other than Ashland's mixed spent acid was disposed of at the Site, providing further grounds to deny Ashland's motion for partial summary judgment.

    II.    *Ashland's Motion Should Be Denied Because it Did Not Comply With Rule 56*

        Ashland has failed to comply with the rule that a court may consider on a motion for summary judgment only evidence that would be admissible at trial, as established, where appropriate, by affidavits based on personal knowledge. Fed. R. Civ. P. 56. *See also*, This Court's Practices and Procedures at 4-5. None of the documents it relies upon were properly made part of the record on this motion by affidavit or otherwise. Many of those documents are used by Ashland to not so subtly preview to this Court proofs it thinks it will offer at trial to dispute the driver testimony that it does not and cannot dispute on this motion -- testimony that the drivers disposed of loads of Ashland waste at the Site.

        By way of example only, Ashland repeatedly relies on what is said to be "an injunctive [sic] order issued by the Bucks County, Pennsylvania Court of Common Pleas (No. 76-9647) on October 15, 1976." Ashland Brief at 4, 16. Ashland's "proof" of such an order, and for the statement "given the fact that the Boarhead Farm site had been shut down on October 15, 1976 by Court Order …," Ashland Brief at 16, consists solely of Exhibit 3 to Ashland's Brief. Exhibit 3 is an unauthenticated two-page document for which Ashland has provided absolutely no foundation. Moreover, the only portion of the document that is actually signed is the second page, wherein the defendants there agree that the order on the first page may be entered. The order itself is not dated, not signed,

and there is no evidence whatsoever that the order was ever entered.  Not a single driver

testified that the Site was "shut down" in the Wissinoming Period.

Similarly, Ashland relies on Exhibit 4 to its brief to support its statement:

"DCC was thereafter billed by the City of Philadelphia for unpaid sewer charges in

connection with its illegal dumping of waste into the Delaware River from the

Wissinoming Facility, which wastes including the very Ashland waste that Plaintiff [sic]

is now claiming, were dumped at the Boarhead Farm Site."  Ashland Brief at 4.  Ashland

neglects to provide a foundation for Exhibit 4, despite the fact that the Exhibit was used

at the deposition of Mr. Healey, the author of the July 5, 1978 letter, and despite the fact

that the document is hearsay.  Any fair reading of Mr. Healey's testimony is that he just

assumed, with absolutely no proof, that every single drop of the waste he thought had

been picked up from the customers of DCC in that time period was disposed of down the

sewer at Wissinoming.  *See, e.g.*, Healey Dep. at 40:20-41:4; 46:9-47:3; 51:6-52:14;

53:5-16.  As Mr. Healey testified:  "The connection between Manfred DeRewal and

taking it to Wissinoming was never there.  There was an assumption on our part."  Healey

Dep. at 47:1-3.

Ashland's citation to transcripts of administrative "depositions" taken by

EPA of Manfred DeRewal, John Barsum, and Jeffrey Shaak is also inappropriate.

Ashland Brief at 7-8.  The transcripts themselves, even if they were properly before this

Court, show very plainly in each instance that the only persons present at the

"deposition" were EPA personnel and the stated witness.  *See* relevant pages of certain

transcripts of alleged EPA depositions attached hereto and marked Exhibit 5.  None of

the witnesses were represented by counsel and none of Plaintiffs here attended these

20

"depositions." For these transcripts to be admissible Ashland would have to establish at trial that: 1) that the deponent is unavailable; 2) the testimony was taken at "another hearing of the same or a different proceeding, or any deposition taken in compliance with law in the course of the same or another proceeding"; and 3) that Plaintiffs herein or a "predecessor in interest" "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. Evid. at 804(b)(1); *PPG Industries, Inc.*, 197 F.3d at 110. Ashland has satisfied none of these prongs and cannot possibly satisfy the third. Moreover, Ashland is well aware that Mr. Shaak testified in this matter that he was never deposed by EPA or anyone else will respect to Boarhead. Shaak Dep. at 114:8-15. Even when shown the supposed transcript of his EPA deposition, Mr. Shaak insisted: "I know I wasn't there. I don't know how they got it. I never said that. I wasn't there that day. I wasn't. I am only saying." Shaak Dep. at 115:15-17.

