EXHIBIT 1

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

    v.

MANFRED DEREWAL
BRUCE DEREWAL
LINDA COCHRAN
JEFFREY SHAAK
JOHN BARSUM
ENVIRONMENTAL CHEMICAL
CONTROL, INC.
DEREWAL CHEMICAL
COMPANY, INC.

:
:
:
:
:
:

CRIMINAL

**F I L E D**

MAY 16 1978

JOHN J. HARDING, Clerk

By_____Dep. Clerk

NO. 77-287 — 1- file
2-7

Philadelphia, Pa., May 8 and 9, 1978

BENCH OPINION

BY: HON. EDWARD R. BECKER, J.

Larry Herr
Official Court Reporter
2722 U. S. Courthouse
Philadelphia, Pa. 19106
Walnut 5 - 9480

BSAI018271

PRESENT:

        PETER J. SMITH, ESQ.,
        ANTOINETTE SERRITELLA, ESQ.,
        for the Government.


        JAMES PERUTO, ESQ.,
        for Bruce Darewal,
           Jeffrey Shaak.
           John Barsum, defendants.


        JONATHAN DUNN, ESQ.,
        for Linda Cochran and
           Environmental Chemical, Inc.,
           Defendants.

BSAI018272

THE COURT: We reconvene in the case of United States v. Manfred Derewal, et al., Criminal No. 77-287.

We are here for the delivery of a bench opinion.

The record should reflect that I met in chambers on Friday with counsel and I stated that I was not yet ready to deliver my bench opinion for a variety of reasons, one of which was I sought further memoranda of law on one point.

I received a memorandum just before noon from Mr. Smith on the point. I take it that the defendants have no further law to offer on that point; is that correct, Mr. Peruto?

MR. J. PERUTO: Your Honor, I submitted a letter shortly after 12:00.

THE COURT: I'm sorry. Here it is. O.K. I will read it now.

The record should reflect that Mr. Smith and Miss Serritella are present on behalf of the Government. Mr. Dunn is present on behalf of Defendants Cochran and ECC, Mr. James Peruto is present on behalf of Defendants Bruce Derewal, Shaak and Barsum. Mr. A. Charles Peruto is not present but Federal Criminal Rule 43(c) does not require the presence of the defendants at a conference or a session involving an issue of law and actually and technically not even the presence of the lawyers are required to hear the Court deliver its bench opinion. But, I take it, you are here on behalf of your father, A. Charles Peruto, as well?

BSAI018273

MR. J. PERUTO:  Yes.  He wanted to be here, but he is engaged in trial.

THE COURT:  Are there any motions to be made, Mr. Peruto?

MR. J. PERUTO:  No, Your Honor.  I left a message on Friday there would not be.

THE COURT:  No motions, Mr. Dunn?

MR. DUNN:  No motions.

THE COURT:  Mr. Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  I will now deliver my bench opinion adjudicating the motions to suppress evidence which have been filed on behalf of all defendants in this case.

### I.  Preliminary Statement

This is an environmental criminal case in which five individual defendants and two corporations are charged with violations of 33 U.S. Code, Section 407, 411, 1311(a), 1319(c)(1)(3) (Deposit of refuse in navigable waters and discharge of pollutants).

The defendants are also charged under 18 USC, Section 1001 (False statements) 18 USC, Section 1623 (False declarations before grand jury) and 18 U.S. Code, Section 371 (Conspiracy).

In more precise factual terms the ten environmental counts charge the defendants with discharging refuse or

BSAI018274

pollutants into the Delaware River from premises leased by defendant Environmental Chemical Control, Inc.,(ECC) in the Wissinoming Industrial Park in Philadelphia, and with conspiracy to deposit refuse and discharge pollutants into the river from that location.

This opinion addresses a motion to suppress evidence which, if the Guinness Book of Records catalogued suppression motions, would doubtless belong there. Or, defendant has moved against some 32 discrete items of evidence obtained by a variety of officials ranging from the Philadelphia Water and Fire Departments and the U. S. Environmental Protection Agency (EPA) to the United States Coast Guard on 11 separate visits to the Wissinoming Industrial Park (Park) premises in March and April of 1977.

Though the various observations, photographs, statements, and physical items sought to be suppressed are joined by the skein of the ongoing investigation into the activities of the defendants, the precise factual and conceptual bases for suppression vel non of the sundry objects of the motion rendered unto us a multiplicity of motions, perhaps 32, to decide within the ambit of this bench opinion.

Understanding and decision of the motions demands that we first explain when, where and how the alleged infringements upon defendants Fourth Amendment rights allegedly occurred.

This we shall do by way of extensive findings of fact. As will be seen, the factual setting implicates a variety of issues in search and seizure law: Standing, reasonable expectation of privacy, the curtilage and "open fields" principles, the emergency and exigent circumstances exceptions to the warrant requirement, the administrative search principle, the "fruit of the poisonous tree" doctrine, and the matter of consent to search, among others.

Moreover, a number of these notions are involved in disposition of several aspects of the motion, making for a complex problem of disposition.

While perforce it would be difficult to dispose of a matter of this complexity in a bench opinion, we find it necessary to do so because of the delays which this case has already encountered because of the time necessary to compile the extensive (1300 pages) suppression record, the months required by counsel to review that record and submit briefs (a problem complicated by counsel's other engagements in protracted and important litigation) and the time required for us to review the record to develop this bench opinion.

For reasons which will appear, the motion to suppress will be denied except as to some of the matters seized and/or observed by Messrs. Kulessa and Healey and their associates of the Philadelphia Water Department on March 25, 1977, between 4:30 and 5:30 P.M. (their third visit of that day

BSAI018276

at Manhole C inside Building G of the park) and certain matters
-sized and/or observed by various officials on Monday morning
and Monday evening, March 28, 1977, in the same location.

Our findings of fact to which we now turn will
not only describe the industrial park premises, but will also
detail each of the visits by Government personnel to the
industrial park premises or vicinity.

II.  Findings of Fact

A.  The Wissinoming Industrial Park

The Wissinoming Industrial Park (park) occupies
11 acres of land in Northeast Philadelphia, bounded on the east
by a privately owned chemical company (Coyne Chemicals) and
by the Delaware River.  Because the physical arrangement of this
park is complicated as well as important to this motion to
suppress, we will attach a drawing of it to the transcript of
this bench opinion (the drawing is already a part of the
record).

The park is a privately owned complex of
buildings and yard space which are leased to various businesses.
Over the past several years, typical businesses leasing space
have included a moving and storage firm, a woodworking shop,
and an automobile repair shop.

While the term "industrial park" evokes a
sense of modern, chicly planned facility, the park is just the
opposite, representing the conversion of the old H.K. Porter

plant, long since abandoned as a production facility, and doubtless dating from the turn of the century.

On May 6, 1976, the Wissinoming Industrial Park as landlord let premises to one of the defendants, ECC (the park and ECC are wholly separate and independent business entities).

The duration of the lease was from June 1, 1976 to May 31, 1977. The leasehold was limited to the first floor of Building "R". On November 1, 1976, an addendum to the lease was executed as follows:

"It is understood and agreed that effective November 1, 1976 tenant will lease additional space in Building "G" and Building "Z" for warehouse and approximately 1400 square feet of yard space in conjunction with the lease on Building "R". Lease will continue for a period of six months from November 1, 1976 to May 31, 1977 and continue for a further year and so on from year to year effective June 1, 1977 unless 60 days' written notice is given by either party."

Attached to the addendum was a diagram of the park outlining the location of the 1400 square feet of yard space that had been leased, by terms of the addendum, in addition to Buildings "G" and "Z." As shown on the map in dotted lines, that area extended to the north and south of Building "Q" in an L-shaped configuration. No land contiguous with Building "R" (which had been rented pursuant to the original

BSAI018278

lease) was included.

However, Paragraph 41 of that original lease provided:

"Tenant will also build a 2 foot by 2 foot square area drain with a cover, in the yard behind the building. Tenant will comply with all Government regulations as far as the use of the drain is concerned, and it is agreed and understood that they will not put anything explosive or flammable down the drain."

Because the location of that drain was ambiguous, testimony was elicited from Joseph Breish, who was manager of the park from 1973 to July 10, 1977 (which included the date on which the original lease was signed, May 6, 1976, the date on which the addendum was signed, November 1, 1976, and the date on which the events involved in this suppression motion took place, March/April 1977).

Mr. Breish testified and we credit that testimony, that the drain in question was located at point "A" on the map, in a part of the park not otherwise rented by ECC. Defendant on the occasion of executing the addendum stated an intention to use the drain "to rinse tank trucks." In exchange for fulfilling the lease commitment to repair the drain and build a manhole, tenants were "to have the use of" this drain.

In sum, we find that defendants had rented,

BSAI018279

[illegible] legal consequences flow

from the leasing: the following property at the park: Buildings

"R", "G", and "D", 1600 square feet of property surrounding

Buildings "G" and "R", as indicated by a dotted line on the

map; and Manhole "A" on the map.

Although one might quibble that neither the

lease nor Mr. Breish's testimony established that ECC was

entitled to exclusive use of Manhole "A" (as opposed to, for

example, sharing use with the industrial park and/or other

tenants), we draw the inference that defendants had the same

possessory rights to that manhole that they had as to the

rest of the property they rented.

The attached map also shows the location

of sewer and storm drain lines, which figure importantly in

this motion.  The storm drain, indicated in the legend by a

solid line, extends east from a junction with the City sewer line

just south of Building "D," makes a 90-degree turn north just

past the Building "R," is fed by a shorter spur line (of

which defendants' Manhole "A" is a part) at junction Manhole

"B," continues northeast to Manhole "C" (where another spur joins

it), and flows due east to the Delaware River.  There an

"outfall pipe" discharges the drain flow into the Delaware.

This outfall pipe is submerged during high, or flood tide,

but is exposed during low, or ebb tide.  When exposed, however,

it is surrounded and covered by bricks and dirt concealing it

BSAI018280

from direct view.

The entire storm drain system has two purposes -- to carry off storm water and to carry away sewage. It is below ground throughout the park and it is owned by the owners of the park. However, as noted previously, defendant ECC, by virtue of its lease, has a property interest in Manhole "C" because it is inside leased Building "G" and in Manhole "A."

The river bank by the outfall is not owned by the park whose property ends west of the railroad tracks. The tracks and land east of the tracks are thus owned by others; whether it is owned privately or publicly is not clear for the owner was not identified of record.

We took a good deal of testimony at the hearing concerning the location and function of the City sewer system which runs under Comly Street an east-west direction beside the industrial park. We will not summarize in any detail the workings of this system, although we must admit that at times we felt like the third man in Vienna or that we were reliving that journey of Jean Valjean's through the sewers of Paris which Victor Hugo described in Les Miserables were our descriptive powers those of Mr. Hugo, we might be tempted to undertake a lengthy discourse. Suffice it to say that the public sewers immediately south of the industrial park carry both water runoff and sewage to the Delaware River, and that the private sewer system, of which Manholes "A," "B," and "C"

BSAI018281

are a part, are an off-shoot of the City sewer. Because of the operation of gates, and because the junction of the private sewer occurs high up on the City sewer pipe, it would only be in extraordinary conditions that anything coming through the City sewer system would be diverted into the industrial park's private sewer system.

The question whether the park as a whole was protected by an aura of "privacy" or not was vehemently disputed at the suppression hearing. As will clearly appear during the course of our discussion we find that it was not. That conclusion is presaged by the following description of the park.

A cyclone fence runs around the park's perimeter. There is only one entrance for vehicles -- a private extension of Milnor Street, which runs between Building 1 and Buildings "A" and "O." At that entrance are gates, which were once closed but which for a number of years have been permanently left open (morning, noon and night, 365 days per year); the industrial park owners found there was more vandalism with the gates closed because police (but apparently not vandals) had a harder time gaining entry. There was a guardhouse at the entrance but no guard has occupied/it for several years. There are several signs erected at the entrance. One sign states the name of the park and lists the tenants and another instructs motorists to sound their horn for the guard, an instruction having no current utility since there is no longer a guard

BSAI018282

to be summoned.

Still another sign says "No Trespassing, Canine Patrol", the second part of which has had no applicability for several years since there has not recently been a canine patrol. In fact, the entire industrial park has been manned in the recent past by only two employees -- Mr. Breish, the park manager, and an assistant, both of whom work only during the daytime.

Mr. Breish admitted under cross-examination that, despite the fact that no vehicle would be physically impeded in gaining access to the property by gates, guards, or canine patrols, that nevertheless "strangers" were not permitted to wander at will through the premises. For example, when boys came into the park chasing rabbits or searching for wayward kites they were "chased out." Similarly no one was permitted to park on the premises unless they rented a parking space.

