**EXHIBIT A**

# CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN, P.C.

### COUNSELLORS AT LAW

CHARLES C CARELLA
BRENDAN T BYRNE
JOHN N BAIN
JOHN G GILFILLAN III
PETER G STEWART
ELLIOT M OLSTEIN
ARTHUR T VANDERBILT, II
JAN ALAN BRODY
JOHN M AGNELLO
CHARLES M CARELLA
JAMES E CECCHI

JAMES D CECCHI 1933-1995

JAMES T BYERS
DONALD F. MICELI
A. RICHARD ROSS
KENNETH L. WINTERS
JEFFREY A. COOPER
CARL R. WOODWARD, III
MELISSA E. FLAX
DENNIS F. GLEASON
DAVID G. GILFILLAN
G. GLENNON TROUBLEFIELD
BRIAN H. FENLON
KHOREN BANDAZIAN
KERRIE R. HESLIN

5 BECKER FARM ROAD
ROSELAND, N.J. 07068-1739
PHONE (973) 994-1700
FAX (973) 994-1744
www.carellabyrne.com

March 15, 2007

RICHARD K. MATANLE, II
DONALD S. BROOKS
FRANCIS C. HAND
AVRAM S. EULE
LINDSEY H. TAYLOR
RAYMOND W. FISHER
DAVID J. REICH
DECANDA M. FAULK

OF COUNSEL

RAYMOND J. LILLIE
WILLIAM SQUIRE
ALAN J. GRANT°
LAURA S. MUNZER
MARC D. MICELI
RAYMOND E. STAUFFER°
JACOB A. KUBERT
STANLEY J. YELLIN
FRANK J. CHESKY III
RAMON A. CAMEJO
STEPHEN R. DANEK
°MEMBER N.Y. BAR ONLY

***Via Email and Ordinary Mail***
Ballard Spahr Andrews & Ingersoll, LLP
Plaza 1000 – Suite 500
Main Street
Voorhees, New Jersey 08043-4636
ATTN:  Glenn A. Harris, Esq.

RE:   **Boarhead Farm Agreement Group v. Advanced**
      **Environmental Technology Corporation, et al.**
      **Case No. 02-03830 (LDD)**
      **File No. 300580-21**

Dear Glenn:

I herewith serve upon you Defendants' Joint Contention Interrogatories to Plaintiffs. The Joint Contention Interrogatories are propounded upon Plaintiffs on behalf of the following Defendants:

Advanced Environmental Technology Corporation
Ashland Inc.
Carpenter Technology Corporation
fgc, Inc.
Handy & Harman Tube Company, Inc.
NRM Investment Co.

Please respond to the enclosed in accordance with the Federal Rules of Civil Procedure.

Very truly yours,

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN

MELISSA E. FLAX

MEF
Enclosure
cc:   All counsel of record (w/enclosure)

**EXHIBIT B**

LAW OFFICES

# BALLARD SPAHR ANDREWS & INGERSOLL, LLP

A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
PLAZA 1000 · SUITE 500
MAIN STREET
VOORHEES, NEW JERSEY 08043-4636
856-761-3400
FAX: 856-761-1020
WWW.BALLARDSPAHR.COM

PHILADELPHIA, PA
BALTIMORE, MD
BETHESDA, MD
DENVER, CO
LAS VEGAS, NV
PHOENIX, AZ
SALT LAKE CITY, UT
WASHINGTON, DC
WILMINGTON, DE

PARTNER RESPONSIBLE FOR
VOORHEES, NJ PRACTICE
BENJAMIN A. LEVIN

AMY M. TROJECKI
DIRECT DIAL: (856) 761-3414
PERSONAL FAX: (858) 761-9014
E-MAIL: TROJECKIA@BALLARDSPAHR.COM

April 17, 2007

<u>Via E-mail and U.S. Mail</u>

ALL COUNSEL ON ATTACHED LIST

   Re: <u>Boarhead Litigation</u>

Dear Counsel:

   I have enclosed copies of the following documents:

- Plaintiffs' Responses to Joint Contention Interrogatories of Advanced Environmental Technology Corporation, Ashland, Inc., Carpenter Technology Corporation, fgc, inc., Handy & Harman Tube Company, Inc. and NRM Investment Company;

- Plaintiffs' Responses and Objections to Interrogatories from Handy & Harman Tube Company, Inc.;

- Plaintiffs' Responses and Objections to Interrogatories from Carpenter Technology Corporation;

- Plaintiffs' Responses and Objections to Interrogatories from fcg, inc.;

- Plaintiffs' Responses and Objections to Interrogatories from Advanced Environmental Technology Corporation;

- Plaintiffs' Responses and Objections to Interrogatories from Ashland, Inc.; and

- Plaintiffs' Responses and Objections to Interrogatories from NRM Investment Company.

     Very truly yours,

     Amy M. Trojecki

AMT/cdg
Enclosures

DMEAST #9767617 v1

**EXHIBIT C**

# PHELAN, PETTIT & BIEDRZYCKI, LLC
## ATTORNEYS AT LAW

RICHARD C. BIEDRZYCKI
JEFFREY L. PETTIT
CHRISTOPHER H. JONES*
DAVID M. DOTO*
JOHN W. PHELAN*
BRENT A. COSSROW*

OF COUNSEL
JOHN M. PHELAN

\* ALSO ADMITTED TO NJ BAR

SUITE 1600
THE NORTH AMERICAN BUILDING
121 SOUTH BROAD STREET
PHILADELPHIA, PA 19107

TELEPHONE (215) 546-0500
FACSIMILE (215) 546-9444

509 SWEDE STREET
NORRISTOWN, PA 19401

TELEPHONE (610) 279-0316
FACSIMILE (610) 279-0378

PLEASE REPLY TO PHILADELPHIA OFFICES

April 30, 2007

**VIA E-MAIL AND FIRST CLASS MAIL**
Glenn M. Harris, Esquire
Ballard, Spahr, Andrews & Ingersoll, LLP
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ 08043-4636

> RE:    **Boarhead Farm Agreement Group v.**
> **Advanced Environmental Technology Corporation, et al.**
> **U.S.D.C., E.D.Pa., Civil Action No. 02-3830**

Dear Glenn:

I am writing on behalf of the remaining Defendants to comply with the first deadline that we anticipate will be set forth in the Tenth Case Management Order. Defendants have conferred and identified several areas where we believe the Plaintiffs' responses to the Joint Contention Interrogatories are deficient and where additional discovery is required. Deficiencies or additional discovery required as a result of the Plaintiffs' responses to Joint Contention Interrogatories that specifically relate to individual defendants or responses to specific Defendant's Contention Interrogatories will be addressed by those defendants in separate correspondence.

