# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES, INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC,
and TI GROUP AUTOMOTIVE
SYSTEMS, LLC
    Plaintiffs

                                CIVIL ACTION NO.
  V                        02-CV-3830 (LDD)

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, ET AL.
           Defendants

        Oral deposition of JURGEN H. EXNER, Ph.D., taken at the law offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, 42nd Floor, Philadelphia, Pennsylvania, on Tuesday, January 9, 2007, at 10:07 a.m., before Jennifer Bermudez, a Registered Professional Reporter, and Notary Public, pursuant to notice.



**James DeCrescenzo Reporting, LLC**
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905 PHONE      215.751.0581 FAX

Page 78

compounds used in steelmaking, as well as steelmaking process chemicals, are often found in steel mills' air emissions, water discharges, or waste shipments for off-site disposal include chromium, manganese, nickel, copper, zinc, lead, sulfuric acid and hydrochloric acid."

MS. FLAX: Thank you very much, Dr. Exner.

I don't have any further questions.

(Discussion off the record.)

(Thereupon, at 12:24 p.m. a luncheon recess was taken until 1:18 p.m., at which time the following proceedings were had:)

EXAMINATION
BY MR. PETTIT:

Q. Good afternoon, Dr. Exner. My name is Jeffrey Pettit. I represent Ashland in this case, and

Page 79

I'm going to be asking you some questions, and my partner, Richard Biedrzycki, may have some to follow up.

The first question that I have for you is, are all the opinions that you expect to give in this case expressed in the report that's been identified today?

A. Yes.

Q. And I want to ask you a question about one of the previous exhibits, Exner 6, which was an e-mail to Mr. Harris, if you have that.

On the first page, actually, the first sentence, it says, "Need to revise Ashland." Could you explain what you meant by that?

A. Yes, I see that. In my initial work on the Ashland waste I had done very little on waste resulting from dyes because there was

Page 80

very little information available in the record on them.

And Mr. Harris indicated that he would prefer to see some more information on these, if they could be found, so we did some more literature work and expanded on that section.

Q. You say "available in the record," what do you mean by "the record"?

A. Well, the information that had been sent to me.

Q. And that would be the information related to Ashland as listed in your report?

If you want to take a look at that, I just want to make sure that's what we are talking about. And that appears on Page 20?

A. Yes. Yes. Yes. Yes.

MR. HARRIS: Well, objection. The list of documents reviewed includes the sentence at the

Page 81

beginning that says "References shown in the opinion."

BY MR. PETTIT:

Q. So, when you say "the record," you mean the references attached at the end and any other references that are set forth in your report?

A. Yes.

Q. And if we were to compare the drafts that have been provided with the final report, and if there are additional references, those would be the ones that you found in this period where Mr. Harris asked you to find some more information on the dyes?

A. I think so, yes.

Q. What was your understanding as to the information that was needed with respect to the Ashland dyes?

A. I have basically given a very generic description of what kinds of wastes might have been made

86

1 consulting business or your
2 employment?
3     A. That was part of my
4 experience at Dow Chemical.
5     Q. With respect to the dyes,
6 in addition to what you testified
7 about your involvement in that
8 litigation case, have you had any
9 personal involvement in processes
10 involving the manufacture of dyes for
11 hair products?
12    A. No.
13    Q. And the phthalide acid
14 process that you described, have you
15 had any experience in those
16 processes?
17    A. No.
18    Q. And you mentioned one other
19 one, the Dipan process that you
20 described. Have you had any
21 experience in that process?
22    A. No.
23    Q. You also mention and your
24 CV reflects experience in hazardous

87

1 waste site investigation and
2 remediation. Am I correct?
3     A. Yes.
4     Q. And were you asked to
5 review any information concerning the
6 remediation at the Boarhead site?
7     A. No.
8     Q. Okay. Just going back to
9 the processes, have you had any
10 experience -- I want to ask you
11 questions about your experience with
12 those Ashland processes, would your
13 answer be the same with respect to
14 waste streams on those processes?
15       MR. HARRIS: Objection to
16 the form.
17 BY MR. PETTIT:
18    Q. Do you understand my
19 question?
20    A. I never actually worked
21 with those kinds of chemicals. Does
22 that answer the question?
23    Q. Right. And have you been
24 involved with any waste streams that

88

1 are similar to the waste streams that
2 you identified for the Ashland
3 processes in your report?
4     A. I have been -- yes, I have
5 been involved with acidic waste
6 streams, I have been involved with
7 waste streams containing aluminum
8 chloride, but not waste streams
9 specifically relating to the
10 compounds that we are talking about.
11    Q. The experience you have had
12 with acidic waste streams, what was
13 the nature of the manufacturing
14 process associated with that?
15    A. It was hydrolysis reaction
16 of catalysts leading to an acidic
17 waste stream.
18    Q. And what was the nature of
19 the acidic waste stream, by that I
20 mean the principal components?
21    A. Hydrochloric acid.
22    Q. Have you had any experience
23 with the kind of nitrating acid that
24 was a waste stream generated by

89

1 Ashland, according to your report?
2     A. No.
3     Q. And the aluminum chloride
4 waste stream, what was the nature of
5 the manufacturing process involved
6 with that?
7     A. Halogenation reaction of
8 aromatic compounds.
9     Q. Is it fair to say, based on
10 the experience that you have
11 represented in your CV, that in other
12 situations involving legal cases you
13 have been asked to express opinions
14 on the nature of remediation at
15 Superfund sites and hazardous waste
16 sites?
17    A. Yes.
18    Q. Have you given opinions on
19 the nature of the remedy and the
20 appropriateness of the remedy?
21    A. Yes.
22    Q. Now, moving down in your
23 report -- well, first of all, you say
24 that the documents referenced in