# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., et al.,

              Plaintiff,

     v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.

            Defendants.

Civil Action No. 02-CV-3830

## REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS' CLAIM FOR CONTRIBUTION TOWARD CERTAIN USEPA PAST COSTS

Defendants respectfully submit this reply memorandum of law in support of their Motion for Partial Summary Judgment.

Five important points need to be made concerning Plaintiffs' arguments in opposition to Defendants' Motion for Partial Summary Judgment. They are set forth below in the order in which Plaintiffs presented their opposition to Defendants' Motion for Partial Summary Judgment.

1.    Plaintiffs Are Not Being Candid With The Court About Their $7,000,000 Settlement With USEPA

In their brief in opposition, Plaintiffs represented to the Court – in their "FACTS" section, no less – that the $7,000,000 paid to USEPA to settle USEPA's claim for approximately $14,000,000 in past costs was arrived at without any identification, by either side, of any basis for such a big discount. Here is what Plaintiffs said in their brief:

> Plaintiffs and EPA simply negotiated until they arrived at a sum of money that Plaintiffs were willing to pay and EPA was willing to accept. Like any other settlement, each side <u>no doubt</u> agreed to that dollar amount for a variety of reasons, <u>none of which were specified by either side in the settlement</u>.

Plaintiffs' brief at 5 (emphasis added). Notably, this statement is unsupported by any affidavit or other evidentiary support. Evidentiary support, of course, is required by Rule 11.

This story, on its face, is not credible. The United States EPA is not in the business of compromising eight figure cost recovery claims in half without a fight. At a minimum it demands justification before agreeing to forego recovering costs that it has already demanded be paid. It is unimaginable that no explanations were offered by either of the two sides to the negotiation, in support of their respective positions, as they addressed the subject of the government's approximately $14,000,000 demand. It is equally unimaginable that USEPA would not identify the reason why it was willing to reduce its claim by nearly $7,000,000. Plaintiffs ask this Court to unthinkingly accept that, in most if not all negotiations with the government over monies owed to the government, the government jumps right to engagement in a back and forth over dollars and cents, all the while saying nothing about its position.

This is not reality. Imagine: If a corporation owes the IRS $14,000,000 in income taxes, and is approached by the IRS for payment, does the IRS not want specific justification for any requested reduction in the payment, before agreeing to cut the bill (at all, let alone in half)? If a U.S. District Court sends a bill for costs to a litigant, does it immediately respond to an unexplained compromise offer from that party with an unexplained counter demand, and then, in silence as to the validity of the bill, horse trade dollars until the party agrees to pay half the amount that was invoiced?

2

But in this particular case, the Court might ask, how can Defendants question whether such a highly unusual, poker game-like process did not actually occur?  The answer is this: Plaintiffs, in an e-mail to Defendants five years ago (one apparently forgotten about by Plaintiffs), addressed the subject.  In this e-mail, Plaintiffs made the following statement as to why USEPA compromised its claim so substantially:

> Specifically, the Agreement Group paid EPA $7 million to compromise EPA's claim for its past response costs of approximately $17 million (please note that the Agreement Group received a substantial orphan share discount in this settlement).

E-Mail from Glenn A. Harris, Esquire to Defendants' counsel, October 10, 2003 (attached as Exhibit 1 to Declaration of Seth v.d.H. Cooley[1]).

