# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC
and TI GROUP AUTOMOTIVE SYSTEMS
L.L.C.,

              Plaintiffs,

      v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

           Defendants.

Civil Action No. 02-CV-3830 (LDD)

## SUR-REPLY MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Glenn A. Harris, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey  08043
E-mail:  harrisg@ballardspahr.com
Phone:  (856) 761-3400

Attorney for Plaintiffs

## Table of Contents

Page

INTRODUCTION. ...............................................................................................1

(a)    Defendants Failed To Establish That Plaintiffs Paid EPA For Any Specific
       Claimed Response Costs. ....................................................................2

(b)    EPA's Claim for Past Response Costs Was Not Time-Barred.............................8

(c)    The $7 Million Paid by Plaintiffs to EPA Are Recoverable As a Matter of
       Law .....................................................................................14

CONCLUSION. .................................................................................15

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Action Manufacturing Company*, 428 F. Supp. 2d at 322 ................................................. 14

*Chanel, Inc. v. The Jupiter Group, Inc.*, 2007 U.S. Dist. LEXIS 31100 (M.D. Pa 2007) .......................................................................................................................... 2

*First American Savings F.A. v. Newark Insurance Co.*, 1990 U.S. Dist. LEXIS 10833 (E.D. Pa. 1990) ..................................................................................................... 2

*Intern. Association of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501 (1986) .............................................................................................................. 6

*Matsushita Electric Indu. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................... 13

*McDowell v. Philadelphia Housing Authority*, 423 F.3d 233 (3d Cir. 2005) .................... 6

*United States v. Allied Battery Co., Inc.*, 2000 U.S. Dist. LEXIS 10328 (N.D. Ala. 2000) ................................................................................................................................. 10

*United States v. Armour & Co.*, 402 U.S. 673, 681-68 (1971) ........................................... 6

*United States v. Horne*, 2006 U.S. Dist. LEXIS 61440 (W.D. Mo.) ................................. 13

*United States v. Manzo*, 2006 U.S. Dist. LEXIS 70860 (D.N.J. 2006) ...................... 10, 11

### FEDERAL STATUTES

40 C.F.R. 300.415(b) ............................................................................................................ 13

40 C.F.R. 300.5 ...................................................................................................................... 9

42 U.S.C. § 9613(g)(2) ......................................................................................................... 11

42 U.S.C. § 9613(g)(2)(A) ............................................................................................. 11, 13

42 U.S.C. § 9613(g)(2)(B) ............................................................................................... 9, 10

42 U.S.C. § 9617 ..................................................................................................................... 9

42 U.S.C. § 9604(c)(1) ......................................................................................................... 12

42 U.S.C. § 9604(c)(1)(A) ................................................................................................... 12

## FEDERAL STATUTES - Continued

42 U.S.C. § 9604(c)(1)(C) ................................................................................................. 12

42 U.S.C. § 9697(a) ......................................................................................................... 3

## <u>INTRODUCTION</u>

Only if this Court holds as a matter of law *both* that Plaintiffs' 2001 settlement with EPA included payment of agency response costs incurred in 1992 and 1993 *and* that recovery of those costs was time barred, would the Defendants be entitled to summary judgment. But this cannot be so. First, Defendants cannot establish that Plaintiffs' $7 million "paid" any of the costs of the 1992-1993 work because Plaintiffs simply settled *all* then existing EPA past costs claims by agreeing to a single, unallocated lump sum payment. There is simply no legal or factual basis to apportion that settlement amount to any particular claimed costs. Second, there should be no doubt that EPA <u>was</u> <u>not</u> time-barred from pursuing Defendants for the costs incurred in 1992-1993 because it brought its 2000 initial action for recovery of its *remedial action* costs within three years of completion of the *removal action*. EPA therefore was not barred from seeking recovery of all of its removal action costs in its subsequent 2001 action.

