IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS L.L.C., | : : : : : : : | Civil Action No. 02-CV-3830 (LDD) |
|              Plaintiffs, | : : | |
|      v. | : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : : | |
|              Defendants. | : | |

**DECLARATION OF GLENN A. HARRIS, ESQUIRE IN SUPPORT OF PLAINTIFFS'
SUR-REPLY MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

GLENN A. HARRIS, ESQUIRE hereby declares:

1.     I am a member of the law firm of Ballard Spahr Andrews & Ingersoll, LLP, and counsel for Plaintiffs in the above-captioned matter.

2.     I submit this declaration in support of Plaintiffs' Sur-Reply Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment.

3.     Attached hereto and marked Exhibit "A" is a true and correct copy of the Orphan Share Policy.

4.     Attached hereto and marked Exhibit "B" is a true and correct copy of EPA's June 2, 2000 Guidance on Exercising CERCLA Enforcement Discretion in Anticipation of Full Cost Accounting Consistent with the 'Statement of Federal Financial Accounting Standards No. 4."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated  April 10, 2008

_____
Glenn A. Harris, Esquire

# Exhibit "A"

CC-G-1799.025



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460



June 3, 1996

> **Received**
>
> MAY 18 1999
>
> Enforcement & Compliance Docket
> & Information Center

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

## MEMORANDUM

SUBJECT:   Interim Guidance on Orphan Share Compensation for Settlors of
            Remedial Design/Remedial Action and Non-Time-Critical Removals

FROM:      Steven A. Herman, Assistant Administrator
            Office of Enforcement and Compliance Assurance

TO:        Regional Administrators, I-X

This memorandum transmits the "Interim Guidance on Orphan Share Compensation for Settlors of Remedial Design/Remedial Action and Non-Time-Critical Removals." This guidance provides Regions with further direction to address orphan share compensation in Superfund settlements.

On October 2, 1995, Administrator Browner announced the third in a series of reforms designed to fundamentally change the way EPA implements the Superfund program. This orphan share guidance is the latest installment in the Clinton Administration's commitment to reform Superfund and provide greater fairness, reduce litigation and promote faster cleanup of Superfund sites. One of the cornerstones of the October announcement is the Agency's initiative to exercise its enforcement discretion to provide orphan share compensation at sites where parties agree to perform the cleanup.

This guidance strikes a balance between the budgetary constraints of a lapse in Superfund taxing authority and the desire to provide meaningful reform consistent with the Administration's legislative proposals. In fiscal year 1996 alone, the Administration is prepared to offer over $50 million in orphan share compensation to potential settlement parties.

For further information concerning this guidance, please contact either Susan Boushell (202-564-5107) or Patricia Mott (202-564-5133) in the Office of Site Remediation Enforcement.

Attachment

cc:    Elliott Laws, Assistant Administrator for Solid Waste and Emergency Response
Lois Schiffer, Assistant Attorney General, DOJ
Jerry Clifford, Director, Office of Site Remediation Enforcement
Steve Luftig, Director, Office of Emergency and Remedial Response
Director, Office of Site Remediation and Restoration, Region I
Director, Emergency and Remedial Response Division, Region II
Director, Hazardous Waste Management Division, Regions III, IX
Director, Waste Management Division, Region IV
Director, Superfund Division, Regions V, VI, VII
Assistant Regional Administrator, Office of Ecosystems Protection and
  Remediation, Region VIII
Director, Environmental Cleanup Office, Region X
Regional Counsel, Regions I-X
Larry Starfield, Associate General Counsel, OGC
John Cruden, Deputy Assistant Attorney General, DOJ
Joel Gross, Chief, Environmental Enforcement Section, DOJ
Bruce Gelber, Principal Deputy Chief, Environmental Enforcement Section, DOJ

2

# INTERIM GUIDANCE ON ORPHAN SHARE COMPENSATION FOR SETTLORS OF REMEDIAL DESIGN/ REMEDIAL ACTION AND NON-TIME-CRITICAL REMOVALS

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
401 M Street, S.W.
Washington, D.C.  20460

# INTERIM GUIDANCE ON ORPHAN SHARE COMPENSATION FOR SETTLORS OF REMEDIAL DESIGN/REMEDIAL ACTION AND NON-TIME CRITICAL REMOVALS

## Policy Statement and Purpose

On October 2, 1995, Administrator Browner announced the third in a series of reforms designed to fundamentally change the way EPA implements the Superfund program. Several of these Superfund Reforms are intended to provide greater fairness, reduce litigation and transaction costs, and promote private party cleanup of Superfund sites. One of the cornerstones of the October announcement was the Agency's initiative to exercise its enforcement discretion to provide orphan share compensation at sites where potentially responsible parties (PRPs) agree to perform the cleanup.

The purpose of this interim guidance is to provide Regions with further direction for providing orphan share compensation in settlements with PRPs. This guidance makes clear that, where EPA determines that there is a share which may be equitably attributed to parties who are insolvent or defunct (i.e., the "orphan share") and which would ordinarily be allocated to viable PRPs under principles of joint and several liability, EPA intends to consider this factor in its assessment of the federal compromise it provides in settlement.[1] EPA anticipates that its willingness to contribute to settlement, based in part upon an increased emphasis on the effect of an orphan share, will facilitate settlement with performing parties.

Of course, the Region's consideration of an "orphan share" is only one component of a Region's settlement analysis. Consistent with our historic practice, the total amount of federal compromise in settlement incorporates other factors in addition to the presence or absence of an orphan share, including: (1) litigation or other risks to recovery or performance; (2) cooperation of performing parties; and (3) the resources of parties. This guidance simply establishes limits upon the amounts the Regions may provide as orphan share compensation in light of current fiscal limitations. This policy preserves the application of common law tort principles of joint and several liability by recognizing the impact of joint and several liability in the settlement analysis factors where EPA determines that an orphan share at a given site may be greater than de minimis.

---

[1] This guidance is intended for settlement purposes only and, therefore, orphan share compensation is appropriate only where settlement occurs. In the event that settlement does not occur, Regions should, as appropriate, pursue PRPs jointly and severally for their performance of cleanup and recovery of response costs. Courts have uniformly found that CERCLA liability is joint and several where the harm is indivisible, which ensures that the costs of cleanup are borne by the parties who contributed to the contamination, rather than the tax-paying public. This guidance does not apply where EPA determines or a court finds that PRPs have met their substantial burden of proving as a defense to joint and several liability that the harm is divisible and reasonably capable of apportionment.

Background

Under CERCLA's joint and several liability system, at sites where there are insolvent or defunct parties who cannot contribute to the cost of cleanup, viable PRPs are required to absorb the shares that may be attributable to such non-viable PRPs. In an effort to mitigate this effect and encourage PRPs to perform cleanup, EPA committed in the October 1995 announcement to compensate performing parties for a limited portion of the orphan share in future cleanup settlements. The Agency stated that this compensation might be accomplished through forgiveness of past costs and of projected oversight costs, and would necessarily be subject to the amount of funding available for the program.

