IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., ET AL., | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ADVANCED ENVIRONMENTAL | : | NO. 02-3830 |
| TECHNOLOGY CORPORATION, ET AL., | : | |
| | : | |
| Defendants. | : | |

ORDER

Presently before the Court are defendants' joint Motion for Partial Summary Judgment as to Plaintiffs' Claim for Contribution Toward Certain USEPA Past Costs (Doc. No. 292), Plaintiffs' Response in Opposition (Doc. No. 297), and Defendants' Reply (Doc. No. 304). After careful review, and for the reasons set forth below, defendants' Motion (Doc. No. 292) is DENIED.[1]

I. Factual and Procedural Background

In May of 1984, Environmental Protection Agency ("EPA") began a site inspection of Boarhead Farms ("the Site"). (Defs.' Mot. Summ. J., Ex. 1, page 2.) The agency issued a final site inspection report in January 1986. (Id.) "In response to a release or a substantial threat of a release of a hazardous substance(s) EPA commenced on December 5, 1989, a Remedial Investigation and Feasibility Study." (Defs.' Mot. Summ. J., Ex. 6, ¶ H.) Thereafter, in March

---

[1] The present Motion for Partial Summary Judgment (Doc. No. 292) was jointly filed by Advanced Environmental Technology Corporation, Ashland, Inc., Carpenter Technology Corporation, fcg, inc. (a/k/a Flexible Circuits, Inc.), Handy & Harman Tube Company, Inc., and NRM Investment Company (collectively referred to as "defendants").

1

1989, the Site was placed on the National Priorities List. (Defs.' Mot. Summ. J., Ex. 1, page 2.) On September 4, 1992, EPA granted a waiver pursuant to 42 U.S.C. § 9604(c)(1)(C), allowing expenditures at the Site to exceed the statutory limit of two million dollars. Years later, EPA completed the Remedial Investigation in January 1997 and the Feasibility Study in July 1997. (Id. at 2-3.)

On January 5, 1998, EPA issued a proposed plan for comprehensive cleanup. (Defs.' Mot. Summ. J., Ex. 6, ¶ J; Defs.' Mot. Summ. J., Ex. 1, page 3.) Following a period for public comment, on November 18, 1998, EPA issued a Record of Decision. (Defs.' Mot. Summ. J., Ex. 6, ¶ K.) After issuance of the Record of Decision, EPA decided to divide its activities at the Site into two operable units.

On May 2, 2000, EPA filed a complaint in the District Court for the Eastern District of Pennsylvania. (Civil Action 00-2248 Compl.) The Court entered a Consent Decree with respect to that complaint on September 28, 2000. (Pls.' Mot. Opp'n, Ex. C.) In the Consent Decree, plaintiffs agreed to perform Operable Unit 1 ("OU-1") and to reimburse EPA for its administrative and oversight costs in the future. (Pls.' Fifth Am. Compl. ¶ 17.)

On December 6, 2001, EPA filed a second complaint in the District Court for the Eastern District of Pennsylvania. (Civil Action 01-6109 Compl.) The Court entered a Consent Decree on March 14, 2002, for the second complaint. (Pls.' Mot. Opp'n, Ex. D.) In the second Consent Decree, plaintiffs agreed to perform Operable Unit 2 ("OU-2"), reimburse EPA "both for $7,000,000 in response costs incurred and accounted for prior to July 2000 ("Past Response Costs") and for an as yet undetermined amount of response costs incurred subsequent to July 2000 ("Interim Response Costs")," and to reimburse EPA for its future response costs with

respect to OU-2.  (Pls.' Fifth Am. Compl. ¶ 20.)

The litigation presently before this Court began in June 2002, when plaintiffs filed a complaint under the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. § 9601, *et seq.*, ("CERCLA") and the Pennsylvania Hazardous Sites Cleanup Act, 35 Pa. Cons. Stat. § 6020.101 *et seq.*, ("HSCA") for the recovery of costs incurred and to be incurred in response to the release or threatened release of hazardous substances at the Site.  Plaintiffs recently filed a Fifth Amended Complaint (Doc. No. 282) with defendants answering shortly thereafter (Doc. Nos. 283-288).  The defendants now move for partial summary judgment with respect to plaintiffs' claims for contribution as to certain EPA past costs.  (Doc. No. 292.)

II.  Legal Standard

In considering a motion for summary judgment, the court must examine "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," to determine whether there is any "genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In ruling on the motion, the court must draw all reasonable inferences in the light most favorable to the nonmoving party, and "may not weigh the evidence or make credibility determinations." Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255. Therefore, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993).

III. Discussion

CERCLA contains several statutes of limitations, the applicability of which depends on the type of recovery sought. For purposes of this motion, the appropriate statute of limitations is for recovery of costs, which is as follows:

> (2) Actions for recovery of costs
>
> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced--
>
> > (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
> >
> > (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). Thus, the three-year statute of limitations to recover costs for a removal action is triggered by the completion of the removal action, whereas the six-year statute of limitations to recover costs for a remedial action is triggered by the commencement of physical on-site construction. Id. However, for purposes of a removal action, if a waiver is granted under 42 U.S.C. § 9604(c)(1)(C), an action for recovery of costs must be brought within six years after EPA's determination to grant the waiver. "The six years begins to run from the date the 'consistency' exemption is granted." United States v. Horne, 2006 WL 2506447 *2 (W.D. Mo. 2006).

In order to apply the statute of limitations, it is necessary to know what type of activities can be considered part of a "removal action" and what type of activities can be considered part of

4

a "remedial action". The term "removal" is statutorily defined as:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

42 U.S.C. § 9601(23). Remedial action is defined as:

> [T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24). Courts have long lamented these vague definitions, which, in practice, provide little help in determining when the statute of limitations begins to run.

