IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AGERE SYSTEMS, INC., ET AL., : | |
| : | CIVIL ACTION |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| ADVANCED ENVIRONMENTAL : | NO. 02-3830 |
| TECHNOLOGY CORPORATION, ET AL., : | |
| : | |
| Defendants. : | |

ORDER

Presently before the Court are defendant Ashland's Motion for Partial Summary Judgment (Doc. No. 294), plaintiffs' Response in Opposition (Doc. No. 299), Defendant's Reply (Doc. No. 303), and plaintiffs' Sur-reply (Doc. No. 314). After careful review, and for the reasons set forth below, defendant Ashland's Motion for Partial Summary Judgment (Doc. No. 294) is DENIED.

I.  Factual and Procedural History

Since 1969, the Boarhead Farms Superfund Site (the "Site"), which is located in Bucks County, Pennsylvania, has been owned by Manfred DeRewal. (Fifth Am. Compl. ¶ 1-3.) In 1969, Manfred DeRewal "incorporated and operated DeRewal Chemical Company, Inc." ("DCC"), a hauler of waste materials. (Id. at 2.) From the time DeRewal purchased Boarhead Farms until 1977, the Site was used for the disposal of hazardous substances. (Id. at ¶ 4.)

After several years of inspection, the United States Environmental Protection Agency ("EPA") placed the Site on the National Priorities List pursuant to 40 C.F.R. Part 300 and 42

1

U.S.C. § 9605(a). (Id. at ¶ 8-10.)  Since that time, extensive cleanup activity, including the location, excavation, and removal of contaminated soil and drums, the treatment of contaminated groundwater, and the removal of radioactive waste, has occurred at the Site. (Id. at ¶ 11-15.)  In 1998, EPA issued a Record of Decision outlining the continuing remedial action required for the Site. (Id. at 14.)  Though plaintiffs deny liability under CERCLA Section 107, they have agreed to collectively fund and perform the cleanup effort. (Id. at 16-21.)

Plaintiffs seek to recover their expenses under CERCLA §§ 107(a) and 113(f). (Id. at ¶ 61-74.)  They also request a declaratory judgment on liability against defendants under CERCLA § 113(g)(2). (Id. at ¶ 75-77.)  Lastly, plaintiffs seek recovery under the Pennsylvania Hazardous Sites Cleanup Act. (Id. at ¶ 78-85.)

In the Fifth Amended Complaint, plaintiffs allege that Advanced Environmental Technology Company ("AETC") arranged with DCC for the disposal of hazardous substances from Ashland Chemical Company ("Ashland"). (Id. at ¶ 33-34.)  "In or around the summer of 1976, Ashland retained [AETC] to arrange for the pick up and disposal of certain chemical wastes from Ashland's Great Meadows facility. [DCC] was one of the transporters that AETC then retained to pick up and dispose of Ashland's wastes from its Great Meadows facility." (Ashland's Mot. for Summ. J. at 3.)  Plaintiffs allege some of the waste DCC hauled from the Ashland facility was disposed at the Boarhead Farms Site. (Id. at ¶ 33-38.)

Ashland now moves for partial summary judgment in this matter. (Doc. No. 294.) Specifically, Ashland argues that although plaintiffs allege that six types of Ashland waste were disposed at the Site, no genuine issue of material fact is presented as to five of the types of waste. (Ashland's Mot. Summ. J., page 6.)  As such, Ashland requests this Court to grant summary

judgment as to plaintiffs' claims (and defendants' cross-claims) that Ashland's dye waste, pthalide acid waste, CDN waste, drummed solvent waste, and bulk solvent waste were disposed at the Site.[1]

II. Legal Standard

In considering a motion for summary judgment, the court must examine "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," to determine whether there is any "genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on the motion, the court must draw all reasonable inferences in the light most favorable to the nonmoving party, and "may not weigh the evidence or make credibility determinations." Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255. Therefore, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993).

