# EXHIBIT "L"

LAW OFFICES

# BALLARD SPAHR ANDREWS & INGERSOLL, LLP

A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP

PLAZA 1000, SUITE 500

MAIN STREET

VOORHEES, NEW JERSEY 08043-4636

856-761-3400

FAX: 856-761-1020

WWW.BALLARDSPAHR.COM

PHILADELPHIA, PA
BALTIMORE, MD
BETHESDA, MD
DENVER, CO
LAS VEGAS, NV
PHOENIX, AZ
SALT LAKE CITY, UT
WASHINGTON, DC
WILMINGTON, DE

GLENN A. HARRIS
DIRECT DIAL: 856-761-3440
PERSONAL FAX: 856-761-9001
HARRISG@BALLARDSPAHR.COM

PARTNER RESPONSIBLE FOR
VOORHEES, NJ PRACTICE
BENJAMIN A. LEVIN

May 7, 2007

BOARHEAD DEFENDANTS

Re:   *Boarhead Farms*

Dear Counsel:

This letter is in response to the April 30, 2007 letter from Jeff Pettit with respect to Plaintiffs' responses to Defendants Joint Contention Interrogatories ("the April 30th letter").

*Scope of Discovery*

Defendants propounded numerous interrogatories that begin with the phrase "Do you contend." Plaintiffs responded "no" in response to many of these interrogatories, clearly stating that they did not contend a certain fact or legal theory stated by Defendants. Defendants now seek to uncover the factual basis for why Plaintiffs do not contend certain facts or theories. There is no legal authority to support such a demand.

The phrase "Do you contend" or the like can only be read to seek to learn what Plaintiffs presently intend to *contend* at trial with respect to issues for which Plaintiffs have the burden of proof. Such interrogatories do *not* ask what Plaintiffs *think* about various factual or legal issues, what evidence Plaintiffs *know of* concerning particular factual or legal issues, or, contrary to what Defendants now say, whether Plaintiffs will contest or disagree with contentions that Defendants themselves *may or may not* make as part of *Defendants'* cases-in-chief. Plaintiffs in each instance responded to such interrogatories by clearly stating what Plaintiffs *do* intend to contend in their case-in-chief with respect to what appear to be the general subject matter of such interrogatories.

Moreover, even if defendants *had* asked interrogatories such as: "If Defendant X contends at trial that [A + B = C], will you contend otherwise?", Plaintiffs would have objected to such interrogatories.[1] The fundamental purpose of a contention interrogatory is to enable the

---

[1]   Jeff Pettit, the author of the letter to which this letter responds, stated on behalf of Ashland in Ashland's April 30, 2007 letter: "the facts that form the subject of these interrogatories may be facts presented by one or more of the Defendants at trial.

(continued...)

Boarhead Defendants
May 7, 2007
Page 2

propounding party to ascertain the opposing party's legal theories and the facts supporting those theories. To this end, it is perfectly proper for Defendants to use contention interrogatories to ask Plaintiffs to state whether they will make a specific contention and, if so, to state the factual basis for that contention. *Moore's Federal Practice 3d*, Section 33.78 at 33-63. It is not proper, however, for Defendants to demand that Plaintiffs state whether they will make a specific contention and, if not, the reasons why Plaintiffs do not contend certain facts or legal theories. Plaintiffs can only imagine the myriad of factual and legal contentions one or more Defendants may chose to make at trial. Plaintiffs will decide whether to present evidence or argument in rebuttal to any such assertions when and if those assertions are made and Plaintiffs evaluate the basis for any such assertions. Plaintiffs simply have no obligation to identify rebuttal arguments or evidence in response to these interrogatories.

*Interrogatory Nos. 1 through 66.*

If Defendants really wanted to know whether Plaintiffs will contend that they are "arrangers" within the meaning of CERCLA, Defendants should have asked that question directly. Defendants are aware of ample evidence that each of them hired DCC to remove wastes from their facilities. Plaintiffs have identified in response to Interrogatory No. 78 which of those wastes Plaintiffs will contend at trial were disposed of at the Site. Defendants thus have the information they now say they were seeking in these interrogatories.

