**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AGERE SYSTEMS, INC., et al.         :

                :

            Plaintiffs      :      Civil Action No.  02-CV-3830

                :

         v.           :      (Hon. Legrome D. Davis)

                :

ADVANCED ENVIRONMENTAL      :

TECHNOLOGY CORPORATION, et al.,      :

                :

           Defendants.      :

**DEFENDANT ASHLAND INC.'S PRETRIAL MEMORANDUM**

I.     **BRIEF STATEMENT OF THE NATURE OF THE CASE TO BE PRESENTED AND THE ISSUES TO BE ADDRESSED**

     A.     **Background**

This case arises under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. ("CERCLA") and the Pennsylvania Hazardous Site Cleanup Act, 35 P.S. § 6020.101, et seq. ("HSCA") as a result of the removal of hazardous waste and the remediation of the Boarhead Farm Superfund Site in Bucks County, Pennsylvania ("Boarhead Site").  After the United States Environmental Protection Agency's ("USEPA") initial action to remove drummed and other waste from the Boarhead Site and install a groundwater treatment system to remove contaminants, the USEPA developed a removal and remediation plan for the Boarhead Site divided into Operable Unit No. 1 ("OU-1") and Operable Unit No. 2 ("OU-2").  On September 28, 2000, Plaintiffs Agere Systems, LLC ("Agere"), Cytech Industries, Inc. ("Cytech"), Ford Motor Company ("Ford") and SPS Technologies, LLC ("SPS") entered into a Consent Decree with the USEPA obligating them to perform the OU-1 remedial design and remedial action and to reimburse the USEPA for certain administrative oversight costs. Cytech, Ford, SPS and the predecessor to Plaintiff TI Group Automotive Systems, LLC ("TI") entered into a Consent Decree on March 14, 2002 for the OU-2 removal and remedial

action, to reimburse USEPA for $7 million in response costs incurred prior to July, 2000 and for response costs arising after July, 2000 in the future. The remaining plaintiff, Agere, made financial contributions to fund the OU-1 and OU-2 operations, but was never a party to either Consent Decree.

In this litigation, Plaintiffs are collectively seeking against the defendants: (a) cost recovery under CERCLA Section 107(a) for certain costs incurred directly by Plaintiffs (Count I), (b) contribution under CERCLA Section 113(f) with respect to these incurred costs and various response costs Plaintiffs allegedly paid by way of reimbursement to the USEPA (Count II), declaratory relief under CERCLA Section 113(g)(2) (Count III), and for contribution under HCSA Section 702(a)(3) (Count IV).

Defendant Ashland Inc. ("Ashland") and the remaining unsettled defendants, Advanced Environmental Technology Corporation ("AETC"), Carpenter Technology Corporation ("Carpenter"), Handy & Harmon Tube Company, Inc. ("Handy & Harmon") and NRM Investment Company ("NRM"), deny that each has any liability to Plaintiffs for response costs incurred or reimbursed based on the factual and legal defenses described herein.

**B.      Plaintiff Agere Settled With The Remaining Plaintiffs And, Therefore, Is No Longer A Party To This Litigation**

According to paragraph 25 of the Fifth Amended Complaint, Agere executed a settlement agreement with the remainder of the Plaintiffs and is no longer seeking recovery of costs incurred or reimbursement of payments made to the EPA in this litigation. By the express terms of the Agreement, Agere is participating in name only, having received a settlement from the Plaintiffs in the amount of $400,000 and assigned whatever rights it may have had against the Defendants to the remaining Plaintiffs. Ashland submits, therefore, that Agere stands in the

2

shoes of a Settled Defendant and cannot obtain any recovery in this action and that the Defendants are entitled to prove Agere's equitable share of response costs in accordance with the Court's Memorandum Order filed June 30, 2004. If Agere is permitted to remain as a Plaintiff, the remaining Plaintiffs' rights to recover on behalf of Agere are limited to the extent of Agere's status as a non-party to either Consent Decree No. 1 or Consent Decree No. 2 and, therefore, recovery is barred under Section 113(f) of CERCLA. If the Plaintiffs are entitled to recover from Defendants the $400,000 paid in settlement to Agere, Plaintiffs must proceed under Count II to obtain contribution for reimbursement of Agere's "incurred costs."

