**IN THE UNITED STATES DISTRICT COURT**
**FOR EASTERN DISTRICT OF PENNSLYVANIA**

---

AGERE SYSTEMS, INC., CYTEC INDUSTRIES
INC., FORD MOTOR COMPANY, SPS
TECHNOLOGIES, LLC, and TI GROUP
AUTOMOTIVES LLC,

                           Plaintiffs,

        -against-

ADVANCED ENVIRONMENTAL TECHNOLOGY
CORPORATION, ET AL.,

CIVIL ACTION NO. -
02-CV-3830

---

**DEFENDANT, CARPENTER TECHNOLOGY CORPORATION'S**
**PRETRIAL MEMORANDUM**

Defendant Carpenter Technology Corporation ("Carpenter"), by and through its

undersigned counsel, hereby submits this Pretrial Memorandum.

**I.**      **BRIEF STATEMENT OF THE NATURE OF THE CASE TO BE**
        **PRESENTED AND THE ISSUES TO BE ADDRESSED**

Plaintiffs bring this action under the Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. §9601, *et seq.* ("CERCLA") and the

Pennsylvania Hazardous Site Cleanup Act, 35 P.S. §6020.101, *et seq.* ("HSCA") seeking

recovery of costs associated with the removal of hazardous waste and remediation of the

Boarhead Superfund Site (the "Site"). Specifically, Plaintiffs seek to allocate among

each of the defendants the costs of removing hundreds of buried drums and other wastes

from the Site; designing, installing and maintaining a groundwater treatment system to

treat hazardous wastes; and reimbursing the Environmental Protection Agency ("EPA")

for certain administrative oversight costs.  The cleanup was due to the illegal dumping by DeRewal Chemical Company ("DeRewal") through its owners and truck drivers.  As set forth in the EPA's documents, the EPA's focus of the cleanup was the removal of the buried drums and the remediation of volatile organic compounds ("VOCs") which were found in the ground, and focused on two "hot spots."

Plaintiffs' claims allegedly arise during four distinct time periods relating to DeRewal's conduct:

1.      The Pre-Ontario Period (January 1, 1972 through December 1, 1973). This is the period where Plaintiffs allege DeRewal dumped primarily at the Site;

2.      The Ontario Period (December 1, 1973 through June 30, 1975).  This is the period where DeRewal operated a waste disposal site on Ontario Avenue in Philadelphia, PA;

3.      The Gap Period (July 1, 1975 through June 1, 1976).  This is the period allegedly where DeRewal did not operate a facility; and

4.      The Wissinoming Period (June 1, 1976 through March 29, 1977).  This is the period where DeRewal operated a facility in the Wissinoming Industrial Park in Philadelphia, PA.

The only periods that are relevant to Carpenter are the six month period before the Ontario facility opened (June 12, 1973-November 30, 1973) and the first five month and three day period of the Ontario Period (December 1, 1973 through May 3, 1974). Carpenter's relationship with DeRewal began on or about on June 12, 1973 and ended on May 3, 1974.

As with each of the defendants, the primary legal and factual issues Plaintiffs must address and prove are: (1) whether DeRewal disposed of Carpenter's waste at the Site; (2) if so, whether the EPA's response and the remediation of the Site was caused by Carpenter's waste, if at all; and (3) whether Plaintiffs' request for allocating the response costs based upon a "general business practice theory" has any factual or equitable basis among the defendants.

Carpenter's answers to each of these issues are straightforward and direct. First, there is simply no evidence that Carpenter's waste even reached the site. Carpenter is a manufacturer of specialty steel products and is located in Reading, PA. Its waste consisted of what is called "pickle liquor" which is also described as rusty water. DeRewal represented to Carpenter that its pickle liquor would be sent to another company in New Jersey that would process and convert it into ferric chloride for another purpose.

Plaintiffs' only factual evidence relating to the location of the disposal of the waste consists of the testimony of certain drivers that relied upon their memories reaching back over thirty years. Notwithstanding the memories of the drivers, their testimony reveals that the clear objective of DeRewal was to dispose of the waste it received in the easiest manner it could. There were several other disposal sites, closer and more efficient than the Site, which DeRewal would have naturally used, particularly given the EPA's scrutiny of the Site and the neighbors' oversight and suspicions. Accordingly, Plaintiffs' general practice theory simply has no factual support and is speculative and self-serving at best.

