## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, LLC, et al., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : | 02-cv-3830 (LDD) |
| | : | |
| ADVANCED ENVIRONMENTAL | : | |
| TECHNOLOGY CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DECLARATION OF MELISSA E. FLAX IN SUPPORT OF DEFENDANT
## HANDY & HARMAN TUBE COMPANY, INC.'S MOTIONS *IN LIMINE*

MELISSA E. FLAX, of full age and upon her oath declares as follows:

1.  I am a member of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, attorneys for defendant Handy & Harman Tube Company, Inc. ("H&H Tube") and am admitted *pro hac vice* before this Court in connection with the above captioned matter.

2.  I submit this declaration in support of H&H Tube's motions *in limine*.

3.  Attached hereto as Exhibit A is a true and accurate copy of a "summary" of an interview of Thomas Curran.

4.  Attached hereto as Exhibit B is a true and accurate copy of a "summary" of an interview of Mary Kollmar.

5.  Attached hereto as Exhibit C is a true and accurate copy of a "summary" of an interview of Jay Crawford.

6.  Attached hereto as Exhibit D is a true and accurate copy of relevant portions of the deposition transcript of Thomas Curran dated December 2, 2004.

7.    Attached hereto as Exhibit E is a true and accurate copy of the January 17, 2005 letter to Mark Davies, counsel for Plaintiffs from Melissa E. Flax.

8.    Attached hereto as Exhibit F is a true and accurate copy of selected pages from what purports to be a 1992 report.

9.    Attached hereto as Exhibit G is a true and accurate copy of relevant portions of expert report of Jurgen H. Exner.

10.    Attached hereto as Exhibit H is a true and accurate copy of relevant portions of the deposition transcript of Jurgen H. Exner.

11.    Attached hereto as Exhibit I is a true and accurate copy of the January 7, 2007 email from Melissa E. Flax to Glenn A. Harris.

12.    Attached hereto as Exhibit J is a true and accurate copy of the January 10, 2007 email from Melissa E. Flax to Glenn A. Harris.

13.    Attached hereto as Exhibit K is a true and accurate copy of the January 13, 2007 email from Glenn A. Harris to Melissa E. Flax.

14.    Attached hereto as Exhibit L is a true and accurate copy of a DeRewal Chemical Invoice dated February 1973.

15.    Attached hereto as Exhibit M is a true and accurate copy of relevant portions of the deposition transcript of Larry Rees, dated November 18, 2004.

16.    Attached hereto as Exhibit N is a true and accurate copy of relevant portions of the deposition transcript of Mary Kollmar, dated November 18, 2004.

17.    Attached hereto as Exhibit O is a true and accurate copy of relevant portions of the deposition transcript of Thomas Bell dated February 24, 2005.

2

18.    Attached hereto as Exhibit P is a true and accurate copy of relevant portions of the deposition transcript of Manfred T. DeRewal, Sr., dated May 8, 2003.

19.    Attached hereto as Exhibit Q is a true and accurate copy of relevant portions of the deposition transcript of Karen Castillo, dated June 3, 2003.

I declare under penalty of perjury that the foregoing is true and accurate. Executed on this 23rd day of May 2008.

[MF1386]
MELISSA E. FLAX [MF4060]

3

# EXHIBIT A



Date Transcribed ___February 12, 1993___

ORIGINAL
(Red)

THOMAS H. CURRAN was interviewed at his office at Handy & Harmon Tube Company, Inc., Township Line and Whitehall Road, Norristown, PA 19403. The following descriptive information was obtained:

Home Address:
Home Telephone:
Date of Birth:
SSAN:
Employer:                    Handy & Harmon Tube Company, Inc.,
                             Norristown, PA
                             Vice President - Manufacturing

JOHN C. BULLOCK, Esquire, Environmental Counsel, Handy & Harmon, Waterbury, CT, was present for the interview. Mr. Grabill identified himself by displaying his credentials and advised Mr. Curran that the interview concerned his knowledge of the type and extent of a possible relationship between Handy & Harmon Tube Company, Inc, and the Boarhead Farms Site during the period from 1969 to 1977. Mr. CURRAN was also advised that the investigation had been authorized by the U. S. Environmental Protection Agency (EPA), Region III, Philadelphia, PA and that his participation was voluntary. Mr. Grabill informed Mr. CURRAN that no information protected by attorney/client privilege would be sought. Mr. CURRAN agreed to be interviewed and stated that he would be willing to review this statement and, after reviewing it for accuracy, sign the statement.

Prior to the start of the interview, Mr. BULLOCK advised that Handy & Harmon Tube Company, Inc. is a separate corporation and that the parent company is Handy & Harmon, Waterbury, CT. Mr. CURRAN then provided the following information:

Mr. CURRAN stated that he has been employed by Handy & Harmon Tube Company, Inc. for twenty-eight years and that he is currently the Vice President of Manufacturing. During the pertinent period, 1969 to 1977, he was an Assistant in the Production Control Office. As such, he was not responsible for waste disposal. During this period, the Maintenance Department may have been responsible for placing liquid wastes in containers for disposal. The Maintenance Department would have contacted Purchasing to have them contact a hauler. BOB ZIMMERMAN was Maintenance Manager during part of the pertinent period, but he is now deceased. ROBERT BECKER was a Purchasing Agent, possibly in 1972 or 1973, but he is no longer employed by Handy & Harmon, and his location is not known. MARY KOLLMAR is currently Purchasing Manager. She began in the Purchasing Department in 1972 or 1973.

Mr. CURRAN stated that Handy & Harmon Tube Company manufactures stainless steel tubes of various diameters and lengths. Some of the tubing is very small and is used for instrumentation. The raw material is placed in acid baths for a

---

view of ____Thomas H. Curran_____     On _2/3/93____     JHA File # __90-150__

d by ____Richard C. Grabill_____     Client File # _CDM Work Asgmt. # C03032__

HEMENWAY ASSOCIATES                    A-3                    Form 302 - Interview Re

ORIGINAL

pickling process which reduces the size. The steel rods are then drawn through a die and over a mandrel in a cold drawing process to further reduce the size. Mr. CURRAN said that the pickling baths use hydrofluoric acid, hydrochloric acid, sulfuric acid, and nitric acid mixed with water. The acid content ranges from 8% to 10%. Ordinarily the acids are not mixed and are separate baths. Spent acids are taken out by tankers. The hauler, currently and during the pertinent period, is Waste Conversion Systems whose headquarters are in Hatfield, PA. Mr. CURRAN could not estimate the volume of spent acid generated and hauled out from 1969 to 1977.

Mr. CURRAN stated that the product was cleaned with a trichloroethylene bath and annealed in a hydrogen atmosphere. No finish coating was applied. The trichloroethylene was redistilled in-house which generated a sludge. The sludge was placed in 55-gallon drums. During the pertinent period, it may have been hauled out by Delaware Container or Chemclene. To the best of Mr. CURRAN's memory, Chemclene hauled out some of the sludge for recycling at no charge to Handy & Harmon.

Mr. CURRAN recalled the name DeRewal but could not associate the name with hauling out sludge or other wastes. He did not recognize DeRewal Chemical Company. invoice number 371, dated 1/5/73, issued to Handy & Harmon Tube Company.

Mr. CURRAN stated that 10W30 and other oils were used in their vacuum furnaces and became a waste stream. This was recycled by outside vendors whom he did not recall. He stated that the volume was not very large.

Mr. CURRAN said that another waste stream was generated by the use of animal fats based, oil based, and rubber based lubricating oils. This waste was collected in 55-gallon drums and picked up by a hauler whom he did not recall.

Mr. CURRAN stated that the finishing operation includes a grinding process lubricated by water which creates a mix of metal particles and water. This mixture must be disposed of, but it is not a hazardous material. Mr. CURRAN advised that the manufacturing process does not generate any copper wastes.

Mr. CURRAN stated that while the name DeRewal was familiar to him, he did not recognize the names DeRewal Chemical Company; Revere Chemical Transport; Revere Chemical Company; Echo, Inc.; MANFRED DeREWAL; ROBERT DeREWAL; JONATHAN DUNN; KAREN DUNN; or any of the other names set forth on page 3, paragraph 5 of the 104(e) letter from the EPA dated September 30, 1992.

Mr. Curran could provide no further information of value, and the interview was terminated.

STATEMENT OF THOMAS M. CURRAN:

I, Thomas M. Curran, have read the above statement; and it is true and accurate to the best of my recollection. I have voluntarily signed this page and have initialed all corrections and each of the above pages to attest to the accuracy of this statement. No threats or promises have been made to me, and no coercion of any kind has been used to make me sign this statement.

Date: _____    Signature: _____

Boarhead Farms Site
Curran, Thomas M.
Page 2

# EXHIBIT B



Date Transcribed  February 13, 1993

ORIGINAL
(Red)

MARY A. KOLLMAR was interviewed in the offices of Handy & Harmon Tube Company, Inc., Township Line and Whitehall Road, Norristown, PA 19403. The following descriptive information was obtained:

Home Address:          Prefers contact at place of business
Home Telephone:        Prefers contact at place of business
Date of Birth:
SSAN:
Employer:              Handy & Harmon Tube Company, Inc.
                       Norristown, PA
                       Purchasing Manager

JOHN C. BULLOCK, Esquire, Environmental Counsel, Handy & Harmon, Waterbury, CT, was present for the interview. Mr. Grabill identified himself by displaying his credentials and advised Ms. KOLLMAR that the interview concerned her knowledge of the type and extent of a possible relationship between Handy & Harmon Tube Company, Inc. and the Boarhead Farms Site during the period 1969 to 1977. Ms. KOLLMAR was also advised that the investigation had been authorized by the U. S. Environmental Protection Agency (EPA), Region III, Philadelphia, PA, and that her participation was voluntary. She was informed that no information protected by attorney/client privilege would be solicited. Ms. KOLLMAR agreed to be interviewed and stated that she would be willing to review this statement and, after reviewing it for accuracy, sign the statement. She then provided the following information:

Ms. KOLLMAR stated that she started working for Handy & Harmon Tube Company, Inc. in 1972 as a clerk/typist in the Purchasing Department. Her duties primarily involved typing and filing purchase orders. She recalled typing purchase orders for Waste Conversion Systems to haul out waste, but she did not recall the type of waste involved.

Ms. KOLLMAR stated that she recalled the name DeRewal, possibly in connection with the pick-up of wastes for disposal. She thought that she had typed a debit memo to the file for DeRewal Chemical Company services. She did not recall ever having typed any purchase orders for DeRewal Chemical Company, and she did not recognize DeRewal Chemical Company invoice number 571, dated 2/5/73, issued to Handy & Harmon Tube Company. Ms. KOLLMAR stated that this invoice would have been received by the Accounting Department and would not have been handled by her. The Purchasing Agent at the time would have made contact with the outside hauler, and she would not have had any contact with the office of DeRewal Chemical Company. She stated that NORM WILLIAMS was a Purchasing Agent form 1975 to 1980, but he is now deceased. BOB ZIMMERMAN was the Plant Manager during the pertinent period, but he is also deceased. Ms. KOLLMAR could not remember any other employees, former or current, who may have been involved in waste disposal. In addition, there are no records available to research since the Purchasing

rview of    Mary A. Kollmar          On  2/5/93      JHA File #  90-150

d by     Richard C. Grabill                Client File #  CDM Work Asgmt.# C03052

HEMENWAY ASSOCIATES              A-5              Form 303 - Interview Report

42

acknowledged



ORIGINAL
(Red)

BOARHEAD FARMS SITE

INTERIM REPORT 18

APPENDIX B

Interview Summary - Rahns Specialty Metals Employee

Pierce, James E. ...................................    B-1

# EXHIBIT C



Date Transcribed __February 12, 1993__

JAY H. CRAWFORD was interviewed in the offices of Handy & Harman Tube Company, Inc., Township Line and Whitehall Road, Norristown, PA 19403. The following descriptive information was obtained:

Home Address:
Home Telephone:
Date of Birth:
SSAN:
Employer:    Handy & Harman Tube Company, Inc.
             Norristown, PA
             Supervisor of Welding and Raw Materials

JOHN C. BULLOCK, Esquire, Environmental Counsel for Handy & Harman, Waterbury, CT, was present for the interview. Mr. Grahill identified himself by displaying his credentials and advised Mr. CRAWFORD that the interview concerned his knowledge of the type and extent of a possible relationship between Handy & Harman Tube Company, Inc. and the Boarhead Farms Site during the period from 1969 to 1977. Mr. CRAWFORD was also advised that the investigation had been authorized by the U. S. Environmental Protection Agency (EPA), Region III, Philadelphia, PA, and that his participation was voluntary. Mr. Grahill informed Mr. CRAWFORD that no information protected by attorney/client privilege would be sought. Mr. CRAWFORD agreed to be interviewed and stated that he would be willing to review this statement and, after reviewing it for accuracy, sign the statement. He then provided the following information:

Mr. CRAWFORD stated that he has been the Supervisor of Welding and Raw Material for twenty-five years including the period from 1969 to 1977. He stated that he is not now involved in waste disposal and was not involved during the pertinent period. He felt that ROBERT TINNERMAN, Engineering, and WALT FOREN, Maintenance Supervisor, may have had knowledge of waste disposal; but both are now deceased.

Mr. CRAWFORD stated that the name DeReval Chemical Company was familiar to him since a company with the name DeReval hauled spent lubricants in 30 and 55-gallon drums. He did not recall what types of lubricants were involved, but he did recall seeing other employees fill the drums. The accumulation of drums prior to pick-up was small, probably fewer than a dozen. Mr. CRAWFORD did not recall the frequency of pick-ups or the period of time that DeReval hauled out the drums, but he did remember that it was sometime during the period 1969 to 1977.

Mr. CRAWFORD stated that he had no knowledge of other wastes being hauled by DeReval and, in fact, was not familiar with the waste streams generated by the manufacturing process.

Mr. CRAWFORD advised that he had no contact with any of the drivers or

---

In review of ____Jay H. Crawford____    On _2/3/93_    JHA File # _90-130_

____ed by ____Richard C. Grahill____    Client File # CDM Work Asgmt. # C03052

JOHN HEMENWAY ASSOCIATES    A-1    Form 300 - Interview Rep

**40**

employees of DeRaval. He did not recognize the names HANFRED DERIVAL; ROBERT DERIVAL; JONATHAN DUNN; KAREN KEAN; Revere Chemical Company; Revere Chemical Transport; Echo, Inc.; or any of the other names set forth on page 3, paragraph 3 o EPA 104(e) letter dated September 30, 1991.

