# Exhibit "D"

# ORIGINAL TRANSCRIPT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC.,   CIVIL ACTION
CYTEC INDUSTRIES,
INC., FORD MOTOR
COMPANY, SPS
TECHNOLOGIES LLC
and TI GROUP
AUTOMOTIVE SYSTEMS
LLC

     Plaintiffs

  v

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION,
ET AL.

                  NO.
   Defendants    02-CV-3830 (LDD)

      Oral deposition of GORDON R. JAMIESON, PG, taken at the law offices of Ballard Spahr, Andrews & Ingersoll, LLP, 1735 Market Street 42nd Floor, Philadelphia, PA, on Wednesday, December 20, 2006, at 9:34 a.m. before Jennifer Bermudez, a Registered Professional Reporter, and Notary Public, pursuant to notice.



## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

```
1    A P P E A R A N C E S :

2    BALLARD SPAHR, ANDREWS & INGERSOLL,
        LLP
3        AMY M. TROJECKI, ESQUIRE
         TROJECKIA@BALLARDSPAHR.COM
4        1735 Market Street
         51st Floor
5        Philadelphia, Pennsylvania  19103
         215-665-8500
6        Attorney for Plaintiffs

7    WOLFF & SAMSON, P.C.
         THOMAS W. SABINO, ESQUIRE
8        tsabino@wolffsamson.com
         The Offices at Crystal Lake
9        One Boland Drive
         West Orange, New Jersey
10       973-530-2044
         Attorney For AETC
11
     PHELAN, PETTIT & BIEDRZYCKI
12       JEFFREY L. PETTIT, ESQUIRE
         Jpettit@pp-b.com
13       121 S. Broad Street
         Suite 1600
14       Philadelphia, Pennsylvania 19107
         215-546-0500
15       Attorneys for Ashland, Inc.

16   CARELLA, BYRNE, BAIN, GILFILLAN,
        CECCHI, STEWART & OLSTEIN
17       MELISSA E. FLAX, ESQUIRE
         mflax@carellabyrne.com
18       5 Becker Farm Road
         Roseland, New Jersey 07068-1739
19       973-994-1700
         Attorney for Handy & Harman Tube
20       Company

21

22

23

24
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation                    FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1                   E X A M I N A T I O N   I N D E X

2     GORDON  R.  JAMIESON,  PG
               DIRECT  BY  MS.  TROJECKI       4
3              CROSS  BY  MS.  FLAX           118
               CROSS  BY  MR.  SABINO         122

4

5

6                   E X H I B I T   I N D E X

7                                              M A R K E D

8     JAMIESON
         1      DRAFT  BOARDHEAD  FARMS           20
9               SUPERFUND  SITE  UPPER
                BLACK  EDDY,  BUCKS  CO.,  PA
10              OPERABLE  UNIT  NO.  1
                GROUNDWATER  MODEL  REPORT
11              OCTOBER,  2004

12       2      E-MAIL  FROM  GORDON            111
                JAMIESON  TO  LEIGH  SHORT
13              AUGUST  24,  2006

14       3      E-MAIL  FROM  GORDON            113
                JAMIESON  TO  LEIGH  SHORT
15              AND  JAMES  ROETZER,  AUGUST
                28,  2006
16
         4      E-MAIL  FROM  JEFF  PETTIT      115
17              TO  GORDON  JAMIESON
                AUGUST  30,  2006
18

19

20

21

22

23

24

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    correct?

2              MR. PETTIT:   Objection to

3    the form.

4              THE WITNESS:   Repeat the

5    question, please.

6    BY MS. TROJECKI:

7         Q.    Do you have any opinion

8    whatsoever regarding what nonmetal

9    bearing acid wastes are?

10        A.    Simply from what I have

11   read from things like Mr. Curley's

12   deposition, that they were different

13   types of acids, mostly nonmetal

14   bearing acids.

15        Q.    Were you asked to do any

16   kind of analysis into what Ashland's

17   waste streams may have been in this

18   matter?

19        A.    No, I wasn't.   No.

20        Q.    Were you asked to determine

21   what types of Ashland's waste

22   products may have gone to the

23   Boarhead Farms site?

24        A.    Was I asked to?   Can you

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
215.564.3905
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX 215.751.0581

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    repeat the question, please.

2              MS. TROJECKI:   Can you

3    repeat that.

4              (The court reporter read

5    back the following:

6              "Q.     Were you asked to

7    determine what types of Ashland's

8    waste products may have gone to the

9    Boarhead Farms site?")

10             THE WITNESS:   No.

11   BY MS. TROJECKI:

12       Q.     And does the Expert Report

13   that's in front of you apply to any

14   type of Ashland waste stream other

15   than nonmetal bearing acid wastes?

