# Exhibit "A"

# Part 1 of 2

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                Civil Action No.  02-3830

 4

 5    AGERE SYSTEMS, et al.,          :

 6                                    :

 7          Plaintiff                 :

 8                                    :

 9              v.                    :

10                                    :

11    AETC, et al.,                   :

12                                    :

13          Defendant                 :

14                              - - - -

15

16       DEPOSITION UNDER ORAL EXAMINATION OF

17            KENNETH GOLDSTEIN, P.E.

18          West Orange, New Jersey

19            December 4, 2006

20            - - - - - - - - - -

21    REPORTED BY:  DUBRAVKA DePEW, CSR

22            - - - - - - - - - -

23       ESQUIRE DEPOSITION SERVICES

         90 Woodbridge Center Drive

24      Woodbridge, New Jersey  07095

       (732)  283-1008  or  (800)  247-8366

25    JOB # 200400
```

2

1    TRANSCRIPT of the deposition of KENNETH
2  GOLDSTEIN, P.E., called for Oral Examination in the
3  above-captioned matter, said deposition taken
4  pursuant to District Court Rules of Practice and
5  Procedure by and before DUBRAVKA DePEW, a Notary
6  Public and Certified Court Reporter of the State of
7  New Jersey, at the Offices of WOLFF & SAMSON, P.C.
8  One Boland Drive, West Orange, New Jersey,
9  commencing at approximately 10:05 in the forenoon.

4

I N D E X

Testimony of: KENNETH GOLDSTEIN, P.E.

Direct by Ms. Mooney          7
Cross by Mr. Pettit         242
Cross by Mr. Cooley         246

E X H I B I T S

EXHIBIT NO.      DESCRIPTION        PAGE NO.

Goldstein-1   Report of Kenneth
              Goldstein, P.E.           9
Goldstein-2   Two-page document list    209
Goldstein-3   Report to the Congress
              dated 1/23/79             212

Goldstein-4   E-mail dated 8/8/06,
              with attachments          214
Goldstein-5   E-mail dated 7/14/06,
              with attachments          216

Goldstein-6   Final report of the
              Pennsylvania Sanitary
              Water Board               224

Goldstein-7   Pennsylvania Bulletin,
              Volume 20                 225
Goldstein-8   Chapter 75, solid waste
              management rules and
              regulations, Pennsylvania 226
Goldstein-9   Report to Congress
              dated 12/19/78            227

3

A P P E A R A N C E S:

BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
BY: MONIQUE MOONEY, ESQ.
1735 Market Street
Philadelphia, Pennsylvania 19103-7599
(215) 864-8189
Attorneys for Plaintiff, Agere Systems

WOLFF & SAMSON, P.C.
BY: DANIEL D. BARNES, ESQ.
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey 07052-3698
(973) 530-2097
Attorneys for Defendant, AETC

CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI,
    STEWART & OLSTEIN, P.C.
BY: MELISSA E. FLAX, ESQ.
5 Becker Farm Road
Roseland, New Jersey 07068-1739
(973) 994-1700
Attorneys for Defendant, Handy & Harman Tube Co.

PHELAN, PETTIT & BIEDRZYCKI, ESQS.
BY: JEFFREY L. PETTIT, ESQ.
The North American Building
121 South Broad Street - Suite 1600
Philadelphia, Pennsylvania 19107
(215) 546-0500
Attorneys for Defendant, Ashland Chemical

DUANE MORRIS, LLP
BY: SETH v.d.H. COOLEY, ESQ.
30 South 17th Street
Philadelphia, Pennsylvania 19103-4196
(215) 979-1838
Attorneys for Defendant, Flexible Circuits

5

E X H I B I T S

EXHIBIT NO.      DESCRIPTION        PAGE NO.

Goldstein-10   Document entitled,
               Mid-Atlantic Superfund    230

Goldstein-11   Letter dated 7/5/05       231

Goldstein-12   Multi-page document
               consisting of handwritten
               notes                     232

Goldstein-13   NJAC 7:26 provisions      236

Goldstein-14   New Jersey solid waste
               regulations, 1957 through
               '78                       237

**6**

DEPOSITION SUPPORT INDEX
DIRECTION TO WITNESS NOT TO ANSWER
Page  Line       Page  Line       Page  Line
13    17

REQUEST FOR PRODUCTION OF DOCUMENTS

Page  Line       Page  Line       Page  Line
                 * None *

STIPULATIONS

Page  Line       Page  Line       Page  Line
                 * None *

QUESTION MARKED

Page  Line       Page  Line       Page  Line
                 * None *

* * *

**7**

KENNETH GOLDSTEIN, P.E.,
c/o Ransom Environmental, 2127 Hamilton
Avenue, Hamilton, New Jersey, after
having been duly sworn, was examined and
testified as follows:
DIRECT EXAMINATION BY MS. MOONEY:
Q.    Good morning, Mr. Goldstein. My name
is Monique Mooney. I'm an attorney, and I represent
the plaintiffs in this matter.
In the room, we have attorneys
representing other defendants in the case. I don't
know if you want to go around and introduce
yourselves?
MS. FLAX:  Good morning,
Mr. Goldstein. My name is Melissa Flax. I
represent Handy & Harman Tube Company.
MR. PETTIT:  Jeffrey Pettit. I
represent Ashland.
MR. COOLEY:  I'm Seth Cooley. I
represent Flexible Circuits.
MR. BARNES:  Just so the record is
clear, I'm Daniel Barnes from Wolff and Samson. I'm
here with the witness
BY MS. MOONEY:
Q.    I'm going to give you some

**8**

instructions. I know you've been deposed before --
I can tell that based on your expert report -- but I
am going to give you some general instructions
before we get started today.
Your answers today are under oath and
carry the same weight as if you were in court.
Please give verbal responses to my questions. Try
not to gesture or say "uh-huh" or "uh-uh". It's
difficult for the court reporter, who is sitting to
your left, to take down.
We should talk one at a time. So
please try not to talk over me, and I will try to do
the same to you. Once again, it makes for a better
transcript if we can pace ourselves in that way.
If you answer my questions, I'm going
to assume that you're answering to the best of your
ability to do so. Don't guess. You may estimate or
approximate, but please indicate to me when you're
doing that.
Unless your attorney instructs you
not to answer a question, you may do so. That's
about it.
Do you have any questions before we
get started?
A.    No.

**9**

Q.    Okay. Are you taking any medication
today, or do you have some other impairment that may
hinder your ability to understand and answer my
questions?
A.    No.
MS. MOONEY: Okay. I'm going to
start out by entering an exhibit.
(Report of Kenneth Goldstein, P.E. is
marked as Exhibit Goldstein-1 for Identification.)
Q.    Mr. Goldstein, is this an accurate
copy of the expert report that you prepared in this
case?
MR. BARNES:  Take a moment to review.
Q.    Take your time and review it.
A.    **Yes, this is a copy of my report.**
Q.    And, Mr. Goldstein, does that include
all the appendices to the report as well?
A.    **Yes, ma'am.**
Q.    Thank you. I'd like to ask you some
questions about your preparation for this deposition
today.
Did you review any documents in
preparation for this deposition today?
A.    **Yes.**
Q.    And what documents were they?

K. GOLDSTEIN, P.E.  -  Direct

**10**

1    A.    The documents that are in the
2 appendix to the report.
3    Q.    And, Mr. Goldstein, are you referring
4 to Appendix B?
5    A.    Yes, ma'am.
6    Q.    And of these documents listed in
7 Appendix B, did you review all of these documents or
8 just certain ones?
9    A.    Just certain ones.
10    Q.    Can you identify the documents that
11 you reviewed in preparation for today?
12    A.    Well, I reviewed my expert report,
13 which is not on the list, but it was one of the
14 documents I reviewed.  I reviewed the two reports to
15 Congress.
16    Q.    And you are referring to the 1979
17 reports?
18    A.    Yes.
19    Q.    Okay.
20    A.    I reviewed the motion for summary
21 judgment and the answer to plaintiff interrogatories
22 from AETC.
23         I reviewed the objections and
24 responses of plaintiffs to the AETC's initial set of
25 interrogatories.

**11**

1         I reviewed bits and pieces of the
2 various depositions, and I reviewed the last item
3 bills of lading, invoices, and various
4 correspondence.
5    Q.    Were you directed to review any of
6 the aforementioned items?
7    A.    No.
8    Q.    The last item that you mentioned at
9 the bottom -- bills of lading, invoices -- do you
10 have copies of those?
11    A.    With me today, you mean?
12    Q.    Yes.  I mean, do you have them today
13 or anywhere?
14    A.    Yes.
15    Q.    Okay.  Do you have them here with you
16 today?
17    A.    They're in Mr. Barnes's office.
18         MS. MOONEY:  Okay.  Can I get copies
19 of those at the break?
20         MR. BARNES:  Sure.  I don't know if I
21 can get you copies.  I can get you access to them.
22         MS. MOONEY:  That's fine.
23    Q.    Are those the same bills of ladings,
24 invoices and various correspondence that -- is it
25 the complete set that is listed here that Mr. Barnes

**12**

1 has?
2    A.    It's a complete set that I possess.
3 I did a review of the document file in one of these
4 offices in this building a few months ago, and I
5 tabbed a few documents to be copied and this is --
6 that is the collection.
7    Q.    The items that you tabbed when you
8 were here previously are the items that Mr. Barnes
9 has?
10    A.    Yes.
11    Q.    Okay.  And when you refer here, at
12 the bottom of Appendix B, to bills of lading,
13 invoices and various correspondence, are you
14 referring only to those tagged items or additional
15 items?
16    A.    Just the tagged items.
17    Q.    Okay.  So if I review what Mr. Barnes
18 has in his office today, that will be the entire
19 category of this last entry here on Appendix B?
20    A.    Correct -- well, clarification.
21 There is one document that I have that is not --
22 that is not on the list that I reviewed.  It's the
23 summary judgment decision that was from the judge
24 last week or the week before.
25    Q.    Is that the order and opinion issued

**13**

1 by the Court on AETC's summary judgment motion?
2    A.    I'm not sure of the title, but it
3 sounds like we're talking about the same thing.  I
4 did look at that over the last week.
5    Q.    And did you do that at someone's
6 direction?
7    A.    Yes.
8    Q.    And whose direction was that?
9    A.    Mr. Sabino.
10    Q.    And do you know why he asked you to
11 read that?
12         MR. BARNES:  Objection.  Calls for
13 speculation.  It's also, I think, an inquiry into
14 work product.
15         MS. MOONEY:  Are you instructing him
16 not to answer?
17         MR. BARNES:  Yes, I am.
18    Q.    Okay.  Other than the documents that
19 you've just identified on Appendix B, and then, in
20 addition, the order that you described, did you
21 review any other documents in preparation for the
22 deposition today?
23    A.    No.
24    Q.    And you mentioned that you brought
25 some documents with you today that Mr. Barnes has

K. GOLDSTEIN, P.E.  -  Direct

---

**14**

1  is that right?
2     A.   **Correct.**
3     Q.   Okay.  Any other documents that were
4  brought today, other than the ones in Mr. Barnes's
5  possession?
6     A.   **No.**
7     Q.   Did you talk with any representatives
8  of AETC in preparation for the deposition today?
9     A.   **No.**
10     MR. BARNES:  By that, you mean other
11  than lawyers?
12     MS. MOONEY:  Yes.
13     MR. BARNES:  Okay.
14     Q.   Other than Counsel for AETC.
15     A.   **Okay.**
16     Q.   Did you talk with any principals or
17  employees of AETC?
18     A.   **No.**
19     Q.   And did you talk with AETC's counsel
20  today --
21     A.   **Yes.**
22     Q.   -- in preparation for this deposition
23  today?
24     A.   **Yes.**
25     Q.   Okay.  And what did you talk about?

---

**15**

1     A.   **Just to general deposition**
2  **guidelines, guidance, if you will.**
3     Q.   And what did that consist of?
4     A.   **To tell the truth, to take breaks**
5  **when I needed, to when lunch would be, things like**
6  **that.**
7     Q.   I should have mentioned that at the
8  beginning.  If you do need to take a break at any
9  time, please let me know and we'll stop.
10     A.   **Sure. Thank you.**
11     Q.   Anything else you talked about?
12     A.   **No.**
13     Q.   I'd like to ask you a few questions
14  now about how you became involved in this case and
15  rendering an expert report.
16     Who first contacted you regarding
17  opining in this case?
18     A.   **Well, Mr. Sabino contacted another**
19  **member of the firm I work with.  They had a --I**
20  **gather -- a previous relationship, either from**
21  **another project or another case.**
22     **And I got involved based on the**
23  **discussion between that other gentleman and**
24  **Mr. Sabino about my capabilities, and perhaps that I**
25  **would be a better expert than he would be.**

---

**16**

1     Q.   Okay.  And who was this person?
