# Exhibit "A"

# Part 2 of 2

K. GOLDSTEIN, P.E.   -   Direct

102

1    Q.    And when you say all the depositions,
2  you mean the entire deposition transcripts?
3    A.    Yes.
4    Q.    When you were here and you read
5  portions of the deposition transcripts, how were
6  those portions picked out?
7    A.    Just leafed through it.  There was no
8  direction of -- as to which section to look at.  I
9  read some of the introduction and what the -- who
10 the person was and whether or not I felt it would be
11 of interest.
12           If there was any doubt, I copied it
13 and read it back at my office.
14    Q.    Did you follow that same procedure
15 with regard to the last entry, the bills of lading,
16 invoices, correspondence?
17    A.    Yes.
18    Q.    You were provided with the entire
19 file and you reviewed --
20    A.    I was provided with a file, and then
21 I looked through it, and a portion of it was copied
22 and sent to me.
23    Q.    At your direction?
24    A.    At my direction, correct.
25    Q.    You had said earlier that you

103

1  contacted some -- I think -- I don't know if you
2  said New Jersey DEP, but some regulatory agencies to
3  get materials from them in preparation for the
4  report.
5           Do you recall the complete list of
6  things that you were seeking from the New Jersey
7  DEP?
8    A.    The sequence that occurred is that I
9  actually contacted the state library first, looking
10 for a journal called Waste Age that I had found in a
11 previous work to be useful for finding out the
12 state-of-the-art of a particular -- at a particular
13 time frame.
14           The librarian said they did not have
15 Waste Age, but she did a key word search through her
16 files for similar materials, and came back with a
17 list of 20 or so items -- just the titles and the
18 authors of 20 or so items for me to pick and choose
19 from.
20    Q.    And what was -- were you looking for
21 information about what was state-of-the-art for what
22 time period?
23    A.    The 1970's.
24    Q.    In New Jersey?
25    A.    New Jersey or Pennsylvania, but since

104

1  I was dealing with the -- I did a similar query to
2  the Pennsylvania state library, and the Pennsylvania
3  DEP.
4    Q.    And just focusing on the New Jersey
5  DEP for a moment, which, if any, of the publications
6  the librarian identified for you did you then refer
7  to in creating a report?
8    A.    The two reports to the Congress that
9  we mentioned, and soon we'll go over.
10    Q.    And any other publications?
11    A.    No.  I went to look at all the
12 publications at the librarian's office at the DEP,
13 and those are the only two that I found relevant.
14    Q.    Did you review the hazardous waste
15 regulations of New Jersey for the mid-1970's time
16 period as well?
17    A.    Yes.
18    Q.    And how did you obtain those?
19    A.    It's one of the books on my book
20 shelf.
21    Q.    From that period?
22    A.    Yes.
23    Q.    In what case or in what situation had
24 you come to be familiar with the Waste Age
25 periodical?

105

1    A.    It was a project that dealt with the
2  discharge of hazardous waste at a farm in South
3  Jersey in the -- I don't remember the time frame,
4  but it was -- it was, you know, a decade or two ago,
5  and Waste Age -- I remember reading articles from
6  Waste Age that talked about what folks were doing
7  during that particular time frame contemporaneous
8  with the journal article to how they were managing
9  hazardous waste.
10           So this was from a project maybe ten
11 years ago.  So when this project came along, I said
12 maybe I can look through the Waste Age for that time
13 period and learn a little bit, but I was not able to
14 obtain those copies.
15    Q.    Is the case that you're describing in
16 that chart at the end of Appendix A, do you recall
17 what the name of the case was?
18    A.    I was not the expert.  I was
19 assisting the president of the company.  He was the
20 expert.
21    Q.    All right.  Any other documents that
22 you either requested or looked for in connection
23 with writing this report?
24    A.    I don't believe so, no.
25    Q.    And you mentioned you tried to

K. GOLDSTEIN, P.E.  -  Direct

106

1  contact Pennsylvania, or you did contact PADEP to
2  get some materials.
3        What were the list of materials that
4  you were requesting from PADEP?
5    **A.    The request centered around the --**
6  **any regulation or guidance documents from the**
7  **1970's. I don't remember the exact wording of the**
8  **request.**
9    Q.    And I think you said that you -- that
10  they did not send that material in time for you to
11  use it in connection with this report?
12    **A.    That's correct. I didn't get it**
13  **until a week or two after the report was produced.**
14    Q.    Okay. Did you rely on anything with
15  regard to Pennsylvania hazardous waste regulations
16  in writing your report?
17    **A.    There's some discussion of**
18  **Pennsylvania's hazardous waste program at that time**
19  **in one, or perhaps even both, of those reports to**
20  **Congress, and I relied on that.**
21    Q.    Did you ever -- did you rely on the
22  Pennsylvania hazardous waste regulations from that
23  mid-1970 time period?
24    **A.    No.**
25    Q.    Were you familiar with the

107

1  Pennsylvania hazardous waste regulations from the
2  mid-1970 time period prior to writing this expert
3  report?
4    **A.    No.**
5    Q.    Anything else you relied on in the
6  Pennsylvania section of your expert report?
7    **A.    Not that I could recall.**
8    Q.    When you reviewed the deposition
9  transcripts listed in Appendix B, did you also
10  review the exhibits to the depositions?
11    **A.    Yes.**
12    Q.    Do you know whether or not you had
13  the complete set of the exhibits to those
14  depositions?
15    **A.    I believe I did, because I would**
16  **usually look at the transcript's second or third**
17  **page, which would have a list of the exhibits, and**
18  **I'd try to match them up.**
19        **Maybe I was missing one or two. I**
20  **don't recall. But I thought I had them all, 'cause**
21  **if I didn't, I would have probably called Mr. Sabino**
22  **up and had him chase it down.**
23    Q.    Okay. Did you conduct any interviews
24  in connection with the expert report?
25    **A.    No.**

108

1    Q.    Did you talk with any company --
2  AETC, I should say, representatives in connection
3  with preparing the report?
4        MR. BARNES: Objection, asked and
5  answered.
6        MS. MOONEY: Did I ask that?
7    **A.    No.**
8    Q.    On page one, the first sentence of
9  the third paragraph there that begins with
10  "nonetheless", do you see that?
11    **A.    Yes.**
12    Q.    This says, nonetheless, counsel has
13  requested that Ransom assess the actions of AETC in
14  providing brokering services to hazardous waste
15  generators whose waste was allegedly and improperly
16  disposed at the site in the 1976 to 1977 -- I assume
17  there's a typo there -- you meant time period?
18    **A.    Oh, yes.**
19    Q.    Okay. But leaving that aside, can
20  you -- I'd like to ask you a few questions about
21  exactly what you mean when you state this sentence.
22        When you say, assess the actions of
23  AETC, what exactly do you mean?
24    **A.    Well, my intentions were to show that**
25  **AETC was following the regulations promulgated at**

109

1  **the time that -- during this time period, and they**
2  **were following best management practices during this**
3  **time period.**
4    Q.    Okay. And when you say, in this
5  sentence, brokering services, what do you mean by
6  that?
7    **A.    Brokering services in the context**
8  **that they assisted the two hazardous waste**
9  **generators in finding transporter and disposal sites**
10  **for their hazardous waste.**
11    Q.    Was the concept of brokering waste a
12  concept with which you were familiar prior to
13  becoming involved in this case?
14    **A.    Yes.**
15    Q.    And how did you first hear of this
16  notion of brokering waste?
17    **A.    I don't know when the first I've**
18  **heard of it, but it's fairly common in our business**
19  **to have a broker -- an expert in the field of**
20  **hazardous waste management, to assist either**
21  **companies or consulting firms in proper business**
22  **disposal of material.**
23    Q.    Do you know, when you say it's fairly
24  common, do you mean today?
25    **A.    Yes.**

K. GOLDSTEIN, P.E.  -  Direct

---

**110**

1    Q.    And what about in the mid-1970 -- or
2  let's be more specific -- the 1976/'77 time period?
3    A.    It's a complex question. That's why
4  I've hesitated. But the -- at the time that the --
5  of the 1976/1977 time frame, there were a -- there
6  was a swing in the -- or a change in the type of --
7  in hazardous waste management.
8       A lot of facilities became closed.
9  New facilities were popping up. And the answer to
10  the question is that I have read about firms that
11  did brokering.
12       Again, that time period is not the
13  time period I was involved with this field. But
14  between this case and other cases that I've worked
15  at, it was common, in my knowledge, for there to be
16  companies that assisted generators in finding places
17  for their hazardous waste to be disposed.
18    Q.    When you say facilities were popping
19  up, what facilities are you talking about?
20    A.    Hazardous waste treatment facilities
21  or disposal facilities.
22    Q.    You mentioned that, in the 1976 to
23  1977 period, you weren't familiar with brokering of
24  hazardous waste in particular.
25       When did you first kind of become

---

**111**

1  aware that this was a practice in the hazardous
2  waste management field?
3    A.    Probably in the late seventies or
4  early eighties, when I started to get more involved
5  with the -- the regulatory program at DEP, the water
6  programs that we talked about earlier and the
7  overlaps between the water and hazardous waste
8  programs. I came to understand how things were done
9  in the real world.
10    Q.    Have you ever rendered an expert
11  opinion regarding waste brokering in any other case?
12    A.    I don't believe so, no.
13    Q.    I can probably ascertain the answer
14  to this from your previous answers, but let me ask
15  it anyway.
16       Do you consider yourself to have
17  specialized knowledge or experience in brokering
18  services that were provided during the 1976/1977
19  time period?
20       MR. BARNES: Objection as to form. I
21  think it's the same problem we had before with the
22  use of the term "expert".
23       MS. MOONEY: I didn't use the term
24  "expert".
25       MR. BARNES: I'm sorry.

---

**112**

1       MS. MOONEY: Can you read it back?
2       (The following question is read back:
3  "Question: Do you consider yourself
4  to have specialized knowledge or experience in
5  brokering services that were provided during the
6  1976/1977 time period?")
7       MR. BARNES: I withdraw the
8  objection. To the extent you can answer.
9    A.    For that narrow a question, during
10  that time frame, I would say no, I don't have
11  special expertise, other than what I've read about.
12       However, the concept of brokering is
13  not a complex concept in terms of how the company
14  assists -- a brokerage company or brokering company
15  assists generators to match up with disposal
16  facilities.
17    Q.    Do you mean that, in understanding
18  brokering services, no specialized knowledge or
19  experience is necessary?
20    A.    Well, not in the context of actually
21  being a broker, but to understand what they do, I
22  don't think you need specialized knowledge.
23    Q.    Okay. Going back to the report, the
24  first sentence of the fourth paragraph on that first
25  page, which begins, Ransom's opinions -- do you see

---

**113**

1  that?
2    A.    Yes.
3    Q.    Is the "our" -- o-u-r -- in that
4  sentence kind of the royal we, or is it -- do you
5  mean that to refer to you?
6    A.    It was more the royal we, but I'm the
7  author of the report. So I suppose I am -- a more
8  elegant way would have been -- upon my knowledge
9  would have been more appropriate.
10    Q.    What's more accurate in your opinion?
11    A.    Well, I'm the author of the report.
12  I may have discussed -- in fact, I do recall
13  discussing Pennsylvania regulations with other
14  people in the office, but I did find the historical
15  information that I was seeking.
16    Q.    Did you consult with other people
17  about the requirements, under the Pennsylvania
18  regulations, for hazardous waste during that time?
19    A.    I asked people about it, but there
20  was no information to consult about. There was -- I
21  was looking for information that somebody may have
22  had on their bookshelf -- similar that I have with
23  New Jersey rules -- that I was trying to get from
24  the lib -- state library of Pennsylvania or from
25  PADEP but was unsuccessful.

---

K. GOLDSTEIN, P.E. - Direct

**114**

1     Q.    When you use the "our", do you
2 mean -- who are you referring to, I guess, with
3 that, our knowledge?
4        Is it you and Mr. Waring? Is it
5 Ransom? Is it some other combination of people?
6     A.    As I say, because there was --
7 specifically about the Pennsylvania regulations, I
8 did not get much information from anybody else. The
9 federal and New Jersey regulations were -- and what
10 I do know about the Pennsylvania rules was mine --
11 was my knowledge.
12     Q.    Okay. What specialized knowledge
13 about the federal hazardous waste regulations do you
14 have?
15     A.    Well, I feel I have a special
16 expertise in reviewing regulations and understanding
17 their purpose. So when I do review a set of
18 historical regulations, I can understand the
19 purpose, the goal -- the regulatory goal of the
20 regulations and how it's to be implemented.
21        So in that context, I can read any
22 set of regulations, whether it be hazardous waste or
23 any type of environmental regulation -- I guess I
24 should clarify -- and understand their purpose.
25 I've learned that to be a specialized expertise.

**115**

1 Because even people who have been in the
2 environmental field as engineers or geologists tend
3 to shy away from regulatory documents 'cause they're
4 difficult to understand.
5     Q.    Yes, they are. So one area of
6 expertise that I think you just described was in
7 understanding and interpreting environmental
8 regulations --
9     A.    Yes.
10     Q.    -- just broadly?
11     A.    Yes.
12     Q.    Not hazardous waste, per se, but any
13 environmental regulation; is that right?
14     A.    Fair enough. Sure.
15     Q.    And with regard to New Jersey
16 environmental regulations in particular, I would
17 assume that you feel you have a special area of
18 expertise?
19     A.    Well, sure, 'cause that is the state
20 rules that I am most familiar with.
21     Q.    We already went over the more
22 specific areas of New Jersey regulations that you
23 consider yourself to have specialized knowledge in,
24 I think.
25        Other than this general expertise in

**116**

1 understanding and interpreting environmental regs,
2 what -- do you consider to have any more
3 particularized specialized knowledge with regard to
4 the Pennsylvania regulations?
5     A.    Well, other than your caveat, no.
6     Q.    Okay. Other than the positions that
7 you held at New Jersey DEP, that we discussed in
8 detail before lunch, and I guess the environmental
9 consulting positions that we discussed before lunch,
10 what -- is there any other specific professional
11 experience you have that forms the basis of the
12 opinions that you render in this report?
13     A.    Well, without being contradictory,
14 that kind of covers my whole career.
15     Q.    I understand. I'm trying to make
16 sure I cover it.
17     A.    But the answer is no. But I feel
18 that I had the expertise to do the job.
19     Q.    Okay. Going on to section two of
20 your report, which starts on page two, the second
21 sentence, where you talk about your broad range of
22 technical and regulatory expertise in these
23 different areas, does the work experience that we've
24 already gone through, that you had at New Jersey DEP
25 and the various environmental consulting positions,

**117**

1 form the basis of that range of technical and
2 regulatory expertise?
3     A.    Yes.
4     Q.    Okay. When you say, in the second
5 sentence of the first paragraph on page two, that
6 waste disposal requirements are one of the areas
7 where you have technical and regulatory expertise --
8 and keeping in mind that we already went through
9 your work experience -- what in particular, in that
10 work experience, would constitute this area of
11 technical and regulatory expertise?
12     A.    Well, as you say, we have gone
13 through it with the disposal of liquid hazardous
14 waste, with the disposal of residuals in landfills,
15 with current hazardous waste management
16 requirements.
17     Q.    I am sorry, current hazardous waste
18 management requirement --
19     A.    Yes.
20     Q.    -- today?
21     A.    Yes.
22     Q.    Are you thinking of your
23 environmental consulting experience in that regard?
24     A.    Both, but we talked about the
25 experience with the client, who's the hazardous

Case 2:02-cv-03830-LDD    Document 335-3    Filed 05/23/2008    Page 6 of 40

118

1  waste treatment, and the storage and disposal
2  facility.
3       So having that type of client makes
4  you understand all the different requirements that
5  they are subject to, and so I feel I have an
6  expertise in that.
7       Q.   Got you.  And that was -- I don't
8  remember what you said -- it was the 1990's?
9       A.   It was mid-nineties, yes.
10      Q.   You detail, in the second paragraph
11  of section two, some positions that you held in New
12  Jersey DEP.
13       Are the positions that we spoke about
14  earlier today all -- did we cover everything that
15  you referred to here in the second paragraph?
16      A.   Yes.
17      Q.   And with regard to the last sentence
18  of the second paragraph on page two, did our prior
19  discussion that covered different duties that you
20  had in New Jersey DEP, is that subsumed within the
21  second sentence of the second paragraph here on page
22  two?
23       Did we cover all the ways in which
24  you directed or assisted development in the
25  regulation of new programs?

