IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS L.L.C., <br><br> Plaintiffs, <br> v. <br><br> ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., <br><br> Defendants. | : <br> : <br> : Civil Action No. 02-CV-3830 (LDD) <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

## MOTION IN LIMINE TO STRIKE DEFENDANTS' EXPERT, JOSEPH J. HOCHREITER, JR.

Plaintiffs Agere Systems, Inc., Cytec Industries, Inc., Ford Motor Company, SPS Technologies, LLC, and TI Group Automotive Systems L.L.C. ("Plaintiffs") move this Court, to strike Defendants' Expert, Joseph J. Hochreiter, Jr. for the reasons set forth in the accompanying memorandum of law.

Dated: May 22, 2008

Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership

By: /s/
Glenn A. Harris, Esquire
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3440
E-mail: harrisg@ballardspahr.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS L.L.C., | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, v. | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION *IN LIMINE* TO STRIKE DEFENDANTS' EXPERT, JOSEPH J. HOCHREITER, JR.**

INTRODUCTION

All Defendants seek to offer Joseph J. Hochreiter, Jr., a hydrogeologist[1] with experience in investigating and remediating environmental contamination, as a person who may be used at trial to present evidence under Rule 702 of the Federal Rules of Evidence. Mr. Hochreiter's expert report does nothing except purport to describe the volume and nature of a multitude of wastes allegedly generated in the 1970s at certain facilities of Plaintiffs and Settled Defendants. Mr. Hochreiter's report does not contain any opinions about whether such wastes were transported by DeRewal Chemical Company ("DCC") or disposed of at the Boarhead Farms Site ("the Site"). *See* Expert Report of Joseph J. Hochreiter, September 29, 2006

---

[1] Mr. Hochreiter's Report states that he is a "hydrogeologist." In his deposition testimony, Mr. Hochreiter refers to himself as both a hydrologist and a hydrogeologist. Hochreiter Dep. at 88:2-7. Hydrology is the study of the occurrence of surface water and groundwater from flow and water quality perspectives. Hochreiter Dep. at 20-21. Hydrogeology focuses on the occurrence of water in rocks.

("Report"), attached hereto as Exhibit A; Deposition of Joseph Hochreiter ("Hochreiter Dep."), attached hereto as Exhibit B. Mr. Hochreiter admitted both in the Report and at deposition that he did nothing more than review documents and deposition transcripts given to him by Defendants, accept as true the information contained therein (in many cases simply copying paragraphs from these documents word for word into his Report), perform simple mathematical calculations on that information, and present the results in tabular form.

Mr. Hochreiter's report and any proffered testimony do not draw on his expertise in hydrology, hydrogeology or site remediation, nor does his work move beyond the knowledge of a layperson. He simply summarized information reflected in documents and testimony that are themselves not now in evidence and may not be admissible into evidence, all without the application of any scientific, technical, or other specialized knowledge. His conclusions with respect thereto do not constitute expert testimony that may be admitted as "evidence" that certain wastes in certain quantities in fact were produced at one or more of the Plaintiff and Settled Defendant facilities. Defendants should not be allowed to use a purported "expert" to sidestep the Federal Rules of Evidence. They should instead be required to offer documents and testimony into evidence at trial and ask this Court to make findings of fact based on that evidence.

Mr. Hochreiter's Report and his anticipated testimony should therefore be barred pursuant to Rules 702 and 703 of the Federal Rules of Evidence, as his proposed testimony is neither "expert" testimony nor testimony that will assist the trier of fact.

## STATEMENT OF FACTS

Mr. Hochreiter was "asked to review and summarize available information related to each of the fourteen Plaintiff and Settled Defendants' manufacturing processes along with the

volume, form and nature of the resulting wastes generated by those processes."[2] Report at Section 1.1. In essence, his task was to tabulate the available information regarding the amount of waste generated, and then -- using dubious methods and based largely upon unsubstantiated personal judgment -- "extrapolate" this number over an arbitrarily-calculated 8 year period. In reality, this "extrapolation" consisted of nothing more than the multiplication of such numbers to cover the entire period.

