# EXHIBIT "B"
# Part 1 of 7

# ORIGINAL TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES, INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES
LLC and TI GROUP
AUTOMOTIVE SYSTEMS LLC
    Plaintiffs

                       CIVIL ACTION
   V               NO.02-CV-3830 (LDD)

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, ET AL.
    Defendants

        Oral deposition of JOSEPH
J. HOCHREITER, JR., CGWP, taken at
the law offices of Ballard Spahr
Andrews & Ingersoll, LLP, 1735 Market
Street, 42nd Floor, Philadelphia,
Pennsylvania, on Tuesday, February
27, 2007, at 9:39 a.m. before
Jennifer Bermudez, a Registered
Professional Reporter, and Notary
Public, pursuant to notice.



## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

```
 1    A P P E A R A N C E S :

 2    BALLARD SPAHR ANDREWS & INGERSOLL,
      LLP
 3        AMY M. TROJECKI, ESQUIRE
          TROJECKIA@BALLARDSPAHR.COM
 4        Plaza 1000, Suite 50
          Main Street
 5        Voorhees, New Jersey 08043-4636
          856-761-3440
 6        Attorney for Plaintiffs

 7

 8    WOLFF & SAMSON, P.C.
          THOMAS W. SABINO, ESQUIRE
 9        tsabino@wolffsamson.com
          The Offices at Crystal Lake
          One Boland Drive
10        West Orange, New Jersey 07052
          973-530-2044
11        Attorney For AETC

12

13    PHELAN, PETTIT & BIEDRZYCKI
          JEFFREY L. PETTIT, ESQUIRE
14        Jpettit@pp-b.com
          121 S. Broad Street
          Suite 1600
15        Philadelphia, Pennsylvania 19107
          215-546-0500
16        Attorneys for Ashland, Inc.

17

18    EDWARDS ANGELL PALMER & DODGE, LLP
          LYNN WRIGHT, ESQUIRE
19        lwright@eapdlaw.com and
          AYANA S. HARVEY, ESQUIRE
20        aharvey@eapdlaw.com
          750 Lexington Avenue
21        New York, New York 10022
          212-308-4411
22        Attorneys for Carpenter Technology
          Corp.

23

24
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

```
1    APPEARANCES (CONT'D):

2    CARELLA, BYRNE, BAIN, GILFILLAN,
     CECCHI, STEWART & OLSTEIN
3        MELISSA E. FLAX, ESQUIRE
         mflax@carellabyrne.com
4        5 Becker Farm Road
         Roseland, New Jersey 07068-1739
5        973-994-1700
         Attorney for Handy & Harman Tube
6        Company

7

8    HINMAN, HOWARD & KATTELL, LLP
         RALPH K. KESSLER, ESQUIRE
9        rkessler@hhk.com
         (Appeared via telephone)
10       106 Corporate Park Drive
         Suite 317
11       White Plains, New York 10604
         914-694-4102
12       Attorney for TI Automotive

13   DUANE, MORRIS, LLP
         SETH v.d.H. COOLEY, ESQUIRE
14       scooley@duanemorris.com
         30 South 17th Street
15       Philadelphia, Pennsylvania 19103
         215-979-1000
16       Attorney for Flexible Circuits

17

18   LAW OFFICE OF EDWARD FACKENTHAL
         EDWARD FACKENTHAL, ESQUIRE
19       edwardfackenthal@cs.com
         One Montgomery Plaza
20       Suite 209
         Norristown, Pennsylvania 19401
21       610-279-3370
         Attorney for NRM Investment Co.

