# EXHIBIT "B"
# Part 2 of 7

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   the audit consortium was we evaluated

2   a number of facilities.

3              We were always working for

4   the same client, which was a group,

5   it was a group of industrial

6   companies, typically the Fortune

7   100-type member companies that

8   collectively decided that every year

9   a number of facilities, 20, 25

10  facilities, where they individually

11  sent their wastes, needed to be

12  evaluated for compliance with laws,

13  compliance with best management

14  practices.

15             And so, basically, we would

16  report back to that consortium and

17  give them an indication of how

18  effective these facilities were at

19  handling the waste, and get a

20  scorecard.

21      Q.    What was the name of the

22  client?

23      A.    That I don't recall.   I

24  don't recall the name of the client.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.    But the work you did for

2   that client was limited to auditing

3   the disposal facility; is that

4   correct?

5      A.    That is correct.  And then

6   sometimes where the audit or the

7   disposal facility actually took their

8   wastes, because these facilities

9   sometimes had clearinghouses where

10   the wastes would come in and be

11   classified and managed and possibly

12   treated, and then the ultimate

13   disposal of that mass was somewhere

14   else.

15         So we would look at either

16   the collection treatment point, the

17   ultimate disposal point or both.

18      Q.    So did that require that

19   you actually go to the actual source

20   of the waste and do any analysis as

21   to how it was generated, the amount,

22   the volume of waste that was

23   generated?

24      A.    Usually for the consortium,

1    usually, we did not do that.  We were

2    looking primarily at the process from

3    the time it left the facility and was

4    ultimately processed off site and

5    disposed of off site for the

6    consortium audits.

7        Q.    And when you say you gave

8    them a scorecard, it was just this

9    landfill is complying with

10   regulations, it's not complying, was

11   that was the score was telling them?

12       A.    We didn't limit it to

13   strict compliance with regulation

14   issues.  We were also looking at best

15   management practices.  Whether there

16   was a law regulating that particular

17   practice or not, it didn't really

18   matter.

19            You could be technically in

20   compliance with all laws and still

21   not be doing the best job you could

22   be in terms of making certain that

23   the waste was being handled properly.

24            So a lot of what we did in

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    terms of recommendations related to

2    best management practices at the

3    time.

4         Q.    And now let's just talk for

5    a minute about the second category of

6    compliance audits where you did

7    compliance audits for direct

8    individual industrial clients; is

9    that correct?

10        A.    That is correct.

11        Q.    And what did that entail?

12        A.    Basically going in -- what

13   we would do is start out with a paper

14   study of the facility or facilities,

15   oftentimes they were multiple

16   facilities for a client, and we would

17   basically go across the country and

18   look at four or five or six different

19   facilities.

20             And we would develop a

21   questionnaire that was custom

22   tailored for that industry and the

23   types of wastes and manufacturing

24   practices that they had, and we would

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                        FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    conduct interviews with appropriate

2    management personnel at each of the

3    facilities, as well as if there was a

4    corporate environmental group we

5    would interview them as well.

6              We would do a physical tour

7    of the facilities and actually start

8    with incoming raw materials and work

9    our way through to waste materials

10   coming out the back end.

11             My role, of course, was

12   almost always these audits were done

13   as teams, interdisciplinary teams.  I

14   was in there as a scientist, we would

15   have, more often than not, a

16   remediation engineer.

17             We would have, oftentimes,

18   a regulatory compliance specialist,

19   who was really well versed with the

20   appropriate regulations for each of

21   those facilities, and we worked as a

22   team and, at the end of the day- or

23   two-day audit for each facility, we

24   would develop our list of

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    recommendations.

2              Depending on how the audit

3    was set up, we would oftentimes make

4    recommendations directly to plant

5    personnel for improvement of things

6    that we thought needed immediate

7    improvement and then we would report

8    back to the client, usually with a

9    written report of our findings,

10   although not always a written

11   report.  Sometimes it was simply a

12   verbal presentation.

13        Q.    And were these audits

14   limited to waste issues?  Did you

15   audit the facility for every area of

16   environmental compliance, or can

17   you -- further narrowing the subject

18   of the audit?

19        A.    The subject of the audit

20   could be one or two issues related to

21   waste.  Oftentimes, it was much more

22   than that.

