# EXHIBIT "B"
# Part 3 of 7

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    any of the lawyers who are

2    representing any of the defendants in

3    this case?

4         A.    I don't believe so.   I'm

5    not sure I know all the lawyers that

6    are representing the other side.

7         Q.    Have you ever worked with

8    Rich Biedryzski?

9         A.    The name doesn't sound

10   familiar, no.

11        Q.    Jeff Pettit?

12        A.    Jeff Pettit is on --

13        Q.    Other than this case, have

14   you worked with him in the past?

15        A.    Oh.   I don't believe so,

16   no.

17        Q.    Melissa Flax?   I'm just

18   going through the names because you

19   said you didn't know all the names.

20        A.    Right.   Not before this

21   case, no.

22        Q.    Tom Sabino?

23        A.    Again, same answer.

24        Q.    Ed Fackenthal?

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.     Same answer.

2          Q.     Lynn Wright?

3          A.     I have worked with Lynn

4    Wright before but not in an expert

5    capacity.

6          Q.     And Andy Foster?

7          A.     Not prior to this case.

8          Q.     And what was the nature of

9    your previous work with Lynn Wright?

10         A.     Lynn and I have served on

11   the same Superfund site committee at

12   a site in Old Bridge, New Jersey.

13   For me, it was since 1992, and I

14   believe that Lynn was involved back

15   then and maybe even prior to that

16   time on that site.

17         MS. WRIGHT:    It's my

18   retirement package.

19         THE WITNESS:    Lynn and I

20   also were involved in another site,

21   Superfund site prior to the Old

22   Bridge site, the one in Winslow

23   Township, and my involvement with

24   that site goes back to 1988.    And I

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  don't think Lynn will acknowledge

2  whether she was involved back then or

3  not.

4  BY MS. TROJECKI:

5      Q.    There's an e-mail in the

6  documents that were provided to me by

7  the defendant's counsel that's from

8  you that states that you did former

9  work at American Cyanamid's Bound

10  Brook facility?

11      A.    Yes.

12      Q.    What was the nature of that

13  work?

14      A.    American Cyanamid was a

15  significant client for BBL until

16  American Home Products purchased

17  American Cyanamid, I think, in 1994

18  or '95.

19          So for the first couple

20  years of my tenure at BBL, I

21  consulted on groundwater issues for

22  the project manager on a number of

23  American Cyanamid sites, including

24  Bound Brook.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Q.    Could you describe for me

2    further what kind of groundwater

3    issues or what specifically you did

4    at the Bound Brook facility?

5    A.    It was probably -- it's

6    going back some years, but it was

7    probably related to conducting

8    groundwater investigations;

9    installation of wells, or overseeing

10   the installation of wells, and

11   looking at groundwater flow data,

12   that sort of thing.

13   Q.    So you were investigating

14   contamination issues on the Bound

15   Brook facility site; is that correct?

16   A.    That's correct.

17   Q.    And did that cause you to

18   have to or to look into the processes

19   at the Bound Brook facility?

20   A.    It did not.  There were

21   other people at BBL that were

22   involved in the engineering design of

23   on-site impoundments and that sort of

24   thing.  I was not involved in that.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    I should say the remediation of
2    onsite impoundments, not the design
3    of the impoundments itself.
4         Q.     Was the American Cyanamid
5    site contaminated, the Bound Brook
6    facility site?
7         A.     That's a broad question.  I
8    prefer not to answer it in that form.
9         Q.     Okay, then how do you
10   suggest answering it?
11        A.     There was contamination at
12   the American Cyanamid facility that
13   the government was requiring us to
14   investigate and remediate.
15        Q.     Did your job involve
16   determining the source of this
17   contamination?
18        A.     It did not.
19        Q.     Other than investigating
20   the contamination, did you have any
21   other role in any sort of work that
22   was at the Bound Brook facility?
23        A.     Not to my knowledge, no.
24   No, I was really primarily brought in

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    just to look at groundwater issues.

2        Q.    How long of a period of

3    time were you involved in that

4    project?

5        A.    I don't know exactly, but I

6    recall that shortly after I started

7    at BBL I was asked to take a look at

8    the facility, and if memory serves,

9    shortly after the acquisition of

10   American Cyanamid by American Home

11   Products, BBL's involvement with the

12   Bound Brook site was terminated.

13            And I believe that was in

14   the mid-1990s, so it couldn't have

15   been more than a couple of years.

16       Q.    How many times would you

17   say you were at the Bound Brook

18   facility?

19       A.    Two.  Maybe three.

20       Q.    Did you write any reports

21   on the Bound Brook facility?

22       A.    I may have been involved in

23   the preparation of parts of reports,

24   but I, myself, did not write a

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   report.

2        Q.    Do you recall what reports

3   you may have been involved with?

4        A.    I can't recall.

5        Q.    And how were you involved?

6        A.    As a consulting hydrologist

7   on the project, basically looking at

8   data, determining groundwater flow

9   patterns, looking at impacted

10  groundwater and where that impacted

11  groundwater might be going.  I seem

12  to recall looking at relationships

13  between groundwater and the Raritan

14  River adjacent to the site.

15       Q.    Did you draft any portions

16  of reports?

17       A.    I probably did draft

18  portions of reports, yes.

19       Q.    Did you inspect the Bound

20  Brook facility, the manufacturing

21  processes at the Bound Brook

22  facility, at any point?

23       A.    The manufacturing

24  processes, as I recall, were largely

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  discontinued by the time I got onto

2  the site, so there were no

3  manufacturing processes.  There may

4  have been some, but if there were, I

5  was not aware of them.  For the most

6  part that facility was closed, and it

7  was both a Superfund and a RCRA

8  corrective action site at that time.

9       Q.    Did you, at any point,

10  research the historical manufacturing

11  processes as part of your former work

12  at the Bound Brook facility?

13       A.    No.  That would have fallen

14  way outside of the scope of work I

15  was asked to do.

16       Q.    Is the information that you

17  provided in Appendix A of your report

18  up to date?

19       A.    It's probably up to date as

20  of this summer.

21       Q.    Are there any projects that

22  come to your mind that need to be

23  included into your CV?

24       A.    Well, I update the -- I try

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    to update the CV on the website every

2    six to eight months, so I'm due for

3    an update.

