# EXHIBIT "B"

# Part 4 of 7

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    most of them that they were in

2    operation, they were manufacturing,

3    they were producing wastes during

4    that period of time.

5        Q.    And given that the Boarhead

6    Farms site was purchased by DeRewal

7    in late 1969 and that DeRewal was

8    arrested in early 1977, isn't that

9    more closer to seven years of

10   duration than eight years of

11   duration?

12           MS. WRIGHT:    Objection.

13           THE WITNESS:    It is not an

14   exact eight years.  We chose to round

15   it to eight years because we had

16   information that suggested that as

17   early as the middle of 1969 there may

18   have been some waste disposed of at

19   the site, and as far as the

20   termination date of 1977, there's

21   some ambiguity as to whether all

22   activities at Boarhead Farms stopped

23   at a particular point in time.

24           So to be conservative, we

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                    www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  felt that if we are going to round

2  somewhere between seven and eight

3  years we would round it up to eight

4  years.

5  BY MS. TROJECKI:

6      Q.    In Paragraph 2, what is

7  meant by the parenthetical at the end

8  of that paragraph?

9      A.    All right, let me read it.

10          If we had enough

11  information to give us insight on the

12  quantity, the amount or the mass of

13  material that was produced, then we

14  tabulated it.

15          If all we had was a visual

16  or a narrative description of wastes

17  with no quantity, then we simply did

18  a qualitative description, we passed

19  along what we saw in the evidentiary

20  material.

21      Q.    Tell me how were the total

22  quantities of waste type physically

23  calculated.

24      A.    Well, quantities -- first

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  of all, it wasn't always quantities.

2  There were reports in mass, typically

3  pounds, as well as quantities,

4  typically gallons, but not always.

5  And we did not make any attempt to

6  transfer pounds into gallons or

7  gallons into pounds; we simply took

8  the reporting as it was provided to

9  us and tabulated it.

10         The question gets to the

11  heart of how we put this report

12  together, so, in broad brush, what we

13  did was, we compiled all of the

14  information we were given and we saw

15  that, in almost every instance, we

16  had wide disparities in terms of the

17  quantity and quality of information

18  provided.

19         For some of the companies,

20  plaintiffs and settled defendants,

21  there was very little information and

22  for some there was quite a bit, but

23  none of the bodies of information was

24  considered complete for the entire

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   period of record.

2           And as a result where we

3   felt that we -- and we stated in here

4   the criteria that we used for

5   extrapolating the unknown time

6   frames -- we extrapolated a total

7   quantity for the period of interest.

8       Q.    So how did you know whether

9   a data set was complete or not?

10      A.    Quite simply, if somebody

11  said that from March to June of 1974

12  they produced X amount of pounds of

13  ammonia, we accepted, and I believe

14  we state in here, we accept all

15  statements of that sort at face

16  value.  We did not attempt to do an

17  independent assessment as to whether

18  the reported volume or mass was

19  accurate.  We simply took it at face

20  value.

21          However, there were a

22  number of instances, as you can see

23  in the tables, where we had detailed

24  information from perhaps Manford

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    DeRewal, his records or 104(e)

2    responses or other factual

3    information for parts of the eight-

4    year period of interest, and then

5    there was no information for other

6    parts of the eight-year period of

7    interest.

8        Q.    Any other reasons why you

9    would conclude that a data set was

10   complete or not?

11       A.    If you are taking

12   everything that is presented to you

13   at a face value, if you have two

14   pieces of information that appear to

15   be representing the same body of

16   wastes and representing it

17   differently, we reported both

18   occurrences, we did not attempt to --

19   because we had no way, I had no

20   expertise and no original knowledge

21   to be able to say, Oh, this reporting

22   is correct and this reporting isn't.

23            We attempted to do the best

24   we could with the information that we

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1     had to understand if, just using as

2     an example, ammonia is the

3     constituent of interest, that we are

4     tabulating and we have two years'

5     worth of data, and it might be

6     scattered over four or five years,

7     it's reasonable, then, to develop an

8     annual average for that waste stream

9     and then, ultimately, an eight-year

10    period of interest average for that

11    waste stream.

12          And, of course, that's all

13    predicated on our understanding that

14    that process that produced the waste

15    was likely in operation during that

16    period of time.

17       Q.    So suppose you had an

18    invoice a month for a particular

19    company, you know, taking a

20    hypothetical, if you had, take,

21    American Cyanamid, an invoice every

22    month for the entire eight years from

23    DCT that references some type of

24    waste product that was picked up by

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    DCT, would you say that that was

2    complete?

3         A.    I would say it's as

4    complete as the reported record will

5    allow us to ascertain, yes.

6         Q.    What do you mean by that?

7         A.    There may be,

8    hypothetically, of course, waste

9    streams that there is no record for.

10   It might be that for ammonia, our

11   hypothetical example, that

12   hypothetical eight-year period of

13   record is very complete and accurate,

14   but there might also have been other

15   waste streams that went out with the

16   ammonia where we have no record

17   whatsoever or we have partial record.

18            In that instance I have no

19   way of independently verifying --

20        Q.    The other waste types?

21        A.    -- the other waste types.

22   And I'd have to take at face value

23   the material reporting, the

24   quantities and nature of that

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   material, whether it was drummed or

2   bulked or however, pretty much at

3   face value.

4           Now, we did do some

5   interpretation.  There were invoices,

6   for example, that said we picked up a

7   tanker wagon full of material, and

8   you could go through the record and

9   get a pretty good idea of what a

10  tanker wagon typically was in terms

11  of volume.

