**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES, INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS LLC, | Civil Action |
| Plaintiffs, | Case No. 02-cv-3830 |
| | Judge LeGrome D. Davis |
| v. | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | |
| Defendants. | |

---

**DEFENDANT AETC'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTIONS IN LIMINE**

---

**WOLFF & SAMSON PC**
John A. McKinney, Jr.
Laurie J. Sands
One Boland Drive
West Orange, NJ 07052
(973) 325-1500
jmckinney@wolffsamson.com
lsands@wolffsamson.com
Attorneys for Defendant Advanced
Environmental Technology Corp.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

POINT I

THE SEPTEMBER 9, 1976 LETTER IS IMPROPERLY OFFERED AS
EVIDENCE OF A PRIOR BAD ACT ................................................................................ 3

    A.    Background Facts.................................................................................................. 4

    B.    Legal Argument .................................................................................................. 5

        1.    The September 9, 1976 Letter Is Not Relevant to This Action. ................. 6

        2.    Prior Bad Act Evidence Is Improper.......................................................... 7

        3.    The September 9, 1976 Letter May Not Be Used for Any Other
            Purpose....................................................................................................... 9

POINT II

MANFRED DEREWAL, SR.'S HEARSAY STATEMENTS AND STATEMENTS
OUTSIDE HIS PERSONAL KNOWLEDGE MAY NOT BE ADMITTED ............................. 11

    A.    Background ......................................................................................................... 11

    B.    Argument .......................................................................................................... 12

        1.    FRE 602 Bars Statements Based Upon the Observations of Others......... 12

        2.    Testimony Where Mr. DeRewal Relies Upon The Statements of
            Others Is Hearsay   Within Hearsay, Without An Applicable
            Exception. .................................................................................................. 14

POINT III

PLAINTIFFS MAY NOT OFFER JAY VANDEVEN'S OPINIONS, AS STATED IN
HIS EXPERT REPORT, INTO EVIDENCE .............................................................................. 14

    A.    Introduction........................................................................................................ 14

B.    Legal Argument ............................................................................... 17

    1.    The Court's Gatekeeper Function is Well Defined and Should Be Applied.................................................................................... 17

    2.    Vandeven's Opinions Are Inadmissible Ipse Dixit. ................................ 18

    3.    There Is No Means to Test the Methodology Or Reliability of Several of Vandeven's Findings. ............................................. 27

POINT IV

PLAINTIFFS' UNFOUNDED ALLOCATION THEORIES MAY NOT BE CONSIDERED ............................................................................ 28

A.    Introduction.................................................................................. 28

B.    Argument ...................................................................................... 28

    1.    The Court Must Allocate Section 113(f) Liability.................................... 28

    2.    Plaintiffs' Opinion Regarding Allocation Is Not Competent Evidence.................................................................................. 31

    3.    Plaintiffs Do Not Have a Witness Competent To Testify Regarding Their Allocation Theory. ...................................... 34

POINT V

PLAINTIFFS CANNOT PROVIDE EVIDENCE THAT THEIR COSTS WERE VOLUNTARILY INCURRED BECAUSE THEY DO NOT HAVE A 107 CLAIM ................. 34

A.    CERCLA § 107 Claims Are Limited to Voluntary Costs..................................... 35

POINT VI

VANDEVEN'S UNTIMELY REPORT SHOULD BE BARRED ............................................. 38

CONCLUSION.................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

**Page**

Action Manufacturing Co. v. Simon Wrecking Co.,
  428 F. Supp. 2d 288 (E.D. Pa. 2006) ...................................................................................30, 31

Becker v. ARCO Chemical Co.,
  207 F.3d 176 (3d Cir. 2000)................................................................................................7, 8

Bradley v. Pittsburgh Board of Education,
  913 F.2d 1064 (3d. Cir. 1990).................................................................................................1

Brown v. Kean,
  355 F.3d 82 (2d. Cir. 2004)...................................................................................................13

Calhoun v. Yamaha Motor Corp.,
  350 F.3d 316 (3d Cir. 2003)..................................................................................................28

Chitayat v. Vanderbilt Associates,
  2007 WL 2890248 (E.D.N.Y. Sept. 27, 2007) ................................................................32, 33

City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust,
  306 F. Supp. 2d 1040 (D. Kan., 2003) ..................................................................................30

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
  509 U.S. 579 (1993)........................................................................................15, 17, 18, 27

General Electric Co. v. Joiner,
  522 U.S. 136 (1997)..............................................................................................................18

Gogol v. Johns-Manville Sales Corp.,
  595 F. Supp. 971 (D.N.J. 1984) ............................................................................................11

Government of the Virgin Islands v. Pinney,
  967 F.2d 912 (3d Cir. 1992)..................................................................................................10

Griggs v. BIC Corp.,
  844 F. Supp. 190, aff'd 37 F.3d 1486 (3d Cir. 1994) ........................................................7, 10

Hudgins v. Vermeer Manufacturing Co.,
  240 F.R.D. 682 (E.D. Ok. 2007) ...........................................................................................39

Inline Connection Corp. v. AOL Time Warner,
  472 F. Supp. 2d 604 (D. Del., 2007)........................................................................34

J& R Ice Cream Corp. v. California Smoothie Licensing Corp.,
  31 F.3d 1259 (3d Cir. 1994)..............................................................................7, 9, 10

Kemp v. Balboa,
  23 F.3d 211 (8th Cir. 1994) ..............................................................................12, 13

Khumo Tire Co. v. Carmichael,
  526 U.S. 137 (1999)................................................................................................17

Kotrous v. Goss-Jewett Co. of Northern California, Inc.,
  523 F.3d 924 (9th Cir. 2008) ...................................................................................36

Lenox Inc. v. Reuben Smith Rubbish Removal,
  91 F. Supp. 2d 743 (D.N.J. 2000) ..........................................................................31

New Castle County v. Halliburton NUS Corp.,
  111 F.3d 1116 (3d Cir. 1997), reh'g denied, 116 F.3d 82 (3d Cir. 1997) ...................29

New Jersey Turnpike Authority v. PPG Industries, Inc.,
  16 F. Supp. 2d 460 (D.N.J. 1998), aff'd, 197 F. 3d 96 (3d Cir. 1999).........................29

Oddi v. Ford Motor Co.,
  234 F.3d 136 (3d Cir. 2000), cert. denied 532 U.S. 921 (2001) .................................16

In re Paoli R.R. Yard PCB Litigation,
  35 F.3d 717 (3d Cir. 1994), cert. denied 513 U.S. 1190 (1995) .................................18

Reger v. AI duPont Hosp. for Children of Nemours Foundation,
  259 Fed. Appx. 499 (3d Cir. 2008)....................................................................16, 17

Rolan v. Vaughn,
  445 F.3d 671 (3d Cir. 2006)....................................................................................14

In re TMI Litigation,
  193 F.3d 613 (3d Cir. 1999).............................................................................18, 19

Simmons v. Ford Motor Co.,
  132 Fed. Appx. 950 (3d Cir. 2005)....................................................................17, 18

Tobias v. Pennsylvania Board of Probation and Parole,
  2005 WL 6042718 (E.D. Pa. Apr. 26, 2005) ............................................................39

U.S. v. Atlas Minerals and Chemicals, Inc.,
  797 F. Supp. 411 (E.D. Pa. 1992) ...................................................................................30

U.S. v. Compaction System,
  88 F. Supp. 2d 339 (D.N.J. 1999) ...................................................................................31

U.S. v. Kramer,
  953 F. Supp. 592 (D.N.J. 1997) ......................................................................................31

U.S. v. Lang,
  589 F.2d 92 (2d Cir. 1978)...............................................................................................13

U.S. v. Pesses,
  120 F. Supp. 2d 503 (W.D. Pa. 2000)..............................................................................31

U.S. v. Stringfellow,
  661 F. Supp. 1053 (C.D. Cal. 1987) ................................................................................30

U.S. v. Union Corp.,
  277 F. Supp. 2d 478 (E.D. Pa. 2003) ...............................................................................30

United States v. Atlantic Research Corp.,
  __ U.S. __ 127 S. Ct. 2331 (2007)..............................................................3, 29, 35, 36, 37

Wanke v. Lynn's Transport Co.,
  836 F. Supp. 587 (N.D. Ind. 1993) ..............................................................................8, 10

## **RULES**

FRCP 26(a)(2)(B)  .............................................................................................................39

FRCP 26(a)(2)(C) .............................................................................................................39

## **STATUTES**

42 U.S.C. § 9607(a)(4)(A) ................................................................................................35

42 U.S.C. § 9607(a)(4)(B) ................................................................................................35

42 U.S.C. § 9613(f)(1) ..................................................................................................29, 30

42 U.S.C. § 9613(f)(3)(B)..................................................................................................35

## PRELIMINARY STATEMENT

Plaintiffs Agere Systems, Inc., Cytec Industries, Inc., Ford Motor Company, SPS Technologies, LLC And TI Group Automotive Systems LLC (collectively, "Plaintiffs") are expected to offer several different categories of evidence and testimony at trial that should not be considered by the Court as trier of fact because the material is beyond the scope of permissible evidence. Bradley v. Pittsburgh Board of Education, 913 F.2d 1064, 1069 (3d. Cir. 1990) (a motion in limine is used "to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions"). As such, defendant Advanced Environmental Technology Company ("AETC") submits six motions in limine to exclude the following categories of evidence and testimony:

1.    **Prior bad act evidence is inadmissible.** Plaintiffs should not be permitted to offer evidence of a purported prior bad act allegedly committed by AETC. Specifically, pursuant to FRE 404(b), Plaintiffs should not be permitted to offer a letter dated September 9, 1976 because the letter relates solely to the disposal of waste that is completely unrelated to this action. In addition, as set forth below, the letter does not demonstrate that a prior bad act was actually committed, and, thus, it is not relevant to this action and should not be considered by the Court as trier of fact.

