**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC, TI GROUP AUTOMOTIVE SYSTEMS, L.L.C., | : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION |
| v. | : : | NO. 02-CV-3830 |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORP.; ASHLAND, INC., CARPENTER TECHNOLOGY CORPORATION; DIAZ CHEMICAL CORPORATION; fcg, INC.; HANDY & HARMAN TUBE COMPANY; NRM INVESTMENT COMPANY, | : : : : : : : : | Judge Legrome D. Davis |
| Defendants. | : : | |

### FIFTH AMENDED COMPLAINT

Plaintiffs Agere Systems, Inc. ("Agere"), Cytec Industries Inc. ("Cytec") , Ford

Motor Company ("Ford"), SPS Technologies, LLC (as successor to SPS Technologies, Inc.)

("SPS"), and TI Group Automotive Systems, L.L.C. (as successor to TI Group Automotive

Systems Corporation ("TI") (collectively "Cooperating Plaintiffs"), by and through their

attorneys, by way of Complaint against the Defendants hereby state as follows:

### FACTUAL BACKGROUND

1.    Plaintiffs seek cost recovery and contribution from Defendants for the

response costs that Plaintiffs have incurred and the damages that Plaintiffs have suffered as a

result of releases or threatened releases of one or more hazardous substance as defined by

Section 101 (14) of the Comprehensive Environmental Response, Compensation and Liability

Act, as amended, ("CERCLA"), 42 U.S.C. § 9601 (14), and Section 103 of the Pennsylvania

Hazardous Sites Cleanup Act ("HSCA"), 35 PA. CONS. STAT. § 6020.103 ("Hazardous

Substances"), at or from the Boarhead Farms Superfund Site, Lonely Cottage Road, Upper Black

Eddy, Bridgeton Township, Bucks County, Pennsylvania (the "Site"). Plaintiffs also seek a

declaratory judgment that Defendants are liable to Plaintiffs for contribution for any and all

response costs that Plaintiffs will or may incur and for any and all damages that Plaintiffs will or

may suffer in the future as a result of releases, threatened releases, or discharges of Hazardous

Substances at or from the Site.

      2.     Manfred DeRewal ("DeRewal") incorporated Boarhead Corporation in

1969. In addition, DeRewal incorporated and operated DeRewal Chemical Company, Inc.

("DeRewal Chemical"), a hauler of waste materials.

      3.     In 1969, Boarhead Corporation purchased the Site. The Site is and was, at

all relevant times, a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S. §

9601(9).

      4.     From some time after purchase until approximately 1977, the Site was

used for, among other things, the disposal of Hazardous Substances.

      5.     In the early 1970s, the Bucks County Department of Health (the "DOH"),

responding to complaints of dead fish, dead plant life, and other environmental and public health

concerns, investigated the Site. The DOH noted the following at the Site: pungent odors; drums

on an open trailer; drums awaiting disposal; empty tanks awaiting removal; a bulldozer burying

old drums; 40 drums filled with solvent; and empty tanker trucks parked at the Site.

      6.     The DOH obtained a search warrant and searched the Site on March 5,

1973. The DOH documented the following at the Site: improperly stored chemicals; chemicals

leaking from 55-gallon drums; liquid and solid waste on the ground; chemicals leaking into

waste pools, on-Site lagoons, and vats; copper ammonia sulfate; paint solvents; arsenic pent

oxide; pesticides; copper naphtholate; and a cleared area in the northeast section of the Site

containing drums.

7.    In October of 1973, a tank truck discharged approximately 3,000 gallons

of ferrous chloride at the Site, for which Boarhead Corporation was found to be in violation of

the Pennsylvania Clean Streams Law, 35 PA. CONS. STAT. §§ 691.1 *et seq.*

8.    Soil samples taken from the Site in 1974 revealed the following:  soil pH

levels of 2.9 and the presence of chloride, iron, chromium, copper, zinc, and nickel.

9.    In September of 1976, a tank truck released approximately 3,000 gallons

of sulfuric acid on the Site, resulting in the evacuation of 34 local residents.

10.    In 1984, the United States Environmental Protection Agency ("USEPA")

performed a Site inspection. On March 31, 1989, the USEPA placed the Site on the National

Priorities List (the "NPL"), 40 C.F.R Part 300, Appendix B, a national list of hazardous waste

sites that the USEPA has determined may pose a threat to health, welfare, and the environment.

The NPL was established under the National Contingency Plan (the "NCP"), 40 C.F.R. Part 300,

as required by Section 105(a) of CERCLA, 42 U.S.C. § 9605(a).

11.    The USEPA has conducted a CERCLA removal action at the Site.  In

connection with this removal action, the USEPA located and removed from the Site 2,600 drums

as well as contaminated soil. Contaminated groundwater is being treated at an on-site treatment

facility.

12.    Under an administrative consent order, USEPA Docket Number: III-92-66-DC, General Ceramics, Inc., performed a separate removal action to address the presence of radioactive waste at the Site.

13.    The USEPA completed a Remedial Investigation and Feasibility Study for the Site in July 1997.

14.    On or about November 18, 1998, the USEPA issued a Record of Decision (the "ROD") selecting a remedial action for the Site. The Commonwealth of Pennsylvania concurred in this remedy selection.

15.    Subsequent to the issuance of the ROD, the USEPA determined to implement the remedial action described in the ROD in two operable units ("OUs"). The USEPA determined that, in general, OU-1 would address: Groundwater extraction, metal precipitation, and air stripping; the installation of additional monitoring wells; the implementation of institutional controls and monitoring for OU-1; residential water treatment; and phytoremediation. The USEPA determined that, in general, OU-2 would address: Soil aeration and the treatment of volatile organic compound hot spots; the excavation and off-site disposal of buried drums; and the implementation of institutional controls and monitoring for OU-2.

16.    Cooperating Plaintiffs have agreed collectively to undertake the cleanup work comprising OU-1 and OU-2, to otherwise collectively resolve the claims of EPA related to the Site, and to seek collectively cost recovery and contribution from the Defendants in this civil action. Cooperating Plaintiffs have agreed that they will, at some future time, and not in this

civil action, reach a final allocation among themselves applicable to all costs associated with group activities, including the costs of the cleanup work comprising OU-1 and OU-2.

17.    Although denying that they are liable parties under Section 107 of CERCLA, 42 U.S.C. § 9607, Cytec, Ford, and SPS are parties to both an Administrative Order on Consent for Remedial Design, USEPA Docket No. III-2000-002-DC, entered in February 2000 (the "OU-1 AOC") and a Consent Decree entered by this Court on or about September 28, 2000 (the "OU-1 Consent Decree") obligating them to perform the OU-1 remedial design and remedial action (the "OU-1 RD/RA") at the Site, and to reimburse the USEPA for its administrative and oversight costs in the future ("Future Response Costs") in connection with the OU-1 RD/RA.

18.    Cooperating Plaintiffs have agreed to collectively fund and perform the OU-1 RD/RA and have entered into an agreement with two other entities, NRM Investment Company ("NRM") and Worthington Steel Company - Malvern ("Worthington") (the "OU-1 Group Agreement") whereby the parties to that agreement ("the OU-1 Parties") agreed to collectively fund and perform the OU-1 RD/RA and to otherwise comply with the OU-1 Consent Decree. Specifically, each of the OU-1 Parties contributes (or has contributed) funds to OU-1 Group trust accounts ("the OU-1 Trust Accounts"). Such contributions are (or have been) made on the basis of an interim allocation among the OU-1 Parties. The interim allocation does not bind any of the OU-1 Parties, and the Cooperating Plaintiffs have agreed to reach a final allocation of their shares separate and apart from this action. Plaintiffs herein assert claims against NRM with respect to response costs for the OU-1 RD/RA and for the Future Response Costs required by the OU-1 Consent Decree. The activities necessary for performance of the

OU-1 RD/RA have been undertaken by Cooperating Plaintiffs (and the two other entities),
collectively by using contractors hired by and paid by them collectively.

19.    Costs related to activities to perform the OU-1 RD/RA and for the Future
Response Costs required by the OU-1 Consent Decree have been paid for and will in the future
be paid for from the OU-1 Trust Accounts.

20.    Although denying that they are liable parties under Section 107 of
CERCLA, 42 U.S.C. § 9607, Cytec, Ford, SPS, and TI are signatories to an Administrative
Order on Consent for Remedial Design, EPA Docket No. III – 2001 – 0010 – DC, effective
October 17, 2001 (the "OU-2 AOC") and a Consent Decree (the "OU-2 Consent Decree")
entered by this Court on March 14, 2002 obligating them to perform the OU-2 remedial design
and remedial action (the "OU-2 RD/RA") at the Site, to reimburse the USEPA both for
$7,000,000 in response costs incurred and accounted for prior to July 2000 ("Past Response
Costs") and for an as yet undetermined amount of response costs incurred subsequent to July
2000 ("Interim Response Costs"), and to reimburse the USEPA for its Future Response Costs in
connection with the OU-2 RD/RA.

21.    Cooperating Plaintiffs have and will in the future collectively fund and
perform the OU-2 RD/RA and to otherwise comply with the OU-2 Consent Decree.
Specifically, Cooperating Plaintiffs contribute funds to OU-2 Group trust accounts ("the OU-2
Trust Accounts"). Such contributions are made on the basis of an interim allocation among
Cooperating Plaintiffs. The interim allocation does not bind any of the Cooperating Plaintiffs,
and they have agreed to reach a final allocation of their shares separate and apart from this

action. The activities necessary for performance of the OU-2 RD/RA have been undertaken by Cooperating Plaintiffs collectively by using contractors hired by and paid by them collectively.

22.    All costs of the activities to perform the OU-2 RD/RA and to perform the other requirements of the OU-2 Consent Decree have been paid for and will in the future be paid for from the OU-2 Trust Accounts.

23.    Plaintiffs have incurred costs and damages, including attorneys fees, in the course of collectively performing the requirements of the OU-1 and OU-2 AOCs and Consent Decrees. These costs constitute necessary costs of response, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), incurred consistently with the NCP, within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Releases or threatened releases of Hazardous Substances at or from the Site have caused Plaintiffs to incur response costs. The response costs incurred by Plaintiffs are also reasonable and necessary or appropriate costs consistent with Section 702(a)(3) of HSCA, 35 PA. CONS. STAT. § 6020.703(a)(3).

