IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES, LLC
and TI GROUP AUTOMOTIVE SYSTEMS
L.L.C.,

              Plaintiffs,

        v.

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, et al.,

              Defendants.

              Civil Action No. 02-CV-3830 (LDD)

**PLAINTIFFS' BRIEF IN OPPOSITION TO ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION'S MOTIONS *IN LIMINE***

Plaintiffs Agere Systems, Inc., Cytec Industries, Inc., Ford Motor Company, SPS

Technologies, LLC and TI Group Automotive Systems L.L.C. ("Plaintiffs"), by and through

their attorneys, respectfully submit this Memorandum in Opposition to Defendant Advanced

Environmental Technology Corporation's ("AETC") six motions *in limine*.

A.     **The September 9, 1976 Letter From AETC To DeRewal Chemical Company
    Is Admissible Into Evidence To Prove What Plaintiffs Intend To Offer It To
    Prove**

The September 9, 1976 letter states that AETC intended to tell its customer that

its wastes would be disposed of at a particular location whether or not the wastes would actually

be disposed of there. Plaintiffs intend to introduce the September 9th letter at trial to prove just

that: a willingness by AETC to tell its customer that its waste would be disposed of at a

particular location irrespective of whether the hauler that AETC arranged to dispose of the waste

would or could actually dispose of the wastes at such location.

There is no reason why the September 9, 1976 letter should not be admitted into evidence for this purpose. AETC's theories about how Plaintiffs intend to use the September 9th letter are wrong. AETC argues that Plaintiffs intend to use the letter to "demonstrate that because AETC purportedly participated in improper disposal with respect to Roche's waste, it must have participated in improper disposal with respect to Ashland's and Diaz's waste." AETC Brief at Pg. 6. This is incorrect. Plaintiffs will not rely on the September 9th letter to prove that AETC disposed of Roche's or any other of its customers' wastes in any particular way or even that AETC had, in fact, misrepresented to Roche where its wastes would be disposed. It is being offered only to prove that AETC *was willing* to make a misrepresentation to its customer. The September 9th letter is not improper character evidence because it is not being offered to prove any particular action by AETC in this action. Moreover, Plaintiffs do not intend to prove that the September 9th letter is evidence of any common plan or scheme by or habit of AETC.

**B.      It Is Premature To Determine Whether Portions Of Manfred DeRewal, Sr.'s Deposition Testimony Herein Should Be Precluded At Trial**

Of course testimony may not be admitted at trial, either from a live witness or read into the record from a transcript, that does not comply with Fed. R. Evid. 602 or that is inadmissible hearsay. Whether a particular statement is hearsay, though, depends upon the purpose for which it is being offered, the nature of the statement itself, and whether, if it is hearsay, any of the hearsay exceptions apply. Fed. R. Evid. 801-807. Neither Plaintiffs nor any other party have yet offered into evidence any of the specific statements identified in AETC's Exhibits C and D, so that there is no way to know now whether the identified statements are actually hearsay and, if they are, whether they fall within any exception to the hearsay rule.

Plaintiffs thus do not think that it is appropriate for such evidence rulings to be made in this motion in limine.[1]

### C.    Jay Vandeven's Testimony Should Not Be Precluded

AETC's third motion seeks to bar all of the opinions of Jay Vandeven, one of Plaintiffs' experts. The sweeping request is surprising given two preliminary observations. First, not a word in AETC's brief discusses the first of Mr. Vandeven's two overall opinions, *e.g.*: "The response activities [undertaken by the EPA and Plaintiffs] address the environmental conditions caused by the disposal of wastes at the Boarhead Farms Superfund Site and are necessary and consistent with the National Contingency Plan." June 30, 2006 Report at 10. A copy of that report is attached to AETC's motion and marked Exhibit E. None of the expert reports produced by Defendants disputed this opinion, and nowhere in AETC's almost sixty pages of facts in its Pretrial Memorandum is there a statement that Mr. Vandeven's opinion is incorrect, or that Plaintiffs' costs are inconsistent with the NCP. There is, therefore, no basis whatsoever to preclude Mr. Vandeven from testifying at trial with respect to his first opinion and all of the bases therefor.[2] AETC's motion must therefore be denied.

Second, not a word in AETC's brief challenges in any way Mr. Vandeven's expertise. Indeed, Mr. Vandeven has precisely the "scientific, technical or other specialized knowledge" to render the specific opinions set forth in his expert reports. As Mr. Vandeven

---

[1]    Plaintiffs note that they have moved to bar the use at trial of *any* portions of the transcripts of Administrative Depositions of Mr. DeRewal and others if those witnesses are not present at trial.

