# Exhibit A

## Part 1 of 5

# COPY OF TRANSCRIPT

## VOLUME I
### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES, INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES LLC
and TI GROUP AUTOMOTIVE SYSTEMS
LLC
    Plaintiffs

V                CIVIL ACTION
                NO.02-CV-3830 (LDD)

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, ET AL.
    Defendants


        Oral deposition of JAY
VANDEVEN, taken at the law offices of
Ballard Spahr, Andrews & Ingersoll,
LLP, 1735 Market Street, 42nd Floor,
Philadelphia, Pennsylvania, on
Tuesday, February 13, 2007, at
9:59 a.m. before Jennifer Bermudez, a
Registered Professional Reporter, and
Notary Public, pursuant to notice.



## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    APPEARANCES:

2    BALLARD SPAHR ANDREWS & INGERSOLL,
     LLP
3        GLENN A. HARRIS, ESQUIRE
         HARRISG@BALLARDSPAHR.COM
4        Plaza 1000 - Suite 500
         Main Street
5        Voorhees, New Jersey 08043-4636
         856-761-3440
6        Attorney for Plaintiffs

7

8    WOLFF & SAMSON, P.C.
         THOMAS W. SABINO, ESQUIRE
         tsabino@wolffsamson.com
9        The Offices at Crystal Lake
         One Boland Drive
10       West Orange, New Jersey 07052
         973-530-2044
11       Attorney For AETC

12

13   PHELAN, PETTIT & BIEDRZYCKI
         JEFFREY L. PETTIT, ESQUIRE
         Jpettit@pp-b.com
14       121 S. Broad Street
         Suite 1600
15       Philadelphia, Pennsylvania 19107
         215-546-0500
16       Attorneys for Ashland, Inc.

17

18   EDWARDS ANGELL PALMER & DODGE, LLP
         LYNN WRIGHT, ESQUIRE
         lwright@eapdlaw.com
19       750 Lexington Avenue
         New York, New York 10022
20       212-308-4411
         Attorney for Carpenter Technology
21       Corp.

22

23

24

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

```
 1   APPEARANCES CONTINUED:

 2   CARELLA, BYRNE, BAIN, GILFILLAN,
     CECCHI, STEWART & OLSTEIN
 3       MELISSA E. FLAX, ESQUIRE
         mflax@carellabyrne.com
 4       5 Becker Farm Road
         Roseland, New Jersey 07068-1739
 5       973-994-1700
         Attorney for Handy & Harman Tube
 6       Company

 7

 8   HINMAN, HOWARD & KATTELL, LLP
         RALPH K. KESSLER, ESQUIRE
         rkessler@hhk.com
 9       106 Corporate Park Drive
         Suite 317
10       White Plains, New York 10604
         914-694-4102
11       Attorney for TI Automotive

12

13   DUANE, MORRIS, LLP
         SETH v.d.H. COOLEY, ESQUIRE
         scooley@duanemorris.com
14       30 S. 17th Street
         Philadelphia, Pennsylvania 19103
15       215-979-1000
         Attorney for Flexible Circuits
16

17   LAW OFFICE OF EDWARD FACKENTHAL
         EDWARD FACKENTHAL, ESQUIRE
18       edwardfackenthal@cs.com
         One Montgomery Plaza
19       Suite 209
         Norristown, Pennsylvania 19401
20       610-279-3370
         Attorney for NRM Investment Co.

21

22                EXAMINATION INDEX

23   JAY VANDEVEN
         BY MS. FLAX                        6
24       BY MR. PETTIT                    129
```

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

4

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

```
 1                    E X H I B I T   I N D E X

 2                                              M A R K E D
      VANDEVEN
 3
      1      EXPERT REPORT, JUNE 30,              7
 4           2006

 5    2      E-MAIL FROM JAY VANDEVEN            16
             TO MARK HAWLEY, MAY 18
 6           2006

 7    3      E-MAIL FROM MARK HAWLEY            19
             TO JAY VANDEVEN, MAY 18
 8           2006

 9    4      E-MAIL FROM MARK HAWLEY            21
             TO JAY VANDEVEN WITH
10           ATTACHED DRAFT EXPERT
             REPORT, JUNE 26, 2006
11
      5      EXPERT REBUTTAL OPINIONS          58
12           OF JAY VANDEVEN, NOVEMBER
             15, 2006
13
      6      E-MAIL FROM MARK HAWLEY           83
14           TO GLENN A. HARRIS
             NOVEMBER 15, 2006, WITH
15           ATTACHED DRAFT EXPERT
             REBUTTAL OPINIONS OF JAY
16           VANDEVEN

17    7      E-MAIL FROM MARK HAWLEY           83
             TO GLENN A. HARRIS
18           NOVEMBER 15, 2006, WITH
             ATTACHED EXPERT REBUTTAL
19           OPINIONS OF JAY VANDEVEN

20    8      E-MAIL FROM MARK HAWLEY          119
             TO JAY VANDEVEN, JUNE 26
21           2006 WITH ATTACHED DRAFT
             EXPERT REPORT OF JAY
22           VANDEVEN

23

24
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX 215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

```
 1    EXHIBIT INDEXX CONTINUED:

 2                                           MARKED

 3    9    E-MAIL FROM MARK HAWLEY              119
           TO JAY VANDEVEN, JUNE 27
 4         2006 WITH ATTACHED DRAFT
           EXPERT REPORT OF JAY
 5         VANDEVEN

 6    10   E-MAIL FROM MARK HAWLEY             119
           TO JAY VANDEVEN, JUNE 28
 7         2006 WITH ATTACHED DRAFT
           EXPERT REPORT OF JAY
 8         VANDEVEN

 9    11   E-MAIL FROM JAY VANDEVEN            141
           TO MARK HAWLEY, OCTOBER
10         13, 2006

11    12   E-MAIL FROM JENNIFER               141
           SCHULTE TO MARK HAWLEY
12         JUNE 26, 2006

13

14

15

16

17

18

19

20

21

22

23

24
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              JAY VANDEVEN, having been

2    duly sworn, was examined and

3    testified as follows:

4                   EXAMINATION

5    BY MS. FLAX:

6         Q.    Good morning,

7    Mr. Vandeven.  My name is Melissa

8    Flax, and I represent the defendant

9    Handy & Harman Tube Company in this

10   matter and you are here for your

11   deposition today.

12            I understand you have been

13   having some health problems, so if

14   you need to take a break at any time,

15   please let us know, just not while a

16   question is pending.

17            Are you taking any

18   medication today that would in any

19   way inhibit your ability to

20   understand my questions and to

21   respond truthfully?

22        A.    No, I'm not.

23        Q.    Have you previously been

24   deposed?

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      A.    In this matter or ever?

2      Q.    Have you ever been deposed

3  in any matter whatsoever?

4      A.    Yes.

5          (Vandeven Exhibit 1 was

6  marked for identification.)

7  BY MS. FLAX:

8      Q.    Mr. Vandeven, you have been

9  handed Vandeven 1.  Can you tell me

10 what that is?

11     A.    This is my June 30th, 2006

12 expert report in this matter.

13     Q.    If you would turn to Page

14 A4 of Vandeven 1.

15     A.    Page?

16     Q.    A4.

17     A.    I'm not sure what you mean

18 by A.  Oh, I'm sorry.  Okay.

19     Q.    You have a section entitled

20 Expert Testimony of Jay Vandeven.  Is

21 that correct?

22     A.    Yes.

23     Q.    You did not indicate

24 whether you gave deposition testimony

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    and/or trial testimony in any of the

2    matters that are listed under that

3    section. Can you tell me whether or

4    not you were deposed in any or all

5    and whether you gave any trial

6    testimony?

7         A.    Sure.  I will just run down

8    them from top to bottom?

9         Q.    Sure.

10        A.    In the Sun Oil matter, the

11   first entry, I gave deposition

12   testimony.

13        Q.    And for whom?

14        A.    On behalf of Sun Oil.  The

15   second entry I represented Beazer

16   East and I gave both deposition and

17   trial testimony in that matter.

18              The next entry, the third

19   entry I represented 1325 G Street

20   Associates and provided deposition

21   testimony.  For Fruehauf Production

22   Company, the fourth entry, that was

23   deposition testimony.

24              For Southern Natural Gas

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Company I represented Southern

2    Natural Gas and I gave both

3    deposition and trial testimony in

4    that matter.   For   Merck v. Amsted I

5    gave deposition testimony and

6    testified in an arbitration.

7              And for GE versus AIG, I

8    represented GE and gave deposition

9    testimony and testified in an

10   arbitration.

11        Q.    Is the question mark in the

12   parenthetical a typo next to your

13   entry for GE Capital?

14        A.    Yes.   I didn't even see

15   that.   Yes.

16        Q.    So you are familiar with

17   how a deposition works.   Correct?

18        A.    Yes.

19        Q.    I'm just going to go over a

20   few background questions just to make

21   sure that you are fresh with these

22   instructions.

23        A.    Okay.

24        Q.    You have been sworn in and

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX 215.751.0581
www.JDReporting.com

10

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1  you are obligated to give truthful

2  answers as though you were testifying

3  in court.  The court reporter sitting

4  to my left and your right can only

5  take down one individual at a time.

6          So while you may anticipate

7  what my question is, I would ask that

8  you wait until I complete my

9  question, and I will hopefully wait

10  until you complete your answer before

11  asking the next question.

12          Please vocalize all your

13  answers.  The court reporter can't

14  take down nods, shrugs, uh-huh,

15  huh-uh.  It just doesn't read well in

16  the transcript.

17          Your attorney may pose

18  certain objections.  In the absence

19  of a direction not to answer, you are

20  to answer the question.

21          If you don't understand a

22  question, tell me and I will rephrase

23  it.  If you answer my question, I

24  will presume that you understood the

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    question as asked.

2                There are several other

3    attorneys sitting around this table.

4    Some may or may not ask you questions

5    when I conclude my questioning.

6                And as I said before, you

7    control the deposition, so if you

8    feel that you need a break to stretch

9    or use the restroom, for whatever the

10   reason may be, please indicate and we

11   will take a break to accommodate you.

