# Exhibit A

## Part 2 of 5

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    quantities of liquids?

2         A.    Well, I guess I'm a little

3    bit confused.  I think unproven is

4    different from proved to be wrong,

5    right?

6              That is, there still could

7    be -- at the end of the day there

8    could still be no specific

9    information saying that there were

10   free liquids in the degreaser sludge.

11             But unless there is

12   specific information saying that the

13   sludges taken from the degreasers at

14   the Handy & Harman facility were 100

15   percent solid, then my opinion would

16   still be that those degreaser sludges

17   contain free liquids.

18        Q.    And that opinion is based

19   upon what?

20        A.    As I said before --

21             MR. HARRIS:  Again, I

22   object, asked and answered.

23             Go ahead.

24             THE WITNESS:  That opinion

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    is based on my knowledge of how

2    trichloroethylene degreasers worked,

3    how TCE has become to be one of the

4    more predominant environmental

5    contaminants, and the physical

6    chemical properties of

7    trichloroethylene.

8    BY MS. FLAX:

9        Q.    So if I understand you,

10   it's your position that only if

11   evidence is proven to demonstrate the

12   absence of free liquid your opinion

13   would stay the same?

14       A.    Correct.

15       Q.    Continuing in that

16   paragraph at the bottom of Page 7 of

17   Vandeven-5, the sentence that starts

18   "In addition, if the volume of

19   degreaser sludge," do you see that

20   sentence?

21       A.    Yes.

22       Q.    If that assumption was

23   disproved or proved to be false,

24   would you still hold the opinion that

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    is contained in that sentence?

2        A.    Are you asking if it's

3    proven that the volume of degreaser

4    sludge was not small but was large?

5            I guess I would -- if it

6    was large and large enough to fill an

7    entire -- to always fill up the drums

8    that they were in, then there

9    wouldn't be any place for liquid

10   waste, other liquid waste.

11       Q.    So then you would not make

12   that statement.  Correct?

13       A.    I would not make that

14   statement if there was evidence that

15   every drum that had trichloroethylene

16   degreaser sludge contained 48

17   gallons, which is how big a 55-gallon

18   drum is.

19            If each drum contained 48

20   gallons of TCE degreaser sludge, I

21   would not make that statement,

22   correct.

23       Q.    But you would make the

24   statement with anything less than 48

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    gallons?

2         A.    Correct.

3         Q.    Earlier I asked you about

4    documents that Dr. Exner considered,

5    some of which I believe you said you

6    reviewed.  Is that correct?

7         A.    That's correct, yes.

8         Q.    Did you have an opportunity

9    to review either in whole or in part

10   the deposition testimony of Thomas

11   Curran?

12        A.    Did he author an expert

13   report?

14        Q.    No.  He's an individual.

15   He's not an expert in this case.

16        A.    Okay.  I'm not sure if I

17   did or not.

18        Q.    I'm handing you the

19   transcript of the deposition of

20   Thomas Curran.  And what I would like

21   to do is I would like to have you

22   read from page 53, line 20 to Page

23   55, line 14.

24             MS. FLAX:  Do you want to

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1   look at my copy while he's reading

2   that?

3                THE WITNESS:  53 20 to 55

4   14?

5   BY MS. FLAX:

6        Q.   Please.  And when you are

7   done, please tell me.

8                MR. HARRIS:  If he wants

9   to, can he look at any other lines?

10               MS. FLAX:  What?

11               MR. HARRIS:  If he wants

12   to, can he look at any other lines?

13               MS. FLAX:  If he wants to.

14               MR. HARRIS:  Well, when you

15   instructed him to read those lines, I

16   wanted him to know if he looks at

17   other lines, it's okay.

18   BY MS. FLAX:

19        Q.   Well, my questions are

20   going to be directed to Mr. Vandeven

21   with respect to the page and lines I

22   just gave you.  But if you feel you

23   need to review before and after, by

24   all means do so.

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    A.    Okay.

2    Q.    You have had an opportunity

3  to read Page 53, line 20 through Page

4  55, line 14 of the deposition of

5  Mr. Curran.  Is that correct?

6    A.    Yes.

7    Q.    I am going to represent to

8  you that Mr. Curran was an employee

9  of Handy & Harman Tube Company, just

10  so that you know that when I ask you

11  about Handy & Harman's industrial

12  wastes that's why I'm asking you,

13  because you have now read testimony

14  from Mr. Curran.  Okay?

15    A.    Okay.

16    Q.    Is there anything in

17  Mr. Curran's testimony that suggests

18  that the industrial waste solution

19  that he describes contains any

20  hazardous material?

21    MR. HARRIS:  Hold on a

22  second.  He's not being offered as an

23  expert -- he's not here to give an

24  opinion as to what was in Handy &

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Harman's waste, so that's not a

2    proper question.

3              MS. FLAX:   Are you

4    directing him not to answer?

5              MR. HARRIS:   I might.   I'm

6    trying to figure out where you are

7    going with this.   He is not going to

8    offer an opinion in this case as to

9    what was in Handy & Harman's waste.

10   That is not in his report.   He's not

11   here to form new opinions.

12             If you are about to ask him

13   to give an opinion as to what was in

14   Handy & Harman's waste, then that's

15   an improper question.

16             MR. PETTIT:   Glenn, can I

17   just say something, because --

18             MR. HARRIS:   Yes.   I'm not

19   trying to be --

20             MR. PETTIT:   You ought to

21   clarify this, because as Melissa

22   pointed out in her questioning, in

23   rebuttal opinion he adopts

24   Dr. Exner's descriptions of the

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    wastes associated with various

2    industries and defendants.

3                MR. HARRIS:  But he

4    clarified -- well, go ahead and

5    finish.

6                MR. PETTIT:  I'm trying to

7    understand the scope of his opinion.

8                MR. HARRIS:  I would like

9    to make this simple.  He is not going

10   to be a second Dr. Exner rendering

11   all the opinions Dr. Exner presented.

12               He looked at that, as he

13   testified earlier, solely for the

14   purpose of understanding better and

15   in more detail basically some of the

16   acid wastes that were associated with

17   some of the companies in this case.

18               That was the intent of that

19   sentence or two in his rebuttal

20   opinion.  We will not put him on the

21   stand and ask him to testify other

22   than what's in his report.

23               MS. FLAX:  Or in his

24   rebuttal report.

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          MR. HARRIS:  Or in his

2     rebuttal report, specifically.

3     Unless he specifically says something

4     about a particular waste, we are not

5     going to put him on and be -- you

6     know, say everything the experts say.

7          MR. COOLEY:  I'm not sure I

8     understood the last sentence.  Unless

9     he says something specific about --

10          MR. HARRIS:  Well, for

11     example, he made some comments

12     specifically about the degreaser

13     sludge.  Certainly that's in his

14     report, certainly he is going to

15     testify to it.

16          He's made some comments

17     generally in one report or the other,

18     frankly I don't remember which, about

19     plating wastes or printed circuit

20     board wastes.  He is going to say

21     whatever is in his report about that.

22          But he is not going to come

23     up with some wholesale opinion about

24     what was in any particular

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    defendant's waste.

2                 In his report here I think

3    Handy & Harman's is the only

4    defendant's waste stream he actually

5    refers to at all by defendant.

6    That's not going to change.

7                 MS. FLAX:  So if you are

8    representing that other than what's

9    contained in Vandeven-1 and

10   Vandeven-5 that Mr. Vandeven will not

11   be at any time offering an opinion as

12   to a party's specific waste stream,

13   with the exception of obviously the

14   Handy & Harman TCE degreaser sludge,

15   then I will withdraw the question.

16                 MR. HARRIS:  Yes.  That's

17   what I'm representing.

18                 MR. COOLEY:  May I clarify

19   one other thing?  I'm not trying to

20   split hairs --

21                 MR. HARRIS:  No, no.  I

22   want to get to the bottom of it so we

23   don't waste a lot of time.

24                 MR. COOLEY:  In the section

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    of I believe it's Vandeven-1 in which

2    there are a series of bullets with

3    statements about types of wastes from

4    certain industries, let's say, do I

5    understand correctly that he is not,

6    in that portion of his report,

7    stating an opinion or a conclusion

8    that the descriptions of waste there

9    apply to any of the defendants in

10   this case?

11          MR. HARRIS:  Any specific

12   defendant?

13          MR. COOLEY:  Correct.

14          MR. HARRIS:  That's

15   correct.  He is not saying that.

16   That's why, just to keep going down

17   the road, that's why he doesn't say

18   anywhere in his report either that

19   any particular waste got to the site.

20          He is simply saying, look,

21   here is what is generally in pickle

22   liquor, not Carpenter's pickle

23   liquor, not specifically NRM's pickle

24   liquor, not Peckel Waste (phonetic)

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

1    pickle liquor, here is generically

2    what's in pickle liquors, and it's

3    generally this kind of stuff.

4              And if you dumped it on the

5    ground at the site, here is what it

6    would be, without representing any

7    particular defendant, without

8    rendering an opinion that any

9    particular defendant's waste has X

10   percent of hydrochloric acid versus,

11   you know, whatever.

12             Is that helpful?  I mean,

13   I'm not barring you from asking him

14   questions.  Melissa, maybe we can

15   take it one at a time.

16             Yes.  He will not say

17   anything about what is in Handy &

18   Harman's industrial waste solution,

19   other than what he already says here

20   about the sludge.

21             MS. FLAX:  Okay.  Then I

22   will withdraw my last question

23   relating to Mr. Curran.

24             (Discussion off the

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX: 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    record.)

2         MS. FLAX:  I am not asking,

3    Glenn, for him to give an opinion.

4         I was asking whether

5    reviewing Mr. Curran's testimony

6    regarding the industrial waste

7    solution that was generated at the

8    Handy & Harman facility whether based

9    upon that description he considered

10   that waste to be a hazardous waste.

11        MR. HARRIS:  I don't think

12   he had an opinion as to that waste.

13   That's my point.

14        MS. FLAX:  And he is not

15   going to offer an opinion as to --

16        MR. HARRIS:  Other than

17   what he says about the TCE sludge.

18        MS. FLAX:  Other than the

19   degreaser sludge?

20        MR. HARRIS:  Sure.  He is

21   not going to take the stand and say

22   it is my opinion that X, Y and Z is

23   in Handy & Harman's industrial waste

24   sludge.

**JDR**
**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    BY MS. FLAX:

2        Q.    Do you have a degree in

3    metallurgy?

4        A.    No, I don't.

5        Q.    Did you take any courses in

6    the field of metallurgy?

7        A.    As part of my master's

8    degree, yes.

9        Q.    And what kinds of courses

10   were those?

11       A.    They were material science

12   courses that included metallurgical

13   sciences.

14       Q.    And since those courses

15   that you took in 19 -- in or about

16   '85 --

17       A.    That's correct.

18       Q.    -- have you taken any

19   other courses or had any other

20   studies in the field of metallurgy?

21       A.    No.

22       Q.    Other than the degreaser

23   sludge, you have not formed any

24   opinions as to the composition,

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

1      nature or characteristics of wastes

2      generated by Handy & Harman Tube

3      Company or the Handy & Harman

4      facility.   Correct?

5           A.    That's correct.

6           Q.     This morning, Mr. Vandeven,

7      I had started to ask you about

8      marked-up versions of drafts of

9      Exner-1.

10                And we came to the --

11     Vandeven-1, excuse me -- and we came

12     to the realization that these weren't

13     intentionally blacked-out markings

14     but were in fact red-lined

15     provisions.

16                And right before we resumed

17     after lunch Mr. Harris provided me

18     with legible copies of the drafts.

