# Exhibit A

## Part 3 of 5

# COPY OF TRANSCRIPT

### VOLUME II, PAGE 228
### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AGERE SYSTEMS, INC., CYTEC
INDUSTRIES, INC., FORD MOTOR
COMPANY, SPS TECHNOLOGIES LLC
and TI GROUP AUTOMOTIVE SYSTEMS
LLC
     Plaintiffs

    V                   CIVIL ACTION NO.
                                02-CV-3830 (LDD)

ADVANCED ENVIRONMENTAL
TECHNOLOGY CORPORATION, ET AL.
    Defendants


          Oral deposition of JAY VANDEVEN, taken at the law offices of Ballard Spahr, Andrews & Ingersoll, LLP, 1735 Market Street, 42nd Floor, Philadelphia, Pennsylvania, on Wednesday, February 14, 2007, at 9:34 a.m., before Jennifer Bermudez, a Registered Professional Reporter, and Notary Public, pursuant to notice.



## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

```
1    APPEARANCES:

2    BALLARD SPAHR ANDREWS & INGERSOLL,
     LLP
3        GLENN A. HARRIS, ESQUIRE
         HARRISG@BALLARDSPAHR.COM
4        Plaza 1000 - Suite 500
         Main Street
5        Voorhees, New Jersey 08043-4636
         856-761-3440
6        Attorney for Plaintiffs

7

8    WOLFF & SAMSON, P.C.
         THOMAS W. SABINO, ESQUIRE
         tsabino@wolffsamson.com
9        (Appeared via telephone)
         The Offices at Crystal Lake
10       One Boland Drive
         West Orange, New Jersey 07052
11       973-530-2044
         Attorney For AETC
12

13   PHELAN, PETTIT & BIEDRZYCKI
         JEFFREY L. PETTIT, ESQUIRE
14       Jpettit@pp-b.com
         121 S. Broad Street
15       Suite 1600
         Philadelphia, Pennsylvania 19107
16       215-546-0500
         Attorneys for Ashland, Inc.
17

18   EDWARDS ANGELL PALMER & DODGE, LLP
         LYNN WRIGHT, ESQUIRE
19       lwright@eapdlaw.com
         (Appeared via telephone)
20       750 Lexington Avenue
         New York, New York 10022
21       212-308-4411
         Attorney for Carpenter Technology
22       Corp.

23

24
```

230

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

```
1    A P P E A R A N C E S   C O N T I N U E D :

2    CARELLA, BYRNE, BAIN, GILFILLAN,
     CECCHI, STEWART & OLSTEIN
3        MELISSA E. FLAX, ESQUIRE
         mflax@carellabyrne.com
4        (Appeared via telephone)
         5 Becker Farm Road
5        Roseland, New Jersey 07068-1739
         973-994-1700
6        Attorney for Handy & Harman Tube
         Company
7

8    HINMAN, HOWARD & KATTELL, LLP
         RALPH K. KESSLER, ESQUIRE
9        rkessler@hhk.com
         (Appeared via telephone)
10       106 Corporate Park Drive
         Suite 317
11       White Plains, New York 10604
         914-694-4102
12       Attorney for TI Automotive

13

14   DUANE, MORRIS, LLP
         SETH v.d.H. COOLEY, ESQUIRE
15       scooley@duanemorris.com
         30 S. 17th Street
16       Philadelphia, Pennsylvania 19103
         215-979-1000
17       Attorney for Flexible Circuits

18   LAW OFFICE OF EDWARD FACKENTHAL
         EDWARD FACKENTHAL, ESQUIRE
19       edwardfackenthal@cs.com
         One Montgomery Plaza
20       Suite 209
         Norristown, Pennsylvania 19401
21       610-279-3370
         Attorney for NRM Investment Co
22

23

24
```

**JDR**

**James DeCrescenzo Reporting**, LLC

231

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1                    E X A M I N A T I O N   I N D E X

2

3    J A Y   V A N D E V E N
          BY  MR.  PETTIT                          2 3 2
          BY  MR.  COOLEY                          2 8 2
4         BY  MR.  FACKENTHAL                      4 4 3
          BY  MR.  COOLEY                          5 1 7
5

6                       E X H I B I T   I N D E X

7
                                                  M A R K E D
8    V A N D E V E N

9     1 3      S E C T I O N  5  C O N T A M I N A N T      2 3 7
              F A T E  A N D  T R A N S P O R T
10

11    1 4      P A G E  5 - 2 0  F R O M  T H E  R I        2 4 8

11    1 5      P A G E S  2  A N D  3  O F  T H E  M I N K   4 7 0
12            R E P O R T  O F  0 9 / 2 8 / 0 6

13

14

15

16

17

18

19

20

21

22

23

24

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

```
1                 JAY VANDEVEN, having been
2       previously duly sworn, was examined
3       and testified as follows:
4                      EXAMINATION (CONT'D)
5       BY MR. PETTIT:
6            Q.      Good morning,
7       Mr. Vandeven.
8            A.      Good morning.
9            Q.      Let me cover just a couple
10      things that we talked about yesterday
11      as follow-up.
12                   When you testified about
13      your role at Boarhead when you were
14      working for CHM2 HILL, you referenced
15      a woman who was a site manager at the
16      time.  Am I right?
17           A.      Just quickly, it's CH2M
18      HILL.  I know it's complicated.  I
19      think I said that in reference to a
20      question about whether or not I was
21      the site manager, I said I believe
22      the site manager was a woman in
23      Philadelphia.
24                   And I believe her name was
```

233

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    Donna Connery or Donna O'Connery,

2    something like that.

3        Q.    Donna Connery is listed for

4    the work plan and for the remedial

5    investigation.  Are you familiar with

6    her?

7        A.    I recall her briefly, but I

8    don't --

9        Q.    Do you know anything about

10   her experience or qualifications?

11       A.    No, I don't.

12       Q.    There's also a field

13   geologist identified in the work

14   plan, Annette Mario.  Do you know

15   her?

16       A.    No, I do not.

17       Q.    And then a Jack Dingledine

18   was indicated as doing the ecological

19   assessment.

20       A.    I'm sure I would have

21   remembered him, but no, I don't

22   remember him.

23       Q.    Given your experience with

24   CH2M HILL -- did I get that right?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          A.      That's correct.

2          Q.      -- do you have any reason

3    to doubt that company's ability to

4    develop the RI/FS work plan in a way

5    consistent with the EPA directive?

6          A.      I have none whatsoever.

7          Q.      And how about the company's

8    ability to perform the remedial

9    investigation and feasibility study,

10   do you have any reason to doubt their

11   competency or ability to follow EPA

12   directives in that area?

13         A.      Not at all.

14         Q.      We talked yesterday about

15   mobilization of metals, and I asked

16   you question about the corrosive

17   wastes without substantial quantities

18   of metals?

19                 And I think your testimony

20   was that once that waste mobilized

21   metals already in the soil that those

22   metals remained in the groundwater

23   for all time.  Am I correct about

24   that?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

235

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.    I don't believe I said for
2  all time.
3      Q.    Okay.  Well, I think you
4  said they would not return to the
5  soil even if the conditions of the
6  groundwater changed.  Do I have that
7  right?
8      A.    Well, what would happen is
9  once they became mobilized, then they
10  would dissolve into the groundwater
11  and then other chemical -- physical
12  chemical interactions may take place
13  which could affect the behavior of
14  those metals.
15          They may become bound up
16  again to soil down gradient, they may
17  stay dissolved in the groundwater.
18          It's a very complex
19  process, and there will be some kind
20  of equilibrium reached at some point,
21  but they will continue to say adsorb
22  to soil, desorb and then move down to
23  gradient.
24      Q.    Okay, then I had that

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905              InnovatingLitigation              FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

236

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    wrong.

2              With respect to the acid

3    wastes that contain substantial

4    quantities of metal, would the same

5    hold true with respect to the

6    mobility of metals and the fact along

7    the site they may reabsorb or

8    deabsorb depending on the conditions

9    of the soil?

10        A.    Just to clarify, are you

11   talking about the metals that were in

12   the wastes or the metals that were in

13   the ground?

14        Q.    I was going to ask you

15   about both.  First about the metals

16   that are already in the waste, not in

17   the soil.

18        A.    They would go through the

19   same -- similar processes.  They

20   would be largely dissolved in that

21   acid waste.

22              And as they -- if that was

23   disposed of on the ground, as the

24   acid waste dispersed in the ground

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

237

1    and encountered some of the buffering

2    capacity of the soil, the metals in

3    the acid waste may interact and

4    become less mobile in the subsurface.

5              As far as the metals that

6    were already in the ground or metals

7    that were already in waste in the

8    ground, similar processes, they would

9    be dissolved in the acid waste and

10   then move down gradient and interact

11   with the soil and groundwater in a

12   way that would -- some of it would be

13   immobilized, some of it would

14   continue on as dissolved metals.

15             (Vandeven Exhibit 13 was

16   marked for identification.)

17   BY MR. PETTIT:

18       Q.    Now, I'm going to hand you

19   what's been marked as Vandeven-13.

20             MR. PETTIT:  For the folks

21   on the phone, this is a section from

22   the remedial investigation report,

23   Pages 5-1 to 5-5.

24             MS. FLAX:  You said the

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    remedial investigation report?

2                MR. PETTIT:  Yes.

3                MS. FLAX:  Thank you.

4    BY MR. PETTIT:

5        Q.    Mr. Vandeven, if you would

6    turn to Page 5-4, and specifically

7    the third full paragraph and the last

8    sentence of that paragraph that

9    starts "The effects of acid spills."

10   I will just give you a moment to read

11   that.

12       A.    Okay.

13       Q.    Do you agree with that

14   statement?

15       A.    I'm not sure what the

16   context is that they are discussing

17   this in.  I would have to look at

18   more of this text, probably, to

19   determine what the context of this

20   is.

21             It sounds like they are

22   saying that the area over which acid

23   spills could mobilize metals would

24   have been contained or not very

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                              1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    large.

2          Q.    Okay.  Do you agree with

3    that part of it?

4          A.    In general, that could be

5    the case.  It would depend on the

6    site-specific conditions.

7                But, again, I think what

8    they are referring to is you would

9    have an area where if you had an acid

10   spill as they are talking about here,

11   the area over which it would mobilize

12   those metals may be contained or

13   finite, but then the metals would

14   continue to -- those dissolved metals

15   would continue to migrate down

16   gradient if they reached the

17   groundwater.

