# Exhibit A

## Part 4 of 5

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    that they -- could you still call

2    something that was sulfuric acid that

3    had a pH closer to 7 sulfuric acid,

4    possibly, theoretically.

5          But if they are calling

6    something acid waste, they are

7    referring to a waste that has a low

8    enough pH, an acidity that is going

9    to impact the environment.

10    BY MR. COOLEY:

11      Q.    I understand what you are

12    saying, and several questions ago I

13    was trying to get an understanding

14    from you as to what kind of pH range

15    would cause EPA to have such a

16    concern.

17          I would like you to tell me

18    what range of pH you think EPA would

19    view as needing to be present in

20    order for EPA to have a concern about

21    that particular acid.

22          MR. HARRIS:    Objection.

23    Asked and answered.

24          THE WITNESS:    I couldn't --

**JⅅR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

```
1    I couldn't tell you a pH range that
2    would cause them concern.
3    BY MR. COOLEY:
4        Q.    Can you tell me a pH range
5    that would cause you concern?
6            MR. HARRIS:  Objection.
7    Asked and answered.
8            THE WITNESS:  No.
9    BY MR. COOLEY:
10       Q.    Just to be clear, by
11   causing you concern, that's a pretty
12   loose expression.
13           I would like to use the
14   description you gave a couple of
15   answers ago which concerned the
16   effect of or the anticipated effect
17   of the acid in question on the
18   environment or other materials.
19           And so if I were to
20   rephrase my question to ask you if
21   you can tell me what range of pH you
22   would view as being the range that
23   could have such an effect, can you
24   now tell me what that range might be?
```

1          MR. HARRIS:  Objection.

2    Asked and answered.

3          THE WITNESS:  No.  Again,

4    that's just one characteristic of

5    this hypothetical waste that you are

6    talking about, so I couldn't give you

7    a pH range that would quote cause me

8    concern.

9          It would depend on other

10   factors such as the volume of the

11   waste, what else was in the waste,

12   where it was disposed of at a site.

13          So just giving a pH range

14   that would cause me concern is not a

15   question that I could answer.

16   BY MR. COOLEY:

17      Q.    But you said to me a few

18   minutes ago that you don't believe

19   that when EPA describes acids or

20   waste acids and investigates and

21   takes steps to address acid wastes

22   that it has in mind materials that

23   are near neutral.

24          Is that a fair summation of

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    what you said a minute ago?

2         A.    I believe what I said was

3    that if they are describing something

4    as acid waste, if they are concerned

5    about it having been spilled at the

6    site or buried in drums at the site

7    and they are referring to it as acid

8    waste, they are concerned about that

9    characteristic of the waste, the

10   acidity of the waste, the pH of the

11   waste to a level that indicates to

12   them that it could have some negative

13   impact on the environment.

14        Q.    Do you know what the range

15   of pH in the soils in the drum

16   disposal, excavation area was when

17   those soils were sampled?

18        A.    No, I don't.

19        Q.    Can you identify what the

20   inorganic contaminants of concern as

21   EPA listed them are at this site?

22        A.    Well, I could provide at

23   least a partial list without any

24   documents in front of me.  I could

**James DeCrescenzo Reporting, LLC**
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    provide a more complete list with the

2    ROD in front of me.

3        Q.    Okay.  Well, just from your

4    recollection, what can you identify?

5            MR. HARRIS:  What was the

6    question now, which kinds of metals

7    are what?

8            MR. COOLEY:  Inorganic

9    contaminants of concern as identified

10   by EPA.

11           MR. HARRIS:  As in COPC?

12           MR. COOLEY:  No.  COCs,

13   contaminants of concern.

14           THE WITNESS:  They

15   identified many inorganic

16   contaminants from some metals that we

17   have talked about thus far; chromium,

18   arsenic, zinc, lead, copper,

19   manganese.

20           That's an incomplete list

21   because the list is substantially

22   larger than that.

23   BY MR. COOLEY:

24       Q.    It's not a test, that's

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905       InnovatingLitigation       FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

342

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    okay.  I just wanted to see what you

2    could say with confidence, so from

3    your recollection, based on your

4    review of the various materials you

5    have looked at.

6              But just to make sure I

7    understand your answer, my question

8    was what contaminants of concern,

9    COCs, do you recall EPA having

10   identified.

11             Mr. Harris questioned

12   whether I meant COPCs, contaminants

13   of potential concern, and I said no,

14   I meant COCs.  And your answer was

15   that the EPA identified many

16   contaminants at the site.

17             I take the word

18   contaminants when it is generally

19   used in environmental matters to be,

20   you know, any contaminant or often

21   hazardous substance that just may be

22   present and detectable, other than

23   naturally occurring if it's a

24   contaminant.

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          But that wasn't my

2    question, my question was what COCs,

3    or contaminants of concern.

4          So did the metals you

5    listed, are they, to you,

6    contaminants of concern as EPA

7    identified them?

8    A.    That would be -- again,

9    that would be a partial list of the

10   contaminants that were of concern at

11   the site, yes.

12   Q.    But each of those you

13   understand to be a COC as defined by

14   EPA on the site?

15          MR. HARRIS:    That's I guess

16   the basis for my objection.    Are you

17   suggesting that there is such a

18   definition?    Are you asking about

19   some specific EPA definition or are

20   you just asking what they were

21   concerned about?

22   BY MR. COOLEY:

23   Q.    Let me ask you, do you

24   understand the acronym COPC, as used

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   in the Superfund process?

2       A.    I understand that

3   abbreviation, yes.

4       Q.    What does it stand for?

5       A.    Contaminants of potential

6   concern.

7       Q.    And how and where is it

8   used in the Superfund process?

9       A.    That concept would be used

10  in many stages of the Superfund

11  process.   You may have contaminants

12  of potential concern starting from

13  the very initial stages of the

14  Superfund process, from the listing

15  process.

16          You may have information

17  about past disposal at a site that

18  help you identify contaminants of

19  potential concern even before you do

20  the preliminary assessment or site

21  inspection.

22          You may have contaminants

23  of potential concern as you move

24  through the HRS process.

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          As you initiate your site

2    investigation you will identify

3    contaminants of potential concern to

4    help guide how you do the

5    investigation and the analytical

6    procedures that you use to analyze

7    samples.

8          You will have contaminants

9    of potential concern relating to

10   human health and ecological risks at

11   the site.

12         You may have contaminants

13   of potential concern that you

14   identify because of the remedies that

15   you are contemplating at the site

16   both in terms of cleanup levels that

17   you need to meet and other ARARs that

18   you need to meet, and they may be

19   contaminants of potential concern.

20         So that concept and the use

21   of that term is used throughout the

22   Superfund process.

23       Q.    Okay.  Are you familiar

24   with the acronym COC in the Superfund

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                         FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    process or context?

2        A.    In general, yes.

3        Q.    And what does it stand for?

4        A.    Not anything dissimilar

5    from what I just described.

6              As you move through the

7    process and you gather more data, for

8    instance as you gather more

9    characterization data, as you gather

10    more detailed records about the

11    history of the site, as you narrow

12    down what your remedies are going to

13    be, as you narrow down what your

14    ARARs are going to be, that list of

15    contaminants of potential concern may

16    become reduced to contaminants of

17    concern.

18              That's generally how it is

19    used.    But it's a fairly -- it's not

20    a very rigid -- that's not a very

21    rigid set of concepts.

22        Q.    Okay.    So with that

23    understanding as to what a COC is,

24    again just for clarification, is it

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    still your response that chromium,

2    arsenic, zinc, lead, copper and

3    manganese represent a partial listing

4    of the COCs for the Boarhead Farms

5    site?

6         A.    Yes.

7         Q.    Now, just talking about

8    those for the moment, are some of

9    those more mobile than others in the

10   subsurface?

11        A.    It would -- that's

12   dependent on other factors.  There's

13   no kind of generic.  It doesn't

14   really lend itself to that kind of

15   general evaluation.

16        Q.    What about in the

17   subsurface specifically at the

18   Boarhead Farms site?

19        A.    Again, it would depend on

20   the form of the metal you are talking

21   about, for instance chromium VI is

22   going to be a lot more mobile than

23   the other metals and a lot more

24   mobile than chromium III.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                FAX 215.751.0581
www.JDReporting.com

1          So it's hard to make kind

2     of generalized statements about the

3     mobility of a metal versus the

4     mobility of an organic compound.

5          Q.    Well, you know, do you not,

6     what the conditions were at points in

7     time when investigated at the

8     Boarhead Farms site, based on your

9     review of administrative record for

10    the site.  Is that correct?

11         A.    I know some information

12    about the characteristics of

13    different parts of the site at

14    different times.

15         Q.    Does that answer reflect

16    that you know only some information

17    because only some information is

18    available, or does that reflect that

19    you don't necessarily know because

20    you haven't studied all of the

21    available information?

22              MR. HARRIS:   Objection to

23    the form.

24              THE WITNESS:   I think it

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    reflects neither.  I think it
2    reflects the fact that, as we
3    actually read earlier, nobody knows
4    everything about the characteristics
5    of the Boarhead Farms site either
6    geographically or temporally.
7              Many, many things were
8    disposed of at the site in many, many
9    places at the site.
10             They don't know exactly
11   where everything was disposed, what
12   areas were used as disposal areas,
13   they don't know everything that was
14   disposed of at the site or the form.
15             They know that everything
16   from organics to metals to acid
17   wastes in drums and in bulk were
18   disposed of at the site.
19             So it really reflects the
20   fact that this is an extremely
21   heterogenous site and that it was,
22   that many, many different disposal
23   activities took place at the site.
24        Q.    Based on the information

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    that is available and that you have

2    reviewed, and it may be in regard to

3    only some area of the site as opposed

4    to the site as a whole, can you

5    identify any of these six metals as

6    having been more mobile than any of

7    the others?

8          A.     No.

9          Q.     Do you know what forms of

10   chromium have been detected at the

11   site?

12         A.     Well, I believe that the

13   way that they run their analytical

14   procedures they would have detected

15   both -- they would have analyzed for

16   and detected both chromium VI and

17   chromium III.

