# Exhibit A

## Part 5 of 5

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    one and then relate what I'm reading

2    to the pickle liquor situation.

3    Okay?

4         A.    Okay.

5         Q.    The very first one says,

6    "The selected remedy includes the

7    following major components," and then

8    there's the very first one.

9              "Soil aeration and

10   treatment of VOC hot spots,

11   mechanical aeration of soil hot spot

12   areas to remove high level of VOCs,

13   and then (primarily TCE and benzene)

14   in a temporary on-site treatment

15   building equipped with carbon

16   filters."

17             Now, looking at just that

18   first item under the remedy, under

19   the ROD remedy, do pickle liquors, in

20   your view, have any relation to that

21   at all, and, if so, what relation?

22        A.    To the soil aeration --

23        Q.    Yes.  Do you want me to

24   read the first part again?

JDR

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
                    1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                            www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.    Yes.  I'm not sure what you

2   are reading from.

3      Q.    Yes.  The very first one.

4            MR. FACKENTHAL:  Off the

5   record.

6            (Discussion off the

7   record.)

8   BY MR. FACKENTHAL:

9      Q.    Back on the record, you are

10  reading No. 1 to yourself.  I just

11  read it for the record.  Will you

12  read it to yourself?

13     A.    Okay.

14     Q.    Okay.  My question was can

15  you relate the pickle liquors which

16  were allegedly disposed of at the

17  Boarhead Farms site to that

18  particular remedy?

19     A.    I think we talked about

20  this very briefly yesterday.  Only to

21  the extent that if wastes such as

22  pickle liquor wastes that may have

23  been acidic tended to spread out the

24  contamination and increase the volume

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   of soil that needed to be aerated.

2       Q.      Looking at it in two ways,

3   the pickle liquor itself, as opposed

4   to what the pickle liquor might have

5   done to other elements that may have

6   been there, how it affected any other

7   elements, just looking at the pickle

8   liquor itself, is that in any way

9   related to No. 1?

10      A.      Pickle liquor should

11  include substantial quantities of

12  volatiles, so that would not have

13  been a remedy for pickle-liquor-

14  impacted soil.

15      Q.      And looking at the second

16  aspect of that, that is how it might

17  have affected properties, chemicals

18  that were inherently there, aside

19  from what might have been in the

20  pickle liquor, can you -- and I know

21  you have testified to this for the

22  last couple of days, but can you

23  relate what the pickle liquors may

24  have done to those chemicals,

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    chemicals of concern?

2         A.    They could have in general

3    spread out the -- as we were just

4    talking about, they could have spread

5    out and made less concentrated the

6    chemicals that were there, including

7    volatile chemicals, which would have

8    increased the volume of soil that

9    needed to be aerated.

10        Q.    But you cannot tell that

11   that happened without knowing an

12   awful lot more about the site, is

13   that correct, and where the pickle

14   liquors were disposed of?

15        A.    That would be correct, yes.

16        Q.    So it may have been that

17   they had no effect, or it may have

18   been that they had a great effect,

19   you just don't know?

20        A.    That's correct.

21        Q.    Now, we looked at the

22   second one, and for the people on the

23   telephone I'm going to read it, it

24   says, "Excavation of off-site

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   disposal of buried drums, excavation

2   of off-site disposal of buried drums

3   to reduce the potential for continued

4   migration of contaminants to the soil

5   and groundwater as well as to reduce

6   exposure risk."

7          Now, again, the first part

8   of what we talked about before, just

9   what's in the pickle liquor itself,

10  would that in any way be related to

11  that second remedy?

12     A.    If it was disposed of in

13  drums.  This part of the remedy has

14  to do with the disposal of buried

15  drums.

16     Q.    That's correct, yes.

17     A.    So if the pickle liquor was

18  disposed of in buried drums or if

19  bulk pickle liquor was disposed of in

20  soil areas that were excavated with

21  the buried drums, then that would

22  have been a connection between pickle

23  liquor and this part of the remedy.

24     Q.    Okay.  But, again, that's

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

215.564.3905                                        FAX  215.751.0581

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    not something you would know about;

2    that is, you don't know where, if

3    any, of the pickle liquor was

4    disposed of in relation to the

5    location of the buried drums?

6              MR. HARRIS:  Objection to

7    the form.

8              THE WITNESS:  I don't

9    recall information specifically on

10   where pickle liquor may have been

11   disposed of.

12   BY MR. FACKENTHAL:

13       Q.    So that you would not know

14   whether pickle liquor was in the area

15   of these drums?

16             MR. HARRIS:  Objection to

17   the form.

18             THE WITNESS:  That's

19   right.  I haven't seen any

20   information about where specifically

21   pickle liquor was disposed of.

22   BY MR. FACKENTHAL:

23       Q.    I believe somewhere in your

24   report you said any acids,

**James DeCrescenzo Reporting**, LLC

215.564.3905          Innovating Litigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    particularly hydrochloric acid which

2    is the particular type of pickle

3    liquor I'm talking about, could have

4    had some effect on the drums.  Right?

5         A.    Correct.

6         Q.    Assume that it was a new

7    steel drum, for an example, and

8    assume that it was a solution of

9    pickle liquor of less than five

10    percent, would that have had a

11    significant effect, and they came

12    together, would the pickle liquor

13    have any substantial effect on that

14    steel drum?

15         A.    It could, yes.  Any

16    increase in the corrosive

17    characteristics of the material

18    that's in contact with the drum will

19    increase the deterioration of that

20    drum.

21         Q.    Well, I used the word

22    significant kind of advisedly, how

23    long would it take for say a solution

24    of five percent or three to five

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    percent hydrochloric acid to erode a

2    new steel drum?

3         A.    I don't know.

4         Q.    It might take a decade, it

5    might take 50 years, for all you

6    know?

7         A.    I couldn't say how long it

8    would take.

9         Q.    Can you describe the

10    corrosivity of that type of pickle

11    liquor that I just described?

12              MR. HARRIS:  Objection.

13    What was the description?

14              MR. FACKENTHAL:  How

15    corrosive it is.

16              MR. HARRIS:  Well, what

17    pickle liquor are we talking about?

18              MR. FACKENTHAL:  The three

19    to five percent pickle liquor.

20              MR. HARRIS:  And that's all

21    he knows about it.

22              MR. FACKENTHAL:  That's all

23    he knows about it.

24              THE WITNESS:  It's three to

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    five percent pickle liquor or three

2    to five percent hydrochloric acid?

3    BY MR. FACKENTHAL:

4        Q.    Three to five percent

5    hydrochloric acid.

6        A.    Well, you would need to

7    know -- you still cannot say anything

8    very informative or detailed about

9    that.

10            You would still need to

11    know, as we talked about earlier, the

12    concentration of that hydrochloric

13    acid, was it a concentrated

14    hydrochloric acid or a weak

15    hydrochloric acid.

16            Five percent concentrated

17    hydrochloric acid in a volume of

18    waste could be very corrosive.

19        Q.    I misunderstood.  I thought

20    when you were talking -- when I said

21    five percent that that meant that it

22    was five parts out of 100, the other

23    95 percent being water or something

24    inert.  Isn't that so?

**JDR**

**James DeCrescenzo Reporting, LLC**

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1     A.     That would be of the bulk

2   wastes that you are talking about,

3   not of the hydrochloric acid.

4     Q.     I'm sorry, I'm talking

5   about the bulk wastes.

