**EXHIBIT A**

00153

1      UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2 _____
          CIVIL ACTION NO.

3 BOARHEAD FARM AGREEMENT    02-CV-3830
  GROUP,        Judge Legrome D. Davis

4
    Plaintiff,    ORAL DEPOSITION OF:

5
  vs.        MANFRED DeREWAL, JR.

6           (VOLUME II)
  ADVANCED ENVIRONMENTAL TECHNOLOGY

7 CORPORATION; ASHLAND CHEMICAL
  COMPANY; BOARHEAD CORPORATION;

8 CARPENTER TECHNOLOGY CORPORATION;
  CROWN METRO, INC.; DIAZ CHEMICAL

9 CORPORATION; EMHART INDUSTRIES,
  INC.; ETCHED CIRCUITS, INC.; FCG,

10 INC.; GLOBE DISPOSAL COMPANY, INC.;
   GLOBE-WASTECH, INC.; HANDY & HARMAN

11 TUBE COMPANY, INC.; KNOLL, INC.;
   MERIT METAL PRODUCTS CORPORATION;

12 NOVARTIS CORPORATION; NRM INVESTMENT
   COMPANY; PLYMOUTH TUBE COMPANY;

13 QUIKLINE DESIGN AND MANUFACTURING
   COMPANY; RAHNS SPECIALTY METALS,

14 INC.; ROHM & HAAS COMPANY, SIMON
   WRECKING COMPANY, INC.; TECHALLOY

15 COMPANY, INC.; THOMAS & BETTS
   CORPORATION; UNISYS CORPORATION;

16 UNITED STATES OF AMERICA
   DEPARTMENT OF NAVY,

17
    Defendants.

18 _____

19       * * * * *
     Tuesday, May 13, 2003

20       * * * * *
    Transcript in the above matter taken at

21 the offices of Ballard, Spahr, Andrews & Ingersoll,
   LLP, 1735 Market Street, 42nd Floor, Philadelphia,

22 Pennsylvania, commencing at 10:00 a.m.

23   Certified Shorthand Reporting Services
      Arranged Through

24    Mastroianni & Formaroli, Inc.
     709 White Horse Pike

25    Audubon, New Jersey 08106
     (856) 546-1100

**Derewal, Manfred Jr. May 13, 2003 (Day 2**    **Page 153**

00367

1        MS. QUINN: That's all the questions I

2   have.  Thank you very much.

3   (EXAMINATION OF MR. DeREWAL BY MR. SHEEHAN:)

4        Q.  Mr, DeRewal, can you hear me?

5        A.  Yes, I can.

6        Q.  Good.  This is John Sheehan, I'm an attorney

7   at the Department of Justice in Washington and I

8   represent the United States Navy in this litigation.

9   I've got a couple of questions for you.

10       If you can't hear me, let me know and I'll

11  try to speak up.  Earlier today you were asked some

12  questions about a deposition you gave to EPA, do you

13  recall that?

14       A.  Yes, I do.

15       Q.  Okay.  And I believe you stated that you

16  recall giving a deposition in Fort Washington at the

17  Holiday Inn; is that right?

18       A.  Well, that's the same one, that's the same

19  one that I gave to the EPA, right.

20       Q.  I think this morning you said that your

21  recollection was that it was in '94 or '95, and the

22  copy of the deposition that I have has a date of

23  February 26, 1997.  Is it possible that that could have

24  been the date?

25       A.  Yes, yeah.  What time in '97?

00368

1    Q.  '97, February, February 26.

2    A.  Yeah, that's correct.

3    Q.  And do you recall answering questions from

4  Sarah Keating at EPA?

5    A.  Yeah, that's correct.

6    Q.  I just wanted to go over a couple of

7  questions and answers that you gave at that deposition

8  with regard to the Navy and see if you recall the

9  testimony.

10        You were asked by Ms. Keating, the question

11  was: "Do you remember DeRewal Chemical Company ever

12  doing business with the Naval facility?"  Your answer

13  was: "I believe they did.  I don't know if I actually

14  went there or not, what exactly they had."

15        MR. HARRIS:  Page number please, John?

16        MR. SHEEHAN:  That is Page Number 89,

17  towards the top.

18  BY MR. SHEEHAN:

19    Q.  Do you recall giving that testimony,

20  Mr. DeRewal?

21    A.  No, I do not.  I mean, if that's what it

22  says, that's what I said.

23    Q.  Do you have any doubt that that was your

24  response to the testimony?

25    A.  I believe so.

**Derewal, Manfred Jr. May 13, 2003 (Day 2**            **Page 368**

00369

1   Q. Okay. Was that your best recollection at

2 the time you gave it?

