**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

AGERE SYSTEMS INC., et al.,       :
      :
             Plaintiffs,       :
      :
             v.       :     CV – 02-3830
      :
CARPENTER TECHNOLOGY       :
CORPORATION, et al.,       :
      :
             Defendants.       :

## DEFENDANT CARPENTER TECHNOLOGY CORPORATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant, Carpenter Technology Corporation ("Carpenter"), by and through its undersigned counsel, submits the following Proposed Findings of Fact and Conclusions of Law.[1]

## PROPOSED FINDINGS OF FACT

### A. Most Of The Pollution Violations At Boarhead Farms Occurred Before DCC Hauled Carpenter's Waste

1. On June 12, 1973, Carpenter Technology Corporation ("Carpenter") contracted with DeRewal Chemical Company, Inc. ("DCC"), which is owned and operated by Manfred DeRewal, Sr. ("DeRewal, Sr.), to remove and dispose of its waste hydrochloric acid pickling solution ("waste") from Carpenter's plant located in Reading, Pennsylvania. (See Ex. C-9).

2. On or about May 12, 1974, Carpenter terminated its contractual relationship with DCC. (See C-14).

---

[1] Carpenter hereby incorporates by reference herein: (1) Facts Stipulated by All Parties, Ex. J-33, attached hereto as Appendix A; (2) Supplemental Facts Stipulated by All Parties, Ex. J-34, attached hereto as Appendix B; (3) Stipulation Between Plaintiffs, Handy & Harman Tube Company, Inc. and Carpenter Technology Corporation, Ex. J-35, attached hereto as Appendix C; (4) Stipulation between Plaintiffs and Handy & Harman Tube Company Inc., P-329, attached hereto as Appendix D; and (5) Supplemental

3.     DCC hauled waste for at least twenty-one companies during the 1970's.  (See Ex. C-28).

4.     Prior to Carpenter's contractual relationship with DCC (June 1973 – May 1974) (the "Pre-Carpenter Period"), Boarhead Farms was being regularly investigated and under intense scrutiny by the Bucks County Department of Health and Pennsylvania Department of Environmental Resources ("DER").

5.     More specifically, on April 26, 1972, the Pennsylvania State Police conducted an investigation at the Boarhead Farms after a complainant alleged that "a stream running through his property located approximately 100 yards east of Bridgeton Hill Road on the north side of Lonely Cottage Road in Bridgeton Twp., Bucks Co., Pa., was being polluted by tanker trucks dumping acid into stream from the property adjoining his."  (See Ex. P-4).

6.     As a result of the complaint, an officer visited the complainant's property, who further explained to the officer that "the water had become murky, and the fish and plant life in the water had died."  The officer determined that the stream was "definitely being polluted" and that "further investigation should be conducted."  (See Ex. P-4).

7.     On February 14, 1973, a representative from the Bucks County Department of Health "attempted to make an inspection of the facility… [but] was prevented from making a complete inspection; however he did notice that some 55-gallon drums were being buried."  (See P-5; P-6; see generally DeRewal, Sr.'s Dep. 5/7/03, 91:9-24).

8.     Less than 1 month later, on March 5, 1973, the Bucks County Department of Health obtained a search warrant for the inspection of the Boarhead Farms.

9.     The inspection, which was conducted by representatives of the Pennsylvania State

Stipulation between Plaintiffs and Handy & Harman Tube Company, Inc., attached hereto as Appendix E.

Police, Bucks County Department of Health and DER, revealed that:

> [S]erious water pollution exist at the site. Specifically, numerous barrels and bags of toxic and hazardous chemicals were improperly stored on the property resulting in active and potential pollution to the Waters of the Commonwealth. Chemicals such as copper ammonia sulfate, paint solvents, arsenic pentoxide, pesticides, copper naphtholate, and other unknown compounds were stored in broken bags and/or leaking barrels which in some cases had no lids. There was evidence of chemicals spilled on the surface of the ground and piles of spilled powdered chemicals completely exposed to the weather. Depressions down slope from the chemical storage areas contained discolored waste liquids from runoff. There was an active discharge of industrial wastes from the one chemical storage area into the Waters of the Commonwealth at the time of inspection.
> ***
> Furthermore, a disabled flat bed truck containing about forty (40) barrels full of solvents was situated on the bank of a drainage course, thus a serious potential pollution problem in its own right.
>
> This Department … recommended … that the strongest possible enforcement action be taken in concert with the Solid Waste Coordinator to eliminate the violations occurring at the site.

(See Ex. P-5 at 1-2).

10.    In a memorandum dated March 12, 1973, DeRewal, Sr. reported to the investigators that "several empty 55 gallon drums were buried in a trench six (6) feet wide by about fifty (50) feet long by five (5) feet deep." In addition, the investigators reported that:

> Scattered over several acres are numerous barrels and drums containing a variety of chemicals. Many are improperly stored and spillage is common. Three samples were taken of spilled chemical materials. A variety of miscellaneous solid waste material was also present.

(See Memorandum dated May 12, 1973, Ex. P-5 at 1).

11.    The 1973 investigators issued recommendations to DeRewal, Sr.:

> 1.    The small lagoon must be drained immediately. …. It may be necessary to remove the soil contaminated by wastes from the impoundment and replace it with clean soil.
> 2.    All solid waste at the site, including the buried drums, must be

3

removed to an approved sanitary landfill site.

3.    A meeting with Revere Chemical Corporation and D.E.R. should be held as quickly as possible to develop a program for eliminating the pollution problems at the site.

(See Memorandum dated May 12,1973, Ex. P-5 at 2-3).

12.    On March 21, 1973, three months before Carpenter contracted with DCC, DeRewal, Sr. entered into an agreement with the DER to:

- Remove all industrial waste from the site;
- Remove all degraded soil; and
- Remove all solid waste material, including drums.

(See Ex. P-5 at 2-3).

13.    The March 21, 1973 agreement also granted DER full access to make inspections of the Boarhead Farms.  (See Ex. P-5 at 3).

14.    Almost 7 months later, on October 31, 1973, a resident, who resides downstream from the Boarhead Farms complained to the Bucks County Department of Health that "a creek which flows through his property had been running discolored and foamy for the **past several days**."  (See Ex. P-9 at 1) (emphasis added).  There are no complaints of discoloration or foaming of water during the previous seven month period.

15.    As a result of the complaint, an investigator visited Boarhead Farms and met with DeRewal, Sr., who stated that "the cause of the violation was an accidental leak of chemicals from a tank truck loaded with ferrous chloride."[2] (See Ex. P-9 at 2).

16.    In his May 7, 2003 deposition, DeRewal Sr. confirmed the intense scrutiny by the Bucks County Department of Health and his clean up efforts at the Boarhead Farms:

Q.    Mr. DeRewal, before the time that DeRewal Chemical leased the

---

[2] Carpenter's waste was not ferric chloride.  Some companies, such as municipal water utilities, convert hydrochloric acid pickling solution into ferric chloride, but this was not done by Carpenter.

> Ontario Street property, where there problems with the Bucks County
> Board of Health with respect to the Boarhead site?
> A.   Yes.
> Q.   What recollections do you have of --
> A.   There was an inspection done because there was some ferric chloride
>      at the property, and that had run down into a small stream.
> Q.   All right.  And what did the board of health --
> A.   Oh, it had to be cleaned up.
> Q.   And how did that ferric chloride come to get into the stream?
> A.   Well, it was discharged from a tank truck.

(See DeRewal's Sr. Dep. 5/7/03, P-337, 91:9-24).

17.    The Bucks County Department of Health advised DeRewal, Sr. "to take all necessary steps including the construction of a dike to contain swamp runoff and to apply lime to neutralize the acid conditions."  (See Ex. P-9 at 2).

18.    "**[S]ince October 31, 1973 [the Bucks County Department of Health] has conducted many follow up inspections of [the Boarhead Farms] … site** and has kept the Department of Environmental Resources informed as to the present status."  (See Ex. P-9 at 2) (emphasis added).

