# APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS L.L.C., NRM INVESTMENT COMPANY,<br><br>                        Plaintiffs,<br>v.<br><br>ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al.,<br><br>                        Defendants. | Civil Action No. 02-CV-3830 (LDD) |

## FACTS STIPULATED BY ALL PARTIES

1. The Boarhead Farms Superfund Site (the "Site") is located in Bridgeton Township, Pennsylvania on Lonely Cottage Road in Upper Black Eddy.

2. The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

3. The Site is a "site" as defined in Section 103 of the HSCA, 35 P.S. § 6020.103.

4. "Hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), were disposed of, placed on, or otherwise became located at the Site.

DMEAST #10060683 v2

J-33

5. There have been "releases" as that term is defined in Section 101(22) of CERCLA 42 U.S.C. § 9601(22), or threatened releases of hazardous substances into the environment at or from the Site.

6. There have been "releases" or "substantial threats of releases" of "hazardous substances" and "contaminants" into the environment at or from the Site, as those terms are defined in Sections 101(22), 103, and 501(a) of HSCA, 35 P.S. §§ 6020.101(22), 6020.103 and 6020.501(a).

7. The release or releases have caused the incurrence of "response" costs at the Site, as that term is defined in 42 U.S.C. § 9601(25).

8. Advanced Environmental Technology Corp., Handy & Harman Tube Company, Carpenter Technology Corporation, Ashland, Inc., Agere Systems, Inc. ("Agere"), Cytec Industries Inc. ("Cytec"), Ford Motor Company ("Ford"), SPS Technologies, LLC ("SPS"), TI Group Automotive Systems L.L.C. ("TI"), and NRM Investment Company ("NRM") are all persons as that term is defined under both 42 U.S.C. § 9601 and 35 P.S. § 6020.103.

9. Manfred T. DeRewal ("DeRewal") incorporated Boarhead Corporation on or about September 2, 1969.

10. The Site was conveyed to Boarhead Corporation by Deed dated October 16, 1969. Boarhead Corporation continues to own the Site today.

11. On or about December 29, 1969 DeRewal incorporated DeRewal Chemical Company, Inc.

**EPA Remedy Selection**

12. A contractor for EPA completed a Preliminary Assessment and Site Investigation of the Site between 1984 and January 1986. The reports of those tasks detailed the presence of a variety of contaminants, including organic compounds.

13. EPA listed the Site on the National Priorities List on March 31, 1989. EPA conducted response actions thereafter. The Army Corps of Engineers also constructed and began operating a groundwater extraction and treatment system, and EPA installed individual well treatment systems at sixteen area residents.

14. A contractor for EPA conducted a "Remedial Investigation" beginning on or about December 5, 1989, to determine if there were contaminants at the Site that pose a risk to human health and the environment.

15. After the investigation, the contractor prepared a "Remedial Investigation Report" for EPA dated January 1997.

16. The remedial investigation found hazardous substances were present in soils, sediments, and groundwater at the Site.

17. A contractor for EPA conducted a "Feasibility Study" to define the objectives of the response action, to develop remedial action alternatives, and to undertake an initial screening and detailed analysis of the alternatives. The contractor prepared a "Feasibility Study Report" dated July 1997. Each alternative addressed both soil and groundwater.

18.     EPA issued a Proposed Remedial Action Plan for comprehensive site clean-up based upon the conclusions of the Remedial Investigation/Feasibility Study in January 1998.

19.     Following public notice and comment on the Proposed Remedial Action Plan, EPA issued the Record of Decision ("ROD") on November 18, 1998.

20.     The ROD lists "chemicals of potential concern" ("COPCs") at the Site, including nine COPCs for surface soil, 53 COPCs for shallow groundwater, 4 COPCs for pond sediments, and 2 COPCs for pond surface water.

