IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AGERE SYSTEMS, INC., CYTEC INDUSTRIES INC., FORD MOTOR COMPANY, SPS TECHNOLOGIES, LLC and TI GROUP AUTOMOTIVE SYSTEMS L.L.C., | : : : : : : | Civil Action No. 02-CV-3830 (LDD) |
| Plaintiffs, | : : | |
| v. | : : | |
| ADVANCED ENVIRONMENTAL TECHNOLOGY CORPORATION, et al., | : : : | |
| Defendants. | : : | |

## PLAINTIFFS' REPLY TO CARPENTER TECHNOLOGY CORPORATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs respectfully submit this Reply to Carpenter Technology Corporation's ("Carpenter") Proposed Findings of Fact and Conclusions of Law.

*Carpenter's Allocation*

Carpenter's proposed allocation is not only misleading, but deliberately so. Carpenter's Exhibit A, showing its "equitable allocation of remediation costs," was contrived from several different, inconsistent, and irreconcilable sources. Carpenter offers a single sentence of explanation for this chart: "Carpenter's percentage of the total volume *generated* by each of the parties to this action is between 5% and 6% (see Exhibit A)." Carpenter's Findings of Fact at 36 (emphasis added). There is no way to parse this statement to make it true.

In the Exhibit, Carpenter's representations of "volumes" for the Settled Parties, Plaintiffs and Carpenter itself are plucked from a variety of sources. The volumes for all of the Settled Parties (except NRM) are from J-34, Supplemental Facts Stipulated By All Parties. That stipulation, it must be underscored, identifies only volumes "hauled" by DeRewal Chemical

Company ("DCC") for the Settled Parties "during the designated time periods," it does not stipulate volumes disposed of at the Site. The volume for NRM comes from C-28, Plaintiffs' November 21, 2007 Responses to Contention Interrogatories, and represents gallons Plaintiffs *then contended*, based on their nexus periods approach and their view of evidence not of record here, were *disposed of* at the Boarhead Farms Site (the "Site"). The volumes for Plaintiffs and for Handy & Harman come from J-35, Stipulation Between Plaintiffs, Handy & Harman Tube Company, Inc. and Carpenter Technology Corporation, and P-329, Stipulation Between Plaintiffs and Handy & Harman Tube Company, Inc., which identify the Plaintiff volumes as "hauled" by DCC during various time periods and the Handy & Harman volumes *disposed of* at the Site. Carpenter's volume (in each of the two columns of Exhibit A) represents Carpenter's view of the volume of its own wastes that were *disposed of* at the Site by Freddie and Bruce DeRewal (as Carpenter construes the testimony of those witnesses).

Contrary to Carpenter's statement in Findings of Fact at 36, the chart does *not* reflect Carpenter's percentage of wastes *generated* by these parties (or even hauled by DCC). Indeed, because the volumes are a mix of wastes "hauled" by DCC and wastes "disposed of at the Site," the chart does not reflect Carpenter's percentage of anything.[1]

No doubt Carpenter hopes the reader lacks the astuteness to discern that what it presents as a reasoned method is none at all, perhaps as this defendant imagined it could, without consequence, patently misrepresent its high-strength acid waste as "rusty water." But the reason for this obfuscation is obvious. Carpenter, as a deliberate trial tactic, failed to create any record to prove that *any other entity's* waste was disposed of at the Site, it merely attacked the truck

---

[1] The information contained in the columns "Waste Type" and "Bulk/Drum" was not included in any stipulation, but came only from C-28, Plaintiffs' November 21, 2007 Responses to Contention Interrogatories.

driver testimony with respect to *Carpenter's* wastes. Failing to so present a nexus case,

Carpenter thus would have to explicitly adopt Plaintiffs' period approach to nexus (e.g., 99% of

all customer wastes were disposed of at the Site before Ontario Street) to prove, for example, that

any Techalloy waste went to the Site (Techalloy was solely a pre-Ontario Street customer).

Carpenter realizes that it is patently absurd to argue that only a few thousand gallons of its waste

was disposed of at the Site based upon the supposedly untruthful driver testimony while relying

on that same testimony to argue that everybody else's waste went to the Site.

