IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGERE SYSTEMS INC., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CV – 02-3830 |
| | : | |
| CARPENTER TECHNOLOGY CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT CARPENTER TECHNOLOGY CORPORATION'S REPLY TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant, Carpenter Technology Corporation ("Carpenter"), by and through its undersigned counsel, submits the following Reply of Carpenter Technology Corporation to Plaintiffs' Proposed Findings of Fact and Conclusions of Law, as follows:

**I.   The Volume of Waste Disposed By Settled Parties Ashland/AETC, Diaz/AETC and NRM Set Forth In Plaintiffs' Answers to Contention Interrogatories Must Be Taken Into Account When Apportioning Defendant Carpenter's Volume Of Waste.**

1.   On October 29, 2007, upon motions to compel of the defendants, the Court entered an Order requiring Plaintiffs to provide amended and supplemented answers to Defendants' Joint Contention Interrogatories (the "Order"). The Order stated, among other things, that:

   a.   Plaintiff's answers should demonstrate precisely how they determined the volume of waste they attribute to each entity. These answers should provide sufficient information such that one can trace back the results to the original date source used. In other words, plaintiffs should provide their step-by-step methodology for determining each volume, by demonstrating: (1) the discrete component volumes used to find the total volume for each defendant; (2) for each discrete component volume, citation(s) to document(s) where this number can be found; and (3) if the

        discrete component volume is not specifically stated in the document, plaintiffs should explain how they calculated, derived, or estimated, the discrete component volume. Given the inherent difficulties of deciphering the photocopied invoices and records, it is crucial that plaintiffs identify the specific values used in their calculations and extrapolations so that defendants may verify plaintiff's conclusory results.

    b.    Plaintiffs' answers should also demonstrate precisely how they determined the percentage of waste they allege was disposed of at the Boarhead Farm Site during distinct time periods. These answers should provide sufficient information such that one can trace back the results to the original date source used. In other words, plaintiffs should provide their step-by-step methodology for determining each volume, by demonstrating: (1) the discrete components or numbers of the calculation used to determine the percentage of waste disposed of at the Site during specific time periods; (2) for each discrete component or number of the calculation, citation(s) to document(s) where these items can be found; and (3) if the component or number is not specifically stated in the document, plaintiffs should explain how they calculated, derived, or estimated the component or number.

2.    Pursuant to the Order, on November 21, 2007, Plaintiffs served the defendants with their detailed sworn and verified Amended Answers and Supplemented Responses to Contention Interrogatories ("Plaintiffs' Answers to Contention Interrogatories"). See C-28.

3.    As required by the Court Order, Plaintiffs' Answers to Contention Interrogatories provided much more than mere contentions or legal theories. Rather, such answers provided detailed admissions regarding the specific content and volume of Plaintiffs' waste and each one of the defendants' waste. Indeed, the volumes Plaintiffs attributed to the defendants were based upon specific evidence that one could "trace back" to the documents and evidence produced in this matter over its six-year history. The content and volumes of the parties, including Plaintiffs', were summarized in Exhibits A and B to Plaintiffs' Answers to Contention Interrogatories.

4. As set forth in Exhibits A and B to Plaintiffs' Answers to Contention Interrogatories, based upon all of the evidence and as required by the Order, Plaintiffs stated the following regarding the specific volumes of defendants, Ashland/AETC, Diaz/AETC and NRM:

| Party Defendant | Waste In | Volumetric Share | Increase to PRPs with Knowledge | 50% Cooperation Credit to Plaintiffs |
|---|---|---|---|---|
| Ashland/AETC | 138,481 | 5.39% | 5.93% | 6.45% |
| Diaz/AETC | 43,275 | 1.68% | 1.85% | 2.02% |
| NRM | 650,475 | 25.33% | 23.19% | 25.23% |

5. The clear intention of Plaintiffs' answers, as required by the Court, was to convey that Plaintiffs had credible and documented evidence to support their answers relating to the type and volume of waste of each of the defendants, including Plaintiffs.

