**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AGERE SYSTEMS INC., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CV – 02-3830 |
| | : | |
| CARPENTER TECHNOLOGY CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT CARPENTER TECHNOLOGY CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
ALTER OR AMEND THE COURT'S JUDGMENT OF AUGUST 22, 2008,
OR FOR NEW TRIAL**

Defendant Carpenter Technology Corporation ("Carpenter"), by its counsel, submits this memorandum of law in support of its Motion for Alter or Amend the Court's Judgment entered on August 22, 2008 (the "Judgment") or for New Trial, pursuant to F.R.C.P. 59. For the reasons stated below and further supported by the affidavit of counsel, Carpenter seeks an evidentiary hearing pursuant to F.R.C.P. 59(a)(2).

I.   INTRODUCTION

The Judgment should be set aside because, if enforced, it would cause plaintiffs to profit from their unlawful pollution activities. Contrary to the express language of CERCLA and its corresponding policy of ensuring the fair and equitable allocation of response costs, plaintiffs will receive approximately $20 million on their $13 million claim for past response costs (profiting nearly $7 million) if the Court's Judgment is allowed to stand. Upon information and belief,

plaintiffs have collected approximately $10 million in settlement proceeds from the settling defendants. Accordingly, the settlement proceeds of nearly $10 million, together with the Judgment against Carpenter in the amount of $10,942,702.84 (plus pre-judgment interest) far exceed the total actual response costs that plaintiffs have incurred in the cleanup of the Boarhead Superfund Site (the "Site").

This Court ruled that the settlement amounts are not relevant in allocating the response costs among non-settling defendants. This ruling is contrary to the purpose of CERCLA and its mechanism to allow plaintiffs to recover response costs that actually were incurred. Instead, the ruling allows plaintiffs to engage in a shell game, where they confidentially settle with fifteen (15) parties, then pursue recovery of costs against the non-settling defendants as if plaintiffs had received no contributions whatsoever.

The Court also reasoned that, to the extent there is an excess in the settlement proceeds to the benefit of the plaintiffs, such excess should be applied to future response costs. This reasoning is flawed because the Court entered a monetary judgment against Carpenter for the past response costs, and a declaratory judgment for the future costs (which have not been estimated or proven at trial). Accordingly, the windfall plaintiffs have received from the settlement proceeds for the past response costs (which were proven and stipulated to) cannot be awarded or applied to unspecified and speculative future costs pursuant to the declaratory judgment. Nor can the excess settlement proceeds compensate plaintiffs for economic or other damages which were not

incurred in a manner that is consistent with the National Contingency Plan, or otherwise not recoverable under CERCLA.  Rather, the settlement proceeds must be accounted for in the Judgment even under the Court's methodology of equitably allocating the response costs pursuant to the Uniform Comparative Fault Act ("UCFA")[1].

Lastly, the Court incorrectly calculated Carpenter's volumetric share of the total waste disposed at the Site during the Pre-Ontario Period by inconsistently and unevenly applying a general practice theory of liability that was against the weight of the evidence and in disregard of specific driver testimony.  The Court properly relied upon driver testimony in determining the volumetric share of waste for the Ontario, Gap and Wissinoming Periods, but failed to do so for the Pre-Ontario Period.  On the one hand, this inconsistency incorrectly distorted the calculation of Carpenter's volumetric share of the total waste disposed at the Site.  On the other hand, other parties' liability was discounted based upon specific driver testimony, particularly as it related to NRM's waste.[2]

As discussed more fully below, the express language of CERCLA and its supporting policy of encouraging fair and equitable settlements did not contemplate or intend such an unjust result, and the Judgment should be modified or set aside accordingly.

---

[1] The pro tanto approach is the approach of the Uniform Contribution Among Tortfeasors Act ("UCATA"), and the pro rata method is codified in the UCFA.
[2] In the interest of brevity, Carpenter incorporates by reference the arguments it asserted in its Proposed Findings of Fact and Conclusions of Law and its Supplemental Proposed Findings of Facts and Conclusions of Law relating to the binding effect of Plaintiffs' answers to contention interrogatories.  As stated therein, Plaintiffs should be bound by their answers to interrogatories, particularly as it relates to the volume attributed to NRM which disposed of 655,000 gallons of pickle liquor (the same kind of waste as Carpenter) at the Site.