Thus, nothing in Ashland's Brief changes the indisputable fact that the DCC drivers picked up many different types of Ashland wastes, and that several of those drivers testified that they disposed of Ashland wastes at the Site. Ashland's motion should therefore be denied.

21

## CONCLUSION

For the foregoing reasons, and in the interests of justice, Plaintiff respectfully requests that this Court deny Ashland's motion for partial summary judgment.

Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership

By: _Amy Trojecki_
Glenn A. Harris, Esquire
Amy M. Trojecki, Esquire
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3440
E-mail: harrisg@ballardspahr.com

Dated: March 14, 2008

22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | : <br> : <br> :    Civil Action No. 02-CV-3830 <br> : (LDD) <br> : |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : <br> : <br> : |
| Defendants. | : |

## CERTIFICATE OF SERVICE

CATHERINE M. DiGIROLAMO, of full age, certifies as follows:

      1.     I am employed by the law firm of Ballard Spahr Andrews & Ingersoll, LLP, as a legal secretary.

      2.     On this date, I caused one copy of Plaintiffs' Brief in Opposition to Defendant Ashland, Inc.'s Motion for Partial Summary Judgment, Declaration of Counsel, proposed form of Order, Certificate of Service, and Declaration of R. Craig Coslett to be served via electronic submission upon the following:

ALL DEFENDANTS ON ATTACHED SERVICE LIST

      I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

                         Catherine M. DiGirolamo /s/

Dated:  March 14, 2008

1

Boarhead Farm Defendant Service List

File No.  892241

Laurie J. Sands, Esquire
Wolff & Samson, PC
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey  07052
Phone:  973-530-2098
Fax:  973-530-2298
e-mail:  lsands@wolffsamson.com

-and-

Robert M. Morris, Esquire
Morris & Adelman, P.C.
1920 Chestnut Street
P.O. Box 30477
Philadelphia, PA  19103
Phone:  215-568-5621
Fax:  215-568-3253
e-mail:  rmmorris@morrisadelman.com
*Advanced Environmental Technology Corp.*


Melissa Flax, Esquire
Carella, Byrne, Bain, Gilfillian, Cecchi,
        Stewart & Olstein, P.C.
5 Becker Farm Road
Roseland, New Jersey  07068-1739
Phone:  973-994-1700
Fax:  973-994-1744
e-mail:  mflax@carellabyrne.com
*Handy & Harman Tube Company*


Lynn Wright, Esquire
Edwards Angell Palmer & Dodge, LLP
750 Lexington Avenue
New York, New York  10022-1200
Phone:  212-308-4411
Fax:  212-308-4844
e-mail:  lwright@ealaw.com
*Carpenter Technology Corporation*

Christopher R. Booth, Jr., Esquire
Booth and Tucker
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 1700
Philadelphia, Pennsylvania  19103
Phone:  215-875-0609
Fax:  215-875-8143
e-mail:  cbooth@boothtucker.com
*Special Litigation Counsel for Carpenter Technology Corporation*

Seth v.d.H. Cooley, Esquire
Duane Morris LLP
United Plaza
30 South 17th Street
Philadelphia, PA  19103-4196
Phone:  215-979-1838
Fax:  215-979-1020
e-mail:  scooley@duanemorris.com
*Flexible Circuits*

Edward Fackenthal, Esquire
Law Office of Edward Fackenthal
One Montgomery Plaza
Suite 209
Norristown, PA  19401
Phone: (610) 279-3370
Fax:  (610) 279-0696
*NRM Investment Co.*
e-mail:  edwardfackenthal@cs.com

Richard C. Biedrzycki, Esquire
Phelan, Pettit & Biedrzycki
The North American Building
Suite 1600
121 South Broad Street
Philadelphia, PA  19107
Phone:  215-546-0500
Fax:  215-546-9444
e-mail:  rbiedrzycki@pp-b.com
*Ashland, Inc.*