In general terms, within the park, and in specific terms, with respect to ECC, no fences or boundaries or signs denoted or delimited the leased premises of a particular tenant or the perimeter thereof. Put differently, there was no way to know and no signs to indicate the boundary of the leased premises of ECC.

Turning to the buildings leased by ECC, it is a fair statement that for the most part they were in ruinous

BSAI018283

condition. Building "G" was a shell with garage doors missing so that one could walk through without physical obstruction. Building "R" was in rundown condition; it had doors intact, although they were unlocked and windows were broken. Building "A" had a "ECC" sign on the building. Both inside and outside the ECC buildings were stacked chemical drums and also on the outside were certain tanks.

The foregoing description of the park in general and the ECC premises in particular represent conditions existing on the days on which the searches and seizures challenged in the present motion took place.

B.  The Evidence Challenged on this Motion and How it was Gathered.

At our request the Government and counsel for the defendants jointly prepared a list of the evidence sought to be suppressed. That list itemizes 35 kinds of evidence (of which 33 apparently remain at issue) gathered over several different days. The list will be attached to this opinion as an appendix. Almost all of this evidence was gathered on one of ten different occasions. This list forms the general charter for the discussion section of this opinion and gives form to what was theretofore an amorphous suppression motion.

We now describe the times and methods of procuring the different items of evidence.

1.  March 25, 1977 between 11:00 A. M. and

2:00 P.M.

On March 25, 1977, at approximately 10:00 A. M., Thomas J. Kulesza, chief of the industrial waste unit of the City of Philadelphia Water Department, received a phone call from an official in the Air Pollution Department of the Philadelphia Health Department.

Mr. Kulesza learned from that phone call that Air Pollution Department had received a complaint concerning a discharge into the Delaware River near the foot of Comly Street from Mr. James Coyne, president of Coyne Chemical Company. (Coyne Chemical Company owns Building "4" on the map, having purchased it from the park).

Mr. Kulesza called Mr. Coyne, who said he had observed a discharge that morning into the river. Mr. Kulesza radioed for two of his field inspectors to meet him at the juncture of Comly Street and the Delaware River; he also called the U. S. Coast Guard base in Gloucester, New Jersey, and requested that an inspector be sent to the same location. Then he and his assistant, Mr. Healey, proceeded to that location.

First on the scene, at about 11:00 A. M., was Petty Officer Warren D. Stolle  of the United States Coast Guard. Mr. Stolle  walked on the edge of the Delaware River bank northeast of Comly Street, and onto the pier extending into the river. He observed a brown sheen on the surface of the normally green water, extending a quarter mile above and

BSAI018285

below the pier. He also observed a brown substance oozing through a pile of bricks and dirt on the riverbank, several feet above water level. He observed that it was ebb, or low, tide. (On later, closer, inspection, the bricks turned out to conceal the location of the 12-inch outfall pipe indicated on the map.)

On the bricks he also noticed a bluish-green substance. An irritating odor was coming from the brown substance seeping through the pile of bricks.

Meanwhile, Mr. Kulesza, his assistant Mr. Healey, and two field inspectors from his office arrived. We credit Mr. Kulesza's testimony that he observed the pile of rocks just north of the pier, and noticed blue-gray solid particles seeping through down the bank and into the river. He also observed around this blue-gray discharge on the river-bank pockets of what he described as a reddish-orange oil-like chemical. We infer that this was the same chemical Mr. Stolle described as brown. Kulesza and his men determined that the bricks concealed the outfall pipe, which was the source of the chemical in the river. They also determined the pipe to be linked to a sewer system of some kind, but they didn't know if it was a private or city sewer.

Mr. Kulesza, Mr. Healey and Mr. Stolle crossed back over the railroad tracks and entered Building "4," offices of the Coyne Chemical Company. Mr. Kulesza's two

BSAI018286

inspectors stayed on the river bank. There they talked to Mr. James Coyne, who had placed the call to the Philadelphia Health Department earlier that morning.

Mr. Kulesza testified, and we credit that testimony, that Mr. Coyne told them that he had seen the oil-like substance on the water that morning. It was very similar to a substance he had seen floating on the water over two months earlier in January. On that occasion he told the officials he suspected the discharge might be coming from somewhere in the park, immediately adjacent to his premises, and contacted the owners of the park. He had also contacted Manfred Derewal, who he knew to be one of the tenants in the park. Mr. Coyne told Mr. Kulesza that Manfred Derewal on that occasion had disclaimed any possible connection with the January discharge.

Mr. Coyne also told the officials that he had that very morning seen a truck emptying its contents into a manhole in the park in the approximate area where Mr. Coyne knew Manfred Derewal rented space. Mr. Coyne was not a witness at the suppression hearing. We are here reporting the substance of the conversation as recalled by Mr. Kulesza during his testimony at the suppression hearing.

The purpose for which Mr. Coyne's conversation has been used in this opinion is not for its truth or falsity, but simply as to what information Mr. Kulesza knew, or thought he knew, prior to entering the Wissinoming Industrial Park property.

BSAI018287

The foregoing recitations, however, also used to authenticate Mr. Coyne's reliability as an informant and we find substantial indicia from the foregoing findings of that reliability.

The name Manfred Derewal was not unknown to Mr. Kulesza. Quite the contrary, he had had personal dealings with him several years before. In the fall of 1974, Mr. Kulesza went to a garage rented by Mr. Derewal in the 3000 block of Ontario Street, several miles from the park, and discovered what he considered to be an illegal discharge of chemical into the City sewer system. He talked with Mr. Derewal on those occasions, and Mr. Derewal told him he was using the garage to transfer chemicals as part of a business operation involving resale of used chemicals for, inter alia, a fertilizer product in North Carolina.

Mr. Kulesza had observed in the Ontario Street garage a hollowed-out pit, approximately 64 square feet, with two drains in it, both of which led to the City sewer system. An inspection of the sewer revealed that waste chemicals had in fact been discharged through those drains into the sewers. Believing Mr. Derewal's story that any chemicals that entered the drains and the sewer were the result of accidental spillage during a transfer operation and not from any attempt to dump chemicals into the sewer, Mr. Kulesza did nothing further until the spring of 1975.

BSAI018288

In a period of several days in late May, 1975, a truck containing waste chemicals exploded beside Derewal's Ontario Street garage, and subsequent inspections revealed a number of drums of chemicals stored in the garage.

Several days later, a sewer engineer reported a strong odor of solvents in the City sewers, which were traced to Derewal's drain. A 15-foot diameter pool, similar to a child's wading pool, filled with copper ammonium sulphate was also discovered in the garage, close to the drain. Mr. Kulesza estimated at the time that if the pool collapsed and its contents entered the drains and thence the City sewers, it would incapacitate the City water treatment plant which provides water for 60 percent of Philadelphia.

Consequently, a letter was sent to Mr. Derewal informing him that the officials were going to plug up his drains with a wooden plug. The plug was installed. Nevertheless, within a month Mr. Kulesza found an oily chemical in the sewers, which was traceable to Derewal's drains. A man believed to be an employee of Derewal was discovered by Mr. Kulesza siphoning chemicals from a drum into the drain; apparently the plug had loose joints which permitted seepage. Mr. Kulesza returned a short time later and put a cement seal in the drain.

These dealings with Derewal several years earlier were in Mr. Kulesza's mind on the morning of March 25, 1977, when he talked to Mr. Coyne about the oil on the

BSAI018289

Delaware, about Mr. Coyne's knowledge that Derewal rented adjacent property, and about Mr. Coyne's observation earlier that morning that a truck had discharged chemicals into a manhole on or near the property owned or frequented by Manfred Derewal.

There was other information in Mr. Kulesza's mind that morning as well, involving the location of the oil in the Delaware River. Mr. Kulesza knew that the Torresdale water treatment plant, which provides drinking water for a large percentage of Philadelphia, was located but three and a half miles up the Delaware River from the point of the discharge. He also knew, as a result of tests done some years before by the EPA, that, because the Delaware is a tidal river past the Torresdale treatment facility, foreign particles or matter could be drawn up the river during flood tide, at which time they would enter the Torresdale plant. In fact, experiments had earlier been performed by monitoring particles introduced six miles below the Torresdale treatment facility (and, therefore, two and a half miles below the location of the discharge) which particles were in fact introduced into the Torresdale facility during flood tide conditions.

Mr. Kulesza knew additionally that it was low, or ebb tide, and that in a matter of hours the high, or flood, tide would come in sending surface water north of the Delaware. Mr. Kulesza also knew that two and a half miles

BSAI018290

below or down the Delaware from the discharge was located a major waste treatment facility for Philadelphia. If the spill or related discharges contained a high degree of acid, that could incapacitate the treatment facility which functions partly on biological processes of waste breakdown.

While Mr. Kulesza, Mr. Healey, and Mr. Stolle were having the foregoing conversation with Mr. Coyne concerning Mr. Coyne's observations of the spill that morning, of the spill two months previously, and of the truck discharge that morning, two of Mr. Kulesza's field inspectors stayed on the bank of the Delaware collecting samples of the substance on the water and the substance oozing out of the outfall pipe.

Item 1 of evidence challenged in this suppression motion involves those samples taken.

Item 2 consists of the observations of the discharge and spill initially made near the outfall pipe by Messrs. Kulesza, Healey, Stolle, and the field inspectors.

Item 5 is a series of photographs of this area taken by Stolle.

Mr. Coyne then took Messrs. Kulesza, Healey, Stolle, and the field inspectors across the boundary line and into the premises of the park to show them the manhole where he had seen the truck discharging that morning. The purpose of this inspection was to determine whether whatever was put into that manhole was the source of the discharge into the Delaware,

BSAI018291

whether if it was the source it was still continuing, and whether it could be stopped or not.

In entering the park, they went from Building "4," west beside the spur railroad track leading into the park, and southwest through or around Building "G". Building "G", as we have noted, was a shell with the garage doors missing so that one could walk through without physical obstruction in order to reach Manhole "B," where Coyne told them he had seen the truck discharge that morning. We infer that, whether they went through Building "G" or around the building, the officials probably entered onto ECC's rented property in order to reach Manhole "B."

As we have noted, however, the perimeters of ECC's property were not marked; there was total access thereto as though they were open fields, and there was no notice to keep out.

At Manhole "B" the officials observed stacked drums for storing chemicals. At first the officials did not see anyone else on the property or any signs identifying the property. The officials walked between Buildings "R" and "G," and peered into Manholes "A" and "B." "A" had no cover and its inner recesses were therefore visible by merely peering in. On a ledge near the bottom, away from the main flow of fluid in the pipe, were blue-green solid particles, which looked identical to Mr. Kulesza to the particles he had

seen on the bricks near the outfall pipe earlier in the morning.
An acid and chemical odor was emanating from both Manholes "A" and
"B."

Item 3 of the challenged evidence are the
samples taken from Manhole "A."

Stolle and Healey then observed a man walking
between Buildings "F" and "G". They approached the man, who
claimed to be named Billy Shaak, and also claimed to be a
handyman employed by ECC. Upon being asked he produced a
driver's license which identified him as Bruce Derewal, defen-
dant in the instant criminal action. Bruce Derewal, son of
defendant Manfred Derewal, both defendants in the present
criminal action. Stolle and Healey identified themselves and
their official positions, told him they were investigating
the oil discharge on the river, and asked if the source could
have come from the premises of ECC. Bruce Derewal stated
the premises were used for prepared chemical fertilizer, and
that there was no possibility the spillage had originated there.
Stolle and Healey asked if Derewal would show them around the
entire ECC facilities. Derewal said he would.

Item 9 on the suppression list is the statement
made by Bruce Derewal.

Derewal first took Stolle, Healey, Kulesza
and the other two inspectors into Building "R." There they
observed that a water pipe came down a wall from the ceiling.

Halfway down the wall there was a faucet, which had a hose attached to it. The hose ran down to the floor, and was inserted into a 6-inch terra-cotta pipe, which had a hole chipped in it near ground level for the purpose of receiving the hose. The pipe then disappeared underground. At the time of this initial observation the water was turned on, and was running through the hose and into the pipe. To Mr. Kulesza the arrangement looked very similar to the siphon he had observed in Manfred Derewal's Ontario Street garage nearly two years before. Upon a question as to the reason for the water's running, Bruce Derewal shut it off. Besides the siphon arrangement, the officials observed chemical drums and boxed chemicals while inside Building "R."

Item 6 consists of the officials' testimony about the visual observations made inside Building "R."

Leaving this building, the officials again looked at Manholes "A" and "B."

Manhole "A" looked "homemade," being of square construction and made of bricks.