As a general matter, the responses are deficient to the extent that they fail to provide or object to providing the legal basis for a contention. Defendants request that Plaintiffs withdraw this objection.

### Interrogatory Nos. 1 through 66

Defendants request that Plaintiffs withdraw their objection on the ground that it seeks information outside of the contentions that the Plaintiffs will make as part of their *prima facie* case at trial.

PHELAN, PETTIT & BIEDRZYCKI
Glenn M. Harris, Esquire
April 30, 2007
Page 2

In paragraph 1, Plaintiffs also objected to the phrases, "arranged for the disposal of drum wastes at the Site" and "arranged for bulk waste to be disposed of at the Site" on the grounds that these phrases were vague, confusing and ambiguous. Since these phrases closely track the statutory language, Defendants assume the basis of Plaintiffs' objection was the inference that the legal term "arrange" was tied to disposal "at the Site." That was not the Defendants' intent. The intent of these contention interrogatories was to determine whether the Plaintiffs were contending that the parties referenced in these paragraphs were or were not "arrangers" within the meaning of CERCLA. Put another way, the intent was to determine whether the Plaintiffs were contending that these parties had arranged for the disposal of wastes that the Plaintiffs have alleged were disposed at the Site; the intent was not to determine whether the Plaintiffs were contending that these parties had selected the Site, as opposed to some other location, for disposal. With that clarification in mind, Defendants request that Interrogatory Nos. 1 through 66 be fully answered.

### Interrogatory Nos. 67-71

Defendants request that the Plaintiffs withdraw their objection on the ground that it seeks information outside of the contentions that the Plaintiffs will make as part of their *prima facie* case at trial.

The Plaintiffs stated in their response to Paragraph 67 that Plaintiffs will request findings of fact and conclusions that drummed and bulk waste, hauled by DCC <u>beginning in 1972</u>, was disposed of at the Site. Plaintiffs' response does not address the 1969-72 period. If the Plaintiffs contend that DCC did not haul wastes before 1972, the factual and legal basis must be stated.

In their response to paragraph 67, Plaintiffs also stated that they will not ask the Court to make any findings of fact or conclusions of law that waste hauled by Globe Disposal Co., Inc./Globe-Wastec, Inc. was disposed of at the Site. Interrogatory Nos. 69 (A) through 71 (A) requested the factual and legal bases for this negative response. These bases were not provided. Please supplement your responses with these bases.

### Interrogatory Nos. 73-77

Defendants request that the Plaintiffs withdraw their objection on the ground that it seeks information outside of the contentions that the Plaintiffs will make as part of their *prima facie* case at trial.

In these paragraphs, Defendants sought to understand each Plaintiff's position on the total clean-up costs for OU-1 and OU-2 incurred by each Plaintiff. The totals outlined on the tables on pages 39 and 40 suggest that the Plaintiffs are seeking contribution toward response costs incurred by NRM Investments and Worthington Industries, Inc., companies that are not plaintiffs in this case. Furthermore, the amounts attributed to the Plaintiffs are inconsistent with other documents produced by the Plaintiffs, such as Jerome Exhibit "10" which purports to be a calculation of contributions to the funds maintained by the OU-1 and OU-2 groups to pay

PHELAN, PETTIT & BIEDRZYCKI
Glenn M. Harris, Esquire
April 30, 2007
Page 3

response costs and EPA oversight costs at the time. Defendants need clarification on these responses and details on every payment by each Plaintiff or payments by others credited to that Plaintiff that are included in the totals indicated.

Furthermore, in their responses Plaintiffs state that they will ask the Court to rule that they have "collectively paid" an amount in excess of their equitable share of the costs identified above. The Contention Interrogatories were specific and consistent with the law to the extent they requested the Plaintiffs to identify each specific Plaintiff's payment in excess of its equitable share. Based on our review of the PRP Group Organizational Documents produced by the Plaintiffs in this case, Defendants are aware there are underlying mechanisms to allocate costs for both OU-1 and OU-2 remediation internally among the parties to those agreements. We will request discovery on whether those allocation mechanisms have been utilized and the results thereof, as well as on the potential for further allocation or reallocation as between any of the Plaintiffs in the future. Defendants further note that on page 41 the Plaintiffs indicated that there has been a settlement with Agere, evidenced by an Agreement dated March 30, 2007. None of the Defendants were advised that this document had been placed in the Repository and request that you produce the Agreement immediately. We also request that you supplement the responses to these Contention Interrogatories to state Plaintiffs' contention with respect to whether or not Agere, having settled with the Plaintiffs, intends to remain a Plaintiff in the case for any purpose and whether or not the Plaintiffs seek to recover the payments made to or by Agere as represented in the present response.

Defendants will also further seek discovery on the OU-1 and OU-2 group discussions, determinations and actions relating to allocations and investigation of other PRPs, subjects referenced in various documents in the Repository. We know from records produced by the Plaintiffs that there was an allocation performed by John M. Barkett, Esq. and an investigation by Environmental Strategies Management in 1998.

These responses are also deficient in that the Contention Interrogatories requested the Plaintiffs' calculation of the Total Clean-Up Costs. The responses only indicate the costs paid by or on behalf of the Plaintiffs, and do not provide the total response costs. For example, we understand that Plaintiffs paid only $7 million of the United States' past response costs, costs which were much greater than that amount.

**<u>Interrogatory No. 78</u>**

The response to this paragraph is cross-referenced in the responses to paragraphs 79 to 111 and, therefore, the deficiencies outlined here are applied to those paragraphs as well.

Defendants request that the Plaintiffs withdraw their objection on the ground that it seeks information outside of the contentions that the Plaintiffs will make as part of their *prima facie* case at trial. These paragraphs request the Plaintiffs to identify their contentions as to the Plaintiffs', Settling Defendants' and Non-Settling Defendants' respective allocable/equitable shares of the total clean-up costs and the factual basis thereof, whether those contentions are

PHELAN, PETTIT & BIEDRZYCKI
Glenn M. Harris, Esquire
April 30, 2007
Page 4

made in the Plaintiffs' *prima facie* case at trial or otherwise. These are essential contentions in a CERCLA contribution action.