---

[1]    Defendants have heavily redacted this e-mail because it addresses settlement between Plaintiffs and Defendants.  Only the relevant sentence describing the basis for the USEPA's agreement to accept $7,000,000 has not been redacted.  In anticipation of Plaintiffs asserting that F.R.E. 408 prohibits the Court's consideration of this sentence, Defendants note their resolute disagreement.  Subdivision (a) of Rule 408 prohibits the admission of evidence consisting of statements made in compromise negotiations between Plaintiffs and Defendants regarding Plaintiffs' claims in this action only "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contraction."  Rule 408 expressly provides that it "does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a)."  Because Defendants are offering the sentence in question solely for the purpose of demonstrating that the requirements of Rule 11 have not been met here, the Court can consider this evidence.  See, e.g., Eisenberg v. University of New Mexico, 936 F.2d 1131 (10th Cir. 1991) ("In addition, we hold that Ms. Torres' affidavit falls under the exception set forth in Rule 408 for 'evidence offered for another purpose' and, as such, is completely admissible for purposes of determining a Rule 11 violation."); see also Joseph Giganti Veritas Media Group, Inc. v. Gen-X Strategies, Inc., 222 F.R.D. 299, 313 (D. Va. 2004) ("While the Rule itself does not expressly indicate that a motion for sanctions qualifies as 'another purpose' such that the rule of exclusion does not apply here, courts in this and other circuits have considered settlement documents when reviewing a motion for sanctions."  The importance of a Court receiving Rule 11-related evidence could not have been more strongly conveyed than by the District of Maryland in Ausherman v. Bank of America Corp., 212 F. Supp. 2d 435, 455 (D. Md. 2002): "Nor will the courts allow a rule [Rule 408] intended to promote the fair resolution of disputes to be perverted by a use that would undermine the very reason for its existence."

So there it is.  In his responsive brief intended to fend off the present Motion for Partial Summary Judgment, Plaintiffs' counsel represented to the Court, without presenting any evidentiary support, that it is a big mystery as to why EPA discounted its $14 million claim.  In his prior statement to Defendants' counsel, he represented something very different – that USEPA had substantially cut its bill in recognition of the "orphan share" associated with the Boarhead Site.

What does this mean?  It means that the Court should not accept the representation made in Plaintiffs' responsive brief that they paid "not so much as one dime" toward the costs of the First and Second Removal Actions, and should hold that Plaintiffs are barred from recovering from Defendants all amounts paid to USEPA in reimbursement of those costs.  Once the "not so much as one dime" representation is discarded, the basis for such a holding can be found right in Plaintiffs' responsive brief, without any need for reference to the October, 2003 e-mail authored by Plaintiffs' counsel.  In their brief, Plaintiffs (a) explicitly acknowledged that USEPA substantially discounted its $14 million demand (Plaintiffs' brief, p. 5), and (b) implicitly acknowledged (by way of asserting that Plaintiffs and the government never identified the discount as being applicable to any one or more components of the government's Past Costs Demand) that the discount applied to all parts of the government's Past Costs Demand – including the costs of the First and Second Removal Actions (Plaintiffs' brief, p. 5).  It follows directly that if the First and Second Removal Actions are found to be distinct removal actions that are time-barred by § 113(g)(2)(A) of CERCLA, then the portion of the $7 million paid by Plaintiffs to USEPA that relates to the First and Second Removal Actions must be cut from Plaintiffs' contribution claim against Defendants.

4

This is the only fair way to handle the issue.[2] Just as Plaintiffs' argument is an overreach (i.e., their argument that because the $7,000,000 settlement amount was not arrived at by adding up specific line item costs, the Court should conclude that "There are simply no 'monies paid by Plaintiffs in reimbursement of USEPA's past costs of the First and Second Removal Actions,'"), it would be an overreach for Defendants to ask the Court to reduce the $7,000,000 figure by the undiscounted, total cost of the First and Second Removal Actions (as discussed below, an amount equal to at least $3,954,553.49).[3] Because the substantial (approx. 50%) discount provided by the government does not correlate with any particular line item(s) in the USEPA Past Costs Demand, that discount must be applied to each line item (component cost item) that is included in the approximate $14,000,000 demand.[4] Put another way, by paying USEPA about 50 cents on the dollar to settle USEPA's Past Cost Demand, Plaintiffs paid USEPA about 50 cents on the dollar for each component of the Past Costs Demand, including the components

---

[2]     This approach is the fair one IF the Court finds that there were multiple removal actions for purposes of CERCLA's statute of limitations. However, should the Court find that there was but one removal action, then, as discussed in section 5 below, the entire $7,000,000 that was paid by Plaintiffs to USEPA should be cut from Plaintiff's contribution claim.