Defendants' motion is nothing more than a theoretical exercise hoping to learn what this Court *might* rule on facts that Defendants have not established. Instead of directly confronting the lack of factual support required for a Rule 56 motion, Defendants in reply seize on a parenthetical comment in a protected settlement email and raise two entirely new arguments. Nothing in that reply changes the fact that Defendants are dead wrong in their statute of limitations analysis and that, if in argument they were correct, they do not now and never will have the factual support they need to prevail on this motion. Defendants' motion should be denied.

### (a)    Defendants Failed To Establish That Plaintiffs Paid EPA For Any Specific Claimed Response Costs.

Defendants' motion sought some non-specific relief with respect to any amounts Plaintiffs' paid to EPA on account of work done by EPA at the Site during 1992 and 1993. They failed to offer any proof of *whether* Plaintiffs *in fact* paid any such costs. Defendants thus want this Court to decide what the legal result would be *if, some day*, Defendants actually establish that there was such reimbursement. Courts are not in the business of deciding "what if" questions. Defendants are not entitled to a summary judgment unless they *prove* there are such costs.[1]

They cannot prove Plaintiffs paid some or all of the 1992-1993 costs. Plaintiffs' settlement of EPA's past costs claim was a settlement of disputed claims without the identification by either party of which claims were being satisfied and which ones were not. The proof of this is in the form of the settlement agreement itself, the 2001 Consent Decree. The 2001 Consent Decree recites simply that "Settling Defendants shall pay to EPA $7,000,000 in payment for Past Response Costs." 2001 Consent Decree at Section 54. "Past Response Costs" is defined to mean "all costs, including, but not limited to, direct and indirect costs, that the

---

[1]    Defendants suggest that they are nevertheless entitled to a summary judgment because "Summary judgment as to a category of costs, without determining the exact amount, is often granted." Defendants' Reply Brief at 8. The two opinions cited to support this statement do not even remotely stand for that proposition. *Chanel, Inc. v. The Jupiter Group, Inc.*, 2007 U.S. Dist. LEXIS 31100 (M.D. Pa 2007) and *First American Savings F.A. v. Newark Ins. Co.*, 1990 U.S. Dist. LEXIS 10833 (E.D. Pa. 1990) are each breach of contract actions in which those courts concluded that summary judgment on liability was appropriate even though the moving parties did not establish the *quantum* of damages because those parties did prove that there was no genuine dispute that they *had been damaged.* Here, Defendants have not proven what the costs are of the 1992-1993 work, so that they are unable to establish whether, even under their analysis, Plaintiffs "paid" any portion of those costs.

United States paid at or in connection with the Site through July 31, 2000, plus interest on all

such costs which have accrued pursuant to 42 U.S.C. § 9697(a) through such date." *Id.* at 11.

Plaintiffs noted in their Brief in opposition to this motion that Defendants cited no

authority for the "proposition that one who settles multiple disputed claims is deemed to have

'paid' some specific amount of dollars (or for that matter *any* dollars), with respect to one or

more of the specific disputed claims." Plaintiffs' Brief at 6. Defendants neither challenge this

statement nor offer any such authority in their Reply Brief. Instead, they suggest that Plaintiffs'

statement that the $7 million they paid to EPA was not in respect of any specific costs that EPA

claimed to have incurred just "can't" be true. Defendants' Reply Brief at 1-4. They point to

(and mischaracterize) a reference to an EPA orphan share accommodation made by counsel for

Plaintiffs in the clear context of settlement negotiations to suggest that it isn't true. *Id.* at 3-4.

Then, with absolutely no citation to authority, Defendants make the entirely new argument that

the overall percentage of "discount" received by Plaintiffs should be applied pro rata to each and

every one of EPA's claimed costs. Defendants' Brief at 4-5. Defendants' simply say that this

would be "fair." *Id.* at 5.