Since the October announcement, however, Congress has not reauthorized Superfund, nor has it provided the Agency with a separate appropriation for orphan share compensation. In addition, Congress has not yet reinstated the Superfund taxing authority -- the principal source of revenue for the Superfund Trust Fund -- which expired at the end of 1995. Until these taxes are reinstated, the Trust Fund will continue to be depleted by costs expended to implement the program and achieve cleanups. Because of this lapse in taxing authority and absence of specific orphan share funding in the FY 96 appropriation, EPA examined ways to compensate a portion of the orphan share within existing appropriations.

EPA also determined that it was important to provide incentives for parties to voluntarily perform cleanups, provide the benefits of this reform to as many qualifying sites as possible, recognize cooperative parties, keep transaction costs low, and use readily available information. Finally, the Agency wants to provide appropriate balance between preserving the Trust Fund and providing meaningful implementation of this reform. Based on these considerations, EPA developed a process that would enable the Regions to implement this reform this fiscal year.

Applicability

This reform applies where: (1) EPA initiates or is engaged in on-going negotiations for a remedial design or remedial action (RD/RA) at a site or for a non-time-critical (NTC) removal at a National Priorities List (NPL) site under the Superfund Accelerated Cleanup Model (SACM); (2) a PRP or group of PRPs agrees to conduct the RD/RA or RA pursuant to a consent decree or the NTC removal pursuant to an administrative order on consent (AOC) or consent decree; and (3) an "orphan share" exists at the site.[2] For the purposes of this reform, the term "orphan share" refers to that share of responsibility which is specifically attributable to identified parties EPA has determined are: (1) potentially liable; (2) insolvent or defunct; and (3) unaffiliated with any party potentially liable for response costs at the site. This definition of orphan share does not include shares due to, for example: (1) unallocable waste; (2) the difference between a party's

_____

[2] This guidance is not intended to apply at sites where the only PRPs at the site currently or formerly owned or operated the facility or at federal facilities.

2

share and its ability to pay; or (3) those parties, such as "de micromis" contributors, municipal solid waste (MSW) contributors or certain lenders or residential homeowners, that EPA would not ordinarily pursue for cleanup costs. See "Policy on CERCLA Enforcement Against Lenders and Government Entities that Acquire Property Involuntarily" (Sept. 22, 1995); "Policy Toward Owners of Property Containing Contaminated Aquifers" (May 24, 1995); "Guidance on CERCLA Settlements with De Micromis Waste Contributors," OSWER Directive No. 9834.17 (July 30, 1993); "Policy Toward Owners of Residential Property" (July 3, 1991); "Interim Policy on CERCLA Settlements Involving Municipalities and Municipal Wastes" (Dec. 6, 1989).

A party may be considered to be "insolvent" if EPA determines that a party has no ability to pay. A party may be considered to be "defunct" if: (1) the entity has ceased to exist or ceased operations; and (2) the entity has fully dissipated its assets such that the party has no ability to pay. For both the insolvent and the defunct determinations, EPA's investigation must indicate that there is no successor or other affiliated party that is potentially liable.

## Methods for Determining Appropriate Orphan Share Component of Federal Compromise

Compensation for the orphan share component of the federal compromise in settlement may be provided through forgiveness of past costs and reduction of liability for future oversight costs.[3] At some sites, forgiveness of some portion of past costs already may have occurred in conjunction with a prior settlement with PRPs at the site. In such cases, those past costs which have been forgiven would not be available for use as compensation under this reform with respect to the same PRPs.

To determine the appropriate orphan share component of the federal compromise at a particular site, Regions should make a rough estimate of the size of the orphan share. At many sites, an estimated range will be sufficient to determine whether the share which may be equitably attributed to insolvent and defunct parties warrants federal compromise. Using total site costs,[4] Regions should estimate the orphan share based upon equitable factors, such as the

---

[3] Although mixed funding might have been used as compensation under this reform, EPA did not receive a separate appropriation for orphan share compensation and, therefore, any mixed funding provided under this reform would have reduced the funds available for cleanups. As a result, compensation under this reform does not include mixed funding. However, this guidance is not intended to modify or alter EPA's enforcement discretion to enter into mixed funding agreements under Section 122(b) of CERCLA, 42 U.S.C. § 9622(b).

[4] "Total site costs" refer to outstanding past costs and future oversight costs at the site or operable unit that is the subject of the ROD or NTC removal and projected ROD or NTC removal costs.

3

Gore factors.[5] To ensure that implementation of this reform does not impede cleanup, cause a delay in statutory negotiation deadlines, or result in increased transaction costs, Regions should rely upon readily available or easily obtainable information in making this estimation.

Given current financial constraints, EPA is limiting the amount that Regions can offer in compensation for the orphan share component of the federal compromise to 25 percent of projected ROD remedy/NTC removal costs. First, EPA determined that such a limitation is necessary to moderate the impact on the Trust Fund in light of the expiration of the taxing authority and lack of separate orphan share appropriation. Second, EPA believes that a 25 percent limitation will minimize the incurrence of additional transaction costs and the delay in cleanup negotiations associated with calculation of the orphan share. Finally, a 25 percent limitation will ensure a fairer distribution among sites because it represents the amount at which most sites will have sufficient past costs and future oversight costs to provide compensation for the orphan share component of the federal compromise in settlement.

Accordingly, Regions should maximize compensation for the orphan share component of the federal compromise as long it does not exceed any of the following: (1) the orphan share; (2) the sum of all unreimbursed past costs and EPA's projected costs of overseeing the design and implementation of the Record of Decision (ROD) remedy or NTC removal costs; or (3) 25 percent of the projected ROD remedy or NTC removal costs at the site. This will be considered the maximum amount appropriate for compensating the orphan share component of the federal compromise under this policy.

There is a presumption that Regions will provide the maximum amount appropriate for the orphan share component of the federal compromise. However, in limited circumstances, Regions may, in their discretion, decide that compensation less than the maximum amount is appropriate after consideration of equitable factors, including: (1) PRP fairness to other PRPs, including small businesses, MSW parties, small volume waste contributors and certain lenders and homeowners; (2) PRP cooperation; and (3) size of the orphan share. Regions should give greater consideration to these factors when activities encompassed by the factors occur after issuance of this guidance.

_____

[5] The "Gore factors" are usually relied upon by courts in making equitable allocations in contribution actions. They include: (1) the amount of hazardous substances involved; (2) the degree of toxicity of the substances; (3) the degree of involvement by parties in the generation, transportation, treatment, storage, or disposal of the substances; (4) the degree of care exercised by the parties with respect to the substances; and (5) the degree of cooperation of the parties with government officials to prevent any harm to public health or the environment. See, e.g., Envtl. Transp. Servs. v. Ensco, Inc., 969 F.2d 503 (7th Cir. 1992).