See e.g. United States v. W.R. Grace & Co., 429 F.3d 1224, 1241 (9th Cir. 2005)("Congress did not draw a clear line between removal and remedial actions . . . ."); United States v. Sensient Colors, Inc., 2007 WL 3227179 (D. N.J.); Cal. Dept. of Toxic Substances v. Alco Pac., 308 F. Supp. 2d 1124, 1135 (C.D. Cal. 2004)("[E]mphasis on semantics, however, is probably inappropriate given the vague and overlapping definitions of the terms 'removal' and 'remedial.'"); United States v. Mottolo, 605 F.Supp. 898, 902 (D. N.H. 1985)("CERCLA has acquired a well-deserved notoriety for vaguely-drafted provisions and an indefinite, if not contradictory, legislative history."). Additionally, several courts note that the definitions of removal and remedial are so broad that cleanup activities can fall within both definitions. See e.g. Geraghty and Miller, Inc. v. Conoco Inc., 234 F.3d 917, 926 (5th Cir. 2000)("[T]he CERCLA definitions are expansive enough that certain activities may well be covered by both.").

In the instant motion, Defendants assert that there were four separate removal actions at the Site. (Defs.' Mot. Summ. J. at 4-5, Ex. 1.) Defendants argue that at the time the plaintiffs signed the OU-2 Consent Decree, EPA's claims to recover the costs of the first and second removal actions were barred by the statute of limitations. Defendants therefore contend that the plaintiffs were not liable for those costs and, as such, there was no common liability for purposes of the contribution action plaintiffs now maintain against defendants. In their opposition, plaintiffs, make several counter-arguments, one of which is that there is a genuine issue of material fact as to whether the cleanup

constituted one or several removal actions.[2] (Pls.' Mot. Opp'n.)

Defendants assert that the first removal action reached completion in 1992 (Defs.' Mot. Summ. J. at 10, Ex. 1) and the second removal action was completed in 1993 (Id. at 10, Ex. 1). In support of this contention, defendants cite EPA's November 18, 1998 Record of Decision ("ROD") which states, "EPA has conducted three removal actions at the Boarhead Farms Site. During the first two, one each in 1992 and 1993, over 2500 buried drums were located, excavated and disposed of offsite . . . ." (Defs.' Mot. Summ. J., Ex. 1, page 3.) Additionally, the EPA website printout announcing the proposed plan for the Site mentions four separate removal actions. (Id. at Ex. 3.)

However, in defendants' second exhibit–the September 4, 1992 waiver approval–there is conflicting language. The waiver refers to a single removal action continuing into the future. (Id. at Ex. 2.) For example, EPA granted the waiver in order to "*further characterize* the property and properly secure and dispose of the hazardous materials encountered at the site." (Defs.' Mot. Summ. J., Ex. 2, page 2 (emphasis added).) Additionally, the OU-1 Consent decree refers to a single removal action that began in 1992 and continued as of the time that the Consent decree was lodged with the Court–September 26, 2000. (Pls.' Mot. Opp'n, Ex. C, page 2.)

It is also notable that the descriptions of the four removal actions in the ROD appear to leave out many cleanup activities discussed in other documents that could be

---

[2]Because there is a genuine issue of material fact as to the number of removal actions, the timing of the removal action(s) as well as the timing of other relevant factors not addressed by either side, plaintiffs' alternative arguments will not be addressed at this stage of the proceedings.

considered removal activities. For example, the OU-1 Consent decree discusses activities[3] that could fall under the definition of "removal" but were not part of any of the activities discussed in the ROD in connection with the four removal actions. (Id. at Ex. C, page 3.) Additionally, the EPA Past Costs Report and Federal On-Scene Coordinator's Report (Pls.' Mot. Opp'n, Ex. A, F) contain documentation of cleanup activities that could be considered "removal" but were not mentioned in connection with the four removal actions discussed in the ROD.

In sum, it is impossible to determine from the evidence submitted by both parties the number of removal actions and, thus, the completion date(s) of the removal action(s). Because the four removal actions listed in the ROD appear to omit a substantial portion of the activity at the Site, compare Defs.' Mot. Summ. J., Ex. 1 with Pls.' Mot. Opp'n, Ex. 1, it is not clear that the document's categorization of the removal activity into four removal actions should be adopted by this Court. Additionally, other documents submitted by the parties refer to a single, continuous removal action and yet others indicate that the removal activities were interrelated. (See Defs.' Mot. Summ. J., Ex. 2; Pls.' Mot. Opp'n, Ex. A, C, F.) For these reasons, a genuine issue of material fact is presented as to the number and duration of the removal action(s), and thus as to the statute of limitations.

---

[3] The Ecological Risk Assessment, the Baseline Risk Human Health Risk Assessment, the Remedial Investigation, and the Feasibility Study are all activities that could be characterized as removal activities as they may have been conducted for the purpose of assessing or evaluating the Site. See 42 U.S.C. § 9601(23).

IV.  Conclusion

And now, this 22nd day of April 2008, upon consideration of Defendants' Motion for Partial Summary Judgment as to Plaintiffs' Claim for Contribution Toward Certain USEPA Past Costs (Doc. No. 292), Plaintiffs' Response in Opposition (Doc. No. 297), and Defendants' Reply (Doc. No. 304), is it ORDERED that the Motion is DENIED.

BY THE COURT:

/S/LEGROME D. DAVIS

Legrome D. Davis, J.