III. Discussion

In order to establish a claim for cost recovery under CERCLA § 107(a), plaintiffs have the burden of establishing: (1) that the defendant is a PRP; (2) that a hazardous substance was disposed at a facility; (3) that there was a release or threatened release of a hazardous substance;

---

[1] Ashland concedes that there is a genuine issue of material fact as to whether Ashland's spent/mixed acid waste was disposed at the Site. (Ashland's Mot. Summ. J., page 6-7.)

and (4) that the release or threatened release required or will require the plaintiff to incur response costs. N.J. Turnpike Auth. v. PPG Industries, Inc., 197 F.3d 96, 103-04 (3d Cir. 1999). To establish a § 113(f) contribution claim, plaintiffs have the burden of establishing the same four elements as under § 107(a) and, in addition, the burden of "demonstrating each defendant's equitable share of the costs." Elementis Chromium L.P. v. Coastal States Petroleum Co., 450 F.3d 607, 612 (5th Cir. 2006)(citing Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 348 (6th Cir.1998); Minyard Enters., Inc. v. Se. Chem. & Solv. Co., 184 F.3d 373, 385 (4th Cir.1999).) See also Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 168 (2d Cir. 2002)(stating that plaintiffs have burden under § 113(f) of establishing both liability under § 107(a) and equitable apportionment of response costs); PPG Indus., Inc., 197 F.3d at 104 n.7 (same).

Thus, in order to succeed on their §§ 107(a) and 113(f) claims against Ashland, plaintiffs must demonstrate that Ashland's waste was disposed at the Site. For purposes of CERCLA, "dispose" is statutorily defined as:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 9601(29)(incorporating by reference the definition of "disposal" from the Solid Waste Disposal Act, 42 U.S.C.A. § 6903(3).)

Plaintiffs contend that during the time period referred to as the "Wissinoming Period", June 1, 1976 through March 30, 1977, Ashland arranged for the disposal of six types of waste: (1) Spent/Mixed Acid in bulk; (2) Dye Waste Water in bulk; (3) Phthalide Waste Water in bulk;

4

(4) CDN Waste Water in bulk; (5) Solvents in bulk; and (6) Solvents in drums.  (Pls.' Mot. Opp'n, Ex. 4.)  Plaintiffs contend that "15% of all wastes handled by DCC after opening DCC's Wissinoming operation on June 1, 1976 until March 29, 1977 were disposed of at the Site, except that 25% of the wastes believed by the DCC drivers to consist of nitrating acids were disposed of at the Site during this period."[2] (Ashland's Mot. Summ. J., Ex. 1, page 73.)  Moreover, plaintiffs assert that the following volumes of waste were arranged for disposal by Ashland and hauled by DCC drivers:  216,650 gallons of nitric acid; 185,300 gallons of dye waste; 50,000 gallons of phthalide waste; 86,410 gallons of CDN waste; 12,950 of solvents in bulk; and 4,345 gallons of solvents in drums.  (Id. at Ex. 1, Ex. B, page 1.)  Using the percentage that plaintiffs allege represents the fraction of Ashland's waste disposed at the Site, plaintiffs contend that the following volumes of Ashland waste were disposed of at the Site: 54,163 gallons of spent/mixed acid in bulk; 46,325 gallons of dye waste water; 12,500 gallons of phthalide waste water; 21,603 gallons of CDN waste water; 3,238 gallons of solvents in bulk; and 652 gallons of solvents in drums.  (Id. at Ex. 1, Ex. B, page 1.)

In its motion for summary judgment, Ashland first contends that only the waste generated at its Great Meadows, New Jersey facility is involved in this case.  (Ashland's Mot. Summ. J. at 3.)  Plaintiffs do not appear to dispute this contention.  Ashland next asserts that, during the

---

[2] Plaintiffs apparently contend that although the DCC drivers were hauling spent/mixed acid, dye waste, phthalide waste, CDN waste, and solvents in bulk, they believed they were hauling nitrating acids.  (See Ashland's Mot. Summ. J., Ex. 1 at 73 and Ex. 1, Ex. B, page 1.)  This contention is supported by the deposition testimony and the bills of lading.  Compare Pls.' Mot. Opp'n, Ex. 3 with Pls.' Mot. Opp'n, Ex. 4.)