*Interrogatory Nos. 67 - 71.*

Plaintiffs' response to these interrogatories set forth the contentions Plaintiffs intend to make as part of their case-in-chief at trial. All of the parties are aware of evidence concerning hauling by DCC or some other DeRewal entities (such as Echo and Revere Chemical) prior to 1972. Plaintiffs will not contend at trial that any such wastes were disposed of at the Site. Should Defendants contend in Defendants' cases-in-chief that any such wastes were disposed of at the Site, Plaintiffs may or may not seek to introduce evidence in rebuttal relevant to such contentions.

*Interrogatory Nos. 73-77.*

Interrogatory Nos. 73-76 sought only Plaintiffs' contentions as to the dollar amount of various categories of response costs, they did not ask for a detailed explanation of how Plaintiffs arrived at those dollar numbers or the identification of the proofs Plaintiffs relied upon to respond to the interrogatories.

---

(...continued)

Defendants are entitled to know whether and how Plaintiffs will contest such factual allegations."

Boarhead Defendants
May 7, 2007
Page 3

Plaintiffs' correctly understood that these interrogatories, just like the other interrogatories asking about what Plaintiffs "contend," "sought to understand each Plaintiffs' position" with respect to the information sought. This is precisely why Plaintiffs objected to these interrogatories on the grounds that they sought information outside the scope of the contentions that Plaintiffs will make as part of their case-in-chief at trial.

Despite that Plaintiffs will not make any contentions at trial regarding the cleanup costs incurred by each individual Plaintiff, Plaintiffs' responses set forth the amount of response costs for work required by the OU-1 Consent Decree and EPA Oversight Costs pursuant to that decree and by the OU-2 Consent Decree and EPA's Oversight Costs pursuant to that decree as well as the payment of EPA's past and interim costs as required by the OU-2 Consent Decree paid by each individual Plaintiff. The Zaumeyer charts and other summary documents previously produced reflect each payment into each OU-1 and OU-2 Group account to date, as well as each payment from each Group account to date. The Document Repository contains each of the transactional documents referenced on those summary charts. The specific dollar numbers appearing in the discovery responses were calculated using the information on those charts. The defendants can easily reproduce those numbers using those documents.

The costs of the response actions required by the OU-1 Consent Decree have been funded until very recently as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. However, Agere stopped making contributions to these and other OU-1 and OU-2 activities as set forth below. The costs of the response actions required by the OU-2 Consent Decree were funded as follows: Ford - 22.5%; Cytec - 22.5%; SPS - 22.5%; Agere - 10%; TI - 22.5%. Payment of EPA oversight costs with respect to the OU-1 work were funded as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. Payment of the EPA oversight costs with respect to the OU-2 work were funded as follows: Ford - 22.5%; Cytec - 22.5%; SPS - 22.5%; Agere - 10%; TI - 22.5%. Payment of the EPA past costs demand were funded as follows: Ford - 25%; Cytec - 25%; SPS - 25%; TI - 25%. Payment of the EPA interim costs demand were funded as follows: Ford - 20%; Cytec - 20%; SPS - 20%; Agere - 20%; NRM - 1/3 of 20%; TI - 1/3 of 20%; Worthington - 1/3 of 20%. Plaintiffs are not seeking contribution towards response costs incurred by NRM Investments or Worthington Industries, but provided this information only to fully explain how the costs relating to the OU-1 Group were paid.

The amounts that were paid by each entity into the various OU-1 and OU-2 accounts include, with respect to the OU-1 and OU-2 RD/RA accounts, amounts spent on Group activities for which Plaintiffs do not seek recovery in this action. Therefore, Plaintiffs determined the amounts set forth in response to Interrogatory No. 73 by applying the respective percentages of all Group costs for a particular category of costs actually paid by Plaintiffs (and Worthington and NRM) to the amounts of such costs for which Plaintiffs seek recovery.