### C.   Plaintiffs Are Not Entitled To Recover Under CERCLA § 107(a), Except With Respect To TI's Share Of Costs Incurred

In <u>United States v. Atlantic Research Corporation,</u> 127 S.Ct. 2331 (2007), the United States Supreme Court addressed the longstanding question of whether potentially responsible parties ("PRPs") can maintain actions for cost recovery under CERCLA § 106 or 107(a). The Court clarified that only those plaintiffs that paid money to satisfy a judgment or settlement "stemming from an action under § 106 or § 107(a) may maintain a contribution action under Section 113(f) only." 120 S.Ct. at 2338. Further, the Court limited the right of a PRP proceeding under Section 107(a) to recover response costs that the PRP voluntarily and directly incurred. A PRP that merely reimbursed response costs paid by other parties is limited to a contribution action under Section 113(f). <u>Id.</u> The Supreme Court expressly left open the question of whether PRPs which have been compelled to incur response costs can recover under Section 107(a) or were limited to Section 113(f).

In this case, Plaintiffs readily admit that their claims for reimbursement paid to the USEPA for response costs is limited to the claim under Section 113(f) and properly so in view of

the <u>Atlantic Research</u> opinion.   However, Plaintiffs also seek recovery for the direct costs incurred under the Consent Decrees for OU-1 and OU-2 pursuant to Section 107(a), thereby requiring the Court to address the very issue left open in <u>Atlantic Research</u>.

Ashland submits that Plaintiffs Cytech, Ford and SPS, as parties to the Consent Decrees entered for both the OU-1 and OU-2 removal and remediation did so because of the USEPA's enforcement action and did not do so "voluntarily".  Those Plaintiffs are limited to a contribution action by the express terms of CERCLA Section 113(f)(3)(B).  Plaintiff TI, as successor to TI Automotive Systems Corp., a party to the second Consent Decree, also is limited to a CERCLA Section 113(f) action for its share of response costs paid pursuant to OU-2.  Ashland further contends that Plaintiff TI is not entitled to recover under Section 107(a) for its costs incurred for the OU-1 remedy because TI did not, itself, incur these costs.  TI did not sign the agreements to engage the contractors which generated the OU-1 responses costs.  TI agreed to reimburse Cytech, Ford and SPS, the parties to the OU-1 decree, for the costs that those parties incurred and, therefore, is relegated to a contribution action under CERCLA Section 113(f) for the costs paid. With respect to Agere, and to the extent it is entitled to remain in this litigation, this Court has already ruled that Agere can seek to recover its costs under Section 113(f).  Ashland submits that under the terms of its settlement agreement, Agere, in effect, has not "incurred" any costs for remediation of the Boarhead Site and, therefore, Agere has no right to proceed under CERCLA Section 107.

D.    **Plaintiffs Cannot Demonstrate Critical Elements Of A Contribution Claim Under CERCLA Section 113(f)**

Plaintiffs' claim for contribution under CERCLA § 113(f) lack essential elements for a contribution action identified below.

1.    **Each Plaintiff Will Be Unable To Demonstrate That The Payments For Response Costs Were In Excess Of Their Individual Fair Share Of The Common Liability**