Second, the clear focus of the EPA's response to the Site was the removal of drums and remediation of VOCs. However, Carpenter's waste admittedly was not contained in drums and its pickle liquor did not contain VOCs.

Third, the only reason Plaintiffs highlight the weight and volume of Carpenter's pickle liquor is because it is basically water – which measures nicely in gallons. Still, even if Carpenter's waste reached the site, the drivers' testimony, upon whom Plaintiffs' rely, reveals that at the most, forty-six (46) loads at approximately 4850 gallons each (totaling 223,100 gallons) were hauled by DeRewal. By Plaintiffs' own account, this is significantly less than the 992,807 gallons that they claim were "estimated" to have been disposed of at the site, based upon their "general practice theory."

## II.    WITNESS LIST

1. Richard Cheri  -- Carpenter employee who will testify regarding accounting records.
2. Charles Polinko – Carpenter employee who will testify regarding Carpenter's chemical waste analysis.
3. William Reger -- Carpenter employee who will testify regarding Carpenter's chemical waste analysis and accounting records.
4. Manfred DeRewal – owner of DeRewal who will testify regarding DeRewal's business practices.
5. Freddi DeRewal – son of Manfred DeRewal who will testify regarding DeRewal's business practices.
6. Bruce DeRewal -- son of Manfred DeRewal who will testify regarding DeRewal's business practices.
7. June Stephens – driver at DeRewal who will testify regarding DeRewal's business practices.
8. John Barsum -- driver at DeRewal who will testify regarding DeRewal's business practices.
9. Dr. Franklin Mink (expert) – environmental toxicologist who will testify regarding Carpenter's pickle liquor toxicity and whether it caused any of the response costs claimed by Plaintiffs.
10. Joseph J. Hochreiter, Jr. (expert) – expert testimony on the wastes disposed of by Plaintiff.
11. EPA and PaDEP witnesses

Carpenter reserves the right to call any and all witnesses identified by another party, including deposition testimony.

## III.     EXHIBIT LIST

1.     CH2M Hill Boarhead Farms Remedial Investigation Report prepared for U.S. Environmental Protection Agency. January 1997
2.     CH2M Hill Boarhead Farms Site Upper Black Eddy, PA Feasibility Study Report prepared for U.S. Environmental Protection Agency. July 1997
3.     EPA Superfund Program Proposed Plan. January 1998
4.     EPA Superfund Program Record of Decision. Boarhead Farms Superfund Site. November 1998
5.     EPA Five Year Report dated August 22, 2007
6.     Letter dated 1/21/00 from Carpenter to EPA
7.     Letter dated 2/14/96 from Carpenter to EPA
8.     Letter dated 4/28/86 from Carpenter to EPA
9.     Letter dated 7/12/88 from Carpenter to EPA
10.    Letter dated 11/14/72 from DeRewal to Carpenter
11.    Undated handwritten note with phone number of DeRewal and address of Sylvan Chemical Co.
12.    Letter dated 11/27/72 from DeRewal to Carpenter
13.    Letter dated 6/5/73 from Carpenter to DeRewal
14.    Agreement dated 6/12/73 between Carpenter and DeRewal
15.    Waster Acid Removal Chart for period July 1972-June 1973
16.    Undated handwritten note from Dick Cheri re: Waster Acid Haulers
17.    Carpenter Purchase Order to remove pickling liquor for 1974
18.    Carpenter Purchase Order to remove pickling liquor for 1973
19.    Carpenter Chart of DeRewal removal for period 1/20/74-5/30/74
20.    Handwritten notes of July 1973-June 1974 Waste Acid Removal
21.    Carpenter Chart of DeRewal Waste Acid Removal for period 6/13/73-5/_/7_
22.    Carpenter Memorandum, "Waste Acid Disposal Costs" dated 10/8/74
23.    Carpenter Chart of Waste Acid Removal Cost for 1973-1974
24.    Expert Report of Frank Mink
25.    Expert Report of Joseph J. Hochreiter, Jr.
26.    Deposition transcripts of witnesses
27.    Affidavit of Charles Polinko and documents attached thereto

Carpenter reserves the right to use any other exhibits (including deposition transcripts) identified by another party.

## IV.     ITEMIZED STATEMENT OF DAMAGES AND/OR OTHER RELIEF

None.

## V.    LIST OF DISPUTED AND UNDISPUTED STIPULATIONS OF FACTS

1. Carpenter Technology Corporation ( hereinafter" Carpenter") is a corporation organized under the laws of the State of Delaware.