Mr. CRAWFORD he could not think of any other employees who would have been familiar with waste disposal during the pertinent period. He could provide no further information of value, and the interview was terminated.

STATEMENT OF JAY M. CRAWFORD:

I, Jay M. Crawford, have read the above statement; and it is true and accurate to the best of my recollection. I have voluntarily signed this page and have initialed all corrections and each of the above pages to attest to the accuracy of this statement. No threats or promises have been made to me, and no coercion of any kind has been used to make me sign this statement.

Date: _____     Signature: _____

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PENNSYLVANIA

_____  CIVIL ACTION NO.
                                  02-CV-3830
BOARHEAD FARM AGREEMENT    Judge Legrome D. Davis
GROUP,
            Plaintiff,          Oral Deposition of:

      vs.                         Thomas M. Curran

ADVANCED ENVIRONMENTAL TECHNOLOGY
CORPORATION; ASHLAND CHEMICAL
COMPANY; BOARHEAD CORPORATION;
CARPENTER TECHNOLOGY CORPORATION;
CROWN METRO, INC.; DIAZ CHEMICAL
CORPORATION; EMHART INDUSTRIES,
INC.; ETCHED CIRCUITS, INC.; FCG,
INC.; GLOBE DISPOSAL COMPANY, INC.;
GLOBE-WASTECH, INC.; HANDY & HARMAN
TUBE COMPANY, INC.; KNOLL, INC.;
MERIT METAL PRODUCTS CORPORATION;
NOVARTIS CORPORATION; NRM INVESTMENT
COMPANY; PLYMOUTH TUBE COMPANY;
QUIKLINE DESIGN AND MANUFACTURING
COMPANY; RAHNS SPECIALTY METALS,
INC.; ROHM & HAAS COMPANY, SIMON
WRECKING COMPANY, INC.; TECHALLOY
COMPANY, INC.; THOMAS & BETTS
CORPORATION; UNISYS CORPORATION;
UNITED STATES OF AMERICA
DEPARTMENT OF NAVY,
            Defendants.
_____

          *   *   *   *   *
      Thursday, December 2, 2004
          *   *   *   *   *

          Transcript in the above matter taken at
the offices of Ballard, Spahr, Andrews & Ingersoll,
LLP, 1735 Market Street, 42nd Floor, Philadelphia,
Pennsylvania, commencing at 10:00 a.m.
      Certified Shorthand Reporting Services
                Arranged Through
         Mastroianni & Formaroli, Inc.
              709 White Horse Pike
            Audubon, New Jersey 08106
                (856) 546-1100

Thomas M. Curran                                                    December 2, 2004

Page 2

APPEARANCES:
  BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
  BY   MARC E. DAVIES, ESQUIRE
  1735 MARKET STREET, 51ST FLOOR
  PHILADELPHIA, PENNSYLVANIA 19103-7599
  (215) 864-8248
  ATTORNEYS FOR THE PLAINTIFF

  HINMAN, HOWARD & KATTELL, LLP
  BY   RALPH K. KESSLER, ESQUIRE
  106 CORPORATE PARK DRIVE, SUITE 317
  WHITE PLAINS, NEW YORK 10604
  (914) 694-4102
  ALSO APPEARING FOR THE PLAINTIFF

  CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
  STEWART & OLSTEIN, ESQUIRES
  BY:  JOHN M. AGNELLO, ESQUIRE
  5 BECKER FARM ROAD
  ROSELAND, NEW JERSEY 07068-1739
  (973) 994-1700
  ATTORNEYS FOR THE DEFENDANT
  HANDY & HARMAN TUBE COMPANY, INC.

  LAW OFFICE OF EDWARD FACKENTHAL
  BY:  EDWARD FACKENTHAL, ESQUIRE
  ONE MONTGOMERY PLAZA, SUITE 209
  NORRISTOWN, PENNSYLVANIA 19401
  (610) 279-3370
  ATTORNEYS FOR THE DEFENDANT
  NRM INVESTMENT COMPANY

Page 4

```
 1        OBJECTIONS
 2        OBJECTION INDEX
 3   (Objection)................... 28:18
         (Objection)................. 28:25
 4   (Objection)................... 29:11
         (Objection)................. 30:4
 5   (Objection)................... 31:1
         (Objection)................. 32:12
 6   (Objection)................... 34:5
         (Objection)................. 36:16
 7   (Objection)................... 58:25
         (Objection)................. 63:24
 8   (Objection)................... 66:9
         (Objection)................. 66:20
 9   (Objection)................... 67:12
         (Objection)................. 77:25
10   (Objection)................... 79:9
         (Objection)................. 80:8
11   (Objection)................... 81:22
         (Objection)................. 84:9
12   (Objection)................... 92:17
         (Objection)................. 94:15
13   (Objection)................... 97:17
         (Objection)................. 114:13
14   (Objection)................... 115:6
         (Objection)................. 115:20
15   (Objection)................... 116:13
         (Objection)................. 117:11
16   (Objection)................... 118:23
17
18
19
20
21
22
23
24
25
```

Page 3

WITNESS INDEX

Examination of Mr. Curran

By Mr. Davies:       Page 5

By Mr. Fackenthal:   Page 99


EXHIBITS

EXHIBIT INDEX
Appears at the conclusion of this Transcript

Page 5

```
 1   (THOMAS M. CURRAN, having been duly
 2   sworn, was examined and testified as follows:)
 3   (EXAMINATION OF MR. CURRAN BY MR. DAVIES:)
 4       Q.   Mr. Curran, thanks for coming here.
 5            Will you state your name, for the
 6   record, please?
 7       A.   Thomas Curran.
 8       Q.   And that's C-u-r-r-a-n?
 9       A.   That's right.
10       Q.   Have you been deposed before?
11       A.   No, I have not.
12       Q.   I'll just go over briefly sort of the
13   rules of the road and if you ever have any questions
14   about what I'm telling you now or in the future,
15   please just ask.
16            This is formal in a way but also
17   informal, we're really just talking. So first your
18   testimony today is sworn testimony, which means the
19   answers you give are under oath, have the same weight
20   as if you were in court. Please make sure because we
21   have the reporter taking down whatever everyone says
22   that your answers are verbal. If you nod your head
23   she can't take that down or if you just sort of give
24   an um-hum. It's clearer to have a yes or no.
25       A.   I understand.
```

rporting@verizon.net                Mastroianni & Formaroli, Inc.              856-546-1100
                              Professionals Serving Professionals

Thomas M. Curran                                                December 2, 2004

Page 58

1    Yeah, that --
2          MR. AGNELLO: Wait. Let's get a period
3    here.
4    BY MR. DAVIES:
5      Q.   Let's start with the early, mid-'70s.
6      A.   I don't know who they were using during
7    that period.
8      Q.   How about the late 1970s?
9      A.   We used Chemclene. I can remember from
10   like the 1983, '84 period on we were using Chemclene
11   at that point.
12     Q.   Do you recall the name DeRewal?
13     A.   I've heard of the name DeRewal simply
14   because the EPA when they -- somebody interviewed me
15   and brought up that same name, I could not recall it
16   and I don't think -- I don't know whether any of our
17   other people did or not, but I don't know the name.
18   I just -- I don't know, you know, again what period
19   it was in, I guess I'm going to be embarrassed but
20   that name was somebody we were using after I sort of
21   took over. I don't recall that name though.
22     Q.   Now, let me just be clear, when you were
23   interviewed before by EPA, did you recall the name
24   DeRewal at that time?
25   (Objection) MR. AGNELLO: Objection. Just

Page 59

1    clarification, when was he interviewed?
2          MR. DAVIES: Well, he mentioned a
3    moment ago that he was interviewed by EPA and asked
4    about the name DeRewal.
5          MR. AGNELLO: So your question is at
6    the time of that interview, whenever that was, does
7    he recall today whether he remembered the name
8    DeRewal at that time?
9          MR. DAVIES: At that time.
10         MR. AGNELLO: Okay.
11         THE WITNESS: I kind of remember the
12   year of the interview but it seemed to me it was in
13   the early '90s some point.
14   BY MR. DAVIES:
15     Q.   I think I have it here. But aside from
16   the year.
17     A.   Anyway, they asked me about the name, I
18   said I could not recall it. But I don't, you know, I
19   don't remember, if we did have them, I don't remember
20   anything about them. And I wouldn't expect myself to
21   remember unless it was like after '84.
22         MR. DAVIES: Why don't I mark, this is
23   I guess a transcript of the interview. Maybe not
24   transcript, a summary and just make it Curran-2.
25         (Exhibit Curran-2, 2-page Summary Interview of

Page 60

1    Thomas M. Curran on 2/5/93, marked for I.D.)
2          MR. AGNELLO: Just for the record for
3    purposes of identification, Curran-2 is a two-page
4    document has the number A-3 and A-4 on the bottom and
5    first and second page, it's an unsigned document
6    looks like it was prepared by someone from Hemenway
7    Associates regarding an interview of Mr. Curran
8    allegedly.
9          THE WITNESS: Is this what we're going
10   to read now?
11         MR. AGNELLO: He's going to show you
12   it. I just wanted to clarify the description.
13   BY MR. DAVIES:
14     Q.   This is Curran-2, take a moment to look
15   at it, looks like it's February 5th, 1993 interview
16   that it's referencing.
17         MR. AGNELLO: Wait a minute, there's no
18   question.
19   BY MR. DAVIES:
20     Q.   Are you done reading it?
21     A.   Yes.
22     Q.   Now, this document Curran-2 seems to
23   indicate that the interviewer was named Richard
24   Grabill. Do you remember speaking with Mr. Grabill?
25     A.   Vaguely.

Page 61

1      Q.   And does the time frame here February
2    5th, 1993, does that appear to be about the same time
3    frame you recalled before when you mentioned you were
4    interviewed by an EPA person?
5      A.   Yes.
6      Q.   Now, on the second page towards the
7    bottom it mentions Mr. Curran stated that while the
8    name DeRewal was familiar to him he did not recognize
9    the names DeRewal Chemical Company, et cetera. Does
10   that seem accurate to you?
11         MR. AGNELLO: Again, just so that we're
12   clear, accurate of his recollection today of what was
13   said or accurate -- yeah, accurate today of what he
14   said at the time?
15         MR. DAVIES: Absolutely.
16         THE WITNESS: Yes.
17   BY MR. DAVIES:
18     Q.   I also see that it mentions the name
19   Robert Becker as a purchasing agent possibly in 1972
20   or 1973.
21         MR. AGNELLO: What paragraph is that?
22         MR. DAVIES: We're on the first page,
23   the third paragraph.
24         THE WITNESS: Um-hum.
25   BY MR. DAVIES:

Thomas M. Curran                                          December 2, 2004

Page 62

1    Q.   Does that seem like the right time frame
2  for Robert Becker as the purchasing agent?
3    A.   It does.
4    Q.   Now, do you recall who was purchasing
5  agent before Mr. Becker?
6    A.   The only name I can come up with is Joe
7  McCarron. I gave you that earlier.
8    Q.   Right. And you just mentioned that
9  there might have been a person in between?
10   A.   There might have been but I don't
11 remember.
12   Q.   I was just fishing for that, you never
13 know.
14        This document also references that you
15 were shown, let me see where that is, you were shown
16 an invoice number -- dated 2/5/73. The 20-year
17 anniversary of the interview.
18        Why don't I just show it to you.
19 Actually I'll have it marked first then I'll ask you
20 a question.
21   A.   Okay.
22        MR. DAVIES: Mark that Curran-3.
23        (Exhibit Curran-3, 1-page copy of Invoice dated
24 2/5/73, marked for I.D.)
25 BY MR. DAVIES:

Page 63

1    Q.   I'll show you Curran-3, which is the
2  February 5th, 1973 invoice reference. Take a look at
3  that, let me know if you recognize it?
4    A.   I'm --
5        MR. AGNELLO: I'm sorry, your question
6  was whether he --
7        MR. DAVIES: Whether he recognizes the
8  document.
9        THE WITNESS: Does that question mean
10 have I seen this before?
11 BY MR. DAVIES:
12   Q.   Yes.
13   A.   The answer is yes.
14   Q.   And other than the 1993 interview with
15 EPA, do you recall whether you had seen that document
16 before?
17   A.   I had not.
18   Q.   If you could just look in the middle of
19 the document it talks about 55-gallon drums and
20 30-gallon drums of industrial waste solution, do you
21 know whether that's the same solution that we were
22 discussing earlier when we talked about industrial
23 waste solution?
24 (Objection)  MR. AGNELLO: Objection as to form. He
25 never saw the document before so how would he know

Page 64

1  anything about that? You can't put -- you can't do
2  that, you just can't do that. He never saw the
3  document so now you're asking him to interpret the
4  document that he never saw before as to whether that
5  means something, can't do it. Just can't do that,
6  Marc. You can ask him other questions but you
7  certainly can't do that because he's told you he
8  never saw the document and quite frankly it's
9  consistent with what this person, whoever this was,
10 wrote on this piece of paper that you've marked
11 Curran-2 that was never signed by Mr. Curran, so.
12        MR. DAVIES: The objection is that that
13 was never signed by Mr. Curran?
14        MR. AGNELLO: No. The objection is
15 he's testified that he never saw the document. And
16 you're now asking him whether or not some reference
17 in that document refers to something he's testified
18 to earlier in the deposition and I'm saying to you
19 that if he never saw the document, how can he tell
20 you what anything in that document references?
21 BY MR. DAVIES:
22   Q.   All right, in 1973, do you recall --
23 let's say the early 1970s, do you recall whether you
24 were involved with the two-week shutdowns that
25 occurred at the facility?