16       A.     Not that I'm aware of.

17       Q.     Can you turn to Page 3 of

18   your opinion, or your report I should

19   say.

20       A.     Yes.

21       Q.     Looking at Opinion 1 at the

22   top of Page 3, can you tell me, does

23   that mean that if the acids did

24   increase mobility of metal

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    contaminants that there would have

2    been increased response costs?

3              THE WITNESS:  Can you repeat

4    that question, please.

5              (The court reporter read

6    back the following:

7              "Q.    Looking at Opinion 1

8    at the top of Page 3, can you tell

9    me, does that mean that if the acids

10   did increase mobility of metal

11   contaminants that there would have

12   been increased response costs?")

13             THE WITNESS:  No, that's not

14   what that says.  No.

15   BY MS. TROJECKI:

16       Q.    So when you speak about

17   increased response costs in Opinion

18   1, what's the point you are trying to

19   get at?

20       A.    With respect to the

21   opinions in this report, I was

22   responsible for Opinion 2B and 3A.

23             The remainder of the

24   report -- I wrote the Introductory

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1   History section, and those are the

2   two opinions that were my

3   responsibility, that I developed.

4   The other ones were developed by Dr.

5   Roetzer and Dr. Short.

6       Q.    So do you feel that you are

7   not an expert to testify regarding

8   the subject matters in the other

9   opinions?

10          MR. PETTIT:   Object to the

11   form.

12          THE WITNESS:   Those opinions

13   were drawn and developed by Dr. Short

14   and Dr. Roetzer, actually while I was

15   out of the country, so I was not part

16   of the development of those opinions.

17          I developed my opinions and

18   was out of the country from September

19   7th to September 30th on a

20   Mediterranean cruise.

21   BY MS. TROJECKI:

22       Q.    I'm sorry, can you repeat

23   those dates?

24       A.    Excuse me?

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1      Q.     Can you repeat those dates?

2      A.     Yes.  I was out of the

3  country from the 7th of September

4  until the 30th of September, 25th

5  wedding anniversary Mediterranean

6  cruise.

7      Q.     So are the opinions

8  contained in this report that are the

9  ones not drafted by you your opinion?

10      A.     I do not disagree with

11  those opinions, but I did not develop

12  those opinions.

13      Q.     Did you have anything to do

14  with the drafting of Opinion 1B,

15  specifically regarding areas down

16  gradient of the source area?  Did you

17  contribute in any way to Opinion 1B?

18      A.     No, I did not.

19          The only time that I saw

20  this was on the 13th of September an

21  e-mail was -- I was able to actually

22  get an e-mail of the draft, of our

23  draft before it went to Mr. Pettit,

24  and I reviewed it, made some

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

1    grammatical small changes and sent it

2    back to Dr. Roetzer, so no.

3        Q.    And did you have anything

4    to do with Opinion 1C?

5        A.    No, I did not.

6        Q.    So in the paragraph under

7    the five bullets there where it

8    speaks about high groundwater flow

9    rates and mobile constituents would

10   have rapidly migrated down gradient

11   of the source areas, are those your

12   opinions?

13       A.    You can -- I think those

14   opinions or similar to that are

15   illustrated in the Opinion 2B that I

16   made with respect to the movement of

17   the organic contaminants that were

18   illustrated in the modeling report

19   that was done by another consultant.

20       Q.    Do you adopt the opinions

21   in 1C as your own?

22       A.    Those aren't my own. Those

23   were -- as I said, those were

24   developed by Dr. Short and Dr.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    Roetzer.

2            They may have read my

3    opinion -- they had my two opinions

4    that were developed before they

5    started working on theirs.

6            They may have used that as

7    part of incorporating that into their

8    opinions, but I don't know if they

9    did that or not.

10    Q.    For right now, then, let's

11    start with the first opinion that you

12    did develop, which is Opinion 2B.

13    Can you paraphrase what the point

14    that you are trying to make is in

15    Opinion 2B?

16    A.    Yes.    In Opinion 2B I'm

17    stating that using the modeling

18    report that Brown & Caldwell

19    developed that it was illustrated

20    that organic contaminants had

21    migrated from source areas past the

22    area where remediation or capture of

23    the plume was determined to be

24    necessary in the ROD.

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1          And that that plume had

2     already extended past where the

3     interceptor trends went and therefore

4     remediation was necessary from

5     contamination that was deposited on

6     the site prior to any releases of --

7     any potential releases of Ashland

8     material.

9        Q.    So is the opinion limited

10    to -- I mean, are you only trying to

11    say that the remediation -- or are

12    you only trying to say that the

13    groundwater extraction remedy was put

14    in to remediate releases prior to

15    1976 and that's it?