2     A.   **Andrew Waring, W-a-r-i-n-g.**
3     Q.   And who is Mr. Waring?
4     A.   **He's a vice-president of the firm.**
5     Q.   And the firm is?
6     A.   **Ransom Environmental, R-a-n-s-o-m.**
7     Q.   You said that Mr. Sabino initially
8  contacted Mr. Waring in order to get expert help in
9  this case?
10     A.   **That's the impression I got, yes.**
11     Q.   Okay.  What are -- do you know
12  anything about the nature of the relationship
13  between Mr. Sabino and Mr. Waring prior to this
14  case?
15     A.   **No.**
16     Q.   And where is -- is Mr. Waring your
17  boss at Ransom?
18     A.   **He's a colleague.  He has a higher**
19  **title than I do, but we all report to the president.**
20     Q.   How long has he been at Ransom?
21     A.   **He's one of the partners who formed**
22  **it, so I think it's eight years.**
23     Q.   Did you say eight?
24     A.   **Eight, yes.**
25     Q.   Do you know anything about

---

**17**

1  Mr. Waring's background?
2     A.   **He's been in the business 20 plus**
3  **years.  He's a geologist, and has an engineering**
4  **degree as well.**
5     Q.   Did you say he was a geologist?
6     A.   **Yes.**
7     Q.   When you say "in the business", what
8  do you mean?
9     A.   **His work experience.**
10     Q.   What business are you referring to?
11     A.   **We're an environmental consulting**
12  **firm.**
13     Q.   Okay.  Do you know if Mr. Waring has
14  any prior regulatory experience?
15     A.   **I don't believe that he has worked**
16  **for any government agency, if that's what you mean,**
17  **but I'm not a hundred percent sure.**
18     Q.   That is what I mean.
19     A.   **I'm not a hundred percent sure if he**
20  **does.**
21     Q.   And how did you, yourself, become
22  involved in this case?
23     A.   **I believe that Mr. Sabino and**
24  **Mr. Waring had a conversation about this project,**
25  **and Mr. Waring thought that, because of my**

---

K. GOLDSTEIN, P.E. - Direct

18

1 regulatory background, that I would be a good person
2 to handle the expert report for this project.
3       Q.    Did Mr. Waring have any hand in the
4 creation of this report?
5       A.    Mr. Waring reviewed a draft of the
6 report, but he did not otherwise have any
7 participation.
8       Q.    So is it fair to say that, once you
9 became involved, you took over creating the report?
10      A.    That is correct.
11      Q.    Did you confer with him --
12 Mr. Waring -- during the -- about any aspect of the
13 report?
14      A.    I may have, on a casual basis, but
15 not in terms of the creation or the -- of the
16 opinions or the development of the work product.
17      Q.    Do you recall any of the casual
18 interactions you had with Mr. Waring concerning this
19 report?
20      A.    Not offhand, no.
21      Q.    Do you remember the general nature of
22 your consultations with him?
23      A.    Not offhand, no.
24      Q.    Who has retained you in this matter
25 formally?

20

1       A.    Yes.
2       Q.    And do you know why, as between you
3 and Mr. Waring, you were the appropriate person to
4 render this report?
5             MR. BARNES:  Objection, asked and
6 answered.
7       A.    It had to with the regulatory
8 experience.
9       Q.    And you said that, after you talked
10 with Mr. Waring, you met with Mr. Sabino as well; is
11 that right?
12      A.    We had a conference call.
13      Q.    And do you remember approximately
14 when that was?
15      A.    I'd say late July.
16      Q.    And other than yourself and
17 Mr. Waring and Mr. Sabino, were there any other
18 participants in the call?
19            MR. BARNES:  Objection.  I don't know
20 if you've established that Mr. Waring was even on
21 the call.
22            MS. MOONEY:  I think he had testified
23 before that he was.  I could be wrong.
24      A.    Mr. Waring was on the call, and
25 Mr. Simon, from Wolff and Samson, joined the call

19

1       A.    Wolff and Samson.
2       Q.    Do you remember approximately when
3 you first became involved in the creation of the
4 report?
5       A.    I believe it was July of this year.
6       Q.    And was it Mr. Waring, you said, that
7 contacted you to talk to you about generating this
8 report, or was it Mr. Sabino?
9       A.    First Mr. Waring talked to me about
10 it, to see what my comfort level will be, if you
11 will, on preparing the report.  And then we had a
12 discussion with Mr. Sabino about it.
13      Q.    When you say comfort level, what do
14 you mean?
15      A.    Well, he gave me the particulars that
16 he knew about the project, and asked me if I felt
17 that I would be able to render -- review the
18 material and render an opinion about it.
19            There's -- there's always a decision
20 that an expert makes of whether or not they want to
21 take on a project, and if they don't feel -- or we
22 don't feel we have an expertise, then we don't do
23 the project.
24      Q.    Did you feel that you had the
25 relevant expertise to generate this report?

21

1 for a brief time.
2       Q.    Did Mr. Sabino, during that
3 conversation, tell you what he wanted you to do?
4       A.    Well, he told us about the project,
5 about the -- little bit of the history of -- a brief
6 overview of the issue that was at hand.
7       Q.    And what was that issue at hand?
8       A.    That AETC was one of several
9 defendants who were in a litigation matter by a
10 group of plaintiffs who were part of the Boarhead
11 Farms -- I forget the -- I think Agreement Group, it
12 was called.
13      Q.    Anything else?
14      A.    No.  I mean, that's pretty much what
15 he talked about.
16      Q.    Did he tell you what he wanted you
17 actually to do in this case?
18      A.    He described generally that he wanted
19 the -- a description of what AETC did during this
20 time period, how they were -- what their business
21 was during the mid-to-late seventies, what they did
22 for customers, how they worked with a particular
23 hauler and disposal company, DeRewal Chemical
24 Company.
25      Q.    Anything other than the description

K. GOLDSTEIN, P.E. - Direct

22

1 that you just described?
2      A.   Well, no, 'cause it was very general,
3 because at the time, we didn't really have an idea
4 of the project, so we hadn't looked at any documents
5 yet. So it was a very general discussion.
6      Q.   At some later point, did the task
7 that Mr. Sabino wanted you to perform narrow?
8      A.   No, I don't think so.
9      Q.   So other than a description of what
10 AETC did, what their business was, what they did for
11 their customers, is there anything else that
12 provides a purpose for this report?
13      A.   Well, I mentioned, a few minutes ago,
14 that a part of it was their relationship with
15 DeRewal Chemical Company. So that was the -- if you
16 could break it up into the two pieces, those would
17 be the two.
18      Q.   Any other communications with
19 representatives of AETC?
20      MR. BARNES:  Objection as to form.
21      Q.   Did you have any other communications
22 with -- let's start with Mr. Sabino?
23      A.   I came up to Wolff and Samson to
24 review documents, as we mentioned earlier. I talked
25 very briefly with Mr. Sabino that date.

23

1           He gave me a little bit more detail
2 as to the different players, kind of introducing me,
3 if you will, to Mr. Michelman and Mr. Risi, in terms
4 of that these deposition transcripts would be
5 interesting to look at and valuable to the case.
6           But otherwise, he left me in the room
7 with a pen and a sticky notes, and I went on my way
8 and made copies.
9      Q.   And were you here all day?
10      A.   I would say half a day.
11      Q.   And did you confer with Mr. Sabino
12 after you reviewed the documents?
13      A.   Other than to say I was leaving, no.
14      Q.   Okay. Any other subsequent
15 communications with Mr. Sabino?
16      A.   I had a deposition preparation
17 meeting with Mr. Barnes and Mr. Sabino last week.
18      Q.   And what was the substance of that
19 meeting?
20      A.   Deposition formatting, and they
21 wanted to make sure that I understood the boundaries
22 and the conditions of a deposition, and I received
23 the judge's ruling that date.
24      Q.   Other than Mr. Sabino, did you ever
25 confer with any other representatives of Wolff and

24

1 Samson with regard to the report?
2      A.   I mentioned Mr. Simon, and obviously
3 the meetings with Mr. Barnes.
4      Q.   Did you ever talk with any other
5 representative of AETC? When I say that, I mean
6 other than counsel for AETC.
7      A.   No.
8      Q.   Did you ever speak with Mr. Robert
9 Landmesser?
10      A.   No.
11      Q.   Did you ever speak with a Mr. John
12 Leuzarder?
13      A.   No.
14      Q.   Have you been deposed before?
15      A.   Yes.
16      Q.   And how many cases have you been
17 deposed in?
18      A.   Perhaps a dozen.
19      Q.   I believe, appended to your report --
20 let's see -- at the end of Appendix A, there's a
21 chart entitled, expert testimony and litigation
22 support.
23           What is this chart?
24      A.   It's a chart of selected expert
25 projects that I have worked on in my career.

25

1      Q.   Okay. Does this chart show all of
2 the depositions that you have been subject to?
3      A.   I believe so, but I -- honestly, when
4 I created the list, I didn't have a perfect record.
5 So I did it on the best of my recollection.
6      Q.   Okay. Let me ask you then about the
7 general nature of the cases that you've been deposed
8 in before.
9           To the extent that you can recall,
10 can you just tell me what the case was, when you
11 were deposed, and the general nature of your
12 involvement in the case?
13      A.   Okay. The third item down, New
14 Jersey Manufacturers is my client. I was deposed
15 regarding a former foundry in South Jersey. And the
16 core issue was an allocation of cleanup costs for
17 the site.
18      Q.   Is that what you rendered expert
19 advice regarding --
20      A.   Yes.
21      Q.   -- allocation issues?
22      A.   Yes.
23      Q.   How about the one underneath that?
24      A.   Island Transportation, I gave
25 deposition testimony regarding a contamination plume

K. GOLDSTEIN, P.E.   -   Direct

26

1  and its -- the relative cleanup costs, compared to a
2  regional groundwater plume that was in the same
3  location.
4       Q.    Was the main purpose of your
5  involvement opining as to the appropriate costs in
6  the case?
7       A.    More as to the source of
8  contamination at the site.
9       Q.    So it was more of a technical
10  opinion?
11       A.    Yes.  A couple down, Heritage
12  Minerals, I gave deposition testimony on behalf of a
13  property owner whose property was impacted by
14  chlorinated solvents flowing on to their property
15  from an upgradient source.
16       Q.    And what was the nature of that
17  testimony?
18       A.    Technical in nature, in terms of
19  confirmation that the contamination did come from
20  the upgradient source.
21       MR. BARNES:  Just so we're clear
22  here, you want him to go over the ones he actually
23  testified in deposition?
24       Q.    You know what, if you could just
25  summarize, for each of these, what the nature of

27

1  your expert report was, that would be useful.
2       MR. BARNES:  His expert report or
3  expert testimony?
4       MS. MOONEY:  Well, let's start with
5  expert report.
6       A.    Okay.  Well, in all of these, I
7  believe I issued an expert report.
8       To be specific, on Mulholland, it was
9  a report on the appropriateness of remedial actions
10  that occurred at the site, and the cost for the
11  clean up of that contamination.
12       For Harleysville Mutual, it was
13  regarding the date that a release took place that
14  caused contamination from a property and impacted
15  some potable wells.
16       Q.    Was that a technical assessment that
17  you rendered in that case?
18       A.    Yes.  Viacom was a report regarding
19  the cost of remediation at a site of -- oh, which
20  entity caused which contamination, and thus
21  allocated costs based upon that.
22       The Recuperacion project was about
23  the -- was about the -- a gasoline contamination
24  case and the costs of cleaning up the contamination
25  and which entity caused the contamination.

28

1       Century Insurance was about a -- that
2  was the project where the -- figuring out when the
3  contamination began at a property from underground
4  storage tanks.
5       The Racklewer (phonetic) matter was
6  about the soil and groundwater contamination at a
7  site, and also a cost allocation type of project.
8       The Estate of Thelma Dear was about