119

1       A.   That sentence is subsumed by the
2  discussion we had earlier about my work experience.
3       Q.   All right.  If you turn to page --
4  let's turn to page three, which is the beginning of
5  section three in your report.
6       The first sentence, under the
7  heading, factual background, says, the following
8  section is provided for context.
9       What exactly do you mean here?
10      A.   Well, the discussion in the rest of
11  the report would make more sense to a reader if
12  there was some context of the background of the
13  issue.  So I summarize the issue the best I could in
14  the short report and presented it in section three.
15      Q.   What are the factual bases of the
16  statements you make in section three here?
17      A.   The document list that is in Appendix
18  B.
19      Q.   Okay.  Any other factual bases other
20  than that?
21       You can take your time looking
22  over -- when I refer to things in different
23  sections, take your time reviewing it, as long as
24  you need.
25      A.   No, it's -- the document list is the

120

1  factual basis.
2       Q.   And I think you just said this, but
3  is it fair to say that this is merely a summary of
4  information that was provided in some of those
5  documents in Appendix B?
6       A.   Correct.
7       Q.   Does any specialized knowledge or
8  experience on your part underlie any of the
9  statements you make in section three?
10       MR. BARNES:  Can you repeat that
11  question?
12       MS. MOONEY:  Does any specialized
13  knowledge or experience on Mr. Goldstein's part
14  underlie any of these statements made in section
15  three?
16       Rather than go through this line by
17  line, if you have an objection, we can work it out,
18  but, you know, I'd rather go by section than line by
19  line.
20      A.   No.
21      Q.   Okay.  Do you have any firsthand
22  knowledge of any of the events or activities
23  described in section three?
24      A.   No.
25      Q.   Okay.  In the second paragraph on

121

1  page three, the fourth sentence, which begins, AETC
2  brokered business deals -- do you see that?
3       A.   Yes.
4       Q.   There's no footnote here.  What -- if
5  you recall, what is the factual basis of this
6  statement here?
7       A.   Well, the deposition testimony of the
8  two AETC employees or partners.  I believe there was
9  also correspondence between AETC and Ashland and
10  AETC and Diaz concerning establishing the business
11  arrangement.
12       I don't recall anything else.
13      Q.   And does -- when you say brokering
14  business deals, I think you testified previously as
15  to your understanding of the term, brokering waste.
16       Does this "brokering business deals"
17  phrase mean anything different than that?
18      A.   No.
19      Q.   The sentence -- it's kind of in the
20  middle towards -- it's the sixth sentence.  It's a
21  little past the middle, in the second paragraph on
22  page three, it begins, unbeknownst to these two
23  generators -- do you see that sentence?
24      A.   Okay.  Yes.
25      Q.   What is the factual basis for this

K. GOLDSTEIN, P.E.   -   Direct

122

1  statement?
2      A.    I believe it's in -- I believe it's
3  in the -- one of the exhibits to the summary --
4  motion for summary judgment, and it may be also in
5  the interrogatories of -- I don't recall if it's the
6  defendant's answers or the plaintiff's answers. But
7  I recall that that was one of the sources of it.
8        I also believe that one of the --
9  several of the exhibits to deposition testimony
10 referred to some of the EPA notices in the early
11 nineties, when they were trying to establish who the
12 PRPs were, and they would send notices to the
13 different PRPs, and I think AETC got several of
14 these notices, and I think some of that factual
15 basis is there, too.
16     Q.    Okay. So this wasn't an independent
17 conclusion on your part, is that right?
18        MR. BARNES: Objection as to form.
19 I'm not sure I follow what you're asking.
20     Q.    Well, did you use any independent
21 methodology or analysis to arrive at this
22 conclusion, or was it merely a summary of something
23 that was contained in either the exhibits, as you
24 mentioned, or the general notice response?
25        I'm just trying to ascertain whether

123

1  or not you have some independent knowledge in
2  forming this statement.
3      A.    No, I don't have any independent
4  knowledge. It came from the documents reviewed.
5      Q.    Okay. Turning to section four,
6  starting on page four, at the top of this page, it
7  says, 4.0, state-of-the-art of hazardous waste
8  management.
9        What do you mean by state-of-the-art?
10     A.    State-of-the-art, to me, means the
11 way things worked in hazardous waste management,
12 what type of regulatory program, what type of
13 compliance was there, what type of activities did
14 people engage in.
15     Q.    When you say what types of activities
16 people engaged in, do you mean any activities they
17 engaged in or the best -- the best management
18 practices with regard to the management of hazardous
19 waste during this time?
20     A.    Well, I think that any activity that
21 a generator, transporter or treatment storage or
22 disposal facility took -- that that occurred during
23 that time frame.
24     Q.    Can you be more specific than any?
25     A.    Well, you kind -- the question, was

124

1  it proper or improper. It could be either. The
2  state-of-the-art is just what happened. Some people
3  did it properly and some people did not.
4      Q.    I guess my understanding of the term
5  state-of-the-art -- and I could be wrong -- is more
6  what's the best in terms of compliance out there.
7        If you have a different
8  understanding, I should probably establish that
9  early on. It sounds like you do.
10     A.    Well, it was not necessarily the
11 intention to show the best of the activities, but to
12 show the spectrum of activities that took place in
13 hazardous waste management, and how it -- the
14 regulatory program evolved.
15     Q.    So when you have section four,
16 state-of-the-art of hazardous waste management, and
17 then you proceed to discuss, in a chronological way,
18 programs in subsections of section four, when you
19 say state-of-the-art, are you saying that, for each
20 of these time periods, that you treat
21 state-of-the-art of hazardous waste management is
22 what who was doing?
23        I guess I don't understand what the
24 touchstone for state-of-the-art is. If it's just
25 kind of what everyone was doing in their different

125

1  waste --
2      A.    Well, the report obviously speaks for
3  itself. It's a focus, in section four, about the
4  regulatory programs in place at the time, and why
5  certain regulations evolved the way they did.
6        State-of-the-art is -- that's my use
7  of the term. Maybe state of regulatory history
8  might have been a little bit more narrow way of
9  describing it. But what I have in the section is a
10 description of the evolution of the regulatory
11 program.
12     Q.    Okay. So when you say
13 state-of-the-art of the hazardous waste management,
14 do you mean anything different than what the
15 regulations required at the relevant time?
16     A.    What regulations meant at any
17 particular time and how they evolved over time, but
18 yes, I agree with your -- the way you phrased the
19 question.
20     Q.    Okay. I'm going to ask you a series
21 of questions that are going to be redundant
22 pertaining to these different subsections and --
23        MR. BARNES: We're at about an hour
24 since we came back from lunch. If this is a natural
25 breaking point --

K. GOLDSTEIN, P.E.  -  Direct

126

1    MS. MOONEY:  That's fine.
2    (Recess taken.)
3    Q.    I'm going to be going through, with
4  you, different sections in section four and in
5  section five and section six as well.
6    I'm going to be asking you a series
7  of questions that are redundant of each other, but I
8  need to get answers to these questions for the
9  different subsections.
10    So it may be that you -- and we'll
11  see how this develops -- but you might find yourself
12  answering the same thing over and over, which is
13  fine.
14    But let me just start, and I'm going
15  to ask you these questions, and I'll be asking them
16  in different sections and in different -- in
17  subsequent sections as well.
18    For section 4.1, which begins on page
19  four of your report, and is headed, national
20  program, other than the documents that you cite here
21  in the footnotes for section 4.1, what are the
22  factual bases of the statements that you make here
23  in section 4.1?
24    Let me also say, take as long as you
25  need looking through section 4.1 before you answer

127

1  the question.
2    A.    Well, other than the list of the
3  documents that are listed in Appendix B or
4  attachment B, other factual bases, some of this is
5  based on my own personal knowledge.
6    As we went through my work history, I
7  talked about different overlaps of the programs. So
8  I have some familiarity with the -- some of the
9  conditions discussed here.
10    Q.    Okay.  Is it possible for you to
11  identify the statements you make that come from your
12  personal knowledge of whatever issues at hand -- let
13  me ask this:  For the statements that you make in
14  section 4.1 that are footnoted, are those
15  statements -- the factual bases for those statements
16  the footnote?
17    A.    Yes, although I may have some
18  independent knowledge of it.  But yes, I cited the
19  source of the information.
20    Q.    Okay.  And for the statements that do
21  not have a footnote, is it more likely to be the
22  case that those are just statements that the factual
23  bases would be your personal knowledge of the issue
24  at hand?
25    A.    Yes, or might be -- what do they

128

1  call -- the sentences that connect different
2  thoughts.
3    Q.    Well, for example, let's look at the
4  second paragraph on page four.  The second sentence
5  in that paragraph says, few controls existed over
6  hazardous waste.
7    What's the factual basis of that
8  statement?
9    A.    I think part of it is the reports
10  that are footnoted earlier and later, that discuss
11  this issue, and part of it is my own knowledge.
12    Q.    And when you say your own knowledge,
13  what do you mean?
14    A.    Well, I -- from about the late
15  seventies onward, I was -- had knowledge of the
16  regulation of a facility based upon my work at the
17  DEP.  And even if you're not in a particular section
18  of the department, you know what's going on.
19    You read the paper.  You know why
20  different problems occur.  So that's part of my
21  personal knowledge.
22    Q.    And -- all right.  This section 4.1
23  deals with state-of-the-art of hazardous waste
24  management in the 1970's from a national -- on a
25  national level, is that right?

129

1    A.    Yes.
2    Q.    Does any specialized knowledge or
3  experience on your part underlie the statements you
4  make regarding the national program of hazardous
5  waste management in 1970's?
6    A.    Well, sure.  I mean, I -- I was
7  involved with regulatory oversight during some of
8  this time period.
9    I remember the RCRA regulations being
10  promulgated by EPA.  I remember the -- well, the
11  consternation during this time period, between the
12  time RCRA was passed until the regulations came out,
13  and how it was going to be implemented in New
14  Jersey.
15    So yes.  The answer is yes.  I do
16  think there's special expertise necessary to
17  understand how complex an issue it was at that time,
18  and how -- even though regulations were not in place
19  that mandated or covered every aspect of hazardous
20  waste management, that the world still spun, that
21  people still generated waste, it got disposed of.
22    The department did the best that it
23  could to manage it all, but while all this flux was
24  going on, things still happened that the waste got
25  generated, it got transported, then it got disposed.

K. GOLDSTEIN, P.E.  -  Direct

130

1  So there was -- having been through it and under --
2  and having been a part of the regulatory atmosphere,
3  I think is a specialized expertise.
4      Q.    Other than being a part of the
5  regulatory atmosphere, as you put it, do you have
6  any specialized or particularized experience
7  regarding the meaning of RCRA, other than being at
8  the agency?
9      A.    Well, it was not just being at the
10  agency, but my talent, if you will, at the DEP was
11  to establish regulatory programs, and knowledge of
12  the federal law was paramount to establishing a
13  program in New Jersey.
14      Q.    When you say the federal law, do you
15  mean RCRA?
16      A.    Yes.  Yes -- or any federal law.  I
17  mean, there was the Clean Water Act more times than
18  I want to count.  I was involved in developing
19  regulatory programs at several levels that we talked
20  about earlier.  And included in that is being able
21  to understand the regulations -- read them and
22  understand them, and to know what the impact is
23  going to be on the regulated community in the state.
24      Q.    Did you ever have any involvement in
25  administering RCRA or the regulations promulgated

131

1  pursuant to RCRA?
2      A.    We talked about that earlier, that --
3  having to do with the -- the sludge management, the
4  industrial waste disposal.  Some of that was
5  hazardous waste for pretreatment.
6          We talked about the discharge of
7  industrial wastewater in the POTWs, and some of that
8  is covered by RCRA.  The disposal of the residuals
9  from underground storage tanks has some RCRA
10  elements to it.
11          I don't remember if -- I don't
12  remember all the things we talked about it, but I
13  think we hit them earlier.
14      Q.    Okay.  I'm going to be asking these
15  questions with regard to each subsection, so I don't
16  want you to get frustrated or upset or anything, but
17  I need to know the bases, both from a specialized
18  knowledge standpoint and a factual standpoint, for
19  the statements made here.  I know it's artificial.
20  I just want to let you know that.  I'm not trying to
21  harass you.
22          Okay.  Did you have any personal
23  involvement in the promulgation of RCRA?
24      A.    No.
25      Q.    Let's turn to page seven, if you

132

1  would, section 4.2.1.  Just let me take a moment.
2  This is just one page -- well, it goes onto the next
3  page at the very top, but just review it and let me
4  know when you've had a chance to review it.
5      A.    Okay.
6      Q.    What are the factual bases of the
7  statements you make in this section?
8      A.    I believe it's strictly the review of
9  the code -- review of the code that I performed.
10      Q.    And when you say review of the code,
11  do you mean the New Jersey Sanitary Code, effective
12  date, July 1st, 1970?
13      A.    Yes.
14      Q.    And in particular, do you mean
15  Chapter 8 of the New Jersey Sanitary Code from 1970?
16      A.    Yes.
17      Q.    Anything else that forms a factual
18  bases of section 4.2.1?
19      A.    No.
20      Q.    Okay.  Did you have any
21  involvement in the promulgation of Chapter 8 of the
22  New Jersey Sanitary Code?
23      A.    No.
24      Q.    Do you have any specialized knowledge
25  or experience that would make you an expert in the

133

1  meaning or interpretation of the New Jersey Sanitary
2  Code?
3      A.    Yes.
4      Q.    Okay.  Can you detail that?
5      A.    Again, that we talked about prior,
6  that my experience as a regulator, and being in the
7  environmental business for 30 years, allows me to
8  read previously adopted regulations and have an
9  understanding of what their purpose and breadth is.
10      Q.    Anything else?
11      A.    No.
12      Q.    Did you have any personal involvement
13  in the events or activities that you describe in
14  section 4.2.1?
15      A.    No.
16      Q.    Have you had any involvement in
17  administering the New Jersey Sanitary Code?
18      A.    No.
19      Q.    Have you had any involvement in
20  enforcing the New Jersey Sanitary Code?
21      A.    No.
22      Q.    Does any specialized knowledge or
23  experience, on your part, underlie the statements
24  you make in section 4.2.1, other than what you've
25  just answered before about experience as a regulator

K. GOLDSTEIN, P.E.   -   Direct

134

1  and the 30 years' experience in the environmental
2  industry?
3       MR. BARNES: Objection as to form.
4  I'm -- it may be that I'm just dense today, but I'm
5  not sure I followed that question.
6       Q.   Okay. Let me restate it. Does any
7  specialized knowledge or experience, on your part,
8  underlie the statements you make in section 4.2.1?
9       MR. BARNES: Objection. Asked and
10 answered.
11      A.   Yeah, other than what -- my
12 experience and expertise, no.
13      Q.   Other than citing or paraphrasing the
14 information that's contained in the New Jersey
15 Sanitary Code, did you employ any methodology or
16 analysis to arrive at the statements you make in
17 section 4.2.1?
18      A.   No.
19      Q.   Let's go to the next section, which
20 is 4.2.2, which starts on page eight, and goes over
21 to page nine.
22      If you want to take a moment and just
23 re-review that section, let me know when you're
24 done.
25      A.   Okay.

135

1       Q.   Okay. What are the factual bases of
2  the statements that you make in section 4.2.2?
3       A.   The -- a copy of the 1974 rules.
4       Q.   When you say the copy of the 1974
5  rules, which rules are you referring to?
6       A.   NJAC 7:26.
7       Q.   Okay. Did you have any personal
8  involvement in the promulgation of the 1974
9  amendments to the New Jersey hazardous waste regs?
10      A.   No.
11      Q.   Do you have any specialized knowledge
12 or experience that would make you an expert in the
13 meaning or interpretation of the 1974 amendments to
14 the New Jersey hazardous waste regs?
15      A.   Same answer as before. The expertise
16 in regulatory review, plus experience in the
17 business.
18      Q.   Did you have any personal involvement
19 in the events or activities that you describe in
20 section 4.2.2?
21      A.   No.
22      Q.   Have you had any involvement in
23 administering the 1974 amendments to the New Jersey
24 hazardous waste regulations?
25      A.   No.

136

1       Q.   Have you had any involvement in
2  enforcing the 1974 amendments to the New Jersey
3  hazardous waste regulations?
4       A.   No.
5       Q.   Other than citing or paraphrasing
6  information in the 1974 amendments to the New Jersey
7  hazardous waste regulations, did you employ any
8  methodology or analysis to arrive at the statements
9  you made in section 4.2.2?
10      A.   Yes.
11      Q.   What's that?
12      A.   Well, as I read through this, there
13 were a couple of places where I had a statement
14 that was my own opinion or -- of my -- a statement
15 of my own, rather than a recitation of the rule.
16 There's several of them throughout this section.
17      Q.   Can you identify them for me?
18      A.   Second sentence of the second
19 paragraph -- well, actually, let me back up.
20      Q.   Sure.
21      A.   Second sentence of the first
22 paragraph, New Jersey DEP did prepare a definition
23 of hazardous waste but it was not detailed or
24 useful.
25      Q.   And that -- how did you arrive at

137

1  that conclusion?
2       A.   I read the definition. I didn't find
3  it detailed or useful. I -- from a regulatory
4  perspective, I did not find it detailed or useful,
5  that it would be able to be understood by the
6  regulated community or enforced by the
7  administrative agency.
8       Q.   And why was that?
9       A.   It wasn't detailed enough for people
10 to understand what hazardous waste was and was not.
11      Q.   And in what way was it not detailed
12 enough?
13      A.   It didn't describe, in enough detail,
14 what waste would be hazardous and what wastes are
15 not hazardous.
16      Q.   Is a copy -- I believe a copy of this
17 is included in the work pile that Mr. Sabino
18 produced, is that right?
19      A.   Yes.
20      Q.   Let's flag this, and maybe we can
21 look at it, and go into a little more depth with the
22 document in front of us, just for purposes of
23 clarity.
24      All right. And were there any other
25 statements that were not mere paraphrasing or

K. GOLDSTEIN, P.E.   -   Direct

138

1  citation of the regs?
2      A.    The second paragraph, the first and
3  second sentence. The first sentence talks about a
4  broader amendment to the rules provided a more
5  substantial change, that's my statement. A detailed
6  definition of hazardous waste was provided for the
7  first time, that's my statement.
8      Q.    Let's look at the first one.
9  However, in June 1974 -- what did you base this
10  conclusion on?
11      A.    Comparison between the June '74
12  regulations and earlier versions of the regulations.
13      Q.    And in the second sentence here that
14  starts, a detailed definition, how -- I mean, what
15  is your own -- you said this is not a paraphrasing
16  or a cite -- you know, it's not a --
17      A.    Well, the fact that it's provided for
18  the first time; that, prior to that, the definition
19  was as we just discussed, not very detailed or
20  useful, but the definition of hazardous waste in
21  1974 was more useful.
22      Q.    When you say more useful, do you mean
23  to the regulated community?
24      A.    And regulators.
25      Q.    In what way to the regulators?