None of Mr. Hochreiter's professed expertise in hydrology and site remediation was used in or necessary for the formulation of the "opinions" he presents. Mr. Hochreiter admitted that he has never prepared an expert report similar to the one he prepared here. Hochreiter Dep. at 103:17-19. He further acknowledged at his deposition that none of his expertise as a hydrologist factored into the preparation of this report. Id. at 365:8-12.

Mr. Hochreiter's "methodology," which is set forth on page 2-2 of his Report, confirms the utter absence of any expertise needed to reach his conclusions. The only skills used were the ability to read, add, multiply, and divide. The first step of this "methodology" was to set the time period to be evaluated, the time span of 1969 to 1977, to which he referred as the "Period of Interest." Report at 2-2, ¶1. He selected these years solely because the Boarhead Farms Site was purchased in October 1969 and he thought that operations ceased at the Site in mid to late 1977. Report at 2-3. Mr. Hochreiter then located in the historical documentation that

---

[2] As admitted at deposition and as apparent in the report, no opinion was provided by Mr. Hochreiter as to whether any of the generated waste was actually disposed of at the Boarhead Farms site. See, e.g., Hochreiter Dep. at 35:3-5 ("We did not make any attempts to connect waste materials to the Boarhead Farms site . . ."). Although the scope of Mr. Hochreiter's opinion was originally contemplated to include an attempt to connect the generated wastes to the Boarhead Farms site, Defendants ultimately decided not to pursue such a link. See Hochreiter Dep. at 124:7-14; 131:22-132:20. Although not the subject of this motion, Plaintiffs retain serious questions and objections as to the relevancy of Mr. Hochreiter's report and any "opinions" expressed therein.

was provided to him descriptions of waste types and quantities generated at a particular facility during some specific time period. He took all quantities and waste descriptions found in those documents at "face value," accepting them as true. Report at 2-2, ¶6. Throughout his deposition, in fact, Mr. Hochreiter confirmed that he performed no independent research or investigation regarding the nature or quantities of Plaintiffs' and Settled Defendants' wastes, and opposing counsel provided a stipulation as to this fact. *See* Hochreiter Dep. at 345:7-9. Report at 2-2, ¶2. Mr. Hochreiter next "estimated" an average yearly amount of waste by "annualizing" volumes of waste (for example, by taking monthly entries and multiplying them by 12 or by taking annual data covering two or more years, adding it up, and then dividing by the number of years). Report at 2-2, ¶3. These simple mathematical computations were used to arrive at an alleged bottom line number for each year. Mr. Hochreiter then again utilized multiplication to "extrapolate" this annual average over the entire eight year period: "Annual average quantities *were multiplied by a factor of 8* to *calculate the extrapolated estimated total waste volumes* generated for each waste type by a specific Plaintiff and Settled Defendant during the 8-year Period of Interest." Report at 2-2, ¶ 4 (emphasis added).

Mr. Hochreiter used this process to come up with a "conclusion" that specific volumes of specific wastes were generated at specific facilities. Defendants propose to have Mr. Hochreiter testify at trial as to these "conclusions."

## ARGUMENT

**A.    Mr. Hochreiter's Testimony Should Be Excluded Because It Is Not Based on "Scientific, Technical Or Other Specialized Knowledge," Is Well Within The Knowledge Of A Layman, Is Not Based Upon Reliable Principles and Methods, And Will Not "Assist The Trier Of Fact."**

The admissibility of expert testimony in federal court is guided by a set of principles established by the United States Supreme Court in *Daubert v. Merrell Dow*

*Pharmaceuticals*, 509 U.S. 579 (1993) and in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The holdings of these cases are incorporated into Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Advisory Committee comments provide useful context to Rule 702. The comments note that expert testimony does not "assist the trier of fact" if it is "superfluous and a waste of time" and would be excluded under Federal Rule of Evidence 403. Further, according to the note, "there is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Comments to Fed. R. Evid. 702. Simply put, expert testimony will only be permitted when it is necessary to understand an issue in the case.

An expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, "only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion." *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998). The opinion must be informed by the witness' expertise rather than simply an opinion broached by a purported expert." *Id.* Additionally, courts will commonly exclude expert testimony when such testimony falls within the knowledge of the average person. *Pelster v. Ray*, 987 F.2d 514 (8th

Cir. 1993) (excluding the opinion of an investigator qualified as an expert because the ability to compare odometer readings was within the knowledge of a layperson); *see also Beech Aircraft Corp. v. United States*, 51 F.3d 834 (9th Cir. 1995) (affirming the exclusion of testimony as to what was being said on a recording because hearing is within the ability and experience of the trier of fact).

Mr. Hochreiter did not call on any "special skill, knowledge or experience" to formulate the "opinions" in his Report, doing instead nothing more than any other layman could have done. He did not base his conclusions upon the formulation or application of reliable principles and methods, and his testimony will not assist the trier of fact with respect to any fact at issue herein. An examination of the analysis Mr. Hochreiter performed with regard to a specific party -- American Cyanamid Company ("American Cyanamid") -- illustrates these points. Mr. Hochreiter's statements concerning American Cyanamid are set forth on pages 3-1 to 3-5 and Table 1 of his Report. The statements, the volume numbers, and the tables came almost word for word from two sets of records -- American Cyanamid's own records produced in discovery, and those of waste hauler Marvin Jonas, Inc. (also produced in discovery).[3]

For example, the first two sentences of Section 3.1.1.1 of the Report are lifted directly from pages 1 and 2 of American Cyanamid's July 2, 1993 letter to the EPA. A copy of that letter is attached hereto and marked Exhibit C with the portions copied by Mr. Hochreiter highlighted. The remainder of Section 3.1.1.1 was taken directly from American Cyanamid's

---

[3] Mr. Hochreiter candidly admitted at deposition that he was unable to differentiate between the two sets of data, with regard to which set was more accurate or complete. *See* Hochreiter Dep. at 232:21-233:12 ("I'm going to take the opinion that we stated in the report, which is we accept everything at face value, and I'm not going to attempt to parse out which one is better than the other. It's really beyond my ability to do that."). This admission underscores the total lack of expertise utilized in the formulation of his report.

April 28, 1994 letter to EPA. A copy of that letter is attached hereto and marked Exhibit D with the portions copied by Mr. Hochreiter highlighted. The lists of wastes that comprise Section 3.1.1.2 were taken directly from the above two documents and from a December 15, 1977 American Cyanamid memorandum. The portion of the list of chemicals starting at "Intermediates Department" through the word "Isoprophanol" came from page 2 of Exhibit C. The portion of the list of chemicals starting at the words "sodium dichromate" and continuing through the words "Scrap paint chemical" were taken from pages 2-3 of Exhibit D. The portion of the list beginning with "Dyes Department" and continuing through "Waste solvents" was created from a December 15, 1977 memorandum by Mr. Frankel, an American Cyanamid employee. Hochreiter Dep. at 211:8-212:6. A copy of the memorandum is attached hereto and marked Exhibit E. Mr. Hochreiter admitted at his deposition that Exhibits C, D, and E were the source of these lists. Hochreiter Dep. at 203:7-212:1-6. He also admitted that the three sources of information from which he took the information most likely overlap and that he was merely "spitting [the information contained in these documents] back at them." Hochreiter Dep. at 212:12-217:7; 223:20-224:21. Mr. Hochreiter did no independent research or analysis to try and reconcile these different sources of information. Hochreiter Dep. at 224:12-225:15. Like he did virtually in the entire Report, he simply repeated what he saw on the page as if it was true using no analysis whatsoever.