22

23

24
```

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905

FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

EXAMINATION INDEX

JOSEPH J. HOCHREITER, JR., CGWP
      BY MS. TROJECKI                                        6


EXHIBIT INDEX

                                                        MARKED
HOCHREITER

1     EXPERT REPORT                                          9

2     E-MAIL FROM LYNN WRIGHT                            125
      TO KISHA MOREIRA-SMALL
      FEBRUARY 21, 2007 WITH
      ATTACHED PROFESSIONAL
      SERVICES AGREEMENT

3     E-MAIL FROM VALERIE                                163
      HOLLIDAY, SEPTEMBER 19
      2006 WITH ATTACHED DRAFT
      EXPERT REPORT

4     E-MAIL FROM LYNN WRIGHT                            189
      AUGUST 22, 2006

5     LETTER FROM AMERICAN                               202
      CYANAMID COMPANY, JULY 2
      1993, CYTC000031 -
      CYTC000038

6     LETTER FROM CYTEC                                  203
      INDUSTRIES, INC. APRIL
      28, 1994, CYTC000043 -
      CYTC000050

7     LETTER FROM SIDNEY A.                              212
      FRANKEL, DECEMBER 15
      1977 WITH ATTACHMENTS

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    EXHIBIT INDEX CONTINUED:

2                                                      MARKED

3    8    ATTACHMENT TO AMERICAN                       229
          CYANAMID'S 1993 RESPONSE
4         TO THE EPA 104(e)
          INFORMATION REQUEST
5
     9    DOCUMENT PREVIOUSLY                           257
6         IDENTIFIED AS JONAS 11

7    10   NRM INVESTMENT STATEMENT                     260
          TO DEFENDANT'S EXPERT
8
     11   E-MAIL FROM VALERIE                          317
9         HOLLIDAY, SEPTEMBER 20
          2006 WITH ATTACHED DRAFT
10        REPORT

11   12   REVISED COPY OF EXPERT                       369
          REPORT
12

13

14

15

16

17

18

19

20

21

22

23

24

1          JOSEPH J. HOCHREITER, JR.,
2    CGWP, having been duly sworn, was
3    examined and testified as follows:
4                    EXAMINATION
5    BY MS. TROJECKI:
6        Q.    Good morning,
7    Mr. Hochreiter.  My name is Amy
8    Trojecki, and I represent the
9    Plaintiffs in this action.
10       A.    Good morning.
11       Q.    I'm just going to go over a
12   few instructions with you about the
13   deposition today in general.
14             First, I want to let you
15   know that your answers today are
16   under oath and they carry the same
17   weight as they would if you were in
18   court.
19             Secondly, I ask that you
20   give verbal responses to all my
21   questions, rather than nodding your
22   head or using any hand gestures so
23   that the court reporter can take down
24   all your testimony.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1            Third, I ask that only one

2    of us speak at a time so there's no

3    confusion for the court reporter.

4            I ask that you listen to my

5    questions, ask for clarification if

6    necessary, and if you do answer the

7    question I assume that you are

8    answering to the best of your

9    ability.

10           Please give full and

11   complete answers but do not guess.

12   You may estimate or approximate at

13   times but do not guess.  If you

14   realize at any point that an answer

15   that you provided to me is incorrect

16   or needs to be amended, just let me

17   know and we will correct that.

18        A.    Okay.

19        Q.    Finally, your lawyer is

20   permitted to object to the form of a

21   question; however, in those instances

22   you must still answer the question.

23   Therefore, it is up to you, not your

24   lawyer to ask for clarification if

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    you do not understand the question.

2              Do you understand that?

3    A.    I understand that.

4    Q.    Are you currently on any

5    medication that would impact your

6    ability to testify today?

7    A.    I am not.

8    Q.    Can you state your name,

9    address, and date of birth.

10   A.    Joseph Hochreiter, Jr., 252

11   Hollow Branch Lane, Yardley, PA,

12   19067.  Date of birth is 1/29/55.

13   Q.    I just want to go through

14   briefly your educational background.

15              Can you tell me, where did

16   you get your undergraduate degree?

17   A.    Temple University.

18   Q.    And your resume --

19   actually, let's mark your expert

20   report.  I am going to have marked as

21   Exhibit 1, Hochreiter 1, your expert

22   report that you prepared in this

23   matter.

24              (Hochreiter Exhibit 1 was

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    marked for identification.)

2    BY MS. TROJECKI:

3        Q.    Your resume indicates in

4    Appendix A that you utilized Temple's

5    Custom Degree Program to get your

6    degree; is that correct?

7        A.    That is correct.

8        Q.    What is a Custom Degree

9    Program?

10       A.    A Custom Degree Program

11   allows the student to basically

12   select their own major, and since I

13   was torn between going to law school

14   at the end of my undergraduate career

15   or staying with the U.S. Geological

16   Survey, where I was working part-time

17   while I was going to school, I took

18   the option of basically developing my

19   own undergraduate curriculum and

20   career path.

21       Q.    And what was that program?

22       A.    What I did was I had a

23   general liberal arts degree,

24   undergraduate, and then I went back

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      under sponsorship with the U.S.

2      Geological Survey and took somewhere

3      near 30 additional semester hours of

4      science and math in order to qualify

5      for what I would call a general

6      physical science degree that would

7      qualify me to become a hydrologist at

8      the USGS.

9          Q.    So your liberal arts

10     degree, I guess what was your course

11     of study, what was your major to get

12     the liberal arts degree?

13         A.    Again, the major was

14     custom-derived, so I studied a broad

15     range of things as an undergrad.  I

16     had some science.  Keep in mind I

17     started at Drexel University my

18     freshman year.

19             So I took computer

20     programming, environmental science, I

21     believe it was called environmental

22     chemistry, a variety of scientific

23     courses, but I also took a heavy

24     concentration of philosophy courses

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

11

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    oriented towards possibly becoming an

2    attorney.

3         Q.    And did you attend school

4    full-time?

5         A.    I attended school full-time

6    and also part-time, because it took

7    me about six years to complete my

8    undergraduate.

9         Q.    And that's through Drexel

10   and Temple you took undergraduate

11   courses, correct?

12        A.    That's correct.

13        Q.    So after you received your

14   liberal arts degree, you then went

15   back and got 30 additional credits;

16   is that correct?

17        A.    That's correct, under the