23              It evaluated at times OSHA

24   health and safety compliance, where

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   we would bring an OSHA expert in on

2   our team, if that was what they were

3   looking for.

4            We would look at impact,

5   environmental potential for practices

6   and their impact on the environment.

7            We would look at compliance

8   with pretreatment disposal to a

9   treatment plant.  For example, if

10  they were sending processed waste to

11  a city sewer plant, are they in

12  compliance with any pretreatment

13  requirements that might exist,

14  because those were coming on line in

15  the early '90s.

16           Just a variety of things of

17  that sort.  So the scope of these

18  audits were really dependent on what

19  the client wanted us to look for.

20       Q.    Was there anything that you

21  were not qualified to do as far as

22  environmental compliance auditing?

23  How would you know to say no, this is

24  something we could do or we are not

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    qualified to do this?

2        A.    Well, if you're talking

3    about me personally or are you

4    talking about the firm?

5        Q.    You personally.

6        A.    There are many things that

7    I wasn't qualified to do on my own,

8    and I wouldn't do them.  I would work

9    with -- for example, if we had an

10   OSHA audit requirement, I would sit

11   in on the discussions, but I would

12   not -- and I might offer an

13   observation here or there, but it was

14   the CIH or the environmental

15   professional in that field that led

16   that audit for that particular

17   component and made the

18   recommendations.

19       Q.    So what were the things,

20   then, that you were qualified to do,

21   as far as the audit is concerned?

22       A.    Environmental compliance,

23   looking at compliance with local

24   environmental regulations, RCRA,

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    CERCLA, state cleanup requirements,

2    certainly anything to do with

3    environmental impacts of plant

4    practices, soil investigations -- I'm

5    sorry, soil contamination,

6    groundwater contamination.

7              I got involved in

8    industrial pretreatment requirements

9    for, you know, compliance with sewage

10   requirements, whatever the treatment

11   works would require in terms of

12   compliance with making sure that we

13   are not sending really nasty stuff

14   out the pipe, that sort of thing.

15        Q.    So when you say just the

16   general overall, you said, first

17   thing, environmental compliance.  I

18   just want to see if we can narrow

19   that down more.

20        A.    Okay.

21        Q.    Are you talking about just

22   the things you said afterwards, RCRA,

23   CERCLA, cleanup requirement,

24   environmental impact on groundwater,

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                    FAX  215.751.0581
www.JDReporting.com

66

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

```
1    industrial pretreatment, is that the

2    limit of the environmental compliance

3    that you are speaking of?

4         A.    I can't, at this point in

5    time, give you a complete universe of

6    things that at that time I was

7    considered by ERM to be qualified to

8    do.

9         And since we worked with a

10   multidisciplinary team, you know, my

11   input was sought on engineering --

12   remediation engineering issues or

13   even plant engineering issues.

14        I'm not an engineer, I'm

15   not a PE, and I never presented

16   myself or would ever present myself

17   as such.  However, as a scientist, I

18   look at things a little differently

19   because of my training than perhaps

20   an engineer does, and the way we set

21   these things up is we deliberately

22   brought scientists and engineers and

23   other environmental professionals,

24   occasionally CIHs, together so they
```

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    are all working together and

2    providing different perspectives on

3    the issues.

4                    Ultimately, for, say, a

5    groundwater contamination problem I

6    would be the lead person to write

7    that recommendation or that part of

8    the audit report.   For an issue that

9    an engineer would be best to opine,

10   that person took the lead.

11                   MS. FLAX:   Could you read

12   back two questions ago?

13                   (The court reporter read

14   back the following:

15                   "Q.    So what were the

16   things, then, that you were qualified

17   to do as far as the audit is

18   concerned?")

19   BY MS. TROJECKI:

20       Q.      You briefly described how

21   your role as a scientist was

22   different than the regulatory

23   compliance expert.

24       A.      The regulatory compliance

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    expert in consulting generally is a

2    multidisciplinary type background.

3              You can be an engineer, you

4    can be a scientist, you can be, from

5    a variety of different disciplines

6    within science and engineering and,

7    because of the work that you are

8    doing and the on-the-job training as

9    well as, you know, some of the

10   specialty coursework training you

11   might take, that can make you a

12   regulatory compliance specialist.