4         Q.    But are there any projects

5    that come to your mind sitting here

6    today that you think you need to add

7    to your CV?

8         A.    There is a report that I'm

9    doing, a case that I'm involved in,

10   where we're working with Bill Howard

11   at Segal McCambridge here in

12   Philadelphia where I'm -- it's a

13   litigation, and I will be an expert

14   for Bill's client, the insurance

15   company, and a trucking company on a

16   site in -- north of Indianapolis,

17   Indiana.

18        Q.    And what is the nature of

19   your work in that case?

20        A.    Right now the nature of the

21   work is we're attempting to mediate a

22   settlement, so I have attended a

23   mediation session with our team and

24   their team, the opposing side's team,

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905         InnovatingLitigation         FAX  215.751.0581
               1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                         www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    within the last month, and we're

2    hopeful that a settlement is

3    imminent.

4           Q.    So what is your role in the

5    mediation, what are you doing for

6    them?

7           A.    I'm basically the technical

8    resource for the defense team.

9           Q.    And providing what kind of

10   technical expertise?

11          A.    Expertise on -- this is a

12   petroleum distribution terminal that

13   has operated for 70 or 80 years.

14              So our expertise, my

15   expertise is being tapped on best

16   management practices, historical

17   operations of such facilities, the

18   characterization of soil and

19   groundwater contamination,

20   distinguishing that contamination

21   related to a particular spill event

22   from historic contamination on the

23   site, fate and transport of organic

24   constituents in soil and groundwater,

114

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    and the potential remediation

2    strategies.

3         Q.    Going back to your first

4    involvement -- can you tell me how

5    you first got involved in the

6    Boarhead case, this case?

7         A.    Lynn Wright called or

8    e-mailed, I think called, and asked

9    me if I would come up to a meeting of

10   several attorneys in New York City --

11   I believe that was in July of 2006,

12   maybe August -- and discuss a matter

13   that they might like to have me help

14   them with.

15        Q.    So during that initial

16   phone call, did Lynn give you any

17   background of the case at all?

18        A.    She gave me a very broad

19   overview of the case.

20        Q.    What did she say?

21        A.    I don't recall.  I mean, it

22   was who we would be representing

23   generally, where the site was.

24   Probably not much more than that.

**James DeCrescenzo Reporting**, LLC

215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX 215.751.0581

115

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.     So did you have -- did you

2   go to the meeting?

3      A.     I went to the meeting.

4      Q.     Who was at the meeting?

5      A.     Since I was meeting all

6   these people for the first time, I

7   might get it wrong, but certainly

8   Lynn was there, Melissa was there and

9   two or three others, and I'm not

10  entirely certain I recall.

11     Q.     Do you recall if Jeff

12  Pettit was there?

13     A.     I think Jeff was there.

14     Q.     Seth Cooley, the guy at the

15  end of the table?

16     A.     At the time -- yes, I think

17  Seth was there.  There were four or

18  five attorneys in total.  And, again,

19  because of the way my mind works, if

20  I'm meeting someone new for the first

21  time and I don't have a firm grasp of

22  their name, I'm probably not going to

23  remember who I saw.  I did remember

24  Lynn, though.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1         Q.    And what did you talk about

2    at that initial meeting?

3              MS. WRIGHT:  Objection.

4              THE WITNESS:  We talked

5    about what they were looking for in a

6    potential expert, that they needed an

7    expert report fairly quickly.  We

8    talked in broad terms about the scope

9    of what the assignment would be and

10   what would need to go into that

11   expert report.

12             We did discuss clearing

13   conflict of interest issues.  I

14   needed to know who we would be

15   opposing and make certain that there

16   weren't any conflict concerns with

17   regards to that.  So they asked me

18   questions about that with each of the

19   plaintiffs and settled defendants at

20   the time.

21             I think that's probably the

22   substance of our discussion.

23   BY MS. TROJECKI:

24        Q.    And when you talked about

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905              InnovatingLitigation              FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    the broad -- the scope of the

2    assignment and what would be in the

3    expert report, what were those

4    discussions?

5         A.    Generally -- and, you know,

6    we had to think about what that scope

7    would be collectively over the first

8    couple weeks of the assignment, but,

9    in general terms, they wanted

10   somebody to evaluate and understand

11   the wastes that were generated by the

12   plaintiffs and settled defendants and

13   attempt to categorize and index

14   those.   That was essentially it.

15        Q.    And what did you speak

16   about with respect to conflicts?

17        A.    I mentioned that I have a

18   friend who works at Ford Motor

19   Company and that I have done work for

20   Ford, although not involved in this

21   case, the Boarhead Farms case.

22             I also mentioned that in

23   the early years of my tenure at BBL

24   that I had done work for American

118

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Cyanamid and their chemical company

2    Cytec Industries.

3        Q.    Anything else?

4        A.    I was not aware of any --

5    the other companies that were

6    involved didn't ring any bells to me

7    in terms of potential issues or any

8    history.

9        Q.    And what was the nature of

10   the work that you did for Ford?

11       A.    Well, the first project

12   that I did with Ford was on a

13   Superfund site, in fact, two

14   Superfund sites, the same ones that

15   Lynn and I are working on together,

16   and that would be the KOP site and

17   the EPLC sites, both in New Jersey,

18   where Ford was a PRP, as was

19   Carpenter Technology, Lynn's client.

20       Q.    So what work did you do for

21   Ford?

22       A.    For Ford directly?

23       Q.    Uh-huh.

24       A.    As a prime client, I didn't

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  do work directly for Ford as a prime

2  client, but they were one of my

3  clients on those two Superfund sites.

4        Q.    So you worked for the --

5  take the first site, the KOP site,

6  you were working for a group of PRPs

7  on that site?

8        A.    That's correct.

9        Q.    Which group?

10        A.    I believe they called

11  themselves the KOP site committee.

12        Q.    Were they collectively

13  transporters, generators, were they

14  divided in that way?

15        A.    I don't have a solid

16  recollection of what the PRP group

17  was.

18        Q.    Or how they got to be a

19  committee?

20        A.    Yes.    There were a number

21  of those PRPs, though, that also were

22  PRPs in the EPLC site, which I'm

23  currently working on.

24        Q.    Is Ford a direct client for

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX 215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  you at the EPLC site?