12          But we were pretty

13  emphatical about making certain that

14  we recorded and we took at face value

15  what people said.  We did not offer

16  editorial comment, if you will, on

17  the reporting.  And we had no

18  alternate sources of information that

19  would allow us to do that, in most

20  instances.

21      Q.   So just getting back to the

22  hypothetical that I raised, which

23  was, if there was an invoice a month,

24  if it was all for one particular

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  waste type, say, it was all for

2  ammonia, just to use a hypothetical,

3  would you say that the records for

4  ammonia specifically would be

5  complete?

6      A.    I would accept it at face

7  value.  Keep in mind, there may be

8  three manufacturing processes that

9  produce ammonia, and what we are

10  seeing is only one manufacturing

11  process' records of waste, and we

12  don't know about the other two.

13          Again, what we were

14  methodical in doing is taking your

15  client's reports of what they did,

16  and pretty much took them at face

17  value.  If they had waste tickets for

18  eight years, month by month, for

19  ammonia, in the hypothetical, we

20  accepted that at face value and

21  reported it.

22          Does that mean that there

23  couldn't have been more waste ammonia

24  generated, either through that

James DeCrescenzo Reporting, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    process or some other process on the
2    site?  No, it doesn't mean that, but
3    we have no knowledge that would allow
4    us to opine as to any other.  We are
5    simply taking the documentation at
6    face value.
7         Q.     So in that instance, is
8    there a basis to extrapolate in that
9    instance?  I mean, how did you decide
10   when you were going to extrapolate
11   and when you weren't?
12        A.     Well, I believe we wrote in
13   the expert report the criteria that
14   we used for determining when we would
15   extrapolate.  If you know where that
16   is, I don't know exactly, but I would
17   prefer to go right to what we said.
18        Q.     Okay.  Is that laid out in
19   the methodology?
20        A.     I believe so.  I believe
21   so.
22        Q.     Can you point me to where
23   you are referring?
24        A.     You know, I don't know

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    exactly where in this section it is,

2    so I would have to read it. If you

3    have already identified it, it might

4    speed us up to take us there.

5         Q.    Well, in Paragraph 4 --

6         A.    Paragraph 4 is probably

7    where we would have this. Okay.

8         Paragraph 4 provides the

9    general criteria that we used. If

10   there was indication that, in our

11   hypothetical example, the ammonia

12   process didn't come on line until

13   1973 or that it was discontinued

14   after 1975, then we would not do the

15   extrapolation.

16        In turn, if we only had an

17   incidental report of a couple drums

18   of something leaving company X's

19   site, there's not enough information

20   to be able to credibly extrapolate

21   because this is -- we don't even know

22   what kind of a subset of the total

23   waste stream this represents over

24   what period of time.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

1           And, in that case, we
2    simply reported what was in the
3    record and, if it was reported as a
4    volume, we put it in the table and
5    said it was probably a minimum volume
6    or a minimum mass.
7        Q.    So if you knew a company --
8    is the reverse of that, then, if
9    manufacturing processes did not
10   change at a company, then you would
11   assume that, because they generated
12   some quantity of waste in some
13   period, that they generated the same
14   quantity throughout the entire eight
15   years; is that correct?
16       A.    That is correct.
17       Q.    And was there any
18   additional criteria that was applied
19   with respect to how much information
20   you had to have; in other words,
21   suppose you knew American Cyanamid
22   processes were the same throughout
23   the eight-year period and you only
24   had records for one month's ammonia

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                                          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

1    waste disposal, would that be enough

2    to extrapolate throughout the eight-

3    year period?

4        A.    It would be a judgment

5    call.  You could probably state that,

6    if we knew the processes hadn't

7    changed over eight years, that a

8    quantity of ammonia had been

9    generated for each month or each

10   reporting cycle for that entire

11   eight-year period.

12            The problem, though, is if

13   the quantities vary from reporting

14   cycle to reporting cycle and we have

15   only got one piece of information and

16   we don't know whether that's a

17   theoretical average monthly amount,

18   whether it is biased high or biased

19   low, and that's where judgment comes

20   into play, and, ultimately, I made

21   those calls, whether we felt we could

22   extrapolate or not.

23       Q.    Can you explain to me in

24   Paragraph 3 of your report where you

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   discuss that sometimes you used a

2   monthly average and sometimes you

3   used an annual average?

4        A.     Sure, if I may, let me read

5   the section.

6        Q.     Sure.

7        A.     Well, in most instances, in

8   fact, I think in all instances, where

9   period of record averages were, you

10  know, we quantified over the eight-

11  year period of record, we had annual

12  averages, we computed those.

13            We would calculate a

14  monthly average where there was

15  enough data that would allow us to

16  comfortably say, yes, we have enough

17  density of data to be able to say

18  this is what an average monthly

19  volume or mass would look like.

20            Beyond that we would have

21  to get into individual specific cases

22  and we can talk about the rationale

23  that would be applied for each one.

24        Q.     And so when you say in the

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    last sentence of Paragraph 3,

2    "Depending on the availability of

3    multiple data entries," is there a

4    number or criteria for what

5    constitutes multiple?

6         A.    No, we did not -- we did

7    not feel we could sit there and say

8    for an eight-year period of interest

9    we had to have X number of records in

10   order to make an average.

11        Q.    In Paragraph 4, the second

12   sentence that starts, "If multiple

13   monthly or yearly data were not

14   available or if there was reason to

15   believe that the operation that

16   generated the wastes might have

17   changed substantively; i.e., ceased

18   entirely or increased by more than a

19   factor of two for any plaintiff or

20   settled defendant, extrapolation was

21   not performed."

22             Do you see that sentence?

23        A.    Yes, I do.

24        Q.    Does that account for

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  decrease in waste generation?