2.    **Plaintiffs may not offer as evidence Manfred DeRewal, Sr.'s prior hearsay testimony and testimony without personal knowledge.**[1]  Manfred DeRewal, Sr. previously testified at a deposition in this action and before the EPA. Although Mr. DeRewal's prior testimony is generally admissible pursuant to FRE 804(b)(1), any statements within that prior

---

[1] It is expected that Manfred DeRewal, Sr. will not appear at trial since he is now allegedly living in Costa Rica.

testimony that are either hearsay, without an applicable exception, or are beyond the scope of his personal knowledge should not be admitted. Witnesses may not testify about statements made by others or present information that is not personally known to them.

**3.    The opinions offered by Plaintiffs' expert, Jay Vandeven, are unsubstantiated "ipse dixit" and may not be offered into evidence.** Plaintiffs are expected to offer the testimony of Jay Vandeven (Vandeven") on several issues. Vandeven's testimony is nothing more than conclusory statements unsupported by any data or evidence. Moreover, Vandeven offers no site-specific information to support his opinions. For example, Vandeven is expected to testify that the mere presence of acid waste at the Boarhead Farms Site caused an increase in the mobility of metals present at the Site. Vandeven does this without setting forth any data or evidence to demonstrate that, although increased mobility may be theoretically possible, it actually occurred on the Site. Specifically, Vandeven is unable to identify any evidence or data to suggest that metals and acids actually interacted at the Boarhead Farms Site, or that the alleged increased mobility contributed to, or increased, response costs. Pursuant to FRE 702, these opinions will not assist the fact finder in performing its role, and, accordingly, these opinions should not be offered in to evidence.

**4.    Plaintiffs may not usurp the Court's role in allocating liability.** Although the Court has broad discretion in assessing how to allocate liability among responsible parties, Plaintiffs may not offer as evidence their own unsubstantiated conclusions regarding the ultimate decision on allocation. Although the parties are free to argue to the Court their views on how allocation may be determined, those arguments may not be admitted into evidence. As such, Plaintiffs may not offer into evidence their unsubstantiated conclusions regarding how the Court should allocate liability.

5.    **Plaintiffs may not offer evidence that payments made by Plaintiffs pursuant to the Consent Decrees for the Site were voluntarily incurred.**  Plaintiffs were previously sued by the EPA for, among other claims, liability pursuant to CERCLA § 107.  That action was settled pursuant to two Consent Decrees which required Plaintiffs to reimburse EPA for certain costs and required Plaintiffs to conduct certain remedial actions.  Pursuant to the Supreme Court's recent decision in United States v. Atlantic Research Corp., __ U.S. __; 127 S. Ct. 2331 (2007), such costs are "involuntary" and are not recoverable pursuant to Section 107 of CERCLA.  Accordingly, Plaintiffs proper relief under CERCLA is for contribution under Section 113.  As a result, Plaintiffs may not offer any evidence to support their claims that payments made by them to the EPA were voluntarily incurred.

6.    **Vandeven's third expert report is untimely and the contents thereof should not be introduced into evidence.**  Finally, Plaintiffs improperly submitted an expert report from Vandeven dated May 8, 2008, well after the close of expert discovery in this action.  It is well settled that an expert may testify solely about information and opinions disclosed in an expert report produced in discovery and that such reports must be produced during discovery.  Here, the report was submitted well after the close of discovery, and, in fact, on the eve of trial.  Therefore, Plaintiffs should be barred from introducing any testimony relating to the information and opinions set forth in the untimely report.

## POINT I

### THE SEPTEMBER 9, 1976 LETTER IS IMPROPERLY OFFERED AS EVIDENCE OF A PRIOR BAD ACT

A letter dated September 9, 1976 from AETC to Manfred DeRewal, Sr. regarding the disposal of waste for AETC customers not involved in this case ("September 9, 1976 Letter") may not be admitted into evidence.  The September 9, 1976 Letter is being offered by Plaintiffs

as evidence of a prior bad act by AETC, and, as such, the September 9, 1976 Letter may not be offered into evidence pursuant to FRE 404(b).

## A.   Background Facts

As the Court is well aware, this action concerns waste disposal at the Boarhead Farms Superfund Site (the "Boarhead Farms Site"). (Declaration of Laurie Sands, Esq. ("Sands Dec."), Exhibit A (Fifth Amended Complaint ("Complaint") at ¶ 1). Specifically, Plaintiffs allege that AETC contracted with Ashland, Inc. ("Ashland") and Diaz Chemical Corporation ("Diaz") to remove and dispose of wastes generated from facilities operated by Ashland and Diaz. (See, e.g., Complaint, ¶ 68). Plaintiffs' further allege that AETC contracted Manfred DeRewal, Sr. and companies he owned or controlled (collectively, "DeRewal") to pick up the wastes generated by Ashland and Diaz for disposal at a neutralization plant in Wissinoming, Pennsylvania (the "Wissinoming Facility"). Plaintiffs further allege that, rather than dispose of all of the wastes generated by Ashland and Diaz through proper means, DeRewal disposed of some of the wastes generated by Ashland and Diaz at the Boarhead Farms Site, leaving behind environmental problems at the Site.

As part of their case in chief, therefore, Plaintiffs must prove that waste generated by Ashland and/or Diaz, which was subject to AETC's agreements with those entities, was actually disposed of at the Boarhead Farms Site. To do this, Plaintiffs intend to offer the September 9, 1976 Letter, which has nothing to do with this action, AETC's efforts on behalf of Ashland or Diaz, the Boarhead Farms Site, or even the Wissinoming facility, in an attempt to prove that AETC was allegedly involved in improper waste disposal activities. (See Sands Decl., Exhibit B, September 9, 1976 Letter). Rather, the September 9, 1976 Letter addresses unrelated work performed by DeRewal on behalf of other AETC customers and is related to waste that was

never bound for the Wissinoming Facility. More importantly, the waste at issue in the Letter was not ultimately disposed of at the Boarhead Farms Site. Rather, the Letter is a written "confirmation" by AETC of the "prices" DeRewal will charge AETC to transfer waste for two AETC customers not involved in this action to disposal facilities unrelated to this case. (Id.)

In the Letter, AETC identifies two shipments to be made by DeRewal, one for AETC customer Diamond Shamrock and the other for AETC customer Roche. Plaintiffs are expected to focus on the following passage that Plaintiffs claim demonstrate it is "more probable" than not that the waste at issue in this case made its way to the Boarhead Farms Site because waste belonging to an entirely different AETC customer, as alleged by the Plaintiffs, was not disposed of in the manner its customer expected,:

> Trucks must be clean and neat in appearance. Roche will be told materials is [sic] going to Grows Landfill (can it – or at least part?) and lime make-up.

(Id.) For the reasons set forth below, the September 9, 1976 Letter is evidence of nothing, and it may not be admitted for any purpose.

**B.    Legal Argument**

The September 9, 1976 Letter should not be admitted into evidence at trial because (a) it is not relevant for any purpose, (b) Plaintiffs may not use evidence of one purported prior bad act in order to demonstrate that AETC acted improperly here, and (c) the letter does not properly address any other issue, including AETC's purported knowledge of DeRewal's actions.

1.    **The September 9, 1976 Letter Is Not Relevant to This Action.**

AETC will not repeat here the standards for relevance because they are well known to the Court. See, e.g., FRE 402. The passage quoted above from the September 9, 1976 Letter will not assist the trier of fact in any manner and certainly does not "make the existence of any fact … more probable … than it would be without the evidence." FRE 401.

Plaintiffs take five (5) words from the Letter and argue that these 5 words demonstrate AETC purportedly participated in the improper disposal of Roche's wastes. First, the September 9, 1976 Letter was to DeRewal and not Roche. Moreover, the Letter was asking DeRewal where the Roche waste can be disposed. There was no indication that Roche was told its waste was going to a facility when, in fact, its waste was disposed illegally elsewhere. Indeed, the landfill identified, GROWS, was a licensed landfill at the time. Yet, the Plaintiffs are holding out the September 9, 1976 Letter as evidence that AETC was involved in improper disposal activities when the language of the Letter does not support this conclusion.