24.    Plaintiffs anticipate that they will incur additional necessary response costs consistent with the NCP.

25.    Agere has to date paid approximately $1,294,196.10 into OU-1 and OU-2 Trust Accounts and to counsel for Plaintiffs for legal fees for this action. On or about March 30, 2007, Agere entered into a settlement agreement with SPS, Ford, Cytec, and TI resolving certain claims, including the rights and obligations, as between Agere and those entities, for Agere's share of all OU-1 and OU-2 Group costs, including the costs of this action. SPS, Ford, Cytec, and TI agreed therein to pay Agere $400,000, none of which was allocated by the parties to any previous contributions by Agere. Agere assigned its rights in this action to those parties.

26.    Smiths Group plc, a United Kingdom corporation, was, prior to April 25, 2001, the ultimate parent of TI. On or about April 25, 2001 Smiths sold the shares of TI (and other related companies) to 329th Shelf Investment Company Limited ("329"). Smiths agreed, as part of that transaction (and as set forth in the April 25, 2001 agreement pursuant to which the shares of TI were sold), to indemnify TI and 329 with respect to any liabilities arising as a result of or in connection with the Site. Smiths has, since April 2001, caused its subsidiaries, Smiths Group Services Corp. and Smiths Group North America, Inc., to transfer funds into the OU-1 and OU-2 Group Trust Accounts on behalf of TI and with respect to TI's obligations to the OU-1 and OU-2 Groups. TI has agreed with Smiths Group plc that it will seek to recover in this action and repay to Smiths Group plc all sums paid by Smiths on TI's behalf.

27.    TI seeks cost recovery and contribution from Defendants for the response costs TI has incurred by making payments itself into the OU-1 and OU-2 Group Trust Accounts. TI also seeks cost recovery and contribution from Defendants in its name on behalf of Smiths.

## JURISDICTION AND VENUE

28.    This action arises under Section 107 of CERCLA, 42 U.S.C. § 9607, Section 113 of CERCLA, 42 U.S.C. § 9613, and Section 702(a)(3) of HSCA, 35 Pa. Cons. Stat. § 6020.702(a)(3).

29.    This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9313(b), 28 U.S.C. §§ 1331 and 1367. This Court has supplemental jurisdiction over the state claims based on 28 U.S.C. § 1367.

30.    This Court has authority to enter a declaratory judgment regarding the

rights and liabilities of the parties pursuant to the Federal Declaratory Judgment Act, 28 U.S.C.

§§ 2201, 2202, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2).

31.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and Section

113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases or threatened release of

Hazardous Substances, wastes, pollutants, and contaminants alleged herein occurred and the

claims set forth herein arose in the Eastern District of Pennsylvania.

## PARTIES

A.    The Plaintiffs

32.    Plaintiffs are persons as defined by Section 101(21) of CERCLA, 42

U.S.C. § 9601(21).  Agere is a Delaware corporation with a principal place of business in

Allentown, Pennsylvania.  Cytec is a Delaware corporation with a principal place of business in

West Paterson, New Jersey.  Ford is a Delaware corporation with a principal place of business in

Dearborn, Michigan.  SPS is a Pennsylvania limited liability corporation with a principal place of

business in Jenkintown, Pennsylvania.  TI is a Delaware limited liability company with a

principal place of business in Warren, Michigan.

B.    The Defendants

### Defendant Advanced Environmental Technology Corp.

33.    Defendant Advanced Environmental Technology Corp. ("AETC") is a

New Jersey corporation with a principal place of business in Flanders, New Jersey.

34.     AETC arranged with DeRewal Chemical for the disposal of Hazardous Substances from Defendants Ashland Inc. ("Ashland") and Diaz Chemical Corporation ("Diaz"), which Hazardous Substances were disposed of at the Site.

### Defendant Ashland Inc.

35.     Defendant Ashland is a Kentucky corporation with a principal place of business in Russell, Kentucky.

36.     Ashland used AETC and DeRewal Chemical to remove industrial wastes from its Great Meadows, New Jersey plant.

37.     Ashland's waste was disposed of at the Site.

38.     Ashland's waste contained Hazardous Substances.

### Defendant Carpenter Technology Corporation

39.     Defendant Carpenter Technology Corporation ("Carpenter Technology") is a Delaware corporation with a principal place of business in Reading, Pennsylvania.

40.     Carpenter Technology used DeRewal Chemical for the removal of waste pickling solution from its Reading, Pennsylvania plant.

41.     Carpenter Technology's waste was disposed of at the Site.

42.     Carpenter Technology's waste contained Hazardous Substances.

### Defendant Diaz Chemical Corporation

43.     Defendant Diaz is a New York corporation with a principal place of business in Holley, New York.

44.    Diaz used AETC and DeRewal Chemical to remove industrial wastes from its Holley, New York, plant.

45.    Diaz's waste was disposed of at the Site.

46.    Diaz's waste contained Hazardous Substances.

**Defendant fcg, inc.
(a/k/a Flexible Circuits, Inc.)**

47.    Defendant fcg, inc. (a/k/a Flexible Circuits, Inc.) ("fcg") is a Pennsylvania corporation with a principal place of business in Warrington, Pennsylvania.

48.    Fcg used DeRewal Chemical to remove spent etchings and other industrial waste from its Warrington, Pennsylvania plant.

49.    Fcg's waste was disposed of at the Site.

50.    Fcg's waste contained Hazardous Substances.

51.    In 1969 fcg became the owner of all outstanding stock of Etched Circuits, Inc. ("Etched Circuits") and thereafter operated the Etched Circuits facility in Cherry Hill, New Jersey. Etched Circuits during this period used DeRewal Chemical to remove industrial waste from its Cherry Hill facility. Etched Circuits' waste contained hazardous substances and was disposed of at the Site. Fcg is thus a person who arranged for the transport, disposal, or treatment of Hazardous Substances from the Etched Circuits facility, which Hazardous Substances were disposed of at the Site.

### Defendant Handy & Harman Tube Company

52.    Defendant Handy & Harman Tube Company ("Handy & Harman Tube")

is a Delaware corporation with a principal place of business in Norristown, Pennsylvania.

53.    Handy & Harman Tube used DeRewal Chemical to remove industrial

waste from its Norristown, Pennsylvania facility.

54.    Handy & Harman Tube's waste was disposed at the Site.

55.    Handy & Harmon Tube's waste contained Hazardous Substances.

### Defendant NRM Investment Company

56.    Defendant NRM Investment Company ("NRMC") is a Pennsylvania

corporation with its principal place of business in Rosemont, Pennsylvania.

57.    From 1974 to 1978 NRMC, then named National Rolling Mills Co., used

DeRewal Chemical to dispose of waste pickle liquor solution from its plant located in Malvern,

Pennsylvania (the "NRM Plant").

58.    Waste from the NRM Plant was disposed of at the Site.

59.    The NRM Plant waste contained Hazardous Substances.

60.    NRMC is a party to the OU-1 Agreement.

### COUNT I

### (CERCLA Section 107(a))

61.    The allegations made in paragraphs 1 through 60 are incorporated by

reference as if set forth here in full.

62.    TI and Agere have incurred response costs for the OU-1 RD/RA and for the Future Response Costs required by the OU-1 Consent Decree.

63.    Agere has incurred response costs for the OU-2 RD/RA and for the Interim Response Costs and Future Response Costs required by the OU-2 Consent Decree.

64.    TI has incurred response costs for the OU-2 RD/RA and for the Interim Response Costs and Future Response Costs required by the OU-2 Consent Decree.

65.    Cytec, Ford, and SPS have incurred response costs for the OU-1 and OU-2 RD/RAs and for the Interim Response Costs and Future Response Costs required by the Consent Decrees.

66.    Plaintiffs are "persons" within the meaning of Sections 101(21) of CERCLA, 42 U.S.C. §§ 9601(21).

67.    Each Defendant is a "person" within the meaning of Sections 101(21) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(21) and 9607(a).

68.    Defendants AETC, Ashland, Carpenter Technology, Diaz; fcg, Handy & Harman Tube, and NRMC are persons who by contract, agreement or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of Hazardous Substances owned or possessed by them or by another party or entity, at the Site, or are successors-in-interest to such persons and are liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

69.     The total amount of the wastes for which the Defendants arranged and that were disposed of at the Site was greater than 110 gallons of liquid or greater than 200 pounds of solid materials. None of such wastes were municipal solid waste as defined by CERCLA § 107.

WHEREFORE Plaintiffs demand judgment in their favor against each of the Defendants, as follows:

(a)     Adjudging, decreeing, and declaring that Defendants are jointly and severally liable pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), to Plaintiffs for such response costs incurred to date and awarding damages to Plaintiffs in that amount and for such response costs to be incurred by Plaintiffs, together with interest thereon;

(b)     Ordering Defendants to pay Plaintiffs their costs of this action, including reasonable attorneys fees; and

(c)     Granting Plaintiffs such other, further, and different relief as the Court may deem just and appropriate.

## COUNT II

### (CERCLA Section 113(f))

70.     The allegations made in paragraphs 1 through 69 are incorporated by reference as if set forth here in full.

71.     Cytec, Ford, and SPS have incurred response costs for the OU-1 RD/RA and for the Future Response Costs required by the OU-1 Consent Decree.

72.     Cytec, Ford, SPS, and TI have paid the Past Response Costs as required by the OU-2 Consent Decree.

73.     Cytec, Ford, SPS, and TI have incurred response costs for the OU-2 RD/RA and for the Interim Response Costs and the Future Response Costs required by the OU-2 Consent Decree.