[2]    The proposed Order submitted by AETC, like its brief, does not specify whether testimony concerning any particular opinions expressed in Mr. Vandeven's expert report should be barred, simply stating that testimony concerning *all* opinions should be barred.

states: "My academic training and professional experience have focused on the sources, movement, and remediation of chemicals in the environment. I have been involved in the study and remediation of hundreds of contaminated properties and sites throughout the United States, Canada, and Eastern Europe." June 30, 2006 Expert Report at 7. He has been previously qualified as an exert in Federal Court in the areas of CERCLA, the Resource, Conservation and Recovery Act, the National Contingency Plan ("NCP"), and chemical fate and transport. *Id.* Mr. Vandeven's second opinion precisely concerns chemical fate and transport, that is, the effect the release of chemicals at the Site had on the environment and the fate and transport of those chemicals through environmental media. AETC's arguments concerning Mr. Vandeven's second overall opinion must be evaluated with the recognition that the he is eminently qualified to discuss the effect of the releases of wastes at the Boarhead Farms Site on the environment there and the response activities that were, and continue to be, necessary to protect human health and the environment from those releases.

Mr. Vandeven's second opinion is: "All of the wastes disposed of at the Boarhead Farms Superfund Site contributed in some manner to the environmental conditions that led to the response activities [undertaken by EPA and by Plaintiffs]." June 30, 2005 Report at 13. Mr. Vandeven's June 30, 2006 Report and November 15, 2006 Rebuttal Report make perfectly clear that this opinion is based on the essential facts of this case: "[T]hat a wide variety of wastes were released in varying modes (bulk disposal, drum burial), at both known and unknown locations over a period of years into a complex environment." November 15, 2006 Report at 7. A copy of that report is attached to AETC's motion and marked Exhibit F. *See also* June 30, 2006 Report at 16 ("The need for remediation at the Site is driven by inorganic chemicals (especially metals) and organic chemicals (especially VOCs) in soil and groundwater.

Disposal of wastes at the Site released a wide variety of hazardous substances to the environment"); Deposition Transcript of Jay Vandeven at 349 ("Many, many things were disposed of at the site in many, many places at the site. . . . So it really reflects the fact that this is an extremely heterogeneous site and that it was, that many, many different disposal activities took place at the site."). The transcript of Mr. Vandeven's deposition is attached hereto and marked Exhibit A.

Mr. Vandeven reviewed and relied upon an extensive series of EPA technical reports detailing the extensive investigation and evaluation EPA did over a decade into the nature and extent of contamination at the Site. The primary documents, containing both detailed factual information concerning contaminants in soil, groundwater and other environmental media, are detailed on pages 2-4 of Mr. Vandeven's June 30, 2006 Report. By way of example only, the Remedial Investigation Report identified sixteen metals and thirty-seven organic compounds as contaminants of potential concern and found, by means of extensive sampling of environmental media and chemical analyses, those chemicals in multiple and wide-ranging areas of the Site in soil and groundwater. June 30, 2006 Report at 3-4, 13-14. The EPA documents also included a discussion of the reasons for EPA's initial response activities, including specific and multiple instances in which releases to the environment took place. *Id.* at 13-14, 16.

Mr. Vandeven's June 30, 2006 Report provided five pages of bases for his second opinion. These bases are precisely within his area of expertise, chemical fate and transport. Essentially, Mr. Vandeven is an expert in what happens when chemicals are released into the environment, how they interact with that environment, how they may be transported through environmental media, how they degrade or interact with other contaminants or Site materials over time, and how they may be ultimately remediated. Mr. Vandeven's review of the technical

documents prepared by or on behalf of EPA provided him with important facts concerning the essential nature of the Site, including Site geology, groundwater conditions and groundwater flow, and the well-documented identification (via soil and groundwater sampling and chemical analyses) of enumerable releases of a wide variety of contaminants over significant areas of the Site. *See e.g.* June 30, 2006 Report at 16-17.