12               In connection with your

13   deposition testimony, what did you do

14   to prepare?

15        A.    I went back over my expert

16   report that you have provided in

17   Exhibit 1, also a rebuttal report

18   that I prepared.

19               I read back over some of

20   the underlying documents.  I believe

21   I reviewed very briefly some of the

22   other expert reports in this matter.

23               I reviewed very briefly

24   some of the other deposition

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    transcripts of the other experts in

2    the matter that were provided after I

3    gave my or submitted my expert

4    report.  And I met briefly with

5    counsel.

6        Q.    Mr. Harris?

7        A.    Yes.

8        Q.    You said you reviewed some

9    of the deposition transcripts of the

10   experts in this case.  Can you tell

11   me which expert or experts you

12   reviewed?

13       A.    I briefly reviewed the

14   transcript, I believe, of Mr. Brown

15   and Mr. Pease.  I think I also

16   reviewed the transcripts of the

17   experts representing Ashland in this

18   matter.

19            MR. COOLEY:  I'm sorry,

20   representing who?

21            THE WITNESS:  Ashland.

22   BY MS. FLAX:

23       Q.    Did you review both days of

24   Dr. Brown's deposition?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
            1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          A.     I believe so.

2          Q.     About how long did you meet

3     with Mr. Harris?

4          A.     For about maybe two and a

5     half hours.

6          Q.     How many times in your

7     professional career have you worked

8     with Ballard, Spahr?

9          A.     This is the first time I

10    have worked with Ballard, Spahr.

11         Q.     How many times in your

12    professional career have you worked

13    with Glenn Harris?

14         A.     This is the first time.

15         Q.     Have you ever worked with

16    Cytec Industries or any of its

17    affiliates before this litigation?

18         A.     I don't believe so, no.

19         Q.     Have you ever worked with

20    SPS Technologies or any of its

21    affiliates prior to this litigation?

22         A.     Yes.

23         Q.     And in what capacity did

24    you work with SPS Technologies?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

14

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          A.      I worked for them on two

2   matters, I believe.  One was over ten

3   years ago.  I don't remember the

4   exact nature of that matter.

5              It was a cost allocation

6   matter, I believe, on a number of

7   properties that they owned, and they

8   were -- the issue had to do with some

9   allocation-related issue with a

10  component of SPS Arnold Engineering.

11             I don't remember the exact

12  nature of the matter.

13             And then I also worked with

14  SPS on an allocation matter at their

15  Ogallala facility.

16        Q.      I'm sorry?

17        A.      Ogallala.  Ogallala,

18  Nebraska.  It's two Ls.

19  O-G-A-L-L-A-L-A, I believe.  And I

20  worked with SPS on an allocation-

21  related groundwater issue at that

22  site.

23        Q.      When you say you worked

24  with SPS on these two previous

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    matters, were you acting as a

2    consultant or were you acting as an

3    expert?

4        A.    On the second matter I was

5    acting as an expert.   I represented

6    them in a mediation.

7        Q.    Was it a mediation that

8    took place while a lawsuit was

9    pending, or was it a mediation that

10   preceded the institution of any

11   lawsuit?

12       A.    I don't recall.

13       Q.    In connection with the

14   first matter that you mentioned, were

15   you serving as an expert or as a

16   consultant for SPS?

17       A.    I believe I was working as

18   a consultant in that matter.

19       Q.    And do you know if that was

20   a litigated matter?

21       A.    I don't remember, no.

22       Q.    Have you ever worked with

23   Agere Systems or any of its

24   affiliates before this litigation?

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1         A.     No.

2    Q.      Have you ever worked with

3    Western Electric or any of its

4    affiliates before this litigation?

5              (Discussion off the

6    record.)

7    BY MS. FLAX:

8         Q.     I believe the last question

9    that I asked you is have you ever

10   worked with Western Electric or any

11   of its affiliates prior to this

12   litigation?

13        A.     No, I have not.

14        Q.     Have you ever worked with

15   Lucent or any of its affiliates prior

16   to this litigation?

17        A.     No.

18        Q.     Have you ever worked with

19   Ford Motor Company or any of its

20   affiliates prior to this litigation?

21        A.     No, I have not.

22             (Vandeven Exhibit 2 was

23   marked for identification.)

24   BY MS. FLAX:

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        Q.    Mr. Vandeven, you have been
2    handed a document that's been marked
3    Vandeven-2, which was produced to me
4    by plaintiff's counsel as part of
5    your work file.  Do you recognize
6    this document?
7        A.    I don't -- I can't say that
8    I recognize this specific e-mail.  I
9    recognize the format of this
10   document.
11       Q.    Well, can you review the
12   contents of this e-mail?
13       A.    Sure.  I'm going to get my
14   glasses.
15       Q.    Sure.
16             Have you had an opportunity
17   to review that e-mail?
18       A.    Yes.
19       Q.    First let me ask you, who
20   is Mark Hawley?
21       A.    Mark Hawley is a
22   hydrogeologist in my office that
23   works with me.
24       Q.    I will come back to

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Mr. Hawley momentarily.  In this

2    e-mail, the last line -- well, the

3    last portion of this e-mail says

4    "Second, can you give me a brief

5    summary of what was wrong with the

6    probabilistic analysis they did in

7    2000."

8              What is a probabilistic

9    analysis?

10        A.    In this case or in general?

11        Q.    Well, this e-mail is from

12    you to Mr. Hawley, so what your

13    understanding of the phrase

14    probabilistic analysis was as you

15    wrote those words in this e-mail?

16        A.    I don't recall what I was

17    referring to with respect to this

18    case and a probabilistic analysis.

19        Q.    Why don't you tell me what

20    your general understanding is

21    initially of the phrase probabilistic

22    analysis?

23        A.    A probabilistic analysis is

24    an analysis of the occurrence of an

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    activity associating a set of

2    probabilities with the likelihood of

3    that occurrence happening.

4              So it's the opposite of a

5    deterministic analysis.  It's not a

6    single number, it's a range or a set

7    of numbers that have a different

8    probability associated with them.

9              (Vandeven Exhibit 3 was

10   marked for identification.)

11   BY MS. FLAX:

12      Q.    Mr. Vandeven, if you would

13   take a moment to read what's been

14   marked as Vandeven-3, and let me know

15   when you have completed that.

16      A.    Okay.

17      Q.    This is an e-mail from Mark

18   Hawley replying to your e-mail which

19   we have marked as Vandeven-2.

20   Correct?

21      A.    Yes.

22      Q.    And in Mr. Hawley's

23   response to your e-mail, which we

24   have marked as Vandeven-2, he says,

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

20

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    "I will leave a brief explanation of

2    my concerns about the prob analysis

3    for you as a voice message.

4              "We can talk about it more

5    tomorrow or call me back tonight if

6    you want to."

7              Do you see that?

8    A.    Yes.

9    Q.    Does this refresh your

10   recollection as to what the

11   probabilistic analysis was that you

12   wrote in your e-mail which has been

13   marked Vandeven-2?

14   A.    No, it doesn't.

15   Q.    Do you recall a voice mail

16   message from Mr. Hawley relating to

17   his concerns about the probabilistic

18   analysis?

19   A.    No, I don't.

20   Q.    Do you recall any

21   conversations with Mr. Hawley either

22   telephonically or in person where you

23   discussed problems or concerns with

24   the probabilistic analysis?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103              FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        A.    No, I don't.

2              (Vandeven Exhibit 4 was

3    marked for identification.)

4    BY MS. FLAX:

5        Q.    Mr. Vandeven, you have been

6    handed a document that we have marked

7    as Vandeven-4, and I just have a few

8    questions relating to this document.

9              If you would turn to Page 2

10   of the attachment.  First of all, if

11   you will go to the first page of the

12   attachment, on the lower left-hand

13   corner there is a date that says

14   12/28/06.  What is that date?

15       A.    I couldn't say for sure.

16       Q.    Well, do you have any

17   information as to what this date

18   means?

19       A.    No, I don't.

20       Q.    Turning back to Page 2 of

21   Vandeven-4, in paragraph number two

22   there appears to be a little more

23   than three lines that are blacked

24   out.  Do you see that?

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX 215.751.0581

22

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      A.     Yes.

2      Q.     What is that?  What is

3  being blacked out?

4      A.     I don't know.

5      Q.     Why is that blacked out?

6      A.     I don't know.

7      Q.     Did you compile your work

8  file for plaintiff's counsel in

9  connection with responding to the

10  deposition notice?

11      A.     Yes.

12      Q.     Do you recall intentionally

13  blacking out certain portions of

14  drafts that were contained in your

15  file?

16      A.     No.

17      Q.     Is it your practice that

18  drafts would have blacked-out

19  portions?

20      A.     No.

21      Q.     Do you have any explanation

22  as to why these three plus lines are

23  blacked out?

24      A.     No, I don't.

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        Q.    All right.  If you would

2    turn to Page 5 of Vandeven-2, and if

3    I asked you the same questions that I

4    just asked you, would your responses

5    be the same?

6              MR. COOLEY:  Excuse me,

7    Vandeven-4?

8              MS. FLAX:  Vandeven-4.

9    Sorry.

10             MR. COOLEY:  What is the

11   date of Vandeven-4?

12             MS. FLAX:  The e-mail is

13   dated June 26, 2006.

14             MR. FACKENTHAL:  Will you

15   describe what it is?

16             MS. FLAX:  I'm sorry.

17   Vandeven-4 is an e-mail dated June

18   26, 2006 from Mark Hawley to Jay

19   Vandeven attaching a draft of

20   Mr. Vandeven's report in this matter.

21             MR. COOLEY:  And I'm sorry,

22   the date on the cover sheet of that

23   draft is?

24             MR. FACKENTHAL:  Did she

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    say June 26th?

2                 MS. FLAX:   The draft says

3    June 24th, 2006.

4                 MR. COOLEY:   Thank you.

5    BY MS. FLAX:

6         Q.     Going back to the

7    questions, I asked you to turn to

8    Page 5 of Vandeven-4, and if I asked

9    you the same questions that I asked

10   you about Page 2, would your response

11   be the same, that you don't know what

12   is being blacked out?