19     So I guess I'm going to have the

20     court reporter mark them, and I'm

21     just going to run through and ask you

22     a few questions.   Okay.

23           A.    Okay.

24                (Vandeven Exhibits 8, 9 &

JDR

James DeCrescenzo Reporting, LLC

InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103         FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    10 were marked for identification,

2    respectively.)

3              MS. FLAX:   For the record,

4    what has been marked as Vandeven-8 is

5    a June 26 e-mail from Mark Hawley to

6    Jay Vandeven attaching a draft expert

7    report of Jay Vandeven dated June

8    24th, 2006.

9              Vandeven-9 is a June 27,

10   2006 e-mail from Mark Hawley to Jay

11   Vandeven attaching a draft expert

12   report of Jay Vandeven dated June

13   blank, 2006.

14             And Vandeven-10 is a June

15   28, 2006 e-mail from Mark Hawley to

16   Jay Vandeven attaching a draft expert

17   report of Jay Vandeven dated June

18   blank, 2006.

19   BY MS. FLAX:

20       Q.    I'm going to come to you,

21   because we only have one copy.

22       A.    Okay.

23       Q.    On Page 2 of Vandeven-8

24   there is a highlighted provision that

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

120

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    says, "The RI Report says 39.9 but

2    the Removal Action Report says 33.3.

3              Although the RI refers to

4    an HRS report dated 9/4/87 no HRS

5    scoring documents are listed on the

6    EPA website or identified in the BSAI

7    index."

8              Do you see that?

9         A.    Yes.

10        Q.    Tell me what the

11   significance of 39.9 versus 33.3 is.

12        A.    I don't think it has any

13   real significance.  We were just

14   trying to be as precise and accurate

15   as possible about what the HRS score

16   was at the site.

17             And we had, again, as it

18   says, the RI, the remedial

19   investigation report says that the

20   HRS score was 39.9, but then there's

21   another report that says it was 33.3.

22             So since there was no HRS

23   package in the administrative record,

24   that was an issue that we were trying

1      to figure out.  It has no real

2      significance.  A site is on the NPL

3      if it scores above 28 and a half.

4          Q.    So it doesn't matter

5      whether it is 33.3 or 39.9?

6          A.    Not at all.

7          Q.    Is there a reason why you

8      selected to include 39.9 as opposed

9      to 33.3 as the HRS?

10         A.    The RI is generally the

11     more authoritative document than a

12     Removal Action Report.

13         Q.    On Page 5 of Vandeven-8 in

14     highlighting it says, "This list will

15     be the basis for Jay's opinions that

16     the response actions were consistent

17     with the NCP.  What specific

18     technical concerns should we try to

19     address in that opinion?"

20              Who is asking this

21     question?

22         A.    I don't know.  We are, a

23     combination of Mark and I, at this

24     point.

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.    And who is the question
2  being posed to, a third party?
3      A.    No.  This could just be
4  carrying through -- I mean, very
5  often when we write reports like this
6  if there's questions that we have, we
7  will write down the question just so
8  we don't forget about it.
9          So it is not necessarily
10  directed to anybody else except to
11  ourselves.
12      Q.    And you do it in third
13  person?
14      A.    Very often, yes.
15      Q.    Were there any specific
16  technical concerns that you were
17  faced with?
18      A.    I don't recall any
19  associated with this, no.
20      Q.    On Page 10 of Vandeven-8 in
21  the long highlighted section at the
22  bottom of the page or the end of the
23  page says, "To be continued, but how
24  do we tie in the specific wastes that

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    are of interest to Glenn without

2    saying why Jay believes they were

3    sent to the site?"

4            Do you see that?

5        A.    Yes.

6        Q.    I believe you have

7    testified that you are not offering

8    an opinion as to whether or not any

9    party's wastes were disposed of at

10   the site.  Is that correct?

11       A.    That is correct.

12       Q.    So this was beyond the

13   scope of your assignment.

14       A.    Right.  And that -- that's

15   correct.

16       Q.    And that's why it was not

17   in your final report.

18       A.    That's right.

19       Q.    And on Vandeven-9 at Page

20   10 there's highlighting that says,

21   "Jay, I put the word actions in blue

22   below because I have tried to refer

23   consistently to response activities.

24            The NCP describes removal

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    actions, remedial actions and other

2    activities, so I was trying to be

3    all-inclusive by using response

4    activities."

5              Do you see that?

6        A.    Correct.

7        Q.    Do you know what was meant

8    by this statement?

9        A.    I believe so.  We are

10   talking here about how we referred to

11   the different activities at the site,

12   whether or not we referred to them as

13   actions or activities or response

14   actions.

15             It really is just semantics

16   and just trying to be consistent.  I

17   generally try to refer to all

18   activities at a Superfund site, an

19   NPL site as response activities,

20   because that's how the National

21   Contingency Plan refers to them.

22       Q.    I'm going on to Page 11 of

23   Vandeven-9 at the bottom of the page

24   in highlighted print it says, "Jay, I

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    copied in the material you prepared

2    but have not otherwise added to the

3    NCP opinion.

4              I will provide a statement

5    re costs that says how much for each

6    element of the OU1 and OU2 RD/RAs

7    based on the demax spreadsheet

8    summaries.

9              I will see what we have re

10   EPA's response cost (11 million

11   claims settled for 7 million)."

12             I don't recall seeing any

13   mention of the EPA response cost of

14   11 million that settled for 7 million

15   in your report.  Did you address

16   that?

17       A.    I think we addressed -- I

18   think what this comment refers to, I

19   asked -- I probably asked Mark to go

20   back and see if we had information

21   about what breakdown of costs we had

22   and to try to -- I wanted to get

23   those in if we could associate

24   specific activities with specific

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    cost information that we had.

2              I don't believe that we

3    addressed specifically the 11 million

4    and the $7 million dollars.

5         Q.    Is the $7 million

6    settlement consistent with the NCP?

7              MR. HARRIS:   Objection to

8    the form.

9              THE WITNESS:   Yes, I'm not

10   sure I understand.

11   BY MS. FLAX:

12        Q.    Yes, I misstated it.   In

13   your opinion regarding the

14   reasonableness of past costs, is the

15   $7 million included in that opinion?

16        A.    Yes.

17        Q.    And that's a recoverable

18   cost?

19        A.    I'm not sure what you mean

20   by recoverable cost.

21        Q.    On Page 13 of Vandeven-9 in

22   highlighting at the end of the third

23   bullet it says, "Should we delete

24   this?  Glenn doesn't want to suggest

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                        FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    that any activities were due to drums

2    alone."

3              What about this paragraph

4    suggests or may suggest that any

5    activities were due to drums alone?

6         A.    Well, in the first sentence

7    I say, "Although the primary

8    contaminants of concern addressed by

9    the remedy described in the ROD are

10   VOCs and metals, the earlier response

11   activities (in particular the

12   emergency removal actions) were

13   necessary to address the potential

14   threat associated with the buried

15   drums."

16             So I think what this

17   highlighted piece refers to is I

18   wanted to be careful throughout these

19   reports that although there was a lot

20   of work done to remove buried drums

21   at the site, all those removal

22   actions also removed contaminated

23   soil, too.

24             So that's probably what

 1   that comment refers to.

 2        Q.     Mr. Vandeven, on Vandeven-

 3   10 at Page 12 there's two separate

 4   highlighted statements.

 5              The first one reads, "Jay,

 6   I don't know what to say here about

 7   EPA's agreement with the PRP groups

 8   to split the remedy into two OUs and

 9   allow them to perform the RD/RA.

10              Is this something we've

11   addressed in previous cases?  Do we

12   have to discuss it here?"

13              You did not in fact discuss

14   the EPA's agreement with the PRP

15   groups to split the remedy into two

16   OUs in either your affirmative report

17   or your rebuttal report.  Correct?

18        A.     I don't think we talked

19   about the EPA's agreement.  I think

20   this statement here refers to, again,

21   Mark writing primarily in this

22   section about the sequence of

23   activities at the site.

24              I wanted to try to be as

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                   FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    complete as possible.  And if there

2    was information about the details of

3    splitting it between OU1 and OU2, I

4    wanted to include that if we could.

5        Q.    So you were just looking at

6    it from a factual perspective as

7    opposed to forming an opinion as to

8    the validity or viability of

9    splitting the remedy into two OUs.

10   Correct?

11       A.    That's correct.

12             MS. FLAX:  Just a second.

13   I think I may be done.  That's all I

14   have.

15             MR. HARRIS:  Who is next?

16             MR. PETTIT:  I guess I am.

17                     EXAMINATION

18   BY MR. PETTIT:

19       Q.    Are you all right,

20   Mr. Vandeven?

21       A.    I'm fine.

22       Q.    Okay.  My name is Jeffrey

23   Pettit.  I represent Ashland in this

24   matter.

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              I am going to have quite a

2    few questions for you, which we may

3    not get complete by the time -- I

4    know we were talking about adjourning

5    today, but I will get started.  I had

6    a couple of follow-up questions to

7    Ms. Flax's questions to you.

8              In reference to Vandeven-2,

9    which was an e-mail about the

10   probabilistic analysis, in your

11   experience is a probabilistic

12   analysis usually reduced to writing?

13        A.    Not necessarily.  It could

14   just be reduced to numbers.

15        Q.    Okay.  Is there some kind

16   of written work product that would

17   either reflect numbers or words?

18        A.    There could be.

19        Q.    And in your experience

20   under what circumstances would there

21   be some kind of writing, whether it

22   is numbers or text?

23        A.    Well, if you were going to

24   use it for something specific, I

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    would think that it would be reduced

2    to some kind of writing or text.

3         Q.     And do you recall seeing

4    such an analysis in connection with

5    the Boarhead site at any time?

6         A.    I don't.

7         Q.     And if you were to do a

8    probabilistic analysis as you have

9    done in your experience, what would

10   be the nature of that as applied to

11   the Boarhead site, as you know the

12   Boarhead site?

13        A.    I don't know.  I could -- I

14   mean, that would just be speculation,

15   coming up with some way that a

16   probabilistic analysis could apply to

17   the Boarhead site.

18             I don't have any specific

19   information about how it was used or

20   how it is contemplated to be used.

21        Q.     Well, in general, what is

22   the final product of a probabilistic

23   analysis, if you could give me some

24   help on that?  And in specific, take

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com.

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    any example if you want from some

2    other project that you worked on.

3        A.    Well, it depends on the

4    nature of the analysis.    A

5    probabilistic analysis could include,

6    you know, the probability that that

7    refinery over there is going to have

8    a major explosion in the next year.

9            And so to go about that you

10   would look at each individual

11   component that would go into causing

12   that explosion, you would associate

13   probabilities with each of those

14   events.

15           And then you would

16   aggregate those probabilities

17   together to find some distribution of

18   probabilities that that outcome,

19   namely an explosion at the refinery,

20   is going to occur within the next

21   year.

22       Q.    And in connection with a

23   Superfund site, is the purpose of a

24   probabilistic analysis to try to

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    associate contaminants with a remedy,

2    or is there some other purpose to

3    that?

4                MR. HARRIS:    Objection to

5    the form.

6                THE WITNESS:    Usually I

7    would say that a probabilistic

8    analysis at a Superfund site,

9    although I have no indication that

10   that's what it was -- that it's been

11   applied at the Boarhead site, I would

12   think most likely be applied to

13   determining what the cost would be at

14   the site, the ultimate cost, the

15   future cost.

16   BY MR. PETTIT:

17       Q.    And what kind of factors

18   would be examined as a part of that

19   analysis?

20       A.    The nature and extent of

21   contamination, the regulations that

22   would apply, the types of remedies

23   that may apply to certain types of

24   contaminants and certain types of

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    media.