18         Q.    And consistent with what

19   you testified to earlier this

20   morning, that would depend on site

21   conditions all the way along the path

22   of the groundwater.  Am I right?

23         A.    That's correct.

24         Q.    If you would turn to the

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    top of the next page, 5-5, the
2    paragraph that's continuing in the
3    last sentence, the "acids disposed of
4    at the surface probably destroyed
5    microorganisms." Do you see that?
6        A.    Yes.
7        Q.    Am I right, this focuses on
8    not only that effect being localized
9    but short-lived. Do you agree with
10   that statement?
11       A.    I'm not sure what they mean
12   by short-lived. I think that
13   localized in their aerial
14   distributions is consistent with what
15   we just discussed.
16           And then the first sentence
17   that you read, "Acids disposed of at
18   the surface probably destroyed
19   microorganisms in the subsurface,
20   thereby reducing the extent of
21   biodegradation" is consistent with
22   what we talked about yesterday, the
23   fact that acid spills could destroy
24   the microorganisms and therefore the

241

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    degradation that you could get of

2    organic compounds like TCE would have

3    been reduced.

4              Again, the second sentence

5    there, the last sentence in that

6    paragraph, again it would depend on

7    when they say the effects of acid

8    disposal, it would really -- in

9    general that statement may be

10   correct, but it would depend on the

11   volume of the acid spill, the type of

12   acid, how strong that acid was.

13             So there would be a lot of

14   other factors that you would have to

15   look at for an individual acid spill

16   or acid disposal.

17        Q.    Now, in connection with the

18   preparation of your report, did you

19   review any information that was

20   specific for those factors with

21   respect to the Boarhead site?

22        A.    I don't believe so, no.

23        Q.    With respect to the

24   destruction of microorganisms being

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    short-lived, is it accurate to say

2    that the microorganisms if destroyed

3    would be regenerated by natural

4    processes?

5            MR. HARRIS:  Object to the

6    form.  I'm not sure that's what this

7    says.

8            THE WITNESS:  I'm not sure

9    from this that they are connecting

10   that second-to-last sentence with the

11   last sentence.

12           I'm not sure that they are

13   saying that particular effect, which

14   is the destruction of microorganisms

15   which is short-lived.

16           In general, once you

17   destroy a microbiological population

18   it doesn't regenerate itself on its

19   own.  So I don't believe that they

20   are referring to the microorganism

21   population when they are talking

22   about short-lived.

23   BY MR. PETTIT:

24       Q.     So what do you understand

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the second sentence to mean, "the

2    effects of acid disposal probably

3    were short-lived," what were the

4    effects?

5        A.    They are probably talking

6    about the actual pH conditions of the

7    area where the acid was disposed, so

8    they may -- an acid waste may be

9    spilled, it can mobilize metals, it

10   can then take up through the

11   buffering capacity of the soil that

12   acid spill may be neutralized or

13   start to be neutralized.

14          And I think that's what

15   they are talking about, the short-

16   lived nature of the acid spill or the

17   localized aerial distribution of the

18   acid spill.

19          If the spill is small

20   enough, if it's not a high strength

21   acid, then the buffering capacity of

22   the soil could limit the extent of

23   those impacts.

24       Q.    And am I correct that the

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    acid could be affected by dilution

2    from rainwater, groundwater on the

3    site, moisture in the soil, they all

4    have an effect on the effects of the

5    acid?

6         A.    Well, both would have an

7    effect on one another.  Just like if

8    you had -- if you poured acid into

9    this water bottle, the water would

10   become more acidic, the acid would

11   become less acidic.

12              It would combine to create

13   a pH that is higher in the

14   groundwater, in this case, in a pH

15   that is lower for the original acid

16   that was spilled.

17        Q.    Now, what is your

18   understanding about the term short-

19   lived as used in this RI?

20              MR. HARRIS:  Objection.

21   Assuming he has an understanding of

22   what they meant.

23   BY MR. PETTIT:

24        Q.    Yes.  Assuming you have an

1    understanding.

2         A.    I don't know exactly what

3    they are referring to by short-lived

4    in the RI.

5         Q.    Well, in your experience in

6    connection with examining the effects

7    of acid disposal, do you have any

8    understanding yourself about how long

9    the effects of acid disposal remain

10   at a site?

11        A.    Well, again, it depends

12   on -- it would depend on a number of

13   factors.

14             Again, the most important

15   ones would be -- see, there's nothing

16   in here about the volume of the acids

17   spilled.  That would be a primary

18   factor in determining how short-lived

19   or long-lived it was.

20             The type of acid would be

21   another factor.  The strength of that

22   acid would be a factor.

23             The only thing that I can

24   think of that they are talking about

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    is if an acid is spilled just on the

2    soil, then the buffering capacity of

3    the soil will eventually help to

4    absorb and neutralize that acid.

5              But if the acid -- but in

6    that process it will mobilize metals

7    in the soil.  And if it reaches

8    groundwater, it will decrease the pH

9    of the groundwater and help to

10   mobilize contaminants in the

11   groundwater.

12        Q.    If you could just turn back

13   to 5-4 of the same exhibit, and this

14   will be the second full paragraph.

15   And that refers to spills of ammonia

16   at the site.

17              Do you agree with the third

18   sentence, "Therefore, ammonia spills

19   could have enhanced the mobility of

20   metals at the site in the past"?

21        A.    Yes.

22        Q.    And would that be limited

23   to certain metals or types of metals?

24        A.    Well, certain metals may

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX 215.751.0581

247

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    have a greater propensity to mobilize

2    in the presence of ammonia, just like

3    any other -- every metal has

4    different properties and behaves in

5    different ways.

6              There may be some

7    similarities between metals but they

8    all behave in different ways.  But

9    ammonia could in general mobilize

10    metals in the soil.

11        Q.    And could ammonia mobilize

12    arsenic?

13        A.    It's possible.  Again,

14    arsenic chemistry is a lot more

15    complex, but it's possible that it

16    could mobilize arsenic.

17        Q.    Is there a particular form

18    of arsenic that would be more likely

19    be mobilized by ammonia than another?

20        A.    I don't know if there is or

21    not.

22        Q.    How about chromium, is

23    chromium mobilized by ammonia?

24        A.    Again, just like arsenic,

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    it could be.  Chromium chemistry is

2    complex also.

3         Q.    Now, you mentioned a form

4    of chromium called chromium VI

5    yesterday, I think that's right,

6    Roman numeral VI?

7         A.    Correct.

8         Q.    Would that be mobilized by

9    ammonia?

10        A.    It could be, yes.

11             (Vandeven Exhibit 14 was

12   marked for identification.)

13   BY MR. PETTIT:

14        Q.    I have also marked as

15   Vandeven-14 Page 5-20 from the RI.

16   And in particular, Mr. Vandeven, the

17   first full paragraph talks about

18   spills of ammonia, sulfuric acid and

19   ferrous chloride at the site.

20             And there's a sentence,

21   fourth or fifth sentence, "However,

22   those effects could have been short-

23   lived and probably no longer

24   represent a source of contamination

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                   FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    at the site."

2             Now, I think we have

3    addressed the short-lived aspect of

4    it.  Am I right?

5        A.    Yes, I believe so.

6        Q.    Excuse me, I have something

7    in my eye.

8             And how about the statement

9    "probably no longer represents a

10   source of contamination at the site"?

11            MR. HARRIS:  What's the

12   question?

13   BY MR. PETTIT:

14       Q.    Do you agree with that

15   statement?

16       A.    Well, to the extent that

17   they are -- and I believe what they

18   are referring to is that the

19   compounds in those spills probably do

20   not represent a source of

21   contamination at the site.

22            If they were spilled in the

23   1970s, and I believe the RI is in the

24   mid 1990s, 20 years later the

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905

FAX  215.751.0581

250

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   compounds in those spills do not

2   represent a source of contamination

3   at the site, and I would generally

4   agree with that.

5       Q.    And how about the last

6   sentence, "Both processes would have

7   enhanced the rate of migration of

8   other metals but also would have been

9   short-lived." Do you agree with

10  that?

11      A.    Again, depending on the

12  particular characteristics of the

13  spill, the ability for the spill to

14  mobilize metals may have been short-

15  lived, but once those metals become

16  mobilized, then other interactions

17  occur in the migration of those

18  metals is not necessarily short-

19  lived.

20          MR. PETTIT:  I'm going to

21  take a break.

22          (Recess taken)

23  BY MR. PETTIT:

24      Q.    Mr. Vandeven, if you could

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    turn to your rebuttal report, if you

2    have that in front of you, on Page

3    5.  And in particular the third

4    bullet of that, if you would just

5    take a second to read that.

6         A.    Okay.

7         Q.    Now, am I correct to read

8    this, you offer an example of some

9    data of a pH reading in the swamp a

10   few days after the bulk release of

11   ferrous chloride in October of '73,

12   and also another example of dying

13   fish and trees a half a mile from the

14   release site in January '74, and some

15   more data in July '74 of pH

16   measurements.  Am I right?

17        A.    Correct.

18        Q.    Now, am I correct that

19   those all are measurements of pH in

20   the surface water?

21        A.    I would say that they are

22   pH measurements of the water in the

23   wetlands, yes.

24        Q.    Are you aware of any other

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    data in the Boarhead record that

2    would indicate measurements of

3    groundwater at this point as opposed

4    to surface water during the period

5    that wastes were disposed of at

6    Boarhead?

7         A.    I'm not aware of any, no.

8         Q.    And if you would, starting

9    on Page 6, I guess the top of Page 6

10   of your report, that sentence "Thus

11   earlier releases of acid wastes would

12   have facilitated a migration of

13   contaminants released at other

14   times."  Could you explain that?

15        A.    The copy I have says "Thus

16   early releases of acid wastes would

17   have facilitated the migration of

18   releases facilitated at later times."

19        Q.    What did I say?

20        A.    I think you said other

21   times.

22        Q.    Later.  You read that

23   correctly.

24        A.    I'm just going to go back

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    and look at the entire bullet.

2        Q.    Sure.

3        A.    Okay.  What this is

4    referring to, again, is something

5    that we have talked about previously.

6            You could have -- if you

7    have a spill of acid waste, it could

8    become neutralized in the soil by the

9    buffering capacity of the soil

10   neutralizing that acid waste.