18         Q.     But do you know whether

19   they did?

20         A.     I don't remember any

21   specific data, no.

22         Q.     Do you know whether any of

23   these six, and if so, which of these

24   six metals were found in drums at the

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1  site?

2      A.    No.

3      Q.    Do you know which of the

4  six -- excuse me.  Do you know

5  whether any of these six metals, and

6  if so which of the six were found in

7  soils of the drum disposal, drum

8  excavation area of the site?

9      A.    No.

10      Q.    Do you know what metals

11  were present in the naturally

12  occurring geologic formations or

13  materials at the site, the so-called

14  diabase geology and in what

15  concentrations?

16      A.    Not without any documents

17  in front of me, I couldn't recite

18  what metals are present in the

19  diabase and certainly not what

20  concentration.

21      Q.    Do you have any knowledge

22  or recollection as to which metal, if

23  there is one, was present at the time

24  of the sampling and analysis at the

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    highest concentrations relative to

2    any other metals detected?

3            MR. HARRIS:   Objection to

4    the form.

5            THE WITNESS:   No.

6    BY MR. COOLEY:

7        Q.    Do you know whether the

8    actual diabase material has been

9    analyzed?

10       A.    Are you asking if they have

11   taken a sample of the actual geologic

12   rock?

13       Q.    Yes.

14       A.    I don't know if they have

15   or not.

16       Q.    Is there a way to

17   understand what the rock contains by

18   way of metals without taking a sample

19   of it and analyzing it?

20       A.    Sure.   You could look at

21   literature descriptions of that kind

22   of diabase and there's very likely

23   information in the literature about

24   the concentration -- the types of and

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the concentration of inorganic

2    materials in that geologic formation.

3         Q.    Inorganic materials you

4    said?

5         A.    Yes.

6         Q.    Have you studied the

7    geology in the greater area of the

8    Boarhead Farms site either for

9    purposes of your work on this matter

10   or previously in some unrelated

11   context?

12            MR. HARRIS:    Objection to

13   the form.

14            THE WITNESS:    Not in any

15   detailed way, no.

16   BY MR. COOLEY:

17        Q.    Do you know what kind of

18   variation exists in the concentration

19   of metals in this diabase rock

20   material from distance to distance?

21   And you can identify for me what kind

22   of distance that might be.

23        A.    No, I don't.

24        Q.    Would you expect to find

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    very consistent concentrations of

2    metals in the geologic material

3    underlying the Boarhead Farms site

4    from point to point across the site

5    or would you expect to see some

6    notable variation?

7        A.    I would expect that you

8    would find some variation.  I cannot

9    say what that variation is.

10        Q.    Would you expect more or

11    less variation for a particular metal

12    or a group of metals than for some

13    other metals?

14        A.    I cannot say.

15        Q.    Did you attempt to

16    determine what the metals

17    concentrations are in the geologic

18    materials underlying the site as part

19    of your work on your reports for this

20    matter?

21        A.    No.

22        Q.    Now, different soil

23    materials, and by that I mean, just

24    for your benefit, materials above

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

355

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    competent geologic material or

2    bedrock, different soils have

3    different degrees of organic material

4    within them.  Is that correct?

5        A.    In general, yes.

6        Q.    For example, some

7    previously or long undisturbed soils

8    here in Philadelphia might have a

9    different organic content than

10   somewhere in Bucks County, than

11   somewhere in Harrisburg.

12       A.    Correct.

13       Q.    Do you know anything about

14   the degree of organic materials in

15   the soils in the uncontaminated areas

16   of the Boarhead Farms site?

17           MR. HARRIS:  Objection to

18   the form.

19           THE WITNESS:  Not without a

20   document in front of me.  I don't

21   recall specific data on the organic

22   carbon content.

23   BY MR. COOLEY:

24       Q.    Is that something you

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    investigated as part of your work in

2    preparation for your report?

3                MR. HARRIS:  Objection to

4    the form.

5                THE WITNESS:  To the extent

6    that it was contained in the RI, but

7    I don't recall specifically looking

8    for that information, no.

9    BY MR. COOLEY:

10        Q.    You have rendered opinions

11   in your reports, have you not,

12   regarding the potential for acid

13   waste to affect and destroy, I think

14   would be the word, organic content in

15   soils.  Is that a fair description?

16        A.    Well, again, what we talked

17   about was two very separate

18   phenomenon.  One is acid wastes

19   destroying the natural microorganisms

20   in the soil.  And then also acid

21   wastes depleting the soil of the

22   organic carbon content.

23        Q.    Okay, right.  And in both

24   contexts you have opined that acids

357

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    can have a destructive effect.    Is

2    that generally a fair summary?

3         A.    Yes.

4         Q.    In order to understand what

5    kind of effect the disposal of acid

6    waste at the Boarhead Farms site

7    might have had on either

8    microorganisms or organic carbon

9    content, would you not need to know

10   what levels of microorganisms and

11   what levels of organic carbon content

12   are found at the site?

13        A.    If you were trying to

14   quantify precisely what effect they

15   had, then, yes, you would need to --

16   you would need to evaluate what the

17   organic carbon content was or what

18   the natural population of

19   microorganisms were.

20        Q.    But even if you are not

21   trying to do it in some precise

22   quantification exercise but rather in

23   order to understand whether there was

24   any significant impact on the

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    potential for mobilization of metals

2    based on destruction of

3    microorganisms or destruction of

4    organic carbon content, wouldn't you

5    need to understand what microorganism

6    levels and organic carbon content

7    levels were present to begin with?

8         A.    No, not necessarily.

9         Q.    Explain yourself, please.

10        A.    Well, any soil is going to

11   have some level of organic carbon

12   content.

13             Some soils will have a

14   greater natural organic carbon

15   content than others, but all soils

16   will have some organic carbon

17   content, and those acid wastes will

18   affect that organic carbon content.

19             The precise degree to which

20   they affect them will require a lot

21   more significant evaluation, but it

22   will affect them.

23             Just like acid wastes will

24   mobilize metals in soils, it will

359

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    affect and destroy the organic carbon

2    content of the soil.

3        Q.    How much of a variation is

4    there, from your experience in

5    working on sites over 20 years, in

6    the degree of organic carbon content

7    from what might be described

8    principally as a clayey soil as

9    opposed to a loamy soil?

10       A.    It can vary from anywhere

11   from less than or around one percent

12   to greater than five percent by

13   weight.

14            So a sandy or clayey soil

15   may have a very low organic carbon

16   content -- well, that's probably not

17   a good -- a sandy soil will have a

18   low organic carbon content.

19            A loamy soil could have a

20   very high organic carbon content,

21   upwards of five percent by weight.

22       Q.    And can you describe for

23   me, again based on your experience

24   working on sites during your

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    professional career, of the range you

2    see in microorganism population based

3    on whatever measure or unit is

4    applied to that?

5        A.    No, I can't.  That really

6    doesn't lend itself to kind of a unit

7    of measure.

8        Q.    And I meant from soil type

9    to soil type, if I didn't say that.

10   That was the context of the question.

11       A.    Well, only qualitatively.

12   And, again, and it doesn't -- it's

13   similar to the organic carbon

14   content.

15           A sandy soil is going to

16   have a less of a population of

17   natural microorganisms than a humic

18   or a loamy soil, but the exact

19   measure of that is not as precise as

20   the measure of organic carbon

21   content.

22       Q.    But it seems that from your

23   answers there's a correlation between

24   the two, you would tend to see more

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    microorganisms where you have more

2    organic material and less

3    microorganisms where you have less

4    organic material?

5         A.    Correct.

6         Q.    But that's not something

7    you studied as part of your review of

8    the Boarhead Farms site conditions.

9              MR. HARRIS:  Objection to

10   the form.

11             THE WITNESS:  I did not

12   study which soils on the Boarhead

13   Farms had more or less organic carbon

14   and microorganisms, no.

15   BY MR. COOLEY:

16        Q.    In your reports and your

17   testimony yesterday and today you

18   spent some time talking about

19   mobilization of metals and the

20   factors that can cause an increase or

21   decrease in mobilization of metals in

22   the subsurface.

23             And you have said on a

24   couple of occasions, if not more, in

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                              FAX  215.751.0581

1    your deposition here that there are a

2    number of circumstances or conditions

3    or factors that can bear on how much

4    mobilization can occur.  Is that a

5    fair summary?

6         A.    That's fair, yes.

7         Q.    Okay.  And I'm wondering if

8    you can provide any description of

9    the circumstances or conditions at

10   the Boarhead site that you have

11   studied to understand what extent of

12   mobilization of metals you could

13   conclude has been promoted as a

14   result of those circumstances and

15   conditions?

16        A.    I'm not sure I understood

17   the question.

18        Q.    Well, I'm simply trying to

19   state it clearly enough to avoid one

20   of Mr. Harris's objections.  But let

21   me elaborate just to help you and

22   then I will try to pose the question

23   again.

24             We talked a minute ago

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

363

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    about soil types, rock formations,

2    microorganism populations.  You may

3    have many other factors in mind that

4    bear on the degree to which metals

5    would be mobilized and move or be

6    retarded in their movement.

7            And so my question is, what

8    site-specific, Boarhead Farms site-

9    specific conditions or circumstances

10   of the subsurface have you

11   investigated to help you understand

12   what the migration potential is for

13   metals at that site?

14           MR. HARRIS:  Objection to

15   the form.

16           THE WITNESS:  Well, I would

17   say the primary factor that I looked

18   at was just the concentration of

19   metals that they are finding in the

20   groundwater in the soil at the site,

21   which indicates, again, along with

22   the information on the kinds of

23   wastes that may have been disposed

24   of, indicate to me, as it indicated

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    to EPA that metals have been

2    mobilized at the site because of

3    these discharges.

4    BY MR. COOLEY:

5        Q.    Other than looking at the

6    concentrations found, did you look

7    at, investigate, study other

8    circumstances, which I think is the

9    word you have used over the course of

10    these two days, or factor is a word I

11    might use, that would bear on how

12    readily metals at the Boarhead Farms

13    site would be mobilized?