6     A.     That's what I was talking

7   about.  The way that I understood

8   your hypothetical, you have five

9   parts of hydrochloric acid and 100

10   parts of bulk wastes.

11     Q.     That's correct.

12     A.     That could still be a very

13   corrosive liquid.

14     Q.     So you would have to know a

15   lot more about it in order to answer

16   that question about how it would

17   attack the steel drums?

18     A.     Certainly if you were

19   trying to estimate how long it would

20   take to eat through a new steel drum,

21   you would need to know a lot more

22   information.

23     Q.     Okay.  And, again, you have

24   no idea whether in fact any pickle

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    liquor affected any of the steel

2    drums.

3                    MR. HARRIS:    Objection.

4                    THE WITNESS:    My opinion

5    was based on if pickle liquor was

6    disposed of at the site and speaking

7    about whether or not it had an impact

8    on the drums is if that pickle liquor

9    was disposed of in a way that it came

10   in contact with drums it would

11   deteriorate those drums.

12   BY MR. FACKENTHAL:

13       Q.    Well, really three

14   assumptions, if it were disposed of

15   and if it came into contact with the

16   drums and if were of such a

17   concentration that it could have a

18   significant impact, if all those ifs

19   were so, then it could.

20                    Is that what you are

21   saying?

22       A.    That's correct.

23       Q.    All right.    If you look at

24   No. 3, and again for the people on

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the phone, "Groundwater extraction,

2    metals precipitation and air

3    stripping, continued extraction and

4    treatment of VOCs in groundwater via

5    the existing interceptor trench and

6    air stripping treatment system and

7    addition of a metals precipitation

8    unit to remove inorganics to reduce

9    contaminants in the groundwater to

10   below maximum contaminant levels,

11   MCLs."

12           Now, again, the same

13   two-part thing that we were talking

14   about with respect to the first two.

15           If you are looking at just

16   the pickle liquor itself, and keeping

17   in mind that this is -- well, strike

18   that.

19           Just looking at the pickle

20   liquor itself, what part of three, if

21   any, would that have to do with the

22   remedy, that third remedy?

23           MR. HARRIS:  Ed, I just

24   want to make clear, are you talking

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    about the pickle liquor -- when you

2    say the pickle liquor, are you

3    talking about this pickle liquor here

4    you are describing to him or pickle

5    liquors in general?

6         MR. FACKENTHAL:  Pickle

7    liquors in general, as he has in his

8    supplemental report.

9         MR. HARRIS:  Okay.

10        THE WITNESS:  Well, I guess

11   most directly any of the metals that

12   may be contained in pickle liquor

13   waste would contribute to the need of

14   the extraction system itself, the

15   need to remove groundwater.

16        The metals that are in

17   pickle liquor would have contributed

18   to the need to treat that groundwater

19   for metals, to reduce it to below

20   maximum contaminant levels.

21        The pickle liquor and the

22   metals that may have been contained

23   in the pickle liquor may have

24   necessitated the need to meet

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    discharge limits for the treated

2    water.

3              So those are some of the

4    ways that pickle liquor would have

5    been included in that part of the

6    remedy.

7    BY MR. FACKENTHAL:

8         Q.    This remedy was designed

9    some, what, 20 years after the end of

10   the disposal period at Boarhead, as I

11   understand it.  Is that correct?  Is

12   that according to your understanding,

13   too?

14        A.    Well, again, this was -- I

15   have never thought about this as --

16   this wasn't like a regulated landfill

17   site that had a disposal period per

18   se.  I'm not sure when exactly the

19   disposal stopped at Boarhead Farms.

20        Q.    Well, let's assume for the

21   moment that it stopped in about 1977

22   and that this ROD was I think

23   November of 1998, and of course it

24   had its going back a couple years

1    before that, but roughly a 20-year

2    span in between the end of the

3    disposal at the Boarhead site and the

4    drafting of these seven remedies that

5    we are talking about.

6              Now, would the hydrochloric

7    acid aspect of the pickle liquor have

8    remained for that 20 years in a

9    measurable way?

10        A.    The hydrochloric acid

11   aspect?

12        Q.    Yes.

13        A.    I'm not sure what you mean

14   by aspect.

15        Q.    Well, as I understand it,

16   the pickle liquor, one type of pickle

17   liquor -- the one I'm most interested

18   in is ferric chloride, so it's a

19   combination I suppose of hydrochloric

20   acid and iron.  Am I correct?

21        A.    Correct.

22        Q.    Now, just looking at the

23   hydrochloric acid, would that have

24   been measurable some 20 years after

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                        FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1   the last disposal, if any, of

2   hydrochloric acid at the site?  Would

3   that still have been detected?

4        A.     Hydrochloric acid or the

5   effects of the disposal of that

6   hydrochloric acid?

7        Q.     No.  Just the hydrochloric

8   acid for the moment.

9        A.     I don't know that

10  hydrochloric acid was ever measured

11  at the site.  They don't measure for

12  specific acids when they are sampling

13  soil in groundwater.

14        Q.     But if there's a mixture,

15  not a mixture, a chemical component

16  of ferric chloride, could that have

17  been measured some 20 years later?

18        A.     The iron component of that

19  most definitely could be measured.

20  Iron -- there's the same amount of

21  iron today as there was when the

22  earth was formed, so that doesn't go

23  away.

24             So if there was iron

**JDR**

**James DeCrescenzo Reporting,** LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    disposed of at the site in 1973, that

2    iron was at the site before the

3    remedy was implemented.  Unless it's

4    removed from the subsurface, it

5    continues to be there.

6        Q.    Okay.  Do you know, and

7    again we are talking about ferric

8    chloride, if the iron content was

9    below or above the maximum

10   contaminant level, as indicated in

11   Paragraph 3?

12       A.    I don't know if it was or

13   not.

14       Q.    Do you know what the

15   background level of iron was at the

16   time in any part of the Boarhead

17   Farms?  When I say at the time, I'm

18   talking about the early '70s.

19       A.    No, I don't.

20       Q.    And do you know what the

21   iron content was in or about 1998?

22       A.    No, I don't.

23       Q.    And whether in either case

24   it was above or below the MCL?

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1     A.     First of all, iron doesn't
2  have an MCL.
3     Q.     Really?
4     A.     It has what is called an
5  SMCL, a secondary maximum contaminant
6  level.
7     Q.     Explain that.
8     A.     An MCL is a concentration
9  that is a health-based
10  concentration.  For instance, TCE
11  will have an MCL for groundwater
12  that's five micrograms per liter.
13  That's based on human health impact.
14          Other compounds will have
15  what's referred to as secondary MCLs,
16  which are based on organoleptic
17  considerations, and iron is one of
18  those.
19     Q.     Well, then looking at
20  number three, the removal of iron
21  would not be involved in number
22  three.  Isn't that right?
23     A.     No.  It very much could be
24  involved in number three.

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          At least in the two -- the
2    last two aspects of number three, the
3    metals precipitation and the air
4    stripping, any iron that's in the
5    subsurface when it comes in contact
6    with oxygen will precipitate out.
7          And therefore before you
8    can effectively operate an air
9    stripping system, you have to remove
10   that iron.
11       Q.    Look at No. 4, if you will,
12   installation of additional monitoring
13   wells.  And the rest of that
14   paragraph just explains the need for
15   additional monitoring wells.
16          And the same question about
17   that, can you relate the pickle
18   liquor, as you have mentioned in your
19   supplemental report to that Item 4?
20       A.    Well, I would say that it
21   relates at least in two ways.  One,
22   again, to the extent that this pickle
23   liquor waste was acidic, it would
24   have increased the mobility of

464

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    contaminants in the subsurface.