3   A. Might not have been my best.

4   Q. Why do you say that?

5   A. Pardon?

6   Q. Why was it maybe not your best?

7   A. Well, because that whole testimony wasn't my

8 best.

9   Q. And why do you say that?

10   A. Well, for several reasons. One, certain

11 people, the situation that they were in.

12   Q. And could you describe that for me?

13   A. Well, it was more or less not getting

14 involved -- I didn't really want to get that far

15 involved at that time. I had other problems myself,

16 and most of that testimony isn't true to the facts.

17   Q. Who were the certain people that you were

18 referring to?

19   A. Well, my father is one. And the chemical

20 companies.

21   Q. The DeRewal Chemical Company?

22   A. And the other companies that we had picked

23 up off of.

24   Q. So is your testimony here today that you

25 didn't give truthful testimony at that time; is that

**Derewal, Manfred Jr. May 13, 2003 (Day 2**          **Page 369**

00385

1    A.  Pottstown, it was only like 25 minutes, 30

2  minutes down the road.

3    Q.  And did you take National's waste to places

4  other than that one --

5        MR. HARRIS:  Objection.

6        MR. FACKENTHAL:  -- during this period of

7  time in the gap?

8        THE WITNESS:  I never have.

9  BY MR. FACKENTHAL:

10    Q.  Did you hear about other drivers taking

11  National's waste to places other than Boarhead during

12  the gap?

13        MR. HARRIS:  Objection, calls for

14  speculation.

15        THE WITNESS:  I can't recall because it

16  was still Marvin Jonas's.  Unless he had a spot, I

17  can't recall.

18  BY MR. FACKENTHAL:

19    Q.  How can you rule out that none of it went to

20  Sewell?

21    A.  I can't rule it out, but I know that myself

22  I never drove it down to Marvin's transfer station.

23    Q.  Okay.  We saw yesterday that the Ontario

24  Street was shut down in June of 1975.  I'm trying to

25  get some time better fixed.

**Derewal, Manfred Jr. May 13, 2003 (Day 2          Page 385**

00386

1    A.  I can't recall the time when it was shut

2  down.

3    Q.  In your deposition before the EPA you said

4  that -- and I'll show you the page if you like -- you

5  said that you stopped working for DeRewal for about six

6  months, and that you started back with your father's

7  company the day or the day after your brother was hurt.

8  Is that correct?

9    A.  It could have been roughly in that time

10  period.  I don't know if it was six months, I don't

11  think it was that long.

12    Q.  Something less than six months?

13    A.  I would say yes.

14    Q.  But your brother returned to work before

15  you?

16    A.  Yes, I believe.

17    Q.  And he was then working obviously at the

18  time of that spill?

19    A.  Correct.

20    Q.  But you hadn't returned to work at that

21  time?

22    A.  I can't recall if I did or not -- no, I

23  believe I did because I was there the night of the

24  spill.

25    Q.  So it was just about the time you started

**Derewal, Manfred Jr. May 13, 2003 (Day 2      Page 386**

00387

1  back to work?

2      A.  Or before that time, yes.

3      Q.  So if it were six months, that would have

4  made it, what, March of 1976, thereabouts that you went

5  to work for the scrap yard?

6          MR. HARRIS:  Objection.

7          THE WITNESS:  No, I think it was before

8  that.

9  BY MR. FACKENTHAL:

10     Q.  Before March?

11     A.  Well, before '76 I believe.

12     Q.  So then you worked more than six months for

13  the scrap yard?

14         MR. HARRIS:  Objection.

15         THE WITNESS:  No, I was only there for

16  six months.  I believe it was before.

17  BY MR. FACKENTHAL:

18     Q.  Oh, you returned to work before that?

19     A.  Before the spill, yes.

20     Q.  How much before the spill?

21     A.  I don't recall.

22     Q.  So it was sometime earlier than March that

23  you left?  If the spill was in September --

24     A.  I think it was only like three months or

25  four months that we had left.

**EXHIBIT B**

00401

1        UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3                  CIVIL ACTION NO.
    BOARHEAD FARM AGREEMENT          02-CV-3830
4 GROUP,                  Judge Legrome D. Davis
         Plaintiff,    Oral Deposition of