19.    As of December 20, 1973 the case involving the Boarhead Farms was "in the hands of the State Pollution Strike Force attorney and [the Bucks County Department of Health was] continuing to inspect and monitor the site."   (See Ex. P-9 at 2).

20.     On November 2, 1973 the DER Ordered DeRewal, Sr. to immediately cease pollution-related activities and remove all hazardous substances on the Boarhead Farms as follows:

> 1.    Immediately take or cause to be taken all necessary steps to prevent
>       injury to property and downstream users of said Waters and to protect
>       said Waters from pollution or a danger of pollution, including, inter
>       alia, steps to prevent said substances from reaching the Waters of the
>       Commonwealth including but not limited to an unnamed tributary of
>       the Delaware River, and all necessary steps to neutralize the polluting

substances present on the aforementioned tract of land and affected Waters of the Commonwealth.

2.     Within fifteen (15) days of said incident or by November 9, 1973, remove from the ground and from the affected waters of the Commonwealth, inter alia, on unnamed tributary to the Delaware River, to the extent required by the Department and in a manner acceptable to the Department the residual substances contained thereon or therein.

(See Order dated November 2, 1973, Ex. P-10 at 1-2).

21.     On November 5, 1973 the DER inspected the Boarhead Farms and found that "lime has been spread at the three spots in swampy areas, but majority of swampy area remains soaked with untreated waste." The DER also reported that DeRewal, Sr. "expects 100,000 lbs of lime tomorrow to continue spreading lime." (See Ex. P-11).

22.     On November 23, 1973 the DER conducted another inspection at the Boarhead Farms and found that "[s]ome more lime appears to have been placed in swamp area nearest office that has already been cleaned off trees—many untreated puddles of waste were also observed in this cleared area." (See Waste Discharge Report, Ex. P-12).

23.     In addition, the DER inspector noted that "no one [was] working at site during inspection." (See Ex. P-12).

24.     On January 8, 1974, the Bucks County Department of Health memorialized the various pollution related incidences at the Boarhead Farms and detailed its intent to "obtain the technical data to successfully prove pollution and violations of the Clean Streams Law." (See Ex. P-13 at 2).

25.     The Bucks County Department of Health conducted at **least ten (10) inspections of the Boarhead Farm since October 13, 1973**. (See Ex. P-13 at 2).

6

**B.     During The Period Carpenter Used DCC's Hauling Services (June 1973 –
May 1974), DCC Used Sites Other Than Boarhead Farms To Dispose Of
Carpenter's Waste**

26.     Witnesses have consistently maintained that DeRewal, Sr. relocated and utilized

alternate waste disposal locations when a primary disposal location came under scrutiny

by the authorities for pollution violations.

27.     Manfred DeRewal, Jr. ("DeRewal, Jr.") highlighted DCC's pattern of relocation:

> Q.     Okay.  Now, when the Ontario Street opened up, wasn't it a practice
> that whenever you were doing this illegal dumping that you moved to
> another location?  When you got caught doing dumping at one
> location, you would just move on to another location, right?
> A.     That is correct.

(See Notes of Testimony 6/30/08, P-337, 56:19-24).

28.     DCC began using the Ontario Street facility in December 1, 1973, six months after

Carpenter began to use DCC's hauling services and approximately six months before

Carpenter terminated its relationship with DCC.

29.     At trial, DeRewal, Jr. also acknowledged that the constant vigilance of neighbors and

scrutiny of authorities during 1972 and early 1973 caused them to get out of the Bucks

County area and find another disposal location:

> Q.     So, isn't it your recollection that the Boarhead site was being heavily
> looked at by the state and the Bucks County Department of Health, is
> that right?
> A.     That is correct.
> Q.     And your neighbors were keeping a close eye on you guys, is that
> right?
> A.     That is correct.
> Q.     So, you knew that you guys had to get out of town, didn't you?
> A.     That is correct.
> Q.     And that's why you went to the Ontario Street location, is that correct?
> A.     That is correct.

(See Notes of Testimony 6/30/08, 57:4-16).

30.    DeRewal, Sr. also confirmed that the regular and constant inspections at the Boarhead Farms, beginning on or around February 1973, forced him to flee Bucks County to continue his illegal operations at Ontario Street in Philadelphia County:

> Q.    Okay.  Did the inspections by the DER or by the board of health have anything to do with DeRewal Chemical leasing the Ontario facility?
> A.    Probably, probably.  I would think that was one of the factors.

(See DeRewal Sr.'s Dep. 5/7/03, P-337, 98:21-25).

31.    Eventually, the Ontario facility came under scrutiny by the Philadelphia Water Department:

> Q.    Did there come a time when DeRewal Chemical stopped using Ontario Street?
> A.    Yes.
> Q.    How did that come about?
> A.    We had problems with the Philadelphia Water Department.  One of Jonas' s trucks … knocked one of the garage doors off, and we just let it stay off there for a week or so.
>          In Philadelphia, you can't do that.  You have to lock things up, and so I think the first people there were the inspections people, license and inspections, and then they called the water people up, and … the water department found something went down the sewer that clogged up their valves, and they traced it to that address.
> Q.    Okay. And these inspections led to the shutting down of that facility?
> A.    Yeah.

(See DeRewal's Sr. Dep. 5/7/03,  P-337, 111:20-112:12).

32.    Similarly, as the Ontario Street location came under the watchful eye of the authorities, DeRewal, Sr. moved to the Wissinoming Industrial Park location:

> Q.    How did it come about that … [Wissinoming] was leased?
> A.    For the same reason Ontario Street was.

(See DeRewal Sr.'s Dep. 5/7/03, P-337, 114:25-115:2).

33.    DeRewal, Jr. confirmed his father's testimony that the inspections at the Ontario

location caused them to lease the Wissinoming facility:

> Q. And then, when you went to the Ontario Street location, you got caught there, is that right?
> A. That is correct.
> Q. So, you had to move somewhere else, is that right?
> A. That is correct.
> Q. And, once you got caught at Ontario Street and had to move on, you went to the Wissinoming location, is that right, at some point?
> A. At some point, yes.

(See Notes of Testimony 6/30/08, 57:17-25).

34.     Once again, DeRewal, Sr. stopped using the Wissinoming facility for similar reasons:

> Q. Did there come a time when DeRewal Chemical stopped using Wissinoming?
> A. Yes.
> Q. What brought that about?
> A. I think we had the same problem with the water department, and we had the problem with the local police, I believe, and I had a problem with the EPA.

(See DeRewal Sr.'s Dep. 5/7/03, P-337, 124:11-18).

35.     Thus, given the level of scrutiny at the Boarhead Farms by the Pennsylvania State Police, the DER, the Bucks County Department of Health, the neighbors, and DeRewal's practice of relocation, Boarhead Farms could not have been and was not the only waste disposal site used by DCC during the period Carpenter used DCC's hauling services.

36.     DeRewal, Sr. testified that while some waste went to the Boarhead Farms site, some of the waste also went to other landfills:

> Q. Where did DeRewal Chemical dispose of waste that it was … picking up from customers before it had this facility on Ontario Street?
> A. I would assume the majority of it was at Boarhead Farms, I would assume that. **Some were at other places; some were at landfills.**

(See DeRewal, Sr., Dep. 5/7/03, C-21, 84:18-24) (emphasis added).

9

37.    Other facilities included landfills that were located near the airport and landfills that

were recommended and known by Marvin Jonas ("Jonas"), a business associate of

DeRewal, Sr.:

> Q.    What other locations for disposal do you know of that DeRewal
> Chemical had other than Boarhead Farm prior to this Ontario Street
> location?
> A.    I believe that the --- there was a landfill out here by the airport, I
> don't know the name of the place, and other places that Marvin
> Jonas had, whichever landfills he had contacts with.

(See DeRewal, Sr., Dep 5/7/03, C-21, 84:25-85:6).