21.     The ROD elected 7 major remedy components: soil aeration and treatment of VOC hot spots; excavation and offsite disposal of buried drums; groundwater extraction, metals precipitation, and air stripping to reduce concentrations of contaminants in the groundwater to below maximum contaminant levels; the installation of additional monitoring wells to monitor the effectiveness of the remedial action; institutional controls and monitoring to protect the integrity of the remedial action components to ensure continued protectiveness of the remedy; residential water treatment consisting of the continued maintenance of the granular activated carbon filters that were installed on residential wells in the downgradient areas to prevent potential exposure to contaminated groundwater from the Site; and phytoremediation consisting of the performance of treatability studies in the main former disposal areas of the Site to determine whether phytoremediation would be a viable treatment technique for groundwater.

22.     EPA determined in the ROD that the selected remedy would be protective of human health and the environment and that it would be cost effective.

23. Subsequent to the issuance of the ROD, EPA determined to implement the remedial action described in the ROD in two operable units ("OUs"). EPA determined that, in general, OU-1 would address groundwater extraction, metal precipitation, and air stripping; the installation of additional monitoring wells, implementation of institutional controls and monitoring for OU-1; residential water treatment; and phytoremediation ("OU-1 RD/RA"). EPA determined that, in general, OU-2 would address: soil aeration and treatment of volatile organic compound hotspots; the excavation and off-site disposal of buried drums in contaminated soil; and implementation of institutional controls and monitoring for OU-2 ("OU-2 RD/RA").

**Plaintiffs' Settlements with EPA and Conduct of Remediation**

24. Cytec, Ford, and SPS are parties to an Administrative Order for Consent for remedial design, USEPA Docket No. III-2000-002-DC, entered in February 2000 and a Consent Decree entered by this Court on or about September 28, 2000. By entering into these two agreements, Cytec, Ford, and SPS agreed to do the work necessary to perform the OU-1 RD/RA, and to reimburse EPA for its administrative and oversight costs in the future in connection with the OU-1 RD/RA.

25. Cytec, Ford, SPS, TI Automotive, and Agere agreed to collectively fund and perform the OU-1 RD/RA, and entered into an agreement with two other entities, NRM Investment Company and Worthington Steel Company - Malvern (collectively the "OU-1 Group") whereby the parties to that agreement agreed to collectively fund and perform the OU-1 RD/RA and to otherwise comply with the OU-1 Consent Decree.

26. Each member of the OU-1 Group contributes (or has contributed) funds to OU-1 group trust accounts (the "OU-1 Trust Accounts").

27. Under the terms of the OU-1 Consent Decree, costs related to activities to perform the OU-1 RD/RA and for the Future Response Costs required by the OU-1 Consent Decree have been paid for and will be paid for in the future from the OU-1 trust accounts.

28. The OU-1 Group hired de maximis, inc. to be the "Supervising Contractor" as required by the 2000 Consent Decree. Geoffrey Seibel of de maximis, inc. is the project coordinator for the OU-1 Group. Mr. Seibel and de maximis, inc. later became the project coordinator for the OU-2 Group. Mr. Craig Coslett was approved by EPA as the Assistant/Alternate Projection Coordinator in 2001. de maximis, inc. provides overall project management of the Site remediation.

29. The OU-1 Group created a Technical Committee comprised of representatives of some of the OU-1 Group members. The Technical Committee supervises and directs the OU-1 work and reviews and approves payment of contractors that do the work. The Technical Committee works closely with de maximis to ensure that the work is completed in accordance with the project documents and EPA's direction and approvals. The Technical Committee later performed the same functions with respect to the OU-2 work.

30. de maximis, inc.'s work at the Site requires it to interact with EPA's remedial project manager for the Site and to seek approval of that work.

31. The OU-1 Group assumed responsibility for all future operation and maintenance of the groundwater extraction and treatment system on May 2, 2000.