Carpenter therefore presents in its allocation Exhibit wastes volumes *hauled* by

DCC, without explaining why that would be relevant. Of course, had Carpenter actually and

honestly compared the volume of its wastes *hauled* by DCC to the volumes of Plaintiffs and the

Settled Parties (other than NRM and Handy & Harman for which there is no record of the

volumes "hauled"), its percentage of that total volume would be approximately 51.5% (916,114

gallons hauled by DCC from Carpenter in the pre-Ontario period plus 816,658 gallons hauled

during the Ontario period is the numerator; that volume plus 1,631,691 (as to Plaintiffs and the

Settled Parties per the stipulations) is the denominator).[2]

Carpenter thus has failed to present to this Court any meaningful alternative to

Plaintiffs' waste-in analysis, which shows that approximately 63% of the total parties' waste

disposed of at the Site came from Carpenter. Rather, its allocation contention is a sham and

demonstrates a continuing recalcitrance of spirit.

*Improper Citations*

---

[2]     Carpenter concedes by Exhibit A that only waste from the parties to this action are
relevant.

Plaintiffs are compelled to note that many of Carpenter's proposed Findings of Fact are not supported by the record. We ask the Court to take note of the following in assessing the credibility and strength of Carpenter's contentions.

1.      Findings of Fact No. 16 - Mr. DeRewal testified to only "an inspection," not to "intense scrutiny" by the Bucks County Department of Health, as suggested by Carpenter.

2.      Findings of Fact No. 29 - Freddie DeRewal's testimony at 56:25-57:3 (not referenced by Carpenter) makes clear that the testimony that is referenced pertains to the "big investigation" that occurred beginning in October 31, 1973, and not to "1972 and early 1973" as stated by Carpenter.

3.      Findings of Fact No. 30 - The cited testimony does not refer to "regular and constant inspections" and makes no reference whatsoever to "beginning on or around February 1973."

4.      Findings of Fact No. 50 - Freddie DeRewal's testimony at 20:14-16 (not referenced by Carpenter) makes clear that Mr. Minthorn was *not* working as a truck driver and dispatcher for DCC in September 1972. 58:10-18 also does not support this Proposed Fact.

5.      Findings of Fact No. 54 - Freddie DeRewal simply said that Bruce DeRewal drove for his father before Freddie started to do so. Freddie did not say that he drove to Carpenter with his brother before Freddie obtained his driver's license, contrary to footnote 3.

6.      Findings of Fact No. 63 - Nowhere in Freddie DeRewal's testimony does he say that he went to Carpenter "for over a two year period between 1973 and 1975."

7.    Findings of Fact No. 70 - Bruce DeRewal was *not* the only driver to haul Carpenter's waste in the Ontario period, as even Carpenter admits in its footnote 7.

8.    Findings of Fact Nos. 83 and 85 - Footnotes 5 and 6 reference deposition testimony that is not in the record.

9.    Findings of Fact No. 125 - The chart included is from Plaintiffs' Interrogatory Answers, is not supported by any record fact, and therefore lacks probative weight. Even so, nothing in the chart reflects that "VOCs" or "arsenic" were in the wastes of Plaintiffs or the Settled Parties (there is also no record evidence that any of the "Waste Types" identified include VOCs or arsenic).

*Carpenter's Nexus to the Site*

Carpenter's Proposed Findings of Fact Nos. 14-25 all reference periods of time on or after October 31, 1973, *after DCC had already hauled hundreds of thousands of gallons of Carpenter's waste pickle liquor*. These inspections prove that DeRewal was then dumping waste at the Site, including Carpenter's wastes. Moreover, the volume of acid wastes dumped at the Site was so large that the regulatory authorities believed it appropriate that DeRewal use *100,000 pounds of lime* to try and neutralize it. P-11. The inspections prior thereto were sporadic, and the Site was located in a rural area on 120 acres, such that virtually no one could see what was being done on the property.