6. Plaintiffs now argue that their sworn and verified Amended and Supplemented Responses to Contention Interrogatories, which were amended pursuant to the Court's Order of October 29, 2007, are meaningless and should not be relied upon by the Court, and consequently, should not have been relied upon by the defendants. See Plaintiff's Proposed findings of Fact, ¶67.

7. Plaintiffs now seek to abandon their sworn and verified answers in an attempt to distort the total volume of waste in a manner that improperly and unfairly increases Carpenter's proposed volumetric share while decreasing other former defendants, namely, NRM, Ashland/AETC and Diaz/AETC.

8. If Plaintiffs represent that such answers cannot be relied upon now, then they similarly could not have been relied upon when they propounded and verified such answers to each of the defendants. One can only assume that that Plaintiffs' purpose in propounding such specific volume amounts and descriptions of the content of such waste

3

was to provide accurate and complete answers that the defendants could rely upon, and not to mislead the defendants, which Plaintiffs have effectively done.

9. Indeed, at no time before the trial of this matter did Plaintiffs seek to amend or supplement Plaintiffs' Answers to Contention Interrogatories. Only after the conclusion of the trial and the submissions of Proposed Findings of Facts and Conclusions of Law do Plaintiffs now seek to side-step their answers and argue that they should be "disregarded."

10. Moreover, Plaintiff did not object to the admission of Plaintiffs' Answers to Contention Interrogatories at trial.

11. After Carpenter moved in its evidence and rested at trial, the burden shifted to Plaintiffs to rebut any of Carpenter's evidence. However, Plaintiffs failed to offer any rebuttal evidence, particularly as it relates to the volume of waste attributed to NRM, Ashland/AETC or Diaz/AETC. If Plaintiffs wanted to rebut the contents of their own verified answers to contention interrogatories, particularly as it relates to the volume of waste attributed to NRM, Ashland/AETC and Diaz/AETC, they could have done so but chose not to.

12. Accordingly, the volumes of waste Plaintiffs attribute to NRM, Ashland/AETC and Diaz/AETC in their Proposed Findings of Fact have no factual basis and are improper.

13. Carpenter's Proposed Findings of Fact referred to the stipulations of the settled parties and Plaintiffs' Answers to Contention Interrogatories with regard to a description of Plaintiffs' waste (which included buried drums and VOCs) and the volume and waste

4

attributed to NRM, Ashland/AETC and Diaz/AETC. There is no evidence to rebut this evidence.

14. Accordingly, the volume of waste Carpenter attributed to NRM, Ashland/AETC and Diaz/AETC (in aggregate, 832,231 gallons, or 32%), as well as the description of Plaintiffs' waste, is uncontradicted by the Plaintiffs.

## II.  **Burden of Proof**

15. As set forth in the Court's Order of January 11, 2004 ("January 11, 2004 Order"), Plaintiffs had the burden of proof on their Section 107 (a) claim and "demonstrating each defendant's equitable share of the costs." See January 11, 2004 Order at p. 8. In its Order of June 30, 2004 ("June 30, 2004 Order"), the Court applied the Uniform Comparative Fault Act ("UCFA") and stated, among other things, that "[t]he UFCA expressly provides for application of comparative fault, and would reduce the Non-Settlor's liability by the amount of the Settlor's equitable share of the obligation." See June 30, 2004 Order at p. 6.

16. However, the Court duly noted one of the disadvantages of the UCFA was that "at trial, a plaintiff must not only advocate his freedom from fault, but also convince the trier of fact of the settler[s] minimal fault. In complex cases the plaintiff may not have access to information that the settling defendant would have had, and a distortion could result from the settler not defending his own interest." Id., at pp.7-8.