3

>    II.   The Judgment is Fundamentally Unfair Because it Gives Plaintiffs a Financial Windfall that is Contrary to the Express Language and Purpose of CERCLA, General Notions of Fairness, and Exceeds the Actual Past Response Costs Incurred by Plaintiffs.

CERCLA Sections 107(a) and 113(f) limit private parties' right to recover actual expenses "incurred" in cleaning up contaminated sites. 42 U.S.C. § 9607(a)(4)(A)-(B); 42 U.S.C. § 9613(F)(3)(B). Specifically, Section 107(a) makes potentially responsible parties ("PRP's") liable for, among other things:

> "(A) all costs of removal or remedial action **incurred** by The United States Government or a state on an Indian Tribe not inconsistent with The national contingency plant [and]

> "(B) any other necessary costs of response **incurred** by any other person consistent with national contingency plan.

> 42 U.S.C.§ 9607(a)(4)(A)-(B)(emphasis added); see also U.S. v. Atlantic Research Corp., 127 S. Ct. 2331, 2333 (2007).

Enacted as part of the Superfund Amendments and Reorganization Action of 1986 ("SARA"), Section 113(f) authorizes one PRP to sue another for contribution towards such response costs "incurred" by plaintiff. 42 U.S.C. § 9613(F)(3)(B).

Accordingly, whether a plaintiff is suing under Section 107(a) or 113(f), the potential recovery to such plaintiff is expressly limited to the actual response costs incurred in the cleanup of a contaminated site. See F.P. Woll & Co. v. Fifth and Mitchell Street Corp., 2006 U.S. Dist. LEXIS 57405 (E.D.Pa. 2006) (the plain language of CERCLA only allows for recovery of costs that have been "incurred"). Indeed, there is no express or implied language under CERCLA that permits a PRP to recover anything beyond the actual responses costs, all of which must have been incurred in a manner that is consistent with the National

4

Contingency Plan. This express statutory limitation is dispositive because it precludes PRPs, such as plaintiffs from recovering anything not authorized under CERCLA.

Here, upon information and belief, plaintiffs have collected settlement amounts that, in addition to the amount of the Judgment, far exceed the total past response costs of $13 million dollars. For these reasons, the Court must modify or set aside its Judgment and conduct a post-trial hearing to determine the settlement amounts collected by plaintiffs so that such amounts can be applied against the total judgment against Carpenter for past response costs.

Indeed, the Court's method of equitably allocating the response costs among PRPs must take into account the settlement proceeds received by plaintiffs. CERCLA mandates such an accounting and the recent cases in this judicial district interpreting Section 113 fully support such an accounting of settlement proceeds in allocating liability among non-settling defendants in cost recovery actions. 42 U.S.C. §9613(A)(2).

For instance, in the case of a suit brought by the government, Section 113(f)(2) expressly provides that **a settlement by one potentially responsible party with the government will reduce the liability of other potentially responsible parties by the amount of the settlement**. 42 U.S.C. §9613(A)(2)(emphasis added); See also F.P. Woll & Co. v. Fifth and Mitchell Street, Corp, 2006 U.S. Dist. LEXIS 57405, *11-12 (E.D. Pa 2006) ("In the case of a suit brought by the government, CERCLA explicitly endorses the pro tanto approach"); Action Manufacturing Co., Inc. v. Simon Wrecking Co., 428 F. Supp.

5

2d 288, 325 (E.D. Pa. 2006) (CERCLA is silent on how to account for settlements in private PRP contribution actions, but mandates the pro tanto approach in government-initiated actions.")  Therefore, when the government is a plaintiff in a cost recovery action, courts must reduce a non-settling defendant's liability by the amount of the settlement proceeds received from the other settling parties.

CERCLA does not expressly provide a method of allocating settlements in private PRP actions.  Rather, Section 113(f)(1) directs courts to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Action, 428 F.Supp.2d at 326.  Accordingly, courts are split and have applied both the pro tanto and pro rata approaches to allocating liability among PRPs in CERCLA actions.  Regardless of the methods used, the clear import of either method of equitably allocating liability, is to protect plaintiff from a shortfall in its cost recovery efforts -- not, as in this case, to provide a windfall.