Manhole "B" was a typical round, metal manhole, similar or identical to the kind usually found on city streets. They decided to determine whether there was a connected system under the park. They spoke of conducting a dye test in Bruce Derewal's presence. We find that they did not specifically ask him whether they could conduct this test. Derewal went

BSAI018294

back with them to Building "R" and turned the water on. Then the officials introduced dye into the terra-cotta pipe. It subsequently appeared at Manholes "A" and "B," but by the time it reached "B" it had become very light in color, indicating the presence of acid in the system. Twenty minutes later the dye appeared at the outfall pipe by the Delaware River.

Item 6 of the evidence is this dye test as it involved Building "R," Manhole "A" and "B" and the outfall pipe.

We credit Mr. Kulessa's testimony that Manhole "C" had not yet been discovered, and therefore find no evidence as to the dye test in Manhole "C" was gathered at this time.

Near Manhole "B," the officials observed a ramp, with chemical drums on an incline. The drums bore the label "Etched Circuits."

Following the dye test, the officials investigated Building "G." As noted previously, it was a shell, with only the frames of two garage doors, but no actual doors themselves. Inside the building were stacked a number of drums of chemicals. The officials also observed a tank truck discharging its contents into a 5000 to 8000-gallon storage tank. A pipe led from the bottom of the tank to Manhole "C." The truck operator was standing next to the truck.

Item 4 of evidence is a series of photographs

BSAI018295

taken by Steele of the manholes, tanks and interior of the buildings described above.

Item 7 is testimony by the officials concerning what they observed while they were on the premises. The officials left the premises of the park, and indeed the area at around 2:30 P.M.

2. Underline March 25, 1977     Second Entry (3:00 P.M. to 3:10 P.M.)

At this time Kulesza and Healey drove back to the outfall pipe. Healey observed an oily chemical, like the kind that had been observed earlier in the river, still seeping from the bricks around the outfall pipe. He took a sample of it. Item 10 is the sample and the observation. Healey and Kulesza then drove through the park and observed Bruce Dorswal and the truck driver leaving.

3. March 25, 1977 - Third Entry (4:30 P.M. to 5:30 P.M.)

Kulesza, Healey and several inspectors returned to the ECC premises around 4:30 P.M. Building "R" was locked and they did not attempt to enter. However, they went inside Building "G" which had no doors. There they found, apparently for the first time, Manhole "C" which was covered by a thick steel plate. It is not clear from the record whether the chemical dye test performed by Kulesza a number of hours earlier was still visible at Manhole "C" or

BSAI018296

not. Kulesza testified that Manhole "C" had not been dis-
covered earlier. Stolls contradicted this as to the result
of the dye test, indicating it had originally been found at
Manhole "C" as well as "A" and "B" and the outfall pipe. How-
ever, since Kulesza was the one who administered the test we
credit his testimony and we therefore conclude that the dye test
discussed above does not include the results from Manhole "C."

When they discovered Manhole "C" they also
found a wooden plug, a foot in diameter and 8 inches long
with a 5-foot metal handle inside the manhole but not then in
place. (The manhole was approximately 8 feet deep.)

In addition to the above, Manholes "A" and "B"
were checked, but there was no flow of liquid through them.
The officials then went to the river bank. The bricks
and outfall pipe were submerged since the tide was up. No
discharge was coming from the pipe.

Item 11 involves testimony concerning the
above observations, both as to Manhole "C" (and possibly "A" and
"B," and at the river bank concerning the outfall pipe.

4. March 25, 1977 (5:00 P.M. to 5:30 P.M.)

The Coast Guard notified the EPA late that
afternoon about the chemical spill on the Delaware. Messrs.
Gilbert and Wise of the EPA, responding to the notification,
drove up to the Comly Street intersection with the river bank
at 5:30. Mr. Wise observed a brown gooey chemical on the river

BSAI018297

bank near the site of the outfall pipe. He did not observe the pipe itself, since the high tide had then covered it. He also saw brown globules bubbling in the water around the pier.

A Coast Guard official led Messrs. Wise and Gilbert into the Wissinoming Park, through the open Milnor Street gate. They walked around the grounds, observing Manholes "A" and "E". It appears from the record they did not enter Building "G" at this time. Building "R" was by then unlocked, and they entered, finding a man behind a desk. Mr. Wise presented his credentials, and the man gave him a business card. That card and the conversation which transpired in Building "R" at the time along the observation of the foregoing paragraph constitute Item 12.

The Government filed a supplemental memorandum stating that Wise and Gilbert also observed a man cleaning up outside the buildings. He disclaimed any knowledge about what the premises were used for, and claimed to be only a sweeper. The man gave Wise and Gilbert a business card containing information about ECC. Wise and Gilbert subsequently identified the man as Bruce Denewal. The testimony concerning this is considered part of Item 12.

The foregoing concludes our accounting of the events of March 25, 1977. We add to these findings only that at no time on that day did any of the relative officials

BSAI018298

notify the staff of the Philadelphia water intake plant at Torresdale or the waste treatment facility down the river or any EPA licensed cleanup contractor about the conditions which they found.

5.  On March 26, 1977.

On Saturday, March 26, 1977, Petty Officer Stolle returned to the Delaware river bank in the morning, and observed that the outfall pipe was submerged and that there was a colored and odiferous discharge at the same location as the previous day.  He took samples.  He also entered the premises of the park and looked in various manholes. His observation and samples are Item 17 of the evidence.

After spending the morning checking out the water lines that supplied the park at the City offices, Healey arrived on the river bank at 3:00 P.M.  He did not observe a discharge.  The samples he took are Item 13 of evidence. Then Healey drove through the Milnor Street entrance into the park.  He parked in the area between Buildings "G" and "F." He saw a man whom he recognized as Manfred Derewal and called to him, but Derewal continued to  his car and drove away.

Item 14 of the evidence sought to be suppressed is this observation.

Bruce Derewal came out, and he and Healey began talking.  The subjects covered whether the ECC property was serviced by a private sewer line or the City sewer, with

BSAI018299

Healey explaining that the Water did not service the park. Healey asked if Manfred Derewal, Bruce's father, had been around and Bruce said he had not. Item 15 of the evidence is this conversation.

Finally, while talking to Bruce Derewal, Healey walked to Building "B." Apparently they entered and observed Ken Gross - - - whom Kulesza had observed on the Ontario garage property several years before - - - disconnecting the siphons hose arrangement that had been in place the previous day. Item 16 is his observation.

6. Sunday, March 27, 1977

Stolle returned on Sunday and made observations at the outfall pipe. He did not enter the park. These observations constitute Item 18.

7. Monday morning, March 28, 1977

On Saturday, following official discussions and Healey's research into the water supply system, a decision was made to shut off the entire water supply feeding the park. Mr. Kulesza, as an officer of the Water Department, explained that by that time he and other officials in the Water Department believed that what they had seen on Friday constituted a potential health hazard to the Philadelphia Water supply. This was not because of the actual Friday discharge, but because they had formed a rather definite idea that:

(a) Manfred Derewal's dumping of waste

chemicals on Friday at the park had been the cause of the discharge on the river that day and that Manfred Derewal was involved;

(b) Manfred Derewal had, to the Water official's knowledge, been involved in similar dumping of waste chemicals into the City sewer system almost two years earlier; and

(c) therefore Manfred Derewal was likely to dump waste chemicals into the private or public sewer lines in or near the park in the future unless quick methods were taken to make it impossible to dump; and

(d) since only one water supply led into the park, the Water officials hoped that closing that water supply would force the park owners to exert pressure on Derewal, presumably on behalf of the other tenants whose water was abruptly shut off.

Mr. Kulesza admitted at the time the decision was made that no analysis of the chemicals discovered on Friday, either in the manholes or at the outfall pipe had been made. Such analysis would have taken about a week to complete. However, he was certain the chemicals were waste chemicals from observing them.

A letter drafted by the Water Department informing them of the decision to cut off the water supply had been written by Monday morning, March 29. Mr. Kulesza and Mr. Healey took it to the park on Monday morning. Besides going to deliver

BSAI018301

the father personally, the Water officials had a pre-arranged meeting with the officials of the Coast Guard, the EPA, and the other agencies near the site of Friday's discharge. One of those officials was Joe Davis, chief of the Enforcement Division of EPA for the region. He had been called on Sunday afternoon by his supervisor, and told to look into the discharges of the previous week, in terms of whether a permit would be needed by EPA to cover any future discharges. Davis, having received information from the EPA Spill Response Team giving the address and phone number of ECC, called the ECC offices Monday morning, and asked to speak to the president. When informed the president was not in, he asked to speak to another officer, and learned that he was speaking to Linda Cochran, who identified herself as such an officer. Davis explained his position, and asked if he could visit the ECC facility in the park to talk about a possible necessity of an EPA permit to cover future discharges. Cochran agreed to meet him there shortly before noon. Davis's testimony concerning Cochran's identification of herself as an ECC officer constitutes Item 20.

That Monday morning, various officials from the EPA, the Pennsylvania Department of Environmental Resources, the Coast Guard, and the Philadelphia Water Department, entered the premises of the park. They parked on vacant area, not part of that rented by ECC. As they waited for Linda Cochran

BSAI018302

to arrive, they walked around the premises, observing the outsides of the buildings. We infer they probably entered upon the 1400 square feet of property rented by SCC surrounding Building "G."

One of the officials was, of course, Mr. Kulesza. When he arrived, he delivered his letter concerning discontinuance of water to Mr. Breish, manager of the park. Mr. Breish in turn, gave his maps showing the private sewer system that ran underground through the park. Kulesza and Healey opened various manholes and smelled chemical odors. Based on their personal observation of the system, along with the dye test they had run Friday, and the structure of the system as portrayed on Mr. Breish's map, Kulesza concluded that Monday morning that ordinarily the flow of water through the industrial park drain would be toward the river. However, if a plug were inserted at Point Manhole "C," the water would flow back up the slightly pitched pipes, and run into the City sewer system which ran along Comly Street.

Mr. Kulesza looked into Manhole "C." Instead of the wooden plug which had been there Friday, someone had stuffed a green plastic trash can at the junction of the sewer lines. Kulesza thought that indicated an attempt to divert the contents of the private sewer back into the City sewer system. Testimony concerning this trash can is part of Item 19 of evidence.

BSAI018303

Shortly before noon, Linda Cochran arrived. She identified herself and gave Davis her business card, which described her as an officer of BCC. She was introduced to the other officials present besides Davis. Cochran's identification of herself as an BCC official is Item 20 of the evidence. It is unclear whether this refers to her identification on the phone, or in the parking lot after she arrived, or both. We will assume it refers to both occasions.

Cochran realized she didn't have a key to Building "R." She left the premises, telling the officials she would return shortly with a key. While she was gone, the officials again walked around, observing the outside of various buildings. As mentioned before, at some point Kulasza made his examination of the interior of Manhole "C" and saw the green plastic wastebasket substituted for the wooden plug. The various officials' visual observations of the premises, made both before Linda Cochran arrived and after she left to get the key to Building "R," constitute Item 19 of the challenged evidence.

Within an hour, Cochran returned. The officials noted she was driving a brown Toyota sedan. Cochran stated that no key was necessary after all, one simply had to lift the door and it would open. She did so, and Davis at least entered with her. Whether or not other officials entered is not clear. Davis's observation inside Building "R" is Item 21. She showed

BSAI018304

officials through other parts of the premises. Shortly there-
after the officials left the premises.

8. **Monday Night, March 28th, 10:15 P.M.**

Petty Officer Stolle received a call that ECC
was about to receive a chemical shipment that night. He
telephoned Kulesza and Healey and headed for the park. The
source of the report was the Coast Guard Officer of the Day.
While driving towards the park, Stolle passed a tank truck
he recognized as having been at the Park on Friday. He parked
on a public street outside the park and waited for Kulesza
to appear. After he did, they noticed a brown Toyota pass
and enter the park. Kulesza and Stolle then entered the park
themselves and had a conversation with a man who identified
himself as John DeMayo, but that is apparently not an item
to be introduced. After observing the tank truck on ECC
property, in the vicinity of Building "G," the officials left
the premises at about 11:30 P.M.

We infer from the testimony about where the
cars were parked and where the conversation was held that neither
Kulesza nor Stolle entered onto ECC rented property while
making the visual observation of the tank truck. Stolle's
and Kulesza's visual observations are Item 22. However, they
also observed the interiors of Manholes "A," "B" and "C,"
noting again the green wastebasket in Manhole "C" they had
seen earlier that morning.

BSAI018305

9. Tuesday, March 29, 1977 (1:30 A. M.

In less than two hours later, at approximately
1:30 A. M. Tuesday morning, Officer Mark Silverman, a member
of the Philadelphia Police Force, who was on duty at the time,
received a radio call to meet a complainant who had stated
that a tanker-trailer was dumping its contents into the
Delaware River. Officer Silverman met the caller in an indus-
trial warehouse. Silverman then went alone to the area of the
river bank where the reported dumping was taking place. The
location was near the Tacony-Palmyra Bridge, a few blocks from
the park.