Although the responses provide a very broad outline of the Plaintiffs' methodology for determining volumes of waste to be attributed to the Plaintiffs, Non-Settling Defendants, and Settled Defendants and indicate percentages of wastes for certain time periods, the responses are deficient because they fail to provide the basis on which these percentages were calculated. For example, the Plaintiffs indicate that they will ask the Court to conclude that 95% of all the waste handled by DCC from 1/72 to 12/1/73 was disposed of at the Site. Certain documents are listed and references are made to deposition testimony. However, these sources do not support the specific percentage identified in the responses and there is no information in the responses as to how the referenced information was utilized to arrive at the specific percentage. Furthermore, the listings of the documents that purportedly justify the Plaintiffs' calculations are all preceded by the disclaimer, "include, but are not limited to." Thus, Defendants are left without knowing all the documents that the Plaintiffs specifically rely upon in developing this percentage. The same comments apply with respect to the other time periods set forth in the response to paragraph 78, and the other calculated percentages. As a result, Defendants will seek additional discovery on the precise manner in which the alleged documents and deposition testimony were utilized to arrive at these percentages.

The response on behalf of Agere Systems, Inc. indicates there is no evidence establishing that any hazardous wastes owned or possessed by Agere's predecessor, Western Electric, was disposed of at the Site. This response fails to address other possible predecessors of Agere, including AT&T and Lucent Technologies, all of whom have been implicated at the Site. In addition, the response on behalf of Agere refers only to hazardous wastes rather than the term "waste" used in most of the other responses. We request that this response be supplemented to include all waste and all waste of predecessors.

The response on behalf of TI Group Automated Systems, LLC refers only to hazardous waste owned or possessed by Bundy Corporation. Defendants do not understand Plaintiffs' contentions as to the relationships between Bundy Corporation and TI Group and National Rolling Mills since none is pleaded in the Fourth Amended Complaint. In addition, this response is deficient because the term "hazardous waste" is used here rather than the term "waste".

The response to Contention Interrogatory No. 78, page 66, also repeats the contention in other responses that the Plaintiffs will allocate to the Plaintiffs collectively rather than individually. Again, individual allocation is necessary in order to compare costs paid by individual Plaintiffs with their respective alleged allocable/equitable shares.

## Interrogatory No. 85

In this response, the Plaintiffs state that Boarhead Corporation is not a party to this action. Boarhead Corporation was originally named as a defendant in the case. Please explain the basis for this statement.

PHELAN, PETTIT & BIEDRZYCKI
Glenn M. Harris, Esquire
April 30, 2007
Page 5

### Interrogatory No. 108

The Plaintiffs failed to respond to this interrogatory which requests the Plaintiffs to identify their contentions as to General Ceramics' allocable/equitable share. The response accurately indicates that General Ceramics conducted a separate removal action. However, it is evident from Exhibit "A" attached to Ashland's Contention Interrogatories that the Plaintiffs received consideration from General Ceramics by way of an assignment of insurance proceeds. Moreover, the Plaintiffs' expert Jay Vandeven, opined that all wastes contributed in some way to response costs. Therefore, Defendants are entitled to a response and further discovery on the details of any funds received by the Plaintiffs in the way of insurance proceeds or otherwise as result of claims against General Ceramics.

### Interrogatory Nos. 92, 93, 104, 105, 106, 107, 109-111

The Plaintiffs did not respond to these interrogatories asking for the Plaintiffs' contentions as to Knoll/Art Metal-Knoll Corporation, Merit Metals, Haven Chemical/Haven Ind., Inc., Envirotec/Enviratech, Sitkin Smelting & Refining, DeRewal's, DCC's and Globe's allocable/equitable shares. The only response was that these entities have no identifiable assets. Defendants are still entitled to know the Plaintiffs' contentions as to the allocable/equitable shares of these parties.

### Interrogatory No. 112

In their response to Interrogatory 112, the Plaintiffs propound a number of objections. First, the Plaintiffs object to this Interrogatory to the extent that it seeks information outside the scope of the contentions that Plaintiffs will make as part of their *prima facie* case at trial. As discussed above, the Defendants are entitled to discovery as to the Plaintiffs' contentions irrespective of when such contentions might be made. Please withdraw, and confirm your withdrawal of, this objection (in connection with all of Defendants' contention interrogatories).

Next, the Plaintiffs object to the phrase "first removal action" as being "vague, confusing and ambiguous." This is an unfounded objection because as the Plaintiffs well know, the administrative record generated by EPA in connection with the Site contains multiple references to, and descriptions of, a series of discrete removal actions. Indeed, Interrogatory 112 specifies the very page and paragraph of the ROD (p. 3, para. 1) where a description of the three distinct removal actions is found. The referenced section of the ROD states, in relevant part, that "EPA has conducted three removal actions at the Boarhead Farms Site. During the first two, one each in 1992 and 1993, over 2500 buried drums were located, excavated and disposed of offsite, reducing the contaminant levels in the subsurface soils. The excavated areas were then covered with a layer of clean fill to reduce exposure risk. A third removal action to intercept, collect and treat contaminated groundwater in an onsite treatment facility is continuing at this time." Please

PHELAN, PETTIT & BIEDRZYCKI
Glenn M. Harris, Esquire
April 30, 2007
Page 6

withdraw, and confirm your withdrawal of, this objection, and in light of this (unnecessary) clarification, please provide a full and complete response to this Interrogatory.

The Plaintiffs' answer to Interrogatory No. 112 states: "Plaintiffs will not ask the Court at trial to make findings of fact or conclusions of law concerning when 'the first removal action conducted by the United States (as that removal action is described in the first paragraph of page 3 of the Record of Decision for the Site)' was completed." Please confirm that this answer means that if Defendants contend at or prior to trial that the referenced first removal action was completed in 1992, the Plaintiffs will not contend otherwise. If you will not provide such confirmation, please provide a full and complete response to this Interrogatory (including its subparts).

### Interrogatory No. 113

The first two paragraphs above relating to Interrogatory 112 apply equally to Interrogatory 113, and Defendants make the same requests of the Plaintiffs with regard to the Plaintiffs' objections and answer to Interrogatory 113 as Defendants made with regard to the Plaintiffs' objections and answer to Interrogatory 112.