[3]     Again, this would be an overreach only IF the Court finds that there were multiple removal actions for purposes of CERCLA's statute of limitations. However, should the Court find that there was but one removal action, then, as discussed in section 5 below, the entire $7,000,000 that was paid by Plaintiffs to USEPA should be cut from Plaintiff's contribution claim.

[4]     Plaintiffs contend that because the costs of the First and Second Removal Actions were less than the substantial discount afforded by the government (or so Plaintiffs suggest, without evidentiary support – see section 2 of this reply brief, below), it "does not matter" whether the costs of the First and Second Removal Actions were legally recoverable by USEPA when Plaintiffs signed the OU-2 Consent Decree, because the settlement amount might have been $7,000,000 in any event. (Plaintiffs' brief, pp. 7-8). This contention is based on pure speculation, and for that reason alone it goes nowhere, legally. Moreover, all other considerations aside, the categories of costs that were, and were not, covered by the $7,000,000 payment could affect the equitable allocation phase of this action.

relating to the First and Second Removal Actions.[5]  Accordingly, approximately half[6] of the costs of the First and Second Removal Actions (as presented in the USEPA Past Costs Demand) should be cut from the $7,000,000 amount toward which Plaintiffs are seeking contribution.[7]  As discussed below, the exact dollar amount of the costs of the First and Second Removal Actions must be determined at trial.

2.    Plaintiffs Are Wrong In Stating That The Costs of the First and Second Removal Action Total $3,954,553.49

Plaintiffs contend that the costs of the First and Second Removal Actions total $3,954,553.49.  This is not so.  It is also not the case, as Plaintiffs have subtly tried to infer, that $3,954,553.49 is Defendants' number.  (In their brief, Plaintiffs stated: "The almost $14 million demand for past costs was made up of [various other items] and approximately $4 million identified by Defendants as relating to what Defendants term the 'First and Second Removal Actions,' namely the excavation of buried drums and contaminated soils."  Plaintiffs' brief, pp. 3-4 (emphasis added).  Plaintiffs also stated: "Defendants identify Environmental Technology of North America as the vendor that performed the referenced 1992-93 work."  Plaintiffs' brief, footnote 10 (emphasis added)).

---

[5]    It should be noted that Plaintiffs' italicized contention (see Plaintiffs' brief, p. 7) that Defendants do not dispute that they were, at the time of the OU-2 Consent Decree, potentially liable for almost $10 million in claimed EPA Past Costs, is dead wrong. Defendants have denied any and all potential liability, on numerous grounds, from the outset, and the fact that their Motion for Partial Summary Judgment targeted only certain USEPA Past Costs is not an admission of potential liability for other USEPA Past Costs.

[6]    The total USEPA Past Costs Demand was $13,662,780.77.  USEPA reduced its demand by $6,662,780.77, accepting $7,000,000 from Plaintiffs.  $7,000,000 is 51.2% of the total $13,662,780.77 in Past Costs.

[7]    See footnotes 2 and 3 above.

DM2\1408737.2

In fact, the costs of the First and Second Removal Actions are likely higher than $3,954,553.49, and Defendants never said otherwise. In the section of Defendants' brief referenced by Plaintiffs, Defendants identified certain pages of the USEPA Past Costs Demand that relate to work performed by Environmental Technology of North America simply to establish the fact that "[t]he USEPA Past Costs Demand includes documentation demonstrating that the costs of the First and Second Removal Actions are included in the "Past Response Costs" as defined in the OU-2 Consent Decree." Defendants' brief at 6. Defendants never said that the Environmental Technology of North America charges were the only charges associated with the First and Second Removal Actions, or that Environmental Technology of North America was "the" (i.e., the only) vendor submitting charges in connection with the First and Second Removal Actions.