It is no secret that Plaintiffs made an "orphan share" submission to EPA; that

submission was produced to Defendants long ago. Plaintiffs asked EPA to apply its Interim

Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and

Non-Time Critical Removals ("Orphan Share Policy"), which policy permits EPA to accept from

parties willing to perform remedial action identified in the Record of Decision ("ROD")[2] up to

---

[2]  These costs are the costs EPA expects to incur for implementation of the remedial actions
selected in the ROD, not EPA's past costs.

25% less than the ROD estimate of that work on account of an orphan share. Orphan Share Policy at 4. A copy of the Orphan Share Policy is attached hereto marked Exhibit "A". As set forth in the Declaration of John P. Judge, Esquire attached hereto, Plaintiffs also argued that EPA should reduce its demand based upon other factors such as litigation risk or other risks to recovery, and because of the cooperation of Plaintiffs in taking over the OU-1 Work in 2000. John Judge Declaration at ¶ 3.

EPA stated in March, 2001 that it would give Plaintiffs the maximum orphan share consideration permitted in its guidelines, $3,289,250, if an overall settlement could be reached. EPA stated too that it would continue to negotiate with Plaintiffs on the basis of its past costs calculation of $13,662,870.77 until only March 30, 2001. Thereafter, it would apply its new guidance for calculating indirect costs (which had become effective on October 2, 2000), making its actual past costs claims almost $17 million.[3] John Judge Declaration at ¶ 4. A copy of EPA's June 2, 2000 Guidance on Exercising CERCLA Enforcement Discretion in Anticipation of Full Cost Accounting Consistent With the "Statement of Federal Financial Accounting Standards No. 4" is attached hereto marked Exhibit "B".

As Defendants admit, the 2001 Consent Decree "does not indicate why Plaintiffs were paying the figure of $7,000,000 to EPA."[4] Defendants' Reply Brief at 9. That is because there was no agreement between the parties as to whether any specific components of EPA's

---

[3]    EPA included in its 2000 past costs demand a claim for EPA "indirect costs" in the amount of $1.039,916.50, calculated using the pre-October 2, 2000 methodology. *See* Exhibit A to Plaintiffs' initial Brief. EPA was also entitled to interest and attorneys fees.

[4]    The next sentence in Defendants' Reply Brief is a total non sequitur. There is no evidence whatsoever that "Plaintiffs had paid money toward all categories of USEPA past costs, including the cost of the first and second removal actions."

then almost $17,000,000 past costs claim were legally recoverable or not.  John Judge
Declaration at ¶ 6.

Counsel's email statement:  "Specifically, the Agreement Group paid EPA $7
million to compromise EPA's claim for past response costs of approximately $17 million (please
note that the Agreement Group received a substantial orphan share discount in the settlement)"
was true.  Plaintiffs' statements in its initial Brief:  "Plaintiffs and EPA simply negotiated until
they arrived at a sum of money that Plaintiffs were willing to pay and EPA was willing to accept.
Like any other settlement, each side no doubt agreed to that dollar amount for a variety of
reasons, none of which were specified by either side in the settlement," Plaintiffs' initial Brief at
5, is also true.  The "settlement," namely the 2001 Consent Decree, does not specify why each
side justified to itself the overall settlement amount.

EPA's statement in the context of settlement negotiations that it would provide
$3,289,250 of orphan share funding is irrelevant to this action, just as would be any other
statements by EPA or Plaintiffs made with respect to "why" they were making the deal.  Parties
to a negotiation can rely on *any* reason or argument to justify to themselves or to the opposing
party their ultimate decision to pay or accept a certain amount of dollars in settlement of disputed
claims.  The settlement is what it is -- the payment of a sum of money Plaintiffs were willing, for
whatever reasons, to pay and EPA was willing, for whatever reasons, to accept.[5]

---

[5]    Defendants' stated reasons for disbelieving that the parties did not agree that certain of
EPA's past cost claims were valid or not are disingenuous.  Plaintiffs never said that they
didn't present arguments to EPA in support of their position or that EPA did not present
arguments why Plaintiffs should pay more than they were offering.  Plaintiffs said only
that the ultimate dollar number was arrived at without any explanation for that dollar
number.