4.

## Implementation

When providing notice of forthcoming negotiations to PRPs or during on-going negotiations, Regions should indicate whether the site is eligible for this reform and should share any available information about the maximum amount appropriate for compensation. Regions may request PRPs to submit information regarding the size of the orphan share at the site, including a basic rationale and supporting documentation.

Headquarters pre-approval will be required for any settlement at a site where the projected ROD remedy or NTC removal cost exceeds $30 million. To satisfy this pre-approval requirement, Regions should contact Headquarters, either orally or in writing, prior to conveying a formal settlement offer to a PRP or group of PRPs that includes an orphan share compensation component. Headquarters will then evaluate such proposed compensation in light of site-specific factors, state concerns and national priorities, including meaningful implementation of the reform and impact on the Trust Fund.

For all sites, an analysis of the proposed orphan share compensation provided through forgiveness of past costs and reduction of liability for future oversight costs should be included in the enforcement confidential ten-point settlement analysis submitted to Headquarters. This guidance is not intended to limit EPA's consideration of other settlement factors. The Regions may elect to compromise a greater or lesser amount than that described herein, based upon other factors they would consider in their routine settlement analyses, such as litigation or other risks to recovery or performance, cooperation of the performing parties, and the resources of parties.

## Orphan Share Assistance Team

We have established an orphan share assistance team with the Department of Justice to assist Regions in implementation of this important reform. The team will be in contact with Regional staff to resolve issues to ensure results.

For further information concerning this guidance, please contact either Susan Boushell (202-564-5107) or Patricia Mott (202-564-5133) in the Office of Site Remediation Enforcement.

## Purpose and Use of this Guidance

This guidance and any internal procedures adopted for its implementation are intended exclusively as guidance for employees of the U.S. Environmental Protection Agency. This guidance is not a rule and does not create any legal obligations. Whether and how EPA applies the guidance to any particular site will depend on the facts at the site.

# Exhibit "B"

comments should be received in the SAB Staff Office at least one week prior to the meeting date so that the comments may be made available to the committee for their consideration. Comments should be supplied to the appropriate DFO at the address/contact information noted above in the following formats: one hard copy with original signature, and one electronic copy via e-mail (acceptable file format: WordPerfect, Word, or Rich Text files (in IBM-PC/Windows 95/98 format). Those providing written comments and who attend the meeting are also asked to bring 35 copies of their comments for public distribution.

*Meeting Access*

Individuals requiring special accommodation at this meeting, including wheelchair access to the conference room, should contact the DFO at least five business days prior to the meeting so that appropriate arrangements can be made.

Dated: May 26, 2000.

**Donald G. Barnes,**

*Staff Director, Science Advisory Board.*

[FR Doc. 00–13847 Filed 6–1–00; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

[FRL–6708–8]

**Guidance on Exercising CERCLA Enforcement Discretion in Anticipation of Full Cost Accounting Consistent With the "Statement of Federal Financial Accounting Standards No. 4"**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** The EPA Office of Enforcement and Compliance Assurance, Office of Site Remediation Enforcement is providing guidance to its regional components on the exercise of enforcement discretion, from May 30, 2000 through October 2, 2000, in anticipation of EPA's implementation of full cost accounting.

Attachments 1 and 2 were prepared by the Office of the Chief Financial Officer. They describe the reasons for full cost accounting and the methodology being used to implement full cost accounting.

**EFFECTIVE DATE:** May 30, 2000.

**FOR FURTHER INFORMATION CONTACT:** Chad Littleton, Office of Enforcement and Compliance Assurance, Office of Site Remediation Enforcement, U.S. EPA, 1200 Pennsylvania Ave., NW,

Washington, DC 20460 (MC 2273A); e-mail: littleton.chad@epa.gov; phone: (202) 564–6064.

**SUPPLEMENTARY INFORMATION:**

**Memorandum**

*Subject:* Guidance on Exercising CERCLA Enforcement Discretion In Anticipation of Full Cost Accounting Consistent with the *Statement of Federal Financial Accounting Standards No. 4*

*From:* Steven A. Herman, Assistant Administrator, Office of Enforcement and Compliance Assurance

*To:*
Regional Administrators, Regions I–X
Deputy Regional Administrators, Regions I–X
Regional Counsel, Regions I–X
Superfund Division Directors, Regions I–X

This memorandum provides guidance to EPA personnel on how to exercise enforcement discretion as it relates to upcoming changes in EPA's indirect cost accounting methodology.

*A. Upcoming Revisions to Indirect Cost Accounting*

EPA's Office of the Chief Financial Officer (OCFO) recently announced that it is revising the Agency's methodology for allocating indirect costs to Superfund sites. These steps will bring Superfund into compliance with cost accounting standards issued by the Federal Accounting Standards Advisory Board (FASAB) on July 31, 1995, (*Statement of Federal Financial Accounting Standards No. 4 (SFFAS No. 4*).[1] The principal goal of those standards is to make it possible for Federal agencies to determine and report the true costs of their programs and activities. The Federal Financial Management Improvement Act of 1996 (Title VIII, Public Law 104–208)[2] requires all Federal agencies to develop and use cost accounting methodologies that are consistent with the SFFAS No. 4 and other applicable standards.[3]

[1] Available as *SFFAS 4* at www.financenet.gov/financenet/fed/fasab/concepts.htm.

[2] Available from the 104th Congress catalog at www.access.gpo.gov/nara/publaw/104publ.html.

[3] "(5) To rebuild the accountability and credibility of the Federal Government, and restore public confidence in the Federal Government, agencies must incorporate accounting standards and reporting objectives established for the Federal Government into their financial management systems so that all the assets and liabilities, revenues, and expenditures or expenses, and the full costs of programs and activities of the Federal Government can be consistently and accurately recorded, monitored, and uniformly reported throughout the Federal Government.

(6) Since its establishment in October 1990, the Federal Accounting Standards Advisory Board

A copy of the OCFO memorandum announcing and describing EPA's implementation of an accounting methodology complying with the SFFAS No. 4 is attached for your reference (Attachment 1). That memorandum describes important background events and EPA's approach to implementing the revised methodology, defines many important accounting terms as they apply to EPA, lists preliminary estimated regional indirect rates based on the revised methodology, and states that OCFO will calculate actual indirect costs rates using the revised methodology (hereinafter "revised rates" or "revised indirect rates") for all fiscal years after 1989. The OCFO expects the revised rates to be completed and issued by October 2, 2000, at which time EPA will begin using the revised rates.

*B. The Revised Rates and Superfund Site Costs*

As described more fully in the attached OCFO memorandum, direct costs are costs an organization incurs when it produces a specific result. Most of the other costs of running the organization are indirect costs. EPA's current indirect cost accounting methodology allocates to Superfund sites only about one-third of the indirect costs that are incurred by EPA and properly allocable to sites. SFFAS No. 4 requires "full cost accounting," which means that Superfund indirect costs must be allocated to sites. For that reason, implementing an indirect cost methodology based on SFFAS No. 4 will increase the aggregate amount of indirect costs allocated to sites.