Wissinoming Period, DCC primarily used its Philadelphia facility for disposal of wastes.[3] (Id. at 4.) Plaintiffs have stated as much in their answers to defendants' contention interrogatories. (Id. at Ex. 1, pages 29-33.) Next, Ashland asserts that its Great Meadows Facility generated six distinct types of waste for disposal during the relevant time period. (Id. at 5.) Again, plaintiffs

---

[3]Ashland notes that DCC was using other sites as well including: (1) An Allentown facility; (2) William Carriccino's facility in Elizabeth, New Jersey; (3) Blosinski's Landfill off Route 100; (4) A landfill under the Platt Bridge in Philadelphia; (5) G.R.O.W.S. Landfill; and (6) A disposal site in Kingwood, Pennsylvania. The DCC drivers did testify to using other disposal locations on occasion. Manfred DeRewal Junior ("Freddie DeRewal") testified that one or two loads of acid were taken to Allentown. (Ashland's Mot. Summ. J., Ex. 12, page 265.) Freddie DeRewal also testified that he personally took waste to G.R.O.W.S. landfill on two occasions, and that he believed that other DCC drivers might also have went there on occasion. (Id. at Ex. 12, page 252-53.) Freddie DeRewal testified that he "might have been" to a disposal site off of Route 100 two times. (Id. at Ex. 12, page 253.) He also testified that he used the disposal location under the Platt Bridge one time and that no other DCC driver used that disposal location. (Id. at Ex. 12, page 257.) Lastly, Freddie DeRewal stated that he "might have taken one or two loads" to a facility in Elizabeth, New Jersey. (Id. at Ex. 12, page 267.)

First, it is unclear why Freddie DeRewal's testimony that he disposed of waste one or two times at several other locations bears on whether he disposed waste during the Wissinoming Period at the Boarhead Farms Site. Nothing in Freddie DeRewal's testimony is inconsistent with his testimony that he disposed of Ashland waste at the Boarhead Farm Site. (See Pls.' Mot. Opp'n, Ex. 3, Dep. of Manfred DeRewal, Jr. at 68:1-4; 404:1-6.) Additionally, it is completely unclear when Freddie DeRewal used the above-mentioned facilities. There is nothing in the excerpted deposition testimony indicating that the use of any of the six named locations (the Allentown facility, the Elizabeth, New Jersey facility, Blosinski's Landfill, the Platt Bridge Landfill, G.R.O.W.S. Landfill, or the Kingwood, Pennsylvania facility) took place during the relevant Wissinoming Period. (See e.g. Id. at Ex. 12, page 251 (Question: "[Disposal at G.R.O.W.S.] occurred sometimes between '72 and '78?" Answer: "That's correct.").)

John Barsum, another DCC driver, stated that he took waste for disposal to a facility in Kingwood, Pennsylvania. (Id. at Ex. 13, page 244.) Barsum states that waste was disposed of at Kingwood "before Philly," meaning before DCC began disposing of waste at its Philadelphia locations, one of which was the Wissinoming facility. (Id. at Ex. 13, page 245. See also Ashland Mot. Summ. J., Ex. 13, page 248 (Question: "And were there tankers like that or they just never went to Boarhead, they went directly to Frenchtown [Kingwood]?" Answer: "Yeah, he didn't bring it up when he couldn't get up there, he went to Kingwood there, Frenchtown." Question: "And what time period was this, when things were– " Answer: "When things got tight be about '76, '75. But I'm just, close as I can remember.").) Because DCC used the Kingwood facility prior to obtaining the Philadelphia locations, any disposal of waste at the Kingwood facility is outside the Wissinoming Period and therefore irrelevant to the disposal of Ashland's waste.

do not appear to dispute this contention. (Id. at Ex. 1, Ex. B, page 1.)

Ashland next asserts that, even if the deposition testimony of the DCC drivers is credited,[4] the only waste generated by Ashland that was disposed of at the Boarhead Site was the spent/mixed nitrating acid. (Id. at 6.) The crux of Ashland's argument is that plaintiffs have insufficient evidence to raise a genuine issue of material fact that Ashland's five other waste streams were disposed of at the Site. In other words, Ashland argues that no reasonable factfinder could find that Ashland's dye waste, phthalide waste, CDN waste, bulk solvent waste, and drummed solvent waste were disposed of at the Site.