Plaintiffs' calculations used to determine the dollar amounts set forth in these responses are as follows:

Boarhead Defendants
May 7, 2007
Page 4

With respect to OU-1 costs, assessments were made as follows: In approximately August of 2000 Ford, Cytec, SPS and Agere each paid $50,000 and in approximately December of 2000 Ford, Cytec, SPS and Agere each paid $40,000; TI paid $36,666.66 toward these costs, NRM paid $27,416.66, and Worthington paid $ 26,666.66; in approximately August of 2001 Ford, Cytec, SPS and Agere each paid $240,000; TI, NRM, and Worthington each paid $80,000; in approximately February of 2002 Ford, Cytec, SPS and Agere each paid $100,000; TI, NRM, and Worthington each paid $33,333.33; in approximately July of 2002 Ford, Cytec, SPS and Agere each paid $30,000; TI, NRM, and Worthington each paid $10,000; in approximately August of 2003 Ford, Cytec, SPS and Agere each paid $120,000; TI, NRM, and Worthington each paid $40,000; in approximately March of 2005 Ford, Cytec, and SPS each paid $120,000; TI, NRM, and Worthington each paid $42,201.05. Each entity's percentage share of assessments was thus: Ford, Cytec, and SPS - 20.665%; Agere 17.123%; TI - 7.15%; NRM - 6.878%; and Worthington - 6.854%. Total costs of the response actions required by the OU-1 Consent Decree through 2006 are $3,381,696.00 as reflected on the de maximis OU-1 invoice tracking chart. Ford, Cytec, and SPS thus each had a $698,827.47 share of those costs; Agere had a $579,047.80 share; TI had a $241,791.26 share; NRM had a $232,593.05 share; and Worthington had a $231,781.44 share.

With respect to OU-1 EPA costs, on or about July 9, 2002 $38,993.30 was paid from PHKS account 1305 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $7,800.00 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $2,600.00. Ford, Cytec, SPS, and Agere thus each had a $7,798.66 share of that reimbursement; TI, Worthington, and NRM each had a $2,599.55 share. On or about September 11, 2003 $169,720.60 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $33,944.12 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $11,314.71. Those payments exactly paid each entity's share. On or about August 10, 2004 $80,466.45 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $16,093.29 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $5,364.43. Those payments exactly paid each entity's share. On or about August 3, 2005 $33,015.66 was paid from MMWR account 402 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and Agere each made payments of $6,603.14 into that account from which the reimbursement was made; TI, NRM, and Worthington each made a payment of $2,201.05. Those payments exactly paid each entity's share. Total OU-1 EPA costs are thus: Ford, Cytec, SPS and Agere - $64,439.21 each; TI, NRM, and Worthington - $21,479.74 each.

With respect to OU-2 costs, three assessments were made as follows: In approximately January of 2002 Ford, Cytec, SPS and TI each paid $61,250 and Agere paid $25,000; in approximately July of 2003 Ford, Cytec, SPS and TI each paid $450,000 and Agere paid $200,000; in approximately February of 2004 Ford, Cytec, SPS and TI each paid $112,500. Each entity's percentage share of assessments was thus: Ford, Cytec, SPS, and TI - 22.932%; Agere 8.272%. Total costs of the response actions required by the OU-2 Consent Decree through 2006 are $2,186,424.06 as reflected on the de maximis OU-2 invoice tracking chart plus

Boarhead Defendants
May 7, 2007
Page 5

$1,286.92 additional invoices from de maximis (available in the Document Repository), plus $74,000 paid for the reconstruction of the DeRewal garage (as reflected on the Zaumeyer charts), for a total of $2,261,710.90. Ford, Cytec, SPS, and TI thus each had a $518,655.54 share of those costs; Agere had a $187,088.72 share. This amends Plaintiffs' response to this interrogatory.

With respect to OU-2 EPA costs, on or about September 8, 2003 $133,327.41 was paid from MMWR account 405 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and TI each made payments of $29,998.66 into that account from which the reimbursement was made; Agere made a payment of $13,332.77. Those payments exactly paid each entity's share. On or about September 15, 2004 $120,958.65 was paid from MMWR account 405 to EPA to reimburse EPA's future costs. Ford, Cytec, SPS, and TI each made payments of $29,535.21 into that account from which the reimbursement was made; Agere made a payment of $13,126.77. Ford, Cytec, SPS, and TI thus each had a $27,215.70 share of that reimbursement; Agere had a $12,095.87 share. On or about August 3, 2005 $71,695.27 was paid from MMWR account 405 to EPA to reimburse EPA's future costs. This payment was made from funds available in the OU-2 RD/RA account. Ford, Cytec, SPS, and TI thus each had a $16,441.16 share of that reimbursement; Agere had a $5,930.63 share. Total OU-2 EPA costs are thus: Ford, Cytec, SPS and TI - $73,655.52 each; Agere - $31,332.27.