A contribution claim under CERCLA § 113(f) is based upon common law remedy of contribution. In The Matter of Reading Co., 115 F.3d 1011, 1019 (3d. Cir. 1997). Thus, a plaintiff seeking contribution under Section 113(f) must prove that it settled all alleged liability to the third party by paying an amount that exceeds "its fair share of the overall liability." New Castle County v. Halliburton N.U.S. Corp., 113 F.3d 1016, 1122 (3d. Cir. 1997). Plaintiffs here cannot sustain this burden. All that the Plaintiffs can prove at the trial of this case is that they paid designated shares of the response costs under OU-1 and OU-2 and reimbursement to USEPA for its past response costs. Indeed, in paragraphs 18 and 21 of the Fifth Amended Complaint, Plaintiffs admit that the contributions they have made toward these costs have been based on the interim allocation that does not bind any of them. This is made even clearer in paragraph 16 of the Fifth Amended Complaint by the averment that the "Plaintiffs have agreed that they will, at some future time, and not in this civil action, reach a final allocation among themselves applicable to all costs associated with group activities, including the cost of clean-up work comprising OU-1 and OU-2." Thus, there will be no way to decipher whether and what amount any particular Plaintiff has made a true contribution to OU-1 or OU-2 costs and payments to the USEPA and, consequently, whether or not a particular plaintiff has paid or ever will pay an amount that exceeded its fair share of liability for overall response costs.

2.    **Plaintiffs Will Be Unable To Prove That They Have Extinguished The Liability Of The Defendants To The United States For The OU-1 and OU-2 Remediation And Oversight Costs**

Another essential element of a contribution action under CERCLA § 113(f) is that the Plaintiffs have "discharged the entire claim for the harm," i.e., have extinguished the liability of

the defendants to the United States for the OU-1 and OU-2 remediation and costs.  The federal common law right of contribution, recognized as the foundation of Section 113(f), depends upon the discharge of a common liability as a critical, necessary condition to the accrual of the right of contribution.  E.I. DuPont de Nemours & Co. v. United States, 297 F.Supp. 2d 740, 752 (D.N.J. 2003).  As a general rule, consent decrees do not extinguish the liability of any other person not party to the agreement unless its terms so provide.  42 U.S.C. § 9622(h)(4); see also, 42 U.S.C. § 9613(f)(2).  In fact, in the two consent decrees, the United States expressly reserved all rights to proceed against the non-settling defendants.

### 3.    Plaintiffs Cannot Sustain A Viable Cause Of Action For Contribution Under The Pennsylvania Hazardous Sites Clean Up Act

Count V of the Plaintiffs' Fifth Amended Complaint pleads a "contribution" action under Section 702(a)(3) of HCSA, 35 P.S. § 6020.702 (a)(3) rather than the express right of contribution and HCSA Section 705, § 6020.705.  The reason is that none of the Plaintiffs meet the threshold requirement of Section 705(a) that there was or is a pending civil action under HCSA § 507 or 1101 against the Plaintiffs or anyone else.  However, the Courts have heretofore recognized a private right of action of contributors under HCSA.  Any contribution claim under HCSA § 702(a)(3) would also fail for the same reasons that the Plaintiffs' CERCLA contribution claim would fail as noted above.

### E.    Plaintiffs Cannot Recover Monies Paid In Reimbursement Of USEPA's Costs For The First And Second Removal Actions

Plaintiffs are seeking in Count II of the Fifth Amended Complaint to recover funds paid by the Plaintiffs to USEPA under the OU-1 and OU-2 consent decrees.  Among the reimbursed costs be paid by some of the Plaintiffs under the OU-2 consent decree was $7,062,926.06 in reimbursement of the USEPA's "past response costs" as defined in the OU-2 consent decree.

These "past response costs" include the costs incurred by the USEPA in connection with a removal action by USEPA in 1992, and a second removal action performed by USEPA in 1993. (The "first removal action" and the "second removal action", respectively.)  In order for Plaintiffs to succeed on their CERCLA § 113(f) claims for contribution towards USEPA's costs for performing the first and second removal actions, Plaintiffs must first establish that they and the defendants shared a common liability to USEPA at the time Plaintiffs Cytech, Ford, SPS and TI executed the OU-2 consent decree.  Only if this common liability were established would the Court need to consider whether Plaintiffs paid more than their proportionate share of the common liability.  In fact, none of the Plaintiffs or Defendants were liable to USEPA for those costs at the time the OU-2 consent decree was signed, because statutory time periods within USEPA could bring a claim for recovery of those past costs (set forth at 42 U.S.C. § 113(g)(2)) had expired.[1]

### F.    Plaintiffs Cannot Recover For Contributions Made Towards Response Costs By Third Parties Who Are Not Plaintiffs In This Case

Two Plaintiffs, TI and Agere, seek to recover "incurred response costs" and contributions for USEPA costs that were paid by others that have a relationship with these Plaintiffs, but who chose not to be plaintiffs in this case.