2. Carpenter operates a specialty steel manufacturing and distribution business in Reading, Pennsylvania, which started operation as Carpenter Steel Company on June 7, 1889.

3. Carpenter is a leading international manufacturer and distributor of specialty alloys, powder alloys, titanium, and ceramic materials serving the automotive, aerospace, energy, industrial, medical, defense, and consumer products industries.

4. Carpenter produces materials in long product form, including bar, wire, strip, plate, fine wire and billet.

5. During the manufacturing process the steel is cleaned by using acidic aqueous materials.

6. This cleaning of steel is also known as pickling and the cleaning solution is known as pickle liquor.

7. The pickle liquors were tested on a regular basis in the production process to determine whether they were efficiently performing the pickling job it was intended to do.

8. When the pickle liquor lost its ability to clean the metal because of low acidity, the pickle liquors were pumped to one of three holding tanks, where it would remain until picked up by a hauler.

9. Carpenter hired several haulers that took the spent pickle liquor off site.

10. By letter dated  November 17, 1972,  Sylvan Chemical Corporation advised Carpenter that it wished to obtain Carpenter's pickle liquor to convert it into ferrous chloride and that the conversion would not take place in Pennsylvania.

11. By letter dated November 27, 1972 DeRewal Chemical Company (DCC) advised Carpenter that any hydrochloric acid that it would remove form Carpenter would go to Sylvan Chemical Corporation in Englewood Cliffs, New Jersey, where Sylvan would use it for the manufacture of ferrous chloride.

12. After these assurances, on May 12, 1973. Carpenter entered into a contract with DeRewal Chemical Company ("DCC") to haul its spent pickle liquor off site.

13. During the relevant time period, there were no major highways or roads connecting the Upper Black Eddy, Bridgeton Township with Reading.

14. At the relevant time period, there were major highways connecting 3015 East Ontario Street, Philadelphia and Reading.

15. During the relevant time period, the Reading Landfill was in operation in Reading Pennsylvania.

16. During the relevant time period, the Enterprise Avenue Landfill was in operation in Philadelphia.

17. During the relevant period, Marvin Jonas operated a landfill in New Jersey.

18. In October 1973, residents around the Boarhead Site complained to government officials about the activities at the Site.

19. When government officials investigated the complaints, they discovered the disposal of ferric chloride, a substance not associated with Carpenter, at the Site.

20. On May 28, 1974, the Commonwealth of Pennsylvania filed an action against Manfred DeRewal and DCC.

21. Carpenter's relationship ended with DCC in May, 1974.

22. EPA conducted an investigation of the Site in January 1986.

23. In 1992 and 1993, EPA removed over 2,500 buried drums from the Site.

24. In 2003, plaintiffs removed over 900 drums from the Site.

25. Carpenter did not use drums for any of its spent pickle liquor.

26. In January 1997 approximately 18 residences were supplied with carbon filters to treat the volatile organic compounds (VOCs) in their drinking water wells.

27. The Record of Decision for the site selected an air stripper for groundwater treatment to address the VOCs in the groundwater.

28. Hot spots identified in the ROD were areas with high concentrations of volatile organic compounds.

29. Parties, other than Carpenter, disposed of VOCs at the Site.

Anticipated Disputed Facts

30. Whether Carpenter's waste was disposed of at the Boarhead site.

31. If so, based upon the testimony referred to by Plaintiffs in their Amended Answers to Defendants' Contention Interrogatories, the volume of spent pickle liquor disposed of at the Boarhead Site is less than the 992,807 gallon estimate

argued by plaintiffs and closer to 223,000 gallons (46 truck loads at 4850 gallons each), assuming the veracity of the witnesses relied upon by Plaintiffs.


## VI.     ESTIMATION OF TIME FOR PRESENTATION OF CASE

Two to three days.

## VII.    OTHER DISCLOSURES REQUIRED BY FED.R.CIV.P 26(a)(3)

None.


Respectfully submitted,

BOOTH & TUCKER, LLP


DATED: May 19, 2008                    By:   /s/Christopher R. Booth, Jr.
                                            Christopher R. Booth, Jr. (CRB 2896)
                                            One Penn Center at Suburban Station
                                            1617 JFK Boulevard, Suite 1700
                                            Philadelphia, PA 19103
                                            (215) 875-0609