Page 65

1    A.   I could not say that specifically.
2    Q.   Okay. Now, a couple minutes ago we were
3  talking about, I was asking about what industrial
4  waste solution was and you indicated that it was a
5  solution generated during the cleaning of machines,
6  et cetera, that happened during this two-week
7  shutdown. Do you recall about how much material
8  would be generated during these shutdowns?
9        MR. AGNELLO: Do you want to put a time
10 frame on that?
11 BY MR. DAVIES:
12   Q.   Let's start with early, mid-1970s.
13        MR. AGNELLO: Again just because he
14 said he wasn't involved in '73.
15        MR. DAVIES: Well, he, I'm not sure he
16 said he wasn't involved. He said he wasn't sure
17 exactly so I'm asking early to mid-1970s. As far
18 back as you can recall.
19        MR. AGNELLO: If you know.
20        THE WITNESS: Would you state the
21 question again?
22 BY MR. DAVIES:
23   Q.   Sure.
24        As far back as you can recall, I'm
25 asking for the volume of industrial waste solution

17 (Pages 62 to 65)

1

1    C E R T I F I C A T E

2        I, Cynthia A. Cormaney, a Notary Public

3    and Certified Shorthand Reporter of the State

4    of New Jersey and a Commissioner of Deeds of

5    the State of Pennsylvania, do hereby certify

6    that the foregoing is a true and accurate

7    transcript of the testimony as taken

8    stenographically by and before me at the time,

9    place and on the date hereinbefore set forth.

10        I do further certify that I am neither a

11    relative nor employee nor attorney nor counsel

12    of any of the parties to this action, and that

13    I am neither a relative nor employee of such

14    attorney or counsel and that I am not

15    financially interested in this action.

16

17    _____
       Cynthia A. Cormaney, C.S.R.
18    Notary Public, State of New Jersey
       My Commission Expires July 24, 2006
19    Certificate No. XI01116

20

21

22

23

24

25

# EXHIBIT E

# CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN, P.C.

### COUNSELLORS AT LAW

| | | | |
|---|---|---|---|
| CHARLES C. CARELLA | JAMES T. BYERS | 5 BECKER FARM ROAD | RICHARD K. MATANLE, II | RAYMOND J. LILLIE |
| BRENDAN T. BYRNE | DONALD F. MICELI | ROSELAND, N.J. 07068-1739 | DONALD S. BROOKS | WILLIAM SQUIRE |
| JOHN N. BAIN | A. RICHARD ROSS | PHONE (973) 994-1700 | RAYMOND R. SIBERINE | ROBERT P. DONOVAN |
| JOHN G. GILFILLAN, III | KENNETH L. WINTERS | FAX (973) 994-1744 | FRANCIS C. HAND | ALAN J. GRANT° |
| PETER G. STEWART | JEFFREY A. COOPER | www.carellabyrne.com | AVRAM S. EULE | MICHAEL P. PASQUALE |
| ELLIOT M. OLSTEIN | CARL R. WOODWARD, III | | LINDSEY H. TAYLOR | LAURA S. MUNZER |
| ARTHUR T. VANDERBILT, II | NABIL N. KASSEM | | ROBERT I. HALPERN° | MARC D. MICELI |
| JAN ALAN BRODY | MELISSA E. FLAX | | RAYMOND W. FISHER | RAYMOND E. STAUFFER° |
| JOHN M. AGNELLO | DENNIS F. GLEASON | | DAVID J. REICH | KERRIE R. HESLIN |
| CHARLES M. CARELLA | DAVID G. GILFILLAN | | —————— | ROBERT C. SCRIVO |
| JAMES E. CECCHI | G. GLENNON TROUBLEFIELD | | OF COUNSEL | JACOB A. KUBERT |
| | BRIAN H. FENLON | | | °MEMBER N.Y. BAR ONLY |
| | KHOREN BANDAZIAN | | | |
| JAMES D. CECCHI (1933-1995) | THOMAS P. MONAHAN, JR.* | **January 17, 2005** | | |
| | *CERTIFIED BY THE SUPREME COURT OF NJ AS A CIVIL TRIAL ATTORNEY | | | |

*Via Facsimile*
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, Pennsylvania 19103
Attn.:  Marc E. Davies, Esq.

        **RE:**    <u>**Boarhead Farm Agreement Group v. Advanced**</u>
                   <u>**Environmental Technology Corporation, et al.**</u>
                   **Case No. 02-03830 (LDD)**
                   **File No. 300580-21**

Dear Mr. Davies:

      In response to your request for the deposition of Jay Crawford, our client's records disclose that Mr. Crawford died in October 2002.

                  Very truly yours,

             CARELLA, BYRNE, BAIN, GILFILLAN,
               CECCHI, STEWART & OLSTEIN

               MELISSA E. FLAX

MEF
Cc:   All counsel of record

# EXHIBIT F

DER-RECEIVED
SOUTHEAST REGION

AUG 1 0 1993

# SITE INVESTIGATION

Handy & Harman Tube Co., Inc.

Norristown, Montgomery County, Pennsylvania

Prepared for:

Handy & Harman Tube Co., Inc.
Township Line and Whitehall Road
Norristown, Pennsylvania   19403

Prepared by:

RMC Environmental Services, Inc.
3450 Schuylkill Road
Spring City, Pennsylvania  19475
(215)948-4700

RMC Project No. 04307

September 1992





**3.0    FINDINGS AND DISCUSSION**

**3.1    Soils Investigation**

Soil boring locations are shown in Figure 1. A summary table of field screening results and laboratory analyses is included in Table 1. Detailed boring logs are included in Appendix A.

The lithology of the soils and bedrock at the site is fairly consistent with regard to the composition of materials. Typically, the upper layer consists of surficial gravel/asphalt/top soil, which ranges from 0 to approximately 3'. This overlies an orange and gray sometimes green clay. The clay ranges from approximately 1' on the western edge of the study area to approximately 9' on the eastern edge of the study area. The clay overlies weathered bedrock. The weathered zone extends from as shallow as 3.5' in the grassy area behind the parking lot (western side)to as deep as 12.2' in the gravel driveway behind the facility (eastern side). This weathered zone overlies competent bedrock.

Five borings, B4, B13, B6, B22 and B18 were advanced to competent bedrock. Depths at which auger refusal occurred were 12.3', 9.8', 8.1', 5.5' and 7' respectively.

The analytical results of the soil investigation indicate that contamination exists in the weathered rock above the bedrock surface at several distinct locations. In the event that field screening did not detect the presence of volatile organics, the deepest sample collected was submitted for laboratory analysis. Chlorinated solvents such as TCE are denser than water, once released into the soil, they tend to sink until they encounter a relatively impermeable barrier. The bedrock at the site is known to have low permeability, therefore it is very likely that spilled solvents would infiltrate downward, pool on top of the bedrock surface, and migrate laterally. In the event that this mode of contaminant transport is occurring at the site, soil samples collected near the bedrock interface would be able to detect it.

Review of the analytical findings indicate three areas of concern, the former cistern, the former parking lot (now covered by the eastern edge of the building), and the current parking lot area.

- Cistern area - One target of the investigation was an old cistern which is believed to be located off the northwest corner of the building. If solvents had been inadvertently disposed of in the cistern, it is highly probable that the solvents would impact soils and groundwater. Three soil borings, B10, B11, and B12 detected concentrations of TCE ranging from 26 ppb in B10 to 4700 ppb in B11. The depth of soil and weathered bedrock is relatively deep at this location, being approximately 10 feet. Field screening also detected volatile organic content throughout the soil profile in B10 and B11 and at shallow and deep levels in B12. Adjacent soil borings B3, B7, B8, and B9 showed no detectable concentrations of solvents at any depth. These results indicate that the cistern is a likely source of groundwater contamination, but sufficient fracturing of the bedrock is present which allows the contamination to sink into the bedrock rather than migrating laterally on top of it.

- 6 -

Former Parking Lot - A former parking lot, which now has been covered over by the expansion of the manufacturing facility, was identified as a potential source of solvent contamination. Lubricants and waste oils that contained solvents had been used for dust control in this area. This area was also the site of the fill pipe for the bulk TCE storage vessels. In addition, it was reported that TCE was used to clean parts on the old lot. To determine if significant contamination exists in this area, borings B17, B18, and B19 were installed in Township Line Road. The present building and underground utilities prevented locating the borings closer to the old lot. Sample numbers B17, B18 and B19 showed concentrations of 38 ppb, 16 ppb and 36 ppb respectively. The contamination at this area was also found in the weathered rock zone which in this case ranged from 5.5' to 7.4'. Mild contamination was detected throughout the soil profile in B17. Mild contamination was only detected in the deep samples above the bedrock surface in B18 and B19. These results indicate that the parking area may be a significant contributor to the groundwater contamination present at the site, but that significant quantities of solvents are not migrating from this area on top of the bedrock surface.

Current Parking Lot - Soil borings were installed in the current parking lot and the grassed area to the east of it to aid in determining the path of contaminant travel from suspected sources in the plant vicinity to the stream. Of the six borings installed in this area, B15 and B21 detected no contamination with either field screening or laboratory analysis. Laboratory analysis detected low levels of contamination in deep samples collected from B20, B22 and B23. These results indicate that the TCE that is present in the stream is not traveling on top of the bedrock surface. If it was, the soil sample results would be much higher. These low levels of contamination may be the result of groundwater contamination. Soil boring B13 did detect low to moderate levels of contamination throughout the soil profile. This is likely to be an indication that some dumping of solvents has occurred in the area east of Township Line Road.

## 3.2    Streambed Piezometers

The results of the piezometer samples indicated the presence of TCE at several locations along the stream bed. Figure 3 depicts the location and concentrations of the samples. There were two locations, P-2 and P-5, where high concentrations of TCE, 3500 ppb and 3300 ppb respectively, were detected. The remainder of the samples ranged from "not detected" in P-4 to 100 ppb in P-8.

The series of water level measurements obtained during the study were used to evaluate the hydrology of the stream. Water level measurements taken on two occasions, 15 July 1992 and 3 and 4 August 1992, are summarized in Appendix B.

# EXHIBIT G

# REPORT OF EXPERT WITNESS

## BOARHEAD FARM AGREEMENT GROUP V. ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, ET AL.

### Submitted by Jurgen H. Exner, Ph.D.

**JHE Technology Systems, Inc.**
**2 Waverly Ct.**
**Alamo, CA 94507**

**June 29, 2006**

## 1. SUMMARY OF BASIS OF OPINION

The following opinions are based upon my professional experience, described in detail in section 5, in the fields of chemistry, process development, hazardous waste production, waste management, and hazardous waste site investigation and remediation. In addition, documents referenced in section 3 were used in developing these opinions.

## 2. STATEMENT AND BASIS OF OPINIONS

I have reviewed the cited documents describing manufacturing processes and chemicals used by the companies described below. I have used the information and my experience to identify the types of wastes that were generated by the companies' manufacturing processes and to estimate the approximate composition of the waste streams.

Chemical wastes generally arise during the following operations:
- Chemical reaction
- Hydrolysis or neutralization of the reaction mixture
- Product purification by crystallization, decolorization, clarification, precipitation, distillation, or extraction
- Separation of solids by filtration
- Separation of liquids by phase separation, distillation, or steam stripping
- Drying, blending, and formulating
- Spills, leaks, and equipment cleaning

The companies processing steel and those manufacturing metal parts and printed circuit boards used specific processes that generated wastes from acid pickling and plating. These operations also generated rinsate wastes, spills, spent reagent baths, and sludges. Lubrication of metals and degreasing also formed residual oil and grease wastes and chemical wastes containing solvents such as trichloroethylene (TCE) consistent with the specific process.

**SIGNATURE**

As discovery in the litigation continues, I reserve the right to modify and/or supplement this opinion based on new information that becomes available. I am being paid $ 175/hour and $ 350/hour for testimony.

Jurgen H. Exner, Ph.D.

## 3. DOCUMENTS RELIED UPON IN THIS OPINION

References shown within opinion.

"The Merck Index," 7th Edition, 1960, 11th Edition, 1989, Merck & Co., Inc., Rahway, NJ.

Vershueren, K., "Handbook of Environmental Data on Organic Chemicals," Van Nostrand Reinhold, New York, NY, 1983.

Hodgman, C.D., ed., "CRC Handbook of Chemistry and Physics, 40th Ed., Chemical Rubber Publishing Co., Cleveland, OH, 1958.

Noller, C.R., "Chemistry of Organic Compounds," 2nd ed., W.B. Saunders Co., Philadelphia, p. 672-705(1957).

Documents received from attorneys:

**Handy & Harman Tube Company**
Curran, T.M., Deposition, 12/2/2004; Curran Exhibit 4
Invoice, DeRewal Chemical Company to Handy & Harman Tube Company, 2/5/73
Rees, L., Deposition 11/18/2004
DeRewal, M. T. Sr., Deposition 5//2003
USEPA Region III, 2/24/2004, Re: Freedom of Information Request, letter to M.B. Moore
Grabbill, R.C., interview of T.M. Curran, 2/12/93
Grabbill, R.C., interview of M.A. Kollmar, 2/13/93
Grabbill, R.C., interview of J.M. Crawford, 2/12/93
Curran, T.M., 1/7/93, Supplemental Information Submission to USEPA
RMC Environmental Services, Inc., 9/2002, Site Investigation, Handy&Harman Tube Co., p.6,10
Flax, M.E., 9/16/2004, Response to Interrogatories to G. A. Harris
**Merit Metal Product Corporation**
Wills, A.W., 2/1/1971, Waste Inspection Report, re. Industrial Wastes, Merit Metal Products Corporation

# EXHIBIT H

# CONDENSED TRANSCRIPT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES, INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC,
and TI GROUP AUTOMOTIVE
SYSTEMS, LLC
    Plaintiffs

                             CIVIL ACTION NO.
    V                          02-CV-3830 (LDD)

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, ET AL.
               Defendants

           Oral deposition of JURGEN H. EXNER, Ph.D., taken at the law offices of Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, 42nd Floor, Philadelphia, Pennsylvania, on Tuesday, January 9, 2007, at 10:07 a.m., before Jennifer Bermudez, a Registered Professional Reporter, and Notary Public, pursuant to notice.



## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

Case 2:02-cv-03830-LDD    Document 333    Filed 05/23/2008    Page 31 of 82

2
DEPOSITION OF JURGEN H. EXNER, Ph.D., 1/9/07

```
1   APPEARANCES:

2   BALLARD SPAHR ANDREWS & INGERSOLL,
    LLP
3       GLENN A. HARRIS, ESQUIRE
        harrisg@ballardspahr.com
4       Plaza 1000 - Suite 500
        Main Street
5       Voorhees, New Jersey 08043-4636
        856-761-3440
6       Attorney for Plaintiffs

7
    WOLFF & SAMSON, P.C.
8       THOMAS W. SABINO, ESQUIRE
        tsabino@wolffsamson.com
9       The Offices at Crystal Lake
        One Boland Drive
10      West Orange, New Jersey 07052
        973-530-2044
11      Attorney for AETC

12
    PHELAN, PETTIT & BIEDRZYCKI
13      JEFFREY L. PETTIT, ESQUIRE
        jpettit@pp-b.com
14      RICHARD C. BIEDRZYCKI, ESQUIRE
        rbiedrzycki@pp-b.com
15      121 S. Broad Street
        Suite 1600
16      Philadelphia, Pennsylvania 19107
        215-546-0500
17      Attorneys for Ashland, Inc.

18
    EDWARDS ANGELL PALMER & DODGE, LLP
19      LYNN WRIGHT, ESQUIRE
        lwright@eapdlaw.com
20      750 Lexington Avenue
        New York, New York 10022
21      212-308-4411
        Attorney for Carpenter Technology
22      Corp.

23

24
```



**James DeCrescenzo Reporting**, LLC
215.564.3905    InnovatingLitigation    FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

3

DEPOSITION OF JURGEN H. EXNER, Ph.D., 1/9/07

```
 1    A P P E A R A N C E S   (C O N T ' D):

 2    CARELLA, BYRNE, BAIN, GILFILLAN,
      CECCHI, STEWART & OLSTEIN
 3        MELISSA E. FLAX, ESQUIRE
          mflax@carellabyrne.com
 4        5 Becker Farm Road
          Roseland, New Jersey 07068-1739
 5        973-994-1700
          Attorney for Handy & Harman Tube
 6        Company

 7
      HINMAN, HOWARD & KATTELL, LLP
 8        RALPH K. KESSLER, ESQUIRE
          rkessler@hhk.com
 9        106 Corporate Park Drive
          Suite 317
10        White Plains, New York 10604
          914-694-4102
11        Attorney for TI Automotive

12
      DUANE MORRIS, LLP
13        SETH v.d.H. COOLEY, ESQUIRE
          scooley@duanemorris.com
14        30 S. 17th Street
          Philadelphia, Pennsylvania 19103
15        215-979-1000
          Attorney for Flexible Circuits
16

17
      LAW OFFICE OF EDWARD FACKENTHAL
18        EDWARD FACKENTHAL, ESQUIRE
          edwardfackenthal@cs.com
19        One Montgomery Plaza
          Suite 209
20        Norristown, Pennsylvania 19401
          610-279-3370
21        Attorney for NRM Investment Co

22

23

24
```



**James DeCrescenzo Reporting, LLC**
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581



DEPOSITION OF JURGEN H. EXNER, Ph.D., 1/9/07

1    Exner 1 in the paragraph following

2    the numbered paragraphs that begins

3    Small Amounts -- do you see where I

4    am?

5        A.    Yes.

6        Q.    -- the third sentence

7    reads, "TCE was also disposed of in a

8    cistern, and lubricating and waste

9    oils were used for dust control on a

10   former parking lot."

11           And my question to you is,

12   the report that you cite to, did the

13   report contain that exact language?

14       A.    This is probably an

15   abstraction of what that report

16   included.

17           (Exner Exhibit 4 was marked

18   for identification.)

19   BY MS. FLAX:

20       Q.    Dr. Exner, I'm going to

21   show you what's been marked Exner 4

22   and ask you if you can identify that?

23       A.    It's two pages of a site

24   investigation report that is

JDR

James DeCrescenzo Reporting, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

1    referenced here.

2        Q.    Dr. Exner, did you ever

3    have a complete copy of Exner 4,

4    which is entitled Site Investigation,

5    Handy & Harman Tube Co, Inc.,

6    Norristown, Montgomery County,

7    Pennsylvania, and it's dated

8    September 1992?

9        A.    No.

10        Q.    Do you know where you

11    obtained the cover page and two pages

12    of this report?

13        A.    They were sent to me.

14        Q.    And by whom was it sent to

15    you?

16        A.    By Ballard Spahr.

17        Q.    Could you tell me where on

18    Exner 4 your statement "TCE was also

19    disposed of in a cistern" is

20    supported.

21        A.    On Page 6, Cistern Area,

22    three soil borings detected

23    concentrations of TCE ranging from 26

24    parts per billion to 4,700 parts per

CERTIFICATION

I, JENNIFER L. BERMUDEZ, a
Court Reporter in and for the Commonwealth
of Pennsylvania, hereby certify that the
foregoing is a true and accurate transcript
of the deposition of said witness who was
first duly sworn by me on the date and
place hereinbefore set forth.

I FURTHER CERTIFY that I am
neither attorney nor counsel for, nor related
to or employed by, any of the parties to
the action in which this deposition was
taken, and further that I am not a relative
or employee of any attorney or counsel
employed in this action, nor am I
financially interested in this case.

_____
JENNIFER L. BERMUDEZ
Court Reporter and Notary Public

James DeCrescenzo Reporting, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX 215.751.0581

# EXHIBIT I

## Melissa Flax

| | |
|---|---|
| **From:** | Melissa Flax |
| **Sent:** | Sunday, January 07, 2007 2:17 PM |
| **To:** | harrisg@ballardspahr.com |
| **Cc:** | 'Trojecki, Amy M. (VH)' |
| **Subject:** | Agere v. AETC |
| **Importance:** | High |

Glenn,

I received Exner's file on 1/4/07. There is one document that I have not previously seen as being included in the repository, that Exner considered and that was not included on the CD. This document is the RMC Environmental Services, Inc. 9/2002 Site Investigation. Please provide me with a copy of this document tomorrow so that I have it before Exner's deposition on Tuesday. Thank you.

Melissa E. Flax, Esq.
Carella, Byrne, Bain, Gilfillan,
  Cecchi, Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
(973) 994-1744 - fax
mflax@carellabyrne.com

**CONFIDENTIALITY NOTE:** The documents accompanying this transmission contain information from the law firm of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, which is confidential and/or legally privileged. The information contained in this email is intended only for the use of the individual named above and others who have been specifically authorized to receive it. If the one receiving it is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this email in error, please notify us by telephone immediately so that we can arrange for the return of the original documents to us at once. Thank you.

# EXHIBIT J

## Melissa Flax

| | |
|---|---|
| **From:** | Melissa Flax |
| **Sent:** | Wednesday, January 10, 2007 10:02 AM |
| **To:** | harrisg@ballardspahr.com |
| **Cc:** | Andrew Foster; Edward Fackenthal; Jeff Pettit; Lynn Wright; Richard Biedrzycki; Seth Cooley; Tom Sabino |

**Subject:** Agere v. AETC

Glenn,

As a follow up to the deposition of Jurgen Exner, as requested during the deposition, please have Dr. Exner provide me with a citation to support his statement on page 11 of his report which reads as follows: "These occasionally entered the general plant streams but were generally disposed in 30-gal drums."

Additionally, please provide me with copies (or Bates stamped numbers) of the following documents listed on the 6/28/06 email that you produced yesterday:

Letter from United States Environmental Protection, Region III re: Freedom of Information Act Request 03-RIN-00363-00 dated February 24, 2000.

Handy & Harman Tube Co. letter to Ms. Joan E. Martin-Banks re: Supplemental Information Submission - Boarhead Farms Site dated January 7, 1993.

Please confirm that you do not have a complete copy of the Site Investigation Report dated September 1992. If you do have a complete copy, I reiterate my January 7 request for a complete copy of the report.

Thank you.

Melissa E. Flax, Esq.
Carella, Byrne, Bain, Gilfillan,
  Cecchi, Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700
(973) 994-1744 - fax
mflax@carellabyrne.com

**CONFIDENTIALITY NOTE:** The documents accompanying this transmission contain information from the law firm of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, which is confidential and/or legally privileged. The information contained in this email is intended only for the use of the individual named above and others who have been specifically authorized to receive it. If the one receiving it is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this email in error, please notify us by telephone immediately so that we can arrange for the return of the original documents to us at once. Thank you.

# EXHIBIT K

## Melissa Flax

**From:** Harris, Glenn A. (VH) [HarrisG@ballardspahr.com]

**Sent:** Saturday, January 13, 2007 1:22 PM

**To:** Melissa Flax

**Cc:** Andrew Foster; Edward Fackenthal; Jeff Pettit; Lynn Wright; Richard Biedrzycki; Seth Cooley; Tom Sabino

**Subject:** RE: Agere v. AETC

Melissa,

The 2/24/00 letter in the 6/28 email is the FOIA response listed in Dr. Exner's report. The H&H letter to Martin Banks in the email is the 1/7/93 "Curran, T.M." document listed in the report. If you still need copies of either, let me know.

We have been unable to locate anything other than the pages provided to Dr. Exner from the 9/92 report. As it is your client's document, perhaps you can provide a complete copy to Plaintiffs.

I have asked Dr. Exner for the reference to the quotation on Page 11. I will provide it when received.


Regards,

Glenn

Glenn A. Harris, Esq.
Ballard Spahr Andrews & Ingersoll, LLP
856-761-3440
harrisg@ballardspahr.com


---

**From:** Melissa Flax [mailto:MFlax@carellabyrne.com]
**Sent:** Wednesday, January 10, 2007 10:02 AM
**To:** Harris, Glenn A. (VH)
**Cc:** Andrew Foster; Edward Fackenthal; Jeff Pettit; Lynn Wright; Richard Biedrzycki; Seth Cooley; Tom Sabino
**Subject:** Agere v. AETC

Glenn,

As a follow up to the deposition of Jurgen Exner, as requested during the deposition, please have Dr. Exner provide me with a citation to support his statement on page 11 of his report which reads as follows: "These occasionally entered the general plant streams but were generally disposed in 30-gal drums."

Additionally, please provide me with copies (or Bates stamped numbers) of the following documents listed on the 6/28/06 email that you produced yesterday:

Letter from United States Environmental Protection, Region III re: Freedom of Information Act Request 03-RIN-00363-00 dated February 24, 2000.

Handy & Harman Tube Co. letter to Ms. Joan E. Martin-Banks re: Supplemental Information Submission - Boarhead Farms Site dated January 7, 1993.

1/15/2007

Please confirm that you do not have a complete copy of the Site Investigation Report dated September 1992. If you do have a complete copy, I reiterate my January 7 request for a complete copy of the report.

Thank you.

Melissa E. Flax, Esq.
Carella, Byrne, Bain, Gilfillan,
  Cecchi, Stewart & Olstein
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700
(973) 994-1744 - fax
mflax@carellabyrne.com


**CONFIDENTIALITY NOTE:** The documents accompanying this transmission contain information from the law firm of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, which is confidential and/or legally privileged. The information contained in this email is intended only for the use of the individual named above and others who have been specifically authorized to receive it. If the one receiving it is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this email in error, please notify us by telephone immediately so that we can arrange for the return of the original documents to us at once. Thank you.

# EXHIBIT L



# INVOICE

N. Mand Chemical Company

BUCKS COUNTY, PENNSYLVANIA ● ● PHONE AREA 215 847-____
P. O. BOX 1, REVERE

SOLD TO:
Handy & Harmon Tube Company
Whitehall Road & Township Line
Morristown, Pennsylvania

SHIPPED TO

| DATE | DATE ORDERED | DELIVERY BY | DESCRIBED | | | | | INVOICE NO. 571 | |
|---|---|---|---|---|---|---|---|---|---|
| 2/1/73 | 2/1/73 | One Truck | 2436 | | | | 1730 | | |

| QUANTITY | | PRICE | AMOUNT |
|---|---|---|---|
| 1 | 250 gallon oil tank | | $ 25 00 |
| 2 | 55 gallon drums Industrial Waste Solution | $6 00/ea | $156 00 |
| 3 | 30 gallon drums Industrial Waste Solution | $5 00/ea | $180 00 |
| 25 | Empty 55 gallon drums delivered | $ 75/ea | $ 18 75 |
| | | | $379 75 |

8/1/? 434

# EXHIBIT M

Page 1

1                UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3   _____ CIVIL ACTION NO.
                                     02-CV-3830
4

    Boarhead Farm Agreement Group,
5
            Plaintiff,            Oral Deposition of
6
        vs.                          Larry Rees
7

    Advanced Environmental
8   Technology Corporation;
    Ashland Chemical Company;
9   Boarhead Corporation;
    Carpenter Technology
10  Corporation; Crown Metro,
    Inc.; Diaz Chemical Corporation;
11  Emhart Industries, Inc.; Globe
    Disposal Company, Inc.;
12  Globe-Wastech, Inc.; Handy &
    Harman Tube Company, Inc.;
13  Knoll, Inc.; Merit Metal
    Products Corporation; Novartis
14  Corporation; NRM Investment
    Company; Plymouth Tube Company;
15  Quikline Design and Manufacturing
    Company; Rahns Specialty Metals,
16  Inc.; Rohm & Haas Company; Simon
    Wrecking Company, Inc.; Techalloy
17  Company, Inc.; Thomas & Betts
    Corporation; Unisys Corporation;
18  United States of America
    Department of Navy,
19
            Defendants.
20  _____
21

22

        Certified Shorthand Reporting Services
23                  arranged through
            Mastroianni & Formaroli, Inc.
24              709 White Horse Pike
            Audubon, New Jersey 08106
25                (856) 546-1100

Larry Rees                                        November 18, 2004

**Page 2**

1           * * * * *
2           Thursday, November 18, 2004
3           * * * * *
3           Transcript in the above matter taken at
   the offices of Ballard, Spahr, Andrews & Ingersoll,
4  Esquires, 1735 Market Street, Philadelphia,
   Pennsylvania, commencing at 9:30 a.m.
5
   A P P E A R A N C E S:
6
      BALLARD, SPAHR, ANDREWS & INGERSOLL, ESQUIRES
7      BY:  MARC E. DAVIES, ESQUIRE
            - and -
8      ANNE HEIDEL, ESQUIRE
       1735 MARKET STREET
9      51ST FLOOR
       PHILADELPHIA, PENNSYLVANIA 19103
10     (215) 864-8248
       Attorneys for the Plaintiff,
11     BFAG
12     HINMAN, HOWARD & KATTELL, ESQUIRES
       BY:  RALPH K. KESSLER, ESQUIRE
13     106 CORPORATE PARK DRIVE
       SUITE 317
14     WHITE PLAINS, NEW YORK 10604
       (914) 694-4102
15     Attorneys for the Plaintiff,
       TI Automotive
16
17     CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
       STEWART & OLSTEIN, ESQUIRES
18     BY:  JOHN M. AGNELLO, ESQUIRE
       5 BECKER FARM ROAD
19     ROSELAND, NEW JERSEY 07068
       (973) 994-1700
20     Attorneys for the Defendant,
       Handy & Harman Tube Company
21
22
23
24
25

**Page 4**

1              E X H I B I T S
2   EXHIBITS ATTACHED TO THE END OF THIS TRANSCRIPT
3              EXHIBIT INDEX
4      Appears at the conclusion of the transcript
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1           W I T N E S S   I N D E X
2   Examination of Mr. Rees by Ms. Heidel:
       Page 5
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1   (LARRY REES, having been duly sworn, was examined and
2   testified as follows:)
3   (EXAMINATION OF MR. REES BY MS. HEIDEL:)
4      Q.   Hi, Mr. Rees.  Thanks for coming in.
5           You understand today your testimony is
6   sworn testimony just like you would give in court.
7           Try to make your responses verbal, so
8   don't nod your head or anything because the court
9   reporter has to write down what you say.
10          And try to just have one person talk at
11  a time.  If you need to interrupt, just take a moment
12  so that she doesn't have to worry about figuring out
13  who's talking at what point.
14          If you need me to repeat the question
15  or clarify, feel free.  Or if your lawyer needs to
16  jump in, he'll do that.
17          I have to ask you have you taken any
18  medications in the last twenty-four hours that might
19  have effected your ability to testify?
20     A.   No.
21     Q.   Okay.
22          Okay.  Can you state your name for the
23  record and spell your last name?
24     A.   Larry Rees, R-E-E-S, as in Sam.
25     Q.   Okay.