16       A.    No.  I'm saying that those

17    prior releases as illustrated in the

18    modeling report created an organic

19    groundwater plume that had already

20    extended, you know, past where

21    interception was necessary and

22    actually had showed that it had

23    actually migrated into the swampy

24    area past that.

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    approximate surface elevation

2    locations, what do you mean by

3    approximate?  Did you approximate

4    them?

5         A.    I used the surface

6    elevation map, looked at the --

7    transposed the locations off of these

8    exhibits just to their location on

9    the map.

10             And then looked at the

11   elevation contours that those

12   areas -- that those areas crossed to

13   look at the elevation -- the variance

14   here is dependent on how the hot spot

15   is located with respect to the

16   topography and how the land is

17   dipping down.

18             So these are within

19   approximate.  They are probably

20   within, I would guess within a couple

21   of feet.

22        Q.    Five, ten feet?

23        A.    No, not ten.  No.  No.

24   They are probably within a couple of

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

```
1    feet.
2         Q.     Two?  Two to five?  What do
3    you mean by couple?
4         A.     Two.
5              MS. TROJECKI:  Do you want
6    to take a break?
7              (Recess taken)
8    BY MS. TROJECKI:
9         Q.     Turning to Page 3 of your
10   report, I want to ask you about the
11   last sentence, "Based on the actual
12   groundwater monitoring data at the
13   site, there is no evidence that acid
14   waste could have affected metal
15   transport in areas down gradient of
16   the source area."
17              Do you know what is meant
18   by source area in that sentence?
19        A.     I believe the -- again, I
20   didn't write this opinion, but I
21   believe that that's referring to --
22   as a source area would have been the
23   area where there was a potential
24   release of the acid waste.
```

52

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1       Q.    If I gave you a map of the

2   site, would you be able to indicate

3   which area is meant by source area in

4   this sentence?

5       A.   I would assume the source

6   areas are the same as indicated on

7   the -- that I indicated on this

8   figure here earlier in my testimony,

9   on Roetzer Exhibit 2.

10      Q.   And when you say assume,

11  you are not really sure what is meant

12  by source area there?

13      A.   I'm assuming that that's

14  what Dr. Short and Dr. Roetzer meant.

15      Q.   So areas down gradient --

16  just to back up, you are assuming

17  that they meant these source areas

18  that you have indicated in red as the

19  areas where Shaak and DeRewal may

20  have allegedly dumped spent acid

21  waste.  Is that right?

22       I just want to make sure

23  the record is clear when you said

24  that you assume they are in the areas

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    on Roetzer-2, which areas that is.

2        A.    Yes, that's correct.

3        Q.    And the areas down gradient

4    of the source area would be, on your

5    map, areas that we have already

6    discussed as far as, you know, where

7    the groundwater direction flow is.

8    Correct?

9        A.    Correct.

10       Q.    And what is it about the

11   actual groundwater monitoring data at

12   the site that tells us that the acid

13   waste could not have affected metal

14   transport in those down gradient

15   areas?

16       A.    Only -- at least in the

17   data that was looked at in this

18   opinion by Dr. Roetzer and Dr. Short,

19   there was only two wells out of, I

20   don't know how many wells they

21   monitored at that point, that

22   actually had a pH, an acidic pH or a

23   pH below the normal range of 6 to 8.

24            There's only two out of I'm

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    not sure how many wells were sampled

2    during that period, but 20, 30 wells,

3    it shows that there is only --

4    there's only two wells that showed

5    that range of a pH below 6.

6         Q.    And is there any other

7    basis or any other groundwater

8    monitoring data that's relied upon?

9         A.    Not that I'm aware of.

10        Q.    And turning to Page 4 of

11   your report, I want to refer you to

12   the paragraph immediately under the

13   bullets.  Midway in that paragraph

14   the sentence that starts "Due to the

15   relatively high groundwater flow

16   rates near the source areas at the

17   site."

18             What is meant by source

19   areas in that sentence?

20        A.    Again, I didn't write this.

21   Give me a minute to read it.

22             Those source areas are

23   the -- I believe they are referring

24   to source areas as any potentially

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1   known areas where metal finishing

2   wastes were released and what they

3   are talking about earlier in the

4   opinion.

5        Q.    Do you have any opinion or

6   did you analyze where potential metal

7   finishing wastes would have been

8   disposed of at the site?

9        A.    No, I did not.

10       Q.    Did you do any calculations

11   of groundwater flow rates and what

12   those areas may have been?  I guess

13   not, if you didn't do any analysis as

14   to where they were.