9  the cause of a discharge of fuel oil at the site,
10  and reviewing the costs of remediation.
11       Conair was a report and deposition
12  testimony regarding underground storage tank
13  integrity tests.
14       Hudson Environmental was a
15  mediation -- I gave testimony at a mediation
16  regarding a malfeasance claim against the client
17  regarding their work at the particular underground
18  storage tank site.
19       Q.    When you say their work, what exactly
20  does that refer to?
21       A.    Their remediation work, underground
22  storage tank soil and groundwater cleanup work.
23       The Island Transportation, there were
24  three separate gas stations involving multiple
25  sources of contamination, and trying to sort out

29

1  what source caused the biggest portion of the
2  cleanup.
3       Pepack-Gladstone was an arbitration
4  hearing about the source of hydrogen sulfide in
5  sewer lines.
6       Hahola was a project about the --
7  figuring out when they -- a gasoline tank discharged
8  for an insurance claim.
9       Hartz Mountain, also about
10  underground storage tanks discharge.
11       Q.    And that was technical in nature?
12       A.    Yes.  Had to do with when the tank
13  started to corrode and leak.  I don't remember much
14  else about it.
15       Home Insurance was a review of a cost
16  estimate -- remedial cost estimate by a claimant for
17  superfund sites, and I worked for the insurance
18  company to write the expert opinion on how much --
19  whether or not their costs were appropriate.
20       A second Home Insurance project, it's
21  very similar, just different superfund sites.  A
22  claimant again produced a bill, if you will, to the
23  insurance company for lots of money, and they wanted
24  someone to review it.
25       And Dover Engineering, remediation of

K. GOLDSTEIN, P.E.  -  Direct

---

**30**

1  an underground storage tank project, again, with the
2  costs -- reviewing the costs, showing that they were
3  appropriate.
4      And the last one is -- was about
5  the -- I gave testimony and prepared a report about
6  the origin of fuel oil discharge, whether -- what
7  date and time the fuel oil discharged at the site.
8      Q.    Thank you. Of the entries in this
9  chart, are any of them -- or are any of the expert
10  reports that you rendered in any of these cases what
11  you would consider to be similar to the expert
12  report you rendered in this case?
13      MR. BARNES: Objection as to form.
14  I'm trying to understand what "similar" means in
15  this context.
16      Q.    Okay. If you understand, you can
17  answer.
18      A.    I'd like the question rephrased.
19      Q.    Okay. Similar -- it sounds, from
20  your description, that most of these were technical
21  in nature.
22      I guess what I'm asking is if any of
23  these expert reports on the chart were based on the
24  kind of historical summary that you rendered in the
25  report today?

---

**31**

1      A.    I understand. The -- you're
2  stretching my recollection, but I believe the Hudson
3  Environmental case did go back to reviewing when
4  certain underground storage tanks -- storage tank
5  laws came into effect, and what the appropriate
6  cleanup requirements were at each particular time.
7      Q.    Do any of these in any of --
8      MR. BARNES: I'm sorry, were you
9  finished with your answer?
10      THE WITNESS: I am, because I don't
11  recall any others.
12      A.    And in almost all the projects,
13  there's some value to knowing what the regulatory
14  history is.
15      So -- but to answer your question the
16  way you framed it, I'd have to go back and think
17  about each one, and if I think of any others besides
18  the Hudson, I'll tell you after the break.
19      Q.    Okay. Let me try to rephrase it one
20  more time, or maybe ask a slightly different
21  question.
22      Have you ever rendered an expert
23  report, the primary thrust of which is whether or
24  not an entity complied with applicable regulatory
25  requirements in the past?

---

**32**

1      A.    Well, that's the way I understood --
2      MR. BARNES: Objection as to form.
3  You can answer, if you believe you can.
4      A.    That's the way I interpreted your
5  question before, so my answer is the same.
6      Q.    Okay. Okay. I'm going to ask you
7  some questions about your background now.
8      A.    Okay.
9      Q.    I'll be referring to your CV in the
10  course of doing that. That's Appendix A in your
11  report.
12      Could you state your full name?
13      A.    Kenneth Goldstein.
14      Q.    And your address?
15      A.    Home address or work?
16      Q.    Home.
17      A.    207 West Ferry Road, Yardley,
18  Pennsylvania.
19      Q.    Your date of birth?
20      A.    12/29/53.
21      Q.    Where did you attend college,
22  undergrad?
23      A.    Rensselaer Polytechnic Institute.
24      Q.    What years did you attend Rensselaer?
25      A.    From '71 through '76.

---

**33**

1      Q.    Did you take any -- was that the
2  normal time period for the program that you were in
3  at that time?
4      A.    Yes. I have a bachelor's and a
5  master's. It's a five-year program.
6      Q.    All right. So your master's -- when
7  you graduated in 1976, you graduated with both --
8      A.    Correct.
9      Q.    -- bachelor of science and a
10  master's --
11      A.    Of engineering, correct.
12      Q.    What was your major or concentration
13  when you were there?
14      A.    Environmental engineering.
15      Q.    Were you taking graduate courses
16  concurrently with undergraduate courses?
17      A.    Yes.
18      Q.    All right. And for the whole five
19  years?
20      A.    No.
21      Q.    Okay. When did you start taking
22  master's courses?
23      A.    In my senior year of college.
24      Q.    So would that be 1975?
25      A.    '74/'75.

---

ESQUIRE DEPOSITION SERVICES

K. GOLDSTEIN, P.E.   -   Direct

34

1   Q.    '74/'75.  And prior to that, prior to
2  '74/'75, what were the types of courses that you
3  were taking?
4   A.    Typical engineering courses -- core
5  courses.  I took calculus, chemistry, physics,
6  introduction to engineering courses, electrical
7  engineering, mechanical, civil type courses.
8   Q.    And when you were taking -- did you
9  finish your undergraduate course load in '74/'75 --
10   A.    No.
11   Q.    -- or did you continue to take
12  undergraduate courses up until '76?
13   A.    Undergraduate was done in '75.
14   Q.    So how many -- how long a time period
15  were you doing the course work for your master's?
16   A.    Part of the year -- part of my senior
17  year, and then the graduate year.
18   Q.    So about a year and a half?
19   A.    That's fair.
20   Q.    And what were the courses that you
21  took in the master's program?
22   A.    Focused on four real world courses,
23  if you will:  Water and wastewater engineering,
24  solid waste management, air pollution engineering,
25  focusing on my major, the environmental engineering

36

1  including the solid waste course, they were geared
2  towards national regulations and statutes that were
3  out at the time.
4       We may have had a class or two
5  specific to New York, but the course load involved
6  all of the environmental laws.  It was a very
7  dramatic time to be going to school for
8  environmental engineering, so there were a lot of
9  federal laws being passed and we talked a lot about
10  them.
11   Q.    Did you have any courses involving
12  New Jersey regulatory requirements regarding waste
13  management?
14   A.    When I was at Rensselaer?
15   Q.    Yes.
16   A.    No.
17   Q.    How about any experience with
18  Pennsylvania regulatory requirements pertaining to
19  waste management while you were at Rensselaer?
20   A.    No.
21   Q.    Did you have any -- were you awarded
22  any honors at Rensselaer?
23   A.    No.
24   Q.    Do you recall your class standing
25  upon graduation?

35

1   Q.    I don't think I asked this, but did
2  you attend Rensselaer for your master's as well?
3   A.    Correct.
4   Q.    What did the solid waste management
5  courses you took consist of?
6   A.    Primarily the management of municipal
7  and commercial refuse.  Pickup -- design of pickups
8  and delivery to solid waste management facility -- a
9  landfill, if you will -- and disposal, design -- we
10  did some design work on landfills.  We looked at
11  some industrial solid waste issues.
12   Q.    Were these tasks that you just
13  described, in connection with your solid waste
14  management course, New York specific or not?
15       MR. BARNES:  Objection as to form.
16  I'm not sure I follow the question.
17   Q.    Well, is it correct that Rensselaer
18  is in New York --
19   A.    Correct.
20   Q.    -- State?
21       Were the things that you were
22  learning in your solid waste management courses
23  tailored to the New York regulatory scheme at the
24  time or some other scheme?
25   A.    No, they were -- all the courses,

37

1   A.    No.
2   Q.    Other than the BS and the master's at
3  Rensselaer, have you received any special training?
4   A.    You mean after my college --
5   Q.    Yes.
6   A.    -- time?
7       I went to a lot of different seminars
8  and training sessions while I worked at the New
9  Jersey Department of Environmental Protection.
10   Q.    Any having to do with waste
11  management?
12   A.    Yes.
13   Q.    Okay.  Do you recall the substance of
14  those courses?
15   A.    Not specifically, no.
16   Q.    Did they deal with hazardous waste
17  management?
18   A.    Yes.
19   Q.    Did they deal with the transportation
20  of waste?
21   A.    Again, I don't recall the specifics.
22  We talked about -- I know we talked about the
23  passage of the Resource Conservation Recovery Act
24  and what it meant for New Jersey's environmental
25  protection and part of the regulatory framework that

K. GOLDSTEIN, P.E. - Direct

---

38

1 we were all working under at the time.
2    Q.    Do you recall the dates of any of
3 those courses?
4    A.    They would be in the late seventies;
5 but other than that, I couldn't be more specific.
6    Q.    Did you ever take any courses or
7 other type of training in waste management in
8 Pennsylvania?
9    A.    Yes.
10    Q.    What was that?
11    A.    I took a course on the Act II law and
12 implementation of that law.
13    Q.    Did you attend that in Pennsylvania?
14    A.    Yes.
15    Q.    Okay. Where did you attend that in
16 Pennsylvania?
17    A.    Harrisburg.
18    Q.    Do you recall when that was?
19    A.    I would say around the year 2000,
20 somewhere in that time frame.
21    Q.    Was there a particular reason you
22 took that training or course?
23    A.    Well, there was a new law in
24 Pennsylvania, and it was a business development
25 opportunity.

---

39

1    Q.    Do you have any experience with Act
2 II in Pennsylvania?
3    A.    Not a lot, no.
4    Q.    Any other training that you've had in
5 the course of your career regarding handling of
6 waste or transportation of waste or disposal of
7 waste?
8    A.    (No response.)
9    Q.    I'm talking about solid waste now.
10    A.    I've been taking OSHA training
11 courses for years and years. Quite a few of the
12 annual training courses that I've taken have dealt
13 with the toxicity of waste, the care that must be
14 taken in packaging waste before it's placed on a
15 truck and shipped.
16         So I have a working knowledge of the
17 DOT rules and the state rules regarding
18 transportation.
19    Q.    And when you say you have a working
20 knowledge, do you mean the present rules?
21    A.    Well, the rules as they've evolved
22 since I've taken the courses.
23    Q.    Okay. And these were taken in the
24 late seventies, you said?
25    A.    No. These particular courses for

---

40

1 OSHA started in '93 perhaps, and annually since
2 then.
3    Q.    Do you have any experience teaching
4 at all?
5    A.    Yes.
6    Q.    Can you describe your teaching
7 experience?
8    A.    Well, the most frequent course that I
9 have taught has to deal with underground storage
10 tanks in New Jersey, and the requirements for
11 management of tanks, and the requirements for the
12 remediation of discharges from these tanks.
13    Q.    Okay. When did you first start
14 teaching those courses?
15    A.    Oh, probably '86.
16    Q.    Have you taught -- and where do you
17 teach these?
18    A.    Where? You mean in New Jersey?
19    Q.    Let's start, in 1986 -- you first
20 started these in 1986?
21    A.    Correct.
22    Q.    Okay. Where do you give these -- is
23 this a course or training or what is it?
24    A.    It's a training. I -- from '86 till
25 '92, I was at DEP, and I taught these courses more