139

1      A.    For enforcement purposes, that the --
2  knowing what a hazardous waste was at that time
3  would allow proper implementation of the rule.
4      Q.    Okay. Any other statements here that
5  aren't paraphrases?
6      A.    Well, the first sentence of paragraph
7  three, hazardous waste generator has similar
8  requirements as the waste producer, but has the
9  added responsibility, and so on.
10      Of that sentence here, I compared the
11  1970 rules with the 1974 rules to show that there
12  were further requirements for the hazardous waste
13  generator.
14      In fact, this was the first time the
15  term, "hazardous waste generator", came out.
16      In the second sentence, the
17  statement, this is the first example in the state
18  rules of the cradle to grave notion of having the
19  generator focus on the final disposition of the
20  waste, that's my own statement.
21      And the last sentence, this allowed
22  DEP to start tracking the volume of waste generated.
23      Q.    That's -- what is that?
24      A.    What is that?
25      Q.    You said that --

140

1      A.    Generators were required, after 1974,
2  to submit a list to the DEP annually of where their
3  waste went.
4      Q.    I mean, all of these things, it
5  seems, are just statements of what the 1974
6  regulations contained.
7      I guess I'm not understanding, when
8  you say it comes from your own knowledge or
9  experience, how that is the case?
10      A.    Well, you didn't quite ask that. I
11  thought the question was where are the statements
12  that are not paraphrased from the regulations.
13      To me, the evolution of the program
14  is a valuable aspect of this report. And my
15  expertise, some of it, is from just reading
16  regulations that were -- pre-dated my exposure.
17      Like in 1974, I am -- I was still in
18  college. I didn't know from RCRA. But after --
19      Q.    You probably did know from RCRA.
20      A.    Probably -- actually, I probably did.
21  At least I understood -- had some basis for
22  knowledge. But the -- as the regulations evolved
23  and I was at the department, there's more and more
24  of my day-to-day involvement with these regulations.
25      But I'm not sure that someone without

141

1  the expertise can even prepare this section. I
2  mean, maybe lawyers can, 'cause they're used to
3  looking at this, but not too many other people who
4  don't have this expertise can do that.
5      Q.    All right. So it sounds as if the
6  methodology involved a comparison between the 1974
7  hazardous waste regulations or prior regs, is that
8  right?
9      A.    Yes, with the highlight on points
10  that allowed better administration or prior versions
11  of the entire hazardous waste management program.
12      Q.    Let's turn to 4.2.3, which starts on
13  page nine. Why don't you just take a moment and
14  look this over.
15      A.    Okay.
16      Q.    Okay. What are the factual bases of
17  the statements you make in section 4.2.3?
18      A.    The code at that time, again, 7:26.
19  The rules that were promulgated on May 1st, 1978.
20      Q.    Did you have any personal involvement
21  in the promulgation of the 1976 amendments to the
22  New Jersey hazardous waste regs?
23      A.    I may have had a peer review of them.
24  It would be about the right time frame.
25      Q.    Can you describe that peer review

K. GOLDSTEIN, P.E.  -  Direct

142

1 process in a little bit more detail? I don't think
2 we fully got into that process.
3      A.    Sure. Regulations that were in the
4 process of drafted -- being drafted by particular
5 programs would be circulated to other programs
6 within the department that might have some type of
7 overlap, and the program managers were asked to
8 comment on the rules as drafted to see if changes
9 were necessary or recommended or suggested to the
10 implementing program.
11      Q.    Were the comments -- when the
12 proposed regulations were disseminated amongst the
13 program people, or the different program people,
14 were the comments meant to be specific to whatever
15 division those program people were in or could they
16 be regarding anything?
17      A.    It could be anything.
18      Q.    Okay.
19      A.    It could be grammatical. It could be
20 spelling. It could be very substantive.
21      Q.    In any of the peer reviews that you
22 were engaged in, did you ever submit any suggested
23 comments?
24      A.    I'm sure, yes.
25      Q.    Any that you recall on the waste

143

1 regulations?
2      A.    Not specifically.
3      Q.    Okay. Turning back to 4.2.3, what is
4 the specialized -- if any, what is the specialized
5 knowledge or experience that would make you an
6 expert in the meaning or interpretation of the 1978
7 amendments to the New Jersey hazardous waste
8 regulations?
9      A.    Same answer as before, with the
10 overall experience in the field and experience in
11 regulatory programs.
12      Q.    Did you have any personal involvement
13 in the events or activities that you describe in
14 section 4.2.3?
15      A.    As I said before, I may have had a
16 peer review of the regulations prior to their
17 adoption.
18      Q.    Did you have any involvement in
19 administering the 1978 amendments to the hazardous
20 waste regulations?
21      A.    Same answer as before. This is the
22 time period where we were dealing with the
23 industrial waste under sludge management, and the
24 industrial wastewaters under the industrial
25 pretreatment program. So there may have been some

144

1 involvement.
2      Q.    Did you have any involvement in
3 enforcing the 1978 hazardous waste regulations?
4      A.    No, not that I can recall.
5      Q.    Did you employ any methodology or
6 analysis to arrive at the conclusions you make in
7 section 4.2.3, other than paraphrasing or comparing
8 the 1978 amendments to other regulations?
9      A.    Well, I think the last two sentences
10 are indicative of the milestone that these
11 regulations became, or upon their promulgation,
12 because of the manifest system, it was a seen
13 change, in terms of being able to effectively manage
14 the hazardous waste program in New Jersey, 'cause
15 now the waste could be tracked.
16      So this was a -- I tried to show, at
17 the end of the section, that this was a big deal.
18 This was a very big deal. And the fact that New
19 Jersey implemented this before the feds did, and
20 that was -- you know, stirred up a lot of issues
21 that the department had to address.
22      Q.    Did the implementation of the
23 manifest system affect the program that you were in
24 at the time?
25      A.    To a small degree. Some of the --

145

1 some of the ways -- when we developed our regulatory
2 program for sludge management industrial
3 pretreatment, we had to kind of steer our clients,
4 if you will, the regulated community to making sure
5 they fulfilled their duties under the manifest
6 program.
7      So in that regard -- in that small
8 regard -- yes.
9      Q.    Turning to your conclusions at 4.2.4,
10 which appear on pages nine and ten, I'm going to ask
11 you some of the same questions.
12      I'm going to ask you, these are your
13 conclusions, which I -- I should ask you, how are
14 these statements in 4.2.4 different than the
15 preceding statements in the subsections before --
16 subsections of four?
17      A.    Well, they're summary conclusions --
18 just like the section is entitled -- on the
19 evolution of the hazardous waste management program
20 in New Jersey from 1970 till '78.
21      Number one is that there was an
22 awareness that there was a problem of hazardous
23 waste disposal, and that the regulatory agencies
24 knew about the problem and were taking some steps to
25 fix it by the passage, in '70, of the Chapter 8 of

K. GOLDSTEIN, P.E.  -  Direct

146

1  the sanitary code.
2  Number two talks about the evolution
3  of the rules, to the point where the manifest became
4  the identifying method of tracking the waste from
5  cradle to grave.
6  And then, in '74, it talks about the
7  awareness of -- that the unmanaged disposal of
8  hazardous waste was contaminating groundwater and
9  banned all future disposal into landfills.
10  I think it's a very -- all three are
11  important statements.
12  Q.  Okay. I wasn't questioning that they
13  were important. I was just asking how they differ
14  in kind from the preceding statements that describe
15  or compare the various regulatory regimes at
16  different time periods.
17  A.  Well, I tried to put it, not
18  necessarily in the comparison mode for the
19  conclusions, but what did all this mean.
20  Yes, there were three or four sets of
21  regulations that got passed, but what happened at
22  the end? What was the good that happened at the end
23  of this eight-year period?
24  And the good is the manifest system
25  and the banning of unmanaged landfill disposal were

147

1  both good things that came out of these programs.
2  Q.  Okay. And are the factual bases for
3  these three conclusions that you make, at 4.2.4, the
4  same factual bases that we've discussed in the
5  preceding subsections of 4.0?
6  A.  Yes. Yes.
7  Q.  Any other factual bases other than
8  what we've discussed for the other section -- four
9  subsections?
10  A.  Not to split hairs, but in number
11  three, I use the term "contaminating groundwater",
12  and I'm not sure that's in the rules themselves.
13  But that's my own knowledge of why it was done, and
14  certainly history has shown that that problem
15  occurred at these landfills.
16  Q.  Other than the specialized knowledge
17  or experience that you testified underlies the
18  preceding subsections of 4.0, is there any
19  specialized knowledge or experience that underlies
20  these conclusions?
21  MS. FLAX:  Are you limiting this to
22  4.0 in its entirety?
23  MS. MOONEY:  When I say subsections
24  of 4.0, I mean all -- four-point -- well, 4.0,
25  'cause the 4.1, 4.2, 4.3 are subsections of 4.0.

148

1  MS. FLAX:  He hasn't addressed 4.3
2  yet. You're asking him a broad question. I'm just
3  trying to make sure that I didn't miss something.
4  MS. MOONEY:  I see what you're
5  saying. You're right.
6  Q.  I'm not including 4.3, which is the
7  next section.
8  When I say the subsections -- thank
9  you -- of 4.0, I mean what we've already discussed
10  up to 4.2.4.
11  A.  Repeat the core of the question now.
12  Q.  Other than the specialized knowledge
13  or experience that you testified underlies the
14  preceding subsections of section 4.0, is there any
15  specialized knowledge or experience on your part
16  that underlies the conclusions you make in section
17  4.2.3?
18  A.  Again, other than of the
19  contaminating groundwater issue of number three, and
20  all the other expertise we talked about earlier,
21  that would cover it.
22  Q.  Can you describe the methodology or
23  analysis you used to arrive at these conclusions at
24  4.2.4?
25  A.  I'm sorry, could you repeat that?

149

1  Q.  Can you describe the methodology or
2  analysis you used to arrive at the conclusions you
3  make in 4.2.4?
4  A.  Well, based upon the review of the
5  various sets of regulations, I came to these
6  conclusions based upon my review.
7  I reviewed the different parts of it.
8  I compared different regulations and how they
9  evolved over time. The starting date of when DEP
10  was aware of the problem -- at least, as I say --
11  was in 1970. It may actually have been earlier.
12  But that's when they adopted regulations.
13  So the review of the rules, the
14  evolution of the rules, and my knowledge of what the
15  lack of rules -- the problems that could develop
16  from the lack of the rules presented these opinions.
17  Q.  Okay. It wasn't a trick question.
18  It's just -- it's a self-evident question that I
19  need to ask.
20  Turning to section four-point -- let
21  me just back up real quick.
22  In your opinion, was AETC, as a
23  broker, subject to any regulatory requirements in
24  New Jersey in 1976 and 1977?
25  A.  AETC was, as a broker, to -- I guess

K. GOLDSTEIN, P.E.   -   Direct

150

1  that's subject to the way you word the question --
2  no, they were not. They were obligated, as a
3  business, to assist their clients to comply with the
4  regulations. But, again, just as a broker.
5        There was no specific requirements,
6  that I'm aware of, or were aware of at that time,
7  that they were subject to.
8      Q.    Let's go to 4.3. The first sentence
9  on page ten, under 4.3, in the second paragraph,
10  which starts, Pennsylvania state officials -- I
11  think I know the answer to this, but I'll ask you
12  anyway -- what is the factual basis of that
13  statement?
14      A.    The report to Congress dated January
15  23, 1979.
16      Q.    We'll ascertain later which of the
17  January 1979 reports it is --
18      A.    Okay.
19      Q.    -- but that's what I thought.
20        All right. And I believe you
21  testified to this earlier as well. Did you review
22  the hazardous waste management regulations in effect
23  in Pennsylvania in 1976 and 1977 in preparing your
24  report?
25      A.    No.

151

1      Q.    Okay. Was that simply because you
2  couldn't locate a copy --
3      A.    That's correct.
4      Q.    -- of the regs?
5        Okay. For the rest of the statements
6  you make in section 4.3, what are the factual bases
7  for those statements?
8      A.    I don't recall. I'm not sure if I
9  got this off a website or some document, PADEP
10  document. I didn't receive the regs till after the
11  report. I must have gotten this off the website.
12  There must have been a history of waste management
13  discussion. I don't really recall.
14      Q.    Did you rely on documented materials
15  in drafting your report?
16        When I say undocumented, what I
17  really mean is that were on the Internet or
18  available through some electronic means which is
19  not, you know, a material object in this dimension.
20      MR. BARNES: Objection as to form.
21  I'm fairly certain that that's objectionable as to
22  form, if only for the use of the term "dimension".
23      Let the record reflect that we are
24  all laughing. I'm going to assume you are going to
25  rephrase the question.

152

1      Q.    Other than the documents that are
2  listed in Appendix B of your report, did you rely on
3  any documents or information available solely via
4  electronic means?
5      A.    Well, as I -- I answered earlier,
6  I -- I have a -- I don't really recall where I got
7  these particular dates, but I may have gotten it off
8  the PADEP website. It's certainly not germane to
9  the opinion that I've offered in the report.
10      Q.    What's not germane to the opinion?
11      A.    The dates of the Pennsylvania -- the
12  first paragraph of section 4.3, Solid Waste
13  Management Act date and the Chapter 75 date of
14  promulgation, and amendment.
15      Q.    The second sentence of the first
16  paragraph under 4.3 that says, these rules were
17  amended in 1977 to specifically define and manage
18  hazardous wastes, does that imply that, prior to
19  1977, the regulations in Pennsylvania did not
20  specifically define or manage hazardous waste?
21      A.    That's the inference that's given. I
22  didn't do any research to verify that.
23      Q.    Do you know what the regulatory
24  requirements, with regards to the transportation and
25  disposal of hazardous wastes, were that were in

153

1  effect in Pennsylvania in 1976 and 1977?
2      A.    No. No, I'm not familiar with them.
3      Q.    In your opinion, was AETC, as a
4  broker, subject to any Pennsylvania regulatory
5  requirements pertaining to hazardous wastes in 1976
6  and 1977?
7      A.    Other than to -- other than to
8  properly assist their clients, I would say no --
9  excuse me, I should say I don't know.
10      Q.    Did you have any personal involvement
11  in the promulgation of any Pennsylvania regulations
12  pertaining to hazardous wastes?
13      A.    No.
14      Q.    Do you have any specialized knowledge
15  or experience that would make you an expert in the
16  meaning or interpretation of the Pennsylvania
17  hazardous waste regulations?
18      A.    Again, same answer as before, where I
19  have an expertise in reviewing regulations.
20      Q.    Did you have any personal involvement
21  in the events or activities described in section
22  4.3?
23      A.    No.
24      Q.    Have you had any involvement in
25  administering the Pennsylvania hazardous waste

K. GOLDSTEIN, P.E.  -  Direct

154

1  regulations?
2     A.   No.
3     Q.   Have you had any involvement in the
4  enforcing the Pennsylvania hazardous waste
5  regulations?
6     A.   No.
7     Q.   Did you employ any methodology or
8  analysis in arriving at the statements that you make
9  in section 4.3, other than paraphrasing documents in
10  Appendix B or that you got on the Internet?
11     A.   No.
12     Q.   All right. Let's turn to section
13  5.0, which starts on page 11. If you could take a
14  moment and just look quickly over section 5.1, which
15  is 11 and 12, and just let me know when you've had
16  an opportunity to look at that.
17     A.   Okay.
18     Q.   In section 5.1, you make a number of
19  statements regarding the motivations of Messrs.
20  Leuzarder and Landmesser in starting up AETC,
21  specifically the last two sentences of the first
22  paragraph, the first sentence of the second
23  paragraph, and the third and fourth sentences of the
24  second paragraph and the last two sentences of the
25  second paragraph.

155

1     If you want to take a moment to look
2  at those, that's fine, and take your time, but my
3  question is, what were the factual bases of these
4  statements, other than the deposition transcripts
5  that you cite in the footnoted sections of section
6  5.1?
7     MR. BARNES: Objection, compound
8  question. Objection as to form. You're calling for
9  a narrative as well.
10     A.   This section is predominantly a
11  summary of the deposition transcripts. I have some
12  independent knowledge of the events, but the
13  deposition transcripts speak for themselves in terms
14  of their discussion of AETC's reasons for start-up.
15     Q.   And what is the personal knowledge
16  you have of these events?
17     A.   The -- I have some knowledge of the
18  effect of the disposal of material at Kin-Buc. I
19  have some knowledge of the fact that hazardous waste
20  was kind of a non-profession at the time, that it
21  was handled by garbagemen, and the fact that -- that
22  the passing of regulations which banned the landfill
23  acceptance of hazardous waste helped trigger gains
24  in the industry, because now it was no longer
25  acceptable to cheaply dispose of hazardous waste.

156

1     When it got more expensive, that
2  created a whole evolution of new hazardous waste
3  treatment and disposal facilities.
4     Q.   And what prior knowledge did you have
5  about the effect of disposal of material on Kin-Buc?
6     A.   While I was at the DEP, one of the
7  issues I dealt with, I believe, in the industrial
8  pretreatment program, was the discharge of leaching
9  from the treatment system that got built at Kin-Buc,
10  in the early eighties, to treat the contamination
11  which was present at that -- it's a superfund site.
12  And I remember reading a summary of the reasons why
13  the contamination was present -- a little bit of the
14  history of the landfill.
15     Q.   And did that include the statement
16  you make in the second paragraph on page 11, that --
17  in the middle -- due in large part to the
18  unsophisticated methods of waste disposal, Kin-Buc
19  charged lower prices to accept waste.
20     Is that what you're --
21     A.   Yes, that's part of it. There was no
22  real treatment taking place at the landfill, other
23  than opening up the back of a tank wagon and letting
24  the liquid flow onto the waste that was present.
25     Q.   And you also said you had some

157

1  independent knowledge of the handling of hazardous
2  waste by garbagemen. Can you describe what that
3  knowledge is?
4     A.   Again, the knowledge is based upon
5  the experience I had at DEP in dealing with
6  different superfund sites and other cleanup at the
7  different properties in New Jersey where the --
8  there was no separate profession for -- there was
9  a hazardous waste management program that was
10  followed across-the-board. And as a result, people
11  got rid of waste in the cheapest way they could.
12     And the garbagemen were picking it
13  up, and they just said bye-bye to their waste
14  without any real knowledge or care about where it
15  went to, as long as it was out of there own site.
16     Q.   Did you have any contemporaneous
17  knowledge of that practice?
18     MR. BARNES: Objection as to form.
19     MS. MOONEY: What?
20     MR. BARNES: What contemporaneous
21  time do you mean?
22     Q.   Did you have any contemporaneous
23  involvement in the activity that you just described
24  with regard to garbagemen handling hazardous waste?
25     A.   I recall that being one of the

K. GOLDSTEIN, P.E.  -  Direct

158

1 positive by-products of the passage of all the
2 regulations, is that it set up a whole new industry
3 of hazardous waste transporters and disposal
4 facilities, where the generators at least had
5 options of what to do with their waste, where,
6 before, the options were fairly limited.
7      Q.    Did you have any personal involvement
8 in any of the statements pertaining to AETC in
9 section 5.1?
10     A.    No.
11     Q.    Turning to 5.2, why don't you look
12 over it for a minute.  Let me know when you've had a
13 chance to do it that.  It goes to page 13.
14     A.    Okay.
15     Q.    Can you describe the factual bases of
16 the statements that you make in section 5.2?
17     A.    The depositions of the two AETC
18 individuals and the answer to plaintiff's
19 interrogatories, and the responses of plaintiff to
20 AETC's interrogatories.
21     Q.    Anything other than the documents you
22 just described that you cited at the bottom in a
23 footnote -- just statements -- made in section 5.2?
24     A.    No other factual basis.
25     Q.    And does that include the statements

159

1 that do not have a footnote in the section?
2      A.    The only statement I saw that was not
3 directly from the -- those citations was the first
4 sentence of the fourth paragraph.  It says, during
5 this time period, government regulations were in the
6 process of changing, and then the next sentence
7 starts, due to the closure of Kin-Buc and the
8 increased attention being paid by regulatory
9 officials -- that's some of my own thoughts, in
10 addition to the deposition transcripts.
11     Q.    And when you say some of your own
12 thoughts, do you just mean your general experience
13 of your knowledge of waste practices at that time?
14     A.    Yes, and that was at the time that I
15 was at DEP.  So it was some knowledge as things were
16 occurring.
17     Q.    When you were at DEP, did you have
18 any colleagues or friends in the waste management
19 division that you conferred with on a regular basis?
20     A.    Oh, yes.
21     Q.    And did you confer about changes in
22 the regulatory regime for treatment of waste and
23 waste management?
24     A.    Yes, that would be discussed.  I
25 mean, we wouldn't necessarily go over there to talk

160

1 about regulations, but we were all interested in
2 what everyone else was doing, and to hear about
3 someone else's concerns about the -- their own
4 program and how it was changing, or what the
5 regulations they were providing were trying to do
6 and what enforcement actions they were doing.
7      It's always very interesting.
8      Q.    Did you have any personal involvement
9 in any of the events or activities that you describe
10 in section 5.2?
11     A.    No.
12     Q.    Okay.  Other than citing or
13 paraphrasing the footnoted documents, did you employ
14 any methodology or analysis in arriving at the
15 conclusions that you make in section 5.2?
16     A.    Well, other than the mention I make
17 at the fourth paragraph, the answer is no.
18     Q.    And does any specialized knowledge or
19 experience on your part underlie any of the
20 statements made in 5.2?
21     A.    Again, with that same paragraph four,
22 the answer is no.
23     Q.    And for paragraph four, what is the
24 different specialized knowledge or experience that
25 would underlie those statement?