Mr. Hochreiter's volume conclusions were also taken directly from exiting documents. Mr. Hochreiter's report contains two sets of waste types and quantities for American Cyanamid - one set based on American Cyanamid's own records and another set based on the records of waste hauler Marvin Jonas, Inc. The first set of waste types and quantities, which is found on page 1 of Table 1a of the Report, was taken directly from a single page of American

Cyanamid's 104(e) response to EPA. Hochreiter Dep. at 228:1-230:5. A copy of the relevant page is attached hereto and marked Exhibit F. Mr. Hochreiter explained where the entries on page 1 of Table 1a came from as follows:

> I mean, the mechanics are pretty simple. We wrote this document, we -- I took this information and literally transcribed it into a tabular format, it was easier to read, provided reference or Bates numbers for every individual entry, and I think on 1A, for at least the first page, the first page of three for Table 1A appears to come from Exhibit 8.
>
> I mean, its just a simple transcription.

Hochreiter Dep. at 229:17-230:5.

The second set of waste types and quantities on page 2 of Table 1a came directly from Jonas's waste hauler statements, which are annual statements required by the New Jersey Department of Environmental Protection that include information about the wastes that Jonas picked up from various municipalities in a given year. Mr. Hochreiter simply added the entries on Jonas's waste hauler statements reflecting waste picked up from Bound Brook, New Jersey and concluded that such quantities were picked up from American Cyanamid. The relevant pages of the hauler statements for 1972, 1974, and 1975 are attached hereto and marked Exhibit G. The quantities added by Mr. Hochreiter and included in his report are highlighted. Mr. Hochreiter testified that that he was not provided a copy of the Jonas hauler statement for the year 1976 when he was preparing his report. For the years 1976 and 1977, Mr. Hochreiter simply added the quantities of waste from American Cyanamid included in a three ring binder that Jonas began compiling in 1976 that includes entries for waste picked up by Jonas in those years. The relevant pages of the three ring binder are attached hereto and marked Exhibit H.

Mr. Hochreiter did not apply any "scientific, technical or other specialized knowledge" to formulate the "opinions" in his Report. Reading, writing, and multiplying are not

"expertise," much less expertise in hydrology or site remediation. The fundamental basis of Rule 702 thus cannot be met.

There is also a total lack of expert methodology in Mr. Hochreiter's Report. An expert's testimony must be based upon "reliable principles and methods" that are reliably applied to the facts of the case. Fed. R. Evid. 702. Reading is not expert methodology. Writing is not expert methodology. Simple arithmetic is not expert methodology. As is clear from the example of American Cyanamid, when Mr. Hochreiter saw a waste type and quantity on a document provided to him by Defendants' counsel, he simply replicated that information in the form of a chart. He could not differentiate between lists of various types of American Cyanamid's wastes contained in various documents. He simply reproduced various lists of wastes that were referenced in documents produced in discovery without understanding whether the lists were the same, different, or overlapping. Similarly, Mr. Hochreiter was not able to compile the information contained in the two sets of documents (American Cyanamid and Jonas documents) into one list of waste types and quantities for American Cyanamid because he simply lifted the information from the various documents without performing any analysis as to the meaning of the information in those documents. He expressly testified that it was "beyond his ability to do that." Hochreiter Dep. at 232:21-233:12. Mr. Hochreiter's transfer of information in many cases word for word from a specific document to a page of the Report is simply not methodology. He did not apply reliable principles and methods to the "facts," he simply moved the "facts" from a portion of a specific document into his Report without changing them in any way.

The only "adjustment" Mr. Hochreiter made to any of the numbers taken directly from specific pages of documents was to multiply certain of those numbers so that the volumes would fit within his artificially selected "Relevant Time Period." For instance, the American

Cyanamid records relied on by Mr. Hochreiter to determine the volume of American Cyanamid's wastes relate to the years 1976-1978. The listed quantities of wastes referenced in those documents were added together, resulting in a subtotal of 54,780 gallons of liquid waste materials for the 2.33 years between 1976 and 1978. This subtotal was then multiplied by 3.43, to "extrapolate" this amount over the full 8 year span,[4] resulting in Mr. Hochreiter's "conclusion" that 187,895 gallons of liquid waste were generated at Bound Brook during those eight years. This information was entered on his Table 1b.