18   sponsorship of the USGS.

19        Q.    And those classes were

20   specifically geared towards

21   hydrology?

22        A.    Well, at the undergraduate

23   level you really couldn't get

24   hydrology courses.  I took the

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    hydrology courses in graduate school
2    later.
3        Q.    So who determined what
4    classes you took for that extra 30
5    credits?
6        A.    That was primarily done in
7    consultation with the USGS.
8        Q.    And was that a program that
9    they offered to many students or
10   something that you worked --
11       A.    I sort of worked that out
12   individually with them.  They didn't
13   want me going to law school, they
14   wanted me to stay in the sciences, so
15   that was the deal we struck.
16       Q.    And was there an issue that
17   they felt that you weren't qualified
18   with your liberal arts degree and you
19   needed to take more training?
20       A.    They felt that I needed to
21   beef up the science and engineering
22   coursework, yes.
23       Q.    Your resume also indicates
24   that you attended Drexel University

JDR

James DeCrescenzo Reporting, LLC

215.564.3905        InnovatingLitigation        FAX 215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                    www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   for graduate studies in environmental

2   engineering and science?  Is that

3   correct?

4        A.    That's correct.

5        Q.    When did you start

6   attending Drexel?

7        A.    I believe it was 1983.

8        Q.    And that's for the graduate

9   studies?

10        A.    That's correct.

11        Q.    Did you get a degree from

12   Drexel?

13        A.    I did not.  The USGS again

14   sponsored me to do that and I went

15   into private consulting before I

16   completed my degree.

17        Q.    How close were you to

18   getting your degree?

19        A.    Probably halfway.

20        Q.    And what courses did you

21   take?

22        A.    I took graduate geology,

23   biostatistics, the complete hydrology

24   sequence.  Actually, I waived the

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    requirement for introduction to

2    hydrology because I was already a

3    hydrologist.   I took surface water

4    hydrology, groundwater hydrology and

5    groundwater modeling.

6         Q.    And how many years were you

7    taking courses at Drexel, graduate

8    courses?

9         A.    About two years.   About two

10   years part-time.

11        Q.    So you had started with the

12   USGS before you went to Drexel for

13   your graduate studies?

14        A.    That's right.   Well, that's

15   not quite right.

16             I got to the U.S.

17   Geological Survey through Drexel, the

18   cooperative education program that

19   they have, at the end of my freshman

20   year.   It was my time to take a

21   co-op, and the job that they offered

22   me was with the U.S. Geological

23   Survey.

24        Q.    I'm just going to ask that

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    you wait until I finish asking my

2    question just so the court reporter

3    can take down everything.

4        A.    Sorry.

5        Q.    Your resume also states

6    that you are a certified groundwater

7    professional, correct?

8        A.    That's correct.

9        Q.    What is that?

10       A.    It's a national

11   certification in the groundwater

12   field.  It is issued by the National

13   Groundwater Association, which is the

14   professional trade association for

15   people in my discipline.

16       Q.    And what do you have to do

17   to become certified?

18       A.    You have to have at

19   least -- now, I don't recall these,

20   because it was a long time ago that I

21   got my certification, but to the best

22   of my recollection it was seven or

23   eight years of professional

24   experience.

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    You had to submit several,
2    what they call white literature
3    reports or papers that you had
4    written for peer review.  They had to
5    review your academic credentials, and
6    there were some other requirements
7    that off the top of my head I can't
8    recall.  It was about a six-month
9    process to complete.
10    Q.    Is there anything that you
11    have to do on a continuing basis to
12    remain certified?
13    A.    I do.  I have to maintain
14    36 professional development credits
15    over every three-year period of
16    recertification.
17    Q.    I will just go briefly
18    through your employment history.  So
19    your first job at the end of your
20    first year at Drexel when you were
21    taking undergraduate courses was with
22    the USGS, correct?
23    A.    After I was finished my
24    freshman year, I started with the

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    USGS, I believe in 1973.

2         Q.    And you went full-time to

3    Drexel your first year; is that

4    correct?

5         A.    That's correct.  Yes.

6         Q.    And what was your position,

7    your first position at the USGS?

8         A.    I was an intern.

9         Q.    And what did you do as an

10   intern?

11        A.    Two things that I recall.

12   One was a study using air photography

13   that one summer of the Manasquan

14   River Basin for a surface water

15   model.  We basically perimetered all

16   of the land use patterns so that we

17   could load that into the surface

18   water model.

19             And I also conducted

20   analytical tests for the USGS

21   chloride intrusion network, where I

22   basically ran chloride titrations.

23        Q.    And that was during the

24   summer after your first year of

1    college, correct?

2         A.    That is correct.

3         Q.    When did you start full-

4    time with the USGS?

5         A.    I don't recall exactly.  It

6    was somewhere in my sophomore year of

7    college.  I would work two or three

8    days a week at the USGS, and then I

9    would take a full 16 or 18 semester

10   hours at Temple and basically shuttle

11   via SEPTA between Trenton and

12   Philadelphia.

13        Q.    And what did you do for the

14   USGS during that time?

15        A.    Mostly field work.  I was

16   considered an intern and also a

17   hydrologic technician.

18             So, basically, I would

19   conduct surface water flow studies,

20   surface water quality studies, what

21   we call time-of-travel studies, a

22   variety of -- I ran, for a period of

23   time, the laboratory that they had in

24   Trenton.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
                        1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                                  www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1              It was pretty much anything
2    that needed to be done in field
3    support, I pretty much did.
4         Q.    So you were actually the
5    guy out there collecting samples?
6         A.    That's correct.
7         Q.    And how long did you do
8    this for the USGS, how long were you
9    a hydrologic technician?