13             For most of us working in

14   the field for many, many years, you

15   become a regulatory compliance

16   specialist because you are dealing

17   with the regulations and advising

18   clients on regulatory compliance

19   issues day in and day out.

20       Q.    Did your work as a

21   scientist on these audits require you

22   to go back into the plant and

23   evaluate what the manufacturing

24   processes were and the waste

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    generated as a result of that?

2        A.    Yes.

3        Q.    And how so?

4        A.    It was the nature of the

5    work we were doing, quite frankly, as

6    we have just talked about for the

7    last 15 minutes.  I think I have

8    described in a number of ways exactly

9    that aspect.  That's what we were

10   looking at.

11            We were looking at

12   manufacturing processes, raw material

13   coming in, how the material was

14   handled and how waste products, waste

15   byproducts, were handled, stored,

16   disposed of.  So it brings you right

17   into the heart of the plant and how

18   you -- how you are dealing with

19   waste.

20            We even had people that had

21   expertise -- particularly starting in

22   1990, '91 with waste minimization

23   and, you know, providing

24   recommendations, and this wasn't my

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      particular area of expertise, but I
2      certainly worked with these people,
3      that would look at a process and say
4      there are ways to minimize the amount
5      of waste or the characterization, the
6      types of waste that you are making.
7          Q.    How often would you say
8      that you performed an audit for these
9      private industrial companies?
10         A.    When I said that I
11     performed audits roughly once a
12     month, those were either consortium
13     audits or private company audits.
14         Q.    And can you give me a
15     better idea as to what percentage was
16     private versus the consortium?
17         A.    Honestly, no.  I would have
18     to say that the consortium probably a
19     little more than the private, but
20     they are close to 50-50.
21         Q.    And can you give me an
22     estimate as to how many audits you
23     performed for the private industrial
24     facilities?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1     A.     For the private industrial

2   facilities, by individual facility or

3   by particular project?

4     Q.     By particular project.

5   Like, could you say, I probably

6   performed 50 audits, you know, while

7   I was with ERM, some sort of

8   estimate?

9     A.     No, it wasn't that many.   I

10   would say private audits a dozen or

11   so, and then the consortium audits a

12   dozen to 15.

13     Q.     And do you recall what

14   types of clients you -- what types of

15   facilities the industrial facilities

16   were, the 12 private ones that you

17   did?

18     A.     One was a

19   telecommunications company.   I

20   believe it was one of the non-Bell,

21   early telephone companies.   I think

22   it was GTE.

23         Another one was a plating

24   operation, where they actually did

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

72

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    metal plating, chrome plating. I did

2    several of those. In fact, I

3    actually did a little bit of work for

4    the trade association that one of the

5    platers was affiliated with.

6         There were audits for

7    chemical companies. Off the top of

8    my head, I can't recall who. But

9    that gives you a good cross section

10   of what we did.

11        Q.    And your training for

12   conducting the audits, that was all

13   on-the-job training?

14        A.    There may have been and, in

15   fact, I believe there was at least

16   one outside course in environmental

17   auditing that I took. I can't recall

18   where and I can't recall when, but

19   Brian Bennett, my former boss was a

20   strong proponent of formal training

21   as well as on-the-job training, but

22   most of my training was on the job.

23        Q.    And that one course, was

24   that a one-week course?

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      A.    I don't recall.  It could

2  have been a week, it could have been

3  a day.  At this point in time I just

4  don't remember, because I can't

5  recall where we took it.

6      Q.    But it certainly wasn't

7  like a semester course or a

8  graduate --

9      A.    It wasn't a college course.

10      Q.    And after you left ERM,

11  where to next?

12      A.    BBL.  Blasland, Bouck &

13  Lee, we will call BBL so the

14  stenographer doesn't have to

15  pronounce or write that long name.

16      Q.    And you started with them

17  in 1992?

18      A.    '92, that's correct.

19      Q.    And did you do the same

20  type of work that you were doing at

21  ERM or something different?

22      A.    Pretty much the same type

23  of work.  The big difference or one

24  of the differences, I would say, is

74

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    that we didn't have at BBL a

2    management consulting auditing

3    practice per se, at least in the

4    business unit that I was working in.

5         So we did that type of

6    work, but it was done more in the

7    traditional site investigation, site

8    remediation side of the shop.