2      A.    They are one of the PRPs at

3  the EPLC site.

4      Q.    And is there a name of the

5  group that you are representing in

6  the EPLC site?

7      A.    They call themselves the

8  EPLC site settled defendants or

9  settling parties.  I think settling

10  parties is the term they use.

11     Q.    So how is Ford involved in

12  the KOP site?

13     A.    I don't know the answer to

14  that now.

15     Q.    And how about in the EPLC

16  site?

17     A.    They are a PRP on that

18  site.

19     Q.    And what is the work you

20  are doing with respect to that site,

21  the EPLC site?

22     A.    That is a Blasland, Bouck &

23  Lee, BBL client, and I am under

24  contract to BBL to continue to help

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    manage the regulatory compliance, the

2    RI/FS remedy implementation for that

3    site.

4         Q.    And what's the nature of

5    your work at the KOP site, or what

6    was it?

7         A.    When I left ERM and went to

8    BBL, my involvement with the KOP site

9    terminated.

10        Q.    What were you doing at the

11   KOP site while you were with ERM?

12        A.    I was the project manager

13   for that site.

14        Q.    And what did that entail?

15        A.    Overseeing the remedial

16   investigation, risk assessment,

17   engineering feasibility studies under

18   the supervision of EPA Region 2 and

19   the New Jersey DEP.

20        Q.    And that was on behalf of

21   the KOP site committee?

22        A.    That's correct.

23        Q.    Other than categorizing the

24   plaintiffs and settled defendants'

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    wastes and indexing the wastes, to

2    use your term, did you have any other

3    idea after that initial meeting as to

4    what the scope of your work in this

5    matter was supposed to be?

6         A.    We had discussed some other

7    ideas related to trying to understand

8    what wastes -- once we understood

9    what the quantity and types of wastes

10   were that were generated during the

11   period of interest, which we consider

12   to be 1979 to 1987 -- '69 to '77, I'm

13   sorry, I'm off at that game -- there

14   was interest in trying to understand

15   which of those wastes might have made

16   their way to the Boarhead Farms site.

17        Q.    Anything else?

18        A.    No.   In broad -- in a broad

19   way those were the two major issues

20   that we talked about.

21        Q.    You can turn to Page 1.1 of

22   your report under Report Objectives.

23        A.    I'm sorry, page or section?

24        Q.    Section.   I mean Page 1-1,

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Section 1.1.  I call your attention

2    to the Report Objectives, and

3    specifically the last sentence -- or

4    actually it's all one sentence of the

5    first paragraph.

6        A.    Yes, it is all one

7    sentence.

8        Q.    Where the objective is "to

9    review and summarize available

10   information related to each of the 14

11   plaintiffs and settled defendants'

12   manufacturing processes along with

13   the volume, form and nature of the

14   resulting wastes generated by those

15   processes."

16          Do you see where I'm

17   referring to?

18       A.    I do.

19       Q.    So that doesn't sound to me

20   that the objective of this report is

21   to determine which wastes went to the

22   Boarhead Farms site; is that correct?

23       A.    In general, yes, that's

24   correct.

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

124

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.    So does the expert report

2  that we marked as Exhibit 1 have any

3  opinion at all with respect to which

4  wastes actually were disposed of at

5  the Boarhead Farms site?

6      A.    It does not.

7      Q.    So determining which wastes

8  went to the Boarhead Farms site was

9  an option that you explored with

10  defense counsel as being a part of

11  your expert report but you ultimately

12  decided not to pursue.  Is that fair?

13      A.    That's fair.  Yes, that's

14  correct.

15              (Discussion off the

16  record.)

17  BY MS. TROJECKI:

18      Q.    I will show you what I will

19  have marked as Exhibit 2, an e-mail

20  from you to Lynn Wright dated August

21  9, 2006, and attached to that is a

22  Professional Services Agreement.

23      A.    Uh-huh.

24              (Hochreiter Exhibit 2 was

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    marked for identification.)

2    BY MS. TROJECKI:

3        Q.    First, your e-mail to Lynn

4    Wright references "yesterday's

5    meeting."  Do you recall if this is

6    the e-mail that you drafted to Lynn

7    after your initial meeting in New

8    York City?

9        A.    I don't have an exact

10    recollection of what date that

11    meeting was, but it would certainly

12    seem from the language in the e-mail

13    that this was prepared the day after

14    we met in New York City.

15        Q.    And do you recall drafting

16    an e-mail and attaching a contract --

17    and sending a contract to Lynn the

18    day after your initial meeting with

19    her?

20        A.    I remember sending --

21    drafting the contract and sending

22    this to her.  I can't specifically

23    say it was the day after the meeting,

24    but in looking at this e-mail it

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    would certainly seem reasonable to

2    reach that conclusion.

3        Q.    And I want to call your

4    attention to the Scope of Work that's

5    attached to SEC's proposal, and it

6    references based on an August 8th,

7    2006 meeting with Lynn Wright,

8    Melissa Flax, Seth Cooley, and Jeff

9    Pettit.

10        A.    By the way, I now remember

11    who I met with.

12        Q.    Okay.  And that's the four

13    people that are listed under the

14    Scope of Work?

15        A.    That's correct.

16        Q.    And the last sentence of

17    the first paragraph of that page,

18    "SEC will prepare a draft expert

19    report of its finding --" I'm sorry,

20    wrong sentence.

21            The sentence that reads

22    "SEC will assess the available data

23    and provide an opinion regarding the

24    nature and magnitude of the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    plaintiff's waste streams that were

2    sent to the Boarhead Farms site for

3    approval."

4              Again, this Scope of Work

5    that speaks about what wastes were

6    sent to the Boarhead Farms site was

7    not ultimately ever done, correct?

8         A.    That is correct.

9         Q.    Was this proposal ever

10   signed? The copy that we have marked

11   as Exhibit 2 was not signed.

12        A.    It was not eventually

13   signed; however, I did receive an

14   e-mail authorization to proceed with

15   the report.

16        Q.    And was there ever a

17   revised Scope of Work that was

18   prepared?