2       A.    I'm not sure I understand

3  the question.

4       Q.    The question is that you --

5       A.    What do you mean by a

6  decrease in --

7       Q.    If you don't have any

8  evidence that the waste changed

9  substantively, and your i.e. means

10  that it either ceased completely or

11  that it actually increased, did you

12  factor into your analysis as to

13  whether extrapolated or not at all,

14  whether waste generation might have

15  decreased?

16       A.    We accepted the possibility

17  of waste over time increasing,

18  staying the same and decreasing, and

19  to the extent that the evidence would

20  allow us to make a determination, I

21  think the underlying assumption was,

22  if we don't have information that

23  tells us that it decreased,

24  increased, or ceased, then it stayed

1    the same.

2         Q.    I want to call your

3    attention to Paragraph 5 under

4    Section 2.2.  Was extrapolation ever

5    performed on the basis of deposition

6    testimony alone?

7         A.    I don't believe so, no.

8    Deposition testimony, by and large,

9    was seen as a less reliable form of

10   evidence than actual tickets, waste

11   tickets, responses, things of that

12   nature, actual written documentation

13   of waste quantities, things like

14   that.

15             I am going to read this, if

16   I may.

17        Q.    Okay.

18        A.    So there probably are

19   instances, although I think there are

20   few, where we use deposition

21   testimony to give us an understanding

22   of volume, and, again, if we had

23   enough indirect evidence over a broad

24   enough period of time, yes, I picked

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    up a tanker or a wagon full of X at

2    this facility over four or five

3    years, and I know they operated

4    through the entire eight-year period,

5    in that hypothetical scenario, then

6    we would probably extrapolate over

7    the eight-year period.

8            To go further we would have

9    to go into the individual companies

10   and see, and I don't believe we did

11   that very often at all with

12   deposition testimony.

13       Q.    Can you turn to Page 2-4 of

14   Exhibit 3, which is one of your draft

15   reports.    It's right here.

16       A.    Page 2-4?

17       Q.    Yes.    That doesn't look

18   like the same page.    It's Section

19   2.3.

20       A.    Are we looking at the same

21   thing?

22       Q.    It's the draft that you

23   produced to counsel on September

24   19th, 2006, Section 2.3.

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

1          A.     Exhibit 3, Section 2.3 on

2     Page 2-4.

3          Q.     Yes, Paragraph 6.  The last

4     sentence on Paragraph 6, "SEC found

5     no consistent recollections," do you

6     see that sentence?

7          A.     Right.

8          Q.     That's not in the final

9     report.  Is that still true?

10         A.     I would like to see what we

11     put in the actual final report, and

12     then I will give you an answer.

13         Q.     Okay.

14         A.     This is where it's

15     possible, and we would have to go

16     into the individual companies -- my

17     recollection is that we did not find

18     a lot of the deposition testimony to

19     be what we would consider to be

20     reliable, because there were

21     inconsistencies.

22              So there may have been,

23     between this draft and the final, an

24     instance where, in fact, we were able

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    to rely on deposition testimony to

2    make an extrapolation.

3        Q.    But do you recall any?

4        A.    I don't have a specific

5    recollection of that, no.

6        Q.    We are going to go through

7    each of them, and we will address

8    that when we go through them.

9        A.    Okay.  We're back in

10   Exhibit 1, right?

11       Q.    Your expert report, right.

12   Section 3.1, American Cyanamid.

13            Actually, before we get

14   there, I just want to mark one more

15   exhibit, and it is a -- the first

16   page of the exhibit is an e-mail from

17   Lynn Wright to the rest of the

18   defense counsel dated August 22nd,

19   2006, but it attaches an e-mail from

20   you to Lynn dated August 22nd, 2006.

21            (Hochreiter Exhibit 4 was

22   marked for identification.)

23   BY MS. TROJECKI:

24       Q.    I just want to call your

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    attention to the second page of this

2    e-mail?

3        A.    If I may, just let me read

4    the beginning of it first.

5        Q.    Sure.

6        A.    Okay, the second page?

7        Q.    The fifth bullet down.

8        A.    From the beginning?

9        Q.    On the top of that page,

10    the fifth bullet down, the one that

11    starts, Ultimately.

12        A.    Okay.

13        Q.    What's the idea there that

14    "The attorneys are probably already

15    aware of this, but they may want to

16    be thinking about what strategies

17    they would find acceptable for the

18    inevitable estimating algorithms we

19    will have to develop --"

20            What's the message that is

21    being conveyed there?

22        A.    I don't know.  Let me read

23    that bullet and I will give you an

24    answer.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1        Q.      Okay.

2             MS. WRIGHT:  I'm going to

3   object to that question, because that

4   is outside the scope of the opinion

5   that Mr. Hochreiter gave in this

6   case.

7             And I'm going to instruct

8   you not to answer that question.

9             THE WITNESS:  Okay.

10            MS. TROJECKI:  Okay, well,

11  I don't think that you can instruct

12  him not to answer.  What's the basis

13  for your instructing him not to

14  answer a question?

15            MS. WRIGHT:  Because he is

16  not here to give an expert opinion on

17  anything that is outside of the

18  expert report that he has given, and

19  that issue is not contained in his

20  expert report.  Therefore, it's an

21  improper question.

22            MS. TROJECKI:  I don't know

23  if the issue is contained in his

24  expert report.  That's what I'm

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

192

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    asking him about.

2          MS. WRIGHT:  Well, you have

3    the report.

4          MS. TROJECKI:  I don't know

5    what the issue is.  That's what I'm

6    asking him about.  I mean, maybe you

7    know because you worked on it with

8    him, but I have to be able to ask him

9    what is the issue there.