Plaintiffs apparently intend to use the September 9, 1976 Letter to demonstrate that because AETC purportedly participated in improper disposal with respect to Roche's waste, it must have participated in improper disposal with respect to Ashland and Diaz's waste. Simply put, the Letter does not demonstrate that any prior bad act actually occurred. There is nothing in the September 9, 1976 Letter that indicates that Roche's waste, or any waste for that matter, was disposed of improperly. Neither the Letter nor any other evidence that will be part of the record before the Court in this case demonstrates in any way that Roche's waste was disposed of improperly. In short, the September 9, 1976 Letter does not evidence anything. It is simply a Letter about an unrelated business transaction in which AETC apparently contracted with

DeRewal to dispose of waste obtained from Diamond Shamrock and Roche. Such a letter has no relevance to this action and this motion in limine should be granted for this reason alone.

## 2. **Prior Bad Act Evidence Is Improper.**

Even if this Court were to find the September 9, 1976 Letter was evidence that Roche's waste was disposed of improperly, the Letter is improper character evidence offered to demonstrate a "prior bad act." FRE 404(b). Under the Federal Rules of Evidence, Plaintiffs may not use the Letter to demonstrate that because AETC purportedly acted improperly with respect to the Roche waste, AETC must have committed wrongdoing with respect to the Ashland and Diaz waste. FRE 404(b) bars evidence of prior bad acts if the act is offered to show that because of the prior bad act, the defendant is more likely to have committed the wrong at issue in the action. See, e.g., Griggs v. BIC Corp., 844 F. Supp. 190, 197 (M.D. Pa.) aff'd 37 F.3d 1486 (3d Cir. 1994) ("In essence, [FRE 404(b)] requires exclusion of evidence of a past act if the only reason for its proffer is that it tends to suggest that the actor acted in a similar way in a material situation"). Thus, evidence of a "propensity inference," that a party has a greater propensity or likelihood of committing one bad act because it committed a prior bad act, is barred under the Federal Rules of Evidence. Id.

The Third Circuit has adopted a four prong test to determine the admissibility of Rule 404(b) evidence: "(1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the [district] court must charge the jury to consider the evidence only for the limited purpose for which it was admitted." Becker v. ARCO Chemical Co. 207 F.3d 176, 189 (3d Cir. 2000) (citing J& R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1268

(3d Cir. 1994) and other similar decisions). Analysis of each of these factors demonstrates that the September 9, 1976 Letter may not be admitted.

First, the September 9, 1976 Letter is not offered for a proper purpose. As set forth in FRE 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." FRE 404(b). This is precisely what is at issue here. Plaintiffs intend to show that a prior bad act is evidence of a propensity to commit the wrongdoing alleged in this action, or, in other words, that part of AETC's "character" is that it has a practice of improperly disposing of waste. This is not a proper purpose under FRE 404(b) and the evidence may not be admitted. See, e.g., Wanke v. Lynn's Transp. Co., 836 F Supp. 587, 594 (N.D. Ind. 1993) ("rule is intended to preclude evidence of a person's propensity as proof of the person's conduct on the occasion at issue"); see also Becker, 207 F.3d at 191 ("the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged.") (citing U.S. v. Morely, 199 F.3d 129, 133 (3rd Cir. 1999)).

Second, as discussed above, the September 9, 1976 Letter is not evidence of anything, much less evidence that AETC committed any wrongdoing with respect to the Roche waste. There is nothing in the September 9, 1976 Letter that indicates that Roche's waste, or any waste for that matter, was disposed of improperly. Plaintiffs are not expected to offer any additional evidence with respect to the ultimate destination of the Roche waste; and, therefore, there is no basis for introduction of any evidence concerning AETC's actions regarding Roche's waste.

Finally, the balancing test under FRE 403(b) weighs dramatically against the admission of the September 9, 1976 Letter. Any marginal evidentiary value associated with the September 9, 1976 Letter is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, and by considerations relating to delay and waste of time. For example, this action concerns waste allegedly disposed of at the Boarhead Farms Site. Allowing Plaintiffs to offer evidence about unrelated waste, which was disposed of at unknown locations, and about which little is known, will only result in a confusion of issues and unnecessary delay. To fully address the Letter, AETC and Plaintiffs will need to offer evidence about what happened to the Roche material, and whether the disposal of that waste was proper. In short, the entire issue is a distracting side-show that will not assist the trier of fact in determining anything and will needlessly delay what is already expected to be a six week trial. Moreover, given the paucity of evidence to support Plaintiffs' claim that AETC acted improperly with respect to Roche, any probative value provided by the September 9, 1976 Letter is substantially outweighed by the danger of unfair prejudice.

### 3.    The September 9, 1976 Letter May Not Be Used for Any Other Purpose.

Furthermore, Plaintiffs may not offer the September 9, 1976 Letter for any other purpose. Specifically, AETC expects Plaintiffs will claim the Letter is evidence that although AETC told Ashland and Diaz its waste was going to Wissinoming, AETC knew that the waste was being disposed elsewhere. As such, the Plaintiffs will argue the exception referenced in FRE 404(b) to evidence of knowledge applies. This argument is without merit.

What Plaintiffs will allege is that AETC purportedly knew that DeRewal improperly disposed of Roche's wastes, and, therefore, AETC also knew DeRewal disposed of Ashland or Diaz's waste improperly. This argument is, at its core, merely a claim that because AETC allegedly knew about other bad acts, it knew about this bad act. This is precisely the same propensity inference discussed above. Thus, Plaintiffs' expected argument is a distinction without a difference that should be rejected by this Court.

Similarly, Plaintiffs may not offer the September 9, 1976 Letter as evidence of a common scheme. As the Third Circuit explained in J & R Ice Cream Corp., 31 F.3d at 1268-69, the prior acts at issue must be part of the same common plan or scheme, which is not present here:

> Ordinarily, when courts speak of 'common plan or scheme,' they are referring to a situation in which the charged and the uncharged ... [acts] are parts of a single series of events. In this context, evidence that the defendant was involved in the uncharged ... [act] may tend to show a motive for the charged ... [act] and hence establish the commission of the ... [act], the identity of the actor, or his intention.

Id. (quoting Government of the Virgin Islands v. Pinney, 967 F.2d 912, 916 (3d Cir. 1992). Here, the allegedly prior bad act at issue involves a completely distinct set of events. The issues here concern AETC's relationship with Diaz and Ashland; Roche and Diamond Shamrock are not at all involved in this action. In addition, the sites – both the eventual and expected destinations for the wastes – are different and the time period is different. In fact, there is nothing to show that GROWS landfill, the disposal facility identified in the Letter, was anything other then a permitted, legitimate disposal site. Accordingly, the September 9, 1976 Letter is not evidence of a common plan or scheme.[2]

Finally, the September 9, 1976 Letter is improper "habit" evidence for which there is insufficient proof. FRE 406. Habit evidence cannot be proven based upon one single incident of wrongdoing. Rather, much more is required. See, e.g., Griggs, 844 F. Supp. at 197 (habit evidence exception to FRE's bar on character evidence may not apply where there is only one prior incident offered to prove habit); Wanke, 836 F. Supp. at 594 (one speeding ticket cannot be used to demonstrate habit of driving too fast).

---

[2] A common scheme may also be evidence of a "signature" crime. We assume this is not at issue here, but if Plaintiffs plan to offer the September 9, 1976 Letter as evidence of a signature crime, AETC reserves its right to object at that juncture.

Plaintiffs are using one alleged incident, the September 9, 1976 Letter, to claim that AETC was in the habit or routine practice of improperly disposing of waste. This one Letter is not enough to support a claim of habit. Also, as discussed above, the Letter does not demonstrate that AETC acted improperly with respect to the Roche waste.

As demonstrated, the September 9, 1976 Letter should not be permitted to be introduced as evidence in this case.

## POINT II

### MANFRED DEREWAL, SR.'S HEARSAY STATEMENTS AND STATEMENTS OUTSIDE HIS PERSONAL KNOWLEDGE MAY NOT BE ADMITTED

#### A.    Background

Manfred DeRewal, Sr. ("Mr. DeRewal") testified at a deposition in this matter and in connection with an EPA civil investigation of the Boarhead Farms Site. (Sands Decl., Exhibits C (deposition testimony) and D (EPA testimony). Plaintiffs are expected to offer this testimony into evidence at trial. Thus, assuming Mr. DeRewal is unavailable to testify at trial, Plaintiffs and AETC are both permitted to offer this testimony into evidence subject to objections. FRE 804(b)(1) (former testimony exception to hearsay rule); see, e.g., Gogol v Johns-Manville Sales Corp., 595 F. Supp. 971 973 (D.N.J. 1984) (applying same).

Nevertheless, to the extent Mr. DeRewal's prior testimony is outside of his personal knowledge or constitutes hearsay for which there is no applicable exception, the testimony may not be admitted under any circumstances. FRE 602; 802. Specifically, attached hereto as Exhibits C and D of the Sands Decl. are lists of statements made by Mr. DeRewal during his prior testimony which either constitute hearsay for which there is no exception and/or testimony

in which Mr. DeRewal makes statements beyond his personal knowledge. As set forth below, this testimony must be excluded.

**B.**    **Argument**

       **1.**    **FRE 602 Bars Statements Based Upon the Observations of Others.**

Pursuant to FRE 602, any statement by a witness must be based upon the witness's own personal knowledge:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.