74.     Cytec, Ford, SPS, and TI are entitled to contribution from Defendants for such response costs paid, incurred, and to be incurred by them and to an allocation by the Court of such response costs as between them and Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE Cytec, Ford, SPS, and TI demand judgment in their favor against each of the Defendants, as follows:

(a)     Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for contribution to them for such response costs incurred to date and awarding damages to them in that amount together with interest thereon and for such response costs to be incurred;

(b)     Allocating responsibility for such response costs incurred to date and to be incurred as between them and Defendants pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), using such equitable factors as the Court determines are appropriate;

(c)     Ordering Defendants to provide contribution to them for such response costs incurred to date and for such response costs to be incurred, together with interest thereon, computed in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

(d)    Ordering Defendants to pay to them their costs of this action, including

reasonable attorneys fees; and

(e)    Granting them such other, further, and different relief as the Court may

deem just and appropriate.

## COUNT III

### (CERCLA Section 113(g)(2) Declaratory Judgment)

75.    The allegations made in paragraphs 1 through 74 are incorporated by

reference as if set forth here in full.

76.    A controversy exists between Plaintiffs and Defendants insofar as

Plaintiffs contend, and Defendants deny, that Defendants are liable under CERCLA for cost

recovery and contribution for all necessary response costs incurred and to be incurred by

Plaintiffs in connection with any response actions taken by Plaintiffs at the Site.

77.    Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), Plaintiffs

request entry of a declaratory judgment that holds Defendants liable for all necessary costs of

response incurred and to be incurred in connection with any response action taken by Plaintiffs at

the Site, which judgment shall be binding in any subsequent action to recover further response

costs or damages.

WHEREFORE Plaintiffs demand judgment in their favor against each of the

Defendants, as follows:

(a)    Entering a declaratory judgment on liability pursuant to Section

113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), in favor of Plaintiffs and against Defendants,

adjudging, decreeing, and declaring that Defendants are liable to Plaintiffs for all response costs

consistent with the NCP that Plaintiffs may incur and for all damages that Plaintiffs may suffer at

or with respect to the Site, together with interest thereon, which judgment will be binding in any

subsequent action or actions brought by Plaintiffs against Defendants to recover response costs

or damages.

<u>COUNT V</u>

(Pennsylvania Hazardous Sites Cleanup Act)

78.     The allegations made in paragraphs 1 through 77 are incorporated by

reference as if set forth here in full.

79.     There has been a "release" at the Site within the meaning of Section 103

of HSCA, 35 PA. CONS. STAT. § 6020.103.

80.     Each Defendant is a "person" within the meaning of Section 103 of

HSCA, 35 PA. CONS. STAT. § 6020.103.

81.     Plaintiffs are "persons" as defined by Section 103 of HSCA, 35 PA. CONS.

STAT. § 6020.103.

82.     Each Defendant is a person who has allowed a release and thereby caused

a public nuisance pursuant to Section 1101 of HSCA, 35 PA. CONS. STAT. § 6020.1101.

83.     Plaintiffs have incurred "reasonable and necessary or appropriate costs"

responding to the release and threatened release of Hazardous Substances at the Site pursuant to

Section 702 of HSCA, 35 PA. CONS. STAT. § 6020.702(a)(3).

84.     Defendants are persons who by contract, agreement or otherwise, arranged

for disposal or treatment, or transport for disposal or treatment of Hazardous Substances owned

or possessed by them or by another party or entity, at the Site, or are successors-in-interest to such persons, and are liable to Plaintiffs pursuant to Sections 701(a)(2) and 702(a)(3) of HSCA, 35 PA. CONS. STAT. §§ 6020.701(a)(2), 6020.702(a)(3).

85.    Pursuant to Sections 701, 702(a)(3) and 1101 of HSCA, 35 PA. CONS. STAT. §§ 6020.701, 6020.702(a)(3), 6020.1101, Plaintiffs are entitled to contribution from Defendants for response costs incurred and for response costs to be incurred by Plaintiffs and to an allocation by the Court of such response costs as between Plaintiffs and Defendants using such equitable factors as the Court determines are appropriate.

WHEREFORE Plaintiffs demand judgment in their favor against each of the Defendants, as follows:

(a)    Adjudging, decreeing, and declaring that Defendants are liable pursuant to Section 702(a)(3) of HSCA, 35 PA. CONS. STAT. § 6020.702(a)(3), for contribution to Plaintiffs for response costs incurred to date and awarding damages to the Agreement Group members in that amount and for response costs to be incurred by Plaintiffs, together with interest thereon.

(b)    Allocating responsibility for such response costs as between Plaintiffs and Defendants using such equitable factors as the Court determines are appropriate;

(c)    Ordering Defendants to provide contribution to Plaintiffs for response costs incurred to date and for all response costs to be incurred, together with interest thereon, computed in accordance with Section 702(b) of HSCA, 35 PA. CONS. STAT. § 6020.702(b).

(d)    Ordering Defendants to pay Plaintiffs their costs of this action, including

reasonable attorneys fees; and

(e)    Granting Plaintiffs such other, further, and different relief as the Court

may deem just and appropriate.

Ballard Spahr Andrews & Ingersoll, LLP

By: _____
Glenn A. Harris, Esquire (#51222)
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3400

Attorneys for Plaintiffs Agere Systems, Inc., Cytec
Industries Inc., Ford Motor Company, SPS
Technologies, LLC, and TI Group Automotive
Systems, L.L.C.

Dated: January 21, 2008

DMEAST #9810545 v4                              19

## CERTIFICATE OF SERVICE

I, Dawn M. Neukirch, hereby certify that I caused a true and correct copy of the

foregoing Fifth Amended Complaint to be served via electronic submission to all counsel on the

attached service list this 22nd day of January, 2008 and via first class mail on the 23rd day of

January, 2008.

Dated:  January 23, 2008

Dawn Neukirch

Laurie J. Sands, Esquire
Wolff & Samson, PC
The Offices at Crystal Lake
One Boland Drive
West Orange, New Jersey  07052
Phone:  973-530-2098
Fax:  973-530-2298
e-mail:  lsands@wolffsamson.com

-and-

Robert M. Morris, Esquire
Morris & Adelman, P.C.
1920 Chestnut Street
P.O. Box 30477
Philadelphia, PA  19103
Phone:  215-568-5621
Fax:  215-568-3253
e-mail:  rmmorris@morrisadelman.com
*Advanced Environmental Technology Corp.*

Melissa Flax, Esquire
Carella, Byrne, Bain, Gilfillian, Cecchi,
        Stewart & Olstein, P.C.
5 Becker Farm Road
Roseland, New Jersey  07068-1739
Phone:  973-994-1700
Fax:  973-994-1744
e-mail:  mflax@carellabyrne.com
*Handy & Harman Tube Company*

Lynn Wright, Esquire
Edwards Angell Palmer & Dodge, LLP
750 Lexington Avenue
New York, New York  10022-1200
Phone:  212-308-4411
Fax:  212-308-4844
e-mail:  lwright@ealaw.com
*Carpenter Technology Corporation*

Christopher R. Booth, Jr., Esquire
Booth and Tucker
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 1700
Philadelphia, Pennsylvania  19103
Phone: 215-875-0609
Fax: 215-875-8143
e-mail: cbooth@boothtucker.com
*Special Litigation Counsel for Carpenter Technology Corporation*

Seth v.d.H. Cooley, Esquire
Duane Morris LLP
United Plaza
30 South 17th Street
Philadelphia, PA  19103-4196
Phone: 215-979-1838
Fax: 215-979-1020
e-mail: scooley@duanemorris.com
*Flexible Circuits & Etched Circuits*

Edward Fackenthal, Esquire
Law Office of Edward Fackenthal
One Montgomery Plaza
Suite 209
Norristown, PA  19401
Phone: (610) 279-3370
Fax:  (610) 279-0696
*NRM Investment Co.*
e-mail: edwardfackenthal@cs.com

Richard C. Biedrzycki, Esquire
Phelan, Pettit & Biedrzycki
The North American Building
Suite 1600
121 South Broad Street
Philadelphia, PA  19107
Phone: 215-546-0500
Fax: 215-546-9444
e-mail: rbiedrzycki@pp-b.com
*Ashland, Inc.*

**EXHIBIT B**

ADVANCED ENVIRONMENTAL TECHNOLOGY CORP., INC.
"THE ENVIROTECH CO."

P. O. Box 152 ● Milltown, New Jersey 08850 ● (201) 238-0020

September 9, 1976

Mr. Fred DeRewal
DeRewal Chemical Co.
Box 58
Revere, Pa.


Dear Fred,

Confirming ours 9/9/76 - your prices to us -

    1)  Diamond Shamrock - Carlstadt
        Still Bottoms 65% $H_2O$ (Ph. 11) 35% dissolved solids
        including -
                $Na_2SO_4$ (largest amount)
                Napthalene sulfonated polymers
                other sulfonated materials
                some diatomaceous earth
                small amount $CaSO_4$
                Trace Phenol

Your price to truck/dispose for Envirotech ----------8¢/gallon.
                               (about 5000 gal./week)

    2)  Roche - Belvidere
        67-75% $H_2O$ (by wt.)
        24-32% sodium sulfate
        0.4% Chlorides
        0.5% Carbon
        (about 2 to 10 loads per week at 5500 gal. each)

        Trucks must be clean and neat in appearance.
        Roche will be told material is going to Grows
        Landfill (can it - or at least part?) and lime
        make-up.

Your price to Envirotech for trucking/disposal ------6¢/gallon.
                             (5500 gal. minimum load)

No pumps required on either account.


Sincerely

John Leuzarder
Technical Service Rep.