Based upon these facts and laboratory data, and on his over twenty years of experience in fate and transport, Mr. Vandeven concluded: "The primary migration pathway for contaminants at the Site is through the shallow groundwater system that exists in and above the upper zone of the bedrock. Wastes released at the Site entered the subsurface environment and the shallow groundwater system as a result of natural processes (such as gravity-driven flow of liquids and infiltration of rainwater and snow melt) and human activities (such as burial drums and disposal in pits)." *Id.* at 16. His report applied fundamental principles of science to these known facts. He will explain in his testimony at trial, as he did in his expert reports, how various types of waste streams and other materials (such as rain) would necessarily have impacted both the native Site conditions and, later, areas of the Site where wastes had previously been released or to which they had migrated after release. June 30, 2006 Report at 16-17. Mr. Vandeven will explain the environmental mobility and persistence of various types of chemicals that this Court will conclude at trial were disposed of at the Site. *Id.* at 16-17. This testimony will be based upon fundamental principles of science and Mr. Vandeven's factual knowledge of the characteristics of the various substances that will be proven to have been disposed of at the Site and of the characteristics of the environment at the Site. *Id.* He will offer the opinion: "After release, all of the wastes with common characteristics had similar cumulative effects on the geochemistry of the environment. . . . Thus, even waste materials that may not have exhibited

the characteristics of RCRA hazardous wastes contributed to the environmental conditions that led to the response activities." *Id.* at 17.

Further, Mr. Vandeven will explain to this Court based upon his experience and expertise, how the Boarhead Farms Site became a Superfund site, why the years of disposal of various kinds of wastes created the presence and concentrations of hazardous substances in the soils, groundwater, and surface waters documented by EPA at the Site, why these contaminated media collectively presented a threat to human health and the environment, and how the various response activities of EPA and of Plaintiffs have removed, and will continue to remove, hazardous substances from those media so that, ultimately, the remedial action selected by EPA in the ROD will be protective of human health and the environment.

Mr. Vandeven's testimony will also cover the topics in his November 15, 2006 Rebuttal Report. Each of the four opinions stated in that Rebuttal Report are consistent with his overall Opinion Two in his initial report. That is, his report, and the testimony he will give as disclosed in his rebuttal report, will state in greater detail how specific categories of waste in fact did substantially contribute to the need for and cost of the response activities at the Site. For example, the fourth point in Mr. Vandeven's November 15, 2006 report is: "The various wastes disposed of at the Boarhead Farms Site interacted with other wastes and environmental media in a very complex manner to cause the environmental conditions that led to the response activities." November 15, 2006 Report at 7. As the text of his rebuttal report indicates, this opinion is based upon fundamental facts of the disposal over years in known and unknown locations of a wide variety of waste types into a "complex environment." It is also based upon accepted principles of science, including the science of chemical fate and transport.

Mr. Vandeven's testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. His testimony will enable this Court to understand the nature and extent of contamination at the Site with hazardous substances that created a threat to human health and the environment. This Court will understand why EPA undertook the various remedial activities at the Site, including selecting the components of the final remedy in the ROD. The Court will understand how those response activities have and will continue to result in the removal of contaminant masses from soils and groundwater, and how the removal of those masses have reduced, and will over time continue to reduce, the concentrations of chemicals to a level at which they no longer present a threat to human health or the environment. This Court will thus have a sound scientific basis upon which to consider what equitable factors, including any that might be related to the specific characteristics of a particular party's wastes, it should determine are appropriate in its task of allocating response costs. 42 U.S.C. § 9613(f)(1). This knowledge will additionally assist the Court in evaluating claims made by other parties, including, as permitted, expert opinion testimony on behalf of those parties, that certain wastes did or did not have a significant impact to the Site.

AETC's motion seeks to preclude Mr. Vandeven's *entire* testimony by focusing on just three of the bases or sub-opinions set forth in Mr. Vandeven's reports.[3] AETC Brief at 15. It completely ignores all of the other portions of his reports pertaining to his second opinion. Its motion is thus grossly overbroad and should be denied for that basis alone. Its argument is

---

[3]     Plaintiffs note again that AETC has not mentioned Mr. Vandeven's first overall opinion, that the response actions taken by EPA and by Plaintiffs were consistent with the NCP, necessary, and that Plaintiffs' costs thereof were reasonable, and that it has not challenged his expertise in, *inter alia*, chemical fate and transport.

premised on a misreading of Fed. R. Evid. 702, and upon its incorrect statements concerning the bases of Mr. Vandeven's opinions.