13        A.     That's correct, yes.

14        Q.     And if I asked you to turn

15   to Page 9 and again asked you the

16   same questions, would your response

17   be the same?

18        A.     Yes.

19        Q.     And lastly, on Vandeven-4,

20   if you turn to Page 10, and I ask you

21   the same questions regarding the

22   blacked-out portions of this draft

23   report, would your response be the

24   same?

25

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      A.    Yes.

2      Q.    Who would know what was

3   contained in these blacked-out

4   portions of your report?

5      A.    I don't know.

6      Q.    Well, Mr. Vandeven, they

7   don't just appear out of nowhere.

8   Someone had to intentionally make

9   these blackouts.

10          So who in your office do

11  you believe would have information or

12  knowledge as to either A, why this

13  was done, or B, what was contained?

14      A.    I doubt that anybody in

15  my -- this is not something that we

16  ever do, black out portions of text

17  like this, so I don't know who would

18  have information about this.  I don't

19  know who -- what portions were

20  blacked out, why, or who did it.

21      Q.    When you were reviewing and

22  compiling your work file for

23  Mr. Harris, did you see on any of

24  your drafts blacked-out portions?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          A.    No.

2               MR. HARRIS:  Can we go off

3      the record for a second?

4               MS. FLAX:  Sure.

5               (Discussion off the

6      record.)

7      BY MS. FLAX:

8          Q.    In connection with your

9      preparation of Vandeven-1, did you

10     have any telephone conversations with

11     either Mr. Harris, any other attorney

12     at Ballard, Spahr and/or any

13     representative of the plaintiffs?

14         A.    Yes.

15         Q.    And do you recall how many

16     telephone conversations you had in

17     connection with your preparation of

18     Vandeven-1?

19         A.    With Glenn Harris or with

20     anybody in that group that you --

21         Q.    Well, let's start with

22     Mr. Harris.

23         A.    I would say with Mr. Harris

24     I probably had on the order of maybe

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    four or five conversations.

2        Q.    And what was the content of

3    those conversations?

4        A.    Generally related to what

5    the objectives were and what

6    schedule, and then some conversations

7    about the opinions that I was

8    reaching.

9        Q.    What were the objectives?

10       A.    Well, the objectives that I

11   was given was to develop two basic

12   opinions on this matter.

13       Q.    And those are the two basic

14   opinions that are contained in

15   Vandeven-1?

16       A.    Correct.

17       Q.    What were your

18   conversations about regarding your

19   opinions themselves?

20       A.    I'm sorry, can you repeat

21   that?

22       Q.    You indicated that in your

23   four or five conversations with

24   Mr. Harris you discussed your

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

28

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1   objectives, your schedule, or the

2   schedule, I should say, and you had

3   some conversations regarding your

4   opinions.

5           So my question is, what was

6   the substance of those conversations

7   regarding your opinions?

8       A.    It had to do with after we

9   reviewed -- after I reviewed the

10  documents what opinions I was

11  reaching, the basis of those

12  opinions, how I saw my report being

13  developed.

14      Q.    During the course of these

15  four or five telephone conversations,

16  did you take any notes of what was

17  being said?

18      A.    No.

19      Q.    During the course of these

20  four or five telephone conversations,

21  did any of them relate to comments on

22  your June 30th report that's been

23  marked as Vandeven-1?

24      A.    I don't remember if they

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    were comments specifically on this

2    report, no.

3        Q.    You don't recall whether or

4    not Mr. Harris or any other attorney

5    at Ballard, Spahr offered comments to

6    what was ultimately your final report

7    dated June 30th, 2006. Is that

8    correct?

9        A.    I recall them offering --

10   Mr. Harris offering. I didn't talk

11   to any other attorney at Ballard,

12   Spahr. I recall Mr. Harris offering

13   some minor comments on a draft

14   report, but nothing more than that.

15       Q.    And when you say minor

16   comments, tell me what you mean by

17   minor comments.

18       A.    Editorial format-related

19   comments.

20       Q.    Now, when I originally

21   started asking you this line of

22   questioning I asked you whether you

23   had spoken to Mr. Harris, any other

24   attorney at Ballard, Spahr or any

30

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    representative or representatives of

2    plaintiffs and you asked me which

3    ones do I want first.

4                So now I'm going to ask you

5    about any conversations you had with

6    any of the plaintiffs'

7    representatives in connection with

8    your June 30th, 2006 report.

9        A.    Okay.   Is there a question

10    there?

11        Q.    Did you speak with any

12    representative from any one or more

13    of the plaintiffs in connection with

14    the preparation of your June 30th,

15    2006 report?

16        A.    On, I can remember, two

17    telephone conversations that I had

18    with Mr. Harris where at least one

19    other individual was on the phone.

20        Q.    Do you know who that

21    individual was?

22        A.    The person that I remember

23    is Tom Mesevage.

24        Q.    Do you recall whether other

1    than Tom Mesevage, any other

2    plaintiffs' representative

3    participated in these discussions?

4        A.    Dennis.    And I don't recall

5    Dennis's last name, but it would be

6    Dennis at SPS.

7        Q.    Would it be Dennis Shea?

8        A.    Dennis Shea.

9        Q.    Did either Mr. Mesevage or

10    Mr. Shea offer comments to what was

11    ultimately your June 30, 2006 report?

12        A.    I don't believe that they

13    did, no.

14        Q.    Do you recall the contents

15    of any conversations that you had

16    with them on those one or two

17    conversations?

18        A.    I don't recall.    All I

19    recall is that they were on the

20    phone.

21        Q.    If you would turn to

22    Vandeven-1, please.    You indicated

23    that your assignment was limited to

24    what you call two basic opinions that

32

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1   are contained on Page 1 of your

2   report.  Is that correct?

3       A.    That's correct, yes.

4       Q.    And those opinions are

5   found in the Paragraphs 1 and 2 that

6   are in nonitalics format.  Is that

7   correct?

8       A.    The opinions are in the

9   italics on Page 1.

10      Q.    Okay.  The nonitalics

11  Paragraphs 1 and 2 are the

12  objectives?

13      A.    Yes.  Those were the

14  general topics I was asked to look

15  at.

16      Q.    If you would turn to Page

17  12 of Vandeven-1.  In the second

18  bullet on Vandeven-1, the last

19  sentence you offer your opinion

20  regarding the PRP group's cost.

21          And you further state, "The

22  anticipated costs associated with

23  ongoing performance of the RD/RA

24  under the terms of the consent

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    decrees are reasonable given the

2    requirements of the ROD and the

3    characteristics of the site."

4              Do you see that?

5        A.    Yes.

6        Q.    Did I read that accurately?

7        A.    Yes.

8        Q.    What's the basis for your

9    offering an opinion as to future

10   costs?

11       A.    Well, the opinion that I'm

12   offering there is whether or not

13   those future costs and the activities

14   associated with those are reasonable

15   given the requirements of the ROD.

16       Q.    Well, do you know what the

17   future costs are?

18       A.    Not specifically, no.  But

19   the activities that will be -- will

20   necessitate the incurrence of those

21   costs are reasonable and will be done

22   consistent with the ROD.

23       Q.    But if activities are

24   reasonable, does that necessarily

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

34

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    follow that the costs associated with

2    those activities are reasonable?

3        A.    I wouldn't say necessarily,

4    no.

5        Q.    So isn't that portion of

6    your opinion really speculative

7    because you don't know what the

8    costs -- what the future costs

9    actually are?

10       A.    But this is -- you asked

11   your question in kind of a general

12   hypothetical.

13           This is the situation where

14   the costs or the activities are going

15   to be incurred at a site where EPA is

16   determining what needs to be done,

17   what activities need to be done.

18           And therefore those

19   response costs will be incurred for

20   activities that are necessary and

21   required at the site.

22       Q.    I wasn't asking you in a

23   hypothetical.  I was asking you

24   because you offer an opinion as to

35

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    future costs.

2              I understand that EPA is

3    going to be involved.  I understand

4    that there were certain activities

5    that must be undertaken at the site

6    in order to fulfill the requirements

7    of the ROD.

8              But that does not mean that

9    the costs associated with those

10   activities are necessarily

11   reasonable.  Is that correct?

12        A.    I would say that ultimately

13   you would have to look at the

14   individual costs, but in a case

15   like -- in a situation like this

16   where the activities are required by

17   EPA, that the activities are

18   necessary and therefore the costs

19   incurred for those will be

20   reasonable.

21        Q.    How do you know that those

22   costs will be reasonable?

23        A.    Because it's going to be

24   conducted in accordance with and

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    under the direction of EPA.

2         Q.    How does the fact that the

3    EPA is overseeing the cleanup that is

4    being performed by some of the

5    plaintiffs under consent decrees

6    necessarily mean that the costs that

7    may be incurred in the future in

8    connection with future necessary

9    activities will be reasonable?

10        A.    That's just the way that

11   I -- that's the way that I look at

12   it.  If the activity is required by

13   the EPA, and it's done in accordance

14   with EPA regulations, then the costs

15   that are incurred for that activity

16   are reasonable response costs.

17        Q.    But EPA doesn't pay these

18   costs.  Correct?

19        A.    In this situation, no.

20        Q.    I'm in this situation.

21        A.    PRPs are doing this work.

22        Q.    So EPA is not paying for

23   the costs, the PRPs have their own

24   consultant, engineer who are

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    overseeing the project for the PRPs

2    and they hire somebody who charges

3    exorbitant prices.  The EPA is not

4    going to see those bills.  Correct?

5        A.    I can't say that

6    categorically, no, that the EPA -- I

7    mean, if you have an EPA order, if

8    you are doing work like this in

9    conjunction with the EPA, the EPA has

10   access to your consultant, they have

11   to approve your consultant very

12   often, so it's not done in a vacuum.

13            The EPA certainly has

14   knowledge of the consultant that you

15   are hiring, the consultant and

16   contractors that are doing the work

17   and how they are doing the work.

18        Q.    But that doesn't translate

19   into the EPA having control over what

20   a particular contractor hired by the

21   PRPs charges the PRPs for actually

22   performing the activities that are

23   required under the ROD?

24        A.    What they charge them as an

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

38

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    hourly rate?