2         Q.     Referring to Dr. Exner, we

3    had some discussion on and off the

4    record about your review of

5    Dr. Exner, and I think you testified

6    that one of the reasons you reviewed

7    Dr. Exner's report was to get a

8    better understanding about acids,

9    acid waste streams.  Am I correct?

10        A.     Correct.

11        Q.     And do you recall

12   specifically what you -- with respect

13   to Ashland, that was one of the

14   parties addressed by Dr. Exner, do

15   you recall what you may have reviewed

16   in terms of the documents that

17   Dr. Exner relied upon in preparing

18   his report?

19        A.     I don't remember any

20   specific titles of documents.  The

21   documents that I looked at on that

22   issue were documents that said

23   something about the type of acid and

24   the strength of the acid.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                                     1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              I think before, when I did
2     my initial expert report, and then
3     even after I read the expert reports
4     from the other side there was still
5     no specific information on the types
6     of acids, I don't believe.
7              Whether it was hydrochloric
8     acid, sulfuric acid, nitric acid,
9     whether or not it was concentrated,
10    dilute.  So I looked at Dr. Exner's
11    report to determine -- well, let me
12    back up.
13              I think when I read
14    Dr. Exner's expert report he said
15    something about the nature of the
16    acids, what kind of acids they were,
17    how strong the acids were.
18              And I wanted to include in
19    my opinion, in my rebuttal opinion
20    something about the type of acids.
21              And if I was going to
22    address that, if I was going to
23    include that in my expert report, I
24    wanted to go back and look at the

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

136

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1  underlying documents that Dr. Exner

2  used so I could adopt that -- in

3  essence, verify the information that

4  was contained in his expert report.

5      Q.     Were the Ashland acids that

6  were addressed by Dr. Exner, was that

7  a type of acid you had not

8  encountered before in your

9  experience?

10     A.     No.    They were common

11  acids, I believe.

12     Q.     Well, tell me why did you

13  need to refer to Dr. Exner to develop

14  an understanding about those acids?

15     A.     Well, some acids are

16  stronger than others.  A strong

17  acid -- and then you could have

18  certain concentrations of acids.

19          So you may have acidic

20  acid, which is a very dilute acid,

21  which the rain in Philadelphia is

22  probably pretty close to acidic acid.

23          Or you can have a very

24  strong acid, say sulfuric acid or

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    hydrochloric acid.  And then even

2    within a particular kind of acid it

3    can be more concentrated -- it can be

4    a concentrated form of that acid.

5              So I looked to his report

6    to see if there was anything about

7    those characteristics of the acid,

8    what kind it was and then how strong

9    it was.

10        Q.    And what understanding did

11   you develop about the Ashland acids

12   that were described in Dr. Exner's

13   report?

14        A.    That they contained some

15   acids that I would consider strong

16   acids, and that concentration of

17   those acids was high concentration.

18        Q.    Anything else about the

19   acids?

20        A.    I don't believe so, no.

21        Q.    And did you review any

22   information in Dr. Exner's report or

23   the documents he identified on the

24   dye wastes from Ashland's facility?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

138

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        A.    I believe seeing that as a
2    heading in his report, but I did not
3    review that in detail, no.
4        Q.    Were there any other waste
5    streams with respect to Ashland
6    identified in Dr. Exner's report that
7    you reviewed in some detail as you
8    did with the acids you described?
9        A.    I believe I read in some
10   detail his discussion of the etchant,
11   but I don't think I used the
12   information that was contained -- but
13   I don't recall using his information
14   on circuit board etchant in my expert
15   report, but I do remember reviewing
16   that from his expert report.
17       Q.    Did you review the
18   transcript of Dr. Exner's deposition
19   at any point up until today?
20       A.    I believe I briefly looked
21   through his deposition transcript,
22   but I don't recall any details from
23   it.
24       Q.    Do you recall whether that

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1   changed your understanding in any way

2   about the Ashland acids that you had

3   considered?

4        A.    No, it did not.

5        Q.    If you could pull out

6   Vandeven-7, one of the drafts.

7             MR. HARRIS:   7, I think, is

8   the final one.   I could be wrong.

9             MR. PETTIT:   This is one of

10  the things that was taken out about

11  the cost allocation.

12            MS. FLAX:   That's 6.

13            MR. PETTIT:   6.   Okay, I

14  got it.

15  BY MR. PETTIT:

16       Q.    I'm sorry, Mr. Vandeven.

17  This is on Page 7 of Vandeven-6.

18  Now, on that last line you state --

19  you provided an opinion at that time

20  that "equitable allocation would

21  require consideration of other

22  factors in addition to those named

23  above."

24            Could you identify what

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX 215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    those other factors were that you

2    were referring to at the time?

3              MR. HARRIS:  Objection to

4    the form.

5              THE WITNESS:  I don't think

6    I was specifically referring to any

7    individual factors, just that it

8    would be -- that what I identified

9    here is an incomplete list, that it

10   would include many other factors,

11   both technical and nontechnical

12   factors.

13   BY MR. PETTIT:

14      Q.    You have done, I think

15   based on your testimony, you have

16   performed cost allocations in other

17   projects.  Am I correct?

18      A.    That's correct.

19      Q.    And when you did that, did

20   your cost allocation include the

21   three factors that are identified on

22   Page 7 of your draft?

23      A.    In general I would say yes.

24      Q.    And do you recall any other

1    factors that you may have utilized in

2    those other projects where you

3    performed cost allocations?

4        A.    Well, yes, but they may

5    not -- I mean, they wouldn't

6    necessarily apply here.

7              I used factors such as how

8    long a particular product was being

9    produced, the volume of the product

10   being produced.  So those are more

11   related to operating facilities

12   rather than a disposal site such as

13   this.

14              (Vandeven Exhibits 11 & 12

15   were marked for identification,

16   respectively.)

17   BY MR. PETTIT:

18       Q.    Mr. Vandeven, I'm showing

19   you a copy of an e-mail from you to

20   Mark Hawley.  The subject is Ashland

21   Comments, and it refers to an

22   attachment, it looks like Ashland

23   with a doc extension.

24              I did not see the

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                   FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    attachment in the records that were

2    provided to us. I was wondering, and

3    maybe I missed it, but did you retain

4    a copy of that?

5         A.    I don't know if I did or

6    not. This was likely my initial

7    comments on reviewing the Ashland

8    expert report, or the expert report

9    from the individuals. That was the

10   one where three individuals --

11        Q.    That's correct.

12        A.    That's the way I always

13   refer to it.

14        Q.    As far as you know, you

15   searched your records and provided

16   everything that was responsive to the

17   document request to counsel.

18   Correct?

19        A.    That's correct.

20        Q.    And if you had it, it would

21   have been in those documents?

22        A.    Yes.

23        Q.    And do you recall whether

24   or not that's been deleted,

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    misplaced?

2          A.    I couldn't say, sitting

3    here right now.

4          Q.    Let me ask you about the

5    document that has been marked

6    Vandeven-12.  And this is an e-mail

7    from Jennifer Schulte to Mark Hawley

8    dated June 26, 2006.  Have you had a

9    chance to read that?

10         A.    Yes.

11         Q.    Do you recall circumstances

12   under which this was sent or this

13   discussion was generated?

14         A.    I believe when we first got

15   the expert reports from the other

16   side that started to mention

17   individual waste streams, we

18   initially started to see what

19   information we may have on those

20   waste streams.

21               Again, not knowing exactly

22   how we were going to address

23   individual waste streams in my expert

24   report, we initially tried to see

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    what information we could find on

2    waste streams that were mentioned.

3        Q.    With respect to the

4    chemicals that are referenced in this

5    e-mail, did you find any association

6    with those chemicals with the

7    conditions at Boarhead?

8        A.    I did not attempt to, no.

9        Q.    Let me ask you a couple of

10   questions about your experience.

11       Have any of the other

12   projects you have worked on, have you

13   had experience with acids such as in

14   the case here you have rendered an

15   opinion that acids mobilize metals at

16   Superfund sites?

17       Have you had an occasion to

18   examine that issue in other

19   contexts?

20       A.    Yes.

21       Q.    For example, where?  Can

22   you tell me -- first of all, if you

23   have any litigation cases I would

24   like to know about those first.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    A.    The only litigation-related

2  case that I could think of that

3  specifically addressed -- that had as

4  a significant component acids and

5  their propensity to mobilize metals

6  would be the work that I did for Sun

7  Oil.

8    Q.    Outside of litigation

9  cases, can you recall other matters

10  you have worked on involving acids

11  mobilizing metals?

12    A.    Well, I mean, on almost any

13  environmental investigation case has

14  to do with acidic conditions

15  mobilizing metals.

16    Q.    Have you rendered an

17  opinion in any other matter where you

18  have concluded that acids did in fact

19  mobilize metals and that contributed

20  to the response activities at a site?

21    A.    I don't -- I can't recall,

22  sitting here right now.

23    Q.    How about in the Sun case,

24  was that an opinion that you rendered

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    in that case?

2         A.    I believe so, yes.

3         Q.    And in the Sun case, did

4    that involve metal bearing acids or

5    non-metal bearing acids?

6         A.    It included both.  The

7    primary source of the acids was a

8    non-metal bearing acid, though.

9         Q.    And what source was that?

10        A.    Acid sludges from refinery

11   waste.

12        Q.    And there was also a metal

13   bearing acid and containing acid in

14   that case?

15        A.    Yes.  There were metals in

16   some of the acids, yes.

17        Q.    And was that the same

18   source?

19        A.    I don't recall exactly

20   where the source of the metals came

21   from.

22        Q.    So in your experience you

23   have encountered both kinds of acids,

24   those that contain metals and those

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    that do not?

2        A.     Correct.

3        Q.     And I think in your report

4    you use the term substantial

5    quantities of metals.  Am I correct?

6        A.     I may have used those words

7    together.

8        Q.     Okay.  Let me ask you

9    this:  How do you differentiate

10   between a non-metal containing acid

11   or bearing acid and a metal bearing

12   acid?  Is there some quantity of

13   metal or some standard by which you

14   could differentiate between the two?

15       A.     I won't say that there's

16   any bright line.

17            If there's an acid waste

18   that originated from a process where

19   metals were a part of the process, I

20   would say that that would be an acid

21   bearing waste that contained metals,

22   as opposed to an acid waste that did

23   not originate from a process that

24   contained metals.

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

215.564.3905                          FAX 215.751.0581

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

148

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          It could be a discarded
2     acid, for instance, just a raw
3     product.
4          Q.    Now, based upon your
5     understanding of Ashland's waste
6     streams, as evidenced by Dr. Exner's
7     report, where do you put Ashland's
8     acids, that you consider, in which
9     category?
10         A.    I consider their acids --
11    the only thing I did was consider
12    their acids after looking at
13    Dr. Exner's report as strong acids.
14         Q.    Did you put them in the
15    category of acids that originated
16    from a metal process and therefore
17    likely to have metal constituents or
18    the other kind of acid that you just
19    described?
20         A.    I don't believe I made that
21    demarcation with their waste.
22         Q.    Do you have an opinion
23    today which category the Ashland
24    acids fall into?

**JD2**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        A.    No.

2        Q.    And do you have an

3    understanding that some metals are

4    not mobilized by acids?

5        A.    I would say that there are

6    some metals that are mobilized to

7    greater degrees than other metals by

8    acidic solutions.

9        Q.    And is there a way to

10   categorize those metals that are

11   mobilized to a greater extent as

12   opposed to those that are mobilized

13   to a lesser extent?

14       A.    Again, there is no bright

15   line.  It would depend on the form of

16   the metal, what compound it was in.