11           But what that does is it

12   depletes the buffering capacity of

13   the soil thus releases at later times

14   won't have the same -- it's possible

15   that they will not undergo the same

16   type of neutralization because the

17   buffering capacity of the soil has

18   already been depleted.

19       Q.    Now, in connection with

20   your report, did you develop an

21   understanding, I mean of your

22   original report, of the period of

23   time that wastes were discharged at

24   Boarhead?

JDR

James DeCrescenzo Reporting, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

254

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.    In general, yes.  I'm not

2  sure anybody ever developed a

3  complete understanding of when wastes

4  were disposed of at Boarhead.

5      Q.    And to your understanding,

6  what period of time was that?

7      A.    From, you know, the late

8  1960s through at least the mid 1970s.

9      Q.    Now, if your opinion is

10  correct that acidic wastes would have

11  mobilized metals already existing in

12  the soil as opposed to being in the

13  waste themselves, and had that

14  occurred early in the period of time

15  that wastes were discharged at

16  Boarhead, is it your opinion that

17  later discharges of wastes would have

18  mobilized metals as well already in

19  the soil?

20      A.    Yes.  It would be a

21  continuous -- it would be a

22  continuous process.

23      Q.    If you were to take the

24  exact same location and acid wastes

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103        FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    were disposed of in say the late '60s

2    and had the effect of mobilized

3    metals, to the extent that all metals

4    present in that soil were then

5    mobilized, what effect, if any, would

6    a later disposal of acid had at the

7    very same location?

8              MR. HARRIS:   Objection to

9    the form.

10             THE WITNESS:   Well, that's

11   a hypothetical that just is very

12   unlikely to occur in nature.

13             Unless -- it's very

14   unlikely that an acid spill would

15   mobilize all the metals in a

16   particular soil volume, unless it was

17   a very, very discreet small volume of

18   soil and a very, very concentrated

19   acid that would in essence dissolve

20   the soil.

21             You are always going to

22   have some soil particles containing

23   metals left after an acid spill.

24             And, again, unless it was a

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    very, very concentrated spill, you

2    would continue to have some metals

3    present that would be susceptible to

4    migration from later spills.

5    BY MR. PETTIT:

6        Q.    Did you review any data

7    from the Boarhead site that would

8    enable you to make those kinds of

9    determinations?

10            MR. HARRIS:   Objection to

11   the form.

12            THE WITNESS:   No.   Not that

13   I can recall.

14   BY MR. PETTIT:

15       Q.    When you used the term

16   migration on the top of Page 6 of

17   your rebuttal report, is that another

18   word for solubility of the metals?

19       A.    No, not necessarily.   They

20   are related, but the solubility of a

21   metal affects the migration.   More

22   soluble metals will migrate further.

23   Metals in soluble form will migrate

24   further.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

257

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      Q.      One of the other things you

2    talked about yesterday was the effect

3    of destruction of organics in the

4    soil and that reduces biodegradation

5    of certain substances.  Am I right?

6      A.      I believe I talked about

7    the effect of acid spills on two

8    things.

9            One, natural microorganisms

10   which would affect the degradation of

11   organic compounds and then also the

12   destruction of organic matter in the

13   soil which would reduce the soil's

14   ability to adsorb or absorb both

15   metals and organics in the soil.

16     Q.      The question wasn't a good

17   one.  You also talked, I think, about

18   degrading TCE and the effect of acids

19   on that.  Am I right?

20     A.      Yes.

21     Q.      And what was your opinion

22   on that?

23     A.      That was the -- just the

24   first example that I just gave.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1            That's when -- and from the

2    RI that you just presented before I

3    think in Exhibit 13, acid spills

4    could have affected and destroyed the

5    natural microorganisms in the soil

6    which would have affected the ability

7    of those microorganisms to degrade

8    organic compounds like TCE.

9        Q.    And under normal conditions

10    how quickly do those microorganisms

11    degrade a substance like TCE?

12        A.    That varies very widely

13    from on the order of weeks and months

14    to years, depending on many other

15    factors.

16        Q.    Is it true, though, that

17    acid will accelerate because of the

18    chemical reaction of the acid with

19    the TCE more quickly than the

20    microorganisms if acid is introduced

21    to TCE?

22        A.    I didn't follow that

23    question.

24        Q.    Okay.    If there's TCE in

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                            FAX  215.751.0581

259

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the soil, and I think you are telling

2    me that microorganisms will work to

3    degrade that, break up the TCE --

4        A.    That's correct.

5        Q.        -- by attacking it.  Is it

6    fair to say that the introduction of

7    acid into that soil containing TCE

8    will accelerate the process whereby

9    TCE is degraded?

10        A.    No.  Not necessarily, no.

11    I mean, you could postulate a

12    situation where the introduction of

13    acid may help.

14            For instance, if you have a

15    very, very basic that is high pH

16    environment and the only process or

17    the only factor eliminating

18    degradation is the acidity of the

19    environment, then, yes, introduction

20    of some acid or reducing the pH to

21    near neutral or slightly acidic

22    conditions may help, but that's more

23    of a laboratory-controlled

24    environment consideration.

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1        Q.    But that basic principle is
2    used by the refineries, is it not, to
3    help degrade organic materials at a
4    refinery?
5        A.    Well, introduction of
6    acid -- and I think we talked a
7    little bit yesterday in response to
8    one question about acid sludges at
9    refineries.
10             Refineries do use acid to
11   destroy microorganisms and to effect
12   the pH reactions to take place in a
13   refinery, but I'm not aware of the
14   introduction of acids to increase the
15   degradation of organic compounds of
16   refineries.
17       Q.    Again, is there any data in
18   the Boarhead record that reflects
19   whether or not the degradation of TCE
20   and other organics was affected by
21   acid, the introduction of acid?
22       A.    Just the language that we
23   read in Exhibit 13 from the RI.
24       Q.    But that is no -- well,

**JDR**
**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
215.564.3905                              FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    that may or may not be a result of

2    data from the Boarhead site, am I

3    right, that statement?

4        A.    That's correct.

5        Q.    And you are not aware if

6    there is any data that supports that

7    statement?

8        A.    That's correct.

9        Q.    Is the mobility of metals

10   in the groundwater controlled by,

11   among other things, the adsorption

12   capacity of the soils in the

13   saturated zone or the unsaturated

14   zone?

15            MR. HARRIS:    Objection to

16   form.

17            THE WITNESS:    Both.

18   BY MR. PETTIT:

19       Q.    And how do you

20   understand this -- what is the

21   saturated zone?  What is your

22   understanding?

23       A.    Well, in simple terms, the

24   saturated zone is the area of the

JDR

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    subsurface below the water table;

2    that is, the area where the soil is

3    saturated with water.

4        Q.    As opposed to the

5    unsaturated zone, that is what?

6        A.    The unsaturated zone would

7    be also referred to as the vadose

8    zone or the area above the

9    groundwater table.

10        Q.    And if acids enter either

11    of those zones, can they be diluted

12    by the introduction of water?

13        A.    Any time that you introduce

14    a liquid to an acid waste that has a

15    different pH it will influence the

16    acidity or pH of that material.

17            So if an acid waste is

18    introduced to water, groundwater as

19    we talked about before, they will

20    equilibrate to some pH which will be

21    lower than the natural pH of the

22    groundwater and higher than the pH of

23    the acid waste that was introduced.

24        Q.    And that is true in both

**JDR**

**James DeCrescenzo Reporting,** LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

263

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the unsaturated and saturated zone,

2    that can happen in both zones?

3        A.    It can happen in both

4    zones.

5            The unsaturated zone

6    doesn't have as much water in it, it

7    may have some, but the soil pores are

8    not saturated with water as they are

9    below the water table, so just that

10   dilution phenomena is not as

11   significant as in the unsaturated

12   zone.

13       Q.    And where are the

14   microorganisms located?

15       A.    They would be in both

16   zones.  They would be in both zones.

17       Q.    Give me just a second

18   here.  I want to check one reference.

19           Mr. Vandeven, if you could

20   go to the first report, Vandeven-1,

21   Page 16.  In the first full paragraph

22   and the last sentence of that, I just

23   want to make sure I understand this.

24   Do you see that?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          A.     Yes.

2          Q.     And it reads, just for the

3    people on the phone, "Wastes released

4    at the site entered the subsurface

5    environment and this shallow

6    groundwater system as a result of

7    natural processes (such as gravity-

8    driven flow of liquids and

9    infiltration of rainwater and

10   snowmelt) and human activities (such

11   as burial of drums and disposal in

12   pits)."

13              Now, when you use the term

14   subsurface environment, could you

15   define that?

16         A.     Well, the subsurface

17   environment would in general

18   encompass both zones that we talked

19   about before.

20              The unsaturated zone, or

21   just the soil that is not saturated

22   with water and then the groundwater

23   system, the subsurface where the

24   pores of the soil are saturated with

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    groundwater.

2        Q.    The gravity-driven flow of

3    liquids, could that include water

4    from other areas of the site moving

5    through a particular area of the

6    site?

7        A.    Yes.    That could include

8    things like rainwater infiltrating in

9    through the soil, through the

10    unsaturated zone.    It could include

11    bulk waste that's disposed of

12    infiltrating through the unsaturated

13    zone.

14        Q.    And just to follow up on

15    this point, and I'm sorry to be

16    jumping through, on Page 6 of your

17    rebuttal, and this is the last time

18    we will probably have to do this, and

19    I'm looking at the very last

20    bullet -- well, first of all, let me

21    go to the first bullet while I'm

22    here.

23            You used a term recharge

24    rates.    What does that mean?

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          A.       Recharge rates refers to

2     how quickly water flows through that

3     unsaturated zone down to the

4     groundwater.

5               So if you have a situation

6     where you have no water in that

7     unsaturated zone, that first inch of

8     rainwater, for instance, that hits is

9     going to take a certain time to get

10    down to the groundwater.

11              If you have that

12    unsaturated zone that already has

13    seen five inches of rainwater in the

14    previous week, that next inch is

15    going to flow through a lot quicker.

16              That's why, you know, it's

17    sometimes -- even though you have

18    only had a little bit of rain the

19    ground becomes saturated because the

20    week before you had a significant

21    amount of rain.

22         Q.       Is there a data in the

23    Boarhead record that would enable one

24    to calculate how much rainwater

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    falling from the sky infiltrates the

2    groundwater in a given area of the

3    site?