14        A.    Well, in addition to what I

15    just said, I would say that just the

16    nature of the disposal practices, if

17    you will, and that's probably a

18    fairly generous term at this site,

19    practices, that the nature of the

20    disposal that it was directly to the

21    ground for the bulk liquids, that it

22    was leaking from drums in the

23    subsurface.

24            That kind of intimate

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX 215.751.0581

1    contact with the waste material and

2    the soil would promote and is a

3    factor in evaluating whether or not

4    metals are likely to be mobilized

5    from the waste.

6          So just the disposal -- the

7    information about the disposal

8    practices themselves.

9          Q.    But you don't know the pH

10   of the various waste acids that are

11   said to have been disposed at the

12   site, do you?

13         A.    I don't recall any pH

14   measurements of the waste, no.

15         Q.    That would be a factor as

16   well, would it not?

17         A.    It would be a factor if you

18   are trying to determine the precise

19   extent of mobilization.

20         Q.    Well, if we said

21   hypothetically that the totality of

22   the liquid acid waste disposed of at

23   the site was from drum to drum and

24   tanker truck to tanker truck 6.95 pH,

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      every last drop, as one possibility,

2      and the other being every last drop

3      was a pH of 1, it would be fair to

4      say, wouldn't it, that you would

5      expect different effects on

6      mobilization of metals in those two

7      disposal scenarios?

8          A.    Everything else being

9      equal?

10         Q.    Everything else being

11     equal.

12         A.    So the volume?

13         Q.    Everything else being

14     equal.

15         A.    You would expect different

16     levels of mobilization, yes.

17             THE WITNESS:   Is this an

18     okay time for a break?

19             MR. COOLEY:   Yes.   Any time

20     you want to take a break.

21             (Thereupon, at 12:00 p.m. a

22     luncheon recess was taken until

23     12:55 p.m., at which time the

24     following proceedings were had:)

1   BY MR. COOLEY:

2       Q.    Mr. Vandeven, yesterday

3   there were a series of questions

4   about Handy & Harman wastes and then

5   some questions about individual

6   company wastes as opposed to types of

7   wastes.

8               And in that line of

9   questions you testified, I believe,

10  that you did not have any knowledge,

11  specific or general about the wastes

12  of Handy & Harman.

13              Now, I know there were then

14  some follow-up questions or later

15  questions regarding a certain sludge

16  material.  But Mr. Harris then

17  attempted to confirm for us what your

18  opinions would relate to and what

19  they wouldn't relate to.

20              So my question, with that

21  reminder is as follows:  Is it true

22  for each of the defendants in this

23  case that you do not have any

24  knowledge specifically about their

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                           FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   wastes generated at their facilities

2   and you are not going to be rendering

3   any opinions about the wastes

4   specifically generated by the

5   defendants in this case?

6       A.    That's true, yes.

7       Q.    Would the same be true for

8   the plaintiff companies in the case?

9       A.    Yes.

10          MR. HARRIS:  Just an excess

11  of caution, he will be saying that

12  circuit board etchant may have been

13  disposed at the site and that it's an

14  acidic solution to dissolve copper

15  and manufactured circuit boards, but

16  he won't say that that's in your

17  guy's waste stream versus anybody

18  else's waste stream.

19  BY MR. COOLEY:

20      Q.    Okay.  Well, why don't we

21  turn then to that page, which I

22  believe is 15 of Vandeven-1, your

23  original expert report.

24      A.    You have taken all the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    exhibits back.

2         Q.    Oh, I'm sorry.

3              Let me direct your

4    attention to the second bullet on

5    Page 15 of your original expert

6    report in which there are several

7    sentences relating to circuit board

8    etchant and spent etchant.

9         A.    Okay.

10        Q.    Correct me if I'm wrong, my

11   understanding is that it is not your

12   opinion and you are not testifying

13   that Flexible Circuits or Etched

14   Circuits, two of the named parties in

15   this case generated the material that

16   you are describing in this bulleted

17   paragraph.

18              Is that correct?

19        A.    That's correct that I am

20   not going to be offering an opinion

21   about that.

22              MR. HARRIS:   About whether

23   they did or not.

24              THE WITNESS:   Right.

**JDR**
**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    BY MR. COOLEY:

2        Q.    Are you going to be

3    offering testimony as a fact witness

4    that either Flexible Circuits or

5    Etched Circuits generated these

6    materials?

7        A.    No.

8        Q.    And finally, you are not

9    going to be offering testimony of any

10   kind regarding any waste generated by

11   either of those two companies.  Is

12   that correct?

13       A.    I'm going to be offering

14   testimony about the impact that

15   circuit board etchant waste would

16   have had if it was disposed of at the

17   site.

18       Q.    But circuit board etchant

19   in a general sense as opposed to

20   circuit board etchant that may or may

21   not have been generated and disposed

22   of by Flexible Circuits or Etched

23   Circuits.  Is that correct?

24       A.    That would be correct, yes.

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      Q.     Or put another way, you

2  will not be offering testimony that

3  either Flexible Circuits or Etched

4  Circuits generated the same material

5  that you are describing in this

6  paragraph?

7      A.     That's correct.

8      Q.     In connection with your

9  review of the administrative record

10 and your work leading up to the

11 writing of your two expert reports,

12 did you investigate or study the

13 matter of groundwater flow direction

14 at the Boarhead Farms site?

15     A.     In general, yes.

16     Q.     And for what purpose?

17     A.     To develop an understanding

18 generally of the characteristics of

19 the site that's a primary

20 characteristic of any contaminated

21 site, the groundwater flow direction.

22         To understand where they

23 put the interceptor trench and why

24 they put it where they put it.  Those

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
            1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    were the general reasons to

2    understand groundwater flow

3    direction.

4         Q.    Does the information that

5    you learned about groundwater flow

6    direction at the site serve as a

7    basis in whole or in part for any

8    opinion that you are rendering in

9    this case?

10         A.    I would say that in

11    general, yes, it's part of the basis

12    for my opinions in this case.

13         Q.    How?

14         A.    Looking at the groundwater

15    flow direction assists in

16    understanding how contaminants may

17    have migrated at the site and how

18    they may have migrated from areas of

19    past disposal to areas where they

20    were detected during the RI, to

21    understand how the off-site

22    residential wells that needed to be

23    treated, how they were impacted by

24    on-site disposal.

373

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          So it's just a very kind of

2   primary component to understanding

3   how the fate and transport of

4   contaminants at a site like this.

5       Q.    Were any off-site receptors

6   affected by contaminants disposed of

7   at the site?

8       A.    Yes.   The off-site

9   residential wells were impacted and

10  required treatment.

11      Q.    Okay.   Those are two

12  different things, of course.   I

13  understand treatment systems were

14  installed and operated at those

15  residences.   On what basis do you

16  conclude that on-site waste disposal

17  impacted those residential wells?

18      A.    Well, the nature of the

19  contaminants that were found in the

20  wells as compared to the nature of

21  the wastes that were disposed of at

22  the site.

23      Q.    What contaminants were

24  found in the wells?

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

374

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1     A.     Both inorganic and organic

2   contaminants.

3     Q.     Regarding the inorganic

4   contaminants, is it your conclusion

5   or opinion, rather, that any of those

6   inorganic substances became present

7   in those off-site wells as a result

8   of migration from the site?

9     A.     I believe that that was a

10   part of the conclusion of the RI.

11     Q.     Did you reach some

12   independent conclusion as to that

13   based on your own focus on it, or are

14   you simply advising that you have

15   seen that that conclusion was reached

16   by others?

17     A.     I did not reach any

18   independent conclusion on that topic,

19   no.

20     Q.     Do you know whether there

21   was any remediation of soils at the

22   site solely for metals?

23     A.     I don't know if there was

24   any remediation at the site solely

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    for metals.

2          It's possible that some

3    soil that was excavated as part of

4    the drum removal was disposed of

5    off-site primarily because of the

6    metals content, but I could not say

7    for sure sitting here right now.

8          Q.    Would the remedy, and by

9    that I mean all aspects of the

10   overall remedy for this site in

11   different phases, operable units,

12   taken all as a whole, would the

13   remedy for the Boarhead Farms site

14   have been any different had there

15   been no disposal of acids containing

16   metals?

17          MR. HARRIS:    Objection to

18   the form.

19          THE WITNESS:    Well, I think

20   I addressed this question before, I

21   guess maybe in a slightly

22   different -- the hypothetical was

23   slightly different.

24          On a site like this that's

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

376

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   very difficult to say.  I couldn't

2   reach a conclusion or an opinion -- I

3   have not reached a conclusion or an

4   opinion about that, and to do so

5   would require a lot more analysis.

6           The only conclusion that I

7   have reached and opinion that I have

8   formed is that all the wastes

9   disposed of at the site contributed

10  in some manner to the need for the

11  cost of remediation.

12  BY MR. COOLEY:

13      Q.    It's your opinion as well,

14  if I understand it correctly, and

15  please tell me if I'm wrong, that

16  even the disposal of inert rock or

17  pick your favorite bottled water at

18  the site would have contributed in

19  some way to the need for remediation

20  at the site?

21      A.    Or the cost of remediation

22  at the site, yes.

23      Q.    So did rainfall contribute

24  to the cost of remediation at the

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    site?

2        A.    In some way the level of

3    rainfall that you have at a site will

4    impact the need for or cost of the

5    remediation, yes.

6        Q.    Are you a soil chemist?

7        A.    I wouldn't consider myself

8    a soil chemist, no.

9        Q.    In your original report you

10   offer two opinions, the second of

11   which, and now I'm looking at Page 1

12   of that report, Paragraph No. 2 in

13   italics near the bottom of the page.

14            The second of which reads,

15   "All of the wastes disposed of at the

16   Boarhead Farms Superfund site

17   contributed in some manner to the

18   environmental conditions that led to

19   the response activities described

20   above."

21            I would like you to direct

22   your attention to the words

23   "contributed in some manner."  What

24   do you mean by the words "some

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

378

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    manner"?

2              And maybe the best way for

3    me to ask that question and so I will

4    retract everything and ask you a

5    fresh one, what are the different --

6    what different manners of

7    contribution to environmental

8    conditions fall within your concept

9    of some manner?