2              And to the extent that

3    metals were contained in pickle

4    liquor waste, it would have required

5    and been part of the reason to

6    install monitoring wells to

7    characterize the concentration of

8    those metals in the subsurface.

9         Q.    Then skip down to No. 6,

10   residential water treatment,

11   "Continued maintenance of the

12   grandular activated carbon, GAC,

13   filters that were installed on --" it

14   means I guess or -- "the affected

15   residential water wells in the

16   surrounding area to prevent exposure

17   to contaminated groundwater from the

18   site."

19             You have already testified

20   a little bit about that. Did the

21   pickle liquor have any effect upon

22   those residential wells which you

23   know about, assuming that pickle

24   liquor were disposed of on the site?

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.    Again, the residential

2   treatment systems were put in both

3   for organic and inorganic

4   contamination.

5           So the metals that were in

6   pickle liquors could have contributed

7   to the concentration of metals in the

8   groundwater that required treatment

9   from those private wells.

10     Q.    Do you know of any of the

11  test results from the private wells

12  that indicated any ferric chloride or

13  iron that needed remediation?

14     A.    I would have to go back and

15  look at the underlying data.  I don't

16  recall sitting here right now.

17     Q.    And, again, you have, I

18  will ask this way, do you have any

19  knowledge about whether pickle liquor

20  and the metallic components of pickle

21  liquor ever did get to the

22  residential wells?

23     A.    Do I have knowledge about

24  whether or not any of the

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    contaminants -- the metals that are

2    in pickle liquor, or specifically

3    pickle liquor metals?  I think that's

4    two different things.

5         Q.    I didn't realize they were

6    two different things.

7         A.    Well, you could have --

8    there could be various sources of

9    chromium at the site, for instance.

10         One question would be

11    whether or not there's evidence that

12    chromium was in the private wells

13    versus evidence that chromium from

14    pickle liquors was in the private

15    wells.

16         Q.    I'm talking about -- again,

17    I'm going to focus on just ferric

18    chloride.  Do you have any knowledge

19    about whether iron, iron in any kind

20    of pickle liquor component, iron got

21    to the residential wells?

22         A.    Not sitting here right now,

23    no.

24         Q.    You said you read the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    Franklin Mink report.  I believe you
2    said that you did read the Franklin
3    Mink report.  Yes?
4        A.    Yes, I did.
5        Q.    Do you know Dr. Mink?
6        A.    Yes, I do.
7        Q.    You used to work in the
8    same place?
9        A.    He used to be employed at
10   Environ, yes.
11       Q.    Over what period of time
12   did you know him?
13       A.    Approximately -- maybe, I
14   don't know, 1999, 2000, 2001, maybe
15   slightly before then.
16       Q.    Did you work with him?
17       A.    I did on a number of
18   matters, yes.
19       Q.    Was he your superior or
20   vice versa?
21       A.    No.
22       Q.    You worked together?
23       A.    Yes.
24       Q.    Do you recognize him as a

468

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    capable practitioner in the same

2    field that you are in?

3              MR. HARRIS:    Objection to

4    the form.

5              THE WITNESS:    No, I don't.

6    BY MR. FACKENTHAL:

7       Q.    Can you explain why?

8       A.    I don't consider Dr. Mink

9    to be a competent professional.

10      Q.    For what reason?

11      A.    My experience with him.

12      Q.    Explain everything that you

13   can about that, please.

14      A.    His experience while

15   working at Environ led a number of

16   people within Environ to conclude

17   that he was not operating to the

18   standards that Environ requires for

19   somebody in his position.

20      Q.    Again, can you elaborate on

21   that?

22      A.    He would, on the matters

23   that I was involved with, would offer

24   opinions that he was not qualified to

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    offer.

2              He would describe himself

3    as having expertise in areas that he

4    clearly did not have expertise.  He

5    would exaggerate his experience.

6    That was enough for us.

7        Q.    When you say enough for us,

8    was his leaving of Environ his choice

9    or Environ's choice?

10       A.    I believe the euphemism

11   that's used is that it was mutual.

12       Q.    Well, subtract the

13   euphemism from it.  What was the

14   reality of it?

15       A.    I was not involved in his

16   leaving, so I couldn't say anything

17   more than that.

18       Q.    Did you read his

19   deposition?

20       A.    I don't believe I was

21   provided with his deposition.

22       Q.    I am going to give you a

23   couple of pages of his report.

24              MR. HARRIS:  Should we mark

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

470

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    it, Ed?

2              MR. FACKENTHAL:  If you

3    want.  Pages 2 and 3 of his report.

4              MR. HARRIS:  Ed, you have

5    given us a draft.

6              MR. FACKENTHAL:  Yes.

7    Frankly, that's all I have.

8              MR. HARRIS:  I mean, I

9    don't care.  I just want to make

10   sure --

11             MR. FACKENTHAL:  It is.

12   The language is the same as in the

13   final report.

14             MR. HARRIS:  Okay.

15             (Vandeven Exhibit 15 was

16   marked for identification.)

17   BY MR. FACKENTHAL:

18       Q.    And on those pages two and

19   three there are a number of -- seven

20   bullet items, and I want to go over

21   those and find what you agree with

22   and what you disagree with.

23             Starting right at the top,

24   "The spent pickle liquors alleged to

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

1    have been released at the site during

2    the late 1960s and 1970s would have

3    consisted of primarily weak

4    hydrochloric acid containing trace

5    amounts of chlorinated iron, nickel

6    and other trace metals."

7        Do you agree with that?

8    A.    I don't have any basis to

9    agree or disagree with that.  I

10   haven't seen anything that indicates

11   that it was --

12   Q.    Incorrect?

13   A.    -- that it was weak

14   hydrochloric acid or that the levels

15   were trace amounts of iron and

16   nickel.

17   Q.    The next sentence, "This

18   spent cleaning solution was in

19   essence rusty water with a low level

20   of hydrogen ions in solution."

21       Do you agree with that?

22   A.    Well --

23       MR. HARRIS:  Could we

24   clarify what you are asking him?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                        www.JDReporting.com

472

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          MR. FACKENTHAL:  Yes.

2    Whether he agrees with that

3    statement, with that sentence that I

4    just read.

5          MR. HARRIS:  But, I mean,

6    as relating to what, though?

7          MR. FACKENTHAL:  I don't

8    follow what your question is.

9          MR. HARRIS:  Are we talking

10   about any particular pickle liquors,

11   are we talking about pickle liquors

12   that were disposed of at the site,

13   are we talking about pickle liquors

14   that anybody reviewed in his report?

15          We have gone back and forth

16   between what you are calling ferric

17   chloride and pickle liquors.

18          MR. FACKENTHAL:  Okay.  We

19   are talking about pickle liquors in

20   general -- pickle liquors in general.

21          MR. HARRIS:  Okay.  Whether

22   or not they were disposed of at the

23   site.

24          THE WITNESS:  Okay,

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    referring to that second sentence.

2    BY MR. FACKENTHAL:

3        Q.     That second sentence,

4    right.

5        A.     Well, rusty water is a, I

6    guess at best I could characterize

7    that as a nontechnical term, so I'm

8    not sure what he means by in essence

9    rusty water.

10       Q.     All right.  Focus on the

11   rest of the sentence.

12       A.     Okay.

13       Q.     Do you agree or disagree

14   with that?