5

    vs.            MANFRED T. DE REWAL, SR.
6 ADVANCED ENVIRONMENTAL TECHNOLOGY
  CORPORATION; ASHLAND CHEMICAL
7 COMPANY; BOARHEAD CORPORATION;
  CARPENTER TECHNOLOGY CORPORATION;
8 CROWN METRO, INC.; DIAZ CHEMICAL
  CORPORATION; EMHART INDUSTRIES,
9 INC.; ETCHED CIRCUITS, INC.; FCG,
  INC.; GLOBE DISPOSAL COMPANY, INC.;
10 GLOBE-WASTECH, INC.; HANDY & HARMAN
   TUBE COMPANY, INC.; KNOLL, INC.;
11 MERIT METAL PRODUCTS CORPORATION;
   NOVARTIS CORPORATION; NRM INVESTMENT
12 COMPANY; PLYMOUTH TUBE COMPANY;
   QUIKLINE DESIGN AND MANUFACTURING
13 COMPANY; RAHNS SPECIALTY METALS,
   INC.; ROHM & HAAS COMPANY, SIMON
14 WRECKING COMPANY, INC.; TECHALLOY
   COMPANY, INC.; THOMAS & BETTS
15 CORPORATION; UNISYS CORPORATION;
   UNITED STATES OF AMERICA
16 DEPARTMENT OF NAVY,
         Defendants.

17

18        * * * * *
          Friday, May 9, 2003
19        * * * * *

20        Transcript in the above matter taken at
    the offices of Ballard, Spahr, Andrews & Ingersoll,
21 LLP, 1735 Market Street, 42nd Floor, Philadelphia,
    Pennsylvania, commencing at 10 o'clock A.M.
22
    Certified Shorthand Reporting Services
23        Arranged Through
          Mastroianni & Formaroli, Inc.
24        709 White Horse Pike
          Audubon, New Jersey 08106
25        (856) 546-1100

**DeRewal, Manfred Sr. May 9, 2003 (Day 3)**        **Page 401**

00473

1  before, right. I'm sorry, before.

2      Q.    Okay.

3      A.    I think my EPA testimony is 1988 or '89.

4      Q.    That's correct.

5      A.    Okay. So then I saw Minthorn before

6  that.

7      Q.    Now, I have your EPA testimony, Mr.

8  DeRewal, but let's see if I can do it without pulling

9  it out.

10          Do you recall testifying to the EPA in

11  1989 that all of Ashland's nitrating acids were

12  disposed of at your Philadelphia facility in

13  Wissinoming?

14      A.    If that's what I said, I don't really

15  recall what I said, but if you recall that's what I

16  said, that's probably what I said then.

17      Q.    I'll tell you what, I don't want to base

18  it on my recollection. Let's pull it out and look at

19  it.

20          MR. HARRIS:  Could we take a

21      five-minute break?

22          (Brief recess.)

23          (Exhibit D-10, Partial Transcript

24      of Deposition dated March 15, 1989,

25      marked for I.D.)

**DeRewal, Manfred Sr. May 9, 2003 (Day 3)**          **Page 473**

00474

1    Q.    Mr. DeRewal, what I placed in front of

2  you I'll represent to you has been marked as D-10.

3  It's an excerpt from the deposition that you took

4  with the EPA on Wednesday March 15th, of 1989.  I'm

5  going to ask you a few questions about that, but

6  before I do, I want to direct your attention to the

7  first page of that excerpt, Page 146 beginning at

8  Line 20.  The lines are marked down the left-hand

9  column of the page, through 147 Line 9 and have you

10  read that to yourself, and after you've had an

11  opportunity to read it, let me know.

12    A.    Yes, I've read it.

13    Q.    Mr. DeRewal, I think the easiest thing

14  to do is I'm going to read this testimony into the

15  record, and I want you to follow along, okay?

16  Beginning to Page 146 Line 20, "Question:  You

17  mentioned you did some business with Ashland

18  Chemical?  Answer:  Yes.

19        "Question:  Do you know which location

20  that was?  Answer:  It is in New Jersey.  I do not

21  recall the name of the town.  It's a small town in

22  New Jersey.  It is Great Meadows, I believe,

23  something like that.

24        "Question:  Did your truck drivers go

25  up to the Ashland plant or facility to pick up waste?

**DeRewal, Manfred Sr. May 9, 2003 (Day 3)**        **Page 474**

00475

1 Answer: Yes.

2       "Question: And what kind of wastes

3 were they? Answer: Sulfuric acid.

4       "Question: Sulfuric acid. And where

5 did your drivers take them to? Answer:

6 Philadelphia."

7       Did I read that correctly, sir?

8    A.    Yes.

9    Q.    Was that your testimony in 1989

10 regarding the disposal of Ashland waste?

11    A.    I guess so. I can't remember if it is

12 or not, but if you tell me this is a copy of what you

13 received, I say yes.

14    Q.    Do you have any reason to believe that

15 this is not an accurate transcription of your

16 testimony?

17    A.    No, I've got no reason to believe.

18    Q.    You were lying when you gave this

19 testimony; is that correct?

20    A.    I was lying? Wait, what did we say so

21 far that is not true and what you just read?