38.    DeRewal, Sr. repeated that DCC used other waste disposal sites during the pre-

Ontario period (prior to December 1973):

> Q.    Were any other places in that time frame pre-Ontario that DeRewal
> Chemical disposed of waste from its customers?
> A.    Any other places?
> Q.    Yes.
> A.    No, there were two or three landfills that Marvin Jonas had
> connections with, which we could go in there. I just don't recall
> where they are. I know one was up on 322 somewhere, I believe, I
> don't know the name of it. I was never there, but it was a standard
> **– it was a regular landfill operation**."
> Q.    How did DeRewal Chemical get access to these landfills that
> Marvin Jonas knew about?
> A.    Marvin told us, and he would made the arrangements for his truck
> to go up there.

(See DeRewal, Sr.'s Dep. 5/7/03, C-21, 89:20- 90:15) (emphasis added).

39.    Other disposal landfills included the one near Reading, PA and one in the City of

Philadelphia on Enterprise Avenue.  (See DeRewal, Sr.'s Dep. 5/7/03, C-21, 296:3-17).

40.    DCC instructed drivers to deposit a company's waste at the easiest and closest site

location to the company.  (See DeRewal, Sr.'s Dep. 5/7/03, 86:10-15).

41.    As a businessman, DeRewal, Sr. found no economic incentive in having his drivers

travel long distances to dispose of the waste.   (See DeRewal, Sr.'s Dep. 5/7/03, C-21, 86:16-25).

42.    Specifically, DeRewal, Sr. testified as follows:

> Q.    Okay. And at least when you were making the direct decision, what when into the factoring for easiest?
> A.    Well, my attitude about the whole thing was this was not easy because it was not making any money, you know.  I mean, certainly you see those invoices, and the company doesn't make at those prices, so the problem that exists is how can you do it and break even, you know, what's the most economical way to do it.
> Q.    All right.
> A.    If a landfill was closer, you would go to a landfill.  If the Boarhead Farm was closer, you'd go to the Boarhead Farms.

(See DeRewal, Sr.'s Dep. 5/7/03, C-21, 86:16 – 87:4).

43.    John Barsum ("Barsum"), who drove trucks for DeRewal, Sr. beginning in 1969 and continuing until the close of operations, corroborated DeRewal, Sr.'s testimony that waste was deposited at the closest location to the company:

> Q.    Mr. Barsum, you did not ever personally …take any loads from Carpenter back to the Boarhead site, is that correct?
> A.    No I haven't.
>                              ***
> Q.    In fact, that would have been out of the way for you to go there, is that correct?
> A.    Yeah, it was out of the way, yeah.

(See Notes of Testimony 6/30/08, 82:8-19).

44.    Thus, given the frequency of investigations at the Boarhead Farms and DeRewal's practice of relocation and economic incentives, it is simply not plausible to believe Plaintiff's assertion that 100% of Carpenter's waste during the Pre-Ontario period (prior to December 1973) was deposited at  Boarhead Farms.  Rather, the evidence strongly weighs in favor of the inference that Carpenter's waste was hauled to one of the closer landfill sites rather

11

than to Boarhead Farms.

### C. There Is No Evidence, Other Than Questionable Testimony From Bad Actors, To Link Carpenter's Waste To Boarhead Farms, And If The Testimony Is Given Any Weight, Then It Only Supports The Theory That A <u>Small Volume Of Carpenter's Waste Was Taken To Boarhead Farms</u>

#### i. Manfred DeRewal, Jr. Is The Only Driver Who Alleges To Have Hauled Carpenter's Waste During The Pre-Ontario Period (Prior To December 1973).

45.    DeRewal, Jr., who presently resides in Costa Rica and whose appearance was financed by Plaintiff's counsel, is the only driver who alleges that he hauled Carpenter's waste during the Pre-Ontario Period (prior to December 1973).  (<u>See</u> Notes of Testimony 6/30/08, 62:13-63:5).

46.    Around 1969, DeRewal, Jr., a high school student, began working part-time for his father, DeRewal, Sr., on the weekends and then assumed a full-time position on or around 1970.  (<u>See</u> Notes of Testimony 6/30/08, 18:18-24).

47.    During that time, DeRewal Jr., mainly worked on the main house and cleared the land at the Boarhead Farms.  (<u>See</u>  Notes of Testimony 6/30/08, 18:25-19:4).

48.    In September 1972, DeRewal, Jr. obtained his drivers license and began working as a truck driver for his father.  (<u>See</u> Notes of Testimony 6/30/08, 19:16-22; 65:22-66:1).

49.    At that time, the Ontario Street location was not open.  (<u>See</u> Notes of Testimony 6/30/08, 22:14-16).

50.    Also, at that time, Richie Minthorn ("Minthorn") was working as a truck driver and dispatcher for DCC.  (<u>See</u> Notes of Testimony 6/30/08, 20:8-12; 58:10-18).

51.    His older brother, Bruce DeRewal ("DeRewal") was already working for their father as a truck driver.  (<u>See</u> Notes of Testimony 6/30/08, 33:20-34:6).

52.    DeRewal, Jr. and his brother presented conflicting testimony regarding the alleged hauling of Carpenter's waste to Boarhead Farms.

53.    DeRewal, Jr. testified at trial that he made several trips with his brother, Bruce DeRewal, who was more experienced driving trucks and more familiar with the routes. (See Notes of Testimony 6/30/08, 33:20-34:6; 55:1-8; 67:15-18).

54.    During the trial, DeRewal, Jr. described his working relationship with his brother:

    Q.    All right. Now, when you went for the first time to Carpenter Technology, how did you know how to make that run?
    A.    **I made several runs with my brother.**
    Q.    Your brother Bruce?
    A.    My brother Bruce, yes.
    Q.    Okay. And why was that helpful?
    A.    Well, he knew the routine and the location of Carpenter Tech at that point, he was – **he drove prior to myself starting to drive.**[3]
    Q.    Okay.  So he showed you where to go and how to go through the gate and where to drive?
    A.    That's correct.

(See Notes of Testimony 6/30/08, 33:20-34-6) (emphasis added).

55.    DeRewal, Jr. received his work schedule from DeRewal, Sr., who told him where and when to pick-up the waste from companies.  (See Notes of Testimony 6/30/08, 21:24-22:3; 62:6-8).

56.    In fact, DeRewal, Sr. made all the business decisions for DCC and hired Richie Minthorn, a dispatcher, who gave the drivers instructions on picking up the waste:

    Q.    Prior to the time of this lease in December '73, who at DeRewal Chemical told truck drivers or anybody else where to dispose of waste?
    A.    That would be Richard Minthorn.

---

[3] This testimony is not credible.  DeRewal, Jr. stated that before he obtained his driver's license in September 1972, he drove with his brother to Carpenter.  However, it is undisputed that DCC did not haul for Carpenter until June 12, 1973.  Accordingly, DeRewal, Jr. is either lying as he has done under oath in the past or his memory is severely lacking.  Either way, DeRewal, Jr.'s testimony in this regard is both inaccurate, misleading and should not be given any weight.

Q.    Anyone else?
A.    No. I mean probably on an occasion if I was there, I did probably, in all probability, but Richard Minthorn was the day-to-day operator, you know.
Q.    And how did Mr. Minthorn learn about places that DeRewal Chemical could dispose of waste?
A.    I probably told him.
Q.    How did you learn about where DeRewal Chemical could dispose of waste.
A.    Other people told me. I would imagine Marvin Jonas was the one that told me.

(See DeRewal, Sr.'s Dep. 5/7/03, C-21, 85:11-86:1).

57.    In or around January 1973, DeRewal, Jr., and his brother stopped working for his

father and started working for Ramos Steel in Easton, PA:

Q.    Now, from the time you started driving a truck for your father, did you continue to do so until your father's operation was shut down in April of '77?
A.    Well, I had left for about maybe four months and went to work for a company up on Easton, Pennsylvania called Ramos Steel, scrap steel.

(See Notes of Testimony 6/30/08, 20:24-21:4).

58.    During the trial, DeRewal, Jr. testified that he worked at Ramos Steel for four months

before resuming employment with DeRewal, Sr.:

Q.    Okay. And then you came back after that three or four months?
A.    And then, yes, I had returned. My brother and I had gone up at the same time period and then we had returned, we only I believe worked up there [f]or four months in Easton.