32. The OU-1 Group retained Bigler Associates, Inc. to design and construct modification to the groundwater extraction and treatment system, as required under the ROD. The OU-1 Group submitted a Remedial Design Work Plan, 2001 and a Remedial Design Basis Report that described the removal of the shallow tray air stripper and the addition of an air sparge tank, metals precipitation unit, air phase carbon for off gas treatment, and liquid phase carbon. The work, conducted between January 2002 and May 2002, was documented in an August 20, 2004 Remedial Action Report to EPA. Each of those plans and reports, and the work referenced in those reports, was approved by EPA.

33. The OU-1 Group also retained Bigler Associates, Inc. to conduct the ongoing operation and maintenance of the treatment plant. Operation and maintenance is being conducted in accordance with the December 2001 Operation and Maintenance Plan. EPA approved that Plan.

34. Between July 2001 and August 2001, the OU-1 Group converted the groundwater extraction system from pneumatic to electric to improve the operation of the system and to decrease operation and maintenance cost. This modification was approved by EPA.

35. The OU-1 Group retained Brown and Caldwell to perform the Remedial Design with respect to the balance of the OU-1 work. The OU-1 Group submitted to EPA the May 2000 Remedial Design Work Plan. EPA approved that

document. Brown and Caldwell was also retained to provide supporting design services to Bigler Associates for the treatment plan upgrade.

36. The OU-1 Group has been maintaining the residential filter program, required by the ROD, since May 2000. The program is documented in the March 25, 2002 Residential Wells - Operation and Maintenance Plan. EPA approved that plan.

37. The OU-1 Group has since May 2000 conducted regular sampling and reporting of the monitoring well system. This work, required by the ROD, has been done in accordance with the March 2002 Final Long-Term Monitoring and Quality Assurance Plan. EPA approved that plan as well as a modification to the plan dated September 21, 2006. The Group and EPA work together to make modifications to the LTMP in response to data.

38. Pursuant to the 2000 Consent Decree and the ROD, the OU-1 Group conducted an evaluation of the potential use of phytoremediation. The results are documented in the Brown & Caldwell July 2000 Phytoremediation Study. Based on the results of the evaluation, EPA determined that phytoremediation would not effectively aid in groundwater cleanup and the treatability study required by the ROD was not necessary. EPA approved that study and agreed to defer its final determination on the applicability of phytoremediation until after the OU-2 work was complete. After completion of the OU-2, EPA confirmed that no additional work relative to phytoremediation was necessary.

39. In November 2000, EPA agreed to defer and combine the OU-1 Institutional Control requirements with the OU-2 Institutional Control requirements. The

OU-1 Group and the OU-2 Group (as defined below) continue to work with the EPA on establishing appropriate Institutional Controls for the Site.

40. Cytec, Ford, SPS, and TI Automotive are signatories to an Administrative Order on Consent for Remedial Design, EPA Docket No. III-2001-0010-DC effective October 17, 2001 and a Consent Decree entered by this Court on March 14, 2002. By entering into these agreements, those entities agreed to do the work necessary to perform the OU-2 RD/RA at the Site, to reimburse EPA both for $7,000,000 in response costs incurred and accounted for prior to July 2000, and for an as yet determined amount of response costs incurred subsequent to July 2000, and to reimburse EPA for its future response costs in connection with the OU-2 RD/RA.

41. Pursuant to an agreement, those four entities and Agere (the "OU-2 Group") agreed to collectively fund and perform the OU-2 RD/RA, and contributed funds to OU-2 Group trust accounts.

42. All costs of the activities to perform the OU-2 RD/RA and to perform the other requirements of the OU-2 Consent Decree have been paid for from the OU-2 trust accounts.

43. The OU-2 Group retained Brown and Caldwell to complete the remedial design of the OU-2 work, to perform construction quality assurance during the remedial action, and to be the "Supervising Contractor" as required by the 2001 Consent Decree.

44. The OU-2 Group retained Code Environmental Inc. to do the construction of the OU-2 remedial action. EPA's contractor provided independent quality assurance oversight of the work.

45. The OU-2 Group submitted a February 2002 Remedial Design Work Plan, and a November, 2002 Remedial Design Report. Those reports were approved by EPA. The cleanup of contaminated soils and drum removal, required by the ROD, is documented in the May 28, 2004 Remedial Construction Report. EPA approved that report.