Carpenter's argument that "other landfills" were used for its waste in the pre-Ontario period (ignoring the obvious implication that *all other* DeRewal customers' waste likewise went to those landfills) is based *exclusively* on the deposition testimony of Fred DeRewal, whom Carpenter itself characterizes as the chief "crook and convicted felon" and who

suggested that "some" waste (quantity unspecified) was disposed of at a landfill and not at the Site prior to the opening of Ontario Street. Not only is there no corroboration of this deposition testimony, Mr. DeRewal is totally contradicted by the testimony of each and every driver, who consistently stated that the Site was the only place he took waste in the pre-Ontario period (except for a handful of loads, none of which were taken to a landfill). Thus, there is absolutely no independent support for Mr. DeRewal's testimony, while the driver testimony is corroborated both by the other drivers and by the record of inspections of the Site.[3]

*UCFA/UCATA*

This Court's decision that UCFA applies to Plaintiffs' settlements with the Settled Parties is the law of the case. Even Carpenter acknowledges that this Court had "broad discretion" in making that decision. This Court stated in its Memorandum Order: "This means that the liability of the Non-Settlors is determined without regard to the dollar amounts of previous settlements." June 30, 2004 Memorandum Order at 6. Carpenter made no attempt to learn from Plaintiffs prior to trial the amounts that Plaintiffs received in settlement, made no mention in either its opening statement or its summation of those amounts or why they might be significant, and offered no evidence concerning those amounts. Carpenter quite clearly conceived this argument *after trial* and without due consideration of the Court's ruling. The dollar amounts of the settlements are irrelevant, Plaintiffs have no discovery obligation to provide them, and the record is closed.

---

[3]    Moreover, Carpenter wants to credit Mr. DeRewal's testimony about use of landfills while ignoring his testimony that the supposed landfill on Route 322 was used only 5 or 10 times, and his testimony that, despite the supposed use of landfills, the "majority" of waste pre-Ontario went to the Site.

*Proof of Equitable Shares of Settled Parties*

Carpenter's statement that Plaintiffs "did not put forth any evidence" as to the shares of the Settled Parties is just wrong. Carpenter Findings of Fact at 33. Plaintiffs put into evidence as part of their case-in-chief the stipulations concerning wastes hauled by DCC from the Settled Parties and proposed in their Findings of Fact and Conclusions of Law that Plaintiffs' nexus period percentages should be applied to those *hauled* volumes in allocating equitable shares. It is *Carpenter* who chose not to put on a case with respect to the Settled Parties' equitable shares.[4]

*Equitable Adjustments for Lack of Cooperation and Engaging a Known Polluter*

*Lack of Cooperation.* It is a matter of particular astonishment to Plaintiffs to read in Carpenter's Proposed Conclusions of Law that "Plaintiffs … did not present any evidence of the degree of cooperation of the parties." Unfortunately, there is a discomfiting familiarity in this obstinacy to acknowledge facts that are self-evident and undisputable. Sadly, Plaintiffs are long acquainted with it. It is of the same spirit that moved Carpenter's management to take the self-interested course, shirk its duty, and hope for the best while Plaintiffs undertook the work at the Site. There can be no doubt that Carpenter's management was on notice of its obligations but failed to act.

---

[4]    Carpenter's further statement that "Plaintiffs … have in turn failed to demonstrate that they paid more than their fair share of the clean-up costs under the circumstances," Carpenter Findings of Fact at 36-37, ignores the record, ignores this Court's June 30, 2004 Memorandum Order, and ignores even Carpenter's own proposed allocation in which Carpenter has a 5-6% share and has paid nothing.

Carpenter received a September 2000 EPA General/Special notice letter, which letter asked Carpenter to resolve its potential liability to the United States for the United States alleged past costs and to agree to do the work required in the ROD but not included in the 2000 Consent Decree. J-29, Facts Stipulated By All Parties, at ¶ 75. The facts stipulated by all parties shows that Carpenter has not paid any portion of such costs. *Id.* at ¶¶ 55-59. Carpenter's name does not appear on either Consent Decree. J-6 2000 Consent Decree; J-7 2001 Consent Decree.

Carpenter failed to settle with EPA after receiving the 2000 General/Special Notice Letter despite knowing that DCC had hauled almost two million gallons of its waste pickle liquor in the relevant time period, and that Carpenter had hired Manfred DeRewal fully aware that he was a polluter and could not be trusted. In contrast, Mr. Judge testified that when Plaintiff TI Group Automotive Systems, L.L.C. ("TI"), received the same letter it immediately reached out to EPA and to the other PRPs, signed the 2001 Consent Decree, and agreed to contribute to OU-1 costs.[5] There can be no equivocation in this -- Carpenter's management, through deliberate calculation, failed to cooperate with Federal and state officials, as well as with Plaintiffs, in addressing harm to human health and the environment at the Site.