17. Accordingly, Plaintiff had the burden of proof at all times to establish the equitable share of liability of each of the settling defendants and the non-settling defendants at trial. Contrary to the concern raised in the June 30, 2004 Order, in this

5

case, Plaintiff had all of the evidence it needed to establish the equitable shares of liability of the settling and non-settling parties, but failed to do so.

18.     Rather, Plaintiffs now argue that the burden was not on them, but on the non-settling defendants to establish the equitable share of liability of plaintiff, settling defendants and other non-settling defendants.  There is no legal support for this conclusion and is directly in contradiction to the June 30, 2004 Order.  The bottom line is that Plaintiffs are not only seeking to capitalize on the absence of the settling parties, to distort the comparative fault and volume of waste attributable to Carpenter.  Indeed, by arguing that Carpenter should be responsible for 80% of the response costs, Plaintiffs are also actually seeking to avoid all of its own admitted liability and profit from this litigation without contributing a single penny to such response costs.  Plaintiffs have gone too far and the true motivation for their overreaching theories against Carpenter has been revealed and should not be sanctioned by the Court.

19.     Indeed, pursuant to the June 30, 2004 Order, all cross-claims and counterclaims against and by the settling parties are dismissed with prejudice.  Accordingly, not only was Carpenter not required to establish the equitable share of liability of each of the settling defendants (that was Plaintiffs' burden), but it would have been highly impractical for Carpenter to bear that burden given that it had no remaining claims against such parties.  The June 30, 2004 Order could not have contemplated such a result that would place upon a non-settling defendant the burden of proving a claim that it had no possibility of collecting.  On the contrary, despite settling with certain Defendants, Plaintiffs' burden of proof remained the same.

20.     Accordingly, at trial, Plaintiffs failed to establish the equitable share of liability of Carpenter since it failed to establish the equitable share of liability of each of the settled parties and Carpenter's relationship thereto.  Plaintiffs also failed to offer any credible evidence in support of its pure conjecture that 99% of Carpenter's waste was disposed of at the site.  Quite to the contrary, the very evidence Plaintiffs presented at trial decried their own "theory" of liability.  Not a single former DCC driver supported this over-reaching "theory."

### III.    Statue of Limitations

21.     For Plaintiffs to recover under Section 113(f) of CERCLA and the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. § 6020.101, *et seq*. for contribution towards USEPA's costs for performing the first and second removal actions in 1992 and 1993, respectively, Plaintiffs must conclusively establish that they and Defendant Carpenter shared a common liability to USEPA at the time Plaintiffs Cytec, Ford, SPS and TI executed the OU-1 and OU-2 Consent Decrees.[1]

22.     Without establishing a common liability between Defendant Carpenter and Plaintiffs Cytec, Ford, SPS and TI, this Court's ability to determine whether Plaintiffs' paid more than their proportionate share of the common liability is severely limited.

23.     More specifically, at the time that Plaintiffs Cytec, Ford, SPS and TI signed the OU-2 Consent Decree, Plaintiffs were not liable to the USEPA for any recovery costs because the statutory period authorizing the USEPA to seek those costs had expired.

---

[1] The OU-1Consent Decree was entered by the Court on September 28, 2000 and requires the Plaintiffs to reimburse the USEPA for administrative and oversight costs in the future ("Future Response Costs").  The OU-2 Consent Decree was entered by the Court on December 6, 2001 and was only signed by Plaintiffs Cytec, Ford, SPS and TI.  Plaintiff Agere did not sign the OU-2 Consent Decree.  See Plaintiff's Fifth Amended Complaint.  The OU-2 Plaintiffs agreed to reimburse USEPA "both for $7,000,000 in response costs incurred and accounted for prior to July 2000 ("Past Response Costs") and for an as yet undetermined amount of response costs incurred subsequent to July 2000 ("Interim Response Costs")."  The OU-2 Consent Decree covers response costs for the first and second removal actions.