In each of the above cited cases, regardless of whether the court applied the pro rata or pro tanto approach of allocation, settlement amounts were applied against the non-settling party's liability. The risk to a non-settling defendant in settling late is not that it may obligated to pay additional monies over and above the response costs that profit plaintiffs, but to potentially face the responsibility for amounts not paid by other settling defendants. See, e.g., United States v. Kramer, 19 F.Supp.2d 273, 286 n. 20 (D.N.J. 1998) ("The risk of disproportionate liability encourages parties to resolve their liability early, **lest they be found responsible for amounts not paid by settling defendants**.") (emphasis

6

added).

In this case, plaintiffs have collected approximately $10 million in settlement monies from other defendants. See Affidavit of Christopher R. Booth, Jr., Esquire attached hereto as Exhibit A. CERCLA was not designed to allow plaintiffs to profit from a contribution action; they are only permitted to recover response costs that were in fact incurred in a manner that is consistent with the National Contingency Plan.

Accordingly, pursuant to the express provisions and policy considerations of CERCLA, this Court should modify or set aside its Judgment and conduct an evidentiary hearing to determine the amount of the settlement proceeds received by plaintiffs so that such amounts can be applied against the total amount of the Judgment. At most, and even consistent with the Court's pro rata methodology of allocating liability, Carpenter should be held responsible only for an appropriate share of the difference between the settlement proceeds Plaintiffs received and the total amount of the response costs incurred to January 1, 2008.

    2.    The Judgment Improperly Applies Plaintiffs' Excess Settlement Proceeds To Unspecified Future Costs

In cost recovery actions, CERCLA requires a court to issue a declaratory judgment for future costs, rather than a monetary judgment. 42 U.S.C. §9613(g)(2)(B). While the Court issued a declaratory judgment against Carpenter on the future costs, it indicated that any excess settlement proceeds received by Plaintiffs could be applied to unspecified and unproven future response costs. In its Judgment, the Court specifically stated, "[a]dditionally, because plaintiff incurred costs after settlements were reached and will continue

7

to incur costs for an indefinite future period, even if they did collect monies in excess of their expenditures thus far, this does not necessarily indicate there will be an excess when cleanup is completely finished at the Boarhead Farms Superfund Site." See Order of August 22, 2008, at pg. 2, fn. 1.

As the district court made clear in F.B. Woll, "[w]hen faced with cost estimates that are best classified as speculative, courts have not allowed plaintiffs to recover lump sum payments of costs that they have not incurred and may never incur and under CERCLA, the plain language of the statute only allows for recovery of costs that have been incurred." F.B. Woll, at *22.  In this case, plaintiffs failed to prove any reasonable estimate of the future response costs for the Site.  Since there is no evidence whatsoever of the future response costs, the Court's reasoning that excess funds recovered – estimated by Carpenter to be approximately $7 million dollars - can be applied to such speculative and unsubstantiated future costs is improper as a matter of law.

Quite to the contrary, CERCLA mandates that plaintiffs are entitled only to a declaratory judgment for speculative future costs.  Therefore, plaintiffs may not profit from the financial windfall, and Carpenter should be held responsible only for an appropriate portion of the difference between the settlement proceeds plaintiffs collected from the settled parties and the total response costs.

It should be noted that the Court's suggestion that the excess settlement proceeds or excess judgment monies could be applied to any deficiency in plaintiffs' proportionate share of the future remediation costs fails in a practical sense as well.  As reflected in the past cost analysis performed by Plaintiffs'

8

experts, de maximis, inc., the average operation and maintenance costs for the period between 2004 through 2007 have been approximately $300,000 per year. Accordingly, if the Judgment stands and Carpenter is responsible for 80% of the future remediation costs, it would take approximately 120 years (or the future costs would have to be $36,000,000) before plaintiffs would pay a single dollar towards future remediation costs.[3]

Needless to say, there has been no expert testimony that supports these outrageous figures. Rather, the excess that plaintiffs would enjoy as a result of the Judgment would, for all practical purposes, last forever and they would never have to come out-of-pocket for a single dime notwithstanding their significant contribution to the clean-up of the Site. CERCLA certainly was not intended to work this kind of blatantly unfair result and it should not be advanced by the Court.