Silverman shone his lights and saw a pickup
truck alongside the trailer tanker. A man was at the wheel
of the pickup truck, later identified as Jeffrey Shaak. Silver-
man approached within 20 feet of the tank trailer and saw two
men at the rear of the tanker-trailer, about one or two feet
from the edge of the river. One section of hose, 15 foot long,
was connected to the back of the tanker. The other section,
about 50 foot long, led down the bank and to the river. The
two men were in the process of disconnecting the two sections
from each other. A fellow officer, Paul Busillo, later found
a hose coupling where the sections had been disconnected. The
two men were identified in court as Bruce Derewal and John
Barsum. Silverman's observations constitute Item 23 of
evidence.

His backup officer, Paul Busillo, having arrived, Silverman returned to talk with the complainant, a Nathan Fox, at the industrial warehouse. As he approached the warehouse, a male driver in a brown Toyota that had been parked nearby turned on its engine and drove away. Silverman had noticed this same car on his initial trip down to the river. While at the river, he saw it circle around the block three or four times. There was no other traffic in the vicinity at that time. Therefore after Silverman interviewed Fox for a minute or two, and he again saw the vehicle parked nearby, he approached the driver. Before Silverman could say anything, the driver said, "Oh, my God, you got me too." Silverman made an in-court identification of the driver as being Manfred Derewal. Derewal's statement constitutes part of Item 24.

Silverman asked Derewal for a driver's license and car registration. Derewal produced neither. Silverman testified, and we credit the testimony, that he "asked" Derewal to follow him back to the river. Derewal drove the Toyota back, while Silverman drove the police car. At some later point, during which the defendants were wandering around while the police officers were examining the scene - - - it is unclear how much time elapsed, but we infer from the record it was under a half hour - - - Officer Busillo asked Derewal for his license and registration for the Toyota. For the second time (the first being with Silverman at the other

BSAI018307

point; Darewal could produce neither.

On instructions from his superior officer, Busillo opened the door on the front driver's side to ascertain the serial number, prefatory to having the number checked by police computer to see if the car had been reported stolen. Immediately as he opened the door, he saw on the passenger's seat a pile of ECC business cards. He also saw, on the floor of the passenger's side, a paper bag which had split open containing a number of reducers and couplings similar or identical to those being used on the hoses by the tanker-trailer. Busillo picked one up for closer examination. Busillo's observations of the interior of Darewal's car constitute Item 26.

After Silverman and Darewal had returned to the scene, Busillo and Silverman -- apparently separately -- looked through a window of the pickup truck, which gave them a view of the back or "bed" area of the truck. Silverman used a flashlight, while Busillo saw by moonlight. They both saw lengths of hose identical to that used in the tanker-trailer, with the same packing tape on them. There were a number of lengths. There was also a large quantity of reducers or couplings similar or identical to the one found on the ground by the tanker-trailer. Busillo's and Silverman's observations of the interior of the pickup truck, and Busillo's observation of the hoses on the ground, the defendants -- general testimony

BSAI018308

about what he saw on the scene — is Item 23.

At some point during this half hour, and apparently after Busillo had opened Derewal's car door, Busillo went over to Manfred Derewal and asked him what he was dumping. Derewal told him it was diluted sulfuric acid which couldn't hurt the water supply. We credit Busillo's testimony that no one during this period had been told not to leave the premises, no one had been told they were under arrest, and no one had been handcuffed.

We infer from the record there was no sustained questioning by police of any of the defendants during this time; any conversation that went on was sporadic and of short duration. Busillo asked Derewal if he knew the other people present (Barsum, Jeffrey Shaak, and Bruce Derewal). Manfred Derewal said he knew them vaguely. Derewal's statements to Busillo constitute the other part of Item 24. (See Government's letter of 12/19/77).

At 10 o'clock that morning J. E. McBride, a police chemist, performed chemical analyses of samples taken from the tanker-trailer. The trailer had been taken at about 2:00 A. M. to the 15th Police District headquarters at Harbison and Levick Streets. Mr. McBride did not, however, come on duty until 9:00 A. M. and began his search at 10:00 A. M. He found the samples to contain sulfuric acid of 32.4 normal concentration, which was a high concentration. He also took

BSAI018309

photographs of the tanker-trailer from which the samples came.
The photographs and the results of his chemical tests comprise
Item 27.

10.  Wednesday, March 10.

The following morning, Wednesday, March 10th,
at approximately 10:00 A.M. Coast Guard Petty Officer Stolle
received a call that there had been another spill on the ECC
premises.  He hastened to the scene, and found the Philadelphia
Police and Fire Departments, among other agencies, had preceded
him there.  He saw that a chemical storage tank outside
Building "G" was leaking its contents into the ground.  He
detected a pungent chemical odor.  Firemen were attempting to
contain the spill to prevent it from reaching the river.  Stolle
took photographs of the ECC premises during this spill, which
are Item 28.  Other members of the Coast Guard took samples from
the outfall pipe, which are Item 29.  Stolle also looked into
Manhole "C" in Building "G" since the discharged contents of
the tank were flowing into Building "G" and hence into
Manhole "C."  His observations of this are part of Item 30.
Included in these observations is the fact that at approximately
2:00 P.M. Bruce Derewal arrived and attempted to plug up the
tank.

Mr. Healey from the Philadelphia Water De-
partment, and Thomas Meehan, Battalion Chief, Philadelphia Fire De-
partment, elaborated on the events of that morning.  Healey had

BSAI018310

initially received a call from Joe Fioli of the Pennsylvania Department of Environmental Resources, who in turn had been alerted by James Coyne of Coyne Chemicals that there was another spillage on the Delaware.

A Water Department inspector sent to investigate, notified Healey that a tank was leaking acid on the ECC premises. By the time Healey arrived several Fire Department units were on the scene. They were using breathing masks because of the prevalent reddish-orange fumes emanating from the leaking chemical storage tank. The fumes had filled up Building "G" since they were belching out from Manhole "C."

The Fire Department tried without success to stop the chemical from leaking from the tank. Eventually lime was thrown over the pools of chemical, producing an intense chemical reaction and succeeding eventually in neutralizing what turned out to be spilled nitric acid.

Healey's and Meehan's observations during the morning and afternoon of March 30, both on the ECC premises and at the river bank, constitute the other part of Item 30.

## 11. April 5, 1977

Five days later, on April 5, 1977, the Philadelphia Police took a series of photographs from outside the ECC premises of the park and the Coyne Chemical Company. These photographs constitute Item 31.

In view of the fundamental theme of defendants"

BSAI018311

motion to suppress, i.e., that prior to ECC's premises ever being searched, the intent and desire was formed by one or more of the Government officials who conducted the search to obtain incriminating evidence against Manfred Derewal, ECC, and its employees. We must make findings on that subject. We reject that contention and expressly refuse so to find.

To the contrary, we find that the sole initial focus of investigative efforts by the Coast Guard, the Water Department, and EPA was the detection of the source of the discharge into the Delaware River first observed by Mr. Coyne, and the prevention of such discharges into the Delaware River or the City Sewer System.

Furthermore, we find that the activity over the balance of the period in question in the suppression motion was directed to that same end.

There is one final item which bears comment. In connection with the dye test conducted by the Water Department officials on the morning of March 25, we have noted that Bruce Derewal was not expressly told as to the nature of the test to be conducted. We infer and find, however, that he consented to the test, participating as he did actively in the test by turning the water on while the Water Department officials were injecting the dye.

Additionally, we find that the list of chemicals turned over by Thomas White, Esq., counsel for ECC in Philadelphia

BSAI018312

Common Pleas Court proceedings, to Mr. Neal Wise of EPA was done as counsel for his clients with their consent and further that the items were turned over freely and not under the duress of compulsion of improper court action.

Finally we find that the grand jury testimony of Linda Cochran, Manfred Derewal and John Barsum was preceded by all necessary warnings.

The foregoing concludes our findings of fact and we now turn to our discussion of the applicable law.

III.  Discussion

A.  Introduction

As we noted in our preliminary statement, and as the foregoing findings of fact suggest to the reader, a plethora of search and seizure issues have been raised by the foregoing findings of fact.  Because we have some 32 or more suppression motions wrapped up into one it is necessary, though cumbersome, to apply the relevant search and seizure principles to each of the items at issue.  However, we will attempt, insofar as is possible, to discuss the items in broad and relevant groupings.  As will appear from our discussion we will analyze the issues involved in all 32 items in conventional Fourth Amendment terms; i.e., we will ask the following questions:

(a)  As to which items do defendants have standing to object?

(b)  As to those to which they can object, as

BSAI018313

44

to which can they claim substantive Fourth Amendment privilege
under the U. S. v. Katz formulation of reasonable expectation
of privacy or freedom from governmental intrusion; and

(c)   As to those items to which defendants
can claim such protection, did officials have both probable
cause and a warrant or one of the recognized exceptions to the
warrant requirement before any searches and seizures were
undertaken?

While the foregoing statement hardly seems
startling, it reflects a rejection of the approach taken by
the Government which has argued at length that the searches and
observations at issue are governed by the so-called administra-
tive search cases.  See Camara v. Municipal Court, 387 U. S.
528 (1967,) See v. City of Seattle, 387 U.S. 541 (1967,)
Colonnade Catering Corp., 397 U. S. 72 (1970,) and United States
v. Biswell, 406 U. S. 311 (1972.)  All four cases hold the
standard for "probable cause" in the administrative search context
to be less than that in the criminal context which is not important

in our situation because, as noted infra,  abundant probable
cause existed here.  Rather, the possible relevance of those
cases lies in the distinction that whereas Camara and See held
a warrant to be necessary for administrative searches, Colonnade
and Biswell held that a warrant may be dispensed with, at least
in the firearms and liquor industries inspection context.  The

BSAI018314

Government argues that Biswell controls our case and justifies all the warrantless searches and seizures **because** (i) they were made by administrative officials, (ii) who were looking for civil violations, not focusing on criminal prosecution.

We also note that the Supreme Court has pending in Marshall v. Barlow's, Inc., No. 76-1143, which tests the applicability of Biswell in the OSHA context.

We have decided Camara, See, Colonnade and Biswell to be inapplicable. All four involve, in Biswell's phrase, "The context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope. . ." 406 U.S. at 315. In our situation, there was simply no inspection "system," and the "time, place, and scope" limitations were non-existent, except for whatever self-limitations the particular officials put on their own inquiry on each of the various occasions. Moreover, there was no single identifiable regulated industry or activity involved in the present case; the practice of chemical or pollutant discharge into navigable waterways can be found in hundreds, if not thousands, of industrial or land uses cutting across a wide spectrum of the economy.

Notably absent from our discussion also will be extensive collaboration about the issue of probable cause or the search or stop or inquiry or whatever intrusion, great or small, may be at issue. That is because probable cause

BSAI018315

has never been a serious problem in this case.

From the first encounter which the public officials had with the case on the morning of March 25, 1977, prompted by Mr. Coyne's telephone call, there was ample probable cause to conduct a search. The probable cause may be described as follows:

During Stolle, Kulesza and Healey's first visit they had probable cause to enter onto ECC property because (1) they had just observed discharge of waste into the Delaware; (2) they could see the source of the discharge -- a pipe covered by bricks -- but did not know if it was a private or public sewer line; (3) a credible and reliable informant, James Coyne, owner of the adjacent premises and an individual engaged in the chemical business himself, had said that he had seen a truck discharging contents into a manhole on ECC property shortly before; and (4) Coyne mentioned the name of Manfred Derewal which triggered Kulesza and Healey's memory of other attempts to dump chemicals into the sewer line, a sort of modus operandi.

Probable cause to search in this context means such information as would lead a reasonable man to believe that the items sought are connected with an impermissible or illegal activity; and, secondly, that they will be found at the place searched. Both parts were satisfied that morning. The initial probable cause was sustained by the results of the

BSAI018316

initial entry.

The observation as to the nature of activity being conducted at BCC in and of itself suggested a continuing kind of operation which would have justified probable cause at least for the week or so in question. However, additionally, and most importantly, the results of the dye tests added substantial additional probable cause. Moreover, the discharge continued for some time during the day of the 25th and during the subsequent few days additional activity was observed on the premises which would have led a reasonable man to believe that discharges were continuing.

When this information is coupled with the various statements, as well as observation of the kind of paraphernalia on the premises, not to mention the fire on the morning of the 30th, there was more than ample probable cause to sustain the various intrusions on the property.

Because the various applicable legal principles cut across the factual situations involved with the various items sought to be suppressed structuring of this discussion is difficult. However, since resolution of a number of legal questions in turn disposes of a number of items we shall first address a number of broad legal issues, generally identifying the items affected. Thereafter we shall address the items sought to be suppressed seriatim with a recapitulation.