Furthermore, the Plaintiffs' answer to Interrogatory No. 113 states: "Plaintiffs will not ask the Court at trial to make findings of fact or conclusions of law concerning when 'the second removal action conducted by the United States (as that removal action is described in the first paragraph of page 3 of the Record of Decision for the Site)' was completed." Please confirm that this means that if Defendants contend at or prior to trial that the referenced second removal action was completed in 1993, the Plaintiffs will not contend otherwise. If you will not provide such confirmation, please provide a full and complete response to this Interrogatory (including its subparts).

### Interrogatory Nos. 114-115

The first two paragraphs above relating to Interrogatory 112 also apply to Interrogatories 114 and 115, except that in response to Interrogatories 114 and 115 the Plaintiffs object that the term "remedial action" is also "vague, confusing and ambiguous." This objection, like the Plaintiffs' parallel objection to the terms "first remedial action" and "second remedial action," is unfounded. Interrogatories 114 and 115 are quite specific in defining "remedial action" to mean " 'remedial action' (as that term is used in 42 U.S.C. § 9613(g)(2))." It is hard to imagine there being less vagueness, confusion or ambiguity concerning the meaning of a term when the specified meaning is that given by the statute being relied upon by the responding parties as the basis of their claims. Defendants make the same requests of the Plaintiffs with regard to the Plaintiffs' objections and answers to Interrogatories 114 and 115 as Defendants made with regard to the Plaintiffs' answers and objections to Interrogatories 112 and 113.

Furthermore, the Plaintiffs' answer to Interrogatory No. 114 states: "Plaintiffs will not ask the Court at trial to make findings of fact or conclusions of law concerning [sic] that 'the

PHELAN, PETTIT & BIEDRZYCKI
Glenn M. Harris, Esquire
April 30, 2007
Page 7

"remedial action" (as that term is used in 42 U.S.C. § 9613(g)(2) at the Site was initiated within three years after the completion of the first removal action conducted by the United states (as that removal action is described in the first paragraph of page 3 of the Record of Decision for the Site).' " Similarly, the Plaintiffs' answer to Interrogatory 115 states: "Plaintiffs will not ask the Court at trial to make findings of fact or conclusions of law concerning [sic] that 'the 'remedial action' (as that term is used in 42 U.S.C. § 9613(g)(2) at the Site was initiated within three years after the completion of the second removal action conducted by the United States (as that removal action is described in the first paragraph of page 3 of the Record of Decision for the Site).' " Please confirm that these answers mean that if Defendants contend at or prior to trial that the referenced remedial action was initiated more than three years after the completion of the first and second removal actions, respectively, the Plaintiffs will not contend otherwise. If you will not provide such confirmation, please provide a full and complete response to these Interrogatories (including their subparts).

### Interrogatory No. 116

Defendants make the same request of the Plaintiffs with regard to the deficiencies in the Plaintiffs' objections and answer to Interrogatory 116 as Defendants made in connection with Interrogatories 112 through 115. In addition, Defendants note that the Plaintiffs have identified a typographical error in Interrogatory 116. For sake of (unnecessary) clarification, this will confirm that the parenthetical following which the Plaintiffs wrote "[sic]" should have read "(as that term is defined in the OU-2 Consent Decree)" (just as that parenthetical reads in Interrogatory 117). The objection to the term "Past Response Costs" as being "vague, confusing and ambiguous" is not only unfounded, but remarkable, inasmuch as most of the Plaintiffs negotiated the language of the OU-2 Consent Decree, including the definition of "Past Response Costs," and then signed that document.

The Plaintiffs' answer to Interrogatory 116 states: "Plaintiffs will not ask the Court at trial to make findings of fact or conclusions of law that, at the time the March 14, 2002 Consent Decree was executed, 'any plaintiff had any potential liability for payment of any "Past Response Costs" (as that term is defined in) [sic] associated with the first two removal actions conducted by the United States (as those removal actions are described in the first paragraph of page 3 of the Record of Decision for the Site).' " Please confirm that this answer means that if Defendants contend at or prior to trial that the Plaintiffs had no potential liability for payment of any "Past Response Costs" (as that term is defined in the OU-2 Consent Decree), the Plaintiffs will not contend otherwise. If you will not provide such confirmation, please provide a full and complete response to this Interrogatory (including its subparts).

### Interrogatory No. 117

Defendants make the same request of the Plaintiffs with regard to the deficiencies in the Plaintiffs' objections and answer to Interrogatory 117 as Defendants made in connection with Interrogatories 112 through 116.

PHELAN, PETTIT & BIEDRZYCKI
Glenn M. Harris, Esquire
April 30, 2007
Page 8

The Plaintiffs' answer to Interrogatory 117 states: "Plaintiffs will not ask the Court at trial to make findings of fact or conclusions of law that, at the time the March 14, 2002 Consent Decree was executed, 'an initial action by the United States for recovery of "Past Response Costs" (as that term is defined in the OU-2 Consent Decree) associated with the first two removal actions conducted by the United States (as those removal actions are described in the first paragraph of page 3 of the Record of Decision for the Site) was not barred by the statute of limitations found at 42 U.S.C. § 9613(g)(2).' " Please confirm that this answer means that if Defendants contend at or prior to trial that an initial action by the United States against the Plaintiffs for recovery of "Past Response Costs" (as that term is defined in the OU-2 Consent Decree) associated with the first two removal actions (as those removal actions are described in the first paragraph of page 3 of the Record of Decision for the Site) was barred by the statute of limitations found at 42 U.S.C. § 9613(g)(2), the Plaintiffs will not contend otherwise. If you will not provide such confirmation, please provide a full and complete response to this Interrogatory (including its subparts).

### Interrogatory No. 118

Interrogatory 118 poses a straightforward question: "Without regard to the Consent Decree(s), do plaintiffs (each, any or all) contend that they have no liability for the contamination at the Site?" The Plaintiffs answered this interrogatory by referring Defendants to the Plaintiffs' response to Interrogatory 78. However, the Plaintiffs' response to Interrogatory 78 does not state whether the Plaintiffs (each, any or all) contend that they have no liability for the contamination at the Site. Although the Plaintiffs' response to Interrogatory 78 lists certain documents and testimony pertaining to certain of the Plaintiffs, we note that Mr. Harris made an absolute representation to the Court during the most recent (April 24, 2007) case management conference that the Plaintiffs had no liability. Please provide a full and complete answer to this Interrogatory (including its subparts).