The reality – fully known to Plaintiffs – is that from the face of the USEPA Past Costs Demand, one cannot determine the full extent of the costs of the First and Second Removal Actions (beyond the $3,954,553.49 that is clearly associated with the First and Second Removal Actions). For example, how much of the $1,500,000 in USEPA indirect and payroll costs is associated with the First and Second Removal Actions? Plaintiffs misleadingly imply that the answer is zero, although that is almost certainly not the case, as USEPA employees necessarily devoted time to managing the First and Second Removal Actions. As another example, how much of the $1,200,000 in laboratory costs that are reflected in 46 pages of cost entries that comprise part of the USEPA Past Costs Demand (BSAI082149-BSAI082194, attached to Plaintiffs' brief) are related to the First and Second Removal Action? The laboratory cost entries in the USEPA Past Costs Demand do not answer the question, but from the fact that many of

7

these entries bear 1992 or 1993 dates, it is certainly possible that some of these costs are associated with the First and/or Second Removal Actions.

For the very reason that one cannot tell, from the USEPA Past Costs Demand documents themselves, the full extent to which the USEPA Past Costs Demand relates to the First and Second Removal Actions, Defendants did not seek an order from this Court quantifying the extent to which Plaintiffs' contribution claim should be pared down. Perhaps a stipulation can be reached on this point in the future. Perhaps witnesses from USEPA will be needed at trial, to explain the agency's cost documentation. For the present, however, the Court can limit its order (granting partial summary judgment) to the <u>category</u> of costs in question (costs of the First and Second Removal Actions), with the amount to be determined at trial. Summary judgment as to a category of costs, without determining the exact amount, is often granted.[8] Plaintiffs' contention that Defendants' Motion for Partial Summary Judgment is somehow flawed because it does not seek judgment as to a specific dollar amount, is simply wrong.

3.    Plaintiffs Mislead The Court In Saying That Defendants Are Attacking Plaintiffs' Settlement with USEPA

Plaintiffs accuse Defendants of trying to belatedly challenge Plaintiffs' settlement with USEPA, arguing that the time for any such challenge was when the OU-2 Consent Decree was lodged.

---

[8]    See, e.g., Chanel, Inc. v. The Jupiter Group, Inc., 2007 U.S. Dist. LEXIS 31100 (M.D. Pa.) ("Summary judgment on this issue will be entered in favor of Chanel. The issue of damages, viz its measure and the amount will remain for trial."); see also First American Sav. F.A. v. Newark Ins. Co., 1990 U.S. Dist. LEXIS 10833 (E.D. Pa.) ("First American is clearly entitled to summary judgment pursuant to this policy and the facts concerning which there is no genuine issue. Accordingly, summary judgment will be granted in favor of First American and against Newark except as to the amount of fire damage. . . . IT IS FURTHER ORDERED:  this case is scheduled for trial as to the amount of damages during the month of September, 1990.")

There are five simple responses to this curious accusation.

First, according to Plaintiffs, they paid "not so much as one dime" toward the costs of the First and Second Removal Actions.    (Plaintiffs' brief at 6).    Therefore, had Defendants challenged the OU-2 Consent Decree on the grounds that Plaintiffs were proposing to pay to USEPA monies not owed to USEPA, the only possible response that Plaintiffs could have provided (if singing the same tune as they now sing) would have been this:  no challenge is necessary, Judge, because Plaintiffs are not paying costs of the First and Second Removal Actions.  Of course, if Plaintiffs were not paying (and, as they have represented to the Court here, did not pay) the costs of the First and Second Removal Actions, they cannot recover contribution toward such costs from Defendants.  That, perhaps, is the simplest basis on which to grant Defendants' present Motion for Partial Summary Judgment.