The United States Supreme Court's comments on the nature of Consent Decrees in *Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501 (1986) are instructive:

> Consent Decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

478 U.S. at 522 (*quoting United States v. Armour & Co.*, 402 U.S. 673, 681-682, (1971))(emphasis in original). The Court also stated: "More important, it is the agreement of the parties, rather than the force of law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." 478 U.S. at 522. A court should therefore "confine its interpretation to the four corners of the decree and not try to divine its meaning from speculation about the purposes of the parties or the background legal regime." *McDowell v. Philadelphia Housing Authority*, 423 F.3d 233, 239 (3d Cir. 2005). Nothing could be clearer. The terms of the settlement *do not* reflect what one or both of the parties thought about the merits of the claims being settled, what they said to each other about those merits, or the reason or reasons why they ultimately agreed to the settlement.

The Supreme Court states what should be obvious. EPA had at the time a "claim." Like any other plaintiff in any other civil action, EPA could "claim" any amount of damages it wanted. The civil action would determine whether any portion of that "claim" was

meritorious.  There is no reason why an ultimate settlement amount would reflect on the merits of any individual portion of the overall "claim," or even of the overall claims.  There is therefore simply no basis to "determine" that Plaintiffs' $7 million was paid on account of any specific portions of EPA's $17 million past costs claim.

Defendants' argument that apportioning some percentage of Plaintiffs' payments to each of the components of EPA's claim not only is legally impermissible, it wouldn't be "fair" here even if it was.  Suppose Plaintiffs had, at the time of the negotiation with EPA, determined that $4 million of EPA's overall $17 million claim was not legally recoverable, then paid full value on the balance of the claim ($13 million).  Defendants would have this Court declare that Plaintiffs could seek contribution only with respect to $9,941,100 of the $13 million paid because Plaintiffs should be deemed to have "paid" 76.47% of the non-recoverable costs (4/17 = 23.53%).  How could any party ever settle with EPA if such would be the result in a later suit for contribution against recalcitrants?[6]

Plaintiffs note too that EPA's orphan share explanation only accounts for $3,289,250 of a $17 million claim.  Plaintiffs paid only $7 million.  Obviously, EPA justified to itself on some unknown (and irrelevant) basis an additional compromise of approximately $6,710,750 from its claim.  Further, the orphan share policy has absolutely nothing to do with the nature or legal recoverability of EPA's past costs or any specific portion thereof.  It did not "apply" to any such portions, contrary to Defendants' legally unsupported suggestion, and

---

[6]     Defendants would presumably also argue that, in a typical personal injury lawsuit wherein the plaintiff claims damages of $1,000,000 under each of five different legal theories, a settlement payment by the defendants of $100,000 "paid" $20,000 with respect to each of the legal theories.

therefore cannot be "evidence" to prove that Plaintiffs' paid some portion of the 1992-1993 costs.

Defendants have not and will never prove that Plaintiffs paid some portion of EPA's claimed 1992-1993 costs of response. Defendants' motion should therefore be denied.

### (b)    EPA's Claim for Past Response Costs Was Not Time-Barred.

Defendants construct the remarkable argument that *all* of the dollars that this Court found were "fair, reasonable and in the public interest" are out the window because of EPA's September 4, 1992 waiver in conjunction with the 1992 and 1993 work. Defendants' Brief at 13-16. This document alone cannot support summary judgment. Defendants offer no affidavit from EPA concerning the circumstances surrounding the waiver or to which particular response actions the waiver applied. Defendants' Reply Brief at 17-18.