The effect of applying the revised rates will vary from site to site because the SFFAS-compliant methodology and the current methodology use different techniques for allocating indirect costs to individual sites. The SFFAS-compliant methodology allocates

(hereinafter referred to as the "FASAB") has made substantial progress toward developing and recommending a comprehensive set of accounting concepts and standards for the Federal Government. When the accounting concepts and standards developed by FASAB are incorporated into Federal financial management systems, agencies will be able to provide cost and financial information that will assist the Congress and financial managers to evaluate the cost and performance of Federal programs and activities, and will therefore provide important information that has been lacking, but is needed for improved decision making by financial managers and the Congress." (*Public Law 104–208*, 110 STAT 3009–389–390).

"Each agency shall implement and maintain financial management systems that comply substantially with Federal financial management systems requirements, applicable Federal accounting standards, and the United States Government Standard General Ledger at the transaction level." (*Id.*)

**35340**    Federal Register / Vol. 65, No. 107 / Friday, June 2, 2000 / Notices

indirect costs in proportion to direct costs, whereas the current methodology uses the number of Superfund staff hours charged to a site. As a result, sites with large direct Federal expenditures compared to the number of Superfund staff hours will generally see the largest indirect cost increases, and few if any decreases. Sites with smaller Federal expenditures compared to the number of Superfund staff hours, such as sites cleaned up by potentially responsible parties (PRPs) where EPA's costs are largely for oversight performed by EPA staff, will generally see smaller indirect cost increases, and are also more likely to see decreases.

*C. Enforcement Discretion as It Relates to the Revised Indirect Rates*

As noted above, the OCFO expects the revised rates to be available on October 2, 2000, and will begin using them as soon as they are issued. In general this means that after October 2, 2000, site costs, including oversight costs, will be calculated using the revised rates. The following sections address areas of particular enforcement interest and describe how the Agency intends to exercise its enforcement discretion in individual cases to provide a fair and efficient transition to the revised accounting methodology.

1. Concluded Matters

EPA has previously settled or litigated numerous claims for past response costs. The costs EPA sought in those cases included indirect costs based on the current rates. EPA recognizes the importance of repose and finality in those cases and therefore the Agency has no plans to re-open any concluded matters to apply the revised rates to claims for past costs that were presented and resolved in those matters. This includes consent decrees, litigated judgments and administrative orders on consent. It also includes ceilings established in settlements and judgments for oversight or other response costs that the Agency can bill to PRPs under those existing settlements or judgments.

2. Oversight Billings

The Agency has no plans to recompute oversight bills that were prepared and sent to PRPs before the revised rates are issued.

3. Claims in Litigation Prior to October 2, 2000

When EPA issues the revised indirect rates there will be a number of cost recovery cases pending in Federal courts. The past costs EPA is seeking in those cases will have been calculated using the current indirect rates. There may be special circumstances in those cases, especially if the litigation is at an advanced stage, that cause the case team to decide not to seek to amend the claim by applying the revised indirect rates. An example might be certain cases in which costs have already been presented to the court and the parties are awaiting the court's decision. These decisions will be made by the EPA/ Department of Justice (DOJ) case team on a case-by-case basis. This approach is intended to be consistent with prior practice (*See,* Policy on Recovering Indirect Costs in CERCLA Section 107 Cost Recovery Actions, OSWER Directive 9832.5, June 27, 1986) (superseded by this guidance).

4. Interim Settlement Policy in Anticipation of the Revised Rates

This memorandum gives advance notice of the revised rates. One purpose of the advance notice is to provide PRPs who have unresolved cost recovery liabilities an opportunity to settle with the United States at the current rates. For sites where the revised rates would result in higher indirect costs, it may be advantageous for the PRPs to settle with the United States under the current rates. Therefore, until the revised rates are issued, which the OCFO expects to occur on October 2, 2000, the Agency will entertain settlement offers resolving the claims of the United States for CERCLA response costs based on the current indirect rates.

Generally, the Agency will consider a settlement offer based on site costs computed using the current indirect cost rates, if: (1) The offer is made prior to October 1, 2000; (2) the Agency determines, in its sole discretion, that there is sufficient information available on which to base a settlement decision; and (3) it appears to the Agency that the offer is likely to lead to an executed final settlement by March 30, 2001. For cases in litigation or that have been referred to DOJ, the DOJ/EPA case teams will determine the appropriate response to any settlement offer. For all other matters, regional case teams will determine the appropriate response to any settlement offer. Case teams may set alternative milestone dates for any individual PRP or site, if appropriate, based on PRP-specific or site-specific circumstances after consultation with the Regional Support Division (RSD) in the Office of Site Remediation Enforcement (OSRE).

After such an offer has been received, if settlement negotiations are unproductive or it becomes evident that the applicable milestone dates have not been met, or are not likely to be met, the Agency may, at its sole discretion, withdraw the opportunity to enter a settlement based on the current rates.

*D. Proving Indirect Costs*

Implementing the SFFAS accounting methodology will not alter the burden of proof that the Agency must meet when seeking recovery of indirect costs. EPA will continue to provide evidence acceptable in a court of law to prove that the indirect costs sought are allocable to the site that is the subject of the enforcement action.

*E. National Consistency/Coordination*

Except for the specific transition related adjustments noted above, existing policy and guidance applicable to considering or accepting settlement offers is unchanged. Implementing the revised indirect rates will not affect the discretion of the Agency or DOJ to settle or compromise cost recovery claims, including those cases where costs are based on the revised rates. Litigation risk, equitable considerations, and other factors that are considered in determining whether to settle or compromise claims may still be taken into account. As always, EPA will exercise its discretion to ensure that any resulting settlements are fair, reasonable, and consistent with CERCLA.

When EPA begins using the revised rates, we expect that the Agency will face questions about matters associated with the transition to the revised rates. EPA has a substantial interest in promoting a nationally consistent approach during this transition period. Therefore, I have asked the RSD to monitor EPA's implementation of the revised indirect rates. I also ask each regional office to designate a point of contact to assist RSD in our effort to quickly resolve key questions about EPA's use of the revised rates, and to promote national consistency among the regional offices. Please send the name and telephone number of your workgroup member to Maria Cintron-Silva, RSD, no later than three weeks after the date of this memorandum. Workgroup contacts will be expected to provide information regarding each of the offers received and their dispositions. For questions about this memorandum and OECA's implementation of the revised rates, please contact Chad Littleton, in the Office of Site Remediation Enforcement, at 202–564–6064.