> A. There is Sufficient Evidence for a Reasonable Factfinder to Determine that Ashland's Dye Waste, Phthalide Waste, and CDN Waste were Disposed of at the Boarhead Farms Site.

In its Motion for Partial Summary Judgment, Ashland asserts "[t]he sole evidence upon which Plaintiffs rely to try to connect Ashland's waste to the Boarhead Farm Site is deposition testimony given in this case by three drivers formerly employed by DCC . . . ." (Ashland Mot. Summ. J. at 7.) This statement is inaccurate. Plaintiffs rely on deposition testimony, bills of lading, correspondence, memoranda, EPA information requests, DCC invoices, waste ledger sheets, photographs, etc. (Id. at Ex 1, page 39-43.) Plaintiffs' evidence is sufficient to create a genuine issue of material fact as to the disposal of Ashland's dye waste, phthalide waste, and

---

[4]Ashland argues that the DCC drivers' testimony should not be credited to the extent that it differs from their testimony given in 1997. (See Ashland Mot. Summ. J., Ex. 10-12.) Even assuming that the 1997 deposition testimony stands in direct contradiction to the 2003 deposition testimony, the Court must draw all inferences in favor of the plaintiffs and cannot disregard the more recent evidence.

CDN waste.[5]

> First, Manfred DeRewal, Junior ("Freddie DeRewal") testified as follows:
>
> Question:  What kind of waste did you pick up at Ashland?
> Answer:  That was a sulfuric nitric mix, I was told.
> Q:  That was going to be my next question.
> A:  Organics.
> Q:  How do you know what it was?
> A:  Well, I believe it was typed on the Bill of Lading, sulphuric nitric.  Never know organics, or anything, I'm no chemist, so.
> Q:  We only want to know what you know and how you know it.  Did anybody at the facility ever tell you what it was you were picking up?
> A: Not that I can remember.

(Pls.' Mot. Opp'n, Ex. 3, Dep. of Manfred DeRewal, Jr. [hereinafter "DeRewal, Jr. Dep."] at 65:18-66:5.)  Later in his deposition, Freddie DeRewal made it clear that he did not know exactly what type of chemical waste he was hauling, and that he made assumptions based on the information contained in the bills of lading.

> Q:  Okay.  Mr. DeRewal, do you recall testifying yesterday that as a general matter your knowledge as to what type of chemical you were hauling was based on what the bill of lading said?
> A:  That's correct.
> Q:  And specifically as to the Ashland waste products that you hauled, is it also accurate to say that your knowledge of what type of chemical was based solely on the bill of lading?
> A:  That's correct. . . .
> . . .
> Q:  Looking at that first bill of lading, Bates Number 60 on it, if you look to the description, it says 'One tank truck containing spent mixed acid.'  Did I read that correctly?
> A:  That's correct.

---

[5]The Court will only discuss that evidence which is sufficient to create a genuine issue of material fact as to the disposal of Ashland's various waste streams at the Boarhead Farms Site.  Specifically, the Court will address Manfred DeRewal, Junior's deposition testimony, the bills of lading, and Jurgen H. Exner's expert testimony.  However, the Court notes that plaintiffs have submitted additional evidence which likewise supports their theory as to the disposal of Ashland's waste at the Site.

> Q: Looking at that description, how is it that you know that spent mixed acid is a sulphuric nitric mixed?
> A: You wouldn't know.
> Q: So is it fair to say that you just assumed when you saw 'spent mixed acid' that that was a sulphuric nitric mix?
> A: Yes. And depending on what type of tank truck you would be using.
> Q: And does that assumption hold true for each of the bills of lading?
> A: Yes.

(DeRewal, Jr. Dep. at 405:4-13; 414:3-19.) Additionally, Freddie DeRewal identified his signature on numerous bills of lading, (See Id. at 415:13-416:3), which indicate that he hauled Ashland's spent/mixed acid, CDN waste water, dye waste water, and phthalide waste water. (See Pls.' Mot. Opp'n, Ex. 4.) Moreover, plaintiffs' expert witness, Jurgen H. Exner, Ph.D., indicates that the dye waste water contained "high concentrations of nitric and sulfuric acid," (Pls.' Mot. Opp'n, Ex. 2, page 5), and the phthalide waste stream contained about 1.5% sulfuric acid (Id. at 6).[6]

Lastly, Freddie DeRewal testified that he disposed of Ashland's waste at the Boarhead Farms Site.