On or about June 17, 2002 $7,062,962.06 was paid from PHKS account 1305 to EPA to reimburse EPA's past costs, including interest thereon. Ford, Cytec, SPS, and TI each made payments of $1,750,000.00 and $15,750.00 into that account from which the reimbursement was made. Each such Plaintiff's share of that reimbursement was thus $1,765,740.52. On or about January 15, 2002 and April 5, 2002 a total of $415,652.74 was paid from the same PHKS account to EPA to reimburse EPA's interim costs. Ford, Cytec, SPS, and Agere each made payments of $84,534.32 into that account with respect to that obligation; TI, Worthington, and NRM each made payments of $28,178.11 into that account as well. Ford, Cytec, SPS, and Agere thus each had a $83,130.55 share of that reimbursement; TI, Worthington, and NRM each had a $27,710.18 share.

Plaintiffs objected to the definition of "Total Cleanup Cost" as used in these interrogatories as overly broad, vague, ambiguous, unduly burdensome and not limited in time precisely because it was not clear exactly what information was being sought. Defendants' suggestion that Plaintiffs' responses are deficient because they included only "costs paid by or on behalf of the Plaintiffs" contradicts their statement with respect to the same interrogatories that the information sought concerned "the total clean-up costs of OU-1 and OU-2 incurred by each Plaintiff," illustrating that confusion. In any event, Plaintiffs may state their contentions in language of their choosing, not in language dictated by Defendants. Without waiving the objections set forth in Plaintiffs' interrogatory responses, the United States and the Commonwealth of Pennsylvania have each claimed to have incurred response costs that have not been reimbursed by Plaintiffs. By way of example only, EPA's past costs demand is in the Repository at bates numbers BSAI082007-BSAI082318; Pennsylvania's is at BSAI084400. Defendants have been provided a copy of the Commonwealth's demand last year for its past

Boarhead Defendants
May 7, 2007
Page 6

costs. General Ceramics no doubt incurred costs for the removal action it conducted. Other than NRM and Worthington, Plaintiffs are unaware of any other person who has incurred response costs with respect to the Site.

With respect to Interrogatory No. 77, Defendants did not ask Plaintiffs to "identify each specific Plaintiffs' payment in excess of its equitable share" as suggested in the April 30th letter. The question specifically asked whether Plaintiffs "*contend*" that any Plaintiff has spent amounts in excess of its equitable share of response costs. As set forth in response to these interrogatories, Plaintiffs will contend that they have collectively paid to date an amount in excess of their share of the costs identified in these answers. Plaintiffs will contend, as set forth on Exhibit A, that Plaintiffs' equitable share of past response costs incurred by them and response costs to be incurred by them in the future is 17.91% (including the 10.44% share that Plaintiffs will contend is attributable to the parties with whom Plaintiffs' have settled).

Plaintiffs have incurred through 2006 $13,207,487.52 (the amounts contributed by each individual Plaintiff to the response costs for work required by OU-1 Consent Decree and EPA Oversight Costs pursuant to that decree, the response costs for work required by the OU-2 Consent Decree and EPA's Oversight costs related to that decree, and the payment of EPA's past and interim costs as required by the OU-2 Consent Decree.) Plaintiffs' equitable share of those costs is thus $2,365,460.90 an amount in excess of the total dollar numbers paid by them of such costs. Of course, Plaintiffs contend that they have paid in excess of their equitable share of all response costs paid by the OU-1 and OU-2 Groups (including the amounts paid by NRM Investments and Worthington Industries, Inc.) for the same reason. It is self-evident from these facts and this analysis that each individual Plaintiff has also incurred more than its equitable share of costs to date. For example, Cytec has paid $3,204,448.71 in response costs, while its equitable share of all costs paid by the OU-1 and OU-2 Groups for such costs is only $800,373.71. SPS, Ford, TI, and Cytec are jointly and severally liable for all future Consent Decree costs.