### 1.    TI

TI is a successor to the TI entity that actually signed the OU-2 Consent Decree and made contributions to a fund to pay response costs required under OU-1.  TI's alleged liability arises out of the fact that its division or subsidiary Bundy Corporation, operated the National Rolling Mills plant for some period.  However, the amounts that TI seeks to recover in this case include

---

[1] Defendants filed a motion for summary judgment on this issue which was denied by the Court on the basis of a genuine issue of material fact.  (Doc. No. 317).

7

contributions from a company identified as Smiths Group Ltd. totaling $2,024,774.99. Plaintiffs disclosed in their response to Defendants' Contention Interrogatories that the payments were caused to be made by Smiths from two of its distant subsidiaries, Smiths Group Service Corp. and Smiths Group North America, Inc. In their motion for leave to file a Fifth Amended Complaint, Plaintiffs sought to add these entities as parties to the case, but the Court denied that part of the motion. (Doc. No. 279). Therefore, payments by the Smiths entities must be deducted from the response costs that Plaintiff TI seeks to collect in this case.

        **2.**    **Agere**

Another non-party to this litigation, Lucent Technologies, Inc., made contributions to the OU-1 remediation and was party to the original Boarhead Farm Agreement Group. Lucent was the corporate successor to Western Electric which was spun off from AT&T as part of the break up of that national phone company. Subsequently, as indicated by documents provided by Plaintiffs, Lucent sold part of its assets to Agere and Agere agreed to assume certain liabilities, including the liabilities for OU-1 and OU-2 remediation as part of the Plaintiff group. Agere never signed on to either the OU-1 or OU-2 consent decree.

Before Lucent sold the assets to Agere, Lucent contributed $115,000 to the accounts established by the Plaintiffs to pay contractors and USEPA costs. Since Lucent is not a party to this case, this amount should be deducted from any claim by Agere or assignees of Agere for Agere's response costs.

        **G.**    **Ashland Was Not An Arranger Of Any Waste That Was Deposed Of At The Boarhead Farm Site**

There is no dispute in this case that Ashland engaged Defendant AETC to haul waste from its Great Meadows, NJ facility from August, 1976 through March, 1977. The amounts of

waste generated and picked up are not in dispute. It is also not disputed that most of this was picked up by DeRewal Chemical Company ("DCC") which was engaged by AETC to pick up Ashland's waste.[2] However, Ashland contends it was not an "arranger" within the meaning of CERCLA Section 107(a)(3) and, in fact, none of the waste picked up by DCC was discharged at Boarhead and, if it was, it was neutralized.

### 1.  Ashland Generated Waste Was Not Disposed At Boarhead

Ashland contends that all of the waste picked up from the Great Meadows Plant by DCC drivers was either sold or taken to DeRewal's Wissinoming, Philadelphia facility where, in March, 1977, DeRewal drivers were caught red-handed disposing of waste in the Philadelphia sewer system. The three DeRewal drivers confirmed in their depositions given to the USEPA that they took all Ashland waste to the Wissinoming Plant. It was only in this litigation that these three drivers testified that they took a few of the loads destined for Wissinoming to the Boarhead Farm Site.

Additional facts to be established in this trial will support the 1976 testimony of the drivers in that the Boarhead Farm Site was under strict scrutiny from local and PADEP enforcement authorities as far back as 1973. In particular, on September 15, 1976, a notorious incident occurred whereby one of the DeRewal drivers was burned by leaking sulfuric acid which caused fumes and response by fire and other personnel. This eventually lead to an injunction order entered on October 15, 1976 ordering DeRewal to remove all hazardous waste from the Boarhead Farm Site and preventing them from bringing anymore waste onto the site.

---

[2] On November 17, 2007 this Court granted Plaintiffs' Cross-Motion for Summary Judgment against Defendants AETC which established AETC's status as an "arranger." (Doc. No. 216).