2 (Pages 2 to 5)

Larry Rees                                                          November 18, 2004

Page 22

1   aware, did they arrange for the pick up of these
2   waste drums?
3       A.   Don't know, that I don't know.
4       Q.   Okay.
5            Are you aware of any companies that
6   Handy & Harman uses to pick up waste?
7       A.   When?
8       Q.   Let's start from '75 to '84.
9       A.   No.
10      Q.   Okay.
11           And then from '84 to the present are
12  you aware of any vendors or companies that Handy &
13  Harman uses to pick up waste?
14      A.   The only one I know of that they used
15  was Safety Clean, and they're not even using them
16  now, I don't know when they used them, they used them
17  in the last five, ten years, but exactly when, I
18  don't know.
19      Q.   Okay.
20           During the time that you worked there
21  was it ever your job to pick a waste hauler, to
22  select a company?
23      A.   No.
24      Q.   Do you have any idea how much Handy &
25  Harman paid for waste hauling?

Page 23

1       A.   No idea.
2       Q.   Okay.
3            So from, let's see, '75 until '84 are
4   you aware of any records that Handy & Harman kept --
5       A.   No --
6       Q.   -- for waste --
7       A.   -- I wouldn't --
8            MR. AGNELLO:  You got to wait until she
9   completes her question.
10           THE WITNESS:  I'm sorry.
11  BY MS. HEIDEL:
12      Q.   -- for keeping track of how much waste
13  is produced?
14      A.   No, I wouldn't have anything to do with
15  that.
16      Q.   So you didn't -- did you ever collect
17  records for how many barrels of the waste lubricants
18  were produced from '79 to '84?
19      A.   No.
20      Q.   Are you familiar with a term industrial
21  waste solution?
22           Have you ever heard that term when you
23  were working at Handy & Harman?
24      A.   No.
25      Q.   Let me show you a document --

Page 24

1            MS. HEIDEL:  Can you mark it LR-2?
2            MR. AGNELLO:  Are you going to do this
3   one LR-2?
4            MS. HEIDEL:  Do this LR-2 and LR-3.
5            MR. AGNELLO:  Only because I wrote it
6   down already.
7            (Exhibit LR-2, Diagram, is marked for
8   identification.)
9            (Exhibit LR-3, Invoice, is marked for
10  identification.)
11  BY MS. HEIDEL:
12      Q.   Just ask if you are familiar at all with
13  that document?
14      A.   I've never seen it.
15      Q.   Okay.
16           Is this company's name De Rewal
17  Chemical, is that at all familiar to you, that name?
18      A.   Now?
19      Q.   Now, yes.
20      A.   No -- well, I've heard it in the course
21  of answering questions, but I've never heard of --
22      Q.   Okay.
23           Let's go back -- bear with me, I know
24  it was a long time ago, when you first started
25  in '75 can you tell me the names of people who were

Page 25

1   involved in the production process in your group in
2   the small tubes department?
3       A.   Doug Willauer.
4       Q.   Can you spell that last name?
5       A.   W-I-L-L-A-U-E-R.
6       Q.   Okay.
7       A.   Let's see, Charlie Friday, they're both
8   deceased, Andy Giovinco, G-I-O-V-I-N-C-O, Abe Kassel,
9   that's about the only ones I remember.
10      Q.   Okay.
11           What about when you were foreman
12  from '79 to '84, can you tell me the names of people
13  who you were supervising?
14      A.   Those guys, Fred Bleuit -- I don't know,
15  it's a been a lot of years, I don't remember.
16      Q.   Okay.
17           Was there any particular person that
18  you were supervising who was responsible for handling
19  the waste that was generated?
20      A.   What time period?
21      Q.   Sorry, from '79 to '84.
22      A.   No.
23      Q.   You said in the production process --
24  let's look at this again.
25           You mentioned part of the process was

mfreporting@verizon.net            Mastroianni & Formaroli, Inc.            856-546-1100
                                   Professionals Serving Professionals

C E R T I F I C A T E

I, Christi A. Argenbright, a Notary Public and
Certified Shorthand Reporter of The State of New
Jersey do hereby certify that the foregoing is a true
and accurate transcript of the testimony as taken
stenographically by and before me at the time, place
and on the date hereinbefore set forth.

I do further certify that I am neither a
relative nor employee nor attorney nor counsel of any
of the parties to this action, and that I am neither
a relative nor employee of such attorney or counsel
and that I am not financially interested in this
action.

Christi A. Argenbright, C.S.R.
Notary Public, State of New Jersey
My commission expires October 16, 2005
Certificate No. XI01789

# EXHIBIT N

1            UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
3    _____   CIVIL ACTION NO.
                                      02-CV-3830
4
     Boarhead Farm Agreement Group,
5
              Plaintiff,             Oral Deposition of
6
          vs.                        Mary A. Kollmar
7
     Advanced Environmental
8    Technology Corporation;
     Ashland Chemical Company;
9    Boarhead Corporation;
     Carpenter Technology
10   Corporation; Crown Metro,
     Inc.; Diaz Chemical Corporation;
11   Emhart Industries, Inc.; Globe
     Disposal Company, Inc.;
12   Globe-Wastech, Inc.; Handy &
     Harman Tube Company, Inc.;
13   Knoll, Inc.; Merit Metal
     Products Corporation; Novartis
14   Corporation; NRM Investment
     Company; Plymouth Tube Company;
15   Quikline Design and Manufacturing
     Company; Rahns Specialty Metals,
16   Inc.; Rohm & Haas Company; Simon
     Wrecking Company, Inc.; Techalloy
17   Company, Inc.; Thomas & Betts
     Corporation; Unisys Corporation;
18   United States of America
     Department of Navy,
19
              Defendants.
20   _____
21
22
             Certified Shorthand Reporting Services
23                  arranged through
               Mastroianni & Formaroli, Inc.
24                709 White Horse Pike
               Audubon, New Jersey 08106
25                  (856) 546-1100

Mary A. Kollmar                                                      November 18, 2004

Page 2

1          * * * * *
2     Thursday, November 18, 2004
          * * * * *
3     Transcript in the above matter taken at
the offices of Ballard, Spahr, Andrews & Ingersoll,
4  Esquires, 1735 Market Street, Philadelphia,
Pennsylvania, commencing at 9:30 a.m.
5
APPEARANCES:
6
7     BALLARD, SPAHR, ANDREWS & INGERSOLL, ESQUIRES
        BY:  MARC E. DAVIES, ESQUIRE
7             - and -
8          ANNE HEIDEL, ESQUIRE
        1735 MARKET STREET
9       51ST FLOOR
        PHILADELPHIA, PENNSYLVANIA 19103
10       (215) 864-8248
        Attorneys for the Plaintiff,
11       BFAG
12     HINMAN, HOWARD & KATTELL, ESQUIRES
        BY:  RALPH K. KESSLER, ESQUIRE
13       106 CORPORATE PARK DRIVE
        SUITE 317
14       WHITE PLAINS, NEW YORK 10604
        (914) 694-4102
15       Attorneys for the Plaintiff,
        TI Automotive
16
17     CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
        STEWART & OLSTEIN, ESQUIRES
18       BY:  JOHN M. AGNELLO, ESQUIRE
        5 BECKER FARM ROAD
19       ROSELAND, NEW JERSEY 07068
        (973) 994-1700
20       Attorneys for the Defendant,
        Handy & Harman Tube Company
21
22
23
24
25

Page 3

1          WITNESS INDEX
2     Examination of Ms. Kollmar by Mr. Davies:
            Page 5
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              E X H I B I T S
2     EXHIBITS ATTACHED TO THE END OF THIS TRANSCRIPT
3              EXHIBIT INDEX
4       Appears at the conclusion of the transcript
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1     (MARY A. KOLLMAR, having been duly sworn, was
2     examined and testified as follows:)
3     (EXAMINATION OF MS. KOLLMAR BY MR. DAVIES:)
4          Q.    Okay.
5                Ms. Kollmar, could you state your name
6     for the record, state and spell your name?
7          A.    Mary A. Kollmar, last name is spelled
8     K-O-L-L-M-A-R.
9          Q.    Okay.
10               Have you ever been deposed before?
11         A.    No.
12         Q.    All right.
13               Well, I'll just briefly go over the
14    outline of sort of how we do it, and if you ever have
15    any questions for what I've said or later, please,
16    just ask.
17               We have a reporter here, but it's a
18    pretty informal thing, it's just like talking.
19               So, first, your testimony today is
20    sworn testimony, so your answers are under oath and
21    carry the same weight just like if you were in court.
22               Please make sure that all of your
23    responses are verbal.  The court reporter can't take
24    down a head nod or if you say uh-huh or something
25    like that, it's easier if you can give verbal

mfreporting@verizon.net                Mastroianni & Formaroli, Inc.                856-546-1100
                                    Professionals Serving Professionals

Mary A. Kollmar

November 18, 2004

Page 34

1  that was a term used?
2      A.   No.
3      Q.   Okay.
4          MR. DAVIES: I think I'm going to mark
5  that as MK-2.
6          (Exhibit MK-2, Invoice, is marked for
7  identification.)
8  BY MR. DAVIES:
9      Q.   You're being handed a document which
10  we've marked MK-2, just take a look at it for a
11  moment, it appears to be an invoice from February 5,
12  1973, actually, it says sold to Handy & Harman Tube
13  Company.
14          Are you familiar with this document?
15      A.   Only because Mr. Agnello showed me this
16  document, other than that I have no familiarity with
17  it.
18      Q.   Okay.
19          Could you describe to me generally were
20  you involved with invoices at all when you started at
21  the company?
22      A.   No.
23      Q.   Okay.
24          Do you recall if an invoice came in
25  where it would go from those offices, who would take

Page 35

1  care of them?
2      A.   This office right next door to me.
3      Q.   Okay.
4          Who was in that office? That's blank
5  still.
6      A.   I honestly don't recall her name. She
7  was only there for probably -- well, not even a year.
8  I started in October and I believe she left in
9  January. I don't remember her name.
10     Q.   Okay.
11          Well, who was the next person that was
12  there?
13     A.   Could possibly have been Marty Miller,
14  but I don't know if -- I don't remember what year she
15  started. There could have been someone else after --
16  whoever this person was when I came.
17     Q.   Well, let's just make it for anywhere in
18  the 1970's, do you recall anyone else that worked --
19     A.   Marty Miller, Tina Sampson.
20     Q.   And what was their job?
21          What did they do?
22     A.   Marty Miller was the accounts payable,
23  Tina was a -- I think she initially was a part-time
24  employee, then she became full-time, and eventually
25  took over accounts payable.

Page 36

1      Q.   Is she still with the company?
2      A.   No.
3      Q.   Do you recall when she left?
4      A.   I would speculate '70's.
5      Q.   Okay.
6          Let's see -- just give me one second.
7          Are you familiar with the term RCRA or
8  Resource Conservation Recovery Act?
9      A.   I've heard the term.
10     Q.   Do you remember -- I think it came into
11  place around 1977, give or take, just to give you a
12  time frame.
13          Do you recall whether Handy & Harman
14  had to create any records or do anything related to
15  RCRA?
16     A.   I would suspect that because of that we
17  made out specific manifests when waste was taken out
18  of the building.
19     Q.   Okay.
20          Do you know whether those manifests
21  were kept -- are kept still?
22     A.   Are kept, in the engineering department.
23     Q.   And do you know who -- let's go back
24  again towards the beginning -- well, towards '77 or
25  so, do you know who was in the engineering department

Page 37

1  in the late '70's?
2      A.   Bob Zimmerman, Jack Schurr.
3      Q.   How do you spell that, do you know?
4      A.   S-C-H-U-R-R, I believe.
5      Q.   Okay.
6          Do you recall whether they would have
7  been the ones that prepared these waste manifests?
8  (Objection) MR. AGNELLO: Objection to the form.
9          You can answer.
10  BY MR. DAVIES:
11     Q.   You can answer.
12          MR. AGNELLO: Yeah, you can answer.
13          THE WITNESS: Okay.
14          Quite possibly it was Bob Zimmerman's
15  secretary, Joan Stinson.
16  BY MR. DAVIES:
17     Q.   Joan --
18     A.   Stinson.
19     Q.   Do you know does she still work at
20  Handy & Harman?
21     A.   No.
22     Q.   Do you remember when she left?
23     A.   Early -- or late '90's.
24     Q.   Okay.
25          I was going to ask you also about

10 (Pages 34 to 37)

C E R T I F I C A T E

        I, Christi A. Argenbright, a Notary Public and
Certified Shorthand Reporter of The State of New
Jersey do hereby certify that the foregoing is a true
and accurate transcript of the testimony as taken
stenographically by and before me at the time, place
and on the date hereinbefore set forth.