15       A.    No, I'm not aware of that.

16       Q.    And does the groundwater

17   flow model that you refer to in

18   Opinion 2B of your report, and I'm

19   speaking about Jamieson-1, does that

20   information apply only to the TCE

21   plume or does it apply to --

22       A.    No.  They were using --

23   that was strictly modeling of TCE,

24   yes.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103                FAX  215.751.0581
www.JDReporting.com

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1      Q.     Did you draft the site

2   history section of this report?

3      A.     Yes, I did.

4      Q.     I am going to show you what

5   we marked yesterday as Roetzer

6   Exhibit 3, and it's a draft copy of

7   the report.  If you could turn to the

8   first page of that draft report.

9      A.     The first page?

10     Q.     The first page of text

11  under Site History.

12          And the end of the first

13  paragraph of the draft report there's

14  a phrase there that says "Waste was

15  disposed of at the site from the

16  early 1970s to 1977."  Do you see

17  that?

18     A.     The last --

19          MR. PETTIT:  The first

20  paragraph.

21          THE WITNESS:  I'm sorry, I

22  was looking at the wrong paragraph.

23  BY MS. TROJECKI:

24     Q.     Right, the first paragraph.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    .FAX  215.751.0581

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1          Do you see what section I'm

2    referring to?

3        A.    Yes.   Uh-huh.

4        Q.    In your final report that

5    was changed to beginning in the early

6    1970s.  Do you see that?

7        A.    Uh-huh.

8        Q.    Did you make that change?

9        A.    No.

10       Q.    Do you know who did make

11   that change?

12       A.    It would probably have been

13   Dr. Roetzer or Dr. Short.

14       Q.    Do you know why that change

15   was made?

16       A.    No.

17       Q.    Can you turn to your CV.   I

18   just want to quickly go through your

19   background.

20          (Discussion off the

21   record.)

22   BY MS. TROJECKI:

23       Q.    I see you went to the

24   University of Waterloo in 1979.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1      Q.     Did they point out to you

2   in the deposition transcripts

3   particular testimony regarding the

4   alleged disposal locations or did you

5   find that yourself?

6      A.     If I recall correctly, I

7   think they said, you know, look in

8   these -- they told us what -- we

9   received a lot of information and

10  told us where we might locate some of

11  these maps where the alleged

12  locations were located.

13     Q.     Do you do your work for

14  Alternative Environmental Strategies

15  at home or at your office in Tetra

16  Tech?

17     A.     Mostly at home.  There's

18  some e-mails that were sent to my

19  office and things of that nature, but

20  I do that work separately at home,

21  yes.

22     Q.     So do you have two separate

23  e-mail accounts?

24     A.     I do.  I have a Yahoo

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    e-mail account and I have my work

2    one.   A number of the things -- a

3    number of the e-mails were sent to my

4    work just because they get to me more

5    quickly.

6         Q.   But they would have been

7    sent to both or were some e-mails

8    regarding this case sent to both

9    e-mail addresses?

10        A.   I know when Jim sent the --

11   when I was out of the country, I

12   couldn't access my company e-mail and

13   Jim sent me the -- when they sent me

14   the draft report on the 13th of

15   September, that was through my Yahoo

16   just because it was the only way to

17   get ahold of me.   There wasn't too

18   many through Yahoo.

19        Q.   Did you actually work on

20   the draft report when you were in

21   your Tetra Tech office?

22        A.   No.   I worked on it at

23   home.

24        Q.   Did you prepare a draft of

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                         FAX  215.751.0581

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    your sections as a Word document?

2         A.    Yes.

3         Q.    Did you save that Word

4    document on your home computer or on

5    your work computer?

6         A.    I have a laptop that I use.

7    I use in both places.

8         Q.    So it's saved on the laptop

9    and that's it?

10        A.    No.  It was -- you know

11   company policies, as you get through

12   drafts of things you get rid of the

13   old drafts just because you don't

14   want to get them confused with the

15   new ones, so I don't have an

16   electronic copy of that anymore.

17        Q.    But as you were working on

18   it, where did you save it?

19        A.    It would have been on the

20   hard drive of my laptop, yes.

21        Q.    And you have actually gone

22   in and deleted it from the hard drive

23   of your laptop.  Is that correct?

24        A.    Yeah, once we -- when I got

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    back from vacation the final had

2    already been completed, so I cleaned

3    it up, yes.

4         Q.    Did you send copies of your

5    portions of -- I guess, how did your

6    portions of the report get

7    incorporated into the final report?