---

41

1 to train other people in the regulated community on
2 what the regulations were and what people had to
3 comply with.
4         From '92 on, I was at a consulting
5 firm, and I taught them as part of a requirement
6 that all certified individuals in New Jersey have to
7 take in order to maintain their certification.
8    Q.    And when you say certification, what
9 certification?
10    A.    It's called underground storage tank
11 certification. There's an act that was passed in
12 1991 that required individuals who performed
13 services for regulated underground storage tanks to
14 be certified by the DEP.
15    Q.    Going back to the '86 to '92 time
16 period, were the trainings that you gave in that
17 time period all the same?
18    A.    No. It evolved as regulations
19 changed.
20    Q.    Other than the substantive regulatory
21 requirements, was the format the same?
22    A.    Could you rephrase or be more
23 specific?
24    Q.    I guess what I'm trying to get at is
25 whether or not this was a yearly thing that you did

---

K. GOLDSTEIN, P.E.  -  Direct

42

1  or some other periodic thing that you did.
2       A.    Oh. It was more as-needed. We
3  designed the courses to be helpful to the owners of
4  underground storage tanks, and those folks who were
5  at that time, were doing the cleanup.
6            So we would do -- between my staff
7  and I, we'd do, you know, a hundred a year perhaps
8  of maybe -- maybe a hundred over the five-year
9  period, but a lot of courses, just to present the
10  regulatory structure that they had to meet.
11      Q.    And these all had to do with
12  underground storage tank requirements?
13      A.    In that time, yes.
14      Q.    You may have already said this, was
15  this something you gave to the public or did you
16  give to other DEP employees?
17      A.    Both. More to the public, but other
18  DEP employees needed to know it as well.
19      Q.    And then -- so that described '86 to
20  '92, is that right?
21      A.    Correct.
22      Q.    Then in '92 to '96, the second period
23  that you described, was that having to do solely
24  with underground storage tank issues as well or
25  something else?

43

1       A.    Well, it was from '92 to 2006 -- to
2  the present.
3       Q.    I am sorry. I wrote that down
4  incorrectly.
5       A.    But that -- while I've given other
6  training courses, the focus that we're talking
7  about, with your question, is -- over that 15-year
8  period, it's been underground storage tanks.
9       Q.    And were these -- were these training
10  courses, or how would you describe them?
11      A.    Mostly courses. As I said, it's a
12  requirement for those individuals maintaining their
13  certification to have this particular course.
14      Q.    Other than what you just described,
15  the '86 to '92, and the '92 to the present work, any
16  other courses or teaching experience that you've
17  had?
18      A.    Well, before '86, from '76 to '86, I
19  was at the DEP in the division of water resources,
20  and I presented regulatory courses on different
21  programs that I was involved with -- industrial
22  pretreatment program, sludge management program, the
23  New Jersey pollutant discharge elimination system
24  program -- so I would give both internal and
25  external training on those.

44

1       Q.    I am going to ask you -- I'm sorry.
2  I talked over you -- but I'm going to ask you
3  detailed questions about your experience at New
4  Jersey DEP and your various functions, and I'd like
5  to save that -- flag that for discussion then.
6       A.    Sure.
7       Q.    Other than that, anything else that
8  you can recall in the way of teaching?
9       A.    After '92, I believe I gave a couple
10  of courses and -- not courses -- excuse me --
11  training on other aspects of environmental
12  protection, but it would focus on my expertise --
13  focus on my expertise in the water and wastewater or
14  site remediation programs.
15      Q.    Have you ever taught at a university?
16      A.    Not as a professor, no.
17      Q.    In any capacity?
18      A.    Well, some of these courses have
19  taken place at university settings. So I didn't
20  want to mislead you.
21      Q.    Got you. Okay. All right. Let's
22  talk about -- going back to what you had just
23  touched on, let's talk about your employment
24  history.
25            I'd like to go -- your CV doesn't

45

1  have any dates in it. What I'd like to do is, from
2  the time that you graduated from Rensselaer, I'd
3  like to, step by step, inquire as to your employment
4  history after that.
5       A.    Sure.
6       Q.    So why don't we start with 1976.
7       A.    Correct.
8       Q.    Is that when you graduated?
9       A.    Correct.
10      Q.    Let's start with 1976. Can you
11  describe the job -- the first job that you had out
12  of college, the time period, the -- you know, the
13  title, where you worked, when you worked?
14            Those are the kinds of things that
15  I'm interested in. So I'll prompt you, but that's
16  just generally where I'm going.
17      A.    Sure. Well, overall, from '76 to
18  '92, I was at the New Jersey DEP at various job
19  titles and capacities.
20            The first job was with an office
21  called program development, and --
22      Q.    Before you go on, how did you get the
23  job at New Jersey DEP?
24      A.    One of the managers at DEP came
25  across a resume of a friend of mine, and I made the

K. GOLDSTEIN, P.E.  -  Direct

46

1  communication through my friend to this individual
2  who was looking for a recent graduate engineer. So
3  I made the connection and applied and got the
4  position.
5      Q.    And where was the New Jersey DEP at
6  that time?
7      A.    Trenton.
8      Q.    Okay. All right. You can go ahead.
9      A.    Okay.
10         MR. BARNES: Objection. You're
11  calling for him to do a narrative answer. I know
12  this is just background.
13         If you could sort of guide him
14  through it.
15         MS. MOONEY: I definitely will.
16     Q.    So in 1976, what was your first job
17  with DEP?
18     A.    At the office of program development.
19     Q.    How long -- what was your position at
20  the office of program development in 1976?
21     A.    I think it's called assistant
22  engineer.
23     Q.    And were you in some media or what
24  was the --
25     A.    It was in the division of water

47

1  resources.
2      Q.    All right. What were your duties in
3  that position?
4      A.    I helped out with the planning --
5  internal planning and policy aspects for the
6  construction grants program.
7      Q.    You said construction grants program?
8      A.    Correct.
9      Q.    And what was that?
10     A.    Construction grants program was an
11  EPA grant program to fund wastewater treatment
12  plants -- publicly owned wastewater treatment
13  plants.
14     Q.    Okay. And what kind of help with the
15  internal planning did you do?
16     A.    I helped develop one of their first
17  computer systems. I wrote up some forms that -- for
18  internal use.
19     Q.    What kind of forms?
20     A.    Just paper forms that people filled
21  out. I don't know how else to describe it.
22     Q.    For what purpose?
23     A.    To better track the status of
24  wastewater treatment plants in New Jersey.
25         At the time, there were a lot of

48

1  plants being upgraded, and the tracking systems in
2  those days were not as sophisticated as they are
3  now. So I helped develop mechanisms to make it
4  easier.
5      Q.    And how did you help out in the
6  policy aspects of this?
7      A.    Well, certainly, I was not a policy
8  maker at the time, but I remember attending a bunch
9  of meetings regarding how the funds were to be
10  distributed, how to keep track of the funds, and the
11  status of each wastewater plant.
12     Q.    When you say the funds distributed,
13  so EPA was funding the -- what -- the upgrading and
14  construction of POTWs in New Jersey?
15     A.    Correct.
16     Q.    And did New Jersey get a pot of money
17  that New Jersey allocated to different POTWs, or how
18  did it work?
19     A.    That's a good overview, but it got a
20  little more complicated, because each POTW had to
21  conduct a needs survey that would itemize what their
22  wish list was, in terms of upgrades, and how much it
23  would cost.
24         Part of the role of the DEP was to
25  figure out a priority list, so that the funds got

49

1  allocated to the facilities that needed them the
2  most.
3      Q.    And how long were you -- or what was
4  the time period that you were in this function?
5      A.    About a year.
6      Q.    So that would take us to 1977, is
7  that right?
8      A.    Correct.
9      Q.    Okay. Anything else that you did in
10  this capacity from 1976 through 1977?
11     A.    Well, I'm sure there were other items
12  but that was -- that's a reasonable overview.
13     Q.    That you recall?
14     A.    Sure. That's fine.
15     Q.    Okay. Did you have any experience,
16  during this time period, in the waste management
17  side of DEP?
18     A.    No.
19     Q.    Okay. In 1977, did you move onto
20  another position at New Jersey DEP?
21     A.    Yes.
22     Q.    What was that?
23     A.    It was in the office of sludge
24  management.
25     Q.    What was the office of sludge

K. GOLDSTEIN, P.E.  -  Direct

50

1 management?
2     A.    Its role was to develop regulations
3 and policy and guidance for the proper treatment and
4 disposal of municipal and industrial sewage sludge.
5     Q.    Did you say industrial sewage sludge?
6     A.    Yes, municipal and industrial.
7     Q.    Municipal and industrial.  And when
8 you say sewage, do you mean sewage as a term of art,
9 sewage?
10     A.    Yes.
11     Q.    All right.  So this -- you do not
12 mean manufacturing sludge -- or I should restate
13 that.
14          Your job in this capacity did not
15 have to -- did it have to do with industrial sludge,
16 other than sewage proper?
17          MR. BARNES:  Objection.  Asked and
18 answered.  I think he gave the answer.
19     A.    Your question's a little bit stilted.
20 Could you rephrase it?  See if there's a different
21 question there.
22     Q.    Let me see if I can phrase it more
23 eloquently.
24          Other than dealing with issues
25 pertaining to sewage, per se, did you, in this job,

51

1 in 1977, deal with industrial -- deal with
2 industrial waste, other than sewage?
3     A.    I understand.  First, a
4 clarification.  The term "sewage" and "sludge"
5 really can't be separated.
6          The sludge is what the role of that
7 office was.  So it's the residual product of the
8 treatment of either municipal sewage or of
9 industrial wastewater.
10          So the residuals could come from
11 municipal plants -- which is the sewage sludge -- or
12 from industrial plants, which would be industrial
13 sludge.
14     Q.    Would the industrial sludge be a
15 by-product of manufacturing operations?
16     A.    The treatment of the wastewater from
17 manufacturing operations.
18     Q.    Got you.  Okay.  And the wastewater
19 itself would be waste from a manufacturing
20 operation?
21     A.    Yes.
22     Q.    How long -- well, what were your
23 duties in this job?
24     A.    The office developed regulations for
25 how to properly manage the sludge from both the

52

1 municipal and industrial facilities.  We developed a
2 guidance on sampling techniques for determining what
3 was in the sludge.
4          We developed -- what's the word I'm
5 looking for -- we managed the treatment and disposal
6 options for the various large POTWs in the state.
7 At that time, they were allowed to dispose of their
8 sludge in the ocean, and there was a federally
9 mandated ban that was sometime in the future -- I
10 believe it was December '81, if I recall -- and we
11 administered the efforts of these POTWs to develop
12 sludge management plans that would figure out a way
13 to dispose of the sludge instead of placing it into
14 the ocean.
15          MR. BARNES:  When you get to a
16 natural breaking point --
17          MS. MOONEY:  Let me just go through
18 this position.
19          MR. BARNES:  Sure.
20     Q.    Can you describe it in any more
21 precise detail, what actually you did in this
22 regard?
23     A.    Sure.  I helped prepare the
24 regulations -- the sludge management regulations in
25 New Jersey.  I attended countless meetings and

53

1 conference calls and memos and letters back and
2 forth with the six ocean dumping sewage authorities
3 in terms of getting them through a process so that
4 they could find a disposal site for their product.