161

1      A.    Oh, that the government regulations
2 are in the process of changing.  The -- as I said
3 earlier, the -- before the regulations evolved into
4 the forms in the late seventies, it was difficult
5 for the regulated community to know what a hazardous
6 waste was, and for DEP to effectively enforce it.
7      The fact that the regulations were
8 changing to require folks to start paying attention
9 to hazardous waste, and to fill out manifest forms,
10 made it a difficult time for generators, because
11 they had no clue until they got instructed of what
12 to do, and AETC provided a valuable service.
13     I mean, that -- maybe the words, I'm
14 paraphrasing out of one of the depositions, but that
15 type of service should not be understated because of
16 the complexity of the regulations.
17     Q.    And your -- what specialized
18 knowledge or experience on your part allows you to
19 make that opinion or to make that conclusion?
20     A.    Well, I think just reading the regs
21 doesn't give you the flavor.  You had to be there --
22 I mean, I -- as we said, I wasn't quite there in '76
23 doing this while AETC was, but this flux was present
24 probably till the RCRA regs came out in '80 or '81,
25 the federal regs.

K. GOLDSTEIN, P.E.   -   Direct

162

1          So for this five-year time frame,
2    there was a lot of this -- of these issues that
3    generators had to deal with of how to properly
4    dispose of their waste, and it just permeated the
5    department because of sites like Kin-Buc, and the
6    other couple of dozen superfund sites in New Jersey
7    that were caused by the improper disposal of
8    hazardous waste.
9          Q.    And still, though, I guess I'm not
10   understanding the particular specialized knowledge
11   that underlies this statement.
12          I mean, you're talking about being at
13   the agency and kind of being in the thick of this
14   great change.
15          Can you pinpoint, in a more precise
16   way, exactly what experience or what specialized
17   knowledge would allow you to make the statement
18   definitively?
19          A.    Well, I'm probably repeating myself,
20   but the part of the other issue in this case is the
21   need for industries to find a location to place
22   their waste.  Otherwise, they would need to shut
23   operations down.
24          I'm not sure you get that flavor
25   simply by reading regulations, but by being

163

1    present -- being present, and understanding that in
2    1978, is not a special expertise, and then I can't
3    answer your question any other way.
4          I think it's having that knowledge
5    and understanding of what happened in that time
6    period is valuable knowledge.  It may not be
7    expertise, per se, but it's knowledge, and I use
8    that knowledge in the development of my opinions.
9          Q.    Okay.  On the last paragraph on page
10   13, you talk about DOT shipping documents.  It
11   starts in the second paragraph (sic) of that last
12   paragraph on the page.
13          You say, a DOT shipping document
14   would be prepared, plus an invoice from the
15   transporter or disposal facility to AETC, and a
16   second invoice from AETC to the customer.
17          What's your understanding regarding
18   who prepared that DOT shipping document?
19          A.    Of who prepared it?
20          Q.    Yes.  You used the passive, "would be
21   prepared".  Do you have an understanding of who
22   would prepare that?
23          A.    Well, if you read the Landmesser and
24   Leuzarder depositions, it sounded like that they did
25   that service for some of their clients.  I am not

164

1    sure it necessarily was them all the time.
2          The documents that I reviewed, I
3    recalled the Diaz Chemical documents were prepared
4    by Diaz, and I believe Ashland's were prepared by
5    Ashland, but they may have been more sophisticated.
6          I definitely got the impression, from
7    reading the depositions, that that was a service
8    that AETC would provide as well.
9          Q.    Do you have any experience in the
10   filling out of DOT shipping documents that you
11   described here?
12          A.    I may have done one or two in my
13   career, but I don't have any specific recollection.
14          Q.    It sounds, from what you just said,
15   that the deposition transcripts were the source of
16   the factual basis of this statement; is that
17   correct?
18          A.    Yes.  Yes.
19          Q.    All right.  If we turn to page 14,
20   section 5.3, just take a moment.
21          A.    Okay.
22          Q.    What are the factual bases of the
23   statements you make in section 5.3?
24          A.    The deposition transcripts of the two
25   AETC individuals.

165

1          Q.    Anything else?
2          A.    No.
3          Q.    Okay.  Other than citing or
4    paraphrasing information contained in the cited
5    documents, did you employ any methodology or
6    analysis to arrive at the statements you make in
7    5.3?
8          A.    No.
9          Q.    Did you have any personal involvement
10   in the events or activities described in 5.3?
11          A.    I may have either attended the
12   training school that they talk about here, or I knew
13   of it, because when I read it in the deposition
14   transcript, it sounded awfully familiar.  But
15   otherwise, I didn't teach the course, for example.
16   I may have attended it, but that's the only thing I
17   could stretch to.
18          Q.    Do you have any specific recollection
19   of having attended it, or is it just a situation
20   where it sounds kind of familiar?
21          A.    It sounded very familiar to me.
22          Q.    Is this the type of thing that you
23   would have attended at the time?
24          A.    I might have.  It couldn't have been
25   a definite, because I was in a different program,

K. GOLDSTEIN, P.E. - Direct

166

1 but as I said, way back in the beginning, I did
2 attend a lot of different seminars and training
3 sessions when I was at the DEP.
4         So it may very well have been one of
5 these or something similar.
6     Q.    Okay. Does any specialized knowledge
7 or experience on your part underlie any of the
8 statements you make here in 5.3?
9     A.    No.
10    Q.    I am going to ask you some questions
11 now about the conclusions you made at section 5.4.
12        Are there any factual bases
13 underlying the conclusions you make in 5.4, other
14 than the factual bases you testified underlie the
15 statements made in the preceding subsections of
16 section five of your report?
17    A.    No. I believe they all came from
18 either the deposition transcripts or the
19 interrogatory -- response to interrogatories that we
20 talked about earlier.
21    Q.    Okay. Is there any specialized
22 knowledge or experience on your part that underlies
23 conclusions A through D in section 5.4?
24    A.    No.
25    Q.    Other than summarizing the

167

1 information in the deposition transcripts or the
2 responses to interrogatories, did you employ any
3 methodology or analysis in arriving at these
4 conclusions in section 5.4?
5     A.    Well, to the extent that it assisted
6 in the remainder of the expert report, then yeah,
7 because it did -- the conclusions are focused on
8 providing context to the rest of the report. But
9 other than that, there's no other specific
10 methodology.
11    Q.    All right. Let me get started -- can
12 we -- section 6.1, that begins on page 15. Just
13 take a minute and look over that.
14    A.    Okay.
15    Q.    Other than the deposition transcripts
16 that you cite at the bottom of section 6.1, are
17 there any other factual bases of the statements you
18 make in section 6.1?
19    A.    Other than the footnotes, plus
20 probably Leuzarder's deposition gave some context
21 from the earlier parts of the report to some
22 statements here. And, again, that's the factual
23 basis.
24    Q.    Okay.
25    A.    Stop there.

168

1     Q.    Did you employ any methodology or
2 analysis -- other than paraphrasing the depositions,
3 did you employ any methodology or analysis in making
4 these statements in 6.1?
5     A.    I guess the first paragraph and the
6 first sentence of the second paragraph are more of
7 my statements, rather than the paraphrasing.
8     Q.    And you had testified before that the
9 information regarding Kin-Buc, you derived from work
10 that you did for a superfund site client; is that
11 right?
12    A.    Not necessarily a superfund client,
13 but at the DEP, the knowledge of what happened at
14 Kin-Buc and why it was closed and what happened
15 afterwards came when I was at DEP.
16    Q.    In 1976?
17    A.    No, it was early eighties.
18    Q.    Had you ever heard of Kin-Buc
19 landfill prior to the 1980's?
20    A.    Yes.
21    Q.    In what context?
22    A.    Two contexts: First, that the --
23 there was investigations going on by other parts of
24 DEP regarding the level of contamination present at
25 the site, and then the groundwater underneath the

169

1 site.
2         So it got some -- a lot of by-play,
3 if you will, within the department staff about what
4 must have been discharged their over time.
5     Q.    And when did you hear that?
6     A.    Late seventies. There was also an
7 effort at the time, by the owners of Kin-Buc, to
8 establish the Kin-Buc II, which was the other
9 landfill with a great name, but presumably with
10 better management of the landfill so that it would
11 be able to accept waste in a proper manner and not
12 just contaminate the environment.
13    Q.    When did you hear about that Kin-Buc
14 II?
15    A.    It would also be the late seventies.
16    Q.    When you say the late seventies, do
17 you mean after 1977 or before 1977?
18    A.    I can't place it. It would be during
19 the time from when I first started to, let's say,
20 the 1980 time frame. I don't know when I first
21 heard about it.
22    Q.    Did you have any personal involvement
23 in the events or activities that you describe in
24 6.1?
25    A.    No.

K. GOLDSTEIN, P.E. - Direct

170

1     Q.     Okay. Does any specialized knowledge
2  or experience on your part underlie the statements
3  that you make in section 6.1?
4     A.     Again, the first paragraph and the
5  first sentence of the second paragraph, I think, are
6  knowledge of what the evolution of the rules was
7  doing to the community at the time.
8     Q.     Okay. Turning to 6.2, which starts
9  on page 16, why don't you take a look at that. It
10  goes on to page 17.
11     A.     Okay.
12     Q.     Can you describe the factual bases of
13  the statements you make in 6.2?
14     A.     The deposition transcripts of the two
15  AETC individuals. There was an insurance policy in
16  the exhibits that I referred to, and a couple of
17  letters that were written by DeRewal to potential
18  clients or actual clients -- I don't recall which --
19  but those letters are part of the factual basis.
20     Q.     Are those letters cited in the
21  footnotes?
22     A.     Yes.
23     Q.     Are those exhibits P-9 and P-44?
24     A.     Yes. And I think I left out -- let's
25  see -- yeah, exhibit Curley-5 is a letter or a memo

171

1  from Curley -- an internal memo in his -- to one of
2  his supervisors about the status of the disposal of
3  their hazardous waste.
4     Q.     Okay. Anything else?
5     A.     No.
6     Q.     Other than citing or paraphrasing the
7  information contained in the footnote cited
8  documents, did you employ any methodology or
9  analysis to arrive at the conclusions you make in
10  6.2?
11     A.     No.
12     Q.     Did you have any personal involvement
13  in the events or activities described in section
14  6.2?
15     A.     No.
16     Q.     Does any specialized knowledge or
17  experience on your part underlie the statements you
18  make in section 6.2?
19     A.     No.
20     Q.     At the end of the first paragraph
21  here on page 16, you refer to permits and licenses
22  that DeRewal purportedly showed representatives of
23  AETC.
24          Do you see that section? I think
25  it's the last two sentences of the first paragraph.

172

1     A.     Yes.
2     Q.     What is your expert opinion regarding
3  the types of permits or licenses that DeRewal would
4  have shown AETC at this time?
5     A.     Well, this was for the
6  Philadelphia -- Wissinoming Philadelphia facility.
7  They would have either a discharge permit to
8  discharge the treated waste stream directly into the
9  Delaware river. That would be Pennsylvania's
10  version of a NJPDES permit -- a national pollutant
11  discharge elimination permit, or some type of
12  approval to discharge that wastewater into the
13  Philadelphia sewer system.
14     Q.     Meaning a Philadelphia licensor
15  permit?
16     A.     Yes, from the City of Philadelphia,
17  right.
18     Q.     Would DeRewal, at this time, have had
19  to have had any New Jersey transportation permits
20  for hauling waste to the Wissinoming facility?
21     A.     Yes.
22     Q.     And what would he have had to have?
23     A.     Under the 1974 regulations, the
24  hauler is required to have been part of a
25  registration program.

173

1     Q.     Would DeRewal have had to have had
2  any New Jersey licenses or permits to dispose of
3  hazardous waste that was picked up in New Jersey?
4     A.     Well, they would have had to have a
5  DOT license to haul hazardous materials.
6     Q.     Would that be separate from the 1974
7  requirement or part of it?
8     A.     I think it's separate from -- DOT had
9  separate regulations regulating trucking of
10  hazardous materials. So they would have to have had
11  a license or approval from DOT, plus the DEP
12  requirement for the registration.
13     Q.     Registration of what?
14     A.     The regulations say that all haulers
15  need to be registered with the department. I'm not
16  sure the regulations go into any further detail than
17  that.
18     Q.     At this time, did a hauler, such as
19  DeRewal, who picked up in New Jersey and purportedly
20  disposed in Pennsylvania, have to get a New Jersey
21  permit for its disposal in another jurisdiction?
22     A.     I'm not even sure there was a New
23  Jersey disposal permit, but the answer is, if it's
24  in another jurisdiction, then it wouldn't be their
25  responsibility either. The hauler wouldn't, because

K. GOLDSTEIN, P.E.   -   Direct

174

1  they're hauling on New Jersey roads but the disposal
2  is in a different jurisdiction.
3      Q.   Let me take you back to page eight
4  for just a second. This is under section 4.2.2.
5  it's the third paragraph, where you're talking about
6  the 1974 requirements or the amendments to the
7  hazardous waste regs.
8          You say, the hazardous waste
9  generator -- right -- would have to be registered
10 with New Jersey DEP and consign the waste to a solid
11 waste facility registered with and authorized by the
12 New Jersey DEP.
13     A.   Okay. I got it.
14     Q.   I know this was with regard to
15 hazardous waste generators as opposed to haulers,
16 but did the New Jersey regulatory scheme require
17 that there be some disclosure of the ultimate
18 disposal site if it was in another state, if you
19 know?
20     A.   I don't think I know the answer to
21 that question.
22     Q.   So going back to 6.2, where we left
23 off, it sounds, from what you just testified, that
24 if DeRewal had shown AETC, at this time, all of the
25 necessary permits and licenses, it would have been

175

1  at least four; is that right?
2      A.   (No response.)
3      Q.   You talked about the discharge
4  permit, the Philadelphia sewer permit, the DOT
5  shipping document, and the -- whatever New Jersey
6  regulations required for the hauler?
7      A.   For the hauler registration. Okay.
8      Q.   Anything else that you can think of?
9      A.   No.
10     Q.   Now, what is your expert opinion
11 regarding the types of permits or licenses that
12 DeRewal would have needed in Pennsylvania?
13     A.   Well, the DOT rules, I believe, were
14 nationwide at the time. So they would have needed a
15 similar type of hauling certificate or approval.
16         And the two permits we talked about,
17 the one from the City of Philadelphia and one for
18 the discharge, they would have needed -- I don't
19 know of any Pennsylvania permit that they would need
20 for the hazardous waste disposal.
21     Q.   Would the discharge permit be the
22 hazardous waste disposal permit?
23     A.   Well, that would be of a discharge.
24 What I meant is that for the -- to operate a
25 hazardous waste treatment facility, like a TSD,

176

1  similar to what evolved into a TSD permit, I don't
2  know if they needed one of them in Pennsylvania in
3  1976.
4      Q.   What about a hauling registration or
5  permit --
6      A.   I don't know.
7      Q.   -- in Pennsylvania?
8          Would they have needed -- would he
9  have needed -- "he" meaning DeRewal -- have needed a
10 Philadelphia permit or license for hauling hazardous
11 waste?
12     A.   I don't know.
13     Q.   Would any separate federal permits or
14 licenses have been necessary at this time?
15     A.   Other than the ones we've spoken
16 about, not that I'm aware of.
17     Q.   In your opinion, did AETC have an
18 obligation to investigate DeRewal in mis-waste (sic)
19 disposal operation under the applicable standards at
20 the time?
21     A.   Well, their obligation was to their
22 clients, not a regulatory obligation.
23     Q.   Are you saying that they may have had
24 a contractual obligation with their clients, but
25 there was nothing in the regulatory scheme that