When considering the Jonas records, which covered the years 1974-1977, Mr. Hochreiter simply added the amounts of all wastes referenced as handled by Jonas for a subtotal of 10,546,745 gallons. Then, to determine amounts for the years 1970, 1971, 1972, and 1973, he assumed that the volumes for those years were equivalent to the amount generated in 1974[5] to arrive at an "Extrapolated Jonas 8-Year Total" of 14,921,473 gallons.[6] These numbers, based upon the Jonas data, were also entered in Table 1b. Both sets of numbers were then entered on Table I ("American Cyanamid, Bound Brook NJ Historical Waste Summary 1969-1977").

Defendants may point to this massaging of specific volumes relating to a particular timeframe to fit his eight year time period as "methodology." First, Mr. Hochreiter simply determined the percentage of the eight year period reflected by the raw data then multiplied the volume for that specific time period to simulate an eight year volume. Division and multiplication are not expert methodology.

---

[4]   8 divided by 2.33 = 3.43. 54,780 multiplied by 3.43 = 187,895.40.

[5]   89,682 + 1,004,000 = 1,093,682.

[6]   10,546,745 (1974-1977) + 4,374,728 (1970-1973) = 14,921,473.

Second, the *decision* whether to multiply a specific "raw" volume was itself lacking in reliable principles and methods. Mr. Hochreiter testified that he extrapolated waste quantities in a given month or year over his entire eight year period whenever there was not evidence to the contrary that indicated that a particular waste or product ceased being manufactured or produced. Hochreiter Dep. at 249:17-254:15. Mr. Hochreiter's only rationale for applying this methodology was that it was a "reasonable assumption" that the wastes were generated consistently over his time period. Hochreiter Dep. at 253:23-256:8. Mr. Hochreiter did not perform any analysis whatsoever regarding the production rate of particular manufacturing processes and resulting waste streams over time for any of the Plaintiffs or Settled Defendants. Hochreiter Dep. at 250:24-251:20. Nothing in Mr. Hochreiter's knowledge of the movement of water through media (hydrology) and nothing in his knowledge of removing contaminants from media (site remediation) contributed in any way to his "assumption" that extrapolation was reasonable with respect to a given Plaintiff or Settled Defendant. He made no independent investigation and applied no independent analysis to determine whether, in fact, a waste stream for which there was evidence for, say, a one and a half year time period between 1974 and 1976 was even generated either before that time period or after that time period. Worse, he had no basis to conclude whether, even if it was, the rates of production in the before and after periods were the same as in the one and half year period. Mr. Hochreiter thus did not use any expertise to construct a "reliable method" that he could use to determine whether evidence of a particular waste stream in a particular time period accurately reflected the existence of the same waste stream and the same volumes throughout his arbitrarily-determined eight year period. Mr. Hochreiter even conceded that the lawyer taking his deposition would

probably have the requisite judgment to perform such extrapolations. *See* Hochreiter Dep. at 366:20-367:8.

The fact that a hyrdogeologist and site remediation expert performed these functions does not somehow transform the results into an "expert" opinion. Mr. Hochreiter's opinion was in no way informed by his expertise as a hydrologist and site remediation expert. In fact, Mr. Hochreiter explicitly states that his expertise as a hydrologist played no part in his preparation of this report. *Id.* at 365:7-12. His expertise in site remediation was not utilized either because, as he readily and repeatedly admits, he took the numbers at "face value" and performed no independent analysis or evaluation. Report at 2-2, Hochreiter Dep. at 345:7-9. Given that the very text of Rule 702 requires that an expert's opinion be based on "scientific, technical, or other specialized knowledge," Mr. Hochreiter's report and the opinions expressed therein simply cannot qualify as "expert testimony."[7]

It is most important to remember that Mr. Hochreiter is not being offered by the Defendants to testify as to the *contents* of the documents he reviewed. He is instead being