10        A.    Until I received my degree,
11   somewhere around 1978 or '79, and
12   then I became a hydrologist.
13        Q.    So up until that point, you
14   were working for the USGS and taking
15   undergraduate courses?
16        A.    That's correct.
17        Q.    Did you do anything at the
18   USGS while you were a hydrologic
19   technician that provided any training
20   or experience related to the
21   preparation of your expert report in
22   this case?
23        A.    As a hydrologic technician,
24   I would say other than

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

20

1    familiarization with chemicals and

2    laboratory processes, probably not

3    much.

4         Q.    So after you received your

5    liberal arts degree you were then, I

6    guess, promoted at the USGS; is that

7    correct?

8         A.    That is correct.

9         Q.    And promoted to what?

10        A.    Hydrologist.

11        Q.    Now, that was after the 30

12   credits, correct?

13        A.    I believe so, yes.  It may

14   not have included completion of all

15   of those credits, but somewhere in

16   that time frame, that one year or

17   year-and-a-half time frame, I

18   received a promotion.

19        Q.    And to the best of your

20   recollection, I think your resume

21   states that that was in 1979; is that

22   correct?

23        A.    That's right, yes.

24        Q.    What is entailed or

1    describe to me what a hydrologist is?

2         A.    It's a water scientist,

3    basically.  It's the field of science

4    that looks at the occurrence of

5    surface water, groundwater, the

6    interactions of the two from a flow

7    perspective, from a water quality

8    perspective.

9         Q.    What did you do for the

10   USGS as a hydrologist?

11        A.    I managed regional aquifer

12   studies.  I shifted from that period

13   of time from mostly a surface water

14   emphasis to a groundwater emphasis.

15             I still conducted field

16   work.  I still oversaw the

17   installation of wells and

18   geotechnical samples and geologic

19   samples on my projects; however, I

20   was transitioning more into a

21   management role where I was managing

22   projects and managing teams of

23   professionals working for me on those

24   projects.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          Q.     Anything else?

2          A.     In broad brush, I think

3     that covers it.

4          Q.     And when you say you

5     managed regional aquifer studies,

6     what is that?

7          A.     Well, I can give you a

8     specific example.  We were

9     investigating the Potomac-Raritan-

10    Magothy aquifer system, which is in

11    the coastal plain -- actually in

12    Philadelphia here as well as in

13    southern New Jersey.

14               And we investigated the

15    occurrence of the formation, in other

16    words, where the Potomac-Raritan-

17    Magothy aquifer units actually

18    existed in three-dimensional space.

19               We conducted regional water

20    level measurements to try to

21    understand how groundwater flow

22    patterns are influenced by pumpage.

23               We did extensive

24    groundwater quality studies where we

JDR

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    looked for things like volatile

2    organic compounds, pesticides, PCBs,

3    those sorts of things, the

4    interaction of the Delaware River

5    estuary with the aquifer.

6              So we did surface water

7    studies of the estuary.  In fact, I

8    probably published one of the first

9    studies of the water quality of the

10   bed material of the Delaware River

11   estuary from Trenton to Wilmington.

12        Q.     And when you say you

13   managed the regional aquifer study --

14        A.     I was the project chief, as

15   they would call it.  I was the person

16   responsible for establishing the

17   budget and making certain that the

18   performance of the project met, you

19   know, the project goals and met the

20   budgetary objectives.

21        Q.     And when you say you

22   shifted to a groundwater emphasis,

23   what do you mean by that?

24        A.     I moved from the surface

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

24

1    water division of the USGS's office

2    in Trenton, New Jersey, to the

3    groundwater division at the time that

4    I shifted from being a hydrologic

5    technician and student intern to

6    becoming a hydrologist.

7         Q.    When you were a hydrologic

8    technician, you worked for the

9    surface water office, correct?

10        A.    The surface water group,

11   yes.  There was another aspect with

12   my experience with the USGS as a

13   hydrologist that you should be aware

14   of, and that was I started a program

15   with Region 2 of the USEPA to bring

16   hydrologic expertise into their case

17   teams on Superfund sites.

18             It was at that time USEPA

19   Region 2 only had one hydrologist on

20   staff.

21        Q.    Was that something that

22   somebody came to you and asked you to

23   do, was it your --

24        A.    You know, the actual

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    genesis of how that started, I don't

2    really recall.  If I had to surmise,

3    I would say that my boss probably

4    brought the opportunity to me.

5        Q.    And what did that entail,

6    bringing hydrologic expertise into --

7        A.    We worked closely with

8    middle-level management at EPA Region

9    2 in the Superfund group, as well as

10   the actual project managers, the case

11   managers as they call them in EPA

12   Region 2, and we would become adjunct

13   staff, essentially, for their

14   Superfund projects.

15            In some instances we would

16   go out and conduct investigations of

17   new Superfund sites side by side with

18   EPA personnel.  In other instances we

19   simply reviewed reports, provided

20   written comments and evaluated the

21   compliance path from a groundwater

22   perspective for a number of Superfund

23   sites.

24       Q.    So it was more on a case-

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   by-case basis.  If EPA needed a

2   hydrologist to get involved, then

3   they would contact the USGS and work

4   with you?

5        A.    That is correct.  That is

6   correct.

7        Q.    And when you say you

8   investigated new Superfund sites,

9   what do you mean by that?

10       A.    I can give you one example

11   that sort of stands out in my mind,

12   because it was the only time that I

13   ever entered a site under the

14   supervision of federal marshals.

15            We waited about two hours

16   for the marshals to arrive at a

17   portion of the Vineland Chemical

18   Company site in Cumberland County,

19   New Jersey.

20            The marshals forced access

21   so that we could look at a -- not the

22   home plant but a remote piece of

23   property where there was -- there

24   were allegations of dumping that had

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                         www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