9         Q.    So at BBL you did the ECRA

10   investigations, Superfund

11   investigations, risk assessments,

12   feasibility studies, correct?

13        A.    That's correct.  I was

14   responsible for the hydrogeology and

15   remediation engineering practices for

16   the New Jersey office of BBL.

17        Q.    They are two separate

18   practices?

19        A.    At that time in that

20   business they were, yes.  They were

21   two different groups in the same

22   office.

23        Q.    Were you actually

24   designing, like, remedial

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    investigations and remedial

2    alternatives or were you doing more

3    like a management supervising role

4    while you were at BBL?

5                    MS. WRIGHT:    Objection as

6    to form.

7                    THE WITNESS:    The work

8    involved both management as well as

9    actual scientific consulting, so I

10   was doing both.

11   BY MS. TROJECKI:

12       Q.    And were the clients at BBL

13   the same type of clients as you

14   serviced at ERM?

15       A.    Yes.    They weren't the same

16   clients, but they were the same type

17   of clients.

18       Q.    And did your position

19   change at all while you were with

20   BBL?

21       A.    No.    I started as a vice

22   president and ended my career,

23   retired with them, as a vice

24   president.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

76

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          Q.     Did you conduct audits

2     while you were with BBL?

3          A.     I did.

4          Q.     The same type of audits

5     that we spoke about with ERM?

6          A.     No, the audits at -- I did

7     a few of the regulatory performance

8     audits similar in scope to what we

9     did with ERM, but I was on, I guess

10    what we would call a super

11    due-diligence team of senior people

12    that would come together and, I

13    believe, we came together three times

14    for merger-acquisition-type

15    transactions, where Mega Company A is

16    buying Mega Company B, and we would

17    be brought in to evaluate 130

18    facilities in two and a half months.

19         Q.     And what were you

20    evaluating?  Was that limited to due

21    diligence?

22         A.     It was usually a pretty

23    robust environmental overview,

24    regulatory compliance, third-party

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    waste disposal, you know, where were

2    they sending their waste?

3                Was there any auditing that

4    had been done?  What do we know about

5    these third-party facilities?  What

6    do we know about soil, groundwater,

7    surface water impacts?  What do we

8    know about potential natural resource

9    damage claims, a whole host of

10   issues?

11       Q.    And how many of those do

12   you think that you performed?

13       A.    I was involved in three of

14   those during my tenure at BBL.

15       Q.    And did that provide any

16   training or experience related to

17   your expert report in this case?

18       A.    I think so.  I think it

19   provided additional incremental

20   experience on plant and industrial

21   practices.

22       Q.    What types of facilities

23   were they?  You said there were three

24   of them.  Do you remember what kinds

**JD**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905
FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   of industrial facilities they were?

2       A.    They were manufacturing

3   facilities for a variety of different

4   products.  A lot of traditional heavy

5   manufacturing.  I don't want to --

6   actually, I'm still bound to

7   confidentiality on at least the most

8   recent one that I have done, so.

9       Q.    The first facility -- all

10  three facilities were manufacturing

11  facilities; is that correct?

12      A.    These were not facilities.

13  These were projects, and each of

14  these projects involved a number of

15  facilities that we would look at,

16  swarm basically, with

17  multidisciplinary teams.

18      Q.    So is it okay to call them

19  companies, then, there were three

20  companies that you worked for?

21      A.    That is correct, yes.

22      Q.    And the first company, what

23  type of company was that, just

24  generally?

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.      A Fortune 50 diversified

2    manufacturing company.

3          Q.      When you say diversified,

4    what did they manufacture?

5          A.      They manufactured aircraft

6    engines and water treatment plant

7    components and a variety of things

8    that, again, I would probably just

9    want to keep very general, because

10   these things were all done under a

11   significant requirement for

12   confidentiality.

13         Q.      What type of company was

14   the second company?

15         A.      It was a chemical company,

16   as I recall, and we were looking at a

17   number of locations that this

18   chemical company would be acquiring,

19   so they were primarily -- and I don't

20   recall exactly what the chemical

21   processes were, but they were

22   basically chemical plants that we

23   were looking at.

24         Q.      And how about the third

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                         FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  company?

2        A.    It was the same as the

3  first.

4        Q.    Was it the same client?

5        A.    The same client, yes.

6        Q.    So just to be clear, your

7  client was the potential buyer in all

8  instances?