19        A.    No.

20        Q.    Turning back again to the

21   Scope of Work in Exhibit 2, there's a

22   sentence that reads that "SEC will

23   conduct a review of available

24   environmental data related to the

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

```
1    quantities and types of waste
2    materials that the BFAG sent to the
3    Boarhead Farms site.  And this data
4    will likely consist of file
5    information on the facility that was
6    developed by the defendants."
7              Do you see that?
8         A.    Yes.
9         Q.    What information or what
10   file information is that referring to
11   when it says it was developed by the
12   defendants?
13             MS. WRIGHT:   Objection.
14             THE WITNESS:   The
15   defendants had a repository, as they
16   described to me, of information that
17   they had received in turn from the
18   plaintiffs and settled defendants.
19             I believe I was told at
20   that time that there was a repository
21   of information at your law firm's
22   office at Ballard Spahr, and that
23   information had been produced by each
24   of the plaintiffs and settled
```

129

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

```
1   defendants and had been distributed
2   to the attorneys for the defense
3   group.
4   BY MS. TROJECKI:
5        Q.    And that's the information
6   that you are referring to when you
7   say that was developed by the
8   defendants?
9        A.    Yes.  Yes.
10       Q.    Do you know why the scope
11  of the work was changed from
12  determining which wastes went to the
13  Boarhead Farms site to just
14  characterizing and quantifying the
15  plaintiffs' wastes?
16            MS. WRIGHT:   Objection.
17            THE WITNESS:   We had
18  discussions between myself and the
19  attorneys about what would be
20  involved in attempting to do -- to
21  address the issue of what wastes went
22  to the Boarhead Farms site, the
23  amount of effort that would be
24  involved in doing that, and the
```

130

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    difficulty associated with trying to

2    do that in a credible way.

3    BY MS. TROJECKI:

4        Q.    And based on those

5    discussions you decided not to --

6        A.    We decided for this expert

7    report not to pursue that path.

8        Q.    What was your first step to

9    completing your task for this matter?

10       A.    Receiving boxes and boxes

11   of documents.

12       Q.    After receiving them, you

13   reviewed all the information in the

14   boxes; is that correct?

15       A.    I and my colleague on this

16   project, Valerie Holliday, reviewed

17   all of the documents in each and all

18   of the boxes.

19       Q.    And what were you reviewing

20   the documents for?

21       A.    We were initially just

22   trying to get a lay of the land, what

23   is actually included, what types of

24   material exists.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1              You know, we had 104(e)

2    response documents from some of the

3    companies, not all.  We had

4    deposition transcripts, we had other

5    information from the companies

6    related to their waste generation

7    practices.

8              So we initially just had to

9    try to figure out what was in the

10   boxes and attempt to categorize it by

11   type.

12        Q.    And what after that?

13        A.    Then we started reviewing

14   every document that was provided to

15   us and compiling tables, making up

16   tables that summarized that

17   information.

18        Q.    At what point in time was

19   the scope of the assignment changed?

20             MS. WRIGHT:   Objection.

21   BY MS. TROJECKI:

22        Q.    The scope of your

23   assignment changed from determining

24   which wastes went to the Boarhead

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  Farms site to not addressing that

2  issue?

3          MS. WRIGHT:  Objection as

4  to form.  It assumes that this is an

5  accurate scope of work that was ever

6  accurate.

7          THE WITNESS:  I'm not sure

8  that the scope -- it's fair to say

9  that the scope of work changed.

10         The scope of work was

11  broadly established in the beginning,

12  and it took some time, probably

13  several weeks until, after reviewing

14  all the documents and as the expert

15  opining as to what I was comfortable

16  being able to say in the time frame

17  that we had to put the report

18  together, we collaborated and evolved

19  into a scope of work that ultimately

20  was manifest by this report.

21         MS. TROJECKI:  Want to take

22  a break for lunch?

23         (Thereupon, at 12:03 p.m. a

24  luncheon recess was taken until

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

133

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

```
1    12:56 p.m., at which time the
2    following proceedings were had:)
3    BY MS. TROJECKI:
4         Q.    Before we broke for lunch,
5    we were speaking about -- we had
6    talked about a meeting that you had
7    with several defense counsels in New
8    York City to discuss the scope of
9    your report.
10             Did you have any other
11   face-to-face meetings with defense
12   counsel regarding your expert report
13   since that time?
14        A.    There were, I believe, two
15   face-to-face meetings following the
16   initial meeting in New York.
17        Q.    And when was the first one
18   after that initial meeting?
19        A.    I don't recall.  I know
20   that we started work in the beginning
21   of August and we finished the report
22   at the end of September, so the two
23   meetings were between those two
24   dates.
```

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

134

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.    And where was the second

2  meeting?

3      A.    The second meeting, the

4  first one after New York, was in

5  Philadelphia.

6      Q.    And what did you discuss at

7  that meeting?

8      A.    We discussed our

9  observations regarding the documents

10  that we had reviewed.  We shared some

11  thoughts as to where I thought we

12  could go with the expert report and

13  what we decided to ultimately do in

14  terms of how to structure the expert

15  report.

16      Q.    And where was the third

17  meeting?

18      A.    That was in Philadelphia

19  also.

20      Q.    And what did you discuss at

21  that meeting?

22      A.    We had produced the expert

23  report as a draft, and at that point

24  we were getting comments on the

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    expert report.

2         Q.    And that third meeting,

3    then, was after you prepared your

4    first draft of the expert report or

5    after you --

6         A.    No.  We didn't have a draft

7    of the report in that second meeting.

8         Q.    So there came a point in

9    time when you produced to the defense

10   counsel a draft expert report.

11   Right?

12        A.    That's correct.

13        Q.    Do you recall when that

14   was?

15        A.    It was in September, and I

16   think it was towards the end of

17   September, but I couldn't tell you

18   exactly what date.

19        Q.    And it was after that time

20   that you first produced your draft

21   expert report to the defendants that

22   you met with the defendants' counsel

23   at this third meeting.  Is that

24   right?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905       InnovatingLitigation       FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.    If you could rephrase.

2          Q.    I'm just trying to get an

3    idea as to when the last meeting you

4    had with defense counsel was.  You

5    said that you discussed the draft

6    report.

7          A.    Uh-huh.

8          Q.    So was the last meeting

9    after you provided the draft report

10   to defense counsel?

11         A.    That's correct, yes.

12         Q.    Do you have any sense of

13   how soon after?