10          MS. WRIGHT:  Well, you can

11    see that the issue relates to

12    Boarhead --

13          MS. TROJECKI:  I want to

14    have him answer.

15          MS. WRIGHT:  But you can

16    read it and see that it relates to

17    wastes going to the Boarhead site.

18          MS. TROJECKI:  If you can

19    answer that, why can't he say that

20    that's what it relates to.

21          MS. WRIGHT:  Well, I'm

22    telling you that it is outside of the

23    scope and that it is an improper

24    question.

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          MS. TROJECKI:  I have asked

2    him many questions about what the

3    scope of his report is, is it related

4    to bringing wastes to the Boarhead

5    site or not, and he has answered all

6    those questions.

7          MS. WRIGHT:  He has

8    answered all those questions, and I

9    have allowed him to answer those

10   questions, but I'm not going to allow

11   him to answer this question because

12   it goes to --

13         MS. TROJECKI:  Well, we

14   have to call somebody then, because I

15   don't think it is a legitimate basis

16   to instruct him not to answer the

17   question.

18         MS. WRIGHT:  Who do you

19   want to call?

20         MS. TROJECKI:  It is

21   directly related to his expert

22   report.  It is an e-mail to you about

23   his process of preparing the report.

24         MS. WRIGHT:  It is the

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   preliminary process that was well

2   before the report was produced.  The

3   report that was produced and what we

4   ultimately provided an expert opinion

5   on does not concern what is raised in

6   No. 6.

7           MS. TROJECKI:  I don't

8   agree with you at all.  I'm just

9   trying to think of how to handle it.

10          MS. WRIGHT:  I understand

11  that you don't agree with me, and,

12  obviously, I don't agree with you.

13          MS. TROJECKI:  Excuse me,

14  there's a question pending and you

15  are whispering something to defense

16  counsel.

17          MS. WRIGHT:  She's allowed

18  to talk to me.  She's my co-counsel.

19          MS. TROJECKI:  I know, but

20  I mean there's a question pending.

21          MR. SABINO:  The witness

22  was directed not to answer the

23  question.

24          MS. FLAX:  The witness was

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  directed not to answer the question;

2  I am therefore allowed to go speak

3  with Ms. Wright about an issue.

4         MS. TROJECKI:  I am just

5  going to hold off for now until I can

6  take a break to see if we are going

7  to call the judge or not, because I

8  think I have no doubt that if I call

9  the judge and say this is the

10  question I'm asking the witness, he

11  is going to say you have to answer

12  the question.

13         MS. WRIGHT:  I will permit

14  Joe to answer questions about that

15  first sentence in that last bullet.

16         THE WITNESS:  Would it be

17  okay, Amy, if you could rephrase the

18  question?

19         MR. FACKENTHAL:  Could you

20  read the first sentence?

21         THE WITNESS:  Is it okay,

22  Amy, for me to read the first

23  sentence?

24  BY MS. TROJECKI:

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    Q.    Yes.   Go ahead.

2    A.    "Ultimately will the

3  attorneys want totals calculated for

4  the volumes of wastes generated by

5  each party and/or disposed of at

6  Boarhead during the 1969 to '77 time

7  frame."

8                MS. TROJECKI:  And why is

9  it that you are permitting him to

10 answer a question about that and not

11 the rest of it?

12               MS. WRIGHT:  Because I

13 think the rest of it is not contained

14 in his expert report and it is

15 outside of the scope of the opinion

16 that he gave.

17               MS. TROJECKI:  How is the

18 first part of it contained in his

19 expert report?

20               MS. WRIGHT:  Well, you

21 know, I'm trying to reach a

22 compromise here, so I'm allowing him

23 to answer the first question because,

24 as I said, I have allowed him to

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    answer it before.

2              And we are getting somewhat

3    repetitive, but if you want him to

4    answer it again, I'm going to allow

5    him to answer it again.

6              MS. TROJECKI:  Let me just

7    take a minute to read it.

8    BY MS. TROJECKI:

9         Q.    Let's just leave it for now

10   and I will come back to it.

11        A.    Okay, that's fine.

12        Q.    Okay, let's turn to Section

13   3.1 of your report.

14        A.    Okay.

15        Q.    In the first paragraph

16   under Section 3.1.1.1, you describe

17   American Cyanamid's manufacturing

18   operations.  Do you see that?

19        A.    I do.

20        Q.    And what is the basis for

21   your statements in that first

22   paragraph under Section 3.1.1.1?

23        A.    If you'll notice in that

24   paragraph, we make reference in two

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103           FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1     places to a document called American

2     Cyanamid 1993.  So if we go to

3     Section 6 of the expert report and

4     look under American Cyanamid, we have

5     for 1993 the response to USEPA May

6     26, 1993 correspondence, includes

7     attachments July 2nd, 1993.

8               So that is the source of

9     that information.

10        Q.    And I am going to hand you

11    a document that is American

12    Cyanamid's July 2nd, 1993 letter to

13    U.S. Environmental Protection Agency,

14    and it's Bates stamped CYTC00031, and

15    it goes to CYTC00038.

16        A.    Do you want to put that --

17        Q.    I don't want to have it

18    marked.

19        A.    Okay.

20        Q.    If you look under Question

21    No. 1, "American Cyanamid's Bound

22    Brook, New Jersey facility currently

23    manufactures bulk pharmaceuticals."

24    Do you see that?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                 1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.    Yes.

2          Q.    And "From 1969 to 1977 the

3    plant manufactures dyes, pigments,

4    rubber chemicals, elastomers, organic

5    intermediates, and bulk

6    pharmaceuticals."  Do you see that?