FRE 602; see also Official Comment, FRE 602 ("This rule is designed to improve the reliability of evidence admitted at trial by insisting that witnesses testify only as to their own observations and perceptions"). Here, there is no dispute that several of the statements made by Mr. DeRewal during his prior testimony are based upon the personal observations of others, and are not based upon Mr. DeRewal's own personal knowledge. By Mr. DeRewal's own admission, he was either not the person who observed the facts described in his testimony or his testimony is based upon information supplied by others. As such, pursuant to FRE 602, testimony not based upon Mr. DeRewal's personal knowledge is inadmissible. FRE 602.

For example, in Kemp v. Balboa, 23 F.3d 211, 212-13 (8th Cir. 1994), the witness was a nurse who testified that the plaintiff had not taken his medication on several prior occasions. Id. On appeal, the Eight Circuit held that nurse's testimony should have been barred because it was not based upon her personal observations, but rather was based upon her reading of certain records which had not been introduced into evidence. Id. The same is true here. Mr. DeRewal cannot testify as to facts he did not personally observe, even if that testimony is based upon the statements of others. Pursuant to FRE 602, if the witness does not have personal knowledge of

the subject matter of his or her testimony, the testimony may not be considered by the trier of fact. Id.

Moreover, if Plaintiffs seek to admit the statements relied upon by Mr. DeRewal pursuant to an exception to the hearsay rule (which, as discussed below, they cannot), Plaintiffs must also establish the predicate foundation, required by FRE 602, that the hearsay declarant had personal knowledge of the subject matter of the statement. See, e.g., U.S. v. Lang, 589 F.2d 92, 98 (2d Cir. 1978). Specifically, "in a hearsay situation, the declarant is, of course, a witness" who must have personal knowledge in order for the statement to be admissible. Id. For example, in Brown v. Kean, 355 F.3d 82, 90 (2d. Cir. 2004), the Second Circuit held that even if hearsay statements made to a 911 operator about the firing of a gun were admissible as an excited utterance, the statements could not be admitted nevertheless because the proponent of the evidence could not establish that the caller had personal knowledge of what he described in the call to 911. Id. The out of court declarant's personal knowledge must be established. In Brown, because it could not be established, the court would not permit the evidence of the call to be presented to the trier of fact. Id. Similarly, if Plaintiffs seek to admit the content of the hearsay statements offered by Mr. DeRewal, they must establish not only an exception to the hearsay rule, but also that the hearsay declarant had personal knowledge of the content of the statement. Plaintiffs will not be able to do so, and, therefore, all statements made by Mr. DeRewal that are based upon information held by other persons may not be admitted into evidence at trial.

2.    **Testimony Where Mr. DeRewal Relies**

**Upon The Statements of Others Is Hearsay**
**Within Hearsay, Without An Applicable Exception.**

In addition to being beyond Mr. DeRewal's personal knowledge, any testimony by Mr. DeRewal in which he relies solely upon a statement made to him by another person is hearsay within hearsay, and, as such, the statement may not be admitted into evidence unless Plaintiffs identify an applicable exception. FRE 805. In these instances, Mr. DeRewal is testifying as to the statement of another person. Therefore, in order for the statement to be admissible, there must be a hearsay exception for both Mr. DeRewal's statement and also the statement upon which Mr. DeRewal relies. FRE 805; Rolan v. Vaughn, 445 F.3d 671, 683 (3d Cir. 2006) (applying FRE 805 to "double hearsay"). The statements AETC has identified in Exhibits C and D to the Sands Decl. are inadmissible hearsay for which there is no exception.

As discussed above, Plaintiffs cannot establish an exception to hearsay for the statements of others repeated by Mr. DeRewal in his testimony, or upon which he relied (which are hearsay within hearsay). Accordingly, the statements may not be admitted into evidence.

## POINT III

**PLAINTIFFS MAY NOT OFFER JAY VANDEVEN'S OPINIONS, AS STATED IN HIS EXPERT REPORT, INTO EVIDENCE**

A.    **Introduction**

This Court should exercise its "gatekeeper" authority to bar Plaintiffs' expert Jay Vandeven ("Vandeven") from offering unsubstantiated opinions that are not based upon any evidence or data. FRE 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) (applying same). Specifically, at trial, Plaintiffs are expected to proffer Vandeven's testimony on issues relating to waste purportedly associated with AETC for which there is no basis in fact,

data or evidence from the Boarhead Farms Site, including but not limited to, the following three

unsubstantiated claims:

> (1)    acid waste disposed of at the Boarhead Farms Site caused metals
> and solvents at the site to become more persistent and more
> mobile;
>
> (2)    acid waste disposed of at the Boarhead Farms Site caused or
> expedited the deterioration of metal drums located at the Site; and,
>
> (3)    acid waste disposed at the Boarhead Farms Site caused metals to
> migrate into off-site wells.

(See, e.g., Sands Dec., Exhibit E, Vandeven Report at 13 ("the acidity of these wastes increased

the mobility of metals in the subsurface environment"); at 13 ("even corrosive wastes that did

not contain metals (if any such wastes were released) would have promoted the degradation of

buried drums"); at 17 ("For example, most metals are considerably more soluble in acidic

conditions, so any release of acidic materials would have promoted the migration of metals").

But Vandeven sets forth these generalized statements as scientific opinions regarding the

contamination at the Boarhead Farms Site without even considering any site-specific conditions.

Accordingly, these are merely generalizations and do not assist the trier of fact nor do they meet

the standards set forth in Daubert for scientific opinions. In fact, Vandeven chastises the work of

another expert for allegedly conducting the same type of generalized analysis:

> General statements regarding the behavior of chemicals that do not
> account for site specific conditions will not necessarily be
> predictive of the behavior of metals and organic chemicals in a
> specific environment.

Consequently, Vandeven himself sets forth the reason why his opinions are not admissible in this

case. As Vandeven maintains, general statements about the behavior of chemicals are not

predictive of occurrences at the Site. Thus, Vandeven's opinions cannot be offered into

evidence.

As set forth in greater detail below, although Vandeven had a significant amount of data regarding the Site available to him, for each of his opinions, he chose to ignore this data, and, instead, made sweeping generalizations about the Site.  Indeed, Vandeven admits, "[my] general statements are used to, in effect, reach a fairly general opinion, that all waste disposed of at the site and all forms of wastes disposed of at the site contributed to the need for and cost of remediation."  Thus, as Vandeven admits, he is engaging in mere speculation and has no basis for his opinions.  This sort of "ipse dixit"[3] opinion is improper and should not be admitted into evidence at trial.  See, e.g., Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir. 2000), cert. denied 532 U.S. 921 (2001) ("An expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.") (citations omitted); Reger v. AI duPont Hosp. for Children of Nemours Foundation, 259 Fed. Appx. 499, 500 (3d Cir. 2008) (3d Cir. 2008) (applying same).

Also, although experts are often useful in the resolution of environmental matters, experts are not permitted to simply espouse conclusions without data to support their claims, which is exactly what Vandeven has done in this case.  Id.  As such, Vandeven's opinions are inadmissible and Vandeven should not be permitted to testify as an expert at trial.

---

[3] The Latin phrase ipse dixit, which means "he himself said it," is commonly used to describe improper expert testimony which is not based upon objective data or requires a leap of faith based solely upon the purported expertise of the witness. See, e.g. Oddi, 234 F.3d at 158.

**B.**    **Legal Argument**

    **1.**    **The Court's Gatekeeper Function is Well Defined and Should Be Applied.**

    The guiding principles regarding the admission of expert testimony pursuant to FRE 702

and the United States Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals,</u>

<u>Inc.,</u> 509 U.S. 579 (1993), are well known.  Specifically, this Court has broad discretion in

determining the admissibility of evidence, and "considerable leeway" in determining the

reliability of particular expert testimony under <u>Daubert</u>.  <u>Simmons v. Ford Motor Co.,</u> 132 Fed.

Appx. 950, 952 (3d Cir. 2005) (citing <u>Khumo Tire Co. v. Carmichael,</u> 526 U.S. 137, 152-53

(1999).  The district court serves as the "gatekeeper" to ensure that even where a witness is

qualified to testify as an expert, the proposed testimony meets the requirements of <u>Daubert</u> and

FRE 702.  Thus, an expert may testify only if:

        (1)     the testimony is based upon sufficient facts or data;

        (2)     the testimony is the product of reliable principles and methods;
              and,

        (3)     the testimony evidences reasoning or methodology that properly
              can be applied to the facts in issue.

<u>Simmons</u>, 132 Fed. Appx. at 952 (citing <u>In re Paoli R.R. Yard PCB Litig.,</u> 35 F.3d 717, 742 (3d

Cir. 1994), <u>cert. denied</u> 513 U.S. 1190 (1995)).  The gravamen of this analysis, and especially

of the first prong of the <u>Daubert</u> analysis, is that a scientific expert's opinions must be based

upon data or other objective evidence that will permit the opposing party to test the conclusions

reached by the expert.  In other words, the expert may not consider a set of facts, and then offer

a conclusion that cannot be connected back to those facts:

               Trained experts commonly extrapolate from existing data. But
               nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires
               a district court to admit opinion evidence which is connected to
               existing data only by the <u>ipse</u> <u>dixit</u> of the expert. A court may

> conclude that there is simply too great an analytical gap between
> the data and the opinion proffered.