· P.U.C. License # 7011R-61
  # N.J.B.S.W.M. 02456003

BSAI020002                 8H    000 3677

**EXHIBIT C**

# EXHIBIT C

## Agere Systems, Inc. et al. v. Advanced Environmental Tech. Corp. et al.
### Case No. 02-cv-3830(LDD)
### Deposition of Manfred DeRewal, Sr. - Hearsay/Personal Knowledge Excerpts
### May 7, 2003 - Day 1

|   | Potentially Inadmissible Statement | Page:Line |
|---|---|---|
|   |   |   |
| 1 | "I was told that the Wissinoming plant could not take all the acid that was coming in." | 121:25; 122:1-9 |
| 2 | "Freddy told me he brought material from Ashland." | 184:1-13 |
| 3 | Regarding waste - "I know Richie told me Diaz's came there also." | 184:14-25 |

00001

1           UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3                    CIVIL ACTION NO.
    BOARHEAD FARM AGREEMENT          02-CV-3830
4   GROUP,              Judge Legrome D. Davis
         Plaintiff,     Oral Deposition of

5

        vs.            MANFRED T. DE REWAL, SR.
6   ADVANCED ENVIRONMENTAL TECHNOLOGY
    CORPORATION; ASHLAND CHEMICAL
7   COMPANY; BOARHEAD CORPORATION;
    CARPENTER TECHNOLOGY CORPORATION;
8   CROWN METRO, INC.; DIAZ CHEMICAL
    CORPORATION; EMHART INDUSTRIES,
9   INC.; ETCHED CIRCUITS, INC.; FCG,
    INC.; GLOBE DISPOSAL COMPANY, INC.;
10  GLOBE-WASTECH, INC.; HANDY & HARMAN
    TUBE COMPANY, INC.; KNOLL, INC.;
11  MERIT METAL PRODUCTS CORPORATION;
    NOVARTIS CORPORATION; NRM INVESTMENT
12  COMPANY; PLYMOUTH TUBE COMPANY;
    QUIKLINE DESIGN AND MANUFACTURING
13  COMPANY; RAHNS SPECIALTY METALS,
    INC.; ROHM & HAAS COMPANY, SIMON
14  WRECKING COMPANY, INC.; TECHALLOY
    COMPANY, INC.; THOMAS & BETTS
15  CORPORATION; UNISYS CORPORATION;
    UNITED STATES OF AMERICA
16  DEPARTMENT OF NAVY,
         Defendants.

17

18         * * * * *
         Wednesday, May 7, 2003
19         * * * * *

20       Transcript in the above matter taken at
    the offices of Ballard, Spahr, Andrews & Ingersoll,
21  LLP, 1735 Market Street, 42nd Floor, Philadelphia,
    Pennsylvania, commencing at 10:10 A.M.
22
        Certified Shorthand Reporting Services
23            Arranged Through
        Mastroianni & Formaroli, Inc.
24         709 White Horse Pike
        Audubon, New Jersey 08106
25          (856) 546-1100

00121

1  People working on it have a hard time staying close

2  to the operation.

3      Q.    All right.  What was done with the

4  nitrating acids after you stopped using that location

5  for disposal?

6      A.    They were taken to Boarhead.

7      Q.    During the time period when there was

8  some nitric acid being neutralized there, was all of

9  the nitric acid that DeRewal was handling at the time

10  neutralized there?

11      A.    No.

12          MR. FOSTER:   Objection to form.

13        You're saying nitric acid.  You have

14        keep using that phrase, and I think

15        he's using a different chemical.

16      Q.    Okay.  What are we calling it?

17      A.    A nitrating acid.

18      Q.    Nitrating acid?

19      A.    Sulfuric nitrating acid is what it is.

20      Q.    You've understood my questions --

21      A.    Yes.

22      Q.    -- about nitric acid to mean nitrating

23  acid?

24      A.    Yes.

25      Q.    So just so I'm clear now, during the

**DeRewal, Manfred Sr.Day1**                    **Page 121**

00122

1  time period that some nitrating acid was being

2  processed at Wissinoming --

3    A.    Right.

4    Q.    -- there was still other portions of it

5  that were being disposed of at Boarhead?

6    A.    Right.

7    Q.    And how do you know that?

8    A.    Because I was told that the Wissinoming

9  plant could not take all the acid that was coming in.

10    Q.    Okay.  And were you -- did you tell

11  somebody to take everything else to Boarhead?

12    A.    I guess I did, but I would suspect Rich

13  Minthorn, he had the authority to do that.  He could

14  have done it either or maybe he had asked me, and,

15  you know -- but I suspect -- I suspect I was aware of

16  it at some point, but on a day-to-day basis, he would

17  make that decision.

18    Q.    He had your authority, didn't he?

19    A.    Yes, and you know, they can't take it at

20  Philadelphia, so you have to take it up here.

21    Q.    Were drummed wastes ever taken to

22  Wissinoming?

23    A.    I don't think so.

24    Q.    And how come you don't think so?

25    A.    Well, the building wasn't designed to

**DeRewal, Manfred Sr.Day1**                    **Page 122**

00184

1 being disposed of at the Boarhead site?

2    A.   I don't know.  I saw once or twice the

3 red fumes that arise from the nitrating acid, but

4 whether that was Ashland's, Diaz or somebody else's,

5 I wouldn't have the foggiest idea.

6    Q.   Do you have a specific recollection of

7 telling someone at Boarhead to dispose of waste that

8 came from Ashland at the Boarhead site?

9    A.   No, people told me that they -- that

10 that's what happened.

11    Q.   Who told you that?

12    A.   I think Freddy told me he brought

13 material from Ashland.

14    Q.   Okay.  Anybody else?

15    MR. DOTO:  Can you read that

16  answer back?

17    (Designated answer is read.)

18    A.   And I'm sure Richie Minthorn told me.

19    Q.   Okay.

20    A.   I know Richie told me Diaz's came there

21 also.

22    Q.   Okay.  Did you remember anybody else

23 telling you that Diaz's waste was disposed of at

24 Boarhead?

25    A.   No.

**DeRewal, Manfred Sr.Day1**        **Page 184**

# EXHIBIT C

## Agere Systems, Inc. et al. v. Advanced Environmental Tech. Corp. et al.
### Case No. 02-cv-3830(LDD)
### Deposition of Manfred DeRewal, Sr. - Hearsay/Personal Knowledge Excerpts
### May 9, 2003 - Day 3

| | Potentially Inadmissible Statement | Page:Line |
|---|---|---|
| 1 | "My own knowledge is what I was told" regarding whether Ashland's nitrating acids were disposed of at Boarhead Farms. "I had to ask some of the younger boys". | 454:7-455:7 |
| 2 | Q: "...your son Fred first told you that some of Ashland's nitrating acids might have been disposed of at Boarhead Farms?"  A: "Right." | 456:5-10 |
| 3 | Q: "...you learned that...when you talked to your son Fred; is that right?" A: "Yes." | 465:18-25 |
| 4 | "Well, we had a dispatcher Richard Minthorn who told me years ago that Ashland material did come here..." | 471:3-472:6 |
| 5 | "...somebody told me what I said was it was disposed of in Philadelphia and at Boarhead Farms..." | 482:19-483:4 |

00401

1      UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3              CIVIL ACTION NO.
    BOARHEAD FARM AGREEMENT        02-CV-3830
4  GROUP,              Judge Legrome D. Davis
        Plaintiff,      Oral Deposition of
5
    vs.          MANFRED T. DE REWAL, SR.
6  ADVANCED ENVIRONMENTAL TECHNOLOGY
    CORPORATION; ASHLAND CHEMICAL
7  COMPANY; BOARHEAD CORPORATION;
    CARPENTER TECHNOLOGY CORPORATION;
8  CROWN METRO, INC.; DIAZ CHEMICAL
    CORPORATION; EMHART INDUSTRIES,
9  INC.; ETCHED CIRCUITS, INC.; FCG,
    INC.; GLOBE DISPOSAL COMPANY, INC.;
10  GLOBE-WASTECH, INC.; HANDY & HARMAN
    TUBE COMPANY, INC.; KNOLL, INC.;
11  MERIT METAL PRODUCTS CORPORATION;
    NOVARTIS CORPORATION; NRM INVESTMENT
12  COMPANY; PLYMOUTH TUBE COMPANY;
    QUIKLINE DESIGN AND MANUFACTURING
13  COMPANY; RAHNS SPECIALTY METALS,
    INC.; ROHM & HAAS COMPANY, SIMON
14  WRECKING COMPANY, INC.; TECHALLOY
    COMPANY, INC.; THOMAS & BETTS
15  CORPORATION; UNISYS CORPORATION;
    UNITED STATES OF AMERICA
16  DEPARTMENT OF NAVY,
        Defendants.

17

18        * * * * *
        Friday, May 9, 2003
19        * * * * *

20        Transcript in the above matter taken at
    the offices of Ballard, Spahr, Andrews & Ingersoll,
21  LLP, 1735 Market Street, 42nd Floor, Philadelphia,
    Pennsylvania, commencing at 10 o'clock A.M.
22
    Certified Shorthand Reporting Services
23          Arranged Through
        Mastroianni & Formaroli, Inc.
24        709 White Horse Pike
        Audubon, New Jersey 08106
25        (856) 546-1100

00454

1    A.    No.

2    Q.    All right.  Mr. DeRewal, I guess a

3  couple of days ago now, do you recall your testimony

4  to Mr. Harris regarding the disposal of Ashland

5  nitrating acids?

6    A.    Yes.

7    Q.    And do you recall testifying to Mr.

8  Harris that you don't have any personal knowledge as

9  to whether or not Ashland's nitrating acids were

10  disposed of at Boarhead Farms?

11    A.    That's correct.  My own knowledge is

12  what I was told.

13    Q.    And I believe you also testified, sir,

14  that you think your son Fred told you that some of

15  Ashland's nitrating acids may have been disposed

16  of --

17    A.    Yes.

18    Q.    -- at Boarhead Farms?

19    A.    Yes, he said he brought some back.

20    Q.    Wait until I'm finished so the court

21  reporter gets everything down.

22    A.    Okay.

23    Q.    Are you sure he told you that or do you

24  think he told you that?

25    A.    I'm sure he told me that, because I

**DeRewal, Manfred Sr.Day3**                    **Page 454**

00455

1 specifically asked him recently.

2     Q.    Is that the first time that he ever told

3 you that?

4     A.    No.  Several weeks ago, after I was

5 talking to Mr. Harris, my recollection of some of the

6 customers, I couldn't recall all this, so I had to

7 ask some of the younger boys who may have.

8     Q.    I understand.  What I'm trying to

9 determine, Mr. DeRewal, is when you first learned

10 from your son Fred that some of Ashland's nitrating

11 acids may have been disposed of at Boarhead Farms.