AETC correctly cites to the language in Fed. R. Evid. 702 that expert opinion testimony should be "based upon sufficient facts or data," but then in the very next sentence of its argument AETC abandons the word "facts" and says repeatedly thereafter "data or other objective evidence." AETC Brief at 17. AETC does so to support its false argument that there is no data to support Mr. Vandeven's conclusions. As set forth in detail above, Mr. Vandeven relied upon extensive facts about the Site, including the extensive and varied contamination found by EPA all over the Site, as well as upon scientific facts, that is, principles of science so fundamental that they are beyond dispute. *See, e.g.*, Transcript at 395:3-6. He relied upon these facts to form his opinions and to make observations about how various types of materials would necessarily have affected the Site if dumped there, and what the fate of those materials would have been. Although EPA plainly collected voluminous environmental analytical data at the Site, which is presented in the agency reports relied upon by Mr. Vandeven in forming his opinion. There simply does not have to be data resulting from testing performed specifically to prove or disprove Mr. Vandeven's opinions for those opinions to be admitted at trial.

Each of the three specific statements upon which AETC focuses concerns the effects that the release of acidic wastes had on the Site environment. AETC Brief at 15. Mr. Vandeven's statements concerning acids were made to support his overall opinion that *all* of the wastes disposed of at the Site contributed in some manner to the environmental conditions that led to the necessary response activities. *See, e.g.*, June 30, 2006 Report at 13-17; November 15, 2006 Report at 3, 4. Mr. Vandeven should thus be permitted to testify concerning his second

overall opinion even if the sub-opinions or statements challenged by AETC are somehow inadmissible.

AETC points to the second bullet point on pages 13 and 14 of Mr. Vandeven's June 30, 2006 report, leaving out a significant portion of that paragraph. AETC Brief at 18-19. The report actually states:

> All of the wastes disposed of at the Site contributed in some manner to the conditions that required response activities. Even release or burial of inert materials (if they occurred) would have affected soil moisture levels, soil structure and permeability, groundwater elevations and recharge rates, and other factors that can influence the fate and transport of the chemicals addressed by the response activities. The ferric chloride, copper ammonium carbonate, sulfuric acid, and other bulk liquid wastes (such as spent etching solutions, acids, and pickling wastes) released at the Site generally contained substantial quantities of metals. Because most metals are more soluble in acidic solutions, the acidity of these waste increased the mobility of metals in the subsurface environment. Even corrosive waste solutions that did not contain metals (if any such wastes were released) would have promoted the degradation of buried drums and altered the subsurface environment in ways that increased the mobility and persistence of hazardous chemicals. Such solutions may also have mobilized metals that were naturally present in the soils at the Site.

June 30, 2006 Report at 13-14.

There are many "facts" recited in this language, as well as Mr. Vandeven's reliance on both fundamental science and his expertise in chemical fate and transport. He states that releases of even inert materials "would have affected soil moisture levels, soil structure and permeability, groundwater elevation and recharge rates." It is a scientific fact that putting liquid into soil affects the moisture level of that soil. It is a scientific fact that liquids released onto

soils move by gravity down through those soils.[4] These statements are simply beyond dispute. Mr. Vandeven also makes statements about the essential nature of acids and corrosive wastes, namely, that they affect most metals. June 30, 2006 Report at 13; November 15, 2006 Report at 4-5. These are statements of scientific fact, not speculation (acids are corrosive; corrosive wastes are corrosive).[5] Transcript at 72-73 ("An acidic solution will, for instance, dissolve the outer coating of soil particles where many metals reside, and that will mobilize those metals and dissolve those metals in groundwater. ... It can be found in any basic soil chemistry or environmental chemistry document."; Transcript at 145::12-15 (extensive experience with acidic conditions mobilizing metals).

AETC does not dispute these facts, and does not say that Mr. Vandeven did not rely upon them in forming his statement that, for example, "the acidity of these wastes increased the mobility of metals in the subsurface environment." Most metals are "more soluble in acidic solutions." June 30, 2008 Report at 13. It is not speculation to say, based upon this fact, that any release of such solutions onto the soils at the Site "increased the mobility of metals in the subsurface environment." *Id.* Instead, it argues that Mr. Vandeven's opinion must be precluded because he "does not use any site specific data" to support that opinion. AETC Brief at 19. Essentially, AETC argues that Mr. Vandeven cannot testify as to the application of fundamental

---

[4]    As set forth above, and as Mr. Vandeven will testify: "Wastes released at the Site entered the subsurface environment and this shallow groundwater system as a result of natural processes (such as gravity-driven flow of liquids and infiltration of rainwater and snowmelt) and human activities (such as burial of drums and disposal in pits)." June 30, 2006 Report at 16. Mr. Vandeven explained how these fundamental processes work in more detail at his deposition. *See, e.g.*, Vandeven Transcript at 264:13-266:21.