2         Q.    Their bills, their monthly

3    bills for performing the activities

4    that are required under the ROD.

5         A.    No.  I would say that EPA

6    doesn't have control over what their

7    monthly bills are, no.

8         Q.    Okay.  So with that said,

9    the PRPs are performing what is

10   required under the ROD and they have

11   a consultant who was approved by the

12   EPA but is not being paid by the EPA

13   is being paid by the PRPs and they

14   are performing necessary activities

15   in order to comply with the

16   objectives of the ROD, does it

17   necessarily follow that the costs are

18   reasonable?

19        A.    I would say in that

20   situation, yes, the costs are

21   reasonable.

22        Q.    And what's the basis for

23   your saying that?

24        A.    The basis for me saying

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    that would be, again, that the EPA is

2    involved in both the work that is

3    required and overseeing the work that

4    is done, in having a stake in seeing

5    that the work is done correctly.

6            And knowing that if the

7    activity is specified and required by

8    the EPA that the contractors and

9    consultants carrying out that work

10   will incur costs that are reasonable

11   response costs.

12       Q.    If you would turn to Page 7

13   of Vandeven-1.  You indicate that you

14   received a Bachelor of Science degree

15   in civil engineering from Clemson

16   University in 1982.  What was your

17   major course of study for your

18   undergraduate degree?

19       A.    Up until my senior year it

20   was kind of traditional civil

21   engineering, which was a broad

22   discipline that included both

23   hydrology, hydrogeology, and then

24   structures and building disciplines.

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                         FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              In my senior year I focused

2      on the environmental engineering

3      aspects of civil engineering.

4          Q.    Can you expound further for

5      me what your studies entailed in your

6      senior year that focused on

7      environmental engineering?

8          A.    They included courses

9      related to water and wastewater

10     treatment, how chemicals -- the

11     sources of chemicals in the

12     environment, how they behave in the

13     environment, water chemistry.

14         Q.    And you further state on

15     Page 7 that you received a master of

16     science degree in civil engineering

17     from Clemson University as well in

18     1985.

19              At any time between the

20     completion of your undergraduate

21     degree and your master's of science,

22     did you work as an engineering

23     professional?

24         A.    Yes, I did.

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.      And where did you work?

2      A.      At the Savannah River Plant

3  in South Carolina.

4      Q.      And what did you do at the

5  Savannah River Plant in South

6  Carolina?

7      A.      I worked on determining the

8  fate and behavior of tritium from

9  their low-level waste burial sites.

10     Q.      You said of tritium?

11     A.      Tritium.

12     Q.      Can you spell that?

13     A.      T-R-I-T-I-U-M.

14     Q.      What is tritium?

15     A.      It's heavy water.  It's a

16  water molecule with three hydrogens

17  in it.  It's used in nuclear weapons.

18     Q.      What research did you do

19  for your master's degree?

20     A.      My master's degree focused

21  on the fate and behavior of cesium-

22  137 and cobalt-60 from a nuclear

23  power plant near Clemson University.

24     Q.      Could you just give me a

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    little more explanation as to what

2    your research was?

3        A.    Well, when you break

4    uranium apart you have fission

5    products.  The two predominant ones

6    are cesium-137 and cobalt-60.  Any

7    nuclear power plant releases those.

8            They release -- the

9    wastewater from this particular power

10   plant went into a large freshwater

11   lake, and I looked at how those

12   chemicals -- how those radioactive

13   chemicals behaved in the lake system.

14       Q.    Are you a professional

15   engineer?

16       A.    I do not have a

17   professional engineering license, no.

18       Q.    Staying on Page 7 of

19   Vandeven-1, you state that you worked

20   for the consulting firm of CH2M HILL

21   from 1987 to 1993 as a senior

22   environmental engineer.

23           My question is, you

24   received your master's in 1985 and in

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    1987 you are suggesting that you were

2    a senior environmental engineer.

3            And I'm curious how you go

4    in a year and a half from being a

5    student to being a senior

6    environmental engineer.  So my

7    question to you is how do you do

8    that?

9        A.    My first employment after

10   my master's degree was with Environ

11   Corporation from 1985 to late 1986,

12   at which time I went to CH2M HILL.

13            My title when I first went

14   to CH2M HILL was probably more a

15   staff engineer.  When I left CH2M

16   HILL I was a senior engineer project

17   manager.

18       Q.    And when did you leave CH2M

19   HILL?

20       A.    I believe in June 1994.

21       Q.    How long were you a staff

22   engineer for CH2M HILL?

23       A.    Oh, I would say probably my

24   first two or three years there.

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

44

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.     And what were your job

2   duties and responsibilities as a

3   staff engineer?

4      A.     I worked on a number of

5   projects primarily relating to the

6   investigation and remediation of

7   contaminated sites.

8      Q.     Any particular type of

9   contaminated sites?

10     A.     I worked both on large

11  Superfund sites, and then also

12  contaminated properties for private

13  plants, primarily the duPont

14  Corporation.

15     Q.     And what was your next

16  title after you were staff engineer

17  for two or three years at CH2M HILL?

18     A.     It was likely a project

19  manager and then progressing to

20  project manager and senior engineer.

21     Q.     For approximately how long

22  were you a project manager?

23     A.     I would say approximately

24  two years.

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.    And what were your job

2  duties and responsibilities as

3  project manager?

4      A.    They didn't really change

5  much.  Still working on the same

6  kinds of sites but just taking more

7  responsibility associated with client

8  coordination and administrative

9  aspects of the projects.

10     Q.    And then your last title

11 while you were employed by CH2M HILL

12 was senior project manager.  Is that

13 correct?

14     A.    I don't recall exactly what

15 it was, but I was a senior project

16 manager and environmental engineer.

17     Q.    What were your job duties

18 and responsibilities as senior

19 project manager, environmental

20 engineer?

21     A.    The same, just generally

22 associated with larger cases, larger

23 sites.

24     Q.    You testified that you do

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

46

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    not -- that you are not a

2    professional engineer.  Correct?

3        A.    Correct.

4        Q.    Do you know what the

5    requirements for certification of a

6    professional engineer in Virginia,

7    since that's where you are from?

8        A.    I believe you have to have

9    an undergraduate degree in a

10   engineering discipline.  And I

11   believe to sit for your exam you have

12   to have five years of relevant

13   experience.

14       Q.    What do you mean five years

15   of relevant experience?

16       A.    Five years working as an

17   engineer.

18       Q.    And would that be working

19   as an engineer in a particular

20   discipline?

21       A.    Not a particular

22   discipline.  Any of the traditional

23   engineering disciplines, I believe.

24       Q.    While you were employed at

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1  CH2M HILL, did you work at the

2  Boarhead Farms Superfund site?

3         A.    When I was with CH2M HILL I

4  was involved in our -- what we refer

5  to as our ARCS contract with EPA

6  Region 3, and I was involved in that

7  contract and Boarhead Farms was one

8  of the sites that CH2M HILL was

9  working on under that contract.

10             So I did work very briefly

11  on the Boarhead Farms site.

12         Q.    Okay.  You need to educate

13  me.  What's an ARCS contract?

14         A.    I believe ARCS stood for

15  Alternative Remedial Contracting.

16         Q.    And CH2M HILL had a

17  contractual relationship with Region

18  3 of the EPA?

19         A.    That's correct.

20         Q.    And under the umbrella of

21  that contract the Boarhead Farms

22  Superfund site was one of several

23  Superfund sites that CH2M HILL was

24  providing services to the EPA?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

48

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    A.    That's correct.

2    Q.    Do you recall when you

3 became involved under this contract

4 with the Boarhead Farms Superfund

5 site?

6    A.    It was at the very early

7 stages, 19 -- maybe '88 or '89.

8    Q.    And do you recall how long

9 you continued to work at the Boarhead

10 site?

11        MR. HARRIS:    Objection.  He

12 didn't say he worked at the Boarhead

13 site.

14        MS. FLAX:    I will withdraw

15 the question and I will re-ask the

16 question.

17 BY MS. FLAX:

18    Q.    Did you personally have any

19 involvement with the activities that

20 CH2M HILL was performing at the

21 Boarhead Farms Superfund site?

22    A.    The only activity that I

23 recall being involved in personally

24 was contracting -- subcontracting an

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
215.564.3905                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    individual to do a cultural resource

2    survey, which is a requirement under

3    the NCP.

4        Q.    Do you recall who that

5    individual was?

6        A.    No, I don't.

7        Q.    Can you explain what the

8    survey was?

9        A.    I only remember it very,

10   very -- it's very sketchy.  That's --

11   conducting a cultural resource survey

12   is a requirement under the national

13   contingency plan.

14           There was indication even

15   early on that there were some

16   structures at the site that may have

17   some cultural significance.

18           So EPA is required -- I

19   think it's actually under -- it may

20   not be under the NCP, it may be under

21   NPO, that they have to do a cultural

22   resource assessment of those

23   structures to determine how they need

24   to be protected and so forth.

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          I think it had to do with

2     the farm house there.

3          Q.    Explain to me what is meant

4     by a cultural resource survey.  Is it

5     like -- whether something is

6     historical, to be preserved?

7          A.    Correct.  I think early on

8     there was some indication that the

9     building itself could have been built

10    by William Penn, so there was some --

11    if EPA was going to go in --

12          MR. HARRIS:  You thought

13    you had heard everything in this

14    case, right?

15          THE WITNESS:  So this was

16    my only involvement in Boarhead

17    Farms, so I remember it like this,

18    that it was just this pristine farm

19    that had one or more buildings that

20    could have dated back to pre

21    Revolutionary War times.

22          So if EPA is going to go in

23    and start investigating, doing any

24    kind of intrusive activity, they

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    needed to understand, not unlike you

2    have to do in Native American lands,

3    understand what the cultural

4    significance is of those structures.

5                And if they do have

6    cultural significance, then protect

7    them as you go about investigating.

8    BY MS. FLAX:

9        Q.    Did you ever, either while

10    you were at CH2M HILL or while you

11    were at Environ visit the Boarhead

12    Farms Superfund site?

13        A.    I did once when I was with

14    CH2M HILL, yes.

15        Q.    Have you been back there?

16        A.    No.

17        Q.    Other than subcontracting

18    with an individual to conduct a

19    cultural resource survey, did you

20    have any other involvement with the

21    Boarhead Farms Superfund site under

22    the ARCS contract with EPA Region 3?