17   But in general all metals, all

18   materials can be mobilized by acidic

19   waste.

20       Q.    And in connection with this

21   particular case, did you develop any

22   new or additional understanding about

23   mobilization of metals in the context

24   of Superfund sites?

150

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      A.      Any new?

2      Q.      New understanding.

3      A.      No.

4      Q.      Now, I noticed in one of

5   the documents in the materials that

6   were provided to us was an EPA

7   groundwater document. Can you tell

8   me why did you -- is it something you

9   referred to in connection with this

10  case in particular?

11     A.      I don't -- if it's listed

12  in my documents that I reviewed, then

13  I'm sure I reviewed it for something,

14  but I couldn't say exactly right now

15  what I reviewed it for.

16     Q.      Can you tell me when you

17  may have reviewed it, in connection

18  with either the preparation of your

19  original report or your rebuttal

20  report?

21          MR. HARRIS:  How about if

22  we make clear what you are referring

23  to.

24          MR. PETTIT:  Okay.

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    BY MR. PETTIT:

2         Q.    I'm referring to the EPA

3    "Ground Water Issue" Behavior of

4    Metals in Soils.    That was one of the

5    documents that was provided to you.

6         A.    Okay.

7         Q.    Can you recall when you --

8    first of all, is that something you

9    had in your library?

10        A.    Yes.    I'm sorry.

11        Q.    Or was it something you

12   obtained particularly in connection

13   with this case?

14        A.    I don't know for sure.

15   It's very likely that we had this in

16   our library.

17        Q.    And can you recall whether

18   you reviewed this in connection with

19   the original report?

20        A.    I don't know for sure.

21        Q.    And by the way, are there

22   any other documents -- I will take

23   that.    I'm not going to ask you

24   anymore questions on that.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          Are there any other
2    documents that you have reviewed in
3    preparation for today's testimony
4    that is not listed either in your
5    original report or your rebuttal
6    report, or like this was not provided
7    to us by counsel?
8          MR. HARRIS:   Documents is a
9    tricky word.   He's testified that he
10   read expert reports that of course
11   aren't listed or may or may not be
12   listed, transcripts.   Make sure he
13   understands what the question was.
14   BY MR. PETTIT:
15        Q.    Well, any piece of paper
16   that has writing on it.   I know you
17   have testified about what you did.   I
18   want to make sure that we know
19   everything that you reviewed in
20   preparation for this.
21        A.    Everything that's cited in
22   my two expert reports, in addition to
23   the expert reports submitted by other
24   experts, and deposition transcripts.

**JDR**

**James DeCrescenzo Reporting**, LLC
215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          Q.    Okay.  If we could turn to

2     your report.  Okay, on Page 1, and

3     particularly Item No. 2 at the top.

4                    MR. HARRIS:  Which report?

5                    MR. PETTIT:  The original.

6     I'm sorry.  Vandeven-1.

7     BY MR. PETTIT:

8          Q.    You identify two topics you

9     were asked to give an opinion on, and

10    the second one is what I'm referring

11    to, the relationship between the

12    wastes that were disposed of at the

13    site and environmental conditions

14    that led to response activities.

15                    My first question is how

16    did you define wastes in connection

17    with that topic?

18         A.    Well, I was -- I didn't

19    restrict myself in any way.  Any

20    information about the types of wastes

21    or the form of wastes disposed of at

22    the site.

23                    So it would include

24    information about any bulk liquids

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    that were disposed of at the site,

2    drum liquids, specific kinds of

3    contaminants that were found at the

4    site from metals to chlorinated

5    solvents.

6              So I didn't -- any

7    information that I had on wastes that

8    were or may have been disposed of at

9    the site.

10        Q.    Now, on Page -- if you

11   could go to Page 10.

12              And that last paragraph

13   before the bullet on the bottom you

14   state, "I have reviewed the record

15   for the site and concluded that the

16   response actions taken were necessary

17   to respond to documented threats and

18   risks posed by hazardous substances

19   at the site."

20              Now, is that the same as

21   the waste you just talked about in

22   connection with the topic that you

23   were addressing?

24        A.    Can you repeat that?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Q.    Sure.  I want to -- when

2    you use the term hazardous substances

3    on Page 10, is that the same as the

4    wastes that were disposed at the site

5    that you reference on Page 1?

6    A.    I would say that the

7    hazardous substances would be part of

8    the wastes that were disposed of at

9    the site.

10    Q.    And how would you define

11    those hazardous substances?  So we

12    differentiate between the wastes and

13    the hazardous substances?

14    A.    Well, hazardous substances

15    has a specific CERCLA definition, a

16    specific regulatory definition.

17         So CERCLA responds to

18    releases or threats of releases of

19    hazardous substances, which is a

20    specific list of contaminants and

21    constituents.

22    Q.    And by that, is that the

23    same as the RCRA hazardous waste that

24    you've identified -- the term you

**James DeCrescenzo Reporting,** LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    used on Page 14 of your report?

2            MR. HARRIS:   Objection to

3    the form.

4            THE WITNESS:   No.

5    BY MR. PETTIT:

6        Q.    So I'm trying to understand

7    when you use the term wastes or

8    hazardous wastes that I have the

9    universe of what you are talking

10   about, because they are used

11   interchangeably, and I just want to

12   have an understanding.

13           So can we just -- I think

14   we have defined what you meant by

15   waste in your topic, okay.  On Page 4

16   you used the term hazardous waste in

17   connection with CERCLA, and now is

18   this a third kind of hazardous

19   waste?

20       A.    No.  I mean, in

21   environmental -- the way that the

22   environmental laws are written,

23   hazardous waste has a very, very

24   specific definition, as does

**JDR**

**James DeCrescenzo Reporting,** LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    hazardous substance.

2        Q.    And what is that

3    definition?

4        A.    Well, hazardous waste under

5    RCRA is defined as either a listed

6    hazardous waste or a characteristic

7    hazardous waste.

8        Q.    And when you use the term

9    hazardous waste without the RCRA

10   qualifier in your report, what are

11   you referring to, yet another kind of

12   hazardous waste or a greater list of

13   hazardous wastes?

14       A.    If you would point me to a

15   specific use of that.

16       Q.    On Page 13 in the first

17   bullet you use the term wide variety

18   of hazardous substances.

19       A.    Right.   That's not

20   hazardous waste.

21       Q.    Okay.   So what did you mean

22   by that, the hazardous substances,

23   when you used it on Page 13 of your

24   report?

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      A.      Well, again, with CERCLA
2  law and the statute and the
3  implementing regulations,
4  particularly the NCP define hazardous
5  substance, which is a long list of
6  specific chemicals that are -- that
7  EPA can respond to under the CERCLA
8  statute.
9      Q.      Okay.  And when you use the
10  term hazardous waste as you did on
11  Page 14, you are referring to the
12  RCRA defined hazardous waste?
13      A.      Correct.
14      Q.      And when you use the term
15  waste, as you did on Page 1, that
16  includes both hazardous substances,
17  hazardous wastes and everything else
18  that you testified about earlier.
19      A.      That would be a broader --
20  the material that was disposed of at
21  the site.
22      Q.      Now, on Page 13, in the
23  second bullet you talk about historic
24  disposal at the site.  I wanted to

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    ask you about the substances.  The

2    ferric chloride, is that a hazardous

3    substance, a hazardous waste or just

4    a waste in general?

5         A.    I don't -- I don't know if

6    ferric chloride is listed on CERCLA's

7    list of hazardous substances.  I

8    would have to look.

9         Q.    How about copper ammonium

10   carbonate?

11        A.    The same, I would have to

12   look.

13        Q.    Sulfuric acid?

14        A.    Sulfuric acid I believe is.

15        Q.    Is a hazardous substance?

16        A.    Yes.

17        Q.    In that same sentence where

18   you talked about ferric chloride,

19   copper ammonium carbonate and

20   sulfuric acid and other bulk wastes,

21   and you go on to say spent etchant

22   solutions, acids and pickle wastes,

23   generally contain substantial

24   quantities of metals, all right,

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    could you tell me what do you mean by

2    substantial?

3         A.    Well, again, they would

4    either be from a process that related

5    to the use of metals or they were

6    actually metals themselves.

7              I mean, ferric chloride has

8    iron in it, iron is a metal. Copper

9    ammonium carbonate has copper in it,

10   that's a metal.

11             So it was either they were

12   from processes that were related to

13   the use of metals or the actual bulk

14   waste contained metals.

15        Q.    So is it fair to say you

16   had no specific quantity in mind when

17   you used the term substantial, it's

18   more a description of the source of

19   the waste?

20        A.    That's correct.

21        Q.    And what metals were you

22   referring to in that sentence?

23        A.    I wasn't distinguishing or

24   limiting myself to any specific

1    metals in that sentence.

2        Q.    Now, in the next sentence

3    you state -- you use the term --

4    okay, in the next -- sorry, the

5    second sentence after that you use

6    the word corrosive waste solutions

7    that did not contain metals.

8            How do you differentiate

9    that substance from the other

10   substances involving ferric chloride,

11   et cetera, in the two sentences

12   before that?

13           MR. HARRIS:    Objection to

14   the form.

15           THE WITNESS:    Well, all I'm

16   saying there is, and again the

17   sentence reads "even corrosive

18   solutions that did not contain

19   metals."

20           So even if there was a

21   solution, as we talked about before,

22   that was just pure discarded sulfuric

23   acid, they would have an impact at

24   the site.

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              They would mobilize metals

2    from other wastes, they would

3    mobilize metals in the soil, and they

4    would generally mobilize all

5    contaminants that were in the

6    subsurface just because of their

7    acidic nature.

8              So even if they did not

9    contain metals, they would have an

10   impact at the site.

11   BY MR. PETTIT:

12        Q.    And is the word corrosive

13   limited to acid or can it include

14   base liquids as well, base

15   substances?

16        A.    The latter.  It can include

17   both acidic solutions, that is low pH

18   solutions and high pH solutions.

19        Q.    Now, on Page 14 of your

20   report, and right to the second

21   bullet, you talk about a variety of

22   wastes.  Then you use the term

23   collectively these wastes exhibited

24   the characteristics of ignitability,

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                 1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                             www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    corrosivity, reactivity and toxicity.

2              Now, I'm focusing on the

3    word collectively.  Does that mean

4    all of those substances or just some

5    of them?

6        A.    I believe that's referring

7    to the materials that were in the

8    drums.

9        Q.    Right.  And my question is

10   did you mean to say by that sentence

11   that all substances in the drums

12   exhibited those characteristics or

13   only some of them?

14       A.    I believe what that is

15   referring to is that all of them had

16   some of these characteristics.

17             All of them were RCRA

18   hazardous wastes based on some RCRA

19   criteria; either they were ignitable,

20   corrosive, reactive, or they failed

21   the EP tox test.

22       Q.    And then the next bullet

23   you talk about substances that are

24   not considered RCRA hazardous waste

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                   FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    and that contribute to environmental

2    conditions.  Am I correct?

3        A.    Correct.

4        Q.    And you use an example of

5    PCBs.  Are there any other substances

6    that you are aware of that would meet

7    that criteria?

8            MR. HARRIS:  Objection to

9    the form.

10            THE WITNESS:  That are

11    not --

12    BY MR. PETTIT:

13        Q.    That are not considered

14    RCRA hazardous wastes but could

15    contribute to environmental

16    conditions addressed by the response

17    activities at Boarhead.

18        A.    No, I'm not.

19        Q.    And you go on to say in

20    this bullet with respect to the RCRA

21    characteristics of corrosivity that

22    means that the substance exhibits a

23    pH between 2 and 12.5.  Am I correct?