4         A.    I'm sure that data is

5    available.    That kind of

6    meteorological data is always

7    presented in the RI.

8         Q.    Am I also correct that the

9    groundwater modeling report for the

10   site would also calculate a recharge

11   rate?

12        A.    It should, yes.

13        Q.    Have you -- I think you've

14   reviewed the groundwater modeling

15   report according to your report.

16   Would you have any reason to

17   challenge the recharge rate that was

18   calculated by the people who did the

19   modeling at the site?

20        A.    I believe you are referring

21   to the Brown & Caldwell groundwater

22   model.    I did review that.

23             I don't recall exactly the

24   recharge rate they calculated or how

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    they calculated it, but I have no

2    reason sitting here today to question

3    their calculated recharge rate.

4         Q.     And you did not make a

5    calculation yourself in preparing

6    your report as to the recharge rate

7    and how much water would have

8    infiltrated the Boarhead site in any

9    particular area of the Boarhead site?

10        A.     That's correct.

11        Q.     Am I right you could also

12   use the groundwater modeling report

13   to measure the flow of water, the

14   groundwater flow of water -- the

15   groundwater flow at the site?

16             MR. HARRIS:   Objection.

17             THE WITNESS:   You are going

18   to have to rephrase that.  I'm not

19   sure I understand.

20   BY MR. PETTIT:

21        Q.     Okay.  Am I correct that

22   the groundwater modeling report gives

23   you data that would enable you to

24   evaluate the volume of water that was

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    flowing through the groundwater

2    system at Boarhead?

3         A.    I believe that that was one

4    of the outputs from their groundwater

5    model, the transmissivity, or the

6    volume of groundwater, as you put it,

7    that flowed through a certain area of

8    the site, yes.

9         Q.    And in preparing your

10   report, did you make any calculations

11   using that data of the flow of

12   groundwater?

13        A.    No, I did not.

14        Q.    And just going back to Page

15   6 of the second bullet, the last

16   bullet on Page 6 of your rebuttal,

17   you talk about large quantities of

18   liquids would cause increase in

19   migration metals in the subsurface.

20             This would tend to reduce

21   the concentration of hazardous

22   substances and spread them over a

23   larger area.

24             Would that include

270

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    rainwater and snowmelt when you say

2    large quantities of liquids?

3         A.    Yes.

4         Q.    Your report, and I'm

5    talking about the original one, and I

6    can give you the reference if you

7    need it, but it talked about the

8    installation of a system to collect

9    and treat contaminated groundwater

10   not as part of OU1 but earlier, it

11   was part of the earlier remedies.  Am

12   I right?

13        A.    Yes.

14        Q.    You know what I'm talking

15   about.  I don't have to point you to

16   the report.  Am I correct that the

17   purpose of that was to contain the

18   VOC plume that was detected at the

19   site?

20        A.    That was installed to

21   intercept the contaminated

22   groundwater plume at the site.

23        Q.    And at that point when that

24   was installed, was there any part of

271

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    that that was designed to collect

2    metals that might be in that

3    groundwater?

4            MR. HARRIS:    Objection to

5    the form.

6            THE WITNESS:    It didn't

7    distinguish between metals in the

8    groundwater and VOCs in the

9    groundwater.    An interceptor trench

10   is going to collect the bulk

11   groundwater and whatever is in that

12   groundwater will be removed from the

13   trench.

14   BY MR. PETTIT:

15       Q.    And am I correct that as

16   part of OU1 that an enhancement to

17   that system was made, including a

18   metal precipitation system.    Am I

19   right?

20       A.    Correct.

21       Q.    Just explain to me, what

22   does that system do that the earlier

23   version of the system could not do

24   with respect to metals?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1        A.     It will, depending on what

2    the cleanup levels are for the

3    groundwater and then what the

4    discharge limits are for the

5    discharge of that treated water, and

6    we talked about this yesterday, that

7    there was both cleanup levels for the

8    groundwater that included metals and

9    discharge limits for the treated

10   water that included both VOCs and

11   metals.

12            The precipitation element

13   of the remedy would remove those

14   metals from the groundwater before

15   they got to the air stripping system,

16   which was largely a VOC-related

17   element of the system.

18            So it would in effect

19   through an engineered system use some

20   of the same natural processes that we

21   have been talking about over the last

22   few days to take those dissolved

23   metals and precipitate them out, make

24   them solids again and remove those

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

273

1    from the groundwater to meet the

2    cleanup levels, the discharge levels

3    and the operational criteria that

4    were necessary to operate the air

5    stripping system.

6        Q.    I am almost done.  I just

7    have two more areas to cover.  If you

8    would turn to Page 7 of the rebuttal

9    report.

10            Okay, that first full

11   paragraph and then the last sentence

12   which reads, "General statements

13   regarding the behavior of chemicals

14   that do not account for site-specific

15   conditions will not necessarily be

16   predictive of the behavior of metals

17   and organic chemicals in a specific

18   environment."

19            Did I read that correctly?

20       A.    Yes.

21       Q.    When you used the term

22   "general statements," what were you

23   referring to?

24       A.    I believe in the rebuttal

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    report here I was referring to the
2    fact that some of the other expert
3    reports that I was looking at that
4    was the basis of this rebuttal report
5    seemed to be making very generalized
6    statements about the behavior of
7    individual metals and how they would
8    have behaved at the site without
9    looking at and evaluating some of the
10   other factors that would have
11   affected the migration of those
12   metals.
13        Q.    Is it fair to say that your
14   original report also makes general
15   statements of that nature?
16        A.    My original expert report
17   makes some general statements, yes,
18   but I don't reach the same -- I'm not
19   reaching the same conclusion.
20            My general statements are
21   used to, in effect, reach a fairly
22   general opinion, that all waste
23   disposed of at the site and all forms
24   of wastes disposed of at the site

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

275

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

```
1    contributed to the need for and the

2    cost of remediation.

3              Whereas, the other expert

4    reports that this statement is

5    related to seem to be making very

6    general statements and then saying,

7    therefore, this waste or this

8    chemical did not contribute to the

9    need for remediation at the site.

10        Q.    Do you believe that the

11   general statements in your original

12   report account for site-specific

13   conditions?

14        A.    To the extent that they

15   needed to to support my opinion, yes.

16        Q.    And for example, could you

17   give me an example of what you refer

18   to as a site-specific condition?

19        A.    A site-specific condition

20   is, for instance, the fact that there

21   is a diabase there that has

22   relatively high concentrations of

23   natural metals and that acid wastes

24   that come in contact with that
```

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                    FAX  215.751.0581
www.JDReporting.com

1    diabase could dissolve those metals,

2    it could enhance the migration of

3    those metals down gradient.

4              That's one of the reasons

5    they had to treat metals in the

6    residential water systems -- water

7    treatment systems that they

8    installed.

9              So that would be a site-

10   specific consideration, the fact that

11   there was a diabase there that had

12   high concentration of metals.

13        Q.    Would the groundwater

14   monitoring wells, the results of that

15   over time, would that give you data

16   on site-specific conditions at the

17   site?

18        A.    Well, sure it will give you

19   information on the concentrations of

20   contaminants that were found at the

21   site.

22        Q.    And how about the recharge

23   rate that was calculated in the

24   remodeling report, would that give

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                           FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    you data on site-specific conditions?

2        A.    Sure.    It would give you an

3    estimate of what the site-specific

4    recharge rate was, yes.

5        Q.    And the groundwater

6    modeling system would give you data

7    on the flow, how quickly the

8    groundwater was flowing through the

9    site?

10       A.    It may.    Again, the

11   modeling that they did was a modeling

12   exercise to help design the

13   interceptor trench system.

14            The volume of flow through

15   the site may have been an element of

16   that modeling, but I don't recall

17   sitting here right now if it was or

18   not.

19       Q.    In your experience, when

20   those groundwater modeling systems

21   are developed, do they rely upon data

22   at the site?

23       A.    To the extent that there is

24   data available.    It's almost always

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

278

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    some combination of site-specific

2    information and literature-derived

3    information.

4        Q.    Do you know in the case of

5    the Boarhead site what site-specific

6    data was available to those who

7    developed the groundwater modeling

8    system?

9        A.    No, I don't.

10       Q.    Mr. Vandeven, is it your

11   opinion that had there been no, and I

12   will use the term corrosive waste

13   solutions without substantial

14   quantities of metal that we talked

15   about yesterday, if that had never

16   been disposed of at the Boarhead

17   site, would the remedy be any

18   different than it is, in your

19   opinion?

20           MR. HARRIS:   Objection to

21   the form.

22           THE WITNESS:   Well, I

23   wasn't asked to look at that

24   question.   That's a fairly complex

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX 215.751.0581

279

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    question.  Again, I wouldn't -- I

2    don't have -- I would have to really

3    evaluate that in some detail to

4    address that question.

5             I believe that the

6    corrosive wastes that did not contain

7    substantial quantities of metals did

8    contribute to the need for and the

9    cost of the remedy at the site.

10             How that may have differed

11    from a remedy if those wastes were

12    never disposed of, I couldn't say

13    sitting here right now.

14    BY MR. PETTIT:

15        Q.    And what information would

16    you need to look at to make that

17    determination?

18        A.    Well, you would have to --

19    I mean, you would have to have

20    information that you very likely

21    don't have at the site.  As we just

22    read before from the RI, the number

23    of bulk discharges at the site and

24    where they occurred is unknown.

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1              This was in large part a
2    clandestined criminal operation.  To
3    the extent that they know where
4    spills took place and the volume of
5    those spills and the character of
6    those spills, all that information is
7    in the record right now.
8              I don't think they are
9    gathering any new information on
10   those issues.
11             And to address a question
12   like you have just posed, you would
13   have to have information that you
14   don't have and likely will never
15   have, and that would include the
16   volume of the waste disposed, exactly
17   where it was disposed, the
18   characteristics of that waste that go
19   beyond what we know, the exact
20   acidity of the waste, the exact
21   strength of that acid waste.
22             Those would be the things
23   that you would have to know to answer
24   such a precise, almost theoretical

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    question like that.

2        Q.    And am I correct that you

3    were not given any testimony from

4    drivers for DeRewal or other drivers

5    who claimed to have disposed of

6    various wastes at the site to review?

7        A.    I don't recall if any of

8    the depositions we looked at included

9    drivers.  I just don't recall,

10   sitting here right now.