10        A.    Well, it could be anything

11   from wastes that were disposed of in

12   bulk historically that contributed in

13   the manner that they would have

14   contributed would have been related

15   primarily to the initial response

16   actions taken by EPA, the initial

17   interest in the site as a potential

18   disposal site.  So that's one

19   example.

20              Another example would be

21   the presence of all contaminants at

22   the site would have contributed to

23   the degree that response actions and

24   costs are incurred to install

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    monitoring wells, retrieve

2    groundwater samples and analyze those

3    samples for those individual

4    constituents.

5                Contributed in some manner

6    could refer to a material such as we

7    have discussed at length over the

8    last two days, acid wastes that have

9    tended to promote and increase the

10   mobility of other wastes or other

11   metals and organics at the site.

12               Contributed in some manner

13   could include contaminants that

14   required EPA or their contractors to

15   develop ARARs or to develop cleanup

16   levels or to analyze and evaluate

17   contaminants of potential concern, or

18   to analyze and evaluate contaminants

19   of concern.

20               Contributed in some manner

21   could include contaminants that were

22   present that required the development

23   of discharge limits.

24               Contributed in some manner

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                    FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    could include contaminants that

2    required EPA to include a specific

3    remedial process unit, such as the

4    metals precipitation unit, or to

5    include a specific unit such as the

6    air stripping system.

7              So that's a list of

8    examples of what contributed in some

9    manner includes.

10       Q.    There's the matter of

11   manner and then there's the matter of

12   degree.

13             You don't use the word

14   degree here, but is it fair to say

15   that different types of contaminants

16   and different volumes of contaminants

17   could and generally do at Superfund

18   sites, in your experience, contribute

19   in different degrees to the

20   environmental conditions that lead to

21   response activities?

22             MR. HARRIS:   Objection to

23   the form.

24             THE WITNESS:   The volume,

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                                    FAX  215.751.0581

1    and what was the other factor that

2    you -- I know you said volume.

3                MR. COOLEY:   Perhaps you

4    can read it back.

5                (The court reporter read

6    back the following:

7                "Q.    There's the matter

8    of manner and then there's the matter

9    of degree.

10               You don't use the word

11   degree here, but is it fair to say

12   that different types of contaminants

13   and different volumes of contaminants

14   could and generally do at Superfund

15   sites, in your experience, contribute

16   in different degrees to the

17   environmental conditions that lead to

18   response activities?")

19               THE WITNESS:   Yes.   Yes,

20   they can.   The different types of

21   wastes or the kind of waste it is and

22   the volume of that waste can be

23   factors that lead to different

24   response actions at a Superfund site.

382

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    BY MR. COOLEY:

2        Q.    And here at the Boarhead

3    Farms site, it's not your opinion, is

4    it, that all of the waste disposed at

5    the site contributed in the same

6    manner, is it?

7            It's instead your opinion

8    that all of the wastes contributed

9    respectively in some manner?

10       A.    It's most definitely the

11   latter, yes.

12       Q.    And the contribution

13   reflected by various of the wastes

14   disposed of at the Boarhead Farms

15   site was in some cases of a

16   relatively significant manner or a

17   relatively insignificant manner.  Is

18   that a fair statement?

19           MR. HARRIS:  Objection to

20   the form.  He's had an opinion here

21   that steadfastly says that he doesn't

22   know if any particular wastes have

23   been disposed of at the site.

24           Your question assumes that

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    there is some knowable number that he

2    has considered it for.

3              MR. COOLEY:  It doesn't at

4    all.  You are misperceiving my

5    question.

6              MR. HARRIS:  He has

7    specifically said did impact the

8    site.

9              MR. COOLEY:  His opinion is

10    that all of the wastes contributed in

11    some manner to the environmental

12    conditions.

13              MR. HARRIS:  Correct.

14    BY MR. COOLEY:

15        Q.    And my question is, is it

16    your opinion that certain of the

17    wastes disposed of at the Boarhead

18    Farms Superfund site contributed in

19    relatively less significant way or

20    ways than other of the wastes

21    disposed of at the Boarhead Farms

22    site?

23        A.    It was not my intention nor

24    did I do that kind of comparative

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                               FAX  215.751.0581

384

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    analysis between different wastes
2    allegedly disposed of at the site.
3        Q.    So you don't know the
4    manner in which any given waste type
5    contributed to the conditions.  You
6    know only, and it's your opinion
7    only, that each of the waste type
8    contributed in some manner, whatever
9    that manner might have been?
10            MR. HARRIS:    Objection.
11            THE WITNESS:    No, that's
12    not the case.
13            In fact, we just went
14    through on Page 15 examples of the
15    manner in which some wastes that may
16    have been disposed of at the site
17    would have contributed to the need
18    for remediation at the site.
19            We have talked about that
20    at length over the last two days.
21    BY MR. COOLEY:
22        Q.    Did certain waste types
23    contribute more to the need for
24    remediation?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905                          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103                          FAX  215.751.0581
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          MR. HARRIS:  Objection.

2          MR. COOLEY:  Excuse me.

3   Strike that.

4   BY MR. COOLEY:

5     Q.   Did certain waste types

6   contribute more to the environmental

7   conditions at the site than other

8   waste types disposed of?

9          MR. HARRIS:  Objection to

10  the form.

11         THE WITNESS:  I was not

12  asked to render an opinion on that,

13  and I don't have an opinion on that

14  sitting here right now.

15  BY MR. COOLEY:

16    Q.   Could you turn your

17  attention, please, to Page 2 of your

18  original expert report, Vandeven-1

19  and look at Paragraph No. 2.

20         And specifically the last

21  part of the second sentence which

22  states in part, "This score was due

23  primarily to elevated levels of

24  organic contaminants (including

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          Innovating Litigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    trichloroethylene and 1, 1, 1, -

2    trichloroethane) and inorganic

3    contaminants (including zinc,

4    chromium and lead) in groundwater."

5           Are you quoting from or

6    paraphrasing some document in

7    referring to the specified organic

8    and inorganic contaminants that

9    appear in those two parentheses?

10        A.    I believe so, yes.

11        Q.    Do you know what that

12    document is?

13        A.    I believe it was the RI

14    that summarized -- has a ranking

15    system process at the site.

16        Q.    Is it your understanding,

17    then, that these specific substances

18    which are identified in the

19    parentheticals in that sentence were

20    deemed to be the primary contaminants

21    associated with the scoring of the

22    site?

23        A.    They would have been the

24    primary contaminants associated with

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the actual score, the HRS score at

2    the site, yes.

3        Q.    That's what I meant, right,

4    okay.  In other words, you didn't

5    select those chemicals for inclusion

6    in this sentence, you looked to

7    another source of information and saw

8    those identified.

9        A.    That's correct.

10        Q.    Could you please turn to

11    Page 3 of your report and look at the

12    top part of the page, which is a

13    carryover of Paragraph No. 3 from

14    Page 2.  Please take your time if you

15    would like to look at the entire

16    paragraph.

17        A.    Okay.

18        Q.    One, two, three, four lines

19    down from the top of Page 3 a

20    sentence begins, "Nearly half of the

21    buried drums removed were empty,

22    which suggests that their contents

23    had leaked out into the environment

24    over time."

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                            FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          The words "which suggest,"

2   are those reflective of your thought

3   or were you really paraphrasing some

4   conclusion of a third party in

5   writing that sentence?

6       A.     I believe that conclusion

7   was contained in some of the

8   underlying documents.

9       Q.     Do you know whether the

10  empty drums had leaked their contents

11  or whether they were disposed of at

12  the site empty?

13          MR. HARRIS:   Objection to

14  the form.

15          THE WITNESS:   I don't have

16  any direct information, no.

17  BY MR. COOLEY:

18      Q.     Directing your attention

19  now to the bottom of Page 3,

20  paragraph numbered 6, would you

21  please take a look at that paragraph

22  and tell me when you are ready.

23      A.     Okay.

24      Q.     Is it your understanding

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    that the EPA concluded that of the

2    metals detected at the site arsenic

3    and chromium presented the greatest

4    risk?

5        A.    I believe so, yes.

6        Q.    Have you ever worked in the

7    electronics industry?

8        A.    No, I have not.

9        Q.    Have you ever worked on a

10    project or a matter involving a

11    circuit board manufacturing facility?

12        A.    I don't -- I can't say

13    right now that I have ever worked on

14    a site that dealt with a circuit

15    board manufacturing facility, no.

16        Q.    On Page 15 of Vandeven-1,

17    returning to that paragraph, bulleted

18    paragraph regarding circuit board

19    etchant, what was the source of the

20    information appearing in that

21    paragraph?

22        A.    I believe we looked in

23    general on information -- publicly

24    available information on the web and

**JDR**

**James DeCrescenzo Reporting,** LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1  possibly in EPA documents regarding

2  the wastes that could be part of

3  circuit board etchant and spent

4  etchant.

5      Q.    None of those resources

6  appear referenced in appendix --

7  excuse me, Attachment B to Vandeven-

8  1, do they?

9      A.    I don't see anything right

10  now that I could say refers to any of

11  those documents, no.

12      Q.    Did Mr. Harris provide you

13  with any information on paper or in a

14  discussion about circuit board

15  etchant or spent etchant?

16      A.    No.

17      Q.    Did you ever review the

18  Complaint against -- or any of the

19  Complaints?  There have been several

20  amendments in this case.

21      A.    I seem to remember

22  reviewing a Complaint, but I couldn't

23  say which Complaint it was at this

24  point.

391

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1        Q.    Did you rely on it for any

2    purpose?

3        A.    I don't believe so, no.

4        Q.    Did you consider it?

5        A.    Like I say, all I can

6    recall right now is I may have

7    reviewed a Complaint or something

8    that looked like a Complaint in this

9    matter.

10       Q.    Could you please turn your

11   attention to Page 10 and 11 of your

12   initial expert report, Vandeven-1.

13            And just so you know where

14   I'm headed, I'm going to be asking

15   you a question about the first

16   bulleted paragraph on Page 11 within

17   the context of Pages 10 and 11.