15       A.     Again, I don't have any

16   basis to agree or disagree that it

17   had a low level of hydrogen ions in

18   solution.  In essence, I have no

19   basis to agree or disagree to what

20   the pH of that solution was.

21       Q.     Well, if it were ferric

22   chloride, would that in any way help

23   you to in your agreement or

24   disagreement with that part of the

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

474

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    sentence?

2        A.    The paragraph says that it

3    contains hydrochloric acid.

4        Q.    Let's back up a little bit.

5              Ferric chloride is iron and

6    hydrochloric acid, is it not?

7        A.    Ferric chloride is iron and

8    chlorine.

9        Q.    Right.  When you are

10   talking about a pickle liquor of

11   hydrochloric acid, is ferric chloride

12   the same thing as that?

13       A.    No.

14       Q.    Look at the last sentence

15   there, "These solutions --" assuming

16   what Dr. Mink has said in the earlier

17   part of that form, "These solutions

18   could not have contributed to the

19   costs of any of the response actions

20   directly or indirectly."

21             Do you agree with that or

22   disagree with that?

23       A.    I disagree with that.

24       Q.    For the reasons you have

1   talked about in the last couple of

2   days?

3        A.    Correct.

4        Q.    Can you quantify in any way

5   the part of the cost of the remedies

6   that we were talking about a little

7   bit earlier that the pickle liquors

8   generally, pickle liquors have played

9   in that and at what fraction of the

10  costs?

11       A.    No.  I was not asked nor

12  did I develop any cost allocation for

13  this case.

14       Q.    Do you believe that the

15  pickle liquors were one of the

16  elements that drove the remedy?

17       A.    I believe that pickle

18  liquor waste if disposed of at the

19  site contributed to the need for the

20  remedy and the cost of the response

21  actions, yes.

22       Q.    But you can't quantify that

23  in any way, whether it is one percent

24  or 99 percent?

476

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    A.    I haven't attempted to

2    quantify that.

3    Q.    What would you have to know

4    in order to quantify that?

5    A.    A number of things,

6    depending on exactly what your

7    objective was.  You would need to

8    know a lot more about the waste that

9    was disposed of and where it was

10   disposed and many things that I did

11   not investigate for my opinions.

12   Q.    Those assumptions that we

13   talked about a little bit earlier, if

14   it were there and where it was and

15   what it was composed of, you would

16   have to know all that.

17   A.    Theoretically, again, if

18   you were attempting to determine

19   specifically how an individual waste

20   contributed to individual elements of

21   the response actions, you would need

22   to know a lot more information.

23   Q.    Look at the second bullet

24   and start with the second sentence.

477

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    And, again, I will read the second

2    sentence for the people on the phone,

3    "The removal actions were undertaken

4    primarily to remove metal drums and

5    associated soils."

6              Do you agree with that?

7        A.    I agree that removal of

8    drums and contaminated soils were

9    part of the removal actions, the

10    initial groundwater remedy was part

11    of the removal actions, too.

12              The initial treatment of

13    the residential wells was part of the

14    removal actions.

15        Q.    Focusing on the word

16    primarily, do you agree with that or

17    not?

18        A.    I'm not sure what he is

19    referring to.  Is he referring -- I'm

20    not sure how he is referring to

21    primarily.

22              If he's referring to some

23    cost breakdown, I did not do a cost

24    breakdown.  If he is referring to

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    number of hours that it took, I have

2    not done that analysis.

3        Q.    The way I read it is the

4    purpose of the removal action.  And

5    assuming that's what he meant, would

6    you agree that that was the primary

7    purpose?

8        A.    I'm not sure.  I don't

9    think that the EPA ranked the

10    relative elements of the removal

11    action in any hierarchy, so I have no

12    basis for saying what was more

13    primary or more important than any

14    other aspect of the removal action.

15        Q.    Well, in ranking of

16    Superfund sites I believe you

17    testified in the last day or so, I

18    guess it was the day before yesterday

19    about when it reached a certain

20    numerical rank then it got onto the

21    list, the Superfund list.

22        A.    Yes.

23        Q.    What elements are taken

24    into consideration there?

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          A.     In the ranking process?

2          Q.     In the ranking process,

3    generally.

4          A.     At this time, which was

5    still prior to the 1990 NCP, the 1985

6    NCP and the HRS at the time

7    considered essentially three -- or

8    four elements; contamination of

9    groundwater, contamination of soil,

10   air contamination and risk of fire

11   and explosion.

12              So particularly prior to

13   1990 if there was contamination of

14   groundwater that was currently being

15   used, that is currently a potable

16   drinking water system that was

17   contaminated, that was enough to get

18   you above a 28 and a half on the HRS.

19              If you had a site that

20   contained drums, that was enough to

21   instigate a removal action at a

22   Superfund site.  So those are some of

23   the factors that were used regarding

24   the listing of the Boarhead Farms

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1     site.

2         Q.     And so when he says the

3     actions were undertaken primarily to

4     remove metal drums and associated

5     soils, you would not be able to

6     answer whether it was truly primarily

7     to remove those things or not.

8         A.     That was just one component

9     of the removal actions.

10        Q.     It could have been the

11    other elements that you just

12    mentioned.

13             MR. HARRIS:  I think we are

14    having -- I'm just trying to help

15    here.  I think we are having a

16    breakdown in communication.

17             You are asking him to focus

18    on specifically the two drum-and-soil

19    removal actions versus the other

20    removal actions?

21             MR. FACKENTHAL:  Yes.

22    Dr. Mink said the removal actions

23    were taken primarily to remove metal

24    drums or associated soils.

JDR

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1              And I think Mr. Vandeven

2     said, well, it could have been that

3     or other considerations which were

4     taken into account back at that time.

5              MR. HARRIS:  But the point

6     is there were other removal actions.

7     I think he is struggling with what

8     Mink is referring to.  In other

9     words, there were --

10              MR. FACKENTHAL:  He is.

11              MR. HARRIS:  Yes.

12              MR. FACKENTHAL:  Well, he

13     is talking about all four, the

14     removal actions.

15              THE WITNESS:  He's talking

16     about all three removal actions; that

17     is, the 1992 and the 1993 and the

18     1995, I believe removal actions.  I

19     would assume that's what he is

20     talking about.

21              And my response is that

22     there is no ranking by the EPA as to

23     what is more important and therefore

24     the primary purpose versus what was

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                 1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                           www.JDReporting.com

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    less important.

2              That's not how they go

3    about doing things.  The removal

4    actions address specific threats at

5    the site.

6              Those threats included

7    drums, they included known exposures

8    in private potable wells, and they

9    included contaminated groundwater

10   that needed to be addressed as a

11   non-time critical removal action.

12   BY MR. FACKENTHAL:

13       Q.    Mr. Cooley was asking you

14   along those same lines whether you

15   could in any way rank the importance

16   of any of the items found at Boarhead

17   Farms either as health threats or

18   large costs involved in making

19   removals.

20              Did you say that you could

21   not rank them at all?

22       A.    I'm saying I did not rank

23   them.

24       Q.    You did not?

**JDR**

**James DeCrescenzo Reporting**, LLC

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    A.    I did not.

2    Q.    Could you rank them?  Is

3  there a process whereby you could

4  rank them, focusing first on the

5  costs, the costs involved in

6  remediating?

7    A.    I suppose one could,

8  theoretically.  I did not, and

9  therefore I don't have an opinion

10  about what was more costly or less

11  costly.