22    Q.    Yes.

23    A.    What did we say that's not true?

24    Q.    Okay.

25    A.    You said did we do business with

**DeRewal, Manfred Sr. May 9, 2003 (Day 3)        Page 475**

**EXHIBIT C**



Date Transcribed __February 12, 1993__

JAY M. CRAWFORD was interviewed in the offices of Handy & Harmon Tube Company, Inc., Township Line and Whitehall Road, Norristown, PA 19403. The following descriptive information was obtained:

Home Address:
Home Telephone:
Date of Birth:
SSAN:
Employer:                    Handy & Harmon Tube Company, Inc.
                             Norristown, PA
                             Supervisor of Welding and Raw Materials

JOHN C. BULLOCK, Esquire, Environmental Counsel for Handy & Harmon, Waterbury, CT, was present for the interview. Mr. Grabill identified himself by displaying his credentials and advised Mr. CRAWFORD that the interview concerned his knowledge of the type and extent of a possible relationship between Handy & Harmon Tube Company, Inc. and the Boarhead Farms Site during the period from 1969 to 1977. Mr. CRAWFORD was also advised that the investigation had been authorized by the U. S. Environmental Protection Agency (EPA), Region III, Philadelphia, PA, and that his participation was voluntary. Mr. Grabill informed Mr. CRAWFORD that no information protected by attorney/client privilege would be sought. Mr. CRAWFORD agreed to be interviewed and stated that he would be willing to review this statement and, after reviewing it for accuracy, sign the statement. He then provided the following information:

Mr. CRAWFORD stated that he has been the Supervisor of Welding and Raw Material for twenty-five years including the period from 1969 to 1977. He stated that he is not now involved in waste disposal and was not involved during the pertinent period. He felt that ROBERT ZIMMERMAN, Engineering, and WALT POSEN, Maintenance Supervisor, may have had knowledge of waste disposal; but both are now deceased.

Mr. CRAWFORD stated that the name DeRewal Chemical Company was familiar to him since a company with the name DeRewal hauled spent lubricants in 30 and 55-gallon drums. He did not recall what types of lubricants were involved, but he did recall seeing other employees fill the drums. The accumulation of drums prior to pick-up was small, probably fewer than a dozen. Mr. CRAWFORD did not recall the frequency of pick-ups or the period of time that DeRewal hauled out the drums, but he did remember that it was sometime during the period 1969 to 1977.

Mr. CRAWFORD stated that he had no knowledge of other wastes being hauled by DeRewal and, in fact, was not familiar with the waste streams generated by the manufacturing process.

Mr. CRAWFORD advised that he had no contact with any of the drivers or

Date Transcribed   February 13, 1993

ORIGINAL (Red)

MARY A. KOLLMAR was interviewed in the offices of Handy & Harmon Tube Company, Inc., Township Line and Whitehall Road, Norristown, PA 19403. The following descriptive information was obtained:

| | |
|---|---|
| Home Address: | Prefers contact at place of business |
| Home Telephone: | Prefers contact at place of business |
| Date of Birth: | |
| SSAN: | |
| Employer: | Handy & Harmon Tube Company, Inc. |
| | Norristown, PA |
| | Purchasing Manager |

JOHN C. BULLOCK, Esquire, Environmental Counsel, Handy & Harmon, Waterbury, CT, was present for the interview. Mr. Grabill identified himself by displaying his credentials and advised Ms. KOLLMAR that the interview concerned her knowledge of the type and extent of a possible relationship between Handy & Harmon Tube Company, Inc. and the Boarhead Farms Site during the period 1969 to 1977. Ms. KOLLMAR was also advised that the investigation had been authorized by the U. S. Environmental Protection Agency (EPA), Region III, Philadelphia, PA, and that her participation was voluntary. She was informed that no information protected by attorney/client privilege would be solicited. Ms. KOLLMAR agreed to be interviewed and stated that she would be willing to review this statement and, after reviewing it for accuracy, sign the statement. She then provided the following information:

Ms. KOLLMAR stated that she started working for Handy & Harmon Tube Company, Inc. in 1972 as a clerk/typist in the Purchasing Department. Her duties primarily involved typing and filing purchase orders. She recalled typing purchase orders for Waste Conversion Systems to haul out waste, but she did not recall the type of waste involved.