(See Notes of Testimony 6/30/08, 21:5-21:9).

59.    However, DeRewal Jr.'s timeframe is inconsistent with his prior May 13, 2003

deposition testimony given under oath, wherein he stated that he worked for Ramos Steel

for six to eight months. (See Notes of Testimony 6/30/08, 53:17 – 54:8).

60.    This is not the first time that DeRewal, Jr. admittedly lied under oath.

14

61.     DeRewal, Jr. admitted to lying to the EPA in February 26, 1997 on whether any of

Carpenter's waste was disposed at Boarhead Farms.  (See Notes of Testimony 6/30/08,

45:4-11).

> Q       .… You recall giving a statement or a deposition to the EPA in 1997,
>         don't you?
> A.      Yes, I do.
>                            ***
> Q.      Question, Line 17:   It's possible that any of the waste was dumped at
>         the Boarhead property?" Do you recall that question being posed to
>         you?
> A.      That is correct.
> Q.      And your answer was, "No." Was that a truthful answer?
> A.      No, it was not.
> Q.      That was a lie?
> A.      That is correct?
> Q.      Question, Line 20: "It all went to the Philadelphia facility? Do you recall
>         that question being posed to you, Mr. DeRewal?
> A.      That is correct?
> Q.      Answer: "Yeah, Philadelphia." Was that a truthful answer?
> A.      Probably not.
> Q.      So that was a lie to the EPA, right?
> A.      That is correct.

(See Notes of Testimony 6/30/08, 42:22-24; 45:4-20).

62.     Yet, a few years later and again under oath, DeRewal, Jr. testified in Court that he

hauled Carpenter's waste to Boarhead Farms.  (See Notes of Testimony 6/30/08,  31:1-3).

63.     DeRewal, Jr. gave several versions of the number of times he allegedly hauled

Carpenter's waste to Boarhead Farms.  These versions range from 30-40 times to almost

60 times over a two year period between 1973 and 1975.  (See Notes of Testimony

6/30/08, 34:13-15; 67:10-14).

64.     For example, during the trial, DeRewal, Jr. testified that he picked up Carpenter's

waste for a total of 40 to 60 times.  (See Notes of Testimony 6/30/08, 13-15).

65.     In a prior deposition on May 13, 2003, DeRewal, Jr. testified that he hauled

Carpenter's waste approximately 45 to 60 times. (See Notes of Testimony 6/30/08, 66:12 – 24).

66.    Earlier in that same deposition, DeRewal, Jr. testified that he hauled Carpenter's waste 30 to 40 times. (See Notes of Testimony 6/30/08, 67:10-14).

67.    Given the inconsistent testimony, none of DeRewal, Jr.'s testimony should be given any weight.

68.    If the Court were to assume that DeRewal, Jr. hauled Carpenter's waste 45 times between June 1973 and May 1974 using 3,500 to 4,000 gallon trucks, and half the trips (22) were made to Boarhead Farms, then he could not have hauled more than 77,000 to 88,000 gallons of waste to the Boarhead Farms site.

69.    However, even this analysis lacks credibility given the testimony of Bruce DeRewal, as set forth more fully below. Indeed, Bruce DeRewal testified confidently that he did not return to work with his father until after the Ontario street location opened in December 1973. (See Notes of Testimony 6/25/08, 84:3-6). Since Bruce and DeRewal, Jr. returned from Easton at the same time, DeRewal, Jr.'s testimony lacks any weight and should not be considered at all.


### ii.    Bruce DeRewal Is The Only Driver Who Alleges To Have Hauled Carpenter's Waste During The Ontario Period (December 1, 1973 – June 30, 1975)

70.    During the Ontario Period (December 1, 1973 through June 30, 1975), Bruce DeRewal ("DeRewal") is the only driver who alleges to have hauled Carpenter's waste. (See Notes of Testimony 06/25/08, 64:9-13).

16

71.    DeRewal testified that he worked for his father as a mechanic and truck driver before and after his high school graduation in June of 1973.  (See Notes of Testimony 06/25/08, 48:19 – 49:1; 61:5-9).[4]

72.    DeRewal also testified that after he graduated from high school, he worked for a company called Ramos Scrap Iron in Easton, PA for approximately one year.  (See Notes of Testimony, 06/25/08 63:3-10; 83:9-21).

73.    While working at Ramos Scrap Iron, DeRewal did not work for his father.  (See Notes of Testimony, 06/25/08 64:3-5).

74.    Following his employment at Ramos Scrap Iron, DeRewal then worked independently collecting scrap iron.  (See Notes of Testimony 06/25/08, 86:18-24).

75.    DeRewal also testified that he dismantled cars for Nick's Auto Parts in Upper Black Eddy, PA for several months.  (See Notes of Testimony 06/25/08, 83:22-84:2).

76.     After working at Nick's Auto Parts, DeRewal then returned to work for his father after the Ontario Street location had opened (after December 1, 1973).  (See Notes of Testimony 6/25/08, 84:3-6).

77.    When he returned to work for his father, Cypecki and Minthorn were also working at the Boarhead Farms.  (See Notes of Testimony 6/25/08, 58:16-59:8).

78.    DeRewal, Sr. instructed Bruce DeRewal where to go and pick up the waste.  (See Notes of Testimony 5/25/08, 49:2-6).

79.    In 1997, DeRewal testified under oath that none of Carpenter's waste reached the Boarhead Farms.  (See Notes of Testimony 6/25/08, 69:16-20).

_____

[4] While Bruce DeRewal claims to have worked for DCC until his high school graduation in June 1973, his brother, DeRewal, Jr., testified that Bruce was out of school prior to June 1973.  (See Notes of Testimony 6/30/08, 51:21-52:17).  This is further support for the fact that neither brother provided credible testimony.

80.     Now in 2008, DeRewal claims that he lied during his prior testimony given under

oath and that he did dispose of Carpenter's waste at the Boarhead Farms.  (See Notes of

Testimony 6/25/08, 69:16-22).

> Q.     Mr. DeRewal, I've handed you a copy of a transcript that appears to have been taken by the EPA on Thursday, March 13, 1997.  Do you see it in front of you?
> A.     Yes.
>
> ***
>
> Q.     Okay. But did you have any intentions of lying to the EPA?
> A.     Did I have any intentions of lying to the EPA? Yes.
>
> ***
>
> Q.     …. Why did you have intentions of lying to the EPA?
> A.     Oh, at that time, I couldn't answer – I don't' know why, but at that time, we did.
> Q.     So you are admitting here that you lied to the EPA --
> A.     Yes.
> Q.     – when you gave this statement.
> A.     Yes.
>
> ***
>
> Q.      "Question: Was any of Carpenter Technology's waste ever disposed of at the Boarhead property? Your answer was, "No. That all went down the city.  We had neutralizing tanks down in Wissinoming." Do you see that?
> A.     Yes.
> Q.     Were you answering that question truthfully?
> A.     No.

(See Notes of Testimony 6/25/08, 66:19-22; 68:6-8; 68:11-18; 69:16-22).

81.     According to DeRewal's latest testimony, he hauled Carpenter's waste to both

Ontario Street and Boarhead Farms.  (See Notes of Testimony 6/25/08, 56:5-10).

82.     DeRewal explained that every week he hauled four to five loads of waste a day from

Carpenter in 3,500 gallon tankers and deposited the waste at the Ontario Street location.

(See Notes of Testimony 06/25/08, 56:13- 17; 65:14-19).

83.     DeRewal explained that at the end of each week, he would take the last load of

waste back to the Boarhead Farms so he could obtain money, fuel and a change of

18

clothes.  (See Notes of Testimony 06/25/08, 55:24-56:1; 56:13-17; 56:19-24).[5]

84.    DeRewal claims that he did not empty the waste disposal trucks, but he admitted

that he knew that the waste was being disposed of at the Boarhead Farms:

>    Q.    Okay. Now, did you come to have an understanding of what
>           happened to the loads of waste that you brought back to the
>           Boarhead Farm?
>    A.    Eventually, yes.
>    Q.    Okay. What did you eventually understand of what was happening to
>           the waste?
>    A.    Well, I would be bringing back the loaded trucks back to the farm, and
>           I'd be going back to pick the same truck back up, and it was empty.
>           So pretty much it had to have been emptied back there somewhere.