46. In addition to the reports and plans mentioned above, ongoing Site operation and maintenance activities are summarized in progress reports submitted to PADEP and EPA regularly since June 2000.

47. All remedial activities conducted at the Site by the OU-1 and OU-2 Groups were consistent with the 1998 ROD and subsequent design documents approved by EPA. Construction and monitoring activities were overseen by EPA and its contractors and verified as conforming with the design documents approved by EPA. The QA/QC program was in conformance with EPA standards.

48. EPA and PADEP conducted a final inspection on September 23, 2003 and determined that the OU-1 and OU-2 Groups conducted the remedy in accordance with the design plans and specifications. The Site achieved construction completion status with the signing by EPA of a November 10, 2003 Preliminary Close-out Report.

49. EPA conducted a Five-Year Review from November 2006 through August 2007. It issued a Five-Year Review Report on August 22, 2007. EPA found therein that the remedy has been constructed in accordance with the requirements of the ROD and is functioning as designed and intended.

50. Mr. Seibel and Mr. Coslett review bills from remediation consultants and contractors and make recommendations to the OU-1 and OU-2 Groups regarding payment. They oversee the work reflected in those bills, which are for work performed in the investigation, remediation, monitoring and maintenance of the Site.

51. The bills are then forwarded by de maximis to two members of the Technical Committee. Those individuals review the bills and de maximis's recommendations and make a final determination regarding the payment of the invoices. If approved, they forward their payment recommendations to common counsel for payment

52. Timothy Bergere, Esquire, a lawyer at Montgomery, McCracken & Rhoads, has, since August 2003, been counsel to the OU-1 and OU-2 Groups with respect to the work done at the Site by those groups.

53. Mr. Bergere reviews all payment recommendations and arranges for them to be paid from the OU-1 and OU-2 trust accounts. Mr. Bergere also maintains the cash flow records of the groups. Mr. Bergere also maintains the OU-1 and OU-2 trust accounts.

54. All of the costs billed to the OU-1 and OU-2 Groups that de maximis reviewed and submitted were for work performed in the investigation and clean-up of the Site.

55. The payments made by the OU-1 Group for the OU-1 RD/RA for work performed through December 31, 2007, consist of the following amounts:

| Agere | $540,874.34 |
|---|---|
| Cytec | $846,674.74 |
| Ford | $841,152.85 |
| SPS | $841,152.85 |
| TI | $286,601.22 |
| NRM | $277,975.20 |
| Worthington | $277,275.80 |

56. The payments made by Plaintiffs for the OU-2 RD/RA are in the following amounts:

| Agere | $188,279.75 |
|---|---|
| Cytec | $530,565.73 |
| Ford | $521,953.31 |
| SPS | $521,953.31 |
| TI | $521,953.31 |

57. The payments made by the OU-1 Group for EPA's oversight costs for the OU-1 RD/RA are in the following amounts:

| EPA Oversight Bill | Agere | Cytec | Ford | SPS | TI | NRM | Worthington |
|---|---|---|---|---|---|---|---|
| $38993.30 | $7,798.66 | $7,798.66 | $7,798.66 | $7,798.66 | $2599.55 | $2599.55 | $2599.55 |
| $169,720.60 | $33,944.12 | $33,944.12 | $33,944.12 | $33,944.12 | $11,314.71 | $11,314.71 | $11,314.71 |
| $80,466.45 | $16,093.29 | $16,093.29 | $16,093.29 | $16,093.29 | $5,364.43 | $5,364.43 | $5,364.43 |
| $33,015.66 | $6,603.14 | $6,603.14 | $6,603.14 | $6,603.14 | $2,201.05 | $2,201.05 | $2,201.05 |
| $10,564.97 |  | $2,641.24 | $2,641.24 | $2,641.24 | $880.41 | $880.41 | $880.41 |