This is no small matter. As the Court observed during summation, the CERCLA statute is structured to encourage cooperation -- to call forth responsible parties to take up the burden of addressing contamination to which they contributed. It is precisely by means of the direction to use 'such equitable factors as the court determines are appropriate" that this Court should both acknowledge Plaintiffs' readiness to cooperate *and* the failure of Carpenter at any

---

[5]    Carpenter acknowledges in the stipulations that no TI waste was disposed of at the Site. TI thus has cooperated with the United States while Carpenter, the party with the greatest volume disposed of at the Site, has done nothing.

time to do so. Only a meaningful adjustment, such as a net increase of Carpenter's percentage share by at least 10 percentage points will serve equity.

      *Knowledge.* Carpenter acknowledged in summation that its leadership was aware when Manfred DeRewal was hired in 1973 that he had violated the law and engaged in pollution. Trial Transcript, July 2, 2008, 135:22-136:7. What the record shows additionally is that the decision to engage DeRewal was made for callous business reasons -- selection of the low-cost provider whose business practices the Carpenter leadership knew were harmful. This conscious "economic" decision resulted in grave consequences to the Site that will persist into the future. Dr. Brown testified that the disposal of such wastes significantly impacted the soils and groundwater, caused specific, serious harms to the Site, and will continue to do so for decades. Dr. Brown Testimony, July 1, 2008, 62:18-64:9; 48:3-49:8. Just as Carpenter's contemporary business leaders for economic reasons adopted self-interested non-cooperation in response to calls for action, its leadership in the early 1970s self-interestedly pursued the cheaper, low-cost provider, turning a blind eye to the inevitable harmful consequences of entrusting the company's dangerous wastes to DeRewal. There may be a temporal separation of the leadership of some thirty years, but there is no distinction in its character and motivation. As counsel stated at summation: "[t]his case, whether or not to engage in a consent decree or whatever, they're all business decisions." Trial Transcript, July , 2008, 141:22-25. Indeed, and such decisions have consequences.

      Carpenter's decision to engage Manfred DeRewal to dispose of its dangerous wastes has had a material impact on the Site. Its knowledge of DeRewal's illegal business practices should result in an equitable adjustment of the Carpenter share that likewise is material

and not inconsequential. Plaintiffs ask the Court that, with respect to this factor, increase Carpenter's share at least an additional 10 percentage points.

*Carpenter's Pickle Liquor*

Carpenter's Proposed Facts 118-122 misconstrue the documents and testimony referenced. The ROD and the 2000 Consent Decree require the continued remediation of Site groundwater until the concentrations of each of seven inorganics (including chromium and nickel that were in Carpenter's pickle liquor) and eight organics are reduced to below the specified levels. J-26, ROD, at 34-35; Geoffrey Seibel Testimony, June 23, 2008, at 64:11-68:6. The groundwater is contaminated with both organics and inorganics across virtually the entire Site. Jay Vandeven Testimony, June 23, 2008, at 151:1-154:5; J-29, figures 1-5 and 1-6. Carpenter conceded at trial that this action is not about the toxicity of different wastes, ran from its own expert, yet raises this topic now. Trial Transcript, July 2, 2008, 122:11-13 (Summation).

*Future Costs*

Carpenter concedes that the same equitable share assigned to it should apply to future remediation costs and past costs. Carpenter's Findings of Facts at 36.

<div style="margin-left: 40%;">

BALLARD SPAHR ANDREWS &
INGERSOLL, LLP

By: <u>Glenn A. Harris /s/s</u>
    Glenn A. Harris, Esquire
    Plaza 1000, Suite 500, Main Street
    Voorhees, New Jersey 08083
    (856) 761-3440
    harrisg@ballardspahr.com

    Attorneys for Plaintiff

</div>

## CERTIFICATE OF SERVICE

I certify that on this day I caused a true and correct copy of Plaintiffs' Reply to

Carpenter Technology Corporation's Proposed Findings of Fact and Conclusions of Law to be

served upon the following by first-class mail, postage prepaid:

Christopher R. Booth, Jr., Esquire
Booth and Tucker
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 1700
Philadelphia, Pennsylvania 19103

Lynn Wright, Esquire
Edwards Angell Palmer & Dodge, LLP
750 Lexington Avenue
New York, New York 10022-1200


Dawn M. Neukirch /s/

Dated: August 8, 2008