7

24.     Under CERCLA, the USEPA must bring a suit to recover costs for a removal action within three (3) years after completion of the removal action or six (6) years after a determination to grant a waiver under section 9604(c)(1)(C), and for remedial action within six (6) years after initiation of physical on-site construction of remedial action. 42 U.S.C. § 9613(g)(2).  In addition, under HSCA the USEPA must initiate a suit within six (6) years following the date in which the costs were incurred.  35 P.S. § 6020.1114.

25.     Here, although the USEPA completed the first removal action in 1992[2] and the second removal action in 1993, the USEPA did not commence a lawsuit against Plaintiffs until after the three-year statute of limitation had passed.

26.     Thus, to recover costs for the first removal action, the USEPA should have timely commenced a lawsuit against PRPs by 1995 and by 1996 for the second removal action. Similarly, the USEPA should have timely commenced a suit by 1999 to recover response costs under the HSCA.

27.     Instead, the USEPA commenced a lawsuit after the statute of limitations under CERCLA and HSCA had run, effectively waiving its right to seek response costs from PRPs.

28.     It follows logically that when Plaintiffs Cytec, Ford, SPS and TI signed the OU-2 Consent Decree with the USEPA in 2001, they were not liable to the USEPA for response costs for the first and second removal actions.

29.     Thus Plaintiffs cannot establish a common liability between themselves and Defendant Carpenter with respect to the monies paid by Plaintiff to the USEPA for the first and second removal actions.

---

[2] On September 4, 1992, the USEPA granted a waiver under §9604(c)(1)(C) for continued removal actions at the Boarhead Farms Site.

30.   In addition, a plain reading of the EPA's record negates any inference that the removal actions at the Boarhead Farms Site were not completed at the time that the USEPA commenced a lawsuit against Plaintiffs.  See <u>United States v. Ambroid Company, Inc.</u>, 34 F. Supp. 2d 86, 90 (D.Mass. 1999) (reasoning that the "EPA's own treatment of the removal activities as two separate 'removal actions' to be persuasive evidence that there were in fact two separate 'removal actions' for purposes of § 9613(g)92)(A)").

31.   Several portions of the USEPA's record demonstrate that the USEPA completed four separate and distinct removal actions at the site.  For example:

- EPA has conducted three removal actions at the Boarhead Farms Site.  During the first two, each in 1992 and 1993, over 2500 buried drums were located, excavated and disposed of offsite, reducing the contaminant levels in the subsurface soils.  The excavated areas were then covered with a layer of clean fill to reduce expose risk.  A third removal action to intercept, collect and treat contaminated groundwater in an onsite treatment facility in continuing at this time.   ROD, p.3.

- Currently, the existing interceptor trench and groundwater treatment system (constructed as part of a separate removal action) collect a large amount of the onsite groundwater and treat it onsite, thus reducing the potential for migration of groundwater offsite. ROD, p.10.

- In 1992 and 1993, EPA removed more than 2500 buried drums from 40 locations in the open field area at the Boarhead Farms Site.  While a significant number of buried drums are believed to have been removed during this effort, some buried drums still remain.  Following completion of the drum removal effort, EPA conducted a magnetometer survey to identify remaining subsurface magnetic anomalies. ROD, p. 11.

- After the drum removal actions of 1992 and 1993, a layer of clean fill was placed over the excavation areas and eliminated the exposure risk to surface soil.  ROD, p. 16.

- EPA mobilized to the Site on June 18, 1992 and conducted two

9

> Superfund removal actions. These involved locating, excavating and disposing of over 2500 buried drums throughout the Site. The excavated areas were then covered with a layer of clean fill to reduce exposure risk. Removal of the drums greatly reduced the contaminant levels in the subsurface soils throughout the Site. A third removal action was performed by General Ceramics, Inc. (GCI) pursuant to an Administrative Order by Consent dated December 11, 1992 (EPA Docket no. III-92-66-DC)." USEPA Proposed Plan, Boarhead Farms Site, January, 1998, "Site Background and History" section.