At the very least, if the excess settlement proceeds are permitted to be applied against future clean-up costs, then those excess funds should be applied first until they are exhausted.

    3.    **The Court Incorrectly Calculated Carpenter's Volumetric Share of the Total Waste Allegedly Dumped at the Site by Inconsistently and Unevenly Applying a General Practice Theory of Liability That Is <u>Against the Weight of the Evidence and Specific Driver Testimony</u>**

To establish the nexus between Carpenter's waste and the Site, the Court relied upon the testimony of the following drivers: Manfred DeRewal, Jr. ("Freddie DeRewal"), Bruce DeRewal, Jeffrey Shaak, John Barsum, June Stephens and

---

[3] 120 years x $300,000 = $36,000,000 in total future costs. $36,000,000 x .80 (80%) = $28,800,000 (responsibility of Carpenter). $36,000,000 x .20 (20%) = $7,200,000 (responsibility of Plaintiffs).

John Bean.[4]  Each driver testified that during the Pre-Ontario period (1/1/1972 to 12/1/1973) he or she took the majority of DCC customer waste to the Site.  Of these six drivers, however, only Freddie DeRewal actually testified that he hauled Carpenter's waste to the Site during the Pre-Ontario period.

The remaining drivers (except for Bruce DeRewal) specifically testified that after December 1, 1973 (the Ontario period) they either hauled Carpenter's waste to the Ontario Street location, did not haul Carpenter's waste at all, or did not specifically remember hauling waste for Carpenter.  Bruce DeRewal testified that he primarily hauled Carpenter's waste to the Ontario Street location, and he once a week hauled Carpenter's waste to the Site.  Accordingly, only two drivers hauled Carpenter's waste to the Site during the Pre-Ontario or Ontario periods – Freddie DeRewal and Bruce DeRewal (the "DeRewal Brothers").

The Court, however, omitted from its Findings of Fact any reference to the clear, specific and uncontroverted testimony of DCC drivers Barsum, Shaak and Bean that they did not haul Carpenter's waste to the Site.[5]  Rather, it appears that the Court disregarded this evidence and determined generally that if the majority of the waste hauled by DCC drivers from customers other than Carpenter was dumped at the Site, then similarly, the majority of Carpenter's waste was disposed of at the Site.  The Court made this finding of fact without attributing any specific amounts of volume to any particular driver, or considering

---

[4] The Court also referenced in its findings of fact that Ed Cypecki and Rich Minthorn were DCC drivers during the Pre-Ontario period.  See Court's Findings of Fact at p. 16.  There is no evidence, however, that either Cypecki or Minthorn hauled waste for Carpenter, or otherwise disposed of Carpenter's waste at the Site.
[5] June Stephens did not recall Carpenter and had no specific recollection of hauling waste for Carpenter, and was unsure who she was working for during the relevant time period.

10

the limited volume of waste Freddie DeRewal claimed he hauled during the Pre-Ontario period. Had the Court relied upon the uncontroverted testimony of the drivers, rather than a general practice theory, it would have been compelled logically to conclude as a matter of fact that the amount of Carpenter's waste disposed of at the Site during the Pre-Ontario period was no more than 88,000 gallons of waste (the waste hauled by Freddie DeRewal), and not 917,214 gallons of waste.[6]

The only inference that can be drawn from the Court's general practice theory is that, even if the drivers specifically denied hauling Carpenter's waste to the Site, some other unidentified drivers must have hauled such waste in addition to the limited trips made by Freddie DeRewal. The only other possible drivers identified during the trial that could have hauled Carpenter's waste were Ed Cypecki and Rich Minthorn. However, there is no evidence from any source that confirms that either Ed Cypecki or Rich Minthorn hauled waste for Carpenter, or otherwise disposed of Carpenter's waste at the Site. Quite to the contrary, the testimony was clear that Rich Minthorn ran the Site and was primarily responsible for dispatching drivers and burying waste at the Site.