B. **Standing**

BSAI018317

The first question which must be addressed is defendants' standing to object to the various searches and seizures. We draw particular instruction in this regard from two United States Supreme Court cases, Mancusi v. DeForts, 392 U. S. 364 (1968) and Brown v. United States, 411 U. S. 223 (1973.)

Mancusi imported Katz's principles into standing doctrine, holding that the capacity (i.e. standing) to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion.

Brown reformulated Fourth Amendment standing and concluded: "There is no standing to contest a search and seizure when, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." 411 U. S. at 229.

For standing purposes, we have treated all defendants together, though plainly some do not have standing in certain instances. However, where one defendant does we shall assume that all do (otherwise the motion becomes far too

BSAI018318

complex.)  For standing purposes we have also divided the evidence in this case into three groups:  First, the evidence at the outfall pipe; second, the evidence from the BCC rented premises on the Wissinoming Industrial Park; third, the evidence involving defendants off those premises, specifically the events in the early morning hours of March 29th.

As to the first category, we conclude no standing.  In Brown's terms, defendants were neither present when any of this evidence was searched or seized, nor could they assert any possessory or proprietary control over them. They did not own the outfall pipe or the river bank.  As to the chemicals, they had abandoned any control over the waste chemicals by attempting to flush them into a sewer system and thence into the Delaware River.  See U. S. v. Minker, 312 F 2d. 632 (Third Circuit 1962) abandonment theory as applied to garbage.  At 634 Note 2.  See also U. S. v. Shelby, 23 Criminal Law Reporter 2077 (Seventh Circuit 3/31/78.)

In Mancusi's formulation, the result is the same:  Defendants can claim no reasonable expectation of governmental non-intrusion as to waste chemicals they have discharged into a public river through someone else's sewer system.

As to the second category, we hold defendants have standing to challenge all the evidence searched or seized involving their premises on the park.  This includes the

BSAI018319

exteriors as well as interiors, the grounds as well as structures.
Under Brown's formulation, defendants do have a possessory or
proprietary interest, and we deem this sufficient for standing
purposes.

By parity of reasoning, defendants have no
standing to contest anything seen or taken from Manhole "B,"
which was not rented by them, and which was not on property
rented by them.  They do, of course, have standing to
question anything taken from Manholes "A" and "C," both of
which were rented by them, and one of which (C,) was actually
inside a building rented by the defendants.

As to the third category, we hold that
defendants' presence on the scene on March 29th in the early
morning is sufficient to confer standing as to all the searches
and seizures on that occasion.

Additionally, common ownership and control
of property confers standing to some extent.  Thus, although
Linda Cochran was not present during the events of March 29th
at 1:30 A. M., the fact that she had earlier been observed
driving the same brown Toyota for company business purposes
that was searched on March 29th is sufficient to confer
standing on her to object to the search of that vehicle.  We,
of course, are not prejudging at this pretrial juncture  that
it actually was the same automobile, or that the Government
will even be able to ask the jury to draw this inference, and

BSAI018320

successive inference therefrom, over pertinent objections
at trial. We merely determine this apparent ownership is
sufficient for standing to object to unconstitutional search
and seizure.

C. **Items as to which Defendants have Fourth**
**Amendment Rights under Katz**

1. Introduction

Treating all the evidence as to which defen-
dants have standing, our next inquiry is as to which items
defendants can claim Fourth Amendment substantive protection.

We leave aside the events occurring in the
early morning of March 29th, on the banks of Delaware River,
because they present different issues. However, as to all the
items searched and seized in the park, on that part of the park
rented by ECC, we find it useful to break those items into
four categories as follows:

First are the items observed from public
streets (or perhaps private land not owned by ECC) -- is in
other words, looking at ECC property from not only off the
property itself, but off the park as well.

Second are those observations and similar
searches (i.e. photographs) taken from inside the industrial
park, but while off the 1400 square feet and building rented
by ECC.

Third are searches made while officials were

standing on the 1400 square feet of land rented by ECC, but outside of any buildings rented by ECC. There were no fences, signs, et cetera separating the 11 acres of the industrial park from these 1400 square feet rented by ECC. Included in this category are searches made of the interior of buildings, to the extent actually made. In other words, if while standing on ECC's grounds outside Building "G," officials could look inside Building "G" (because it was missing its doors and/or windows), such searches are included in this category.

Fourth, and finally, are searches and seizures made inside Buildings "R" and "G" after officials had entered those buildings. Included in this would, of course, be observations of Manhole "C," which was a covered manhole in the middle of Building "G," and the interior of which could only be observed by entering Building "D." Similarly, the siphon arrangement inside Building "R" was, and apparently could be, only observed after one entered Building "R."

The issue is as to which of these items, gathered in which of the above fashions, can defendants claim the protection of the Fourth Amendment.

We shall forego in the context of this bench opinion our reflections as to the extent to which US v. Santana, 96 Supreme Court 2406 (1976) seems to return to a public place/private place rationale reminiscent of the pre-Katz trespassory approach, and the extent to which the

BSAI018322

"curtilage" concept and "open-fields" doctrines have, notwith-
standing Katz in the light of recent cases.   Our ruminations
in this area are fed by the apparent citation with approval
by Santana of Hester v. United States, 265 U. S. 57 (1924,)
Justice Holmes' famous enunciation of the open-fields doctine.
See, for example, Fullbright v. United States 392 F. 2d 432
(Tenth Circuit 1968) cert denied 393 U. S. 830 and Wattenburg
v. United States, 388 F. 2d, 853, (Ninth Circuit 1968) (alter-
native holding).   See generally:   "A reconsideration of the
Katz expectation of privacy, '76 Michigan Law Review 154
(1977.)

          We must, however, inquire as to whether some
of the items of evidence involved "searches" at all.   A number
of items consist of officials' observations of people on the
premises of the ECC property.   It is possible to argue that,
for example, standing outside the industrial park and looking at
ECC premises is not a "search" and hence can raise no Fourth
Amendment issue.   We disagree.   In Texas v. Gonzales, 388 F.
2d, 145 (Fifth Circuit 1968) the Court rejected the contention
that "The eye cannot commit the trespass condemned by the
Fourth Amendment" and that "Observations cannot constitute a
search."   Id. at 147. We follow that case in holding that any
visual observations of defendants' premises constituted a
search.   Since the rest of the challenged items were more
traditional, tangible items, we further hold that all the items

BSAI018323

controverted in the motion to suppress meet the threshold
definition of searches for Fourth Amendment purposes.

We now return to the question of whether the
Fourth Amendment can protect defendants as to every, or any,
of the four categories of searches and seizures we described
earlier. In other words, to what extent could they enjoy a
reasonable expectation of privacy?

2. <u>Observations from public streets.</u>

As to the first category we described -- the
searches made by officials looking at ECC property from public
streets outside the industrial park, we hold defendants can
claim no Fourth Amendment protection. Katz stated "What a
person knowingly exposes to the public, even in his own house
or office, is not a subject of Fourth Amendment protection."
<u>389 U.S. at 351.</u> <u>U.S. v. Santana, Supra</u>, reaffirmed and
supports this interpretation.

3. <u>Observations made from inside the park</u>
<u>but off the 1400 square feet and buildings rented by ECC.</u>

The second category involves searches of
officials made by going through the gates of the industrial
park and looking at the ECC property while on park land. Since
the park was ECC's landlord, the question presented here is
to what extent ECC could place a reasonable reliance -- other-
wise put, had a reasonable expectation of privacy -- as to

BSAI018324

3

the presence or absence of officials on its landlord's property.

We have located a series of cases which discuss this issue in somewhat different factual settings. The paradigmatic situation is one where officials have intruded into an apartment or rooming house and the Court has to determine the expectation of privacy the tenant could place in the part of the premises owned by the landlord and not let by the ____.

We note at the outset that, since virtually all of the following cases involved dwellings, we have decided, after reviewing the cases, whether defendants now before the Court are entitled to any less Fourth Amendment protection vis-a-vis their landlord's property: (a) because they leased premises, not for dwelling but for a business, and that Mancusi v. DeForte notwithstanding, businesses are accorded less protection than dwellings. (Mancusi merely stated businesses could also be protected, it did not state they were to be accorded the same protection as dwellings); or (b) because ECC's property was apparently not even used as a fulltime business premise -- it was seemingly used on an irregular, haphazard basis.

The cases which we have found are the following: McDonald v. United States, 335 U. S. 451 (1948); Perkins v. United States 432 F. 2d, 612, D.C.(Circuit 1970); United States v. Anderson, 533 Fed. 2d, 1210 (D.C. Circuit 1976); U. S. v. Miguel, 340 Fed. 2d, 812 (Second Circuit 1965); U. S. V. Conti, 361, Fed. 2d, 152 (Second Circuit 1966); U. S. V. Llanes, 398 F 2d,

BSAI018325

880 (Second Circuit 1968); and U. S. v. Wilkes, 451 Fed. 2d.

938 (1971). (Again Miguel and Conti were before Katz, Llanes

and Wilkes after Katz); United States v. Holmes, 521 F. 2d

859 (Fifth Circuit 1975); United States v. Carrigar, 541 Fed.

2d. 545 (Sixth Circuit 1976); United States v. Cas. 435 Fed.

2d, 766 (Seventh Circuit 1970); United States v. Rosenberg, 416

Fed. 2d, 680 (Seventh Circuit 1969); U. S. v. Fluker, 543 Fed. 2d,

709, (Ninth Circuit 1976); and U. S. v. Eisler, 567, Fed. 2d 814

(Eighth Circuit 1977).

We will recess until tomorrow morning at 9:30

and I will deliver the balance of the bench opinion at that

time.

————

(Adjourned at 5:00 P. M.)

————

BSAI018326

Date:  May 9, 1978

PRESENT:

PETER J. SMITH, ESQ.,
ANTOINETTE SERRITELLA, ESQ.,
for the Government.

JAMES PERUTO, ESQ.,
for Bruce Perewal,
    Jeffrey Shaak,
    John Barsum,
    Defendants.

THE COURT:  We have refrained because of the format and length of this bench opinion from explicating the facts and holding of the above cases.

By way of brief summary, however, we note the following:

Perkins was the only case to consider whether a tenant has a reasonable expectation of privacy.   to evidence gathered while on a landlord's property after gaining warrantless entry through an open front door in the building.   It held that the tenant did not have such an expectation.  Holmes reached the same result in a rural setting where there were no doors but where the landlord's property was surrounded by shrubs.  Wilkes and Rosenberg considered the issue with the

BSAI018327

vanish, being the front door was closed and unlocked. Third
held that, was no expectation related; Rawlings held that there
was not. The Anderson case did not consider how the back door
was secured or whether it was secured at all; it upheld the
search on though this fact did not matter.

Six cases have considered whether evidence
gathered from a landlord's property immediately outside the
tenant's property after gaining warrantless entry through a
locked outer door (frequently with a buzzer security system as
well) violates the tenant's reasonable expectation of privacy,
may have right through-though, with Miguel, Booth and Fluker
holding that there was no justified expectation by the tenant
in these circumstances and Carriger, Case and Fluker holding
that there was.

As noted previously, the fact that Miguel
and Conti were decided before Katz does not seem important to
us since they were reaffirmed in the post-Katz – Wilkes opinion.

We also note that most of these cases involved
a dwelling, and in translating their principles to our factual
setting we must take cognizance of the possibility, that, Katz
notwithstanding, or possibly because of Katz, a dwelling enjoys
incremental Fourth Amendment protection over an occasionally
used business premises. See United States v. Reed, 23 Criminal
Law Reporter, 1915, Second Circuit, filed April 11, 1978, in
which Judge          concurred that "it is also clear that one's

reasonably in publisher or author who has ... to establish a right to exclusive their federal territory, see also [text] U.S. District Court (61 U.S. 384); is ... "physical scope of the area in the chief with against which the warning of the trust boundary is directed"). Note "Importance of property," [?] Michigan Law Review, 334 at 377 (". . . the sanctity of the home appears to be the very core of the Fourth Amendment,").

We believe that the case law above cited supports the conclusion that defendants had no reasonable expectation of privacy, hence can claim no Fourth Amendment [text], as ... intruder gathered by officials onto those [text] didn't was on the park property, and not on that part of [text] property [text] by BCC. The officials enter [text] the [text], for the most part, through an open front gate which had not been locked for several years. There was no guard at the gate, nor canine patrol, nor electronic warning system, nor anything else that would entitle defendants to justifiably rely on an expectation of privacy. No one had even made the minimal effort to close those gates, let along locking them. Defendants sole reliance seems to have rested on Mr. Breish and his assistant who testified that they would chase out intruders. But there were no guards at the gate and their offices were inside the park with their main function being to act as the owner's agents vis-a-vis the public. Any signs that existed at those gates, such as "No Trespassing" we deem

reasonable expectation of privacy in a home is entitled to
a unique sensitivity from federal courts". See also U. S. V.
U. S. District Court, 407 U. S. 297, 313 (. . . "physical entry
of the home is the chief evil against which the wording of the
Fourth Amendment is directed"). Note "Expectation of privacy,"
76 Michigan Law Review, 154 at 177 (". . . the sanctity of the
home appears to be at the very core of the Fourth Amendment.")