### Interrogatory Nos. 119-123

Defendants request that the Plaintiffs withdraw their objection on the ground that it seeks information outside of the contentions that the Plaintiffs will make as part of their *prima facie* case at trial.

The only answer provided by the Plaintiffs was the amount of settlements reached with other Defendants in this action. Defendants are entitled to know any credits, including insurance proceeds, contributions from predecessors or any other source offsetting its costs and will seek discovery of those items.

### Interrogatory Nos. 124-125

Defendants are entitled to know whether the Plaintiffs contend that there are parties who have an allocable/equitable share of response costs but which may not have the assets to pay and whether Plaintiffs contend that Defendants are responsible.

PHELAN, PETTIT & BIEDRZYCKI
Glenn M. Harris, Esquire
April 30, 2007
Page 9


        The remaining Defendants look forward to your timely response to the matters addressed
in this letter.


                                        Very truly yours,



                                        Jeffrey L. Pettit

JLP/vic

cc:     All defense counsel (via e-mail)

G:\DATA\1357-29\Ltrs\GMH-026.doc

**EXHIBIT D**

LAW OFFICES

# BALLARD SPAHR ANDREWS & INGERSOLL, LLP

A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
PLAZA 1000, SUITE 500
MAIN STREET
VOORHEES, NEW JERSEY 08043-4636
856-761-3400
FAX: 856-761-1020
WWW.BALLARDSPAHR.COM

PHILADELPHIA, PA
BALTIMORE, MD
BETHESDA, MD
DENVER, CO
LAS VEGAS, NV
PHOENIX, AZ
SALT LAKE CITY, UT
WASHINGTON, DC
WILMINGTON, DE

PARTNER RESPONSIBLE FOR
VOORHEES, NJ PRACTICE
BENJAMIN A. LEVIN

GLENN A. HARRIS
DIRECT DIAL: 856-761-3440
PERSONAL FAX: 856-761-9001
HARRISG@BALLARDSPAHR.COM

May 7, 2007

BOARHEAD DEFENDANTS

Re:   *Boarhead Farms*

Dear Counsel:

This letter is in response to the April 30, 2007 letter from Jeff Pettit with respect to Plaintiffs' responses to Defendants Joint Contention Interrogatories ("the April 30th letter").

*Scope of Discovery*

Defendants propounded numerous interrogatories that begin with the phrase "Do you contend." Plaintiffs responded "no" in response to many of these interrogatories, clearly stating that they did not contend a certain fact or legal theory stated by Defendants. Defendants now seek to uncover the factual basis for why Plaintiffs do not contend certain facts or theories. There is no legal authority to support such a demand.

The phrase "Do you contend" or the like can only be read to seek to learn what Plaintiffs presently intend to *contend* at trial with respect to issues for which Plaintiffs have the burden of proof. Such interrogatories do *not* ask what Plaintiffs *think* about various factual or legal issues, what evidence Plaintiffs *know of* concerning particular factual or legal issues, or, contrary to what Defendants now say, whether Plaintiffs will contest or disagree with contentions that Defendants themselves *may or may not* make as part of *Defendants'* cases-in-chief. Plaintiffs in each instance responded to such interrogatories by clearly stating what Plaintiffs *do* intend to contend in their case-in-chief with respect to what appear to be the general subject matter of such interrogatories.

Moreover, even if defendants *had* asked interrogatories such as: "If Defendant X contends at trial that [A + B = C], will you contend otherwise?", Plaintiffs would have objected to such interrogatories.[1] The fundamental purpose of a contention interrogatory is to enable the

---

[1]    Jeff Pettit, the author of the letter to which this letter responds, stated on behalf of Ashland in Ashland's April 30, 2007 letter: "the facts that form the subject of these interrogatories may be facts presented by one or more of the Defendants at trial.

(continued...)

DMEAST #9777529 v3



Boarhead Defendants
May 7, 2007
Page 2

propounding party to ascertain the opposing party's legal theories and the facts supporting those theories. To this end, it is perfectly proper for Defendants to use contention interrogatories to ask Plaintiffs to state whether they will make a specific contention and, if so, to state the factual basis for that contention. *Moore's Federal Practice 3d*, Section 33.78 at 33-63. It is not proper, however, for Defendants to demand that Plaintiffs state whether they will make a specific contention and, if not, the reasons why Plaintiffs do not contend certain facts or legal theories. Plaintiffs can only imagine the myriad of factual and legal contentions one or more Defendants may chose to make at trial. Plaintiffs will decide whether to present evidence or argument in rebuttal to any such assertions when and if those assertions are made and Plaintiffs evaluate the basis for any such assertions. Plaintiffs simply have no obligation to identify rebuttal arguments or evidence in response to these interrogatories.

*Interrogatory Nos. 1 through 66.*

        If Defendants really wanted to know whether Plaintiffs will contend that they are "arrangers" within the meaning of CERCLA, Defendants should have asked that question directly. Defendants are aware of ample evidence that each of them hired DCC to remove wastes from their facilities. Plaintiffs have identified in response to Interrogatory No. 78 which of those wastes Plaintiffs will contend at trial were disposed of at the Site. Defendants thus have the information they now say they were seeking in these interrogatories.

*Interrogatory Nos. 67 - 71.*

        Plaintiffs' response to these interrogatories set forth the contentions Plaintiffs intend to make as part of their case-in-chief at trial. All of the parties are aware of evidence concerning hauling by DCC or some other DeRewal entities (such as Echo and Revere Chemical) prior to 1972. Plaintiffs will not contend at trial that any such wastes were disposed of at the Site. Should Defendants contend in Defendants' cases-in-chief that any such wastes were disposed of at the Site, Plaintiffs may or may not seek to introduce evidence in rebuttal relevant to such contentions.

*Interrogatory Nos. 73-77.*

        Interrogatory Nos. 73-76 sought only Plaintiffs' contentions as to the dollar amount of various categories of response costs, they did not ask for a detailed explanation of how Plaintiffs arrived at those dollar numbers or the identification of the proofs Plaintiffs relied upon to respond to the interrogatories.

---

(...continued)
        Defendants are entitled to know whether and how Plaintiffs will contest such factual allegations."

Boarhead Defendants
May 7, 2007
Page 3

Plaintiffs' correctly understood that these interrogatories, just like the other interrogatories asking about what Plaintiffs "contend," "sought to understand each Plaintiffs' position" with respect to the information sought. This is precisely why Plaintiffs objected to these interrogatories on the grounds that they sought information outside the scope of the contentions that Plaintiffs will make as part of their case-in-chief at trial.