Second, Defendants had no reason to challenge the settlement between Plaintiffs and USEPA, at least not on the grounds of <u>overpayment</u>.  As a simple proposition, any overpayment by Plaintiffs would not, and did not, imbue Plaintiffs with the right to recover their overpayment from Defendants.

Third, and in any event, at the time the OU-2 Consent Decree was lodged, it was not apparent that Plaintiffs had overpaid USEPA by reimbursing USEPA for the costs of the First and Second Removal Actions.  The OU-2 Consent Decree did not indicate why Plaintiffs were paying the figure of $7,000,000 to USEPA.  Not until this litigation had been commenced were Defendants informed that, in effect, Plaintiffs had paid monies toward <u>all</u> categories of USEPA Past Costs, including the costs of the First and Second Removal Actions.

Fourth, Defendants simply are not asserting that the settlement between Plaintiffs and USEPA was fair or unfair.  Defendants are merely explaining that (a) by the terms of the

9

governing statute itself, 42 U.S.C. § 9613(g)(2)(A), Plaintiffs and Defendants were not liable to USEPA for the costs in question; (b) Plaintiffs therefore did not extinguish a shared, common liability; and (c) Plaintiffs therefore cannot seek contribution toward the costs in question. (See Defendants' main brief in support of their Motion for Partial Summary Judgment).

Fifth, and most importantly, Plaintiffs' argument that they are entitled to recover the $7,000,000 paid to USEPA "as a matter of law" is not supported by the authorities they cite. According to Plaintiffs, "Courts have routinely held that <u>dollars paid</u> to EPA or a state for past governmental costs pursuant to a Consent Decree constitute response costs that are recoverable as a matter of law by the person or persons who paid those dollars." (Plaintiffs' brief, p. 9, emphasis added). Plaintiffs cite three cases in support of this proposition: <u>Action Mfg. Co., Inc. v. Simon Wrecking Co.</u>, 428 F. Supp. 2d 288 (E.D. Pa. 2006), <u>United States v. Atlas Minerals & Chemicals, Inc.</u>, 1995 WL 510304 (E.D. Pa.), and <u>Morrison Enterprises v. McShares</u>, 302 F.3d 1127 (10th Cir. 2002). Upon review, all three of these cases stand for quite a different proposition, which is that <u>costs incurred by parties when performing cleanup</u> pursuant to a Consent Decree constitute response costs that are, subject to rebuttal, presumed to comply with the USEPA National Contingency Plan (the "NCP," codified at 40 CFR Part 300, is a detailed set of regulations that guides the performance of CERCLA cleanups). Compliance with the NCP is a prerequisite to recoverability of response costs.

The only case cited by Plaintiffs that even addresses "dollars paid" to USEPA pursuant to a Consent Decree, as opposed to costs incurred by parties when performing cleanup under a Consent Decree, is the <u>Atlas</u> case. The <u>Atlas</u> Court, while noting that the dollars in question had been paid to USEPA in compliance with the terms of a prior Consent Decree, did <u>not</u> hold that

by virtue of that fact the payment was recoverable as a matter of law. Rather, the Atlas court

performed a review of the record to determine whether the costs in question were recoverable:

> Third-Party Defendants argue that Third-Party Plaintiffs have failed to adequately document the $1,209,250 they have paid to the United States pursuant to the Consent Decree. Third-Party Defendants point out that the documents that Third-Party Plaintiffs have submitted to the court fail to specify whether any of the costs for which Third-Party Plaintiffs have compensated the United States were related to nonrecoverable oversight costs. See Rohm & Haas, 2 F.3d at 1279 (costs incurred in connection with government's supervision of private removal and remedial actions are not recoverable response costs, but instead are nonrecoverable oversight costs). However, the court finds Third-Party Plaintiffs' payments to be reasonable and adequately documented.

Atlas, 1995 WL 510304.*104-105 (emphasis added).