Defendants' argument is mistakenly premised (as is their original argument that the statute of limitations ran on what they call the "First and Second Removal Actions") upon only one of two applicable statutes of limitation. Defendants overlook Section 113(g)(2)(B) which states:

> An *initial action* for the recovery of the costs referred to in section 9607 of this title must be commenced --
>
> (B)     for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, *except that*, if the remedial action is initiated within 3 years after the completion of the removal action, *costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.*

42 U.S.C. § 9613(g)(2)(B)(*emphasis added*). Plaintiffs noted in their initial Brief that the 2000 Consent Decree, lodged on May 21, 2000 in conjunction with a Complaint wherein EPA stated a

claim for all of its past response costs and for the costs of the remedial actions identified in the

ROD, constituted the "initial action" by EPA for recovery of its past and future remedial action

costs and its past removal action costs. Plaintiffs' Brief at 11; 2000 Consent Decree at 1. This

action was timely with respect to all of EPA's past costs, including the costs associated with the

1992 and 1993 work challenged by Defendants.

The ROD is the document wherein EPA selects each component of the remedial

action. 42 U.S.C. § 9617. Every action EPA took after November 18, 1998 was thus a remedial

action, and the costs it incurred for those actions were remedial action costs. For example, the

2000 Consent Decree recites that EPA had by then begun the remedial design for OU-1 work

specified in the ROD. 2000 Consent Decree at Section M. The remedial design is one of the

first steps of implementation of a remedial action. 40 C.F.R. 300.5 ("Remedial Design (RD)

means the technical analysis and procedures which follow the selection of remedy for a site and

result in a detailed set of plans and specifications for implementation of the remedial action").

As set forth in detail on pages 10-20 of Plaintiffs' initial Brief, the facts and

circumstances concerning EPA's comprehensive involvement with the Site, the applicable

decisional law[7], and EPA's own policy, each require the conclusion that all of EPA's actions up

---

[7]    Defendants mention again *United States v. Manzo*, 2006 U.S. Dist. LEXIS 70860 (D.N.J. 2006). That unpublished opinion was, in relevant part, the resolution of a motion for reconsideration in which the court affirmed its prior ruling that the statute of limitations is analyzed separately for separate *operable units* or separate *RODs*, both *remedial actions*. This citation is surprising, both because this case concerns *removal* action costs, and because the initial decision that was being affirmed cites with approval *Kelley* and four other opinions consistent with *Kelley* to hold that the United States was not barred from recovering *removal* costs where its initial action for remedial costs was filed within three years of the completion of the removal action. 182 F. Supp.2d 385, 404 (D.N.J. 2001). Indeed, the *Manzo* court held that the entire removal action was not complete for

(continued...)

until the date of the ROD constituted a single removal action for purposes of the statutes of limitations. The earliest date for "completion of the removal action" was thus November 18, 1998.[8]

The Section 9613(g)(2)(B) statute of limitations uses only the words "the completion of the removal action for" for timing purposes. It does *not* include the words "except that such cost recovery action must be brought within 6 years after a determination to grant a waiver …" included in Section 9613(g)(2)(A). Thus, EPA would not have been time barred from collecting as part of its initial action for remedial action costs all of its removal action costs even if the "except that" language in § 9613(g)(2)(A) has the effect asserted by Defendants.

---

(...continued)

      limitations purposes until completion of the remedial design *after* the ROD was issued. *Id.*

[8]    Defendants' discussion of the long-standing EPA guidance with respect to the meaning of the words "completion of removal action" completely misses the point. Virtually the entire basis of Defendants' argument that the 1992 and 1993 work by EPA consisted of two separate and independent removal actions is the statement by EPA in the ROD and in the Proposed Plan that there were four removal actions at the Site. Defendants offered these statements because they had absolutely no proof of the actual facts concerning the initiation, cessation, or details of the 1992 or 1993 work. The guidance shows that EPA fully understood the usages of the words "removal action" in different contexts when it made the ROD and Proposed Plan statements. Those statements thus cannot meet Defendants' burden of proof that the 1992 and 1993 work was, as a matter of law, two separate and independent removal actions within the meaning of the statute of limitations. *United States v. Allied Battery Co., Inc.*, 2000 U.S. Dist. LEXIS 10328 (N.D. Ala. 2000) does not, contrary to Defendants' suggestion, refer to this same guidance. That opinion refers to the same *1987* memorandum that was also rejected by the *Kelley* court as not persuasive as to the meaning of "completion of the removal action." *Allied Battery* at Section IV(A). Indeed, *Allied Battery* cites *Kelley* with approval for the rejection of the 1987 memorandum. *Allied Battery* thus supports Plaintiffs' argument that this Court should consider the *later* and long-standing EPA guidance when considering that meaning.