Attachments

Dated: May 26, 2000.
**Steven A. Herman,**
*Assistant Administrator, Office of Enforcement and Compliance Assurance.*

**Memorandum**

*Subject:* Accounting for Indirect Costs Associated with Superfund Site-Specific Activities
*From:* Joseph Dillon, Acting Comptroller (2731)
*To:* Senior Resource Officials

This Policy Announcement provides the policies and procedures for implementing Statement of Federal Financial Accounting Standards (SFFAS) No. 4, Managerial Cost Accounting for the Federal Government, for the Superfund Site Cleanup Program by providing a revised indirect cost methodology. This methodology along with existing policies and procedures regarding direct costs results in accounting for the "full costs" of actions taken at or in connection with Superfund Sites.

*Background*

The Office of Management and Budget (OMB) issued SFFAS No. 4 on July 31, 1995, with an effective date of October 1, 1997. SFFAS No. 4 requires federal agencies to determine the full cost of their outputs (programs). The full cost of programs includes both those costs specifically identifiable with each particular program, or direct costs, and those costs which collectively support the many programs, or indirect costs.

Since 1985, EPA has been identifying the indirect costs associated with Superfund site-specific activities for all fiscal years after 1982. However, the indirect cost methodology developed at that time was conservative and did not result in allocating all indirect costs to sites. As a result, the General Accounting Office, the EPA Office of Inspector General, OMB and Congress have repeatedly criticized EPA's methodology. The Office of the Chief Financial Officer (OCFO) has developed an indirect cost methodology to compute indirect cost rates for Superfund site-specific activities in accordance with SFFAS No. 4. By incorporating the resulting indirect cost rates into their analyses, Superfund Managers will be able to compute the full cost of their program.

*Policy and Procedures*

The OCFO has developed a Superfund indirect cost methodology based upon full cost accounting concepts. Using that new methodology, OCFO is presently calculating and will

issue indirect cost rates based upon the full cost accounting methodology ("revised rates"). The OCFO will issue revised rates for each Fiscal Year, by Region beginning with FY 1990. The revised rates will be issued after the date of this Policy Announcement and are expected to be completed and issued by October 2, 2000. Once the revised rates are issued, Superfund managers should use the revised rates to determine the full cost of Superfund site specific activities. In the meantime, EPA Superfund program managers may use the preliminary, estimated indirect cost rates identified in Attachment 1 as the basis for estimating the full cost of Superfund site-specific activities.

Beginning with FY 2001, the Agency will no longer compute nor issue, as provisional or final, indirect cost rates based upon the earlier Ernst & Whinney methodology.

A brief description of the full cost methodology is as follows: EPA's annual costs are analyzed to determine whether the costs represent general Agency or Regional support activities, program support activities, or program direct costs. Those general Agency support activities and the Superfund program support activities are included in calculations that allocate these costs to programs and produce a Superfund indirect cost pool for each region. Each Region's indirect cost pool, including appropriate Regional support costs, is divided by the Region's direct costs incurred for site-specific activities to determine the Region's indirect cost rate for the fiscal year, which is expressed as a percentage of direct costs. The Region's indirect cost rate is multiplied against the direct costs incurred for a particular Superfund site to determine the amount of indirect costs that will be allocated to that site. By adding the direct site costs and the indirect costs allocated to a particular site, or group of sites, the total cost for that site or group of sites is determined.

For a more detailed description of the Superfund Indirect Cost Rate Methodology, please refer to Attachment 1.

*Effective Date*

OCFO expects to complete and issue the new Superfund Full Indirect Cost Rates by October 2, 2000, at which time they will be effective for all accounting purposes.

*Additional Information*

If you need further information on this Policy Announcement, please contact Charles Young of the Program and Cost Accounting Branch, Financial

Management Division at (202) 564–4914.

**Attachment 2**

**Superfund Full Cost Indirect Cost Rate Methodology**

*Background*

OMB, the Secretary of the Treasury and the Comptroller General established the Federal Accounting Standards Advisory Board (FASAB) in October 1990 to set Federal Government Accounting Standards. In September 1993, the Vice President in his report on the National Performance Review recommended an action which required the FASAB to issue a set of cost accounting standards for all federal agencies. FASAB issued the Statement of Federal Financial Accounting Standards (SFFAS) No. 4, Managerial Cost Accounting Concepts and Standards for the Federal Government on July 31, 1995, which became effective for EPA on October 1, 1997. Title VIII of the Federal Financial Management Improvement Act of 1996 (Title VIII, Public Law 104–208) requires federal agencies to comply with the Federal Financial Accounting Standards and emphasizes that agencies' systems must report the total costs of programs and activities. EPA will comply with this requirement for all the Agency's programs, based on specific needs of each program and applicable accounting requirements. The methodology described in this Policy Announcement applies to EPA's Superfund site-specific activities as set forth below.

SFFAS No. 4 sets forth five fundamental elements of managerial cost accounting to provide information on the cost of federal programs. One of those elements is to determine the full cost of government goods and services. According to the Standard, full cost includes both direct and indirect costs. Direct costs are defined as "costs that can be specifically identified with an output." Indirect costs are costs that are common to multiple outputs but cannot be specifically identified with any particular output. In the context of the Superfund program, direct costs include those that are directly incurred by the United States for site-specific activities performed at or in connection with a particular site or a particular group of sites. Site-specific activities include the assessment, investigation and clean-up of a site, ancillary site-associated activities, and related enforcement actions. Indirect costs are those that support the Superfund program as a whole and cannot be identified to any one site or other "output" of the

35342          Federal Register / Vol. 65, No. 107 / Friday, June 2, 2000 / Notices

program. The government's full cost at a Superfund site consists of the direct costs incurred for site-specific activities and the proportionate share of all the costs that provide indirect support to the site.

In 1985, EPA, with the assistance of the accounting firm Ernst & Whinney, developed an indirect rate methodology for determining the government's cost of site-specific activities under CERCLA. The indirect rates developed were conservative. As a result of the conservative methodology, a substantial portion of the indirect cost pool was not allocated to individual Superfund sites, even though site-specific activities are the direct output that the indirect costs support. As a result, the General Accounting Office (GAO), the EPA Office of Inspector General (OIG), OMB and Congress have repeatedly criticized the methodology for failing to identify the full cost of Superfund site clean-ups and therefore failing to allow potential recovery of all indirect costs. The OIG considered this method of recovering less than full overhead costs as a Federal Manager Financial Integrity Act (FMFIA) "material weakness" and suggested the Agency identify it as such.

EPA has revised the Superfund indirect cost methodology to enable the Agency to report the full cost of the program in compliance with SFFAS No. 4 and with other federal mandates requiring the reporting of cost information. During the preparation of the revised methodology, EPA sought separate independent reviews of the methodology by both GAO and the national accounting firm KPMG. KPMG found the revised methodology in compliance with SFFAS No. 4, as well as "easier to understand, more thorough and more complete than the previous methodology." GAO reviewed the revised methodology and found "that the design of EPA's proposed Superfund indirect cost methodology complies with cost accounting standards for federal government" as well as the requirements of SFFAS No. 4.