> Q: On how many occasions total do you think you went to pick up waste at Ashland?
> A: 25-30.
> Q: When you first went to Ashland to pick up waste, was the Wissinoming facility open yet?
> A: Yes, it was.
> Q: Where did you take these 25-30 loads of Ashland waste for disposal?
> A: From what I could remember, on the first tank truckload that we pulled out of Ashland went to Wissinoming.
> . . .

---

[6] The Court acknowledges that Arthur Curly's deposition testimony describes the dye waste water as "a very dilute wastewater with a pretty intense color from the dye." (Ashland's Mot. Summ. J., Ex. 16 (submitted on the Electronic Court Filing ("ECF") System as Ex. 18), page 69.) However, for purposes of a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.

> Q: Okay. Where did you personally–other than Wissinoming, where did you personally take Ashland waste?
> A: Boarhead Farms.
> Q: How many loads of Ashland waste did you take to Boarhead Farms for disposal, you personally?
> A: Eight to 15.
> . . .
> Q: "You testified a few minutes ago that Ashland's sulphuric nitric mix was at times taken to the Wissinoming facility and flushed down the sewer?"
> A: "That's correct."
> Q: "Can you tell me what percentage of the sulphuric nitric mix that you hauled for Ashland was disposed of at the Wissinoming facility?"
> A: "Myself, maybe four to five loads."
> Q: "And where was the rest disposed of?"
> A: "Boarhead Farms."

(DeRewal, Jr. Dep. at 66:13-24; 68:1-7; 403:22-404:6.)

This evidence is sufficient to raise a genuine issue of material fact as to the disposal of the dye waste water, the phthalide waste water, and the CDN waste water at the Boarhead Farms Site. Freddie DeRewal identified his signature on numerous bills of lading which indicate that he hauled spent acid, CDN waste water, dye waste water, and phthalide waste water from the Ashland facility in Great Meadows, New Jersey. All told, there are twenty-three bills of lading bearing Freddie DeRewal's signature. Additionally, Freddie DeRewal testified that he personally disposed of Ashland's waste eight to fifteen times at the Site. As such, it is a reasonable inference that Freddie DeRewal disposed of some of the spent acid, CDN waste water, dye waste water, and the phthalide waste water at the Site.

Although Ashland asserts that Freddie DeRewal only disposed spent/mixed nitrating acid at the Site, the Court finds this argument unpersuasive. First, Freddie DeRewal's deposition testimony indicates that he did not know exactly what type of chemical waste he was picking up from the Ashland facility, but that he assumed it was a mix of sulfuric and nitric acid.

Additionally, Freddie DeRewal acknowledged his signature on numerous bills of lading which state that he hauled CDN waste water, dye waste water, and phthalide waste water from the Ashland facility.  Moreover, nothing in Freddie DeRewal's testimony indicates that he believed he *only* hauled spent/mixed nitrating acid, that he disagreed with the bills of lading that bore his signature, or that the bills of lading misrepresented the waste being hauled.  Lastly, there is the added confusion that not only did the spent/mixed acid contain sulfuric and/or nitric acid, but the dye waste water and the phthalide waste water also contained either sulfuric or nitric acid or both.

      Lastly, Ashland's description of Freddie DeRewal's testimony is inaccurate.  Ashland's Motion for Partial Summary Judgment states:

> While DeRewal testified that he took most of this acid waste to the Wissinoming Facility, he further testified that he took eight to fifteen loads to the Boarhead Farm Site for disposal.  At no time did DeRewal testify that he took any other type of Ashland-generated waste to the Boarhead Farm Site or, for that matter, that he even picked up any other waste at all.