With respect to Agere, I have enclosed a copy of the Agere settlement agreement. Please note that Agere remains a named Plaintiff, and that Plaintiffs seek to recover the payments made by Agere with respect to recoverable response costs. The dollar amounts of such costs paid by Agere to date are reflected in Plaintiffs' response to these interrogatories. The $400,000 to be paid to Agere by the other four Plaintiffs is not reflected in those amounts, either as a reduction to amounts paid by Agere or as increases to the amounts paid by the other four Plaintiffs.

Defendants have requested further discovery with respect to OU-1 and OU-2 "Group discussions, determinations and actions relating to allocations." Plaintiffs do not understand what this means. Plaintiffs have agreed to fund on an interim allocation basis OU-1 and OU-2 Group costs as set forth above. Plaintiffs will at some future time, and not in this litigation, reach a final allocation amongst themselves of all such costs. Plaintiffs have produced written agreements concerning such interim allocations, and the fact that such allocations were in fact funded on the agreed-to interim bases is established by the documents reflecting the actual payments by the various entities into the OU-1 and OU-2 Group accounts, as well by the

Boarhead Defendants
May 7, 2007
Page 7

payments from those accounts. Plaintiffs note that discovery of this information was previously available. Plaintiffs will not agree to any discovery concerning "discussions" among Plaintiffs that lead to these interim shares or otherwise concerning those shares. Such information is both privileged and irrelevant.

With respect to Defendants' request for discovery concerning "investigation of other PRPs," it is unclear what exact discovery is sought. Plaintiffs will not permit any discovery of Plaintiffs with respect to their historic efforts to identify PRPs, the analysis made by Plaintiffs of the results of such efforts, or the decision-making process of Plaintiffs with respect to whether or not to include such PRPs as parties in this action. Such information is both privileged and irrelevant. Plaintiffs note that discovery of this information was previously available, and has nothing to do with either these specific interrogatories nor any of the other interrogatories propounded here by Defendants.

*Interrogatory No. 78*

Plaintiffs set forth in response to this series of interrogatories exactly what equitable shares they will ask the Court to assign to each party based upon findings of fact and conclusions of law regarding the volumes of wastes disposed of at the Site (and certain other allocation factors), including the evidence upon which Plaintiffs will rely to prove those facts. That is exactly the information sought in this series of interrogatories.

Plaintiffs understand that Defendants believe that the referenced evidentiary sources "do not support the specific percentage identified in the responses." However, Defendants' request to learn "as to how the referenced information was utilized to arrive at the specific percentage" seeks core attorney work product, and is not within the proper scope of contention interrogatories. Fed. R. Civ. P. 33(c) and 26(b)(3). Plaintiffs have no obligation to reveal their analysis of documents and testimony, or the statements they may make in summation at trial to support their interpretation of such proofs. Simply stated, Plaintiffs need only to provide the "contentions" they intend to make and the proofs upon which they intend to rely to support those contentions, they have no obligation to provide Defendants with a transcript of their summation. Plaintiffs accordingly will refuse any additional discovery on the manner in which Plaintiffs "utilized" the underlying facts in this case to arrive at the nexus percentages.

With respect to Agere, the North Carolina facility was operated during the relevant time period by Western Electric. The Allentown facility was operated during the relevant time period by Western Electric, either under that name or under the name AT&T (a name to which Western Electric's name was changed). Neither Lucent nor Agere existed during the relevant time period, so those entities did not arrange for DCC to remove their wastes. The response may be read to refer generally to "wastes."

With respect to TI Group, Bundy Corporation operated the Malvern facility through its National Rolling Mills division during the relevant period up to 4/23/74. Bundy Corporation changed its name to TI Automotive some years after selling that facility.

Boarhead Defendants
May 7, 2007
Page 8

*Interrogatory No. 85*

Boarhead Corporation, like Globe Disposal Co., Inc., Globe-Wastech, Inc., and Knoll International, Inc., was named as a Defendant in the Complaint but was never served with process. None of those entities thus have ever been parties to this action.