9

2.     **Ashland Was Not An "Arranger" Within The Meaning Of CERCLA Section 107(a)(3)**

If the Court determines that Ashland generated waste was, in fact, taken to Boarhead Farm, Ashland contends that it was not an "arranger" of the disposal of hazardous waste under the facts of the case and as defined by CERCLA Section 107(a)(3). In Morton International Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669 (3d. Cir. 2003), the Court of Appeals established the broad, requisite elements of arranger liability. The critical finding is that "a plaintiff must also demonstrate either control over the process that results in a release of hazardous waste *or* knowledge that such a release will occur during the process." Id. at 677 (emphasis by Court).

In this case, Ashland had no basis to believe that its waste was being treated and disposed in such a way that hazardous wastes would be released. Ashland's representative, Arthur Curley, was duped into believing that Ashland's waste was initially being sold and then, later, waste was being neutralized at the Wissinoming facility instead of Boarhead.

3.     **Alleged Hazardous Waste in Two Drums Discovered At Boarhead Bearing Ashland Labels Did Not Contain Ashland Generated Waste**

It is not disputed that two drums bearing Ashland labels and a deteriorated drum with an Ashland label were found at the Boarhead Farm Site. However, contents of only one of the intact drums was analyzed and the drum fragment. The contents of the intact drum were not one of the "drummed solvents" that was allegedly picked up by DCC from the Great Meadows Plant and allegedly taken to Boarhead. Indeed, there is no evidence how these drums reached Boarhead. Furthermore, the analysis of these two items conducted by Ashland's own personnel indicates that the product in the drums was not an Ashland manufactured product. Therefore, the only reasonable inference can be drawn is that this was an empty Ashland drum filled by some third party and deposited at Boarhead. Therefore, Ashland did not generate the waste and

10

therefore cannot be deemed to be an arranger of the waste because there is no evidence that it was picked up by DCC.

**H.    Ashland Is Entitled To The Third-Party Defense Provided By CERCLA Section 107(b)(3)**

CERCLA Section 9607(b) provides the following defense to liability:

> "(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff as acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taken in consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that it could foreseeably result in such acts or omissions."

42 U.S.C. § 9607(b)(3).

Ashland had no contractual relationship with DeRewal.  DeRewal picked up Ashland's waste from Broad Meadows through an arrangement with AETC and a Uniform Commercial Code Bill of Lading which designated AETC as consignee.  Curly's actions in actually inspecting the Wissinoming site and trying to verify the location for the treatment and disposal of the waste establishes due care.

**I.    Any Alleged Disposal Of Ashland Waste At the Boarhead Farm Site Did Not Lead To An Increase In Response Costs**

Ashland intends to prove through its expert witnesses that even if the Court should find that Ashland waste was disposed of at the Boarhead Farm Site, the waste did not lead to

11

increased response costs. Almost half of the waste allegedly taken to Boarhead was spent/mixed nitrating acid. The remainder of the waste was phthalide acid waste (containing very low percentages of acid), dye waste and CDN waste water. Furthermore, the only time period in which Ashland waste is implicated at the Boarhead Farm Site is from August 1976 to March 1977, well after years of disposal of other wastes by other generators and arrangers, starting in 1969 when Manfred DeRewal purchased the property. The complete details of the expert opinions are set forth in the experts' reports. However, following is a summary of the points to be made.

1.     **Disposal Of Non-Metal Bearing Acid Waste In Or Subsequent To August, 1976 Did Not Result In Increased Mobility Of Metal Contaminants Leading To Increased Response Costs**

The EPA's Remedial Investigation report commented that the effects of any acid disposed of at the Boarhead Farm Site would have been "localized" and "short lived". Plaintiffs contest the accuracy of this statement because the effect of the acid was to free inert, pre-existing metals in the soil and transfer them to the groundwater. Since metals were removed from groundwater pursuant to the OU-1 removal and remediation, Plaintiffs assert that Ashland's acid waste could have contributed to the extent and cost of remediation.