        I do further certify that I am neither a
relative nor employee nor attorney nor counsel of any
of the parties to this action, and that I am neither
a relative nor employee of such attorney or counsel
and that I am not financially interested in this
action.

_____
Christi A. Argenbright, C.S.R.
Notary Public, State of New Jersey
My commission expires October 16, 2005
Certificate No. XI01789

# EXHIBIT O

Thomas Bell                                                    February 24, 2005

Page 1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
 2
                                          Civil Action No.
 3    _____         02-CV-3830
      BOARHEAD FARM AGREEMENT
 4    GROUP,
 5              Plaintiff,          Oral Deposition of
 6         vs.                        THOMAS BELL
 7    ADVANCED ENVIRONMENTAL TECHNOLOGY
      CORPORATION; ASHLAND CHEMICAL
 8    COMPANY; BOARHEAD CORPORATION;
      CARPENTER TECHNOLOGY CORPORATION;
 9    CROWN METRO, INC.; DIAZ CHEMICAL
      CORPORATION; EMHART INDUSTRIES,
10    INC.; ETCHED CIRCUITS, INC.; FCG,
      INC.; GLOBE DISPOSAL COMPANY, INC.;
11    GLOBE-WASTECH, INC.; HANDY & HARMAN
      TUBE COMPANY, INC.; KNOLL, INC.;
12    MERIT METAL PRODUCTS CORPORATION;
      NOVARTIS CORPORATION; NRM INVESTMENT
13    COMPANY; PLYMOUTH TUBE COMPANY;
      QUIKLINE DESIGN AND MANUFACTURING
14    COMPANY; RAHNS SPECIALTY METALS,
      INC.; ROHM & HAAS COMPANY, SIMON
15    WRECKING COMPANY, INC.; TECHALLOY
      COMPANY, INC.; THOMAS & BETTS
16    CORPORATION; UNISYS CORPORATION;
      UNITED STATES OF AMERICA DEPARTMENT
17    OF NAVY,
18              Defendants.

19    _____
                 *   *   *   *   *
20         Thursday, February 24, 2005
                 *   *   *   *   *
21
22
           Certified Shorthand Reporting Services
23                   Arranged Through
             Mastroianni & Formaroli, Inc.
24               709 White Horse Pike
             Audubon, New Jersey 08106
25                 (856) 546-1100
```

Thomas Bell                                                    February 24, 2005



**Page 2**

```
 1
        Transcript in the above matter taken at
 2   the offices of Drinker, Biddle & Reath, Esquires,
     1000 Westlakes Drive, Berwyn, Pennsylvania,
 3   commencing at 10:00 A.M.
 4
     A P P E A R A N C E S :
 5
     BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
 6   BY:  MARC E. DAVIES, ESQUIRE
     1735 Market Street
 7   51st Floor
     Philadelphia, PA 19103-7599
 8   215-864-8248
     Attorneys for the Plaintiff
 9
     CARELLA, BYRNE, BAIN, GILFILLAN,
10    CECCHI, STEWART & OLSTEIN, ESQUIRES
     BY:  JOHN M. AGNELLO, ESQUIRE
11   5 Becker Farm Road
     Roseland, NJ 07068
12   973-994-1700
     Attorneys for the Defendant,
13   Handy & Harman Tube Company
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   W I T N E S S   I N D E X
 2
     Examination of Mr. Bell
 3
 4   By Mr. Davies:  Page 4
 5
 6
 7
 8
 9
10   E X H I B I T S
11
     (Exhibits appear at the
12   conclusion of the transcript)
13   (Exhibits are retained by
     counsel)
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1   (Thomas Bell, having been duly sworn, was examined
 2   and testified as follows:)
 3       (EXAMINATION OF MR. BELL BY MR. DAVIES:)
 4       Q.    Mr. Bell, my name is Marc Davies.  We
 5   just met.  I am an attorney representing a group of
 6   companies involved with paying for the remediation or
 7   clean-up of the landfill and we are suing another
 8   number of other companies that they believe are also
 9   involved.
10           We are going to go over the
11   instructions briefly.
12           I will ask, have you been deposed
13   before?
14       A.    You mean --
15       Q.    A deposition, with a court reporter.
16       A.    Uh-uh.
17       Q.    I will just go over a couple of the
18   instructions.  Again, if you have any questions about
19   these instructions or anything, please just ask.
20           First, your testimony is sworn
21   testimony.  You are answering under oath, just like
22   if you were in a courtroom.
23           Please make sure that your answers are
24   verbal.  The court reporter can't take down a shrug
25   or uh-huh.  We need a yes or no, whatever your answer
```

**Page 5**