8         A.    I e-mailed my two opinions

9    and the history I had done and I

10   guess a copy of a cover page with my

11   signature on it.  I may have Fed Ex'd

12   that to Jim, I'm not sure, the cover

13   page.

14           I sent the opinions and

15   that to Leigh and Jim just before I

16   left the country.

17       Q.    And were they all on one

18   document?

19       A.    Yes.  Uh-huh.  Yes.

20       Q.    And you sent that by

21   e-mail?

22       A.    Yes.

23       Q.    From which account?

24       A.    Probably from Yahoo, but

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1    I'm not certain.  It would depend.

2    If I'm working at home, I can access

3    either e-mail account, so I'm not

4    certain which one I sent it on.

5         Q.    Did you send it from home?

6         A.    I was at home.

7         Q.    Oh, you were at home when

8    you finally sent it?

9         A.    Yes.

10        Q.    So you didn't send Jim or

11   Leigh any draft copies of your report

12   until you actually got back from the

13   Mediterranean, is that it?

14        A.    Oh, no.  It was before I

15   went.

16              We were engaged on the

17   21st.  I finished up my work by

18   probably around the 4th, which would

19   have been I think the long weekend, I

20   worked all through the long Labor Day

21   weekend.  And then either on the 4th

22   or 5th sent it to Jim.

23              And I left San Diego on the

24   6th and then to New Jersey and then

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1  on the 7th left for Europe.

2      Q.   So on the 4th or 5th you

3  sent your report by e-mail to Dr.

4  Short and Dr. Roetzer?

5      A.   Yes.   That's correct.

6      Q.   And did you send a signed

7  copy of the signature page at that

8  time, too?

9      A.   Yes, so that they had my

10  signature on it.

11      Q.   Because you weren't going

12  to be around.

13      A.   I wasn't going to be around

14  before it had to be submitted.

15      Q.   So you deleted the draft

16  copy from your hard drive.  Did you

17  also delete the e-mail that you sent

18  to Dr. Short and Dr. Roetzer?

19      A.   Yes.  It's probably gone

20  too, I would expect.  I clean out my

21  e-mail quite often.  It gets too big.

22      Q.   Do you have a routine

23  practice of cleaning out the e-mail,

24  cleaning out your e-mail?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation     FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1      A.    Yes.   And actually, in the

2   office, e-mails are only kept for 60

3   days and then they are automatically

4   deleted at work if they are not

5   archived.

6      Q.    So if you would have sent

7   it from work, it would have been

8   automatically deleted in 60 days.   Is

9   that right?

10      A.    Yes, unless I archived the

11   e-mails.   I'm pretty sure it was sent

12   from home.

13      Q.    Oh, from the --

14      A.    From the Yahoo account,

15   yes.

16      Q.    And do you have a routine

17   practice of deleting the e-mails from

18   your Yahoo account?

19      A.    Yeah, just the ones I don't

20   need or getting too big.   And also,

21   as I said, it's company policy

22   getting rid of any drafts of

23   documents so you don't get things

24   confused as you move forward.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

ORAL DEPOSITION OF GORDON R. JAMIESON, PG, 12/20/06

1          Q.     When did you delete it from
2     your hard drive?
3          A.     I don't recall.
4          Q.     Is it something that you
5     think you would have done, you know,
6     the day that you sent the e-mail, the
7     day the final --
8          A.     Oh, no.  It would have been
9     at some point after I returned from
10    vacation.
11         Q.     Did you visit the site
12    prior to drafting your portions of
13    the report?
14         A.     Not prior, no.  It was
15    after the report was submitted.
16         Q.     And when did you visit the
17    site?
18         A.     Last Tuesday.
19         Q.     What was the purpose of
20    that visit?
21         A.     Just to go to the site and
22    make sure that the lay of the land
23    and what I had seen in the reports
24    and all that stuff, just doing a

1                        CERTIFICATION

2

3                   I, JENNIFER L. BERMUDEZ, a

4     Court Reporter in and for the Commonwealth

5     of Pennsylvania, hereby certify that the

6     foregoing is a true and accurate transcript

7     of the deposition of said witness who was

8     first duly sworn by me on the date and

9     place hereinbefore set forth.

10                  I FURTHER CERTIFY that I am

11    neither attorney nor counsel for, nor related

12    to or employed by, any of the  parties to

13    the action in which this deposition was

14    taken, and further that I am not a relative

15    or employee of any attorney or counsel

16    employed in this action, nor am I

17    financially interested in this case.

18

19

20    ------------------------------------------

21    JENNIFER L. BERMUDEZ

22    Court Reporter and Notary Public

23

24

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX 215.751.0581
                 1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