5          We also -- I also worked with various
6 industries that had wastewater sludges, to make sure
7 that they complied with the sludge quality assurance
8 regulations.  Those were the sampling and testing
9 rules.
10          I remember attending some meetings
11 with the waste management side of the department
12 concerning the hauling of the sludge -- both the
13 industrial and the municipal sludge -- in terms of
14 what existing rules existed and what new rules
15 needed to be put into place.
16          I went to different seminars.  I gave
17 different seminars also regarding the technical
18 aspects of sludge treatment and disposal.
19          I'm sure there's more, but that's a
20 pretty good recollection.
21     Q.    Was sludge, at this time -- the
22 sludge that you were describing -- being dumped in
23 landfills as well?
24     A.    Yes.
25     Q.    Did you have any hand in that aspect

K. GOLDSTEIN, P.E.  -  Direct

54

1  of the regulatory requirements?
2      A.    Yes. There were a couple of
3  different things. The first is that the landfills
4  were getting kind of overwhelmed with the amount of
5  sludge that was being disposed of. A lot of it had
6  to do with the fact that it was liquid -- primarily
7  liquid when it was being discharged.
8      So we were looking to ways to reduce
9  the volume of the sludge being disposed of in
10  landfills.
11      There was also an effort for septage,
12  which is septic tank clean out, to -- that was also
13  discharged into landfills, and that was getting to
14  be overwhelming as well.
15      So we looked for ways to set up
16  different sewage treatment plants around the state
17  to accept septage as part of their influent, so it
18  didn't have to be discharged into landfills.
19      Q.    Do you recall any of the regulations
20  in particular that you helped prepare -- strike that
21  last question.
22      When you say prepare regulations,
23  what do you -- precisely, what do you mean?
24      A.    At DEP, there would be a team of a
25  technical person and an attorney, a regulatory -- I

55

1  forgot their titles, but they were -- office of
2  regulatory services -- an attorney who worked with
3  the office of regulatory services and a technical
4  person would work together to prepare the set of
5  regulations.
6      Q.    And what was your participation in
7  this regard?
8      A.    Well, I worked on a lot of
9  regulations.
10      Q.    No, I wasn't clear. Were you the
11  technical person or the attorney?
12      A.    Hopefully I was the technical person.
13      Q.    Okay. And the next question goes to
14  what you were just speaking of.
15      Do you recall any -- any regulations
16  particularly that you worked on during this time
17  period?
18      A.    Sure. I worked on the sludge quality
19  assurance regulations. I worked on the industrial
20  pretreatment regulations. I worked on the New
21  Jersey pollutant discharge elimination system
22  regulations.
23      That's all I could recall.
24      Q.    What were the sludge quality
25  assurance regulations?

56

1      A.    Those were rules that required
2  generators of sludge to test their residual material
3  to determine the contaminant level.
4      Q.    Did you have an area of concentration
5  in the way of municipal versus industrial sludges in
6  your job at this time?
7      A.    Well, I would think that the -- about
8  95 percent of our work dealt with municipal sludge
9  in the office. So I had a similar ratio.
10      Q.    So about 95 percent of your work
11  dealt with municipal sludges?
12      A.    Correct.
13      Q.    Were the municipal sludges human
14  waste sludges primarily?
15      A.    Well, municipal treatment plants in
16  New Jersey take a mixture of both domestic sewage --
17  which is the human waste -- restaurants, commercial,
18  and a lot of industrial waste goes into municipal
19  plants.
20      So it eventually evolved to my next
21  position, which, when we get to that, I'll explain
22  why -- how that evolved.
23      Q.    Just quickly, how long were you in
24  this position at the office of sludge management?
25      A.    About four years.

57

1      Q.    So to approximately 1981?
2      A.    Correct.
3      MS. MOONEY:  You want to stop there?
4      MR. BARNES:  I think we've been about
5  an hour and a quarter, so it's a good time.
6      (Recess taken.)
7      Q.    Just going back to the 1977 to 1981
8  time period, with your position in the office of
9  sludge management, during this time, did you have
10  any involvement in regulations dealing with
11  industrial hazardous waste, per se?
12      A.    No.
13      Q.    Okay. Was sludge considered
14  hazardous waste or non-hazardous waste?
15      A.    Municipal sludge -- well, the
16  definitions at the time, the municipal sludge, at
17  the time, I believe, was exempt from being a
18  hazardous waste in New Jersey.
19      Industrial waste, depended on its
20  characteristics.
21      Q.    When you say industrial waste, you
22  mean industrial sludge waste?
23      A.    Correct.
24      Q.    All right. In 1981, did you move
25  onto another position at New Jersey DEP?

K. GOLDSTEIN, P.E.  -  Direct

58

1      A.    Yes.  In the office, kind of
2 expanded, and it became the office of sludge
3 management and industrial pretreatment, and I was
4 promoted to become chief of the office of industrial
5 pretreatment, or the section -- industrial
6 pretreatment section, it was called.
7      Q.    Can you say that again?
8      A.    Industrial pretreatment section.
9      Q.    Did you say that you became chief of
10 the industrial pretreatment section?
11      A.    Yes.
12      Q.    Okay.  How long were you chief of the
13 industrial pretreatment section?
14      A.    Approximately five years.
15      Q.    And what were your duties as the
16 chief of the industrial pretreatment section of the
17 office of sludge management -- is that it?
18      A.    Yes.
19      Q.    Okay.
20      A.    Well, I had general managerial duties
21 to direct staff, prepare monthly reports, and other
22 internal documents dealing with the activities of
23 the section.
24           Specific technical aspects of the
25 section, we went to the municipal sewage authorities

59

1 that had industrial wastewater discharges into them,
2 and created regulations that required the sewage
3 authority to develop industrial pretreatment
4 programs -- which, in simple terms, is just a way of
5 managing the industrial wastewater that was
6 discharged into the sewage treatment plant.
7      Q.    Any other technical aspects of your
8 job?
9      A.    Well, we looked into different types
10 of pretreatment, which is wastewater treatment of
11 industrial wastewater, before it is discharged into
12 the sewage plant.  So we did that type of technical
13 education and review.
14           We had to more completely understand
15 the mechanisms of a municipal sewage treatment plant
16 because -- to see what the impacts of the industrial
17 waste was on the plant, and if it was impacting the
18 plant's operations, its discharge or its generation
19 of sludge.
20      Q.    Were the issues that you worked on,
21 as the chief of the industrial pretreatment section
22 of the office of sludge management -- let me
23 rephrase that.
24           To what extent did the issues that
25 you handled in this position as chief pertain to

60

1 waste that was not discharged to a body of water?
2      A.    Well, I'm not sure if this is
3 responsive to your question, but the regulations
4 dealing with hazardous waste transportation and
5 discharge had certain provisions that involved the
6 discharge into sewage treatment plants.
7           There were certain exemptions, called
8 the domestic sewage exemption, for example, under
9 RCRA, that we got involved with.  We also -- I still
10 dealt with the issue of the disposal of sewage
11 sludge.
12           It was still part of the overall
13 responsibility of the office to figure out how to
14 effectively dispose of the sludge, and the idea of
15 the industrial treatment program was to improve the
16 quality of the sludge so it could be disposed of in
17 different ways.  So we did get involved with
18 landfills and which landfills could accept the
19 waste.
20           We got involved with incinerators and
21 which incinerators could accept the waste.  So there
22 were some aspects of it, but it was -- it focused on
23 the -- on the discharge of industrial wastewater
24 into sewage treatment plants.
25           But those are some of the overlaps

61

1 with the hazardous waste program.
2      Q.    And to what extent were you
3 personally involved in the overlaps with the
4 hazardous waste program?
5      A.    Well, I did a lot of communication
6 with the hazardous waste program to treat -- to sort
7 out the rules that were -- in fact, a set of rules
8 that the EPA put out, called the consolidated permit
9 rules, I believe in 1980, '81, that try to integrate
10 the water program with the waste program.  And it
11 took months and months and months to try to figure
12 out these rules.  And eventually they got recanted
13 by the EPA because they were just so difficult to
14 deal with.
15           But I attended a lot of meetings with
16 the hazardous waste people to try to sort out the
17 differences between the two sets of regulations, and
18 the overlap between the two sets of regulations.
19      Q.    Was the office of sludge management
20 and industrial pretreatment a subset of any other
21 larger office?
22      A.    It's part of the division of water
23 resources.
24      Q.    Is the -- was, during this time
25 period, the management of industrial hazardous waste

K. GOLDSTEIN, P.E.  -  Direct

---

**62**

1  in a different division of the New Jersey DEP?
2      A.    Yes.
3      Q.    And what division was that?
4      A.    That name changed over time, but it
5  started out as the solid waste administration in the
6  mid-seventies, and it evolved to the division of
7  solid waste management in the late seventies, and
8  eventually to the division of solid and hazardous
9  waste management by the mid-eighties.
10     Q.    Any other duties that you recall as
11  the chief of the industrial treatment section of the
12  office of sludge management and industrial
13  pretreatment between 1981 and 1986?
14     A.    Well, we developed a set of
15  regulations for industrial pretreatment -- I'm not
16  quite sure if I mentioned that -- that mirrored the
17  EPA program -- I should say that EPA had a set of
18  regulations out at that time, and also similar to
19  the NJPDES program, that they had the effort to
20  delegate the regulatory program to each state.
21          So the industrial pretreatment
22  program, we had a set -- promulgate a matching set
23  of the regulations to the EPA regulations, and then
24  show the EPA that we could run our own program at
25  the state level.

---

**63**

1          So we developed a whole massive
2  application to DEP for the delegation of the
3  program.
4      Q.    Does NJPDES stand for the New Jersey
5  Pollutant Discharge Elimination System?
6      A.    Elimination system.
7      Q.    Anything else you can recall -- well,
8  strike that.
9          Any other involvement with the
10  hazardous waste side of DEP during this time period
11  that you recall when you were the chief?
12     A.    Not that I recall.
13     Q.    Okay.  In 1986, did you move onto
14  another position at New Jersey DEP?
15     A.    Yes.
16     Q.    What was that position?
17     A.    Chief of the bureau of underground
18  storage tanks.
19     Q.    And why did you move to that
20  position?
21     A.    Promotion.
22     Q.    And how did you get that promotion?
23     A.    I applied.  It was a --.
24     Q.    And how long were you the chief of
25  the bureau of underground storage tanks?

---

**64**

1      A.    Approximately six years.
2      Q.    So approximately till 1992, is that
3  right?
4      A.    Yes, till early '92.
5      Q.    And was the bureau of underground
6  storage tanks a subdivision of another broader
7  program at New Jersey DEP?
8      A.    It was also part of the division of
9  water resources for -- from '86 until '91.  And then
10  from '91 and '92, it was within the division of --
11  division of responsible party site remediation.
12     Q.    Okay.  And can you describe what your
13  duties entailed, in the 1986 to early 1992 period,
14  as the chief of the bureau of underground storage
15  tanks?
16     A.    Well, I was the manager in charge of
17  a staff of 30 some odd individuals.  I did typical
18  managerial stuff of supervising them, preparing
19  reports -- internal reports.
20          The overall purpose of the bureau was