177

1  would require AETC to investigate DeRewal and his
2  methods?
3          MR. BARNES: Objection as to form.
4      A.   Yes, I would -- I would say that.
5      Q.   You talk about, in 6.2, in the
6  middle, you talk about the permits that DeRewal
7  showed AETC, and measures that AETC did --
8  implemented to do due diligence on DeRewal.
9          In your opinion, did AETC investigate
10 adequately DeRewal and his waste disposal operation?
11     A.   Well, I think for what the -- I'll
12 call it the standard at the time, that they went and
13 met with DeRewal, they talked to him, they found out
14 what type of systems he had, they looked at the
15 permits -- or they were shown the permits that
16 DeRewal had.
17         So the answer is yes, they did due
18 diligence to determine if DeRewal was a legitimate
19 disposal -- transporter and disposal facility.
20     Q.   Well, I know they did due
21 diligence -- or they purport to -- but in your
22 opinion as an expert on this time period, did they
23 do adequate due diligence of DeRewal, keeping in
24 mind what you wrote earlier in your report about
25 unscrupulous dealers and garbagemen, and the

K. GOLDSTEIN, P.E.  -  Direct

---

**178**

1  purported impulse of Leuzarder and Landmesser to
2  kind of clean up the industry?
3      A.    Again, given the -- this is
4  pre-superfund, pre-CRCLA (phonetic) now, when the
5  standard of due diligence got a little bit more
6  focused.
7          They saw the types of trucks he
8  hauled, which were acceptable for hauling acid
9  waste. They visited the facility and saw the
10  neutralization facility in Wissinoming.
11          The answer to the question is yes,
12  the standard at the time, I felt they did adequate
13  due diligence.
14      Q.    In your opinion, were there any other
15  measures that AETC could have taken to investigate
16  DeRewal and his waste disposal methods?
17          MR. BARNES: Objection as to form.
18      A.    Are you putting me in a time frame or
19  are you putting me at year 2006?
20      Q.    I'm asking you today, given your --
21      A.    Given 20/20 hindsight?
22      Q.    Given your expert knowledge of waste
23  disposal practices at the time, sitting here today,
24  do you believe that AETC could have taken --
25  reasonably taken additional measures for

---

**180**

1          MS. MOONEY: Can you read it back?
2          (The following question is read back:
3  "Question: In the 1976/1977 time
4  period, were you aware of other brokering services
5  that were similar to AETC?")
6      Q.    Let me clarify. In the 1976/1977
7  time frame, were you aware, at that time, of any
8  brokering services along the lines of what AETC did?
9      A.    I was not aware. I was just ignorant
10  of it.
11      Q.    And would that apply also to other
12  states as well?
13      A.    Yes.
14      Q.    In other words, you didn't know of
15  any brokering services along those lines in
16  Pennsylvania?
17      A.    That's correct.
18      Q.    Or New York or any other state?
19      A.    That's correct.
20      Q.    Okay.
21          (Recess taken.)
22      Q.    Let's turn to 6.3, which is on page
23  17. Why don't you take a minute and just look over
24  that. It goes to page 18.
25      A.    Okay.

---

**179**

1  investigating DeRewal's waste disposal methods?
2          MR. BARNES: Objection as to form.
3      A.    I believe they did appropriate due
4  diligence for the time period. If they rode on
5  DeRewal trucks and followed them around -- all of
6  them around -- and walked around that farm that they
7  visited that turned out to be the superfund site,
8  maybe they would have seen something. But I believe
9  they took adequate care, compared to what other
10  types of facilities were doing that were so very
11  inappropriate. They felt that they found an
12  appropriate transporter and disposal facility for
13  their clients' waste streams.
14      Q.    In the 1976 and 1977 time frame,
15  what's your understanding about how many companies
16  in New Jersey -- let's limit it to New Jersey right
17  now -- provided the type of brokering service that
18  AETC provided?
19      A.    I don't know.
20      Q.    In the 1976/1977 time period, were
21  you aware of other brokering services that were
22  similar to AETC?
23          MR. BARNES: Objection as to form.
24  Is he aware now of what existed in '76, or in '76,
25  was he aware?

---

**181**

1      Q.    Okay. Other than the documents cited
2  in the footnotes to 6.3, are there any other factual
3  bases of the statements that you make in this
4  section?
5      A.    No.
6      Q.    Other than citing or paraphrasing the
7  information contained in the cited documents, did
8  you employ any methodology or analysis to arrive at
9  the conclusions you make in 6.3?
10      A.    I would say that page 18, the last
11  sentence of the first paragraph, is my own
12  statement.
13      Q.    What is that based on?
14      A.    Just an impression I get from
15  Mr. Curley's deposition and the exhibits that he
16  provided -- that were provided to his transcript
17  regarding his internal memoranda to his boss.
18      Q.    Okay. Any other factual bases of any
19  of the other statements in 6.3?
20      A.    No.
21      Q.    Okay. Did you have any personal
22  involvement in the events or activities that you
23  describe in section 6.3?
24      A.    No.
25      Q.    Does any specialized knowledge or

---

K. GOLDSTEIN, P.E.   -   Direct

182

1   experience on your part underlie the statements that
2   you make in 6.3?
3       A.    Again, other than that last sentence
4   of the first paragraph on page 18, no.
5       Q.    Let's turn to 6.4. What are the
6   factual bases of the statements that you make in
7   6.4?
8       A.    The footnotes, again, with the
9   deposition transcripts of the two AETC individuals,
10  and Mr. Michelman, and the one Exhibit, P-52,
11  that were the Diaz bills of lading.
12      Q.    Okay. Other than citing or
13  re-paraphrasing the information contained in the
14  citations here, did you employ any methodology or
15  analysis to arrive at the conclusions you make in
16  6.4?
17      A.    Well, if you look at the paragraph on
18  page 19 -- well, I guess it is a paraphrase. I was
19  going to say that, although both had visited Manfred
20  DeRewal at Boarhead Farms, they believed the farm
21  was DeRewal's country residence. AETC never
22  transported any waste to Boarhead Farms, nor did
23  they broker any business deal that contemplated
24  transport of any waste to Boarhead Farms, that is
25  from the transcripts.

183

1       Q.    Did you have any personal involvement
2   in the events or activities that you describe in
3   6.4?
4       A.    No.
5       Q.    Do you have any specialized knowledge
6   or experience that would underlie the statements
7   that you make in 6.4?
8       A.    No.
9       Q.    Looking at the first paragraph under
10  6.4 that starts, both Landmesser and Leuzarder --
11      A.    Got it.
12      Q.    In your opinion, was the expectation
13  that the nitration acid from Ashland Diaz would be
14  transported to Wissinoming a reasonable expectation?
15      A.    Yes.
16      Q.    And why is that?
17      A.    Well, the acid waste needed
18  specialized equipment to transport, and then to
19  treat strong, highly acidic waste stream. The
20  Wissinoming facility had the equipment and the
21  supplies to do that.
22          The discussions with DeRewal were
23  that the waste would be transported to Wissinoming
24  for treatment. That's why they went to the facility
25  to look it over.

184

1       AETC never transported any waste to
2   Boarhead Farms, nor did they broker any business
3   deal that contemplated transport of any waste to
4   Boarhead Farms.
5       The different bills of lading that I
6   reviewed had Wissinoming as the final destination, I
7   believe, on the Diaz bills of lading. So there was
8   this knowledge between AETC and Ashland and Diaz
9   that Wissinoming was where the waste was going.
10      Q.    I'd like to turn to the conclusions
11  at 6.5. Why don't you review these quickly --
12  actually, not quickly. Take your time.
13          Okay?
14      A.    Okay.
15      Q.    Okay. What are the factual bases for
16  the statements you make in 6.5?
17      A.    All of the documents that we
18  discussed and the rest of section six.
19      Q.    Anything else?
20      A.    No.
21      Q.    What if any specialized knowledge or
22  experience underlies these conclusions in 6.5?
23      A.    I'm not sure there is any specialized
24  knowledge. It's an evaluation of the facts that I
25  reviewed, and developed a framework for why I

185

1   believe that DeRewal Chemical Company deceived AETC
2   and Ashland and Diaz.
3       Q.    Did you employ any methodology or
4   analysis to arrive at these conclusions in 6.5?
5       A.    Other than the distillation of the
6   factual information, no.
7       Q.    Okay. Looking at D -- 6.5(d) -- what
8   is your understanding regarding the types of
9   equipment and materials that were at the Wissinoming
10  facility?
11      A.    There was -- there was a storage tank
12  there and a -- some type of mixing tank -- there was
13  a different term for it, but it was a mixing tank
14  where the acid and the lime could be mixed before it
15  was discharged.
16      Q.    Anything else?
17      A.    No. In terms of specialized
18  equipment that's all I could recall.
19      Q.    Okay. Did you personally see this
20  equipment?
21      A.    No.
22      Q.    Okay. Where did you get the
23  information that you have regarding the types of
24  equipment and materials that were present at
25  Wissinoming?

K. GOLDSTEIN, P.E.   -   Direct

186

1    A.   Curley described it, and either
2  Landmesser or Leuzarder described it. One of the
3  other visited the facility -- I don't remember who
4  offhand -- but I could probably figure it out from
5  the report. But those two individuals described
6  what was present in their depositions.
7    Q.   Okay. What specialized knowledge or
8  experience on your part qualifies you to make this
9  statement at D?
10    A.   Well, the neutralization of strong
11  acids is a process of adding some type of alkaline
12  material in order to bring the pH of the acid up to
13  a level which is acceptable for discharge.
14    Q.   Have you ever had any experience with
15  acid neutralization?
16    A.   Yes.
17    Q.   In what context?
18    A.   It's a wastewater treatment method.
19  We talked about my experience in industrial
20  pretreatment, and that was one of the common methods
21  for neutralizing an acidic or a caustic waste stream
22  before it was discharged.
23    Q.   Is it your opinion that the setup at
24  Wissinoming, that was described in the materials
25  that you reviewed, was adequate for the application

187

1  that DeRewal was proposing?
2    A.   I mean, in theory, it was adequate.
3  You add caustic to an acidic waste stream, it will
4  neutralize it.
5    Q.   And in practice though, was this a
6  viable treatment method?
7    A.   Oh, sure. In practice, it's a viable
8  treatment method.
9    Q.   In the way that was described in the
10  materials that you reviewed?
11    A.   Yes, it is a viable treatment method
12  as described.
13    Q.   In E -- 6.5(e) -- in the first
14  sentence, what do you mean by ownership of the
15  wastes here?
16         Is this a legal conclusion on your
17  part or something else?
18    A.   Certainly it's not a legal
19  conclusion.
20    Q.   I'm just asking.
21    A.   I'm an engineer. So -- it's a
22  statement based upon the records that I reviewed
23  that there was -- there were no documents that
24  showed that AETC took ownership of the waste, and I
25  think I say somewhere else -- and I'm not sure they

188

1  even had that capability -- there was no capability
2  of transferring that ownership from a generator to a
3  broker under the rules.
4         I recall an agreement between Ashland
5  and AETC that never got signed that talked of
6  transferring the ownership from one to the other.
7  So the statement is based upon documents I reviewed
8  that AETC never accepted ownership of the waste.
9    Q.   When you say ownership, do you mean
10  physical possession?
11    A.   No, I meant ownership, in the sense
12  that it was not only physical possession, but then
13  their responsibility to address in the rest of the
14  hazardous waste management chain.
15    Q.   The second sentence in E, can you
16  explain what you mean by this statement?
17    A.   Statement is the decision to utilize
18  DeRewal Chemical Company's treatment facility was
19  made by Ashland and Diaz representatives.
20         Well, I got the impression, from
21  reading the transcripts and looking at the
22  documents, that AETC recommended the use of DeRewal
23  Chemical Company to Ashland and Diaz
24  representatives, and they decided that, yes, it was
25  an acceptable alternative. Let's go for it.

189

1    Q.   What is your opinion regarding the
2  nature of the relationship between AETC and DeRewal?
3    A.   Other than the brokering of the waste
4  from the generator to DeRewal -- the generators to
5  DeRewal, AETC received a bill from DeRewal for the
6  treatment of the waste, and AETC, in turn, billed
7  the client -- the generators -- for the disposal of
8  the waste.
9         So I think that's the only
10  relationship that AETC and DeRewal had.
11    Q.   In your opinion, was AETC's
12  introduction of DeRewal to Ashland and Diaz an
13  indication that AETC made a decision to utilize
14  DeRewal?
15         MR. BARNES: Objection as to form.
16    A.   Well, AETC made a decision -- they
17  certainly made a recommendation to the generators,
18  but the generators make the decision of where their
19  waste would be going.
20    Q.   Is it your --
21    A.   Maybe I misunderstood your question.
22    Q.   You say, in the second sentence of E,
23  on page 19, that the decision to utilize DeRewal was
24  made by the generators.
25         My question is, wasn't AETC's

K. GOLDSTEIN, P.E.  -  Direct

190

1  introduction of DeRewal an indication that AETC made
2  a decision to utilize DeRewal as well?
3          MR. BARNES: Objection as to form.
4      A.   Well, AETC's use of DeRewal -- I
5  don't quite understand that term because they --
6  they brokered the deal between the generator and the
7  transporter and disposal facility to transport the
8  waste from the generator to the disposal facility.
9          They didn't use DeRewal, other than
10  in the context that they were a go-between for the
11  financial part of it -- which is DeRewal charging
12  the generators for the treatment process, and AETC
13  was the go-between -- but they took the bill from
14  DeRewal and they marked it up and then gave it to
15  the generators.
16     Q.   Previously in your report, you talk
17  at length about the motivations of AETC in improving
18  handling of waste in New Jersey, and I guess
19  elsewhere, and, also, their due diligence in terms
20  of identifying disposers of hazardous waste.
21         Is it your opinion that AETC would
22  have introduced DeRewal to its customers -- meaning
23  Ashland and Diaz in this case -- had it not approved
24  of DeRewal and his methods?
25         MR. BARNES: Objection as to form.

191

1      A.   No. I think that what you said is a
2  fair statement.
3          They approved of DeRewal in the
4  context that they felt DeRewal could handle the
5  waste stream. But they didn't have a capability of
6  telling Ashland, you must take your waste here.
7  This is what you're going to do.
8          They gave a recommendation. This
9  chemical company seems to have the capability of
10  transporting and disposing of your waste stream. Do
11  you want to go with them?
12         I mean, Curley goes through a couple
13  of memos, that were in his exhibits to his
14  deposition, of having several different companies
15  come to him and begging to service Ashland's waste
16  stream, and trying to figure out who to go with and
17  what's the best choice.
18         And so he had choices, and in some
19  cases, he was using two of them at once, if I
20  recall. So he used DeRewal for some period of time.
21     Q.   Is it your opinion that AETC would
22  have introduced DeRewal to Ashland and Diaz had it
23  not approved of DeRewal and his methods of waste
24  disposal?
25         MR. BARNES: Objection as to form.

192

1      A.   If AETC did not approve of them, I
2  presume they would not have recommended it. I think
3  that's fair to say, just from a common sense
4  perspective.
5          AETC -- both individuals at AETC make
6  very strong statements that they try to find the
7  best possible disposal areas, and if they didn't
8  approve of somebody, they just didn't work with
9  them.
10     Q.   Okay. All right. Let's turn to the
11  opinions now on page 21. Why don't you look over
12  the opinions.
13     A.   Okay.
14     Q.   In the first sentence, under 7.0,
15  opinions, you state, based on the documents
16  reviewed, I have -- are those documents reviewed
17  those listed on Appendix B?
18     A.   Correct.
19     Q.   Any other documents reviewed in
20  connection with this report?
21     A.   Other than the regulations that we've
22  talked about, readily available public documents,
23  no.
24     Q.   For opinion number one, can you state
25  the precise factual basis for this opinion?

193

1          MR. BARNES: Objection as to form.
2  There's a lot of sentences there. Do you want to
3  break it up or are you just talking about the whole
4  paragraph?
5          MS. MOONEY: I think a lot of it is
6  going to be documents reviewed. And so if the
7  witness would like me to break it down, I'd be happy
8  to do so.
9          MR. BARNES: I'm trying to make
10  things go along smoother.
11     Q.   If you would like to break it down,
12  Mr. Goldstein, that's fine.
13     A.   Well, the answer is, it is based upon
14  the documents reviewed.
15         AETC conducted its business in
16  compliance with state-of-the-art hazardous waste
17  management, as it existed in '76 to '77, plus some
18  of the experience that I've had that we've talked
19  about.
20     Q.   That we've talked about previously
21  today?
22     A.   Correct.
23     Q.   Anything else?
24     A.   No.
25     Q.   Okay. Focusing on that sentence that

K. GOLDSTEIN, P.E.  -  Direct

194

1  you just read, AETC conducted -- which is the last
2  sentence in opinion one -- can you describe the
3  methodology you employed to reach that conclusion?
4      A.    Well, I developed a section in the
5  report that discusses the different regulatory
6  requirements in the '76/'77 time frame on a national
7  level, and on a New Jersey level, and on a
8  Pennsylvania level.
9          I talked about what AETC did in the
10  start-up of their company, over that time frame,
11  based upon the documents reviewed. And I concluded
12  that they were good guys and that they were trying
13  to meet regulations when they did their work.
14      Q.    Okay. What is -- what if any
15  specialized knowledge or experience underlies that
16  statement, the last sentence of paragraph one?
17      A.    Well, I think you have to have some
18  type of regulatory knowledge in order to determine
19  if someone is complying or not complying with rules.
20  So I will go back to my standard answer of my
21  regulatory experience.
22      Q.    You had testified earlier that, in
23  your opinion, AETC was not required to comply with
24  any waste management regulations that were in effect
25  in 1976 and 1977.