---

[7] The decision not to exclude the expert testimony presented in *Total Control, Inc. v. Danaher Corp.*, 338 F. Supp.2d 566 (E.D. Pa. 2004), is distinguishable. In *Total Control*, plaintiff presented a financial analyst who reviewed financial and business records and created a Report that calculated and summarized these damages. The defendant attempted to exclude such testimony by arguing that the expert used basic skills of arithmetic to arrive at his damage calculations, skills which are within the competence of an ordinary lay person. 338 F. Supp. 2d at 569. The Court disagreed, however, stressing that "*as a financial analyst*, his ability to present a vast quantity of calculations derived from disparate sources in an understandable format will assist the jury." *Id.* (emphasis added). Here, however, there is no jury, but the Court sitting as the finder of fact. More importantly, unlike the expert in *Total Control*, Mr. Hochreiter's expertise in hydrology and site remediation bear no relationship to the Report he created. The expert in *Total Control* instead utilized his "experience" as a financial analyst to pull together and present information on damages. There was thus a relationship between the background of the expert and the opinion that was being offered, a relationship utterly lacking in this case.

offered to testify, supposedly as an expert, that the volumes of waste set forth in the Report were *in fact* produced at the American Cyanamid facility over his eight year period of time. Defendants are no doubt intending to ask this Court to rely upon Mr. Hochreiter's testimony to itself make a finding of fact at trial that those volumes were produced in those quantities. This goes to the very core of Rule 702's requirement that expert opinion evidence that itself can be utilized by the trier of fact to determine facts in issue is only permitted where the requirements of that Rule are met. Nothing about Mr. Hochreiter's experience, knowledge, training, etc., and certainly nothing about the way in which he compiled the Report, satisfies those requirements. He should not be permitted to testify about *his* conclusions from the documents he read. This *Court* should instead make findings of fact at trial based upon *its* review and analysis of whatever evidence is permitted at trial.[8]

        Mr. Hochreiter's opinions are the results of simple mathematical calculations using only information generated by others and do not draw on any of his expertise in hydrology and site remediation. Such opinions cannot assist the trier of fact, as the subject matter is already within the understanding of a layperson. Mr. Hochreiter's Report and testimony therefore do not constitute admissible expert testimony pursuant to Rule 702 and should be barred.

---

[8] As set forth in the following Section, some or all of the documents Mr. Hochreiter reviewed may not actually be admitted into evidence at trial, so that there may be little or no evidence from which this Court could make the findings of fact proposed by Defendants.

**B.     Mr. Hochreiter's Opinions Are Inadmissible Because They Are Improperly Based On Hearsay Evidence In Violation Of Rule 703.**

Rule 703 clarifies that the expert generally may not disclose otherwise inadmissible evidence. Rule 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. The Advisory Committee comments to Rule 703 explain that the requirement that the facts or data "be of a type reasonably relied upon by experts in the particular field" is meant to prevent the undue break down of the rules of exclusion. For example, according to the comments, the opinion of an "accidentologist" based on statements of bystanders as to the point of impact in an automobile collision, would not be admissible since there is no area of expertise called "accidentology," such that no experts in that field reasonably rely on statements of witnesses in forming opinions. Advisory Committee Comments to Fed. R. Evid. 703.

Rule 703 makes clear that, for an expert's opinion to be admissible, the facts or data relied upon by the expert in forming his opinion do not need to be admissible into evidence "*if of a type reasonably relied upon by experts in the particular field* in forming opinions or inferences upon the subject." Fed. R. Evid. 703 (emphasis added). The Rule permits experts to rely on hearsay so long as that hearsay is of the kind normally employed by experts in the field. *In re TMI Litigation*, 193 F.3d 613, 697 (3d Cir. 1999). Moreover, courts have seen fit to

exclude expert testimony pursuant to Rule 703 when the expert merely repeats hearsay evidence without applying any expertise. *U.S. v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2002) (excluding testimony where the expert deviated from his expertise and was not translating drug jargon but instead relying on conversations with non-testifying witnesses to prove the truth of the underlying drug conversations); *see also U.S. v. Garcia*, 447 F.3d 1327 (11th Cir. 2006) (recognizing that where an expert repeats hearsay evidence without applying any expertise the expert's testimony must be excluded).