```
1    occurred.
2                 And we went out and
3    actually conducted surface
4    geophysical investigations to look
5    for buried drums and containers and
6    things of that nature.
7         Q.    So how is that something
8    that a hydrologist -- or why is it
9    something a hydrologist would do as
10   opposed to an EPA staff?
11        A.    The ultimate concern, I
12   guess, for most Superfund sites, once
13   you have dealt with removal of the
14   source material, is where did the
15   material that got released to the
16   environment end up in the
17   environment, and it almost always
18   ends up -- oftentimes ends up in
19   groundwater.
20                So from the very beginning
21   of the investigation of a Superfund
22   site, you want to have a pretty good
23   idea of whether there's a threat for
24   groundwater and, if there is, start
```

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    to understand how you can investigate

2    the groundwater, and if you need to

3    do some sort of mitigation, start

4    thinking about that as well.

5        Q.    Was this the first time

6    that you actually started doing work

7    at contaminated sites?

8        A.    No.  The program that we

9    had with EPA was the first time that

10   we specifically focused on Superfund

11   sites.

12           However, the groundwater

13   work that I started doing in 1979

14   when we were looking at the regional

15   occurrence of volatile organic

16   compounds in regional aquifer systems

17   was really the first time that I

18   started looking at, you know, the

19   occurrence of organic chemicals in

20   the environment and trying to figure

21   out where they might be coming from.

22       Q.    But was that work that you

23   did when you were studying the

24   regional aquifer system related to

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                    FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    particular contaminated sites?

2         A.    In some instances it was.

3    The regional Potomac-Raritan-Magothy

4    aquifer system study was not

5    particularly focused on individual

6    sites, although we probably sampled

7    wells at 30 or 40 industrial

8    facilities along the Delaware

9    estuary.

10         However, there were follow-

11   up studies that resulted, for example

12   in Logan Township, down near the

13   Commodore Barry Bridge, where we did

14   very specific -- we did a subregional

15   study of groundwater quality, and we

16   were looking and actually sampling

17   wells and doing investigations at

18   Rollins Environmental Services and at

19   the Bridgeport Rental & Oil Services

20   site, the B.R.O.S. site, the Monsanto

21   Chemical site, all in that particular

22   community.

23         Q.    Did you do anything at the

24   USGS while you were a hydrologist

James DeCrescenzo Reporting, LLC
InnovatingLitigation
215.564.3905
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      that provided any training or

2      experience related to the preparation

3      of your expert report in this case?

4           A.     I believe so, yes.

5           Q.     And what were those things?

6           A.     The familiarity with

7      disposal practices at contaminated

8      sites; the familiarity with the types

9      of chemicals that are typically

10     deposited at these sites when they

11     are used as disposal facilities; some

12     of the investigative techniques that

13     are used and that were used, for

14     example, at Boarhead Farms in the RI;

15     we were doing those types of

16     investigations back from 1979 through

17     the early and mid-1980s.

18          Q.     Anything else?

19          A.     Nothing else, that I can

20     think of.

21          Q.     How did learning or

22     becoming familiar with disposal

23     practices help you to prepare your

24     expert report in this case?

JDR

James DeCrescenzo Reporting, LLC

215.564.3905                 InnovatingLitigation              FAX  215.751.0581
                      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                             www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1        A.    The expert report required

2    familiarity with waste

3    classifications and understanding

4    inorganic wastes from organic wastes

5    and the different types of waste

6    categories that comprise the universe

7    of things that could have

8    theoretically left the plaintiffs and

9    settled defendants sites.

10            So, certainly developing a

11    good familiarity with those wastes

12    firsthand through investigations of

13    other sites in the field, I think,

14    gave me a very good understanding of

15    how to understand what those

16    chemicals are all about and how they

17    behave in the environment.

18            (Discussion off the

19    record.)

20    BY MS. TROJECKI:

21        Q.    I guess just -- can you

22    kind of go over that again for me.

23    Basically, you said that you acquired

24    a familiarity with disposal practices

32

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    while you were a hydrologist, and can

2    you explain to me how that helped you

3    in your expert report in this case?

4         A.    Well, it gave me a

5    familiarity with disposal practices

6    generally at contaminated sites; it

7    gave me a familiarity with the types

8    of chemicals, the classifications of

9    chemicals that are oftentimes

10   disposed of at contaminated sites;

11   and since the objective of our expert

12   report was to give us as thorough an

13   understanding as possible of the

14   types of waste materials that were

15   generated by the plaintiffs and

16   settled defendants during the period

17   of time that the Boarhead Farms site

18   operated, I see a direct connection

19   between those early investigative

20   efforts and the studies that we did

21   and the type of investigation that we

22   needed to do here.

23        Q.    How did you becoming

24   familiar with types of chemicals help

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   you prepare your expert report in

2   this case?

3       A.   I'm not sure I understand

4   exactly what you are looking for

5   beyond what I have already given you,

6   so perhaps if you can help me focus

7   on what it is you are looking for.

8       Q.   You listed three areas

9   where your training as a hydrologist

10  helped you prepare your expert report

11  in this case.  First was your

12  familiarity with disposal practices,

13  correct?

14      A.   That's correct.

15      Q.   The second was your

16  familiarity with types of chemicals?

17      A.   That were generated as

18  waste materials going to sites of

19  this type, yes.

20      Q.   So they are interrelated,

21  then?

22      A.   They are.  In my mind they

23  are interrelated, yes.

24      Q.   And the third thing that

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

34

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    you named is investigative

2    techniques, such as the investigative

3    techniques that were used at the RI