9        A.    I would really rather not

10  say.

11        Q.    I guess what I'm trying to

12  get at, then, is the type of company

13  that you actually were doing the work

14  for and you actually got experience

15  learning about the plant processes,

16  was that the diversified manufacturer

17  that you are speaking of?

18        A.    Yes.   Uh-huh.

19        Q.    And why did you leave BBL?

20        A.    I decided that I wanted to

21  retire.   I had just turned 50 years

22  old and I wanted to do more -- I

23  wanted more balance in my life

24  between professional work and the

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    nonprofit work that I have always

2    been involved in, I wanted to do more

3    of that.

4              And I had a clause in my

5    contract, as a long-standing partner

6    at BBL, that allowed me to form my

7    own company and not have it seen as

8    being in competition with BBL, with

9    certain guidelines, and that clause

10   was probably going to go away in the

11   next year or so, so I exercised the

12   option to take it.

13        Q.    Do you want to take a

14   break?

15        A.    Sure.  Yes.

16             MS. TROJECKI:  Let's take a

17   quick break.

18             (Recess taken)

19   BY MS. TROJECKI:

20        Q.    So after you left BBL, you

21   started your own company; is that

22   correct?

23        A.    That's correct.

24        Q.    And what kind of company is

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                    FAX  215.751.0581
www.JDReporting.com

82

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Senior Environmental Consulting?

2         A.    It is essentially a sole

3    proprietor company.  I continue to do

4    consulting work to some of BBL's

5    clients under contract to now Arcadis

6    BBL, because just about the time that

7    I left they executed an agreement for

8    BBL to be purchased by Arcadis.

9              And I have a number of my

10   own clients now that I am doing

11   environmental consulting work, too.

12        Q.    What type of consulting

13   work?

14        A.    Primarily higher-end site

15   investigations, site redevelopment,

16   ground fields redevelopment type

17   work, continuing to do some work in

18   Superfund site investigation and

19   cleanup, water supply consulting,

20   litigation support where I'm

21   occasionally a technical expert in

22   disputes and helping people resolve

23   disputes.  That pretty much covers

24   it.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1        Q.        Who is the owner of SEC?

2        A.        I am.

3        Q.        Do you have any employees?

4        A.        I do not.

5        Q.        If you can just turn to

6    Page 1-2 of your report, and it

7    states there that you managed or

8    directed the investigation of over 50

9    contaminated sites as an

10   environmental consultant.  Do you see

11   that?

12       A.        Yes.

13       Q.        Does this pertain to the

14   collective number of sites while you

15   were at ERM, BBL, and SEC?

16       A.        As well as the work that I

17   did while I was essentially the

18   hazardous waste specialist at the

19   USGS working with EPA Region 2.

20       Q.        Were the six sites that are

21   listed on Page 1-2, the six Superfund

22   sites, the only Superfund sites that

23   you worked on?

24       A.        No.

84

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          Q.     Can you estimate the number
2    of Superfund sites that you worked
3    on?
4          A.     These were projects that I
5    had a significant management role in
6    and scientific consulting role.
7    There were other Superfund sites
8    where I was brought in as a
9    consultant, but I was, you know, one
10   of many that were providing support
11   services, so I didn't list those.
12         Q.     The first paragraph under
13   qualifications states that you are a
14   hydrogeologist.  What training did
15   you receive that enables you to call
16   yourself a hydrogeologist?
17         A.     Part of the training that
18   we did not discuss was the USGS
19   national training center coursework
20   that I took.
21            The USGS has their own -- I
22   won't call it a university, but it is
23   certainly a national training center
24   for training people in the field of

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103         FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    hydrology.   Since very few people

2    graduate with an undergraduate degree

3    in hydrology, you really need to take

4    people from other disciplines and

5    turn them into hydrologists.

6              So I've had a number of

7    courses at that center in Lakewood,

8    Colorado, and, occasionally, in other

9    locations throughout the country.

10             I took a year of graduate

11   hydrology while I was at Drexel.   I

12   had other academic coursework,

13   terrestrial ecology, aquatic ecology,

14   environmental science courses, as

15   well as the on-the-job training that

16   I received at the USGS, as well as at

17   ERM and BBL.

18        Q.    So there's no sort of

19   certification that you need to

20   complete to be able to say, you know,

21   I'm a hydrogeologist now?

22        A.    If you are practicing in

23   certain states that have a

24   requirement for a professional

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  geologist certification, then in

2  order to be able to certify a report

3  you need to have a PG.