14         A.    Within a couple days.

15         Q.    And what did you discuss at

16   that meeting?

17         A.    We discussed, basically,

18   comments on the report.  People --

19   you know, we realized that counsel is

20   far more familiar and has worked on

21   this case a lot longer than we had,

22   so if there was a factual statement

23   of something that they felt was

24   incorrect, we would go back to the

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    original documents and see what the

2    right answer was, that sort of thing.

3        Q.    During the second meeting

4    that you had, the second face-to-face

5    meeting, which is the first one in

6    Philadelphia, you said that you

7    discussed observations that you had

8    after reviewing documents and where

9    you were going to go?

10       A.    That's correct.

11       Q.    What were your observations

12   at that time?

13       A.    Observations initially were

14   that this was an awfully big project

15   with a very short time frame.

16           That, in order to prepare a

17   credible expert report, we would need

18   to focus on those things that we

19   thought we could truly do well in

20   that time frame, and that was using

21   all of the evidentiary material that

22   was produced to get a good

23   understanding of where -- of what and

24   when it was produced by the

138

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    plaintiffs and settled defendants

2    during the period of interest.

3              But to take the analysis

4    any further would not be prudent, in

5    my view.

6         Q.    Because of timing; is that

7    it?

8         A.    Timing and also technical

9    challenge.  We hadn't formulated any

10   opinions as to whether anything

11   further could actually be done.

12             We needed to do more

13   research in order to be able to

14   determine whether that could even be

15   a possibility, and we didn't have the

16   time to do that.

17        Q.    What was the outcome of

18   that meeting?

19        A.    I had a very clear sense of

20   what the expert report was going to

21   consist of, what it was going to

22   focus on, as I had previously

23   mentioned, and what it was not going

24   to mention and address.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                    FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.     And what was it going to
2  focus on?
3      A.     It was going to focus on an
4  accurate, as accurate as we could
5  make it based on evidentiary
6  material, characterization and
7  classification of waste materials
8  produced by the plaintiffs and
9  settled defendants for the period of
10  record -- the period of interest.
11     Q.     Anything else?
12     A.     That was pretty much it.
13     Q.     And during the second
14  meeting in Philadelphia, did you
15  discuss anything other than comments
16  to your draft report?
17     A.     There was no draft report
18  at the second meeting.  The second
19  Philadelphia meeting?
20     Q.     Yes.  Yes.
21     A.     Oh, okay.  In the second
22  Philadelphia meeting, we discussed
23  the logistics of producing the final
24  report and its distribution, in

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    addition to comments on the report.

2         Q.     How, physically, was the

3    expert report prepared?

4         A.     Using a computer.

5         Q.     And did you type the expert

6    report?

7         A.     I wrote portions of it.

8         Q.     And did anybody else write

9    any portions of it?

10        A.     One other individual, the

11   person I mentioned previously, my

12   research assistant, Valerie Holliday

13   wrote sections of it under my

14   supervision.

15        Q.     And what portions of the

16   report did you draft personally?

17        A.     It was a collaborative

18   effort, so it would be impossible for

19   me to say I wrote these five words

20   and Valerie wrote these six words.   I

21   wouldn't be able to tell you that.

22        Q.     Who is Valerie Holliday?

23        A.     Valerie Holliday is a

24   hydrogeologist who works for

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1     GeoLogos, LLC.

2          Q.     And how did you come to

3     work with Valerie on this project, on

4     your report?

5          A.     I asked her to provide

6     assistance as a research scientist on

7     this effort, and she agreed.

8          Q.     What is your relationship

9     with GeoLogos?

10         A.     I have a contractual

11    relationship with GeoLogos whereby,

12    if I need services that I, as a sole

13    proprietor company, can't or choose

14    not to provide, if I need support,

15    then I can go to GeoLogos and get

16    that support.

17         Q.     Do you have any ownership

18    interest in GeoLogos?

19         A.     No.

20         Q.     Did Valerie Holliday draft

21    the tables that are referenced in the

22    appendix in your report?

23         A.     Valerie Holliday did the

24    final compilation in Excel of all of

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                                              FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   the tables, because I'm not that good

2   at Excel; so we worked

3   collaboratively in pulling those

4   together, but she was the actual

5   person that created the Excel output.

6       Q.    For each of the tables that

7   you created, for each plaintiff and

8   settled defendant, did you have a

9   hand in each of those, the

10  preparation of each of those tables

11  or did you divide up between you and

12  Valerie, you know, which of you were

13  going to handle which parties?

14      A.    I oversaw the entire

15  preparation of the report and Valerie

16  did things at my request and

17  suggestion. She certainly provided

18  ideas and thoughts, but they had to

19  pass through me. So at the end of

20  the day, anything that was done on

21  that report was done with my approval

22  and supervision.

23      Q.    And when you first asked

24  Valerie to get involved, what was it

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    that you told her that you needed

2    help in, what was it that she was

3    supposed to do?

4         A.    We would be given boxes and

5    boxes of documents and that we would

6    go through them.  We had joint work

7    sessions.  We also had independent

8    work sessions where she would review

9    some material or I would review some

10   material, and then we would bring

11   that to a meeting, and we met a

12   number of times during the two months

13   that I prepared the report.

14        Q.    Did each of you review all

15   of the documents in the boxes?

16        A.    No.

17        Q.    Did you go back and verify

18   information that may be prepared by

19   Valerie with respect to a particular

20   plaintiff or settled defendant?

21        A.    I had her walk me through

22   the construction of the factual

23   information, the tables, the

24   summaries, at a fair level of

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

144

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    detail.  We did not check every

2    single document, but we checked a

3    large percentage of them.

4         Q.    And what are her

5    credentials, you said she is -- what

6    is she?

7         A.    She's a hydrogeologist, has

8    a master's degree from Lehigh

9    University in geology, as well as an

10   undergraduate degree in geology from

11   Lehigh.  She and I have worked on and

12   off together professionally since

13   1988.

14        Q.    Who determined what

15   documents you and Valerie reviewed in

16   preparing your expert report?

17        A.    That's a hard question to

18   answer.  Certainly, at the first

19   level, the attorneys representing my

20   clients made that decision, because

21   they provided documentation that they

22   were given and passed it along to us.