7          A.    Yes, I do.

8          Q.    And that's essentially the

9    exact same sentence that is the first

10   page or the first sentence under

11   Section 3.1.1 of your report,

12   correct?

13         A.    It contains many of the

14   same words, yes.  I believe, at least

15   in part, that's where that came from,

16   yes.

17         Q.    So what I have just read to

18   you is the basis for your statement

19   under the first sentence of your

20   Section 3.1.1, correct?

21         A.    If you will notice, I

22   didn't make a specific page

23   reference, so the reference in both

24   places refers to the entirety of this

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

1    letter.  So there may be other

2    statements that reinforce or add to

3    the paragraph that you just pointed

4    out.

5                So without reading this

6    entire thing, I don't know that I can

7    answer your question with confidence.

8        Q.    But this letter is

9    certainly the basis for how you knew

10   what was manufactured in American

11   Cyanamid; is that correct?

12               MS. WRIGHT:  Objection as

13   to form.

14               THE WITNESS:  Yes.  We

15   reference that as our source.

16   BY MS. TROJECKI:

17       Q.    And the second sentence,

18   "During the late 1970s and early

19   1980 --" is the basis for that

20   statement on the page that's marked

21   CYTC00032, the last sentence of that

22   page -- "the Bound Brook plant went

23   through extensive downsizing during

24   the late 1970s and early 1980s and

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  many product lines were

2  discontinued." Do you see that?

3      A.   Yes, it's almost word for

4  word. So, yes, I would say that's

5  true.

6              MS. FLAX:  I'm going to ask

7  that this document be marked as an

8  exhibit.

9              MR. PETTIT:  Melissa, were

10  the attachments marked too?  There's

11  substantial attachments.

12              MS. FLAX:  Do you just want

13  to put on the record what the exhibit

14  is and what the Bates range is?

15              MS. TROJECKI:  I already

16  did.

17              MS. FLAX:  Again.  Well, I

18  don't think the record is clear

19  because the document was not marked

20  at the time she was asking the

21  questions.

22              MS. TROJECKI:  Exhibit B

23  is -- can you read the Bates

24  numbers?  Exhibit 5, I'm sorry.  We

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    just marked at the request of Melissa

2    Flax as Exhibit 5 the document with

3    the Bates numbers CYTC000031 and

4    ending with CYTC000038.

5              MR. PETTIT:  This is Jeff

6    Pettit.  I want to note for the

7    record that the exhibit is

8    incomplete.  It does not have

9    attachments A and B, which are quite

10   substantial of things that

11   Mr. Hochreiter had to review.

12              (Hochreiter Exhibit 5 was

13   marked for identification.)

14   BY MS. TROJECKI:

15        Q.    Okay, the exhibit doesn't

16   include the attachments, but we are

17   just speaking about now the first

18   paragraph under Section 3.1.1.1, and

19   I just want to confirm, then, that

20   the basis for the two statements in

21   that paragraph are the sentences that

22   I read to you from Exhibit 5; is that

23   correct?

24              MS. WRIGHT:  Objection.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
              1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    It's been asked and answered.  He

2    said he relied on the 1993 or Exhibit

3    5 in its entirety, which would

4    include the attachments and the

5    entire letter.

6    BY MS. TROJECKI:

7        Q.    But you did also testify

8    that the sentences were almost word

9    for word, correct?

10       A.    I did.

11       Q.    Now, let's look at the

12   1994.

13              MS. TROJECKI:  I'm going to

14   mark as Exhibit 6 American Cyanamid's

15   April 28th, 1994 letter to USEPA.   It

16   has Bates numbers CYTC000043 to

17   CYTC000050.

18              (Hochreiter Exhibit 6 was

19   marked for identification.)

20   BY MS. TROJECKI:

21       Q.    And the list --

22       A.    If you will give me one

23   second.

24       Q.    Sure.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.     Okay.

2          Q.     The list that you -- the

3     first bulleted list on Page 3-1 of

4     your expert report starting with

5     Research --

6          A.     Yes.

7          Q.     -- does the information in

8     that list come from Page 2 of Exhibit

9     6, the numbered Page 2 at the bottom?

10         A.     Oh, okay, thank you.  I'm

11    not sure it does.

12         Q.     Why do you think it doesn't

13    come from the --

14         A.     Well, I'm looking at

15    Research, Administrative, and

16    Analytical Labs, and the list that

17    you have asked me to look at includes

18    individual chemicals and waste types,

19    so it's apples and oranges.

20         Q.     I'm referring to the list

21    at the top of Page 2.

22         A.     Oh, I'm sorry, I thought

23    you said the bottom.  I apologize.

24         Q.     That's okay.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          A.     Boy, it sure looks that
2   way, doesn't it?  Yes, I would agree.
3          Q.     And going down to the Waste
4   Generation and Handling section of
5   your report, 3.1.1.2.
6          A.     Okay.
7          Q.     Under that section, there
8   are three separate bulleted lists of
9   waste streams.  The first one begins
10  at the bottom of Page 3-1 and ends
11  with Isoprophanol.  Do you see that?
12         A.     Yes.
13         Q.     The second one, in the
14  middle of Page 3-2, it starts with
15  Sodium Dichromate and ends with Scrap
16  Paint Chemical.
17         A.     Yes.
18         Q.     And the third waste that
19  I'm referring to starts at the bottom
20  of Page 3-2 with Dyes Department and
21  ends with Waste Solvents,
22  Monochlorinated Waste Organics, and
23  Flammable.
24         A.     Okay, it jumps over to

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

1    Pharmaceuticals.

2        Q.    Right.

3        A.    All right, I see those

4    lists.  And we are starting with the

5    Isoprophanol?

6        Q.    We are starting with the

7    first list, the one that begins on

8    Page 3-1.  It starts with 3NOX under

9    the Intermediates.