General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997); In re TMI Litigation, 193 F.3d 613,

683 (3d Cir. 1999) (same).  Accordingly, if the expert fails to demonstrate the link between his

conclusions and data or evidence, the conclusions may not be considered by the trier of fact.  Id.

### 2.    Vandeven's Opinions Are Inadmissible Ipse Dixit.

Applying these principles to Vandeven's expected expert testimony, Vandeven's

conclusions are inadmissible pursuant to FRE 702:

**(a)    There is no data to support Vandeven's claim that acid wastes resulted in the
increased mobility or persistence of metals.**  Vandeven's conclusion that acid wastes resulted

in increased mobility of metals, and, thus, increased response costs, is not supported by any data,

and constitutes precisely the type of ipse dixit opinion which this Court is required to set aside.

As such, AETC is entitled to an Order in limine barring Plaintiffs from offering Vandeven's

testimony in this regard at trial.

One of the issues in this action is the import and effect of the disposal of non-metal

bearing acid wastes at the Boarhead Farms Site.  Plaintiffs allege, through the testimony of their

expert Vandeven, that "all of the wastes disposed of at the [Boarhead Farms Site] contributed to

the environmental conditions that led to the response activities" conducted at the Site and also

the disposal of acid wastes led to response costs. (Vandeven at 13).  More specifically, Plaintiffs

allege, again relying upon Vandeven's opinion, that acid wastes resulted in the increased

mobility of metals, and, consequently, increased response costs.  (Id.)  All of this is set forth on

page 13-14 of Vandeven's Initial Report:

> All of the wastes disposed of at the Site contributed in some
> manner to the conditions that required response activities. ...
> Because most metals are more soluble in acidic solutions, the

> acidity of these wastes increased the mobility of metals in the
> subsurface environment. Even corrosive waste solutions that did
> not contain metals (if any such wastes were released) would have
> promoted the degradation of buried drums and altered the
> subsurface environment in ways that increased the mobility and
> persistence of hazardous chemicals. Such solutions may also have
> mobilized metals that were naturally present at the site.

(Sands Dec., Exhibit E (Vandeven Initial Report) at 13-14). (emphasis added); see also (Sands

Dec., Exhibit F (Vandeven Reply Report) at 14) ("Acid wastes released to the environment

increased the mobility of metals and the corrosivity of the subsurface materials, thus contributing

to the need for and cost of the response activities taken at the" Boarhead Site)).

The fundamental problem with this conclusion is that Vandeven does not use any site

specific data, or any data at all, to support his conclusion of a link between acids and metal

mobility at the Boarhead Farms Site. Rather, Vandeven merely states that (a) because acids and

metals were disposed of, or present at, the Boarhead Site, and (b) because when some metals

come into contact with some acids there is sometimes an increase in mobility for the metal, (c) it

must be that the acids present at the Boarhead Farms Site contributed to the response costs by

increasing the mobility of the metals present at the Site. But, "no scientific analysis has been

presented to indicate that increased mobility has occurred, or could have occurred, for the actual

conditions at the Site." (Sands Dec., Exhibit G (Expert Report by W. Leigh Short, et al) at 6).

Moreover, there is no opinion or evidence offered, by Vandeven or anyone else, as to how the

alleged increased mobility caused an alleged increase in response costs. Also, there is no

evidence or data to suggest that these increases actually occurred.

For example, on page 17 of his initial report, Vandeven makes the blanket statement that

"most metals are considerably more soluble in acidic conditions, so any release of acidic

materials would have promoted the migration of metals." At his deposition, however, Vandeven

conceded that, although sampling and groundwater modeling was conducted for the Site, Vandeven did not consider any site specific data or modeling. In fact, Vandeven did not even look at the groundwater modeling results. (Sands Dec., Exhibit H (Vandeven Dep.) at 268:4-269:13). Similarly, on page 14 of his expert report, Vandeven makes the blanket statement that acid wastes without metals "may also have mobilized metals that were naturally occurring in the soil." Again, Vandeven provides no analysis or data to support this conclusion and testified at his deposition that he made this conclusion because there is a "diabase" at the Site that has a relatively high concentration of natural metals. (Vandeven Dep. at 275:10-276:12). Therefore, according to Mr. Vandeven, acids disposed of at the Boarhead Farms Site could have come in contact with that diabase, possibly dissolving metals in the diabase and potentially enhancing the migration of those metals down gradient. (Id.) Vandeven had data available to him. Instead of using this data and conducting the proper analysis for the Site, he decided to make sweeping generalizations. These generalizations cannot hold up in a court of law as an "expert opinion," especially when it is being offered to saddle Defendants with millions of dollars in remediation costs.

In his Reply Report, Vandeven offers seven different "observations" upon which his opinion regarding acids and metal mobility purportedly is "based." (Vandeven Reply Report at 4-6). Each observation, however, is either merely additional conjecture or merely evidence that acid wastes or metals were present at the Boarhead Farms Site. Vandeven offers no site specific evidence that the increased mobility of metals actually occurred at the Site or that the acid wastes actually interacted with metals at the Site. For example, as support for his opinions, Vandeven points to the identification by Plaintiffs' expert, Jurgen Exner, of "some of the acid wastes that may have been disposed of" at the Boarhead Farms Site. (Vandeven Reply at 4). Exner simply

speaks to acids that may have been disposed of at the Site. Yet, Vandeven uses Exner's opinion to support his statements regarding acid wastes and the alleged increase in the mobility of metals at the Site. Vandeven does so without offering any additional data or evidence of a connection between the acid wastes and metals at the Boarhead Farms Site and offers no data or evidence that the two actually interacted on the Site to increase metal mobility. Similarly, he claims that "most of the metals" that were present in the site are "generally more soluble in acidic solutions" and that, therefore, the "acidity of wastes disposed of in bulk increased the acidity of the water in the subsurface, thus increasing the solubility and mobility of these metals." (Vandeven Reply at 5). Again, however, Vandeven offers no data or evidence to connect the existence of metals at the Site to any interaction with the acidic waste at the Site. Therefore, his opinion fails to be rise to the level of an "expert opinion".

Moreover, Vandeven relies upon general statements in the government's Remedial Investigation Report ("RI Report") conducted by the EPA[4] that generally describe how acids and metals react in the abstract. Then, Vandeven concludes, again without any data or evidence from the Boarhead Farms Site, that the reactions actually occurred or that the acids came into contact with metals and that "early releases of acid wastes would have facilitated the migration of contaminants released at other times." (Vandeven Reply at 5-6). Vandeven also offers no statement, data, or evidence that the actual conditions at the Boarhead Farms Site had anything to do with the opinions he is offering. This is insufficient to support an expert opinion.

Similarly, on page 5 of his Reply Report, Vandeven repeats a statement from the EPA's RI Report relating to the possibility that certain "coatings" might interact with "certain

---

[4] According to Vandeven, the RI was conducted by an EPA contractor. (Vandeven Initial Report at 2).

chemicals" to cause the increased mobility of metals. (Vandeven Reply at 5). He then concludes that this interaction actually occurred on the Site, despite the fact that neither he nor the authors of the RI Report conducted any tests to determine if the metals and chemicals found at the Boarhead Farms Site were of the type to cause such a reaction, or if they actually came into contact in a way that would permit such a reaction. In other words, Vandeven relies upon an out of context statement in the RI Report and concludes "these sentences clearly indicate that disposal of acids tended to mobilize metals at the site." (Vandeven Reply at 5). This is nonsense. He cannot merely repeat someone else's statement, interpret that sentence without data or evidence, and offer his opinion to the trier of fact.

Of course, when confronted with statements from the RI Report that undercut his unfounded hypothesis, Vandeven simply disregards them. For example, Vandeven acknowledges that the RI Report contains statements to the effect that "acids would have been neutralized by 'the limited buffering capacity of the soil.'" (Vandeven Reply Report at 5) (quoting RI). In other words, the EPA concluded in the RI Report that any impact by acids would have been limited by the fact that acids would have become less acidic once they mixed with the soil. In order to avoid this finding, Vandeven claims – without any data, evidence, or other support – that the "buffering capacity of the soil" diminished over time as more acids were increased. (Id. at 5-6). In so doing, he fails to offer any evidence that this purported phenomenon actually occurred, that the buffering capacity actually diminished, or that even if the buffering capacity diminished it could rejuvenate itself. All Vandeven offers is his own unsubstantiated opinion, which again is an insufficient basis for an expert's opinion.

Further, when Vandeven was asked at his deposition about the conclusions in the RI Report that the effects of acid disposal at the Site would have been "short-lived", Mr. Vandeven

testified that to determine the effect of the acid spills "there would have to be a lot of other factors that you would have to look at for an individual acid spill or acid disposal." (Vandeven Dep. at 241). He also stated that "short-lived" would "depend on the volume of the acid spill, the type of acid, how strong that acid was." (Vandeven Dep. at 241). Again, however, when asked whether he examined any of these factors with respect to the Site, Mr. Vandeven stated "I don't believe so, no." (Vandeven Dep., pg. 241).