12 Do you recall when that was?

13         MR. HARRIS:   Objection.

14     A.    It would probably have been a year or

15 two since we started talking about this, and this is

16 when probably at the start of this group, the third

17 party liability group, whenever they started to get

18 together, and it wasn't Harris, I forget the

19 gentleman's name, the first man I met that

20 represented the group.

21         There's been -- Mr. Harris is the third

22 attorney that represents the group that I know of,

23 that I knew of.

24     Q.    Okay.

25     A.    And the first one, the first Jeremy

**DeRewal, Manfred Sr.Day3**                    **Page 455**

00456

1  something, I forget his name, was probably two or

2  three years ago is when he started asking me if I

3  could recall, and, of course, I would ask my son what

4  he could recall.

5      Q.    And is it your understanding then that

6  it was during that initial meeting with an attorney

7  that your son Fred first told you that some of

8  Ashland's nitrating acids might have been disposed of

9  at Boarhead Farms?

10     A.    Right.

11     Q.    Who else was present at that meeting

12  besides your counsel and your son?  Do you recall

13  anyone else being there?

14         MR. HARRIS:  Objection.

15     A.    No.  When the first attorney that used

16  to come up, he was from Washington, Jeremy something,

17  I forget what his last name is, Jeremy Akers, and he

18  used to stop by frequently, at least once a month,

19  and he was trying to locate some of the truck drivers

20  that work for the company.  Anybody related to the

21  company, he was trying to get in touch with, and he

22  was trying to see whether our memory couldn't help

23  him contact these people.

24         Then he was talking about who the

25  customers that DeRewal called for and what we could

**DeRewal, Manfred Sr.Day3**                    **Page 456**

00465

1  that, did you read my prior testimony, because if you

2  did, I'm going to read it -- mine before you get

3  here. I've got to review myself what I said, you

4  know.

5      Q.    Did Mr. Harris make any comments about

6  that testimony to you at all?

7      A.    No.

8      Q.    Did you ask him whether he had read the

9  testimony of any of your sons to the EPA?

10     A.    I don't know if I did or not. I don't

11  know if I did or not. I don't really recall.

12     Q.    Do you recall whether you discussed

13  anyone else's testimony with Mr. Harris?

14     A.    No. We didn't really discussed mine

15  that much. I mean, we just -- we didn't discuss any

16  particular aspect of it, just the fact that, gee, I

17  read your testimony, period, you know.

18     Q.    Okay. I want to take you back now, Mr.

19  DeRewal, to where we started. I think you had

20  testified that the first time you learned that some

21  of Ashland's nitrating acids may have been disposed

22  of at Boarhead was a few years ago when you talked to

23  your son Fred; is that right?

24         MR. HARRIS:  Objection.

25     A.    Yes.

**DeRewal, Manfred Sr.Day3**          **Page 465**

00471

1  wasn't telling the EPA the truth rather than saying

2  he wasn't telling me the truth, all right?

3     Q.    Is it fair to say then, Mr. DeRewal,

4  that since you don't have personal knowledge about

5  the disposal of Ashland's nitrating acids that you

6  would defer to your son's testimony in such regard?

7        MR. HARRIS:   Objection.

8     A.    Yes.  Well, we had a dispatcher Richard

9  Minthorn who told me years ago that Ashland material

10  did come there, and who was -- actually, Minthorn was

11  the person responsible to decide whether the trucks

12  should go to Philadelphia or where it should go.  So

13  he told me this, oh, I don't know, back in the '80s,

14  I guess, after Boarhead ceased all of that operation

15  of handling waste altogether.

16     Q.    So if I understand you right, what

17  you're saying is that Mr. Minthorn told you back in

18  the 1980s that some of Ashland's nitrating acids were

19  disposed of at Boarhead Farms?

20     A.    Yes, yes.

21     Q.    When did Mr. Minthorn pass away?

22     A.    I don't know whether it was -- let me

23  see, probably about '96 or '97, probably around '97.

24     Q.    Do you remember when in the '80s Mr.

25  Minthorn told you that some of Ashland's nitrating

**DeRewal, Manfred Sr.Day3**          **Page 471**

00472

1  acids were disposed of at the Boarhead Farms?

2     A.    No, I don't.  He, I think -- I think he

3  came to Costa Rica to visit me.  He was there for a

4  vacation, and during the week or two weeks or three

5  weeks he was there, he was talking about what

6  happened back at the Boarhead Farm.

7     Q.    And when was it that you were in Costa

8  Rica?

9     A.    Oh, I moved there in 1978, I believe, or

10  '79.

11    Q.    And did you live there continuously for

12  a period of time?

13    A.    Yes, for twelve years, ten years.

14    Q.    And he visited you at some point while

15  you were living continuously in Costa Rica?

16    A.    Yes.

17    Q.    Did he visit you before or after you

18  first testified to the EPA?

19    A.    Oh, this was before.

20    Q.    Do you recall, I think in response to

21  Mr. Dillon's questions yesterday that you gave

22  testimony to the EPA?

23    A.    Oh, wait.  This was -- I'm sorry.

24    Q.    I believe in 1989?

25    A.    Oh, wait, this was after.  No, this was

**DeRewal, Manfred Sr.Day3**                    **Page 472**

00482

1    A.    Do I have any?

2    Q.    Yes.

3    A.    No.

4    Q.    Do you know of any?

5    A.    Not documents, no.

6    Q.    Do you know of any other information

7 other than what your son Fred supposedly told you and

8 Richie Minthorn told you that Ashland's waste was

9 disposed of at Boarhead facility?

10    A.    Well, I said it was disposed of under

11 oath in New Jersey when I was called as a witness in

12 the court I believe in Flemington, New Jersey prior

13 to this testimony.

14    Q.    You said it was disposed of in New

15 Jersey?

16    A.    No, disposed of at Boarhead.

17    Q.    And let's go back to that for a minute.

18 Who was involved in that lawsuit?

19    A.    DeRewal was suing Advanced Environmental

20 Technology, Advanced Environmental Chemical, whatever

21 they're called who was the broker for Ashland

22 Chemical Company, and I was -- they called me on as a

23 witness, and they -- about where the material was

24 disposed of, and as I -- somebody told me what I said

25 was it was disposed of in Philadelphia and at

**DeRewal, Manfred Sr.Day3**                    **Page 482**

00483

1  Boarhead Farms, and that was back -- and that was

2  actually concerning Ashland.  Ashland wasn't a

3  defendant; their broker was that was handling Ashland

4  material.

5           I thought at that time there was an

6  attorney there that represented Ashland.  I thought

7  so.

8      Q.    Do you know what year that testimony was

9  given?

10     A.    Well, it was, I would say it was 1976 or

11  '77.

12     Q.    What was the lawsuit about, sir?  Why

13  were you suing AETC?

14     A.    It was because they had delivered a

15  truckload of laboratory chemicals to the Philadelphia

16  facility, and we refused it.  It was just dropped

17  there.  We refused it, and I had to get it out of

18  the -- I had to remove it from that industrial park,

19  and the only person that we thought would take it was

20  Chemical Control up in Newark, so Advanced made

21  arrangements with Carriccino to accept that

22  truckload, and the amount of money that I believe

23  Advanced owed us $10,000 which they said because once

24  their truckload of reagent chemicals, once it reached

25  our property, it was our material, it was no longer

**DeRewal, Manfred Sr.Day3**            **Page 483**

**EXHIBIT D**

# EXHIBIT D

## Agere Systems, Inc. et al. v. Advanced Environmental Tech. Corp. et al.

### Case No. 02-cv-3830(LDD)

**EPA Deposition of Manfred DeRewal, Sr. - Hearsay/Personal Knowledge Excerpts**
**December 10, 1996 - Day 1**

| | Potentially Inadmissible Statement | Page:Line |
|---|---|---|
| 1 | Regarding waste haulers to Boarhead Farm - "You know, and it was one of these things, hey Fred...can I pull my truck up there?" | 54:25; 55:1-25; 56:1-25; 57:1-19 |
| 2 | Regarding AETC disposal permitted by Minthorn - "They'd send a truck down with some stuff on it, and he said, Fred, they were your friends." | 58:18-25 |
| 3 | Regarding AETC disposal permitted by Minthorn - Q:"Would he actually dig a trench..." A:"I would assume, yeah." | 59:1-24 |
| 4 | Regarding AETC disposal permitted by Minthorn - "...he wouldn't feel obligated to tell me..." | 60:2-21 |
| 5 | Regarding drums at Boarhead and AETC - "...I just suspect that they [Environmental Technologies] were doing business with them instead of Jonas.  "...I don't know." | 70:11-22 |
| 6 | Regarding Jonas or AETC drum pick up - Q:"Could this be one of those situations where he brought -- or AETC...brought it themselves?" A:"It could be." | 125:10-25; 126:1-7 |
| 7 | Regarding "Ashland ever having disposed of waste at Boarhead." - "There weren't many people.  I think it was Ed Long." | 135:12-25; 136:1-3 |

MANFRED TATARA DeREWAL, VOL. I   12-10-96

1
2
3
4
5   IN RE:  BOARHEAD FARMS SUPERFUND SITE
6
7
8
9
10
11              SWORN STATEMENT OF
12             MANFRED TATARA DeREWAL
13                  VOLUME I
14
15
16
17          On the 10th and 11th days of December,
18   1996, at 10:17 a.m. and 10:35 a.m., respectively, the
19   sworn statement of the above-named witness was taken
20   at the instance of the United States Environmental
21   Protection Agency before Greg B. Hunt, Certified
22   Shorthand Reporter in and for the State of Texas, at
23   the Bureau of Prisons Federal Medical Center, 3150
24   Horton Road, in the City of Fort Worth, County of
25   Tarrant, State of Texas.