[5]    AETC did not designate an expert with respect to its wastes or any other wastes. *No expert* disputed Mr. Vandeven's statements concerning the effect of acids and corrosive wastes on most metals.

scientific principles to generally known conditions at the Site because he has no test data from this specific site. AETC presumably means that there must be actual sampling data where some specific acidic waste was released on some specific occasion, in some specific quantity, in some specific location, where the soils consisted of some specific constituents, after which someone took a sample of that actual soil to measure the precise effect of that exact event. Such data is simply not required for an acknowledged expert in the field of chemical fate and transport to give the opinions set forth in Mr. Vandeven's report.

Indeed, Mr. Vandeven's testimony discusses repeatedly what "would" have happened in the event of releases of various types of materials in the 1970s at the Site, rather than offer an opinion as to what *actually* happened when some specific tanker load of waste was dumped there because he does not want to speculate. No one will ever know the details of any such precise event. His testimony is intended instead to assist the Court understanding how the releases of *numerous* types of waste on hundreds of occasions throughout the Site created the conditions that Plaintiffs are remedying based upon what *must* have happened, given the fundamentals of science and the undisputed facts of the presence of contaminants at the Site.

By way of further example, Mr. Vandeven supports his opinions concerning the effects of acid wastes on the soils and already-released other wastes by reference to seven bullet point observations. November 15, 2006 Report at 4-6. Those statements include the following facts upon which he relied: most of the metals identified as contaminants of potential concern by EPA are cationic metals that are generally more soluble in acid solutions than in near-neutral conditions; neutralization of acids by interaction with soils depletes the buffering capacity of soils, making the subsurface environment more susceptible to further changes in pH; acids destroy microorganisms in surface and subsurface soils, thereby reducing the extent of

biodegradation.  *Id.*; Transcript at 211:8-215:17 (detailed discussion of scientific principles);
Transcript at 499:23-500:14 (discussion of acidic effect on soil buffering capacity).  Other of
those observations rely on and agree with conclusions made by EPA in the Remedial
Investigation Report.  Again, AETC argues that Mr. Vandeven can testify to his conclusions only
if he has actual data from the Boarhead Site to support his conclusions.[6]

Finally, AETC says Mr. Vandeven has "no evidence" to support his opinion that
metal drums buried at the Site would have corroded faster if they were placed in soils that had
either been affected by earlier releases of acidic wastes or were exposed to releases of such
wastes after the drums were buried.  AETC Brief at 23.  Mr. Vandeven relied not only on
fundamental science ("Any increase in the corrosive characteristics of the material that's in
contact with the drum will increase the deterioration of that drum"), among other things, in
forming this opinion.  Transcript at 41:15-20; Transcript at 178:9-12 (discussing migration of
acidic wastes through soils).  Mr. Vandeven pointed out that the fact that some drums were intact
years later and others were fully deteriorated is "primary evidence" that corrosive wastes
impacted drums.  Transcript at 186:14-22; June 30, 2006 Report at 13-14; November 15, 2006
Report at 6.  Similarly, he pointed out that there are many facts to support his opinion that acidic
wastes released at the Site mobilized the naturally occurring metals in the diabase soils at the
Site, such that they migrated into the groundwater.  Transcript at 216:1-217:8.

In conclusion, AETC not only ignores Mr. Vandeven's entire first general opinion
but it ignores large portions of his reports and testimony concerning his second general opinion.

---

[6]     Of course, if there was actual data about the precise effect of some specific release, then
        there would be no reason for an expert opinion about the effect of that release.

There is thus absolutely no basis to *entirely* preclude Mr. Vandeven from testifying at trial. This Court can and may, as the trier of fact and as the final arbitrar of the admissibility of evidence, decide at trial how much of Mr. Vandeven's testimony should be admitted and to what weight it should be given. AETC's Motion to Preclude Mr. Vandeven's Testimony should therefore be denied.

**D.    Plaintiffs Are Entitled To Argue In Summation What Equitable Factors This Court Should Consider And How They Should Be Applied**

AETC's fourth motion is frankly difficult to understand. Plaintiffs have been for years saying that, because each party in this action has Section 113(f) contribution claims against each other party, this Court at the conclusion of trial, and based upon the record at the trial, allocate that liability among all parties this Court finds at trial are liable. There is no disagreement either that the Court should do so based upon competent evidence or by "using such equitable factors that the court determines are appropriate." 42 U.S.C. § 96.3(f)(1).