23        A.    Nothing that I can

24    remember, no.

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        Q.    How long was your
2    involvement with the cultural
3    resource survey?
4        A.    It was very brief, on the
5    order of a month, I would say.
6        Q.    So you were not a project
7    manager or a site manager for the
8    Boarhead Farms Superfund site?
9        A.    I don't know if I was ever
10    referred to as a site manager of the
11    Boarhead Farms site.   How they may
12    have designated people to EPA, I'm
13    not sure, but I don't believe so.
14          '    I believe the site manager
15    for the Boarhead Farms site was a
16    woman in the Philadelphia office of
17    CH2M HILL.
18        Q.    Do you recall whether you
19    had any involvement while at CH2M
20    HILL after 1990 with the Boarhead
21    Farms Superfund site?
22        A.    I don't remember the time
23    frame.   It was right around then,
24    maybe say '88, '89, '90.   I can't

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

1    remember the exact time frame.

2         Q.    Do you recall whether you

3    contributed to the preparation of the

4    draft RI/FS work plan?

5         A.    I don't believe I did, no.

6         Q.    Did you contribute to the

7    final RI/FS work plan?

8         A.    No.

9         Q.    Do you know whether CH2M

10   HILL participated in the two removal

11   actions for buried drums in

12   contaminated soil that was performed

13   by EPA?

14        A.    I don't know if they did or

15   not.   That was certainly after my

16   involvement.

17        Q.    Did you have any

18   participation in the preparation of

19   the federal on-scene coordinators

20   report?

21        A.    No.

22        Q.    Do you even know what

23   report I'm talking about?

24        A.    I know generically what

**James DeCrescenzo Reporting, LLC**
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

1     that kind of report is, but I don't

2     know specifically for this site what

3     report you are referring to.

4          Q.   Would you turn to Page 13

5     of Vandeven-1.

6               Do you hold your Opinion 2

7     to a reasonable degree of scientific

8     certainty?

9          A.   Yes.

10         Q.   Do you hold the basis for

11    Opinion 2 to a reasonable degree of

12    scientific certainty?

13         A.   Yes.

14         Q.   On a scale from 1 to 100,

15    from 1 percent to 100 percent, what

16    percentage of certainty would you

17    ascribe to constitute a reasonable

18    degree of scientific certainty?

19              MR. HARRIS:   Objection.

20    You are assuming that he does it that

21    way.

22              THE WITNESS:   Yes.  I have

23    never really thought about it -- I

24    have never really thought about it

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

55

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    that way.

2    BY MS. FLAX:

3        Q.    Well, if I asked you to

4    tell me what you believe is a

5    reasonable degree of scientific

6    certainty, how do you answer that

7    question?

8        A.    Well, I would very likely

9    answer it a lot more qualitative than

10   giving you a precise percentage.

11           I would say that a

12   reasonable degree of scientific

13   certainty is based on and refers to a

14   conclusion that I reach based on the

15   totality of an evaluation.  It's

16   not -- it doesn't have any specific

17   percentage associated with it.

18       Q.    Well, you would agree that

19   50 percent is not a reasonable degree

20   of scientific certainty.  Correct?

21       A.    50 percent of what?

22       Q.    If you were only 50 percent

23   certain of your opinion, you would

24   not say that that's within a

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    reasonable degree of scientific

2    certainty.    Correct?

3        A.    If I was doing an analysis

4    and reaching an opinion that allowed

5    me to associate a specific percentage

6    with it and that percentage was 50

7    percent, I would say that that was

8    not a reasonable degree of scientific

9    certainty.

10       Q.    Do you have any level of

11   comfort in giving me what percentage

12   you believe an opinion would qualify

13   as one that was within a reasonable

14   degree of scientific certainty?

15       A.    A percentage?   No.

16       Q.    On Page 13 of Vandeven-1 in

17   the first bullet point you say, "The

18   PA report indicates that bulk

19   releases of ferric chloride, copper

20   ammonium carbonate, ammonia and

21   sulfuric acid were documented."

22           Do you see that?

23       A.    Yes.

24       Q.    Did the Handy & Harman

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

57

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1   facility generate ferric chloride as

2   a waste?

3        A.    I don't know.

4        Q.    Did the Handy & Harman

5   facility generate copper ammonium

6   carbonate as a waste?

7        A.    I don't know what you

8   referring to.  This facility that you

9   are referring to I don't have any

10  information on.

11       Q.    In connection with your

12  retention in this matter, did you

13  review any information regarding the

14  defendants?

15       A.    To the extent that I

16  reviewed the other expert reports in

17  this matter, which contained

18  information about specific waste

19  streams.

20            MR. HARRIS:  Time for a

21  break?

22            MS. FLAX:  Sure.

23            (Recess taken)

24            (Vandeven Exhibit 5 was

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    marked for identification.)

2    BY MS. FLAX:

3        Q.    Mr. Vandeven, you have been

4    handed Vandeven-5.  Can you please

5    tell me what Vandeven-5 is?

6        A.    This is my November 15th,

7    2006 Rebuttal Expert Report.

8        Q.    Okay.  And if you would

9    turn to Page 1 of Vandeven-5.

10           The first paragraph

11    following the bullets says, and I

12    quote, "I have also reviewed the

13    expert report prepared on behalf of

14    the plaintiffs by Jurgen H. Exner of

15    JHE Technology Systems, Inc.

16           I have also reviewed the

17    documents Dr. Exner relied upon which

18    are listed in his report.  I accept

19    and agree with Dr. Exner's

20    descriptions of the wastes associated

21    with various industries and

22    defendants."

23           Do you see that?

24        A.    Yes.

1      Q.      Did I read that accurately?

2      A.      Yes.

3      Q.      What exactly did you review

4   of the documents that Dr. Exner

5   relied upon that allowed you to

6   accept and agree with Dr. Exner's

7   descriptions of the wastes associated

8   with various industries and

9   defendants?

10      A.      I believe there I was

11   looking primarily at his description

12   of some of the acid wastes that were

13   disposed of at the site to determine

14   if there was information -- if he had

15   more specific information in his

16   expert report in the documents that

17   he based his opinion on regarding the

18   type of acids they may have been, how

19   strong those acids were.

20              That was the primary reason

21   I went back and looked at his report

22   and the documents that he relied on.

23      Q.      So is it fair to say that

24   you did not review any documents that

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

60

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Dr. Exner relied upon with respect to

2    Handy & Harman Tube Company?

3        A.    I'm not sure -- I frankly

4    don't -- I'm not sure who Handy &

5    Harman is.   I really never concerned

6    myself with particular companies in

7    this matter, so --

8        Q.    So if I asked you about any

9    of the wastes generated at Handy &

10   Harman, you would have no knowledge

11   one way or the other.   Correct?

12       A.    I would have no specific

13   knowledge, no.

14       Q.    Well, what general

15   knowledge would you have?

16       A.    I don't have any knowledge

17   sitting here today about what --

18   there may be information in the

19   documents that I have been provided

20   in this matter, but I don't have any

21   information specific or general about

22   their wastes, sitting here right now.

23       Q.    Turning back to Vandeven-1,

24   if you would turn to Page 15 of your

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    report.  I would ask you to take a

2    moment and read the four bulleted

3    points that are on Page 15 of

4    Vandeven-1.

5         A.    Okay.

6         Q.    Nowhere in those four

7    bullet points do you mention Handy &

8    Harman Tube Company or the Handy &

9    Harman facility.  Correct?

10        A.    You mean --

11        Q.    Handy & Harman Tube Company

12   or the Handy & Harman facility.

13   Correct?

14        A.    That's correct.

15        Q.    And nowhere in those four

16   bullet points do you attribute any of

17   the wastes ascribed to Handy & Harman

18   Tube Company.  Is that correct?

19        A.    I don't know if any of

20   these wastes are related to Handy &

21   Harman Tube Company.

22        Q.    Nowhere on Page 15 does

23   your report state that waste from

24   Handy & Harman Tube Company or the

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Handy & Harman facility was disposed

2    of at the Boarhead site.  Is that

3    correct?

4         A.    That's correct.

5         Q.    And it's fair to say that

6    nowhere in your report do you state

7    that waste from Handy & Harman Tube

8    Company or the Handy & Harman

9    facility disposed of wastes at the

10   site.  Is that correct?

11        A.    That's correct.

12        Q.    In the first bullet point

13   on Page 15 the first line says, "The

14   wastes disposed of at the site may

15   have included pickle liquors."

16             Do you see that?

17        A.    Yes.

18        Q.    Does the phrase "may have"

19   equate with a reasonable degree of

20   scientific certainty?

21        A.    I would say that that

22   refers to the fact that the

23   information that I relied on for that

24   had similar language in the ROD or in

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905              InnovatingLitigation              FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    other underlying documents relating

2    to whether or not pickle liquors were

3    disposed of at the site.

4        Q.    Okay.  But regardless of

5    how something may have been phrased

6    in a document, do you believe that

7    use of the words "may have" rise to

8    the level of a reasonable degree of

9    scientific certainty?

10       A.    Well, I'm not sure I would

11   associate the two concepts.  This is

12   not an opinion, all right.  I'm not

13   saying that it's my opinion that

14   wastes disposed of at the site may

15   have included pickle liquors.

16           The underlying information

17   about the site indicates that pickle

18   liquors may have been disposed of at

19   the site.

20           My opinion, then, is if

21   there were, would those constituents

22   of the pickle liquors have

23   contributed to the need for and cost

24   of remediation.

**JD̲R̲**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                    FAX  215.751.0581
www.JDReporting.com

64

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.     So if I understand your

2  response correctly -- because in

3  several places on Page 15 you used

4  the words may have and other similar

5  types of phrases.

6           Your opinion is based upon

7  the assumption that assuming these

8  wastes were disposed of at the site,

9  do you then offer an opinion as to

10  the activities that are being

11  undertaken under the ROD.  Is that

12  fair?