24        A.    That do not exhibit.

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.     Right.   So if a substance

2   has a pH between 2 and 12.5, it is

3   not considered corrosive under RCRA.

4   Am I correct?

5      A.     That's correct.

6      Q.     And by the same token, if

7   it's less than pH of 2 it's

8   considered corrosive under RCRA.   Am

9   I correct?

10     A.     That's correct.

11     Q.     And if it exceeds 12.5 it's

12  also considered corrosive under

13  RCRA.

14     A.     Correct.

15     Q.     Now, on Page 16, this will

16  be the second full paragraph, you

17  talk about -- this is the fourth

18  sentence, "these and other wastes

19  released in bulk -- " do you see

20  that?

21     A.     Yes.

22     Q.     -- "were generally

23  corrosive and likely contained

24  substantial quantities of metals,"

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    and you identify them.  What basis do

2    you have for, first of all, that they

3    were generally corrosive?

4         A.    The description of the

5    wastes in the underlying documents,

6    sulfuric acid, for instance is an

7    acid that's going to very likely have

8    a pH of less than 2 and be corrosive.

9              And, again, here we are not

10   necessarily -- we are not necessarily

11   talking about corrosive under RCRA,

12   that is a pH less than 2.

13             It could be a pH higher

14   than 2 but still be corrosive, still

15   mobilize metals and still promote the

16   deterioration of drums.  So the

17   description of the wastes contributes

18   to determining whether or not they

19   are corrosive.

20        Q.    Is there a pH that you

21   would consider a substance not to be

22   corrosive?

23        A.    7.

24        Q.    That's neutral?

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          A.     That's neutral.

2          Q.     Anything but that?

3          A.     No.  I wouldn't say

4     anything but that, but generally --

5     anything below 7 can be corrosive.

6          Q.     And again, in this sentence

7     you use the word "substantial

8     quantities of metals."  Did you have

9     a specific quantity in mind when you

10    wrote that?

11         A.     No.

12         Q.     Is there a minimum quantity

13    that would satisfy your definition of

14    substantial quantities, percentage

15    or --

16         A.     No.

17         Q.     So is it your opinion that

18    bulk wastes that generally are

19    corrosive contain substantial

20    quantities of metals drive the need

21    for remediation at Boarhead?

22         A.     I would say that wastes

23    that contain metals contributed to

24    the need for and cost of remediation

JDR
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    at Boarhead Farms, yes.

2        Q.    And how about the wastes

3    that are not corrosive, do they

4    contribute to the need to remediate

5    the Boarhead site?

6        A.    What wastes are those?

7        Q.    Well, you have used -- I'm

8    trying to understand.  In this

9    section, generally corrosive wastes

10    that contain substantial quantities

11    of metals, and they are connected to

12    the remedy.

13        So the converse of that or

14    one of the different kind of wastes

15    would be a noncorrosive waste, so my

16    question is did that contribute to

17    the remedy at Boarhead?

18        MR. HARRIS:    Objection to

19    the form.

20        THE WITNESS:    If you had a

21    drum of trichloroethylene that was

22    not corrosive or a bulk load of

23    another chlorinated solvent that may

24    not have had a low pH, I would say

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    that that absolutely did contribute

2    to the need for remediation at the

3    site.

4    BY MR. PETTIT:

5        Q.    How about wastes that are

6    corrosive as you have just defined it

7    but do not contain metals, did they

8    contribute to the need for

9    remediation at the site?

10       A.    Yes.

11       Q.    I'm just trying to find the

12   right page.    You referred to solvent-

13   containing wastes.    That is on Page

14   15, the bottom of 15.    And the first

15   category you talk about are

16   halogenated solvents.

17            And do you have any

18   information on the quantity of

19   halogenated solvents that were

20   disposed of at Boarhead?

21       A.    A specific quantity, no.

22       Q.    Is there any minimum

23   quantity, in your opinion, that would

24   be related to the remedy at Boarhead?

170

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      A.    No.

2      Q.    So am I correct to assume

3  it means any quantity that is present

4  at Boarhead would have been related

5  to the remedy?

6      A.    I would say that any

7  halogenated solvent like

8  trichloroethylene that was disposed

9  of at the site contributed to the

10  remedy.

11      Q.    Any other halogenated

12  solvents that fall into that category

13  that you understand were disposed of

14  at Boarhead?

15      A.    I don't recall right now

16  any other halogenated compounds

17  except trichloroethylene.  There may

18  have been others,

19  tetrachloroethylene, but I don't

20  recall sitting here right now.

21      Q.    You also talk about

22  nonhalogenated solvents.  Again, do

23  you have any information on the

24  quantities of nonhalogenated solvents

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1   that were disposed of at Boarhead?

2       A.    No.

3       Q.    Is there any minimum

4   quantity had they been disposed of at

5   Boarhead that would have been related

6   to the remedy at the Boarhead Farms

7   site?

8       A.    I did not develop an

9   opinion about that, no.

10              THE WITNESS:   If you are at

11   a point, this is probably --

12              MR. PETTIT:   Yes.

13              (Recess taken)

14   BY MR. PETTIT:

15       Q.    Mr. Vandeven, I want to

16   draw your attention to the bottom of

17   Page 5 of your report, your original

18   report.  And there you set forth the

19   components of the remedy known as

20   OU2.  Am I correct?

21       A.    Yes.

22       Q.    In the beginning of that

23   paragraph, Paragraph 12 you state a

24   group of PRPs that form the RD/RA

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

1    actions for OU2.  Do you know what
2    group of PRPs performed the RD/RA
3    actions for OU2?
4        A.    Not specifically, no.
5        Q.    Now, with respect to the
6    first component of the OU2 remedy
7    which you identify as the soil
8    aeration and treatment of VOC hot
9    spots, did the wastes that you
10   described as corrosive waste
11   solutions without substantial
12   quantities of metals drive the soil
13   aeration treatment and VOC hot spots
14   in OU2?
15            MR. HARRIS:  Objection to
16   the form.
17            THE WITNESS:  It could have
18   contributed to that, yes.
19   BY MR. PETTIT:
20       Q.    And in what way could it
21   have contributed?
22       A.    As I said before, corrosive
23   wastes would have mobilized not only
24   metals but can mobilize any

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

215.564.3905                                    FAX  215.751.0581

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    contaminant in a subsurface.

2           So, for example, if you

3    have a contaminant that's addressed

4    by the soil aeration remedy, say

5    trichloroethylene, and that was

6    present and absorbed to the soil at

7    the site, if that came in contact

8    with an acid waste, that acid waste

9    would immobilize that

10   trichloroethylene and spread it over

11   a larger area, so to that extent it

12   would contribute to the soil aeration

13   and treatment remedy.

14       Q.    Am I correct that the VOC

15   hot spots in OU2 were in specific

16   areas at the site?

17       A.    They were in defined areas,

18   yes.

19       Q.    So is it fair to say that

20   the corrosive waste solutions without

21   substantial quantities of metal would

22   have to be located in some vicinity

23   of those hot spots in order to have

24   the effect that you just described?

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        A.    They would have to come in
2   contact with them, yes.
3        Q.    And if they were down
4   gradient from those hot spots, would
5   it be your opinion that they would
6   not have contributed to the soil
7   aeration and treatment of those hot
8   spots?
9        A.    If you could show that they
10  never came in contact with
11  VOC-contaminated soil, then I would
12  agree that they wouldn't have
13  contributed.
14       Q.    And if the disposal of
15  those wastes were down gradient,
16  under what circumstances could they
17  become in contact with the VOC hot
18  spots?
19       A.    Well, when you say down
20  gradient --
21       Q.    I mean downhill.
22       A.    Okay, that's different.
23  Downhill does not mean down gradient
24  to me.

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.      Okay.   Then I will use the
2   word downhill.
3      A.      Downhill.
4      Q.      Yes.
5      A.      So if they were found
6   downhill of the VOC spots.
7      Q.      Or the evidence is that
8   they were disposed of downhill from
9   the VOC hot spots.   My question is
10  under what circumstances could they
11  have contributed to the soil aeration
12  treatment of those hot spots?
13     A.      Well, if they were found
14  downhill, as you put it, they could
15  have originated from uphill and flown
16  downhill.
17     Q.      I didn't say found, I said
18  disposed of downhill.   Assuming the
19  evidence establishes they were
20  actually discharged at a location
21  downhill from the VOC hot spots.
22     A.      If they were disposed of
23  downhill, they could have migrated in
24  the subsurface to areas where the VOC

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

1  hot spots were.

2      Q.     And is that your opinion?

3  Do you have an opinion on that?

4      A.     I don't have any specific

5  information that that phenomenon

6  occurred, but I'm just responding to

7  your -- what I thought was a

8  hypothetical.

9      Q.     Okay.  Another component of

10  the OU2 remedy that you identified is

11  the excavation and off-site disposal

12  of buried drums.  Am I correct?

13      A.     Correct.

14      Q.     And in your opinion, did

15  corrosive waste solutions without

16  substantial quantities of metal

17  contribute to the excavation and

18  off-site disposal of buried drums?

19      A.     It could have, yes.

20      Q.     And I think you have

21  offered in your report that it would

22  have assisted with the deterioration

23  of the drums, am I correct?  That's

24  one way that would have occurred?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

177

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        A.    That's correct.    That's one

2   way.    It could have also mobilized

3   materials that were released from the

4   drums.

5              And, again, the buried drum

6   remedy, as I have said from the

7   start, buried drums do not just

8   include excavation of buried drums,

9   but it includes soil, contaminated

10  soil around the buried drums.

11       Q.    And typically at a site

12  like this they excavate not only the

13  drums but the soil around the drums.

14  Am I correct?

15       A.    Correct.

16       Q.    And you can usually define

17  that area by the documents that the

18  contractor generates as a result of

19  that, am I right?    You would know how

20  much soil or how far the soil

21  surrounding the drums was excavated.

22       A.    Correct.

23       Q.    Now, again, assuming that

24  the corrosive wastes without

178

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    substantial quantities of metals was

2    discharged at a location downhill

3    from the site of the drums, would it

4    be your opinion that that waste would

5    have assisted the deterioration of

6    the drums?

7          A.    It could have, yes.

8          Q.    And in what way?

9          A.    Well, any number of ways.

10   Again, it could have -- when it gets

11   into the subsurface it could migrate

12   to the area of the drums.

13              This, again, was a very --

14   this wasn't a routine operation, a

15   routine disposal site that

16   Mr. DeRewal operated that was -- he

17   did lots of different things there.

18              It's not -- it's possible

19   that soil from one area was used to

20   bury the drums.

21              So you could have had soil

22   moved from one place to another and

23   that could have created a situation

24   where soil that had contained acidic

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

1    waste came in contact with drums.

2        Q.    Do you have any evidence

3    that occurred at this site?

4        A.    I don't recall seeing

5    anything specific like that, but,

6    again, there was very little on how

7    he actually operated the site.

8        Q.    And you also stated that

9    another way that the kind of wastes I

10   was talking about could contribute to

11   the excavation and off-site disposal

12   of buried drums was by mobilizing

13   metals and the substances in these

14   drums.  Correct?

15       A.    Correct.

16       Q.    Again, would that be true

17   if the disposal site of the waste was

18   downhill from where the drums were

19   buried?

20       A.    Again, it's possible, if it

21   migrated in the subsurface to the

22   location of the buried drums.

23       Q.    And again, and you were not

24   asked to give an opinion on that, am

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                         www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    I right, in this case?

2        A.    That specific phenomena,

3    no, I was not.

4        Q.    Are you aware of any data

5    in the Boarhead record that would

6    indicate migration uphill of

7    substances in that part of the

8    ground?