11       Q.    And if you had, that would

12   have been listed in terms of the

13   materials that you reviewed to

14   prepare your report?

15       A.    That is correct.

16            MR. PETTIT:   That's all the

17   questions I have, Mr. Vandeven.

18   Thank you.

19            MR. HARRIS:   Seth, you want

20   to go next?

21            MR. COOLEY:   Sure.

22            MR. HARRIS:   We still have

23   you guys on the phone, right?

24            (Discussion off the

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

282

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    record.)

2                        EXAMINATION

3    BY MR. COOLEY:

4        Q.    Good morning,

5    Mr. Vandeven.  My name is Seth

6    Cooley.  I represent Flexible

7    Circuits in this case.

8              MS. FLAX:  Seth, I'm sorry,

9    can you speak up.

10             MR. PETTIT:  We're going to

11   switch seats, Melissa.  He will be a

12   little closer to the phone.

13             MS. FLAX:  Okay, thank you.

14   BY MR. COOLEY:

15       Q.    Again, Mr. Vandeven, my

16   name is Seth Cooley.  I represent

17   Flexible Circuits.  I have some

18   questions for you this morning.

19             Let me pick up on perhaps

20   one of the last questions asked by

21   Mr. Pettit regarding your review of

22   depositions and I will expand that to

23   documents generally.

24             In terms of deposition or

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    other testimony and any historical

2    documents relating to any of the

3    parties in this case, what do you A,

4    know, and B, recall reviewing in

5    preparation of your original report,

6    of those kinds of documents?

7        A.    Well, from my original

8    report I primarily reviewed what I

9    would refer to as the administrative

10   record, the underlying environmental

11   reports from EPA.

12            I don't recall right now

13   whether or not any of those documents

14   included any deposition-related

15   material or any material specifically

16   from any of the individual companies

17   related to this matter.

18       Q.    Information from any of the

19   individual companies or even

20   pertaining to any of the individual

21   companies?

22       A.    Well, I was referring to

23   the former.    There may have been

24   information in the underlying record

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    about individual companies.  And to

2    the extent that there was, I reviewed

3    that.

4            But I did not review -- I

5    don't recall reviewing documents that

6    were from or generated by or related

7    to individuals through, say,

8    deposition testimony related to

9    individual companies.

10           Q.    So do I understand it

11   correctly that the kind of

12   information you are describing as

13   information you may have reviewed in

14   preparation of your original report

15   that related to any one or more

16   individual companies would have been

17   information included within some

18   document that was part of the

19   administrative record?

20           A.    That's correct.

21           Q.    And in fact it would have

22   been in some document that's listed

23   on the attachment to your expert

24   report that lists documents from the

**James DeCrescenzo Reporting**, LLC

215.564.3905          Innovating Litigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    administrative record?

2         A.    That's correct.

3         Q.    How many hours did you

4    spend on your original expert report?

5         A.    Me individually?

6         Q.    You personally.

7         A.    I don't recall.  I would

8    have to go back and look at my

9    records.  I can estimate.

10        Q.    Okay.

11        A.    I would estimate that I

12   spent maybe on the order of 150

13   hours.

14        Q.    And what about your

15   colleague, Mr. Hawley, is it, how

16   many hours do you know or can you

17   estimate that he spent on that

18   original report?

19        A.    I would say approximately

20   the same.

21        Q.    Now, when you completed

22   that report you sent a bill to

23   Mr. Harris or someone for your work,

24   I assume?

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

286

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.    We send bills more
2  frequently than that, yes.    A
3  monthly -- we would have sent a
4  monthly invoice.
5      Q.    And considering the
6  totality of the invoices, however
7  many there were for your work up to
8  and including the issuance of your
9  original expert report, do you know
10  what the total billing amount was?
11      A.    No, I don't.
12      Q.    Would those invoices
13  reflect the number of hours you spent
14  on the report?
15      A.    Yes.
16      Q.    By individual or
17  timekeeper?
18      A.    They would have -- they
19  should include by individual, yes.
20  So they would have names associated
21  with them.
22      Q.    Do you keep time records?
23      A.    Yes.
24      Q.    And did you keep them for

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    this project?

2         A.    We keep time sheets, which

3    would include time spent on

4    individual projects, so time spent on

5    this individual project would be on

6    time records, yes.

7         Q.    And those records still

8    exist?

9         A.    They should, yes.

10        Q.    Did you have a budget for

11   the project?

12        A.    We did not have a specific

13   budget, no.

14        Q.    Did you estimate at the

15   beginning of the project how many

16   hours and/or how many dollars might

17   be involved in producing your report?

18        A.    I believe I provided

19   counsel with an estimate originally

20   for what I thought at the beginning

21   of the project would be a budget for

22   developing the original expert

23   report.

24        Q.    Do you recall what that

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    estimate was?

2         A.    I believe it was on the

3    order of maybe $30,000 to $35,000.

4         Q.    Do you know what the final

5    bill through the issuance of the

6    original report amounted to?  And

7    when I say bill, I mean the summation

8    of your monthly bills, however many

9    there may have been.

10        A.    No, I don't remember what

11   it was.

12        Q.    When did you start, you

13   personally, start any work in

14   preparation of your original report?

15        A.    Well, in June of 2006 it

16   was issued.  I believe we started

17   work on it in early 2006.

18        Q.    But you personally, when

19   did you first begin working on this

20   report, and by that I mean not just

21   drafting, I mean reviewing documents

22   to educate yourself on site history

23   or any other issue that you felt you

24   needed to become educated on to be

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

289

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    able to write a report?

2        A.    And that's what I was

3    referring to, my -- the original

4    involvement was my involvement, so it

5    would have been early 2006.

6        Q.    Can you be more specific

7    about early 2006?

8        A.    No.

9        Q.    Do you know a date by which

10   you began your work?

11       A.    No, I don't.

12       Q.    In your rebuttal report or

13   as an attachment to your rebuttal

14   report you list some additional

15   materials that were reviewed and/or

16   relied upon.

17           And among those are

18   documents relied upon by Dr. Jurgen

19   Exner as listed in his expert report

20   of June 29, 2006. Do you see that

21   first line on Appendix A?

22       A.    Yes.

23       Q.    As written, that is not a

24   specific statement, by which I mean

JDR
**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX 215.751.0581

1    it says documents.  That could mean

2    some, all, one.

3              Could you help me

4    understand specifically what

5    documents you relied upon as opposed

6    to reviewed or did something else

7    with?

8        A.    Sure.  As I testified

9    yesterday, I reviewed -- I was

10   provided with and reviewed all of the

11   documents that he relied on, that

12   Dr. Exner relied on.

13             But I relied on and had the

14   need to pull out from those documents

15   one very kind of narrow -- documents

16   related to a very narrow issue, and

17   that is information related to the

18   characteristics of the acid wastes

19   that were disposed of at the site.

20             So I focused on that kind

21   of narrow portion of his documents.

22       Q.    Dr. Exner did not reach a

23   conclusion or opinion as to what

24   specific acid wastes or other wastes

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1  were disposed of at the site, did he?

2      A.    I believe he did reach a

3  conclusion about the types of wastes

4  that -- and the concentration of

5  waste and the strength of the wastes

6  that were disposed of at the site,

7  yes.

8      Q.    Actually disposed of at the

9  site?

10     A.    Well, whether or not they

11 were actually disposed of at the site

12 or came from a party that was alleged

13 to have disposed of at the site,

14 that's not something that I was

15 concerned about.

16         I looked at what he was

17 saying about the acid wastes that are

18 connected with the site.

19     Q.    Connected with, even as in

20 via an allegation, let's say?

21     A.    Correct.

22     Q.    When you say you relied

23 upon the documents -- strike that.

24         When you said a minute ago,

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    I believe you said, correct me if I'm

2    wrong, that you relied upon certain

3    documents, I think you used the word

4    a narrow portion of the documents

5    upon which Dr. Exner relied, how do

6    you know what documents he relied

7    upon as opposed to what documents he

8    may have reviewed?

9        A.    I believe that the way that

10   it was described to me was these are

11   the documents -- well, the way that

12   it proceeded was I, in developing my

13   original expert report, I did not

14   review or necessarily even know what

15   Dr. Exner was doing in the

16   development of his expert report.

17           In development of my

18   rebuttal report, I concluded that I

19   wanted to try to say something about,

20   and that it was important to look

21   into a little bit more detail the

22   characteristics of the acid wastes

23   that may have been disposed of at the

24   site.

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1              Then I reviewed Dr. Exner's

2    report.  He said something in that

3    report about the characteristics of

4    that waste.

5              I determined that if I

6    wanted to say something about the

7    characteristics of that acid wastes

8    that I wanted to look at the

9    underlying documents.  And so that's

10   how that proceeded.

11             I looked at -- I got the

12   documents that he relied on or

13   reviewed and relied on, I'm not -- I

14   can't say exactly what he -- how he

15   viewed the documents that he had.

16             But I looked at the

17   documents that Dr. Exner had and

18   cited for his expert report and

19   focused on those documents that were

20   related to the acid wastes.

21        Q.    Although, in your rebuttal

22   report you didn't address or describe

23   or speak to specific acid wastes from

24   specific companies, did you?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation                    FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.     I didn't speak about

2   specific wastes from specific

3   companies, no.   I talked in a little

4   bit more detail about the types of

5   wastes -- the types of acid wastes

6   that may have been disposed of at the

7   site, and the strength of those

8   wastes.

9      Q.     In your original expert

10   report on Page 15, and I guess

11   carrying over onto Page 16 you have a

12   series of four bulleted paragraphs

13   that talk about certain types of

14   wastes, I might say industry-related,

15   not company-related, if that's a fair

16   description.

17         You said a minute ago that

18   you didn't look at any information or

19   have any information from Dr. Exner

20   prior to your preparation of this

21   original report.

22         So you didn't know what he

23   relied upon, you didn't know what he

24   even reviewed when you were writing

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    this original report.

2              So where do you get

3    information about these particular

4    industries and wastes associated with

5    the industries?  Why were you even

6    looking at these industries as

7    opposed to some other industries or

8    nothing?

9              MR. HARRIS:  Objection to

10   the form.  There's about ten

11   questions in that question.

12   BY MR. COOLEY:

13        Q.    Do you understand my

14   question?