18       A.    Okay.

19       Q.    On Page 10, the paragraph

20   that immediately precedes the

21   bulleted paragraph, I'm referring now

22   to the paragraph beginning with "I

23   have reviewed the record," in that

24   paragraph you state that you

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
               1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    concluded that the response actions

2    taken were necessary to respond to

3    documented threats and risks posed by

4    hazardous substances at the site and

5    that these actions were appropriate

6    and consistent with the NCP.

7          Now, having said that, you

8    proceed to list a number of points in

9    these following bulleted paragraphs.

10          And in the first bulleted

11   paragraph on Page 11, among other

12   things, you refer to groundwater

13   being the sole source of drinking

14   water to 100 residences within one

15   mile of the site.

16          Are you intending to

17   suggest that groundwater

18   contamination threatens drinking

19   water wells of a distance of a mile

20   from the site?

21          MR. HARRIS:  Objection to

22   the form.

23          THE WITNESS:  No.  I was

24   just summarizing what was in the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                              www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    EE/CA as a characteristic of the site

2    that contributed to the EPA's

3    conclusion that a removal action was

4    appropriate and necessary at the

5    site.

6    BY MR. COOLEY:

7        Q.    In your own judgment, with

8    your experience with contaminated

9    sites, and based on your review of

10   the record in this case, do you

11   believe it relevant that there are

12   residences as remote as a mile away

13   to determining whether removal action

14   is appropriate here?

15       A.    Yes.

16       Q.    Is that another way of

17   saying that you believe that

18   groundwater quality at a distance of

19   a mile was threatened by the

20   conditions at the site?

21       A.    Those are two different

22   things.

23           The presence of drinking

24   water wells within a mile of a site

**JDR**

**James DeCrescenzo Reporting,** LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    is an explicit consideration within

2    the National Contingency Plan at that

3    time, in the time that we are talking

4    about would be the 1985 NCP.

5              And so the HRS, the hazard

6    ranking system at that time

7    explicitly included in their target

8    factor wells that I think were even

9    further away than a mile.

10             So that characteristic of

11   the site was an explicit

12   consideration in determining whether

13   or not a site was listed and whether

14   or not emergency or removal action

15   was needed at the site.

16             Whether or not wells a mile

17   from the site are actually threatened

18   comes later as you do either the

19   EE/CA, as part of the removal action

20   or the RI/FS as part of the remedial

21   action.

22        Q.    Have you reviewed or

23   attempted to determine independently

24   what the organic and inorganic

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

1    contaminant plumes are associated

2    with this site?

3        A.    I have generally reviewed

4    the distribution of inorganic and

5    organic contamination of the

6    groundwater.

7        Q.    With inorganic

8    contamination, have you generally

9    reviewed the matter of plume contours

10   on a contaminant-by-contaminant

11   basis?

12       A.    I don't recall getting down

13   to that level of detail, no.

14       Q.    Would you describe the

15   inorganic -- excuse me, strike that.

16   Would you describe the organic plume

17   size to be greater than the inorganic

18   plume size?

19       A.    I don't know if it was.

20   Without looking back at the

21   underlying documents I can't recall

22   the comparative or relative sizes of

23   the plumes.

24       Q.    Did your review of plume

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
              1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                      www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    contours, organic and inorganic, at

2    the time you performed that review

3    come to serve as a basis of your

4    opinions in this report in any way?

5              MR. HARRIS:  Objection to

6    the form.

7              THE WITNESS:  Well, I would

8    say yes to the extent that it

9    confirmed and assisted me in

10   concluding that both the nature of

11   the disposal at the site and then the

12   nature of contaminant distribution at

13   the site is very heterogenous, it

14   occurred in many different places

15   spatially.

16             And therefore understanding

17   where the contaminants were and if

18   they had been described as a plume,

19   understanding where those plumes were

20   helped and assisted me in developing

21   that opinion at the site.

22   BY MR. COOLEY:

23        Q.    Did you look at cost

24   documentation for the Boarhead Farms

1    site, by which I mean documents

2    reflecting actual costs incurred to

3    this point in time or to the point in

4    time that you wrote your reports?

5        A.    I did, yes.

6        Q.    What documentation did you

7    look at?

8        A.    I guess there were various

9    documents.

10        Some documents that

11    summarized what total costs had been

12    incurred to date for certain

13    activities, and then we also looked

14    at the cost documents that were

15    prepared and provided to us by a

16    company called demaximus.

17        Q.    I'm sorry, the second

18    category was cost documentation

19    provided to you by demaximus?

20        A.    Cost documentation that was

21    developed by demaximus.  It could

22    have been provided through counsel,

23    but it was cost documentation or cost

24    documents that were generated by

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1  demaximus.

2      Q.    Meaning reflecting work

3  done by demaximus and the cost

4  therefore?

5      A.    No.  I believe not work

6  done by demaximus but work that had

7  been done at the site by anybody

8  involved at the site, that were just

9  summarized, and the accounting was

10 done and the organization was done by

11 demaximus.

12     Q.    And the first category of

13 cost documentation that you reviewed,

14 then, is what?  I'm not sure I --

15     A.    For instance, that would be

16 information in the ROD or information

17 in other underlying documents that

18 described how much was spent, for

19 instance, on OU1 or how much was

20 spent on components of OU2 that kind

21 of summarize large activities at the

22 site.

23     Q.    Did you perform any

24 analysis of either of those two types

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    of cost documentation that you have

2    just described in an effort to

3    determine whether the expenditures

4    were reasonable, whether the work

5    that had been performed had been

6    performed cost effectively?

7       A.    Yes.   I did look at it to

8    determine whether or not the costs

9    were reasonable given the magnitude

10   of the costs and what I knew about

11   the complexity of the site and the

12   activities that had taken place at

13   the site.

14      Q.    So what specifically did

15   you do as part of that review;

16   meaning, did you go to estimating

17   resources, did you compare your own

18   firm's charges for similar work, did

19   you look at bid packages -- I'm

20   making up hypothetical examples, but

21   I would like to know exactly what you

22   did as part of that review.

23      A.    It was more -- and when

24   this kind of opinion is developed



**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    about the reasonableness of costs you

2    can either do it very generally or

3    you can do it kind of invoice by

4    invoice.  And the examples that you

5    gave kind of are within those

6    extremes.

7              The analysis that I did

8    here was very general, just looking

9    at large categories of costs and

10   looking at the general activities

11   that were done at the site to

12   determine whether or not they seemed

13   reasonable primarily based on my

14   experience at similar sites and the

15   nature of what I knew about the

16   Boarhead Farms site.

17        Q.    So would it be fair to say

18   you did an overall review and you

19   attempted to reach a conclusion about

20   the general reasonableness of the

21   costs in connection with the nature

22   of the work performed?

23        A.    That would be a fair

24   statement, yes.

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    Q.    And you did not, therefore,
2    for example, look to determine the
3    specific number of wells that were
4    installed, the depth to which the
5    drillings had to occur, the number of
6    rounds of samples taken, the number
7    of analytes analyzed by the
8    laboratories and do some number
9    crunching to determine whether the
10   costs that you saw were consistent or
11   inconsistent with what you would
12   expect based on your experience?
13   A.    That's correct, I did not
14   do that very, very detailed analysis.
15   Q.    Do you know whether any
16   aspects of the work done at the site,
17   and by work done I mean by any party
18   under any contract, any operable unit
19   was bid?
20   A.    Maybe I'm not understanding
21   the question.
22   Q.    Do you know whether a
23   bidding process was utilized
24   preliminary to the contracting with

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    any consultant or contractor which

2    performed work at the Boarhead Farms

3    site?

4        A.    Well, all I can say would

5    be based on my personal experience

6    having been at CH2M HILL at the time,

7    that contract with EPA was bid, they

8    won that contract through a

9    competitive bidding process. So to

10   that degree, yes, a bidding process

11   was used.

12       Q.    Beyond your knowledge about

13   the CH2M HILL contract, which had a

14   name you gave us yesterday, ARCS?

15       A.    ARCS, yes.

16       Q.    Beyond your personal

17   knowledge, recollection about that

18   contract and how it came to be

19   through a bidding process, do I take

20   it and infer that you are not aware

21   one way or the other about any

22   bidding procedures used for any other

23   work at the site?

24       A.    Not specifically, no.  I

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    can only speak to my general

2    understanding of how an investigation

3    and remediation proceeds at a site

4    like this. But I don't have any

5    specific information on bids or

6    proposals or awarding of contracts at

7    this site.

8              MS. FLAX:   Excuse me,

9    counsel.  This is Melissa Flax.

10             I'm going to drop off and

11   then dial back in in about five or

12   ten minutes from my mobile.  So you

13   can continue going, but I just wanted

14   to let you know that I was dropping

15   off and then will rejoin.

16             MR. COOLEY:   Okay.

17             MS. FLAX:   Thank you.

18             MR. COOLEY:   Thank you.

19   BY MR. COOLEY:

20        Q.   Ms. Flax, actually --

21   speaking of Ms. Flax -- yesterday

22   asked you some questions about the

23   second bulleted paragraph on Page 12

24   of Vandeven-1, specifically questions

**JD℞**

**James DeCrescenzo Reporting**, LLC

215.564.3905         InnovatingLitigation         FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

1    about what you refer to as the

2    anticipated costs.

3            And I'm not sure if she

4    asked you this question, so I will

5    ask it this way:  How do you know

6    that costs which have not yet been

7    incurred will in fact be reasonable

8    until they have been charged and

9    paid?

10        A.    Well, as I --

11            MR. HARRIS:  I am going to

12    object, but go ahead and answer.

13            THE WITNESS:  As I said

14    yesterday, all I'm referring to there

15    is given how the process has

16    proceeded to date at the Boarhead

17    Farms site and given that the

18    requirements and the activities

19    associated with the performance of

20    the RD/RA are requirements that are

21    dictated by the EPA, that it's my

22    opinion that those activities and the

23    costs that are incurred will be

24    reasonable response costs.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
215.564.3905          1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103          FAX  215.751.0581
www.JDReporting.com

405

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    BY MR. COOLEY:

2         Q.    Well, I think I understand

3    what you are saying to me regarding

4    the nature of the work yet to be

5    performed.