12    Q.    Well, if you took something

13  like acid rain, as it existed back at

14  that time, with a pH of close to 7 as

15  opposed to a VOC, you would be able

16  to rank that quite easily, I mean

17  wouldn't you, I mean compare those

18  quite easily as to which would be the

19  more important and which would be the

20  one that should be given attention?

21    MR. HARRIS:    Objection to

22  the form.

23  BY MR. FACKENTHAL:

24    Q.    And which one would, you

**JDR**
**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                    FAX  215.761.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    know, drive the remedy?

2        A.    I thought we were talking

3    about wastes that were disposed of at

4    the site.  I'm not sure how acid rain

5    fits in.

6        Q.    Well, we are talking about

7    the situation at the site.  We are

8    talking about two things which could

9    have affected the site.

10            And one is, say, acid rain

11    with a pH of close to 7, and the

12    other is what I suppose everybody

13    would recognize is something which

14    would need immediate attention, like

15    a VOC, that was disposed of at the

16    site.

17            Now, you would be able to

18    rank those quite easily, would you

19    not, as to which one was the most

20    critical and which one is going to be

21    the more costly to treat?

22            MR. HARRIS:  Objection to

23    the form.

24            THE WITNESS:  I'm not --

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1     the EPA Superfund process does not

2     respond to acid rain.

3     BY MR. FACKENTHAL:

4          Q.     I know that.   I'm talking

5     about -- all right, let me make

6     another example.

7               This is a hypothetical, of

8     course.

9               A disposal of a small

10    amount of a weak acid, using the

11    example citric acid or acidic acid,

12    at someplace on the site as opposed

13    to a disposal of VOC on the site,

14    would you be able to rank between

15    those two which would be the more

16    important, which would be -- which

17    would drive the remedy and which

18    would be the more costly to attend

19    to?

20              MR. HARRIS:   Objection to

21    the form.

22              THE WITNESS:   It's

23    possible, yes.

24    BY MR. FACKENTHAL:

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX 215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      Q.    And it would be the VOC

2   that would be the more costly and the

3   one that would require the immediate

4   attention?

5              MR. HARRIS:   Objection to

6   the form.

7              THE WITNESS:   Not

8   necessarily, no.

9   BY MR. FACKENTHAL:

10     Q.    Why do you say that?

11     A.    Well, you could -- in the

12  hypothetical that you have introduced

13  all you have said is that the only

14  two characteristics are one is a weak

15  acid, one is a small amount of VOC,

16  you have said nothing about the

17  volume.

18              So I could have a tanker

19  truck of acidic acid and my wife

20  spilling her nail polish remover that

21  has acetone in it, a VOC.

22              So, you see how there's

23  almost nothing about this that lends

24  itself to generalities when you are

**JDR**

**James DeCrescenzo Reporting, LLC**
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    talking about allocating or

2    determining what costs more to

3    address.

4         Q.   You would have to know a

5    lot more about it, you would have to

6    know about volume and you would have

7    to know about the timing?

8         A.   You would need to know a

9    number of factors.

10         Q.   If you were going to equate

11    those?

12         A.   If you are going to attempt

13    to allocate, yes.

14         Q.   Look at the third bullet,

15    this is Page 2.

16         Looking at the third bullet

17    where it has "The cost of the

18    response actions taken to date were

19    primarily incurred due to migration

20    of organic solvents (chlorinated

21    ethenes, benzene, 1, 2 - DCA,

22    ethylbenzene, methlyene chloride and

23    1, 2 - DCP) and to a lesser

24    methylenetals such as arsenic,

488

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    chromium, nickel and cadmium -- "

2              (Discussion off the

3    record.)

4              MR. HARRIS:  Okay, where

5    were we?

6    BY MR. FACKENTHAL:

7         Q.    -- chromium, nickel and

8    cadmium into the shallow/intermediate

9    groundwater, associated surface

10   water, and nonaqueous NAPL underlying

11   the Boarhead Farms site."

12             Do you agree with that

13   sentence, and if not, why not?

14        A.    Well, again, at the most

15   basic level I don't agree with it

16   because the word primarily introduces

17   a hierarchy or a ranking which I have

18   not done which is clearly if one were

19   to do that would require a lot more

20   detailed evaluation than the

21   generalities that presented here, so

22   that would be the basic reason why I

23   don't agree with this statement.

24        Q.    And the next sentence, "The

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    pattern of contamination at the site

2    clearly demonstrate that this liquid

3    solvent and heavy metal contamination

4    originated from the areas of drum

5    burial on-site and migrated via site-

6    associated waters (ground and

7    surface) as well as nonaqueous phase

8    liquids."

9           Do you agree with that

10   sentence?  Strike that question.  Do

11   you disagree with that sentence?

12       A.    I would say that I disagree

13   with that sentence to the extent that

14   it implies that there is a clear

15   distribution of contamination and a

16   clear and complete understanding of

17   the sources and areas of

18   contamination at the site.

19           Even the RI notes that a

20   complete understanding of where

21   materials may have been disposed of

22   at the site is not known, so I don't

23   think anything about this site could

24   allow one to say that there's any

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    clear demonstration of any

2    characteristic of the site.

3        Q.    Do you disagree with the

4    part that says the "pattern of

5    contamination," is that what you are

6    talking about?

7        A.    That's correct.  Right, the

8    pattern or distribution of

9    contamination.

10        Q.    You would say it's

11    indefinite enough that his statement

12    would be inaccurate?

13        A.    Or at best this particular

14    sentence is incomplete.  It's likely

15    that contamination at the site did

16    originate from areas of drum burial.

17        But I don't think it's

18    correct to say that those were

19    necessarily the only areas that were

20    sources of contamination at the site.

21        Q.    Any other areas that you

22    know that?

23        A.    That were what?

24        Q.    Sources of contamination at

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the site.

2         A.    Areas where bulk wastes

3    were disposed of would be areas of

4    contamination, and any other area

5    where DeRewal disposed of wastes

6    would be areas of contamination.

7         Q.    You don't know where they

8    were, though, do you?

9         A.    Completely?

10        Q.    At all.

11        A.    No.    There is some

12   indication of some specific areas

13   where wastes were disposed of.

14        Q.    Bulk, bulk wastes?

15        A.    Bulk wastes.    But again as

16   the RI states, nobody knew at the

17   time of the RI or today completely

18   where those areas are.

19        Q.    The next bullet, the fourth

20   bullet on Page No. 2, "Spent pickle

21   liquors (primarily weak less than

22   five percent hydrochloric acid

23   containing inert ferrous chloride and

24   traces of metals such as zinc, nickel

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    and dilute mineral oil compounds at

2    this site) allegedly disposed in bulk

3    on-site after 1969 could not have

4    substantially altered the pH of the

5    site soils or contributed

6    significantly to the toxicity,

7    mobility or persistence of any of the

8    site chemicals of concern found to

9    drive the response actions."

10            Is there anything that you

11   can add to what you have already

12   testified to about whether you agree

13   or disagree with that long sentence?

14        A.    No.    I think this would be

15   a perfect example of a sentence that

16   is the opposite of what I have said;

17   that is, that all wastes at the site

18   contributed in some manner to the

19   need for and cost of remediation at

20   the site.

21        Q.    And the next bullet, this

22   is on No. Page 3, "Select metals from

23   buried waste drums (arsenic,

24   hexavalent chrome, cadmium, lead,

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    zinc, so forth) contributed to the

2    cost of the remedy in a significant

3    way primarily through drum/soil

4    excavation and to a lesser extent

5    metals precipitation treatment of

6    groundwater."