Ms. KOLLMAR stated that she recalled the name DeRewal, possibly in connection with the pick-up of wastes for disposal. She thought that she had typed a debit memo to the file for DeRewal Chemical Company services. She did not recall ever having typed any purchase orders for DeRewal Chemical Company, and she did not recognize DeRewal Chemical Company invoice number 571, dated 2/5/73, issued to Handy & Harmon Tube Company. Ms. KOLLMAR stated that this invoice would have been received by the Accounting Department and would not have been handled by her. The Purchasing Agent at the time would have made contact with the outside hauler, and she would not have had any contact with the office of DeRewal Chemical Company. She stated that NORM WILLIAMS was a Purchasing Agent form 1975 to 1980, but he is now deceased. BOB ZIMMERMAN was the Plant Manager during the pertinent period, but he is also deceased. Ms. KOLLMAR could not remember any other employees, former or current, who may have been involved in waste disposal. In addition, there are no records available to research since the Purchasing

| | | | | |
|---|---|---|---|---|
| rview of | Mary A. Kollmar | On 2/5/93 | JHA File # | 90-150 |
| d by | Richard C. Grabill | | Client File # | CDM Work Asgmt.# C03052 |

HEMENWAY ASSOCIATES                    A-5

Form XX2 - Interview Report

42

Department maintained records for only three years during the pertinent period.

Ms. KOLLMAR stated that during the pertinent period, "TCE" and lubricating oils were collected in 55-gallon drums and were hauled away by an outside vendor. She did not recall the volume of waste or who may have hauled it out for disposal.

Ms. KOLLMAR stated that she recognized the name MANFRED DEREWAL, probably as the result of hearing the name in the office and because it is an unusual name. She recalled having seen the name Revere Chemical Company in an old rolodex which was disposed of many years ago. She did not know what the connection between Revere Chemical Company and Handy & Harmon Tube Company was.

Ms. KOLLMAR did not recognize the names Echo, Inc.; Revere Chemical Transport; KAREN BEAN; or any of the other names set forth on page 3, paragraph 5 of the 104(e) letter from the EPA dated September 30, 1992 as having any connection with Handy & Harmon Tube Company, Inc.

Ms. KOLLMAR could provide no further information of value, and the interview was terminated.

STATEMENT OF MARY A. KOLLMAR:

I, Mary A. Kollmar, have read the above statement; and it is true and accurate to the best of my recollection. I have voluntarily signed this page and have initialed all corrections and each of the above pages to attest to the accuracy of this statement. No threats or promises have been made to me, and no coercion of any kind has been used to make me sign this statement.

Date: _____     Signature: _____

Boarhead Farms Site
Kollmar, Mary A.
Page 2

A-6



Date Transcribed ___February 12. 1993___

ORIGINAL
(Red)

THOMAS M. CURRAN was interviewed at his office at Handy & Harmon Tube Company, Inc., Township Line and Whitehall Road, Norristown, PA 19403. The following descriptive information was obtained:

Home Address:
Home Telephone:
Date of Birth:
SSAN:
Employer:                    Handy & Harmon Tube Company, Inc.,
                             Norristown, PA
                             Vice President - Manufacturing

JOHN C. BULLOCK, Esquire, Environmental Counsel, Handy & Harmon, Waterbury, CT, was present for the interview. Mr. Grabill identified himself by displaying his credentials and advised Mr. Curran that the interview concerned his knowledge of the type and extent of a possible relationship between Handy & Harmon Tube Company, Inc. and the Boarhead Farms Site during the period from 1969 to 1977. Mr. CURRAN was also advised that the investigation had been authorized by the U. S. Environmental Protection Agency (EPA), Region III, Philadelphia, PA and that his participation was voluntary. Mr. Grabill informed Mr. CURRAN that no information protected by attorney/client privilege would be sought. Mr. CURRAN agreed to be interviewed and stated that he would be willing to review this statement and, after reviewing it for accuracy, sign the statement.

Prior to the start of the interview, Mr. BULLOCK advised that Handy & Harmon Tube Company, Inc. is a separate corporation and that the parent company is Handy & Harmon, Waterbury, CT. Mr. CURRAN then provided the following information:

Mr. CURRAN stated that he has been employed by Handy & Harmon Tube Company, Inc. for twenty-eight years and that he is currently the Vice President of Manufacturing. During the pertinent period, 1969 to 1977, he was an Assistant in the Production Control Office. As such, he was not responsible for waste disposal. During this period, the Maintenance Department may have been responsible for placing liquid wastes in containers for disposal. The Maintenance Department would have contacted Purchasing to have them contact a hauler. BOB ZIMMERMAN was Maintenance Manager during part of the pertinent period, but he is now deceased. ROBERT BECKER was a Purchasing Agent, possibly in 1972 or 1973, but he is no longer employed by Handy & Harmon, and his location is not known. MARY KOLLMAR is currently Purchasing Manager. She began in the Purchasing Department in 1972 or 1973.