(See Notes of testimony 6/25/08, 50:20-51:4).

85.    If DeRewal's testimony is given any weight, most of the loads of waste from

Carpenter went to the Ontario Street location. (See Notes of Testimony 06/25/08, 65:4-6;

65:20-24).[6]

86.    DeRewal allegedly hauled Carpenter's waste for a few months.  (See Notes of

Testimony 06/25/08, 57:23 - 58:1).

87.    DeRewal estimated that his 4-5 trips to the Ontario Street location took

approximately 3½ - 4 hours each or 16-20 hours per day:

>    Q.    Today, you said that you would go to Carpenter about four times a
>           day, is that right?
>    A.    Yes.
>    Q.    And that your tankers were about 3500 gallons, is that right?
>    A.    That's correct.
>    Q.    And when you were going down- when you did this four or five times a
>           day, you were taking primarily the waste from Carpenter down to

---

[5] During a deposition conducted on June 16, 2003, Bruce DeRewal testified that he did not like going back to the Boarhead Farms because he wasn't getting along with his father. (See Bruce DeRewal's Dep. 6/16/03, 57:8-14).
[6] Bruce DeRewal also testified during the June 16, 2003 deposition that he went to Carpenter 5 or 6 times and that most of them went to Ontario Street to dispose of waste through the storm drain.  (See Bruce DeRewal's Dep. 6/16/03, 47:9-10; 47:12-14).

Ontario street, located in Philadelphia, is that right?

A.    Yes.

Q.    Do you have any idea how long that trip took, to go to Philadelphia and back?

A.    It took about, oh, I would say three and a half hours, four hours.

Q.    Three and a half to four hours total for each trip?

A.    Yes.

Q.    So if you were – if I were to multiply that by four or five times, you were working 16 to 20 hours a day just on Carpenter, is that right?

A.    That's correct.

(See Notes of Testimony 6/25/08, 65:14-66:9).

88.    According to DeRewal's testimony, the total volume of waste hauled by DeRewal amounts to 330,000 to 420,000 gallons per month, which significantly exceeds the volumes in Carpenter's records. (See Notes of Testimony 7/2/08, 20-25).

89.    Carpenter's waste disposal records show the following volumes of waste being hauled by DCC between January and May 1974:

| Month | Gallons |
|-------|---------|
| 1/74 | 49,800 |
| 2/74 | 190,00 |
| 3/74 | 161,850 |
| 4/74 | 206,550 |

(See Ex. P-36).

90.    Assuming DeRewal began hauling Carpenter's waste in February 1974, given the number of trips he allegedly made, he would have been the only driver to haul Carpenter's waste in 1974. [7]

91.    However, based on DeRewal's testimony that he only went to Carpenter's site once a week, then all of Carpenter's waste was not disposed at the Boarhead Farms.

92.    If the Court gives weight to Bruce DeRewal's testimony, at most 45,500 to 52,000

---

[7] Since Carpenter's records indicate that only 49,800 gallons were hauled in January 1974, given Bruce DeRewal's testimony, it is unlikely that he started hauling again for his father until around February, 1974. John Barsum admitted hauling waste to Ontario Street, which would have included the period between

gallons of Carpenter's waste reached Boarhead Farms for the period between February, 1974 and May, 1974.[8]

93.    DeRewal, Jr.'s testimony is inconsistent with his brother's testimony, Bruce DeRewal, who stated that he did not take any loads of Carpenter's waste to the Boarhead Farms site during the Ontario period.

> Q.    Now, were you personally still making runs to Carpenter when Ontario Street opened?
> A.    Yes, I was.
> Q.    Where did that waste go?
> A.    That went to – we had a building right off of Ontario Street.
> Q.    Okay.  So when you picked up the loads from Carpenter after Ontario Street opened, you took them to Ontario Street?
> A.    That's correct.

(See Notes of Testimony 6/30/08 36:12-20).

### iii.    Apart From DeRewal, Jr. For The Pre-Ontario Period And Bruce DeRewal For The Post-Ontario Period, No Other Driver Alleges to Have Hauled Carpenter's Waste to the Boarhead Farms

94.    No other driver hauled Carpenter's waste during the Pre-Ontario or Ontario periods and there is no evidence to the contrary.

95.    Thus, DeRewal and DeRewal, Jr. are the only drivers who allegedly hauled Carpenter's waste to the Boarhead Farms site.

96.    June Stephens ("Stephens") worked as a truck driver for DCC in the early 70s (the pre-Ontario period).  (See Stephens Dep. 7/28/03, 13:12-16; 19:22-20:4).

97.    In describing her duties, Stephens testified that she was responsible for driving the trucks and, at no time, did she or was she responsible for unloading the waste from the

---

December 1973 and January 1974.  (See Notes of Testimony 6/30/08, 82:8-19).
[8] The Court took Judicial Notice that there were 13 weeks between February and April, 1974: 4 weeks in February, 5 weeks in March and 4 weeks in April.  Thus, 3,500 to 4,000 gallon trucks multiplied by 13 weeks equals 45,500 to 52,000 gallons.

trucks. (See Stephens Dep. 7/28/03, 69:24-70:19; 176:16-177:3).

98.    Stephens stated that after picking up a load of waste from a company, she routinely parked the truck at the Boarhead Farms and went home.  (See Stephens Dep. 7/28/03, 63:21-64:5).

99.    Stephens testified that she may have hauled for another company in Reading, PA. (See Stephens Dep. 7/28/03, 97:5-8).

100.    At no time did Stephens testify that she hauled any of Carpenter's hydrochloric acid waste.

101.    Likewise, John Bean ("Bean") testified that he worked part-time as a truck driver for DCC in the '70s and continued working for DeRewal until the close of operations.[9]  (See Notes of Testimony 6/25/08 100:14-15; 102:8-13).

102.    Bean stated that he did not personally dispose of any waste.   Bean testified that after picking up a load of waste, he returned to the Boarhead Farms, parked the truck and went home.  (See Notes of Testimony 6/25/08,105:24-106:2; 106:24-107:2).

103.    At no time did Bean testify that he hauled any of Carpenter's hydrochloric acid waste.

104.     Similarly, Jeff Shaak ("Jeff") worked for DCC as a truck driver during the pre-Ontario period.   (See Notes of Testimony 6/25/05, 109:22-24; 110:14-16).

105.    At the time of Shaak's employment with DCC, other drivers included Freddie DeRewal, Bruce DeRewal, Richie Minthorn and Ed Barsum.  (See Notes of Testimony 6/25/08, 110:2-10).

---

[9] John Bean's recollection of the exact time period that he worked for Carpenter is inconsistent.   During the July 30, 2003 Deposition, he testified that he worked for DCC around 1973.  However at trial, he testified that he worked for Carpenter around 1976 to 1976. (See Notes of Testimony 6/25/08, 100:14-19).

106.    Shaak testified that he did not haul Carpenter's waste:

> Q.      … Whether during the first time you worked for Fred DeRewal
> or afterwards, you never took any waste from Carpenter
> Technology, is that correct?
> A.      That is correct.

(See Notes of Testimony, 6/30/08, 120:4-7).

107.    Neither did John Barsum ("Barsum"), who started working for DeRewal, Sr. in 1969 as a truck driver and remained throughout the entire operations at the Boarhead Farms. (See Notes of Testimony 6/30/08, 70:11-13; 71:25-72:2; 74:16-19).

108.    Barsum testified that he did not take any loads from Carpenter back to the Boarhead Farms because, doing so, would have been out of his way.  (See Notes of Testimony 6/30/08, 82:8-19).

109.    Barsum's testimony is consistent with and corroborates Manfred DeRewal, Sr.'s testimony about disposing waste at the closet and most convenient locations.