58. The payments made by Plaintiffs for EPA's oversight costs for the OU-2 RD/RA are in the following amounts:

| EPA Oversight Bill | Agere | Cytec | Ford | SPS | TI |
|---|---|---|---|---|---|
| $133,327.41 | $13,332.77 | $29,998.66 | $29,998.66 | $29,998.66 | $29,998.66 |
| $120,958.65 | $12,095.87 | $27,215.70 | $27,215.70 | $27,215.70 | $27,215.70 |
| $71,695.27 | | $18,144.72 | $17,850.18 | $17,850.18 | $17,850.18 |

59. The payments made by Plaintiffs for EPA's past costs are in the following amounts:

| EPA Past Costs | Agere | Cytec | Ford | SPS | TI | NRM | Worthington |
|---|---|---|---|---|---|---|---|
| $7,062,962.06 | | $1,765,740.52 | $1,765,740.52 | $1,765,740.52 | $1,765,740.52 | | |
| $415,652.74 | $83,130.55 | $83,130.55 | $83,130.55 | $83,130.55 | $27,710.81 | $27,710.81 | $27,710.81 |

60. The costs incurred by the OU-1 and OU-2 Groups were necessary to comply with the requirements of the ROD and were consistent with the National Contingency Plan.

61. Agere has to date paid approximately $1,061,084.30 into OU-1 and OU-2 Trust Accounts and counsel for Plaintiffs' legal fees of $233,111.81 for this action. On or about March 30, 2007, Agere entered into a settlement agreement with SPS, Ford, Cytec, and TI resolving certain claims, including the rights and obligations, as between Agere and those entities, for Agere's share of all OU-1 and OU-2 Group costs, including the costs of this action. SPS, Ford, Cytec, and TI agreed therein to pay Agere $400,000, none of which was allocated by the parties to any previous contributions by Agere.

**Disposal of Waste at the Site by DCC**

62. DeRewal entered into a lease for a one-story building at 3013-31 East Ontario Street in Philadelphia on November 15, 1973. Possession was permitted under the Lease on December 1, 1973.

63. Ontario Street was a warehouse about two blocks from the Delaware River.

64. On September 24, 1974, the Water Department wrote to DeRewal about his "spent chromic acid transfer operations." The Water Department directed DeRewal to install a limestone interceptor at the facility and a two compartment oil inceptor necessary to prevent oil discharges to the city sewer system."

65. The Water Department again wrote to DeRewal and to his landlord on June 2, 1975. This letter noted various deficiencies in DCC's operation of the Ontario Street Site and informed DCC that it planned to terminate both sewer and water services to the facility to end those operations.

66. The Water Department plugged the lateral connection between June 2, 1975 and June 13, 1975.

67. The Water Department severed and sealed the lateral on June 13, 1975.

68. DeRewal formed a Pennsylvania corporation named Environmental Chemical Control ("ECC") on October 18, 1976.

69. ECC entered into a lease dated May 6, 1976 wherein the landlord was the Wissinoming Industrial Park and the leased premises were on Comly Street in Philadelphia. The term of the lease was June 1, 1976 to May 31, 1977. The initial leasehold was limited to the first floor building "R."

70. On November 1, 1976 an addendum to the lease was executed stating that effective that date additional space was leased in Building "G" and Building

"Z" and approximately 1,400 square feet of yard space. The lease was to continue for its remaining six months and then for another year.

**Defendant Wastes**

71. Carpenter Technology Corporation is a Delaware corporation with its principal place of business in Reading, Pennsylvania.

72. David Mann was employed by Carpenter in its engineering department from June 24, 1968 to March 18, 1977.

73. John Adams was employed by Carpenter in its engineering department from November 1952 to January 1986.

74. Mr. Adams was Mr. Mann's supervisor.

75. Carpenter entered into a June 12, 1973 agreement with DCC in which DCC agreed to pick up and dispose of Carpenter's waste hydrochloric acid pickle liquor.