- A fourth removal action to intercept, collect, and treat contaminated groundwater in an onsite treatment facility and provide nearby residents with home well treatment systems in continuing at this time (Figure 3)." USEPA Proposed Plan, Boarhead Farms Site, January, 1998, "Site Background and History" section.

- In 1992 and 1993 more than 2500 drums were excavated from the open field areas (Areas 5 and 6, Figure 2). After these removal actions, a magnetometer survey was conducted and remaining subsurface anomalies were identified." USEPA Proposed Plan, Boarhead Farms Site, January, 1998, "Nature and Extent of Contamination" section.

- The previous removal actions have reduced the risk of exposure. USEPA Proposed Plan, Boarhead Farms Site, January, 1998, "Summary of Site Risks" section.

32. In light of these completed removal actions at the Boarhead Farms site, it is evident that at the time that Plaintiffs signed the OU-2 Consent Decree with Plaintiffs Cytec, Ford, SPS and TI, the USEPA claims for response costs under CERLA and HSCA were barred by the applicable statute of limitations.

33. Plaintiff's Cytec, Ford, SPS and TI were not liable to the USEPA for any response costs and thus, there was no common liability for contribution between Plaintiffs Cytec, Ford, SPS and TI to Defendant Carpenter.

34. As such, Plaintiffs' have no right, as matter of law, to seek contribution from Defendant Carpenter for monies paid to the USEPA in reimbursement for the USEPA

10

response costs.

### IV. **Plaintiffs did not incur voluntary response costs under Section 107(a) claims**

35. A party that incurs costs due to a settlement (including the settlement of a Section 107 claim) has not incurred costs voluntarily, and therefore, may only seek contribution pursuant to Section 113(f) and may not pursue a Section 107 (a) claim. As the Supreme Court held in United States v. Atlantic Research Corp., 127 U.S. 2331, 2238 (2007):

> "Hence, a PRP that pays money to satisfy a settlement or a court judgment may pursue §113(f) contribution. But by reimbursing response costs paid by others, the PRP has not incurred its own costs of response and therefore cannot recover under §107(a). As a result, though eligible to seek contribution under §113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under §107(a)."

Atlantic Research, 127 U.S. at 2238.

36. As a result of the EPA's lawsuit against the Plaintiffs, they entered into two separate Consent Decrees for OU-1 and OU-2.

37. Accordingly, Plaintiffs' sole cause of action is under Section 113(f) and they cannot assert a cause of action under Section 107(a).

                                                  **BOOTH & TUCKER, LLP**

Dated: August 8, 2008            BY:   /s/CRB2896_____
                                                      Christopher R. Booth, Jr., Esquire
                                                        Attorney I.D. No. 59395
                                                        Joan E. Clarke, Esquire
                                                        Attorney I.D. No. 91576
                                                        One Penn Center at Suburban Station
                                                        1617 JFK Blvd., Suite 1700
                                                        Philadelphia, PA 19103

**CERTIFICATE OF SERVICE**

      I, Christopher R. Booth, Jr., Esquire, hereby certify that I am an Attorney admitted to the bar of this court, and on this day a copy of Defendant Carpenter Technology Corporation's Reply to Plaintiffs' Proposed Findings of Fact and Conclusions of Law was sent by first class mail to each of the following:

Glenn A. Harris, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
Plaza 1000 – Suite 500
Main Street
Voorhees, NJ  08043=4636
(856) 761-3440
(856) 761-9001 (Fax)
harrusg@ballardspahr.com

(Counsel for Boarhead Farms Agreement Group)

**BOOTH & TUCKER, LLP**

Dated: August 8, 2008        BY:   /s/CRB2896_____
                                                Christopher R. Booth, Jr., Esquire
                                                Attorney I.D. No. 59395
                                                Joan E. Clarke, Esquire
                                                Attorney I.D. No. 91576
                                                One Penn Center at Suburban Station
                                                1617 JFK Blvd., Suite 1700
                                                Philadelphia, PA 19103
                                                (215) 875-0609