In contrast to the general practice theory the Court applied against Carpenter for the Pre-Ontario period, the Court relied upon specific driver testimony in other instances. For example, the Court relied upon specific driver testimony in calculating the volume of waste that did not reach the Site during the

---

[6] Specifically, assuming the credibility of Freddie DeRewal, which the Court has done in its Findings of Fact, approximately 88,000 gallons of waste (22 trips x 4000 gallon tankers) was disposed of at the Site during the Pre-Ontario period rather than 917,214 gallons as calculated by the Court based upon its general practice theory. See Carpenter's Findings of Fact at ¶68.

11

Pre-Ontario period but was disposed of at some other unknown location. See Court's Findings of Fact at p. 23. Based solely upon the testimony of Freddie DeRewal and John Barsum, the Court found that all but 7-8 tankers of 4000 gallons each was disposed of at the Site during the Pre-Ontario period, representing 32,000 gallons. Id.

Although the Court's deduction of 32,000 gallons from the total volume of waste during the Pre-Ontario period was based upon specific evidence, it did not conform to the Court's general practice theory of calculating the total volume of Carpenter's waste for this time period. Freddie DeRewal and John Barsum only hauled a portion of the total waste from customers during the Pre-Ontario period. A certain percentage of this waste did not reach the Site. While Carpenter does not believe a general business practice should be applied, if it is being utilized, it must be done in an even fashion. If Freddie DeRewal and Barsum did not deliver all waste to the Site, it must be presumed that the other drivers did not haul a similar percentage of waste from Carpenter to the Site. This same percentage should be deducted from Carpenter's volume.

Consistent with the Court's formula applied in its Findings of Fact, if each driver hauled 3-4 loads at 4000 gallons each, then an additional 12,000 to 16,000 gallons per driver or an additional 72,000 to 96,000 gallons must be deducted from the total waste for the Pre-Ontario period. This amount, plus the 32,000 gallons deducted by the Court, equals 104,000 to 128,000 gallons that should have been deducted from the total volume of waste disposed of by Carpenter and the other parties during the Pre-Ontario period.

However, the Court properly relied solely upon Bruce DeRewal's testimony in determining the amount of Carpenter's waste that was disposed of at the Site during the Ontario Period between December 1, 1974 and June 30, 1975. The Court reached this conclusion notwithstanding its finding of fact that "with the exception of four to six tankers, [June Stephens] took all of the waste she hauled to the Boarhead Farms Site" and "all of the waste [John Bean] hauled went to the Boarhead Farms Site." See Court's Findings of Fact at pp. 27-28.[7] Accordingly, the Court correctly relied upon the specific testimony of a specific driver, Bruce DeRewal, whom had hauled Carpenter's waste rather than the testimony of other drivers that had not hauled Carpenter's waste.

Further, the Court properly determined the percentage volume of waste disposed of at the Site during the Ontario Period for each of the other parties based upon its calculation of Carpenter's waste. The Court should have, in turn, performed the same calculation in a consistent manner for the Pre-Ontario Period. Specifically, the Court should have used the percentage volume of waste Freddie DeRewal hauled for Carpenter in determining the percentage volume of waste for the other parties during this time period.[8] As with its calculation for the Ontario Period, the Court should have relied upon actual driver testimony in determining the percentage volume of waste for Carpenter and the other parties

---

[7] The Court omitted, however, John Barsum's specific testimony that he did not take any loads from Carpenter back to the Site because, doing so, would have been out of his way. See Barsum N.T. 82:8-19. Barsum's testimony was consistent with Manfred DeRewal's testimony about disposing of waste at the closest and most convenient locations, which the Court did not accept as credible.

[8] 88,000 gallons (gallons of waste hauled by Freddie DeRewal during Pre-Ontario Period) ÷ 917,214 gallons (total gallons of waste as determined by Carpenter's business records) = .10 or 10% rounded. 368,953 gallons (gallons from plaintiffs, settled entities and Handy & Harmon) x .10 = 36,895 gallons.