We believe that the case law above cited
supports the conclusion that defendants had no reasonable
expectation of privacy, hence can claim no Fourth Amendment
privilege, as to evidence gathered by officials while those
officials were on the park property, but not on that part of
the property rented by ECC. The officials entered the
property, for the most part, through an open front gate which
had not been locked for several years. There were no
guards at the gate, nor canine patrol, nor electric buzzer
system, nor anything else that would entitle defendants to
justifiably rely on an expectation of privacy. No one had even
made the minimal effort to close those gates, let along locking
them. Defendants sole reliance seems to have rested on Mr.
Breish and his assistant who testified that they would chase out
intruders. But there were no guards at the gate and their
offices were inside the park with their main function being
to act as the owner's agents vis-a-vis the public. Any signs
that existed at those gates, such as "No Trespassing" we deem

BSAI018330

from either "G," and the equipment furnace were in play on various premises -- a long wooden plug on one premises and a substituted plastic trash can on another).

We believe this Category 1 we are in the process of adjudicating extends as well to the interior of Building "G," to the extent that the interior could be seen while standing on industrial park property and looking into the structure. Building "G" did not have doors. Defendants therefore can have no reasonable expectation as to its interior, to the extent those interiors could be viewed from off BSI premises.

4. **Evidence Gathered on BSI Grounds (1400 square feet but outside BSI buildings)**

We turn now to the Category 2, that evidence gathered after officials crossed from park to BSI property but before entering either Building "G" or "R." We refer here only to the 1400 square feet of property surrounding Building "G."

We hold that defendants do not have a Fourth Amendment right as to evidence gathered in this fashion. Defendants made absolutely no effort to segregate or put on notice anyone that they were entering onto their rented property. The 1400 square feet were wholly undifferentiated from the other 11 acres in the park. They extended from two sides of Building "G," but not from the other sides, and not from any

BSAI018331

from manhole "C," where two permanent fixtures were in place on various occasions -- a long wooden plug on one occasion and a substituted plastic trash can on another).

We believe this Category 2 we are in the process of adumbrating extends as well to the interiors of Building "G," to the extent that the interior could be seen while standing on industrial park property and looking into the structure. Building "G" did not have doors. Defendants therefore can have no reasonable expectation as to its interiors, to the extent those interiors could be viewed from off ECC premises.

4. **Evidence Gathered on ECC Grounds (1400 square feet but outside ECC buildings)**

We turn now to the Category 3, that evidence gathered after officials crossed from park to ECC property but before entering either Building "G" or "R." We refer here only to the 1400 square feet of property surrounding Building "G."

We hold that defendants do not have a Fourth Amendment right as to evidence gathered in this fashion. Defendants made absolutely no effort to segregate or put on notice anyone that they were entering onto their rented property. The 1400 square feet were wholly undifferentiated from the other 12 acres in the park. They extended from two sides of Building "G," but not from the other sides, and not from any

BSAI018332

side of Building "R." It would be anomalous for us to hold
that officials were free to search by observation ECC premises
from industrial park property, but to hold that once they crossed
that invisible line on ECC rented grounds all the protections
of the Fourth Amendment magically descended. Such an approach
smacks too much of the trespassory concept which the post-Katz
Fourth Amendment cases have essentially interred. If defendants
wanted to rely on an expectation of privacy as to those 1400
square feet, they would have had to have taken a minimal effort,
fencing perhaps, or some other means of demarcation to serve
notice of such demarcation. Compare this case with Pixel v.
Wainwright, 492 Fed. 2d. 480 (Fifth Circuit 1974), where the
Fifth Circuit found an intrusion into a backyard of a
multi-unit building, a violation of the Fourth Amendment where
the yard was "completely removed from the street and surrounded
by a chain-link fence." Id. At 484. We find support for
our view in United States v. Fluker, cited above. Part of
the challenged evidence in that case were police observations
of activities in a window, made while police were on the
grounds outside the window. The Court held these to be
admissible. "There was no evidence in the record which would
indicate that the yard was in any way fenced off or removed
from the street. . ." 543 2d. 2d at 718.

Another authority is U. S. v. Holmes, also
cited above. We mentioned this case earlier as the one in the

BSAI018333

rural setting. While part of the case focused on the lessee's expectation of privacy in the premises, another part focused on the defendant Moody's expectation. Moody owned the grounds, which included a barn, a house, a shed, and a stand of trees. A river and thick shrubs bordered the property on the west. Agents entered from this direction, "sneaking through the thick growth. . . under dense cover." Id. at 862. The Court emphasized that a rural dweller need not have fences, or even no trespassing signs, to have a reasonable expectation of privacy. And yet, crucially, Moody's property perimeter was clearly delimited, in a way appropriate for the rural area, by thick shrubs and dense growth. That is what aligns Schma with Fixel, and distinguishes it from Fluker and from our case. In the former two, there had been some attempt to define a property line, and defendants could reasonably rely on that; in the latter two, there was no such effort. See also Fullbright v. U. S., 392 Fed. 2d, 452 (Tenth Circuit 1968). (No protection for observations into detached shed separate from main residence.)

There is one other authority warranting discussion on this issue, Wattenburg v. United States, 388, Fed. 2d 853 (Ninth Circuit 1968). Again, in view of the limitations of the bench opinion format we shall not discuss Wattenburg at length but simply note that it is clearly distinguishable because it was the nature of the search, rather than the

mere fact that officials were standing on defendants' property and hence were technical trespassers that were dispositive. Wattenburg involved a meticulous search; here the officials simply wandered around, on and off the property, looking at the exterior of buildings and drums, and to the extent it could be seen, the interior of Building "G" through its doorless entry way. As noted below, we would not sanction prying the tops of chemical drums on the 1400 square feet, but officials did not do this. We would find this kind of activity analogous to the investigation that took place in Wattenburg.

Our conclusion as to the logic of the distinction we have drawn is borne out by the voluminous testimony in this case: No one attempted to distinguish, on direct or cross-examination, items searched from off the 1400 square feet from items searched from on it. It may have been, and seems to us unlikely, that defendants themselves were unaware of where this property line was. There is no indication that when Bruce Darswal or Linda Cochran escorted officials around the property they pointed out to officials that BCC had rented some ground as well as two buildings.

In this Category 3 we place all things seen from the 1400 square feet looking into the interior of Building "G" since, as noted several times before, Building "G" did not have doors. It would not include opening any covered chemical drums and peering inside or taking samples; but as far as we can

BSAI018335

tell, none of the items involve the interiors of any drums so the question is moot.

### 5. Evidence Gathered from Inside Either Building "G" or Building "R."

The final category relates to evidence gathered from inside either Building "G" or Building "R." We hold that defendants did have a legitimate expectation of privacy as to the contents of those two structures. We realize that, especially as to Building "G," which was little more than a shed with open door, a number of the cases we have cited would support the opposite conclusion, and permit officials to enter that building. After all, if we are correct that there was no logical dividing line between the park property and the 1400 square feet of ECC property, is it logical to say there is any difference between crossing over the threshold of Building "G" and standing outside Building "G" on those 1400 square feet, especially since Building "G" did not have a door? We think there is. The temporal sequence buttresses our conclusion; the officials' first tour of the interior of these two buildings was occasioned by Bruce Derewal taking them around. He indicated which structures ECC leased by taking the officials into those structures. We discuss below whether he consented to searches of the premises on that occasion. But leaving aside the question of consent from the initial visit, that first visit was sufficient so that after that initial tour officials

BSAI018336

were on notice that ECC considered the building there
official premises. This conclusion is supported by the
fact that Building "G" had a sign on it identifying it as ECC
property.

Therefore, we conclude that defendants had
a reasonable expectation of privacy as to the interiors of
the two buildings, and more precisely, as to those parts of
the interiors which were not readily visible from outside the
interiors. This would include, for example, the interior
of Manhole "C." a covered manhole in the middle of Building
"G." It would also apparently cover the siphon arrangement
in Building "R," since no testimony established that this was
readily visible by normal perception from outside Building
"R," and Building "R," unlike Building "G," had its doors
intact.

We have recited general principles as to the
reach of the Fourth Amendment in this context. We turn now to
an item by-item evaluation of the evidence, in order to analyze
as to those items which are protected by the Fourth Amendment,
which were seized with an exception to the warrant requirement
and which were not. We have already made findings with respect
to probable cause. In so doing we shall first discuss the
events of the first visit to the premises on the morning of
March 25, 1977 (This comprises Items 1 through 9). We will
do this under a separate heading and then in our final heading

take up the remaining items.

D.  The First Visit -- Exceptions to the Warrant
Requirement and Consent.

We have already explicated the probable cause
which Stolle, Kulesza and Healey had to enter ECC property during
the first visit and will not recapitulate that discussion here.
We find that there were at least two applicable exceptions
to the warrant requirement present on that occasion.  First,
there was the "emergency", a bona fide threat to safety of
people or property justifying duly authorized officials from
dispensing with a warrant to the extent necessary to cope with
that emergency.  In Steigler v. Anderson, 496 Fed. 2d 793
(Third Circuit 1974), the Third Circuit said that fire creates
just such an emergency, and "emergency" extends to the time
the firemen are extinguishing, searching for smoldering fire,
and cleaning up prior to departing.  Accord, U. S. v. Gargotto,
476 Fed. 2d, 109, (Sixth Circuit 1973); U. S. v. Green, 474,
Fed. 2d, 1385 (Fifth Circuit 1973).  Chemical discharge in this
case was   comparable emergency, since officials knew of the
water treatment plant above the discharge susceptible to entry
of the pollutants at high or flood tide, and of the waste
treatment plant below, subject to serious damage by organic
waste.  Either of these alternatives could have serious,
adverse effects upon millions of people in the Philadelphia
metropolitan area.  At the time and place of the discharge the

BSAI018338

officials had no way of knowing the quantity of chemicals
which were being discharged.  Confluence of these factors
created a genuine emergency.

Defendants had attempted to impeach the
Government's emergency contentions by pointing out that the
officials took no action to call either facility or to summon
a clean-up contractor.  However that may be, at issue is the
bona fide initial emergency, and that is not judged by what
they learned subsequently after investigating.  Perhaps they
determined that thousands of gallons were not being discharged
and that the facilities would not be adversely affected.  The
record is silent on that point.  Perhaps they were simply
negligent and forgot to call.  We are, however, not here
to decide that issue.  The point is that what the officials
subsequently did goes to the scope of the emergency as they
came to perceive it after  Investigation but does not impeach
the existence of an emergency as of the time they first saw
it.

The second exception to the warrant re-
quirement present in these facts is search to prevent loss of
evidence, the classical exigent circumstances exception.  The
Third Circuit has justified such a search in United States
v. Rubin, 474 Fed. 2d 262 (1973), holding that if there is
probable cause "and, in addition, based on the surrounding
circumstances or the information at hand, they reasonably conclude

BSAI018339

that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified." Id. at 268. Accord, U.S. v. Doyle, 456 Fed. 2d, 1246 (Fifth Circuit 1972.) Applying the Rubin factors, 474 Fed. 2d at 268, we conclude that the officials were justified to enter ECC property because the evidence of the chemical discharge was in the process of being destroyed. It was literally entering into  the private sewer system, and thence the river.

Either one of the two rationales, emergency or destruction of evidence, would suffice to justify entry on the morning of March 25th. Both were present.

Since we have found this initial entry justified, defendants' argument that all items found subsequent to that entry were tainted by the illegality of the entry must fail. Whether individual items were in fact tainted by illegal search and seizure of other individual items we consider in more detail below. But to the extent defendants' attempt to suppress all items of evidence found, over the subsequent days, because they were tainted by an initial illegal entry, we reject that argument.

Although we believe the probable cause and exigencies outlined above would have justified entry on to ECC property on this occasion, including two buildings, "G" and "R," we need not rely on this rationale. It is not even clear the officials were ever on ECC property, or whether they

BSAI018340

were standing on park or ECC grounds, they almost immediately
saw Bruce Derewal walking on the grounds. They identified
themselves; Derewal pretended to be a handyman. The subsequent
items were gathered after, and pursuant to, Bruce Derewal's
showing the officials around. We must therefore determine
whether Derewal consented to a search. Under Schnecklreth v.
Bustamonte's totality of the circumstances' test, 412 U. S.
218 (1973), we conclude the consent was voluntary. Bruce Derewal
was not in custody; he was not deceived or coerced in any fashion
by the officials. He voluntarily took them into Buildings
"G" and "R." Therefore Item 8 of the observations,
especially inside Building "R," need not be suppressed.