Despite that Plaintiffs will not make any contentions at trial regarding the cleanup costs incurred by each individual Plaintiff, Plaintiffs' responses set forth the amount of response costs for work required by the OU-1 Consent Decree and EPA Oversight Costs pursuant to that decree and by the OU-2 Consent Decree and EPA's Oversight Costs pursuant to that decree as well as the payment of EPA's past and interim costs as required by the OU-2 Consent Decree paid by each individual Plaintiff. The Zaumeyer charts and other summary documents previously produced reflect each payment into each OU-1 and OU-2 Group account to date, as well as each payment from each Group account to date. The Document Repository contains each of the transactional documents referenced on those summary charts. The specific dollar numbers appearing in the discovery responses were calculated using the information on those charts. The defendants can easily reproduce those numbers using those documents.

The costs of the response actions required by the OU-1 Consent Decree have been funded until very recently as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. However, Agere stopped making contributions to these and other OU-1 and OU-2 activities as set forth below. The costs of the response actions required by the OU-2 Consent Decree were funded as follows: Ford - 22.5%; Cytec - 22.5%; SPS - 22.5%; Agere - 10%; TI - 22.5%. Payment of EPA oversight costs with respect to the OU-1 work were funded as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. Payment of the EPA oversight costs with respect to the OU-2 work were funded as follows: Ford - 22.5%; Cytec - 22.5%; SPS - 22.5%; Agere - 10%; TI - 22.5%. Payment of the EPA past costs demand were funded as follows: Ford - 25%; Cytec - 25%; SPS - 25%; TI - 25%. Payment of the EPA interim costs demand were funded as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. Plaintiffs are not seeking contribution towards response costs incurred by NRM Investments or Worthington Industries, but provided this information only to fully explain how the costs relating to the OU-1 Group were paid.

The amounts that were paid by each entity into the various OU-1 and OU-2 accounts include, with respect to the OU-1 and OU-2 RD/RA accounts, amounts spent on Group activities for which Plaintiffs do not seek recovery in this action. Therefore, Plaintiffs determined the amounts set forth in response to Interrogatory No. 73 by applying the respective percentages of all Group costs for a particular category of costs actually paid by Plaintiffs (and Worthington and NRM) to the amounts of such costs for which Plaintiffs seek recovery.

Plaintiffs' calculations used to determine the dollar amounts set forth in these responses are as follows:

Boarhead Defendants
May 7, 2007
Page 4

With respect to OU-1 costs, assessments were made as follows:  In approximately August of 2000 Ford, Cytec, SPS and Agere each paid $50,000 and in approximately December of 2000 Ford, Cytec, SPS and Agere each paid $40,000; TI paid $36,666.66 toward these costs, NRM paid $27,416.66, and Worthington paid $ 26,666.66; in approximately August of 2001 Ford, Cytec, SPS and Agere each paid $240,000; TI, NRM, and Worthington each paid $80,000; in approximately February of 2002 Ford, Cytec, SPS and Agere each paid $100,000; TI, NRM, and Worthington each paid $33,333.33; in approximately July of 2002 Ford, Cytec, SPS and Agere each paid $30,000; TI, NRM, and Worthington each paid $10,000; in approximately August of 2003 Ford, Cytec, SPS and Agere each paid $120,000; TI, NRM, and Worthington each paid $40,000; in approximately March of 2005 Ford, Cytec, and SPS each paid $120,000; TI, NRM, and Worthington each paid $42,201.05.  Each entity's percentage share of assessments was thus: Ford, Cytec, and SPS - 20.665%; Agere 17.123%; TI - 7.15%; NRM - 6.878%; and Worthington - 6.854%.  Total costs of the response actions required by the OU-1 Consent Decree through 2006 are $3,381,696.00 as reflected on the de maximis OU-1 invoice tracking chart. Ford, Cytec, and SPS thus each had a $698,827.47 share of those costs; Agere had a $579,047.80 share; TI had a $241,791.26 share; NRM had a $232,593.05 share; and Worthington had a $231,781.44 share.

With respect to OU-1 EPA costs, on or about July 9, 2002 $38,993.30 was paid from PHKS account 1305 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $7,800.00 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $2,600.00. Ford, Cytec, SPS, and Agere thus each had a $7,798.66 share of that reimbursement; TI, Worthington, and NRM each had a $2,599.55 share. On or about September 11, 2003 $169,720.60 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $33,944.12 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $11,314.71. Those payments exactly paid each entity's share. On or about August 10, 2004 $80,466.45 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $16,093.29 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $5,364.43. Those payments exactly paid each entity's share. On or about August 3, 2005 $33,015.66 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $6,603.14 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $2,201.05. Those payments exactly paid each entity's share. Total OU-1 EPA costs are thus: Ford, Cytec, SPS and Agere - $64,439.21 each; TI, NRM, and Worthington - $21,479.74 each.

With respect to OU-2 costs, three assessments were made as follows:  In approximately January of 2002 Ford, Cytec, SPS and TI each paid $61,250 and Agere paid $25,000; in approximately July of 2003 Ford, Cytec, SPS and TI each paid $450,000 and Agere paid $200,000; in approximately February of 2004 Ford, Cytec, SPS and TI each paid $112,500. Each entity's percentage share of assessments was thus: Ford, Cytec, SPS, and TI - 22.932%; Agere 8.272%. Total costs of the response actions required by the OU-2 Consent Decree through 2006 are $2,186,424.06 as reflected on the de maximis OU-2 invoice tracking chart plus



Boarhead Defendants
May 7, 2007
Page 5

$1,286.92 additional invoices from de maximis (available in the Document Repository), plus $74,000 paid for the reconstruction of the DeRewal garage (as reflected on the Zaumeyer charts), for a total of $2,261,710.90. Ford, Cytec, SPS, and TI thus each had a $518,655.54 share of those costs; Agere had a $187, 088.72 share. This amends Plaintiffs' response to this interrogatory.