4.    Plaintiffs' Presentation Of The Law Relating To The Statutes Of Limitations For Removal Actions Is Not Complete

In their main brief, Defendants acknowledged the existence of case law on both sides of

the legal question presented here – whether there can be only one removal action, or multiple

removal actions. Defendants cited two important cases in their favor – United States v. Ambroid

Company, Inc., 34 F. Supp. 2d 86 (D. Mass. 1999), and United States v. Manzo, 2006 U.S.

LEXIS 70860 (D.N.J. 2006). With regard to the Ambroid case, Defendants acknowledged the

meaningful distinctions between many of the facts in that case and the facts here, but alerted the

Court to the one, important fact common to the two cases: in both Ambroid and here, USEPA

itself described its removal work as having consisted of separate removal actions. That is the

point of the Ambroid case, for purposes of this action. With regard to Manzo, Defendants

explained why it is a better reasoned decision than the cases cited by Plaintiffs for purposes of

this action.

In their brief in opposition, Plaintiffs ignored Defendants' acknowledgment of the distinctions between Ambroid and this case, and glossed over the important point of parallel between the two cases (USEPA identification of multiple removal actions). Plaintiffs' argument about how Ambroid can be distinguished (in part) was unnecessary; the point had already been acknowledged.

As for Manzo, Plaintiffs offered no comment.

Plaintiffs do emphasize an April, 2007 USEPA internal guidance document, arguing that the USEPA position espoused in that document should influence the Court here. Notably, however, even the language in that document that is most attractive to Plaintiffs, and thus quoted by them (Plaintiffs' brief at 13), does not specifically address whether there can be multiple removal actions for purposes of the statute of limitations. But more importantly, USEPA guidance regarding the statute of limitations for removal actions, which (as noted by Plaintiffs) goes back to 1987, has changed over time, and has at times been disregarded, as well as given consideration, by other courts. See, e.g., United States v. Allied Battery Company, Inc., 2000 U.S. Dist. LEXIS 10328 (N.D. Ala.) (in which the United States itself asserted that, "(1) the memorandum is only a statement of policy and does not bind the agency or constitute an admission; [and] (2) two courts have rejected statute of limitations arguments based on that memorandum." Allied Battery, 2000 U.S. Dist. LEXIS 10328, *18. Furthermore, under the United States' Supreme Court's decision in United States v. Mead Corp., 533 U.S. 218, 234, 150 L. Ed. 2d 292, 121 S. Ct. 2164 (2001), in which the Court significantly narrowed the circumstances in which, and extent to which, consideration is to be given to administrative agency views on the meaning of a statute, the 2007 EPA document cited by Plaintiffs (one they candidly acknowledge is "intended solely for the guidance of EPA employees") is entitled to no

more respect than its persuasiveness offers. Defendants respectfully suggest that the 2007 USEPA internal guidance document offers nothing persuasive regarding the meaning of §113(g)(2), which it does not analyze; the guidance merely states that USEPA's "policy" is that removal is not complete until, in effect, EPA decides that it is complete. The Court can read §113(g)(2) long and hard and not see this meaning in the statute.[9]

> 5.    If There Is Only One "Removal Action" For Statute of Limitations Purposes, Then The Entire $7 Million Paid To EPA Is Not Recoverable

If the Court were to find that, as argued by Plaintiffs, there can be only one removal action for purposes of the statute of limitations, the question becomes: what is the consequence of that determination?

To answer this question, the starting point is the CERCLA statute of limitations, 42 U.S.C. § 9613(g)(2)(A). For a removal action, there are two parts to this section: an initial cost recovery action must be brought by the government within <u>three (3) years after completion</u> of the removal action, <u>except that</u> such an action must be brought within <u>six (6) years after a determination</u> to grant a § 9604(c)(1)(C) waiver (known as a "consistency waiver"). The statute reads:

---

[9]    Defendants note that in a ruling against Defendant Handy & Harmon Tube Co. in the present action, the Court stated, with respect to another USEPA guidance document that was then the subject of briefing as to its import: "With respect to the EPA Guideline, this court notes that the purpose of this EPA Guideline is to provide guidance *to the EPA* for settling *de minimus* claims. The Guideline is not binding on this Court and is of minimal influence given the nature of the guideline and the law of the Third Circuit. The July 1993 EPA Guideline provides guidance for *settlement* with respect to parties who made *de minimus* contributions." October 30, 2007 Order denying Handy & Harmon Motion for Summary Judgment (emphasis in original).