Because the May 2, 2000 Complaint was an "initial action for recovery of costs . . . [f]or a remedial action," initiated within three years of the "completion of the removal action," it was timely and EPA had the right to seek therein not just its past and future costs of remedial action but also all of its "costs incurred in the removal action."

Section 9613(g) additionally provides, in relevant part: "A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action." 42 U.S.C. Section 9613(g)(2). Because EPA's "response action" was continuing as of December 6, 2001, the date the 2001 Consent Decree was lodged with this Court, the Complaint lodging that Consent Decree was a timely "subsequent action." EPA's claims for all of its past and future costs of response were therefore then timely, including for the costs of the 1992 and 1993 work challenged here by Defendants. *See Manzo*, 182 F. Supp. 2d at 404.

Defendants' argument that EPA could not proceed in 2001 under 9613(g)(2)(A) should also be rejected. That argument rests on Defendants' conclusion that EPA's September 4, 1992 EPA determination to exempt its ongoing work from the statutory $2,000,000 limit to the cost of removal actions was made pursuant to CERCLA Section 9604(c)(1)(C), the type of waiver with respect to which the six year date applies. Defendants' Reply Brief at 17. There is a genuine dispute of material fact as to the one or more bases relied upon by EPA to approve the continued expenditure of funds.

Section 9604(c)(1) also provides that EPA may incur more than $2,000,000 in removal action costs if it finds that "(i) continued response actions are immediately required to

prevent, limit, or mitigate an emergency, (ii) there is an immediate risk to public health or

welfare or the environment, and (iii)  such assistance will not otherwise be provided on a timely

basis." 42 U.S.C. Section 9604(c)(1)(A).  The September 4, 1992 document recites that the

removal action was begun to "mitigate direct contact threats to humans, the threat of release of

hazardous substances, and the threat of fire and/or explosion posed by buried drums at the Site."

It notes that many drums remain buried and that "[s]oil contamination from leaking drums is

extensive."  Finally, the memorandum states:

> Because the conditions at the Boarhead Farms Site continue to
> meet the criteria set forth in the NCP, Section 300.415 for
> Removal Actions *and* the criteria in CERCLA Section
> 104(c)(1)(C) (Exemption to the $2 Million limit for Removals
> based on the consistency waiver), *and* pursuant to the Delegation
> of Authority 14-2-B giving the Regional Administrator authority to
> approve continued Removal Actions above $2 Million pursuant to
> the consistency waiver at NPL Sites, Region III has approved the
> use of additional CERCLA funds in the amount of $6,239,000 to
> further characterize the property and *properly secure and dispose*
> of the hazardous materials encountered at the Site.

September 4, 1992 Memorandum at 1-2 (emphasis added).  The use of the word "and" must

mean that each of the three statements justified EPA's continued expenditure of money.  There

also can be no question from the face of this document that EPA believed that the Site continued

to pose an immediate threat to human health and the environment.  The NCP criteria, said to be

satisfied, include a determination by EPA that, *inter alia*, actual or potential exposure to human

populations and animals, actual or potential contamination of drinking water supplies or sensitive

ecosystems, or "[h]azardous substances or pollutants or contaminants in drums, barrels, tanks, or

other bulk storage containers, … may pose a threat of release." 40 C.F.R. 300.415(b).  The 1992

document does not explicitly recite the statutory elements of either an "emergency" waiver or a

"consistency" waiver. It was just such explicit language upon which the court in *United States v. Horne*, 2006 U.S. Dist. LEXIS 61440 (W.D. Mo.), relied upon by Defendants, focused.