*Approach*

EPA's approach to developing a full cost indirect cost methodology for Superfund is based on the guidance provided by SFFAS No. 4. In addition, certain other factors are also taken into account. These include the nature and classification of Agency costs, private sector cost accounting practices and the cost/benefit of obtaining the data necessary to compute indirect cost rates. Indirect cost rates will be developed for each region and each Fiscal Year beginning with FY 1990. We are beginning with FY 1990 because active

Superfund sites have costs incurred in prior years generally no earlier than FY 1990, with limited exceptions. Thus, computing full cost indirect rates back to FY 1990 will allow Superfund managers to determine the full cost of site-specific activities for nearly all active sites, while going back before FY 1990 would be of primarily historic interest. Therefore, we consider it most cost effective to compute rates no further back than 1990; if managers need indirect cost information for years prior to 1990, the rates computed using the current methodology may be used for those earlier years. Use of the revised indirect cost rates will provide Superfund managers, other EPA management and Congress with the full cost of Superfund site-specific activities.

The current Superfund indirect cost methodology uses indirect rates which are expressed as a rate per hour of labor effort. This rate is computed using a base consisting of all labor hours (including both site and non-site labor), but is applied to only site labor hours. This results in an under-allocation of indirect costs. This approach, although acceptable from an accounting standpoint, is conservative in its allocation of indirect costs to individual sites and led to the criticisms noted above. The principal conceptual change the Agency will make as it moves to full cost accounting in compliance with SFFAS No. 4 with respect to Superfund site-specific activities, is to ensure that indirect costs that support site clean-up are fully allocated to site charges. In order to do so, EPA will allocate the appropriate indirect cost pool using total direct site costs as an allocation base. This will result in indirect cost rates expressed as a percentage of total direct site costs rather than a dollar rate per hour as is the current method. The change in the allocation base is the most important difference between the full cost accounting methodology and the prior methodology, with only minor changes to the indirect cost pool (further described below). The indirect cost pool identified for calculation of the new indirect cost rate will reflect only those costs which are appropriately allocable to and support the Superfund site-specific activities.

In determining the indirect costs associated with the Superfund program, certain costs funded from non-Superfund appropriations are included as indirect costs because they provide services that benefit the Superfund program and are necessary to reflect full cost. SFFAS No. 4 states that one of the components of full cost is the "cost of support services provided by other responsibility segments * * * and by

other reporting entities." We include other appropriations because our approach determines the allocability of indirect costs according to the organizational unit that provides the support services regardless of which appropriation has been charged with the costs. We begin with the total costs of organizational units and then allocate these costs to all units receiving support services.

Not all appropriations, however, are included as indirect costs. For example, charges under the Oil Spill appropriation are not included. Oil Spill disbursements support only the Oil Spill program and should not be allocated to other programs. State and Tribal Assistance Grants appropriations are also excluded. These are grants to states, local and tribal governments which fund a variety of environmental programs and infrastructure projects pertaining to water quality initiatives. Funding under the Science and Technology appropriation is excluded. These funds support research and development initiatives. The treatment of research and development costs is discussed under the section on direct costs. The programs funded by the appropriations listed above are considered to be separate from Superfund and have their own outputs. These appropriations do not include any indirect costs that are allocable to the Superfund program.

As explained below under Exclusions from the Pool, costs associated with certain organizational units are also removed from the indirect cost pool depending on their relationship to the Superfund program.

The concept of full cost, according to the Standard, also requires that inter-entity costs or the costs of services received from other entities be recognized. Costs of employee benefits funded by the Office of Personnel Management (OPM) are considered inter-entity costs and will be included as indirect costs. Because methodologies to estimate the costs of services received from federal agencies other than OPM are still under development, these costs are not included in the indirect cost pool at this time.

The methodology for determining indirect costs allocable to Superfund site-specific activities is patterned after private sector models that group costs according to levels of organization and benefit. Indirect costs are classified hierarchically. At the highest level are Agency-wide costs, i.e., national costs which benefit all organizations. Examples of these are facilities management, budget functions, human resource management, and OPM inter-

Federal Register / Vol. 65, No. 107 / Friday, June 2, 2000 / Notices    **35343**

entity costs. The next level incorporates regional costs which benefit each of the Agency's ten regions. These are general costs which are essentially counterparts of national costs but benefit regions only. Examples include the costs of regional administration, support, and policy and planning functions. Superfund program management costs comprise the next two levels. These are the support costs incurred at both headquarters and regions to implement Superfund site-specific activities. Costs from each of these four levels form the basis of the indirect cost pool. The final product—separate indirect cost rates for each of EPA's ten regions—will be expressed as a percentage of direct (site-specific) costs for each region.

*Direct Costs*

In determining the direct costs of the Superfund program, we use SFFAS No. 4's definition of direct costs. However, the direct costs of the Superfund program as a whole, are not necessarily synonymous with the direct costs of Superfund site-specific activities. Superfund site-specific activity is one component of the Superfund program.

Site-Specific Costs

The major component of Superfund direct costs is the costs of site-specific activities, *i.e.* the cost of all activities that go toward the assessment, investigation and actual clean up of a site, related enforcement actions, and other site-associated activities. Examples include, but are not limited to, the costs of salaries and benefits of employees who work directly at the site or provide other site-related effort, contractor costs of removal or remedial activities, and analytical work performed for the site.

Certain other Superfund-related costs are also considered direct costs, although they may or may not be associated with site-specific activities. These costs are described in the next several paragraphs.

ZZ Costs

"ZZ" costs are expenses incurred for site work before a site is established as a Superfund site and assigned a site-specific identifier. If a site-specific identifier is established, the ZZ costs incurred in connection with the site are reclassified to that site-specific identifier. If reclassified, they become part of direct site-specific costs, but for purposes of the indirect rate calculation, ZZ costs are classified as direct costs even if not reclassified.

R&D Costs

Research and Development (R&D) costs are treated as direct costs. All costs incurred within the Office of Research and Development, a separate and distinct organizational unit within the Agency, are excluded from the indirect cost pool. Research and Development costs are considered to be directly incurred for production of R&D outputs. Superfund-related research and development costs are mainly related to the Superfund Innovative Technology (SITE) program. This program evaluates the application of emerging remediation technologies.

NIEHS Costs

Costs associated with the National Institute of Environmental Health Sciences (NIEHS) interagency agreement (IAG) are treated as direct costs. This indirect cost methodology is designed to determine the indirect costs that support Superfund site-specific activities. Therefore NIEHS costs are excluded in their entirety from the indirect cost pool.

OSWER Immediate Office Program Area Costs

Costs associated with certain offices within the Office of Solid Waste and Emergency Response (OSWER) Immediate Office are treated as direct costs. Although these costs are related to the Superfund program and are direct costs of the functions they perform, they are not allocable to Superfund site-specific activities and so are not included in the indirect cost pool for site-specific response costs. For example, the Chemical Emergency Preparedness and Prevention Office (CEPPO), which reports directly to the OSWER Assistant Administrator, implements Agency-wide chemical emergency preparedness and prevention programs. The costs connected with Federal Facilities activities, whether within OSWER or OECA, as well as the costs of activities associated with Brownfields and the Emergency Planning and Community Right-to-know Act, are also considered direct and thus excluded from the indirect cost pool.