(Ashland's Mot. Summ. J. at 9 (internal citations omitted).)  This interpretation of Freddie DeRewal's testimony is unfair.  Freddie DeRewal specifically stated that he took eight to fifteen loads of waste to the Site.  (DeRewal, Jr. Dep. at 68:1-4.)  He does not state that the eight to fifteen loads were spent/mixed acid.  Although Freddie DeRewal later testified that disposal of the waste at the farm was slow because there were "a lot of nitratic fumes" it is unclear whether this refers to *every* load of waste Freddie DeRewal took to Boarhead Farms or whether the disposal of the other waste also caused fumes.  Additionally, as noted above, Freddie DeRewal's testimony indicates that he generally referred to Ashland's waste as "sulfuric nitric" even though he did not

11

know specifically what type of waste he was hauling.[7]

For all of the above reasons, there is a genuine issue of material fact as to the disposal at Boarhead Farms of Ashland's CDN waste, dye waste, and phthalide waste.

B.  There is Sufficient Evidence for a Reasonable Factfinder to Determine that Ashland's Bulk Solvent Waste was Disposed of at the Boarhead Farms Site.

Plaintiffs contend that 3,238 gallons of bulk solvent from Ashland's Great Meadows facility, were disposed at the Site.  (See Ashland's Mot. Summ. J., Ex. 1, Ex. B, page 1.) Plaintiffs rely on the following documents to support their contention regarding the bulk solvent: ASHL000 53, 56, 63, and 124.  Document ASHL00053 states that a DCC driver picked up "1 Tank Truck Containing Waste Toluene Flammable Liquid N.OSS FLAMMABLE LIQUID APPROX 2,500 Gallons."  (Pls.' Mot. Opp'n, Ex. 4.)  Document ASHL00056 states that a DCC driver picked up "18-55 Gal Drums Containing Flammable Liquid N.O.S.; 4 Drums Tolulene [sic] NFA; 2 Drums CAO 30 Tolulene [sic] M/LS; 1 Drum IPA&MEOH; 1 Drum MEOH; 2 Drums XYLENE; 2 Drums IPA."  (Id.)   Document ASHL00063 indicates that a DCC driver picked up "80-55 gallons steel drum containing chemical N.O.I.B.N Flammable Liquid N.O.S." (Id.)  Document ASHL000124 indicates that a DCC driver picked up 39 Drums containing xylene; 30 drums containing toluene; 4 Drums containing methanol; and 7 drums containing 6MT distillation (NAPHTHA).  (Id.)  As such, plaintiffs have established that solvents were picked up

---

[7]It is also noteworthy that in a few places in his deposition, Freddie DeRewal refers to Ashland's waste as containing "organics".  (See Pls.' Mot. Opp'n, Ex. 3, page 65:18-22; 65:25-66:1.)  This bolsters plaintiffs' argument that Freddie DeRewal was hauling more than just spent/mixed acid, as the CDN waste, dye waste, and phthalide waste all contained organic compounds.  (Id. at Ex. 2, pages 3-6.)

by DCC drivers.[8]

Additionally, plaintiffs have provided evidence that Freddie DeRewal picked up four different kinds of waste from Ashland, that he picked up waste on at least twenty-three different occasions, and that he took eight to fifteen loads of waste to the Site. (Pls.' Mot. Opp'n, Exs. 3 and 4.) Plaintiffs have likewise submitted evidence that John Barsum picked up four different types of waste from Ashland, that he picked up waste on at least sixteen different occasions, and that he took "maybe two" back to the Site. (Id.) Jeffrey Shaak picked up four different types of waste from Ashland, he picked up waste from Ashland on at least thirty different occasions, and he took three or four loads to Boarhead Farms. (Id.) Based on this evidence, it is reasonable to infer that DCC disposed of Ashland's solvent waste in the same manner as any of its other waste, and that therefore, a fraction of the Ashland's solvent waste was disposed of at the Site.

Although Ashland asserts that certain waste–specifically spent/mixed acid–went to the Site while other waste was disposed of at Wissinoming, this argument lacks evidentiary support. First, Ashland's characterization of the DCC drivers' deposition testimony is incorrect. For example, with respect to Freddie DeRewal's testimony, he refers to Ashland's waste generally as "sulfuric nitric mix". However, at one point he states that Ashland's waste included "organics", which indicates that when he was referring to Ashland's waste as "sulfuric nitric" he was generalizing.