*Interrogatory No. 108*

Plaintiffs' responses accurately identified their contentions as to General Ceramics. Plaintiffs contend that, for the reason set forth therein, General Ceramics should be assigned no equitable share of response costs. Plaintiffs have received no funds from or on behalf of General Ceramics or its insurers, as is evident from the list of payees into the OU-1 and OU-2 Group accounts in the two Zaumeyer reports.

*Interrogatory Nos. 92, 93, 104, 105, 106, 107, 109-111*

Defendants incorrectly state that Plaintiffs did not respond to these interrogatories, each of which ask what Plaintiffs contend the equitable share is for a specific entity. None of the stated entities appear on Exhibit B to Plaintiffs' responses, and the shares of all of the entities on that exhibit add up to 100%. It is clear that Plaintiffs contend that the equitable shares of response costs for each of the stated entities is zero. The facts upon which Plaintiffs base those contentions is that the entities are not parties to the action and have no identifiable assets that would enable them to participate financially in the cleanup of the Site, as stated in Plaintiffs' responses to these interrogatories.

*Interrogatory Nos. 112-13, 116-17*

These interrogatories, as well as Interrogatory Nos. 114-15, appear to concern an argument Defendants may make concerning the CERCLA statutes of limitations. Plaintiffs will not make any contention related thereto. The phrases "the first removal action" and "the second removal action" are vague, confusing, and ambiguous despite Defendants' reference to the ROD because EPA and Plaintiffs have agreed, and this Court has found, that there was instead a single removal action beginning in 1992 and continuing to the date of the Consent Decree entered on or about September 28, 2000. *See also* other documents referenced in Plaintiffs' responses to these interrogatories. Plaintiffs' response to these interrogatories does *not* mean that, if *Defendants* make the stated contention, Plaintiffs will not contend otherwise. In any event, Plaintiffs have no unique knowledge of EPA's activities at the Site in 1992 and 1993. Whether or not EPA's actions constitute one or more removal actions (or, for that matter, a remedial action) is a legal issue, as is what relevance, if any, the determination of that issue has on this action.

Plaintiffs withdraw their objection to the phrase "'Past Response Costs'" in Interrogatory No. 116 based upon Defendants' explanation.

Boarhead Defendants
May 7, 2007
Page 9

*Interrogatory Nos. 114-15*

Plaintiffs are aware of the definition of "remedial action" in CERCLA. Nevertheless, whether any particular response action constitutes a "removal action" or a "remedial action" is a legal question. Plaintiffs thus do not understand to which response action Defendants are referring in these interrogatories as "the remedial action." Plaintiffs' response to these interrogatories does *not* mean that, if *Defendants* make the stated contention, Plaintiffs will not contend otherwise.

*Interrogatory No. 118*

Each Plaintiff appears on Exhibit B to Plaintiffs' responses, and the shares of all of the entities on that exhibit add up to 100%. It is clear that Plaintiffs contend that three Plaintiffs have liability and two do not. Plaintiffs' response to Interrogatory No. 78 sets forth the factual basis for those contentions, and was incorporated into Plaintiffs' response to this interrogatory.

*Interrogatory Nos. 119-23*

Defendants have identified no authority suggesting that any amounts paid into OU-1 or OU-2 Group accounts on behalf of Plaintiffs by insurers, indemnitors, predecessors, or successors are relevant to this action. Indeed, the Court has ruled that amounts received from settling parties are *not* relevant. The payee for each payment made into each Group account is set forth on the summary documents provided, and the payment proofs are available in the Document Repository. Agere is a corporation created as a spin off from Lucent. Agere acquired as part thereof the liability for this matter. Lucent made certain payments prior to the creation of Agere. TI Automotive is the current name of Bundy, the entity that operated the Malvern facility up to 4/23/74. TI Automotive is a wholly-owned subsidiary of Smiths Industries. Certain payments were made by Smiths on behalf of TI; those payments accrued to TI on its books. No Plaintiff has received proceeds from insurers.

*Interrogatory Nos. 124-25*

These interrogatories appear to concern an argument Defendants may make concerning what they term "orphan share." Plaintiffs contend that entities that do not have the assets to pay, and entities that are not parties to the action, are not allocated an equitable share as a matter of law.

Very truly yours,

Glenn A. Harris

GAH/dmn