Plaintiffs' position is unsupportable for several reasons. There is no specific evidence found at the Boarhead Farm Site to support the mobilization claim. The metals being removed from the groundwater at the Boarhead Farm Site, particularly arsenic and chromium, are not mobilized by acids. The most likely source of metal contamination at the site was the high concentration of metals in other wastes disposed there, particularly pickling acid and other metal treatment wastes.

12

2. **Any Disposal Of Acid Waste Generated By Ashland In Or Subsequent To August, 1976 Could Not Have Resulted In Increased Response Costs Because Other Releases Prior To 1976 Created The Maximum Extent Of Contamination From Volatile Organics At The Site**

The primary contaminates at the Boarhead Site were volatile organics such as TCE. By 1976, when Ashland waste was allegedly disposed at the site, the full extent of TCE contamination had already occurred. The site contractor's three-dimensional groundwater flow and mass transport model indicated that by 1976 the plume of contaminated groundwater had moved down gradient of the area where Ashland's wastes were allegedly disposed of and well past the location of the groundwater interceptor trench that was installed by the USEPA removal remedy of OU-1. Thus, the necessary groundwater remedy would have been independent of any Ashland waste that may have been disposed of at the Boarhead Site.

3. **Disposal Of Ashland's Wastes In Or Subsequent To August, 1976 Did Not Contribute To The Environmental Conditions That Lead To The Soil Remediation Response Actions Under OU-2**

The OU-2 remedy primarily was the soil remediation process designed to treat two specific "hot spots" at the Boarhead Farm Site. These locations were located above gradient and away from the areas where DCC drivers allegedly discharged Ashland's wastes. Not only are these locations down gradient topographically, they are down gradient hydrogeologically from the two "hot spots". Therefore, contaminated groundwater flow from such waste could not have contaminated the soil located on a higher grade. In addition, the spent acid generated by Ashland did not contain any of the contaminants in concentration or type that was found to have existed in the two hot spots treated as part of the OU-2 remedy.

**J.    Application Of The "Gore Factors" Favors A Finding Of Minimal Equitable Apportionment of Liability to Ashland**

Finally, Plaintiffs have the burden to establish a reasonable basis for apportioning the overall liability for response costs among the parties. DeGussa Construction Chem. Operations, Inc. v. Berwind Corp., 280 F. Supp. 2d 393, 401 (E.D. Pa. 2003). In determining an equitable apportionment of response costs among Plaintiffs and Defendants, the Court should look to certain facts labeled the "Gore Factors". These have been described as follows:

> (i)    the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
>
> (ii)    the amount of hazardous waste involved;
>
> (iii)    the degree of toxicity of the hazardous waste involved;
>
> (iv)    the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
>
> (v)    the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
>
> (vi)    the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

Ashland submits that the first five factors favor Ashland. The last factor does not, simply because there was no reason for Ashland to have believed that it was implicated at Boarhead in view of the testimony of the DeRewal drivers given to the USEPA and Ashland's full cooperation in resolving its liability to the City of Philadelphia because of DeRewal's activities at the Wissinoming facility.

14

II.    **LIST OF WITNESSES**

Fact Witnesses

Arthur Curley – Great Meadows Plant Manager, waste generated and disposal theory

Peter Noll – Bucks County Department of Health official involved in shut-down of Boarhead Site in October, 1976

Everett Hoagg– Bucks County Department of Health official involved in shut-down of Boarhead Site in October, 1976.

Gary Schoening – Ashland employee conducted analysis of contents of drums found at Boarhead

Edward Marti – Ashland employee conducted analysis of contents of drums found at Boarhead

Danny DeGarmo– Ashland employee conducted analysis of contents of drums found at Boarhead

Ashland reserves the right to call any witness identified by other Parties, including John Barsum, John C. Bean, Karen Castillo, Linda Cochran, Bruce DeRewal, Manfred DeRewal, Sr., Elaine Gawronski, Karen Porter and June A. Stephens as to disposal of non-Ashland-generated wastes at the Boarhead Site and/or the disposal of Ashland-generated wastes at facilities other than the Boarhead Site.