```
 1   is.
 2           Also, please listen to my questions.
 3   If you don't understand something, ask me to clarify,
 4   I'm happy to do that.
 5           On the same token, if I'm asking you
 6   about something that you have a good basis to answer,
 7   but you can't be precise, if you want to give a
 8   range, an approximation, that's fine.  I don't want
 9   you to guess.  If you don't know, don't guess, but if
10   you feel like you have a good handle on something and
11   you can give an exact number or a range, I would ask
12   you to do that.
13           We also need to make sure we don't talk
14   over each other so the court reporter can take
15   everything down.  Please make sure that I finish my
16   question completely before answering.  Also, the
17   attorney for the company might want to say something
18   as well, so just let's try to make sure we speak one
19   person at a time.
20           I will ask you whether you've taken any
21   medication of any kind within the last 24 hours that
22   might impact your ability to testify today.
23       A.    No.
24       Q.    Let's briefly go through your personal
25   information.  Your name again for the record?
```

2 (Pages 2 to 5)

Thomas Bell                                                    February 24, 2005

Page 66

1    Q.    We have com, c-o-m?
2    A.    Yes, and we have finishing and the weld
3  mills.
4    Q.    So you've written from left to right,
5  finishing, com for commercial, then furnace, and then
6  weld mills?
7    A.    Right.
8    Q.    Okay, that's great. Could you --
9    A.    That area there, I am going to say that
10 is where the weld mills were in 1977 (indicating).
11   Q.    For a frame of reference, could you put
12 any of the roads that would be passing by the
13 facility?
14   A.    I've been going down that road for 43
15 years.
16       MR. AGNELLO: One of these is Township
17 Line.
18       THE WITNESS: One is Township Line and
19 one is Whitehall.
20       MR. AGNELLO: I think this is Township
21 Line and this is Whitehall (indicating).
22 BY MR. DAVIES:
23   Q.    Now, where would the -- is there an area
24 where the products are taken from finishing out of
25 the facility?

Page 67

1    A.    Through the doors here (indicating).
2        MR. AGNELLO: Do you want to write door
3  there?
4        THE WITNESS: Okay.
5  BY MR. DAVIES:
6    Q.    Is that like a cargo door?
7    A.    Yes. Your tractor trailers would back
8  up to that, your trucking doors.
9    Q.    Now, where would the degreaser or
10 degreasers be on this drawing?
11   A.    About like that (indicating).
12       MR. AGNELLO: Do you want him to write
13 degreaser, Marc?
14       MR. DAVIES: Please.
15       Where are the machines, like the dye
16 machines, the benches?
17       THE WITNESS: The benches would be here
18 (indicating).
19 BY MR. DAVIES:
20   Q.    So mostly the commercial mill department
21 is made up of the benches?
22   A.    Yes.
23   Q.    And then there is a place where the
24 derodding would take place? The small little boxes?
25   A.    Yes, what I would call rolls, the Luster

Page 68

1  Jordan derodding machine.
2        MR. AGNELLO: Luster Jordan is where
3  you marked the small boxes, rolls?
4        THE WITNESS: Yes.
5        MR. AGNELLO: There are eight straight
6  lines in the commercial area that you've said are the
7  benches?
8        THE WITNESS: Right.
9  BY MR. DAVIES:
10   Q.    Now, would the second floor set-up be
11 significantly different from the first floor?
12   A.    If you looked at the second floor, you
13 would not have this (indicating).
14   Q.    You wouldn't have the commercial --
15   A.    Right, and you wouldn't have this
16 (indicating).
17   Q.    Okay.
18   A.    Your second floor would be over this
19 area here, over the finishing and the weld mills.
20 That is the only second floor area that you would
21 have (indicating).
22   Q.    And what took place over finishing on
23 the second floor?
24   A.    Capillary.
25   Q.    And what about over the weld mills?

Page 69

1    A.    Small tube. Again, there was a time
2  frame when small tube was moved over to capillary and
3  I'm not exactly sure what year that was and I don't
4  want to give you a bad answer, if I can possibly help
5  it.
6    Q.    And I don't want you to.
7        MR. AGNELLO: Should we mark this,
8  Marc?
9        (Exhibit Bell-1, Diagram, is marked for
10 identification.)
11 BY MR. DAVIES:
12   Q.    Now, besides the trichloride, were there
13 any other solvents that were used at the facility?
14   A.    Acetone.
15   Q.    What was acetone used for?
16   A.    Cleaning, just wiping something off.
17   Q.    Anything else?
18   A.    Not that I can think of.
19       MR. DAVIES: Can I have this marked
20 Bell-2?
21       (Exhibit Bell-2, De Rewal Chemical Company
22 Invoice, February of 1973, is marked for
23 identification.)
24 BY MR. DAVIES:
25   Q.    You are being shown Bell-2, which is an

18 (Pages 66 to 69)

Thomas Bell                                                                February 24, 2005

Page 70

1    invoice from De Rewal Chemical Company dated February
2    of 1973. Have you ever seen this invoice before?
3        A.    No.
4        Q.    Have you ever seen an invoice from
5    De Rewal Chemical Company or anything with the name
6    De Rewal on it?
7        A.    Not to my knowledge or not to my memory,
8    anyway.
9        Q.    Aside from perhaps preparing for this
10    deposition, have you ever heard the name De Rewal?
11        A.    No.
12        Q.    Looking under the description, the first
13    thing that is mentioned is a 250-gallon oil tank.
14    Did you ever have an oil tank like that at Handy &
15    Harman?
16        A.    You mean -- are we talking about 1973?
17        Q.    Well, that would be where to start, yes.
18        A.    I couldn't honestly say. I don't know
19    if they had a 250-gallon oil tank in 1973 or not. I
20    mean -- I don't know.
21        Q.    Can you, in your mind, to your best
22    recollection, ever recall Handy & Harman having a
23    250-gallon oil tank at any time?
24        A.    Gas?
25        Q.    I don't really know what it would hold,

Page 71

1    but a tank that would hold 250 gallons, whether it be
2    gas or oil or whatever it holds. It could hold
3    water. A tank of the size that would hold
4    approximately 250 gallons.
5    (OBJECTION) MR. AGNELLO: Objection. I'd ask for a
6    clarification.
7        At any time during his 45 years or 44
8    years at Handy & Harman does he remember ever seeing
9    a 250-gallon tank that was used for any purpose, to
10    store anything?
11        MR. DAVIES: Yes.
12        MR. AGNELLO: So it's any time,
13    anything.
14        THE WITNESS: There was a gas tank, we
15    used to fill the trucks and I believe that was 250
16    gallons. I could be wrong, but we had a gas tank
17    that to me would have been 250 gallons.
18    BY MR. DAVIES:
19        Q.    Where on Bell-1 would that have been?
20        MR. AGNELLO: Now, again, Bell-1 is the
21    mid -- early to mid '70's document. You are now
22    asking him for a gas tank. I guess the question is,
23    not to ask it, but so we get the time periods, when
24    did this time period exist, and Mr. Davis would like
25    to know where it was.

Page 72

1        THE WITNESS: The gas tank that I'm
2    referring to would be in the late '90's into the 2000
3    area and it would have been kept about right there
4    (indicating).
5        MR. AGNELLO: Why don't you put gas
6    tank and put late '90's, 2000? That way, there is no
7    question.
8    BY MR. DAVIES:
9        Q.    So prior to the late '90's, the gas tank
10    wasn't there that you've written on that drawing?
11    There was not a gas tank there prior to the late
12    '90's?
13        A.    I don't know when it came. Within the
14    last couple of years, it went. I can't say it got
15    there February 10th, 1987. I don't know when it
16    first came. I remember -- the question was do you
17    remember ever seeing a tank, okay. I remember this
18    tank sometime in the '90's, at least in the '90's.
19        Q.    Okay. Now, do you know that the tank
20    wasn't there in the '70's or do you just not recall
21    one way or the other?
22        A.    I don't recall to say it wasn't there.
23    I'm just not sure of that. To say it was there, I'm
24    not sure of that.
25        Q.    Fair enough. Going back to Bell-2,

Page 73

1    there are several 55-gallon drums and 30-gallon
2    drums, what is referred to as industrial waste
3    solution. Do you know what that is referring to?
4        A.    No.
5        Q.    Is that a term that you recall using
6    when you worked at Handy & Harman?
7        A.    I wouldn't know what -- I don't know
8    what the term would be, how they would send out waste
9    product. I wouldn't have been privied to this or, if
10    I would have, I don't remember or recognize it.
11        Q.    Now, under that, it says 25 empty
12    55-gallon drums delivered.
13        Can you tell me why they would be
14    delivering empty drums?
15    (OBJECTION)  MR. AGNELLO: Objection as to form.
16    He already said he never saw the document before, so
17    I guess if your question is -- I object as to form,
18    foundation.
19        MR. DAVIES: I will rephrase slightly.
20        We talked a little bit earlier about
21    55-gallon drums being delivered for the two-week
22    shut-down. Aside from that, do you recall whether
23    empty drums were ever delivered to the facility?
24    (OBJECTION)  MR. AGNELLO: Objection. I don't
25    think there is any testimony specifically about

19 (Pages 70 to 73)

1

C E R T I F I C A T E

2

3

4

5        I, Lori A. Porto, a Notary Public and

6   Certified Shorthand Reporter of the State of New

7   Jersey, do hereby certify that that the

8   foregoing is a true and accurate transcript of

9   the testimony as taken stenographically by and

10   before me at the time, place and on the date

11   hereinbefore set forth. ·

12        I do further certify that I am neither a

13   relative nor employee nor attorney nor counsel

14   of any of the parties to this action, and that I

15   am neither a relative nor employee of such

16   attorney or counsel and that I am not

17   financially interested in this action.

18

19

20

21   _____
     Lori A. Porto, C.S.R.
22   Notary Public, State of New Jersey
     Certificate No. XI01577
23

24

25

MASTROIANNI & FORMAROLI, INCORPORATED
PROFESSIONALS SERVING PROFESSIONALS

# EXHIBIT P

1                                                                   187

                    UNITED STATES DISTRICT COURT
2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

       BOARHEAD FARM AGREEMENT                 CIVIL ACTION NO.
4      GROUP,                                  02-CV-3830
5                   Plaintiff,            Judge Legrome D. Davis
                                          Oral Deposition of
6             vs.
                                          MANFRED T. DE REWAL, SR.
       ADVANCED ENVIRONMENTAL TECHNOLOGY
7      CORPORATION; ASHLAND CHEMICAL
       COMPANY; BOARHEAD CORPORATION;
8      CARPENTER TECHNOLOGY CORPORATION;
       CROWN METRO, INC.; DIAZ CHEMICAL
9      CORPORATION; EMHART INDUSTRIES,
       INC.; ETCHED CIRCUITS, INC.; FCG,
10     INC.; GLOBE DISPOSAL COMPANY, INC.;
       GLOBE-WASTECH, INC.; HANDY & HARMAN
11     TUBE COMPANY, INC.; KNOLL, INC.;
       MERIT METAL PRODUCTS CORPORATION;
12     NOVARTIS CORPORATION; NRM INVESTMENT
       COMPANY; PLYMOUTH TUBE COMPANY;
13     QUIKLINE DESIGN AND MANUFACTURING
       COMPANY; RAHNS SPECIALTY METALS,
14     INC.; ROHM & HAAS COMPANY, SIMON
       WRECKING COMPANY, INC.; TECHALLOY
15     COMPANY, INC.; THOMAS & BETTS
       CORPORATION; UNISYS CORPORATION;
16     UNITED STATES OF AMERICA
       DEPARTMENT OF NAVY,
17                  Defendants.

18

                          *   *   *   *   *
19                    Thursday, May 8, 2003
                          *   *   *   *   *
20

                      Transcript in the above matter taken at
21     the offices of Ballard, Spahr, Andrews & Ingersoll,
       LLP, 1735 Market Street, 42nd Floor, Philadelphia,
22     Pennsylvania, commencing at 10:15 A.M.

23             Certified Shorthand Reporting Services
                        Arranged Through
24                 Mastroianni & Formaroli, Inc.
                       709 White Horse Pike
25                   Audubon, New Jersey 08106
                        (856) 546-1100

188

1    A P P E A R A N C E S:

2        BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
         BY: GLENN A. HARRIS, ESQUIRE
3        PLAZA 1000, MAIN STREET, # 500
         VOORHEES, NEW JERSEY  08043
4        (856)761-3400
         ATTORNEYS FOR THE PLAINTIFF
5
         CYTEC INDUSTRIES, INC.
6        BY:  THOMAS A. WALDMAN, ESQUIRE
         5 GARRET MOUNTAIN PLAZA
7        WEST PATERSON, NEW JERSEY  07424
         (973)357-3136
8        ALSO APPEARING FOR THE PLAINTIFF

9        FORD MOTOR COMPANY
         BY:  KATHY J. HOFER, ESQUIRE
10       PARKLANE TOWERS WEST, SUITE 1500
         3 PARKLANE BOULEVARD
11       DEARBORN, MICHIGAN  48126-2493
         (313)594-1687
12       ALSO APPEARING FOR THE PLAINTIFF

13       WOLFF & SAMSON, PC
         BY:  THOMAS W. SABINO, ESQUIRE
14       THE OFFICES AT CRYSTAL LAKE
         ONE BOLAND DRIVE
15       WEST ORANGE, NEW JERSEY  07052-3698
         (973)530-2044
16       ATTORNEYS FOR THE DEFENDANT,
         ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION
17
         PHELAN, PETTIT & BIEDRZYCKI, ESQUIRES
18       BY:  DAVID M. DOTO, ESQUIRE
         NORTH AMERICAN BUILDING
19       121 SOUTH BROAD STREET, SUITE 1600
         PHILADELPHIA, PENNSYLVANIA  19107
20       (215)546-0500
         ATTORNEYS FOR THE DEFENDANT,
21       ASHLAND CHEMICAL COMPANY

22       EDWARDS & ANGELL, LLP
         BY:  LYNN WRIGHT, ESQUIRE
23       51 JOHN F. KENNEDY PARKWAY
         SHORT HILLS, NEW JERSEY  07078-5006
24       (973)376-7700
         ATTORNEYS FOR THE DEFENDANT,
25       CARPENTER TECHNOLOGY CORPORATION

189

1  A P P E A R A N C E S (CONTINUED:)

2          SWIDLER, BERLIN, SHEREFF, FRIEDMAN, LLP
            BY:  LAURA A. FORD, ESQUIRE
3          3000 K STREET, N.W., SUITE 300
            WASHINGTON, D.C. 20007-5116
4          (202)424-7861
            ATTORNEYS FOR THE DEFENDANTS,
5          CROWN METRO and EMHART INDUSTRIES

6          DUANE MORRIS
            BY:  A. NICOLE FRIANT, ESQUIRE
7          ONE LIBERTY PLACE
            PHILADELPHIA, PENNSYLVANIA  19103-7396
8          (215)979-1818
            ATTORNEYS FOR THE DEFENDANT,
9          FLEXIBLE CIRCUITS

10         CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
            STEWART & OLSTEIN, PC
11         BY:  MELISSA E. FLAX, ESQUIRE
            6 BECKER FARM ROAD
12         ROSELAND, NEW JERSEY  07068-1739
            (973)994-1700
13         ATTORNEYS FOR THE DEFENDANT,
            HANDY & HARMAN TUBE COMPANY, INC.
14

15         MC NEES, WALLACE & NURICK, LLC
            BY:  RICHARD H. FRIEDMAN, ESQUIRE
16         100 PINE STREET
            HARRISBURG, PENNSYLVANIA  17108-1166
17         (717)237-5469
            ATTORNEYS FOR THE DEFENDANT, KNOLL, INC.

18         MONTEVERDE, MC ALEE & HURD, ESQUIRES
            BY:  STEPHEN P. CHAWAGA, ESQUIRE
19         1617 JFK BOULEVARD, SUITE 1500
            PHILADELPHIA, PENNSYLVANIA  19103-1815
20         (215)557-2900
            ATTORNEYS FOR THE DEFENDANT,
21         MERIT METALS PRODUCTS CORPORATION

22         MORGAN, LEWIS & BOCKIUS, LLP
            BY:  MICHAEL R. DILLON, ESQUIRE
23         1701 MARKET STREET
            PHILADELPHIA, PENNSYLVANIA  19103-2921
24         (215)963-4938
            ATTORNEYS FOR THE DEFENDANT,
25         NOVARTIS CORPORATION

190

1     A P P E A R A N C E S (CONTINUED:)

2          HENDERSON, WETHERILL, O'HEY & HORSEY, ESQUIRES
           BY:  EDWARD FACKENTHAL, ESQUIRE
3          ONE MONTGOMERY PLAZA, SUITE 902
           NORRISTOWN, PENNSYLVANIA  19404
4          (610)279-3370
           ATTORNEYS FOR THE DEFENDANT,
5          NRM INVESTMENT COMPANY

6          JONES, LEMON, GRAHAM & CLANCEY, ESQUIRES
           BY:  STEVEN J. LEMON, ESQUIRE
7          223 EAST STATE STREET
           GENEVA, ILLINOIS  60134-0805
8          (630)208-0805
           ATTORNEYS FOR THE DEFENDANT,
9          PLYMOUTH TUBE COMPANY

10         SCHMIDT & TOMLINSON, ESQUIRES
           BY:  MARGARET QUINN, ESQUIRE
11         29 UNION STREET
           MEDOFRD, NEW JERSEY  08055
12         (609)714-0600
           ATTORNEYS FOR THE DEFENDANT,
13         QUICKLINE DESIGN AND MANUFACTURING COMPANY

14         ROHM AND HAAS COMPANY
           BY:  JENNIFER BERKE LEVIN, ESQUIRE
15         100 INDEPENDENCE MALL WEST
           PHILADELPHIA, PENNSYLVANIA  19106-2399
16         ATTORNEYS FOR THE DEFENDANT,
           ROHM AND HAAS COMPANY
17

18         MATTLEMAN, WEINROTH & MILLER, PC
           BY:  SHARON ORAS MORGAN, ESQUIRE
19         LAND TITLE BUILDING, SUITE 2226
           BROAD & CHESTNUT STREETS
20         PHILADELPHIA, PENNSYLVANIA  19110
           (215)923-2225
21         ATTORNEYS FOR THE DEFENDANT,
           SIMON WRECKING COMPANY, INC.

22

23

24

25

191

1       A P P E A R A N C E S (CONTINUED:)

2               DRINKER, BIDDLE & REATH, LLP
                BY:  ANDREW P. FOSTER, ESQUIRE
3                    and ADINA M. DZIUK, ESQUIRE
                ONE LOGAN SQUARE
4               18TH & CHERRY STREETS
                PHILADELPHIA, PENNSYLVANIA  19103-6996
5               (215)988-2512
                ATTORNEYS FOR THE DEFENDANTS,
6               RAHNS SPECIALTY METALS, INC.,
                TECHALLOY COMPANY, INC., THOMAS & BETTS
7               CORPORATION and UNISYS CORPORATION

8               NAVY LITIGATION OFFICE
                BY:  ROBERT MANLEY, ESQUIRE
9               WASHINGTON NAVY YARD
                WASHINGTON, D.C.  20002
10              (202)685-6987
                     -and-
11              UNITED STATES DEPARTMENT OF JUSTICE
                ENVIRONMENT & NATURAL RESOURCES
12              BY:  JOHN SHEEHAN, ESQUIRE (present via phone)
                601 D STREET NW, SUITE 8120
13              WASHINGTON, D.C.
                (202)514-0995
14              ATTORNEYS FOR THE DEFENDANT,
                UNITED STATES OF AMERICA DEPARTMENT OF NAVY
15

16

17

18

19

20

21

22

23

24

25

1        Q.      When was the first time you heard of

2    Handy & Harman Tube Company?

3        A.      I don't know.

4        Q.      How did you learn about Handy & Harman

5    Tube Company?

6        A.      I don't know.

7        Q.      Do you know, and I apologize if you

8    answered this in response to another question, do you

9    know what the business of Handy & Harman Tube Company

10   is?

11       A.      No.

12       Q.      Are you familiar with any of the

13   processes used by Handy & Harman Tube Company?

14       A.      No.

15       Q.      Are you familiar with the types of waste

16   generated by Handy & Harman Tube Company?

17       A.      No.

18       Q.      Mr. DeRewal, if you would turn to P-42

19   which was marked yesterday, do you have P-42 in front

20   of you?

21       A.      Yes, I have.

22       Q.      Does P-42 represent a typical DeRewal

23   Chemical Company invoice?

24       A.      Yes.

25       Q.      If you would just look across the top

254

1        Q.     Mr. DeRewal, it says 250 gallon oil

2    tank. Do you know whether the 250 oil tank was

3    coming from Handy & Harman Tube Company or being

4    delivered to Handy & Harman Tube Company?

5        A.     I have no idea.

6        Q.     Do you know who owned the 250 gallon oil

7    tank?

8        A.     No.

9        Q.     Do you know whether looking at the

10   second line under description, whether the 26

11   55-gallon drums were full or empty?

12       A.     I would assume they're full of waste

13   solution. That's what it says, industrial waste

14   solution, so...

15       Q.     I'm not asking you to assume.  I'm

16   asking you whether you know if they were full or

17   empty.

18       A.     I would not know whether they were full

19   or empty.

20       Q.     Was DeRewal picking up the 26 55-gallon

21   drums from Handy & Harman Tube Company containing

22   industrial waste solution?

23       A.     I don't know what they did with the 25

24   drums.

25       Q.     Do you know whether the 36 30-gallon

255

1    drums were full or empty?

2         A.    No, I do not know.

3         Q.    Do you know whether the 36 30-gallon

4    drums were being delivered to or being picked up from

5    Handy & Harman Tube Company?

6         A.    No, but the invoice would suggest that

7    they are being picked up.  They have waste solution

8    in them.

9         Q.    But you don't know as you sit here today

10   whether they were being picked up from or delivered

11   to Handy & Harman Tube Company; is that correct?

12              MR. HARRIS:    Objection.

13        A.    No, I wouldn't -- I wouldn't know what

14   they were -- just looking at this invoice, you know,

15   I don't think Handy & Harman is ordering waste

16   solutions.  I think they are getting rid of waste

17   solutions.  I mean --

18        Q.    Mr. DeRewal, I didn't ask you what you

19   think.  I asked you whether you knew or did not know.

20        A.    I absolutely do not know.

21        Q.    Okay.  Can you tell me what the $6 per

22   55-gallon drum price represents?

23        A.    What?

24        Q.    Looking in the third column under the

25   second preprinted line where it says price, second

256

1    line down says $6 each.

2         A.    Right.

3         Q.    Can you tell me what the $6 per

4    55-gallon drum price represents?

5         A.    No.

6         Q.    Can you tell me what the $5 per

7    30-gallon drum price represents?

8         A.    No.

9         Q.    Can you tell me what the $25 per

10   250-gallon oil tank price represents?

11        A.    No.

12        Q.    Looking at the first preprinted line on

13   P-42 in the third column which says shipped via, do

14   you know what the reference to "our truck" means?

15        A.    Well, this is DeRewal invoice, so our

16   truck means a DeRewal -- a DeRewal truck.

17        Q.    If you look at the bottom of P-42,

18   MrDeRewal --

19        A.    Yes.

20        Q.    -- there's a marking on the bottom.

21        A.    Yes.

22        Q.    Do you know what that is?

23        A.    No, I do not.

24        Q.    Is that a signature of some sort?

25        A.    I thought that was his marking.  I mean,

400

1              C E R T I F I C A T E

2        I, NORA M. GALLAGHER, a Notary Public and

3    Certified Shorthand Reporter of the State of New

4    Jersey, and Commissioner of Deeds of the Commonwealth

5    of Pennsylvania, do hereby certify that prior to the

6    commencement of the examination,

7              MANFRED T. DE REWAL, SR.

8    Was duly sworn by me to testify to the truth, the

9    whole truth and nothing but the truth.

10              I do further certify that the foregoing

11   is a true and accurate transcript of the testimony as

12   taken stenographically by and before me at the time,

13   place and on the date hereinbefore set forth.

14              I do further certify that I am neither

15   a relative nor employee nor attorney nor counsel of

16   any of the parties to this action, and that I am

17   neither a relative nor employee of such attorney or

18   counsel and that I am not financially interested in

19   this action.

20

21

22        Nora M. Gallagher, C.S.R.
          My Commission Expires October 24, 2007
23        Certificate No. XI00911
          Date:

24

25

# EXHIBIT Q

#188793 v1

1