21  to develop regulations for the management of
22  underground storage tanks in New Jersey.  Again,
23  this was a federal program that EPA wanted to shift
24  down to the state level.  So we needed to develop a
25  set of regulations and a delegation document to be

---

**65**

1  submitted to the DEP.
2          The regulations that we developed
3  entailed the management of the upgrade and closure
4  of tanks, as well as the remediation of leaks on
5  those tanks.
6      Q.    Did you have a personal hand in the
7  development of the regulations, managing upgrade and
8  closure of the tanks?
9      A.    Yes.
10     Q.    And what was your personal
11  involvement?
12     A.    Well, I coordinated the effort of the
13  technical staff and the regulatory services staff to
14  produce the regulations.  I was involved with every
15  aspect of it from the writing -- almost every
16  meeting -- there was a loan program involved with
17  it.  There was a financial responsibility aspect.
18          So I had different people working on
19  each aspect, and I would be involved with every --
20  seems like every meeting that took place.
21     Q.    You were the chief.  How about the
22  remediation of the leaks of tanks, those
23  regulations, were you involved personally in the
24  development of those regulations?
25     A.    Yes.

---

K. GOLDSTEIN, P.E.   -   Direct

66

1   Q.   And in what capacity?
2   A.   In a similar manner. The department
3   had already had a set of regulations -- or at least
4   a regulatory program that addressed how to clean up
5   contaminated sites. The underground storage tank
6   program developed its own set of regulations for the
7   clean up of these sites.
8        And, eventually, by the late
9   eighties, the department realized that there were
10  multiple sets of regulations dealing with cleanup of
11  various sites that sometimes were consistent and
12  sometimes were not consistent.
13       So there was a large effort to
14  consolidate all the cleanup regulations, which
15  culminated in a proposal in '92 called, technical
16  requirements for site remediation. And I
17  participated in all aspects of that, from the
18  generation of the underground storage tank
19  regulations to the working on the -- on these
20  technical requirements in '92.
21  Q.   Did you have any involvement with the
22  hazardous waste program at DEP during this time
23  period?
24       MR. BARNES: Can you establish the
25  time period you are talking about?

67

1        MS. MOONEY: 1986 through early 1992.
2   A.   There were some involvement. The
3   cleaning out of tanks, for example, had -- there was
4   a residual waste that -- that, at the time, was
5   considered a hazardous waste.
6        So we worked with that program to
7   develop specific requirements for this residual
8   material that was inside of tanks. It was called an
9   X waste at the time.
10       We also worked with that program
11  concerning the cleanup of the contaminated sites
12  because certain of the material that was cleaned up
13  at the sites was considered a hazardous waste. So
14  we worked on the requirements for that distribution
15  of -- or transportation and disposal of that
16  material.
17       And, finally, hazardous waste were
18  stored in tanks at a lot of facilities. So we went
19  over requirements of the hazardous waste program and
20  the underground storage tank program, because they
21  had an overlap in terms of how hazardous waste was
22  stored in underground tanks.
23  Q.   Any other hazardous waste
24  experience -- did you have any other hazardous waste
25  experience during this tenure as the chief of the

68

1   bureau of underground storage tanks, other than what
2   you've already described?
3   A.   No, that's to the best of my
4   recollection right now.
5   Q.   Did you -- what job did you go on to
6   hold after early 1992 when you were no longer the
7   chief of the bureau of USTs?
8   A.   My last job at DEP was with -- was
9   chief of the bureau of applicability and compliance.
10  It was a -- it -- the bureau's responsibilities were
11  to address the -- address the registration and
12  billing aspects of the underground storage tank
13  program, the enforcement program under the ECRA
14  program -- E-C-R-A -- which stands for Environmental
15  Cleanup and Responsibility Act.
16       The enforcement, the funding of the
17  other administrative aspects of the ECRA program
18  were part of that bureau's responsibilities.
19  Q.   And was the bureau of applicability
20  and compliance a subset of a larger bureau or
21  program --
22  A.   Yes.
23  Q.   -- at New Jersey DEP?
24       What was that?
25  A.   That's the same division of

69

1   responsible party site remediation.
2   Q.   Okay. Did you first become the chief
3   of the bureau of applicability in early 1992?
4   A.   Yes.
5   Q.   Okay. And how long were you the
6   chief?
7   A.   Approximately nine months.
8   Q.   Would that take us into 1993?
9   A.   No, it's the end of '92. It's
10  December of '92.
11  Q.   And what were your -- you,
12  personally -- what were your duties as the chief of
13  the bureau of applicability?
14  A.   Similar type of managerial functions
15  as we've discussed with the other bureaus.
16  Q.   Anything from a technical standpoint
17  that you did?
18  A.   Not that I could recall.
19  Q.   Did you develop any regulations
20  during this time?
21  A.   No.
22  Q.   Did you administer any of the
23  regulations at New Jersey DEP during this time?
24  A.   Yes.
25  Q.   And what were they?

K. GOLDSTEIN, P.E. - Direct

70

1    A.    Well, the underground storage tank
2 regulations, and the ECRA regulations.
3    Q.    Other than administering these
4 regulations and the various managerial functions,
5 any other duties that you had as chief during this
6 time period?
7    A.    No. I think that, again, to the best
8 of my recollection, that covers it.
9    Q.    Did you go on to hold another
10 position at the end of 1992?
11    A.    No.
12    Q.    What did you do at that point?
13    A.    I left the DEP and joined Sadat
14 Associates, S-a-d-a-t.
15    Q.    Why did you leave New Jersey DEP?
16    A.    Just a different job opportunity.
17    Q.    And what was Sadat Associates?
18    A.    Sadat Associates is an environmental
19 consulting firm, an environmental engineering firm.
20    Q.    And where is it located?
21    A.    Trenton, New Jersey.
22    Q.    Okay. And what was your title when
23 you went to Sadat Associates in '92?
24    A.    I believe it was senior project
25 manager.

71

1    Q.    How long were you a senior project
2 manager at Sadat?
3    A.    Approximately six, seven years.
4    Q.    '98 -- 1998 or 1999?
5    A.    I really don't recall when the next
6 position title came in. I don't have a recollection
7 of exactly when that is.
8    Q.    And what types of work did you do as
9 a senior project manager in Sadat?
10    A.    I managed environmental projects for
11 clients. We had municipal, industrial, governmental
12 clients who needed assistance in getting through the
13 regulatory process, whether it be permitting for a
14 new facility or an operating facility, or cleanup of
15 discharge of contaminants onto their soil, or in the
16 groundwater underneath their property.
17    Q.    Did you work in a particular division
18 or practice area of Sadat?
19    A.    It was called the science group.
20    Q.    And what did the science group do?
21    A.    Pretty much what I described.
22    Q.    Did they work in all media?
23    A.    Yes.
24    Q.    What media did you, yourself, work on
25 as part of the science group?

72

1    A.    I probably was involved with projects
2 in all media during that time frame.
3    Q.    What was your involvement, if any,
4 with hazardous waste?
5    A.    I had a client who was a hazardous
6 waste TSD facility -- treatment storage disposal
7 facility -- and I assisted that client in obtaining
8 different permits, helping them with a site
9 remediation issue at their property, preparing spill
10 prevention plans for the property -- there was
11 probably a dozen different things that we did for
12 that facility.
13        I'm sure I was involved with projects
14 where clients needed to dispose of hazardous waste
15 because -- as part of either a cleanup or a disposal
16 issue of a tank residue or of a manufacturing
17 residue, but I don't recall any off the top of my
18 head.
19    Q.    Was the client that you described
20 here who had the TSD facility located in New Jersey?
21    A.    Yes.
22    Q.    Did you hold another position at
23 Sadat after senior project manager?
24    A.    Yes.
25    Q.    And what was that?

73

1    A.    Vice-president.
2    Q.    Was that in the 1998/'99 time period?
3    A.    Yes.
4    Q.    Okay. And how long were you V-P of
5 Sadat?
6    A.    I left Sadat in 2005.
7    Q.    And from 1998/'99 to 2005, were you
8 vice-president of Sadat?
9    A.    Correct.
10    Q.    And what kind of work did you do as
11 V-P of Sadat?
12    A.    Similar work in relation to client
13 relations and project management; a little bit more
14 managerial responsibilities in terms of supervision
15 of staff and assisting in running of the company.
16    Q.    Were you a principal of Sadat?
17    A.    No -- oh, excuse me -- yes, I was a
18 shareholder, if that's what you meant by principal.
19    Q.    Yes. Yes, it was.
20    A.    A very minority shareholder.
21    Q.    Between 1998/'99 and 2005, did you
22 have any firsthand experience dealing with hazardous
23 waste regulations or management?
24    A.    Well, I had the same client that we
25 talked about earlier that was the hazardous waste

K. GOLDSTEIN, P.E.   -   Direct

74

1   TSD facility. Again, I don't recall any other
2   specific projects. If I do, I'll try to get them on
3   the record before we depart.
4        Q.   Okay. In 2005, did you go on to have
5   another position somewhere?
6        A.   Yes. I moved to Ransom
7   Environmental.
8        Q.   Okay. And is Ransom Environmental an
9   environmental consulting company?
10       A.   Yes.
11       Q.   Is that where you are today?
12       A.   Correct.
13       Q.   And you've been there since you left
14  Sadat in 2005?
15       A.   Correct.
16       Q.   What's your title at Ransom?
17       A.   Director of technical services.
18       Q.   I should ask, why did you leave
19  Sadat?
20       A.   Different job opportunity.
21       Q.   Okay. What are your -- what are your
22  duties as director of technical services at Ransom?
23       A.   Again, I have a cadre of clients that
24  I manage for environmental -- get them through the
25  environmental regulatory process, permitting, site

75

1   remediation -- again, similar types of activities.
2        Q.   And have you had any involvement at
3   Ransom in dealing with hazardous waste issues of
4   your clients?
5        A.   Again, I have some recollections of
6   certain clients needing hazardous waste transported,
7   disposal services, but I don't -- no names are
8   jumping up at me.
9        Q.   Going back to when you were at
10  Rensselaer --
11       A.   Rensselaer.
12       Q.   -- Rensselaer, did you have a job
13  while you were taking courses at Rensselaer?
14       A.   I was a teaching assistant for a
15  year.
16       Q.   What were you doing as a teaching
17  assistant?
18       A.   Grading papers.
19       Q.   In what course?
20       A.   Oh. I did -- it was a course on
21  wastewater management, and there was a course on air
22  pollution that I helped out at the lab.
23       Q.   In the time that you graduated from
24  Rensselaer to the present, have you had occasion to
25  be involved with Pennsylvania regulations or rules

76

1   involving hazardous waste?
2        A.   I -- as I mentioned earlier, I did
3   take a training course in Act II requirements. I --
4   I'm sure I had a client or two from Pennsylvania.
5        Q.   In hazardous waste -- well, I should
6   say dealing with hazardous waste issues?
7        A.   I don't believe so.
8        Q.   Have you had any experience, that you
9   can recall, in any capacity dealing with the
10  Pennsylvania requirements pertaining to hazardous
11  waste?
12       A.   Not that I can recall.
13       Q.   From the time that you graduated from
14  Rensselaer to the present, what percentage of --
15  what percentage of your work-related duties pertain
16  to management of hazardous waste in New Jersey?
17       A.   One percent.
18       Q.   What's that?
19       A.   One percent.
20       Q.   What would you say is -- strike that.
21       From the time that you graduated from
22  Rensselaer to the present, what would you say is --
23  was your primary area of focus -- in terms of work