196

1  properly and what decisions were made on a day by
2  day basis.
3          The '74 amendments are at least a
4  framework that people had to follow. It's the
5  documents I had available to me. If I had other
6  documents, I could expand on that. But I think that
7  that's what the regulatory community needed to
8  comply with, in 1976 and 1977, were those
9  amendments.
10      Q.    In your opinion, what were the
11  respective obligations of AETC and its customers in
12  the brokering relationship?
13          MR. BARNES: Objection as to form.
14  Compound. Can you break that up?
15          MS. MOONEY: Well, I'm talking about
16  the respective obligations of AETC and its
17  customers.
18          MR. BARNES: Are you asking for the
19  obligations of ETC, and then the obligations --
20          MS. MOONEY: All right.
21      Q.    Let me rephrase that, Mr. Goldstein.
22  In your opinion, what was AETC's obligation to its
23  customers in the brokering relationship?
24      A.    Well, in simple terms, to ensure that
25  the clients -- the customers complied with

195

1          How do you jive that earlier
2  testimony with this statement, the last sentence of
3  paragraph one?
4      A.    Well, it's -- their business is to
5  try to have their customers in compliance with the
6  rules. I think the question you asked about whether
7  they were in compliance was specific to their
8  brokering business. But the state-of-the-art of the
9  hazardous waste management is making sure your
10  customers are in compliance with the generator
11  requirements, the transporter requirements, or the
12  disposal requirements.
13          So that's the message of conclusion
14  number one.
15      Q.    When you say, in the beginning of
16  paragraph one, state-of-the-art was best exemplified
17  by the 1974 amendments to the New Jersey code, what
18  do you mean by "best exemplified"?
19      A.    Well, I'm sure there were other
20  documents or -- let me start over -- strike that,
21  please.
22          I'm sure there were -- there were
23  people who were involved in the business, in that
24  time frame, could have had even more stories about
25  how things were done and how things were done

197

1  regulatory requirements, both from the DEP and the
2  DOT.
3          They also seem to have -- a strong
4  component of their business is training the customer
5  on both the regulatory aspects and the chemistry
6  aspects of the particular waste stream, of what
7  equipment to wear, what shipping material to use,
8  which types of trucks to use -- all of these
9  components are part of their business plan, if you
10  will.
11      Q.    Okay. And were those -- I understand
12  you to say that there were no regulatory
13  requirements applicable to AETC at that time, is
14  that right?
15      A.    As a broker.
16      Q.    In any other sense?
17      A.    Well, they did do some transport
18  later on.
19      Q.    Leaving that aside, leaving the
20  transport aside --
21      A.    Well, again, for '76 to '77, as a
22  broker, that's what my answer is.
23      Q.    Okay. And what is your opinion
24  regarding the obligations of AETC's customers in
25  this brokering relationship they have with AETC?

K. GOLDSTEIN, P.E.  -  Direct

198

1      A.     Obviously, they have the obligation
2  to have knowledge of where the waste is going. They
3  had to fill out the bill of lading, under the DOT
4  requirements, and the DEP requirements, that we
5  discussed, that the DEP eventually evolved into a
6  manifest system; but the pre-manifest system of just
7  making sure that the type of waste, the volume of
8  waste and the consignee was listed on the bills of
9  lading.
10     Q.     Okay. And is it your opinion that
11  AETC's customers were subject to regulatory
12  requirements, as opposed to just contractual
13  obligations?
14     A.     Yes.
15     Q.     When you refer to customers in
16  opinion one -- let's see where is it -- it's the
17  second sentence, based on the documents reviewed, do
18  you see that, AETC's customers --
19     A.     Yes.
20     Q.     -- customers, does that word refer to
21  Ashland and Diaz?
22     A.     Yes.
23     Q.     Okay. Is it your opinion that AETC,
24  in 1976 and 1977, should have been subject to
25  regulatory requirements?

199

1            MR. BARNES: Objection as to form.
2  I'm not also sure that -- well --
3            MS. MOONEY: This is an expert
4  regulator. You're presenting him as an expert.
5            MR. BARNES: I withdraw the
6  objection, other than as to form.
7      Q.     Okay.
8      A.     Is it my opinion that AETC should
9  have been subject to some regulatory requirements?
10     Q.     In 1976 and 1977.
11     A.     I don't think so. It's a very --
12  that's a very odd question, and my best answer is, I
13  don't think so.
14     Q.     Okay. And why do you not think so?
15     A.     Well, 'cause they never owned or
16  transported the waste. Again, leaving ownership
17  aside -- 'cause especially with the judge's
18  decision -- I don't want to dabble in questioning
19  the judge's decision -- but AETC didn't generate the
20  waste. They didn't transport the waste -- again,
21  for this time period -- and didn't dispose of the
22  waste. And those are the aspects that the program
23  was meant to -- meant to regulate.
24            As a broker, they were an information
25  source, and if they didn't do a good job of being an

200

1  information source, they wouldn't have been in
2  business. But, obviously, they were pretty
3  successful at it.
4            People used them, and they worked
5  hard at it. But in terms of their ability or the
6  necessity to regulate that type of firm, I don't see
7  the value.
8      Q.     Very good. At the end of the first
9  sentence, in number one, you refer to -- let's
10  see -- at the very end -- and consign the waste
11  stream to an approved hauler and waste -- it's kind
12  of in the -- it's along sentence.
13     A.     Consign the waste stream --
14     Q.     -- to an approved hauler and waste
15  disposal facility.
16     A.     Yes.
17     Q.     Focusing on that language -- approved
18  hauler and disposal facility -- in your opinion, was
19  DeRewal Chemical Company an approved hauler and
20  disposal facility?
21            MR. PETTIT: Objection to form.
22     A.     Based on the testimony that I
23  reviewed, that they provided adequate or appropriate
24  permits to AETC's representatives, they felt it was
25  an approved hauler and disposal facility.

201

1            I have no personal knowledge of
2  DeRewal, other than what I've read in the documents.
3  So they felt it was an approved hauler and disposal.
4  That's why they recommended to their customers to
5  use them.
6      Q.     In your expert opinion, did AETC have
7  the responsibility to ensure that DeRewal Chemical
8  Company was an approved waste disposal facility?
9            THE WITNESS: Could you read back the
10  question?
11            (The following question is read back:
12        "Question: In your expert opinion,
13  did AETC have the responsibility to ensure that
14  DeRewal Chemical Company was an approved waste
15  disposal facility?")
16            MR. BARNES: Objection as to form.
17     A.     As a responsibility to their
18  customers, yes.
19     Q.     Do you feel that they fulfilled that
20  responsibility?
21     A.     Well, we talked about that prior, and
22  my answer was that AETC fulfilled a due diligence
23  for that time period, in terms of investigating
24  DeRewal, felt they had the appropriate permits based
25  upon what DeRewal represented to them and showed

K. GOLDSTEIN, P.E. - Direct

202

1  them, and had the equipment to manage and transport
2  and dispose of the material.
3          So the answer is yes.
4      Q.    That's the answer to a different
5  question, I think.
6      A.    Okay.
7      Q.    What my question was, in your expert
8  opinion, did AETC have the responsibility to ensure
9  that DeRewal Chemical Company was an approved hauler
10 and waste disposal facility?
11     A.    I'm not sure I know what you mean by
12 "ensure".
13     Q.    It sounds like what you're saying is
14 they did adequate due diligence of DeRewal Chemical
15 Company?
16     A.    Yes.
17     Q.    By ensure, I mean determine, with
18 finality, that DeRewal was conducting his operation
19 in compliance with all applicable regulations.
20     A.    Well, finality is a fairly strong
21 word. Even today, if you consign a waste to
22 someone, I don't go -- I try to do due diligence for
23 my customers and find out where waste is going, but
24 I don't ride on the truck.
25          That truck could very well make a

203

1  left turn, when it should make a right turn, and end
2  up in a field somewhere.
3          You're almost saying that it's a
4  guarantee that DeRewal was on the up-and-up at
5  all -- their disposal facilities were on the
6  up-and-up to ensure with finality that they were
7  doing things in a proper manner.
8          You do things to a point when you're
9  satisfied as a professional that things are okay.
10 AETC did that. They didn't ride on all the trucks
11 obviously. Otherwise, there wouldn't have been the
12 superfund site.
13          But an awfully lot of people were
14 deceived by DeRewal. But AETC did what they needed
15 to do to feel comfortable that this was an
16 acceptable disposal and transport facility.
17     Q.    Do you think it would have been
18 reasonable for AETC to check the accuracy of the
19 permits that were purportedly shown to them by
20 DeRewal?
21          MR. BARNES: Objection as to form.
22     A.    Well, I -- in the 1976/'77 time
23 frame, they obviously accepted what they saw as
24 appropriate permits.
25          You want me to say, in hindsight,

204

1  what they should have done, sitting here in 2006?
2      Q.    No. No. At the time. As an expert
3  in the regulatory requirements in 1976 and 1977, is
4  it your opinion that the accuracy or validity of
5  those purported permits should have been verified?
6      A.    I think, at that time frame, what
7  they did was very appropriate. I don't think that
8  the scope of the hazardous waste dumping or dis --
9  improper disposal was as well-known across-the-board
10 in all states as it is now, or was a few years after
11 the '76/'77 time frame.
12          So they saw permits. They thought
13 they were acceptable. And they followed through on
14 it.
15     Q.    What is the specialized knowledge or
16 experience that qualifies you to testify regarding
17 the state-of-the-art of hazardous waste management
18 in 1976 and 1977?
19     A.    My ability to understand regulations
20 by being in the field for the years after '76/'77,
21 which had similar -- although not precisely the
22 same -- conditions at the time.
23          Just knowledge of the state of -- I'm
24 repeating myself -- knowledge of the state of the
25 hazardous waste management program at that time

205

1  period.
2      Q.    Opinion number three, turning your
3  attention to that quickly, why don't you take a
4  second to look at that.
5      A.    Okay.
6      Q.    I'm going to show you an exhibit that
7  was previously marked in this case as P-52.
8          MR. BARNES: Are you going to mark it
9  for this deposition?
10         MS. MOONEY: No, I'm going to leave
11 it as P-52.
12     Q.    And I'm going to direct your
13 attention to -- well, first of all, your counsel
14 presented this to me today as one of the documents
15 that you had tabbed in your review of the files here
16 at Wolff and Samson when you were researching
17 information for this report.
18         Do you recognize this document?
19     A.    Yes.
20     Q.    Okay. What is it?
21     A.    It's a bill of lading from the Diaz
22 Chemical Corporation.
23     Q.    Okay. I am going to direct your
24 attention to a line at the top that says, consigned
25 to. And then it says, Advanced Environmental Tech

K. GOLDSTEIN, P.E.   -   Direct

206

1  Corporation - Milford, New Jersey.
2       Do you see that?
3    A.   Yes.
4    Q.   In your review of the bills of lading
5  at Wolff and Samson, in preparation for your expert
6  report, did you note that this bill of lading
7  consigned, to Advanced Environmental Technology
8  Corporation, the waste?
9    A.   (No response.)
10   Q.   I'll restate it. When you reviewed
11 this document in preparation for writing your
12 report, did you note that the bill of lading
13 consigns the waste to AETC?
14   A.   Yes.
15   Q.   In your opinion, does this constitute
16 evidence that AETC took ownership of hazardous waste
17 from Ashland -- not Ashland -- from Diaz Chemical?
18   **A.   It is my opinion that it does not.**
19   Q.   Why is that?
20   **A.   Well, my understanding of the word**
21 **"consigned" is that it's -- it's that the waste is**
22 **passed along to the consignee to be managed for the**
23 **generator -- for the consignor.**
24   Q.   I'm sorry, what was that?
25   **A.   For the -- to manage the waste for**

207

1  **the consign -- consign -- I got my "consignee",**
2  **"consignor" -- that AETC was going to manage the**
3  **waste for the generator. That's what the purpose of**
4  **consigned is.**
5       **Now, AETC didn't really do anything**
6  **with the waste. DeRewal is the one who transported**
7  **the waste to the Philadelphia facility that's listed**
8  **in destination.**
9       **So the bill of lading, by my**
10 **understanding of the term, is improper. That it**
11 **shouldn't have been saying, consigned to AETC. It**
12 **should have said, consigned to DeRewal for the**
13 **transport of the waste, and then to Philadelphia.**
14      **AETC simply set up the arrangement**
15 **with -- or brokered the contractual deal between**
16 **Diaz and DeRewal, and then passed along some costs.**
17 **So maybe I don't understand the word "consigned"**
18 **accurately, but I would feel that this was -- it was**
19 **typed inaccurately.**
20   Q.   Okay. In number three -- opinion
21 number three on page 21, you say, based on my
22 experience as a regulator, it is my opinion that the
23 ownership of the hazardous waste could not pass from
24 a generator to another party under waste management
25 regulations.

208

1       Do you see that?
2    **A.   Yes.**
3    Q.   What is the precise experience or
4  knowledge that you have as a regulator that
5  qualifies you to render this statement?
6    **A.   The experience that I've had is that**
7  **the -- especially since the days of the manifest**
8  **program, that the generator has the ownership of the**
9  **waste until such time as it's no longer a waste.**
10      **Again, I say it as a regulator, but**
11 **not as an attorney. So that it can't be -- that the**
12 **ownership of a waste can't be transferred by, let's**
13 **say, a contractual arrangement between the generator**
14 **of the waste and a transporter or a broker or a**
15 **disposal facility.**
16      **That the way the regulations read,**
17 **the generator is the owner throughout. The**
18 **transporter has certain responsibilities once they**
19 **take the waste. The disposal or treatment facility**
20 **have a certain responsibility. But the ownership of**
21 **the waste is still the generator.**
22      **Okay. I'll caveat that with the**
23 **judge's decision, which is a little bit beyond my**
24 **ken as a regulator or as an engineer to understand**
25 **fully, but this is the -- what I wrote in the**

209

1  **opinion.**
2    Q.   Opinion number two, what is the
3  factual basis of opinion number two?
4    **A.   Again, you are talking about which**
5  **documents?**
6    Q.   Is it just the documents that appear
7  in Appendix B?
8    **A.   Yes.**
9    Q.   Anything else?
10   **A.   No. It's just the documents.**
11   Q.   Okay. In opinion number four, are
12 there any factual bases for opinion number four,
13 other than the documents that appear in Appendix B?
14   **A.   No.**
15   Q.   I am going to go through -- now I am
16 going to go through some documents that were
17 provided to me by Mr. Sabino, who represented that
18 these were documents from your work file --
19   **A.   Okay.**
20   Q.   -- in connection with the creation of
21 the expert report. I have copies for everybody.
22      (Two-page document list is marked as
23 Exhibit Goldstein-2 for Identification.)
24   Q.   Do you recognize this document,
25 Mr. Goldstein?

K. GOLDSTEIN, P.E.  -  Direct

210

1  A.  Yes.
2  Q.  Can you describe what it is?
3  A.  It's a list of documents that are
4  available at the information resource center of the
5  New Jersey DEP, which is their library.
6  Q.  Their -- New Jersey DEP?
7  A.  Yes.
8  Q.  How did you get this document?
9  A.  The librarian sent it to me.
10  Q.  Okay. Was this one -- was this the
11  list of documents that the New Jersey DEP library
12  sent to you when you had requested the waste -- I
13  can't remember the name of the periodical --
14  A.  Waste Age.
15  Q.  -- Waste Age?
16  A.  They actually sent me a longer list.
17  That's why some of the record numbers are staggered.
18     I picked out these and sent it back
19  to them and said, could you please look up records
20  two, three, seven, nine, 11 and 15, and they sent
21  this back to me that says, these documents are
22  available for your review.
23  Q.  Are these check marks your check
24  marks?
25  A.  No.

211

1  Q.  Are they the New Jersey DEP's
2  librarian check marks?
3  A.  I don't know.
4  Q.  Did they come from New Jersey DEP?
5  A.  Yes.
6  Q.  Okay. The notation at the top, F --
7  I think that's four -- but it's blotted out on my
8  copy -- Ken Goldstein, is that something that you
9  wrote?
10  A.  No.
11  Q.  Is that something that New Jersey DEP
12  wrote?
13  A.  No -- I don't know.
14  Q.  Did it come back with that from New
15  Jersey DEP?
16  A.  Yes.
17  Q.  Did you review any of these entries
18  in preparation for your expert report?
19  A.  Yes.
20  Q.  You reviewed these documents?
21  A.  Yes.
22  Q.  Did you provide them to your counsel,
23  too?
24  A.  I didn't get copies. I'm sorry.
25  Q.  Go ahead.

212

1  A.  I didn't copy them. I went to look
2  at these at the library, and I copied the two
3  reports to Congress. I think that's the records 11
4  and 15.
5  Q.  I see.
6  A.  But the others, I didn't feel were
7  valuable. So they're still at the library.
8     (Report to the Congress dated 1/23/79
9  is marked as Exhibit Goldstein-3 for
10  Identification.)
11  Q.  I'm going to show you another
12  document that your counsel provided.
13     Do you recognize this document?
14  A.  Yes.
15  Q.  Can you describe what it is?
16  A.  Title is, report to the Congress by
17  the controller general of the United States. Title
18  is, hazardous waste management programs will not be
19  effective. Greater efforts are needed. Dated
20  January 23, 1979.
21  Q.  Okay. Did you use this document in
22  the preparation of your expert report?
23  A.  Yes.
24  Q.  How did you use this document in
25  preparing your expert report?