There is no doubt Mr. Hochreiter relied on hearsay evidence -- the records of American Cyanamid and Marvin Jonas, Inc. -- to prepare his report. His opinions based on these records cannot be admitted because such records are not of the type normally relied upon by experts in the field. To begin with, there is no particular "field" in which Mr. Hochreiter is forming his opinions and inferences. His opinions are most certainly not opinions in the fields of hydrology or site remediation, his areas of expertise. It is difficult to classify any particular "field" at all because his opinions amount to little more than a reorganization and restatement of the underlying information contained in the records. Additionally, as discussed above in Section B, Mr. Hochreiter has applied no expertise to this hearsay evidence. Mr. Hochreiter's report and "opinions" are merely an attempt by Defendants to establish the truth of the matters asserted in the records, namely the volume, form and nature of the wastes generated by the Plaintiffs' and Settled Defendants' manufacturing processes, without going through the proper procedures of admitting those documents into evidence.

Defendants should be required to establish at trial an evidentiary foundations for each specific document or other proof they want to offer into evidence and this Court should rule on the admissibility (including relevance) of each. This Court should thereafter make findings of

fact based upon any actual evidence admitted, rather than upon Mr. Hochreiter's own "findings of fact." As exemplified in *Dukagjini* and the Advisory Committee comments to Rule 703, where an expert applies no expertise to hearsay evidence, the requirements of Rule 703 are not satisfied and his opinion based on such evidence is inadmissible.

Because the hearsay evidence on which Mr. Hochreiter relied for his opinions is not of the type reasonably relied upon by experts in the particular field, his testimony does not meet the requirements of Rule 703 and should be excluded.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion *in Limine* to Strike Defendant's Expert.

Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership

By: _____
Glenn A. Harris, Esquire
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3440
E-mail: harrisg@ballardspahr.com

Dated: May 22, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS L.L.C., <br><br> Plaintiffs, <br> v. <br><br> ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., <br><br> Defendants. | : <br> : <br> : <br> : Civil Action No. 02-CV-3830 (LDD) <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

### DECLARATION IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION IN LIMINE TO STRIKE DEFENDANTS' EXPERT, JOSEPH J. HOCHREITER, JR.

GLENN A. HARRIS, ESQUIRE hereby certifies:

1.    I am a member of the law firm of Ballard Spahr Andrews & Ingersoll, LLP, and counsel for Plaintiffs in the above-captioned matter.

2.    I submit this declaration in support of Plaintiffs' Memorandum of Law in Support of Their Motion in Limine to Strike Defendants' Expert, Joseph J. Hochreiter, Jr.

3.    Attached hereto and marked Exhibit A is a true and correct copy of the Expert Report of Joseph J. Hochreiter, Jr., dated September 29, 2006.

4.    Attached hereto and marked Exhibit B is a true and correct copy of the Oral Deposition of Joseph J. Hochreiter, Jr., dated February 27, 2007.

DMEAST #9855654 v7

5.      Attached hereto and marked Exhibit C is a true and correct copy of a letter from American Cyanamid to the U.S. Environmental Protection Agency, dated July 2, 1993.

6.      Attached hereto and marked Exhibit D is a true and correct copy of a letter from Cytec Industries, Inc. to the U.S. Environmental Protection Agency, dated April 28, 1944.

7.      Attached hereto and marked Exhibit E is a true and correct copy of a letter from American Cyanamid Company to Jonas Inc., dated December 15, 1977.

8.      Attached hereto and marked Exhibit F is a true and correct copy of a document entitled "Summary of Waste Shipments Made by Bound Brook Plant Via Jonas 1976-1978", marked as "Hochreiter Exhibit No. 8."

9.      Attached hereto and marked Exhibit G is a true and correct copy of relevant portions of Jonas's waste hauler statements covering activities in the years 1972, 1974 and 1975.

10.     Attached hereto and marked Exhibit H is a true and correct copy of Jonas's ledgers for American Cyanamid.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Glenn A. Harris, Esquire

Dated: May 22, 2008