4    at Boarhead Farms.   Correct?

5         A.    That is correct.

6         Q.    How did that help you

7    prepare your expert report in this

8    case?

9         A.    For one thing, I was given

10   as part of the documentation the

11   RI/FS reports that CH2M HILL

12   prepared, and we read those reports

13   as part of our research for trying to

14   understand site conditions, even

15   though the main focus of the expert

16   report was not what was actually

17   disposed, in fact it wasn't the focus

18   at all of what was disposed at the

19   Boarhead Farms site.

20            We were primarily

21   interested in the direction that we

22   took, and we were provided direction

23   by counsel as to look at waste

24   materials that were produced by these

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

35

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    companies during the period of

2    interest.

3            We did not make any

4    attempts to connect waste materials

5    to the Boarhead Farms site, but it

6    was important to understand what

7    kinds of materials were disposed of

8    at the Boarhead Farms site since

9    that's the reason we are here.

10        Q.    So given that explanation,

11   did the fact that you knew how to

12   read an RI really help you out in

13   preparing your expert report in this

14   case?

15        A.    It helped to some extent,

16   yes.

17        Q.    Just in the general

18   understanding of what you were

19   reading?

20        A.    I believe so, yes.

21        Q.    After you left the USGS,

22   what did you do next?

23        A.    I went to Environmental

24   Resources Management, or ERM, in

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Princeton, New Jersey.  I believe

2    that was 1987.

3        Q.    Your resume actually

4    indicates that you started with ERM

5    in '88 but that you started

6    consulting in '87, and I just wanted

7    to make sure that you didn't do

8    anything in between?

9        A.    If there is inconsistency

10   in the resume, please point it out

11   and I will make a correction.

12       Q.    It's a small -- it says

13   that you started consulting in 1987?

14       A.    With ERM.  It was the end

15   of '87.

16       Q.    Okay.

17       A.    And certainly if it's

18   inconsistent on the resume, I can

19   correct that.

20       Q.    So what did you do for ERM?

21       A.    I started as a project

22   manager and the person responsible

23   for the groundwater science practice

24   in their new Princeton office.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    I was the first employee

2    that the branch manager hired and, in

3    that role, I basically helped him

4    develop the consulting practice from

5    a business standpoint as well as a

6    science standpoint.

7    Q.    Did your position change at

8    any point while you were with ERM?

9    A.    Yes.

10    Q.    How so?

11    A.    As I indicated, I started

12    as a project manager, and in the four

13    and a half or five years that I was

14    there I ended up taking over the

15    branch manager position, which was

16    the responsibility for running the

17    Princeton office of ERM.

18    Q.    So what types of things did

19    you do on a day-to-day basis when you

20    first started with ERM?

21    A.    We did -- well, first of

22    all, I did very little field work.

23    That was probably a point in my

24    career where going out in the field

38

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    and actually collecting the data or

2    doing the laboratory analysis ceased

3    and now I was purely in management.

4              So I was hiring

5    professional staff; I was developing

6    business with the assistance of my

7    colleagues; I was developing

8    relationships with the parent office

9    in West Chester, Pennsylvania, and

10   the large hydrogeology practice that

11   they had there.

12             I conducted ECRA

13   investigations, NPL or Superfund site

14   investigations, worked as part of

15   multidisciplinary teams to conduct

16   risk assessments, engineering

17   feasibility studies, did some

18   environmental compliance auditing,

19   because my boss at that time was an

20   environmental compliance auditor, so

21   he taught me basically how to do

22   that.

23        Q.    What training did you

24   receive to enable you to do those

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  types of activities, the ECRA

2  investigations, Superfund

3  investigations?

4      A.    There were some on-the-job

5  training experiences; there was

6  coursework that I took where Rutgers

7  University would offer an extension

8  course on ECRA and compliance with

9  ECRA.  I remember several of those

10  courses over the course of my early

11  career as a consultant.

12      Q.    Were you the only person in

13  the office when you worked at ERM?

14      A.    With my boss Brian Bennett,

15  we were the only two people.

16      Q.    Throughout the whole time

17  you worked with ERM?

18      A.    No.  No.  Probably for the

19  first four or five months.

20      Q.    You were there for four

21  years, correct?

22      A.    Four and a half years, to

23  be precise.  I think it was October

24  '87 to March of '92.  I'm pretty

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    certain that was the time frame.

2         Q.    What types of clients did

3    you have while you were with ERM?

4         A.    Almost exclusively

5    industrial clients or Superfund site

6    committee clients comprised of

7    industry.

8         Q.    And at what point did you

9    become a branch manager?

10         A.    I don't recall exactly, but

11    I believe it was around 1990, maybe

12    early '91.

13         Q.    And how did your

14    responsibilities change as a branch

15    manager?

16         A.    Fairly importantly.  I

17    became responsible for the profit-

18    and-loss of that business unit.

19              I supervised not only the

20    investigation side of the shop, which

21    was my primary responsibility up to

22    that point, but also the engineering

23    side of the shop, the, what we called

24    management consulting, which was the

JDR
James DeCrescenzo Reporting, LLC

215.564.3905              InnovatingLitigation              FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    regulatory auditing and compliance

2    side.

3            I had responsibility for

4    overseeing all of those business

5    practices, including also an

6    environmental construction practice

7    that came on line the last year, year

8    and a half I was there.

9        Q.    What is that?

10       A.    At the time it was called

11   ERM Enviro Clean.

12           It was basically -- I took

13   one of my scientists and gave him to

14   the environmental construction

15   company, the in-house construction

16   company for ERM, and he was setting

17   up, essentially, a construction

18   practice.

19           What do they do?  They do

20   environmental demolition, demolishing

21   old chemical plants, they do the

22   actual remedy implementation, they