4           In New Jersey there is no

5  requirement, where most of my work is

6  done, there is no certification for

7  geologists, so I decided early on in

8  my consulting career when I needed a

9  certification I would go for a

10 national one, which I did.  The CGWPG

11 has served that role for me.

12      Q.    Now, in the states that do

13 have the requirement that you would

14 be a certified geologist, would you

15 qualify for that?

16      A.    I would qualify, but I

17 haven't made application for it,

18 because, frankly, I haven't needed

19 it.

20      Q.    Appendix A of your report

21 lists various representative projects

22 that you worked on.  I'm going to

23 call your attention to the section

24 titled Expert Services.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.     Okay, I'm there.

2          Q.     Were the projects that are

3     listed under Expert Services all

4     performed while you were with SEC,

5     your own company, or throughout your

6     career?

7          A.     Throughout my career.  In

8     fact, there's a place on my website

9     which is the source for all this

10    material there, and I don't know

11    exactly where it says that but -- in

12    fact, I think it says it two pages

13    back.  Let's see.

14          "Much of this experience

15    represents work performed by

16    Mr. Hochreiter during his 13-year

17    tenure at BBL.  Mr. Hochreiter

18    continues to consult to BBL as a

19    senior scientist on several of these

20    projects."

21          So I would say the majority

22    of this experience summary is derived

23    from my 13 or so years at BBL.

24          Q.     And when you say Expert

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Services, what do you mean by that?

2        A.    What I mean by that are

3    projects where my expertise as an

4    environmental scientist, as a

5    hydrologist, as a hydrogeologist, are

6    brought into situations where we are

7    either doing high-end auditing, there

8    is actually litigation where parties

9    are in dispute, and they need help

10   resolving that dispute.

11           In most of those cases, I

12   have been involved in a role where I

13   have helped the parties settle the

14   dispute before it gets to trial.

15           I have been involved in two

16   mediations as a technical resource.

17   I have been involved in a couple of

18   arbitrations where I have provided

19   technical expertise.

20           So I broadly defined expert

21   services as not just situations where

22   I wrote an expert report.  Most of

23   these, in fact, were situations where

24   I was providing high-end consulting

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    services to help people either in a

2    compliance environment or in a

3    potential litigation environment.

4         Q.    Now, are all of the times

5    that you actually drafted an expert

6    report in litigation referenced under

7    Expert Services in your report?

8         A.    I believe so.  I believe

9    so.

10        Q.    I think there are 12

11   descriptions.  Can you point out

12   which ones you actually prepared an

13   expert report, as far as the

14   litigation?

15        A.    Well, I would have to go

16   through each one and see.  On the

17   first page of Expert Services at the

18   bottom you will see -- or I actually

19   mentioned an expert report in the

20   Ernstrom & Dreste matter.  The entry

21   above that, the Flaster Greenberg

22   entry, that was an expert report as

23   well on a water supply litigation.

24              On the second page of

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Expert Services for the Confidential

2    Steel Company, and that produced an

3    expert report.   The project below

4    that, the chlorinated solvent in

5    Landing, New Jersey, that produced an

6    expert report.   And the next one,

7    which was the Bateman, Coley, et al.,

8    confidential insurance company

9    litigation, that produced an expert

10   report.

11            I tried to be careful if I

12   produced an expert report to actually

13   say so.

14        Q.    Okay.   That's why when I

15   was reading it, some of them I

16   noticed you did and some didn't.

17        A.    No, because in the other

18   examples I provided expert services,

19   but we either resolved the dispute

20   before we had to get to expert report

21   or we went to mediation or something

22   else.

23        Q.    Are there any others where

24   you didn't produce an expert report

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.      The Blank, Rome case in

2     southeastern Pennsylvania, we did not

3     produce an expert report for that.

4          Q.      Where were you --

5          A.      We were actually doing the

6     environmental compliance on that.

7          Q.      And you were with what

8     company?

9          A.      That one was ERM.  Although

10     I believe that project also carried

11     over into my early days at BBL.

12          Q.      Okay, how about the next

13     one?