23             However, that's not the

24   whole answer, because the documents

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1     that they were given came from the

2     plaintiffs and settled defendants.

3                So, ultimately, the

4     plaintiffs -- I think the plaintiffs

5     and settled defendants made the

6     determination as to what we would

7     review, because we reviewed, as I

8     understand it, everything that was

9     made available to our clients, that

10    was relevant to this particular

11    expert report.

12       Q.     And who determined whether

13    it was relevant or not, the defense

14    counsel?

15       A.     I would have to say that

16    the defense counsel ultimately

17    determined whether it was relevant,

18    although there was obviously a

19    screening of documents sent to

20    defense counsel.

21                As you know, we received

22    some material from the repository,

23    the Ballard, Spahr repository at the

24    end of January, two months after this

146

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    report was prepared, so there are

2    still documents coming from the

3    repository that ideally we should

4    have seen before we completed this

5    report.

6         Q.    So I just want to be clear

7    on this.  Defense counsel originally

8    gave you some documents to look at;

9    is that correct?

10        A.    They gave us probably the

11   bulk of the documents to look at.

12        Q.    And then you also visited

13   the Ballard, Spahr office and

14   reviewed documents in the repository?

15        A.    Valerie and I compiled a

16   list of documents based on the

17   initial document review of documents

18   that we knew existed but we didn't

19   have copies of.

20             And I honestly don't know

21   what the process was for production

22   of those documents.  I don't know if

23   someone walked over here or e-mailed

24   a request or how that was handled.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1       Q.    But there was a list of
2   documents that you requested through
3   the defense counsel and they got them
4   for you?
5       A.    That's correct, yes.
6       Q.    And were there any
7   documents that you didn't receive
8   that were on your list?
9       A.    There were documents that
10  we did not receive as of the time
11  that this report was prepared.
12      Q.    Do you know why you didn't
13  receive them?
14      A.    I do not.
15      Q.    Was the list of documents
16  something that you had typed up, was
17  it a handwritten list of documents?
18      A.    I think, initially, it was
19  a handwritten list.  We converted
20  that somehow to an electronic file,
21  and whether it was an e-mail or a
22  Word document at the end, I don't
23  think we sent a handwritten list over
24  to the repository, but honestly, I

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   don't know.

2        Q.    When you say you sent a

3   handwritten list over to the

4   repository, do you mean you sent it

5   to defense counsel to get it from the

6   repository or you sent it to somebody

7   directly at my office?

8        A.    Yes, I don't believe I said

9   that.

10            What I said was that

11   initially Valerie and I prepared a

12   list in handwriting of the documents

13   we were interested in.  How that

14   ended up getting to the Ballard,

15   Spahr repository and whether it

16   stayed in handwritten form or was

17   converted to type, I don't know.

18            But there was a list, and

19   we did convey that list over to

20   somebody at Ballard, Spahr to produce

21   the documents.

22        Q.    So that's what I'm asking,

23   you conveyed a list to somebody

24   directly at Ballard, Spahr or through

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    defense counsel?

2          A.    I did not, no.   Yes, we

3    went through defense counsel.   Yes.

4          Q.    Plaintiffs sent a notice to

5    defense counsel in this case

6    requesting copies of all documents

7    considered by you in preparing your

8    expert report, including draft copies

9    of your report, notes, and,

10   basically, your file.

11             Did the defense counsel ask

12   you to produce your file, do you

13   know, in response to plaintiffs'

14   request?

15         A.    They did.

16         Q.    And did you produce your

17   file?

18         A.    We did.

19         Q.    Did you produce any notes

20   that you drafted, that you created

21   while you were working on the expert

22   report?

23         A.    Any draft work product

24   notes for the most part, once we were

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   finished with it and it got

2   transmitted into the expert report,

3   our work practice is to throw that

4   stuff away. It's not relevant any

5   longer.

6             So, I believe I haven't

7   seen everything that was conveyed to

8   you, but I believe there was a draft

9   report preceding this version that

10  was sent over to you, so you have a

11  copy of the draft report.

12       Q.    Do you have any copies of

13  your notes today?

14       A.    No.

15       Q.    Do you have copies of draft

16  reports?

17       A.    I do not.

18       Q.    Did you destroy copies of

19  draft reports?

20       A.    As we were producing them,

21  yes.

22       Q.    Physically you threw them

23  out or you also destroyed them on

24  your computer?

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

151

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      A.     We got rid of them on the

2   computer as well as throwing out any

3   paper.  And that was just standard

4   work practice as we were producing.

5      Q.     So the draft report that I

6   have, how did that survive?

7      A.     I don't know.  If you want

8   to show me the draft report, I can

9   talk about it, but I don't have that

10  in front of me.

11     Q.     But sitting here today, you

12  are not aware of any drafts of the

13  expert report that exist?

14     A.     I'm not aware of --

15  everything that we had

16  electronically, as well as in our

17  file, we produced to defense counsel

18  and they, in turn, made a production

19  to you.

20     Q.     Did you review Vandeven's

21  expert report in this case?

22     A.     I read it.  I did not

23  critically review it.  It fell

24  outside the scope of work that --

152

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.    Did you review Exner's

2    report?

3      A.    I know of its existence.  I

4    didn't go through it in detail.

5      Q.    Did you read it at all?

6      A.    I did read portions of it

7    just to get a gist of the direction

8    that he was going.

9      Q.    Did you review Vandeven's

10   supplemental report?

11     A.    I don't believe so.  You

12   might want to clarify the Vandeven

13   report.  Do you have -- I just want

14   to make sure that my recollection is

15   correct as to exactly what that is.

16     Q.    I don't have a copy of it.

17   I can get you one.  But it's dated

18   June the 30th, and it's the

19   plaintiffs' expert report in this

20   matter.

21     A.    I believe that's the one

22   that I saw.

23          MR. COOLEY:  For the

24   record, there are three plaintiffs'

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    reports in this matter.

2              MS. FLAX:   I think there

3    are more than that.   We have the

4    damages reports as well.   It's not

5    artfully stated.

6    BY MS. TROJECKI:

7         Q.     Vandeven produced two

8    reports, one dated June 30th and then

9    a supplemental report.   You do recall

10   reading a report by Vandeven.