10        A.    Okay.  All right.

11        Q.    Can you turn to what we

12    marked as Exhibit 5.  That

13    information in the first list, does

14    that come from the second page of

15    Exhibit 5?

16        A.    I want to make sure I'm

17    answering the question accurately.

18    In my expert report, Exhibit 1,

19    Section 3.1.1.2, at the bottom of the

20    page the three items listed under

21    Intermediates Department?

22        Q.    And continuing onto Page

23    3-2.

24        A.    How far into 3-2?

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.    Well, if you look it is

2    almost a word-for-word compilation,

3    and I just want to confirm that the

4    material that is in your expert

5    report, in Exhibit 1, that you got

6    that from the second page of Exhibit

7    5?

8      A.    I believe so.   I mean, I'm

9    seeing right now down to

10   Isoprophanol.   And when we go into

11   the next list, I don't see that here

12   but I'm sure it's somewhere else.

13     Q.    So the next list is the one

14   that begins with Sodium Dichromate,

15   and did you get the information in

16   that list from Exhibit 6, Page 2?

17     A.    This was -- it appears to

18   be the source for that list, although

19   there are a couple differences.

20     Q.    Okay, what are the

21   differences?

22     A.    We, I believe, did not

23   include in my expert report poisonous

24   flammable solids, which exists in the

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1   Cyanamid letter marked Exhibit No. 6,

2   because, frankly, poisonous flammable

3   solids doesn't have a definition in a

4   hazardous substance parlance, so I

5   don't believe we put that in.

6       Q.    For that reason?

7       A.    Right.

8       Q.    Any other differences

9   between these two lists?

10      A.    It would take my a little

11  bit of time.  I mean, I see that BAA

12  sludge is not identified,

13  butylacetanilide.  We actually

14  identified what that is.  It's not

15  stated here.

16      Q.    You actually wrote out BAA

17  sludge is contained on the list on

18  Exhibit 6, but the acronym isn't

19  spelled out, correct?

20      A.    The name isn't spelled

21  out.  The acronym exists but not the

22  name, and we provided the name.

23      Q.    Are there any other

24  differences between your list and the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    list --

2        A.    I mean, I would have to,

3    you know, really look at this

4    closely.  It doesn't appear that

5    there are any others that jump out at

6    me, but if there are it's because I'm

7    just missing it.

8        Q.    So the source of the

9    information in Page 3-2 of your

10   report is Exhibit 6, correct?

11       A.    It certainly appears to be,

12   yes.

13           MS. TROJECKI:  Did you want

14   to say something?

15           MS. WRIGHT:  Yes, I do.

16   There's another reference on Page 3-1

17   for a source material.  But I was

18   also wondering, just so that it might

19   be more efficient, if you know that

20   there's a difference why don't you --

21           MS. TROJECKI:  No, I didn't

22   know there was a difference.  I

23   thought they were word for word.

24   They appear to be word for word.

210

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    BY MS. TROJECKI:

2        Q.    Okay, getting to the third

3    list, the December 15th, 1977

4    memorandum authored by Sid Frankel

5    provides an extensive list.  You cite

6    that as the source for the list of

7    wastes that are contained on Page 3-3

8    of your report, correct?

9        A.    Starting at the bottom of

10   3-2 and working through 3-3, yes.

11       Q.    So I have here a copy of a

12   note from Sid Frankel dated December

13   15th, 1977.  I just want to show it

14   to you before I mark it as an exhibit

15   and ask you if that's the source of

16   the information that's contained on

17   Paragraph 3.3 of your report, Page

18   3-3.

19       A.    Yes, this is an extensive

20   list, the December 15th, 1977 letter

21   from Sid Frankel, so I am finding

22   consistencies in the lists, but for

23   me to say with absolute certainty

24   that everything in my expert report

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1  in this grouping of chemicals came

2  solely from this, I believe it's the

3  case because that's the reference

4  that we made, but I'm not in a

5  position now to be able to say

6  everything cross-correlates

7  perfectly.

8      Q.   I'm just saying you do have

9  to state the basis for your

10  information in your report, and there

11  wasn't a citation to this list in

12  your report and that's why I'm asking

13  you the question.  It references a

14  December 15, 1977 Cyanamid memorandum

15  but there is not a citation to --

16      A.   Okay.  That's an oversight

17  on my part, and I apologize for that,

18  if we didn't put that in.

19      Q.   Can you just wait until I'm

20  finished, for the court reporter.

21      A.   Oh, I'm sorry.  Okay.

22           So that's one reference, I

23  guess, that didn't get into Section

24  6.

**JD R**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1        Q.    But this document that I

2    just handed you, which is the

3    December 15th, 1977, is the source of

4    the information that's contained on

5    Page 3-3 of your report, correct?

6        A.    I believe it is.

7            MS. TROJECKI:  Do you want

8    to mark this as the next exhibit.

9            (Hochreiter Exhibit 7 was

10    marked for identification.)

11    BY MS. TROJECKI:

12        Q.    What is the difference

13    between the first list of wastes that

14    we were discussing and the second

15    list?

16        A.    Okay, if you would be good

17    enough just to again refresh me on

18    what is first and second in this

19    definition.

20        Q.    Okay.  The first list is

21    the list that starts on Page 3-1, the

22    bottom of Page 3-1.

23        A.    Okay.

24        Q.    And the second list is the

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    second list of bulleted items in the

2    report that starts with Sodium

3    Dichromate.

4        A.    Okay.

5        Q.    In other words, are some of

6    the wastes that are talked about in

7    the first list more specifically

8    referenced in the second list, are

9    they the same chemicals, are they

10   different chemicals?