**(b)** **There is no basis for Vandeven's conclusory findings that acid wastes impacted drums disposed of at the Site.** Similarly, Plaintiffs should be barred from offering Vandeven's conclusory and unsubstantiated statements that acid wastes had any impact upon the metal drums found buried at the Boarhead Farms Site. There is no basis for any of Vandeven's statements regarding the purported relationship between acid wastes and the drums. Therefore, Vandeven should not be permitted to testify about his unsubstantiated conclusions in this area.

At trial, Plaintiffs are expected to offer Vandeven's testimony for the proposition that the disposal of acid wastes increased response costs because acid wastes caused metal drums containing other waste to deteriorate faster:

> Metal drums that were placed in soils that had been affected by earlier releases of acids would tend to corrode faster than drums placed in unaffected soils. Releases of acid that occurred after the drums were in place would also have increased the rate of corrosion. Thus, the releases of acid to the subsurface environment tended to increase the rate at which buried drums released their contents.

(Vandeven Reply Report at 7). Again, Vandeven makes this blanket assertion without any data or evidence to support his conclusion. He offers no data or evidence to show that acids came into contact with the metal drums, that the metal drums did in fact corrode more quickly, or that the acids and the drums at the Site (as opposed to acids and metal drums generally) are of the

type where such an increase could be expected. Instead, he offers a general statement about acids and metal drums, with no connection to the facts or evidence of site-specific conditions. This testimony may not be admitted into evidence.

In fact, during his deposition, Vandeven conceded that he had conducted no studies or analysis to determine if there was an actual, as opposed to hypothetical, connection between acid wastes and the drummed waste:

> Q.    Put another way, the drum disposal area might have been down gradient of the likely bulk disposal locations, but that doesn't necessarily mean that the bulk materials disposed up gradient reached the drum disposal area, does it?
>
> A.    Right. It doesn't necessarily mean that, no.
>
> Q.    And you didn't do any independent calculation to try to determine that, did you?
>
> A.    No.

(Vandeven Dep. at 439:23-440:12). Similarly, Vandeven admitted at his deposition that he had no evidence that acid waste actually came into contact with drummed waste at the site:

> Q.    Do you have any evidence that occurred at this site?
>
> A.    I don't recall seeing anything specific like that, but, again, there was very little on how he actually operated the site.

(Vandeven Dep. at 179:2-7). Moreover, Vandeven did not review any information regarding where certain wastes were disposed of at the Boarhead Site as evidenced by the fact that none of the deposition transcripts of the DeRewal Chemical Company drivers are listed in the materials reviewed by Mr. Vandeven for his expert reports. (See, e.g., Vandeven Report at B-1). This fact, especially when combined with Vandeven's deposition testimony, demonstrate that Vandeven's expected testimony regarding acid wastes and metal drums is mere ipse dixit that may not be admitted at trial.

1127138.7                                  24

**(c)** **Finally, there is no basis for any claim that acidic waste caused naturally occurring**

**metals to migrate into residential wells.**    During his deposition, Vandeven made the

unsubstantiated claim that as a result of acidic waste at the Boarhead Farms Site off-site wells

were contaminated with metals:

> Q.    Do you believe that the general statements in your original
> report account for site-specific conditions?
>
> A.    To the extent that they needed to … support my opinion,
> yes.
>
> Q.    And for example, could you give me an example of what
> you refer to as a site-specific condition?
>
> A.    A site-specific condition is, for instance, the fact that there
> is a diabase there that has relatively high concentrations of
> natural metals and that acid wastes that come in contact
> with that diabase could dissolve those metals, it could
> enhance the migration of those metals down gradient.
> That's one of the reasons they had to treat metals in the
> residential water systems – water treatment systems that
> they installed.    So that would be a site-specific
> consideration, the fact that there was a diabase there that
> had high concentration of metals.

(Vandeven Dep. at 275:10-276:12) (emphasis added).  Vandeven offers no data or evidence to

support the contention that off-site wells were contaminated with metals because acidic waste

was present at the Boarhead Site, a fact he conceded at his deposition:

> Q.    The next sentence reads, "Such solutions may have also
> mobilized metals that were naturally present in the soils at
> the site." Is that an opinion you hold to a reasonable degree
> of scientific certainty?
>
> A.    Yes.
>
> Q.    And why do you use the term "may" there?  Is that the
> equivalent of reasonable degree of scientific certainty?
>
> A.    I guess, again, the only reason I use "may" there is there
> was no specific test that was done at the site to determine

that that's how, for instance, the high levels of metals were
found in the residential wells that they were dissolved from
the diabase material because of the corrosive wastes. There
was no specific evaluation or testing done to determine that
that was the phenomenon that caused that.

Q.    What data is there at the site that relates to that question?

A.    Well, there's data relating to the fact that you did have
corrosive materials disposed of at the site, there's data
related to the fact that you have high levels of metals
throughout the site both in soils and in groundwater and in
residential wells off site, and there's data at the site
indicating that there is a geologic formulation, namely this
diabase that has high concentrations of metals.

Q.    Is there any other data that you are aware of that's at the
site that relates to that opinion?

A.    No.

(Vandeven Dep. at 215:18-217:12). As demonstrated, Vandeven makes his conclusions without

even considering the groundwater modeling that occurred at the Site. Again, in light of the

foregoing, there is no basis for Vandeven's unsubstantiated claim. There are no studies, no data,

and no evidence linking acid waste to the presence of metals in off-site wells making

Vandeven's conclusions mere supposition. As such, Vandeven's expected testimony in this

regard may not be considered by the Court as trier of fact.

**3.    There Is No Means to Test the Methodology Or Reliability of Several of Vandeven's Findings.**

In addition to the fact that several of Vandeven's findings are not based upon any data, these same findings cannot withstand scrutiny with respect to the reliability and methodology as set forth in <u>Daubert</u>. For example, in assessing reliability, the Court is guided by a number of factors, including:

(1)    whether a method consists of testable hypotheses;

(2)    whether the method has been subject to peer review;

(3)    the known or potential rate of error;

(4)    the existence and maintenance of standards controlling the technique's operation;

(5)    whether the method is generally accepted;

(6)    the relationship of the technique to methods which have been established to be reliable;

(7)    the qualifications of the expert witness based on the methodology employed; and,

(8)    the non-judicial uses to which the method has been put.

<u>Calhoun v. Yamaha Motor Corp.</u>, 350 F.3d 316, 321 (3d Cir. 2003). Here, these factors cannot even be applied because Vandeven did not conduct any tests or utilize data that may be assessed. Vandeven used no scientific analysis to come to his conclusions. Therefore, the Court cannot test his method, cannot decide the potential rate of error, and cannot determine whether it is generally accepted or reliable. Vandeven simply assumed certain facts were true, leaped to conclusions that are based purely on his own supposition and called them expert opinions. This is improper and the opinions of Vandeven may not be presented to the Court this reason alone.

## POINT IV

### PLAINTIFFS' UNFOUNDED ALLOCATION THEORIES MAY NOT BE CONSIDERED

**A.**    **Introduction**

Plaintiffs should not be permitted to offer into evidence unfounded opinions concerning the allocation of liability for the response costs among the parties. Plaintiffs' Responses to Joint Contention Interrogatories reveal that Plaintiffs will ask the Court to consider certain "factors" for use in allocating responsibility among the parties herein. These factors, however, are nothing more than unfounded opinions and assumptions and are inadmissible. The plain language of CERCLA and the relevant case law demonstrate that allocation is the sole province of the Court after consideration of the information admitted into evidence. Such information may only be admitted into evidence in compliance with the Federal Rules of Evidence and the Federal Rules of Civil Procedure. Any attempt by Plaintiffs to admit their own unfounded opinions into evidence regarding allocation methodology is contrary to these well-established rules. AETC, therefore, requests that the Court bar Plaintiffs from offering their own unfounded opinions as evidence regarding allocation.

**B.**    **Argument**

**1.**    **The Court Must Allocate Section 113(f) Liability.**

Each of the parties in this action has claims against all of the other parties for contribution pursuant to Section 113(f) of CERCLA, which provides, in relevant part, that "[a]ny person may seek contribution from any other person who is liable or potentially liable under Section 9607 of this title..."   42 U.S.C.  §  9613(f)(1) ("Section 113").   See, e.g., New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1121 (3d Cir. 1997), reh'g denied, 116 F.3d 82 (3d Cir. 1997) ("contribution" in the CERCLA context is a "standard legal term that refers to a claim by

and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make"). Section 113's contribution provision is designed to "clarify and confirm the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the clean up or cost that may be greater than its equitable share under the circumstances." Id. at 1122 (quoting H.R. Rep. No. 99-253(I), at 79 (1985), reprinted in 1986 U.S.C.C.A.N.2835, 2861). In sum, Section 113 allows a party to recover that portion of its expenditures that exceed its fair share of the overall liability. Id.; see also Atlantic Research, 127 S. Ct. at 2338 (describing Section 113 and 107 claims as "complementary").