COPY

STANLEY, RICE & ASSOCIATES   720-4567        BSAH036651

---

MANFRED TATARA DeREWAL, VOL. I   12-10-96        2

1                 A P P E A R A N C E S
2   U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION III
3   841 Chestnut Building
    Philadelphia, PA 19107-4431
    BY: MS. SARAH P. KEATING
4
5                  Senior Assistant Regional Counsel
6   U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION III
    841 Chestnut Building
    Philadelphia, PA 19107-4431
7   BY: MS. KEVIN HARDY
8                  Paralegal Specialist
9   U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION III
    841 Chestnut Building
10  Philadelphia, PA 19107-4431
    BY: MR. PAUL J. NEALE, JR.
11
12                 Paralegal Specialist
13
14
15
16
17
18
19
20
21
22
23
24
25

STANLEY, RICE & ASSOCIATES   720-4567        BSAH036652

---

MANFRED TATARA DeREWAL, VOL. I   12-10-96        3

1                     I N D E X
2   WITNESS
    MANFRED TATARA DeREWAL
3
                                            PAGE
4   EXAMINATION                               4
    BY:  MS. KEATING
5
6   EXHIBITS                                 PAGE
7   Exhibit No. 1 . . . . . . . . . . . . . . 8
8   Exhibit No. 2 . . . . . . . . . . . . . . 10
9   Exhibit No. 3 . . . . . . . . . . . . . . 12
10  Exhibit No. 4 . . . . . . . . . . . . . . 19
11  Exhibit No. 5 . . . . . . . . . . . . . . 68
12  Exhibit No. 6 . . . . . . . . . . . . . . 88
13  Exhibit No. 7 . . . . . . . . . . . . . . 69
14  Exhibit No. 8 . . . . . . . . . . . . . . 76
15  Exhibit No. 9 . . . . . . . . . . . . . . 80
16  Exhibit No. 10 . . . . . . . . . . . . . . 83
17  Exhibit No. 11 . . . . . . . . . . . . . . 86
18  Exhibit No. 12 . . . . . . . . . . . . . . 93
19  Exhibit No. 13 . . . . . . . . . . . . . . 95
20  Exhibit No. 14 . . . . . . . . . . . . . . 98
21  Exhibit No. 15 . . . . . . . . . . . . . . 100
22  Exhibit No. 16 . . . . . . . . . . . . . . 101
23  Exhibit No. 17 . . . . . . . . . . . . . . 102
24  Exhibit No. 18 . . . . . . . . . . . . . . 103
25  Exhibit No. 19 . . . . . . . . . . . . . . 105

STANLEY, RICE & ASSOCIATES   720-4567        BSAH036653

---

MANFRED TATARA DeREWAL, VOL. I   12-10-96        4

1   Exhibit No. 20 . . . . . . . . . . . . . . 116
2   Exhibit No. 21 . . . . . . . . . . . . . . 118
3   Exhibit No. 22 . . . . . . . . . . . . . . 123
4   Exhibit No. 23 . . . . . . . . . . . . . . 125
5   Exhibit No. 24 . . . . . . . . . . . . . . 131
6   Exhibit No. 25 . . . . . . . . . . . . . . 133
7   Exhibit No. 27 . . . . . . . . . . . . . . 137
8   Exhibit No. 28 . . . . . . . . . . . . . . 138
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

STANLEY, RICE & ASSOCIATES   720-4567        BSAH036654

MANFRED TATARA DeREWAL, VOL. I   12-10-96   53

1    MS. KEATING: -- former customers.

2    (Recess taken.)

3    Q    Okay. Mr. DeRewal, I think at this point

4    we're going to turn our attention to some of the

5    companies that EPA believes, through its

6    investigation, that you did business with at Boarhead

7    Farms. Again, these companies are companies that may

8    be liable for the cleanup costs out there, and what

9    we're trying to get from you is some information that

10   confirms that for us.

11   Some of these companies were also recently

12   the subject of discussions that we had with Linda

13   Cochran. She and others that we've interviewed in

14   the past have confirmed that you did business with

15   some of these companies at Boarhead Farms; and since

16   1989, we haven't had a chance to discuss them with

17   you, so the reason that we're back here today is to

18   talk about these companies with you.

19   And we're going to start first with a

20   company called General Ceramics, Inc., and I believe

21   it was the National Berylia Division that we're

22   talking about. Are you familiar with a company

23   called General Ceramics?

24   A    No.

25   Q    National Berylia Division doesn't ring a

MANFRED TATARA DeREWAL, VOL. I   12-10-96   54

1    bell with you?

2    A    No. We -- DeRewal Chemical nor Boarhead

3    never did anything with that company. The only

4    beryllium company I know of is out in Reading, which

5    is Berylco.

6    THE COURT REPORTER: The only --

7    THE WITNESS: -- beryllium

8    corporation --

9    MS. HARDY: Beryllium.

10   THE WITNESS: -- I know is Berylco.

11   I --

12   MS. HARDY: Berylco?

13   THE WITNESS: Yeah. I --

14   MS. HARDY: Can you spell that?

15   THE WITNESS: Berylco, B-E-R-Y-L-C-O,

16   I believe. And National Beryllium, I believe, is up

17   in North Jersey, if I'm not mistaken. Now, I -- I

18   read that -- in one of the reports that some material

19   was excavated that came from National Beryllium. I

20   believe they were spark plugs. They were -- they

21   happened to be radioactive. I think they used

22   thorium oxide, which is slightly radioactive. I

23   suspect -- I don't know, I suspect that material came

24   from a company called Environmental Technology.

25   MR. NEALE: Is that AETC, Advanced

MANFRED TATARA DeREWAL, VOL. I   12-10-96   55

1    Environmental Tech --

2    THE WITNESS: Is that what it is?

3    MR. NEALE: I'm asking you, really.

4    THE WITNESS: It may be Advanced. I

5    knew the two boys at -- at one time I knew the two

6    fellows that ran that company.

7    MS. HARDY: What are their names?

8    THE WITNESS: I forget their names

9    now, Jesus. I would know them if I heard them,

10   but --

11   MS. HARDY: Why do you think they were

12   responsible for this --

13   THE WITNESS: Because that was

14   their -- that was the -- part of the area that they

15   serviced.

16   MS. HARDY: Can you explain this

17   further? I'm not sure I'm understanding.

18   THE WITNESS: Well, there were waste

19   disposers --

20   MS. HARDY: Right.

21   THE WITNESS: -- and they did that in

22   the whole North Jersey area.

23   MS. HARDY: And they would -- how did

24   this have relation to --

25   THE WITNESS: I don't --

MANFRED TATARA DeREWAL, VOL. I   12-10-96   56

1    MS. HARDY: -- Boarhead?

2    THE WITNESS: -- know. I don't know.

3    I suspect that did -- they came down after -- let's

4    see, Boarhead Farms was like a club. There were

5    several waste haulers that I knew, you know, and it was one

6    waste haulers that I knew about it, several

7    of these things, hey, Fred, if I'm in trouble, can I

8    pull my truck in there? Well, I'm not there, so you

9    better talk to somebody.

10   Now, I don't know about Environmental --

11   these -- this Advanced Environmental. I don't know

12   about them, because, see, I ended up suing them,

13   so they -- they're not very friendly with me. I just

14   suspect that's where it came from.

15   After I read about this, the other

16   person I talked to about this -- let me see -- in

17   nineteen -- in Christmas around -- it was Christmas

18   of '92, I talked to a couple of people. Richard

19   Minthorn, who had moved to Georgia -- he was living

20   in Georgia and he came up for Christmas and he came

21   up and spent about a week up there and he stopped by

22   and talked to me almost every day, and we were

23   talking about things, what happened in the past,

24   because from a lot of the things I've read, what was

25   dug up was unbelievable, the amount, and I was

MANFRED TATARA DeREWAL, VOL. I   12-10-96     57

1   curious. did all you fellows have your own little
2   business, you know, and some of the things that he
3   had said -- and the other person I talked to was
4   Marvin Jonas, who had Jonas Waste over in New Jersey.
5   I happen to know Marvin, you know, personally.  I
6   didn't know much about his business, but I knew him,
7   and as a matter of fact, back in 1980, he went to
8   Costa Rica with me for -- he stayed there for a year
9   or so, so, you know -- and I talked to Marvin about
10  things in 1993, talking about what happened in the
11  past, you know, and everyone's talking about all
12  their sentencing, because he had his share of them, I
13  understand, and he used to use that place.
14       Q    Meaning Boarhead Farms?
15       A    Yes.
16       Q    To dispose --
17       A    And I always thought this was once or
18  twice, but apparently it was a lot more than once or
19  twice.  And --
20            MS. HARDY:  Did he admit to bringing
21  waste and disposing of it at the property?
22            THE WITNESS:  Yeah.  Well, he said --
23  well, he never said how much, but he did, and he had
24  a fellow over in Jersey -- I don't know what his name
25  is -- who also brought stuff over there.  I'm trying

STANLEY, RICE & ASSOCIATES   720-4567     ESAJ026707

---

MANFRED TATARA DeREWAL, VOL. I   12-10-96     58

1   to think of what his name is.  I met him once a long,
2   long time ago, you know, but go -- as I'm saying --
3   now, like the Beryllium Corporation, you could check
4   with them.  They have never even heard of DeRewal or
5   Boarhead --
6            MS. KEATING:  Right.
7            THE WITNESS:  -- I'm sure they
8   haven't.
9            MS. HARDY:  When you talked to Richie
10  in Georgia, what did he say?  You said that you
11  talked --
12            THE WITNESS:  Some of those boys --
13            MS. HARDY:  -- to him.
14            THE WITNESS:  -- used to come down
15  there.
16            MS. HARDY:  From a -- from --
17            THE WITNESS:  Yeah.
18            MS. HARDY:  -- this Environmental
19  Technology --
20            THE WITNESS:  Yeah.
21            MS. HARDY:  -- two men that --
22            THE WITNESS:  Well, their -- or
23  they'd -- they'd send a truck down with some stuff on
24  it, and he said, well -- he said, Fred, they were
25  your friends, you know.