Plaintiffs' "opinions" as to what equitable factors this Court should look to and as to how the Court should apply those factors is within the proper scope of summation. Plaintiffs have no idea why AETC seems to think that Plaintiffs think that their counsel can simply offer testimony about Plaintiffs' views. AETC is apparently concerned because Plaintiffs stated in response to Defendants' Joint Contention Interrogatories (as they were required to) what they "contend" each party's share should be and the reasons therefore. The relevant portions of those responses are quoted on pages 31-32 of AETC's Brief. Each of the four paragraphs identifies a fact or facts that Plaintiffs expect to prove at trial and states what they will ask in summation for the Court to do with respect to each of those factors.

For example, the first paragraph of Plaintiffs' discovery responses addresses the equitable factor of volume of wastes disposed of at the Site, the second of the "Gore factors."

Plaintiffs expect that evidence will be presented at trial from which this Court can determine the volumes of waste of Plaintiffs, of Defendants, and of Settled Defendants that were disposed of at the Site. Plaintiffs in summation will suggest to the Court that this should be the primary equitable factor. Similarly, paragraphs two and three of Plaintiffs' responses point to facts Plaintiffs expect to prove at trial with respect to AETC, Ashland, and Carpenter's knowledge of DCC and Manfred DeRewal's history of pollution violations before or during the time period in which they permitted DeRewal to dispose of their wastes. Plaintiffs will ask that each of those parties have their otherwise volumetric allocation increased by 10% ("Gore factors" four and five). Finally, Plaintiffs will ask the Court to reduce their own share by 50% of what it would otherwise be because they have for eight years been remediating the Site as set forth in the ROD and as required by the 2000 and 2001 Consent Decrees, because they settled EPA's past costs claims, and because none of the Defendants (other than NRM) did so. Many CERCLA opinions rely on the equitable factor of "cooperation" ("Gore factor" six).

AETC's statement: "In essence, plaintiffs intend to offer the court their own conclusions regarding the application of the Gore factors, but without offering any evidence supporting those conclusions. Plaintiffs, for example, do not offer any evidence upon which to base their demand to decrease their share by 50%" makes no sense. AETC Brief at 32. Plaintiffs have not yet offered any evidence because the trial hasn't started. Plaintiffs believe that the evidence relevant to the equitable factors will be admitted at trial and that this Court will make the factual conclusions with respect to each of the four factors to which Plaintiffs point.[7] Indeed,

---

[7] Interestingly, AETC first argues that expert opinion testimony concerning a proper equitable allocation of costs is impermissible. AETC Brief at 32-33, then complains that Plaintiffs have not produced a witness to testify about Plaintiffs' "allocation theory." AETC Brief at 34.

there should be absolutely no dispute with respect to the facts underlying the final three allocation factors. For example, it is self evident that Plaintiffs alone resolved EPA's past cost claim, that Plaintiffs alone (along with NRM and Worthington) have conducted all Site remediation since 2000, and that AETC has done nothing.

Plaintiffs do not intend to offer evidence concerning what they believe to be equitable factors that this Court *should use* in doing equity. They do intend to offer testimony, documentary evidence, and expert opinion, all of which will provide the basis for this Court to make findings of fact and conclusions of law, including with respect to which equitable factors this Court deems are relevant and how this court expects to apply them. AETC's motion should therefore be denied.

**E.      Plaintiffs' May Introduce At Trial Evidence With Respect To All Of Their Costs, Including Those Costs That Were "Voluntarily" Incurred**

AETC's argument that Plaintiffs cannot provide evidence that some of their costs were voluntarily incurred on the basis that they do not have a claim under Section 107(a) of CERCLA is disingenuous. It totally misstates the decision of the United States Supreme Court in *United States v. Atlantic Research Corp.*, 127 S. Ct. 2331 (2007), ignores the plain language of Plaintiffs' Fifth Amended Complaint, and lumps all of Plaintiffs together despite the fact that AETC and the other Defendants have spent six years arguing that each Plaintiff must proceed individually in this action.

The Supreme Court in *Atlantic Research* unequivocally stated that costs incurred by a person to perform remedial activities pursuant to the requirements of a Consent Decree are recoverable under *either* Section 107(a), Section 113(f), or *both*. 127 S. Ct. at 2338, n. 6. AETC simply ignores this footnote in arguing Section 107(a) "are limited to 'costs incurred voluntarily' . . .." AETC Brief at 34-35. AETC joined in the Brief filed on behalf of many Defendants on

September 10, 2007 (Docket 251-2) in which Defendants acknowledge that the Supreme Court left this question unresolved. Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend the Fourth Amended Complaint at 10.