13     A.     Well, I would say that -- I

14  would agree with your first point,

15  assuming that these wastes were

16  disposed of at the site would the

17  constituents of these wastes or the

18  form that these wastes were disposed

19  of contribute to the need for and

20  cost of the response at the site.

21     Q.     What other assumptions were

22  made in connection with you reaching

23  your opinions?

24           MR. HARRIS:   Objection.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Objection to the form of the

2    question.  Vague.  Ambiguous.

3         THE WITNESS:  I don't

4    recall any other assumptions that I

5    had to make to reach my opinions.

6    BY MS. FLAX:

7         Q.    Mr. Vandeven, you are not

8    offering an expert opinion with

9    respect to allocation.  Is that

10   correct?

11        A.    That's correct.

12        Q.    And you are not offering an

13   opinion as to the causes and timing

14   of environmental property damage.  Is

15   that correct?

16        A.    Well, I would -- well, I'm

17   not sure I would say that.  I would

18   say that my opinion would generally

19   come under the category of causes of

20   property damage at the Boarhead Farms

21   site.

22        The causes of property

23   damage at the Boarhead Farms site are

24   in totality all of the wastes that

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    may have been disposed of there.

2        Q.    And when you say all of the

3    wastes, you include under that

4    umbrella not only the defendants'

5    waste but the plaintiffs' waste.

6    Correct?

7        A.    I really didn't distinguish

8    between plaintiffs, defendants or

9    individual companies.

10            I looked at the kinds of

11    wastes that may have been disposed of

12    and then reached an opinion about

13    whether or not the constituents of

14    those wastes or the form of those

15    wastes contributed to the need and

16    cost of remediation.

17        Q.    So regardless of who the

18    generator was, any wastes that went

19    to the Boarhead Farms site in your

20    opinion contributed to the response

21    actions?

22        A.    That's correct.

23        Q.    And so based upon that, you

24    are offering an opinion as to a cause

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
            1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                    www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    of environmental property damage but

2    you are not offering an opinion as to

3    the timing of environmental property

4    damage.  Correct?

5         A.    No.  My opinion doesn't

6    really have a temporal aspect to it,

7    no.

8         Q.    And you are not offering an

9    opinion as to the fate and transport

10   of the contamination at the Boarhead

11   Farms Superfund site.  Correct?

12        A.    Well, I believe my opinion

13   includes aspects that are fate and

14   transport opinions, yes.

15        Q.    Tell me what your opinions

16   are that include aspects of fate and

17   transport.

18        A.    Looking at the specific

19   constituents of a waste that may have

20   been disposed of there, how that

21   would have behaved at the Boarhead

22   Farms site and why it would have

23   contributed to the need for costs of

24   remediation and looking at the form

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX 215.751.0581

68

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1  of the waste, be it in bulk or in

2  drums, and how that would have

3  impacted the behavior and movement of

4  chemicals in the environment and the

5  necessity for cleanup costs at the

6  site.

7           I'm looking at how

8  different constituents or different

9  wastes impacted other wastes or

10  impacted other materials at the site,

11  for instance drums. All those things

12  are kind of fate and transport

13  opinions, I would say.

14      Q.    Can you show me in

15  Vandeven-1 where you have a

16  discussion about any or all of those

17  topics that you just articulated?

18      A.    Sure.  A complete or just

19  in examples?

20      Q.    I would like you to be as

21  complete as possible.

22      A.    Okay.

23           Opinion 2 starts on Page

24  13.  The second bullet includes a

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    fate and transport -- an opinion

2    based on fate and transport.

3         Q.    Are you saying that the

4    whole bullet is related to fate and

5    transport or just portions of that?

6         A.    At least portions of it

7    are.

8              There's subjects such as

9    how materials could affect the

10   permeability in groundwater

11   elevations and how those can

12   influence fate and transport of

13   chemicals, how acidic solutions can

14   affect the fate and transport of

15   inorganic contaminants, how corrosive

16   solutions promote the degradation of

17   buried drums and the release of

18   material.

19             So all of those are fate-

20   and-transport-related opinions.

21        Q.    Okay.

22        A.    Let's see, on Page 14, the

23   last bullet, maybe halfway through

24   the last bullet the sentence that

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

1    starts, "In addition, wastes that do

2    not exhibit the RCRA characteristic

3    of corrosivity (i.e. that exhibit a

4    pH between 2 and 12 and a half) can

5    still promote the disintegration of

6    metal drums.

7              Even near-neutral acidic

8    wastes consume some of the buffering

9    capacity of the soils; this

10   facilitates the migration of many

11   chemicals, for example metals, that

12   are more soluble in acid or basic

13   conditions."

14             That's a fate-and-

15   transport-related opinion.

16             Now we are into the bullets

17   that we talked about before on Page

18   15.

19             The first bullet refers to

20   pickle liquors that may have been

21   disposed of at the site and how the

22   acidity of pickle liquors can affect

23   the mobility of metals in soil and

24   groundwater.  That's a fate and

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    transport opinion.

2              The second bullet on 15

3    refers to circuit board etchant.  And

4    if that was released at the Boarhead

5    Farms site, the acidity associated

6    with that material can affect the

7    levels and fate of metals in the soil

8    and groundwater.

9              A similar topic in the

10   third bullet relating to various

11   plating wastes, nickel and chromium

12   plating wastes that may have been

13   disposed of at the site and how the

14   acidity of those materials could have

15   increased the solubility of metals.

16             At the bottom of Page 16,

17   the start of the last paragraph on 16

18   over to 17 is a fate-and-transport-

19   related basis for my opinion, as is

20   the last paragraph on 17.

21        Q.    If we can go back to Page

22   14 of Vandeven-1, the runover

23   paragraph at the top of the page, the

24   last sentence of the runover

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    paragraph that says, "Such solutions

2    may also immobilize metals that were

3    naturally present in the soils at the

4    site."

5              Do you see that?

6    A.    Yes.

7    Q.    Did I read that accurately?

8    A.    Yes.

9    Q.    Can you tell me what the

10   basis is for that statement?

11   A.    I would have to just

12   quickly go back and look at the whole

13   bullet there.  Okay.

14             There again we are talking

15   about corrosive or acidic solutions

16   and not only for the same reasons

17   they could mobilize metals that are

18   contained in wastes at the site, they

19   could also mobilize metals that are

20   naturally contained in the soils at

21   the site.

22             An acidic solution will,

23   for instance, dissolve the outer

24   coating of soil particles where many

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    metals reside, and that will mobilize

2    those metals and will dissolve those

3    metals in groundwater.

4         Q.    And the basis for that

5    statement can be found in what

6    document?

7              MR. HARRIS:    Objection.    It

8    assumes it can be found in a

9    document.

10             THE WITNESS:    It can be

11   found in any basic soil chemistry or

12   environmental chemistry document.

13   BY MS. FLAX:

14        Q.    So you don't need expertise

15   in order to make this statement.    Is

16   that correct?

17        A.    I think you need expertise

18   in soil chemistry and environmental

19   chemistry, yes.

20        Q.    Do you have expertise in

21   soil chemistry and environmental

22   chemistry?

23        A.    Yes.

24        Q.    How have you acquired the

**James DeCrescenzo Reporting**, LLC

215.564.3905    Innovating Litigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

74

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    expertise in soil chemistry and

2    environmental chemistry?

3         A.    Both through my academic

4    training and my professional

5    experience over the last 20 years.

6         Q.    In the next bullet, the

7    second part of the first sentence

8    says, "because of the history of

9    waste disposal (documented releases)

10   at the site."

11            What do you mean by that

12   portion of your statement?

13        A.    You read a portion of one

14   sentence there.  I just want to

15   make --

16        Q.    Yes.  I'm sorry.  It's the

17   first sentence and in the middle of

18   the sentence it starts with the word

19   "because."

20        A.    Okay.  Okay.  I'm sorry,

21   can you ask your question again?  I

22   just wanted to read that bullet.

23        Q.    What is meant by that

24   portion of the sentence that says

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905               InnovatingLitigation               FAX 215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    "because of the history of waste

2    disposal (documented releases) at the

3    site"?   What are you intending to

4    mean by that?

5        A.    I believe I'm referring

6    there to some of the early 1970s

7    documented bulk releases at the

8    Boarhead Farms site, and I believe I

9    mentioned at least some of those in

10   the opening to my expert report.

11       Q.    Can you show me where in

12   your expert report that you reference

13   the 1970s documented releases.

14       A.    On page 13.  I think we

15   referred to this before where the

16   preliminary assessment report

17   indicates bulk releases of ferric

18   chloride, copper ammonium carbonate,

19   ammonia and sulfuric acid.

20       Q.    That's a reference to 1970s

21   documented releases?

22       A.    I believe that that's what

23   the PA is referring to, yes.

24       Q.    And what's the PA?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        A.      It's the Preliminary

2    Assessment.

3        Q.      And did you review the

4    Preliminary Assessment in connection

5    with the preparation of your report?

6        A.      I believe so, yes.

7        Q.      Back on Page 14 of

8    Vandeven-1, the first sentence, you

9    refer to documents.  Can you identify

10   what documents you are referring to?

11       A.      The first sentence where?

12       Q.      In the second bullet on

13   Page 14.

14       A.      I believe that's referring

15   to documents related to the removal

16   action.

17       Q.      Can you identify on your

18   Attachment B what documents you would

19   be referring to?

20       A.      Specifically, I cannot say

21   for sure specifically, no.

22       Q.      Well, reviewing Attachment

23   B, are there any documents that you

24   have reason to believe are the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    documents that you are referring to

2    in the second bullet on Page 14?

3          A.    I would say documents such

4    as EPA 1993, the On-scene

5    Coordinators Report.

6          Q.    And you are on what page of

7    your --

8          A.    B1.   It's possible that the

9    1995 Engineering Evaluation Cost

10   Analysis Report has information about

11   that also.

12         Q.    Does that complete your

13   answer?

14         A.    Yes.

15         Q.    Mr. Vandeven, have you ever

16   worked in a steel manufacturing plant

17   or facility?

18         A.    No, I have not.

19         Q.    As a consultant, have you

20   ever worked for a steel manufacturing

21   plant or facility?