9        A.    Again, you are confusing --

10    I didn't say anything about uphill, I

11    didn't say contaminants migrated

12    uphill.  You are referring to a

13    topographic characteristic.  I'm

14    referring to a subsurface

15    characteristic.

16        Q.    Okay.  Let me ask you this

17    way:  If you assume that the wastes

18    I'm talking about were discharged in

19    the ground downhill from the site of

20    where these particular drums were

21    located in OU2, did you do any

22    investigation or find any data that

23    would indicate that substances moved

24    uphill to that area?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              MR. HARRIS:  Objection to

2    the form.

3              THE WITNESS:  No.

4    BY MR. PETTIT:

5        Q.    Isn't it true that the

6    contents of the drums in this area in

7    OU2 would have had to have been

8    removed, whether they are in the

9    drums or the drums had deteriorated

10   and the contents spilled out in the

11   soil underneath?

12             MR. HARRIS:  Objection to

13   the form.

14             THE WITNESS:  Can you

15   repeat or rephrase that?

16   BY MR. PETTIT:

17       Q.    Sure.

18             If there was nothing to

19   accelerate the deterioration of the

20   drums in this location of OU2, the

21   drums would have been removed and

22   some degree of soil may have been

23   removed around the drums.  Am I

24   correct?

**James DeCrescenzo Reporting, LLC**
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          MR. HARRIS:  Objection to
2    the form.
3          THE WITNESS:  Yes.
4    BY MR. PETTIT:
5      Q.    And if your opinion is
6    correct that certain waste solutions
7    acted on the drums to deteriorate the
8    drums spilling the -- releasing the
9    contents of the drums, all that would
10   have occurred is that the waste in
11   the drums and some additional
12   surrounding soil would have been
13   removed.
14     A.    No, not -- that would not
15   have been the only effect of drums
16   deteriorating.
17          You could have had material
18   released from the drums migrating
19   both in the soil and then downward to
20   the groundwater, so it would have
21   been an impact both to the soil and
22   to the groundwater.
23     Q.    But if that occurred, the
24   contents of the drums would have been

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
                      1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                      www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1     at another location at the Boarhead

2     Farms.   Am I right?

3          A.     They could have been in any

4     number of locations both proximate to

5     the original drum and at considerable

6     distances from the drums.

7          Q.     But, in any event, the

8     remediation -- or the activities in

9     OU2 or OU1 would have addressed the

10    contents of the drums, whether they

11    are on an exact area where the drum

12    was originally located or some other

13    place in the site?

14              MR. HARRIS:   Object to the

15    form.

16              THE WITNESS:   I cannot

17    follow that.

18    BY MR. PETTIT:

19         Q.     The hazardous substances in

20    the drums had to be remediated as

21    part of this remedy.   Am I correct?

22         A.     Correct.

23         Q.     If there is no accelerated

24    deterioration of the drums, the

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103            FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    hazardous substances in the drums

2    would have been removed as part of

3    the remedy at the site where the

4    drums were buried?

5        A.    I would say that that's a

6    fair statement.

7        Q.    Okay.  If the accelerated

8    deterioration of drums released the

9    contents into the groundwater, that

10   still would have been remediated as

11   well.

12       A.    Very likely, yes.

13       Q.    And in fact there was

14   remediation of the groundwater with

15   many of the substances that were in

16   those drums.  Am I correct?

17       A.    Many of the substances that

18   required remediation in the

19   groundwater were substances that were

20   in the drums, yes.

21       Q.    So tell me, then, how does

22   the addition of corrosive waste

23   without substantial quantities of

24   metals increase the cost of the

JDR

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    remedy if the contents of those drums

2    had to be removed in any event?

3        A.    Well, you actually just

4    provided the answer to that.

5            If the corrosive waste

6    deteriorated the drums and released

7    materials from the drums that then --

8    and that allowed or exacerbated the

9    mobility of those materials, then

10   groundwater needed to be investigated

11   and remediated, additional soil

12   needed to be investigated and

13   remediated, in addition to the

14   physical removal of that drum.

15       Q.    But those things were

16   already being remediated for other

17   reasons, were they not, because of

18   the hot spots and other substances

19   discharged at Boarhead?

20       A.    Well, and that's the core

21   of my opinion, that all wastes at the

22   site and all activities at the site

23   and all forms of waste at the site

24   contributed to the need for and cost

1    of the remedy.

2              Yes, there were other

3    contributors to the need for

4    groundwater and soil remediation, but

5    that doesn't negate the fact that

6    corrosive wastes were contributed to

7    the need for and cost of the remedy.

8        Q.    Now, do you have any data

9    from the Boarhead site that would

10    indicate that the corrosive waste

11    without substantial quantities of

12    metal did in fact accelerate the

13    deterioration of those drums?

14        A.    Specific evidence?  I would

15    say the primary evidence is the fact

16    that you do have some drums intact

17    and some drums have been

18    deteriorated.

19              So there was some

20    deterioration of drums and that was

21    very likely due to acidic conditions

22    in the subsurface.

23        Q.    Are there other conditions

24    that could have caused that,

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    particularly the deterioration of

2    some drums and not the others?

3       A.   Well, just the original --

4    the original state of the drum would

5    have contributed to, and if it was a

6    rusty drum to begin with, then it

7    likely deteriorated quicker in the

8    subsurface, as opposed to an intact

9    new drum.

10       Q.   And in your experience,

11    have you encountered drums that were

12    made of particular metals or other

13    substances that resisted

14    deterioration while they were in the

15    ground?

16       A.   Well, sure, a fiberglass

17    drum is not going to deteriorate as

18    fast as a metal drum. But in sites

19    like this, I think most of the drums

20    are in that era, in the late 1960s,

21    '70s were metal, steel metal drums.

22       Q.   Now, am I correct there

23    were -- and you have mentioned that

24    there were drum removals in an

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                      FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    earlier time, in 1992 and 1993.  Am I
2    correct?
3         A.    That's correct, there were
4    two removal actions during that time.
5         Q.    And if I ask you the same
6    questions with respect to the effect
7    of corrosive waste solutions without
8    substantial quantities of metals,
9    would your answers be the same?
10        A.    Yes.
11        Q.    And would that also be true
12    of the -- you identified some removal
13    of general ceramic drums, would your
14    answer be the same with respect to
15    that removal operation?
16        A.    Yes.  They were I think
17    removed for the specific wastes that
18    they contained, but, again, they
19    would have been susceptible to the
20    same deterioration and the same
21    acidic conditions.
22        Q.    Still on Page 5.  I want to
23    move on to OU1.  I'm going to start
24    from the bottom of the various

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    components of OU1. The first thing

2    you mentioned were phytoremediation

3    studies. Could you describe what

4    that is, just real briefly.

5        A.    That's, particularly back

6    then, it was a new kind of remedy, an

7    innovative remedy that attempted to

8    immobilize or treat contaminants

9    either in soil or groundwater by

10   using plants and sunlight to

11   immobilize those compounds.

12       Q.    And would that have

13   addressed metals in groundwater or

14   soil?

15              MR. HARRIS:   Objection to

16   the form.

17              THE WITNESS:   It would have

18   addressed primarily metals, yes, in

19   groundwater or soil.

20   BY MR. PETTIT:

21       Q.    And was such a study

22   conducted at the Boarhead site?

23       A.    I believe they did do a

24   study.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                   FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.     And is it your opinion that

2   corrosive waste solutions without

3   substantial quantities of metals

4   would have been related to a

5   phytoremediation study at the

6   Boarhead site?

7      A.     Yes.

8      Q.     And in what way?

9      A.     Again, it would have

10  contributed to the nature and extent

11  of metal contamination at the site.

12            Corrosive waste would have

13  mobilized the metals and contributed

14  to where you are finding metals and

15  the level of metals that you are

16  finding.

17     Q.     And what data do you have

18  that you rely upon to reach that

19  conclusion?

20     A.     Again, the information

21  about the nature of the wastes that

22  were disposed of, that they were

23  acidic wastes, the RI information

24  regarding where they were finding

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    metals, the level of metals that they

2    were finding, the types of metals

3    that they were finding, and then my

4    expertise and experience on how

5    metals behave in a subsurface.

6         Q.     Where they were finding

7    metals, how does that relate to that

8    remedy?

9         A.     The fact that they are

10   finding metals throughout the site

11   creates the need to address metals in

12   the subsurface.  They were finding

13   metals that needed to be addressed

14   both in soil and groundwater

15   throughout the site.

16        Q.     And you also, in connection

17   with the OU1 remedy you identified

18   residential water treatment as a

19   component of that.

20              Are the corrosive waste

21   solutions without substantial

22   quantities of metal related to the

23   residential water treatment

24   component?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        A.    Yes.

2        Q.    In what way?

3        A.    The same way, they would

4    have contributed to the mobility of

5    metals in the subsurface.  They could

6    have also contributed to the mobility

7    of organic compounds in the

8    subsurface.

9            And the residential water

10   treatment units address both organic

11   and inorganic contaminants.

12       Q.    Am I correct that the

13   residential water wells are off site,

14   in other words the residences are off

15   site?

16       A.    I believe there was one

17   well on site, too.

18       Q.    And the water treatment was

19   addressing the well water on those

20   off-site locations and the one that's

21   on site.

22       A.    Correct.

23       Q.    Didn't the ROD conclude,

24   however, that the metals detected in

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

1    the off-site wells were due to the

2    diabase rock formation?

3        A.    I'm not sure if they

4    conclusively determined that or not.

5    But, again, that goes back to the

6    question that we addressed before.

7    You could have acidic solutions that

8    mobilize metals in the natural soils.

9            So it's possible that that

10    diabase which contains high

11    concentrations of metals, those

12    metals were mobilized because of the

13    acidic wastes that were disposed of

14    at the site.

15        Q.    Do you have any data to

16    indicate that the acidic conditions

17    reached these off-site wells?

18            MR. HARRIS:    Objection to

19    the form.

20            THE WITNESS:    That acid

21    conditions reached --

22    BY MR. PETTIT:

23        Q.    Acidic groundwater reached

24    the off-site wells.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          A.     No.

2          Q.     And just so I understand,

3    your opinion about the mobilization

4    of metals is the acidic nature of the

5    groundwater created by the addition

6    of corrosive wastes.  Am I correct?

7          A.     That's correct.  That

8    creates the initial mobilization of

9    the metal.  The acidic condition, if

10   you will, doesn't have to follow that

11   metal throughout the site.

12               That acidic condition can

13   mobilize the metal.  Once mobilized,

14   the metal may stay mobilized.

15         Q.     Does that assume, however,

16   that the media, let's say it's

17   groundwater, that has metals which

18   have been initially mobilized, is it

19   your opinion that that water does no

20   longer have to be acidic  to

21   transport those metals that have been

22   mobilized?

23         A.     Exactly.

24         Q.     And is it your opinion that

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    if the pH of that groundwater were to

2    increase say to 7, that those metals

3    nevertheless would still stay in that

4    groundwater?

5        A.    They would -- that

6    geochemistry is very complex, but

7    some of the metals would definitely

8    stay dissolved in the groundwater.

9        Q.    But not all the metals?

10       A.    Again, it depends on other

11   factors, not just pH.  PH is just but

12   one factor.

13       Q.    And what are the other

14   factors?

15       A.    Temperature.  The -- what's

16   referred to as the EH conditions of

17   the groundwater, the other electron

18   acceptors or donators in the

19   groundwater, the concentration of

20   other compounds in the groundwater

21   that the dissolved metal could bind

22   with, the concentration of organic

23   material in the groundwater and in

24   the aquifer that the metal could bind

1  with.