15        A.    In general, yes.

16             And I think we discussed

17   this yesterday a little bit, that

18   information that I refer to here and

19   the wastes that I refer to here came

20   from both a review of the underlying

21   documents and also a discussion with

22   counsel about what wastes -- if these

23   wastes had been disposed of at the

24   site, what's your opinion about how

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    they would behave at the site and

2    contribute to the need for

3    remediation at the site.

4        Q.    Are you able today to go

5    through these four paragraphs and

6    identify which sentences or

7    statements are based upon information

8    drawn from documents you reviewed and

9    that would be listed on the

10   attachment to this original expert

11   report and which of these sentences

12   or statements were made based on

13   information obtained from counsel?

14       A.    I don't believe I could do

15   that completely.

16            I know that, for instance,

17   the fourth bullet that refers to

18   solvent-containing wastes, there's

19   information in the underlying record

20   about TCE, which is a solvent waste,

21   being disposed of at the site.

22            As far as the others, I

23   could not say which came from or what

24   combination came from a review of the

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    underlying documents or discussions

2    with counsel.

3         Q.    Is there any statement

4    in -- sentence or statement in any

5    of these four bullets that you can

6    identify as being based upon

7    information provided by counsel?

8         A.    As compared to information

9    from the underlying documents?

10        Q.    Yes.

11        A.    No.

12        Q.    When did you start actually

13   writing your original expert report,

14   or that portion of it that you wrote,

15   as opposed to Mr. Hawley?

16        A.    I couldn't tell you.

17   Sometime prior to June 30th, 2006.

18        Q.    No earlier than the

19   beginning of 2006.  Is that fair?

20        A.    That would be fair.

21        Q.    Did you do all your writing

22   within the month of June?

23        A.    I don't know.

24        Q.    Returning again to

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX  215.751.0581

298

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    attachment -- excuse me, Appendix A

2    to your rebuttal report. This is

3    headed additional materials reviewed

4    and/or relied upon.

5              And that same first line,

6    documents relied upon by Dr. Jurgen

7    Exner in his original report of June

8    29, 2006, how did you obtain those

9    documents?

10        A.    I believe I obtained those

11   documents from counsel.

12        Q.    And how many pages, boxes

13   or other unit that you might choose

14   to use did those documents comprise?

15        A.    I believe they took up

16   about two banker's boxes,

17   approximately. And I take that back,

18   I believe that Dr. Exner -- I believe

19   I got the documents physically mailed

20   to me from Dr. Exner, but it was

21   through a request via counsel.

22        Q.    Okay. And did you turn

23   every page, so to speak and read

24   every page of the documents in those

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    boxes, or did you in some cases

2    identify a multi-page document,

3    review it to understand what it was

4    and decide that it was unnecessary to

5    review all pages that it was

6    comprised of?

7              MR. HARRIS:  Objection to

8    the form.

9              THE WITNESS:  We, both

10   myself and Mr. Hawley, a combination

11   looked at every document, again

12   because we were interested in finding

13   information on a specific issue.

14             So we wanted to make sure

15   that we were complete in identifying

16   the documents that related to that

17   issue.  So we generally reviewed

18   every page, if you will, in those

19   boxes.

20   BY MR. COOLEY:

21        Q.    So to the extent -- well,

22   let me ask you, were there any

23   deposition transcripts in those

24   boxes?

**JDR**

**James DeCrescenzo Reporting, LLC**

215.564.3905                InnovatingLitigation                FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1        A.    I don't recall if there

2    were or not.

3        Q.    Do you recall reading any

4    deposition transcripts in this

5    matter?

6        A.    Yes.

7        Q.    What specific witness

8    testimony do you recall reading?

9        A.    The deposition transcripts

10   from the experts that are listed in

11   my rebuttal report.

12       Q.    Other than those expert

13   depositions, do you recall any other

14   witness whose deposition transcript

15   you read?

16       A.    No, I don't.

17       Q.    Do you know that you did

18   not read any deposition transcripts

19   other than the transcripts of

20   experts' depositions?

21       A.    No.  I could have looked at

22   some depositions, I just don't recall

23   reviewing depositions as part of my

24   original expert report.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

301

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          Q.    How about as part of your
2     preparation for writing your rebuttal
3     expert report?
4          A.    The same.
5          Q.    And I'm sorry if I asked
6     this already, but were there -- do
7     you recall whether there were any
8     deposition transcripts in those boxes
9     that you received from Dr. Exner?
10         A.    I don't recall if there
11    were or not.
12         Q.    Okay.  So if I understood
13    you correctly, you looked at, I guess
14    in a complete way, if I could use
15    that word, each of the documents that
16    you identified among those received
17    from Dr. Exner that related to the
18    acid wastes or particular issues of
19    concern to you for purposes of your
20    rebuttal expert report.  Is that
21    correct?
22         A.    That's a fair statement,
23    yes.
24         Q.    However, documents that you

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    identified as not being pertinent to

2    acid wastes or issues you wanted to

3    address in your expert report you

4    didn't necessarily review thoroughly

5    because you concluded that they were

6    not related to the subjects of your

7    concern?

8         A.    That's correct.

9         Q.    Do you know how long it

10   took you to review the documents that

11   you did identify as pertinent to your

12   rebuttal expert report?

13        A.    Not precisely, but

14   certainly within a couple of days.

15             MR. COOLEY:  Off the record

16   for a second.

17             (Recess taken)

18   BY MR. COOLEY:

19        Q.    Mr. Vandeven, did you have

20   any occasion at any point prior to

21   today to talk with Dr. Exner about

22   the Boarhead Farms site?

23        A.    No.

24        Q.    Do you know Dr. Exner?

303

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          A.     No, I do not.

2          Q.     Have you ever had occasion

3     to read any of his writings?

4          A.     Only his expert report in

5     this matter.

6          Q.     Did your associate

7     Mr. Hawley have any occasion to speak

8     with Dr. Exner?

9          A.     I don't believe so, no.

10          Q.     Was there anyone in your

11     office other than yourself and

12     Mr. Hawley, as professionals, who

13     worked on this assignment for

14     plaintiffs in this matter?

15          A.     I believe, as we looked at

16     yesterday, there was a little bit of

17     work done by a woman named Jennifer

18     Schulte, but that would have been a

19     very, very, a very small amount of

20     work.  It was essentially myself and

21     Dr. Hawley.

22          Q.     Dr. Hawley is a doctor of

23     what?

24          A.     He has a Ph.D. in

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    hydrogeology.

2        Q.    I think you referred to him

3    as your hydrogeologist?

4        A.    Correct.

5        Q.    You are not a

6    hydrogeologist?

7        A.    I do not have a degree in

8    hydrogeology, that is correct.

9        Q.    Do you consider yourself an

10   expert in hydrogeology?

11       A.    I consider myself an expert

12   in fate and transport of chemicals in

13   groundwater, which I would consider

14   part of hydrogeology.

15       Q.    You are not a professional

16   geologist.  Is that correct?

17       A.    That's correct.

18       Q.    Do you consider yourself an

19   expert in geology?

20       A.    Some aspects of -- geology

21   is an extremely large discipline.  To

22   the extent that it relates to

23   chemicals in the subsurface, I

24   consider myself an expert in those

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    areas.

2        Q.    Did you ever sit for any PE

3    exams?

4        A.    No.

5        Q.    Why did Mr. Hawley work

6    with you on this project?

7        A.    Mark has a lot of

8    experience with -- both as a

9    hydrogeologist and a lot of

10    experience with the Superfund

11    process.  And also Mark and I work a

12    lot together on projects, so he was a

13    natural person to assist me on this

14    project.

15        Q.    Could you describe for me

16    the breakdown of responsibility or

17    assignments or lead or any other term

18    you might want to apply to the work

19    that the two of you did respectively

20    on the project?

21        A.    I could generally describe

22    it, as I have done before.  Mark

23    assisted me in reviewing the

24    underlying documents.  There is, as

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                                                      FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    you know, a very significant volume

2    of documents in the underlying

3    record.

4                He helped me write up the

5    parts of my expert report that deal

6    with the chronological development of

7    the site, issues related to some of

8    the fate and transport questions he

9    and I talked about together.

10               He helped review some of

11   the expert reports on the other side

12   of the case.  In general was part of

13   every aspect of the case.  That's

14   just generally how we work.

15         Q.    Well, I guess my real

16   question was, was there any aspect of

17   the work leading toward the two

18   reports in which it was important to

19   you to have Mr. Hawley's experience

20   or expertise, as opposed to applying

21   your own?

22               MR. HARRIS:  Objection to

23   the form.

24               THE WITNESS:  It was -- as

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                    FAX  215.751.0581

1    a scientist and engineer you always
2    want to collaborate. Collaboration
3    is always better than isolation.
4              So on issues related to
5    fate and transport processes, it's
6    always better to get Mark's input on
7    those issues.
8              Even though I consider
9    myself an expert on those topics,
10   it's always better to get some input
11   from others.
12   BY MR. COOLEY:
13        Q.    Do you recall there being
14   any point of disagreement between the
15   two of you as to any issue involved
16   in the subjects of your two reports?
17        A.    No, I don't.
18        Q.    Yesterday two documents
19   were marked as exhibits, Exhibits
20   Vandeven 2 and 3. And you may recall
21   these were the e-mails between you
22   and Dr. Hawley regarding this
23   probabilistic analysis that's
24   referenced here.

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1              Did you review or discuss

2     either those two documents, or either

3     one of them, or the subject of a

4     probabilistic analysis with

5     Mr. Harris in preparation for the

6     deposition yesterday and today?

7          A.    I don't recall discussing

8     it with him, no.

9          Q.    You I think said you spent,

10    correct me if I'm wrong, something

11    like two and a half hours in

12    preparation with Mr. Harris?

13         A.    In preparation for my

14    deposition yesterday and today?

15         Q.    Correct.

16         A.    Correct.  I met with

17    Mr. Harris for approximately two and

18    a half hours.