6              To the extent that that

7    work has been described, and to the

8    extent it's being mandated by the

9    EPA, you know what it is, you know

10   why it is to be performed and you can

11   say something about it.

12             The actual costs incurred

13   to perform that work might be costs

14   reflecting gross waste and excess

15   labor, materials or other charges by

16   contractors.

17             I'm not making a

18   prediction, I'm just saying until the

19   bill comes in and is reviewed, you

20   can't say whether that bill is going

21   to be reasonable, can you?

22        A.    Well, I can give my opinion

23   about whether or not I think it's

24   going to be reasonable.

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1            And, again, what I'm

2    referring to here is, for example,

3    there will be ongoing costs

4    associated with disposing of the

5    sludge that's generated from the

6    metals precipitation unit and the

7    treatment system.

8            To the extent that that

9    metals precipitation is required, to

10    the extent that costs like that have

11    been incurred already that the

12    contractor and the experience that

13    they have doing that at the site is

14    going to continue in the future that

15    it's my opinion that those costs and

16    the activities associated with those

17    costs will be reasonable.

18        Q.    So if we assume a number of

19    things about what's going to happen,

20    or if you assume a number of things

21    about what's going to happen, then on

22    the basis of those assumptions you

23    feel comfortable rendering this

24    opinion, but those assumptions have

1    to in fact occur for that opinion to

2    hold.   Correct?

3        A.    I think that in general is

4    correct, but, again, I think those

5    assumptions are a lot more reasonable

6    than assumptions you would have to

7    make for this not to occur.

8            You would have to have EPA

9    do away with all the institutional

10   knowledge that they have gained at

11   the site through the contracts and

12   the consultants that they have used,

13   assume that they are going to retain

14   a disreputable consultant or that the

15   PRPs are going to try to retain a

16   disreputable or wasteful consultant.

17           That the EPA will approve

18   that wasteful consultant, that they

19   will ignore the activities that are

20   taking place at the site starting

21   now, even though that they have been

22   intimately involved for more than a

23   decade and a half.

24           So I think the assumptions

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    that you would have to make to opine

2    that the costs going forward and the

3    activities going forward are not

4    reasonable are a lot more dramatic

5    assumptions than the assumptions that

6    I have made.

7        Q.    Actually, I postulated some

8    extreme case just for purposes of an

9    example.

10        In fact, for costs to be

11    other than reasonable they only need

12    to be just on the outside of the

13    bounds of reasonableness, they don't

14    need to be associated with a

15    disreputable contractor or reflective

16    of fraud or some kind of gross

17    behavior.

18        Isn't that fair to say?

19        MR. HARRIS:    Objection.

20    Asking for a legal conclusion and an

21    incorrect legal conclusion, too.

22        THE WITNESS:    Yes.    I

23    wouldn't know how to respond.    I

24    don't know what you mean by however

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    you termed it, just on the other side

2    of reasonable.

3    BY MR. COOLEY:

4        Q.    Well, let me ask you this:

5    Are you trying to define costs as

6    being reasonable if those costs are

7    associated with work performed by

8    anyone other than a disreputable

9    contractor?

10       A.    No, I wouldn't say that.

11   No.

12       Q.    If a PRP group utilizes a

13   laboratory for analytical work that

14   charges 15 percent more than another

15   EPA-approved laboratory that can do

16   the same work, would you consider the

17   costs charged by the more expensive

18   laboratory to be reasonable?

19       A.    It depends on other

20   circumstances.  They very well may

21   be.  Or put another way, there may be

22   no reason to consider them

23   unreasonable.  There may be a

24   capacity issue.

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

215.564.3905                          FAX  215.751.0581

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

 1              They don't have the

 2      capacity at the lab that's ten miles

 3      away so they have to send it to a lab

 4      that is 25 miles away.

 5              There could be specific

 6      analytical requirements associated

 7      with this site that can't be met by a

 8      lab that charges 15 percent less.

 9              So there could be any

10      number of reasons that a cost that's

11      slightly more than another cost is

12      considered reasonable.

13              Our lunch may have cost 15

14      percent more than the lunch you ate,

15      we probably both feel like we paid a

16      reasonable amount for our lunch.

17          Q.     Well, we are not talking

18      about lunch, we are talking about

19      millions of dollars.  And my question

20      asked you to assume that both labs

21      could do the work, not that one was

22      unequipped or incapable for any

23      reason of doing the same work.

24              And I understand your

**JDR**

**James DeCrescenzo Reporting,** LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

1    answer to be not necessarily, but my

2    question to you back would be it

3    could be that the extra 15 percent

4    charge is unnecessary and therefore

5    unreasonable, couldn't it?

6              MR. HARRIS:  Objection,

7    that assumes that that's the test.

8              THE WITNESS:  Again,

9    it's -- there's so many other factors

10   associated with purchasing that

11   commodity.

12             And, again, whether or not

13   it's millions of dollars or whether

14   or not it is lab costs or a lunch,

15   the concept is the same.  There could

16   be other factors associated with why

17   one lab costs 15 percent more than

18   another lab.

19   BY MR. COOLEY:

20      Q.     Well, let's make it

21   simple.  Let's assume the two labs

22   are completely equivalent in quality,

23   timing, performance, and any other

24   respect that makes a difference to

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905              InnovatingLitigation              FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    anyone; the PRPs, the EPA, community,

2    citizens or other, and simply because

3    there was no focus on, concern about

4    or attention to the availability of a

5    cheaper alternative, a PRP group

6    retains the more expensive lab.

7            Would it be reasonable --

8    would the costs paid to that lab fall

9    within the bounds of reasonableness?

10            MR. HARRIS:  Objection to

11    the form.

12            THE WITNESS:  There could

13    be.  Again, in my experience there's

14    no requirement that to find something

15    a reasonable cost it has to be the

16    cheapest cost as you have just

17    postulated.  It doesn't have to be

18    the cheapest cost.

19    BY MR. COOLEY:

20        Q.    How do you define

21    reasonable?

22            MR. HARRIS:  Objection to

23    the form.

24            THE WITNESS:  I would

1    define reasonable in the example that

2    you gave to be costs that are within

3    some range of costs associated with

4    that service or that product or that

5    commodity.

6    BY MR. COOLEY:

7        Q.     Are you familiar with the

8    NCP definition of reasonableness?

9        A.     I am familiar with it.     I

10   could not recite it for you right

11   now.

12       Q.     Could you paraphrase it or

13   describe it in any way?

14       A.     No, not sitting here right

15   now.   No.

16       Q.     Could you please turn to

17   Page 13 of Vandeven-1.   And let me

18   direct your attention to the second

19   bulleted paragraph, the first

20   sentence.

21           We talked a little earlier

22   about the words "in some manner," but

23   now I would like to direct your focus

24   to the words "conditions that require

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    response activities."
2             What conditions are you
3    referring to there?
4         A.    Any condition at the site
5    that required response activities.
6         Q.    Which ones did?
7         A.    Examples would include
8    allegations of or evidence that bulk
9    wastes were disposed of at the site.
10   Conditions would include the presence
11   of contaminants in the soil and
12   groundwater.
13            Conditions would include
14   evidence or allegations that drums
15   were buried at the site.  Conditions
16   could include the presence of
17   contaminants in the stream at the
18   site or in potable private drinking
19   water wells.
20            So those would be examples
21   of conditions at the site that
22   required response activities.
23        Q.    Does the presence of any
24   degree of contamination require

**JDR**

**James DeCrescenzo Reporting,** LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                     FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    response activities; meaning the

2    detection of some contaminant at any

3    concentration?

4          A.    Not necessarily, no.

5          Q.    At this site can you

6    identify any contamination at the

7    site that did not require response

8    activities?

9          A.    No.

10         Q.    Can you identify any

11   contamination at the site that did

12   not require remediation following the

13   completion of the RI/FS process and

14   risk assessment process?

15         A.    No.

16         Q.    Could you please direct

17   your attention to the top of Page 14,

18   the first full sentence at the top of

19   that page, it begins with "such

20   solutions."

21                And I apologize in advance

22   if I have asked this before, it's

23   been asked and answered, I just don't

24   recall, so I want to make sure that

1      you're referring in that sentence to

2      metals that were naturally present in

3      soils at the site.

4              Do you know what metals you

5      are referring to there?

6      A.    I don't believe I was

7      referring to any specific metal or

8      restricting myself to any specific

9      metal in that statement.

10     Q.    If acid or acidic wastes

11     and basic wastes were disposed in a

12     common or same area, would there not

13     be some neutralization effect one of

14     the other?

15     A.    Well, any number of

16     reactions, if you will, could have

17     occurred if they were mixed.  Some

18     kind of neutralization could have

19     taken place.  A more violent reaction

20     could have taken place also that may

21     also have resulted in some

22     neutralization.

23             But anytime that you mix an

24     acidic solution with a basic solution

**JDR**

**James DeCrescenzo Reporting,** LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      there's any number of outcomes.  A

2      lot also depends on the volume of the

3      two contributing acids and bases.

4           Q.    Do you know the extent to

5      which that did or did not occur at

6      the Boarhead Farms site?

7           A.    No.

8           Q.    Do you know what kind of

9      buffering capacity the soils at the

10     Boarhead Farms site had prior to

11     disposal of wastes at the site?

12          A.    No, I do not.

13          Q.    Or how much that buffering

14     capacity was impacted by any waste

15     disposal at the site?

16          A.    No, I don't.

17          Q.    Could you please turn to

18     Page 16 of Vandeven-1, and I will

19     direct your attention to the second

20     full paragraph on the page, the first

21     sentence.

22          A.    Okay.

23          Q.    In the first sentence you

24     refer to inorganic chemicals and you

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

418

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1  follow that with (especially

2  metals).   What other inorganic

3  chemicals did you have in mind other

4  than metals?

5      A.    Well, I believe I was

6  generally referring there to ammonia,

7  which is inorganic, it is not a

8  metal, and depending on some people,

9  I think that the shorthand is to

10  generally refer to arsenic as a

11  metal, but it really is not a metal,

12  it's an inorganic contaminant.