7         Do you disagree with that?

8    A.    I don't disagree that it

9    contributed to the cost of the

10   remedy.  I have not done anything to

11   determine how significant those costs

12   were compared to any other costs at

13   the site.

14   Q.    The next bullet, "The

15   nature and extent of the metals

16   contamination in the site soils and

17   associated shallow groundwater

18   suggest background sources at the

19   site were significant contributors to

20   the elevated analytical results

21   reported in the RI/FS."

22        Just stopping with that

23   sentence, do you agree with that?

24   A.    I don't have -- I don't

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

494

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    recall seeing anything that said that

2    the natural background levels in the

3    soil were significant contributors to

4    the analytical results.

5              They may have contributed,

6    but I have seen nothing that says

7    they were significant contributors.

8         Q.    Do you remember what the

9    RI/FS said about the background?

10        A.    Not specifically, no.

11        Q.    Well, can you disagree with

12   what he said in that respect?  You

13   say you don't remember.

14        A.    I'm saying that I don't

15   have any information that would allow

16   me to say the degree to which they

17   contributed to the elevated

18   analytical results.

19              As we talked about

20   yesterday, the diabase at this site

21   does have naturally high levels of

22   metals, and to the extent that those

23   metals may have been mobilized by

24   acids disposed of at the site, those

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    naturally occurring metals could have

2    contributed to the analytical results

3    reported in the RI/FS.

4        Q.    Look at the last bullet

5    where Dr. Mink is of the opinion, and

6    I'm reading now, "Over 95 percent of

7    the response actions' cost at the

8    site to date has been driven by

9    organic solvents released from

10    buried/stored drums on-site."

11        Do you have anything to

12    add, other than what you have already

13    testified to, about that sentence?

14        A.    No.    I don't have anything

15    to add.    I have no idea where that

16    numerical --

17        Q.    95 percent?

18        A.    Yes.    I have no idea where

19    that came from.

20        Q.    Do you disagree with this

21    sentence?

22        A.    I have no basis for

23    determining how he developed that 95

24    percent, so I would say that I would

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    not agree with that.

2         Q.    Now, the next sentence in

3    the last bullet, "Their migration to

4    shallow/intermediate groundwater has

5    necessitated the removal and

6    remediation of approximately 80,000

7    cubic yards of site soils."

8              That's true, is it not?

9         A.    I'm not sure what that

10   pronoun refers to, "their."

11             He's talking about

12   apparently organic solvents released

13   from the buried and stored drum

14   sites, the drums on site.

15             Well, clearly the response

16   to the drums and the soils on site

17   was conducted for reasons more than

18   just organic solvents.  There were

19   metals contained in the drums, there

20   were metals contained in the soils.

21             We talked just a little bit

22   ago about the fact that some of the

23   costs of the drum removal and

24   disposal was due to the fact that

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    they were characteristic hazardous

2    wastes because of their metals

3    concentrations, so I would not agree

4    with that statement.

5         Q.    Do you remember whether

6    ferric chloride was one of the items

7    mentioned in the chemicals of

8    potential concern?

9         A.    I don't recall if it was or

10   not.

11        Q.    Do you know whether it is

12   included within the chemicals of

13   concern?

14        A.    I don't know if it is or

15   not.

16        Q.    Do you know whether it is

17   mentioned in the ROD at any place;

18   that is, that that's one of the

19   things to be remediated?

20        A.    I believe that iron is

21   mentioned in the ROD, but I would

22   have to go back and review the ROD to

23   determine where it's mentioned and in

24   what context it's mentioned.

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    Q.    Are you sure that it's

2    mentioned in there someplace?

3    A.    Iron?

4    Q.    Yes.  In the ROD.

5    A.    I couldn't -- I would have

6    to go back and look at the ROD to

7    determine if it is mentioned and in

8    what context.

9    Q.    You would remember if it

10   were an item that had to be

11   remediated.

12   A.    Without the ROD in front of

13   me, I wouldn't necessarily remember

14   that, no.

15   Q.    Is that something you could

16   find easily if you had the ROD in

17   front of you?

18   A.    I would have to look

19   through the ROD.

20   Q.    I mean it would take time.

21   A.    I would have to review the

22   entire ROD, yes.

23   Q.    You testified yesterday,

24   and today too, I believe, about the

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    buffering effect that certain soils

2    had on acids and that acids would

3    reduce the spill of acids or the

4    placement of acids on the soil would

5    reduce the buffering effect of them.

6              Is that correct?

7         A.    It would take up or deplete

8    the buffering capacity of the soil,

9    yes.

10        Q.    Is that something that is a

11   permanent effect on the soils, or is

12   that something that regenerates over

13   a period of time?

14        A.    It can -- it's not

15   necessarily an irreversible process.

16   Almost nothing in the environment is

17   an irreversible process.

18        Q.    Can you explain that in a

19   little more detail what buffering

20   means and why it would be harmed by

21   acid and why it would not be

22   irreversible?

23        A.    If you introduce an acid to

24   soil and that acid again has a --

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    increases the hydrogen ion

2    concentration of the environment, be

3    it the saturated zone or the

4    unsaturated zone, soil particles that

5    may have a, either because of a

6    physical process, like adsorption, or

7    a chemical process, say a negatively

8    charged compound on the soil, can

9    take up those hydrogen ions and

10   therefore reduce the pH, if you will,

11   of the acid or of the liquid that the

12   acid is in.

13          So that's generally how

14   that buffering capacity would work.

15          So that process can be --

16   that process is not necessarily

17   irreversible; that is, you could have

18   situations where the negative charge

19   of the soil particle or the ability

20   of the soil to adsorb hydrogen ions

21   is regenerated over time, either be

22   it through some introduction of a

23   negatively charged, depending on the

24   characteristics of the subsurface,

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    say oxygen, which would be a

2    negatively charged, which would lend

3    a negative charge to the soil, that

4    could reverse or bring back a

5    buffering capacity to the soil over

6    time.

7         Q.    When you say over time, can

8    you give us a range of what you are

9    talking about when you say over time,

10   are you talking days, weeks, months

11   years, what are you talking about?

12        A.    It could be anything within

13   that time frame, depending on many --

14   that depends on many factors.  It

15   could be relatively short-term or it

16   could take a longer period of time.

17        Q.    Well, make an example.  If

18   a tanker load of pickle liquor, as

19   you have described in your

20   supplemental report, that type of

21   pickle liquor were deposited say at

22   Boarhead Farms and it were say a five

23   percent solution, what else would you

24   have to know in order to tell whether

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the buffering effect which would be

2    limited by that could be regenerated,

3    what would you have to know?

4        A.    You would have to know a

5    lot about the geochemistry of the

6    soil, what the soil particles were

7    made of, what other elements were in

8    the soil.

9           You would need to know

10   something about or a lot about the

11   physical properties of the soil, what

12   the porosity was.

13          You would need to know what

14   the oxygen concentration was and what

15   the concentration of other electron

16   acceptors were.

17          So that kind of

18   geochemistry is extremely

19   complicated, and even a prediction

20   about the buffering capacity of soil

21   or how long it takes to deplete the

22   buffering capacity and certainly how

23   long it would take to regenerate the

24   buffering capacity is a very

503

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    complicated and complex evaluation.

2         Q.    And as you said, it could

3    be a very short time, it could be a

4    very long time depending upon a lot

5    of factors that we just don't know.