Mr. CURRAN stated that Handy & Harmon Tube Company manufactures stainless steel tubes of various diameters and lengths. Some of the tubing is very small and is used for instrumentation. The raw material is placed in acid baths for a

---

ORIGINAL

pickling process which reduces the size. The steel rods are then drawn through a die and over a mandrel in a cold drawing process to further reduce the size. Mr. CURRAN said that the pickling baths use hydrofluoric acid, hydrochloric acid, (furic acid, and nitric acid mixed with water. The acid content ranges from 8% 18%. Ordinarily the acids are not mixed and are separate baths. Spent acids are taken out by tankers. The hauler, currently and during the pertinent period, is Waste Conversion Systems whose headquarters are in Hatfield, PA. Mr. CURRAN could not estimate the volume of spent acid generated and hauled out from 1969 to 1977.

Mr. CURRAN stated that the product was cleaned with a trichloroethylene bath and annealed in a hydrogen atmosphere. No finish coating was applied. The trichloroethylene was redistilled in-house which generated a sludge. The sludge was placed in 55-gallon drums. During the pertinent period, it may have been hauled out by Delaware Container or Chemclene. To the best of Mr. CURRAN's memory, Chemclene hauled out some of the sludge for recycling at no charge to Handy & Harmon.

Mr. CURRAN recalled the name DeRewal but could not associate the name with hauling out sludge or other wastes. He did not recognize DeRewal Chemical Company invoice number 571, dated 2/5/73, issued to Handy & Harmon Tube Company.

Mr. CURRAN stated that 10W30 and other oils were used in their vacuum furnaces and became a waste stream. This was recycled by outside vendors whom he did not recall. He stated that the volume was not very large.

Mr. CURRAN said that another waste stream was generated by the use of animal fats based, oil based, and rubber based lubricating oils. This waste was collected in 55-gallon drums and picked up by a hauler whom he did not recall.

Mr. CURRAN stated that the finishing operation includes a grinding process lubricated by water which creates a mix of metal particles and water. This mixture must be disposed of, but it is not a hazardous material. Mr. CURRAN advised that the manufacturing process does not generate any copper wastes.

Mr. CURRAN stated that while the name DeRewal was familiar to him, he did not recognize the names DeRewal Chemical Company; Revere Chemical Transport; Revere Chemical Company; Echo, Inc.; MANFRED DEREWAL; NORBERT DEREWAL; JONATHAN DUNN; KAREN BEAN; or any of the other names set forth on page 3, paragraph 5 of the 104(e) letter from the EPA dated September 30, 1992.

Mr. Curran could provide no further information of value, and the interview was terminated.

STATEMENT OF THOMAS N. CURRAN:

I, Thomas N. Curran, have read the above statement; and it is true and accurate to the best of my recollection. I have voluntarily signed this page and have initialed all corrections and each of the above pages to attest to the accuracy of this statement. No threats or promises have been made to me, and no coercion of any kind has been used to make me sign this statement.

Date: _____    Signature: _____

Boarhead Farms Site
Curran, Thomas M.
Page 2

A-4

Date Transcribed  February 12, 1993



JAY N. CRAWFORD was interviewed in the offices of Handy & Harmon Tube Company, Inc., Township Line and Whitehall Road, Norristown, PA 19403. The following descriptive information was obtained:

Home Address:
Home Telephone:
Date of Birth:
SSAN:
Employer:                      Handy & Harmon Tube Company, Inc.
                               Norristown, PA
                               Supervisor of Welding and Raw Materials

JOHN C. BULLOCK, Esquire, Environmental Counsel for Handy & Harmon, Waterbury, CT, was present for the interview. Mr. Grabill identified himself by displaying his credentials and advised Mr. CRAWFORD that the interview concerned his knowledge of the type and extent of a possible relationship between Handy & Harmon Tube Company, Inc. and the Boarhead Farms Site during the period from 1969 to 1977. Mr. CRAWFORD was also advised that the investigation had been authorized by the U. S. Environmental Protection Agency (EPA), Region III, Philadelphia, PA, and that his participation was voluntary. Mr. Grabill informed Mr. CRAWFORD that no information protected by attorney/client privilege would be sought. Mr. CRAWFORD agreed to be interviewed and stated that he would be willing to review this statement and, after reviewing it for accuracy, sign the statement. He then provided the following information:

Mr. CRAWFORD stated that he has been the Supervisor of Welding and Raw Material for twenty-five years including the period from 1969 to 1977. He stated that he is not now involved in waste disposal and was not involved during the pertinent period. He felt that ROBERT ZIMMERMAN, Engineering, and WALT POSEN, Maintenance Supervisor, may have had knowledge of waste disposal; but both are now deceased.

Mr. CRAWFORD stated that the name DeReval Chemical Company was familiar to him since a company with the name DeReval hauled spent lubricants in 30 and 55-gallon drums. He did not recall what types of lubricants were involved, but he did recall seeing other employees fill the drums. The accumulation of drums prior to pick-up was small, probably fewer than a dozen. Mr. CRAWFORD did not recall the frequency of pick-ups or the period of time that DeReval hauled out the drums, but he did remember that it was sometime during the period 1969 to 1977.