110.    There was no testimony that any other drivers hauled Carpenter's waste or had knowledge that Carpenter's waste was disposed of at Boarhead Farms during the period between June 12, 1973 (the commencement date of Carpenter's use of DCC's services) and December 1, 1973 (the commencement of the Ontario Street period).


### D.  DCC Mislead Carpenter About The Destination Of Carpenter's Waste

111.    In an effort  to obtain a waste disposal contract with Carpenter, DeRewal, Sr. led Carpenter to believe that its hydrochloric acid waste will be disposed of at Sylvan Chemical Corporation in Englewood Cliffs, NJ and will be used by Sylvan to manufacture ferric chloride:

> Q.     What was your intention of really doing with this waste from
>        Carpenter Technology?
> A.     I don't know.  I guess just giving him a story and telling him the way
>        things might go.
> Q.     Okay.  What was really – what really happened to the waste?
> A.     It would be disposed of.
> Q.     So just so I'm clear, DeRewal Chemical didn't actually have any
>        agreement with Sylvan chemical to take this waste out?
> A.     Correct.

(See DeRewal, Sr.'s Dep. 5/7/03, C-21, 139:2-12).

112.    DeRewal, Sr. perpetuated the fraud by providing references of two similar steel

companies and asking Sylvan to send a confirmation letter to Carpenter.  (See Ex. C-7).

113.    Accordingly, in a November 17, 1972 letter from Sylvan to Carpenter, Sylvan stated

that:

> Mr. Fred DeRewal of DeRewal Chemical Company advised us that he may
> be offered the opportunity to acquire from you substantial quantities of
> HYDROCHLORIC PICKLING LIQUORS.
> This material Mr. DeRewal will deliver to us.
> The spent solution is processed and converted into Ferric Chloride.

(See Letter from Joseph J. Darvin of Sylvan Chemical Corporation to Edward Straka

dated November 17, 1972, Ex. C-28).

114.    When questioned about Sylvan's misrepresentation, DeRewal, Sr. responded that

"[he] probably asked him to write it."  (See DeRewal, Sr.'s Dep. 5/7/03, C-21, 140:6-11).

115.    DeRewal, Sr.'s fraud was perpetuated at a time when Carpenter was attempting to

recycle the hydrochloric acid as a cost saving strategy.  (See Notes of Testimony 6/26/08,

58:9 – 14; 59:25-60:13).

**E.     Waste Deposited by Plaintiffs And Settled Parties Lead To The EPA's
Remediation Efforts At The Boarhead Farms**

116.    As part of the remedial investigation of the Boarhead Farms, the EPA identified the

24

hazardous substances that have the most effect on human health and the environment.

(See Remedial Investigation Report, J-29 at 7-97).

117.    Based on the historical nature of contamination Boarhead Farms, the EPA found that "potential future migration pathways already have been identified for the site where contaminants have already migrated from buried waste and drums to groundwater." (See January 1997 Final Remedial Investigation Report, J-29 at 7-97 (AR311273)).

118.    The EPA determined that inorganics, primarily arsenic, posed the most important risk to the human health and thus should be remediated:

> Human health risks to a worker under current land-use conditions are primarily from exposure to surface soil and are within acceptable limits of 1 to 100 in a million, and the HI is below 1.0.  **Risks to future workers from ingestion of shallow groundwater are unacceptable because of the high levels of VOCs, SVOCs, and metals in groundwater.**
>
> Risk posed by surface soil contamination to current or future residents at the site are within acceptable limits of 1 to 100 in a million, and the HI is below 1.0.  **Future risks from shallow groundwater are unacceptable because of the presence of high levels of VOCs, SVOCs, and metals in groundwater**.
>
> Risks from surface soil exposure for recreational visitors (adult and child) in the wooded areas are within acceptable limits of 1 to 100 in one million, and the HI is below 1.0.
>
> Risks from surface water and sediment from the ponds, wetland areas, and streams all are within the acceptable limits of 1 to 100 in a million, and the HI is below 1.0,  except for ingestion of fish caught in the culvert, which is less than an order of magnitude above an HI of 1.0.
>
> ***
>
> **The majority of the carcinogenic risk and noncarcinogenic hazard is due to inorganics, in particular arsenic**.

(See J-29, 7-98 to 7-100 (AR311274 – 6)).

119.    The risk assessment conducted by the EPA is consistent with the remediation, which entailed the removal of 2,500 buried drums of waste, soil aeration and the installation of the

25

groundwater treatment system to treat VOC contamination.  (See EPA Record of Decision, J-29).

120.    The EPA's Remedial Investigation and Five-Year Review Report is also consistent with Dr.  Brown's opinion that  "[s]pent acids did not drive the remedy at the Site."  (See Notes of Testimony 7/1/08, 56:5-6).[10]

121.    Dr. Brown explained that the acids simply "facilitated the movement, and also resulted … in the high concentration of metals in the groundwater that have to be remediated."  (See Notes of Testimony 7/1/08, 57:11-19).

122.    Accordingly, Dr. Brown concluded that the acids, themselves, were just a facilitator. (See Notes of Testimony 7/1/08, 57:11-19).

123.    In hauling Carpenter's pickle liquor, it is undisputed that DCC did not dispose of any drums or VOCs belonging to Carpenter.

> Q.    Dr. Brown, you are aware that Carpenter Technology did not generate … VOCs, or volatile organic compounds, that went to the site; is that correct?
> A.    I've not seen any evidence that would indicate that VOCs were sent by Carpenter to the site.
> Q.    And isn't it also true that out of all of the documents that you reviewed in connection [with] your report, that there's no indication that Carpenter disposed of drums; is that correct?
> A.    That's correct.

(See Notes of Testimony 7/1/08, 69:2-12).

124.    Like Mr. Brown, Plaintiffs' expert, Jurgen Exner, Ph.D. opined that Carpenter did not dispose of drums or VOCs:

---

[10] Dr. Brown's testimony that "spent acids did not drive the remedy at the site" is consistent with Dr. Franklin Mink's opinion that the driver of the remedy was the removal of drums, treatment of VOCs and inorganics, particularity arsenic.  (See Notes of Testimony 6/30/08, 169:12-22).  Dr. Brown, however, disagrees with Dr. Mink's opinion that the effect of spent acids was deminimus.  (See Notes of Testimony 7/1/08, 59:14-15).

Q.    And based upon all of the materials that you reviewed to render your opinions you didn't come across any materials that indicated that Carpenter disposed of any waste acids in drums, did they?

A.    I don't remember anything about drums.

Q.    Okay.  And in your description of the constituents of the acids that were generated by Carpenter did you find anywhere in the document[s] that you reviewed that arsenic was contained in any of those constituents, as one of those constituents?

A.    No.

***

A.    I do not have arsenic listed in my report …

Q.    And isn't it true that the metals that you described earlier in your testimony were the iron nickel chromium or some of the metals that were contained or listed in Mann-15 I think you referred to, none of those constituents are considered to be volatile organic compounds, are they?

A.    That's correct.

(See Notes of Testimony 6/30/08, 130:19-131:11).

125.    In fact, the waste that drove the EPA's remediation efforts (that is, drums, VOCs and inorganics such as arsenic) belonged to the Plaintiffs and Settled Defendants, as demonstrated in the chart below:

| Settled Parties/Plaintiffs | Waste Type | Bulk/Drum |
|---|---|---|
| Ashland/AETC | Nitric Acid | Bulk |
| | Dye Waste | Bulk |
| | CDN Waste | Bulk |
| | Pthalide Acid | Build |
| | Solvents | Bulk |
| | Solvents | Drum |
| Diaz/AETC | Nitric Acid | Bulk |
| Flexible | Etchant | Bulk |
| | Etchant | Drum |
| Etched/Flexible | Etchant | Drum |
| NRM | Pickle Liquor | Bulk |
| Cytec | Ammonia | Bulk |
| Ford | Plastics | Drums |
| Ford | Finishing Mat. | Drums |
| Ford | Industrial Waste | Drums |

| SPS | Chromic Acid | Drums |
| SPS | Cyanide Waste | Drums |
| SPS | Cyanide Waste | Bulk |
| SPS | Degreasers | Drums |
| SPS | Acetone | Drums |
| SPS | Nickle Waste | Drums |
| Quickline | Etchant | Drums |
| Navy | Waste | Drums |
| Simon Wrecking | Sulphuric Nitrate | Bulk |
| Novartis | Nitric Acid | Bulk |
| Bostik | Nitric Acid | Bulk |
| Techalloy | Waste Oil | Drums |
| Techalloy | Pickle Liquor | Bulk |
| Plymouth Tube | Pickle Liquor | Bulk |
| Unisys | Etcchant | Drums |

(See Plaintiff's Answers to Joint Contention Interrogatories, Ex. C-28).