76. Carpenter received a Section 104(e) Request from EPA with respect to the Site.

77. Carpenter received a Special Notice Letter from EPA dated September 28, 2000. The letter asked Carpenter to resolve its potential liability to the United States for the alleged past costs incurred, and to agree to do the work required by the ROD but not included in the 2000 Consent Decree. The letter included a list of 10 previous recipients of Special Notice letters from the EPA for the Site and also enclosed a list of 10 recipients of the identical letter.

78. Advanced Environmental Technology Corp. ("AETC") was at all relevant times a New Jersey corporation with its principal place of business in Flanders, New Jersey.

79. The principals of AETC were Robert Landmesser and Robert Leuzarder.

80. Ashland received a Section 104(e) Request from EPA with respect to the Site.

81. Ashland received a General Notice Letter from EPA dated May 18, 1989. The letter informed Ashland that EPA considered Ashland to be a potentially responsible party and asked Ashland to perform the RI/FS and potentially some removal actions at the Site.

82. AETC received a Section 104(e) Request from EPA with respect to the Site.

83. AETC received a General Notice Letter from EPA dated May 18, 1989. The letter informed AETC that EPA considered AETC to be a potentially responsible party and asked AETC to perform the RI/FS and potentially some removal actions at the Site. AETC did not receive a Special Notice Letter from EPA.

84. NRM Investment Company ("NRM") is a Pennsylvania Corporation with its principal place of business in Rosemont, Pennsylvania.

85. In May 1974 NRM purchased and thereafter operated a steel rolling mill facility in Malvern, Pennsylvania.

86. In May 1974 NRM contracted with Marvin Jonas for Jonas to remove, transport, and dispose of NRM's waste pickle liquor from NRM's Malvern, Pennsylvania facility.

87. Jonas billed NRM for that work.

88. The first time he [Freddie DeRewal] went to NRM Ontario Street was open.

89. NRM received a Section 104(e) Request from EPA with respect to the Site.

90. NRM received a General Notice Letter from EPA dated July 28, 1989. The letter informed NRM that EPA considered NRM to be a potentially responsible party and asked NRM to volunteer to perform the RI/FS and potentially some removal actions at the Site. NRM did not receive a Special Notice Letter from EPA.

91. NRM was asked to join Cytec, Ford, and SPS in agreeing to do the OU-1 work, and agreed to do so.

92. NRM was asked to join Cytec, Ford, SPS, and TI in agreeing to do the OU-2 work and settle EPA's past costs claim, but declined to do so.

93. Handy & Harman Tube Company ("Handy") is a Delaware Corporation with its principal place of business in Norristown, Pennsylvania.

94. Handy received a Section 104(e) Request from EPA with respect to the Site.

95. Handy received a General Notice/Special Notice Letter from EPA dated September 28, 2000. The letter asked Handy to resolve its potential liability to the

United States for the alleged past costs incurred, and to agree to do the work required by the ROD but not included in the 2000 Consent Decree. The letter included a list of 10 previous recipients of Special Notice letters from the EPA for the Site and also enclosed a list of 10 recipients of the identical letter.

Dated:            , 2008

                                                          Respectfully submitted,

BALLARD SPAHR ANDREWS                   WOLFF & SAMSON, PC
& INGERSOLL, LLP                             Attorneys for Advanced Environmental
Attorneys for Plaintiffs                          Technology Corporation

By: _____           By: _____
Glenn A. Harris                                    John McKinney
Amy J. Trojecki                                     Laurie Sands

BOOTH & TUCKER                        CARELLA, BYRNE, BAIN, GILFILLAN,
Attorneys for Carpenter Technology       CECCHI, STEWART & OLSTEIN
Corporation                                         Attorneys for Handy & Harman Tube
                                                    Company, Inc.

By: _____           By: _____
Christopher Booth                                  John M. Agnello
Melissa E. Flax

LAW OFFICES OF EDWARD
FACKENTHAL
Attorneys for NRM Investment
Company

By: _____
     Edward Fackenthal