13

that disposed of waste during this time period, rather than using a general practice theory which distorted the calculation of the total waste disposed at the Site.[9]

Lastly, the Court relied upon specific driver testimony in calculating the volume of waste disposed at the Site for NRM during the Gap Period (stipulated by the parties as 7/1/1975 through 6/1/1976) and the Wissinoming Period (7/1/1976 through 3/30/1977), rather than using a general practice theory. The Gap Period is particularly comparable to the Pre-Ontario Period because the Site was the only location that was purportedly used by DCC drivers to dispose of waste during this time period. In its Findings of Fact, the Court calculated the amount of NRM's waste by referring to specific driver testimony and determined that six to ten tankers of NRM waste went to the Site during the Gap Period. See Court's Findings of Fact at p. 33.

Also, the Court concluded that 15% of all waste hauled by DCC drivers during the Wissinoming Period was disposed at the Site. However, the Court relied upon the specific driver testimony of Freddie DeRewal and Jeff Shaak in determining that none of NRM's waste went to the Site during this time period. Because of this specific driver testimony, the Court excluded NRM's waste in its calculation of volume of waste that was disposed at the Site during the Wissinoming Period, but applied the 15% factor against the other parties that

---

[9] This percentage is also consistent with Carpenter's theory that due to the extensive scrutiny at the Site from April 1972 through November 30, 1973, DCC hauled significantly most of its customer's waste to other sites. It should be noted that the Court's Findings of Fact do not refer to the parties' stipulated facts and Plaintiff's Exhibits which were admitted into evidence that document the extensive scrutiny by the Bucks County Department of Health, the Pennsylvania State Police and the Pennsylvania Department of Environmental Resources. See Carpenter's Findings of Fact at ¶¶4-25.

14

disposed of waste during this time period. See Court's Findings of Fact at pp. 37-39.

Accordingly, for the Ontario, Gap and Wissinoming Periods, the Court did not apply a general percentage across the board to each of the parties where there was specific testimony relating to a parties' volume of waste that was disposed at the Site. Only for the Pre-Ontario Period did the Court disregard specific driver testimony, and instead, apply a general practice theory that was against the weight of the evidence. Quite to the contrary, the Court should have relied upon the specific evidence introduced at trial to determine Carpenter's volume of waste for the Pre-Ontario Period as it properly did for the Ontario, Gap and Wissinoming Periods.

Respectfully, the inconsistent and uneven manner in which the Court applied its general practice theory of liability in some instances and relied upon specific driver testimony in other instances, was highly prejudicial to Carpenter, against the weight of the evidence, and an abuse of discretion. The Judgment, therefore, must be modified and/or set aside to conform to the evidence as established by the specific driver testimony relating to the Pre-Ontario Period.

II. CONCLUSION

For the above reasons, following an evidentiary hearing, the Court's Judgment should be altered, amended or set aside so that it may conform to the actual evidence introduced at trial. Further, Carpenter respectfully requests a new trial on the actual damages alleged suffered by plaintiffs and plaintiff's contribution rights in this case. Lastly, Carpenter reserves all rights with regard to its pre-trial and trial objections and arguments asserted in this litigation.

**BOOTH & TUCKER, LLP**

BY: /s/CRB2896_____
 Christopher R. Booth, Jr.,
 Attorney I.D. No. 59395
 Joan E. Clarke, Esquire
 Attorney I.D. No. 91576
 1617 JFK Blvd., Suite 1700
 Philadelphia, PA 19103

Dated: September 8, 2008

**CERTIFICATE OF SERVICE**

    I, Christopher R. Booth, Jr., Esquire, hereby certify that I am an Attorney admitted to the bar of this court, and on this day a copy of Defendant, Carpenter Technology Corporation's Motion to Alter or Amend the Court's Final Judgment of August 22, 2008 or For New Trial was sent via electronic filing:

Glenn A. Harris,
Ballard Spahr Andrews & Ingersoll, LLP
Plaza 1000 – Suite 500
Main Street
Voorhees, NJ  08043=4636
(856) 761-3440
(856) 761-9001 (Fax)
harrisg@ballardspahr.com

(Counsel for Boarhead Farms Agreement Group)


**BOOTH & TUCKER, LLP**


BY:    /s/CRB2896
        Christopher R. Booth, Jr.
        Attorney I.D. No. 59395
        Joan E. Clarke, Esquire
        Attorney I.D. No. 91576
        One Penn Center at Suburban Station
        1617 JFK Blvd., Suite 1700
        Philadelphia, PA 19103
        (215) 875-0609

Dated: September 8, 2008