The final issue is whether Item 6, the dye
test, was within the scope of Derewal's consent. The officials
did not directly ask him if they could run the dye test.
Nevertheless they spoke of it in his presence. He voluntarily
returned to Building "R" and turned on the water, which was
necessary to flush the dye through the terra-cotta pipe
in Building "F" and through the rest of the system. Hence
he witnessed the initial introduction of the dye, and helped
perform the test by turning on the water. We infer sufficient
voluntariness under Schneckloth to support for an inference of
consent from this behavior.

The question whether his consent extended
to the officials following the dye as it progressed to Manhole "A"

BSAI018341

and "B" is moot, since we have earlier held there is no standing as to "B" and no expectation of privacy as to "A." Regardless, we think that by consenting to the introduction of a dye test -- the introduction of dye at the source -- it is reasonable to conclude that Darewal consented to observation of that test as it passed through the system.

Defendants have argued that his consent was vitiated because he pretended to be a handyman, and gave a false name, and handymen don't have the capacity to consent to searches of their employer's property. Whatever the merits of this argument when there is a bona fide agency issue, it cannot be raised on this record, where someone with actual authority to consent pretended to be someone without actual authority. If this were the law, it would merely encourage duplicity. It is plain from the evidence that Bruce Darewal was in charge of the premises at that time.

We add that consent also seems to justify Stolle's photographs even if they were of the interior of Buildings "G" and "R," on this initial visit. By consenting to take officials through those buildings, we find Darewal consented to have those observations recorded and photographs as well.

Recapitulating the items involved on the first visit, we conclude as follows:

Item 1. Observations at the river bank and

BSAI018342

outfall -- no standing.

Item 2.  Samples obtained from outfall and river -- no standing.

Item 3.  Sample from board rear of Building "R" -- from Manhole "A" -- no expectation of privacy because on park land looking into open manhole.

Item 4.  Photographs justified by probable cause and exceptions to warrant requirement and consent.

Item 5.  Four photographs from river bank -- no standing.

Item 6.  Dye test from Building "R." Manholes "A" and "B" -- no standing as to B, no expectation of privacy as to "A," as to introducing the dye in Building "R" in the first place there was consent.  Moreover, probable cause and emergency and exigent circumstances justified the conduct.

Item 7.  Visual observations of Manholes "A" and "B", courtyard tanks, tank truck and drums stored outside the buildings -- these visual observations were justified by the probable cause plus exceptions to warrant requirement by consent and either by lack of standing or lack of expectation of privacy.

Item 8.  Observations inside Building "R," including siphon hose and drain -- justified by consent and also by probable cause plus exception to emergency requirement.

Item 9.  Bruce Derewal's statements to Stolle

BSAI018343

and Healey -- we find that these were given with Bruce Danzwal's consent.

We will expand our consent discussion briefly. We note in this regard that Bruce Danzwal was not in Miranda type custody. In this regard we note Judge Friendly's opinion in U. S. v. Hall, 421 Fed. 2d, 540 (Second Circuit 1969) which formulated the following tests, whether there had been a significant deprivation of freedom outside the station house to necessitate Miranda warnings: "In the absence of actual arrest, something must be said or done by the authorities, either in the manner of approach or in the tone and extent of their questioning, which indicates that they would not have heeded a request to depart or allow the suspect to do so." Id. at 545. See also Adams v. Williams, 407 U. S. 143 (1972) (Permissible investigative stops). A number of cases in that general genre. There have been a number of cases in recent years in which law-enforcement officers whose suspicions have been aroused by circumstances or who were appropriately responding to some type of emergency have been held to have acted properly when they approached a citizen and inquired as to his conduct or the suspect activity. See inter alia Chung Tin Wong v. U. S. INS, 468 Fed. 2d, 1123 (D.C. Circuit 1972); U. S. v. Hall, 525 Fed. 2d 857 (D.C. Circuit 1976); U. S. v. Maeda, 547 Fed. 2d, 256, (Second Circuit 1976); U. S. v. Wickhizer, 465 Fed. 2d, 1154 (Eighth Circuit 1972).

BSAI018344

Those cases have upheld statements made or evidence seized as the result of a response to valid approaches and questions by the law-enforcement officers. For a variety of reasons then Bruce Derewal's statements may not be suppressed.

E.    The Remaining Items Sought to be Suppressed

The foregoing discussion has, with the exception of the question of Linda Cochran's consent on March 28 and the events of March 29 in the early morning hours off the park premises at Robbins Street and the Delaware River, essentially disposed of all the items sought to be suppressed. We shall not therefore extend our discussion except with respect to the two items mentioned; rather, we shall recapitulate the basis for granting or denying suppression of those other items.

I.    March 25th, second visit, Item 10 -- samples from river bank plus observations at river bank -- no standing.

II.    Item 11, March 25th, third visit -- visual observations at and in Manhole "C." On this occasion Sealey and Kulesza were inside Building "G" looking into Manhole "C." It was 4:30 P.M., and by this time the original emergency had dissipated. The failure to call the Torresdale water station or the Northeast waste treatment plant corroborates the view that the officials did not consider there to be an emergency by this time. Moreover, they had taken samples of evidence by this time so concern about the destruction of evidence was past.

BSAI018345

Therefore, judged by general principles articulated above, the observations inside Manhole "C" must be suppressed as well as any observations made from inside Building "G" at that time. Neither do we find that Bruce Derewal's earlier consent continued to be operative in this situation.

Item 12. Conversation with man at ECC and receipt of card -- the officials entered Building "R" with consent of the occupant and may therefore testify about the interior of the building. The man was not in custody. He freely gave them ECC's business card.

Item 13. March 26th -- samples at river bank -- no standing.

Item 14. Healey's observations of Manfred Derewal leaving premises on March 26th -- Healey had parked car to west of Building "G" and therefore was not on ECC property which was south and east of Building "G." Derewal therefore can claim no Fourth Amendment protection of "search" made from landlord's property.

Item 15. March 26th statement of Bruce Derewal to Healey. Regardless of whether Healey was still on park ground or had moved onto the 1400 square feet of ECC's leased premises, Bruce Derewal came out and voluntarily talked to him. Non-custodian, no Fifth Amendment rights violated, see discussion supra.

Item 16. March 26, Healey's observations of

BSAI018346

Ken Gross working with siphon inside Building "R" -- we
credited Healey's testimony that he and Bruce Darewal went
to Building "R" and they were walking and talking. We infer
that Bruce Darewal gave Healey consent to enter Building "R."

Item 17. Stolle's observation of discharge
at outfall in river and samples -- no standing.

Item 18. March 27, Stolle's observation
of discharge at outfall in the river -- no standing.

Item 19. March 28 -- morning visit to
ECC premises by representatives of EPA, Coast Guard, Pennsylva-
nia Department of Environmental Resources and Philadelphia Water
Department -- visual observations of outside of premises on
morning of March 28.

At issue here are observations made while
the officials were waiting for Linda Cochran to show up. We
do not construe her consent to meet them as a general consent
that they might wander through the premises before she got there.
Mr. Breish, as agent for the landlord, gave them sewer maps
and had capacity to consent to observations of the sewer lines
since they were owned by the industrial park even though
Manhole "C" was inside ECC's Building "G."

While Breish may have had the capacity, the
record does not support the conclusion that he actually consented
to observation of Manhole "C." This issue is therefore governed
by the general principles we have enunciated before. When

BSAI018347

Kulesza went back into Building "G" to observe Manhole "G"
he infringed upon defendants' Fourth Amendment rights.  Addi-
tionally, his desire to look into Manhole "G" was prompted
by what he had seen there three days earlier, the long wooden
plug.  This time he saw the green trash can.  Since his
motivation for going was a product of his earlier search,
there is an additional grounds for suppression, i.e., exploitation
of the previous illegal search.  The rest of the observations
made on that morning were perfectly proper, those made outside
the buildings and those made at Building "R" because they
did not enter Building "R" until Linda Cochran came and
consented.

Item 20.  Linda Cochran's statements to Mr.
Davis of EPA in re:  Her being an official of ECC -- these
conversations were non-custodial, no Fifth Amendment privilege,
see discussion supra.

Item 21.  March 28 -- Observations inside
Building "R" -- Cochran took them in and clearly consented to
this entry.

Item 22.  -- This item is somewhat unclear.
It is stated in the joint submission of counsel to include
only visual observations of Stolla and Kulesza from their
vehicles on the street and in the parking area of the industrial
park.  However, in the record there is some indication that
on that Monday evening at about 10:30 P.M. Kulesza may have

BSAI018348

inspected Manhole "C." To the extent that what is at issue
were observations from the street at the parking lot of the
industrial park, there is no standing or Katz expectation
of privacy. However, to the extent that evidence of inspection
of Manhole "C" at or about 10:30 P.M. is claimed, that evidence
will be suppressed.

The opinion has been interrupted with inquiry as
to whether I suppressed all observations inside Building "G"
on the morning of March 28 before Linda Cochran arrived, and
the answer to that inquiry is that I have.

We turn now to the events of the early
morning hours of March 29 at Robbins Street and the Delaware
River and will discuss Items 23 to 26.

We first turn to Item 23, Officer Silverman's
observations when he arrived on the scene. Defendants have
no expectation of privacy as to things exposed to the public,
and this includes everything except what was inside the
pickup truck and inside the tanker-trailer. Hoses on the
ground, and things of that kind, are exposed to public view
and there is no expectation of privacy with respect to them.

Turning to Manfred Derewal's statement to
Officer Silverman "You got me too." This was made as Silverman
approached the car, before he had asked Derewal for anything.
Miranda states equivocally: "Volunteered statements of any
kind are not barred by the Fifth Amendment and their admissibility

BSAI018349

is not affected by our holding today." 384 U. S. 436 (1966).
We cannot imagine a statement more volunteered than this one.
See, e.g. Commonwealth v. Eperjesi, 224 A 2d 216, 219 (1966.)

Derewal's statment to Officer Busillo after
he had accompanied, in his own car, Silverman back to the site
of the alleged dumping by the Delaware River under the Tacony-
Palmyra Bridge at Robbins Street is the next object of our
intention.

The issue here is whether Derewal was in
custody; if he was, then Miranda warnings were necessary
(and they were not given).  If he was not in custody then there
was no need for such warnings.

We found the following facts:  (1)  Derewal
accompanied Silverman back in his own car, not Silverman's
police car; (2) Silverman gave credible testimony he "asked"
Derewal if he would accompany him back; (3) The conversations
took place within a half hour of Derewal arriving on the scene
and lasted for a total of a few minutes; (4) No police officer
handcuffed Derewal, the normal procedure when someone is
put under arrest; (5) Busillo heard the lieutenant say he
would "appreciate it" if Derewal stayed during the investigation;
(6) Derewal, along with the other defendants present that night,
wandered around the area during this time, rather than being
forced to stay in one particular spot.  We add to the foregoing
that obviously the police were still trying to find out

BSAI018350

precisely what was going on and had not brought their
investigation into clear focus.

Miranda defined the crucial word "in custody"
as follows:  It occurs only when the individual is "in custody
at the station or otherwise deprived of his freedom of action in
any significant way."  In other words, there is a conjunctive
requirement of deprivation of significant freedom and inter-
rogation.

Judge Friendly, in U. S. v. Hall formulated
a test which we have described above.  That test and the cases
which we cited from various circuits are certainly apposite
here.  Employing the Hall test in light of the factors enumerated
above, we conclude that Derewal had not been significantly
deprived of his freedom within the meaning of Miranda, and hence
can claim no violation of the Fifth Amendment privilege as to
what he told the police on the scene by the river.  Concomitantly,
the police approach and questioning was proper.

We conclude therefore that all of Item 24
is admissible, at least as to any constitutional objections.
We are not sure whether statements by other defendants present
that night are sought to be introduced, but there is nothing
in the record from which to conclude that they were any more
in custody than was Manfred Derewal.

We turn to Item 25 which includes all police
observations at the scene at Robbins and the River, including

BSAI018351

hoses on the bank, the exterior of the truck, the presence of the defendants, et cetera. None of these raise any real issues except the contents of the pickup truck. All the rest were exposed for the world to see, and defendants can claim no Fourth Amendment privilege as to them.

As to the truck, we found the rear was covered, and officers looked through a window; Silverman by flash-light, Busillo by moonlight. Although of very limited scope, we find that these observations constituted a search under Texas v. Gonzales, supra. The question is whether the Fourth Amendment was complied with, and especially if the so-called "automobile exception" is applicable to these facts.