      With respect to OU-2 EPA costs, on or about September 8, 2003 $133,327.41 was paid from MMWR account 405 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and TI each made payments of $29,998.66 into that account from which the reimbursement was made; Agere made a payment of $13,332.77. Those payments exactly paid each entity's share. On or about September 15, 2004 $120,958.65 was paid from MMWR account 405 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and TI each made payments of $29,535.21 into that account from which the reimbursement was made; Agere made a payment of $13,126.77. Ford, Cytec, SPS, and TI thus each had a $27,215.70 share of that reimbursement; Agere had a $12,095.87 share. On or about August 3, 2005 $71,695.27 was paid from MMWR account 405 to EPA to reimburse EPA's future costs. This payment was made from funds available in the OU-2 RD/RA account. Ford, Cytec, SPS, and TI thus each had a $16,441.16 share of that reimbursement; Agere had a $5,930.63 share. Total OU-2 EPA costs are thus: Ford, Cytec, SPS and TI - $73,655.52 each; Agere - $31,332.27.

      On or about June 17, 2002 $7,062,962.06 was paid from PHKS account 1305 to EPA to reimburse EPA's past costs, including interest thereon. Ford, Cytec, SPS, and TI each made payments of $1,750,000.00 and $15,750.00 into that account from which the reimbursement was made. Each such Plaintiff's share of that reimbursement was thus $1,765,740.52. On or about January 15, 2002 and April 5, 2002 a total of $415,652.74 was paid from the same PHKS account to EPA to reimburse EPA's interim costs. Ford, Cytec, SPS, and Agere each made payments of $84,534.32 into that account with respect to that obligation; TI, Worthington, and NRM each made payments of $28,178.11 into that account as well. Ford, Cytec, SPS, and Agere thus each had a $83,130.55 share of that reimbursement; TI, Worthington, and NRM each had a $27,710.18 share.

      Plaintiffs objected to the definition of "Total Cleanup Cost" as used in these interrogatories as overly broad, vague, ambiguous, unduly burdensome and not limited in time precisely because it was not clear exactly what information was being sought. Defendants' suggestion that Plaintiffs' responses are deficient because they included only "costs paid by or on behalf of the Plaintiffs" contradicts their statement with respect to the same interrogatories that the information sought concerned "the total clean-up costs of OU-1 and OU-2 incurred by each Plaintiff," illustrating that confusion. In any event, Plaintiffs may state their contentions in language of their choosing, not in language dictated by Defendants. Without waiving the objections set forth in Plaintiffs' interrogatory responses, the United States and the Commonwealth of Pennsylvania have each claimed to have incurred response costs that have not been reimbursed by Plaintiffs. By way of example only, EPA's past costs demand is in the Repository at bates numbers BSAI082007-BSAI082318; Pennsylvania's is at BSAI084400. Defendants have been provided a copy of the Commonwealth's demand last year for its past

Boarhead Defendants
May 7, 2007
Page 6

costs. General Ceramics no doubt incurred costs for the removal action it conducted. Other than NRM and Worthington, Plaintiffs are unaware of any other person who has incurred response costs with respect to the Site.

With respect to Interrogatory No. 77, Defendants did not ask Plaintiffs to "identify each specific Plaintiffs' payment in excess of its equitable share" as suggested in the April 30th letter. The question specifically asked whether Plaintiffs "*contend*" that any Plaintiff has spent amounts in excess of its equitable share of response costs. As set forth in response to these interrogatories, Plaintiffs will contend that they have collectively paid to date an amount in excess of their share of the costs identified in these answers. Plaintiffs will contend, as set forth on Exhibit A, that Plaintiffs' equitable share of past response costs incurred by them and response costs to be incurred by them in the future is 17.91% (including the 10.44% share that Plaintiffs will contend is attributable to the parties with whom Plaintiffs' have settled).

Plaintiffs have incurred through 2006 $13,207,487.52 (the amounts contributed by each individual Plaintiff to the response costs for work required by OU-1 Consent Decree and EPA Oversight Costs pursuant to that decree, the response costs for work required by the OU-2 Consent Decree and EPA's Oversight costs related to that decree, and the payment of EPA's past and interim costs as required by the OU-2 Consent Decree.) Plaintiffs' equitable share of those costs is thus $2,365,460.90 an amount in excess of the total dollar numbers paid by them of such costs. Of course, Plaintiffs contend that they have paid in excess of their equitable share of all response costs paid by the OU-1 and OU-2 Groups (including the amounts paid by NRM Investments and Worthington Industries, Inc.) for the same reason. It is self-evident from these facts and this analysis that each individual Plaintiff has also incurred more than its equitable share of costs to date. For example, Cytec has paid $3,204,448.71 in response costs, while its equitable share of all costs paid by the OU-1 and OU-2 Groups for such costs is only $800,373.71. SPS, Ford, TI, and Cytec are jointly and severally liable for all future Consent Decree costs.

With respect to Agere, I have enclosed a copy of the Agere settlement agreement. Please note that Agere remains a named Plaintiff, and that Plaintiffs seek to recover the payments made by Agere with respect to recoverable response costs. The dollar amounts of such costs paid by Agere to date are reflected in Plaintiffs' response to these interrogatories. The $400,000 to be paid to Agere by the other four Plaintiffs is not reflected in those amounts, either as a reduction to amounts paid by Agere or as increases to the amounts paid by the other four Plaintiffs.

Defendants have requested further discovery with respect to OU-1 and OU-2 "Group discussions, determinations and actions relating to allocations." Plaintiffs do not understand what this means. Plaintiffs have agreed to fund on an interim allocation basis OU-1 and OU-2 Group costs as set forth above. Plaintiffs will at some future time, and not in this litigation, reach a final allocation amongst themselves of all such costs. Plaintiffs have produced written agreements concerning such interim allocations, and the fact that such allocations were in fact funded on the agreed-to interim bases is established by the documents reflecting the actual payments by the various entities into the OU-1 and OU-2 Group accounts, as well by the



Boarhead Defendants
May 7, 2007
Page 7

payments from those accounts. Plaintiffs note that discovery of this information was previously available. Plaintiffs will not agree to any discovery concerning "discussions" among Plaintiffs that lead to these interim shares or otherwise concerning those shares. Such information is both privileged and irrelevant.

With respect to Defendants' request for discovery concerning "investigation of other PRPs," it is unclear what exact discovery is sought. Plaintiffs will not permit any discovery of Plaintiffs with respect to their historic efforts to identify PRPs, the analysis made by Plaintiffs of the results of such efforts, or the decision-making process of Plaintiffs with respect to whether or not to include such PRPs as parties in this action. Such information is both privileged and irrelevant. Plaintiffs note that discovery of this information was previously available, and has nothing to do with either these specific interrogatories nor any of the other interrogatories propounded here by Defendants.