(2) Actions for recovery of costs

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced –

(A) for a removal action, within 3 years after completion of the removal action, <u>except that</u> such cost recovery action <u>must be brought</u> within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action.

§ 113(g)(2)(A), 42 U.S.C. § 9613(g)(2)(A) (emphasis added).

Plaintiffs, in their brief, mix these two separate parts into one, arguing that the statute of limitations is six years following the completion of the removal action. (See pp. 11-12 of Plaintiffs' brief, where Plaintiffs state: "The question, then, is the meaning of the words 'completion of the removal action,' the event that must have occurred no earlier than 6 years prior to May 2, 2000 (May 3, 1994) to be timely.") This is not the question. As the plain language of CERCLA expresses, completion of a removal action not subject to a consistency waiver is the trigger for the three year statute of limitations, not the six year statute of limitations. The six year statute of limitations (which applies to larger (in excess of $2 million) and longer (in excess of 12 months) removal actions found to be consistent with remedial action to be taken) is triggered by the making of a determination to grant a consistency waiver.

Defendants expect Plaintiffs to argue that § 113(g)(2)(A) offers two limitations deadlines to the government in the case of a removal action that proceeds longer than 12 months pursuant to a consistency waiver: a three year deadline (following completion) and a six year deadline (following the determination to grant the waiver), and that the <u>later of</u> these two is the deadline

that applies in a given case. But there is no case law to that effect, and for the reasons explained below, the argument makes no sense. What does make sense is that if the government determines that a removal action will take longer than 12 months, or will cost more than $2 million dollars, and grants a consistency waiver from those otherwise applicable time and money caps, there should be a limitations period that is of reasonable duration. Congress, in its wisdom, picked six years following the determination to grant a consistency waiver.

The construction that Plaintiffs are expected to advocate would mean that a long-running – say 25 year – removal action for which a consistency waiver had been granted could be the subject of an initial cost recovery action 28 years following its initiation, because a deadline 28 years following initiation (i.e., three years following completion) is the "later of" that deadline and the other option – six years following the determination to grant the consistency waiver (six years following such a determination would necessarily be no more than seven years following initiation of the removal action, because the waiver determination has to be made before the 12 month cap period has expired). This is obviously not what Congress intended. From the plain language of the statute (see Congress's use of the "except that" phraseology) it is quite apparent that Congress intended to impose what is effectively a seven year limitations period on commencement of suit (i.e., six years following the initial 12 month, capped period).

The only alternative construction of § 113(g)(2)(A) is this: (a) Congress intended to allow an initial cost recovery action to be filed as late as decades after a removal action is initiated, as long as suit is filed within three years following completion of the removal action, and (b) Congress added the six year limitations period simply to give the government a few more years (in addition to the three years following completion of the removal action) to file suit in cases where the removal action lasts less than four years (if the removal action lasts four years or

longer, the "later of" deadline would always be three years following completion). This makes no sense.