Plaintiffs are entitled to have all evidence construed in their favor, and to the benefit of all favorable inferences that can be drawn from that evidence. *Matsushita Elec. Indu. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Defendants have provided no affidavits from EPA personnel with personal knowledge of the circumstances surrounding this waiver and EPA's reasons for granting it. Absent such testimony (or for that matter *any* additional proof as to this waiver), Defendants cannot meet their burden of showing that there is no genuine issue whether this waiver was issued pursuant to the "consistency" waiver or pursuant to both waivers.[9] Defendants thus cannot establish as a matter of law that EPA could not in 2001 proceed pursuant to Section 9613(g)(2)(A).

There can be no doubt that EPA's claims for past response costs were not time barred against either Plaintiffs or Defendants when Plaintiffs settled their liability for those claims. Defendants' motion must therefore be denied.

---

[9]  Moreover, the waiver itself expressly limits EPA's authority to incur costs for the actions related to the waiver to $8,173,000. Exhibit "2" to Defendants' Initial Brief at 2. Defendants fail to explain how such a waiver would apply to all of the other costs EPA incurred in excess of this dollar number. This highlights further the absence of testimonial or other evidence concerning the intent and effect of this waiver.

(c)     **The $7 Million Paid by Plaintiffs to EPA Are Recoverable As a Matter of Law**

Plaintiffs stated in their Brief in opposition to this motion that Defendants offered no explanation and no legal authority for their proposition that *Atlantic Research* somehow trumps the well-settled case law that payments made pursuant to a Consent Decree are recoverable as a matter of law. Defendants simply restate their proposition in the Reply Brief without contradicting Plaintiffs' statement. Defendants' Reply Brief at 9-10. Defendants also suggest that Plaintiffs have incorrectly cited cases holding that dollars paid to EPA or a state for past governmental response costs pursuant to a Consent Decree are recoverable as a matter of law. $60,401 in Pennsylvania past response costs that had been reimbursed by the *Action Manufacturing* plaintiffs were included in the costs identified by the court as recoverable pursuant to the Consent Decree. *Action Manufacturing Company*, 428 F. Supp. 2d at 322 and at fn 22. The court stated in the *Atlas Minerals* opinion at Conclusion of Law 62: "All expenses incurred in connection with actions taken by the third-party plaintiffs pursuant to the terms of the OU-1 Orders, the OU-2 Order, or the Consent Decree are deemed consistent with the NCP and are therefore recoverable," noting that the NCP contains an *irrebutable* presumption that costs incurred in complying with the terms of an administrative order or Consent Decree are consistent with the NCP. *Atlas Minerals* at Conclusion of Law 62. The court specifically found that payments made to the United States in the amount of $1,209,250 by Third-Party Plaintiffs to reimburse the United States for its past response costs were "presumptively consistent with the

NCP and therefore represents recoverable response costs." *Atlas Minerals* at Conclusions of Law 64. Defendants cite no authority to that contrary.[10]

Because Plaintiffs paid the $7 million as dictated by the 2001 Consent Decree that this Court found to be "fair, reasonable, and in the public interest," Defendants' motion should be denied.

## CONCLUSION

For all the foregoing reasons, and in the interest of justice, Plaintiffs respectfully request that this Court deny Defendants' motion for partial summary judgment.

Dated: April 16, 2008

Respectfully submitted,

Ballard Spahr Andrews & Ingersoll, LLP

By: _____
Glenn A. Harris, Esquire
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey  08043
E-mail:  harrisg@ballardspahr.com
Phone:  (856) 761-3400

Attorney for Plaintiffs

---

[10]    Plaintiffs note the extreme irony that Defendants are arguing that, because Plaintiffs paid less than the $17 million claim, thereby reducing greatly the amount they are seeking here, Defendants should pay *even less* or *even nothing*.