*Indirect Cost Pool*

The indirect cost pool consists of all costs classified as indirect for all appropriations that fund administrative, management and support functions. The pool includes Superfund non-site-specific costs that provide support to Superfund site-specific activities and the other direct Superfund activities. The indirect cost pool includes the non-site portion of: Personnel compensation and benefits, travel, rent,

communications, utilities, contracted services, materials and supplies costs. Depreciation and inter-entity costs are also included. The major organizational units contributing costs to the indirect cost pool are described below.

EPA headquarters organizations providing services on an Agency-wide or national basis include the Office of the Administrator, the Office of Administration and Resources Management (human resources, procurement, facilities), the Office of the Chief Financial Officer (Comptroller, budget, finance), the Office of Information Resources Management, the Office of Policy, Planning and Evaluation, the Office of the Inspector General and the Office of General Counsel. The ten EPA regional offices have corporate structures similar in function to those of headquarters. Each region has a regional administrator's office and offices providing general regional support services such as personnel, finance, policy and information management. Costs for these organizations comprise regional indirect costs.

Management and support costs associated with carrying out the Superfund program are another component of the indirect cost pool. These costs are incurred at both headquarters and the regions. At the headquarters level, these are the program management and support costs incurred by the Office of Solid Waste and Emergency Response (OSWER) and by the Office of Enforcement and Compliance Assurance (OECA). At the regional level, Superfund program management costs incurred by regional program divisions in support of Superfund site-specific activities are included in the indirect cost pool. Any of the offices noted above may also have Superfund site-specific charges. Those site-specific charges are subtracted from the total cost of the organization during the indirect cost computation.

The Superfund indirect cost pool, that is, the pool of indirect costs which is ultimately allocable to Superfund sites, will consist of proportionate amounts of Agency-wide, regional and program-related costs. In other words, the Superfund indirect cost pool will be comprised of only the portion of Agency-wide, regional and program-related costs which supports Superfund sites, with the remaining costs supporting all other Agency programs.

Exclusions From the Pool

Superfund non-site specific contractor costs, such as program management, that are distributed through the annual allocation process are excluded from the

indirect cost pool. Annual allocation is the process by which response action contractor non-site support costs are allocated to sites on which the contractor worked. The site-allocable portion of these contracts is removed from the pool because it is allocated to individual sites under a separate process and is treated as a portion of direct site-specific costs incurred by EPA.

Costs of organizational units that provide no direct or indirect support to Superfund are excluded. Examples include the Office of International Activities and certain organizations within the Office of the Administrator, such as the Science Advisory Board and the Office of Administrative Law Judges.

*Indirect Cost Base*

To properly distribute costs, the indirect cost base must reflect the services provided to each organizational recipient and finally, to the Superfund sites themselves. There are several intermediate allocations of costs, as described below, which use appropriate allocation bases. The choice of allocation base depends on the type of cost to be allocated.

Agency-wide or national indirect costs, also referred to as general and administrative (G&A) costs, are allocated using one of two allocation bases. Facilities, human resources and OPM inter-entity costs are allocated to all EPA organizations based on personnel compensation and benefits (PC&B) costs. The rationale for using PC&B costs as the allocation statistic is that these indirect costs are purely workforce-related and would not otherwise be incurred. Costs associated with other organizations providing Agency-wide benefits, such as procurement, budget, finance, information management, policy, planning, general counsel and inspector general, are distributed across the entire Agency based on total Agency costs. Depreciation will be allocated to all EPA organizations using appropriate cost accounting principles. We are in the process of gathering these costs and determining the appropriate allocation base. Depreciation costs will be incorporated into the rates as soon as possible.

The next level of indirect costs is regional costs which provide general and administrative support similar to that provided at the Agency-wide level. Regional G&A cost pools, including each region's share of national G&A, personnel and facilities costs, depreciation and inter-entity costs are distributed across the entire region based on total regional costs. This is

similar to the distribution of Agency-wide support costs across total Agency costs.

Headquarters program management and support costs incurred by OSWER and OECA must be allocated to program areas within each office of an EPA Assistant Administrator and to the regions. Program areas are designated by sub-organization or by funding vehicle such as interagency agreements which fund a particular type of activity. The allocation of headquarters program management and support costs is based on the total costs associated with each program area and region. The headquarters allocation base includes administrative and program costs from appropriations other than Superfund and Superfund site-specific and non-site-specific costs. The regional allocation base consists of regional site charges made within each office of an EPA Assistant Administrator.

The final Superfund indirect cost pool is allocated using Superfund site charges. These site charges include both headquarters and regional site charges, ZZ charges, site charges made under the Department of Justice (DOJ), Corps of Engineers, Bureau of Reclamation, *etc.,* interagency agreements and the Superfund response contract program management costs that are allocated to sites in a separate process. EPA charges arising from mixed funding settlements are direct site costs and are also included in the indirect cost base. The charges for the Agency for Toxic Substances and Disease Registry (ATSDR) are not included in the indirect cost base because their funding mechanism—a "transfer allocation"—does not result in a charge to EPA's accounting system. Again, instead of a rate per hour as in the current methodology, the indirect cost rate will be expressed as a percentage of direct (site) costs.

*Computation of Indirect Cost Rates*

Data used for the indirect cost computations are obtained from the Agency's Integrated Financial Management System.

The indirect cost pool supporting Superfund site-specific activities in each region for a given fiscal year consists of proportionate shares of the following: program management and support costs incurred by relevant units of EPA headquarters (including their share of nationwide G&A); the region's G&A; and the region's non-site Superfund costs.

The computation of the indirect cost rates consists of nine steps. A detailed document more fully describing the accounting methodology employed will

be released with the calculated rates by region by fiscal year. That document will contain a detailed description of each of the nine steps. Briefly, steps 1 and 2 compute the nationwide G&A rate and step 3 computes the regional G&A rates. Steps 4 through 9 perform various allocations and refinements of costs ensuring that the regional Superfund cost pools, which are summarized in step 9, reflect only costs by region associated with Superfund site-specific activities.

*Estimated Indirect Rates by Region*

As noted above, the revised indirect cost rate methodology will for the first time provide information on the full costs of the outputs of Superfund site-specific activities. The process of computing rates using the full cost methodology is ongoing. As noted above, the revised rates by region by fiscal year will not be issued for several months. In the meantime, we are providing an approximation of the rates that can be used as a means to estimate the full cost of Superfund site-specific activities. These rates are based on the average of preliminary computed rates for fiscal years 1994, 1997 and 1998. It should be noted that rates for any given region may vary considerably from year to year; therefore, the final calculated rates may differ from the estimated average rates listed below.