Second, Ashland's Motion states that while Freddie DeRewal "testified that he took most

---

[8]These bills of lading (ASHL000 53, 56, 63, and 124) are nearly identical to the numerous other bills of lading contained in plaintiffs' Exhibit 4. However, unlike the other bills of lading, the Court notes the difficulty in discerning the drivers' signatures. Document ASHL00056 appears to be signed by "Robert W. Landmesser," an AETC employee, and Document ASHL000124 appears to be signed by "Sarry". There is no deposition testimony from either of these people. The signatures on Documents ASHL00053 and ASHL000124 are not identifiable to the Court.

of this *acid waste* to the Wissinoming Facility, he further testified that he took eight to fifteen loads to the Boarhead Farm Site for disposal." (Ashland Mot. Summ. J. at 9 (citing Dep. DeRewal, Jr. at 68)(emphasis added).) On the contrary, however, Freddie DeRewal's deposition testimony does not state that he took *acid waste* to the Site. Rather, it states that he personally disposed of *Ashland waste* at the site.

      Third, although Ashland states that the DCC drivers took the spent/mixed acid to Boarhead Farms because of the fumes, this allegation does not lead to the conclusion that other waste was not taken to the Site. Freddie DeRewal did testify that there were times that he did not use the Wissinoming site because "people were complaining about fumes in certain buildings" (Ashland's Mot. Summ. J., Ex. 12, page 53, 80), and there is evidence that the spent/mixed acid could generate fumes. However, there is a lack of evidence that *only* the spent/mixed acid waste was taken to the Site. It is notable that some of Ashland's other waste streams were acidic and there is no evidence regarding whether or not disposal of these wastes would generate fumes. Additionally, Freddie DeRewal lists various other reasons for not using the Wissinoming facility including "the DER, the Philadelphia, the city . . . being watched. . . . If you're being watched, you knew if you're being watched, the cops, the city, then it would go back to Boarhead Farms or it would go someplace else." (Ashland's Mot. Summ. J., Ex. 12, page 53-54.) None of these reasons would pertain exclusively to the spent/mixed acid such that it is the only waste that would have been taken to the Boarhead Farms Site.

      Fourth, Ashland's argument regarding the Boarhead Farms Site being shut down due to court injunction is equally unpersuasive. Ashland's Motion states that because plaintiffs contend that "DCC consistently used one *primary* disposal location for its customers' waste at any given

14

time . . . it is reasonable to infer that given the availability of its Wissinoming Facility during the 'Wissinoming Period' DCC transported *no* Ashland-generated waste to the Boarhead Farm Site other than possibly bulk nitrating waste." (Ashland's Mot. Summ. J. at 17 (emphasis added).) Plaintiffs have always contended that during the so-called Wissinoming Period DCC disposed of 15-25% of the waste it hauled at the Site. The Court finds no reason to infer that *no* waste was disposed of at the Site simply because the majority of waste was being disposed of at the Wissinoming facility.[9, 10]

For the above reasons, the Court finds that there is a genuine issue of material fact regarding the disposal of Ashland's bulk solvent waste at the Boarhead Farms Site.

C.  There is Sufficient Evidence for a Reasonable Factfinder to Determine that Ashland's Drummed Solvent Waste was Disposed of at the Boarhead Farms Site.

Plaintiffs assert that 652 gallons of Ashland's drummed solvent waste was disposed of at

---

[9] Ashland's Motion asserts:

Further, the few instances of the disposal of waste at the Boarhead Farm Site referenced in Plaintiffs' Answers to Defendants Joint Contention Interrogatories occurred during the 'Wissinoming Period' only in July and September, 1976 (Exhibit "1", p. 37), prior to the October 15, 1976 injunction. Plaintiffs have offered nothing to support a contention that any waste was disposed of at the Boarhead Farm Site after October 15, 1976.

(Ashland's Mot. Summ. J. at 17.) The Court is unable to come to the same conclusion from Ashland's citation to Exhibit 1, page 37. Additionally, the deposition testimony of the DCC drivers appears to be in contradiction to this assertion.

[10] The Court also notes that the gallons of waste attributed to Ashland in the City of Philadelphia's calculation of the sewer surcharge (See Ashland's Mot. Summ. J., Ex. 4) does not account for the total volume of Ashland waste picked up by DCC (See Pls.' Mot. Opp'n, Ex. 4.). Nor does it account for Ashland's solvent waste. (See Ashland's Mot. Summ. J., Ex. 4.) This further supports plaintiffs' argument regarding Ashland's waste disposal at the Site.