Court Reporters for EPA depositions and 6/19/78 Plea Hearing

Robert W. Harley (Norristown)- Manfred DeRewal, Jr.(2/26/97); Bruce DeRewal(3/13/97)

Heather L. Ashton (Clementon, N.J.)- John Barsum (6/4/97,6/5/97)

Linda Rossi Rios (Philadelphia) – Jeffrey Shaak (6/25/97)

Barbara A. Burke – Manfred DeRewal,Sr. (3/15/89)

Carl Dillich – Manfred DeRewal,Sr. (3/17/89)

Greg B. Hunt (Dallas,Tex.) - Manfred DeRewal,Sr. (12/10/96,12/11/96)

Larry Herr (Official Court Reporter E.D.Pa.) – Guilty Plea Hearing

15

Expert Witnesses

W. Leigh Short Ph.D., P.E.
James F. Roetzer, Ph.D.
Gordon R. Jamieson, P.G.
Joseph Hochreiter

## III.   **LIST OF EXHIBITS**

See attached Ashland List of Exhibits.  Ashland reserves the right to rely on any other

exhibits identified by Defendants.

## IV.   **ITEMIZED STATEMENT OF DAMAGES**

Not applicable.

## V.   **LIST OF STIPULATIONS AND LIST OF DISPUTED AND UNDISPUTED FACTS**

Plaintiffs' and Ashland's counsel have communicated on the subjects of stipulation of

facts and admissibility of exhibits.  Counsel have tentatively agreed to meet on May 28, 2008 to

confer on these matters.  The broad areas of facts upon which Ashland's counsel has a

reasonable expectation that it will be able to stipulate to are outlined below:

1.    History of the development of the Boarhead Farms site and general disposal of wastes through October 15, 1976.  We generally do not dispute the facts established by documents developed by local law enforcement authorities and as set forth in Plaintiff's Responses to Joint Contention Interrogatories and Amended and Supplemental Responses thereto on the "Nexus Periods."  We do dispute the percentages of wastes transported by DeRewal Chemical Co. and discharged during these periods at Boarhead.

2.    History and operation of the Wissinoming facility.

3.    History of removal and remediation established by the Administrative Record and EPA and other contractor records, except as to the allegations of Ashland's hazardous waste alleged to have been disposed of at Boarhead, the disposal of which waste at Boarhead is denied.

4.    Removal and remediation costs incurred by EPA and paid to its contractors.

5.    Removal and remediation costs paid by Plaintiffs and others to contractors.

6.    The amounts paid, as agreed among Plaintiffs to be paid, by each Plaintiff for its respective share of reimbursement of EPA costs, including costs for removal and remediation as part of OU-1 and OU-2, subject to an agreement among the Plaintiffs as to a future final allocation as alleged in paragraph 16 of the Fifth Amended Complaint.

7.    Amount and nature of hazardous waste generated by certain settled defendants and transported by DeRewal Chemical Co., namely, Plymouth, Quickline, U.S. Department of Navy, Simon Wrecking, Unisys, Bostick, Novartis, Hahn's Specialty Metals/Techalloy, Inc.

8.    Identity and quantities of waste generated by Ashland's Great Meadows plant and transported by DeRewal Chemical Co. pursuant to its contractual arrangement with AETC.

Counsel does not believe that agreement will be able to be reached on the following subjects:

1.    The disposal of hazardous wastes at Boarhead ceased no later than the entry of the injunction order entered by the Bucks County Court of Common Pleas on October 15, 1976.

2.    The disposal of hazardous wastes at Boarhead generated by non-settled defendants (we assume that each non-settled defendant will dispute such allegations).

3.    Hazardous wastes generated by Ashland were not disposed of at Boarhead.

4.    Drums bearing Ashland labels found at Boarhead did not contain hazardous substances manufactured or generated by Ashland.

5.    Any hazardous waste generated by Ashland and alleged to have been disposed at Boarhead did not lead to increased response costs of remediating the contamination at the site.