```
 1               UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3                                CIVIL ACTION NO.
      BOARHEAD FARM AGREEMENT      02-CV-3830
 4    GROUP,                       Judge Legrome D. Davis
                Plaintiff,
 5                                 Oral Deposition of
                vs.                KAREN CASTILLO
 6    ADVANCED ENVIRONMENTAL TECHNOLOGY
      CORPORATION; ASHLAND CHEMICAL
 7    COMPANY; BOARHEAD CORPORATION;
      CARPENTER TECHNOLOGY CORPORATION;
 8    CROWN METRO, INC.; DIAZ CHEMICAL
      CORPORATION; EMHART INDUSTRIES,
 9    INC.; ETCHED CIRCUITS, INC.; FCG,
      INC.; GLOBE DISPOSAL COMPANY, INC.;
10    GLOBE-WASTECH, INC.; HANDY & HARMAN
      TUBE COMPANY, INC.; KNOLL, INC.;
11    MERIT METAL PRODUCTS CORPORATION;
      NOVARTIS CORPORATION; NRM INVESTMENT
12    COMPANY; PLYMOUTH TUBE COMPANY;
      QUIKLINE DESIGN AND MANUFACTURING
13    COMPANY; RAHNS SPECIALTY METALS,
      INC.; ROHM & HAAS COMPANY, SIMON
14    WRECKING COMPANY, INC.; TECHALLOY
      COMPANY, INC.; THOMAS & BETTS
15    CORPORATION; UNISYS CORPORATION;
      UNITED STATES OF AMERICA
16    DEPARTMENT OF NAVY,
                Defendants.
17

18              *   *   *   *   *
             TUESDAY, JUNE 3, 2003
19              *   *   *   *   *

20              Transcript in the above matter taken at
      the offices of Ballard, Spahr, Andrews & Ingersoll,
21    LLP, 1735 Market Street, 42nd Floor, Philadelphia,
      Pennsylvania, commencing at 10:00 A.M.
22
          Certified Shorthand Reporting Services
23                    Arranged Through
              Mastroianni & Formaroli, Inc.
24               709 White Horse Pike
               Audubon, New Jersey 08106
25                  (856) 546-1100
```

2

```
 1   A P P E A R A N C E S:

 2        BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
          BY: GLENN A. HARRIS, ESQUIRE
 3        PLAZA 1000, MAIN STREET, # 500
          VOORHEES, NEW JERSEY  08043
 4        (856)761-3400
          ATTORNEYS FOR THE PLAINTIFF
 5
          WOLFF & SAMSON, PC
 6        BY:  THOMAS W. SABINO, ESQUIRE
          THE OFFICES AT CRYSTAL LAKE
 7        ONE BOLAND DRIVE
          WEST ORANGE, NEW JERSEY  07052-3698
 8        (973)530-2044
          ATTORNEYS FOR THE DEFENDANT,
 9        ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION

10        PHELAN, PETTIT & BIEDRZYCKI, ESQUIRES
          BY:  RICHARD E. STABINSKI, ESQUIRE
11        NORTH AMERICAN BUILDING
          121 SOUTH BROAD STREET, SUITE 1600
12        PHILADELPHIA, PENNSYLVANIA  19107
          (215)546-0500
13        ATTORNEYS FOR THE DEFENDANT,
          ASHLAND CHEMICAL COMPANY
14
          EDWARDS & ANGELL, LLP
15        BY:  ROBIN WRIGHT, ESQUIRE  (present via phone)
          51 JOHN F. KENNEDY PARKWAY
16        SHORT HILLS, NEW JERSEY  07078-5006
          (973)376-7700
17        ATTORNEYS FOR THE DEFENDANT,
          CARPENTER TECHNOLOGY CORPORATION
18
          SWIDLER, BERLIN, SHEREFF, FRIEDMAN, LLP
19        BY:  LAURA A. FORD, ESQUIRE
          3000 K STREET, N.W., SUITE 300
20        WASHINGTON, D.C.  20007-5116
          (202)424-7861
21        ATTORNEYS FOR THE DEFENDANTS,
          CROWN METRO and EMHART INDUSTRIES
22

23

24

25
```

```
1    A P P E A R A N C E S (CONTINUED:)

2         DUANE MORRIS
          BY:  A. NICOLE FRIANT, ESQUIRE
3         ONE LIBERTY PLACE
          PHILADELPHIA, PENNSYLVANIA  19103-7396
4         (215)979-1818
          ATTORNEYS FOR THE DEFENDANT,
5         FLEXIBLE CIRCUITS

6         CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
          STEWART & OLSTEIN, PC
7         BY:  MELISSA E. FLAX, ESQUIRE
          6 BECKER FARM ROAD
8         ROSELAND, NEW JERSEY  07068-1739
          (973)994-1700
9         ATTORNEYS FOR THE DEFENDANT,
          HANDY & HARMAN TUBE COMPANY, INC.
10
          MC NEES, WALLACE & NURICK, LLC
11        BY:  RICHARD H. FRIEDMAN, ESQUIRE
          100 PINE STREET
12        HARRISBURG, PENNSYLVANIA  17108-1166
          (717)237-5469
13        ATTORNEYS FOR THE DEFENDANT, KNOLL, INC.

14        MONTEVERDE, MC ALEE & HURD, ESQUIRES
          BY:  STEPHEN P. CHAWAGA, ESQUIRE
15        1617 JFK BOULEVARD, SUITE 1500
          PHILADELPHIA, PENNSYLVANIA  19103-1815
16        (215)557-2900
          ATTORNEYS FOR THE DEFENDANT,
17        MERIT METALS PRODUCTS CORPORATION

18        MORGAN, LEWIS & BOCKIUS, LLP
          BY:  MICHAEL R. DILLON, ESQUIRE
19        1701 MARKET STREET
          PHILADELPHIA, PENNSYLVANIA  19103-2921
20        (215)963-4938
          ATTORNEYS FOR THE DEFENDANT,
21        NOVARTIS CORPORATION

22        HENDERSON, WETHERILL, O'HEY & HORSEY, ESQUIRES
          BY:  EDWARD FACKENTHAL, ESQUIRE
23        ONE MONTGOMERY PLAZA, SUITE 902
          NORRISTOWN, PENNSYLVANIA  19404
24        (610)279-3370
          ATTORNEYS FOR THE DEFENDANT,
25        NRM INVESTMENT COMPANY
```

4

```
 1
      A P P E A R A N C E S (CONTINUED:)
 2
          JONES, LEMON, GRAHAM & CLANCEY, ESQUIRES
 3        BY:  STEVEN J. LEMON, ESQUIRE
          223 EAST STATE STREET
 4        GENEVA, ILLINOIS  60134-0805
          (630)208-0805
 5        ATTORNEYS FOR THE DEFENDANT,
          PLYMOUTH TUBE COMPANY
 6
          SCHMIDT & TOMLINSON, ESQUIRES
 7        BY:  MARGARET QUINN, ESQUIRE
          29 UNION STREET
 8        MEDFORD, NEW JERSEY  08055
          (609)714-0600
 9        ATTORNEYS FOR THE DEFENDANT,
          QUICKLINE DESIGN AND MANUFACTURING COMPANY
10
          ROHM AND HAAS COMPANY
11        BY:  JENNIFER BERKE LEVIN, ESQUIRE
          100 INDEPENDENCE MALL WEST
12        PHILADELPHIA, PENNSYLVANIA  19106-2399
          ATTORNEYS FOR THE DEFENDANT,
13        ROHM AND HAAS COMPANY

14        MATTLEMAN, WEINROTH & MILLER, PC
          BY:  SHARON ORAS MORGAN, ESQUIRE
15        LAND TITLE BUILDING, SUITE 2226
          BROAD & CHESTNUT STREETS
16        PHILADELPHIA, PENNSYLVANIA  19110
          (215)923-2225
17        ATTORNEYS FOR THE DEFENDANT,
          SIMON WRECKING COMPANY, INC.
18
          DRINKER, BIDDLE & REATH, LLP
19        BY:  ADINA M. DZIUK, ESQUIRE
          ONE LOGAN SQUARE
20        18TH & CHERRY STREETS
          PHILADELPHIA, PENNSYLVANIA  19103-6996
21        (215)988-2512
          ATTORNEYS FOR THE DEFENDANTS,
22        RAHNS SPECIALTY METALS, INC.,
          TECHALLOY COMPANY, INC., THOMAS & BETTS
23        CORPORATION and UNISYS CORPORATION

24

25
```

5

1

A P P E A R A N C E S (CONTINUED:)

2

    UNITED STATES DEPARTMENT OF JUSTICE

3

    ENVIRONMENT & NATURAL RESOURCES
    BY:  JOHN SHEEHAN, ESQUIRE (present via phone)

4

    601 D STREET NW, SUITE 8120
    WASHINGTON, D.C.

5

    (202)514-0995
    ATTORNEYS FOR THE DEFENDANT,

6

    UNITED STATES OF AMERICA DEPARTMENT OF NAVY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    accused of transporting.  It was Ruth that was

2    accused of transporting.

3         Q.    Let me rephrase my question.

4               Do you know what type of chemicals Mr.

5    DeRewel, Senior was accused of importing?

6         A.    No.

7         Q.    You testified in response to some

8    questions asked by Mr. Harris that you prepared the

9    invoices for DeRewel Chemical; is that correct?

10        A.    Correct.

11        Q.    Did you also prepare invoices for Echo?

12        A.    Correct.

13        Q.    While you were at the Boarhead Farm

14   office were you the only individual who prepared

15   invoices?

16              MR. HARRIS:  Objection.

17        A.    While I was there, yes.

18        Q.    My question was limited to while you

19   were there.

20        A.    Yes.

21        Q.    I believe you testified in response to

22   one of Mr. Harris's questions that the information

23   that was ultimately typed up on the invoice was

24   provided to you; is that correct?

25        A.    Correct.

1          Q.     Do you know who provided you this

2     information?

3          A.     No.

4          Q.     Was there a price list for what was

5     charged to customers?

6          A.     No.

7          Q.     How did you know how much to charge a

8     customer say, for example, disposing of a 55-gallon

9     drum?

10          A.     I would get that info from Fred, Senior.

11          Q.     So Mr. DeRewel, Senior would provide you

12     with the cost per 55-gallon drum to charge a

13     particular customer; is that correct?

14          A.     Yes, or it was in black and white as a

15     quote.

16          Q.     And do you know who prepared any such

17     quotes?

18          A.     Fred, Senior.

19          Q.     Do you know what the cost of disposing a

20     full 55-gallon drum was during the time of your

21     employment with any DeRewel company?

22          A.     No.

23          Q.     Do you know what the cost of disposal of

24     a full 30-gallon drum would cost, was for any --

25     while you worked for any DeRewel company?

```
 1          A.     No.

 2          Q.     Do you know what the cost of disposing

 3     an empty 55-gallon drum would have been while you

 4     worked for any DeRewel company?

 5          A.     No.

 6          Q.     Do you know what the cost would have

 7     been for an empty 30-gallon drum while you worked for

 8     any DeRewel chemical company?

 9               MR. HARRIS:  Objection.

10          A.     No.

11          Q.     Do you know what the cost for -- strike

12     that.

13               If I say the term bulk load, do you

14     understand what I mean by that?

15          A.     I do.

16          Q.     Can you tell me what you understand that

17     to mean?

18          A.     Bulk load would be a tanker or a full

19     tractor trailer.

20          Q.     Do you know what would be charged to

21     dispose of a bulk load?

22               MR. HARRIS:  Objection.

23          A.     No.

24          Q.     I just want to be clear.  All prices

25     charged by DeRewel Chemical Company to its customers
```

78

1    were set by Fred DeRewel, Senior?

2         A.      Yes.

3         Q.      Did DeRewel Chemical Company ever sell

4    empty 55-gallon drums?

5         A.      I don't know.  I don't know.  I don't

6    recall, but I don't honestly know.

7         Q.      Do you know who would know whether or

8    not DeRewel Chemical Company sold empty 55-gallon

9    drums?

10        A.      If they sold empty drums?  Well, since

11   Marvin Jonas was in the business I would imagine

12   Marvin Jonas would know, except he is dead.

13        Q.      In response to my last question you said

14   since Marvin Jonas was in the business.  Can you tell

15   me what business you are referring to?

16        A.      Empty 55-gallon drums.

17               MS. FLAX:  That's all I have.  Thank

18   you.

19               MR. STABINSKI:  I will go next.  Rick

20   Stabinski for Ashley.

21   (EXAMINATION OF MS. CASTILLO BY MR. STABINSKI:)

22        Q.      We have never met, have we?

23        A.      No.

24        Q.      I would like to direct your attention to

25   some of the responses you gave to Mr. Sabino about

138

```
1              C E R T I F I C A T E
2          I, RUTHANN WALKER, a Notary Public and
3    Certified Shorthand Reporter of the State of NJ
4    and Commissioner of Deeds of the Commonwealth of
5    Pennsylvania, do hereby certify that prior to the
6    commencement of the examination
7                    KAREN CASTILLO
8    was duly sworn by me to testify to the truth, the
9    whole truth and nothing but the truth.
10         I do further certify that the foregoing is a
11   true and accurate transcript of the testimony as
12   taken stenographically by and before me at the time,
13   place and on the date hereinbefore set forth.
14         I do further certify that I am neither a
15   relative nor employee nor attorney nor counsel of any
16   of the parties to this action, and that I am neither
17   a relative nor employee of such attorney or counsel
18   and that I am not financially interested in this
19   action.
20
21   _____
22   RUTHANN WALKER, C.S.R.
     Notary Public, State of New Jersey
23   My Commission Expires August 28, 2005
     Certificate No. 415
24   Date:  June 12, 2003
25
```