24  duties -- from New Jersey DEP through consulting?
25       What -- I'm not stating this very

77

1   well, but what was the lion's share of your
2   experience in the environmental realm in your work
3   history, would you say?
4        MR. BARNES: Objection as to form.
5   You can answer if you think you can.
6        A.   Well, while I was at the DEP, I think
7   the most time was spent in hazardous waste
8   management when I was in the industrial pretreatment
9   section.
10       Q.   Actually, my question is totally
11  convoluted.
12       What would you consider to be your
13  main area of experience in the environmental realm,
14  let's say, during your tenure at New Jersey DEP?
15       A.   There were several. I went through
16  the history. I have expertise in wastewater
17  engineering, in underground storage tank management,
18  in sludge management regulations, industrial
19  pretreatment, all types of discharges.
20       Could you be more specific?
21       Q.   I guess what I'm trying to get at is,
22  you know, what area -- whether water or waste or air
23  or something else -- what was the primary area of
24  experience that you've had working in the
25  environmental realm?

K. GOLDSTEIN, P.E.  -  Direct

78

1      A.    It's in water and in site
2  remediation.
3      Q.    Was that just in the New Jersey DEP
4  or subsequent to that as well?
5      A.    Subsequent.
6      Q.    Just subsequent?
7      A.    No, both.
8      Q.    All right. Other than New Jersey
9  DEP, did you have any experience working for any
10  other governmental entity?
11      A.    I had a summer job at the City of New
12  Rochelle on a surveying team.
13      Q.    When was that?
14      A.    Oh, '72.
15          MR. BARNES: Just to clarify, you're
16  also not talking about engagements that he had where
17  the client was a government agency?
18          MS. MOONEY: No. No. I was talking
19  about work experience.
20      Q.    Summer job at the City of New
21  Rochelle, in the summer of 1972, what was that?
22      A.    On a surveying crew.
23      Q.    I should probably ask -- that reminds
24  me.
25          Did you have any summer jobs while

79

1  you were at Rensselaer?
2      A.    Yes.
3      Q.    What were they?
4      A.    Well, we just talked about the
5  surveying crew. I worked in an assembly shop for
6  one summer. I stayed in the college for a summer
7  and did lab work. It's part of my master's.
8      Q.    What did that consist of?
9      A.    I had -- my master's project
10  consisted of a treatment process called ultra
11  filtration, and I had a lab set up where the
12  contaminated waste stream would circulate and go
13  through a filter, and I would measure the
14  effectiveness of the filter.
15      Q.    Any other summer jobs during your
16  time at Rensselaer?
17      A.    Not that I can recall.
18      Q.    During the time that you were at New
19  Jersey DEP, did you have any involvement in the
20  development or promulgation of any statutes or
21  regulations -- or I should say regulations, not
22  statutes -- pertaining to hazardous waste, other
23  than what you talked about in the sludge division
24  and the bureau of applicability, anything having to
25  do with hazardous waste regs, per se?

80

1      A.    I probably was asked to review draft
2  copies of regulations.
3      Q.    Of hazardous --
4      A.    Yeah, in hazardous waste
5  management -- certainly not in the development. I
6  would contribute to the peer review.
7      Q.    Was peer review cross-office --
8  something that was done on a normal basis at New
9  Jersey DEP?
10      A.    If there was a reason for that office
11  to review it, yes.
12      Q.    So there had to be some kind of nexus
13  subject-wise --
14      A.    Yes.
15      Q.    -- for cross-review?
16          Do you recall specific instances of
17  reviewing hazardous waste regs in New Jersey DEP?
18      A.    Well, I mentioned earlier the
19  consolidated permit regs that EPA developed.
20          New Jersey was working on developing
21  a similar set of consolidated regs with the NJPDES
22  program and the hazardous waste program when EPA
23  decided to pull the plug on that effort.
24          So I was involved with that for some
25  period of time in the early eighties. But once the

81

1  plug got pulled, I concentrated on the water
2  aspects, and some other group concentrated on the
3  hazardous waste aspects.
4      Q.    Were you involved in the development
5  or promulgation of any hazardous waste regs in the
6  '74 -- 1974 through 1977 time period?
7      A.    No.
8      Q.    Other than the sludge regs, and the
9  other regs that you testified that you were involved
10  in at New Jersey DEP, did you ever have any
11  experience administering any of the hazardous waste
12  regulations while you were at New Jersey DEP?
13      A.    I mentioned, when we were talking
14  about industrial pretreatment, that there was one
15  aspect of the hazardous waste regs that dealt with
16  the discharge of wastewater -- industrial wastewater
17  at the sewage treatment plants.
18          So that particular aspect was called
19  industrial waste management facilities. I did have
20  a hand in administering, but it's admittedly a
21  narrow hand.
22      Q.    Anything else that you recall?
23      A.    No.
24      Q.    Okay. And when you say
25  administering, do you include enforcement in that as

K. GOLDSTEIN, P.E.    -    Direct

82

1  well?
2      A.    I don't recall offhand if we did any
3  enforcement.
4      Q.    What do you mean?
5      A.    I don't recall.
6      Q.    When you say, we did any enforcement,
7  what do you mean?
8      A.    "We" being the industrial
9  pretreatment section.
10     Q.    I see.  What you were just talking
11  about?
12     A.    Correct.
13     Q.    What about the time that you were at
14  New Jersey DEP, did you have any hand in enforcing
15  any statutes or regulations dealing with hazardous
16  waste, per se, other than the sludge and the
17  industrial pretreatment standards, anything else
18  that you can recall?
19     A.    No.
20     Q.    Okay.  What expertise -- and by
21  expertise, I mean specialized knowledge or
22  experience -- do you consider yourself to have with
23  regard to New Jersey hazardous waste statutes?
24     A.    Well, I had the opportunity to read
25  RCRA -- the Resource Conservation and Recovery

83

1  Act -- R-C-R-A.  I've read the New Jersey solid
2  waste management act -- this is while I was at DEP,
3  when these different acts got adopted or -- and the
4  regulations got promulgated, I read them as part of
5  my job responsibilities.
6      Q.    Do you mean read them
7  pre-promulgation or something else?
8      A.    Well, certainly, RCRA, I read after
9  it was adopted.  The solid waste management act of
10  New Jersey after it was adopted.  The -- I believe I
11  read, prior to its proposal, the regulations dealing
12  with the hazardous waste management program.  I'm
13  trying to put a year on that, but --
14     Q.    Was it before 1977?
15     A.    No.
16     Q.    Anything else that you can recall?
17     A.    Well, the hazardous waste regs got
18  modified and amended from the early eighties onward,
19  and I'm sure I read either drafts or the final
20  product after it was -- after it was promulgated.
21     Q.    In the eighties?
22     A.    Yes.
23     Q.    And when you say you read drafts of
24  the hazardous waste regs in the 1980's, do you mean
25  read them for input into the final form, or for some

84

1  other reason?
2      A.    The peer review we talked earlier
3  about, yeah.
4      Q.    Do you recall if you had any comments
5  or suggestions or changes?
6      A.    No, that's too long ago.
7      Q.    Okay.  Other than the peer review
8  that you're talking about, do you consider that you
9  have any specialized knowledge or experience with
10  regard to the handling of hazardous waste in New
11  Jersey?
12     A.    Well, I think, as a person who's been
13  in the environmental business in New Jersey for 30
14  years, I have a reasonable working knowledge of the
15  hazardous waste program.
16     Q.    Any particularized knowledge that you
17  would consider yourself to have?
18     A.    Well, I need to make sure my clients
19  stay in compliance with the rules.  So I have a --
20  I'd say a working knowledge of everything from
21  generation to transport to storage to disposal.
22     Q.    Would you consider yourself an expert
23  in the handling of hazardous waste in New Jersey?
24     A.    Define expert.
25     Q.    Well, we were just talking about some

85

1  of the areas that you have specialized knowledge or
2  expertise in, and you discussed peer review, you
3  discussed having a 30-year experience in the
4  environmental field, and helping clients comply with
5  various regulations.
6            Anything more narrow or specific than
7  that?
8      A.    Well, expert's a subjective term.
9  Obviously, I'm more expert than 99.999 percent of
10  the population, but there's people who probably know
11  more than I do in the field.  But I think I have a
12  pretty good understanding of what the rules are.
13     Q.    Okay.  Have you published any books?
14     A.    No.
15     Q.    Have you published any articles?
16     A.    I've had articles published based
17  upon seminar proceedings.
18     Q.    By that, do you mean materials that
19  would be disseminated during a seminar or something
20  else?
21     A.    Or afterwards, that somebody would
22  compile all the different papers that are presented
23  at a particular seminar and issue a proceedings
24  book.
25     Q.    How many of your papers were

K. GOLDSTEIN, P.E.  -  Direct

86

1 presented in that way?
2     A.    Two or three.
3     Q.    Any other articles in publications,
4 for instance, you know, technical journals or
5 anything like that?
6     A.    No.
7     Q.    And the subject matter of the papers
8 that were compiled and published in that form, do
9 you recall what those were?
10     A.    Well, most of them dealt with
11 regulatory issues in terms of how to -- how the --
12 how responsible parties would comply with
13 regulations that I was familiar with.
14          I do recall one that had to deal with
15 the discharge of superfund cleanup wastewater into
16 municipal treatment plants. That was a pretty
17 interesting one. But there was only a couple. So
18 mostly dealt with regulatory issues.
19     Q.    Did they mostly deal with -- or
20 exclusively deal with discharge to bodies of water
21 of different types of waste?
22     A.    It was either, again, the industrial
23 treatment program that we discussed earlier, or the
24 sludge management, or the underground storage tank
25 program and all the boundaries we talked about

87

1 earlier.
2     Q.    Do you have any membership in any
3 kind of professional society?
4     A.    Yes.
5     Q.    What is that?
6     A.    I'm currently a member of the New
7 Jersey Board of Environment Association.
8     Q.    And what is that organization?
9     A.    It's a group of professionals that
10 get together to share information on the current
11 state of environmental regulation technology,
12 professional development in the state.
13     Q.    When you say professionals, who do
14 you mean?
15     A.    Professionals is the engineers,
16 geologists, sewer treatment plant operators -- a
17 wide spectrum of folks involved with the
18 environmental protection of water in the state.
19     Q.    And how long have you been a member
20 of this society?
21     A.    Off and on for 20-plus years. My
22 membership lapses once in a while, but I renew it --
23 it's over 20 years.
24     Q.    Did you ever hold any positions of
25 authority in the organization?

88

1     A.    No.
2     Q.    Do you subscribe to any professional
3 journals?
4     A.    Not at this time, no.
5     Q.    Are there any particular books or
6 treatises in your personal or professional library
7 on which you rely on a regular basis?
8     A.    I've got a large collection. That's
9 a big question. I have different regulations on all
10 different aspects of environmental protection.
11          I've had technical textbooks from
12 anything from hydrogeology to physics. I have
13 guidance documents in the dozens -- maybe
14 hundreds -- from DEP and from other agencies in
15 terms of how to get things done.
16     Q.    Okay. I asked you before what
17 expertise you consider yourself to have in the field
18 of hazardous waste management. I'm going to ask you
19 a slightly different question now.
20          What are the fields or specialties in
21 which you, yourself, consider yourself to be an
22 expert?
23          MR. BARNES: I am going to object as