213

1  A.  There were certain references in here
2  that I felt were valuable for the state-of-the-art
3  section of the report.
4  Q.  Is that section five of your report?
5  A.  (No response.)
6  Q.  Do you mean the section that's
7  captioned, state-of-the-art?
8  A.  (No response.)
9  Q.  I think that's four actually.
10  A.  Yes, 4.1.
11  Q.  Okay. Can you pinpoint any of the
12  precise conclusions or opinions in your report that
13  this helped to form the basis of, this document?
14  A.  You mean specific, not general?
15  Q.  If it's footnoted, that's fine. I
16  mean, that's easily ascertainable.
17     But other than -- if you can recall,
18  other than the footnoted sections, do you recall any
19  other conclusions, statements, opinions that this
20  would form the basis of?
21  A.  None of the other conclusions -- I
22  footnoted this document pretty thoroughly, so I
23  think it's pretty clear where I used this.
24  Q.  Okay. Did you read this entire
25  report of Congress that's been entered as G-3 or

K. GOLDSTEIN, P.E.   -   Direct

214

1  Goldstein-3?
2     A.    Yes.
3          MS. MOONEY: All right. Can you mark
4  this Goldstein-4?
5          (E-mail dated 8/8/06, with
6  attachments, is marked as Exhibit Goldstein-4 for
7  Identification.)
8     Q.    I'm going to show you what's been
9  marked as Goldstein-4. I'm showing you a document
10 that's been marked as Goldstein-4.
11         Let me know when you've had a chance
12 to review it.
13    A.    I'm done.
14    Q.    Okay. Do you recognize, I guess, the
15 e-mail at the bottom that says, name, Ken Goldstein,
16 and provides some identifying information --
17    A.    Yes.
18    Q.    -- with regard to you?
19         Did you type that?
20    A.    Yes.
21    Q.    Okay. Is this the request for
22 information that you sent to New Jersey DEP for
23 documents pertaining to waste regulations in '76 and
24 '77?
25    A.    Yes. Actually, the request went to

215

1  the state library, and it was more than just
2  regulations.
3          So -- but otherwise, yes, this is the
4  reply that came back from the state, the DEP
5  library. They must have some type of internal
6  process to forward these requests.
7     Q.    Are the documents -- did you make the
8  circles on the records that are in the attachment to
9  the e-mail in this document?
10    A.    Yes.
11    Q.    And what do those circles indicate?
12    A.    Those are the documents -- well, the
13 records that I wanted to see.
14    Q.    And I think you testified earlier
15 that you reviewed the circled documents, but didn't
16 copy them, except that you copied the congressional
17 reports; is that right?
18    A.    Yeah, the controller's reports,
19 that's correct.
20    Q.    All right. Of these circled
21 documents, did they form the basis of any opinions
22 in your report?
23    A.    Well, yeah. The records 11 and 15
24 are the -- is the two documents, Goldstein-3. So
25 the answer is yes, they helped provide the framework

216

1  for the opinions.
2     Q.    Just those two, or are there other
3  ones that you --
4     A.    No, just those two. There was
5  nothing in the other documents that I found
6  valuable.
7     Q.    Okay.
8          (E-mail dated 7/14/06, with
9  attachments, is marked as Exhibit Goldstein-5 for
10 Identification.)
11    Q.    I'm showing you a document that's
12 been marked Goldstein-5. Take a second and look
13 over those, if you would.
14         MR. BARNES: Just so the record is
15 clear, it appears to be more than one document.
16         MS. MOONEY: Yes.
17    Q.    Goldstein-5 is a collection of
18 several e-mail memos/messages that are the e-mail
19 correspondence that your attorney, Mr. Sabino,
20 provided from your work file to me in this case.
21    A.    That's correct. Okay.
22    Q.    Do you recognize these e-mails?
23    A.    Yes.
24    Q.    All right. Referring to the first
25 page of Goldstein-5, it's an e-mail from Andrew

217

1  Waring to Kenneth Goldstein dated July 14, 2006. It
2  refers to -- well, Mr. Waring says, Ken, see me
3  about this, in the body.
4          Do you see that?
5     A.    Yes.
6     Q.    Is "Ken" you?
7     A.    Yes.
8     Q.    Did you end up seeing Ken about this?
9     A.    Seeing Ken? I'm Ken.
10    Q.    I mean Mr. Waring. Did you end up
11 seeing Mr. Waring about this?
12    A.    Yes.
13    Q.    What was the -- what was the subject
14 of your meeting?
15    A.    I think I testified earlier that
16 Mr. Sabino and Mr. Waring had some type of previous
17 work together, and Tom sent the e-mail, on the
18 bottom, to Drew to discuss this, the AETC project
19 with Drew. And then that's what Mr. Waring and I
20 talked about.
21    Q.    Okay. Can you recall any specifics
22 from what you discussed at that meeting?
23         MR. BARNES: Objection. Asked and
24 answered.
25    A.    It's just what's here.

K. GOLDSTEIN, P.E.  -  Direct

218

1    Q.    Was there any outcome from that
2  meeting?
3    A.    Well, we talked -- Andrew and I
4  talked about the -- whether or not I would be
5  comfortable being an expert in this project.
6       I think we talked about this, and I
7  said, it sounds fine, that I'd be a better expert
8  because of my regulatory experience.
9       So that was the gist of that
10  conversation.
11    Q.    Does Mr. Waring -- you might have
12  answered this, it slipped my mind -- does Mr. Waring
13  have any regulatory experience?
14       MR. BARNES:  Objection.  Asked and
15  answered.
16    A.    I don't recall.  I don't think so but
17  I don't recall.
18    Q.    The second page is an e-mail from
19  Mr. Sabino to Andrew Waring, with a cc to you.  The
20  body refers to a meeting that he's trying to set
21  up -- "he", meaning Mr. Sabino -- on July 28th.
22       Do you recall whether or not that
23  meeting ever went forward?
24    A.    It was a call, if I recall properly,
25  and I believe it did take place.  I can't guarantee

219

1  it took place on that date, but it was very close to
2  that time frame.
3    Q.    Okay.  Do you recall the substance of
4  that meeting?
5    A.    We talked about that earlier today.
6  This was the discussion where Mr. Sabino gave an
7  overview of the project, and generally talked about
8  the fact that I would be the expert and not
9  Mr. Waring.
10    Q.    Got you.  Any outcome from that
11  meeting?
12    A.    Yes.  We decided that there were
13  files at Wolff and Samson that somebody from Ransom
14  would come up and review.  I think either a
15  subsequent e-mail or discussion, we picked a date
16  when I would come up, but that was it.
17       That was all, and that's the call
18  that Mr. Simon attended briefly.
19    Q.    Skip the next e-mail, if you would.
20  Direct your attention to one from Tom Sabino, dated
21  August 8, 2006, to Kenneth Goldstein, re AETC's SJ
22  motion.
23       Do you see that one?
24    A.    Right.
25    Q.    If you look halfway down that page,

220

1  there's an e-mail -- embedded e-mail from you,
2  Kenneth Goldstein, to Tom Sabino.  Is this -- the
3  body of this message that you wrote to Tom were
4  arrangements for the review of the files that you
5  did here at Wolff and Samson?
6    A.    Yes.
7    Q.    We talked about what you reviewed
8  there.  Some of this, we've already covered, so I'm
9  just going to skip it.
10       Couple pages further on, this e-mail
11  is dated -- the top e-mail is September 7, 2006, to
12  Kenneth Goldstein from Tom Sabino, re Boarhead Farm.
13  And then there's an embedded message from Kenneth
14  Goldstein to Tom Sabino, and the subject is,
15  Boarhead Farm.
16       Do you see that?
17    A.    Yes.
18    Q.    In the body of that text, did you
19  write this?
20    A.    Yes.
21    Q.    Okay.  You write, in the very middle,
22  but I am in the process of reworking the
23  AETC/DeRewal section, which is probably the key to
24  the report.
25       Why do you say that that section is

221

1  the key to the report?
2    A.    Well, that section of the report is
3  the one that discusses how AETC got to know DeRewal,
4  how they introduced DeRewal to their customers, how
5  the different logistics of the brokering deal went
6  forward from the generator to transporter to
7  disposal facility, and then how the problems
8  occurred at the end of the day.
9    Q.    And that, in your opinion, is the key
10  to the report?
11       MR. BARNES:  Objection as to form.
12  I'm not quite sure that that's what it says there.
13    A.    Well, I think, in terms of the
14  contents of the report, I think it is a key.
15       Whether it's the key now -- or the
16  conclusions are probably the key now -- that's -- I
17  don't think that makes that much difference.  But at
18  the time, I thought it was the key.
19    Q.    Okay.  Fair enough.  A couple more
20  e-mails further on, this one is dated September 27,
21  2006.  It's from Ken Goldstein to Tom Sabino, re
22  report.  It's the top half of the page.
23       Do you see that one?
24    A.    Yes.
25    Q.    You write -- did you write this

K. GOLDSTEIN, P.E.   -   Direct

---

**222**

1  e-mail here? It's the second one on the page.
2  A.   Yes.
3  Q.   It says, original message, Ken
4  Goldstein, Wednesday, September 26, 2006, 2:02 p.m.
5  to Sabino, Thomas, subject, re report.
6       Do you see that?
7  A.   Yes.
8  Q.   Did you write that message?
9  A.   Yes.
10  Q.   What are you referring to there,
11  where you say, okay, but shouldn't it be 1976/'77?
12  A.   **Tom and I had a discussion about**
13  **certain aspects of the -- about a certain sentence**
14  **in the report, and it was probably an e-mail, but I**
15  **could not find it -- despite the fact I seem to have**
16  **found a lot of things on my e-mail server -- but he**
17  **referred to an event that occurred, and he had the**
18  **wrong dates. I think he had '96/'97 on it.**
19  **So I clarified. I said okay to his**
20  **comment, but shouldn't it be '76 to '77?**
21  **Now, I went back and looked, 'cause**
22  **this certainly is -- begs a question of what I'm**
23  **talking about, but I don't remember what it was. I**
24  **couldn't find it. Otherwise, I would have produced**
25  **it.**

---

**223**

1  Q.   Fair enough. Next page is an
2  e-mail -- an embedded e-mail from Kenneth Goldstein
3  to Tom Sabino dated September 27,2006, 1:06 p.m.,
4  subject, report.
5       Do you see those?
6  A.   Yes.
7  Q.   Did you write this e-mail?
8  A.   Yes.
9  Q.   You refer, in the body of the
10  message, to -- you say, if I am ever deposed, I will
11  have more info at my fingertips, but I will not have
12  it for another one to two weeks.
13       What do you mean by -- not the
14  ungrammatical part of it, but what do you mean
15  substantively by it?
16  A.   **Thank you.**
17       MR. BARNES: Objection as to form.
18  A.   **This is the Pennsylvania regulations**
19  **that I referred to earlier that I did not receive**
20  **prior to the production of the report, but I did**
21  **receive them subsequent to the report.**
22  Q.   Did you review those Pennsylvania
23  regulations in preparation for the deposition today?
24  A.   **I reviewed them when I got them. I**
25  **did not review them in preparation, because I didn't**

---

**224**

1  **find them particularly useful to the project. They**
2  **didn't have the same type of dates and involvement**
3  **that the New Jersey regulations had.**
4  **So it was very hard to figure out**
5  **when they were prom -- that particular set was**
6  **promulgated.**
7  **So I read them and I put them aside.**
8  **They're probably in the work file, but I haven't**
9  **looked at them since.**
10  Q.   You can put Goldstein-5 to the side.
11       (Final report of the Pennsylvania
12  Sanitary Water Board is marked as Exhibit
13  Goldstein-6 for Identification.)
14  Q.   Do you recognize this document that's
15  been marked Goldstein-6?
16  A.   Yes.
17  Q.   Okay. Can you tell me what it is?
18  A.   **I got this off the Internet when I**
19  **was first working on the project. It's a document**
20  **called, Final Report of the Pennsylvania Sanitary**
21  **Water Board, May 1971 -- I'm sorry, that's not part**
22  **of the title.**
23  **That's the heading for one of the**
24  **subsections. The title is 1923 to 1971.**
25  Q.   Did you obtain this document in order

---

**225**

1  to render an opinion or a conclusion in your expert
2  report?
3  A.   **From the title, I thought it might be**
4  **useful. It turns out that it was not, and it's been**
5  **sitting happily in my file ever since. I have not**
6  **used it.**
7  Q.   So this did not form a basis in
8  anything in your expert report, is that right?
9  A.   **That's correct.**
10  Q.   Put that to the side.
11       (Pennsylvania Bulletin, Volume 20, is
12  marked as Exhibit Goldstein-7 for Identification.)
13  Q.   Do you recognize this document,
14  Mr. Goldstein?
15  A.   Yes.
16  Q.   Can you describe what it is?
17  A.   **It's from the Pennsylvania Bulletin,**
18  **dated -- excuse me -- Volume 20, number six,**
19  **Saturday, February 10, 1990, Harrisburg, PA.**
20  Q.   And -- sorry -- go ahead.
21  A.   **I was just going to describe it.**
22  **It's a description of changes to codification of**
23  **certain rules and regulations.**
24  Q.   Did you use this document in
25  preparing your expert report?

---

K. GOLDSTEIN, P.E.　-　Direct

---

226

1　　A.　No.
2　　Q.　Did you receive this document prior
3　to writing your expert report and submitting it in
4　this case?
5　　A.　No.
6　　Q.　Did you receive it after you
7　submitted your expert report in this case?
8　　A.　Yes.
9　　Q.　All right. So did this form the
10　basis of anything in your expert report?
11　　A.　No.
12　　Q.　Okay. Put that to the side.
13　　　　(Chapter 75, solid waste management
14　rules and regulations, Pennsylvania, is marked as
15　Exhibit Goldstein-8 for Identification.)
16　　Q.　Do you recognize this document?
17　　A.　Yes.
18　　Q.　Can you describe what it is?
19　　A.　It is Chapter 75, solid waste
20　management rules and regulations, State of
21　Pennsylvania.
22　　Q.　Okay. Did you use this document in
23　preparing your expert report in this case?
24　　A.　No.
25　　Q.　Did you receive this document after

---

227

1　your expert report had already been submitted in
2　this case?
3　　A.　Yes.
4　　Q.　Okay. Put it aside.
5　　　　(Report to Congress dated 12/19/78 is
6　marked as Exhibit Goldstein-9 for Identification.)
7　　Q.　Do you recognize this document?
8　　A.　Yes.
9　　Q.　Can you describe what it is?
10　　A.　It's a report to the Congress from
11　the controller general of the United States
12　entitled, how to dispose of hazardous waste, a
13　serious question that needs to be resolved. Dated
14　December 19, 1978.
15　　Q.　Okay. Did you use this document in
16　preparing your expert report in this case?
17　　A.　Yes.
18　　Q.　How did you use this document in
19　preparing your expert report?
20　　A.　The report provides reference
21　footnotes to where I used this document, but it is
22　part of the state-of-the-art section for the
23　national program and of the state programs, New
24　Jersey and Pennsylvania programs.
25　　Q.　What's your understanding of the

---

228

1　authoritative impact of this report to Congress?
2　　　MR. BARNES: Objection as to form.
3　　Q.　Let me restate it. What, if any, is
4　your opinion regarding the authority or the
5　authoritativeness of this report to Congress?
6　　A.　Well, if you -- do you mean the
7　accuracy of it? Authoritative is --
8　　Q.　How about the -- what's your
9　understanding regarding the purpose of this report?
10　　A.　Well, the controller general has the
11　responsibility to provide information to Congress
12　and to the executive branch concerning different
13　programs, different areas of regulation, over a
14　broad spectrum, not just environmental. And I used
15　it as a document -- as a factual document.
16　　Q.　Do you mean to say that you took the
17　assertions in this document as true?
18　　A.　Yes, I presume that they -- that the
19　controller general -- and I believe the GAO is part
20　of -- did some of the work here -- that they did
21　their research, and did the interviews that they
22　said they did, and wrote what they found.
23　　Q.　Is this -- to your knowledge, is a
24　report to Congress, by the government accounting
25　office, used by Congress to inform their statutes or

---

229

1　their proposed legislation or something else?
2　　　MR. BARNES: Objection as to form.
3　　A.　Could you rephrase, please?
4　　Q.　Well, to your knowledge, what is the
5　purpose of the controller general reporting to
6　Congress?
7　　　MR. BARNES: Objection as to form.
8　　A.　I can't tell you what the purpose is.
9　What I could do is read the report and draw the --
10　just read it and draw the conclusions that they're
11　trying to raise a red flag concerning the hazardous
12　waste program.
13　　Q.　And do you know what -- I'm sorry.
14　　A.　I was just going to say around the
15　country.
16　　Q.　Do you know if they have a particular
17　agenda in doing so?
18　　　MR. BARNES: Objection as to form.
19　　A.　Again, I have some knowledge of what
20　GAO's responsibilities are. I'm not sure if this
21　was directed by anyone in particular, or if they did
22　it just as part of their duty and their job
23　assignment. So I can't answer that.
24　　Q.　Did you read this entire report to
25　Congress in preparing your expert report?

---

K. GOLDSTEIN, P.E.   -   Direct

230

1    A.    Yes.
2    Q.    All right.
3         (Document entitled, Mid-Atlantic
4    Superfund, is marked as Exhibit Goldstein-10 for
5    Identification.)
6    Q.    I'm handing you what's been marked as
7    Goldstein-10.  Do you recognize this document?
8    A.    Yes.
9    Q.    Can you describe what it is?
10   A.    It's a document off the -- off a
11   website. It's a U.S. EPA website, subheading,
12   Mid-Atlantic Superfund, sub-subheading, Boarhead
13   Farms.
14   Q.    Did you use this document in
15   preparing your expert report in this case?
16   A.    No.
17   Q.    Did you obtain this document yourself
18   from the Internet?
19   A.    No. Mr. Waring did.
20   Q.    And at some point, did Mr. Waring
21   give you this document?
22   A.    Yes.
23   Q.    And do you recall when that was?
24   A.    Probably at that meeting that we
25   discussed, after the e-mail, where he said, come see

231

1    me about this. I think that's when I got introduced
2    to the Boarhead Farms site, and he may have handed
3    me this.
4    Q.    Do you know the purpose of his giving
5    you this document?
6    A.    It's -- this type of document that's
7    on the EPA website is a very general description of
8    the -- of any superfund site around the country.
9         This one happens to be on Boarhead
10   Farms. So it gives a little bit of background on
11   the superfund site itself.
12   Q.    Did you read this entire document?
13   A.    Yes.
14   Q.    Okay.
15        (Letter dated 7/5/05 is marked as
16   Exhibit Goldstein-11 for Identification.)
17   Q.    I'm handing you what's been marked as
18   Goldstein-11. Did you receive this document?
19   A.    Did I receive the document?
20   Q.    Yes.
21   A.    No.
22   Q.    Do you know why it was in your file?
23   A.    I presume Mr. Waring gave it to me.
24   Q.    Do you know why he would give it to
25   you?

232

1    A.    He probably gave me all the documents
2    that he had in his possession for the several weeks
3    that he and Mr. Sabino were trading calls and
4    information.
5    Q.    All right. Did anything in this
6    document form a basis of anything in your expert
7    report?
8    A.    No.
9    Q.    All right. The last one, I think --
10   actually, there's two more.
11        (Multi-page document consisting of
12   handwritten notes is marked as Exhibit Goldstein-12
13   for Identification.)
14   Q.    I'm handing what you what's been
15   marked as Goldstein-12.
16        MR. BARNES: Just for the record,
17   this is several documents?
18        MS. MOONEY: Yes. It's a series of
19   several documents, all consisting of handwritten
20   notes.
21   Q.    The first two pages of this document
22   have been clipped together, and at the top left-hand
23   corner appears, Ransom Environmental Consultants,
24   Inc.
25        Do you see that?