23   construct the groundwater treatment

24   systems, the soil and surface water

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

42

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    treatment, depending on what the

2    technology was.

3              So we would take the

4    engineering side of things, the

5    design, and move it over into

6    construction, and we would actually

7    do that as well.

8         Q.    When you say you worked on

9    Superfund site investigations, what

10   specifically did you do?  Did you

11   design a remedial investigation?

12   Describe to me what specifically that

13   entails.

14        A.    We would design remedial

15   investigations, I think that says it

16   quite accurately, and then oversee

17   their implementation and then, when

18   the data would come in, we would

19   evaluate that data and write reports

20   and then make recommendations for

21   further study when it was warranted.

22        Q.    Why did you leave ERM?

23        A.    I had a job offer that was

24   much more attractive to me at

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Blasland, Bouck & Lee.

2         Q.    And what did you do at ERM

3    or what training or experience did

4    you acquire from working at ERM that

5    relates to the preparation of your

6    expert report in this case?

7         A.    It gave me additional

8    experience working in industrial

9    plant settings. So I had a better

10   understanding of plant processes and

11   how waste is generated and how it is

12   transported and disposed of, or at

13   least it was in previous times.

14         I also had a hand through

15   our management consulting practice in

16   helping companies change those

17   practices so that they were more

18   compliant with current environmental

19   regulations and laws.

20         The environmental

21   construction practice gave me direct

22   experience understanding how you

23   build and construct environmental

24   remedies, how you dig up drums from a

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    site, how you dig up underground

2    tanks.

3              I became, somewhere during

4    that period of time, a licensed

5    subsurface evaluator for the New

6    Jersey DEP, because of the

7    underground tank work that we were

8    doing at that time.

9        Q.    Anything else?

10       A.    I'm sure there are many

11   other specific examples I could

12   provide, but, I mean, in general, I

13   think that speaks to the issues that

14   were germane in that expert report.

15       Q.    And how did you get -- when

16   you say you got additional experience

17   in industrial plant settings, how did

18   that help you in your preparation of

19   your expert report in this case?

20       A.    That's a hard question to

21   answer, because there aren't

22   specific -- I can't point to a

23   specific piece of information that I

24   gleaned while doing an environmental

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1     audit of a chemical facility that all
2     of a sudden gave me insight on how to
3     go through all of the documentation
4     of nine or ten or eleven entities and
5     their waste generation practices.
6            But it's a cumulative
7     effect.  You go to enough facilities
8     and you see how material is
9     generated; you audit how they handle
10    that material and how it's ultimately
11    disposed of.
12            You investigate how they
13    disposed of these things in the past,
14    and it gives you a general
15    understanding of industry practices,
16    not only current -- current circa,
17    1987 to '92, but also how things were
18    done 10, 15, 20 years prior.
19        Q.    Did you ever, up until that
20    point at the USGS or with ERM, study
21    what types of industrial waste may
22    have been generated by a particular
23    facility?
24        A.    Yes.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1        Q.      How so?

2        A.      Well, when we would conduct

3    a remedial investigation and we would

4    find things in soil and we would find

5    things in groundwater, we were

6    obligated to try to determine where

7    that came from, what was the source.

8            You know, it was one thing

9    to understand how these things move

10   in the environment, but it was

11   ultimately our job to find out how

12   they got there.

13           And once we understood how

14   they got there, we needed to

15   understand how to fix that problem,

16   not only the release of the

17   chemicals, but also start to look

18   backward into the plant process and

19   understand how they handle those

20   materials, to see if we can help them

21   do a better job of handling them in a

22   way that doesn't cause a release into

23   the environment.

24       Q.      So let's just start with

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    the first one where you said the goal

2    was to determine the source of

3    contamination and that led you to

4    actually go back and find out what

5    facility it came from, correct?

6         A.    What part, usually part of

7    the facility, if we were working on a

8    facility, unless it was an off-site

9    source, and that's always a

10   possibility, where we would be

11   looking at other contributions to a

12   problem on our facility or our

13   client's facility.

14             But, principally, what we

15   were looking at were situations where

16   contaminants were released on our

17   client's facility and we had to do

18   the forensic investigation back to

19   try to understand how they got there

20   and do something about it, design a

21   remedy to correct the problem.

22        Q.    And that's more on a

23   contaminated site basis, correct, not

24   an environmental audit?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.       It really blended both.   It

2    really blended both.

3               And I think that's one of

4    the reasons why my boss Brian

5    Bennett, very early on in my career

6    with ERM, got me involved in the

7    environmental audit process, because

8    he wanted me to understand, and he

9    felt as a government scientist coming

10   into consulting, that it was really

11   important for me to have a good

12   understanding of how industrial

13   processes and practices occur, and,

14   frankly, I learned a lot from those

15   experiences and what he taught me.

16        Q.    Okay.   Let's, if it makes

17   sense to separate the two, to say,

18   first, let's deal with the

19   contaminated site issue.

20        A.       Uh-huh.

21        Q.    If you have a contaminated

22   site, you want to determine the

23   source of contamination of that site?

24        A.       That's correct.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.     And that would allow you to

2  understand the industrial processes

3  or how the waste got to be there; is

4  that correct?

5      A.     In a very general way,

6  yes.  In order to -- you can have a

7  contamination event and, if you do

8  nothing to try to understand how it

9  got there, you still have the ability