14          A.      That did not produce, the

15     PCBs in central New Jersey, that did

16     not produce a report.

17          Q.      And which company were you

18     at when you worked on that project?

19          A.      That was BBL.

20          Q.      And was that a litigation?

21          A.      It was.

22          Q.      So what was your role in

23     that case?

24          A.      Advising my client on the

93

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    issues that, if we were actually to

2    go to trial, providing technical

3    opinions on essentially the degree of

4    cleanup and the cost of cleanup at

5    this site.

6          Q.    How about the one above

7    that, Schwartz, Simon & Eddelstein?

8          A.    Neither of those cases,

9    which are still active, have yet

10   provided or required an expert

11   report.

12         Q.    So when you say those, you

13   are talking about the first two on

14   the last page?

15         A.    For a confidential

16   insurance company that is represented

17   by the law firm of Schwartz, Simon &

18   Eddelstein providing expert services

19   in defense of two separate cost

20   recovery actions.

21         Q.    And you are still working

22   on that now for SEC; is that correct?

23         A.    That is correct, yes.

24         Q.    And what is the nature of

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    the expert services in that case?

2         A.    We are advising the

3    insurance company and qualifying

4    remediation expenses associated with

5    the cleanup of petroleum hydrocarbons

6    that released from residential home

7    heating oil tanks.

8         Q.    So you were providing an

9    estimate of the remediation costs, is

10   that --

11        A.    Among other things, yes.

12        Q.    How about the one above

13   that, the Cozen and O'Connor?

14        A.    That was one that settled

15   very, very quickly.  We did not

16   provide an expert report on that.

17        Q.    And which company were you

18   working with for that project?

19        A.    We were working for an

20   insurance company who was supporting

21   a railroad, as I recall.  And these

22   were sites in Colorado, Wyoming, the

23   western U.S.

24        Q.    What was the nature of the

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    work that you did for the insurance

2    company?

3         A.    Basically evaluating -- as

4    I recall, the case related to the

5    disposal of -- or not the disposal,

6    that's the inappropriate word.  The

7    use of certain types of material as

8    railroad ballasts and the

9    environmental implications associated

10   with using that material along rail

11   right-of-ways throughout several

12   states.

13        Q.    So what did you

14   particularly do with respect to that

15   project?

16        A.    We advised counsel on some

17   of the environmental geochemical

18   remediation option-type issues

19   associated with -- you know,

20   basically starting to understand what

21   the potential environmental science

22   issues are associated with the use of

23   that material as a railroad ballast.

24        Q.    And which company were you

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    working for when you worked on this

2    project?

3         A.    It was an insurance

4    company.  Actually, I think it was a

5    group of insurance companies.

6         Q.    No, I mean were you with

7    ERM?

8         A.    Oh, I'm sorry.  I'm sorry.

9    I was with BBL.

10        Q.    And the one above that,

11   where you prepared an expert report

12   on contaminant transport, were you

13   working with ERM, BBL, or SEC?

14        A.    BBL.

15        Q.    What was the nature of your

16   work in that case?

17        A.    We were working for an

18   insurance company that was

19   representing a transporter and

20   disposer of material at this site, as

21   my recollection serves, and we

22   evaluated issues related to how far

23   contaminants traveled on the

24   Superfund site in the subsurface,

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   primarily groundwater. And I believe

2   an out-of-court settlement was

3   reached in that case.

4        Q.    And the one above that,

5   were you with ERM, BBL, or SEC?

6        A.    I was with both ERM and BBL

7   on that case. And I believe the

8   litigation actually was during BBL's

9   tenure.

10       Q.    How about the one above

11  that, confidential steel company?

12       A.    That was ERM. Hold on a

13  minute. Was that -- let me refresh.

14  That was with BBL, I was right at the

15  beginning of my tenure at BBL.

16       Q.    And the one that starts

17  before Environmental Construction

18  Company that is represented by the

19  law firm of Ernstrom & Dreste?

20       A.    Yes.   That's SEC.

21       Q.    And the Flaster Greenberg

22  one you said you provided expert

23  services with respect to water supply

24  issues; is that correct?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
            1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.     Yes, water supply

2     litigation.   We actually sued the

3     State of New Jersey and the DEP

4     commission.

5          Q.     Was that while you were

6     with SEC?