11   Correct?

12        A.     I have a recollection of

13   that.   But I would like to see the

14   report to confirm whether that, in

15   fact, is the report that I read, and

16   then I can tell you definitively.

17        Q.     But, again, if it's the one

18   that you are thinking of, you just

19   skimmed it, you didn't review it

20   critically.   Is that right?

21        A.     It was not in my work scope

22   to take any other expert report and

23   do a critical review of it.   So, in

24   broad brush, I may have read a

154

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  report, but I did not critically

2  review it or factor it into my work.

3       Q.    What did you do to prepare

4  for today's deposition?

5       A.    I met with counsel

6  yesterday for about an hour, hour and

7  a half.  I did another read of my

8  expert report, since we had produced

9  it several months ago.  I wanted to

10 try to bring the recollection fresh.

11 That's pretty much it.

12      Q.    And who did you meet with

13 yesterday for that hour, hour and a

14 half?

15      A.    I met with Jeff and Lynn

16 and Ed and -- who else was there?

17 Lynn's colleague, Ayana, I believe.

18           MS. HARVEY:  Yes, I was

19 there.

20           THE WITNESS:  Lynn, Ed, and

21 Jeff.

22 BY MS. TROJECKI:

23      Q.    And what did you discuss

24 yesterday with Lynn, Ed, and Jeff?

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.     For the most part, what we

2     discussed was the response that we

3     had to the supplemental material that

4     was produced by the Ballard, Spahr

5     repository.

6                We had received that

7     information towards the end of

8     January and drafted modifications,

9     proposed modifications to the expert

10    report in some of the tables based on

11    the additional information that we

12    had received.

13               Counsel had not seen that

14    additional work until yesterday, and

15    we brought that to the meeting, I

16    brought that to the meeting for the

17    purpose of having a conversation

18    about it and giving counsel the

19    option to produce it to you, which I

20    believe they did.

21         Q.     Anything else?

22         A.     No.   I think there was a

23    general discussion about the form of

24    the deposition, you know, how long it

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1     might go, it would probably be all

2     day, pretty much that's it, just

3     general description of what we might

4     face, but nothing in any detail.

5          Q.    Did you review any other

6     documents other than your expert

7     report in preparation for your

8     deposition today?

9          A.    No.   Everything that I

10    reviewed was related to the expert

11    report.

12               I may have pulled that out

13    over the last couple weeks, and I

14    know I did because of the

15    supplemental material that came in,

16    in our preparation of that, some of

17    the background documents that are

18    listed in the references section, so

19    that we could corroborate the new

20    material that we were seeing with our

21    understanding of what we had seen

22    prior.

23          Q.    Did you, at any point

24    throughout your work in this matter,

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    talk with any representatives of the

2    defendants themselves?  Did you speak

3    with anybody who was a representative

4    of the individual defendant clients?

5         A.    To the best of my

6    knowledge, no.  I believe that the

7    people that I spoke with were counsel

8    to those clients.

9         Q.    Did you visit the Boarhead

10   site at any time?

11        A.    I did not.

12        Q.    Can you turn to Page 1-1 of

13   your report and the Report

14   Objective.  We talked about this a

15   little bit earlier.  I just wanted to

16   confirm or get a better sense of what

17   the objective of this report is.

18             When you say you were to

19   review and summarize available

20   information, what were you reviewing

21   and summarizing available information

22   for?

23        A.    I'm not sure I understand

24   the question.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

158

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.    In the last section of the
2    first paragraph under Report
3    Objectives, you say that "The
4    objective of this report was to
5    review and summarize available
6    information."
7      A.    Uh-huh.    Yes.
8      Q.    What was the scope of that
9    review?  What were you reviewing that
10   information for?
11     A.    We were reviewing the
12   information to assess, during the
13   period of interest, what each of the
14   plaintiffs and settled defendants
15   generated in terms of hazardous
16   wastes, constituents that would need
17   to be taken off site for disposal,
18   based and using exclusively the
19   plaintiffs' and settled defendants'
20   own records on the matter, as well as
21   deposition testimony from previous
22   court proceedings.
23     Q.    So when you say available
24   information, what you mean by that is

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    the documents that were produced from
2    the repository or deposition
3    transcripts; is that correct?
4        A.    I believe that's correct;
5    however, I have no way of knowing
6    that everything that was in those
7    boxes and boxes came exclusively from
8    the repository, because I didn't
9    retrieve them from the repository.  I
10   believe they came from the
11   repository.
12       Q.    Did you do any independent
13   research or, you know, outside
14   research of any of the plaintiffs or
15   settled defendants to determine what
16   their waste would have been?
17       A.    No, not to address that
18   issue.
19       Q.    And it states that you were
20   reviewing the information related to
21   each of the plaintiff and settled
22   defendant manufacturing processes
23   along with the volume, form, and
24   nature of the resulting waste.  What

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    do you mean by form of the waste?

2         A.    Whether it was a gas, a

3    liquid, or a solid.

4         Q.    And what do you mean by

5    nature of the waste?

6         A.    Whether it was -- and,

7    again, there is some overlap here,

8    but nature of the waste would be

9    whether it was bulked or in drums.

10        Q.    And when you say you

11   reviewed and summarized available

12   information, what expertise did you

13   apply in summarizing the information

14   from the documents you reviewed?

15        A.    I used my expertise in

16   understanding the hazardous substance

17   list, the CERCLA hazardous substance

18   list; the classifications of

19   different types of hazardous wastes;

20   the kinds of containers and vessels

21   that typically are used for

22   transporting such material; and

23   probably other knowledge that off the

24   top of my head I can't put my hands

JDR
James DeCrescenzo Reporting, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    on.

2              But, I mean, it was an

3    understanding of, and years of

4    experience in dealing with, hazardous

5    wastes generated in the 1960s and

6    1970s.

7         Q.    Do the wastes that are

8    referenced in your expert report from

9    the plaintiffs and the settled

10   defendants, are those wastes all

11   hazardous wastes?

12        A.    It would be --

13        Q.    Or did you render an

14   opinion about that?

15        A.    I did not render an opinion

16   on that.

17        Q.    So how did your

18   understanding the CERCLA hazardous

19   substances list, how did that help

20   you in summarizing the documents?