11       A.    The intent of listing both

12   of these is there is three -- they

13   are basically three sources of

14   information that collectively give us

15   the best insight that we have on what

16   the manufacturing processes were for

17   the period of interest at American

18   Cyanamid.

19            Could there be overlap?

20   Yes, I think there probably could

21   be.  In fact, I see 3NOX in both

22   lists, so certainly in that regard

23   there is -- the BAA sludge is in both

24   lists.

**JDR**

**James DeCrescenzo Reporting,** LLC

215.564.3905        InnovatingLitigation
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
                    www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      Q.     Where is the 3NOX on the
2   second list?
3      A.     Page 3-3 at the very top,
4   the first bullet.
5      Q.     That's the third list.  I'm
6   just asking about the first and
7   second so far.  Let's make sure we
8   are getting the list identified.
9      A.     Then I need to better
10  understand what list we are talking
11  about.  And I can't mark on this,
12  right?
13     Q.     You can mark on it.
14     A.     All right.  Tell me what
15  list number one was.
16     Q.     On the bottom of Page 3-1
17  it starts Intermediate Department.
18  That's list one.  And that goes up
19  until Isoprophanol.
20     A.     All right.
21     Q.     Then there's a second list
22  that starts with Sodium Dichromate
23  and ends with Scrap Paint Chemical,
24  and there's a separate reference for

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                         FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    that list.

2        A.    Okay.

3        Q.    Then there's a third list

4    that begins on the bottom of 3-2 that

5    starts with Dyes Department.

6        A.    Okay.

7        Q.    And that goes --

8        A.    To waste solvents?

9        Q.    It actually, because I

10   believe the reference includes also

11   wastes listed for the pigments

12   department, includes pigments, so it

13   goes to the end of that page, the end

14   of Page 3-3, so that's list three.

15            So what I'm trying to do is

16   get a feel for what are these three

17   different lists, what are they lists

18   of.  So the question that I asked is

19   what's the difference between list

20   one and list two, let's start with

21   that.

22        A.    They have different --

23   let's see, list one and list two.  I

24   would have to go into the '93 and '94

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    documents to be able to give you an

2    exact reason, because I think what

3    you are asking is why do we have

4    these listed as, as you are calling

5    them, two separate lists, although in

6    reality they are one, two, three,

7    four separate lists.

8              We have the intermediate

9    department's waste, we have the

10   rubber chemicals department wastes

11   and then we have the pharmaceutical

12   department wastes all in list one,

13   but, in essence, they are segmenting

14   wastes by departments.

15             And then there is a list of

16   waste streams from the entire

17   facility, department irrelevant, that

18   is in what we are calling list two.

19   So without going through these

20   documents in detail, why we ended up,

21   you know, breaking out certain wastes

22   associated with the departments,

23   because it was reported that way.

24             The second list, however,

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    is more general as I read it and, you

2    know, representative of waste coming

3    from the facility, not specifically

4    related to a particular department,

5    and that's simply the way that the

6    parent documents reported this.  So

7    we were spitting it back at them.

8         Q.    Are you able to say with

9    respect to list two which of those

10   wastes came from which department at

11   American Cyanamid?

12        A.    We could only do that in

13   instances where the Cyanamid

14   documentation actually told us that a

15   waste came from a particular

16   department.  So if they didn't tell

17   us that, we weren't able to identify

18   it as coming from a particular

19   department.

20             Now, again, if I could go

21   back and spend time looking at the

22   documents, we might be able to find

23   whether there is references to

24   specific departments.  I don't

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    believe, from my recollection, that

2    there is.

3         Q.    But sitting here today, you

4    are not able to say whether the

5    wastes listed in list one are the

6    same as some of the wastes that are

7    listed in list two; is that correct?

8         A.    All right, well, that, to

9    me, is a slightly different question.

10             We have in list one spent

11   waste acid, the second bullet.  We

12   have waste spill bottoms in list

13   two.  Could I say with certainty that

14   they are completely different?  I

15   believe they are because a spill

16   bottom comes from a different

17   process, but could there be waste

18   acid in the spill bottoms?  I suppose

19   it's possible.

20             We are working with the

21   information that we were provided.

22        Q.    Are all of the items that

23   are bulleted in list two, are they

24   all waste products?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1      A.    They are listed as such,

2  and they were identified in the

3  Cyanamid parent documents as waste

4  streams.

5      Q.    But if you refer to the

6  1994 response, which you cite as a

7  source for this list, which I think

8  we marked as Exhibit 6 --

9          MS. WRIGHT:  When you are

10  talking about lists, you talking

11  about list two?

12          MS. TROJECKI:  Yes, list

13  two.

14  BY MS. TROJECKI:

15      Q.    If you look at Page 2 of

16  Exhibit 6 -- actually, Page 3.  Page

17  3 sets out American Cyanamid's

18  response to the question that EPA

19  raised asking about these particular

20  products or these particular

21  substances, and you will see American

22  Cyanamid's response to several of

23  these items is that it is a product

24  manufactured by the OCD Division at

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

 1      the Bound Brook plant.

 2              If you look at, for

 3      instance, the second -- under

 4      subparagraph B on Page 3 of Exhibit

 5      6, "Methotrexate - This product is a

 6      bulk pharmaceutical." And you have

 7      it on your report as being a waste.

 8          A.     Okay.

 9          Q.     So I just want to see if

10      that was an oversight on your part,

11      or if it is a waste stream, or why it

12      wasn't included in the list of

13      wastes.