As such, to the extent the trier of fact determines that more than one of the parties herein is liable, the Court will need to allocate that liability among the responsible parties. In so doing, the Court will have broad discretion in determining the relative equitable apportionment of that liability under Section 113.[5] This discretion emanates directly from the CERCLA statute, which provides in relevant part that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. 9613(f)(1) (emphasis added).

Although CERCLA, and case law interpreting it, provide broad discretion to the Court in its role as allocator, it is also well settled that the Court may only consider competent evidence

---

[5] See, e.g., U.S. v. Union Corp., 277 F. Supp.2d 478, 486 (E.D. Pa. 2003) ( "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate"); New Jersey Turnpike Authority v. PPG Industries, Inc., 16 F. Supp. 2d 460 (D.N.J. 1998), aff'd, 197 F. 3d 96 (3d Cir. 1999) ("[i]n any given case, a court may consider several factors or a few, depending on the totality of the circumstances and equitable considerations."); U.S. v. Atlas Minerals and Chemicals, Inc., 797 F. Supp. 411, 417 (E.D. Pa. 1992) (quoting U.S. v. Stringfellow, 661 F. Supp. 1053 (C.D. Cal. 1987) ("The Court has discretion to use equitable factors in apportioning damages in order to mitigate the hardships of

properly submitted at trial. For example, Courts have permitted parties to submit the testimony of experts as to waste volume. See, e.g. Action Mfg. Co., 428 F. Supp.2d at 314, 337-38 (use of experts); see also City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust, 306 F. Supp.2d 1040 (D. Kan., 2003) (same). Parties may also introduce evidence of the presence, or lack thereof, of one or more of the so-called "Gore factors," named for a proposed amendment to CERCLA by then Representative Albert Gore in 1980, which, even though it was not adopted, is sometimes used by courts for guidance in Section 113 contribution allocations. See, e.g., Action Mfg. Co., 428 F. Supp.2d at 329 (E.D. Pa. 2006) (applying Gore factors and citing other Third Circuit decisions doing same). The Gore factors are:

> (i)　　the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
>
> (ii)　　the amount of the hazardous waste involved;
>
> (iii)　　the degree of toxicity of the hazardous waste involved;
>
> (iv)　　the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
>
> (v)　　the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such waste; and
>
> (vi)　　the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

Id.; see also Lenox Inc. v. Reuben Smith Rubbish Removal, 91 F. Supp.2d 743, 747 (D.N.J. 2000) (discussing Gore factors); U.S. v. Pesses, 120 F. Supp.2d 503, 506 (W.D. Pa. 2000)

---

imposing joint and several liability upon defendants who have only contributed a small amount to a potentially large indivisible harm").

(same); <u>U.S. v. Compaction Sys.</u>, 88 F. Supp.2d 339, 355 (D.N.J. 1999) (same); <u>U.S. v. Kramer</u>, 953 F. Supp. 592, 598 (D.N.J. 1997) (same).

Although a party may set forth facts to assist the court in its allocation analysis, a party is not permitted to set forth as evidence it own allocation of liability, which is what the Plaintiffs are attempting to do in this case.

### 2.    Plaintiffs' Opinion Regarding Allocation Is Not Competent Evidence.

During discovery, Plaintiffs were required to respond to contention interrogatories in which they were asked to set forth the evidence they will offer at trial regarding allocation. (<u>See</u> Sands Dec., Exhibit I (Plaintiff's Responses to Contention Interrogatories) at Nos. 78-111). Plaintiffs stated that they intend to invade the province of the Court as the allocator of liability and offer their own unfounded conclusions for allocating liability. Specifically, in response to Contention Interrogatory No. 78(B), Plaintiffs made the following statements:

> Plaintiffs will ask the Court at trial to allocate response costs primarily based upon the equitable factor of volume of wastes of Plaintiffs, Non-Settling Defendants, and Settling Defendants that were disposed of at the Site.
>
> Plaintiffs will also ask the Court at trial <u>to increase the allocation to AETC and Ashland by 10%</u> because those parties knew that Manfred DeRewal had a history of pollution violations and that he intended to dispose of Ashland waste at the Site and because AETC knew that he was in fact disposing of those wastes at the Site.
>
> Plaintiffs will also ask the Court at trial <u>to increase the allocation to Carpenter by 10%</u> because Carpenter knew before it contracted with DCC in 1973 to remove Carpenter's wastes that Manfred DeRewal was a principal in DCC and that he had a history of pollution violations.
>
> Plaintiffs will also ask the Court at trial <u>to decrease Plaintiffs' share by 50%</u> based upon the fact that Plaintiffs have cooperated with EPA and the Commonwealth of Pennsylvania by, <u>inter alia</u>,

> settling EPA's past costs claim and conducting the response actions required by the OU-1 and OU-2 Consent Decrees and because the Non-Settling Defendants did not do so, despite having received notice letters from EPA.

(Contention Interrogatories at No. 78(B)) (emphasis added). In essence, Plaintiffs intend to offer the Court their own conclusions regarding the application of the Gore factors, but without offering any evidence supporting those conclusions. Plaintiffs, for example, do not offer any evidence upon which to base their demand to decrease their share by fifty percent. No expert testimony will be offered to justify Plaintiffs' unfounded conclusions, no documentary evidence will be offered to support it, and there are no witnesses competent to explain why increases and decreases in allocation are appropriate. As such, Plaintiffs should not be permitted to offer into evidence their unfounded allocation conclusions at trial.

The district court's decision in Chitayat v. Vanderbilt Associates, 2007 WL 2890248, *6 (E.D.N.Y. Sept. 27, 2007) is directly on point. In Chitayat, the district court barred the defendant's expert from testifying as to equitable allocation of costs in a CERCLA action because, the court held, to permit the witness to so testify would improperly permit the witness to usurp the function of the court. Id. In Chitayat, the expert held a Masters of Science in Geology, was certified as a Professional Geologist by the American Institute of Professional Geologists, and had "extensive experience in the fields of hydrogeology and environmental remediation." Id. at *2. The district court, however, held that this did not provide him with the requisite "knowledge, skill, experience, training, or education" to testify as to the equitable factors for allocation of liability. Id. at 6. Rather, the court in Chitayat determined that it must make its own findings and legal conclusions, and it would not accept the testimony of the defendant's witness because to do so would permit him to "invade the province of the court":

> [A]n expert is not permitted to provide legal opinions [or] legal conclusions ...; those roles fall solely within the province of the court.
>
> ***
>
> [The defendant's experts] proposed testimony as to cost allocation based on the Gore factors violates the precept precluding an expert from stating ultimate legal conclusions based upon facts. As [third party plaintiff] aptly states, while "[e]xpert testimony might illuminate the court's consideration of equitable factors, ... balancing those factors to arrive at an equitable allocation is an essentially judicial function."

Id. at *5-6. The same is true here. Although no expert is involved, any evidence of the proper conclusions for the ultimate issue of allocation is not proper. The Court alone must make that decision, and may not consider the unsubstantiated conclusions offered by Plaintiffs.

In sum, the Court, not Plaintiffs, must apply the facts and evidence to the Gore factors and any other factors the Court in its discretion deems relevant. Plaintiff cannot offer its own allocation conclusions into evidence. Any opinions Plaintiffs may have concerning the allocation of liability are merely that – the opinions of a party. In sum, the proper means for the adjudication of the allocation issue is for the parties to offer evidence of facts relevant to allocation factors (including both the Gore factors and any other factors the Court deems relevant) and for the Court to make the allocation determination based upon the evidence. In so doing, the parties will be free to make arguments regarding how the Court should make its ultimate decision, but those are arguments should not be permitted to be admitted into evidence.

3.    **Plaintiffs Do Not Have a Witness Competent**
      **To Testify Regarding Their Allocation Theory.**

In any event, even if Plaintiffs' unfounded allocation conclusions could be considered by the Court, Plaintiffs have not identified any witnesses competent to testify about these conclusions and there are no documents, other than discovery responses drafted by Plaintiffs' counsel, that describe them.  As such, because no evidence has been produced in discovery regarding Plaintiff's allocation theory, it may not be considered by the trier of fact.  See, e.g., Inline Connection Corp. v. AOL Time Warner, 472 F. Supp.2d 604, 612 (D. Del., 2007) (failure to disclose evidence during discovery requires bar of evidence from trial).

Specifically, none of the fact witnesses in this action testified in any way regarding Plaintiffs' allocation theory.  Moreover, Plaintiffs have identified only two expert witnesses, and both disclaimed any testimony regarding allocation.  For example, Jay Vandeven specifically testified at his deposition that he would not offer an expert opinion with respect to allocation.  (Vandeven Dep. at 65:7-11; 475:11-13) (Q:  [Y]ou are not offering an expert opinion with respect to allocation", A:  "That is correct.").    Similarly, the expert report submitted by Plaintiff's other expert, Jurgen Exner, does not include any reference to allocation and he did not testify about that issue during his deposition.  (See, e.g., Sands Dec., Exhibit J (Exner Report)).