STANLEY, RICE & ASSOCIATES   720-4567     ESA026708

---

MANFRED TATARA DeREWAL, VOL. I   12-10-96     59

1        Q    So where --
2        A    He's obligated, he feels, to help.
3        Q    So he would allow them to dispose of
4   that --
5        A    Yeah.
6        Q    -- at Boarhead Farms?
7        A    Yeah.
8        Q    Would he actually dig a trench or a ditch
9   for them to pour it into?
10       A    I would assume, yeah.
11       Q    Uh-huh.  So he would use the equipment
12  that was located --
13       A    Yeah.
14       Q    -- on the site?  Did Richie ever give you
15  the names of any of the companies whose waste it
16  might have been, whose waste was actually buried
17  there?
18       A    Well, see, it's -- like this case, if
19  these boys from Environmental came in there, he
20  wouldn't have known whose waste it was.
21       Q    He wouldn't know what was in the truck?
22       A    No, no.
23       Q    Did -- would they pay -- Environmental --
24       A    I'm sure they did.
25       Q    -- they would pay Richie?

---

MANFRED TATARA DeREWAL, VOL. I   12-10-96     60

1        A    Yeah.
2        Q    And would he turn that money over to you
3   or would he put that money in his pocket?
4        A    I would assume -- this was -- Minchorn did
5   some other things for me.  We had -- we had done some
6   other things, and it has nothing to do with the
7   pollution business at all, and so if he -- if he made
8   an extra three or four or five hundred dollars, he
9   wouldn't feel obligated to tell me and I wouldn't
10  really care.
11       Q    Right.
12            MS. HARDY:  But you didn't receive any
13  money for any of this?
14            THE WITNESS:  No.  Well, DeRewal --
15  DeRewal never -- I don't think DeRewal ever made any
16  money in hauling anyone's waste.  See, the
17  government's position's always been that that was a
18  front I had to hide what I was doing.  That's what
19  they claim.  As long as people think you're
20  polluting, they're not going to really look at what
21  you really are doing.
22       Q    Right.  Yeah.  I don't think that any of
23  us here have any judgment on --
24       A    All right.
25       Q    -- on what you did in the past --

MANFRED TATARA DeREWAL, VOL. I  12-10-96    69

1    Q    Uh-huh.  Prior to looking at this pictures,
2  had you ever seen any containers like that?
3    A    No.
4    Q    These are some pictures of the drums that
5  were uncovered.
6    A    Well, what did the company do?  Did they
7  have their name on the drum or something or their
8  name's --
9         MR. NEALE:  The drums were full of
10  bags and containers such as those marked with the --
11  you know --
12         THE WITNESS:  Uh-huh.
13         MR. NEALE:  -- the material inside.
14         MS. HARDY:  And General Ceramics came
15  out and --
16         THE WITNESS:  Yeah, right.
17         MS. HARDY:  -- performed the removal.
18    Q    We're also going to introduce Exhibit 7 --
19         MS. KEATING:  This is a new map,
20  right, Paul?
21         MR. NEALE:  Right.
22         MS. KEATING:  Okay.
23    Q    Exhibit 7, and this is a map which
24  depicts Pit W, which is an EPA term --
25    A    Yeah.

STANLEY, RICE & ASSOCIATES   720-4567    BSAH236719

MANFRED TATARA DeREWAL, VOL. I  12-10-96    70

1    Q    -- where we uncovered 30 General Ceramics
2  drums which contained beryllium oxide and radioactive
3  thorium oxide at the Boarhead site.
4    A    Uh-huh.
5    Q    And Pit W is --
6         MR. NEALE:  There's a driveway --
7    Q    -- right there.
8         MR. NEALE:  -- that comes in --
9         THE WITNESS:  Right.
10         MR. NEALE:  -- the property here.
11    Q    And I'm circling that with a green pen.
12  Do you have any idea how those drums could have been
13  buried there other than if it was by Environmental
14  Technologies?
15    A    No.  I don't even know if they did.  I
16  just suspect that.
17    Q    Okay.
18    A    I mean, you know, I just suspect that they
19  were doing business with them instead of Jonas.  I
20  mean, I don't know.  I would think they could -- it
21  would be easier to go to them and find out who their
22  waste haulers were.
23    Q    Uh-huh.
24         MS. HARDY:  Did anyone have the
25  authority to receive waste at Boarhead Farms, did

STANLEY, RICE & ASSOCIATES   720-4567    BSAH236720

MANFRED TATARA DeREWAL, VOL. I  12-10-96    71

1  this Richie Minthorn?  Did you give him any authority
2  to do anything like that or do you think that he had
3  the -- he was --
4         THE WITNESS:  Not really, not really.
5  I mean -- no.  Somebody would bring in some drums
6  like that, no, no.
7    Q    But Richie Minthorn would be a good person
8  for us to talk to?
9    A    Well, he was a day-to-day type of manager.
10    Q    Uh-huh.  Okay.
11    A    I mean, he wasn't there all the time
12  either, but he was basically the person I would call
13  if I was looking for something up there and --
14         MR. NEALE:  So this could have been
15  one of the operations where Richie just looked the
16  other way and let them dispose of their drums --
17         THE WITNESS:  I don't --
18         MR. NEALE:  -- or --
19         THE WITNESS:  -- know, I don't know.
20  Richie had told me -- he told me this a couple of
21  years ago -- that this did go on, you know.
22         MR. NEALE:  Okay.
23         MS. KEATING:  Okay.  Do you have any
24  other questions about General Ceramics?
25         MR. NEALE:  Huh-uh.

BSAH236721

MANFRED TATARA DeREWAL, VOL. I  12-10-96    72

1         MS. HARDY:  No.
2         MS. KEATING:  Okay.
3    Q    All right.  I think -- we'll move on to
4  another company, and this company's name is National
5  Rolling Mills, Inc.
6    A    All right.
7    Q    And I believe that National Rolling Mills
8  was purchased in 1983 by a company called Worthington
9  Steel.  And National Rolling Mills is one of the
10  companies that Linda confirmed for us that you did
11  business with at Boarhead, so we obtained some
12  information from Linda, but we wanted to see if we
13  could get some more information from you.
14         We have investigated National Rolling
15  Mills quite extensively with regard to its liability
16  at Boarhead, but we need some more information if
17  you can help us with that, so I'll just start with my
18  questions.  Are you familiar with a company called
19  National Rolling --
20    A    Yes.
21    Q    -- Mills?
22    A    Yes.
23    Q    Did you ever do business with National
24  Rolling Mills?
25    A    Yes.

MANFRED TATARA DeREWAL, VOL. I  12-10-96    125

```
1              MS. HARDY:  Yeah.
2         A    -- you know.
3         Q    Okay.  I'm going to introduce Exhibit 23,
4    which is a DeRewal Chemical Company invoice, number
5    1388, dated March 19th, 1977, in the amount of
6    $4,665.70, for waste removed from Ashland Chemical to
7    AETC, which is Advanced Environmental Technology, by
8    DeRewal Chemical.
9              (Exhibit No. 23 marked.)
10        Q    Where was this waste transported to?
11        A    I don't know where the drums were.  I
12   mean, I don't even know whose drums they would be.  I
13   mean, I don't have a good copy.  It says --
14             MS. HARDY:  I know.
15        A    -- drums per somebody.
16        Q    I think it says John.
17             MS. HARDY:  Jonas?  Is --
18        Q    Or maybe Jonas --
19        A    I mean, I think --
20        Q    -- yeah, per Jonas.
21             MS. HARDY:  Could this be one of those
22   situations where he brought -- or AETC, the -- or the
23   Environmental Technologies brought it themselves?
24             THE WITNESS:  It could be.  I mean, I
25   don't think we picked up drums at Ashland.
```

STANLEY, RICE & ASSOCIATES  720-4567      BSAJ026774

MANFRED TATARA DeREWAL, VOL. I  12-10-96    126

```
1    Everything was bulk there.
2         Q    But this -- this invoice seems to indicate
3    that $760 worth of drums were picked up.
4         A    I see, yeah.
5         Q    So these drums could have been dumped by
6    Jonas at Boarhead Farms?
7         A    They could have.
8         Q    Would Richie Minthorn have knowledge of
9    this, do you think, this transaction?
10        A    Well, he would have -- at that time, he
11   would have.  I mean, I would have if I was there at
12   that time.  I mean -- you know, I mean, I'm looking
13   at this and I just absolutely don't know.  We had --
14   from Advanced Environmental Technology, we had a
15   couple of truckloads of drums.  I'm just looking at
16   the date, and it says 1977.  That was probably --
17   that's just about that time.  They had brought a
18   couple of loads of drums down to Philadelphia.  We
19   didn't want them, as I recall.  We wanted them off
20   the place down there.  I was having some problems
21   with Advanced Environmental.  I just can't recall
22   what it was.  And so they told us to take them up
23   to -- there was a fellow up in Newark.  He had a
24   million drums there.  I forget what his name was.  It
25   was a disposal company.  I'll -- if I hear his name,
```

STANLEY, RICE & ASSOCIATES  720-4567      BSAJ026775

MANFRED TATARA DeREWAL, VOL. I  12-10-96    127

```
1    I'll know it.  Anyway, he had a very bad reputation
2    with the EPA.  He's one of these fellows who had
3    50,000 drums and they caught on fire and they -- they
4    just started exploding, but I recall them bringing
5    stuff in where -- we would send back.  Now, whether
6    it was these drums, I don't know, but, you know, it
7    ended up I had to sue them and we -- everybody got
8    nasty at each other.  We just didn't even want to
9    talk to these people anymore.
10             MS. HARDY:  But you picked these up,
11   right?
12             THE WITNESS:  I don't know.
13             MS. HARDY:  Isn't that what this
14   invoice --
15             THE WITNESS:  I don't know whether
16   they were delivered --
17             MS. KEATING:  You're looking at the
18   wrong one.
19             THE WITNESS:  -- or whether we picked
20   them up.
21             THE WITNESS:  Now, the acid -- yeah, I
22   would say the acid, because they didn't -- they
23   didn't have -- they didn't have tank trucks like we
24   did, so anything in bulk we would pick up.  They had
25   a truck that could deliver 38 drums.  Now, whether we
```