Plaintiffs' motion for leave to amend the Fourth Amended Complaint laid out precisely this open issue and sought leave to assert on behalf of those Plaintiffs who are parties to the 2000 Consent Decree (SPS, Ford, and Cytec) and to the 2001 Consent Decree (those three and TI) claims for *both* Section 107(a) and Section 113(f) for the costs those entities have incurred in performing work pursuant to those Consent Decrees. Memorandum in Support of Motion for Leave to Amend Fourth Amended Complaint (Docket No. 244-3) at 8. The Fifth Amended Complaint in fact asserts Section 107(a) claims for just such costs on behalf of those four entities with respect to costs incurred under those Consent Decrees. Fifth Amended Complaint at ¶¶ 62-65 and ¶¶ 71-73. Neither AETC nor any other Defendant moved to dismiss those claims after the Fifth Amended Complaint was filed, and neither AETC nor any other Defendant moved for summary judgment on this question when required to do so. Those 107(a) claims are thus in this case, and evidence at trial concerning the costs of work done pursuant to the two Consent Decrees is relevant.

Moreover, by arguing that "Plaintiffs" could not have "voluntarily" incurred such costs by reference to the two Consent Decrees, AETC ignores the fact that Agere was a party to neither Consent Decree and TI was not a party to the 2000 Consent Decree. Those plaintiffs

were thus not "compelled" to pay those costs to EPA but paid them instead pursuant to their agreements with the OU-1 and OU-2 groups.  Those claims will therefore be at issue at trial.[8]

This perhaps explains why AETC does not articulate exactly what it means when it says that Plaintiffs should not be permitted to introduce "evidence" that some of their costs were "voluntarily incurred."  AETC Brief at 37.  The two Consent Decrees say what they say, and Plaintiffs will present at trial proofs that each of them contributed certain monies to pay to the OU-1 and OU-2 Group accounts from which EPA's past costs claims were paid, work done pursuant to the two Consent Decrees was paid for, and EPA's costs of overseeing that work were paid.

AETC's motion *in limine* should therefore be denied.

### F.    Jay Vandeven's Testimony As Disclosed In His Supplemental Report Should Not Be Precluded

AETC argues as its sixth point that Mr. Vandeven's May 7, 2008 supplemental report was untimely, such that testimony with respect to that report should be barred.  AETC Brief at 38-39.  AETC simply misrepresents the facts in making this argument.  The essential fact is that Plaintiffs continue to incur response costs every day that goes by, and will continue to be incurring additional response costs through and after the trial.  This is so because they are continuing to operate and maintain the remedial action at the Site, including the on-going extraction and treatment of contaminated groundwater.  They will likely be doing so for decades.

---

[8]    AETC does not ask that any of these claims be dismissed (a request which would be improper in this motion *in limine*) but argues only that the claims are *per se* barred by *Atlantic Research.*

Plaintiffs have periodically provided to Defendants charts summarizing their continuing response costs year by year and have made available in the Document Repository the response action contractor invoices and payment proofs with respect to those invoices as well as charts summarizing each invoice and the nature of the work done pursuant to that invoice. Earlier this year, Plaintiffs provided to the Defendants just such information with respect to response costs incurred for work done through December 31, 2007. They have recently provided Fed. R. Evid. 1006 summary charts showing all of their costs through 2007.

As this Court has recognized, each of Plaintiffs' Complaints has clearly stated that they seek a recovery at trial of their past response costs and a declaratory judgment that Defendants are liable to them for all of their future response costs. Plaintiffs have stated in letters and briefs to this Court that a "past costs" cutoff date should be set so that costs incurred to that date are recoverable at trial in a dollar judgment while costs incurred after that date are subject to the declaratory judgment relief.

Plaintiffs' initial expert reports were due on or before June 30, 2006. Plaintiffs had by that time produced to the Defendants all of the costs for work done through November, 2005 pursuant to the 2000 Consent Decree and the 2001 Consent Decree through November, 2005. Accordingly, Mr. Vandeven in his initial report examined the activities undertaken by the OU-1 and OU-2 Groups through that time and the costs associated therewith. His conclusion was: "Each of the components of the remedy described in the ROD has been addressed. The remedial designs and remedial actions conducted by the PRP groups were approved by the EPA. The costs incurred by the PRP groups are related to activities required by the NCP. In my opinion, the PRP groups' costs (approximately $3.24 million for OU-1 and $2.19 million for OU-2 through November 2005) and the anticipated costs associated with ongoing performance

of the RD/RA under the terms of the consent decrees are reasonable given the requirements of the ROD and the characteristics of the Site." June 30, 2006 Report at 12.