22         A.    I don't believe so, no.

23         Q.    Have you written and/or

24   published any scientific papers

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    regarding the operation and/or

2    processes at a steel manufacturing

3    facility or plant?

4        A.    No.

5        Q.    Have you authored and/or

6    published any articles relating to

7    wastes generated from the operations

8    and/or processes at a steel

9    manufacturing facility or plant?

10       A.    No.

11       Q.    And is it fair to say that

12   you are not analyzing or evaluating

13   the operations and/or wastes

14   generated from a steel manufacturing

15   facility or plant in this litigation?

16       A.    That's a fair statement,

17   yes.

18       Q.    And is it fair that you

19   don't have any firsthand knowledge of

20   any steel manufacturing operations or

21   facilities?

22       A.    Any steel manufacturing

23   operations or facilities?  I have

24   some -- I have -- in my 20 years of

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
              1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

1    experience I have some experience of

2    steel manufacturing facilities, but

3    no direct experience working for a

4    steel manufacturing facility.

5         Q.    What is your experience

6    over your 20 years in connection with

7    a steel manufacturing facility?

8         A.    I would say that the

9    primary one would be a case that I've

10   worked on where there was a steel

11   manufacturing facility -- it was a

12   dispute between a steel manufacturing

13   facility or a facility that included

14   steel manufacturing and my client.

15              So we were looking at the

16   wastes associated with both

17   facilities.

18         Q.    Was this a litigated

19   matter?

20         A.    It's not a litigated matter

21   currently, no.

22         Q.    Was this a recent matter?

23         A.    Yes.

24         Q.    Have you been engaged as a

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

80

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    consultant in this matter that you

2    have just described?

3         A.    Yes.

4         Q.    When were you engaged as a

5    consultant?

6         A.    I would say maybe two years

7    ago.

8         Q.    Can you tell me -- you said

9    you were looking at the wastes of

10   both facilities.  What is actually

11   your charge with this project?

12        A.    It has -- my charge with

13   this project is determining the

14   contribution to a piece of land that

15   both companies owned at one time, so

16   looking at the waste that was

17   generated and potentially disposed of

18   on this piece of land by each entity.

19        Q.    And what's your

20   understanding of the wastes that are

21   being looked at with the steel

22   manufacturing -- or the facility that

23   also contains some steel

24   manufacturing?

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      A.     The wastes include

2  almost -- it's just -- it's a very

3  long list of wastes from petroleum

4  products to acid wastes to organic

5  wastes.    It was a large integrated

6  facility that included steel

7  manufacturing.

8      Q.     And are wastes from that

9  portion of the operations that

10  involve steel manufacturing included

11  in your review and consideration of

12  the contribution to the contamination

13  at this one piece of land?

14      A.     Yes.

15      Q.     And do you know what those

16  particular wastes are?

17      A.     They include both

18  petroleum -- as I said, petroleum

19  wastes, acidic wastes and volatile

20  organic wastes.

21      Q.     And that's limited to that

22  portion of the operations that was

23  related to steel manufacturing?

24      A.     No.    It's not limited to

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

82

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1  that.  It's limited -- the entire

2  facility.

3     Q.    Do you know what wastes are

4  limited to the steel manufacturing

5  aspect of this facility or do you

6  just know the big picture?

7     A.    We are not limiting it to

8  any particular part of the facility,

9  so it's the big picture.

10     Q.    And in connection with your

11  work on this particular project you

12  haven't tried to ascertain what waste

13  streams are generated from one

14  operation of the facility versus what

15  waste streams are generated in

16  another operation of the facility.

17         Is that correct?

18     A.    No, that wouldn't be

19  correct.  That's part of what we are

20  doing, yes.

21     Q.    So in connection with the

22  work that you are doing, did you take

23  or have you looked at the wastes that

24  are generated from that portion of

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    the operations that were engaged in

2    steel manufacturing?

3         A.    I don't know if we have

4    specifically looked at that, no.

5              (Vandeven Exhibits 6 & 7

6    were marked for identification,

7    respectively.)

8              MS. FLAX:    For the record,

9    I have had marked as Vandeven-6 a

10   November 15th, 2006 e-mail timed at

11   10:57 a.m. from Mark Hawley to Glenn

12   Harris.

13             And attached to it is a

14   draft expert rebuttal opinions of Jay

15   Vandeven, and the date on that is

16   November 15th, 2006, as well.

17   BY MS. FLAX:

18        Q.    Do you need a break?

19        A.    No, I'm fine.

20             MS. FLAX:    And I'm also

21   identifying for the record what has

22   been marked as Vandeven-7, which is a

23   November 15th, 2006 e-mail timed at

24   4:40 p.m. from Mark Hawley to Glenn

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

84

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Harris CC'd to Jay Vandeven attaching

2    to it expert rebuttal opinions of Jay

3    Vandeven also dated November 15th.

4    BY MS. FLAX:

5        Q.    Mr. Vandeven, if you would

6    turn to Page 7 of Vandeven-6 and Page

7    7 of Vandeven-7, the last

8    paragraph -- well, what I would like

9    you to do is I would like you to read

10   the last paragraph on Page 7 of

11   Vandeven-6 and the last paragraph of

12   Vandeven-7 on Page 7.

13       A.    To myself or do you want me

14   to read --

15       Q.    To yourself.

16       A.    Okay.

17       Q.    Can you tell me how it came

18   about that the last paragraph on Page

19   7 of Vandeven-6 was deleted and how

20   the last paragraph of Vandeven-7 on

21   Page 7 that runs onto Page 8 was

22   substituted?

23       A.    Well, I can tell you what I

24   recall.  I think the origin of the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    paragraph that's in Exhibit 6 was a

2    generic general opinion about the

3    site-specific nature of doing a --

4    and the complexity of doing an

5    allocation of response costs in a

6    site like this.

7              As I said, I was not asked

8    to do an allocation in this matter,

9    and my original report did not

10   include any allocation-related

11   opinions.

12             But then after reading the

13   expert reports from the other side

14   and doing this rebuttal, they seemed

15   to speak to the issue of allocation.

16             So I thought in my rebuttal

17   report I would say something general

18   at the end about the complexity of

19   that process at a site like this.

20   And then I likely determined that

21   that didn't really add anything to my

22   report.

23             And instead I tried to find

24   an example of something specific

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    about the complexity of the site and

2    the complexity of the wastes that may

3    have been disposed of at the site and

4    the complexity of how the allocation

5    process would need to consider the

6    wastes and how it behaved in the

7    environment and the response costs

8    associated with that waste.    And

9    that's why I substituted the last

10    paragraph in Vandeven-7.

11         Q.    Between 10:57 a.m. on

12    November 15th and 4:40 p.m. November

13    15th, did you speak with Mr. Harris,

14    any other attorney at Ballard, Spahr

15    or any representative of one or more

16    of the plaintiffs regarding your

17    rebuttal report?

18         A.    I may have.    I don't recall

19    the time of individual phone calls on

20    an individual day.

21         Q.    Did you speak to any other

22    attorney at Ballard, Spahr other than

23    Mr. Harris?

24         A.    No, I did not.



87

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.    Did you speak to Mr. Harris

2   regarding your rebuttal report?

3      A.    Yes.

4      Q.    Can you tell me what those

5   conversations were?

6      A.    Similar to my original

7   expert report, what -- we discussed

8   the reports that I was rebutting, who

9   they were from, generally what they

10  contained.

11          He asked me if anything --

12  to look at these reports and

13  determine whether anything in these

14  reports would cause me to change my

15  original opinion.  And that was the

16  general nature of our discussions.

17     Q.    Do you recall what

18  conversation, if any, that you had

19  with Mr. Harris with respect to the

20  contents of your rebuttal report?

21     A.    I recall having, I would

22  say, maybe two conversations with him

23  about my initial -- after I looked at

24  the expert reports from the other

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    side, what my initial impressions

2    were, whether or not I thought --

3    again, whether or not I thought they

4    would cause me to change my original

5    opinion.

6          Q.    And I believe you stated in

7    your rebuttal report they did not

8    lead you to change your opinions.  Is

9    that correct?

10         A.    That's correct.

11         Q.    On Vandeven-6, the last

12   paragraph that ultimately did not

13   make it into your final rebuttal

14   report, you proffer an opinion

15   regarding equitable allocation?

16               And I just want to be

17   absolutely sure, you are not offering

18   an opinion either in your initial

19   report or your rebuttal report as to

20   allocation among the parties to this

21   litigation.  Is that correct?

22         A.    That's correct.

23         Q.    If you would look at

24   Vandeven-5.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1            You would agree with me

2    that Vandeven-5 does not state that

3    drums of degreaser sludge containing

4    TCE that were generated by Handy &

5    Harman Tube Company or the Handy &

6    Harman facility were disposed of at

7    the Boarhead site?

8        A.    I don't believe that I

9    reached that conclusion, no.

10        Q.    And do you have any

11    evidence or are you aware of any

12    evidence that drums of degreaser

13    sludge waste containing TCE that was

14    generated by Handy & Harman Tube

15    Company or the Handy & Harman

16    facility was in fact disposed of at

17    the Boarhead site?

18        A.    Only to the extent that

19    Dr. Brown refers to that waste being

20    disposed of at the site.

21        Q.    You say Dr. Brown refers to

22    wastes being disposed of at the

23    site.  In Dr. Brown's report, which I

24    presume you read, there was a section

JDR

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    entitled assumptions. Do you recall

2    that?

3        A.    I don't recall specific

4    sections of his report, no.

5        Q.    Well, if I represent to you

6    that there was a section entitled

7    assumptions and that those

8    assumptions presumed disposal at the

9    site, you don't have any independent

10   evidence that degreaser sludge waste

11   containing TCE that was generated at

12   Handy & Harman Tube Company or the

13   Handy & Harman facility was disposed

14   of at the site, other than

15   Dr. Brown's assumption. Correct?

16       A.    I would say that's correct,

17   yes.

18       Q.    In the last paragraph on

19   Page 7 of Vandeven-5, the very end of

20   the third line of that last paragraph

21   which starts "In response."