2       Q.     Anything else?

3       A.     I think that's a pretty

4  thorough list.

5       Q.     Did you review any data in

6  connection with your opinion that

7  addresses any of those items?

8       A.     We may -- I may have

9  mentioned generally what those

10  conditions were in one of my

11  opinions.  I don't recall if I did or

12  not.

13       Q.     But I'm asking you did you

14  see any data from the Boarhead site

15  that would give you information on

16  any of those factors that you just

17  identified?

18       A.     I don't recall if I did or

19  not.

20       Q.     In your experience in

21  connection with Superfund sites, is

22  that kind of data measured in

23  connection with either the RI or the

24  RF?

1              MR. HARRIS:  Objection to

2    the form.

3              THE WITNESS:  I'm not sure

4    what an RF is.

5    BY MR. PETTIT:

6         Q.    I'm sorry, FS, Feasibility

7    Study.

8         A.    It can be.  Very often it

9    is, but it's not necessarily

10   information that's gathered as part

11   of RI/FS.

12        Q.    Another component of OU1

13   that you identify was the

14   installation of additional monitoring

15   wells.  What was the purpose, as you

16   recall it, for the decision to

17   install additional monitoring wells?

18        A.    To get further

19   characterization information, to

20   understand exactly where the

21   contaminants were at the site.

22        Q.    And, in your opinion, did

23   the discharge of corrosive wastes

24   without substantial quantities of

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    metal necessitate the installation of

2    additional monitoring wells?

3         MR. HARRIS:  Objection to

4    the form.

5         THE WITNESS:  Yes.  That

6    and every other waste -- any

7    investigation activity or

8    characterization activity is

9    necessitated by the totality of the

10   wastes or chemicals disposed of at

11   the site.

12   BY MR. PETTIT:

13        Q.    So you are putting that as

14   an investigation function as opposed

15   to a remedy?

16        A.    Well, I'm putting it as

17   more of a characterization function.

18        Q.    Did the discharge of

19   corrosive waste solutions with

20   substantial quantities of metals

21   drive the groundwater extraction

22   remedy that you have identified in

23   Paragraph 11 of your report?

24        MR. HARRIS:  Objection to

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

```
1    the form.
2              THE WITNESS:  Did you say
3    with or without substantial
4    quantities?
5    BY MR. PETTIT:
6         Q.   Without.  Without
7    substantial quantities.
8              MR. HARRIS:  Objection to
9    the form.
10             THE WITNESS:  Yes.  Again,
11   it would have mobilized metals that
12   were in other wastes, deteriorated
13   drums that then created a source of
14   the contaminants to the groundwater
15   that needed to be treated.
16             It could have mobilized and
17   solubilized elements like iron that
18   needed to be addressed in the
19   groundwater remedy.
20             So it was most definitely a
21   contributor to the need for
22   groundwater extraction in metals
23   precipitation system.
24   BY MR. PETTIT:
```

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1        Q.      Am I correct that there was

2   a groundwater treatment system before

3   the OU1 remedy was implemented?

4        A.      There was an initial

5   groundwater interceptor trench, yes.

6        Q.      And was the water captured

7   in that trench being treated?

8        A.      I believe it was being

9   treated, yes.

10       Q.      And what was the

11  enhancement, as you understand it, by

12  the OU2 remedy for groundwater

13  extraction?

14       A.      I believe they enhanced the

15  metals precipitation elements of it.

16  They may have increased the size of

17  the interceptor trench.  I don't

18  recall if they made any significant

19  changes to the air stripping system.

20       Q.      And does the air stripping

21  system implemented as part of OU1

22  address metals at the Boarhead site?

23       A.      Not directly, no.  That

24  would have been removing volatile

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    contaminants.

2        Q.    Now, the groundwater

3    extraction and the metals

4    precipitation component that you talk

5    about in Paragraph 11, which metals

6    are being addressed by that remedy?

7        A.    I would have to go back and

8    look at the ROD to give you a

9    complete list.

10       Q.    I have the ROD here.  I

11   believe it's Page 34.  I will hand

12   you the Record of Decision.  That may

13   have been marked in another

14   deposition.  I don't know if we need

15   to mark it now.  Just let me know

16   when you are ready to answer some

17   questions.

18           MR. HARRIS:  Well, are you

19   going to ask him a question?  I mean,

20   do you want him to read the whole

21   thing?

22           MR. PETTIT:  Well, first I

23   wanted to ask him if he wanted to

24   look at the Record of Decision, and I

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      pointed him to Page 34.

2      BY MR. PETTIT:

3          Q.     Does that assist you in

4      identifying what you meant by metals

5      precipitation in your report as part

6      of the OU1 remedy?

7          A.     This may refer to that part

8      of the remedy, but I couldn't say for

9      sure that this is inclusive of every

10     element of -- or every issue

11     associated with that remedy.

12         Q.     Let me just then talk about

13     the metals that are identified on

14     Page 34 of the ROD, then.  Do you

15     have that?

16         A.     Yes.

17         Q.     Am I correct that the

18     Record of Decision establish certain

19     criteria to remediate a series of

20     metals or several metals and those

21     metals are arsenic, beryllium,

22     cadmium, chromium, lead and nickel?

23         A.     And zinc.

24         Q.     And zinc.  And have you

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

203

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    studied any of the data with respect

2    to Boarhead to determine whether at

3    the moment the standards identified

4    on Page 34 have been met or have been

5    satisfied for any of those metals?

6                MR. HARRIS:    Objection to

7    the form.

8                THE WITNESS:    No, I

9    haven't.  Again, you read Section A

10   of that groundwater treatment.

11   Right?

12   BY MR. PETTIT:

13       Q.     Right.

14       A.     And there's Section B which

15   refers to metals that need to be

16   treated in accordance with discharge

17   limitations under the Clean Water Act

18   in Pennsylvania state regulations.

19       Q.     Yes.  And the second part

20   of that, what the state requires, is

21   it your opinion that those metals

22   are -- that remedy is associated with

23   the contamination at Boarhead in that

24   that's part of the OU1 remedy?

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

1      A.    If there's state
2  regulations that require treatment
3  before discharge, then that's
4  absolutely related to the Boarhead
5  Farms remedy.
6      Q.    And I assume that there is
7  a cost associated with doing that.
8  Am I correct?
9      A.    Correct.
10     Q.    Now, going back to Page 13
11 of your report.  I'm looking at the
12 sentence that's the fourth line from
13 the bottom.  It begins "Most metals
14 are more soluble in acidic
15 solutions."  Do you see that?
16     A.    Yes.
17     Q.    What do you mean by "most
18 metals"?
19     A.    By that I mean with very,
20 very few exceptions metals are more
21 soluble in acidic solutions.
22     Q.    And what are the
23 exceptions?
24     A.    I couldn't say, sitting

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    here right now, but you could have

2    certain metals where you have other

3    conditions where they may not be more

4    soluble in acidic solutions.

5              But in the vast majority of

6    cases and the vast majority of

7    situations, acidic solutions are

8    going to render metals more mobile.

9        Q.    Is the mobility of those

10   metals enhanced if the metal comes

11   from a manufacturing process that

12   involves metal as you described as an

13   acid waste from a metal manufacturing

14   process and there are metals in that

15   waste acid?

16             MR. HARRIS:   Objection to

17   the form.

18   BY MR. PETTIT:

19       Q.    The mobility is the same

20   there or is it the same with a

21   corrosive acid without substantial

22   quantities of metal, is there a

23   difference between the two in terms

24   of the mobility of metals?

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

```
 1              MR. HARRIS:  Objection to
 2    the form.
 3              THE WITNESS:  Are you
 4    referring to the comparative ability
 5    of those two waste streams to
 6    mobilize say metals that are in other
 7    wastes at the site or in soils at the
 8    site?
 9              So if you have two waste
10    streams, one is pure sulfuric acid,
11    the other waste stream is sulfuric
12    acid with some dissolved metals in it
13    and both of those waste streams are
14    disposed of at the site, how would
15    those two waste streams differ in how
16    they mobilize --
17    BY MR. PETTIT:
18         Q.    The metals already existing
19    at the site.
20         A.    Okay.  They wouldn't have
21    any substantial difference in their
22    impact.  It would really be the
23    acidic nature of the bulk waste
24    rather than any metals that happen to
```

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation

215.564.3905                                      FAX  215.751.0581

1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103

www.JDReporting.com

207

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    be already dissolved in the waste.

2         Q.    Okay.  Now, of the very few

3    exceptions to your statement that

4    metals are mobilized by acidic

5    conditions, are any of those

6    exceptions present at the Boarhead

7    site?

8         A.    I don't have any

9    information that they are, no.

10        Q.    Would arsenic be one of

11   those exceptions?

12        A.    Arsenic is a compound that

13   has very complex chemistry, and it's

14   possible that there could be

15   situations where it would be less

16   mobile in acidic solution, yes.

17        Q.    How about beryllium?

18        A.    I'm not familiar with

19   how -- I'm not familiar with

20   situations where beryllium could be

21   less mobile in an acidic solution.

22        Q.    How about cadmium?

23        A.    I would say that cadmium

24   would always be mobile in an acidic

208

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1   solution.

2       Q.    How about lead?

3       A.    The same.

4       Q.    Nickel?

5       A.    It's the same.

6       Q.    And zinc?

7       A.    The same.

8       Q.    How about chromium?

9       A.    Chromium's chemistry is a

10  little bit more complex, probably not

11  as complex as arsenic.

12          But again you could

13  probably find situations where given

14  other characteristics of the

15  groundwater or soil that chromium in

16  certain states could be less mobile

17  in an acidic solution.

18      Q.    And am I correct that at

19  Boarhead the form of chromium called

20  hexavalent chromium was addressed by

21  the remedy and not the other form?

22      A.    I don't recall exactly how

23  that broke down, but I would assume

24  that the majority of the issues at

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    the site were related to chromium VI,

2    hexavalent chromium.

3        Q.    And is hexavalent chromium

4    or chromium VI, is that more soluble

5    in acidic solutions?

6        A.    I would say in general,

7    yes.  But, again, chromium chemistry

8    is very complex.

9        Q.    Also in the sentence you

10    use the term the "acidity of these

11    wastes."  How do you measure acidity?

12        A.    By pH.

13        Q.    Am I correct that when that

14    is measured in a Superfund site

15    that's a scale of 0 to 10?

16        A.    Well, in general it's a

17    scale of 0 to 14.

18        Q.    14, okay.  But is there

19    ever a negative pH measured Superfund

20    site?

21            MR. HARRIS:  Objection to

22    the form.

23            THE WITNESS:  I certainly

24    hope not.

210

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    BY MR. PETTIT:

2        Q.    Is it possible to do so,

3    given the nature of the testing or

4    the practices that are followed?

5        A.    No.    Because what pH stands

6    for is the hydrogen ion

7    concentration, so you wouldn't have a

8    negative hydrogen ion concentration,

9    so it should only be a positive

10   number.    It can be pretty low, but it

11   should only be a positive number.

12       Q.    Is there any data at the

13   Boarhead site of measurement of pH in

14   the groundwater other than the

15   monitoring wells that were installed?

16       A.    Not that I'm aware of, no.

17       Q.    On the top of Page 14 you

18   are talking about the corrosive waste

19   solutions that did not contain

20   metals, and you use the phrase

21   altered the subsurface environment in

22   ways that increased mobility

23   persistence of the hazardous

24   chemicals.