19         Q.    I thought that's what you

20    said, right.  And did you review any

21    documents during that time with

22    Mr. Harris?

23         A.    We went back and reviewed

24    in general my two expert reports.  I

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    believe we went through very briefly
2    some of the drafts of the expert
3    reports.
4              I believe a question came
5    up about information that I thought
6    was in the record of decision, so we
7    may have pulled out the record of
8    decision in the case.
9              Other than that, I don't
10   recall a specific document that we
11   referred to in our preparation.
12        Q.    Prior to meeting with
13   Mr. Harris, did he ask you to review
14   documents in preparation for your
15   deposition?
16        A.    Any specific documents, no.
17        Q.    Any category of documents
18   or general documents?
19        A.    Well, like most attorneys
20   that I work with, he said in
21   preparation, review your expert
22   reports.
23        Q.    When you reviewed the
24   drafts of your report with

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    Mr. Harris, were there any particular
2    issues that you discussed relating to
3    differences between any draft or
4    drafts and the finals?
5        A.    I believe we generally
6    discussed a couple of pieces of the
7    report that changed from draft to
8    draft, but nothing -- nothing
9    specifically that I can remember.
10        Q.    Did you discuss the matter
11    of allocation with him at all?
12        A.    I believe we discussed
13    briefly the issue that we talked
14    about yesterday, the change in that
15    one last paragraph of I believe it
16    was the rebuttal, I believe it's the
17    rebuttal expert report.
18            But that's the only one
19    that we discussed that had anything
20    to do with allocation.
21        Q.    And what was said by either
22    of you?
23        A.    I believe, as I said
24    yesterday, I reminded Mr. Harris

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                    FAX  215.751.0581

311

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    about the development of that
2    paragraph and why I changed it from
3    the draft to the final.
4            And that was, again, after
5    reviewing the expert reports from the
6    other side they made certain
7    statements about allocation.
8            And so in my rebuttal
9    report I had that last paragraph that
10   spoke to, at least in general terms,
11   the allocation issue.
12           And then decided that
13   rather than give that general
14   narrative I would give a specific
15   example of why an allocation analysis
16   would be complex at the site.
17           And that was therefore the
18   origin of the paragraph that we spent
19   some time on yesterday regarding the
20   TCE degreaser sludge.
21       Q.    It's not my objective to
22   make you repeat yourself.
23           I don't recall that the
24   testimony yesterday had to do with

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    discussions between you and

2    Mr. Harris about differences between

3    the drafts, I recall it being just

4    your testimony about the difference

5    or differences and what the story was

6    behind them.

7            But the answer you just

8    gave included a description of what

9    you said to Mr. Harris. Do you

10    recall anything that Mr. Harris said

11    to you during that discussion?

12    A.    Only agreeing with me that

13    that's how that developed. I don't

14    recall anything else, no.

15    Q.    Another document marked

16    yesterday as an exhibit is Vandeven-

17    11. I will hand it to you.

18            It's an e-mail with what

19    appears to be a PDF icon beneath the

20    text of the e-mail or narrative words

21    of the e-mail with a reference to

22    Ashland comments. Do you recall

23    that?

24    A.    Do I recall the testimony

313

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    yesterday?

2        Q.    The document.  Do you

3    recall seeing the document yesterday?

4        A.    This exhibit?

5        Q.    Yes.  This exhibit.

6        A.    Yes.  Sorry.

7        Q.    And I think there was some

8    question-and-answer testimony about

9    what comments that icon might refer

10   to, whether you recalled having the

11   document still, et cetera.

12           My question is, did you do

13   a review of individual companies or

14   documents associated with individual

15   companies other than Ashland?

16           MR. HARRIS:  Objection to

17   the form.

18           THE WITNESS:  Well --

19   BY MR. COOLEY:

20       Q.    Well, let me -- strike that

21   question.

22           And, again, I don't want to

23   recover ground, I just want to make

24   sure I have the foundation here

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      right.

2              I think yesterday you said

3      you or your firm did some review of

4      some documents relating to Ashland

5      and prepared some comments concerning

6      them.  Is that correct or am I

7      mistaken in that recollection?

8          A.    I don't know if you are

9      mistaken or not.  I can -- I don't

10     know if this is responsive, but I

11     will start and you tell me if it's

12     not.

13             The reason that this is

14     called Ashland is this -- the first

15     expert report that I received was the

16     expert report that had three authors,

17     which was unusual.

18             I usually don't get expert

19     reports that have three authors, as

20     opposed to some of the other expert

21     reports from, say, Dr. Brown or

22     Dr. Mink that were from individuals.

23             And I would have referred

24     to those as Brown or Mink, this was

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                           FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    from three individuals so I referred

2    to it as Ashland.

3              So Ashland refers to that

4    expert report, it doesn't refer to an

5    Ashland document in any way, it just

6    refers to the expert report from the

7    three individuals that were retained

8    by Ashland.

9         Q.    May I see the exhibit

10   again?   Thank you.

11             Well, Exhibit 11, Vandeven-

12   11 states Attachments:   Ashland

13   comments dot doc.

14             Is the answer that you just

15   gave your way of telling me that you

16   understand the document, and it's

17   actually a Word icon here, the

18   document that -- an icon for which

19   appears on this e-mail to be the

20   expert report of these three

21   individuals as opposed to some

22   comments on it?

23        A.    No.   It refers to my

24   initial comments of my review of that

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    expert report.

2        Q.    Okay, all right.    That's

3    helpful.    Thank you.

4             Now, did you perform a

5    review of any other expert reports

6    that you received in this matter

7    other than the Ashland report

8    authored by the three experts?

9        A.    I did, and those are

10    outlined in my rebuttal report.

11        Q.    Did you prepare some

12    comment document or documents

13    pertaining to any other expert's

14    report?

15        A.    I don't recall putting

16    together a report or formal review

17    like that for any of the other

18    experts.

19        Q.    But you recall putting

20    together some document, comment

21    document.    Tell me if that's a fair

22    description, pertaining to Ashland.

23        A.    Yes, I do.

24        Q.    It's just a question of

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

1    whether you still have it or --

2        A.    Correct.

3        Q.    There was some question-

4    and-answer yesterday regarding pH and

5    pH ranges, zero at one end, do I

6    recall correctly, 13 or 14 at the

7    other?

8        A.    14 at the high end, yes.

9        Q.    14, right.

10       A.    14 at the other end.

11       Q.    And I believe you testified

12    that neutral was 7.0?

13       A.    That would be considered

14    neutral pH, yes.

15       Q.    Considered by whom?

16       A.    Considered by chemists.

17    That's generally referred to as a

18    neutral pH.

19       Q.    Is there a range that's

20    generally considered to be a neutral

21    range that spans 7.0 on one side or

22    both?

23       A.    Depending on what the

24    circumstance is or what the

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905    FAX 215.751.0581

318

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    application of the pH measurement is

2    there may be a range of pHs that are

3    considered -- I'm sorry, that are

4    considered neutral for that

5    particular situation.

6              For instance, rainwater,

7    individuals, regulators for instance

8    that are -- or scientists that are

9    concerned about acid rain may

10   consider neutral rainwater a range

11   from, say, 6 and a half to 7 and a

12   half and not a precise number of 7,

13   but it depends on the situation.

14        Q.    Are you using 6 and a half

15   to 7 and a half with precision in

16   referring to the subject of acid

17   rain, or are you just using those

18   numbers in a general exemplary way?

19        A.    I'm using them as the

20   latter, an illustrative example.

21        Q.    What is the range of pH in

22   acid rain experienced in, say, the

23   northeast in this country over the

24   past decades.  Do you know?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.    No.

2      Q.    Have you ever studied acid

3   rain as a subject matter?

4      A.    Not professionally.  Only

5   academically in school.

6      Q.    What do you recall from

7   your study of it academically?

8      A.    That it's bad.

9      Q.    Do you have any knowledge

10  as to the range of pH associated with

11  acid, what's called acid rain,

12  referred to as acid rain?

13     A.    No.

14     Q.    Do you have any knowledge

15  as to the pH of rain in the greater

16  area of the Boarhead Farms site

17  during the 1960s and '70s?

18     A.    No.

19     Q.    Is it possible that the pH

20  of rain regularly occurring at the

21  Boarhead Farms site during the, let's

22  say, late '60s through 1970s was

23  lower, i.e. more acidic than some of

24  the liquid wastes disposed of at the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

1    site?

2              MR. HARRIS:   Objection to

3    the form.

4              THE WITNESS:   Sure, it's

5    possible.

6              If for no other reason as

7    we discussed yesterday, the pH of

8    some of the wastes could have been

9    corrosive because they were basic at

10   a high pH, therefore the rainwater

11   could have been more acidic than

12   those wastes.

13   BY MR. COOLEY:

14        Q.    What about so-called acid

15   wastes as you have read of such

16   wastes in your review of the

17   administrative record and materials

18   received from Dr. Exner, could the

19   rainfall at the Boarhead Farms site

20   have been more acidic than some of

21   those so-called acid wastes?

22        A.    Well, anything is possible,

23   but I would certainly doubt that.

24        Q.    When you have both read and

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    written and in the last two days

2    testified as to "acid wastes," have

3    you had a singular understanding as

4    to what the meaning of that term is

5    in each of those three contexts,

6    things you have read, things you have

7    written, things you have testified

8    to?

9         A.    Well, again, without having

10   any precise pH measurement associated

11   with a particular waste, if EPA or

12   contractors by the EPA or the

13   Pennsylvania Department of

14   Environmental Control or any other

15   regulatory agency or environmental

16   entity, if they describe something as

17   acidic waste to a professional in

18   this industry, that means that it is

19   a material that is going to have an

20   effect on other materials because of

21   its acidity, even though they don't

22   have a precise pH measurement

23   associated with it.

24        So that's my general

1    understanding or how I viewed that

2    term acid waste that was described in

3    the underlying record.

4              That's why, for instance, I

5    wanted to go back and see in

6    Dr. Exner's documents if there was

7    any other information that would go

8    beyond that.

9              So if there was information

10   about it being sulfuric acid or

11   hydrochloric acid or nitric acid,

12   that gave me more information about

13   what kind of acid it was.

14        Q.   Now, the answer you just

15   gave I understood to address

16   principally your understanding of the

17   general intended meaning of the term

18   acid waste as you read it in

19   documents contained within the

20   administrative record.

21              What about when you have

22   used the term acid wastes in your

23   expert reports, what did you mean by

24   it?  Generally the same thing?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          A.     Yes.

2          Q.     And in your testimony

3    yesterday and today, likewise when

4    you have used that expression you

5    have meant generally the same thing?

6          A.     Correct.

7          Q.     And so since we have a

8    commonality in all three contexts, we

9    will treat them as one, and my

10   question would be, what range of pH

11   do you consider is applicable to this

12   concept of acid waste as you just

13   described it a couple of answers ago?