13          So I think the more

14  accurate category is inorganic, which

15  metals are a subset of that.

16      Q.    On the top of Page 4 of

17  Vandeven-1 is a statement that we

18  looked at earlier this afternoon in

19  which you describe that the baseline

20  human health risk assessment

21  concludes that risks are due to

22  elevated levels of VOCs and metals

23  (especially arsenic and chromium).

24          Do I take it that in that

419

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      part of your report you happen to be

2      referring to arsenic as a metal?

3           A.    That's correct.

4           Q.    Now, turning back to Page

5      16 you say, "Need for remediation is

6      driven by inorganic chemicals and

7      organic chemicals," but as for the

8      inorganic chemical part of that

9      sentence you have (especially

10     metals).

11              Would arsenic fall within

12     the word metals, as you use it there?

13          A.    I would say in general that

14     it would fall within metals, yes.

15          Q.    As you use it in that

16     parentheses?

17          A.    Correct.

18          Q.    And what other metals would

19     fall within your use of that word in

20     those parentheses?

21              MR. HARRIS:   Objection to

22     the form.

23              THE WITNESS:   On Page 16?

24     BY MR. COOLEY:

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

215.564.3905                                              FAX  215.751.0581

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

420

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    Q.    Yes.    On Page 16 you have a

2    parenthetical reading (especially

3    metals), and I believe you just said

4    that your use of the word metals

5    there would generally encompass

6    arsenic, and my question is what

7    other metals would it encompass?

8        A.    Again, we've talked about

9    this before, I would need to go back

10   and look at the ROD to give you a

11   complete list, but there was a number

12   of metals that drove the need for

13   response actions at the site.

14       Q.    Well, in this sentence you

15   are talking about the need for

16   remediation as opposed to response

17   actions.    I know yesterday you made a

18   point of talking about your focus on

19   using the term response activities --

20       A.    Right.

21       Q.    -- which is a broad

22   encompassing term, it incorporates

23   investigat-*+*7-+*ive activities, for

24   example.    I was reading this sentence

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

215.564.3905                                          FAX 215.751.0581

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

1    to refer to something different.

2          Am I correct that here you

3    are referring to the need for

4    remediation as opposed to the need

5    for response activities?

6          A.    Again, we may be -- and we

7    talked about this a little bit

8    yesterday, about the word action or

9    response activities.

10          In general I'm talking

11   about the overall response activities

12   at the site, not necessarily a

13   specific cleanup or remediation

14   process, but the overall response

15   activities at the site.

16          Q.    So in this sentence you are

17   not saying, then, that remediation or

18   the need for remediation is

19   necessarily driven by organic

20   chemicals, especially metals, but

21   that response activities were driven

22   by those substances?

23          A.    I don't think there's -- I

24   don't really think there's any

422

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   difference.

2            I think both the response

3   activities were driven by a large

4   group of inorganic and organic

5   contaminants, and actual remedial

6   elements, actual cleanup processes,

7   be it the metals precipitation or the

8   air stripping system or the

9   residential home well treatment

10  systems or the soil aeration were

11  also driven by a large list of

12  inorganic and organic contaminants.

13       Q.    Inorganic and organic, is

14  that what you said?

15       A.    Inorganic and -- inorganic

16  in addition to organic contaminants.

17       Q.    Right.  Are those lists one

18  in the same or are there some

19  contaminants, whether organic or

20  inorganic which in your opinion drove

21  the need for response activities

22  other than remediation but did not

23  necessarily drive the need for

24  remediation?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1              MR. HARRIS:  Objection to

2      the form.

3              THE WITNESS:  I didn't

4      really look at it to that level of

5      detail, no.

6      BY MR. COOLEY:

7          Q.    In that same paragraph, the

8      third sentence you state, "Releases

9      of ferric chloride, ammonia, sulfuric

10     acid and copper ammonium carbonate

11     are documented in the files of state

12     and local agencies."

13              Did you review only reports

14     that referred to documented releases

15     of those substances, or did you

16     review what I will call the

17     underlying or first generation

18     documents concerning such releases?

19         A.    I believe both.

20              I believe that there were

21     some documents in the file relating

22     to the contemporaneous, if you will,

23     information regarding those early

24     1970s releases from the state

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                          FAX  215.751.0581

424

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1     agencies or the local health

2     department.

3              I think it was a

4     combination of the local health

5     department and the Pennsylvania state

6     regulators.

7          Q.    That you reviewed?

8          A.    Yes.

9          Q.    In the next sentence you

10    say, "these and other wastes released

11    in bulk". What other wastes released

12    in bulk are you referring to there?

13         A.    I believe there I'm

14    referring to other wastes such as

15    acid wastes where there's evidence

16    that those wastes were released in

17    bulk as opposed to contained in

18    drums.

19         Q.    Evidence or allegations or

20    both?

21         A.    Well, the way that I looked

22    at this is there's information, be it

23    in the underlying investigation

24    documents summarized by the EPA, that

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1     those releases may have occurred at

2     the site.

3          Q.     So is it fair to say your

4     reference to other wastes released in

5     bulk is a way of summarizing the

6     descriptions in various documents

7     that there were such disposals as

8     opposed to your having certain

9     specific bulk releases in mind?

10         A.     That's correct.

11         Q.     And you go on to say that,

12    "These wastes likely contain

13    substantial quantities of metals,

14    such as iron, nickel, chromium,

15    cobalt," et cetera.  "Likely

16    contain," on what do you base those

17    words?

18         A.     Well, again, they are based

19    on a combination of looking at the

20    specific material that could have

21    been released at the site, for

22    example, ferric chloride, which

23    likely contained or did contain iron,

24    that's one example.

**JDR**
**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                    FAX  215.751.0581

426

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1              And also information about

2    what general -- what contaminants are

3    generally found in specific kinds of

4    wastes if they were disposed of at

5    the site, like spent etchant, looking

6    at general information about what

7    that waste stream contains in

8    combination with looking at whether

9    or not those compounds have been

10   found at the site.

11       Q.    Are each of the substances

12   that you identify in the sentence we

13   were just reviewing, the sentence

14   beginning with "these and other

15   wastes released in bulk," are each of

16   those identified substances found in

17   the subsurface at the Boarhead Farms

18   site in substantial quantities?

19              MR. HARRIS:   Objection to

20   the form.

21              THE WITNESS:   Well, I doubt

22   very much that gold was found in

23   substantial quantities.

24              But I would say that most

1    of these compounds were found at

2    concentrations that required some

3    either evaluation by EPA or action on

4    the part of EPA or its contractors.

5    BY MR. COOLEY:

6        Q.    Other than gold, is there

7    any substance identified in that

8    sentence that you would say was not

9    found in substantial quantities at

10   the site?

11       A.    Again, I would have to go

12   back and look -- to say anything more

13   than that, I would have to go back

14   and look at the underlying data.

15       Q.    You read Dr. Exner's expert

16   report, I think you said.  Correct?

17       A.    Yes, sir.

18       Q.    In a portion of his report

19   I will represent to you that he

20   described his understanding of

21   processes conducted at Flexible

22   Circuits and waste generated by

23   Flexible Circuits.

24            And in part of his

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

215.564.3905                    FAX 215.751.0581

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

```
 1    discussion in his report he stated
 2    that Flexible Circuits used wave
 3    soldering or performed wave
 4    soldering.  Do you agree with that?
 5         A.    I don't have any basis to
 6    agree or disagree with that.
 7         Q.    In your rebuttal report on
 8    Page 1, and this is Vandeven-5, I
 9    believe.  I will give this to you.
10    I'm sorry.
11            So Page 1, the paragraph
12    appearing just below the bullets, the
13    last sentence you state, "I accept
14    and agree with Dr. Exner's
15    descriptions of the wastes associated
16    with the various industries and
17    defendants."
18            My question is, on what
19    basis do you accept, and secondly on
20    what basis do you agree with his
21    descriptions?
22            MR. HARRIS:  Objection.  We
23    have been over this several times.
24            THE WITNESS:  Well, I think
```

**James DeCrescenzo Reporting, LLC**
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                           FAX  215.751.0581

429

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    as I have said before, that really

2    refers to the specific review of

3    Dr. Exner's description of the acids

4    that may have been disposed of at the

5    site.

6         I did not review in any

7    detailed way any of the other

8    descriptions of the waste streams or

9    the companies or the processes that

10   he addresses in his report.

11        I was -- I went back and

12   looked at his report for the specific

13   purpose of determining whether or not

14   there was information about the types

15   of acids or the strength of the acids

16   that were disposed of at the site or

17   may have been disposed of at the

18   site.

19        MR. COOLEY:  Glenn, I know

20   we have covered this to some extent

21   and I'm not out to beat a dead horse,

22   but I do see a distinction in the

23   sentence at the very end between

24   associated with various industries

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    and associated with various
2    defendants.
3             MR. HARRIS:  Okay.
4             MR. COOLEY:  And I don't
5    know whether you are comfortable with
6    a stated understanding that
7    Mr. Vandeven's testimony would
8    include an acceptance, an agreement
9    on his part with what Dr. Exner has
10   described about industries generally
11   as opposed to individual defendants
12   specifically, because on its face
13   this sentence uses both words.
14            MR. HARRIS:  I think --
15   well, he can tell me if I'm wrong,
16   but I think it's fair to say that
17   other than the acid wastes which he
18   says somewhere in this thing include
19   strong acids, the descriptions of
20   industries' wastes do not appear on
21   this report anyway, they appeared in
22   his first report.
23            So he is not going to
24   testify that I think Exner is right

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

1    about what's generally in pickle

2    liquor.  He had his own opinion about

3    what he thought was in pickle liquor.

4    That's in his first report.

5              So he's not going to on the

6    witness stand say oh, yes, I reviewed

7    everything that Exner said about the

8    printed circuit board industry and I

9    agree with everything that he said,

10   he's not going to say that.

11             He's going to say what he

12   said in his own report, Vandeven No.

13   1, as to what was generally in

14   circuit board etchants and waste.

15             MR. COOLEY:  Nor is he

16   going to say, I take it, that I have

17   looked at what Dr. Exner said about a

18   given defendant company's waste and I

19   accept and agree with that.