6    Right?

7         A.    That I don't know sitting

8    here right now.

9         Q.    That's what I'm asking.

10        A.    Correct.

11        Q.    One of the documents

12   referred to yesterday, not introduced

13   into evidence, I believe, but

14   referred to was a paper entitled

15   Behavior of Metals in Soils.  Do you

16   remember that?

17        A.    No, I don't.

18        Q.    It was one of the things

19   that you reviewed, one of the things

20   that was circulated to counsel.

21             MR. HARRIS:  Jeff had it.

22   "Ground Water Issue Behaviors of

23   Metals in Soils," October 1992 EPA

24   whatever.

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

504

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    BY MR. FACKENTHAL:

2        Q.    Do you have that in front

3    of you?

4        A.    Yes.

5        Q.    I copied a piece from Page

6    20.  Will you turn to Page 20?

7        A.    Okay.

8        Q.    I found a part where it

9    says "Metals added to soils."  Do you

10   find a sentence beginning that way?

11       A.    The first sentence under

12   the title Summary?

13       Q.    "Metals added to soils

14   would normally be retained at the

15   soil surface."

16       A.    Yes.

17       Q.    I will read the part that I

18   want, and then I will ask you if you

19   can comment on that.

20            Metals added to soils would

21   normally be retained at the soil

22   surface.  "Movement of metals into

23   other environmental compartments,

24   i.e. groundwater, surface water or

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

505

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

```
1    the atmosphere should be minimal so
2    long as the retention capacity of a
3    soil is not exceeded.
4              The extent of movement of
5    metal in the soil is intimately
6    related to the solution and surface
7    chemistry of the soil and to the
8    specific properties of the metal and
9    the associated waste matrix."
10             Did I copy that correctly?
11   A.     You read it correctly, yes.
12   Q.     That's what I'm saying.  Do
13   you agree with that paragraph?
14   A.     Yes, I do.
15   Q.     Focusing first on the first
16   sentence, "Metals added to soils
17   would normally be retained at the
18   soil surface."
19             Is there any reason for you
20   to believe that metals deposited at
21   the Boarhead site would not normally
22   be retained at the soil surface?
23   A.     Yes.
24   Q.     And the reasons?
```

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation

1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103

www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      A.      Well, any number of

2   reasons.    Probably first and foremost

3   is that they find them in significant

4   concentrations in the groundwater at

5   the site.

6      Q.      Well, stop there for a

7   minute.    They found metals in the

8   groundwater, but can you relate the

9   metals that they found in the

10  groundwater to any of the alleged

11  deposits from the generators in this

12  case?

13     A.      Well, I believe that the

14  metals in the groundwater at the site

15  and the elevated levels of metals in

16  the groundwater at the site came from

17  the wastes that were disposed of at

18  the site.

19     Q.      Which metals are you

20  talking about?

21     A.      The entire list of -- at

22  least a substantial number of the

23  metals that were listed in the ROD,

24  that were listed in the RI/FS.

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1      Q.     Do you know if iron was one

2    of them?

3      A.     If iron was one of the --

4      Q.     Ones listed in the RI/FS.

5      A.     Again, I don't know if iron

6    was listed in the RI/FS.  I would

7    have to go back and look at it.

8      Q.     Go ahead.  You said there

9    was a number of reasons and I stopped

10   you at the first one.  What are the

11   other ones?

12     A.     Okay.  Just sticking with

13   this paragraph, this says, "The

14   extent of movement of a metal in the

15   soil system is intimately related to

16   the solution and surface chemistry of

17   the soil and to the specific

18   properties of the metal and

19   associated waste matrix."

20          So this is just almost

21   exactly what we have been saying over

22   the last two days.  The solution that

23   we are talking about here is for the

24   bulk wastes that were deposited at

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    the site was a solution that was

2    acidic.

3              And therefore the movement

4    of those metals would have been

5    increased, the mobility of those

6    metals would have been increased

7    because, as this says, the extent and

8    movement of a metal in soil is

9    intimately related to the solution,

10    in our case it's an acidic waste, and

11    it's also related to the specific

12    properties of the metal and

13    associated waste matrix.

14              The properties of our waste

15    matrix here are waste matrices that

16    are acidic in nature, and therefore

17    the metals would be more mobile in

18    the soil system and would not be

19    retained just in the surface soil.

20        Q.    Well, looking again at the

21    quotation that I believe is in your

22    supplemental report from the RI.

23              And I believe this is

24    something that you and Mr. Pettit

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

1    went over this morning, I think it is

2    Page 5-4.

3              It says, "The effect of

4    acid spills probably were short-lived

5    because the acids would have been

6    flushed in the soil by infiltrated

7    water and possibly would have been

8    neutralized by the limited buffering

9    capacity of the soil."

10             Isn't what I just read

11   there from the RI a little bit

12   different from what you just said

13   about the quotation from the study

14   that we just went over?

15        A.    I'm not sure. You

16   referenced my supplemental report, I

17   guess you meant my rebuttal report,

18   but then you read from something that

19   was clearly not my rebuttal report.

20        Q.    I'm sorry, I thought I

21   did.

22        A.    You said Page 5-4?

23             MR. HARRIS: Just to help

24   things along, I think he is

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    mentioning that you had referenced

2    several portions of the RI talking

3    about the short-lived issue in your

4    rebuttal report, one of which was the

5    sentence that he read.

6            MR. PETTIT:  The reference

7    to 5-4 is the remedial investigation

8    page number.

9            THE WITNESS:  Is there a

10   specific question asked?

11           MR. FACKENTHAL:  I'm

12   looking for the part of his -- here

13   it is, Page 5.

14           MR. HARRIS:  That page has

15   a couple references to sections of

16   the RI.

17   BY MR. FACKENTHAL:

18       Q.    It's the third bullet on

19   Page 5 of your supplemental report,

20   or your rebuttal report, I guess is

21   what you call it.  And what I read I

22   think is identical to what you have

23   in the beginning of your third

24   bullet.  Are we straight on that now?

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    A.    I'm not -- I think I know.

2   I think we are on the third bullet of

3   Page 5 of my rebuttal report.  I'm

4   not sure what the question is.

5    Q.    Yes.  We just read from the

6   part of the metals in groundwater

7   study, and you also read that third

8   bullet on Page 5 of your report, and

9   to me they seem to be a bit

10  inconsistent.

11        And I was wondering if you

12  could explain the difference between

13  those two; that is, your explanation

14  of the paragraph that we read from

15  the study and the quotation from the

16  remedial investigation on Page 5 of

17  your supplemental report?

18    A.    I'm still confused as to

19  what the real issue is.

20    Q.    Well, as I read the

21  quotation from the remedial

22  investigation it says that the acid

23  spills are short-lived and they would

24  have been flushed from the soil.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
                1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

512

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1              But the other one seems to
2    me to say, or from what you testified
3    to, was that they would not, the
4    metals which were mixed with the acid
5    spills, were mixed with the acids
6    would not normally be retained at the
7    soil surface, that they would move.
8              Do you understand what I'm
9    saying now?
10       A.    Not entirely, but I think I
11   can attempt to answer your question
12   or clear up the confusion.
13       Q.    I wish you would.
14       A.    And I think we talked about
15   this a little earlier today.
16              When they say the effects
17   of acid spills were probably,
18   probably were short-lived, I think
19   when they are talking about short-
20   lived they are talking about how long
21   the acid that spilled can mobilize
22   material in the soil.
23              So if you spill a load of
24   acid onto the soil, it's going to

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    mobilize metals that are in the soil,

2    or mobilize metals that were

3    deposited in the soil.  And once

4    those metals become mobile they will

5    migrate.