Mr. CRAWFORD stated that he had no knowledge of other wastes being hauled by DeReval and, in fact, was not familiar with the waste streams generated by the manufacturing process.

Mr. CRAWFORD advised that he had no contact with any of the drivers or

In  rview of _____ Jay H. Crawford _____   On _2/3/93_ ·  ___ JHA File # _90-150_

    ed by ____ Richard C. Grabill _____     Client File # _CDM Work Asgmt.# C03052_

Form NT2 - Interview Rep

employees of DeReval. He did not recognize the names MANFRED DEREVAL; NORBERT DEREVAL; JONATHAN DUNN; KAREN BEAN; Revere Chemical Company; Revere Chemical Transport; Echo, Inc.; or any of the other names set forth on page 3, paragraph 5 e EPA 104(e) letter dated September 30, 1992.

Mr. CRAWFORD he could not think of any other employees who would have been familiar with waste disposal during the pertinent period. He could provide no further information of value, and the interview was terminated.

STATEMENT OF JAY M. CRAWFORD:

I, Jay M. Crawford, have read the above statement; and it is true and accurate to the best of my recollection. I have voluntarily signed this page and have initialed all corrections and each of the above pages to attest to the accuracy of this statement. No threats or promises have been made to me, and no coercion of any kind has been used to make me sign this statement.

Date: _____     Signature: _____

oarhead Farms Site
Crawford, Jay M.
Page 2

A-2

**EXHIBIT D**



**H**
Nigroni v. Trump Plaza Associates
C.A.3 (Pa.),2002.
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please
use FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local Ap-
pellate Rule 28.3(a) and Internal Operating Proced-
ure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP
APP I 5.3.)
United States Court of Appeals,Third Circuit.
Louis NIGRONI; Mary Nigroni; Joseph F. Lom-
bardo,
v.
TRUMP PLAZA ASSOCIATES, d/b/a Trump
Plaza Hotel and Casino; Millar Elevator Service
Company, Millar Elevator Service Company, Ap-
pellant.
No. 01-3639.

Submitted Under Third Circuit LAR 34.1(a) Oct.
31, 2002.
Decided Nov. 8, 2002.

In action to recover for injuries sustained when es-
calator malfunctioned, the United States District
Court for the Eastern District of Pennsylvania,
Stewart Dalzell, J., entered judgment on jury ver-
dict in favor of plaintiffs and denied defendants'
motion for new trial. Defendants appealed. The
Court of Appeals, Nygaard, Circuit Judge, held
that: (1) employee's statements regarding mechanic-
al aspects of escalator constituted admissions by
party-opponent; (2) evidence regarding breakdown
of adjacent escalator after inspection was admiss-
ible; and (3) instruction explaining effects of in-
dustry standard was permissible.

Affirmed.

West Headnotes

**[1] Evidence 157 ⬤➞241(1)**

157 Evidence

157VII Admissions
157VII(D) By Agents or Other Representat-
ives
157k240 Agents or Employees
157k241 In General
157k241(1) k. In General. Most
Cited Cases
Employee's statements regarding mechanical as-
pects of escalator at time of inspection and immedi-
ately after accident constituted admissions by party-
opponent in action by injured person against em-
ployer to recover for injuries sustained when escal-
ator malfunctioned, where employee was employed
as mechanic, and was present for state inspection of
escalators, and immediately after accident in ques-
tion. Fed.Rules Evid.Rule 801(d)(2)(D), 28 U.S.C.A.

**[2] Negligence 272 ⬤➞1635**

272 Negligence
272XVIII Actions
272XVIII(C) Evidence
272XVIII(C)4 Admissibility
272k1635 k. Similar Facts and Trans-
actions; Other Accidents. Most Cited Cases
Evidence regarding breakdown of adjacent escalat-
or after state inspection was admissible in action
against service company to recover for injuries sus-
tained when escalator malfunctioned to demonstrate
that mere fact that escalator passed state inspection
less than one month before accident did not fore-
close possibility of malfunction at time of accident,
where escalators were located in same escalator
bank, were subject to same preventive maintenance,
and both passed inspection shortly before accident.

**[3] Negligence 272 ⬤➞1736**

272 Negligence
272XVIII Actions
272XVIII(E) Instructions
272k1733 Premises Liability
272k1736 k. Buildings and Other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

54 Fed.Appx. 31
54 Fed.Appx. 31, 2002 WL 31492370 (C.A.3 (Pa.))
(Cite as: 54 Fed.Appx. 31, 2002 WL 31492370 (C.A.3 (Pa.)))