126.   The total past, future and present costs incurred to date for remediation at the

Boarhead Farms site is $14,333,769.52.  (See Appendix A at pp. 12-13).

127.   Dr. Brown opined that the response costs incurred by Plaintiffs should be driven by

the volume of waste disposed at the site and not the toxicity of waste disposed at the site:

> … In this case, what really drives the cost is … the number of barrels… that was dug out and had to be disposed of, how much soil was dug out, and the cost of putting in monitoring wells, the extraction trench, the extraction wells, and the cost of implementing the clean up of that groundwater, including the treatment, the operation, and maintenance.  And those are based … more by the volume of material that has be[een] contaminated, whether that volume has a small concentration of one or -- a high concentration of another, which would drive the risk, doesn't enter into the equation.
>
> ***
>
> And the same for the metals.  It doesn't distinguish by their tox[c]ity.  [W]e can't put a cost that says it would cost more to treat the arsenic than it did to treat the chromium.  It just don't work that way.

(See Notes of Testimony 7/1/08, 60:12-24; 61:5-8).

128.   While acknowledging that volume determines the response cost incurred by the

parties, neither Dr. Brown nor Jay Vandeven opined on the volume of Carpenter's waste

that was allegedly deposited at the site or that Carpenter's waste contributed more or less

to the remediation costs.

129.    In particular, Mr. Vandeven testified that he did not consider the particular waste

streams for any defendant:

> Q.    Now, just to be clear, you do not offer an opinion that Carpenter's pickle liquor actually was disposed of at the site, do you?
> A.    No.
> Q.    And you did not offer an opinion as to any particular defendant's waste was actually disposed of at the site, do you?
> A.    That's correct.
> Q.    And in fact, the individual waste streams from these particular defendants was really not relevant to you in your analysis, was it?
> A.    That's true.
> 
> ***
> 
> Q.    And you did not rely upon the individual waste streams of Carpenter in rendering your opinion, is that correct?
> A.    That's correct.

(See Notes of Testimony, 6/23/08, 187:25-188:11; 188:20-22).

131.    In fact, Mr. Vandeven would have issued the same expert opinion even if

Carpenter's waste was never alleged to have been associated with Boarhead Farms.  (See

Notes of Testimony 6/23/08, 190:18-21).[11]

132.    Moreover, Mr. Vandeven's opinion that the drums at the site were deteriorated

by the ph Level  in the soil is completely speculative and not based on any of the

evidence.  Indeed, the clear evidence in the record is that even during the Pre-Carpenter

period, numerous drums were found to have been "crushed" and damaged at the site.

(See J-29).

---

[11] Moreover, Mr. Vandeven agrees with the EPA's conclusion that "[t]he effects of acid spills probably were short-lived because the acids would have been flushed from the soil by infiltrating water and possibly would have been neutralized by the limited buffering capacity of the soil."  (See Notes of Test. 6/23/08,

133.    It is also clear that Mr. Vandeven was not qualified to offer such an opinion, as he was admittedly not an expert on corrosion and could not opine on the temporal aspect of the corrosion of a completely intact drum verses a used, rusty drum that may have been versed at the site.  (See Notes of Testimony, 6/23/08, 205:11-206-24).

## PROPOSED CONCLUSIONS OF LAW

### A.    Plaintiff's Burdens Under CERCLA Sections 107(a) and 113(f)

Carpenter incorporates by reference the Court's analysis contained in its Memorandum and Order dated January 11, 2008, which succinctly outlines the elements of proving claims asserted under CERCLA Sections 107(a) and 113(f).  In sum, as the Court noted, the Section 113(f) counterclaims "will necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the §107(a) action." See Memorandum and Order dated January 11, 2008, p. 10.  Accordingly, for the purposes herein, the primary focus of the Court's inquiry is determining the equitable allocation of each of the parties' share of liability in this action.

### B.    Settled Parties' Shares of Liability

This Court has already ruled that the *pro rata* analysis prescribed by the Uniform Comparative Fault Act ("UCFA") governs the allocation of the settled parties' share of liability in this matter, rather than the *pro tanto* approach set forth under the Uniform Contribution Among Tortfeasors Act ("UCATA"). See Memorandum and Order dated June 30, 2004.  Accordingly, the settled parties are thereby protected from further contribution liability by either counter-claims or cross-claims by the non-settling party.  Carpenter,

---

208:9-16; see also J-29 (AR311091)).

however, is entitled under the law to have its potential liability reduced by the equitable shares of the settled parties based upon an equitable allocation theory.  See Court's Memorandum and Order dated January 11, 2008 (Plaintiff has burden of demonstrating each defendant's equitable share of the costs.)

CERCLA itself is silent on how to account for settlements in private PRP contribution suits, but mandates the *pro tanto* approach in government-initiated actions. When a party settles with the United States or a state, such settlement "does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others *by the amount of the settlement*." § 9613(f)(2) (emphasis added). In contrast, no method of allocating settlements is specified for private PRP actions, beyond directing the court to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). The broad discretion granted courts in Section 113(f) allocations allows courts to decide whether to use the *pro tanto* approach or *pro rata* approach, depending on the equitable considerations. See, e.g., F.P. Woll & Co. v. Fifth and Mitchell Street Corp., 2006 U.S. Dist. LEXIS 57405 (E.D.Pa. 2006)(McLaughlin, J.).

The Third Circuit has not yet addressed the question of how to account for prior settlements in a Section 113(f) contribution action.   District courts within the Third Circuit appear to be split on whether to apply the *pro rata* approach under the UCFA or the *pro tanto* approach under the UCATA.  See, e.g., F.P. Woll & Co. v. Fifth and Mitchell Street Corp., 2006 U.S. Dist. LEXIS 57405 (E.D.Pa. 2006)(McLaughlin, J.)(applying the *pro tanto* approach); Action Manufacturing Co., Inc. v. Simon Wrecking Co., 428 F.Supp. 2d 288 (E.D.Pa. 2006)(Brody, J.)(applying the *pro tanto* approach); but see United States v. Atlas

Minerals and Chemicals, Inc., 1995 U.S. Dist. LEXIS 13097 (E.D.Pa. 1995)(Cahn, C.J.)(applying the *pro rata* approach under the UCFA); and Lyncott Corp. v. Chemical Waste Management, Inc., 690 F.Supp. 1409, 1417-18 (E.D.Pa. 1988)(applying the UCFA); see also Joseph A. Fischer, All CERCLA Plaintiffs Are Not Created Equal: Private Parties, Settlements, and the UCATA, *30 Hous. L. Rev. 1979 (1994)*. Here, this Court determined before trial that the *pro rata* approach under the UCFA was the most equitable manner to allocate the settled parties' share, and to implement CERCLA's policy to encourage settlements.

In Atlas Minerals, the parties agreed that earlier settlements were representative of the settling parties' shares. The court stated that it was adopting the UCFA approach, but decided to "treat the settlement values as representative of the settled parties' equitable shares and...reduce the Third-Party Defendants' liability accordingly." 1995 U.S. Dist. LEXIS 13097, at *235. The court noted that under the UCFA, the plaintiff PRPs bore the risk that settling PRPs' actual proportionate shares may be greater than their settlement amounts, which would give them an incentive to settle for as close to the settling PRPs' proportionate shares as possible. Id.