We conclude that the officers had abundant probable cause to look in the truck. It was parked right next to the tank trailer from which the hoses were being rapidly uncoupled; the circumstances surrounding the tank trailer were highly suspicious and Mr. Perewal had already represented there to be sulfuric acid in the tanker. The pickup truck had a driver inside, and it was a reasonable inference that its being stationed there was intimately connected with the tanker being there. Indeed, since the hoses used on the tanker extended for many tens of feet, it would have been logical to assume they were being carried in the back of the pickup truck. Indeed, this is exactly what Busillo and Silverman discovered, not only just hoses, but

BSAI018352

reducer couplers and various other apparatus.

The question then is whether the officers needed a search warrant. This is a troublesome issue, and the Supreme Court has attempted to establish guidelines in the "automobile search" area in a number of notable cases, e.g. Cardwell v. Lewis, 417 U. S. 583 (1974), Coolidge v. New Hampshire, 403, U.S. 443 (1971,) Chambers v. Maroney, 399 U. S. 42 (1970), and Carroll v. U. S., 267, U.S. 132 (1925.)

We find useful to our discussion of this issue our earlier discussion in United States v. Kulp, 365, Fed. Supp. 747 (EDPA 1973). We referred in Kulp to an earlier opinion, United States ex rel Johnson v. Johnson, 340 Fed. Supp. 1368 (EDPA 1972) in which we had analyzed warrantless automobile searches in light of Carroll, Chambers and Coolidge. In Johnson we concluded that the result in Coolidge was merely the fruition of the warning in Chambers that exigent circumstances do not in every instance accompany the search of an automobile. We noted in Kulp, however, that the facts of that case were governed by Carroll and Chambers because the car was stopped on the open highway in an isolated unfamiliar area at 10:30 P.M. and because the car was movable, making the opportunity to recover the stolen items fleeting. That was, we found, a classic automobile search where there existed exigent circumstances to justify a warrantless search. We found that conclusion bolstered by the Third Circuit

BSAI018353

decision in U. S. v. Menke, 468 Fed. 20 (Third Circuit 1972)
and U. S. v. Moody, 485 Fed. 2d. 531 (Third Circuit 1973).
We find the facts and language of Kulp in apposite here. The
vehicles were highly movable, they were in a relatively
isolated unfamiliar area, several potential drivers were
immediately available, et cetera. The facts fall within the
classical automobile exception. Of course we note that to this
point the intrusion was minimal.

5

We turn to Item 26 which involved Busillo's
opening of Derewal's car door and seeing couplers and reducers
inside.

Busillo opened the door for the purpose of
ascertaining Derewal's car's serial number, to run a radio
and computer check on reported stolen vehicles. This was
justified since Derewal could produce neither a driver's
license nor registration. Under Adams v. Williams, 407 U. S. 143,
a brief stop of Derewal in this situation was reasonable, and
a limited intrusion into his car to get the serial number
was also reasonable because the lack of registration raised
suspicions as to Derewal's ownership. Also helpful in this
respect is the recent United States Supreme Court opinion
in Commonwealth v. Mimms reported at 46 U. S. Law Week 3370.
In Mimms, while on routine patrol, two Philadelphia police
officers observed respondent driving an automobile with an
expired license plate. The officers stopped the vehicle for the

BSAI018354

purpose of issuing a traffic summons. One of the officers approached and asked Mimms to step out of the car and produce his owner's card and operator's license. He alighted whereupon the officer noted a large bulge under his sports coat and this ultimately led to a frisk and Mimms' arrest. The Pennsylvania Supreme Court reversed the conviction holding that while the officers acted reasonably in stopping the car, the search was constitutionally infirm because the officers ordered the respondent to get out of the car with an impermissible seizure. This was said to be so because the officer could not point to "objective observable facts to support a suspicion that criminal activity was afoot. . ."

The Supreme Court reversed noting that the touchstone of Fourth Amendment analysis is also "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security". The court further noted that the intrusion was de minimis. While the focus of Mimms is slightly different from the present case, it is one of a line of cases which support the Government's position that the limited intrusion after opening the car door for the purpose of ascertaining the serial number was reasonable. See also U. S. v. Hall, 557, Fed. 2d, 114 (Fifth Circuit 1977); U. S. v. Mazda; U. S. v. Wickhiser, Supra.

Silverman would of course have been equally justified in doing this earlier, when Darewal blurted out his

inculpatory remarks away from the scene, but Silverman did not. It seems insignificant that Busillo, and not Silverman performed this limited search to ascertain the serial number after Derewal had voluntarily followed Silverman back to the scene of the river.

Once having opened the door justifiably, the couplings in the torn bag on the front floor, and business cards on the front seat were clearly in plain view. The inadvertence requirement of the plain-view rule was clearly met. Coolidge v. New Hampshire, 403, U. S. 443, (1971.)

We turn now to Item 27, the police chemist's McBride's analysis of the trunk which had been removed to the police station at Harbison and Levick Streets at approximately 10:00 A. M. Mr. McBride was a civilian employed by the Police Department and took a sample from the liquid content of the tanker in response to a request at 7:45 A. M. that morning by Philadelphia detectives. The police were uncertain as to the contents of the tanker. Defendant John Barsum had told Officer Busillo that the truck contained "a mechanically white substance used as a fertilizer". Manfred Derewal had told the police detectives that they were dumping sulfuric acid. The Government seeks to introduce the sample obtained from the tanker on the basis of the automobile search exception which we have discussed previously. The Government relies in this case on Chambers v. Maroney and U. S. ex rel Johnson v.

BSAI018356

Johnson, Supra. In Johnson we applied the Chambers rule to justify the warrantless search of a private automobile at the police station notwithstanding that the search was conducted eight hours after the initial stopping of the vehicle. We held that this fell reasonably within the definition of "immediately," under the Chambers doctrine.  In this case it was impossible for the tanker to be sampled immediately because no police chemist was available at 2:00 A. M.  The tanker was, however, sampled within a reasonable time after the police chemist came on duty; indeed the request of him had been made at 7:30 A.M. He was presented at the suppression hearing, established a substantial basis for a finding that probable cause existed for the search and we believe that the automobile exception is likewise applicable to the tanker.

We have noted that the police impounded the car, as it were, for purposes of the examination.  We find instructive in this regard the Supreme Court's opinion in Cardwell v. Lewis where the Supreme Court stated at 2470: "Concluding, as we have, that the examination of the exterior of the vehicle upon probable cause was reasonable, we have yet to determine whether the prior impoundment of the vehicle rendered that examination a violation of the Fourth and Fourteenth Amendments. We do not think that, because the police impounded the car prior to the examination, which they could have made on the spot, there is a constitutional barrier to the

BSAI018357

use of the evidence obtained thereby.  Under the circumstances of this case, the seizure itself was not unreasonable."

Cardwell instructs us then that if the police could have made the inspection on the spot the intervening impoundment of the vehicle does not vitiate it.  This is of course subject to the reasonable time requirement which we have found to be met.  Indeed it would have been unreasonable for the police to have left the vehicle at the river site where it, by virtue of leakage, if sulfuric acid or organic wastes which they had reason to believe were contained therein might have a harmful effect on the Delaware River with possible consequences to the Torresdale intake or Northeast waste treatment plant nearby.  This position is further supported by Cadis v. Dombrowski, 413 U. S. 433 (1973) where the court recognized a legitimate police caretaking function in removing a vehicle from the scene of an accident as a public nuisance. The court acknowledge there the propriety of searching the vehicle after it had been removed from the scene to determine the existence of a possible danger to the public.  This principle supports search either at the river or at Harbison and Levick Streets where potential leaking of sulfuric acid or organic wastes could cause harm.  The police were entitled  to determine the nature of the substance therein.  The fact that liquid container was on the wheels exacerbates the police concern.

R 6

BSAI018358

We also note in this regard that the expecta-
tion of privacy in the contents of a chemical tanker trailer
is not great.  A number of the foregoing positions are supported
by   United States v. Harris, 464 Fed. Supp. 1116 (EDPA 1975)
where the court held that the stopping of a   mmercial vehicle
involves a lesser degree of intrusion than would occur if
a privately owned automobile had been stopped and where the
court noted the inability of the driver of the vehicle to
produce a bill of lading or the vehicle's contents together
with the highly unusual circumstances surrounding the presence
of the truck at the location where it was stopped were sufficient
to provide probable cause to search the vehicle for contraband.

    We find the recent United States Supreme
Court decision in U. S. v. Chadwick, 97 Supreme Court 2476
(1977) in apposite.  First of all, we have held Chadwick to
be non-retroactive.  See United States v. Powell,    Fed. Supp.
  , Federal No. 7 -272, slip opinion filed May 3, 1978.

        Moreover, even if Chadwick were to be
retroactively applied, it would be in apposite because the
Chadwick court carefully distinguished the automobile exception
from the circumstances with which it was there confronted.  There
is of course a great difference between the expectation of
privacy in a foot locker, which concerned the court in Chadwick,
and the expectation of privacy in the contents of a chemical
tanker-trailer which is in the process of being dumped into

BSAI018359

a public body of water while located at a public place.

We turn now to the events of March 30 when the Fire Department was called because of a spill on the ECC premises. There was plainly probable cause for the entry and the same emergency doctrine which we discussed above applies to justify the presence of the officials on the property and to observe anything related to the emergency. Since vapors were bubbling up from Manhole "C" (Building "G" had to be evacuated) observations of Manhole "C" were permissible at that time. The foregoing discussion relates to Item 28.

As to Item 29, samples taken on March 30 from the river bank, there is no standing.

As to Item 30, the observations of the various officials, including those of the Fire Department during the emergency, they are justified by probable cause and the emergency exception and the officials were authorized to look at anything reasonably connected with the emergency, including Manhole "C."

Turning to Item 31 relative to police photographs from outside the ECC premises on April 5, there was no reasonable expectation of privacy under Katz for the reasons stated earlier in this discussion. We have already noted that the inventory of chemicals obtained from Linda Cochran pursuant to grand jury subpoena and also obtained from counsel for the defendants were voluntarily obtained. Those

BSAI018360

items will not be suppressed. Furthermore, the federal grand jury testimony of Linda Cochran, Manfred Barewal and John Barsum was preceded by appropriate warnings. We do not find that testimony vitiated by taint of earlier unlawful searches and seizures. Indeed, having reviewed the entire record we do not find any evidence to be within the "fruit of the poisonous tree" doctrine except that which has been mentioned above, i.e., inspections of Manhole "C" on March 28, 1977. We reject the defendants' contentions that the one area of suppressible observation, that of Manhole "C," required vitiation of other evidence because of the fruit of the poisonous tree doctrine. Those observations represent but a small part of the overall picture and given the broad-based probable cause and the justifications for official conduct detailed at such great length in this bench opinion we find that observations of Manhole "C" are not related in any respect to observations of other portions of the premises.

This concludes the bench opinion and in consideration thereof we will enter the following order:

And now this 9th day of May, 1978, in consideration of the foregoing bench opinion, it is hereby ordered that defendants' motion to suppress is granted as to the items of evidence enumerated in the table which has been filed of record and which will be attached to the bench opinion: (i) Item 11, to the extent it involved samples and/or observa-

BSAI018361

tions of the interior of Manhole "C" and/or any other samples
and/or observations made while officials were inside Building
"G" on the afternoon of March 25, 1977, between 4:30 P.M. and
5:30 P.M.; (ii)  Item 19 to the extent it involved samples
and/or observations of the interior of Manhole "C" and any other
samples and/or observations made while officials were inside
Building "G" on the morning of March 28, 1977 without Linda
Cochran's consent; (iii) Item 22 to the extent that Messrs.
Kulesza or Stolle made observations or took samples from the
interior of Manhole "C" if inside Building "G" on the evening of
March 28, 1977.

In all other respects defendants' motion to
suppress is hereby denied.

The Court notes that it has reviewed the
Third Circuit's opinion in U. S. v. Dolan, 570 Fed. 2d, 177 and
has considered it against the background of the extensive
voir dire of the defendants in this case on the subject of
conflict of counsel.  In view of the fact that no actual
conflicts of interest appear we deem Dolan in apposite.

The case is specially listed for trial on
Monday, June 19, 1978, in Courtroom 16A.

Is there anything else on the record, Mr.
Smith?

MR. SMITH:  No, Your Honor.

THE COURT:  Mr. Peruto?

4

MR. J. PERTEC:  Not that I can think of.

——

of
h Opinion

I Certify that the foregoing is a correct
transcript from the record of proceedings
in the above-entitled matter.

5-16-78                 _Larry Herr_
Date                    Official Court Reporter

BSAI018363