*Interrogatory No. 78*

Plaintiffs set forth in response to this series of interrogatories exactly what equitable shares they will ask the Court to assign to each party based upon findings of fact and conclusions of law regarding the volumes of wastes disposed of at the Site (and certain other allocation factors), including the evidence upon which Plaintiffs will rely to prove those facts. That is exactly the information sought in this series of interrogatories.

Plaintiffs understand that Defendants believe that the referenced evidentiary sources "do not support the specific percentage identified in the responses." However, Defendants' request to learn "as to how the referenced information was utilized to arrive at the specific percentage" seeks core attorney work product, and is not within the proper scope of contention interrogatories. Fed. R. Civ. P. 33(c) and 26(b)(3). Plaintiffs have no obligation to reveal their analysis of documents and testimony, or the statements they may make in summation at trial to support their interpretation of such proofs. Simply stated, Plaintiffs need only to provide the "contentions" they intend to make and the proofs upon which they intend to rely to support those contentions, they have no obligation to provide Defendants with a transcript of their summation. Plaintiffs accordingly will refuse any additional discovery on the manner in which Plaintiffs "utilized" the underlying facts in this case to arrive at the nexus percentages.

With respect to Agere, the North Carolina facility was operated during the relevant time period by Western Electric. The Allentown facility was operated during the relevant time period by Western Electric, either under that name or under the name AT&T (a name to which Western Electric's name was changed). Neither Lucent nor Agere existed during the relevant time period, so those entities did not arrange for DCC to remove their wastes. The response may be read to refer generally to "wastes."

With respect to TI Group, Bundy Corporation operated the Malvern facility through its National Rolling Mills division during the relevant period up to 4/23/74. Bundy Corporation changed its name to TI Automotive some years after selling that facility.

Boarhead Defendants
May 7, 2007
Page 8

*Interrogatory No. 85*

Boarhead Corporation, like Globe Disposal Co., Inc., Globe-Wastech, Inc., and Knoll International, Inc., was named as a Defendant in the Complaint but was never served with process. None of those entities thus have ever been parties to this action.

*Interrogatory No. 108*

Plaintiffs' responses accurately identified their contentions as to General Ceramics. Plaintiffs contend that, for the reason set forth therein, General Ceramics should be assigned no equitable share of response costs. Plaintiffs have received no funds from or on behalf of General Ceramics or its insurers, as is evident from the list of payees into the OU-1 and OU-2 Group accounts in the two Zaumeyer reports.

*Interrogatory Nos. 92, 93, 104, 105, 106, 107, 109-111*

Defendants incorrectly state that Plaintiffs did not respond to these interrogatories, each of which ask what Plaintiffs contend the equitable share is for a specific entity. None of the stated entities appear on Exhibit B to Plaintiffs' responses, and the shares of all of the entities on that exhibit add up to 100%. It is clear that Plaintiffs contend that the equitable shares of response costs for each of the stated entities is zero. The facts upon which Plaintiffs base those contentions is that the entities are not parties to the action and have no identifiable assets that would enable them to participate financially in the cleanup of the Site, as stated in Plaintiffs' responses to these interrogatories.

*Interrogatory Nos. 112-13, 116-17*

These interrogatories, as well as Interrogatory Nos. 114-15, appear to concern an argument Defendants may make concerning the CERCLA statutes of limitations. Plaintiffs will not make any contention related thereto. The phrases "the first removal action" and "the second removal action" are vague, confusing, and ambiguous despite Defendants' reference to the ROD because EPA and Plaintiffs have agreed, and this Court has found, that there was instead a single removal action beginning in 1992 and continuing to the date of the Consent Decree entered on or about September 28, 2000. *See also* other documents referenced in Plaintiffs' responses to these interrogatories. Plaintiffs' response to these interrogatories does *not* mean that, if *Defendants* make the stated contention, Plaintiffs will not contend otherwise. In any event, Plaintiffs have no unique knowledge of EPA's activities at the Site in 1992 and 1993. Whether or not EPA's actions constitute one or more removal actions (or, for that matter, a remedial action) is a legal issue, as is what relevance, if any, the determination of that issue has on this action.

Plaintiffs withdraw their objection to the phrase "'Past Response Costs'" in Interrogatory No. 116 based upon Defendants' explanation.



Boarhead Defendants
May 7, 2007
Page 9

*Interrogatory Nos. 114-15*

Plaintiffs are aware of the definition of "remedial action" in CERCLA. Nevertheless, whether any particular response action constitutes a "removal action" or a "remedial action" is a legal question. Plaintiffs thus do not understand to which response action Defendants are referring in these interrogatories as "the remedial action." Plaintiffs' response to these interrogatories does *not* mean that, if *Defendants* make the stated contention, Plaintiffs will not contend otherwise.

*Interrogatory No. 118*

Each Plaintiff appears on Exhibit B to Plaintiffs' responses, and the shares of all of the entities on that exhibit add up to 100%. It is clear that Plaintiffs contend that three Plaintiffs have liability and two do not. Plaintiffs' response to Interrogatory No. 78 sets forth the factual basis for those contentions, and was incorporated into Plaintiffs' response to this interrogatory.

*Interrogatory Nos. 119-23*

Defendants have identified no authority suggesting that any amounts paid into OU-1 or OU-2 Group accounts on behalf of Plaintiffs by insurers, indemnitors, predecessors, or successors are relevant to this action. Indeed, the Court has ruled that amounts received from settling parties are *not* relevant. The payee for each payment made into each Group account is set forth on the summary documents provided, and the payment proofs are available in the Document Repository. Agere is a corporation created as a spin off from Lucent. Agere acquired as part thereof the liability for this matter. Lucent made certain payments prior to the creation of Agere. TI Automotive is the current name of Bundy, the entity that operated the Malvern facility up to 4/23/74. TI Automotive is a wholly-owned subsidiary of Smiths Industries. Certain payments were made by Smiths on behalf of TI; those payments accrued to TI on its books. No Plaintiff has received proceeds from insurers.

*Interrogatory Nos. 124-25*

These interrogatories appear to concern an argument Defendants may make concerning what they term "orphan share." Plaintiffs contend that entities that do not have the assets to pay, and entities that are not parties to the action, are not allocated an equitable share as a matter of law.

Very truly yours,

Glenn A. Harris

GAH/dmn