The proper construction of § 113(g)(2)(A) is explained succinctly in <u>United States v. Horne</u>, 2006 U.S. Dist. LEXIS 61440 (W.D. Mo.):

> Because removal actions are often followed by longer-term remedial measures, CERCLA requires that removal actions (1) be completed within 12 months and (2) not exceed $2,000,000 unless EPA determines that one of two available waivers is appropriate. 42 U.S.C. § 9604(c)(1). The first waiver is termed an "emergency exemption" . . ..
>
> EPA's second option to continue removal actions is to seek a "consistency exemption." A "consistency exemption" applies if the EPA's proposed plan is appropriate and is consistent with the remedial action which is to follow. 42 U.S.C. § 9604(c)(1)(C). . . .
>
> Which exemption EPA chooses has a direct bearing on the statute of limitations that applies to its eventual attempt to recover response costs. . . . In plain terms, the six-year statute of limitations is triggered by a request for an exemption under section 104(c)(1)(C), the "consistency" exemption provision. The six years begins to run from the date the "consistency" exemption is granted. All other removal actions, including ones where an "emergency" exemption has been given under section 104(c)(1)(A), are subject to a three year statute of limitations which runs from the date of completion of the removal action, not the date when the exemption is granted.

<u>Horne</u>, 2006 U.S. Dist. LEXIS 61440, *4-*7.

The argument anticipated from Plaintiffs also ignores the fact that § 113(g)(2)(A) uses the term "except that" to make clear that the three year limitations period is supplanted by the six year limitations period in cases where a consistency waiver is granted. Had Congress wanted to provide that the "later of" the three year and six year limitations periods is applicable, it easily could have said so. After all, Congress wrote this very concept into CERCLA in several other places. <u>See</u>, <u>e.g.</u>, § 107(a)(4)(D) ("Such interest shall accrue from the <u>later of</u> (i) the date

16

payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." (Emphasis added). <u>See also</u> § 107(l)(2) ("DURATION.—The lien imposed by this subsection shall arise at the <u>later of</u> the following: (A) The time costs are first incurred by the United States with respect to a response action under this Act. (B) The time that the person referred to in paragraph (1) is provided (by certified or registered mail) written notice of potential liability." (Emphasis added). <u>See also</u> § 112(d)(2) ("CLAIMS FOR RECOVERY OF DAMAGES.—No claim may be presented under this section for recovery of the damages referred to in section 107(a) unless the claim is presented within 3 years after the <u>later of</u> the following: (A) The date of the discovery of the loss and its connection with the release in question. (B) The date on which final regulations are promulgated under section 301(c)."

In summary, as the Court is aware, Defendants have read the USEPA administrative record in this matter, and the relevant case law (particularly the <u>Manzo</u> decision), as leading to the conclusion that multiple removal actions were conducted at the site, and are to be treated separately for purposes of the statute of limitations. However, if the Court were to accept Plaintiffs' argument and find that, for purposes of the statute of limitations, only one removal action occurred, then only one conclusion can follow: the <u>entire</u> USEPA Past Costs Demand was time-barred when Plaintiffs signed the OU-2 Consent Decree. This inexorable result is a function of simple math based on the following set of uncontroverted dates:

1.    The determination to grant a consistency waiver under § 9604(c)(1)(C) occurred on September 4, 1992;

2.    The six year anniversary of that date is September 4, 1998; and

3.    Plaintiffs signed the OU-2 Consent Decree no earlier than September 28, 2000, meaning that they necessarily signed it after September 4, 1998, the expiration of the six year statute of limitations.

Defendants request that the Court determine that multiple removal actions occurred, and that the costs of the First and Second Removal Actions were time-barred because the OU-2 Consent Decree was signed more than six years following the determination to grant a consistency waiver.  However, should the Court determine that, as Plaintiffs argue, a single removal action occurred, Defendants request that the Court find all of the USEPA Past Costs to be time-barred because the OU-2 Consent Decree was signed more than six years following the determination to grant a consistency waiver.  There being no third option, Defendants are entitled to partial summary judgment on one of these two bases.

Dated: April 4, 2008                    Respectfully submitted,

                                        DUANE MORRIS LLP

                        By:    _____
                               Seth v.d.H. Cooley – PA 41801
                               Duane Morris LLP
                               30 South 17th Street
                               Philadelphia, PA 19103-4196

                               Attorneys for Defendant
                               fcg, inc.

DM2\1408737.2