Estimated Rates*

*(Subject to Change)*
Region 1—30.0%
Region 2—30.8%
Region 3—43.6%
Region 4—48.1%
Region 5—41.6%
Region 6—29.0%
Region 7—54.4%
Region 8—35.1%
Region 9—40.9%
Region 10—38.6%

* Based on the average of preliminary rates for Fiscal Years 1994, 1997 and 1998.

The overall effect of implementing the full cost accounting methodology for Superfund indirect costs will be to increase the aggregate amount of indirect costs allocated to site-specific activities. As compared to indirect costs allocated using the current methodology, the indirect costs allocated to individual sites may increase or decrease, depending on a number of factors, and will not be known with certainty until all the rates are computed. The estimated rates provided above, however, may be used to predict generally the amount of indirect costs to be allocated to a particular site using the full cost accounting methodology.

Federal Register / Vol. 65, No. 107 / Friday, June 2, 2000 / Notices     35345

To apply these rates to an individual site, identify the total direct site-specific costs of that site (including any DOJ costs but excluding any ATSDR costs) and multiply that total by the appropriate region's indirect cost rate. If you have total site costs including indirect costs using the current labor hours-based rates, total direct site-specific costs consists of the total site costs minus the previously-assessed indirect costs. Adding the direct site-specific costs and the indirect costs calculated under the new methodology will result in the full cost of that site.

[FR Doc. 00–13845 Filed 6–1–00; 8:45 am]

BILLING CODE 6560–50–P

## FEDERAL COMMUNICATIONS COMMISSION

### Public Information Collections Approved by Office of Management and Budget

May 25, 2000.

The Federal Communications Commission (FCC) has received Office of Management and Budget (OMB) approval for the following public information collections pursuant to the Paperwork Reduction Act of 1995, Public Law 104–13. An agency may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a currently valid control number. For further information contact Shoko B. Hair, Federal Communications Commission, (202) 418–1379.

**Federal Communications Commission**

*OMB Control No.:* 3060–0927.
*Expiration Date:* 05/31/2003.
*Title:* Auditor's Annual Independence and Objectivity Certification.
*Form No.:* N/A.
*Respondents:* Business or other for-profit.
*Estimated Annual Burden:* 7 respondents; 10 hours per response (avg). 70 total annual burden hours.
*Estimated Annual Reporting and Recordkeeping Cost Burden:* $0.
*Frequency of Response:* On occasion; Annually.
*Description:* The Responsible Accounting Officer Letter (RAO) 28, released December 1, 1999 requires that carriers' independent auditors disclose in writing all relationships between the auditor and its related entities and the carrier and its related entities that in the auditor's professional judgment may reasonably be thought to bear on independence; confirm in writing in its professional judgment it is independent of the carrier; and discuss the auditor's

independence. The information will be used to determine whether the auditors are performing their audits independently and unbiased of the carrier they audit. Obligation to respond: Mandatory.

*OMB Control No.:* 3060–0514.
*Expiration Date:* 05/31/2003.
*Title:* Section 43.21(b)—Holding Company Annual Report.
*Form No.:* N/A.
*Respondents:* Business or other for-profit.
*Estimated Annual Burden:* 20 respondents; 1 hour per response (avg.); 20 total annual burden hours.
*Estimated Annul Reporting and Recordkeeping Cost Burden:* $0.
*Frequency of Response:* Annually.
*Description:* The SEC 10K Form is needed from holding companies of communications common carriers to provide the Commission with the data required to fulfill its regulatory responsibilities and by the public in analyzing the industry. Selected information is compiled and published in the Commission's annual common carrier statistical publication. Obligation to respond: Mandatory.

*OMB Control No.:* 3060–0894.
*Expiration Date:* 05/31/2003.
*Title:* Certification Letter Accounting for Receipt of Federal Support, CC Docket Nos. 96–45 and 96–262.
*Form No.:* N/A.
*Respondents:* State, Local or Tribal Government.
*Estimated Annual Burden:* 51 respondents; 3 hours per response (avg.); 153 total annual burden hours.
*Estimated Annual Reporting and Recordkeeping Cost Burden:* $0.
*Frequency of Response:* On occasion; Annually.
*Description:* The Commission requires states to certify that carriers within the state had accounted for its receipt of federal support in its rates or otherwise used the support pursuant with Section 254(e). A state may file a supplemental certification for carriers not subject to the state's annual certification. This information will be used to show that federal high-cost support is being provided to the carrier to assist in keeping rates affordable in those subscribers' area. Further, the collection of information will be used to certify that the carriers have accounted for its receipt of federal support in its rates or otherwise used the support for the provision, maintenance, and upgrading of facilities and services for which the support is intended in accordance with section 254(e). Obligation to respond: Required to obtain or retain benefits.

*OMB Control No.:* 3060–0755.

*Expiration Date:* 05/31/2003.
*Title:* 47 CFR Sections 59.1–59.4—Infrastructure Sharing.
*Form No.:* N/A.
*Respondents:* Business or other for-profit.
*Estimated Annual Burden:* 75 respondents; 31 hours per response (avg.); 2325 total annual burden hours.
*Estimated Annual Reporting and Recordkeeping Cost Burden:* $0.
*Frequency of Response:* On occasion; Third party disclosure.
*Description:* In CC Docket No. 96–237, the Commission implemented the infrastructure sharing provisions of the Communications Act of 1934, as amended. Section 259 requires incumbent LECs to file any arrangements showing the conditions under which they share infrastructure. See also 47 CFR Section 59.2. (No. of respondents: 75; hours per response: 15; total annual burden: 375 hours). Section 259 also requires incumbent LECs to provide information on deployments of new services and equipment to qualifying carriers. See also 47 CFR Section 59.3 (No. of respondents: 75; hours per response: 24 hours; total annual burden: 1800 hours). The Commission requires incumbent LECs to provide 60-day notices prior to terminating section 259 agreements. See 47 CFR Section 59.2. (No. of respondents: 75; hours per response: 2 hours; total annual burden: 150 hours). The information collected under the requirement that incumbent LECs file any tariffs, contracts or other arrangements for infrastructure sharing would be made available for public inspection. The information collected under the requirement that incumbent LECs provide timely information on planned deployments of new services and equipment would be provided to third parties. The information collected under the requirement that providing incumbent LECs furnish sixty days notice prior to termination of a section 259 sharing agreement would be provided to third parties to protect customers from sudden changes in services. Obligation to respond: Mandatory.

*OMB Control No.:* 3060–0933.
*Expiration Date:* 11/30/2000.
*Title:* Community Broadband Deployment Database Reporting Form.
*Form No.:* FCC Form 460.
*Respondents:* Not-for-profit institutions; Federal Government; State, Local or Tribal Government.
*Estimated Annual Burden:* 30 respondents; .25 hours per response (avg.); 7 total annual burden hours.
*Estimated Annual Reporting and Recordkeeping Cost Burden:* $0.