15

the Site. In plaintiffs' answers to defendants' contention interrogatories, they state that they intend to rely on Document ASHL00097. Document ASHL00097 is an invoice indicating that DCC picked up 64 drums of isopropanol and 15 drums of methanol. Furthermore, plaintiffs have submitted pictures of a drum ("BF-18") which was excavated at the Site, bore an Ashland Chemical Company label, and was filled with "organic resin (solidified)".[11, 12]

---

[11] Ashland makes much of the fact that R. Craig Coslett described the waste contained in drum BF-18 as being composed of "among other things, benzene, several other benzene compounds, phenols, methylene chloride, acetone, toluene, and toluene compounds" whereas the drum was elsewhere described as containing "organic resin (solidified)". (Compare Decl. R. Craig Coslett ¶ 8-10 with Ashland Reply, Ex. 15, 16.) Because the compounds listed by Coslett are organic and "organic resin (solidified)" appears, without expert testimony to the contrary, to be a more general description of the contents of the drum, the Court fails to see the import of this argument.

[12] Ashland asserts that "Ashland's practice was to properly label any waste placed in a drum. (8/21/96 deposition of A. Curley, Exh. "17", pp. 202-204.) Drum BF-18 is not labeled as containing any waste, much less isopropanol or methanol." With respect to Ashland's labeling practices, the Court notes that, in fact, Arthur Curley testified as follows:

> Question: So for any particular drum out there, how many drums were there?
> Answer: At one point I guesstimated with full and empty it was something around 4,000 drums.
> Q: And for any particular drum or set of drums you can't state with certainty what the chemical constituents of the drums were, can you?
> A: No. Some of them were labeled, some of them were not labeled. The labels on some of them were not actually what was in them, so we had to really use our judgment as to roughly what it was.
> . . .
> Q: You have no way of knowing when the drum load was, in fact, generated as waste, do you?
> A: As time went on, if we are talking about the relevant time period, no. But as time went on, yes, because we started labeling the drums. In fact the law said you had to label them a certain way and then we were able to pinpoint it.
> Q: I am staying in the relevant period as defined by Mr. Rachlin, July 1, 1976 to November of 1977 in that time period . . . .

(Ashland's Reply, Ex. 17 (submitted on ECF as Ex. 18), Curley Dep. 202:16-204:4.) As such, Curley's testimony is that during the "relevant time period" of July 1, 1976 to November

The Court agrees with Ashland's assertion that Document ASHL00097 cannot be connected to drum BF-18 in that the bill of lading describes chemicals not contained within drum BF-18. However, this does not preclude the inference that Ashland's drummed solvent waste was disposed of at the Site. There is evidence that Ashland generated solvent waste (See e.g. Pls.' Mot. Opp'n, Ex. 2 ("Ashland generated a variety of organic solvent wastes. . .")), that some of this waste was drummed (See e.g. Pls.' Mot. Opp'n Ex. 4, AHSL00056; Ashland's Reply, Ex. 18, Dep. Arthur Curley 202:3:13 (stating that he and another Ashland employee would "check drum after drum . . . We would smell it, try to determine what solvent was in it.")), that DCC hauled Ashland's waste (See Pls.' Mot. Opp'n, Ex. 4), and that a drum bearing Ashland's label and containing organic material[13] was excavated at the Site along with a drum fragment bearing Ashland's label (See Decl. R. Craig Coslett).

Based on this evidence, the Court finds that a reasonable factfinder could infer that Ashland's drummed solvent waste was disposed of at the Site.

---

1977–which overlaps with the time period at issue in this case, the Wissinoming Period–Ashland was not properly labeling its drums.

[13] The Court recognizes that the waste material contained within the drum was characterized as "organic resin (solidified)". However, without expert testimony the Court has no way of knowing whether this waste material was a "solvent".

IV. Conclusion

And now, this 23rd day of April 2008, it is ORDERED that defendant Ashland's Motion for Partial Summary Judgment is DENIED.

BY THE COURT:

/S/LEGROME D. DAVIS

Legrome D. Davis, J.