6.    The amount of hazardous waste disposed of at Boarhead by Plaintiffs and/or its predecessors.

7.    The amount of the payments by each Plaintiff in reimbursement of its share of EPA's past response costs. Particular issues are proper deduction

17

of payments made by non-plaintiff contributors, NRM Investment Worthington, Lucent, and Smith Industries.

8.      The amount of hazardous waste generated by each Plaintiff disposed of at the Boarhead site.

9.      The amount of hazardous waste generated by certain settled defendants, namely Rohm & Haas, Thomas & Betts, that was disposed of at the Boarhead site.

10.     The disposal of hazardous waste at Boarhead by General Ceramics and National Beryllia Corporation.

11.     Costs and dates of completion of various removal actions by the United States.

In the meantime, Ashland's counsel has been informed by Plaintiffs' counsel that it can stipulate to 121 of the 417 facts proposed by Plaintiffs' counsel at this time.

## VI.    ESTIMATION AS TO THE TIME FOR PRESENTATION OF ASHLAND'S CASE

Two-three days.

## VIII.   OTHER DISCLOSURES REQUIRED BY FED.R.CIV.P. 26(a)(3)

None.

/s/ Jeffrey L. Pettit
JEFFREY L. PETTIT
Attorney I.D. No. 21624
RICHARD C. BIEDRZYCKI
Attorney I.D. No. 30604
Phelan, Pettit & Biedrzycki, LLC
1600 North American Building
121 South Broad Street
Philadelphia, PA   19107
(215) 546-0500

Counsel for Defendant Ashland Inc.

Date: May 19, 2008
G:\DATA\J357-29\PretrialMemo\Pretrial Memorandum.doc

18

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 19, 2008, a true and correct copy of the

Defendant Ashland Inc.'s Pretrial Memorandum was served by e-mail on all counsel of record

addressed as follows:

> Glenn A. Harris, Esquire
> Ballard Spahr Andrews & Ingersoll, LLP
> Plaza 1000 - Suite 500
> Main Street
> Voorhees, NJ 08043-4636
> e-mail: harrisg@ballardspahr.com
> ***Counsel for Plaintiffs***
>
> Laurie J. Sands, Esquire
> Wolff & Samson, PC
> 280 Corporate Center
> 5 Becker Farm Road
> Roseland, New Jersey  07068-1776
> e-mail: lsands@wolffsamson.com
> ***Advanced Environmental Technology Corp.***
>
> Robert M. Morris, Esquire
> Morris & Adelman, P.C.
> 1920 Chestnut Street
> P.O. Box 30477
> Philadelphia, PA  19103
> e-mail: rmmorris@morrisadelman.com
> ***Advanced Environmental Technology Corp.***
>
> Lynn Wright, Esquire
> Edwards & Angell, LLP
> 750 Lexington Avenue
> New York, New York  10022-1200
> e-mail: lwright@eapdlaw.com
> ***Carpenter Technology Corporation***
>
> Christopher R. Booth, Jr., Esquire
> Booth & Tucker, LLP
> One Penn Center at Suburban Station
> 1617 JFK Boulevard, Suite 1700
> Philadelphia, PA 19103
> e-mail: cbooth@boothtucker.com
> ***Carpenter Technology Corporation***

Seth v.d.H. Cooley, Esquire
Duane Morris LLP
Suite 4200, One Liberty Place
Philadelphia, PA  19103-7396
e-mail:  scooley@duanemorris.com
***Flexible Circuits and Etched Circuits***

Melissa Flax, Esquire
Carella, Byrne, Bain, Gilfillian, Cecchi,
Stewart & Olstein, P.C.
5 Becker Farm Road
Roseland, New Jersey  07068-1739
e-mail:  mflax@carellabyrne.com
***Handy & Harman Tube Company***

Edward Fackenthal, Esquire
Suite 209 - One Montgomery Plaza
Norristown, PA  19401
e-mail:  edwardfackenthal@cs.com
***NRM Investment Co.***


                        s/Jeffrey L. Pettit
                        JEFFREY L. PETTIT

Date: May 19, 2008