24 to form. I think he already testified that he was
25 uncomfortable with the term "expert". So perhaps

89

1 you can find some clarification.
2     Q.    What do you consider yourself to have
3 specialized knowledge or experience in, in the
4 environmental realm?
5          MR. BARNES: Objection as to form.
6 You can answer to the extent of your ability.
7     A.    Sure. The underground storage tank
8 management, wastewater discharge regulations,
9 wastewater treatment, sewage -- publicly owned
10 treatment works -- management and regulation -- site
11 remediation -- which involves soil and groundwater
12 and vapor issues and cleanup and technology and
13 regulation.
14          I feel like I'm leaving things out
15 because it's a very broad question, but we'll take
16 that as the answer.
17     Q.    Okay. Anything else?
18     A.    That's fine.
19     Q.    Okay. We talked about prior
20 retention of you as an expert witness. We talked
21 about prior testimony.
22          Have you ever given expert advice --
23 let me rephrase that.
24          Have you ever given an expert opinion
25 on behalf of a government entity?

90

1    A.    Yes.
2    Q.    What was that?
3    A.    (No response.)
4    Q.    Is it in the chart?
5    A.    The one I can remember is
6  Pepack-Gladstone Borough, second from the bottom on
7  the first page.
8    Q.    I see.  Yes.
9    A.    I don't recall any others, but I have
10  a sense that there might be.
11    Q.    Okay.  If you think of any,
12  throughout, just let me know.
13    A.    Sure.
14    Q.    What percentage of the work that you
15  do right now entails working as an expert?
16    A.    Five to ten percent.
17    Q.    What percentage of your income
18  derives from serving as an expert witness?
19    A.    I don't receive anything.  The
20  company, though, I would say five to ten percent is
21  fair, that I get paid the same.
22    Q.    I see.  So Ransom, you mean?
23    A.    Yes.
24    Q.    Okay.  All right.  Do you know what
25  the financial arrangement is that Ransom has with

91

1  AETC in this case, or I guess counsel for AETC in
2  this case?
3    A.    Yes.
4    Q.    Can you explain what that is?
5    A.    I believe we had a time and materials
6  contract with -- I think it was a "not to exceed
7  understanding" for the preparation of the expert
8  report of $15,000, and with the additional
9  understanding that deposition preparation and today,
10  and if it goes to trial would be additional costs.
11    Q.    Is there an hourly rate that you
12  have?
13    A.    Yes.
14    Q.    What is that?
15    A.    $190 an hour.
16    Q.    Is this the normal rate -- your
17  normal rate as an expert?
18    A.    Yes.
19    Q.    Does Ransom, or you, yourself, have
20  an expectation in terms of the total amount of fees
21  that you expect to get from this case?
22    A.    No.
23    Q.    Okay.  Do you know if Ransom has been
24  paid already by AETC?
25    A.    There have been payments made.

92

1    Q.    Do you have any idea how much?
2    A.    I think we're caught up.  I think
3  we've gotten somewhere around $15,000.
4    MS. MOONEY:  All right.  It's a
5  natural breaking point.  Do you want to stop now for
6  lunch?
7    THE WITNESS:  Sure.
8    (Luncheon recess taken.)

93

1    A F T E R N O O N   S E S S I O N
2    MR. BARNES:  I just want to note, for
3  the record, that in accordance with the request made
4  by plaintiff's counsel during the deposition, we
5  made available, during the lunch break, certain
6  discovery materials -- documents produced in the
7  case that the witness had previously identified for
8  photocopying for his own files when he reviewed
9  them -- reviewed the discovery materials in the case
10  previously.
11    I think that's a fair description of
12  what we did.
13    MS. MOONEY:  Yes.
14  BY MS. MOONEY:
15    Q.    I just want to go back and ask you a
16  question about the -- going back to the office of
17  sludge management, your position there from 1977
18  through 1981, if you cast your mind back to that.
19    Was the office of sludge management
20  an office within a broader program or office of New
21  Jersey DEP?
22    A.    It's within the division of water
23  resources.
24    Q.    And then what about the office of
25  program development, the position that you had, in

K. GOLDSTEIN, P.E.  -  Direct

94

1  which you held a position from 1976 to 1977, was
2  that a, you know, smaller division of a broader DEP
3  office or program?
4      A.    Also the division of water resources.
5      Q.    Okay.  Turning now to the work that
6  you've done on this case, can you describe the
7  different tasks that you performed in generating
8  your expert report?
9      A.    I reviewed files at Wolff and Samson
10 that seemed like they would be of interest to my
11 objective.  I reviewed the documents.  I --
12     Q.    When you say reviewed the documents,
13 do you mean the documents in Appendix B?
14     A.    Yes.  I also tried to do a couple of
15 library searches through the Internet for relevant
16 documents.
17         I obtained some documents through the
18 New Jersey Department of Environmental Protection
19 that I used for preparation of the report.  I also
20 received some documents from the Pennsylvania
21 Department of Environmental Protection, but they
22 came in after the report was produced.
23         And the last task was to prepare the
24 report.
25     Q.    Do you recall what documents you

95

1  requested from PADEP -- being Pennsylvania
2  Department of Environmental Protection?
3      A.    I asked for regulations during the
4  mid-seventies -- the time period of interest, '75 to
5  '80 time period.
6      Q.    Did you ever procure those
7  regulations in advance of preparing this expert
8  report --
9      A.    No.
10     Q.    -- from any source?
11     A.    From past regulations, no.
12     Q.    Okay.  I assume one of the tasks was
13 you wrote the report, is that correct?
14     A.    Correct.
15     Q.    Did you, yourself, write the entire
16 report --
17     A.    Yes.
18     Q.    -- personally?
19     A.    Yes.
20     Q.    Did Mr. Waring have any involvement
21 in the actual writing of the report?
22     A.    No.
23     Q.    Any other tasks that you can recall
24 that went into the preparation of this report?
25     A.    No.

96

1      Q.    Can you estimate how long you spent
2  reviewing regulations and other documents in advance
3  of writing the actual report?
4          MR. BARNES:  Objection as to form.
5  I'm not sure I follow.  Are you talking about just
6  the regulations themselves or other materials and
7  the regulations?
8          MS. MOONEY:  Just the documents upon
9  which the report is based.
10     A.    Approximately 40 to 50 hours.
11     Q.    And how long did you spend actually
12 writing your report?
13     A.    Twenty to 30 hours.  It's a very
14 rough.
15     Q.    Do you have any evidence of the
16 amount of time you spent on the various tasks that
17 went into generating this report, such as time cards
18 or billing entries or anything like that?
19     A.    I'm not sure they would be
20 descriptive of the task that you just defined.  I'm
21 just making an estimate based upon my recollection.
22     Q.    Okay.  What I'm asking is if you have
23 any contemporaneous evidence, in the way of notes or
24 time cards or billing statements, that would show
25 for discrete tasks on the report, how much time was

97

1  spent on each task?
2      A.    Well, again, they were invoices, but
3  I'm not sure they'd be descriptive to make that
4  division.  That's just my recollection, which is
5  probably pretty accurate.  But, yeah, there were
6  invoices produced for the client.
7      Q.    So you're referring to invoices that
8  Ransom gave AETC's counsel, is that right?
9      A.    Yes.
10     Q.    Other than that, is there anything
11 that would describe the amount of time you spent on
12 the different tasks?
13     A.    No, not that I can recall.
14     Q.    Okay.  I'd like to turn to the report
15 itself -- I think you have a copy there -- which is
16 Exhibit Goldstein-1.
17         Turning to section one, page one,
18 here, you describe, I think, the purpose of scope,
19 as your heading indicates.
20         What was your understanding of the
21 scope of the project that Mr. Sabino asked Ransom to
22 perform in this case?
23     A.    I think I talked about that earlier.
24 That -- to evaluate the state-of-the-art of
25 hazardous waste management in the mid-seventies to

K. GOLDSTEIN, P.E. - Direct

98

1  evaluate AETC's business practices or roles during
2  that time period, and then the relationship between
3  AETC and the DeRewal Chemical Company.
4       Q.   Do you have an understanding of what
5  the goal of this expert report was in the case?
6            MR. BARNES: Objection as to form.
7  I'm not sure I understand what the goal means.
8       Q.   What was the purpose of having you
9  write this report, if you know?
10      A.   Well, just based upon the history and
11 the caption, and a little bit of the history that
12 Mr. Sabino gave me, I got the impression that the
13 plaintiffs were part of the PRP group that funded
14 the Boarhead -- or the cleanup at the Boarhead Farm
15 superfund site, and they were looking to bring in
16 more parties into that PRP group.
17      Q.   And how was your expert report
18 b- ring on that situation?
19      A.   Well, AETC is a defendant in a suit
20 that was brought by the plaintiffs to bring them
21 into the PRP group. And the overall goal of the
22 report, or the context of the report, or the overall
23 big picture is to get AETC out of being a PRP in the
24 group.
25           MR. BARNES: Off the record for a

99

1  second.
2            (Discussion off the record.)
3       Q.   The first sentence, the second
4  paragraph on page one here, says, the opinions
5  presented herein are based on information provided
6  by counsel.
7            Do you see that --
8       A.   Yes.
9       Q.   -- the very first sentence there?
10           Is the information provided by
11 counsel all those documents listed on Appendix B, is
12 that what you're referring to here?
13      A.   Except for two of them, they were
14 provided by counsel.
15      Q.   Okay. Which two were not provided by
16 counsel?
17      A.   The two reports to the Congress, one
18 dated -- it was -- the dates are wrong in this.
19           There are two reports to Congress
20 listed in the Appendix B. Those were not provided
21 by counsel. Those, I found through my research.
22      Q.   Okay. I actually have copies of
23 those reports. We're going to be talking about them
24 later. So if there's a discrepancy with regard to
25 the dates -- they're not the same date is what

100

1  you're saying?
2       A.   Yes. It's listed in Appendix B that
3  they're the same date.
4       Q.   We'll go over that then. That's
5  fine.
6       A.   Thank you.
7       Q.   Okay. Other than -- leaving aside
8  those two documents -- those two reports -- are you
9  saying that everything else was provided by counsel
10 to you to review for this expert report -- on
11 Appendix B, I'm talking about.
12      A.   Could you rephrase that? I'm sorry.
13 I might have misunderstood.
14      Q.   Leaving aside those two reports to
15 Congress listed in Appendix B, is it the case that
16 every other document listed here was provided by
17 counsel for AETC to you?
18      A.   Yes.
19      Q.   And did you actually have copies of
20 these documents provided by AETC's counsel, or did
21 you just review them here at Wolff and Samson and
22 take notes?
23           How did it -- how did you actually
24 access the documents?
25      A.   I believe Mr. Sabino sent me the

101

1  depositions of Mr. Landmesser and Mr. Leuzarder
2  prior to my visit to this office, and then, when I
3  came to the office, I tabbed these for review.
4       Q.   You tabbed what?
5       A.   I tabbed these documents for copying
6  so they were sent to me for review.
7       Q.   The remaining documents, you mean?
8       A.   Yes.
9       Q.   Okay. Did you tab certain sections
10 that were copied and sent to you, or were the entire
11 documents sent to you?
12      A.   Honestly, I don't recall. It's my
13 normal practice to tab just sections that I want to
14 review, and those are copied. I don't know, in this
15 case, if that was done.
16      Q.   When you reviewed these documents at
17 Wolff and Samson, did you review the entire
18 document?
19           For instance, these deposition
20 transcripts, did you review the entire thing or just
21 portions thereof?
22      A.   While I was here, I only reviewed
23 portions, but when -- as part of the preparation of
24 the report, I did read all of the depositions listed
25 here.