233

1    A.    Yes.
2    Q.    Do you recognize the first three-page
3    document of Goldstein-12?
4    A.    Yes.
5    Q.    Can you describe what it is?
6    A.    It's my notes from the review of the
7    different New Jersey regulations of the time period
8    we've been talking about.
9    Q.    Are these notes that you took on the
10   New Jersey regulations that you had in your own
11   possession?
12   A.    Yes.
13   Q.    Okay. So did you make these notes in
14   your office or wherever your New Jersey regulations
15   were?
16   A.    Yes. My office, yes.
17   Q.    Okay. On the second page, at the
18   top, it says 6/30/74 supplement.
19        What does that refer to?
20   A.    The date of the regulation that I was
21   looking at.
22   Q.    Is it the supplement to the code?
23   A.    Yes.
24   Q.    Okay. And then underneath that it
25   says -- it looks like, hazardous waste defined -- is

K. GOLDSTEIN, P.E. - Direct

234

1  that "some" -- that word "some"?
2  A. (No response.)
3  Q. It says, 1.4B has waste defined same?
4  A. I think it's "same".
5  Q. Is it "same"? I just wanted to
6  double-check.
7      Is this your handwriting?
8  A. Yes, this is mine.
9  Q. And in the next line, 2.6, is the
10 responsibility of generator same, too?
11 A. Correct.
12 Q. In the middle of this page, you note
13 that the disposal requirements -- no chemical waste
14 shall be deposited in direct or indirect contact
15 with surround (sic) water of the state.
16     Do you see that?
17 A. Yes.
18 Q. Wouldn't the waste disposal operation
19 DeRewal purportedly had at Wissinoming have violated
20 this provision?
21 A. Well, the -- several things. First,
22 it was -- Wissinoming was in Pennsylvania, so this
23 is New Jersey rules.
24     If the waste was treated -- the acid
25 was treated, so it was neutralized, arguably, it's

235

1  no longer a chemical waste. So it would be allowed
2  to be discharged under the Clean Water Act
3  requirements. But that's what I copied out of the
4  1973 rules, so --.
5  Q. The fourth page of Goldstein-12 is
6  headed, I think -- correct me if I'm wrong --
7  deposition of David Michelman?
8  A. That's correct.
9  Q. Do you see that?
10 A. Uh-hum.
11 Q. Did you take these notes?
12 A. Yes.
13 Q. Did you take these notes in reviewing
14 the depositions here at Wolff and Samson?
15 A. No. I copied the transcript, took it
16 to my office, and did this review in my office.
17 Q. And does the same hold for the
18 remaining notes on the following pages?
19 A. (No response.)
20 Q. You can take your time looking
21 through them.
22 A. Yes. These are all documents that I
23 copied at Wolff and Samson, or were sent to me --
24 were sent to Drew by Mr. Sabino.
25     I think the Landmesser and Leuzarder

236

1  depositions were mailed by Tom. The rest were
2  copied here, and then taken back to the office. And
3  all these notes are just my office notes.
4  Q. Okay. Did you rely on these notes in
5  generating your expert report in this case?
6  A. Yes. The notes are almost
7  word-for-word statements out of the depositions. So
8  the answer is yes.
9  Q. Okay. Put that to the side.
10     (NJAC 7:26 provisions is marked as
11 Exhibit Goldstein-13 for Identification.)
12 Q. I'm handing you what's been marked as
13 Goldstein-13. Do you recognize this document?
14 A. Yes.
15 Q. Can you describe what it is?
16 A. It's a series of iterations of the
17 New Jersey solid waste rules from the time period of
18 July 1st, 1978 till December 31st, 1979, NJAC 7:26.
19 Q. Did you use this document in
20 preparing your expert report?
21 A. I certainly read the document. I'm
22 not quite sure if I footnoted anything. I'd have to
23 go check.
24 Q. But this was one of the documents
25 that you reviewed in preparing your expert report?

237

1  A. That is correct.
2  Q. Okay. Did you read this entire
3  document?
4  A. No.
5  Q. Do you recall what portions of this
6  document you read?
7  A. I read -- I went by heading, and if
8  the heading described a point that I needed to learn
9  about -- like the definitions of the generator,
10 transporter or disposer of hazardous waste -- I
11 would read it.
12     If it dealt with municipal waste or
13 radioactive waste, or the definitions I didn't care
14 about, I skipped over it.
15 Q. So is it fair to say that you focused
16 in on the hazardous waste regulations and did not
17 focus on the rest?
18 A. That is correct.
19 Q. Okay. Put that aside.
20     (New Jersey solid waste regulations,
21 1957 through '78, is marked as Exhibit Goldstein-14
22 for Identification.)
23 Q. I'm showing you what's been marked as
24 Goldstein-14. Do you recognize this document?
25 A. Yes.

K. GOLDSTEIN, P.E.  -  Direct

238

1    Q.    Can you describe what it is?
2    A.    It's a compendium of different
3    iterations of the New Jersey solid waste regulations
4    from May 10th, 1957 till February 27th, 1978.
5    Q.    Okay. And did you compile this
6    document?
7    A.    Not me personally, no.
8    Q.    Did someone else compile it?
9    A.    Someone else under my command --
10   charge, when I was at Sadat Associates, did it.
11   Q.    Did you use this document in
12   preparing your expert report?
13   A.    Yes.
14   Q.    Okay. How did you use this document
15   in preparing your expert report?
16   A.    I remembered certain of the
17   regulations in the preparation of the report,
18   especially the part of how the hazardous waste
19   program evolved over time in New Jersey.
20   Q.    Okay. In the middle of this
21   document -- and I -- you know, can't really be any
22   more specific than that -- there is a section that's
23   headed -- it's about 40 percent through -- I am
24   going to direct you to a heading -- or a page in
25   this document headed, provisions in effect from

239

1    September 15, 1975 to November 1st, 1976, and it's
2    about -- I should have marked it for you, but it's
3    about 40 percent of the way through.
4          MR. BARNES: Is that the correct
5    page?
6          MS. MOONEY: That is the correct
7    page.
8    A.    I found it.
9    Q.    Do you have that page, Mr. Goldstein?
10   A.    Provisions in effect from September
11   15, 1975 to November 1st, 1976.
12   Q.    Yes. That's it.
13   A.    Okay.
14   Q.    The regulations, after this heading,
15   were these regulations in effect for part of the
16   1976 to 1977 period that your expert report deals
17   with?
18   A.    Yes.
19   Q.    And did you refer to these -- this
20   copy of these regulations that appears in this
21   report for information about the regulations of
22   1976?
23   A.    Yes.
24   Q.    Okay. I'm going to direct you to a
25   page -- I don't know -- about maybe 25 pages further

240

1    on in the document, to the header, provisions in
2    effect from November 1st, 1976 to July 20, 1977.
3          It's the next heading in the big
4    document.
5          MR. BARNES: Incorporation of
6    amendments effective November 1st, 1976?
7          MS. MOONEY: That's the one.
8    A.    I got it.
9    Q.    Were these regulations in this
10   document those that you relied upon for the solid
11   waste management rules in effect in 1976 and 1977
12   for purposes of your expert report?
13   A.    Yes.
14   Q.    Did you rely on any other versions of
15   the New Jersey regulations pertaining to hazardous
16   waste management in effect in 1976 and 1977, other
17   than these documents?
18   A.    I don't believe so. The reason for
19   my equipollence is that some of the later versions
20   do have pages that are missing. This is not a
21   complete set, as it were.
22         There are some pages that are
23   missing, so I may have looked at a later version to
24   find out the -- that particular section, and
25   depending on what the footnote is of that particular

241

1    section, you can tell when it was adopted. So I --
2    with that caveat, this is what I used.
3    Q.    Okay. All right. During the course
4    of our deposition, we were talking about section
5    4.2.2, and we were going to flag a discussion of the
6    changes in the 1974 regulations from prior years.
7    Until -- we actually might have gone over this. Let
8    me just -- I think we covered this.
9          MR. BARNES: Do you want to take a
10   few minutes to look at your notes?
11         MS. MOONEY: Yes. I'll let Jeff go.
12   Q.    The one thing I do want to ask you is
13   just to clarify, in Appendix B, the report to
14   Congress discrepancy on the dates. I forgot to do
15   that when I had that exhibit.
16         But you'll recall, Mr. Goldstein,
17   that you noted that the year of one of the
18   congressional reports listed in Appendix B was
19   correction incorrect. If you could just go back and
20   look at what exhibit was entered showing the
21   corrected --
22   A.    It would be --
23   Q.    Let me show you, Mr. Goldstein,
24   Exhibit Number 9 in this case.
25         Do you think you could identify, on

K. GOLDSTEIN, P.E.    -    Direct/Cross

242

1  Appendix B, which of these reports corresponds to
2  Exhibit 9?
3    A.    Yes. The fifth item on the document
4  list is this report to Congress, how to dispose of
5  hazardous waste. The date on the document list is
6  inaccurate. It should say December 19, 1978.
7    Q.    So in Appendix B, the fifth document
8  date of January 23, 1979 should be changed to
9  December 19, 1978.
10    Is that right?
11    A.    Correct.
12    MS. MOONEY: Okay. Why don't you go,
13  Jeff?
14    Thank you very much, Mr. Goldstein.
15  I might come back with a few questions. I believe
16  other counsel have some questions for you.
17  CROSS-EXAMINATION BY MR. PETTIT:
18    Q.    Hi, Mr. Goldstein. I'm Jeffrey
19  Pettit. I represent Ashland. I have a couple of
20  questions about your report, if you could pull that
21  out.
22    If you turn to page three --
23    A.    Okay.
24    Q.    -- I'm looking at the sentence about
25  three-quarters of the way down, the unbeknownst to

243

1  these two generators and AETC, that sentence.
2    A.    Yes.
3    Q.    You testified before about the source
4  for that statement, but this actually has a couple
5  factual statements. I just want to confirm that
6  your sources are the same for each component.
7    First, the first statement is that
8  the DeRewal Chemical Company improperly and secretly
9  transported some of the waste stream to some
10  property owned by DeRewal.
11    The sources you described earlier in
12  your testimony would be the source for that
13  statement?
14    A.    Yes.
15    Q.    Then it says, where the waste streams
16  were allegedly discharged to the ground without
17  treatment -- again, your source is the source that
18  you stated previously; am I right?
19    A.    You'll have to refresh me on what
20  source that I referred to.
21    Q.    I think you referred to answers to --
22  the plaintiff's answers to discovery posed by AETC,
23  and then the summary judgment?
24    A.    Yeah, the summary judgment motion,
25  and the exhibits to that, yes.

244

1    Q.    Okay. Now, I want to focus on one
2  other phrase in that sentence, where it talks about
3  the transportation of some of that waste stream to
4  Boarhead.
5    Do you see that?
6    A.    Yes.
7    Q.    All right. Did you know whether you
8  were referring to the waste stream from Ashland or
9  Diaz or both?
10    Do you have -- did you have any idea
11  what you were referring to there?
12    A.    No.
13    Q.    Okay. Page -- if you could turn to
14  page 15, the last paragraph, the first sentence
15  refers to Ciba-Geigy.
16    Did you have any knowledge, based on
17  any source, about the nature of the relationship
18  between DeRewal and Ciba-Geigy at this time?
19    MR. BARNES: Objection as to form.
20    A.    I recall that Ciba-Geigy was -- had a
21  similar type of acid waste stream, and they were the
22  first -- they were a user of DeRewal -- DeRewal took
23  their waste stream and treated it -- presumably
24  treated it at Wissinoming, and that's how the
25  contact was made to AETC.

245

1    Q.    Okay. Now, just the same paragraph,
2  the next sentence, it starts, AET saw the
3  opportunity --
4    A.    Yes.
5    Q.    -- and you reference a disposal
6  agreement between Ashland and DeRewal.
7    Are you aware whether there was ever
8  a written agreement between Ashland and DeRewal for
9  disposal?
10    A.    I don't believe I've ever seen one.
11    Q.    Okay. And are you aware -- or did
12  you see any agreement between Ashland and AETC over
13  this brokering -- what you described as a brokering
14  relationship?
15    A.    Well, I did not see a formal
16  contract, but there were letters from AETC to
17  Ashland that said, I will do the following: I
18  will -- that the waste stream would be taken care of
19  for a fee of "X" -- there were different waste
20  streams and different fees.
21    I don't know if that constitutes an
22  agreement, but there were letters to that effect.
23    MR. PETTIT: Okay. That's all the
24  questions I have. Thank you.
25    MR. BARNES: We're out at 5:30, which

K. GOLDSTEIN, P.E.  -  Cross

246

1  is when I think we agreed to stop.
2      Does anybody have any other
3  questions?
4  CROSS-EXAMINATION BY MR. COOLEY:
5      Q.   Good afternoon. I'll be short.
6  Again, I'm Seth Cooley. I represent Flexible
7  Circuits.
8          You spoke several times during your
9  testimony, I believe -- I don't have a transcript --
10  and, please, I'm not trying to quote you, so correct
11  me if I'm wrong in any respect -- but on the first
12  point, I can refer you to opinion number two, where
13  you make reference, in your text there, to highly
14  acidic waste streams, and I think a few times today,
15  you referred to strong acid waste or strong waste or
16  highly acidic. Those kinds of references.
17      A.   Sure.
18      Q.   I'm just wondering if you can -- if
19  you can tell us whether, from your review of any
20  documents, or any information you've obtained in the
21  course of your work leading up to your report,
22  whether you can quantify that in terms of pH.
23          Did you see any references to what
24  the acidity of any of these wastes that you
25  characterized with these terms might have been?

247

1      A.     There were several documents that
2  referred to the composition of the waste stream, and
3  I remember it was 83 percent, plus or minus, of
4  sulfuric acid, and five percent nitric acid, and
5  then a few other components.
6          So that certainly indicates that it's
7  a strong waste stream, just from knowledge of
8  chemistry.
9          I also recall there was a document
10  from AETC regarding the -- what was called a paper
11  analysis, where somebody did a lab test and it
12  was -- but I don't recall what the pH was on it.
13          I mean, that's the one that I have,
14  and if it's -- if it's not there, then I probably
15  just made the inference from the concentration of
16  sulfuric acid in the waste stream.
17      Q.   Okay. I understand. Secondly -- and
18  lastly -- you testified at one point a little bit
19  about your understanding of the neutralization
20  process at the Wissinoming facility; lime or caustic
21  material being used to neutralize acid waste, I
22  think, was something you referenced --
23      A.   Yes.
24      Q.   -- I can't quote you -- but -- and I
25  think you said that -- something about

248

1  neutralization sufficient to permit the discharge to
2  the river.
3      A.   Yes.
4      Q.   Okay. I just wonder what you meant
5  by sufficient?
6          In other words, how much
7  neutralization, or how neutral, if you could
8  elaborate on that?
9      A.   The -- there were requirements, under
10  permits that were issued either by the federal
11  government or by the state, for the discharge of
12  wastewater into a surface water body, under the
13  Clean Water Act and the NJPDES program.
14          As part of those permits, the pH was
15  usually one of the parameters regulated, and I'm
16  pretty sure that the limitations for discharge to
17  surface water were from pH six to pH nine -- no, I'm
18  certainly not -- I don't have the DeRewal permit in
19  front of me, and I don't know what it said, but
20  that's my recollection of what the typical pH was.
21          So that was the genesis of my
22  comment.
23          MR. COOLEY: I understand. That's
24  it. Thank you.
25          MR. BARNES: Does anybody have any

249

1  other questions?
2          This deposition is now closed, and I
3  think we all agree that we're done.
4          (Witness excused.)
5          (Deposition is concluded at 5:30
6  p.m.)

250

C E R T I F I C A T E

1
2
3    I, DUBRAVKA DE PEW, a Notary Public and
4    Certified Court Reporter of the State of New Jersey,
5    do hereby certify that prior to the commencement of
6    the examination, KENNETH GOLDSTEIN, P.E., was duly
7    sworn by me to testify to the truth, the whole truth
8    and nothing but the truth.
9    I DO FURTHER CERTIFY that the foregoing is a
10   verbatim transcript of the testimony as taken
11   stenographically by and before me at the time, place
12   and on the date hereinbefore set forth, to the best
13   of my ability.
14   I DO FURTHER CERTIFY that I am neither a
15   relative of nor employee nor attorney nor counsel
16   for any of the parties to this action, and that I am
17   neither a relative nor employee of such attorney or
18   counsel, and that I am not financially interested in
19   the action.
20
21   _____
22   DUBRAVKA DePEW, CCR
     NOTARY PUBLIC OF THE STATE OF NEW JERSEY
     MY COMMISSION EXPIRES JANUARY 5th, 2008
23   CSR Number: XI00929
     Dated:  December 14, 2006
24
25

252

ERRATA SHEET

1
2    PAGE    LINE #    CHANGE
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

251

INSTRUCTIONS TO WITNESS

1
2
3    Please read your deposition over
4    carefully and make any necessary corrections.  You
5    should state the reason in the appropriate space on
6    the Errata Sheet for any corrections that are made.
7    After doing so, please sign the Errata
8    Sheet and date it.
9    You are signing same subject to the
10   changes you have noted on the Errata Sheet, which
11   will be attached to your deposition.
12   It is imperative that you return the
13   original Errata Sheet to the deposing attorney
14   within thirty (30) days of receipt of the deposition
15   transcript by you.  If you fail to do so, the
16   deposition transcript may be deemed to be accurate
17   and may be used in court.
18
19
20
21
22
23
24
25

253

ACKNOWLEDGMENT OF DEPONENT

1
2
3    I, _____, do
4    hereby certify that I have read the foregoing pages,
5    _____, and that the same is a
6    correct transcription of the answers given by me to
7    the questions therein propounded, except for the
8    corrections or changes in form or substance, if any,
9    noted in the attached Errata Sheet.
10
11   ------------------------------------------------------
12   DATE:
13
14
15   Subscribed and sworn to before me
16   on this _____ day of
17   _____, 2006
18   My Commission Expires _____
19
20
21   ------------------------------------------------------
22   Notary Public
23
24
25

254

1    LAWYER'S NOTES
2   PAGE   LINE
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

ESQUIRE DEPOSITION SERVICES