10  to deal with that contaminated event

11  or that contamination event.

12         You can evaluate the impact

13  of soil, you can evaluate the

14  potential for impact to groundwater

15  and maybe to surface water streams,

16  sewers, that sort of thing, and

17  implement remedies, dig up

18  contaminated soil or treat it or

19  investigate groundwater, understand

20  where it's going and determine the

21  appropriate technology.

22         You don't have to bring an

23  understanding of how that material

24  got there necessarily for dealing

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    with what you call the contaminated

2    site issue.

3         However, if you really want

4    to serve the client effectively, you

5    want to be able to say okay, well,

6    this contaminated event occurred,

7    let's figure out ways and improve

8    processes so that it doesn't happen

9    into the future.

10        And that brings you into

11   the compliance and audit side.

12        Q.    Taking out the audit side

13   and the goal to prevent that this

14   would happen in the future, if you

15   are just dealing with a contaminated

16   site issue, would that cause you to

17   have to go back and actually

18   determine what part of an industrial

19   process would have contributed to the

20   contamination?

21        A.    There are instances where

22   you find a suite of chemicals and you

23   need to understand whether those

24   chemicals were part of the original

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

51

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  depositing or the release or whether

2  they perhaps were biotransformation

3  products of biological degradation of

4  those materials.

5          It would be helpful then to

6  know what's going on in the plant so

7  that you can determine is it possible

8  that chemical X might have been

9  actually released from a process, or

10  did it occur as part of some sort of

11  a biological transformation in the

12  subsurface.

13          That would be one example

14  of where it would be important just

15  on the contaminated site side to

16  understand what is going on in the

17  plant.

18      Q.    Are there any other

19  reasons, other than that, just on the

20  contaminated site side?

21      A.    Certainly.  There was an

22  ECRA/ISRA case, it was both because

23  it lasted that long, that I worked on

24  where they basically cleaned printed

1    circuit boards, they manufactured

2    printed circuit boards.

3         And they used chlorinated

4    solvents to clean those circuit

5    boards before doing repairs on them,

6    and they were on private well and

7    septic.

8         So any of the waste

9    material that was generated from the

10   solvent cleaning of the circuit

11   boards ended up in the septic system,

12   which was not designed to degrade

13   chlorinated hydrocarbons, and that

14   resulted in a significant groundwater

15   contamination problem that actually

16   left the property in North Jersey and

17   impacted a water supply system for a

18   hotel.

19        And, in that instance, it

20   became evident that, once we

21   understood that we had a problem in

22   the subsurface and we traced it to

23   the septic system, that it was

24   immediately apparent that we go into

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    the plant and understand what

2    processes were occurring in that

3    facility to generate those chemicals

4    and actually talk to plant employees

5    and have them explain how they

6    handled the chemicals so that we

7    could find a pathway between the

8    place where the chemicals were used

9    and the septic system.

10           And once we identified

11   that, it was paramount that we worked

12   with plant personnel to change those

13   disposal practices so that it didn't

14   happen again.

15           So there is a very good

16   example of site contamination issues

17   bringing us right back into

18   operations and compliance practices

19   in a facility.

20      Q.      But that's more of a -- we

21   were talking about just contaminated

22   site issues, forgetting about the

23   audit side.

24      A.      But it was a

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

54

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   contaminated -- I mean, that was a

2   contaminated site issue, and for the

3   first year and a half of our

4   examination, maybe a year, we were

5   just focused on chlorinated solvents

6   in groundwater and trying to figure

7   out what was going on there.

8            And once we traced it back

9   to the septic system, we immediately

10  worked our way into the plant. Does

11  that address your question?

12      Q.    But the importance of

13  tracing it back into the plant was

14  more for an ongoing basis, correct,

15  and not to address the cleanup of the

16  contamination?

17      A.    Absolutely, it was directly

18  associated with the cleanup of the

19  contamination.  There was

20  contamination that was released

21  several years prior to our discovery

22  of the problem that had already left

23  the site, but there was also material

24  being released ongoing into that

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    septic system, and it was absolutely

2    critical that we stop that or there

3    was no way that we could implement a

4    remedy.

5        Q.     Okay.    Now let's talk about

6    just the audit side, the

7    environmental compliance side.

8            How often did you do

9    environmental audits while you were

10   with ERM, or what percentage of your

11   practice would you say that that

12   entailed?

13       A.    I would say that once a

14   month for at least a couple years I

15   was involved in a regulatory

16   compliance audit.  Most of those,

17   although not all of them, was work

18   that was done for what was called an

19   audit consortium.  We worked for

20   groups of industrial companies that

21   sent waste to facilities for

22   destruction and disposal.

23           So we would audit the

24   transportation disposal treatment

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

215.564.3905

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    process on behalf of that audit

2    consortium of these third-party

3    waste-processing and handling and

4    disposal facilities.

5          In addition, we would do

6    regulatory compliance audits directly

7    for industry, where we would go into

8    their facilities and actually

9    evaluate their compliance with RCRA,

10   resource conversation and recovery

11   act requirements, individual state

12   requirements and, in one instance,

13   the Commonwealth of Puerto Rico

14   requirements.

15        Q.    Can you describe to me a

16   little bit further the transportation

17   disposal treatment audits, was that

18   for, you know, one group of

19   companies?  What's the difference

20   between that and when you said you

21   did individual regulatory compliance

22   work?

23        A.    Okay, that's a good

24   question.  The work that we did for