7          A.     BBL and, currently, at SEC.

8          Q.     And the one above that for

9     a confidential insurance company

10    client, you worked with the law firm

11    of Cozen and O'Connor?

12         A.     Okay.   That was at BBL.

13    And, in that instance, I actually

14    brought another professional in to

15    actually do the testifying in my

16    company.   So I provided the behind-

17    the-scenes, I was sort of the behind-

18    the-scenes expert but not the

19    testifying expert.

20         Q.     So when you say selected

21    the testifying expert, do you mean

22    the company was selecting the

23    testifying expert?

24         A.     The individual.

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
215.564.3905                    FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1       Q.     Oh, not you?

2       A.     It was not me.  I was the

3   non-testifying expert in that case.

4       Q.     And the first one, "Served

5   as a technical expert on a peer

6   review panel of the U.S. Army

7   Environmental Center."

8       A.     That was at BBL.

9       Q.     And was that litigation?

10      A.     No, that was not

11  litigation.

12      Q.     So what was the nature of

13  your work --

14      A.     That was high-end.  We were

15  basically -- at the request of the

16  U.S. Army Environmental Center, they

17  were trying to get their arms around

18  remediation practices at military

19  facilities, Army facilities

20  throughout the country.

21           So they would bring teams

22  of very senior experts in, usually

23  four or five per facility, and we

24  would do a thorough remediation

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                   FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    compliance audit to understand how

2    they are selecting remedial

3    technologies and making decisions

4    about how much money they will spend.

5        Q.     How many times were you

6    deposed?

7        A.     I was deposed three times,

8    I believe.

9        Q.     Is this the third or the

10   fourth?

11       A.     This would be the fourth,

12   if memory serves.

13       Q.     And the three times that

14   you were deposed, were they related

15   to -- can you describe to me each

16   one?

17       A.     The first one was the

18   Morgan Lewis case that's listed in

19   here, the steel company in

20   Pennsylvania.  The second one was the

21   Landing, New Jersey case, and the

22   third one was the NPL site in the New

23   Jersey Pinelands region.  And I'm

24   fairly certain I'm accurate in that.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                    www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Q.    Did you ever testify as an

2  expert in court?

3    A.    No.

4    Q.    Were you ever deposed as an

5  expert in a litigation?

6    A.    I think the previous yes

7  answer related to those three

8  instances that were involved in

9  litigation.

10   Q.    Did you give deposition

11 testimony as an expert within the

12 last four years?

13   A.    I'm trying to think if the

14 Pinelands case -- I don't believe it

15 was within the last four years.  I

16 think it was five or six years ago.

17   Q.    And I call your attention

18 to the section of Appendix A that

19 starts Remediation and Risk

20 Management.

21        Are any of the projects

22 that are listed under Remediation and

23 Risk Management duplicative of

24 projects that may be listed somewhere

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    else on your website?

2         A.    It was not my intent to

3    make them duplicative.  It's possible

4    there might be one or two, but it

5    wasn't my intent to list them twice.

6         Q.    So, generally, each project

7    that's listed on your website is a

8    separate project, it doesn't fall

9    under, you know, multiple, two

10   headings; is that correct?

11        A.    We will probably go through

12   them and we will find out.

13        Q.    But, generally speaking,

14   when you -- you said you designed it

15   to not be duplicative?

16        A.    That was my intent, yes.

17   And I think I achieved that

18   objective, but I'm sure we will find

19   out.

20        Q.    And is the same true for

21   the projects listed under Remediation

22   and Risk Management, that these were

23   performed throughout your tenure at

24   ERM, BBL, and SEC?

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1        A.    I believe so.  I don't

2    think I put any of the USGS

3    experience in here.

4        Q.    What fields do you consider

5    yourself to be an expert in?

6        A.    Hydrology, site

7    remediation.

8        Q.    Any others?

9        A.    I would say those are the

10   two primary areas that I believe my

11   expertise and experience qualifies me

12   to say I'm an expert in.  And site

13   remediation has a, in my view, a

14   broad range of things associated with

15   it.

16       Q.    Have you ever prepared an

17   expert report that's similar to the

18   one you prepared in this case?

19       A.    No.

20       Q.    Have you ever worked as an

21   expert for any of the defendants in

22   this case?

23       A.    No.

24       Q.    Have you ever worked with