21             MS. WRIGHT:   Objection.

22             THE WITNESS:   It helped in

23   terms of understanding what was a

24   chemical waste, what was a

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

162

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      constituent.  Keep in mind that the

2      EPA, through their consultants CH2M

3      HILL, conducted an investigation of

4      the Boarhead Farms site and

5      identified categories of materials

6      that had been sent there, not only in

7      terms of its form, drum, bulk, et

8      cetera, but also its composition.

9                So while we never rendered

10     an opinion with regards to whether a

11     particular molecule of waste ended up

12     at Boarhead Farms, it was important

13     to understand what the universe of

14     constituents of concern would

15     possibly be.

16                But, in the end, we were

17     looking at everything other than

18     municipal refuse in terms of the

19     categories of wastes, the stuff that

20     you typically report in a 104(e)

21     notice, that sort of thing.

22         Q.    I am going to have marked

23     as Exhibit 3 a draft copy of your

24     expert report.  It's attached to an

163

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    e-mail that is sent from Valerie

2    Holliday to defense counsel on

3    September 19th, 2006.

4              (Hochreiter Exhibit 3 was

5    marked for identification.)

6    BY MS. TROJECKI:

7         Q.    I am going to ask you to

8    turn to Page 1-1 of Exhibit 3.

9         A.    Okay.  I just want to look

10   at the -- if you would give me a

11   minute here, I just want to see what

12   this is.

13        Q.    Sure.

14        A.    1-1?

15        Q.    Uh-huh.  And under Section

16   1.1, Report Objectives.  In Paragraph

17   B, it states that one of the report

18   objectives at the time that this

19   report was prepared was to "Indicate

20   whether the waste generated by each

21   party during the period of time of

22   interest contained hazardous

23   substances."

24              Do you see that?

**James DeCrescenzo Reporting**, LLC

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.     Yes, I do.

2          Q.     And just to clarify, that

3     was not something that you did in

4     your final expert report; is that

5     correct?

6          A.     That's correct.

7          Q.     Paragraph C states that you

8     were at that time to "Indicate

9     whether the hazardous substances

10    generated by each party are of the

11    same type found at the Boarhead Farms

12    site that contributed to the need for

13    remediation."

14          Do you see that?

15          A.     I do.

16          Q.     And was that something that

17    you ultimately did in your expert

18    report in this matter?

19          A.     No, I did not.

20          Q.     So you did not render an

21    opinion regarding B or C in this

22    draft report, correct?

23          A.     That is correct.

24          Q.     And this report also

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  discusses, this report meaning

2  Exhibit 3, the qualification of the

3  plaintiffs' and settled defendants'

4  wastes --

5        A.    I'm sorry, where are you?

6        Q.    Section 2.4 and 2.3 --

7  sorry, 2.4. I just want to confirm

8  that qualifying any of the

9  plaintiffs' and settled defendants'

10  wastes was not something that you did

11  or have an opinion about with respect

12  to your final expert report; is that

13  correct?

14        A.    I'm not sure that I

15  understand the question.

16  Quantification or qualification?

17        Q.    Qualification. Section 2.4

18  of this draft report.

19        A.    Let's look at this for a

20  minute and see what we meant at that

21  time by qualification.

22              MS. FLAX:  Are you

23  referring to a particular provision

24  on that page, a particular paragraph,

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Amy, that you are directing him to

2    look at?

3              MS. TROJECKI:    Section 2.4,

4    Qualification of PSD Wastes, uh-huh.

5              THE WITNESS:    Okay, now I

6    can answer your question, if you

7    would restate.

8    BY MS. TROJECKI:

9        Q.    Was qualifying plaintiffs'

10   and settled defendants' wastes

11   something that you ultimately did in

12   your final expert report in this

13   matter?

14       A.    If by qualification we mean

15   in this draft, in Exhibit 3 on Page

16   2-5, the three numbered qualifying

17   criteria, the answer is no, we did

18   not.

19       Q.    What do you believe is the

20   importance of the information in your

21   expert report, your final expert

22   report?

23              MS. WRIGHT:    Objection.    I

24   don't understand that.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1                THE WITNESS:  I'm not sure
2     I understand it either.
3     BY MS. TROJECKI:
4          Q.    Let's make sure -- let's go
5     back and lay the foundation.  So the
6     scope of your expert report is to
7     summarize and review information and
8     quantify plaintiffs' and settled
9     defendants' wastes; is that correct?
10         A.    Yes.
11         Q.    Why do you believe that's
12    important?
13         A.    I believe it's been
14    established by others, and perhaps by
15    the plaintiffs and settled defendants
16    themselves, that they contracted with
17    individuals that were involved with
18    the Boarhead Farms Superfund site for
19    the disposal of waste.
20              We were interested in
21    identifying the types of wastes,
22    quantities of wastes, that each of
23    these companies likely produced
24    during that eight-year period.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1              We did not opine as to

2     where that waste ultimately went,

3     because, quite frankly, we did not

4     have enough information and enough

5     time to be able to investigate that

6     thoroughly and to a level of comfort

7     that I would be willing to put in a

8     report.

9              So your question is why is

10    that relevant?

11         Q.     Uh-huh.

12         A.     You want to establish that

13    wastes were actually created by

14    entities, potential responsible

15    parties at a site before you start

16    trying to determine whether their

17    wastes actually ended up there.

18         Q.     Turning to -- I want to

19    call your attention to --

20         A.     The same exhibit?

21         Q.     -- your expert report,

22    Section 2.2.  I want to walk you

23    through your methodology.

24         A.     Page or section?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX 215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1        Q.      Both.

2        A.      Sections are small, it's

3    easy --

4        Q.      Okay, let's go by section,

5    Section 2.2, Paragraph 1.  What is

6    the basis of your defining the period

7    of interest as from 1969 to 1977?

8        A.      That is our understanding

9    based on record documents, including

10   things like the CH2M HILL reports and

11   other documents, identifying the time

12   frame that the Boarhead Farms site

13   was used for the disposal of waste

14   material that was brought to it.

15       Q.      So that is not the time

16   frame that any particular plaintiff

17   or settled defendant was in

18   operation?

19       A.      It has no relevance to the

20   time period of operation of a

21   plaintiff or settled defendant, with

22   one exception, and that is that, in

23   all instances, we believed that, and

24   we had information to suggest for