14          A.     Well, the question which

15      presumably came from EPA, "Your July

16      2nd, 1993 response identifies several

17      of the waste streams generated by

18      your Bound Brook facility during the

19      time period. However, the

20      documentation accompanying the

21      response indicates that Jonas hauled

22      many wastes from your facility that

23      you did not discuss in your response.

24      Those wastes include -- "

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1          So the EPA has taken a

2     position that they had documentation

3     presumably from Jonas' files that

4     these were taken off site as wastes.

5          Q.     And the fact that American

6     Cyanamid responded to that question

7     by saying that certain products were

8     actually bulk pharmaceuticals or

9     product manufactured, does that

10    change your opinion at all?

11         A.     I don't think so.  I mean,

12    it's possible for a product to also

13    be a waste.  In fact, it's likely

14    that if you are going to have

15    off-spec product, product that

16    doesn't conform to whatever the

17    criteria are, that it is going to end

18    up as waste.

19          So it's entirely possible

20    that they are both correct, that it

21    is a product and it is also a waste.

22         Q.     Just to be clear, the only

23    reason that you are saying that it is

24    a waste versus a product is because

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

1    EPA characterized it as such in

2    their --

3        A.    Right, and they made

4    reference to documentation that they

5    had.

6        Q.    Did you see that

7    documentation or did you ever do an

8    independent analysis of that

9    documentation?

10       A.    If we were given that

11   document, then we saw it.  If we

12   weren't given that document, we did

13   not see it.  But in making this list,

14   we simply used this document.

15       Q.    So you took it at face

16   value?

17       A.    We were comfortable at face

18   value, yes.

19              (Recess taken)

20              MS. WRIGHT:  Can I

21   interrupt your flow of question?  I

22   wanted to go back to Exhibit 4 and

23   the question that I objected to.  I

24   had it backwards.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                    www.JDReporting.com

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    It was the first sentence
2  that I don't want Joe to speak to
3  because he is not going to offer an
4  opinion on that, but if you want to
5  ask questions about the second
6  sentence in the last bullet of
7  Exhibit 4, that's fine.
8    MS. TROJECKI:  That's good,
9  because we were ready to call the
10  judge.  I'm only kidding.
11    THE WITNESS:  I'm sure you
12  would have gotten him on the first
13  try, too.
14  BY MS. TROJECKI:
15    Q.   We were talking before the
16  break about the three lists that we
17  have defined under Section 3.1.1.2 of
18  your report.
19    A.   Yes.
20    Q.   And we talked about what
21  the difference is between the first
22  and the second list.
23    So can you tell me briefly
24  with respect to the third list, is it

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    the same general answer that you

2    really don't have an opinion as to

3    whether there is duplication or not,

4    you kind of just went off of the

5    documents?

6        A.    We went off the documents,

7    and there is -- particularly between

8    list two and three, the example that

9    I mentioned previously, the BAA

10   sludge is listed in both, I believe,

11   both lists, and the MNB recovery

12   sludge is listed on both, and I'm

13   sure there are probably a few others.

14             These, I don't believe,

15   were ever intended to be completely

16   exclusionary.

17       Q.    It was just three lists

18   from three sources of information; is

19   that correct?

20       A.    That's my recollection,

21   yes.

22       Q.    And you didn't do any

23   independent analysis or research of

24   any kind to explore or determine what

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    wastes came from American Cyanamid,

2    other than what was on the three

3    documents that we discussed; is that

4    correct?

5         A.    We didn't do any

6    independent research.  Whether this

7    was the only document -- I mean this

8    is certainly -- these are the

9    documents that we just made exhibits

10   that we cited.  Were there other

11   documents that reinforced our

12   understanding of wastes that came

13   from American Cyanamid Bound Brook,

14   it's possible, but these are the ones

15   that we cited because --

16        Q.    But those other documents

17   are not contained in your report

18   anywhere, are they?

19        A.    Well, I mean, there's a

20   number of reports -- you know, we

21   have a list of documents in Section 6

22   that we considered.  We didn't make

23   specific text references in every

24   single location to every document

226

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1    that might have given us an

2    understanding of site conditions, for

3    example, or wastes generated.

4           These were the predominant

5    ones, the ones we just made exhibits

6    were the predominant documents that

7    we used to create this section of the

8    expert report, but there may have

9    been other documents that maybe gave

10   us reinforcing knowledge or something

11   of that nature.

12          Again, anything that we

13   referenced is in Section 6.

14       Q.    Except for Exhibit 7.

15   Right?

16       A.    Yes.  Although it's

17   referenced in the text of the report,

18   we omitted it inadvertently in

19   Section 6.

20       Q.    But the documents that we

21   marked as Exhibits 5, 6, and 7 are

22   almost word for word from the three

23   lists that are in your report,

24   correct?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

DEPOSITION OF JOSEPH J. HOCHREITTER, JR., 2/27/07

1                    MS. WRIGHT:   Objection.

2    Asked and answered.

3                    THE WITNESS:   They are

4    substantially equivalent.

5    BY MS. TROJECKI:

6         Q.    I want to call your

7    attention to Table 1. -- or 1a in

8    Appendix B of your report.

9         A.    Okay.

10        Q.    I just want to make sure

11   I'm clear as to where you got the

12   information that's contained in that

13   table.

14        A.    Okay.

15        Q.    We are going to have to

16   flip back and forth a little bit

17   here.

18        A.    Between the text and the

19   table?

20        Q.    And the table.

21        A.    All right.   That's fine.   I

22   will keep the text open.   Actually, I

23   haven't taken any notes yet, so I'm

24   going to --

**JDR**

**James DeCrescenzo Reporting,** LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581