## POINT V

### PLAINTIFFS CANNOT PROVIDE EVIDENCE THAT
### THEIR COSTS WERE VOLUNTARILY INCURRED
### BECAUSE THEY DO NOT HAVE A 107 CLAIM

In their Complaint, and in other contexts, Plaintiffs have identified costs incurred as a result of repayment and reimbursement obligations to other persons or entities as damages pursuant to their claim with respect to Section 107 of CERCLA.  CERCLA § 107 claims, however, are limited solely to "costs incurred voluntarily" and not for "costs of reimbursement to

another person pursuant to a legal judgment or settlement." <u>United States v. Atlantic Research</u>

<u>Corp.</u>, __ U.S. __; 127 S. Ct. 2331, 2338 (2007).  Thus, AETC moves to bar Plaintiffs from

introducing evidence in support of their CERCLA § 107 claim for damages.

A.    **CERCLA § 107 Claims Are Limited to Voluntary Costs.**

Section 107 of CERCLA provides that potentially responsible parties ("PRPs") are liable

for, among other things, "all costs of removal or remedial action incurred by the United States

Government or a State or an Indian tribe not inconsistent with the national contingency plan" and

"any other necessary costs of response incurred by any other person consistent with the national

contingency plan."  42 U.S.C. § 9607(a)(4)(A)-(B) ("Section 107").  In contrast, Section 113 of

CERCLA provides that "[a]ny person may seek contribution from any other person who is liable

or potentially liable under [Section 107] of this title, during or following any civil action under

[Section 106] of this title or under [Section 107] of this title…"  42 U.S.C. 9613(f)(3)(B).

In 2007, the United States Supreme Court defined the interplay between Section 107 and

113 in <u>Atlantic Research</u>.  In that decision, the Supreme Court drew a clear distinction between

what could be recovered pursuant to Section 107, and what could be recovered pursuant to

Section 113, deciding that Section 107 of CERCLA provides private parties, including PRPs,

with a cause of action to recover their actual costs voluntarily incurred from remedial action, but

not the costs they incurred involuntarily:

> Accordingly, the remedies available in §§ 107(a) and 113(f)
> complement each other by providing causes of action "to persons
> in different procedural circumstances."  …    Section 113(f)(1)
> authorizes a contribution action to PRPs with common liability
> stemming from an action instituted under § 106 or § 107(a). And §
> 107(a) permits cost recovery (as distinct from contribution) by a
> private party that has itself incurred cleanup costs. <u>Hence, a PRP</u>
> <u>that pays money to satisfy a settlement agreement or a court</u>
> <u>judgment may pursue § 113(f) contribution. But by reimbursing</u>
> <u>response costs paid by other parties, the PRP has not incurred its</u>

> own costs of response and therefore cannot recover under § 107(a).
> As a result, though eligible to seek contribution under § 113(f)(1),
> the PRP cannot simultaneously seek to recover the same expenses
> under § 107(a).

Id. at 2238 (emphasis added).

As a result, a party may only bring a cost-recovery action under Section 107(a) for costs the party itself incurred voluntarily in remediating a site, and "must proceed under § 113(f)(1) for contribution if the party has paid to satisfy a settlement agreement or a court judgment pursuant to an action instituted under § 106 or § 107." Kotrous v. Goss-Jewett Co. of Northern California, Inc., 523 F.3d 924 (9th Cir. 2008); see Atlantic Research, 127 S. Ct. at 238 ("[c]osts incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f)."). In short, a party that incurs costs due to a settlement (including the settlement of a Section 107 claim) has not incurred costs voluntarily, and, therefore, may only seek contribution pursuant to § 113(f) and may not pursue a claim pursuant to Section 107 of CERCLA. See, e.g., Kotrous, 523 F.3d 924 (9th Cir. 2008).

In 2000 EPA filed suit against some or all of Plaintiffs seeking to address the environmental issues at the Boarhead Site, and, as a result, Plaintiffs reached a settlement with the government and entered into at least two Consent Decrees with the EPA pursuant to which they are required to conduct remediation and required to reimburse the EPA for its costs. These Consent Decrees are denominated as Consent Decree "OU-1" and Consent Decree "OU-2."[6] (Sands Dec., Exhibits K and L (Consent Decree OU-1) and (Consent Decree OU-2). Nevertheless, Plaintiffs now seek recovery for these involuntary costs pursuant to Section 107. (Fifth Amended Complaint, Count I, ¶¶ 62-65) (seeking recovery for Consent Decree related

expenses pursuant to CERCLA Section 107). This is not permissible and evidence supporting such a claim may not be introduced into evidence.

Even cursory review of the Consent Decrees demonstrates that they are precisely the type of settlement for which a Section 107 plaintiff may not recover after Atlantic Research. For example, in Consent Decree OU-2, the parties explicitly acknowledge that the Consent Decrees are the means by which they are settling a pending litigation for Section 107 claims between EPA and Plaintiffs. (Consent Decree OU-2 at ¶¶ I-A and I-B). This fact alone demonstrates that all of the claims relating to costs incurred as a result of the Consent Decrees are truly contribution claims that may only be made pursuant to Section 113, and may not be made pursuant to Section 107. In fact, the Consent Decrees also state that they are the product of a "negotiation" to settle litigation between EPA and Plaintiff. (Consent Decree OU-2 at ¶ I-O). Finally, there may be no dispute that the obligations pursuant to the Consent Decrees are not voluntary. They are Judgments from the United States District Court for the Eastern District of Pennsylvania and Plaintiffs are required to abide by them. (Consent Decree OU-2). Review of Consent Decree OU-1 reveals the same facts. (Consent Decree OU-1). Plaintiffs' payments and costs pursuant to it are not voluntary as that term is defined in Atlantic Research, those payments are pursuant to a settlement of a prior Section 107 claim initiated by the EPA, and, therefore, these costs may not be recovered pursuant to Section 107 of CERCLA. Accordingly, Plaintiffs only have a Section 113 claim for costs incurred with respect to OU-1 and OU-2. Therefore, Evidence that costs incurred by Plaintiffs were "voluntarily incurred" is irrelevant and Plaintiffs should be not be permitted to product such evidence.

---

[6] "OU" apparently refers to "operational unit"

## POINT VI

### VANDEVEN'S UNTIMELY REPORT SHOULD BE BARRED

Finally, Plaintiffs are also expected to offer testimony from Vandeven set forth in an untimely supplemental expert report. Pursuant to the Federal Rules of Procedure, all expert testimony must be disclosed <u>during</u> discovery in an expert report submitted to all parties. The Vandeven supplemental report at issue is dated May 7, 2008 (the "May 7, 2008 Vandeven Report"), well after the close of expert discovery which ended years ago and literally on the eve of trial in this case. Therefore, Plaintiffs should not be permitted to offer Vandeven's testimony with respect to the information and opinions set forth in that report. (A copy of the May 7, 2008 Vandeven Report is attached as Exhibit M to the Sands Dec.).

Rule 26(a)(2) requires that parties seeking to offer expert testimony must provide a report from the expert setting forth all of the expected testimony from the expert:

> Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> (i)    a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii)    the data or other information considered by the witness in forming them;
>
> (iii)    any exhibits that will be used to summarize or support them; ….

FRCP 26(a)(2)(B). The rule also provides that parties must produce such reports during discovery, as ordered by the trial court: "A party must make these disclosures at the times and in the sequence that the court orders." FRCP 26(a)(2)(C). Thus, this Court is fully empowered to

bar testimony based upon an untimely expert report. See, e.g., Hudgins v. Vermeer Mfg. Co., 240 F.R.D. 682 (E.D. Ok. 2007) (granting motion in limine to bar untimely expert report); see also Tobias v. Pennsylvania Bd. of Probation and Parole, 2005 WL 6042718 (E.D. Pa. Apr. 26, 2005) (same).

Here, by Case Management Order No. 8, dated May 16, 2006, the Court Ordered that all expert reports be served by September 29, 2006 for initial reports, and by November 15, 2006 for rebuttal reports. (Sands Dec., Exhibit N (CMO No. 8)). Thus, years have passed and there is no basis for Plaintiffs' delay. The information contained in the report has long been known to them, and they never asked the Court for leave to file a supplemental report beyond the deadline. More importantly, the May 8, 2008 report was served just a few weeks before the trial date for this action, making it impossible for AETC or any other party to take discovery or otherwise investigate the claims made in the report or provide a response. If it is allowed, AETC and the other Defendants will be unfairly prejudiced by their lack of ability to properly explore the viability of the statements made in the report. Thus, although not required under the rules, all testimony that is set forth in the May 8, 2008 Report should be barred.

## CONCLUSION

For the forgoing reasons, each of defendant Advanced Environmental Technology Company's motions in limine should be granted.

WOLFF & SAMSON PC
Attorneys for Defendant Advanced Environmental
Technology Corporation

By:
JOHN A. MCKINNEY, JR., ESQ.
jmckinney@wolffsamson.com

Dated:  May 23, 2008

Robert M. Morris, Esq.
Morris & Adelman
1920 Chestnut Street
Philadelphia, Pennsylvania

40

1127138.7