MANFRED TATARA DeREWAL, VOL. I  12-10-96    128

```
1    picked those drums up or they did, I don't know, but
2    I know a couple of times during our talks with these
3    boys over the fence they had -- they had some medical
4    waste they wanted to bring down to Boarhead and we
5    said -- you know, we said we didn't want them to do
6    it there.  We told them to take it to an incinerator
7    somewhere.
8              MS. HARDY:  They wanted to bring it to
9    Boarhead?
10             THE WITNESS:  Yeah.  They didn't know
11   what we were going to do with it, but yeah --
12             MS. HARDY:  Right.
13             THE WITNESS:  -- that's what we
14   said -- we don't want anything -- we don't want
15   anything that's hospital waste, find an incinerator
16   somewhere or something.  But, I mean, they were
17   always -- they were always trying to tell you, this
18   is just rinse water, you can drink it, you know.
19             MS. HARDY:  Yeah.
20             THE WITNESS:  You know, this is what
21   they're always trying to do.  They say one thing and
22   it's something else.
23        Q    Do you have any idea what this CASH means
24   under the --
25        A    Yes --
```

BSAJ026777

1   A   I know it's not mine. It's a lot better
2  than my handwriting. I can read this one.
3   Q   Okay. I'll introduce Exhibit 25, which is
4  a multi-page exhibit. It's Ashland Chemical Company
5  sales orders and invoices dated July 26th, 1977
6  through February 15th, 1978.
7          (Exhibit No. 25 marked.)
8   Q   These sales orders and invoices indicate
9  that various chemicals were purchased by DeRewal
10  Company --
11   A   Right.
12   Q   -- DeRewal Chemical Company. Do you
13  recall who might have picked up these chemicals from
14  Ashland for your company?
15   A   No. They were either picked up or they
16  delivered them. I don't know if it was -- does it
17  say they were picked up? These -- these -- this was
18  not the same facility that Ashland had. This is a
19  company -- distributing company, Reading. That
20  Ashland company is owned -- Ashland owns both of
21  them.
22   Q   Oh, okay.
23   A   But the Ashland we hauled waste for was in
24  Great Meadows. This was up in Easton or Allentown.
25  That was a distributor up there where we buy our

1  chemicals from.
2   Q   Oh, okay, so two separate facilities?
3   A   Yeah, these were all companies -- we were
4  buying.
5          MS. HARDY: What did you do with them?
6          THE WITNESS: Made things out of
7  them --
8          MS. HARDY: Okay.
9          MS. HARDY: -- other compounds.
10   Q   And then you resold the product --
11   A   Yeah.
12   Q   -- to somebody else?
13   A   Uh-huh.
14   Q   And --
15   A   I mean -- yeah, I mean, we're not going to
16  buy -- we're not going to buy this -- $400 worth of
17  chemicals and go throw it in the ground, you know.
18   Q   Right. How about the -- if you were doing
19  some kind of manufacturing or processing, where were
20  the wastes that were generated from that process
21  disposed of?
22   A   Probably down the sewer. This was not
23  down in Philadelphia. It didn't -- it didn't have --
24  it didn't generate such of a waste. You can see the
25  volume is relatively small. It was like pot plant

1  quantities, you know.
2   Q   So this processing was done in
3  Philadelphia?
4   A   Yeah.
5   Q   Okay. So it would just be put down the
6  sewer right there?
7   A   Yeah.
8   Q   Okay. Can you think of any other person
9  who might have knowledge of any Ashland disposal at
10  the Boarhead site?
11   A   Of anybody what?
12   Q   Can you think of any other person -- other
13  than your son, who you'll check with maybe on that
14  spill incident, can you think of any other person
15  that we could talk to to get any information about
16  Ashland ever having disposed of waste at Boarhead?
17   A   Of Ashland? No, I can't think of
18  anybody. Oh, that son that got burned is Bruce.
19  That's not my son Fred, it's Bruce.
20   Q   Oh, it's Bruce?
21   A   Right.
22   Q   Okay.
23   A   And I take it he's probably the most
24  likely one who could tell you where it came from. I
25  think maybe Ed Long was there that day also.

1   Q   Okay.
2   A   There weren't many people. I think it was
3  Ed Long.
4          MR. NEALE: How about Linda Cochran,
5  was she there, do you remember that?
6          THE WITNESS: I don't believe so, I
7  don't believe so.
8          MS. HARDY: Well, I think she was.
9          MS. KEATING: I think Linda Cochran
10  was interviewed by the --
11          MS. HARDY: Yeah, many newspapers.
12          THE WITNESS: She remembers it because
13  she lived very close and the plume was going right
14  through the woods and right into her window.
15   Q   Do you know where Ed Long is today? Do
16  you know --
17   A   I haven't --
18   Q   -- where he lives?
19   A   I haven't seen Ed Long since about
20  probably 1978 or 1980, was the last time I saw him.
21  I don't know where he is, but he lived -- he lived
22  there -- right there in Bucks County. I don't know
23  if his mother still lives there or not, I don't know.
24   Q   I don't either. Okay. I think we'll move
25  on to Diaz Chemical Corporation, and we just -- we

# EXHIBIT D

### Agere Systems, Inc. et al. v. Advanced Environmental Tech. Corp. et al.

### Case No. 02-cv-3830(LDD)

**EPA Deposition of Manfred DeRewal, Sr. - Hearsay/Personal Knowledge Excerpts**
**December 11, 1996 - Day 2**

| | Potentially Inadmissible Statement | Page:Line |
|---|---|---|
| | | |
| 1 | Regarding AETC material found at Boarhead - "And that, too, I suspect was their material." | 228:17-25; 229:1-13 |

1127799.1

1

2

3

4

5      IN RE:  BOARHEAD FARMS SUPERFUND SITE

6

7

8

9

10

11                    SWORN STATEMENT OF

12                MANFRED TATARA DeREWAL

13                      VOLUME II

14

15

16

17          On the 10th and 11th days of December,

18    1996, at 10:17 a.m. and 10:35 a.m., respectively, the

19    sworn statement of the above-named witness was taken

20    at the instance of the United States Enviornmental

21    Protection Agency before Greg B. Hunt, Certified

22    Shorthand Reporter in and for the State of Texas, at

23    the Bureau of Prisons Federal Medical Center, 3150

24    Horton Road, in the City of Fort Worth, County of

25    Tarrant, State of Texas.

1  with GAF.

2  Q    Okay.  Marvin Jonas hauled waste from

3  GAF's Gloucester City facility.

4  A    Right.  Okay.

5  Q    And they used him for disposal.  We found

6  a container at the Boarhead site labeled GAF ammonia

7  number II.  It contains L89 -- well, catalog number

8  2-017, and it says, warning, extremely irritative,

9  limit exposure, burns vapor, extremely irritative,

10  keep away from heat and flame.

11  Can you explain how these drums were found

12  at the Boarhead site?

13  A    No.  I don't think DeRewal ever did

14  business with GAF.  Where are they located?

15  Q    Well, Jonas picked up from their Glocester

16  City facility.

17  A    Okay.

18  Q    And it looks like they -- Osalid machines,

19  O-Z-A-L-I-D machines --

20  MR. NEALE:  Ozalid.

21  Q    -- Ozalid machines utilized the ammonia II

22  product that was excavated from the Boarhead Farms,

23  and they used these Ozalid machines at GAF's Johnson

24  City and Vestal, New York facilities.

25  A    No, I'm not familiar at all.

1  Q    But you never disposed --

2  A    No, it's not familiar at all.

3  Q    Okay.

4  A    I don't even recognize it --

5  Q    Okay.

6  A    -- the name, anything.

7  Q    There's really nothing else.  Is it

8  possible that Marvin Jonas may have disposed --

9  A    It's always --

10  Q    -- of this waste at Boarhead?

11  A    All these things are possible, I mean, you

12  know, but, I mean, that doesn't ring a bell with me

13  at all.

14  Q    Okay.  Getting back to AETC, which is

15  Advanced Environmental Technology Corporation, we

16  have some documentation that they provided to us that

17  says that they arranged for the disposal of waste for

18  Diamond Shamrock, Roche, I guess it is, R-O-C-H-E --

19  A    Right.

20  Q    -- and Chrome Tube Division, Channel

21  Master.  Are you familiar with any of these

22  companies?

23  A    Oh, La Roche is right there in New Jersey.

24  We could have.  I don't know what they would have

25  had.  Diamond Shamrock?  I'm trying to think what

1  they would have had.  The only people I'm familiar

2  with -- that AETC had was nitrating acid.  That was

3  from -- up there in Rochester, Diaz Chemical --

4  Q    Uh-huh.

5  A    -- and one over in New Jersey.  What's

6  their name, the other people that had the strong

7  sulfuric acid?

8  Q    Ashland?

9  A    Ashland.  Those people were originally

10  customers of AETC.

11  Q    Okay.

12  A    Diamond Shamrock?  I don't know.  The name

13  sounds familiar.  Of course, you've got Diamond

14  Shamrock.  I certainly know the name.  It doesn't

15  sound familiar that we did business with them up

16  there at all.  We may have.

17  Q    Yesterday you talked about Environmental

18  Technology and two men that either worked there or

19  owned the company --

20  A    Right.

21  Q    -- that you used to do business with and

22  that they -- they could have possibly disposed of

23  waste at Boarhead.

24  A    Right.

25  Q    Could you explain that a little bit, why

1  you think that?

2  A    Well, no, because of what you -- what was

3  found.

4  Q    Right.

5  A    And that, too, I suspect, was their

6  material.  At another time, they brought material

7  like that to Philadelphia, and we sent it back, we

8  had sent it back to them, and it created a real

9  problem because they couldn't take it, and so they

10  just want up to another company in North Jersey.  I

11  forget the name of -- how they traded it, but it was

12  a problem.  It ended up being a financial problem and

13  we had to sue them.

14  Q    Uh-huh.  Did Richie Minthorn ever tell you

15  that they disposed of waste at Boarhead Farms, AETC

16  employees?

17  A    No, he never said that specifically, no.

18  Q    No?  Do you know --

19  A    No, I suspect that because of Beryllium --

20  National Beryllium --

21  Q    Right.

22  A    -- see, and I didn't know anybody was

23  doing work for National Beryllium.  When I first

24  heard this in 1992, that they had taken out some

25  radioactive material from National Beryllium, that's