Plaintiffs learned of the trial date herein shortly after Plaintiffs had produced to Defendants the documentation of their costs through 2007. The trial date made it possible to set a cutoff date for the Group's "past costs" claim, with costs incurred thereafter subject to the Group's declaratory claim. Plaintiffs accordingly provided to Mr. Vandeven all of the cost documentation for work done from December 1, 2005 through December 31, 2007 and asked him to review that documentation solely with respect to his first opinion. Mr. Vandeven did so, producing a supplemental expert opinion dated May 7, 2008, a copy of which is attached as Exhibit M to AETC's motion. Plaintiffs provided the report that day to Defendants by e-mail stating that the charts and documents referenced in the report were those provided to them by Plaintiffs' April 1, 2008 letter. A copy of the May 7, 2008 e-mail is attached hereto and marked Exhibit B. Mr. Vandeven reviewed the additional documents provided as listed in Attachment A to that report and provided the supplemental opinion that: "The costs incurred by the PRPs from November 2005 through the end of 2007 are associated with ongoing performance, remedial design and remedial activities required by the National Contingency Plan and conducted under the terms of the Consent Decree. In my opinion, these costs are reasonable given the requirements of the ROD and the characteristics of the Site." That opinion and the supporting comments are on a single page of Mr. Vandeven's two page report. May 7, 2008 Report at 2. The bases for his opinion are simple, and are set forth on that page. *Id.* In other words, Mr. Vandeven simply confirmed that the work done (and costs thereof) continued to be required by the obligations under the Consent Decrees and was otherwise necessary and reasonable.

AETC's statement: "Thus, years have passed and there is no basis for plaintiffs' delay. The information contained in the report has long been known to them . . .", AETC Brief at 39, is incorrect. The reason for the supplementation was only to bring Mr. Vandeven's June 30, 2006 opinion up to date with respect to the costs incurred since his initial report, including with respect to costs only recently incurred, documented, and provided to Defendants. Plaintiffs moved expeditiously to do so upon learning of the trial date.[9]

There is absolutely nothing revolutionary in Mr. Vandeven's new report. No Defendant could possibly have been surprised, especially if they had spent any time at all reviewing the updated costs information provided since his initial report and had observed for themselves that Plaintiffs' ongoing response actions were, indeed, consistent with the requirements of the ROD and otherwise necessary. AETC's claim of unfair prejudice is empty. Plaintiffs will make Mr. Vandeven available for what could be at most a sixty minute deposition so that he can tell them orally exactly what it says in his two page report. Neither AETC nor any other Defendant retained an expert to challenge Mr. Vandeven's initial opinion concerning the Group's costs through November 2006. There is surely no expert they now have or even would consider to review only his supplemental opinion with respect to recent costs. Such a deposition, if AETC really wants one, would eliminate any prejudice at all to them from the testimony of Mr. Vandeven at trial with respect to these recent costs.

To bar this testimony would be unfair to Plaintiffs. Plaintiffs are entitled to prove their past costs fairly and fully at trial. Setting any date other than November of 2005 as the

---

[9]    Plaintiffs could, theoretically, have sought leave to produce this supplemental expert report. However, the motion practice associated therewith would have further delayed production of that report. Plaintiffs believe that it was fairer to Defendants to produce the report as soon as possible.

cutoff date for past costs would mean that Plaintiffs would go to trial without the benefit of an expert's opinion with respect to costs since that date. Alternatively, November 2005 could be the cutoff date for past costs at trial. Plaintiffs would then have the benefit of Mr. Vandeven's initial opinion testimony with respect to all of its "past costs." All costs since then would be subject to the declaratory judgment portion of their claim. It simply makes more sense for the cutoff date for past costs at this trial to be December 31, 2007.

Accordingly, this Court should deny AETC's motion *in limine* with respect to Mr. Vandeven's supplemental report and rule instead that Mr. Vandeven is permitted to testify that the costs incurred by Plaintiffs since December 2005 through the end of 2007 are necessary, reasonable and consistent with the NCP.

## CONCLUSION

For all the foregoing reasons, and in the interest of justice, Plaintiffs respectfully request that AETC's motions *in limine* be denied.

Ballard Spahr Andrews & Ingersoll, LLP
A Pennsylvania Limited Liability Partnership

By: _____
Glenn A. Harris, Esquire
Plaza 1000, Suite 500, Main Street
Voorhees, New Jersey 08043
Phone: (856) 761-3440
E-mail: harrisg@ballardspahr.com

Dated: June 6, 2008