22       A.    Okay.

23       Q.    Do you know how much free

24   liquid was present in the degreaser

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    sludge generated at the Handy &

2    Harman facility or Handy & Harman

3    Tube Company?

4        A.    No.

5        Q.    Do you know if in fact any

6    free liquid was present in the

7    degreaser sludge generated at the

8    Handy & Harman facility?

9        A.    Specifically of that

10   facility, no.

11       Q.    Are you aware of any

12   references that would indicate the

13   quantity of free liquid in the

14   degreaser sludge that was generated

15   at Handy & Harman Tube Company or the

16   Handy & Harman facility?

17       A.    No.

18       Q.    You describe the degreaser

19   sludge or you state that, "The

20   description of the degreaser sludge

21   provided in his --" referring to

22   Dr. Brown's -- "Paragraph 55 does not

23   establish that the amount of free

24   liquid TCE was minimal; materials

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    described as sludges and handled with

2    shovels may contain substantial

3    quantities of liquids."

4            Now, you testified that you

5    don't know how much free liquid was

6    in the degreaser sludge. You don't

7    know if any free liquid was in fact

8    in the degreaser sludge.

9            So is it fair to say, then,

10   that your description of the

11   degreaser sludges as sludges handled

12   with shovels that may contain

13   substantial quantities of liquids is

14   speculation?

15        A.    I wouldn't call it

16   speculation. It may not be -- it may

17   not be facility specific, however you

18   refer to your clients, Handy & Harman

19   Tube, it may not be facility

20   specific.

21            But from the environmental

22   insult or impact of TCE used as a

23   degreaser is well known to anybody

24   that's practiced in this industry

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

1     over the last 20 years.

2                   And degreasers used during

3     that time and the sludge that was

4     generated by those activities contain

5     free liquids.

6                   It was not solid grit metal

7     parts that were generated that were

8     shoveled out of TCE degreasers by any

9     stretch.  So it may not be facility

10    specific, but it is absolutely not

11    speculation.

12         Q.    Notwithstanding that you

13    don't have any information regarding

14    the quantity or whether there was any

15    free liquid in Handy & Harman's

16    degreaser sludge waste, the basis for

17    you saying that such a statement in

18    this context is not speculative is

19    based upon what?

20                   MR. HARRIS:   Objection.

21    Asked and answered.

22                   THE WITNESS:   Yes.   I just

23    went through that.

24                   Any description of the

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    history of TCE use in this country

2    and why it's one of the primary

3    contaminants in groundwater will

4    discuss how TCE was used, how it was

5    generated at facilities, how it came

6    to be disposed of in the environment.

7                    Anybody that's ever looked

8    at the operations of a TCE degreaser

9    knows that the sludge that is

10   generated from a TCE degreaser is not

11   solid material, that it contains free

12   liquids, that it contains mobile

13   trichloroethylene and that the

14   materials disposed of from TCE

15   degreasers contains liquids.

16        Q.    You further state in the

17   last paragraph on Page 7 of Vandeven-

18   5, "In addition, if the volume of

19   degreaser sludge was as small as

20   suggested in Paragraph 60 of

21   Dr. Brown's report, the drums that

22   contained the degreaser sludge may

23   well have contained other liquid

24   wastes."

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

95

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1             Do you see that?

2       A.    Yes.

3       Q.    Did I read that accurately?

4       A.    Yes.

5       Q.    Do you know if in fact the

6  drums or the degreaser sludge from

7  the Handy & Harman facility contained

8  other liquid waste?

9       A.    No, I do not.

10      Q.    And you don't know

11 quantitatively how much alleged other

12 liquid waste might have been in the

13 drums with the degreaser sludge.

14 Correct?

15      A.    That's correct.

16      Q.    Are you aware of any

17 evidence that would indicate the

18 quantity of the alleged other liquid

19 wastes that might have been in the

20 drums with the degreaser sludge?

21      A.    No, I'm not.

22      Q.    What is the basis for your

23 statement that the drums containing

24 the degreaser sludge may well have

**James DeCrescenzo Reporting**, LLC

215.564.3905              InnovatingLitigation              FAX 215.751.0581
                 1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                             www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    contained other liquid wastes?

2         A.    Simply the fact that if

3    they were going to dispose of a full

4    drum, if they were going to dispose

5    of a drum and it only contained a

6    certain amount of TCE degreaser

7    sludge that they may have included

8    other wastes in that drum.

9         Q.    But you have no evidence of

10   that.  Correct?

11        A.    That's correct.

12        Q.    So isn't that statement

13   speculative?

14        A.    I say that it -- I use the

15   word may.

16        Q.    So you would agree with me

17   that it's speculative?

18        A.    What I'm referring to is if

19   it did contain other liquids, that

20   the TCE would have partitioned into

21   those other liquids.

22        Q.    So that statement that you

23   are making about the other liquids,

24   that's not being made with a

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    reasonable degree of scientific

2    certainty, correct?

3        A.    The opinion is made to a

4    reasonable degree of scientific

5    certainty.  The opinion is that if

6    there were other liquids in a drum

7    that contained a small amount of TCE

8    degreaser sludge, then the TCE would

9    dissolve into that other liquid.

10       Q.    With respect to the free

11   liquid or the alleged other liquid,

12   are you aware of any method that

13   could be used to quantify the content

14   of either of those two?

15       A.    I'm not sure -- I don't

16   understand the question.

17       Q.    Well, are you aware in your

18   experience of a means or a method to

19   quantify what part of a 55-gallon

20   drum would contain the degreaser

21   sludge waste and what would contain

22   the other liquid waste?

23       A.    Only if you had records

24   showing what that breakdown was.

98

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        Q.    Staying on Page 7 of
2   Vandeven-5, you further state, "The
3   degree to which the TCE was
4   partitioned in the sludge would
5   likely depend on the other
6   constituents of the waste in the
7   drum.  If water was present, it
8   probably contained dissolved TCE."
9            Do you see that?
10       A.    Yes.
11       Q.    Did I read that accurately?
12       A.    Yes.
13       Q.    Do you know if the drums
14  with the degreaser sludge contained
15  any water?
16       A.    No, I don't.
17       Q.    Do you know quantitatively
18  how much water could have been
19  contained in the drums?
20       A.    No, I don't.
21       Q.    Are you aware of any
22  evidence that demonstrates that water
23  was in the 55-gallon drums with the
24  degreaser sludge waste?

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
                   1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

99

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1       A.     No, I'm not.

2       Q.     And, again, your opinion is

3   premised upon the assumption of if

4   water was present.  Correct?

5       A.     The opinion about TCE

6   dissolving into water from a drum

7   that contained both TCE degreaser

8   sludge and water, yes, is premised on

9   the assumption that there was some

10  water contained in the drum.

11      Q.     And assuming that

12  assumption, it is in fact your

13  opinion within a reasonable degree of

14  scientific certainty?

15      A.     Yes.

16          MS. FLAX:  Why don't we

17  take a five-minute break.

18          (Thereupon, at 12:13 p.m. a

19  luncheon recess was taken until

20  1:14 p.m., at which time the

21  following proceedings were had:)

22  BY MS. FLAX:

23      Q.     At the beginning of the

24  deposition, Mr. Vandeven, I asked you

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    who Mark Hawley was and you said that

2    he was a hydrogeologist in your

3    office.   What role did he play in the

4    preparation of Vandeven-1?

5        A.    Mark assisted me in

6    reviewing some of the underlying

7    documents.   He assisted me in

8    evaluating the -- in obtaining

9    documents related to the history of

10    the site, and assisted me in the

11    preparation of the expert report.

12        Q.    What exactly did Mr. Hawley

13    do in connection with assisting you

14    in the preparation of the expert

15    report?

16        A.    Well, I'm not sure I could

17    tell you exactly.   But, for instance,

18    in Vandeven-1 there's a portion of

19    the expert report that provides a

20    chronological summary of activities

21    at the site.

22          I believe Mark helped me

23    put that together, going through the

24    underlying documents, understanding

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    the chronology of the EPA response

2    actions at the site, and drafting

3    those sections of the report.

4        Q.    Did you physically write

5    this report?

6        A.    Large portions of it, yes.

7        Q.    Did Mr. Hawley write any

8    portions of this report, other than

9    the response activity section that

10   you just testified to?

11       A.    He may have written other

12   small parts of it.  I couldn't say

13   exactly which parts he wrote, at this

14   point.

15       Q.    What portion would you say

16   is your effort and what portion would

17   you say is Mr. Hawley's effort?

18       A.    As far as the physical

19   writing of it?

20       Q.    Well, the overall report.

21       A.    Well, the overall report is

22   my report, they are my opinions, but

23   the actual writing of it I would say,

24   you know, maybe 25 percent Mark.

102

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.     And would the same be true

2   with respect to Vandeven-5, which is

3   your rebuttal report, as to

4   Mr. Hawley's assistance in the

5   preparation of Vandeven-5?

6      A.     It was probably less there,

7   since there was no real background

8   information to summarize.

9           This was probably more --

10  his effort here was probably more

11  related to reviewing the other expert

12  reports with me and us discussing

13  what we -- getting his input on what

14  he thought about those other expert

15  reports, too.

16          But the primary writing of

17  the rebuttal report was mine.

18     Q.     Before the break we were

19  talking about various portions of the

20  last paragraph on Page 7 of Vandeven-

21  5.

22          And I believe that you

23  testified that with the assumptions

24  that are contained in those three

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    sentences that we discussed, your

2    opinions are within a reasonable

3    degree of scientific certainty.

4    Correct?

5        A.    That's correct.

6        Q.    If the assumptions proved

7    untrue, would you have any basis to

8    make the statements that you make in

9    the last paragraph on Page 7 of

10   Vandeven-5, and if you want me to go

11   through each one again I will.

12                MR. HARRIS:   Object to the

13   form.

14                MS. FLAX:   Okay.   Strike

15   that.

16   BY MS. FLAX:

17       Q.    If the assumption that you

18   make in the third sentence of the

19   second paragraph on Page 7 that

20   starts "in response," if the

21   assumptions were unproven, would you

22   still make the opinion that materials

23   described as sludges and handled with

24   shovels may contain substantial

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581