**JDR**
**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

1              In what ways did, in your
2    opinion, would those kinds of wastes
3    alter the subsurface environment?
4         A.    Can you just tell me where
5    you are reading from exactly?
6         Q.    The last word on the bottom
7    of 13.
8         A.    Okay.  And I think we
9    touched on this a little bit
10   earlier.  If you have an acidic
11   solution that is disposed of at the
12   site, it could, for example -- it
13   could degrade or mobilize the organic
14   carbon in the soil.
15              That reduction in organic
16   carbon content in the soil will in
17   turn affect how organic compounds
18   such as trichloroethylene behave in
19   the soil.
20              So you could have a
21   situation where if you didn't have
22   the corrosive waste, the
23   trichloroethylene may be bound up in
24   the organic carbon in the soil.

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              But because that subsurface

2    environment was altered because of

3    the corrosive wastes, there's no

4    longer as much organic carbon content

5    and therefore the trichloroethylene

6    is a lot more mobile in the

7    subsurface.

8         Q.    Okay.   In any other ways do

9    you believe that those wastes altered

10   the subsurface environment?

11        A.    Well, sure, there's other

12   ways.

13             Again, it could dissolve

14   the outer coating of soil particles,

15   the outer coating where you have a

16   lot of oxygen or hydroxide compounds

17   that if they hadn't been exposed to

18   that acidic waste would have helped

19   adsorb or absorb contaminants.

20             But because the soil

21   particles have been stripped of that

22   outer coating, contaminants will

23   generally flow a lot more freely in

24   the subsurface.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

213

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Q.    Is that generally what's

2    referred to as buffering capacity or

3    is that something different?

4    A.    It's similar.   It's not

5    exactly that, but it's a similar

6    concept to buffering capacity.   You

7    could have materials in the soil that

8    tend to buffer acid solutions or

9    corrosive solutions.

10            So if you spill a low pH

11    material and if you have a high pH

12    material in the soil, that will tend

13    to buffer it.

14            The more acidic solution

15    you spill you deplete that buffering

16    capacity and therefore the soil loses

17    its capacity to retain contaminants.

18    Q.    Okay.  Any other ways that

19    these wastes alter the subsurface

20    environment?

21    A.    I would say that they would

22    also alter the subsurface environment

23    in a physical way too.   Not

24    dissimilar to if you spilled sulfuric

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    acid on that stack of paper, it's

2    going to eat a hole in the paper.

3              These corrosive liquids

4    will increase the permeability of the

5    soil, they will create holes in the

6    soil.

7              Therefore wastes that are

8    there already or wastes that may be

9    disposed of will migrate a lot freer

10   because the permeability of the soil

11   is a lot greater.

12        Q.    Am I right that all those

13   things that you have mentioned

14   increase the mobility of metals in

15   the soil and other substances?

16        A.    And other substances, yes.

17        Q.    Now, you also used the term

18   "persistence of hazardous

19   chemicals." What did you mean by

20   that? That's in the same sentence.

21        A.    Persistence refers to for

22   organic compounds you could have

23   environments that are conducive to

24   degrading those organic compounds.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
                 1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              For instance,

2    trichloroethylene could degrade to

3    dichloroethylene, vinyl chloride and

4    then carbon dioxide.

5              If you release corrosive

6    materials in the subsurface, the

7    microorganisms that facilitate that

8    degradation aren't going to survive,

9    just like if somebody dumped a vat of

10   sulfuric acid on you, you are not

11   going to survive.

12             It kills living organisms.

13             And so those living

14   organisms aren't around to degrade

15   the trichloroethylene and therefore

16   the trichloroethylene can be a lot

17   more persistent.

18        Q.    The next sentence reads,

19   "Such solutions may have also

20   mobilized metals that were naturally

21   present in the soils at the site."

22   Is that an opinion you hold to a

23   reasonable degree of scientific

24   certainty?

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1           A.     Yes.

2           Q.     And why do you use the term

3    "may" there?  Is that the equivalent

4    of reasonable degree of scientific

5    certainty?

6           A.     I guess, again, the only

7    reason I use "may" there is there was

8    no specific test that was done at the

9    site to determine that that's how,

10   for instance, the high levels of

11   metals were found in the residential

12   wells that they were dissolved from

13   the diabase material because of the

14   corrosive wastes.

15           There was no specific

16   evaluation or testing done to

17   determine that that was the

18   phenomenon that caused that.

19           Q.     What data is there at the

20   site that relates to that question?

21           A.     Well, there's data relating

22   to the fact that you did have

23   corrosive materials disposed of at

24   the site, there's data related to the

**James DeCrescenzo Reporting**, LLC
215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

217

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    fact that you have high levels of

2    metals throughout the site both in

3    soils and in groundwater and in

4    residential wells off site, and

5    there's data at the site indicating

6    that there is a geologic formulation,

7    namely this diabase that has high

8    concentrations of metals.

9        Q.    Is there any other data

10   that you are aware of that's at the

11   site that relates to that opinion?

12       A.    No.

13       Q.    And did you consider all

14   that data in coming up with this

15   opinion?

16       A.    Yes, I did.

17       Q.    Now, is there any data at

18   the site that indicates that there's

19   a degradation of organic carbon as a

20   result of discharge of corrosive

21   solutions without substantial

22   quantities of metal?

23       A.    Any specific data to show

24   that?

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1      Q.    Yes.

2      A.    No.

3      Q.    How about the same question

4   with respect to what you talked

5   about, dissolving the outer coating

6   of the soil.

7      A.    I don't believe that there

8   is, no.

9      Q.    And how about the effects

10  on buffering capacity?

11     A.    I couldn't say for sure.

12  There may be data or there may have

13  been some evaluation done of that

14  phenomena.  I can't say for sure.

15     Q.    What kind of evaluation do

16  you mean?

17     A.    It could be an evaluation

18  that looked at the buffering capacity

19  of can I say a background soil sample

20  versus the buffering capacity of the

21  soils that were found at the site

22  that had been exposed to these

23  corrosive wastes.

24     Q.    Is there any data on the

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    impact of microorganisms on the site

2    by the discharge of corrosive waste

3    solutions?

4        A.    I don't know.  It occurs to

5    me that that was mentioned in the RI,

6    but I could not say for sure.

7        Q.    Is there anything in a

8    historical record at Boarhead that

9    would address any of those factors,

10   supply data that one could review to

11   address those factors?

12            MR. HARRIS:  Objection.

13   Asked and answered.

14            THE WITNESS:  Well, you

15   could -- I guess you could go back

16   and look at -- it's possible that

17   they did gather data on the organic

18   carbon content of the soils.

19            And you can look at that

20   versus background soil samples or the

21   organic carbon content of what you

22   would expect to find in soils such as

23   are found in upper Bucks County,

24   Pennsylvania to determine whether or

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    not the presence of corrosive

2    materials over the years had rendered

3    that soil bereft or had rendered that

4    soil -- or depleted the organic

5    carbon content of that soil.

6              But, again, that's not what

7    the EPA was attempting to do.  The

8    EPA was simply attempting to address

9    the health risks, the immediate

10   health risks associated with the

11   site.

12   BY MR. PETTIT:

13        Q.    In rendering your opinion,

14   did you do anything along those

15   lines, collect that data and analyze

16   it?

17        A.    No.  I collected no new

18   data, no.

19        Q.    Okay.  Mr. Vandeven, if you

20   could move to Page 16 of your

21   report.  Looking at the very last

22   paragraph that starts "once

23   released."

24        A.    Yes.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    Q.    And you use the term
2    "dependent on the characteristics of
3    the chemical of interest."  What kind
4    of characteristics were you referring
5    to?
6    A.    Different chemicals have
7    different physical and chemical
8    characteristics that determine their
9    behavior in the environment.
10   Q.    So that I don't get you off
11   on the wrong tangent.  Do you include
12   metals as a chemical of interest in
13   that sentence?
14   A.    Yes.
15   Q.    Okay.  Let me limit, then,
16   my question to what characteristics
17   of metals did you mean when you said
18   this?
19   A.    Well, different metals will
20   have different characteristics also.
21   You can have a metal that is
22   predominantly present as a cation,
23   it's referred to, which is a metal
24   that has a plus 2 valence charge.

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1              You can have metals that

2    have a propensity to bind with other

3    materials in the subsurface.

4              You can have metals that

5    are more influenced by the oxygen

6    content of the subsurface, and that

7    determines how mobile or persistent

8    they are.

9         Q.    And then you go on and in

10   the same sentence as it goes to the

11   next page, 17, you use the term

12   "characteristics of the environment

13   into which the chemical has been

14   released."

15             With respect to metals,

16   again, what characteristics of the

17   environment were you referring to?

18        A.    That would refer to the

19   soil properties in the -- say if you

20   are talking about the vadose zone or

21   the area above the groundwater table,

22   it would include, again, the coatings

23   that you may have on the soil

24   particles, different metals would

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905            Innovating Litigation            FAX  215.751.0581
              1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                         www.JDReporting.com

223

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    adhere to soil particles depending on

2    what other metals and what other

3    compounds are on the soil particles.

4              In the groundwater it would

5    be influenced by the oxygen content

6    of the groundwater.

7              It could be influenced by

8    other materials both organic and

9    inorganic that were in the

10    groundwater.  Many metals combine to

11    organic material, just like an

12    organic compound binds to organic

13    material.

14         Q.    Toward the bottom of 17,

15    about the fifth line from the bottom

16    you state, "all the acidic waste

17    increase the concentrations and

18    mobility of the metals."

19              Is there anything more you

20    want to add about the mobility of

21    metals and the effect of acidic

22    wastes other than what we have

23    already talked about?  I just want to

24    make sure I have all the bases for

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                    FAX 215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    your statement on that.

2        A.    I think we have talked

3    about everything.

4        Q.    Explain to me what you mean

5    by the acidic waste increased the

6    concentrations of the metals.

7        A.    Well, what I'm referring to

8    there is would increase the

9    concentration in the groundwater.  If

10   it mobilizes the metals, it will then

11   increase the concentrations of the

12   metals in the groundwater.

13       Q.    All right.  When you talk

14   about mobility of metals as affected

15   by the acidic waste, are you

16   referring to the acidity of the waste

17   itself or the acidity of the soil and

18   medium, be it groundwater, saturated

19   zone soil?

20           MR. HARRIS:  Objection to

21   the form.

22           THE WITNESS:  It could be

23   both.  It could be metals that may

24   have come in contact with the bulk

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1    acidic waste.

2                It could be metals that

3    have come in contact with groundwater

4    that's been acidified because of the

5    acidic waste.  So I would say it

6    could be both.

7                MR. PETTIT:  This might be

8    a good place to stop.  I have another

9    area I'm going to move onto, but I

10   can keep going.

11               MR. HARRIS:  Well, again, I

12   just want to make sure we're done

13   tomorrow.

14               MS. FLAX:  Off the record.

15               (Discussion off the

16   record.)

17               (Thereupon, at 3:41 p.m.

18   the deposition adjourned.)

19

20

21

22

23

24

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX 215.751.0581

226

DEPOSITION OF JAY VANDEVEN, VOLUME I, 2/13/07

1          WITNESS CERTIFICATION

2

3

4

5                  I hereby certify that I

6    have read the foregoing transcript of

7    my deposition testimony, and that my

8    answers to the questions propounded,

9    with the attached corrections or

10   changes, if any, are true and

11   correct.

12

13

14

15   DATE------        --JAY VANDEVEN----

16

17

18

19

20   PRINTED NAME------

21

22

23

24

**J DR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905          FAX 215.751.0581

CERTIFICATION

I, JENNIFER L. BERMUDEZ, a Court Reporter in and for the Commonwealth of Pennsylvania, hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

_____
JENNIFER L. BERMUDEZ
Court Reporter and Notary Public

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                    FAX 215.751.0581