14         A.     I haven't associated a

15   particular pH range with it.

16         Q.     Can you do that?

17         A.     Nothing more than saying

18   it's below -- it's below 7.  It would

19   be below 7.

20         Q.     So if a liquid material was

21   6.95, would you expect EPA to

22   describe that liquid material as an

23   acid waste?

24         A.     No.

**JDR**
**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

1    Q.    Neither would I.  So I'm

2  just trying to understand whether

3  there are any numerical pH bounds

4  that you would think would be

5  appropriate to assign to what has

6  been described by others and yourself

7  as acid wastes?

8    A.    No.  I can't say anything

9  more than I have, that the only --

10  EPA did not feel that it was

11  necessary to describe a bound,

12  therefore there's no bound provided

13  in the underlying record.

14          If all you are doing is

15  asking me the academic question,

16  what's the range of pH measurements

17  that would be considered acidic, any

18  high school chemistry book is going

19  to say below 7.

20    Q.    Well, I'm not asking you an

21  academic question, I'm asking you

22  something very different, which is in

23  the documents in the administrative

24  record and now in your two expert

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   reports and then further in your

2   testimony there's been a common use

3   of the express acid wastes or similar

4   waste-containing acids, variants of

5   the theme, and I'm trying to

6   understand whether you believe

7   there's some range of pH that's fair

8   to associate with that descriptive

9   term.

10                  MR. HARRIS:    Objection.

11  Asked and answered.

12                  THE WITNESS:    No, there's

13  not.

14  BY MR. COOLEY:

15      Q.      You said a few minutes ago

16  that acid rain was one example of --

17  I don't want to put words in your

18  mouth, so I'm trying to be careful,

19  but I'm having a tough time recalling

20  exactly what you said.

21              The discussion we were

22  having concerned neutrality and

23  whether neutral meant 7.0 or perhaps

24  some range on one side or both of

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                                    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

326

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    7.0.   It was in the context of that

2    discussion that you mentioned acid

3    rain, as an example.

4              So my question now is, from

5    your experience with site

6    investigation remediation matters and

7    environmental regulation over some 20

8    years, are you aware of any other

9    context in which neutral is defined

10   by some range of pH rather than the

11   specific number 7.0?

12       A.    No, I'm not.

13       Q.    Are you aware of any

14   context within site investigation,

15   remediation or environmental

16   regulation generally where a pH of

17   less than 7 is an acceptable

18   criterion for some purpose?

19       A.    I don't understand that

20   question.

21       Q.    Take for example discharge

22   limits under wastewater discharge

23   permitting programs and permits, do

24   you have any familiarity with what pH

327

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    values are acceptable for discharge

2    criteria?

3         A.    That would be facility-

4    specific, receiving-water specific,

5    permit-specific.

6         Q.    Do you have any experience

7    or familiarity with wastewater

8    discharge permitting?

9         A.    Yes.

10        Q.    Are you aware of any

11    discharge programs, and by that I

12    mean regulatory programs or specific

13    permits for specific facilities, so

14    I'm going from broad to narrow, in

15    which a pH below 7 was permissible?

16        A.    Not specifically sitting

17    here right now, no.

18        Q.    Yesterday I believe you

19    testified that you considered the

20    acidity of Ashland acids to be

21    strong, or you referred to them,

22    categorized them as strong acids.  Do

23    you recall saying that?  Do I have

24    that correct?

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.    I recall saying that the

2  information that I found in

3  Dr. Exner's documents indicated that

4  they were acids, such as

5  hydrochloric, sulfuric acids, that I

6  would consider strong acids.

7      Q.    So my question is, would

8  you please define strong or tell me

9  as specifically as you can what you

10 mean by strong when you use that as

11 an adjective with acids?

12     A.    Okay.  Well, different

13 acids have different characteristics,

14 they are different strengths.

15          And I think we talked a

16 little bit yesterday about you could

17 have anywhere from a very weak acid,

18 say citric acid, acidic acid, that

19 are generally weak acids, they don't

20 give up their hydrogen ion

21 concentration very readily, versus

22 acids that are very strong acids,

23 such as sulfuric acid, hydrochloric

24 acid, nitric acid.

**James DeCrescenzo Reporting**, LLC

Innovating Litigation

215.564.3905

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

FAX  215.751.0581

329

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          So that's what I was

2     referring to as a strong acid versus

3     a weaker acid.

4          Q.    I think your answer just

5     told me that by strong you mean not

6     weak, and you have identified certain

7     specific kinds of acids that you

8     would associate with the word strong

9     or include it under the heading

10    strong acids --

11         A.    Right.

12         Q.    -- and the only thing that

13    I took away from your answer to help

14    me drill down and understand a little

15    more specifically what you mean by

16    strong or weak was the degree to

17    which an acid gives up its ions.

18         A.    How it affects -- pH,

19    again, is the hydrogen ion

20    concentration, so how it affects that

21    hydrogen ion concentration determines

22    whether or not it is a strong acid or

23    a weak acid.

24         Q.    How what affects that

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                            FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    hydrogen ion concentration?

2         A.    How the acid does.

3         Q.    How the acid affects the

4    hydrogen ion concentration of

5    something else when exposed to

6    something else?

7         A.    Yes.

8         Q.    So it's not the hydrogen

9    ion concentration of the acid itself,

10   it's the hydrogen ion concentration

11   of the substance to which the acid is

12   exposed?

13        A.    Correct.

14        Q.    And is there some value or

15   set of values that are assigned to

16   acids to quantify strength of acid?

17        A.    It's generally referred to

18   as the normality of the acid.

19        Q.    And what does that mean?

20        A.    I couldn't tell you the

21   exact definition of normality, but

22   that's the parameter, that's the

23   measurement of an acid that describes

24   how strong it is.

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

331

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1       Q.    Is that stated in some kind

2    of unit?

3       A.    It's usually stated as a --

4    it's stated as -- it's referred to as

5    normal.

6             So it would be the sulfuric

7    acid is 2 normal sulfuric acid.  So

8    that in and of -- that word normality

9    or normal is the unit that's used to

10   describe the strength of an acid.

11      Q.    And when you say 2 normal,

12   does that mean one might see 3 normal

13   or 4 normal?

14      A.    The range that that goes up

15   to I'm not sure, but, yes, in general

16   the larger the number the stronger it

17   is.

18      Q.    Does the number get

19   negative?  And this is a different

20   question than negative pH, but rather

21   the normal number.

22      A.    I don't recall if it does

23   or not.  That's a very kind of very

24   narrow chemistry issue that I don't

332

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    know if the normality of an acid can

2    be a negative number.

3        Q.    Okay.    When we discuss a

4    given acid, say sulfuric acid, in

5    common understanding when one says

6    sulfuric acid, does that connote a

7    specific normality?

8        A.    Not necessarily, no.

9            It could connote a specific

10   normality if it's -- in general you

11   are not going to find that the

12   normality of an acid discussed,

13   except if you are in a lab doing

14   basic chemistry work, in most

15   descriptions of acid you are going to

16   find it described as concentrated or

17   weak, a lot more qualitative in

18   general.

19           So you may see concentrated

20   sulfuric acid versus weak sulfuric

21   acid.

22       Q.    But those word labels could

23   in concept be translated into some

24   normality value.    Is my understanding

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    correct as to what you mean?

2        A.    That's correct, yes.

3        Q.    So if my understanding is

4    further correct, sulfuric acid isn't,

5    per se, of a given strength, there

6    may be a weaker sulfuric acid and a

7    stronger sulfuric acid.

8        A.    That is correct.

9        Q.    Is it also the case that if

10   an acid is used in some way, exposed

11   to some other substance or material

12   and becomes either used or partially

13   used or spent or partially spent that

14   its strength is affected as a result

15   of that use or exposure?

16       A.    Yes.  If you -- as we

17   talked about before, if you mix it

18   with a liquid that's a higher pH, for

19   instance water, the pH of the mixture

20   will be greater than the original

21   acid and less than the original

22   water.

23       Q.    So strength, then, and

24   please correct me if I'm wrong, I'm

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      trying to understand it, strength is

2      directly related to or effectively

3      the same as its concentration or

4      dilution, the more diluted the

5      weaker, the less diluted the more

6      concentrated thus stronger.

7              Or is that not correct?

8          A.    That is correct.

9          Q.    And there is also a like

10     correlation between pH and strength,

11     the lower the pH, as in closer to 0

12     and less close to 7, so in that sense

13     the lower the pH the stronger the

14     acid, the higher the pH the weaker

15     the acid?

16         A.    That's correct.

17         Q.    And so if we see a

18     reference in a document in the

19     administrative record, let's say, and

20     I don't have one in mind, I'm just

21     generally trying to give you some

22     context and there's a reference to

23     sulfuric acid waste.

24             By that wording alone you

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

335

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    can't really say how strong or weak

2    it is, can you?

3        A.    You can say how strong

4    sulfuric -- how strong the acid is,

5    it's a sulfuric acid, which is a

6    strong acid, you can't tell how

7    strong that particular sulfuric acid

8    is.

9        Q.    Or that particular sulfuric

10   acid waste, if that's what is being

11   described?

12       A.    That is correct.

13       Q.    I mean, the waste might be

14   a dilute material or a concentrated

15   material, unless that's called out or

16   spelled out in some specificity to

17   help the reader understand more

18   precisely what's being described, you

19   don't know.  Is that fair?

20       A.    I think it's fair to say

21   that unless the pH is described, you

22   don't know exactly what the pH is of

23   that waste, that's correct.

24       Q.    You don't know exactly what

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

```
 1    it is, in fact you don't know whether

 2    it is 6.95 or 1.0, do you?

 3              MR. HARRIS:  Objection to

 4    the form.

 5              THE WITNESS:  Well, again,

 6    I think you are discussing a

 7    hypothetical situation that in my

 8    experience that just really has no --

 9    it doesn't really apply to situations

10    like this.

11              If EPA is investigating a

12    site that has the characteristics of

13    the Boarhead Farms site where they

14    had information about past disposals,

15    they had information about

16    Mr. DeRewal's other operations, they

17    had information about the kinds of

18    industries that he was servicing, if

19    you will, and the types of wastes

20    that were alleged to be disposed of

21    at the site, if they are calling

22    something an acid waste or if they

23    are talking about spills of sulfuric

24    acid, is it theoretically possible
```

**JDR**

**James DeCrescenzo Reporting, LLC**
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581