20             MR. HARRIS:  Correct.

21             MR. COOLEY:  So would it be

22   fair to say that this sentence

23   doesn't really even need to be here?

24             MR. HARRIS:  I think that's

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    probably right.

2              He wanted to understand, as

3    he has testified at length, get a

4    better understanding of the types of

5    acids that might have been disposed

6    of at the site and that led to his

7    statement on whatever page it is of

8    this thing that these acid wastes

9    generally contain strong acids;

10   sulfuric, hydrochloric and nitrates,

11   in some cases at very high

12   concentrations.

13             That's the sentence this is

14   the whole thing is about, and that's

15   all it's about.

16   BY MR. COOLEY:

17        Q.    Could you please turn your

18   attention to Page 3 of Vandeven-5,

19   your rebuttal report, and I direct

20   your attention to the second bullet

21   on that page.

22             The last sentence of that

23   bullet states "A substantial portion

24   of this cost --" meaning the

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

433

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    $4,280,150 cost figure identified in

2    the previous sentence -- "can be

3    attributed to the levels of metals

4    found in some of the materials, which

5    cause them to be classified and

6    handled as characteristic hazardous

7    wastes."

8         Can you elaborate or

9    specify what you mean by a

10   "substantial portion"?

11   A.    No.   I can't give you a

12   precise breakdown or what it would --

13   that's simply to address the issue of

14   if they were not characteristic

15   hazardous wastes the disposal costs

16   would have been substantially less.

17        I did not try to determine

18   what those costs would have been.

19        But that's just referring

20   to the fact that if something is a

21   hazardous waste, it's clearly going

22   to cost more to dispose of than if

23   it's not a hazardous waste.

24   Q.    Could you please turn your

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    attention to Page 5 of Vandeven-5,

2    your rebuttal report, specifically

3    the third bullet.

4         A.    Okay.

5         Q.    In that bullet paragraph

6    you refer to the RI indicating that a

7    pH reading below one was obtained in

8    the swamp a few days after a bulk

9    release of ferric chloride in late

10   October '73.

11              You go on to say that lime

12   was spread in the affected area and

13   that dying fish and trees were

14   reported about half a mile from the

15   release site in January of '74 and pH

16   measurements made it three locations

17   in July '74 were only 2.9.

18              Do you know one way or the

19   other whether there were any other

20   disposals of acid wastes or other

21   contaminants between October '73 and

22   January '74 or between January '74

23   and July '74 in the same area or

24   areas being described here?

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.      No, I don't.

2      Q.      Are you trying to suggest

3   in this report that these dying fish

4   and tree conditions were associated

5   with the October '73 bulk release of

6   ferric chloride that you referred to?

7      A.      I believe that that's what

8   the RI is saying.

9      Q.      Would it be fair to say

10  that if there were some other bulk

11  release at a later point in time that

12  that would or could be a cause or the

13  cause of a later discovered dying

14  fish or trees?

15          MR. HARRIS:    Objection to

16  the form.

17          THE WITNESS:    I believe

18  that that could have contributed to

19  that situation, yes, as I have said

20  before.    All releases contributed in

21  some manner to the effects at the

22  site.

23          So if there were other

24  releases of acids at that time or in

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   between that time, it could have

2   contributed to that, yes.

3   BY MR. COOLEY:

4       Q.     But you say in this same

5   bulleted paragraph in the last

6   sentence, "'Short-lived' is a

7   relative term; that the facts

8   demonstrate that the effects of bulk

9   disposal of acid waste persisted for

10  months (if not longer) even after

11  lime was applied, and that these

12  effects were observed at a

13  considerable distance from the

14  disposal location."

15          Am I reading that

16  correctly, that you are accepting as

17  a fact that the October '73 purported

18  release of ferrous chloride caused

19  the dying fish and tree conditions

20  and the 2.9 pH measurement in July

21  '74?

22      A.    Yes.   I'm taking that fact

23  from the RI.

24      Q.     You are taking it and

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

1    accepting it but you don't know
2    whether from any independent review
3    of underlying analytical reports,
4    field notes, driver deposition
5    testimony or any other information
6    whether in fact there could be other
7    factors or causes of the dead fish
8    and trees in July '74 pH value, do
9    you?
10        A.    No, I don't.
11        Q.    In most of the bulleted
12   paragraphs that begin at the bottom
13   of Page 4 of Vandeven-5 and carry
14   through to the middle of Page 6 of
15   Vandeven-5 you either quote from or
16   refer to the RI as a source of what
17   you have written.
18        However, in the first
19   bullet at the top of Page 6 I do not
20   see any reference to the RI.
21        Is it the case that what
22   you have stated there is based upon
23   statements in the RI, or is there
24   some other source or sources for the

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    statements made there?

2        A.    I believe that at the very

3    least the first sentence there about

4    the proximity of the drums to areas

5    where bulk wastes were likely

6    disposed, that came from the RI,

7    either narrative in the RI or figures

8    in the RI.

9        Q.    How about the statement

10   that metal drums were placed in soils

11   that had been affected by earlier

12   releases of acids, is the source of

13   that information in the RI?

14            MR. HARRIS:    Objection to

15   the form.

16            THE WITNESS:    No.    That's

17   not necessarily from the RI.

18            That's a conclusion of mine

19   that if drums were placed in soils

20   that had been affected by releases

21   from acids that those drums would

22   deteriorate faster because of the

23   presence of acids.

24   BY MR. COOLEY:

**JDR**

**James DeCrescenzo Reporting, LLC**
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          Q.    Well, does the fact that,

2     as stated in the RI, that drums were

3     removed from areas that are down

4     gradient of some of the likely bulk

5     disposal locations mean that

6     materials disposed in the bulk

7     disposal locations actually migrated

8     to become located later in the area

9     that became the drum disposal area?

10          A.    I didn't follow that.

11          Q.    Well, the first sentence of

12     this bullet, which you have

13     identified as being based upon the

14     RI, states that drums were removed

15     from areas that are down gradient of

16     likely bulk disposal locations.

17          If we accept that as a

18     fact, that fact does not necessarily

19     mean, does it, that materials

20     disposed in the bulk disposal

21     locations migrated to reach the drum

22     disposal area?

23          Put another way, the drum

24     disposal area might have been down

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    gradient of the likely bulk disposal

2    locations, but that doesn't

3    necessarily mean that the bulk

4    materials disposed up gradient

5    reached the drum disposal area, does

6    it?

7         A.    Right.   It doesn't

8    necessarily mean that, no.

9         Q.    And you didn't do any

10   independent calculation to try to

11   determine that, did you?

12        A.    No.

13        Q.    At the bottom of Page 6 of

14   Vandeven-5 there's a bulleted

15   paragraph which reads, "Even if their

16   pH was nearly neutral, releases of

17   large quantities of liquids would

18   cause increased migration of

19   materials into the subsurface.

20            This would tend to reduce

21   the concentrations of hazardous

22   substances and spread them over a

23   larger area.

24            Unless the concentrations

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    were reduced to levels below the

2    applicable standards, these effects

3    could increase the area to be

4    remediated and the volumes of areas

5    needing to be addressed thus

6    increasing the total response costs."

7              Isn't it possible that the

8    release of large quantities of

9    liquids with near neutral pH or the

10   infiltration of large quantities of

11   rainfall, precipitation in this area

12   over time could tend to reduce the

13   concentrations of hazardous

14   substances and spread them over a

15   larger area and thereby limit and

16   reduce the extent of remediation work

17   required as compared to what would

18   have been required had there been no

19   introduction of large quantities of

20   near neutral pH materials or large

21   amounts of rainfall?

22              MR. HARRIS:  Objection to

23   the form.

24              THE WITNESS:  I would say

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

1  no.  Almost always it's less costly

2  to remediate a smaller volume of

3  concentrated material than it is to

4  remediate a larger volume of less

5  concentrated material.

6          So if you have disposal of

7  a bulk liquid that's near neutral pH,

8  as you have postulated, and that

9  tended to spread out the

10 contamination over a larger area,

11 that, in general, would be more

12 expensive to remediate than if that

13 bulk liquid had not been disposed of

14 and you just had a smaller volume of

15 higher concentration material.

16 BY MR. COOLEY:

17     Q.    But that's not necessarily

18 true in every case.  Is that a fair

19 statement?

20     A.    Not necessarily true in --

21 yes, it's not necessarily true in

22 every case.

23     Q.    Now, in this case have you

24 analyzed the extent to which what I

**JDR**
**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX 215.751.0581

443

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1 will call dilution, if you would

2 accept that term as a single word to

3 describe the phenomenon we are

4 talking about, resulted in higher or

5 lower costs than what would have been

6 incurred if there were no such

7 dilution?

8     A.    I'm sorry, can you just

9 repeat that?  I lost the first part.

10     Q.    Sure.

11          MR. COOLEY:  I retract the

12 question.

13          I may have one or two, but

14 I will hand the ball over to Ed.

15          THE WITNESS:  Can we take a

16 quick five minutes?

17          (Recess taken)

18               EXAMINATION

19 BY MR. FACKENTHAL:

20     Q.    Mr. Vandeven, we didn't

21 introduce ourselves yet.  I'm Edward

22 Fackenthal.

23          I represent one of the

24 defendants, and the defendant I

**JDR**

**James DeCrescenzo Reporting,** LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    represent is NRM Investment Company,

2    and in its earlier form that was

3    known as National Rolling Mills,

4    that's a steel company out in Paoli,

5    near Paoli, Pennsylvania.

6            And my greatest interest in

7    this controversy has to do with

8    pickle liquor and the effect of

9    pickle liquor. So most of my

10   questions are going to be devoted to

11   that subject.

12           I think Mr. Cooley and

13   Mr. Pettit yesterday covered most of

14   the other questions that I had, so

15   I'm really going to focus on that.

16           What I'm going to start

17   with, I have made a copy of some of

18   the remedies required by the ROD. As

19   you may remember, there were seven of

20   them, there were seven paragraphs

21   dealing with the remedies.

22           Now, I have only one copy

23   of this, and maybe I can share it

24   with you. I am going to read one by

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581