6              The ability of that

7    original acid spill to keep

8    mobilizing metals is what they are

9    referring to as short-lived.  It is

10   not going to keep mobilizing metals

11   indefinitely.

12             It will be buffered by the

13   buffering capacity or neutralized by

14   the buffering capacity of the soil,

15   but the metals that it liberates will

16   continue to migrate.

17             And so that statement is

18   not inconsistent at all with the

19   paragraph that we read from, this

20   behavior of metals and soils

21   document.

22        Q.    Maybe that's what's

23   confusing me.  Why would it continue

24   to migrate?  If they were initially

514

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    deposited on the surface and the

2    effect of the acid spills were short-

3    lived, why would they continue to

4    mobilize?

5                    MR. HARRIS:  Objection to

6    the form.

7                    THE WITNESS:  Are you

8    talking about metals that are

9    deposited on the surface soil in an

10   acidic waste?

11   BY MR. FACKENTHAL:

12        Q.    That's correct, yes.

13        A.    Okay.  And why would

14   they --

15        Q.    Continue to mobilize, I

16   think that was your expression a

17   minute ago.

18                    MR. HARRIS:  Migrate.

19                    THE WITNESS:  They will

20   continue to migrate, as this

21   paragraph says, that the extent of

22   movement, how far they migrate, how

23   they continue to migrate is related

24   to the solution, i.e. the acid and

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

1    the acidity of that solution and the

2    waste matrix.

3              So if you have a waste

4    matrix or solution that's acidic in

5    nature, that metal will not be

6    retained at the surface, it will

7    continue to migrate downward.

8    BY MR. FACKENTHAL:

9        Q.    Mr. Cooley was asking you

10   about that, what was it, a 1973

11   spill, and the comment that, oh, what

12   was it, that some time afterwards

13   that there was a distressed

14   vegetation at some distance from the

15   spill site.

16             Do you see a causal effect

17   with the spill and that distressed

18   vegetation which could be limited to

19   just the spill?

20       A.    It could be limited to that

21   spill or that spill could have been

22   one of any number of contributors to

23   that distressed vegetation.

24       Q.    I guess that's really what

**JD℞**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                      FAX  215.751.0581

516

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    I'm asking.  If you eliminated any

2    other cause, would that spill itself

3    be enough to cause that distressed

4    vegetation?

5        A.    It could.  All I'm doing is

6    summarizing and noting what was in

7    the RI regarding that spill and the

8    impact of that spill.

9            But it's not -- it's

10   certainly not -- considering what we

11   know about the site, it's certainly

12   possible that a spill or a discharge

13   back in that time period could have

14   impacted the site in that way, i.e.,

15   distressed the vegetation and

16   contributed to fish kills in the

17   creek.

18       Q.    It could do that by itself?

19       A.    Absolutely.

20           MR. FACKENTHAL:  I think

21   that's all I have.

22           MR. HARRIS:  On the phone,

23   anybody still there?  Anybody want to

24   ask questions?

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1          MR. SABINO:  This is Tom

2    Sabino.  I have no questions.  Thank

3    you, Mr. Vandeven.

4          MS. FLAX:  Melissa Flax.  I

5    have no further questions.

6          MS. WRIGHT:  I'm Lynn, I

7    have no further questions.

8          MR. HARRIS:  Guys?

9          MR. PETTIT:  Give us a

10   minute, please.

11          THE WITNESS:  I'm going to

12   make a quick call.

13          (Recess taken)

14              EXAMINATION

15   BY MR. COOLEY:

16      Q.    I have a question.  You

17   know, it could lead to just one or

18   two follow-ups on the same subject.

19          MR. HARRIS:  Take a shot.

20          MR. COOLEY:  Sure.

21   BY MR. COOLEY:

22      Q.    Mr. Vandeven, my question

23   is whether you have any experience

24   either working on a project or

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

518

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    through research efforts with the

2    subject of the corrosion of metal

3    drums?

4         A.    I've worked on sites where

5    releases from drums and the corrosion

6    of metal drums as the release

7    mechanism was important, but I think

8    that's the extent of what my

9    experience is on that issue.

10        Q.    Okay.  So just to be clear,

11   am I correct in taking your answer to

12   mean that you haven't ever had

13   occasion to learn about or have any

14   particular specialized knowledge

15   about the rate of corrosion or the

16   factors that would accelerate in or

17   decelerate in and in what ways the

18   corrosion of metal drums in the

19   subsurface?

20        A.    Oh, no, I wouldn't say

21   that.  I would say that I do have a

22   fair amount of knowledge on that

23   through case work on sites that

24   include the corrosion of metal drums

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

1    and metal tanks on the subsurface.

2        Q.    Well, maybe we are talking

3    about two different things.

4            Do you have any specialized

5    or particular knowledge about the

6    rate at which metal drums corrode

7    under different conditions and how to

8    calculate or determine or predict the

9    rate at which metal drums would

10   corrode?

11           MR. HARRIS:    Objection to

12   the form.

13           THE WITNESS:    I don't have

14   any particular expertise on

15   determining the rate.

16           I would say that I have a

17   fair amount of knowledge on the

18   conditions that lead to a

19   deterioration of metal drums in the

20   subsurface.

21   BY MR. COOLEY:

22       Q.    But on the subject of rate,

23   for example, you have not studied the

24   relative rate of corrosion of a new

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                FAX  215.751.0581

520

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1    drum as opposed to a once-used drum

2    as opposed to an oft-used 10-year-old

3    drum or the like when disposed of in

4    the subsurface?

5         A.    No, I have not.

6              MR. COOLEY:    That's all I

7    have.

8              MR. HARRIS:    Anything

9    further?

10             MR. PETTIT:    No.

11             (Thereupon, at 4:03 p.m.

12   the deposition concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

521

DEPOSITION OF JAY VANDEVEN, VOLUME II, 2/14/07

1                          **WITNESS CERTIFICATION**

2

3

4                          I hereby certify that I

5      have read the foregoing transcript of

6      my deposition testimony, and that my

7      answers to the questions propounded,

8      with the attached corrections or

9      changes, if any, are true and

10     correct.

11

12

13

14

15     DATE‾‾‾‾‾‾        ‾‾‾JAY VANDEVEN‾‾‾

16

17

18

19

20     PRINTED NAME‾‾‾‾‾‾‾

21

22

23

24

**James DeCrescenzo Reporting**, LLC

215.564.3905           InnovatingLitigation                    FAX  215.751.0581
                  1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                             www.JDReporting.com

```
 1                          CERTIFICATION

 2

 3                I, JENNIFER L. BERMUDEZ, a

 4    Court Reporter in and for the Commonwealth

 5    of Pennsylvania, hereby certify that the

 6    foregoing is a true and accurate transcript

 7    of the deposition of said witness who was

 8    first duly sworn by me on the date and

 9    place hereinbefore set forth.

10                I FURTHER CERTIFY that I am

11    neither attorney nor counsel for, nor related

12    to or employed by, any of the  parties to

13    the action in which this deposition was

14    taken, and further that I am not a relative

15    or employee of any attorney or counsel

16    employed in this action, nor am I

17    financially interested in this case.

18

19

20    _____

21    JENNIFER L. BERMUDEZ

22    Court Reporter and Notary Public

23

24
```