Page 2

Structures. Most Cited Cases
Instruction explaining effects of industry standard was permissible in action against service company to recover for injuries sustained when escalator malfunctioned, even though no uniform industry standard was established, where both parties elicited testimony from expert witnesses as to proper standards for escalator maintenance and repair, and instruction did not create presumption that any particular expert's testimony about standard was determinative.

*31 On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civil No. 00-cv-03317). District Judge: The Honorable Stewart Dalzell.

Before NYGAARD and WEIS, Circuit *32 Judges and IRENAS,FN* District Judge.

> FN* Honorable Joseph E. Irenas, Senior District Judge for the United States District Court for the District of New Jersey, sitting by designation.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.
**1 Appellant Millar Elevator Service Company appeals the District Court's order denying Millar's motion for a new trial pursuant to FED R. CIV. P. 59. Specifically, Millar alleges that the District Court erred by: (1) allowing references to certain hearsay testimony; (2) permitting the introduction of evidence concerning escalators adjacent to the one involved in the claim; (3) instructing the jury as to industry standards when no standards were put into evidence, and; (4) finding that the inappropriate statements made by Plaintiff's counsel during closing remarks did not influence the jury's verdict. The facts of this case are well known to the parties and only those relevant to our disposition are cited herein. We will affirm.

Millar first argues that the District Court erred by

permitting the introduction of hearsay testimony when it allowed Nigroni's counsel to make references to the deposition of Len Cannon, an employee of Millar. With regard to the motion for new trial, the District Court found that the references to Len Cannon's deposition were not employed for the truth of Cannon's statements, but rather to form hypothetical questions to witnesses. Further, the District Court found that the jury was instructed that questions by counsel were not evidence to be considered, and that the use of the testimony did not in any way affect Millar's substantive rights.

[1] Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED R. EVID. 801(c). The rule further explains that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED.R.EVID. 801(d)(2)(D). As Millar's brief explains, "[a]t the time of the accident Len Cannon was an hourly employee of Millar." App. Br. at 10. Mr. Cannon was employed as a mechanic and was present for the state inspection of the escalators, as well as immediately after the accident in question. His statements concerning the mechanical aspects of the escalator at the time of the inspection and immediately after the accident were thus made during, and in the context of, his employment for Millar. Because Mr. Cannon's statements do not qualify as hearsay, but rather as admissions by a party-opponent, they may be properly admitted against Millar.

[2] Next, Millar contends that the introduction of evidence regarding the breakdown of an adjacent escalator after a state inspection was inappropriate. We disagree. Escalator 16 was located in the same escalator bank as escalator 17-the escalator in question-and was subject to the same preventive maintenance. Further, both escalators passed state inspection shortly before Mr. Nigroni's accident. As

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

54 Fed.Appx. 31
54 Fed.Appx. 31, 2002 WL 31492370 (C.A.3 (Pa.))
**(Cite as: 54 Fed.Appx. 31, 2002 WL 31492370 (C.A.3 (Pa.)))**

the District Court explained, such "testimony was naturally relevant to demonstrate that the mere fact that escalator 17 passed a state inspection less than a month before the accident did not foreclose a malfunction at the time of Nigroni's accident." Order of August 23, 2001. Given that the maintenance of the escalators was in issue, and that evidence concerning the state inspection of the escalators was entered, the District Court did not abuse its discretion by permitting evidence as to the post-inspection condition of escalator 16.

**\*33 \*\*2** [3] In instructing the jury, the District Court explained the effects of an industry standard on their deliberations. We have reviewed both the instruction and Millar's objections to it and find such an instruction was permissible. Both parties elicited testimony from expert witnesses as to the proper standards for escalator maintenance and repair, although no uniform industry standard was established. The District Court instructed the jury that "[c]ompliance with an industry standard is not necessarily conclusive as to the issue of negligence, and does not, of itself, absolve the defendant from liability." The instruction provided by the District Court simply informed the jury of how it should consider the standards discussed by the experts under New Jersey law, but did not create a presumption that any particular expert's testimony about a standard was determinative. Such an instruction was not prejudicial to either party and was permissible.

Millar also alleges that the remarks made by Nigroni's counsel during the closing arguments were inappropriate and improperly influenced the jury. The District Court considered this argument in deciding Millar's motion for new trial and found that the remarks, although inappropriate, did not influence the jury. When the motion for new trial relates to counsel misconduct, we will defer to the trial court's assessment of the level of prejudice involved. The District Court was in a better position to judge the effects of the remarks by Nigroni's counsel. Looking at the record, we cannot say that

the District Court abused its discretion by finding that the remarks did not improperly influence the jury.

We will affirm.

C.A.3 (Pa.),2002.
Nigroni v. Trump Plaza Associates
54 Fed.Appx. 31, 2002 WL 31492370 (C.A.3 (Pa.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.