Unlike in Atlas Minerals, the Plaintiffs here have refused to disclose the settlement amounts necessary for either the Court or Carpenter to make an informed determination as to whether the more equitable approach is to treat the settlement values as representative of the settled parties' equitable shares of liability, and reduce Carpenter's potential exposure accordingly. Carpenter objects to Plaintiffs' unilateral refusal to disclose the settlement amounts for this purpose.

Indeed, Plaintiffs' clear focus at the trial was on the volume generated by Carpenter, and they did not put forth any evidence on the potential equitable share of liability of any of the settled parties, which was their burden under Section 113. <u>See</u> Court's Memorandum and Order dated January 11, 2008 at pp. 7-8; <u>see</u> <u>also</u> <u>Atlas</u> at *229 ("Third-Party Plaintiffs concurrently seek an equitable apportionment of past response costs under Section 113(f), and thus have the additional burden of proving each Third-Party Defendant's equitable share.")

Accordingly, without this evidence, both the Court and Carpenter are limited in their ability to determine the most equitable approach to allocate the shares of the settled parties.  In the alternative, as discussed more fully below, the Court must rely solely on the stipulated volumes of the settled parties and Plaintiffs' answers to the contention interrogatories relating to the volume of NRM in order to  allocate the equitable share of liability of all of the settled parties.

In its determination of the allocation of the equitable share of liability among the Plaintiffs, the settled parties and Carpenter, the Court must consider the fact that no evidence, other than highly questionable and conflicting testimony, links Carpenter's waste to Boarhead Farms.

**C. <u>Equitable Allocation of Response Costs</u>**

The allocation of response costs in a Section 113(f) contribution case is governed by CERCLA's broad instruction that the court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). The Third Circuit and others have noted that the language of Section 113(f) demonstrates Congress's intent that trial courts exercise their discretion in determining

33

what factors to consider. <u>Beazer East, Inc. v. Mead Corp</u>., 412 F.3d 429, 446 (3d Cir. 2005) (citing <u>Envtl. Trans. Sys., Inc. v. ENSCO</u>, 969 F.2d 503, 508 (7th Cir. 1992); <u>U.S. v. R.W. Meyer, Inc</u>., 932 F.2d 568, 576-77 (6th Cir. 1991)). The Third Circuit has also held that "a court may consider several factors or a few, depending on the totality of the circumstances." Id. (citing <u>New Jersey Turnpike Auth. v. PPG Indus., Inc</u>., 197 F.3d 96, 104 (3d Cir. 1999)).

An unsuccessful CERCLA amendment proposed by then-Representative Al Gore (referred to since as the "Gore Factors") is often cited as a non-exclusive list of appropriate considerations:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
> (ii) the amount of the hazardous waste involved;
> (iii) the degree of toxicity of the hazardous waste involved;
> (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
> (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such waste; and
> (vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

<u>See</u> 126 Cong. Rec. 26,779-81 (1980).

While this list is not binding because the Gore Amendment was not passed, it provides some helpful guidance. The evidence presented at trial focused mostly on three of these factors: (1) whether the parties could demonstrate that their contribution to a discharge, release or disposal of a hazardous waste could be distinguished; (2) the volume of hazardous waste allegedly disposed of at Boarhead Farms; and (3) the degree of care exercised by Carpenter in the disposal of its waste by DCC.

The other Gore Factors are not applicable in this case. Plaintiffs focused their case on the volume that allegedly reached the Site, not the degree of toxicity of such waste. Quite to the contrary, because Plaintiffs and other parties disposed of drums, VOCs and heavy metals at the site (including arsenic), they purposefully avoided a discussion on toxicity, which could only lead to a higher degree of culpability for Plaintiffs and the settled defendants than a volumetric analysis. Rather, Plaintiffs argued strenuously at trial, with the support of the expert testimony of Dr. Kirk Brown, that the parties' contribution to the site's contamination could not be distinguished from each other. Dr. Brown, however, opined that the response costs were not due primarily to the disposal of spent acids at the site.

Finally, Plaintiffs did not focus on Carpenter's degree of involvement and did not present any evidence of the degree of cooperation by the parties. In fact, Plaintiffs failed to introduce any evidence from any representative of the Plaintiffs' group that entered into the Consent Decrees with the EPA or from any other party regarding Carpenter's cooperation. Moreover, Plaintiffs failed to present any testimony or documentary evidence to suggest that Carpenter did not cooperate with the EPA in its investigation of PRPs. Accordingly, these particular Gore Factors are irrelevant to the Court's analysis in determining Carpenter's equitable allocation of liability in this case.

### D. Carpenter's Equitable Allocation of Past and Future Response Costs

By Plaintiff's design, this case focused solely on the volume of Carpenter's waste that allegedly reached Boarhead Farms. As set forth more fully in the Proposed Findings of Fact, the only evidence of Carpenter's alleged volume that reached the site came from the

highly questionable and conflicting oral testimony of Manfred DeRewal, Jr. and his older brother Bruce DeRewal (the "DeRewal Brothers").  No other driver testified that they hauled Carpenter's waste to the site, or even had knowledge that other drivers hauled Carpenter's waste to the site.

Accordingly, the only evidence this Court may review to determine Carpenter's volume is the testimony of the DeRewal Brothers.

If the Court gives any weight to the trial testimony of the DeRewal Brothers, Carpenter's percentage of the total volume generated by each of the parties to this action is between 5% and 6% (see Exhibit A).  Accordingly, applying these percentages to the total past remediation costs, Carpenter's equitable share is between $716,688.48 and $860,026.17. See Exhibit A, Carpenter's Equitable Allocation of Past and Future Response Costs.

Moreover, Carpenter proposes that the same percentages be applied to its equitable allocation of the future remediation costs which have yet to be determined, and that the Court enter a declaratory judgment to that effect.

Based upon the above analysis, Plaintiffs' equitable share far outweighs the potential equitable share of Carpenter's liability for contribution of the remediation costs.  Since Plaintiffs failed to present any evidence of the equitable share of liability of the settled parties, they have in turn failed to demonstrate that they paid more than their fair share of the cleanup costs under the circumstances.  See 42 U.S.C. §9613(f)(CERCLA authorizes a PRP to seek contribution "when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances."); In

36

re Reading Co., 115 F.3d 1111, 1120 (3rd Cir. 1997)(citing S. Rep. No. 11, 99th Congress., 1st Sess. At 44 (1985))(a PRP may seek contribution "when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.")  On the contrary, by keeping the settlement amounts confidential, it is possible that the Plaintiffs may collect more than the remediation costs, a windfall that is offensive to public policy.

Accordingly, Plaintiffs' Section 113(f) contribution claim fails as a matter of law.


**BOOTH & TUCKER, LLP**


Dated: July 18, 2008                    /s/CRB2896_____

                                   By:    Christopher R. Booth, Jr., Esquire
                                          Attorney I.D. No. 59395
                                          Joan E. Clarke, Esquire
                                          Attorney I.D. No. 91576
                                          One Penn Center at Suburban Station
                                          1617 JFK Blvd., Suite 1700
                                          Philadelphia, PA 19103
                                          (215) 875-0609

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher R. Booth, Jr., Esquire, hereby certify that I am an Attorney admitted to the bar of this court, and on this day a copy of Defendant Carpenter Technology Corporation's Proposed Findings Of Fact And Conclusions Of Law was sent by first class mail to each of the following:

Glenn A. Harris, Esquire
Ballard Spahr Andrews &
  Ingersoll, LLP
Plaza 1000 – Suite 500
Main Street
Voorhees, NJ  08043=4636
(856) 761-3440
(856) 761-9001 (Fax)
harrusg@ballardspahr.com

**(Counsel for Boarhead Farms Agreement Group)**

**BOOTH & TUCKER, LLP**

Dated: July 18, 2008            By: <u>/s/CRB2896_____</u>
                                    Christopher R. Booth, Jr., Esquire
                                    Attorney I.D. No. 59395
                                    Joan E. Clarke, Esquire
                                    Attorney I.D. No. 91576
                                    One Penn Center at Suburban Station
                                    1617 JFK Blvd., Suite 1700
                                    Philadelphia, PA 19103
                                    (215) 875-0609